

# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES

| | |
|---|---|
| **DATE INTERVIEWED:** | October 24 & 26, 2017 |
| **PERSON INTERVIEWED:** | Detective Jonathan Seal |
| **INTERVIEWED BY:** | AUSA Bryan Fields<br>AUSA Martha Paluch<br>Special Agent Sandra Ennis |
| **LOCATION:** | Tempe Police Department<br>1855 E Apache Rd, Conference Room<br>Tempe, Arizona 85281 |
| **CASE NUMBER:** | 12-080234 |
| **CASE NAME:** | Pikes Peak Community College Fraud Ring |

After being advised of the nature and purpose of the interview and the identities of all present, Detective Jonathan Seal provided the following information, summarized as follows:

Seal was previously injured on the job by someone driving under the influence (DUI).

Seal provided a Vehicle Impound Report from Tramell Thomas' arrest on August 30, 2012. This report is also referred to as a tow report (Attachment A).

Tempe Police Department (PD) policy requires a tow of any vehicle in which the driver is arrested for DUI or a felony when there is no other person to drive the car. Thomas was not arrested for DUI but he was arrested on a felony possession charge and the vehicle he was driving could not be left at the intersection of Mill Street and US Highway 60. The statute detailing the reason for the tow is listed on the tow report.

Taking an inventory of items in the vehicle prior to towing is a Tempe PD policy. Seal provided Tempe PD's Vehicle Inventories, Towing and Seizures policy (Attachment B).

Detective Seal pulled Thomas over because the vehicle he was driving was drifting in between lanes and the tires of the vehicle crossed the double line. Both of these violations have been identified as potential indicators of DUI by the National Highway Traffic Safety Administration (NHTSA).

Since the mid-seventies, NHTSA has conducted impaired driver studies on thousands of vehicle stops. A vehicle drifting in a lane is an NHTSA clue with a 50-75% chance that the driver's blood-alcohol level will be above .08.

In October 2006, Seal went through basic police academy training. A portion of this training included field sobriety testing and identifying NHTSA clues. Seal is certified in drug recognition through the International Chiefs of Police Association (IACP) and is an instructor in Horizontal Gaze Nystagmus (HGN) testing. Seal provided his curriculum vitae (Attachment C).

Prepared by: Sandra Ennis                                                                 Date Prepared: October 25, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)                                                                                                     Page 1 of 5

MOI_00000447

Interview of Detective Jonathan Seal, October 24, 2017                                    12-080234

Seal has made approximately 400 DUI arrests.

During Seal's initial encounter with Thomas, Seal detected an odor of alcohol coming from the vehicle.

Upon his initial encounter, Seal did not notice the open container of alcohol sitting upright on the passenger side floorboard. Thomas must have placed the container there.

When shown photos of a white vehicle, Seal did not remember the vehicle in the photo. Seal confirmed the vehicle in the photo was the same vehicle Thomas was driving the night of his arrest. Seal did so after comparing the vehicle plate number in the photo to the plate number listed in the tow report. Seal positively identified a photo of Thomas.

Seal pulled Thomas over at or around US Highway 60 and Mill road when Thomas' vehicle crossed the double yellow line. Thomas initially stopped in the right left turn lane, at the front of the turn lane. Seal jumped out of the vehicle and yelled at Thomas to pull further down the highway. The vehicle came to a stop about another block down at the off ramp of west bound US highway 60, north of Carter on the west side curb.

Seal cannot remember the exact verbiage of Tempe PD's voice recording policy because it has changed since the department has issued body cameras. Pre-body camera, domestic violence cases were required to be recorded. Generally, Seal's practice of using a voice recorder was on a case by case basis, usually when Seal believed a felony might have been committed or when he felt the encounter might become confrontational. Seal does not record every encounter.

At the time of Thomas' traffic stop, Seal had a voice recorder in his left shirt pocket. At some point during the encounter, Seal made the decision to record the encounter because he felt Thomas was being less than cooperative and he wanted to interview Thomas about what was located in the vehicle.

The unrecorded portion of Seal's encounter with Thomas included asking Thomas where he was headed. Thomas' response did not make sense to Seal. Thomas indicated that he was coming from Chandler and headed home to Chandler. Thomas then said he was going to Chandler after picking up mail from his post office box in downtown Tempe.

Seal stopped behind Thomas' vehicle and turned on his vehicle's spotlight. Seal turned on and held his flashlight in his left hand as he approached the vehicle Thomas was driving. Seal directed his flashlight toward the driver's side mirror. Doing so creates a distraction for the driver of the vehicle and is done for officer safety.

