**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 16-cr-054-WJM-2

UNITED STATES OF AMERICA,

Plaintiff,

vs.

**2.    TRAMMELL THOMAS**,

Defendant.

---

## ORDER DENYING MOTIONS TO SUPPRESS

---

In this financial aid fraud case, Defendant is charged with conspiracy to defraud the United States Government (specifically the United States Department of Education ("DOE")), in violation of 18 U.S.C. § 286, and related counts of aiding and abetting mail fraud, 18 U.S.C. §§ 1341 & 2.  (ECF No. 131.)  Now before the Court are Defendant's Motion to Suppress #1 (ECF No. 181) and Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrant (ECF No. 194).  For the reasons set forth below, both motions are denied.

## I.  MOTION TO SUPPRESS #1 (WARRANTLESS TRAFFIC STOP)

**A.    Facts**

At 2:40 a.m. on August 30, 2012, Officer Jonathan Seal of the Tempe, Arizona, Police Department pulled Defendant over, suspecting drunk driving, after seeing Defendant's vehicle first drift within its lane and then cross the double line marking the

oncoming traffic lane.  (ECF No. 193-2 at 11; ECF No. 193-1 at 1.)[1]  Officer Seal asked

Defendant to move to a safer location, which he did, after which the traffic stop

effectively began at approximately 2:44 a.m.

When Officer Seal approached the vehicle, he noticed the odor of alcohol

coming from inside, and thought Defendant's eyes looked "bloodshot and watery."

(ECF No. 193-2 at 12.)  When asked where he was going, Defendant answered that he

was both coming from and also going to Chandler, Arizona—an answer which did not

make sense to Officer Seal.  Defendant then indicated that he was headed to Chandler

after picking up mail from his post office box in Tempe.  (ECF No. 193-4 at 2.)

While speaking with Defendant, Officer Seal saw a plastic bag containing

approximately 50 credit cards on the vehicle's back seat.  (*Id.* at 12.)[2]  When Officer

Seal asked about the bag, Defendant first did not respond.  When Officer Seal asked if

he could see the bag, Defendant reached into the back seat as if to comply, but instead

moved the bag containing credit cards onto the floor, while handing Officer Seal an

empty bag which was located nearby.  (*Id.* at 12.)  Observing these actions did not

alleviate Officer Seal's suspicions about the credit cards.  (ECF No. 193-4 at 3.).

Officer Seal then asked Defendant to exit the vehicle, and Defendant complied.

(ECF No. 193-2 at 13.)  While Defendant was speaking with Officer Seal, a K-9 unit

arrived, including Officer Jason Papke and a trained drug-sniffing dog, Neo.  (ECF No.

---

[1] All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

[2] These turned out to be 52 debit cards.  The Court uses the terms "credit card" here, since the distinction makes no difference for present purposes.

193-2 at 13.) According to Officer Seal's report, Defendant was detained at the time Officer Papke arrived, at approximately 2:47 a.m. (ECF No. 193-2 at 13.)[3]

At approximately 2:50 a.m., Officer Seal began recording the traffic stop on an audio recorder. (ECF No. 193-3.)[4] At approximately 2:54 a.m., following a few minutes in which Defendant asked whether he was being detained, and why, Officer Papke asked if they could search the vehicle, and Defendant declined. (Tr. at 7–8.) At approximately 2:55 a.m., Defendant offered to take a sobriety test. (Tr. at 8.) Officer Seal conducted a field sobriety test—in particular, a horizontal gaze nystagmus or "HGN" test—beginning at approximately 2:56 a.m., or approximately 12 minutes after the traffic stop had begun. This took slightly less than 2 minutes to complete. (Tr. at 9–11.)

Officer Seal was satisfied that Defendant was not intoxicated, but still wanted to inquire about the credit cards. Therefore, approximately 15 minutes after initiating the stop, Officer Seal told Defendant that he was not under arrest but was "just being detained . . . until we can complete our investigation," and that "because you are not free to leave," he informed Defendant of his *Miranda* rights. (Tr. at 12–13.)

