**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No.   16-cr-00054-WJM-2

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2. TRAMMEL THOMAS,

      Defendant.

---

**GOVERNMENT'S SENTENCING STATEMENT**

---

On November 30, 2017, a jury found the defendant guilty of all charges in the Superseding Indictment: one count of conspiracy to file false claims and six counts of mail fraud. The defendant is scheduled to be sentenced on April 12, 2018, at 9:30 a.m. As set forth in more detail below, the United States Sentencing Guidelines ("U.S.S.G." or "guidelines") recommend that the defendant be imprisoned for between 135 and 168 months. In advance of the sentencing hearing, the United States of America, by Robert C. Troyer, United States Attorney for the District of Colorado, through Martha A. Paluch and Bryan D. Fields, Assistant United States Attorneys, hereby files this statement pursuant to D.C. Colo. LCrR 32.1 in support of its recommendation that the Court sentence the defendant to 168 months' imprisonment followed by 5 years of supervised release, a restitution judgment of $563,890.85 and a forfeiture money judgment in the amount of fraud proceeds directly attributable to this defendant as established at the sentencing hearing by a preponderance of the evidence.

1

I.     <u>ALL OF THE FACTORS THAT MUST BE CONSIDERED BY THE COURT SUPPORT A SENTENCE OF AT LEAST 168 MONTHS</u>

A sentence of 168 months is fully supported by each of the factors set forth in 18 U.S.C. § 3553(a). The defendant's entire adult life has been devoted to crime. Convictions have not deterred him. Prison did not stop him. Supervised release has not rehabilitated him. To the contrary, at every stage of his life — inside of prison and out — the defendant has demonstrated repeatedly that the only person he cares about is himself. Denied what he wants, he takes it by force, manipulation, or fraud, without regard for the substantial harm imposed on his victims. At many points along the way, the justice system had an opportunity to prevent these harms by imposing the sort of stiff sentences that might cause him to consider the consequences of his actions, or at the very least to protect the public from those actions by incapacitating him in prison. That did not always happen. The defendant took advantage of the opportunities provided by his liberty, not to make himself a better person and not to atone for his crimes, but instead to harm more victims. A sentence of 168 months is necessary to prevent this from happening again.

A. **The Nature and Seriousness of the Offense Support the Recommended Sentence**

The Court heard extensive evidence of the conspiracy at trial. The harms inflicted by the defendant were substantial, and fully support the sentence recommended by the government. First, to make the scheme work, the defendant had to work with his coconspirators to steal the identities of prisoners. These individuals are particularly vulnerable victims. Prisoners, especially those incarcerated for many years, face daunting obstacles to their successful reintegration into society. The victims in this case must now shoulder the additional burden of

2

sorting through the damage to their credit histories. Second, the defendant and his co-conspirators targeted community colleges, which provide much needed, last-resort educational services to underserved communities. Finally, the scheme stole precious tax dollars by abusing the implicit bonds of trust that make it possible to provide government services to those in need. This type of fraud erodes support for vital government programs and increases the cost of administering such programs.

The defendant was an enthusiastic participant in the charged scheme. Characteristically, one of his first significant actions to further the fraud was to gain the trust of Christine Duncan — someone he said he loved — and then to betray that trust by stealing her identity to line his pockets with money. Evidence at trial showed that the defendant took Duncan to Pikes Peak Community College (PPCC) in 2010 under the guise of helping her enroll in classes to make a better life for herself. They obtained the necessary paperwork to sign up for financial aid, but Duncan never completed it. Years later, when Duncan applied for a car loan, she learned what happens to people who put their trust in the defendant: they become victims. When the loan officers checked Duncan's credit report, they found defaulted student loans that Duncan had never actually obtained. *See* Gov't Ex. 57j (2010 FAFSA submitted in Duncan's name); Gov't Ex. 57k (2011 FAFSA submitted in Duncan's name); Gov't Ex. 57L (2011 Master Promissory Note submitted in Duncan's name). The truly ruthless nature of Thomas's betrayal came through at trial when Duncan testified that she could not have enrolled in school in 2011 because — convinced that Thomas loved her — she was working in Arizona to help pay a lawyer to defend Thomas on other charges. The money for those loans went to the address she shared with the defendant on Radiant Drive in Colorado Springs.

