**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 16-cr-00054-WJM

UNITED STATES OF AMERICA,

Plaintiff,

v.

2. TRAMMEL THOMAS,

Defendant.

---

**GOVERNMENT'S POSITION STATEMENT RE LOSS, RESTITUTION AND FORFEITURE**

---

The United States of America (the government), by Robert C. Troyer, United States Attorney, through Martha A. Paluch and Bryan D. Fields, Assistant United States Attorneys, respectfully submits this position statement pursuant to the Court's February 21, 2018 Minute Order. ECF 326. In this filing, the government sets forth its argument pertaining to 1) the loss amount to be attributed to this defendant pursuant to U.S.S.G. §§ 1B1.3 and 2B1.1; 2) the amount of restitution the defendant should be ordered to pay; and 3) the amount of the forfeiture money judgment it will request that the Court impose.

## I. Burden of Proof

At the sentencing hearing, the government bears the burden of proving all three amounts at issue by a preponderance of the evidence. *See United States v. Riesterer,* 224 F.Supp.3d 1156, 1167 (D. Colo. 2016) (loss amount) (citing *United States v. Schild,* 269 F.3d 1198, 1200 (10th Cir. 2001)); *Riesterer,* 224 F.Supp.3d at 1167 (as to

restitution, the government must prove "the amount of loss sustained by a victim as a result of the offense," by a preponderance of the evidence) (citing 18 U.S.C. § 3664)); *see also United States v. Bader,* 678 F.3d 858, 893 (10th Cir. 2012) ("[a] forfeiture judgment must be supported by a preponderance of the evidence") (citations omitted).

The preponderance of the evidence standard requires the government to "show it is more likely than not that the factual matters on which it bears the burden are true." *Riesterer,* 224 F.Supp.3d at 1167 (citing *United States v. Craig,* 808 F.3d 1249, 1257 n.7 (10th Cir. 2015)). The government will meet its burden of proving all three amounts at the sentencing hearing through the testimony of Special Agent Sandra Ennis.

## II. The loss amount is over $550,000 for a 14-level increase in the base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(H)

The defendant was convicted at trial of conspiring with his co-defendants, Heather Carr, Mercedes Diaz, and Marcelle Green, to submit 181 false Free Applications for Federal Student Aid (FAFSAs) to the United States Department of Education (the Department). The government proved at trial through the testimony of Special Agent Sandra Ennis that the total amount of loss suffered by the Department and the victim community colleges from this scheme is $563,890.85. Gov't Ex. 72. The government submits that the entire amount of the loss is attributable to the defendant pursuant to the Relevant Conduct provisions set forth at U.S.S.G. § 1B1.3.

### a. Legal Framework

Commentary Note 3(A) to § 1B1.3 provides that with respect to jointly undertaken criminal activity, such as a scheme to defraud, the defendant is accountable for the acts and omissions of others that were: "(i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably

foreseeable in connection with that criminal activity"; *see also United States v. Gordon,* 710 F.3d 1124, 1165 (10th Cir. 2013) ("reasonably foreseeable gains attributable to co-conspirators' acts are properly tabulated in § 2B1.1(b)(1)'s offense-conduct computations") (citations omitted).

When several defendants are convicted of the same conspiracy as occurred here, '"jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." U.S.S.G. § 1B1.3 cmt. n.3(B). To determine a particular defendant's accountability for the conduct of others, the Court "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement)." *United States v. Godinez-Perez,* 864 F.3d 1060, 1063 (10th Cir. 2016) (citing § 1B1.3 cmt. n.3(B)); *United States v. Green,* 175 F.3d 822, 837 (10th Cir. 1999) ("the district court must make particularized findings tying the defendant to the relevant conduct used to increase the base offense level") (citation omitted).

**b. The scope of the criminal activity the defendant agreed to jointly undertake**

Special agents executed a search warrant at the defendant's home on November 29, 2012. There, stenciled on the wall of the bedroom he shared with co-defendant Heather Carr, was the statement "Like two armed co-defendants We stick together." [1]

---

1 The statement is a quote from the song "Streets is Watching." *See* Jay-Z, In My Lifetime, Vol. 1 (Roc-A-Fella Records and Def Jam Recordings, 1997). Heather Carr told investigators that she put up the stencil and that she got the idea from the song. The Court can consider this statement --- one the defendant would have seen every time he woke up in that bedroom while carrying out the scheme --- as part of its evaluation of whether the defendant was fully immersed in the scheme. *See United*

(Attachment 1). There's no reason to doubt that the couple's decorating choice was a sincere one: the evidence presented at sentencing will show that the defendant agreed to jointly undertake all of the criminal activity necessary to further the scheme.

