1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLORADO

3      Criminal Action No. 16-cr-0054-WJM-2

4      UNITED STATES OF AMERICA,

5      Plaintiff,

6      vs.

7      TRAMMEL THOMAS,

8      Defendant.

9      ------------------------------------------------------------

10                REPORTER'S PARTIAL TRANSCRIPT
                    (Jury Trial - Day 2)
11               TESTIMONY OF MARCELLE GREEN

12     ------------------------------------------------------------

13          Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
       Judge, United States District Court for the District of
14     Colorado, commencing at 3:29 p.m., on the 28th day of
       November, 2017, in Courtroom A801, United States
15     Courthouse, Denver, Colorado.

16

17                         APPEARANCES

18          MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
       Attorneys, 1801 California Street, Suite 1600, Denver,
19     Colorado 80202, appearing for the plaintiff.

20          DANIEL T. SMITH, Attorney at Law, 4582 South Ulster
       Street, Suite 1400, Denver, Colorado 80237 and
21          THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
       Suite 1400, Denver, Colorado 80202, appearing for the
22     defendant.

23                 MARY J. GEORGE, FCRR, CRR, RMR
                901 19th Street, Denver, Colorado 80294
24            Proceedings Reported by Mechanical Stenography
                 Transcription Produced via Computer

25

1                    P R O C E E D I N G S

2          (In open court in the presence of the jury at 3:29

3    p.m.)

4          THE COURT:  Thank you very much for your patience,

5    ladies and gentlemen of the jury.  As I mentioned to you on

6    the first day that there would be these kind of pauses, but

7    we ask for your indulgence and your patience given the

8    importance of what we're dealing with here.

9          Let me just mention to you the next witness is

10   going to be a codefendant in this case who has pled guilty,

11   is not going to trial.  She has her lawyer here present,

12   Ms. Jeralyn Merritt, at the back table there, and she's --

13   Ms. Merritt is here because the law allows individuals in

14   Ms. Green, the next witness' situation, to have counsel

15   present in the courtroom to make any appropriate objections

16   that counsel sees fit.

17         All right.  The Government may call its next

18   witness.

19         MR. FIELDS:  Thank you, Your Honor.  We call

20   Marcelle Green to the stand.

21         THE COURT:  All right.

22         COURTROOM DEPUTY:  Right here, ma'am.  Just please

23   stand in the box and raise your right hand.

24       MARCELLE GREEN, GOVERNMENT'S WITNESS, SWORN

25         COURTROOM DEPUTY:  Please be seated.  Scoot your

3

Direct - Green

1    chair up.  Put your elbows right on the stand so that we

2    can -- put your mouth right there.

3         Please state your full name for the record and

4    spell your first and last name.

5         THE WITNESS:  Marcelle Ruby Green,

6    M-a-r-c-e-l-l-e, G-r-e-e-n.

7         THE COURT:  You may proceed, counsel.

8         MR. FIELDS:  Thank you, Your Honor.

9         Before we get into it, at this point I would move

10   into evidence Government's Exhibit 32, which has been

11   stipulated to by the parties.

12        THE COURT:  Okay.  One second.  All right, given

13   the stipulation of the parties, Government Exhibit 32 is

14   admitted into evidence and may be published to the jury.

15       (Government's Exhibit 32 received)

16        MR. FIELDS:  Thank you, Your Honor.

17                      DIRECT EXAMINATION

18   BY MR. FIELDS:

19   Q.   Ms. Green, did you participate in a scheme to steal

20   money from the Department of Education?

21   A.   Yes, I did, sir.

22   Q.   Did you agree to participate in that scheme with other

23   people?

24   A.   Yes, I did.

25   Q.   Do you see one of those people in the courtroom here

Direct - Green

1    today?

2    A.   Yes, I do.

3    Q.   Who do you see?

4    A.   Trammel Thomas.

5    Q.   Could you describe where he's sitting and an article

6    of clothing that he's wearing.

7    A.   In the side over here, between his two lawyers, and he

8    has a black jacket on.

9         MR. FIELDS:  Your Honor, I'd like the Court -- or

10   to re -- the record to reflect that the witness has

11   identified the defendant.

12        THE COURT:  The record will so reflect.

13   BY MR. FIELDS:

14   Q.   Ms. Green, as a result of your choice to participate

15   in a fraud scheme, what has happened to you?

16   A.   I've been indicted and I pleaded guilty.

17   Q.   Do you have an agreement with the Government?

18   A.   Yes, I do.

19   Q.   Let's look at it.  It's Government Exhibit 32.  Is

20   this your agreement?

21   A.   Yes, sir.

22   Q.   If we could go to the last page.  Does that have your

23   signatures on it?

24   A.   Yes, it does.

25   Q.   Take it down.

Direct - Green

1        What are your obligations under that agreement?

2    A.   Just to be truthful.

3    Q.   And what do you hope to get in return for this

4    agreement?

5    A.   Leniency on my sentence.

6    Q.   Do you know how much you will get off of your

7    sentence?

8    A.   No, I don't.

9    Q.   Who decides what your stints will be?

10   A.   The judge.

11   Q.   Now, is this the first time you've been in trouble

12   with the law?

13   A.   No, sir.

14   Q.   Have you been convicted of a drug crime?

15   A.   Yes, I have.

16   Q.   What happened?

17   A.   Possession of marijuana with the intent to sell was

18   my -- what I was convicted with.

19   Q.   How much marijuana?

20   A.   300 pounds.

21   Q.   Does that have anything to do with your involvement in

22   this fraud scheme?

23   A.   No, sir.

24   Q.   Have you already been sentenced for that crime?

25   A.   Yes, I have.

6

Direct - Green

1    Q.   So does your plea agreement in this case have any

2    effect on the outcome in that case?

3    A.   No, sir.

4    Q.   When did you first agree to be part of the conspiracy?

5    A.   Somewhere in 2010.  I can't give you an exact date,

6    I'm sorry.

7    Q.   Who approached you about becoming part of the

8    conspiracy?

