EXHIBIT A TO THOMAS OBJECTIONS TO PSIR



# UNITED STATES DEPARTMENT OF EDUCATION

## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES



**DATE INTERVIEWED:** November 3, 2016

**PERSON INTERVIEWED:** Heather Carr

**ALSO PRESENT:** Mary Butterton, Assistant Federal Defender
Jessica Leto, Paralegal

**INTERVIEWED BY:** Martha Paluch, Assistant US Attorney
Beth Gibson, Assistant US Attorney
Sandra Ennis, ED-OIG Special Agent

**LOCATION:** U.S. Attorney's Office
1225 17th St., 7th Floor Conference room
Denver, Colorado 80202

**CASE NUMBER:** 12-080234

**CASE NAME:** Pikes Peak Community College Fraud Ring

After being advised of the nature and purpose of the interview and the identities of all present, Heather Carr, voluntarily provided the following information, summarized as follows:

In approximately July 2015, Carr moved from Arizona to Virginia Beach, Virginia, to live with her oldest daughter Ayanna Brown, formerly Ayanna Jones. Brown moved to Virginia because her husband is in the Navy. He is currently deployed and will not return home until January 2017. Brown is currently attending college and is enrolled in a pharmaceutical internship.

The following are Carr's four children: Ayanna (21), Kaira (16), Milani (5), and Tru (1). Aubrey, who is Ayanna's friend, has resided with Carr since she was 15.

Carr was a mother figure to Mercedes Diaz also. Carr and Diaz's biological mother both worked at a car dealership. Diaz's mother was prepared to give up Diaz to the state because Diaz was constantly in trouble. Carr offered to take her in. At the time, Diaz was in junior high at Panorama Middle School. On Christmas Eve, Diaz stole Carr's vehicle and was arrested. While in custody, Diaz's brother was murdered. Carr's daughters are like sisters to Diaz.

Carr was born in Virginia but moved to Colorado Springs, Colorado, when she was approximately ten years old. Shortly after her family moved, her mother divorced and remarried. Carr ran away from home and stopped attending school in junior high. Carr got pregnant at 17 and obtained her GED during this time period. Omar Jones, who is the father of her two oldest daughters, was her legal guardian.

In approximately 1997, Carr became familiar with the financial aid process when she attended Pikes Peak Community College (PPCC) and received federal student aid (FSA).

In approximately 2003, Carr moved from Colorado to Arizona and resided there until summer 2015.

Prepared by: Ennis, Sandra                                    Date Prepared: November 4, 2016

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)

DEFENDANT'S
EXHIBIT

Interview of Heather Carr, November 3, 2016                    12-080234

people to do stuff for him. Pickens resided at 1418 Rushmore at various times but Carr could not recall the exact dates. Thomas briefly resided in Pickens garage at 1418 Rushmore. Thomas stayed at other places and also resided at an apartment on 3820 Radiant Drive in Colorado Springs, Colorado.

Pickens was not aware this address was being used for the mailing of debit cards in the names of prison inmates. The mailbox was located at the end of the street. Carr and Thomas would drive-by and pick up student inmate mail from the mailbox. The mailman delivered any and all names to this address.

There was a period of two to three days when Carr knew the Higher One debit card would be delivered. Once the school application was accepted, the student received an email letting them know that a green Higher One envelope would be arriving in the mail. This envelope contained the debit card.

Carr was aware of inmate Robert Pickens. Carr conducted the DOC query in the name Pickens and chose this name because she wanted to make sure the card was delivered to the mail box. Carr thought this card was initially rejected or returned by the postal service.

Prior to moving to Arizona, Carr resided at 2441 Lexington Village Lane, Colorado Springs, Colorado. Her friend, Michelle Grant (aka Michaela) resided at 2372 Lexington Village Lane, Colorado Springs, Colorado. Carr asked Grant to help forward her mail to Arizona. Carr still had the key to her old mailbox.

The postal service would only deliver the last name Grant so they had to use inmates with the last name of Grant at this address. Grant never checked her mailbox. The mailboxes were located in a central area and the backside of the boxes could be removed. Carr, Diaz, Green, and/or Thomas removed the back side of the mailbox on their trips to Colorado and obtained the mail in the inmates' names.

During the 2010 timeframe and prior to Thomas' arrest, Thomas asked Carr to query social security numbers and he would assist in the retrieval of student mail. Carr does not know if he knew how to complete and submit an electronic FAFSA. Both Thomas and Sanders resided at 3820 Radiant Drive, Colorado Springs, Colorado. Carr saw Sanders' signature in the notarized documents provided to PPCC.

Green obtained her own addresses to use. Carr confirmed the Blackhawk address was her step-brother, Matthew Sander's residence. Diaz was responsible for opening private post office boxes and using the Dragoon and 724 W. Knox Court addresses. The Pleasant or Kaibab addresses were never used to receive any school or Higher One information.

People were directed to send the school mail or Higher One debit card to Carr's private mail box address at 975 E. Riggs Road in Chandler, Arizona. Thomas directed Kimmisha Mullett to send debit cards that she received to the private mail box address. Carr does not know about the Oakland Street address in Aurora, Colorado.

Mullett and Thomas had a business together. The business was called 911 Design and Printing. Carr had nothing to do with the business and never met Mullett. Carr later said she may have met Mullett on one or two occasions. Mullett and Thomas shared text messages between each other about where to send the Higher One mail because Mullett's address was used to receive student loan mail in the names of inmates.

Interview of Heather Carr, November 3, 2016                                    12-080234

Michael Cox, Thomas' cousin, resided at the Rice Drive address in Colorado Springs, Colorado. Carr hates Cox and does not speak to him. Carr believes Thomas and Cox talked about the scheme with each other.

Carr was not aware that Arizona addresses were being used to apply for FSA to attend school at PPCC. It was her understanding that this could not be done and that is why they used the mailing addresses in Colorado. In seeing the discovery, the Arizona addresses were new to Carr.

Once the Higher One cards were forwarded to Arizona, Diaz and Green would get people they knew to drive around and withdraw money from the debit cards at various ATM locations until all of the funds were withdrawn from the debit cards. Initially, they did it themselves but it became exhausting because there was a daily withdrawal limit on the debit cards. Diaz and Green would get half of whatever amount was on the debit card.

The cards were used primarily to withdraw funds but there were occasions when the cards were used for purchases. When a purchase was made, they requested additional cash back on the transaction. Thomas and Carr were also involved in withdrawing funds from the debit cards at various ATM and store locations. The bulk of the funds were split between Carr, Diaz, Green, and Thomas. A fee of usually $10 was paid to the "meth-heads" that drove around to the various ATM machines.

