

# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES



**DATE INTERVIEWED:** November 3, 2016

**PERSON INTERVIEWED:** Heather Carr

**ALSO PRESENT:** Mary Butterton, Assistant Federal Defender
Jessica Leto, Paralegal

**INTERVIEWED BY:** Martha Paluch, Assistant US Attorney
Beth Gibson, Assistant US Attorney
Sandra Ennis, ED-OIG Special Agent

**LOCATION:** U.S. Attorney's Office
1225 17th St., 7th Floor Conference room
Denver, Colorado 80202

**CASE NUMBER:** 12-080234

**CASE NAME:** Pikes Peak Community College Fraud Ring

After being advised of the nature and purpose of the interview and the identities of all present, Heather Carr, voluntarily provided the following information, summarized as follows:

In approximately July 2015, Carr moved from Arizona to Virginia Beach, Virginia, to live with her oldest daughter Ayanna Brown, formerly Ayanna Jones. Brown moved to Virginia because her husband is in the Navy. He is currently deployed and will not return home until January 2017. Brown is currently attending college and is enrolled in a pharmaceutical internship.

The following are Carr's four children: Ayanna (21), Kaira (16), Milani (5), and Tru (1). Aubrey, who is Ayanna's friend, has resided with Carr since she was 15.

Carr was a mother figure to Mercedes Diaz also. Carr and Diaz's biological mother both worked at a car dealership. Diaz's mother was prepared to give up Diaz to the state because Diaz was constantly in trouble. Carr offered to take her in. At the time, Diaz was in junior high at Panorama Middle School. On Christmas Eve, Diaz stole Carr's vehicle and was arrested. While in custody, Diaz's brother was murdered. Carr's daughters are like sisters to Diaz.

Carr was born in Virginia but moved to Colorado Springs, Colorado, when she was approximately ten years old. Shortly after her family moved, her mother divorced and remarried. Carr ran away from home and stopped attending school in junior high. Carr got pregnant at 17 and obtained her GED during this time period. Omar Jones, who is the father of her two oldest daughters, was her legal guardian.

In approximately 1997, Carr became familiar with the financial aid process when she attended Pikes Peak Community College (PPCC) and received federal student aid (FSA).

In approximately 2003, Carr moved from Colorado to Arizona and resided there until summer 2015.

Prepared by: Ennis, Sandra

Date Prepared: November 4, 2016

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)

EXHIBIT

Page 1 of 12

Interview of Heather Carr, November 3, 2016                                                12-080234

Carr worked for Wells Fargo from approximately June 2003 through July 2015. During her employment, Carr held the following positions: mortgage processor, mortgage underwriter, and credit analyst for Car Maxx. Carr's position as credit analyst began with Car Maxx in approximately 2006.

In approximately August 2009, Wachovia and Wells Fargo merged and Carr was one of 200 employees laid off. Carr was brought back and began working from home because Wachovia employees worked from home. Wells Fargo decided that their employees would work from home also.

Carr was issued a T460 Laptop for her work at home. The laptop required her to sign in with a login ID and password. Her work day was spent verifying a potential purchaser's eligibility to get a car loan by conducting credit reviews. These were non-stop deals that required decisions to be made in five minutes or less. She verified the potential purchaser's credit information and their debt-to-income ratio and then indicated whether the potential purchaser's loan should be approved or denied.

Carr had many user names and passwords for different systems. Carr confirmed her LexisNexis login ID as heathercarr1. Her login ID, heathercarr1, remained the same but she was required to change her LexisNexis password every six months. Carr used LexisNexis to verify a potential purchaser's employment history, social security number, date of birth, and/or driver's license information. Carr accessed LexisNexis from her own personally owned computer but she did not think she could access it outside of her home or on a mobile device. There were occasions when she conducted work business on her personally owned computer. This was usually done to verify someone's personal information, such as a Google search on someone. Ayanna Jones did not use or have access to LexisNexis.

From approximately 2006 through 2013, Carr put the Cox Communication's internet service in her daughter's name (Ayanna Jones). Carr did so because she had an outstanding internet bill of $300 dollars in Colorado and could not get internet service in Arizona until that was paid. Carr made the internet service payments to Cox Communications.

In approximately 2003, Carr became acquainted with Tramell Thomas through her step-brother, Matthew Sanders. Carr did not know her parents very well and wanted to learn more about her family. She and Sanders wrote each other while he was in prison in Colorado. Sanders told Carr that Thomas, who was also in prison in Colorado, looked out for him. Carr began exchanging letters with Thomas until his release from prison in approximately 2009. Carr met up with Thomas after he was released from prison. She wanted to thank him for taking care of her "nerdy white-boy step-brother."

Thomas and Carr were together from approximately 2009 through 2012. In 2014, they had a brief reconciliation and travelled to San Diego when Carr won a free trip from work. Carr conceived her son on this trip. Their relationship ended after the trip. Carr and Thomas were never married.

Thomas and Carr have a very strained relationship. When Carr contacts Thomas, she usually puts the phone on speaker and lets him talk to their two children. Thomas does not call his children directly and he does not pay child support. She lets her daughter send him emoji's. In June 2015, Carr filed for child support and the state of Arizona has not served him with the paperwork. When the two of them do talk, it is never about the investigation. Even if they did talk about it, Thomas would lie. He lies so much it sickens Carr. Carr is not intimidated by Thomas.

Interview of Heather Carr, November 3, 2016                                    12-080234

In approximately 2010, while on parole in Colorado, Thomas and his acquaintances applied for student loans for themselves. Thomas would take individuals to PPCC and show them how to enroll in courses and apply for federal student aid (FSA). The following individuals voluntarily agreed to have Thomas assist them in applying for FSA to attend PPCC: Lola Thomas (Thomas' wife), Christine Duncan, Vanessa Lopez, Ismael Omar (Thomas' friend), and Michael Cox (Thomas' cousin). Cox legitimately went to PPCC and did well in school. Carr believed that Thomas was helping people go to school and he received a portion of their FSA for helping them enroll.

During this time period, Carr and Thomas would fly back and forth from Arizona to Colorado to visit each other.

Carr's friend, Marcy Green, was doing something similar to Thomas, in that Green would sign up people to receive FSA and she would take a portion of their FSA for assisting.

While at a barbeque, Carr was present when Green and Thomas were discussing how it was a hassle to convince people to sign up for school to get financial aid. They were discussing the need for a more elaborate way to get FSA funds. Green watched a show where a woman was sentenced to life in prison for burning her children. The three of them rationalized that using the identities of prison inmates was acceptable because inmates hurt other people. In the event these inmates were released, any student loans in their name could be forgiven because they could show they were in prison during the time period the loans were taken out. The three of them believed they were not hurting anyone and they would no longer need to split the FSA funds with the applicant. Using PPCC was Thomas' idea because he and his acquaintances already obtained FSA from there. The three of them were all in agreement. Diaz was not present at the barbeque.

Carr and Green met under unusual circumstances. Carr dated Green's ex-boyfriend, Roderick Smith.  Although the two have had a tumultuous friendship, she helped Green when she was going through a rough period. In approximately 2007, Smith beat up Green and knocked out her tooth. Carr took care of her three sons during this time.

Carr stated Green minimized her involvement when speaking to investigators in November 2012. During the timeframe of the interview, Green was facing marijuana charges. It was a complete lie when Green told investigators that Carr hung out at Green's residence. Green used computers at both of Carr's residences at 1351 Pleasant and 1822 E. Kaibab in facilitating the scheme to obtain FSA in the names of inmates. Debit cards mailed to Green's house were mailed there at Green's direction, not because Carr asked Green to use her address. Carr never paid Green any money for the receipt of debit cards and/or use of Green's address. Carr did not need to pay Green because Green, herself, was getting FSA funds from the debit cards in inmate's names.

Carr did not care to hang out at Green's house because she is involved in drugs and prostitution. Carr and Green do not hang out with the same people. There were possibly the following three occasions when Carr went to Green's house: to pick up one of Green's sons, to help hang pictures, and to attend a barbeque. Green would come to Carr's house because there was a better atmosphere there. Green resided in her Aunt Hazel's home and her uncle resided in a shed in the backyard. Green's aunt was like a mother to Green. Green did not want her Aunt Hazel hearing stuff that she was involved in.

Green came to Carr's residence while Carr was working from home. Carr typically worked five days a week from 9:00 a.m. until 8:00 p.m. Green used various computers at Carr's residence

Interview of Heather Carr, November 3, 2016                    12-080234

to look up names on various Department of Corrections websites (DOC). Green brought Carr the names and/or dates of birth obtained from DOC websites. With the information Green provided, Carr queried the information in the LexisNexis database and would obtain the information necessary to apply for FSA.

Seeing the number of queries conducted in LexisNexis in the discovery was shocking to Carr. Carr would ask Green to bring her additional inmate names because there were times when the queries conducted would not work, meaning they were unable to get student loans using those names. This was due to the inmate already having student loans and/or other credit issues. Both Green and Thomas conducted DOC inmate searches and had Carr obtain the social security number from LexisNexis. Carr further confirmed this because Green, who would be in another room, would often ask Carr to look at photos of the inmates, "hey, come look at this lady." Carr also queried inmate names on various DOC websites, usually to verify a date of birth.

There was not any particular reason why they chose the various inmate names. Although, they did think the mailman would be more likely to deliver a name that was the same as the person who already occupied the residence. For example, the last name Grant was the same as the person, Michelle Grant, who occupied the residence on Lexington.

