

# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES

| | |
|---|---|
| DATE INTERVIEWED: | October 30, 2017<br>November 7, 2017<br>November 13, 2017 |
| PERSON INTERVIEWED: | Heather Carr |
| ALSO PRESENT: | Mary Butterton, Defense Counsel |
| INTERVIEWED BY: | Martha Paluch, Assistant US Attorney<br>Bryan Fields, Assistant US Attorney<br>Special Agent Sandra Ennis |
| LOCATION: | Telephonic<br>1801 California, 16th floor conference room<br>Denver, Colorado 80202 |
| CASE NUMBER: | 12-080234 |
| CASE NAME: | Pikes Peak Community College |

On various dates, Assistant United States Attorneys, Martha Paluch and Bryan Fields, and Special Agent Sandra Ennis, United States Department of Education (ED), Office of Inspector General (OIG), interviewed Heather Carr telephonically. Carr's legal counsel, Mary Butterton, was also present on the call. After being advised of the nature and purpose of the interview and the identities of all present, Carr voluntarily provided the following in essence:

Carr's communications with Thomas are bad. Thomas started paying child support in what Carr believes is an effort to make himself look better at trial. Last month, Thomas stopped paying. Thomas and Carr do not speak. He sends text messages directly to his daughter. Carr feels so stupid and cannot stand Thomas. He is a liar and there is no point in trying to have a conversation with him.

Approximately three months ago in mid-August, on three separate occasions, a strange man came to her door and it scared the shit out of her. The first time he came to her house was around 4:00 p.m. and Carr was at the YMCA. The individual had dreadlocks and was seen on his cellphone standing in her driveway. The individual was not in a car. The second time was around 8:00 p.m. and Aubrey (LNU) was home but Carr was not. About three days later, the same individual came back. Carr answered the door and the individual said, "You are testifying against Marcy. Make sure you do not say anything about anyone else."

Some of Green's family members reside in Virginia. Carr does not know how Green knows where she lives. The occurrence was completely random and has not happened again.

Green is lying about not having been to Colorado. She has been to Colorado on many occasions when transporting drugs from Colorado to California.

Carr has never testified and never been in trouble. Carr owns her own company called "That Goodish" and she is a driver for Lyft.

Prepared by: Sandra Ennis     Date Prepared: November 08, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)     Page 1 of 5

 

MOI_00000549

In approximately January 2009, Thomas applied for his own federal student aid (FSA) for attendance at Pikes Peak Community College (PPCC). Thomas used this money as a source of income.

In approximately 2010, Thomas took friends to PPCC and helped them enroll. These individuals were Lola Thomas, Vanessa Lopez, Christine Duncan, Ismael Omar, and Thomas' cousin, Michael Cox. Thomas received a portion of the FSA funds for assisting these individuals. Carr knew this because Thomas told her this information. Cox legitimately attended school.

Thomas met Lola Thomas while he was in prison. At some point, Lola Thomas was not allowed to visit Thomas in prison because she was caught bringing in drugs. Thomas lived with Duncan, and Omar was a friend of Thomas. Carr does not know anything about Lopez.

In searching for inmate names, Carr, Diaz, and Green did Google searches of department of corrections and found inmates through various department of corrections websites. These inmate searches were conducted at both the Pleasant and Kaibab addresses. Green also did inmate searches from her residence.

Carr was not certain if Thomas conducted inmate searches while living in Colorado. Carr was sure Thomas also conducted inmate searches on department of corrections websites while residing in Arizona. Thomas was involved in completing homework, submitting FAFSAs and getting money off the debit cards.

Carr was able to get an inmate's social security number (SSN) from her access to Lexis Nexis at work. Carr conducted legitimate business queries when verifying a customer's SSN. This query was done for auditing purposes. Carr conducted queries related to the scheme on her work issued laptop and on her personally owned computer.

The four of them made up information when filling out documents provided to the school. The applicant's mailing address was not made up. There needed to be a valid address for the Higher One debit card to be mailed to. Higher One sent an email, usually to an email address generated by the school. The email stated that a debit card was mailed and the student should expect to see a bright green envelope containing the debit card within two to three business days. All four of them provided addresses for the debit cards to be mailed to.

Thomas' business partner, Kimmisha Mullet, allowed Thomas to use her address for receipt of the Higher One debit cards. Thomas told Carr this information.

Higher One debit cards were mailed to the 975 E. Riggs Road post office box address. These debit cards were taken out of the original green envelope that they were mailed in and placed in another envelope. These envelopes were addressed to Carr and were in Thomas' handwriting or another female's handwriting.

