IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM-02

UNITED STATES OF AMERICA,

    Plaintiff,

v.

**2.    TRAMMEL THOMAS,**

    Defendant.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT TRAMELL THOMAS'S MOTION FOR NEW TRIAL (ECF No. 358)**

The United States of America (the government), by Robert C. Troyer, United States Attorney, through Martha A. Paluch and Bryan D. Fields, Assistant United States Attorneys, respectfully submits this response in opposition to Defendant Trammel Thomas's "Motion for New Trial" (ECF No. 358) (hereinafter the "Motion"). For the reasons set forth below, the motion should be denied.

**I.    LEGAL QUESTION PRESENTED**

The question presented by the defendant's motion is whether there was undisclosed evidence favorable to the defendant, that, had it been disclosed, raises the reasonable probability that the defendant would have been found not guilty. *United States v. Reese*, 745 F.3d 1075, 1084 (10th Cir. 2014). That is, does the allegedly undisclosed evidence "shake [the court's] confidence in the guilty verdict"? *Id.* As set forth below, there was no undisclosed evidence. Furthermore, the allegedly undisclosed evidence would have had no bearing on the outcome of the trial. Accordingly, the answer to the question presented is that there was no undisclosed evidence that undermines the jury's finding, beyond a reasonable doubt, that the defendant is

1

guilty.

## II.     THE GOVERNMENT DID NOT SUPPRESS EVIDENCE

### A. The Motion Tendentiously Packages Old Disclosures as New Revelations

There is nothing novel about the "new" evidence presented by the defense. Perhaps unsurprisingly, it is quite common for defendants who have already been sentenced — and who thus have nothing left to lose— to recant prior statements and otherwise make efforts to assist their former partners in crime (and love). Unsurprising at all is that the Supreme Court and Tenth Circuit have taken an extremely dim view of these post-trial efforts to manipulate the justice system with strategic recantations and affidavits. *See generally, Herrerra v. Collins*, 506 U.S. 390, 392, 423 (1993) (explaining that because post-trial affidavits are "obtained without the benefit of cross-examination," they "are to be treated with a fair degree of skepticism" (O'Connor, J., concurring); *In re Barrett*, 840 F.3d 1223, 1229 (10th Cir. 2016) ("Postconviction recantations are to be viewed with extreme suspicion and have long been disfavored as the basis for a claim of innocence.") (internal quotation marks and citation omitted).

What *is* surprising is that the defendant would file a motion raising serious allegations of prosecutorial misconduct involving "Undisclosed Information" — attaching two pages of a twelve page report, *see* Motion Ex. 8 — and then *fail to disclose to the Court the information in the missing pages*. For example, the defendant makes the eye-opening allegation that the government failed to disclose that Carr had never seen the defendant fill out a FAFSA. Motion, p. 5; Ex. 2, ¶ 4. But the government did disclose this statement. Attached as Exhibit A to this response is the full report of Carr's first proffer with the United States. That report, provided to defense counsel on March, 22, 2017, relayed Carr's comments that (1) she did "not know if he [Thomas] knew how to complete and submit an electronic FAFSA" and (2) "she never

2

personally saw Thomas submit FAFSA's or fill out loan records for the school." Ex. A, p. 5, 7. Moreover, when Carr told investigators during one of the 2017 proffer sessions that "she never personally saw him [Thomas] submit FAFSAs" the government recorded that statement and provided it to the defense in the report attached as Exhibit 1 to the Motion. *See* Ex. 1, p. 4.

Further examination of the entire reports shows that much of the allegedly "Undisclosed Information" was anything but. The Motion asserts the government failed to disclose that the defendant helped people who really went to college. It did not. Ex. A, p. 3 (relaying, among other things, Carr's statement that she believed "Thomas was helping people go to school"). The Motion also claims the government suppressed Carr's statement that she was not present in Colorado before 2011. But this, too, is something the government disclosed early in the case. Ex. A., p. 11 (relaying Carr's belief that Duncan used Carr's identity when Duncan was arrested in Colorado in January 2011).[1]

### B. The Motion Mischaracterizes the Affidavit

Other claims in the Motion mischaracterize the defendant's own "new evidence." The Motion avers that Carr told prosecutors that Green regularly and continually used the Dodge Charger in 2011 and 2012 "*including right before Thomas was arrested in that vehicle and 52 debit cards were seized from that automobile*." Motion, p. 5-6. But the italicized portion is conspicuously missing from Carr's affidavit. Ex. 2, ¶ 9(h). And neither Carr nor the defense

