**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 16-cr-054-WJM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

**2. TRAMMELL THOMAS**,

Defendant.

---

## ORDER DENYING MOTION FOR NEW TRIAL

---

In this federal financial aid fraud case, Defendant Trammell Thomas ("Thomas") was charged with conspiracy to defraud the United States Department of Education ("DOE"). On November 30, 2017, he was convicted by a jury. (ECF No. 233.) Now before the Court is Thomas's Motion For a New Trial, which argues the Government withheld or suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (ECF No. 358.) As explained below, Defendant has not shown that material evidence was suppressed, and therefore the Motion is denied.

## II. BACKGROUND

Thomas was charged in this case, along with three co-defendants, including Heather Carr ("Carr"), Marcelle Green ("Green") and Mercedes Diaz ("Diaz"), with conspiracy to defraud the government, 18 U.S.C. § 286, specifically DOE, along with related counts of aiding and abetting mail fraud. (*See generally* ECF No. 131.) In summary, the fraud scheme for which all four Defendants now stand convicted

involved submitting falsified federal student financial aid applications (*i.e.*, "FAFSAs") and related community college enrollment paperwork in the names of incarcerated prisoners, without their knowledge or consent. The Defendants provided various mailing addresses they controlled or could access, so that when student aid funds were disbursed by means of debit cards issued in the names of inmates whose identities Defendants had stolen, the Defendants could collect those debit cards from the addresses they had provided and withdraw the disbursed federal financial aid funds for their own use. The Defendants also took various steps to maintain the illusion that the inmates were enrolled in a community college and were benefitting from the financial aid funds, by nominally registering the inmates for courses and then completing online tests and homework.

This scheme was carried out from roughly August 2010 through October 2012. During much of that time, Thomas and co-Defendant Carr were in a romantic relationship and living together. However, Thomas was jailed on unrelated charges in El Paso County, Colorado, from January to November 2011.

After being indicted, Carr, Green, and Diaz all entered guilty pleas. Carr and Green both agreed to cooperate with the Government as witnesses. Carr had a proffer interview with the Government in November 2016, and then several telephone interviews in October–November 2017, in advance of Thomas's trial. DOE's lead investigator, Special Agent Sandra Ennis, documented the contents of these interviews in written reports, which were disclosed to Thomas. (ECF No. 373-1 (the "2016 Ennis Report") and ECF No. 358-1 (the "2017 Ennis Report").) As reported by Special Agent Ennis, Carr provided substantial information to the Government regarding the operation

of the fraud scheme, including the participation of each of the charged co-conspirators.

Thomas proceeded to trial on November 27–30, 2017. On the first day of trial, the Government, Defendant, and the Court, all expected Carr to testify during the Government's case in chief. She was endorsed in the Government's final witness list, and in its opening statement the Government promised the jury it would "pull back the curtains on [the] conspiracy. . . . because the defendant's most trusted co-conspirator, Heather Carr, has agreed to testify," and that Carr's testimony would "explain to [the jury] exactly how the scheme worked."[1]

However, on the morning of the second day of trial, the Government informed Defendant and the Court that Carr had changed her mind about testifying, had "no intention of coming into court [that day]," and would not be abiding by the terms of her cooperation agreement. Thomas represents (and the Government does not dispute) that before trial the parties agreed that all witnesses endorsed by the Government would be under subpoena, thus, in Thomas's view, "obviat[ing] the need for [Thomas] to subpoena any person who was on the Government's witness list." (ECF No. 358 at 2.) However, although the Government had arranged for Carr to travel from Virginia to Colorado to testify (and although she evidently *did* fly to Colorado on the first day of trial), the Government had not placed her under a subpoena. So far as the Court is aware, Thomas made no attempt to subpoena Carr or call her as a defense witness, and in any event she did not testify. Nevertheless, Thomas was convicted on all

[1] Although a complete trial transcript has not been docketed, references and quotations from portions of the trial record rely on the Court reporter's draft transcript, to which the Court has access, as well as the Court's own recollection of and notes taken during the trial.

counts, in part based on the testimony of co-Defendant Green.

