156

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3     Criminal Action No. 16-cr-0054-WJM-2

4     UNITED STATES OF AMERICA,

5     Plaintiff,

6     vs.

7     TRAMELL THOMAS,

8     Defendant.

9     ------------------------------------------------------------

10                    REPORTER'S TRANSCRIPT
                      (Jury Trial - Day 1)
11                         Volume I

12    ------------------------------------------------------------

13         Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14    Judge, United States District Court for the District of

15    Colorado, on the 27th day of November, 2017, in Courtroom

16    A801, United States Courthouse, Denver, Colorado.

17                         APPEARANCES

18
          MARTHA A. PALUCH and BRYAN FIELDS, Assistant U.S.
19    Attorneys, 1801 California Street, Suite 1600, Denver,
      Colorado 80202, appearing for the plaintiff.
20
          DANIEL T. SMITH, Attorney at Law, 4582 South Ulster,
21    Suite 1400, Denver, Colorado 80237 AND
          THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
22    Suite 1400, Denver, Colorado 80202, appearing for the
      defendant.
23

24              MARY J. GEORGE, FCRR, CRR, RMR
             901 19th Street, Denver, Colorado 80294
25          Proceedings Reported by Mechanical Stenography
               Transcription Produced via Computer

1              P R O C E E D I N G S

2        (This transcript excludes jury voir dire)

3                  *     *     *     *     *

4        THE COURT:  All right, folks, we're -- I'm going

5   to read you a couple of preliminary instructions and then

6   we'll take our lunch break.  We have a couple of things

7   first.

8        All right.  Members of the jury, to ensure

9   fairness, you must follow the following rules:  Please do

10  not talk to each other about this case or about anyone

11  involved with this case until the end of the trial when you

12  go to the jury room to decide your verdict.  This rule

13  applies even when the court is not in session and when

14  there's a recess of the trial.

15       Do not talk with anyone else about this case or

16  about anyone else involved with this case until the trial

17  has ended and you've been discharged as jurors.  So "anyone

18  else" means just that, anyone else, and it includes your

19  spouse or partner, members of your family, your friends or

20  acquaintances.

21       You can tell anyone who needs to know that you are

22  a juror in this case and that the judge has ordered you not

23  to discuss the case until you have been discharged.

24  Outside the courtroom, please do not let anyone tell you

25  anything about the case or about anyone involved with the

1   case until the trial has ended.  If someone should try to

2   talk to you about the case during the trial, please report

3   it to my courtroom deputy, Ms. Hansen.

4          During the trial, you should not talk with or

5   speak to any of the parties, any of the lawyers, or

6   witnesses involved in this case.  It's important not only

7   that you do justice in this case, but that you also give

8   the appearance of doing justice.  If any lawyer, party, or

9   witness does not speak to you when you pass in the hall or

10  ride in the elevator together, please remember that they

11  are not being rude, and that I've ordered them not to

12  exchange even small talk with you.

13         During the course of the trial, you will receive

14  all the evidence you legally may consider to decide the

15  case.  You, as jurors, must decide this case based solely

16  on the evidence presented here within the four walls of

17  this courtroom.  This means that during the trial, you must

18  not conduct any independent research about the issues in

19  the case or the involvement -- or the individuals or

20  companies -- there aren't any companies -- or any

21  individuals involved in this case, including the lawyers,

22  the parties and the witnesses.

23         You must not consult any reference materials,

24  search the internet, websites, blogs, or use any electronic

25  tools to obtain information about this case or to help you

1    decide the case.  You must not try to find out information

2    about this case from any source outside this courtroom.

3         After you've retired to deliberate, you may begin

4    discussing this case with your fellow jurors, but you

5    cannot discuss the case with anyone else until you have

6    returned a verdict and the case is at an end.

7         You may not under any circumstances have your cell

8    phones on when the court is in session, so please turn your

9    cell phones off and not just on vibrate.  You may not

10   communicate electronically with anyone about this case on

11   your cell phone, through e-mail, text messaging or Twitter,

12   or by way of any social networking websites such as

13   Facebook or LinkedIn.

14        Researching any information on your own which you

15   think might be helpful is against the law and would be a

16   violation of your oath.  Violation of this instruction

17   could cause a mistrial, meaning that all of our efforts

18   over the course of this trial would have been wasted and we

19   would have to start all over again with a new trial before

20   a new jury.

21        If you were to cause a mistrial by violating this

22   order, you would be subject to paying all the costs of

23   these proceedings, and you could be punished for contempt

24   of court.  Let me point out that in the -- at the

25   conclusion of the evidence in another criminal case in this

1    district court, one juror, despite this order, Googled

2    information she thought was relevant to the case.  A

3    mistrial had to be declared and the juror faced contempt of

4    court charges that could have resulted in her being jailed

5    and/or ordered to reimburse both the prosecution and the

6    defense for costs incurred in the trial.

7          Her actions compromised a year's-long

8    investigation and prosecution, violated the defendant's

9    right to confront all evidence against him, and wasted all

10   of the time expended by the Court, the counsel, and her

11   fellow jurors to hear the case.

12         Please do not decide during the trial what your

13   verdict should be.  Keep an open mind throughout the trial,

14   reaching your conclusion only after you have gone to the

15   jury room to decide the case and you and your fellow jurors

16   have discussed all the evidence.

17         If you need to tell me something, simply give me a

18   signed note -- please give a signed note to Ms. Hansen and

19   she will give it to me.

20         You know, I've -- given the length, I think I'm

21   going to read instruction No. 2 when we come back from

22   lunch, so we're going to pause there.  Let me just tell

23   you, Ms. Hansen is going to accompany you now for the first

24   time through these doors.  She will take you to the jury

25   deliberation room, which will be your home away from home

1    for the next week when you're not in here, and that's where
2    you're going to deliberate your verdict.
3         She's going to give you your access cards, she'll
4    give you your instructions for your time here with the
5    court, and she'll distribute to you your jury code of
6    conduct.
7         All right.  So when we return, I will finish
8    reading this remaining preliminary instruction and then
9    we'll go to the opening statements of the parties.  So it's
10   12:35.  We will be in recess until 1:45.  So try to be back
11   in the deliberation room at least five, 10 minutes before
12   that so we can promptly start at that time.
13        All right.  We'll be in recess until 1:45.
14        (Recess taken 12:33 p.m.)
15                      AFTERNOON SESSION
16        (Jury was present at 1:53 p.m.)
17        THE COURT:  Welcome back, ladies and gentlemen of
18   the jury.  I'm going to read you the final preliminary
19   instruction that I need to read to you and then we'll go to
20   opening statements.
21        At the end of the trial, I will give you detailed
22   guidance on the law and how you will go about reaching your
23   decision, but now I simply want to generally explain how
24   the trial will proceed.
25        The first step in the trial will be opening

1    statements.  The Government, in its opening statement, will

2    tell you about the evidence which it intends to put before

3    you.  Just as the indictment is not evidence, neither is

4    the opening statement.  Its purpose is only to help you

5    understand what the evidence will be.  It is a roadmap to

6    show you what is ahead.

7          After the Government's opening statement, the

8    defendant may make an opening statement or the defendant

9    may wait until after the presentation of the Government's

10   case before he makes an opening statement.

11         The Government will then offer its evidence.

12   After the Government's evidence, the defendant may present

13   evidence, but he's not required to do so, and we've

14   discussed this already.  If the defendant submits evidence,

15   the Government may thereafter introduce rebuttal evidence.

16         Now, during the trial, it may be necessary for me

17   to talk with the lawyers out of your hearing about

18   questions of law or procedure.  Sometimes you may be

19   excused from the courtroom for these discussions.  I will

20   try to limit these interruptions, but you should remember

21   the importance of the matter you are here to determine and

22   you should be patient even though the case may at times

23   appear to you to be progressing slowly.

24         During the trial, I will make rulings on

25   objections or motions made by the lawyers.  It is the duty

1    of the lawyer on each side of the case to object when the

2    other side offers testimony or an exhibit that the lawyer

3    believes is not properly admissible under the rules of law.

4         Only by making an objection can the lawyer request

5    and obtain a ruling from me on the admissibility of the

6    evidence being offered by the other side.  You should not

7    be influenced for or against any lawyer or lawyers or the

8    lawyer's client simply because the lawyer has made an

9    objection.

10        When I overrule an objection, that means I am

11   permitting that evidence to be admitted.  When I sustain an

12   objection, that means I am excluding that evidence from

13   this trial for a good reason.  If I sustain an objection to

14   a question, then the witness cannot answer the question and

15   you should not draw any inferences for conclusions simply

16   from the question.  If the witness has already answered a

17   question to which I've sustained an objection and I order

18   that testimony stricken, you must entirely ignore that

19   testimony.

20        Some evidence may be admitted in this trial for a

21   limited purpose only.  When I instruct you that an item of

22   evidence has been admitted for a limited purpose, you must

23   consider it only for that limited purpose and for no other.

24   When I say "admitted into evidence," or "received into

25   evidence," I mean this particular statement or that

1    particular exhibit may be considered by you in making the

2    decisions you must make at the end of this case.

3         Do not attempt to interpret my rulings on

4    objections as somehow indicating how I think you should

5    decide this case.  I am simply making a ruling on a legal

6    question.  You should not infer or conclude from any ruling

7    or any other comment that I may make during the course of

8    the trial that I have an opinion on the merits of the case

9    favoring one side or the other.  I do not favor one side or

10   the other.

11        You as jurors are the sole judges of the facts of

12   this case.  It is your recollection and evaluation of the

13   evidence that is important to the verdict in this case.  By

14   your verdict, you will decide disputed issues of fact.  I

15   will decide all questions of law that arise during the

16   trial.

17        Before you begin your deliberations at the close

18   of the case, I will instruct you in more detail on the law

19   that you must follow and apply.

20        Because you will be asked to decide the facts of

21   this case, you should give careful attention to the

22   testimony and evidence presented.  During the trial, you

23   should keep an open mind and should not form or express any

24   opinion about the case until you have heard all the

25   testimony and evidence, the lawyers' closing arguments, and

1    my instructions to you on the law.

2              Now, the evidence in this case will consist of the

3    following:  No. 1, the sworn testimony of the witnesses on

4    both direct and cross-examination, no matter who calls that

5    witness.

6              No. 2, all exhibits received in evidence,

7    regardless of who may have produced that exhibit.

8              No. 3, all facts that have been judicially noticed

9    or stipulated to or -- and as to which you may, but are not

10   required to, take as true for purposes of this case.

11             In deciding the facts, you may have to decide

12   which testimony to believe and which testimony not to

13   believe.  You may believe everything a witness says, part

14   of it, or none of it.

15             In considering the evidence of any witness, you

16   should -- you may take into account many factors, including

17   the witness' opportunity and ability to see, hear, or know

18   the things about which the witness testified, the quality

19   of the witness' memory, the witness' appearance and manner

20   while testifying, the witness' interest in the outcome of

21   the case, and any bias or prejudice the witness may have,

22   other evidence that may have contradicted that witness'

23   testimony, and the reasonableness of the witness' testimony

24   in light of all of the evidence in the case.

25             Statements and arguments of the lawyers are not

1    evidence unless they are made as an admission or

2    stipulation of fact.  And I will let you know if that's the

3    case.  A stipulation is an agreement between both sides

4    that certain facts are true or that a person would have

5    given certain testimony.  When the lawyers on both sides

6    stipulate or agree to the existence of a fact, you may, but

7    are not required to, accept the stipulation as evidence and

8    regard that fact as proved.

9         In your consideration of the evidence, you are not

10   limited to the statement of the witnesses.  In other words,

11   you're not limited solely to what you see and hear as the

12   witnesses testified.  You may draw from the facts that you

13   find have been proved such reasonable inferences or

14   conclusions as you feel are justified in light of your

15   experience and common sense.

16        You may take notes during the trial, if you wish.

17   In deciding whether to take notes, let me inform you -- and

18   this is important -- that when you're deliberating the case

19   after the conclusion of the trial, you will not be provided

20   with a transcript of any witness' testimony.  If you do

21   take notes, do not discuss them with anyone before you

22   begin your deliberations.

23        At the end of each day, please leave your notes

24   out here on your chair in the jury box.  You will be

25   allowed to take your notes with you when you begin your

1   deliberations at the conclusion of the evidence.  At the
2   end of the trial, your notes will be shredded.  No one will
3   read your notes either during or after the trial.
4            If you choose not to take notes, remember it is
5   your own individual responsibility to listen carefully to
6   all the evidence.
7            Again, let me emphasize that neither in these
8   instructions, nor in any ruling, action, or remark that I
9   may make during the course of this trial, has it been or
10  will it be my intention to give any opinion or suggestion
11  as to what your verdict should be.  That is entirely your
12  decision to make.
13           All right.  That concludes the preliminary
14  instructions from the Court.  Opening statement by the
15  Government.
16           MR. FIELDS:  Thank you very much, Your Honor.
17           THE COURT:  All right.  Counsel, you have 20
18  minutes.
19           MR. FIELDS:  Thank you.
20           I have a couple of PowerPoint slides involving one
21  of the stipulated exhibits, that I'd ask permission to
22  publish that.
23           THE COURT:  Sure.  And we won't start your 20
24  minutes until you're all set up technologically here.
25           MR. FIELDS:  Thank you very much.  May it please

1    the Court.

2         THE COURT:  Counsel.

3         MR. FIELDS:  This is a case of greed.  The

4    evidence in this case will show that the defendant, Tramell

5    Thomas, stole thousands of dollars from the U.S. Department

6    of Education to fuel the lifestyle that he wanted.  Now, he

7    did that through student loans.  Loans that he didn't

8    intend to pay back.  As you are aware from jury selection,

9    many of you have filled out a FAFSA.  It's the first, and

10   often tedious, step on the path towards enrolling in

11   college.  It's free, anyone can use it, and it's easy to

12   access on the internet.

13        In July of 2012, the United States Department of

14   Education received a FAFSA through its website for a man

15   named Manuel Abate.  What you're looking at now is the

16   electronic information that the Department of Education

17   received.  And on the surface, at least, this tells the

18   story of a man who's looking to apply to college to build a

19   better life for himself.

20        It told the Department of Education that Mr. Abate

21   was single, that he was about 50 years old, that he had no

22   income, and that he wanted to attend classes at Pikes Peak

23   Community College at Colorado Springs, Colorado.  It was

24   electronically signed using a PIN number, a personal

25   identification number, that's unique to everyone who fills

1    out a FAFSA.

2        Now, because Mr. Abate had told the Department of

3    Education that he wanted to attend Pikes Peak Community

4    College, Pikes Peak Community College got the information

5    in the FAFSA.  And then Pikes Peak Community College made a

6    determination of how much student aid Mr. Abate should get.

7    And in this case, because he had no income, and he was

8    single, they determined that he was entitled to about

9    $6,000 in student aid.  A combination of student loans,

10   about $4,700, and a Pell Grant, a special grant that's

11   given based on need that doesn't have to be paid back, for

12   about $1,388.

13       A few days after the FAFSA was submitted, loan

14   paperwork was submitted, and it was also signed using that

15   same PIN number.

16       Now, student aid first goes directly to the

17   school.  So in this case, the United States Department of

18   Education paid money directly to Pikes Peak Community

19   College.  Pikes Peak Community College deducted tuition and

20   fees and then they made arrangements to send the rest of it

21   to Mr. Abate to pay for his qualified living expenses while

22   he was a student.  In this case, they made arrangements to

23   send a debit card that could be loaded with $4,700 directly

24   to the address listed on the FAFSA, 1112 Meadow Oaks Drive

25   in Colorado Springs, Colorado.

1           Ladies and gentlemen, Mr. Abate wasn't at 1112

2     Meadow Oaks Drive in Colorado Springs, Colorado.  He was

3     thousands of miles away because he was an inmate with the

4     Florida Department of Corrections.  He was a prisoner.

5     That FAFSA was a lie.  It was part of an elaborate scheme

6     by the defendant and his co-conspirators to steal money

7     from the Government.

8           And that FAFSA, it wasn't submitted through the

9     internet through a prison in Florida, it was submitted from

10    a computer at the house in Arizona where the defendant was

11    living.  And Mr. Abate obviously didn't get that debit card

12    at 1112 Meadow Oaks Drive.  Instead it ended up in Mr.

13    Thomas' wallet.  He's the one who got the money.

14          You'll learn during the course of this trial that

15    Mr. Thomas was part of an elaborate scheme to steal money

16    from the Government and altogether, the greed of Thomas and

17    his co-conspirators led them to submit over 180 false

18    FAFSAs, seeking over a million dollars in federal student

19    aid funds that they were not entitled to.  And it was as a

20    result of these false FAFSA, debit cards, that altogether

21    can be loaded with about $415,000 in cash were sent to

22    addresses controlled by Thomas and his co-conspirators.

23          Now, ladies and gentlemen, my name is Bryan

24    Fields, and I'm a federal prosecutor.  You already met my

25    colleague, Martha Paluch, who's also a federal prosecutor.

1    With us at counsel table is Special Agent Sandra Ennis.

2    She is with the Department of Education Office of Inspector

3    General and she was the lead investigator on this case.

4    Also joining us is Postal Inspector Sonia Hacker.  She's

5    with the Postal Inspector Service, which also investigated

6    this case.  And together, we will be presenting the case

7    against Tramell Thomas.

8            So how did it work?  How did this scheme all come

9    together?  Well, the scheme here operated between August of

10   2010 and October of 2012.  You'll learn during the course

11   of this trial that Thomas and his partners used computers

12   in Arizona to submit FAFSAs in the names of prison inmates.

13   FAFSAs claim that the prisoners had no income and they

14   wanted to attend community colleges in Colorado and

15   Arizona.

16           Why community colleges?  Because the tuition's a

17   little bit lower, which means your refund is going to be a

18   little bit higher.  By filling out the FAFSAs the way they

19   did, Thomas and his co-conspirators were able to get debit

20   cards with anywhere from $1,000 to $7,000 sent to these

21   various addresses.

22           Now, of course this is a fraud scheme and the

23   prisoners were in prison.  The prisoners couldn't actually

24   go to school.  So to make it look real, Thomas and his

25   co-conspirators actually submitted fake paperwork to the

1   schools to make those schools think that a real student was

2   enrolling.

