1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3    Criminal Action No. 16-cr-0054-WJM

4    UNITED STATES OF AMERICA,

5    Plaintiff,

6    vs.

7    TRAMELL THOMAS,

8    Defendant.

9    -----------------------------------------------------------

10                      REPORTER'S TRANSCRIPT
                       (Jury Trial - Day 2)

11   -----------------------------------------------------------

12
          Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
13   Judge, United States District Court for the District of
     Colorado, commencing at 8:47 a.m., on the 28th day of
14   November, 2017, in Courtroom A801, United States
     Courthouse, Denver, Colorado.
15
                            APPEARANCES
16
          MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
17   Attorneys, 1801 California Street, Suite 1600, Denver,
     Colorado 80202, appearing for the plaintiff.
18
          DANIEL T. SMITH, Attorney at Law, 4582 South Ulster
19   Street, Suite 1400, Denver, Colorado 80237 and
          THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
20   Suite 1400, Denver, Colorado 80202, appearing for the
     defendant.
21

22               MARY J. GEORGE, FCRR, CRR, RMR
                901 19th Street, Denver, Colorado 80294
23           Proceedings Reported by Mechanical Stenography
                 Transcription Produced via Computer
24

25

1                       P R O C E E D I N G S

2           (In open court outside the presence of the jury at

3      8:47 a.m.)

4           THE COURT:  All right.  First, Mr. Smith, have we

5      come to a decision with respect to Mr. Cox?

6           MR. SMITH:  I will not be calling Mr. Cox, Your

7      Honor.

8           THE COURT:  Okay.  Very well, then let's get the

9      motion here in front of me.  That portion of the

10     Government's motion ECF 213, which requested appointment of

11     independent counsel to represent potential witness, Michael

12     Cox, is denied as moot.

13          All right.  I understand the Government has an

14     issue regarding exhibits.

15          MR. FIELDS:  We do, Your Honor.  Trials are

16     exciting and we had some late-breaking developments last

17     night.

18          THE COURT:  Okay.

19          MR. FIELDS:  The first relates to the --

20          THE COURT:  Some are more exciting than others.

21          MR. FIELDS:  Yeah.  Perhaps, you know, "May you

22     live in exciting times" is the old curse.  So first thing,

23     the first witness from the Government this morning will be

24     Kimmisha Mullett.  We were able to speak to her in more

25     detail last night, and during the course of that

1    conversation, it became clear that she had some guilty

2    knowledge of what was happening with regard to these

3    mailings and, as a result, the United States was able to

4    reach an agreement between her and her attorney over a

5    nonprosecution agreement.

6              THE COURT:  Okay.

7              MR. FIELDS:  We've marked that as an exhibit; it's

8    new Government's Exhibit 84.  That's been provided to

9    defense counsel.

10             THE COURT:  All right.

11             MR. FIELDS:  I have copies here for the Court,

12   which I can pass out, and I put the original on the stand

13   over there.

14             THE COURT:  Yeah.  I don't have one up here; if

15   you could give one to Ms. Hansen, she can give it to me.

16             COURTROOM DEPUTY:  Oh, you put one in the book?

17             MR. FIELDS:  I didn't put it in the book.

18             COURTROOM DEPUTY:  It's on that stand?

19             MR. FIELDS:  It's just on the stand.

20             COURTROOM DEPUTY:  Okay.

21             THE COURT:  All right.  Exhibit 84.  And this is

22   in reference to the -- your next witness?

23             MR. FIELDS:  Yes.

24             THE COURT:  Okay.  One second.  Okay.  And did you

25   say you've already given a copy to counsel?

1           MR. FIELDS:  We have, Your Honor.

2           THE COURT:  Okay.  And what -- and are you -- what

3    do you want me to do with it?

4           MR. FIELDS:  We'll be offering its admission into

5    evidence.  I haven't been able to speak to defense counsel

6    about whether they'll stipulate to its admission.  I just

7    wanted to alert the Court, of course, that there's a new

8    exhibit.

9           THE COURT:  Okay.  Very well.

10          MR. FIELDS:  There's one other matter, Your

11   Honor.

12          THE COURT:  Yes.

13          MR. FIELDS:  This one's, you know, even more

14   exciting.

15          THE COURT:  Oh, wow.

16          MR. FIELDS:  Late last night --

17          THE COURT:  Okay.  What can be more exciting than

18   that kind of development with a witness?  Anyway.

19          MR. FIELDS:  Late last night, the Government was

20   informed by Heather Carr's defense attorney that she has no

21   intention of coming into court today, and she will not be

22   abiding by the terms of her cooperation agreement.

23          THE COURT:  Oh.

24          MR. FIELDS:  This obviously puts a bit of a --

25   throws us for a loop in terms of our trial presentation

1  because she was scheduled to testify for, between direct

2  and cross, about four hours.  We have two witnesses here

3  this morning, we have Ms. Mullett and then we have Michelle

4  Allred.  I think together their testimony, depending on the

5  cross-examinations, will take an hour and a half to two

6  hours.  Ms. Duncan --

7           THE COURT:  Combined or each?

8           MR. FIELDS:  Combined.

9           THE COURT:  Okay.

10          MR. FIELDS:  Ms. Duncan, Christina Duncan, and

11  Alison Stailey are scheduled to fly in to Denver at 10:00.

12  They are going to race to the courthouse as quickly as

13  possible.  And we will put on the first witness that is

14  available.

15          THE COURT:  Okay.

16          MR. FIELDS:  But it is possible that we may have a

17  short gap and I would just beg the Court's indulgence.  You

18  know, we could take a break or something else, but --

19          THE COURT:  Right.

20          MR. FIELDS:  -- we might not have the witnesses

21  here and ready to go.

22          THE COURT:  Well, thank you for letting me know.

23  Sure, under these circumstances, it's something you didn't

24  have any control over what Ms. Carr was going to do with

25  respect to her testimony, so I'll work with you.  If it

1       becomes -- if it becomes too late or -- or too long,

2       rather, then what you're telling me is you have no one else

3       for today.

4               MR. FIELDS:  We do have the case agent, Ms. Ennis.

5       The problem with that is we need certain exhibits to be

6       admitted before her testimony will make sense.

7               THE COURT:  Yeah.  And I think you had her as

8       last, right?

9               MR. FIELDS:  Yeah.  And, you know, we can play

10      with that a little bit, you know.  We're, of course, doing

11      everything we can.  We've researched the evidentiary

12      issues, but there are limits to where we could put her in

13      terms of the order, just because we need other exhibits to

14      be in evidence before she can talk about them.

15              THE COURT:  Okay.  All right.  So they're

16      scheduled -- do you know if their flight's on time?

17              MR. FIELDS:  Their flights -- I have no reason to

18      believe their flights are delayed.  They've already been

19      informed they need to get to the courthouse ASAP.  And, of

20      course, our witness coordinator will be working with them,

21      you know, to the minute.  Like the minute they get off that

22      plane, we should hopefully be in --

23              THE COURT:  Okay.  I'll work with you.  I think

24      these are extenuating circumstances and we'll do that.  I

25      mean, maybe we will take an early lunch, depending on how

1    things go.

2            With respect to Ms. Carr, are you going to want to

3    have some kind of discussion with me outside the presence

4    of the defense counsel to tell me about what's going to

5    happen with her in her case?  Do you want to do that at

6    another time, or you haven't thought through what you're

7    going to do with her?

8            MR. FIELDS:  We've certainly thought about it, but

9    I think at this point it's premature.  She did fly to

10   Denver, so she's here.

11           THE COURT:  Oh, she's here.  She's just not going

12   to come to the --

13           MR. FIELDS:  According --

14           THE COURT:  You can't get a process server on her

15   to --

16           MR. FIELDS:  Well, yeah.  There's lots of

17   different options.  The bottom line is when we talked to

18   defense counsel yesterday, defense counsel, obviously,

19   because of the reasons of attorney-client privilege,

20   couldn't tell us certain things, right, about exactly how

21   the discussions went yesterday, but I suspect that her

22   attorney is trying to prevail upon her to follow the

23   agreement that she signed and there is hope that maybe she

24   will reconsider.

25           THE COURT:  Okay.  Have you put some kind of time

1    limit on them in terms of when they have to tell us today

2    so that we can try to arrange her schedule today?

3              MR. FIELDS:  It would be today, Your Honor.  I

4    mean, first thing this morning is what we told the defense

5    attorney and we haven't heard anything.

6              THE COURT:  Okay.

7              MR. FIELDS:  So, you know, the hope is

8    diminishing.

9              THE COURT:  Right.  Okay.

10             MR. FIELDS:  I think right now it's probably

11   premature to discuss exactly what will happen with Ms.

12   Carr, but we can certainly have that conversation --

13             THE COURT:  I was just asking if you were going to

14   want to.  Obviously, you know, you have to think through

15   what your strategy's going to be, if, in fact, she doesn't

16   comply with the terms of her agreement and, you know, you

17   probably want to talk to folks in your office and all that

18   good stuff.  I was just wanting to know if you were going

19   to want to take some time now that she's here, during a

20   lunch break or something, when we could have that

21   discussion, but that's fine if we don't.

22             MR. FIELDS:  Thank you, Your Honor.  I appreciate

23   it.

24             THE COURT:  Thank you for telling me all that.

25   It's good to know what's coming down the pike.

1            All right.  Let's bring in the jury.

2            So I'm assuming you don't want me to tell the jury

3       that Ms. Carr is not testifying?

4            MR. FIELDS:  No, Your Honor.

5            THE COURT:  Because you don't know if -- so we'll

6       just go through the witnesses you have and then if there's

7       a break in the action, then I'll just inform them -- I'll

8       give some kind of generic explanation of some procedural or

9       timing issues and that we're going to be needing to take a

10      break.

11           MR. FIELDS:  And reminding the jury -- I mentioned

12      it in my opening, you can remind them that the statement of

13      counsel's not evidence and they have to consider just the

14      evidence.

15           THE COURT:  Right.  Okay.  Correct.

16           (In open court in the presence of the jury at 8:56

17      a.m.)

18           THE COURT:  Good morning, ladies and gentlemen of

19      the jury.  Welcome back to day 2 of our jury trial.  Thank

20      you for your patience.  The lawyers and I were dealing with

21      a number of matters that the law requires be discussed

22      outside of your presence.  So it's not that we were late

23      this time, we were here on time, but we have been working

24      on other matters.

25           All right, the Government may call its next

Direct - Mullett

1    witness.

2         MR. FIELDS:  Thank you, Your Honor.  The United

3    States calls Kimmisha Mullett.

4         COURTROOM DEPUTY:  Right here, ma'am.  Please just

5    step in the box and raise your right hand.

6         KIMMISHA MULLETT, GOVERNMENT'S WITNESS, SWORN

7         COURTROOM DEPUTY:  Please be seated.  Please state

8    your full name for the record and spell your first and last

9    name.

10        THE WITNESS:  Kimmisha Mullett.  K-i-m-m-i-s-h-a,

11   last name M-u-l-l-e-t-t.

12                    DIRECT EXAMINATION

13   BY MR. FIELDS:

14   Q.   Good morning, Ms. Mullett.  Do you know Tramell

15   Thomas?

16   A.   Yes.

17   Q.   Do you see him in the courtroom today?

18   A.   Yes.

19   Q.   Could you please tell us where he's sitting and

20   describe an article of clothing that he's wearing.

21   A.   He is sitting by his counsel in a black-and-gray-ish

22   sweater.

23        MR. FIELDS:  Your Honor, I would like the record

24   to reflect that the witness has identified the defendant.

25        THE COURT:  The record will so reflect.

Direct - Mullett

1    BY MR. FIELDS:

2    Q.   Ms. Mullett, where did you live in 2012?

3    A.   In Colorado Springs, Colorado.

4    Q.   What address?

5    A.   1112 Meadow Oaks Drive, Colorado Springs.

6    Q.   How long had you lived at that address?

7    A.   Roughly about a year and a half.

8    Q.   When did you move out of that address?

9    A.   The fall of 2012.

10   Q.   While you lived there, did you receive mail with other

11   people's names on it?

12   A.   Yes.

13   Q.   Who asked if that mail could be sent to that

14   address?

15   A.   It was set up through Tramell.

16   Q.   When you received that mail with other people's names

17   on it, what did you do with it?

18   A.   I sent it to Tramell in Arizona.

19   Q.   Are you prepared today to tell the ladies and

20   gentlemen of the jury about the arrangement that you had

21   with Mr. Thomas?

22   A.   Yes.

23   Q.   Let's step back for just a little bit.  Have you ever

24   applied for student aid, yourself?

25   A.   Yes.

Direct - Mullett

1   Q.   At what school?

2   A.   Pikes Peak Community College.

3   Q.   So as a result, do you know what student aid mail from

4   Pikes Peak Community College looks like?

5   A.   Yes.

6   Q.   Describe it to us.

7   A.   You get an acceptance letter from the college that has

8   your S number on it, and then after that, you get a card

9   from the bank that does the funding of the student loan if

10  you get a refund.

11  Q.   What does that card look like?

12  A.   Back then, it would have been a black Higher One card.

13  Q.   And you've been describing the contents of the mail.

14  When the mail comes, does it come in an envelope that's

15  distinctive?

16  A.   Yes.

17  Q.   What does that envelope look like?

18  A.   It's just an envelope that has the school logo on it.

19  Q.   "School" being Pikes Peak Community College?

20  A.   Yes.

21  Q.   If you'll look at Government's Exhibit 57-I.  It

22  should be in notebook No. 2.  If you could put that in

23  front of you.  It's already in evidence so we can also put

24  it up on the monitor.

25          Can you see that in front of you?

303

Direct - Mullett

1   A.   Yes.

2   Q.   All right.  Do you see the name on the first page?

3   A.   Yes.

4   Q.   What is the name listed there?

5   A.   Dennis Miller.

6   Q.   Are you looking at 57-I?  Could you just look in the

7   bottom right-hand corner.

8        COURTROOM DEPUTY:  Oh, sorry.  You said this was

9   received into evidence?

10        MR. FIELDS:  I believe so.

11        COURTROOM DEPUTY:  I don't have 57-I --

12        THE COURT:  One thing --

13        MR. FIELDS:  I apologize.  I apologize.

14        THE COURT:  Hold on.  One thing at a time.  One

15   second, Mr. Fields.  I don't show any of 57 in evidence.

16        MR. FIELDS:  Your Honor, at this point, I would

17   move, pursuant to the parties' stipulation, that

18   Government's Exhibits 57-I --

19        THE COURT:  Just I?

20        MR. FIELDS:  And 57-H be moved into evidence.

21        THE COURT:  All right.  Given the stipulation of

22   the parties, Exhibit -- Government Exhibit 57-H and 57-I

23   are received into evidence and may be published to the

24   jury.

25        (Government's Exhibits 57-H and 57-I received)

Direct - Mullett

1      MR. FIELDS:  Thank you, Your Honor.  I apologize.

2    BY MR. FIELDS:

3    Q.   So now I think we've got that hiccup worked out.

4         Are you looking at 57-I, ma'am?

5    A.   Yes.

6    Q.   All right.  Thank you.  And what is the name listed on

7    this page?

8    A.   Abate, Manuel.

9    Q.   Now we'll go to the last page of this exhibit.  Do you

10   see it says in the column or a row there that says Date

11   FAFSA Received by CPS.  Do you see that?

12   A.   Yes.

13   Q.   What is the date?

14   A.   7-7-12.

15   Q.   So now let's go back again to the first page.  Do you

16   see a row for Address?

17   A.   Yes.

18   Q.   What is the address listed there?

19   A.   1112 Meadow Oaks Drive, Colorado Springs, Colorado.

20   Q.   Is that your address?

21   A.   Yes.

22   Q.   Did you live there in July of 2012?

23   A.   Yes.

24   Q.   Did anyone named Mr. Manuel Abate live with you there

25   in July of 2012?

Direct - Mullett

1   A.   No.

2   Q.   In July of 2012, did you receive mail at 1112 Meadow

3   Oaks Drive?

4   A.   Yes.

5   Q.   What kind of mailbox did you have?  Describe it to us.

6   A.   It was one of Oaks Community mailboxes.

7   Q.   Did it have a key or key slot?

8   A.   Yes.

9   Q.   Who had a key to that mailbox?

10  A.   I did.

11  Q.   Anyone else?

12  A.   No.

13  Q.   Now let's look at Government's Exhibit 56-G.  And this

14  is in evidence.

15        Do you see the name up at the top?

16  A.   Yes.

17  Q.   What is the name?

18  A.   Manuel Abate.

19  Q.   Is that the same name as the exhibit we just looked

20  at?

21  A.   Yes.

22  Q.   Now if we go to into the middle of this exhibit.

23        COURTROOM DEPUTY:  One minute, Mr. Fields.  We're

24  having a hard time hearing you, so if you could just speak

25  as loud as you can into the mic.

Direct - Mullett

1    BY MR. FIELDS:

2    Q.   Now we're looking at the middle there.  This describes

3    a credit card.  Do you see over there on the far right,

4    there's a column marked Detail?  Do you see that?

5    A.   Yes.

6    Q.   Below that it says, Card Shipping Address.  What is

7    that address?

8    A.   1112 Meadow Oaks Drive.

9    Q.   And then a little bit over on the left, there's a

10   column and it says Due Date For U.S. Mail Delivery.  What

11   is the date there?

12   A.   7-26-12.

13   Q.   Did you receive mail at 1112 Meadow Oaks Drive around

14   that date?

15   A.   Yes.

16   Q.   Now let's look at 57-H.  It will be in the binder in

17   front of you, but also on the monitors.

18        If we could zoom in a little bit on the top there.

19        Do you see the rows for Last Name and First Name?

20   A.   Yes.

21   Q.   What is the name there?

22   A.   Dennis Miller.

23   Q.   We're going to follow a pattern here.  Let's go to the

24   last page.

25        And do you see that row, Date FAFSA Received By

Direct - Mullett

1    CPS?  What is that date?

2    A.    5-16-12.

3    Q.    All right.  So now we go back to the first page.  And,

4    again, what is the address listed on this exhibit?

5    A.    1112 Meadow Oaks Drive, Colorado Springs, Colorado.

6    Q.    That's your address?

7    A.    Yes.

8    Q.    In May of 2012, did you receive any mail at 1112

9    Meadow Oaks Drive?

10   A.    Yes.

11   Q.    Did someone named Dennis Miller live with you at that

12   address at that time?

13   A.    No.

14   Q.    Now, again, let's look at Government Exhibit 56-F,

15   which is in evidence.

16         So if we look at the top, what is the name?

17   A.    Dennis Miller.

18   Q.    Is that the same name that was on Government's Exhibit

19   57-H?

20   A.    Yes.

21   Q.    Now, let's go back to the middle here.

22         And, again, we've got that column marked Detail.

23   What is the card shipping address listed there?

24   A.    1112 Meadow Oaks Drive, Colorado Springs, Colorado.

25   Q.    Now if we go to the last page of this exhibit, it's

Direct - Mullett

1    page 6, and we blow up that box again.

2            Do you see where it says Ordered From Production

3    Facility?

4    A.   Yes.

5    Q.   What is the date there?

6    A.   6-26-12.

7    Q.   And then do you see where it says Activated?

8    A.   Yes.

9    Q.   What is the date?

10   A.   7-7-12.

11   Q.   So between June 26th, 2012, and July 7th, 2012, were

12   you living at 1112 Meadow Oaks Drive?

13   A.   Yes.

14   Q.   Did you receive mail?

15   A.   Yes.

16   Q.   So in July of 2012, did you get mail from Manuel Abate

17   and Dennis Miller delivered to your address?

18   A.   Yes.

19   Q.   Did someone ask you to have it delivered there?

20   A.   Yes.

21   Q.   Who?

22   A.   My contact was Tramell.

23   Q.   What did you do with it when it arrived?

24   A.   I sent it to an address in Arizona.

25           COURTROOM DEPUTY:  You'll have to speak up,

Direct - Mullett

1    please.

2    BY MR. FIELDS:

3    Q.   Did you get that?  Did the witness -- let's step back

4    for a bit.

5         You said you know Mr. Thomas.  How do you know

6    him?

7    A.   That he was a customer that used to come into the

8    store.

9    Q.   What is the store?

10   A.   Print shop.

11   Q.   Whose print shop?

12   A.   Mine.

13   Q.   Where was it at?

14   A.   Colorado Springs.

15   Q.   Approximately when did he come into your print shop?

16   A.   Between 2008 and 2009.

17   Q.   Did you do printing for his businesses?

18   A.   Yes.

19   Q.   What were his businesses?

20   A.   The one that I remember was the barbershop.

21   Q.   Did he have others?

22   A.   There was another one, but I don't remember the

23   nature.

24   Q.   Do you know whether he made any money through those

25   businesses?

Direct - Mullett

1    A.    No.

2    Q.    And the name of your print shop, what was its name at

3    the time?

4    A.    9-1-1 Design and Party.

5    Q.    Did you meet with the Government before your

6    testimony?

7    A.    Yes.

8    Q.    Do you have an agreement with the Government?

9    A.    Yes.

10   Q.    What are your obligations under that agreement?

11   A.    To tell the truth.

12   Q.    And in return for that, what are you getting?

13   A.    Immunity.

14   Q.    So let's look at -- this is Government's Exhibit 84,

15   which is not in evidence.

16          Do you recognize that?

17   A.    Yes.

18   Q.    Is that your agreement with the Government?

19   A.    Yes.

20          MR. FIELDS:   Your Honor, at this time I would move

21   to admit Government's Exhibit 84.

22          THE COURT:   Any objection?

23          MR. SMITH:   May I voir dire?

24          THE COURT:   You may.

25                    VOIR DIRE EXAMINATION

311

Voir Dire - Mullettt

1    BY MR. SMITH:
2    Q.   Ms. Mullett, you have Exhibit 84 before you?
3    A.   Yes.
4    Q.   Is that dated?
5    A.   Yes.
6    Q.   What is the date on it?
7    A.   11-28-2017.
8    Q.   That's today?
9    A.   Yes.
10   Q.   So you've entered into this agreement with the
11   Government today?
12   A.   Yes.
13             MR. SMITH:   Thank you.   Nothing further.
14             I have no objection to the exhibit, Your Honor.
15             THE COURT:   All right.   Given that there's no
16   objection, Exhibit 84 is admitted into evidence and may be
17   published to the jury.
18        (Government's Exhibit 84 received)
19                  DIRECT EXAMINATION (Continued)
20   BY MR. FIELDS:
21   Q.   Ms. Mullett, you were just asked when you signed that
22   agreement.   When did you get into Denver?
23   A.   Well, late Sunday night.
24   Q.   And before that, where were you living?
25   A.   In St. Croix, in the Virgin Islands.

                          Direct - Mullett

1    Q.   Is the Virgin Islands in good shape right now?

2    A.   No.

3    Q.   What happened?

4    A.   Two Category 5 hurricanes hit it.

5    Q.   As a result, is it pretty difficult to communicate

6    with people on the Continental United States?

7    A.   Yes.

8    Q.   In 2012, did you have telephone number 719-209-2675?

9    A.   Yes.

10   Q.   Did you talk to Mr. Thomas using that telephone?

11   A.   Yes.

12   Q.   Did you text him using that telephone?

13   A.   Yes.

14   Q.   So if you look in the binder in front of you -- well,

15   actually, we need a different binder.  Binder No. 1,

16   please.

17        Would you go to Government Exhibit No. 15, please.

18   Do you have that in front of you?

19   A.   Yes.

20   Q.   Did you see this exhibit before your testimony today?

21   A.   Yes.

22   Q.   Are these text messages between you and the defendant,

23   Tramell Thomas?

24   A.   Yes.

25        MR. FIELDS:  Your Honor, at this time I would move

Direct - Mullett

1    for the admission of Government Exhibit 15.

2              MR. SMITH:  May I have a moment, Your Honor?

3              THE COURT:  You may.

4              Mr. Fields, let me ask you a question and tell me

5    if we need to do this up here.  You have a different

6    witness listed in your exhibit document -- exhibit list

7    through which you were going to get this document.

8              MR. FIELDS:  That is right, Your Honor.  We had to

9    upset the order of our witnesses and I believe this

10   witness, through her personal knowledge, can lay the

11   appropriate foundation and has, which is why we referred

12   its admission.

13             THE COURT:  Okay.

14             MR. SMITH:  Your Honor, the Exhibit 15 that I have

15   is a six-page exhibit and my objection would be relevancy

16   as to a majority of it.  There are a series of texts that

17   span from June 4th to July 17th of 2012.

18             THE COURT:  Let me ask Ms. Mullett:  Do you

19   recognize these text messages?

20             THE WITNESS:  Yes.

21             THE COURT:  All right.  And are those text

22   messages between yourself and the defendant?

23             THE WITNESS:  Yes.

24             THE COURT:  All right.  The objection's overruled.

25   15 is admitted into evidence and may be published to the

Direct - Mullett

1    jury.

2          (Government's Exhibit 15 received)

3                MR. FIELDS:   Thank you, Your Honor.

4    BY MR. FIELDS:

5    Q.   So if we could pull up page 2 of that.  There we go.

6                All right.  You also have it in front of you in

7    the binder.

8                Now zoom in on lines 46 through 48.

9    A.   Okay.

10   Q.   Now, just to orient you here, if you see the column

11   over on the left, it's column A, you'll see a 1 or 2 in

12   that column.  Do you see that?

13   A.   Yes.

14   Q.   If there's a 1 in column A, that means it's a text

15   from you.  If there's a 2, it's a text from Mr. --

16               MR. SMITH:   I'm going to object.  If these are her

17   text messages, she should be the witness testifying, not

18   the prosecutor.

19               THE COURT:   That's true.  I mean, she said that it

20   was her and Mr. -- and the defendant.  Let's get her to

21   identify who's who.

22               MR. FIELDS:  Sure, Your Honor.  Sorry about

23   that.

24               THE COURT:  All right.

25   BY MR. FIELDS:

315

Direct - Mullett

1    Q.   So lines 46 and 47, who sent those texts?

2    A.   I did.

3    Q.   And line 48, who sent that text?

4    A.   Tramell.

5    Q.   Now, if you'll look at column A, you see a 1 in the

6    column for the text that you sent?

7    A.   Yes.

8    Q.   And in the text that Mr. Thomas sent, what do you see

9    in that column?

10   A.   A "2."

11   Q.   All right.  So in line 46, what does that read?

12   Please read that into the record for us.

13   A.   "For Dennis Miller, what do u want me to do with the

14   letter I have?"

15   Q.   And line 47.

16   A.   "U also have other" -- or, wait, "U also have mail."

17   Q.   So Dennis Miller, is that the same person referenced

18   in the documents we looked at earlier in your testimony?

19   A.   Yes.

20   Q.   What was Thomas' response?

21   A.   I was asked to send mail to an address in Arizona.

22   Q.   Well, for purposes of this, could you just read line

23   48, the first part of it there.

24   A.   "Yea, I'll jus have u send it altogether.  I'm gonna

25   send u this lady number.  Three restaurant owners want

316

Direct - Mullett

1   orders."

2   Q.   So the first part of that, "I'm going to send it to

3   you altogether," what is it that you're -- that was

4   referenced there?

5   A.   Mail.

6   Q.   And then the other part of that, "I'm going to send

7   you this lady number, three restaurant owners want orders,"

8   is that relating to a different topic of conversation?

9   A.   Yes.

10  Q.   So now let's zoom out of this.  And let's look at

11  line -- this goes between pages 2 and 3, so let's look at

12  line -- oh, there we go -- let's see if we could zoom in on

13  lines 56 and 57.

14          What does line 56 say?

15  A.   "It is here."

16  Q.   Is that -- who's that text from?

17  A.   Me.

18  Q.   What was the response in line 57?

19          "Cool.  U can send all the mail to me at 975 East

20  Riggs Road," "12-7-" -- I mean "174, Chandler, Az, 85249.

21  Thanku babe."

22  Q.   All right.  So now let's look at Exhibit 64, which is

23  not yet in evidence.  It will be in -- we're switching back

24  and forth between the binders.  It will be in that other

25  binder there, but we also can pull it up on the screen just

Direct - Mullett

1          for you, Ms. Mullett.

2                  MR. FIELDS:  Your Honor, Government Exhibit 64 is

3          not in evidence, but the parties have stipulated to its

4          authenticity and to its status as a business record, and at

5          this time I would move its admission into evidence.

6                  MR. SMITH:  Your Honor, may counsel approach?

7                  THE COURT:  All right.  What exhibit are we

8          talking about?

9                  MR. FIELDS:  64.

10                 THE COURT:  Okay.  Yeah, let's do that.  Let me

11         pull the binder.

12             (Sidebar conference held)

13                 MR. SMITH:  Do you mind if I place my book here?

14                 THE COURT:  No.

15                 MR. SMITH:  Your Honor, the defense have indicated

16         that stipulation to Exhibit 64 based on our understanding

17         of what the Government's case would be and witnesses they

18         would be calling.

19                 THE COURT:  Right.

20                 MR. SMITH:  At this point in time, I would ask the

21         Court to withdraw the stipulation because, as I understand

22         it, in all likelihood Ms. Carr's not going to testify.

23                 THE COURT:  Well, I can't force you to stipulate,

24         so if you're withdrawing the stipulation, that's how we

25         will have to deal with it.  So -- and then you're asserting

1     an objection?

2            MR. SMITH:  Yes.

3            THE COURT:  Okay.  The objection being --

4            MR. SMITH:  Well, this witness can't identify the

5     document.  She can't lay any foundation.

6            THE COURT:  Your response.

7            MR. FIELDS:  Your Honor, we provided Rule 902(11)

8     certificates to the defense several weeks ago.  There's no

9     doubt as to the authenticity of this document or to its

10    status as a business record.  That custody -- that

11    certificate -- the 902(11) certificate describes that under

12    oath -- or under, you know, threat of perjury because it's

13    a declaration, that this is a document --

14           THE COURT:  From whom?

15           MR. FIELDS:  From the UPS store where it was

16    received.  That these documents are kept in the ordinary

17    course of this business, that the store relies on them to

18    conduct its business.  And the face of the document

19    actually bears it out.  This is the application that you

20    receive to get a post office box.  It's --

21           THE COURT:  I don't see any -- I don't see the 902

22    affidavit.

23           MR. FIELDS:  We did not include it in the exhibit

24    binder because of the parties' stipulation, but I can

25    provide it to the Court.  And it has been provided to

Direct - Mullett

1    defense counsel.

2              So under Rules 902(11) and the business records

3    exception to the hearsay rule, I believe this comes in.

4              THE COURT:  I appreciate the bind that you're in

5    given what Ms. Carr has done to you today, or appears to

6    have done to you today, but I have to agree with counsel

7    that this witness is incompetent to enter -- or lay the

8    foundation for the admission of a document that would

9    otherwise be clear hearsay.  So I'm sustaining the

10   objection.

11             MR. FIELDS:  Your Honor, may I be heard just on

12   that?

13             THE COURT:  You can make your record, I'm not

14   changing my objection.

15             MR. FIELDS:  I would --

16             THE COURT:  Lower your voice.

17             MR. FIELDS:  I would concede that this record --

18   this witness cannot lay the foundation, but the whole

19   purpose of 902(11) is to have declarations from a custodian

20   of records.

