528

                THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-0054-WJM-2

UNITED STATES OF AMERICA,

Plaintiff,

vs.

TRAMELL THOMAS,

Defendant.
------------------------------------------------------------
                    REPORTER'S TRANSCRIPT
                    (Jury Trial - Day 3)
                       Volume III
------------------------------------------------------------

     Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

Judge, United States District Court for the District of

Colorado, commencing at 8:48 a.m., on the 29th day of

November, 2017, in Courtroom A801, United States

Courthouse, Denver, Colorado.

                        APPEARANCES

     MARTHA A. PALUCH and BRYAN FIELDS, Assistant U.S.
Attorneys, 1801 California Street, Suite 1600, Denver,
Colorado 80202, appearing for the plaintiff.

     DANIEL T. SMITH, Attorney at Law, 4582 South Ulster,
Suite 1400, Denver, Colorado 80237 AND
     THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
Suite 1400, Denver, Colorado 80202, appearing for the
defendant.

                 MARY J. GEORGE, FCRR, CRR, RMR
              901 19th Street, Denver, Colorado 80294
              Proceedings Reported by Mechanical Stenography
                 Transcription Produced via Computer

1                      P R O C E E D I N G S

2           (Call to order of the court outside the presence of

3      the jury at 8:48 a.m.)

4               THE COURT:  I want to get an understanding from

5      Government what it proposes in terms of letting the jury

6      know, or whether you're going to bring it up at all, that

7      Ms. Carr's not going to be testifying.

8               MS. PALUCH:  Your Honor, I intend to reference

9      that in the closing argument and explain that their role is

10     to consider the evidence -- only the evidence presented in

11     this case and not to speculate as to why she did not

12     testify.

13              THE COURT:  Okay.

14              MS. PALUCH:  And explain that the opening

15     statement was the Government's expectation of its evidence

16     and, as the Court has instructed, opening statements are

17     not evidence in the case.

18              THE COURT:  Okay.  So you're comfortable leaving

19     it to the closing and not raising it as an issue before you

20     close?  Because you're going to get a lot of quizzical

21     looks because Mr. Fields made a big point about this

22     witness that was going to pull back the curtains on -- pull

23     back the curtain on the operations of this conspiracy and

24     we're going to -- you're going to get up and say, "The

25     Government rests," and they're going to be looking at each

1     other.

2           MS. PALUCH:  And in light of that, Your Honor,

3     we'd have no objection to the Court instructing the jury

4     that while Ms. Carr's expected testimony was referenced in

5     the opening, you did not hear from Ms. Carr and you are

6     instructed to -- that opening statements are not evidence

7     in the case.  We have absolutely no objection with the

8     Court doing that.  And that might be the better approach

9     given what we told the jury and was our complete

10    expectation up until that evening of Monday night.

11          THE COURT:  Okay.  I'm just throwing it out there.

12    I don't -- again, I don't want to tell you how to put on

13    your trial, you know, because the contrary argument could

14    be that if we draw too much attention to it, it will take

15    on an importance beyond that which it would otherwise have.

16          So why don't you give it some more thought and

17    maybe when we come back from morning break, you could let

18    me know which way you want to go.

19          MS. PALUCH:  Thank you, Your Honor.

20          THE COURT:  We're ready to bring in the jury.  Any

21    other issues?

22          MR. SMITH:  The defense would strenuously object

23    to the Court making any statement about a witness'

24    nonappearance.  It seems to me the Court then is injecting

25    itself into the facts of the case.  There are numerous

1     witnesses in this case that the Government hasn't called

2     and their names have been all over the record.

3              And, further, my understanding is this witness,

4     Ms. Carr, wasn't even under subpoena.

5              THE COURT:  Right.

6              MR. SMITH:  I just think it's improper --

7              THE COURT:  She wasn't under a subpoena but she

8     was under a -- or she was party to a cooperation agreement

9     by which I think it was the Government -- the Government

10    reasonably anticipated that she was going to comply with

11    that agreement and testify.  So I don't think the reference

12    to her anticipated testimony was improper.

13             MR. SMITH:  Oh, I don't think the opening

14    statement was improper, Your Honor.  No.

15             THE COURT:  Okay.

16             MR. SMITH:  I just object to the Court commenting

17    on it.

18             THE COURT:  Okay.  Well, that's -- what about

19    that?

20             MS. PALUCH:  Well, Your Honor, I would respond to

21    one statement Mr. Smith said that numerous witnesses that

22    the Government didn't call.  We called every person listed

23    on our witness list save Ms. Carr.  She is the only

24    witness --

25             THE COURT:  Correct.

1          MS. PALUCH:  -- who did not testify in this case

2    beyond -- for reasons completely beyond our control and,

3    certainly, our wishes, and so I don't agree with that

4    statement that was made.  I do believe I can address this

5    in opening [sic] statement, and if counsel has a strenuous

6    objection to the Court saying anything, you know, we are

7    completely fine with saying it in --

8          THE COURT:  Okay.

9          MS. PALUCH:  I do agree with you that the jury's

10   going to have questions based on opening statement, and --

11   there is a way that I could elicit that possibly through

12   this witness.  I could ask Ms. -- Agent Ennis --

13         THE COURT:  Well, again, I -- you know, we may --

14   if you draw -- I don't want to tell you how to do your --

15   put on your trial, but you may be drawing too much

16   attention to this.  But I think Mr. Smith raises a fair

17   point, that for me to interject myself and make a comment

18   as to reference to a Government witness that was called or

19   not called.  You know, we could look at it the other way,

20   if there was some -- you know, there was some reference

21   earlier that I told the jury that the defendant did not

22   have to put on any evidence, but maybe they're anticipating

23   some evidence.  And if I do anything more than just hear --

24   or let the counsel put on the record that they're not

25   calling witnesses or they are, or whatever it's going to

1   be, that it would be the same thing coming from the other

2   direction.

3           So why don't we -- I think Mr. Smith raises a fair

4   point.  So let's leave it with your first -- your first

5   inclination to reference it in your closing argument.

6           MS. PALUCH:  I will do that.  Thank you, Your

7   Honor.

8           THE COURT:  All right.  Okay.  Anything --

9           MR. GOODREID:  Your Honor, one other matter.

10  There are two stipulations in the case and, as I

11  understood, what the Court was planning to do beforehand

12  was to read them at some point for the jury.

13          THE COURT:  I was, if you gave me the stipulated

14  facts that I was looking for but you didn't.  And I

15  tried -- I have probably -- it appears to me now that I

16  didn't do a good enough job at the final trial preparation

17  conference distinguishing what kind of factual stipulations

18  I would read to the jury.  And that was the brass tacks

19  facts as opposed to what you folks have stipulated to --

20  which is entirely proper, and you can move for the -- those

21  exhibits to be admitted into evidence, you can make

22  reference to them in your closing arguments, you can do

23  whatever you want to do that you can do with any other

24  admitted exhibit.

25          But when I reviewed those two exhibits, they were

1    not the type of factual stipulations that I -- that I

2    informed you at the trial preparation conference that I

3    generally read at the beginning of the trial, those being,

4    No, the light was red, it was Tuesday, he was wearing a

5    brown sweater.  Those are not the kind of factual

6    stipulations you gave me so that's why I didn't read it.

7           MR. GOODREID:  Well, if I may inquire further,

8    Your Honor, one of the stipulations that the parties agreed

9    to relates to the time that Mr. Thomas spent in the El Paso

10   County Jail.  I want to reference that stipulation when I

11   cross-examine Special Agent Ennis.  So would the Court

12   permit me to read it, would you prefer to read it?  How

13   would you like me to proceed?

14          THE COURT:  Have we admitted it into evidence yet?

15          MR. GOODREID:  No.  No.

16          THE COURT:  Okay.

17          MR. GOODREID:  And I don't know that it has to be

18   admitted as an exhibit.  I mean, I think just reading it --

19          THE COURT:  Well, I think the cleanest way to do

20   it is to handle it just like you would with any other

21   admitted exhibit.

22          So if it's stipulated -- the admissibility of that

23   exhibit is stipulated to, in addition to the contents

24   stipulated to, then move for its admission and we put it up

25   on the -- on the screens and you can examine Agent Ennis on

1    it.

2         MR. GOODREID:  Well, what I was suggesting, Your

3    Honor, is I don't know that it has to be admitted as an

4    exhibit.  I think just that reading the statement is

5    sufficient unless --

6         THE COURT:  Well, I don't -- but I don't -- but I

7    don't want documents that are not in evidence to be read

8    from, you know, beyond just like we do to introduce any

9    exhibit:  You do some preliminary foundational things to

10   establish what the document is.  But beyond that, if it's

11   not in evidence, I don't allow it to be read in any form.

12        So if you want to read from that exhibit, get it

13   into evidence.

14        MR. GOODREID:  Okay.

15        THE COURT:  All right.

16        MR. GOODREID:  May I confer with Government

17   counsel for just a minute, Your Honor?  Sorry, just --

18        THE COURT:  Let's bring in the jury while you're

19   doing that.

20        COURTROOM DEPUTY:  Your Honor, I need to explain a

21   couple of things to a couple of jurors that are spending

22   the night, so it will be a couple of minutes.

23        THE COURT:  Okay.

24     (Jury was present at 8:57 a.m.)

25        THE COURT:  Good morning, ladies and gentlemen of

1    the jury.  Welcome back to day 3 of our jury trial.

2              Government may call its next witness.

3              MS. PALUCH:  Thank you, Your Honor.  The United

4    States calls Special Agent Sandra Ennis.

5              SANDRA ENNIS, GOVERNMENT'S WITNESS, SWORN

6              COURTROOM DEPUTY:  Please be seated.  State your

7    full name for the record and spell your first and last

8    name.

9              THE WITNESS:  Sandra Ennis.  S-a-n-d-r-a,

10   E-n-n-i-s.

11             MS. PALUCH:  May I proceed --

12             THE COURT:  You may proceed, counsel.

13             MS. PALUCH:  Thank you, Your Honor.  Before I

14   begin to ask questions of this witness, I would like to

15   state that exhibits falling within the range of Government

16   Exhibit 66-B through 69 and 72 through 81 are exhibits I

17   will be asking her about.  These exhibits have all been

18   stipulated to and I would move for their admission at this

19   time and permission to publish as the exhibits are

20   discussed.

21             THE COURT:  Okay.  Given the stipulation of the

22   parties, Government Exhibits 66-B through 69 and 72 through

23   81 are admitted into evidence and may be published to the

24   jury.

25             (Government's Exhibits 66-B thru 69 and 72 thru 81

Direct - Ennis

1    received)

2              MS. PALUCH:   Thank you, Your Honor.

3                    DIRECT EXAMINATION

4    BY MS. PALUCH:

5    Q.   Ma'am, how are you employed?

6    A.   I'm employed with the U.S. Department of Education's

7    Office of Inspector General's Office.

8    Q.   And what is your title?

9    A.   I am a special agent.

10   Q.   And generally what do your duties entail as a special

11   agent with the Department of Education?

12   A.   I investigate allegations of fraud, waste, and abuse

13   as they relate to U.S. Department of Education program

14   funding.

15   Q.   Are you the lead case agent in this case?

16   A.   Yes, I am.

17   Q.   How did your investigation into this matter begin?

18   A.   In approximately December 2011, our office received a

19   phone call from Pikes Peak Community College.  They were

20   concerned -- there were -- they had concerns of fraud with

21   respect to multiple applications, FAFSA applications and

22   school enrollment applications, coming back to one address.

23   Q.   And did you look into those specific applicants that

24   they identified for you?

25   A.   Yes, I did.  So I requested the school to send me the

Direct - Ennis

1    records and, in reviewing those records, I wanted to verify

2    the information contained in them, so I conducted Social

3    Security number queries in a data place called Accurint.

4    It is also commonly referred to as LexisNexis.  I will

5    refer to it as Accurint from here on out.

6           But what I did is I took those records and I would

7    query the Social Security number in the records the school

8    provided.

9    Q.    Did you take any further steps to verify that, in

10   fact -- first of all, did you already state what did you

11   find out about these applicants?

12   A.    Yes.  So when I conducted the Social Security number

13   queries, I was able to determine that the majority of these

14   applications were inmates -- prison inmates.

15   Q.    And once you found that out, did you take any further

16   steps to verify that, in fact, those applicants were prison

17   inmates?

18   A.    Yes, I did.  So that -- like Mrs. Paluch said, I

19   wanted to confirm for myself that these people were prison

20   inmates, so I went to various public Department of

21   Corrections web sites and confirmed the name and date of

22   birth matched the name and date of birth on the records

23   that Pikes Peak Community College had provided to me.

24   Q.    And you were able to verify that, in fact, they were

25   all inmates?

Direct - Ennis

1    A.   Yes, I was.

2    Q.   Now, over the course of your investigation, what was

3    the time frame of the conduct you were investigating?

4    A.   The time frame was from approximately August 2010

5    through October 2012.

6    Q.   Where were these inmates incarcerated?

7    A.   There were inmates located in Arizona Department of

8    Corrections, Colorado, Florida, Illinois, and Ohio

9    Department of Corrections.

10   Q.   Did you interview some of these inmates?

11   A.   Yes.  I interviewed approximately 43 inmates from all

12   the various Department of Corrections.

13   Q.   And after these interviews, did you determine whether

14   these inmates were involved in a scheme to defraud the

15   Department of Education?

16   A.   Yes.  Through my interviews, I was able to determine

17   that none of these people authorized student loans to be

18   taken out in their name.  And I was also able to determine

19   that they were, indeed, incarcerated during the time that

20   the fraud incurred.

21   Q.   If the witness could please be shown Government's

22   Exhibit 37, which should be in the first book, Ms. Hansen.

23   A.   Exhibit 38?

24   Q.   It's actually 37.

25   A.   Oh.

Direct - Ennis

1    Q.   Can you identify that document, ma'am?

2    A.   Yes, it is.

3    Q.   And what is it?

4    A.   It's a -- it's a court-related document, and it's a

5    stipulation as to testimony of certain witnesses.

6            MS. PALUCH:  Your Honor, at this time, I'd move

7    for the admission and publication of Government's

8    Exhibit 37.

9            THE COURT:  All right.  Given the stipulation of

10   the parties, Government Exhibit 37 is admitted into

11   evidence and may be published to the jury.

12       (Government's Exhibit 37 received)

13   BY MS. PALUCH:

14   Q.   And, Agent Hacker, if you could make the text of that

15   document -- zoom in on the text, please.  Okay.

16           Agent Ennis, what I need you to do is read that so

17   it is part of the record, if you could.

18   A.   Sure.  "The United States of America, by and through

19   Assistant United States Attorneys Martha A. Paluch and

20   Bryan D. Fields, and the Defendant Tramell Thomas, by and

21   through his counsel, Daniel T. Smith and Thomas E.

22   Goodreid, hereby agree and stipulate that if called to

23   testify at trial, the following witnesses -- Ishmael Omar,

24   Virginia Jones, Robert Pickens, Eddie Jones, Dennis Miller,

25   and Manuel Abate whose initials appear in Counts 2-7 of the

Direct - Ennis

1    Superseding indictment -- would testify that 1) they were

2    incarcerated at the time FAFSAs requesting federal student

3    aid and related school documents were submitted in their

4    names; 2) they did not submit these documents to the

5    Department of Education or to the schools in question; and

6    3) they did not authorize anyone to submit these documents

7    in their names using their personal identifying

8    information."

9    Q.    Thank you.  You can take that exhibit down.  Thank

10   you, Agent Hacker.

11           Now, what, if anything, did you determine about

12   the FAFSAs that were submitted to the Department of

13   Education?

14   A.    So when a FAFSA's submitted to the Department of

15   Education, the Department of Education captures an IP

16   address, an internet protocol address.

17   Q.    Did you request information about the IP addresses

18   that you discovered?

19   A.    Yes.  So I submitted the names to a group within our

20   Office of Inspector General saying, "Hey, I would like IP

21   data for these applicants," and they were able to provide

22   me IP address information.

23   Q.    Approximately how many IP addresses did you identify

24   in your investigation as being involved in this scheme?

25   A.    There were four primary IP addresses, and then there

Direct - Ennis

1    were other IP addresses that fell outside of a retention

2    period.

3    Q.   Could you explain what you mean by a "retention

4    period."

5    A.   Yes.  A retention period -- so internet service

6    providers such as Century Link, they have IP information

7    and they have IP subscriber information.  They only retain

8    those records for a certain set amount of time.  And so

9    some of these records that I requested for certain IP

10   addresses, they were outside of a retention period.

11   Q.   What did you learn about the four primary IP

12   addresses?

13   A.   Three of these IP addresses came back to Ayana Jones.

14   When I say "come back," I mean to say the internet

15   subscriber was Ayana Jones.

16        And then there was another IP address, the

17   internet subscriber was Elmer Green.

18   Q.   Can you remind the jury who Ayana Jones is.

19   A.   Yes, Ayana Jones -- at the time of the fraud, Ayana

20   Jones was the minor daughter of Heather Carr.

21   Q.   What did your investigation reveal as to who Elmer

22   Green is?

23   A.   Elmer Green's the uncle of Marcelle Green.

24   Q.   The Marcelle Green that testified yesterday?

25   A.   Correct.

Direct - Ennis

1   Q.   Did the subscriber information for Ayana Jones come

2   back to a physical address or addresses?

3   A.   Yes.  So two of the IP addresses for subscriber Ayana

4   Jones came back to 1351 Pleasant Drive, unit 1110 in

5   Chandler, Arizona.  And then another IP address associated

6   with Ayana Jones came back to 1822 East Kaibab in Chandler,

7   Arizona.

8   Q.   Did you investigate Ms. Carr?

9   A.   Yes, I did.

10  Q.   And what did you learn about her in relation to those

11  addresses?

