```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
 2
     Criminal Action No. 16-cr-0054-WJM-2
 3
     UNITED STATES OF AMERICA,
 4
         Plaintiff,
 5
     vs.
 6
     TRAMELL THOMAS,
 7
         Defendant.
 8
     ------------------------------------------------------------
 9
                          REPORTER'S TRANSCRIPT
10                         (Jury Trial - Day 4)
                                VOLUME IV
11
     ------------------------------------------------------------
12
13        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14   Judge, United States District Court for the District of

15   Colorado, commencing at 9:11 a.m., on the 30th day of

16   November, 2017, in Courtroom A801, United States

17   Courthouse, Denver, Colorado.

18                            APPEARANCES

19        MARTHA A. PALUCH and BRYAN FIELDS, Assistant U.S.
20   Attorneys, 1801 California Street, Suite 1600, Denver,
     Colorado 80202, appearing for the plaintiff.
21
          DANIEL T. SMITH, Attorney at Law, 4582 South Ulster,
22   Suite 1400, Denver, Colorado 80237 AND
          THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
23   Suite 1400, Denver, Colorado 80202, appearing for the
     defendant.
24                    MARY J. GEORGE, FCRR, CRR, RMR
                  901 19th Street, Denver, Colorado 80294
25              Proceedings Reported by Mechanical Stenography
                   Transcription Produced via Computer
```

P R O C E E D I N G S

1

2       (In open court outside the presence of the jury at

3   9:11 a.m.)

4       THE COURT:  I understand there was a delay with

5   one of the jurors getting here, so that's why we're

6   unfortunately starting as late as we are.

7       Ms. Paluch, have you decided how you're going to

8   divide up your closing argument?

9       MS. PALUCH:  Yes, Your Honor.  Along the lines we

10   discussed yesterday, where you said I could reserve 14

11   minutes.

12       THE COURT:  Up to you.  It's your choice.

13       MS. PALUCH:  Yeah.

14       THE COURT:  And that's what you want to do?

15       MS. PALUCH:  I would like to do that, Your

16   Honor.

17       THE COURT:  So 26 and -- 26 and 14.  With a

18   two-minute warning on each?

19       MS. PALUCH:  Yes, sir.

20       THE COURT:  Okay.  And just so everyone knows,

21   we're going to -- I'm going to read the instructions and

22   then we're going to take a 10-minute recess after the

23   opening segment of the Government's closing argument

24   because my staff and I, and I'm sure the jurors, can't go

25   straight through with the instructions and all of the

1    closing argument.  So we'll take a brief recess at that
2    point.
3              Okay.  Let's bring in the jury.
4          (Jury was present at 9:12 a.m.)
5              THE COURT:  Good morning, ladies and gentlemen of
6    the jury.  Welcome back to day 4 of our jury trial.
7              All right.  At this time, I am going to read to
8    you the final set of the Court's jury instructions that
9    will govern your deliberations.
10             All right.  Members of the jury, in any jury
11   trial, there are, in effect, two judges.  I am one of the
12   judges, and you are the other.  I am the judge of the law
13   and you, as jurors, are judges of the facts.  I presided
14   over the trial and decided what evidence was proper for
15   your consideration.  It is also my duty at the end of the
16   trial to explain to you the rules of law that you must
17   follow and apply in arriving at your verdict.
18             In explaining the rules of law that you must
19   follow, first, I will give you some general instructions
20   which apply in every criminal case.  For example,
21   instructions about burden of proof and insights that might
22   help you judge the believability of witnesses.  Then I will
23   give you some specific rules of law that apply to this
24   particular case.  And, finally, I will explain the
25   procedures you should follow in your deliberations and the

1    possible verdicts that you may return.  These instructions

2    will be given to you for your use in the jury room, so you

3    need not take notes at this time.

4         In determining what actually happened, that is, in

5    reaching your decision as to the facts, it is your sworn

6    duty to follow all of the rules of law as I explain them to

7    you.  You have no right to disregard or give special

8    attention to any one instruction or to question the wisdom

9    or correctness of any rule that I may state to you.  You

10   must not substitute or follow your own notion or opinion as

11   to what the law is or ought to be.  It is your duty to

12   apply the law as I explain it to you, regardless of the

13   consequences.  However, you should not read into these

14   instructions, or anything else I may have said or done

15   during the trial, any suggestion as to what your verdict

16   should be.  That is entirely up to you.

17        It is also your duty to base your verdict solely

18   on -- upon the evidence without prejudice or sympathy.

19   That was the promise you made and the oath that you took.

20        The Government has the burden of proving the

21   defendant guilty beyond a reasonable doubt.  The law does

22   not require a defendant to prove his innocence or produce

23   any evidence at all.  The Government has the burden of

24   proving the defendant guilty beyond a reasonable doubt and

25   if it fails to do so, you must find the defendant not

1   guilty.

2          Proof beyond a reasonable doubt is proof that

3   leaves you firmly convinced of the defendant's guilt.

4   There are few things in this world that we would know --

5   that we know with absolute certainty, and in criminal

6   cases, the law does not require proof that overcomes every

7   possible doubt.  It is only required that the Government's

8   proof exclude any reasonable doubt concerning the

9   defendant's guilt.  A reasonable doubt is a doubt based on

10  reason and common sense after careful and impartial

11  consideration of all the evidence in the case.  If, based

12  on your consideration of the evidence, you are firmly

13  convinced that the defendant is guilty of the crimes

14  charged, you must find him guilty.  If, on the other hand,

15  you think there is a real possibility that he is not

16  guilty, you must give him the benefit of the doubt and find

17  him not guilty.

18         You must make your decision based only on the

19  evidence that you saw and heard here in court.  Do not let

20  rumors, suspicions, or anything else that you may have seen

21  or heard outside of the courtroom influence your decision

22  in any way.

23         The evidence in this case includes only what the

24  witnesses said while they were testifying under oath, the

25  exhibits that I allowed into evidence, and the stipulations

1    to which the lawyers agreed.  Nothing else is evidence.

2    The lawyers' statements and arguments are not evidence.

3    Their questions and objections are not evidence.  My legal

4    rulings are not evidence.  And my comments and questions

5    are not evidence.

6         During the trial, I did not let you hear the

7    answers to some of the questions that the lawyers asked.  I

8    also ruled that you could not see some of the exhibits that

9    the lawyers or parties wanted you to see.  You must

10   completely ignore all of these things.  Do not even think

11   about them.  Do not speculate about what a witness might

12   have said or what an exhibit might have shown.  These

13   things are not evidence, and you are bound by your oath not

14   to let them influence your decisions in any way.

15        The lawyers for the Government and the lawyers for

16   the defendant objected to some of the things that were said

17   or done during the trial.  Do not hold that against either

18   side.  The lawyers have a duty to object whenever they

19   think that something is not permitted by the Rules of

20   Evidence.  Those rules are designed to make sure that both

21   sides receive a fair trial.

22        Do not interpret my rulings on their objections as

23   any indication of how I think this case should be decided.

24   My rulings are based on the Rules of Evidence and not about

25   how I feel about this case.  Remember, your verdicts must

1    be based solely on the evidence that you saw and heard here
2    in court.
3         There are, generally speaking, two types of
4    evidence from which a jury may properly determine the facts
5    of a case.  One is direct evidence, such as the testimony
6    of an eyewitness.  The other is indirect, or circumstantial
7    evidence, that is, the proof of a chain of facts which
8    point to the existence or nonexistence of certain other
9    facts.
10        As a general rule, the law makes no distinction
11   between direct and circumstantial evidence.  The law simply
12   requires that you find the facts in accord with all the
13   evidence in the case, both direct and circumstantial.
14        While you must consider only the evidence in this
15   case, you are permitted to draw reasonable inferences from
16   the testimony and exhibits, inferences you feel are
17   justified in light of common experience.  An inference is a
18   conclusion that reason and common sense may lead you to
19   draw from facts which have been proved.
20        By permitting such reasonable inferences you may
21   make deductions and reach conclusions that reason and
22   common sense lead you to draw from the facts which have
23   been established by the testimony and evidence in this
24   case.
25        During this trial, you viewed a transcript of the

1    audio recording of a traffic stop.  Keep in mind that the

2    transcript is not evidence.  The transcript was shown to

3    you only as a guide to help you follow what was being said.

4    The recording, itself, is the evidence.  If you noticed any

5    differences between what you heard on the recording and

6    what you read in the transcript, you must rely on what you

7    heard, and not on what you read.  If you could not hear or

8    understand certain parts of the recordings, you must ignore

9    the transcript as far as those parts are concerned.

10        I remind you that it is your job to decide whether

11   the Government has proved the guilt of the defendant beyond

12   a reasonable doubt.  In doing so, you must consider all of

13   the evidence.  This does not mean, however, that you must

14   accept all of the evidence as true or accurate.

15        You are the sole judges of the credibility or

16   believability of each witness and the weight to be given to

17   the witness's testimony.  An important part of your job

18   will be to think about the testimony of each witness -- I'm

19   sorry, let me start that sentence again.

20        An important part of your job will be making

21   judgments about the testimony of the witnesses who

22   testified in this case.  You should think about the

23   testimony of each witness that you have heard and decide

24   whether you believe all or any part of what each witness

25   had to say and how important that testimony was.  In making

1    that decision, I suggest that you ask yourself a few

2    questions:

3            Did the witness impress you as honest?

4            Did the witness have any particular reason not to

5    tell the truth?

6            Did the witness have a personal interest in the

7    outcome in this case?

8            Did the witness have any relationship with either

9    party?

10           Did the witness seem to have a good memory?

11           Did the witness clearly see or hear the things

12   about which he or she testified?

13           Did the witness have the opportunity and ability

14   to understand the questions clearly and to answer them

15   directly?

16           Did the witness's testimony differ from the

17   testimony of other witnesses?

18           When weighing the conflicting testimony, you

19   should consider whether the discrepancy has to do with a

20   material fact or with an unimportant detail.  And you

21   should keep in mind that innocent misrecollection, like

22   failure of recollection, is not uncommon.

23           In reaching a conclusion on a particular point, or

24   ultimately in reaching a verdict in this case, do not make

25   any decisions simply because there were more witnesses on

1   one side than the other.

2            The testimony of a drug abuser must be examined

3   and weighed by the jury with greater caution than the

4   testimony of a witness who does not abuse drugs.

5            Christine Duncan may be considered to be an abuser

6   of drugs.

7            You must determine whether the testimony of this

8   witness has been affected by the use of drugs or the need

9   of drugs.

10            During the trial, you heard the testimony of

11   Alison Stailey who expressed opinions concerning computer

12   forensic analysis.  In some cases, such as this one,

13   scientific, technical, or other specialized knowledge may

14   assist the jury in understanding the evidence or in

15   determining a fact in issue.  A witness who has knowledge,

16   skill, experience, training or education may testify and

17   state an opinion concerning such matters.

18            You are not required to accept such an opinion.

19   You should consider opinion testimony just as you would

20   consider other testimony in this trial.  Give opinion

21   testimony as much weight as you think it deserves,

22   considering the education and experience of the witness,

23   the soundness of the reasons given for the opinion, and

24   other evidence in the trial.

25            The defendant did not testify and I remind you

1     that you cannot consider this decision not to testify as

2     evidence of guilt.  You must understand that the

3     Constitution of the United States grants to the defendant

4     the right to remain silent.  That means the right not to

5     testify.

6            This is a constitutional right in this country, it

7     is very carefully guarded, and you must not presume or

8     infer guilt from the fact that a defendant does not take

9     the witness stand and testify or call any witnesses.

10           The Government called Kimmisha Mullett to the

11    stand.  The Government entered into a nonprosecution

12    agreement providing that it will not -- that it will not

13    prosecute Ms. Mullett for her involvement in the fraud

14    scheme.

15           A person may testify under a grant of immunity,

16    which is an agreement with the Government, and her

17    testimony alone, if believed by the jury, may be of

18    sufficient weight to sustain a verdict of guilt even though

19    it is not corroborated or supported by other evidence.  You

20    should consider testimony given under a grant of immunity

21    with greater care and caution than the testimony of an

22    ordinary witness.  You should consider whether testimony

23    under a grant of immunity has been affected by that

24    witness's own interest, the Government's agreement, the

25    witness's interest in the outcome of the case, or by

1    prejudice against the defendant.

2              On the other hand, you should also consider that

3    an immunized witness can be prosecuted for perjury for

4    making a false statement.  After considering these things,

5    you may give testimony given under the grant of immunity

6    such weight as you feel it deserves.

7              You should not convict a defendant based on the

8    unsupported testimony of an immunized witness unless you

9    believe the unsupported testimony beyond a reasonable

10   doubt.

11             You may have heard the testimony of one or more

12   witnesses who, before this trial, made statements that may

13   be different from their testimony here in court.

14             These earlier statements were brought to your

15   attention only to help you decide how believable these

16   witnesses' testimony was in this trial.  You cannot use

17   these statements as proof of anything else.  You can only

18   use them as one way of evaluating their testimony here in

19   court.

20             The testimony of a witness may be discredited or

21   impeached by showing that the witness previously had been

22   convicted of a felony.  That is, a crime punishable by an

23   imprisonment for a term of years.  A prior conviction does

24   not mean that a witness is not qualified to testify, but is

25   merely one circumstance that you may consider in

1    determining the credibility of that witness.  You may

2    decide how much weight to give any prior felony conviction

3    that was used to impeach a witness.

4         You will note that the superseding indictment

5    charges that the crimes were committed on or about certain

6    dates.  The Government must prove beyond a reasonable doubt

7    that the defendant committed the crimes reasonably near

8    those dates.

9         You are here to decide whether the Government has

10   proved beyond a reasonable doubt that the defendant -- one

11   second.

12        Thank you, Mr. Fields.  I skipped it because it

13   wasn't in my set.  Does defense counsel agree that I need

14   to read the instruction on cooperating witness?

15        MR. GOODREID:  We do, Your Honor.

16        THE COURT:  All right.  For some reason, folks, my

17   set has it missing.  One second.  All right.  Here's an

18   instruction that I skipped, but will be in your set in the

19   deliberation room, so no worries as far as you're

20   concerned.

21        The Government called as a witness an alleged

22   co-conspirator, Ms. Marcelle Green, who was named as a

23   codefendant in the superseding indictment.  The Government

24   has entered into a plea agreement with Ms. Green providing

25   for the dismissal of some charges and a recommendation of a

1    lesser sentence than she would otherwise likely receive.

2    Plea bargaining is lawful and proper.  In fact, the rules

3    of this court expressly provide for it.

4         An alleged co-conspirator, including Marcelle

5    Green, who entered into a plea agreement with the

6    Government is not prohibited from testifying.  On the

7    contrary, the testimony of an alleged co-conspirator may,

8    by itself, support a jury -- a guilty verdict.  You should

9    receive this type of testimony with caution and weigh it

10   with great care.

