1

1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
    Criminal Action No. 16-cr-0054-WJM-2
3
    UNITED STATES OF AMERICA,
4
    Plaintiff,
5
    vs.
6
    TRAMELL THOMAS,
7
    Defendant.
8
    ------------------------------------------------------------
9
10               REPORTER'S TRANSCRIPT
11          (Continuation of Sentencing Hearing)
12    ------------------------------------------------------------
13
14       Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
15    Judge, United States District Court for the District of
16    Colorado, commencing at 10:05 a.m., on the 4th day of June,
17    2019, in Courtroom A801, United States Courthouse, Denver,
18    Colorado.
19                       APPEARANCES
20       MARTHA A. PALUCH and BRYAN FIELDS, Assistant U.S.
      Attorneys, 1801 California Street, Suite 1600, Denver,
21    Colorado 80202, appearing for the plaintiff.
22       TASHA A. STEWARD, Law Office of Tasha A. Steward, LLC,
      3570 East 12th Avenue, Denver, Colorado 80206, appearing for
23    the Defendant.
24                MARY J. GEORGE, FCRR, CRR, RMR
              901 19th Street, Denver, Colorado 80294
25         Proceedings Reported by Mechanical Stenography
               Transcription Produced via Computer

1                  P R O C E E D I N G S

2       (Call to order of the court at 10:05 a.m.)

3          THE COURT:  All right.  We're on the record in

4  criminal case No. 16-cr-054, defendant No. 2, United States

5  of America versus Tramell Thomas.  I'll take appearances of

6  counsel.

7          MS. PALUCH:  Good morning, Your Honor.  Martha

8  Paluch and Bryan Fields appearing on behalf of the United

9  States.  With us at counsel table is Special Agent Ennis.

10         THE COURT:  All right.  Good morning to the three

11  of you.  For the defendant.

12         MS. STEWARD:  Tasha Steward for Mr. Thomas.

13         THE COURT:  All right.  Good morning to the two of

14  you.  Probation officer please identify herself for the

15  record.

16         PROBATION OFFICER:  Good morning, Your Honor.

17  Laura Ansart with the probation office.

18         THE COURT:  All right.  Ms. Ansart, good morning

19  and welcome to you.

20         All right, Mr. Thomas, will you please stand and

21  I'm going to have my courtroom deputy administer the oath to

22  you.

23         COURTROOM DEPUTY:  Please raise your right hand.

24       (Defendant sworn in)

25         THE COURT:  All right.  The record reflects that on

1    the 30th of November, way back in 2017, a jury convicted Mr.

2    Thomas on each of seven counts of the superseding indictment

3    returned by the grand jury against him in this case:  With

4    respect to Count 1, conspiracy to defraud the Government

5    with respect to claims in violation of 18 United States Code

6    Section 286; with respect to Counts 2 through 7, aiding and

7    abetting mail fraud in violation of 18 United States Code

8    Sections 1341 and 2.

9         We are here for the resumption of the sentencing

10   hearing for the defendant, much delayed.  At least we have

11   started it on one occasion, at least back on October 22d of

12   last year.  I want to recap for the record what I decided

13   subsequent to that hearing:

14        On the 22d of October of last year, I ruled that I

15   would not take evidence on, or take into consideration, when

16   determining the sentence to impose on the defendant whether,

17   during the time of the charged conduct in this case, the

18   defendant was also engaged in a commercial sex business and

19   committed armed robbery and rape.

20        At that earlier hearing I found that the interests

21   of justice, as well as the sentencing statute, would be

22   undermined were I to exercise my discretion in favor of

23   hearing evidence with respect to unproven, dismissed, and

24   unrelated alleged criminal conduct.

25        That hearing was then prematurely concluded when I

1    granted the defendant's oral motion to continue the

2    sentencing hearing purportedly because he was feeling ill.

3    So we are now resuming that hearing.

4            The parties briefly summarize their respective

5    sentencing recommendations.  Ms. Paluch.

6            MS. PALUCH:  Thank you, Your Honor.  The Government

7    is seeking a sentence of 180 months in prison, followed by

8    three years of supervised release, $700 in special

9    assessment fees, which is $100 on each count of conviction,

10   and an order of restitution of $563,890.85, with all but

11   1,403 of that amount ordered to be paid jointly and

12   severally with his codefendants, Heather Carr, Marcelle

13   Green and Mercedes Diaz.

14           We know that the Court's order of forfeiture that

15   was entered yesterday at ECF 475, and as referenced in that

16   order, we would ask that that order be made a part of

17   today's sentence and included in the judgment.  Thank you.

18           THE COURT:  All right.  Thank you.  Ms. Steward.

19           MS. STEWARD:  Yes, Your Honor.  The defense would

20   ask that the Court sentence Mr. Thomas in accordance with --

21   I'm sorry, similarly to his codefendant Sabrina Diaz.

22   Although he was not a cooperating witness in this case, we

23   believe that he was not given the opportunity to be that.

24           We believe that based on the minimum role that Mr.

25   Thomas played, that that would be serving the interest of

1    justice in this case.  We also believe that --

2         THE COURT:  So what -- so you'll have plenty of

3    opportunity in this hearing for argument.  Right now I just

4    want you to summarize the sentencing recommendation.  So

5    with respect to the custodial sentence, what is the

6    recommended custodial sentence you are seeking?

7         MS. STEWARD:  Based on the guidelines, we believe

8    the recommendation should be -- should be 15 to 21 months.

9         THE COURT:  You realize that your prior counsel has

10   filed with me submissions where the requested variance was

11   to 84 months.

12        MS. STEWARD:  I understand, Your Honor.

13        THE COURT:  So I'm just to ignore that and now go

14   to 15 and 21 months?

15        MS. STEWARD:  Based on what we believe the

16   guideline calculations are, yes, Your Honor.

17        THE COURT:  All right.  And what's your position on

18   restitution, forfeiture, and supervised release?

19        MS. STEWARD:  We believe Mr. Thomas is responsible

20   for approximately $38,000 in restitution, that is jointly

21   and severally liable with his other codefendants.  We

22   believe that he would probably be eligible for supervised

23   probation of three years after sentencing.

24        THE COURT:  Supervised release?

25        MS. STEWARD:  Yes.

1              THE COURT:  Of how long?

2              MS. STEWARD:  I'm sorry, Your Honor?

3              THE COURT:  Of how long?

4              MS. STEWARD:  Three years.

5              THE COURT:  Okay.  And what's your position on

6      forfeiture?

7              MS. STEWARD:  We -- I looked at document 474, Your

8      Honor.  I don't agree -- I object to that document; however,

9      we understand that the Court and the Government has had a

10     much longer time to come to that number than we have.

11             THE COURT:  All right.  Well, we're going to get to

12     that later on in the hearing.  All right.  Thank you.

13             MS. STEWARD:  Thank you.

14             THE COURT:  From my review of the submissions of

15     the Government, this is what I understand are matters as to

16     which you may be putting on evidence this morning, Ms.

17     Paluch.  And you tell me which you actually are going to.

18             First, there's the issue of whether the indicted

19     scheme was devised by Mr. Carr -- Ms. Carr and Mr. Thomas.

20     Are you planning on putting on any evidence on that issue?

21             MS. PALUCH:  We are, Your Honor.

22             THE COURT:  Okay.  So we'll do that when we deal

23     with the defendant's objection No. 4.

24             With respect to amounts of loss and restitution and

25     forfeiture -- well, actually, forfeiture will be handled

1   later -- with respect to amounts of loss and restitution, do

2   you anticipate putting on any evidence with respect to those

3   issues?

4          MS. PALUCH:  We do, Your Honor.

5          THE COURT:  Okay.  So we'll deal with that when I

6   take up the defendant's objection No. 7.

7          With respect to the two-level enhancement for

8   reckless endangerment during flight under guideline Section

9   3C1.2, does the Government anticipate putting on evidence on

10  this issue?

11         MS. PALUCH:  We do, Your Honor.

12         THE COURT:  All right.  Well, since there -- this

13  is probably a good place to start, then, because the other

14  two issues I'll deal with as I get to the objections.  We

15  can take up the specific offense characteristics and the

16  two-level enhancement now.

17         Are there any other issues that the Government

18  anticipates putting on evidence?

19         MS. PALUCH:  Your Honor, just briefly.  When Agent

20  Ennis is testifying, she will also be testifying briefly

21  about our assertion that the defendant was still involved in

22  the scheme while he was incarcerated and that funds from the

23  scheme were used to pay his attorney as well as be put in

24  his commissary account.  And this testimony, we believe,

25  refutes the defendant's assertion that he is entitled to a

1    minor role adjustment.

2          So when Agent Ennis is testifying, we would seek

3    the Court's permission to briefly talk to her about that

4    issue.

5          THE COURT:  All right.  Let me see.  One second.

6          So that has to do with the eighth objection --

7    defendant's eighth objection filed by prior counsel to what

8    is now paragraph 95 of the report?

9          MS. PALUCH:  That's correct, Your Honor.

10         THE COURT:  Okay.  All right.  Just let me make a

11   note of that.

12         All right.  Apart from that, anything else?

13         MS. PALUCH:  One last issue, Your Honor.  As you

14   know, there is a two-level enhancement for obstruction of

15   justice on a number of grounds, that's separate from the

16   reckless endangerment.  And one of those grounds is lying to

17   the probation officer about residence and employment.  We

18   also have lies in the record that we have briefed to the

19   Court about lies the defendant told to his state parole

20   officer.  And we believe those are proper consideration

21   under history and characteristics of the defendant.  So I

22   was going to briefly examine Agent Ennis about that last

23   matter.

24         THE COURT:  Okay.  All right.  All right.  So let

25   me -- let's take up as -- the first issue that I will take

Direct - Willhite

1    evidence on is whether a two-level enhancement for reckless

2    endangerment during the flight should be assessed under

3    guideline Section 3C1.2.

4              All right.  Ms. Paluch.

5              MS. PALUCH:  Thank you, Your Honor.  Mr. AUSA

6    Fields will be handling this --

7              THE COURT:  Okay.  Mr. Fields, the Government may

8    call its first witness.

9              MR. FIELDS:  We will call Deputy U.S. Marshal Pat

10   Willhite.

11             THE COURT:  Okay.  You can come forward, sir.

12             COURTROOM DEPUTY:  Please raise your right hand.

13              PAT WILLHITE, GOVERNMENT'S WITNESS, SWORN

14             COURTROOM DEPUTY:  Okay.  Please be seated.  You

15   may need to move your chair toward the microphone.

16             Please state and spell your name for the record.

17             THE WITNESS:  My name is Pat Willhite.  Last name

18   is spelled W-i-l-l-h-i-t-e.

19                        DIRECT EXAMINATION

20   BY MR. FIELDS:

21   Q.   Good morning, sir.

22   A.   Good morning, sir.

23   Q.   Do you work for the marshal service?

24   A.   Yes, sir, I do.

25   Q.   What's your title?

Direct - Willhite

1    A.    I'm a supervisory Deputy U.S. Marshal.

2    Q.    What unit are you currently in?

3    A.    I am in charge of the prisoner operations in the

4    District of Arizona.

5    Q.    And in March of 2018, where were you assigned?

6    A.    I was the supervisor over there.  Arizona Task Force.

7    Q.    What was your responsibilities in the Arizona Fugitive

8    Task Force?

9    A.    Mine was the supervision of the state and local

10   partners, along with deputies, to go out and arrest state

11   and local fugitives.

12   Q.    Are you familiar with a case involving a fugitive

13   status of Tramell Thomas?

14   A.    Yes, sir.

15   Q.    How did the marshal service learn about his fugitive

16   status?

17   A.    The District of Colorado had a case and they had the

18   warrant for Mr. Thomas.  They received information that

19   possibly he was residing somewhere in the Phoenix area and

20   sent what they call a collateral lead to the office in

21   Phoenix.

22   Q.    To whom was that collateral lead assigned?

23   A.    DUSM -- or, excuse me, Deputy Faranda.

24   Q.    At the time that this lead was assigned, was Tramell

25   Thomas on supervision by the District of Colorado?

Direct - Willhite

1    A.   I believe he was, yes.

2    Q.   Did Deputy U.S. Marshal Joseph Faranda ask his

3    probation officer where Tramell Thomas had reported to

4    probation that he was living?

5    A.   Yes, he did.

6    Q.   Was Faranda able to find him at that address?

7    A.   No, sir.

8    Q.   Generally how was -- well, was Deputy U.S. Marshal

9    Faranda able to track down Tramell Thomas?

10   A.   Yes, sir, he was.

11   Q.   Generally how?

12   A.   Through some interviews, I believe that Deputy Faranda

13   had talked to certain individuals and provided information

14   that he was residing at a different address.

15   Q.   What was that address?

16   A.   6039 West Hughes Drive in Phoenix, Arizona.

17   Q.   On March 29th, 2018, did DUSM Faranda and a team of

18   marshals go to that address?

19   A.   Yes, they did.

20   Q.   At about 4:00 on March 29th, 2018, did a member of DUSM

21   Faranda's team see a female in the backyard of the house?

22   A.   Yes, Deputy Strand contacted a female in the back.  Her

23   last name was Conrad.

24   Q.   What happened when he contacted Ms. Conrad?

25   A.   He instructed her to go --

Direct - Willhite

1          MS. STEWARD:  Your Honor, we're going to object to

2     hearsay.

3          MR. FIELDS:  Your Honor, the rules of evidence

4     don't apply at sentencing.

5          THE COURT:  Right.  Well, they don't strictly

6     apply, but let me ask you, where's Deputy Faranda?

7          MR. FIELDS:  Your Honor, we filed an amended

8     witness list; unfortunately --

9          THE COURT:  Yes, I noticed his name wasn't on it.

10          MR. FIELDS:  DUSM Faranda was, unfortunately,

11     rediagnosed with testicular cancer.  He had surgery last

12     week, and is recovering from the surgery.  So rather than

13     delay these proceedings further, Deputy Willhite was at the

14     scene that day and will be able to provide a firsthand

15     account to what happened when Mr. Thomas was captured.

16          THE COURT:  All right.  So he has personal

17     knowledge of what took place on that day.

18          MR. FIELDS:  Yes.

19          THE COURT:  All right.  So right now we're covering

20     background information.

21          MR. FIELDS:  Correct.

22          THE COURT:  All right.  Okay.  Ms. Steward, the

23     rules of evidence do not strictly apply to these hearings.

24     I will, however, point out, as I've done in other cases,

25     that I will sustain objections to leading questions because,

1    in my experience, testimony by an attorney is of little use
2    to me.  I want to hear the testimony from a witness.  So
3    that objection's overruled.
4            You may proceed, Mr. Fields.
5            MR. FIELDS:  Thank you, Your Honor.
6    BY MR. FIELDS:
7    Q.    Deputy Willhite we were talking about when DUSM Strand
8    encountered the female.  What happened when DUSM Strand
9    encountered Ms. Conrad in the backyard of that house?
10   A.    He instructed her that law enforcement was at the front
11   door and go to the front door and open the door.
12   Q.    Did she comply?
13   A.    No, sir.  She went back inside, said she was going to
14   call the police.
15   Q.    Was anyone with the marshals able to figure out if she
16   called the police?
17   A.    Deputy Tillman called the Phoenix Police Department
18   which covers that area and asked if they received a call
19   from that address and they had not.
20   Q.    At some point did members of the team question
21   neighbors about who lived at the address?
22   A.    Yes.  Deputy Tillman interviewed several of the nearby
23   residents and no -- and they identified Mr. Thomas as
24   staying there and driving both the vehicles that were parked
25   in the front yard.

14

Direct - Willhite

1    Q.   After Ms. Conrad ran into the house, what did the team

2    do?

3    A.   As she went into the front -- she went in the

4    residence, deputies went to the front and knocked and

5    announced, basically the police presence and for them -- any

6    occupants inside to come to the front door with their hands

7    up.

8    Q.   Now, this knock-and-announce procedure, what does that

9    entail?

10   A.   The knock-and-announce is something that the law

11   enforcement does to announce to the occupants in the

12   residence their presence, that they're law enforcement, and

13   they need to come to the front door and comply with their

14   commands.

15   Q.   Is this sort of a quiet tap-tap at the door or could

16   you describe it to us?

17   A.   It's a very loud banging of the front door.

18   Q.   Why are the marshals so loud when they do this

19   knock-and-announce --

20   A.   To make sure any occupants inside hear.

21   Q.   What do they do after the knock-and-announce?

22   A.   There was no response.  And then they ended up taking a

23   perimeter around the residence and DUSM Faranda went back to

24   his vehicle, which is equipped with a PA system, and made

25   announcements from the PA system.

Direct - Willhite

1    Q.   This PA system, could you describe it to us, please.

2    A.   It's a -- basically like a bullhorn.  You give an

3    announcement, basically calling Mr. Thomas' name and any

4    occupants inside the residence.  Giving the residence

5    address to notify the people inside that that's the actual

6    residence that they're addressing, and giving commands to

7    come to the front door.  And it's loud enough to where you

8    can hear from the backyard and other residents in the area

9    could hear it as well.

10   Q.   Was there a response from inside the house?

11   A.   No, sir.  Ms. Conrad did go back out in the backyard

12   several times and encountered some of the deputies, and they

13   were giving her instructions to come to the front door.

14        And at one point she said she would call her lawyer

15   and she was on the phone with her lawyer and he advised her

16   not to open the door.

17   Q.   At what point did you arrive at the scene?

18   A.   I believe this started at about 1500, 3:00 in the

19   afternoon.  I arrived between 4:30 and 5:00.

20   Q.   What did you see when you arrived?

21   A.   What I observed when I first got on scene was vehicles

22   surrounding the area, law enforcement in the back, law

23   enforcement to the east and to the west of the residence.

24   DUSM Faranda giving verbal commands through the PA system.

25        I talked to DUSM Faranda and Tillman, and they

Direct - Willhite

1    briefed me on what the situation was at the time.

2    Q.   What did you decide to do when you arrived?

3    A.   I instructed DUSM Faranda to continue giving

4    announcements over the PA system.  I went around to check

5    the east and the west and make sure that no law enforcement

6    was in a dangerous situation or position.  I then instructed

7    them to start porting out windows.

8    Q.   At some point did you also give an order to evacuate

9    neighbors?

10   A.   Yes.  The neighbors to the east and the west, some of

11   them had small children, and we had -- we had concerns of

12   Mr. Thomas' criminal history, of possibly the situation was

13   escalating, so we evacuated them residents.

14   Q.   And what was the purpose of evacuating the neighbors?

15   A.   Is -- with the criminal history that Mr. Thomas has, if

16   there was any weapons involved -- bullets do go through

17   windows, doors, walls -- we didn't want to put any civilians

18   in harm's way.

19   Q.   Now, you also mentioned that you decided to port the

20   windows.

21   A.   Yes, sir.

22   Q.   What does that mean?

23   A.   Porting the windows is basically using a shotgun with a

24   bean-bag round and it is to hit in the upper sides of the

25   windows to knock off any curtains, any blinds, to gain us --

Direct - Willhite

1    law enforcement access and an advantage to possibly see the
2    occupants inside the residence.
3    Q.   All right.  Now there should be a binder there in front
4    of you.  If you take a look at that, could you please go to
5    Government's Exhibit 6.
6    A.   Yes, sir.
7    Q.   Do you recognize that?
8    A.   Yes, sir, that's the round used.
9    Q.   It's the box that holds the rounds?
10   A.   Yes, sir, it is.
11           MR. FIELDS:  All right.  Your Honor, I would move
12   its admission into evidence.
13           THE COURT:  Okay.  One second.  Are there any
14   objections?
15           MS. STEWARD:  No objection, Your Honor.
16           THE COURT:  All right.  There being no objection,
17   Government Exhibit -- what does the GS stand for, Mr.
18   Fields?
19           MR. FIELDS:  Government sentencing exhibit, Your
20   Honor, to distinguish these from trial exhibits.
21           THE COURT:  Oh, okay.  Government Exhibit GS-6 is
22   admitted into evidence.
23       (Government's Exhibit GS-6 received)
24   BY MR. FIELDS:
25   Q.   Mr. Willhite, do you see there where it says

Direct - Willhite

1   "Deployment" --
2   A.   Yes.
3   Q.   -- in the box?
4   A.   Yes, sir.
5   Q.   What does it say after "however"?
6   A.   "However, it is stressed that shot placement rather
7   than deployment range is the critical factor in determining
8   the extent of injury caused.  Shots to the head, neck,
9   thorax, heart, or spine can result in fatal or serious
10  injury."
11  Q.   So these bean bags, are they considered nonlethal arms?
12  A.   Yes, sir.
13  Q.   Even though they're considered nonlethal, can they be
14  dangerous?
15  A.   They can be, yes, sir.
16  Q.   How so?
17  A.   If they're hitting any glass, sometimes the glass will
18  project inside the residence and create small shards that
19  possibly could strike any occupant inside.
20  Q.   And on this particular case, did the team port a back
21  patio door?
22  A.   Yes, sir, they did.
23  Q.   When it was ported, what happened to the glass that
24  made up the door?
25  A.   The glass shattered and it also projected inside to the

Direct - Willhite

1    residence.

2    Q.    In your experience as a Deputy U.S. Marshal, can those

3    glass shards be dangerous?

4    A.    Yes, they can.

5    Q.    How so?

6    A.    Like I said, it is -- if it hits an occupant inside, it

7    can cause -- it can penetrate inside the skin, cause damage

8    if it hits the face area.

9    Q.    I want to show you Government's Sentencing Exhibit 5 in

10   that binder there in front of you.

11          Do you recognize that?

12   A.    Yes, sir.

13   Q.    What is it?

14   A.    That is the back patio window.

15          MR. FIELDS:  Your Honor, I move the admission of

16   Government sentencing Exhibit 5.

17          THE COURT:  Is there any objection?

18          MS. STEWARD:  No objection, Your Honor.

19          THE COURT:  There being no objection, Exhibit --

20   Government Exhibit GS-5 is admitted into evidence.

21       (Government's Exhibit GS-5 received)

22   BY MR. FIELDS:

23   Q.    DUSM Willhite, where at the residence on March 29th,

24   2018, was this photograph taken?

25   A.    Where was it taken?

Direct - Willhite

1    Q.   Yeah.

2    A.   Inside the residence.

3    Q.   And what is this photo depicting?

4    A.   The back patio glass door.

5    Q.   After it had been ported?

6    A.   Yes, sir.

7    Q.   You mentioned glass shattering.  Can you -- do you see

8    in the photograph any glass shards?

9    A.   Yes, sir, several.

10   Q.   Where do you see them?

11   A.   I see them on the floor and then also protruding into

12   the residence.

13   Q.   As a result of that glass shattering on March 29th,

14   2018, was anyone hurt?

15   A.   Yes, Ms. Conrad was.

16   Q.   How was she hurt?

17   A.   She received cuts to her face and, I believe, her

18   forehead.

19   Q.   During the stand-off that day, did your team also

20   decide to use pepper gas rounds?

21   A.   Yes, sir, they did.

22   Q.   What are pepper gas rounds?

23   A.   It's pepper balls.  Basically it's like a paint ball

24   gun on steroids.  It has a little pepper ball you shoot

25   inside and it disburses small areas of gas and pepper, and

Direct - Willhite

1    this is to get the occupants inside to exit the residence.

2    Q.   Did it work?

3    A.   No, sir.

4    Q.   At some point, did the team break and rake the windows?

5    A.   Yes, sir, they did.

6    Q.   What does break and rake mean?

7    A.   Break and rake is basically getting closer up with a

8    device and smashing the window out and opening it up, so to

9    speak, with removing the curtains and the blinds.  That was

10   a done in the front window.

11   Q.   What is the purpose of that procedure?

12   A.   That was to gain access to see inside the residence of

13   any occupants.

14   Q.   What happened after the team that performed this

15   break-and-rake procedure?

16   A.   Once they performed that, Ms. Conrad said that she

17   would come out, and she came out with her hands up and was

18   taken into custody.

19   Q.   A the time she came out, how long had the stand-off

20   been occurring?

21   A.   I believe it was about two to three hours in.

22   Q.   Did Ms. Conrad say whether anyone was inside the house?

23   A.   She did not.

24   Q.   While this stand-off was occurring, did the team

25   develop suspicions that Tramell Thomas was inside the house?

Direct - Willhite

1    A.    Yes.   Once Ms. Conrad was taken from the residence,

2    announcements continued.   Deputies from the west side of the

3    house stated that they heard noises inside the house, loud

4    banging, something possibly moving around inside.

5    Q.    Were you able to obtain a search warrant to enter the

6    house to look for Tramell Thomas?

7    A.    Yes, DUSM Faranda did so.

8    Q.    Did you call for a SWAT team?

9    A.    I did.

10   Q.    What is a SWAT team?

11   A.    A SWAT team is a special -- specialized team that

12   specializes in situations like this in barricades.   Once

13   they escalate to a certain situation, then it puts law

14   enforcement and civilians at risk.   They are the ones that

15   are equipped to come in and take care of the situation as

16   peaceful as possible.

17   Q.    What sort of risks were created by this situation?

18   A.    The risk created was the -- was the civilians in the

19   area possibly being in harm's way if anything was to happen

20   inside the residence, any rounds being shot inside the

21   residence, outside the residence.   And that created a

22   situation to where I was going to put law enforcement

23   personnel, basically my team, in harm's way if they were not

24   equipped to handle the situation basically going into

25   somebody else's backyard and not knowing the playing field.

Direct - Willhite

1    Q.   What kind of equipment and tactics does SWAT use in a

2    situation like this?

3    A.   They have heavier equipment, something that can sustain

4    like a rifle round.  They -- that's how I can explain it.

5    They have the equipment to be able to absorb that, the

6    helmets, the equipment, to be able to handle that

7    situation.

8    Q.   What happened when SWAT got to the scene?

9    A.   When SWAT got to the scene, they -- they announced as

10   well.  They went on their PA system, gave out more

11   announcements, called for Mr. Thomas, told him to come

12   outside the residence, and they got no response.