For officer safety, Seal stopped a little behind the driver's side door and window, just behind the driver. Seal proceeded with his traffic stop by asking the driver where he was headed. Seal also asked for a driver's license, and the vehicle's proof of insurance and registration.

In scanning the interior of the vehicle for officer safety, Seal noticed what he believed to be contraband in plain view. There was a Ziploc plastic bag containing a large stack of credit cards in the rear passenger seat side of the vehicle. The back seat of the vehicle was a bench seat. Seal believed these to be credit cards because they had all the similar characteristics of credit cards such as the same size and shape, silver lettering, and the Master Card symbol.

When shown U.S. Department of Education Office of Inspector General's (ED-OIG) evidence item #4 (Tracker Item #58), Seal confirmed the envelope containing the 52 debit cards had a

Interview of Detective Jonathan Seal, October 24, 2017                                             12-080234

Tempe PD evidence tag created by him. It is customary practice for Seal to seal evidence with his initials and badge number. These identifiers were located on the backside of the envelope.

While on scene at the traffic stop, Seal took photos of the credit cards and made photocopies when the credit cards were entered into evidence. Also taken into Tempe PD custody was a cheetah wallet containing credit cards in the name of Hedy Collard.

Seal provided a Tempe PD Property Report that is included as attachment D.

The debit cards were taken out of the envelope and counted in front of Seal, confirming there were 52 debit cards. Seal noted that four of the debit cards did not have the Colorado Community Colleges name on the card.

Seal asked Thomas about the stack of credit cards in the back seat. Thomas just sat there and did not respond. Seal asked Thomas to hand him the Ziploc plastic bag from the rear of the vehicle and Thomas said "sure." Thomas handed Seal an empty Ziploc plastic bag. It appeared that Thomas was trying to conceal the Ziploc bag full of credit cards underneath the front passenger seat.

Seal determined the encounter needed to be looked into further and for officer safety reasons Seal radioed for assistance. Seal did not want Thomas to drive off or destroy evidence. He was not the most cooperative in answering questions about the credit cards.

Seal detained Thomas by taking him out of the vehicle and placing him in handcuffs. After being placed in handcuffs, Thomas was placed in between the rear of the vehicle Thomas was driving and in front of Seal's patrol vehicle. Thomas' feet were in the gutter and his bottom was on the sidewalk. It is Tempe PD policy to place an individual in handcuffs when they are being detained.

The first officer to arrive was Officer Papke, who was a K-9 officer. In reviewing the Computer Aided Dispatch (CAD) log, Seal assumed Officer Papke was the first to arrive because he was the closest officer in the vicinity. When asked if he requested a K-9 officer to respond, Seal stated "no" and noted that the CAD log showed that Officer Shearan was dispatched as backup (Attachment E).

The CAD log shows the patrol officer's call sign when radioed into dispatch. The CAD log also shows the dispatcher ID who took the call. At times, the dispatcher will not log every radioed call by an officer. A dispatcher's main focus is to get a second unit out to a patrol officer.

The CAD log reflects where Office Papke added himself to the call and arrived approximately five minutes after Thomas' traffic stop. Thomas was out of the vehicle prior to Papke's arrival.

Seal is not a K-9 handler. K-9 officers are out on patrol to assist. There are times when they will arrive at a traffic stop. Drugs do not need to be identified in a traffic stop for a K-9 officer to show up. They are a useful law enforcement tool.

Seal was standing at the A-pillar of Seal's patrol car when Seal informed Papke of what was going on. Papke offered to run the dog around the vehicle. Papke ran his K-9 around the vehicle and the dog alerted on the vehicle. Once inside the vehicle, the dog alerted on the center console of the vehicle and in the rear floorboard area of the vehicle.

A baggie containing a usable amount of marijuana was located in the center console. An approximately 20 ounce plastic cup, containing brown liquid that smelled like alcohol and was

Interview of Detective Jonathan Seal, October 24, 2017                                    12-080234

cold to the touch, was located in the center of the passenger floorboard. Seal seized the Ziploc bag of credit cards. Seal recalled that all of the credit cards were in the names of different individuals. Seal thought these credit cards were fraudulent credit cards or a result of identity theft. Seal has prior experience investigating identity theft.

When shown ED-OIG item #1 (Tracker Item #45), Seal confirmed that it also contained a Tempe PD evidence tag created by him and was the pink laptop located in the vehicle Thomas was driving. The laptop was located in the backseat floorboard area of the vehicle.