Officer Seal then questioned Defendant regarding the credit cards, asking "what's the deal with those credit cards" and similar follow-up questions. (Tr. at 13.)

---

[3] Defendant was handcuffed and seated on a curb. Defendant makes no argument that either being asked to exit the vehicle or being handcuffed constituted a Fourth Amendment violation, so the Court does not further address these facts.

[4] The Court has reviewed the complete audio recording, as submitted to the Court, along with the accompanying written transcripts. (*See* ECF No. 193-3.) All of the activity material to the Court's analysis was recorded on the first of the three submitted recording files. The Court cites the transcript of that recording as "Tr."

Defendant responded by insisting he was not drunk or on drugs and had committed no crime, and generally questioning why he was being detained, but Defendant did not answer Officer Seal's questions regarding the credit cards.  (Tr. at 13–16.)

While Officer Seal was questioning Defendant about the credit cards, Officer Papke and Neo initiated a sniff of the exterior of the vehicle.  (*See* Tr. at 15.) Approximately 2 minutes after Officer Seal began questioning Defendant about the credit cards, Neo alerted, leading Officer Papke to open the vehicle's door and begin searching inside of the car.  (Tr. at 15.)  At this point, Officer Seal was still questioning Defendant about the credit cards.  (Tr. at 13–16.)[5]

The search inside the vehicle—which turned out to belong to Defendant's girlfriend, co-defendant Heather Carr—discovered a useable quantity of marijuana, as well as an open container of what appeared to be an alcoholic beverage.  This container was found sitting on the passenger side floorboard in such a position that the officers believed it could not have been in that position while the vehicle was in motion without spilling, making them suspect Defendant had placed it there subsequent to the traffic stop, as if to hide it.

Defendant was arrested and the vehicle was towed and impounded.  The items inside it were inventoried and the bag of credit cards was seized and placed into evidence by the Tempe Police Department, along with a laptop computer found in the vehicle.  (ECF No. 193-4 at 1.)  In connection with its own investigation of Defendant

---

[5] A third officer, Patrick Shearan, had also arrived on the scene by this time and later took the primary role in speaking with Defendant, who continued to protest the reasons for his detention.  (Tr. at 16.)

and the crimes alleged in this case, DOE was notified of this evidence on December 6, 2012 (ECF No. 193-5), and in February 2013 sought and obtained a warrant to search the laptop (ECF No. 181-1).

Defendant now seeks to suppress "any and all evidence seized from the Defendant on or about August 30, 2012," arguing the seizure of evidence following the traffic stop was illegal and that the fact a warrant was later issued to search the laptop "does nothing to remove the taint that emanated from the original seizure." (ECF No. 181 at 1, 4.)

**B.**    **Legal Standard**

      1.    <u>Evidence Obtained From a Warrantless Search or Seizure</u>

The Fourth Amendment to the U.S. Constitution provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." However, "[t]he Amendment says nothing about suppressing evidence obtained in violation of this command. That rule—the exclusionary rule—is a prudential doctrine created by th[e Supreme] Court to compel respect for the constitutional guaranty." *Davis v. United States*, 564 U.S. 229, 236 (2011) (internal quotation marks omitted). Pursuant to the exclusionary rule, a defendant may move for suppression of evidence obtained in violation of the Fourth Amendment. *Id.*

On a motion to suppress evidence derived from a warrantless search (such as the search of the vehicle here), the defendant bears the burden of presenting a *prima facie* case that the Fourth Amendment has been "implicated," at which point the burden

shifts to the Government to prove "that its warrantless actions were justified (*i.e.*, as a lawful investigatory stop, or under some other exception to the warrant requirement)." *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); *see also id.* at nn.1–2 (citing authorities); 6 Wayne R. LaFave, *Search & Seizure* § 11.2(b) at n.35 and accompanying text (5th ed., Oct. 2015 update) (hereinafter "*Search & Seizure*").  The record on Defendant's Motion reflects that his Fourth Amendment rights were implicated by the traffic stop and ensuing seizure.