Duncan wasn't the defendant's only victim in 2010. The parties stipulated at trial as to the testimony of several of the conspiracy's victims, including an inmate named I.O. At the upcoming sentencing hearing, Special Agent Ennis will testify that I.O. told her much more than was in the stipulation. I.O told investigators that, in October 2010, the defendant tried to recruit I.O. into the scheme, claiming that they could commit student aid fraud to earn money. True to form, Thomas betrayed I.O., just as he betrayed others who put their trust in him. Evidence at trial showed that I.O.'s identity was stolen while I.O was a prisoner, that a fraudulent FAFSA was submitted in I.O's name in 2010, and that Thomas was in possession of a debit card with I.O.'s name when he was arrested during a traffic stop in August 2012. *See* Gov't Ex. 57(b) (fraudulent FAFSA submitted in I.O.'s name in 2010); Gov't Ex. 4(a) (fraudulently obtained debit card in the name of I.O.).

The defendant was arrested in January 2011 for, among other things, aggravated robbery. *See* Gov't Ex. 35 (stipulating to fact of defendant's detention). He spent most of the rest of the year in the El Paso County jail, but this didn't stop him from continuing to profit from his 2010 investment of labor into the scheme. Evidence at trial showed that Thomas's coconspirators used addresses procured by the defendant to continue to receive fraudulent student aid proceeds, which were used in part to help pay for the defendant's legal fees. *See* Gov't Exs. 67, 68, and 69 (confirming the defendant's use of the Rushmore Drive address in Colorado Springs to obtain student aid while outside of prison in 2010); Gov't Exs. 57(e), 57(f), 57(g), 63(c), 63(d), and 63(e) (fraudulently submitted student aid paperwork using the Rushmore Drive address); Gov't Ex. 74 (summary chart of addresses used in the scheme, showing the Rushmore Drive address was used to receive the proceeds of student loans

fraudulently obtained in the names of 17 prison inmates who had their identities stolen by the defendant and his coconspirators).

Nearly a year in jail did nothing to dissuade the defendant from continuing to participate in the scheme. Nor did it cause the defendant to stop and reconsider his contempt for the law. After released from jail in November 2011, the defendant continuously lied to the parole officer charged with supervising his release from his earlier aggravated robbery convictions. And he deepened his involvement in the fraud scheme, fully realizing its benefits by moving into the nice house Heather Carr paid for with fraud money.

Records from the Arizona Department of Corrections show that Thomas told his parole officer he was living with his sister.   He was not. He was living with Heather Carr. When Carr used fraud money to upgrade her lifestyle by moving to a new address, the defendant moved with her, but told his parole officer that he was moving because his "sister" had been evicted from the prior address. As established at trial, the defendant was arrested in August 2012 after a patrol officer found him with a stack of debit cards in other people's names. Consistent with his faith that he can use lies and deceit to avoid getting caught and to advance his interests, Thomas did not report this arrest and instead told his parole office that he had not had any police contact.

The defendant lied to his parole officer so that he could hide his involvement in the fraud scheme. Free from the constraints of jail (and obviously convinced that his parole officer was an easy mark, like his other victims), the defendant quickly devoted himself back to the fraud. During one meeting, coconspirator Marcelle Green gave him tips on how to fill out FAFSAs to avoid additional scrutiny. During that same meeting, the defendant, Green and Carr shouted

out the names of the victims they were respectively using to submit fraudulent FAFSAs. In February 2012, just a few months after his release from prison, the defendant starting receiving mail at a UPS store on Riggs Road in Chandler, Arizona. *See* Gov't Ex. 64. Evidence at trial showed that the defendant used this mailbox to receive debit cards with the proceeds of the fraud.

While in the El Paso County jail, the defendant had to rely on his coconspirators to keep the fraud moving along. Once released, however, he advanced the scheme using his particularly cruel brand of manipulation. In 2012, Kimmisha Mullett was going through one of the most difficult periods of her life. Health issues and other extremely taxing emotional trials had left her particularly vulnerable. Mullett thought the defendant was a friend; he thought she was a tool to be exploited. Seeing an opportunity to take advantage of her situation, the defendant offered Mullett money (which he never paid) to receive mail in the names of other people. Text messages between Mullett and the defendant established that the defendant directed Mullett to send inmate mail to the Riggs Road PO Box, and specifically, mail related to inmate D.M. Gov't Ex. 15.   Mullett didn't know at first what she had signed up for, but it became obvious when envelopes from community colleges arrived. The defendant used Mullett, just like everyone else in his life, to advance his selfish desires.