The trial evidence established that Heather Carr searched her employer Wells Fargo's Lexis Nexis database for the social security numbers (SSNs) used on all 181 false FAFSAs submitted to the Department. Special Agent Ennis will testify that Carr stated in proffer sessions that the defendant knew she obtained SSNs in this manner for use in the scheme, and that he knew of, and participated in, every other aspect of the scheme to defraud the Department. Specifically, Carr told Special Agent Ennis:

1) The defendant conducted inmate searches on department of corrections websites looking for inmate names to use on false FAFSAs while he resided in Arizona. Attachment 2 at 2 (MOI_00000549 through MOI_00000553).
2) All four conspirators made up information when filling out documents provided to the schools for admission. *Id.*
3) All four conspirators participated in submitting electronic applications to Pikes Peak Community College (PPCC). The conspirators chose PPCC because the defendant had previously submitted applications to PPCC and "it was working for him." *Id.* at 3. Carr was also familiar with obtaining federal student aid (FSA) from PPCC. *Id.*
4) While Thomas was involved in the submission of documents for FSA to be disbursed in the names of C.D., V.L., and I.O. (and others), he asked Carr to

---

*States v. Reico*, 2018 WL 1176938, --- F.3d ---, at **3 (4th Cir. March 7, 2018) ("Lyrics can also be relevant to show a defendant's knowledge or motive.")

keep the SSN information for all three in case he lost it. *Id.* at 2, 5. In addition, Carr conducted SSN searches for C.D., V.L., and I.O. through the Lexis Nexis database. Gov't Ex. 72.

5) All four conspirators submitted FAFSAs, completed homework, and pulled money off the debit cards. Attachment 2 at 2-5.

6) At some point during the scheme, all four conspirators submitted Master Promissory Notes (MPNs). *Id.* at 3.

7) All four conspirators provided addresses for use in the scheme. *Id.* at 2.

8) Specifically, Kimmisha Mullett allowed the defendant to use her address for receipt of debit cards. *Id*. (The Court heard testimony from Ms. Mullett confirming this point at the trial.)

9) Debit cards were taken out of their original green envelopes, placed in other envelopes, and mailed to Carr's Arizona Riggs Road post office box addressed to Carr in either the defendant's or a woman's handwriting. *Id.*

10) The defendant stored his belongings at the Rushmore Drive address, lived at the Radiant Drive address, and both were used in the scheme. Carr and the defendant picked up debit cards from the Rushmore address from the mailbox at the end of the curb. *Id.* at 3.

11) The defendant gave Carr Matthew Sanders's Blackhawk address to use in the scheme. *Id.* at 4.

12) During the 2010-2011 time frame, the defendant stayed with Carr at the Pleasant Street address in Chandler, Arizona. Numerous FAFSAs were submitted from IP addresses associated with this address. While at this address, the defendant

gave Carr Colorado addresses for use in the scheme and enrolled women he knew in Colorado at community colleges. The defendant also asked Carr to obtain SSNs for him. *Id.* at 3.

13) In 2011 while the defendant was detained in the El Paso County Jail, debit cards were still being mailed and the defendant knew the scheme was continuing. During Carr's multiple visits to Colorado to visit the defendant while in jail, they discussed the scheme in code. For example, the defendant asked Carr how she was doing in school and if she was getting good grades, when the defendant knew Carr was not enrolled in school. Carr would say she had a lot of homework. Carr used funds from the scheme for the defendant's legal fees and placed money from the scheme into his jail commissary account. *Id.*

14) After the defendant's release from jail, he moved to Arizona to live with Carr at the Kaibab address. He did not work while living in Arizona and continued his involvement in the scheme. *Id.* at 4.

15) While living at the Kaibab address, the defendant submitted FAFSAs from his computer located in his office. Carr provided the defendant with a list of SSNs. Carr saw the defendant's handwritten notes that were related to FAFSA submissions, such as PIN numbers and email addresses in his office. *Id.* at 4.

16) The defendant completed homework for the scheme to work. On one occasion, when Thomas could not save or submit psychology coursework on his computer, Carr saved Thomas's coursework to a USB thumb drive and then transferred the coursework to her computer in her office. Carr did not use the computer in the defendant's office because it was password-protected and the defendant did not

give her the password. *Id.*

17) In 2012 while living with Carr at the Kaibab address, the defendant went to ATM locations to withdraw money from the debit cards. Carr knew this because the defendant would bring home wads of cash and had the debit cards with him or in his wallet. The defendant liked to withdraw the cash himself because he did not trust other people with the money. *Id.* at 3.