9    A.   Heather Carr.

10   Q.   Where did that happen?

11   A.   At her location in Pleasant Drive.

12   Q.   Pleasant Drive where?

13   A.   In Chandler.  I believe Chandler, Arizona.

14   Q.   Describe to us what happened.

15   A.   Conversation at a barbecue, I believe it was around

16   Easter -- yeah, Easter, and just a discussion on how to get

17   money fraudulently by filing false claims.

18   Q.   After that discussion, how long were you part of the

19   conspiracy?

20   A.   To roughly about 2012.

21   Q.   While you were a member of the conspiracy, who were

22   the other members of the conspiracy?

23   A.   Mercede Diaz, Heather Carr and Trammel Thomas.

24   Q.   Now, you testified, you pleaded guilty to a scheme to

25   defraud the Government.  Did you file false claims with the

Direct - Green

1   Government?

2   A.   Yes, I did, sir.

3   Q.   What were the false claims?

4   A.   The false claims were the FAFSA and the enrollment to

5   school.

6   Q.   What was false about the FAFSAs you submitted?

7   A.   The information on the students as far as their

8   addresses and their locations.

9   Q.   If you had put the truth into those FAFSAs, would you

10  have received money?

11  A.   No.

12  Q.   Why not?

13  A.   Because they -- you have to be a present-person

14  student, and they weren't present.  So if we would have put

15  they were in prison, nothing would have happened.

16  Q.   So you've been talking about these people in prison.

17  Whose identities did you put into the FAFSAs?

18  A.   Inmates.

19  Q.   Why prison inmates?

20  A.   Because prison inmates are incarcerated for a number

21  of years and wouldn't think that it would come up -- they

22  wouldn't look it up, theirself, while they were in prison.

23  Q.   How did you decide which prison inmates to use?

24  A.   The length of sentence.

25  Q.   And how did you find out whether or not someone was in

Direct - Green

1    prison?

2    A.   It's public records.  You can just see if they're in

3    prison or not.

4    Q.   So what was the overall purpose of the conspiracy?

5    A.   To receive funds.

6    Q.   And who were the victims of the conspiracy?

7    A.   The inmates and the school and the Government.

8    Q.   Did you submit the FAFSAs using the internet?

9    A.   Yes, I did.

10   Q.   What computer did you use?

11   A.   I used the black laptop and a desktop.

12   Q.   Where was that desktop located?

13   A.   At 4630 South 21st Place.

14   Q.   What is that address?  What --

15   A.   That's my house.  That's my address.

16   Q.   That's your house?

17   A.   Yes.

18   Q.   And you mentioned a laptop?

19   A.   Yes.

20   Q.   Where was the laptop located?

21   A.   The laptop was located at 4630 South 21st Place and

22   the address on Pleasant Drive in Chandler.

23   Q.   That address on Pleasant Drive, what's significant

24   about that?

25   A.   That's Heather Carr's location.

Direct - Green

1    Q.    Did you need the internet to submit the FAFSAs?

2    A.    Yes, sir.

3    Q.    Where did you go to use the Internet?

4    A.    My address at 4630 Pleasant Drive and then a local

5    Starbucks.

6    Q.    After a FAFSA was submitted, what did you have to do

7    next to get loan money?

8    A.    You have to enroll in school.

9    Q.    How would you enroll?

10   A.    Go to the internet site of the school and enroll and

11   then you would get a letter of acceptance.

12   Q.    What kind of information did you need to enroll in the

13   school?

14   A.    The student's information -- I mean the inmate's

15   information, the location of the address where they're

16   going to.

17   Q.    So just like the FAFSA, was the information in the

18   paperwork you submitted to schools truthful?

19   A.    No, sir.

20   Q.    What was untruthful about it?

21   A.    The address of the inmates.

22   Q.    Also was the identity of the --

23   A.    Of the identity, yes.

24   Q.    Would colleges sometimes ask for documents that were

25   signed?

Direct - Green

1   A.   Yes.

2   Q.   So when a college asked for a document that had to be

3   physically signed, what would you do?

4   A.   Get it printed out, sign it, and then fax it over at a

5   local mail and sell, where you can do fax and things like

6   that.

7   Q.   Would you sign it in your own name?

8   A.   No, sir.

9   Q.   What name would you sign?

10   A.   The -- the name of the inmate.

11   Q.   How did you decide which colleges to pick?

12   A.   Colleges that had online classes where you didn't

13   physically have to be in the classroom.

14   Q.   Why was that important?

15   A.   Because the people were not here, so we couldn't get

16   classes that you had to attend in person.

17   Q.   Where were these colleges located?

18   A.   In Colorado and in Phoenix, Arizona.

19   Q.   What were the colleges in Colorado?

20   A.   Pikes Peak.

21   Q.   And what were the colleges in Arizona?

22   A.   Sorry.  Phoenix College, sorry, and Mesa Community

23   College.

24   Q.   In order to actually get money for student aid, were

25   you required to take classes?

Direct - Green

1    A.    Yes, sir.

2    Q.    How many?

3    A.    Four.

4    Q.    Did you take classes?

5    A.    Yes, I did.

6    Q.    So how did that part of the scheme work?

7    A.    You would just log in and -- into the classes and do

8    the homework and submit it so you can stay enrolled in the

9    class.

10   Q.    And why did you have to stay enrolled in the class?

11   A.    In order to receive the funds, you have to be enrolled

12   in class.

13   Q.    How did you decide which classes to pick?

14   A.    The classes that mainly just had discussions or short

15   essays that you could submit.  Those classes you didn't,

16   you didn't want to pick classes that included like math or

17   anything too long like that.

18   Q.    Would you take lots of different classes or the same

19   classes?

20   A.    Usually the same classes.

21   Q.    Why the same classes?

22   A.    Because we already knew -- the work, and we would just

23   resubmit it.

24   Q.    How would the colleges actually send out the student

25   aid?

Direct - Green

1    A.    In a debit card form.

2    Q.    And where would the colleges send those debit cards?

3    A.    To the addresses that's on the enrollment form.

4    Q.    How did you decide which addresses to put on the

5    enrollment forms?

6    A.    Just split them up on the list.  It wasn't just like a

7    pinpoint, oh, this one's going to go here; it was just

8    randomly.