Thomas did not reside in Arizona until approximately February 2012. Thomas visited the 1351 Pleasant address on his trips to Arizona but he never resided there. In 2012, Carr moved from the 1351 Pleasant address to 1822 E. Kaibab. Carr and her children resided at the 1822 E. Kaibab address for approximately two weeks prior to Thomas coming to Arizona and moving in with them.

During Thomas' incarceration between approximately January 2011 through November 2011, Thomas was aware of the scheme. Carr and Thomas' conversations about the scheme were limited due to the possibility of his jail calls being recorded. Carr used FSA funds obtained in the names of inmates to pay for Thomas' legal fees. Approximately $10,000 in FSA funds were used to pay for Thomas' attorney. Carr also deposited FSA funds into Thomas' inmate trust account (commissary). It would be a fair assessment that Carr submitted more than ten FAFSA's, considering this money was used to pay for Thomas' attorney fees.

In discussing the Tempe Police car stop, Thomas admitted to Carr that he was seeing another girl. The girl threatened to call Carr at 1:00 a.m. and tell her about Thomas' cheating. The girl had the debit cards and laptop at her house so Thomas went to the girl's house to retrieve these items. On his way home from the girl's house, Thomas was pulled over with the laptop and debit cards. Thomas was driving a vehicle registered to Carr. Thomas used the vehicle, not Carr.

Carr could not find a logical reason why he would still have cards from a long time ago. Higher One mailed the debit cards prior to the disbursement of any FSA funds. In seeing the discovery, Carr noted that some of the cards were never activated. Carr does not understand why someone would have kept a card that was not activated. Green kept the majority of the debit cards and she owned a pink laptop at one time. Carr wondered if that is why her relationship with Green became awkward, because Green and Thomas were messing around with each other.

The four of them took part in filling out the various loan documents for the schools. Diaz was primarily responsible for taking these student loan records to various locations where they could

Interview of Heather Carr, November 3, 2016                                    12-080234

be faxed to the school, such as the FedEx location. They also had the "meth-head people" assist with this. There were times with Green personally hand delivered the documents to the school.

The four of them took part in the electronic submission of school enrollment applications in the names of various inmates.

Carr has no idea how school loan records were faxed to PPCC from a Wells Fargo location. Carr has never worked in a Wells Fargo branch building. She either worked from home or at a leased building while employed with Wells Fargo.

The social security number searches in LexisNexis were only done by Carr.

Prior to 2012, Carr personally saw Diaz and Green fill out documents but she never personally saw Thomas submit FAFSA's or fill out loan records for the school. She would be able to verify his handwriting if shown documents.

In 2012, Thomas wanted more money when he was released. When Thomas resided with Carr in 2012, he submitted FAFSA's and did coursework to ensure FSA funds were released. Carr recalled him saying he had a psychology paper due. The four of them knew they had to show attendance in order for funds to be released. Thomas was also involved in the submission of handwritten loan records to the school and the withdrawing of FSA funds from ATM locations. Carr knew he did this but she was never with him when he did it. Carr admitted that Thomas was involved.

Carr worked all day and did not have a lot of time to spend on the scheme. They all communicated amongst each other about coursework and the four of them took part in logging in to record attendance. Carr volunteered to do coursework that she was interested in. Specifically, Carr recalls Green complaining about having four essays due. One was a psychology assignment about Freud. Carr volunteered to complete that assignment.

The four of them enrolled in courses that interested them. Green, having a degree in criminal justice, chose a lot of criminal justice courses.

At this point during the meeting, Carr was provided a copy of the search warrant sketch. Carr annotated what the various rooms identified in the sketch were (Attachment A).

The day the search warrant was executed, Carr was asleep on the couch. At first, Carr thought her daughter, who was getting ready for school, was playing her music too loud. Carr knew that law enforcement was outside because they were shining lights on the house. Initially, Carr was not sure if law enforcement was trying to come in their house. A canine cop resided across the street from them. Carr went to brush her teeth and put on makeup, knowing she would need to go outside. She went upstairs to look out the window and flash bang devices were heard in the backyard.

During this timeframe, she went to her office where she had a notebook with information related to the inmates' school information written down. Rather than shedding the records in the shredder she had in her office, she tore the pieces and flushed them down the toilet in the master bathroom. She did this because she envisioned agents spending hours piecing together the shredded records. She flushed approximately three pages of information.

The information contained in the notebook was for organizational purposes. It was a checklist used to keep track of the status of FAFSA's, school applications, and homework. Sometime

Interview of Heather Carr, November 3, 2016                    12-080234

during all of this Thomas came up the stairs. She does not know what he was doing during this timeframe.

Carr does not know why Thomas broke his cell phone. It was an old phone that he was not using. Thomas was downstairs for a portion of the time that Carr was upstairs. Thomas later told Carr that he broke the phone because he did not want Carr to find out about other "bitches."

Initially, Carr did not manage the organization of the inmates' school information. She just started doing that right before the search warrant was executed, once the school's fall semester started.

After Thomas's arrest and the search warrant, Carr and Green became distant. Carr assumed Green was jealous of Carr's relationship with Thomas and the lifestyle they were living. Carr wondered if Green and Thomas were having an affair. Carr thinks Green kept the debit cards and that the pink laptop belonged to Green.

At the time of Thomas' arrest, Thomas told Tempe PD arresting officers that marijuana located in the vehicle belonged to Carr's daughter, Ayanna. When told this, Carr responded that Ayanna did not use marijuana but Thomas did. Marijuana was never used in front of the children. Green used marijuana.

Carr related the following in reviewing photos taken during the search warrant and photos obtained from seized computers (Attachment B):

SW_00001436:   The photo was 1822 E. Kaibab

SW_00000218:   Carr purchased the mural located in the master bedroom. She got the idea from a Jay-Z song.

SW_00000214:   The ACER laptop in the photo was her daughter's Milani. The iPad tablet was her other daughter's Kaira. Green always lost stuff, including her computers. Green used the ACER laptop and other computer devices at Carr's residence. The ACER laptop was used to activate inmate debit cards, including Higher One debit cards. There was the probability that any one of the four of them (Carr, Diaz, Green, and Thomas) could have used the ACER laptop to do this.

SW_00000216:   This was a photo of Thomas' office and his computer.

SW_00000217:   The photo was a close-up of the computer in Thomas' office. Carr did not use this computer because Thomas would not give her the password. The computer's profile login ID was King.

SW_00000223:   Carr confirmed these were the torn notes she tried flushing down the toilet.

SW_00000219:   The broken phone was Thomas' old phone located in his portion of the master bedroom closet. Thomas had a box of miscellaneous items he brought with him when he moved from Colorado. There were other old phones in the box.

SW_00000220:   Carr confirmed the close-up photo of the broken phone was Thomas'.





# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES

DATE INTERVIEWED:   April 12, 2017

PERSON INTERVIEWED:  Marcelle Green

INTERVIEWED BY:     Special Agent Sandra Ennis
                      Postal Inspector Sonia Hacker

LOCATION:           111 W. Monroe Street
                      Phoenix, Arizona

CASE NUMBER:     12-080234

CASE NAME:       Pikes Peak Community College

After being advised of the identities of the interviewing agents, Marcelle Green was advised of her rights. Upon learning of the purpose of the interview, Green voluntarily signed the attached Advice of Rights Waiver form and consented to the recording of the interview. Green voluntarily provided the following information:

In approximately November 2016, Trammel Thomas came to Green's uncle's home at 4630 S 21st in Phoenix, Arizona. Thomas was looking for Green and left his phone number with her uncle. Green never contacted him. She did not know what Thomas wanted to talk about after so much time had passed. Green's Uncle Elmer told her this information.

In approximately October 2016, Carr called Green about the discovery in the student loan fraud case. Carr wanted to know why Green snitched on her. Green told Carr the interviewing agents asked her questions and she answered them. Green got nervous because she realized information she told investigators was made public.

In 2012, Green was interviewed by investigating agents. Green never heard any more until approximately four or five years later when agents went to her auntie's house to serve Green with a letter. She met the agents at QT. Green was then served with another letter and again met the agents at Circle K.

Shortly after receipt of the second letter, Green's car was repossessed and she lost the letter that required her attendance in Colorado. She contacted the justice department and they could not locate her information.

Green realized that failing to respond to the target letters and trial subpoena did not look good.

The student loan fraud was Carr's idea. Green admitted to allowing the use of her address to receive debit cards. Green would throw away any other mail that did not have a debit card. Green was told to be on the lookout for various names. At the time, Green was enrolled in school and she has since graduated.

Carr was the person who had access to Accurint through her employment at Wells Fargo. Both Thomas and Carr were from Colorado and Green assumed that is how the two were able to use

Prepared by: Sandra Ennis

Date Prepared: April 25, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)

TTHOM EX A, P.006



# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES



**DATE INTERVIEWED:**     August 29, 2017

**PERSON INTERVIEWED:**   Marcelle Green

**ALSO PRESENT:**         Jeralyn Merritt, Defense Attorney

**INTERVIEWED BY:**       Martha Paluch, Assistant US Attorney
                          Bryan Fields, Assistant US Attorney
                          Sandra Ennis, ED-OIG Special Agent

**LOCATION:**             U.S Attorney's Office
                          1801 California Street, 16th Floor Conference Room
                          Denver, Colorado 80202

**CASE NUMBER:**          12-080234

**CASE NAME:**            Pikes Peak Community College Fraud Ring

After being advised of the nature and purpose of the interview and the identities of all present, Marcelle Green, voluntarily provided the following information, summarized as follows:

Green was born and raised in Phoenix, Arizona. Green attended high school in Sacramento, California, where she played volleyball. Green later moved back to Arizona and has resided there ever since.

Green received her associate's degree in liberal arts from Gateway College in Phoenix, Arizona. She wants to pursue her education in social work but Green has not had time because of her three sons. At some point, she wants to attend Arizona State University (ASU). Her oldest son (20) is currently enrolled in school to become a commercial pilot. Her middle son (17) is a senior in high school and plans to attend Northern Arizona University (NAU). Her youngest is 16 years old and is a junior in high school. Green is not married.

While enrolled at Gateway, Green obtained approximately $14,000 in federal student aid (FSA) in the form of loans. She received her student aid refund in the form of a prepaid debit card and confirmed the card was called Citi Prepaid.

Currently, Green resides at 4424 E. Baseline Road, #2072 in Phoenix, Arizona and is employed full time at Granger. Up until last week, she also worked the night shift at Alpha Connect. Prior to her recent employment with Granger, Green was employed at Alpha Connect for the last three years.

Green resided at 1915 E. Mobile Lane, Phoenix, Arizona, when she was in grade school. This house has been owned by her family since approximately 1940. Green's Uncle Jimmy Green resided at the residence. Her Uncle Jimmy is now deceased.

The 4630 S. 21st Place, Phoenix, Arizona, address is owned by her Aunt Hazel Green. Green's aunt did not reside at the address when Green was residing there with her three sons. Green's Uncle Elmer Green resided in the studio type structure that is located behind the house.

Prepared by: Sandra Ennis                                    Date Prepared: August 29, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)

Interview of Marcelle Green, August 29, 2017                                   12-080234

Green's prior criminal history includes a felony theft charge in 2000, a felony robbery charge in Los Angeles, California in 2007, and a felony marijuana possession charge in 2010.

Approximately 11 years ago, Green met Heather Carr through Green's son's father, Roderick Smith. Smith is her son's father and Carr was dating Smith. Green was no longer involved with Smith so she had no issue with Carr dating Smith. Carr and Green met and became friends when Smith went to jail and Carr called Green. The two became close and Green's son went to Carr's house a lot.

Green met Trammel Thomas when Thomas moved to Arizona to live with Carr. Carr was still residing at the 1351 Pleasant address in Chandler, Arizona. Thomas was out on parole and received permission to serve out the remainder of his sentence in Arizona. Green met Thomas while Thomas and Carr were residing at the Pleasant address.

Green met Mercedes Diaz through Carr. Carr was a mother figure to Diaz. Diaz kept getting into trouble in Colorado and moved to Arizona because of Carr. Carr, Diaz, and Thomas had all lived in Colorado prior to living in Arizona.

The student aid fraud scheme and using the identities of inmates was Carr's idea. Carr had the ability to obtain the personally identifiable information (PII) of inmates through a system that Carr had access to at her work.

Carr and Green discussed how the scheme would work. Carr initially brain stormed the idea and presented it to Green. Green agreed with Carr and told her, "Yeah, I think we could make this work." The idea was brought up when the two of them were discussing how to make money. Green was struggling financially with her three sons. Green often spent time at Carr's address. Carr's and Green's kids were close and the two families spent the holidays together. Green believes the initial conversation occurred at Carr's house during a barbeque for the Easter holiday.

In discussing the scheme, it was Carr's idea to use inmate's identities to apply for FSA. Since Carr, Diaz, and Green had all received financial aid, they knew how the FSA application process worked.

Green did not know what conversations regarding the scheme Carr had with Thomas while in Colorado. Green knew Thomas had knowledge about the scheme while in Colorado because Carr told Green this.

The rationale behind using inmate identities was because the inmate could prove they were in prison and therefore would not have any liability for paying back the FSA. There was never a story or idea to use inmate identities because they were bad people or because of a story on TV. Being a felon herself, Green does not judge or hold anything against felons.