Prior to 2012, Carr does not know how Thomas obtained names or if he visited DOC websites to obtain information because he was residing in Colorado at the time. She believes he was mainly signing up people he knew in Colorado.

Prior to 2012, Green asked Carr to obtain a lot of inmate identifiers through LexisNexis. Green was responsible for getting the scheme to work. Green, who was also attending school and familiar with the FSA process, submitted the majority of the FAFSA's. Carr submitted approximately ten FAFSA's in the names of inmates.

Green conducted DOC searches, submitted FAFSA's, and electronic school enrollment applications on her own laptop, and on laptops and computers located in each of Carr's residences, often times when she sat outside and smoked. Carr's wireless internet was used during the DOC searches and electronic FAFSA and school application submissions. Diaz was also present and would assist in the various processes done to receive FSA in the names of inmates. Carr's daughter, Ayanna, was present and saw what was going on but she was usually playing. Ayanna was not involved.

Diaz was legitimately enrolled and attending college during this timeframe. Green, who was not employed, was also enrolled and attending college at Gateway Community College, where she eventually received her degree in criminal justice.

After 2012, when Thomas moved in with Carr in Arizona, things got weird between Carr and Green. Green began doing more of the student loans on her own. Carr did not submit near the amount that was submitted by Green. Green wanted to do it herself because she said Carr kept messing up.

After the search warrant in 2012, Carr and Green ceased communicating with one another for a long period of time. Carr has her own business where she creates caricature shirts. The last time she spoke with Green was almost a year ago when she created a shirt for one of Green's sons.

Carr's friend, La Tania Pickens, allowed Thomas to use her rental property address at 1418 Rushmore Drive in Colorado Springs for his parole address. Thomas has a way of getting

Interview of Heather Carr, November 3, 2016                                    12-080234

people to do stuff for him. Pickens resided at 1418 Rushmore at various times but Carr could not recall the exact dates. Thomas briefly resided in Pickens garage at 1418 Rushmore. Thomas stayed at other places and also resided at an apartment on 3820 Radiant Drive in Colorado Springs, Colorado.

Pickens was not aware this address was being used for the mailing of debit cards in the names of prison inmates. The mailbox was located at the end of the street. Carr and Thomas would drive-by and pick up student inmate mail from the mailbox. The mailman delivered any and all names to this address.

There was a period of two to three days when Carr knew the Higher One debit card would be delivered. Once the school application was accepted, the student received an email letting them know that a green Higher One envelope would be arriving in the mail. This envelope contained the debit card.

Carr was aware of inmate Robert Pickens. Carr conducted the DOC query in the name Pickens and chose this name because she wanted to make sure the card was delivered to the mail box. Carr thought this card was initially rejected or returned by the postal service.

Prior to moving to Arizona, Carr resided at 2441 Lexington Village Lane, Colorado Springs, Colorado. Her friend, Michelle Grant (aka Michaela) resided at 2372 Lexington Village Lane, Colorado Springs, Colorado. Carr asked Grant to help forward her mail to Arizona. Carr still had the key to her old mailbox.

The postal service would only deliver the last name Grant so they had to use inmates with the last name of Grant at this address. Grant never checked her mailbox. The mailboxes were located in a central area and the backside of the boxes could be removed. Carr, Diaz, Green, and/or Thomas removed the back side of the mailbox on their trips to Colorado and obtained the mail in the inmates' names.

During the 2010 timeframe and prior to Thomas' arrest, Thomas asked Carr to query social security numbers and he would assist in the retrieval of student mail. Carr does not know if he knew how to complete and submit an electronic FAFSA. Both Thomas and Sanders resided at 3820 Radiant Drive, Colorado Springs, Colorado. Carr saw Sanders' signature in the notarized documents provided to PPCC.

Green obtained her own addresses to use. Carr confirmed the Blackhawk address was her step-brother, Matthew Sander's residence. Diaz was responsible for opening private post office boxes and using the Dragoon and 724 W. Knox Court addresses. The Pleasant or Kaibab addresses were never used to receive any school or Higher One information.

People were directed to send the school mail or Higher One debit card to Carr's private mail box address at 975 E. Riggs Road in Chandler, Arizona. Thomas directed Kimmisha Mullett to send debit cards that she received to the private mail box address. Carr does not know about the Oakland Street address in Aurora, Colorado.

Mullett and Thomas had a business together. The business was called 911 Design and Printing. Carr had nothing to do with the business and never met Mullett. Carr later said she may have met Mullett on one or two occasions. Mullett and Thomas shared text messages between each other about where to send the Higher One mail because Mullett's address was used to receive student loan mail in the names of inmates.

Interview of Heather Carr, November 3, 2016                                    12-080234

Michael Cox, Thomas' cousin, resided at the Rice Drive address in Colorado Springs, Colorado. Carr hates Cox and does not speak to him. Carr believes Thomas and Cox talked about the scheme with each other.

Carr was not aware that Arizona addresses were being used to apply for FSA to attend school at PPCC. It was her understanding that this could not be done and that is why they used the mailing addresses in Colorado. In seeing the discovery, the Arizona addresses were new to Carr.

Once the Higher One cards were forwarded to Arizona, Diaz and Green would get people they knew to drive around and withdraw money from the debit cards at various ATM locations until all of the funds were withdrawn from the debit cards. Initially, they did it themselves but it became exhausting because there was a daily withdrawal limit on the debit cards. Diaz and Green would get half of whatever amount was on the debit card.

The cards were used primarily to withdraw funds but there were occasions when the cards were used for purchases. When a purchase was made, they requested additional cash back on the transaction. Thomas and Carr were also involved in withdrawing funds from the debit cards at various ATM and store locations. The bulk of the funds were split between Carr, Diaz, Green, and Thomas. A fee of usually $10 was paid to the "meth-heads" that drove around to the various ATM machines.

Thomas did not reside in Arizona until approximately February 2012. Thomas visited the 1351 Pleasant address on his trips to Arizona but he never resided there. In 2012, Carr moved from the 1351 Pleasant address to 1822 E. Kaibab. Carr and her children resided at the 1822 E. Kaibab address for approximately two weeks prior to Thomas coming to Arizona and moving in with them.

During Thomas' incarceration between approximately January 2011 through November 2011, Thomas was aware of the scheme. Carr and Thomas' conversations about the scheme were limited due to the possibility of his jail calls being recorded. Carr used FSA funds obtained in the names of inmates to pay for Thomas' legal fees. Approximately $10,000 in FSA funds were used to pay for Thomas' attorney. Carr also deposited FSA funds into Thomas' inmate trust account (commissary). It would be a fair assessment that Carr submitted more than ten FAFSA's, considering this money was used to pay for Thomas' attorney fees.

In discussing the Tempe Police car stop, Thomas admitted to Carr that he was seeing another girl. The girl threatened to call Carr at 1:00 a.m. and tell her about Thomas' cheating. The girl had the debit cards and laptop at her house so Thomas went to the girl's house to retrieve these items. On his way home from the girl's house, Thomas was pulled over with the laptop and debit cards. Thomas was driving a vehicle registered to Carr. Thomas used the vehicle, not Carr.

Carr could not find a logical reason why he would still have cards from a long time ago. Higher One mailed the debit cards prior to the disbursement of any FSA funds. In seeing the discovery, Carr noted that some of the cards were never activated. Carr does not understand why someone would have kept a card that was not activated. Green kept the majority of the debit cards and she owned a pink laptop at one time. Carr wondered if that is why her relationship with Green became awkward, because Green and Thomas were messing around with each other.

The four of them took part in filling out the various loan documents for the schools. Diaz was primarily responsible for taking these student loan records to various locations where they could

be faxed to the school, such as the FedEx location. They also had the "meth-head people" assist with this. There were times with Green personally hand delivered the documents to the school.

The four of them took part in the electronic submission of school enrollment applications in the names of various inmates.

Carr has no idea how school loan records were faxed to PPCC from a Wells Fargo location. Carr has never worked in a Wells Fargo branch building. She either worked from home or at a leased building while employed with Wells Fargo.

The social security number searches in LexisNexis were only done by Carr.

Prior to 2012, Carr personally saw Diaz and Green fill out documents but she never personally saw Thomas submit FAFSA's or fill out loan records for the school. She would be able to verify his handwriting if shown documents.

In 2012, Thomas wanted more money when he was released. When Thomas resided with Carr in 2012, he submitted FAFSA's and did coursework to ensure FSA funds were released. Carr recalled him saying he had a psychology paper due. The four of them knew they had to show attendance in order for funds to be released. Thomas was also involved in the submission of handwritten loan records to the school and the withdrawing of FSA funds from ATM locations. Carr knew he did this but she was never with him when he did it. Carr admitted that Thomas was involved.

Carr worked all day and did not have a lot of time to spend on the scheme. They all communicated amongst each other about coursework and the four of them took part in logging in to record attendance. Carr volunteered to do coursework that she was interested in. Specifically, Carr recalls Green complaining about having four essays due. One was a psychology assignment about Freud. Carr volunteered to complete that assignment.

The four of them enrolled in courses that interested them. Green, having a degree in criminal justice, chose a lot of criminal justice courses.

At this point during the meeting, Carr was provided a copy of the search warrant sketch. Carr annotated what the various rooms identified in the sketch were (Attachment A).