Carr and Diaz resided at 2441 Lexington Village Lane in Colorado Springs. Michelle Grant, also known as Mychalea, resided at 2372 Lexington Village Lane. Carr forwarded her mail to the 2372 address when she moved to Arizona. Grant gave Carr a key to the mailbox so that Carr could get her actual mail. Initially, Grant did not know that her address was being used in the scheme. Grant became aware when an investigator came around looking to speak with her. The address was no longer used after the investigator came around.

Carr and Diaz did the majority of picking up the debit cards from the 2372 address. Carr recalled a conversation when Diaz did not have the key so Diaz broke into the backside of the mailboxes. Thomas possibly picked up mail from the 2372 address also.

The Dragoon and W. Knox addresses were provided by Diaz and Diaz opened post office boxes for the receipt of debit cards. The Blackhawk address was associated with her step-brother, Matthew Sanders, and the Rice address was associated with Thomas' cousin, Cox.

Thomas provided the 1418 Rushmore address to parole but he did not actually reside there. He had access to the garage and kept his belongings there. He resided at the 3820 Radiant address. La Tania Pickens goes by Tania or Shanelle and she was the owner of the Rushmore address. An individual named La Toya (LNU) is a different person that was mentioned in Duncan's interview. La Toya is a crack head.

At times, the Rushmore address has been vacant. Carr and Thomas picked up debit cards from this address. The mail box at Rushmore sits at the end of the curb.

Carr typically worked from 9 a.m. until 8:00 p.m. and every other weekend. She needed to be available for CarMax loan decisions.

All four of them submitted FAFSAs. They were not always successful. At times, an applicant was already in default or had an active PIN number with ED. There were also times when an SSN was invalid.

All four of them participated in submitting electronic applications to PPCC. Part of the reason in choosing PPCC was because Thomas had already submitted applications at PPCC and it was working for him. Carr was also familiar with obtaining FSA from PPCC. Some of the schools were chosen because of their familiarity with the school as a result of their own enrollment. Diaz attended Mesa Community College. Green attended Gateway College and Carr attended Phoenix College. Carr was not familiar with applications being submitted to Chandler-Gilbert Community College, the Community College of Denver, Pueblo Community College, and Red Rocks Community College.

At some point, all of them submitted master promissory notes (MPNs) and attended and completed online coursework. In order to receive the FSA funds, a student had to be enrolled in at least six credit hours and register attendance. Green did a lot of the work because she was not employed. The scheme was Green's job.

In 2012, Thomas went to ATM locations to withdraw money from the debit cards. Carr was never with him but she knew he was withdrawing money because he brought home wads of cash and had the debit cards with him or in his wallet. Thomas liked to withdraw the cash himself because he did not trust other people with money. Carr believed the debit cards had a daily cash withdrawal limit of either $300 or $500. The debit card could also be used to obtain cash with a purchase.

During the 2010-2011 timeframe, Thomas stayed at the Pleasant address when he visited Carr in Arizona. Thomas gave Carr Colorado mailing addresses to use for inmate applicants, and he was still enrolling females that he knew in Colorado. Thomas asked her to obtain SSN information for him. Carr does not recall Thomas sending her text messages with SSN information. They were always cautious about what information they put in a text message.

Higher One debit cards were still being mailed while Thomas was in El Paso County jail, and Thomas knew the scheme was continuing. Carr and Thomas did not discuss the scheme on the jail phone. Carr and Thomas spoke in code. An example of the code was Thomas asking how Carr was doing in school and if she was getting good grades. Carr would say she had a lot of homework. Thomas knew Carr was not enrolled in school. Carr used funds from the scheme for Thomas' commissary and legal fees.

Carr saw the photos of Thomas and money that were taken from his cell phone. Carr assumed he was trying to impress his friends and looked like a dumb ass. Carr has no knowledge of Thomas selling weed. There were two sides to Thomas. He had a family oriented side with her and a flashy showy side with others.

Thomas did not know how much Carr made. He assumed she had a really good job. Carr was making approximately $50-$60K. Carr was broke but it would look like she made a lot of money to someone in jail. Carr used money from the scheme to pay rent at the Kaibab address. Thomas never asked Carr to stop the scheme and never gave Carr the impression that he no longer wanted to be part of the scheme.

After his release from El Paso County, Thomas did not work in Arizona and was still involved in the scheme. Thomas and Kimmisha Mullet co-owned a business and that was his only employment.