---

[1] Footnote 4 on Page 10 of the Motion infers something sinister about the government's reference in its sentencing statement, ECF No. 262, to Colorado Springs Police Reports documenting that one of the women at the hotel where Thomas was arrested identified herself as Heather Carr. True, Carr denied being there (admitting to being at the scene of a prostitution ring is something that many would find difficult to admit) — a fact disclosed to the defense. But the notion that the government is required to take everything Carr said at face value — or that it naively did so — is misguided. Carr's statement that Duncan impersonated her does not make sense given the other information in the report documenting Duncan's presence at the scene and her statement that she took the police to the Radiant Drive address she shared with Thomas. It makes no sense she was the third person identified as Heather Carr by the police.

challenges Carr's prior statements to the government that "Thomas used the vehicle, not Carr," Ex. A, p. 6, or that Thomas "had the vehicle in Colorado and he brought it with him when he moved to Arizona," Ex. 1, p. 4, a statement corroborated at trial by Duncan's testimony that Thomas drove the Charger in Colorado.

Similarly, the Motion asserts "Carr declares in her affidavit that Green had participated in collecting money in Colorado that had been generated by the scheme." Motion, p. 5 (citing Ex. 2, ¶ 9(a). The affidavit doesn't say that. Instead, it says "Marcelle Green had assisted myself by picking up student loan related mail in the state of Colorado." Ex. 2, ¶ 9(a). This exact information was disclosed to the defense well before trial. Ex. A, p. 5 (relaying Carr's statement that "Carr, Diaz, *Green*, and/or Thomas removed the back side of the mailbox on *their* trips to Colorado and obtained the mail in the inmates' names.") (emphasis added).

### C. The Motion Characterizes New Opinions as Old Evidence

Still other claims in the Motion are less "new evidence" than new opinions about old evidence. For example, the Motion says Carr now claims she, Diaz and Green were the "main" participants in the scheme. Motion, p. 5; Ex. 2, ¶ 6. But this is an odd claim because Carr does not simultaneously disavow the many detailed statements she made about the defendant's involvement in the scheme. Carr told investigators that the defendant obtained addresses, submitted fake Master Promissory Notes, completed coursework, withdrew scheme money from ATMs, used DOC lookups to identify victims, and asked Carr to query the social security numbers of victims. *See generally* Ex A; Ex. 1.[2]

More to the point, the implication that the government somehow suppressed evidence

---

[2] Carr also stated that "Thomas was involved with submitting FAFSAs." Ex. 1, p. 4. She explained while "she never personally saw him submit FAFSAs," she saw "Thomas's handwritten notes that were related to FAFSA submissions, such as PIN numbers and email addresses in his office." *Id.*

4

about the relative culpability of the defendants is, as above, belied by the documentary record. The proffer reports cited throughout this response make it clear that Carr was not shy about fingering Green, but not Thomas, as taking the lead in certain aspects of the scheme. Ex. A, p.3. (recording Carr's statements about how it was Green's idea to use prison inmates to advance the scheme); *Id.,* p 4 (recording Carr's statement that "Green was responsible for getting the scheme to work"); *Id.*, p.5 (recording Carr's statement that Green obtained her own addresses to use); *Id.,* p 7 (recording Carr's statement that she saw Diaz and Green, but not Thomas, filling out FAFSAs); *Id.*, p. 8 (relaying Carr's statement that Green "kept the debit cards and that the pink laptop belonged to Green"); Ex. 1, p. 3 (relaying Carr's statement that "Green did a lot of the work because she was not employed. The scheme was Green's job."). In short, there is no basis for defendant's claims that Carr's opinions about the relative culpability of members of the conspiracy was not disclosed to the defense.

### D. The Motion is an Exercise in Tactical Gamesmanship

The Motion highlights the considerations animating judicial cynicism of post-hoc affidavits. Carr, like any dissatisfied defendant in possession of the government's discovery file, is in a position to strategically pick and choose how she might best help Thomas (the father of two of her children).