When Carr appeared for her sentencing, on January 4, 2018, she addressed on the record her reasons for deciding not to testify, as part of her allocution, and addressing her failure to comply with the cooperation terms of her plea agreement. In part, Carr reported that during one of her 2017 telephone interviews with the Government before trial, one of the prosecutors became frustrated with what he perceived as inconsistencies with, or recantations from, her earlier statements regarding Thomas's involvement in the fraud scheme, and that the prosecutor then began "yelling at" Carr, and threatened to "rip up" her plea agreement and to "send her to prison" for a lengthy sentence. (*See* ECF No. 358-2 ¶ 4.) Per Carr's account, this led her own attorney to terminate the interview, and also to an apology from the Government and the representation that Carr would no longer deal with that prosecutor.[2]

Given Carr's statements at sentencing, Thomas's lawyers contacted her (through her attorney), and ultimately spoke with her about her interviews with the Government. They then prepared an affidavit, signed by Carr, setting out her account of statements she made to the Government during her pretrial interviews. (ECF No. 358-2.) Thomas's present Motion argues, based on Carr's affidavit, that she made statements to the Government that were helpful to Thomas but that the Government did not include in the 2016 and 2017 Ennis Reports, allegedly in violated of the Government's

---

[2] The Court summarizes Carr's allegations to present the facts and context prompting Thomas's Motion. The Government's Response does not dispute Carr's account, but it is not material to resolution of the present Motion. The Court takes no view on whether Carr's allegations are disputed, nor does it attempt to resolve any factual disputes that do exist.

disclosure obligations under *Brady*.

## II. LEGAL STANDARDS

### A. Rule 33

Rule 33(a) of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "[I]n deciding a motion for new trial, the court may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred." *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994) (internal quotation marks and citation omitted). "The Court's broad discretion empowers it to grant relief based not only on the sufficiency *vel non* of the evidence at trial but on any other circumstance that might render the trial 'essentially unfair,' including trial errors." *United States v. D'Amelio*, 636 F. Supp. 2d 234, 238 (S.D.N.Y. 2009). However, "[d]istrict courts view motions for new trials with disfavor." *United States v. Lamy*, 521 F.3d 1257, 1266 (10th Cir. 2008). "[T]he authority to grant a new trial should be exercised sparingly and with caution." *United States v. Sturdivant*, 513 F.3d 795, 802 (8th Cir. 2008).

### B. New Trial on *Brady* Grounds

Under *Brady*, "[d]ue process mandates disclosure by the prosecution of all evidence that favors the defendant and is 'material either to guilt or punishment." *United States v. Velarde*, 485 F.3d 553, 558–59 (10th Cir. 2007) (internal quotation marks omitted). "A defendant who seeks a new trial under Rule 33 based on an

alleged *Brady* violation must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material." *Id.* at 558 (internal quotation marks omitted). The Tenth Circuit has observed that it is "easier to meet" this three-part standard where a defendant claims that evidence was suppressed than where the request for a new trial is based on "evidence merely newly discovered." *See United States v. Redcorn]*, 528 F.3d 727, 743 (10th Cir. 2008); *see also United States v. Torres*, 569 F.3d 1277, 1281 (10th Cir. 2009) ("If these three factors are satisfied, regardless of the prosecution's intentions in suppressing the evidence, a new trial is justified.").

The test of materiality is whether there is "a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed." *United States v. Reese*, 745 F.3d 1075, 1083 (10th Cir. 2014). "A reasonable probability means the 'likelihood of a different result is great enough to undermine confidence in the outcome.'" *Id.* (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)). "Put another way," the Court is to ask "whether the absence of the withheld evidence at trial shakes [its] confidence in the guilty verdict." *Reese*, 745 F.3d at 1083 (internal quotation marks omitted). The Court determines materiality after reviewing the record as a whole. *Id.* The focus is not on the Government's intentions or culpability, but on *Brady's* purpose, "not to punish the misdeeds of the prosecutor, but to avoid an unfair trial." *Id.*

## III. ANALYSIS

Thomas's Motion latches onto a number of statements included in Carr's present affidavit, arguing information helpful to his defense was provided to the Government but

not fairly disclosed by the Ennis Reports, in violation of *Brady*. (ECF No. 358 at 5–6.) However, reviewing each of the factual points raised by Thomas in turn, in the Court's judgment none presents a *Brady* violation or warrants a new trial.