3          And then to keep up the charade, they actually

4   enrolled in online courses and pretended to be a student,

5   all so that the student aid money would keep flowing in the

6   mail.

7          Now, after submitting these false FAFSAs, the

8   money came on debit cards.  But it would be too fishy if

9   all of the debit cards went to one address.  So also to

10  make this look a little bit more legitimate, an important

11  part of the scheme was to recruit other people so that

12  their addresses could be used so that Thomas and his

13  co-conspirators could have those addresses and put them on

14  the FAFSAs.

15         So as you might imagine, a scheme like this

16  couldn't be done by itself.  It took a team, it was a

17  conspiracy, a group of people all working together to do

18  their part of the job to ensure that everyone can get a cut

19  of the money.

20         So you'll hear about the co-conspirators during

21  this case, but you'll also hear that the defendant was

22  involved in every major part of this conspiracy.  The

23  defendant cruised the Department of Corrections web pages

24  looking for the identities of prisoners that he could use

25  in the FAFSAs.

1          The defendant used computers to submit the false

2    FAFSAs to the Department of Education.  The defendant

3    manipulated other people to let their addresses be used.

4    He made arrangements for that address at 1112 Meadow Oaks

5    Drive to be used, but he also made arrangements for other

6    addresses to be used, including an address on Rushmore

7    Drive in Colorado Springs, an address on Radiant Drive in

8    Colorado Springs, and an address on Rice Drive in Colorado

9    Springs.

10         And then Thomas and his co-conspirators, once they

11   got these debit cards -- you could only take about $500 a

12   day on these debit cards -- so they would go around to

13   various ATMs day after day to turn those debit cards into

14   cold hard cash, or they would go to stores and purchase

15   personal items and get cash back.  Same thing.

16         So the scheme satisfied Thomas's greed.  Thomas

17   got money from the scheme.  Thomas also got to live with

18   his girlfriend and co-conspirator, Heather Carr, in a nice

19   house paid in large part with money from the fraud scheme.

20   And Carr and Thomas also used the money to pay for

21   vacations together.

22         And you'll find out that when there was a period

23   of time where Mr. Thomas got in trouble with the law, fraud

24   scheme proceeds were used to pay for his defense attorney.

25   For this conduct, Count 1 of the indictment charges the

1    defendant with a conspiracy to submit false claims to the

2    Government.  The false claims here are the false FAFSAs

3    with the stolen prisoner identities used to claim loans

4    that the group was not entitled to.

5            Counts 2 through 7 charge the defendant with

6    aiding and abetting, which is just legalese for helping

7    with mail fraud.  Mail fraud is the crime of lying to get

8    money and using the post office to help.  So in this case,

9    Counts 2 through 7 charge seven specific mailings of debit

10   cards that were important for the scheme.  So Thomas caused

11   these debit cards to be sent through the mail to addresses

12   that he controlled.

13           There's no dispute in this case that the prisoners

14   in Counts 2 through 7 had their identity stolen.  The

15   parties have stipulated, they've agreed, if those prisoners

16   were called to the stand to testify, each of them would

17   testify that they were in prison when the false FAFSAs were

18   submitted in their name; that they didn't submit fake

19   paperwork to these colleges; and they didn't authorize

20   anyone else to do it either.

21           So the issue in this case is not whether there was

22   a fraud scheme.  The issue is:  Did the defendant know

23   about it and intend to be part of it?  And the Government

24   has to prove that beyond a reasonable doubt.  It's a burden

25   that we embrace, and here's how we're going to do it:

1          During the course of this trial, you're going to

2    hear from numerous witnesses who are going to walk you

3    through all of the documentary evidence in this case.  One

4    of the first witnesses you'll hear from is Kristina Moss

5    with Pikes Peak Community College.

6          You'll hear that Thomas and his partners worked

7    hard not to get caught.  They used many addresses and they

8    used the names of prisoners who would be in jail for a long

9    time, thinking that if those prisoners are going to be in

10   jail for a long time, they're not going to be checking

11   their credit and they're not going to know that their

12   identities were stolen.  But Kristina Moss started to see

13   something fishy.  She started to see that students often

14   had clusters, all at the same address.  She noticed that

15   these students all seemed to be enrolled in the same

16   classes; she noticed that they all seemed to have similar

17   references; their e-mail addresses all had similar formats.

18   And it seemed weird.

19         So she reported her findings to the Department of

20   Education and she tipped them off to the fraud.  You will

21   also hear from Michelle Allred with the United States

22   Department of Education, and she'll tell you what should be

23   obvious:  The Department of Education relies on people to

24   tell the truth when they submit a FAFSA.  So she'll explain

25   to you how the Department of Education and the community

1    colleges are victimized when people lie to get loans that

2    they're not entitled to and that they don't intend to pay

3    back.

4         You'll also hear from Rebecca Joseph.  She's a

5    representative from Higher One Bank, the company that

6    actually sent out the debit cards.  She'll tell you how

7    those debit cards were generated and when they were mailed,

8    which was important for the mail fraud accounts.

9         And during this trial, ladies and gentlemen, we'll

10   pull back the curtains on this conspiracy and give you an

11   inside look at what was happening between 2010 and 2012.

12   And that's because the defendant's most trusted

13   co-conspirator, Heather Carr, has agreed to testify.  She's

14   pleaded guilty to participating in the scheme and, as part

15   of the plea deal, she's agreed to come here to court and

16   explain to you exactly how the scheme worked.

17        She'll explain to you how she was able to use her

18   job at a bank to get Social Security numbers and dates of

19   birth for these inmates that could be used on the FAFSAs.

20   She'll explain to you how she gave Thomas the lists with

21   those Social Security numbers and identifying information

22   so that Thomas could fill out the FAFSA and submit it on

23   the internet.

24        She'll tell you how the defendant lived in her

25   home and used computers to submit these false FAFSAs to the

1    Department of Education.  And she'll tell you how she and

2    Thomas made thousands of dollars from the scheme which they

3    used to live in their big house and that paid for nice

4    vacations.

5         You'll also hear from others who knew Thomas

6    personally.  Kimmisha Mullett, she'll testify that Thomas

7    convinced her to let him use her address, which was, guess

8    what, 1112 Meadow Oaks Drive.  She'll tell you how that was

9    her address and how she received mail for the defendant,

10   which she then shipped to him down in Arizona.

11        A woman named Christina Duncan will come to court

12   and she'll tell you that she knew Thomas, too.  She'll tell

13   that you she saw text messages on Thomas' phone, text

14   messages that aroused her suspicion because these text

15   messages were to another woman.

16        So Christina Duncan will tell you when she saw

17   these text messages, she saw that they were about Social

18   Security numbers and about student loans.

19        Now, witnesses like Carr, Mullett, and Duncan,

20   they'll explain how the scheme worked to you and show you

21   that a conspiracy actually existed.  But you'll learn from

22   these witnesses that not everyone involved in the

23   conspiracy knew each other.  There were two other

24   co-conspirators, Marcelle Green and Mercedes Diaz.  They

25   were close friends with Carr and they did many of the

1    things that Thomas did.

2           They went around to ATMs to get cash off the debit

3    cards, they submitted false FAFSAs, they got the Social

4    Security number list from Heather Carr.  And in return for

5    getting those Social Security numbers, they paid Carr a cut

6    of the money.  Carr, of course, is living with Thomas, so

7    some of that money was used to pay for their house.

8           But, ladies and gentlemen, you'll find out that to

9    be involved in a conspiracy, you don't need to know

10   everyone else who's involved.  You'll also learn during

11   this trial that for a period of time between 2010 and 2012,

12   while this conspiracy was going on, the defendant was in

13   jail on charges that were later dismissed, so he couldn't

14   participate in every aspect of the conspiracy.  But, ladies

15   and gentlemen, you'll find out that however he could, even

16   when his ability was limited, the defendant eagerly

17   participated in this scheme.  Even while in jail, he

18   continued to help it succeed by continuing to use e-mail --

19   or mailing addresses that he controlled and were used as

20   part of the scheme to keep getting debit cards, and that

21   money from those debit cards was used to pay for his

22   defense attorney.

23          Also, ladies and gentlemen, you'll learn that as

24   part of this investigation, special agents with the

25   Department of Education and postal inspectors with the

1    Postal Inspection Service executed a search warrant at

2    Thomas' home, the home that he and Carr shared.  Now Thomas

3    was there and you'll find out that after agents started

4    knocking on the door, he took his cell phone and he broke

5    it in half.

6            But, ladies and gentlemen, special agents with the

7    Department of Education gave that cell phone to computer

8    forensic expert Alison Stailey and, even though it was

9    broken, she found out what was on it.  She will come to

10   court and she'll tell you what was on that phone that was

11   broken in half.

12           She also analyzed the computers found in that

13   house.  And when she takes the stand, she'll explain to you

14   what the defendant was doing on the computers in that

15   house.

16           Near the end of this trial, you'll hear from

17   Special Agent Sandra Ennis, and she'll tell you about the

18   thousands of pages that she reviewed as part of this case,

19   hours of analysis that went into looking at all these false

20   FAFSAs, the fake paperwork submitted to the schools, the

21   bank records from Higher One, internet records showing IP

22   addresses and where these FAFSAs were submitted from.  So

23   she'll show you how she was able to tie certain mailing

24   addresses to the defendant in this case and she'll also

25   tell you about all of the money that was generated as a

1    result of this scheme, and what the total losses were to

2    the United States Department of Education.

3          Ladies and gentlemen, that's not all.  You'll be

4    asked to consider another piece of evidence:  The debit

5    card from Manuel Abate.  It was mailed out near the end of

6    July, 2012.  A couple of weeks later, police officers in

7    Tempe, Arizona, pulled over a white Dodge Charger

8    registered to Heather Carr.  It was late.  It was about

9    2:00 in the morning.  So when the detective who made the

10    stop, Officer Jonathan Seal, when he went up to the window,

11    he carried his flashlight and he used that to illuminate

12    the driver's license and registration of the person driving

13    the car.  The man behind the wheel was Tramell Thomas.

14          Now, because it was late at night and officers are

15    always concerned about their safety, no matter who they

16    pull over, Jonathan Seal used that flashlight to look to

17    see if there was anyone else in the car.  And as the beam

18    of his flashlight crossed over the back passenger seat,

19    something caught Jonathan Seal's eye.  He saw a clear

20    Ziploc bag filled with more credit cards than he had ever

21    seen before.

22          So Detective Seal asks the defendant to hand him

23    the bag.  The defendant looked back at the bag and he

24    looked back at the officer.  So Officer Seal asked again.

25    This time the defendant looked back at the cards and he

1    swept them on to the floorboard and then he reached down

2    and he grabbed an empty bag and he handed it to Officer

3    Seal as though that was the bag that the officer wanted to

4    look at.

5             COURTROOM DEPUTY:  You have two minutes.

6             MR. FIELDS:  The ruse didn't work, ladies and

7    gentlemen.  Officer Seal will testify about what happened

8    during that traffic stop.  And what's more, because Officer

9    Seal realized that this wasn't just any old traffic stop,

10   Officer Seal made a recording of it -- of most of it, using

11   a hand-held audio recording device.  So you'll get to hear

12   exactly what the defendant said when he was asked about

13   those credit cards.

14             Eventually during the stop, Officer Seal got to

15   search the car and he'll tell you that when he searched the

16   car, on the floorboard he found a bag filled with 52 debit

17   cards.  All of them in the names of other people.  All of

18   them in the names of prison inmates.

19             As part of the stop, Officer Seal also searched

20   Thomas' wallet.  Inside was the defendant's identification.

21   But next to it, safe inside one of those wallet's card

22   slots was the debit card for Manuel Abate.  The same debit

23   card mailed out as a result of a fake FAFSA sent to the

24   Department of Education and false applications sent to

25   Pikes Peak Community College.

1          After you've heard and seen all of the evidence in

2     this case, you will know how Tramell Thomas ended up with a

3     debit card for Manuel Abate in his wallet and 52 other

4     examples of his greed in the back seat of his car.

5          And at the close of this case, my colleague Martha

6     Paluch will get to address you again, and she'll ask you to

7     return the only verdict that is consistent with all of this

8     evidence:  That's a verdict of guilty on all counts.

9          THE COURT:  Thank you, Mr. Fields.

10          Opening statement for the defendant.

11          MR. SMITH:  Your Honor, at this time, the

12     defendant would reserve its right to give an opening

13     statement.

14          THE COURT:  Okay.  Very well.  Government may call

15     its first witness.

16          MS. PALUCH:  Thank you, Your Honor.  The

17     Government calls Ms. Kristina Moss.

18          THE COURT:  Ms. Paluch, could you swivel that

19     lectern back.

20          MS. PALUCH:  I sure can.

21          THE COURT:  Careful with the wires.

22          Is Ms. Moss anywhere near her?  Ms. Paluch?

23          MS. PALUCH:  Yes, Your Honor.  The agent just went

24     to find her, but I will go check with her.

25          COURTROOM DEPUTY:  Step in the box and raise your

183
Direct - Moss

1    right hand.

2            KRISTINA MOSS, GOVERNMENT'S WITNESS, SWORN

3            COURTROOM DEPUTY:  Please be seated.  Please state

4    your full name for the record and spell your first and last

5    name.

6            THE WITNESS:  Kristina Moss.  K-r-i-s-t-i-n-a,

7    M-o-s-s.

8            MS. PALUCH:  May I proceed, Your Honor?

9            THE COURT:  You may, counsel.

10                      DIRECT EXAMINATION

11   BY MS. PALUCH:

12   Q.   Good afternoon, ma'am.  How are you employed?

13   A.   I'm employed with Pikes Peak Community College.

14   Q.   What is your title there?

15   A.   I'm assistant director of financial aid.

16   Q.   And generally what do your job duties entail?

17   A.   I assist the director with his duties, and I currently

18   supervise eight individuals who verify FAFSA applications.

19   Q.   Just so the record is clear, can you explain what a

20   FAFSA is.  What does that acronym stand for?

21   A.   Free Application for Federal Student Aid.

22   Q.   To what agency is a FAFSA submitted?

23   A.   To the Department of Education.

24   Q.   How many students attend Pikes Peak Community College?

25   A.   We have about 22,000 students.

Direct - Moss

1  Q.   Does Pikes Peak offer online as well as campus
2  courses?
3  A.   Yes, we do.
4  Q.   Are you familiar with the name Colorado Community
5  College System?
6  A.   Yes, I am.
7  Q.   And what is that?
8  A.   They are 13 community colleges in the state
9  of Colorado that all belong in one group, and the --
10 Pikes Peak is part of that group.
11 Q.   Where does Pikes Peak Community College rank as far as
12 size among those 13 schools?
13 A.   We're in the top three.
14 Q.   What are the requirements for someone applying to
15 attend Pikes Peak?
16 A.   There are no requirements; it's an open admissions.
17 Q.   Is it necessary that they have a GED or a high school
18 diploma to attend?
19 A.   No.
20 Q.   Are there academic requirements for someone to receive
21 federal student aid?
22 A.   Yes.
23 Q.   And what are those requirements?
24 A.   One has to have a high school diploma or its
25 equivalency of a GED, and maintain a 2.0 GPA.

Direct - Moss

1    Q.   To apply for admission, does a person need to
2    physically come into the school?
3    A.   No, they do not.
4    Q.   Okay.  And how would they go about applying and
5    accomplishing being admitted?
6    A.   Everything is done online.
7    Q.   Are you familiar with an application certification
8    page?
9    A.   Yes, I am.
10   Q.   And what is that?
11   A.   The confirmation sheet that a student gets when they
12   apply for admissions online.  It's their confirmation page
13   and it applies -- it gives them their student ID number for
14   the school.
15   Q.   And what is the student ID number used for?
16   A.   To access any school database, e-mails, their classes,
17   register for courses.
18   Q.   I'd like to direct your attention, ma'am, to August of
19   2010.  What was your job title then?
20   A.   I was a financial aid advisor.
21   Q.   What were your job responsibilities as a financial aid
22   advisor?
23   A.   To verify files from the Department of Education.
24   Q.   Now, you testified that FAFSAs are submitted to the
25   Department of Education?

Direct - Moss

1    A.    That is correct.

2    Q.    So how is it that Pikes Peak would be involved in the

3    FAFSA verification process?

4    A.    When a student applies for the FAFSA application, they

5    can put up to 10 schools on that application.  And then the

6    Department of Education sends those applications to each

7    school that is placed on that application.

8    Q.    Can you explain for us how the FAFSA verification

9    process begins.

10   A.    Yes.  The Department of Education randomly selects one

11   in every three students for schools to verify.

12   Q.    What are the areas of verification?

13   A.    Household size, income, such as tax information, and

14   certain untaxed income, like child support or tax pensions.

15   Q.    What types of federal student aid are available?

16   A.    There are federal grants and federal student loans.

17   Q.    Can you explain the difference between the two.

18   A.    Yes.  Federal grants are monies that the student does

19   not have to pay back, and student loans are monies that the

20   student has to pay back.

21   Q.    So if awarded a grant, is there an enrollment

22   required -- requirement of the student?

23   A.    Students can be in at least -- in half a credit and

24   still get federal Pell Grant monies.

25   Q.    What about for a loan?

Direct - Moss

1    A.   Students have to be in a minimum of six credit hours
2    to obtain a student loan.
3    Q.   Now, ma'am, you mentioned online classes.  If a
4    student is taking online classes, are there any steps to be
5    completed before that student can receive federal financial
6    student aid?
7    A.   Yes.  A student has to go on and initiate contact with
8    the instructor and let them know they will be participating
9    in the online course.
10   Q.   What happens, if anything, with respect to federal
11   student aid if the student drops or fails a class?
12   A.   The school then has to determine a personal
13   calculation to see how much of the monies that was paid for
14   them to attend school has to be repaid back.
15   Q.   And when you say "repaid back," who has to pay the
16   money back?
17   A.   So the school sends the money back to the Department
18   of Education and then the student is responsible for paying
19   back the institution, the funds that we returned on their
20   behalf to the Department of Education.
21   Q.   So the student is required to pay back Pikes Peak
22   Community College?
23   A.   Yes, ma'am.
24   Q.   Does Pikes Peak send notification to the students if
25   that occurs?