21             THE COURT:  Right.

22             MR. FIELDS:  There's no way we would be able to

23   get a custodian of records here, and the Rules of Evidence

24   are designed to prevent that, to prevent unnecessary delay

25   and difficulty in laying very basic principles of

Direct - Mullett

1    evidentiary law, which is that this is kept in the regular
2    course of business.
3           So for those reasons, I think the 902(11)
4    certificate by itself is enough and we don't have to rely
5    on this witness to lay the foundation.
6           THE COURT:  What is her relationship to this
7    exhibit?
8           MR. FIELDS:  So she has no relationship to it.
9    But --
10          THE COURT:  So what --
11          MR. FIELDS:  Because it's a business record --
12          THE COURT:  So, I mean --
13          MR. FIELDS:  Well --
14          THE COURT:  The documents can be business records,
15   but how do you connect it up with this witness?
16          MR. FIELDS:  The text message that she just
17   referenced has this address in it.  It's the address to
18   which she sent all of that mail, so that's its relevance.
19   It is very relevant and probative evidence that Mr. Thomas,
20   who's on here, received the mail at that address.
21          THE COURT:  All right.  Mr. Smith.
22          MR. SMITH:  This witness still can't lay the
23   foundation, Your Honor.  And --
24          THE COURT:  What about counsel's point that the
25   902 declarations is in lieu of that foundation testimony?

Direct - Mullett

1          MR. SMITH:  I -- we would not have stipulated to

2     the declarations had we known the status of the

3     Government's case, Your Honor.

4          THE COURT:  Well, so we're unravelling -- we're

5     going back in time that I can't -- I can't force a party to

6     stipulate to anything.  The defendant is withdrawing its

7     stipulation to the declarations and to the -- and to this

8     underlying -- and to this exhibit.

9          MR. FIELDS:  May I be heard on that, Your Honor?

10          THE COURT:  Yes.

11          MR. FIELDS:  The parties don't have to stipulate

12     to a 902(11) certificate and if they did, 902(11) wouldn't

13     be a very good rule at all.  The whole purpose of 902(11)

14     is to expedite the presentation of trial testimony by

15     really eliminating boring testimony from custodians of

16     records, so that is a self-authenticating document.  It is

17     a declaration signed by the witness who would come here to

18     testify, and you, under Rule 104, can conclude by a

19     preponderance of the evidence that it meets the business

20     records exception to the hearsay rule based on that

21     certificate alone.  And that's what the Rules of Evidence

22     allow.  And then it's admitted into evidence and the jury

23     gets to consider whether -- what they want to do with it.

24          THE COURT:  Okay.  Well, to some -- go ahead.

25          MR. SMITH:  My problem with that is, Your Honor,

Direct - Mullett

1    to have the witness -- the business records witness come

2    into court, I could have gone through this document with

3    them.  There's information in this document related to

4    Carr.  My client's name happens to be on the document.

5         I would have wanted to go in and identify how they

6    got this document, who presented it.  What -- what relation

7    does page 2 of Exhibit 64 have to page 1, that type of

8    thing.

9         And now that Carr's not -- evidently not going to

10   be here, I'm denied that opportunity.

11        MR. FIELDS:  Your Honor, may I be heard on that?

12        THE COURT:  Yes.

13        MR. FIELDS:  In terms of being able to confront

14   hearsay witnesses, this is a well-established exception to

15   the hearsay rule and there are cases that there's no right

16   to confront a business records custodian.  That's the whole

17   purpose of the 902(11) certificates, which were provided to

18   defense counsel months ago.

19        So even though Heather Carr has decided not to

20   come in and testify, Heather Carr might have been able to

21   answer these questions, but defense counsel could have told

22   us months ago that they still wanted the custodian of

23   records here.

24        We are entitled to rely on those 902(11)

25   certificates and we are entitled under the Rules of

323
Direct - Mullett

1      Evidence to have them come in because they're relevant,

2      extremely probative evidence of the defendant's involvement

3      in this scheme.

4              THE COURT:  Well, to a great extent all of that's

5      academic because I don't have a 902 declarations as an

6      exhibit or in front of me --

7              MS. PALUCH:  Yes, we can provide that to the

8      Court.

9              THE COURT:  Well, for right now, because I don't

10     have it, I'm sustaining the objection.  You have to get

11     that declaration here, you have to get it labeled, and you

12     have to lay the foundation for its admission.

13             MR. FIELDS:  Can we -- I'll have our agents run

14     and get it right now.  May I have --

15             THE COURT:  Sorry, what?

16             MR. FIELDS:  I'll have one of our agents go and

17     get that certificate right now.  May I have just a minute

18     to talk to my agent?

19             THE COURT:  Okay.  Let's -- okay.  Are there -- is

20     this going to come up with other documents with other

21     witnesses?  Are there other 902 declarations that you need

22     to get?

23             MS. PALUCH:  I don't believe that there are any.

24     Defense counsel would be able to answer that better.  I

25     think the other 902(11) certifications went to the

Direct - Mullett

1    underlying, you know, Comcast and internet service
2    providers.
3              MR. FIELDS:  The summary charts.
4              MS. PALUCH:  The summary charts, the school
5    records.
6              MR. SMITH:  I'm not trying to avoid counsel's
7    comments, Your Honor, and I'm not trying to go back on
8    statements that were made earlier, but when Mr. Goodreid
9    and I are told this morning at 8:30 that Ms. Carr is not
10   going to testify, that changes the complexion of this case
11   and our approach to the case.  And I'm not prepared at this
12   point in time to say that other 902 declarations or
13   stipulations are still appropriate.
14             THE COURT:  Are you hearing this?
15             MR. FIELDS:  Yes.
16             MR. SMITH:  There are -- as Ms. Paluch said
17   yesterday, there are thousands of documents in this case.
18             THE COURT:  And the only reason you stipulated to
19   accept the 902 verification in lieu of the foundational
20   testimony is because you anticipated Ms. Carr was going to
21   testify?
22             MR. SMITH:  In relation to this Exhibit 64,
23   absolutely.
24             THE COURT:  I'm trying to think ahead so we don't
25   go through this five times.

Direct - Mullett

1          MR. SMITH:  Right.

2          THE COURT:  With respect to the other

3     declarations, are you telling me as an officer of the court

4     that the fact that you only entered into -- you only

5     stipulated to the use of the court -- of those 902

6     verification declarations in lieu of foundational testimony

7     because you anticipated that Ms. Carr was testifying?

8          MR. SMITH:  I'm not saying that to every one, Your

9     Honor.

10          THE COURT:  Okay.  But there are some.

11          MR. SMITH:  But I am saying I believe there are

12     others, and I will have to go back and look at this and

13     re-assess our position as to individual exhibits.

14          THE COURT:  Okay.  Well, to answer your question,

15     yes, you can have a minute with your assistants, get the

16     declarations.  And when they come back, we can take -- if

17     it's time for the morning break, we'll take a morning

18     break, or we can take a very quick recess to allow you to

19     label those as an exhibit and get that in front of me.  And

20     then at least insofar as this 64 is concerned and this

21     witness, we can proceed in that fashion.

22          What I'm also suggesting is that it sounds like

23     counsel's potentially re-assessing the stipulation to those

24     declarations for other documents, so I think you need to

25     get an understanding between yourselves whether he's

Direct - Mullett

1    withdrawing those stipulations, and which you're going to

2    have to bring those declarations in.

3            It might be a good idea for her to bring all the

4    declarations, have them here in the courtroom so you can --

5    so -- but for now --

6            MR. FIELDS:  Thank you, Your Honor.

7            THE COURT:  The objection's sustained subject to a

8    review of the declarations.

9            MR. FIELDS:  Thank you, Your Honor.

10           THE COURT:  All right.

11        (End of discussion at sidebar)

12           THE COURT:  All right.  The objection to Exhibit

13   15 is sustained without prejudice to the Government to move

14   again for its readmission or -- or for its admission based

15   on the discussion we had at sidebar.

16           MR. FIELDS:  Thank you very much, Your Honor.

17           MR. SMITH:  Excuse me, counsel.  I believe it's

18   Exhibit 64.  I might have misunderstood the Court.  I

19   thought the Court said 15.

20           MS. PALUCH:  It is 64.  You are correct, counsel,

21   it is 64.

22           THE COURT:  You're right.  Exhibit 15 came --

23   that's right.  Exhibit 64 is the one we were having the

24   argument about at the sidebar.  Okay.  So that objection is

25   sustained without prejudice to the Government renewing its

Direct - Mullett

1    offer of 64 into evidence subject to the conditions we

2    discussed at the sidebar.

3            You may proceed, Mr. Fields.

4            MR. FIELDS:  Thank you, Your Honor.

5    BY MR. FIELDS:

6    Q.   So we were talking about Government Exhibit 50.  Let's

7    go back to that.  In particular, we were looking at lines

8    56 through 57, and they straddle pages 2 and 3?

9            COURTROOM DEPUTY:  Did you reference 50?

10           MR. FIELDS:  15.  I'm sorry, that's one of

11   those --

12           COURTROOM DEPUTY:  15.  Okay.

13   BY MR. FIELDS:

14   Q.   All right.  Line 57, who sent that text?

15   A.   Tramell.

16   Q.   Please read that for us.

17   A.   "Cool.  U can send all the mail to me at 975 East

18   Riggs Rd. 12-174, Chandler, AZ, 85249.  Thank u babe."

19   Q.   You testified earlier that you sent mail to Mr. Thomas

20   in Arizona.  What address did you send it to?

21   A.   To the 975 East Riggs Road.

22   Q.   In Arizona?

23   A.   Yes.

24   Q.   Now let's look at lines 85 through 86.  They're on

25   page 3.

328
Direct - Mullett

1          I should note for the record they travel pages 3

2     and 4.

3          So line 85, please read that for us.

4     A.   "Im cool.  U get a chance to send tht out?"

5     Q.   Who sent that text?

6     A.   Tramell.

7     Q.   And the response from you was what?

8     A.   It -- "it went out today."

9     Q.   What is "it"?

10    A.   Mail.

11    Q.   And now if we go -- this is completely on page 105 --

12    or page -- page 4, lines 105 through 112.

13         Line 105, who is that a text from?

14    A.   I sent it.

15    Q.   To who?

16    A.   Tramell.

17    Q.   So the first text is from you, line 105, and line 106

18    is from Tramell?

19    A.   Yes.

20    Q.   And then they alternate, you, Tramell, you, Tramell;

21    is that right?

22    A.   Yes.

23    Q.   So starting with line 105, and going to line 112,

24    please read those lines into the record.

25    A.   "U got another letter."

Direct - Mullett

1          "Ok babe."

2          "U want me to send or wait."

3          "It can wait till I get there."

4          "I cant get another student loan yet is there"

5     another "way around that?"

6          "U cant get one?"

7          "Ok I figured there is more coming."

8          "I'll call u later."

9     Q.   In line 108, there's a reference to "it can wait till

10    I get there."  Did you meet with Mr. Thomas in person?

11    A.   I do not remember meeting with him in person.

12    Q.   Okay.  And now if we go to page 5.  Lines 135 to 136.

13         Again, to orient us, line 135, who sent that text?

14    A.   I did.

15    Q.   What does it say?

16    A.   "Received another letter."

17    Q.   And line 136, who sent that?

18    A.   Tramell.

19    Q.   And what does it say?

20    A.   "Cool."

21    Q.   "Received another letter."  What type of letter?

22    A.   A letter from the college.

23    Q.   If you look at the next page, lines 150 through 151.

24         Again, to orient us, who sent the text in line

25    150?

Direct - Mullett

1    A.   I did.  I did.

2    Q.   What does it say?

3    A.   You "got another letter."

4    Q.   And what was the response in line 151?

5    A.   "Cool, thx.  Do you know a good cpa?"

6    Q.   Who sent that text?

7    A.   Tramell.

8    Q.   "Got another letter."  What kind of letter?

9    A.   From the school.

10   Q.   All right.  Let's put Government Exhibit 15 away.  Now

11   let's go to Government Exhibit 14.  It's not in evidence,

12   so, yeah.

13        Do you have it in the binder?

14   A.   Okay.

15   Q.   Did you see this before your testimony today?

16   A.   I'm sorry, repeat.

17   Q.   Did you see this exhibit before your testimony today?

18   A.   Yes.

19   Q.   Are these also text messages between you and the

20   defendant, Tramell Thomas, but from different phones?

21   A.   Yes.

22        MR. FIELDS:  Your Honor, at this time I'd move for

23   the admission of Government's Exhibit 14.

24        THE COURT:  Any objection?

25        MR. SMITH:  May I voir dire?

Voir Dire - Mullett

1       THE COURT:  You may.

2                    VOIR DIRE EXAMINATION

3    BY MR. SMITH:

4    Q.   Ms. Mullett, counsel asked you if you had seen Exhibit

5    14 before your testimony.  Did you see that last night in

6    your meeting with the prosecutors?

7    A.   I did see it last night, but I also believe you showed

8    me the texts.

9    Q.   Okay.  And that was also yesterday.

10   A.   Yes.

11   Q.   Okay.  These texts in Exhibit 14, they're all sent in

12   calendar year 2012, correct?

13   A.   Yes.

14   Q.   And do I understand you're saying that you actually

15   remember the content of these individual texts?

16   A.   I only remembered because it's right -- it's printed

17   in front of me.

18   Q.   You have no independent memory of them, do you?

19   A.   No.

20        MR. SMITH:  Thank you.  I would object,

21   insufficient foundation, Your Honor.

22        THE COURT:  That objection's overruled.  Exhibit

23   14 is admitted into evidence and may be published to the

24   jury.

25        (Government's Exhibit 14 received)

                         Direct - Mullett

1              MR. FIELDS:  Thank you, Your Honor.
2                    DIRECT EXAMINATION (Continued)
3    BY MR. FIELDS:
4    Q.   You were asked about when you first saw this exhibit,
5    Ms. Mullett.  Did you have a meeting with the defense
6    counsel yesterday?
7    A.   Yes.
8    Q.   When was that meeting?
9    A.   During lunch.
10   Q.   And did you talk to defense counsel about this
11   exhibit?
12   A.   Yes.  He showed me several different text messages
13   conversations.
14   Q.   Okay.  So now let's look at lines 4 and 5, Government
15   Exhibit 14.  And, actually, sorry, 4 through 6.
16            So, again, just to orient us here, who sent the
17   text messages in lines 4 and 5?
18   A.   I did.
19   Q.   Who sent the text message in line 6?
20   A.   Tramell.
21   Q.   And, again, in -- for this one, it's column B, so
22   it's -- this column right here.  What do you see in the
23   column next to the text messages that you sent?
24   A.   What do you mean?
25   Q.   What number is there?

Direct - Mullett

1    A.    Oh, 1.

2    Q.    And what number is there?

3    A.    2.

4    Q.    So 1 means you sent it, 2 means Thomas sent it?

5    A.    Correct.

6    Q.    Could you please read for us the text messages that

7    are in lines 4 through 6.

8    A.    Tramell it's Kim.  I was calling to see if you were

9    coming into town?  Also I got another letter for you.  By

10   chance did you get that deposit?  The only reason why I'm

11   asking is I'm going out of town first thing in the morning

12   and I could really use it."

13        "I didnt get it but Ill call u at 9 tonight cuz I

14   do hv something for u."

15   Q.    And line 4, you say, "Also I got another letter for

16   you."  And line 6, the response is "I didn't get it."  What

17   was the letter?

18   A.    Another letter from the school.

19   Q.    All right.  We can put that exhibit away.

20        Your testimony has been that Mr. Thomas asked you

21   to get mail for him.  What was the deal that Thomas

22   proposed to you regarding this mail?

23   A.    Just that if I receive mail and it worked out, I could

24   get paid.

25   Q.    When you first agreed to the deal, did you know what

Direct - Mullett

1    kind of mail would be sent to your address?

2    A.   No, not at the time.

3    Q.   When the mail arrived, again, what did it look like?

4    A.   It was a letter from the school.

5    Q.   At that point, what did you think the mail was?

6    A.   What is that -- not an offer letter, a welcome letter.

7    Q.   Did you suspect -- did you have any inclination one

8    way or another as to whether some of these envelopes

9    contained debit cards?

10   A.   Yes, there was.

11   Q.   What makes you think that?

12   A.   They're -- it was -- there was a card in the envelope.

13   Q.   So when you got this mail and it was Pikes Peak's

14   school mail and there was a debit card in it, did you talk

15   to Thomas about what to do with it?

16   A.   Yes.

17   Q.   What did he ask you to do with it?

18   A.   To mail them.

19   Q.   So your testimony is that Thomas arranged to have mail

20   sent to you, and then when the mail arrived, to send it to

21   him.  Why didn't he just have it sent directly to him?

22   A.   I have --

23            MR. SMITH:   Objection, Your Honor.  Foundation.

24            THE COURT:   Sustained.

25   BY MR. FIELDS:

Direct - Mullett

1    Q.   Did you have a discussion with Mr. Thomas about

2    details as to why mail was being sent to your address?

3    A.   No.  There were no details.

4    Q.   Well, did you have a discussion?

5    A.   Yes, I was asked to receive mail.

6    Q.   Describe that discussion to us.  What did Thomas tell

7    you about the mail?

8    A.   Just that I would receive letters in the mail and that

9    whatever I received, to send it to him.

10   Q.   Would he describe details about why the mail was

11   coming to you?

12   A.   No.

13   Q.   Why not?

14   A.   Because they didn't have --

15             MR. SMITH:  Objection, Your Honor.  Again,

16   foundation.

17             THE COURT:  Oh, I -- that's overruled.  You may --

18   you may answer, ma'am.  Please keep your voice up so we can

19   hear you.

20             THE WITNESS:  He didn't have all the details.

21   BY MR. FIELDS:

22   Q.   Did he tell you why he wouldn't tell you the details?

23   A.   He didn't have all the details.  He just asked if I

24   receive the letters and if it worked out, I would get paid.

25   Q.   Did he say anything else?

                            Direct - Mullett

1    A.    That he didn't want to get me into any kind of

2    trouble.

3    Q.    After Thomas mentioned the idea of trouble, did you

4    still send him the mail?

5    A.    I did.

6    Q.    Was it all in one big package or did you send it to

7    him individually?

8    A.    No, it was one package.

9    Q.    After you sent down that one package, did you get

10   additional mail addressed to other people?

11   A.    Yes.

12   Q.    Did you send that mail to Thomas?

13   A.    No.

14   Q.    What did you do with it?

15   A.    I started sending letters back.

16   Q.    Why?

17   A.    Because I was nervous that I was going to get in

18   trouble, so I sent them back.

19   Q.    Did you know that you were doing something wrong?

20   A.    Yes.

21   Q.    Why did you do it?

22   A.    Because there was a lot going on personally at the

23   time and just was trying to earn extra money.

24          MR. FIELDS:  I have no further questions, Your

25   Honor.

Cross - Mullett

| | |
|---|---|
| 1 | THE COURT:  All right.  Cross-examination. |
| 2 | CROSS-EXAMINATION |
| 3 | BY MR. SMITH: |
| 4 | Q.   Ms. Mullett, you just said there was a lot going on in |
| 5 | your life at the time and you needed some extra money, |
| 6 | correct? |
| 7 | A.   Correct. |
| 8 | Q.   You were going through some marital difficulties? |
| 9 | A.   Yes. |
| 10 | Q.   Getting a divorce? |
| 11 | A.   Yes. |
| 12 | Q.   You had some health issues? |
| 13 | A.   Yes. |
| 14 | Q.   And when this discussion started, you asked Mr. Thomas |
| 15 | if he could help you financially, if he knew of any way you |
| 16 | could make some money, correct? |
| 17 | A.   Correct. |
| 18 | Q.   And he said he'd try? |
| 19 | A.   Yes. |
| 20 | Q.   And you talked about this mail. |
| 21 | A.   Correct. |
| 22 | Q.   You never were paid for doing any of this, were you, |
| 23 | by Mr. Thomas? |
| 24 | A.   No. |
| 25 | Q.   You weren't paid by anybody, were you? |

Cross - Mullett

1   A.   No.

2   Q.   Do you still have Exhibit 15?

3   A.   Yes.

4   Q.   You went over several lines in this exhibit.  I'd like

5   to direct your attention to page 2 of the exhibit.  You

6   talked about this text exchange on lines 46 through 49.  Do

7   you remember that?

8   A.   Yes.

9   Q.   On line 46, this is your text going to Mr. Thomas?

10  A.   Yes.

11  Q.   "For Dennis Miller, what do you want me to do with

12  this letter?"  Correct?

13  A.   Correct.

14  Q.   And then you also say, "You also have mail."  Correct?

15  A.   Correct.

16  Q.   So there was more mail there other than this Dennis

17  Miller letter, correct?

18  A.   Correct.

19  Q.   And you sent all of the mail down to Arizona.

20  A.   Correct.

21  Q.   Mr. Thomas wasn't an actual employee of your printing

22  company, was he?

23  A.   No.

24  Q.   But he did a lot of work with you, didn't he?

25  A.   Correct.

Cross - Mullett

1    Q.   He was, for lack of a better name, maybe kind of a

2    sales representative for you?

3    A.   Yes.

4    Q.   He would go out and find printing jobs?

5    A.   Yes.

6    Q.   Bring in to you?

7    A.   Yes.

8    Q.   You would print whatever for the client, the client

9    would pay you?

10   A.   Yes.

11   Q.   And then you would pay Mr. Thomas whatever the sales

12   commission agreement was, correct?

13   A.   Yes.

14   Q.   And this went on for several years, didn't it?

15   A.   Yes.

16   Q.   It was hiding from me.

17        The mail that came to Mr. Thomas at your house,

18   did you open it?

19   A.   No.

20   Q.   So you never saw any of the contents?

21   A.   No.

22   Q.   You believed there was some kind of card in one of the

23   envelopes.

24   A.   Yes.

25   Q.   Do you have any idea what the card was?

Cross - Mullett

1    A.    No.

2    Q.    During the 2012 time frame, your printing company was

3    actually operating out of your residence, correct?

4    A.    Correct.

5    Q.    And that's where -- when Mr. Thomas would meet with

6    you in Colorado Springs, that's where you'd meet, correct?

7    A.    At that time.

8    Q.    Okay.  And that's this address, 1112 Meadow Oak Drive?

9    A.    Correct.

10   Q.    So that's how Mr. Thomas knew your address.

11   A.    No, he knew me from when I was in a retail space.

12   Q.    I understand that, but knowing your home address, he'd

13   actually been there because that's where you were doing

14   business --

15   A.    Yes.

16   Q.    -- during this time period, correct?

17   A.    Yes.

18              MR. SMITH:  Your Honor, may counsel approach?

19              THE COURT:  All right.

20          (Sidebar conference at bench)

21              MR. SMITH:  Your Honor, this morning -- this

22   morning I received several documents from the Government.

23              THE COURT:  Okay.

24              MR. SMITH:  One is a -- it appears to be a

25   criminal record of this witness.

1           THE COURT:  Okay.

2           MR. SMITH:  And if I'm reading it correctly, it

3    appears that the witness has a felony tax conviction.

4           MR. FIELDS:  She was arrested but not convicted.

5           MR. SMITH:  The form says disposition:  Guilty.  I

6    don't want to go into this, but this is the only record the

7    Government's provided me.

8           MR. FIELDS:  This is the only record we have, Your

9    Honor.  We ran her criminal history immediately, and it

10   does say guilty -- that she pleaded guilty to a tax charge.

11          THE COURT:  A felony charge?

12          MR. SMITH:  Yes.

13          MR. FIELDS:  I would also represent for the record

14   that she told us that that charge was dismissed.  That's

15   what I believe her testimony would be.

16          THE COURT:  Charge 1 was dismissed; Charge 2,

17   guilty.  Right?

18          MR. FIELDS:  Yeah, that is the way I'm reading

19   it.

20          THE COURT:  Okay.  So what court is this?  Oh,

21   first of all, what's the date of the --

22          MR. SMITH:  It's in 2013, I believe, Your Honor.

23   '11 --

24          THE COURT:  2011.  So six years ago.  So, okay, so

25   it's dismissed.  What's your issue about that?

Cross - Mullett

1           MR. SMITH:  Well, I intend to ask the witness

2      about it because the record indicates to me that she has a

3      felony tax conviction for a false statement on a tax

4      return.  I normally wouldn't rely on this type of document,

5      but just having received it this morning, I . . .

6           THE COURT:  So you want to -- you want to preclear

7      an impeachment of her --

8           MR. SMITH:  I just want to --

9           THE COURT:  -- impeachment of her by a felony

10     conviction.

11           What's the Government's position?

12           MR. FIELDS:  We have no objection to that, Your

13     Honor.

14           THE COURT:  Okay.  Is this -- is that all you're

15     going to do in terms of --

16           MR. SMITH:  Yes, uhm-hum.

17           THE COURT:  -- impeachment by a prior conviction?

18     Okay.  All right.  So the Government has no objection.

19           MS. PALUCH:  And, Your Honor, while we're here.

20     This is our -- these are the UPS declarations by the

21     custodian for UPS.

22           THE COURT:  Okay.  Do we have copies for defense

23     counsel?

24           MS. PALUCH:  Yes.

25           THE COURT:  These are all copies of the same --

1          MR. FIELDS:  Yup.

2          MS. PALUCH:  Yes.

3          THE COURT:  So is this for the official --

4          MS. PALUCH:  That would be for the original.

5          MR. FIELDS:  You can keep that one.

6          THE COURT:  Okay.  Let's see.  With respect to

7    Exhibit 64, this is the 902 declarations the Government is

8    offering to function as the foundation for the authenticity

9    of the document?

10          MR. FIELDS:  Yes.

11          THE COURT:  Okay.  Does the defense disagree that

12   this complies with 902?

13          MR. SMITH:  I don't disagree that it may comply

14   with 902, Your Honor, but in the current status of this

15   case with the specter of Ms. Carr not testifying, I

16   don't -- I don't have a witness now that I can go into

17   Exhibit 64 about and identify what's in there and who

18   provided the information.  I'm effectively prevented from

19   cross-examining the document.

20          I understand this may comply with the rule, but

21   because of the situation we're in in trial, had I known

22   before trial that Ms. Carr was not going to be a witness, I

23   would have subpoenaed Pratt or someone from UPS to look

24   into what's behind this -- these documents.

25          THE COURT:  Well, but --

Cross - Mullett

1    MR. SMITH:  So I object to its admission under the
2    current status of the trial.
3    THE COURT:  I understand.  What about counsel's
4    contention that the whole purpose of the rule is if you
5    have a declaration that complies with the rule, that it
6    eliminates the -- this whole process of examination,
7    cross-examination of foundational witnesses for the purpose
8    of admission of a document?
9    MR. SMITH:  I don't --
10    THE COURT:  In other words, that -- if I accept
11    this document as complying with Rule 902, that that's the
12    end of the discussion.
13    MR. SMITH:  I don't think it is the end of the
14    discussion because what the rule talks about is it's
15    satisfying an exception to the hearsay rule as the record
16    and the documents being -- having credibility and
17    believability.
18    The status of this trial right now is I can't go
19    into Exhibit 64 and -- and identify and question the source
20    of the material and the veracity of who's there and who did
21    it.  The implication is being left at this point in time
22    that this post office box, 975 East Riggs Road, Suite 12,
23    that it's Mr. Thomas', and it isn't.
24    But I'm effectively prevented from putting on the
25    evidence to establish that.

1          THE COURT:  Mr. Fields.

2          MR. FIELDS:  Your Honor, there's no right to

3     cross-examine a document.  Let's say it's a bank record.

4     The bank record said it was Mr. Thomas' account.  You

5     wouldn't have a right to cross-examine from the bank about

6     what the record says.  The record speaks for itself.

7          The whole purpose of the business records

8     exception to the hearsay rule is that these are records

9     that were relied upon by businesses and, therefore, there's

10    an independent reason to trust their veracity.  So the

11    document, itself, comes in.

12         We're not asking for testimony about the document,

13    just the document, itself.  And this particular witness,

14    she's not really going to be testifying about the document

15    because she hasn't seen it, but it does link up that text

16    message that we referenced earlier.  So all I want to do is

17    show the jury the document, which is a business record, to

18    show that address.  That's going to be the limitation.

19         THE COURT:  Okay.  So the connection is going to

20    be that we have in Exhibit 15 the defendant texting this

21    witness a message saying "Send those documents to Riggs

22    Road in Chandler."

23         MR. FIELDS:  Correct.

24         THE COURT:  Okay.  All right.  So this is what

25    we're going to do:  With respect to 64, I'm going to allow

346
Redirect - Mullett

1    you, on redirect, to renew your request to admit it into

2    evidence and base -- and base it on this declaration.  And

3    if I allow it in, then I'm going to give you recross on

4    this document -- on 64, if it comes in.  Because obviously

5    it's not going to come in until redirect, so I'll give you

6    a recross.

7              MR. SMITH:  Fine, Your Honor.  If the witness

8    doesn't know anything about the document, so the cross

9    is --

10             THE COURT:  I understand.  So -- and we're all in

11   agreement that counsel can impeach with the criminal

12   history.

13             MR. FIELDS:  Yes, Your Honor.

14             THE COURT:  All right.  Okay.  Thank you.

15         (End of discussion at sidebar)

16             MR. SMITH:  Excuse me, Your Honor.

17             THE COURT:  All right.

18             MR. SMITH:  Thank you, Ms. Mullett.

19   I have no further questions, Your Honor.

20             THE COURT:  All right.  Redirect.

21             MR. FIELDS:  Thank you, Your Honor.  Just give me

22   a second to set up the Elmo.

23                    REDIRECT EXAMINATION

24   BY MR. FIELDS:

25   Q.   All right, Ms. Mullett, could you look at Government's

Redirect - Mullett

1    Exhibit 15 again.

2    A.   Okay.

3    Q.   What was the address -- well, first of all, let me

4    actually get you to the specific line.  It's several pages.

5    Let's look again --

6              THE COURT:  It's not in front of the jury yet.

7              MR. FIELDS:  Okay.  Thank you.

8              THE COURT:  So remember, Mr. Fields, if it's not

9    on that back screen, that's your -- that's what you know

10   the jury's looking at.

11             MR. FIELDS:  Oh, thank you very much, Your Honor.

12   BY MR. FIELDS:

13   Q.   All right.  So could we try to put Government's

14   Exhibit 15 up to the jury.  All right.  And if we go to

15   lines 56 through 57.  I believe those travel pages 2 and 3.

16             Do you remember talking about the -- those text

17   messages?

18   A.   Yes.

19   Q.   What was the address in line 57?

20   A.   975 East Riggs Road, 12-174, Chandler, Arizona 85249.

21   Q.   And I want to show you an exhibit, that's not in

22   evidence, on the Elmo.

23             Thank you very much.

24             Could you just read the -- well, just -- have you

25   ever seen this document before?

Redirect - Mullett

1    A.   No.

2              MR. FIELDS:  Your Honor, Government Exhibit 64-A

3    has been previously discussed and I would move its

4    admission into evidence.

5              THE COURT:  All right.  Is there an objection?

6              MR. SMITH:   There is, Your Honor.  Based on my

7    arguments at the bench, I would object to 64-A.