12  A.   Heather Carr resided at the Pleasant address for a

13  duration of time in 2011 and then at some point in the

14  early part of 2012, she moved to the 1822 East Kaibab

15  address.

16  Q.   And with whom, if anyone, did she live at these

17  addresses?

18  A.   At the 1351 Pleasant address she resided with her

19  three children and at the 1822 Kaibab address, she resided

20  with the defendant, Tramell Thomas, and her three children.

21  Q.   Did your investigation reveal the connection of the

22  defendant and -- the defendant and Ms. Carr?

23  A.   Yes.  The defendant and Ms. Carr were in a

24  relationship and they had a child together.

25  Q.   Did you discover any other addresses tied to Heather

544

Direct - Ennis

1    Carr?

2    A.    Yes.  At some point in time, she had put a forwarding

3    address through the United States Postal Service to a P.O.

4    Box at 975 East Riggs Road in Chandler, Arizona.

5    Q.    If we could please publish Government Exhibit 64,

6    which has been admitted.  And if you could zoom in on the

7    handwriting, Agent Hacker.

8          First of all, can you identify what this document

9    is?

10   A.    Yes.  I obtained this application from the private --

11   they're called private mailbox locations.  It's a post

12   office box location at a UPS store in Chandler, Arizona.

13   Q.    And you requested these documents from that UPS store?

14   A.    Yes, I did.

15   Q.    Whose names are listed for receipt of mail on that

16   P.O. Box?

17   A.    As indicated in No. 2, Heather Carr, Jones, and

18   Thomas.

19   Q.    Okay.  Thank you.

20   A.    Uhm-hum.

21   Q.    What did you discover about Ms. Carr's employment?

22   A.    I was able to determine that she was employed at Wells

23   Fargo Bank and she helped approve loans for CarMax through

24   Wells Fargo Bank.

25   Q.    In that position, did she have access to certain

Direct - Ennis

1    databases?

2    A.    Yes.  Heather Carr had access to the database I

3    referred to earlier, Accurint.

4    Q.    And what does the Accurint database allow someone to

5    do?

6    A.    The Accurint database allows someone to obtain

7    personal identifying information on someone.

8    Q.    Okay.  Would that include a Social Security number?

9    A.    Yes, it would.

10   Q.    Did your investigation reveal what information she

11   needed to obtain someone's Social Security number?

12   A.    Yes.  She could query a name via just a name or a

13   name -- or a date of birth, or a combination of the two.

14   Q.    Did you obtain records from Wells Fargo pertaining to

15   Ms. Carr?

16   A.    Yes, I did.

17   Q.    Did those records confirm that Ms. Carr had performed

18   those searches for Social Security numbers?

19   A.    Yes, they did.

20   Q.    Now, you mentioned Accurint.  What, if any,

21   relationship does Wells Fargo have with Accurint?

22   A.    So Wells Fargo contracts with Accurint, and Accurint

23   provided the records to Wells Fargo who, in turn, provided

24   those records to me.

25   Q.    And did you review those records before your

Direct - Ennis

1    testimony?

2    A.   Yes, I did.

3    Q.   And did those -- and throughout your investigation, in

4    fact, did you rely on those records?

5    A.   Yes, I did.

6    Q.   And did those records reveal that Ms. Carr had, in

7    fact, performed the searches in question?

8    A.   Yes.  So for the approximately 181 applications that I

9    identified in my investigation, she had queried those 1- --

10   the 181 names I had identified in my investigation.

11   Q.   Was there a user name tied to those searches related

12   to your investigation?

13   A.   Yes.

14   Q.   What was that user name?

15   A.   Heather Carr 1.

16   Q.   Did Wells Fargo in fact confirm that was Heather

17   Carr's login name?

18   A.   Yes, they did.

19   Q.   When was the first query done with the Heather Carr 1

20   logon that you determined related to this scheme?

21   A.   It was July 3d, 2010.  And it was a query for Ismael

22   Omar.

23   Q.   Was there another query done in July of 2010?

24   A.   Yes.  It was approximately July 19th, 2010.  And it

25   was a query for Virginia Jones.

Direct - Ennis

1  Q.   After further investigation, did you determine who was

2  involved in this scheme?

3  A.   Yes, I did.  Heather Carr, Tramell Thomas, Mercedes

4  Diaz, and Marcelle Green.

5  Q.   Now, you testified as to the relationship between Carr

6  and Thomas.  What is the connection, if any, between Diaz

7  to any of the named conspirators?

8  A.   Heather Carr and Mercedes Diaz are very close.

9  Heather Carr is like a mother figure to Heather Carr -- or,

10 sorry, Heather Carr is a mother figure to Mercedes Diaz.

11 Q.   And what about Marcelle Green?

12 A.   Marcelle Green and Heather Carr were close friends.

13 Q.   Now, you mentioned the 181 false FAFSAs.  How much

14 money from the Department of Education were those FAFSAs

15 seeking?

16 A.   1.3 million.

17 Q.   And how much did the Department of Education pay out

18 on those claims?

19 A.   Approximately 582,000.

20 Q.   And where did the money go?

21 A.   Into the conspir- -- the conspirators' pockets.

22 Q.   Did some of it go to the schools?

23 A.   Oh, yes, it did.  So the school first went -- the

24 money first went to the school to pay for tuition and fees,

25 and then the remaining refund would go to a purported

Direct - Ennis

1    student who were the conspirators in this case.

2    Q.   And what were the alleged students supposed to be

3    using that money refunded to them for?

4    A.   That refunded money was supposed to be used for

5    educational purposes.

6    Q.   How does the money in this case get distributed to the

7    alleged students?

8    A.   It was distributed in the form of a Higher One, or

9    City Prepaid debit card.

10   Q.   So out of that 582,000, how much was paid out in the

11   debit cards?

12   A.   Approximately 419,000.

13   Q.   And the difference between those two numbers went to

14   the schools?

15   A.   Correct.

16   Q.   Okay.  What agency or department paid that money?

17   A.   The U.S. Department of Education.

18   Q.   And is that a federal agency?

19   A.   Yes, it is.

20   Q.   Did you investigate the addresses listed on the FAFSAs

21   that were submitted?

22   A.   Yes, I did.

23   Q.   And what did you determine?

24   A.   The addresses where the debit cards were mailed were

25   some -- in some way associated with Heather Carr, Tramell

549
Direct - Ennis

1    Thomas, Mercedes Diaz, and Marcelle Green.

2    Q.   At some point in your investigation, were you notified

3    that the defendant had been arrested in Tempe, Arizona?

4    A.   Yes, I was.

5    Q.   And what, if any, evidence was recovered during the

6    arrest that pertained to your investigation?

7    A.   A Sony Vaio laptop, 52 debit cards located in the

8    vehicle, and one debit card located in the defendant's

9    wallet.

10   Q.   And you heard Ms. Stailey testify about the evidence

11   located on the Sony Vaio laptop.

12   A.   Yes, I did.

13   Q.   Let's talk about the debit cards.  Were all 53 debit

14   cards in the names of inmates listed?

15   A.   Yes.  Yes, they were.

16   Q.   If the witness could be shown Government's Exhibits 4

17   and 5.  Those are the envelopes.

18        Let's start with Government Exhibit 4, which has

19   been admitted.  Do you recognize that exhibit?

20   A.   Yes, I do.

21   Q.   And do the -- and what is that exhibit?

22   A.   This is the envelope we received from Tempe Police

23   Department, and in the envelope are the 52 debit cards in

24   the names of inmates.

25   Q.   Did the Tempe PD turn those debit cards over to you?

Direct - Ennis

1    A.   Yes, they did.

2    Q.   And what did you do with those cards?

3    A.   I stored these debit cards in our evidence room.

4    Q.   And have you brought them to court every day this week

5    and including today?

6    A.   Yes, I have.

7    Q.   Please look at Government's Exhibit 5 and state what

8    that is.

9    A.   This is the debit card that I received from Tempe

10   Police Department, and this was the debit card located in

11   the defendant's wallet.  The debit card is in the name of

12   Manuel Abate.

13   Q.   And did you similarly store that debit card in your

14   evidence locker?

15   A.   Yes, I did.

16   Q.   And bring it to -- bring it with you to court?

17   A.   Yes, I did.

18   Q.   All right.  Do you recall the testimony, Ms. Stailey,

19   regarding text messages found on the broken Huawei phone?

20   A.   Yes, I do.

21   Q.   Please publish Government Exhibit 16, which has

22   already been admitted.  And if we could blow up the last

23   two lines of that exhibit.  As large as you can make that.

24        Could you read, Agent Ennis, line -- the last line

25   on that entry.

Direct - Ennis

A.   Yes.  So it says No. 2, so we know that it's an outgoing text from the phone.  It was done on 7-3-2012 at 1:31 and 40 seconds.  The number was -- that the text was being sent to was 260-602-7165.  And it says, "Chase Tramell Thomas, 455435276."

Q.   Okay.  At this time -- if we could take that exhibit down -- I'd move to admit and publish -- actually, Government Exhibit 66-B.  It was already admitted, Your Honor.

THE COURT:  I thought we did that this morning earlier.

MS. PALUCH:  I just meant to say if we could please publish.

THE COURT:  Sure.

MS. PALUCH:  Thank you.

BY MS. PALUCH:

Q.   If we could highlight the top half.  In fact, make that even larger, if you can.  Agent Ennis, what is this document?

A.   This is a Chase signature card for Tramell Thomas.

Q.   Did you request that from Chase?

A.   Yes, I did.

Q.   And did you confirm that this was a business record?

A.   Yes, I did.

Q.   All right.  On that first page, does it contain the

Direct - Ennis

1    defendant's name?

2    A.   Yes, it does.

3    Q.   What's the address listed for him?

4    A.   1822 East Kaibab Drive in Chandler, Arizona, 8- --

5    Q.   And if you could read for the record his bank account

6    number?

7    A.   455435276.

8    Q.   Is that the same number listed in the text message,

9    Government Exhibit 16?

10   A.   Yes, it is.

11   Q.   Okay.  Thank you.  Turning your attention now to the

12   debit cards, did you create a summary chart pertaining to

13   debit card mailings?

14   A.   Yes, I did.

15   Q.   Please publish Government's Exhibit 75.  Okay.  So

16   we'll zoom in a bit, but for -- first, can you identify

17   this exhibit?

18   A.   This was a summary chart that I created, and it's a

19   summary of the mailings that occurred from City Prepaid and

20   Higher One.

21   Q.   Does this chart reference every debit card mailed in

22   this case?

23   A.   No, it does not.

24   Q.   What cards does it contain?

25   A.   It's a representation of the cards that were located

Direct - Ennis

1    in the defendant's wallet and is also representative of the

2    City Prepaid cards that were mailed out in 2012.

3    Q.   Can you explain what City Prepaid is.

4    A.   Yes.  So Higher One, the Colorado Community College

5    System, uses Higher One.  The Maricopa County Community

6    College in Arizona use City Prepaid to distribute refunds

7    to students.

8    Q.   Okay.  So I'd like you to walk us through the columns

9    on this chart.  So let's start with the first column, if

10   you could please highlight that.  At least on this first

11   page.

12        And can you explain what this chart shows.

13   A.   So the first row is indicative of the debit cards --

14   the name that the debit card was issued in that name.

15   Q.   Okay.  Let's go to the next column.

16   A.   This would have been the student ID or user ID for

17   that particular name.

18   Q.   And you would have received that from the school?

19   A.   Yes.

20   Q.   Okay.  Let's go to the next column.

21   A.   This is a Higher One or City Prepaid account number.

22   Q.   Thank you.  Next column.

23   A.   This is the school which distributed -- or authorized

24   funds to be released.

25   Q.   And the next column that you see there.

1   A.   That would have been the last four digits of the debit

2   card.

3   Q.   Okay.  And the next one.

4   A.   This would have been where the debit card was shipped.

5   Q.   Thank you.  Let's do the next two columns together.

6   A.   So this shows when the card was created from the

7   production facility, and then the second one is when the

8   card is activated.

9   Q.   Okay.  And then let's go with the last section there.

10  A.   That's the date of activation.  And at times Higher

11  One provided a time of activation -- or, wait -- yes, and

12  City Prepaid did not.

13  Q.   Okay.  And if we could scroll through that exhibit and

14  just show how many pages that is.

15          10 pages total?

16  A.   Correct.

17  Q.   Thank you.  What records did you rely on to create

18  that chart?

19  A.   Records obtained from Higher One and City Prepaid.

20  Q.   Please publish Government Exhibit 76.

21          Okay.  And if we could -- if you could -- is there

22  any way to make that exhibit larger?  Let's start with

23  highlighting the blue box.

24          First of all, Agent Ennis, can you identify what

25  this exhibit is?

Direct - Ennis

1   A.   Yeah.  This is a composite exhibit.  These -- it comes

2   from Higher One records.  And what this tells us is when

3   the Higher One card was mailed as alleged in Count 2 of the

4   indictment for Ismael Omar.

5   Q.   Okay.  So Agent Hacker, if you could please highlight

6   the blue box.

7        And state what it is saying as far as the mailing

8   dates on the Count 2 of the indictment.

9   A.   That the mailing occurred sometime between

10  approximately February 8th through February 22d, 2011.

11  Q.   Okay.  If you could please then highlight the box.

12  And what does that box tell you?

13  A.   It shows when the card was ordered from the production

14  facility on February 8th, 2011, and then when the card was

15  activated.  So we know that at some point in time between

16  when the card was ordered and when it was activated, we

17  know the mailing occurred of that card through the U.S.

18  Postal Service.

19  Q.   And that's how Higher One got these debit cards to the

20  students?

21  A.   That is correct.

22  Q.   Thank you.  Please publish Government Exhibit 77.

23  Again, the blue box.

24        First of all, what is this document, Agent Ennis?

25  Can you identify it?

Direct - Ennis

1    A.    Again, it's a composite exhibit and it describes what

2    is alleged in Count 3 of the superseding indictment.  And

3    it reflects the date range of when the Higher One debit

4    card was mailed, purported student Virginia Jones, at 1418

5    Rushmore.

6    Q.    And that's August 11th through October 15th?

7    A.    That is correct.

8    Q.    And then let's look at the box from Higher One.  And

9    what are the dates there?

10   A.    It was ordered from the production facility on August

11   11th, 2011, and it was activated by the cardholder on

12   October 3d, 2011?

13   Q.    So are dates in the indictment off by a few days

14   there?

15   A.    Correct.  It was on or about.

16   Q.    Okay.  Please publish Government Exhibit 78.  And

17   we'll go with the blue box.

18         And, first, what is this exhibit, ma'am?

19   A.    Composite exhibit of what is alleged in Count 4 of the

20   superseding indictment.  The date range that the debit card

21   was mailed was August 4th through October 3d, 2011, for

22   Robert Pickens, at 1418 Rushmore Drive in Colorado Springs.

23   Q.    Did I hear you say August 4th?

24   A.    Oh, August 11th through October 3d.

25   Q.    Okay.

Direct - Ennis

1    A.    My apologies.

2    Q.    And then let's blow up the box.

3          Do those two dates, August 11th and October 3d,

4    appear in that box?

5    A.    Yes, they do.

6    Q.    Okay.  Please publish Government Exhibit 79.

7          And what is this exhibit?

8    A.    A composite exhibit of what is alleged in Count 5 of

9    the superseding indictment.  The debit card was mailed at

10   some point during August 29th through November 9th, 2011,

11   in the name of Eddie Jones, to 1418 Rushmore in Colorado

12   Springs, Colorado.

13   Q.    And then please blow up the box.

14         Do those same dates appear in that box?

15   A.    Yes, they do.

16   Q.    Okay.  Let's publish Government Exhibit 80.  We have

17   two more to go.

18         What is that exhibit?

19   A.    It's a composite exhibit of Count -- what is alleged

20   in Count 6 of the superseding indictment.  We're alleging

21   that from the time period of June 26th through July 7th,

22   2012, a Higher One debit card was sent through the mail in

23   the name of Dennis Miller, to 1112 Meadow Oaks Drive,

24   Colorado Springs, Colorado.

25   Q.    And do those dates correspond to the Higher One

Direct - Ennis

1    records?

2    A.   Yes, they do.

3    Q.   Last one.  Government Exhibit 81, please.

4         What does this exhibit relate to?

5    A.   It is a composite exhibit of what is alleged in

6    Count 7 of the superseding indictment.  A Higher One debit

7    card was mailed between the time period of approximately

8    July 18th through July 26th, 2012, in the name of Manuel

9    Abate, to the mailing address of 1112 Meadow Oaks Drive,

10   Colorado Springs, Colorado.

11   Q.   And do those same dates appear in the Higher One

12   records?

13   A.   Yes, they do.

14   Q.   Okay.  So I know we see the date imported.  If you

15   could back out of that exhibit, and highlight down below.

16        There's the July 26th date?

17   A.   Correct.  And above that you see Due Date for U.S.

18   Mail Delivery.

19   Q.   Okay.  That -- exactly.  Okay.

20        That appears above the July 26th date, correct?

21   A.   That is correct.

22   Q.   Thank you.  Ma'am, you testified as to the loss to the

23   Department of Education from this scheme?

24   A.   Yes, I did.

25   Q.   Did you prepare a summary chart detailing that loss?

Direct - Ennis

1    A.   Yes, I did.

2    Q.   Please publish Government Exhibit 72.  And this is a

3    lot, so we will be highlighting and zooming in.

4         But, ma'am, can you identify what this document

5    is?

6    A.   Yes.  This is the loss sheet I created to reflect the

7    loss to the Department of Education and the loss to the

8    schools affected.