11        You should never convict a defendant upon the

12   unsupported testimony of an alleged accomplice unless you

13   believe that testimony beyond a reasonable doubt.  The fact

14   that an alleged co-conspirator has entered a guilty plea to

15   the offense charged is not evidence of the guilt of any

16   other person.

17        You are here to decide whether the Government has

18   proved beyond a reasonable doubt that the defendant is

19   guilty of the crimes charged.  The defendant is not on

20   trial for any act, conduct, or crime not charged in the

21   superseding indictment.

22        It is not up to you to decide whether anyone who

23   is not on trial in this case should be prosecuted for the

24   crimes charged.  The fact that another person also may be

25   guilty is no defense to a criminal charge.

1          The question of the possible guilt of others

2     should not enter into your thinking as you decide whether

3     this defendant has been proved guilty of the crimes

4     charged.

5          If you find the defendant guilty, it will be my

6     duty to decide the punish- -- what the punishment will be.

7     You should not discuss or consider the possible punishment

8     in any way while deciding your verdict.

9          Some of the counts of the superseding indictment

10    accuse the defendant of violating a statute in more than

11    one way.  In other words, the superseding indictment

12    alleges that statute was violated by various acts that, in

13    the superseding indictment, are joined by the word "and,"

14    while the statute and the elements of the offense are

15    stated using the word "or."  In these instances, it is

16    sufficient for a finding of guilt if the evidence

17    establishes beyond a reasonable doubt the violation of the

18    statute by any one of the facts charged.

19         All right.  That concludes the part of my

20    instructions explaining your duties and the general rules

21    that apply in every criminal case.  Now I will explain the

22    elements of the crimes with which the defendant is charged.

23         A separate crime is charged in each count of the

24    superseding indictment.  You must separately consider the

25    evidence on each count and return a separate verdict.

1          Your verdict as to any one count, whether it is

2     guilty or not guilty, should not influence your verdict as

3     to any other count.

4          The superseding indictment charges in Count 1 a

5     violation of a federal statute known as Title 18 United

6     States Code Section 286.  That statute prohibits:  Entering

7     into any agreement, combination, or conspiracy to defraud

8     the United States, or any department or agency thereof, by

9     obtaining or aiding to obtain the payment or allowance of

10    any false, fictitious or fraudulent claim.

11         To find the defendant guilty of this crime, you

12    must be convinced that the Government has proved each of

13    the following elements beyond a reasonable doubt.

14         First:  The defendant agreed with at least one

15    other person to obtain or aid in obtaining the payment or

16    allowance of any false, fictitious, or fraudulent claim;

17         Second:  The defendant knew the essential

18    objective of the conspiracy;

19         Third:  The defendant knowingly and voluntarily

20    participated;

21         And, fourth:  There was an interdependence among

22    the members of the conspiracy; that is, the members, in

23    some way or manner, intended to act together for their

24    shared mutual benefit within the scope of the conspiracy

25    charged.

1          A conspiracy is an agreement between two or more

2     persons to accomplish an unlawful purpose.  It is a kind of

3     "partnership in criminal purpose" in which each member

4     becomes the agent or partner of every other member.  The

5     evidence may show that some of the persons involved in the

6     alleged conspiracy are not on trial.  This does not matter.

7     There is no requirement that all members of a conspiracy be

8     charged or tried together in one proceeding.

9          The evidence need not show that the members of the

10     alleged conspiracy entered into an express or formal

11     agreement.  Nor does the law require proof that the members

12     agreed on all the details.  But the evidence must show that

13     the members of the alleged conspiracy came to a mutual

14     understanding to try to accomplish a common and unlawful

15     plan.

16          If you are convinced that the charged conspiracy

17     existed, then you must next determine whether the defendant

18     was a member of that conspiracy; that is, whether the

19     defendant knew at least the essential goals of the

20     conspiracy and voluntarily chose to be part of it.  The law

21     does not require proof that the defendant knew all the

22     other members of the conspiracy or knew all the details

23     about how activities were to be carried out.  A person may

24     belong to a conspiracy for a brief period of time or play a

25     minor role.  On the other hand, proof is not sufficient if

1    it merely shows that the defendant knew about the existence

2    of the conspiracy or was associated with members of the

3    conspiracy.  Rather, the evidence must show the defendant

4    knowingly joined the conspiracy with the intent to advance

5    its purpose -- its purposes.

6              You are also required to find that the

7    interdependence existed among the members of the

8    conspiracy.  This means that the members intended to act

9    for their shared mutual benefit.  To satisfy this element,

10   you must conclude that the defendant participated in a

11   shared criminal purpose and that his actions constituted an

12   essential and integral step toward the realization of that

13   purpose.

14             The word "knowingly" means that an act was done

15   voluntarily and intentionally and not because of mistake or

16   accident.

17             The intent of a person or the knowledge that a

18   person possesses at any given time may not ordinarily be

19   proved directly because there is no way of directly

20   scrutinizing the workings of the human mind.  In

21   determining the issue of what a person knew or what a

22   person intended at a particular time, you may consider any

23   statements made, or acts done, by that person and all other

24   facts and circumstances received in evidence which may aid

25   you in your deliberation of that person's knowledge or

1    intent.

2          You may infer, but are certainly not required to

3    infer, that a person intends the natural and probable

4    consequences of acts knowingly done or knowingly omitted.

5    It is entirely up to you, however, to decide what facts to

6    find from the evidence received during this trial.

7          Counts 2 through 7 of the superseding indictment

8    charge the defendant with violating Title 18 United States

9    Section 2.  That statute makes it a crime intentionally to

10   help someone else commit a crime.  The statute provides in

11   pertinent part as follows:

12          Whoever aids, abets, counsels, commands, induces,

13   or procures the commission of an offense against the United

14   States, shall commit an offense against the United States.

15          The superseding indictment charges the defendant

16   with aiding and abetting others with respect to committing

17   mail fraud.  This law makes it a crime to use the mails in

18   carrying out a scheme to defraud.  A scheme to obtain money

19   or property by means of false or fraudulent pretenses,

20   representations, or promises is a specific type of scheme

21   to defraud.  This crime is based upon a federal statute

22   known as Title 18 United States Code Section 1341, which

23   provides in pertinent part as follows:

24          Whoever, having devised or intending to devise any

25   scheme or artifice to defraud, or for obtaining money or

672

1    property by means of false or fraudulent pretenses,

2    representation, or promises, for the purpose of executing

3    such scheme or artifice or attempting so to do, places in

4    any post office or authorized depository for mail matter,

5    any matter or thing whatever to be sent or delivered by the

6    Postal Service, or takes or receives therefrom, any such

7    matter or thing, or knowingly causes to be delivered by

8    mail, according to the direction thereon, or at a place at

9    which it is directed to be delivered by the person to whom

10   it is addressed any such matter or thing shall commit an

11   offense against the United States.

12        I need to pause and take a drink after that one.

13        To find the defendant guilty of aiding and

14   abetting mail fraud as charged in Counts 2 through 7 of the

15   superseding indictment, you must be convinced that the

16   Government has proved each of the following elements beyond

17   a reasonable doubt for each count:

18        First:  Someone else committed the crime, and

19        Second:  The defendant intentionally associated

20   himself in some way with the crime and intentionally

21   participated in it as he would in something he wished to

22   bring about.  This means that the Government must prove

23   that the defendant consciously shared the other person's

24   knowledge of the underlying criminal act and intended to

25   help him or her.

1           The defendant need not perform the underlying

2    criminal act, be present when it is performed, or be aware

3    of the details of its commission to be guilty of aiding and

4    abetting.  But a general suspicion that an unlawful act may

5    occur or that something criminal is happening is not

6    enough.  Mere presence at the scene of a crime and

7    knowledge that a crime is being committed are also not

8    sufficient to establish aiding and abetting.

9           To find that "someone else" committed the crime of

10   mail fraud, the first element of aiding and abetting, you

11   must be convinced that the Government has proved each of

12   the following beyond a reasonable doubt:

13          First:  A person or persons other than the

14   defendant devised or intended to devise a scheme to defraud

15   the United States Department of Education by making false

16   and fraudulent representations regarding the eligibility of

17   prison inmates for student financial aid, as alleged in the

18   superseding indictment;

19          Second:  A person or persons other than the

20   defendant acted with specific intent to defraud;

21          Third:  A person or persons other than the

22   defendant caused another person to mail something through

23   the United States Postal Service for the purpose of

24   carrying out the scheme;

25          Fourth:  The scheme employed false or fraudulent

1   pretenses, representations, or promises that were material.

2          A "scheme to defraud" is conduct intended to or

3   reasonably calculated to deceive persons of ordinary

4   prudence or comprehension.

5          An "intent to defraud" means an intent to deceive

6   or cheat someone.

7          A representation is "false" if it is known to be

8   untrue or is made with reckless indifference as to its

9   truth or falsity.  A representation would also be "false"

10  when it constitutes a half truth -- half truth or

11  effectively omits or conceals a material fact, provided it

12  is made with intent to defraud.

13         A false statement is "material" if it has a

14  natural tendency to influence or is capable of influencing

15  the decision of the person or entity to which it is

16  addressed.

17         What must be proved beyond a reasonable doubt is

18  that a person or persons other than the defendant devised

19  or intended to device a scheme to defraud that was

20  substantially the same as the one alleged in the

21  superseding indictment, and that the use of the mails was

22  closely related to the scheme in that a person or persons

23  other than the defendant caused something to be mailed in

24  an attempt to execute or carry out the scheme.  To "cause"

25  the mails to be used is to do an act with knowledge that

1   the use of the mails will follow in the ordinary course of

2   business or where such use can reasonably be foreseen even

3   though a person or persons other than the defendant did not

4   intend or request the mails to be used.

5           An indictment is only a formal method used by the

6   Government to accuse a defendant of a crime.  It is not

7   evidence of any crime against the defendant.  The defendant

8   is not -- the defendant is presumed to be innocent of the

9   crimes charged.

10          The defendant has pleaded "not guilty" to the

11  superseding indictment and, therefore, denies that he is

12  guilty of the charges contained in the superseding

13  indictment.

14          Okay.  That concludes my part of the instructions

15  explaining the law that applies in this case.  Let me

16  finish up by explaining some things about your

17  deliberations in the jury room and your possible verdicts.

18          After the parties' closing statements, the bailiff

19  will escort you to the jury room where each of you will

20  have a copy of the instructions that I've just read.  Any

21  exhibits admitted into evidence will also be placed in the

22  jury room for your review.

23          When you go to the jury room, you should first

24  select a foreperson who will help to guide your

25  deliberations and will speak for you here in the courtroom.

1    The second thing you should do is review the instructions.

2    Not only will your deliberations be more productive if you

3    understand the legal principles upon which your verdict

4    must be based, but for your verdict to be valid you must

5    follow the instructions throughout your deliberations.

6           Remember, you are the judges of the facts, but you

7    are bound by your oath to follow the law stated in the

8    instructions.

9           To reach a verdict, whether it is guilty or not

10   guilty, all of you must agree.  Your verdict must be

11   unanimous on each of the counts in the indictment.  Your

12   deliberations will be secret.  You will never have to

13   explain your verdict to anyone.

14          You must consult with one another and deliberate

15   in an effort to reach agreement if you can do so.  Each of

16   you must decide the case for yourself, but only after an

17   impartial consideration of the evidence with your fellow

18   jurors.  During your deliberations, do not hesitate to

19   re-examine your own opinions and change your mind if you

20   are convinced that you were wrong, but do not give up your

21   honest beliefs solely because of the opinion of your fellow

22   jurors or for the mere purpose of returning a verdict.

23          A form of verdict has been prepared for your

24   convenience and it reads as follows:

25          In the matter of criminal case No. 16-cr-054,

1   defendant No. 2, WJM.  United States of America versus

2   Tramell Thomas.  Verdict Form.  Count 1:  We, the jury,

3   upon our oaths, do unanimously find the defendant, Tramell

4   Thomas, in Count 1 of the indictment, not guilty or guilty,

5   with a line next to each for the jury to indicate its

6   decision.

7           Count 2:  We, the jury, upon our oaths, do

8   unanimously find the defendant, Tramell Thomas, in Count 2

9   of the indictment, again, not guilty or guilty.

10          Count 3:  We, the jury, upon our oaths, do

11  unanimously find the defendant, Tramell Thomas, in Count 3

12  of the indictment, not guilty or guilty.

13          And it goes on that way for Counts 4 through 7.  I

14  don't think I need to read all those.  And it ends -- the

15  verdict form ends up by providing a date and signature line

16  for the foreperson.  The foreperson should sign the verdict

17  form and should date the form as well.

18          After you have deliberated and consulted with each

19  other, the foreperson will write the unanimous answer of

20  the jury in response to each questions in the verdict form

21  and sign it.

22          Only one copy each verdict form -- of the verdict

23  form will be provided to you.  If you make an error on the

24  form, please tell the bailiff.  The bailiff will destroy

25  the erroneous form and a blank form will be provided.

1          Do counsel agree that should be changed to "only

2     one copy of the verdict form," and instead of "either the"

3     in the second line?  So let me read what I believe it --

4     that's how I read it, but let me read it and ask counsel if

5     they agree.

6          Only one copy of the verdict form will be provided

7     to you.  If you make an error on the form, please tell the

8     bailiff.  The bailiff will destroy the erroneous form and a

9     blank form will be provided.

10          MR. FIELDS:  Thank you, Your Honor.  Yes.

11          MR. GOODREID:  I believe that's correct, Your

12     Honor.

13          THE COURT:  All right.  Thank you, counsel.

14          If you want to communicate with me at any time

15     during your deliberations, please write down your message

16     or question and give it to the bailiff who will bring it to

17     my attention.  I will respond as promptly as possible

18     either in writing or by having you return to the courtroom

19     so that I can address you orally.  I caution you, however,

20     that with any message or question that you may send, you

21     should not tell me any details of your deliberations or

22     indicate how many of you are voting in a particular way on

23     any issue.

24          Let me remind you again that nothing that I have

25     said in these instructions, or in anything that I've said

1   or done during the course of this trial, was meant to

2   suggest to you what I think your decision should be.  That

3   is your exclusive responsibility.

4           And you'll find a part 4 to these instructions,

5   which I'm not going to read, it's for your review and

6   information.  It's a reprint of the actual superseding

7   indictment.  It goes on for a few pages.  Like I said, I

8   won't read it now, but it will be included in -- at the

9   back of the instructions.

10          Okay, ladies and gentlemen, we are now going to

11  hear the closing arguments of the parties beginning with

12  the Government, then the defendant, and then ending with

13  the Government.

14          Let me explain a couple of things to you.  One is

15  that each side gets the exact amount of time, 40 minutes.

16  But the law provides that because the Government has the

17  burden of proof, the Government can elect to not use its 40

18  minutes at one time.  It can apportion its 40 minutes with

19  an opening segment and a rebuttal segment.  The Government

20  has indicated to me that it's chosen to do that, so the

21  Government will have an opening segment and a rebuttal

22  segment totaling 40 minutes.