13   Q.   Did SWAT finally enter the residence?

14   A.   Yes, sir, they did.

15   Q.   What did they find inside?

16   A.   They searched the house and found Mr. Thomas in a

17   west-side back bedroom.

18   Q.   Was he brought outside to the marshals?

19   A.   Yes, sir, he was.

20   Q.   Did he say anything to the marshals when he was brought

21   outside?

22   A.   He was handed off to DUSM Faranda and he stated to DUSM

23   Faranda that he was asleep and did not hear.

24   Q.   DUSM Willhite, how long had you been with the marshal

25   service?

Direct - Willhite

1    A.    19 years, sir.

2    Q.    How many fugitives would you say you've apprehended?

3    A.    A little over hundreds to a thousand.

4    Q.    How many barricade situations have you confronted?

5    A.    At least 15.

6    Q.    In your opinion, did Thomas' refusal to come out create

7    risk that someone might be seriously hurt?

8    A.    Yes, sir.

9    Q.    How so?

10   A.    By the situation that kept escalating from -- from one

11   hour to six hours, it puts the civilians in harm's way, it

12   puts the law enforcement in harm's way if it keeps

13   escalating, it -- like I said before, if there's rounds that

14   are -- shots being fired, it could cause harm to law

15   enforcement, innocent civilians in the area.  Just causing

16   everybody to have to actuate the area to deal with the

17   situation.

18            Plus it takes local law enforcement off the streets

19   to handle everyday calls when they have to put out a

20   perimeter to not allow anybody to come in or outside the

21   scene.

22            MR. FIELDS:  Your Honor, may I have a moment?

23            THE COURT:  You may.

24   BY MR. FIELDS:

25   Q.    DUSM Willhite, just a point of clarification.  Where

Cross - Willhite

1    was Tramell Thomas found inside the house?

2    A.   I believe it was on the west side of the residence.

3    Q.   Was he hiding inside the house?

4    A.   He was in the back bedroom.  Once he was contacted by

5    SWAT, he gave himself up.

6    Q.   Do you know where he was hiding in that bedroom?

7    A.   I don't.

8         MR. FIELDS:  Thank you.  I have no further

9    questions.

10        THE COURT:  All right.  Cross-examination.

11        MS. STEWARD:  Thank you, Your Honor.

12                    CROSS-EXAMINATION

13   BY MS. STEWARD:

14   Q.   DUSM Willhite, you didn't write a report for this case,

15   did you?

16   A.   No, ma'am, I did not.

17   Q.   And to prepare for today's case, what did you review?

18   A.   I had a couple reports that DUSM Faranda had written

19   and I refreshed my recollection by his reports.

20   Q.   Okay.  So you reviewed Faranda's reports?

21   A.   I did.

22   Q.   Okay.  Were you mentioned in any of those reports?

23   A.   No, ma'am.

24   Q.   Did you review any other notes or anything like that

25   that you took?

26
Cross - Willhite

1    A.   No, ma'am, I didn't have any notes.

2    Q.   Okay.  Now, you say that during this incident, that

3    there was contact with Ms. Conrad, correct?

4    A.   Yes, ma'am.

5    Q.   And Ms. Conrad was in the backyard when she was

6    contacted originally, correct?

7    A.   Yes, ma'am.

8    Q.   And at that point, Ms. Conrad went into the home and

9    said that she was going to call the police; isn't that

10   correct?

11   A.   Yes, ma'am.

12   Q.   And she went in the home on her -- by her own volition?

13   A.   She did.

14   Q.   Okay.  And then you guys began these PA announcements

15   to come out of the home, right?

16   A.   Yes, ma'am.

17   Q.   And Ms. Conrad did not come out of the home, correct?

18   A.   Only in the backyard.

19   Q.   Right.  When I say "not come out of the home," she

20   didn't come out of the home and give herself to law

21   enforcement, did she?

22   A.   No, ma'am.

23   Q.   In fact, she went into the backyard and explained that

24   she was on the phone with her lawyer, correct?

25   A.   Yes.

Cross - Willhite

1    Q.   And her lawyer advised her to stay in the home and not

2    give herself up, correct?

3    A.   Yes.

4    Q.   Okay.  And you said that based on Thomas' criminal

5    history, you guys decided to use a shotgun with bean bags to

6    break out windows, correct?

7    A.   Yes, ma'am.

8    Q.   And what criminal history did you base that on, sir?

9    A.   What I was briefed on when I was on scene was his

10   criminal history involved conduct of -- misconduct of

11   weapons, aggravated assault.  And based on my experience, if

12   I have anything with a weapon factor in it, we're going to

13   take a little bit slower approach than just making entry

14   into the home.

15   Q.   So you're saying that Mr. Thomas' history, the bank

16   robbery included an aggravated weapon; is that what you're

17   saying, sir?

18   A.   I didn't say it's an aggravated weapon, ma'am, I said

19   aggravated assault.

20   Q.   Aggravated assault?

21   A.   Yes, ma'am.

22   Q.   And that refers to Mr. Thomas' bank robbery conviction,

23   correct?

24   A.   I believe so, yes, ma'am.

25   Q.   And in that case, sir, were you aware that Mr. Thomas

Cross - Willhite

1    was just the driver and he never went inside the bank?

2    A.   No, ma'am, I was not.

3    Q.   Okay.  You didn't know whether -- I mean, none of the

4    agents knew whether or not Thomas was in the home; isn't

5    that right?

6    A.   The information that was provided that he was in the

7    home.

8    Q.   When I say "knew," they didn't have knowledge.  They

9    were provided some information, but they didn't know for

10   sure that he was in the home; isn't that right?

11   A.   I have no idea on that.

12   Q.   When you were there, did you know for sure that he was

13   in the home?

14   A.   Just by the information I was provided that he was in

15   the home.

16   Q.   Okay.  And when you were there, you saw -- you saw Ms.

17   Conrad, correct?

18   A.   I did.

19   Q.   And she appeared to make her own decisions?

20   A.   Yes, ma'am.

21   Q.   Okay.  And then you broke out -- there was this window

22   that was broken out.  I believe it's Government Exhibit 5,

23   correct?

24   A.   The back patio?

25   Q.   Yes.  And as a result of that window being broken out,

1   some of the glass came into the home, right?

2   A.   Yes, ma'am.

3   Q.   And some of that glass cut Ms. Conrad.

4   A.   Yes, ma'am.

5   Q.   And that's after Ms. Conrad made the decision not to

6   come out of the home on her own, correct?

7   A.   I believe so.

8   Q.   Okay.  How many officers or agents were at the home

9   that day?

10  A.   I would have to give you a rough count.

11  Q.   I'll make it clear, prior to SWAT being called in.

12  A.   Yes, ma'am.  10 to 12.

13  Q.   Okay.  And after SWAT?

14  A.   20-plus.

15  Q.   20-plus.  Do you know if any of those officers were

16  armed?

17  A.   All of them were armed, ma'am.

18  Q.   Armed?  How many vehicles were there?

19  A.   I'd say 15-plus.

20  Q.   Okay.  And there were no civilians hurt on this day,

21  other than Ms. Conrad, correct?

22  A.   Yes, ma'am.

23  Q.   No law enforcement hurt?

24  A.   None.

25  Q.   Sir, would you consider it reasonable to have a fear of

                        Cross - Willhite

1    such a show of force, 20-plus agents, police officers?

2    A.   No, ma'am.

3    Q.   You wouldn't consider it reasonable to be fearful of

4    those agents?

5    A.   No, ma'am.

6    Q.   Why is that, sir?

7    A.   It's the situation that you put yourself in.  There

8    wasn't that many at the beginning of the situation.  It

9    escalated by the actions that were taken upon us that Ms.

10   Conrad did.

11   Q.   Okay.  So initially, there were 12 agents, correct?

12   A.   Yes, ma'am, but they cannot all be seen at one time.

13   Q.   But there were 12 agents, right?

14   A.   Yes, ma'am.

15   Q.   And Ms. Conrad, you know, having seen some of these

16   agents, decided not to come out of the home, right?

17   A.   Yes, ma'am.

18   Q.   And you are saying you don't believe that it was

19   reasonable for her to be fearful of those agents?

20   A.   Not when they explained themselves the reason why they

21   were there.

22   Q.   Did they -- okay.  And do you believe that after the 20

23   or so agents arrived, that she might have been fearful?

24   Especially --

25   A.   I did --

Cross - Willhite

1    Q.   I'm sorry, I apologize, sir.

2    A.   It's -- I'm not saying that probably -- it was at least

3    12 of them when the front window was ported out, and that's

4    when she decided to give herself up.

5    Q.   Okay.  So 12 agents, plus your windows being broken in,

6    is that something that might be fearful to someone of . . .

7    A.   I'd say it could be.

8    Q.   Okay.  And this arrest, was it due to some probation

9    violation or some missed hearings or something like that on

10   behalf of Mr. Thomas?

11   A.   It was a probation violation warrant.

12   Q.   A warrant?  Do you know whether he missed any of his

13   hearings or any of that information?

14   A.   I wasn't aware of that.

15   Q.   Do you know what the basis of that probation violation

16   warrant was?

17   A.   No, ma'am.

18   Q.   Okay.  And you don't know whether it was a violent

19   probation violation?

20   A.   No, ma'am.

21   Q.   Okay.  Were you aware that Mr. Thomas had a court date

22   about 13 days after this situation?

23   A.   No, ma'am.

24         MS. STEWARD:  Okay.  Can I have a second, Your

25   Honor?

                              Redirect - Willhite

1              THE COURT:  You may.

2              MS. STEWARD:  Okay.  No further questions.

3              THE COURT:  All right.  Redirect.

4                         REDIRECT EXAMINATION

5    BY MR. FIELDS:

6    Q.   DUSM Willhite, you were asked a lot of questions about

7    fear.  When the marshals are making announcements to the

8    house, what do they say in those announcements?

9    A.   When they make announcements knocking at the front

10   door, they'll say, "Police, U.S. Marshals.  Any occupants in

11   the residence, come out to the front door with your hands

12   free and clear of all objects."

13   Q.   When the marshals are trying to arrest a fugitive, do

14   they try to do so while minimizing the risk?

15   A.   Yes, sir.

16   Q.   How do they try to minimize the risks?

17   A.   One is the knock-and-announce contact that they have.

18   Explain themselves why they're here, meaning if they have a

19   warrant for a certain individual, they'll call that

20   individual's name out, and have them come to the front door,

21   hands free and clear of all objects.

22   Q.   Despite the efforts of the marshal service to minimize

23   risk, were risks created in the situation on March 29th,

24   2018?

25   A.   Yes.

Redirect - Willhite

1    Q.   In your experience, how did those risks get created?

2    A.   They're created by the noncompliance of the occupants

3    inside the residence.  It kept escalating.  The

4    announcements were repeated over and over.  As a supervisor,

5    I always have them repeat it over and over continuously so

6    there's no question or doubt that the occupants are well

7    aware of why we're there and what we're there for.

8    Q.   In your experience, do you think it was feasible for

9    anyone to sleep through those announcements and the events

10   that happened --

11   A.   No, sir.

12   Q.   -- that day?

13              MR. FIELDS:  No further questions, Your Honor.

14              THE COURT:  All right.  Supervisor Willhite, thank

15   you for your testimony.  You're excused.  You may step down.

16              THE WITNESS:  Thank you, sir.

17              THE COURT:  Does the Government have any additional

18   witnesses on this issue?

19              MR. FIELDS:  No, Your Honor.

20              THE COURT:  All right.  Does the defendant have any

21   witness on this issue?

22              MS. STEWARD:  No, Your Honor.

23              THE COURT:  All right.  All right.  I'm ready to

24   rule on this specific offense characteristic.  I find that

25   the Government has proven by a preponderance of the evidence

Redirect - Willhite

1    that the two-level enhancement in the offense level is

2    appropriate in regards to this defendant under Section 3C1.2

3    of the guidelines.  I find there's ample evidence from which

4    I can conclude that the defendant engaged in conduct which

5    resulted in a reckless endangerment during flight.

6            In addition, I conclude that the Government has met

7    its burden of establishing by a preponderance of the

8    evidence, as articulated by the Tenth Circuit in the *Gray*

9    case, that, "A defendant acts recklessly for purposes of

10   this enhancement when he was aware of the risk created by

11   his conduct and the risk was of such a nature and degree

12   that to disregard that risk constituted a gross deviation

13   from the standard or care that a reasonable person would

14   exercise in such a situation."

15           Specifically I find that the evidence that I just

16   heard that supports that finding is the repeated failure

17   over a course of nearly three hours of the defendant to

18   respond to the directions and commands of the U.S. Marshals

19   to come out of the residence with hands free and clear of

20   all objects.

21           The unrebutted testimony is that at the conclusion

22   of this incident the defendant informed the U.S. Marshals

23   that he was sleeping in the west side bedroom of the home.

24   I find that it is completely incredible and not believable

25   that a defendant could sleep through such an event, a

35

Redirect - Willhite

1    three-hours' long engagement in which PA announcements and

2    repeated banging on the door, shotgun filled with bean bags

3    breaking glass doors and windows, in my view, it's

4    impossible for someone to sleep through something like that.

5         I find that the defendant intentionally refused to

6    heed the U.S. Marshals' commands to exit the residence with

7    hands free and clear of all objects, and that this failure

8    to respond to repeated commands, as the unrebutted testimony

9    has shown over the course of nearly three hours, created a

10   heightened risk of serious injury to civilians in the

11   neighborhood and to law enforcement.

12        And as we saw that, in fact, that risk came to be

13   in that Ms. Conrad, herself, was injured from the glass

14   shattered from the glass door that was ported, as I

15   understand that term to be used, through the use of shotguns

16   armed -- that were -- that contained bean bags.

17        So for all those reasons, I find that that

18   two-level enhancement under guideline 3C1.2 is appropriate

19   and has been established by a preponderance of the evidence.

20        I should have noted earlier that no objections to

21   the report were filed by the Government.

22        Let me next turn to the objections that were filed

23   by prior counsel for the defendant at ECF 348.  The first of

24   those objections was an objection to the inclusion of the

25   parties' respective sentencing enhancements in the offense

36
Redirect - Willhite

1    conduct portion of the report at paragraphs 7 through 58.

2          I am going to sustain this objection in part.  I

3    agree with the defendants that the parties' legal arguments

4    about the facts should not be included in this section of

5    the report, especially because the sentencing statements are

6    already part of the Court's record by virtue of their

7    separate filings, and also because, as prior defense counsel

8    points out, the report in its final form will follow the

9    defendant throughout his stay with the Bureau of Prisons.

10         With this in mind, I find it inappropriate to have

11   counsel's arguments and contentions, some of which on both

12   sides are quite inflammatory, be contained in the report as

13   facts.  At least in this courtroom, facts continue to

14   matter.

15         I am, therefore, going to order that the probation

16   officer prepare an amended final presentence report which

17   has deleted from it the following paragraphs:  8 and 9, 22

18   through 44, 48 and 49, and 53 through 58.

19         Given this ruling and the respective paragraphs

20   which will be deleted from the amended final report,

21   defendant's objections to -- defendant's objections 2 and 3

22   are overruled as moot.

23         All right.  I'm going to next turn to objection No.

24   4, to the statement in paragraph 63 of the report that the

25   scheme was devised by -- the criminal fraud scheme that was

Direct - Ennis

1    indicted by the grand jury was devised by Ms. Carr and Mr.

2    Thomas.  All right, Ms. Paluch.

3              MS. PALUCH:  Thank you, Your Honor.  The United

4    States calls Special Agent Sandra Ennis.

5              THE COURT:  Agent Ennis, if you'll come forward.

6              COURTROOM DEPUTY:  Please raise your right hand.

7               SANDRA ENNIS, GOVERNMENT WITNESS, SWORN

8              COURTROOM DEPUTY:  Okay.  Please be seated.  You

9    may need to move your chair up to the microphone.

10             And please state and spell your name for the

11   record.

12             COURTROOM DEPUTY:  My name is Special Agent Sandra

13   Ennis.  Sorry, pull this chair up.  The spelling

14   S-a-n-d-r-a, last name Ennis, E-n-n-i-s.

15             MS. PALUCH:  May I proceed, Your Honor?

16             THE COURT:  You may.

17                       DIRECT EXAMINATION

18   BY MS. PALUCH:

19   Q.   Good morning, Agent Ennis.

20   A.   Good morning.

21   Q.   Are you the case agent for this matter?

22   A.   Yes, I am.

23   Q.   And did you testify at trial as to your investigation?

24   A.   Yes, I did.

25   Q.   How were the Social Security numbers of the individuals

Direct - Ennis

1    listed on the applicants obtained?

2    A.   Heather Carr obtained these Social Security numbers

3    through her employment at Wells Fargo Bank.

4    Q.   When did Heather Carr first use her Wells Fargo access

5    to search for an individual's Social Security number that

6    you tied to this scheme?

7    A.   It was July 3d, 2010.

8    Q.   Before the August date, start date, of 2010 and listed

9    in the superseding indictment?

10   A.   That is correct.

11   Q.   And whose Social Security number was she searching?

12   A.   Ismael Omar.

13   Q.   And who is Ismael Omar?

14   A.   Mr. Ismael Omar was a friend of the defendant.

15   Q.   And how -- and did you uncover any associations between

16   Ismael and the defendant and anyone else?

17   A.   Yes.  Mr. Omar met the defendant through the

18   defendant's cousin, Michael Cox.

19   Q.   Did you interview Mr. Omar?

20   A.   Yes, I did.

21   Q.   And how many times did you interview him?

22   A.   I interviewed him twice.

23   Q.   And did you talk to him about students financial aid?

24   A.   Yes.  Mr. Omar told me that he, Mr. Cox, and the

25   defendant would sit around and devise ways to commit fraud

Direct - Ennis

1    and that the --

2              THE COURT:  One second.  Oh, I thought you were

3    done.  I'll let you finish your answer and then I'll

4    interject what I was going to say.  Go ahead.

5              THE WITNESS:  Okay.  Mr. Omar informed me that the

6    defendant told him that they could commit financial aid

7    fraud as a way to earn money and that the defendant knew how

8    to do this.

9              THE COURT:  All right.  Agent Ennis, as you, better

10   than anyone else knows, there are four defendants in this

11   case.  So instead of just saying "the defendant," let's make

12   the record clear and either say "Mr. Thomas or "Defendant

13   Thomas," if, in fact, you're referring to the defendant

14   Thomas.

15             THE WITNESS:  Okay.  Thank you.

16             THE COURT:  All right.

17   BY MS. PALUCH:

18   Q.   So before -- let's back up a little bit.

19             Did he -- did you ask him about whether he,

20   himself, had ever applied for financial aid?

21   A.   Yes.  Mr. Omar informed me that he had applied for

22   federal student aid in April of 2010.

23   Q.   And was it your first interview in which he related

24   this conversation between the defendant and Mr. Cox?

25   A.   That is correct.

Direct - Ennis

1  Q.   And during your second interview with him, did you give

2  him an opportunity to review the report of his first

3  interview?

4  A.   Yes.   When I interviewed Mr. Omar the second time, he

5  informed me that there was an error in the report.   That the

6  conversation he had with the defendant about committing

7  federal student aid fraud did not occur in October 2010 as

8  the report indicated.   This was not possible because Mr.

9  Omar was in prison at the time.

10      Mr. Omar informed me that the conversation with

11  Defendant Thomas would have occurred between March 2010 and

12  June 2010.

13      MS. PALUCH:   And, Your Honor, at this time, I need

14  to make one correction for the record, and that is ECF 357

15  on page 4, we stated, consistent with the first report, that

16  the conversation had occurred in October of 2010.   The

17  correct time frame was, as the agent testified, March

18  through June of 2010.

19      That information was provided to the defense prior

20  to trial in a memorandum of interview, and the Bates numbers

21  were 597 to 598 MOI.

22      THE COURT:   All right.   I believe you filed a

23  notice of that correction at some point, didn't you?

24      MS. PALUCH:   Correct, Your Honor.

25      THE COURT:   It's hard to keep track of everything

Direct - Ennis

1   that's been filed in this -- see, we're -- I think, aren't

2   we over 600 or something in this case?

3            MS. PALUCH:  Getting close.

4            THE COURT:  Okay.  One second.  So March through --

5   March through June of 2010 as opposed to October?

6            MS. PALUCH:  That's correct, Your Honor.

7            THE COURT:  Okay.  Go ahead.

8            MS. PALUCH:  Thank you.

9   BY MS. PALUCH:

10  Q.   Were false applications for student aid actually filed

11  in Ismael Omar's name?

12  A.   Yes.  The false applications for federal student aid

13  were filed for Mr. Omar on -- in December 2010 and May 2011.

14  Q.   And, again, where was Mr. Omar when those were filed?

15  A.   Mr. Omar was in prison with the Colorado Department of

16  Corrections.

17  Q.   And what address was used on the false applications

18  submitted in Mr. Omar's name?

19  A.   An address of 3820 Radiant Drive was used.

20  Q.   Did the Government attempt to secure Mr. Omar's

21  appearance as a witness in this case at trial?

22  A.   Yes, they did.  Mr. Omar was interviewed prior to

23  trial.  Mr. Omar informed us that he would refuse to answer

24  any questions if he was put on the stand.

25  Q.   Now, you mentioned -- or you testified that the Radiant

Direct - Ennis

1    Drive address was used on Mr. Omar's application.  Were

2    other false applications submitted using the referenced

3    address?

4    A.   Yes.  An application for Vanessa Lopez was used.

5    Q.   And did you interview Ms. Lopez?

6    A.   Yes, I did.  I had left a business card at her address.

7    Ms. Lopez contacted me claiming to be a victim of identity

8    theft.

9    Q.   Did you eventually meet with her?

10   A.   Yes.  I met with Ms. Lopez in approximately October of

11   2015.

12   Q.   And what did she say about the identity theft that she

13   had referenced?

14   A.   Ms. Lopez said that she had met Defendant Thomas in

15   2010.  The two had dated for approximately nine months to a

16   year.  The defendant knew she didn't have a GED and the two

17   of them went to Pikes Peak together to apply for federal

18   student aid.  That the defendant --

19            THE COURT:  Ms. Ennis, please.  Mr. Thomas --

20            THE WITNESS:  Sorry.  Mr. Thomas, okay.

21            Mr. Thomas moved Ms. Lopez out of the way and he

22   started filling out the forms while Ms. Lopez provided her

23   personal identifying information.

24   BY MS. PALUCH:

25   Q.   And by moving her out of the way, this occurred at

Direct - Ennis

1   Pikes Peak Community College?

2   A.   Yes, it did.

3   Q.   Okay.  And did she later learn that her application for

4   federal student aid had been submitted?

5   A.   Yes, she did.  She didn't think that federal student

6   aid was disbursed in her name because she said she never

7   attended any courses.  She also said that she didn't benefit

8   from any of the federal student aid money.

9   Q.   Did she say she had -- did she have a conversation with

10  Defendant Thomas about student loans taken out in her name?

11  A.   Yes.  Ms. Lopez received a call from Defendant Thomas

12  and it was then she informed him that she had been contacted

13  by the U.S. Department of Education regarding loans.  The

14  Defendant Thomas informed her that he took out loans in her

15  name because he needed money and that the Defendant Thomas

16  told her to tell the U.S. Department of Education -- to tell

17  the U.S. Department of Education that the loans were hers

18  and not his.  And that the Defendant Thomas said he would

19  repay her any money owed and she could make payments on the

20  loan.

21  Q.   And did she tell you what her response was to that?

22  A.   Ms. Lopez told Defendant Thomas that she was upset

23  about this because she, herself, was going through hard

24  times financially and that this would put a bad mark on her

25  credit.

44

Direct - Ennis

1    Q.   When you were interviewing Ms. Lopez, at first was she

2    willing to give you the name of her ex-boyfriend?

3    A.   No, she was not.

4    Q.   And why was that?

5    A.   Ms. Lopez was afraid of the Defendant Thomas because

6    she was aware of her -- she was in fear for her safety and

7    was aware of what he or her family could do to her.

8    Q.   Did she say anything about when it was that she

9    actually learned his real name?

10   A.   Ms. Lopez said that the Defendant Thomas and her had

11   dated for an entire month before she had learned his name --

12   his true name.

13   Q.   Did Ms. Lopez say anything about threats made by the --

14   by Defendant Thomas?

15   A.   Yes.   There were -- on occasion where she had spoken to

16   Defendant Thomas, Defendant Thomas told her that he would

17   kill any man coming and going from her house, and those men

18   would never be seen from again.

19   Q.   Did she know about his criminal history?

20   A.   Yes, she did.

21   Q.   What did she know?

22   A.   Ms. Lopez knew that Defendant Thomas had served

23   approximately 10 years for robbery.

24   Q.   Did she tell you what she believed would happen if the

25   defendant knew about this investigation?

Direct - Ennis

1    A.    Yes.  Ms. Lopez said that Defendant Thomas would never

2    be seen from again and he would not go back to prison

3    without a fight.

4    Q.    Did the Government attempt to secure Ms. Lopez's

5    appearance as a witness in this case?

6    A.    Yes.  Ms. Lopez was served a subpoena to testify at the

7    grand jury.  She failed to appear.  And then multiple

8    attempts were made to locate Ms. Lopez prior to trial and we

9    were unsuccessful in locating her.

10   Q.    Were there any other false applications submitted using

11   the Radiant Drive address?

12   A.    Yes.  There was applications filed in the name of

13   Christine Duncan.

14   Q.    And when were those submitted?

15   A.    Applications for Christine Duncan were submitted in

16   December 2010 and May 2011.

17   Q.    And did she testify at trial?

18   A.    Yes, she did.

19   Q.    And did she state whether she authorized the filing of

20   those applications in her name?

21   A.    Yes, she said she did not authorize the use of her name

22   for student loans.