Typically, Seal confirmed his voice recorder was operational at the start of his shift by checking to ensure the batteries were not dead. It was common practice for Seal to keep the voice recorder in his left breast pocket. Arizona is a one party state that does not require notification to the person being recorded. Seal's voice recorder is a digital recorder that has a USB hook-up. Seal attaches the USB to transfer the recordings to his agency laptop. These recordings are then transferred to a CD and entered into evidence. This information is annotated on the Tempe PD Property Report.

In reviewing the CAD log, it is customary for an officer to obtain additional information during a traffic stop. A PACE check is an inquiry to obtain information such as wants and warrants, information about a vehicle, and whether or not the driver's license is valid.

In reviewing the voice recordings, Seal confirmed his own voice and the voice of the driver, Thomas. Seal had Thomas step out of the vehicle due to Thomas being less than cooperative and for two possible offenses, DUI and the credit cards in the back seat. The odor of alcohol vanished when Thomas was outside of the vehicle and Thomas did not appear intoxicated.

Seal confirmed Papke's voice. Seal does not recall handing Papke the voice recorder. He may have set the recorder on the hood of his patrol vehicle.

At recorded duration 6 minutes and 23 seconds, Seal looked into Thomas' eyes and noted that they were bloodshot. Seal did not notice any indicators of intoxication. Seal only documents failed HGN test results.

An open container is a misdemeanor arrestable offense in Arizona. It falls under Title IV of Arizona's penal code. The decision to arrest is discretionary. Having a usable amount of marijuana is a felony arrestable offense and arrest is not discretionary. Thomas was booked for both offenses.

There are times when an individual is booked and released pending charges for a narcotic offense. When a drug arrest is made, the alleged drug is sent to the crime lab to verify whether or not it is a controlled substance.

At duration 11 minutes and 32 seconds, a click of the door handle is heard. Seal recalled this was when the dog alerted on the vehicle and was sent into the vehicle. There was another voice heard on the recording. This was Officer Patrick Shearan. Shearan filled out the tow report and showed up later behind the K-9 unit. Officer Shearan stayed with Thomas while Seal and Papke searched the vehicle. Seal could not recall if he handed the voice recorder to Shearan or if he placed it on the hood of Seal's patrol car.

Thomas told Seal that the vehicle he was driving belonged to his girlfriend, Heather Carr.

Seal did not think Thomas was drunk and Thomas was not given a preliminary breath test (PBT).

Interview of Detective Jonathan Seal, October 24, 2017                                        12-080234

When shown ED-OIG evidence item #3 (Tracker Item #57), Seal confirmed the envelope containing the one debit card bearing the name Manuel Abate had a Tempe PD evidence tag created by him. Seal confirmed this debit card was located in Thomas' wallet. Seal does not recall where he retrieved Thomas' wallet.

Seal counted money in front of Thomas. Seal cannot remember where the money was located.

At this point, Seal placed Thomas under arrest. Thomas was stood up and placed in the patrol car.

Seal has a practice of turning off his recording device when talking to another officer. If it's not Tempe PD policy, it is a common practice.

In reviewing page 41 of the voice recorded transcript, Seal confirmed there was a call made for a tow.

In reviewing page 43 of the voice recorded transcript, Seal could not remember saying something about alcohol. The DUI investigation would have continued if there were additional NHTS clues identified.

In reviewing page 44 of the voice recorded transcript, Seal is asking questions required for booking. These booking forms are included as attachment F.

The entire duration of the stop was two hours and eight minutes. Seal noted most of that time was spent waiting for the tow truck. Seal noted that the CAD report reflects that he got to Thomas' window at 2:44 a.m. and the 10-42 code at 3:12 a.m. indicated the time that Thomas was placed under arrest. A fourth officer came and transported Thomas to the police station.

Seal's call sign is 4P51.

A typical DUI stop on the side of the road takes Seal approximately 30 minutes. A routine traffic stop takes Seal approximately eight minutes. Back in 2012, Seal took approximately 15 minutes for a traffic stop due to a lack of familiarity with the traffic codes, which would require more time spent in looking up the codes.

The marijuana, credit cards, and alcohol were all factors which led to Thomas' detention.

Seal provided a CD of photos taken during the traffic stop. A copy of the disc will be provided to the U.S. Attorney's Office. These photos are included as attachment G.

On October 26, 2017, Detective Seal emailed additional Tempe PD policies to the investigating agent. His email and its attached Tempe PD policies are included as attachment H.

On October 26, 2017, Detective Seal emailed photographs of Tempe Police Department evidence item number TE122314-4. This item was the marijuana inside a plastic baggie located in the center console of the driver's vehicle. Detective Seal's email and its attachments are included as attachment I.

On October 26, 2017, Detective Seal emailed photographs of Tempe Police Department evidence item number TE122314-7. The email and its attachments are included as attachment J.