      2.    <u>Reasonable Suspicion</u>

    The Tenth Circuit has explained reasonable suspicion as follows:

> Reasonable suspicion is a less demanding standard than probable cause.  Specifically, reasonable suspicion is merely a particularized and objective basis for suspecting criminal activity.  To determine whether investigating officers had reasonable suspicion, we consider both the quantity of information possessed by law enforcement and its reliability, viewing both factors under the totality of the circumstances.

*United States v. Mabry*, 728 F.3d 1163, 1167 (10th Cir. 2013) (internal quotation marks, citations, and ellipses omitted).  Reasonable suspicion, "does not deal with hard certainties, but with probabilities.  Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers."  *United States v. Cortez*, 449 U.S. 411, 418 (1981).  Reasonable suspicion is an objective standard, asking only "whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate."  *United States v. McHugh*, 639 F.3d 1250,

1256 (10th Cir. 2011) (internal quotation marks omitted).

Consistent with this objective standard, the Tenth Circuit does not require an officer to have a particular penal offense in mind. *United States v. Guardado*, 699 F.3d 1220, 1225 (10th Cir. 2012) ("[W]e reject the argument that the officers were required to have evidence linking [the defendant] to . . . particular criminal activity. Direct evidence of a specific, particular crime is unnecessary."); *see also United States v. Harmon*, 871 F. Supp. 2d 1125, 1160 (D.N.M. 2012) ("to establish that reasonable suspicion exists, officers have no obligation to articulate a specific offense which they believe the suspect may have committed"). It is generally sufficient if the facts known to the officer would reasonably, objectively suggest "some particular variety of criminal activity." 4 *Search & Seizure* § 9.5(c), text following n.122.

## C.    Analysis

Defendant does not contest the legality of the initial traffic stop, based on Officer Seal's suspicion of drunk driving. (ECF No. 181, ¶ 14.) However, Defendant argues that "at the point when Officer Sea[l] abandoned his investigation of the driving offense that the continued detention of the Defendant became illegal," that the use of the drug detection dog was illegal in these circumstances, and that "once [Officer Seal] determined the Defendant was not intoxicated, the justification for the detention ended and the Defendant should have been allowed to leave." (ECF No. 181 ¶¶ 17–18; ECF No. 196 ¶ 2.)

1.    *Rodriguez*

Defendant relies principally on *United States v. Rodriguez*, 135 S. Ct. 1609

(2015).  (ECF No. 181 at 4, ¶ 20.)  Similar to the facts here, in *Rodriguez*, the police

pulled over the defendant for veering onto the shoulder late at night.  *Id.* at 1612.  The

officer who initiated the stop had a drug dog in the car, *id.*, but he completed the

records check and "got all the reasons for the stop out of the way" without having his

dog sniff the vehicle, and without identifying any articulable reasonable suspicion of a

crime, *id.* at 1613.  Nevertheless, *after* completing all the necessities of the traffic stop,

the officer ordered defendants to exit the vehicle to conduct a dog sniff.  *Id*.

The Supreme Court held this dog sniff had been impermissible, reiterating that

"the tolerable duration of police inquiries in the traffic-stop context is determined by the

seizure's 'mission'—to address the traffic violation that warranted the stop, and to

attend to related safety concerns."  *Id.* at 1614.  "Because addressing the infraction is

the purpose of the stop, it may 'last no longer than is necessary to effectuate that

purpose.'"  *Id*. at 1614 (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985);

alterations incorporated).  Thus, a traffic stop "remains lawful only 'so long as unrelated

inquiries do not measurably extend the duration of the stop.'"  *Id.* at 1615 (quoting

*Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

*Rodriguez* does not call for suppression here for the reasons addressed below.