The defendant's efforts to hide the scheme from investigators, his parole officer, and anyone else who might catch him were remarkably successful for a period.   Ultimately, however, the defendant's arrogant flouting of the law caught up with him.   On August 30, 2012, he decided to fill a large cup with alcohol, get into a car (with marijuana in the center console), and drive. Detective Seal saw him drifting across his lane and pulled him over. During that stop,

Detective Seal saw in plain view a bag containing 52 debit cards, none of which was in the defendant's name.[1] But the defendant had no shame at getting caught red-handed. The defendant thought he could manipulate Detective Seal just like every other law enforcement official he had ever encountered. When Seal asked the defendant to hand him the bag of cards, the defendant tried to hide them and give Detective Seal an empty bag. It didn't work, and the traffic stop was the first sign that, eventually, the law would catch up to the defendant.

The defendant's scheme worked well, but eventually someone saw through his lies. PPCC employee Kristina Moss testified at trial that she uncovered a suspicious pattern in student loan documents. After she referred the case to the Department's Office of Inspector General ("ED-OIG"), Special Agent Ennis began investigating. It didn't take SA Ennis long to see through the deceit. By November, 2012, agents were at the defendant's house executing a search warrant.   It's unlikely the defendant was surprised when they showed up: he didn't know that the Department was unaware of his traffic stop, but he certainly was. Instead of answering the door, occupant(s) of the home frantically tried to rip up compromising documents and flush them down the toilet. Thomas used the time to break his cell phone in half, hoping that agents wouldn't be able to retrieve from it his text messages with Mullett, *see* Gov't Ex. 15, or the photographs of him proudly flashing cash, *see* Gov't Exs. 26 & 29, and celebrating his trips to the shooting range (despite being a felon).

The defendant's efforts to obstruct the investigation didn't end with the broken cell phone. After the search, he and Carr went to the home of coconspirator Marcelle Green. There,

---

[1] Among those cards was one in the name of Vanessa Lopez, yet another woman who trusted the defendant as a friend, only to have her identity stolen as part of the fraud.

they probed her with questions to determine whether she was cooperating and pointedly noted

that their home had been searched while Green's had not. As special agents reviewed

thousands of pages of documents created by the defendant and his coconspirators,

interviewed numerous victims, and analyzed the computers used in the scheme, Thomas used

the time to contact witnesses in an effort to influence their testimony. He tried to reach out to

Marcelle Green by going to her uncle's house. He called Kimmisha Mullett to talk about his

case (and her trial subpoena) and to once again manipulate her into thinking he was her friend.

It didn't work. ED-OIG's investigation was too thorough and, though some witnesses

refused to testify, enough were brave enough to come to court and explain to the jury what

happened. He was convicted and now stands before the Court to be sentenced for his

conduct.

### B.  The defendant's history and characteristics justify a 168-month sentence

The defendant draws strength for himself by preying on the weak. He has robbed the

defenseless. He facilitated the gang rape of a woman who thought he loved her. He used lies

and deceit to avoid getting caught. The history and characteristics of this defendant weigh

heavily towards the 168-month sentence recommended by the government.

The fraud scheme was not enough to satisfy the defendant's greed. The government

will prove at the sentencing hearing by a preponderance of the evidence that while defrauding

the Department, the defendant worked on the side as a pimp who used manipulation and force

to profit from a commercial sex business and to rob its customers.

At around 4 or 5am on November 11, 2010, Victim 1 (a "john") awoke to find Victim 2 (a

woman prostituted by the defendant) texting on her phone. About twenty minutes later, the

defendant began knocking loudly on the door of the hotel room the victims were sharing. When Victim 1 answered the door, the defendant, with a knit cap obscuring his face, walked into the room. The defendant pulled out a gun, pointed it at Victim 1, and told Victim 1 to get on the ground. Victim 1 did what he was told. The defendant then rummaged through Victim 1's stuff, taking what he wanted: a cell phone, a laptop, a camera, a watch, and about $500. The defendant yelled at Victim 2 to pack up her stuff and then the two of them left together.

The Colorado Springs Police Department ("CSPD") investigated. They discovered that Victim 2 was using backpage.com, a website frequently used by commercial sex traffickers, to advertise her services. Suspecting that the man who robbed Victim 1 was Victim 2's pimp, CSPD used the website to find a phone number for Victim 2 and to set up a liaison.

On January 27, 2011, an undercover CSPD detective went to a Motel 6 in Colorado Springs to meet with Victim 2, who was using an assumed name. Other CSPD officers conducted surveillance. Among other things, they saw a black male, later identified as the defendant, walking along the second floor landing between two hotel rooms. Below the hotel rooms being used for prostitution, CSPD officers saw a red Toyota sedan. The CSPD detective met with Victim 2 and, after she agreed to perform sex acts for money, signaled to his colleagues to make an arrest. When the officers knocked on the door, Victim 2 called the defendant with her cell phone.