18) With respect to the white Dodge Charger the defendant was driving the night of his traffic stop, while that vehicle belonged to Carr, the defendant drove it in Colorado and brought it with him when he moved to Arizona. *Id.* at 4.

19) After the defendant's arrest on traffic charges and subsequent release from jail, Carr drove the defendant to the impound lot to retrieve the Charger. The defendant was "panicky" after he searched the car and realized the police took the debit cards. The defendant told Carr he drove to a girl's house to retrieve the debit cards and a pink laptop (which laptop was used in the scheme). *Id.* at 4.

20) After the Kaibab residence was searched by law enforcement, the defendant admitted to Carr that he broke his cell phone (he told her it was so that Carr wouldn't find out about other "bitches"; the government will show at sentencing that it was to obstruct the investigation). Carr confirmed that the picture of the broken phone was taken in the defendant's closet, and that she and the defendant each had their own closets. *Id.* at 5; Gov't Exs 13-16 (text messages related to the scheme that were retrieved from this phone and admitted at trial.)

21) Carr and the defendant went to co-defendant Marcelle Green's home after the search of their home and asked Green what questions law enforcement asked

her and what she told them. Carr stated that both she and the defendant were nervous during this meeting. Attachment 2 at 5.

22) Carr stated she used funds from the scheme to pay the rent on the Kaibab address (where she lived with the defendant), to pay for trips that she took with the defendant, and stated that she and the defendant used funds from the scheme at casinos. *Id.* at 4-5.

Carr's statements, along with the debit cards found in the defendant's possession and the addresses he provided to be used in the scheme, clearly establish the scope of his jointly undertaken criminal activity. In addition to all of this evidence, the Court heard the following testimony of co-defendant Green at trial about the defendant's participation in the scheme:

1) Green testified that she agreed to participate with the defendant in a scheme to steal money from the Department. Attachment 3 (Transcript of Green's trial testimony) at 3-4; *see also id.* at 6 (identifying Mercedes Diaz, Heather Carr, and Tramell Thomas as the other members of the conspiracy).

2) She withdrew money from the debit cards and delivered the money in stacks of cash to Heather Carr while the defendant and Diaz were present. *Id.* at 13-16.

3) These deliveries of cash occurred during the course of the conspiracy, which began "[l]ate in the summer of 2010, all the way until 2012, the middle of 2012." *Id.* at 14-15.

4) In 2012, the defendant, Carr, and their children lived at the Kaibab address and had a "nice house, nice cars . . . up-to-date electronics." *Id.* at 17.

5) She assisted the defendant with filling out the education part of the FAFSA. *Id.*

at 19-21, 33.

6) The defendant, Green, and Carr would throw out names of inmates "to process the fraudulent FAFSAs and the school applications." *Id.* at 21-22.

7) Green testified that Carr used some of the fraud proceeds for the defendant's lawyer's fees. *Id.* at 16, 23-24.

8) Green testified that her knowledge about the defendant filling out FAFSAs and withdrawing money from debit cards came from her conversations with Carr. *Id.* at 40, 43.

9) Green testified that the defendant and Carr visited her home after their Kaibab residence was searched and asked her what questions law enforcement asked her, what she said to the investigators, and what pictures law enforcement showed her. She described the defendant as nervous, moving his hands back and forth and asking the same questions "over in just a different format." *Id.* at 26.

Factors relevant to determining the scope of jointly undertaken criminal activity include 1) "the existence of a single scheme"; 2) "similarities in modus operandi"; 3) "coordination of activities among schemers"; 4) "pooling of resources or profits"; 5) "knowledge of the scope of the scheme"; and 6) the "length and degree of the defendant's participation in the scheme."  *United States v. Salem,* 657 F.3d 560, 564 (7th Cir. 2011) (citations omitted).