9    Q.    Well, did you know which addresses the card would go

10   to?

11   A.    Yes.

12   Q.    How did you get those addresses?

13   A.    The addresses were my physical address.

14   Q.    Were any other addresses used as part of the scheme?

15   A.    Yes.

16   Q.    Which addresses?

17   A.    1915 East Mulberry.

18   Q.    And why didn't you just have all the cards sent to one

19   address?

20   A.    Because we feel it would set off an alert if we had

21   too many going to the address.

22   Q.    After you got the debit cards, could you get money off

23   of them?

24   A.    Yes.

25   Q.    How much in a day?

Direct - Green

1    A.    $1,000 was the limit.

2    Q.    So as a result of that, what did you do to actually

3    get the money off the cards?

4    A.    Go to local ATMs or go to local grocery stores and get

5    cash back.

6    Q.    You went to the grocery stores, would you get items,

7    too?

8    A.    Yes.  Buy like a pack of gum and get the cash back

9    limit that they have for the day.

10   Q.    Did you divide up this money with other members of the

11   conspiracy?

12   A.    Yes, I did.

13   Q.    Who?

14   A.    Heather Carr.

15   Q.    How much money did Heather Carr get?

16   A.    If the cards were coming to my house, she would

17   receive 60, I would receive 40.  And then if I went and

18   helped her with her cards, she would receive 70, I would

19   receive 30.

20   Q.    You say "helped her with her cards."  What does that

21   mean?

22   A.    Withdraw her money for her for cards that she had in

23   her possession already.

24   Q.    Do you know how she got those cards in her possession?

25   A.    To the addresses that were used on the forms filled

Direct - Green

1    out.

2    Q.   At any point during the conspiracy, did Thomas get any

3    of that money?

4    A.   I physically didn't hand any money to him.

5    Q.   Who would you hand the money to?

6    A.   Heather.

7    Q.   Who would be present when you handed the money to

8    Heather?

9    A.   Either Trammel Thomas, sometimes Mercedes Diaz, and

10   our children.

11   Q.   Describe to the members of the jury the times where

12   the defendant, Trammel Thomas, was there when you delivered

13   the money.

14   A.   I can't --

15         MR. SMITH:  Could we have some foundation as to

16   time, Your Honor.

17         THE COURT:  Yeah.  I -- let's get this in a time

18   frame.

19         MR. FIELDS:  All right.

20   BY MR. FIELDS:

21   Q.   When did the conspiracy take place?

22   A.   In 2010, around April, but the first enrollment wasn't

23   until July, I believe.

24   Q.   And approximately when were you delivering money to

25   Heather Carr?

Direct - Green

1  A.   Late in the summer of 2010, all the way until 2012,

2  the middle of 2012.

3  Q.   And these times that we're going to talk about where

4  the defendant was there, do you remember approximately when

5  that was?

6  A.   I can't give a definite date.

7  Q.   Sometime within that time period?

8  A.   Yes, within that time period.

9  Q.   So, again, describe to the members of the jury those

10  times where Trammel Thomas was present.  What was he doing?

11  A.   I'm just --

12       MR. SMITH:  Well, Your Honor, I would object.

13  Could we take it in sequence?  He's referring to multiple

14  times.

15       THE COURT:  Overruled.  I think we can -- I think

16  she has set the stage well enough.  Go ahead.

17  BY MR. FIELDS:

18  Q.   You can answer the question, Ms. Green.  So when you

19  saw the defendant present when you delivered money,

20  describe what you saw.

21  A.   Just us hanging around.  It was either sometimes a

22  barbecue or just over there for -- randomly, but it wasn't

23  physically him -- me handing him the money, it was just him

24  standing around.

25  Q.   When you handed the money, describe how the money was

Direct - Green

1   packaged.

2   A.   In 20s.

3   Q.   Was it rolled up, was --

4   A.   No, just in form -- just -- not rolled up, not

5   anything, just altogether.

6   Q.   Did you put it in an envelope?

7   A.   No.

8   Q.   So when you say altogether, again, describe to me, is

9   it sort of fanned out --

10  A.   No, it's just in a stack.  Just in a stack.

11  Q.   What did Carr do with that money?

12  A.   Her living expenses to care -- and financial -- and

13  legal fees.

14  Q.   Would she go on vacation?

15  A.   Yes.

16  Q.   Who did she go on those vacations with?

17  A.   Her children and sometimes Mercedes.

18  Q.   Anyone else?

19  A.   Not that I know of.

20  Q.   What kind of house did she live?

21  A.   She had two different house locations, so the one on

22  Pleasant Drive or the one on Kaibob.

23  Q.   The latter one.

24  A.   Kaibob, it was a nice house.  Beautiful --

25  Q.   When did she get that house?

Direct - Green

1    A.   I would say sometime in the beginning of 2012.  I

2    could be wrong.

3    Q.   Who lived there with her?

4    A.   Heather Carr, Trammel Thomas, and their children.

5    Q.   Were you able to observe Thomas and Carr's lifestyle?

6    A.   Yes.

7    Q.   How would you describe that lifestyle?

8    A.   Nice lifestyle.

9    Q.   Can you go into any more detail?  What would be nice?

10   A.   I mean, nice house, nice cars, you know.  Just all the

11   basic, and the up-to-date electronics.  Just not too many

12   worries, that's what I would say.

13   Q.   Let's talk about other members of the conspiracy.  You

14   mentioned Heather Carr.  What was her role in the

15   conspiracy?

16   A.   I believe it was a major role.

17   Q.   What did she do?

18   A.   She got the information of the inmates and the Social

19   Security numbers and the birth dates and as far as

20   processing FAFSAs and applications and homework.

21   Q.   Do you know how she got that information?

22   A.   From her job.

23   Q.   What was her job?

24   A.   She was a loan closer at CarMax.

25   Q.   Who would she give that information to?

Direct - Green

1   A.   To the -- for me, I know me, myself.

2   Q.   Did she give it to anyone else?

3   A.   I can't speak for that.

4   Q.   When she gave it to you, how would she give it to

5   you?