Prior to using inmate identities, Green previously assisted in signing up her ex-boyfriend, Jesse Rowsely. Rowsely gave Green money for her assistance. Green also provided assistance to her cousin by telling her what steps were required to obtain FSA.

Green did not recall a conversation with Carr or Thomas about how it was a pain to enlist individuals in signing up for FSA and sharing in the FSA funds.

Green and Carr discussed how to submit a certain amount of applications in order to get money. Green had three kids and was in school herself so she needed the money. Green was all for

Interview of Marcelle Green, August 29, 2017                                        12-080234

Carr told Green that Thomas and Sanders became close while the two were in prison together and that Sanders provided an address to be used in the scheme.

In October or November 2016, after Carr, Diaz, and Thomas were charged, Carr reached out to Green through Facebook after turning herself in. Carr wanted to know why Green snitched on her. Carr told Green that she should have remained quiet and not said anything. Carr told Green that she cannot be helped if she perjures herself. Also during this timeframe, Green's Uncle Elmer told Green that Thomas showed up looking for her at Aunt Hazel's house on 4630 S 21st Place. Her uncle described Thomas as tall and dark and said he left his name. The individual left his phone number with her Uncle Elmer, requesting that Green contact him. Green can check to see if her uncle still has the phone number. Green will also look through her belongings to see if she has Thomas' number. Green does not have contact information for Thomas in her phone.

Green has been contacted by Carr on three occasions. Once after Carr was charged, when she contacted Green through Facebook, the second time was after Carr saw Green's written statement to interviewing agents, and the third time was after Carr had seen all of the discovery. Carr told Green that she was upset because she thought the two were best friends.

Green met Duncan through Carr. Duncan was brought to Arizona because she was involved in one of Thomas' arrest. They did not want Duncan to be called as a witness to testify against Thomas. Thomas and Duncan had a relationship. Duncan began taking escorting calls as soon as she moved to Arizona. Green assumed she was doing the same thing in Colorado and seemed comfortable hopping into it. Duncan eventually ran off with one of her escorting clients. Duncan escorted for a couple of months while in Arizona.

Carr impersonated Thomas' sister and brought Duncan to Arizona because the police were looking for Duncan. Carr posted online escorting advertisements for Duncan and Diaz and Green took Duncan to the escorting calls. Duncan was provided with a throw-away phone so that Duncan was available for calls. Carr told Green to give Duncan money for food and take the rest of the money and bring it to Carr. Green was allowed to take money from the escorting calls for gas and Duncan's toiletries.

Green did not meet Michelle Grant. She was Carr's best friend from Colorado Springs, Colorado. Green possibly saw a photo of Grant on Facebook through her Facebook friendship with Carr. Green thought Grant allowed Carr to use her address for the receipt of school records and debit cards.

Sanders also provided an address or addresses for the receipt of school records and debit cards. Green has never heard of the following names: Vanessa Lopez, Terrell Smith (aka Swiss), La Tania Pickens, Lola Thomas, the name of Matthew Sander's mother, or Michael Cox. Green thought the name Kimmisha Mullet sounded familiar. Green heard that Thomas had been married and thought the name Lola Thomas sounded familiar.

Thomas was involved in looking up inmates and received money from the debit cards from Carr. Carr told Green this information. Green was also present during the trial run hang out where Carr and Green helped show Thomas how to fill out FAFSA's at this trial run meeting.

Green heard from both Carr and Duncan that Thomas took Duncan to PPCC.

While Thomas was in jail, Carr paid Thomas' attorney's fees and put money on Thomas' inmate account. Green knew this from conversations with Carr.

Attachment 3

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLORADO

3    Criminal Action No. 16-cr-0054-WJM-2

4    UNITED STATES OF AMERICA,

5    Plaintiff,

6    vs.

7    TRAMMEL THOMAS,

8    Defendant.

9    ------------------------------------------------------------

10   REPORTER'S PARTIAL TRANSCRIPT
     (Jury Trial - Day 2)
11   TESTIMONY OF MARCELLE GREEN

12   ------------------------------------------------------------

13   Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
     Judge, United States District Court for the District of
14   Colorado, commencing at 3:29 p.m., on the 28th day of
     November, 2017, in Courtroom A801, United States
15   Courthouse, Denver, Colorado.

16

17   APPEARANCES

18   MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
     Attorneys, 1801 California Street, Suite 1600, Denver,
19   Colorado 80202, appearing for the plaintiff.

20   DANIEL T. SMITH, Attorney at Law, 4582 South Ulster
     Street, Suite 1400, Denver, Colorado 80237 and
21   THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
     Suite 1400, Denver, Colorado 80202, appearing for the
22   defendant.

23   MARY J. GEORGE, FCRR, CRR, RMR
     901 19th Street, Denver, Colorado 80294
24   Proceedings Reported by Mechanical Stenography
     Transcription Produced via Computer

25

6

Direct - Green

1  Q.    So does your plea agreement in this case have any

2  effect on the outcome in that case?

3  A.    No, sir.

4  Q.    When did you first agree to be part of the conspiracy?

5  A.    Somewhere in 2010.  I can't give you an exact date,

6  I'm sorry.

7  Q.    Who approached you about becoming part of the

8  conspiracy?

9  A.    Heather Carr.

10  Q.    Where did that happen?

11  A.    At her location in Pleasant Drive.

12  Q.    Pleasant Drive where?

13  A.    In Chandler.  I believe Chandler, Arizona.

14  Q.    Describe to us what happened.

15  A.    Conversation at a barbecue, I believe it was around

16  Easter -- yeah, Easter, and just a discussion on how to get

17  money fraudulently by filing false claims.

18  Q.    After that discussion, how long were you part of the

19  conspiracy?

20  A.    To roughly about 2012.

21  Q.    While you were a member of the conspiracy, who were

22  the other members of the conspiracy?

23  A.    Mercede Diaz, Heather Carr and Trammel Thomas.

24  Q.    Now, you testified, you pleaded guilty to a scheme to

25  defraud the Government.  Did you file false claims with the

18

Direct - Green

1   A.   To the -- for me, I know me, myself.

2   Q.   Did she give it to anyone else?

3   A.   I can't speak for that.

4   Q.   When she gave it to you, how would she give it to

5   you?

6   A.   On a paper -- on a lined piece of paper, regular

7   subject paper.

8   Q.   Describe to us what would be on a typical sheet of

9   paper from Heather Carr.

10  A.   The names, the birth dates, and the address -- I mean,

11  sorry, the names, the birth dates, and the Social Security

12  numbers.

13  Q.   And what would you do with that information?

14  A.   I would submit that into FAFSA.

15  Q.   Now, let's talk about Trammel Thomas.  You said he was

16  part of the conspiracy.