The day the search warrant was executed, Carr was asleep on the couch. At first, Carr thought her daughter, who was getting ready for school, was playing her music too loud. Carr knew that law enforcement was outside because they were shining lights on the house. Initially, Carr was not sure if law enforcement was trying to come in their house. A canine cop resided across the street from them. Carr went to brush her teeth and put on makeup, knowing she would need to go outside. She went upstairs to look out the window and flash bang devices were heard in the backyard.

During this timeframe, she went to her office where she had a notebook with information related to the inmates' school information written down. Rather than shedding the records in the shredder she had in her office, she tore the pieces and flushed them down the toilet in the master bathroom. She did this because she envisioned agents spending hours piecing together the shredded records. She flushed approximately three pages of information.

The information contained in the notebook was for organizational purposes. It was a checklist used to keep track of the status of FAFSA's, school applications, and homework. Sometime

Interview of Heather Carr, November 3, 2016                    12-080234

during all of this Thomas came up the stairs. She does not know what he was doing during this timeframe.

Carr does not know why Thomas broke his cell phone. It was an old phone that he was not using. Thomas was downstairs for a portion of the time that Carr was upstairs. Thomas later told Carr that he broke the phone because he did not want Carr to find out about other "bitches."

Initially, Carr did not manage the organization of the inmates' school information. She just started doing that right before the search warrant was executed, once the school's fall semester started.

After Thomas's arrest and the search warrant, Carr and Green became distant. Carr assumed Green was jealous of Carr's relationship with Thomas and the lifestyle they were living. Carr wondered if Green and Thomas were having an affair. Carr thinks Green kept the debit cards and that the pink laptop belonged to Green.

At the time of Thomas' arrest, Thomas told Tempe PD arresting officers that marijuana located in the vehicle belonged to Carr's daughter, Ayanna. When told this, Carr responded that Ayanna did not use marijuana but Thomas did. Marijuana was never used in front of the children. Green used marijuana.

Carr related the following in reviewing photos taken during the search warrant and photos obtained from seized computers (Attachment B):

SW_00001436:     The photo was 1822 E. Kaibab

SW_00000218:     Carr purchased the mural located in the master bedroom. She got the idea from a Jay-Z song.

SW_00000214:     The ACER laptop in the photo was her daughter's Milani. The iPad tablet was her other daughter's Kaira. Green always lost stuff, including her computers. Green used the ACER laptop and other computer devices at Carr's residence. The ACER laptop was used to activate inmate debit cards, including Higher One debit cards. There was the probability that any one of the four of them (Carr, Diaz, Green, and Thomas) could have used the ACER laptop to do this.

SW_00000216:     This was a photo of Thomas' office and his computer.

SW_00000217:     The photo was a close-up of the computer in Thomas' office. Carr did not use this computer because Thomas would not give her the password. The computer's profile login ID was King.

SW_00000223:     Carr confirmed these were the torn notes she tried flushing down the toilet.

SW_00000219:     The broken phone was Thomas' old phone located in his portion of the master bedroom closet. Thomas had a box of miscellaneous items he brought with him when he moved from Colorado. There were other old phones in the box.

SW_00000220:     Carr confirmed the close-up photo of the broken phone was Thomas'.

Interview of Heather Carr, November 3, 2016                                    12-080234

SW_00000244:    The disks in the photo were from Thomas' dismissed case. Carr did not
                know who the phone in the photo belonged to. The photo was taken in
                the master bedroom vanity area.

SW_00000233:    The phone in the photo was Carr's work phone. The photo was taken in
                one of the restrooms.

SW_00000230:    The iPad and iPod in the photo belonged to Carr's daughter, Ayanna.

SW_00000231:    Carr did not know who the phone in the photo belonged to. They had a lot
                of phones in the house that were no longer used. Carr confirmed the
                phone was located on a couch in Ayana's bedroom.

SW_00000232:    The laptop was her daughter's, Kaira.

SW_00000236:    The Kindle was located in one of the bedrooms and it belonged to one of
                Carr's daughters.

SW_00000237:    Carr did not know who the phone in the photo belonged to.

SW_00000234:    The laptop was her daughter's, Ayanna.

SW_00000226:    This was a photo of Carr's office, with her computer and her Wells Fargo
                work laptop.

SW_00000227:    This was a photo of Carr's computer in her office.

SW_00000246:    This was a close-up photo of Carr's computer in her office. Carr did not
                know the profile name created for this computer. This computer and the
                computer in Thomas' were the same brand and type of computer.

SW_00000228:    This was a close-up phot of Carr's Wells Fargo work laptop.

SW_00000238:    This was an iPad and BlackBerry located in Carr's vehicle. She did not
                know who they belonged to. They had so many Apple devices and
                phones in the residence. To say that they all used them is a fair
                statement.

SW_00000245:    This was a photo of Carr's step-brother, Matthew Sanders and Thomas.

SW_00000205-213: These were photos of Heather Carr's gun. Carr has always owned a
                gun because she was a victim of a home invasion. The gun was
                registered in her name. She used to go to "ladies night" at the shooting
                range. Thomas never went to the ranges with her and he did not access
                the gun.

Following Thomas's arrest with the debit cards and laptop, Carr was troubled enough to get rid
of an old computer of hers. The computer was one she had while residing at the 1351 Pleasant
address. She destroyed the laptop and threw it away in a dumpster. Carr was concerned
because Thomas used the 1351 Pleasant address for his parole in Arizona.

Interview of Heather Carr, November 3, 2016                                    12-080234

The four of them continued to apply for FSA in the names of inmates following Thomas' arrest. Thomas minimized the arrest and did not make a big deal of it.

The night of the search warrant, Carr went to Green's house to discuss what happened. Green was very dismissive and did not want to discuss what happened. She did mention that people came to her house to talk to her. She told Carr that these people took her kids to school while she was interviewed. She did not want to talk about any details of the interview. Green did not want her Aunt Hazel to find out what happened. Green tried cutting ties with Carr after the search warrant. Approximately a year after the search warrant, Green tried to be friends with Carr. During this timeframe, Carr removed her Facebook profile for a while, and she and Green were Facebook friends.

Carr found out Diaz was arrested the day of the search warrant. Carr was trying to get a hold of Diaz after agents left her residence. She eventually went to Diaz's house. Diaz's roommate was upset because Diaz owed her money and she could not be located. After making a few phone calls, Carr learned Diaz was arrested.

Carr did not recall how some of the names and numbers ended up on her iPad contact list. In reviewing the discovery, she did not believe she had as many contacts as the iPad contact list indicated. She is not sure how iCloud works but she thinks a lot of those contacts are left over from items backed up to iCloud. For example, there was a contact she had in there from 2007, Akeimi. Akeimi is Green's friend. Carr cannot stand Akeimi because Carr claimed that Akeimi hates white people. The last time she spoke with Akeimi is when Green was arrested in Los Angeles, California.

Thomas told Carr to never get rid of Christine Duncan's, Vanessa Lopez', or Ismael Omar's social security numbers so she stored them in her iPad contact list. She does not know why Thomas wanted to keep this information.

Carr had Roderick Smith's social security number in her iPad because she was his power of attorney at one time. Carr did not know why she had Green's social security number stored in her iPad.

Carr does not know why Michael Cox's Chase credit card number was in her iPad contact list. She does not like him.

Carr never contacted the schools and pretended to be one of the students. She does not think anyone did that. They (Carr, Diaz, Green, and Thomas) made inmate queries on the DOC websites.

In reviewing SW_00001427, a document titled "Adams County Jail Population Sheet" that was located on Carr's computer, Carr did not know how this document was located on her computer. She is not familiar with Denver County jail websites, she only queried DOC websites. Carr assumed this was booking information that was pulled from an Adams County website. Thomas might have asked Carr to look up one of his friends that was recently released from jail. Carr could not recall his name. Carr is not aware of anyone using her computer. Thomas and Carr's computers were purchased approximately a week before the search warrant.

Carr met Terrell Smith once. He was a pimp and she did not know him.

Interview of Heather Carr, November 3, 2016                    12-080234

The screen shots from Chandler-Gilbert Community College were from Ayanna's husband. He was attending Chandler-Gilbert and did his course work while at their house. A review of the course login screenshot information shows that the courses listed had prerequisites. They did not enroll inmates in courses that had prerequisites.

Carr is not afraid of Thomas. She believes Thomas is capable of being intimidating because he protected her step-brother while he was in prison. Carr and Thomas never married. They were together from approximately 2009 through 2012 and again in 2014, when they went to San Diego but ended their relationship shortly after the trip.

After Carr left Arizona, Thomas moved his wife, Lola Thomas, down to Arizona.

Carr never met Christine Duncan. Duncan used Carr's identity when Duncan was arrested with Thomas at a hotel in 2011. A police report from January 2011 stated that Carr was present during the arrest. Duncan told law enforcement that she was Heather Carr. Duncan and Thomas commited robberies together.

Carr knew Duncan's name because Thomas told her about signing up Duncan up for school. He asked Carr to save Duncan's social security number. Carr knew they were arrested together and that the two committed robberies together. Duncan was a "meth head." Until seeing the discovery, Carr was not aware that Diaz and Green were involved with Duncan.

One time Carr saw Duncan in a car with Diaz at a gas station. That was the only time Carr saw Duncan. Carr recalled asking Diaz who was with her. Diaz told Carr she was a friend visiting from Colorado. Diaz did not give Carr a name. Carr did not get involved with Diaz's meth life.

Carr knew nothing about Vanessa Lopez. Thomas knew her.