Thomas was involved with submitting FAFSAs. Carr believed he did so in his office at the Kaibab address. While she never personally saw him submit FAFSAs she remembers providing Green and Thomas with lists of SSNs. Carr saw Thomas' handwritten notes that were related to FAFSA submissions, such as PIN numbers and email addresses in his office.

Thomas completed coursework. There was one occasion where Thomas could not save or submit the psychology coursework on his computer. Carr saved Thomas' coursework to a USB thumb drive and then transferred the coursework to her computer located in her office. Carr did not use the computer located in Thomas' office. It was password protected and Thomas did not give her the password.

Carr recognized the photo of the white Dodge Charger on Thomas' phone. It was the vehicle Thomas was driving the night of his traffic stop. While the vehicle belonged to Carr, Thomas had the vehicle in Colorado and he brought it with him when he moved to Arizona.

The night of Thomas' traffic stop, Carr was worried because Thomas never came home. Thomas had court the following morning and was released. The vehicle was impounded. Thomas was quiet and did not want to discuss what happened. Thomas seemed nervous. He told Carr that he just wanted to go home, shower, and go to sleep. Carr dropped off Thomas at the impound lot. Thomas called Carr shortly thereafter and asked Carr to meet him near the Pleasant address. Thomas searched the Charger for the debit cards and realized the cops took the debit cards when he was pulled over. He seemed panicky. Carr was not aware he still had the debit cards. She assumed the debit cards were gone. There was no reason for him to still have the debit cards.

Thomas told Carr that he had been cheating on her. The girl Thomas was cheating on her with called him at 1:00 a.m. and threatened to tell Carr. Thomas went to the girl's house to get everything from her house. This included the debit cards, pink laptop, and some other things. Following the traffic stop, Thomas went to stay at a hotel for about three days.

Thomas's time spent in El Paso County jail was approximately two months for the pimping charges. The remaining time was spent for the accessory to murder charge. All of the charges were dismissed.

Thomas gave Carr Sanders' Blackhawk address to use in the scheme. Carr did not speak with Sanders about the scheme. There was an occasion when Sanders inadvertently told Carr about Thomas and some girl at the Radiant address. After that, Carr and Sanders did not talk that much. If they did, it was always about positive stuff.

Interview of Heather Carr, October 30, 2017                                12-080234

Carr and Thomas assumed the search warrant at the Kaibab address resulted from Thomas' traffic stop. They did not answer the door immediately because items were being destroyed and she took the time to brush her teeth and put on makeup. During the search a police officer asked Thomas why he broke his phone. Thomas did not respond. Later, Thomas admitted to Carr that he broke his phone. He told Carr he did not want her to find out about other bitches. Carr confirmed the broken phone was in Thomas' closet. Carr and Thomas had their own closet at the Kaibab address. Carr saw the photo of Thomas standing in a closet. Carr confirmed it was a photo of Thomas standing in his closet.

Following the search warrant execution at the Kaibab address, both Carr and Thomas went to Green's house to discuss what happened. Both of them were questioning Green about what law enforcement asked her and what she told them. Both Carr and Thomas were nervous.

While in El Paso County jail, Thomas asked and Carr offered to assist him with his legal fees and putting money on his commissary account. The topic of Thomas' legal fees was brought up when Thomas told Carr he could not use a public defender. Carr assumed he has no one else to help him.

A portion of Thomas' legal fees came from Christine Duncan's escorting. Carr did not mention this previously because she was embarrassed. Carr believes there were three payments of $200. To be on the safe side, Carr thinks she received approximately $800 from Duncan's escorting. Carr did not receive this money directly from Duncan. She received this money from Diaz or Green.

In discussing Carr's financial statements, Carr advised there were charges related to a trip to California. Thomas was on the trip. Carr used funds from the scheme to pay for the California trip and other trips that she took with Thomas. Carr and Thomas also used funds from the scheme to go to casinos.

Carr's only knowledge of Thomas' employment was with 911 Design & Printing in Colorado. This was the business he had with Mullett. Thomas had wads of cash but he was secretive with Carr.

Thomas told Carr to keep SSN information for Duncan, Lopez, and Omar in case he lost it.

Carr admitted to lying to Wells Fargo about the Lexis Nexis searches. Carr was afraid of losing her job and she had her children to think of. Lying to her employer and lying under oath are two completely different things.

Carr is not angry or jealous of Thomas.

Carr admitted to contacting Green and telling her not to talk to law enforcement. Carr thought Green should get a lawyer and told Green she could be charged with perjury if she lied to law enforcement.

Carr did not sign up Thomas for FSA without his permission.

AUSA Bryan Fields was not present during the telephonic interview that occurred on November 13, 2017.

MOI_00000553