For example, the Motion, citing Carr's affidavit, argues the government suppressed evidence that Carr told investigators the defendant did not participate in or benefit from the scheme while he was in jail. Motion, p.5; Ex. 2, ¶ 9(c). This cleverly worded statement means that Carr does not have to explicitly recant her pre-trial statement that "Thomas knew the scheme was continuing" while in jail. Ex. 1, p.3. Instead, the implication seems to be that the defendant may have known about the scheme, but did not knowingly participate in it or knowingly benefit from it while he was in prison. But even these statements are contradicted by Carr's prior

5

statements (not recanted in the affidavit), that she and the defendant slyly communicated with one another in "code" while the defendant was in jail so that prison officials wouldn't learn about the scheme. *Id.* (giving specific examples). They are also contradicted by Carr's statements (likewise not recanted in the affidavit) to investigators that she paid for the defendant's legal fees while he was in prison, a fact corroborated by at least one check made out to the law firm that represented Thomas in state proceedings. Ex. A, p. 6; Ex. 1, p.3; CMB_00000145 (showing check from Heather Carr to Griffith Law Firm for $774, dated July 11, 2011 with "last payment Tramell Thomas" in the memo line). In other words, Carr now claims that Thomas did not participate in or benefit from the scheme, but also does not deny her prior claims that she paid his attorneys fees and used code to discuss the scheme in prison.

More importantly, whether or not Carr told the government that Thomas did not participate in the fraud scheme while in jail is legally irrelevant. The government's position has always been that Thomas joined the conspiracy in 2010 and never withdrew from it. Whether he could actively participate in the conspiracy while in prison is thus irrelevant to whether he was still guilty of the conspiracy. *See United States v. Alcorta*, 853 F.3d 1123, 1139 (10th Cir. 2017) (explaining that "a conspiracy does not end simply because one conspirator has been arrested" and "incarceration by itself is insufficient to constitute [a conspirator's] withdrawal from the conspiracy") (quotation and citation omitted).

Something similar is afoot with two other claims in the Motion. The Motion claims that the government suppressed evidence that Thomas did not provide the Radiant Drive address. Carr's affidavit makes this claim now, Motion, p. 9; Ex. 2, ¶ 9(b), but does not retract her prior statements to investigators that Thomas resided at that address, Ex. 1, p.3; Ex. A, p. 5. Moreover, the defense ignores the evidence presented at trial on this issue. This address was used for a false FAFSA in the name of I.O., the defendant's former friend, as charged in Count 2

6

of which the defendant was convicted. In addition, Christine Duncan testified that she lived at the Radiant Drive address with Thomas. In other words, the government never asserted it had direct evidence that Thomas told Carr that he used the Radiant Drive address in the scheme. Instead, it asked the jury to make reasonable inferences from the available evidence: that Thomas enriched himself from the scheme by using his address.

The Motion also claims that the government suppressed evidence that co-defendant Mercedes Diaz dated Michael Cox, and that had the defense known this, they could have argued that Diaz actually provided the Rice Drive address for the conspiracy and not Thomas. Motion, p. 5; Ex. 2, ¶ 9(h). Carr never told the government that Diaz and Cox dated. Indeed, Carr does not retract her prior statements that "Cox resided at the Rice Drive address," Ex. A, p. 6, that she "hates Cox and does not speak to him," *id.,* her belief that "Thomas and Cox talked about the scheme together," *id.,* or that she did not know how Cox's credit card number ended up in her iPad's list of contacts. *Id.* at 10.

In any event, the defense was in a position to obtain testimony from the two people who would know if this dating allegation were true: Mercedes Diaz and Michael Cox. Both individuals were on the defendant's witness list. The defendant could have placed Diaz under subpoena and compelled her to testify. But Diaz's lawyer informed the government before trial that Thomas's defense team never tried to serve a subpoena on his client. With Cox, the situation was even better for the defense. Cox appeared on the first day of trial under the mistaken impression that he was still under the government's subpoena. The government informed defense counsel that Cox was present and defense counsel was able to talk to Cox that day. Ultimately, they decided not to call him to testify.

The defendant's strategic decisions not to compel testimony from Diaz or Cox substantially undermines his claim that now, after trial, things would have been different if his

7

defense team had access to this alleged "new" information that Diaz and Cox dated.

### E. The Motion Points to "New Evidence" That Was Never the Subject of Dispute

The Motion also tilts at windmills. For example, the Motion ascribes something nefarious to the idea that the 2017 proffer report has three dates, but Carr says there were four meetings. There were four meetings. Only three are listed in the report because Carr provided new or additional information at only three of the meetings. The last meeting, on November 20, 2017, was a trial prep session to formally ask questions that had already been answered (and described in the report). The government is not required to give its direct examination outlines to defense counsel before trial.