*First*, Carr's affidavit states she had four interviews with the Government in 2017, not three, as reflected in Ennis's 2017 Report. (ECF No. 358 at 5.) The Government states there were, in fact, four interviews, but that the fourth interview was for final preparation of trial testimony, arguing it was not obligated to disclose a trial outline of the questions it planned to ask Carr on direct examination. (ECF No. 373 at 8.) Defendant makes no showing of how the fact that this fourth trial preparation meeting occurred would have been helpful to his defense or is material for *Brady* purposes, and does not claim this requires a new trial.

*Second,* Thomas points to the claim in Carr's affidavit that she never saw Thomas fill out a FAFSA form. (ECF No. 358 at 5; ECF No. 358-2 ¶ 4.) But this fact *was* plainly disclosed before trial. Ennis's 2016 Report clearly stated that Carr "never personally saw Thomas submit FAFSA's [*sic*] or fill out loan records" (ECF No. 373-1 at 4), but also that Thomas "was . . . involved in the submission of handwritten loan records," and "withdrawing of FSA funds from ATM[s]" (*id.* at 7). The 2017 Ennis Report likewise stated that Carr knew "Thomas was involved with submitting FAFSAs," although "she never personally saw him submit FAFSAs." (ECF No. 358-1 at 4.) Because this information was not suppressed, and in fact had been plainly disclosed on at least two prior occasions, there has been no *Brady* violation. Thomas's misrepresentation of the record is not well taken.

*Third*, Carr's affidavit states that she "told the prosecutors . . . that Thomas had never threatened her." (ECF No. 358 at 5; ECF No. 358-2 ¶ 6.) But no allegations of such threats were part of Thomas's trial, nor would it have been relevant or admissible as to any element of the fraud and conspiracy charges on which he was convicted. Even if such a statement had been suppressed (and the Court is unpersuaded that is the case), it is not material, since facts irrelevant to any of the elements of Thomas's charges and conviction could have no likelihood of changing the result in a new trial.

*Fourth*, Thomas points to Carr's claim that she told the Government that she, Diaz, and Green were the "main participants" in the fraud scheme, as opposed to Thomas. Initially, the Court sees no true inconsistency between this general characterization and the statements recorded and disclosed in the Ennis Reports regarding the specific acts taken by each of the conspirators, including Thomas. It is, at a minimum, debatable that Carr's characterization of the "main participants" constitutes "undisclosed" information, given the extensive disclosure of specific facts regarding each of the Defendants' actual conduct. In any event, her view of the "main" participants is not material, since again, it does nothing to undermine Thomas's conviction on the basis of his specific actions, proved by the evidence at trial. No charge on which Thomas was convicted required a showing that he was a "main" participant, and Carr's mere *opinion* on this question does nothing to undermine the Court's confidence in Thomas's conviction as *one* of the willing participants in the charged fraud conspiracy.

*Fifth*, Carr's affidavit claims Green "assisted [Carr] by picking up student loan related mail in the state of Colorado." (ECF No. 358-2 ¶ 9.a.) The Court once again

rejects Thomas's contention that this constitutes undisclosed information, since the 2016 Ennis Report clearly disclosed that "Carr, Diaz, Green, and/or Thomas" took trips to Colorado to retrieve fraud-related mail delivered in inmates' names. (ECF No. 373-1 at 5.)[3]

*Sixth*, Carr's affidavit states that Green "regularly and continually" used a car registered to Carr in 2011 and 2012, and Thomas argues this information was not disclosed. The evidence at trial was that Thomas also used this car, that he was stopped while driving it on August 30, 2012, and that 52 debit cards issued in inmates' names were seized from the car during that traffic stop. These cards were important evidence in the Government's case, and Thomas argues that Green's use of the same car might have led the jury to believe that Green, not Thomas, was responsible for the debit cards.