Direct - Moss

1   A.   Yes, we send them a letter via e-mail that lets them

2   know that we sent the money back to the Department of

3   Education, how much, and how much they are to pay back to

4   our institution.

5   Q.   I'd like to take you back, ma'am, to August of 2010

6   when you were verifying FAFSAs.  Is there anything you

7   recall that occurred during that time frame with respect to

8   the return to Title IV process that was out of the

9   ordinary?

10  A.   Yes, we received a handful of returned mail back all

11  from the same address.

12  Q.   And when you say -- I believe you said a handful, do

13  you recall an approximate number?

14  A.   I'd say between five and six.

15  Q.   Was that a significant enough number to cause you

16  concern?

17  A.   Yes, it was.

18  Q.   Do you happen to remember the street name on those

19  letters that were returned?

20  A.   Rushmore.

21  Q.   And how was it you remember the name Rushmore?

22  A.   Because as they were coming back, we, within the

23  office, referred to them as the Rushmore people.

24  Q.   Did you then investigate the students listing the

25  Rushmore address?

Direct - Moss

1    A.    We did.

2    Q.    And what documents did you review?

3    A.    All documents that were submitted for the FAFSA

4    application that were on file.

5    Q.    And after reviewing those documents, is there anything

6    else that you remember about the Rushmore people's

7    documents?

8    A.    Yes.  They all had similarities with respect to

9    personal e-mail addresses that were on the system.  Their

10   handwriting seemed to be the same.  Their addresses within

11   reference sheets seemed to be similar.  And they were

12   coming from the same fax numbers.

13   Q.    Did you notice anything about handwriting?

14   A.    Yes.  It was similar within the documents.

15   Q.    Does the school generate an e-mail address for its

16   students?

17   A.    Yes, it does.

18   Q.    So when you're talking about similar e-mail addresses,

19   can you explain that a little bit.

20   A.    Yes.  When students fill admissions application or a

21   FAFSA, they're required to use a personal e-mail address,

22   and those e-mail addresses were the ones that we found were

23   similar in nature.

24   Q.    I'm going to ask if you recall the following names:

25   Manuel Abate?

Direct - Moss

1    A.    I do.

2    Q.    Why is it you recall that name?

3    A.    While working on his file, I had to call to get some

4    additional information and a female had picked up and

5    identified herself as Manuel Abate.

6    Q.    Did that stand out to you?

7    A.    It did.

8    Q.    Why is that?

9    A.    Because our records indicated that it was a male and

10   the voice on the other end was very female sounding.

11   Q.    I'm going to ask you if you know the name Christine

12   Duncan.

13   A.    I do.

14   Q.    Why is it you remember that name?

15   A.    She called me.

16   Q.    Do you recall the topic of conversation?

17   A.    Identity theft.

18   Q.    Do you recall the name Tramell Thomas?

19   A.    I do.

20   Q.    Why is it you recall that name?

21   A.    Because his name reminded me of my son's.

22   Q.    Were there any -- were there documents pertaining to

23   Mr. Thomas?

24   A.    Yes, throughout the investigation, I was asked to

25   provide documents with his name on them.

Direct - Moss

1    Q.   Okay.  Were there any other common addresses that you
2    noticed?
3    A.   Yes.  We had a similar address at Lexington Avenue.
4    Q.   Do you recall the number of students coming back to
5    the Lexington address?
6    A.   I would say about the same, a handful, between five
7    and six.
8    Q.   Did you look into that address?
9    A.   I did.
10   Q.   And what did you do?
11   A.   I Googled it and found that it was within a short
12   distance from our main campus, and that it was a little
13   small townhome.
14   Q.   And did that strike you as odd?
15   A.   It did.
16   Q.   And why is that?
17   A.   Because it was not a big townhome, it was small,
18   compared to the number of returned mail that we were
19   getting from that address.
20   Q.   What occurred after you identified these addresses and
21   commonalities between the various documents?
22   A.   We notified the Department of Education's OIG office
23   with our concerns.
24   Q.   Okay.  And after Pikes Peak reported this information,
25   what, if anything, was required of Pikes Peak by the

Direct - Moss

1    Department of Ed?

2    A.    To submit all documentation that we felt was in the

3    nature of fraudulent activity to the Department -- forward

4    those students to them.

5    Q.    And in the course of their investigation, did you

6    continue to provide those records?

7    A.    Yes, we did.

8            MS. PALUCH:  Your Honor, at this time I note that

9    we will be asking the witness to testify about Government

10   Exhibits 63-B through 63-G.  The parties have stipulated to

11   these exhibits.  At this time, I would move for the

12   admission of 63-B through 63-G, and I would request

13   permission to publish as these exhibits are discussed.

14           THE COURT:  All right.  Given the stipulation of

15   the parties, Government Exhibits 63-B through 63-G are

16   admitted into evidence and may be published to the jury.

17        (Government's Exhibits 63-B thru 63-G received)

18           MS. PALUCH:  Thank you, Your Honor.

19   BY MS. PALUCH:

20   Q.    Could you please publish Government's Exhibit 63-B.

21           And, ma'am, you should see that on the screen in

22   front of you.

23   A.    Yes.

24   Q.    Can you identify that exhibit?

25   A.    This is a loan adjustment form.  It's a form that the

Direct - Moss

1    student at the institution completes to ask for loan monies

2    from the Department of Education.

3    Q.    I think, ma'am, what I'm going to have you do first is

4    just look through 63-B and just tell me generally what

5    those documents relate to.

6    A.    Okay.

7    Q.    Can you just scroll through?

8          Okay.  If we could now go back to page 1.

9    Generally what are these documents?

10   A.    Documents that our institution required of the student

11   if they were asking for additional funds, such as loan --

12   Q.    Who is the individual referenced in 63-B?

13   A.    This one is -- his name is Ismael Omar.

14   Q.    Okay.  If you could please publish the last page of

15   that exhibit.

16         And I'll ask you, ma'am, that last page, what is

17   that document?

18   A.    That is the acceptance letter.

19   Q.    Is there an address listed for Mr. Omar?

20   A.    Yes.

21   Q.    And what is that address?

22   A.    3820 Radiant Drive, Colorado Springs, Colorado.

23   Q.    Okay.  And please publish the first page of that

24   exhibit.

25         And, ma'am, what is that document?

Direct - Moss

1  A.   That's a loan adjustment -- or a loan request form

2  that the student fills out to ask for loan monies.

3  Q.   If you could go to the third page of that exhibit

4  ending in 2692.

5       Does it appear to be signed and dated by Ismael

6  Omar

7  A.   Yes, it does.

8  Q.   Please publish the next document on the next page.

9       Ma'am, can you identify that page?

10 A.   Yes.  This is a loan reference sheet that we ask

11 students to fill out when asking or applying for a student

12 loan.

13 Q.   And why are references asked of a student?

14 A.   In case a student cannot -- doesn't pay back their

15 student loan then we have references to contact to follow

16 up to track the student down to ensure that they're paying

17 back their student loans.

18 Q.   And, Agent Hacker, if you could please enlarge the

19 reference area.

20       Do you recognize any of the addresses on those

21 referenced section?

22 A.   I do.  No. 3, for Virginia Jones, 1420 Rushmore Drive.

23 Q.   Please publish the next page of this exhibit.

24       What is that document?

25 A.   This is an internal form that Pikes Peak uses to

Direct - Moss

1    determine the student's budget and how much loan monies

2    they are eligible for.

3    Q.   Okay.  And how much aid was awarded to Mr. Omar?

4    A.   $9500.

5    Q.   Please publish the next page of this exhibit.

6          And what is that document?

7    A.   This one is the return of Title IV letter letting

8    Ismael know that we returned part of his money back to the

9    Department of Education and he now owes us money.

10   Q.   And how much -- if you could highlight the indented

11   paragraph there.

12          How much was he being notified that was required

13   to pay back to Pikes Peak?

14   A.   $1,649.

15   Q.   Please publish the next page of this exhibit.

16          And please identify that page.

17   A.   This is also a return of Title IV letter letting

18   Ismael know that we were returning funds back and that he

19   owed Pikes Peak.

20   Q.   And if you could state for the record the amount that

21   was owed.

22   A.   $827.

23   Q.   Could you please publish the page ending in 2693.

24   Flip to the beginning of that document.  The third page

25   in -- fourth page.  The reference sheet.

Direct - Moss

1      Do you see the fax number at the bottom of that

2  page, ma'am?

3  A.    Yes.

4  Q.    Do you recall anything about the fax numbers?

5  A.    They usually came from the same fax, or the fax

6  number, and were on the same date.

7  Q.    Okay.  Do you recall anything about the Fed Ex

8  office?

9  A.    We got a couple of fax documents from that office.

10  Q.    Okay.  If you could please publish Government Exhibit

11  63-C.

12      Can you generally, ma'am, identify that packet of

13  documents.

14  A.    Yes.

15      MS. PALUCH:  And, you know, if the witness could

16  have the book in front of her, that might help her to be

17  able to just look through the pages that way.  We are on --

18      COURTROOM DEPUTY:  63-C?

19      MS. PALUCH:  63-C.  Thank you, ma'am.

20  BY MS. PALUCH:

21  Q.    Do you see 63-C?

22  A.    Yes, ma'am.

23  Q.    And generally what are -- what is that exhibit?

24  A.    This is a loan -- again, a loan request form that is

25  filled out by the student asking for monies.

Direct - Moss

1    Q.   Is that a packet of documents pertaining to a specific
2    individual?
3    A.   Yes, ma'am.
4    Q.   Okay.  And who's the individual being addressed in
5    that packet?
6    A.   Virginia Jones.
7    Q.   Okay.  Let's look -- please publish the last page of
8    that exhibit, please.
9         And what is that document?
10   A.   That is the acceptance letter into Pikes Peak.
11   Q.   For Ms. Jones?
12   A.   Yes, ma'am.
13   Q.   What is the address listed for Ms. Jones?
14   A.   1418 Rushmore Drive.
15   Q.   Is that the Rushmore address you discussed
16   previously?
17   A.   Yes, ma'am.
18   Q.   Please publish the first page of that exhibit.  Can
19   you identify that page.
20   A.   Yes.  This is the loan request form filled out by
21   Virginia Jones asking for $9,000.
22   Q.   Okay.  And please look at the second page of -- do you
23   see a signature and a date there as well?
24   A.   Yes, ma'am.
25   Q.   The next page, please.

Direct - Moss

1        What is that document?

2    A.   This is the reference sheet.

3    Q.   Okay.  The same information you talked about earlier?

4    A.   Yes.

5    Q.   Okay.  Please publish the next page of this document.

6        What is that page?

7    A.   The budget sheet letting us know how much funds and

8    loans to give Virginia Jones.

9    Q.   If you could blow up the middle part of that page.

10       How much was awarded for Ms. Jones?

11   A.   $9,000.

12   Q.   Okay.  Now please look at Government's Exhibit 63-D.

13   You should have a packet of documents in the book in front

14   of you.  And generally can you state who that packet of

15   documents pertains to.

16   A.   Yes.  This is Robert Pickens.

17   Q.   We'll publish first, if we could, the last page of

18   that exhibit.

19       And what is that page?

20   A.   The acceptance letter for Robert Pickens to be

21   accepted to Pikes Peak Community College.

22   Q.   What's the address listed for Mr. Pickens?

23   A.   1418 Rushmore Drive.

24   Q.   Please publish the first page.

25       What is that document?

Direct - Moss

A.   The loan request form that Mr. Pickens filled out

asking for $9500.

Q.   Please, Agent Hacker, go two pages in, 2739.

What is that document, ma'am?

A.   The budget sheet, again, that Pikes Peak fills out to

see how much money the student is eligible for.

Q.   And how much money was Mr. Pickens awarded?

A.   9500.

Q.   Okay.

THE COURT:   Counsel, can you hold on a second?

How do you get out -- I don't see the number 9500.

THE WITNESS:   So there's a top portion on the top

calculation where we -- there's two different types of

loans that the student can get:  A subsidized loan and an

unsubsidized loan.  The top portion is the calculation

where we calculate the cost of attendance and any other

financial aid that the student gets.  So the estimated

financial aid, that 5550, would be the federal grant that

the student was awarded.  His EFC of zero, which he gets

from filling out the FAFSA, and then his need based on the

budget is still 20,500.  So for a subsidized student loan,

they can get 3500 extra, so that certified subsidized is

the $3500.  The second portion underneath that is the

unsubsidized student loan, again, with the budget and the

certified unsubsidized is the 6,000.  So the 6,000 plus the

Direct - Moss

1    3500 is the 9500 that the student's been awarded.

2              THE COURT:  All right.  Thank you.

3              MS. PALUCH:  Thank you for clarifying that.

4              THE WITNESS:  You're welcome.

5    BY MS. PALUCH:

6    Q.   What is the next page of that exhibit?

7    A.   A return of Title IV letter letting Robert know that

8    we've returned funds on his behalf to the Department of

9    Education and that he owes us money.

10   Q.   And how much was required to be returned?

11   A.   $900.

12   Q.   Please show you -- please display, if you would,

13   Government's Exhibit 63-E.

14             And, ma'am, if you could look in your box and just

15   tell me generally to whom are those records pertaining?

16   A.   These are for Eddie Jones.

17   Q.   So let's stay on the first page of this exhibit.  What

18   is that document?

19   A.   This is the loan request form for Eddie asking for

20   $9,000 in student loan monies.

21   Q.   And is the 9,000 reflected?

22             If you could highlight that middle portion.

23   A.   Yes, on line 3.

24   Q.   Okay.  And does that appear to be signed by Eddie

25   Jones and dated as well?

Direct - Moss

1    A.    Yes.

2    Q.    Okay.  And the next page -- let's go down to the next

3    document, it's a couple of pages later, ending in 2166.

4          What is that document?

5    A.    The loan records sheet that the students fill out.

6    Q.    And is there an address for Mr. Jones at the top, if

7    you could highlight the top portion?

8    A.    Yes, there is.

9    Q.    And what is that address?

10   A.    1418 Rushmore Drive.

11   Q.    Please publish the page after that.

12         What is that document?

13   A.    The budget sheet that we do to find out how much

14   monies Eddie Jones was eligible for.

15   Q.    And what was the total amount disbursed for him?

16   A.    9,000.

17   Q.    And, again, so the record's clear, can you explain the

18   two numbers that you're adding to get to the 9,000?

19   A.    Yes, the top portion, so the certified subsidized of

20   3500 and then the unsubsidized loan certified of 5500.

21   Q.    Okay.  The next page of this exhibit, please.

22         What is that document?

23   A.    This is a -- what we call a loan proceeds letter.  Any

24   time the school sends this student -- or disburses the

25   student loan monies, we're required to send them a letter

Direct - Moss

1    letting them know that we have paid them their funds.

2    Q.   All right.  Turn to 63-F, if you could, and look at

3    that packet of documents.  And to what student, ma'am, do

4    those documents pertain?

5    A.   Mr. Dennis Miller.

6    Q.   Please publish the last page of that exhibit.

7         What is that document?

8    A.   The acceptance letter to Pikes Peak Community College.

9    Q.   What is the address listed for Mr. Miller?

10   A.   1112 Meadow Oaks Drive.

11   Q.   Okay.  Please publish the first page of that exhibit.

12        And please identify what that is.

13   A.   This is the loan form that Dennis Miller filled out

14   asking for $9500 in student loan.

15   Q.   Please go to page -- let's see -- please go to page 3

16   of that document, ending in 2623.

17        And what is that document?

18   A.   The loan reference sheet that we have students fill

19   out.

20   Q.   And the next page of this exhibit.

21   A.   Again, it's the loan budget sheet that we fill out.

22   Q.   And how much money was awarded for Mr. Miller?

23   A.   3500, and 572 in unsubsidized loans.

24   Q.   If we could highlight that, that's the bottom number

25   in both of those boxes.  Okay.  Please publish the next

Direct - Moss

1    page of that exhibit.

2              And what is that document?

3    A.    The return of Title IV letter that we sent out letting

4    him know that he owes us money.

5    Q.    And what's the amount that he owed?

6    A.    $891.

7    Q.    And the last number is 63-G, and I would ask you to

8    look at that packet and tell us to which student does that

9    apply?

10   A.    This one is for Manuel Abate.

11   Q.    And is that the name you testified to previously as

12   remembering?

13   A.    Yes, ma'am.

14   Q.    Please publish the last page of that document.  Please

15   identify that.

16   A.    This is an acceptance letter from Manuel to Pikes Peak

17   Community College.

18   Q.    And what is the address listed for Mr. Abate?

19   A.    1112 Meadow Oaks Drive.

20   Q.    Okay.  Please publish the first page of this exhibit.

21              What is that document?

22   A.    The loan request form filled out by Manuel Abate

23   asking for $9500 in student loans.

24   Q.    Okay.  Page 3 of this document ending in 25.

25              What is that document, ma'am?

Cross - Moss

1    A.    Again, this is the reference sheet that the students

2    fill out.

3    Q.    Next page, please.  And please blow up the amount.

4          What is this document, ma'am?

5    A.    The budget sheet that we use to see how much the

6    student is eligible for in student loans.

7    Q.    And how much aid was awarded for Mr. Abate?

8    A.    $9500.

9    Q.    Next page of this exhibit.

10         And what is that document, ma'am?

11   A.    The return of Title IV letter letting Mr. Abate know

12   that we returned money on his behalf.

13   Q.    And how much did Mr. Abate owed -- owe to Pikes Peak?

14   A.    $829.

15         MS. PALUCH:  Thank you.  No further questions.

16         THE COURT:  Cross-examination.

17                    CROSS-EXAMINATION

18   BY MR. GOODREID:

19   Q.    Good afternoon, Ms. Moss.

20   A.    Good afternoon.

21   Q.    Now, you indicated on your direct examination that you

22   recall quite distinctly following up on the Manuel Abate

23   matter, right?

24   A.    Correct.

25   Q.    In fact, you said that the reason that that sticks in

Cross - Moss

1    your mind is because when you contacted that number, it was

2    actually a female that answered and claiming to be Mr.

3    Abate, right?

4    A.    Correct.

5    Q.    And not surprisingly you found that to be suspicious,

6    didn't you?

7    A.    Correct.

8    Q.    But you weren't actually able to follow up on that,

9    were you, because of some internal regulations?  Is that

10   right?