8              THE COURT:  All right.  Okay.  This is my ruling:

9    Based on the declaration that's been labeled Exhibit 64-A,

10   that's been provided to me a few moments ago, I find that

11   this declaration provides per Rule 902 the foundational

12   information necessary to admit Exhibit 64 as a business

13   record exception to the hearsay rule and, based on that,

14   the objection is overruled.

15             Government Exhibit 64 is admitted into evidence

16   and may be published to the jury.

17             MR. FIELDS:  Thank you very much, Your Honor.

18             (Government's Exhibit 64 received)

19   BY MR. FIELDS:

20   Q.   Let's look at Government's Exhibit 64.  We'll switch

21   back to the computer.

22             COURTROOM DEPUTY:  64 or 64-A?

23             MR. FIELDS:  Government Exhibit 64, which is now

24   in evidence.

25             COURTROOM DEPUTY:  Thank you.  Do you have it on

Redirect - Mullett

1    the lectern or the --

2            MR. FIELDS:  It should be on the computer.

3            COURTROOM DEPUTY:  Okay.  Thank you.

4    BY MR. FIELDS:

5    Q.   All right.  So, first of all, before your involvement

6    with this case, have you ever seen this document before?

7    A.   No.

8    Q.   What I'd like to draw your attention to, you see --

9    let's zoom in to that box, please.  All right.

10           So do you see lines 4-A, B, and C?  Do you see

11   those?

12   A.   Yes.

13   Q.   So 4-A, what does that say?

14   A.   The UPS Store No. 4060.

15   Q.   And line B, what does that say?

16   A.   975 East Riggs Road, No. 12-174, Chandler, Arizona

17   85249.

18   Q.   Is that the same address referenced in the text

19   message in Government Exhibit 15, line 57?

20   A.   Yes.

21   Q.   And if you look at box 2, what are the names listed

22   there?

23   A.   Heather Carr, Jones, Thomas.

24   Q.   Do you know Heather Carr?

25   A.   Yes.

1    Q.   Who is she?

2    A.   At the time, she was Trammel's girlfriend.

3    Q.   If we could zoom out.

4         How did you meet her?

5    A.   He brought her into the store one time.

6         MR. FIELDS:  Just one moment, Your Honor.

7         THE COURT:  Okay.

8         MR. FIELDS:  No further questions.

9         THE COURT:  All right.  Based on our discussion at

10   the bench, I'm allowing recross to the defendant.

11         MR. SMITH:  May I have one moment, Your Honor?

12         THE COURT:  You may.

13         MR. SMITH:  Based on the -- our arguments at the

14   bench, Your Honor, we continue our objection and I have no

15   questions of --

16         THE COURT:  In recross?

17         MR. SMITH:  -- recross.

18         THE COURT:  Okay.  May this witness be excused,

19   for the Government?

20         MR. FIELDS:  Yes, Your Honor.  Thank you.

21         THE COURT:  For the defendant?

22         MR. SMITH:  Yes.

23         THE COURT:  All right.  Ma'am, thank you very much

24   for your testimony.  You're excused and you may step down.

25         I think we're going to take our morning break at

1    this time.  Based on the discussion I had with counsel

2    first thing this morning, we're going to take a slightly

3    longer morning break.  We'll be in recess for 20 minutes.

4         (Recess at 10:12 a.m.)

5         (In open court out of the presence of the jury at

6    10:39 a.m.)

7              THE COURT:  Does the Government have any update on

8    the witnesses coming in?

9              MR. FIELDS:  We do, Your Honor.  Alison Stailey is

10   on her way here in a cab.  She'll definitely be here, I

11   think, by the time this witness is finished, so we'll have

12   that witness.

13             Christina Duncan is also at the airport, on her

14   way here, so we'll have another witness.  And then the

15   witness after that we think will be Marcelle Green.  Her

16   flight is set to arrive at 1:10 and she's going to come

17   immediately to the courthouse.

18             THE COURT:  All right.  You've not had additional

19   communication with Ms. Butterton?

20             MR. FIELDS:  We have not heard from Ms.

21   Butterton.

22             THE COURT:  Okay.  All right.  Let's bring in the

23   jury.

24        (Jury was present at 10:39 a.m.)

25             THE COURT:  Government may call its next

352

1    witness.

2            MR. FIELDS:  Thank you, Your Honor.  The United

3    States calls Michelle Allred.

4            COURTROOM DEPUTY:  Right here, ma'am.  If you'll

5    step up in the box, and raise your right hand.

6          MICHELLE ALLRED, GOVERNMENT'S WITNESS, SWORN

7            COURTROOM DEPUTY:  Please be seated.  State your

8    full name for the record and spell your first and last

9    name.

10           THE WITNESS:  Michelle Lee Allred.

11   M-i-c-h-e-l-l-e, A-l-l-r-e-d.

12           MR. FIELDS:  May I begin, Your Honor?

13           THE COURT:  Yes, you may proceed.

14           MR. FIELDS:  Before we start with testimony,

15   pursuant to the stipulation of the parties, I would move

16   for the admission of Government's Exhibits 57-B through

17   57-G.  57-H and -I have already been admitted.

18           THE COURT:  All right.  Given the stipulation of

19   the parties, Government Exhibits 57-B through and including

20   57-G are admitted into evidence and may be published to the

21   jury.

22        (Government's Exhibits 57-B thru 57-G received)

23           MR. FIELDS:  Thank you very much, Your Honor.

24           THE COURT:  Okay.

25                         DIRECT EXAMINATION

1   BY MR. FIELDS:

2   Q.   Ms. Allred, where do you work?

3   A.   U.S. Department of Education.

4   Q.   How long have you worked at the U.S. Department of

5   Education?

6   A.   Seven years.

7   Q.   What is your current title?

8   A.   Compliance manager.

9   Q.   And what are your responsibilities as a compliance

10  manager?

11  A.   I oversee a team of reviewers who oversee the federal

12  student aid programs.  They visit colleges and universities

13  to make sure that those entities are utilizing the funds

14  correctly.

15  Q.   Before you became a compliance manager, what was your

16  title?

17  A.   Institutional review specialist.

18  Q.   What's an institutional review specialist?

19  A.   Those are the people that go out to the colleges and

20  review the programs.

21  Q.   And you said you've been at the Department of

22  Education for seven years?

23  A.   Yes.

24  Q.   What did you do before that?

25  A.   I had had a variety of jobs that were within the

Direct - Allred

1    federal student aid industry.  I was a financial aid

2    advisor, a loan coordinator, a financial aid director, and

3    I also worked with the student loan guarantor for a number

4    of years also.

5    Q.   How long, total, have you had jobs related to federal

6    student aid?

7    A.   19 years.

8    Q.   Based on these jobs and your experience, have you been

9    able to personally observe how federal student aid is

10   processed?

11   A.   Yes.

12   Q.   Are you prepared today to tell members of the jury

13   about all that?

14   A.   Yes.

15   Q.   Are you familiar with something called Title IV?

16   A.   I am.

17   Q.   What is Title IV?

18   A.   Title IV is a program by which the federal government

19   provides funds to students to assist them in attending

20   college.

21   Q.   Who administers Title IV?

22   A.   The colleges and federal student aid.

23   Q.   What is federal student aid?

24   A.   Federal student aid is the department of the

25   Department of Education that oversees the Title IV

Direct - Allred

1    programs.

2    Q.    And the United States Department of Education, is that

3    a department or agency of the United States?

4    A.    Yes.

5    Q.    What types of programs are administered as part of

6    Title IV?

7    A.    The Pell Grant Program, the Stafford Direct Student

8    Loan Program, Supplementary Educational Opportunity Grant,

9    Federal Work Study, Parkinson.

10   Q.    Let's talk about the Stafford loans.  What is a

11   Stafford loan?

12   A.    The Stafford loan is, as it implies, money that the

13   student can borrow to pay for college.  It has to be

14   repaid.

15   Q.    Where does the money for the Stafford loans come from?

16   A.    From the federal government and taxpayers, and other

17   programs that generate funds.

18   Q.    Are there different types of Stafford loans?

19   A.    Subsidized and unsubsidized.

20   Q.    What is a subsidized Stafford loan?

21   A.    In the subsidized program, the interest does not

22   accrue for the student.  The Government pays the interest

23   on the student's behalf while the student is in school and

24   during their grace period.

25   Q.    And the unsubsidized student loan, I know it might

Direct - Allred

1    sound obvious, but what is that?

2    A.   The interest does accrue from the beginning.

3    Q.   Who's in charge of paying the interest --

4    A.   The student is responsible for that interest.

5    Q.   Are you familiar with something called a master

6    promissory note?

7    A.   Yes.

8    Q.   What is that?

9    A.   This is the document that the student signs as their

10   promise to pay the funds back to the Government.

11   Q.   It's called a master promissory note.  What is it the

12   master of?

13   A.   It's reusable.  So you sign each year that you decide

14   to borrow funds and it can be used for up to 10 years.

15   Q.   Who is responsible for paying back a Stafford loan?

16   A.   The student.

17   Q.   What happens if the money is not repaid?

18   A.   The student will go into default.

19   Q.   What are the consequences of default?

20   A.   Well, this costs the taxpayer money.  It could also

21   end up -- well, it does end up impacting the student's

22   credit.  They can have funds withheld from their tax

23   refunds, lottery winnings, wage garnishment.

24   Q.   So if the money is not repaid, you talked about the

25   consequences of default, but who ultimately bears the loss

Direct - Allred

1    of this money that's been paid out and not repaid?

2    A.    The government, the taxpayers.

3    Q.    Is there anyone else who might bear the loss?

4    A.    The school's accounts will be impacted.

5    Q.    Explain that.  How could the school be impacted?

6    A.    Well, the default rate that a student who doesn't pay

7    their money back, that number is calculated for the school.

8    All the students that borrow at that school go into an

9    annual default rate calculation.  And so if a high number

10   of students don't pay their loans back, the student -- the

11   school can risk losing their eligibility for the Stafford

12   Loan Program.

13   Q.    And are there any cases where the school might bear a

14   financial loss as a result of a loan that's not repaid?

15   A.    In instances where the student is ineligible for the

16   funds, if the school has to return those funds, the school

17   can end up on the line because they're responsible for

18   returning the money to the government and then the school

19   then would -- or the student then would be responsible for

20   returning their portion to the school, and sometimes that

21   doesn't happen.

22   Q.    You also mentioned something called a Pell Grant.

23   What is that?

24   A.    The Pell Grant is money that does not have to be

25   repaid and it's need-based.

Direct - Allred

1   Q.   Who provides the money for the Pell Grant?

2   A.   The federal government.

3   Q.   Now, you said in a Pell Grant it doesn't have to be

4   repaid?

5   A.   Correct.

6   Q.   What happens, though, if the Pell Grant -- what

7   happens to Pell Grant money if a student receives a Pell

8   Grant that later is found to be ineligible?

9   A.   The school has to return it.

10   Q.   To who?

11   A.   To the federal government.

12   Q.   And what happens if that money's already been spent?

13   A.   Then the school can end up holding the bag, so to

14   speak, in that the school, being required to return the

15   money, then might turn around and tell the student that

16   they are required to pay the school back and -- but if the

17   money's already been spent, then the school ends up in a

18   situation where they're owed money.

19   Q.   Talking about Title IV, does every school participate

20   Title IV?

21   A.   No.

22   Q.   How do schools decide to participate in Title IV?

23   A.   There's an application process.  So they determine if

24   they have programs that are eligible and students who need

25   the assistance, and they apply to federal student aid with

Direct - Allred

1    the -- a description of the school, the programs that

2    they're offering, and who, within their organization, will

3    be administering the programs.

4    Q.   Before your testimony today, did you review Department

5    of Education records to determine whether certain schools

6    participated in Title IV between 2010 and 2012?

7    A.   Yes.

8    Q.   What about Chandler-Gilbert Community College?

9    A.   Yes.

10   Q.   They participated?

11   A.   They did.

12   Q.   Did the Community College of Denver participate in

13   Title IV?

14   A.   Yes.

15   Q.   Did Mesa Community College participate in Title IV?

16   A.   Yes.

17   Q.   Did Pikes Peak Community College participate in Title

18   IV?

19   A.   Yes.

20   Q.   Did Phoenix College participate in Title IV?

21   A.   Yes.

22   Q.   Did Pueblo Community College participate in Title IV?

23   A.   They did.

24   Q.   And what about Red Rocks Community College?

25   A.   Yes.

Direct - Allred

1    Q.   All right.  Let's switch gears a little bit.  We've

2    talked about Title IV, but now I wanted to talk about

3    something else.

4         Are you aware of the document called the Free

5    Appication for Federal Student Aid?

6    A.   I am.

7    Q.   What is that?

8    A.   This is the application that the student fills out to

9    let the school and federal student aid, the Department of

10   Education, know that they're interested in applying for

11   assistance -- financial assistance for colleges.

12   Q.   Is it also sometimes called the FAFSA?

13   A.   It is.

14   Q.   How does someone get access to the FAFSA?

15   A.   It's either on paper or electronic.  You can go to

16   *fafsa.ed.gov* or *fafsa.gov*.

17   Q.   Those web sites that you mentioned, who controls those

18   websites?

19   A.   The federal government, Department of Education.

20   Q.   And who administers the websites?

21   A.   The federal student aid.

22   Q.   This FAFSA form, who can use it?

23   A.   Any person who intends to enroll in college.

24   Q.   Is it possible to get federal student aid funds

25   without first filling out a FAFSA?

Direct - Allred

1    A.    No.

2    Q.    Why not?

3    A.    Because that is the requirement before a student is

4    eligible.  They must provide the information on this

5    document which, in turn, generates a report to the school

6    and determines and describes the student's eligibility to

7    the school.

8    Q.    So earlier we were talking about Stafford loans and

9    Pell Grants.  When it comes to those forms of aid in

10   particular, can someone get those forms of aid without

11   first filling out a FAFSA?

12   A.    No.

13   Q.    Who has access to the information in the FAFSA after

14   it's submitted to the Department of Education?

15   A.    The Department of Education and the schools that the

16   student lists on the FAFSA.

17           MR. FIELDS:  Your Honor, I forgot one exhibit at

18   the beginning.  It's Government's Exhibit 30.  The parties

19   have also stipulated to its admission.  At this time I

20   would move that it be admitted.

21           THE COURT:  One second.  All right.  Given the

22   stipulation of the parties, Government Exhibit 30 is

23   admitted into evidence and may be published to the jury.

24       (Government's Exhibit 30 received)

25   BY MR. FIELDS:

                            Direct - Allred

1    Q.   All right.  It's got its big title up at the top.

2    What are we looking at here?

3    A.   The Federal Application for Federal Student Aid.

4    Q.   Let's zoom out a little bit.  This is a document

5    that's several pages?

6    A.   Yes.

7    Q.   Page 1.  And then let's go to page 2.

8            Those are just general instructions on how to fill

9    out the form?

10   A.   Correct.

11   Q.   Let's look at page 3, then.

12           So do you see up at the top, it says Step 1, and

13   then Student.  What is step 1 of filling out the FAFSA?

14   A.   This is demographic information about the student.

15   Basic information like your Social Security number, your

16   date of birth, and contact information.

17   Q.   So Social Security number.  Why does the Department of

18   Education need anyone's Social Security number?

19   A.   To determine identity and -- and eligibility.

20   Q.   What about date of birth?  Why does the Department of

21   Education need that?

22   A.   The same.  To determine identity and eligibility.

23   Q.   So identity, why is it important to determine

24   identity?

25   A.   Well, since this program is eligible to specific

Direct - Allred

1    people, we need to determine that the money that is
2    delivered for that person is who they say they are.
3    There's maximums of what a student can receive and so it's
4    important that the right person receive those funds so that
5    they don't run out of their eligibility before they're
6    realizing that they're out of funds.  If somebody else is
7    using their identity, then they don't have access to their
8    funds when they need them.
9    Q.    Does the Department of Education rely on the
10   information, the Social Security number, and the date of
11   birth, when they're making decisions about whether someone
12   qualifies for student aid?
13   A.    Yes.
14   Q.    So what happens if the information in this section is
15   not truthful?
16   A.    Well, then the wrong person can be receiving funds.
17   Q.    And this form also asks for a street address.  Why
18   does the Department of Education ask for a street
19   address?
20   A.    We use that to communicate with the student.
21   Q.    Is that information important?
22   A.    It is because the student will need to be receiving
23   documentations.  There's information that can come to the
24   student electronically and in the mail.
25   Q.    And then it also asks for an e-mail address.  How does

Direct - Allred

1    the Department of Education use an e-mail address?

2    A.   We do communicate with the student electronically as

3    well; confirmation that the form has been sent and

4    processed.

5    Q.   Now, a little bit further down on the form, it asks

6    whether someone's got a high school diploma.  How is that

7    information used?

8    A.   The information is utilized because in order to be

9    eligible for student aid, a student needs to either have a

10   high school diploma or a GED, or, before 2012, show the

11   ability to benefit from higher education.

12   Q.   That high school diploma, do some schools ask for

13   evidence of a high school diploma?

14   A.   Yes.

15   Q.   Why do they do that?

16   A.   To -- to prove that the student is being truthful on

17   the FAFSA.

18   Q.   Now let's look at page 4.  We've been on page 3 so

19   just the very next page.

20        Now here, we've finished up 1, with all that

21   information.  It says step 2, Students.  What information

22   goes in the step 2?

23   A.   This is income information particularly related to tax

24   forms and other sources of income for the student.

25   Q.   And why does the Department of Education need the

Direct - Allred

1    information that's in step 2?

2    A.    Because some of the programs that the students are

3    eligible for are need-based.

4    Q.    So does the Department of Education rely on the

5    information that's in step 2?

6    A.    Yes.

7    Q.    How does it rely on that information?

8    A.    They use the numbers there to calculate something

9    called the expected family contribution, which is a number

10   that's utilized in determining need.

11   Q.    So expected family contribution used to determine

12   need.   Let's break that down.

13         Expected family contribution, what is that?

14   A.    So this would be the amount of money that, based on

15   crunching of the numbers in the FAFSA, which include the

16   income and household size, this is the amount that is the

17   output number.   And the Government is saying you can afford

18   to pay this number of dollars towards your school based on

19   the numbers you have given us.

20   Q.    And how does that expected family contribution impact

21   the amount of aid that is given?

22   A.    The lower the expected family contribution, the higher

23   the need-based data.

24   Q.    So in section 2, all of the information that's

25   required there, what if the information in that section is

Direct - Allred

1   not truthful?

2   A.   Then the student could end up receiving more aid or

3   less aid that's need-based than they're eligible for.

4   Q.   Now, if we go to the next page.  Step 2.

5          So the next one is step 3.  And it also says

6   Student.  What information goes into step 3?

7   A.   This is information that helps determine the student's

8   dependency status.  A student who's married or born before

9   a certain date or served in the Armed Services -- there's

10  also a few other categories -- they would be considered

11  independent and only their information is asked for on this

12  form.

13         If a student is considered dependent, then they

14  still are required to include their parents' information on

15  the form.

16  Q.   Does the Department of Education rely on the

17  information that's in this part of the form?

18  A.   Yes.

19  Q.   How does it rely on that information?

20  A.   To determine which questions need to be answered by

21  the student.

22  Q.   And whether someone's designated a dependent or an

23  independent, how does that affect the amount of financial

24  aid they might get?

25  A.   Well, they can affect it greatly.  If you have more

1    resources and if your parents' information is included,
2    sometimes your information -- your eligibility for
3    financial aid could either increase or decrease based on
4    what information is provided.
5    Q.   Now let's go on to page 5.  So I think -- is this
6    page 6?  Okay.  Page 6, step 4.  So step 1, step 2, step 3.
7            We have step 4.  What information goes into this
8    part of the form?
9    A.   This is a parent's identity and household.
10   Q.   And same questions I've been asking before, what --
11   why is this information important to the Department of
12   Education?
13   A.   Well, this -- the household size, particularly, is
14   important because the higher number of people that you have
15   in your household, the more money that you need to support
16   those number of people.  So if you pro -- identify the same
17   amount of money by a higher number of people, your expected
18   contribution is going to go down because you can afford to
19   pay less.
20   Q.   And if your expected family contribution goes down,
21   what does that do to the amount of student aid money?
22   A.   It increases it.
23   Q.   So what happens if the information in this section of
24   the form is untruthful?
25   A.   Then the student can receive more information -- more

1    financial aid than they're eligible for.

2    Q.   All right.  So step 4.  Now let's move on.  After 4

3    comes 5.

4         So step 5.  It says step 5, Student.  What goes

5    into step 5?

6    A.   This is the student's household information.  So for a

7    student who's independent, they would include their

8    household information, how many people are in their family,

9    and how many of them are in college.  There's also some

10   questions about public programs that the student might be

11   participating in, like food stamps or other public

12   programs.

13        And then there's also, let's see -- you didn't ask

14   about step 6 yet.  I'll wait.

15   Q.   Yeah, we'll get to step 6.  But same question that

16   I've asked with steps 1, 2, 3, and 4:  In step 5 why is

17   this information important?

18   A.   To help determine the amount of aid the student's

19   eligible for can impact it.

20   Q.   So what if the information in step 5 is untruthful?

21   A.   A student can receive more financial aid than they're

22   eligible for.

23   Q.   Now on to step 6.  What are you doing in step 6?

24   A.   This is where the student would like their information

25   sent and where they plan on living -- on campus, with

1    parent, off campus -- so they can list the colleges there

2    that they want this to be sent to.

3    Q.   So what happens if a student puts a college on the

4    step 6?

5    A.   Then that school will receive the information.

6    Q.   Now, finally, let's go to step 7.  This one is Student

7    and Parent.  What is this?

8    A.   This is the promise that the information provided on

9    the form is accurate.

10   Q.   Is this an important part of the FAFSA form?

11   A.   Yes.

12   Q.   How so?

13   A.   Because it is promising that the information is --

14   that you are who you say you are, that the information has

15   been answered to the best of your ability, and that you're

16   being truthful.

17   Q.   Does the form describe the consequences of giving

18   false or misleading information on the FAFSA?

19   A.   It does.

20   Q.   What are the consequences?

21   A.   If you purposely give false and misleading

22   information, you may be fined up to $20,000, sent to

23   prison, or both.

24   Q.   The certification also says in bold -- do you see that

25   right there?

Direct - Allred

1    A.    Uhm-hum.

2    Q.    What does it say in bold?

3    A.    The Secretary of Education has the authority to verify

4    information reported on this application with the Internal

5    Revenue Service and other federal agencies.

6    Q.    What does it mean to verify?

7    A.    Well, that means we're going to compare the

8    information entered in the form with the entities that we

9    have contact with.  And we have arrangements with the IRS

10   to compare tax forms to this data.

11   Q.    Is every FAFSA application verified?

12   A.    The -- about 30 percent of applications are verified

13   by the school.  It's sort of a separate process than the

14   IRS verification.  The student has the ability, during the

15   application process, to pull information directly from the

16   IRS into the form and that's where we communicate directly.

17         The verification process, the school could request

18   copies of tax transcripts to provide to the school to

19   participate in the actual verification process.  So every

20   student has the ability to communicate directly with the

21   IRS through this form, but only 30 percent are selected for

22   a secondary verification process through their school.

23   Q.    Why only 30 percent?  Why not verify every single one

24   of these things?

25   A.    Well, the administrative burden to process that many

Direct - Allred

1    applications on the level of detail that is occurring

2    during the verification process would be significant.

3    Q.   That 30 percent, how is it determined which

4    applications are going to be verified and which are not?

5    A.   Some of it is random.  There are certain things that

6    could trigger a verification.  If there's information that

7    looks like it might be inaccurate, like a high household

8    size and a really low income amount, it might trigger a

9    student getting selected for verification.

10   Q.   So at the bottom -- so this is step 7.  There's a box

11   right here in the bottom left-hand corner.  Do you see

12   that?

13   A.   Yes.

14   Q.   And then it's got 104, 105, 106.  I'm just designating

15   that so we know what we're talking about.  What goes into

16   that box?

17   A.   This would be if somebody besides the student is

18   preparing the FAFSA for the student for a fee.

19   Q.   Is that allowed?

20   A.   It is.

21   Q.   Why is it important to know who helped prepare a

22   FAFSA?

23   A.   Well, if the information is a lie, then you want to

24   know whose advice it was that the lie was given.

25   Q.   And who actually signs this certification; the

Direct - Allred

1    preparer or the person who's providing the information?

2    A.   This is the preparer's signature.

3    Q.   But the certification that's above, does the person

4    actually submitting this FAFSA have to sign the

5    certification?

6    A.   They're admitting the same truth in that step on

7    behalf of the student.

8    Q.   Okay.  Either, whether it's the preparer or the

9    student?

10   A.   Correct.

11   Q.   Now, line 103 is the line for Student Sign Below.

12   A.   Correct.

13   Q.   Does it require that the FAFSA be signed?

14   A.   Yes.

15   Q.   But earlier you were talking about how a lot of FAFSAs

16   are submitted through the internet.

17   A.   Right.

18   Q.   So you can't sign a computer screen.  How do you sign

19   an electronic FAFSA?

20   A.   There's a PIN process.  The student applies for

21   federal student aid for a PIN number that they can use to

22   sign.

23   Q.   What is a PIN number?

24   A.   A PIN number is a four-digit number similar to your

25   debit card or banks and authorization code that you use to

                        Direct - Allred

1    sign and say, "This is me."  It's individually assigned.

2    Q.   So how do you know whether or not a PIN number is

3    associated with a particular person just like a signature?

4    A.   The Government keeps track of that through a system

5    called STAN.

6    Q.   STAN?

7    A.   It's a -- it's a -- it is the identification system

8    that pairs up people with their PIN numbers.

9    Q.   So that PIN number, is it unique to every

10   individual?

11   A.   Yes.

12   Q.   And, you know, we just went through a paper FAFSA

13   form, but you say it's available online.  Is the online

14   form any different?

15   A.   No, it's identical.

16   Q.   And if you go back to Government Exhibit 30 and you go

17   to page 1, up at the top, that's for July 1st, 2011, to

18   June 30th, 2012?

19   A.   Yes.

20   Q.   Was the form any different in the year prior, so July

21   1st, 2010, to June 30th, 2011?

22   A.   No.  It's the same.

23   Q.   When the Department of Education gets information of

24   FAFSA through the internet, does it reformat that

25   information?

Direct - Allred

1    A.    Yes.

2    Q.    What is the format that they use?

3    A.    There's an archive format, there's a student aid

4    report and a ISIR, which is the Institutional Student

5    Information Report.

6    Q.    So let's look at Government Exhibit 57-B, which was

7    already admitted.  What is this?

8    A.    This is the -- this is the Inspector General's format

9    for archiving the information.

10   Q.    Is this a FAFSA --

11   A.    It is.

12   Q.    It doesn't look like Exhibit 30.  Why is that?

13   A.    Because this is the output document that includes just

14   the answers.

15   Q.    So -- and, actually, let's get a binder in front of

16   you so you can look at that.  It would be in binder No. 2,

17   please.

18            COURTROOM DEPUTY:  57-B?

19            MR. FIELDS:  Yes, please.

20   BY MR. FIELDS:

21   Q.    So if you look through Government Exhibit 57-B, based

22   on the information that's in that document, can you tell

23   who submitted it?

24   A.    Yes.  The student submitted this application online.

25   Q.    How can you tell that?

Direct - Allred

1    A.   Because on the last page of the document, there is a

2    field called Origin of FAFSA Source, and it says "web

3    student."

4    Q.   Does the application identify the schools that were of

5    interest to this student?

6    A.   Yes.   This student was interested in Colorado

7    Technical University and Pikes Peak Community College.

8    Q.   Was this -- so this is a FAFSA, but it was filled out

9    on the internet.   Was a certification signed?

10   A.   Yes.

11   Q.   How can you tell?

12   A.   Because it says there was an electronic signature on

13   the field that says Student's Signature Indicator.

14   Q.   Let's go back to page 1.   I got a little bit ahead of

15   myself.

16        What is the name of the student for which this

17   FAFSA was submitted?

18   A.   Ismael Omar.

19   Q.   Is there an address listed on this?

20   A.   3820 Radiant Drive, No. 239, Colorado Springs.

21   Q.   How would the Department of Education respond if the

22   address listed there wasn't a house like this, but was,

23   instead, a state prison?

24   A.   I don't know that we're cross-referencing for that

25   particular item.

376

Direct - Allred

1   Q.   At this year in question -- the year in question, were

2   state prisoners eligible to receive federal student aid?

3   A.   No.

4   Q.   And earlier we went through the various steps of a

5   FAFSA form, so here, how much income did the student report

6   for purposes of determining financial aid?

7   A.   Zero.

8   Q.   So generally speaking, what is the effect of reporting

9   no income?

10  A.   Then the expected family contribution would also be

11  zero.

12  Q.   And if the expected family contribution is zero, what

13  does that do to the amount of student aid it might get?

14  A.   It increases it.

15  Q.   So now let's look at Government Exhibit 57-C, which

16  has also been admitted into evidence.

17          What is this?

18  A.   This is the master promissory note.

19  Q.   Do you see there's a black box that says section C?

20  A.   Yes.

21  Q.   And then there are items 12-A and 12-B.  Do you see

22  those?

23  A.   Yes.

24  Q.   You can blow them up.

25          What is that?

Direct - Allred

1    A.   This is the certification that the information is true

2    and correct to the best of the signer's knowledge, and that

3    the belief that the information is true is made in good

4    faith, and that the proceeds of the loan will be used for

5    authorized educational expenses.

6    Q.   And why is it important that the information in the

7    master promissory note be true?

8    A.   So that the correct eligible student receives

9    financial aid.

10   Q.   And item 12-B talks about authorized educational

11   expenses.  What are authorized educational expenses?

12   A.   Expenses that are related to the attendance of the

13   student in college, which can include living expenses.

14   Q.   Would it include vacations?

15   A.   No.

16   Q.   And what if a student wants to pay for something

17   that's not authorized?

18   A.   Then they're not allowed to do that.

19   Q.   Is there a signature page for this master promissory

20   note?

21   A.   The -- yes.

22   Q.   Where is that?

23   A.   The first time that it is signed, either on paper or

24   electronically, the signature is attributed to this

25   document, and so it would be -- for the electronic version,

Direct - Allred

1    it would be corrected as part of the PIN number that they

2    can use to sign through our -- the federal student aid

3    system of record.

4    Q.   The same PIN used to sign the FAFSA?

5    A.   Correct.

6    Q.   And what does that signature indicate once it's on the

7    master promissory note?

8    A.   That the student promises to repay the funds and that

9    the information is correct.

10   Q.   Now, let's look at -- well, first, just for purposes

11   of the record, do you see the name for the student who got

12   the loan here?

13   A.   Yes.

14   Q.   Who is that?

15   A.   Ismael Omar.

16   Q.   All right.  Now let's look at Government 57-D.  Are

17   you familiar with this document?

18   A.   Yes.

19   Q.   What is it?

20   A.   This is a summary of loans received by Ismael Omar.

21   The money was disbursed to the school, which means it was

22   transferred and paid to the school on behalf of the student

23   at Pikes Peak Community College.