9    Q.   And what type of records did you use to create this

10   document?

11   A.   I created -- I use what's called a COD report.  It's

12   called Common Origination Disbursement report that the U.S.

13   Department of Education -- it's how they keep track of the

14   money that goes to the schools, and then it also keeps

15   track of any money that comes back from the school as

16   required by the return to Title IV calculation of when a

17   student doesn't earn all of their financial aid.

18   Q.   What I would like you to do is just generally explain

19   to the jury how this chart is organized.  And let's go

20   ahead and start with column A.  Agent Hacker, how about we

21   go with the next two, over to Disbursed by Schools.  Let's

22   do that whole box at once.

23        Okay.  Can you explain what's contained here?

24   A.   So, yeah, at the top you'll see Disbursals to School

25   by ED.  ED is U.S. Department of Education.  So it's broken

Direct - Ennis

1   down by unsubsidized loans that are disbursed to the

2   school, the subsidized loans that are disbursed to the

3   school, and the Pell Grant funds that are disbursed.

4          And then if you take those numbers across to the

5   right, you'll see that the total that was -- that was the

6   total amount of aid disbursed by the Department of

7   Education.

8   Q.   Okay.  So let's explain on column 11, can you just

9   state what that -- I'm sorry, not 11.  I don't know what

10  I'm talking about.  There on the left-hand side of this

11  summary chart, what is contained there?

12  A.   So if you go to the left-hand side, because it's a

13  rather large document, you don't see all of it in its

14  entirety but you see that I've broken it down by school.

15  So there was aid disbursed from Chandler-Gilbert Community

16  College, Community College of Denver, Mesa Community

17  College, I think Pikes Peak is the next one, Pueblo

18  Community College -- I'm having to scroll down to refresh

19  my memory, but I think it's Phoenix.  So, yes.

20  Q.   Let's see.  There's Phoenix.  Let's go to the next

21  school after Phoenix.  There's Pikes Peak.  What are the

22  last two?

23  A.   Pueblo Community College and Red Rocks Community

24  College.

25  Q.   Okay.  And let's back out and go back to the first

Direct - Ennis

1    page of that exhibit.  So let's highlight in the box

2    starting with Adjustments and take that to the end so the

3    agent can explain that section of the chart.

4    A.   So you heard testimony this week where Department of

5    Education, they disbursed the money to the school, and

6    there are times when all of the aid is not earned by the

7    applicant or the purported student because they drop out of

8    the course or they withdraw from the course.  So they

9    haven't attended the entire time so, therefore, they

10   haven't earned all of that aid.  So there is a requirement

11   by the school to return that money to the U.S. Department

12   of Education.

13        So what you see reflected here are the times when

14   the school returned money to the U.S. Department of

15   Education.  And what you heard earlier this week is there

16   are times when the money goes to the school, the school

17   takes their tuition and fees, and they disburse that refund

18   to the student so that they can get their educational

19   expenses buying books, transportation to get to school,

20   whatever is related to education.

21        Well, that money's out the door.  But now there's

22   a requirement to return the money to the Department of

23   Education, so the school has to use their own institutional

24   funds to pay back the Department of Education, and that's

25   what the losses reflect there.  That's -- the adjustment is

Direct - Ennis

1   where the school -- they either returned money and they

2   were able to do it before money went out the door, or there

3   were times when money had already gone out the door and the

4   school suffered a loss.

5   Q.   Thank you for that explanation.

6        The names on the left-hand side of this exhibit,

7   are those all names that were implicated in this scheme, or

8   funds were disbursed in these names as part of the scheme?

9   A.   Correct.  These were names identified in this

10  investigation.

11  Q.   Let's use Manuel Abate as an example.

12  A.   Okay.  If we --

13  Q.   Pardon me.

14  A.   Did you want to discuss the very last --

15  Q.   Did we not get to the very last -- I apologize.  Go

16  ahead, and if you could explain that last section.

17  A.   Yes.  So the FSA refunds, that's what I was talking

18  about.  That's what went onto the debit card.  That was the

19  refund that was provided to the purported student.

20  Q.   Thank you.

21  A.   Uhm-hum.

22  Q.   Let's talk about one example and then we'll go to your

23  summaries at the end.  But let's use Abate as an example.

24  If you could highlight -- there's another Abate.  So we've

25  got to scroll down to --

Direct - Ennis

1    A.   Pikes Peak.

2    Q.   The Pikes Peak on page 2.  And if you could look in --

3    we're just looking for a highlighting of Manuel Abate.  Can

4    you find his name?  There he is.  Let's just highlight

5    Pikes Peak and Abate, line 63, if you could.  Okay.  We're

6    going to need to make that bigger.

7         Okay.  So tell us what happened with Manuel Abate.

8    A.   Okay.  What had happened -- and that's kind of hard

9    to -- if you start going -- is there any way to --

10   Q.   Let's -- can we do the whole line for Abate?

11        AGENT HACKER:  It won't be large enough.

12   BY MS. PALUCH:

13   Q.   Let's take this and see how large that is.  There's no

14   way to make it larger?

15        AGENT HACKER:  No, ma'am.

16   BY MS. PALUCH:

17   Q.   Okay.

18   A.   So I'll start with what was disbursed.  You'll see

19   that if you go across, there was subsidized loans,

20   unsubsidized loans, Pell money.  And so the total was

21   $6,091 was provided to the school Pikes Peak -- Pikes Peak

22   Community College.

23   Q.   So then let's back out and pick up from that number

24   and take that to the end.

25        What do these numbers represent?  Are you able to

1   say that without the headings?

2   A.   I think so.  So we show that $829 was returned to the

3   Department required by the return to Title IV calculation.

4   And there was also money returned at some point, 3,874.

5   I'll explain that in a moment.  So the remaining amount --

6   amount was 13,088, which is what the school used for

7   tuition and fees.

8        As you heard earlier this week, the school always

9   uses the Pell money first.  And I might need to -- and then

10  the 4,706 I believe is the refund that was issued in the

11  form of a refund for Manuel Abate.

12  Q.   Okay.  Okay.

13  A.   And do you want me to continue?

14  Q.   Yeah, why don't you explain what happened with Mr.

15  Abate's money.

16  A.   So what we found out was that the debit card was never

17  activated.  Manuel Abate never selected the -- the

18  purported Manuel Abate never selected a refund selection.

19  You know, they have the option to have a bank account and

20  activate the debit card, they could choose a check be

21  mailed.  Well, because neither -- neither preference was

22  chosen, Higher One mailed out checks to 1112 Meadow Oaks

23  Drive.  Those checks were never cashed.  Higher One could

24  not keep the money, so they returned the money to the

25  school, and then the school returned that portion you saw,

1    that I said I would explain in a minute, they returned that

2    money to the department.  But there was still a loss

3    because the school took their portion for tuition and fees.

4    Q.   And that $4700 amount was allocated for Manuel Abate

5    had he activated the card or selected some form of

6    payment?

7    A.   That is correct.

8    Q.   Let's go to the last section of this card.  I would

9    like to point out your totals at the end.  If we could

10   highlight just where it talks about totals.

11        What do these numbers represent?

12   A.   You see the 582,000 -- approximately 582-, that is

13   what was disbursed to all the schools based on the amount

14   that was returned to the Department of Education.  You see

15   that 491,000, the loss -- did I say that correctly?

16        The U.S. Department of Education was approximately

17   491,000.  Because some of the money had been returned to

18   them, the school suffered a loss of approximately 72,000,

19   because of, like I said, they had to use their own

20   institutional funds to pay back the department.  So the

21   total of those two numbers are approximately 563,000, you

22   see the total loss there.

23        And then what you see over to the far right is the

24   money that went -- that was distributed via the debit cards

25   and that loss is approx- -- that went to the defendants

1    Heather Carr, Tramell Thomas, Mercedes Diaz, and Marcie

2    Green, and that's approximately $419,000.

3    Q.   By "defendants," you mean the conspirators?

4    A.   Yes, I do.

5    Q.   Okay.  Thank you.  I think we're done with that

6    exhibit.

7         Now, you testified about IP addresses used in this

8    scheme.  Did you create a summary chart of the IP addresses

9    used in this case?

10   A.   Yes, I did.

11   Q.   Please publish Government's Exhibit 73.

12        What is that document?

13   A.   This is a summary chart that I created, and this was

14   related to IP activity -- IP activity associated with the

15   case.

16   Q.   Okay.  What records did you rely on to create this

17   chart?

18   A.   I relied on records I received from the Department of

19   Education, attendance records received from the Colorado

20   Community College System, Higher One, and City Prepaid IP

21   activity, and records obtained from Century Link and Cox

22   Communications.

23   Q.   Okay.  Let's start with -- if I could, I would like to

24   back out, if you could, Agent.  I'd like to do the first

25   column with the names.

Direct - Ennis

1          So tell us what -- who's listed here.

2     A.   So this is a representation, this isn't all of the

3     names identified in the investigation.  This is a

4     representation of the names.  All but two of the names are

5     inmates identified in this investigation.

6     Q.   And who are the two that are not inmates?

7     A.   Vanessa Lopez and Tramell Thomas.

8     Q.   And who's Vanessa Lopez?

9     A.   Vanessa Lopez is a former girlfriend of Tramell

10    Thomas.

11    Q.   Okay.  Let's back out of that.  And then let's

12    highlight the top column, all of the -- across the row.

13         Tell us what we have here.

14    A.   So going from left to right, you'll see the first

15    number, the two four number, that subscriber information we

16    weren't able to obtain records because it was outside of

17    the retention period --

18    Q.   Agent Ennis, I'm going to interrupt you for a second.

19    I'm going to ask Agent Hacker to just blow up the first two

20    columns so we could read those a little bit easier.  Okay.

21         So you -- finish your testimony on that first box.

22    A.   Yes.  So the first box, we weren't able to obtain

23    records due to it falling outside of retention periods.

24         The second column, Subscriber Information, came

25    back to Ayana Jones with service at 1351 Pleasant Drive.

Direct - Ennis

1    Q.   Okay.  And let's go to two more boxes together.

2         What can you tell us about those two boxes?

3    A.   These two IP addresses, Subscriber Information was for

4    Ayana Jones.  One was for service at 1351 Pleasant and then

5    the other six eight number was at 1822 East Kaibab.

6    Q.   Okay.  And you testified that is Heather Carr's minor

7    daughter, correct --

8    A.   That's correct.

9    Q.   -- at the time?

10        Let's go to the last two boxes.

11   A.   So these IP addresses were associated with subscriber

12   Elmer Green, for service at 4630 South 21st Place in

13   Phoenix, Arizona.

14   Q.   Okay.

15   A.   And the --

16   Q.   Go ahead.

17   A.   There's a column for other IP addresses where we

18   weren't able to obtain subscriber information.

19   Q.   Okay.  Could we go to the bottom of the first page and

20   highlight off to the left.  Is there a key at the bottom of

21   this exhibit?

22   A.   Yes, there is.

23   Q.   Can you explain that key.

24   A.   Yes.  So you'll find letters in the spreadsheet and

25   these letters are representative of the following:  An F

1   stands for FAFSA, meaning the FAFSA was submitted from that

2   IP address; A is any attendance IP activity associated with

3   Colorado Community College Systems; an H is the Higher

4   One -- any IP activity associated with Higher One.

5   Q.   Okay.  We could back out of that.  And let's use Abate

6   as an example, if we could.  Is he on there?

7            So what is this showing about Abate?

8            And I think what we'll have to do is back out and

9   grab that heading above.

10           What does this show as far as Manuel Abate?

11  A.   So we show that there was attendance activity, FAFSA

12  was submitted, and Higher One activation or card activity

13  coming back to 1822 East Kaibab Drive in Chandler, Arizona.

14  Q.   And you did that for every inmate listed -- if we

15  could back out of that -- every inmate listed on this

16  summary chart?

17  A.   Yes, I did.

18  Q.   And, Agent Hacker, if you could scroll through to show

19  the jury how many pages are comprised of this exhibit list.

20  Okay.  Thank you.  How many pages is that?  Three.  All

21  right.  You -- thank you for that exhibit.

22           You talked about the physical addresses used in

23  this scheme, correct?

24  A.   That is correct.

25  Q.   I think I'd like to talk about your final summary

1    chart and that's Government Exhibit 74.  Can you identify

2    that exhibit?

3    A.   Yes.  I created this summary chart reflecting

4    addresses associated where Higher One debit card or school

5    enrollment records, any activity related to the scheme that

6    used these addresses.

7    Q.   Okay.  And what addresses are listed on -- on this in

8    relation to the scheme?

9    A.   There's approximately representative of 11 addresses

10   and they are not all -- they didn't all fit on one page,

11   but these addresses are associated with the co-conspirators

12   in this case.

13   Q.   How did you determine that?

14   A.   Through my investigation through conducting interviews

15   and basically my investigation.

16   Q.   To include Department of Education records?

17   A.   Oh, where did I -- yes.  I apologize.  So I obtained

18   this information through Department of Education records,

19   Higher One records.  Department of Education records I

20   obtained from the school, and then also -- that was all, I

21   think.

22   Q.   And you relied on those records to create this chart?

23   A.   Correct.

24   Q.   And now you stated you couldn't get all 11 across.  If

25   we could look at page 4 of this exhibit.  Does that contain

Direct - Ennis

1   the remaining addresses?

2   A.   Yes, it does.

3   Q.   Okay.  So we're going to start with the left-hand

4   column on page 1.  What's contained here?

5   A.   These are the names identified in my investigation.

6   All of these names except for two were prison inmates.

7   Q.   Okay.  And those are the two you said was Vanessa

8   Lopez and the defendant?

9   A.   That is correct.

10  Q.   Okay.  Please explain the next column.  Let's just go

11  with -- for now what we're going to do is just talk about

12  the addresses and let's do two at a time.

13       So the first address, what address is that?

14  A.   1418 Rushmore Drive, Colorado Springs, Colorado.

15  Q.   And whose address is that?

16  A.   That is the address of LaTanya Pickens.

17  Q.   And who is LaTanya Pickens?

18  A.   LaTanya Pickens is a friend of Heather Carr and at an

19  address where the defendant had information associated with

20  such school records.

21  Q.   And can you explain that.  What do you mean

22  "associated with"?

23  A.   School records.

24  Q.   Did he list that address?

25  A.   Yes, he did.

Direct - Ennis

1    Q.   As his own?

2    A.   Correct.

3    Q.   Okay.  Let's go to the next address.

4    A.   2372 Lexington Village Lane.

5    Q.   And whose address is that?

6    A.   That is the address of Makayla Grant.

7    Q.   And who is Makayla Grant?

8    A.   Makayla Grant is a close friend of Heather Carr.

9    Q.   Okay.  Let's go to two more addresses.  Let's start

10   with Black Hawk.  Whose address is that?

11   A.   3239 Black Hawk Drive is the address of Matthew

12   Sanders.  Matt --

13   Q.   Who -- I'm sorry, who's Matthew Sanders?

14   A.   Matthew Sanders is the stepbrother of Heather Carr and

15   friend of Tramell Thomas.

16   Q.   Okay.  The next address, Radiant Drive?

17   A.   This is the address where Christine Duncan and Tramell

18   Thomas resided.

19   Q.   Okay.  Let's go to the next -- the last two addresses

20   on this page.  Can you tell us about Rice Drive?

21   A.   1063 Rice Drive is the address of the defendant's

22   cousin, Michael Cox.

23   Q.   And the next address.

24   A.   1112 Meadow Oaks Drive was the address of Kimmisha

25   Mullett.

Direct - Ennis

1    Q.   Let's go to page 4 of this exhibit.  Let's start with

2    two addresses first.  Go to Mobile Lane.

3         Whose address is that?

4    A.   Mobile Lane was the address of Marcelle Green's

5    deceased uncle, Jimmy Green.

6    Q.   How about Dragoon Circle?

7    A.   115 west Dragoon Circle is associated with Mercedes

8    Diaz.

9    Q.   Let's go to two more addresses.  How about Knox Road?

10   A.   Knox Road was the address of Mercedes Diaz at some

11   time.

12   Q.   Mills Avenue?

13   A.   Mills Avenue is a post office box that was opened by

14   Terrel Smith.

15   Q.   And who is Terrel Smith?

16   A.   Terrel Smith is a friend of the defendant.

17   Q.   Okay.  Let's go to the last address.

18        Whose address is that?

19   A.   That is the address of Marcelle Green.

20   Q.   And your investigation revealed that all 11 of those

21   addresses were used in this scheme for receipt of debit

22   cards and on FAFSAs?

23   A.   Correct.

24   Q.   All right.  So now let's go to your last column on

25   this chart and have you explain what that means.

Direct - Ennis

1    A.   So the X is indicative that a debit card was located

2    in the car the defendant was driving, and those are the

3    debit cards that were taken into evidence by Tempe PD.

4    Q.   Okay.  Now, let's go to the bottom of the -- and

5    highlight the key, please, if we could.

6         And could you explain the key for this chart to

7    the jury.

8    A.   Yes.  So when you see an F in the columns, it's

9    indicative that that address was used on a FAFSA.  An M

10   stands for master promissory note, that address was used; H

11   or C, that's Higher One or City Prepaid records reflected

12   that that address was used; S stands for school records had

13   that address; and as I said before, X was the card located

14   in Heather Carr's vehicle driven by the defendant.

15   Q.   Okay.  Let's, just for ease of reference, stay with

16   Manuel Abate.  Can you highlight his column and you explain

17   to us what this chart shows us.

18   A.   Correct.  So if you see Manuel Abate's name, and you

19   go to the far right, you'll see that a FAFSA was submitted

20   using the address 1112 Meadow Oaks Drive.  Higher One

21   records that same address was used; master promissory note,

22   that address was used; and it was also used on school

23   records.