23          The defendant does not have that opportunity under

24  the law.  The defendant must use his 40 minutes all in one

25  stretch.

1          Because of the amount of time it took me to read

2     the instructions, what we're going to do is we'll hear the

3     opening segment of the Government's closing argument and

4     then we'll take a brief 10-minute recess and then we'll

5     come back and listen to the remaining portions of closing

6     arguments.

7          Let me finally remind you again that these

8     arguments, just like any arguments or statements of the

9     lawyers during the trial, are not evidence and you should

10    not consider it as such.

11         All right.  Closing argument for the Government.

12         MS. PALUCH:  Thank you, Your Honor.

13         THE COURT:  All right.  Ms. Paluch.

14         MS. PALUCH:  Your Honor, counsel, members of the

15    jury.  You see Mr. Fields holding that stack of the 52

16    debit cards from the plastic bag that the defendant tried

17    to hide from Detective Seal and the one tucked into his

18    wallet.  53 debit cards.  There are 13 of you in the jury

19    box.  Those cards represent four jury boxes of inmates

20    whose identities were stolen.  Those cards represent

21    thousands of dollars of fraud proceeds.  Those cards

22    represent this defendant's greed.

23         Now, during his opening statement, Mr. Fields told

24    you the issue in this case is not whether there was a

25    scheme to defraud the Department of Education.  Clearly

1    there was.  The issue is whether the defendant knew about

2    and intended to be a part of it.  The evidence is clear

3    that he did.  He tried to hide that stack of debit cards

4    from Detective Seal because he knew he'd been caught

5    red-handed.  He snapped his cell phone in half because he

6    knew that the text messages on that phone proved his

7    involvement.  He went to Marcelle Green's house after the

8    search warrant because he knew he was in trouble and he

9    wanted to know how bad it was.

10          These are not the actions of someone who didn't

11   know what they were doing.  They're the deliberate actions

12   of someone who knows they're committing a crime.  They are

13   evidence he knew what he was doing was illegal and he

14   didn't want to get caught.  They're evidence that he knew

15   about the scheme and he intended to participate in it.

16          Let's start with the bag of debit cards.  Why did

17   he try to hide them?  Why try to pass off an empty plastic

18   bag to Detective Seal when Detective Seal asks him to hand

19   him the bag?  If he knew nothing about this -- those cards,

20   doesn't it make sense that his response would have been,

21   "What bag?  What are you talking about?"

22          He doesn't say that.  Instead, in response to

23   Detective Seal asking no fewer than 10 times, "What's the

24   deal with those cards?" the only response this defendant

25   provides is, "If you do my job and what I do."  And then he

1   refused to answer when the officer asked, "Well, what do
2   you do?"

3          Here's what the defendant did:  He sat in that
4   nice office at his computer in his nice house and he
5   searched for inmates' names and he submitted documents so
6   that he could receive money from the Department of
7   Education to which he was not entitled.  Ms. Stailey told
8   you about the evidence related to this scheme that she
9   recovered from that computer in room J.  The computer where
10  the defendant is sitting in this photo.  Hundreds of hits
11  to DOC websites, hits for inmate names, e-mail
12  communication between a Tramell Thomas and a state
13  employee.  That was his computer and that's his office.

14         Agent Ennis told you about the other office in the
15  house and how they found a Wells Fargo laptop in that other
16  office.  What this defendant did for a living was he sat at
17  the computer and he committed fraud, and he couldn't
18  possibly explain that to Detective Seal.

19         Now, you heard Ms. Stailey describe all of the
20  searches related to the scheme found on the Sony laptop
21  that was taken from the car that the defendant was driving
22  and the fact that that computer had been shut down less
23  than two days before the defendant's arrest.  The laptop
24  and the debit cards in the defendant's possession are
25  irrefutable proof of his guilt.

1           In his opening statement, Mr. Fields told you that

2    this is a case about greed, and it is.  This defendant's

3    greed is why he is sitting in that chair.  Instead of

4    earning money in a legitimate way, he stole it.  And he was

5    proud of it.  So much so, that he took selfies of himself

6    posing with wads of cash.  Who does that?  Who does that?

7    Someone showing off about how they're ripping off the

8    Government, that's who does that.

9           Ms. Green told you they were able to pull off

10   $1,000 a day from the debit cards and she would drop the

11   money off at the house that the defendant shared with

12   Heather Carr.  Stacks of 20s, she told you.

13          You heard Agent Ennis testify she could find no

14   reported wages for this defendant while living in Colorado.

15   You will decide the source of the cash in these photos.

16          Now, you've heard testimony from witnesses and you

17   have seen a number of exhibits and you heard the issue in

18   this case is the defendant's knowledge and intent.  But the

19   Government must prove all of the evidence of the crimes

20   charged beyond a reasonable doubt and here's how the

21   evidence we presented during the trial did just that:

22          Count 1 charges the defendant with participating

23   in a conspiracy to submit false claims.  And as the Court

24   instructed, the first element is that he had entered into

25   an agreement with at least one other person to engage in

684

1    this scheme.

2         Now, Mr. Fields told you in his opening statement

3    that Heather Carr would testify in this trial, and she did

4    not.  As the Court instructed you in an opening statement,

5    the Government discusses the evidence it expects to present

6    during the trial.  But such statements, themselves, are not

7    evidence.  And the Judge has instructed you you're required

8    to examine the evidence and the testimony that was admitted

9    during this trial and you cannot speculate about why Ms.

10   Carr did not testify.

11        Now, you did hear, however, from Marcelle Green,

12   and she told you that she and the defendant and Mercedes

13   Diaz and Heather Carr were all involved in this conspiracy.

14   Green told you she helped the defendant with the FAFSA.

15   She told you that he was present when she was dropping the

16   cash off.  She told you he was present when they were

17   calling out names for inmate searches.  She also told you

18   she had conversations with her friend, Heather Carr, about

19   the defendant's involvement in this scheme.  Now, you heard

20   about Heather Carr and you heard that she and the defendant

21   were in a relationship.  They lived together and they had a

22   child together.

23        Ultimately, you didn't get to hear her testify,

24   but ladies and gentlemen, you didn't need her to testify to

25   know what the others told you.  She and the defendant were

1     close and they committed the fraud together.

2               Ms. Green also told you how Carr and the defendant

3     went to Ms. Green's house after their home had been

4     searched and asked her, "What did you tell them?  What did

5     the officers ask you?"

6               If he's not involved with Green, why would he go

7     to her house, nervous, asking those questions?

8               The Government's Exhibit 74 shows you that the

9     debit card in the name of Eryn Allegra was sent to Marci

10    Green's uncle's house and that card was found in the bag.

11    That card is on the table.  That was found in the bag in

12    the defendant's possession.  Think about that.  A card sent

13    to Marci Green's address is located with the defendant.  It

14    is clear that he conspired with at least one other person.

15              So still on the first element, let's talk about

16    the false claims.  Okay.  So the false claims, of course,

17    are the FAFSAs that are submitted to the Department of

18    Education, an agency of the United States, claiming the

19    funds to which the conspirators were not entitled.  Now, as

20    you know, the FAFSA is the claim that starts the whole

21    financial aid process.  And these FAFSAs were lies.  They

22    were designed to deceive the Department of Education into

23    thinking that real students wanted to attend college when

24    the reality is that the defendant and his partners in crime

25    had stolen identities as part of their plan to obtain loans

1     that they didn't intend to pay back.

2              They listed those inmates' names and including

3     their Social Security numbers, their dates of birth.  181

4     of them were filed.  And they also listed addresses that

5     gave them access to the debit cards.

6              Now, the summary charts prepared by Agent Ennis,

7     Exhibit 73 to 75, set forth the IP and the physical

8     addresses used in the scheme by the conspirators and lists

9     a portion of the debit cards mailed in this case based on

10    those false FAFSAs.  In another chart she prepared, Exhibit

11    72, she shows you how much money the Department of

12    Education paid out on those false claims:  582,000 of the

13    181 claims, seeking 1.3 million.  That's a pretty good

14    return.  There's no question the claims were false.

15             Now, the second and third elements are that the

16    defendant knew the objective of the conspiracy and he

17    voluntarily participated in it.  And the Court instructed

18    you that the intent of a person at any given time may not

19    ordinarily be proved directly, but here you do have direct

20    evidence.  You have the testimony of Ms. Duncan about her

21    conversation with the defendant in 2010 about the use of

22    federal student aid for a laptop and even a car.

23             And she told you what happened when she gave the

24    defendant her personal information and that was it -- it

25    was used to take out student loans.  And you have Green's

1    testimony about explaining to the defendant how best to

2    fill out a FAFSA to commit the fraud.

3            So what if you don't believe these women?  Well,

4    what about the texts from the defendant, himself, to Ms.

5    Mullett related to the scheme?  Mullett sent the text to

6    the defendant saying, for Dennis Miller, "What do you want

7    me to do with this letter I have?"

8            And he responds, "You can send all the mail to me

9    at 975 East Riggs Road."

10           And as you know, that's the defendant's P.O. Box

11   that he shared with Heather Carr.  You know from the

12   evidence that Dennis Miller is an inmate, and Higher One

13   records show that a debit card in his name was mailed to

14   Ms. Mullett's address on Meadow Oaks Drive, it was

15   activated on July 7th, 2012, $3,650 went out to Mr. Miller

16   as a refund on that debit card.  And all of that evidence

17   supports what Ms. Mullett told you.

18           What better evidence of a defendant's knowledge of

19   and voluntarily participating -- voluntary participation in

20   the scheme than his own words sent in a text message

21   establishing just that?  A text message he tried to hide by

22   breaking his phone.  A text message he never thought law

23   enforcement or 12 people in the jury box would see.

24           The last element for the conspiracy count is

25   called interdependence.  And I'm not keeping up with my

1    PowerPoint there.  Okay.  Interdependence.  And essentially

2    that means that members of the conspiracy worked together

3    so that they would all benefit.  So everybody had their

4    role and, as you know, Heather Carr provided the Social

5    Security -- the Social Security numbers, but Green told you

6    the conspiracy could not walk -- work without the

7    addresses.  And that's how they got the money is through

8    the addresses.

9        And she told -- Agent Ennis told you how 11

10   different mailing addresses all tied to at least one of the

11   four members of the conspiracy were used.

12       Now, the defendant Diaz, Green, all participated

13   in different aspects of the conspiracy, including

14   conducting inmate searches, filling out FAFSAs, the school

15   and the loan documents, providing addresses as we

16   discussed, doing the homework, withdrawing cash from the

17   ATMs using the debit cards that Ms. Green told you about.

18   All of the members of the conspiracy benefited.

19       Carr and Thomas' share went to fund their

20   comfortable lifestyle.  And you heard from Green that even

21   while detained, the defendant benefited through the payment

22   of his legal fees from proceeds from the scheme.

23       Now, keep in mind the Court also instructed you

24   that to find the defendant guilty of conspiracy, the

25   Government does not have to prove that the defendant knew

1     every member of the conspiracy.  We don't have to prove

2     that he knew all of the details.  And someone can be guilty

3     of a conspiracy even if they're involved in that conspiracy

4     for a brief period of time or play a minor role.

5              The conspiracy charged in this case is from August

6     of 2010 through October of 2012.  If you find that the

7     defendant participated in this conspiracy at any time

8     during that time frame, he's guilty of Count 1.

9              The fact that he was detained in the El Paso

10    County Jail for a certain number of months during the year

11    2011 does not control your determination as to whether he's

12    guilty on Count 1.  What matters is that we prove that the

13    members of the conspiracy had a mutual understanding in

14    trying to accomplish a common and unlawful plan of stealing

15    money from the Department of Education, and that the

16    defendant participated in a conspiracy for even a brief

17    period of time.

18             Now, think of all of the addresses used in this

19    scheme that are tied to the defendant.  The Rushmore Drive

20    address -- let's see -- I'm not staying up here with

21    this -- think of all the addresses.  Let's start with

22    Rushmore Drive.  He used that address for his own loan

23    documents.  And that's found in Government's Exhibit 67

24    through 69.  And think of Agent Ennis's testimony when she

25    told you about card after card after card that were mailed

1    to the Rushmore address that were later found in the

2    defendant's possession.

3           The Radiant Drive is the address where Thomas

4    lived with Duncan.  Kimmisha Mullett's Meadow Oaks Drive

5    address you heard testimony, you saw the text messages

6    about the defendant's use of that address for receipt of

7    these -- during this scheme.

8           Now, those addresses, along with the defendant

9    performing the tasks of the conspiracy, were all necessary

10   to make this scheme work.  You saw irrefutable evidence

11   that Thomas had access to the cards sent to these

12   addresses.  Abate's card was sent to Mullett's address and

13   was found in his wallet.  It was set for delivery on July

14   26th, 2012, and one month later it's in his wallet.  How

15   did it get there?  It got there because Thomas intended to

16   put it there by telling Mullett to mail it to him at his

17   P.O. Box.  It got there because Thomas was a part of the

18   scheme.

19          When you consider the overwhelming evidence in

20   this case, there is no question the Government has proven

21   beyond a reasonable doubt that this defendant participated

22   in this conspiracy in each and every element, that

23   defendant knowingly and voluntarily involvement in it, and

24   the fact that these conspirators relied on each other to

25   make the scheme work for their mutual benefit.

1          Now, next the defendant was charged with six

2     counts of aiding and abetting mail fraud.  And those are

3     Counts 2 through 7 of the indictment.  And keep in mind the

4     mailings at issue here involve an employee at Higher One

5     placing in the United States mail debit cards that the

6     conspirators were not entitled to because of the fraud, and

7     mailing those cards to addresses under the conspirators'

8     control.

9          Now, the Court instructed you generally about the

10     elements of aiding and abetting.  So, first, the Government

11     has to show that someone else committed the crime; and,

12     second, that the defendant helped to commit the crime as

13     something he wished to bring about.  Now, the best evidence

14     that the defendant wished for the mailing of these six

15     debit cards to be brought about is his possession of five

16     of the six cards.  Each of the mailings in Counts 2 through

17     5 and Count 7 ended up in the defendant's possession when

18     he was pulled over.  And those cards are Exhibits 4-A

19     through 4-D, and Exhibit 5, the Abate card in his wallet.

20          Count 6 is the Dennis Miller count.  And a card

21     for him was not found in the defendant's car, but you have

22     the Mullett text to prove that count.

23          Now, if the defendant did not wish to bring these

24     mailings about, why did he have those cards?  If he didn't

25     wish to bring about those mailings, why were they sent to

692

1    addresses he used and controlled:  Rushmore, Radiant,

2    Meadow Oaks?  He is connected to and he provided the

3    addresses listed in each count.  He did wish to bring about

4    those mailings from Higher One because he wanted to get the

5    money.