23              MS. PALUCH:  Your Honor, I will stop here.  This is

24   the Government's evidence that we would submit that supports

25   the finding that not only was Heather Carr using her

Direct - Ennis

1    Accurint database in July of 2010 prior to the start of the

2    conspiracy as alleged, but information from Mr. Omar

3    indicated that he had a conversation with the defendant

4    about committing student fraud between March and June of

5    2010.  And this, along with Ms. Lopez's statements, we

6    believe supports the Government's assertion that this scheme

7    was devised by the Defendant Thomas and Defendant Carr, and

8    we'd ask that you deny or overrule the defendant's objection

9    on that point.

10          THE COURT:  All right.  Now, thank you for that.

11   Instead of having Agent Ennis come back to the witness stand

12   two more times to deal with the other subject matter, why

13   don't we run through all those and then I'll take up those

14   portions of her testimony with respect to the objections

15   that they relate to, you know, as it comes up.

16          MS. PALUCH:  Certainly, Your Honor.

17          THE COURT:  So just tell me which is the next issue

18   or objection.

19          MS. PALUCH:  I apologize.  With the Court's

20   permission, we would proceed to the loss calculation.

21          THE COURT:  Okay.  Go ahead.

22   BY MS. PALUCH:

23   Q.   All right.  Did you testify, Agent Ennis, at trial as

24   to the amount of loss suffered by the various schools and

25   the Department of Education?

Direct - Ennis

1    A.   Yes, I did.

2    Q.   And can you please remind us today how you calculated

3    the loss in this case.

4    A.   Yes.   Through the course of my investigation, I

5    identified approximately 181 false free applications for

6    federal student aid.   These are commonly referred to as a

7    FAFSA.   In review of these FAFSAs, I was able to determine

8    how much money in loans and grants the U.S. Department of

9    Education disbursed to the identified schools.

10        Once the identified schools took out their portion

11   for tuition and fees, any remaining funds were disbursed to

12   the purported students in the form of a Higher One debit

13   card.   It was through my review of the records that I was

14   able to determine the loss in this case.

15   Q.   Okay.   Did you create a chart showing the amount of

16   loss in this case for use at trial?

17   A.   Yes, I did.

18   Q.   And was that chart marked as Government's Trial Exhibit

19   72?

20   A.   Yes, it was.

21   Q.   I'd like to show you what's -- if you could look in

22   your book, Agent Ennis, to what's been marked as GS, for

23   Government's sentencing, Exhibit 72-1.

24   A.   Okay.

25   Q.   Can you identify that chart -- or that exhibit.

Direct - Ennis

1    A.    Yes.   This is Government Trial Exhibit 72, with the

2    addition of a column to the far right side.

3    Q.    Okay.   And is it marked as 72-1?

4    A.    Yes, it is.

5          MS. PALUCH:   And for the record, Your Honor, this

6    same chart was submitted to the Court as attachment 4 to the

7    Government's position -- sentencing position on loss,

8    restitution and forfeiture, and that's ECF 341.

9          THE COURT:   All right.   Thank you.

10         MS. PALUCH:   And I would move to admit this exhibit

11   at this time.

12         THE COURT:   Any objection?

13         MS. STEWARD:   No objection, Your Honor.

14         THE COURT:   There being no objection, Government

15   Exhibit 72-1 is admitted into evidence.

16       (Government's Exhibit 72-1 received)

17         MS. PALUCH:   One second, Your Honor, if I could.

18         THE COURT:   Sure.

19   BY MS. PALUCH:

20   Q.    Now, you indicated the difference between this and the

21   sentencing exhibit is the far right column.   Could you

22   explain the heading on the far right column.

23   A.    Yes.   The heading is called Thomas Associations.

24   Q.    Okay.   And what appears under that heading?

25   A.    It is a key explaining the entries in the remainder of

Direct - Ennis

1    this spreadsheet.

2    Q.   Okay.  Before we get to that, let's step back for a

3    moment to your investigation.  What did your -- what did

4    that investigation reveal as to the scope of the criminal

5    activity that this defendant agreed to jointly undertake?

6    A.   This investigation revealed that Defendant Thomas was

7    involved directly through the entire course of this scheme

8    and that Defendant Thomas knew Heather Carr -- Defendant

9    Heather Carr was obtaining Social Security numbers through

10   the course of her employment.

11   Q.   Okay.  So if you could break that down a little bit

12   when you talk about every aspect of the scheme.  What were

13   some of those aspects?

14   A.   The investigation disclosed that Defendant Thomas was

15   obtaining addresses that were used in the scheme.  He was

16   assisting in the filing of free applications for federal

17   student aid.  Defendant Thomas was using cash -- or using

18   the Higher One debit cards to obtain cash, and Defendant

19   Thomas was assisting in completion of the homework.

20   Q.   And when you say "obtaining addresses," why were

21   addresses so important, or were they?

22   A.   Addresses were very important.  Multiple addresses had

23   to be used so that the Higher One debit card could be sent

24   to multiple addresses and not arising suspicion in, say,

25   only being delivered to one address.

Direct - Ennis

1    Q.   Okay.  I'd like to direct your attention back to

2    Government Exhibit 72-1.  And we're going to start on the

3    left-hand side and have you explain the columns.  And if we

4    could start, first, the headings in blue.

5    A.   Yes.  The headings in blue are the schools listed in

6    alphabetical order.  These were the schools identified in

7    the investigation as being impacted by the scheme.

8    Q.   And then under the blue headings, what appears?

9    A.   Below the blue headings are 91 applicants who had

10   federal student aid disbursed in their name.

11   Q.   And why the difference between the 181 false

12   applications you testified to as compared to the 91 on this

13   chart?

14   A.   Out of the 181, 91 individuals had federal student aid

15   disbursed in their name.

16   Q.   Okay.  If we could go to the next block entitled

17   Disbursals to School by ED.  Could you explain that, please.

18   A.   Yes.  This breaks down the loans and grants that were

19   disbursed to the schools by the U.S. Department of

20   Education.

21   Q.   And the next block entitled Adjustments Returned by

22   School, please explain.

23   A.   At times when an applicant would withdraw or fail out

24   in the courses, the school was required to return money to

25   the U.S. Department of Education.  This column indicates

Direct - Ennis

1     money returned to the department.

2     Q.    And how did those amounts that were returned to the

3     department factor into your loss calculation in this case?

4     A.    These -- these were money returned by the school.  At

5     times the school had to take money out of their own coffers

6     to pay back money to the Department of Education because

7     money had already been disbursed to the students.  So this

8     reflects a loss to the schools.

9     Q.    Okay.  Your next column is entitled Losses.  Could you

10    please explain.

11    A.    Yeah.  This is just the breakdown of loss to the U.S.

12    Department of Education and to the identified schools.

13    Q.    FSA Refunds, please.

14    A.    So when the U.S. Department of Education disburses

15    money to the school, the school takes their portion for

16    tuition and fees, and any remaining amount goes to an

17    applicant.  These numbers here represent money that was

18    disbursed in the form of a Higher One debit card.

19    Q.    Then your final column that you've testified to about

20    Thomas' Associations, could you please go through the key

21    and explain what we're seeing here on this --

22    A.    Yes.  So IP stands for internet protocol activity

23    coming from the Kaibab address, during the month and year at

24    which the Defendant Thomas resided at the Kaibab address

25    with Defendant Heather Carr and their children.

Direct - Ennis

1    Q.   Okay.  If you could go on to the letter A.

2    A.   A stands for addresses that were tied to Defendant

3    Thomas and/or the other three co-conspirators in this

4    investigation.

5    Q.   And the letters DC.

6    A.   DC stands for a debit card.  Debit card being one of

7    the debit cards that was found in the possession of

8    Defendant Thomas at the time of his arrest in August 2012.

9    Q.   Final reference is to the letter C.

10   A.   C stands for an Accurint query conducted by Defendant

11   Heather Carr.

12   Q.   Is there a C listed for every single entry at issue in

13   this case?

14   A.   Yes.

15   Q.   Okay.  So let's focus on the address entries.  And what

16   I'd like to do now is have you explain how each address is

17   tied to Defendant Thomas or to one or more of the other

18   three defendants in this case.

19   A.   Okay.

20   Q.   And what we'll do is start with -- the first dash

21   there, you will see it says PMB, Diaz.  Can you explain what

22   that reference is?

23   A.   Yes, this was a private mailbox location.  This address

24   was used in the submission of false applications for federal

25   student aid.  This private mailbox was opened up by

Direct - Ennis

1    Codefendant Diaz -- Mercedes Diaz.

2    Q.   And who is Diaz again?

3    A.   She was one of the codefendants in this matter.

4    Q.   Okay.  The next address that we see is Dragoon Circle.

5    What is the connection of that address to this case?

6    A.   1161 Dragoon Circle is an address where Codefendant

7    Mercedes Diaz resided, and there was also a private mailbox

8    address used for this applicant.  And investigation

9    disclosed that Mercedes Diaz opened up this private mailbox.

10   Q.   Okay.

11             THE COURT:  Ms. Paluch, it's not your intention to

12   go through every entry in the spreadsheet, is it?

13             MS. PALUCH:  You know, Your Honor, there are 13

14   addresses that we tie to the defendant.

15             THE COURT:  Oh, you're going to go through the

16   addresses.  Okay.

17             MS. PALUCH:  To -- just the 13 addresses --

18             THE COURT:  Right.

19             MS. PALUCH:  -- and we did confer with counsel

20   before to confirm that they are contesting.

21             THE COURT:  I understand.  Okay.  Now I understand

22   where you're going.

23             MS. PALUCH:  Right.

24             THE COURT:  I just wanted to confirm you weren't

25   going --

Direct - Ennis

1        MS. PALUCH:  Not through all 91, Your Honor.

2        THE COURT:  -- through all the --

3        MS. PALUCH:  Yeah, we so we have 11 more to go.

4        THE COURT:  All right.

5    BY MS. PALUCH:

6    Q.   Now, in that same entry, you see a DC, and it states

7    mailed to PMB, Swiss.  Can you explain that entry?

8    A.   Yes, this entry actually should reflect an A.  This was

9    a private mailbox opened up by Terrel Smith.  Terrel Smith

10   is known as Swiss.

11   Q.   And how is it that you know that Terrel Smith is known

12   as Swiss?

13   A.   We know this through law enforcement contact, and we

14   also determined Terrel Smith was Swiss based on text

15   messages recovered from the defendant's broken -- Defendant

16   Thomas' broken phone.

17   Q.   And I believe we jumped over:  How is Terrel Smith

18   connected to anyone in this scheme?

19   A.   Smith -- Terrel Smith is connected to the Defendant

20   Thomas.

21   Q.   How so?

22   A.   We know this from the text messages recovered from the

23   broken phone.

24   Q.   That meaning they're friends or what was --

25   A.   They are friends.

Direct - Ennis

1    Q.    Okay.  Let's go back to the chart.  The next entry we

2    see is Lexington Village.  What is the connection with that

3    address?

4    A.    Lexington village was the address of Makayla Grant.

5    Makayla Grant was a friend of co-conspirator Heather Carr.

6    Q.    Okay.  Now, under the Lexington Village, you see two

7    lines there.  What are those for?  You have James -- Deanna

8    James and Martin -- Sharon Martin.

9    A.    Yes.  Those individuals ultimately did not have aid

10   received in their name.

11   Q.    Okay.  So those entries actually shouldn't have been on

12   the chart; is that right?

13   A.    That is correct.

14   Q.    So the next new address that we see here is Meadow Oak.

15   Can you testify as to what connection, if any, Meadow Oak

16   has to this case?

17   A.    Yes.  Meadow Oak is the address of Kimmisha Mullett.

18   Kimmisha Mullett is a friend of Defendant Thomas.  Kimmisha

19   Mullett testified at trial that Defendant Thomas asked her

20   to use her address for the receipt of federal student aid

21   mail.  And there were text messages recovered from Defendant

22   Thomas' broken phone between Ms. Mullett and Defendant

23   Thomas.

24   Q.    Okay.  The next new address we see, there's an A, and

25   it says tied to Lola Thomas.  Who is Lola Thomas?

Direct - Ennis

1   A.   Lola Thomas is the former wife of Defendant Thomas.

2   Q.   Okay.  And the assertion there is that debit cards were

3   being mailed to that address; is that --

4   A.   Well, it was a friend of Lola Thomas.  Her name is Dora

5   Davis.  Dora Davis' address was also used for the receipt of

6   federal student aid mail and text messages on the

7   defendant's broken phone -- Defendant Thomas' broken phone.

8   There were text messages between Defendant Thomas and Lola

9   Thomas about the use of the Dora Davis address.

10  Q.   So we're still on the first page, and the next new

11  address is Blackhawk address, Sanders.  Can you explain

12  that?

13  A.   Yes.  Matthew Sanders resided at the Blackhawk address.

14  Matthew Sanders is the stepbrother of Defendant Heather

15  Carr.  Matthew Sanders met Defendant Thomas while in prison

16  in Colorado Department of Corrections.

17  Q.   Did you interview Mr. Sanders?

18  A.   Yes, I did.

19  Q.   Did he acknowledge receiving mail related to student

20  financial aid?

21  A.   Yes, he did.

22  Q.   And what did he say?

23  A.   He said when he received federal student aid mail, he

24  would throw the mail away.

25  Q.   Did any of the debit cards mailed to Sanders' Blackhawk

57

Direct - Ennis

1    address end up in the defendant's possession?

2    A.    Yes.  I believe six debit cards were in the Defendant

3    Thomas' possession at the time of his arrest in August 2012.

4    Q.    Okay.  Moving on to page 2 of this exhibit.  And the

5    next new address that we see is -- highlighted here is the

6    4630 South 21st Street, it says Green.  Can you please

7    explain?

8    A.    4630 South 21st is the address where Defendant Marcelle

9    Green resided.

10   Q.    And, again, for the record, Marcelle Green?

11   A.    Marcelle Green is a defendant in this matter.

12   Q.    Okay.  Under that entry is the address of Rushmore, and

13   it says Pickens.  Can you explain that?

14   A.    Yes.  1418 Rushmore was the address of LaTanya Pickens.

15   LaTanya Pickens was the friend of Defendant Heather Carr.

16   We also know that 1418 Rushmore was used by Defendant Thomas

17   when he applied for his own federal student aid and

18   Defendant Thomas also used this address on an El Paso

19   Sheriff County booking form dated January 28th, 2012.

20   Q.    Okay.  The next address we see is 1915 East Mobile

21   Lane, Green.

22   A.    Yes, 1915 East Mobile Lane is the deceased Marcelle --

23   Defendant Marcelle Green's deceased uncle, Jimmy.  Defendant

24   Marcelle Green advised that the address was used for receipt

25   of fraudulent federal student aid mail.

Direct - Ennis

1    Q.   Okay.  Moving on to page 3, there is references to

2    Radiant Drive.  And have you already testified about the

3    Radiant Drive address?

4    A.   Yes, I have.

5    Q.   And, for the record, who resided at that address?

6    A.   Defendant Thomas resided at the address, along with

7    Christine Duncan.

8    Q.   Okay.  Under that, we see a Rice address with Cox.  Can

9    you explain that?

10   A.   1063 Rice was the address of Defendant Thomas' cousin,

11   Michael Cox.

12   Q.   And was Michael Cox interviewed?

13   A.   Yes, he was.

14   Q.   And what did he say?

15   A.   Mr. Cox advised that federal student loan mail would be

16   delivered to the house and any of that mail he would return

17   to the letter carrier.

18   Q.   In fact, were debit cards that had been mailed to

19   Michael Cox's Rice Drive address found in the defendant's

20   possession?

21   A.   Yes.

22   Q.   Approximately how many?

23   A.   I believe two debit cards.

24   Q.   Okay.  And after the Rice Drive address, can you scroll

25   through the rest to confirm that we've already explained the

Direct - Ennis

1    connection.

2    A.   Yes, we have.

3    Q.   Okay.  I'd like you to look at the last page of this

4    exhibit.

5         On the last page, did you total the loss suffered

6    by the Department of Education as a result of this case?

7    A.   Yes, I did.

8    Q.   And what is that amount?

9    A.   The loss to the Department of Education was -- the

10   total loss?

11   Q.   Yes, ma'am.

12   A.   To U.S. Department of Education and schools or just

13   Department of Education?

14   Q.   The total loss reflected at the very bottom of the

15   chart.

16   A.   The total loss was $563,890.85.

17   Q.   Okay.  And of that amount, how much was paid to the

18   conspirators in the form of refunds or debit cards?

19   A.   $419,218.50.

20   Q.   And is that the amount that appears to the right of the

21   total?

22   A.   Yes.

23   Q.   Okay.  And the difference between those two amounts,

24   what happened to the difference?

25   A.   The difference would be the portion that the schools

Direct - Ennis

1    took out for tuition and fees.

2    Q.   Okay.   And the loss to the schools, is that reflected

3    on this chart as well?

4    A.   Yes.

5    Q.   And what is that amount?

6    A.   $72,540.85.

7    Q.   And it's not reflected on this chart, but had aid been

8    disbursed on all 181 false applications, how much would have

9    been paid out?

10   A.   1.3 million.

11   Q.   Are you familiar with plea agreements reached for

12   Codefendants Carr, Diaz and Green?

13   A.   Yes, I am.

14   Q.   And did those plea agreements list a different loss

15   amount?

16   A.   Yes, they did.

17   Q.   And what accounts for the difference between the two

18   losses?

19   A.   In preparing these exhibits for trial, I learned that

20   $1,403 was inadvertently left off the spreadsheet.

21   Q.   Okay.

22          MS. PALUCH:   Your Honor, that is the presentation

23   the Government has on the loss amount --

24          THE COURT:   Okay.

25          MS. PALUCH:   -- which is the same amount we are

61
Direct - Ennis

1    seeking in restitution.

2         I would seek guidance from the Court at this point

3    if you would like me to proceed to evidence on the

4    forfeiture or --

5         THE COURT:  We're going to deal with forfeiture, as

6    I said before, at the end of the hearing.  I don't think I

7    need to take any more evidence on that.  I thought you had

8    told me that Agent Ennis was also going to testify on the

9    known minor role downward adjustment as well.

10        MS. PALUCH:  Yes, Your Honor.

11        THE COURT:  Okay.  Why don't you go to that.

12        MS. PALUCH:  Okay.  Okay.

13   BY MS. PALUCH:

14   Q.   In the course of your investigation, were Defendant

15   Heather Carr's bank records reviewed?

16   A.   Yes, they are.

17   Q.   In those records, did you find evidence of payment from

18   Carr to an attorney?

19   A.   Yes, I did.

20   Q.   I'd like you to look in your exhibit look -- exhibit

21   book at Government's Sentencing Exhibit 2.  When you get

22   there, could you please identify that exhibit.

23   A.   Yes.  This is a check written by Heather Carr to

24   Griffin Law Firm.

25        MS. PALUCH:  Your Honor, I'd move for admission of

Direct - Ennis

1    Government's Exhibit 2.

2              THE COURT:  Is there any objection?

3              MS. STEWARD:  No objection, Your Honor.

4              THE COURT:  There being no objection, Exhibit 2 is

5    admitted into evidence.

6         (Government's Exhibit GS-2 received)

7    BY MS. PALUCH:

8    Q.    And who is that check to and from?

9    A.    The check is written from the account of Heather Carr

10   and it was written to Griffin Law Firm.

11   Q.    And what is referenced in the notation?

12   A.    It says "last payment Tramell Thomas."

13   Q.    And what's the amount of that check?

14   A.    $774.

15   Q.    Okay.  Did you research, in the course of your

16   investigation, the Griffin Law Firm?

17   A.    Yes.  I learned Griffin Law Firm was -- had an

18   attorney, Tracey Eubanks, who actually later became Tracey

19   Griffin.

20   Q.    Did the Government make attempts to talk to Ms. Eubanks

21   about that check?

22   A.    Yes.

23   Q.    And were those attempts successful?

24   A.    No, they were not.

25   Q.    Was she endorsed as a witness by the defense for trial?

63
Direct - Ennis

1    A.   Yes, she was.

2    Q.   And did she appear?

3    A.   No, she did not.

4    Q.   In the course of your investigation, did you obtain the

5    jail log visits from El Paso County Jail?

6    A.   Yes, I did.

7    Q.   I'd like you to look at Government's Sentencing Exhibit

8    No. 3.

9    A.   Okay.

10   Q.   And can you identify that document?

11   A.   Yes.   This is the inmate visitor history for Defendant

12   Tramell Thomas, received from El Paso County, and it lists

13   visitors.

14   Q.   And what's the time period of this log?

15   A.   The time period of the log ranges from -- bear with me,

16   I have to remove -- from November 2d -- starting in

17   January -- on January 30th, 2012, and ending November 2d,

18   2012.

19          MS. PALUCH:   Your Honor, at this time I'd move for

20   the exhibit -- admission of Government's Sentencing

21   Exhibit 3.

22          THE COURT:   Any objection?

23          MS. STEWARD:   No objection, Your Honor.

24          THE COURT:   All right.   There being no objection,

25   Government's Sentencing Exhibit 3 is admitted into evidence.

Direct - Ennis

1      (Government's Exhibit GS-3 received)

2    BY MS. PALUCH:

3    Q.   Okay.   Did those records document numerous visits to

4    the defendant from Ms. Eubanks?

5    A.   Yes, it did.

6    Q.   Approximately how many times?

7    A.   There were approximately 20 visits from Tracey Eubanks.

8    Q.   Did those records also document visits from Heather

9    Carr to Tramell Thomas?

10   A.   Yes.

11   Q.   Approximately how many times?

12   A.   There were approximately 23 visits from Heather Carr.

13   Q.   In 11 months?

14   A.   Correct.

15   Q.   And where was Ms. Carr living at that time?

16   A.   Ms. Carr was riding -- residing in Arizona.

17   Q.   Okay.   Was the scheme continuing throughout the time

18   that the Defendant Thomas was incarcerated at El Paso County

19   Jail?

20   A.   Yes, it was.

21   Q.   Okay.   Switching gears here:   In the course of your

22   investigation, did you become aware of the fact that the

23   defendant was on state parole while he was committing the

24   instant offense?

25   A.   Yes.

Direct - Ennis

1    Q.    And what was the state offense of which he was

2    convicted?

3    A.    One count of aggravated robbery and three counts of use

4    of a weapon in a violent offense.

5    Q.    Did you review the records obtained from his parole

6    officer?

7    A.    Yes, I did.

8    Q.    Please look at Government Sentencing Exhibit No. 4.

9    A.    Okay.

10   Q.    Can you identify those records?

11   A.    Yeah.   These are records I obtained from Arizona

12   Department of Corrections for Defendant Tramell Thomas.

13   Q.    And in those records, did you find information provided

14   by the defendant to his parole officer that was false?

15   A.    Yes, I did.

16   Q.    What was the first false statement?

17   A.    The first false statement was -- you'll see it on page

18   6 of 6.   It's dated February 21st, 2012.

19   Q.    Can I stop you there, agent?

20         MS. PALUCH:   Your Honor, I'd like to move for the

21   admission of Government's Sentencing Exhibit No. 4.

22         THE COURT:   Any objection?

23         MS. STEWARD:   No objection, Your Honor.

24         THE COURT:   There being no objection, Exhibit 4 is

25   admitted.

Direct - Ennis

1        (Government's Exhibit GS-4 received)

2   BY MS. PALUCH:

3   Q.    If you could proceed, Agent Ennis.  What date are you

4   referencing?

5   A.    Yes.  So on page 6 of 6, entry dated February 21st

6   2012.

7   Q.    What's represented?

8   A.    Defendant Thomas "represented that he will reside with

9   his sister Sara Forney at 1351 North Pleasant Drive in

10  Chandler, Arizona."

11  Q.    And was that true?

12  A.    No, that was not.

13  Q.    Who was he living with at that time?

14  A.    He was living with Defendant Heather Carr and their

15  children.

16  Q.    At that Pleasant Drive address?

17  A.    Correct.

18  Q.    Any other false statements you saw in those records?

19  A.    Yes.  There's an entry on page 5 of 6 on April 17th,

20  2012.  Defendant Thomas states that he will be residing with

21  his sister at 1822 East Kaibab Drive in Chandler, Arizona.

22  Q.    And was that true?

23  A.    No, it was not.

24  Q.    And, in fact, what did your investigation reveal?

25  A.    The Defendant Thomas was residing with Defendant

Direct - Ennis

1   Heather Carr and their children.

2   Q.   Was he living at that address when a search warrant was

3   executed in this case?

4   A.   Yes, he was.

5   Q.   Were there any other false statements you saw in those

6   records?

7   A.   Yes, there was.

8   Q.   And what would that be?

9   A.   Let's see.  Bear with me.

10   Q.   Refer your attention to page 1, entry September 27.

11   A.   Okay.  There's also an entry on page 3 of 6.

12   Q.   Okay.

13   A.   For -- actually, that's incorrect.  You were correct,

14   on 9-27, on page 1 of 6, there's an entry where the

15   defendant informs his parole officer that he has had no

16   police contact.

17   Q.   And was that true?

18   A.   No, it was not.  Defendant Thomas had been pulled over

19   and arrested by Tempe Police Department in August 2012.

20   Q.   And he did not report that law enforcement contact to

21   the -- his parole officer?

22   A.   That is correct.

23   Q.   In fact, did he spend the night in jail?

24   A.   Yes, he did.

25         MS. PALUCH:  No further questions at this time,

                          Cross - Ennis

1    Your Honor.

2              THE COURT:  All right.  Cross-examination.

3                      CROSS-EXAMINATION

4    BY MS. STEWARD:

5    Q.   Good morning.

6    A.   Good morning.

7    Q.   Give me just a second to get back to the beginning of

8    my notes.  I apologize.

9              Now, ma'am, you testified earlier that Defendant

10   Carr, Heather Carr, received all of the Social Security

11   numbers through her job at Wells Fargo; is that correct?