2.    Reasonable Suspicion of a Crime in Addition to Traffic Violation

Unlike *Rodriguez*, where there was no identified reasonable suspicion of any

crime other than a traffic infraction, here Officer Seal did have reasonable suspicion to

investigate the credit cards.  "[A] a traffic stop may be expanded beyond its initial

purpose . . . 'if the officer has an objectively reasonable and articulable suspicion that

illegal activity has occurred or is occurring.'" *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015) (quoting *United States v. Caro*, 248 F.3d 1240, 1244 (10th Cir. 2001)).  This rule is well established and continues to be the law following *Rodriguez*. *See, e.g.*, *United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017) ("A traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to the circumstances that initially justified it.   A stop may, however, be extended beyond that scope . . . *if the police have a reasonable suspicion that other illegal activity has occurred or is occurring*." (emphasis added; citations omitted)).[6]

Defendant's argument suggests that Officer Seal was required to ignore any evidence he observed of other criminal activity while he completed the traffic stop, and then send Defendant on his way.  That is not the law, and *Rodriguez* does not hold otherwise.  Rather, *Rodriguez* affirmed only that unrelated investigations (such as a dog sniff) may not unreasonably prolong a traffic stop "*absent the reasonable suspicion ordinarily demanded to justify detaining an individual.*"  *Id.* at 1615 (emphasis added).[7]

---

[6] Defendant's effort to distinguish *Moore* is unavailing.  (*See* ECF No. 196 ¶ 8.)  In *Moore*, the officer suspected a drug crime and conducted a dog sniff "[a]pproximately two and a half minutes" after the traffic investigation was complete and the defendant had refused a consensual search.  795 F.3d at 1229.  The Tenth Circuit found it a "close question" whether the officer had an articulable reasonable suspicion for further investigation, based on "(1) Moore's nervousness, (2) Moore's acknowledgment [of] a prior criminal history, and (3) Moore's name being recently added to the vehicle's registration."  *Id*. at 1229.  As analyzed below, the Court finds Officer Seal had a *greater* basis for reasonable suspicion of criminal activity than was present in *Moore*, warranting a reasonable period of additional detention to question Defendant.  And, as noted, the rule that a traffic stop may be reasonably extended when there is suspicion of other illegal activity is not limited to the facts of *Moore*.

[7] Defendant also cites *United States v. Hawley*, 660 Fed. App'x 702 (10th Cir. 2016). *Hawley* supports the Government's position, not Defendant's.  *Hawley*, citing *Rodriguez*, reiterated that "*absent reasonable suspicion of other criminal activity*, police may not extend an

Here, Officer Seal had such an objectively reasonable suspicion of an additional crime, justifying his detention of Defendant while he took reasonable steps to investigate his suspicions regarding the credit cards.  Before that questioning was complete, the drug dog had alerted, providing the officers a permissible basis to search the vehicle for illegal drugs, which they then found.  Defendant argues that "the alleged probable cause for the theft investigation" and "[t]he significance of [the] bag of credit cards" are in dispute.  (ECF No. 196 ¶¶ 5, 6.)[8]  But Defendant does not advance any factual argument or legal authority to contest the Government's showing that Officer Seal had an objectively reasonable suspicion of criminal activity, based on the totality of the circumstances, including:  (1) Officer Seal's observation of a bag in plain view containing a large number of credit cards; (2) Defendant's refusal to answer any questions about them, (3) Defendant's attempt to hide the cards from Officer Seal by switching the credit cards for an empty bag, while Officer Seal looked on.  The Court agrees with the Government that these circumstances created an objectively reasonable suspicion of criminal activity in the totality of the circumstances, thus permitting a reasonable period of additional detention (*i.e.*, seizure) to question Defendant about the credit cards.  *See, e.g.*, *United States v. Alabi*, 597 Fed. App'x

---

otherwise-completed traffic stop in order to conduct a dog sniff."  *Id.* at 708 (emphasis added).  But*,* similar to the facts here, in *Hawley*, "the dog sniff did not unreasonably prolong the stop," and thus suppression of evidence was not appropriate.  *Id.*

[8] This argument was raised for the first time in Defendant's Reply.  Defendant's Motion nowhere disputed that Officer Seal had a reasonable suspicion regarding the credit cards.  The Court thus might treat this argument as waived (as the Government urges), but is reluctant to resolve a criminal defendant's constitutional arguments on procedural grounds.  Here, Defendant's position is unsupported by the law or the facts shown in the record, so it is readily resolved on the merits.