While Victim 2 was being arrested, the defendant slinked away. Surveillance saw him leave a hotel room near the one Victim 2 was using, meet up with a woman, and then get into the red Toyota, which began driving away from the hotel. CSPD detectives, in unmarked undercover vehicles, were unable to follow the Toyota. But El Paso County Sheriff's deputies

found it, saw it run a stop sign, and pulled it over.   Inside, behind the steering wheel, was the defendant. In a preview of what happened during the search of the defendant's house in November 2012, the deputies were unable to gather evidence from the defendant's cell phone: he smashed it, and broken pieces of it were found on the floorboard.

Victim 2 told detectives that the defendant was her pimp. She told CSPD that she made somewhere between $5,000 and $7,000 as a prostitute between September 2010 and January 2011, but that all of the money was given to the defendant. The exploitative nature of the arrangement was confirmed when the police asked Victim 2 how much she had made that day. She said $700. None of that money was with her. Instead, when the police arrested the defendant, they found approximately $726 in his pocket.

Victim 2 initially cooperated with the police. She told them about the defendant's activities as a pimp. She also positively identified him as the man who had committed the robbery in November. She also took the police to an address used by the defendant. That address was also used as part of the FAFSA fraud.

Two other women were found by CSPD in the hotel room next to Victim 2's.   One of those women was Heather Carr. Just as in this case, Carr refused to testify against the defendant. Victim 2, and others, also refused to testify. As a result, the charges against the defendant were dropped.

Victim 2 also reported that on one occasion the defendant held her down while five of his friends raped her. Victim 2 reported that the defendant would throw her to the floor and choke her. He once told her "you know when you are flopping around like a fish, like you're having a seizure? It's because I've choked to you the point you're no longer breathing and I

10

slap you in order to bring you back to life."   The defendant terrorized Victim 2 to prevent her from going to the authorities.   "Your family, no one, would ever find you," he told her, explaining that if he killed her, he would feed her body to pigs.

This defendant's character and previous criminal conduct support the sentence the government seeks. District courts are routinely permitted to "enhance a defendant's sentence using uncharged conduct proven to the court by a preponderance of the evidence." *United States v. Rodriguez-Felix,* 450 F.3d 1117, 1131 (10th Cir. 2006); *Witte v. United States,* 515 U.S. 389, 401 (1995) ("consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted").

### C.  A sentence of at least 168 months is necessary to promote respect for the law

The defendant was only 19 when he committed his first violent felony. In 1999, he was convicted of three counts of aggravated robbery, three counts of using a weapon in a violent crime, and one count of car theft. Undeterred, unrepentant and unconcerned with the law, he was convicted just five years later of smuggling contraband into prison.

The defendant was released in 2009. Almost ten years in prison taught him nothing except the value of lost time. He didn't work to make up for past misdeeds.   He didn't try to make himself a productive and valued part of civil society. Instead, by the end of 2010 he was committing the felonies for which he was just convicted, while also investing considerable time and energy into his job as a pimp. After serving nearly a decade in prison, he used the freedom of his release to commit more crimes. Worse, he committed those crimes while on parole — a clear message to the judiciary that he has no respect for its authority.

When the defendant gets caught, his first instinct is not to admit his wrongdoing, or seek redemption. His first instinct is to try to manipulate the justice system by destroying or hiding evidence. When arrested for his pimping activities in Colorado Springs in 2011, he destroyed his cell phone. When he was caught in November 2012, he did the same. When Detective Seal saw a giant bag of fraudulently-obtained credit cards in the defendant's car, the defendant was so confident in his ability to fool law enforcement that he tried to swipe them under his seat and pass off an empty bag as the one of interest. The defendant either believes that he can commit crimes without being caught, or that the benefits of crime outweigh its consequences. Either way, the only way to convince this particular defendant to take the law seriously is to impose a serious sentence.

### D.  168 Months is a Just Punishment for the Offense

The recommended sentence is a just one that takes into account the multi-faceted harms imposed by the defendant's conduct. As reflected in the guidelines, the defendant's punishment should be a substantial one that takes into account the fact that the defendant chose particularly vulnerable victims, that he didn't stop selecting such vulnerable victims until he was caught (thus increasing the total harm inflicted), that he chose to obstruct justice, that he has never expressed remorse or accepted responsibility for his conduct. These facts all support a sentence of 168 months' imprisonment.