All of these factors weigh in favor of the conclusion that the scope of the defendant's jointly undertaken criminal activity covers every aspect of the scheme. There existed a single scheme, that of defrauding the Department. The similarities in

the modus operandi included 1) the manner in which the conspirators obtained the inmates' names from state DOC websites; 2) Carr obtained all of the SSNs through her work database; 3) all of the conspirators applied for admission to the community colleges, enrolled in classes, and completed coursework; 4) the conspirators took the same classes because they had already completed the work and would "just resubmit it," Attachment 3 at 11; and 4) all of the conspirators withdrew cash from debit cards. The conspirators coordinated their activities: Carr was the source of the SSNs, and they all completed coursework and withdrew cash from ATMs. Attachment 2 at 2-4. The conspirators shared in the proceeds, and Green testified to giving a portion of the money from the debit cards to Carr in the defendant's presence. Attachment 3 at 13-15. The defendant himself withdrew cash from the debit cards. Attachment 2 at 3. In addition, the defendant here "knew of the scope of the scheme and participated in it fully and for a lengthy time period – more than two years." *Salem,* 657 F.3d 560 at 564.

Any argument that the defendant should not be held accountable for losses to the Department that occurred while he was detained in the El Paso County Jail is refuted by the jury's guilty verdicts convicting him beyond a reasonable doubt on Counts 2-5 of the Superseding Indictment. All of the debit cards listed in these counts were mailed while the defendant was detained. In addition, Carr stated that the defendant knew the scheme was continuing while he was detained, and asked in code about the progress of the scheme. Attachment 2 at 3. Moreover, the defendant benefitted from the scheme while he was in jail through the payment of his legal fees and deposits into his commissary account from the fraud proceeds. *Id.* "Thomas never asked Carr to stop the scheme and never gave Carr the impression that he no longer wanted to be

part of the scheme." *Id.* at 4. As soon as the defendant was released from jail, he was back playing an active role in all aspects of the scheme. *Id.*

All of this evidence establishes that "the scope of the specific conduct and objectives embraced by the defendant's agreement" includes the entire amount of loss caused by the scheme. *Godinez-Perez,* 864 F.3d at 1063.

**c. The conspirators' conduct was in furtherance of the jointly undertaken criminal activity**

The defendant's conspirators all acted in ways to further the objectives of the jointly undertaken criminal activity – defrauding the Department through the submission of false FAFSAs. Carr stated that each conspirator performed every function necessary for the conspiracy to work, with the exception of obtaining the SSNs. Multiple addresses were necessary because sending all the cards to one address "would set off an alert." Attachment 3 at 12. Each conspirator contributed to the conspiracy and worked "together in [the] jointly undertaken criminal activity, as opposed to working independently and autonomously." *Salem,* 657 F.3d at 564-65. This conspiracy was successful because each conspirator performed his or her role and they relied on each other to do so.

**d. The conspirators' conduct was reasonably foreseeable in connection with the criminal activity**

Carr and Green's conduct in connection with the scheme was *known and encouraged by* this defendant, not just reasonably foreseeable to him. For example, the defendant was in possession of debit cards that had been mailed to addresses obtained by Green, as well as by Diaz — a co-conspirator with whom he did not have direct contact, but from whose conduct he profited. Attachment 4 to this pleading is a revised

version of Gov't. Ex. 72. The far right column of this chart details how every debit card mailed as a result of this scheme is tied to one of the conspirators, and therefore, tied to this defendant. Agent Ennis will explain the chart more fully at sentencing.

In any event, the test "is reasonable foreseeability, not actual knowledge." *United States v. Snow,* 468 F. App'x 830, 837 (10th Cir. 2012); *United States v. Aslan,* 644 F.3d 526, 537 (7th Cir. 2011) ([f[oreseeability is not equivalent to actual knowledge") (citation omitted). Indeed, a defendant "need not know of a co-schemer's actions for those actions reasonably to be foreseeable to the defendant." *Aslan,* 644 F.3d at 537. Nor does the inquiry require "that a defendant interact with, or even know of, [his] fellow coconspirators, provided of course that the involvement of the others and their actions in furtherance of the conspiracy were reasonably foreseeable." *United States v. Sykes,* 774 F.3d 1145, 1151 (7th Cir. 2014) (citing *United States v. Wang*, 707 F.3d 911, 916 (7th Cir. 2013), for the proposition that "a defendant could reasonably foresee the loss caused by forty-one other coconspirators even though he only knew of three others that were involved in the conspiracy"). The Court can base its reasonable foreseeability determination "on whether [the defendant] demonstrated a substantial degree of commitment to the conspiracy's objectives, either through his words or his conduct." *Wang*, 707 F.3d at 916 (citations omitted). And a defendant's enhancement under the loss table "holds him responsible for losses caused by the reasonably foreseeable acts of his co-conspirators, with no consideration given to the degree of his culpability." *United States v. Gallant,* 537 F.3d 1202, 1240 (10th Cir. 2008) (reversing district court's loss calculation because it did not include "losses attributable to the reasonably foreseeable acts of the defendant's co-conspirators" and instead, "used gain

as a proxy for each defendant's culpability").