6   A.   On a paper -- on a lined piece of paper, regular

7   subject paper.

8   Q.   Describe to us what would be on a typical sheet of

9   paper from Heather Carr.

10   A.   The names, the birth dates, and the address -- I mean,

11   sorry, the names, the birth dates, and the Social Security

12   numbers.

13   Q.   And what would you do with that information?

14   A.   I would submit that into FAFSA.

15   Q.   Now, let's talk about Trammel Thomas.  You said he was

16   part of the conspiracy.

17   A.   Correct.

18   Q.   What was his role?

19   A.   His role -- I can't say if he did homework and I can't

20   say if he had a major role, but he had some role in it.

21   Q.   Well, did you ever see him participating in the

22   conspiracy?

23   A.   Yes.

24   Q.   What did you see him doing?

25   A.   The FAFSA part, just one time.

19

Direct - Green

1    Q.    When was that?

2    A.    I can't give a definite date.  Our season, I want to

3    say it was somewhere in 2011.  My -- my mind's a little

4    cloudy there.  I'm sorry.

5    Q.    Well, was this down in Arizona?

6    A.    Yes.

7    Q.    Does Arizona really have seasons?

8    A.    No, we don't.

9    Q.    So was it sometimes hard to frame exactly when

10   something happened?

11   A.    It is, because it's hot all the time.

12   Q.    So this one time where you saw him participating in a

13   conspiracy, where was that at?

14   A.    At the Pleasant Drive address.

15   Q.    Who lived there?

16   A.    Heather Carr, her children, and at that part in time,

17   Trammel Thomas.

18   Q.    So what did you see him doing?

19   A.    The FAFSA part.  Just submitting the FAFSA and just

20   the steps as far as the education part.  That's it.

21   Q.    Explain to us exactly why that was part of the

22   conspiracy, what you saw.

23   A.    Because the education part, the people -- the inmates,

24   we don't know their high school information, so it was

25   easier just to put if they had their GED and we put the

Direct - Green

1   year based on their age.

2   Q.   So let me back up here.  Was this a conversation you

3   were having with the defendant?

4   A.   This was a conversation that I had with Heather Carr,

5   but I showed on that FAFSA.  So I didn't have this

6   conversation with Trammel.

7   Q.   Who were you showing this information?

8   A.   I showed him the information, but I didn't have the

9   physical conversation with him like I did with Heather

10  Carr.

11  Q.   And what was the purpose of showing him this

12  information in the FAFSA?

13  A.   So the FAFSAs wouldn't come back because, you know,

14  when you submit so many, some of them do still come back as

15  invalid, basically.  So that was just the way to by- -- it

16  was a bypass system as I would call it.

17  Q.   So, again, just to make this clear, what was the

18  bypass system you were explaining to the defendant?

19  A.   The information for the education part.  Sorry.  The

20  education part.

21  Q.   And when this happened, did you see him actually

22  submit the FAFSA?

23  A.   I didn't -- the FAFSA was up, but I didn't see the

24  submit button because I had walked away.

25  Q.   When you say "up," up on what?

21

Direct - Green

1    A.    The computer laptop, sorry.

2    Q.    What kind of laptop was he using?

3    A.    I can't recall.  I'm sorry.

4          Can I get some water?

5          THE COURT:  Right next to you.

6    BY MR. FIELDS:

7    Q.    When you were explaining this sort of bypass system,

8    were other people present in the room?

9    A.    Yes.

10   Q.    And was information being thrown out into the room?

11   A.    Yes.

12   Q.    Describe that.

13   A.    Just random names.  I can't recall the names, again,

14   I'm sorry, it was a while ago, but just random names.

15   Q.    Who would throw out random names?

16   A.    Heather Carr and myself.

17   Q.    Anyone else?  Anyone else?

18   A.    Myself.

19   Q.    Who else was present?

20   A.    Oh, Heather Carr, me, Trammel, and our children.

21   Q.    Did Trammel throw out any names?

22   A.    At that time, it was a name, but I can't recall the

23   name.  I'm sorry.

24   Q.    What was the purpose of everyone sitting around in

25   this room throwing out names?

22

Direct - Green

1    A.    It was part of the -- to process the fraudulent FAFSAs

2    and the school applications.

3    Q.    How was it part of the process of filling out these

4    fraudulent FAFSAs?

5    A.    Because of the names, when you get the names and the

6    information was already there.  So, like I said, I can't

7    recall the names.

8    Q.    When you say the information was already there, what

9    information?

10   A.    The Social Security numbers and the birth dates,

11   sorry.

12   Q.    Did you see Mr. Thomas participate in a scheme at any

13   other time?

14   A.    No.

15   Q.    How often would you see the defendant during this time

16   period?

17   A.    I wouldn't see him as much as I seen Heather and

18   Mercedes, but I've seen him several occasions.

19   Q.    So who would you say was your major contact within the

20   conspiracy?

21   A.    Heather Carr.

22   Q.    How much money did you get from the scheme?

23   A.    I roughly would say a little -- in the $20,000 range.

24   Q.    What did you do with that money?

25   A.    Paid for bills and my financial living situations and

Direct - Green

1   my children.

2   Q.   Why did you decide to participate in this fraud

3   scheme?

4   A.   To -- financial gain, to live above.

5   Q.   Did you know it was wrong?

6   A.   Yes, I did.

7   Q.   How did you know it was wrong?

8   A.   Because it's taking -- it's filing something that's

9   false, that's not you, so if it's not you and you're doing

10  it, it's wrong.

11  Q.   Did the conspiracy eventually end?

12  A.   Yes, it did.

13  Q.   What happened to end the conspiracy?

14  A.   A search warrant was served at the Kaibob address.

15  Q.   Who lived at that address?

16  A.   Heather Carr, Trammel Thomas, and their children.

17  Q.   Do you remember approximately when that was?

18  A.   I want to say it was somewhere in August of 2012.

19  Q.   Now, before the conspiracy ended, you mentioned that

20  Ms. Carr used some of the fraud money for lawyers' fees.

21  Do you remember that?

22  A.   Correct.

23  Q.   Whose lawyers' fees?

24  A.   Trammel Thomas.

25  Q.   Do you remember when he was in trouble with the law?

Direct - Green

1    A.   At which -- no, I don't remember the definite date,

2    the time frame.