17  A.   Correct.

18  Q.   What was his role?

19  A.   His role -- I can't say if he did homework and I can't

20  say if he had a major role, but he had some role in it.

21  Q.   Well, did you ever see him participating in the

22  conspiracy?

23  A.   Yes.

24  Q.   What did you see him doing?

25  A.   The FAFSA part, just one time.

22

Direct - Green

1    A.   It was part of the -- to process the fraudulent FAFSAs

2    and the school applications.

3    Q.   How was it part of the process of filling out these

4    fraudulent FAFSAs?

5    A.   Because of the names, when you get the names and the

6    information was already there.  So, like I said, I can't

7    recall the names.

8    Q.   When you say the information was already there, what

9    information?

10   A.   The Social Security numbers and the birth dates,

11   sorry.

12   Q.   Did you see Mr. Thomas participate in a scheme at any

13   other time?

14   A.   No.

15   Q.   How often would you see the defendant during this time

16   period?

17   A.   I wouldn't see him as much as I seen Heather and

18   Mercedes, but I've seen him several occasions.

19   Q.   So who would you say was your major contact within the

20   conspiracy?

21   A.   Heather Carr.

22   Q.   How much money did you get from the scheme?

23   A.   I roughly would say a little -- in the $20,000 range.

24   Q.   What did you do with that money?

25   A.   Paid for bills and my financial living situations and

30

Cross - Green

1    A.    Yes.

2    Q.    And it's just you and Ms. Carr.

3    A.    And our children, yes.

4    Q.    Okay.  Mr. Thomas isn't there?

5    A.    Not that I recall for the first conversation.

6    Q.    Okay.  And you get a good understanding of what Carr's

7    idea is?

8    A.    Yes.

9    Q.    Okay.  And am I correct that this whole thing can't

10   work without Heather Carr?

11   A.    That is correct.

12   Q.    And why is that?

13   A.    Because she was able to pull the information from her

14   database at work.

15   Q.    Okay.  So if I'm understanding how this goes about,

16   you can sit down on a computer and access a public website

17   that deals with some state Department of Corrections?

18   A.    Correct.

19   Q.    So maybe Florida?

20   A.    Any -- yeah, any public record, yes.

21   Q.    And you could identify an inmate who was serving a

22   sentence for X number of years?

23   A.    Yes.

24   Q.    And then with -- you'd get that name, correct?

25   A.    Yes.

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated at Denver, Colorado, this 13th day of February, 2018.

*Mary J. George*

MARY J. GEORGE, FCRR, CRR, RMR

1

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLORADO

3    Criminal Action No. 16-cr-0054-WJM-3

4    UNITED STATES OF AMERICA,

5    Plaintiff,

6    vs.

7    MERCEDES DIAZ,

8    Defendant.

9    ------------------------------------------------------------

10                    REPORTER'S TRANSCRIPT
                        (Sentencing)

11   ------------------------------------------------------------

12

13        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14   Judge, United States District Court for the District of

15   Colorado, commencing at 10:33 a.m., on the 12th day of

16   January, 2018, in Courtroom A801, United States Courthouse,

17   Denver, Colorado.

18
                          APPEARANCES
19
         MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
20   Attorneys, 1801 California Street, Suite 1600, Denver,
     Colorado 80202, appearing for the plaintiff.
21
         SIDDHARTHA H. RATHOD, Rathod Mohamedbhai, LLC, 2701
22   Lawrence Street, Suite 100, Denver, Colorado 80205,
     appearing for the defendant.
23
                 MARY J. GEORGE, FCRR, CRR, RMR
24           901 19th Street, Denver, Colorado 80294
             Proceedings Reported by Mechanical Stenography
25              Transcription Produced via Computer

11

1    History Category to be 6, which yields an advisory

2    guideline sentencing range of 92 to 115 months, a period of

3    supervised release of one to three years, a fine range of

4    10,000 to $100,000, and a special assessment of $100.

5           Does counsel agree the Court has correctly

6    calculated the guideline sentencing range in this case

7    before the application of any departure or variance?

8           MS. PALUCH:  Correct, Your Honor.

9           THE COURT:  Okay.

10          MR. RATHOD:  Yes, Your Honor.

11          THE COURT:  All right.  Thank you, counsel.

12          All right.  The -- I'll next take up the

13   Government's motion for a downward departure for

14   substantial assistance, ECF 261.  Ms. Paluch, anything you

15   wish to add to your written submission?

16          MS. PALUCH:  No, Your Honor.

17          THE COURT:  All right.  Mr. Rathod, do you wish to

18   be heard on this?

19          MR. RATHOD:  Not on the Government's --

20          THE COURT:  Okay.  For the reasons set forth in

21   the motion, I grant the Government's motion for a downward

22   departure.  I expressly find that the statutory purposes of

23   sentencing are best served by the imposition of a reduced

24   custodial sentence pursuant to Section 5K1.1 of the

25   guidelines.  Specifically, I find that Ms. Diaz has

1   provided truthful and credible information as to her

2   involvement with this offense and the involvement of

3   others, the defendant's information was significant and

4   helpful to the Government's ongoing investigations and

5   prosecutions of criminal activities within the District of

6   Colorado and elsewhere.  More specifically, it was Ms.

7   Diaz's cooperation with the prosecution and law enforcement

8   which provided the Government with the grounds and evidence

9   it needed in order to charge codefendant Marcelle Green in

10  this case.

11      As a result of granting the Government's motion,

12  subject to my ruling on the defendant's motion for

13  departure and the defendant's motion for a variant

14  sentence, I will sentence the defendant to a range centered

15  on the Government's requested departure of 35 percent off

16  the bottom of the guideline sentencing range, which is

17  approximately 16 months.

18      All right.  At this time, I'll take up that

19  portion of the defendant's motion at ECF 255 which seeks a

20  departure based on the grounds that her criminal history

21  category of VI substantially overrepresents the seriousness

22  of her criminal history pursuant to guideline Section

23  4A1.3(b).  Mr. Rathod.

24      MR. RATHOD:  Thank you, Your Honor.  I'm familiar

25  with the Court's practices and so I'm not going to rehash

36

1      THE COURT:  All right, but you haven't answered my

2  question --

3      MS. PALUCH:  Exactly right.

4      THE COURT:  Maybe I keep interrupting and

5  preventing you from answering my own question, which is:

6  How does the Government view the relative culpability of

7  the four defendants?

8      MS. PALUCH:  Right.  And I have a difficult time

9  answering that because it's our view that with -- that they

10  all four made it happen, all four of them made it happen.

11  I think an argument could be made that Carr is the most

12  culpable because of her access to that database.

13      THE COURT:  Could be made or should be?  I mean,

14  clearly the Government doesn't view Ms. Diaz as undertaking

15  a role as significant and major and culpable as Ms. Carr.