Thomas was evasive about a lot of things. He was a whore who had a crafty way of telling stories. There was an overwhelming amount of stuff that he lied about. If it were not for their kids, she would tell him to "fuck off."

Currently, Carr runs her own business selling t-shirts and is an Uber driver. It is difficult to make ends meet. Carr texts Thomas asking him to send money and he responds by saying that he will see what he can do.

Carr confirmed the number tied to "Daddy" in her iPad contact list belonged to Thomas. Carr confirmed the "Rocketmail" email address belonged to Thomas.

At times, Thomas was a family person and they did things as a family. All four names of Carr's children are tattooed on Thomas. None of this is fair to the kids. Thomas has only seen his kids approximately ten times since 2012. He has been to see the kids in Virginia once. Thomas was there for the birth of their son, Tru. He has seen his son approximately three times. There is a whole other side to Thomas.

Carr confirmed the Blackhawk address in the scheme belonged to her step-brother, Matthew Sanders. Carr did not keep in touch with Sanders. She may have met him once while at the airport in Denver.

Interview of Heather Carr, November 3, 2016                         12-080234

Carr assumed Sanders knew about the scheme because debit cards were mailed to her private mail box on Riggs road. The cards arrived without the green envelope that they were originally sent in. There were a lot of cards coming from different addresses.

Carr did not know an address belonging to Sander's mother was used. Carr does not talk with Sander's mother. She knows her name is Sandy. Carr had nothing to do with the use of this address to obtain FSA.

Marcy Green used to have a pink laptop. Carr never used the laptop that was with Thomas the night that he was arrested.





# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES

**DATE INTERVIEWED:** April 12, 2017

**PERSON INTERVIEWED:** Marcelle Green

**INTERVIEWED BY:** Special Agent Sandra Ennis
Postal Inspector Sonia Hacker

**LOCATION:** 111 W. Monroe Street
Phoenix, Arizona

**CASE NUMBER:** 12-080234

**CASE NAME:** Pikes Peak Community College

After being advised of the identities of the interviewing agents, Marcelle Green was advised of her rights. Upon learning of the purpose of the interview, Green voluntarily signed the attached Advice of Rights Waiver form and consented to the recording of the interview. Green voluntarily provided the following information:

In approximately November 2016, Trammel Thomas came to Green's uncle's home at 4630 S 21st in Phoenix, Arizona. Thomas was looking for Green and left his phone number with her uncle. Green never contacted him. She did not know what Thomas wanted to talk about after so much time had passed. Green's Uncle Elmer told her this information.

In approximately October 2016, Carr called Green about the discovery in the student loan fraud case. Carr wanted to know why Green snitched on her. Green told Carr the interviewing agents asked her questions and she answered them. Green got nervous because she realized information she told investigators was made public.

In 2012, Green was interviewed by investigating agents. Green never heard any more until approximately four or five years later when agents went to her auntie's house to serve Green with a letter. She met the agents at QT. Green was then served with another letter and again met the agents at Circle K.

Shortly after receipt of the second letter, Green's car was repossessed and she lost the letter that required her attendance in Colorado. She contacted the justice department and they could not locate her information.

Green realized that failing to respond to the target letters and trial subpoena did not look good.

The student loan fraud was Carr's idea. Green admitted to allowing the use of her address to receive debit cards. Green would throw away any other mail that did not have a debit card. Green was told to be on the lookout for various names. At the time, Green was enrolled in school and she has since graduated.

Carr was the person who had access to Accurint through her employment at Wells Fargo. Both Thomas and Carr were from Colorado and Green assumed that is how the two were able to use

Prepared by: Sandra Ennis

Date Prepared: April 25, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)


EXHIBIT
B

Page 1 of 3



# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES



| | |
|---|---|
| **DATE INTERVIEWED:** | August 29, 2017 |
| **PERSON INTERVIEWED:** | Marcelle Green |
| **ALSO PRESENT:** | Jeralyn Merritt, Defense Attorney |
| **INTERVIEWED BY:** | Martha Paluch, Assistant US Attorney |
| | Bryan Fields, Assistant US Attorney |
| | Sandra Ennis, ED-OIG Special Agent |
| **LOCATION:** | U.S Attorney's Office |
| | 1801 California Street, 16th Floor Conference Room |
| | Denver, Colorado 80202 |
| **CASE NUMBER:** | 12-080234 |
| **CASE NAME:** | Pikes Peak Community College Fraud Ring |

After being advised of the nature and purpose of the interview and the identities of all present, Marcelle Green, voluntarily provided the following information, summarized as follows:

Green was born and raised in Phoenix, Arizona. Green attended high school in Sacramento, California, where she played volleyball. Green later moved back to Arizona and has resided there ever since.

Green received her associate's degree in liberal arts from Gateway College in Phoenix, Arizona. She wants to pursue her education in social work but Green has not had time because of her three sons. At some point, she wants to attend Arizona State University (ASU). Her oldest son (20) is currently enrolled in school to become a commercial pilot. Her middle son (17) is a senior in high school and plans to attend Northern Arizona University (NAU). Her youngest is 16 years old and is a junior in high school. Green is not married.

While enrolled at Gateway, Green obtained approximately $14,000 in federal student aid (FSA) in the form of loans. She received her student aid refund in the form of a prepaid debit card and confirmed the card was called Citi Prepaid.

Currently, Green resides at 4424 E. Baseline Road, #2072 in Phoenix, Arizona and is employed full time at Granger. Up until last week, she also worked the night shift at Alpha Connect. Prior to her recent employment with Granger, Green was employed at Alpha Connect for the last three years.

Green resided at 1915 E. Mobile Lane, Phoenix, Arizona, when she was in grade school. This house has been owned by her family since approximately 1940. Green's Uncle Jimmy Green resided at the residence. Her Uncle Jimmy is now deceased.

The 4630 S. 21st Place, Phoenix, Arizona, address is owned by her Aunt Hazel Green. Green's aunt did not reside at the address when Green was residing there with her three sons. Green's Uncle Elmer Green resided in the studio type structure that is located behind the house.

Prepared by: Sandra Ennis          Date Prepared: August 29, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)          EXHIBIT C          Page 1 of 9

Interview of Marcelle Green, August 29, 2017                                        12-080234

Green's prior criminal history includes a felony theft charge in 2000, a felony robbery charge in Los Angeles, California in 2007, and a felony marijuana possession charge in 2010.

Approximately 11 years ago, Green met Heather Carr through Green's son's father, Roderick Smith. Smith is her son's father and Carr was dating Smith. Green was no longer involved with Smith so she had no issue with Carr dating Smith. Carr and Green met and became friends when Smith went to jail and Carr called Green. The two became close and Green's son went to Carr's house a lot.

Green met Trammel Thomas when Thomas moved to Arizona to live with Carr. Carr was still residing at the 1351 Pleasant address in Chandler, Arizona. Thomas was out on parole and received permission to serve out the remainder of his sentence in Arizona. Green met Thomas while Thomas and Carr were residing at the Pleasant address.

Green met Mercedes Diaz through Carr. Carr was a mother figure to Diaz. Diaz kept getting into trouble in Colorado and moved to Arizona because of Carr. Carr, Diaz, and Thomas had all lived in Colorado prior to living in Arizona.

The student aid fraud scheme and using the identities of inmates was Carr's idea. Carr had the ability to obtain the personally identifiable information (PII) of inmates through a system that Carr had access to at her work.

Carr and Green discussed how the scheme would work. Carr initially brain stormed the idea and presented it to Green. Green agreed with Carr and told her, "Yeah, I think we could make this work." The idea was brought up when the two of them were discussing how to make money. Green was struggling financially with her three sons. Green often spent time at Carr's address. Carr's and Green's kids were close and the two families spent the holidays together. Green believes the initial conversation occurred at Carr's house during a barbeque for the Easter holiday.

In discussing the scheme, it was Carr's idea to use inmate's identities to apply for FSA. Since Carr, Diaz, and Green had all received financial aid, they knew how the FSA application process worked.

Green did not know what conversations regarding the scheme Carr had with Thomas while in Colorado. Green knew Thomas had knowledge about the scheme while in Colorado because Carr told Green this.

The rationale behind using inmate identities was because the inmate could prove they were in prison and therefore would not have any liability for paying back the FSA. There was never a story or idea to use inmate identities because they were bad people or because of a story on TV. Being a felon herself, Green does not judge or hold anything against felons.

Prior to using inmate identities, Green previously assisted in signing up her ex-boyfriend, Jesse Rowsely. Rowsely gave Green money for her assistance. Green also provided assistance to her cousin by telling her what steps were required to obtain FSA.

Green did not recall a conversation with Carr or Thomas about how it was a pain to enlist individuals in signing up for FSA and sharing in the FSA funds.

Green and Carr discussed how to submit a certain amount of applications in order to get money. Green had three kids and was in school herself so she needed the money. Green was all for

Interview of Marcelle Green, August 29, 2017                                    12-080234

trying to see if the scheme would work. Thomas was not mentioned in these initial conversations because he was in jail or prison during that time.

The consequence of enlisting a regular person was that the regular person would realize they were a victim sooner than an inmate might, unless an inmate's family checks the inmate's credit history. Using an inmate's identity was still wrong.

Green was aware of the following individuals being involved in the scheme, either by helping or allowing the use of their address for the FSA application and school enrollment process: Heather Carr, Trammel Thomas, Michelle Grant, Christine Duncan, Mercedes Diaz, and Matthew Sanders. Matthew Sanders was the step-brother of Carr and Grant was Carr's longtime friend. Green saw photos of other individuals who were involved but Green did not know their names.