The claim that the government suppressed evidence that Thomas never threatened Carr is likewise empty. The government hasn't claimed otherwise. To the contrary, the reports repeatedly relay Carr's thoughts about Thomas before the trial. *See* Ex. A, p. 2 (recording Carr's statement that she was "not intimidated by Thomas;) *id.* at 11 (recording Carr's statement that she is "not afraid of Thomas"); Ex. 1, p. 1 (recording Carr's statement that she and Thomas "do not speak"); *id.* p. 5 ("Carr is not angry or jealous of Thomas.").

## III. THE "NEW" EVIDENCE DOES NOT UNDERMINE THE OVERWHELMING EVIDENCE OF THE DEFENDANT'S GUILT

The government disclosed Carr's pre-trial statements to the defense. There is no "Undisclosed Information." But even if there was such information, none of it would have changed the outcome of the trial.

### A. There Was Overwhelming Evidence of the Defendant's Guilt

It's important to put the trial into perspective. The defendant's suggestion that Thomas's conviction rests on "three pillars" is a vast oversimplification of hours of testimony and dozens of exhibits.

8

Text messages found on the defendant's broken phone contained evidence he communicated with Kimmisha Mullett to coordinate the shipment of fraud mail to his P.O. Box in Arizona. Mullett testified about how the defendant manipulated her into sending him mail in the names of other people, including Manuel Abate (whose debit card was in Thomas's *wallet*, not just in the car) and Dennis Miller (who was referenced by name in her text conversations with the defendant). The recording of the traffic stop did more than prove Thomas possessed fruits of the scheme: it showed that the defendant had no good answer for why the cards were in his car (i.e., if it were true that Green had driven the car before him, Thomas could simply have told the officer that. Instead, he babbled on about having a mysterious job that resulted in him having the cards). And Alison Stailey's testimony showed that the defendant used the computer at the home he shared with Carr to advance the scheme. In short, even if the allegedly "Undisclosed Information" (which, as set forth above, was actually disclosed) undermined portions of the government's case (which, as set forth below, it did not) there was still overwhelming evidence that the defendant was guilty. That information would not have changed the outcome of the trial.

### B. The Allegedly "Undisclosed Information" Would Not Have Changed the Defense's Approach to Cross-Examining Marcelle Green

There is no need to resort to speculative counterfactual scenarios to determine if the "Undisclosed Information" would have changed the outcome of the trial. It would not have, and the Court can be confident of this because, as set forth above, the government disclosed to the defense Carr's assertion that she never saw Thomas personally submit a FAFSA, didn't know if Thomas could even complete and submit a FAFSA, and never saw Thomas fill out loan records. Ex. A, p. 5,7; Ex. 1, p. 4. Accordingly the defense had all it needed to fully and effectively undermine Green's testimony regarding her FAFSA tutorial with Thomas.

9

In a footnote, the defense implies that it would have called Carr to the stand had it known of the limitations in her testimony. But, again, they did know. Furthermore, the government had good faith bases to believe that all of the witnesses on its witness list would, in fact, testify. Heather Carr was under the obligations of a contract with the government, the breach of which exposed her to the risk of a higher sentence. What more would a subpoena have done? As the defense surely knows from their presence at Carr's sentencing, this very issue was the subject of debate, with Carr claiming that the government should have subpoenaed her after she said she would not testify. The Court rejected that argument then; it should reject similar arguments from Thomas now. Ex. 4, p. 46-48; *See United States v. Turner,* 864 F.2d 1394, 1399 (7th Cir. 1989) ("[a]ll cooperation means is testifying when there is no legal obligation to do so").

Defense counsel was told that Carr would not testify on the second day of trial. Should they have really wanted to call her the stand — a dubious claim to say the least given her prior statements implicating Thomas and the inherent advantages that the mode of cross-examination would have given the government — it was in a position to immediately ask for a trial subpoena, for assistance from the Court in securing her appearance, and a continuance, if necessary. The defense did no such thing and there's nothing in the record to show that this was anything more than what it appears: a deliberate tactical choice. Once Carr broke her promise with the government and refused to testify under oath she became a wildcard that both sides —confronted with substantial unknowns, trial risks, and ethical concerns about whether she would follow an oath after breaking a promise with the government — were reluctant to play.