But such an argument fails to acknowledge that the evidence introduced at trial showed not only that these 52 debit cards were in the car, but that one of the cards was in Thomas's wallet. And, this argument also totally ignores trial evidence in the form of an audio recording of the traffic stop, which showed that Thomas made a failed attempt to hide the cards from police, that he was evasive in answering questions about why he had them, but never claimed they were not his or pled ignorance of them. Further, according to the 2016 Ennis Report, Carr had told the Government that on the night of

[3] Thomas's Motion again misrepresents the record, claiming Carr specified that Green had "participated in collecting *money* in Colorado," although the affidavit signed by Carr does not say this. (*Compare* ECF No. 358 at 5 (emphasis added) *with* ECF No. 358-2 ¶ 9.a.) The several exaggerations and mischaracterizations of the record made in Thomas's Motion serve only to highlight how thin his factual argument truly is.

the stop, Thomas had used the vehicle specifically for the purpose of retrieving the debit cards.[4] Thus, to the extent there was any non-disclosure regarding Green's use of the car, it was not material. The Court sees zero likelihood that this information would have undermined the far stronger incriminating evidence directly and unambiguously connecting Thomas to the debit cards. There is no reasonable probability that this information concerning Green's unrelated use of the vehicle in question would have altered the outcome of trial.

*Seventh,* Carr's affidavit claims she "was not present nor . . . a witness to any type of criminal activity occurring in Colorado Springs . . . in January of 2011." (ECF No. 358-2 ¶ 9.e.) The Court rejects the claim that this constitutes undisclosed information, since it refers back to an incident specifically discussed by the 2016 Ennis Report, reflecting Carr's belief that another person used Carr's name as an alias in Colorado Springs in January 2011, during alleged criminal conduct that led to Thomas's arrest and detention in El Paso County. But in any event, these events were not part of the evidence at trial, nor relevant to any charge on which Thomas was convicted, and therefore are not material under a *Brady* analysis.

*Eighth*, Carr's affidavit states Thomas "did not provide the address on Radiant Drive [in Colorado Springs] for use in the student loan fraud," referring to one of the addresses the conspirators used to receive debit cards. (ECF No. 358-2 ¶ 9.b.) But, it

---

[4] *See* ECF No. 373-1 at 6 ("In discussing the Tempe Police car stop, Thomas admitted to Carr that he was seeing another girl. The girl threatened to call Carr at 1:00 a.m. and tell her about Thomas' cheating. The girl had the debit cards and laptop at her house so Thomas went to the girl's house to retrieve these items. On his way home from the girl's house, Thomas was pulled over with the laptop and debit cards. Thomas was driving a vehicle registered to Carr. Thomas used the vehicle, not Carr.").

remains true that Carr told the Government that Thomas resided at that address (ECF No. 373-1 at 5), a fact that was also established by other testimony at trial. Thomas's conviction did not rest on a showing that he "provided" this address, but on strong evidence that he was associated with multiple addresses to which debit cards were mailed, and that he took other acts to advance the conspiracy. As to the Radiant Drive address, the evidence at trial showed that numerous fraudulent debit cards were mailed to that address, including cards found in Thomas's possession during the August 2012 traffic stop. Thus, even taken at face value, when viewed in the context of the evidence as a whole, the Court easily concludes that there is no "reasonable probability" that Carr's conclusory statement that Thomas did not "provide" this single specific address would have altered the outcome at trial. *See Reese*, 745 F.3d at 1083.

*Ninth*, and lastly, Carr's affidavit claims she told the Government that Thomas "did not participate in the loan scheme nor knowingly benefit from the scheme while he was incarcerated . . . . from approximately late January of 2011 through early November of 2011." (ECF No. 358-2 ¶ 9.c.) This statement echoes a central theme of Thomas's defense, which argued that he could not be culpable for any activity during this time period.

Again, however, Carr's conclusory affidavit falls short of showing that any material evidence was withheld by the Government. Even if Carr's statement had been presented at trial there is, in the Court's view, no likelihood it would have avoided Thomas's conviction on any counts. Initially, given Carr's repeated reports to the Government to the effect that Thomas "lies so much it sickens [her]" (*see* ECF No. 373-1 at 2–3), that he was unfaithful to her, and that he hid facts from her at virtually every

turn, there is little reason a jury would have credited Carr as having complete (let alone accurate) knowledge of what Thomas was or was not doing while he was incarcerated in Colorado and she was residing in Arizona.