11   A.    I don't understand your question.

12   Q.    Well, let me put it to you a different way.  I mean,

13   you thought it was suspicious that a woman was claiming to

14   be Manuel Abate.  Were you able to do anything about that?

15   A.    I still talked to the student.  I can't determine

16   whether or not a student has a female voice or not, so I

17   still conducted my business with that person who identified

18   themself as Manuel Abate.

19   Q.    Right.  So, in other words, you had to proceed as if

20   this female person or this female voice was actually Manuel

21   Abate.

22   A.    Correct.

23   Q.    Okay.  Now, going back to the 2009-2010 time frame, it

24   was possible during -- at least during that period for a

25   person to apply for admission to Pikes Peak Community

Cross - Moss

1    College in person; isn't that right?

2    A.    Yes.

3    Q.    In other words, you -- one, a prospective student did

4    not have to do it over the internet, right?

5    A.    They did not have to, no.

6    Q.    Okay.  And did Pikes Peak Community College keep any

7    record of how it is that a person applied to get -- for

8    admission?  In other words, whether it was in person or

9    over the internet?

10   A.    Yes.  They keep the hard copy paper application as

11   well as the electronic version in the student's records.

12   Q.    Okay.  And you had occasion, in preparing for your

13   testimony today, to review these records, have you not?

14   A.    Yes.

15   Q.    And you know that -- so you're able to -- at least

16   with respect to the people who are connected with this

17   case, you could say, couldn't you, as to who applied in

18   person and who applied over the internet?

19   A.    No.

20   Q.    You couldn't?

21   A.    I could not.

22   Q.    Now, Ms. Paluch asked you on direct about certain

23   circumstances that raised your suspicion, right?  You

24   recall generally some of those questions?

25   A.    Yes, sir.

Cross - Moss

1    Q.   And you indicated that one of the things that raised

2    your suspicion is that some of these applications or some

3    of these documents that came to the same address appeared

4    to have similar handwriting, correct?

5    A.   Correct.

6    Q.   And you also indicated that a number of these

7    documents from the same address had similar signatures,

8    right?

9    A.   Correct.

10    Q.   And it's also correct, is it not, that in many

11    instances, documents from the same address were coming from

12    the same fax number, right?

13    A.   Well, when the fax is from random businesses in

14    Colorado, that's what brings our suspicion.

15    Q.   Right.  But in this -- my question is in this

16    particular instance, or in this particular case, there were

17    a number of documents that came from the same fax number,

18    right?

19    A.   Correct.

20    Q.   And you found that to be suspicious, didn't you?

21    A.   Correct.

22    Q.   Now, Ms. Paluch asked you about a number of people.

23    She went through Ms. Abate, Mr. Pickens, several people.

24    You recall in 63 you went through a number of different

25    individuals?

Cross - Moss

1    A.    Yes.

2    Q.    And a number of those people came to your attention

3    because they were suspicious, right?

4    A.    I'm sorry?

5    Q.    Well, these applications were suspicious, that's

6    what -- that's why they raised attention -- or why they

7    raised your attention; isn't that right?

8    A.    Some of them the department -- after we were notified

9    of our original -- we were given names to provide

10   documentation to the Department of Education as

11   fraudulent --

12   Q.    Right.

13   A.    -- files.

14   Q.    So, yeah, to clarify:  So a number of these people

15   were determined -- or were at least under suspicion of

16   being fraudulent applications, right?

17   A.    Correct.

18   Q.    Okay.  Now, Ms. Paluch asked you -- you also said that

19   you produced a number of documents in the course of your

20   involvement with this case that were related to Mr. Thomas;

21   isn't that right?

22   A.    Yes.

23   Q.    Okay.  Mr. Thomas was in a little bit different

24   situation, wasn't he?

25   A.    I am not sure what you're talking about.

Cross - Moss

1    Q.   Well, Mr. Thomas actually enrolled at Pikes Peak

2    Community College; isn't that right?

3    A.   From the research that I did, yes.

4    Q.   So he was a student and, in fact, he actually -- a

5    transcript was issued in his name; isn't that right?

6    A.   I don't have access to transcripts, so I don't know.

7    Q.   So -- but you know he actually attended classes at

8    Pikes Peak Community College, don't you?

9    A.   I can't confirm that he actually attended, no.

10   Q.   Well, you know that he applied.

11   A.   Based on the documents that I collected to send to the

12   Department of Education, yes.

13   Q.   You know that he applied, you know that -- you know

14   that he received financial aid --

15   A.   Yes.

16   Q.   -- right?

17        But you have no idea whether he actually attended

18   Pikes Peak Community College; is that your testimony?

19   A.   I don't know if he attended classes, to be specific.

20   Q.   Okay.

21        MR. GOODREID:  That's all I have, Your Honor.

22        THE COURT:  Redirect.

23        MS. PALUCH:  None, Your Honor.  Thank you.

24        THE COURT:  All right.  I have a couple questions

25   for the witness.

Examination - Moss

1                          EXAMINATION

2    BY THE COURT:

3    Q.   Help me understand the distinction between the funds

4    that went from DOE directly to the college and what portion

5    of that went to the student.

6    A.   So when the student is awarded a -- grants or loans,

7    they're awarded in advance.  So when a student does not

8    pass courses, withdraw or fail, then we have to do the

9    return of Title IV calculation, and there's a percentage --

10   a system that the Department of Education has us use to

11   determine the amount that goes back.

12        When we do that calculation, we, as an

13   institution, send that money back to the Department of

14   Education so that the student doesn't owe the Department of

15   Education directly and, instead, owes the school.

16        If we returned -- had the student have to pay the

17   Department of Education directly, it would cause -- the

18   Department of Education would have to do additional steps

19   on the student.

20   Q.   Right.  I think my question was not clear because

21   that's --

22   A.   I'm sorry.

23   Q.   Let me ask it this way:  Is Pikes Peak Community

24   College free?

25   A.   No, it's not free.

Examination - Moss

1    Q.    How much tuition is it?

2    A.    It's per credit hour.  I think right now it's like

3    $145 per credit hour.

4    Q.    Does any monies go from DOE to Pikes Peak Community

5    College directly, without stopping with the student --

6    A.    Oh, I'm sorry.

7    Q.    -- to pay tuition and fees?

8    A.    So when the money comes in, Pikes Peak takes

9    whatever's owed for tuition and fees, and if the student

10   charged books at the book store.  And if there's anything

11   left over -- we call it residuals -- it's deposited on our

12   bank card for the student to use at their discretion.

13   Q.    All right.  So the 9500, for example, 9,000, 9500 that

14   we saw in your calculations, are those -- is that the sum

15   that is going directly to the student via the debit card or

16   is a portion of the 9500 being withheld by the college for

17   tuition and fees?

18   A.    That would depend if the student also got Pell Grants.

19   So on some of these all of them got Pell Grant money, so

20   the grant and some of the loan would be used to pay for the

21   tuition and fees.  And then a majority of the loan would go

22   back to the student.

23   Q.    But looking at the documents we just reviewed, we

24   can't tell how much went to the student and how much went

25   to the university?

Examination - Moss

1   A.   Not -- not with the current documents on file.

2   Q.   Okay.  All right.

3           THE COURT:  I'll allow follow-up questions from

4   counsel based on the Court's questions.  From the

5   Government.

6                        EXAMINATION

7   BY MS. PALUCH:

8   Q.   Ms. Moss, are you familiar with a company named Higher

9   One?

10  A.   I am.

11  Q.   And what is their function?

12  A.   When Pikes Peak owes the student money for refunds, we

13  deposit onto the Higher One card.

14  Q.   Okay.  So is Higher One the company that is involved

15  in the refunds or the amount of money going to the student?

16  A.   Yes.  It's through -- the system office has that.

17  Q.   Okay.  That's not necessarily Pikes Peak that's

18  getting the money to the students; is that correct?  It's

19  Higher One?

20  A.   Correct.  Correct.

21          MS. PALUCH:  Thank you, ma'am.

22          THE COURT:  Okay.  Additional questions from the

23  defendant?

24          MR. GOODREID:  Your Honor, I have no follow-up

25  questions based on the Court's questions.

Examination - Moss

1    THE COURT:  All right.  May the witness be excused

2    from the Government?

3        MS. PALUCH:  Yes, Your Honor.

4        THE COURT:  May the witness be excused from the

5    defendant?

6        THE COURT:  Yes, Your Honor.

7        THE COURT:  Thank you, Ms. Moss.  Thank you for

8    joining us.  You are excused.  You may step down.

9        The Government may call its next witness.

10       MS. PALUCH:  Thank you, Your Honor.  Government

11   calls Ms. Rebecca Joseph.

12       COURTROOM DEPUTY:  Right here, ma'am.  Step up

13   into the box and raise your right hand.

14       REBECCA JOSEPH, GOVERNMENT'S WITNESS, SWORN

15       COURTROOM DEPUTY:  Please be seated.  Scooch all

16   the way up here.  Put your elbows right on the stand there.

17       Please state your full name for the record and

18   spell your first and last name.

19       THE WITNESS:  Rebecca Joseph.  R-e-b-e-c-c-a,

20   J-o-s-e-p-h.

21       MS. PALUCH:  Thank you.  Ms. Hansen, does the

22   witness have the exhibit book in front of her?

23       COURTROOM DEPUTY:  The same one?

24       MS. PALUCH:  Yes.  Thank you, ma'am.

25                      DIRECT EXAMINATION

Direct - Joseph

1    BY MS. PALUCH:

2    Q.   Good afternoon --

3             MS. PALUCH:   May I proceed, Your Honor?

4             THE COURT:   You may, counsel.

5    BY MS. PALUCH:

6    Q.   Good afternoon, ma'am.

7    A.   Hello.

8    Q.   How are you employed?

9    A.   I'm employed with BankMobile, a division of Customers

10   Bank.

11   Q.   And what is your position with BankMobile?

12   A.   I'm legal, slash, fraud research analyst.

13   Q.   Was BankMobile previously known by another name?

14   A.   Yes, it was.

15   Q.   And what was that?

16   A.   Higher One.

17   Q.   And when did Higher One become BankMobile?

18   A.   June of 2016.

19   Q.   So back in 2010-2012, was the company known as Higher

20   One?

21   A.   Yes, it was.

22   Q.   And so how long have you been employed with Higher One

23   or BankMobile?

24   A.   Five years.

25   Q.   Generally, can you explain what type of business

Direct - Joseph

1    Higher One is.  I'll refer to as Higher One for purposes of

2    this.

3    A.    Okay.  Higher One was a business that contracted with

4    colleges and universities to process financial aid refunds.

5    Q.    And to whom were those refunds disbursed?

6    A.    They were disbursed to the students of the colleges

7    and universities that Higher One contracted with.

8    Q.    And in the 2010-2012 time frame, how did Higher One

9    provide funds to the students?

10   A.    So during that time frame, Higher One proactively

11   mailed debit cards to the students of those colleges and

12   universities, and they also provided the refunds -- or

13   could provide the refunds on a paper check or by ACH to

14   another financial institution.

15   Q.    So was it up to the student to tell Higher One how

16   they wanted those funds?

17   A.    Yes.

18   Q.    Okay.  During that time, how did Higher One provide

19   debit cards to students?

20   A.    By U.S. mail.

21   Q.    Were there employees within Higher -- that worked for

22   Higher One that directed that debit cards be mailed --

23   A.    Yes.

24   Q.    -- to the students?

25   A.    Yes.

216

Direct - Joseph

1    Q.   Now, how did Higher One know where to send a debit
2    card?
3    A.   We would receive an address for the student from the
4    school.
5    Q.   Does Higher One keep records regarding the ordering
6    and mailing of debit cards to students?
7    A.   Yes.
8    Q.   And were you requested to provide Higher One records
9    of that information to the Department of Education
10   pertaining to the debit cards at issue in this case?
11   A.   Yes.
12   Q.   And did you provide those records?
13   A.   Yes.
14   Q.   And, generally, what is the type of information that
15   Higher One records would show?
16   A.   It would show the name, the address, the phone number,
17   the e-mail address.  It would also show any of the card
18   history, when it was ordered, the card number, where it was
19   mailed to, and when it was activated.
20   Q.   And when we say "activated," by whom is a debit card
21   activated?
22   A.   The debit card would have to be activated by the
23   student.
24   Q.   How does a student activate a debit card?
25   A.   They would have to activate the card online.

Direct - Joseph

1   Q.   What steps were required for funds to be loaded onto a

2   debit card?

3   A.   They would have to activate the debit card and open a

4   Higher One account in order -- and then make a selection

5   for the refund to be placed in their Higher One account.

6   Q.   Is that a time-consuming process?

7   A.   No.

8   Q.   In order to receive a Higher One debit card, was it

9   necessary for the students to have a phone conversation

10  with Higher One?

11  A.   No, it was not.

12  Q.   How would they do their business with Higher One?

13  A.   They could do all their business with Higher One

14  online.

15  Q.   When a card is about to be mailed, would Higher One

16  contact a student to let them know that?

17  A.   Yes, they would contact them by e-mail.

18          MS. PALUCH:  At this time, Your Honor, I will be

19  asking this witness to testify about Government's Exhibits

20  56-B through 56-G.  The parties have stipulated to these

21  exhibits.  At this time, I move for the admission of 56-B

22  through 56-G and I request to publish these exhibits as

23  they are discussed.

24          THE COURT:  All right.  Given the stipulation of

25  the parties, Government Exhibits 56-B through 56-G are

1   admitted into evidence and may be published to the jury.

2        (Government's Exhibits 56-B thru 56-G received)

3             MS. PALUCH:   Thank you.

4   BY MS. PALUCH:

5   Q.   Ma'am, you'll find the jury -- the witness -- the

6   exhibit book in front of you.  And I'm going to send --

7   direct your attention to 56-B.  And then the exhibit also

8   will be displayed on the screen in front of you.

9             So, first, can you look at 56-B and just identify

10  generally what that exhibit is.

11  A.   So this is the profile for Ismael Omar.

12  Q.   And please publish the last page of Exhibit 56-B.

13            Does this page indicate -- and I'd ask you to

14  highlight, if you could, the lighter-colored box.

15            Does that page indicate whether a card was ordered

16  in the name of Ismael -- Ismael Omar?

17  A.   Yes, it does.

18  Q.   And what date was it ordered?

19  A.   It was ordered on February 8 of 2011.

20  Q.   And you can just mark that with your finger, just

21  to -- make a mark.

22            THE COURT:   There's also a stylus up there.

23  BY MS. PALUCH:

24  Q.   Okay.  There you go.  Can you mark that with a stylus

25  and see if it will just make a mark there?

Direct - Joseph

1        Okay.  That was the date you said it was ordered.
2   Okay.  Was that card activated?
3   A.   Yes, it was.
4   Q.   And where does that appear?
5   A.   Right here.
6   Q.   And what is the date that that card was activated?
7   A.   February 22d of 2011.
8   Q.   Okay.  Please publish the first page of this exhibit.
9        Was the debit card mailed to Ismael Omar?
10  A.   Yes, it was.
11  Q.   To what address was it mailed?
12  A.   3820 Radiant Drive, Apartment 239, Colorado Springs,
13  Colorado 80907-3932.
14  Q.   If you could highlight that portion, Agent Hacker.
15       THE COURT:  Counsel, when you go to a new exhibit,
16  you should clear the marks.
17       MS. PALUCH:  We just did.
18       THE COURT:  Mr. Fields just did it for you, but
19  keep that in mind.
20       MS. PALUCH:  All right.
21  BY MS. PALUCH:
22  Q.   Do you see Detail column on this page?
23  A.   Yes.
24  Q.   And what information is under the Detail column?
25  A.   So under the Detail column it shows the address where

Direct - Joseph

1    the card was mailed to.

2    Q.   Okay.  And do you know approximately when the debit

3    card for Ismael Omar would have been mailed?

4    A.   It would have been mailed any time after the date it

5    was ordered and before it was activated.  So it was ordered

6    February the 8th, so it would have been mailed the day

7    after or shortly after that.

8    Q.   Direct your attention to the first page under the

9    column Action.  What is listed under Action?

10   A.   Report lost.

11   Q.   And what does that mean?

12   A.   That would mean that the card was reported lost or

13   stolen to Higher One.

14   Q.   Was another card ordered?

15   A.   Yes.

16   Q.   Okay.  The very -- at the bottom of that page, do you

17   see a heading that says School Address Listing?

18   A.   Yes.

19   Q.   From whom does Higher One receive those addresses?

20   And if you could go on to the next page.

21   A.   We receive those addresses from the school.

22   Q.   Do you see the sections here where it has addresses

23   and e-mails and phone numbers listed?

24   A.   Yes.

25   Q.   All of that information, where would Higher One

Direct - Joseph

1   receive that?

2   A.   From the school.

3   Q.   Okay.  I'd like to refer your attention under E-mail

4   Addresses where it says "confirmed."

5   A.   Yes.

6   Q.   Do you see that?

7   A.   Yes, I do.

8   Q.   What is listed under that column?

9   A.   So we have false, true, false, false.

10  Q.   If you could please highlight that.

11       And so what is meant when it says false or true?

12  A.   So for false, it would mean that the e-mail address

13  was not confirmed.  For true, it would mean that the e-mail

14  address was able to be confirmed.

15  Q.   And what effect, if any, on Higher One is there if the

16  e-mail address is false?

17  A.   If the e-mail address is false, we would use the one

18  that is confirmed, so the one that would show as true.

19  Q.   Is a debit card still sent if an e-mail is not

20  confirmed?

21  A.   Yes.

22  Q.   Now towards the bottom -- if we could back out of

23  that -- towards the bottom do you see a reference to

24  Customer Communication Log?

25  A.   Yes.

Direct - Joseph

1    Q.    And then let's go on to the next page of that exhibit.

2          Can you explain what type of information is

3    captured in the customer communication log.

4    A.    The customer communications log just captures any time

5    the student logged on and Higher One had a promotion for

6    them that we wanted them to participate in and what action

7    they took.

8    Q.    Okay.  The next column there has a heading of

9    Cardholder Activity Log.  What information is captured

10   there?

11   A.    So that shows every time the student logged into their

12   account.

13   Q.    Please turn now to Government Exhibit 56-C.  And if

14   that could be published.