24   Q.   What loans did this student receive?

25   A.   A direct Stafford subsidized loan and a direct

Direct - Allred

1    Stafford unsubsidized loan.

2    Q.   In what amounts?

3    A.   3500 and 3510.

4    Q.   And why did the student get a subsidized loan?

5    A.   Because they demonstrated need.

6    Q.   And if you go to page 2 of the Government Exhibit

7    57-D, what is listed on page 2?

8    A.   This is the scheduled amount of the loan, which is

9    5550.  And the amount that the school received for the --

10   oh, this is -- yeah, this is a Pell Grant, and the amount

11   that was disbursed to the school on behalf of the student

12   was 4163 for the federal Pell Grant to Pikes Peak Community

13   College.

14   Q.   So going back, the first -- at first you seemed to

15   mention this was a loan, but is this actually for the

16   grant?

17   A.   It is for the grant.  I apologize.

18   Q.   And what does it say at the top?

19   A.   Grant Data.

20   Q.   Okay.  Do all students get Pell Grants?

21   A.   No.

22   Q.   Why did this student get a Pell Grant?

23   A.   They demonstrated need on the FAFSA.

24   Q.   How did they demonstrate need?

25   A.   By the information that was presented.  It described a

Direct - Allred

1    situation that a student would need -- would demonstrate

2    need with low income, perhaps high family size.

3    Q.   All right.  So we won't go through all of these

4    documents, but I do want to go through a couple of

5    additional examples.  So let's look at Exhibit 57-E.

6              What is the name of the student on this FAFSA?

7    A.   Virginia Jones.

8    Q.   Is this student identified by Social Security number

9    and date of birth?

10   A.   Yes.

11   Q.   How much income did Virginia Jones report on the

12   FAFSA?

13   A.   None.

14   Q.   And if you go to -- actually, on the last page, what

15   school did this student aspire to attend?

16   A.   Pikes Peak Community College.

17   Q.   Was this application also signed?

18   A.   Yes, electronically by the student.

19   Q.   How was this FAFSA submitted?

20   A.   On the web.

21   Q.   Now let's look at Government Exhibit 57-F.

22             What is the name of the student?

23   A.   Robert Pickens.

24   Q.   Also identified by Social Security number and date of

25   birth?

381

Direct - Allred

1    A.    Yes.

2    Q.    How much income did Mr. Pickens report to the --

3    A.    Zero.

4    Q.    And what college did Mr. Pickens aspire to attend?

5    A.    Pikes Peak Community College.

6    Q.    Is this also signed?

7    A.    Yes.  Electronically on the web.

8    Q.    How was this FAFSA submitted?

9    A.    Through the website.

10   Q.    Let's look at Government Exhibit 57-G.

11         What is this student's name?

12   A.    This is Eddie Jones.

13   Q.    Identified by Social Security number and date of

14   birth?

15   A.    Yes.

16   Q.    How much income did Mr. Jones report?

17   A.    Zero.

18   Q.    And if you go to the last page, to what college did he

19   aspire to attend?

20   A.    Pikes Peak Community College.

21   Q.    This was also signed?

22   A.    Yes.

23   Q.    How was it submitted?

24   A.    Electronically.

25   Q.    Now before we move on to three additional examples, I

382

Direct - Allred

1    want you to look at 57-E, F, and G, so side-by-side.  You

2    can take them out of the binder if you need to.

3           Do you have E, F, and G all up in front of you?

4    A.   I do.

5    Q.   Now, if you please look at the listed address on each

6    of those FAFSAs.

7    A.   Yes, they're the same.

8    Q.   What is that address?

9    A.   1418 Rushmore Drive, Colorado Springs.

10   Q.   All right.  You can put those -- just set those off to

11   the side, we'll put them back in the binder later.

12          57-H, let's pull that one up.

13          And, you know, same thing we did with the earlier

14   ones:  What is the name of this student?

15   A.   Dennis Miller.

16   Q.   Identified by Social Security number and date of

17   birth?

18   A.   Yes.

19   Q.   How much income did Mr. Miller report to the

20   Department of Education?

21   A.   Zero.

22   Q.   And what college did Mr. Miller aspire to attend?

23   A.   Pikes Peak Community College.

24   Q.   How was this signed?

25   A.   Electronically.

Direct - Allred

1   Q.   How was it submitted?

2   A.   On the web.

3   Q.   All right.  One more.  57-I.

4        What's the name of this student?

5   A.   Manuel Abate.

6   Q.   And identified by Social Security number and date of

7   birth?

8   A.   Yes.

9   Q.   How much income did Mr. Abate report to the Department

10  of Education?

11  A.   Zero.

12  Q.   What college did Mr. Abate aspire to attend?

13  A.   Pikes Peak Community College.

14  Q.   How was -- was this signed electronically?

15  A.   Yes.

16  Q.   How was it submitted?

17  A.   On the web.

18  Q.   So, again, if you could pull out 57-H and -I.  And

19  just lay them side-by-side, please.

20  A.   Uhm-hum.

21  Q.   Do you -- look at the listed address.  What do you

22  notice?

23  A.   They're the same.

24  Q.   What is the address?

25  A.   1112 Meadows Oak Drive, Colorado Springs.

Direct - Allred

1    Q.   All right.  We've talked about these FAFSAs, the

2    FAFSAs used by the student to get aid.  But you mentioned

3    earlier, I think, that schools also participate in

4    financial aid programs.

5    A.   Yes.

6    Q.   So how does a school participate in a financial aid

7    program?

8    A.   Well, they -- when they apply for eligibility and

9    they're granted access, then they begin requesting funds.

10   Q.   What does the school have to do in order to

11   participate in a Title IV program?

12   A.   They submit their application to federal student aid,

13   explaining their programs and the administration of those

14   programs.

15   Q.   Must they have a staff that can review financial aid

16   applications?

17   A.   Yes.

18   Q.   Would they also need staff that can verify

19   applications?

20   A.   Correct.

21   Q.   Once that information's submitted to the Department of

22   Education through the FAFSA, can a school get access to it?

23   A.   Yes.

24   Q.   How does the school get access?

25   A.   The student requests that the school have access.

385

Direct - Allred

1    Q.   And you testified earlier that the Department of

2    Education relies on the information in the FAFSA.  Do the

3    schools also rely on that information?

4    A.   Yes.

5    Q.   How?

6    A.   Well, the student uses that information to make the

7    award to the student -- the school does.

8    Q.   So how, if at all, might the school be harmed if the

9    information in the FAFSA is not truthful?

10   A.   Well, the information that the school uses to make the

11   awards determines how much money the student receives, and

12   if it turns out that the student is ineligible, then the

13   school could be on the hook for those funds if they have to

14   return them.

15   Q.   After the school gets the information in the FAFSA,

16   what do they do when they get it?

17   A.   They review it for action on their part to determine

18   if it needs to be verified and then they -- once that

19   process is completed, they look for any additional missing

20   information that they might need to determine if they have

21   all the answers to make the award.  And then they award the

22   student based on the rules of the programs.

23   Q.   Who gets the financial aid money after that process is

24   finished?

25   A.   The school is the -- the money is delivered directly

Direct - Allred

1   to the school.

2   Q.   What does the school do with it?

3   A.   They apply that money to eligible expenses, the

4   tuition and fees.

5   Q.   If a school gets both a Pell Grant and a Stafford

6   loan, are there any rules governing how that money is

7   distributed?

8   A.   The Pell pays first.

9   Q.   That's just pursuant to the regulations?

10  A.   Yes.

11  Q.   So when you say the Pell pays first, what do you mean

12  by that?

13  A.   The funds that are utilized on the student's behalf

14  for tuition and fees and whatever eligible expenses there

15  are, if a Pell Grant and a Stafford loan are received, the

16  Pell Grant would be applied towards that money -- towards

17  those expenses first.

18  Q.   What happens if there's money left over after tuition

19  and fees are deducted?

20  A.   Then the student gets what's called a credit balance

21  refund.

22  Q.   Generally speaking, is the tuition for community

23  colleges on the high end or the low end of tuition for

24  universities?

25  A.   It's lower.

Direct - Allred

1    Q.   As a result, is the student's refund likely to be
2    higher or lower than it would be at a school?
3    A.   It's likely to be higher.
4    Q.   So students gets the rest.  How does a school actually
5    get the money to the student?
6    A.   They -- it can be a debit card or direct deposit to
7    the bank account or a paper check.
8    Q.   How does the school know where to send the paper check
9    or a debit card?
10   A.   The student determines that.
11   Q.   How?
12   A.   By communicating with the school as to their
13   preference.
14   Q.   As to their preference as to how they would like to
15   get the aid?
16   A.   Correct.
17   Q.   How does the school know what address to send the card
18   to?
19   A.   The student provides that information.
20   Q.   Are there certain requirements a student has to meet
21   in order to earn their student aid?
22   A.   They -- yes.
23   Q.   What are their requirements?
24   A.   Well, they do have to begin school and they have to
25   continue attending school and participating.

Direct - Allred

1    Q.    Have you heard of something called a Return to Title

2    IV?

3    A.    Yes.

4    Q.    What is that?

5    A.    That's the process by which the school is required to

6    determine how much aid a student has received if they stop

7    attending school, either with notice or without notice.

8    Q.    So what happens if the school needs to return money to

9    Title IV, but the student's already spent the money?

10   A.    Then the school can end up re -- sending that money --

11   having to send that money back to the Government, which

12   then puts them in a situation where they're owed money by

13   the student.

14   Q.    And what happens if the student doesn't pay the

15   school?

16   A.    Then the school is owed that money, then they're in a

17   position -- they're short.

18   Q.    Ultimately, if someone gets a loan without intending

19   to pay it back, who suffers?

20   A.    The school can suffer, the taxpayer can suffer, the

21   government.

22   Q.    One last general question.  Back in the period between

23   2010 and 2012, were prison inmates eligible for federal

24   student aid?

25   A.    Not state and federal.

Direct - Allred

1   Q.   If a prison inmate had applied, what would have

2   happened?

3   A.   They would be denied.

4   Q.   So would a prison inmate have been able to get a debit

5   card mailed to them in prison?

6   A.   No.

7            MR. FIELDS:  One moment, Your Honor.

8            THE COURT:  Sure.

9            MR. FIELDS:  No further questions, Your Honor.

10           THE COURT:  All right.  Thank you.

11   Cross-examination.

12           MR. GOODREID:  Your Honor, may I have just a

13   moment, please?

14           THE COURT:  Yes.

15           MR. GOODREID:  Your Honor, I have no questions for

16   this witness.

17           THE COURT:  All right.  May this witness be

18   excused, for the Government?

19           MS. PALUCH:  Yes, Your Honor.

20           THE COURT:  All right.  For the defendant?

21           MR. GOODREID:  Yes.

22           THE COURT:  Ms. Allred, thank you for your

23   testimony.  You may step down.  You're excused.

24           THE WITNESS:  Thank you.

25           THE COURT:  All right, the Government may call its

Direct - Stailey

1    next witness.

2              MS. PALUCH:  Thank you, Your Honor.  The United

3    States calls Alison Stailey.

4              COURTROOM DEPUTY:  Go ahead and step in the box

5    and raise your rights hand.

6              ALISON STAILEY, GOVERNMENT'S WITNESS, SWORN

7              COURTROOM DEPUTY:  Please be seated.  State your

8    full name for the record and spell your first and last

9    name.

10              THE WITNESS:  My full name is Alison Stailey.

11    It's A-l-i-s-o-n, S-t-a-i-l-e-y.

12              MS. PALUCH:  May I proceed, Your Honor?

13              THE COURT:  Yes, you may, counsel.

14                        DIRECT EXAMINATION

15    BY MS. PALUCH:

16    Q.   Good morning, ma'am.

17    A.   Good morning.

18    Q.   What is your educational background?

19    A.   I have a bachelor's degree in management information

20    systems and a master's degree in computer science.

21    Q.   And how are you employed?

22    A.   I work for a company called Mandiant.

23    Q.   What type of company is that?

24    A.   It's an incident response consulting company.  So when

25    companies get hacked or have some sort of security

Direct - Stailey

1    incident, they hire my company to investigate and determine
2    what happened.
3    Q.   Generally what are your duties and responsibilities?
4    A.   I'm an incident response consultant, so I'm part of
5    the investigative team that investigates those security
6    breaches.
7    Q.   How long have you been employed by Mandiant?
8    A.   A little over two years.
9    Q.   Before working for that company, where did you work,
10   ma'am?
11   A.   I worked for the United States Department of Education
12   in the Office of Inspector General.
13   Q.   Did you work in a particular division within the
14   Office of Inspector General?
15   A.   Yes, I worked in the Technology Crimes Division.
16   Q.   And was that for a specific department?
17   A.   For the Department of Education.
18   Q.   Okay.  And what does the Technology Crimes Division
19   do?
20   A.   It provides computer forensic support and analysis in
21   support of any of the Office of Inspector General's
22   investigations into fraud, waste, or abuse of the
23   department's programs.
24   Q.   I'd like to take you to 2012 to 2014.  What was your
25   title during -- titles during that time period?

Direct - Stailey

1   A.   I was a senior forensic analyst as well as the digital

2   forensics team lead.

3   Q.   What would be your responsibilities in those

4   positions?

5   A.   As a senior forensic analyst, I conducted computer

6   forensic exams in support of any of the department's

7   investigations or audits into fraud or waste of the

8   programs -- the department's programs.  I also would assist

9   with on-site acquisitions of any computer or computer

10  media, for example in support of the execution of search

11  warrants.  And I would repair -- prepare reports of my

12  analysis and findings.

13        And as a team lead, I was responsible for the

14  management of our digital forensics lab, which included the

15  budget, the equipment, assigning examinations to other

16  staff members, reviewing all reports that came through the

17  department.

18  Q.   Ma'am, did you receive specialized training for work

19  in computer forensics?

20  A.   Yes, I did.

21  Q.   And in your line of work, are there software programs

22  that you use as a computer forensic examiner for which you

23  received specialized training?

24  A.   Yes.  In particular, I've been trained on Access

25  Data's Forensic Tool Kit, or FTK, and a device called

Direct - Stailey

1    Cellebrite's UFED Touch, that's U-F-E-D, Touch, and it's

2    primarily for acquiring information from the local devices.

3    Q.   Are those programs generally accepted by computer

4    forensic examiners?

5    A.   Yes.

6    Q.   While employed by the Department of Education, can you

7    estimate approximately how many computer forensic

8    examinations you performed?

9    A.   Probably examined hundreds of electronic devices while

10   I was employed there.

11   Q.   Is it a regular practice for your work to be

12   peer-reviewed --

13   A.   Yes.

14   Q.   -- when you analyze computers?

15   A.   Yes.

16   Q.   Can you explain that?

17   A.   Yes.  Every report that -- or every exam and every

18   report that we write goes through a peer review process.

19   Not just a peer review, but a quality assurance review and

20   then a supervisory review before it's issued as a final

21   product, so it's generally reviewed three times.

22   Q.   Have you served as an instructor in computer

23   forensics?

24   A.   Yes, I have.

25   Q.   Approximately how many times would you say you've done

1    that?

2    A.    During my master's program, I was a teaching assistant

3    for the computer forensics course, so that was an entire

4    semester.  And then in my professional career, I've taught

5    probably 15 or 20 times.

6            MS. PALUCH:  Your Honor, at this -- oh, I would

7    back up.

8    BY MS. PALUCH:

9    Q.    Who were you instructing, ma'am?

10   A.    When I was at the Department of Education, I would

11   instruct fellow employees, other forensic examiners, how to

12   use our tools and what our policies and procedures were and

13   how to conduct forensic exams.

14           In my current role at Mandiant, we sell an

15   incident response course to our clients where we help teach

16   security professionals for other companies how to respond

17   to a security incident.  So I teach that course in my

18   current position.

19           MS. PALUCH:  Thank you.  Your Honor, at this time,

20   the Government tenders Ms. Alison Stailey as an expert in

21   computer forensic analysis in this case.

22           THE COURT:  Any objection?

23           MR. GOODREID:  No objection, Your Honor.

24           THE COURT:  All right.

25   BY MS. PALUCH:

395

Direct - Stailey

1    Q.   Ms. --

2              THE COURT:  Hold on.

3              MS. PALUCH:  Oh, I apologize, Your Honor.

4              THE COURT:  There being no objection, Ms. Stailey

5    is qualified under Federal Rule of Evidence 702 to give

6    expert opinion testimony in the field of computer forensic

7    analysis.

8              MS. PALUCH:  Thank you, Your Honor.

9    BY MS. PALUCH:

10   Q.   Ms. Stailey, were you asked to work on this case?

11   A.   Yes.

12   Q.   And what work did you do?

13   A.   I did computer forensic analysis of mobile devices and

14   hard drives that were seized during this investigation.

15   Q.   And the mobile devices, did that include cell phones?

16   A.   Yes.

17   Q.   Let's start with cell phones.  Did you examine the

18   actual phones?

19   A.   Yes, I did.

20   Q.   Okay.  And did you extract data from those phones?

21   A.   Yes, I did.

22   Q.   And did you analyze that data from the phones?

23   A.   Yes.

24   Q.   And were images made of the data?

25   A.   Yes.

Direct - Stailey

1    Q.   And where were the original images of the cell phone

2    data maintained?

3    A.   The original images are maintained in the computer

4    forensic lab for the Technology Crimes Division of the

5    Department of Education in Washington, D.C.

6    Q.   And in preparation for your trial testimony today, did

7    you travel to Washington, D.C., to review those images?

8    A.   Yes, I did.

9    Q.   So let's start with mobile devices.  Let's talk about

10   the universe of mobile devices that you examined.

11   A.   There were several mobile phones, cell phones, as we

12   mentioned.  iPads, an iPod, a Kindle, as well as SD cards,

13   or media cards, that were located inside some of those

14   devices.

15   Q.   And where -- from where were those devices obtained?

16   A.   They were obtained during the execution of the search

17   warrant at a home in Chandler, Arizona.

18   Q.   Did you -- do you happen to recall the street address?

19   A.   Can I check my notes?

20   Q.   Certainly.  And just look up when you've refreshed

21   your recollection.

22   A.   Yeah.  1822 --

23   Q.   I'm sorry, ma'am, I need you to set your notes aside.

24   A.   Oh, sorry.

25   Q.   Yeah.  Can you -- have you had a chance to refresh

Direct - Stailey

1    your recollection on the address?

2    A.   Yes.

3    Q.   Okay.  Could you state for the record the address of

4    that search warrant?

5    A.   It's 1822 Kaibob Street.

6    Q.   Thank you.  Now, were you asked to look for certain

7    evidence on these devices?

8    A.   Yes, I was.

9    Q.   And what type of evidence was requested that you look

10   for?

11   A.   Contact lists, incoming and outgoing call logs, and

12   text messages, as well as photos.

13   Q.   And who gave -- who provided that information to you?

14   A.   Special Agent Sandra Ennis.

15   Q.   And how did you know what specific information or

16   terms to look for?

17   A.   Special Agent Ennis provided me with a list of key

18   terms for the investigation and I used those to generate

19   search words to search the devices.

20   Q.   Okay.  If the witness could be shown book 1 or

21   Government Exhibit No. 12.

22   A.   Okay.

23   Q.   Can you identify that document, ma'am.

24   A.   Yes.  This is the list of search terms that Special

25   Agent Ennis provided to me.

Direct - Stailey

1  Q.   And did you rely on those terms and use those terms in

2  performing your search?

3  A.   Yes, I did.

4       MS. PALUCH:  Your Honor, at this time I'd move to

5  admit and publish Government's Exhibit 12.

6       THE COURT:  Any objection?

7       MR. GOODREID:  Yes, Your Honor.  Among other

8  things, on the first page, there appears to be commentary

9  by somebody about what they're doing in their

10  investigation.  I don't think that's properly admissible.

11       Your Honor, if I direct the Court's attention to

12  the first page of the exhibit, it's down at the very

13  bottom, there's an asterisk.

14       THE COURT:  Right, I see that.

15       MR. GOODREID:  First of all, lack of foundation.

16  Secondly, it's hearsay so far.  And, thirdly, I don't think

17  it's proper to be in this exhibit.

18       THE COURT:  Are you offering this for the truth of

19  the matter asserted?

20       MS. PALUCH:  I'm not, Your Honor.  Only for the

21  effect on the listener as to how -- the actions that she

22  took in response to receiving these search terms.

23       THE COURT:  What about this remark by the

24  asterisk?

25       MS. PALUCH:  I agree with counsel that that should

Direct - Stailey

1    be redacted.  And I could take care of that during the

2    lunch break, Your Honor.

3              THE COURT:  Okay.  So how are we going to publish

4    this --

5              MS. PALUCH:  At this point, I won't need to

6    publish this and I assume we will resume with Ms. Stailey's

7    testimony after the break and I could revisit this exhibit

8    at that time.

9              THE COURT:  All right.  Well, let's do this:  I'm

10   going to overrule the objection.  I'm going to admit

11   Government Exhibit 12, but without the statement that

12   appears at the bottom of page 1 next to the asterisk.  And

13   this exhibit cannot be published to the jury until that

14   comment is removed from the first page.

15             MS. PALUCH:  Thank you, Your Honor.

16        (Government's Exhibit 12 received)

17   BY MS. PALUCH:

18   Q.   Now, in your examination, did you retrieve information

19   from a Huawei cell phone?

20   A.   I retrieved information from an SD card that was found

21   inside the Hauwei cell phone.

22   Q.   Am I pronouncing that right, Huawei?

23   A.   Yes.

24   Q.   Now, can you explain why it is you retrieved

25   information from an SD card rather than the phone itself?

Direct - Stailey

1    A.    When I received the phone, it was broken in half,

2    almost as though someone had just taken it and bent it in

3    half, so we weren't able to recover any data from the

4    phone, itself.

5    Q.    But the SD card was intact?

6    A.    Yes.

7    Q.    And who actually removed the SD card from that cell

8    phone?

9    A.    I did.

10   Q.    Was there a number assigned to that specific piece of

11   evidence in your report?

12   A.    Yes.  I believe it was No. 12.

13   Q.    Okay.  So could you explain for us, please, what an SD

14   card is.

15   A.    It's just another form of storage media, like a USB

16   thumb drive.  Typically SD cards are used in cameras and

17   cell phones because they're very small and flat, so they

18   can fit inside those devices very well.  And they can store

19   any kind of file that a USB thumb drive can store.

20   Q.    So even though the cell phone was broken in half, the

21   SD card was not damaged?

22   A.    Correct.

23   Q.    Okay.  Now let's start with text messages.  Did you

24   find text messages that contained certain of the terms or

25   names provided to you by Agent Ennis on the SD card?

Direct - Stailey

1    A.   Yes, I did.

2    Q.   And what was the process you used to extract these

3    text messages from the SD card?

4    A.   The text messages were stored in a database, so I used

5    a forensic program that was capable of reading that

6    database to extract all of the text messages from the

7    database file into an Excel spreadsheet so that they would

8    be easier to read and review.

9    Q.   Okay.  Please display for the witness only -- or,

10   actually, you can look at the book, ma'am, in front of you.

11   If you could turn to Government's Exhibit 13.

12        Can you identify that exhibit?

13   A.   Yes, this is an excerpt of some of the text messages

14   that I extracted from the SD card.

15        MS. PALUCH:  Your Honor, at this time I move to

16   admit and publish Government Exhibit 13.

17        THE COURT:  Is there an objection?

18        MR. GOODREID:  Your Honor, may I have just a

19   moment, please?

20        THE COURT:  You may.

21        MR. GOODREID:  No objection, Your Honor.

22        THE COURT:  All right.  I have a couple of

23   questions for this witness.

24        Ms. Stailey, the comments headed Address, is

25   that -- what is that?

Direct - Stailey

1          THE WITNESS:  That is a phone number that

2     represents the phone number not of the Huawei phone,

3     itself, but of the other phone that was communicating over

4     text message.

5          THE COURT:  So that's the phone number that the

6     phone that you were examining the SD card from was texting

7     to?

8          THE WITNESS:  Correct.

9          THE COURT:  Okay.  Government Exhibit 13 is

10    admitted into evidence and may be published to the jury.

11         (Government's Exhibit 13 received)

12    BY MS. PALUCH:

13    Q.   And I would like to begin by explaining what the

14    columns of this exhibit represent, starting with column A.

15    A.   Column A is a typed column.  It either has a value 1

16    or 2.  The value 1 represents that the text message was

17    incoming to the phone, it was a received text message; and

18    the No. 2 indicates an outgoing communication from the

19    phone.  So 1 is received and 2 is sent.

20    Q.   So is 2 -- all of the entries 2 is -- the person using

21    the Huawei phone is sending the 2; is that right?

22    A.   Yes, that's correct.

23    Q.   I'd like to refer your attention to line 7 and 8 of

24    this exhibit.

25              And if you could please blow those up.

403

Direct - Stailey

1           And, first, could you just state the date of that
2     transmission.
3     A.    June 26th, 2012.  The time is 21:06:58 for the first
4     one.
5     Q.    And could you please read for the record lines 1 and
6     2.
7     A.    Line 1 says, "Who is this?"
8           And line 2 says, Tramell."
9     Q.    And as you stated, line 2 would be the individual
10    using that Huawei phone, correct?
11    A.    Correct.
12    Q.    Okay.  At this time, I'd like to publish Government
13    Exhibit 14, which has already been admitted.
14          And, ma'am, when you have a chance to look at that
15    exhibit, can you identify what that is.
16          COURTROOM DEPUTY:  I don't show that that's
17    admitted.  14?
18          MS. PALUCH:  I believe it was admitted through Mr.
19    Fields' testimony.
20          THE COURT:  I have that in, Deb.
21          COURTROOM DEPUTY:  Do you?  Oh, sorry.
22          MS. PALUCH:  Thank you, Ms. Hansen.
23    BY MS. PALUCH:
24    Q.    All right.  We're looking at Exhibit 14.  Can you
25    identify, ma'am, what this exhibit is?

1    A.   Yes, it's another excerpt from the SD card that

2    contains both text messages and call log entries.

3    Q.   And it appears as though there's a different phone

4    number listed on this exhibit; is that right?

5    A.   Yes.

6    Q.   And is it still -- could you identify the 1s and the

7    2s for us with respect to this exhibit.

8    A.   Yes.  The -- they mean the same thing, where a 1 is an

9    incoming message, a 2 is an outgoing message.

10   Q.   Okay.  If you could please blow up lines 4 and 5 of

11   this exhibit.

12           And, ma'am, could you please read those -- and,

13   actually, take in line 6, please.

14           THE COURT:  Can you make those any bigger -- that

15   font any bigger?

16   BY MS. PALUCH:

17   Q.   Yeah, is there any way we can blow that up any more?

18   You know what we could do, could you just take the text and

19   blow up just the text.

20           Okay.  Could you read those into the record,

21   ma'am?

22   A.   One of 2, Tramell it's Kim.  I was calling to see if

23   you were coming into town?  Also I also got another letter

24   for you.  By chance did you get that deposit?  The only

25   reason" -- and it continues on 2 of 2 -- "why I'm asking is

Direct - Stailey

1    I'm going out of town first thing in the morning and could

2    really use it."

3    Q.   Okay.

4    A.   "I didnt get it but Ill call u at 9 tonight cz I do hv

5    something for u."

6    Q.   At this time I'd like to publish what's been admitted

7    Government's Exhibit 15.

8            Can you identify that exhibit, ma'am.

9    A.   This is another excerpt of the text messages that was

10   retrieved from the SD card.

11   Q.   Okay.  And if you could please blow up lines 46

12   through 48 for the witness.

13           And for 46 and 48, we will first blow those up and

14   have you say 1 and 2, and then we will just blow up the

15   text.

16           So 1 is incoming and 2 is the Huawei user?

17   A.   That's correct.

18   Q.   Okay.  So if you could, please, Agent Hacker, blow up

19   just the text.

20           And, ma'am, could you please read those into the

21   record.

22   A.   "For Dennis miller, what do u want me to do with this

23   letter I have?  U also have mail."

24           "Yea Ill just have u send it altogether.  Im gonna

25   send u this lady number.  Three restaurant owners want

1    orders."

2    Q.   Okay.  I'd like now, if you could go, Agent Hacker, to

3    line 57 of that exhibit.  And we'll -- actually, could you

4    pull 56 as well.

5         And I will have you read -- let's see.

6         Agent Hacker, are you able to pull that?

7         And I will have you read those two entries into

8    the record.

9    A.   The first line says, Is it here [sic]?

10        And the second line says, "Cool.  U can send all

11   of the mail to me at 975 East Riggs Rd. 12-174, Chandler,

12   Az 85249.  Thank u babe."

13   Q.   Okay.  And 2, again, is the Huawei user, correct?

14   A.   Yes.

15   Q.   Okay.  Let's look at Government Exhibit No. 16, the

16   last of the text messages that I'm going to ask you about.

17        And Exhibit 16 is not in evidence yet, so if you

18   could just look at it in the book, ma'am.  Do you recognize

19   that exhibit?

20   A.   Yes.  It's another excerpt of text messages that were

21   retrieved from the SD card.

22   Q.   Retrieved by you, correct?

23   A.   Yes.

24        MS. PALUCH:  At this time, I'd move to admit and

25   publish Government's Exhibit 16.

Direct - Stailey

1          THE COURT:  Any objection?

2          MR. GOODREID:  No objection, Your Honor.

3          THE COURT:  There being no objection, Exhibit 16

4   is admitted into evidence and may be published to the jury.

5       (Government's Exhibit 16 received)

6   BY MS. PALUCH:

7   Q.   Okay.  If we could display that and please blow up

8   lines 4 and 5.  And what I'd like to show you first here

9   is -- if you could state for the record the date of that

10  transmission.

11  A.   July 1st, 2012.

12  Q.   And can you blow up the text alone.

13       Okay.  And could you read that into the record.

14  A.   "Give me ur bank and acct number."

15       "Chase number 455435276."

16  Q.   And if we could back out again so you can state who's

17  giving the bank account number -- or which user's giving

18  the bank account number?

19  A.   The person using the Huawei cell phone.

20  Q.   Okay.  And then if you could please blow up the last

21  line of this exhibit -- or, actually, the last two lines,

22  please, Agent Hacker.  Can you grab the line before that,

23  23?  Okay.  23 and 24.  There you go.

24       Okay.  1 and 2, the date of that transmission?

25  A.   July 3d, 2012.

Direct - Stailey

1    Q.   Okay.  And then please just blow up the text.  And I'd
2    like you to read those two text messages in.
3    A.   "Im working on it routing number got messed up it was
4    sent to sydney alishia.  1 number different acct number
5    then urs calm down puddytang."
6              "Chase Tramell Thomas 455435276."
7    Q.   Is that the same number that we just looked at
8    before?
9    A.   Yes.
10   Q.   Okay.  And the Chase indication is coming from the 2,
11   from the Huawei user?
12   A.   Yes, that's correct.
13   Q.   Okay.  Thank you.  You can take that exhibit down.
14             Ma'am, did you locate any photographs taken -- or
15   from the SD card?
16   A.   Yes, I did.
17   Q.   And can you state approximately how many?
18   A.   There were approximately 1750 images on the SD card,
19   and there were around 450 images that were specific to a --
20   the camera folder.
21   Q.   Okay.  And where on the SD card did you locate those
22   images?
23   A.   The camera folder was in another folder called DCIM,
24   which stands for digital camera images.  And it's a folder
25   that basically all digital cameras use to store any photos

Direct - Stailey

1  taken with that camera, and that includes digital cameras

2  used -- that are part of cell phones.