24   Q.   And if we go over to page 4, will that indicate

25   whether it was found on the defendant?

Direct - Ennis

1   A.   Yes.   There's an X in the Tempe PD evidence column.

2   Q.   Okay.   Now, Ismael Omar is a name included on this

3   chart.   What was the address listed for Ismael Omar?   And,

4   Agent, if you could scroll down and find him.   Yup, you're

5   there.   Yup.

6        Where is the activity coming back for Ismael Omar?

7   A.   3820 Radiant Drive.

8   Q.   Okay.   How about Virginia Jones, on page 2?

9   A.   1418 Rushmore.

10  Q.   How about Robert Pickens on page 2?

11  A.   1418 Rushmore.

12  Q.   Eddie Jones.

13  A.   1418 Rushmore.

14  Q.   Sorry, we're going too fast there, Agent Hacker.

15       How about Dennis Miller?

16  A.   1112 Meadow Oaks Drive.

17  Q.   Okay.   And we -- thank you.   We're done with that

18  chart.

19       Ma'am, we talked about the Rushmore Drive address.

20  And in the course of your investigation, did you come

21  across documentation tying the defendant to the Rushmore

22  Drive address?

23  A.   Yes, I did.

24  Q.   At this time, I'd move to publish Government

25  Exhibit -- oh, I believe it's already admitted, Government

Direct - Ennis

1    Exhibit 67.  Please publish.  And can you highlight the top
2    portion of that.  Even a little more if you could grab that
3    first area down to the address.
4          Okay.  What is this document, ma'am?
5    A.   It is a FAFSA.
6    Q.   Okay.  And who -- in whose name?
7    A.   Tramell Thomas.
8    Q.   All right.  And what's the address listed for him?
9    A.   1418 Rushmore Drive.
10   Q.   Okay.  And let's go to the back -- the last page of
11   this exhibit.
12         And can you tell us the date that that was
13   submitted?
14   A.   June 27th, 2010.
15   Q.   And for what school?
16   A.   Pikes Peak Community College.
17   Q.   Okay.  Let's now look at Government Exhibit 68, if you
18   could publish that exhibit.  And let's highlight the top
19   box, if we could.  Okay.  Down to there.  Great.  Can you
20   make the name larger in that?  Take just that box there.
21         First of all, what is this document?
22   A.   This is a master promissory note.
23   Q.   In whose name?
24   A.   Tramell Thomas.
25   Q.   And at what address?

Direct - Ennis

1    A.   1418 Rushmore Drive.

2    Q.   And what's the date of that master promissory note?

3              I think we have to scroll down to the bottom of

4    the document.  And if you could highlight the 17 and 18.

5    A.   It shows it was electronically signed by Tramell

6    Thomas on June 24th, 2010.

7    Q.   Thank you.  Please publish Government Exhibit 69.  And

8    highlight as much as you can of that document.

9              First, ma'am, what is -- what is this document?

10   A.   These are Higher One bank statements.

11   Q.   And let's highlight, if we can, at the top, the name

12   and address.

13             What is listed there?

14   A.   Tramell Thomas, 1418 Rushmore Drive, Colorado Springs,

15   Colorado.

16   Q.   And did you obtain those records from Higher One?

17   A.   Yes, I did.

18   Q.   Thank you.  We are done with that exhibit.

19             Ma'am, was a search warrant executed in this case

20   on the Kaibab address?

21   A.   Yes, it was.

22   Q.   What date did that search occur?

23   A.   November 29th, 2012.

24   Q.   And who lived at that address at that time?

25   A.   Heather Carr, Tramell Thomas, Heather Carr's children,

Direct - Ennis

1    and one of the children was Tramell Thomas'.

2    Q.   Let's look at Government Exhibit 7.  Can you identify

3    that exhibit -- I'm sorry, I don't know that 7 has been

4    admitted.

5              THE COURT:  One second.  Deb, do you show it in?

6              COURTROOM DEPUTY:  No, Your Honor.

7              MS. PALUCH:  No.

8              THE COURT:  Neither do I.

9              MS. PALUCH:  Right.  If the exhibit could be shown

10   just to the witness.  Exhibit No. 7.

11   BY MS. PALUCH:

12   Q.   Can you identify that document, ma'am?

13        Is it up yet?

14   A.   Not yet.

15             COURTROOM DEPUTY:  Do you want the hard copy?

16             MS. PALUCH:  She can look at it out of the book.

17   BY MS. PALUCH:

18   Q.   Do you have the first book --

19   A.   I have it now.

20   Q.   Okay.  Can you identify that exhibit?

21   A.   Yes.  It's 1822 East Kaibab.  It's the address where

22   the search warrant was executed.

23   Q.   And it's the front of the house; is that right?

24   A.   That is correct.

25   Q.   And when was that photograph taken?

                       Direct - Ennis

1   A.   The day of the search warrant.

2   Q.   Okay.  And you were present then?

3   A.   Yes, I was.

4        MS. PALUCH:  I move to admit and publish

5   Government Exhibit 7.

6        THE COURT:  Any objection?

7        MR. GOODREID:  No, Your Honor.

8        THE COURT:  There being no objection, Exhibit 7 is

9   admitted into evidence and may be published to the jury.

10       (Government's Exhibit 7 received)

11  BY MS. PALUCH:

12  Q.   Now, you stated you participated in the search; is

13  that right?

14  A.   Correct.

15  Q.   When you got to the home, were you able to get in

16  right away?

17  A.   No, we were not.

18  Q.   And what happened once you finally got into the house?

19  A.   Once we got into the house, there were torn-up pieces

20  of paper in the toilet.  These torn-up pieces had acronyms

21  relating to federal student aid, such as FAFSA.  One of the

22  torn pieces of paper had the name of inmate Bianca Johnson.

23  She's from Florida Department of Corrections.

24       There was a broken cell phone located in one of

25  the master bedroom closets.  There were laptops and cell

580
Direct - Ennis

1    phones taken into evidence, as well as there were

2    Pikes Peak enrollment records located in the home.

3    Q.    What about cell phones?

4    A.    Yes, there were cell phones seized into evidence.

5    Q.    Was a broken cell phone seized?

6    A.    Yes, there was.

7    Q.    Where was that broken cell phone found?

8    A.    In one of the master bedroom closets.

9    Q.    What type of clothing was found in that closet?

10   A.    Male clothing.

11   Q.    When you're at that level of the house, were there

12   additional closets?

13   A.    Yes.  There were two master bedroom closets.

14   Q.    And what was contained in the other closet?

15   A.    Female clothing.

16   Q.    Please publish Government's -- let's see.  This is in

17   evidence, Government's Exhibit 25.  If you could please

18   publish that.

19         Can you identify that exhibit, ma'am?

20   A.    Yeah.  That's the defendant standing in the master

21   bedroom.

22   Q.    Is there any way to zoom in on that, Agent Hacker?

23         Do you recognize that room?

24   A.    Yes, I do.

25   Q.    And what is that room?

Direct - Ennis

1    A.    It's the -- one of the master bedroom closets.

2    Q.    What, if anything, was found in that closet during

3    your search?

4    A.    A broken Huawei phone.

5    Q.    Okay.  Please -- this has not been admitted.  I'd like

6    the witness only to see Government Exhibit 70.

7          Can you identify that exhibit?

8    A.    Yes.  That was the broken Huawei phone.

9    Q.    And when was that photo taken?

10   A.    The day of the search warrant.

11              MS. PALUCH:  Move to admit and publish Government

12   Exhibit 70.

13              THE COURT:  Any objection?

14              MR. GOODREID:  No, Your Honor.

15              THE COURT:  There being no objection, Exhibit 70

16   is admitted into evidence and may be published to the jury.

17         (Government's Exhibit 70 received)

18              MS. PALUCH:  Thank you, Your Honor.

19   BY MS. PALUCH:

20   Q.    Agent Hacker, you can zoom in a little bit.  There you

21   go.

22          And is the phone off to the left there?

23   A.    That is correct.

24   Q.    Okay.  I'd like the witness only to be shown

25   Government Exhibit 71.

Direct - Ennis

1          Can you identify that exhibit, ma'am?

2     A.   Yes, it's a close-up of the broken Huawei phone.

3     Q.   Again taken when?

4     A.   The day of the search warrant.

5          MS. PALUCH:  And move to admit and publish

6     Government Exhibit 71.

7          THE COURT:  Any objection?

8          MR. GOODREID:  No, Your Honor.

9          THE COURT:  There being no objection, Exhibit 71

10    is admitted into evidence and may be published to the jury.

11         (Government's Exhibit 71 received)

12    BY MS. PALUCH:

13    Q.   Thank you.  Ma'am, during the search, was a sketch

14    made of the layout of the home?

15    A.   Yes, it was.

16    Q.   Did you designate rooms by letters?

17    A.   Yes, we did.

18    Q.   Please look at Government Exhibit 8, just for the

19    witness only.

20         Ma'am, can you identify that exhibit?

21    A.   Yeah, that is room J.

22    Q.   And what is room J?

23    A.   Room J was a closet -- sorry, not a closet -- an

24    office.

25    Q.   And how many offices did you -- were at the Kaibab

Direct - Ennis

1  residence?

2  A.    There were two.

3  Q.    Okay.  And was this photograph taken at the time of

4  the search?

5  A.    Yes, it was.

6  Q.    And is that what the office looked like at the time of

7  the search?

8  A.    Yes.

9         MS. PALUCH:  Move to admit and publish Government

10  Exhibit 8.

11         THE COURT:  Any objection?

12         MR. GOODREID:  No, Your Honor.

13         THE COURT:  There being no objection, Exhibit 8 is

14  admitted into evidence and may be published to the jury.

15      (Government's Exhibit 8 received)

16  BY MS. PALUCH:

17  Q.    Please publish Government Exhibit 9, which has already

18  been admitted.

19         Can you identify that exhibit?

20  A.    Yeah.  That is the defendant sitting in the office

21  identified as room J.

22  Q.    Okay.  And the room J, you recall the testimony

23  about -- of Ms. Stailey where she talked about the room J

24  computer?

25  A.    Correct.

584

Direct - Ennis

1    Q.   Is that the room J computer?

2    A.   It is.

3    Q.   Let's publish, please, Government Exhibit 28, which

4    has been admitted.

5             And can you identify that exhibit?

6    A.   That is the defendant sitting in room J.

7             MS. PALUCH:  Okay.  Could I have one moment, Your

8    Honor?

9             THE COURT:  You may.

10   BY MS. PALUCH:

11   Q.   If the witness could be shown Government Exhibit 36,

12   please.

13            THE COURT:  Does someone have their phone on?

14            UNIDENTIFIED WOMAN:  I just turned it off.  I

15   apologize.

16   BY MS. PALUCH:

17   Q.   Can you see that exhibit, ma'am?

18   A.   Yes, I can.

19   Q.   What is that?

20   A.   That was the second office that was located on the

21   second floor of the residence, and it was identified as

22   room Z.

23   Q.   Okay.  And if you could, please --

24            MS. PALUCH:  At this time, Your Honor, I would

25   move to admit and publish Government Exhibit 36.

Cross - Ennis

1          THE COURT:  Any objection?

2          MR. GOODREID:  No, Your Honor.

3          THE COURT:  There being no objection, Government

4    Exhibit 36 is admitted into evidence and may be published

5    to the jury.

6          (Government's Exhibit 36 received)

7    BY MS. PALUCH:

8    Q.   And if you could highlight that.

9          And that was the second office that you located?

10   A.   Correct.

11   Q.   Did you see a laptop there?

12   A.   I'm not sure if that's a laptop, but there was a

13   laptop located in that room, room Z.

14   Q.   Okay.

15   A.   And it was a Wells Fargo laptop.

16   Q.   Okay.  Thank you.

17         MS. PALUCH:  No further questions at this time,

18   Your Honor.

19         THE COURT:  All right.  Cross-examination.

20         MR. GOODREID:  Yes, thank you, Your Honor.

21                    CROSS-EXAMINATION

22   BY MR. GOODREID:

23   Q.   Good morning, Special Agent Ennis.

24   A.   Good morning, sir.

25   Q.   Now, you testified on direct -- if I heard you

Cross - Ennis

1    correctly, you testified that the loss to the Government

2    was approximately $500,000, half a million dollars, give or

3    take?

4    A.    Correct.

5    Q.    Okay.  And you said that money went into the

6    conspirators' pockets, didn't you?

7    A.    Not that amount.

8    Q.    Okay.  What sum did you say went into the

9    conspirator's pockets?

10   A.    Approximately 419,000.

11   Q.    Okay.  So you said approximately $419,000 went into

12   the conspirator's pocket, right?

13   A.    Correct.

14   Q.    But you can't say of that $419,000, what specific

15   amount went to Mr. Thomas as opposed to the other

16   conspirators, can you?

17   A.    No, I cannot.

18   Q.    You can't say if he got $30,000 or $300,000 or

19   $319,000, can you?

20   A.    That is correct.

21   Q.    And you also talked about this stop.  And you know

22   what I'm referring to about the stop, the stop of Mr.

23   Thomas?  We've heard a lot of evidence about, you

24   understand what I'm referring to there?

25   A.    The Tempe PD traffic stop?

Cross - Ennis

1    Q.   Yes.  Yeah.  That's what I'm referencing as a stop.

2    Do you understand that?

3    A.   Yes.

4    Q.   Okay.  And, again, you mentioned about things that

5    were -- that the Sony Vaio laptop was seized there,

6    correct?

7    A.   That is correct.

8    Q.   Okay.  But, again, you don't have any evidence, do

9    you, that Mr. Thomas, himself, ever used the Sony Vaio

10   laptop, do you?

11   A.   No, I do not.

12   Q.   All right.  Let's take a look at Government's

13   Exhibit 73.  If we could pull it up, please.

14         And before we go to that exhibit, Special Agent

15   Ennis, you indicated that through the course of your

16   investigation, you found, I believe you said, four

17   different IP addresses that were associated with this case,

18   right?

19   A.   That is correct.

20   Q.   And you said that three of them, if I understood you

21   correctly, were attributable to Ayana Jones, right?

22   A.   Correct.

23   Q.   And you found one to Mr. Elmer Green, right?

24   A.   Correct.

25   Q.   And, again, just to be clear, Ayana Jones was

Cross - Ennis

1    associated with Heather Carr, that was her daughter, right?

2    A.    Correct.

3    Q.    And Mr. Green, Elmer Green, is Marcelle Green's

4    deceased uncle, correct?

5    A.    Elmer Green isn't the deceased uncle.  Jimmy Green is

6    the deceased --

7    Q.    I'm sorry.  So Mr. Green is associated with Marcelle

8    Green, correct?

9    A.    He is an uncle, correct.

10   Q.    Okay.  So you didn't find any IP addresses in the

11   course of your investigation that were specifically

12   associated with Mr. Thomas; isn't that right?

13   A.    An IP address was associated with the address that Mr.

14   Thomas was living at.

15   Q.    Well, I understand that.  But of these four

16   addresses -- well, let's take a look at your chart.  I

17   mean, you've got four different numbers here associated

18   with various addresses, right?  But none of those -- those

19   IP addresses, the subscriber is Tramell Thomas, right?

20   A.    That is correct.

21   Q.    Okay.  And let's take a look at, if we can, Exhibit 7-

22   -- again, still on 73, and let's take a look at the last

23   page of the exhibit, page 3.  And if we can, to the extent

24   we can, let's either highlight or try to enlarge the last

25   line that deals with Mr. Thomas.  Okay.

Cross - Ennis

1          And at the very end there, it says you have F and

2     H for the line for Mr. Thomas, right?

3     A.   Correct.

4     Q.   And that means that there was a FAFSA associated with

5     him, and that there was a Higher One card associated with

6     him, right?

7     A.   That is correct.

8     Q.   But under IP address it says Subscriber Information

9     Not Available, right?

10    A.   That is correct.

11    Q.   So as was established earlier, as far as you know, Mr.

12    Thomas, he applied for aid in his own name, correct?

13    A.   That is correct.

14    Q.   He applied to enroll at Pikes Peak Community College,

15    correct?

16    A.   Yes.

17    Q.   And, in fact, as far as you know, he actually went to

18    school there, didn't he?

19    A.   Yes, he did.

20    Q.   All right.  So this last category, other IPs --

21    Subscriber Information Not Available, you also don't even

22    know if he applied to go to school over the internet, do

23    you?

24    A.   I know that there was an electronic application

25    submitted.

Cross - Ennis

1    Q.   But you don't have an IP address associated with that
2    as such, right?
3    A.   It fell outside of the retention period.
4    Q.   Right.  So talking about 73 as a whole here, you've
5    got a list of all these people and these names who are
6    associated with the fraud generally speaking, right?
7    A.   Correct.
8    Q.   Mr. Thomas is at the end of this exhibit, but he, in
9    contrast to the other people on this list, actually went to
10   school; isn't that right?
11   A.   Yes.
12   Q.   All right.  Let's pull up Government's Exhibit 64,
13   please.
14        And you have this in front of you, Special Agent
15   Ennis?
16   A.   Yes, I do.
17   Q.   Make sure -- okay.  And this is the document you
18   talked about application for delivery of mail through --
19   well, that you got from UPS, right?
20   A.   Correct.
21   Q.   And let's take a look at box 2, if we could enlarge
22   that a little bit.
23        Do you see the names on there?
24   A.   Yes, I do.
25   Q.   Okay.  Do you know whose handwriting that is?

1    A.    No.  I know No. 6 says the applicant is Heather Carr.

2    Q.    Okay.  So you -- and you don't have any reason to

3    believe, then, do you, that Ms. Carr didn't actually fill

4    this out, do you?