6            And then the Court specifically applied these

7    principles to aiding and abetting mail fraud and instructed

8    you about the first element:  Someone other than the

9    defendant came up with the scheme to steal money from the

10   Department of Education in submitting these false claims.

11   Clearly someone came up with the scheme because that's what

12   happened.  And Green tells you it was Carr's idea.  But it

13   doesn't matter really whose idea it was, what's matter --

14   what matters is this defendant thought it was a good idea

15   and he got in on it.

16           Second is that someone other than the defendant

17   acted with a specific intent to defraud.  There's no

18   question about that element.  You heard Ms. Green tell you

19   that it was her specific intent to steal money from the

20   Government.  She also told you about Heather Carr's intent

21   and her efforts to steal the money.  You saw for yourself

22   the Accurint searches done by Heather Carr to steal the

23   inmates' identities.  Mercedes Diaz agreed in her plea

24   agreement that she had specific intent to defraud in this

25   conspiracy, and that's found in the Defendant's Exhibit U.

1          Now, third -- let's see -- someone other than the

2     defendant caused another person to mail something through

3     the U.S. Postal Service for the purpose of carrying out the

4     scheme.  And for this element, you could find that any of

5     the conspirators caused another person, here an employee at

6     Higher One, to mail debit cards through the U.S. mail to

7     carry out the scheme.

8          Now, fourth, that the scheme employed false or

9     fraudulent pretenses, representations or promises that were

10    material.  Now, as to this element, the parties have

11    stipulated or agreed that the FAFSAs listed in Counts 2

12    through 7 were false.  And that's found in Government

13    Exhibit 37.  The inmates referred to in these counts were

14    incarcerated when their FAFSAs were submitted in their

15    names.  They did not fill out the FAFSAs, and they didn't

16    authorize anyone to do that for them.  So the defendant has

17    stipulated, agreed, that the information in those FAFSAs

18    couldn't possibly be true.

19         Now, as you know, the information, those

20    falsities, were material.  The Department of Education made

21    decisions based on those falsities because Michelle Allred

22    told you how important it is for people to tell the truth

23    on their FAFSAs, because if they don't, then people get

24    money that they're not entitled to.

25         Now, based on the evidence already discussed

1    there's no question that the defendant aided and abetted in

2    the use of the mail and the mailing of the debit cards to

3    the address listed.

4           Now, the first four counts, Counts 2 through 5,

5    the cards, themselves, were mailed while the defendant was

6    detained at the El Paso County Jail, but that's not a

7    defense.  Ask yourself, ladies and gentlemen:  Did he --

8    did he help make those mailings a success?  Did he benefit

9    from them?  The answer to both questions is yes because he

10   is tied to both of those addresses used for those four

11   counts, and he was in possession of all but Miller's card.

12          Now, specifically Count 2, that's a debit card in

13   Ismael Omar's name and it was mailed to the Radiant Drive

14   address.  And that's the address where the defendant lived

15   with Christine Duncan.  Now, remember Christine Duncan was

16   asked whether she knew Ismael Omar and whether she

17   submitted a FAFSA in his name, and she said her answers to

18   both of those were no.  And, of course, the Omar debit card

19   was found in the defendant's possession.

20          Now, Counts 2 through 5 -- actually, 3 through 5,

21   those were the cards for Virginia Jones, Robert Pickens,

22   and Eddie Jones and all three were mailed to the Rushmore

23   address.

24          Now, remember Exhibits 67 through 69.  These are

25   documents where the defendant listed that address as his

1    own mailing address.

2         Now, the debit cards keep coming to the Rushmore

3    Drive address while the defendant is in El Paso County

4    Jail.  And then when he's arrested, he's found with those

5    cards in his possession.  But for the defendant obtaining

6    that address, those mailings don't occur.

7         The next two counts, 6 and 7, this is the Meadow

8    Oaks Drive, and these are the ones for Dennis Miller and

9    Abate.  And you've heard the evidence.  The defendant was

10   not in jail when those mailings occurred and these were the

11   ones sent to Mullett's address.  And she testified that the

12   defendant directed her to mail those cards -- the Miller

13   card, to her P.O. Box.  And you saw that text message.  And

14   the Higher One records confirmed the information she gave

15   you.

16        The Miller debit card was activated, the Abate

17   card was found in the defendant's wallet.

18        COURTROOM DEPUTY:  You have two minutes.

19        MS. PALUCH:  Thank you.

20        There's no question that the Government has met

21   its burden beyond a reasonable doubt of each and every

22   element of aiding and abetting.

23        Those photos you were shown of the defendant

24   holding wads of cash, that pile of credit cards on the

25   table:  That's what greed looks like.

1          Look at the photos of the defendant's broken

2    phone, 70 and 71.  You heard Ms. Stailey tell you it looked

3    like someone just took that phone and broke it in half.

4    That's what criminal intent looks like.  It looks like

5    destroyed evidence.  It looks like the defendant going to

6    Green's house asking federal agents -- after federal agents

7    searched his house, trying to find out if Green was

8    talking.

9          It looks like a defendant who rents an apartment

10   that's not registered in his name so nothing comes back to

11   him.  It looks like a defendant who responds to a question

12   from Mullett about why Pikes Peak mail needed to be

13   forwarded to him by answering he didn't want to get her in

14   trouble.

15          The defendant knew that what he was doing was

16   trouble.  He made the deliberate choice to get himself into

17   trouble because he thought the money was worth it and he

18   thought he would be able to avoid getting caught.  But,

19   ladies and gentlemen, you've seen the evidence he didn't

20   want anyone to see.  Don't let him avoid accountability for

21   what he's done in this scheme.

22          When you apply the law that the Court has given

23   you to the facts that were presented in this trial, there

24   is no question about this defendant's guilt.  We ask you at

25   that time to return the only verdicts possible and that is

1    guilty on all counts.  Thank you.

2              THE COURT:  Thank you, counsel.

3              All right.  We're going to take a brief 10-minute

4    recess.

5         (Recess taken 10:15 a.m. to 10:27 a.m.)

6              THE COURT:  All right.  Closing argument for the

7    defendant.

8              MR. SMITH:  Thank you, Your Honor.

9              THE COURT:  Mr. Smith.

10             MR. SMITH:  Ladies and gentlemen, let me take this

11   opportunity to thank you on behalf of myself and Mr.

12   Goodreid and Mr. Thomas for your attention the last four

13   days and your hard work already and the hard work you're

14   about to set sail on.

15             I want to go back to Monday morning, early Monday

16   afternoon.  His Honor talked to you about his duty

17   instructing you on the law and your duty to follow it and

18   the oath you took promising to follow the law.  You can't

19   speculate on what happened here.  That curtain that Mr.

20   Fields talked about in his opening statement, the curtain

21   that he was going to pull back to show you all the secrets

22   in this conspiracy, it is still closed.  You never heard

23   from Carr.  You never heard from Diaz.

24             When you go back into that jury room, the first

25   thing you're going to do is encounter the two bedrocks of

1   our criminal justice system.  The first one is Tramell
2   Thomas is presumed innocent.  He was presumed innocent the
3   day he was indicted, he was presumed innocent on Monday
4   when you all were sworn in, and as we stand here today,
5   right now, he is presumed innocent.  He has no duty, no
6   requirement to prove anything.
7           So you approach the second bedrock of our criminal
8   justice system and that's proof beyond more than a
9   reasonable doubt.  That presumption stays with Mr. Thomas
10  until each one of you unanimously are convinced that every
11  single element of every single crime charged has been
12  proved to your satisfaction beyond a reasonable doubt.  A
13  doubt based upon reason, common sense, after careful
14  impartial consideration.  You must be firmly convinced, you
15  can't guess.
16          Let's talk about what must be proved here.  Count
17  1, the conspiracy charge.  Several elements to the crime.
18  A couple of them particularly stick out to me.  You first
19  must find that Mr. Thomas agreed with at least one other
20  person to obtain or aid in obtaining payment or allowance
21  of any false, fictitious or fraudulent claim.  Remember the
22  sole co-conspirator charged that you heard from in this
23  case:  Marcelle Green.  "Ms. Green, did you ever talk to
24  Tramell Thomas about filing false claims?"
25          "No."

1          "Did you ever talk to Thomas about collecting with

2     these cards?"

3          "No."

4          She never talked about the scheme with him.  That

5     was her testimony from that witness stand.

6     Interdependence.  Remember Ms. Green.  This can't work.

7     The whole scheme falls flat on its face without Carr.  They

8     can dream up all the inmate names they want from any

9     Department of Corrections throughout this country, but

10    without Carr's access to her employer, Wells Fargo, and her

11    access to those Accurint records, all they have was Mr.

12    Jones, date of birth, May 1st, 1947.  They had to have a

13    Social Security number.  They had to make sure that the

14    person didn't already have a student loan.  They had to

15    make sure the person had some decent credit or it won't be

16    approved.  And without Carr, they don't have any of that.

17         The aiding and abetting charges, the Government

18    says -- because they have to say -- Mr. Thomas didn't

19    commit these crimes charged in Counts 2, 3, 4, and 5.

20    Well, of course he didn't.  He was in jail.  He was in jail

21    on charges for some 10 months that were all dismissed.  So

22    since he couldn't do it, the only way the Government can

23    charge him is to try to convince you that he is an aider

24    and abetter.

25         To be that aider and abetter, they have to prove

1    that someone other than the defendant devised the scheme,

2    that someone other than the defendant caused another person

3    to mail something.  They have to prove that Tramell Thomas

4    knew this.  This isn't the conspiracy charge, ladies and

5    gentlemen; these are specific set crimes.  Read that

6    indictment.

7           Count 2, it's a crime that happened sometime

8    between February 8th and February 22d.  Mr. Thomas is in

9    jail.  What evidence did you hear that he knew someone was

10    filing a false FAFSA on Mr. Omar and someone was causing

11    that card to be mailed out and someone got that card?  It's

12    your memory that controls here, ladies and gentlemen, but I

13    suggest you heard no evidence of that.  You saw Exhibit 76.

14    That relates to Count 2, Mr. Omar.  February 8th to 22d,

15    2011.

16           You had Exhibit 77, that's Count 3, Mrs. Jones.

17    That happens between August and October of 2011.

18    Exhibit 78, Count 4, Mr. Pickens.  That happens between

19    August and October of 2011.  Count 5, Exhibit 79, Mr.

20    Jones.  Sometime between August and early November of '11.

21    He's in jail.  Did you hear any evidence that he knew

22    anything about what was happening?

23           Mr. Goodreid asked Agent Ennis, "You knew he was

24    in jail during this time period, and at the jail, they

25    record phone calls, don't they?"

1              "Yes."

2              "Did you get any of those recordings?"

3              "No."

4         When you're thinking about this burden of proof,

5    this reasonable doubt, you have to think of the witnesses,

6    especially the lay witnesses, that the Government is asking

7    you to rely on.  And the Court has given you several

8    instructions to help you there.  We have the cooperating

9    witnesses:  Ms. Mullett, Ms. Green.  The instruction:  You

10   should receive this type of testimony with caution and

11   weigh it with great care.  Let me come back to that in a

12   minute.

13        The drug abuser, Ms. Duncan.  A person addicted to

14   drugs must be examined and weighed by the jury with greater

15   caution than other testimony.  Pretty obvious.

16             "Ms. Duncan, were you using methamphetamines in

17   2010, 2011?"

18             "Yes."

19             "How often?"

20             "I smoked it every day."

21             "What effect did that have on your mind, Ms.

22   Duncan?"

23             "It put me in a zone.  I was zoned out."

24        And, of course, the methamphetamine comes after

25   years on crack cocaine.  And the Government says you can

1   believe this woman when she has such a specific memory of

2   that time period five years later; that she remembers

3   seeing Social Security numbers and student loan information

4   on a text message on a phone.

5          The Court gave you a general credibility of

6   witness instruction.  This isn't magic, ladies and

7   gentlemen.  It's what you and I do every day of our lives

8   when we meet people, talk to people, engage in business

9   with people.  You're trying to determine:  Are they being

10  honest with me?

11         What's probably a little different for you all in

12  this setting is I doubt very many of you have dealt with

13  people that are bargaining for their freedom.  Hopefully

14  you haven't had to deal with people that are so sadly

15  addicted to a drug like methamphetamine.  But keeping those

16  things in mind, the Court gives you this help:  Does the

17  witness have a particular reason not to tell the truth?

18         Does the person have a personal interest in the

19  outcome of the case?

20         Does the witness have a relationship with the

21  Government?

22         Green, Mullett, they hit on all three.

23         Does the witness seem to have a good memory?  I

24  won't belabor poor Ms. Duncan any longer.

25         And remember Ms. Green.  "Well, I don't know if it

1    was '10 or '11 or '12, or -- I'm not -- the dates, it's too
2    far back.  I don't remember."

3          What did the Government promise you, say they were
4    going to give you last Monday afternoon?  Were you going to
5    see evidence of these 180-some false student loan
6    application, the so-called FAFSAs?  And they gave them to
7    you.  In not a single one is there any evidence that Mr.
8    Thomas prepared it, filed it, or delivered it.

9          They told you they were going to present and give
10   you evidence that Thomas controlled the money.  Well, the
11   evidence you got on money was from Green, first evidence.
12   "I split with Carr.  If it came to my house, the split was
13   60-40.  If it went to her house, the split was 70-30."

14         Green always getting the most, because Green's in
15   charge.  Green is the linchpin; none of this works without
16   Carr.

17         I suppose they did give you some evidence of money
18   if you want to look at the picture of Mr. Thomas holding a
19   wad of cash.  A picture that's undated, a picture that
20   there's no evidence as to when it was taken, where it was
21   taken, why it was taken, what the -- what's going on at the
22   time.  That's not evidence of him controlling the money in
23   this scheme, ladies and gentlemen.

24         Mr. Fields said they were going to present
25   evidence of the lavish lifestyle that Thomas lived,

1    although this morning it's referred to as not lavish, but

2    comfortable.  It was a 2006 used automobile, lived in a

3    rented house.  And remember Green said to Ms. Paluch, I

4    believe, "Did Carr go on vacations?"

5                 "Oh, yes."

6                 "Many?"

7                 "Yes."

8                 "Who did she go with?"

9                 "Her kids."

10         Not Thomas.  There's probably a good reason for

11   that, ladies and gentlemen, especially with Green's

12   knowledge, because, remember, Thomas didn't live in Arizona

13   in 2010 or 2011.  He didn't move to Arizona, according to

14   the Government's evidence, until sometime into 2012.  And

15   then, remember, Ms. Green said when Carr moved to Kaibab,

16   Kaibab address -- however you say it -- "I only went there

17   once."

18         The Government said in its opening it was going to

19   give you all this evidence of how Mr. Thomas controlled all

20   these addresses.  I'll come back to that.