12   A.   That is correct.

13   Q.   And these -- her first access to -- her first

14   unauthorized access was in 2010 on July 3d?

15   A.   Correct.

16   Q.   Okay.  And that was an Ismael Omar.

17   A.   That is correct.

18   Q.   And then you spoke to Omar, but Mr. Omar later refused

19   to testify, correct?

20   A.   Correct.

21   Q.   And did he state why he refused to testify?

22   A.   He said that he would refuse to answer questions if put

23   on the stand.

24   Q.   Okay.  And he didn't give you a further description of

25   why?

Cross - Ennis

1    A.   He didn't want to be involved.

2    Q.   Okay.  And then, ma'am, you stated that later you spoke

3    to a Ms. Lopez in 2015, correct?

4    A.   Correct.

5    Q.   And Ms. Lopez knew Defendant Thomas.

6    A.   That is correct.

7    Q.   And they briefly -- they briefly dated?

8    A.   That is correct.

9    Q.   And during that time that they dated, they both

10   attend -- they both attempted to register at Pikes Peak

11   College, correct?

12   A.   That is correct.

13   Q.   And at that time, they both had sincere intentions to

14   register for college, correct?

15   A.   I --

16        MS. PALUCH:  Objection.  Objection, Your Honor, she

17   can't speak to the sincerity.

18        THE COURT:  It's cross-examination.  The rules of

19   evidence, as we've established, don't apply.

20        Go ahead.

21        THE WITNESS:  I can't speak to the sincerity.  She

22   said that they -- the two went to Pikes Peak together and

23   that Defendant Thomas knew she didn't have a GED.

24   BY MS. STEWARD:

25   Q.   Okay.  At that time, ma'am, did you -- was there any

1    information that you were able to obtain that would suggest
2    that they did not intend to enroll in college?
3    A.   Just based on all the false applications that had been
4    filed in this investigation, that led me to question any
5    sincerity and legitimate attendance at post-secondary
6    institution.
7    Q.   So no, but based on your further investigation, you
8    don't believe that they were insincere; is that correct?
9    A.   Based on the totality of the false FAFSA submitted, I
10   would question the sincerity of anyone's intentions to
11   attend.
12   Q.   Okay.  Did Mr. Thomas attend courses at Pikes Peak
13   College?
14   A.   Yes, he did.
15   Q.   And for how long?
16   A.   Off the top of my head, like I don't have that in front
17   of me, so I wouldn't be comfortable saying for the duration
18   of time.
19   Q.   Do you have an estimate?
20   A.   I would say between when he was released from Colorado
21   Department of Corrections in -- through, approximately, June
22   2010.
23   Q.   Okay.  Now, you also said that Ms. Lopez was afraid for
24   her safety, correct?
25   A.   That is correct.

Cross - Ennis

1    Q.   And that allegedly Mr. Thomas made threats towards
2    people coming to her house, correct?
3    A.   That is correct.
4    Q.   Did she report any threats made directly to her?
5    A.   Not to my knowledge.
6    Q.   Okay.  And you also said that they dated for a month
7    and he -- she didn't know his correct first name, correct --
8    or his correct name?
9    A.   That is correct.
10   Q.   And, ma'am, if you know, is it rare nowadays to have --
11   meet somebody on the internet or whatnot and not know their
12   name in the first month?
13   A.   Based on the investigations I conduct and how many
14   identity theft investigations I conduct, I would not be
15   surprised how people are unwilling to provide their true
16   identity.
17   Q.   Okay.  And then you said that Christine Duncan was also
18   involved -- or her name was also involved and Social
19   Security was involved in the scheme, correct?
20   A.   That is correct.
21   Q.   Wasn't Ms. Duncan, herself, involved in the scheme at
22   some point?
23   A.   Ms. Duncan also went with Defendant Thomas to Pikes
24   Peak Community College to apply for federal student aid.
25   She, like Ms. Lopez, ultimately did not attend classes and

Cross - Ennis

1    assumed that federal student aid was not disbursed in her

2    name because of that.

3    Q.   Okay.  Did Ms. Duncan go to Arizona and reside with Ms.

4    Carr at some point?

5    A.   No, she did not.

6    Q.   Was she involved in the scheme, if you know?

7    A.   No, she wasn't involved in the scheme.  There's the

8    separate matter that we shouldn't be discussing that she was

9    involved in.

10   Q.   All right.  Ma'am, and you said that 181 false

11   applications were submitted to the FAFSA system, correct?

12   A.   Correct.

13   Q.   And if I remember reading correctly, about 10 of those

14   might have been attributed to Mr. Thomas?

15   A.   Say that again, please.

16   Q.   About 10 of those were attributed to Mr. Thomas?

17   A.   10 addresses?

18   Q.   Yes, ma'am.

19   A.   Yes, approximately between 10 and 13 addresses.

20   Q.   And some of those -- some of those applicants resulted

21   in a Higher One debit card being sent to those addresses,

22   correct?

23   A.   That is correct.

24   Q.   And some of those -- approximately 50 of those cards

25   were taken by the Phoenix police, correct?

Cross - Ennis

1    A.    That is correct.

2    Q.    And they were taken when Mr. Thomas was arrested?

3    A.    That is correct.

4    Q.    Were those items searched for fingerprints?

5    A.    Yes, they were.

6    Q.    Were Mr. Thomas' fingerprints on those items?

7    A.    Neither Defendant Thomas' nor any of the other

8    defendants' fingerprints were located on those debit cards.

9    Q.    Okay.  So no -- what information do you have that

10   Defendant Thomas knew that Ms. Carr was using her Accurint

11   account in this way?

12   A.    Could you clarify that, please?

13   Q.    Yes.  What information do you have that Mr. Thomas knew

14   that Ms. Carr was using her Accurint account to take

15   people's Social Security numbers?

16   A.    Based on his relationship with the defendant Heather

17   Carr.

18   Q.    So just the relationship?

19   A.    Well, based on, I think, the totality of the

20   investigation you would know how the scheme worked, that you

21   would visit Department of Corrections' websites, obtain a

22   name and date of birth, and there had to be someone who was

23   able to obtain the Social Security number.

24   Q.    And all of that could have been done without Mr.

25   Thomas' knowledge; isn't that correct?

Cross - Ennis

1    A.    No, I don't think so.

2    Q.    You don't believe that someone could have gone on the

3    Department of Corrections' website without Mr. Thomas'

4    knowledge?

5    A.    It's possible, but the investigation -- the evidence in

6    this investigation I believe reflects that Defendant Thomas

7    was involved in every aspect of this scheme.

8    Q.    Okay.  I'm going to re-ask the question, ma'am:  Do you

9    believe that someone can go onto the Department of

10   Corrections' website without his knowledge?

11   A.    That would possibly -- that could be possible.

12   Q.    Okay.  Do you believe that Ms. Carr could have used her

13   Accurint access without his knowledge?

14   A.    It could be possible.

15   Q.    Could be possible.  Okay.  Do you believe that homework

16   could have been completed without Mr. Thomas' knowledge?

17   A.    Any -- any of it could be possible.

18   Q.    Okay.  And, ma'am, you interviewed Marcelle Green -- is

19   it Marcelle Green in this case, correct?

20   A.    That is correct.

21   Q.    And she stated that while she was aware that Ms. Carr

22   was involved in the scheme, that Mr. Thomas was just kind of

23   around.

24   A.    Actually, no.  She said that there was like this

25   homework or free application party where they were all there

Cross - Ennis

1    and they were all filling out forms and submitting FAFSAs,

2    and that Defendant Thomas was present.

3    Q.   Right.  And that's the only time she saw Mr. Thomas

4    involved in the scheme, correct?

5    A.   That is what Marcelle Green said.

6    Q.   So other times when she would give Ms. Carr money, Mr.

7    Thomas wasn't necessarily around, correct?

8    A.   She said there were occasions when Mr. Thomas --

9    Defendant Thomas was not present.

10   Q.   Okay.  And when she and Ms. Diaz went to Ms. Carr's

11   home, Mr. Thomas was in the home, but he would leave the

12   room, correct?

13   A.   There were occasions where he was not present in the

14   room.

15   Q.   Okay.  Ma'am, when you looked at the Government exhibit

16   that had all of the addresses and whatnot on that, there was

17   no address before May of --

18            THE COURT:  Are you talking about 72-1?

19            MS. STEWARD:  Yes.  Yes, sir, I apologize.

20            THE COURT:  Let's make the record clear.

21   BY MS. STEWARD:

22   Q.   Yes.  Exhibit 72-1, that exhibit, there was no address

23   that was attributed to Mr. Thomas before May 2012, correct?

24   A.   No, there were addresses attributed to him.  The reason

25   why we left it at May 2012 time frame is because there was a

Cross - Ennis

1    period Defendant Thomas was incarcerated.

2    Q.   So on that exhibit, there were no addresses attributed

3    to him before May 2012, correct?

4    A.   No, there are addresses attributed to him.

5    Q.   Okay.  Where on the exhibit, ma'am?

6    A.   The Blackhawk address, the Rice Drive address, the 1418

7    Rushmore address, the Lexington Village address.

8    Q.   Now, the Lexington Village address is -- excuse me --

9    attributed to a Grant, correct?

10   A.   Makayla Grant, correct.

11   Q.   Okay.  And Makayla Grant knew Heather Carr, correct?

12   A.   That is correct.

13   Q.   And she might have known Mr. Thomas, but she knew

14   Heather Carr, correct?

15   A.   Correct.  She was not interviewed in this

16   investigation.

17   Q.   All right.  The Radiant Drive address, that Mr. Thomas

18   resided there, correct?

19   A.   That is correct.

20   Q.   And when did he reside there, ma'am?

21   A.   He resided there during the approximate time frame of

22   2010 through his arrest in -- on January 28th, 2012.

23   Q.   Okay.  And then the Rushmore address is attributed to

24   Pickens, correct?

25   A.   It's attributed to Pickens.

Cross - Ennis

1     Q.   And Pickens knew Ms. Carr, correct?

2     A.   She did.  Defendant Thomas also used the 1418 Rushmore

3     address prior to the 2012 time frame in submitting

4     applications for federal student aid.

5     Q.   His own application --

6     A.   His own applications.

7     Q.   Do you know whether Mr. Carr -- I'm sorry, Mr. Thomas

8     resided at that address?

9     A.   Definitely, I don't believe, no.

10    Q.   And then Mr. Sanders, he is related to Ms. Carr as

11    well, correct?

12    A.   Correct.  Mr. Sanders also served time with the

13    Defendant Thomas.

14    Q.   But he has a familial relationship to Ms. Carr,

15    correct?

16    A.   I would say he has a familiar relationship to both of

17    them.

18    Q.   I'm sorry, not familiar, familial?

19    A.   Oh, familial, yes.

20    Q.   I apologize.

21    A.   That's okay.

22    Q.   Okay.  So, ma'am, you said that you were aware that Mr.

23    Thomas benefited from the scheme, correct?

24    A.   That is correct.

25    Q.   And it's clear that Ms. Carr wrote a check to his

Cross - Ennis

1    attorney, correct?

2    A.    That is correct.

3    Q.    Now, benefiting from the scheme doesn't necessarily

4    mean that he was aware of it, correct?

5    A.    That could be correct, but based on the other evidence

6    in this investigation, we believe he was fully aware of the

7    scheme.

8    Q.    Okay.  So benefiting doesn't mean that he was aware of

9    it, correct?

10   A.    That is correct.

11   Q.    Okay.  And he was in a relationship with Ms. Carr,

12   correct?

13   A.    That is correct.

14   Q.    And that relationship was approximately seven years,

15   correct?

16   A.    I'm not sure of the exact time frame.

17   Q.    Okay.  And during that relationship, Ms. Carr did

18   things for Mr. Thomas, correct?

19   A.    I assume she did.

20   Q.    She bore two children for him?

21   A.    Yes, she did.

22   Q.    They lived in the home together?

23   A.    Correct.

24   Q.    Okay.  And the bank -- the check that Ms. Carr wrote to

25   Mr. Thomas' attorney, that only had Ms. Carr's name on it,

                         Cross - Ennis

1      correct?

2      A.    That is correct.

3      Q.    It was signed by Ms. Carr?

4      A.    Yes, it was.

5      Q.    Okay.

6            THE COURT:   Ms. Steward, let's take a pause here.

7      We're going to take a 10-minute recess.

8            Agent Ennis, because you're in the middle of your

9      testimony, I direct you not to speak with any of the lawyers

10     during the recess.

11           All right.   We'll be in recess for 10 minutes.

12           (Recess taken 11:39 a.m. to 11:51 a.m.)

13           THE COURT:   Agent Ennis, I remind you that you

14     remain under oath.

15           THE WITNESS:   Yes, sir.

16           THE COURT:   Ms. Steward, you may resume your

17     cross-examination.

18           MS. STEWARD:   Thank you, Your Honor.

19     BY MS. STEWARD:

20     Q.    Agent Ennis, the -- all the addresses that are on your

21     spreadsheet on 73-1, are those addresses --

22           THE COURT:   72-1.

23           MS. STEWARD:   72-1.   I apologize, Judge.

24     BY MS. STEWARD:

25     Q.    72-1, are those addresses tied to other defendants in

Cross - Ennis

1    this case?

2    A.    Yes, they are.

3    Q.    Okay.  In particular, are all of the addresses tied to

4    Ms. Carr?

5    A.    Yes, they are.

6    Q.    Okay.  And I believe earlier you testified that there

7    was some information about a gentleman named Terrel Smith.

8    A.    Correct.

9    Q.    And that gentleman went by the name of Swift?

10   A.    Swiss.

11   Q.    Swiss.  I apologize.  Swiss.

12   A.    Uhm-hum.

13   Q.    And that there was some text message back and forth

14   between Mr. Swiss and Mr. Thomas, correct?

15   A.    That is correct.

16   Q.    And, ma'am, didn't Swiss and Diaz also date?

17   A.    I'm not aware of that.

18   Q.    Okay.  Ma'am, you interviewed Marcelle Green several

19   times in this case, correct?

20   A.    That is correct.

21   Q.    And Ms. Green told you that Ms. Carr came up with the

22   plan, right?

23   A.    That is correct.

24   Q.    And she said that she invited -- Ms. Carr invited Ms.

25   Green to participate, correct?

Redirect - Ennis

1    A.   That is correct.

2    Q.   Ms. Green never mentioned Mr. Thomas inviting her to

3    participate, correct?

4    A.   I interpreted Marcelle Green's interview to mean that

5    they all devised a way, and it was through conversations

6    that Ms. Green had with Ms. Carr, that her assumption was

7    that Defendant Thomas was involved.

8    Q.   All right.  So Ms. Green assumed that Thomas was

9    involved, correct?

10   A.   That is correct.

11   Q.   She didn't say that she knew that Thomas was involved.

12   A.   Well, she testified that she knew he was involved.

13   Q.   At the end.  But in the beginning when she was

14   approached by Ms. Carr?

15   A.   That is correct.

16          MS. STEWARD:  Okay.  Can I have a second, Your

17   Honor?

18          THE COURT:  You may.

19          MS. STEWARD:  Okay.  No further questions.

20          THE COURT:  All right.  Redirect.

21          MS. PALUCH:  Thank you, Your Honor.

22                     REDIRECT EXAMINATION

23   BY MS. PALUCH:

24   Q.   You were just asked a question about whether or not Ms.

25   Green assumed that the Defendant Thomas was involved in the

Redirect - Ennis

1    scheme, correct?

2    A.   That is correct.

3    Q.   Did -- in your interviews of Ms. Green, did she talk

4    about essentially a tutorial or helping the defendant with

5    any aspect of the application?

6    A.   Yes, she did.  She also said that it appeared that

7    Defendant Thomas was benefiting quite well while he was in

8    jail in the 2012 time frame and that it was because

9    Defendant Carr was paying for his legal fees and putting

10   money on his inmate commissary bank account.

11   Q.   And I think my question wasn't clear, but did Marcelle

12   Green testify about helping the defendant with an

13   application?

14   A.   That is correct.

15   Q.   And can you --

16   A.   Yes.

17   Q.   And can you recount that for us?

18   A.   She said there was an occasion when they were all

19   sitting around and that Defendant Green showed Defendant

20   Thomas how to fill out a free application for federal

21   student aid.

22   Q.   Okay.  You were asked by defense counsel that all of

23   the addresses on 72-1, Government Exhibit, were tied to

24   other defendants.  Did you recall that question?

25   A.   Yes.

Redirect - Ennis

1    Q.   Were addresses on that chart tied directly to Defendant

2    Thomas?

3    A.   Yes, it was.

4    Q.   Can you give some examples of those addresses?

5    A.   Yes.  Again, those addresses -- can I pull up 72-1?

6            THE COURT:  Do what you need to do.

7            THE WITNESS:  Okay.  So this exhibit reflects how

8    Thomas was associated.  It was the Meadow Oak address where

9    Kimmisha Mullett resided --

10   BY MS. PALUCH:

11   Q.   And I'm going to stop you there.  Was there any

12   evidence that Heather Carr was involved with Kimmisha

13   Mullett?

14   A.   No, there was not.  Kimmisha Mullett advised she had

15   met Defendant Carr on approximately one occasion, but it was

16   the relationship Ms. Mullett had with Defendant Thomas.

17   Q.   And how did they know each other?

18   A.   Ms. Mullett advised there was some like business

19   opportunity that she was working with the defendant and that

20   the defendant also -- Defendant Thomas asked her to receive

21   federal student aid mail.

22   Q.   Uhm-hum.

23   A.   There was also the Rice Drive -- 1063 Rice Drive

24   address.  1063 is the Defendant Thomas' cousin, Michael

25   Cox's, address.  There was, like I stated earlier, the 1418

Redirect - Ennis

1    Rushmore address where we know LaTanya Pickens was a friend

2    of Defendant Heather Carr, but we also know Defendant Thomas

3    used that address not only in applying for federal student

4    aid, but also in providing that address to El Paso County

5    sheriffs.

6    Q.   How about Radiant Drive?

7    A.   3820 Radiant Drive is where the Defendant Thomas

8    resided with Christine Duncan.

9    Q.   So you've listed a handful of addresses that are

10   directly related to this defendant, correct?

11   A.   That is correct.

12   Q.   You testified previously about Ismael Omar, Christine

13   Duncan, Vanessa Lopez.

14   A.   That is correct.

15   Q.   Do any of those individuals have a connection to

16   Heather Carr?

17   A.   No, they do not.

18   Q.   And were their Social Security numbers obtained for use

19   on school applications?

20   A.   Yes, they were.

21   Q.   And who obtained their Social Security numbers?

22   A.   Based on information -- so Ismael Omar, the defendant

23   Mr. Thomas knew --

24   Q.   I'm going to stop you there.  I'm talking about the

25   Social Security numbers.

Redirect - Ennis

1    A.    So it appears that Defendant Heather Carr queried

2    Ismael Omar's.  The other two, Vanessa Lopez and Christine

3    Duncan, it appears that Defendant Thomas obtained their

4    personal identifying information.

5    Q.    Was there connection between Defendant Thomas and

6    Heather Carr related to those specific Social Security

7    numbers as far as saving those numbers?

8    A.    Yes.  We were informed by Defendant Heather Carr that

9    Defendant Thomas asked her to save the Social Security

10   numbers of Ismael Omar, Vanessa Lopez, and Christine Duncan.

11              MS. PALUCH:  Okay.  No further questions, Your

12   Honor.

13              THE COURT:  All right.  Thank you for your

14   testimony.  Agent Ennis, you may step down.

15              THE WITNESS:  Thank you, Your Honor.

16              THE COURT:  Does the Government have any other

17   witness on any of the issues that was covered by testimony

18   of Agent Ennis?

19              MS. PALUCH:  We do not, Your Honor.

20              THE COURT:  Does the defendant have any witness he

21   wishes to present on the issues raised by the testimony of

22   Agent Ennis?

23              MS. STEWARD:  Not other than -- none other than

24   himself, Your Honor.

25              THE COURT:  Other than what?

Direct - Thomas

1          MS. STEWARD:  Himself.

2          THE COURT:  He wants to testify in this?  And let

3    me just be clear, we're talking about -- I took testimony

4    from Agent Ennis on the issues on objection No. 4, the

5    scheme in this case to be conducted by Ms. Carr and Mr.

6    Thomas, the amount of loss, and the objection to the

7    probation officer's failure to recommend a minor role

8    adjustment.  Any of those three issues.

9          MS. STEWARD:  Your Honor, Mr. Thomas would like to

10   testify.

11         THE COURT:  All right.  Come forward, sir.  You've

12   already been put under oath, so we don't have to do that

13   again.  And it will be helpful for me, Ms. Steward, if

14   you'll signal to me which of the three issues we're talking

15   about.

16         MS. STEWARD:  Yes, Your Honor.  I'm pulling them up

17   now so I make sure I stay on task here.

18         THE COURT:  Okay.

19                      DIRECT EXAMINATION

20   BY MS. STEWARD:

21   Q.   Can you state and spell your name for the record, sir?

22   A.   Yes.  Tramell, T-r-a-m-e-l-l, Thomas, T-h-o-m-a-s.

23   Q.   Okay.  And, sir, how do you find yourself in this

24   situation?

25   A.   Well, so long story, but I'll condense it.  I found

Direct - Thomas

1    myself in this situation, you know, is -- was a trying

2    situation.  I was in prison, as you well know, for a very

3    long time.  Most of my 20s.  And, you know, I got out in

4    2009 and things were pretty much a blur as far as the

5    movement of how things evolved since I first -- when I left

6    in 1999, technology evolved, just the movement, the speed.

7    Interactions with people was very fast for me.  I had to

8    adapt to that.

9         And I was married to Lola Thomas while I was in

10   prison and she was there for me while I was in prison.  I

11   got out of prison and we realized that our relationship was

12   better -- it was more set off as a friendship.  We didn't

13   have a lot of money and I didn't have a job or anything like

14   that.  And I reconnected with Ms. Carr in 2009.  And in

15   reconnecting with her, it was more or less like a fairytale,

16   a saving grace situation because I just have viewed her as

17   being, you know, a -- a great job, a great mom.  She had

18   articulate conversation and I was -- I was in awe of her.

19   Q.   Okay.  And so when did you begin your relationship with

20   Ms. Carr?

21   A.   We actually began in 2009.  I would say roughly July of

22   2009.

23   Q.   And --

24   A.   August.

25   Q.   In the early parts of that relationship, who had the

Direct - Thomas

1    upper hand, I -- and when I say "upper hand," I mean
2    financially.
3    A.    She did.  She -- I didn't have a job.  I was on parole.
4    I was just trying to find my way in society and life in
5    general.  I felt -- I know I was 30 years old, but I was
6    still operating at a 22 or 21 mentality -- year-old
7    mentality.  And she understood that because her previous
8    boyfriend before me was an ex-con.  He just got out of
9    prison and that relationship went awry.
10          And she, you know, she told me about that.  And in
11   my mind I'm thinking, well, if I was in his place, I would
12   never mess that up because, you know, she told me she took
13   care of him, she helped him get into school, she helped him
14   with clothing.  And it just seemed -- it seemed like if I
15   had that position, that I would be in a better position than
16   I was before.
17          And so to answer your question, she was more well
18   off.  She was the head of the household -- head of the
19   relationship.
20   Q.    Okay.  Did she help you with any of the basic -- your
21   basic needs once you were out of prison?
22   A.    Yes.
23   Q.    In what way?
24   A.    She took care of all of the needs.  Like I said, I
25   wasn't working and, at the time -- when you are in prison

Direct - Thomas

1    for so long and you get out of prison and you still live in

2    the same city like Colorado Springs, you run into a lot of

3    ex-cons, people you're involved with in prison.

4         And I wasn't -- I was seeking a job but I had one

5    foot in and one foot out.  I wasn't being proactive like I

6    should have been as far as a man.  So it was easier

7    transition to -- to utilize -- I don't want to say a certain

8    word, but my -- who I am as a man, there were sexual acts,

9    or being that to her, in order for her not to look at all my

10   other things I don't bring to the table.

11        So it was more or less a boy toy type thing.  And

12   it's difficult saying that now because I've changed since

13   then, I've grown since that took place, but at the time, I

14   feel like my worth with her was who I could be to her

15   emotionally at the time and her worth to me was both

16   emotionally and financially.

17   Q.   Okay.  So we're --

18        THE COURT:  Ms. Steward, time out.  We're not going

19   to spend the day here on this -- I didn't allocate the whole

20   day for this hearing.  You need to ask more focused

21   questions.

22        And, Mr. Thomas, you need to give more focused

23   answers.  We're talking about three discrete issues that

24   were raised by objections filed by your prior counsel.  I

25   don't really want to hear your life story.  I don't really

Direct - Thomas

1    want to hear intimate details of your relationship with your

2    prior girlfriends.  Let's stick with the issues that we're

3    talking about here and I want crisp, efficient questions and

4    crisp efficient answers.

5              MS. STEWARD:  Okay.

6              THE WITNESS:  Understood.

7    BY MS. STEWARD:

8    Q.   So let's fast-forward to your time in El Paso County.

9    When you were in El Paso County, were you aware that Ms.

10   Carr was involved in any -- any scheme?

11   A.   No.

12   Q.   And did she pay your bail -- I'm sorry, did she pay for

13   your attorney?

14   A.   Yes.

15   Q.   Do you know where the money she paid for your attorney

16   came from?

17   A.   No.

18   Q.   Did she put money on your accounts?

19   A.   Yes.

20   Q.   Did you know where money came from?

21   A.   No.

22   Q.   Okay.  And at some point, you moved to Arizona with Ms.

23   Carr, correct?

24   A.   Yes.

25   Q.   And you were arrested in Arizona, right?

Direct - Thomas

1   A.   Correct.

2   Q.   When was that?

3   A.   That was August 30th, 2012.

4   Q.   And when you were arrested, did you become aware of

5   some things in the car?