991, 998 (10th Cir. 2015) (possession of multiple credit cards in other peoples' names contributed to reasonable suspicion of a crime); *United States v. Simpson*, 609 F.3d 1140, 1153 (10th Cir. 2010) (circumstances including "evasive answers that describe[d] a fairly implausible travel plan" contributed to reasonable suspicion, justifying extension of a traffic stop); *United States v. DeJear*, 552 F.3d 196, 101 (10th Cir. 2009) ("furtive gestures in response to the presence of the police can serve as the basis of an officer's reasonable suspicion" (quoting *United States v. Bullock*, 510 F.3d 342, 348 (D.C.Cir.2007)); *United States v. Corral*, 970 F.2d 719, 725 (10th Cir. 1992) (suspicious package seen within car justifiably seized under plain view doctrine, even though specific contents could not be observed; vehicle occupant's attempt to hide that package by tossing it behind her seat also supported probable cause).

In addition, while Defendant argues that the "use of the drug detection dog Neo was an illegal effort to try to gain some justifiable reason to search the interior of the car" (ECF No. 181 ¶ 18), it is well established that "the use of a well-trained narcotics-detection dog—one that does not expose noncontraband items that otherwise would remain hidden from public view—during a lawful traffic stop, generally does not implicate legitimate privacy interests," *Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (internal quotation marks omitted), and that "a positive alert by a certified drug dog is generally enough, by itself, to give officers probable cause to search a vehicle," *United States v. Ludwig*, 641 F.3d 1243, 1250–51 (10th Cir. 2011).  The relevant Fourth Amendment analysis is therefore not whether the dog sniff itself was impermissible, only whether the seizure of Defendant—that is, the additional period of detention during

which the dog sniff was conducted—was unreasonable.  *See Rodriguez*, 135 S.Ct. at 164.  Because Officer Seal had a reasonable basis to detain to ask about the credit cards, and because the dog sniff itself was conducted while that questioning was occurring, the dog sniff did not constitute a Fourth Amendment violation.

    3.    <u>The Traffic Stop Was Not Unreasonably Prolonged by the Dog Sniff</u>

In addition, the record does not reflect that the traffic stop was unreasonably prolonged by the dog sniff.  The animating Fourth Amendment concern in *Rodriguez* and related cases is whether the stop was unreasonably prolonged:  "The critical question is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'---*i.e.*, adds time to---'the stop.'" *Rodriguez*, 135 S. Ct. at 1616.  Contrary to Defendant's argument, the record does not show that the investigation and checks related to the traffic stop were completed (much less abandoned) as soon as Officer Seal saw the credit cards.  Rather, although he observed the credit cards early on in the traffic stop, Officer Seal then asked Defendant to exit his vehicle and completed the incidents of the traffic stop, including the HGN sobriety test, before turning to investigation of the credit cards.

Then, *while* Officer Seal was speaking with Defendant, the K-9 unit arrived, roughly 3 minutes after the 2:44 a.m. traffic stop commenced.  The dog sniff was initiated shortly thereafter, no later than *during* the time Officer Seal was questioning Defendant about the credit cards, and the dog alerted *while* Officer Seal's questioning about the credit cards continued.  (Tr. at 13–16.)  This record reflects two things.  First, the time by which Defendant's detention was arguable prolonged after completion of

the HGN test and before Neo alerted was no more than approximately 3 minutes, notably less than the 7 to 8 minute delay in *Rodriguez*. Second, and more importantly, this added time was the result of Officer Seal's questioning regarding the credit cards; it was not the result of the dog sniff which was conducted simultaneously. Thus the dog sniff did not unreasonably prolong the traffic stop.