### E.  Deterrence Requires the Sentence Recommended by the Government

The need to deter the defendant from further crimes also weighs heavily in favor of the recommended sentence. *See United States v. Pruitt*, 502 F.3d 1154, 1166 (10th Cir. 2007) (concluding that defendant's 292-month sentence was substantively reasonable where, among

other things, it was "reasonable to infer that [the defendant] is not easily deterred from engaging in unlawful conduct") *vacated by Pruitt v. United States*, 552 U.S. 1306 (2008)*, and sentence reimposed on remand by United States v. Pruitt*, 312 F. App'x 100, 2008 WL 4218798 (10th Cir. Sept. 16, 2008).

This was not a crime born of difficult circumstances. It was the deliberate choice of a calculating criminal weighing the potential rewards of success against the likelihood of being caught and the consequences that would follow if he was. The defendant had already been sentenced to serve ten years in prison, but concluded that, even so, it was worthwhile to commit yet another aggravated robbery and then to participate in this fraud scheme. If ten years was not enough to deter the defendant the first time around, a substantially more severe sentence is necessary this time. *See United States v. Morgan,* 635 F. App'x 423, 457 (10th Cir. 2015) (unpublished) (noting that deterrence "is particularly important in the area of white collar crime"); *United States v. Courtney*, 76 F.Supp. 3d 1267, 1307 n.13 (D.N.M. 2014) ("the Court must still consider specific deterrence when sentencing, because Congress demands it").

## F.  The Need to Protect the Public from Further Crimes

Of course, the court should also consider the possibility that no sentence will adequately deter this defendant. The defendant turned to crime right after a lengthy prison sentence, thinking nothing of his parole or the possible consequences of being caught again. In these circumstances, this factor, too, weighs heavily in favor of the 168-month sentence recommended by the government.

### G.  The Sentence Recommended by the Advisory Sentencing Guidelines

The total offense level is 31: the base offense level is 7 because the defendant was convicted of mail fraud, which carries a maximum sentence of twenty years imprisonment, U.S.S.G. § 2B1.1(a)(1); plus 14 levels as a result of the defendant's intent to cause losses of more than $550,000 but less than $1.5 million, U.S.S.G. § 2B1.1(b)(1)(H); plus 2 levels because there were 10 or more victims, U.S.S.G. §2B1.1(b)(2)(A); plus 2 more levels because the defendant stole identities to get other identification cards, U.S.S.G. § 2B1.1(b)(11)(C)(i)-(ii); plus 2 more levels because the defendant chose prison inmates, vulnerable in their captivity, as his victims, U.S.S.G § 3A1.1(b)(1); *United States v. Pierre*, 825 F.3d 1183 (11th Cir. 2016); 2 more levels because the defendant was not content with just a few vulnerable victims and, instead, participated in a scheme to victimize hundreds of inmates, U.S.S.G. § 3A1.1(b)(2); and plus 2 more levels because the defendant tried to obstruct justice by destroying evidence on his cell phone and by reaching out to potential witnesses in an effort to influence their willingness to testify, U.S.S.G. § 3C1.1. The defendant has not accepted responsibility for this offense and should receive no related decrease.

Based on what the government knows, the defendant's criminal history will likely place him into Category III. At offense level 31, the guidelines recommend that the defendant be imprisoned for between 135 and 168 months.

Even if the Court believes that the Guidelines are too harsh, or otherwise not entitled to deference, the Court should consider that, in this case, the guidelines substantially *underemphasize* the truly heinous nature of the defendant's criminal history and conduct as detailed above. This defendant is not the typical white-collar criminal. He is a hardened criminal

14

who uses force, violence and intimidation — the same methods employed throughout his life — to avoid justice. The court can and should consider all of these facts when fashioning an appropriate sentence in this case.

## II.    <u>CONCLUSION</u>

The government intends to present testimony at the sentencing hearing.    Therefore, it respectfully requests that the Court allow 2.5 hours for that hearing. At that time, the Government will request that the Court impose a sentence of 168 months in prison.

Dated this 29th day of December, 2017.

Respectfully submitted,

ROBERT C. TROYER
United States Attorney

*s/ Martha A. Paluch*
MARTHA A. PALUCH
BRYAN D. FIELDS
Assistant U.S. Attorneys
1801 California Street, Suite 1600
Denver, Colorado   80202
(303) 454-0100
FAX: (303) 454-0402
Email: Martha.paluch@usdoj.gov
Bryan.fields3@usdoj.gov
Attorneys for the government

**CERTIFICATE OF SERVICE**

I certify that on this 29th day of December, 2017, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system that will send

notification of such filing to all counsel of record in this case.


s/ *Martha A. Paluch*
MARTHA A. PALUCH
BRYAN DAVID FIELDS
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov
bryan.fields3@usdoj.gov