Accordingly, even if this Court finds the defendant played a lesser role in this conspiracy than his co-conspirators, he is still accountable for the acts of his co-conspirators as they were reasonably foreseeable to him.

### III. The defendant should be ordered to pay $563,890.85 in restitution

The Mandatory Victims Restitution Act of 1996 made restitution mandatory in certain cases, "particularly crimes of violence and theft crimes with identifiable victims who 'suffered a physical injury or pecuniary loss.'" *United States v. Serawop,* 505 F.3d 1112, 1117 (10th Cir. 2007) (citing 18 U.S.C. § 3663A(c)(1)).  At trial, Agent Ennis testified that the loss suffered by the Department and various community colleges amounted to $563,890.85.  *See* Attachment 4 (annotating government trial exhibit 72 to include information specifically relevant to sentencing).  Based on the evidence available at the time Carr, Diaz and Green pleaded guilty, the government believed that the total loss for purposes of restitution was $562,487.85 .  However, in preparing for trial, Agent Ennis discovered that the Department had suffered an additional $1,403 in loss.  Accordingly, at sentencing, the government will request that the Court order that the defendant pay $562,487.85 in restitution jointly and severally with his co-defendants Carr, Diaz, and Green,[2] and that he be ordered individually to pay an additional $1,403 in loss to the Department.[3]

---

2  Green's plea agreement states that the restitution amount in her case "will not exceed $562,487.85," ECF 178 at 1-2.  The government will therefore seek a restitution order in that amount at her April 11, 2018 sentencing hearing.

3 C.D. has submitted a claim to the probation office for $16,610.65 in restitution due to loans taken out in her name as part of this scheme and resulting collection fess.  The Department and PPCC are in the process of resolving this matter.  If Ms. Duncan is still out any money at the time of sentencing, the government will modify its restitution request accordingly.  Inclusion of

**IV. Forfeiture**

The Supreme Court, in *Honeycutt v. United States,* 137 S.Ct. 1626 (2017), held that under 21 U.S.C. § 853, which mandates forfeiture of proceeds derived from certain drug crimes, a defendant may not be held "jointly and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire." *Id.* at 1630. Writing for the unanimous Court, Justice Sotomayor explained that the structure and language of § 853(a) "limit[s] forfeiture under § 853 to tainted property; that is, property flowing from ... or used in ... the crime itself," *id.* at 1632, and "defines forfeitable property solely in terms of personal possession or use." *Id.* at 1629. As a result, only "tainted property acquired or used by the defendant" is subject to § 853(a) forfeiture. *Id.* at 1633; *United States v. McGinty,* 610 F.3d 1242, 1247 (10th Cir. 2010) ("restitution and forfeiture will not necessarily be in the same amount because 'restitution is calculated based on the victim's loss, while forfeiture is based on the offender's gain'") (citation omitted).

Accordingly, the government will file prior to sentencing a motion for a preliminary order of forfeiture seeking a forfeiture money judgment in the amount of $260,226.85, which is a conservative calculation of the gain directly attributable to this defendant. Attachment 5 to this filing is a chart that sets forth this gain calculation. The government attributed to the defendant the gain from all 52 debit cards found in his possession upon his arrest. A reference of "DC" for "debit card" is noted in the far right column on Attachment 5.

---

this amount will not affect the loss calculation.

The government also attributed to the defendant any funds mailed to the addresses listed in Counts of the Superseding Indictment of which he was convicted beyond a reasonable doubt: Counts 6 and 7 (Meadow Oaks – Mullett's address); Count 2 (Radiant Drive – the defendant's residence); and Counts 3-5 (Rushmore Drive – the address the defendant used on school/loan documents, and Carr stated the defendant retrieved debit cards from this address, Attachment 2 at 3).

Respectfully submitted this 9th day of March, 2018.

ROBERT C. TROYER
United States Attorney
District of Colorado

By: *s/ Martha A. Paluch*
MARTHA A. PALUCH
BRYAN DAVID FIELDS
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
Martha.Paluch@usdoj.gov
Bryan.Fields3@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on this 9th day of March, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to all counsel of record in this case.

s/ *Martha A. Paluch*__________
MARTHA A. PALUCH
BRYAN DAVID FIELDS
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov
Bryan.Fields3@usdoj.gov