3    Q.   But you do remember that he had a defense attorney?

4    A.   Correct.

5    Q.   So, again, let's go back.  We were talking about this

6    search warrant.

7    A.   Uh-huh.

8    Q.   Remind me, when was it executed, approximately?

9    A.   I want to say around August of 2012.

10   Q.   Did anything happen after that search warrant was

11   executed?

12   A.   Yes.

13   Q.   What happened?

14   A.   I -- on the part of -- I was questioned and then I was

15   visited by the defendants, Trammel Thomas, Heather Carr, at

16   my residence.

17   Q.   Let me start with that first one.  When you were

18   questioned, who questioned you?

19   A.   The Department of Education, the FB -- the federal.

20   Q.   Federal agents?

21   A.   Yes.

22   Q.   Were you truthful to those federal agents?

23   A.   No, I wasn't.

24   Q.   Why not?

25   A.   Because I was scared.

Direct - Green

1    Q.    Scared of what?

2    A.    Of getting in trouble, or -- well, I know I was in

3    trouble when they came, but getting in more trouble.

4    Q.    And even after that, did investigators come to your

5    house a second time?

6    A.    Yes, they did.

7    Q.    And were you truthful to them even then?

8    A.    No.

9    Q.    But those times when you were untruthful to the

10   investigators, was that all before you pleaded guilty and

11   signed your cooperation agreement?

12   A.    Yes.

13   Q.    Now let's go back.  You said you were questioned.

14   A.    Yes.

15   Q.    What else happened after the search warrant was

16   executed?

17   A.    And then I was visited by Trammel Thomas and Heather

18   Carr.

19   Q.    Do you remember approximately what time of day it was

20   when they came?

21   A.    It was later in the day because the sun was down, I

22   know that.  It was dark.

23   Q.    Did Trammel Thomas say anything to you when he came to

24   your house after his house was searched?

25   A.    Yes.

Cross - Green

1    Q.   What did he say?

2    A.   What did they say to you when the investigators were

3    there?  What did they say to you?  What did you tell them?

4         I told him they had these pictures of people, if I

5    recognized them.  He said that -- Trammel Thomas said, How

6    did this happen?  Trying to figure out why the search

7    warrant was served.  And basically just asking what did I

8    say to the investigators.  And, again, what did -- what

9    were their questions?  And who were the people that they

10   showed me?

11   Q.   Describe to the members of the jury his general

12   demeanor.

13   A.   Nervous.

14   Q.   Describe that.  What makes you think he was nervous?

15   A.   Just the moving of the hands, the moving back and

16   forth, and the same questions over in just a different

17   format.

18        MR. FIELDS:  One moment, Your Honor.

19        THE COURT:  Okay.

20        MR. FIELDS:  Thank you, Your Honor.  I have no

21   further questions.

22        THE COURT:  Cross-examination.

23                    CROSS-EXAMINATION

24   BY MR. SMITH:

25   Q.   Ms. Green, if you mentioned this, I missed it and I

Cross - Green

1    apologize.  You indicated you have this marijuana issue

2    where you were convicted of possessing and selling 300

3    pounds.  When was that?

4    A.    That was in late 2011, I believe.  I can't give a

5    definite date.

6    Q.    Okay.  So it was during the same time that you

7    testified you were involved in this --

8    A.    No.

9    Q.    -- fraudulent scheme?

10   A.    Well, testify as -- I'm testifying today.  But did it

11   take place when all this was going on?

12   Q.    Yes.

13   A.    Towards the end of it.

14   Q.    Okay.  Well, I understood you to say that you thought

15   your conviction was in 2011?

16   A.    2011.  And then it was pleaded out in 2012, I

17   believe.

18   Q.    Okay.  And you indicated you'd been involved in this

19   student loan business from sometime in 2010 into 2012.

20   A.    Correct.

21   Q.    So at the same time you're involved in the student

22   loan situation, you're involved in the marijuana situation?

23   A.    That is correct, if my dates are correct, sir.

24   Q.    Okay.  This agreement you have with the Government,

25   you have to cooperate, correct?

Cross - Green

1    A.    Truthfully, yes.  Correct.

2    Q.    And then when your sentencing comes up, you're hoping

3    that Ms. Paluch and Mr. Fields will make a recommendation

4    for a lighter sentence?

5    A.    That's correct, sir.

6    Q.    Okay.  And you were represented in negotiating this

7    agreement with Ms. Merritt?

8    A.    Yes, sir.

9    Q.    I assume that you've probably talked a lot more than

10   you wish about this concept of Federal Sentencing

11   Guidelines?

12   A.    I have, Your Honor -- I mean, sir.  I'm sorry.

13             MR. SMITH:  Almost got elevated.

14             THE COURT:  Careful what you wish for.

15             MR. SMITH:  I understand, Your Honor.

16   BY MR. SMITH:

17   Q.    You have some idea of what the guidelines would

18   indicate your sentence might be, correct?

19   A.    I do.

20   Q.    And that sentence could be anywhere from about four

21   years to about six years.

22   A.    Correct.  46 to 71 months, I believe.

23   Q.    Okay.

24   A.    Or 57 to 71 months.

25   Q.    And how much are you hoping that your sentence will be

Cross - Green

1   reduced?

2   A.   I can't give a definite answer because I don't know

3   what the percentage would be.  At least -- hopefully 20

4   percent.  I don't know exact amount when it comes to

5   federal.

6   Q.   Okay.  I didn't -- I didn't say that you knew.  What

7   are you hoping Ms. Paluch and Mr. Fields recommend --

8   A.   Just any less time than what my guidelines say.

9   Q.   -- to the Court?

10          Okay.  And this recommendation depends on your

11   cooperation?

12   A.   Correct.

13   Q.   And their view of it, correct?

14   A.   Correct.

15   Q.   So if you're saying things that they don't like,

16   that's not going to be cooperation, is it?