16      MS. PALUCH:  We do not, Your Honor.  And that's --

17  as you saw in the plea agreement, we agreed with the

18  two-level reduction for minor role in the offense.  So

19  clearly if you were to rank the four, I would say Ms. Diaz

20  is No. 4.  I think Ms. Green was much more involved than

21  Ms. Diaz.  And Mr. Thomas, our view, is that he has a

22  history of manipulating women and these three women we

23  believe were manipulated and that he benefited, but that

24  the other women probably did more of the work, did have

25  evidence --

37

```
 1              THE COURT:  I thought your theory was Ms. Diaz was
 2    manipulated by Ms. Carr, not by Mr. Thomas.
 3              MS. PALUCH:  That's correct.  That's correct, Your
 4    Honor.  I stand corrected.  I don't -- we don't have
 5    evidence of Mr. Thomas' direct involvement with Ms. Diaz.
 6    But I do think Mr. Thomas benefited just as much as anyone
 7    else in this scheme and there is information that he was at
 8    the computer doing the work that he did.
 9              So I don't know that I'm answering your question.
10    I guess I would put Ms. Carr at the top, I would put Ms.
11    Diaz as No. 4, Mr. Thomas and Ms. Green in the middle.  I
12    hope I've answered your question --
13              THE COURT:  Yes, you have.  Thank you.
14              MS. PALUCH:  For those reasons we are seeking a
15    sentence, as we've stated at the beginning of this
16    hearing.
17              THE COURT:  So 34 months incarceration?
18              MS. PALUCH:  33 -- 33 months, Your Honor.
19              THE COURT:  Oh, 33.  Okay.
20              MS. PALUCH:  Yes.
21              THE COURT:  Thank you.
22              MS. PALUCH:  Thank you.
23              THE COURT:  Mr. Rathod, it's your motion, I'll
24    give you an opportunity for a brief reply.
25              Ms. Diaz, you can remain seated.
```

70

1                    REPORTER'S CERTIFICATE

2         I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled

4    matter.

5         Dated at Denver, Colorado, this 21st day of February,

6    2018.

7

8

9

10        _                                                 _

11                   MARY J. GEORGE, FCRR, CRR, RMR

12

13

14

15

16

17

18

19

20

21

22

23

24

25




# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES

**DATE INTERVIEWED:** February 10, 2017

**PERSON INTERVIEWED:** Mercedes Diaz

**ALSO PRESENT:** Siddhartha Rathod, Defense Attorney

**INTERVIEWED BY:** Martha Paluch, Assistant US Attorney
Sandra Ennis, ED-OIG Special Agent
Sonia Hacker, Postal Inspector

**LOCATION:** Colorado Springs Post Office
201 E Pikes Peak Avenue
Colorado Springs, Colorado 80903

**CASE NUMBER:** 12-080234

**CASE NAME:** Pikes Peak Community College Fraud Ring

After being advised of the nature and purpose of the interview and the identities of all present, Mercedes Diaz, voluntarily provided the following information, summarized as follows:

Diaz met Heather Carr at the Phil Long Ford car dealership in Colorado Springs, Colorado. Both Carr and Diaz's mother were employed at the dealership. Diaz was expelled from school when she was approximately 11 or 12 years old so she would hang out in the basement of the dealership while her mother worked. Diaz enjoyed hanging out with Carr because she was one of the youngest people working there.

Carr, who was 24 years old at the time, offered to take Diaz under her care because Diaz was taken out of her mother's home due to issues Diaz had with her step-father. Carr came from an upbringing of group homes and foster care and Carr did not want that environment for Diaz.

Carr became a mother figure to Diaz. Diaz lived with Carr for less than a year and during that time, Diaz continued to get into trouble. On Christmas Eve, Diaz stole Carr's vehicle and the state took Diaz from Carr's care.

At approximately age 13, Diaz was committed to the Juvenile Youth Corrections in Colorado Springs, Colorado for approximately two years. Carr wrote to Diaz during this timeframe.

At age 19, Diaz was out of the youth corrections system and living in Denver. While living in Denver, Diaz was using drugs and involved in prostitution. Diaz got hurt on a call and decided she wanted a fresh start.

Diaz could not find employment in Colorado and knew Carr was residing in Arizona with her daughters. At the time, Arizona had the fourth best economy in the country and Diaz was able to find employment within a week of moving there.

Diaz enrolled in Phoenix College and was able to pay for classes with student loans and with help from her father, who was prior military. Diaz also purchased a car. Diaz felt like she was supposed to be in Arizona.

Prepared by: Ennis, Sandra                                      Date Prepared: February 13, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)                                                        Page 1 of 6

Diaz attended Remington College when she was residing at the Dale House Project in Colorado Springs, Colorado, following emancipation from her mother. Diaz was enrolled in a medical assistant program. During this timeframe, Diaz was employed at Antler's Hilton in Colorado Springs, Colorado.

Diaz resided with Carr at the 1351 Pleasant Drive address in Chandler, Arizona, for about a month. During this timeframe, Tramell Thomas did not live in Arizona. While residing in Colorado, Diaz met Thomas on only one occasion, when Carr came from Arizona to visit him. Carr and Thomas were not married.

Diaz rarely ever saw Thomas when he was on parole. Carr usually travelled once a month to Colorado to see Thomas. Diaz did not know every detail about Carr and Thomas' relationship. Carr and Diaz had more of a mother-daughter relationship.

Diaz was not aware of what part, if any, Thomas played in the financial aid fraud scheme. Thomas was always trying to start businesses and doing all sorts of things to impress Carr. Diaz felt Thomas was mooching off Carr. Carr did not discuss Thomas' involvement in the scheme with Diaz.

Diaz first learned of the financial aid fraud scheme after living in Arizona for approximately six months. Carr informed Diaz of the scheme and told her that it was a way for Diaz to make money.

Part of Diaz's involvement was to receive college and financial aid mail in other people's names. Diaz got into a confrontation with a letter carrier while residing at one of the addresses in Mesa, Arizona. The United States Postal Service (USPS) refused delivery of mail in the names of various individuals to Diaz's house. Diaz questioned this because the mail was correctly addressed. Diaz told the letter carrier that she helped people by receiving their financial aid funds and this is how she paid for her rent.

Diaz knew Christine Duncan from escorting in Colorado. Duncan was messing around with Thomas. When residing in Colorado, Diaz did not hang out with Thomas. Duncan got Thomas in trouble and Diaz and Marcy Green helped Duncan come down to Arizona to raise money for his legal fees.

Diaz never liked Green. Carr introduced the two of them and at no time did Green or Diaz just hang out together. It was a business relationship. Diaz and Green did not drive around together and withdraw funds from the financial aid debit cards. The two of them did their own thing and they did not hang out.