Carr, Diaz, Green, and Thomas all conducted searches of inmate names on department of corrections websites at the Pleasant address. At times, everyone was present and hanging out when these searches were being conducted.

Carr told Green that Thomas also obtained identities from people he knew from being in prison. Thomas provided this information to Carr. Carr used her ability to search information through her access to a system at her work.

There were also times when Carr provided Green with a list of inmate names and identifying information that was already ran by Carr. With the list, Green started the FSA process by submitting a Free Application for Federal Student Aid (FAFSA).

Green did not have a lot of discussions about the scheme with Diaz and Thomas. Grant and Sanders were not Green's friends so she did not know the details of their involvement.

Carr also told Green that Thomas took Duncan to Pikes Peak Community College (PPCC). Green also heard this information in conversations she had with Duncan. The last time Green spoke with Duncan was when Duncan was stranded at a Motel 6 on 44th and Baseline. Green's understanding was that Duncan followed Thomas to Phoenix.

Carr told Green that Thomas was in jail twice before and went back to jail again prior to moving to Arizona.

In conducting department of corrections website searches they were able to obtain an inmate name and date of birth. With a name and date of birth, Carr obtained a social security number from her access through her job at Wells Fargo. Carr also worked at CarMax and was able to continue to pull up personally identifiable information for school applications.

Inmate names were pulled up randomly on department of corrections websites. They did look at inmates serving longer sentences so that the chances of the inmate becoming aware of student loans in their name were less likely.

Carr gave Green a black HP laptop and Green had a black desktop computer at her residence at 4630 S. 21st Place. Green faxed documents to the community colleges from the Mail & Cell location in Arizona.

Green took part in filling out FAFSA's. Filling out FAFSA's using inmate identities was very easy because they submitted the inmate information as an independent student. This did not require

Interview of Marcelle Green, August 29, 2017                                        12-080234

Carr told Green that Thomas and Sanders became close while the two were in prison together and that Sanders provided an address to be used in the scheme.

In October or November 2016, after Carr, Diaz, and Thomas were charged, Carr reached out to Green through Facebook after turning herself in. Carr wanted to know why Green snitched on her. Carr told Green that she should have remained quiet and not said anything. Carr told Green that she cannot be helped if she perjures herself. Also during this timeframe, Green's Uncle Elmer told Green that Thomas showed up looking for her at Aunt Hazel's house on 4630 S 21st Place. Her uncle described Thomas as tall and dark and said he left his name. The individual left his phone number with her Uncle Elmer, requesting that Green contact him. Green can check to see if her uncle still has the phone number. Green will also look through her belongings to see if she has Thomas' number. Green does not have contact information for Thomas in her phone.

Green has been contacted by Carr on three occasions. Once after Carr was charged, when she contacted Green through Facebook, the second time was after Carr saw Green's written statement to interviewing agents, and the third time was after Carr had seen all of the discovery. Carr told Green that she was upset because she thought the two were best friends.

Green met Duncan through Carr. Duncan was brought to Arizona because she was involved in one of Thomas' arrest. They did not want Duncan to be called as a witness to testify against Thomas. Thomas and Duncan had a relationship. Duncan began taking escorting calls as soon as she moved to Arizona. Green assumed she was doing the same thing in Colorado and seemed comfortable hopping into it. Duncan eventually ran off with one of her escorting clients. Duncan escorted for a couple of months while in Arizona.

Carr impersonated Thomas' sister and brought Duncan to Arizona because the police were looking for Duncan. Carr posted online escorting advertisements for Duncan and Diaz and Green took Duncan to the escorting calls. Duncan was provided with a throw-away phone so that Duncan was available for calls. Carr told Green to give Duncan money for food and take the rest of the money and bring it to Carr. Green was allowed to take money from the escorting calls for gas and Duncan's toiletries.

Green did not meet Michelle Grant. She was Carr's best friend from Colorado Springs, Colorado. Green possibly saw a photo of Grant on Facebook through her Facebook friendship with Carr. Green thought Grant allowed Carr to use her address for the receipt of school records and debit cards.

Sanders also provided an address or addresses for the receipt of school records and debit cards. Green has never heard of the following names: Vanessa Lopez, Terrell Smith (aka Swiss), La Tania Pickens, Lola Thomas, the name of Matthew Sander's mother, or Michael Cox. Green thought the name Kimmisha Mullet sounded familiar. Green heard that Thomas had been married and thought the name Lola Thomas sounded familiar.

Thomas was involved in looking up inmates and received money from the debit cards from Carr. Carr told Green this information. Green was also present during the trial run hang out where Carr and Green helped show Thomas how to fill out FAFSA's at this trial run meeting.

Green heard from both Carr and Duncan that Thomas took Duncan to PPCC.

While Thomas was in jail, Carr paid Thomas' attorney's fees and put money on Thomas' inmate account. Green knew this from conversations with Carr.

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLORADO

 3     Criminal Action No. 16-cr-0054-WJM-3

 4     UNITED STATES OF AMERICA,

 5     Plaintiff,

 6     vs.

 7     MERCEDES DIAZ,

 8     Defendant.

 9     ------------------------------------------------------------

10                    REPORTER'S TRANSCRIPT
11                        (Sentencing)

12     ------------------------------------------------------------

13         Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14     Judge, United States District Court for the District of