### C. The Allegedly "Undisclosed Information" Would Not Have Undermined the Fact that Thomas Was Caught Red Handed Trying to Hide a Giant Bag of Debit Cards

The Motion attempts to re-litigate the trial by reducing the traffic stop to an episode in which Thomas was driving around in a car that happened to have a bag of 52 debit cards. But as

the Court and Jury saw at trial, it was much more than that. Detective Seal testified that the defendant actively tried to hide the cards by sweeping them onto the floorboard. The audio recording of the encounter featured several moments in which Seal showed the defendant the cards and asked for an explanation. The defendant didn't have one — not even the easy excuse of claiming that the cards belonged to someone else who might have been driving the car (which everyone knew was not registered in his name). Most compelling, the defendant also had one of the debit cards in the wallet he kept on his person.

The Motion claims the defense was stymied because the government suppressed evidence that Green drove the car. The government denies that Carr ever made such a statement, which, by the way, contradicts her detailed account of how Thomas reacted to being pulled over that night and his frantic attempts to retrieve the cards from the Charger while in the impound lot. More importantly, the defense already had plenty of information to argue that the cards belonged to Carr: there were no fingerprints on the cards, the Charger was registered in Carr's name, Carr was the person with the most responsibility for the scheme, and Thomas's efforts to hide the cards could have been the act of a love-sick fool seeking to protect a partner. The defense never made such an argument. The defense also knew, before trial, that Carr claimed that Green owned a pink laptop,[3] Ex. A, p. 6, that forensic work on that laptop did not show ties to Thomas, and that Carr made many statements about Green's extensive involvement in the scheme, Ex. A, p. 3, 4, 7, 8. The defense thus had plenty of information to press the theory that someone else put the cards in the car. They chose not to do that. *See* Ex. 7 (showing that defense counsel asked Green no questions about the pink laptop in the Charger). The defense also had plenty of information to cross-examine Green under the theory that the defendant had a small role in the

---

[3] Green denied being the owner of the laptop, a fact disclosed to defense counsel before trial in the agent's reports of interviews with Green. MOI_00000392.

11

scheme relative to Green or Diaz. In fact, they pursued this line of questioning at trial. *Id.* (featuring questions probing Green's testimony that she only helped the defendant one time and questions about the close relationship between Carr and Diaz). The jury obviously found it unconvincing when juxtaposed to the rest of the evidence showing the defendant's guilt.

### IV. BECAUSE THE DEFENDANT'S MOTION RAISES PURE ISSUES OF LAW, NO HEARING IS REQUIRED

The Court has considerable discretion in ruling on the Motion. Its determination will not be disturbed on appeal except for abuse. *United States v. Easter*, 981 F.2d 1549, 1553 (10th Cir. 1992). The Court has the same discretion when it comes to deciding whether or not to have a hearing on the motion. *United States v. Sutton*, 767 F.2d 726, 729 (10th Cir. 1985). This is true even when, as here, the "new evidence" consists of post-trial declarations from a co-defendant that recants or calls into question evidence presented at the trial. *United States v. Jones*, 315 F. App'x 714, 715 (10th Cir. 2009) (Gorsuch, J.) (not precedential).

*Jones* itself is not precedential, but the case is nevertheless instructive as an application of binding Tenth Circuit precedent. In that case the Tenth Circuit affirmed a district court's decision to deny a motion for a new trial without an evidentiary hearing. In that case, as in this one, the "new evidence" consisted primarily of a post-trial declaration from the defendant's family member (cousin) and co-conspirator. The Tenth Circuit noted that a new trial cannot be granted unless the court is satisfied that "challenged testimony was actually false" and that "recantation of prior trial testimony is not looked upon with favor but rather with downright suspicion." *Id.* at 716. Ordinarily, a hearing is necessary to evaluate the credibility and impact of a recantation. *Id.* (citing *United States v. Page*, 828 F.2d 1476, 1478 (10th Cir. 1987). But not in every case. "In cases where the written record allows a district court judge to make credibility findings (and for us to evaluate such findings), no evidentiary hearing is necessary."

12

*Jones,* 315 F. App'x at 716 (citations omitted). Applying these principles, the *Jones* panel noted that the district judge who denied the motion had also presided over the trial, had taken the guilty plea of the recanting coconspirator, and was thoroughly familiar with all of the evidence presented in the case, much of which corroborated the recanted testimony. Under those circumstances, "we can hardly say that the district court abused its discretion in denying [the defendant's] request for an evidentiary hearing" nor could the Tenth Circuit conclude that the district court's decision to find the coconspirator declaration not credible without an evidentiary hearing arbitrary, capricious, whimsical or manifestly unreasonable. *Id.* at 716-717.