Moreover, even if this statement were disclosed as-is, it would have been presented at trial alongside Carr's unrecanted statements that Thomas *did* benefit from the conspiracy during this time period, when Carr used fraud proceeds to pay his legal bills and to fund his inmate commissary account, and that the two of them continued speaking about the ongoing fraud scheme, using code words to discuss it while Thomas was in jail. The Court therefore again sees no likelihood that disclosure of Carr's vague statement regarding Thomas's conduct in 2011 would have changed the result at trial. This is particularly true for the conspiracy conviction (Count 1), since the Government needed only to prove some affirmative act taken by Thomas between August 2010 and October 2012, and there was introduced at trial strong evidence which implicated Thomas *after* his release in November 2011, including being caught with the debit cards in August 2012.

As for his convictions for aiding and abetting mail fraud in Counts 2–5, while the charged dates fell during the period of Thomas's incarceration, these dates also correspond to when DOE's debit card provider, Higher One, mailed the cards to addresses used by the conspirators. The fact that Thomas was in jail when Higher One mailed the cards does not undermine the jury's conviction on the aiding and abetting charges, because these convictions did not rest on Thomas himself mailing the debit cards on the specified dates, but rather on actions taken by Thomas beforehand, which in turn led Higher One to mail the debit cards, namely, participating in submitting

fraudulent financial aid applications and providing fraudulent addresses. Thomas was ultimately found in possession of the cards that were mailed and which in turn related to each of these four counts. Thus, any nondisclosure of Carr's general statement that he did not "participate" in the scheme while in jail does not meaningfully undermine the Court's confidence in the convictions on these counts.

In sum, to the limited extent that Carr's present affidavit reflects information not disclosed in the Ennis Reports, as opposed to containing different wording of information that was disclosed, any such nondisclosure was not material. Reviewing the record as a whole, as required for the relevant *Brady* analysis, *Reese*, 745 F.3d at 1083, there is in the Court's view no reasonable probability that any of the allegedly undisclosed information would have altered the result at trial, and absolutely nothing in Carr's post-judgment affidavit alters the Court's confidence in Thomas's conviction, or in the fairness of his trial.

Finally, the Court notes that Thomas conspicuously does not request a hearing at which Carr could testify as to the matters set out in a vague, summary fashion in her affidavit, which was obviously written by Thomas's attorneys. Nor does Thomas seek a deposition of Carr, or any other means of obtaining her testimony under oath and subject to cross-examination.

Clearly, Carr's statements as set out in the attorney-written affidavit present the best possible version of the allegedly undisclosed facts for Thomas. But even taken at face value, Carr's affidavit does not present any undisclosed facts or information that warrant a new trial. It is also plain to the Court—having reviewed the affidavit and the Ennis Reports, presided at trial, and heard Carr's statements on the record at her

sentencing—that any hearing at which Carr were to testify and be subject to cross-examination would serve only to eviscerate her credibility as to any testimony or *post hoc* recantations offered in Thomas's favor, while drawing out in greater detail the far greater volume of incriminating facts reported by Carr and documented in detail in the Ennis reports.

Likewise, given the damning contents of those reports, which Carr does not now recant or contradict, there can be no contention that Thomas would have fared better at a trial where Carr had testified. This leaves the Court's confidence in the jury's convictions unshaken. Moreover, to the extent Thomas argues that he "could have called Carr as a defense witness . . . if the prosecution had adhered to its . . . agreement" to have her under subpoena (ECF No. 358 at 8 n.3), Thomas has presented no reason to take this suggestion seriously, much less to grant a new trial on this basis.

## IV. CONCLUSION

For the reasons set forth above, Defendant Thomas's Motion for New Trial (ECF No. 358) is DENIED.

Dated this 27th day of April, 2018.

BY THE COURT:

______________________________
William J. Martínez
United States District Judge