15         And can you state, once you look at that exhibit,

16   to whom those records apply.

17   A.    This is the profile for Virginia Jones.

18   Q.    Please publish the last page of that exhibit.

19         Referring your attention to that page -- and if we

20   could blow up that box -- was a debit card ordered for Ms.

21   Jones?

22   A.    Yes, it was.

23   Q.    And what date was that ordered?

24   A.    August 11th of 2011.

25   Q.    And was that card activated?

Direct - Joseph

1    A.   Yes, it was.

2    Q.   What date was that?

3    A.   October 3d of 2011.

4    Q.   So the mailing of this card would have occurred

5    when?

6    A.   Any time after August 11th and prior to October 3d.

7    Q.   Please turn to the next page of this exhibit.

8         To what address -- let's see.  To what address was

9    the debit card mailed?  I think we need to go back to --

10   can you see on that page to what address the card was

11   mailed?

12   A.   Yes.

13   Q.   And what was that address?

14   A.   1418 Rushmore Drive, Colorado Springs, Colorado

15   80910-2027.

16   Q.   Okay.  And does this exhibit -- if we could back out

17   of it and scroll on to the next page.

18        Does it contain the same type of information that

19   you testified to about the previous exhibit?

20   A.   Yes, it does.

21   Q.   Okay.  Now, was Higher One able to confirm the e-mail

22   address provided to Ms. Jones by the school?

23   A.   No, it was not.

24   Q.   Okay.  And if you could highlight -- do you see that,

25   Agent Hacker?  Okay.  Please turn to Government Exhibit

Direct - Joseph

1    56-D and please publish that exhibit.

2              And identify those records, ma'am.

3    A.    This is the profile for Robert Pickens.

4    Q.    And please publish the last page of that exhibit.

5              Was a debit card ordered for Mr. Pickens?

6    A.    Yes, it was.

7    Q.    On what date?

8    A.    August 11th of 2011.

9    Q.    And was that card activated?

10   A.    Yes, it was.

11   Q.    On what date?

12   A.    October 3d of 2011.

13   Q.    So would the mailing have occurred between those

14   dates?

15   A.    Yes, it would.

16   Q.    Please publish the first page of this exhibit.  If

17   could you highlight on the right-hand side.

18              To what address was this card mailed?

19   A.    1418 Rushmore Drive, Colorado Springs, Colorado

20   Springs 80910-2027.

21   Q.    If we could back out of that and flip through the next

22   few pages of this exhibit.

23              Do the same sections, with e-mail and addresses

24   and phone numbers, type of information appear on these

25   records?

225

Direct - Joseph

1    A.   Yes, it does.

2    Q.   Was the e-mail address for Mr. Pickens confirmed?

3    A.   No, it was not.

4    Q.   Okay.  Was his card still mailed?

5    A.   Yes.

6    Q.   56-E, please.  If you could please publish that

7    exhibit.

8             And, ma'am, if you can identify that when you see

9    it.

10   A.   It's the profile for Eddie Jones.

11   Q.   Please publish the last page of that exhibit.  And

12   highlight the box.

13            Was a card ordered in the name of Eddie Jones?

14   A.   Yes, it was.

15   Q.   What date did that occur?

16   A.   August 29th of 2011.

17   Q.   Does it indicate on the last page whether his card was

18   activated?

19   A.   Yes, it does.

20   Q.   What was that date?

21   A.   November 9th of 2011.

22   Q.   So when would that have -- would that card have been

23   mailed between those dates?

24   A.   Yes, it would have.

25   Q.   Please publish the first page of Exhibit 56-E.

Direct - Joseph

1       And does it show where Mr. Jones' debit card was

2   mailed?

3   A.   Yes, it does.

4   Q.   And what is that address?

5   A.   1418 Rushmore Drive, Colorado Springs, Colorado

6   80910-2027.

7   Q.   And I haven't been asking you this, ma'am, but where

8   on these records would we see the dollar amounts that were

9   placed on those debit cards?

10  A.   You would see it under the Refund History.

11  Q.   Okay.  And let's -- can you look through your exhibit

12  book, ma'am, and tell us where that would be.  I don't know

13  that we have that -- okay, we will move on there.

14       THE COURT:  Ms. Paluch, I just want to make sure

15  you're aware, at least for me, anything that you're not

16  blowing up, I cannot read.

17       MS. PALUCH:  Okay.

18       THE COURT:  This is tiny, tiny font, so unless the

19  jurors have hawk-eyes, I don't think they're reading it

20  either.  So, you know, for me right now, I can't read a

21  single thing on this page.

22       MS. PALUCH:  Right.

23       THE COURT:  Your witness has the hard copy, that's

24  why she can read it, but none of the rest of us are reading

25  anything.

Direct - Joseph

1           MS. PALUCH:  Right.  Right.  We've been trying to

2    blow up, Your Honor, on the order, date, and the activation

3    dates in those boxes.

4           THE COURT:  I know what you've been trying to do.

5    I'm just pointing out to you, when you don't do it, assume

6    nobody is reading everything.

7           MS. PALUCH:  Understood, Your Honor.

8           THE COURT:  All right.

9           MS. PALUCH:  Okay.

10   BY MS. PALUCH:

11   Q.   Now let's publish the first page of 56-E.

12          THE COURT:  Let's -- why don't we break here now

13   for our afternoon recess.

14          Ladies and gentlemen of the jury, we'll be in

15   recess for 15 minutes.

16       (Jury left at 3:16 p.m.)

17          THE COURT:  Ms. Joseph, since you're in the middle

18   of your testimony, I direct you not to speak with any of

19   the lawyers during the break.

20          THE WITNESS:  Okay.  Thank you.

21       (Recess taken at 3:16 p.m.)

22       (In open court in the presence of the jury at 3:31

23   p.m.)

24          THE COURT:  Ms. Joseph, I remind you that you

25   remain under oath.

228
Direct - Joseph

1           Ms. Paluch, you may resume your examination.

2           MS. PALUCH:   Thank you, Your Honor.

3    BY MS. PALUCH:

4    Q.   Ms. Joseph, when we left off, we were talking about

5    Government Exhibit 56-E.  And could you state for the

6    record again from which students do these records pertain?

7    A.   They're for Eddie Jones.

8    Q.   And please publish the last page of that exhibit.  And

9    if we can, as much as we can, if we can highlight the

10   light-colored box and make that as big as we can.

11          Ma'am, can you state whether a card was ordered in

12   the name of Eddie Jones?

13   A.   Yes, it was.

14   Q.   And what was the date?

15   A.   August 29th of 2011.

16          MS. PALUCH:   Your Honor, is that more visible?

17          THE COURT:   Yes.

18          MS. PALUCH:   Okay.

19   BY MS. PALUCH:

20   Q.   Does it indicate on that page whether Mr. Jones' debit

21   card was activated?

22   A.   Yes, it does.

23   Q.   And what date was that?

24   A.   November 9th of 2011.

25   Q.   So would the card have been mailed between those two

Direct - Joseph

1   dates?

2   A.   Yes, it would have.

3   Q.   Please publish the first page of 56-E.

4        On that page, does it show the address to which

5   that debit card was mailed?

6   A.   Yes, it does.

7   Q.   What is that address?

8        And if you could highlight that part, Agent

9   Hacker.   Thank you.

10  A.   The address is 1418 Rushmore Drive, Colorado Springs,

11  Colorado 80910-2027.

12  Q.   And if you could go back, back out of that, and let's

13  highlight the information contained on this page, if we

14  can.   And scroll down.

15       Does this exhibit contain the same type of

16  information we've been talking about with school address

17  listing, address listing, that you've testified about?

18  A.   Yes, it does.

19  Q.   And if you could go down to the next page where it

20  talks about e-mail addresses.   Where it has the Confirm.

21  That middle section, e-mail address listing, could you

22  highlight that.   Make that as big as we can.

23       Was Higher One able to confirm the e-mail address

24  provided for Mr. Jones?

25  A.   No.

Direct - Joseph

1    Q.   Was a debit card still mailed, though?

2    A.   Yes.

3    Q.   Please turn to Government Exhibit 56-F, if you could

4    please publish that exhibit.

5            Ma'am, to what student do these records pertain?

6            And if you could highlight the top portion of that

7    document.

8    A.   These records are to Dennis Miller.

9    Q.   Okay.  Please publish the last page of this exhibit

10   and highlight the clear -- or the lighter-colored box.  As

11   large as you can make that.

12           Was a debit card ordered for Mr. Miller?

13   A.   Yes, it was.

14   Q.   On what date?

15   A.   June 26th of 2012.

16   Q.   And is it indicated there whether that card was

17   activated?

18   A.   Yes, it is.

19   Q.   On what date?

20   A.   July 7th of 2012.

21   Q.   Please publish the first page of this exhibit.  And

22   please highlight on the right-hand side.

23           Does that page indicate the address to which that

24   debit card was mailed?

25   A.   Yes, it does.

1    Q.   And would that -- what would be the time frame for the

2    mailing of that card?

3    A.   It would have been between the date it was ordered and

4    the date it was activated.

5    Q.   If you could back out to the first page, and if you

6    could highlight the page, the entire page, if you could.

7         Are these the same type of records -- and scroll

8    on to the next page -- that we've been talking about with

9    respect to the other students with the same type of

10   information?

11   A.   Yes, it is.

12   Q.   And under the e-mail address down at the bottom, if

13   you could highlight that.

14        Was Higher One able to confirm that e-mail address

15   for Mr. Miller?

16   A.   Yes.

17   Q.   Okay.  Finally, if you could please turn to Government

18   Exhibit 56-G, and if you could highlight the top portion of

19   that.

20        To what student did these records pertain?

21   A.   Manuel Abate.

22   Q.   And if you go -- we're just going to highlight down

23   below, the bottom portion -- actually, right there, that

24   middle portion of the document, Agent Hacker.

25        Now, reading -- referring you to that section,

Direct - Joseph

1    does that indicate whether a Higher One debit card was

2    ordered for Mr. Abate?

3    A.    Yes, it does.

4    Q.    And what's the date of that ordering?

5    A.    July 19th of 2012.

6    Q.    Okay.  Could you highlight that, Agent Hacker.  Okay.

7    I'm sorry, could you back out of that and take -- grab the

8    column to the right of that -- there you go.  Along with

9    the date.  Off to the left there.

10        I'm sorry, ma'am, I'm trying to capture the date.

11   Is that where you're getting the order date from?

12   A.    Yes.

13   Q.    Okay.  If you could back out of that.

14        Was that debit card mailed?

15   A.    Yes, it was.

16   Q.    All right.  If you could please highlight this whole

17   portion here, Agent Hacker.

18        All right.  Do you see Due Date for U.S. Mail?

19   A.    Yes, I do.

20   Q.    And what's the date listed there?

21   A.    July 26th of 2012.

22   Q.    Okay.  And still looking at that portion, what is the

23   address to which that debit card was mailed?

24   A.    1112 Meadow Oaks Drive, Colorado Springs, Colorado

25   80921-3681.

233
Direct - Joseph

1    Q.   Please publish the second to the last page of this

2    exhibit, which is found at page ending in 12.  All right.

3    If you could please highlight that whole middle portion

4    there.

5         Ma'am, in that section, does it tell you how

6    much -- how much money was allocated for Mr. Abate?

7    A.   Yes, it does.

8    Q.   And can you tell us where that appears.

9    A.   Under where it says total, it says $4,746.10.

10   Q.   And that's at the bottom of this portion?

11   A.   Yes.

12   Q.   Can you highlight that, please, Agent Hacker.  Okay.

13   Please turn to the fourth page of that exhibit ending in

14   Bates number 08.

15        Was that card activated, ma'am?

16   A.   No, it was not.

17   Q.   Please publish the second to the last page of the

18   exhibit ending in number 12.

19        Ma'am, what is the -- if you could highlight from

20   the title there, Agent Hacker, taking that down, and

21   take -- yeah, keep going down.  There you go.  Just make

22   that larger.  And let's see -- back out.  If you could back

23   out of that a little bit.

24        What is the title of that page?  Do you see a

25   title on that page?

1          Are we at the document ending in 12?  I think you

2    need to go over a few more pages.  Okay.  Could you please

3    highlight the title of that page.

4          And, Ms. Joseph, could you state for the record

5    what that title is.

6    A.   Refund Search.

7    Q.   Okay.  And what is a refund search?

8    A.   It's the page we use to pull up the refund history for

9    each student.

10   Q.   Okay.  And if you could highlight that portion -- yes,

11   there you go -- does this page indicate whether funds were

12   ultimately disbursed for Manuel Abate?

13   A.   Yes, it does.

14   Q.   And how were they disbursed?

15   A.   By paper check.

16   Q.   And tell us where on this exhibit you're able to see

17   that.

18   A.   Under Current Status.

19   Q.   So Agent Hacker, if you could please enlarge the

20   Current Status column.

21         Tell us what you're seeing there.

22   A.   It says, "Return to university.  Check returned, time

23   out."  And then "Returned to university, stale check."

24   Q.   So what does that tell you?

25   A.   That tells me that a paper check was sent; however, it

Direct - Joseph

1    was never cashed and so the funds were returned to the

2    university.

3    Q.   Okay.  When would those checks have been mailed?

4         And if you could back out of that exhibit and

5    highlight the middle section.

6         Can you tell us in that column, ma'am, does it

7    give you a date of when the checks were mailed?

8    A.   So, it would have been -- it would have been mailed on

9    the final disbursement date or the day after.

10   Q.   And what is that date?

11   A.   For the first one, it's March 22d of 2013, and then

12   the second one, it's April 2d of 2013.

13   Q.   How much money would have loaded to the debit card had

14   it been activated back in July of 2012?

15   A.   $4,746.10.

16   Q.   And is that the total amount?

17        If you could highlight the total at the bottom.

18   A.   Yes, it is.

19   Q.   That's the amount that would have gone on the card had

20   it been activated?

21   A.   Yes.

22   Q.   Generally under what circumstances would Higher One

23   mail a check?

24   A.   We would mail a check if the student put "paper check"

25   as their refund selection, or if they had not made a refund

Cross - Joseph

1    selection, then we would be automatically required to mail

2    a paper check.

3    Q.   Can you explain that, when you say "automatically

4    required"?

5    A.   So we can't -- because it's financial aid refunds, we

6    can't hold it forever.  So if a refund selection is not

7    made, then we have to mail a paper check.

8    Q.   So in this case, when the card was not activated, is

9    that why the check was mailed?

10   A.   Well, it would have been for two reasons:  the card

11   wasn't activated and a refund selection wasn't made.

12   Q.   So in that event, then Higher One is --

13   A.   Would have to mail a paper check, yes.

14              MS. PALUCH:  Thank you, ma'am.

15              No further questions, Your Honor.

16              THE COURT:  All right.  Cross-examination.

17                        CROSS-EXAMINATION

18   BY MR. GOODREID:

19   Q.   Good afternoon, Ms. Joseph.

20   A.   Hello.

21   Q.   Now, you indicated on direct when Government counsel

22   was going through a number of these people's records, that

23   at least on one or more occasions with these people, the

24   e-mail addresses were not able to be confirmed; is that

25   right?

Cross - Joseph

1    A.    Yes.

2    Q.    Okay.  But even though on those occasions the e-mail

3    addresses were not able to be confirmed, the debit cards

4    were nonetheless sent out, right?

5    A.    Correct.

6    Q.    All right.  So let's go -- if we could pull up -- let

7    me ask you from memory first.  If you can't remember, we

8    can go to the exhibit, all right?

9    A.    All right.

10   Q.    I'll ask you some questions about some dates.  So do

11   you recall Exhibit 56-B when Government counsel went

12   through with you, remember the name Ismael Omar?

13   A.    Yes.

14   Q.    Okay.  And if it would be helpful to you, ma'am, if

15   you would turn to page 4 of that exhibit.

16   A.    Okay.

17   Q.    And that indicates that the card for Mr. Omar was

18   activated sometime after February of 2011, right?

19   A.    Yes.

20   Q.    And, similarly, if you can remember -- and if you

21   can't we'll look at the exhibit -- but for Exhibit 56-B,

22   for -- excuse me, 56-C, for Virginia Jones, that card was

23   activated in 2011 as well; isn't that right?

24         Please look, if you don't remember.  If it will be

25   helpful, it will be page 4 of 56-C.

238

Cross - Joseph

1   A.   Yes.

2   Q.   And so that was activated on October 3d of 2011?

3   A.   I'm sorry, which --

4   Q.   56-C for Virginia Jones.

5   A.   Yes.  It was activated on October 3d.

6   Q.   Okay.  So now we've got Mr. Omar activated in 2011,

7   Ms. Jones in 2011, right?

8   A.   Yes.

9   Q.   Okay.  And 56-D, Robert Pickens, his was also

10  activated in 2011, in October; isn't that right?  And,

11  again, if it would help for you to look at 56-D, as in dog,

12  on page 5.

13  A.   Yes.  It was.  October of 2011.

14  Q.   Okay.  So now we've got Omar, Jones, and Pickens all

15  activated in 2011, right?

16  A.   Yes.

17  Q.   Okay.  And same thing with Eddie Jones was also

18  activated in 2011 -- in November 9th, 2011, right?  And,

19  again, if it would help you to look at 56-E on page 4.

20  A.   Yes, in 2011.

21  Q.   So, again, the four individuals we've just gone

22  through, those cards were all activated in 2011, correct?

23  A.   Correct.

24  Q.   All right.  Now, let's change directions here and talk

25  about Mr. Omar.  With any given individual who receives aid

Cross - Joseph

1   and is going to be paid through Higher One, three

2   possibilities for getting the money, right?

3   A.   Yes.

4   Q.   Okay.  So they can get a debit card, correct?

5   A.   Correct.

6   Q.   They can get a check, right?

7   A.   Correct.

8   Q.   Or they can have money directly deposited into their

9   account, correct?

10  A.   Correct.

11  Q.   Okay.  And in the case of Mr. Omar, at least initially

12  the records indicated that he wanted a card sent to him,

13  correct?

14  A.   Well, all the cards were proactively mailed.

15  Q.   All right.  So -- fair enough.  So the card was the

16  first option, if you will, and that was sent to Mr. Omar,

17  right --

18  A.   Correct.

19  Q.   -- at the address?  Okay.

20         Now, you've seen -- and you've seen these cards

21  when they get sent out, haven't you?  You've seen a card

22  when it gets sent out?