3  Q.   Okay.   There are six of those images I'd like to ask

4  you about this morning.   And if you could please look at

5  that first exhibit book.   And I'd like you to start with

6  Government Exhibit 9.

7        And can you just state for the record what that

8  exhibit is.

9  A.   It is a photo that I located on the SD card.

10  Q.   Okay.   And now I'm going to direct your attention to

11  Government's exhibit starting at 24.   Are they in that book

12  or do we need the next book?

13  A.   They're not in this book.

14        MS. PALUCH:   Ms. Hansen, if you could help us with

15  that.   Thank you.

16  BY MS. PALUCH:

17  Q.   So we're going to start with Government Exhibit 24,

18  please.   And I want you to just flip through.   I'm going to

19  give you the page number -- the exhibit numbers and then

20  I'm going to ask you about those exhibits.   So start with

21  24 and let me know -- look up when you're done, and 25.

22  26.   28.   And 29.

23        What are those exhibits, ma'am?

24  A.   They are photos that I extracted from the camera

25  folder on the SD card.

410

Direct - Stailey

1    Q.   And did you use the same forensic tools that you have

2    described here today in extracting those photographs?

3    A.   Yes, I did.

4            MS. PALUCH:   Your Honor, at this time I'd move to

5    admit and publish these exhibits one at a time.

6            THE COURT:   Why don't you tell me them again.

7            MS. PALUCH:   They are Exhibits 9, Exhibits 24

8    through 26, and Exhibits 28 and 29.

9            THE COURT:   Any objection?

10           MR. GOODREID:   No, Your Honor.

11           THE COURT:   All right.   There being no objection,

12   the following Government exhibits are admitted into

13   evidence and may be published to the jury:   Exhibit 9,

14   Exhibit 24, 25, 26, 28, and 29.

15       (Government's Exhibits 9, 24 thru 26, 28, 29 received)

16   BY MS. PALUCH:

17   Q.   Thank you.   Agent Hacker, if we could start with

18   Government Exhibit 9.   And since you've already identified

19   these, ma'am, I'm just going to now have Agent Hacker

20   display them for the jury.   So that is Exhibit 9.   Could

21   you please display Exhibit 24.   Exhibit 25.   Is there any

22   way to blow up that image?   Exhibit 26.   Exhibit 28.

23   Exhibit 29.   Okay.   You can take that image down.

24           Ma'am, were you also asked to forensically examine

25   a number of computer hard drives seized during the search

Direct - Stailey

1    of the residence on Kaibab Avenue in Chandler, Arizona?

2    A.   Yes, I was.

3    Q.   Now before we talk about those computer hard drives,

4    generally can you describe what an IP address is.

5    A.   Yes.   An IP address is an internet protocol address.

6    Every computer that is on a network must have an IP address

7    in order to communicate with other computers on the

8    network.   Similar to a physical mailing address, you have

9    to have an address to communicate with a house, you have to

10   have an address to communicate with a computer.

11        For a home computer, for example, an IP address

12   would be assigned by the internet router or the modum.  And

13   then the router or the modum is assigned an internet -- an

14   IP address by an internet service provider such as Comcast

15   or AT&T.

16   Q.   Okay.   In this case, how many computer hard drives

17   were you asked to examine that were seized from the home?

18   A.   Five.

19   Q.   Okay.   Were you also asked to examine a hard drive

20   from a laptop seized by the Tempe Police Department?

21   A.   Yes.

22   Q.   So seven items total or six?

23   A.   Six hard drives.   There was a memory card that was

24   also seized at the home.

25   Q.   Okay.   So seven items total.   Okay.   And did you find

1   evidence related to this case on any of those seven items?

2   A.   Yes.

3   Q.   And how many?

4   A.   On six -- on all six hard drives.

5   Q.   Okay.  All except the --

6   A.   The SD memory card.

7   Q.   All right.  And what were you asked to look for on

8   those devices?

9   A.   The same search terms that I was provided by Special

10  Agent Ennis.

11  Q.   And how did you conduct those searches?

12  A.   I used the forensic program FTK.  It is a software

13  program designed for forensic analysis of computer devices.

14  And one of its capabilities is to search for any terms

15  across any piece of digital evidence, no matter where on

16  the hard drive that term would exist.  It's designed to

17  search and return results for any of those search terms.

18  Q.   Did you develop keyword searches in order to perform

19  that analysis?

20  A.   Yes.  So I took the -- the list of relevant terms that

21  Special Agent Ennis provided to me, and I developed my own

22  list of search terms based on that list.

23  Q.   Okay.  One moment here.

24       I'd like to start asking you about an examination

25  that you performed on an item designated as Q-21.  Can you

Direct - Stailey

1   state what that item is.

2   A.   That was a hard drive that was located in a Sony Vaio

3   laptop computer.

4   Q.   And do you know who the seizing agency was of that

5   Sony Vaio laptop?

6   A.   It was the Tempe Arizona Police Department.

7   Q.   In performing your examination, were you able to

8   determine when that laptop was last properly shut down?

9   A.   Yes, I was.

10  Q.   And what was that date and time?

11  A.   May I refer to my report?

12  Q.   Yes, you may.  I'm looking for a date and time, ma'am.

13       Have you refreshed your recollection?

14  A.   Yes, I have.

15  Q.   Yes, ma'am, can you tell us?

16  A.   August 28th, 2012, at about 9:21 p.m. Pacific time.

17  Q.   Did you locate any hits for the names of certain of

18  the terms provided to you from Agent Ennis?  For example,

19  did you receive the names of community colleges to look

20  for?

21  A.   Yes.

22  Q.   Did you locate hits for community colleges on that

23  Sony Vaio computer?

24  A.   Yes, I did.

25  Q.   Approximately how many?

Direct - Stailey

1    A.    Hundreds.

2    Q.    In those hundreds of hits, did you retrieve hits for

3    Maricopa County Community College District?

4    A.    Yes.

5    Q.    Did you recover hits for Pikes Peak Community College?

6    A.    Yes.

7    Q.    How about Colorado Community College System?

8    A.    Yes.

9    Q.    Where on the hard drive did you find these hits to

10   these school names or districts?

11   A.    They were located in artifacts associated with the

12   Internet Explorer internet browser.

13   Q.    Can you tell us what that means.

14   A.    Yes.   Internet Explorer browser is just a tool to --

15   that you use to browse the internet, so locating these art-

16   -- these community college names in these artifacts

17   indicate that the user of that computer used Internet

18   Explorer to browse to those websites.

19   Q.    Did you locate any search results related to FAFSA

20   application pages?

21   A.    Yes.

22   Q.    And where did you locate those search results on the

23   Vaio laptop?

24   A.    Also in the Internet Explorer artifacts.

25   Q.    The same explanation you gave us just previously?

Direct - Stailey

1    A.    Yes.

2              THE COURT:   Can I interject a question here?

3    Maybe I'm the only one that doesn't know the answer to

4    this:   What is an artifact?

5              THE WITNESS:   In this case, it represented

6    temporary internet files.   So when you browse to a website,

7    some of the pieces that make up that website are downloaded

8    locally to your computer, so that the next time you visit

9    that website, it loads faster.

10             And so that's what some of these artifacts were.

11   Some were just history entries, just showing that that

12   website was visited.   And some of them were internet

13   cookies, which is a small file that a website will write to

14   your computer that will save information like your user

15   name, for example.   So when you visit that website again,

16   it will recognize you and it will say "Welcome back," for

17   example.

18             THE COURT:   All right.   Thank you.

19             MS. PALUCH:   Thank you, Your Honor.

20   BY MS. PALUCH:

21   Q.    Could you please look in one of the books in front of

22   you, Government Exhibit 19.

23   A.    Okay.

24   Q.    Can you identify that exhibit, ma'am.

25   A.    This is -- these are history entries showing visits to

1    the *fafsa.ed.gov* website.

2    Q.   And are these -- is this an exhibit that you created

3    after retrieving this information from that laptop?

4    A.   Yes.

5         MS. PALUCH:  At this time, Your Honor, I'd move to

6    admit and publish Government Exhibit 19.

7         THE COURT:  Any objection?

8         MR. GOODREID:  No objection, Your Honor.

9         THE COURT:  All right.  There being no objection,

10   Government Exhibit 19 is admitted into evidence and may be

11   published to the jury.

12        (Government's Exhibit 19 received)

13        MS. PALUCH:  Thank you, Your Honor.

14   BY MS. PALUCH:

15   Q.   Now, if we can blow this up, Agent Hacker, so that we

16   can -- let's go ahead and -- for purposes so we can read

17   this, just blow up column A.

18        And, Ms. Stailey, I'm going to ask you to just

19   explain what -- and if you could pull -- yeah, that's good.

20   Could you explain what's represented in column A.

21   A.   This is a time stamp of the most recent time that the

22   websites defined in the rest of the exhibit were visited.

23   Q.   Okay.  And I believe you testified previously that the

24   laptop was last shut down approximately 9:21 p.m.  Does

25   that time relate to what's reflected here as far as the

Direct - Stailey

1    time?

2    A.   Yes.  So the 9:21 p.m. was converted from UTC, which

3    is what you see in the exhibit, to the local time zone,

4    which was Pacific.  So in UTC, that 9:21 p.m. would be 4:21

5    a.m.  So what we see here are all of these time stamps in

6    the exhibit happened within about a day of that laptop last

7    being shut down.

8    Q.   And so that the record is clear, could you explain

9    what UTC stands for?

10   A.   It's Universal Coordinated Time.  It's just the

11   general time stamp that all computer time stamps are stored

12   in, and then your computer will convert that to your local

13   time zone, like Mountain time.

14   Q.   I see.  Could you please blow up Exhibit -- column B

15   for us, please.

16        And what's represented here?

17   A.   This is the user account or the user profile on the

18   computer, where these artifacts were located.

19   Q.   And, who sets up a user profile?

20   A.   Usually that's done by the user when they boot up the

21   computer for the first time.

22   Q.   Okay.  Let's go to column C, please.

23        What is represented in this column?

24   A.   This is the internet address or the website that was

25   visited.

418

Direct - Stailey

1    Q.   Okay.  And let's go to column D, please.

2         And what do we see here?

3    A.   This is the title of the web page.  So what we just

4    saw is just the web page, itself, the URL, and this is what

5    the actual title of the web page would be.

6    Q.   Okay.  And can you describe for us what a URL means.

7    A.   It's a Universal -- Uniform Resource Locator, and it's

8    just -- it's another term for internet address for a

9    website address.

10   Q.   Okay.  And the next column, please.

11        What does this show us?

12   A.   This column represents the number of unique times that

13   the web pages were visited by this user on this computer.

14   Q.   Okay.  If we could back out and go to the prior

15   column, column D, and blow that up one more time.

16        I'd like to ask you, ma'am, does the term or the

17   letters "FAFSA" appear on every single entry there?

18   A.   Yes.

19   Q.   Okay.  All right.  If you could take that exhibit

20   down.  Thank you.

21        Ma'am, did you find any HTML files relating to the

22   keyword search terms on the Sony Vaio?

23   A.   Yes.

24   Q.   And can you explain for us what an HTML file is.

25   A.   HTML is Hypertext Markup Language.  It's a program

Direct - Stailey

1    link -- programming language that is used to create and
2    define all the elements that make up a web page.
3    Q.   And approximately how many HTML files related to this
4    case did you find on the Sony Vaio laptop?
5    A.   About 300.
6    Q.   Okay.  Is an HTML file readable?
7    A.   It is human readable; however, it has a number of
8    reserved words and symbols that are part of the programming
9    language that make it hard to just read and understand it.
10   So a -- an internet browser like Internet Explorer will
11   read that language and then display the web page to us the
12   way that we're used to seeing web pages.
13   Q.   Did you locate any HTML files related to FAFSAs in the
14   names of any -- in any of the names on the list you were
15   provided by Agent Ennis?
16   A.   Yes, I did.
17   Q.   Approximately how many names are there?
18   A.   I believe 22.
19   Q.   Did you find HTML files related to a person named
20   Manuel Abate?
21   A.   Yes.
22   Q.   How many?
23   A.   Seven.
24   Q.   Okay.  Let's have you look in the book at Government
25   Exhibit 20, please.

420

Direct - Stailey

1          And can you identify that exhibit, ma'am?

2     A.   Yes.  This is one of the HTML files I identified for

3     Manuel Abate.

4          MS. PALUCH:  At this time, Your Honor, I'd move to

5     admit and publish Government Exhibit 20.

6          THE COURT:  Any objection?

7          MR. GOODREID:  And, again, Your Honor, no

8     objection.

9          THE COURT:  All right.  Just for clarification,

10    Ms. Stailey, are these still all from this Q-21 --

11         THE WITNESS:  Yes.

12         THE COURT:  -- Sony laptop?

13         THE WITNESS:  Yes, sir.

14         THE COURT:  Exhibit 20 is admitted into evidence

15    and may be published to the jury.

16        (Government's Exhibit 20 received)

17    BY MS. PALUCH:

18    Q.   Okay.  So let's -- you stated that this is an HTML

19    file, correct?

20    A.   Yes.

21    Q.   And it's readable for us, so can you explain that?

22    A.   Yes, this is -- this is what the HTML file looks like

23    when it's opened with a browser like Internet Explorer.

24    Q.   Okay.  So let's blow up the middle portion of this

25    exhibit, if you could.

421

Direct - Stailey

1          And can you tell us what type of information is
2     represented there.
3     A.   Yes.  It contains the Social Security number, a -- two
4     times; a first name and a last name; and a date of birth.
5     Q.   Now, you testified that you found seven such HTML
6     files related to Mr. Abate.
7          If you could please take that exhibit down now.
8          In the other six, did you find similar
9     information?
10    A.   Yes, I did.
11    Q.   Similar in the sense of identifying information?
12    A.   Yes.  Social Security numbers; first name, last name;
13    date of birth.
14    Q.   Did any of those files for Mr. Abate list a physical
15    address?
16    A.   Yes.
17    Q.   And how many?
18    A.   Two.
19    Q.   And do you recall, as you testify here, what this
20    address was?
21    A.   Can I review my notes?
22    Q.   Yes, ma'am.  And what was that address?
23    A.   1112 Meadow Oaks Drive in Colorado Springs, Colorado.
24    Q.   Did any of those files list e-mail addresses for Mr.
25    Abate?

Direct - Stailey

1    A.    Yes.

2    Q.    How many?

3    A.    Two.

4    Q.    Did you retrieve Department of Education PIN

5    applications on the Sony Vaio in the names of individuals

6    listed on Agent Ennis' list?

7    A.    Yes.

8    Q.    And for how many of those 22 names did you find those?

9    A.    Can I refresh?

10   Q.    Yes, ma'am.  Oh, I'm sorry.  How many names did you

11   find out of -- for DOE PIN applications?

12   A.    Eight.

13   Q.    And how about for application certification pages?

14   A.    Eight.

15   Q.    Did you find any hits for Pikes Peak Community

16   College?

17   A.    Yes.

18   Q.    What type of hits?

19   A.    They were Google searches for Pikes Peak Community

20   Colleges, or Community College.

21   Q.    What about for Maricopa, the term Maricopa?

22   A.    Yes.  The same thing.  Google search results for

23   Maricopa.

24   Q.    How about Pueblo Community College?

25   A.    Yes.

Direct - Stailey

1    Q.   And how many names on the names on Agent Ennis' list

2    did you find pages for that?

3    A.   May I --

4    Q.   Yes, ma'am.

5    A.   Okay.

6            THE COURT:   Okay.  Can you ask that question

7    again?

8            MS. PALUCH:   Right.

9    BY MS. PALUCH:

10   Q.   We're talking about application certification pages.

11   Did you find those in the names of students on Agent Ennis'

12   list with respect to Pueblo Community College?

13   A.   Yes.

14   Q.   And how many?

15   A.   Two.

16   Q.   Okay.  What about Maricopa County Community College

17   District?

18   A.   Yes.

19   Q.   How many?

20   A.   May I --

21   Q.   Yes, ma'am.

22   A.   13.

23   Q.   13.  Okay.  Now, did you find any shortcuts on the

24   Sony Vaio laptop?

25   A.   Yes.

424
Direct - Stailey

1   Q.   Can you explain what a shortcut is?

2   A.   Yeah.  A shortcut is just a file that points to

3   another file or website.  So if you double-click the

4   shortcut file, it will open up the website, for example.

5   Q.   Okay.  What shortcuts did you find?

6   A.   I found 10 shortcuts for websites that were part of

7   the *Maricopa.edu* website.

8   Q.   Okay.  Please look at what's been marked as Government

9   Exhibit 21.  Can you identify that exhibit.

10  A.   Yes.  These are the 10 shortcuts that I identified.

11        MS. PALUCH:  At this time, I'd move to admit and

12  publish Government Exhibit 21.

13        THE COURT:  Any objection?

14        MR. GOODREID:  No objection, Your Honor.

15        THE COURT:  All right.  There being no objection,

16  Exhibit 21 is admitted into evidence and may be published

17  to the jury.

18      (Government's Exhibit 21 received)

19  BY MS. PALUCH:

20  Q.   Ma'am, let's go ahead and blow up the first -- first

21  of all, just generally, what's the information contained in

22  this exhibit?  And I'll have you go through the columns.

23  A.   These are the 10 internet shortcuts for *Maricopa.edu*

24  websites.

25  Q.   Okay.  So let's blow up column A.

                        Direct - Stailey

1            And tell us what's contained there.
2     A.   These are the file names that would appear on the
3     computer.
4     Q.   Okay.  And who would -- how would these file names --
5     explain that to me, if you can.
6     A.   So, for example, if these were on the user's desktop,
7     the user could just double-click on these files and they
8     would open up the websites that are in column B.
9     Q.   Okay.  So let's go to column B, if we could.  And is
10    there any way to make that larger?  Okay.
11           Looks like gobbledygook to me, but can you tell me
12    what is represented in that column?
13    A.   Yes.  So those are the actual websites that would be
14    opened by double-clicking on the shortcut files.
15    Q.   Okay.  Thank you.
16           You can take that exhibit down.
17           Did you find on the Sony Vaio any hits on the
18    inmate names provided to you by Agent Ennis?
19    A.   Yes.
20    Q.   Approximately how many?
21    A.   Can I review my notes?
22    Q.   Yes, ma'am.
23           Okay, how many names of the inmate names did you
24    locate?
25    A.   53.

Direct - Stailey

1    Q.   And from that 53, did we ask you to remove certain

2    names from that 53?

3    A.   Yes.

4    Q.   What names did you remove?

5    A.   Heather Carr, Ayana Jones, and Terrel Smith.

6    Q.   Did any of those 53 names include the name Tramell

7    Thomas?

8    A.   No.

9    Q.   So did you create a summary of those 50 names?

10   A.   Yes.

11   Q.   Please look at Government Exhibit 22.  Hopefully you

12   have that in the book in front of you.

13           THE COURT:  Before we go into that exhibit, would

14   this be a good time for our lunch break?

15           MS. PALUCH:  Certainly, Your Honor.

16           THE COURT:  All right.  Ladies and gentlemen of

17   the jury, I need to remind you again, because I have to:

18   Please do not do any independent research into or discuss

19   with anyone the facts, the law, the issues, or individuals

20   involved in this case.

21           We are going to take a lunch recess to 1:30.  I

22   ask that you be back in the jury assembly room by 1:20.

23           (Jury left the courtroom at 12:13 p.m.)

24           THE COURT:  Ms. Stailey, because you're in the

25   middle of your testimony, I direct you not to speak with

427
Direct - Stailey

1    any of the lawyers during the lunch break.

2          THE WITNESS:  Okay.

3       (Recess taken 12:13 p.m.)

4                    AFTERNOON SESSION

5       (In open court in the presence of the jury at 1:35

6    p.m.)

7          THE COURT:  Ms. Stailey, I remind you that you

8    remain under oath.

9          THE WITNESS:  Yes.

10         THE COURT:  All right, Ms. Paluch, you may resume

11   your examination.

12         MS. PALUCH:  Thank you, Your Honor.

13   BY MS. PALUCH:

14   Q.   Ms. Stailey, I'd like to start with this:  Earlier in

15   your testimony, you talked about whether you were given

16   certain terms to search for when you examined the digital

17   and evidence and the mobile devices.  Do you recall that?

18   A.   Yes.

19   Q.   And can you state again who provided you with those

20   terms?

21   A.   Yes, Special Agent Sandra Ennis.

22   Q.   Okay.  I'd like you to look at what's been marked as

23   Government's Exhibit 12.  And I don't know that it's in the

24   book.  Is it in the book?  Okay.

25         COURTROOM DEPUTY:  12?

428
Direct - Stailey

1          MS. PALUCH:  Yes.  I think she has it there.

2     Thank you, Ms. Hansen.

3     BY MS. PALUCH:

4     Q.   Can you identify that exhibit, ma'am.

5     A.   It's the list of search terms that -- and key terms

6     that Special Agent Ennis provided to me.

7     Q.   And you used those terms in order to conduct your

8     examination in this case?

9     A.   That's correct.

10         MS. PALUCH:  Your Honor, at this time I would move

11    for the admission and publication of Government's

12    Exhibit 12.

13         THE COURT:  Well, 12's already been admitted and

14    it's -- now, with the redaction, can be published to the

15    jury.

16         MS. PALUCH:  Thank you, Your Honor.

17         COURTROOM DEPUTY:  Are you going --

18         MS. PALUCH:  Ms. Hansen, I was going to use the

19    Elmo, please.  Thank you.

20    BY MS. PALUCH:

21    Q.   And what I would like to do is have you talk about

22    these headings.  Are you able to see that?

23         THE COURT:  Ms. Paluch, if you're going to be

24    using the Elmo, then move the mic towards you so --

25         MS. PALUCH:  Certainly, Your Honor.

Direct - Stailey

1        THE COURT:  Yeah, we're totally losing you when

2    you move over that far.

3        MS. PALUCH:  Understood, Your Honor.

4    BY MS. PALUCH:

5    Q.   All right.  What I'd like you to do, Ms. Stailey, is

6    just state for the record what the categories of search

7    terms were as represented on this first page.

8    A.   Bank sites, cell phone provider sites, community

9    colleges.

10   Q.   Okay.  And then let's turn to the second page of that

11   exhibit.  And could you state those headings of search

12   terms.

13   A.   Department of Education and miscellaneous sites.

14   Q.   And specifically for the record what's listed under

15   Department of Education?

16   A.   Free Appication for Federal Student Aid, or FAFSA.

17   Q.   If you could turn to the next page, please.  What I'd

18   like to focus on is the column to the far left.

19        And can you state what's listed in that column.

20   A.   Last name.

21   Q.   And the next column over?

22   A.   First name.

23   Q.   And so these are individuals you're searching for?

24   A.   Yes.

25   Q.   And are you also given Social Security numbers and

1  dates of births as well as addresses?

2  A.   Yes.

3  Q.   Okay.  And if you could count in this exhibit how many

4  pages that goes on.

5  A.   Eight pages.

6  Q.   And eight pages of the similar type of information?

7  A.   Yes.

8  Q.   Thank you.  What I'd like to do now is return to what

9  we were talking about before the lunch break, ma'am.  And

10  that is we were talking about:  Do you recall that list I

11  had asked you about hits for inmate names on the list

12  provided that you found on the Sony Vaio?

13  A.   Yes.

14  Q.   And do you recall we had that discussion about a --

15  the number was 53?

16  A.   Yes.

17  Q.   And do you recall the three names you said that you

18  removed from that list?

19  A.   Heather Carr, Ayana Jones and Terrel Smith.

20  Q.   Okay.  And then I had asked you if the defendant's

21  name, Tramell Thomas, was in that 50?

22  A.   It was not.

23  Q.   Okay.  So did you create a summary of those 50 names?

24  A.   Yes, I did.

25  Q.   Please look at Government's Exhibit 22.

Direct - Stailey

1          Do you see that exhibit, ma'am?

2     A.   Yes.

3     Q.   Can you identify that?

4     A.   This is the summary that I prepared.

5     Q.   The summary of?

6     A.   Of the search hits for the names on the list.

7     Q.   From the Sony Vaio?

8     A.   Yes.

9          MS. PALUCH:  Your Honor, at this time I would move

10    to admit and publish Government's Exhibit 22.

11         THE COURT:  Any objection?

12         MR. GOODREID:  No, Your Honor.

13         THE COURT:  All right.  Exhibit 22 is admitted

14    into evidence and may be published to the jury.

15       (Government's Exhibit 22 received)

16    BY MS. PALUCH:

17    Q.   Okay.  So why don't we do this:  Let's start with the

18    first column.  And, Agent Hacker, if you could please

19    enlarge column A.

20         And first, before we talk about the individual

21    columns, Ms. Stailey, how large is this exhibit?

22    Approximately how many pages?

23    A.   It's 193 pages.

24    Q.   Okay.  And what is contained in Exhibit A?

25    A.   In column A?

Direct - Stailey

1    Q.   I'm sorry, column A.   Excuse me.

2    A.   Column A is the first name and last name of the person

3    from the list that Special Agent Ennis provided.

4    Q.   Okay.  Let's go to the next column.

5    A.   Column B is the file path, or the location, on the

6    Vaio where I located the search hit.

7    Q.   So would it be fair to say that's the address or the

8    location on --

9    A.   Yes.

10   Q.   Okay.  Let's go to the next column.  What is contained

11   in column C?

12   A.   Column C is the search hit, itself, as well as some

13   context, the few characters before the search hit as well

14   as the few characters after the search hit to give the

15   search hit a little bit of context.

16   Q.   Okay.  I'd like to refer your attention to page 2 of

17   this exhibit.  And specifically entry 30.

18        If we could highlight 30 to the bottom of the

19   page.

20        Can you state the name for these hits?

21   A.   Manuel Abate.

22   Q.   Okay.  What I'd like you to do now, Ms. Stailey, is

23   count in that exhibit how many pages have entries for

24   Manuel Abate.

25        You can scroll through, Agent Hacker.

Direct - Stailey

1    A.   Seven pages.

2    Q.   Okay.  In what part of the hard drive were these hits

3    located?

4    A.   These were located in System Files and in unallocated

5    space.

6    Q.   Can you describe what you mean by System Files?

7    A.   A system file is a file designed to help the operating

8    system run, like an executable, a program, or a driver.

9    They're not designed for user interaction.

10   Q.   Can you explain what "unallocated space" means.

11   A.   Unallocated space is the unused portion of the hard

12   drive, or the space that's not allocated to a file.  So if

13   we see readable content in an allocated space, it indicates

14   that at one time there was a file saved to that area of the

15   hard drive but that file has since been deleted.

16   Q.   Now, you testified that you examined evidence seized

17   from the Kaibab residence, correct?

18   A.   Correct.

19   Q.   Okay.  And were you provided with an evidence

20   inventory form regarding that search?

21   A.   Yes, I was.

22   Q.   And who provided that form to you?

23   A.   Special Agent Ennis.

24   Q.   And what information did that form provide you with?

25   A.   It has a description of the item that was seized as

434
Direct - Stailey

1   well as the location within the residence where it was

2   found.  And it assigns an item number to each item that was

3   seized.

4   Q.   Did it also assign a room number of where the evidence

5   was located?

6   A.   Yes.

7   Q.   Okay.  Did you find any evidence on any of the hard

8   drives located at the Kaibab address?

9   A.   Yes.

10  Q.   How many of them?

11  A.   Five.

12  Q.   What I'd like to talk to you about now is one of those

13  specific hard drives that was labeled Q-7.  Do you know

14  what type of computer Q-7 was?

15  A.   May I refer to my notes, please?

16  Q.   Yes, ma'am.

17  A.   It was an HP Touchsmart desktop computer.

18  Q.   And did the inventory form that you just testified

19  about tell you in what room that computer was located?

20  A.   It was room J.

21  Q.   Room J.  On that room J computer, did you locate hits

22  for Department of Corrections websites?

23  A.   Yes.

24  Q.   Do you recall which states?

25  A.   Colorado, California, Indiana, and also a Cook County

435

Direct - Stailey

1    sheriff's office.

2    Q.   Can you state approximately how many hits you

3    retrieved for those states' DOC websites?

4    A.   Hundreds.

5    Q.   Did Q-7 contain search hits for the inmate names on

6    Agent Ennis' list?

7    A.   Yes.

8    Q.   Approximately how many?

9    A.   18.

10   Q.   Did you remove any of the names from that 18?

11   A.   I did.  I removed eight.

12   Q.   And what -- do you happen to recall, or would you need

13   to refer to your report?

14   A.   I can refer to my report.

15   Q.   Okay.

16   A.   Can I read them --

17   Q.   Yes, ma'am.  I think you need to just refresh your

18   recollection, if you can.  If you can't remember them,

19   I'll . . .

20   A.   I may not be able to remember all eight, but Ayana

21   Jones, Heather Carr, Tramell Thomas, Michael Cox, LaTanya

22   Pickens, Leombe Agent.  I think there were one or two more.

23   Q.   Okay.  So I think you testified there were 10

24   remaining names.

25   A.   Yes.

436

                              Direct - Stailey

1    Q.   Did you create a summary of those 10 remaining names?

2    A.   Yes.

3    Q.   Please look at Government's Exhibit 23 in the book,

4    please.

5         Can you identify that document?

6    A.   This is the summary I created from the computer in

7    room J, search hits for names on the list.

8    Q.   And what tools did you use to extract that evidence?

9    A.   The FTK, Forensic Tool Kit, analysis program.

10        MS. PALUCH:  At this time, I'd move to admit and

11   publish Government's Exhibit 23.

12        THE COURT:  Any objection?

13        MR. GOODREID:  No, Your Honor.

14        THE COURT:  Exhibit 23 is admitted into evidence

15   and may be published to the jury.

16      (Government's Exhibit 23 received)

17        MS. PALUCH:  Thank you, Your Honor.

18   BY MS. PALUCH:

19   Q.   Okay.  So, again, just briefly, if we could highlight

20   column A.

21        And just -- if you could just state what is

22   represented.

23   A.   It's the first and last name of the person whose

24   identifiers were found in the search hits.

25   Q.   And the next column, please.

Direct - Stailey

1  A.    That's the location on the hard drive where the search

2  hit was found.

3  Q.    Okay.   Could you go back to that search location.   All

4  right.

5         Does it reference room J there?

6  A.    It does.

7  Q.    And that's telling you that that -- whatever you

8  created on this exhibit was located on the computer in room

9  J?

10 A.    Yes.

11 Q.    Okay.   Let's go to the next column, please.

12        And what's represented here?

13 A.    This has the search hit, itself, as well as characters

14 before and after to provide some context around the search

15 hit.

16 Q.    Okay.   If you could please publish the third page of

17 that exhibit.

18        And do you see, Ms. Stailey, towards the bottom of

19 that page, there's reference to a Dennis Miller?