5    A.    No, I do not.

6    Q.    All right.  Let's talk about the day of the search.

7    That is, I'm talking about the search of the address at

8    Kaibab.

9    A.    Correct.

10   Q.    You indicated on your direct examination that there

11   were pieces of paper that were torn up and did you say

12   placed in the toilet?

13   A.    They were floating in the toilet, yes.

14   Q.    You don't know who tore those pieces of paper up, do

15   you?

16   A.    No, I do not.

17   Q.    And you don't know who put them in the toilet.

18   A.    No, I do not.

19   Q.    And you recall -- back to my question about the

20   handwriting on that UPS document:  You recall, don't you,

21   that Ms. Moss -- you recall her testimony on Monday, she

22   was the representative of Pikes Peak Community College?  Do

23   you recall her testifying that she found -- one of the

24   things that raised her suspicion in this case was that

25   there was -- a lot of the handwriting on a number of these

Cross - Ennis

1    documents was the same?  Do you remember her saying that?

2    A.    Similar handwriting, right.

3    Q.    Similar handwriting, yes.  Okay.  And you've seen a

4    lot of those documents yourself, haven't you?

5    A.    Yes, I have.

6    Q.    But the Government in this case never conducted a

7    handwriting analysis, did it?

8    A.    No, they did not.

9    Q.    So the Government never came -- as far as you know,

10   never came into court and asked for an order compelling Mr.

11   Thomas to give a handwriting exemplar, right?

12   A.    That is correct.

13   Q.    You know what a handwriting exemplar is, right?

14   A.    Yes, I do.

15   Q.    Could you tell the ladies and gentlemen of the jury

16   what it is?

17   A.    Well, I'm not an expert, but it's basically when you

18   go to someone with a court order and you have them write

19   certain things.  You can ask them what to write or you

20   might have a sample, you ask for a number of signatures.

21   And basically this is done so that you can, I would say,

22   test it against a true document that you know the person

23   wrote.

24         Again, I'm not an expert in this area, so I'm

25   probably not the best person to be speaking about it.

Cross - Ennis

1    Q.   But you do know that the Government did not do that in

2    this case to compare Mr. Thomas' handwriting with the

3    document -- with the handwriting of these documents,

4    right?

5    A.   That is correct.

6    Q.   And you also recall Ms. Moss testifying, don't you,

7    that a number of the fax numbers was -- on a number of

8    these documents was very similar, in other words, documents

9    were being sent to Pikes Peak Community College with --

10   with the identical fax number?

11   A.   That is correct.

12   Q.   And you were not able to do any sort of trace or

13   determine where that fax number was coming from, were you?

14   A.   No.  Just in conducting -- like a Google internet

15   query, we were able to determine that it came back to a

16   Mailbox Express or certain Mailbox Express locations.

17        If I could also clarify, located during the search

18   was --

19   Q.   Well, I'm sorry to cut you off, but -- Special Agent

20   Ennis, but my question was simply:  You were not able to

21   determine where the fax number -- excuse me, were not able

22   to tie that to any particular individual, right?

23   A.   Oh, tie it to an individual, no.

24   Q.   All right.  Let me ask you another point about the

25   search, all right?  Which is that in the search -- one

Cross - Ennis

1    moment, please.

2            THE COURT:  Mr. Goodreid, would this be a good

3    time for us to take our morning break?

4            MR. GOODREID:  Yes, it would, Your Honor.  I'm

5    sorry, I'm not able to locate the document.  I appreciate

6    it.  Thank you.

7            THE COURT:  Ladies and gentlemen of the jury, we

8    will be in recess for 15 minutes.

9        (Jury left the courtroom at 10:14 a.m.)

10       (Recess taken at 10:14 a.m. to 10:34 a.m.)

11           THE COURT:  Special Agent Ennis, I remind you you

12   remain under oath.

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  Mr. Goodreid, you may resume your

15   cross-examination.

16           MR. GOODREID:  Thank you, Your Honor.

17   BY MR. GOODREID:

18   Q.   All right, Special Agent Ennis, let's go back to your

19   charts for a minute.  I'm going to ask for some comparison

20   among several of them, all right?

21   A.   All right.

22   Q.   Okay.  So we'll start with -- start with the 73 again.

23   Pull that up, please.

24           And, again, this is the document we went through

25   before the break.  Do you recall that?

Cross - Ennis

1    A.   Correct.

2    Q.   And I asked you some questions about at the very

3    bottom of this document, that Tramell -- excuse me, Tramell

4    Thomas' name appears on this?

5    A.   That is correct.

6    Q.   Along with all these other names that you've

7    determined were fraudulent applications, right?

8    A.   That is correct.

9    Q.   Okay.  So we've got that in 7- -- excuse me, we've got

10   that in 73.  Let's take a look at 74 now.

11            And, again, this document, a little bit different,

12   summary of addresses used, right?

13   A.   Correct.

14   Q.   And the number of most of the people on here, as you

15   described previously, were deemed to be associated with

16   fraud, correct?

17   A.   Correct.

18   Q.   And Mr. Thomas' name also appears in this document,

19   right?

20   A.   The defendant, yes.

21   Q.   Yes.  That's 74.  Let's take a look at 75.

22            And at the top of 75, we have Tramell Thomas'

23   name, and then we've got a bunch of other names down

24   through the rest of this document.  And, again, all these

25   people are associated with -- with fraud.  In other words,

Cross - Ennis

1   these were fraudulent applications made in the names of

2   these people and they didn't actually make them, correct?

3   A.   That is correct.

4   Q.   But Mr. Thomas' name also appears in that document,

5   right?

6   A.   That is correct.

7   Q.   So we've got three documents -- three summary exhibits

8   we've just been through with the names of a lot of people

9   whose identities were used to appropriate this fraud, and

10  we have Mr. Thomas' name in all those three documents; is

11  that right?

12  A.   That is correct.

13  Q.   Even though you've already conceded that Mr. Thomas --

14  Mr. Thomas' application resulted in him, as far as you

15  know, actually going to school; isn't that right?

16  A.   That is correct.

17  Q.   In fact, the Government doesn't contend that Mr.

18  Thomas' application was fraud, because if we take a look at

19  Government Exhibit 72 -- pull that up, please.

20         And, again, we don't need to zoom in, I just want

21  to ask you about:  This is a summary of the losses from the

22  fraud.  Mr. Thomas' name does not appear in this document,

23  does it?

24  A.   No, it does not.

25  Q.   All right.  Special Agent Ennis, I'll switch gears

Cross - Ennis

1    here.   Let's talk about -- do you remember the stop?  We
2    talked about that a little bit before, right?  And you
3    certainly remember the -- the -- all the debit cards and
4    the cards in the bag that were seized at the Tempe Police
5    Department stop of Mr. Thomas?
6    A.   That's correct.
7    Q.   So those documents actually got sent, did they not,
8    to -- for the investigation that was to determine if there
9    were fingerprints on those cards; isn't that right?
10   A.   Correct.
11   Q.   And, in fact, there was a fingerprint analysis done of
12   a single debit card, 52 Master Cards, some Pikes Peak
13   documents that were seized in the search, and also some
14   photocopies of two ID cards, right?  Does that ring a bell?
15   A.   That is correct.
16   Q.   Okay.  And they were -- those -- those documents I've
17   just mentioned were compared to see if there are any latent
18   fingerprints of certain individuals, if they were on those
19   documents, right --
20   A.   Correct.
21   Q.   -- on the cards?
22        And the fingerprints that were compared were
23   fingerprints of Mr. Thomas, right?
24   A.   Correct.
25   Q.   Ms. Carr.

598
Cross - Ennis

1    A.    Correct.

2    Q.    Ms. Diaz.

3    A.    Correct.

4    Q.    Makayla Grant.

5    A.    Yes.

6    Q.    Ms. Green.

7    A.    Yes.

8    Q.    And Mr. Sanders, right?

9    A.    That is correct.

10   Q.    Okay.  And the only positive ID that came back, there

11   were a couple of them, right?  I mean, there was Heather

12   Carr's fingerprint on one of the Pikes Peak documents came

13   back positive, right?

14   A.    That is correct.

15   Q.    And Ms. Diaz, there were six fingerprints found on one

16   of the -- on the Edward Jones documents, right?

17   A.    That is correct.

18   Q.    And five fingerprints of Ms. Diaz on the Virginia

19   Jones documents, right?

20   A.    That is correct.

21   Q.    Okay.  So there were no known fingerprints that

22   matched Mr. Thomas', correct?

23   A.    Correct.  And can I clarify my response?

24   Q.    Well, let me ask you the next question, all right?

25   There were no known palm prints of Mr. Thomas on those --

Cross - Ennis

1    on those items we just mentioned, right?

2    A.    That is correct.

3    Q.    Okay.  But there was some suggestion, was there not,

4    from the lab that if additional fingerprints were taken

5    from a number of these people, including Mr. Thomas, that

6    perhaps an additional comparison or analysis could be done;

7    isn't that right?

8    A.    That is correct.

9    Q.    Okay.  But that was not in fact done with respect to

10   Mr. Thomas; isn't that right?

11   A.    Correct.

12   Q.    So as far as you know, the Government did not come

13   into this court and ask His Honor for an order compelling

14   Mr. Thomas to give fingerprints that could be compared to

15   what was on these items; isn't that right?

16   A.    That is correct.

17   Q.    Now, you recall, don't you, Special Agent Ennis, you

18   recall Ms. Green's testimony from yesterday?

19   A.    Yes, I do.

20   Q.    And you recall her saying, don't you, that one of the

21   ways they actually got money -- or at least that she, she

22   got money off of these debit cards was they would go to

23   ATMs and simply withdraw cash, right?

24   A.    That is correct.

25   Q.    Now, you know in your experience as a law enforcement

Cross - Ennis

1    officer, as well as I assume just a citizen of our country,

2    that many, if not all, ATM machines have surveillance

3    cameras associated with them, don't they?

4    A.   Correct.

5    Q.   And -- but you didn't seek out any surveillance

6    cameras from any of the ATMs where these cards were cashed

7    to see if Mr. Thomas was on those -- those surveillance

8    tapes, did you?

9    A.   We actually did.

10   Q.   Oh, you did.  Okay.

11   A.   And we were unable to obtain any video surveillance.

12   Q.   Okay.  So you did search it out, but in the end you

13   did not find any surveillance video that showed Mr. Thomas

14   cashing one of these cards, right?

15   A.   We were not able to obtain any video or camera stills.

16   Q.   All right.  And in the course of this investigation

17   that you worked on for many years, you don't have any

18   evidence, do you, that Mr. Thomas, himself, ever personally

19   cashed one of those cards, do you?

20   A.   No, we do not.

21   Q.   Other than perhaps the one that he got for his own

22   loan, right?

23   A.   And even then I wouldn't know personally --

24   Q.   Okay.  That's --

25   A.   -- right.

Cross - Ennis

1    Q.   Okay.  All right, Special Agent Ennis, let me ask you

2    to take a look, just to yourself, at Government's

3    Exhibit 35.  And it may be easier, Special Agent Ennis, to

4    look at a hard copy.  It's up to you which is easier.

5    A.   This is fine.

6    Q.   Okay.  All right.  Do you recognize that document?

7    A.   This is --

8    Q.   Take a minute and read it and then tell me if you know

9    what it is.

10   A.   Okay.  Yes.

11   Q.   Okay.  And without revealing the contents, what is

12   it?

13   A.   A stipulation.

14        MS. PALUCH:  Okay.  And, Your Honor, since this is

15   a stipulation, I would ask that it be admitted into

16   evidence and I would ask this witness some questions about

17   it.

18        THE COURT:  All right.  Given the stipulation of

19   the parties, the Government Exhibit 35 is admitted into

20   evidence and may be published to the jury.

21        (Government's Exhibit 35 received)

22   BY MR. GOODREID:

23   Q.   Okay.  And I'm going to ask you -- I'm going to read

24   through this to see if you agree that this is a correct

25   reading of this document, okay?  Are you with me?

Cross - Ennis

1   A.   Yes.

2   Q.   So "The United States of America, by and through

3   Assistant United States Attorneys Martha A. Paluch and

4   Bryan D. Fields, and the Defendant Tramell Thomas, by and

5   through his counsel Daniel T. Smith and Thomas E. Goodreid,

6   hereby agree and stipulate that the defendant Tramell

7   Thomas was detained in El Paso County Jail through January

8   28th, 2011 through November 3d, 2011, at which time he was

9   released from custody as a result of the dismissal of all

10  charges upon which he had been detained."

11       Would you say that's an accurate reading of what

12  the stipulation says?

13  A.   Yes.

14  Q.   Okay.  So given that, ask you to take a look at

15  Exhibit 67.  If we could pull that up, please.  All right.

16  And, yeah, if we could highlight -- not highlight, I'm

17  sorry -- if we could enlarge, say, the top four lines, so

18  from Student, down to first name.

19       And just by way of review, Special Agent Ennis,

20  this is Mr. Thomas' FAFSA, correct?

21  A.   That is correct.

22  Q.   And do you see on there where it says Award Year, it

23  says 2011?

24  A.   Correct.

25  Q.   That's probably not -- well, actually, so hold that in

Cross - Ennis

1    your mind.  And then let's take a look at Exhibit 75,

2    please.  If we could pull that up.  And, again, if we could

3    just enlarge the part dealing with Tramell Thomas through

4    the 2010 mailings column.  So -- the card shipping address

5    there.  Yeah.

6         So it looks like from 75, does it not, that Mr.

7    Thomas got his card and was going to school in 2010?

8    A.   Correct.

9    Q.   So would you agree that back the other exhibit, that

10   the FAFSA saying that it was award year for 2011, is

11   unlikely given that we have now just learned that he was in

12   jail during that time?

13   A.   No, I would not.  If you would please go back to the

14   prior exhibit, the FAFSA.

15   Q.   Sure.  Good point.  Sure.

16   A.   And go to the last page.

17   Q.   Okay.  Yeah, 67.

18   A.   And highlight.  If I can explain.

19   Q.   Well, okay.  So what you're saying here is it does say

20   on 2010 -- my point, perhaps, is a small one -- and that is

21   it says 2010 on there, that's probably when he got the

22   cards, even though they call it the award year for 2011,

23   right?

24   A.   Correct.

25   Q.   So, in other words, the point being that it's not

Cross - Ennis

1    likely that he got the cards in 2011, but rather in '10; is
2    that right?
3    A.   I think if you look back at the other summary chart --
4    or the mailing, it shows it was mailed in 2010.
5    Q.   Right.  So it was mailed in '10, yeah.
6    A.   Correct.
7    Q.   Okay.  And the -- even though it says Award Year on
8    the FAFSA in 2011, Mr. Thomas was in jail, as we've just
9    learned, for most of 2011, right?
10   A.   That's -- yes.
11   Q.   Okay.
12   A.   I'm not sure where you were going with that.
13   Q.   All right.  So let's take a look at Government Exhibit
14   76, please.  And if we can highlight kind of a series of
15   these -- not highlight, I keep saying that -- if we could
16   enlarge the box to the right.  The box that's -- yeah.
17        Okay.  This document relates to Mr. Omar, right?
18   A.   That is correct.
19   Q.   All right.  And it says that with respect to his card,
20   that it was activated in February of 2011, right?
21   A.   That is correct.
22   Q.   And, again, based on the stipulation, it appears at
23   that time that Mr. Thomas was in jail, right?
24   A.   That is correct.  However, I --
25   Q.   Ma'am, I'm sorry, that's all my question.  My question

Cross - Ennis

1    is he was in jail, wasn't he?

2    A.   Yes.  I would like to clarify my response.

3    Q.   You can do that on redirect, ma'am.

4         My question was he was in jail; would you agree

5    with that?

6    A.   Yes, that is correct.

7    Q.   All right.  Let's take a look, then, at Exhibit 79.

8    And, again, if you -- let's enlarge that box again.

9         And this has to do with Mr. Jones.  Mr. Eddie

10   Jones, right?  Or at least the identity of Eddie Jones.

11   Would you agree with that?  Would you agree that's what

12   this exhibit is about?

13   A.   Yes.  I wanted to see the initials E.J. --

14   Q.   Okay.

15   A.   -- to verify that I was giving accurate testimony.

16   Q.   Sure.  And with respect to this one, it looks like

17   that the card was ordered for the would-be Eddie Jones on

18   August 29th of 2011.  Right?

19   A.   That is correct.

20   Q.   And Mr. Thomas was in jail at that point, right?

21   A.   Yes, he was.

22   Q.   Okay.  All right.  And then let's take a look at

23   Government Exhibit 77.  And this one has to do with the

24   identity of Virginia Jones, right?

25   A.   That is correct.

Cross - Ennis

1   Q.   Okay.  And, again, taking a look here, it looks like

2   that her card -- say would-be her card, is ordered from

3   production facility on August 8 -- excuse me, August 11th,

4   2011; right?

5   A.   That is correct.

6   Q.   And Mr. Thomas was in jail then, right?

7   A.   That is correct.

8   Q.   Okay.  And then same thing looking above that, the

9   card is actually activated on October 3d of 2011, right?

10  A.   That is correct.

11  Q.   And, again, Mr. Thomas was in jail at that point,

12  right?

13  A.   That is correct.

14  Q.   Okay.  And, finally, let's pull up Government

15  Exhibit 78.

16         And you see on -- you see on this one, this has to

17  do with Mr. -- the identity of Mr. Pickens, right?