21         This conspiracy was shrouded in secrecy.  The

22   Government's four charged conspirators were behind this

23   curtain and they kept everything secret.  "And we're going

24   to pull the curtain back and show you what went on."

25         Ms. Carr:  Nope.  Ms. Diaz:  Nope.

1    Yesterday Exhibits U and V came into evidence.  I

2    didn't bother with having you have to sit there and read

3    them yesterday afternoon, but when you go back to the jury

4    room, read those two.  U is Diaz's plea agreement, she pled

5    guilty.  V is the transcript of her doing that in this

6    courtroom before Judge Martinez.  Why didn't she come

7    through that door?  If she's conspiring with Mr. Thomas, if

8    they're out running around cashing these cards, why isn't

9    she here?  Why isn't Carr here?

10    What did you get in the way of evidence?  You got

11    the stop.  It's August 30th of 2012.  Keep that in mind.

12    The charged conspiracy ends two months later.  There are 52

13    cards in the back seat in a plastic bag and a card in his

14    wallet.  Officer Seal painstakingly went through with what

15    happened to that plastic bag.  Remember I had my hand up

16    holding a bag with my fingers, that's what Mr. Thomas did,

17    and then he supposedly pushed it under the seat.  Okay?

18    Wouldn't you like to know independently if that

19    happened?  And he could have done it.  He told Thomas he

20    was going to do it.  He told Thomas on that tape recording,

21    "You did that with the bag, and I'll prove it.  You don't

22    have gloves on.  You picked it up.  I have gloves on."

23    Detective Seal:  "My fingerprints won't be on that."

24    But we don't have it.  Where did the plastic bag

25    go?  I have no idea.

1          He took all the cards and put them in the manila

2  envelope, but not the plastic bag.  It never got to a lab.

3  Would it be helpful?  I suggest to you it would be very

4  helpful.

5          But look at these cards.  They pull four out and

6  individually label them 4-A, 4-B, 4-C, 4-D, because they

7  relate to specific aiding and abetting counts.

8          All those cards were approved, issued, and cashed

9  while Mr. Thomas is in jail.  If you look at Exhibit 4 and

10  those cards, and compare it to just the ones that Agent

11  Ennis picked out and displayed on her Exhibit 75, one of

12  her summary exhibits, the vast majority of the cards in the

13  envelope are in the same category.  They were issued in

14  2011, they were cashed in 2011, when Mr. Thomas is in jail.

15          He has a card in his wallet.  It's worthless.  And

16  we know it's worthless because Mr. Goodreid talked to, I

17  believe it was Ms. Joseph from Higher One.  The card is

18  mailed out, it's not loaded.  You have to tear that sticker

19  off, call in, use the PIN, and then it's loaded, then it

20  can be used.  There are eight other cards in that baggy

21  that are just like that.

22          How did -- how did it get there?  Does it make any

23  sense that this man is supposedly in charge of this vast

24  scheme and he would go and collect these cards?  Remember

25  this morning, you're reminded that -- I think it's the

1    Allegre card, it was mailed to Green.  So does Thomas go

2    over to Green's house and get that card and put it in the

3    baggy along with the other 51, and the one in his wallet?

4    Put it in the back seat.  And then go out driving a car

5    around at 2:00 in the morning?  Does that make any sense?

6         Ms. Mullett.  She and the defendant had a

7    long-standing business relationship.  He was somewhat of a

8    sales rep for her printing company.  And remember how this

9    relationship on the mail started.  Tramell Thomas didn't

10   bring it up.  Mullett told me -- answered in one of my

11   questions, "How did this begin?"

12        "I was going through a tough time in my life, a

13   divorce, health issues.  I needed some money.  I asked him

14   if he had anything I could do to make some money and he

15   said he'd try."

16        "Maybe you can accept some mail.  I don't know if

17   I can pay you or not."

18        I asked her, "Did Mr. Thomas seem to understand

19   what was going on with this mail?"

20        "Not really."

21        She became concerned because she had gotten

22   student loans, she had gotten the cards, and when the one

23   card from Dennis Miller came, she didn't know it was a

24   card.  She never opened any of the mail, but she thought it

25   was.  And she was concerned.  She forwarded mail one time

1   and stopped.

2           Exhibit 15, the texts.  I encourage you to read

3   those texts.  They talk about the business relationship.

4   Dennis Miller is a side thought.

5           One time back to Ms. Duncan.  We were talking

6   about her memory and the effect of the meth -- smoking the

7   methamphetamine every day, how it would have on her memory

8   and her ability to perceive.  Remember, she said, "Thomas

9   took me to the school just to get information so I could --

10  I could enroll in the school.  That's all that was about.

11  I didn't have anything to do with anything else."

12          And then I asked her, "Do you remember on

13  September 7th, 2012, talking to Agent Ennis?"

14          "Well, I talked to her a lot.  I don't know."

15          Well, she wrote down, "Do you remember telling

16  Agent Ennis on that date Duncan admitted going with Thomas

17  to Pikes Peak Community College and applying for a student

18  loan?"

19          That's what she said the first time she talked to

20  the Government way back in September of 2012.

21          Ms. Green.  They brought Ms. Green in.  And she

22  told you she became aware of the scheme, she was brought

23  into the scheme, she learned how to play with the scheme by

24  Heather Carr.  It was Carr's idea.  No one else was there

25  when she and Carr got together and decided to put this

1    scheme together between themselves.  Green worked in

2    Arizona.  She had the two addresses, one's her uncle, one's

3    where she lived.

4           She told you she talked to Carr and Diaz about the

5    scheme.  She worked with them at the Pleasant Drive

6    address.  They would be over there.  They would be -- Diaz

7    and Green would be on the computers looking up various

8    Department of Corrections websites.  They would give Carr

9    names, she'd go on her computer, get the rest of the

10   information, then the three of them would fill out.  The

11   three of them would send in, the three of them would get

12   the cards.  Green and Diaz would go out and turn them into

13   cash.  The three of them would do homework so that it

14   appeared the student was -- was involved.

15          She never mentions Thomas in those descriptions

16   with the exception of one time.  One time at Pleasant

17   Drive.

18          "I was there and I helped teach Thomas how to put

19   the educational information on to the FAFSA."

20          "When was that?"

21          "2011."

22          Couldn't have been.

23          "Are you sure it was 2011?"

24          "Well, maybe 2012, maybe -- I don't -- I don't

25   remember."

1          Well, we know it didn't happen in 2012 because she

2     said she went to Kaibab one time and that wasn't when it

3     was.  So is it January of '11?  Or back in 2010?  Thomas

4     isn't in Arizona.  He's in school at Pikes Peak College in

5     the fall of '10, and he's living in the Springs with

6     Duncan.

7          What's the Government trying to prove with Thomas'

8     schooling and loan?  Exhibit 67, 68, and 69.  He applied

9     and was accepted at Pikes Peak Community College, as

10    everybody is who applies.  And he applied for a student

11    loan, was awarded one, and he went to school.  There's

12    nothing fraudulent about it.  And yet we see that loan put

13    on various summary charts.  The IP address chart, the

14    address chart.  Why?  There's nothing fraudulent about it.

15    Agent Ennis told you that.

16         "Did he go to school?"

17         "Yes, he went to school."

18         We know that because we know from DOE that if the

19    student isn't in school, the school has to pay back the

20    tuition and then the school sends a letter to the student,

21    "Now you have to pay us."  And you see many of those

22    letters in all of these files.  None in Thomas.

23         The only summary chart they don't put that on is

24    the loss chart when they're trying to show this $500,000

25    loss.  Thomas isn't there.  It's not fraudulent.

1          The Government gives you literally hundreds and

2     hundreds of pages of FAFSA filings, of printouts from hard

3     drives, the computers, it goes on and on and on.  And it

4     proves beyond any doubt that whoever was operating those

5     three computers in Carr's house or the one computer in

6     Green's house was involved in this loan scheme.  But there

7     is nothing on any of that paper that relates to Thomas.

8          He's guilty because the night that his home he

9     shared with Carr, that she rented and paid for, he and Carr

10    go over to Green and Green says he appears nervous.  And

11    the question he -- she mentioned from the witness stand:

12    "What did he say?"

13         What did Thomas say?  "How did this happen?"

14         He's not -- he's not asking what happened over

15    here.  "How did this happen?"

16         Let's talk about these addresses because the

17    Government stresses them and they're so important.

18    Exhibit 74 gives you the list, as you wade through it, of

19    the 11 addresses.  Remember Monday afternoon, Thomas

20    controls.  1915 Mobile, 4630 South 21st.  Both in the

21    Phoenix area.  Green's uncle and Green's home.  1153 West

22    Dragoon, 724 West Knox.  The Government says these are Diaz

23    addresses.  We don't know how they say that, why they say

24    that, because Diaz never walked through that door.

25         3166 South Mills, Tempe, Arizona.  That relates to

1   Terrel Smith.  The Government says he's a friend of Thomas.

2   Based on what?  Where's Terrel Smith?  1418 Rushmore,

3   Colorado Springs.  That's Thomas.

4        Now, think about this, ladies and gentlemen:  In

5   2010, Mr. Thomas applies to go to Pikes Peak Community

6   College and he applies for a loan and he lists 1418

7   Rushmore as his residence.  Fast-forward three, four

8   months, and he's controlling that address, albeit he's in

9   jail.  And he's knowingly using that address for -- for a

10  fraud scheme?  That doesn't make any sense.

11        2372 Lexington.  The Government says that's

12  controlled to home of Michelle Green, Carr's good friend.

13  And remember, 1418 Rushmore, the Government says that's the

14  home of LaTanya Pitkens, Carr's good friend.  Well, where's

15  Ms. Pickens and where's Ms. Green?

16        3239 Black Hawk Drive, Mr. Sanders' home, Carr's

17  stepbrother.  Where's Sanders?

18        3820 Radiant.  That's where Mr. Thomas lived in

19  2010.  Again, would you use your home address, give it to

20  somebody and say, "Go ahead and use it in this fraud

21  scheme"?

22        1063 Rice.  Supposedly Mr. Cox lives there.  The

23  Government says that's Thomas' cousin.  Well, where are

24  you, Mr. Cox?

25        The Government says these addresses are the key to

1   the whole scheme.  It's what keeps it going.  It's why they

2   had so many.  And yet they don't give you but one

3   witness -- two witnesses, excuse me, Ms. Green and Ms.

4   Mullett, to say how they're tied to a witness.

5        What could the Government have done here?  Well,

6   you see all the handwriting on all these applications.

7   This isn't new science, handwriting exemplars.  Order the

8   man in.  Have him write out one of those applications.

9   Have him write out whatever you want.  The Court can order

10  it done.  Did they?  No.  Not one handwriting comparison.

11       Fingerprinting.  Well, they started that.  They

12  sent a couple of pieces of paper that they had gotten from

13  the search at Kaibab, they sent them into a lab, and they

14  got results.  They said compare -- see if you can find any

15  prints on this paper, and see if they belong to Carr, Diaz,

16  Green, Thomas, Pickens, Grant.  Sure enough, they get two

17  hits:  Carr, Diaz.

18       But the expert in the lab said, "Send me some more

19  known fingerprints.  Reprint Thomas and send those to me.

20  And let me see if I can get matches there."

21       What did they do?  Nothing.

22       I mentioned the jail phone calls earlier.  If he's

23  running the show, ladies and gentlemen, he's got to be

24  talking to somebody on the outside.  They're investigating

25  this in 2012.  We know that.

714

1      They execute a search warrant.  They're talking to

2   Duncan.  And yet there's not one single picture of anybody

3   using one of these cards to get cash at an ATM machine all

4   over Arizona or all over Colorado.

5      You heard this morning the Government say Mr.

6   Thomas snapped his phone in half.  I want you to think

7   back.  I don't believe anyone got on that witness stand and

8   said that.  I don't believe there's any evidence of that

9   before you.

10      It was said that Mr. Thomas sat behind that desk

11   in his office.  Remember that's the picture from Kaibab.

12   He sat there and searched for inmates and filed false

13   FAFSAs.  There's simply no evidence of that, ladies and

14   gentlemen.  Green said, "One time, Pleasant Drive.  I only

15   went to Kaibab once."

16      Green is dropping money off at Kaibab.  There's no

17   evidence of it, ladies and gentlemen.  She went there once.

18   That's what she said.

19      And the statement:  Somebody, somebody came up

20   with this scheme, this fraud scheme.  It doesn't matter

21   who.  Well, ladies and gentlemen, yes, it does matter who

22   because they're asking you to deprive this man of his

23   freedom.  It matters.

24      Go back to the bedrocks.  He's presumed innocent.

25   And until you're convinced beyond a reasonable doubt, that

1    presumption never leaves.  It matters who did this.

2         There are simply too many holes, ladies and

3    gentlemen.

4         COURTROOM DEPUTY:  You have two minutes.

5         MR. SMITH:  The evidence on Mr. Thomas, he's --

6    he's not in Arizona in 2010 where Green and Diaz and Carr

7    are.  He's in jail most of '11.  Little or no ties to a

8    vast majority of these addresses.  And so many, so many

9    missing witnesses.

10        I simply go back to Monday afternoon, ladies and

11   gentlemen.  The Government told you, promised you, that

12   this curtain that these conspirators had hung, that they

13   could hide behind and conceal all their criminal acts, that

14   was going to be pulled back and Carr was going to tell you

15   everything about this crime.  Didn't happen, ladies and

16   gentlemen.

17        Read that instruction.  You must rely on the

18   evidence that you heard from that witness stand or you see

19   in the exhibits.  Only that.  You can't guess at what Carr

20   would have said.  You can't assume.

21        I submit to you when you really look at this

22   evidence, the only verdicts that you can return, and I ask

23   you to return, are not guilty.  Thank you very much.

24        THE COURT:  Thank you, counsel.

25        All right, Ms. Paluch, the Government has 14

1   minutes in rebuttal.

2          MS. PALUCH:   Thank you, Your Honor.

3          I'd like to start with what defense counsel calls

4   a side note.  The Dennis Miller text is a side note?

5   Dennis Miller, the inmate in whose name a debit card was

6   issued, which was mailed to Mullett's address, and the

7   defendant tells her, "Mail it to me at Riggs Road."

8          That's a side note?  That's your evidence right

9   there that he's in this scheme.  He's directing Mullett to

10  send him mail that she agreed to receive for him.  That's

11  more than a side note.

12         When he talks about it matters who started the

13  scheme, we've never said it doesn't matter who was in the

14  scheme.  That's what we've been trying to prove.  What we

15  said is whose idea it was.  You know, did Carr come up with

16  this?  Did Green?  That's not one of the elements.  It's

17  who was in the scheme.  It matters who was in the scheme

18  and that's what we've proved to you through this trial.

19         Counsel talked a lot about Diaz.  This is not

20  Diaz's trial.  You have Diaz's plea agreement.  You can see

21  in that plea agreement she agreed that she conspired with

22  this defendant.