6   A.   Yes.

7   Q.   Tell us a little bit about that.

8   A.   Well, I know I had alcohol in the car, so when I got

9   pulled over, it's the natural reaction is to search around

10  and see what's in the car.  So I'm doing a basically --

11  basically a check over the car.  And as I'm looking around

12  the car, I notice a bag of cards.  And when I saw it, it was

13  more like -- because I had been drinking as well, I had a

14  lot of drinks, but I drunk that night.  It was a shock.

15         And that's why you can hear the dialogue and the

16  call between -- not the call, excuse me -- the interaction

17  between me and the officer, I was kind of off.  And so I saw

18  the cards and I was shocked.

19  Q.   Okay.  After you found those cards, did you have a

20  conversation with Ms. Carr?

21  A.   Yes.

22  Q.   Regarding?

23  A.   Those cards.

24  Q.   And can you give us some details of that conversation.

25  A.   Well, I went into a long dialogue, Ms. Carr, she wore

Direct - Thomas

1    the pants in the relationship, so certain things I was privy

2    to and certain things I weren't -- I wasn't privy to.  So if

3    I asked her a question, she would give me short answers.

4    But then knowing that all the bills are in her name and

5    she's controlling the situation, it was more of a, "It's?

6    Okay, it will be fine.  Look, I told you be fine."

7    Q.    Okay.  Eventually your home was searched, correct?

8    A.    Correct.

9    Q.    And at that point, you were pretty aware that there was

10   some criminal activity going on.

11   A.    That's when I knew, yeah, it wasn't looking good.

12   Q.    Did you ever participate in the activity, sir?

13   A.    No.

14   Q.    Okay.  Did you ever ask anybody to receive information

15   at their addresses?

16   A.    Yes.

17   Q.    Who was that, sir?

18   A.    Kimberly Mullett.

19   Q.    And when did you do that?

20   A.    Summer 2012.

21   Q.    Okay.  And why would you -- why did you do that?

22   A.    Well, Heather asked me to -- the address in Colorado

23   and -- and the reason I chose Kim is because I thought that

24   Heather was doing something more business.

25              She said she needed a reliable address.  And like I

Direct - Thomas

1    have been stating for a while, had -- if I was criminally --

2    in the criminal mindset, I wouldn't go to Kim Mullett, she's

3    the one of the most cleanest person -- people I know.

4             So I went to Kim, asked her, and she said yes.

5    Q.    Okay.  And did you ever do any homework or anything

6    like that in furtherance of this scheme?

7    A.    No.  I -- that was one of the reasons why I actually

8    quit my course in school because I could not keep up with

9    the online courses.  I had two on-campus courses and I had

10   two online courses.  So I had to drop the online at first

11   and did two on-campus; wasn't enough credits to maintain so

12   I just dropped them both.

13   Q.    And when you went to school, did you -- were you going

14   sincerely?

15   A.    Absolutely.

16   Q.    And what were you going for?

17   A.    One was business administration, if I can recall

18   correctly, and the other, it was criminal justice.

19   Q.    Okay.  And then did you also take Ms. Lopez and Ms.

20   Duncan to school?

21   A.    I did.

22   Q.    Why did you do that, sir?

23   A.    Because they wanted to further their education as well.

24   And not only that, I did know that schools disbursed funds

25   to help you out with bills and stuff like that because I

Direct - Thomas

1    received the same thing.

2         And Christine and Vanessa both said that they

3    wanted to help with finances and things of that nature, they

4    wanted the cards to come to the apartment.  And because I

5    was supposed to help them out and get a cut of the actual

6    disbursement by helping them out.  And the same way I did

7    with other friends I had, so it wasn't a first-time thing

8    that I've done, so . . .

9    Q.   Are you saying you took other people and helped them

10   enroll in school?

11   A.   Absolutely.

12   Q.   And you did that sincerely?

13   A.   Absolutely.  Then I did it then and after.  I've done

14   it numerous times since 2012.

15   Q.   You've done it since the end of the scheme?

16   A.   Yes.

17   Q.   Okay.  And, sir, what would you estimate your -- the

18   amount that might be attributed to you, the loss amount that

19   might be attributed to you in this scheme?

20   A.   The loss that -- I want to take responsibility for the

21   things that came to Kim's house because I feel that --

22   it's -- it's difficult explaining now.  I don't want to get

23   into it, sir, but it's difficult explaining it now because I

24   was a different man then.

25        So the man in me now goes back and think, well, how

Direct - Thomas

1    could you not understand what the complete complexion of

2    things that are going on?  It's a part of me that's thinking

3    did I not want to see it?  Did I not want to see that she

4    was doing this massive scheme, or -- because I benefited

5    from it?  Or because I'm that dumb, right?  One or the

6    other.

7              So from Kim Mullett, I knew that that was my

8    interaction, that's what I did.  That was the cards that

9    were mailed.  I asked Kim to receive mail there and when I

10   received it from Kim, I gave them to Heather Carr.

11   Q.   Did you use those cards yourself?

12   A.   I did not.

13   Q.   Okay.  When you moved to Arizona, did you intend to

14   live with your sister?

15   A.   Well, no, I did not.

16   Q.   Okay.

17   A.   What happened -- what happened was this:  I had had a

18   best friend -- I can't even think of her name right now --

19   and that was a way for me to parole to Arizona and to have

20   an address to parole there.  And Heather was still going

21   through something with her ex, and when I -- and she gave me

22   some big spiel.  I listened, used my sister's address -- or

23   my best friend's address, and you can parole out there.  And

24   then when we move, then you can move me then, and put -- but

25   put your parole address.  I changed the address once I moved

Cross - Thomas

1    there and I was there for like two months, so . . .

2    Q.   Okay.  Sir, did you have very much contact with -- with

3    Ms. Green or Ms. Carr -- Ms. Diaz?

4    A.   No, I did not.  I would see them come to the house.

5    They came over a lot.  They was always together.  As you

6    know Ms. Diaz and Heather Carr grew up together.  Ms. Green,

7    Heather Carr are best friends -- close friends.

8    Q.   Okay.  Did Ms. Green ever show you how to fill out a

9    FAFSA form?

10   A.   No.

11   Q.   Sir, did you ever submit any applications to the

12   Department of Education in an effort to get loan money that

13   was fraudulent?

14   A.   No.

15             MS. STEWARD:  No further questions, Your Honor.

16             THE COURT:  All right.  Cross-examination.

17             MS. PALUCH:  Thank you, Your Honor.

18                        CROSS-EXAMINATION

19   BY MS. PALUCH:

20   Q.   Your testimony, sir, is that you went to Pikes Peak

21   just to help Duncan and Lopez apply for federal student aid;

22   is that correct?

23   A.   Well, yeah.  I gave them a ride and helped them out,

24   yes.

25   Q.   And is that the extent of your involvement with their

1   applications for student aid is just going with them to kind
2   of show them through the process?
3   A.   Well, I just showed them basically what I had done.
4   Q.   Okay.  So how is it that the IP activity related to
5   their applications came back to your house with Heather
6   Carr?
7   A.   I do not know.  During what time period?
8   Q.   During the time period that their applications were
9   submitted, they were submitted through the IP address
10   associated with the residence where you were living with
11   Heather Carr.
12   A.   I didn't do it.  I mean, it -- at what time period?  I
13   didn't do it at all, but when are you speaking of, exactly?
14   Q.   Their applications were submitted, sir, in 2011 time
15   frame, 2010.  They come back to the Pleasant Street address
16   and the Kaibab address.  My question is:  Regardless of the
17   time frame, if your testimony here is -- today is that you
18   only went to Pikes Peak to kind of show them the ropes and
19   show them how to -- how to apply, how do you explain that
20   the IP address related to those applications come back to
21   the house that you shared with Heather Carr?
22   A.   I was in jail in 2011.  If any activity was done with
23   those cards, I couldn't do it.
24   Q.   All right.  So what would be the connection, then, with
25   Carr if you had nothing to do with you -- your testimony

Cross - Thomas

1    here today is it was just you helping them at the school?

2    A.    Okay.   The -- when the cards were mailed from the

3    school after Diaz -- excuse me, Lopez -- Ms. Lopez and Ms.

4    Duncan, I took them to the school, the cards were mailed to

5    3820 Radiant Drive, and they both agreed to that.   While I

6    was in jail, those cards were delivered.   Ms. Carr was the

7    only one who had the actual mailbox key.

8         And it is my belief that that is when Ms. Carr

9    decided -- devised this scheme.   She was upset that I was

10   cheating on her with Vanessa Lopez and Christine Duncan.

11   Q.    Isn't it true you told Heather Carr to hold on to their

12   Social Security numbers in case you forgot them?

13   A.    No.   What -- what purpose would that do to hold on to

14   Social Security number?   Why don't I just ask them for the

15   Social Security number if that was the case.   If they're

16   willing to go to the school with me and have me sit -- help

17   them through the process --

18   Q.    Let's move on.   When you were arrested in 2012, you had

19   the bag of debit cards, correct?

20   A.    Yes.

21   Q.    You knew -- you knew to look back there and try to hide

22   them from the officer, correct?

23   A.    No.

24   Q.    Well, isn't it true you tried to sweep the bag

25   underneath the seat?   Isn't that what the audio and the

Cross - Thomas

1   evidence at trial established?

2   A.   All right.   When I saw the bags of card -- excuse me,

3   the cards -- bag of cards, I was -- I went in shock.   I was

4   nervous, and that made me suspect that Heather was up to no

5   good.   And, you know, now, me knowing I'm on parole at the

6   time, I'm on parole, have liquor in the car, and there's a

7   bag of cards in the back seat.

8   Q.   Sir, if you knew nothing about those cards, why

9   wouldn't you just tell that to the officer?   "I know

10  nothing.   I don't know if there's a bag of cards."

11         Why would you -- why would you try to hide them?

12  A.   Heather Carr is -- was the mother of my -- of my child

13  at the time, and I don't know if I did it in the way to

14  protect her or -- I just knew that my experience, being in

15  the prison, it's a -- it's a natural thing, coming from --

16  where I come from to be nervous in a situation like that.

17  Q.   You knew those cards were there.   You knew those cards

18  were there when the officer stopped you and that's why you

19  tried to hide them.

20  A.   I knew the cards were there as the officer was coming

21  to the car, yes.

22  Q.   So if -- you just knew automatically there must be

23  something illegal about this bag of cards?

24  A.   Yes.   It -- and it looked pretty -- you know, it didn't

25  look good.   It was a bad look.

Cross - Thomas

1    Q.   So included in that bag was a card that was being

2    mailed to -- that was mailed to -- in the name of Ismael

3    Omar.

4    A.   Uhm-hum.

5    Q.   And that card was mailed to the Radiant Drive address

6    where you lived.

7    A.   Correct.

8    Q.   And that card was in the bag of cards that you were

9    trying to hide from Officer Seal.  Yes or no?

10   A.   Yes, but --

11   Q.   Okay.  Let's -- that's the address where you lived.

12   And that card was mailed to your address in February of

13   2011, correct?  And you were in prison at that time?

14   A.   I was in jail, right.

15   Q.   Right.  But it's still in your possession in the back

16   seat of your car.

17   A.   In the back seat of Heather's car.

18   Q.   Right.

19   A.   I -- at the time, I owned a car.  I was driving

20   Heather's car that night.

21   Q.   Right.  So why didn't you tell the officer, "I know

22   nothing about this bag, it isn't mine"?

23   A.   My thought was when I get home, I'm going to discuss it

24   with Heather and see what she says.  It's more or less if

25   I -- being in prison for the long period that I have, what

Cross - Thomas

1    happens is you start thinking in a certain way.  It's a

2    cover-up, you want to cover it up, you want to -- especially

3    for your significant other.  And so I knew it be a big bomb

4    on Heather if I instantly say, "It's not mine, this is my

5    girl's car."

6    Q.   So you --

7              THE COURT:  Let's move on, Ms. Paluch.  I think

8    we've --

9              MS. PALUCH:  Yeah.

10             THE COURT:  -- exhausted that point.

11   BY MS. PALUCH:

12   Q.   Okay.  You talked about Ms. Mullett and that you had

13   asked for -- to use her address because you needed an

14   address in Colorado; is that correct?

15   A.   Ms. Carr needed an address, yes.

16   Q.   She needed an address.

17   A.   Uhm-hum.

18   Q.   But yet you're texting with Ms. Mullett about specific

19   inmate names.  For example, Dennis Smith.  The card came for

20   Dennis Smith.  Do you recall that trial testimony?

21   A.   No.  Actually, Kim Mullett said she had a card in the

22   name of Dennis Miller --

23   Q.   Dennis Miller, correct?

24   A.   And when she said that, my response was, "Okay."

25   Q.   And you told her to send it on down to you.

Cross - Thomas

1   A.   I told her to send it to Mrs. Carr's P.O. Box, correct.

2   Q.   So you're involved.  You're involved.  You're involved

3   with these inmates' cards going to an address that you

4   secured and then you're sending it down on to Heather Carr.

5   A.   That's -- and that's why I'm saying that the portion

6   that went to Kim Mullett's house I -- I feel responsible for

7   even bringing Kim involved into it.  I would not have -- if

8   I thought it was criminal, Kim would not be the person I'd

9   bring into a criminal enterprise.

10  Q.   So you're taking responsibility for the cards mailed to

11  Mullett because you were involved in the scheme.

12  A.   Because that's the address that I provided for Ms.

13  Carr.

14  Q.   Let's move to the parole records.

15       You didn't give Heather Carr's name because you

16  wanted to distance yourself from Heather Carr, correct?

17  A.   Excuse me?

18  Q.   You did not tell your state parole officer that you

19  were living with Heather Carr because you knew when this

20  fraud scheme broke wide open, you didn't want to be

21  associated with Heather Carr in any way.

22  A.   That's not correct.  I -- I used that address from

23  Arizona that wasn't Heather Carr's address when I moved

24  there.  And then once I was there, I changed my parole

25  address to Mrs. Carr address.

Cross - Thomas

1   Q.   Nowhere in the parole records do you reference Heather

2   Carr.  It's always your sister.

3   A.   Well, I -- we -- there's been numerous visits from the

4   parole office that stopped by and they asked -- they met

5   Heather Carr.  When the parole officer typically comes to a

6   home and verify your residence, they ask the main person for

7   the ID to verify the residence.

8   Q.   Let's go back just briefly to the cards that you were

9   trying to protect Heather Carr by moving them.  How do you

10  explain the Manuel Abate card in your wallet?

11  A.   Okay.  The Manuel Abate card was in the actual glove --

12  the cup holder when the cop came.  I knew that that was the

13  card that had came from Kim's house.  I had that -- I put

14  that card in my wallet way before the -- the cop pulled me

15  over because I was going to give the card back to Heather

16  Carr.

17        When I got in the car, the card was already in the

18  cup holder, it wasn't -- I didn't put it in there once I saw

19  the cops.

20  Q.   So your testimony is once the officer pulled you over,

21  then you put that card in your wallet?

22  A.   No, no, I'm saying when I got in the car, I noticed the

23  card in the cup holder and my thought was, Why is this card

24  in this cup holder?

25  Q.   So you wouldn't just leave it there, it's not your

1    card, right?  It's Heather Carr's.  So why would you stick

2    it in your wallet?

3    A.   Why not give it to her?  Is it -- is it -- my

4    recollection certainly is correct, that card was never ever

5    used.  I didn't -- I didn't go to any ATM and take money off

6    of it.  Why would it be in my wallet if I wasn't going to

7    use it to take money off of it?

8    Q.   Well, what does that matter, sir?  What matters is you

9    have a card in an inmate's name in your wallet.

10   A.   Because I knew that that card -- the name -- before I

11   saw the bag of cards, I put the -- that card in my wallet to

12   give back to Heather Carr.

13   Q.   Isn't your strategy to just always place the blame on

14   the women around you?

15   A.   No, it isn't.

16   Q.   It's not?

17   A.   No --

18   Q.   You take responsibility -- you take full responsibility

19   for your conduct?

20   A.   For my things I partake in, yes.

21   Q.   So I believe in your statement that you filed

22   yesterday, it was stated that you take full responsibility

23   for your conduct as of the time of the search warrant at

24   your residence, is that not the case?

25   A.   I'm sorry?  I'm --

Cross - Thomas

1      MS. PALUCH:  One moment, Your Honor.

2      THE COURT:  Sure.

3      MS. PALUCH:  I -- we're --

4  BY MS. PALUCH:

5  Q.   Page 7 of your statement, it says, Tramell takes full

6  responsibility for his role in the case once he became aware

7  of it after the search of the home on Kaibab.

8      So you take responsibility for the scheme?

9  A.   Well, what I take responsibility for is -- it's very

10  difficult to explain -- the portion of me asking Kim and

11  involving Kim for her address.  The other addresses, there

12  was no need for me to even be involved.

13  Q.   So this statement's incorrect, then.  You don't take

14  responsibility for the scheme?

15  A.   I take responsibility for my -- the address that I

16  asked for which was Kim Mullett.

17  Q.   You submitted in support -- I promise, Your Honor, I'm

18  almost done here -- you submitted in support of your letter

19  of -- of your statement a letter from an individual named

20  Frank Wood, didn't you?

21  A.   I'm sorry?

22  Q.   Do you know a Frank Wood?

23  A.   Frank Wood?

24  Q.   Yeah.

25  A.   It doesn't sound familiar.

1    Q.   You don't know a Frank Wood?

2    A.   (Shook head.)

3    Q.   So if there's a letter submitted in support of your

4    sentencing statement filed yesterday talking about this

5    letter's in reference to a Tramell Thomas signed by Frank

6    Wood, you have no idea who that is.

7    A.   If you're talking about somebody maybe a support letter

8    from somebody I employed for my business, it's possible.

9    Q.   So how about if we called that phone number and -- if I

10    were to tell you that when we called that number, the person

11    on the other line said, "Quit calling the wrong number.

12    There's no Frank Wood at this number."

13         You don't have an answer for that, correct?

14    A.   Then you can show me the letter.  I had like --

15    Q.   It's a letter that your attorney filed on your behalf.

16    You claim in this filing that you're now an ordained

17    minister, correct?

18    A.   Yes.

19    Q.   And that's just something you went online to apply for,

20    and anybody can do that, isn't that true?  Isn't that true,

21    that's how people just get a license so they can marry

22    someone?

23    A.   No.  I'm a minister and I minister the Word.

24         MS. PALUCH:  Can I have just one moment, Your

25    Honor?

1        THE COURT:  You may.

2        MS. PALUCH:  Nothing further, Your Honor.

3        THE COURT:  All right.  Redirect.

4        MS. STEWARD:  None, Your Honor.

5        THE COURT:  All right.  Mr. Thomas, you may step

6   down.

7        THE WITNESS:  Thank you.

8        THE COURT:  All right, I am going to first take up

9   the defendant's objection to the statement in paragraph 63

10  of the report that the scheme -- "the scheme was devised by

11  Carr and Thomas."  I have now heard evidence and I've

12  reviewed the arguments of counsel that have been previously

13  submitted.  I find that the Government has established by a

14  preponderance of the evidence that the fraudulent scheme

15  which was the subject of the superseding indictment in this

16  case was devised by both defendants Carr and Thomas.

17       A sample of the evidence in support of that

18  conclusion is as follows:

19       Agent Ennis testified about her interview with the

20  defendant's friend, Ismael Omar, who stated that in

21  approximately March through June of 2010 during a

22  conversation with Mr. Thomas, he "talked about committing

23  student financial aid fraud as a way to make money, that he

24  heard of such a scheme and knew how it could be successfully

25  carried out."

1          There's also evidence that in December of 2010, six

2    months after the defendant's conversation with Mr. Omar

3    about financial aid fraud, a fraudulent FAFSA was submitted

4    in Mr. Omar's name listing the 3820 Radiant Drive address in

5    Colorado Springs as Mr. Omar's address.  That address had at

6    one time been the defendant's residence.

7          Then there's evidence now that came in at trial

8    that the defendant was caught with the fruit of his fraud

9    right in his hands, as the debit card issued to Mr. Omar was

10   in his possession when he was pulled over and arrested in

11   2012.

12         In terms of additional evidence at this hearing,

13   the Government has introduced evidence that the Defendant

14   Thomas was individually and knowingly involved in the

15   preparation of false FAFSA applications in the names of

16   Christine Duncan and Vanessa Lopez, both of whom were

17   individuals known well to the defendant.

18         In addition, there was testimony at trial that the

19   defendant had a very close, in fact, a intimate common-law

20   marriage, I guess you could characterize it, of several

21   years' length with Ms. Carr, including the fact that he's

22   the father of Ms. Carr's children, and that two of them had

23   ample opportunity to discuss the scheme and how they would

24   play it out.

25         So for all these reasons, the defendant's objection

1    to paragraph 63 of the report is overruled.

2            I'm next going to turn to objection 81 of the

3    report with respect to the two-level enhancement for

4    obstruction of justice under Section 3C1.1.  Ms. Paluch, do

5    you have anything else you would like to add to your written

6    submissions on this objection?

7            MS. PALUCH:  Not to our written submissions, Your

8    Honor.

9            THE COURT:  All right.  Ms. Steward, I know the

10   objection was submitted by prior counsel; do you have

11   anything to add to the written submission?

12           MS. STEWARD:  We would stand on prior counsel's

13   objection.

14           THE COURT:  All right.  I am going to overrule the

15   defendant's objection to paragraph 81 of the report.  I find

16   that the Government has established by a preponderance of

17   the evidence that this two-level enhancement in the offense

18   level is warranted, given the defendant's destruction of

19   evidence of this crime, in reaching out to potential

20   witnesses in this case in an effort to influence their

21   willingness to testify against him.

22           Again, as a small sample of the evidence supporting

23   this conclusion and this ruling on the objections as

24   follows:

25           Evidence was introduced at trial with respect to

1    the defendant destroying evidence that was on his cell

2    phone.  In addition that evidence and testimony was

3    submitted with respect to the defendant reaching out to

4    potential witnesses in violation of -- in direct violation

5    of the terms of his pretrial release.  There is, as well,

6    evidence of the false statements and pretenses regarding his

7    residence that we have evidence of in the record and, in

8    addition, the false statements regarding his employment, all

9    of which provide ample grounds, I believe, for the two-level

10   enhancement for that specific offense characteristic.

11           With respect to the objection No. 6 to paragraph 82

12   of the report regarding obstruction of justice by providing

13   false information to the probation officer regarding correct

14   residence.  This is effectively a complement to the prior

15   objection, objection No. 5, complementary in the sense that

16   they, for all intents and purposes, deal with the same

17   conduct.  And given my ruling on the defendant's objection

18   to paragraph 81 of the report, I am also going to overrule

19   the defendant's objection to paragraph 82.

20           I find, once again, that the Government has

21   established by a preponderance of the evidence that the

22   defendant engaged in the obstruction of justice by providing

23   the materially false information regarding his correct and

24   current address.

25           With respect to objection No. 7 of the defendant,

1    and this time with respect to paragraph 90 of the report, in

2    which the probation officer recommends that the offense

3    level be increased by 14 levels given the loss and

4    restitution amounts.  I know we took evidence on this point,

5    Ms. Paluch, but if you have any additional argument you wish

6    to make at this time or you can rely on your written

7    submission.

8          MS. PALUCH:  We rely on our written submission,

9    Your Honor, as well as Agent Ennis' testimony today.

10          THE COURT:  Right.  Ms. Steward, same question.

11          MS. STEWARD:  We would rely, Your Honor, on the

12    prior counsel's objection.

13          THE COURT:  All right.  I find that the

14    Government's established by a preponderance of the evidence

15    that the total amount of loss and restitution owed jointly

16    and severally in this case by all four defendants

17    $563,890.85.  Pursuant to Section 2B1.1(b)(1)(H) of the

18    guidelines, this corresponds to an enhancement in the

19    offense level by 14 levels, given that the intended loss

20    exceeded 550,000 but was less than 1.5 million.

21          In addition to the testimony, I'm going to rely on

22    this decision specifically and expressly on the testimony of

23    Agent Ennis at trial and in addition to her testimony at

24    this hearing, specifically her testimony with respect to

25    trial Exhibit 72-1, and her related testimony as to that

1    exhibit; that being the spreadsheet of the loss calculations

2    in this case.

3           The testimony of Agent Ennis was clear and specific

4    that there was a connection of 13 addresses that were

5    contained in this exhibit of FAFSA applicants, 13 different

6    residences, addresses, that were tied to either Mr. Thomas

7    or his co-conspirators, his codefendants.

8           And, in addition, there was direct specific

9    testimony of the fact that the -- this defendant, Defendant

10   Thomas, had a connection, correlation -- a connection and

11   relationship with the following individuals and, as well,

12   the false applications made in their names:  Ms. Mullett,

13   Mr. Cox, Ms. Pickens, and Ms. Duncan, the latter of whom he

14   lived with -- the defendant lived with on Radiant Drive.

15          So with -- for all those reasons, the objection of

16   the defendant to paragraph 90 of the report is overruled.

17          Turning to objection No. 8, which is an objection

18   to paragraph 95 of the report, for the fact that the

19   probation officer did not recommend an adjustment for an

20   alleged minor role in the offense, I heard additional

21   testimony today at this sentencing hearing and I rely on

22   that, and I also am going to rely on the testimony at trial

23   on this issue.  But before I actually rule, I'll let counsel

24   inform me if they're going to make any additional arguments

25   at this time.

1          MS. PALUCH:  No, Your Honor.  Thank you.

2          THE COURT:  All right.  Ms. Steward?

3          MS. STEWARD:  Your Honor, we would stand on the

4     previous arguments and on our sentencing statement.

5          THE COURT:  All right.  All right.  I'm going to

6     overrule the defendant's objection to paragraph 95 of the

7     report where he contests the failure of the probation

8     officer to recommend that he receive a downward adjustment

9     for an alleged minor role played by him in the criminal

10    scheme in this case.