This record does not suggest that officers may purposefully drag out the time they take to complete ordinary traffic checks in order to create opportunities for unrelated investigations absent objectively reasonable suspicion of criminal activity. That is exactly the result which *Rodriguez* and related cases prohibit. *See Rodriguez*, 135 S. Ct. at 1614, 1616 ("Because addressing the [traffic] infraction is the purpose of the stop it may last *no longer than is necessary to effectuate that purpose*," and "[i]f an officer can complete traffic-based inquiries *expeditiously*, then that is the amount of 'time reasonably required to complete the stop's mission.'" (internal quotation marks omitted; certain alterations incorporated; emphasis added)). But that is not what occurred here, where the officer had an objectively reasonable suspicion of criminal activity unrelated to the traffic infraction, and where the additional detention was reasonable. Moreover, having reviewed the record as a whole, including the audio recording, the Court cannot say that Officer Seal's brief questioning regarding the credit cards was pretextual or dilatory. In this circumstance, the Court sees no Fourth Amendment violation calling for suppression of evidence.

4. <u>Seizure Following Evidence Inventory</u>

Other than generically arguing that the subsequent impoundment, inventory, and search of the laptop and credit cards was tainted by the alleged illegality of the original

traffic stop, Defendant makes no Fourth Amendment argument regarding this sequence of events.  Nor does he challenge the eventual search of the laptop pursuant to warrant, except to make a generic "taint" argument.  (ECF No. 181 ¶ 22.)  The Court therefore deems any challenge based on these facts waived and sees no grounds for suppression based on these facts.  *See United States v. Martínez,* 518 F.3d 763, 768 (10th Cir. 2008) (undeveloped arguments deemed waived); *United States v. Lugo*, 978 F.2d 631, 634 (10th Cir. 1992) (contemporaneous vehicle searches incident to arrest generally valid); *United States v. Hight*, 127 F. Supp. 3d 1126, 1137 (D. Colo. 2015) ("Inventory searches are an exception to the Fourth Amendment's warrant requirement," when conducted according to standardized procedures (citing *United States v. Blaze*, 143 F.3d 585, 591–92 (10th Cir. 1998))).

     5.    <u>Evidentiary Hearing</u>

Defendant requests an evidentiary hearing "where the government produce [*sic*] its witnesses to the above detention and search and where the Defendant can challenge that evidence."  (ECF No. 181 at 4.)  However, other than raising a rhetorical question about "what actually occurred in the early morning hours of August 30, 2012 in Tempe, Arizona "(ECF No. 196 at 3), Defendant does not identify any facts in dispute. Having reviewed the written materials submitted by both parties and the audio recording of the traffic stop, the Court finds the Government has discharged its burden and that no facts are materially disputed which an evidentiary hearing might resolve.

## II.  MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANT (HOME SEARCH)

Defendant separately moved to suppress several mobile (*i.e.*, cellular) phones

seized from his residence in Chandler, Arizona, in November, 2012, along with any data found on those phones.  (*See* ECF No. 194.)

A.    **Facts**

As part of DOE's investigation, Special Agent Sandra R. Ennis submitted an application for a search warrant in the U.S. District Court for the District of Arizona on November 27, 2012.  (ECF No. 194-1.)  The court granted the application, issuing a warrant authorizing the search of Defendant's residence at 1822 East Kaibab Drive. (*Id.* at 1.)

The search warrant, in its list of "Items to Be Seized," permitted seizure of a broadly enumerated list of "documents and items including information and/or data stored in a computer readable format," which included among other items: (1) "[a]ll records, documents, programs, applications or materials, in whatever form, of personal and business activities relating to the operation and ownership of the computer systems in the subject premises," (2) "[a]ny and all . . . data disks . . . hard drives, and other computer related operation equipment, computers, and any other equipment that would assist in the completion or submission of federal and non-federal student financial aid and/or loan application[s] or supporting documentation," and (3) "[a]ny and all scanners, fax machines, printers, as well as other digital devices falling with the scope of [the warrant's] search categories that could have been used to manufacturer, produce, or to facilitate the . . . violations."  (ECF No. 194-1 at 5–6, ¶¶ 13, 15.)  Further, the warrant explicitly authorized seizure of "[a]ny personal computer, *cell phone*, PDA, or other digital device used to facilitate the . . . violations."  (*Id.* at 4, ¶ 16 a. (emphasis added).).

The warrant further defined "the term records, documents, programs, applications or materials [to] include records, documents, programs, applications or materials created, modified or stored in any form, including in digital form on any digital device . . . the term 'digital device' includes any electronic system or device capable of storing and/or processing data in digital form, including: . . . wireless communication devices such as *telephone paging devices, beepers and mobile telephones*."  (*Id.* at 5–6, ¶ 17 (emphasis added).)