17   A.   Correct.

18   Q.   Some time in 2010, you had this conversation with

19   Heather Carr at a barbecue about this student loan scheme.

20   A.   That is correct.

21   Q.   Okay.  Was that over at her house?

22   A.   Yes, it was.

23   Q.   And that's the Pleasant --

24   A.   The Pleasant Drive address.

25   Q.   Pleasant Drive address.

30

Cross - Green

1    A.    Yes.

2    Q.    And it's just you and Ms. Carr.

3    A.    And our children, yes.

4    Q.    Okay.  Mr. Thomas isn't there?

5    A.    Not that I recall for the first conversation.

6    Q.    Okay.  And you get a good understanding of what Carr's

7    idea is?

8    A.    Yes.

9    Q.    Okay.  And am I correct that this whole thing can't

10   work without Heather Carr?

11   A.    That is correct.

12   Q.    And why is that?

13   A.    Because she was able to pull the information from her

14   database at work.

15   Q.    Okay.  So if I'm understanding how this goes about,

16   you can sit down on a computer and access a public website

17   that deals with some state Department of Corrections?

18   A.    Correct.

19   Q.    So maybe Florida?

20   A.    Any -- yeah, any public record, yes.

21   Q.    And you could identify an inmate who was serving a

22   sentence for X number of years?

23   A.    Yes.

24   Q.    And then with -- you'd get that name, correct?

25   A.    Yes.

Cross - Green

1    Q.    And probably a date of birth?

2    A.    Not for sure what if the date of birth was on the

3    public records, but their time.  Their time and their

4    sentence was -- yes, their date of birth is on there.  I'm

5    sorry, yes.

6    Q.    Okay.  And then you would give that information to Ms.

7    Carr?

8    A.    The names, correct.

9    Q.    Okay.  And she would take that information and because

10   of her position with Wells Fargo -- that's who she worked

11   for, right?

12   A.    She worked for Wells Fargo and CarMax.

13   Q.    Okay.  She worked for Wells Fargo as a loan

14   underwriter and supervisor looking at whether or not Wells

15   Fargo would loan customers money to buy CarMax cars,

16   correct?

17   A.    Correct.

18   Q.    Okay.  And she worked from home.

19   A.    Yes, she did.

20   Q.    Okay.  So she would go in and access these private

21   databases to get the inmate's Social Security number and

22   credit history that you'd provide her, correct?

23   A.    That was provided, correct.

24   Q.    All right.  And you would give her an inmate name and

25   date of birth and she would get the other information,

Cross - Green

1    correct?

2    A.    She would be able to pull that information.

3    Q.    Okay.  And then she would give you back all the

4    information so you could fill out the FAFSA?

5    A.    She would give me the list with all the information on

6    it already.

7    Q.    Okay.  And that would be for any number of inmates?

8    A.    Yes.

9    Q.    Okay.  And you would take that list and then set about

10   filling out the paperwork required to get a student loan.

11   A.    That is correct.

12   Q.    Okay.  And you concentrated in Arizona.

13   A.    Yes.

14   Q.    And you used addresses for these inmates that were

15   your residence?

16   A.    Yes.

17   Q.    And another house, I think you said Mobile?

18   A.    1915 East Mobile Lane.

19   Q.    And did you have any relationship to that address?

20   A.    Yes, that's my deceased uncle's house.

21   Q.    Your uncle's house?

22   A.    Yes.

23   Q.    Okay.  When did you actually start filing?

24   A.    In July of 2010 for the summer session.

25   Q.    Okay.  And so in the fall, you started getting cards

33

Cross - Green

1    and money?

2    A.   You received the first money -- if you fill out for

3    the summer, you got the summer money; and then the fall;

4    and if you went, into the spring.

5    Q.   Okay.  And at this point in time, Ms. Carr's still

6    living at the Pleasant --

7    A.   Correct.

8    Q.   -- is it Drive?  I'm sorry, I --

9    A.   I think it's Pleasant Drive.  I can't --

10   Q.   Pleasant Drive address.  Okay.

11        And at some point in time in 2011, you're over at

12   that house, if I understood you correctly, and you're

13   talking with Ms. Carr, and Mr. Thomas is there.

14   A.   At that time, yes.

15   Q.   Okay.  And it's at that time when you're explaining to

16   Mr. Thomas something about filling out these -- this

17   paperwork?

18   A.   The FAFSA part, just the education part, sir.

19   Q.   The education part --

20   A.   Yes.

21   Q.   -- of the FAFSA?

22   A.   Yes.

23   Q.   Okay.  But it's at that meeting?

24   A.   Yes.

25   Q.   At Heather Carr's on Pleasant Drive?

Cross - Green

1    A.    Correct.

2    Q.    And you believe it's in 2011?

3    A.    I believe it's in 2011.  Like I said, the dates are

4    cloudy, so I can't give you a definite.

5    Q.    Okay.  So it's in Phoenix.

6    A.    Correct, in Phoenix.

7    Q.    Okay.  Is it really hot out?

8    A.    It's hot all the time, sir.  I don't -- I'm sorry.

9    Q.    I'm just trying to -- is it in the spring, the summer,

10   the fall?

11   A.    I can't give a definite time.  I'm sorry.

12   Q.    But it's 2011.

13   A.    2011.

14   Q.    Okay.  If I -- if I could go back just a minute to

15   your agreement with the Government.  My memory is that you

16   had some sort of paperwork that you were going to try to

17   find and give the Government.

18   A.    It was the list of the names, correct.

19   Q.    Okay.  And you weren't able to find that, correct?

20   A.    No, I wasn't.

21   Q.    Okay.

22   A.    I've moved since then.

23   Q.    You mentioned the name Mercedes Diaz.

24   A.    Correct.

25   Q.    I understand Ms. Diaz was -- was very close to Heather

Cross - Green

1   Carr.

2   A.   Yes.

3   Q.   Ms. Carr pretty much raised her?

4   A.   Like her daughter.

5   Q.   And that started up in Colorado?

6   A.   Yes.

7   Q.   And then they moved down to Arizona?

8   A.   Heather moved first and then Mercedes followed.

9   Q.   Followed?

10  A.   Yes.

11  Q.   And Ms. Diaz actually lived with Heather Carr for

12  quite a bit of time?