Carr asked Diaz for mailing addresses. Diaz got paid $500 for each piece of mail. Diaz knew people in the "hood" that agreed to accept mail in other people's names and did not ask any questions about the mail.

Diaz recalled using three mailing addresses on Dragoon Circle in Mesa, Arizona and she also used one of her previous addresses at 724 West Knox Court, Chandler, Arizona. Diaz collected mail from her friends that agreed to accept the mail and she turned over all the mail pieces over to Carr. Diaz received $500 in cash and she gave her friends $100. Diaz did not have any knowledge about the addresses used in Colorado Springs, Colorado, such as the Lexington address.

Green was also tasked with finding friends that would allow the use of their address and she also received $500.

Interview of Mercedes Diaz, February 10, 2017                    12-080234

After approximately two semesters, Carr showed Diaz how to submit Free Applications for Federal Student Aid (FAFSA) and how to complete the online coursework. Carr paid Diaz additional money for submitting the assignments. There were homework assignments for approximately 20 to 30 students and Carr could not complete all of them on her own because she was working full time. Diaz was somewhat familiar with the financial aid process because she submitted FAFSA's to obtain student loans in her own name.

Diaz randomly queried names on various department of corrections' websites and provided Carr a list of inmate names and dates of birth. Carr made additional queries by using a database she had access to with her employment at Wells Fargo. Carr obtained additional information, such as the inmate's social security number. Only inmates serving a sentence of more than eight to ten years were used because they figured the inmates would not access their credit history for a long period of time.

Carr filled in the list with additional information required for the financial aid application process. Diaz took Carr's information and submitted the FAFSA and obtained the FAFSA PIN.

Diaz submitted FAFSA's and did homework at various locations, including Carr's and Green's house and at her own residence too. Diaz did not recall Green's address.

Carr, Diaz, and Green did not discuss the fraud scheme at length with one another. It might have been brought up on one or two occasions at a barbeque, only to mention about a homework assignment being due. The three of them had homework parties. They sat around to complete homework, query department of corrections websites, and fill out FAFSA's while drinking.

Green did everything that Diaz and Carr did in the financial aid fraud scheme. Green had her own laptop to use. Diaz recalled Green's laptop having stickers on it but could not recall the color of the laptop. Carr had Macintosh laptops in her home. If they were hanging out, any laptop or computer in Carr's residence was used for convenience when checking on something related to the financial aid fraud scheme. Diaz owned two laptops that she also used in the financial aid fraud scheme. Her laptops were black in color.

Green and Diaz were not close. They worked together to make money. They saw each other at parties and were cordial. Green lived on the south side so she was not always at Carr's house when Diaz was there but Diaz knows that Green was logging in to register attendance just like she was.

Once the student loan debit cards started coming in, Carr needed help withdrawing the money from the cards since she was working full-time from home. The debit cards had a daily withdraw limit of $500. Each card had approximately $2,500 to $3,000 in financial aid funds. Diaz would hang onto the card until it had been drained. At times, she would also go to Fry's grocery store to buy something and get cash back from the debit card. Other times, she went to various ATM locations or used the cards for personal purchases.

The debit cards were divided up. If you received the mail, then the debit card was yours. Initially, Diaz received a flat fee of $500 but she started receiving three-fourths of the card amount when she started doing homework, department of corrections queries, and FAFSA submissions. Carr received the remaining one-fourth of the amount on each card.

Green also kept the money on the debit card and she also gave a portion of the funds to Carr. Diaz knows this because of conversations between Carr and Green when Diaz was present. Carr also told Diaz that Green gave Carr a portion of the financial aid funds on the debit card.

Interview of Mercedes Diaz, February 10, 2017                    12-080234

==Carr and Green taught Diaz how to do everything. Diaz does not know if Carr taught Green the financial aid fraud scheme or vice versa.==

When asked about Marcy Green's interview with investigating agents, Diaz replied that Green was a "fucking liar." Green was way more involved than Diaz. She was a seasoned veteran at the financial aid fraud scheme. She was doing way more than Diaz was, it was scandalous.

The day the search warrants were executed, Diaz went to jail. Diaz was trying to contact Carr. When Carr and Diaz finally spoke about the search warrant, they wondered why investigators took Green's children to school. Their only conclusion was that Green must have talked with the investigators.

Diaz initially agreed to speak with investigators, only to find out what information they were looking for. Once Diaz realized it was about the student loans, she invoked her right to an attorney and questioning stopped.

==Carr, Diaz, and Green were all involved in the financial aid fraud scheme.==

Diaz was never involved in obtaining mailing addresses from Colorado and she never visited Colorado to retrieve mail. Thomas might have been providing names of people in Colorado who were willing to receive mail in other people's names to Carr.

Diaz may have made one trip to Colorado with Carr but Carr would have retrieved the student loan mail on her own time. Diaz made frequent trips to Colorado to visit her family but not to collect student loan mail. Diaz never visited Thomas while he was in jail in Colorado. Diaz thought the retrieval of student loan mail in Colorado was done by Carr.

Duncan came to Arizona to make money for Thomas' legal fees by escorting. Thomas was cheating on Carr with Duncan. Diaz knew Duncan from Colorado and she knew she could get information from her. The three of them (Carr, Diaz, and Green) decided Duncan could not run into Carr because Duncan had already seen pictures of Carr. Diaz and Green meet with Duncan and Carr impersonated Thomas' sister. Thomas' sister was never involved, it was Carr acting like she was Thomas' sister.

Carr did not know Thomas was involved in pimping until his arrest in Colorado Springs. Carr was hurt and wanted to know who this Duncan person was.

Duncan gave all of her escort earnings to Diaz and Green. In return, Diaz and Green fed Duncan and paid for the hotels, where the escorting calls took place. Diaz did not do any escorting while residing in Arizona.

Basically, Diaz and Green were supporting Duncan. They had to do everything, such as setting up client calls and taking Duncan to the call, while Duncan only had to lay there. Some of Duncan's escorting earnings went to Carr so that she could pay for Thomas' attorney's fees.

Diaz and Green were not hanging out, they worked together, and it was only a business relationship.

Diaz was not involved with any of Duncan's student loans. Diaz assumed Duncan took those loans out on her own. Neri Lattimore is of no relation to Thomas. They lied and told Duncan that Lattimore was a relative of Thomas'. Lattimore was Diaz's boyfriend and he went by the name "Larry."

Interview of Mercedes Diaz, February 10, 2017                          12-080234

Diaz did not recognize a photo of Vanessa Lopez.

Once Thomas was out of custody, he received permission to come live in Arizona with Carr. Things were good until Thomas was arrested on a Driving Under the Influence (DUI) and all of the student loan debit cards were in the vehicle. Carr was frantic and pissed at Thomas. Carr told Diaz that Thomas put all of their lives in jeopardy by having the debit cards with him. Carr kicked him out of the house shortly after his arrest.