15     Colorado, commencing at 10:33 a.m., on the 12th day of

16     January, 2018, in Courtroom A801, United States Courthouse,

17     Denver, Colorado.

18

                          APPEARANCES
19
           MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
20     Attorneys, 1801 California Street, Suite 1600, Denver,
       Colorado 80202, appearing for the plaintiff.
21
           SIDDHARTHA H. RATHOD, Rathod Mohamedbhai, LLC, 2701
22     Lawrence Street, Suite 100, Denver, Colorado 80205,
       appearing for the defendant.
23
                   MARY J. GEORGE, FCRR, CRR, RMR
24              901 19th Street, Denver, Colorado 80294
                Proceedings Reported by Mechanical Stenography
25                Transcription Produced via Computer
```



2

1                    P R O C E E D I N G S

2           (Call to order of the court at 10:33 a.m.)

3           THE COURT:  We're on the record in criminal case

4    No. 16 cr 054, defendant No. 3, United States of America

5    versus Mercedes Diaz.  I'll take appearances of counsel.

6           MS. PALUCH:  Good afternoon, Your Honor, Martha

7    Paluch appearing on behalf of the United States.  With me

8    at counsel table is Special Agent Sandra Ennis.

9           SPECIAL AGENT ENNIS:  Good morning, Your Honor.

10          THE COURT:  Good morning to the two of you.  For

11   the defendant.

12          MR. RATHOD:  Good morning, Your Honor, Siddhartha

13   Rathod, appearing on behalf of Ms. Diaz, who's here to my

14   left.  Also appearing at counsel table today is Nicholas

15   Lutz, another attorney in our office who's not entered on

16   the case, who's just assisting me.

17          THE COURT:  That's fine.  All right.  Welcome to

18   the three of you.

19          Will the probation officer please identify herself

20   for the record.

21          PROBATION OFFICER:  Good morning, Your Honor.

22   Kyla Hamilton with probation.

23          THE COURT:  Good morning, Ms. Hamilton.  Welcome.

24          All right.  Mr. Rathod, will you and your client

25   please approach the lectern.

1          Ms. Hansen, will you please administer the oath to

2     the defendant.

3          COURTROOM DEPUTY:  Please raise your right hand.

4       (Defendant sworn in)

5          THE COURT:  All right.  The record reflects that

6     way back on the 7th of October of 2016, Ms. Diaz entered a

7     plea of guilty to and she was convicted of Count 1 of the

8     indictment, charging a conspiracy to defraud the Government

9     with respect to claims in violation of 18 United States

10    Code Section 286.  In addition, at her change of plea

11    hearing, the defendant also admitted the forfeiture

12    allegation in the indictment.

13          We are here for the sentencing of the defendant.

14    Since we have three motions respecting the length of the

15    sentence that I'll take considerable argument on, for now,

16    I just need counsel to very briefly summarize their

17    respective sentencing recommendations.

18          MR. RATHOD:  Your Honor, briefly.  The AUSA and I

19    both agreed, and I think there's a motion filed much more

20    significantly.  At the time of the plea agreement, Ms. Diaz

21    was an addict.  She had a positive UA within a period of

22    time -- in time to within 24 hours or 48 hours of her plea

23    agreement.

24          The Government has asked that Ms. Diaz reaffirm

25    her guilty plea and we are in agreement with that as well.

1    History Category to be 6, which yields an advisory

2    guideline sentencing range of 92 to 115 months, a period of

3    supervised release of one to three years, a fine range of

4    10,000 to $100,000, and a special assessment of $100.

5             Does counsel agree the Court has correctly

6    calculated the guideline sentencing range in this case

7    before the application of any departure or variance?

8             MS. PALUCH:  Correct, Your Honor.

9             THE COURT:  Okay.

10            MR. RATHOD:  Yes, Your Honor.

11            THE COURT:  All right.  Thank you, counsel.

12            All right.  The -- I'll next take up the

13   Government's motion for a downward departure for

14   substantial assistance, ECF 261.  Ms. Paluch, anything you

15   wish to add to your written submission?

16            MS. PALUCH:  No, Your Honor.

17            THE COURT:  All right.  Mr. Rathod, do you wish to

18   be heard on this?

19            MR. RATHOD:  Not on the Government's --

20            THE COURT:  Okay.  For the reasons set forth in

21   the motion, I grant the Government's motion for a downward

22   departure.  I expressly find that the statutory purposes of

23   sentencing are best served by the imposition of a reduced

24   custodial sentence pursuant to Section 5K1.1 of the

25   guidelines.  Specifically, I find that Ms. Diaz has

1   provided truthful and credible information as to her

2   involvement with this offense and the involvement of

3   others, the defendant's information was significant and

4   helpful to the Government's ongoing investigations and

5   prosecutions of criminal activities within the District of

6   Colorado and elsewhere.  More specifically, it was Ms.

7   Diaz's cooperation with the prosecution and law enforcement

8   which provided the Government with the grounds and evidence

9   it needed in order to charge codefendant Marcelle Green in

10  this case.

11       As a result of granting the Government's motion,

12  subject to my ruling on the defendant's motion for

13  departure and the defendant's motion for a variant

14  sentence, I will sentence the defendant to a range centered

15  on the Government's requested departure of 35 percent off

16  the bottom of the guideline sentencing range, which is

17  approximately 16 months.

18       All right.  At this time, I'll take up that

19  portion of the defendant's motion at ECF 255 which seeks a

20  departure based on the grounds that her criminal history

21  category of VI substantially overrepresents the seriousness

22  of her criminal history pursuant to guideline Section

23  4A1.3(b).  Mr. Rathod.

24       MR. RATHOD:  Thank you, Your Honor.  I'm familiar

25  with the Court's practices and so I'm not going to rehash

36

1           THE COURT:  All right, but you haven't answered my

2     question --

3           MS. PALUCH:  Exactly right.

4           THE COURT:  Maybe I keep interrupting and

5     preventing you from answering my own question, which is:

6     How does the Government view the relative culpability of

7     the four defendants?

8           MS. PALUCH:  Right.  And I have a difficult time

9     answering that because it's our view that with -- that they

10    all four made it happen, all four of them made it happen.

11    I think an argument could be made that Carr is the most

12    culpable because of her access to that database.

13          THE COURT:  Could be made or should be?  I mean,

14    clearly the Government doesn't view Ms. Diaz as undertaking

15    a role as significant and major and culpable as Ms. Carr.

16          MS. PALUCH:  We do not, Your Honor.  And that's --

17    as you saw in the plea agreement, we agreed with the

18    two-level reduction for minor role in the offense.  So

19    clearly if you were to rank the four, I would say Ms. Diaz

20    is No. 4.  I think Ms. Green was much more involved than

21    Ms. Diaz.  And Mr. Thomas, our view, is that he has a

22    history of manipulating women and these three women we

23    believe were manipulated and that he benefited, but that

24    the other women probably did more of the work, did have

25    evidence --

1          THE COURT:  I thought your theory was Ms. Diaz was

2    manipulated by Ms. Carr, not by Mr. Thomas.

3          MS. PALUCH:  That's correct.  That's correct, Your

4    Honor.  I stand corrected.  I don't -- we don't have

5    evidence of Mr. Thomas' direct involvement with Ms. Diaz.

6    But I do think Mr. Thomas benefited just as much as anyone

7    else in this scheme and there is information that he was at

8    the computer doing the work that he did.

9          So I don't know that I'm answering your question.

10   I guess I would put Ms. Carr at the top, I would put Ms.

11   Diaz as No. 4, Mr. Thomas and Ms. Green in the middle.  I

12   hope I've answered your question --

13         THE COURT:  Yes, you have.  Thank you.

14         MS. PALUCH:  For those reasons we are seeking a

15   sentence, as we've stated at the beginning of this

16   hearing.

17         THE COURT:  So 34 months incarceration?

18         MS. PALUCH:  33 -- 33 months, Your Honor.

19         THE COURT:  Oh, 33.  Okay.

20         MS. PALUCH:  Yes.

21         THE COURT:  Thank you.

22         MS. PALUCH:  Thank you.

23         THE COURT:  Mr. Rathod, it's your motion, I'll

24   give you an opportunity for a brief reply.

25         Ms. Diaz, you can remain seated.

Attachment 3

1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3    Criminal Action No. 16-cr-0054-WJM-2

4    UNITED STATES OF AMERICA,

5    Plaintiff,

6    vs.

7    TRAMMEL THOMAS,

8    Defendant.

9    ------------------------------------------------------------

10                REPORTER'S PARTIAL TRANSCRIPT
                    (Jury Trial - Day 2)
11             TESTIMONY OF MARCELLE GREEN

12   ------------------------------------------------------------

13        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
     Judge, United States District Court for the District of
14   Colorado, commencing at 3:29 p.m., on the 28th day of
     November, 2017, in Courtroom A801, United States
15   Courthouse, Denver, Colorado.

16

17                     APPEARANCES

18        MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
     Attorneys, 1801 California Street, Suite 1600, Denver,
19   Colorado 80202, appearing for the plaintiff.

20        DANIEL T. SMITH, Attorney at Law, 4582 South Ulster
     Street, Suite 1400, Denver, Colorado 80237 and
21        THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
     Suite 1400, Denver, Colorado 80202, appearing for the
22   defendant.

23             MARY J. GEORGE, FCRR, CRR, RMR
                901 19th Street, Denver, Colorado 80294
24          Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

25



2

```
 1                        P R O C E E D I N G S

 2            (In open court in the presence of the jury at 3:29

 3     p.m.)

 4            THE COURT:  Thank you very much for your patience,

 5     ladies and gentlemen of the jury.  As I mentioned to you on

 6     the first day that there would be these kind of pauses, but

 7     we ask for your indulgence and your patience given the

 8     importance of what we're dealing with here.

 9            Let me just mention to you the next witness is

10     going to be a codefendant in this case who has pled guilty,

11     is not going to trial.  She has her lawyer here present,

12     Ms. Jeralyn Merritt, at the back table there, and she's --

13     Ms. Merritt is here because the law allows individuals in

14     Ms. Green, the next witness' situation, to have counsel

15     present in the courtroom to make any appropriate objections

16     that counsel sees fit.

17            All right.  The Government may call its next

18     witness.

19            MR. FIELDS:  Thank you, Your Honor.  We call

20     Marcelle Green to the stand.

21            THE COURT:  All right.

22            COURTROOM DEPUTY:  Right here, ma'am.  Just please

23     stand in the box and raise your right hand.