The Court had ample opportunity to assess Carr's credibility at her change of plea and sentencing hearings. At sentencing, Carr downplayed her own role by claiming she was working eleven hours a day on her legitimate job. Ex. 4, p 40 ("I worked from 9:00 a.m. to 8:00 p.m. everyday."). Then she blamed everything on Green. *Id.,* p. 39 (stating that Green went into Carr's Accurint account, Green got addresses without Carr's knowledge, Green did the scheme before Carr got involved and Green was "introduced in this"); *id.* p. 42-43 (claiming that "without her [Green] in the picture" Carr would have stopped the fraud in 2012 when Thomas moved in); *id.* p. 44 (blaming the fraud on "being around" Green). She also blamed Mercedes Diaz, the woman she helped raise. *Id.* p. 44-45 (claiming the scheme "kept going" in part because 'Mercedes didn't have a job and she was, you known, on drugs . . . and I was just trying to help people"). She even blamed her own children. Ex. 4, p. 41 ("At the time, you know, my daughter was about to be 16 and she wanted, you know, stuff 16-year-olds want[.]"). She also, of course, blamed the government.

On the other hand, the Court heard all of the evidence at trial and can see, from the *complete* reports that the government disclosed information about Carr's inconsistent statements, her statements about Green's responsibility for the scheme, and the limitations of her testimony

13

relating to the defendant. Other information allegedly disclosed to the government before trial and then allegedly not disclosed to the defense is consistent with Carr's obvious dislike for Green. Carr's affidavit, just like her statements at sentencing, elevates Green's role related to the Charger and other aspects of the scheme, and is inconsistent with many statements Carr made before trial that she has not recanted. As set forth above, Carr's new claims do nothing to change the nature or outcome of the defendant's trial.

The Court has abundant evidence to determine whether information was actually undisclosed to the defense. The evidence before the Court establishes that the statements the defendant now claims were never turned over were in fact turned over or simply were never made pre-Affidavit. On this basis, the Court can, and should, dismiss Carr's affidavit as being unworthy of belief. But even if the Court credits those allegations, for the reasons above, there is sufficient evidence in the record to support the determination that the allegedly "Undisclosed Information" was not "material." Whether evidence is "material" is a legal dispute, not a factual one, that the Court can resolve without a hearing. The Court should not hold an evidentiary hearing where the defendant has done nothing more than present an unsubstantiated affidavit from a disgruntled former conspirator who has numerous familial and emotional ties to the defendant. *See, e.g., United States v. Bell*, 169 F. Supp. 3d 826, 833 (N.D. Ill. 2015) (seeing no need to hold an evidentiary hearing on basis of post-trial declaration from co-conspirator that, even if called to testify, would "merely solidify [his] status as a perennially flip-flopping witness[.]"); *United States v. Taylor*, 600 F.3d 863, 870 (7th Cir. 2010) (noting that hearing testimony from former co-defendant would simply illustrate witness's contradictions and that such post-trial statements do not warrant a new trial); *cf. United States v. Turns*, 198 F.3d 584, 588 (6th Cir. 2000) (noting that granting new trials on the basis of post-trial affidavits would only encourage such practices from those who "after learning of the defendant's conviction, state

for the first time that they are willing to testify truthfully on the defendant's behalf."); *Baumann v. United States* 692, F.2d 565, 580 (9th Cir. 1982) (raising similar concerns of post-trial "sandbagging").

## V. CONCLUSION

For all of the reasons set forth above the Court should deny the defendant's motion without a hearing.

Respectfully submitted this 10th day of April, 2018.

        ROBERT C. TROYER
        United States Attorney
        District of Colorado

By:   s/ *Bryan David Fields*
        BRYAN DAVID FIELDS
        MARTHA A. PALUCH
        Assistant United States Attorneys
        1801 California Street, Suite 1600
        Denver, CO 80202
        Telephone 303-454-0100
        Facsimile 303-454-0402
        Bryan.Fields3@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on this 10th day of April, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

s/ *Bryan David Fields*
BRYAN DAVID FIELDS
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
Bryan.Fields3@usdoj.gov