23  A.   Not when it gets sent out, but I've seen what our

24  cards look like, yes.

25  Q.   That's what I mean, right.  And a Higher One card,

1    when it got sent out, it would have a little sticker on it,

2    just like when a person gets a credit card, to activate it;

3    isn't that right?

4    A.    Yes.

5    Q.    Okay.  And, again, just to be clear, with Mr. Omar,

6    the records indicate that his card was never activated,

7    right?

8    A.    Ismael Omar's?

9    Q.    I'm sorry, beg your pardon, with respect to Mr. Abate.

10   Beg your pardon.

11   A.    Correct.

12   Q.    So Mr. Abate's was never activated?

13   A.    Correct.

14   Q.    And as a result, two checks got sent out after that,

15   right, and those were not cashed either?

16   A.    Correct.

17          MR. GOODREID:  Your Honor, may I have just a

18   moment, please, to confer with counsel?

19          THE COURT:  You may.

20          MR. GOODREID:  Your Honor, I have no additional

21   questions.

22          THE COURT:  All right.  Redirect.

23          MS. PALUCH:  None, Your Honor.  Thank you.

24          THE COURT:  All right.  May this witness be

25   excused, for the Government?

Direct - Seal

1    MS. PALUCH:  Yes, Your Honor.

2    THE COURT:  For the defendant?

3    MR. GOODREID:  Yes, Your Honor.

4    THE COURT:  All right.  Ms. Joseph, thank you so

5  much for joining us.  You're excused.  You may step down.

6    THE WITNESS:  Thank you.

7    THE COURT:  Government may call its next witness.

8    MR. FIELDS:  Thank you, Your Honor.  The United

9  States calls Jonathan Seal.

10    COURTROOM DEPUTY:  Step up in the box and raise

11  your right hand.

12    JONATHAN SEAL, GOVERNMENT'S WITNESS, SWORN

13    COURTROOM DEPUTY:  Please be seated.  State your

14  full name for the record and spell your first and last

15  name.

16    THE WITNESS:  My name is Jonathan Seal.  Last name

17  is spelled S-e-a-l.

18    MR. FIELDS:  May I proceed, Your Honor?

19    THE COURT:  Yes, you may, counsel.

20                    DIRECT EXAMINATION

21  BY MR. FIELDS:

22  Q.   Mr. Seal, where do you work?

23  A.   I'm a police detective in the City of Tempe, Arizona.

24  Q.   How long have you worked with the City of Tempe Police

25  Department?

Direct - Seal

1    A.   11 years.

2    Q.   What is your current title?

3    A.   I'm a detective assigned to our vehicular crimes unit.

4    Q.   What was your position on August 30th, 2012?

5    A.   I was a patrol officer.

6    Q.   Were you on patrol that night?

7    A.   I was.

8    Q.   Do you remember making a traffic stop late that night?

9    A.   I do.

10   Q.   Well, let's just pull it up on the screen.  It's not

11   yet in evidence.  Is this a -- looking at Government

12   Exhibit 3.  Should pull up.  Or we can pull it up on a

13   binder.  It will be No. 1.  It won't be published up on the

14   screen.

15          Thank you, Ms. Hansen.  Am I right that we can

16   pull it up just for the witness?

17          COURTROOM DEPUTY:  Yes.

18   BY MR. FIELDS:

19   Q.   So please pull it up for the witness.  Exhibit 3.

20          Just look at it in the binder.  3.  Yes, please.

21          Okay.  I think we've got that sorted out.

22          Do you see that in front of you?

23   A.   I do.

24   Q.   Do you recognize that?

25   A.   I do.

Direct - Seal

1    Q.   Is that a photograph of a car?

2    A.   It is.

3    Q.   How do you recognize it?

4    A.   That is a vehicle that I stopped on the night in

5    question.

6         MR. FIELDS:  Your Honor, at this time I'd move for

7    the admission of Government's Exhibit 3.

8         THE COURT:  All right.  It's stipulated to?

9         MR. FIELDS:  It has not been stipulated to.

10        THE COURT:  Okay.

11        MR. GOODREID:  I believe it is stipulated to.

12        MR. SMITH:  I believe it is stipulated, too, Your

13   Honor.

14        MR. FIELDS:  I'm sorry.  It makes it a lot easier.

15   At this time, then, Your Honor, I move for the stipulated

16   Government Exhibit 3 be admitted into evidence.

17        THE COURT:  I wanted to be sure we're looking at

18   the same document.  I'm looking at what I think was filed

19   on Friday.  I don't know when it was filed.  But I have it

20   in -- the exhibit list that I have, it says Exhibit 3 is

21   stipulated to.  So --

22        MR. FIELDS:  Yeah, Your Honor, I'm sorry.  That's

23   my mistake.

24        THE COURT:  Given the stipulation, Government

25   Exhibit 3 is admitted into evidence and may be published to

244
Direct - Seal

1      the jury.

2          (Government's Exhibit 3 received)

3      BY MR. FIELDS:

4      Q.   I'd like to publish that.

5          So that's the car you pulled over that night?

6      A.   Yes, it is.

7      Q.   Do you remember who was driving the car that night?

8      A.   I do.

9      Q.   Do you see the driver in the courtroom here today?

10     A.   I do.

11     Q.   Could you just describe where he's sitting and what

12     he's wearing.

13     A.   Sure.  He's seated to my right in the white button-up

14     shirt and tie.

15         MR. FIELDS:  Your Honor, I'd like the record to

16     reflect that the witness has identified the defendant.

17         THE COURT:  The record will so reflect.

18     BY MR. FIELDS:

19     Q.   As part of the traffic stop that night, did you end up

20     searching the car that's in Government Exhibit 3?

21     A.   I did.

22     Q.   What did you find?

23     A.   Inside the center console, I found a usable

24     quantity --

25     Q.   Let's stop there.  Let's just stop with:  What did you

Direct - Seal

1    find in the back seat?

2    A.    Okay.   In the back seat, on the rear passenger side, I

3    found a Ziploc baggie containing a number of credit cards.

4    Q.    Are you prepared today to tell the jury how you found

5    those credit cards?

6    A.    Yes.

7    Q.    Let's start at the beginning, always a good place.

8    Where were you at around 2:40 in the morning on August

9    30th, 2012?

10   A.    Sure.   I was traveling southbound on Mill Avenue,

11   approaching the intersection of Southern in Tempe in a

12   fully marked police patrol vehicle.

13   Q.    I think you said, but Mill Avenue, we're talking about

14   Tempe, Arizona now?

15   A.    Correct.

16   Q.    Fully marked police vehicle?

17   A.    Yes.   Traveling southbound in the left lane.

18   Approaching the intersection of Southern Avenue, also in

19   Tempe.

20   Q.    What did you see while you are driving southbound on

21   Mill Street?

22   A.    My -- my attention was drawn to a white Dodge Charger,

23   which had also been traveling southbound on Mill Avenue,

24   approaching the intersection of Southern, because the

25   vehicle was drifting both within its lane and outside of

Direct - Seal

1    its lane.

2    Q.   When you say "outside of its lane," describe what you

3    saw.

4    A.   Sure.  As the vehicle traveled southbound from the

5    intersection of Southern, it drifted so that its driver's

6    side tires were on top of the double-yellow solid line that

7    separates the north and southbound lanes of traffic.

8    Q.   As a result of that, what did you do?

9    A.   I initiated a vehicle stop by activating my

10   red-and-blue police lights on top of my vehicle.

11   Q.   Did the car pull over?

12   A.   It did.

13   Q.   Where did it first pull over?

14   A.   It first pulled over on southbound Mill Avenue, just

15   north of the intersection with U.S. 60.

16   Q.   What did you do after he stopped there?

17   A.   After the vehicle stopped there, I got out of my

18   patrol vehicle.  And as I started to approach the driver's

19   open window, I saw the window roll down, and I yelled to

20   the driver for him to pull further south of the freeway and

21   over to the side of the road.

22   Q.   Did he do what you asked?

23   A.   He did.

24   Q.   Did you pull in behind him?

25   A.   I did.

247
Direct - Seal

1   Q.   Did you walk to the driver's side door?

2   A.   I did.

3   Q.   What did you do when you got to the driver's side

4   door?

5   A.   When I got to the driver's side door, I asked the

6   driver for his license, registration, insurance, initially.

7   Q.   Did you ask him where he was coming from?

8   A.   I did.

9   Q.   What did he say?

10   A.   He told me he was coming from Chandler, which is the

11   next city over from Tempe.

12   Q.   Did he say anything else about where he was coming

13   from?

14        MR. SMITH:   Your Honor, I would object at this

15   point and merely renew the arguments that we had made in a

16   suppression motion as to the legality of the interaction.

17        THE COURT:   Well, your objection's noted.

18   Overruled.

19   BY MR. FIELDS:

20   Q.   We were talking about the driver's responses as to

21   where he was coming from.   You said he came from Chandler.

22   Did he also be claiming to come from somewhere else?

23   A.   He also claimed to be coming from his P.O. Box in

24   downtown Tempe.

25   Q.   Did he say anything about the car?   Who it belonged

Direct - Seal

1    to?

2    A.   He told me that it belonged to his girlfriend.

3    Q.   And before we get too far, let's go back to this P.O.

4    Box.  Did he say where that P.O. Box was located?

5    A.   Yes.  Off the top of my head, I don't recall the

6    address, but somewhere around Mill Avenue and 3d Street in

7    downtown Tempe.

8    Q.   If you saw your report, would that help you refresh

9    your recollection as to the address?

10   A.   Yes, it would.

11   Q.   This is not in evidence.  I'm showing it to you just

12   for your -- to refresh your recollection.  Just take a look

13   at this.  You'll see it up on the screen in front of you.

14   Don't read from it.  We're just going to use this to

15   refresh your recollection.

16           COURTROOM DEPUTY:  Do you have it on the lectern,

17    Mr. --

18           MR. FIELDS:  I have it on the Elmo.

19           COURTROOM DEPUTY:  Okay.  I just have to switch

20   that feed.

21   BY MR. FIELDS:

22   Q.   Does that help refresh your recollection?

23   A.   It does.

24   Q.   What was the address?

25           COURTROOM DEPUTY:  Mr. Fields, one minute.  Could

Direct - Seal

1    you move up a little bit.  Your voice is trailing off and

2    the jurors may not be able to hear you.  Thank you.

3    BY MR. FIELDS:

4    Q.   What was the address?

5    A.   360 -- 316 South Mill Avenue.

6    Q.   Now, when you went to this driver's side door, did you

7    carry a flashlight with you?

8    A.   I did.

9    Q.   Why?

10   A.   It was nighttime.  On vehicle stops, a flashlight

11   provides me a couple of advantages.  One is a tactical

12   advantage, as I approach the vehicle, especially at night,

13   it's hard for me to see inside of it.  And for a tactical

14   advantage, I use that flashlight to shine it in the

15   driver's rearview mirror so that it kind of conceals my

16   approach of that vehicle, and hides me in case the driver

17   may want to assault me or attack me.

18        Additionally, when I get up to the vehicle, it

19   assists me in being able to clearly see inside the vehicle;

20   one, to look for contraband or possible contraband; and,

21   two, to watch the occupants' movements inside the vehicle,

22   again for officer safety purposes, to make sure that the

23   individuals inside the vehicle aren't reaching for weapons

24   or trying to conceal things from me.

25   Q.   You talk about attacks, assaults, officer safety.

Direct - Seal

1    Were you concerned about this particular car or are these

2    universal precautions?

3    A.    These are universal precautions.

4    Q.    What did you do with the flashlight when you got to

5    the driver's side door?

6    A.    I held it in my left hand and I used it to scan the

7    interior of the vehicle.

8    Q.    So describe to the members of the jury exactly what

9    you saw.

10   A.    Sure.  On the back passenger side seat, again I

11   observed this Ziploc baggie which contained a very thick

12   stack of what appeared to be credit cards.  It was probably

13   four or five inches thick.

14   Q.    When you say "appeared to be credit cards," how could

15   you tell that they appeared to be credit cards?

16   A.    They just -- they were rectangular shaped, looked like

17   any common credit or debit card that anyone might have in

18   their wallet.

19   Q.    How long had you been a patrol officer at that point?

20   A.    About five years or so.

21   Q.    Had you ever seen anything like that before?

22   A.    No.

23   Q.    What was your reaction?

24   A.    I -- I immediately zeroed in on that.  That -- I had

25   never seen that before this traffic stop, I hadn't seen

Direct - Seal

1    something like that since this traffic stop.  It was highly

2    unusual to see someone in possession of that many cards.

3              I immediately started to think about possible

4    crimes that could be associated with that, and thinking

5    about the fact that I needed to investigate further into

6    those credit cards.

7    Q.   What did you ask the driver to do at that point?

8    A.   I asked him to step out of the vehicle.

9    Q.   Well, before that, did you ask him to get that bag?

10   A.   Yes.

11   Q.   And what did he do?

12   A.   He reached back on the passenger seat and I watched

13   with my flashlight, and he grabbed that bag off of the

14   passenger seat, he then placed it on the rear passenger

15   side floorboard, and then kind of tucked it up underneath

16   the front passenger seat, so it was kind of concealed from

17   my view.  He then grabs an empty Ziploc bag and handed that

18   back to me.

19   Q.   And is this the second time you had asked him to give

20   you the bag?

21   A.   Yes.

22   Q.   What did he do the first time?

23   A.   The first time, he -- he looked back at the bag and

24   then looked back at me and just sat there.  Did nothing,

25   didn't say anything.

252

Direct - Seal

1   Q.   So after the defendant tried to give you the empty

2   bag, what did you do?

3   A.   I then had him step out of the vehicle.

4   Q.   At some point during the traffic stop, did you decide

5   to record what was happening?

6   A.   I did.

7   Q.   Why?

8   A.   The Tempe Police Department issues us digital -- or at

9   the time issued us digital recorders.  For us in -- we were

10  required to record domestic violence investigations, which

11  this was not one, but also I personally recorded all felony

12  or potential felony investigations.

13  Q.   So you didn't have a body camera at the time?

14  A.   No.

15  Q.   This was just a hand-held audio recorder?

16  A.   Correct.

17  Q.   If you'll look in that binder -- it should be the

18  binder No. 1 -- if you look at 1-A, you should see a DVD.

19          COURTROOM DEPUTY:  1-A?

20          MR. FIELDS:  Yup.

21          THE WITNESS:  Okay.

22  BY MR. FIELDS:

23  Q.   Do you see 1-A?

24  A.   I do.

25  Q.   Before your testimony today, did you review a copy of

Direct - Seal

1    the recording that's on that disk?

2    A.   I did.

3    Q.   And was a transcript of that recording also made?

4    A.   Yes.

5    Q.   And did you also review a copy where the transcript

6    had been synced to the audio in the recording?

7    A.   Yes.

8         MR. FIELDS:   Your Honor, at this time, I'd move

9    for admission into evidence of Government's Exhibit 1-A,

10   which is the audio recording, and would also like to

11   publish Government Exhibit 1, which is the synced

12   transcript of 1-A and 1-B.

13        THE COURT:   Any objection?

14        MR. SMITH:   I'm sorry, counsel, what is 1-B?

15        MR. FIELDS:   1-B is the transcript.

16        MR. SMITH:   I don't have it.  I have 1 and 1-A.

17        MR. FIELDS:   It should be in that binder.

18        MR. SMITH:   May we have one moment, Your Honor?

19        THE COURT:   Yeah.  While you're looking, I may ask

20   Mr. Field:   So what's the difference between 1 and 1-B?

21        MR. FIELDS:   1 is a composite of both 1-A and 1-B,

22   so 1-A and 1-B is different parts of 1.  1-A, the audio,

23   1-B is the transcript, and 1 just synced the two

24   together.

25        THE COURT:   And you're moving for the admission of

Direct - Seal

1-A.

MR. FIELDS:  1-A, and then 1 will just be an aid
to the jury which I'd like to publish --

THE COURT:  Publish 1.  Okay.  And are you doing
anything with 1-B?

MR. FIELDS:  It's there for reference, Your Honor.
At this time I'm not seeking to admit it.

THE COURT:  Okay.  Any objection?

MR. SMITH:  No objection to 1 and 1-A, Your Honor.

THE COURT:  Okay.  There being no objection, 1-A
is admitted into evidence and may be published to the jury.

(Government's Exhibit 1-A received)

THE COURT:  And 1, you're not seeking for its
admission, but you're seeking to have it published to the
jury.

MR. FIELDS:  Correct, Your Honor.

THE COURT:  All right.  Proceed.

BY MR. FIELDS:

Q.   At some point during the stop, did another officer
arrive?

A.   Yes.

Q.   Who was that?

A.   Officer Jason Papke.

Q.   Why did he arrive?

A.   I had asked -- after seeing the credit cards in the

Direct - Seal

1    back seat, I knew that I was going to bring the driver out

2    of the vehicle.  I didn't want to do that by myself so I

3    asked for a second unit to assist me.  He was nearby so he

4    responded.

5    Q.   Did Jason Papke, the officer who responded, have any

6    special features to his unit?

7    A.   Yes, he was a K-9 officer, so he had with him his K-9

8    partner.

9    Q.   What was the K-9 trained to do?

10   A.   The K-9 was trained to detect the presence of illegal

11   substances.

12   Q.   What was the K-9's name?

13   A.   Neo.

14   Q.   Officer Papke arrived.  And did another officer arrive

15   at the stop?

16   A.   Yes.

17   Q.   Who was that?

18   A.   Officer Patrick Sheeran.

19   Q.   What did you do when the other officers arrived at the

20   scene?

21   A.   When Officer Papke, who arrived first, when he first

22   arrived, I briefly explained to him what I had seen in the

23   vehicle, and Officer Papke and I then detained the driver.

24   Q.   What do you mean by "detained"?

25   A.   Placed him into handcuffs.

Direct - Seal

1    Q.   Why did you put him in handcuffs?

2    A.   Let me back up just a little bit.  Prior to deciding

3    to put him in handcuffs, while I was explaining to Officer

4    Papke what I'd seen in the vehicle, we had decided that we

5    were -- Officer Papke offered to take his K-9 partner, Neo,

6    and conduct an exterior sniff of the vehicle to again check

7    for the presence of some illegal substance in the vehicle.