20        If you could highlight that, Agent Hacker.

21 A.    Yes.

22 Q.    Using Mr. Miller as an example, could you explain the

23 entries that you see here.

24 A.    The search hits contain identifiers associated with

25 Dennis Miller, including Social Security number, first and

1    last name, as well as a date of birth.

2    Q.  If you could hold on one second.  Let's -- we need to

3    highlight that area.  Okay.

4         So we're on the Dennis Miller entries.  Can you

5    tell us what you're seeing here.

6    A.  Yes.  So the first line is his Social Security number,

7    and then we see his first name and last name, as well as

8    the 06-11, 1951 is the date of birth, followed by the

9    *fafsa.gov* website as context around that search hit.

10   Q.  And I'm going to stop you there.  When you had

11   received the terms from Agent Ennis, did it provide you

12   with dates of birth and Social Security numbers for

13   specific individuals?

14   A.  Yes.

15   Q.  Okay.  And if you could proceed on to some of the

16   other entries you see for Dennis Miller.

17   A.  The next three are auto recovery save of Dennis

18   Miller.  Generally this is associated with -- Microsoft

19   Office will autosave a file -- in case Office or Microsoft

20   Word crashes, it has this auto recovery save that it can

21   restore from.

22        So that's what this indicates, is that document

23   called Dennis Miller had been autosaved by Microsoft

24   Office.

25   Q.  Okay.  And if you could back out, Agent Hacker, and

439

Direct - Stailey

1   show us -- continue on to the next page and see if we could

2   continue on.

3          Ms. Stailey, do you see the entries for Dennis

4   Miller proceeding onto the next page?

5   A.   Yes.

6   Q.   And that's page 4.  Let's go on to page 5.

7          Are there more entries for Dennis Miller?

8   A.   Yes.

9   Q.   Let's go on to page 6.

10         Is page 6 all of Dennis Miller?

11  A.   Yes.

12  Q.   Let's go to page 7.  I do not have my glasses on.  Can

13  you tell me there -- okay.  All righty.

14         I think they end on that page; is that correct?

15  A.   That's correct.

16  Q.   Okay.  Now I'd like to ask:  Did you retrieve any

17  e-mails from Tramell Thomas from the computer's hard drive

18  located in room J that were between Tramell Thomas and a

19  Arizona state agency employee?

20  A.   Yes, I did.

21  Q.   What was the name of that employee?

22  A.   Adrian Zamora.

23         MS. PALUCH:  Could I have one second, Your Honor?

24         THE COURT:  You may.

25         MS. PALUCH:  No further questions.

Cross - Stailey

1    THE COURT:  All right.  Cross-examination.

2    MR. GOODREID:  Yes, thank you, Your Honor.

3    CROSS-EXAMINATION

4    BY MR. GOODREID:

5    Q.   Ms. Stailey, good afternoon.

6    A.   Good afternoon.

7    Q.   Now, you recall, don't you, Government counsel asking

8    you some questions about an IP address?

9    A.   Yes.

10   Q.   And you testified -- well, please tell me if this is

11   correct -- that you testified that an IP address, say for a

12   desktop computer in someone's home, that would be assigned

13   to them typically by the IP service provider such as AT&T

14   or Comcast; is that right?

15   A.   Typically the computer, itself, is assigned an address

16   automatically by the internet router, and the router is

17   assigned an IP address by the ISP, the internet service

18   provider.

19   Q.   Okay.  So let's say a laptop, for example -- so if I

20   had my laptop at home plugged into my router there, we'd

21   have a particular IP address, correct?

22   A.   Correct.

23   Q.   So if I took that same laptop, though, and I went

24   someplace else, say to Starbucks, would it have the same IP

25   address or a different one?

Cross - Stailey

1    A.   It's possible it would have the same because you're

2    joining a local network and local networks use a reserved

3    set of IP addresses that can be used over and over again by

4    any local network.

5         But the device that assigns you that IP address,

6    like the modem or the router, that is going to have a

7    different IP address for different locations.

8    Q.   So in my example of the laptop computer, it might be

9    the same IP address and it might not; is that fair?

10   A.   Yes.

11   Q.   Okay.  All right.  Let's take a look at Government

12   Exhibit 12 again that Ms. Paluch was just asking you about.

13   Do you recall that?

14   A.   Yes.

15   Q.   And, Ms. Hansen, may I have some assistance from you

16   with respect to the Elmo?  I seem to have -- oh, there we

17   go.  We do have it up?  Beg your pardon.  Okay.

18        So before I get -- before we take a look at that,

19   you recall, don't you, Ms. Stailey, that this was the

20   exhibit that you talked about that had a bunch of search

21   terms that were given to you by Special Agent Ennis, right?

22   A.   Yes.

23   Q.   Okay.  So I'd like you to focus on the last page.

24        Well, first of all, before we get to that, the

25   spreadsheet -- just to be clear, the multiple pages of the

1    spreadsheet on here, again, those are terms that were given

2    to you by Ms. Ennis, correct?

3    A.    Correct.

4    Q.    Okay.  So let's take a look at the very last page.

5    And you see that the last name on there is Tramell Thomas.

6    A.    Yes.

7    Q.    And he's -- you know he's the defendant in this case,

8    right?

9    A.    Yes.

10   Q.    Okay.  And then let's scroll across.  You see the

11   addresses now, starting with 1418 Rushmore?

12   A.    Yes.

13   Q.    And 3532 North Carefree Circle, No. B, and then 1351

14   Pleasant Drive?

15   A.    Yes.

16   Q.    I just want to be clear, so these are search terms

17   that were given to you by Special Agent Ennis, right?

18   A.    Yes.

19   Q.    This is not data that you found in any device --

20   A.    That's correct.

21   Q.    -- right?  All right.  I can take that down.

22          Now let me ask you a hypothetical, Ms. Stailey.

23   Suppose my colleague here, Mr. Smith, and I were in a law

24   office and we had a single desktop computer that we shared.

25   Okay?  And suppose that he used it and I used it and then

Cross - Stailey

1    later, for whatever reason, you were asked to analyze the

2    hard drive.  It is correct, is it not, that you would not

3    be able to tell whether, let's say, a given e-mail was

4    actually input by Mr. Smith or by me; isn't that right?

5    A.   Unless you were using your own user accounts, that is

6    correct.

7    Q.   Okay.  Assume we did not differentiate user accounts.

8    You would not be able to tell by analyzing the hard drive

9    whether he sent an e-mail or whether I did, right?

10   A.   That's correct.

11   Q.   And by the same token, if there was -- if the hard

12   drive analysis showed that I had -- oh, excuse me, that

13   someone on the computer had accessed a particular website,

14   you wouldn't be able to tell whether I had done that or

15   whether Mr. Smith had done that, right?

16   A.   That's correct.

17   Q.   And by the same token, or whether somebody else in the

18   office had used the computer, correct?

19   A.   That's correct.

20   Q.   So let's talk about the Sony Vaio that you actually

21   did an analysis of.  Do you remember that laptop?

22   A.   Yes, I do.

23   Q.   And do you recall that Ms. Paluch asked you a number

24   of questions about that?

25   A.   Yes.

Cross - Stailey

1   Q.   Okay.  Same thing with respect to that laptop
2   computer:  It's not possible to say who made a
3   particular -- excuse me, who accessed a particular website
4   off of that laptop, is it?
5   A.   That's correct, it's not possible.
6   Q.   And it's not possible to say whether -- whether, with
7   respect to a search term or an inmate, whether a particular
8   person did that, right?
9   A.   That's correct.
10  Q.   And with the same inmate, it's conceivable that two
11  different people could have made the same search for the
12  same inmate; isn't that right?
13  A.   Yes, that's correct.
14  Q.   All right.  Let's talk about the Q-007 hard drive.  Do
15  you remember Ms. Paluch asking you questions about that?
16  A.   Yes.
17  Q.   And that's what was found in what you understood to be
18  what's been labeled as room J, right?
19  A.   Yes.
20  Q.   And that was a hard drive from a desktop, right?
21  A.   Yes.
22  Q.   I believe you said it was an HP Desk Smart computer;
23  is that right?
24  A.   A Touchsmart.
25  Q.   Touchsmart.  Okay.  Touchsmart computer.  All right.

Cross - Stailey

1    And you indicated that on that computer -- excuse

2    me, on that hard drive, you found search hits for a number

3    of the individuals that Special Agent Ennis had given you,

4    right?

5    A.    Yes.

6    Q.    You also found some other things -- and that was also

7    the hard drive upon which the e-mail, apparently from Mr.

8    Thomas to the Arizona state employee, was found, correct?

9    A.    Yes.

10   Q.    Okay.  But you also found some other things not -- not

11   e-mails, as such, that were on that laptop -- excuse me, on

12   that hard drive, didn't you?

13   A.    Yes.

14   Q.    In fact, you discovered a Facebook page for Heather

15   Carr; isn't that right?

16   A.    Yes.

17   Q.    You also found an ADT Pulse Live video page for,

18   quote, Heather Carr Home; isn't that right?

19   A.    Yes.

20   Q.    And, again, back to what I was asking you before:

21   There's no way of knowing who put that Facebook for Heather

22   Carr on there, is there?

23   A.    No, there's no way to know.

24   Q.    And there's no way of knowing who put the ADT Pulse

25   Live video page for Heather Carr Home on there, is there?

                          Cross - Stailey

1    A.    That's correct.

2            MR. GOODREID:   Your Honor, may I have just a

3    moment, please?

4            THE COURT:   You may.

5    BY MR. GOODREID:

6    Q.    All right.   If we could pull up Exhibit -- Government

7    Exhibit 23, please.   And if we could highlight -- excuse

8    me, not highlight, but if we could enlarge, say, lines 26

9    and 27 of page 1.

10           All right.   And just to re-situate this, Ms.

11   Stailey, again, this is -- this exhibit is a list of things

12   that you actually found on that particular hard drive;

13   isn't that right?

14   A.    Yes.

15   Q.    And so, for example, here we have in 26, we have Eryn

16   Allegre.   You see that, right?

17   A.    Yes.

18   Q.    And 27, we have Shiraki Ellis, right?

19   A.    Yes.

20   Q.    Again, you found those on the hard drive.   In the next

21   column there, where it talks about the partition, tells you

22   where on the hard drive they were found, right?

23   A.    Yes.

24   Q.    But, again, there's no way of telling who looked --

25   who looked for Eryn Allegre, right?

447
Redirect - Stailey

1   A.   That's correct.

2   Q.   And there's no telling who did for Ms. Ellis, right?

3   A.   That's correct.

4   Q.   And you recall Ms. Paluch asked you a number of

5   questions later on in this exhibit about a person named

6   Dennis Miller?

7   A.   Yes.

8   Q.   And, in fact, there are pages and pages of hits for

9   Dennis Miller, right?

10  A.   Yes.

11  Q.   And all those pages and pages, again, there's no way

12  of telling who accessed the computer to look for Dennis

13  Miller, right?

14  A.   That's correct.

15        MR. GOODREID:   That's all I have, Your Honor.

16        THE COURT:   All right.  Redirect.

17        MS. PALUCH:   Thank you, Your Honor.

18                    REDIRECT EXAMINATION

19  BY MS. PALUCH:

20  Q.   Ms. Stailey, you were asked a hypothetical about

21  e-mail communications and Mr. Goodreid gave you an example

22  that if he and his colleague were sending e-mails from the

23  same computer, would it be difficult to tell who was

24  sending the e-mail; is that correct?

25  A.   Yes.

                        Redirect - Stailey

1    Q.   And do you recall I asked you about whether you found
2    e-mail communication between Tramell Thomas and a state
3    employee?  Do you recall that testimony?
4    A.   Yes.
5    Q.   And you gave the name of that woman, correct?
6    A.   Yes.
7    Q.   And without going into details about that
8    communication, was -- based on your review, was there any
9    question that those e-mails were between an individual
10   named Tramell Thomas and an individual named Adrian
11   Zambora?
12   A.   There was no question that they were between an e-mail
13   account with Tramell Thomas, and the name of the e-mail
14   account, and Adrian Zambora.
15          MS. PALUCH:  Thank you.  No further questions.
16          THE COURT:  May this witness be excused?
17          MS. PALUCH:  Yes, Your Honor.
18          THE COURT:  For the defendant?
19          MR. GOODREID:  Yes, Your Honor.
20          THE COURT:  Ms. Stailey, thank you so much for
21   joining us.  You're excused.  You may step down.
22          All right, the Government may call its next
23   witness.
24          MS. PALUCH:  Thank you, Your Honor.  The United
25   States calls Christine Duncan.

 1            COURTROOM DEPUTY:  Right here, ma'am.

 2            THE WITNESS:  Oh, excuse me.

 3            COURTROOM DEPUTY:  That's okay.  Step in the box

 4    and raise your right hand.

 5          CHRISTINE DUNCAN, GOVERNMENT'S WITNESS, SWORN

 6            COURTROOM DEPUTY:  Please be seated.  State your

 7    full name for the record and spell your first and last

 8    name.

 9            THE WITNESS:  Yes, my name is Christine Duncan.

10    C-h-r-i-s-t-i-n-e, D-u-n-c-a-n.

11            MS. PALUCH:  May I proceed, Your Honor?

12            THE COURT:  You may, counsel.

13            MS. PALUCH:  Thank you.

14                       DIRECT EXAMINATION

15    BY MS. PALUCH:

16    Q.   Good afternoon, ma'am.

17    A.   Good afternoon.

18    Q.   Did you at one time live in Colorado?

19    A.   Yes.

20    Q.   And in the 2010 to 2011 time frame, did you live in

21    Colorado Springs?

22    A.   Yes.

23    Q.   While living in Colorado Springs, did you meet an

24    individual named Tramell Thomas?

25    A.   Yes.

1    Q.   How did you meet him?

2    A.   Through an acquaintance.

3    Q.   Do you know approximately when that was?

4    A.   August of 2010.  At the end of August.

5    Q.   What was the nature of your relationship with Tramell

6    Thomas?

7    A.   I believed it to be a personal relationship.

8    Q.   Did you live together?

9    A.   Yes.

10   Q.   Do you see Tramell Thomas in the courtroom today?

11   A.   Yes.

12   Q.   Could you state where he's seated and what he's

13   wearing.

14   A.   Yes.  He's over there.  And he's wearing a light blue

15   shirt and dark blue tie with a grayish jacket.

16          MS. PALUCH:  I'd ask that the record reflect the

17   witness has identified the defendant.

18          THE COURT:  The record will so reflect.

19          Ma'am, can you scooch up a little bit in your

20   chair, get a little closer to the edge -- there.  Closer to

21   the mic, please.  There you go.

22          THE WITNESS:  Is that better?

23          THE COURT:  That's better.

24   BY MS. PALUCH:

25   Q.   Try to speak right into the microphone if you can.

451

Direct - Duncan

1    A.   Okay.

2    Q.   Ma'am, when you and the defendant were living

3    together, what address was that?

4    A.   It was off of Radiant Drive.

5    Q.   Did you rent that -- was it an apartment or a home?

6    A.   An apartment.

7    Q.   Did you rent that apartment?

8    A.   Yes.

9    Q.   Was the rental in your name?

10   A.   No.

11   Q.   Was it in the defendant's name?

12   A.   No.

13   Q.   In whose name was it?

14   A.   I'm not exactly sure of the exact name.

15   Q.   Do you know why the apartment was not in your name or

16   the defendant's name?

17   A.   Yes, because Tramell explained to me that he didn't

18   want anything coming back to us.

19   Q.   To that address?

20   A.   To the address, yes.

21   Q.   Did anyone else live with you at that Radiant Drive

22   address?

23   A.   No.

24   Q.   When you lived with the defendant in Colorado Springs,

25   do you know what type of car he drove?

Direct - Duncan

1    A.   Yes.  A white Dodge Charger.

2    Q.   Did you ever have occasion to visit Pikes Peak

3    Community College with the defendant?

4    A.   Yes.

5    Q.   Could you explain what occurred during that time.

6    A.   Yes.  We went to Pikes Peak Community College and I

7    inquired about attending.  We received an enrollment

8    packet.  I proceeded to ask a few questions regarding some

9    courses.  And we left with the enrollment packet shortly

10   afterwards.

11   Q.   And what happened after you left with the packet?

12   A.   We went back to the apartment and I filled out the

13   enrollment packet and provided my driver's license and my

14   Social Security card to Tramell.

15   Q.   And why was it necessary for you to give him those

16   documents?

17   A.   He said that he wanted to make some copies.

18   Q.   And what did he do -- did he make those copies, to

19   your knowledge?

20   A.   Yes.

21   Q.   Was it your intent to attend Pikes Peak Community

22   College?

23   A.   Yes.

24   Q.   Did you actually attend Pikes Peak and enroll?

25   A.   No.

453

Direct - Duncan

1    Q.   And why not?

2    A.   I moved to Arizona shortly after I enrolled the

3    following year.

4    Q.   Did you actually complete all the paperwork to enroll?

5    A.   Yes.

6    Q.   Okay.  Now, at some point did you have a discussion

7    with the student -- with the defendant about federal

8    student funds?

9    A.   Yes.

10   Q.   And could you describe for us that conversation.

11   A.   Yes.  So after I filled out the enrollment paperwork,

12   he explained to me that we could apply for student loans,

13   and that the student loans didn't necessarily need to be

14   for items that I needed for school, like books, that we

15   could use it for personal use, such as laptops or a car.

16   Q.   Did you ever fill out a Free Application for Federal

17   Student Aid known as a FAFSA?

18   A.   No.

19   Q.   Have you ever filled out a FAFSA in your life?

20   A.   No.

21   Q.   Did you ever actually receive money to attend

22   Pikes Peak Community College?

23   A.   No.

24   Q.   Were you ever notified that, in fact, you did owe

25   money to Pikes Peak?

Direct - Duncan

1    A.   Yes.

2    Q.   And how did that come about?

3    A.   When I had gone to buy a car, they checked my credit

4    and they showed me my credit report and stated that I had

5    current loans open for Pikes Peak Community College in the

6    state of Colorado that were current.

7    Q.   Okay.  If we could please publish Government's Exhibit

8    57-J, which I believe has been admitted.

9         Mr. Fields, could you confirm that for me.  Could

10   you confirm 57-J, 57-K, and 57-L?  Are they all in?  Oh,

11   which ones?  Oh, they are not in?  Okay.

12        At this time I'd just like you to look -- and

13   there should be an exhibit book, I think it should be book

14   2, Ms. Hansen -- for an exhibit --

15        THE COURT:  Which exhibits are we talking about,

16   counsel?

17        MS. PALUCH:  Your Honor, I'm going to be asking

18   her about 57-B, 57-J through 57-L.  I do believe they are

19   stipulated.

20        THE COURT:  All right.  B is in.  J, K, and L are

21   not.

22        MS. PALUCH:  So I would like to move for their

23   admission and publication at this time.

24        THE COURT:  All right.  Given the stipulation of

25   the parties, Government Exhibits 57-J, 57-K, and 57-L are

Direct - Duncan

1    admitted into evidence and may be published to the jury.

2         (Government's Exhibits 57-J thru 57-L received)

3              MS. PALUCH:   Thank you.

4    BY MS. PALUCH:

5    Q.   Let's begin with 57-J.

6    A.   I'm sorry, this is 57-B.

7    Q.   Okay.  I'm going to ask you about that one.  Let's

8    start, ma'am, though, with 57-J.  And it should show up on

9    the screen right in front of you.

10             Do you see that there?

11   A.   Yes.

12   Q.   Okay.

13   A.   Thank you.

14   Q.   So if we could highlight the caption there, Agent

15   Hacker, the heading.

16             What's the acronym that you see right at the end

17   of that heading?  Do you see where it says FAFSA?

18   A.   FAFSA?  FAFSA.

19   Q.   Do you see your name on this document, ma'am?

20   A.   Yes.

21   Q.   Is that your Social Security number?

22   A.   Yes.

23   Q.   Is that your date of birth?

24   A.   Yes.

25   Q.   And let's go to the next page of that document.  And

Direct - Duncan

1   then one more.  One more.  Do you see -- if you could

2   highlight that, please.

3          Do you see where it says Date FAFSA Received?

4   A.   Yes.

5   Q.   What is the date?

6   A.   12-15 of 2010.

7   Q.   And where were you living, what address on December of

8   2010?

9   A.   We were living off of Radiant Drive.

10  Q.   Please go back to page 1, and highlight the top

11  portion of that document.

12          And underneath your Social and your date of birth,

13  do you see the address there?

14  A.   Yes.

15  Q.   That was your address at that time?

16  A.   Yes.

17  Q.   Okay.  Have you ever seen that document before, ma'am?

18  A.   No.

19  Q.   And you were living, you said, with the defendant at

20  that time?

21  A.   Yes.

22  Q.   Did you submit a FAFSA to receive financial aid in

23  December 2010?

24  A.   No.

25  Q.   Did you give the defendant permission to submit a

Direct - Duncan

1   FAFSA in your name?

2   A.   No.

3   Q.   Did you give anyone else permission to -- to submit a

4   FAFSA for you?

5   A.   No.

6   Q.   If we could please publish now Government's Exhibit --

7   Exhibit 57-K.  And if we could highlight the top portion.

8          Ma'am, do you see your name and date of birth

9   on --

10  A.   Yes.

11  Q.   -- this document?

12         Is that your Social Security number?

13  A.   Yes.

14  Q.   And you see the address listed there?

15  A.   Yes.

16  Q.   Please publish the last page of this exhibit.

17         And I'd like you to tell us:  What is the date

18  FAFSA Received By?

19  A.   5-11, 2011.

20  Q.   Where were you living in May of 2011?

21  A.   Arizona.

22  Q.   Did you submit a FAFSA in May of 2011?

23  A.   No.

24  Q.   Did you give anyone permission to do that for you?

25  A.   No.

Direct - Duncan

1    Q.   Please publish Government's Exhibit 57-L.  And if we

2    could highlight the top caption of that document.

3           And if you could, ma'am, do you see the second to

4    the bottom term -- what is the heading of this document?

5    What's that say?  Do you see where it says Master

6    Promissory Note?

7    A.   William D. Ford Federal Direct Loan Program.

8    Q.   And right above that, what does that say?

9    A.   Federal Direct Unsubsidized Stafford/Ford Loan.

10   Q.   And you see where it says Master Promissory Note?

11   A.   Yes.

12   Q.   Okay.  So let's highlight the information in the next

13   box.

14          And do you see off to the left, ma'am, is that

15   your name?

16   A.   Yes.

17   Q.   And then up at the top right, is that your Social

18   Security number?

19   A.   Yes.

20   Q.   Box 5, is that your date of birth?

21   A.   Yes.

22   Q.   If we could go to the bottom of that document.  And if

23   you could highlight that bottom box.

24          Do you see your name at the bottom left?

25   A.   Yes.

Direct - Duncan

1          THE COURT:  Can we make that any bigger?  I can't
2    read it.
3          MS. PALUCH:  Yes, let's please enlarge that.
4    BY MS. PALUCH:
5    Q.    Do you see your name there?  Is that your middle
6    initial?
7    A.    Yes.
8    Q.    Okay.  If you could go, Agent Hacker, over to the
9    date.
10         Did you affix an electronic signature to that
11   document in January of 2011?
12   A.    No.
13   Q.    Okay.  Let's go to box 7, please, and highlight that,
14   if you could.  It's up at the top.  Or actually, let's see,
15   box 7.  Do you see that?  And can you make that larger?  If
16   you could just take the individuals' names there.  First of
17   all, let's just look at the heading of that box.
18         Can you read the heading of box 7?
19   A.    References.  "List two persons with different U.S.
20   addresses who have known you for at least three years.  The
21   first reference should be a parent or legal guardian."
22   Q.    Okay.  Agent Hacker, could you blow that up.  Thank
23   you.
24         Do you see the names there listed under 1 and 2?
25   A.    Yes.

460

Direct - Duncan

1    Q.   Are you related to anyone named Michelle Duncan?

2    A.   No.

3    Q.   How about Reese Duncan?

4    A.   No.

5    Q.   Are you familiar with either of the addresses under 1

6    or 2?

7    A.   No, I do not have any family members with those

8    addresses.

9    Q.   Do you have any familiarity with the Rice Drive

10   address?

11   A.   No.

12   Q.   Or how about the Circle Drive address?

13   A.   No.

14   Q.   Did you submit this master promissory note?

15   A.   No.

16   Q.   Did you authorize anyone to submit this in your name?

17   A.   No.

18   Q.   You can take that exhibit down, thank you.

19            Ma'am, do you know someone by the name of Ismael

20   Omar?

21   A.   No.

22   Q.   Please publish Government's Exhibit 57-B.  And if you

23   could blow up the top part of that document.  Taking

24   down -- that would be great.

25            Do you see the name "Ismael Omar" in this

Direct - Duncan

1    document?

2    A.   Yes.

3    Q.   Do you see the address listed for him?

4    A.   Yes.

5    Q.   Was that your address?

6    A.   Yes.

7    Q.   Okay.  Let's go to the last page of that document.

8             Do you see Date Received on this document?

9    A.   Yes.

10   Q.   Okay.  And what is that date?

11   A.   04-09 of 2010.

12   Q.   Were you living at Radiant Drive in April of 2010?

13   A.   No.

14   Q.   Okay.  Did you ever live at Radiant Drive with Ismael

15   Omar?

16   A.   No.

17   Q.   Okay.  Did you fill out a FAFSA for Mr. Omar in

18   December 2010?

19   A.   No.

20   Q.   Ma'am, have you -- have you ever lived on Rushmore

21   Drive?

22   A.   Not that I recall, no.

23   Q.   Do you know a woman named Latoya or LaTanya?

24   A.   Yes.

25   Q.   Did you ever live with her?

1    A.   I lived with her for about a week.

2    Q.   Do you recall what address she lived at?

3    A.   No.

4    Q.   Okay.  Ma'am, have you ever been convicted of a

5    felony?

6    A.   Yes.

7    Q.   When was that?

8    A.   2007.

9    Q.   And what was the crime you were convicted of?

10   A.   Identity theft.

11   Q.   Can you explain generally what happened.

12   A.   Yes.  I was with my ex in Pueblo, Colorado.  He had

13   stolen some credit cards from a gas station, as well as

14   held a guy up at knifepoint at a Kmart parking lot.  And we

15   were arrested together.  And -- I believe that was the

16   question, correct?

17   Q.   Right.  Just -- were you later found to have those

18   credit cards in your purse?

19   A.   Yes.

20   Q.   What was your original charge?

21   A.   It was accessory to aggravated assault and identity

22   theft.

23   Q.   And what did you end up pleading guilty to?

24   A.   The identity theft.

25   Q.   And what was your original sentence?

Direct - Duncan

1    A.   My original sentence was a two-year upon-completion

2    deferred.

3    Q.   And did you complete that term?

4    A.   No, I did not.  It was a two-year upon-completion --

5    excuse me, preferred -- deferred probation.  Sorry about

6    that.

7    Q.   So did you -- if you didn't complete that, what

8    happened, then?

9    A.   I --

10   Q.   Did you end up serving any time, ma'am, on that

11   offense?

12   A.   Oh, yes, I'm sorry.  I served 8 and 1/2 months in

13   county.

14   Q.   Okay.  Have you been charged with any other crimes

15   since 2007?

16   A.   No.

17   Q.   While living with Tramell Thomas, did you see him use

18   a cell phone?

19   A.   Yes.

20   Q.   Do you know what type of phone he had?

21   A.   It was a Cricket Huawei phone.

22   Q.   How is it you remember that?

23   A.   We both shared Huawei phones.  We both had a Huawei

24   phone, excuse me.

25   Q.   Did you ever have occasion to see text messages on

                        Direct - Duncan

1    Tramell Thomas' phone?

2    A.   Yes.

3    Q.   Did you ever see Social Security numbers in those text

4    messages?

5    A.   Yes.

6    Q.   Can you tell us about that.

7              MR. SMITH:   I'm going to object, Your Honor.   I

8    believe it calls for hearsay.

9              MS. PALUCH:   Your Honor --

10             THE COURT:   Ms. Paluch.

11             MS. PALUCH:   Admission of the party opponent, Your

12   Honor.   These are -- this is evidence pertaining to the

13   crime at issue here.   These are messages this witness has a

14   familiarity with --

15             THE COURT:   Well, the --

16             MS. PALUCH:   -- the defendant's --

17             THE COURT:   The messages coming back to him are

18   not an admission of a party.

19             MS. PALUCH:   Correct, but messages that, if this

20   witness can testify --

21             THE COURT:   Well, you asked -- you asked a general

22   question about all text messages on his phone.

23             MS. PALUCH:   You're correct, Your Honor.   Let me

24   correct that, if I may.

25             THE COURT:   Okay.   You may have.

465
Direct - Duncan

1    BY MS. PALUCH:

2    Q.   Did you ever see messages that appeared to be sent by

3    the defendant Tramell Thomas?

4    A.   Yes.

5    Q.   And what messages -- or what was in the messages that

6    you saw, specifically only stating what was in a message

7    that you believed to be from the defendant?

8             MR. SMITH:   Renew my objection, Your Honor.

9             THE COURT:   Overruled.   It's nonhearsay.   It's a

10   statement by the party.   Go ahead.

11            THE WITNESS:   Okay.   So the text message --

12            THE COURT:   But, ma'am, just -- just the text

13   messages that were being sent from that phone, from Mr.

14   Thomas' phone.

15            THE WITNESS:   Okay.

16            THE COURT:   All right.   Go ahead.

17            THE WITNESS:   I'm sorry, Your Honor, the ones that

18   he sent?

19            THE COURT:   Correct.

20            THE WITNESS:   Okay.   He sent a text message that

21   stated, "Don't worry, I have a woman out here working for

22   me."   And --

23   BY MS. PALUCH:

24   Q.   Was there anything --

25   A.   I'm sorry.

Direct - Duncan

1    Q.   Was there anything said about student loans --

2    A.   Yes.

3    Q.   -- from the defendant's -- from the defendant?

4    A.   Yes.

5    Q.   What was said about student loans?

6    A.   He stated that she will -- we will be applying for

7    student loans for her.

8    Q.   Did you see any reference from the defendant about

9    money in those text messages?

10   A.   Yes.

11   Q.   And what do you recall the defendant saying in those

12   text messages about money?

13   A.   That the money that I was making -- he said, "I have a

14   girl out here working and that's how you'll receive the

15   money.  She gave me the money."

16   Q.   What were you thinking when you saw those texts?

17   A.   Well, I was --

18           MR. SMITH:  Objection.  Relevance, Your Honor.

19           THE COURT:  Overruled.

20           THE WITNESS:  I was personally hurt by the text

21   messages because I had found out that the money that I was

22   making was going to another individual.

23   BY MS. PALUCH:

24   Q.   When you say "another individual," do you know if it

25   was a woman or a man?