18  A.   That is correct.

19  Q.   Okay.  And it looks like that this card was ordered on

20  August 11th -- thank you -- August 11th of 2011, right?

21  A.   That is correct.

22  Q.   When Mr. Thomas was in jail, right?

23  A.   That is correct.

24  Q.   And then, finally, that the card was activated on

25  October 3d of 2011, when Mr. Thomas was in jail, right?

Cross - Ennis

1    A.   That is correct.

2    Q.   Okay.  Now, the Government's allegation in this case,

3    as you understand it, is that the conspiracy was ongoing

4    while Mr. Thomas was in jail; isn't that right?

5    A.   That is correct.

6    Q.   And on -- based on the stipulation here, he was in the

7    El Paso County Jail, right?

8    A.   Yes.

9    Q.   Do you have any knowledge as to whether inmates' phone

10   calls are recorded in jail?

11   A.   Yes, they are.

12   Q.   Okay.  And did you seek out the phone calls of Mr.

13   Thomas in this case while he was in jail?

14   A.   Yes, we did.

15   Q.   And did you -- did you -- you weren't able to get any

16   of them?

17   A.   We were not able to get any.

18   Q.   So you don't have any phone calls from him while he's

19   in the El Paso County Jail that indicates he's involved in

20   the conspiracy, right?

21   A.   We weren't able to get phone calls.

22          MR. GOODREID:  Your Honor, may I have just a

23   moment to confer with counsel?

24          THE COURT:  You may.

25          MR. GOODREID:  Your Honor, I have no additional

Redirect - Ennis

1    questions at this point.

2            THE COURT:  All right.  Redirect.

3            MS. PALUCH:  Thank you, Your Honor.

4                    REDIRECT EXAMINATION

5    BY MS. PALUCH:

6    Q.   Agent Ennis, you were asked whether you could say how

7    much money the defendant received from this scheme.  Do you

8    recall that question?

9    A.   Say that again, please.

10   Q.   You were asked by Mr. Goodreid whether you could say

11   how much money the defendant personally received as a

12   result of this scheme.

13   A.   Correct.

14   Q.   Do you know how many debit cards were found in his

15   possession?

16   A.   There were 52 debit cards located in the vehicle that

17   he was driving and there was one located in a wallet.

18   Q.   And do you know how much money could have been loaded

19   to the card in his wallet at the time he was stopped in

20   August of 2012?

21   A.   Approximately $47,000 -- 4,700.

22           THE COURT:  47,000 or 4700?

23           THE WITNESS:  Yeah, my apologies.  4,700.

24           THE COURT:  Okay.

25   BY MS. PALUCH:

1   Q.   Had any of the cards found in his possession had

2   been -- had they been activated?

3   A.   Yes, they had.

4   Q.   Now, you were asked whether there was any evidence

5   that ties the defendant to the Sony Vaio.

6   A.   That is correct.

7   Q.   Do you recall Alison Stailey's testimony about the

8   evidence found on the Sony Vaio?

9   A.   Yes, I do.

10  Q.   And, again, for the record, where was that laptop

11  found?

12  A.   Located in the vehicle Tramell Thomas was driving.

13  Q.   And was that laptop used to query, for example, Manuel

14  Abate?

15  A.   Yes, it was.

16  Q.   And where was Manuel Abate's debit card found?

17  A.   Located in the defendant's wallet.

18  Q.   Okay.  You were asked whether the defendant actually

19  attended Pikes Peak Community College.

20  A.   Correct.

21  Q.   What records indicate that he actually attended that

22  school?

23  A.   Pikes Peak records disclosed that he was enrolled for

24  two semesters and he took one course in the fall of 2009,

25  which he failed; and he took three courses in the fall of

610

Redirect - Ennis

1    2010, all of which he failed.

2    Q.   And without going into the details, was there a

3    handwritten letter contained in those dockets -- documents

4    from Tramell Thomas to Pikes Peak Community College?

5    A.   Yes, there was.

6    Q.   Was there -- was the Rushmore address contained within

7    the Pikes Peak records as to this defendant?

8    A.   Yes, it was.

9    Q.   Were debit cards sent to the Rushmore address as part

10   of this scheme?

11   A.   Yes, it was.

12   Q.   If we could please display Government Exhibit 74.

13        And what I'd like you to do, Agent Ennis, is look

14   at debit cards that were mailed to the Rushmore address

15   that were also located in the defendant's vehicle.

16   A.   We would need to turn to page 4, please.  That's kind

17   of hard.  Is there like a physical copy I could --

18   Q.   Yeah.  There should be in the book in front of you.

19        COURTROOM DEPUTY:  What number?

20        MS. PALUCH:  This is -- it's in binder 2,

21   Exhibit 74.

22   BY MS. PALUCH:

23   Q.   So the question is we're looking for debit cards

24   mailed to the Rushmore address that were located in the

25   defendant's possession on August 30th.

Redirect - Ennis

1   A.   There was one for Likita Hall -- bear with me.

2   Alethia Jones, Eddie Jones, Keavin Jones, Linda Jones,

3   Patsy Jones, Shamika Jones, Virginia Jones, Vanessa

4   Lopez -- bear with me.  Dana Miller, Starla Miller, Cynthia

5   Mitchell, Mercedes Mitchell, Robert Pickens, Ismael Omar,

6   Annie Robinson, Telsa Robinson, Tessa Robinson, Gina

7   Sanders.

8   Q.   And those were all debit cards mailed to the Rushmore

9   address that were found in the defendant's possession; is

10  that correct?

11  A.   That is correct.

12  Q.   Now, you were asked whether the defendant's name

13  appeared as a subscriber on the IP records at issue in this

14  case.  Do you recall that?

15  A.   Yes, I do.

16  Q.   Are any of the conspirators in this case listed on --

17  their names listed on any of the subscriber records?

18  A.   No, they are not.

19  Q.   Do you have experience investigating these types of

20  offenses?

21  A.   Yes.

22  Q.   In your experience, why might IP records be in someone

23  else's name?

24  A.   Because they don't want the activity tied to

25  their fraudulent activity -- they don't want IP subscriber

Redirect - Ennis

1    information tied to their fraudulent activity.

2    Q.   You were asked about fax numbers and evidence located

3    during the search.  Do you recall that?

4    A.   Yes, I do.

5    Q.   And you asked if you could clarify your answer.

6    A.   Yes.

7    Q.   Could you please provide that information now.

8    A.   So during the execution of the search warrant at 1822

9    East Kaibab, there was a fax cover sheet and on the top of

10   the cover sheet was one of the fax numbers that was used

11   repeatedly in this scheme.

12   Q.   Okay.

13   A.   And was located in the residence.

14   Q.   Okay.  Now you were asked about handwriting exemplars.

15   Do you recall that?

16   A.   Yes, I do.

17   Q.   And you're not a handwriting expert, are you?

18   A.   Absolutely not.

19        MS. PALUCH:  I would like the witness to be shown

20   two exhibits that are not on the exhibit list.

21        THE COURT:  All right.  If you could hand them to

22   Ms. Hansen.

23        MS. PALUCH:  They are not marked, Your Honor.  I

24   would ask -- actually, did I give you the marked version?

25   I think I gave the marked -- I apologize.  Your Honor, if I

Redirect - Ennis

1    could -- let me give these to you -- these are the marked

2    exhibits.

3    BY MS. PALUCH:

4    Q.   Ma'am, do you have before you Exhibits 85 and 86?

5    A.   Yes, I do.

6    Q.   Do you recognize these documents?

7    A.   These are Department of Motor Vehicle documents.   One

8    from Colorado and one from Arizona.

9    Q.   And did you obtain those documents?

10   A.   Yes, I did.

11   Q.   How did you obtain them?

12   A.   Through a -- just a request as a law enforcement

13   officer.

14   Q.   I'd like to look at -- have you compare those two

15   documents.   Do the signatures on those pages appear similar

16   to you?

17   A.   To me, they do not.

18   Q.   Okay.

19             MS. PALUCH:   Your Honor, at this time I would move

20   for the admission of Government's Exhibits 85 and 86.

21             MR. GOODREID:   I object on hearsay grounds, Your

22   Honor.

23             MS. PALUCH:   Your Honor, they're public records.

24             MR. GOODREID:   They're not certified.   There's no

25   declarations.   How do we know what they are?   We have two

Redirect - Ennis

1   pieces of paper that look like they came from -- I don't

2   know where they came from.

3          THE COURT:  I agree.  Objection sustained.

4          MS. PALUCH:  Thank you, Your Honor.

5   BY MS. PALUCH:

6   Q.   Now, you were asked about your summary charts and

7   asked about the fact that the defendant's name is shown on

8   those summary charts.

9   A.   That is correct.

10  Q.   And what was the purpose of including his name on the

11  summary charts?

12  A.   He was the defendant in this case that was going to

13  trial.

14  Q.   Well, did it pertain to addresses that were tied to

15  that defendant?

16  A.   Yes.

17  Q.   So you were asked also -- well, first of all, you had

18  asked to clarify your answer regarding fingerprint

19  evidence.

20  A.   Correct.

21  Q.   Could you do that now, ma'am?

22  A.   Yes.  So the debit cards, all of the debit cards,

23  none -- there weren't any fingerprints identifiable to any

24  of the co-conspirators in this case.  There weren't any

25  fingerprints that could be lifted from the debit cards.

Redirect - Ennis

1    Q.   But who was in possession of 53 of them?

2    A.   It was in the -- the 52 were in the vehicle that the

3    defendant was driving, and one was located in his wallet.

4    Q.   Okay.  Counsel asked you that -- whether there was any

5    evidence that the defendant personally withdrew funds from

6    debit cards.  Do you recall that?

7    A.   Yes.

8    Q.   Was there evidence that you uncovered in your

9    investigation that the defendant benefited from the scheme?

10   A.   Say that again, please.

11   Q.   Was there evidence that you uncovered through your

12   investigation that the defendant, in fact, benefited from

13   the funds obtained in this scheme?

14   A.   Yes.

15   Q.   For example, where did he live?  What type of a house?

16   A.   At 1822 Kaibab.

17   Q.   Was it a large house?

18   A.   It was a large house.

19   Q.   Do you have any idea approximately how much money that

20   house cost?

21   A.   I don't.

22   Q.   Okay.  Based on your investigation, were you able to

23   determine through wage and labor records how much the

24   defendant made?

25   A.   At some point in time, wage records were obtained from

Redirect - Ennis

1      the State of Colorado.  We had no identifiable wage records
2      for the defendant.
3      Q.   And how much money was Ms. Carr making as an employee
4      at Wells Fargo?
5      A.   Approximately 50- to 60,000 a year.
6               MS. PALUCH:  Could I have one moment, Your Honor?
7               THE COURT:  You may.
8      BY MS. PALUCH:
9      Q.   Let's look at Government Exhibit 76, if we could.
10               Now, you asked -- when you were asked about this
11     exhibit, you asked counsel if you could clarify your
12     answer.
13     A.   Yes, I did.
14     Q.   Could you do that now, ma'am?
15     A.   Yes.  So this debit card showed it was activated on
16     February 22d, 2011.  Department of Education records show
17     that a FAFSA was submitted for Ismael Omar in December of
18     2010.
19     Q.   Now, you were asked about a number of these composite
20     exhibits where the cards were ordered or activated while
21     the defendant was in jail.  Do you recall that?
22     A.   Yes, I do.
23     Q.   Do you have the Exhibit 4 in front of you, the
24     envelope?  The envelope of the debit card.
25     A.   Oh, yes.

Redirect - Ennis

1    Q.   I'd like you to look at Government's Exhibit 4-A

2    through 4-D.  4-A through 4-D.  And if you could state,

3    ma'am, when you get those out, in whose names those debit

4    cards -- those four marked debit cards are.

5    A.   Government Exhibit 4-A is a Higher One debit card in

6    the name of Ismael Omar.  Government Exhibit 4-B is a

7    Higher One debit card in the name of Virginia Jones.

8    Government Exhibit 4-C is a Higher One debit card in the

9    name of Robert Pickens.  Government Exhibit 4-D is a Higher

10   One debit card in the name of Eddie Jones.

11   Q.   And you were asked about each of those individuals,

12   weren't you, on the composite exhibits, and as to whether

13   or not they were in jail at the time that the debit cards

14   were ordered?

15   A.   That is correct.

16   Q.   And where were those debit cards found?

17   A.   In the vehicle that the defendant was driving.

18             MS. PALUCH:  No further questions, Your Honor.

19             THE COURT:  All right.  Special Agent Ennis, thank

20   you for your testimony.

21             THE WITNESS:  Thank you.

22             THE COURT:  Just leave everything there.

23             THE WITNESS:  Thank you, Your Honor.

24             THE COURT:  All right.  All right, the Government

25   may call its next witness.

Redirect - Ennis

1        MS. PALUCH:  Your Honor, the Government rests.

2        THE COURT:  All right.  Is there going to be a

3   motion from the defendant?

4        MR. SMITH:  There is, Your Honor.

5        THE COURT:  All right.  Ladies and gentlemen of

6   the jury, we're going to need to deal with a motion and

7   some other matters that the law requires be done outside

8   your presence.  So the lawyers and I will continue in here

9   and ask that you be patient and wait for us in the

10  deliberation room.

11       (Jury left at 11:06 a.m.)

12       THE COURT:  I'll hear a motion from the defendant.

13       MR. SMITH:  Your Honor, as to the state of the

14  evidence at the close of the Government's case, and

15  specifically referring to Count 1, the conspiracy count, I

16  would state to the Court that I don't believe the evidence

17  supports the conspiracy as charged in the superseding

18  indictment.

19       THE COURT:  Let me just interrupt you for a

20  second.  Let's get on the record as to which counts you're

21  moving against.

22       MR. SMITH:  I'm talking about Count 1 now.

23       THE COURT:  All right.  Well, just -- I know

24  you're talking about Count 1 now.  Is your motion as to all

25  or a portion or one of the counts?

Redirect - Ennis

1           MR. SMITH:  My motion goes to all counts.  There

2      are different grounds on Counts 1 --

3           THE COURT:  I understand.

4           MR. SMITH:  Okay.

5           THE COURT:  Because the motion doesn't have to be

6      brought against all counts, so I just want to get on the

7      record and have an understanding where you're going with

8      your argument, how many -- so you're moving against all

9      counts.  Go ahead.

10          MR. SMITH:  Correct, Your Honor.

11          The conspiracy that's charged here runs from

12     August of 2010, it's alleged, then, through October of

13     2012.  We heard only from Ms. Green.  She talked about her

14     efforts as they related in Arizona and when she started

15     with Carr.

16          The principal defect, I think, here, is the

17     failure of the Government to comply with the requirement of

18     interdependence between the charged conspirators.

19          As to Counts 2, 3, 4, and 5, they charge my client

20     with violating the mail fraud statute as an aider and

21     abetter.  As I understand the burden on the Government in

22     proving my client guilty as a principal under an aider and

23     abetting theory, they have to show that he intentionally

24     participated.  He doesn't have to perform an underlying

25     act, but he must be aware of the details and the

Redirect - Ennis

1   commission.

2        In this case, my client goes to jail the end of

3   January of '11, and the operative facts in Counts 2 through

4   5 deal with things taking place while he's incarcerated in

5   El Paso County.  I submit to the Court that there's simply

6   a lack of evidence that he was aware, knew, or did anything

7   to further the act.

8        And as to Counts 6 and 7 -- and this actually

9   applies to all of the substantive Counts 2 through 7, there

10  simply is no evidence that my client did anything, that he

11  filed any of the fraudulent forms, that he was operating

12  any of the computers tied to these IP addresses.  We simply

13  have a lot of paper here that says from these IP addresses

14  this fraud scheme was operated, but there is no evidence

15  tying Mr. Thomas to the same.

16        I don't have any further argument --

17        THE COURT:  Let me ask you, going back to your

18  Count 1, you said there's no evidence of interdependence.

19  Well, we have Ms. Green's testimony yesterday that the

20  defendant -- she specifically identified the defendant as

21  being a co-conspirator and in a conspiracy with her

22  together with the other co-conspirators to conceive of and

23  discharge the conspiracy.  That was her testimony.

24        MR. SMITH:  I understand that, Your Honor.  But

25  her testimony also was she never talked to the defendant

Redirect - Ennis

1    about anything in this conspiracy.  The only thing she did

2    with the defendant, she said, was attempt to tutor him on

3    filling out the educational requirements in the FAFSA form.

4              THE COURT:  Well, she also testified she saw him

5    filling out a FAFSA form on the computer while she was in

6    his presence.

7              MR. SMITH:  Right.

8              THE COURT:  And -- go ahead.

9              MR. SMITH:  It's all on the same occasion, to my

10   memory.  And she said it happened in 2011.  Simply couldn't

11   have.  The parties have agreed he was residing in the

12   El Paso County Jail.

13             THE COURT:  Well, not for all of 2011.  He was

14   free for nearly all of January and nearly all of November

15   and all of December.

16             MR. SMITH:  I understand.

17             THE COURT:  And so that's three months.  So for

18   one quarter of the year of 2011, the defendant was not in

19   custody, and the dates of the conspiracy charged in the

20   superseding indictment are not limited to January 28th

21   through November 3d of 2011.

22             MR. SMITH:  I understand.

23             THE COURT:  Thank you.  I'll hear from the

24   Government in response.

25             MS. PALUCH:  Thank you, Your Honor.  As to the

Redirect - Ennis

1    motion pertaining to Count 1, as the Court indicated,

2    Marcelle Green places this defendant in the conspiracy.

3    Kimmisha Mullett's text in which the defendant tells her to

4    send Dennis Miller's mail to him places him in the

5    conspiracy.  Christine Duncan's testimony about

6    conversations with this defendant about student financial

7    aid fraud places him in this conspiracy.  There is ample

8    evidence that this defendant was a member.