23         It says in the instruction on page 18 the fact

24  that another person may also be guilty is not -- is no

25  defense to a criminal charge.  Diaz admitted what she did

1    and you can see that in that exhibit, but she's not the one

2    that was found with 52 debit cards in a bag and one in her

3    wallet.  She's not the one that manipulated Mullett to let

4    him use her address.  She's not the one who was using the

5    computer in room J.

6          Counsel says there's no evidence of that.  What

7    about the e-mail communications from Tramell Thomas to a

8    state employee that were found on the computer in room J?

9          She's not the one who had the Sony Vaio in her

10   back seat with all the evidence that the search was being

11   conducted.

12         A lot is being made of Heather Carr.  And he's

13   correct, you didn't get to hear from Heather Carr.  And the

14   Government told you what it expected to present to you in

15   this trial and we expected to present that testimony.  But

16   as we've stated, and as the Court told you before you heard

17   opening statements, the opening statements are not

18   evidence.  The defendant lived with Carr during the

19   conspiracy.  He used the computers in their houses to look

20   for inmates.  You heard Green tell you that they -- the

21   yelling out of the names, the talking about names.  He was

22   there when Green brought the fraud money.  He's driving

23   around in his car with all of the cards and the one in his

24   wallet.

25         You know, to argue that the Abate card wasn't

1   activated so that somehow means that he's not involved in

2   that scheme, how does that make any sense at all?  You

3   heard from the Higher One person there was $4700 waiting to

4   be activated on that card.  I asked her, "How difficult is

5   it to activate?"

6          "It's not difficult.  You make a phone call or you

7   go online.  You take off a sticker."

8          He's walking around with $4700 in his pocket that

9   he can use at any point that he wants to.  The fact that

10  later on when -- when the card wasn't activated that checks

11  were mailed and checks were returned, that doesn't matter.

12  On August 30th, he had money in his pocket just waiting for

13  him to use.

14         But here's the bigger question:  Why does this

15  defendant have debit cards in the names of 53 inmates in

16  his possession at all?  Why would he have a debit card in

17  the name of Manuel Abate in his wallet?  In his wallet.

18  How does that make any sense at all?  If he's not involved

19  in the scheme, he wouldn't be trying to hide the cards from

20  the officer.

21         You heard on the audio the officer said, "I saw

22  you try to move those cards under the seat.  I saw you take

23  them off the back seat."

24         That's guilty knowledge.  That's consciousness of

25  guilt.  He knew.  "If I get caught with these debit cards,

1   I am done for."

2          He knew it.  And he is.

3          Defense says there's no evidence of who broke the

4   phone.  You heard who was in the house during that search.

5   Agent Ennis told you it was Heather Carr and her children.

6   They found the broken phone.  So someone else broke that

7   phone?  Someone else broke the phone with his damning text

8   messages on them?  The phone's found in the closet with the

9   male clothes, exactly where you saw a photo during this

10  trial of the defendant standing.

11         Now, counsel made mention we're speculating or

12  guessing.  We're not asking you to speculate or guess.

13  We're asking you to look at the hard evidence presented

14  here.  Look at the computer evidence, look at the text

15  messages, look at the cards in his possession.

16         Now he talks a lot about Green and how you can't

17  believe her and she didn't know anything.  Do you think if

18  Green's plan was to come into this Court and lie about his

19  involvement, don't you think she would have done a better

20  job of it?  Don't you think she would have said he was more

21  involved than what she said?

22         She said she showed him how to use the FAFSA.  She

23  said he was there when she dropped off the money.  She told

24  you right away off the bat.  Mr. Fields asked, "Who were

25  you involved in this scheme with?"  And she named all of

1    the conspirators.

2            We've never disputed the critical role that

3    Heather Carr played in this scheme.  Never.  Certainly

4    she's the one who got the Social Security numbers.  But if

5    they don't have the addresses, how do they get the cash?

6    They can't get the cash.

7            We've never said that this defendant is tied to

8    all 11 addresses.  We have always said that all 11

9    addresses are tied to one of the four conspirators, and the

10   three addresses that come back to this defendant are

11   Radiant Drive, Mullett's address on Meadow Oaks and the

12   Rushmore Drive address that the defendant, himself, used.

13   Those are the three addresses that we've also asserted are

14   tied to him.

15           Talks about the jail recordings.  I mean, Agent

16   Ennis told you they couldn't obtain the jail recordings.

17           Talking about fingerprints.  You know, really,

18   what's the importance of fingerprints here?  The officer

19   saw him move the bag, the cards were taken into evidence in

20   an inventory search of the vehicle.  He's the only person

21   in the car.  What do we need fingerprints -- what do you

22   need fingerprint evidence to establish here?

23           Talked about don't believe a thing that Duncan had

24   to tell you.  She explained why she remembered those text

25   messages and it was because she was earning money and she

1   thought the two of them were going to start a life together

2   and instead he's sending her money to another woman to be

3   with that other woman.  Does that sound like something

4   somebody would recall?

5           Counsel brought up Count No. 2, the mail fraud

6   count, and said that his client was in jail when that FAFSA

7   was submitted.  Take a look at 57-B.  Mr. Omar's FAFSA was

8   submitted to the Department of Education in December of

9   2010, prior to the defendant going to jail.

10          Going back to the jail calls:  Those calls were

11  just no longer available.  There wasn't a lack on the part

12  of the law enforcement of not trying to get those.

13          Counsel indicated that there was no evidence tying

14  this defendant to any of the FAFSAs.  Think about that.

15  None of the conspirators in this case do their names appear

16  on any of these FAFSAs.  That was the whole fraud.  Of

17  course the defendant's name doesn't show up on any of

18  those.  All these FAFSAs at issue that we're talking about

19  were submitted in the names of inmates.

20          He talks about the defendant's name being on Agent

21  Ennis's charts.  His name is on the charts because it shows

22  the address that comes back to him and then we tie that

23  address to the other false submissions.

24          He talks about the stop.  The stop occurred two

25  months before the conspiracy ended.  The stop occurs while

1    the conspiracy is going on.  There is -- there is no way to

2    explain why somebody would have that many cards in other

3    people's names in their possession.  And that's why Officer

4    Seal didn't let it go.  That's why he asked over and over

5    and over.  He told you he had never seen anything like

6    that.

7         Perhaps counsel's argument appeared to insinuate

8    that Mullett is behind this, or Mullett was the one

9    bringing this up.  You heard her testify that she needed to

10   make extra money.  She was experiencing a difficult time.

11   And then once she kind of figured out that this didn't

12   sound right, she started sending the letters back.  This is

13   the defendant manipulating another woman in his life to do

14   what he wants them to do.

15        Look at Christine Duncan.  She's making money

16   thinking it's for the two of them.  Look at Mullett.  She's

17   receiving mail for him thinking that she's helping him out

18   and all of a sudden she realizes, "Maybe I shouldn't be

19   doing this."

20        Counsel concedes that Green says one time, one

21   time she helped him with the FAFSA.  We submit that's

22   enough.  That's enough, but you have so much more than

23   that.

24        Talked about the loans that the defendant took out

25   to go to Pikes Peak Community College.  We submitted that

1    evidence to you to show -- to tie him to that address.

2              Excuse me one second.

3              Counsel talked to you about aiding and abetting

4    and I'd ask that you go back to the instruction.  And what

5    we're required to prove there somebody else committed the

6    crime and that the defendant helped the person commit the

7    crime as something he wished to bring about.  And we've

8    told you his involvement and that is those addresses, and

9    those addresses being used while he's in prison for the

10   receipt of the cards that he's later found out -- found

11   with.

12             COURTROOM DEPUTY:  You have two minutes.

13             MS. PALUCH:  Thank you.

14             Now, the argument of defense is you can't believe

15   anything that the women say.  Don't believe a thing that

16   they say.  Even if you don't believe them, look at all the

17   physical evidence.  Look at Agent Ennis's investigation,

18   how it corroborates, it supports what they told you.  The

19   text messages, the computer evidence, the searches

20   performed.  The cards, themselves.  All of that convicts

21   this defendant of each and every offense charged.

22             Members of the jury, sometimes in life things

23   might seem too straightforward and you ask yourself, "What

24   am I missing?  There must be a catch."  You're not missing

25   anything.  There is no catch.  The evidence in this case is

1    that clear.

2          The Government's job was to present that clear

3    evidence to you, to make your job less difficult.  Not

4    easy, because there is nothing about a criminal trial that

5    is easy.  But you took an oath to consider all of the

6    evidence and to apply the law as given to you by the Court,

7    proof beyond a reasonable doubt, not all possible doubt.

8    And after you carefully and impartially consider all of the

9    evidence that was presented, what does your reason and your

10   common sense tell you?  It tells you that this defendant is

11   guilty of all charges beyond a reasonable doubt.  Thank

12   you.

13          THE COURT:  Thank you, Ms. Paluch.

14          Okay.  Members of the jury, you will remember at

15   the beginning of the trial I informed you that the law

16   prescribes that in a criminal trial such as this one, there

17   will be 12 jurors that deliberate the case to a verdict and

18   one alternate.  The alternate is included in case one of

19   you becomes ill or for some other reason cannot hear all of

20   the evidence.

21          So it's come time for me to dismiss the alternate.

22   At this time, I'm going to release Mr. Kemmis.  I know I

23   can just -- you can -- hold tight there, because you're

24   going to go back with the rest of your colleagues -- I know

25   I speak on behalf of both parties and all lawyers and the

1    Court when I thank you, Mr. Kemmis, for your service and

2    the time that you've taken out of your life and your

3    obligations to be with us this week.

4         In a moment, you're going to return to the

5    deliberation room with your colleagues, and at that time,

6    you should collect your belongings, give your badge back to

7    Ms. Hansen, but -- and make sure that she has your mobile

8    cell phone number before you leave home.

9         Please continue not to talk about this case or do

10   any independent research into this case until you hear from

11   us that a verdict has been returned.  The reason being, and

12   this has already happened in one of my criminal trials, the

13   deliberations will start, but something can happen when one

14   of the 12 either physically cannot or for other reasons

15   does not complete his or her deliberations, in which case

16   you would be recalled to come back and fill in for the --

17   that missing juror.  And like I said, believe it or not,

18   that has happened.

19        So please do not look at the media, research

20   anything or talk to anyone about this case.

21        Okay.  As to the remaining 12 of you, in a few

22   moments you are going to be escorted back to your

23   deliberation room to begin your deliberations and, finally,

24   finally, you're able to talk about this case among

25   yourselves, but only when all 12 of you are present at the

726

1    same time.

2         To ensure that your deliberations are private, a

3    court security officer will serve as a bailiff and he will

4    be present outside the jury room to ensure that you are not

5    interrupted or disrupted by anyone.  Also, the bailiff will

6    collect all of your cell phones during the time that you

7    are deliberating.

8         You will now be able to take your notes that you

9    have been taking during the course of this trial back with

10   you to the deliberation room.  As I mentioned before,

11   you're each going to get your own personal set of jury

12   instructions, so those should be back in the deliberation

13   room when you go back there.

14        After a few moments, or a few minutes after the

15   lawyers and Ms. Hansen have an opportunity to physically go

16   through the binders of exhibits to make sure that only that

17   which has been admitted into evidence are in those binders,

18   those binders will be brought to you in the deliberation

19   room and you'll have all the exhibits that have been

20   admitted into evidence.

21        And, finally, I need to tell you, or should tell

22   you, that today there is such a thing as a free lunch.

23   Lunch will be brought to the deliberation room so you can

24   continue your deliberations without interruption.

25        All right.  Will the court security officer please

1    come forward.  Ms. Hansen, please administer the oath to

2    the court security officer.

3         (court security officer sworn in)

4         THE COURT:  All right, members of the jury, if

5    you'll follow the bailiff.

6         (Jury left at 11:26 a.m.)

7         THE COURT:  All right, counsel, will you please,

8    if you haven't already, provide Ms. Hansen with your mobile

9    phone numbers in the event we get a question from the jury

10   and also, obviously, to advise you when we have a verdict.

11        I'm going to ask the lawyers not to go further

12   than 15 minutes from the courthouse so we can promptly

13   re-assemble in case there is a question or a verdict.  My

14   practice is is that if we do not have a verdict by 5:00,

15   Ms. Hansen will call your offices and let you know that.

16   We will release the jury at 5:00.  There's no need for you

17   to come back to the courtroom.  We'll just release them and

18   tell them to come back tomorrow morning at the usual time.

19        I would ask if that happens, that you do come back

20   tomorrow morning.  We'll bring them out for 30 seconds to

21   make sure all 12 are present and accounted for, and then

22   we'll send them back to the deliberation room to continue

23   their deliberations.

24        Once I go off the bench right now, as you just

25   heard me tell the jury, please stick around for a few

1    minutes and go through those physical court -- the physical

2    exhibits in the court binders and the loose exhibits to

3    make sure that only that which has been admitted into

4    evidence goes back to the deliberation room.

5         I want to thank counsel for their professionalism

6    and zealous representation of their clients.

7         All right.  We will be in recess until we have a

8    question for the jury -- from the jury or we have a

9    verdict.

10        (Recess taken at 11:28 a.m.)

11                       AFTERNOON SESSION

12        (In open court outside the presence of the jury at

13   3:05 p.m.)

14        THE COURT:  The record will reflect that all

15   counsel and both parties are present.

16        All right.  At 2:30 today, November 30th, I

17   received the following:  A note to the Court:  We the jury

18   have a question.  The question being:  If something

19   fraudulent is mailed, under the law, is it true that anyone

20   in possession of that item is aiding and -- I guess they

21   meant to say aiding and/or abetting -- in the fraudulent

22   crime?  Signed by -- it looks like Mr. Prosser is our

23   foreperson.

24        All right, I'll take input from the Government as

25   to its preferred response from the Court.

729

1          MR. FIELDS:  Thank you, Your Honor.  We would
2     propose the following response:  No, but you may consider
3     that evidence in addition to all the other evidence when
4     evaluating whether the defendant is guilty of aiding and
5     abetting.  And I would refer you, ladies and gentlemen,
6     again, to the instruction on page 27.
7          THE COURT:  All right.  Hear from the defendant.
8          MR. GOODREID:  Now, Mr. Fields, can I see the
9     instruction, please?
10          Your Honor, I'd like to give the defense's
11     position in order of priority.  Our first -- our first
12     response would be just no.  I think that's a correct
13     statement of the law.  The mere possession of a fraudulent
14     item, whether it's a product of mail fraud or anything
15     else, is not by itself a crime.  So our first response
16     would be no.
17          THE COURT:  Okay.
18          MR. GOODREID:  If the Court is inclined to give
19     any part of the Government's instruction, we would
20     advocate:  No, but you may consider that evidence when
21     evaluating whether the defendant is guilty of aiding and
22     abetting.
23          The key here is we would eliminate the language,
24     "in addition to all the other evidence."  I think that's
25     almost argumentative, go back and look at everything else.