11         I agree with the Government that although

12    Codefendant Carr was indicted as the lead defendant in this

13    case, and even though the Government views Ms. Carr as the

14    most culpable member of this criminal enterprise, these

15    facts alone do not provide a basis from which this defendant

16    can contend that he's entitled to a reduction in his

17    applicable offense level for an allegedly minor role in his

18    crimes of conviction.

19         Indeed, as the Tenth Circuit has itself stated, "A

20    defendant is not entitled to a minor participant reduction

21    merely because he is the least culpable among several

22    participants in a jointly undertaken criminal

23    enterprise."  This is from the case of *United States v.*

24    *Lockhart*, 37 F.3d 1451 at 1455, a 1994 case out of the Tenth

25    Circuit.

1          Beyond this, I agree with the Government that

2     there's ample evidence in the record from which I can

3     conclude that this defendant did not have a minor role in

4     the criminal scheme carried out in this case.  For example,

5     the trial testimony of Codefendant Green made clear that

6     while she only personally assisted this defendant on one

7     occasion with one FAFSA application, she also testified her

8     knowledge about Mr. Thomas filling out FAFSA applications in

9     the scheme and withdrawing money from debit cards and that

10    that information came from conversations she had with

11    Codefendant Carr.

12          Ms. Green also testified at trial about the fact

13    that she delivered cash to Ms. Carr in the defendant's

14    presence and about the comfortable lifestyle that this

15    defendant and Ms. Carr shared.  Ms. Green also testified

16    concerning the questions this defendant asked of her after

17    his house had been searched.  I believe it fair to say that

18    Ms. Green's testimony established this defendant's knowledge

19    "concerning the scope and structure of the enterprise and of

20    the activities of others involved in the offense," and it

21    also established that Mr. Thomas was one of the primary

22    beneficiaries of this fraudulent scheme.

23          In spite of being convicted of the conspiracy

24    charge for conduct beginning in August of 2010 and

25    continuing until August of 2012, I note that the defendant

now claims that he did not join the conspiracy until February of 2012.  Given the jury's verdict, I reject this contention out of hand.  Moreover, I note that the trial testimony contradicts the defendant's contention that his involvement in enrolling four or five individuals at Pikes Peak Community College prior to 2012 was unrelated to the criminal scheme charged in this case because these individuals were not inmates.

I make this finding based on the evidence summarized by the Government in its response to this objection and that is filed at ECF 357 and can be found at pages 12 and 13 of that document.

I also reject the defendant's argument that he's entitled to a minor role reduction because he was involved in the conspiracy for only 10 of the 26 months of the conspiracy.  In the first instance, this contention flies in the face of the jury's verdict.  But even if this statement were factually true, I agree with the Government that 10 months is more than enough involvement to disqualify him from consideration for a minor role adjustment.

In the *Adams* case, the Tenth Circuit in 2014 decided the issue of the appropriateness of a minor role adjustment wherein the defendant recruited a friend to drive him and two other individuals to a bank robbery.  Mr. Adams in that case claimed he was entitled to minor role

adjustment because the other two individuals planned the robbery, he never entered the bank, and the recruitment of his friends to drive was "merely opportunistic."  The Tenth Circuit rejected this claim noting that the defendant had "acted as a lookout, planned to assist in the escape, and admitted to the knowledge of the scheme," and that this was sufficient involvement in the criminal conduct to disqualify the defendant in that case from a minor role adjustment in the offense level.

Also in support of my decision to overrule this objection was additional evidence that came in via the form of testimony of Agent Ennis today, that being that the criminal scheme in this case and the charged -- the indictment that was charged in the superseding indictment by the grand jury continued during the time that the defendant was incarcerated at the El Paso County Jail, and that this was directly tied to this defendant given his very frequent contacts while he was incarcerated and while the criminal scheme continued with both Ms. Carr and Ms. Harris.

So for all these reasons, the defendant's objection to paragraph 95 of the report is also overruled.

The defendant also filed a second through, or via, his prior counsel also filed a second set of objections at ECF 390.  And the defendant's objection to the second-level specific offense characteristic in paragraph 91 of the

1    report is overruled as moot given the elimination of that

2    enhancement in the final report.  So that two-level

3    enhancement is no longer contained in the final report and

4    that -- contained in the second set of objections which I

5    granted leave to prior defense counsel to file is overruled

6    as moot.

7            Given my rulings on the defendant's objections, I

8    find that the total offense level in this case is 31.  The

9    probation officer has determined the defendant's Criminal

10   History Category to be IV, yielding an advisory guideline

11   sentence of 120 months on Count 1, a guideline sentencing

12   range of 151 to 188 months on Counts 2 through 7, a period

13   of supervised release of one to three years on each count of

14   conviction, a fine range of 15,000 to $150,000, and a

15   special assessment of $700.

16           Subject to the objection the parties may have to my

17   rulings on the defendant's objections in this case, do

18   counsel agree that the Court has correctly calculated the

19   guideline range in this case?

20           MS. PALUCH:  We do, Your Honor.

21           THE COURT:  Defendant?

22           MS. STEWARD:  We do, subject to objection, Your

23   Honor.

24           THE COURT:  Yes.  And that's what I just said.

25           All right.  It's almost 10 to 1:00.  We're going to

1    take a short lunch break.  When we come back, Ms. Steward,

2    just so you're prepared, I'm going to take up argument on

3    defendant's motion for a variant sentence.  I'll hear, of

4    course, from the Government in response.

5            I would say let's keep it short so we can get out

6    of here earlier in the afternoon than otherwise.  Let's all

7    be back here at 1:20.  We will resume with the remainder of

8    the sentencing hearing at that time.

9            All right, we will be in recess.

10        (Recess taken at 12:48 p.m.)

11                        AFTERNOON SESSION

12        (In open court at 1:24 p.m.)

13            THE COURT:  All right.  At this time, I'll take up

14   the defendant's motion for a downward variant sentence filed

15   at ECF 353.  Ms. Steward.

16            MS. STEWARD:  Yes, Your Honor.

17            THE COURT:  Can you take the lectern, please.

18            MS. STEWARD:  Sure.  Your Honor, we mostly stand on

19   the sentencing statement that we submitted yesterday;

20   however, I would like to mention the fact that Mr. Thomas

21   grew up in a single-parent home, he was born to a very young

22   mother, and he also -- he witnessed abuse as he -- as a

23   child, particularly alcohol abuse and then physical abuse.

24            From that home, he spent time in juvenile hall

25   where he -- he was -- experienced some head trauma and was

1    often knocked out due to the policies that he -- in the

2    Indiana juvenile home.  I would also mention --

3              THE COURT:  The policy of being hit --

4              MS. STEWARD:  Not in the policy of the home, but

5    the internal workings of the home with the older children

6    and the guards often making people fight each other.

7              THE COURT:  Okay.

8              MS. STEWARD:  That was mentioned in the statement,

9    Your Honor.

10             I would also mention that, you know, Mr. Carr --

11   Mr. Thomas is a father for the first time.  He didn't think

12   that that was something that could happen for him.  He met

13   Ms. Carr and Ms. Carr was willing to have children for him

14   and those children are now the love of his life.

15             His older child, Milani, is a young and small

16   little girl, and his younger child, Tru, is a child that

17   suffers from autism.  You know, he's a particularly

18   vulnerable child, and both of those children are being

19   raised by their sibling, who is a young woman who's going

20   through her own marital trouble at this time.

21             I'd also make mention that while -- after the

22   indictment and prior to his incarceration, Mr. Thomas didn't

23   commit any other offenses.  He intend -- he attempted and

24   was successful in turning his life around.  He mentored some

25   people and he got a mentor.  He did his best to try to

1    reintegrate back into society, even though this indictment
2    was pending.
3              THE COURT:  What about -- well, as you know, I've
4    overruled prior counsel's objection to obstruction of
5    justice with respect to false information being provided to
6    the probation officer, so that's not something that helps in
7    terms of a mitigating factor with respect to his conduct
8    awaiting trial.
9              MS. STEWARD:  Yes, Your Honor.  I know that, but,
10   you know, it's something that Mr. Thomas made sure to ask me
11   to mention today.
12             THE COURT:  What about the fact that Ms. Carr did
13   not testify at trial?
14             MS. STEWARD:  Well, Your Honor, when I was
15   reviewing the case, and I looked at Ms. Carr's sentencing,
16   it appeared that Ms. Carr was initially going to testify at
17   trial, but ultimately decided not to because she didn't want
18   to give false testimony in this court.  There was some
19   information about, you know, a blowup between her and an
20   AUSA.  I'm not really sure of that gentleman's name, but
21   that's why she pulled out of her testimony agreement.
22             Ultimately that hurt Ms. Carr but she did so
23   because she knew that Mr. Thomas wasn't as involved as the
24   Government was saying.
25             THE COURT:  And so your position is that your

1    client was not involved in any way in Ms. Carr's decision

2    not to comply with the plea agreement, the cooperation

3    agreement, and testify at trial against him?

4              MS. STEWARD:  He was not.  He -- she relied on her

5    own conscience and what she felt was right with her

6    children.

7              THE COURT:  All right.  Let's move on beyond that.

8    You know, your first point about having a less than ideal

9    childhood, unfortunately it's something I see almost every

10   day with almost every single defendant.  And you know that

11   the cases talk about judges to look at variant sentences

12   when the situations really point to something that goes

13   beyond, you know, the usual circumstances that are presented

14   by defendants.  And, again, it is unfortunate, but physical,

15   emotional, sexual abuse, growing up in an impoverished

16   background, which I don't think -- I don't know if that's

17   really the case here, or even growing up in a -- in a

18   violent neighborhood, unfortunately does not distinguish

19   your client from too many other defendants.

20             MS. STEWARD:  I understand, Your Honor; however, we

21   do want you to take note of the fact that those things did

22   occur in his life.  And although he wasn't physically

23   abused, he certainly -- he certainly suffered psychological

24   abuse listening to his mother being abused.  I mean, for a

25   young man, especially one that's about 12 or 13, which is

1    when this happened for Mr. Thomas, and to witness those

2    things, or to hear those things, it's confusing.

3         It -- you know, it's put ideas in their head about

4    what should and shouldn't happen between two adults.  And,

5    you know, this gentleman that started the abuse against his

6    mother, Mr. Jones, Mr. Thomas saw him as a father and, you

7    know, ultimately the trust he put in him -- the trust that

8    Mr. Thomas put into Mr. Jones was betrayed by the fact that

9    Mr. Jones decided to beat his mother.

10        THE COURT:  I take it you disagree with the

11   Government's -- one of the Government's viewpoints of the

12   evidence in this trial, which was highlighted by Ms. -- in

13   part by Ms. Paluch's cross-examination of your client today,

14   that you -- that you disagree with the view that your client

15   is very good at putting blame and responsibility on the

16   women in his life and has taken precious little

17   responsibility for his actions.

18        MS. STEWARD:  I would disagree with that, Your

19   Honor.  You know --

20        THE COURT:  What's the basis for that disagreement?

21        MS. STEWARD:  Well, you know, I -- we still

22   maintain that Mr. Thomas did not get involved into this

23   scheme until 2012 -- about summer of 2012.  However, we

24   understand that -- this Court's ruling in that matter.  We

25   know that -- I know after speaking -- from speaking with

1    Mr. Thomas that he does take full responsibility for all of

2    the things that happened at -- with Ms. Mullett and the

3    things that happened after that.  I mean, so much so that he

4    decided to break off a relationship with the woman that he

5    had been romantically involved with for several years,

6    including that woman was the mother of his child.

7            While he, in this particular --

8            THE COURT:  Wait, wait, hold on.  How does that --

9    I'm not catching the causal relationship.  What's the

10   connection between ending the relationship between Ms. Carr

11   and taking responsibility or not taking responsibility for

12   his conduct in this case?

13           MS. STEWARD:  Well, what I'm saying, Your Honor, is

14   he is taking responsibility from his -- for his conduct.

15   The addresses with Ms. Mullett and -- and anything that

16   happened between those months of about August to November

17   when the raid happened -- when the raid -- the search

18   happened of the home on Kaibab street.  When that search

19   happened, he decided that this -- he could no longer be in

20   the relationship or be around Ms. Carr because he no longer

21   trusted her.

22           That being said, you know, he's not putting the

23   responsibility of those things onto Ms. Carr.  She was

24   involved in this scheme and he's not saying that he had no

25   involvement, he's certainly taking full responsibility for

1    the things that he was involved in.

2            THE COURT:  All right.  Anything else you wish to

3    say in support of the motion?

4            MS. STEWARD:  Well, we would stand on our -- on the

5    legal arguments that we made in our sentencing statement.

6            I would mention, Your Honor -- and I don't know if

7    you are willing to listen or would like the testimony -- but

8    there's a gentleman here named Markel Taylor that spent

9    several -- a good amount of his life in prison and knows Mr.

10   Carr -- Mr. Carr -- Mr. Thomas very well.  He also knows

11   some things about the -- you know, the psychology of being

12   in prison and, you know, Mr. Thomas would like for him to

13   testify, about two minutes or so, on his behalf.

14           THE COURT:  Testify or give a statement?

15           MS. STEWARD:  Give a statement.  I apologize, not

16   testify.

17           THE COURT:  And what's the -- his relationship to

18   the defendant?

19           MS. STEWARD:  They are friends and they worked

20   together on a House Bill, Your Honor.

21           THE COURT:  How would that be helpful for me in

22   terms of considering the sentencing factors under 3553(a) to

23   take in -- or listen to this statement?

24           MS. STEWARD:  Well, I think it goes to just

25   punishment.  It shows that Mr. Thomas worked hard to change

1       his life after that.  You know, when he was involved in this

2       scheme, you know, he -- he just wasn't being up to being the

3       man that he should have been.

4               After the search, he decided that he needed to do

5       what he had to do to support his children and to support his

6       community.  And Mr. Taylor can testify a little bit to that.

7               THE COURT:  All right.  I am going to exercise my

8       discretion and not allow a statement to that regard from Mr.

9       Taylor.

10              If you want to summarize, make an offer of proof,

11      if you will, on what he would have said, you can.  I'll give

12      you a few seconds to do that.

13              MS. STEWARD:  Sure, Your Honor.  After speaking to

14      Mr. Taylor, he explained to me that he and Mr. Thomas worked

15      together on a House Bill that hasn't been introduced yet,

16      but is hopefully --

17              THE COURT:  A House Bill?

18              MS. STEWARD:  Yes.  In Colorado.

19              THE COURT:  A bill for legislature?

20              MS. STEWARD:  Yes, Your Honor.

21              THE COURT:  Okay, go ahead.

22              MS. STEWARD:  That would help inmates and former

23      inmates with mental health issues and make sure that they

24      are getting the mental health evaluations that they need as

25      they're leaving prison so that they can come into society

126

1    and find the treatment they might need after leaving prison.

2              THE COURT:  All right.  Anything else?

3              MS. STEWARD:  Other than Mr. Thomas' statement, no,

4    Your Honor.

5              THE COURT:  Yeah, and he'll have his opportunity

6    for an allocution.  All right.  Thank you, ma'am.

7              I'll hear from the Government in response to the

8    variance motion.

9              MS. PALUCH:  Thank you, Your Honor.  I don't

10   believe there is a basis to vary from the guidelines.  With

11   respect to what counsel stated, I don't have anything to

12   refute the defendant's background.  I would like to speak to

13   the sentences imposed on the other defendants because I know

14   that was a concern of the Court, so with the Court's

15   permission, I would go in that direction.

16             THE COURT:  Right.  I think the -- and you're

17   right, that has been my concern on the sentencing phase for

18   this defendant for quite a while now, and we've had

19   opportunities to get a glimpse of that because we've been

20   coming back here so many different times.  And that would be

21   the disparate -- the huge disparity at 180 months as

22   compared to the codefendants' sentences that I've imposed

23   upon them.

24             And I understand, you know, very well the

25   differences in their criminal history, the differences in

1    the specific offense characteristics that cause the

2    significant increase in the offense level that were of the

3    defendant's own doing in terms of obstruction of justice and

4    flight and those things.  But we still are not even talking

5    about 50 percent more -- the highest sentence I imposed was

6    on Ms. Carr, the longest sentence in terms a custody, was

7    57 months.  And so we're looking at not a 50 percent

8    increase or a double, you're asking me to impose a sentence

9    that's more than triple that of Ms. Carr's, and so that's

10   what I need you to address.

11          MS. PALUCH:  Absolutely, Your Honor, and as the

12   Court has alluded to, this defendant's adjusted offense

13   level is eight levels higher than his codefendants.  And

14   those are eight levels where he earned every single one.

15   One of them is for being convicted of a mail fraud scheme,

16   so that's one additional point.  Four of them are for the

17   obstructive conduct that we've been talking about.  And then

18   three of them are for not taking responsibility.

19          And I differ with defense counsel, he still has not

20   accepted responsibility.  I don't think anything the Court

21   heard this morning indicates that he has accepted

22   responsibility for his role in this scheme.  So to -- if we

23   were to look at Heather Carr, she starts -- her offense

24   level was a 25, Your Honor, with a Criminal History Category

25   I, and that put her in a range of 57 to 71 months and the

1    Court imposed 57 months.  If we were to take Heather Carr

2    and add those eight levels, if she had engaged in the same

3    conduct that he has, her adjusted offense level guideline

4    range would have been 135 to 168.

5            And what our point is is that to just look at this

6    from a distance and say Okay, Carr got this, Green got this,

7    Diaz got this, where should Mr. Thomas fall?  We believe

8    that that will not result in a just sentence because it

9    would be discounting the harm that he put those SWAT

10   officers in, it would be discounting what he did to

11   probation.  It would be discounting his refusal to accept

12   responsibility.  All of those things have to be addressed

13   and we believe that that's why the defendant finds himself

14   in that 151 to 188 range.

15           So let's talk criminal history.  Okay.  So this

16   defendant's in at a 4, Ms. Green was at a 4, and Ms. Diaz, I

17   believe, was at a 6.  And as, if you will recall with Ms.

18   Diaz, Your Honor, she was receiving points for a criminal

19   history that dated back to when she was 13 years old.  As

20   you recall, this is a girl whose mother abandoned her and

21   Heather Carr took over the role.  And so this Court agreed

22   that her criminal history score was overrepresented.  And

23   that's also an individual who pled guilty, accepted

24   responsibility early on in the case, she received 5K

25   cooperation credit for her time.  So I think what we have to

1    do is look at each defendant individually.

2           You look at Marcelle Green, she received a 5K.  She

3    was the only one brave enough to come into this courtroom

4    and testify.  She received acceptance of responsibility.

5    She wasn't convicted of a mail fraud scheme, she -- as far

6    as a level 7, starting out at a 7.

7           So I think the inquiry really should be this

8    defendant is appropriately in that guideline range, and is

9    there a basis upon which to base a variance, to go down all

10   the way -- I mean, counsel astonishingly is asking for a 15-

11   to 21-month sentence or something along those lines.  I

12   mean, how does that make any sense at all?  There has to be

13   a basis -- how do we get from 151 and how do we justify a

14   variance all the way down to even the 84-month sentence

15   proposed by prior counsel?  We think that's 50 percent of

16   where he falls in the guideline range.

17          So we believe basing this defendant's sentence

18   solely on what his codefendants received ignores the SWAT

19   stand-off, it ignores what he did to probation.  You know,

20   he is the master manipulator and we believe he manipulated

21   this Court at his bond hearing after the trial.  He

22   represented he was employed, he had a place to live.  As it

23   turned out, he was not employed, he was homeless, and then

24   we end up having to get an arrest warrant and send out the

25   SWAT team for him.

1          Let's talk about the harm from the defendant's

2     conduct.  And as this Court has noted in the other

3     sentencing hearings, this is 181.  I mean, that's a

4     staggering number of inmates whose identity was stolen.  And

5     as you recognized with the other inmates, these are

6     vulnerable victims who have little ability to monitor their

7     credit score.

8          You know, what's particularly telling is that this

9     defendant and Marcelle Green -- well, first of all, this

10    defendant spent 10 of his 39 years of life in prison.  And

11    so he, better than anyone else, as well as Marcelle Green,

12    they know how vulnerable those people were and yet they

13    still victimized them.  The community colleges that were

14    harmed, the Department of Education that was harmed.

15         They took funds for themselves that were meant for

16    people that are trying to better themselves and go to

17    school.  So we all know that student loan debt is staggering

18    in this country, and that was money that could have gone to

19    students to help them fund their education legitimately.

20         You know, this sentence matters for those students.

21    This sentence matters for the parents who are struggling to

22    put their kids through college.  The Department of Education

23    is owed a half million dollars, the community colleges are

24    owed $72,000.  They're probably never going to see a penny

25    of that money.

1        So we've got the harm to all of those entities, as

2   well as Ismael Omar, Vanessa Lopez, Kimmisha Mullett,

3   Christine Duncan.  These are people who trusted the

4   defendant and he violated that trust and used their identity

5   or used their address, and caused all sorts of problem for

6   them.

7        This Court is very well aware of Christine Duncan's

8   letter and the abuse that she suffered at the hands of this

9   man.  You look at history and characteristics.  Does that

10  provide you with the basis to vary?  There's nothing there

11  that would warrant -- certainly the Court can consider

12  comments of counsel this morning, but when we talk about

13  what we elicited as him lying to his state parole officer,

14  at every step this defendant doesn't want people to know his

15  name, he doesn't want them to know where he lives, he didn't

16  want to associate himself with Heather Carr.  He had to have

17  known, given his history, that whole thing was going to blow

18  and he wanted nowhere near that.  He didn't want to be

19  associated with that fraud.

20       Your Honor, what I'd like to move to is this

21  defendant is --

22       THE COURT:  Before you do that, so it sounds to me

23  like what you're saying is it's because of the

24  defendant's -- this defendant's conduct in the obstruction

25  of justice and the endangerment and flight that justifies

1    these tripling of the guideline range and, more

2    specifically, where I should come out in that range or below

3    that range.  But how do we -- how do we deal with the fact

4    that in terms of the underlying scheme -- the criminal

5    scheme that the grand jury indicted on in the superseding

6    indictment and, as I think you, yourself, conceded at one of

7    the sentencings of the other defendants, that Ms. Carr is

8    and always has been the most culpable individual in this

9    conspiracy and it was but for her theft of the identity of

10   these individuals from her Accurint database, this crime

11   could not have happened.

12          So I understand that this defendant made terrible

13   choices and undertook terrible conduct or engaged in conduct

14   that now what I'm faced with in terms of sentencing has

15   really come back to bite him.  But putting the

16   post-conduct -- the post-scheme conduct aside, isn't it

17   critical for me to sentence individuals here with at least

18   part of the factor that I'm considering here, their relative

19   culpability in the criminal scheme that they were indicted

20   on?

21          MS. PALUCH:  Certainly.  That has to be a

22   consideration for the Court.  Two responses to that:  First

23   of all, when we have Omar saying that back in between March

24   and June, the defendant saying, "I know how to do this.  I

25   know how to commit student financial aid."  And then we have

1    this relationship with Carr.  And in July is the very first

2    time she used her -- uses her Accurint database to get a

3    Social Security number on Omar, it's a logical inference

4    that it's this defendant's involvement with Ms. Carr that

5    leads her down this path.  It's her relationship with him

6    that has led to this.  Do we think she's most culpable

7    because without her the scheme doesn't work?  Absolutely.

8         But is it a stretch to say that she's manipulated

9    by him as well?  We don't think that's a stretch.  And we

10   are firm in our belief that her last-minute decision not to

11   testify is because of this defendant.  Just like all these

12   other people we presented evidence to the Court on who were

13   afraid of him and they were afraid to come to court, we

14   believe that's what happened with Ms. Carr.

15        I think ultimately when it came down to having to

16   testify against the father of her children, she couldn't do

17   it.  She couldn't do it and we think she was afraid of him

18   as well.  So I might have gotten off on a tangent there, but

19   let's say that you're trying to figure out how -- how do we

20   gauge their culpability?  And so we had Carr at a 57, and

21   that deserves a footnote.

22        The reason why there was a 57, as the Court knows,

23   is because we stood by the plea agreement when the Court has

24   noted repeatedly we could have pulled out of that.

25             THE COURT:  Right.

1          MS. PALUCH:  We could have pulled out of that and

2     we would have had a whole 'nother trial on this case, and we

3     felt it was wiser to argue that the Court should consider

4     her conduct in assessing her sentence.  And we believe that

5     the Court did that.  And we provided you case law that said

6     when the defendant reneges on their cooperation agreement,

7     the Court could factor that in imposing a sentence and

8     that's what happened there.  So she is at a 57.

9          So if we use that as a benchmark and then you take

10    someone with a criminal history I, and then you take him

11    with a IV, you know, that would put you easily in the 84- to

12    100-month range if you were going to keep those two

13    comparable.  I think that's a fair statement.

14         So then you take that about 100-month sentence --

15    well, if he's at an 84, let's say -- and I'm just talking

16    numbers here -- but if he were at 84 and she were 57, you've

17    got to add onto the 84 for all the obstructive conduct and

18    for the refusal to accept responsibility.

19         You know, at least Heather Carr stood at this

20    podium and agreed repeatedly with the Court about what she

21    did, and she accepted full responsibility and told the Court

22    that she did participate in this -- this scheme.  So I don't

23    see any world in which we even get below 100 months, or even

24    120 months, when you factor in all of these issues that

25    we've been talking about.

1          So I know on the one page, it's like should we

2     look -- okay, Carr did this, Thomas did this, Green.  I

3     mean, Thomas benefited just as much as Carr.  He benefited

4     probably more because of his attorney being paid for in

5     prison and the money on his commissary account.

6          But if we look at relative culpability and then

7     say, well, he's got to be put down closer to Carr's

8     guideline sentence, that ignores all of his additional

9     conduct.  And I just simply don't view that as being a fair

10    or just sentence.