## B.    Legal Standard

"As a general matter, if the search or seizure was pursuant to a warrant, the defendant has the burden of proof" to demonstrate that it violated the Fourth Amendment.  *United States v. Maestas*, 2 F.3d 1485, 1491 (10th Cir. 1993) (internal quotation marks omitted).  When reviewing a magistrate judge's finding of probable cause for issuance of a search warrant, a court must consider the totality of the circumstances and determine whether the affidavit established the probability that evidence of criminal activity would be located in the desired search area.  *United States v. Le*, 173 F.3d 1258, 1265 (10th Cir. 1999).  The magistrate judge's determination that probable cause exists is entitled to "great deference," and a court asks only whether the issuing magistrate had a "substantial basis" for determining probable cause existed.  *United States v. Wittgenstein*, 163 F.3d 1164, 1172 (10th Cir. 1998).  Close calls should be resolved in favor of the issuing magistrate judge.  *Massachusetts v. Upton*, 466 U.S. 727, 734 (1984) (*per curiam*).

The Supreme Court has stated that probable cause is a "fluid concept—turning

on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). In the context of search warrants, the Tenth Circuit requires that a magistrate judge issuing a search warrant find that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001). "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." *United States v. Corral-Corral*, 899 F.2d 927, 937 (10th Cir. 1990).

As to particularity, a stated place to be searched is sufficiently particularized if "the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort . . . ." *United States v. Lora-Solano*, 330 F.3d 1288, 1293 (10th Cir. 2003). "Whether a search warrant is sufficiently particular depends in part on the nature of the crimes being investigated." *United States v. Cooper*, 654 F.3d 1104, 1127 (10th Cir. 2011). Thus, "[w]arrants relating to more complex and far-reaching criminal schemes may be deemed legally sufficient even though they are less particular than warrants pertaining to more straightforward criminal matters." *Id.*

## C.    Analysis

Defendant argues that the warrant lacked probable cause, given the alleged "dearth of any meaningful discussion of cellular devices" in Special Agent Ennis's affidavit in support (ECF No. 194 at 5), and that the warrant's "boilerplate grants of permission" were overbroad as to seizure of the phones (*id.* at 6). On that basis, Defendant argues that under the "severability doctrine," the Court should hold the

warrant invalid as to the mobile phones and suppress their use as evidence in this case. (ECF No. 194 at 6 (citing *United States v. Sells*, 463 F.3d 1148, 1150 (10th Cir. 2006).) The Court agrees with the Government that the search warrant was based on adequate probable cause to seize mobile phones, and was not overbroad or insufficiently specific.

Special Agent Ennis's affidavit supporting her warrant application is 24 pages long. (ECF Nos. 194-3 & 193-4.) It details the investigation and the suspected crimes which—summarized only generally—allege a multi-year conspiracy to engage in identity theft and to defraud the government by submitting falsified applications for financial aid applications and related documents on behalf of individuals who were incarcerated and therefore ineligible to receive the relevant forms of financial aid. (*See id.* ¶¶ 6–8.) The investigation had traced the originating IP addresses for these fraudulent applications to several residences, including Defendant's. (*Id.* ¶¶ 10, 22.) The affidavit implicated at least five other individuals in addition to Defendant (*id.* ¶¶ 10, 35), as well as the use of multiple addresses (*id.* ¶¶ 22–32). Given the substantial detail included in the affidavit, the Court has no trouble concluding it amply provided probable cause to search Defendant's residence and seize evidence found there. With the exception of the mobile phones, Defendant does not argue otherwise.

As to the mobile phones, Defendant points out that the affidavit itself contained only one explicit reference to mobile phones. (ECF No. 194 at 3.) However, the affidavit stated that based on her background and experience, Special Agent Ellis "know[s] that individuals, including persons engaged in illicit activities and/or fraud, frequently retain records of their transactions," which "are often stored on computer

18

media." (*Id.* ¶ 47.)  Further, Special Agent Ellis averred that the search of Defendant's residence "should include the search of any computer-based storage media," and that based on her experience, knowledge and training, "suspects in similar investigations possess storage safes, computers, facsimile machines, cell phones, and pagers which they use as part of their method of operation." (*Id.* ¶ 46.)