13  A.   A little bit, I believe at the Pleasant Drive, but I

14  don't believe it was a long period of time.

15  Q.   Okay.  She often spent time at Heather Carr's house.

16  A.   Yes.

17  Q.   Okay.  And she would be there when you were there?

18  A.   Yes.

19  Q.   Okay.  Were you all close?

20  A.   Not super close, like me and Heather, but we're

21  okay.

22  Q.   Okay.  You and Heather go back quite a ways?

23  A.   Correct.

24  Q.   Before this got started, you'd known her for some 11

25  years.

Cross - Green

1    A.   I -- 2004, I believe is when I met Heather, or 2005.

2    Q.   Okay.  And you'd been friends ever since.

3    A.   Yes.

4    Q.   Until this happened?

5    A.   Correct.

6    Q.   What was Ms. Diaz's part?

7    A.   The enrolling and then doing homework and receiving --

8    getting addresses -- sorry, addresses.

9    Q.   Okay.  And how do you know that was her job?

10   A.   Just conversation.

11   Q.   With her?

12   A.   Yes.

13   Q.   Okay.  And you knew Heather Carr's job because she

14   told you.

15   A.   Yes.

16   Q.   What was Heather's -- Ms. Carr's Facebook name?

17   A.   Heather Carr.

18   Q.   Heather Bacardi?

19   A.   She changed it before, Heather Carr, Bacardi.

20   Q.   And where did the Bacardi moniker come from?

21   A.   Because she likes to drink Bacardi.

22   Q.   A lot?

23   A.   Yes.

24   Q.   You know this scheme started because of your

25   conversation with Carr in 2010 --

Cross - Green

1    A.    Correct.

2    Q.    -- correct?  That's when you think it started.

3    A.    Correct.

4    Q.    And your part was down in Arizona.

5    A.    Yes.

6    Q.    You didn't file anything at Pikes Peak Community

7    College?

8    A.    Yes, I had a card sent to my address.

9    Q.    Okay.  For Pikes Peak?

10   A.    Yes, for Pikes Peak, sorry.

11   Q.    To your address?

12   A.    In Phoenix at 4630.

13   Q.    Okay.  You didn't have them sent to addresses in

14   Colorado?

15   A.    No.

16   Q.    When you got these debit cards -- and you had to

17   activate them, correct?

18   A.    Correct.

19   Q.    And what was that process?

20   A.    You would just call the number on the card, you know,

21   when you get your sticker, and you would just call and

22   activate it.

23   Q.    Okay.  There's a sticky thing over it and you had to

24   pull that off?

25   A.    Yes.

38

Cross - Green

1  Q.   Okay.  Call the number and whammo, you had 4- or

2  $5,000?

3  A.   Yes.

4  Q.   And then you had to turn that card into the actual

5  cash.

6  A.   Correct.

7  Q.   And you would do that by going to ATMs?

8  A.   Yes.

9  Q.   And that's how you got the 20s?

10  A.   Yes.

11  Q.   Where else would you go to get the cash?

12  A.   Local grocery stores that we have in Arizona.

13  Q.   Okay.  And they have ATMs there or how did that work?

14  A.   Cash backs, so you just buy something and get cash

15  back.

16  Q.   Okay.  Could you pay bills with these cards?

17  A.   Yes.

18  Q.   And did you ever do that?

19  A.   Yes, I did, one time.

20  Q.   One time.

21  A.   Yes.

22  Q.   And that wasn't a very good idea, right?

23  A.   No, it wasn't.

24  Q.   Because then there was a record of your using that

25  card.

                        Cross - Green

1    A.    That is correct.

2    Q.    And it would come back to the bank and --

3    A.    My address is linked to it, yes.

4    Q.    All right.  And then eventually the Government and

5    then everybody knows.

6    A.    Correct.

7    Q.    My understanding, Ms. Green, is that when Carr lived

8    at the Pleasant Drive address, that wasn't very far away

9    from where you lived?

10   A.    Yes, it was.

11   Q.    It was far away?

12   A.    Yes.

13   Q.    Okay.  But you were over there quite a bit.

14   A.    Yes.

15   Q.    Okay.  But then I understand once the move was made

16   when Carr moved to the -- I call it Kaibob, is that --

17   A.    I think we're all having issue with that, I think it's

18   Kaibob.  I don't know --

19   Q.    Kaibob?  Okay, I'll use yours.

20   A.    Okay.

21   Q.    To the Kaibob address.

22   A.    Yes.

23   Q.    You didn't go over there very much?

24   A.    No, I didn't.

25   Q.    Okay.  In fact, as I understand it from one of your

Cross - Green

1   statements, you only went there one time.

2   A.   One time.

3   Q.   So if Ms. Carr moved into that Kaibob house in March

4   or April of 2012, were you only there once after that?

5   A.   Correct.

6   Q.   So your conversations and dealings in this situation,

7   as far as that residence, were almost all at the Pleasant

8   Drive address.

9   A.   Correct.

10  Q.   Aside from your memory of tutoring, if you will, Mr.

11  Thomas on the education part of the FAFSA, you never talked

12  to him about this scheme, did you?

13  A.   Not personally to him, no.

14  Q.   Okay.  He never told you that he filled out FAFSAs,

15  did he?

16  A.   No.  Him, personally, no.

17  Q.   He never told you that he went out and got money from

18  these cards, did he?

19  A.   No.

20  Q.   Those conversations that you had about that were

21  principally with Heather Carr.

22  A.   That is correct, sir.

23  Q.   And you had some of those conversations, certainly to

24  a lesser degree, with Mercedes Diaz?

25  A.   Correct.

41

Redirect - Green

1           MR. SMITH:  May I have a moment?

2           THE COURT:  You may.

3           MR. SMITH:  Thank you very much, Ms. Green.

4           I don't have any further questions at this time,

5    Your Honor.

6           THE COURT:  All right.  Redirect.

7           MR. FIELDS:  Thank you, Your Honor.

8                     REDIRECT EXAMINATION

9    BY MR. FIELDS:

10   Q.   Ms. Green, do you remember being asked questions about

11   your cooperation agreement?