Once Carr moved into the Kaibab residence with Thomas, Diaz rarely went over to the house because it was a farther distance away from the Dragoon address where Diaz was residing and Thomas was always home.

When Diaz lived at the 724 West Knox address, she spent a lot of time at the 1351 Pleasant address because she did not have internet service. The two addresses were within blocks of each other.

Duncan was out of the picture when Thomas moved to Arizona and Diaz was not involved in prostitution while in Arizona. Any texts that Thomas made in reference to Diaz's "keeping the hoes in line" would have been regarding the assistance she provided with Duncan. Thomas was like family, like a step-father figure. Money made from Duncan's escorting was used to pay for Thomas' attorney and Carr added money to Thomas' inmate commissary account.

Diaz was not impressed by Thomas so she limited her visits to Kaibab. Diaz went to the Kaibab residence for barbeques, parties, and holidays. He cheated on Carr and Diaz did not want Carr to be with him. Carr loved Thomas and Diaz respected Carr, so she stayed out of it.

Thomas was arrested in 2012 and Carr freaked out. The group continued the scheme following the arrest because the arrest occurred right before funds were going to be disbursed to the debit cards. After Thomas' DUI arrest, if there was a way to get student loan funds, they still tried.

Diaz used Joelle Chase's ID's to open up three private mail boxes. These private mail boxes were all opened on the same day. Chase was Diaz's friend and she gave Diaz permission to use the ID's in exchange for money. Chase did not know about the financial aid fraud scheme. Diaz gave the private mail box keys to Carr. Diaz opened these boxes after the confrontation with the letter carrier. She wanted to stop the student loan mail coming to her address.

It was stupid to keep the cards but the group used the cards to buy gas. If the card had at least one dollar on it, then a full tank of gas could be purchased.

Diaz never went with Thomas to withdraw money from ATM locations and never talked to Thomas about the financial aid fraud scheme. Carr, Diaz, and Green were not afraid of Thomas. Diaz did not think that Thomas was having an affair with Green.

Carr is very private and has a lot of secrets. Carr and Diaz did not discuss Thomas' involvement but Diaz was under the impression that Thomas knew about the financial aid fraud scheme. Common sense would indicate that Thomas knew. The financial aid fraud scheme was discussed while Thomas was at home but he may not have been in the room. Carr never said not to talk about it in front of Thomas or that it should be a secret kept from Thomas.

The community colleges began requiring more information, usually in the form of a faxed document, from the purported students. Diaz assisted in the faxing of requested documents to the community colleges. Diaz learned this from Carr. Diaz did not always use the same FedEx

Requestor: USPIS\PLCornell

**UNITED STATES POSTAL SERVICE**

Forensic Laboratory Examination Report
Forensic Laboratory Services
22433 Randolph Dr.
Dulles, VA 20104-1000

October 28, 2015

Case No.1939700-MF - Lab File No. 9-349-011357(2)
Type of Examination: Fingerprint
Request Date(s): 05-11-2015

K. P. Haithcoat
Postal Inspector
1745 Stout Street, Suite 900
Denver, CO 80299

EXAMINATIONS:
Examine Exhibits 1 through 5, a debit card, fifty-two Mastercards, Pikes Peak documents and photocopies of two identification cards, for the presence of latent prints of value for identification.

Compare any latent prints to the fingerprints of the following:

   Tramel Thomas, FBI No. 944342FB2, designated as Exhibit K-1
   Heather Elizabeth Carr, FBI No. 72302EB7, designated as Exhibit K-2
   Mercedes Dee Diaz, FBI No. 269620VC6, designated as Exhibit K-3
   Michaela Inez Grant, FBI No. 480570ED5, designated as Exhibit K-4
   Marcelle Ruby Green, FBI No. 555483MB0, designated as Exhibit K-5
   Matthew Kenneth Sanders, FBI No. 710044RB0, designated as Exhibit K-6

FINDINGS AND OPINIONS:
Exhibits 1 through 5 were examined for the presence of latent prints. Twelve latent fingerprints and one latent palm print were developed on parts of Exhibit 3. No latent prints of value were present or developed on the remaining exhibits. The latent prints were compared to Exhibits K-1 through K-6 resulting in the following identifications:

   Heather Elizabeth Carr, FBI No. 72302EB7, Exhibit K-2
   One latent fingerprint on part of Exhibit 3, Pikes Peak document "Donald F. Grants"

   Mercedes Dee Diaz, FBI No. 269620VC6, Exhibit K-3
   Six latent fingerprints on part of Exhibit 3, Pikes Peak document "Edward Jones",
   Five latent fingerprints on part of Exhibit 3, Pikes Peak document "Virginia Jones"

No known palm prints of Tramel Thomas, Heather Elizabeth Carr, Mercedes Dee Diaz, Michaela Inez Grant, Marcelle Ruby Green or Matthew Kenneth Sanders were available for comparison.



AN ASCLD/LAB - *International* ACCREDITED TESTING LABORATORY SINCE DECEMBER 8, 2014

Case No.1939700-MF - Lab File No. 9-349-011357(2)

Page 2

**REMARKS:**
Clearly and completely recorded palm prints of Tramel Thomas, Heather Elizabeth Carr, Mercedes Dee Diaz, Michaela Inez Grant, Marcelle Ruby Green and Matthew Kenneth Sanders are required for a conclusive comparison to some of the unidentified latent prints.

Photographs of the latent prints have been prepared and will be available for any additional comparisons you may request or for the preparation of court exhibits should it become necessary.

In the event latent print testimony is necessary in the trial of this case, a current set of known prints of Heather Elizabeth Carr and Mercedes Dee Diaz, recorded and signed by an individual who will be available to testify, should be submitted prior to any request for testimony.

**EXHIBITS:**
Exhibits 1 through 5, received in this laboratory on May 14, 2015, are being returned with this report via Registered Mail.

The fingerprints of Tramel Thomas and Heather Elizabeth Carr, obtained from the FBI on October 27, 2015, and the fingerprints of Mercedes Dee Diaz, Michaela Inez Grant, Marcelle Ruby Green and Matthew Kenneth Sanders, obtained from the FBI on October 28, 2015, are being retained.

Secondary evidence, created during this examination, is being retained in this laboratory.

Patricia L. Cornell
Forensic Latent Print Analyst, Sr.
Telephone: 703-406-7113
Fax: 703-406-7115

This is an official FLS examination report only if it contains an original signature of the forensic analyst.



AN ASCLD/LAB - *International* ACCREDITED TESTING LABORATORY SINCE DECEMBER 8, 2014