24         MARCELLE GREEN, GOVERNMENT'S WITNESS, SWORN

25            COURTROOM DEPUTY:  Please be seated.  Scoot your
```

3

Direct - Green

1    chair up.  Put your elbows right on the stand so that we

2    can -- put your mouth right there.

3           Please state your full name for the record and

4    spell your first and last name.

5           THE WITNESS:  Marcelle Ruby Green,

6    M-a-r-c-e-l-l-e, G-r-e-e-n.

7           THE COURT:  You may proceed, counsel.

8           MR. FIELDS:  Thank you, Your Honor.

9           Before we get into it, at this point I would move

10   into evidence Government's Exhibit 32, which has been

11   stipulated to by the parties.

12          THE COURT:  Okay.  One second.  All right, given

13   the stipulation of the parties, Government Exhibit 32 is

14   admitted into evidence and may be published to the jury.

15      (Government's Exhibit 32 received)

16          MR. FIELDS:  Thank you, Your Honor.

17                     DIRECT EXAMINATION

18   BY MR. FIELDS:

19   Q.   Ms. Green, did you participate in a scheme to steal

20   money from the Department of Education?

21   A.   Yes, I did, sir.

22   Q.   Did you agree to participate in that scheme with other

23   people?

24   A.   Yes, I did.

25   Q.   Do you see one of those people in the courtroom here

18

Direct - Green

1    A.    To the -- for me, I know me, myself.

2    Q.    Did she give it to anyone else?

3    A.    I can't speak for that.

4    Q.    When she gave it to you, how would she give it to

5    you?

6    A.    On a paper -- on a lined piece of paper, regular

7    subject paper.

8    Q.    Describe to us what would be on a typical sheet of

9    paper from Heather Carr.

10   A.    The names, the birth dates, and the address -- I mean,

11   sorry, the names, the birth dates, and the Social Security

12   numbers.

13   Q.    And what would you do with that information?

14   A.    I would submit that into FAFSA.

15   Q.    Now, let's talk about Trammel Thomas.  You said he was

16   part of the conspiracy.

17   A.    Correct.

18   Q.    What was his role?

19   A.    His role -- I can't say if he did homework and I can't

20   say if he had a major role, but he had some role in it.

21   Q.    Well, did you ever see him participating in the

22   conspiracy?

23   A.    Yes.

24   Q.    What did you see him doing?

25   A.    The FAFSA part, just one time.

22

Direct - Green

1    A.    It was part of the -- to process the fraudulent FAFSAs

2    and the school applications.

3    Q.    How was it part of the process of filling out these

4    fraudulent FAFSAs?

5    A.    Because of the names, when you get the names and the

6    information was already there.  So, like I said, I can't

7    recall the names.

8    Q.    When you say the information was already there, what

9    information?

10   A.    The Social Security numbers and the birth dates,

11   sorry.

12   Q.    Did you see Mr. Thomas participate in a scheme at any

13   other time?

14   A.    No.

15   Q.    How often would you see the defendant during this time

16   period?

17   A.    I wouldn't see him as much as I seen Heather and

18   Mercedes, but I've seen him several occasions.

19   Q.    So who would you say was your major contact within the

20   conspiracy?

21   A.    Heather Carr.

22   Q.    How much money did you get from the scheme?

23   A.    I roughly would say a little -- in the $20,000 range.

24   Q.    What did you do with that money?

25   A.    Paid for bills and my financial living situations and

29

Cross - Green

1    reduced?

2    A.    I can't give a definite answer because I don't know

3    what the percentage would be.  At least -- hopefully 20

4    percent.  I don't know exact amount when it comes to

5    federal.

6    Q.    Okay.  I didn't -- I didn't say that you knew.  What

7    are you hoping Ms. Paluch and Mr. Fields recommend --

8    A.    Just any less time than what my guidelines say.

9    Q.    -- to the Court?

10           Okay.  And this recommendation depends on your

11   cooperation?

12   A.    Correct.

13   Q.    And their view of it, correct?

14   A.    Correct.

15   Q.    So if you're saying things that they don't like,

16   that's not going to be cooperation, is it?

17   A.    Correct.

18   Q.    Some time in 2010, you had this conversation with

19   Heather Carr at a barbecue about this student loan scheme.

20   A.    That is correct.

21   Q.    Okay.  Was that over at her house?

22   A.    Yes, it was.

23   Q.    And that's the Pleasant --

24   A.    The Pleasant Drive address.

25   Q.    Pleasant Drive address.

30

Cross - Green

1    A.    Yes.

2    Q.    And it's just you and Ms. Carr.

3    A.    And our children, yes.

4    Q.    Okay.  Mr. Thomas isn't there?

5    A.    Not that I recall for the first conversation.

6    Q.    Okay.  And you get a good understanding of what Carr's

7    idea is?

8    A.    Yes.

9    Q.    Okay.  And am I correct that this whole thing can't

10   work without Heather Carr?

11   A.    That is correct.

12   Q.    And why is that?

13   A.    Because she was able to pull the information from her

14   database at work.

15   Q.    Okay.  So if I'm understanding how this goes about,

16   you can sit down on a computer and access a public website

17   that deals with some state Department of Corrections?

18   A.    Correct.

19   Q.    So maybe Florida?

20   A.    Any -- yeah, any public record, yes.

21   Q.    And you could identify an inmate who was serving a

22   sentence for X number of years?

23   A.    Yes.

24   Q.    And then with -- you'd get that name, correct?

25   A.    Yes.



# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES



DATE INTERVIEWED:     February 10, 2017

PERSON INTERVIEWED:  Mercedes Diaz

ALSO PRESENT:         Siddhartha Rathod, Defense Attorney

INTERVIEWED BY:       Martha Paluch, Assistant US Attorney
                      Sandra Ennis, ED-OIG Special Agent
                      Sonia Hacker, Postal Inspector

LOCATION:             Colorado Springs Post Office
                      201 E Pikes Peak Avenue
                      Colorado Springs, Colorado 80903

CASE NUMBER:          12-080234

CASE NAME:            Pikes Peak Community College Fraud Ring

After being advised of the nature and purpose of the interview and the identities of all present, Mercedes Diaz, voluntarily provided the following information, summarized as follows:

Diaz met Heather Carr at the Phil Long Ford car dealership in Colorado Springs, Colorado. Both Carr and Diaz's mother were employed at the dealership. Diaz was expelled from school when she was approximately 11 or 12 years old so she would hang out in the basement of the dealership while her mother worked. Diaz enjoyed hanging out with Carr because she was one of the youngest people working there.

Carr, who was 24 years old at the time, offered to take Diaz under her care because Diaz was taken out of her mother's home due to issues Diaz had with her step-father. Carr came from an upbringing of group homes and foster care and Carr did not want that environment for Diaz.

Carr became a mother figure to Diaz. Diaz lived with Carr for less than a year and during that time, Diaz continued to get into trouble. On Christmas Eve, Diaz stole Carr's vehicle and the state took Diaz from Carr's care.

At approximately age 13, Diaz was committed to the Juvenile Youth Corrections in Colorado Springs, Colorado for approximately two years. Carr wrote to Diaz during this timeframe.

At age 19, Diaz was out of the youth corrections system and living in Denver. While living in Denver, Diaz was using drugs and involved in prostitution. Diaz got hurt on a call and decided she wanted a fresh start.

Diaz could not find employment in Colorado and knew Carr was residing in Arizona with her daughters. At the time, Arizona had the fourth best economy in the country and Diaz was able to find employment within a week of moving there.

Diaz enrolled in Phoenix College and was able to pay for classes with student loans and with help from her father, who was prior military. Diaz also purchased a car. Diaz felt like she was supposed to be in Arizona.

Prepared by: Ennis, Sandra                          Date Prepared: February 13, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)              EXHIBIT F              Page 1 of 6

Interview of Mercedes Diaz, February 10, 2017                              12-080234

Diaz attended Remington College when she was residing at the Dale House Project in Colorado Springs, Colorado, following emancipation from her mother. Diaz was enrolled in a medical assistant program. During this timeframe, Diaz was employed at Antler's Hilton in Colorado Springs, Colorado.

Diaz resided with Carr at the 1351 Pleasant Drive address in Chandler, Arizona, for about a month. During this timeframe, Tramell Thomas did not live in Arizona. While residing in Colorado, Diaz met Thomas on only one occasion, when Carr came from Arizona to visit him. Carr and Thomas were not married.

Diaz rarely ever saw Thomas when he was on parole. Carr usually travelled once a month to Colorado to see Thomas. Diaz did not know every detail about Carr and Thomas' relationship. Carr and Diaz had more of a mother-daughter relationship.

Diaz was not aware of what part, if any, Thomas played in the financial aid fraud scheme. Thomas was always trying to start businesses and doing all sorts of things to impress Carr. Diaz felt Thomas was mooching off Carr. Carr did not discuss Thomas' involvement in the scheme with Diaz.

Diaz first learned of the financial aid fraud scheme after living in Arizona for approximately six months. Carr informed Diaz of the scheme and told her that it was a way for Diaz to make money.

Part of Diaz's involvement was to receive college and financial aid mail in other people's names. Diaz got into a confrontation with a letter carrier while residing at one of the addresses in Mesa, Arizona. The United States Postal Service (USPS) refused delivery of mail in the names of various individuals to Diaz's house. Diaz questioned this because the mail was correctly addressed. Diaz told the letter carrier that she helped people by receiving their financial aid funds and this is how she paid for her rent.

Diaz knew Christine Duncan from escorting in Colorado. Duncan was messing around with Thomas. When residing in Colorado, Diaz did not hang out with Thomas. Duncan got Thomas in trouble and Diaz and Marcy Green helped Duncan come down to Arizona to raise money for his legal fees.

Diaz never liked Green. Carr introduced the two of them and at no time did Green or Diaz just hang out together. It was a business relationship. Diaz and Green did not drive around together and withdraw funds from the financial aid debit cards. The two of them did their own thing and they did not hang out.

Carr asked Diaz for mailing addresses. Diaz got paid $500 for each piece of mail. Diaz knew people in the "hood" that agreed to accept mail in other people's names and did not ask any questions about the mail.

Diaz recalled using three mailing addresses on Dragoon Circle in Mesa, Arizona and she also used one of her previous addresses at 724 West Knox Court, Chandler, Arizona. Diaz collected mail from her friends that agreed to accept the mail and she turned over all the mail pieces over to Carr. Diaz received $500 in cash and she gave her friends $100. Diaz did not have any knowledge about the addresses used in Colorado Springs, Colorado, such as the Lexington address.

Green was also tasked with finding friends that would allow the use of their address and she also received $500.

Interview of Mercedes Diaz, February 10, 2017                                    12-080234

After approximately two semesters, Carr showed Diaz how to submit Free Applications for Federal Student Aid (FAFSA) and how to complete the online coursework. Carr paid Diaz additional money for submitting the assignments. There were homework assignments for approximately 20 to 30 students and Carr could not complete all of them on her own because she was working full time. Diaz was somewhat familiar with the financial aid process because she submitted FAFSA's to obtain student loans in her own name.