8           So we decided for officer safety purposes, because

9    we had the driver outside the vehicle already, we were

10   going to detain him for investigative purposes while we

11   investigated further into what was in the car.

12   Q.   And that means putting him in handcuffs?

13   A.   Correct.

14   Q.   Putting him in handcuffs, did that have anything in

15   particular to do with this particular person or is that,

16   again, a universal precaution?

17   A.   I -- it's a pretty universal thing.

18   Q.   Why do you do it?

19   A.   It helps to have better control over an individual

20   while you're investigating a crime.

21   Q.   While you were recording the stop, did the driver of

22   the car identify himself?

23   A.   He did.

24   Q.   So in Exhibit 1 -- let's see if we can play -- this

25   will be from 1 minute 35 seconds to 1 minute 38 seconds, a

Direct - Seal

1    very short clip.

2          MR. SMITH:  Well, Your Honor, the exhibit's been

3    admitted.  If we're going to play it, I would ask that it

4    be played in its entirety.

5          MR. FIELDS:  Your Honor, it's a rather long tape.

6    We can play it, but I think it will be more efficient --

7          THE COURT:  No, I don't want to do that.  If

8    there's any section or portion of the tape that the

9    defendant wants to have played that the Government doesn't

10    play, you're free to do that.  But I'm not going to have

11    the Government play the entire tape.

12          Go ahead.

13          MR. FIELDS:  Thank you, Your Honor.

14          THE COURT:  Overruled.

15    BY MR. FIELDS:

16    Q.   So let's play 1:35 to 1:38, please.

17       (Audio played)

18    BY MR. FIELDS:

19    Q.   All right.  Stop there.

20          So there are two voices on that tape.  One says

21    Tramell Thomas.  Whose voice is that?

22    A.   That was the driver.

23    Q.   The other voice that's on the tape, the officer who

24    asked the question, who was that?

25    A.   That's Officer Patrick Sheeran.

Direct - Seal

1    Q.   Now, on the transcript, which is synced to the audio,

2    does it mistakenly identify Officer Sheeran as Officer

3    Papke?

4    A.   It does.

5    Q.   During the stop, did the defendant protest being

6    detained?

7    A.   Yes.

8    Q.   Let's see if we can play the second clip.  This will

9    be from a minute 2:13 to 3:02.  It might take us just a

10   second to queue it up.  Looks like we're good.  All right.

11        (Audio played)

12   BY MR. FIELDS:

13   Q.   All right.  So, again, it says Officer Papke.  Who's

14   speaking there?

15   A.   I heard both Officer Papke and Officer Sheeran.  The

16   main officer in that segment is Officer Sheeran.

17   Q.   And the defendant at that point said that it was his

18   girlfriend's car.  Did you run the registration on the car?

19   A.   I did.

20   Q.   To whom was it registered?

21   A.   Heather Carr.

22   Q.   What was the address on the registration?

23   A.   I don't recall.

24   Q.   If you saw the tow slip, would that help refresh your

25   recollection?

Direct - Seal

1    A.   It would.

2    Q.   This is not in evidence, but you should see it on the

3    screen up in front of you.  Again, please don't read from

4    it.  Please take a look at that for a second.  If that

5    refreshes your recollection, just look back at me.

6    A.   Okay.

7    Q.   What was the address that the car was registered to?

8    A.   1321 North Pleasant Drive in Chandler, Arizona.

9    Q.   Say that one more time, please.

10   A.   1321 North Pleasant Drive in Chandler, Arizona.

11   Q.   Are you sure about that?  Would it help to have your

12   recollection refreshed again?

13   A.   Possibly.

14   Q.   Do you write a lot of reports?

15   A.   I do.

16   Q.   Have you conducted many traffic stops?

17   A.   I have.

18   Q.   So when you conduct traffic stops, do you document

19   what happens --

20   A.   Yes.

21   Q.   -- so that you can remember later on?

22   A.   Correct.

23   Q.   All right.  Let's take a look at it one more time.

24   A.   Okay.

25   Q.   All right.  So, again, memory quiz.  Do you remember

Direct - Seal

1    the address?

2    A.   Now that it's been zoomed in, I can see that it's 1351

3    North Pleasant Drive in Chandler.

4    Q.   Okay.  Thank you.

5         During the stop, did the defendant give a

6    different address as his residence?

7    A.   Yes.

8    Q.   Let's see if we can pull up another clip from

9    Government Exhibit 1.  That will be 3 minutes and 16

10   seconds to 4 minutes and 32 seconds.

11       (Audio played)

12   BY MR. FIELDS:

13   Q.   What was the address he identified?

14   A.   1822 East Kaibab.

15   Q.   Now, this part of the transcript, again, identifies

16   one of the individuals speaking as Officer Papke.  Did you

17   also recognize another voice in that portion of the tape?

18   Or was that Papke?

19   A.   That was Papke.

20   Q.   That was Papke.

21   A.   Yes.

22   Q.   Okay.  At some point during the stop, did you decide

23   to read the defendant his rights?

24   A.   I did.

25   Q.   Let's see if we can go to 9:01 to 9:36.

261

Direct - Seal

1        (Audio played)

2    BY MR. FIELDS:

3    Q.   Why did you read the defendant his rights?

4    A.   As you can hear me explain in the recording, at that

5    point in time he had been detained, he wasn't free to

6    leave.  And any time someone is not free to leave and that

7    I'm going to question them about some offense that they're

8    suspected of possibly being involved in, I'm required to

9    advise them of their Miranda rights.

10   Q.   You also talk about an investigation.  What were you

11   investigating?

12   A.   There was several crimes that I was looking into that

13   could be associated with those credit cards assembly, such

14   as in Arizona we have identity theft, possession of stolen

15   credit cards, possession of fictitious credit cards, all of

16   which are felony offenses.

17   Q.   So did you ask the defendant about the bag of credit

18   cards you had seen?

19   A.   Yes.

20   Q.   And let's play -- this is a longer clip, from 9:52 to

21   12:21, please.

22        (Audio played)

23   BY MR. FIELDS:

24   Q.   During that clip, the defendant says there was a dog

25   going around his car.  Was that Officer Papke's K-9?

Direct - Seal

1    A.    Yes.

2    Q.    And during that clip, the defendant said there were no

3    credit cards.  Did you hear that?

4    A.    I did.

5    Q.    After the K-9 went around the car, did you search the

6    car?

7    A.    I did.

8    Q.    Did you look on the back floorboard?

9    A.    I did.

10   Q.    What did you find?

11   A.    I found that same Ziploc baggie full of really thick

12   four-, five-inch thick stack of credit cards.

13   Q.    Now let's take a look at Government Exhibit 4.  It's a

14   physical exhibit that's on that cart there.  It looks like

15   a big envelope.  It's not yet in evidence.

16         Do you recognize that bag?

17   A.    I do.

18   Q.    How do you recognize it?

19   A.    I recognize it because it has an evidence bar code

20   sticker, or label.  It has my name on it.  This was created

21   by me on August 30th, 2012.  Additionally on the backside

22   of it, I sealed it up with tape and put my initials on it

23   and my badge number.

24   Q.    Did you review that exhibit before your testimony?

25   A.    Yes.

Direct - Seal

1    Q.   How many cards are inside there?

2    A.   52.

3    Q.    Is that the same number you found when you searched

4    the car Thomas was driving on August 30th, 2012?

5    A.   Yes.

6    Q.   Are they in the same condition they were when you

7    found them?

8    A.   All but a couple that have been put together with a

9    binder clip and some Government exhibit stickers.

10   Q.   So there's a couple that have been set aside and an

11   exhibit sticker's been put on them?

12   A.   Correct.

13   Q.   Otherwise are they in the same condition?

14   A.   Yes.

15            MR. FIELDS:  Your Honor, at this time I would move

16   to admit Government Exhibit 4 and then Exhibit 4-A through

17   4-D.

18            THE COURT:  4, 4-A and 4-B.  All right.  Is there

19   any objection?

20            MR. SMITH:  Your Honor, I haven't seen this

21   exhibit.  May I look at it?

22            THE COURT:  Yes, you may.

23            Have you seen 4-A?  What is 4-A?

24            MR. FIELDS:  4-A, 4-B, 4-C and 4-D are just four

25   particular credit cards.

Voir Dire - Seal

1          THE COURT:  Are they in four?

2          MR. FIELDS:  They are in there, Your Honor.

3          THE COURT:  Does -- does defense counsel know

4    which cards are 4-A through 4-D?

5          MR. SMITH:  I do, Your Honor.  I can see that.

6          THE COURT:  All right.

7          MR. SMITH:  May I voir dire?

8          THE COURT:  You may.

9                    VOIR DIRE EXAMINATION

10   BY MR. SMITH:

11   Q.   It's Detective Seal now?

12   A.   Right.

13   Q.   Detective, I thought I understood you to say when you

14   saw those credit cards that night they were in a plastic

15   baggie.

16   A.   Correct.

17   Q.   That's when you first saw them with your flashlight?

18   A.   Yes.

19   Q.   And then when you actually recovered them, when you

20   seized them, they were still in a plastic baggie, correct?

21   A.   Correct.

22   Q.   And what did you do with them after you seized them?

23   A.   After I seized them, I took them to our police

24   substation at 8201 South Hardy Drive in Tempe.  While there

25   I took them out of the plastic bag, made photocopies of the

1    credit cards to attach to my report, and then they were

2    impounded as evidence.

3    Q.    Where's the plastic bag?

4    A.    I -- I don't know.

5    Q.    It's not -- it's not in this exhibit, is it?

6    A.    No, it's not.

7              MR. SMITH:  I object, Your Honor.  The evidence is

8    not in the same condition, it's not in the bag that it was

9    contained in, which I think is going to become an issue in

10   this matter.

11             THE COURT:  Mr. Fields, do you want to ask more

12   questions or respond to that objection?

13             MR. FIELDS:  May I ask just a couple follow-up

14   questions?

15             THE COURT:  Sure.

16                  DIRECT EXAMINATION (Cont'd)

17   BY MR. FIELDS:

18   Q.    The cards that are in there, are they the same cards

19   you found in the plastic bag?

20   A.    They are.

21   Q.    How do you know they're the same cards in the plastic

22   bag?

23   A.    Because I've reviewed them -- reviewed them against

24   the photocopies of the cards I made that night.

25             MR. FIELDS:  Your Honor, at this time I move for

Direct - Seal

1    the admission of Government Exhibit 4.

2            THE COURT:  Let me ask a question of the

3    detective.  Did you personally take the credit cards out of

4    the bag -- plastic bag and then put them into that evidence

5    bag?

6            THE WITNESS:  I did.

7            THE COURT:  All right.  And you took the

8    photographs of them before you did that?

9            THE WITNESS:  Yes, sir.

10           THE COURT:  And you examined the photographs

11   against the cards and they are -- they match up?

12           THE WITNESS:  Correct.

13           THE COURT:  All right.  The objection is

14   overruled.  4, 4-A and 4-B are admitted into evidence and

15   may be published to the jury.

16           MR. FIELDS:  And I just want to make sure I

17   understand, Your Honor, it's 4 and then 4-A through 4-D as

18   in --

19           THE COURT:  Oh, I'm sorry, you're right.  I

20   misspoke.  Let me say that again.  The objection's

21   overruled.  Exhibit 4, 4-A, 4-B, 4-C, and 4-D are admitted

22   into evidence and may be published to the jury.

23        (Government's Exhibits 4 and 4-A thru 4-D received)

24   BY MR. FIELDS:

25   Q.   All right.  So publishing might be a little bit

267
Direct - Seal

1    tricky, but can you please take those cards out of that bag
2    there.  And then to the extent you can, just try to put
3    them in a stack so we can show to the jury.
4            COURTROOM DEPUTY:  Do you want me to move the
5    book, too?
6            MR. FIELDS:  That might help, too.
7    BY MR. FIELDS:
8    Q.   All right.  And if you just stand up, just make sure
9    the members of the jury can see it.
10           All right.  Thank you very much.
11           And then those four, 4-A through 4-D, can you
12   please hand them to the courtroom deputy so I can publish
13   them up here on the Elmo.
14           I'll start at the beginning.  I'm going to first
15   look at the back.  Does that say Exhibit 4-A?
16   A.   Yes.
17   Q.   Okay.  All right.  Can you just read what's on the top
18   right of Exhibit 4-A.
19   A.   Sure, it says, "CCCS refund card."
20   Q.   And what does it say -- do you see two yellow bars
21   across the top?
22   A.   Yes.
23   Q.   What's does it say inside those bars?
24   A.   On the left side it says "Colorado Community College
25   System."  And on the right side, it says "Higher One."

Direct - Seal

1    Q.   Does this card bear a logo?

2    A.   Yes.

3    Q.   A credit card logo?

4    A.   Yes.

5    Q.   What's the logo?

6    A.   A MasterCard logo.

7    Q.   Is there a name on this card?

8    A.   Yes.

9    Q.   What is the name?

10   A.   Ismael Omar.

11   Q.   What does it say below that?

12   A.   "Pikes Peak CC."

13   Q.   And what is the number on the card -- well, let's not

14   read the whole number, but just for identification

15   purposes, what are the last four digits on that number --

16   on that card?

17   A.   5158.

18   Q.   Okay.  Thank you.

19        Showing you the back of Government Exhibit 4-B.

20   Does that have the exhibit sticker 4-B?

21   A.   It does.

22   Q.   I just flipped it around to the front side.  Does this

23   card look substantially the same as 4-A?

24   A.   It does.

25   Q.   What is the name on this card?

269

Direct - Seal

1   A.   The name as far as the person that's issued to?

2   Q.   Yes.

3   A.   Virginia Jones.

4   Q.   What does it say below that?

5   A.   "Pikes Peak CC."

6   Q.   And, again, just for purposes of the record, what are

7   the last four digits?

8   A.   2903.

9   Q.   Showing you the back of Government Exhibit 4-C, does

10  that bear the exhibit sticker?

11  A.   It does.

12  Q.   Again, I flipped it around to the front.  Is it

13  substantially the same in appearance as the others?

14  A.   Yes.

15  Q.   Does it have the name of the person to whom it was

16  issued?

17  A.   Yes.

18  Q.   What is that name?

19  A.   Robert Pickens.

20  Q.   What does it say below that?

21  A.   "Pikes Peak CC."

22  Q.   And what are the last four digits?

23  A.   8668.

24  Q.   Last one.  Back of the card, does it bear the exhibit

25  sticker, Government Exhibit 4-D?

270
Direct - Seal

1    A.    Yes.

2    Q.    Okay.  Again, I flipped it around to the front.  Is it

3    substantially the same in appearance as 4-A, 4-B, and 4-C?

4    A.    It is.

5    Q.    Does it have the name of the person to whom it was

6    issued?

7    A.    It does.

8    Q.    What is that name?

9    A.    Eddie J. Jones.

10   Q.    What does it say below that?

11   A.    "Pikes Peak CC."

12   Q.    Again, for purpose of the record, what are the last

13   four digits of the card?

14   A.    0165.

15   Q.    All right.  If I could ask the courtroom deputy to

16   give this back to you, we'll put Exhibit 4 away.

17           Did you find anything else on the back seat

18   floorboard of the car?

19   A.    I did.

20   Q.    What did you find?

21   A.    A pink Sony Vaio laptop computer.

22   Q.    When you found these cards that are in Government

23   Exhibit 4, did you confront the defendant with them?

24   A.    I did.

25   Q.    Let's play 19:51 to 21:46.

Direct - Seal

1          (Audio played)

2     BY MR. FIELDS:

3     Q.   During that portion of the clip, did you hear a

4     crinkling sound?

5     A.   Yes.

6     Q.   What was that?

7     A.   That was the plastic Ziploc baggie that the cards were

8     in.

9     Q.   At one point on the tape, you mentioned fingerprints.

10    Did you actually check it for fingerprints?

11    A.   I did not.

12    Q.   Do you know if anyone did?

13    A.   I know that the Tempe Police Department did not.

14    Q.   Earlier you said on the tape that the defendant was

15    detained but not arrested.  Did you eventually place him

16    under arrest for possession of stolen property?

17    A.   Not for possession of stolen property.

18    Q.   Did you eventually place him under arrest?

19    A.   I did.

20    Q.   Did you ask him again about the credit cards?

21    A.   Yes.

22    Q.   So let's play from 22:49 to 23:20.

23         (Audio played)

24    BY MR. FIELDS:

25    Q.   Since you arrested Thomas, did you have to fill out a

1    booking paperwork form?

2    A.    Yes.

3    Q.    As part of that process, did you have to ask him what

4    he did for a living?

5    A.    Yes.

6    Q.    So in the first portion of that tape, do you remember

7    him saying, "If you do my job and what I do," but he didn't

8    answer?

9    A.    Yes.

10   Q.    So let's go to the booking paperwork.  That's 30:15 to

11   32.

12        (Audio played)

13   BY MR. FIELDS:

14   Q.    Is it fair to say that you asked him multiple times

15   about the credit cards?

16   A.    Yes.

17   Q.    Did he ever answer your questions about him?

18   A.    Not once.

19   Q.    When you placed him under arrest, did you search him?

20   A.    Yes.

21   Q.    At some point, did you find his wallet?

22   A.    I did.

23   Q.    What did you find inside his wallet?

24   A.    Inside the wallet I found another MasterCard, credit

25   or debit card, which had the same Colorado Community

1    College System wording up at the top with the same

2    background design, with a different name other than the

3    defendant's.

4    Q.   So let's pull up Government Exhibit 38, which is not

5    in evidence so it should go just to the witness.

6             MR. SMITH:   Exhibit?

7             MR. FIELDS:   38.

8    BY MR. FIELDS:

9    Q.   Do you recognize that?

10   A.   I do.

11   Q.   Is it a photograph?

12   A.   It is.

13   Q.   Who took the photo?

14   A.   I took the photograph.

15   Q.   Does it fairly and accurately depict your observations

16   of what was on the left-hand side of the wallet you found

17   that night?