Direct - Duncan

1    A.    Yes.  It was a woman.  And I was hurt because he had
2    told me that we were going to start a family together and
3    that we were in love, basically, so it was hurtful.
4    Q.    Did you ask him about those messages?
5    A.    Yes.
6    Q.    What did he say to you?
7    A.    He told me not to worry about them, that we were still
8    going to apply for the student loans and be happy together,
9    be a family.
10   Q.    During that time, Ms. Duncan, were you using
11   methamphetamine?
12   A.    Yes.
13   Q.    Was your -- was your memory clouded by that drug?
14   A.    Yes.
15   Q.    Are you off drugs now, ma'am?
16   A.    Yes.
17   Q.    How long have you been off?
18   A.    Four years.
19   Q.    Congratulations.
20   A.    Thank you.
21   Q.    How is it, given your drug use, that you specifically
22   recall those text messages?
23   A.    I recall those text messages because I was, you know,
24   alone in our apartment and I was just hurt by them because
25   I found out that the money that I was working so hard to

468
Direct - Duncan

1    get was going towards another woman and a family out in
2    another state.
3    Q.   In what state was that?
4    A.   Arizona.
5    Q.   During the time you were with Tramell Thomas, did he
6    travel outside of Colorado?
7    A.   Yes.
8    Q.   Where?
9    A.   He told me he was going to Arizona.
10   Q.   Did he tell you why he was going to Arizona?
11   A.   He told me he was traveling out there to set up
12   housing and get everything situated for him and me to move
13   out there.
14   Q.   I'd like to move you to the spring of 2011.  Where did
15   you live at that time?
16   A.   Arizona.
17   Q.   And why did you move from Colorado to Arizona?
18   A.   To continue working.
19   Q.   And what were you doing with the money that you
20   earned?
21   A.   I was handing the money over to who I had believed to
22   be his family members.
23   Q.   And do you remember any names of those individuals?
24   A.   Marcie and Sadie.
25   Q.   Sadie.  Okay.  Did you -- what was the purpose of you

Cross - Duncan

1    handing money over to those individuals?

2    A.    They told me that the money would be going to his

3    lawyer fees.

4    Q.    So did you ever pay the money directly to an attorney?

5    A.    No.

6    Q.    In -- I think you testified you gave it to those two

7    women?

8    A.    Yes.

9    Q.    Do you know for certain that the money you gave to --

10   you said Sadie and Marcie?

11   A.    Yes.

12   Q.    Do you know if that money actually went to Thomas'

13   attorney?

14   A.    No.

15          MS. PALUCH:  Could I have one moment, Your Honor?

16          THE COURT:  You may.

17          MS. PALUCH:  No further questions, Your Honor.

18          THE COURT:  All right.  Cross-examination.

19                      CROSS-EXAMINATION

20   BY MR. SMITH:

21   Q.    Ma'am, these text messages you saw on the phone, when

22   did you see those?

23   A.    I believe I saw them in the year of 2010.

24   Q.    Okay.

25   A.    The end of 2010.

                        Cross - Duncan

1    Q.   The end of 2010?

2    A.   Yes.

3    Q.   Would that be December, November?

4    A.   Yes, I believe so.

5    Q.   Which?

6    A.   I'm not exactly sure which month.

7    Q.   Okay.  How much methamphetamine were you using during

8    November and December of 2011?

9    A.   I would use daily.

10             THE COURT:  Of 2011 or '10?

11             MR. SMITH:  Excuse me, 2010, Your Honor.  Thank

12   you.

13             THE COURT:  You said 2011.

14             THE WITNESS:  I was using daily.

15   BY MR. SMITH:

16   Q.   And how did you use the meth?

17   A.   I smoked it.

18   Q.   Okay.  And when you ingested the methamphetamine, what

19   was the effect on you?

20             MS. PALUCH:  Objection, Your Honor.  Relevance.

21             THE COURT:  Overruled.  You opened the door.

22             THE WITNESS:  I was -- I would describe it as

23   pretty far gone.  I was high.

24   BY MR. SMITH:

25   Q.   You were high.  You were pretty far gone.  It affects

Cross - Duncan

1    your ability to move, ambulate, does it not?

2    A.    No.   I -- I'm able to move.   It's just felt numb.

3    Q.    You felt numb.   Physically numb.   What did your mind

4    feel like?

5    A.    Mentally numb as well.   Just zoned out.

6    Q.    Zoned out.   Okay.

7              THE COURT:   You have to give an audible answer,

8    ma'am.   You just shook your head.   You have to give an

9    audible -- an oral answer.

10             THE WITNESS:   Oh, I'm sorry.   Just zoned out.

11   There, present, but not -- like mentally there, if that

12   makes any sense.

13   BY MR. SMITH:

14   Q.    Okay.   And you're smoking this methamphetamine daily

15   in November and December of 2010.

16   A.    Yes.

17   Q.    Okay.   If I understood you correctly, ma'am, I believe

18   you said you went to Pikes Peak Community College with Mr.

19   Thomas?

20   A.    Yes.

21   Q.    To investigate enrolling?   Enrolling --

22   A.    I was inquiring about enrolling to Pikes Peak

23   Community College.

24   Q.    Okay.   And you got a packet?

25   A.    Yes.

1    Q.   Okay.  Did you examine that packet?

2    A.   Yes.

3    Q.   Okay.  And in January -- this was in January of 2011,

4    correct?

5    A.   I don't really recall the exact month that we went

6    there.

7    Q.   Okay.  Well, would it have been in November of 2010?

8    A.   I can't recall the exact month.

9    Q.   Okay.

10   A.   Sorry.

11   Q.   Was it before or after you saw these text messages?

12   A.   It was before.

13   Q.   Okay.  So it could have been in the fall of -- early

14   fall of 2010?

15   A.   Like I said, I can't recall the exact month or -- I

16   know it was towards the end of 2010, the year 2010.

17   Q.   Okay.  But it was during the same time period when you

18   were smoking methamphetamine daily?

19   A.   Yes.

20   Q.   And does that affect your ability to remember when you

21   went to the school?

22   A.   Yes.

23   Q.   What did you do with the packet that you got at the

24   school that day?

25   A.   I filled it out fully -- fully, I filled it out.

1    Q.   Okay.  And what happened to it?

2    A.   I left it for Tramell to do what he needed to do with

3    it.

4    Q.   Okay.  He was to turn it in for you?

5    A.   We -- we had discussed that we would eventually turn

6    it in, but I never knew what happened to it after -- after

7    I filled it out.

8    Q.   Okay.  And you're certain you weren't applying for any

9    financial assistance, any student loans?

10   A.   No -- yeah, I'm certain.

11   Q.   You're certain of that?

12   A.   Yes.  I just filled out the enrollment packet.

13   Q.   During the investigation of this case, you've been

14   interviewed half a dozen times by agents of the federal

15   government, correct?

16   A.   Yes.

17   Q.   And do you remember your first interview with them

18   back on September 7th of 2012?

19   A.   Vaguely.

20   Q.   Vaguely?  Were you still smoking methamphetamine

21   daily?

22   A.   In 2012?

23   Q.   Yes.

24   A.   No.

25   Q.   You weren't?  Were you smoking it at all?

Cross - Duncan

1    A.   Periodically, yes.

2    Q.   Okay.  Do you remember telling -- you recognize Agent

3    Ennis here, do you not?

4    A.   Yes.

5    Q.   She's interviewed you any number of times?

6    A.   Yes.

7    Q.   Do you remember telling her on September 7th of 2012

8    that you admitted going with Thomas to Pikes Peak Community

9    College and applying for student loans?

10   A.   No.

11   Q.   You never said that to her?

12   A.   I don't recall.

13   Q.   Okay.  If she wrote that down, is she in error?

14   A.   She might -- she might be.

15   Q.   She made the mistake, not you?

16   A.   I -- I know that I didn't apply for student loans.

17   Q.   But you don't remember when you went there?

18   A.   Correct.

19   Q.   Do you remember talking to Agent Ennis again about a

20   week later on September 13th, 2012?

21   A.   I've had many conversations with Ms. Ennis.  I don't

22   really recall all the exact dates.  I don't . . .

23   Q.   I understand.  That's fair enough.

24        Do you remember the interview before you actually

25   broke down during the interview crying because of your use

Cross - Duncan

1    and abuse of methamphetamine?

2    A.    I've been hysterical talking with Ms. Ennis quite a

3    few times because of my past.

4    Q.    I'm confused about this felony conviction of yours.

5    As I understand your description, when you originally pled

6    guilty, you got a deferred judgment?

7    A.    Yes.  It would have been a deferred upon me completing

8    probation.

9    Q.    Okay.  So the --

10   A.    Complying with it.

11   Q.    The agreement was as long as you don't violate the law

12   for two years, you won't have a felony conviction?

13   A.    Yes.

14   Q.    But you do have a felony conviction.

15   A.    Yes.

16   Q.    What law did you violate to trigger the default on the

17   deferred judgment?

18   A.    I violated my probation.

19   Q.    And how did you do that, ma'am?

20   A.    I continued using, and I did not meet with my

21   probation officer on scheduled appointment days, and I did

22   not comply with the rehab that they sent me to.

23   Q.    And this goes back to the '07-'08 time period?

24   A.    Yes.

25   Q.    And were you smoking methamphetamine then as well?

476

1    A.   Yes.  Oh, no, I'm sorry, in 2007, 2008, no.  My drug

2    of choice was crack cocaine back then.

3    Q.   Crack cocaine.

4              MR. SMITH:  May I have one moment, Your Honor?

5              THE COURT:  You may.

6              MR. SMITH:  Thank you very much, ma'am.  I have no

7    further questions at this time.

8              THE COURT:  Redirect.

9              MS. PALUCH:  None, Your Honor.  Thank you.

10             THE COURT:  All right.  I have a question for you,

11   Ms. Duncan.

12             You testified that when you discovered the text

13   messages on the defendant's cell phone, that you were hurt

14   because all the money you were making you found out was

15   going to another woman.  What money are we talking about?

16             MS. PALUCH:  May we approach?

17             MR. SMITH:  Your Honor, may we approach?  May we

18   approach?

19             THE COURT:  Okay.

20        (Discussion at side bar)

21             MS. PALUCH:  Your Honor, the money she earned was

22   through her prostitution, so this is the topic that we had

23   discussed not getting into.

24             THE COURT:  Oh, that's right.  I was just

25   trying -- I didn't understand if this was legitimate earned

477
                    Examination - Duncan

1   income that wasn't reported on this FAFSA summary where
2   there's a zero.
3           MS. PALUCH:  Yeah.  It's for prostitution.
4           THE COURT:  Okay.  That's your understanding?
5           MR. SMITH:  Yes.
6           THE COURT:  Okay.
7           MS. PALUCH:  Thank you.
8           THE COURT:  Let me think here now how to back out
9   of this without causing --
10          MS. PALUCH:  I think you could follow up by just
11  saying:  Did I understand correctly that you were -- you
12  remember the text message because it was money you were
13  earning, and just stop with that?
14          THE COURT:  All right.  I think that's good.  All
15  right.
16      (End of discussion at sidebar)
17          THE COURT:  Just so I'm understanding your
18  testimony correctly, Ms. Duncan, you remembered these
19  messages and you were upset by them because this was money
20  that you had earned and you learned it was going to another
21  woman?
22          THE WITNESS:  Yes, your Honor.
23          THE COURT:  Okay.  I'll allow additional follow-up
24  questions from counsel based on the Court's questions.
25                      EXAMINATION

                      Examination - Duncan

1    BY MS. PALUCH:

2    Q.   Ma'am, you've been very open about your drug abuse.

3    A.   Yes.

4    Q.   Does that affect your ability to recall those text

5    messages as you sit here today?

6    A.   Yes.

7    Q.   Do you recall those text messages --

8    A.   I mean, the specific text messages that I remember

9    distinctly, no.  But I mean, other text messages that I

10   saw, it's --

11   Q.   Right.  You've testified here today that you were hurt

12   and you've explained why you were hurt.

13   A.   Yes.

14   Q.   Do you recall that, as you testify here today?

15   A.   Yes.

16   Q.   Thank you, ma'am.

17           THE COURT:  Okay.  For the defendant?

18           MR. SMITH:  I have nothing, Your Honor.

19           THE COURT:  Okay.  May this witness be excused,

20   for the Government?

21           MS. PALUCH:  Yes, Your Honor.

22           THE COURT:  For the defendant?

23           MR. SMITH:  Yes.

24           THE COURT:  All right.  Ms. Duncan, thank you for

25   your testimony.  You're excused and you may step down.

Examination - Duncan

1          Government may call its next witness.

2          MR. FIELDS:  Your Honor, we've been informed that

3     our next witness is en route.  She should be here shortly

4     after 3:00.

5          THE COURT:  Okay.  So I guess we'll take an early

6     afternoon break.  Do you have any estimate of when she'll

7     be here?

8          MR. FIELDS:  En route from Denver International

9     Airport, so --

10         THE COURT:  Is she like leaving the airport or

11    closer to downtown?

12         MR. FIELDS:  On the highway.

13         THE COURT:  All right.  Folks, we're going to take

14    a 20-minute afternoon break, and if our next witness is not

15    here, I'll just ask you to please be patient.

16         All right.  We'll be in recess.

17       (Recess taken at 2:39 p.m.)

18       (In open court outside the presence of the jury at

19    3:27 p.m.)

20         THE COURT:  All right.  For the Government, I want

21    to get a sense of who's left and when you anticipate

22    calling as witnesses.

23         MS. PALUCH:  Your Honor, the next witness is

24    Marcelle Green.  After Marcelle Green, it would be Special

25    Agent Ennis.  And that is the last witness that we have.

Examination - Duncan

1        THE COURT:  Okay.  So you anticipate calling
2    Special Agent Ennis tomorrow morning?
3        MS. PALUCH:  If that's the Court's preference.  It
4    depends --
5        THE COURT:  Well, how long are we going to go with
6    Ms. Green?
7        MS. PALUCH:  It's hard to say, depending on the
8    cross with Ms. Green, but it's very likely that could take
9    the rest of the afternoon.
10        THE COURT:  Okay.  All right.
11        MS. PALUCH:  So then if that were the case, we
12    would start with Agent Ennis in the morning and that
13    would -- we would then rest after her testimony.
14        THE COURT:  All right.  And does Ms. Green have
15    counsel here?
16        MS. PALUCH:  She does.
17        MS. JERALYN MERRITT:  Yes, Your Honor, Jeralyn
18    Merritt appearing for Ms. Green.
19        THE COURT:  Yes, Ms. Merritt.  Can you get a
20    little bit closer so that --
21        MS. JERALYN MERRITT:  Sure.
22        THE COURT:  Why don't you sit at that -- maybe you
23    could sit at that back table there.
24        MS. JERALYN MERRITT:  Here?
25        THE COURT:  Yes.  And then I will introduce you to

Examination - Duncan

1   the jury and let them know that you're the witness'
2   attorney.  And I think that's all we need to discuss right
3   now.
4           MS. JERALYN MERRITT:  Okay.
5           THE COURT:  Okay, let's bring in the jury.
6           THE COURT:  Thank you very much for your patience,
7   ladies and gentlemen of the jury.  As I mentioned to you on
8   the first day that there would be these kind of pauses, but
9   we ask for your indulgence and your patience given the
10  importance of what we're dealing with here.
11          Let me just mention to you the next witness is
12  going to be a codefendant in this case who has pled guilty,
13  is not going to trial.  She has her lawyer here present,
14  Ms. Jeralyn Merritt, at the back table there, and she's --
15  Ms. Merritt is here because the law allows individuals in
16  Ms. Green, the next witness' situation, to have counsel
17  present in the courtroom to make any appropriate objections
18  that counsel sees fit.
19          All right.  The Government may call its next
20  witness.
21          MR. FIELDS:  Thank you, Your Honor.  We call
22  Marcelle Green to the stand.
23          THE COURT:  All right.
24          COURTROOM DEPUTY:  Right here, ma'am.  Just please
25  stand in the box and raise your right hand.

                              Direct - Green

1           MARCELLE GREEN, GOVERNMENT'S WITNESS, SWORN

2               COURTROOM DEPUTY:  Please be seated.  Scoot your

3       chair up.  Put your elbows right on the stand so that we

4       can -- put your mouth right there.

5               Please state your full name for the record and

6       spell your first and last name.

7               THE WITNESS:  Marcelle Ruby Green,

8       M-a-r-c-e-l-l-e, G-r-e-e-n.

9               THE COURT:  You may proceed, counsel.

10              MR. FIELDS:  Thank you, Your Honor.

11              Before we get into it, at this point I would move

12      into evidence Government's Exhibit 32, which has been

13      stipulated to by the parties.

14              THE COURT:  Okay.  One second.  All right, given

15      the stipulation of the parties, Government Exhibit 32 is

16      admitted into evidence and may be published to the jury.

17          (Government's Exhibit 32 received)

18              MR. FIELDS:  Thank you, Your Honor.

19                          DIRECT EXAMINATION

20      BY MR. FIELDS:

21      Q.   Ms. Green, did you participate in a scheme to steal

22      money from the Department of Education?

23      A.   Yes, I did, sir.

24      Q.   Did you agree to participate in that scheme with other

25      people?

Direct - Green

1    A.   Yes, I did.

2    Q.   Do you see one of those people in the courtroom here

3    today?

4    A.   Yes, I do.

5    Q.   Who do you see?

6    A.   Tramell Thomas.

7    Q.   Could you describe where he's sitting and an article

8    of clothing that he's wearing.

9    A.    In the side over here, between his two lawyers, and he

10   has a black jacket on.

11          MR. FIELDS:  Your Honor, I'd like the Court -- or

12   to re -- the record to reflect that the witness has

13   identified the defendant.

14          THE COURT:  The record will so reflect.

15   BY MR. FIELDS:

16   Q.   Ms. Green, as a result of your choice to participate

17   in a fraud scheme, what has happened to you?

18   A.   I've been indicted and I pleaded guilty.

19   Q.   Do you have an agreement with the Government?

20   A.   Yes, I do.

21   Q.   Let's look at it.  It's Government Exhibit 32.  Is

22   this your agreement?

23   A.   Yes, sir.

24   Q.   If we could go to the last page.  Does that have your

25   signatures on it?

484

Direct - Green

1    A.    Yes, it does.

2    Q.    Take it down.

3          What are your obligations under that agreement?

4    A.    Just to be truthful.

5    Q.    And what do you hope to get in return for this

6    agreement?

7    A.    Leniency on my sentence.

8    Q.    Do you know how much you will get off of your

9    sentence?

10   A.    No, I don't.

11   Q.    Who decides what your stints will be?

12   A.    The judge.

13   Q.    Now, is this the first time you've been in trouble

14   with the law?

15   A.    No, sir.

16   Q.    Have you been convicted of a drug crime?

17   A.    Yes, I have.

18   Q.    What happened?

19   A.    Possession of marijuana with the intent to sell was

20   my -- what I was convicted with.

21   Q.    How much marijuana?

22   A.    300 pounds.

23   Q.    Does that have anything to do with your involvement in

24   this fraud scheme?

25   A.    No, sir.

Direct - Green

1    Q.    Have you already been sentenced for that crime?

2    A.    Yes, I have.

3    Q.    So does your plea agreement in this case have any

4    effect on the outcome in that case?

5    A.    No, sir.

6    Q.    When did you first agree to be part of the conspiracy?

7    A.    Somewhere in 2010.  I can't give you an exact date,

8    I'm sorry.

9    Q.    Who approached you about becoming part of the

10   conspiracy?

11   A.    Heather Carr.

12   Q.    Where did that happen?

13   A.    At her location in Pleasant Drive.

14   Q.    Pleasant Drive where?

15   A.    In Chandler.  I believe Chandler, Arizona.

16   Q.    Describe to us what happened.

17   A.    Conversation at a barbecue, I believe it was around

18   Easter -- yeah, Easter, and just a discussion on how to get

19   money fraudulently by filing false claims.

20   Q.    After that discussion, how long were you part of the

21   conspiracy?

22   A.    To roughly about 2012.

23   Q.    While you were a member of the conspiracy, who were

24   the other members of the conspiracy?

25   A.    Mercede Diaz, Heather Carr and Tramell Thomas.

Direct - Green

1   Q.   Now, you testified, you pleaded guilty to a scheme to

2   defraud the Government.  Did you file false claims with the

3   Government?

4   A.   Yes, I did, sir.

5   Q.   What were the false claims?

6   A.   The false claims were the FAFSA the enrollment to

7   school.

8   Q.   What was false about the FAFSAs you submitted?

9   A.   The information on the students as far as their

10  addresses and their locations.

11  Q.   If you had put the truth into those FAFSAs, would you

12  have received money?

13  A.   No.

14  Q.   Why not?

15  A.   Because they -- you have to be a present-person

16  student and they weren't present.  So if we would have put

17  they were in prison, nothing would have happened.

18  Q.   So you've been talking about these people in prison.

19  Whose identities did you put into the FAFSAs?

20  A.   Inmates.

21  Q.   Why prison inmates?

22  A.   Because prison inmates are incarcerated for a number

23  of years and wouldn't think that it would come up -- they

24  wouldn't look it up, theirself, while they were in prison.

25  Q.   How did you decide which prison inmates to use?

Direct - Green

1    A.   The length of sentence.

2    Q.   And how did you find out whether or not someone was in

3    prison?

4    A.   It's public records.  You can just see if they're in

5    prison or not.

6    Q.   So what was the overall purpose of the conspiracy?

7    A.   To receive funds.

8    Q.   And who were the victims of the conspiracy?

9    A.   The inmates and the school and the Government.

10   Q.   Did you submit the FAFSAs using the internet?

11   A.   Yes, I did.

12   Q.   What computer did you use?

13   A.   I used the black laptop and a desktop.

14   Q.   Where was that desktop located?

15   A.   At 4630 South 21st Place.

16   Q.   What is that address?  What --

17   A.   That's my house.  That's my address.

18   Q.   That's your house?

19   A.   Yes.

20   Q.   And you mentioned a laptop?

21   A.   Yes.

22   Q.   Where was the laptop located?

23   A.   The laptop was located at 4630 South 21st Place and

24   the address on Pleasant Drive in Chandler.

25   Q.   That address on Pleasant Drive, what's significant

Direct - Green

1    about that?

2    A.   That's Heather Carr's location.

3    Q.   Did you need the internet to submit the FAFSAs?

4    A.   Yes, sir.

5    Q.   Where did you go to use the Internet?

6    A.   My address at 4630 Pleasant Drive and then a local

7    Starbucks.

8    Q.   After a FAFSA was submitted, what did you have to do

9    next to get loan money?

10   A.   You have to enroll in school.

11   Q.   How would you enroll?

12   A.   Go to the internet site of the school and enroll and

13   then you would get a letter of acceptance.

14   Q.   What kind of information did you need to enroll in the

15   school?

16   A.   The student's information -- I mean the inmate's

17   information, the location of the address where they're

18   going to.

19   Q.   So just like the FAFSA, was the information in the

20   paperwork you submitted to schools truthful?

21   A.   No, sir.

22   Q.   What was untruthful about it?

23   A.   The address of the inmates.

24   Q.   Also was the identity of the --

25   A.   Of the identity, yes.

Direct - Green

1    Q.   Would colleges sometimes ask for documents that were
2    signed?
3    A.   Yes.
4    Q.   So when a college asked for a document that had to be
5    physically signed, what would you do?
6    A.   Get it printed out, sign it, and then fax it over at a
7    local mail and sell, where you can do fax and things like
8    that.
9    Q.   Would you sign it in your own name?
10   A.   No, sir.
11   Q.   What name would you sign?
12   A.   The -- the name of the inmate.
13   Q.   How did you decide which colleges to pick?
14   A.   Colleges that had online classes where you didn't
15   physically have to be in the classroom.
16   Q.   Why was that important?
17   A.   Because the people were not here, so we couldn't get
18   classes that you had to attend in person.
19   Q.   Where were these colleges located?
20   A.   In Colorado and in Phoenix, Arizona.
21   Q.   What were the colleges in Colorado?
22   A.   Pikes Peak.
23   Q.   And what were the colleges in Arizona?
24   A.   Sorry.  Phoenix College, sorry, and Mesa Community
25   College.

490

Direct - Green

1    Q.   In order to actually get money for student aid, were
2    you required to take classes?
3    A.   Yes, sir.
4    Q.   How many?
5    A.   Four.
6    Q.   Did you take classes?
7    A.   Yes, I did.
8    Q.   So how did that part of the scheme work?
9    A.   You would just log in and -- into the classes and do
10   the homework and submit it so you can stay enrolled in the
11   class.
12   Q.   And why did you have to stay enrolled in the class?
13   A.   In order to receive the funds, you have to be enrolled
14   in class.
15   Q.   How did you decide which classes to pick?
16   A.   The classes that mainly just had discussions or short
17   essays that you could submit.  Those classes you didn't,
18   you didn't want to pick classes that included like math or
19   anything too long like that.
20   Q.   Would you take lots of different classes or the same
21   classes?
22   A.   Usually the same classes.
23   Q.   Why the same classes?
24   A.   Because we already knew -- the work, and we would just
25   resubmit it.

491
Direct - Green

1   Q.   How would the colleges actually send out the student
2   aid?
3   A.   In a debit card form.
4   Q.   And where would the colleges send those debit card?
5   A.   To the addresses that's on the enrollment form.
6   Q.   How did you decide which addresses to put on the
7   enrollment forms?
8   A.   Just split them up on the list.  It wasn't just like a
9   pinpoint, oh, this one's going to go here; it was just
10  randomly.
11  Q.   Well, did you know which addresses the card would go
12  to?
13  A.   Yes.
14  Q.   How did you get those addresses?
15  A.   The addresses were my physical address.
16  Q.   Were any other addresses used as part of the scheme?
17  A.   Yes.
18  Q.   Which addresses?
19  A.   1915 East Mulberry.
20  Q.   And why didn't you just have all the cards sent to one
21  address?
22  A.   Because we feel it would set off an alert if we had
23  too many going to the address.
24  Q.   After you got the debit cards, could you get money off
25  of them?

492

Direct - Green

1    A.    Yes.

2    Q.    How much in a day?

3    A.    $1,000 was the limit.

4    Q.    So as a result of that, what did you do to actually

5    get the money off the cards?

6    A.    Go to local ATMs or go to local grocery stores and get

7    cash back.

8    Q.    You went to the grocery stores, would you get items,

9    too?

10   A.    Yes.  Buy like a pack of gum and get the cash back

11   limit that they have for the day.

12   Q.    Did you divide up this money with other members of the

13   conspiracy?

14   A.    Yes, I did.

15   Q.    Who?

16   A.    Heather Carr.

17   Q.    How much money did Heather Carr get?

18   A.    If the cards were coming to my house, she would

19   receive 60, I would receive 40.  And then if I went and

20   helped her with her cards, she would receive 70, I would

21   receive 30.

22   Q.    You say "helped her with her cards."  What does that

23   mean?

24   A.    Withdraw her money for her for cards that she had in

25   her possession already.

Direct - Green

1    Q.   Do you know how she got those cards in her possession?

2    A.   To the addresses that were used on the forms filled

3    out.

4    Q.   At any point during the conspiracy, did Thomas get any

5    of that money?

6    A.   I physically didn't hand any money to him.

7    Q.   Who would you hand the money to?

8    A.   Heather.

9    Q.   Who would be present when you handed the money to

10   Heather?

11   A.   Either Tramell Thomas, sometimes Mercedes Diaz, and

12   our children.

13   Q.   Describe to the members of the jury the times where

14   the defendant, Tramell Thomas, was there when you delivered

15   the money.

16   A.   I can't --

17             MR. SMITH:   Could we have some foundation as to

18   time, Your Honor.

19             THE COURT:   Yeah.   I -- let's get this in a time

20   frame.

21             MR. FIELDS:   All right.

22   BY MR. FIELDS:

23   Q.   When did the conspiracy take place?

24   A.   In 2010, around April, but the first enrollment wasn't

25   until July, I believe.

494

Direct - Green

1    Q.   And approximately when were you delivering money to
2    Heather Carr?
3    A.    Late in the summer of 2010, all the way until 2012,
4    the middle of 2012.
5    Q.   And these times that we're going to talk about where
6    the defendant was there, do you remember approximately when
7    that was?
8    A.   I can't give a definite date.
9    Q.   Sometime within that time period?
10   A.   Yes, within that time period.
11   Q.   So, again, describe to the members of the jury those
12   times where Tramell Thomas was present.  What was he doing?
13   A.   I'm just --
14        MR. SMITH:  Well, Your Honor, I would object.
15   Could we take it in sequence?  He's referring to multiple
16   times.
17        THE COURT:  Overruled.  I think we can -- I think
18   she has set the stage well enough.  Go ahead.
19   BY MR. FIELDS:
20   Q.   You can answer the question, Ms. Green.  So when you
21   saw the defendant present when you delivered money,
22   describe what you saw.
23   A.    Just us hanging around.  It was either sometimes a
24   barbecue or just over there for -- randomly, but it wasn't
25   physically him -- me handing him the money, it was just him

Direct - Green

1    standing around.

2    Q.   When you handed the money, describe how the money was

3    packaged.

4    A.   In 20s.

5    Q.   Was it rolled up, was --

6    A.   No, just in form -- just -- not rolled up, not

7    anything, just altogether.

8    Q.   Did you put it in an envelope?

9    A.   No.

10   Q.   So when you say altogether, again, describe to me, is

11   it sort of fanned out --

12   A.   No, it's just in a stack.  Just in a stack.

13   Q.   What did Carr do with that money?

14   A.   Her living expenses to care -- and financial -- and

15   legal fees.

16   Q.   Would she go on vacation?

17   A.   Yes.

18   Q.   Who did she go on those vacations with?

19   A.   Her children and sometimes Mercedes.

20   Q.   Anyone else?

21   A.   Not that I know of.

22   Q.   What kind of house did she live?

23   A.   She had two different house locations, so the one on

24   Pleasant Drive or the one on Kaibob.

25   Q.   The latter one.

Direct - Green

1   A.   Kaibob, it was a nice house.  Beautiful --

2   Q.   When did she get that house?

3   A.   I would say sometime in the beginning of 2012.  I

4   could be wrong.

5   Q.   Who lived there with her?

6   A.   Heather Carr, Tramell Thomas and their children.

7   Q.   Were you able to observe Thomas and Carr's lifestyle?

8   A.   Yes.

9   Q.   How would you describe that lifestyle?

10  A.   Nice lifestyle.

11  Q.   Can you go into any more detail?  What would be nice?

12  A.   I mean, nice house, nice cars, you know.  Just all the

13  basic, and the up-to-date electronics.  Just not too many

14  worries, that's what I would say.

15  Q.   Let's talk about other members of the conspiracy.  You

16  mentioned Heather Carr.  What was her role in the

17  conspiracy?

18  A.   I believe it was a major role.

19  Q.   What did she do?

20  A.   She got the information of the inmates and the Social

21  Security numbers and the birth dates and as far as

22  processing FAFSAs and applications and homework.

23  Q.   Do you know how she got that information?

24  A.   From her job.

25  Q.   What was her job?

Direct - Green

1    A.   She was a loan closer at CarMax.

2    Q.   Who would she give that information to?

3    A.   To the -- for me, I know me, myself.

4    Q.   Did she give it to anyone else?

5    A.   I can't speak for that.

6    Q.   When she gave it to you, how would she give it to

7    you?

8    A.   On a paper -- on a lined piece of paper, regular

9    subject paper.

10   Q.   Describe to us what would be on a typical sheet of

11   paper from Heather Carr.