9         Marcelle Green talked about the fact that Carr and

10    Thomas came to her home after -- after the search warrant

11    to ask her, "What did you say and what did law enforcement

12    ask you about?"

13         There's just overwhelming evidence of his

14    involvement in this conspiracy.

15         THE COURT:  And that he was nervous -- appeared

16    nervous when he heard of the search warrant.

17         MS. PALUCH:  That's exactly right.

18         THE COURT:  The search of the Kaibab home.

19         MS. PALUCH:  For the defendant to have the debit

20    card in his wallet, on his person, in the car to have that

21    many, to claim that he's not a member of this conspiracy,

22    there's absolutely no basis for that motion.

23         As to the mail fraud counts, what we have to prove

24    is that he assisted somehow in some way for those crimes to

25    be committed, and what we've established, we believe

1  overwhelmingly, is an address tied to him, Rushmore;

2  another address tied to him, Radiant, were used to receive

3  those debit cards while he was in prison; and then these

4  cards are found in his possession when he is stopped in

5  2012.

6        So to say that he had nothing to do with the mail

7  fraud counts simply isn't accurate.  Kimmisha Mullett's

8  texts completely, absolutely establishes that count on

9  Count 7 when he tells her to mail -- or, actually, it's

10  Count 6 -- to mail Dennis Miller's card to him.  So it's

11  the Government's position that there is more than

12  sufficient evidence in this case to warrant the Court

13  denying the defendant's motion.

14        THE COURT:  All right.  We're going to take a very

15  brief recess.  I'll come back and give you the -- my ruling

16  on the motion.

17     (Recess taken 11:16 a.m. to 11:31 a.m.)

18        THE COURT:  All right, I'm prepared to rule on the

19  defendant's Rule 29 motion.

20        This matter is before me on the defendant's oral

21  mid-trial motion for judgment of acquittal under Federal

22  Rule of Criminal Procedure 29(a).  The defendant's motion

23  seeks acquittal on all counts.  For the reasons that

24  follow, I deny the motion.

25        In considering the defendant's Rule 29(a) motion,

Redirect - Ennis

1    the Court is required to consider the evidence presented in

2    the light most favorable to the Government and may enter

3    judgment of acquittal only if no reasonable jury could find

4    guilt beyond a reasonable doubt.  In making this

5    determination, the Court is not permitted to weigh

6    conflicting evidence or consider the credibility of

7    witnesses as that is the province of the jury.  *United*

8    *States v. White*, 673 F.2d 292 at 301, Tenth Circuit, 1982.

9    The Government bears the burden of establishing each

10    element of the crime charged beyond a reasonable doubt.

11         Count 1 of the superseding indictment alleges

12    conspiracy to defraud the Government with respect to claims

13    in violation of 18 United States Code Section 286.  That

14    statute prohibits entering into any agreement, combination,

15    or conspiracy to defraud the United States, or any

16    department or agency thereof, by obtaining or aiding to

17    obtain the payment or allowance of any false, fictitious or

18    fraudulent claims.

19         To convict on this count, the Government must

20    prove beyond a reasonable doubt:  First, that the defendant

21    agreed with at least one other person to obtain or aid in

22    obtaining the payment or allowance of any false, fictitious

23    or fraudulent claim.

24         Second, that the defendant knew the essential

25    objective of the conspiracy.

Redirect - Ennis

1          Third, that the defendant knowingly and

2     voluntarily participated.

3          And, fourth, that there was an interdependence

4     among the members of the conspiracy; that is, that the

5     members in some way or manner intended to act together for

6     their shared mutual benefit within the scope of the

7     conspiracy charged.

8          On this count, codefendants Marcelle Green --

9     codefendant Marcelle Green testified directly that the

10    defendant, herself, and codefendants Carr and Diaz agreed

11    and acted together as co-conspirators to defraud the

12    Government by submitting falsified FAFSA applications and

13    related submissions to apply for and receive student loans

14    and grants in the name of incarcerated inmates.

15         Ms. Green testified that the applications

16    submitted were not truthful in as much as they were

17    submitted without the inmates' knowledge or consent and

18    used falsified addresses to divert the funds to disburse to

19    the conspirators, rather than to the inmates in whose names

20    they were submitted.  She described how the co-conspirators

21    submitted the materials, used a variety of addresses to

22    receive the disbursed funds, and also participated in

23    online classes to keep the nominally enrolled inmates

24    enrolled and the financial aid payments forthcoming.

25         Ms. Green testified unequivocally that the

1    defendant participated in this conspiracy and that she had

2    seen him completing falsified FAFSAs on at least one

3    occasion.  She testified that he was present when she

4    delivered debit cards to codefendant Carr that were the

5    payments in excess or refunded financial aid payments, and

6    also that the defendant confronted her nervously after a

7    search warrant was executed at his residence and she was

8    questioned by federal agents, providing a reasonable

9    inference that he was aware of the conspiracy's objectives

10   and was integral to its interdependent actions.

11        Taken as a whole, if the jury accepts Ms. Green's

12   testimony, and viewing that testimony in the light most

13   favorable to the Government, it could support a finding

14   that the Government has proven all elements of Count 1

15   beyond a reasonable doubt.

16        Further, as was established during the testimony

17   of Detective Seal, at the time the defendant was stopped in

18   Tempe, Arizona, in August of 2012, he was in possession of

19   52 debit cards issued in the names of prison inmates.

20   Other evidence including the testimony of Special Agent

21   Ennis tended to show that these debit cards were issued as

22   a result of falsified FAFSA and related documentary

23   submissions that were made on the behalf of these inmates

24   but without their authorization.

25        Moreover, one of these debit cards issued in the

Redirect - Ennis

1    name of Manuel Abate was found in defendant's wallet, as

2    reflected by Detective Seal's testimony, in conjunction

3    with Exhibits 5 and 38.  When questioned about the debit

4    cards during the 2012 traffic stop, the defendant neither

5    claimed they were not his nor did he disavow knowledge of

6    them, instead evading questions and giving answers to the

7    detective that made little sense.  This could further

8    confirm a finding that the defendant knowingly and

9    voluntarily participated in the conspiracy charged in Count

10   1.

11           In addition, the Government's other evidence,

12   including the testimony of Special Agent Ennis, tended to

13   establish that the falsified FAFSA submissions and related

14   documents were sent from computers located at addresses

15   affiliated with the defendant and the charged

16   co-conspirators, including his residence on East Kaibab

17   Drive in Chandler, Arizona.  The digital and documentary

18   evidence seized from the Kaibab residence pursuant to a

19   search warrant, and detailed through the testimony of Ms.

20   Stailey, Special Agent Ennis, and Ms. Allred could further

21   support a reasonable finding that the falsified FAFSAs were

22   submitted by the co-conspirators, including the occupants

23   of the defendant's residence on Kaibab Drive, and made use

24   of devices seized there where the -- when the search

25   warrant was executed at that residence.

Redirect - Ennis

1        In Counts 2 through 7, the defendant is charged

2   with six counts of aiding and abetting mail fraud in

3   violation of 18 United States Code Sections 2 and 1341.  To

4   prove each of these counts, the Government must prove

5   beyond a reasonable doubt that someone else committed mail

6   fraud by placing items in the mail for purposes of

7   executing a scheme or artifice to defraud, and that the

8   defendant aided and abetted these acts -- aided or abetted

9   these facts -- these acts.

10        Here, the Government charges that the defendant

11   caused others to mail envelopes containing the Higher One

12   debit cards issued in the inmates' names and by which the

13   defendant and the codefendants allegedly received the

14   proceeds of fraudulently submitted financial aid

15   applications.

16        As established by the testimony of Ms. Rebecca

17   Joseph, as well as the exhibits introduced into evidence

18   which she explained, including Exhibits 56-B through 56-G,

19   as a result of the falsified FAFSAs and related paperwork

20   submitted in the inmates' names, debit cards were issued

21   and mailed by Higher One to the addresses and during the

22   time frames alleged in the indictment as to Counts 2

23   through 7.

24        Special Agent Ennis' testimony also explained the

25   Government's summary charts admitted as Exhibits 75 through

Redirect - Ennis

81, which trace the material facts relevant to each of the debit cards corresponding to Counts 2 through 7, including the dates that they were mailed, the addresses to which they were mailed, and the inmates in whose names the cards were issued and to whom they were addressed.

Special Agent Ennis' testimony and that of Ms. Joseph could support a jury finding that these debit cards were, in fact, mailed to the addresses affiliated with the defendant, and an inference, at a minimum, that the defendant provided the addresses for that purpose. Even more directly and as pertains to the facts charged in Count 6, the testimony of Ms. Mullett was that the defendant directed mail for Dennis Miller be sent to her address and that she then forwarded that mail to the defendant, himself. Moreover, the debit card related to these counts were found in the defendant's possession at the time of the August 2012 traffic stop in Tempe, Arizona.

Further, the parties stipulated, as expressed in Exhibit 37, that, if called, these inmates -- the inmates whose names were used on the debit cards mailed in connection with Counts 2 through 7 would testify that they did not submit the underlying FAFSAs, they did not authorize anyone else to do so, and were incarcerated at the relevant times. This evidence could support a reasonable jury finding that the applications for financial

Redirect - Ennis

1    aid in these individuals' names were part of a fraudulent

2    scheme and that the mailing of the debit cards to the

3    addresses provided by the defendant was part of the

4    execution of that scheme.

5           Given this evidence, a reasonable jury could find

6    that the Government has proved the necessary elements of

7    all the counts charged against the defendant in the

8    superseding indictment beyond a reasonable doubt.

9    Therefore, the defendant's motion for acquittal pursuant to

10   Rule 29 on all counts is denied.

11          All right.  Is the defendant going to put on any

12   evidence?

13          MR. SMITH:  Your Honor, I would ask the Court to

14   adjourn until 1:15, so that we might have an opportunity to

15   meet with our client and discuss that.

16          THE COURT:  All right.  Because I'm trying to

17   figure out what I'm going to do with the jury today.

18   Because of the codefendant -- the key witness' decision not

19   to testify in this case, we're finishing about two-thirds

20   of a day earlier than I had anticipated, so Mr. Foster and

21   I are still going to need time to finalize our jury

22   instructions, and I don't want the jury hanging around for

23   that.

24          The best that I can foresee right now is not

25   having the jury here for that and that we would do our jury

Redirect - Ennis

1    charging conference today, we would deal with some

2    remaining loose ends, and that tomorrow morning I would

3    instruct the jury and we would have closing arguments

4    tomorrow morning.  That all assumes that if you decide to

5    do -- to put on evidence, that it's of a sufficiently short

6    duration that it doesn't conflict with that.  But obviously

7    I'm not for a moment suggesting that I'm going to limit

8    your -- the time that you're going to put on, I'm just

9    trying to think ahead of what to do.  The jurors get very

10   angry if they have to hang around here for hours and hours

11   when they're not doing anything.

12           So what we could do is take an early lunch and

13   give you the opportunity to make that decision and then

14   have the jury come back and you will either put on evidence

15   or you'll stand up and say that you have no opening

16   statement, because you've reserved yours from the beginning

17   of the trial, and you have no evidence.  In which case at

18   that point, I would send them home for the day and then we

19   would get to work on the jury instructions.  So is that

20   amenable to you?

21           MR. SMITH:  Sounds like a plan, Your Honor.

22           THE COURT:  Okay.  So how much time did you say

23   you wanted?

24           MR. SMITH:  An hour and a half.  1:15.

25           THE COURT:  Well, I guess we could use that time

Redirect - Ennis

1   to work on the jury instructions.  So, all right, does the

2   Government have any objection to proceeding in that

3   fashion?

4           MS. PALUCH:  No, Your Honor.

5           THE COURT:  All right.  All right, let's bring in

6   the jury.

7       (Jury was present at 11:44 a.m.)

8           THE COURT:  All right, members of the jury, thank

9   you again for your patience.  We are going to take an early

10  lunch break and so it's going to be slightly longer than

11  what we've been taking.  I have to deal with matters

12  related to the jury instructions and some other matters

13  that have to be dealt with, again, outside of your

14  presence.

15          So we're going to be in a lunch recess for 90

16  minutes.  We'll be back on the record at 1:15.  I ask you

17  to be back in the deliberation room by five minutes after

18  1:00.

19          Again, I need to remind you, please do not do any

20  independent research into or talk to anyone about the

21  facts, the law, the issues, or the individuals involved in

22  this case.

23          We'll be in recess until 1:15.

24      (Recess taken 11:47 a.m.)

25                          AFTERNOON SESSION

Redirect - Ennis

1      (In open court outside the presence of the jury at

2    1:27 p.m.)

3           THE COURT:  All right, Mr. Smith, have you -- you

4    and your client reached a decision as to what you're going

5    to do?

6           MR. SMITH:  We have, Your Honor.  My intentions

7    would be to offer Defense Exhibits U and V, which are

8    stipulated exhibits.

9           THE COURT:  Okay.

10           MR. SMITH:  And upon the Court's acceptance of

11    those, the defense would rest.

12           THE COURT:  Okay.  All right.  Let's bring in the

13    jury.

14      (In open court in the presence of the jury at 1:29

15    p.m.)

16           THE COURT:  All right.  The defendant may call his

17    first witness.

18           MR. SMITH:  Your Honor, at this time, the defense

19    would offer into evidence Defendant's Exhibit U, a plea

20    agreement between the United States Government and Mercedes

21    Diaz.  It is a stipulated exhibit.

22           THE COURT:  All right.  Given the stipulation of

23    the parties, Defendant's Exhibit U is received into

24    evidence.  Do you wish for it to be published to the jury

25    at this time?

634

Redirect - Ennis

1       MR. SMITH:  I don't believe that's necessary at

2  this time, Your Honor.

3       THE COURT:  All right.

4     (Defendant's Exhibit U received)

5       MR. SMITH:  I would also request permission to

6  offer Defendant's Exhibit V, as in Victor, which is a

7  transcript of the entry of guilty plea by Mercedes Diaz.

8  Also a stipulated exhibit.

9       THE COURT:  All right.  Given the stipulation of

10  the parties, Defendant's Exhibit V is admitted into

11  evidence and may be published to the jury.

12     (Defendant's Exhibit V received)

13       MR. SMITH:  With that, Your Honor, the defendant

14  would rest.

15       THE COURT:  All right.  Okay.  So, folks, I know

16  you were -- you went to lunch and were waiting and -- but

17  at this point, unfortunately, or fortunately, depending on

18  how you look at your schedules for today, I'm going to

19  release you for the day, because what's left in terms of

20  the trial for the lawyers and I has to be done, again,

21  outside your presence, and it really has to do with

22  finalizing the jury instructions and related documents.

23       So let me tell you what's going to happen tomorrow

24  morning.  I'm going to have you come back in at 8:35.  At

25  8:45, I will read to you the final jury instructions that I

Redirect - Ennis

1    have decided would be the instructions that will guide your

2    deliberations.

3           At that point -- after that, the parties will have

4    their closing arguments.  Then after the closing arguments,

5    I will have the duty to dismiss one of you as our alternate

6    juror and then the remaining 12 will begin your

7    deliberations on the verdict.

8           All right.  The jury -- oh, I have to remind you

9    again:  Please do not do any independent research into or

10   discuss with anyone the facts, the law, the issues or the

11   individuals involved in this case.

12          The jury is released until 8:45 tomorrow morning.

13       (Jury left the courtroom at 1:32 p.m.)

14          THE COURT:  Okay.  Let's talk about closing

15   arguments.  What amount of time would the Government

16   request?

17          MS. PALUCH:  40 minutes total, Your Honor.

18          THE COURT:  All right.  How much does the

19   defendant request?

20          MR. SMITH:  I think 30 minutes is fine, Your

21   Honor.

22          THE COURT:  All right.  Okay.  We'll go with the

23   40.  That means, Ms. Paluch, you cannot reserve more

24   than -- we'll call it 14 -- I'll give you 14 minutes in

25   rebuttal.  You don't have to decide right now how much

Redirect - Ennis

1    you're going to reserve for your rebuttal.  You can let us

2    know first thing in the morning.

3            Let me tell you that if you do not -- let's say

4    you reserve 14, which would leave 26 for your opening

5    portion of your closing argument, say you only use 20 of

6    the 26.  In that example, you can't -- you cannot add 6 to

7    the 14.  You can never have more than 14.

8            MS. PALUCH:  Understood.

9            THE COURT:  All right?  Okay.  And then,

10   obviously, the defendant will have one 40-minute segment

11   for the closing argument.

12           How much of a warning would you want for the two

13   portions of your closing argument, Ms. Paluch?

14           MS. PALUCH:  Two-minute warning for each, Your

15   Honor.

16           THE COURT:  For each?  Okay.  How much of a

17   warning -- who will be doing the closing argument for the

18   defendant?

19           MR. SMITH:  I will, Your Honor.

20           THE COURT:  Okay.

21           MR. SMITH:  Five minutes.

22           THE COURT:  Five minutes.  All right.  Five-minute

23   warning for the defendant.

24           All right.  At this time, it is my practice for

25   Ms. Hansen to go through the exhibits per her records in

Redirect - Ennis

1   terms of what has been received into evidence, so each side

2   follow along with your records.  We will start with the

3   Plaintiff's -- or the Government's exhibits.

4          COURTROOM DEPUTY:  I'm going to just say the ones

5   that are received.  A-1, 3, 4, 4-A, 4-B, 4-C, 4-D, 5, 7, 8,

6   9, 12, 13, 14, 15, 16, 19, 20, 21, 22, 23, 24, 25, 26, 28,

7   29, 30, 32, 35, 36, 37, 38, 56-B, 56-C, 56-D, E, F, G.

8   57-B, C, D, E, F, G, H, I, J, K, L.  63-B, C, D, E, F, G.