1   And we certainly would not want then to read the

2   instructions again.  They have the instructions.  So is --

3   you know, before the Court's question, is my position at

4   least clear?  First would be no --

5           THE COURT:  Yes.

6           MR. GOODREID:   -- and then second would be, "But

7   you may consider that evidence when evaluating whether the

8   defendant is guilty of aiding and abetting," period.

9           THE COURT:  Generally it's my practice with these

10  type of substantive questions to tell the jury I can't

11  answer the question and they're directed to the Court's

12  instructions, and requested to apply the law as best they

13  can to the facts as they determine it.

14          The exception to that practice is when parties can

15  agree to a response that I think comports with the law.

16  And then I'll -- I at least seriously consider putting that

17  in the response.  Sounds like the two of you at least agree

18  on the first word, "No."  And then you have a disagreement

19  beyond that.

20          Is there an agreement from the parties that if

21  that is all that I put on the response or the answer form,

22  that that would not be objectionable to the -- or let me

23  put it in the positive as opposed to the negative -- would

24  the Government object to the Court, in lieu of what I said

25  is my normal practice, respond merely by stating "No"?

1           MR. FIELDS:  Your Honor, we would object.  And the

2    reason for that is we think that this is both a legal and

3    an evidentiary question.  And if you were to say "no," then

4    it might have the effect of de-emphasizing that particular

5    piece of evidence in their deliberations in a way that's

6    unfair to the Government.

7           THE COURT:  All right.  Well, then we don't have

8    an agreement between the parties, so --

9           MR. GOODREID:  Your Honor, may I inquire sort of

10   openly of the Government, if the Government would meet us

11   halfway and at least meet me on my secondary position?

12          MR. FIELDS:  We would, Your Honor.

13          THE COURT:  Let's do this.  Why don't I take a

14   very brief recess.  Let's see if you folks can come up with

15   the language, and I'll give you five minutes.  If you don't

16   have an agreement by then, I'll come back out in five

17   minutes.  And if you do before five minutes, let Deb know

18   so she can let me know and then I'll -- write it down on

19   one of these and then I'll look at it, and then consider

20   whether to give it to the jury.

21          We'll be in recess.

22       (Recess taken 3:09 p.m. to 3:14 p.m.)

23          THE COURT:  All right.  It appears that the

24   parties have reached an agreement as to the Court's

25   response to the question.  I've reviewed it and I find that

1    it comports with the law and I will respond to the

2    foreperson using the language that the parties have agreed

3    to.  So let me just state it again for the record and then

4    we'll put on the record that you stipulate that that is an

5    appropriate response to the foreperson.

6            The answer being:  No, but you may consider that

7    evidence when evaluating whether the defendant is guilty of

8    aiding and abetting, period.

9            Does the Government stipulate to that response to

10   the jury?

11           MR. FIELDS:  We do, Your Honor.

12           THE COURT:  Does the defendant stipulate?

13           MR. GOODREID:  Yes, Your Honor.

14           THE COURT:  All right.  Let me fill out this form.

15   And we will get it back to them so they can continue.

16           While I'm writing this, you folks know about the

17   attorney lounge on the third floor?  Okay.  So that you

18   don't have to be hanging out in these rooms out here, if

19   you were necessarily, or in the courtroom.  That's another

20   place you can be waiting in addition, of course, to your

21   offices.

22           All right.  I'm signing it today, the 30th of

23   November, 2017, at 3:16.

24           All right.  Ms. Hansen will give this form back to

25   the jury.  We'll be in recess until there's another

733

1    question or we have a verdict.

2         (Recess taken at 3:17 p.m. to 3:43 p.m.)

3              THE COURT:  Okay.  The record will reflect that

4    all counsel and both parties are present.

5              At 3:30 today, November 30th, 2017, I received the

6    following note to the Court:  We the jury have reached a

7    verdict, and signed by the foreperson.

8              All right.  Let's bring in the jury.

9         (Jury was present at 3:45 p.m.)

10             THE COURT:  Okay.  I've been informed by a note

11   from the jury's foreperson that the jury has reached a

12   verdict in this case.  Will the jury foreperson please

13   stand to be identified.  All right.  Mr. Prosser.

14             Has the jury reached a unanimous verdict in this

15   case?

16             THE FOREPERSON:  Yes, Your Honor.

17             THE COURT:  Have you, as the jury foreperson,

18   signed and dated this verdict form?

19             THE FOREPERSON:  Yes, Your Honor.

20             THE COURT:  All right.  Will you please hand the

21   verdict form to the bailiff, who will hand the verdict form

22   to me.

23             All right.  I will now read the jury's verdict.

24             In the matter of criminal case No. 16-cr-052,

25   defendant -- 054, No. 2, WJM, United States of America,

1       plaintiff, versus Tramell Thomas, defendant.

2              Verdict form.  Count 1:  We, the jury, upon our

3       oaths, do unanimously find the defendant, Tramell Thomas,

4       in Count 1 of the indictment:  Guilty.

5              Count 2:  We, the jury, upon our oaths, do

6       unanimously find the defendant, Tramell Thomas, in Count 2

7       of the indictment:  Guilty.

8              Count 3:  We, the jury, upon our oaths, do

9       unanimously find the defendant, Tramell Thomas, in Count 3

10      of the indictment:  Guilty.

11             Count 4:  We, the jury, upon our oaths, do

12      unanimously find the defendant, Tramell Thomas, in Count 4

13      of the indictment:  Guilty.

14             Count 5:  We, the jury, upon our oaths, do

15      unanimously find the defendant, Tramell Thomas, in Count 5

16      of the indictment:  Guilty.

17             Count 6:  We, the jury, upon our oaths, do

18      unanimously find the defendant, Tramell Thomas, in Count 6

19      of the indictment:  Guilty.

20             Count 7:  We, the jury, upon our oaths, do

21      unanimously find the defendant, Tramell Thomas, in Count 7

22      of the indictment:  Guilty.

23             Dated the 30th day of November, 2017, signed by

24      the jury foreperson, Derek Prosser.

25             All right.  Is there a request from the Government

735

1     for me to poll the jury?

2          MS. PALUCH:  Yes, Your Honor.

3          THE COURT:  All right.  Members of the jury, when

4     I call out your name, will you please stand.

5          Okay.  Rachelle Saxton.  Ms. Saxon, is this your

6     individual verdict in all respects?

7          THE JUROR:  It is, Your Honor.

8          THE COURT:  Thank you.  Ms. German, is this your

9     individual verdict in all respects?

10         THE JUROR:  Yes, sir.

11         THE COURT:  Thank you.  Ms. Bator, is this your

12     individual verdict in all respects?

13         THE JUROR:  It is, Your Honor.

14         THE COURT:  Thank you.  Mr. Fritzler, is this your

15     individual verdict in all respects?

16         THE JUROR:  Yes, Your Honor.

17         THE COURT:  Thank you.  Mr. Dow, is this your

18     individual verdict in all respects?

19         THE JUROR:  Yes, sir.

20         THE COURT:  Thank you.  Ms. Conley, is this your

21     individual verdict in all respects?

22         THE JUROR:  Yes, sir.

23         THE COURT:  All right.  Mr. Prosser, is this your

24     individual verdict in all respects?

25         THE JUROR:  Yes, Your Honor.

736

1          THE COURT:  Thank you.  Ms. Kirton, is this your

2     individual verdict in all respects?

3          THE JUROR:  Yes, Your Honor.

4          THE COURT:  Thank you.  Mr. Scott, is this your

5     individual verdict in all respects?

6          THE JUROR:  It is, sir.

7          THE COURT:  All right.  Ms. Opie, is this your

8     individual verdict in all respects?

9          THE JUROR:  Yes, Your Honor.

10          THE COURT:  Thank you.  Mr. Jackson, is this your

11     individual verdict in all respects?

12          THE JUROR:  Yes, Your Honor.

13          THE COURT:  Thank you.  And, Ms. Tacha, is this

14     your individual verdict in all respects?

15          THE JUROR:  Yes, Your Honor.

16          THE COURT:  All right.  Thank you.

17          Okay, ladies and gentlemen of the jury, you've now

18     completed your duties as jurors in this case and you're

19     discharged with the considerable thanks and appreciation

20     not just from the Court, but I know also on the part of the

21     parties and their lawyers.  We greatly appreciate, all of

22     us do here in court, your time, your effort and your

23     service here on the jury and that you've taken a four-day

24     interruption of your lives to help us continue this system

25     of justice we have in this country.

1          I hope you're not in too much of a hurry to leave

2     us because I ask those of you who can to stick around in

3     the deliberation room for a few minutes.  I and Mr. Foster,

4     my law clerk, would like to join you back there to discuss

5     the case a little bit, the trial a little bit with you, and

6     also to give you the Court's certificates of appreciation

7     for your service during these last four days.

8          It will be a few -- you'll have to be patient, it

9     will be a few minutes because we have to tend to a matter

10     that only the -- once again, only the lawyers and the

11     parties can do this with me outside of your presence.  But

12     if you'll be patient, Mr. Foster and I will get back to you

13     as soon as we can.

14          You are now probably wondering whether you can

15     finally discuss this case with others.  I should tell you

16     that the local rules of the Court prohibit the parties in

17     this case from contacting you.  I have, however, given the

18     lawyers in this case permission to speak to those of you

19     who wish to speak with them.

20          This discussion will happen, if at all, after I've

21     met with all of you and I'll explain to you in the

22     deliberation room how this process works if you are open to

23     coming back into the courtroom and speaking with the

24     lawyers.

25          Apart from that, whether you talk to anyone about

1     your service on this jury is entirely your own decision.

2     You may talk with others as much or as little as you like

3     about your deliberations or the facts that influence your

4     decision.

5          If any person persists in discussing -- in

6     attempting to discuss this case with you over your

7     objection and you do not choose to discuss this matter with

8     them, or becomes critical of your service either before or

9     after any such discussion has begun, please report it to

10    Ms. Hansen who will let me know about it and I'll do what I

11    can to bring it to an end quickly.

12          All right.  The jury is now discharged.

13         (Jury left at 3:52 p.m.)

14          THE COURT:  Let's take care of the quick thing

15    first -- hopefully quick -- is to set a sentencing date.

16    If counsel will bring out their -- get out their schedules

17    and we'll see what -- I am looking at the middle of April.

18    What works best for me is the Thursday, April 12th, or

19    Friday, April 13th.  Is the Government available on either

20    of those dates?

21          MS. PALUCH:  Yes, Your Honor.

22          THE COURT:  All right.  How about the defendant?

23          MR. SMITH:  That's fine, Your Honor.

24          THE COURT:  All right.  All right.  So let's set

25    this, then, for Thursday, April 12th, at 9:30 a.m.

1          All right.  We now have to deal with the

2     application of Section 3143, given that the defendant is

3     out on bond and I have to make a decision as to whether to

4     continue that bond or order that the defendant be taken

5     into custody at this time.

6          Under 3143, given the guilty verdict, the burden

7     is now on the defendant to show by clear and convincing

8     evidence that the defendant is not likely to flee nor does

9     he pose a danger to the safety of any other person or the

10    community within the meaning of Section 3143(a)(1).

11         So I will hear from the defendant first in terms

12    of -- well, first let me ask:  Does the Government have an

13    objection to the defendant remaining on bond?

14         MS. PALUCH:  We do, Your Honor.

15         THE COURT:  All right.  So then we'll have to go

16    through this.

17         All right.  I'll hear from the defendant in terms

18    of the factors of 3143 and whether clear and convincing

19    evidence exists for me to allow the defendant to remain

20    free on bond.  Mr. Smith.

21         MR. SMITH:  Thank you, Your Honor.  Your Honor, in

22    looking back through the docket in this case, I noted that

23    Mr. Thomas was originally released on his own recognizance

24    March 8th of 2016.  If my rough calculation is correct,

25    that's some 632 days ago.  He has appeared at every court

1    appearance.  He has resided in Phoenix where he resided

2    when he was -- when he surrendered.

3          He has complied, it's my understanding, with all

4    requirements of the pretrial release program.  Your staff

5    gave to me this morning the release status report to the

6    Court, which indicates that he has been totally compliant

7    with supervision.

8          That length of time, Your Honor, facing these

9    charges, the type of case that the Government had,

10   certainly I would think that his compliance with the

11   Court's directive to appear on the date set is very

12   indicative of what he would do in the future.

13         As to danger, in my experience, what the Court is

14   looking at here is the potential for harm -- criminal harm

15   to the public.  The crime here ended -- Count 1, the charge

16   ended in October of 2012, over five years ago.  I don't

17   believe the record shows that my client has had any contact

18   with law enforcement or the criminal justice system, state

19   or federal, during that time period.

20         Certainly, he is no stranger to the criminal

21   justice system.  He finished his parole term on his

22   Colorado convictions, state convictions, I believe in

23   mid-2012 and he completed it successfully.

24         I don't think there's any evidence to show that he

25   is a danger to the community, and certainly his reporting

741

1    record on this case I think gives the Court every

2    indication that he would continue.  I also note from the

3    release status report to the Court that I was provided this

4    morning that the recommendation of pretrial release is that

5    he be continued on release pending sentencing.  And we

6    would so request.

7              THE COURT:  Let me ask you, I believe it's a

8    standard condition in this Court, but just to confirm, to

9    your knowledge, has your client surrendered his passport?

10             MR. SMITH:  I believe that was done some time

11   ago.

12             THE COURT:  Okay.  That was my understanding,

13   that's a standard condition.  Anything else you wish to

14   say?

15             MR. SMITH:  I have nothing unless the Court has

16   further questions of me.

17             THE COURT:  All right.  Is it -- the pretrial

18   service report that was prepared on March 8th, 2016,

19   indicates -- and correct me if I'm wrong, Mr. Smith -- I'm

20   looking at the criminal history of your client that's

21   reflected in this document, sometimes it's not perfectly

22   accurate, but that the last conviction suffered by your

23   client was in Las Animas County, Colorado, February 2006, a

24   guilty plea.  Is that your understanding?

25             MR. SMITH:  My understanding is that conviction

1    was in 2003, Your Honor.  It was a crime that was incurred

2    while he was incarcerated in the Department of Corrections

3    in Colorado.

4         THE COURT:  All right.  So I'm just -- I'm reading

5    a report with respect to a three-count indictment against

6    the defendant filed in state charges in September of 2005

7    in Las Animas County, Counts 2 and 3 were dismissed and

8    that your client pled guilty to Count 1, smuggling

9    contraband into prison in February of -- February 10th,

10   2006.

11        MR. SMITH:  That is the conviction, Your Honor.

12   And I apologize to the Court, I'm not familiar with that

13   report.  I wasn't counsel for Mr. Thomas when that report

14   was prepared.  But I -- we do readily acknowledge that is

15   his second felony conviction in the state of Colorado,

16   correct.