11         So I think where we are is the Court starting with

12    the 151 to the 188.  We're arguing 180.  Probation is

13    submitting to you that they could find no basis for a

14    variance.  And they're telling you a 151 sentence is

15    appropriate.

16         And I do think when you look at the history and

17    characteristics of this defendant, as far as the nature of

18    his criminal history -- I understand the Court's ruling on

19    not considering the uncharged conduct, but you've heard

20    testimony here today that's concerning.  And I think where

21    that falls in under 3553(a) is the deterrence as well as

22    protecting the public.

23         You know, this individual serves 10 years in prison

24    and he's not deterred.  Within a year of being released,

25    he's involved in this scheme.  Then he goes to prison for an

1    aggravated robbery, he sits in prison for 11 months, and

2    what does he do?  He gets right back into the scheme.  It's

3    like every time he goes to prison, he doesn't learn that the

4    right thing to do is stay out of legal trouble.  Instead, he

5    just -- what's the next scam?  How can I get back involved

6    in criminal activity?

7           Doesn't seem like it matters how much time you give

8    him, it doesn't reform him.  And so those are the type of

9    people that you're more -- more concerned about, that you

10   have to send the message of deterrence.  And those are the

11   type of people where you have to be concerned about

12   protection to the public.  I mean, it's concerning to me

13   that we have that many people that are afraid of this

14   defendant that didn't come in, that I do think protection of

15   the public, deterrence, history and characteristics of this

16   defendant all counsel in favor of a stiff sentence.

17          You know, Your Honor, it's absolutely offensive

18   when we go to the SWAT stand-off -- and I know the Court has

19   already issued a detailed ruling on that -- but for that

20   many hours and to place that many people in danger, and his

21   response is, "Well, I was just sleeping."  As the Court

22   said, that has absolutely no credibility.

23          At the prior bond hearing, his -- his prior counsel

24   argued, "Well, he didn't come out because he was scared."

25          Well, you know who should have been scared are the

1    SWAT members having to go in and arrest this man who has

2    firearm violations in his history.  Who should have been

3    scared is Ms. Conrad, who's in this house and who knows

4    what's going to happen.

5           He placed all those people at risk.  I mean, that's

6    extremely concerning that he would engage in that conduct,

7    and it's exactly what Ms. Lopez said he would do.  She said

8    this defendant will not go back without a fight, and that's

9    exactly what happened.

10          You know, I've talked a lot about this defendant's

11   desire to manipulate people and he's been successful and

12   he's avoided a lot of things in his life because he does

13   have that ability to manipulate people.  And we believe

14   that's what he's trying to do with this Court is manipulate

15   you.  He tried to do that in a letter he sent to you prior

16   to one of his many last sentencing hearings.

17          And through that letter he tried to convince the

18   Court he's just a good guy trying to save lives.  He wasn't

19   saving lives when he caused that stand-off.  He wants you to

20   believe it's the Government who's trying to make him look

21   bad.

22          We are here talking about his conduct; his actions;

23   his choices.  We're not making this stuff up.  He

24   continually blames everyone around him.  And noticeably

25   absent from that letter, Your Honor, was any acceptance of

1   responsibility or remorse at all.  You heard no remorse from

2   him on the stand.  I -- I would submit to you that you can

3   discredit every single thing he said from the stand.

4         You know, he has assertions in his supplemental --

5   his sentencing statements submitted to you yesterday that he

6   doesn't even agree with.  He has no idea who this Frank Wood

7   person is who allegedly sent in a letter in support.

8         I mean, it's just consistent, every stage of this

9   case.  "I'm not feeling well."  "I want to fire my

10   attorneys."  Now at the last minute, "I want to hire an

11   attorney."

12         He has tried successfully to put as much time

13   between the guilty verdict and sentencing as he could.  And

14   I think what he was trying to do there, Your Honor, "If I

15   could put as much distance -- here we are at a year and a

16   half later, that maybe everybody will just -- the fatigue

17   will be too much.  Maybe they'll just stop caring, like

18   what's the big deal, that was so long ago?"

19         We do care.  We haven't forgotten.  We haven't

20   forgotten the harm that he and his co-conspirators caused.

21   We haven't forgotten the harm and the risk to the U.S.

22   Marshal service and to the SWAT team members.

23         We haven't forgotten the harm to Christine Duncan,

24   Lopez, Omar.  We're not going to forget.  And the fact that

25   we're here, a year and a half later, that's okay because the

1    Court has gone through every single objection, we're

2    spending most of the day here today to go through all of the

3    factors of 3553(a).

4              And I think at the end of the day when the Court

5    does that careful analysis, you will agree with the

6    Government that 84 months is too short of a sentence and we

7    submit the 180 that we're asking is appropriate and, at a

8    minimum, we would suggest a guideline sentence, Your Honor,

9    because there simply are not factors that would warrant the

10   variance clearly to what defense counsel is asking for.  But

11   as probation can find no grounds, nor can we.  And for those

12   reasons, we ask you to impose the 180 months.

13             THE COURT:  All right.  Thank you.

14             Ms. Steward, it's your motion.  I'll give you an

15   opportunity for a brief reply.

16             MS. STEWARD:  Thank you, Your Honor.

17             Your Honor, we would state that the Government

18   would be -- before they -- during the plea agreement that

19   they had with Ms. Carr, allowed her to argue for 24 months

20   in confinement.  24 months, which is essentially two years.

21   I mean, ultimately she was sentenced to 57 months, but here

22   is a major --

23             THE COURT:  I don't understand what you just said.

24   The Government allowed her to make an argument?

25             MS. STEWARD:  Per the plea agreement, Your Honor,

1    there was a stipulation that she could argue for 24 months.

2    I understand --

3          THE COURT:  Oh, I see.

4          MS. STEWARD:  -- there were some issues with the

5    plea agreement and ultimately they upheld their end of the

6    bargain, whereas Ms. Carr didn't do so, but the Government

7    was willing to allow Ms. Carr to argue for 24 months at some

8    point, which means that even though she was a major

9    contributor, a major conspirator in this case, they felt

10    that 24 months was something that she could potentially

11    argue for.

12          Here they're asking for, you know, four or five

13    times that amount.  Further, Mr. Thomas didn't take a plea

14    because he felt that he couldn't.  He felt that he couldn't

15    tell the Government that he was fully involved in this

16    scheme because he wasn't.  And he felt that by doing so, he

17    would perjure himself.

18          And when --

19          THE COURT:  Well, that's one way to look at it.

20    The other way to look at it is he didn't want to accept

21    responsibility.

22          MS. STEWARD:  Yes, Your Honor, that's another way

23    to look at it.  But after speaking to Mr. Thomas, that's

24    what he told me, that he felt like he couldn't take a plea

25    because he felt like he would be committing perjury to the

1    Court by doing so.

2              When they said that he tried his hardest to

3    distance himself --

4              THE COURT:  I don't understand that argument.  If

5    someone goes to trial and they decide -- a defendant, and

6    they decide to take the stand -- which no one's going to

7    require them to do -- there's no perjury as long as you tell

8    the truth.

9              MS. STEWARD:  That's correct.

10             THE COURT:  So what's the fear -- it's -- as I

11   recall, there was a similar argument for General Flynn, that

12   he was afraid of having to commit perjury.  Well, no one

13   forces anybody to commit perjury, right?

14             MS. STEWARD:  That --

15             THE COURT:  You decide under oath whether you're

16   going to tell the truth or not.

17             MS. STEWARD:  You're right, Your Honor.  However,

18   what I'm referring to is that he felt like he would have to

19   say that he was fully involved in this scheme from the very

20   beginning and he maintains that he was not.  He was

21   involved, certainly, but not from the very beginning.  And

22   that's why he felt like he couldn't take a plea in this

23   case.  By doing so, he would have to say, "Yes, I was fully

24   involved," and that's not the truth.

25             Further, Your Honor, the Government wants you to

1    believe that he's trying his hardest to distance himself
2    from Mrs. Carr; however, these two have two children
3    together and he is on their birth certificates.  That he
4    can't distance himself from Mrs. Carr, they have children
5    together.  He's not ever denied that they have children --
6             THE COURT:  So there's no such thing as absentee
7    fathers?
8             MS. STEWARD:  Well, Your Honor, there are such --
9    there is absentee fathers --
10            THE COURT:  Because you have your name on --
11   unfortunately because someone has their name on a child's
12   birth certificate does not mean they're going to be around
13   for that child's life.
14            MS. STEWARD:  You're right.  However, Mr. Thomas
15   has been around for his children's lives.  He's been in
16   Milani Thomas' life since he was released from custody in
17   Colorado Springs, and he was there for the birth of Tru
18   Thomas and has been there since.  He -- since the birth.  He
19   briefly didn't have contact with Mr. -- with Tru Thomas
20   whenever Ms. Carr moved to Virginia, but at that point,
21   they -- the child was diagnosed with autism and the two came
22   back together to do what they could to make sure that this
23   child was fully supported.
24            You know, the Government suggests that Mr. Thomas
25   had some hold over Ms. Carr and that she didn't testify

1    because he told her not to do so.  When I looked at

2    Mrs. Carr's sentencing statement, that's not what she said.

3    She said, "I couldn't say what I had said previously about

4    Tramell because that wasn't true.  And that I got into

5    the -- I was talking to the AUSA and he yelled at me and

6    ultimately there was an apology and everything came

7    together."  And she was able to keep her plea agreement, but

8    she didn't say that she was scared, she didn't say that she

9    didn't want to, she said, "I couldn't do it because it was

10   wrong."

11              THE COURT:  Right, but as you know there are

12   oftentimes situations where there's no direct evidence of

13   anything.  We -- there was never any evidence produced at

14   trial of a recording of a phone call that your client placed

15   to Ms. Carr intimidating her into not testifying.  But we,

16   as triers of fact, both a jury and myself -- although this

17   issue wasn't in front of them -- we have to take

18   inferences -- reasonable inferences, from facts.

19              I'll tell you, it really -- let's just say the

20   timing of her pulling out of her testimony was very

21   interesting to me, and she had already come out -- all the

22   way out here from Virginia, or wherever -- I think she lives

23   in Virginia --

24              MS. STEWARD:  Yes, she did.

25              THE COURT:  -- and she was here, she was ready to

1    testify, and then all of a sudden, the cold feet.

2    Knowing -- she didn't know if the Government was going to

3    pull out of the -- of the cooperation agreement or not.  She

4    very well, by doing that, threatened the viability of her

5    agreement and was facing a trial with the potential

6    conviction of all these counts.

7            It's very hard for me to believe that someone does

8    all -- takes that risk and does all that just because

9    allegedly one of the AUSAs raised his voice to her.

10           MS. STEWARD:  Well, and also she has children with

11   Mr. Thomas.  I mean, it's not really -- I mean, if I recall

12   what I read correctly, she was very concerned that her --

13   her oldest child was going to have to take custody of her

14   younger three children, some -- two of which weren't born

15   when the scheme began, and then they were born.

16           So she -- she felt bad for burdening her child, her

17   older child, and she felt like if Tramell didn't have to

18   spend so much time in custody, perhaps he could help take

19   care of the children, too.

20           She has more than one alliance here, not just to

21   Mr. Thomas, but to the children that they have together,

22   especially Tru Thomas, who like I said, is a vulnerable

23   child.

24           Your Honor -- I apologize -- you know, the

25   stand-off, I know that we -- there was a lot of testimony

1    about that stand-off and Mr. Thomas' involvement in it.  You

2    know, I don't know that much can be said that is very

3    positive of Mr. Thomas in the stand-off.  I know that it --

4    it seems like, you know, being asleep through all of that

5    would not be something that someone could do; however, Mr.

6    Thomas --

7              THE COURT:  You would have to be in a deep coma.

8              MS. STEWARD:  I -- I would agree, Your Honor.

9    However, Mr. Thomas did have a reason to be afraid.  You

10   have 12 officers show up at your home and then they call

11   SWAT.

12             You know, sadly -- and I'm -- not that I want to

13   make this a big issue, but sadly in this country people get

14   shot by the police.  Now, that doesn't mean that these

15   people were intending to do that, but that's a concern that

16   some people have.  And so it's not an unvalid concern.

17             THE COURT:  I agree.  I agree that unfortunately

18   those kind of things happen and they have happened in our

19   country, but I think someone in that situation would take a

20   very, very different approach than letting this thing

21   escalate for three hours and just hiding in a home.

22             I mean, I think -- you know, apparently Ms. Conrad

23   had a telephone, you know, there's individuals that had been

24   called, they could have called the -- he could have called

25   the marshals directly and said, "Look, I'm in here.  I'm

1    going to come out, my hands up.  I won't have anything.  You

2    assure me that I will be okay."

3          There's a lot of different ways this could have

4    played out other than hiding in the bedroom for three hours

5    and letting Ms. Conrad do all the interaction with the

6    marshals and having her put herself at risk by being near

7    the glass door that gets shattered and cuts her when the

8    porting of those -- of that door and the windows take place.

9          So it's -- hypothetically, what you've just said is

10   true.  I don't think the facts here bear it out.

11         MS. STEWARD:  Your Honor, my only response to that

12   would be that, you know, what people do when they're scared

13   or when they're afraid is not --

14         THE COURT:  That's not what he said.  I mean, the

15   unrebutted testimony of Supervisor Willhite was that when he

16   was finally taken into custody, all that your client said

17   was that he was asleep in the west side bedroom.

18         MS. STEWARD:  That's correct, Your Honor.

19         THE COURT:  And I have nothing -- I have no other

20   evidence to controvert that, so that's all I can base my

21   assessment of that factual -- that portion of the facts on.

22   There's nothing else in front of me.

23         MS. STEWARD:  I understand.  Well, let me move over

24   to the desire -- the Government's contention that he has a

25   desire to manipulate people.

1          You know, I know we're not necessarily looking at

2     Mr. Thomas' post-scheme conduct, but when we look at that

3     conduct, and the break from Ms. Carr, Mr. Thomas went on in

4     an effort to -- to -- to work with people, he went on to

5     help a young man, Mr. Buffet, to become -- get out of

6     homelessness, he helped his family.  He got his own mentor,

7     Mr. Joseph Conrad, who I believe is the father of Ms. Conrad

8     who was involved in the stand-off there.

9          He went on to try to build a life that was both

10    law-abiding and good.  We all know that it takes a long time

11    for people that have been incarcerated to do that.  And

12    so -- I mean, you know --

13         THE COURT:  Well, then, what -- the problem,

14    again -- I mean the argument, the words make sense and in

15    the abstract and hypothetically could be a meritorious basis

16    for consideration in mitigation, but the facts again don't

17    bear it out.

18         As the -- as Ms. Paluch pointed out, within a few

19    months of being -- you would think if he truly was as you

20    described, someone who has learned his lesson and spent a --

21    to lose your freedom for a decade in your 20s is

22    unmanageable -- or at any age, but especially when you're in

23    the prime of your life.  And someone that would be

24    approaching things differently, earnestly and in good faith,

25    to put that kind of criminal lifestyle behind them and move

1    forward, that's belied by the -- by the evidence we have

2    here which is, in a few months your client was right back

3    into committing a new crime.  And then we have the

4    incarceration in El Paso County, which the charges are

5    dropped, and he's there for almost a year.  Comes out and

6    again goes back into, as the evidence at the trial bore out,

7    into criminal conduct again.

8          So, again, I'm just not seeing how the facts

9    support the thrust of the argument that you're making.

10         MS. STEWARD:  Well, Your Honor, I liken Mr. Thomas'

11   conduct to that of a drug abuser.  Certainly they often go

12   into treatment and then relapse, go into treatment and then

13   relapse, and go into treatment and then relapse.  Until

14   something happens to them that forces them -- or they make

15   the decision to get clean totally.

16         Mr. Thomas went to prison as a 19-year-old.  He was

17   stunted in prison.  He didn't -- he wasn't allowed to grow.

18   He -- I mean, well, the growth that he got there wasn't very

19   large, let me just say that, not that he wasn't allowed to

20   grow.  I mean, such that, you know, when he went to prison,

21   America Online was our web-based system.  That's the only

22   thing we had.  We could dial up AOL.

23         So you think about all the things that occurred

24   during the 10 years that he was in prison, and then getting

25   out and just being thrust into the world, you know, all he

1   knows is criminal activity.  All he knows is that, you know,

2   "I need to figure out how to pay for -- get these things, so

3   that I can live."

4            Now, is that correct?  Is that the right thinking

5   to have?  Not necessarily.  But it's something that happens

6   to people that are incarcerated.

7            THE COURT:  Let me ask you to direct your attention

8   to the major point of the Government, which is but for your

9   client's own conduct, we wouldn't be looking at anything

10  near these kind of sentences or at least the guideline

11  range.  So, as you know, because of actions he took to bring

12  this upon himself, we have an eight -- in the aggregate, in

13  the total, eight levels that were increased to the adjusted

14  offense level based on the conduct that was in great part at

15  issue here today.

16           If you remove those eight -- if you subtract,

17  rather, those eight levels from the 31 total offense level

18  we have here, that gets you -- I think it was 31 --

19           MS. STEWARD:  I believe so.

20           THE COURT:  31.  Okay.  31 minus 8 is 23.  Offense

21  level of 23, Criminal History Category of IV, we're at 70 to

22  87 months.  So if your client had just -- you know, when he

23  got arrested, goes to his bonds -- his detention hearing,

24  either gets bond or doesn't, stays on the straight and

25  narrow, keeps his head down, gets a job if he's given bond,

1    you'd be arguing for a variant sentence down from the bottom
2    of guideline range of 70.
3           But, in fact, you're standing here arguing to me
4    for a variant sentence down from the bottom of 151 months.
5    Totally, completely 100 percent of your client's own doing.
6           MS. STEWARD:  You are correct, Your Honor.  I would
7    mention that the mail fraud is 1 point and then for every
8    other codefendant that was able to plead in this case, that
9    the mail fraud counts were dropped against them.  I would
10   say that in our view Mr. Thomas has taken responsibilities,
11   which is another three points.
12          THE COURT:  How so?  How has he taken response --
13   where and in what testimony or filing has your client taken
14   any responsibility in -- for his conduct in this case?
15          MS. STEWARD:  Well, he took responsibility today,
16   Your Honor.  He talked about Ms. Mullett and the fact that
17   he used her address and that he felt terrible for having
18   done so and that, you know, he, you know, probably should
19   have known a little bit better, but he did that anyway.
20          THE COURT:  That's the tiny little piece, I will
21   agree with you, that he did take responsibility for.  But
22   the rest of it that I heard, I have to agree with Ms.
23   Paluch, I don't think your client helped himself much with
24   his testimony today, especially on that score of taking
25   responsibility.

1       MS. STEWARD:  Okay.  Well, Your Honor, like I said,

2   we disagree.  We believe that, you know, he's admitted to --

3   while he didn't admit to the cards at the arrest -- the

4   traffic stop arrest, you know, he ultimately did today, and

5   he's said it to me, certainly, that said that he felt

6   terrible for what had happened with Ms. Mullett, that he did

7   not intend for her to get involved in anything like that,

8   and that she was a friend of his that he felt had gotten

9   used in this situation.

10       And so -- and we would just ask, Your Honor, that

11  you take into account the things that we put in our

12  sentencing memo, along with the sentences of the other

13  codefendants in this case when you're thinking of the

14  sentence for Mr. Thomas.

15       THE COURT:  All right.  Thank you.

16       MS. STEWARD:  Thank you.

17       THE COURT:  All right.  Before I rule on the

18  defendant's motion, I'm going to consider some of the

19  history and characteristics of this defendant as they apply

20  under Section 3553(a).  The record in this case indicates

21  that Mr. Thomas is 40 years old, he's a citizen of the

22  United States, he was born in Fort Wayne, Indiana, to

23  parents who were never married.  Mr. Thomas was raised by

24  his mother and his mother's boyfriend, Steven Jones.  The

25  defendant moved with his family to Colorado Springs in 1997

when he was 18 years old.  His mother continues to live in Fort Wayne and his father now lives in Phoenix, Arizona.

The defendant has three half-sisters and one half-brother.  The defendant left South Side High School in Fort Wayne, Indiana, in 1993 prior to completing the 10th grade.  He never resumed his high school studies and never received a high school diploma.  He did, however, complete the requirements to be awarded a GED certificate in 1996.

The defendant married Lola Gallegos in 2004 and the couple divorced in 2010.  Mr. Thomas has two children from a previous relationship with codefendant Heather Carr, as we've discussed at length, whom he dated for approximately seven years.  His two children reside in Phoenix and they live with Ms. Carr's eldest daughter.

With regard to gainful employment, Mr. Thomas was unable to provide the probation officer with any employment information which could be independently confirmed.  Not too many defendants appear in front of me that I'm able to say that about.

With regard to defendant's criminal history, according to the presentence report, he has no juvenile criminal adjudications, he has been assessed eight criminal history points by the probation officer, which places him in a Criminal History Category of IV.  Most notably in terms of his prior criminal history is the fact that in 1999, the

1    defendant was convicted of two counts of aggravated robbery

2    with the use of a weapon and was not paroled until 2009.

3           Turning to the nature and circumstances of the

4    offenses, as all counsel and the parties and -- not all

5    counsel, now that we've had new defense counsel -- with the

6    exception of Ms. Steward, but clearly prior defense counsel

7    was present at the trial, heard all the evidence as did the

8    prosecutors and myself.  I believe little purpose would be

9    served here today by a detailed recitation of the nature and

10   circumstances of the offenses.  I will instead incorporate

11   herein by reference the statements of fact contained in the

12   Government's sentencing statement which was filed pursuant

13   to General -- the Court's General Order 2002-3, as well as

14   local Criminal Rule 32.1, and which were set forth by the

15   probation officer in paragraphs 11 through 21 of the report.

16          I also incorporate herein by reference those

17   statements of facts set forth by the defendant filed in

18   response to the Government's sentencing statement as he was

19   permitted to do so under the Court's General Order 2002-3,

20   as well as local Criminal Rule 32.1, and which were also set

21   forth by the probation officer in paragraphs 50 and 51 of

22   the report, with the important caveat, however, that I will

23   do so only to the extent that these factual contentions are

24   not inconsistent with my findings in this hearing as they

25   relate to the parties' respective objections and their

1    sentencing related motions.

2          For purposes of this hearing, however, I will state

3    for the record a very substantially abbreviated summary of

4    the facts as determined by the jury in this case.

5          Mr. Thomas' offense conduct spanned over two years

6    and involved the defendant, as well as his codefendants,

7    conspiring to defraud the Department of Education by

8    submitting false claims for federal student aid.  This

9    defendant and his codefendant, Heather Carr, obtained names,

10   birth dates, and Social Security numbers for a large number

11   of incarcerated individuals and used their personal

12   information to apply for federal student aid.  In these

13   circumstances, these inmates are correctly considered to be

14   vulnerable victims.

15         While the defendant and Ms. Carr devised the

16   scheme, codefendant, Mercedes Diaz and Marcelle Green,

17   agreed to receive mail in the name of the inmates at their

18   residences as well as other residences under their control.

19   During the course of the conspiracy, Mr. Thomas and his

20   codefendants were involved in submitting over 150 false aid

21   applications seeking approximately $1.3 million in federal

22   financial aid funds.

23         The Department of Education disbursed over $550,000

24   as a result of Mr. Thomas and Ms. Carr's false claims.  Of

25   this amount, the defendants received over 420,000 in

1    refunds.

2            As of today, the defendant has served 433 days or

3    nearly 14 1/2 months in pretrial detention.

4            Ms. Ansart, you've been sitting there very

5    patiently all day.  Do you have any statement you wish to

6    make at this time on behalf of your office?

7            PROBATION OFFICER:  I don't, Your Honor, but thank

8    you.

9            THE COURT:  All right.  Thank you, ma'am.

10           All right, Ms. Steward, if you and your client

11   would please approach the lectern, please.

12           Mr. Thomas, do you wish to make any statement to

13   the Court on your own behalf before I announce your

14   sentence?

15           THE DEFENDANT:  Yes, sir, I do.

16           THE COURT:  Go ahead.

17           THE DEFENDANT:  Your Honor, you said it the best

18   way possible, and you were being kind in saying it, because

19   it's actually worse than what it is.  You said I made wrong

20   choices.  I've made a lot of idiotic, stupid choices.

21           And, honestly, I don't know how I -- how I arrived

22   at the choices that I make.  It's like I have good

23   intentions, or my mind, my thinking is head on to the right

24   process, but then somewhere, I don't know if it's thinking

25   errors or my brain is not adapting like normal people's

1    brains, or what the case may be.  I know I'm not like, you

2    know, stupid.  I know that I have some intelligence.  I can

3    hold a conversation.  I try to be kind to people.

4          I've -- since this scheme ended, yes, you're right,

5    I made wrong choices with the probation department, and how

6    I handled the extraction, if you will, from the SWAT team

7    was completely wrong.  I could say a reason that I was

8    scared or that I was asleep, but both of those are excuses.

9    I feel it's not a reason.  I wish I could have handled it

10   differently.  But that's what happens to me every time.

11         I -- something happens and afterwards I say, "Well,

12   I should have done that this way or I should have -- why

13   didn't I not think that time?"

14         And it's been going on since -- since long as I can

15   remember.  I can't remember when that actually started.  I

16   mean, I think quite often about people that I've heard in my

17   life or I've -- if I lied and I try to find the actual

18   source of why I'm doing that and I'm never able to answer

19   that question for myself.

20         I will say this:  Outside those idiotic choices, I

21   have helped a lot of individuals obtain employment.  My

22   business partner and I had begin a business in Phoenix,

23   Arizona, and -- and he -- I made it a must to -- to hire

24   people who were out of prison, individuals who live in

25   women's homeless shelters, and people -- individuals who are

1    homeless.

2          I guess looking at it, I targeted them, in a way,

3    to maybe give back to the community, knowing I have taken so

4    much from the community.  That's my way to give back.  I

5    don't know.