Furthermore, the affidavit incorporated by reference two attachments detailing the places and items to be searched.  These (specifically, "Attachment B") explicitly and repeatedly called for search or seizure of "cell phone[s]," "wireless communication devices such as . . . mobile telephones," and "[a]ny . . . electronic . . . device capable of storing data, such as . . . cellular telephones." (ECF No. 194-1 at 4–7, ¶¶ 16.a, 17, 19.c.)  This attachment was approved and included in the search warrant issued by the magistrate judge, as quoted above. (*Id.* at 1.)  In sum, the affidavit (including Exhibit B) enumerated almost *ad nauseum* the many kinds of electronic devices and storage media that would likely contain evidence of criminal activity and would be subject to search and seizure.  Mobile or cellular telephones were explicitly mentioned at least four times.

Given this record, the Court has little trouble affirming the magistrate judge's conclusion that probable cause existed to seize the mobile phones.  The affidavit made clear the investigators' well-founded suspicion that the suspects were using a wide variety of computer and electronic devices to submit allegedly fraudulent documents and to communicate with one another,  and as a corollary, that records of their transactions and communications would likely be found stored on similarly variety of electronic devices. *Accord United States v. Gholston*, 993 F. Supp. 2d. 704, 719–20

(E.D. Mich. 2014) ("In a number of other cases, the courts have pointed to analogous facts as supporting the inference that a search of a cell phone was likely to uncover evidence of criminal activity involving multiple participants." (describing and collecting cases)).[9]

Moreover, given the uses, ubiquity, and sophistication of "mobile phones" as of November 2012, the Defendant's attempted distinction between, on the one hand, the permissible search and seizure of "computers" and all other electronic devices, and, on one hand, the allegedly unauthorized seizure of "mobile phones" (but only mobile phones), makes little sense. Applying the "fluid concept" of probable cause, and considering the complexity and reach of the criminal scheme described in the affidavit, the Court finds the warrant and supporting affidavit adequately provided probable cause to seize mobile phones and described them with sufficient specificity, along with a laundry list of other digital devices likely to contain evidence. *See Gates*, 462 U.S. at 222; *Cooper*, 654 F.3d at 1127. Defendant's concession that the warrant was adequate as to everything else seized in his home is effectively fatal to his argument that "the

_____

[9] Defendant's effort to distinguish *Gholston*—as well as other cases cited therein and by the Government—is unavailing. (*See* ECF No. 198 at 2–4.) Defendant argues Special Agent Ennis's affidavit should have more explicitly spelled out, for example, that "cell phones are capable of electronically storing numerous types of information." *See United States v. Barret*, 824 F. Supp. 2d 419, 448 (E.D.N.Y. 2011). Here, the affidavit stated that the suspects likely possessed "cell phones . . . which they use as part of their method of operation," and that records of their transactions were likely stored on "computer media," albeit without stating in the same paragraph that "computer media" include mobile phones and their storage capabilities. (ECF No. 194-4 ¶¶ 46–47.) The Court fails to see a meaningful difference for Fourth Amendment purposes between the record here and in *Barret*, *Gholston*, or other cited cases. Given the extensive detail in the affidavit and Defendant's concession it provided sufficient probable cause to seize all devices found in his residence *other than* mobile phones, the failure to belabor obvious points such as stating that modern mobile phones may store data reveals no legal defect.

cellphones" should be suppressed, or that the magistrate judge should have excluded mobile phones (and only mobile phones) from the warrant request, while approving it in all other respects.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motions to Suppress #1 (ECF No. 181) is DENIED; Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrant (ECF No. 194) is DENIED; and Defendant's request for an evidentiary hearing is also DENIED.

Dated this 14th day of November, 2017.

BY THE COURT:

William J. Martínez
United States District Judge