12   A.   Yes.

13   Q.   And you were asked about whether or not it would be

14   cooperation if you say something that the Government

15   doesn't like.  Do you remember that?

16   A.   Yes, I do, sir.

17   Q.   Ms. Green, what happens if you lie under oath because

18   you think that would help the Government?

19   A.   That's a lot more trouble than what I'm in now.

20   Q.   How so?

21   A.   Perjury is -- is -- I'm not saying it's the highest

22   offense, but it's an offense in any courts.

23   Q.   Even if you think that will help the Government?

24   A.   Correct.

25   Q.   So does your agreement involve lying to anyone with

Redirect - Green

1   regard to this courtroom here today?

2   A.   No.

3   Q.   Does it cover -- it covers lies to anyone, right?

4   A.   Yes.  Sorry.

5   Q.   Including lies in responses to defense counsel

6   questions?

7   A.   Yes.

8   Q.   So you had to answer defense counsel questions just as

9   truthfully as you answer our questions; isn't that right?

10  A.   That is correct.

11  Q.   And if the judge asks questions, you would have to

12  answer those questions truthfully?

13  A.   That is correct.

14  Q.   Now, you were also asked about whether or not the

15  scheme could work without Heather Carr.

16  A.   Yes.

17  Q.   Do you remember being asked that question?

18  A.   Yes.

19  Q.   Was it also important to the scheme to get other

20  addresses that could be used?

21  A.   Yes.

22  Q.   Would the scheme have been successful if people hadn't

23  been able to get other addresses?

24  A.   No.  Because, like I said before, it's an alert if you

25  send to some addresses, so multiple addresses needed to be

43

Redirect - Green

1   used.

2   Q.   You used multiple addresses, right?

3   A.   Yes, I did.

4   Q.   Did other members of the conspiracy also use multiple

5   addresses?

6   A.   Yes.

7   Q.   The address you mentioned, this 1915 East Mobile Lane,

8   did you get permission to use that address?

9   A.   It's my -- well, it's a deceased family member, so it

10  was our family house.

11  Q.   Anyone living in the house?

12  A.   No.

13  Q.   You were also asked questions about how frequently you

14  would talk to Thomas.  Did you talk to him all that much?

15  A.   I didn't talk to him much.

16  Q.   Who would you talk to about Thomas' involvement in the

17  scheme?

18  A.   Heather Carr.

19  Q.   Without telling us exactly what was said, how

20  frequently did you have those conversations?

21  A.   We had them frequently, but not like once every other

22  day.  Probably like a couple of times a month.

23  Q.   And during the conspiracy, who did Heather Carr live

24  with?

25  A.   She lived with her children and Trammel Thomas, and at

44

Redirect - Green

1    a time -- well, I can't say because I don't think Mercedes

2    lived there at that time, so, yeah, just her children and

3    Trammel Thomas.

4    Q.   Did Heather Carr appear to be close to Trammel Thomas?

5    A.   Yes.

6    Q.   What made it appear that they were close?

7    A.   Because they were in a relationship and they had

8    children together.

9    Q.   And going back to -- you were asked about, you know,

10   this incident involving Thomas and the FAFSAs.  Do you

11   remember being asked questions about that?

12   A.   Yes.

13   Q.   And defense counsel really tried to pin you down on a

14   date.

15   A.   Yes.

16   Q.   You said it was -- when was it, approximately?

17   A.   Approximately in 2011.  And, like I said before, I

18   cannot give a definite date because I don't want to lie,

19   because I can't recall the date.  I'm sorry.

20   Q.   Do you remember also being asked questions about a

21   period of time in which Trammel Thomas was incarcerated?

22   A.   Yes.

23   Q.   Do you remember approximately when that was?

24   A.   I can't say.  I -- because I know it was several

25   times.  I want to say it was early summer, 2010.  I'm not

45

Redirect - Green

1    for sure.

2    Q.    This incident where you recall seeing Mr. Thomas

3    filling out the FAFSA, did that occur before he was

4    incarcerated or after?

5    A.    Which -- before.

6    Q.    It occurred before?

7    A.    Yes.

8    Q.    Okay.  So you can't remember an exact date?

9    A.    I can't remember the date.

10   Q.    But can you remember a sequence of events?

11   A.    No.

12         MR. FIELDS:  No further questions, Your Honor.

13         THE COURT:  All right.  May this witness be

14   excused?

15         MR. FIELDS:  Yes, from the Government.

16         THE COURT:  All right.  For the defendant?

17         MR. SMITH:  No objection.

18         THE COURT:  All right.  Ms. Green, thank you for

19   your testimony.  You're excused and you may step down.

20         All right, ladies and gentlemen of the jury, I've

21   discussed with the lawyers the sequence of witnesses and

22   this is going to be our last witness for today.  So you're

23   getting released early.  I need to remind you again, please

24   do not do any independent research into or discuss with

25   anyone the facts, the law, the issues or the individuals in

46

1     this case.

2              We're going to attempt to resume tomorrow again at

3     8:45, that is, if I don't have additional issues with the

4     lawyers before that.  But I ask you to please be in the

5     jury deliberation room by 8:35.

6              All right, we'll be in recess until 8:45 tomorrow

7     morning.

8          (Proceedings concluded at 4:20 p.m.)

9

10                              **INDEX**

11    Item                                              PAGE

12                    GOVERNMENT'S WITNESSES

13    **MARCELLE GREEN**
      Direct Examination by Mr. Fields              3
14    Cross-examination by Mr. Smith                26
      Redirect Examination by Mr. Fields            41
15

16

17                    GOVERNMENT'S EXHIBITS

18    EXHIBITS:        Offered    Received    Refused    Stipulated

19    32                            3                    3

20

21

22                       *      *      *      *      *

23

24

25

1                    REPORTER'S CERTIFICATE

2

3        I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled

5    matter.

6        Dated at Denver, Colorado, this 13th day of February,

7    2018.

8

9

10

11

12                    MARY J. GEORGE, FCRR, CRR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25