Diaz randomly queried names on various department of corrections' websites and provided Carr a list of inmate names and dates of birth. Carr made additional queries by using a database she had access to with her employment at Wells Fargo. Carr obtained additional information, such as the inmate's social security number. Only inmates serving a sentence of more than eight to ten years were used because they figured the inmates would not access their credit history for a long period of time.

Carr filled in the list with additional information required for the financial aid application process. Diaz took Carr's information and submitted the FAFSA and obtained the FAFSA PIN.

Diaz submitted FAFSA's and did homework at various locations, including Carr's and Green's house and at her own residence too. Diaz did not recall Green's address.

Carr, Diaz, and Green did not discuss the fraud scheme at length with one another. It might have been brought up on one or two occasions at a barbeque, only to mention about a homework assignment being due. The three of them had homework parties. They sat around to complete homework, query department of corrections websites, and fill out FAFSA's while drinking.

Green did everything that Diaz and Carr did in the financial aid fraud scheme. Green had her own laptop to use. Diaz recalled Green's laptop having stickers on it but could not recall the color of the laptop. Carr had Macintosh laptops in her home. If they were hanging out, any laptop or computer in Carr's residence was used for convenience when checking on something related to the financial aid fraud scheme. Diaz owned two laptops that she also used in the financial aid fraud scheme. Her laptops were black in color.

Green and Diaz were not close. They worked together to make money. They saw each other at parties and were cordial. Green lived on the south side so she was not always at Carr's house when Diaz was there but Diaz knows that Green was logging in to register attendance just like she was.

Once the student loan debit cards started coming in, Carr needed help withdrawing the money from the cards since she was working full-time from home. The debit cards had a daily withdraw limit of $500. Each card had approximately $2,500 to $3,000 in financial aid funds. Diaz would hang onto the card until it had been drained. At times, she would also go to Fry's grocery store to buy something and get cash back from the debit card. Other times, she went to various ATM locations or used the cards for personal purchases.

The debit cards were divided up. If you received the mail, then the debit card was yours. Initially, Diaz received a flat fee of $500 but she started receiving three-fourths of the card amount when she started doing homework, department of corrections queries, and FAFSA submissions. Carr received the remaining one-fourth of the amount on each card.

Green also kept the money on the debit card and she also gave a portion of the funds to Carr. Diaz knows this because of conversations between Carr and Green when Diaz was present. Carr also told Diaz that Green gave Carr a portion of the financial aid funds on the debit card.

**AFFIDAVIT:**

I, Heather Carr, affirm that the statements made in this affidavit are true and correct to my best information and belief.

1. I am a Defendant in case #2016-cr-00054-WJM pending in the United States District Court for the District of Colorado. I was charged in this case along with Tramell Thomas, Mercedes Diaz, and Marcelle Green with participating in a federal student loan fraud scheme. I have previously entered a plea of guilty in the case and have been sentenced pursuant to my plea. I make this affidavit freely and voluntarily and understand that it may be used in a pleading to be filed with the Court by my co-defendant Tramell Thomas.

2. I entered into a cooperation agreement with the United States government and pursuant to that agreement, I was interviewed by representatives of the government on numerous occasions spanning over a 12 month time period.

3. Of particular relevance to this affidavit, I participated in interviews conducted by telephone on the following approximate dates: October 30, 2017, and November 6, 13, and 20, 2017. With the exception of the interview on November 13, 2017, it is my understanding that the participants in the interviews aside from myself, were, my attorney Mary Butterton, Assistant United States Attorneys Paluch and Fields, and Special Agent Ennis. I was advised that Mr. Fields was not a participant in the November 13, 2017 interview. All of the above referenced interviews were conducted by telephone.

4. Early in the interview on October 30, 2017 in response to questioning, I told the government representatives (as I had previously stated in an earlier interview) that I had never seen Tramell Thomas fill out a FAFSA loan application nor did I know if he knew how to fill out such an application.



5. Once I made these statements AUSA Fields became quite upset and told me that I was now saying something different than what I had said during my original interview with the government in November of 2016.

6. In the November 6, 2017 interview AUSAs Paluch and Fields were asking me if Mr. Thomas had ever threatened me or in any other way had forced me to be involved in the student loan fraud scheme. My response was that he had not and further that the main participants in the scheme were myself, Mercedes Diaz, and Marcelle Green. Mr. Fields was apparently very frustrated with my answers and he began yelling at me. At one point he stated, "I will rip up your fucking plea agreement and send you to jail for a long time".

7. At this point in the interview my attorney Ms. Butterton told Mr. Fields that his behavior was inappropriate and she terminated the interview.

8. The third interview in 2017 occurred the following week on, I believe the thirteenth of November. At the start of the interview, Ms. Paluch advised that Mr. Fields was not participating on the call and would no longer be involved with my participation in the case. She was most apologetic for Mr. Field's prior outbursts. The final interview was held I believe on November 20, 2017 and Mr. Fields was again a participant.

9. During my interviews with the government I remember telling the government representatives the following:

   a. That Marcelle Green had assisted myself by picking up student loan related mail in the state of Colorado.

   b. That Tramell Thomas did not provide the address on Radiant drive for use in the student loan fraud.

   c. That Tramell Thomas did not participate in the loan scheme nor knowingly benefit from the scheme while he was incarcerated in the El Paso County Jail in Colorado Springs, Colorado from approximately late January of 2011 through early November of 2011.

   d. That it was my understanding that the people Tramell Thomas helped apply for federal student loans to assist in attending Pikes Peak

Community College in Colorado prior to his moving to Arizona in 2012 actually did attend or intended to attend school.

e.   That further it is my belief, that between statements that I made to the government and what my attorney Mary Butterton told the government, that the government is well aware that I was not present nor was a witness to any type of criminal activity occurring in Colorado Springs, Colorado in January of 2011, as I was residing in Arizona and recovering from the delivery of my child.

f.   In the last interview with the government I attempted to explain my understanding of my agreement with the government and was told no such promises or agreement had been made.

g.   During my initial interview with the government, I told them that Mercedes Diaz dated Michael Cox prior to her moving to Arizona.

h.   During my interviews with the government, I told them that I originally purchased the Dodge Charger automobile (government's exh. 3 in the Thomas trial) for Roderick Smith.  Mr. Smith is the father of Marcelle Green's children.  Throughout my ownership of that automobile and specifically in 2011 and 2012, Marcelle Green continually borrowed and operated that automobile for her own personal needs.

Further Affiant sayeth not:

Heather Carr

State of Arizona

County _Maricopa_

Subscribed and sworn to before me this __5th__ day of ~~January,~~ _February,_ 2018 by

_____.

Witness my Hand and official Seal.

My Commission expires: __04 | 30 / 2019__          _____
                                                   Notary Public

                                                   __02 | 05 / 18__

                                                   _____

SEAL RAQUEL ARAUJO
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
April 30, 2019

Requestor: USPIS\PLCornell

 **UNITED STATES POSTAL SERVICE**

Forensic Laboratory Examination Report
Forensic Laboratory Services
22433 Randolph Dr.
Dulles, VA 20104-1000

October 28, 2015

Case No.1939700-MF - Lab File No. 9-349-011357(2)
Type of Examination: Fingerprint
Request Date(s): 05-11-2015

K. P. Haithcoat
Postal Inspector
1745 Stout Street, Suite 900
Denver, CO 80299

EXAMINATIONS:
Examine Exhibits 1 through 5, a debit card, fifty-two Mastercards, Pikes Peak documents and photocopies of two identification cards, for the presence of latent prints of value for identification.

Compare any latent prints to the fingerprints of the following:

    Tramel Thomas, FBI No. 944342FB2, designated as Exhibit K-1
    Heather Elizabeth Carr, FBI No. 72302EB7, designated as Exhibit K-2
    Mercedes Dee Diaz, FBI No. 269620VC6, designated as Exhibit K-3
    Michaela Inez Grant, FBI No. 480570ED5, designated as Exhibit K-4
    Marcelle Ruby Green, FBI No. 555483MB0, designated as Exhibit K-5
    Matthew Kenneth Sanders, FBI No. 710044RB0, designated as Exhibit K-6

FINDINGS AND OPINIONS:
Exhibits 1 through 5 were examined for the presence of latent prints. Twelve latent fingerprints and one latent palm print were developed on parts of Exhibit 3. No latent prints of value were present or developed on the remaining exhibits. The latent prints were compared to Exhibits K-1 through K-6 resulting in the following identifications:

    Heather Elizabeth Carr, FBI No. 72302EB7, Exhibit K-2
    One latent fingerprint on part of Exhibit 3, Pikes Peak document "Donald F. Grants"

    Mercedes Dee Diaz, FBI No. 269620VC6, Exhibit K-3
    Six latent fingerprints on part of Exhibit 3, Pikes Peak document "Edward Jones",
    Five latent fingerprints on part of Exhibit 3, Pikes Peak document "Virginia Jones"

No known palm prints of Tramel Thomas, Heather Elizabeth Carr, Mercedes Dee Diaz, Michaela Inez Grant, Marcelle Ruby Green or Matthew Kenneth Sanders were available for comparison.

EXHIBIT
H
Blumberg No. 5119



AN ASCLD/LAB - *International* ACCREDITED TESTING LABORATORY SINCE DECEMBER 8, 2014

Case No.1939700-MF - Lab File No. 9-349-011357(2)                                      Page 2

REMARKS:
Clearly and completely recorded palm prints of Tramel Thomas, Heather Elizabeth Carr, Mercedes Dee Diaz, Michaela Inez Grant, Marcelle Ruby Green and Matthew Kenneth Sanders are required for a conclusive comparison to some of the unidentified latent prints.

Photographs of the latent prints have been prepared and will be available for any additional comparisons you may request or for the preparation of court exhibits should it become necessary.

In the event latent print testimony is necessary in the trial of this case, a current set of known prints of Heather Elizabeth Carr and Mercedes Dee Diaz, recorded and signed by an individual who will be available to testify, should be submitted prior to any request for testimony.

EXHIBITS:
Exhibits 1 through 5, received in this laboratory on May 14, 2015, are being returned with this report via Registered Mail.

The fingerprints of Tramel Thomas and Heather Elizabeth Carr, obtained from the FBI on October 27, 2015, and the fingerprints of Mercedes Dee Diaz, Michaela Inez Grant, Marcelle Ruby Green and Matthew Kenneth Sanders, obtained from the FBI on October 28, 2015, are being retained.

Secondary evidence, created during this examination, is being retained in this laboratory.

Patricia L. Cornell
Forensic Latent Print Analyst, Sr.
Telephone: 703-406-7113
Fax: 703-406-7115

This is an official FLS examination report only if it contains an original signature of the forensic analyst.



AN ASCLD/LAB - *International* ACCREDITED TESTING LABORATORY SINCE DECEMBER 8, 2014