18   A.   I believe that's the right-hand side of the wallet,

19   but yes, it's --

20   Q.   Sorry.   Thank you.

21   A.   -- accurate depiction of what I saw in the wallet.

22   Q.   So it's the right-hand side of the wallet.

23   A.   Yes.

24   Q.   Okay.   Thank you very much.

25             MR. FIELDS:   At this time, Your Honor, I'd move

274
Direct - Seal

1   for the admission of Government Exhibit 38.  It has not

2   been stipulated to.

3          THE COURT:  Any objection?

4          MR. SMITH:  May I have one moment, Your Honor?

5          THE COURT:  You may.  While counsel's looking at

6   that, is there a reason why, in my exhibit list, there's a

7   reference to a wallet photograph taken by Mesa Police

8   Department?

9          MR. FIELDS:  That's an error, Your Honor.  It

10  should say "Tempe."

11         THE COURT:  Tempe.  Okay.  I guess one Arizona

12  city's like the other.

13         MR. FIELDS:  You have a sharp eye, Your Honor.

14  Thank you.

15         MR. SMITH:  Well, Your Honor, I object to the

16  photograph because, as I looked at the Government's exhibit

17  list, Exhibit 5 appears to be the card.  I don't know why

18  we have a photo if we have the actual card.

19         THE COURT:  Okay.  So you're -- first of all, is

20  the Government going to be moving to admit Exhibit 5 at

21  some point?

22         MR. FIELDS:  We are, Your Honor, so that's just

23  the card.  But it doesn't show the position of where it was

24  found that night.

25         THE COURT:  Okay.  So you -- all right.  Is that

275
Direct - Seal

1    your only objection --

2            MR. SMITH:  Yes, Your Honor.

3            THE COURT:  -- Mr. Smith?

4            All right.  That objection's overruled.

5    Exhibit 38 is admitted into evidence and may be published

6    to the jury.

7        (Government's Exhibit 38 received)

8    BY MR. FIELDS:

9    Q.   Thank you, Your Honor.

10           Let's publish it.

11           So first of all, I just circled the bottom

12   right-hand corner.  What was there?

13   A.   That is the defendant's driver's license -- Arizona

14   driver's license.

15   Q.   I just circled an object in the middle of the screen.

16   Describe that for us.

17   A.   That is a black-colored MasterCard debit card.  On the

18   top right corner of that it says "CCCS refund card."  And

19   then it has a green sticker in the middle of it.

20   Q.   All right.  I just zoomed in, so a little bit clearer.

21   Can you read what the green sticker says.  Hold off, we'll

22   get right to it.

23           Did you take this card into evidence?

24   A.   I did.

25   Q.   So now let's look at Government Exhibit 5.  It's

276
Direct - Seal

1    another physical exhibit over on that cart.

2            We can take this down, please.

3            COURTROOM DEPUTY:  5?

4            MR. FIELDS:  Yes.  It's on the cart, I believe.

5            COURTROOM DEPUTY:  Oh, okay.

6            MR. FIELDS:  It's another envelope.  A small one.

7            COURTROOM DEPUTY:  Thank you.  I don't see an

8    exhibit sticker.

9            MR. FIELDS:  The exhibit sticker is inside.  Thank

10   you.

11   BY MR. FIELDS:

12   Q.   So do you recognize that bag?

13   A.   Are you referring to the envelope?

14   Q.   Yeah, sorry.  The envelope.

15   A.   Yes.

16   Q.   How do you recognize it?

17   A.   Again, it has an evidence label that was generated by

18   myself.  As you can see my name on the bottom of it.  It

19   also has the date of August 30, 2012, on it.

20   Q.   So open that up and please take the object out.

21           Do you recognize that?

22   A.   Yes.

23   Q.   Is that the card you found in the defendant's wallet

24   on August 30th, 2012?

25   A.   It is.

Direct - Seal

1    Q.   Is it in the same or substantially the same condition

2    as when you found it?

3    A.   Yes, other than the Government exhibit sticker on the

4    back.

5         MR. FIELDS:   Your Honor, at this time I'd move to

6    admit Government Exhibit 5.

7         THE COURT:   Is there an objection?

8         MR. SMITH:   May I see the exhibit, Your Honor?

9         THE COURT:   You may.

10        MR. SMITH:   No objection, Your Honor.

11        THE COURT:   All right.   There being no objection,

12   Exhibit 5 is admitted into evidence and may be published to

13   the jury.

14        (Government's Exhibit 5 received)

15   BY MR. FIELDS:

16   Q.   All right, Ms. Hansen, I'd like to publish it on the

17   Elmo.

18        All right, so this is the back of the card.   Does

19   it bear the Government's exhibit sticker, Exhibit 5?

20   A.   Yes.

21   Q.   Okay.   I flipped it around to the top.   Does this card

22   appear to be substantially the same in appearance as

23   Government's Exhibits 4-A through 4-D?

24   A.   Yes, it does.

25   Q.   Except does this one have a green sticker on it?

Direct - Seal

1   A.   It does.

2   Q.   What does the green sticker say?

3   A.    It says, "The card is issued by Wright Express

4   Financial Services Corporation pursuant to license by

5   MasterCard International.  The card is administered by

6   Higher One, Incorporated."

7   Q.   What is the name on this card?

8   A.   Manuel Abate.

9   Q.   And what does it say below that?

10  A.   "Pikes Peak CC."

11  Q.   Again, just for purposes of the record, what are the

12  last four digits of the card?

13  A.   6173.

14  Q.   Thank you.  After you got all of these cards, what did

15  you do with them?

16  A.   I transported them back to our police station where,

17  again, I photocopied them -- well, out at the scene I took

18  photographs of them.  I then -- back at the station, I took

19  photocopies of them, placed them in the manila envelope,

20  and sealed them and impounded them as evidence.

21  Q.   Is it fair to say you looked at all 52 of those cards?

22  A.   Yes.

23  Q.   How many of them had the defendant's name on them?

24  A.   Not one.

25            MR. FIELDS:  One moment, Your Honor.

279

Cross - Seal

1          THE COURT:  All right.

2          MR. FIELDS:  I have no further questions for this

3     witness, Your Honor.

4          THE COURT:  All right.  Cross-examination.

5          MR. SMITH:  Your Honor, may I have one moment to

6     look at Exhibit 4 before I begin my --

7          THE COURT:  Sure.

8                         CROSS-EXAMINATION

9     BY MR. SMITH:

10    Q.   Detective, do you know where the wallet is?

11    A.   The defendant's wallet?

12    Q.   Yes.

13    A.    It was placed in its property, after I removed that

14    card, which is Government's Exhibit 5, out of it, and given

15    to him upon his release from Tempe City Jail.

16    Q.   Okay.  And Exhibit 38, the photograph of the

17    MasterCard card, there's another credit card there, right,

18    a Chase card?

19    A.   Yes.

20    Q.   Whose name was that in?

21    A.   The defendant's.

22    Q.   Were there other cards in the wallet?

23    A.   There were.

24    Q.   And they were in his name?

25    A.   Yes, sir.

Cross - Seal

1    Q.   And his driver's license was in his name.

2    A.   Correct.

3    Q.   So this was the only card that didn't have his name on

4    it?

5    A.   To my recollection, yes.

6    Q.   Thank you.  I understood you on direct examination to

7    say that at one point in time he told you he was coming

8    from his post office box?

9    A.   Correct.

10   Q.   And that was in Tempe, Arizona.

11   A.   Yes.

12   Q.   Not Chandler.

13   A.   Correct.

14   Q.   This car, Exhibit 3, the white Charger, that car was

15   registered to Heather Carr?

16   A.   Correct.

17   Q.   And at various times Mr. Thomas identified her as his

18   girlfriend or fiancee?

19   A.   Correct.

20   Q.   Back in August of 2012, did you have any reason to

21   doubt that information?

22   A.   No.

23   Q.   You say that you saw Mr. -- Mr. Thomas reach into the

24   back seat of his car and slide that baggie onto the floor?

25   A.   No, he -- he actually physically picked it up off of

1   the back seat and then placed it on the floor and slid it

2   under the seat.

3   Q.   So he picked it up with his fingers?

4   A.   Correct.

5   Q.   Put it on the floor and under the seat.

6   A.   Correct.

7   Q.   And you saw him do this.

8   A.   I did.

9   Q.   And you were really suspicious of those 52 cards.

10  A.   I was.

11  Q.   To the point that you told him that night that you had

12  gloves on, the only prints that would be on that bag would

13  be his because of his moving the bag, correct?

14  A.   Correct.

15  Q.   And yet we don't even know where the bag is today.

16  A.   Correct.

17  Q.   It was never sent to a lab for fingerprinting.

18  A.   Correct.

19  Q.   When you initially observed the Charger, is a proper

20  term you thought the car was weaving?

21  A.   Drifting.

22  Q.   Drifting.  It was going over too far?

23  A.   It was driving at an angle in relation to the

24  direction of the lane.  Very gradual movement and it would

25  go from one side of the lane to the other, and then back to

Cross - Seal

1    the other side of the lane, and then back to the other side

2    of the lane continuously.

3    Q.   Sometimes in Colorado we call that weaving.  Would you

4    quarrel with that description?

5    A.   I -- I call it drifting --

6    Q.   Fine, no problem.  You saw the defendant operating a

7    motor vehicle in the state of Arizona and he was drifting

8    and it was after 2:00 a.m. in the morning, correct?

9    A.   Correct.

10   Q.   You thought he was drunk, didn't you?

11   A.   I thought that it was a possibility he was impaired.

12   Q.   And you were with him at the scene for half hour, 45

13   minutes?

14   A.   Thereabouts, yes.

15   Q.   Okay.  And am I correct in my understanding that you

16   determined that he was not under the influence of alcohol?

17   A.   I determined he was not impaired, yes.

18   Q.   Throughout your -- your time that early morning with

19   Mr. Thomas, he certainly denied any -- any involvement in

20   any criminal wrongdoing, correct?

21   A.   Correct.

22   Q.   He acknowledged that he had been pulled over for a

23   traffic violation.

24   A.   Yes.

25   Q.   Aside from his dispute with you, arguing with you,

Cross - Seal

1   about what you thought the credit cards were and his

2   ignoring that, and his arguing about what he was doing

3   there, he was cooperative with you, wasn't he?

4   A.   Yes.

5   Q.   I mean --

6   A.   For the most part.

7   Q.   When he pulled over, you wanted him to go farther down

8   the road, for safety purposes, I assume.

9   A.   Correct.

10  Q.   You asked him to.

11  A.   Yes.

12  Q.   And he did.

13  A.   Correct.

14  Q.   You asked him eventually to get out of the car?

15  A.   Yes.

16  Q.   He did.

17  A.   He did.

18  Q.   You asked him to go sit on the sidewalk, I believe?

19  A.   Yes.

20  Q.   He did.

21  A.   Correct.

22  Q.   He didn't try to run away from you.

23  A.   No.

24  Q.   He wasn't physical with you in any way.

25  A.   No.

Cross - Seal

1    Q.   He was cooperative during the -- during the encounter,

2    aside from denying any involvement in the crime you were

3    alleging.

4    A.   Yes.

5    Q.   The cards that were in Exhibit 4 --

6              THE COURT:   Can you stay closer to the mic.

7    Remember what I said --

8              MR. SMITH:   Excuse me, Your Honor.

9              THE COURT:   Yeah.

10   BY MR. SMITH:

11   Q.   The cards that were in Exhibit 4 I've taken out of

12   that envelope, correct?

13   A.   Correct.

14   Q.   And there's a smaller stack with a half a dozen --

15   seven, eight cards?

16   A.   These ones?

17   Q.   The shorter stack.

18   A.   Yes.

19   Q.   They're different than the rest of the cards, aren't

20   they?

21   A.   There are a few things about them that are different

22   than the others, yes.

23   Q.   Well, the one thing that sticks out most obviously is

24   they all have a sticker on them, don't they?

25   A.   Correct.

285

Redirect - Seal

1    Q.   Those cards haven't been activated, have they?

2    A.   They don't appear to have been.

3    Q.   Okay.

4         MR. SMITH:  One moment, Your Honor.

5         THE COURT:  Yes.

6         MR. SMITH:  Thank you, Detective.

7         I don't have any further questions at this time,

8    Your Honor.

9         THE COURT:  All right.  Redirect.

10        MR. FIELDS:  Yes, Your Honor, thank you.

11                    REDIRECT EXAMINATION

12   BY MR. FIELDS:

13   Q.   Detective Seal, do you remember being asked questions

14   about whether you thought the defendant was impaired?

15   A.   Yes.

16   Q.   And you concluded that he was not impaired, right?

17   A.   Correct.

18   Q.   So when he was answering your questions, did he seem

19   lucid?

20   A.   He did.

21   Q.   In any way, did he indicate that he didn't understand

22   your questions?

23   A.   No.

24   Q.   Any reason, as you sit here today testifying, to

25   believe that he didn't understand what you were asking him?

Redirect - Seal

1    A.    No.

2    Q.    You were also asked a lot of questions about how

3    cooperative he was.  Do you remember those questions?

4    A.    I do.

5    Q.    How many times would you say you asked him about the

6    credit cards?

7    A.    Without counting -- I mean you could hear it on the

8    recordings, I asked him probably -- probably at least 10

9    times -- 10, 15 times, somewhere in there.

10   Q.    Was he cooperative with that part of the traffic stop?

11   A.    No.

12              MR. FIELDS:  No further questions, Your Honor.

13              THE COURT:  All right.  May this witness be

14   excused?

15              MR. FIELDS:  Yes, Your Honor.

16              THE COURT:  All right.  For the defendant?

17              MR. SMITH:  I have no objection.

18              THE COURT:  All right.  Detective, thank you so

19   much for joining us.  You're excused.  You may step down.

20              THE WITNESS:  Thank you, Your Honor.

21              THE COURT:  Safe travels back to Arizona.

22              THE WITNESS:  Thank you.

23              THE COURT:  All right.  We're going to call it a

24   day.

25              Ladies and gentlemen of the jury, I don't think I

Redirect - Seal

1    mentioned this to you before, but starting tomorrow, we're

2    going to start each remaining day of the trial at 8:45, so

3    I ask that you be in the deliberation room by 8:35.

4         In 97 percent of the trials I've had, the second

5    morning we've had issues with jurors trying to figure out

6    where they're going to park and how long it's going to take

7    them to get from their home, and to be able to be sitting

8    in that room by 8:35, so let's see if you can be -- this

9    can be one of the 3 percent that get it on time.  So give

10   yourself extra time tomorrow morning and then you figure

11   out how long it takes you, then Wednesday through Friday we

12   will be fine.

13        I need to remind you, please don't do any

14   independent research into and don't discuss with anyone any

15   of the facts, or the law, the issues, or the individuals

16   involved with this case.

17        I have something to raise with the lawyers, so

18   lawyers can stick around for a couple of minutes.  I'm

19   releasing the jury at this time.  We will be in recess

20   until 8:45.

21        (Jury left at 4:55 p.m.)

22        THE COURT:  All right, Mr. Smith, where are we

23   with respect to Mr. Cox?

24        MR. SMITH:  No further, Your Honor.  We must have

25   had a miscommunication.  I wasn't able to reach him over

288
Redirect - Seal

1    the lunch hour.  I will continue to try when I get back to

2    my office.

3            THE COURT:  Okay.  Well, you know, I don't know

4    how much longer I'm going to wait and defer ruling on the

5    Government's motion with respect to appointing counsel for

6    Mr. Cox.

7            MR. SMITH:  I understand.

8            THE COURT:  Let's do this:  First thing before the

9    jury comes in tomorrow, we're going to bring this up.  If

10   you haven't communicated with him then, I'm not going to

11   delay any further, I'm going to go forward and grant the

12   Government's motion and -- because it takes time to --

13   these things aren't done instantaneously --

14           MR. SMITH:  I understand.

15           THE COURT:  -- and then we'll get a ruling on it,

16   unless you tell me to the contrary by tomorrow morning that

17   that's no longer necessary.

18           MR. SMITH:  I understand.

19           THE COURT:  All right.  We'll be in recess until

20   8:45.

21       (Proceedings concluded at 4:57 p.m.)

22

23                            **INDEX**

24   <u>Item</u>                                          <u>PAGE</u>

25                       <u>GOVERNMENT'S WITNESSES</u>

Redirect - Seal

1    **KRISTINA MOSS**
     Direct Examination by Ms. Paluch          183
2    Cross-examination by Mr. Goodreid         204
     Examination by the Court                  210
3    Examination by Ms. Paluch                 212

4    **REBECCA JOSEPH**
     Direct Examination by Ms. Paluch          214
5    Cross-examination by Mr. Goodreid         236

6    Item                                      PAGE

7                  GOVERNMENT'S WITNESSES

8    **JONATHAN SEAL**
     Direct Examination by Mr. Fields          241
9    Voir Dire Examination by Mr. Smith        264
     Direct Examination by Mr. Fields (Cont'd) 265
10   Cross-examination by Mr. Smith            279
     Redirect Examination by Mr. Fields        285

11

12

13                 GOVERNMENT'S EXHIBITS

| 14 | EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|---|
| 15 | 1-A | 253 | 254 | | |
| 16 | 3 | 243 | 243 | | |
| 17 | 4 | 263 | 266 | | |
| 18 | 4-A | 263 | 266 | | |
| 19 | 4-B | 263 | 266 | | |
| 20 | 4-C | 263 | 266 | | |
| 21 | 4-D | 263 | 266 | | |
| 22 | 5 | 277 | 277 | | |
| 23 | 38 | 273 | 274 | | |
| 24 | 56-B | 217 | 217 | | |
| 25 | 56-C | 217 | 217 | | |

290

Redirect - Seal

1                        GOVERNMENT'S EXHIBITS

2   EXHIBITS:        Offered    Received   Refused   Stipulated

3   56-D             217        217

4   56-E             217        217

5   56-F             217        217

6   56-G             217        217

7   63-B             192        192

8   63-C             192        192

9   63-D             192        192

10  63-E             192        192

11  63-F             192        192

12  63-G             192        192

13

14                  *      *      *      *      *

15                    REPORTER'S CERTIFICATE

16       I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled

18  matter.

19       Dated at Denver, Colorado, this 8th day of August,

20  2019.

21

22

23

24

MARY J. GEORGE, FCRR, CRR, RMR

25