12   A.   The names, the birth dates, and the address -- I mean,

13   sorry, the names, the birth dates, and the Social Security

14   numbers.

15   Q.   And what would you do with that information?

16   A.   I would submit that into FAFSA.

17   Q.   Now, let's talk about Tramell Thomas.  You said he was

18   part of the conspiracy.

19   A.   Correct.

20   Q.   What was his role?

21   A.   His role -- I can't say if he did homework and I can't

22   say if he had a major role, but he had some role in it.

23   Q.   Well, did you ever see him participating in the

24   conspiracy?

25   A.   Yes.

Direct - Green

1    Q.   What did you see him doing?

2    A.   The FAFSA part, just one time.

3    Q.   When was that?

4    A.   I can't give a definite date.  Our season, I want to

5    say it was somewhere in 2011.  My -- my mind's a little

6    cloudy there.  I'm sorry.

7    Q.   Well, was this down in Arizona?

8    A.   Yes.

9    Q.   Does Arizona really have seasons?

10   A.   No, we don't.

11   Q.   So was it sometimes hard to frame exactly when

12   something happened?

13   A.   It is, because it's hot all the time.

14   Q.   So this one time where you saw him participating in a

15   conspiracy, where was that at?

16   A.   At the Pleasant Drive address.

17   Q.   Who lived there?

18   A.   Heather Carr, her children, and at that part in time,

19   Tramell Thomas.

20   Q.   So what did you see him doing?

21   A.   The FAFSA part.  Just submitting the FAFSA and just

22   the steps as far as the education part.  That's it.

23   Q.   Explain to us exactly why that was part of the

24   conspiracy, what you saw.

25   A.   Because the education part, the people -- the inmates,

1    we don't know their high school information, so it was

2    easier just to put if they had their GED and we put the

3    year based on their age.

4    Q.   So let me back up here.  Was this a conversation you

5    were having with the defendant?

6    A.   This was a conversation that I had with Heather Carr,

7    but I showed on that FAFSA.  So I didn't have this

8    conversation with Tramell.

9    Q.   Who were you showing this information?

10   A.   I showed him the information, but I didn't have the

11   physical conversation with him like I did with Heather

12   Carr.

13   Q.   And what was the purpose of showing him this

14   information in the FAFSA?

15   A.   So the FAFSAs wouldn't come back because, you know,

16   when you submit so many, some of them do still come back as

17   invalid, basically.  So that was just the way to by- -- it

18   was a bypass system as I would call it.

19   Q.   So, again, just to make this clear, what was the

20   bypass system you were explaining to the defendant?

21   A.   The information for the education part.  Sorry.  The

22   education part.

23   Q.   And when this happened, did you see him actually

24   submit the FAFSA?

25   A.   I didn't -- the FAFSA was up, but I didn't see the

Direct - Green

1    submit button because I had walked away.

2    Q.   When you say "up," up on what?

3    A.   The computer laptop, sorry.

4    Q.   What kind of laptop was he using?

5    A.   I can't recall.  I'm sorry.

6         Can I get some water?

7         THE COURT:  Right next to you.

8    BY MR. FIELDS:

9    Q.   When you were explaining this sort of bypass system,

10   were other people present in the room?

11   A.   Yes.

12   Q.   And was information being thrown out into the room?

13   A.   Yes.

14   Q.   Describe that.

15   A.   Just random names.  I can't recall the names, again,

16   I'm sorry, it was a while ago, but just random names.

17   Q.   Who would throw out random names?

18   A.   Heather Carr and myself.

19   Q.   Anyone else?  Anyone else?

20   A.   Myself.

21   Q.   Who else was present?

22   A.   Oh, Heather Carr, me, Tramell and our children.

23   Q.   Did Tramell throw out any names?

24   A.   At that time, it was a name, but I can't recall the

25   name.  I'm sorry.

Direct - Green

1    Q.   What was the purpose of everyone sitting around in

2    this room throwing out names?

3    A.   It was part of the -- to process the fraudulent FAFSAs

4    and the school applications.

5    Q.   How was it part of the process of filling out these

6    fraudulent FAFSAs?

7    A.   Because of the names, when you get the names and the

8    information was already there.  So, like I said, I can't

9    recall the names.

10   Q.   When you say the information was already there, what

11   information?

12   A.   The Social Security numbers and the birth dates,

13   sorry.

14   Q.   Did you see Mr. Thomas participate in a scheme at any

15   other time?

16   A.   No.

17   Q.   How often would you see the defendant during this time

18   period?

19   A.   I wouldn't see him as much as I seen Heather and

20   Mercedes, but I've seen him several occasions.

21   Q.   So who would you say was your major contact within the

22   conspiracy?

23   A.   Heather Carr.

24   Q.   How much money did you get from the scheme?

25   A.   I roughly would say a little -- in the $20,000 range.

Direct - Green

1    Q.   What did you do with that money?

2    A.   Paid for bills and my financial living situations and

3    my children.

4    Q.   Why did you decide to participate in this fraud

5    scheme?

6    A.   To -- financial gain, to live above.

7    Q.   Did you know it was wrong?

8    A.   Yes, I did.

9    Q.   How did you know it was wrong?

10   A.   Because it's taking -- it's filing something that's

11   false, that's not you, so if it's not you and you're doing

12   it, it's wrong.

13   Q.   Did the conspiracy eventually end?

14   A.   Yes, it did.

15   Q.   What happened to end the conspiracy?

16   A.   A search warrant was served at the Kaibob address.

17   Q.   Who lived at that address?

18   A.   Heather Carr Tramell Thomas and their children.

19   Q.   Do you remember approximately when that was?

20   A.   I want to say it was somewhere in August of 2012.

21   Q.   Now, before the conspiracy ended, you mentioned that

22   Ms. Carr used some of the fraud money for lawyers' fees.

23   Do you remember that?

24   A.   Correct.

25   Q.   Whose lawyers' fees?

Direct - Green

1    A.    Tramell Thomas.

2    Q.    Do you remember when he was in trouble with the law?

3    A.    At which -- no, I don't remember the definite date,

4    the time frame.

5    Q.    But you do remember that he had a defense attorney?

6    A.    Correct.

7    Q.    So, again, let's go back.  We were talking about this

8    search warrant.

9    A.    Uh-huh.

10   Q.    Remind me, when was it executed, approximately?

11   A.    I want to say around August of 2012.

12   Q.    Did anything happen after that search warrant was

13   executed?

14   A.    Yes.

15   Q.    What happened?

16   A.    I -- on the part of -- I was questioned and then I was

17   visited by the defendants, Tramell Thomas Heather Carr at

18   my residence.

19   Q.    Let me start with that first one.  When you were

20   questioned, who questioned you?

21   A.    The Department of Education, the FB -- the federal.

22   Q.    Federal agents?

23   A.    Yes.

24   Q.    Were you truthful to those federal agents?

25   A.    No, I wasn't.

Direct - Green

1    Q.    Why not?

2    A.    Because I was scared.

3    Q.    Scared of what?

4    A.    Of getting in trouble, or -- well, I know I was in

5    trouble when they came, but getting in more trouble.

6    Q.    And even after that, did investigators come to your

7    house a second time?

8    A.    Yes, they did.

9    Q.    And were you truthful to them even then?

10   A.    No.

11   Q.    But those times when you were untruthful to the

12   investigators, was that all before you pleaded guilty and

13   signed your cooperation agreement?

14   A.    Yes.

15   Q.    Now let's go back.  You said you were questioned.

16   A.    Yes.

17   Q.    What else happened after the search warrant was

18   executed?

19   A.    And then I was visited by Tramell Thomas and Heather

20   Carr.

21   Q.    Do you remember approximately what time of day it was

22   when they came?

23   A.    It was later in the day because the sun was down, I

24   know that.  It was dark.

25   Q.    Did Tramell Thomas say anything to you when he came to

Direct - Green

1    your house after his house was searched?

2    A.    Yes.

3    Q.    What did he say?

4    A.    What did they say to you when the investigators were

5    there?  What did they say to you?  What did you tell them?

6            I told him they had these pictures of people, if I

7    recognized them.  He said that -- Tramell Thomas said, How

8    did this happen?  Trying to figure out why the search

9    warrant was served.  And basically just asking what did I

10   say to the investigators.  And, again, what did -- what

11   were their questions?  And who were the people that they

12   showed me?

13   Q.    Describe to the members of the jury his general

14   demeanor.

15   A.    Nervous.

16   Q.    Describe that.  What makes you think he was nervous?

17   A.    Just the moving of the hands, the moving back and

18   forth, and the same questions over in just a different

19   format.

20            MR. FIELDS:  One moment, Your Honor.

21            THE COURT:  Okay.

22            MR. FIELDS:  Thank you, Your Honor.  I have no

23   further questions.

24            THE COURT:  Cross-examination.

25                        CROSS-EXAMINATION

Cross - Green

1    BY MR. SMITH:

2    Q.   Ms. Green, if you mentioned this, I missed it and I

3    apologize.  You indicated you have this marijuana issue

4    where you were convicted of possessing and selling 300

5    pounds.  When was that?

6    A.   That was in late 2011, I believe.  I can't give a

7    definite date.

8    Q.   Okay.  So it was during the same time that you

9    testified you were involved in this --

10   A.   No.

11   Q.   -- fraudulent scheme?

12   A.   Well, testify as -- I'm testifying today.  But did it

13   take place when all this was going on?

14   Q.   Yes.

15   A.   Towards the end of it.

16   Q.   Okay.  Well, I understood you to say that you thought

17   your conviction was in 2011?

18   A.   2011.  And then it was pleaded out in 2012, I

19   believe.

20   Q.   Okay.  And you indicated you'd been involved in this

21   student loan business from sometime in 2010 into 2012.

22   A.   Correct.

23   Q.   So at the same time you're involved in the student

24   loan situation, you're involved in the marijuana situation?

25   A.   That is correct, if my dates are correct, sir.

507

Cross - Green

1    Q.   Okay.  This agreement you have with the Government,

2    you have to cooperate, correct?

3    A.   Truthfully, yes.  Correct.

4    Q.   And then when your sentencing comes up, you're hoping

5    that Ms. Paluch and Mr. Fields will make a recommendation

6    for a lighter sentence?

7    A.   That's correct, sir.

8    Q.   Okay.  And you were represented in negotiating this

9    agreement with Ms. Merritt?

10   A.   Yes, sir.

11   Q.   I assume that you've probably talked a lot more than

12   you wish about this concept of Federal Sentencing

13   Guidelines?

14   A.   I have, Your Honor -- I mean, sir.  I'm sorry.

15            MR. SMITH:  Almost got elevated.

16            THE COURT:  Careful what you wish for.

17            MR. SMITH:  I understand, Your Honor.

18   BY MR. SMITH:

19   Q.   You have some idea of what the guidelines would

20   indicate your sentence might be, correct?

21   A.   I do.

22   Q.   And that sentence could be anywhere from about four

23   years to about six years.

24   A.   Correct.  46 to 71 months, I believe.

25   Q.   Okay.

1    A.   Or 57 to 71 months.

2    Q.   And how much are you hoping that your sentence will be

3    reduced?

4    A.   I can't give a definite answer because I don't know

5    what the percentage would be.  At least -- hopefully 20

6    percent.  I don't know exact amount when it comes to

7    federal.

8    Q.   Okay.  I didn't -- I didn't say that you knew.  What

9    are you hoping Ms. Paluch and Mr. Fields recommend --

10   A.   Just any less time than what my guidelines say.

11   Q.   -- to the Court?

12           Okay.  And this recommendation depends on your

13   cooperation?

14   A.   Correct.

15   Q.   And their view of it, correct?

16   A.   Correct.

17   Q.   So if you're saying things that they don't like,

18   that's not going to be cooperation, is it?

19   A.   Correct.

20   Q.   Some time in 2010, you had this conversation with

21   Heather Carr at a barbecue about this student loan scheme.

22   A.   That is correct.

23   Q.   Okay.  Was that over at her house?

24   A.   Yes, it was.

25   Q.   And that's the Pleasant --

Cross - Green

1   A.   The Pleasant Drive address.

2   Q.   Pleasant Drive address.

3   A.   Yes.

4   Q.   And it's just you and Ms. Carr.

5   A.   And our children, yes.

6   Q.   Okay.  Mr. Thomas isn't there?

7   A.   Not that I recall for the first conversation.

8   Q.   Okay.  And you get a good understanding of what Carr's

9   idea is?

10  A.   Yes.

11  Q.   Okay.  And am I correct that this whole thing can't

12  work without Heather Carr?

13  A.   That is correct.

14  Q.   And why is that?

15  A.   Because she was able to pull the information from her

16  database at work.

17  Q.   Okay.  So if I'm understanding how this goes about,

18  you can sit down on a computer and access a public website

19  that deals with some state Department of Corrections?

20  A.   Correct.

21  Q.   So maybe Florida?

22  A.   Any -- yeah, any public record, yes.

23  Q.   And you could identify an inmate who was serving a

24  sentence for X number of years?

25  A.   Yes.

Cross - Green

1    Q.   And then with -- you'd get that name, correct?

2    A.   Yes.

3    Q.   And probably a date of birth?

4    A.   Not for sure what if the date of birth was on the

5    public records, but their time.  Their time and their

6    sentence was -- yes, their date of birth is on there.  I'm

7    sorry, yes.

8    Q.   Okay.  And then you would give that information to Ms.

9    Carr?

10   A.   The names, correct.

11   Q.   Okay.  And she would take that information and because

12   of her position with Wells Fargo -- that's who she worked

13   for, right?

14   A.   She worked for Wells Fargo and CarMax.

15   Q.   Okay.  She worked for Wells Fargo as a loan

16   underwriter and supervisor looking at whether or not Wells

17   Fargo would loan customers money to buy CarMax cars,

18   correct?

19   A.   Correct.

20   Q.   Okay.  And she worked from home.

21   A.   Yes, she did.

22   Q.   Okay.  So she would go in and access these private

23   databases to get the inmate's Social Security number and

24   credit history that you'd provide her, correct?

25   A.   That was provided, correct.

1    Q.   All right.  And you would give her an inmate name and

2    date of birth and she would get the other information,

3    correct?

4    A.   She would be able to pull that information.

5    Q.   Okay.  And then she would give you back all the

6    information so you could fill out the FAFSA?

7    A.   She would give me the list with all the information on

8    it already.

9    Q.   Okay.  And that would be for any number of inmates?

10   A.   Yes.

11   Q.   Okay.  And you would take that list and then set about

12   filling out the paperwork required to get a student loan.

13   A.   That is correct.

14   Q.   Okay.  And you concentrated in Arizona.

15   A.   Yes.

16   Q.   And you used addresses for these inmates that were

17   your residence?

18   A.   Yes.

19   Q.   And another house, I think you said Mobile?

20   A.   1915 East Mobile Lane.

21   Q.   And did you have any relationship to that address?

22   A.   Yes, that's my deceased uncle's house.

23   Q.   Your uncle's house?

24   A.   Yes.

25   Q.   Okay.  When did you actually start filing?

Cross - Green

1    A.    In July of 2010 for the summer session.

2    Q.    Okay.  And so in the fall, you started getting cards

3    and money?

4    A.    You received the first money -- if you fill out for

5    the summer, you got the summer money; and then the fall;

6    and if you went, into the spring.

7    Q.    Okay.  And at this point in time, Ms. Carr's still

8    living at the Pleasant --

9    A.    Correct.

10   Q.    -- is it Drive?  I'm sorry, I --

11   A.    I think it's Pleasant Drive.  I can't --

12   Q.    Pleasant Drive address.  Okay.

13         And at some point in time in 2011, you're over at

14   that house, if I understood you correctly, and you're

15   talking with Ms. Carr, and Mr. Thomas is there.

16   A.    At that time, yes.

17   Q.    Okay.  And it's at that time when you're explaining to

18   Mr. Thomas something about filling out these -- this

19   paperwork?

20   A.    The FAFSA part, just the education part, sir.

21   Q.    The education part --

22   A.    Yes.

23   Q.    -- of the FAFSA?

24   A.    Yes.

25   Q.    Okay.  But it's at that meeting?

513

Cross - Green

1    A.   Yes.

2    Q.   At Heather Carr's on Pleasant Drive?

3    A.   Correct.

4    Q.   And you believe it's in 2011?

5    A.   I believe it's in 2011.  Like I said, the dates are

6    cloudy, so I can't give you a definite.

7    Q.   Okay.  So it's in Phoenix.

8    A.   Correct, in Phoenix.

9    Q.   Okay.  Is it really hot out?

10   A.   It's hot all the time, sir.  I don't -- I'm sorry.

11   Q.   I'm just trying to -- is it in the spring, the summer,

12   the fall?

13   A.   I can't give a definite time.  I'm sorry.

14   Q.   But it's 2011.

15   A.   2011.

16   Q.   Okay.  If I -- if I could go back just a minute to

17   your agreement with the Government.  My memory is that you

18   had some sort of paperwork that you were going to try to

19   find and give the Government.

20   A.   It was the list of the names, correct.

21   Q.   Okay.  And you weren't able to find that, correct?

22   A.   No, I wasn't.

23   Q.   Okay.

24   A.   I've moved since then.

25   Q.   You mentioned the name Mercedes Diaz.

514

Cross - Green

1    A.   Correct.

2    Q.   I understand Ms. Diaz was -- was very close to Heather

3    Carr.

4    A.   Yes.

5    Q.   Ms. Carr pretty much raised her?

6    A.   Like her daughter.

7    Q.   And that started up in Colorado?

8    A.   Yes.

9    Q.   And then they moved down to Arizona?

10   A.   Heather moved first and then Mercedes followed.

11   Q.   Followed?

12   A.   Yes.

13   Q.   And Ms. Diaz actually lived with Heather Carr for

14   quite a bit of time?

15   A.   A little bit, I believe at the Pleasant Drive, but I

16   don't believe it was a long period of time.

17   Q.   Okay.  She often spent time at Heather Carr's house.

18   A.   Yes.

19   Q.   Okay.  And she would be there when you were there?

20   A.   Yes.

21   Q.   Okay.  Were you all close?

22   A.   Not super close, like me and Heather, but we're

23   okay.

24   Q.   Okay.  You and Heather go back quite a ways?

25   A.   Correct.

Cross - Green

1    Q.   Before this got started, you'd known her for some 11
2    years.
3    A.   I -- 2004, I believe is when I met Heather, or 2005.
4    Q.   Okay.  And you'd been friends ever since.
5    A.   Yes.
6    Q.   Until this happened?
7    A.   Correct.
8    Q.   What was Ms. Diaz's part?
9    A.   The enrolling and then doing homework and receiving --
10   getting addresses -- sorry, addresses.
11   Q.   Okay.  And how do you know that was her job?
12   A.   Just conversation.
13   Q.   With her?
14   A.   Yes.
15   Q.   Okay.  And you knew Heather Carr's job because she
16   told you.
17   A.   Yes.
18   Q.   What was Heather's -- Ms. Carr's Facebook name?
19   A.   Heather Carr.
20   Q.   Heather Bacardi?
21   A.   She changed it before, Heather Carr, Bacardi.
22   Q.   And where did the Bacardi moniker come from?
23   A.   Because she likes to drink Bacardi.
24   Q.   A lot?
25   A.   Yes.

Cross - Green

1  Q.  You know this scheme started because of your

2  conversation with Carr in 2010 --

3  A.  Correct.

4  Q.  -- correct?  That's when you think it started.

5  A.  Correct.

6  Q.  And your part was down in Arizona.

7  A.  Yes.

8  Q.  You didn't file anything at Pikes Peak Community

9  College?

10  A.  Yes, I had a card sent to my address.

11  Q.  Okay.  For Pikes Peak?

12  A.  Yes, for Pikes Peak, sorry.

13  Q.  To your address?

14  A.  In Phoenix at 4630.

15  Q.  Okay.  You didn't have them sent to addresses in

16  Colorado?

17  A.  No.

18  Q.  When you got these debit cards -- and you had to

19  activate them, correct?

20  A.  Correct.

21  Q.  And what was that process?

22  A.  You would just call the number on the card, you know,

23  when you get your sticker, and you would just call and

24  activate it.

25  Q.  Okay.  There's a sticky thing over it and you had to

Cross - Green

1    pull that off?

2    A.    Yes.

3    Q.    Okay.  Call the number and whammo, you had 4- or

4    $5,000?

5    A.    Yes.

6    Q.    And then you had to turn that card into the actual

7    cash.

8    A.    Correct.

9    Q.    And you would do that by going to ATMs?

10   A.    Yes.

11   Q.    And that's how you got the 20s?

12   A.    Yes.

13   Q.    Where else would you go to get the cash?

14   A.    Local grocery stores that we have in Arizona.

15   Q.    Okay.  And they have ATMs there or how did that work?

16   A.    Cash backs, so you just buy something and get cash

17   back.

18   Q.    Okay.  Could you pay bills with these cards?

19   A.    Yes.

20   Q.    And did you ever do that?

21   A.    Yes, I did, one time.

22   Q.    One time.

23   A.    Yes.

24   Q.    And that wasn't a very good idea, right?

25   A.    No, it wasn't.

Cross - Green

1  Q.   Because then there was a record of your using that

2  card.

3  A.   That is correct.

4  Q.   And it would come back to the bank and --

5  A.   My address is linked to it, yes.

6  Q.   All right.  And then eventually the Government and

7  then everybody knows.

8  A.   Correct.

9  Q.   My understanding, Ms. Green, is that when Carr lived

10 at the Pleasant Drive address, that wasn't very far away

11 from where you lived?

12 A.   Yes, it was.

13 Q.   It was far away?

14 A.   Yes.

15 Q.   Okay.  But you were over there quite a bit.

16 A.   Yes.

17 Q.   Okay.  But then I understand once the move was made

18 when Carr moved to the -- I call it Kaibob, is that --

19 A.   I think we're all having issue with that, I think it's

20 Kaibob.  I don't know --

21 Q.   Kaibob Okay, I'll use yours.

22 A.   Okay.

23 Q.   To the Kaibob address.

24 A.   Yes.

25 Q.   You didn't go over there very much?

Cross - Green

1    A.   No, I didn't.

2    Q.   Okay.  In fact, as I understand it from one of your

3    statements, you only went there one time.

4    A.   One time.

5    Q.   So if Ms. Carr moved into that Kaibob house in March

6    or April of 2012, were you only there once after that?

7    A.   Correct.

8    Q.   So your conversations and dealings in this situation,

9    as far as that residence, were almost all at the Pleasant

10   Drive address.

11   A.   Correct.

12   Q.   Aside from your memory of tutoring, if you will, Mr.

13   Thomas on the education part of the FAFSA, you never talked

14   to him about this scheme, did you?

15   A.   Not personally to him, no.

16   Q.   Okay.  He never told you that he filled out FAFSAs,

17   did he?

18   A.   No.  Him, personally, no.

19   Q.   He never told you that he went out and got money from

20   these cards, did he?

21   A.   No.

22   Q.   Those conversations that you had about that were

23   principally with Heather Carr.

24   A.   That is correct, sir.

25   Q.   And you had some of those conversations, certainly to

520

Redirect - Green

1    a lesser degree, with Mercedes Diaz?

2    A.    Correct.

3              MR. SMITH:  May I have a moment?

4              THE COURT:  You may.

5              MR. SMITH:  Thank you very much, Ms. Green.

6              I don't have any further questions at this time,

7    Your Honor.

8              THE COURT:  All right.  Redirect.

9              MR. FIELDS:  Thank you, Your Honor.

10                        REDIRECT EXAMINATION

11   BY MR. FIELDS:

12   Q.    Ms. Green, do you remember being asked questions about

13   your cooperation agreement?

14   A.    Yes.

15   Q.    And you were asked about whether or not it would be

16   cooperation if you say something that the Government

17   doesn't like.  Do you remember that?

18   A.    Yes, I do, sir.

19   Q.    Ms. Green, what happens if you lie under oath because

20   you think that would help the Government?

21   A.    That's a lot more trouble than what I'm in now.

22   Q.    How so?

23   A.    Perjury is -- is -- I'm not saying it's the highest

24   offense, but it's an offense in any courts.

25   Q.    Even if you think that will help the Government?

Redirect - Green

1    A.   Correct.

2    Q.   So does your agreement involve lying to anyone with

3    regard to this courtroom here today?

4    A.   No.

5    Q.   Does it cover -- it covers lies to anyone, right?

6    A.   Yes.   Sorry.

7    Q.   Including lies in responses to defense counsel

8    questions?

9    A.   Yes.

10   Q.   So you had to answer defense counsel questions just as

11   truthfully as you answer our questions; isn't that right?

12   A.   That is correct.

13   Q.   And if the judge asks questions, you would have to

14   answer those questions truthfully?

15   A.   That is correct.

16   Q.   Now, you were also asked about whether or not the

17   scheme could work without Heather Carr.

18   A.   Yes.

19   Q.   Do you remember being asked that question?

20   A.   Yes.

21   Q.   Was it also important to the scheme to get other

22   addresses that could be used?

23   A.   Yes.

24   Q.   Would the scheme have been successful if people hadn't

25   been able to get other addresses?

Redirect - Green

1    A.    No.  Because, like I said before, it's an alert if you

2    send to some addresses, so multiple addresses needed to be

3    used.

4    Q.    You used multiple addresses, right?

5    A.    Yes, I did.

6    Q.    Did other members of the conspiracy also use multiple

7    addresses?

8    A.    Yes.

9    Q.    The address you mentioned, this 1915 East Mobile Lane,

10   did you get permission to use that address?

11   A.    It's my -- well, it's a deceased family member, so it

12   was our family house.

13   Q.    Anyone living in the house?

14   A.    No.

15   Q.    You were also asked questions about how frequently you

16   would talk to Thomas.  Did you talk to him all that much?

17   A.    I didn't talk to him much.

18   Q.    Who would you talk to about Thomas' involvement in the

19   scheme?

20   A.    Heather Carr.

21   Q.    Without telling us exactly what was said, how

22   frequently did you have those conversations?

23   A.    We had them frequently, but not like once every other

24   day.  Probably like a couple of times a month.

25   Q.    And during the conspiracy, who did Heather Carr live

Redirect - Green

1    with?

2    A.    She lived with her children and Tramell Thomas and at

3    a time -- well, I can't say because I don't think Mercedes

4    lived there at that time, so, yeah, just her children and

5    Tramell Thomas.

6    Q.    Did Heather Carr appear to be close to Tramell Thomas?

7    A.    Yes.

8    Q.    What made it appear that they were close?

9    A.    Because they were in a relationship and they had

10   children together.

11   Q.    And going back to -- you were asked about, you know,

12   this incident involving Thomas and the FAFSAs.  Do you

13   remember being asked questions about that?

14   A.    Yes.

15   Q.    And defense counsel really tried to PIN you down on a

16   date.

17   A.    Yes.

18   Q.    You said it was -- when was it, approximately?

19   A.    Approximately in 2011.  And, like I said before, I

20   cannot give a definite date because I don't want to lie,

21   because I can't recall the date.  I'm sorry.

22   Q.    Do you remember also being asked questions about a

23   period of time in which Tramell Thomas was incarcerated?

24   A.    Yes.

25   Q.    Do you remember approximately when that was?

Redirect - Green

1    A.    I can't say.  I -- because I know it was several

2    times.  I want to say it was early summer, 2010.  I'm not

3    for sure.

4    Q.    This incident where you recall seeing Mr. Thomas

5    filling out the FAFSA, did that occur before he was

6    incarcerated or after?

7    A.    Which -- before.

8    Q.    It occurred before?

9    A.    Yes.

10   Q.    Okay.  So you can't remember an exact date?

11   A.    I can't remember the date.

12   Q.    But can you remember a sequence of events?

13   A.    No.

14          MR. FIELDS:  No further questions, Your Honor.

15          THE COURT:  All right.  May this witness be

16   excused?

17          MR. FIELDS:  Yes, from the Government.

18          THE COURT:  All right.  For the defendant?

19          MR. SMITH:  No objection.

20          THE COURT:  All right.  Ms. Green, thank you for

21   your testimony.  You're excused and you may step down.

22          All right, ladies and gentlemen of the jury, I've

23   discussed with the lawyers the sequence of witnesses and

24   this is going to be our last witness for today.  So you're

25   getting released early.  I need to remind you again, please

525

1    do not do any independent research into or discuss with

2    anyone the facts, the law, the issues or the individuals in

3    this case.

4          We're going to attempt to resume tomorrow again at

5    8:45, that is, if I don't have additional issues with the

6    lawyers before that.  But I ask you to please be in the

7    jury deliberation room by 8:35.

8          All right, we'll be in recess until 8:45 tomorrow

9    morning.

10        (Proceedings concluded at 4:20 p.m.)

11

12                           **INDEX**

13   Item                                              PAGE

14                  GOVERNMENT'S WITNESSES

15   **KIMMISHA MULLETT**
     Direct Examination by Mr. Fields                 300
16   Voir Dire Examination by Mr. Smith               311
     Direct Examination by Mr. Fields (Cont'd)        311
17   Voir Dire Examination by Mr. Smith               331
     Direct Examination by Mr. Fields (Cont'd)        332
18   Cross-examination by Mr. Smith                   337
     Redirect Examination by Mr. Fields               347
19
     **MICHELLE ALLRED**
20   Direct Examination by Mr. Fields                 353

21   **ALISON STAILEY**
     Direct Examination by Ms. Paluch                 390
22   Cross-examination by Mr. Goodreid                440
     Redirect Examination by Ms. Paluch               447
23
     **CHRISTINE DUNCAN**
24   Direct Examination by Ms. Paluch                 449
     Cross-examination by Mr. Smith                   469
25   Examination by Ms. Paluch                        477

1                                  **INDEX**

2     <u>Item</u>                                                      <u>PAGE</u>

3                        <u>GOVERNMENT'S WITNESSES</u>

4         **MARCELLE GREEN**
          Direct Examination by Mr. Fields            482
5         Cross-examination by Mr. Smith              506
          Redirect Examination by Mr. Fields          520
6

7                        <u>GOVERNMENT'S EXHIBITS</u>

8     EXHIBITS:      <u>Offered</u>    <u>Received</u>  <u>Refused</u>   <u>Stipulated</u>

9     9              410        410

10    12             398        399

11    13             401        402

12    14             330        331

13    15             313        313

14    16             406        406

15    19             416        416

16    20             420        420

17    21             424        424

18    22             431        431

19    23             436        436

20    24             410        410

21    25             410        410

22    26             410        410

23    28             410        410

24    29             410        410

25    30             361        361

527

1                        GOVERNMENT'S EXHIBITS

2    EXHIBITS:        Offered    Received   Refused    Stipulated

3    32               482        482

4    57-B             352        352

5    57-C             352        352

6    57-D             352        352

7    57-E             352        352

8    57-F             352        352

9    57-G             352        352

10   57-H             303        303

11   57-I             303        303

12   57-J             454        454

13   57-K             454        454

14   57-L             454        454

15   64               348        348

16   84               310        311

17                     *      *      *      *      *

18                     REPORTER'S CERTIFICATE

19       I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled
20   matter.
         Dated at Denver, Colorado, this day of August, 2019.

21

22

23

24
     _____
25   MARY J. GEORGE, FCRR, CRR, RMR