9   64, 66-B, 67, 68, 69, 70, 71, 72, all the way through 80,

10  84.

11         THE COURT:  All right.  Does that comport with the

12  Government's records?

13         MR. FIELDS:  I also have 81 being admitted, Your

14  Honor.

15         COURTROOM DEPUTY:  I meant to say that.  Yes.  81.

16  Sorry.

17         THE COURT:  81.  Okay.  Does that comport with the

18  defendant's records?

19         MR. SMITH:  It does with that correction, yes,

20  Your Honor.

21         THE COURT:  All right.  Then obviously we just

22  admitted Exhibits U and V for the defendant.

23         All right.  We're going to go into recess again.

24  Mr. Foster and I are going to finalize the Court's final

25  set of jury instructions.  Yes?

Redirect - Ennis

1          MR. SMITH:  For the charging conference, may I

2     waive my client's appearance and may he be excused?

3          THE COURT:  Yes, he may be.

4          MR. SMITH:  Thank you.

5          THE COURT:  He's not -- it's not necessary for him

6     to be in attendance.

7          MR. GOODREID:  And, Your Honor, one other thing.

8     I don't know if it will be timely to tell you now, but we

9     did find one error in the stipulated instructions, or at

10    least as the evidence turns out.  Do you want me to bring

11    it up now or wait?

12         THE COURT:  Might as well bring it up -- I don't

13    have the set in front of me, but that's what the charging

14    conference is for, to bring -- might as well make those

15    corrections now.

16         MR. GOODREID:  It's -- Your Honor, it's what was

17    in joint instruction No. 11.

18         THE COURT:  Which is about what?

19         MR. GOODREID:  Witness --

20         THE COURT:  Like I said, I don't --

21         MR. GOODREID:  I'm sorry, Your Honor.  I

22    apologize.  It's witness use of addictive drugs.

23         THE COURT:  Okay.

24         MR. GOODREID:  And right now it says Christine

25    Duncan and Virginia Jones may be considered to be --

639

Redirect - Ennis

1          THE COURT:  Yeah, we caught that.

2          MR. GOODREID:  Oh, you did.

3          THE COURT:  Just Ms. Duncan.  Right.

4          MR. GOODREID:  Sorry.

5          THE COURT:  Okay.  So what my practice is:  Once

6     we finalize the jury instructions back in chambers, we will

7     bring out two sets for each side of the Court's final set

8     and will give you 15 minutes to review that proposed set.

9     15 minutes after you've gotten them I will come out on the

10    bench and we will have our charging conference.

11         So we'll be in recess.

12         (Recess taken at 1:39 p.m. to 2:19 p.m.)

13         THE COURT:  All right.  The record will reflect

14    that all counsel are present and the presence of the

15    parties have been -- has been waived for this charging

16    conference.

17         The record will also reflect that counsel has had

18    15 minutes to review the Court's final set of jury

19    instructions.

20         All right.  Because this was a case in which all

21    the jury instructions were stipulated to, this is going to

22    be a fairly simple charging conference.  I just want to put

23    on the record those instructions that something other than

24    just a wholesale adoption by the Court took place.

25         So with respect to joint instruction 1, the

640
Redirect - Ennis

1    statement of the case, that was read during the voir dire

2    portion of the trial and will not be included in the final

3    set of instructions.

4         Joint instruction 8 regarding transcripts,

5    instruction 11 regarding witnesses who abuse drugs, and 14,

6    regarding cooperating witnesses, were modified to conform

7    to the evidence and testimony as it came in at trial.

8         Joint instructions 9 regarding the factual

9    stipulations and 15 regarding impeachment by prior

10   inconsistencies were eliminated as unnecessary or

11   irrelevant given the evidence and the testimony as it

12   actually came in at trial.

13        Joint instruction 10 was modified to eliminate the

14   redundancy with joint instruction 13 regarding the

15   nontestifying defendant.  And, finally, a redundant

16   sentence of joint instruction 30 was eliminated.

17        All right.  For the Government, is there -- or are

18   there any objections to the Court's final set of jury

19   instructions?

20        MR. FIELDS:  Minor objections, Your Honor.

21        THE COURT:  All right.

22        MR. FIELDS:  If I could start, it will be on

23   page 14 of the Court's proposed instructions.

24        THE COURT:  All right.

25        MR. FIELDS:  Your Honor, in the second paragraph,

1   we would change the language to read as follows:  An

2   alleged co-conspirator, including Marcelle Green, who

3   entered into a plea agreement with the Government, is not

4   prohibited from testifying.

5          So we would change it from the plural to the

6   singular to reflect that only one cooperating defendant

7   testified during this trial.

8          THE COURT:  Okay.  What's the defendant's view on

9   that?

10         MR. GOODREID:  No objection, Your Honor.

11         THE COURT:  Okay.  So it would change -- I agree,

12  Mr. Fields.  It will be including -- an alleged

13  co-conspirator, including Marcelle Green, who entered into

14  a plea agreement.  But the Government is not prohibited

15  from testifying.  That was the suggested revision you

16  stated?

17         MR. FIELDS:  Yes, Your Honor.

18         THE COURT:  Okay.  All right.

19         MR. FIELDS:  A second change, which is

20  substantial, but I think minor in the grand scheme of

21  things, is that we would add a jury instruction.  This jury

22  instruction would reflect the fact that Kimmisha Mullett

23  testified pursuant to a nonprosecution agreement.

24         So what we would do is after this instruction on

25  page 14 for cooperating witness, would add an instruction

Redirect - Ennis

1    for immunized witnesses.  And we would adopt in large part

2    the Tenth Circuit's pattern criminal jury instruction at

3    1.14, which covers immunized witnesses.  And here's exactly

4    what we would do.  We would add a short preface pursuant to

5    the use instruction to that jury instruction, which says

6    that it should be tailored to describe the agreement, at

7    least in a general sense.

8         So the new proposed instruction would start out:

9    The Government called Kimmisha Mullett to the stand.  The

10   Government has entered into a nonprosecution agreement

11   providing that it will not prosecute Ms. Mullett for any

12   involvement in a fraud scheme.

13        And then we would adopt in toto the Tenth

14   Circuit's pattern jury instruction 1.14, which is very

15   similar to the cooperating witness instruction, just with

16   regard to immunized witnesses.

17        THE COURT:  Okay.  Two questions.  One, why didn't

18   you propose such an instruction in the first place?

19   Secondly, do you have a physical copy of that instruction?

20        MR. FIELDS:  I'm very sorry, Your Honor.  The

21   answer to the first one is oversight and for that I am

22   truly sorry.  We should have noticed this earlier.  And the

23   second is no, I'm sorry, I don't have a copy because we

24   just recognized it while we were reviewing these

25   instructions.

Redirect - Ennis

1          THE COURT:  All right.  Let me get the -- why

2     don't you stay there.  Let me get the defendant's position.

3          MR. GOODREID:  Your Honor, we -- I discussed this

4     with Mr. Fields and said we're fine with that instruction,

5     yeah, as he's proposed it.

6          THE COURT:  Okay.  All right.  Okay.  I -- since

7     there's no objection from the defendant and I don't see any

8     real problem with that, I will agree to that.

9          Why don't, when I get off the bench, I can -- you

10     can work with Mr. Foster and dictate to him the exact

11     language that you want.  And let's do it this way:

12     Assuming it's exact -- it's what you -- that what you

13     propose that I approve it, then we'll just put that into

14     the set and we won't take it up any further tomorrow

15     morning.

16          If there's some revision after I've actually seen

17     it on paper and read it, then I'll take it up first thing

18     in the morning before we bring in the jury.

19          MR. FIELDS:  Thank you, Your Honor.  And, again,

20     I'm sorry for not bringing this to the Court's attention

21     sooner.

22          THE COURT:  Okay.  And then let's see if we can

23     somehow -- maybe we can paginate it as 14-A, Nathan, or

24     something so that we don't -- we can save a couple of tree

25     limbs and not have to redo -- repaginate all the remaining

Redirect - Ennis

1    pages and have to reprint out everything.

2            All right.  Anything else?

3            MR. FIELDS:  Yes, Your Honor.  We would also ask

4    that the Court give what was joint instruction No. 15 on

5    impeachment by prior inconsistencies.

6            THE COURT:  Okay.

7            MR. FIELDS:  And the reason we would do that is we

8    believe that Ms. Duncan was actually cross-examined about

9    an inconsistent statement regarding a prior statement that

10   she made, and so we think that the instruction's proper.

11           THE COURT:  Remind me what it is that she

12   testified to that you believe makes the instruction proper.

13           MR. FIELDS:  My recollection is very general, but

14   I believe had to do with her viewing of the cell phone and

15   what she told agents initially versus what her testimony

16   was in court, it was an inconsistency.

17           THE COURT:  Tell me what that inconsistency was.

18   I'm not remembering.

19           MR. SMITH:  It was -- Your Honor, if I may

20   interject.  I asked Ms. Duncan if she had previously made a

21   statement to the postal inspectors on September 7th, 2012,

22   where she admitted going with Thomas to Pikes Peak

23   Community College and applying for student loans.  She had

24   said, and in her direct testimony, that they only went

25   there to apply for school and had gotten the forms and

Redirect - Ennis

1    left.

2           THE COURT:  That's -- I do recall that.  Okay.

3    And so the defendant does not object?

4           MR. SMITH:  No, Your Honor.

5           THE COURT:  All right.  Where did you want --

6    where did you think it most logically should be placed?

7           MR. FIELDS:  I think it goes either before or

8    after the instruction on page 15 of the Court's proposed

9    instructions, which is impeachment by prior conviction.

10          THE COURT:  Okay.  Well, I think that our

11   pagination thing is -- my concern just -- we'll just forget

12   about that.  We'll just -- we'll repaginate everything

13   after 14.  So the immunized witness instruction will now be

14   page 15 and the impeachment by prior inconsistent -- and

15   you have no objection to the text of that instruction as

16   it -- as it was -- obviously it was your stipulated

17   instruction, so you don't have an objection.  That's the

18   one you want to keep for our purposes now?

19          MR. FIELDS:  Yes, please.

20          THE COURT:  Okay.  So page 16 will be the prior

21   inconsistent statement impeachment.  Okay.

22          MR. FIELDS:  And the last one, Your Honor, is on

23   page 37.  This just has to do with a description of the

24   indictment.

25          THE COURT:  Okay.

646

Redirect - Ennis

1              MR. FIELDS:  In paragraph 2 there, it currently

2     reads:  Beginning on or about August 2010 and continuing

3     until in or about October 2012, in the State and District

4     of Colorado and elsewhere, defendants, plural, Tramell

5     Thomas and Marcelle Green.  We would change that to

6     defendant, singular, Tramell Thomas, and then it would read

7     along with co-conspirators Heather Carr, Marcelle Green,

8     and Mercedes Diaz.

9              THE COURT:  Well, it's generally my practice to

10    allow the jury to see the superseding indictment as it was

11    handed down by the grand jury, not to make revisions and

12    changes to it.

13             MR. FIELDS:  That's acceptable, Your Honor, if

14    that's your general practice.  I just wanted the record to

15    reflect obviously she's not a codefendant, but that's

16    perfectly acceptable.

17             THE COURT:  Right.  I think it was pretty clear to

18    the jury that she's a codefendant, that she's pled guilty,

19    and she testified how she's hoping to get a more lenient

20    sentence in exchange for her cooperation.  So I would

21    prefer to leave the superseding indictment in the -- as it

22    was handed down by the grand jury.

23             MR. FIELDS:  Then I withdraw any objection, Your

24    Honor.

25             THE COURT:  All right.

647

Redirect - Ennis

1          MR. FIELDS:  That's fine as it is.

2          THE COURT:  While I have you up there, does the

3     Government have any objection to the verdict form?

4          MR. FIELDS:  We do not, Your Honor.

5          THE COURT:  All right.  Thank you.

6          MR. FIELDS:  Thank you.

7          THE COURT:  All right.  Any objections from the

8     defendant to the Court's proposed final set of jury

9     instructions?

10          MR. GOODREID:  Your Honor, the only thing we had

11     was the one that's already been addressed by the Court

12     about impeachment by prior inconsistencies.  That's already

13     been addressed, so that was it.

14          THE COURT:  All right.  And do the defendant -- so

15     you have -- just so the record's clear, defendant has no

16     other objection to the Court's final set of jury

17     instructions?

18          MR. GOODREID:  He does not.

19          THE COURT:  Okay.  And does the defendant have any

20     objection to the verdict form?

21          MR. GOODREID:  No, Your Honor.

22          THE COURT:  All right.  All right.  Do counsel

23     agree that, as I read these instructions to the jury

24     tomorrow morning, that I may make any necessary revision on

25     the fly, if you will, as a result of any typographical,

648

Redirect - Ennis

1    clerical, or syntactical error?

2          MR. FIELDS:  Yes, Your Honor, we would appreciate

3    it.

4          THE COURT:  Okay.

5          MR. GOODREID:  Absolutely, Your Honor.

6          THE COURT:  Okay.  Thank you.  Just so we're all

7    on the same page, each juror is going to have their own set

8    of jury instructions.  Each juror's going to be allowed to

9    take their notes that they've been taking this week back

10   with them after the closing arguments.  And I don't

11   believe, but you can correct me if I'm wrong, that there

12   are any exhibits that were admitted into evidence but which

13   were not going back to the jury.  Because I don't think the

14   audio -- the synchronized transcript was -- was that

15   admitted into evidence.  And I'm just misrecollecting right

16   now.

17         MR. FIELDS:  The synced transcript was not

18   admitted into evidence, it was demonstrative.  The admitted

19   exhibit is the disk with the audio.

20         THE COURT:  Okay.

21         MR. FIELDS:  So what I would propose is if the

22   jury wants to hear that audio they can write a note and at

23   that point the Court could provide them with a laptop and a

24   disk and they can play it if they desire.

25         THE COURT:  What's the defendant's position on

Redirect - Ennis

1    that?

2              MR. GOODREID:  Your Honor, we would oppose that,

3    along the lines of what the Court itself said in the

4    beginning, which is that gives undue emphasis to one piece

5    of testimony.  I mean, they're rehearing that piece of

6    evidence, the same way they can't hear -- they can't rehear

7    other evidence from a witness, so we would oppose that.

8              THE COURT:  All right.  I agree.  I sustain the

9    defendant's objection.  And that's why I have this down

10   here on my list of things to remember to bring up because

11   of that very thing, that there are exhibits that could be

12   received into evidence that don't go back to the jury and

13   the rehearing of statements like that comes within that

14   category.

15             So all right.  Okay.  Anything else that we need

16   to attend to today before we recess?

17             MS. PALUCH:  Not for the Government, Your Honor.

18             THE COURT:  All right.  Have you discussed with

19   the defendant your -- your intentions --

20             MS. PALUCH:  Not yet.  We were going to discuss

21   that tomorrow but we can certainly talk about it --

22             THE COURT:  I think it's fair that defense counsel

23   be apprised of your intentions so that they're prepared to

24   respond to the motion you're going to make in the event

25   there's a guilty verdict.

Redirect - Ennis

1        MS. PALUCH:  Right.  And, Your Honor, just so that

2    the record is clear, we did have this discussion weeks ago

3    with Mr. Smith as well, but we will discuss it now as well.

4        THE COURT:  Okay.  Anything further from the

5    defendant that we need to attend to today?

6        MR. SMITH:  No, Your Honor.

7        THE COURT:  All right.  Okay.  So, Mr. Fields, if

8    you'll work with Mr. Foster to get your immunity --

9    immunized witness instruction finalized, that will be all

10   set for tomorrow.

11       Okay.  We'll be in recess until 8:45 tomorrow

12   morning.

13       (Proceedings concluded at 2:35 p.m.)

14

15                           **INDEX**

16   Item                                              PAGE

17                   GOVERNMENT'S WITNESSES

18   **SANDRA ENNIS**
     Direct Examination by Ms. Paluch              537
19   Cross-examination by Mr. Goodreid             585
     Redirect Examination by Ms. Paluch            608
20

21   RULE 29(a) ARGUMENT:
     Mr. Smith                                     618
22   Ms. Paluch                                    621

23   FINDING BY THE COURT:                         623

24   CHARGING CONFERENCE:                          639

25

Redirect - Ennis

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|
| 7 | 579 | 579 | | |
| 8 | 583 | 583 | | |
| 35 | 601 | 614 | | |
| 36 | 584 | 585 | | |
| 37 | 540 | 540 | | |
| 66-B | 536 | 536 | | |
| 67 | 536 | 536 | | |
| 68 | 536 | 536 | | |
| 69 | 536 | 536 | | |
| 70 | 581 | 581 | | |
| 71 | 582 | 582 | | |
| 72 | 536 | 536 | | |
| 73 | 536 | 536 | | |
| 74 | 536 | 536 | | |
| 75 | 536 | 536 | | |
| 76 | 536 | 536 | | |
| 77 | 536 | 536 | | |
| 78 | 536 | 536 | | |
| 79 | 536 | 536 | | |
| 80 | 536 | 536 | | |
| 81 | 536 | 536 | | |
| 85 | 613 | | 614 | |
| 86 | 613 | | 614 | |

652

Redirect - Ennis

1                    DEFENDANT'S EXHIBITS

2    EXHIBITS:        Offered   Received   Refused   Stipulated

3    U                633       633

4    V                633       634

5

6                    *        *        *        *        *

7                    REPORTER'S CERTIFICATE

8

9         I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled

11   matter.

12        Dated at Denver, Colorado, this 8th day of August,

13   2019.

14

15

16

17

18        .

19

20

21

22

23

24

25

MARY J. GEORGE, FCRR, CRR, RMR