17        THE COURT:  Okay.  Do you want to speak to

18   connection to the community in terms of family, employment,

19   matters of that nature?

20        MR. SMITH:  Well, Your Honor, Mr. Thomas has

21   resided in the Phoenix, Arizona, area since 2012.  His

22   father and stepmother reside in the area.  He's employed in

23   the area.

24        THE COURT:  Where is he employed and what is he

25   employed as?

1          MR. SMITH:  He's employed as a sales

2     representative, Your Honor.  And if I may have one moment

3     so I make sure I get the name of the company correct.

4          THE COURT:  Sure.

5          MR. SMITH:  The company name is MSI, Inc., Your

6     Honor.  It is in the -- it's a company that its business

7     is -- revolves around the solar energy industry.  Mr.

8     Thomas has been employed there for several years selling

9     mostly in the wholesale area.

10          THE COURT:  The two children that your client has

11     with Ms. Carr, where are they?

12          MR. SMITH:  I believe they're with Ms. Carr, and

13     my understanding --

14          THE COURT:  And where is she?  Apart from what

15     happened this week, where is she?

16          MR. SMITH:  I believe she's in Virginia.  That's

17     the last we knew of.

18          THE COURT:  Okay.  All right.  Thank you.  I'll

19     hear from the Government.

20          MS. PALUCH:  Thank you, Your Honor.  It's the

21     Government's position that the defendant cannot carry his

22     burden to establish that he should be released after this

23     conviction.  Specifically, the defendant is facing --

24     first, I'd like to address the likelihood -- or the risk of

25     the defendant fleeing.  The Government has calculated the

1    base offense level after this conviction as a 30, criminal

2    History Category III, facing a guideline range of 121 to

3    151 months in prison.

4         While it is true that the defendant has appeared

5    for his court appearances prior to trial, the situation is

6    completely different now that the defendant has been

7    convicted of a federal felony and is facing such a

8    sentence.

9         Additional support for the Government's argument

10   regarding flight risk is found in statements of certain

11   witnesses.  We have copies of those; they've already been

12   provided in discovery.  But for interest of time, I'm going

13   to go ahead and make a proffer for the Court.

14        Vanessa Lopez told investigators that at the time

15   this case was being investigated, she said if Thomas knows

16   about this investigation, he will be long gone by now.  He

17   will not go back to prison and he will not go back without

18   a fight.

19        Witness Christine --

20        THE COURT:  That hasn't turned out to be true.

21        MS. PALUCH:  Absolutely, Your Honor, but I'm just

22   reciting --

23        THE COURT:  Why are you reading to me comments

24   about someone's opinion about what's going to happen when,

25   in fact, the opposite happened?

1          MS. PALUCH:  Well, Your Honor, what I'm saying is

2     is there --

3          THE COURT:  Ms. Paluch, please don't interrupt

4     me.

5          MS. PALUCH:  I'm sorry.

6          THE COURT:  If Ms. Lopez's statement had any

7     validity at all today, November 30th, 2017, then the

8     defendant would not have come back here freely on his own

9     to another state and for his trial.  So, you know, her --

10    what she said -- what you read to me isn't worth the paper

11    it's written on.  So go ahead.

12         MS. PALUCH:  I will go ahead, Your Honor.  Thank

13    you for that.

14         What I'd like to point out is that this defendant

15    was indicted in -- on February 8th of 2016.  One of his

16    conditions of his release, which, of course, was in

17    Arizona, we had sought detention, he was released in

18    Arizona, was that he not have any contact with any

19    witnesses or any individuals involved in this matter.

20         In April of 2017, Marcelle Green indicated that in

21    approximately -- she reported that in November of 2016,

22    Tramell Thomas went to her uncle's home on 21st Place in

23    Phoenix, Arizona.  He was looking for Green, and he left

24    his phone number with her uncle.  Green never contacted

25    him.

746

1              We had learned --

2              THE COURT:  That's a condition of the pretrial

3    release?

4              MS. PALUCH:  Correct.

5              THE COURT:  Well, then why does his supervising

6    officer tell me in a filing I received yesterday, and I

7    shared with both -- with all counsel this morning,

8    according to his supervising pretrial service -- pretrial

9    services officer, Jason Cohen, in Arizona, that he has been

10   in full compliance with all conditions of release?

11             MS. PALUCH:  And I don't believe that the officer

12   in Arizona is aware of all the facts that the Government

13   has in its possession.  After we became aware of this

14   information, we contacted Mr. Smith and told him that if

15   the defendant contacted any more witnesses in this case, we

16   would seek to revoke his bond.

17             We learned in trial prep with Ms. Kimmisha

18   Mullett, when she arrived in Denver, that the defendant had

19   contacted her after the hurricanes, just recently, and

20   spoke -- spoke to her about this case.  He said he knew

21   that she had been subpoenaed.  He told her that the charges

22   in the case had been dropped down from 20-something charges

23   down to about five or six.  He knew she was coming to

24   Denver to testify.

25             That's a complete violation of the conditions of

1    his bond in having contact with a subpoenaed Government

2    witness.

3              THE COURT:  And what is the evidence you're -- I

4    know you're making a proffer, but what is the source of

5    your proffer?

6              MS. PALUCH:  My source of that proffer is meeting

7    with Kimmisha Mullett.  And when we asked if she'd had

8    contact with the defendant she said yes, she had.  And that

9    on occasion, she and the defendant speak.  And he called

10   after the hurricanes to inquire, and they discussed the

11   case.

12             In discussing the case with the Government

13   witness, he knew she had been subpoenaed to testify on

14   behalf of the Government.

15             We, in trial prep -- this is the information

16   received from Ms. Carr -- on three separate occasions, a

17   strange man came to her door.  On the third occasion she

18   answered the door.  The individual said, "You are

19   testifying against Marcie.  Make sure you do not say

20   anything about anyone else."

21             THE COURT:  Well, she could hardly describe a

22   strange man to the father of her two children.

23             MS. PALUCH:   Well, no, this was an individual she

24   did not know.

25             THE COURT:  All right.  So you're not --

1          MS. PALUCH:  I'm not claiming that it was the

2     defendant that showed up --

3          THE COURT:  What evidence do you have --

4          MS. PALUCH:  I don't --

5          THE COURT:  Please don't interrupt me.

6          What evidence do you have that the defendant was

7     the person that caused this strange person to come at Ms.

8     Carr's residence?

9          MS. PALUCH:  I do not have any, Your Honor.

10          THE COURT:  All right.  Go ahead.

11          MS. PALUCH:  The next item, it's in discovery, it

12     is an item that we retrieved off of the defendant's phone.

13     And this is an item that Alison Stailey recovered, and it

14     is from the defendant's phone.  He says, "I love it out

15     here.  I swim in my pool every day.  I go to the shooting

16     range, casino's be crackin'."

17          We uncovered on his phone a picture of an

18     individual at a shooting range with a firearm.  It is from

19     the back.  I can't -- we cannot identify that it is the

20     defendant, but combined with the text message, given

21     that -- this defendant's prior criminal history, that is

22     concern.

23          We have reason to believe -- I haven't even gotten

24     to the -- the other parts of the defendant's criminal

25     history, but I think the Court is aware of his prior

1    convictions of robbery, other convictions that he does

2    have.

3              We have reason to believe that the defendant has

4    lied to his parole officer in Arizona.  The evidence that

5    we have for that is found in Government's Exhibit 15 that

6    was admitted at trial.  In those text messages to Kimmisha

7    Mullett, there is an entry, "Can you send me a check stub

8    from May 3d to June 3d, like $2200?  This will be my last

9    one.  I got one month and then I'm off everything."

10             What he reported to his Arizona Department of

11   Corrections parole officer is that he was employed by 911

12   Designs.  That is the company that Kimmisha Mullett said

13   was her company.  She testified she did not employ this

14   defendant.  It states in the Arizona Department of

15   Corrections notes that have been turned over that that's

16   the place of the defendant's employment.

17             Notably in these correction notes, on 9-27 of

18   2012, the defendant met with his parole officer -- and this

19   is one month after his arrest by the Tempe Police

20   Department -- it states here that "the offender reports no

21   police contact."

22             He had been arrested, he had been kept overnight,

23   had court appearance the next morning, and a month later he

24   reports to his parole officer he's had he no contact.

25             Based on all of these factors, Your Honor, we do

1    not believe that the defendant can establish his burden of

2    proving by clear and convincing evidence that he will

3    comply with orders of the Court now that he's facing such a

4    significant prison sentence and we would ask for his

5    remand.

6              THE COURT:  Would you agree with me, just so we

7    know what subsection of 3143 we're talking about, that this

8    conviction does not come under 3143 A-2?

9              MS. PALUCH:  Yes, Your Honor.

10             THE COURT:  All right.  So that the factors and in

11   the standards applicable to (a)(1) is what applies here.

12             MS. PALUCH:  That's correct, Your Honor.

13             THE COURT:  Okay.  Thank you.  Since it's the

14   defendant's burden, I'll give the defendant an opportunity

15   for a reply.

16             MR. SMITH:  Thank you, Your Honor.

17             I guess let me respond in order.  And I won't

18   waste the Court's time with the Lopez allegation.  This

19   alleged contact with Green, the witness Green in November

20   of 2016, is not with Marcelle Green.  It's alleged to be

21   that Mr. Thomas stopped by her home and talked to her

22   father.  He supposedly left his phone number.  Nothing has

23   ever been found.  When the man was interviewed, he didn't

24   remember it.

25             I asked Ms. Green on the stand, part of her plea

751

1    agreement was to provide the Government any papers --

2    evidence she had.  She provided none.

3           The Mullett contact and her -- his work with Ms.

4    Mullett, I asked her on the witness stand if Mr. Thomas had

5    not worked as a sales rep for her for an extended period of

6    time, she said yes, and she paid him based on his sales.

7           I don't know what to say about this Carr thing.

8    It doesn't -- it doesn't relate to Thomas.  It's talking

9    about Green.  I -- I don't know how it relates to my

10   client.

11          As far as his parole situation, he was terminated

12   from parole in the summer of 2012, successfully.  There

13   were no violations.

14          As to this shooting range incident, the Court saw

15   pictures of my client going back to at least 2012 in

16   Phoenix in this case.  I'm familiar with the picture that

17   the Government is relying on, I'm sorry I don't have it

18   here today, but what I can tell this Court as an officer of

19   the Court is the picture is of a man holding a gun

20   shooting.  His back is to the camera.

21          What you can clearly see in that picture is a man

22   has hair on the top of his head.  My client has had a

23   shaved head going back to at least 2012.  I think we met

24   our burden.  I think we showed that he has complied with

25   the Court's order, and we've showed that he's not a danger

1    to the community.  I'd ask for a continued release.

2          THE COURT:  All right.  I'm prepared to rule.  I'm

3    going to enumerate the factors that I find to be material

4    to my decision.

5          The first is that the defendant has been on bond,

6    as counsel has stated, for 632 days and, according to his

7    supervising parole officer -- or pretrial services officer,

8    rather, according to Officer Cohen, the defendant has been

9    and is currently in complete compliance with the terms of

10   his pretrial release.

11         I find it material that the crimes of conviction

12   are not violent and they are not drug-related crimes.  The

13   last conviction for this -- while this defendant does

14   have -- as counsel's stated, he's not unfamiliar with the

15   criminal justice system, I note for the record that a

16   number of these convictions were when he was a teenager or

17   age 20 years old, and that the last conviction this

18   defendant suffered before today was at age of 26 in

19   February of 2006.  So it's been almost 12 years that --

20   according to the record that's available to me, that the

21   defendant has been -- has not been convicted of any crime

22   for the last 12 years.

23         It's -- I give considerable weight to the fact

24   that knowing what the defendant was facing, that he

25   voluntarily came at his expense to another state back here

1    to Colorado to stand for his trial.  I think if he were

2    going to flee, he would have probably thought very strongly

3    about it sometime between the time he was first arraigned

4    632 days ago and today.

5            I note that he is full-time employed and he has

6    parents and other family members in the Phoenix area where

7    he resides.

8            I find, therefore, under Section 3143(a)(1) and

9    Rule 46(c), that -- by clear and convincing evidence, that

10   the defendant is not likely to flee nor does he pose a

11   danger to the safety of any other person or the community

12   within the meaning of that rule or that statutory

13   provision.  I will allow the defendant to remain free on

14   bond until the sentencing hearing.  All conditions set

15   forth in the magistrate judge's order setting conditions of

16   release shall continue to apply.

17           Mr. Thomas, let me speak directly to you.  You

18   need to know that should you fail to return to Colorado on

19   April 12th for your sentencing, that that, itself, will be

20   a separate and new federal felony crime, and which would

21   just be tacked on if you were convicted of that to

22   everything else you're going to get today.  So that you

23   have a -- first of all, are you -- do you understand that?

24   Are we clear on that?

25           THE DEFENDANT:  Completely.

1          THE COURT:  And that, secondly, some of what Ms.

2    Paluch was referring to was of some concern to me.  I think

3    if she had some stronger, more direct evidence of it, I

4    think I might have ruled differently today, but it was very

5    indirect and attenuated evidence that I heard on these

6    points.  But the best advice I can give you, in addition to

7    showing up on April 12th, is that you follow all the

8    conditions of the magistrate judge's order setting your

9    conditions of release to the T.

10          THE DEFENDANT:  Yeah.

11          THE COURT:  Because if you give any cause to your

12   supervising officer to file with me a report that you're

13   not in compliance with those conditions, then I will, upon

14   motion of the Government, re-examine this question.

15          THE DEFENDANT:  May I speak?

16          THE COURT:  You may.

17          THE DEFENDANT:  Thank you, Your Honor.  You've

18   been very fair to me.  I respect that.  I would definitely

19   be here at sentencing or any other obligations you guys

20   want me to go through.  I'll be here.

21          THE COURT:  All right.  Thank you.

22          All right.  There's -- is there anything further

23   from the Government at this time?

24          MS. PALUCH:  No, Your Honor.

25          THE COURT:  All right.  Anything further from the

755

1     defendant?

2            MR. SMITH:  No, Your Honor.

3            THE COURT:  All right.  The trial's concluded and

4     the Court is adjourned.

5         (Proceedings concluded at 4:20 p.m.)

6

7                            **INDEX**

8     Item                                            PAGE

9     JURY INSTRUCTIONS READ TO THE JURY:             655

10    CLOSING ARGUMENTS:

11    By Ms. Paluch                                   680
      By Mr. Smith                                    697
12    By Ms. Paluch                                   716

13    QUESTION FROM THE JURY:                         728

14    VERDICT:                                        733

15               *     *     *     *     *

16                REPORTER'S CERTIFICATE

17         I certify that the foregoing is a correct transcript

18    from the record of proceedings in the above-entitled

19    matter.

20         Dated at Denver, Colorado, this 8th day of August,

21    2019.

22

23

24

25

                                   MARY J. GEORGE, FCRR, CRR, RMR