6          But I do know this:  That I'm worth more than what

7    I've displayed.  I -- I can be salvaged.  I'm not -- I'm not

8    just something we should throw away.  I've spent --

9          THE COURT:  No one's talking here about throwing

10   you away.

11         THE DEFENDANT:  I've spent a lot of my life in

12   prison -- in prison.  And in prison, you adapt certain

13   thinking.  You adapt the thought to cover up.  Cops coming,

14   cover up.  Oh, you don't want them to know what you're doing

15   over here because if they know what you're doing over here,

16   it's a weakness.  Now this guy is going to exploit that

17   weakness.  Now you're the guy who's being exploited.

18         And those things I had to adapt in my 20s when I

19   was in prison.  Then as the older I get, I see that my

20   thinking is -- it's parallel to a coward.  Yeah, I was

21   scared when the SWAT team got there, but, like you said, I

22   could have handled it differently.  But I resorted to hide

23   out, the coward response.

24         And like I say, Your Honor, I've tried.  I know I

25   have good intents.  I have good intentions.  And -- and I

1    wrote you a letter in -- about -- last year, about 2014 when
2    I was saved, and that's my way to begin to start to try to
3    implement not just have good thoughts or help people in
4    certain ways but really find a passion in it, and I found a
5    passion.  But then something happened where probation
6    officer asked me a question and I lie.  Something happened
7    where the cops are at the door, I hide.
8              THE COURT:  What do you mean "something happens"?
9    You're almost talking like you're a puppet and someone's
10   above you manipulating the strings.
11             THE DEFENDANT:  Yeah --
12             THE COURT:  These actions you take, these decisions
13   you make, that's you acting out those actions and making
14   those decisions.  So how -- how is that -- how should I take
15   that as some kind of mitigation, something that should cause
16   me to reduce the sentence that I impose upon you when you're
17   just telling me that thoughts come into your head,
18   approaches that you learn in prison come instinctually to
19   you and then you act out on those.  Well, how is that a
20   factor in mitigation in your favor?
21             THE DEFENDANT:  Because I -- I know that if -- that
22   if I had help with those issues, I -- I took a course while
23   I was in -- being detained.  That's one of the most
24   extensive courses that BOP has to offer.  And it's called
25   Criminal Thinking.  And in that course they had different

1   chapters.  They had one called Rationalization and they

2   had -- whereas -- that hit me dead on, that the examples

3   are, I rationalize things to fit my benefit.

4            Well, you know, not knowing is -- well, it's okay.

5   You know, even though you know, but it's like a thin line.

6   And I can't explain or articulate why I think that way.  I

7   just can't.  I've tried.  And to -- you are exactly right.

8   It's me making the choices.  No one's pulling my -- no one's

9   pulling my strings.  No one forces me, but it's more of an

10  impulsive thing -- thought.

11           If I think on it long enough, those results don't

12  happen.  When I think about the actual what's going on, I

13  get good results.  But when I --

14           THE COURT:  Well, your conduct in this case, as the

15  jury pointed out, took place over two years and that's

16  plenty of time for you to get past that instinctual

17  impulsive act at the beginning -- let's say you did this one

18  time -- and then if you're to be believed, if you're given

19  the time, you reflect on it, you think through your -- your

20  decisions, and you come to some conclusion that you

21  shouldn't proceed with that course of conduct.

22           What -- can you point to me any evidence that had

23  you -- had this scheme not been uncovered, had you not --

24  you and your role and the role of your codefendants had not

25  been discovered, that you of your own volition would have

1    stopped this criminal conduct anywhere -- any time before

2    the conclusion of those two years?

3            THE DEFENDANT:  Well, I -- I don't have any actual

4    evidence, but --

5            THE COURT:  Well, describe for me a point in time

6    when that was something that you considered.

7            THE DEFENDANT:  Okay.  Heather Carr and I had

8    discussions -- you know, I want to -- the hard point, the

9    same thing about because it's difficult to admit now that

10   she wore the pants in the relationship.  It's -- because I

11   don't want to -- I don't want anybody assigning excuse, but

12   that's what the situation was.

13           But I -- I asked Heather one time -- because she

14   explained to me something totally different than what she

15   explained obviously was what the truth was.  And I asked

16   her, I said, "You know what, this -- you -- you're spending

17   this money like it's -- like it's free."

18           And she was traveling to the Bahamas and to Hawaii.

19   And I wasn't -- I wasn't going on those trips.  And I talked

20   to my father about it and my father had told me that, "Look,

21   man, if you continue dealing with Heather -- you have a

22   record, she doesn't.  And when this happens -- when whatever

23   happens comes down, you're going to get hammered."

24           And at that time, that was when our relationship

25   really started to tank, different routes.  I did not leave

1    her at that time.  I did not.  We did not part ways or I did

2    not stop benefiting at the time, I didn't.

3         But Your Honor, I will say this:  There's a good

4    man inside of me.  There's a good spirit inside of me.  When

5    I look at Ms. Paluch, when I look at the prosecutors, I

6    don't get angry.  I don't get upset.  When I went -- when I

7    came to trial here, we were out in the hallway, I was

8    respectful, held doors.  I had no resentment -- no

9    resentment.

10        I can conduct myself in the community and society.

11   It's those choices that I make that gets me right where I am

12   at right now.  That's a -- that's a pattern that only I can

13   stop the pattern, but as it's happening, it's as I don't

14   know the pattern's happening.

15        And, Your Honor, I ask you -- ask the Court, I --

16   don't throw me away.  I can be salvaged.  I can be -- I can

17   be a success story versus a suicide mission.  The longer

18   years of in prison is a suicide mission.  I've done that.

19   Like you said earlier, I've done that, and all my 20s.  And

20   now I'm facing through all my 40s.

21        And I've been watching television and news and --

22   and -- about certain things, and as far as the -- the stigma

23   of being taken off of what somebody happens -- in their

24   mental health, it's hard for me to admit something is wrong

25   with me with mental health that possibly something could be

1    wrong with me, but when I look at it in retrospect, I look
2    at it, I don't want to admit it, but then I have to face it,
3    what -- what happened to me, what transpired during the
4    course of the last 20 years or longer than that, 25 years,
5    well, I just can't get it right.
6         I've -- I got -- I got a mentor.  I started
7    mentoring youths, helping them get jobs, so I know I can do
8    that.  But then when law enforcement comes around and -- and
9    they coming for me, I think impulsively.
10        And I also put in the letter that I wrote you last
11   year about that I should have took better actions and -- and
12   when being arrested by the SWAT team.  I'm in a thousand
13   percent agreeance with that to the point where my -- see, I
14   have -- I also have good impulses as well, too.  My impulse
15   on that was, well, I need to show these kids a better way to
16   respond to a certain situation like that.  I know I could
17   have responded to it better, but I think if I ever had a
18   training module or if I trained some kids that same
19   situation wouldn't happen to them.
20        And I feel that my niche and my passion in life is
21   to -- is to fix my mistakes, show others how not to fall in
22   the same pit, because I've put my foot in the bear trap
23   numerous times.
24        And like I say, Your Honor, rationalization was one
25   of the big things in my psych class.  It just stood out to

1    me.

2              THE COURT:  Do you have any remorse for your

3    actions in this case?

4              THE DEFENDANT:  Absolutely.  I'm remorseful for

5    every single inmate that was infected -- affected by this

6    because I was once an inmate as well, too.  And being that,

7    I know how difficult it is to -- I'm expressing to you now

8    how -- what it was for me off of choices I made, so you

9    couple that with a financial hardship, that's doubling

10   the -- the hardship for them.

11             THE COURT:  So did you give any thought to that

12   while you were engaging in this scheme?  That you -- that

13   the victims of this scheme were folks who you, better than

14   most persons in this society, knew exactly how vulnerable

15   they were?

16             THE DEFENDANT:  Yes, I -- yes, I did, Your Honor.

17   And that -- and that is the point -- that's the part where

18   my thinking error comes in.  I think, oh, well, if I'm not

19   directly involved, then I'm not hurting them like -- like

20   someone else would be hurting them.

21             And I am remorseful.  I'm remorseful for wasting

22   the Court's time.  I'm remorseful for not being there for my

23   son who's -- he's regressing in his autism.  He has a newer

24   diagnosis.  He has SPD, which is sensory processing

25   disorder.  He has hyposensitivity pain -- to pain, meaning

1    that he can't relate danger to pain.  If he's feeling pain,

2    he doesn't relate to danger, which -- and so he can go

3    outside and get hurt, but not understand the point that he

4    must remove himself from the hurt.

5           And his regression, I can't help but to think that

6    his regression stems from Mrs. Carr and my abandonment of

7    him, the same way I was abandoned from my father.  It's now

8    going into a cycle.  Now my son's feeling -- doing the same

9    thing.  And I'm very remorseful for that.

10          I'm very remorseful for just the -- this entire

11   situation this entirety.  And if I could take ownership of

12   all of the loss, if I could take my time, Heather's time,

13   Diaz's time, Green's time and -- in order for someone to be

14   there with my child, I would do that.

15          Your Honor, it's sad to admit these things, but

16   prison -- I'm not afraid of prison.  I've -- that's --

17   that's like more of what I know than being in the community.

18   I'm -- I've been in prison as an adult more than I have in

19   society -- being in society.  So I understand it's a form of

20   punishment, I do understand that; however, I don't want to

21   go to prison and have the same issues that I have now.

22          I -- I want to be better.  I know I can be better.

23   I've done things to prove to myself I can be better.  And I

24   ask the Court to not ignore the things I've done, but also

25   do not ignore the things I've done positively and what I can

1    do and how I can help someone.  I'm not -- I can be

2    salvaged, Your Honor.  I know that.  I know with the proper

3    help, treatment, conversation, connectivity with others,

4    these patterns will be obliterated.  And -- and I also have

5    a thing whereas --

6            THE COURT:  All right, sir, I'm going to need you

7    to wrap it up pretty quick here.

8            THE DEFENDANT:  Okay.  Lastly, I will say this,

9    Your Honor:  I ask you -- humbly ask you to give me the

10   opportunity because I know that I'm -- I'm aware -- I'm

11   aware of the circumstances and I'm also aware that I don't

12   have too many times being in front of a bench where I don't

13   go away -- I'm 40 years old, I don't go away for the rest of

14   my life.

15           I ask you for the opportunity to prove not only to

16   myself to show how remorseful I am to all the victims by

17   being productive -- more productive to the community and to

18   inmates who are now in prison.  I feel there's no other way

19   for me to be part of the solution versus part of the

20   problem, but be productive.

21           I don't -- I want to change my thinking errors.  I

22   need a navigation system to get to that change.

23           THE COURT:  I'll give you one more minute.

24           THE DEFENDANT:  Okay.  You've been very patient

25   with me, Your Honor, this entire course -- this entire time.

1    I wasted the court time.  I have.  I caused a lot of hurt,

2    not just in this case, but to other cases, I've caused hurt

3    to things that -- to people that it wasn't the case.  I also

4    feel remorseful for that.

5            And lastly, Your Honor, I can look you in your eyes

6    as a man who has a belief in the faith that if given the

7    opportunity, to show that I can change, I will change.  I

8    will not only change, I will present and show my change.  I

9    will show how remorseful I am to everyone I've ever hurt.

10           THE COURT:  All right.  Thank you.  I'm prepared to

11   rule on the defendant's motion for downward variant

12   sentence.  Let me first state the matters that I have taken

13   into account in mitigation.  There really is only one factor

14   here in mitigation that I see, and that is that the Tenth

15   Circuit has directed that amongst a whole host of other

16   factors I have to consider is the potential for sentencing

17   disparities with codefendants, not just defendants in other

18   cases.  And the sentencing disparity restriction really

19   applies, as the lawyers and I know, to cases in which the

20   defendants are similarly situated.

21           And Ms. Paluch has done a very good job, excellent

22   job, of pointing out how the codefendants are not similarly

23   situated to this defendant, but I can't lose sight of the

24   fact that in terms of the underlying criminal scheme, there

25   were -- there was at least one other member of the

1    conspiracy that, in my view, was more culpable of a scheme

2    that inflicted so much damage on so many different

3    vulnerable victims.  And that person received a custodial

4    sentence of 57 months from me.  But really that's the only

5    factor in mitigation that I see in this case.

6          On the other hand, I see very -- several factors

7    and matters in aggravation.  Mr. Thomas was convicted of all

8    charges in which he was named in the superseding indictment.

9    Count 1, conspiring to defraud the Government.

10          With respect to claims in Counts 2 through 7,

11    aiding and abetting in mail fraud.  So initially it would be

12    noted that the base offense level for mail fraud is 7, as

13    compared to 6 for the conspiracy count that the three

14    codefendants in this case have pled.  In addition, because

15    the defendant chose to go to trial and put the Government to

16    its proof, the defendant is not entitled to a three-level

17    reduction in his offense level of acceptance of

18    responsibility.

19          And beyond that, I agree again with Ms. Paluch that

20    I did not hear today from the defendant a true acceptance of

21    responsibility other than for the one minor point -- or at

22    least the single point of taking responsibility for the

23    Mullett -- using the address of Ms. Mullett.  Apart from

24    that, and even just a few moments ago in his statement to

25    me, the defendant said when I asked him, "You, yourself,

1    were an inmate.  Didn't you ever consider -- did you

2    consider how vulnerable inmates -- your victims of this

3    crime were?"

4           And Mr. Thomas, your response was, "Yeah, I did,

5    but it helped me to know that at least I wasn't directly

6    involved".

7           That, to me, is someone who to this moment has not

8    accepted full responsibility for your conduct in this

9    criminal scheme.  And I think that's a hugely aggravating

10   point.  And, moreover, as I previously ruled with respect to

11   one of the defendants's objections, the defendant's role in

12   this case was sufficiently involved and knowing such, that

13   he was not deserving of a minimal role reduction in the

14   offense level, and I think that factors in aggravation.

15          Also, as I previously ruled, a significant

16   aggravation in this case is the defendant's -- is the

17   conduct the defendant freely engaged in both before and

18   after his conviction on all counts found by the jury, which

19   had the effect of obstructing justice and recklessly

20   endangering others during flight.  This conduct was

21   sufficiently serious that I've ruled that the defendant's

22   offense level should be increased by several offense levels

23   called for by the applicable guideline sentencing

24   enhancements.

25          Another factor in aggravation is the victims in

1    this case, which we've already discussed to some extent.

2    The letters that I received from the victims were very

3    moving, very poignant, and it reflected and points out

4    what's obvious to most of us in this courtroom, but I think

5    very few people think of when they actually -- if they ever

6    think about it, that although they have committed a crime

7    for which they've been convicted, the folks in our nation's

8    prisons are truly among the most vulnerable victim groups of

9    cohorts of victims that we have in this country because they

10   have so little open and available to them to protect

11   themselves from various things, assaults in prison being, of

12   course, physically the most grievous, but also having their

13   financial and economic integrity stolen from them.

14           And as I've said in the sentencing hearings for the

15   other codefendants, it is truly difficult for me to imagine

16   how hard it would be for these victims when they're already

17   struggling, those who were felony convicts, obviously -- or

18   maybe not so obviously, but I'm assuming some were possibly

19   not felony convicts, but for these individuals to get

20   employment, to rent an apartment, to buy things on credit

21   when their credit is perfect, or near perfect, or intact,

22   when that credit is destroyed because their identity has

23   been stolen, the multiple -- multiplying effect of those

24   adversities is truly hard for us, I think, to measure and

25   quantify.

1           So if you balance all those aggravating factors and
2     the one mitigating factor, my initial response -- my initial
3     consideration was that there should be no downward variance
4     from the guideline range in this case; however, I am going
5     to grant the motion in part based solely on the parsimony
6     clause, which as the lawyers know, requires me to impose a
7     sentence that is sufficient but not greater than necessary
8     to accomplish the goals of sentencing.
9           And I have to come to the conclusion that 151
10    months is more than sufficient to satisfy the requirements
11    of both protecting the public, of providing both specific
12    and general deterrence, and reflecting the seriousness of
13    the crime.  And so I'm going to grant the motion in part.
14          So it is my intention to sentence the defendant to
15    a period of imprisonment of 120 months on all counts of
16    conviction with each such sentence and count to be served --
17    on each -- with respect to each sentence on those counts to
18    be served concurrently.
19          I also intend to order that this be followed by a
20    term of supervised release of three years on all counts of
21    conviction.  Again, with all such periods to be served
22    concurrently.  I also intend to order that Mr. Thomas pay
23    restitution in the total amount of 563 dollars and --
24    $563,890.85, jointly and severally with his codefendants, in
25    addition to a special assessment of $700.

Case No. 1:16-cr-00054-WJM   Document 506   filed 08/09/19   USDC Colorado   pg 171 of 179

171

1      Imposing a fine in this case would, in my view,
2  impair Mr. Thomas' ability to simultaneously pay restitution
3  and for this reason I intend to waive payment of any fine
4  apart from the special assessment, as well as any interest
5  on the restitution amount.
6      Finally, I intend to enter at the appropriate time
7  a final order of forfeiture for personal money judgment.
8  Before I actually impose sentence, I'll give counsel a final
9  opportunity to make any record they believe appropriate.
10  Ms. Paluch.
11      MS. PALUCH:  Nothing further for the Government,
12  Your Honor.
13      THE COURT:  All right.  Ms. Steward.
14      MS. STEWARD:  Nothing further for the defendant,
15  Your Honor.
16      THE COURT:  All right.  I find that a guideline
17  sentence in this case would be greater than necessary to
18  accomplish the goals of sentencing and I will instead impose
19  a sentence below the guideline range.  I find that the
20  sentence I'll impose in this case reflects the seriousness
21  of the offense, affords adequate deterrence to future
22  criminal conduct, and will protect the public from further
23  crimes of this defendant.
24      Accordingly pursuant to the Sentencing Reform Act
25  of 1984, it is the judgment of this Court that the

1    defendant, Tramell Thomas, be committed to the custody of

2    the Bureau of Prisons to be imprisoned for a term of 120

3    months on each of the seven counts of conviction with each

4    such sentence to be served concurrently.  In serving this

5    term of incarceration the Court recommends that the director

6    of the Bureau of Prisons give the defendant full credit for

7    his time served in pretrial detention.

8               Ms. Steward, are you asking that I make any

9    recommendation with respect to the location of the

10   institution to be designated?

11              MS. STEWARD:  Yes, Your Honor.  We would ask that

12   Mr. Thomas be able to go to a facility in the Arizona area

13   so that he's closer to his family.

14              THE COURT:  All right.  Is there any objection from

15   the -- from the Government?

16              MS. PALUCH:  No, Your Honor.  Thank you.

17              THE COURT:  All right.  All right.  I'll grant that

18   request.  And the judgment will include an additional

19   recommendation to the director that the defendant be

20   incarcerated at a facility appropriate to his security

21   designation located within the District of Arizona.

22              Upon release from imprisonment, the defendant shall

23   be placed on supervised release for a period of three years

24   on each of the seven counts of conviction, with each such

25   period of supervision to be served concurrently.

1          While on supervised release, the defendant shall

2   not commit another federal, state or local crime, shall not

3   possess a firearm as defined in 18 United States Code

4   Section 921, and shall comply with the standard conditions

5   that have been adopted by this Court in District of Colorado

6   General Order 2016-1.

7          The defendant shall not unlawfully possess and he

8   shall refrain from unlawfully using a controlled substance.

9   The defendant shall submit to one drug test within 15 days

10  of release on supervised release and two periodic tests

11  thereafter.  The defendant shall cooperate in the collection

12  of DNA as directed by the probation officer.

13         The Court finds that the following special

14  conditions of supervision recommended by the probation

15  officer in the report are reasonably related to the factors

16  enumerated in Sections 3553(a) and 3583(d), they do not

17  constitute a greater deprivation of liberty than reasonably

18  necessary to accomplish the goals of sentencing, and they

19  will be included in the Court's judgment.  Those being

20  special conditions numbers 1 through 12.

21         With respect to restitution, the defendant is

22  ordered to make restitution in the final amount of 563

23  dollar -- $563,890.85 in the amounts and to the individual

24  victims as set forth in paragraph 148 in the presentence

25  report filed at ECF 456.

1      The defendant will pay a special assessment of

2    $700, which shall be due and payable immediately.  The Court

3    finds that the defendant does not have the ability to pay a

4    fine in light of the restitution obligation imposed by this

5    judgment.  The Court therefore waives the payment of any

6    fine other than the special assessment.  And for this

7    reason, payment of interest on the restitution amount is

8    also waived.

9      Now, let's get to the issue of forfeiture.  We have

10   gone so long in this case and we're so close to wrapping it

11   up with the final defendant, but I want to make sure that I

12   get everything right.

13     Yesterday, as everyone knows, I entered the Court's

14   preliminary order of forfeiture for personal money judgment

15   that was filed at ECF 343.  And I entered that order over

16   the opposition filed by prior defense counsel at ECF 346.

17   That preliminary order of forfeiture was entered in the

18   amount of $260,226.85 as a money judgment against the

19   defendant, Tramell Thomas, and entered in accordance with 18

20   United States Code Sections 981(a)(1)(C) and 28 United

21   States Code Section 2461(c).

22     However, this is the problem that I see:  The

23   Government's own motion makes clear pursuant to Rule

24   32.2(b)(2)(B) and circuit cases construing that provision,

25   it's mandatory that the preliminary order of forfeiture be

1   entered "sufficiently in advance of sentencing to allow the

2   parties to suggest revisions or modifications before the

3   order becomes final as to the defendant."

4          So I take responsibility for the fact that the

5   preliminary order was not entered until yesterday afternoon

6   around 3:30.

7          Unless the defendant -- and I'm going to ask Ms.

8   Steward -- unless the defendant waives the opportunity to

9   have additional time to suggest revisions or modifications

10  as the rule sets forth before I make the order final, if you

11  don't do that then the only alternative I see before us

12  is -- and believe me, I don't want to do this, but I will

13  have to continue this last remaining piece of the hearing to

14  some time next week to give the defendant the opportunity to

15  make final response to the preliminary order.  I'll allow

16  the Government to file a reply to that response and then we

17  can wrap it all up next week, if there's not a waiver.  So

18  do you -- would you like a minute to discuss with your

19  client?

20          MS. STEWARD:  Yes, Your Honor.

21          THE COURT:  Go ahead.

22      (Pause)

23          MS. STEWARD:  We're ready when you are, Your Honor.

24          THE COURT:  Yes.  Go ahead.

25          MS. STEWARD:  Mr. Thomas would waive at this time.

1          THE COURT:  Okay.  Well, given the express waiver
2     of the defendant of his right under Rule 32.2(b)(2)(B) to
3     suggest revisions or modifications of the preliminary order,
4     that order is -- will be entered as the final order of this
5     Court with respect to forfeiture in the form of a personal
6     money judgment against the defendant and the judgment will
7     so indicate.  The special assessment, restitution, and
8     forfeiture obligations are due immediately.  Any unpaid
9     restitution or forfeiture balance, upon release from
10    incarceration, shall be paid in monthly installment payments
11    during the term of supervised release of not less than 10
12    percent of the defendant's gross household monthly income.
13         Within 15 days of release from custody, the
14    defendant shall meet with the probation officer to develop a
15    plan for a payment of the unpaid portion of his financial
16    obligations under the Court's judgment.  This plan will be
17    based on the defendant's income and expenses.
18         Lastly, Mr. Thomas, I need to advise you that you
19    have the right to appeal both your conviction and your
20    sentence.  If you wish to file such an appeal, a notice of
21    appeal must be filed with the Clerk of the Court within 14
22    days after entry of judgment or the right to appeal will be
23    lost.  If you're unable to afford an attorney for an appeal,
24    the Court will appoint one to represent you.  If you're
25    unable to afford the fees for filing an appeal, you may file

1    a request with the Court that such fees be waived.

2            All right.  Is there anything further from the

3    Government at this time?

4            MS. PALUCH:  No, Your Honor.  Thank you.

5            THE COURT:  All right.  Anything further from the

6    defendant?

7            MS. STEWARD:  No, Your Honor.

8            THE COURT:  All right.  Anything further from the

9    probation officer?

10           PROBATION OFFICER:  Your Honor, I may have missed

11   it.  Was the restitution obligation ordered joint and

12   several with the codefendants?

13           THE COURT:  Did I not say that?  Good catch.  I did

14   not say that.  So the judgment will reflect that the

15   restitution obligation imposed on the defendant will be

16   joint and several with the restitution obligation of his

17   codefendants.

18           Apart from that, anything else, Ms. Ansart?

19           PROBATION OFFICER:  No.  Thank you, Your Honor.

20           THE COURT:  All right.  Defendant is remanded to

21   the custody of the United States Marshal.  Thank you, that

22   will be all.

23       (Proceedings concluded at 3:00 p.m.)

24

25                            **INDEX**

178

```
 1   Item                                                       PAGE

 2                      GOVERNMENT'S WITNESSES

 3       PAT WILLHITE
         Direct Examination by Mr. Fields                        9
 4       Cross-examination by Ms. Steward                       25
         Redirect Examination by Mr. Fields                     32
 5
         SANDRA ENNIS
 6       Direct Examination by Ms. Paluch                       37
         Cross-examination by Ms. Steward                       68
 7       Redirect Examination by Ms. Paluch                     82

 8

 9                      DEFENDANT'S WITNESSES

10       TRAMELL THOMAS
         Direct Examination by Ms. Steward                      87
11       Cross-examination by Ms. Pakluch                       96

12

13                      GOVERNMENT'S EXHIBITS

14   EXHIBITS:      Offered    Received   Refused   Stipulated

15   GS-2           62         62

16   GS-3           63         64

17   GS-4           65         66

18   GS-5           19         19

19   GS-6           17         17

20   GS-72-1        48         48

21

22

23                  *       *       *       *       *

24

25
```

1                      REPORTER'S CERTIFICATE

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5          Dated at Denver, Colorado, this 9th day of August,

6     2019.

7

8

9

10                    MARY J. GEORGE, FCRR, CRR, RMR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25