APPEAL,TERMED

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CRIMINAL DOCKET FOR CASE #: <u>1:16–cr–00054–WJM</u>–2

Case title: USA v. Carr et al

Date Filed: 02/08/2016
Date Terminated: 06/05/2019

Assigned to: Judge William J. Martinez

Appeals court case number: 19–1209 Tenth Circuit

**<u>Defendant (2)</u>**

**Trammel Thomas**
*TERMINATED: 06/05/2019*

represented by **Trammel Thomas**
#57094408
ENGLEWOOD
FEDERAL CORRECTIONAL INSTITUTION
Inmate Mail/Parcels
9595 WEST QUINCY AVENUE
LITTLETON, CO 80123
PRO SE

**Michael Gary Root**
Michael G. Root, Attorney at Law
217 East Seventh Avenue
Denver, CO 80203
303–318–7181
Fax: 303–318–7182
Email: mroot@mikerootlaw.com
*TERMINATED: 01/05/2017*
*LEAD ATTORNEY*
*Designation: CJA Appointment*

**Daniel T. Smith**
Daniel T. Smith, Attorney at Law
4582 South Ulster
Suite 1400
Denver, CO 80237
303–860–8100
Fax: 303–860–8018
Email: danieltsmith@qwestoffice.net
*TERMINATED: 08/08/2018*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Renee V. Cooper**
Cooper & Associates, LLC

1

501 South Cherry Street
Suite 1100
Denver, CO 80246
303–831–1021
Fax: 303-831-1025
Email: attyrcooper@gmail.com
*TERMINATED: 03/15/2017*
*ATTORNEY TO BE NOTICED*

**Tasha Anya Steward**
Tasha A. Steward, LLC, Law Office of
3570 E. 12th Ave
Denver, CO 80206
720–772–6145
Fax: 720.815.3884
Email: tsteward@tstewardlaw.com
*TERMINATED: 06/13/2019*
*Designation: Retained*

**Thomas Edward Goodreid**
Thomas E. Goodreid, Attorney at Law
1801 Broadway
Suite 1400
Denver, CO 80202
303–296–2048
Fax: 303–292–0522
Email: t.goodreid@comcast.net
*TERMINATED: 08/08/2018*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| Pending Counts | Disposition |
|---|---|
| 18:286.F Conspiracy to Defraud the Government with Respect to Claims (1) | Dismissed. |
| 18 U.S.C. § 286 Conspiracy to Defraud the Government with Respect to Claims (1s) | Defendant sentenced to 120 months imprisonment as to Counts 1 through 7, to run concurrently. 3 years of supervised release as to Counts 1 through 7, to run concurrently. $700 special assessment fee. $563,890.85 restitution joint and several with co–defendants. |
| 18:1343.F Wire Fraud (2–7) | Dismissed. |
| 18 U.S.C. § 1341 Aiding and Abetting Mail Fraud (2s–7s) | Defendant sentenced to 120 months imprisonment as to Counts 1 through 7, to run concurrently. 3 years of supervised release as to Counts 1 through 7, to run concurrently. $700 special assessment fee. $563,890.85 restitution joint and several with co–defendants. |

| 18:1343.F Wire Fraud (8–13) | Dismissed. |
| 18:1341.F Mail Fraud (14–26) | Dismissed. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| None | |

**Plaintiff**

| **USA** | represented by | **Daniel Edward Burrows** |

U.S. Attorney's Office–Denver
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0201
Email: daniel.burrows@usdoj.gov
*TERMINATED: 10/06/2016*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Martha Ann Paluch**
U.S. Attorney's Office–Denver
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0100
Fax: 303–454–0402
Email: Martha.Paluch@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Beth N. Gibson**
U.S. Attorney's Office–Denver

3

1801 California Street
Suite 1600
Denver, CO 80202
303–454–0100
Fax: 303–454–0406
Email: Beth.Gibson@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Bryan David Fields**
U.S. Attorney's Office–Denver
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0100
Fax: 303–454–0402
Email: bryan.fields3@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Paul Farley**
U.S. Attorney's Office–Denver
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0361
Email: paul.farley2@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 02/08/2016 | 1 | 36 | INDICTMENT as to Heather Carr (1) count(s) 1, 2–13, 14–26, 27–29, Trammel Thomas (2) count(s) 1, 2–13, 14–26, Mercedes Diaz (3) count(s) 1, 20–21. (Attachments: # 1 Criminal Information Sheet, # 2 Criminal Information Sheet, # 3 Criminal Information Sheet) (cthom, ) (Entered: 02/09/2016) |
| 02/08/2016 | 2 | | RESTRICTED DOCUMENT – Level 4: as to Heather Carr, Trammel Thomas, Mercedes Diaz. (cthom, ) (Entered: 02/09/2016) |
| 02/08/2016 | 4 | | Arrest Warrant Issued in case as to Trammel Thomas. (cthom, ) (Entered: 02/09/2016) |
| 03/08/2016 | 8 | | Arrest of Trammel Thomas in Arizona. Initial Appearance set for 3/29/2016 02:00 PM in Courtroom C201 before Magistrate Judge Kathleen M. Tafoya. (Text Only entry)(morti, ) (Entered: 03/08/2016) |
| 03/09/2016 | 11 | | Rule 5(c)(3) Documents Received as to Trammel Thomas from the District of Arizona in Phoenix. (nmarb, ) (Entered: 03/09/2016) |
| 03/29/2016 | 25 | | COURTROOM MINUTES for Initial Appearance as to Trammel Thomas held on 3/29/2016 before Magistrate Judge Kathleen M. Tafoya. Defendant present on bond and advised. Criminal Justice Act counsel appointed. Arraignment |

| | | | |
|---|---|---|---|
| | | | and Discovery hearings set for 4/5/2016 10:00 AM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty. Discussion regarding waiving the Defendant's appearance for the next set of hearings since he resides in Arizona. Defendant is advised to discuss the waiver with counsel. Defendant's bond continued. (Total time: 9 mins, Hearing time: 219–228)<br><br>**APPEARANCES**: Martha Paluch on behalf of the Government, Pat Hanley on behalf of pretrial. FTR: KMT C201. (sgrim) Text Only Entry (Entered: 03/29/2016) |
| 03/29/2016 | 26 | | ORDER APPOINTING CJA COUNSEL as to Trammel Thomas by Magistrate Judge Kathleen M. Tafoya on 3/29/16. Text Only Entry (sgrim, ) (Entered: 03/29/2016) |
| 03/29/2016 | 27 | | CJA 23 Financial Affidavit by Trammel Thomas. (sgrim, ) (Entered: 03/29/2016) |
| 03/29/2016 | 28 | | CJA 20/30 Appointment of Michael Gary Root for Trammel Thomas by Magistrate Judge Kathleen M. Tafoya on 3/29/2016. (shugh) (Entered: 03/30/2016) |
| 03/29/2016 | 41 | | Utility Setting/Resetting Deadlines/Hearings as to Trammel Thomas: Discovery Hearing set for 4/5/2016 10:00 AM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty, original setting terminated in error. Text Only Entry (cthom, ) (Entered: 04/04/2016) |
| 03/31/2016 | 30 | | MOTION to Disclose Grand Jury Material to Defendant by USA as to Heather Carr, Trammel Thomas, Mercedes Diaz. (Attachments: # 1 Proposed Order (PDF Only))(Paluch, Martha) (Entered: 03/31/2016) |
| 03/31/2016 | 31 | | WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Trammel Thomas (Root, Michael) Modified on 4/4/2016 (nmarb, ). (Entered: 03/31/2016) |
| 03/31/2016 | 33 | | ORDER granting 30 Motion to Disclose Grand Jury Material as to Heather Carr (1), Trammel Thomas (2), Mercedes Diaz (3) by Judge William J. Martinez on 03/31/2016. (cthom, ) (Entered: 03/31/2016) |
| 03/31/2016 | 34 | | Unopposed MOTION for Protective Order *Regarding Grand Jury Material and Personal Identifying Information of Third Parties* by USA as to Heather Carr, Trammel Thomas, Mercedes Diaz. (Attachments: # 1 Proposed Order (PDF Only))(Paluch, Martha) (Entered: 03/31/2016) |
| 04/01/2016 | 35 | | ORDER Setting Trial Date and Related Deadlines as to Heather Carr, Trammel Thomas, Mercedes Diaz: Motions due by 5/3/2016. Responses due by 5/13/2016. 6 day Jury Trial set for 5/31/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Trial Preparation Conference set for 5/24/2016 at 03:00 PM in Courtroom A 801 before Judge William J. Martinez. ORDERED by Judge William J. Martinez on 04/01/2016. (cthom, ) (Entered: 04/01/2016) |
| 04/01/2016 | 36 | 55 | ORDER granting 34 Motion for Stipulated Protective Order as to Heather Carr (1), Trammel Thomas (2), Mercedes Diaz (3) by Judge William J. Martinez on 04/01/2016. (cthom, ) (Entered: 04/01/2016) |
| 04/01/2016 | 37 | 58 | |

| | | | |
|---|---|---|---|
| | | | ORDER on Procedures as to Heather Carr, Trammel Thomas, Mercedes Diaz, by Judge William J. Martinez on 04/01/2016. (cthom, ) (Entered: 04/01/2016) |
| 04/01/2016 | 38 | 62 | ORDER Regarding Joint Defense Agreement Disclosures as to Heather Carr, Trammel Thomas, Mercedes Diaz, by Judge William J. Martinez on 04/01/2016. (cthom, ) (Entered: 04/01/2016) |
| 04/01/2016 | 39 | | Utility Setting/Resetting Deadlines/Hearings pursuant to 35 as to Heather Carr, Trammel Thomas, Mercedes Diaz: Text Only Entry Motions due by 5/3/2016. Responses due by 5/13/2016. 6 day Jury Trial set for 5/31/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Trial Preparation Conference set for 5/24/2016 at 03:00 PM in Courtroom A 801 before Judge William J. Martinez. (cthom, ) (Entered: 04/04/2016) |
| 04/04/2016 | 40 | | MINUTE ORDER granting 31 WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Trammel Thomas (2) by Magistrate Judge Michael E. Hegarty on 04/04/2016. The Arraignment set for 4/5/2016 is CANCELED. The Discovery Hearing is still on the Court's docket. Text Only Entry. (mdave, ) (Entered: 04/04/2016) |
| 04/05/2016 | 42 | | COURTROOM MINUTES/MINUTE ENTRY for proceedings held before Magistrate Judge Michael E. Hegarty: Arraignment and Discovery Hearing as to Trammel Thomas held on 4/5/2016. Plea of NOT GUILTY entered by defendant. Defendant appearance waived, Discovery memorandum executed, Defendants bond continued, Counsel is directed to chambers, (Total time: 3 mins, Hearing time: 10:07–1010 a.m.)<br><br>**APPEARANCES**: Martha Pollack on behalf of the Government, Michael Root on behalf of the defendant, Michelle Sinaka on behalf of pretrial. FTR: Courtroom A501. (mdave, ) Text Only Entry (Entered: 04/05/2016) |
| 04/05/2016 | 43 | | Discovery Conference Memorandum and ORDER: Estimated Trial Time – 8 days as to Trammel Thomas by Magistrate Judge Michael E. Hegarty on 04/05/2016. (mdave, ) (Entered: 04/05/2016) |
| 04/19/2016 | 45 | | ORDER granting 44 Motion to Exclude as to Heather Carr (1). All days from today, to and including July 18, 2016, shall be excluded from the Speedy Trial Clock as to **ALL Defendants** ; The 6–day Jury Trial set to commence on May 31, 2016 and the Final Trial Preparation Conference set for May 24, 2016 at 3:00 p.m. are hereby **VACATED as to ALL Defendants**. The Court will enter a separate Order resetting the Trial date and related deadlines. ORDERED by Judge William J. Martinez on 04/19/2016. (cthom, ) (Entered: 04/19/2016) |
| 04/19/2016 | 46 | | ORDER Resetting Trial Date and Related Deadlines as to Heather Carr, Trammel Thomas, Mercedes Diaz: Motions due by 8/1/2016. Responses due by 8/11/2016. 6 day Jury Trial set for 8/29/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Trial Preparation Conference set for 8/19/2016 at 04:00 PM in Courtroom A 801 before Judge William J. Martinez. Ordered by Judge William J. Martinez on 04/19/2016. (cthom, ) (Entered: 04/19/2016) |
| 04/20/2016 | 49 | 64 | NOTICE *REGARDING OF JOINT DEFENSE AGREEMENT* by Trammel Thomas (Root, Michael) (Entered: 04/20/2016) |

| 04/20/2016 | 50 | | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 49 Notice (Other) : The format for the attorneys signature block is not correct. **DO NOT REFILE THE DOCUMENT. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 4.3(d) of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (cthom, ) (Entered: 04/20/2016) |
| 04/27/2016 | 51 | | MOTION to Continue *Trial* by Trammel Thomas. (Root, Michael) (Entered: 04/27/2016) |
| 04/27/2016 | 52 | | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 51 MOTION to Continue *Trial* : The format for the attorneys signature block is not correct. **DO NOT REFILE THE DOCUMENT. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 4.3(d) of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (cthom, ) (Entered: 04/27/2016) |
| 04/28/2016 | 53 | | CJA 21/31 Request for Service as to Trammel Thomas. (Attachments: # 1 CJA Attachment)(Root, Michael) (Entered: 04/28/2016) |
| 05/01/2016 | 54 | | MOTION to Exclude *An Additional 60 Days From Speedy Trial* by Trammel Thomas. (Root, Michael) (Entered: 05/01/2016) |
| 05/02/2016 | 55 | | ORDER granting 54 Motion to Exclude as to Trammel Thomas (2). All days from September 4, 2016, to and including November 3, 2016, shall be excluded from the Speedy Trial Clock as to **ALL Defendants** ; The 6–day Jury Trial set to commence on August 29, 2016 and the Final Trial Preparation Conference set for August 19, 2016 are hereby VACATED as to **ALL Defendants**. ORDERED by Judge William J. Martinez on 05/02/2016. (cthom, ) (Entered: 05/02/2016) |
| 05/10/2016 | 56 | | CJA 21/31 Authorization for Service as to Trammel Thomas by Judge William J. Martinez on 5/10/2016. (shugh) (Entered: 05/10/2016) |
| 05/11/2016 | 57 | | ORDER Resetting Trial Dates and Related Deadlines as to Heather Carr, Trammel Thomas, Mercedes Diaz: Motions due by 9/23/2016. Responses due by 10/3/2016. 6 day Jury Trial set for 10/24/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Trial Preparation Conference set for 10/17/2016 at 02:00 PM in Courtroom A 801 before Judge William J. Martinez. There will be no trial day on Friday October 28th, accordingly, the trial will extend to November 1st. ORDERED by Judge William J. Martinez on 05/11/2016. (cthom, ) Modified on 5/11/2016 (cthom, ). (Entered: 05/11/2016) |
| 05/11/2016 | 58 | | Utility Setting/Resetting Deadlines/Hearings as to Heather Carr, Trammel Thomas, Mercedes Diaz: Text Only Entry Jury Trial set for 10/24/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Jury Trial set for 10/25/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Jury Trial set for 10/26/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Jury Trial set for 10/27/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Jury Trial set for 10/31/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Jury Trial set for 11/1/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. (cthom, ) (Entered: 05/11/2016) |

| 05/17/2016 | 59 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant's Motion to Continue Jury Trial Set for August 28, 2016 51 . Because the Defendant has since filed a Motion to Exclude 60 Additional Days from the Requirement of the Speedy Trial Act 54 , which was granted at 55 Order Granting Defendant Thomas' Unopposed Motion to Exclude 60 Additional Days from the Requirement of the Speedy Trial Act, the Court DENIES the Motion to Continue Jury Trial 51 as MOOT. SO ORDERED. by Judge William J. Martinez on 05/17/2016. Text Only Entry (wjmsec, ) (Entered: 05/17/2016) |
|---|---|---|---|
| 08/30/2016 | 71 | | MOTION to Exclude *an Additional 90 days from speedy trial* by Trammel Thomas. (Root, Michael) (Entered: 08/30/2016) |
| 08/30/2016 | 72 | | MOTION to Continue *Trial of October 25, 2016* by Trammel Thomas. (Root, Michael) (Entered: 08/30/2016) |
| 08/30/2016 | 73 | | ORDER granting 71 Motion to Exclude as to Trammel Thomas (2); Denying as moot 72 Motion to Continue as to Trammel Thomas (2). **All days from November 4, 2016, to and including February 2, 2017, shall be excluded from the Speedy Trial Clock as to ALL Defendants**. The 6–day Jury Trial set to commence on October 24, 2016 and the Final Trial Preparation Conference set for October 17, 2016 are hereby **VACATED as to ALL Defendants**. ORDERED by Judge William J. Martinez on 08/30/2016. (cthom, ) Modified to add text on 8/30/2016 (cthom, ). (Entered: 08/30/2016) |
| 08/31/2016 | 74 | | ORDER Re–setting Trial Date and Related Deadlines as to Heather Carr, Trammel Thomas. Motions due by 1/2/2017. Responses due by 1/12/2017. 6 day Jury Trial set for 1/30/2017 08:30 AM in Courtroom A 801 before Judge William J. Martinez; the trial will conclude on Tuesday, February 7, 2017, with no trial being held on Friday, February 3, 2017. Trial Preparation Conference set for 1/23/2017 at 10:30 AM in Courtroom A 801 before Judge William J. Martinez. ORDERED by Judge William J. Martinez on 08/31/2016. (cthom, ) (Entered: 08/31/2016) |
| 10/05/2016 | 77 | | NOTICE OF ATTORNEY APPEARANCE Beth N. Gibson appearing for USA. Attorney Beth N. Gibson added to party USA(pty:pla) (Gibson, Beth) (Entered: 10/05/2016) |
| 10/05/2016 | 78 | | MOTION to Withdraw as Attorney by Daniel E. Burrows by USA as to Heather Carr, Trammel Thomas, Mercedes Diaz. (Attachments: # 1 Proposed Order (PDF Only))(Burrows, Daniel) (Entered: 10/05/2016) |
| 10/06/2016 | 79 | | ORDER as to **Heather Carr (1), Trammel Thomas (2), and Mercedes Diaz (3)** granting the Motion to Withdraw 78 : The Motion is GRANTED for good cause shown. Daniel Burrows is hereby granted leave to withdraw from this case. The Clerk shall terminate all further CM/ECF notifications to Mr. Burrows in this case. SO ORDERED by Judge William J. Martinez on 10/06/2016. Text Only Entry (wjmsec, ) (Entered: 10/06/2016) |
| 11/15/2016 | 87 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. In light of the filing of notice of dispositions for the other two Defendants in this case, leaving Defendant Thomas as the only remaining Defendant, the 6 day Jury Trial set to begin on January 30, 2017 is hereby **VACATED and RESET to a 5 day Jury Trial set to begin on January 30, 2017 at 8:30 a.m.** in Courtroom A801. The Trial will conclude on Friday, |

| | | | |
|---|---|---|---|
| | | | February 3, 2017. The Final Trial Preparation Conference remains set for **January 23, 2017 at 10:30 a.m.** in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards to ensure compliance with all deadlines triggered by the dates of the Final Trial Preparation Conference and Trial. SO ORDERED by Judge William J. Martinez on 11/15/2016. Text Only Entry (wjmsec, ) (Entered: 11/15/2016) |
| 11/28/2016 | 88 | | **WITHDRAWN** NOTICE of Disposition by Trammel Thomas (Root, Michael) Modified on 5/15/2017 Pursuant to 152 Order (angar, ). (Entered: 11/28/2016) |
| 11/28/2016 | 89 | | ORDER Setting Change of Plea Hearing as to **Trammel Thomas (2)**: Pursuant to the Notice of Disposition 88 filed by the Defendant, a **Change of Plea Hearing is hereby set for December 28, 2016 at 3:00 p.m. in Courtroom A801. The dates set for the Final Trial Preparation Conference and Trial are hereby VACATED.** Counsel for the parties shall e–mail to Chambers courtesy copies of the "Statement by Defendant In Advance of Change of Plea" and the "Plea Agreement and Statement of Facts" no later than **12:00 p.m. on December 21, 2016**. If these documents are not timely submitted, the hearing may be vacated. The signed original and one copy of these documents must also be given to the courtroom deputy at the time of the hearing, pursuant to D.C.COLO.LCrR 11.1E. It is FURTHER ORDERED that defense counsel who reviewed and advised Defendant regarding the plea agreement must attend this Change of Plea Hearing. Pursuant to WJM Revised Practice Standard IX.1.1.c the AUSA assigned to this matter must also be present at the hearing. If that AUSA cannot attend in person, s/he must be present by phone and a fully–briefed substitute AUSA must be physically present in the courtroom at the time of the hearing. SO ORDERED by Judge William J. Martinez on 11/28/2016. Text Only Entry (wjmsec, ) (Entered: 11/28/2016) |
| 11/28/2016 | 90 | | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 88 Notice of Disposition filed by attorney Michael Root. The format for the attorneys signature block is not correct; missing attorney contact information. **DO NOT REFILE THE DOCUMENT. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 4.3(d) of the Electronic Case Filing Procedures (Criminal Cases). The document is also missing the certificate of service page. (Text Only Entry) (cthom, ) (Entered: 11/28/2016) |
| 12/21/2016 | 97 | | ORDER as to **Trammel Thomas (2)**: At the Change of Plea Hearing set for December 28, 2016, the parties should be prepared to discuss whether, pursuant to 18 U.S.C. § 3143, Defendant Thomas should remain on pretrial release pending imposition of his sentence, or whether his bond should be revoked and he should be remanded at the conclusion of the Change of Plea Hearing. SO ORDERED by Judge William J. Martinez on 12/21/2016. Text Only Entry (wjmsec, ) (Entered: 12/21/2016) |
| 12/21/2016 | 98 | | MOTION to Withdraw as Attorney *for Trammel Thomas* by Michael Root by Trammel Thomas. (Root, Michael) (Entered: 12/21/2016) |
| 12/21/2016 | 99 | | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 98 MOTION to Withdraw as Attorney *for Trammel Thomas* by Michael Root filed by attorney Michael Root. The format |

| | | | |
|---|---|---|---|
| | | | for the attorneys signature block is not correct; missing attorney contact information. The Certificate of Service page is also incomplete. **DO NOT REFILE THE DOCUMENT. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 4.3(d) of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (cthom, ) (Entered: 12/21/2016) |
| 12/21/2016 | 100 | | MEMORANDUM regarding 98 MOTION to Withdraw as Attorney *for Trammel Thomas* by Michael Root filed by Trammel Thomas. Motion(s) referred to Magistrate Judge Michael E. Hegarty. by Judge William J. Martinez on 12/21/2016. Text Only Entry (wjmsec, ) (Entered: 12/21/2016) |
| 12/21/2016 | 101 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defense Counsel's Motion to Withdraw and Appointment of New CJA Counsel 98 . This Motion has been referred to United States Magistrate Judge Michael E. Hegarty 100 . The Change of Plea Hearing set for Wednesday, December 28, 2016 at 3:00 p.m. is hereby **VACATED**. In the event the referred Motion to Withdraw is granted, upon the entry of appearance of Defendant Thomas' new counsel, s/he and counsel for the Government are DIRECTED to jointly contact Chambers (303–335–2805) to inform the Court of their available dates to reset the Change of Plea Hearing. SO ORDERED by Judge William J. Martinez on 12/21/2016. Text Only Entry (wjmsec, ) (Entered: 12/21/2016) |
| 12/22/2016 | 102 | | ORDER Setting Hearing on Motion as to Trammel Thomas. 98 MOTION to Withdraw as Attorney *for Trammel Thomas* by Michael Root by Magistrate Judge Michael E. Hegarty on 12/22/2016. Motion Hearing set for 1/5/2017 02:00 PM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty. Text Only Entry (mdave, ) (Entered: 12/22/2016) |
| 01/03/2017 | 103 | | Unopposed MOTION to Continue *Sentencing* by Mercedes Diaz as to Heather Carr, Trammel Thomas, Mercedes Diaz. (Rathod, Siddhartha) (Entered: 01/03/2017) |
| 01/03/2017 | 104 | | MOTION to Excuse *Mr. Thomas' Presence at January 5 Hearing* by Trammel Thomas. (Root, Michael) (Entered: 01/03/2017) |
| 01/03/2017 | 105 | | Amended MOTION to Excuse *Mr. Thomas' Presence at January 5 Hearing* by Trammel Thomas. (Root, Michael) (Entered: 01/03/2017) |
| 01/05/2017 | 107 | | MEMORANDUM regarding 105 Amended MOTION to Excuse *Mr. Thomas' Presence at January 5 Hearing* filed by Trammel Thomas. Motion(s) referred to Magistrate Judge Michael E. Hegarty, by Judge William J. Martinez on 01/05/2017. Text Only Entry (wjmlc1) (Entered: 01/05/2017) |
| 01/05/2017 | 108 | | ORDER granting 105 Motion to Excuse as to Trammel Thomas (2) by Magistrate Judge Michael E. Hegarty on 01/05/2017. Trammel Thomas is excused from the motion hearing set for 1/5/2017. Text Only Entry (mdave, ) (Entered: 01/05/2017) |
| 01/05/2017 | 109 | | COURTROOM MINUTES/MINUTE ENTRY for proceedings held before Magistrate Judge Michael E. Hegarty: granting 98 Motion to Withdraw as Attorney. Michael Gary Root withdrawn from case as to Trammel Thomas (2); Motion Hearing as to Trammel Thomas held on 1/5/2017. Defendant not present, CJA counsel is appointed. (Total time: 3 mins, Hearing time: |

| | | | |
|---|---|---|---|
| | | | 1:58–2:01 p.m.)<br><br>**APPEARANCES**: Beth Gibson on behalf of the Government, Michael Root on behalf of the defendant. FTR: Courtroom A501. (mdave, ) Text Only Entry (Entered: 01/05/2017) |
| 01/05/2017 | 110 | | ORDER APPOINTING COUNSEL as to Trammel Thomas by Magistrate Judge Michael E. Hegarty on 01/05/2017. CJA counsel is reappointed. (mdave, ) (Entered: 01/05/2017) |
| 01/06/2017 | 111 | | NOTICE OF ATTORNEY APPEARANCE: Renee Cooper appearing for Trammel ThomasAttorney Renee Cooper added to party Trammel Thomas(pty:dft) (Cooper, Renee) (Entered: 01/06/2017) |
| 01/19/2017 | 112 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court upon communication with Counsel regarding the resetting of the Change of Plea Hearing for Defendant Thomas. The Change of Plea Hearing is hereby **RESET to March 10, 2017 at 10:00 a.m.** in Courtroom A801. Counsel for the parties shall e–mail to Chambers courtesy copies of the "Statement by Defendant In Advance of Change of Plea" and the "Plea Agreement and Statement of Facts" no later than **12:00 p.m. on March 3, 2017**. If these documents are not timely submitted, the hearing may be vacated. The signed original and one copy of these documents must also be given to the courtroom deputy at the time of the hearing, pursuant to D.C.COLO.LCrR 11.1E. It is FURTHER ORDERED that defense counsel who reviewed and advised Defendant regarding the plea agreement must attend this Change of Plea Hearing. Pursuant to WJM Revised Practice Standard IX.I.1.c the AUSA assigned to this matter must also be present at the hearing. If that AUSA cannot attend in person, s/he must be present by phone and a fully–briefed substitute AUSA must be physically present in the courtroom at the time of the hearing. It is FURTHER ORDERED that at the Change of Plea Hearing, the parties should be prepared to discuss whether, pursuant to 18 U.S.C. § 3143, Defendant Thomas should remain on pretrial release pending imposition of his sentence, or whether his bond should be revoked and he should be remanded at the conclusion of the Change of Plea Hearing. SO ORDERED by Judge William J. Martinez on 1/19/2017. Text Only Entry (wjmsec, ) (Entered: 01/19/2017) |
| 02/01/2017 | 113 | | NOTICE of Change of Address/Contact Information (Paluch, Martha) (Entered: 02/01/2017) |
| 02/01/2017 | 114 | | NOTICE of Change of Address/Contact Information (Burrows, Daniel) (Entered: 02/01/2017) |
| 03/02/2017 | 118 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. The Change of Plea Hearing currently set for **March 10, 2017 at 10:00 a.m. in Courtroom A801 is hereby VACATED and will be RESET at a later date**. SO ORDERED by Judge William J. Martinez on 3/2/2017. Text Only Entry (wjmsec, ) (Entered: 03/02/2017) |
| 03/02/2017 | 119 | | First MOTION to Withdraw Document *88 Notice of Disposition* by Trammel Thomas. (Attachments: # 1 Exhibit Exhibit A)(Cooper, Renee) (Entered: 03/02/2017) |
| 03/14/2017 | 121 | | |

| | | | |
|---|---|---|---|
| | | | MOTION to Withdraw as Attorney by Renee Cooper by Trammel Thomas. (Cooper, Renee) (Entered: 03/14/2017) |
| 03/15/2017 | 122 | | ORDER as to **Trammel Thomas (2)** granting Attorney Renee Cooper's Motion to Withdraw as Counsel 121 : The Motion is GRANTED for good cause shown. Renee Cooper is hereby granted leave to withdraw from this case. New counsel from the CJA Panel shall be appointed to represent Defendant Thomas. The Change of Plea Hearing will be reset upon the entry of appearance of new counsel for Defendant Thomas. SO ORDERED by Judge William J. Martinez on 3/15/2017. Text Only Entry (wjmsec, ) (Entered: 03/15/2017) |
| 03/15/2017 | 123 | | ORDER APPOINTING COUNSEL as to Trammel Thomas pursuant to 122 Order by Judge William J. Martinez on 3/15/2017. Text Only Entry (wjmsec, ) (Entered: 03/15/2017) |
| 03/16/2017 | 124 | | NOTICE OF ATTORNEY APPEARANCE: Daniel T. Smith appearing for Trammel ThomasAttorney Daniel T. Smith added to party Trammel Thomas(pty:dft) (Smith, Daniel) (Entered: 03/16/2017) |
| 03/17/2017 | 125 | | ORDER as to **Trammel Thomas (2)**: Pursuant to this Court's Order 122 and the Notice of Attorney Appearance of Daniel T. Smith as Defendant Thomas' new counsel, the Change of Plea Hearing for Defendant Thomas is hereby **RESET to April 26, 2017 at 10:00 a.m.**, in Courtroom A801. Counsel for the parties shall e–mail to Chambers courtesy copies of the "Statement by Defendant In Advance of Change of Plea" and the "Plea Agreement and Statement of Facts" no later than **12:00 p.m. on April 19, 2017**. SO ORDERED by Judge William J. Martinez on 3/17/2017. Text Only Entry (wjmsec, ) (Entered: 03/17/2017) |
| 03/29/2017 | 126 | | MOTION to Vacate *and motion to exclude 90 days from speedy trial calculation* by Trammel Thomas. (Smith, Daniel) (Entered: 03/29/2017) |
| 04/03/2017 | 127 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant's Unopposed Motion to Vacate Hearing and to Exclude 90 Days from the Requirements of the Speedy Trial Act 126 . A Status Conference to discuss the matters raised in the Motion is hereby **SET for April 21, 2017 at 10:30 a.m.** in Courtroom A801. SO ORDERED by Judge William J. Martinez on 4/3/2017. Text Only Entry (wjmsec, ) (Entered: 04/03/2017) |
| 04/04/2017 | 128 | | AMENDED ORDER 127 as to **Trammel Thomas (2)**: At the Status Conference set for April 21, 2017, Defendant Thomas's appearance is MANDATORY, but the Court hereby grants leave for him to appear telephonically, presuming he continues to reside in Arizona. Defendant's Counsel, Mr. Smith, must contact Chambers at (303) 335–2805 on or before April 20, 2017 to provide a **land line** telephone number that will be used by Defendant Thomas for participation in the Status Conference. **Chambers will initiate the call to Defendant Thomas**. Mr. Smith must appear in person. SO ORDERED by Judge William J. Martinez on 4/4/2017. Text Only Entry (wjmsec, ) (Entered: 04/04/2017) |
| 04/07/2017 | 129 | | MOTION to Vacate *Status Conference* by Trammel Thomas. (Smith, Daniel) (Entered: 04/07/2017) |
| 04/07/2017 | 130 | | |

| | | | |
|---|---|---|---|
| | | | ORDER as to **Trammel Thomas (2)** granting the Defendant's Motion to Vacate 129 . The Defendant's Motion is GRANTED for good cause shown. The Status Conference set for April 21, 2017 at 10:30 a.m. is hereby **VACATED and RESET to April 21, 2017 at 1:30 p.m.**, in Courtroom A801. SO ORDERED by Judge William J. Martinez on 4/7/2017. Text Only Entry (wjmsec, ) (Entered: 04/07/2017) |
| 04/11/2017 | 131 | 67 | SUPERSEDING INDICTMENT as to Trammel Thomas (2) count(s) 1s, 2s–7s, Marcelle Green (4) count(s) 1, 8. (Attachments: # 1 Criminal Information Sheet, # 2 Criminal Information Sheet) (angar, ) (Entered: 04/12/2017) |
| 04/11/2017 | 133 | | RESTRICTED DOCUMENT – Level 4 (angar, ) (Entered: 04/12/2017) |
| 04/11/2017 | 134 | | MINUTE ORDER as to Trammel Thomas Re–Arraignment set for 4/27/2017 10:00 AM in Courtroom A 401 before Magistrate Judge Kristen L. Mix pursuant to 131 Superseding Indictment on 4/11/2017. Text Only Entry (angar, ) (Entered: 04/12/2017) |
| 04/14/2017 | 137 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant Trammel Thomas' Unopposed Motion to Vacate Hearing and to Exclude 90 Days From the Requirements of the Speedy Trial Act 126 . Given the filing of a Superseding Indictment 131 in this case, and the addition of a new defendant who has yet to be have his initial appearance and arraignment, the Court Orders as follows: (1) That portion of Defendant Thomas' Motion seeking to vacate the Change of Plea Hearing currently set for April 26, 2017 at 10:00 a.m. is GRANTED and said Hearing is hereby VACATED; and (2) the Status Conference currently set for April 21, 2017 at 1:30 p.m. is also VACATED. That portion of Defendant Thomas' Motion which seeks an Ends of Justice Continuance of 90 days will be ruled on after new defendant Marcelle Greene has had his initial appearance and the Speedy Trial Act deadlines for him have been established. In the interim, Defendant Thomas' Notice of Disposition 88 , which the Court fully understands at some point will be withdrawn, will nonetheless for the time being continue to toll Speedy Trial Act deadlines for Defendant Thomas. SO ORDERED by Judge William J. Martinez on 4/14/2017. Text Only Entry (wjmsec, ) (Entered: 04/14/2017) |
| 04/27/2017 | 138 | | COURTROOM MINUTES for Re–arraignment on Superseding Indictment as to Trammel Thomas held on 4/27/2017 before Magistrate Judge Kristen L. Mix. Defendant present on bond. Plea of NOT GUILTY entered by defendant. Defendant continued on bond. (Total time: 2 mins, Hearing time: 1017–1019)  **APPEARANCES**: Martha Paluch on behalf of the Government, Dan Smith on behalf of the defendant, Michelle Sinaka on behalf of pretrial. FTR: KLM A401. (sgrim) Text Only Entry Modified on 4/27/2017 to note defendant was on bond and to correct attorneys (Entered: 04/27/2017) |
| 05/11/2017 | 148 | | MOTION to Amend/Correct 126 MOTION to Vacate *and motion to exclude 90 days from speedy trial calculation* filed by Trammel Thomas by Trammel Thomas. (Smith, Daniel) (Entered: 05/11/2017) |
| 05/12/2017 | 149 | | ORDER as to **Trammel Thomas (2)** granting Defendant's Unopposed Motion to Amend Defendant's Previous Motion to Exclude 90 Days from the Requirements of the Speedy Trial Act 148 . Defendant's Motion is GRANTED |

| | | | |
|---|---|---|---|
| | | | for good cause shown. Defendant's Unopposed Motion to Vacate Hearing and to Exclude 90 Days from the Requirements of the Speedy Trial Act 126 is amended to reflect Defendant's request for exclusion of time from 90 days to 120 days. SO ORDERED by Judge William J. Martinez on 5/12/2017. Text Only Entry (wjmsec, ) (Entered: 05/12/2017) |
| 05/15/2017 | 152 | | ORDER as to **Trammel Thomas (2)** granting Defendant Thomas' Motion to Withdraw Notice of Disposition 119 . The Defendant's Motion is hereby GRANTED for good cause shown. The Clerk's Office is DIRECTED to designate the originally−filed Notice of Disposition 88 as WITHDRAWN. SO ORDERED by Judge William J. Martinez on 5/15/2017. Text Only Entry (wjmsec, ) (Entered: 05/15/2017) |
| 05/15/2017 | 153 | | ORDER Granting Defendant Green's 151 Amended Unopposed Motion to Vacate Current Deadlines and Court Dates, And to Exclude 190 Days From Speedy Trial Act Calculations. 126 Unopposed Motion to Vacate Hearing and to Exclude90 Days from the Requirements of the Speedy Trial Act DENIED AS MOOT. 147 AND 150 Unopposed Motion to Amend Motion to Vacate CurrentDeadlines and Court Dates, and to Exclude 90 Days from Speedy Trial ActCalculations ARE DENIED AS MOOT. ORDERED by Judge William J. Martinez on 5/15/2017. (angar, ) (Entered: 05/15/2017) |
| 05/17/2017 | 154 | | ORDER as to Trammel Thomas, Marcelle Green Motions due by 10/30/2017. Responses due by 11/9/2017. Trial Preparation Conference is set for 11/17/2017 at 02:00 PM in Courtroom A 801 before Judge William J. Martinez and a 6−day Jury Trial is set for 11/27/2017 08:30 AM in Courtroom A 801 before Judge William J. Martinez. ORDERED by Judge William J. Martinez on 05/17/2017. (angar, ) (Entered: 05/17/2017) |
| 07/20/2017 | 156 | | CJA MOTION by Trammel Thomas. (Smith, Daniel) (Entered: 07/20/2017) |
| 07/20/2017 | 157 | | First MOTION for Leave to Restrict by Trammel Thomas. (Smith, Daniel) (Entered: 07/20/2017) |
| 07/20/2017 | 158 | | RESTRICTED DOCUMENT − Level 3: by Trammel Thomas. (Smith, Daniel) (Entered: 07/20/2017) |
| 07/20/2017 | 160 | | ORDER as to **Trammel Thomas (2)** granting the Defendant's Motion for Leave to Restrict 157 . The Defendant's Motion is GRANTED for good cause shown. The documents filed at ECF Nos. 156 and 158 shall remain RESTRICTED at RESTRICTION LEVEL 3 (viewable only by the Filer and the Court). SO ORDERED by Judge William J. Martinez on 7/20/2017. Text Only Entry (wjmsec, ) (Entered: 07/20/2017) |
| 07/27/2017 | 163 | | ORDER Granting 156 CJA Motion as to Trammel Thomas (2) ORDERED by Judge William J. Martinez on 07/27/2017. (angar, ) (Entered: 07/27/2017) |
| 07/27/2017 | 164 | | Certificate of Service by Mail by Clerk of Court as to Trammel Thomas re: 163 Order on CJA Motion. Mailed to attorney as Ordered. TEXT ONLY ENTRY (angar, ) (Entered: 07/27/2017) |
| 08/07/2017 | 165 | | NOTICE OF ATTORNEY APPEARANCE: Thomas Edward Goodreid appearing for Trammel ThomasAttorney Thomas Edward Goodreid added to party Trammel Thomas(pty:dft) (Goodreid, Thomas) (Entered: 08/07/2017) |
| 08/25/2017 | 166 | | |

| | | | |
|---|---|---|---|
| | | | NOTICE OF ATTORNEY APPEARANCE Bryan David Fields appearing for USA. Attorney Bryan David Fields added to party USA(pty:pla) (Fields, Bryan) (Entered: 08/25/2017) |
| 09/13/2017 | 169 | 80 | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. In light of the filing of notice of dispositions for the other three Defendants in this case, leaving Defendant Thomas as the only remaining Defendant, the 6 day Jury Trial set to begin on November 27, 2017, is hereby **VACATED and RESET to a 5 day Jury Trial set to begin on November 27, 2017 at 8:30 a.m.** in Courtroom A801. **The Trial will conclude on Friday, December 1, 2017**. The Final Trial Preparation Conference remains set for November 17, 2017 at 2:00 p.m. in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards to ensure compliance with all deadlines triggered by the dates of the Final Trial Preparation Conference and Trial. SO ORDERED by Judge William J. Martinez on 9/13/2017. Text Only Entry (wjmsec, ) (Entered: 09/13/2017) |
| 10/04/2017 | 172 | | NOTICE of Change of Address/Contact Information (Smith, Daniel) (Entered: 10/04/2017) |
| 10/13/2017 | 174 | 82 | NOTICE *of Stipulation* by Trammel Thomas (Smith, Daniel) (Entered: 10/13/2017) |
| 10/13/2017 | 175 | | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 174 Notice (Other) filed by attorney Daniel T. Smith. **DO NOT REFILE THE DOCUMENT. Action to take –** counsel must submit a change of contact request through the Attorney Services Portal Account pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (angar, ) (Entered: 10/13/2017) |
| 10/13/2017 | 176 | 84 | NOTICE of Intent to Use Evidence by USA as to Trammel Thomas (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Paluch, Martha) (Entered: 10/13/2017) |
| 10/20/2017 | 181 | 107 | MOTION to Suppress *# 1* by Trammel Thomas. (Attachments: # 1 Exhibit)(Smith, Daniel) (Entered: 10/20/2017) |
| 10/20/2017 | 182 | | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 181 MOTION to Suppress *# 1* filed by attorney Daniel T. Smith. **DO NOT REFILE THE DOCUMENT. Action to take –** counsel must submit a change of contact request through the Attorney Services Portal Account pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (angar, ) (Entered: 10/23/2017) |
| 10/23/2017 | 183 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant's Motion to Suppress #1 181 . Given that trial in this matter is set for 5 weeks from today, the Court orders the following accelerated briefing schedule on the Motion: (a) the Government's Response to the Motion shall be filed by no later than **October 27, 2017**; and (b) Defendant's Reply Brief shall be filed by no later than **November 1, 2017**. NO EXTENSIONS OF THESE FILING DEADLINES WILL BE GRANTED. After receipt of the Defendant's Reply Brief the Court will determine whether an evidentiary hearing on the Motion will be necessary. SO ORDERED by Judge William J. Martinez on |

| | | | |
|---|---|---|---|
| | | | 10/23/2017. Text Only Entry (wjmsec, ) (Entered: 10/23/2017) |
| 10/25/2017 | 184 | | MOTION for Writ of Habeas Corpus ad Testificandum by USA as to Trammel Thomas. (Attachments: # 1 Proposed Order (PDF Only), # 2 Exhibit)(Paluch, Martha) (Entered: 10/25/2017) |
| 10/25/2017 | 185 | | MOTION for Writ of Habeas Corpus ad Testificandum by USA as to Trammel Thomas. (Attachments: # 1 Proposed Order (PDF Only), # 2 Exhibit)(Paluch, Martha) (Entered: 10/25/2017) |
| 10/25/2017 | 186 | | MOTION for Writ of Habeas Corpus ad Testificandum by USA as to Trammel Thomas. (Attachments: # 1 Proposed Order (PDF Only), # 2 Exhibit)(Paluch, Martha) (Entered: 10/25/2017) |
| 10/25/2017 | 187 | | MOTION for Writ of Habeas Corpus ad Testificandum by USA as to Trammel Thomas. (Attachments: # 1 Proposed Order (PDF Only), # 2 Exhibit)(Paluch, Martha) (Entered: 10/25/2017) |
| 10/25/2017 | 188 | | ORDER for Writ of Habeas Corpus ad Testificandum re: 184 as to Trammel Thomas (2), by Judge William J. Martinez on 10/25/2017. (angar, ) (Entered: 10/25/2017) |
| 10/25/2017 | 189 | | ORDER for Writ of Habeas Corpus ad Testificandum re: 185 as to Trammel Thomas (2), by Judge William J. Martinez on 10/25/2017. (angar, ) (Entered: 10/25/2017) |
| 10/25/2017 | 190 | | ORDER for Writ of Habeas Corpus ad Testificandum re: 186 as to Trammel Thomas (2), by Judge William J. Martinez on 10/25/2017. (angar, ) Modified on 10/25/2017 to edit document (angar, ). (Entered: 10/25/2017) |
| 10/25/2017 | 191 | | ORDER for Writ of Habeas Corpus ad Testificandum re: 187 as to Trammel Thomas (2), by Judge William J. Martinez on 10/25/2017. (angar, ) (Entered: 10/25/2017) |
| 10/25/2017 | 192 | | Writ of Habeas Corpus ad Testificandum Issued in case as to Trammel Thomas (Attachments: # 1 Writ of Habeas Corpus ad Testificandum, # 2 Writ of Habeas Corpus ad Testificandum, # 3 Writ of Habeas Corpus ad Testificandum)(angar, ) (Entered: 10/25/2017) |
| 10/27/2017 | 193 | 148 | RESPONSE to Motion by USA as to Trammel Thomas re 181 MOTION to Suppress # 1 (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Fields, Bryan) (Entered: 10/27/2017) |
| 10/30/2017 | 194 | 198 | MOTION to Suppress *EVIDENCE SEIZED PURSUANT TO SEARCH WARRANT* by Trammel Thomas. (Attachments: # 1 Exhibit Application for Search Warrant, # 2 Exhibit Search Warrant, # 3 Exhibit Affidavit in Support of Application for Search Warrant, part I, # 4 Exhibit Affidavit in Support of Application for Search Warrant, part II)(Goodreid, Thomas) (Entered: 10/30/2017) |
| 10/31/2017 | 195 | | ORDER as to **Trammel Thomas(2)**: This matter is before the Court on Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrant 194 . Given that trial is set to commence in less than four weeks, the Court orders the following accelerated briefing schedule on the Motion: (a) the Government's Response shall be filed no later than **Friday, November 3, 2017**; and (b) Defendant's Reply shall be filed no later than **Monday,** |

| | | | |
|---|---|---|---|
| | | | **November 6, 2017**. NO EXTENSIONS OF THESE FILING DEADLINES WILL BE GRANTED. After receipt of the Defendant's Reply Brief the Court will determine whether an evidentiary hearing on the Motion will be necessary. SO ORDERED by Judge William J. Martinez on 10/31/2017. Text Only Entry (wjmlc2, ) (Entered: 10/31/2017) |
| 11/01/2017 | 196 | 260 | REPLY TO RESPONSE to Motion by Trammel Thomas re 181 MOTION to Suppress *# 1* (Smith, Daniel) (Entered: 11/01/2017) |
| 11/03/2017 | 197 | 263 | RESPONSE in Opposition by USA as to Trammel Thomas re 194 MOTION to Suppress *EVIDENCE SEIZED PURSUANT TO SEARCH WARRANT* (Paluch, Martha) (Entered: 11/03/2017) |
| 11/06/2017 | 198 | 273 | REPLY TO RESPONSE to Motion by Trammel Thomas re 194 MOTION to Suppress *EVIDENCE SEIZED PURSUANT TO SEARCH WARRANT* (Goodreid, Thomas) (Entered: 11/06/2017) |
| 11/09/2017 | 199 | | Proposed Voir Dire by Trammel Thomas (Goodreid, Thomas) (Entered: 11/09/2017) |
| 11/09/2017 | 200 | | Proposed Voir Dire by USA as to Trammel Thomas (Paluch, Martha) (Entered: 11/09/2017) |
| 11/09/2017 | 201 | | Proposed Jury Instructions by USA as to Trammel Thomas (Paluch, Martha) (Entered: 11/09/2017) |
| 11/09/2017 | 202 | 280 | WITNESS LIST by USA as to Trammel Thomas (Fields, Bryan) (Entered: 11/09/2017) |
| 11/10/2017 | 203 | 281 | EXHIBIT LIST by USA as to Trammel Thomas (Fields, Bryan) (Entered: 11/10/2017) |
| 11/10/2017 | 204 | 298 | EXHIBIT LIST by Trammel Thomas (Smith, Daniel) (Entered: 11/10/2017) |
| 11/10/2017 | 205 | 303 | WITNESS LIST by Trammel Thomas (Smith, Daniel) (Entered: 11/10/2017) |
| 11/14/2017 | 206 | 304 | ORDER Denying Motions to Suppress as to Trammel Thomas (2). Defendant's Motions to Suppress #1 (ECF No. 181 ) is DENIED; Defendants Motion to Suppress Evidence Seized Pursuant to Search Warrant (ECF No. 194 ) is DENIED; and Defendant's request for an evidentiary hearing is also DENIED. ORDERED by Judge William J. Martinez on 11/14/2017. (angar, ) (Entered: 11/14/2017) |
| 11/17/2017 | 207 | 325 | MINUTE ENTRY for proceedings held before Judge William J. Martinez: Trial Preparation Conference as to Defendant 2. Trammel Thomas held on 11/17/2017. ORDERED: Each side will be allowed twenty minutes for voir dire and opening statements.ORDERED: The Government's oral motion to quash the Writs of Habeas Corpus Ad Testificandum for 1) Manuel Abate, 2) Eddie Jones, Jr., 3) Dennis Miller and 4) Robert Pickens is GRANTED. The Writs of Habeas Corpus Ad Testificandum for 1) Manuel Abate, 2) Eddie Jones, Jr., 3) Dennis Miller and 4) Robert Pickens are QUASHED. ORDERED: The Government shall send an email to chambers identifying the title and role of anyone who will be seated at counsel table during the trial. ORDERED: The Government shall file its Amended Witness List by November 21, 2017. ORDERED: No later than the end of the day Monday, November 20th counsel shall meet face–to–face to go over the exhibits and |

| | | | |
|---|---|---|---|
| | | | stipulate to the admissibility of as many exhibits as possible. The parties shall file Amended Exhibit Lists by November 22, 2017.ORDERED: Counsel shall be present at 8:30 a.m., on November 27th. The court will address pretrial matters at that time. The jury panel will be brought to the courtroom at 9:00 a.m. ORDERED: The Government shall email to chambers, by Tuesday, November 21, the jury instructions, proposed stipulated instructions and verdict forms in an editable format. ORDERED: No trial briefs are allowed Court Reporter: Mary George. (dhans, ) (Entered: 11/20/2017) |
| 11/21/2017 | 208 | 327 | WITNESS LIST *Amended* by USA as to Trammel Thomas (Paluch, Martha) (Entered: 11/21/2017) |
| 11/22/2017 | 209 | 328 | WITNESS LIST *First amended Witness List* by Trammel Thomas (Smith, Daniel) (Entered: 11/22/2017) |
| 11/22/2017 | 210 | 333 | EXHIBIT LIST – *Amended* by USA as to Trammel Thomas (Fields, Bryan) (Entered: 11/22/2017) |
| 11/24/2017 | 211 | | MOTION to Appoint Counsel *for Proposed Defense Witnesses* by USA as to Trammel Thomas. (Fields, Bryan) (Entered: 11/24/2017) |
| 11/24/2017 | 212 | 342 | EXHIBIT LIST *second amended exhibit list* by Trammel Thomas (Smith, Daniel) (Entered: 11/24/2017) |
| 11/24/2017 | 213 | | Amended MOTION to Appoint Counsel *for Proposed Defense Witnesses* by USA as to Trammel Thomas. (Fields, Bryan) (Entered: 11/24/2017) |
| 11/27/2017 | 214 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on the Government's oral motion for authorization to communicate with members of the jury in this case. Pursuant to Local Criminal Rule 24.1 the Motion is GRANTED. Such communications with the jury are authorized under the following restrictions, which will be strictly enforced:(1) only counsel may speak with the jurors; (2) the communication may only take place after the conclusion of the trial; (3) the communication may ONLY occur within this courtroom; (4) and ONLY with those jurors who voluntarily choose to return into the courtroom to speak with the lawyers after I meet with them; and (5) there will be NO communication with a juror after that juror has left this courtroom. The intent of this Order is to provide counsel with the opportunity to discuss with jurors what transpired in the jurys presence in the courtroom, and to receive input from them which may assist counsel in improving their trial skills in future cases. Accordingly, counsels communications with the jurors will be restricted to these topics. This Order is NOT intended to give counsel the opportunity to make inquiry into the jurys deliberations or to examine with them the validity or consistency of their verdict. Accordingly, counsel are prohibited from discussing with jurors: (a) facts or information which were not received into evidence; (b) the content of the jurys deliberations; or (c) the reasons the jury returned the verdict that it did. Any attorney violating any of these restrictions is subject to being held in contempt of Court. SO ORDERED by Judge William J. Martinez on 11/27/2017. Text Only Entry (wjmsec, ) (Entered: 11/27/2017) |
| 11/27/2017 | 215 | | ORDER as to **Trammel Thomas (2)** granting in part the Government's Motion to Appoint Counsel for Defense Witnesses 213 . That portion of the Motion which requests the appointment of counsel for Mathew Sanders is GRANTED for good cause shown. Counsel from the CJA Panel shall be |

| | | | |
|---|---|---|---|
| | | | appointed to represent Mr. Sanders in this matter. That portion of the Motion that requests appointment for Michael Cox will be ruled on by separate order. SO ORDERED by Judge William J. Martinez on 11/27/2017. Text Only Entry (wjmsec, ) (Entered: 11/27/2017) |
| 11/27/2017 | 217 | 347 | MINUTE ENTRY for proceedings held before Judge William J. Martinez: Jury Trial – Day One as to Defendant 2. Trammel Thomas held on 11/27/2017. Trial continued. Court Reporter: Mary George. (dhans, ) Modified on 11/29/2017 (dhans, ). (Entered: 11/28/2017) |
| 11/28/2017 | 216 | | ORDER as to **Trammel Thomas (2)** denying in part 213 the Government's Motion to Appoint Counsel for Defense Witnesses as moot. That portion of the Motion which requests the appointment of independent counsel for potential witness Michael Cox is DENIED as MOOT. SO ORDERED by Judge William J. Martinez on 11/28/2017. Text Only Entry (wjmsec, ) (Entered: 11/28/2017) |
| 11/28/2017 | 218 | 352 | MINUTE ENTRY for proceedings held before Judge William J. Martinez: Jury Trial – Day Two as to Defendant 2. Trammel Thomas held on 11/28/2017. Trial continued. Court Reporter: Mary George. (dhans, ) (Entered: 11/29/2017) |
| 11/29/2017 | 219 | 356 | MINUTE ENTRY for proceedings held before Judge William J. Martinez: Jury Trial – Day Three as to Defendant 2. Trammel Thomas held on 11/29/2017. Trial continued. Court Reporter: Mary George. (dhans, ) (Entered: 11/29/2017) |
| 11/30/2017 | 223 | 359 | MINUTE ENTRY for proceedings held before Judge William J. Martinez: Jury Trial – Day Four as to Defendant. 2 Trammel Thomas held on 11/30/2017. Jury Verdict of guilty as to Counts 1 through 7 of the Superseding Indictment. Sentencing set for 4/12/2018 at 09:30 AM in Courtroom A801 before Judge William J. Martinez. Defendant is permitted to remain free on bond subject to the conditions of release as set forth in the Magistrate Judges Order Setting Conditions of Release. Court Reporter: Mary George. (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 224 | | Jury List – Unredacted – Restricted Doc. – Level 4 (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 225 | 362 | Clerk's copy of Government's Witness List (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 226 | 363 | Clerk's copy of Government's Exhibit List (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 227 | 372 | Clerk's copy of Defendant's Exhibit List (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 228 | 377 | Jury Instructions as to Defendant 2. Trammel Thomas (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 229 | 418 | Jury Note as to Defendant 2. Trammel Thomas (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 230 | 419 | Jury question; and answer to the question, as to Defendant 2. Trammel Thomas (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 231 | | Jury Note – Unredacted – Restricted Doc. – Level 4 (dhans, ) (Entered: 12/01/2017) |

| 11/30/2017 | 232 | | Jury question; and answer to the question, as to Defendant 2. Trammel Thomas – Unredacted – Restricted Doc. – Level 4 (dhans, ) (Entered: 12/01/2017) |
|---|---|---|---|
| 11/30/2017 | 233 | 420 | JURY VERDICT as to Defendant 2. Trammel Thomas (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 234 | | Jury Verdict Un–Redacted – Level 4 – Viewable by Court Only (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 235 | | STIPULATION AND ORDER REGARDING CUSTODY OF ORIGINAL EXHIBITS as to Defendant 2. Trammel Thomas, by Judge William J. Martinez on 11/30/2017. (dhans, ) (Entered: 12/01/2017) |
| 12/29/2017 | 262 | 423 | SENTENCING STATEMENT by USA as to Trammel Thomas (Paluch, Martha) (Entered: 12/29/2017) |
| 01/08/2018 | 279 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on the Government's Sentencing Statement 262 . The Defendant is DIRECTED to file a Response to the Government's Sentencing Statement on or before **January 26, 2018**. No Reply will be permitted. SO ORDERED by Judge William J. Martinez on 1/8/2018. Text Only Entry (wjmsec, ) (Entered: 01/08/2018) |
| 01/26/2018 | 318 | 439 | SENTENCING STATEMENT by Trammel Thomas (Goodreid, Thomas) (Entered: 01/26/2018) |
| 01/30/2018 | 319 | | REPORTER TRANSCRIPT ORDER FORM filed by Mary George re 298 Notice of Appeal. Transcript due by 2/28/2018. (nrich) (Entered: 01/30/2018) |
| 02/06/2018 | 320 | | ORDER as to **(2) Trammel Thomas**: The Government is DIRECTED to file a Response to 318 Defendant's Sentencing Statement, no later than **February 20, 2018**. SO ORDERED by Judge William J. Martinez on 2/6/2018. Text Only Entry (wjmlc2, ) (Entered: 02/06/2018) |
| 02/20/2018 | 324 | 444 | RESPONSE by USA as to Trammel Thomas re: 318 Sentencing Statement filed by Trammel Thomas (Attachments: # 1 Attachment A)(Paluch, Martha) (Entered: 02/20/2018) |
| 02/21/2018 | 326 | 504 | ORDER as to **(2) Trammel Thomas**: This matter is before the Court on 262 the Government's Sentencing Statement, 318 , Defendant's Sentencing Statement, and 324 the Government's Response. The Government has taken the position that the amount of loss is "more than $550,000 but less than $1.5 million" which would lead to a 14–level increase under U.S.S.G. §2B1.1(b)(1)(H), and also that the judgment should include restitution of $563,890.85. (ECF No. 262 at 1, 14.) Defendant has "advise[d] the Court, as a preliminary matter, that he disputes... the loss amount," but without indicating what calculation of loss he believes is correct, and without addressing restitution. (ECF No. 318 at 4.) The Government's Response 324 addresses only the issues surrounding uncharged conduct, but does not address loss or restitution. Accordingly, the parties are DIRECTED to confer as to whether there is a genuine factual dispute regarding the correct calculations of loss and/or restitution. If the parties are in agreement, they shall file a joint statement reflecting their shared position no later than **March 9, 2018**. If the parties disagree, then each party shall file a separate position statement by |

|  |  |  | **March 9, 2018**, including each party's calculation of loss and/or restitution, the evidentiary materials supporting that position, and a statement as to whether an evidentiary hearing regarding loss and/or restitution is required, either before the sentencing hearing or simultaneous to it. SO ORDERED by Judge William J. Martinez on 2/21/2018. Text Only Entry (wjmlc2, ) (Entered: 02/21/2018) |
|---|---|---|---|
| 03/05/2018 | 331 | 506 | MOTION for Leave to Restrict by USA as to Trammel Thomas. (Attachments: # 1 Proposed Order (PDF Only))(Fields, Bryan) (Entered: 03/05/2018) |
| 03/05/2018 | 332 |  | RESTRICTED DOCUMENT – Level 3: by USA as to Trammel Thomas (Fields, Bryan) (Entered: 03/05/2018) |
| 03/05/2018 | 333 |  | RESTRICTED DOCUMENT – Level 3: by USA as to Trammel Thomas (Fields, Bryan) (Entered: 03/05/2018) |
| 03/05/2018 | 334 | 509 | MEMORANDUM regarding 333 Motion(s) referred to Magistrate Judge Nina Y. Wang. by Judge William J. Martinez on 3/5/2018. Text Only Entry (wjmsec, ) Modified on 3/5/2018 to add text (angar, ). (Entered: 03/05/2018) |
| 03/06/2018 | 335 | 511 | ORDER as to **Trammel Thomas (2)** granting the Government's Motion to Restrict Documents 331 . The Government's Motion is GRANTED for good cause shown. The documents filed at ECF Nos. 332 and 333 shall remain RESTRICTED at RESTRICTION LEVEL 3 (viewable only by the Filer and the Court). SO ORDERED by Judge William J. Martinez on 3/6/2018. Text Only Entry (wjmsec, ) (Entered: 03/06/2018) |
| 03/06/2018 | 336 |  | RESTRICTED DOCUMENT – Level 4. (nmarb, ) Modified on 3/7/2018 (nmarb, ). (Entered: 03/07/2018) |
| 03/07/2018 | 338 | 513 | RESPONSE to Motion by Trammel Thomas re 331 MOTION for Leave to Restrict *and Order #337* (Smith, Daniel) (Entered: 03/07/2018) |
| 03/08/2018 | 339 | 516 | MINUTE ORDER by Magistrate Judge Nina Y. Wang on 3/8/18 as to Trammel Thomas re 333 Restricted Document – Level 3 filed by USA. Clerk of Court to amend the restriction level of 333 from Level 4 to Level 2. The Motion is reserved as to whether Defendant's bond will be revoked. The Parties are directed to contact the chambers of Magistrate Judge Nina Y. Wang to set a revocation hearing and a deadline for a substantive response by Defendant Trammel Thomas. (nmarb, ) (Entered: 03/08/2018) |
| 03/08/2018 | 340 |  | RESTRICTED PRESENTENCE REPORT first disclosure for attorney review as to Trammel Thomas (aarag, ) (Entered: 03/08/2018) |
| 03/09/2018 | 341 | 517 | RESPONSE by USA as to Trammel Thomas re: 326 Order,,,,,, (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Paluch, Martha) (Entered: 03/09/2018) |
| 03/09/2018 | 342 | 593 | MEMORANDUM in Support by Trammel Thomas re 326 Order,,,,,, (Smith, Daniel) (Entered: 03/09/2018) |
| 03/12/2018 | 343 |  | MOTION for Order *of Forfeiture for a Personal Money Judgment Against Defendant Tramell Thomas* by USA as to Trammel Thomas. (Attachments: # 1 Proposed Order (PDF Only))(Paluch, Martha) (Entered: 03/12/2018) |
| 03/13/2018 | 344 |  |  |

| | | | |
|---|---|---|---|
| | | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on the United States' Motion for Preliminary Order of Forfeiture for a Personal Money Judgment against Defendant Trammel Thomas 343 . The Defendant is DIRECTED to file a Response to the Government's Motion on or before **March 22, 2018**. No Reply will be permitted. SO ORDERED by Judge William J. Martinez on 3/13/2018. Text Only Entry (wjmsec, ) (Entered: 03/13/2018) |
| 03/15/2018 | 346 | 597 | RESPONSE in Opposition by Trammel Thomas re 343 MOTION for Order *of Forfeiture for a Personal Money Judgment Against Defendant Tramell Thomas* (Smith, Daniel) (Entered: 03/15/2018) |
| 03/22/2018 | 348 | 601 | OBJECTION/RESPONSE to Presentence Report 340 by Trammel Thomas (Attachments: # 1 Exhibit Exhibit A to Defendant's PSIR objections)(Goodreid, Thomas) (Entered: 03/22/2018) |
| 03/23/2018 | 349 | | ORDER as to **Tramell Thomas (2)**: This matter is before the Court on Defendant Tramel [*sic*] Thomas's Objections to the Presentence Investigation Report 348 . The Government is DIRECTED to file a Response to Defendant's Objections on or before **April 3, 2018**. No Reply will be permitted. SO ORDERED by Judge William J. Martinez on 3/23/2018. Text Only Entry (wjmsec, ) (Entered: 03/23/2018) |
| 03/29/2018 | 352 | 637 | RESPONSE by Trammel Thomas *to motion to revoke release status #333* (Smith, Daniel) (Entered: 03/29/2018) |
| 03/29/2018 | 353 | 640 | SENTENCING STATEMENT *and request for specific/variant sentence* by Trammel Thomas (Attachments: # 1 Exhibit exhibits A through G)(Smith, Daniel) (Entered: 03/29/2018) |
| 04/02/2018 | 355 | | RESTRICTED PRESENTENCE REPORT as to Trammel Thomas (Attachments: # 1 Exhibit A, # 2 Exhibit B)(aarag, ) (Entered: 04/02/2018) |
| 04/02/2018 | 356 | | RESTRICTED ADDENDUM to Presentence Report 355 as to Trammel Thomas (aarag, ) (Entered: 04/02/2018) |
| 04/03/2018 | 357 | 687 | RESPONSE by USA as to Trammel Thomas re: 348 Objection/Response to Presentence Report filed by Trammel Thomas (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Paluch, Martha) (Entered: 04/03/2018) |
| 04/03/2018 | 358 | 723 | MOTION for New Trial by Trammel Thomas. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7, # 8 Exhibit Exhibit 8)(Goodreid, Thomas) (Entered: 04/03/2018) |
| 04/03/2018 | 359 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. In the course of preparing for the Sentencing Hearing, currently set for April 12, 2018 at 9:30 a.m, it has become apparent to the undersigned that he is in need of additional time to adequately prepare for said Hearing. As a consequence the Court hereby **VACATES the current Sentencing Hearing and RESETS same to August 9, 2018 at 9:30 a.m.** in Courtroom A801. SO ORDERED by Judge William J. Martinez on 4/3/2018. Text Only Entry (wjmsec, ) (Entered: 04/03/2018) |
| 04/04/2018 | 360 | | CJA MOTION by Trammel Thomas. (Attachments: # 1 Exhibit)(Smith, Daniel) (Entered: 04/04/2018) |

| 04/04/2018 | 362 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant's Motion for New Trial 358 . The Government is DIRECTED to file a Response to Defendant's Motion on or before **April 13, 2018**. After the Government's Response has been received, the Court will determine whether a Reply Brief will be permitted. SO ORDERED by Judge William J. Martinez on 4/4/2018. Text Only Entry (wjmsec, ) (Entered: 04/04/2018) |
| 04/04/2018 | 369 | | Arrest of Trammel Thomas (Text Only entry) (cthom, ) (Entered: 04/10/2018) |
| 04/04/2018 | 370 | 861 | Rule 5(c)(3) Documents Received as to Trammel Thomas (Attachments: # 1 Waiver, # 2 Notice, # 3 Exhibit to Notice, # 4 Exhibit List, # 5 Order of Detention, # 6 Docket Sheet)(cthom, ) (Entered: 04/10/2018) |
| 04/04/2018 | 371 | | CJA 23 Financial Affidavit by Trammel Thomas. (cthom, ) (Entered: 04/10/2018) |
| 04/04/2018 | 372 | | RESTRICTED DOCUMENT – Level 3 as to Trammel Thomas. (cthom, ) (Entered: 04/10/2018) |
| 04/05/2018 | 363 | | RESTRICTED DOCUMENT – Level 2: ORDER as to Trammel Thomas. (angar, ) Modified to change restriction level pursuant to 368 Order on 4/10/2018 (cthom, ). (Entered: 04/05/2018) |
| 04/09/2018 | 367 | | CJA MOTION by Trammel Thomas. (Smith, Daniel) Modified on 8/1/2018 to terminate as motion – should have not been a motion but rather a supplement to 360 (angar, ). (Entered: 04/09/2018) |
| 04/09/2018 | 368 | | RESTRICTED DOCUMENT – Level 2 as to Trammel Thomas. (cthom, ) (Entered: 04/09/2018) |
| 04/10/2018 | 373 | 872 | RESPONSE in Opposition by USA as to Trammel Thomas re 358 MOTION for New Trial (Attachments: # 1 Exhibit)(Fields, Bryan) (Entered: 04/10/2018) |
| 04/13/2018 | 375 | 900 | Government's Motion to Restrict as to Trammel Thomas. (Attachments: # 1 Proposed Order (PDF Only))(Paluch, Martha) Modified on 4/13/2018 to edit text(angar, ). (Entered: 04/13/2018) |
| 04/13/2018 | 376 | | RESTRICTED DOCUMENT – Level 2: as to Trammel Thomas. (Paluch, Martha) (Entered: 04/13/2018) |
| 04/13/2018 | 377 | | RESTRICTED DOCUMENT – Level 2: as to Trammel Thomas. (Paluch, Martha) (Entered: 04/13/2018) |
| 04/13/2018 | 379 | | ORDER as to **Trammel Thomas (2)** granting the Government's Motion to Restrict Document 375 . The Government's Motion is GRANTED for good cause shown. The documents filed at ECF Nos. 376 and 377 shall remain RESTRICTED at RESTRICTION LEVEL 2 (viewable only by Selected Parties and the Court). SO ORDERED by Judge William J. Martinez on 4/13/2018. Text Only Entry (wjmsec, ) (Entered: 04/13/2018) |
| 04/16/2018 | 383 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant's Sentencing Statement and Request for a Specific/Variant Sentence 353 . This is the Defendant's second Sentencing Statement (the first having been filed at 318), and nothing in the Court's Revised Practice Standards permits the Defendant to file such an additional statement, particularly without obtaining prior leave of Court to do so. Given that this Defendant's sentencing |

| | | | |
|---|---|---|---|
| | | | hearing has been reset to August 9, 2018, however, and in light of the new relief requested by this Defendant in his latest Sentencing Statement for a variant sentence, in the interest of justice the Court will not strike this filing. As a consequence, the Government is DIRECTED to file a Response to Defendant's additional Sentencing Statement 353 on or before **May 14, 2018**. No Reply will be permitted. SO ORDERED by Judge William J. Martinez on 4/16/2018. Text Only Entry (wjmsec, ) (Entered: 04/16/2018) |
| 04/18/2018 | 387 | 903 | OBJECTION/RESPONSE to Presentence Report by Trammel Thomas (Smith, Daniel) Modified on 4/18/2018 to show as pending motion (angar, ). (Entered: 04/18/2018) |
| 04/19/2018 | 388 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant Thomas's Unopposed Motion Requesting Permission to File an Additional Unopposed Objection to Presentence Investigation Report 387 . The Defendant's Motion is GRANTED for good cause shown. Defendant Thomas is granted leave to file an additional objection limited to the matter raised in the Motion only by no later than **Monday, April 23, 2018**. SO ORDERED by Judge William J. Martinez on 4/19/2018. Text Only Entry (wjmsec, ) (Entered: 04/19/2018) |
| 04/20/2018 | 389 | | RESTRICTED DOCUMENT – Level 3: Minute Order as to Trammel Thomas. (nmarb, ) (Entered: 04/20/2018) |
| 04/20/2018 | 390 | 906 | OBJECTION/RESPONSE to Presentence Report by Trammel Thomas (Smith, Daniel) (Entered: 04/20/2018) |
| 04/26/2018 | 392 | | MINUTE ORDER as to Trammel Thomas pursuant to request from the Chambers of Magistrate Judge Nina Y. Wang on 4/26/18. Initial Appearance on Revocation Proceedings set for 4/30/2018 11:00 AM in Courtroom C204 before Magistrate Judge Nina Y. Wang. Text Only Entry (nmarb, ) (Entered: 04/26/2018) |
| 04/27/2018 | 393 | 909 | ORDER Denying 358 Motion for New Trial as to Trammel Thomas (2). ORDERED by Judge William J. Martinez on 4/27/2018. (angar, ) (Entered: 04/27/2018) |
| 04/27/2018 | 394 | | ORDER as to 360 CJA Motion as to Trammel Thomas (2). ORDERED by Judge William J. Martinez on 4/27/2018. (angar, ) (Entered: 04/27/2018) |
| 04/30/2018 | 395 | | MOTION to Continue *TODAYS INITIAL APPEARANCE ON REVOCATION PROCEEDINGS* by Trammel Thomas. (Goodreid, Thomas) (Entered: 04/30/2018) |
| 04/30/2018 | 396 | | MEMORANDUM regarding 395 MOTION to Continue *TODAYS INITIAL APPEARANCE ON REVOCATION PROCEEDINGS* filed by Trammel Thomas. Motion(s) referred to Magistrate Judge Nina Y. Wang. by Judge William J. Martinez on 4/30/2018. Text Only Entry (wjmsec, ) (Entered: 04/30/2018) |
| 04/30/2018 | 397 | | ORDER granting 395 Motion to Continue as to Trammel Thomas (2). The Initial Appearance on Revocation Proceedings set for 4/30/2018 at 11:00 AM is RESET for today at 01:30 PM in Courtroom C204 before Magistrate Judge Nina Y. Wang. By Magistrate Judge Nina Y. Wang on 4/30/2018. Text Only Entry (nywlc2, ) (Entered: 04/30/2018) |

| 04/30/2018 | 399 | | COURTROOM MINUTES for Initial Appearance regarding revocation of pre−sentence release as to Trammel Thomas held on 4/30/2018 before Magistrate Judge Nina Y. Wang. Defendant present in custody. Parties discuss if defendant is entitled to a detention hearing in this district, and his rights for appealing the detention decision by Magistrate Willett from the District of Arizona. Defendant's counsel has done further research and retracts his stance in Defendant's Motion for Brief Continuance 395 . Parties request more time to brief the issue. Defendant waives the three days for a detention hearing. Parties discuss how long defendant may delay a Detention Hearing. The court finds good cause exists to continue any Detention Hearing in this district from 5/3/2018 to 5/9/2018. The court will confer with the USMS on the time for the hearing and issue a further order. Defendant advised of violations of conditions of release. Court appoints counsel. Parties shall file a motion or Joint Status Report on or before May 3, 2018. Defendant remanded. (Total time: 26 minutes, Hearing time: 1:35−2:01)<br><br>**APPEARANCES**: Bryan Fields on behalf of the Government, Thomas Goodreid on behalf of the Defendant, Laura Ansart on behalf of Probation. FTR: Courtroom C−204. (bwilk, ) Text Only Entry Modified on 4/30/2018 to add motion deadline (bwilk, ). (Entered: 04/30/2018) |
| 04/30/2018 | 400 | | ORDER APPOINTING COUNSEL for revocation of release as to Trammel Thomas by Magistrate Judge Nina Y. Wang on 4/30/2018. Text Only Entry (bwilk, ) (Entered: 04/30/2018) |
| 05/03/2018 | 402 | | MEMORANDUM in Support by Trammel Thomas *For Revocation Hearing* (Goodreid, Thomas) (Entered: 05/03/2018) |
| 05/03/2018 | 403 | | MEMORANDUM in Opposition by USA as to Trammel Thomas (Fields, Bryan) (Entered: 05/03/2018) |
| 05/08/2018 | 404 | | MINUTE ORDER as to Trammel Thomas setting Status Conference for 5/9/2018 02:00 PM in Courtroom C204 before Magistrate Judge Nina Y. Wang. The United States Marshals are directed to transport Mr. Thomas to Courtroom C204 at the designated time. By Magistrate Judge Nina Y. Wang on 5/8/2018. Text Only Entry (nywlc2, ) (Entered: 05/08/2018) |
| 05/08/2018 | 405 | | MEMORANDUM in Support by USA as to Trammel Thomas *Regarding Defendant's Detention Pending Sentencing* (Attachments: # 1 Exhibit Arizona Order of Detention, # 2 Exhibit Transcript of Arizona Detention Hearing, # 3 Exhibit Original Arizona Order Setting Conditions of Rlease, # 4 Exhibit Marshals Reports Regarding Defendant's Apprehension, # 5 Exhibit Search Warrant for Defendant's Person, # 6 Exhibit Defendant Objections to PSR, # 7 Exhibit Defendant Sentencing Statement)(Fields, Bryan) (Entered: 05/08/2018) |
| 05/09/2018 | 406 | | COURTROOM MINUTES for Status Conference as to Trammel Thomas held on 5/9/2018 before Magistrate Judge Nina Y. Wang. Defendant present in custody. Parties discuss issues briefed in 402 , and 403 . The court will set a Revocation Hearing in this district. Revocation Hearing re: violations of conditions of release is set for 5/30/2018 10:30 AM in Courtroom C204 before Magistrate Judge Nina Y. Wang. Probation shall have staff present for the hearing. The court will issue a written order. Defendant indicates that counsel may file a motion to withdraw. Defendant remanded. (Total time: 9 minutes, |

| | | | |
|---|---|---|---|
| | | | Hearing time: 2:03–2:12)<br><br>**APPEARANCES**: Bryan Fields on behalf of the Government, Thomas Goodreid on behalf of the Defendant. FTR: Courtroom C–204. (bwilk, ) Text Only Entry (Entered: 05/09/2018) |
| 05/11/2018 | 407 | 923 | RESPONSE by USA as to Trammel Thomas re: 353 Sentencing Statement filed by Trammel Thomas (Paluch, Martha) (Entered: 05/11/2018) |
| 05/15/2018 | 408 | | ORDER as to Trammel Thomas by Magistrate Judge Nina Y. Wang on 5/15/18. Bond Revocation Hearing set for 5/30/2018 10:30 AM in Courtroom C204 before Magistrate Judge Nina Y. Wang. (nmarb, ) (Entered: 05/15/2018) |
| 05/21/2018 | 409 | | Unopposed MOTION to Continue *Time of Revocation Hearing* by Trammel Thomas. (Goodreid, Thomas) (Entered: 05/21/2018) |
| 05/21/2018 | 410 | | MEMORANDUM regarding 409 Unopposed MOTION to Continue *Time of Revocation Hearing* filed by Trammel Thomas. Motion(s) referred to Magistrate Judge Nina Y. Wang. by Judge William J. Martinez on 5/21/2018. Text Only Entry (wjmsec, ) (Entered: 05/21/2018) |
| 05/21/2018 | 411 | | RESTRICTED SECOND ADDENDUM to Presentence Report 355 as to Trammel Thomas (Attachments: # 1 Exhibit A)(sdean, ) (Entered: 05/21/2018) |
| 05/22/2018 | 412 | | MOTION to Withdraw as Attorney by Thomas E. Goodreid and Daniel T. Smith by Trammel Thomas. (Goodreid, Thomas) (Entered: 05/22/2018) |
| 05/22/2018 | 413 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. The Court has been informed that the Probation Office has training on August 9, 2018. As a result, the Sentencing Hearing set for August 9, 2018 is hereby **VACATED and RESET to August 8, 2018 at 9:30 a.m.** in Courtroom A801. SO ORDERED by Judge William J. Martinez on 5/22/2018. Text Only Entry (wjmsec, ) (Entered: 05/22/2018) |
| 05/22/2018 | 414 | | MEMORANDUM regarding 412 MOTION to Withdraw as Attorney by Thomas E. Goodreid and Daniel T. Smith filed by Trammel Thomas. Motion(s) referred to Magistrate Judge Nina Y. Wang. by Judge William J. Martinez on 5/22/2018. Text Only Entry (wjmsec, ) (Entered: 05/22/2018) |
| 05/23/2018 | 415 | | MINUTE ORDER by Magistrate Judge Nina Y. Wang on 5/23/18, as to Trammel Thomas re 412 MOTION to Withdraw as Attorney by Thomas E. Goodreid and Daniel T. Smith filed by Trammel Thomas. Motion Hearing set for 5/25/2018 01:30 PM in Courtroom C204 before Magistrate Judge Nina Y. Wang. The United States Marshal is DIRECTED to TRANSPORT Defendant Thomas to court for the purposes of the hearing. (nmarb, ) (Entered: 05/23/2018) |
| 05/25/2018 | 418 | | COURTROOM MINUTES for Motion Hearing as to Trammel Thomas held on 5/25/2018 before Magistrate Judge Nina Y. Wang. Defendant present in custody. Parties discuss the Motion to Withdraw as Attorney 412 as to Trammel Thomas (2). Government counsel is asked to leave the courtroom. Record is sealed to discuss reasons for the motion. Record is unsealed and Government counsel re–enters courtroom. Defendant withdraws his request for counsel to withdraw. The court denies as MOOT the Motion to Withdraw as Attorney 412 as to Trammel Thomas(2). Parties discuss the Unopposed |

| | | | |
|---|---|---|---|
| | | | Motion to Continue Time of Revocation Hearing 409 . The Unopposed Motion to Continue Time of Revocation Hearing 409 is GRANTED. The Revocation Hearing is moved from 5/30/2018 at 10:30AM to 5/30/2018 at 2:30PM in Courtroom C−204. Defendant remanded. (Total time: 15 minutes, Hearing time: 1:38−1:53, a portion of this hearing is **sealed 1:39−1:48**)<br><br>**APPEARANCES**: Bryan Fields on behalf of the Government, Thomas Goodreid, and Daniel Smith (via telephone) on behalf of the Defendant, Laura Ansart on behalf of Probation. FTR: Courtroom C−204. (bwilk, ) Text Only Entry (Entered: 05/25/2018) |
| 05/30/2018 | 421 | | COURTROOM MINUTES for Bond Revocation Hearing as to Trammel Thomas held on 5/30/2018 before Magistrate Judge Nina Y. Wang. Defendant present in custody. Parties proceed by proffer. Parties argue if Defendant's order of release should be revoked. The court takes under advisement the Government's Motion to Revoke and will issue a written order by end of day tomorrow (May 31, 2018). Defendant remanded. (Total time: 31 minutes, Hearing time: 2:59−3:30)<br><br>**APPEARANCES**: Bryan Smith and Martha Paluch on behalf of the Government, Thomas Goodreid and Daniel Smith (via telephone) on behalf of the defendant, Justine Kozak on behalf of pretrial. FTR: Courtroom C−204. (bwilk, ) Text Only Entry (Entered: 05/30/2018) |
| 05/31/2018 | 422 | | ORDER OF DETENTION as to Trammel Thomas by Magistrate Judge Nina Y. Wang on 5/31/18. (nmarb, ) (Entered: 05/31/2018) |
| 07/20/2018 | 431 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. In order to more efficiently use the time available for courtroom settings, the Sentencing Hearing set for August 8, 2018 at 9:30 a.m. is hereby **RESET to August 8, 2018 at 9:00 a.m.** in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards with regard to the deadlines for filing sentencing−related motions. SO ORDERED by Judge William J. Martinez on 7/20/2018. Text Only Entry (wjmsec, ) (Entered: 07/20/2018) |
| 07/24/2018 | 435 | 928 | SUPPLEMENT to 262 Sentencing Statement by USA as to Trammel Thomas (Paluch, Martha) (Entered: 07/24/2018) |
| 07/25/2018 | 436 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on the Government's Supplemental Sentencing Statement 435 . The Defendant is DIRECTED to file a Response to the Government's Supplemental Sentencing Statement on or before **August 1, 2018**. No Reply will be permitted. SO ORDERED by Judge William J. Martinez on 7/25/2018. Text Only Entry (wjmsec, ) (Entered: 07/25/2018) |
| 07/25/2018 | 437 | | RESTRICTED REVISED PRESENTENCE REPORT as to Trammel Thomas (Attachments: # 1 Exhibit A, # 2 Exhibit B)(aarag, ) (Entered: 07/25/2018) |
| 07/25/2018 | 438 | | RESTRICTED THIRD ADDENDUM to Presentence Report 437 as to Trammel Thomas (aarag, ) (Entered: 07/25/2018) |
| 07/25/2018 | 439 | | MOTION for Extension of Time to File *response* by Trammel Thomas. (Smith, Daniel) (Entered: 07/25/2018) |
| 07/26/2018 | 440 | | |

| | | | |
|---|---|---|---|
| | | | ORDER as to **Trammel Thomas (2)** granting in part Defendant's Motion for Extension of Time 439 . Were the Court to grant the motion in full, the undersigned would have no time to meaningfully consider the response in preparing for the sentencing hearing the following day. Furthermore, the current sentencing hearing date has been set since May 22, 2018 413 , and counsel made their vacation plans knowing, as experienced criminal defense counsel, of the flurry of filings generally submitted on the eve of a sentencing hearing. Moreover, it should be noted that defense counsel balked at the Court's inquiry into the feasibility of rescheduling the sentencing hearing to August 9 or 10, 2018. In the interest of justice, however, the Motion is GRANTED IN PART. The Defendant's deadline to file his Response to the Government's Supplemental Sentencing Statement is extended up to and including **Monday, August 6, 2018**. SO ORDERED by Judge William J. Martinez on 7/26/2018. Text Only Entry (wjmsec, ) (Entered: 07/26/2018) |
| 08/01/2018 | 441 | 937 | EXHIBIT LIST *for Sentencing Hearing* by USA as to Trammel Thomas (Attachments: # 1 Exhibit)(Fields, Bryan) (Entered: 08/01/2018) |
| 08/01/2018 | 442 | 941 | WITNESS LIST *for Sentencing Hearing* by USA as to Trammel Thomas (Attachments: # 1 Exhibit)(Fields, Bryan) (Entered: 08/01/2018) |
| 08/03/2018 | 443 | 945 | EXHIBIT LIST *Amended for Sentencing* by USA as to Trammel Thomas (Attachments: # 1 Exhibit)(Fields, Bryan) (Entered: 08/03/2018) |
| 08/06/2018 | 444 | 950 | OBJECTION/RESPONSE to Presentence Report by Trammel Thomas (Smith, Daniel) (Entered: 08/06/2018) |
| 08/06/2018 | 445 | 955 | Letter by Trammel Thomas (Attachments: # 1 Envelope)(angar, ) (Entered: 08/07/2018) |
| 08/06/2018 | 447 | | **DUPLICATE ENTRY** NOTICE of Letter by Trammel Thomas (angar, ) Modified on 8/8/2018 to correct filing date (angar, ). Modified on 8/8/2018 to show duplicate to 445 Letter (angar, ). (Entered: 08/08/2018) |
| 08/08/2018 | 446 | 964 | MINUTE ENTRY for all–day Evidentiary Sentencing Hearing, held on 8/8/2018 as to defendant 2. Trammel Thomas, before Judge William J. Martinez: ORDERED: The defendant's oral request for the Court to appoint new counsel is DENIED. ORDERED: The defendant's oral request to appear pro se is GRANTED. ORDERED: Leave for defense counsel to withdraw from this case is GRANTED. ORDERED: The defendant's oral request for a continuance of the sentencing hearing is GRANTED IN PART. ORDERED: This sentencing hearing is continued to Monday, October 22, 2018 at 10:00 a.m. ORDERED: No further briefing will be accepted. Court Reporter: Mary George. (dhans, ) (Entered: 08/08/2018) |
| 10/15/2018 | 448 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. Given the potential length of the Sentencing Hearing in this matter currently set for October 22, 2018 at 10:00 a.m., said Sentencing Hearing is hereby **RESET to October 22, 2018 at 9:30 a.m.** in Courtroom A801. SO ORDERED by Judge William J. Martinez on 10/15/2018. Text Only Entry (wjmsec, ) (Entered: 10/15/2018) |
| 10/15/2018 | 449 | | CERTIFICATE of Mailing by Clerk, re 448 Order, to Trammel Thomas, #57094408, FCI – ENGLEWOOD, 9595 WEST QUINCY AVENUE, LITTLETON, CO 80123. Text Only Entry. (sphil, ) (Entered: 10/15/2018) |

| 10/22/2018 | 450 | 967 | MINUTE ENTRY for Sentencing Hearing, held on 10/22/2018 as to defendant 2. Trammel Thomas, before Judge William J. Martinez. ORDERED: The defendant's oral request for a continuance is GRANTED. ORDERED. This sentencing hearing is continued to Monday, January 14, 2019 at 9:30 a.m. Court Reporter: Mary George. (swest) (Entered: 10/22/2018) |
|---|---|---|---|
| 11/20/2018 | 456 | | RESTRICTED REVISED PRESENTENCE REPORT as to Trammel Thomas (Attachments: # 1 Exhibit A, # 2 Exhibit B)(aarag, ) (Entered: 11/20/2018) |
| 11/20/2018 | 457 | | RESTRICTED FOURTH ADDENDUM to Presentence Report 456 as to Trammel Thomas (aarag, ) (Entered: 11/20/2018) |
| 11/21/2018 | 458 | | TRANSCRIPT of Sentencing Hearing as to Trammel Thomas held on October 22, 2018 before Judge Martinez. Pages: 1–36. <br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 11/21/2018) |
| 01/09/2019 | 459 | 969 | NOTICE *OF CORRECTION* re 357 Response by USA as to Trammel Thomas (Paluch, Martha) (Entered: 01/09/2019) |
| 01/10/2019 | 460 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. Due to a conflict with a criminal jury trial the week of January 14, 2019, the Sentencing Hearing set for January 14, 2019 at 9:30 a.m. is hereby **VACATED and RESET to April 30, 2019 at 9:30 a.m.** in Courtroom A801. SO ORDERED by Judge William J. Martinez on 1/10/2019. (wjmsec, ) (Entered: 01/10/2019) |
| 04/23/2019 | 464 | | NOTICE OF ATTORNEY APPEARANCE: Tasha Anya Steward appearing for Trammel ThomasAttorney Tasha Anya Steward added to party Trammel Thomas(pty:dft) (Steward, Tasha) (Entered: 04/23/2019) |
| 04/23/2019 | 465 | | First MOTION to Continue by Trammel Thomas. (Steward, Tasha) (Entered: 04/23/2019) |
| 04/23/2019 | 466 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant's Motion to Continue the Sentencing Hearing 465 . The Government is DIRECTED to file a Response to Defendant's Motion on or before **tomorrow, April 24, 2019**. No Reply will be permitted. SO ORDERED by Judge William J. Martinez on 4/23/2019. Text Only Entry (wjmsec, ) (Entered: 04/23/2019) |
| 04/24/2019 | 467 | | RESPONSE to Motion by USA as to Trammel Thomas re 465 First MOTION to Continue *Sentencing Hearing* (Paluch, Martha) (Entered: 04/24/2019) |
| 04/25/2019 | 468 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant's Motion to Continue the Sentencing Hearing 465 . In its Response to the Motion 467 the Government states that it reluctantly does not oppose a |

| | | | |
|---|---|---|---|
| | | | brief continuance of the sentencing hearing, although it does oppose the re–opening of any briefing on the sentencing–related mattes which have already been extensively briefed and are ripe for decision. As the Government correctly points out in its Response, the instant Motion is the Defendant's third request to continue his sentencing hearing. The Court shares the Government's frustration at the Defendant's seeming unending and consistent pattern of manipulating the Court's calendar in successive efforts to delay as much as possible the date on which he will be sentenced. Indeed, the Court's frustration at this state of affairs was previously made clear at the last sentencing hearing on October 22, 2018, at which time the Court stated that "[a]bsent a true emergency, this sentencing hearing is continued for a final time to Monday, January 14, 2019 at 9:30 a.m." *See* Minutes of October 22, 2018 hearing 450 . Balancing all the factors and arguments set forth by counsel in their respective filings on the instant Motion, the Court ORDERS as follows: (a) The sentencing hearing for this Defendant will be continued for a FINAL TIME to **Tuesday, June 4, 2019 at 10:00 a.m.** in Courtroom A801; (b) the briefing on any pending sentencing–related motion filed by either party WILL NOT be reopened; and (c) given that the deadlines for the filing of any sentencing–related motions expired several months ago, NO NEW sentencing–related motion or request for relief will be accepted. SO ORDERED by Judge William J. Martinez on 4/25/2019. Text Only Entry (wjmsec, ) (Entered: 04/25/2019) |
| 05/29/2019 | 473 | | WITNESS LIST *for June 4, 2019 Sentencing Hearing (Amended)* by USA as to Trammel Thomas (Attachments: # 1 Amended Witness List)(Fields, Bryan) (Entered: 05/29/2019) |
| 06/03/2019 | 474 | | SENTENCING STATEMENT by Trammel Thomas (Attachments: # 1 Exhibit Letter of Support, # 2 Exhibit Letter of Support, # 3 Exhibit Letter of Support/Employment, # 4 Exhibit Letter of Support, # 5 Exhibit Letter of Support, # 6 Exhibit Testimony Exhibit, # 7 Exhibit Testimony Exhibit, # 8 Exhibit Certificate, # 9 Exhibit Certificate, # 10 Exhibit Photos, # 11 Exhibit Photos, # 12 Exhibit Photos)(Steward, Tasha) (Entered: 06/03/2019) |
| 06/03/2019 | 475 | | ORDER THAT a Preliminary Order of Forfeiture for a Personal Money Judgment against Defendant Trammell Thomas in the amount of $260,226.85 shall be entered in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). Pursuant to Federal Rule of Criminal Procedure 32.2(b)(4), this Forfeiture Money Judgment shall become final as to the Defendant at the time of sentencing and shall be made part of the sentence and included in the judgment.THAT this Preliminary Order of Forfeiture may be entered pursuant to Rule32.2(e)(1) of the Federal Rules of Criminal Procedure. by Judge William J. Martinez on 6/3/2019. (evana, ) (Entered: 06/03/2019) |
| 06/04/2019 | 476 | | STIPULATION AND ORDER Regarding Custody of Original Exhibits as to Trammel Thomas (2). Entered by Judge William J. Martinez on 6/4/2019. (afran) (Entered: 06/04/2019) |
| 06/04/2019 | 477 | | COURTROOM MINUTES for Sentencing Hearing as to defendant Trammel Thomas (2) held before Judge William J. Martinez on 6/4/2019. Granting Government's Oral Motion for a Two–Level Enhancement in the Offense Level. Granting in part 353 Defendant's motion referenced in the Sentencing Statement and Request for a Specific/Variant Sentence. Defendant sentenced |

| | | | |
|---|---|---|---|
| | | | as reflected on the record. Defendant remanded. Court Reporter: Mary George. (Attachments: # 1 Government's Exhibit List) (afran) (Entered: 06/04/2019) |
| 06/04/2019 | 478 | | RESTRICTED AMENDED PRESENTENCE REPORT as to Trammel Thomas (Attachments: # 1 Exhibit A – Sentence Recommendation, # 2 Exhibit B – Victim Impact Statements)(sdean, ) (Entered: 06/04/2019) |
| 06/04/2019 | 479 | | RESTRICTED FIFTH ADDENDUM to Presentence Report 478 as to Trammel Thomas (sdean, ) (Entered: 06/04/2019) |
| 06/05/2019 | 480 | | JUDGMENT as to defendant Trammel Thomas (2). Counts 1 through 7 of the Superseding Indictment: Defendant sentenced to 120 months imprisonment as to Counts 1 through 7, to run concurrently. 3 years of supervised release as to Counts 1 through 7, to run concurrently. $700 special assessment fee. $563,890.85 restitution joint and several with co–defendants. Entered by Judge William J. Martinez on 6/5/2019. (afran) (Entered: 06/05/2019) |
| 06/05/2019 | 481 | | STATEMENT OF REASONS as to Trammel Thomas (2). (afran) (Entered: 06/05/2019) |
| 06/11/2019 | 482 | | First MOTION to Withdraw as Attorney by Tasha A. Steward by Trammel Thomas. (Steward, Tasha) (Entered: 06/11/2019) |
| 06/12/2019 | 483 | | MEMORANDUM regarding 482 First MOTION to Withdraw as Attorney by Tasha A. Steward filed by Trammel Thomas. Motion(s) referred to Magistrate Judge Scott T. Varholak. by Judge William J. Martinez on 6/12/2019. Text Only Entry (wjmsec, ) (Entered: 06/12/2019) |
| 06/12/2019 | 484 | | ORDER DENYING WITHOUT PREJUDICE 482 Motion to Withdraw as Attorney as to Trammel Thomas (2). Judgment was entered on 6/5/2019 480 as to Defendant Thomas, and the Court is concerned that allowing counsel to withdraw prior to the filing of any notice of appeal will leave new counsel insufficient time to perfect Defendant's appellate rights. If Defendant wishes to appeal, current counsel should assist in filing the notice of appeal. Once any notice of appeal is filed, counsel may file a renewed motion to withdraw as counsel. SO ORDERED, by Magistrate Judge Scott T. Varholak on 6/12/2019. Text Only Entry (stvlc2, ) (Entered: 06/12/2019) |
| 06/12/2019 | 485 | | NOTICE OF APPEAL as to 393 Order on Motion for New Trial, 223 Jury Trial/Jury Verdict,,, Set Hearings,, 480 Judgment, by Trammel Thomas. (Steward, Tasha) (Entered: 06/12/2019) |
| 06/12/2019 | 486 | | MOTION for Leave to Appeal In Forma Pauperis, by Trammel Thomas. (Steward, Tasha) Modified on 6/13/2019 to correct text (angar, ). (Entered: 06/12/2019) |
| 06/12/2019 | 487 | | MOTION to Appoint Counsel by Trammel Thomas. (Attachments: # 1 CJA Attachment Fin. Aff.)(Steward, Tasha) (Entered: 06/12/2019) |
| 06/12/2019 | 488 | | Second MOTION to Withdraw as Counsel by Trammel Thomas. (Steward, Tasha) Modified on 6/13/2019 to correct text (angar, ). (Entered: 06/12/2019) |
| 06/13/2019 | 489 | | MEMORANDUM regarding 488 MOTION to Withdraw as Attorney filed by Trammel Thomas, 487 MOTION to Appoint Counsel filed by Trammel Thomas. Motion(s) referred to Magistrate Judge Scott T. Varholak. by Judge William J. Martinez on 6/13/2019. Text Only Entry (wjmsec, ) (Entered: |

| | | | |
|---|---|---|---|
| | | | 06/13/2019) |
| 06/13/2019 | 490 | | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 485 Notice of Appeal as to Trammel Thomas to the U.S. Court of Appeals. ( CJA,) (Attachments: # 1 Preliminary Record and Docket Sheet)(angar, ) (Entered: 06/13/2019) |
| 06/13/2019 | 491 | | ORDER granting 487 Motion to Appoint Counsel as to Trammel Thomas (2); granting 488 Motion to Withdraw as Attorney. Tasha Anya Steward withdrawn from case as to Trammel Thomas (2) by Magistrate Judge Scott T. Varholak on 6/13/2019. (jgonz, ) (Entered: 06/13/2019) |
| 06/13/2019 | 492 | | ORDER Denying as Moot 486 The Prisoner's Motion and Affidavit for Leave to Proceed on Appeal Pursuant to 28 U.S.C. § 1915 and FED.R.APP.24 as to Trammel Thomas (2), by Judge William J. Martinez on 6/13/2019. (angar, ) (Entered: 06/13/2019) |
| 06/13/2019 | 493 | | USCA Case Number as to Trammel Thomas 19–1209 for 485 Notice of Appeal filed by Trammel Thomas. (angar, ) (Entered: 06/17/2019) |
| 06/13/2019 | 494 | | ORDER of USCA as to Trammel Thomas re 485 Notice of Appeal. (USCA Case No. 19–1209) (angar, ) (Entered: 06/17/2019) |
| 07/03/2019 | 495 | | DESIGNATION OF RECORD ON APPEAL re 485 Notice of Appeal by Trammel Thomas. (Truskoski, Ryan) (Entered: 07/03/2019) |
| 07/03/2019 | 496 | | TRANSCRIPT ORDER FORM re 485 Notice of Appeal by Trammel Thomas. (Truskoski, Ryan) (Entered: 07/03/2019) |
| 07/15/2019 | 497 | | REPORTER TRANSCRIPT ORDER FORM filed by Mary George re 485 Notice of Appeal. Transcript due by 8/12/2019. (nrich) (Entered: 07/15/2019) |
| 08/09/2019 | 498 | | TRANSCRIPT of Final Trial Preparation Conference as to Trammel Thomas held on November 17, 2017 before Judge Martinez. Pages: 1–44. <br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 499 | | VOIR DIRE TRANSCRIPT of proceedings held on November 27, 2017 before Judge Martinez. Pages: 1–155. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 500 | | TRANSCRIPT of Jury Trial, Day 1 as to Trammel Thomas held on November 27, 2017 before Judge Martinez. Pages: 156–290. <br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic** |

| | | |
|---|---|---|
| | | **Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 501 | TRANSCRIPT of Jury Trial, Day 2 as to Trammel Thomas held on November 28, 2017 before Judge Martinez. Pages: 291–527. <br><**br**> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 502 | TRANSCRIPT of Jury Trial, Day 3 as to Trammel Thomas held on November 29, 2017 before Judge Martinez. Pages: 528–652. <br><**br**> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 503 | TRANSCRIPT of Jury Trial, Day 4 as to Trammel Thomas held on November 30, 2017 before Judge Martinez. Pages: 653–755. <br><**br**> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 504 | Partial TRANSCRIPT of Sentencing Hearing as to Trammel Thomas held on August 8, 2018 before Judge Martinez. Pages: 1–7. <br><**br**> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br> |

| | | | |
|---|---|---|---|
| | | | Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 505 | | RESTRICTED TRANSCRIPT of proceedings held on August 8, 2018 before Judge Martinez. Pages: 1–16. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 506 | | TRANSCRIPT of Sentencing Hearing as to Trammel Thomas held on June 4, 2019 before Judge Martinez. Pages: 1–179. <br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 08/09/2019) |
| 09/03/2019 | 507 | | TRANSCRIPT ORDER FORM re 485 Notice of Appeal by Trammel Thomas. (Truskoski, Ryan) (Entered: 09/03/2019) |
| 09/18/2019 | 509 | | REPORTER TRANSCRIPT ORDER FORM filed by AB Court Reporting & Video, Inc. re 485 Notice of Appeal. Transcript due by 9/30/2019. (nrich) (Entered: 09/18/2019) |
| 09/23/2019 | 510 | | REPORTER TRANSCRIPT ORDER FORM filed by Julie Thomas re 485 Notice of Appeal. Transcript due by 10/18/2019. (nrich) (Entered: 09/23/2019) |
| 10/07/2019 | 511 | | TRANSCRIPT of TRANSCRIPT OF PROCEEDINGS as to Trammel Thomas held on 05/09/2018 before Magistrate Judge Wang. Pages: 1–9. Prepared by: AB Court Reporting & Video, Inc.. <br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 10/07/2019) |
| 10/17/2019 | 514 | | TRANSCRIPT of MOTION HEARING as to Trammel Thomas held on 5/25/18 before Judge Wang. Pages: 1–7. <br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made** |

| | | | |
|---|---|---|---|
| | | | **electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (Thomas, Julie) (Entered: 10/17/2019) |
| 10/17/2019 | 515 | | RESTRICTED TRANSCRIPT of MOTION HEARING proceedings held on 5/25/18 before Judge Wang. Pages: 1–7. (Thomas, Julie) (Entered: 10/17/2019) |
| 11/18/2019 | 522 | | ORDER of USCA as to Trammel Thomas re 485 Notice of Appeal. (USCA Case No. 19–1209) (angar, ) (Entered: 11/19/2019) |
| 11/21/2019 | 523 | | DESIGNATION OF RECORD ON APPEAL re 485 Notice of Appeal by Trammel Thomas. (Truskoski, Ryan) (Entered: 11/21/2019) |

Case No. 1:16-cr-00054-WJM-1   Document 523-1   filed 12/12/19   USDC Colorado   pg 36 of
971
Case 1:16-cr-00054-WJM   Document 1   Filed 02/09/16   Page 1 of 15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No.    16-cr-54-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.  HEATHER CARR,
2.  TRAMMEL THOMAS,
3.  MERCEDES DIAZ,

     Defendants.

---

### INDICTMENT

Count 1:  18 U.S.C. § 286
Conspiracy to Defraud the Government with Respect to Claims

Counts 2-13:  18 U.S.C. § 1343
Wire Fraud

Counts 14-26:  18 U.S.C. § 1341
Mail Fraud

Counts 27-29:  18 U.S.C. § 1028A(a)(1)
Aggravated Identity Theft

FORFEITURE ALLEGATION
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)

---

The Grand Jury charges:

### Count 1
### Conspiracy to Defraud the Government with Respect to Claims

1.     At all times relevant to this Indictment:

     a.     The United States Department of Education (the Department) was an

agency of the United States government. The Department's responsibilities

included overseeing the administration of federal student assistance programs, including financial aid programs designed to assist qualified students with paying for college. These financial aid programs included both grant and loan programs.

b.      In order to qualify as recipients/borrowers for these financial aid programs, students needed to, among other things, certify that the funds borrowed would be used for authorized educational purposes.

c.      Students generally began the process of applying for federal financial aid by completing and submitting the Free Application for Federal Student Aid (FAFSA). The FAFSA required identifying information such as a student's name, date of birth, address, Social Security number, telephone number, and e-mail address. After processing, the information from the FAFSA was sent to the schools designated by the applicant.

d.      Once awarded financial aid, and after a student enrolled at a particular school, financial aid funds were disbursed from the Department to the school in the student's name. Those funds were applied to tuition, fees, and other educational expenses the student owed to the school. Any funds in excess of the amount owed were then "refunded" to the student.

e.      The Department and community colleges within the State and District of Colorado worked with a company called Higher One to deliver "refunds" of federal financial aid to students. Refund amounts were placed into accounts in the students' names maintained by Higher One. Students accessed these refunds through the accounts and debit cards issued and mailed to them by Higher One.

f.      The Colorado Community College System (CCCS) includes several different schools, including but not limited to Pikes Peak Community College, Red Rocks Community College, and Pueblo Community College. CCCS operates a website at www.ccconline.org that is sometimes referred to as "Colorado Community Colleges Online." This website allows a prospective student to create

an online account by entering information such as his or her name, address, e-mail address, telephone number, and Social Security number. He or she can then use that information to apply to the various schools in the CCCS. The schools within the CCCS are "open enrollment" colleges, which means that any person who meets certain minimum criteria (e.g., having a high school diploma or GED) may enroll and attend classes.

g.     After a student enrolls at a particular CCCS school, the student can then use Colorado Community Colleges Online to take various online distance learning courses offered by that particular school.

h.     A company called LexisNexis maintains an electronic database called "Accurint," which contains personally identifiable information for individuals throughout the country, including Social Security numbers. The Accurint database is a subscription service that is accessed via a username and password assigned to a particular user.

i.     Several state departments of corrections maintain publicly accessible inmate locator websites. Through these websites, one can search for individuals held in the custody of the particular department whose website is being searched. The search can be conducted using the inmate's name, or a portion thereof. At the time of the events described in this indictment, some inmate locator websites also displayed the inmate's birthday.

2.     Beginning in or about August 2010, and continuing until in or about October 2012, in the State and District of Colorado and elsewhere, Defendants Heather Carr, Trammel Thomas, and Mercedes Diaz (collectively, "the conspirators"), knowingly agreed, combined, and conspired with each other to defraud an agency of the United States by obtaining and aiding to obtain the payment and allowance of false and fraudulent claims by submitting false claims for federal student aid to the U.S. Department of Education.

Case No. 1:16-cr-00054-WJM Document 528-1 filed 12/19/16 USDC Colorado pg 39 of
Case 1:16-cr-00054-WJM Document 1 filed 02/03/16 USDC Colorado Page 4 of 15
971

3.    The conspiracy was accomplished, in part, through the following manner and

means:

a.    Defendant Carr obtained names and dates of birth for inmates by

searching inmate locator websites for common last names such as "Jones" and

"Smith." Once she had the names and dates of birth of inmates, she searched the

Accurint database to obtain further personally identifiable information for these

people, such as their Social Security numbers. Defendant Carr had access to this

database through her employment in Arizona, and used her assigned LexisNexis

username, "heathercarr1," in performing these searches.

b.    After Defendant Carr obtained Social Security numbers and other

personally identifiable information from the Accurint and inmate locater databases,

Defendants Carr and Thomas used this information to apply for federal student

assistance funds in the names of the people whose identifying information

Defendant Carr had gathered. These applications for federal student assistance

funds contained materially false representations about the identity of the person

submitting the application and the purported applicant's intent to attend

educational institutions. These false representations supported improper

determinations by the Department that the purported applicants were eligible to

receive federal student assistance funds.

c.    Defendants Carr and Thomas also applied for admission to schools

within the CCCS and elsewhere, using the identities of the same persons in

whose name they had applied for federal student assistance funds.

d.    Defendant Diaz agreed to receive mail in the names of purported

students at her place of residence and at private mailbox addresses she rented in

the name of another person, and then provided that mail to Defendants Carr and

Thomas.  Defendants Carr and Thomas also convinced other individuals, both

known and unknown to the Grand Jury, to receive mail in the names of purported

Case No. 1:16-cr-00054-WJM   Document 528-1   filed 12/12/19   USDC Colorado   pg 40 of
971
Case 1:16-cr-00054-WJM   Document 1   Filed 02/08/16   USDC Colorado   pg 5 of 15

students and then cause that mail to be delivered to Defendants Carr and
Thomas. Both the applications for federal student assistance funds and the
applications for enrollment in the community colleges submitted by the
conspirators contained false information regarding the purported applicants'
mailing addresses: instead of listing the purported applicant's actual address, the
applications typically gave one of three types of addresses: 1) private mailboxes
opened by Diaz; 2) addresses of those individuals who had agreed to receive mail
for the conspirators; or 3) the actual address of one of the conspirators.

    e.    Higher One accounts were created in the names of the purported
applicants after financial aid funds were disbursed to the community colleges in
the purported applicants' names. Funds were deposited into these accounts and
Higher One debit cards intended for the purported applicants were then mailed to
the false addresses submitted by Defendants Carr and Thomas. The conspirators
then, through the debit cards and associated Higher One accounts, used the
funds for their own purposes.

    f.    Often, schools would not release financial aid refunds without some
confirmation that the student was attending classes. In such cases, Defendant
Carr would sign into online courses as the purported student. Defendant Carr had
obtained the student identification number assigned to a particular purported
student by applying and enrolling at a college in that student's name.  Defendant
Carr then used that student identification number to log into the Colorado
Community Colleges Online learning management system and register the
student's attendance in a course or courses in which that student was enrolled.
She did so with the intent of thereby obtaining financial aid funds meant for that
purported student.

    4.    During the course of the conspiracy, the conspirators were involved in
submitting over 150 false FASFAs to the Department, resulting in the disbursement of

over $500,000 in federal financial aid funds.  Of this amount, the conspirators received over $200,000 in refunds deposited in Higher One accounts and on debit cards.

## Counts 2-13
## Wire Fraud

5.      Paragraphs 1 and 3 (including the subparagraphs) are incorporated herein as if fully set forth.

6.      Beginning in or about August 2010, and continuing until in or about October 2012, the defendants devised and intended to devise a scheme and artifice to defraud the U.S. Department of Education as set forth in Paragraph 3 above ("the scheme") by obtaining money by means of false and fraudulent pretenses, representations, and promises in connection with applications for federal financial aid.

7.      On or about the date listed below for each count, in the State and District of Colorado, having devised and intending to devise the scheme, and for the purpose of executing the scheme, Defendants Carr and Thomas transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, to wit, online wire transmissions from Arizona to Colorado, which wire transmissions had the effect of registering attendance for a purported student in an online course hosted by Colorado Community Colleges Online so that a Higher One debit card would be issued in the purported student's name listed below:

| Count | Date | Purported Student |
|:-----:|:----:|:-----------------:|
| 2 | Oct. 17, 2011 | M.E. |
| 3 | Oct. 17, 2011 | E.J. |
| 4 | Oct. 18, 2011 | L.E. |
| 5 | Oct. 19, 2011 | L.E. |
| 6 | Oct. 19, 2011 | M.E. |

Case No. 1:16-cr-00054-WJM Document 528-1 filed 12/12/19 USDC Colorado pg 42 of
971
Case 1:16-cr-00054-WJM Document 1 Filed 02/08/16 Page 7 of 15

| Count | Date | Purported Student |
|:---:|:---:|:---:|
| 7 | Oct. 20, 2011 | E.J. |
| 8 | Oct. 22, 2011 | E.J. |
| 9 | Oct. 23, 2011 | E.J. |
| 10 | Oct. 29, 2011 | L.E. |
| 11 | Oct. 30, 2011 | L.E. |
| 12 | June 7, 2012 | D.M. |
| 13 | Aug. 28, 2012 | M.A. |

All in violation of 18 U.S.C. § 1343.

## Counts 14-26
## Mail Fraud

8.     Paragraphs 1 and 3 (including the subparagraphs) are incorporated herein
as if fully set forth.

9.     Beginning in or about August 2010, and continuing until in or about October
2012, the defendants devised and intended to devise a scheme and artifice to defraud
the U.S. Department of Education as set forth in Paragraph 3 above ("the scheme") by
obtaining money by means of false and fraudulent pretenses, representations, and
promises in connection with applications for federal financial aid.

10.    Between on or about the dates listed below for each count, in the State and
District of Colorado, for the purpose of executing the scheme, the defendants named in
the counts listed below knowingly caused to be delivered by United States mail to the
name and address listed below, according to the direction thereon, an envelope
containing a Higher One debit card:

| Defendant | Count | Dates | Card Number (Last Four Digits) | Purported Student | Address Where Sent |
|---|---|---|---|---|---|
| Carr Thomas | 14 | Feb. 8–22, 2011 | 5158 | I.O. | 3820 Radiant Dr.; Apt. 239; Colorado Springs, CO |
| Carr Thomas | 15 | July 25–Oct. 3, 2011 | 0878 | A.J. | 1418 Rushmore Dr.; Colorado Springs, CO |
| Carr Thomas | 16 | Aug. 4–Oct. 3, 2011 | 2567 | L.J. | 1418 Rushmore Dr.; Colorado Springs, CO |
| Carr Thomas | 17 | Aug. 4–Oct. 3, 2011 | 6964 | P.J. | 1418 Rushmore Dr.; Colorado Springs, CO |
| Carr Thomas | 18 | Aug. 4–Oct. 15, 2011 | 3804 | S.J. | 1418 Rushmore Dr.; Colorado Springs, CO |
| Carr Thomas | 19 | Aug. 4–Oct. 15, 2011 | 6112 | K.J. | 1418 Rushmore Dr.; Colorado Springs, CO |
| Carr Thomas Diaz | 20 | Aug. 11–Oct. 3, 2011 | 2903 | V.J. | 1418 Rushmore Dr.; Colorado Springs, CO |
| Carr Thomas Diaz | 21 | Aug. 11–Oct. 3, 2011 | 2749 | E.L.J. | 1418 Rushmore Dr.; Colorado Springs, CO |
| Carr Thomas | 22 | Aug. 11–Oct. 3, 2011 | 8668 | R.P. | 1418 Rushmore Dr.; Colorado Springs, CO |
| Carr Thomas | 23 | Aug. 29–Nov. 9, 2011 | 0165 | E.J. | 1418 Rushmore Dr.; Colorado Springs, CO |
| Carr Thomas | 24 | Jan. 5–Mar. 19, 2012 | 8572 | A.R. | 1418 Rushmore Dr.; Colorado Springs, CO |
| Carr Thomas | 25 | June 26–July 7, 2012 | 7111 | D.M. | 1112 Meadow Oaks Dr.; Colorado Springs, CO |

| Defendant | Count | Dates | Card Number (Last Four Digits) | Purported Student | Address Where Sent |
|---|---|---|---|---|---|
| Carr Thomas | 26 | July 18–26, 2012 | 6173 | M.A. | 1112 Meadow Oaks Dr.; Colorado Springs, CO |

All in violation of 18 U.S.C. § 1341.

**Counts 27-29**
**Aggravated Identity Theft**

11.    Paragraphs 1 and 3 (including the subparagraphs) are incorporated herein as if fully set forth.

12.    On or about the dates set forth in the table below, in the State and District of Colorado, Defendant Carr did knowingly use, without lawful authority, a means of identification of another person during and in relation to a felony violation of 18 U.S.C. § 1343, knowing that the means of identification belonged to another actual person. Specifically, she used the identified person's name and date of birth to apply for admission to Pikes Peak Community College, during and in relation to the wire fraud scheme described above in Paragraphs 5-7.

| Count | Date | Victim |
|---|---|---|
| 27 | Aug. 14, 2011 | E.J. |
| 28 | Aug. 15, 2011 | M.E. |
| 29 | Aug. 15, 2011 | L.E. |

All in violation of 18 U.S.C. § 1028A(a)(1).

## **FORFEITURE ALLEGATION**

13. The allegations contained in Counts 2 through 13 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

14. Upon conviction of the violations alleged in Counts 2 through 13 of this Indictment involving wire fraud in violation of 18 U.S.C. § 1343, Defendants HEATHER CARR and TRAMMEL THOMAS shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all of their right, title and interest in all property constituting and derived from any proceeds they obtained directly and indirectly as a result of such offense, including, but not limited to:

A money judgment in the amount of proceeds obtained by those crimes.

15. If any of the property described in paragraph 14 above, as a result of any act or omission of Defendants HEATHER CARR and TRAMMEL THOMAS:

a) cannot be located upon the exercise of due diligence;

b) has been transferred or sold to, or deposited with, a third party;

c) has been placed beyond the jurisdiction of the Court;

d) has been substantially diminished in value; or

e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/02/19 USDC Colorado  pg 46 of
Case 1:16-cr-00054-WJM Document 1 Filed 02/08/16 Page 11 of 13
971

forfeiture of any other property of Defendants HEATHER CARR and TRAMMEL
THOMAS up to the value of the forfeitable property.

16.  The allegations contained in Counts 14 through 26 of this Indictment are
hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture
pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

17. Upon conviction of the violations alleged in Counts 14 through 26 of this
Indictment involving mail fraud in violation of 18 U.S.C. § 1341, Defendants HEATHER
CARR and TRAMMEL THOMAS shall forfeit to the United States, pursuant to Title 18,
United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section
2461(c), any and all of the their right, title and interest in all property constituting and
derived from any proceeds they obtained directly and indirectly as a result of such
offense, including, but not limited to:

A money judgment in the amount of proceeds obtained by those crimes.

18.  If any of the property described in paragraph 17 above, as a result of any act
or omission of Defendants HEATHER CARR and TRAMMEL THOMAS:

a)      cannot be located upon the exercise of due diligence;

b)      has been transferred or sold to, or deposited with, a third
         party;

c)     has been placed beyond the jurisdiction of the Court;

d)      has been substantially diminished in value; or

e)      has been commingled with other property which
         cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of Defendants HEATHER CARR and TRAMMEL THOMAS up to the value of the forfeitable property.

19.    The allegations contained in Counts 20 and 21 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

20.  Upon conviction of the violations alleged in Counts 20 and 21 of this Indictment involving mail fraud in violation of 18 U.S.C. § 1341, Defendant MERCEDES DIAZ shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all of the her right, title and interest in all property constituting and derived from any proceeds she obtained directly and indirectly as a result of such offense, including, but not limited to:

A money judgment in the amount of proceeds obtained by those crimes.

21.  If any of the property described in paragraph 20 above, as a result of any act or omission of Defendant MERCEDES DIAZ:

a)     cannot be located upon the exercise of due diligence;

b)     has been transferred or sold to, or deposited with, a third party;

c)    has been placed beyond the jurisdiction of the Court;

d)     has been substantially diminished in value; or

e)     has been commingled with other property which cannot be subdivided without difficulty;

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/22/19 USDC Colorado pg 48 of
Case 1:16-cr-00054-WJM Document 1 Filed 02/08/16 Page 13 of 13
971

it is the intent of the United States, pursuant to Title 21, United States Code, Section
853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek
forfeiture of any other property of Defendant MERCEDES DIAZ up to the value of the
forfeitable property.

A TRUE BILL

s/Ink signature on file in Clerk's Office
**Foreperson**

**John F. Walsh**
United States Attorney

s/Martha A. Paluch_____
**Martha A. Paluch**
Assistant U.S. Attorney
1225 17th St., Suite 700
Denver, CO 80202
Telephone: (303) 454-0100
FAX: (303) 454-0409
E-mail: martha.paluch@usdoj.gov

s/Daniel E. Burrows_____
**Daniel E. Burrows**
Special Assistant U.S. Attorney
1225 17th St., Suite 700
Denver, CO 80202
Telephone: (303) 454-0100
FAX: (303) 454-0409
Email: daniel.burrows@usdoj.gov

Page | 13

Case No. 1:16-cr-00054-WJM-Document 525-1 filed 12/12/18 USDC Colorado pg 49 of
Case 1:16-cr-00054-WJM Document 1 Filed 02/08/16 Page 2 of 2
971

DEFENDANT: HEATHER CARR

DOB: 1977

ADDRESS:

1385 Fordham Drive, No. 105
Virginia Beach, VA   23464

COMPLAINT FILED?          _____ YES    X    NO

OFFENSE:

| | |
|---|---|
| **Count 1:** | 18 U.S.C. § 286 – Conspiracy to Defraud the Government with Respect to Claims |
| **Counts 2-13** | 18 U.S.C. § 1343 – Wire Fraud |
| **Counts 14-26** | 18 U.S.C. § 1341 – Mail Fraud |
| **Counts 27-29** | 18 U.S.C. § 1028A(a)(1) – Aggravated Identity Theft |

LOCATION OF OFFENSES:   El Paso and Denver Counties, Colorado

PENALTIES:

| | |
|---|---|
| **Count 1:** | NMT 10 years imprisonment; a fine of NMT twice the financial gain, or $250,000, whichever is greater; NMT 3 years supervised release; and $100 Special Assessment |
| **Counts 2-13** | NMT 20 years of imprisonment; a fine of NMT twice the financial gain, or $250,000, whichever is greater; NMT 3 years of supervised release; restitution; $100 special assessment fee for each count. |
| **Counts 14-26** | NMT 20 years of imprisonment; a fine of NMT twice the financial gain, or $250,000, whichever is greater; NMT 3 years of supervised release; restitution; $100 special assessment fee for each count. |
| **Counts 27-29** | NMT 20 years of imprisonment; a fine of NMT twice the financial gain, or $250,000, whichever is greater; NMT 3 years of supervised release; restitution; $100 special assessment fee for each count, **and consecutive two-year term of imprisonment.** |

AGENT:                  Department of Education, Office of Inspector General Special
                        Agent Sandra Ennis

AUTHORIZED BY:  Martha A. Paluch, Assistant U.S. Attorney

ESTIMATED TIME OF TRIAL:
_____ five days or less
____X__ over five days
_____ other

THE GOVERNMENT
_____X___ will seek detention in this case
_____ will not seek detention in this case

The statutory presumption of detention **is not** applicable to this defendant.

OCDETF CASE:     _____ Yes          __X___ No

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/18 USDC Colorado pg 51 of
Case 1:16-cr-00054-WJM Document 1 Filed 02/08/16 Page 2 of 2
971

<u>DEFENDANT:</u> TRAMMEL THOMAS

<u>DOB:</u> 1979

<u>ADDRESS:</u>

6818 South 40th Drive
Phoenix, AZ   85041

<u>COMPLAINT FILED?</u>        _____ YES    <u>X   </u> NO

<u>OFFENSES:</u>

| | | |
|---|---|---|
| **Count 1:** | 18 U.S.C. § 286 – Conspiracy to Defraud the Government with Respect to Claims |
| **Counts 2-13** | 18 U.S.C. § 1343 – Wire Fraud |
| **Counts 14-26** | 18 U.S.C. § 1341 – Mail Fraud |

<u>LOCATION OF OFFENSES:</u>        El Paso and Denver Counties, Colorado

<u>PENALTIES:</u>

| | |
|---|---|
| **Count 1:** | NMT 10 years imprisonment; a fine of NMT twice the financial gain, or $250,000, whichever is greater; NMT 3 years supervised release; and $100 Special Assessment |
| **Counts 2-13** | NMT 20 years of imprisonment; a fine of NMT twice the financial gain, or $250,000, whichever is greater; NMT 3 years of supervised release; restitution; $100 special assessment fee for each count. |
| **Counts 14-26** | NMT 20 years of imprisonment; a fine of NMT twice the financial gain, or $250,000, whichever is greater; NMT 3 years of supervised release; restitution; $100 special assessment fee for each count. |

<u>AGENT:</u>        Department of Education, Office of Inspector General Special
Agent Sandra Ennis

<u>AUTHORIZED BY:</u>  Martha A. Paluch, Assistant U.S. Attorney

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/12/18   USDC Colorado   pg 52 of
971
Case 1:16-cr-00054-WJM   Document 1   Filed 02/08/16   Page 2 of 2

ESTIMATED TIME OF TRIAL:
_____ five days or less
____X__ over five days
_____ other

THE GOVERNMENT
____X____ will seek detention in this case
_____ will not seek detention in this case

The statutory presumption of detention **is not** applicable to this defendant.

OCDETF CASE:          _____ Yes          __X___ No

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/18 USDC Colorado pg 53 of
Case 1:16-cr-00054-WJM Document 1 filed 02/08/16 USDC Colorado Page 2 of 2
971

<u>DEFENDANT:</u> MERCEDES DIAZ

<u>DOB:</u> 1989

<u>ADDRESS:</u>

Arizona State Prison Complex-Perryville
Inmate No. 280050
2105 North Citrus Road
Goodyear, AZ   85395

<u>COMPLAINT FILED?</u>        _____ YES   <u>X   </u>NO

<u>OFFENSES:</u>

| | | |
|---|---|---|
| **Count 1:** | 18 U.S.C. § 286 – Conspiracy to Defraud the Government with Respect to Claims | |
| **Counts 20-21** | 18 U.S.C. § 1341 – Mail Fraud | |

<u>LOCATION OF OFFENSES:</u>      El Paso and Denver Counties, Colorado

<u>PENALTIES:</u>

**Count 1:**                NMT 10 years imprisonment; a fine of NMT twice the financial gain, or $250,000, whichever is greater; NMT 3 years supervised release; and $100 Special Assessment

**Counts 20-21**          NMT 20 years of imprisonment; a fine of NMT twice the financial gain, or $250,000, whichever is greater; NMT 3 years of supervised release; restitution; $100 special assessment fee for each count.

<u>AGENT:</u>                Department of Education, Office of Inspector General Special Agent Sandra Ennis

<u>AUTHORIZED BY:</u>  Martha A. Paluch, Assistant U.S. Attorney

<u>ESTIMATED TIME OF TRIAL:</u>
_____ five days or less
_____<u>X</u>__  over five days
_____ other

53

<u>THE GOVERNMENT</u>
<u>      X    </u> will seek detention in this case
<u>         </u> will not seek detention in this case

The statutory presumption of detention **is not** applicable to this defendant.

<u>OCDETF CASE:</u>    <u>        </u>    Yes        <u>  X    </u> No

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 16-cr-054-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**1.     HEATHER CARR**,
**2.     TRAMMEL THOMAS,**
**3.     MERCEDES DIAZ,**

      Defendants.

---

## STIPULATED PROTECTIVE ORDER

---

      The United States of America, through Assistant United States Attorney Martha

A. Paluch, and Defendants Heather Carr, through her counsel Mary V. Butterton,

Trammel Thomas, through his counsel Michael G. Root, and Mercedes Diaz, through

her counsel Siddhartha H. Rathod, respectfully move this Court to enter this Stipulated

Protective Order governing the discovery in this case in order to protect grand jury

material and the personal identifying information of third parties.

      The instant offense involves the Defendants' alleged submission of false

applications for federal student aid and applications to community colleges for

admission in the names of approximately 180 individuals.  The discovery in this case

includes documents submitted to the Department of Education and community colleges

in these individuals' names, which documents contain these individuals' personal

identifying information such as dates of birth, alleged addresses, and social security

Case No. 1:16-cr-00054-WJM-Document 525-1 Filed 12/13/19 USDC Colorado pg 56 of
Case 1:16-cr-00054-WJM Document 36 Filed 04/01/16 Page 2 of 8
971

numbers.  The discovery also includes grand jury testimony and exhibits.  It is

necessary for the Government to make these materials available to the Defendants and

their counsel in discovery.

In order to balance the privacy concerns of the individuals named in these

documents and other records against the important interest in the government providing

broad discovery in this case, the parties have stipulated to the terms set forth in the

attached proposed protective order.  For good cause, the Court may enter a protective

order regulating discovery in a criminal case pursuant to Fed. R. Crim. P. 16(d)(1).

IT IS STIPULATED that disclosure of information contained in the documents

and other records at issue in this case shall be made only to the Defendants, their

attorneys, and anyone hired or employed for the purpose of assisting in the preparation

of the defense in this case (to include third-party vendors); the Defendants and their

attorneys or agents will not use this information, or the substance thereof, in any way

except as is necessary in preparing and presenting the legal defense of this case; this

information shall be maintained in the defense attorneys' (or third-party vendors')

custody; and such information shall not otherwise be disclosed, reproduced, or

disseminated.  Defense counsel agree that if any portion of the discovery is provided to

a third-party vendor, defense counsel will provide that vendor with a copy of this

Stipulated Protective Order and will ensure that the third-party vendor agrees to the

terms set forth in this Protective Order prior to receipt of any discovery.

IT IS ALSO STIPULATED that this agreement may be modified by specific

agreement between the United States and Defendant(s) where disclosure of certain

non-Grand Jury redacted discovery to a Defendant or Defendants is necessary.

2

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/13/19 USDC Colorado pg 57 of
Case 1:16-cr-00054-WJM Document 36 Filed 04/01/16 Page 3 of 3
971

SO STIPULATED:


s/Mary V. Butterton   3/31/16     s/Michael G. Root   3/31/16
Mary V. Butterton    Date       Michael G. Root    Date
Counsel for Heather Carr       Counsel for Trammel Thomas



s/Siddhartha H. Rathod  3/31/16    s/ Martha A. Paluch   3/31/16
Siddhartha H. Rathod   Date      AUSA Martha A. Paluch  Date
Counsel for Mercedes Diaz


    Dated this 1st day of April, 2016.


              BY THE COURT:


              _____
              William J. Martínez
              United States District Judge

3

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/13/19 USDC Colorado pg 58 of
971
Case 1:16-cr-00054-WJM Document 37 Filed 04/01/16 USDC Colorado Page 1 of 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 16-cr-054-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**1.      HEATHER CARR**,
**2.      TRAMMEL THOMAS,**
**3.      MERCEDES DIAZ,**

      Defendants.

---

## ORDER ON PROCEDURES

---

THIS MATTER comes before the Court *sua sponte*. It is the Court's experience that multi-Defendant criminal cases often present unusual and significant administrative challenges for both counsel and the Court. In an attempt to preemptively alleviate some of those burdens, and to expressly advise counsel of procedures that the Court will follow,

**IT IS ORDERED** that:

(1)     All documents filed by any party in this case shall bear the complete case caption. If a document pertains only to a particular Defendant or Defendants, the name of such Defendant or Defendants shall be in **bold** print on the caption. The caption is deemed amended and the name of a Defendant may be removed therefrom upon the sentencing of any particular Defendant.

Case No. 1:16-cr-00054-WJM  Document 525-1  filed 12/13/19  USDC Colorado  pg 59 of
971
Case 1:16-cr-00054-WJM  Document 37  Filed 04/01/16  Page 2 of 4

(2)     If a Defendant files a Notice of Disposition, that Defendant and his or her
counsel are excused from participating in all subsequent hearings <u>except</u> for hearings
which pertain to that Defendant, *e.g.*, change of plea and sentencing hearings.

(3)     If counsel for a Defendant is unable to attend a hearing, that Defendant
may file a motion to allow substitute counsel to represent him or her at such hearing.
Such motion must be filed <u>before</u> said hearing and must be accompanied by a
statement that the Defendant consents to representation by substitute counsel at the
particular hearing.

(4)     Any Defendant who has not filed a Notice of Disposition shall attend all
scheduled hearings (apart from changes of plea or sentencing hearings for co-
Defendants who have filed Notices of Disposition) with his or her counsel.  If any
Defendant or defense counsel desires to waive his or her appearance at any hearing,
an appropriate motion shall be filed no later than **2 business days prior to the
hearing**.

(5)     With regard to any Defendant who is not in custody, a motion seeking
leave to allow the Defendant to travel shall be filed at least 5 business days before the
requested travel date.  No such motion will be granted unless the Office of Pretrial
Services is in agreement and either (a) the Government files written assent to the travel
at least 2 business days before the requested travel date or (b) the motion is stipulated.

(6)     In accordance with D.C.COLO.LCrR 12.1, the Court will not accept a
"Motion to Join" in a motion filed by another party.  Instead, the Defendant should file a
motion that requests specific relief and includes a title that identifies the relief

requested.  In the body of the motion, the party may indicate that the party approves,

adopts, or may incorporate by reference any or all of the reasons stated, arguments

advanced, and/or authorities cited by a party in another motion.  The party shall identify

the related motion of another party by providing at least the following information: (1)

the name of the other party; (2) the precise title of the motion filed by the other party; (3)

the document number assigned to the other motion by the court's CM/ECF docketing

system; and (4) the date the other motion was filed.

      (7)    In accordance with WJM Revised Practice Standard IX.H, counsel are

strongly encouraged, to the fullest extent possible given the similarity of the facts and

legal positions between or among each other, to file joint motions on all issues and

matters of common ground or interest.

      (8)    Counsel should carefully review the current version of the undersigned's

Revised Practice Standards.  The Court will strictly enforce compliance therewith.

Please be aware of the Court's specific procedures on the following points:

      (a)    <u>Severance</u>:  Although the general motions deadline governs the

filing of motions to sever, please be advised that the Court will not typically rule on

motions seeking severance until the time of the Final Trial Preparation Conference, at

which point the contours of the case to be tried have become clearer.

      (b)    *James* proffers: The Court does not typically conduct hearings on

requests for *James* determinations of the admissibility of co-conspirator statements.

When a *James* issue is raised, the Government is required to make a written proffer

containing: (i) identification of the facts showing the existence, composition, scope, and

object of the conspiracy; and (ii) a specific identification of each statement that is to be

offered, its declarant, and an explanation as to how that statement is admissible under Fed. R. Evid. 801(d)(2).  This proffer is made on a form available from Chambers.  The form also includes a place for each Defendant to note those statements to which he or she objects and a place to state the nature of such objection.  Upon its review of a completed proffer, the Court will usually issue a written ruling either:  (i) finding the proffer to be *prima facie* adequate to permit the admission of the co-conspirator testimony under Rule 801(d)(2), subject to the Government establishing the necessary foundational facts at trial; or (ii) finding that specific statements are inadmissible under Rule 801(d)(2).

Dated this 1st day of April, 2016.

BY THE COURT:

William J. Martínez
United States District Judge

-4-

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/13/19 USDC Colorado pg 62 of
971
Case 1:16-cr-00054-WJM Document 38 Filed 04/01/16 Page 1 of 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 16-cr-054-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**1.      HEATHER CARR**,
**2.      TRAMMEL THOMAS,**
**3.      MERCEDES DIAZ,**

      Defendants.

---

## ORDER REGARDING JOINT DEFENSE AGREEMENT DISCLOSURES

---

      This matter comes before the Court *sua sponte*. This Court has the inherent authority to require disclosure of the precise nature of a criminal defendant's representation to ensure that no conflict of interest exists which would deprive a defendant of his Sixth Amendment right to effective assistance of counsel. See *United States v. Stepney*, 246 F.Supp.2d 1069 (N.D. Cal. 2003). Accordingly the Court ORDERS as follows:

     1.      On or before April 15, 2016, any Defendant who has entered into a Joint Defense Agreement shall submit such Agreement to the Court (filed under Restriction Level 3) for *in camera* review.

     2.      On or before April 15, 2016, any Defendant who has had his or her Initial Appearance prior to that date, and who as of that date has not entered a Joint Defense Agreement, shall submit a filing (under Restriction Level 3)

informing the Court of as much.

3.      Should any Defendant contemplate entering into a Joint Defense

Agreement after this Order, that Defendant shall submit such Agreement

to the Court (filed under Restriction Level 3) **for *in camera* review PRIOR**

**TO ITS EXECUTION.**

Dated this 1st day of April, 2016.

> BY THE COURT:
>
> _____
> William J. Martínez
> United States District Judge

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/13/19 USDC Colorado pg 64 of
Case 1:16-cr-00054-WJM Document 49 Filed 04/20/16 Page 1 of 5
971

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE MARTINEZ PRESIDING

Criminal Case No. 16-CR-00054-WJM

UNITED STATES OF AMERICA,
Plaintiff,

v.

1. HEATHER CARR
2. **TRAMMEL THOMAS**
3. MERCEDES DIAZ

Defendants.

---

## NOTICE CONCERNING JOINT DEFENSE AGREEMENT

---

Mr. Thomas provides notice that at this time no joint defense agreement has been

entered into on his behalf. Counsel is still in the early stages of reading the discovery and

is not able to state of one will be entered into in the future.

_____S/MichaelRoot_____
Michael Root, attorney for the defendant

A copy of the notice of motion to continue change of plea hearing was served on all by

electronic service on April 20, 2016.

1

Case 1:16-cr-00054-WJM Document 49 Filed 04/20/16 Page 2 of 5

_____mr_____

Case 1:16-cr-00054-WJM Document 49 Filed 04/20/16 Page 3 of 3

3

Case No. 1:16-cr-00054-WJM  Document 525-1  Filed 12/04/19  USDC Colorado   pg 67 of
Case 1:16-cr-00054-WJM  Document 131  Filed 04/11/17  Page 1 of 9
971

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.  TRAMMEL THOMAS, and
2.  MARCELLE GREEN,

     Defendants.

_____

### SUPERSEDING INDICTMENT

Count 1:  18 U.S.C. § 286
Conspiracy to Defraud the Government with Respect to Claims

Counts 2-8:  18 U.S.C. §§ 1341 and 2
Aiding and Abetting Mail Fraud

FORFEITURE ALLEGATION
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)

_____

The Grand Jury charges:

### Count 1
### Conspiracy to Defraud the Government with Respect to Claims

1.    At all times relevant to this Superseding Indictment:

    a.    The United States Department of Education (the Department) was an

agency of the United States government. The Department's responsibilities

included overseeing the administration of federal student assistance programs,

including financial aid programs designed to assist qualified students with paying

for college. These financial aid programs included both grant and loan programs.

    b.    In order to qualify as recipients/borrowers for these financial aid

programs, students were required to, among other things, certify that the funds borrowed would be used for authorized educational purposes.

c.    Students generally began the process of applying for federal financial aid by completing and submitting the Free Application for Federal Student Aid (FAFSA). The FAFSA required identifying information such as a student's name, date of birth, address, Social Security number, telephone number, and e-mail address. After processing, the information from the FAFSA was sent to the schools designated by the applicant.

d.    Once awarded financial aid, and after a student enrolled at a particular school, financial aid funds were disbursed from the Department to the school in the student's name. Those funds were applied to tuition, fees, and other educational expenses the student owed to the school. Any funds in excess of the amount owed were then "refunded" to the student.

e.    The Department and community colleges within the State and District of Colorado worked with a company called Higher One to deliver "refunds" of federal financial aid to students. Refund amounts were placed into accounts in the students' names maintained by Higher One. Students accessed these refunds through the accounts and debit cards issued and mailed to them by Higher One.

f.    The Colorado Community College System (CCCS) included several different schools, such as Pikes Peak Community College, Red Rocks Community College, and Pueblo Community College. CCCS operated a website at www.ccconline.org, sometimes referred to as "Colorado Community Colleges Online," allowing a prospective student to create an online account by entering information such as name, address, e-mail address, telephone number, and Social Security number. A prospective student could then use that information to apply to the various schools in the CCCS. The schools within the CCCS allowed any person who met certain minimum criteria (e.g., having a high school diploma or

GED) to enroll and attend classes.

g.     After a student enrolled at a particular CCCS school, the student could then use Colorado Community Colleges Online to take various online distance-learning courses offered by that particular school.

h.     LexisNexis maintained an electronic database called "Accurint," containing personally identifiable information, including Social Security numbers, for individuals throughout the country.  To access Accurint, an individual needed a subscription and a username and password.

i.     Several state departments of corrections maintained publicly accessible inmate locator websites so members of the public could search for individuals held in custody.  A person could search using an inmate's name, or a portion thereof.  Inmate locator websites also displayed the inmate's date of birth.

2.     Beginning in or about August 2010, and continuing until in or about October 2012, in the State and District of Colorado and elsewhere, Defendants TRAMMEL THOMAS and MARCELLE GREEN, along with co-conspirators Heather Carr and Mercedes Diaz (collectively, "the conspirators"), knowingly agreed, combined, and conspired with each other to defraud an agency of the United States by obtaining and aiding to obtain the payment and allowance of false and fraudulent claims by submitting false claims for federal student aid to the U.S. Department of Education.

3.     The conspiracy was accomplished, in part, through the following manner and means:

a.     The conspirators obtained names and dates of birth for inmates by searching inmate locator websites.  Using the Accurint database, conspirators then obtained the social security number of a particular inmate.

b.     The conspirators then applied for federal student assistance funds in the names of inmates and using the inmates' social security numbers. The conspirators prepared and submitted FAFSAs that contained materially false

Case No. 1:16-cr-00054-WJM-1 Document 525-1 Filed 12/12/19 USDC Colorado   pg 70 of
Case 1:16-cr-00054-WJM Document 113 Filed 04/11/17 USDC Colorado   Page 4 of 9
971

representations about the identity of the person submitting the application, the address of the purported applicant, and the purported applicant's intent to attend college. These false representations supported improper determinations by the Department that the purported applicants were eligible to receive financial aid.

  c.  The conspirators also applied for admission to schools within the CCCS and elsewhere, using the identities of the inmates in whose name they had applied for federal student assistance funds. The applications contained false information regarding the purported applicants' mailing addresses. Instead of listing the purported applicant's actual address at a prison or jail, the applications typically listed an address from which the conspirators could obtain the mail.

  d.  The conspirators convinced other individuals, known and unknown to the Grand Jury, to receive mail in the names of purported students so the conspirators could obtain the mail.

  e.  Higher One accounts were created in the names of the purported applicants after financial aid funds were disbursed to the community colleges in the purported applicants' names. Funds were deposited into these accounts and Higher One debit cards intended for the purported applicants were then mailed to the addresses provided by the conspirators. Through the debit cards and associated Higher One accounts, the conspirators used the funds for their own purposes.

  f.  Often, schools would not release financial aid refunds without some confirmation that the student was attending classes. In such cases, the conspirators would sign into online courses to make it appear as if the purported student was in fact attending courses to obtain financial aid funds meant for that purported student.

4.  During the course of the conspiracy, the conspirators were involved in submitting more than 180 false FASFAs to the Department seeking approximately $1.3

million in federal financial aid funds.  The Department disbursed more than $550,000 as a result of the conspirators' false claims.  Of this amount, more than $415,000 in refunds were deposited in purported students' accounts and on debit cards.  The conspirators shared in these proceeds.

## Counts 2-7
### Aiding and Abetting Mail Fraud
### Trammel Thomas

5.     Paragraphs 1 and 3 (including the subparagraphs) are incorporated herein as if fully set forth.

6.     Beginning in or about August 2010, and continuing until in or about October 2012, the conspirators devised and intended to devise a scheme and artifice to defraud the U.S. Department of Education as set forth in Paragraph 3 above ("the scheme") by obtaining money by means of false and fraudulent pretenses, representations, and promises in connection with applications for federal financial aid.

7.     Between on or about the dates listed below for each count, in the State and District of Colorado, for the purpose of executing the scheme, Defendant TRAMMEL THOMAS knowingly caused and aided and abetted another who knowingly caused to be delivered by United States mail addressed to the purported student at the address listed below, according to the direction thereon, an envelope containing a Higher One debit card:

| Count | Dates | Card Number (Last Four Digits) | Purported Student | Address Where Sent |
|---|---|---|---|---|
| 2 | Feb. 8–22, 2011 | 5158 | I.O. | 3820 Radiant Dr.; Apt. 239; Colorado Springs, CO |

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 72 of
Case 1:16-cr-00054-WJM Document 131 Filed 04/11/17 Page 6 of 9
971

| 3 | Aug. 11 – Oct. 15, 2011 | 2903 | V.J. | 1418 Rushmore Dr. Colorado Springs, CO |
|---|---|---|---|---|
| 4 | Aug. 11 – Oct. 3, 2011 | 8668 | R.P. | 1418 Rushmore Dr. Colorado Springs, CO |
| 5 | Aug. 29–Nov. 9, 2011 | 0165 | E.J. | 1418 Rushmore Dr.; Colorado Springs, CO |
| 6 | June 26–July 7, 2012 | 7111 | D.M. | 1112 Meadow Oaks Dr.; Colorado Springs, CO |
| 7 | July 18–26, 2012 | 6173 | M.A. | 1112 Meadow Oaks Dr.; Colorado Springs, CO |

All in violation of 18 U.S.C. §§ 1341 and 2.

**Count 8**
**Aiding and Abetting Mail Fraud**
**Marcelle Green**

8.    On or about August 8, 2012, in the State and District of Colorado, for the
purpose of executing the scheme, Defendant MARCELLE GREEN knowingly caused
and aided and abetted another who knowingly caused to be delivered by United States
mail an envelope containing an acceptance letter from Pikes Peak Community College
for purported student D.H., according to the direction thereon, namely to an address
under her control, which acceptance letter provided a student identification number for
purported student D.H., which number was necessary to obtain federal student aid.

All in violation of 18 U.S.C. §§ 1341 and 2.

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/04/19 USDC Colorado pg 73 of
971
Case 1:16-cr-00054-WJM Document 131 Filed 04/11/17 Page 7 of 9

## FORFEITURE ALLEGATION

9.     The allegations contained in Counts 2 through 7 of this Superseding
Indictment are hereby re-alleged and incorporated by reference for the purpose of
alleging forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C.
§ 2461(c).

10. Upon conviction of the violations allege in Counts 2 through 7 of this
Superseding Indictment involving mail fraud in violation of 18 U.S.C. § 1341, Defendant
TRAMMEL THOMAS shall forfeit to the United States, pursuant to Title 18, United
States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c),
any and all of his right, title and interest in all property constituting and derived from any
proceeds he obtained directly and indirectly as a result of such offense, including, but
not limited to:

A money judgment in the amount of proceeds obtained by those crimes.

11.  If any of the property described in paragraph 10 above, as a result of any act
or omission of Defendant TRAMMEL THOMAS:

a)     cannot be located upon the exercise of due diligence;

b)     has been transferred or sold to, or deposited with, a third
party;

c)    has been placed beyond the jurisdiction of the Court;

d)     has been substantially diminished in value; or

e)     has been commingled with other property which
cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of Defendant TRAMMEL THOMAS up to the value of the forfeitable property.

12. The allegations contained in Count 8 of this Superseding Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

13. Upon conviction of the violation alleged in Count 8 of this Superseding Indictment involving mail fraud in violation of 18 U.S.C. § 1341, Defendant MARCELLE GREEN shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all of her right, title and interest in all property constituting and derived from any proceeds she obtained directly and indirectly as a result of such offense, including, but not limited to:

A money judgment in the amount of proceeds obtained by that crime.

14. If any of the property described in paragraph 13 above, as a result of any act or omission of Defendant MARCELLE GREEN:

a) cannot be located upon the exercise of due diligence;

b) has been transferred or sold to, or deposited with, a third party;

c) has been placed beyond the jurisdiction of the Court;

d) has been substantially diminished in value; or

e) has been commingled with other property which cannot be subdivided without difficulty;

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 75 of
971
Case 1:16-cr-00054-WJM Document 131 Filed 04/11/17 Page 9 of 9

it is the intent of the United States, pursuant to Title 21, United States Code, Section

853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek

forfeiture of any other property of Defendant MARCELLE GREEN up to the value of the

forfeitable property.

<div align="center">A TRUE BILL</div>

<div align="center">Ink signature on file in Clerk's Office</div>

<div align="right">*Foreperson*</div>

**Robert C. Troyer**
Acting United States Attorney

s/Martha A. Paluch
**Martha A. Paluch**
Assistant U.S. Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: (303) 454-0100
FAX: (303) 454-0409
E-mail: martha.paluch@usdoj.gov

s/Beth Gibson
**Beth Gibson**
Assistant U.S. Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: (303) 454-0100
FAX: (303) 454-0409
Email: beth.gibson@usdoj.gov

Case No. 1:16-cr-00054-WJM Document 525-13 filed 12/12/19 USDC Colorado pg 76 of
Case 1:16-cr-00054-WJM Document 131-1 Filed 04/11/17 Page 1 of 2
971

<u>DEFENDANT:</u> MARCELLE GREEN

<u>DOB:</u>          1981

<u>ADDRESS:</u>

 Phoenix, AZ
85040


<u>COMPLAINT FILED?</u>          _____ YES    <u>X</u>     NO

<u>OFFENSE:</u>

      **Count 1:**                    18 U.S.C. § 286 – Conspiracy to Defraud the
                                               Government with Respect to Claims

      **Count 8:**                    18 U.S.C. § 1341 – Aiding and Abetting Mail Fraud


<u>LOCATION OF OFFENSES:</u>   El Paso and Denver Counties, Colorado

<u>PENALTIES:</u>

**Count 1:**                    NMT 10 years of imprisonment; a fine of NMT twice the
                                      financial gain, or $250,000, whichever is greater; NMT 3
                                      years supervised release; and $100 Special Assessment
                                      fee.

**Count 8:**                    NMT 20 years of imprisonment; a fine of NMT twice the
                                      financial gain, or $250,000, whichever is greater; NMT 3
                                      years of supervised release; restitution; $100 Special
                                      Assessment fee.

<u>AGENT:</u>                        Department of Education, Office of Inspector General
                                      Special Agent Sandra Ennis

<u>AUTHORIZED BY:</u>  Martha A. Paluch, Assistant U.S. Attorney

<u>ESTIMATED TIME OF TRIAL:</u>
_____ five days or less
____ <u>X</u> ___ over five days
_____ other

<u>THE GOVERNMENT</u>
_____<u>X</u>_____ will seek detention in this case

Case No. 1:16-cr-00054-WJM Document 525-13 filed 12/12/19 USDC Colorado pg 77 of
Case 1:16-cr-00054-WJM Document 131-4 Filed 04/11/17 Page 2 of 2
971

_____ will not seek detention in this case

The statutory presumption of detention **is not** applicable to this defendant.

<u>OCDETF CASE:</u>       _____       Yes       ___X___       No

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 78 of
Case 1:16-cr-00054-WJM Document 131-2 Filed 04/11/17 Page 1 of 2
971

<u>DEFENDANT:</u> TRAMMEL THOMAS

<u>DOB:</u>          1979

<u>ADDRESS:</u>

 Phoenix, AZ   85041


<u>COMPLAINT FILED?</u>          _____ YES     <u>X</u>___ NO

<u>OFFENSES:</u>

|  |  |  |
|---|---|---|
| **Count 1:** | 18 U.S.C. § 286 – Conspiracy to Defraud the Government with Respect to Claims |
| **Counts 2-7** | 18 U.S.C. § 1341 – Aiding and Abetting Mail Fraud |

<u>LOCATION OF OFFENSES:</u>      El Paso and Denver Counties, Colorado

<u>PENALTIES:</u>

**Count 1:**           NMT 10 years imprisonment; a fine of NMT twice the financial gain, or $250,000, whichever is greater; NMT 3 years supervised release; and $100 Special Assessment

**Counts 2-7**        NMT 20 years of imprisonment; a fine of NMT twice the financial gain, or $250,000, whichever is greater; NMT 3 years of supervised release; restitution; $100 special assessment fee for each count.

<u>AGENT:</u>               Department of Education, Office of Inspector General Special Agent Sandra Ennis

<u>AUTHORIZED BY:</u>  Martha A. Paluch, Assistant U.S. Attorney


<u>ESTIMATED TIME OF TRIAL:</u>
_____ five days or less
____ <u>X</u>__ over five days
_____ other

<u>THE GOVERNMENT</u>
_____ will seek detention in this case

Case No. 1:16-cr-00054-WJM Document 525-13 filed 12/12/19 USDC Colorado pg 79 of
Case 1:16-cr-00054-WJM Document 131-2 Filed 04/11/17 Page 2 of 2
971

_____X_____ will not seek detention in this case

The statutory presumption of detention **is not** applicable to this defendant.

<u>OCDETF CASE:</u>          _____     Yes          ___X___  No

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_DEF@localhost.localdomain
Bcc:
--Case Participants: Daniel Edward Burrows (brittany.herrera@usdoj.gov,
caseview.ecf@usdoj.gov, daniel.burrows@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Mary
Virginia Butterton (clarita_costigan@fd.org, cox_ecf@fd.org, mary_butterton@fd.org,
mitzi_tarver@fd.org), Renee V. Cooper (attyrcooper@gmail.com,
crimdefenseattyrcooper@gmail.com), Bryan David Fields (bryan.fields3@usdoj.gov,
caseview.ecf@usdoj.gov, dequesa.boucher@usdoj.gov, diana.brown@usdoj.gov,
kelsey.totura@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Beth N. Gibson
(beth.gibson@usdoj.gov, caseview.ecf@usdoj.gov, diana.brown@usdoj.gov,
stephanie.price1@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Thomas Edward Goodreid
(cdobson@ggklaw.com, t.goodreid@comcast.net), Jeralyn E. Merritt (jeralynm@gmail.com),
Martha Ann Paluch (caseview.ecf@usdoj.gov, dequesa.boucher@usdoj.gov,
diana.brown@usdoj.gov, mariah.hill@usdoj.gov, martha.paluch@usdoj.gov,
usaco.ecfcriminal@usdoj.gov), Siddhartha H. Rathod (ls@rmlawyers.com, qm@rmlawyers.com,
sr@rmlawyers.com), Daniel T. Smith (danieltsmith@qwestoffice.net,
srammage@qwestoffice.net, terriwilcox@comcast.net), Judge William J. Martinez
(deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Gregory Allen Holloway (maureen.carle@usdoj.gov), Michael Evan
Sander (docketalarm-ecf-admin-0@inbound.docketalarm.com), khami
(kyla_hamilton@cod.uscourts.gov), mgill (matthew_gill@cod.uscourts.gov), Probation-General
(cod_efiling@cod.uscourts.gov), USM-Criminal Division (gillian.fleck@usdoj.gov,
usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:6158970@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00054-WJM USA v. Carr et al Order
Content-Type: text/html
```

## U.S. District Court

## District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 9/13/2017 at 3:20 PM MDT and filed on 9/13/2017

**Case Name:**        USA v. Carr et al

**Case Number:**      1:16-cr-00054-WJM

**Filer:**

**Document Number:** 169(No document attached)

**Docket Text:**
 **ORDER as to Trammel Thomas (2): This matter is before the Court *sua sponte*. In light of the filing of notice of dispositions for the other three Defendants in this case, leaving Defendant Thomas as the only remaining Defendant, the 6 day Jury Trial set to begin on November 27, 2017, is hereby VACATED and RESET to a 5 day Jury Trial set to begin on November 27, 2017 at 8:30 a.m. in Courtroom A801. The Trial will conclude on Friday, December 1, 2017. The Final Trial Preparation Conference remains set for November 17, 2017 at 2:00 p.m. in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards to ensure compliance with all deadlines triggered by the dates of the Final Trial Preparation Conference and Trial. SO ORDERED by Judge William J. Martinez on 9/13/2017. Text Only Entry (wjmsec, )**

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/12/19   USDC Colorado   pg 81 of
971
Case 1:16-cr-54    NEF for Docket Entry 169    Filed 09/13/2017    Page 2 of 2

**1:16–cr–00054–WJM–2 Notice has been electronically mailed to:**

Daniel T. Smith     danieltsmith@qwestoffice.net, srammage@qwestoffice.net, terriwilcox@comcast.net

Jeralyn E. Merritt     jeralynm@gmail.com

Renee V. Cooper (Terminated)     attyrcooper@gmail.com, crimdefenseattyrcooper@gmail.com

Martha Ann Paluch     Martha.Paluch@usdoj.gov, CaseView.ECF@usdoj.gov, Mariah.Hill@usdoj.gov, diana.brown@usdoj.gov, usaco.ecfcriminal@usdoj.gov

Thomas Edward Goodreid     t.goodreid@comcast.net, cdobson@ggklaw.com

Siddhartha H. Rathod     sr@rmlawyers.com, ls@rmlawyers.com, qm@rmlawyers.com

Daniel Edward Burrows (Terminated)     daniel.burrows@usdoj.gov, CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov

Beth N. Gibson     Beth.Gibson@usdoj.gov, CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov, stephanie.price1@usdoj.gov

Mary Virginia Butterton     mary_butterton@fd.org, COX_ECF@fd.org, clarita_costigan@fd.org, mitzi_tarver@fd.org

Bryan David Fields     bryan.fields3@usdoj.gov, CaseView.ECF@usdoj.gov, Dequesa.Boucher@usdoj.gov, Kelsey.Totura@usdoj.gov, diana.brown@usdoj.gov, usaco.ecfcriminal@usdoj.gov

**1:16–cr–00054–WJM–2 Notice has been mailed by the filer to:**

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 82 of
Case 1:16-cr-00054-WJM Document 174 Filed 10/13/17 Page 1 of 2
971

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM

UNITED STATES OF AMERICA,

       Plaintiff,

v.

**2. TRAMMEL THOMAS**

       Defendant

---

## PARTIES STIPULATION CONCERNING EVIDENCE OFFERED UNDER FRE 801(d)(2)(E)

---

The parties, Tramell Thomas through counsel, Daniel T. Smith and Thomas E. Goodreid and the government through Assistant United States Attorneys Martha Paluch and Bryan D. Fields submit the following stipulation for the Court's consideration.

1. Counsel have discussed at length the issues surrounding potential hearsay evidence that might be admissible at trial pursuant to FRE 801(d)(2)(E). Those discussions have resulted in the below described agreement which is submitted as a stipulation for the Court's consideration.

2. The government represents to the Court and the Defendant, that it is not currently in possession of any statements that it would offer at trial pursuant to FRE 801(d)(2)(E).

3. The government further states to the Court and the Defendant that should it become aware of any such statements in its trial preparation, that it will file with the Court a "James" proffer and statement log detailing its proof of the alleged conspiracy and the Defendant's membership therein as well as the statements it intends to offer.

Case No. 1:16-cr-00054-WJM-Document 525-1 filed 12/12/19 USDC Colorado pg 83 of
Case 1:16-cr-00054-WJM Document 171 Filed 10/13/17 Page 2 of 2
971

4.    Should the government determine a need to file the pleading reference in
paragraph 3 above, it will do so on or before November 9, 2017, the date
currently set for the government's motion response.

Dated this 13th day of October, 2017

s/ Daniel T. Smith                          Robert Troyer
Daniel T. Smith                             Acting United States Attorney
1900 Grant St. #580                         by
Denver, Colorado 80203                      s/ Martha Ann Paluch
Telephone: 303 860 8100                     Martha Ann Paluch
Fax: 303 860 8018                           Bryan David Fields
danieltsmith@qwestoffice.net                Assistant United States Attorneys
                                            1801 California St. #1600
Thomas Edward Goodreid                      Denver, Co. 80202
1801 California St #1400                     303 454 0100
Denver, Co. 80202                            303 454 0402
303 296 2048                                Email: Martha.paluch@usdoj.gov
303 292 0522                                Attorney for the United States
Email: t.goodreid@comcast.net

Attorneys for Defendant
Tramell Thomas

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 13, 2017 the foregoing
**STIPULATION CONCERNING EVIDENCE OFFERED UNDER FRE
801(d)(2)(E)** was electronically filed with the Clerk of the Court using the CM/ECF
system which will send notification of said filing to all counsel of record.

s/ Daniel T. Smith

Case No. 1:16-cr-00054-WJM-2 Document 525-1 filed 12/13/19 USDC Colorado pg 84 of
Case 1:16-cr-00054-WJM Document 176 Filed 10/13/17 Page 1 of 9
971

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.  16-cr-00054-WJM-2

UNITED STATES OF AMERICA,

       Plaintiff,

v.

2.  TRAMMEL THOMAS,

    Defendant.

---

**GOVERNMENT'S NOTICE OF INTENT TO USE EVIDENCE
PURSUANT TO FED. R. EVID. 702**

---

The United States of America, by Robert C. Troyer, Acting United States

Attorney, and through Martha A. Paluch and Bryan D. Fields, Assistant United States

Attorneys, pursuant to Fed. R. Crim. P. 16(a)(1)(G), submits its Notice of Intent to Use

Evidence Pursuant to Fed. R. Evid. 702.  The government also intends to supplement

this Notice with additional reports and information as they become available.

**I.    The Government's Computer Forensic Expert:  Qualifications,
Experience and Training**

Ms. Alison Stailey is an expert in computer forensic analysis.  Ms. Stailey's

curriculum vitae, which outlines her training, experience, and qualifications, was

produced in discovery,[1] is incorporated by reference, and is attached hereto as

Attachment 1.  Between July 2005 and August 2015, Ms. Stailey was a Forensic

Analyst for the Technology Crimes Division of the Office of Inspector General, United

---

[1]  EXPERT_00000001 through EXPERT_00000003.

1

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/13/19   USDC Colorado   pg 85 of
971
Case 1:16-cr-00054-WJM   Document 176   Filed 10/13/17   Page 2 of 9

States Department of Education, and served as Digital Forensics Team Lead from 2009
to 2015. While Ms. Stailey currently works in the private sector, she will testify at trial
about her work on this case during her tenure in the Technology Crimes Division.
Specifically, Ms. Stailey will testify that while employed at the Department of Education,
she conducted forensic analysis of any type of digital media, to include computer files,
emails, and text messages that were collected to support investigations of fraud in the
Department of Education programs.

## II.      The Government's Computer Forensic Expert: Nature of Testimony

During its case-in-chief, the government expects to introduce evidence and
testimony regarding computer hard drives, a memory card, and mobile devices that
were seized during the search of the defendant's home in Chandler, Arizona, and a
laptop computer seized from the vehicle the defendant was driving during a traffic stop
in Tempe, Arizona. Ms. Stailey will testify regarding the imaging of this electronic
evidence and the steps taken to preserve the integrity of that electronic evidence. As to
her examination of this evidence, Ms. Stailey will explain how she used the Technology
Crimes Division's tools, and the policies and procedures established by that Division, to
conduct her examination reliably.

Ms. Stailey's testimony will be based on her education, experience, training,
certifications, and her application of each of those to the evidence in this case. She
derived her findings by conducting a forensic examination of the seized computer hard
drives, memory card, and mobile devices using imaging equipment and computer
forensic software in a way that is reliable and that can be reproduced, and that is
generally accepted in the field of computer forensics. In broad summary, such

Case No. 1:16-cr-00054-WJM-GJR   Document 525-1   Filed 12/12/19   USDC Colorado   pg 86 of
971
Case 1:16-cr-00054-WJM   Document 171   filed 10/13/17   USDC Colorado   page 3 of 9

examination consists of making a forensically sound, verifiable, and exact copy of the digital evidence.  She will explain how various computer forensic software and methods were then used to search the digital evidence depending on the type of evidence sought in the investigation.

Specifically, Ms. Stailey will testify to the methods and practices used to make forensically accurate copies of seized media, which methods and practices are generally accepted in the field of computer forensics.  She will testify that she examined all of the digital media without altering the content.  She will also discuss particular files, and the metadata pertaining to those files found during those examinations and that those items truly and accurately represent the files and metadata contained on the digital media.

With respect to the mobile devices and memory card examined, Ms. Stailey's specific findings and the information about which she will testify are contained both in her written findings and in the attachments referenced in those findings, which are incorporated herein by reference.  Ms. Stailey's written findings, designated as Report #857, dated March 12, 2013, was produced in discovery[2] and is attached hereto as Attachment 2. In this report, Ms. Stailey details the extraction of data from the mobile devices and memory card to include contact numbers, incoming and outgoing call logs, and text messages.  Ms. Stailey will testify as to the software used to perform the extractions, to view the data extracted, and to maintain the integrity of that data.

As to the computer hard drives, Ms. Stailey's specific findings and information about which she will testify are contained both in her written findings and in the

---

[2] SW_00000255 through SW_00000259.  The attachments to this report are hundreds of pages long and are not attached here.

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/12/19   USDC Colorado   pg 87 of
971
Case 1:16-cr-00054-WJM   Document 117e   Filed 10/13/17   Page 4 of 9

attachments referenced in those findings, which are incorporated herein by reference.

Ms. Stailey's written findings, designated as Report #863, dated April 10, 2014, was

produced in discovery[3] and is attached hereto as Attachment 3. In this report, Ms.

Stailey details her analysis of the internet activity on these devices.  Ms. Stailey will

testify regarding the source of, and in certain cases, the metadata belonging to, various

electronic documents and emails found on these devices.  In this context, Ms. Stailey

will explain to the jury such terms as metadata, unallocated space, cookies, and slack

space.  Ms. Stailey will also offer opinion testimony regarding the meaning of text

fragments found in unallocated space and data fragments found in slack space.

<div style="margin-left:40%;">

Respectfully submitted,

*s/ Martha A. Paluch*
Martha A. Paluch
Bryan D. Fields
Assistant U.S. Attorneys
United States Attorney's Office
1801 California Street, Suite 1600
Denver, CO  80202
(303) 454-0100
Martha.paluch@usdoj.gov
Bryan.fields@usdoj.gov

</div>

---

[3] SW_00001905 through SW_00001914.  The attachments to this report are hundreds of pages
long and are not attached here.

**CERTIFICATE OF SERVICE**

   I hereby certify that on this 13th day of October, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to the following e-mail address:


Mary Virginia Butterton
Counsel for Heather Carr
mary_butterton@fd.org

Daniel T. Smith
Counsel for Trammel Thomas
danieltsmith@qwestoffice.net


Siddhartha H. Rathod
Counsel for Mercedes Diaz
sr@rmlawyers.com

Jeralyn Merritt
Counsel for Marcelle Green
jeralynm@gmail.com


          s/ Mariah Hill_____
          MARIAH HILL
          Legal Assistant
          U.S. Attorney's Office
          1801 California Street, Ste 1600
          Denver, CO  80202
          Telephone:  (303) 454-0100
          Fax:  (303) 454-0401
          e-mail: Mariah.Hill@usdoj.gov

# ALISON D. STAILEY

## EXPERIENCE

**Mandiant, A FireEye Company (2015 - present)**
*Senior Incident Response Consultant*
Investigate and resolve computer security events ranging from single-system compromises to enterprise-wide intrusions by advanced attack groups that span hundreds of thousands of systems. Evaluate whether attackers are currently operating undetected in client environments or whether they have been there in the past.

**U. S. Department of Education (2005 – 2015)**
*Digital Forensics Team Lead (2009 – 2015)*
Monitored the overall effectiveness and reliability of the forensic program. Identified and resolved issues related to the operation of the forensic laboratory and associated common-use equipment. Developed and implemented standard operating procedures for evidence handling and forensic analysis. Evaluated and drafted departmental policies. Managed the budget and procurement of all maintenance contracts for lab equipment, including forecasting future requirements. Monitored the progress of all forensic requests for assistance and other work of the team and assigned tasks to appropriately trained personnel. Performed quality action reviews to ensure all critical issues impacting the quality of forensic work are addressed in a timely manner. Reviewed and approved all preliminary forensic reports and other reports generated by the team. Conducted quality assurance reviews of forensic reports prior to supervisory approval. Oversaw junior examiners, including new full-time forensic examiners and part-time examiners in regional offices. Provided feedback to senior examiners.

**U. S. Department of Education (2005 – 2015)**
*Senior Forensic Analyst (2005 – 2015)*
Conducted traditional disk-based and network forensic analysis in investigations of fraud, waste, abuse, and intrusions within and into Departmental programs and systems. Prepared comprehensive forensic reports for investigators, prosecutors, and management officials detailing the findings of forensic analysis. Participated in search warrants and other on-site situations to identify and acquire digital evidence for analysis. Tasks included preparing equipment prior to the search, overseeing the acquisition of all systems ranging from user desktop and laptop computers to servers to mobile devices, and appropriately preserving and logging all evidence collected at the search site. Maintained proficiencies in forensic programs and operating systems. Tested forensic software and other analytical tools, assembled and configured forensic workstations, and participated in forensic associations and meetings. Served as primary evidence custodian and developed evidence handling policies. Tasks included protecting the integrity of all evidence collected by or submitted to the forensic laboratory, maintaining an appropriate chain of custody for each evidence item, conducting an annual evidence inventory, and seeking the authorized destruction of evidence when no longer needed. Prepared oral or written testimony at trial and other legal proceedings, if needed.

**National Security Agency (2004)**
*Summer Intern*
Completed a professional training course for the Department of Energy's 3D analytic software tool Starlight including how to modify and ingest data sets, develop new code and interfaces, and navigate, query, and analyze data. Rotated through several offices to learn defensive and offensive information operations utilizing Starlight, and worked with an information visualization group that provides visualization products to data analysts. Learned to use several COTS and GOTS visualization tools and attended a professional training course for Analyst's Notebook, a visualization

tool used extensively by intelligence and law enforcement organizations. Completed several small projects within this organization, including modeling data sets and developing training materials.

**Tulsa Police Department, Cyber Crimes Unit (2004-2005)**
*Intern*
Observed and assisted with the examination and collection of electronic evidence, writing report summaries, and completing other tasks as needed. Cases included forgery, fraud, and child pornography investigations.

**University of Tulsa Computer and Network Forensics (2005)**
*Teaching Assistant*
Developed lab and project assignments, configured lab machines for assignments, and reviewed lab reports.

**EDUCATION**

University of Tulsa, Tulsa, OK, National Center of Academic Excellence
**MS Computer Science (GPA: 4.0)**            May 2005

University of Tulsa, Tulsa, OK
**BS Business Administration (GPA: 3.69)**        May 2003
Major: Management Information Systems

**CERTIFICATIONS**

- Certified Information Systems Security Professional
- Certified Computer Examiner
- Department of Defense Certified Digital Media Collector
- Certified BlackLight Examiner
- Cellebrite Certified Logical Operator
- Cellebrite Certified Physical Analyst
- CNSS 4013: INFOSEC Systems Administrator
- CNSS 4014: Information Systems Security Officer
- CNSS 4015: Systems Certifier
- CNSS 4011: Information System Security Professional
- CNSS 4012: Designated Approving Authority

**PROFESSIONAL TRAINING**

*Leadership Training*
U.S. Department of Education Office of Inspector General New Leaders Program
American Management Association Preparing for Leadership
Developing Emotional Intelligence Skills
Leadership Skills for Non-Supervisors

*Technical Training*
Enterprise Incident Response
Network Threat Assessment Program
Binary Triage and Analysis
SANS FOR508: Advanced Computer Forensic Analysis and Incident Response
AccessData Forensic Toolkit (multiple courses)

EXPERT_00000002

Guidance Software EnCase (multiple courses)
Magnet Forensics Internet Evidence Finder
BlackBag Technologies BlackLight
Cellebrite Logical and Physical Analyzer
Forensics and Intrusions in a Windows Environment
Computer Network Investigations Training Program
EnScript Programming
Examination of NTFS
UNIX and Linux Tools and Utilities

## PROFESSIONAL ASSOCIATIONS

- International Association of Computer Investigative Specialists
- International Information System Security Certification Consortium
- Young Government Leaders

## HONORS AND AWARDS

- U.S. Department of Education, Office of Inspector General, Lawrence Newman Memorial Award – 2006
- U.S. Department of Education, Office of Inspector General, IG Award for Excellence – 2011
- U.S. Department of Education, Office of Inspector General, Technology Crimes Division Team Award – 2012
- U.S. Department of Education, Office of Inspector General, Gainful Employment Audit Team Award – 2012
- U.S. Department of Education, Office of Inspector General, IG Award for Excellence - 2013

## VOLUNTEER WORK AND COMMUNITY INVOLVEMENT

- University of Tulsa Alumni Association Board of Directors – At-Large Member, Committee Chair
- University of Tulsa Alumni Association Kansas City Chapter – Vice President
- Junior League of Kansas City, Missouri – Member

## SECURITY CLEARANCES

Top Secret/Sensitive Compartmented Information (TS/SCI) – debriefed in August, 2016.

Case No. 1:16-cr-00054-WJM Document 525-17 Filed 12/21/19 USDC Colorado, pg 92 of 971
Case 1:16-cr-00054-WJM Document 176-2 Filed 10/13/17 Page 1 of 1
Attachment 2




# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
### TECHNOLOGY CRIMES DIVISION

**DATE:**               March 12, 2013

**PREPARED BY:**        Alison Stailey        Digitally signed by Alison Stailey
                                              Date: 2013.04.11 12:43:49 -05'00'

**CASE TITLE:**         Pikes Peak Community College Fraud Ring

**CASE NUMBER:**        12-080234

**REPORT RE:**          Acquisition and Analysis of Mobile Devices

**TCD REQUEST #:**      857

*Request*: TCD received a request from Special Agent Sandra Ennis regarding 15 mobile devices seized during the execution of a search warrant in Chandler, Arizona, on November 29, 2012. Special Agent Ennis requested extraction of data from the devices to include contact numbers, incoming and outgoing call logs, text messages, and email and internet history analysis where applicable. Special Agent Ennis also requested the extraction of photos on items 19, 24, 25, and 26.

*Status*: Closed.

*Data Analyzed*:

SEIZED ITEM #10:   Apple 16 gigabyte iPod Touch A1288 MP3 player with serial number 9C9225EW203

SEIZED ITEM #11:   LG VS910 mobile phone with serial number 105KPYR0211890, containing a Kingston 8 gigabyte MicroSDHC card and a Verizon 4GLTE Subscriber Identity Module (SIM) card with Integrated Circuit Card Identifier (ICCID) 89148000000168868991

SEIZED ITEM #12:   Huawei M865 MUVE mobile phone with serial number T8U9MA1241620286, containing a 2 gigabyte MicroSD card

SEIZED ITEM #13:   T-Mobile Samsung SGH-T749 mobile phone with serial number RPJSC58117R

SEIZED ITEM #14:   HTC MyTouch 4G Slide mobile phone with serial number HT18GTB00134, containing a Samsung 8 gigabyte MicroSDHC card and a T-Mobile SIM card with ICCID 8901260542520803856

---

This report is the property of the Office of Inspector General and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.**

Case No. 1-16-cr-00054-WJM  Document 525-1  Filed 12/12/19  USDC Colorado  pg 93 of
971
Case 1:16-cr-00054-WJM  Document 176-2  Filed 10/13/17  Page 2 of 5

SEIZED ITEM #15:   Blackberry Curve 8520 mobile phone with unknown serial number and
International Mobile Equipment Identity (IMEI) number
351938041097334, containing a Samsung 1 gigabyte MicroSD card and a
T-Mobile SIM card with ICCID 8901260542520803872

SEIZED ITEM #16:   T-Mobile Samsung T919 mobile phone with unknown serial number and
IMEI number 351915030519442, containing a SIM card with ICCID
89014103254966906343

SEIZED ITEM #17:   Virgin Mobile LG VM101 mobile phone with serial number
007CYEA0168780

SEIZED ITEM #18:   Cricket Huawei M615 mobile phone with serial number
S9X9MB9292308176

SEIZED ITEM #19:   Amazon Kindle X43Z60 with unknown serial number

SEIZED ITEM #20:   Verizon Samsung SCH-U640 mobile phone with unknown serial number

SEIZED ITEM #21:   AT&T Pantech P8000 mobile phone with serial number 112300106025,
containing an AT&T SIM card with ICCID 89014102254944153357

SEIZED ITEM #24:   Apple 32 gigabyte iPad A1416 with serial number DMPJ3H0PDVD2

SEIZED ITEM #25:   Apple 64 gigabyte iPad A1430 with serial number DMPHQJ8QDVGJ

SEIZED ITEM #26:   Apple 64 gigabyte iPad A1430 with serial number DMPH9UCHDVGJ

Cellebrite's UFED Touch Ultimate, with software version 1.8.1.31, was used to perform
extractions as described below.  The extractions were reviewed using AccessData's Forensic
Toolkit version 4.1.0.165 and Cellebrite's UFED Physical Analyzer version 3.6.1.6.

ITEM #10
The UFED Touch was used to complete a file system extraction of the iPod Touch.  The UFED
Touch was then used to complete a logical extraction of the device's contacts,
calendar/notes/tasks, audio/music files, videos, and ringtones.  Special Agent Ennis reviewed the
audio files and ringtones and determined they were not relevant to the investigation.  Links to the
audio files and ringtones were removed from the device report generated by the UFED Touch,
which is provided as Attachment 1.  No relevant internet history, emails, or text messages were
located on the device.

ITEM #11
Neither the UFED Touch, nor any other tools held by TCD, supports the extraction of data from
the LG VS910 mobile phone.  No data was acquired from this device.

The phone contained a MicroSDHC card and a SIM card.  The MicroSDHC card was acquired
using AccessData's FTK Imager version 3.0.1.1467.   No relevant data was located on the
MicroSDHC card.  Cellebrite's UFED Logical with software version 1.8.0.0 was used to acquire
call logs, phone book, and Short Message Service (SMS) messages stored on the SIM card.  A
review of the SIM card report generated by the UFED showed that the data were not available,
indicating the phone did not use the SIM as a storage location.

Date Prepared:  03/12/2013                ADS                Case No:  12-080234

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be
reproduced without written permission.  The report is **FOR OFFICIAL USE ONLY and its disclosure to unauthorized
persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.**

OIG-301A (11/06)                                                         Page 2 of 5

ITEM #12
The Huawei M865 MUVE mobile phone was broken in pieces and no data was acquired from the device.

The phone contained a MicroSD card, which was acquired using FTK Imager version 3.0.1.1467. The MicroSD card contained two sets of database backups, from July 18, 2012, and October 5, 2012.[1] The Bookmark, Call Log, and SMS databases from each set contained relevant entries. The entries are summarized as <u>Attachment 2</u>.[2]

ITEM #13
A physical extraction of the data on the Samsung SGH-T749 mobile phone was completed using the UFED Touch. The UFED provided instructions for: 1) changing the phone's USB setting to Samsung PC Studio, 2) placing the phone in Qualcomm mode by entering *#782872#, and 3) returning the phone to Samsung mode by entering *#726872# following successful acquisition. SMS messages were located on the device and are summarized in <u>Attachment 3</u>.

ITEM #14
Extraction of the data on the HTC MyTouch 4G Slide mobile phone was attempted using the UFED Touch. The device was locked with an unknown passcode, and the UFED Touch requires the password to complete a successful extraction of any type. No data was acquired from the device.

The phone contained a MicroSDHC card and a SIM card. The MicroSDHC card was acquired using AccessData's FTK Imager version 3.0.1.1467. No relevant data was located on the MicroSDHC card. The UFED Touch was used to acquire call logs, phone book, and Short Message Service (SMS) messages stored on the SIM card. A review of the SIM card report generated by the UFED showed that the data were not available, indicating the phone did not use the SIM as a storage location.

ITEM #15:
Extraction of the data on the Blackberry Curve 8520 mobile phone was attempted using the UFED Touch. The device was locked with an unknown passcode, and the UFED Touch requires the password to complete a successful extraction of any type. No data was acquired from the device.

The phone contained a MicroSDHC card and a SIM card. The MicroSDHC card was acquired using AccessData's FTK Imager version 3.0.1.1467. No relevant data was located on the

---

[1] The databases were located at [root]/HuaweiBackup/Backup_2012_07_18.zip/ and
[root]/HuaweiBackup/quick/Quick_2012_10_05.zip/.
[2] The documentation for this type of database indicates that dates and times can be stored in Unix Time, or the number of seconds since January 1, 1970 00:00:00 UTC. Accordingly, the dates and times in Attachment 2 have been converted from Unix Time to recognizable dates and times. (www.sqlite.org/datatype3.html#datetime)

Date Prepared: 03/12/2013          ADS          Case No: 12-080234

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.**

MicroSDHC card. The UFED Touch was used to acquire call logs, phone book, and Short Message Service (SMS) messages stored on the SIM card. A review of the SIM card report generated by the UFED showed that only 3 generic contact entries[3] were available, indicating the phone did not use the SIM as a storage location for call logs, SMS messages, or most contacts.

ITEM #16:
The Samsung T919 mobile phone did not contain a battery. The phone could not be powered on or acquired without battery power. No data was acquired from the device.

The phone contained a SIM card. Extraction of the call logs, phone book, and SMS messages stored on the SIM card was attempted using the UFED Touch. The SIM card was protected with a PIN code which had previously been locked, most likely due to successive incorrect PIN entries. The SIM card required a PIN unlock key from the service provider to allow access to any data. No data was acquired from the SIM card.

ITEM #17:
Neither the UFED Touch, nor any other tools held by TCD, supports the extraction of data from the LG VM101 mobile phone. No data was acquired from this device.

ITEM #18:
Physical extraction of the data on the Huawei M615 mobile phone was completed using the UFED Touch. The UFED Touch offered two options for the download mode: FW NAND driver and CB NAND driver. Although extractions were completed using each of the download modes, no relevant data was located on the device.

ITEM #19:
Neither the UFED Touch, nor any other tools held by TCD, supports the extraction of data from the Kindle. No data was acquired from this device.

ITEM #20:
Acquisition of the data stored on the Samsung SCH-U640 mobile phone, including contacts, SMS messages, multimedia messaging service (MMS) messages, pictures, audio/music files, videos, ringtones, and call logs, was completed using the UFED Touch. The phone report generated by the UFED Touch is provided as Attachment 4. No internet history or email was recovered from this device.

ITEM #21:
Extraction of the data on the Pantech P8000 mobile phone was attempted using the UFED Touch. The device was locked with an unknown passcode, and the UFED Touch requires the password to complete a successful extraction of any type. No data was acquired from the device.

---

[3] The contact entries were: 1) #646# for "Check Minutes;" 2) #674# for "Check Text Usage;" and 3) #225# for "Check Balance."

Date Prepared: 03/12/2013          ADS          Case No: 12-080234

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.**

OIG-301A (11/06)                                        Page 4 of 5

SW_00000258

The phone contained a SIM card. The UFED Touch was used to acquire call logs, phone book, and Short Message Service (SMS) messages stored on the SIM card. A review of the SIM card report generated by the UFED showed that the data were not available, indicating the phone did not use the SIM as a storage location.

ITEM #24:
Extraction of the data on the iPad was attempted using the UFED Touch. The device was locked with an unknown passcode, and the UFED Touch requires the password to complete a successful extraction of any type. No data was acquired from the device.

ITEM #25:
A file system extraction of the data on the iPad was completed using the UFED Touch. Contacts were located on the device, but no other relevant items were located. The contacts are provided as Attachment 5. Per Special Agent Ennis's request, the graphic files were exported from the data and are provided as Attachment 6.

ITEM #26:
Extraction of the data on the iPad was attempted using the UFED Touch. The device was locked with an unknown passcode, and the UFED Touch requires the password to complete a successful extraction of any type. No data was acquired from the device.


*Attachments*
1. Item 10 – Logical Extraction Report
2. Item 12 – Database Entries
3. Item 13 – SMS Messages
4. Item 20 – Logical Extraction Report
5. Item 25 – Contacts
6. Item 25 – Graphic Files

Date Prepared: 03/12/2013                    ADS                    Case No: 12-080234

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.**

**Attachment 3**



# OFFICE OF INSPECTOR GENERAL
## INFORMATION TECHNOLOGY AUDITS
## AND COMPUTER CRIME INVESTIGATIONS



## Technology Crimes Division

# Digital Forensic Report

## Request #863

## 12-080234
## Pikes Peak Community College Fraud Ring

## Internet History Analysis

## April 10, 2014

Digitally signed by
Alison Stailey
Date: 2014.04.10
11:01:09 -05'00'

_____
Alison Stailey
Analyst

Digitally signed by Mark A Smith
Date: 2014.04.10 15:27:53 -04'00'

_____
Mark A. Smith
Special Agent in Charge

This report is the property of the Office of Inspector General and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 515 (1/10)

Case No. 1:16-cr-00054-WJM, Document 525-17 filed 12/12/19 USDC Colorado pg 98 of
Case 1:16-cr-00054-WJM Document 525-17 Filed 10/13/17 Page 2 of 10
971

## Request

On December 11, 2012, the Technology Crimes Division (TCD) received a request for assistance from Special Agent Sandra Ennis regarding a fraud ring investigation. Special Agent Ennis requested an analysis of the Internet activity on the evidence seized from a residence pursuant to a search warrant in Chandler, Arizona. TCD received an additional Internet activity analysis request from Special Agent Ennis on February 26, 2013, regarding an evidence item received from the Tempe, Arizona, Police Department.

## Summary

Internet history records, temporary Internet files, and cookies related to Web sites of interest were located on the evidence items. The relevant index entries are summarized in Microsoft Excel workbooks, and the relevant files were exported. The workbooks and files are provided as attachments. Of particular note, personal identifiers of over 100 individuals on a list provided by the case agent were located on the evidence items. A number of relevant banking, cell phone provider, community college, and Department of Corrections web sites were also located on the evidence items.

## Evidence Analyzed

**Q0001**: Forensic acquisition of a Western Digital hard drive, with serial number WXEZ07E10041 and a storage capacity of 120 gigabytes, which was located in an Apple MacBook laptop computer with serial number W8743S5CZ62. The computer was located in Room R at Site 1.

**Q0002**: Forensic acquisition of a Western Digital hard drive, with serial number WXF0AA9M4652 and a storage capacity of 320 gigabytes, which was located in an Apple MacBook laptop computer with serial number W87502P4Z62. The computer was located in Room X at Site 1.

**Q0003**: Forensic acquisition of a Seagate hard drive, with serial number W200EC97 and a storage capacity of 750 gigabytes, which was located in an HP Envy 23 TouchSmart All-in-One desktop computer with serial number 3CR2371BMW. The computer was located in Room Z at Site 1.

**Q0004**: Forensic acquisition of a Hitachi hard drive, with serial number DSE034NL and a storage capacity of 250 gigabytes, which was located in an Acer Aspire 5552-3691 laptop computer with serial number LXR4402149103054181601. The computer was located in Room A at Site 1.

**Q0006**: Forensic acquisition of a SanDisk SDHC memory card, with serial number BI1116822065D and a storage capacity of 8 gigabytes. The memory card was attached to Q0003.

**Q0007**: Forensic acquisition of a Western Digital hard drive, with serial number WCAYUDK44885 and a storage capacity of 500 gigabytes, which was located in an HP TouchSmart 520 PC desktop computer with serial number 3CR15117TD. The computer was located in Room J at Site 1.

**Q0021**: Forensic acquisition of a Fujitsu hard drive, with serial number MHZ2320BH G1 and a storage capacity of 320 gigabytes, which was located in a Sony Vaio PCG-3G5L laptop computer with serial number 00148134168911. The computer was originally seized by the Tempe, Arizona, Police Department.

SW_00001906

Case No. 1:16-cr-00054-WJM  Document 525-17 filed 12/12/19 USDC Colorado  pg 99 of
971
Case 1:16-cr-50054-WJM  Document 525-17  Filed 10/13/15  Page 3 of 971

## Analytical Process

The forensic acquisitions were analyzed using AccessData Forensic Toolkit (FTK) version 4.1.0.165.  The Windows registry files were reviewed using AccessData Registry Viewer version 1.6.3.34.  Internet artifacts were viewed using FTK and Magnet Forensics Internet Evidence Finder version 6.3.0.0112.  Internet Explore cookie files were parsed using McAfee's Galleta version 1.0.

Each of the forensic acquisitions was reviewed to determine which Internet browsers were installed.  The Internet browser artifacts, such as history, bookmarks, cookies, and cached files, were reviewed as applicable to each acquisition.

Special Agent Ennis provided a list of potential fraud ring members or victims.  The list included identifiers such as first name, last name, social security number, date of birth, and email address for 239 people.  Special Agent Ennis also provided lists of banking, cell phone provider, community college, Department of Corrections, and other websites for Internet history analysis.  Keywords were generated based on those lists and keyword searches performed to attempt to identify any relevant Internet activity.

Relevant files located during the analysis were exported for review, as described in the Analysis Details section below.  A file listing containing information for each exported file, including item number, full file path, file size, file creation date, file modification date, date of last file access, and MD5 checksum, is provided as Attachment 1.

Identifiers of 116 people on the list provided by the case agent were located in unallocated space and system files.  The keyword search hits were extracted from the forensic acquisitions and provided as Attachment 2.  In addition, references to the Department of Corrections websites specified by the case agent were located in unallocated space and system files.  The search hits were extracted from the forensic acquisitions and provided as Attachment 3.  The attachments show the file path, item number, and context data for each search hit.  The search hits for each evidence item are specified in the Analysis Details section below.  False positives were removed from the attachments when possible.

Avast! version 4.8 Professional was used to scan all extracted files for malicious code.  No malicious files were located during the scan.  At the conclusion of the analysis, all forensic acquisitions were verified and determined to be unaltered since originally acquired.

## Analysis Details

### Q0001 – Site 1 Room R

Mac OS X version 10.6.3[1] was installed on Q0001.  No registered owner or organization information was located.  The computer was named *User'sMacBook.*[2]  The computer time zone was set to America/Phoenix.[3]  The user profile list under the Users directory contained a user profile for *user.*[4]  Google Chrome and Apple Safari were installed on Q0001.[5]  The Internet artifacts discussed below were located under the *user* user profile.

Internet history index entries were located in the Internet artifacts for Chrome.  The index entries were related to T-Mobile.  The index entries are summarized in a Microsoft Excel spreadsheet and provided as Attachment 4.

Q0001 contained search hits for many individuals on Special Agent Ennis's list, as well as hits for the Arizona Department of Corrections web site.  The individuals were:  Justin Acevedo, Niambi Agent, Sarah Allen, Heather Carr, Michael Cox, Mercedes Diaz, Babetta Gaines, Michelle Grant, Marcelle Green, Bobbie Hills, Carla Johnson, Alexander Jones, Ayanna Jones, James Jones, Neri Lattimore, John Miller III, Richard Miller, Latania

Case No. 1:16-cr-00054-WJM Document 526-1 Filed 12/12/19 USDC Colorado pg 100 of
Case 1:16-cr-00054-WJM Document 176-3 Filed 10/13/17 Page 4 of 10
971

Pickens, Michael Sherman, David Smith, Gloria Smith, Kevin Smith, Michael Smith, Patrick Smith, Robert Smith, and Tramell Thomas.  The search hits are provided as <u>Attachment 2</u> and <u>Attachment 3</u>.

### Q0002 – Site 1 Room X

Mac OS X version 10.6.8[1] was installed on Q0002.  Ayanna Jones was listed in the computer's registration information.[6]  The computer was named *Ayanna Jones's MacBook*.[2]  The computer time zone was set to America/Los_Angeles.[3]  The user profile list under the Users directory contained a user profile for *ayannajones*.[4]  Google Chrome and Apple Safari were installed on Q0002.[5]  The Internet artifacts discussed below were located under the *ayannajones* user profile.

Web cookie index entries were located in a corrupt cookies file in the Internet artifacts for Safari.  The index entries were related to Higher One and are summarized in the table below.  The corrupt cookies file is provided as <u>Attachment 5</u>.

| | |
|---|---|
| Entry 1 | `<dict>    <key>Created</key>    <real>331965240.24336398</real> <key>Domain</key>    <string>higherone.com</string> <key>Expires</key>    <date>2012-06-29T04:32:06Z</date> <key>Name</key>    <string>Default_tpl</string>    <key>Path</key> <string>/</string>    <key>Value</key>    <string>Default</string> </dict>` |
| Entry 2 | `<dict>    <key>Created</key>    <real>331965241.190768</real> <key>Domain</key>    <string>.higherone.com</string> <key>Expires</key>    <date>2013-07-09T04:34:01Z</date> <key>Name</key>    <string>__utma</string>    <key>Path</key> <string>/</string>    <key>Value</key> <string>226945668.266624659.1310272441.1310272441.1310272441.1</string>    </dict>` |
| Entry 3 | `<dict>    <key>Created</key>    <real>331965241.19535702</real> <key>Domain</key>    <string>.higherone.com</string> <key>Expires</key>    <date>2012-01-08T16:34:01Z</date> <key>Name</key>    <string>__utmz</string>    <key>Path</key> <string>/</string>    <key>Value</key> <string>226945668.1310272441.1.1.utmccn=(organic)|utmcsr=google|utmctr=higher+one|utmcmd=organic</string>    </dict>` |

Q0002 contained search hits for many individuals on Special Agent Ennis's list, as well as hits for the Florida and Colorado Department of Corrections web sites.  The individuals were:  Dominique Aaron, Robert Abbott, Justin Acevedo, Juan Acosta, Maximo Acosta, John Actisdano, Calvin Adair, Niambi Agent, Sherline Alexander, Lori Allain, Eryn Allegra, Delta Allen, Mandy Allen, Margaret Allen, Elizabeth Angel, Heather Carr, Michael Cox, Antonio Diaz, Jennifer Diaz, Mercedes Diaz, Michael Ellis, Babetta Gaines, Carmen Gonzalez, Michelle Grant, Willie Hampton, Jameisha Hardin, Kenneth Jackson, Ayanna Jones, Eddie Jones, James Jones, Neri Lattimore, Vanessa Lopez, John Miller III, Arlie Miller, Dennis Miller, Richard Miller, Mercedes Mitchell, Latania Pickens, Marie Rivera, Telsa Robinson, Jesse Rowsley, Maria Ruiz, Matthew Sanders, Rosalyn Sanders, Michael Sherman, Adam Smith, David Smith, Joseph Smith, Joshua Smith, Kevin Smith, Michael Smith, Oscar Smith, Robert Smith, and Tramell Thomas..  The search hits are provided as <u>Attachment 2</u> and <u>Attachment 3</u>.

### Q0003 – Site 1 Room Z Computer 2

Microsoft Windows 8[7] was installed on October 27, 2012, at 3:34:37 AM Universal Coordinated Time (UTC).[8]  The computer was named *OFFICE*.[9]  The registered organization value was set to *Hewlett-Packard Company*,[10] and the registered owner value was set to *N607265*.[11]  The computer was last properly shut down on November

SW_00001908

26, 2012, at 1:37:05 AM UTC.[12]  The computer was set to Pacific Standard Time.[13]  The user profile list under the Users directory contained user profiles for *Heather* and *N607265*.[4]  Microsoft Internet Explorer was installed on Q0003.[14]  The Internet artifacts discussed below were located under the *N607265* user profile.

Web cookie files related to BBVA Compass, Heather Carr (a subscriber at T-Mobile), T-Mobile, LinkedIn, Spokeo, and the Colorado Department of Corrections web site were located in the artifacts for Internet Explorer and Google Search.  The details of the cookie files are provided as Attachment 6, while the cookie files themselves are provided as Attachment 7.

Nine relevant HTML files were located in the artifacts for Internet Explorer and Google Search.  They included: a BBVA Compass sign-off page for an unknown user; Facebook pages for Heather Carr; a fragment of a Statement Summary for an account ending in 1136 linked to Tramell Thomas; and account summary pages for Tramell Thomas on Go Daddy.  The HTML files are provided as Attachment 8.

Q0003 contained search hits for many individuals on Special Agent Ennis's list, as well as hits for the Colorado Department of Corrections web site.  The individuals were:  Niambi Agent, Heather Carr, Michael Cox, Jennifer Diaz, Mercedes Diaz, Christine Duncan, Mark Ellis, Michelle Grant, Marcelle Green, Kelly Johnson, Ayanna Jones, Eddie Jones, James Jones, Vanessa Lopez, Ismael Omar, Latania Pickens, Adam Smith, David Smith, Jeremy Smith, Joshua Smith, Kevin Smith, Michael Smith, Patrick Smith, Richard Smith, Robert Smith, and Tramell Thomas.  The search hits are provided as Attachment 2 and Attachment 3.

### Q0004 – Site 1 Room A

Microsoft Windows 7[7] Home Premium[15] was installed on October 4, 2011, at 7:49:08 AM UTC.[8]  The computer was named *KAI-PIE*.[9]  The registered organization value was not set,[10] but the registered owner value was set to *Kai - Pie*.[11]  The computer was last properly shut down on November 16, 2012, at 3:04:03 PM UTC.[12]  The computer was set to Pacific Standard Time.[13]  The user profile list under the Users directory contained user profiles for *Kai – Pie*.[4]  Mozilla Firefox, Google Chrome, and Microsoft Internet Explorer were installed on Q0004.[14]  Artifacts for the Internet Explorer Compatibility View List discussed below were located in system directories; all other Internet artifacts discussed below were located under the *Kai - Pie* user profile.

Web cookie index entries, temporary Internet file cache index entries, and history index entries were located in the Internet artifacts for Firefox, Chrome, and Internet Explorer.  The index entries were related to TurboTax, Higher One, Verizon, T-Mobile, Citi Prepaid, and Gmail.  Index entries for Citibank, Wells Fargo, Sprint, Verizon, TurboTax, and the Department of Education's FAFSA were located on the Internet Explorer Compatibility View List.  The index entries are summarized in Microsoft Excel spreadsheets and provided as Attachment 9.

Web cookie files related to BBVA Compass, Higher One, Wells Fargo, Colorado Community College System, Pikes Peak Community College, Pueblo Community College, Red Rocks Community College, T-Mobile, TurboTax, and Gmail were located in the artifacts for Internet Explorer.  Gina Sanders's email address was located in one of the cookie files.  The details of the cookie files are provided as Attachment 10, while the cookie files themselves are provided as Attachment 11.

Two relevant HTML files were located in the artifacts for Firefox and Internet Explorer.  One contained Calvin Adair's information on the Citi Prepaid Card Enrollment web site, while the other was related to Ayanna Jones's Netflix account.  The HTML files are provided as Attachment 12.

Q0004 contained search hits for many individuals on Special Agent Ennis's list, as well as hits for the Colorado Department of Corrections web site.  The individuals were:  Calvin Adair, Heather Carr, Michael Cox, Mercedes Diaz, Katherine Freeman, Monica Freeman, Celeste Frotten, Donald Grant, Paula Gutierrez, Michelle Hung,

SW_00001909

David Jackson, Byanca Johnson, Carla Johnson, Ayanna Jones, Vanessa Lopez, John Miller III, Dennis Miller, Ruth Perez, Latania Pickens, Jannette Ramos, Tessa Robinson, Wanda Rodriguez, Veronica Ruiz, Gina Sanders, David Smith, Gregory Smith, Joseph Smith, Kevin Smith, Michael Smith, Patrick Smith, Robert Smith, and Terrell Thomas. The search hits are provided as Attachment 2 and Attachment 3.

### *Q0006 – Site 1 Room Z Computer 2 – SDHC Card*

Q0006 did not contain an operating system. No relevant artifacts were located.

### *Q0007 – Site 1Room J*

Microsoft Windows 7[7] Home Premium Service Pack 1[15] was installed on June 14, 2012, at 6:17:08 AM UTC.[8] The computer was named *SMART-HP*.[9] The registered organization value was set to *Hewlett-Packard Company*,[10] and the registered owner value was set to *Smart*.[11] The computer was last properly shut down on November 23, 2012, at 10:12:01 PM UTC.[12] The computer was set to Pacific Standard Time.[13] The user profile list under the Users directory contained user profiles for *King* and *Smart*.[4] Google Chrome and Microsoft Internet Explorer were installed on Q0007.[14] All Internet artifacts discussed below were located under the *Smart* user profile.

Web cookie index entries, temporary Internet file cache index entries, and history index entries were located in the Internet artifacts for Internet Explorer. The index entries were related to BBVA Compass, Verizon, Sprint, and LinkedIn. Index entries for Wells Fargo, Sprint, Verizon, T-Mobile, TurboTax, and the Department of Education's FAFSA were located on the Internet Explorer Compatibility View List. The index entries are summarized in Microsoft Excel spreadsheets and provided as Attachment 13.

Web cookie files related to Verizon and LinkedIn were located in the artifacts for Internet Explorer. Tramell Thomas's email address was located in one of the cookie files. The details of the cookie files are provided as Attachment 14, while the cookie files themselves are provided as Attachment 15.

Eight relevant HTML files were located in the artifacts for Internet Explorer. They included: gift card balances and transaction history for Bancorp Vanilla Visa Gift Cards ending in 2915 and 3869; a member login page for a Vanilla Visa Gift Card; a Facebook page for Heather Carr; an ADT Pulse Live Video page for "Heather Carr Home;" Gary Burandt's profile on LinkedIn; a password request page showing Tramell Thomas's email address; and a Yahoo! mail fragment for Tramell Thomas. The HTML files are provided as Attachment 16.

Q0007 contained search hits for many individuals on Special Agent Ennis's list, as well as hits for the Colorado and Arizona Department of Corrections web site. The individuals were: Niambi Agent, Eryn Allegra, Heather Carr, Michael Cox, Mercedes Diaz, Shiraki Ellis, Michelle Grant, Ayanna Jones, Dennis Miller, Latania Pickens, Gina Sanders, David Smith, Jamain Smith, Joshua Smith, Michael Smith, Patrick Smith, Terrell Smith, and Terrell Thomas. The search hits are provided as Attachment 2 and Attachment 3.

### *Q0021 – Site 2 Sony Vaio*

Microsoft Windows Vista Home Premium[7] Service Pack 2[15] was installed on January 1, 2008, at 10:08:44 AM UTC.[8] The computer was named *SONY-PC*.[9] The registered organization value was not set,[10] but the registered owner value was set to *Sony*.[11] The computer was last properly shut down on August 29, 2012, at 4:21:09 AM UTC.[12] The computer was set to Pacific Standard Time.[13] The user profile list under the Users directory contained a user profile for *Sony*.[4] Google Chrome and Microsoft Internet Explorer were installed on Q0021.[14] All Internet artifacts discussed below were located in either orphan files or under the *Sony* user profile.

SW_00001910

Web cookie index entries, temporary Internet file cache index entries, and history index entries were located in the Internet artifacts for Internet Explorer. The index entries were related to Maricopa County Community College District, Pikes Peak Community College, Colorado Community College System, the Department of Education's FAFSA, LinkedIn, and Gmail. Index entries for Citibank, Wells Fargo, Sprint, Verizon, TurboTax, and the Department of Education's FAFSA were located on the Internet Explorer Compatibility View List. The index entries are summarized in Microsoft Excel spreadsheets and provided as Attachment 17.

Web cookie files related to Maricopa County Community College District, Pikes Peak Community College, and Colorado Community College System were located in the artifacts for Internet Explorer. Robert Acee's email address was located in one of the cookie files. The details of the cookie files are provided as Attachment 18, while the cookie files themselves are provided as Attachment 19.

Nearly 300 relevant HTML files were located in the artifacts for Internet Explorer. Their content included:
- FAFSA Application pages, some with student information for Manuel Abate, Gary Abbate, William Abbate, Jerry Abbott, Robert Abbott, Sean Abraham, Robert Abrams, Faustino Aceuedo-Beltran, Robert Acosta, John Actisdano, Omar Adames, Dee Dee Adams, Jerrie Alcon, Elizabeth Angel, Anna Apodaca, Amy Bauer, Stephanie Bellino, Barbara Dirito, Heather Dison, Joyce Dockins, Kenneth Jackson, and Tyson Jones;
- Department of Education PIN Application pages for Manuel Abate, William Abbate, Jerry Abbott, Sean Abraham, Javier Abreu-Perez, Jerrie Alcon, Anna Apodaca, and Barbara Dirito;
- Pikes Peak Community College Application Certification pages, Application Confirmation pages, and general contact information for Billy Aaron, Manuel Abate, Gary Abbate, Jerry Abbott, Otha Abney, Anna Apodaca, Nancy Bautista, and Amy Bauer;
- Google search results for Pikes Peak Community College and Maricopa;
- Pueblo Community College Application Certification pages for William Abbate and Jerry Abbott;
- Miscellaneous Maricopa County Community College District pages, to include Chandler-Gilbert Community College, Mesa Community College, and Maricopa Community College, related to Jerry Abbott, Robert Abbott, Robert Abrams, Robert Acosta, John Actisdano, Calvin Adair, Stephanie Bellino, Theodore Chase, Barbara Dirito, Bobbie Hills, Kenneth Jackson, Jerome Smith, and Joseph Smith, as well as the student IDs KEN2169981, kor2131635, dav2217178, joy2158993, cyn2173511, joe2155781, the2128611, bra2201016;
- Fragments from an unknown website containing the user IDs of Jerry Abbott, Robert Abrams and Barbara Dirito;
- The classroom dashboard from an unknown course for Robert Abrams;
- Student pages at an unknown school for Calvin Adair;
- Fragments of Internet searches for Heather Carr;
- Creation of a new Gmail account for "Dana" with the attempted username "lordlinkministries;" and
- Creation of a new Yahoo! account for kerrychase480@yahoo.com.

The HTML files are provided as Attachment 20.

Ten recently used Internet shortcuts were located on Q0021. All link to the Maricopa Internet domain. The shortcut details are summarized in Attachment 21 and the shortcut files themselves are provided as Attachment 22.

Q0021 contained search hits for many individuals on Special Agent Ennis's list, as well as hits for the Colorado Department of Corrections web site. The individuals were: Billy Aaron, Dominique Aaron, Manuel Abate, Gary Abbate, William Abbate, Jerry Abbott, Robert Abbott, Sean Abraham, Robert Abrams, Javier Abreu-Perez, Robert Acampora, Robert Acee, Faustino Aceuedo-Beltran, Justin Acevedo, Maximo Acosta, Robert Acosta, John Actisdano, Calvin Adair, Omar Adames, Dee Dee Adams, Jerrie Alcon, Sarah Allen, Elizabeth Angel, Anna Apodaca, Amy Bauer, Stephanie Bellino, Heather Carr, Antonio Diaz, Barbara Dirito, Heather Dison, Darlene

SW_00001911

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 104 of
971
Case 1:16-cr-00054-WJM Document 176-3 Filed 10/13/17 Page 8 of 10

TCD Digital Forensic Report                                                 Request #863

Dixon, Joyce Dockins, Bobbie Hills, Kenneth Jackson, Byanca Johnson, Ayanna Jones, James Jones, Tyson
Jones, Von Jones, Dennis Miller, Amanda Powell, Cynthia Powell, Joyce Powell, Kortni Robinson, David Smith,
Jamain Smith, Jerome Smith, Joseph Smith, Judy Smith, Kelly Smith, Michael Smith, Patrick Smith, and Terrell
Smith.  The search hits are provided as Attachment 2 and Attachment 3.

SW_00001912

Case No. 1:16-cr-00054-WJM Document 528-1 Filed 12/12/19 USDC Colorado pg 105 of
971
Case 1:16-cr-00054-WJM Document 176-3 Filed 10/13/17 Page 9 of 10

TCD Digital Forensic Report                                                                 Request #863

## Definitions

*Cookies*: A small file that a remote Web host writes on the hard drive of a person browsing the Web site. Cookies may contain a variety of information, including the date the user (or the user's machine) last visited the site, which pages were viewed on previous visits, a username or password if required for access to the site, and IP address history. A cookie may also contain any personal information (such as name, address, or credit card number) voluntarily disclosed to the Web site by the user; in these cases, the Web site can use the cookie to tie browsing activity to a specific individual. A user's browser may be configured to refuse cookies. In addition, because cookies are files, the user can delete them.

*Forensic Acquisition*:  Data acquired using forensic methods.  Forensic acquisitions can be either physical, when a bit stream duplicate of the original data is collected, or logical, when only specific files are collected.

*HTML*: Hypertext Markup Language. The language used to create and define a Web page. This language is used to define the locations and characteristics of each element of the page.

*Index Data File*: A database file (index.dat) used to manage, among other things, Microsoft Internet Explorer (IE) browser functions. Multiple index data files exist for indexing different content—cache files, visited URLs, cookies, etc.

*Internet Cache*: Files that the Web browser saves onto the hard drive to maximize the efficiency and speed of Web browsing. These files contain the individual component files such as HTML pages and images that make up Web pages.

*Internet Explorer Compatibility View List*: The Compatibility View List contains websites known to have problems when viewed with Internet Explorer, most likely because the websites are programmed using outdated Internet industry standards.  Before displaying a webpage, Internet Explorer checks to see whether the domain name of the website appears in the Compatibility View List.  If so, the site is displayed using Internet Explorer's Compatibility View.

*Orphan File*:  A file whose parent folder has been overwritten.  The file's record in the file table points to the parent folder, but the record for the parent folder no longer has the correct information.

*Unallocated Space*: Data storage areas available for use by the computers.  The areas may already contain previously stored information.

*Windows Registry*: A central hierarchical database used in Microsoft Windows operating systems used to store information that is necessary to configure the system for one or more users, applications and hardware devices.

SW_00001913

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 106 of
Case 1:16-cr-00054-WJM Document 176-1 Filed 10/13/17 Page 10 of 10
971

TCD Digital Forensic Report                                                          Request #863

## Attachments

1.  File Listing
2.  Unallocated Search Hits – Students
3.  Unallocated Search Hits – Department of Corrections
4.  Q0001 History Records
5.  Q0002 Corrupt Cookie File
6.  Q0003 Cookie Details
7.  Q0003 Cookie Files
8.  Q0003 HTML Exports
9.  Q0004 History, Cache, and Cookie Records
10. Q0004 Cookie Details
11. Q0004 Cookie Files
12. Q0004 HTML Exports
13. Q0007 History, Cache, and Cookie Records
14. Q0007 Cookie Details
15. Q0007 Cookie Files
16. Q0007 HTML Exports
17. Q0021 History, Cache, and Cookie Records
18. Q0021 Cookie Details
19. Q0021 Cookie Files
20. Q0021 HTML Exports
21. Q0021 Internet Shortcut Details
22. Q0021 Internet Shortcut Files

[1] [root]/System/Library/CoreServices/SystemVersion.plist
[2] [root]/Library/Preferences/SystemConfiguration/preferences.plist
[3] [root]/Library/Preferences/.GlobalPreferences.plist
[4] System or default profiles are not listed.
[5] [root]/Applications
[6] [root]/Users/ayannajones/Library/Assistants/Send Registration.setup
[7] HKEY_LOCAL_MACHINE\Software\Microsoft\Windows NT\CurrentVersion\ProductName
[8] HKEY_LOCAL_MACHINE\Software\Microsoft\Windows NT\CurrentVersion\InstallDate
[9] HKEY_LOCAL_MACHINE\System\ControlSet001\Control\ComputerName\ComputerName\ComputerName
[10] HKEY_LOCAL_MACHINE\Software\Microsoft\Windows NT\CurrentVersion\RegisteredOrganization
[11] HKEY_LOCAL_MACHINE\Software\Microsoft\Windows NT\CurrentVersion\RegisteredOwner
[12] HKEY_LOCAL_MACHINE\System\ControlSet001\Control\Windows\ShutdownTime
[13] HKEY_LOCAL_MACHINE\System\ControlSet001\Control\TimeZoneInformation
[14] [root]/Program Files or [root]/Program Files (x86)
[15] HKEY_LOCAL_MACHINE\Software\Microsoft\Windows NT\CurrentVersion\CSDVersion

SW_00001914

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM

UNITED STATES OF AMERICA,

> Plaintiff,

v.

**2. TRAMMEL THOMAS**

> Defendant

---

## MOTION TO SUPPRESS #1

---

The Defendant through counsel Daniel T. Smith and Thomas E. Goodreid, requests that the Court enter an order suppressing from use at any hearing or trial in this matter any and all evidence seized from the Defendant on or about August 30, 2012, in Tempe, Arizona. As grounds therefore the Defendant states as follows:

1. In the early morning hours of August 30, 2012, in the city of Tempe, Arizona, the Defendant was contacted by Officer Seal of the Tempe, Arizona Police Department. Officer Seal reports that he stopped the Defendant for a "civil traffic violation".

2. After certain conversation between Officer Seal and the Defendant, the Defendant was ordered out of the car and ordered to sit on the curb adjacent to the road on which he was stopped.

3. Further questioning ensued, and at this point K-9 Officer Papke arrived with his dog Neo. According to Officer Seal's reports, when he initially encountered the Defendant he detected "a distinct odor of intoxicating beverage". Upon shining his lights on the Defendant, the officer reportedly observed bloodshot and watery eyes.

4. Officer Seal states that his attention was initially drawn to the car that the Defendant was driving because it was "drifting left to right within its lane".

5. It is important to note that prior to K-9 Officer Papke's arrival, there is no mention or any indication in Officer Seal's reports of any suspicion of illicit drugs being involved in the situation.

6. Officer Papke reports that upon his arrival he directed his dog "Neo" to walk around the car and the dog "alerted" indicating the presence of a controlled substance. When placed in the car the dog alerted initially on the center console area between the two front seats of the vehicle.

7. When Officer Seal had initially contacted the Defendant, Seal says that he saw a plastic bag in the backseat of the car, which bag, appeared to contain some 50 credit cards. Officer Seal obviously wanted to see the bag and he asked the Defendant to show it to him. Officer Seal reports that the Defendant handed him an empty bag only after placing the bag with the cards on the floorboard of the vehicle.

8. The two Tempe police officers then searched the entirety of the interior of the vehicle. They recovered a glass containing liquid that smelled of alcohol, a small quantity of a green leafy substance and the baggie containing some 52 master card debit/credit cards. The officers also seized a pink Sony Vaio laptop computer.

9. In Officer Seal's report he states that during the search of the interior of the car, he also found a wallet that he believed belonged to the Defendant. It appears from the report, that Officer Seal seized the wallet but did not search its contents at that time.

10. Officer Seal then reports that he placed the Defendant under arrest for possession of marijuana and for having an open container of alcohol in the passenger compartment of a vehicle.

11. Officer Seal then reports that he searched the wallet and seized a credit card in the name of "Manuel Abate".

12. As referenced in paragraph 8 above, on August 30, 2012, a Sony Vaio laptop computer was seized from the vehicle that the Defendant had been driving. Apparently this computer subsequently was stored with the Tempe, Arizona police department.

Case No. 1:16-cr-00054-WJM  Document 528-1  filed 12/12/19  USDC Colorado  pg 109 of
Case 1:16-cr-00054-WJM  Document 181  Filed 10/20/17  Page 3 of 5
971

13. Attached hereto and incorporated herein as Exhibit A, is a copy of the search and seizure warrant, the application and affidavit in support thereof, as well as other associated documents from the  United States District Court for the District of Arizona which, relate, to the laptop computer.  It is stated in attachment A to the search warrant, that the computer was located at the Tempe police department, 120 E. 5th St. Tempe, Arizona.  The application and affidavit as well as the search warrant are dated February 8, 2013, over five months after the seizure.

### ARGUMENT

14. The Defendant does not challenge the legality of the initial stop.  It is obvious from a review of Officer Seal's report, that based upon the Defendant's operation of the automobile, Officer Seal suspected that the Defendant's conduct was not normal and was being affected in all probability by alcohol.  Consistent with this hypothesis,  Officer Seal reports that upon contacting the Defendant,  Seal smelled the odor of alcohol and observed the Defendant's eyes to be bloodshot and watery.

15. It is at this point however, that Officer Seal  abandoned his driving under the influence investigation.  At no time did he ask the Defendant to perform any coordination maneuvers or request to test his breath or blood for alcohol content.  Instead, after observing what he believed to be a large number of credit cards inside the car, Officer Seal's focus changed from the Defendants errant driving to the cards.  Seals asked  the Defendant to give Seals the cards.  The Defendant did not comply with the request, so Officer Seal employed his plan B.

16. Officer Papke arrived and immediately the investigation turned to one involving illicit drugs.  Up until this point, there had been no mention nor hint in Officer Seal's reports that he had any indication or reasonable cause to believe illegal drug possession or use was occurring.

17. It is the position of the Defendant that at the point when Officer Seals abandoned his investigation of the driving offense that the continued detention of the Defendant became illegal.

18. It is further the position of the Defendant that Officer Seals' use of the drug detection dog Neo was an illegal effort to try to gain some justifiable reason to search the interior of the car.

19. Warrantless searches are presumptively illegal. See *Arizona v. Gant* 556 U S 332 (2009). When law enforcement has stopped a driver for a suspected traffic violation, the period of time to conclude that matter has been determined to be a reasonable detention period.   However once the purpose for which the stop was initiated has been completed or reasonably should have been completed, the detention should cease. *U.S. v. Caballes* 125 S.Ct. 834 (2005)

20. In this instance, once the legal justification for the stop having expired the ensuing search was a violation of the Defendant's 4th Amendments rights. *Rodriquez v. U.S.* 135 S.Ct. 1609 (2015) and *U.S. v. Hawley* 660 Fed. Appx. 702 (10th Cir. 2016).

21. As previously referenced in paragraphs 8,12, and 13, the Tempe police also seized the Sony Vaio laptop computer at the time of the car search.  For the reasons previously stated, that seizure was illegal and thus its retention by the Tempe police department for some five plus months was also illegal.

22. The fact that federal agents in February of 2013 obtained a search warrant for the laptop (Exhibit A), does nothing to remove the taint that emanated from the original seizure.  The original taking was illegal and no subsequent actions can cure that illegality. *Wong Sun v. U.S.* 83 S.Ct. 87 (1963).


The Defendant requests that the Court schedule an evidentiary hearing prior to trial in this matter where the government  produce its witnesses to the above detention and search and where the Defendant can challenge that evidence.


Dated this 20th  day of, October , 2017

s/ Daniel T. Smith
Daniel T. Smith
1900 Grant St. #580
Denver, Colorado 80203
Telephone: 303 860 8100
Fax: 303 860 8018
danieltsmith@qwestoffice.net

Thomas Edward Goodreid
1801 Broadway #1400
Denver, Co. 80202
303 296 2048
303 292 0522
Email: t.goodreid@comcast.net
Attorneys for Tramell Thomas

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 20th, 2017 the foregoing **MOTION TO SUPPRESS #1** was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all counsel of record:

s/ Daniel T. Smith

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Arizona

AGEN

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.   13-041 MB |
| (1)   **Sony VIOA Laptop Computer** | ) |
|       **Pink in Color, Model PCG3G5L** | ) |
|       **Serial No. 00148134168911** | ) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

      An application by a federal law enforcement officer or an attorney for the government requests the search

*(identify the person or describe the property to be searched and give its location)*:
      See Attachment A – Location to Collect and Seize Evidence

      The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
      See Attachment B – Item to be Seized and Searched, and the Affidavit Submitted in Support of the Application for the Search and Seizure Warrant Which is Incorporated by Reference Herein

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before     *February 22, 2013*
                                                                  *(not to exceed 14 days)*

  ☑ in the daytime 6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been established.

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge *on criminal duty in Dist. of AZ.* *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.

                                   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   *February 8, 2013 @ 11 AM*        _____
                                                           *Judge's signature*

City and state:    Phoenix, Arizona            Honorable Michelle H. Burns, U.S. Magistrate Judge
                                                                  *Printed name and title*

EXHIBIT
A

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A - LOCATION TO COLLECT EVIDENCE

The following computer is presently stored within the Tempe Police Department offices located at 120 East 5th Street, Tempe, Arizona, 85281:

(1)     Sony VIOA Laptop Computer, Pink in Color, Model PCG3G5L, Serial No. 00148134168911, Stored Under Tempe Police Department Case No. 12-111699, and Bearing Evidence Tag No. TE122315-1.

The computer may only be collected and seized with the consent and assistance of the Tempe Police Department.

## ATTACHMENT B – ITEM TO BE SEIZED AND SEARCHED

1.　　All records contained in the following computer and any internal storage medium contained within, or attached to the computer:

(1)　　Sony VIOA Laptop Computer, Pink in Color, Model PCG3G5L, Serial No. 00148134168911, Stored Under Tempe Police Department Case No. 12-111699, and Bearing Evidence Tag No. TE122315-1.

hereinafter the "COMPUTER," relating to violations of 20 U.S.C. § 1097 (Financial Aid Fraud), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 641 (Theft of Government Funds), 18 U.S.C. § 1001 (False Statements), 18 U.S.C. § 1341 (Mail Fraud) and 18 U.S.C. § 1343 (Wire Fraud), committed by Heather Carr and/or Tramell Thomas, and occurring during the period of January 1, 2010 through August 30, 2012, including:

2.　　Financial aid applications, financial aid worksheets, financial aid records, tax records, and any other documentation containing the names or personal identifying information for any person related to the subject fraudulent student financial aid scheme in violation of the aforementioned statutes.

3.　　Records and information containing items such as personal identifiers not belonging to Heather Carr or Tramell Thomas, IP addresses, electronically stored financial aid applications in names other than Heather Carr or Tramell Thomas, all related to financial aid fraud, in whatever digital form and by whatever means they may have been created or stored.

4.    Bank records, checks, including canceled checks, receipts of deposit or withdrawal, and bank statements.

5.    Employment records or documents pertaining to sources of income.

6.    Telephone bills, business cards, debit card records, credit card records, message books, notes, calendars and appointment books.

7.    Evidence in any format of passwords, user identifications, login identifications that may allow or control access to a computer operating system, individual computer files, or websites.

8.    Indicia of occupancy, residency, rental and/or ownership of the premises located at 1822 East Kaibab Drive, Chandler, Arizona 85249, the residence of Heather Carr or Tramell Thomas.

9.    Any and all digital documentation of debit cards, credit cards, banking information, loan documents, personal identifiers, etc, in the names used in furtherance of a student aid fraud scheme including but not limited to Heather Carr and Tramell Thomas.

10.    For the COMPUTER whose collection and seizure is authorized by this warrant, any:

a.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and

2

correspondence;

   b.     evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c.     evidence of the lack of such malicious software;

   d.     evidence of the attachment to the COMPUTER to other storage devices or similar containers for electronic evidence;

   e.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

   f.     evidence of the times the COMPUTER was used;

   g.     passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

   h.     documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

   i.     records of or information about Internet Protocol addresses used by the COMPUTER;

   j.     records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

3

k.      contextual information necessary to understand the evidence described in this attachment.

l.      Internal or connected routers, modems, and network equipment used to connect the COMPUTER to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

4

AGENT

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

In Re:

Search Warrant For:

(1)    Sony VIOA Laptop Computer
Pink in Color, Model PCG3G5L
Serial No. 00148134168911

13-041 MB

ORDER TO SEAL

(Under Seal)

Based upon the Motion of the United States of America, and good cause appearing,

IT IS ORDERED that the Application and Affidavit for the Search and Seizure Warrant, the Motion to Seal and this Order are hereby sealed on the grounds that disclosure would jeopardize an ongoing investigation and should remain sealed until further order of this Court.

DATED this 8ᵗʰ day of February, 2013.

MICHELLE H. BURNS
United States Magistrate Judge

1   JOHN S. LEONARDO
    United States Attorney
2   District of Arizona

3   FREDERICK A. BATTISTA
    Assistant U.S. Attorney
    Maryland State Bar Member
    Two Renaissance Square
4   40 N. Central Avenue, Suite 1200
    Phoenix, Arizona 85004-4408
5   Telephone: (602) 514-7500
    Fred.Battista@usdoj.gov

6

7                    UNITED STATES DISTRICT COURT

8                         DISTRICT OF ARIZONA

9   In Re:                                13-041 MB

10  Search and Seizure Warrant For:       MOTION TO SEAL SEARCH WARRANT
                                          APPLICATION AND AFFIDAVIT
11  (1)   Sony VIOA Laptop Computer
          Pink in Color, Model PCG3G5L         (Filed Under Seal)
12        Serial No. 00148134168911

13

14       The United States of America moves this Court for an Order sealing the Application and

15  Affidavit for the Search and Seizure Warrant, the Motion to Seal and the Order to Seal in this

16  matter, on the grounds that disclosure would jeopardize an ongoing investigation.

17       Respectfully submitted this 6th day of February, 2013.

18

19                                        JOHN S. LEONARDO
                                          United States Attorney
20                                        District of Arizona

21

22

23                                        FRED BATTISTA
                                          Assistant United States Attorney
24

25

26

27

28

Case No. 1:16-cr-00054-WJM Document 535-18 filed 12/12/18 USDC Colorado pg 121 of 971
Case No. 1:16-cr-00054-WJM Document 525-18 filed 12/12/18 USDC Colorado pg 121 of 971
AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Arizona

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched)* | ) |
| | ) Case No. 13-041 MB |
| (1) Sony VIOA Laptop Computer | ) |
| Pink in Color, Model PCG3G5L | ) |
| Serial No. 00148134168911 | ) |

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Brandon Lewis, a Special Agent with the U.S. Department of Education, Office of Inspector General - Investigation Services, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property *(describe the property to be searched and give its location)*:

### See Attachment A - Location to Collect and Seize Evidence

located in the _____ District of _____ Arizona _____ , there is now stored
*(Describe the property to be seized)*:

### See Attachment B – Item to be Seized and Searched

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

&#9746; evidence of a crime;

&#9746; contraband, fruits of crime, or other items illegally possessed;

&#9746; property designed for use, intended for use, or used in committing a crime;

&#9744; a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Sections | Offense Descriptions |
|---|---|
| 18 U.S.C. §§ 371, 641, 1001, 1341 & 1343 | Conspiracy, Theft of Government Funds, False Statements, Mail Fraud and Wire Fraud |
| 20 U.S.C. § 1097 | Financial Aid Fraud |

The application is based on these facts:

### See Attached Affidavit Incorporated by Reference Herein

Continued on the attached sheet.

&#9744; Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Frederick A. Battista   *FAB*

_____
*Applicant's signature*

*Brandon D. Lewis     Special Agen*
*Printed name and title*

Sworn to before me and signed in my presence.

Date: *February 8, 2013*

_____
*Judge's signature*

City and state: Phoenix, AZ

Michelle H. Burns, U.S. Magistrate Judge
*Printed name and title*

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/12/18 USDC Colorado pg 122 of
971
Case 1:16-cr-00054-WJM Document 181 Filed 10/20/17 Page 11 of 369

## ATTACHMENT A - LOCATION TO COLLECT EVIDENCE

The following computer is presently stored within the Tempe Police Department offices located at 120 East 5th Street, Tempe, Arizona, 85281:

(1)    Sony VIOA Laptop Computer, Pink in Color, Model PCG3G5L, Serial No. 00148134168911, Stored Under Tempe Police Department Case No. 12-111699, and Bearing Evidence Tag No. TE122315-1.

The computer may only be collected and seized with the consent and assistance of the Tempe Police Department.

## ATTACHMENT B – ITEM TO BE SEIZED AND SEARCHED

1.     All records contained in the following computer and any internal storage medium contained within, or attached to the computer:

(1)     Sony VIOA Laptop Computer, Pink in Color, Model PCG3G5L, Serial No. 00148134168911, Stored Under Tempe Police Department Case No. 12-111699, and Bearing Evidence Tag No. TE122315-1.

hereinafter the "COMPUTER," relating to violations of 20 U.S.C. § 1097 (Financial Aid Fraud), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 641 (Theft of Government Funds), 18 U.S.C. § 1001 (False Statements), 18 U.S.C. § 1341 (Mail Fraud) and 18 U.S.C. § 1343 (Wire Fraud), committed by Heather Carr and/or Tramell Thomas, and occurring during the period of January 1, 2010 through August 30, 2012, including:

2.     Financial aid applications, financial aid worksheets, financial aid records, tax records, and any other documentation containing the names or personal identifying information for any person related to the subject fraudulent student financial aid scheme in violation of the aforementioned statutes.

3.     Records and information containing items such as personal identifiers not belonging to Heather Carr or Tramell Thomas, IP addresses, electronically stored financial aid applications in names other than Heather Carr or Tramell Thomas, all related to financial aid fraud, in whatever digital form and by whatever means they may have been created or stored.

4.    Bank records, checks, including canceled checks, receipts of deposit or withdrawal, and bank statements.

5.    Employment records or documents pertaining to sources of income.

6.    Telephone bills, business cards, debit card records, credit card records, message books, notes, calendars and appointment books.

7.    Evidence in any format of passwords, user identifications, login identifications that may allow or control access to a computer operating system, individual computer files, or websites.

8.    Indicia of occupancy, residency, rental and/or ownership of the premises located at 1822 East Kaibab Drive, Chandler, Arizona 85249, the residence of Heather Carr or Tramell Thomas.

9.    Any and all digital documentation of debit cards, credit cards, banking information, loan documents, personal identifiers, etc, in the names used in furtherance of a student aid fraud scheme including but not limited to Heather Carr and Tramell Thomas.

10.   For the COMPUTER whose collection and seizure is authorized by this warrant, any:

a.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and

2

correspondence;

b.　　evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.　　evidence of the lack of such malicious software;

d.　　evidence of the attachment to the COMPUTER to other storage devices or similar containers for electronic evidence;

e.　　evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.　　evidence of the times the COMPUTER was used;

g.　　passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.　　documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.　　records of or information about Internet Protocol addresses used by the COMPUTER;

j.　　records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

3

k.      contextual information necessary to understand the evidence described in this attachment.

l.      Internal or connected routers, modems, and network equipment used to connect the COMPUTER to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

4

## SWORN AFFIDAVIT OF BRANDON LEWIS

I, Brandon Lewis, being duly sworn, depose and state:

I.      INTRODUCTION

    A.      Professional Background

1.      I am a Special Agent with the United States Department of Education (ED), Office of Inspector General (OIG) - Investigation Services (ED-OIG). I am presently based in Phoenix, Arizona, but am also assigned to investigate allegations of fraud occurring in the Western Region of the United States, including, but not limited to, California, Colorado, and New Mexico. I have been employed in this position since May, 2010.

2.      Prior to my employment with ED-OIG, I graduated from the United States Postal Inspection Service law enforcement academy where I received instruction regarding the investigation of mail fraud and other federal criminal offenses. Upon graduating from the academy, I was employed as a Postal Inspector and as Special Agent with the Bureau of Land Management for nearly six years and conducted complex white-collar fraud investigations. During nearly nine years as a federal agent, I have been the affiant on numerous search warrants, most of which included the search and seizure of computers and electronic storage devices that were used to store, process, and transmit data during the commission of various fraud schemes.

3.      As part of my official duties as a Special Agent, I am authorized to conduct investigations in connection with the enforcement and administration of all laws, regulations,

1

orders, contracts, and programs to which ED is or may be a party of interest, and to perform other duties on behalf of the Secretary of Education. As a Special Agent, I have participated in investigations of various types of crimes including grant fraud, student loan fraud, and mail fraud. I have also worked closely with, and learned from, other federal agents who are experienced in investigating criminal cases, making arrests, executing search warrants, and in the seizure, acquisition, and recovery of electronically-stored evidence.

4.    Based on my training and experience and through my personal participation, as well as information received from other law enforcement sources, I have become familiar with the facts and circumstances of this investigation. The information set forth in this affidavit reflects my personal knowledge or has been provided to me by my colleague, Special Agent Sandra Ennis, who told me she received some of this information from other law enforcement agencies, sources, victims, and other interested parties who have themselves obtained the information and subsequently reported it to her. Special Agent Sandra Ennis also received information through the review of various database searches and institutional documents. Conclusions set forth below are the result of the investigation as communicated to me by Special Agent Sandra Ennis and do not purport to set forth all of her knowledge into this matter. This affidavit is presented for purposes of establishing a basis for a search and seizure warrant to seize and search the digital evidence in the form of a Sony Vaio laptop computer that is currently in the custody of the State of Arizona's Tempe Police Department as further described in Attachment A - Location to Collect and Seize Evidence and

2

Attachment B - Item to be Seized and Searched, incorporated by reference herein. As detailed below, I have probable cause to believe records kept on this computer are evidence of fraud perpetrated by Heather Carr and/or Tramell Thomas.

II.     OVERVIEW OF THE ALLEGED CRIME

5.      This investigation began in approximately December, 2011, when the Financial Aid Director of Pikes Peak Community College in Colorado Springs, Colorado, reported to ED-OIG that the school had received student enrollment and Federal Student Aid (FSA) financial aid applications for approximately sixteen (16) students who represented themselves as residing in the Colorado Springs, Colorado area. Indications of fraud with respect to these sixteen (16) applications included common last names, common mailing addresses, representations of zero income, and multiple dependent family members.

6.      A review of various law enforcement databases, including an inmate search of the various state Department of Corrections (DOC) websites for these applicants, disclosed that all sixteen (16) applicants were incarcerated at various DOC facilities located in Arizona, Colorado, Illinois, Ohio, and Florida and would therefore be ineligible to receive FSA.

7.      Further investigation into the initial complaint from Pikes Peak Community College disclosed from approximately January, 2010 through the present, approximately two-hundred and thirty-five (235) FSA applications were electronically submitted for potential enrollment at various community colleges in Colorado and Arizona. All but twenty-one (21) of these two hundred and thirty five (235) individuals listed as applicants

3

are currently incarcerated at various DOC facilities and were incarcerated during the electronic submission of these FSA applications. Five (5) of these twenty-one (21) individuals are former inmates from the Colorado Department of Corrections. These applicants received or attempted to receive FSA for which they are not eligible. Many of these applicants shared similar course enrollments and fell into similar patterns such as entering zero income and multiple dependents on their Free Application for Federal Student Aid (FAFSA). Many of these electronically submitted applications shared the same mailing addresses and many of the same characteristics including the same FSA Personal Identification Number (PIN) and FSA PIN challenge question and answer. These are all indicators of potential FSA fraud.

8.      The Internet is a global network of computers and other devices. Every device on the Internet is identified by a unique number called an Internet Protocol, or "IP" address. This number is used to exchange even the smallest amount of information. Accordingly, when one computer requests information from a second computer, the requesting computer specifies its own IP address so that the responding computer knows where to send its response. An IP address is analogous to a telephone number.

9.      Based on IP activity and corresponding physical addresses obtained, there is probable cause to believe individuals residing at 1822 East Kaibab Drive, Chandler, Arizona 85249 (Heather Carr and Tramell Thomas), have electronically submitted FAFSA and Master Promissory Note (MPN) applications using the identities of individuals to receive or attempt

4

to receive FSA funds. It appears that upon obtaining the identifying information of approximately two-hundred and fourteen (214) prison inmates from various Department of Corrections (DOC) locations, either through consent or from the unlawful procurement of this information, Carr, Thomas, and others, known and unknown to this investigation, have knowingly enrolled or attempted to enroll prison inmates at community colleges in Colorado and Arizona and filed applications on their behalf for FSA.

10.     As explained more fully below, FSA funds are normally disbursed on behalf of the student to the school. The school applies the funds to the student's account at the school, and any award amount that exceeds the cost of tuition and fees is normally given directly to the student, by the school in the form of a refund. The student's refund can be used to assist the student in paying for living expenses while attending school. Refunds are disbursed in the form of a debit card, a check, or electronic transfer to an outside account.

11.     To date, approximately $562,466.00 in FSA funds have been disbursed to various community colleges under false pretenses, resulting in approximately ninety-one (91) of the potential two hundred and thirty five (235) applicants receiving FSA refunds in the form of a debit card. Approximately $247,676.10 in debit card refunds has been mailed to applicants at one of approximately forty (40) suspect addresses. Although the applicants use different mailing addresses, IP activity collected from ED disclosed applications submitted for approximately seventy-two (72) individuals has traced back to 1822 East Kaibab Drive, Chandler, Arizona 85249, which is the residence of Carr and Thomas.

5

III.    OVERVIEW OF THE STUDENT AID PROGRAM

   A.    Student Aid Eligibility

   12.    In order to be eligible for Federal Financial Assistance under Title IV of the Code of Federal Regulations, including funding under the Federal Pell Grant Program and Federal Family Education Loan (FFEL) programs, students are required to meet federal eligibility requirements, which include among others that the student:

   a.    Is a regular student enrolled, or accepted for enrollment, in an eligible program at an eligible institution (34 C.F.R. § 668.32 (a)(2)).

   b.    For purposes of the FFEL and Direct Loan Programs, is at least a half-time student.

   c.    For the purposes of the Federal Pell Grant Program, Federal Perkins Loan, FFEL, and Direct Loan Programs, is not incarcerated in a Federal or State penal institution (34 C.F.R. §§ 668.32 (c)(2) and 668.32 (c)(3)).

   13.    Students apply for the above listed federal financial aid programs each academic year by submitting a FAFSA which contains material representations pertaining to the student's need and eligibility, such as income level, dependency status, and marital status.  The student may mail the FAFSA to an ED processing center or transmit it electronically via the Internet.  Alternatively, the school may electronically transmit the FAFSA to a processing center contracted with ED.  Processing of the FAFSA occurs at the Central Processing System (CPS), which is located in Plano, Texas.  After processing is

6

complete, the CPS produces output documents or records that show the information the student originally provided. Colleges may require additional supporting documentation relating to an individual's application for financial aid for verification purposes.

14.     Information captured on the FAFSA at the time of the on-line application, includes name, date of birth, SSN, address, telephone number, email address, and IP address. The CPS uses the application data to calculate the Expected Family Contribution (EFC), which is used to determine financial aid eligibility and amount of aid to be awarded. Relying on representations made on the FAFSA, ED determines how much the student and/or the student's family is able to pay towards the cost of attendance. Schools award financial aid based on or up to the cost of attendance and offer those funds to students at the beginning of each enrollment period. Students may elect to receive all or a portion of their financial aid award, and must notify the school of their decision.

15.     After a student accepts his or her financial aid award, FSA funds are normally disbursed on behalf of the student to the school where the student is enrolled. The school applies the funds to the student's account at the school, and any award amount that exceeds the cost of tuition and fees is normally given directly to the student, by the school, in the form of a refund. As noted, refunds are disbursed in the form of a debit card, a check, or electronic transfer to an outside account. If issued a refund check, the school will mail the check to the student's address on record with the school or it can be picked up in person, depending on the school's internal procedures.

7

16.     Should an individual falsify information relating to obtaining a high school diploma or its equivalent, fail to complete courses or withdraw from courses, or fail to maintain satisfactory academic progress, the individual would become ineligible for further federal financial aid and would be required to repay any funding previously received. The accuracy of the information provided by the individual during the application process is important because it is used to determine eligibility for federal financial aid. The FAFSA also includes a warning that by purposely providing false and misleading information, the applicant may receive a fine up to $20,000, a prison sentence, or both.

B.     Federal Loan Programs and Colorado Community Colleges

17.     The Colorado Community College System (CCCS) operates a website called www.ccconline.org. This website allows a prospective student to create an on-line account which collects basic information such as name, address, email address, telephone number, and Social Security Number required for admission to all community colleges in Colorado. Community colleges within the CCCS deliver some of their courses in an on-line distance learning format.

18.     It is the policy of community colleges in the CCCS to use a contracted vendor, "Higher One" to process the student's financial aid refunds. CCCS students can receive their refund from Higher One in three ways: (1) Easy Refund – the funds will be available within 24 hours to the student in the form of a Higher One Bank debit card that is mailed to the student's address; (2) EFT Transfer – Higher One will electronically wire the refund to the

8

student's own independent bank account within 2-3 business days; or (3) Paper Check – Higher One will prepare and mail a paper check for the refund within 21 days. A paper check will automatically be issued if the Higher One card is never activated.

IV.    Execution of Search Warrant at 1822 East Kaibab Drive, Chandler, Arizona 85249.

19.    On November 27, 2012, United States Magistrate Judge Bridget Bade authorized a search warrant for the premises of 1822 East Kaibab Drive, Chandler, Arizona 85249. Case No. 12-7626MB. This warrant was executed by Special Agents from ED-OIG, Postal Inspectors from the United States Postal Inspection Service (USPIS), and entry assistance from Chandler Police Department. Investigation and information received from the United States Postal Service (USPS) confirmed Carr and Thomas were residing at 1822 East Kaibab Drive, Chandler, Arizona 85249.

20.    During search warrant entry, law enforcement officers made repeated knock and announce attempts requesting that occupants of the premises answer the door. After a lengthy delay and the use of a flash bang device, the door was answered by one of the occupants. Upon entry into the premises, law enforcement officers discovered pieces of paper floating in the toilet and a destroyed cell phone in one of the master bedroom closets. These items were taken into evidence and a later review of the scraps of paper disclosed common FSA acronyms such as FAFSA, MPN (Master Promissory Note), and SAR (Student Aid Report) written on the various scraps of paper. The name Byanca Johnson was also written on one of the scraps of paper. Johnson is currently incarcerated in the Florida DOC.

9

21.     Evidence recovered at the search warrant premises connect Carr and Thomas to the allegations of FSA fraud occurring at community colleges located in Arizona and Colorado. Specifically, various Pikes Peak Community College application documents that were in the names of incarcerated individuals, documents containing personal identifying information for prison inmates, and/or for other individuals not known to reside at 1822 East Kaibob Drive, Chandler, Arizona 85249, were found in the premises.

22.     This search warrant, recorded under Case No. 12-7626MB, remains under seal.

V.      Evidence Associated with the Arrest of Tramell Thomas

23.     On or about December 6, 2012, the Financial Aid Director of Pikes Peak Community College advised Special Agent Sandra Ennis that the CCCS office had been contacted by Tempe Police Department Sergeant Rick Vasquez.

24.     On or about December 6, 2012, communication with Sergeant Vasquez conveyed Tempe Police Department arrested Tramell Thomas for possession of marijuana and an open container of alcohol in the passenger compartment of a vehicle on or about August 30, 2012. Initially, Thomas had been stopped for a traffic violation.

25.     During initial contact with Thomas, the arresting officer observed a Ziploc baggie with what appeared to be approximately fifty (50) credit cards in the back seat of the vehicle. The arresting officer asked Thomas what was in the bag and pointed toward the back seat. The arresting officer asked for Thomas to hand him the bag. Thomas replied "Sure" and grabbed the bag containing what appeared to be credit cards and placed the bag

10

on the floorboard.  Thomas then picked up an empty Ziploc bag that was already on the floorboard.  Thomas handed the arresting officer the empty bag.

26.     Back up was requested and the arresting officer asked the backup officer to have the narcotic detection K9 do an exterior sniff of the vehicle based on Thomas' suspicious behavior.  The K9 alerted on the driver door by scratching on it.  With the exterior alert, the K9 was sent into the vehicle, where the K9 alerted on the center console and the bottom of the rear seat on the passenger side.  As a result of the K9 alerts, a search of the vehicle was conducted.  A usable quantity of marijuana was located in the center console, which led to the arrest of Thomas for possession of marijuana.

27.     During the search of the vehicle incident to Thomas's arrest, a Sony Vaio laptop computer, a described in Attachment A - Item to be Collected and Seized, and the Ziploc baggie containing the fifty-two (52) MasterCard credit/debit cards were located in the back seat of the vehicle.  Each debit card was in a name different than Thomas's and all but two of the debit cards had the name "Colorado Community College System" printed on the top of the card.  Upon Thomas's arrest, the Sony Vaio laptop computer was subsequently impounded for safekeeping.

28.     Tempe Police Department confirmed Thomas's residence as 1822 East Kaibab Drive, Chandler, Arizona 85249.  Investigation and IP activity has disclosed numerous FAFSA and MPN applications using the identities of incarcerated individuals to receive or attempt to receive FSA funds have been electronically submitted from this address. Thomas

11

was driving a vehicle registered to his girlfriend, Heather Carr at the time of his arrest. Carr is also known to reside at 1822 East Kaibab Drive, Chandler, Arizona 85249.

29.　None of the fifty-two (52) debit cards contained in the Ziploc baggie were in the name of Heather Carr or Thomas. When questioned about the fifty-two (52) debit cards, Thomas initially stated that he didn't know what the officer was talking about. Thomas then stated he did not want to talk about it and would not respond to any further questions.

30.　During the search of the vehicle, the officer located the wallet Thomas had removed from his pocket when providing his driver's license. This wallet would accompany Thomas to jail, so a search of the wallet was conducted. The wallet contained several credit cards with Thomas's name on them. Also inside the wallet, was a MasterCard debit card bearing the name "Manuel Abate." This card had the same "Colorado Community College System" printed on it as the other cards in the Ziploc baggie. This debit card, along with all debit/credit cards that did not belong to Thomas, were seized and impounded as evidence.

31.　On or about October 2, 2012, the Financial Aid Director of Pikes Peak Community College provided ED-OIG with names of applicants and students which appeared questionable. Investigation into these applicants disclosed one individual named "Manuel Abate." FSA funds in the amount of $6,138 were disbursed in the name of "Manuel Abate" to attend Pikes Peak Community College. Approximately $4,746.10 was refunded in the name of "Manuel Abate" in the form of a debit card. A search of Manuel Abate through various law enforcement databases and an inmate search of the Florida DOC website

12

disclosed Manuel Abate is currently incarcerated in a Florida DOC facility.

32.     On or about January 8, 2012, a review of IP address data collected from ED websites disclosed an electronic application for "Manuel Abate" traced back to IP address 68.2.27.159. Cox Communications Inc., confirmed subscriber information for IP address 68.2.27.159 to be that of Ayanna Jones at 1822 East Kaibab Drive, Chandler, Arizona 85249. Ayanna Jones is the daughter of Heather Carr.

VI.     Evidence Associated with 1822 East Kaibab Drive, Chandler, Arizona 85249

33.     To date, IP data collected from ED when the student accessed either the FAFSA submission or the FAFSA PIN websites disclosed that applications submitted for approximately seventy-two (72) individuals traced back to the same IP address of 68.2.27.159 which Cox Communications Inc., has confirmed subscriber information for IP address 68.2.27.159 to be that of Ayanna Jones at 1822 East Kaibab Drive, Chandler, Arizona 85249.

34.     Approximately $29,335 in FSA funds in the form of debit cards has been disbursed to twenty-three (23) of the approximately seventy-two (72) applicants using the common IP address of 68.2.27.159. All but three (3) of the seventy-two (72) applicants who have received or attempted to receive FSA funds are currently incarcerated at various DOC facilities and are ineligible to receive FSA funds.

35.     Based on training, experience, and information provided in the aforementioned paragraphs, there is reason to believe that Carr and Thomas are utilizing the identities of

13

incarcerated individuals to electronically apply for FSA that they would be ineligible to receive and that information such as names, Social Security numbers, and dates of birth are maintained by the perpetrators to be used year after year.

VII.   PROPERTY TO BE SEARCHED AND ITEMS TO BE SEIZED

36.   This affidavit is in support of an application for issuance of a search and seizure warrant to seize and search the digital device, i.e. the subject Sony Vaio Laptop computer, found in the back seat of the vehicle that is registered to Carr and that Thomas was driving when he was arrested on August 30, 2012.  I believe there is probable cause that evidence, fruits, and instrumentalities of violations of 20 U.S.C. § 1097 (Financial Aid Fraud), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 641 (Theft of Government Funds), 18 U.S.C. § 1001 (False Statement to a Government Agency), 18 U.S.C. § 1341 (Mail Fraud), and 18 U.S.C. § 1343 (Wire Fraud), will be found on the digital device which is described in Attachment A – Item to be Collected and Seized.

a.   The subject digital device has not been used since it was recovered on August 30, 2012, and was impounded for safekeeping by Tempe Police Department.  The current physical location of where the laptop is being held is Tempe Police Department at 120 East 5th Street, Tempe, Arizona, 85281.

37.   From my background and experience I know that individuals, including persons engaged in illicit activities and/or fraud, frequently retain records of their transactions within their residence, computers, vehicles, and other places under their control.

14

These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, tax documents, school records, and other miscellaneous records. Records of this kind are often stored on computer media.

38.     The forensic examination of a computer will not only reveal IP addresses of additional computers that the seized computer has communicated with, but will also reveal websites visited, including Federal Student Aid (FSA) websites, and electronic communications with other individuals involved in the scheme to defraud the United States Government of FSA monies described above.

VIII.   Search and Seizure of Electronic Devices

39.     Probable cause to search computers: I submit that there is probable cause to believe that records related to the FSA fraud ring will be stored on that computer or storage medium, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

15

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.   In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

40.   Forensic evidence:  As further described in Attachment B -- Item to be Seized and Searched, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence

16

will be on this computer because:

    a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b.     Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

    c.     A person with appropriate familiarity with how a computer works can, after

17

examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer with respect to on-line learning (that is, for financial aid applications, enrollment and coursework), the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be

18

a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

41. Necessity of seizing or copying entire computers or storage media – in most cases, a thorough search for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. Seizure is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination: The site location of the subject laptop computer is the Tempe Police Department in Tempe, Arizona. However, as noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the

19

volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements:  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      Variety of forms of electronic media: Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

42.     Nature of examination:  Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

20

## IX.   CONCLUSION

43.   For the reasons stated above, I believe that probable cause exists to seize and

search the digital device for evidence, fruits, and instrumentalities of violations of 20 U.S.C.

§ 1097 (Financial Aid Fraud), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 641 (Theft of

Government Funds), 18 U.S.C. § 1001 (False Statements), 18 U.S.C § 1341 (Mail Fraud) and

18 U.S.C. § 1343 (Wire Fraud).  Accordingly, I respectfully request that the Court issue the

requested search and seizure warrant.

BRANDON LEWIS
Special Agent
United States Department of Education
Office of Inspector General


Subscribed and sworn to before me this _8th_ day of _February_ , 2013,


MICHELLE H. BURNS
United States Magistrate Judge

21

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/12/19   USDC Colorado   pg 148 of
971
Case 1:16-cr-00054-WJM   Document 195   Filed 10/27/17   USDC Colorado   Page 1 of 16

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No.  16-cr-00054-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**2.**     **TRAMMEL THOMAS,**

      Defendant.

---

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT TRAMELL THOMAS'S "MOTION TO SUPPRESS #1" (ECF NO. 181)

A uniformed patrol officer observed the defendant in a car trying to hide a clear plastic baggie filled with a large stack of debit cards, which the defendant obtained from his scheme to defraud the Department of Education.  The defendant has asked the Court to prevent a jury from seeing this evidence on the grounds that the police extended the stop on a pretext and used the time to get a drug dog to sniff the car.  The defendant ignores the fact that the K-9 officer and dog arrived on the scene three minutes into the stop.  Despite well-established precedent allowing the police to investigate when they witness a crime, the defendant argues that a police officer — who saw the defendant's car drifting in its lane late at night, observed the defendant's bloodshot, watery eyes, and smelled alcohol wafting from his open window, and who saw the defendant deliberately try to hide a large stack of credit cards — did not have reasonable and articulable suspicion to believe that the defendant was drinking and driving and possibly in possession of stolen property.  The police *did* have reasonable suspicion to investigate these crimes, and the defendant's generalized citations to Fourth Amendment cases do not explain why the Court should suppress evidence.

1

Case No. 1:16-cr-00054-WJM Document 528-1 filed 12/11/19 USDC Colorado pg 149 of
971
Case 1:16-cr-00054-WJM Document 198 Filed 10/27/17 USDC Colorado Page 2 of 16

For these reasons, and for the additional reasons set forth below, the United States of

America (the government), by Robert C. Troyer, Acting United States Attorney, through Martha

A. Paluch and Bryan D. Fields, Assistant United States Attorneys, respectfully submits this

response in opposition to Defendant Tramell Thomas's "Motion to Suppress #1" (ECF No. 181)

(hereinafter the "Motion to Suppress").

## I.   SUMMARY OF ISSUES PRESENTED

**1.      Did Tempe Police Officer Jonathan Seal have reasonable and articulable**

**suspicion that the defendant, drifting in his lane, late at night, in a car that smelled of**

**alcohol, was engaged in an alcohol-related traffic violation?**  The answer is "yes."  And, as

set forth in more detail below, this means that the officer had a constitutionally valid reason to

extend the traffic stop to investigate the violation.

**2.      Did Tempe Police Officer Jonathan Seal have reasonable and articulable**

**suspicion that the defendant — who ignored a question about a large bag of credit cards in**

**his back seat and then, when asked to hand that bag to Officer Seal, tried to sweep it onto**

**the floorboard and fob off a separate, empty bag, as the one that was of interest — was**

**engaged in some sort of theft?**  The answer is "yes," and just as with the question above, this

also provided the officer with a constitutionally valid reason to extend the traffic stop to

investigate this violation.

**3.      Was it reasonable for Tempe K-9 Police Officer Jason Papke's certified drug**

**detection dog to sniff the defendant's car when Officer Papke and the dog arrived on the**

**scene soon after the stop and the dog sniff did not independently extend the stop more than**

**was already the case for the investigations described above?**  The answer is "yes."  The dog

sniff did not independently extend the duration of the officer's investigations which were based

2

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/17 USDC Colorado pg 150 of
Case 1:20-cr-00054-WJM Document 155 Filed 10/27/17 USDC Colorado pg 3 of 26
971

on reasonable and articulable suspicion, and was therefore permissible.

      **4.    Did the positive alert of a certified drug detection canine provide probable
cause to search the defendant's car?**  The answer is "yes."  Supreme Court and Tenth Circuit
precedent clearly establishes that a properly trained dog's positive alert provides probable cause
to search a vehicle.  And, under the equally well-established "automobile exception" to the
warrant requirement, probable cause is all that is required for the police to search a car.

      **5.    Was the seizure of the laptop legal, despite the time the laptop was in Tempe
Police Department's custody?**  The answer is "yes."  The Department of Education was
notified on December 6, 2012, of the defendant's arrest and the seizure of the evidence from his
car.  The government obtained a warrant to seize this evidence from the Tempe Police
Department on February 8, 2013, two months later.  The search was not stale as the evidence was
stored in the Tempe Police Department's evidence locker and therefore its location was known.

      **6.    Is the defendant entitled to an evidentiary hearing on his motion to suppress?**
The answer is "no" given the issue presented is a legal, not factual, one.  In addition, the attached
audio and transcript of the stop, along with the officers' reports, provide the Court with the best
evidence to determine the validity of the search of the vehicle.

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/11/19 USDC Colorado pg 151 of
971
Case 1:16-cr-00054-WJM Document 135 Filed 10/27/17 Page 4 of 26

## II.   **FACTUAL PROFFER – THE AUGUST 30, 2012 TRAFFIC STOP**[1]

Uniformed police officer Jonathan Seal was patrolling the streets of Tempe, Arizona

during the wee hours of August 30, 2012, when he saw a white sedan drifting in its lane — a

classic indicator of drunk driving.  While following the sedan as it drifted to and fro, Seal

eventually saw it drift onto the double-yellow line separating the car from oncoming traffic.  Seal

turned on his lights, and pulled the car over.  It was 2:44 in the morning,[2] so he used his spotlight

to illuminate the car, flicked on his flashlight, and walked to the driver's side door.

Officer Seal was greeted by the distinct odor of alcohol wafting from the open window.

Moreover, the driver in the car had the bloodshot and watery eyes common to someone who had

been drinking alcohol.  A check of the driver's license revealed that those eyes belonged to the

defendant, Trammel Thomas.  "I don't drink," he told the officer.  *See* Original Officer

Narrative, MOA_00000463 (**Attachment 2** (MOA_00000452-472)).

Seal suspected he did.  But something else caught Seal's eye.  As he used the flashlight to

---

[1] The proffer in this brief is submitted for the purpose of aiding the Court in making
evidentiary decisions prior to trial.  It is not a full proffer of the evidence the government intends
to present at trial and cannot serve as a basis to challenge the factual sufficiency of the
government's case.  *See, e.g., United States v. Binday*, 908 F. Supp. 2d 485, 490 (S.D.N.Y. 2012)
("'Unless the government has made what can fairly be described as a full proffer of the evidence
it intends to present at trial,' any inquiry into the sufficiency of the evidence or assertions of fact
contrary to those alleged in the indictment is inappropriate.") (quoting *United States v. Alfonso*,
143 F.3d 772, 776-77 (2d Cir. 1998); *United States v. Urso*, 369 F. Supp. 2d 254, 259 (E.D.N.Y.
2005) (finding that government's memorandum, which briefly summarized the anticipated trial
evidence and was submitted for the sole purpose of supporting its motion for pretrial detention,
constituted a "limited proffer," not a "full proffer").

2 Specific times referenced in this proffer are pulled from the Tempe Police
Department's "CAD Call Hardcopy," a contemporaneous log of events created by police
dispatch during the events in question.  It is attached to this report as **Attachment 1**
(MOI_00000490-495) and is referred to in this response as the "CAD report."  Seal initially
stopped the defendant at 2:40 a.m., but then asked the defendant to pull over into a safer location,
which he accomplished at 2:44 a.m..

illuminate the scene and look for other occupants or safety threats in plain view, the beam of the

flashlight caught an unusual sight in the back passenger's seat, just across from the driver and

within his easy reach.  It was a large stack of "credit"[3] cards, clearly identified by a string of

numbers across the plastic face of the card on top and the ubiquitous "MasterCard" logo.  Seal

asked the defendant what was in the bag.  The defendant looked into his backseat, looked back at

Seal, and ignored the question.  Seal then asked the defendant to hand him the bag.  The

defendant moved as if to comply with the request and reached over to the cards.  However,

instead of grabbing the bag and handing it to the officer, he casually swept it onto the floorboard,

grabbed an empty plastic bag that was already on the floor, and handed the officer an empty bag.

The empty-bag ruse immediately raised Seal's suspicion.  Suspecting that he had

stumbled onto something other than a routine stop for driving under the influence, Seal decided

that the stack of credit cards the defendant was trying to sweep away from discovery needed to

be investigated.  Just one minute into the stop, at 2:45 a.m., Seal called dispatch for backup and

dispatch assigned an officer to respond.  However, K-9 officer Jason Papke, who happened to be

closer to the stop and who was listening to the radio traffic, called into dispatch that he would be

responding to the call.  Papke and his trained drug detection canine, "Neo," arrived just two

minutes later, at 2:47 a.m.

By the time Papke arrived at the scene, Seal had decided to remove the defendant from

the car so that he could safely investigate.  Pursuant to police protocol, the defendant was

handcuffed and asked to sit on the sidewalk.  At 2:50 a.m., Seal also began using a handheld

---

3 They were actually debit cards, but "credit card" is the most popular colloquialism for
referring to these devices and Seal's report refers to them as credit cards.  This motion uses the
two terms interchangeably because the credit or debit distinction has no legal significance on the
outcome of this motion.

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/11/17   USDC Colorado   pg 153 of
971
Case 1:16-cr-00054-WJM   Document 195   Filed 10/27/17   Page 6 of 26

audio recorder to record his interactions with the defendant. *See* Audio Recording of August 30,

2012 Traffic Stop, Synched with Transcript (**Attachment 3**) ("Rec.").[4] A few minutes later,

Officer Patrick Shearan, the officer originally assigned by dispatch, also arrived at the scene.

As part of his investigation into the suspected drunk driving, Officer Seal performed a

horizontal gaze nystagmus ("HGN") test, which is a standard field test used to determine

whether someone is impaired. Tr. 8 – 10. The test was negative. However, since he was already

at the scene with K-9 Neo and it would not unreasonably prolong the as-yet-incomplete

investigation into the credit cards, Papke asked Seal if Neo could sniff the car. Seal agreed and,

again pursuant to police protocol, the officers moved the defendant away from the car before

Neo was moved around it. Tr. 11. Out of an abundance of caution, Seal also used this time to

read the defendant his *Miranda* rights before interviewing him about the credit cards. Tr. 12-13.

After the defendant acknowledged that he understood his rights, Seal reminded the

defendant that he had asked to see the bag of credit cards and twice asked the defendant "what's

the deal with those credit cards?" Tr. 13 and 14. The defendant avoided the question each time,

generally protesting the stop and denying having any drugs. While Seal asked these questions,

Papke and Neo walked around the car. As Neo approached the driver's side door, he pawed at

the door — an "alert" that Papke was trained to recognize as a signal that Neo smelled a

substance he was trained to recognize (methamphetamine, marijuana, heroin and cocaine) — and

---

4 This attachment, the synched transcript, will be provided to the Court and counsel this same
date on a disk. The recording begins with Seal using a phonetic alphabet to report the defendant's
name and date of birth to dispatch for the purpose of running routine checks related to the status
of the defendant's license and any outstanding warrants. The CAD Report notes this occurrence
at 2:50 a.m. This means that if the parties or the Court want to determine how long into the stop
something occurred, they can simply add approximately 6 minutes to the time stamp in the
recording (that is, the stop was at 2:44 and the recording started at 2:50, which means that, say, 2
minutes into the recording is 8 minutes into the overall stop).

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 154 of
Case 1:16-cr-00054-WJM Document 135 Filed 10/27/17 Page 7 of 16
971

Papke opened the door.  Tr. 15 (Thomas:  "you got the dog going against my car.").  Inside the

car, Neo pawed at the center console — another "alert" signaling that Neo smelled a drug.  Seal

continued to question the defendant about the credit cards and the defendant continued to avoid

the question, or deny the presence of any credit cards.

After Papke informed Seal of the results of the dog sniff, Seal searched the car.  In the

center console, he found the marijuana that had alerted Neo.  On the front passenger floorboard,

he found a 20-ounce orange plastic cup.  The cup, which was about three-quarters full, smelled

strongly of alcohol and was cold to the touch.  It was also not secured or braced against anything,

which strongly suggested that it was moved onto the floorboard just before the stop in an effort

to hide it and that it would have tipped over if it had been so positioned when the car was

moving.  Finally, Seal found the plastic bag with the credit cards he had seen the defendant try to

hide, along with a laptop computer.

Seal again confronted the defendant with the cards (that Thomas had previously denied

having), but the defendant continued to elide responsibility, either by avoiding questions or by

answering questions with cryptic answers suggesting that the cards were "not a big deal" or that

the officer might understand "if you do my job and what I do."  Tr. 24.  Ultimately, the

defendant was arrested for possession of marijuana and for having an open container of alcohol

in his car.  *See* **Attachment 4** (MOI_00000447-451) at MOI_00000450 (MOI of Officer Seal:

"Having a useable amount of marijuana is a felony arrest-able offense and arrest is not

discretionary" in Arizona).  Because there was no one else with the defendant who could drive

the defendant's vehicle, the vehicle was towed pursuant to Tempe Police Department policy, and

therefore, was subject to an inventory search prior to towing.  *Id.* at 1. The bag of credit cards

and laptop were seized and placed into evidence at the Tempe Police Department.  The

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/12/19   USDC Colorado   pg 155 of
971
Case 1:16-cr-00054-WJM   Document 135   Filed 10/27/17   USDC Colorado   pg 16 of 26

Department of Education was notified of the defendant's arrest and of the evidence seized from
his vehicle on December 6, 2012. **Attachment 5** (MOA_00000452).

III.   **THERE IS NO BASIS TO SUPPRESS THE EVIDENCE BECAUSE A
CERTIFIED DRUG DETECTION CANINE'S ALERT PROVIDED PROBABLE
CAUSE AND THE USE OF THE CANINE DID NOT INDEPENDENTLY OR
UNREASONABLE EXTEND THE TAFFIC STOP**

Officer Seal searched the defendant's car only after a drug dog alerted and gave him
probable cause to believe the car contained contraband. And that dog sniff occurred while Seal
was investigating his reasonable and articulable suspicion that the defendant was a drunk driver
with stolen property. Accordingly, the search was valid and the Court should deny the
defendant's motion.

   A.   **Officer Seal Had Objectively Reasonable and Articulable Suspicion to
Believe that the Defendant was Up to No Good:  He was Drinking and
Driving and He Was Committing a Theft**

The defendant was caught red-handed while transporting the fruits of his fraud scheme:
52 debit cards, all in the names of other people, which names all turned out to be those of prison
inmates. An officer saw that stack of cards in plain view, saw the defendant deliberately try to
hide them, and then watched as the defendant tried to pass off an empty bag as a ruse. Under
these circumstances, Seal had reasonable and articulable suspicion that the defendant was
committing some kind of theft or identity crime. It follows that he had lawful authority to extend
the traffic stop to investigate that crime.

A traffic stop is a "seizure" that is analyzed under the rubric established by the Supreme
Court in *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Doyle*, 129 F.3d 1372, 1375 (10th
Cir. 1997). Here, the defendant concedes that the initial stop was permissible. And he does not
dispute or otherwise quibble with the officer's authority to look into the vehicle and observe
what might be in plain view. The defendant instead argues that Seal's initially legal stop became

8

illegal when he "abandoned his investigation of the driving offense" and asserts that the "use of the drug detection dog Neo was an illegal effort" to gain entry into the vehicle. Motion at 4. Neither claim has merit.

A dog sniff on the exterior of a car during a lawful traffic stop is not a "search" at all because a sniff in those circumstances can *only* reveal evidence of contraband for which there is no legitimate privacy interest. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). Thus, the issue is not the *search*; it is the *seizure* of the defendant's person and whether the seizure was unreasonably extended. It was not.

The defendant ignores the well-established rule that a stop may be extended when an officer "has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." *United States v. Moore*, 795 F.3d 1224, 1228 (10th Cir. 2015). Here, Seal had reason to suspect, and evidence to articulate, two possible criminal endeavors: driving under the influence of alcohol (or driving with an open container of alcohol) and theft.

As to the first, it was reasonable to suspect that the defendant might either already be driving while impaired, or well on his way towards that point: Seal could articulate that the defendant was drifting in his lane (a classic sign of drunk driving), very late at night (the typical time for those inclined to make their way home from drinking establishments), had bloodshot, watery, eyes (another sign of drinking), and that the car itself smelled of alcohol. Any objectively reasonable officer would have extended the stop of such a person to investigate and make sure that the person was safe to drive.

As to the second crime, it was reasonable to suspect that the defendant was engaged in some sort of theft. The officer saw in plain view a large stack of credit cards in a clear plastic bag. This is not typical cargo: in an increasingly paper-less age, such a stash might as well be

<div align="center">9</div>

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 157 of
971
Case 1:18-cr-00054-WJM Document 193 Filed 12/27/17 Page 10 of 16

the equivalent of a large bag of dollar bills. But that is not all. When the officer asked to see the

stack of cards, the defendant *actively tried to conceal them*, ignored the inquiry, and then made a

farcical effort to pass off an empty bag as the subject of Seal's interest. Any officer in the same

position would be suspicious of this behavior. *See United States v. DeJear*, 552 F.3d 1196, 1201

(10th Cir. 2009) (noting that furtive gestures inside a car contribute to reasonable suspicion)*;*

*United States v. Johnson*, 212 F.3d 1313, 1317 (D.C. Cir. 2000) ("[F]urtive gestures in response

to being confronted by a police officer [are] suspicious enough to support a reasonable belief that

[a person] may have been engaged in criminal activity.")

The recording proves that Seal acted reasonably in response to these suspicions. In order

to investigate these suspicions, he removed Thomas from the vehicle and sat him on the

sidewalk. Then he did the HGN test. Seal finished the test about 8 minutes into the recording,

about 14 minutes after the 2:44 stop.[5] About a minute later, 9:15 into the recording, Seal read the

defendant his rights and began questioning him about the credit cards. The defendant agreed to

continue speaking with Seal, but always evaded and avoided answering any questions about the

cards.

The defendant's argument seems to be that after Seal finished investigating one crime

(the driving offense), he could not investigate the other (possession of the credit cards). Or,

perhaps, that Seal was legally required to investigate both crimes simultaneously, rather than

ruling out one and then the other. However, the defendant cites no legal authority for such a

novel position and the government cannot find any. Moreover, the defendant does *not* argue that

Seal lacked reasonable and articulable suspicion to investigate a possible crime related to the

---

[5] Seal concluded at that point, on the basis of this test and on his observation that the alcohol
smell was not coming from the defendant's person, but rather, was coming from the vehicle, and
that therefore, the defendant was not sufficiently impaired to warrant a drunk-driving citation.

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 158 of
Case 1:16-cr-00054-WJM Document 119 Filed 10/27/17 Page 11 of 16
971

credit cards.[6]  In short, there is no reason for the Court to conclude that Seal's extension of the traffic stop to investigate the credit cards, during which time a drug dog sniff occurred, was illegitimate or unconstitutional.

> **B.**     **The Sniff of the Car by a Certified Drug Detection Canine Was Constitutionally Permissible Because it Did Not Extend the Stop.**

If the Court concludes that there was reasonable and articulable suspicion to investigate the credit cards, then there is no way for the defendant to prevail on his motion.  The recording shows that the dog sniff took place *while* Seal was investigating the credit cards by questioning the defendant and there is thus no doubt that the dog sniff did not independently or unreasonably extend the traffic stop.

"[A] positive alert by a certified drug dog is generally enough, by itself, to give officers probable cause to search a vehicle."  *United States v. Ludwig*, 641 F.3d 1243, 1250 (10th Cir. 2011) (citation omitted).  Furthermore, the Supreme Court has concluded that roadside dog sniffs are permissible under the Fourth Amendment, so long as the stop is not "prolonged beyond the time reasonably required" to complete a traffic stop.  *Caballes*, 543 U.S. at 407; *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (reaffirming rule that roadside dog sniff is permissible when it does not prolong the stop beyond the time already required for the "ordinary inquiries incident to [the traffic] stop)."

Of course, this case is not like *Rodriguez* or *Caballes* because this was no ordinary stop: in this case, the officer conducting the stop observed evidence establishing reasonable and articulable suspicion of a crime separate from the traffic violation that started the encounter.  At

---

[6] The defendant should not be allowed to raise such an objection, for the first time, in his reply. Instead, because the defendant has not raised issues regarding the officer's authority to investigate crimes relating to the credit cards, the Court should deem the argument waived.

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 159 of
971
Case 1:16-cr-00054-WJM Document 198 Filed 12/17/17 Page 12 of 16

about 9:15 into the recording, Seal read the defendant his rights. From then, until 11:28 into the

recording, Seal is heard investigating the credit cards by asking the defendant about them. And

at 11:34, the defendant is heard contemporaneously narrating his observation of the dog in his

car. In short, the recording unambiguously shows that the dog sniff, and the alert, occurred *while*

Seal was already lawfully investigating the credit cards. As such, the officer's investigation was

not "prolonged beyond the time reasonably required" to either validate their suspicions, or dispel

them. *Caballes*, 543 U.S. at 407.

Because the dog sniff was positive, the officers had probable cause to believe there was

contraband in the car. For almost a century, the Supreme Court has repeatedly affirmed that the

inherent mobility of automobiles and a reduced expectation of privacy means that probable cause

is enough to search a car, even without a warrant. *California v. Acevedo*, 500 U.S. 565, 580

(1991); *United States v. Ross*, 456 U.S. 798, 804-09 (1982); *Pennsylvania v. Labron*, 518 U.S.

938, 940 (1996) (per curiam); *California v. Carney*, 471 U.S. 386, 392 (1985); *Carroll v. United*

*States*, 267 U.S. 132, 155-56 (1925).

In short, because the dog sniff did not unreasonably prolong the stop beyond what was

already allowed under the law, there is no basis to ignore the dog's alert and suppress the

evidence in this case.

## IV.  THERE IS NO LEGAL OR FACTUAL BASIS FOR SUPPRESSING THE LAPTOP

Separate and apart from his arguments regarding the stop, the defendant suggests that the

Court should suppress the laptop because the search warrant on the Tempe Arizona Police

Department was not executed until five months after Seal took it out of the defendant's car. [7]

---

7 The government obtained a seizure warrant for the debit cards on the same day, February 8, 2013.
SW_00001706-1729.

This argument is both factually and legally baseless.

As a factual matter, although Seal took the laptop after the August 2012 traffic stop, the United States did not learn of the defendant's arrest or the seizure of the laptop by the Tempe Police Department until December 6, 2012. *See* **Attachment 5** (MOA_00000452).

As a legal matter, there is no support for a conclusion that the search was somehow stale. "Probable cause for a search warrant cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched." *United States v. Harris,* 369 F.3d 1157, 1165 (10th Cir. 2004) (citation and internal quotations omitted). However, "the passage of time [is] less critical," *United States v. Mathis,* 357 F.3d 1200, 1207 (10th Cir. 2004), where there is a "fair probability that contraband or evidence of a crime will be found" in the location to be searched. *United States v. Sells,* 463 F.3d 1148, 1154 (10th Cir. 2006). Here, there was no question about where the laptop would be found; it was stored in the Tempe Police Department's evidence locker. For these reasons, defendant's argument that the laptop should be suppressed due to the time between the defendant's arrest and the government's seizure of this evidence should be denied.

## V. ABSENT DELIBERATE MISCONDUCT, SUPPRESSION IS NOT THE PROPER REMEDY

In *Davis v. United States*, the Supreme Court made it clear that that "the *sole* purpose of the exclusionary rule is to deter" Fourth Amendment violations. 564 U.S. 229, 245 (2011) (emphasis in original). That is, the "extreme sanction of exclusion" should be applied only as a "last resort" to deter police conduct that is "deliberate, reckless or grossly negligent." *United States v. Leon,* 468 U.S. 897, 916, 926 (1984); *Herring v. United States*, 555 U.S. 135, 140, 144 (2009). Furthermore, the exclusionary rule applies "only where it result[s] in appreciable deterrence" and, even if it might result in deterrence, "the benefits of deterrence must outweigh

the costs." *Herring*, 555 U.S. at 141.

The defendant asserts that the officers deliberately extended the stop to make time for a dog sniff. As explained above, such an allegation is belied by the evidence and should be rejected by the Court. Even if the Court determines that the officers violated the Fourth Amendment, the recording and the other evidence shows that their investigatory detention was based on a good faith belief that the defendant was drinking and driving and carrying around stolen property. Applying the exclusionary rule on the unique facts of this case would run against the very purpose of the automobile exception to the warrant requirement, which was crafted to give police officers flexibility to conduct searches of fast-moving vehicles before criminals can move contraband outside the reach of the law.

Similarly, absent a finding of deliberate misconduct or recklessness, excluding the evidence of the search serves no deterrent purpose. And even if it did, preventing the jury from seeing evidence of the truth — that the defendants was in possession of 52 debit cards all in the names of inmates, which names were used in the scheme to defraud the Department of Education, and a laptop which contained evidence of this scheme — would have considerable social costs outweighing any benefit. *See Davis*, 564 U.S. at 237 (recognizing that the bottom-line effect of suppression is that courts "ignore reliable, trustworthy evidence bearing on guilt or innocence," "suppress the truth," and "set the criminal loose in the community without punishment.").

## VI.    BECAUSE THE DEFENDANT'S MOTION RAISES PURE ISSUES OF LAW, NO HEARING IS REQUIRED

The defendant's dispute is a legal one, not a factual one. And even if the defendant were inclined to quibble with the facts, the record in this case, comprised of the contemporaneous and regularly kept records of Tempe Police Dispatch and an audio recording of the encounter, leaves

no doubt as to what happened.  In such a circumstance, the Court is empowered to rule on the motion without holding a formal hearing.  *See, e.g., United States v. Pettigrew*, 468 F.3d 626, 638 (10th Cir. 2006) (district court did not abuse its discretion in denying evidentiary hearing where no material facts were in dispute).  The Court should not hold an evidentiary hearing where the defendant has failed to identify with particularity the facts that he believes are reasonably subject to dispute and whether those facts are material to his motion.

## VII.  <u>CONCLUSION</u>

For all of the reasons set forth above — 1) because the officers had reasonable suspicion to investigate the defendant for drunk driving; 2) because the officers had reasonable suspicion to investigate the defendant for trying to conceal a large stack of debit cards visible in plain view; 3) because the officers lawfully searched the vehicle after the drug dog alerted for narcotics; 4) because the evidence would have inevitably been found when the officers impounded the defendant's car due to his felony arrest for possession of marijuana; and 5) because the search warrant seeking the laptop was not stale in that the location of the laptop was known  — the Court should deny the defendant's motion as well as his request for an evidentiary hearing.

Respectfully submitted this 27th day of October, 2017.

ROBERT C. TROYER
Acting United States Attorney
District of Colorado

By:　*s/ Bryan David Fields*
　　BRYAN DAVID FIELDS
　　MARTHA A. PALUCH
　　Assistant United States Attorneys
　　1801 California Street, Suite 1600
　　Denver, CO 80202
　　Telephone 303-454-0100
　　Facsimile 303-454-0402
　　Bryan.Fields3@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on this 27th day of October, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

s/ *Bryan David Fields*
BRYAN DAVID FIELDS
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
Bryan.Fields3@usdoj.gov

## TEMPE POLICE DEPARTMENT
### CAD CALL HARDCOPY

**CP 2012-111699**                                    **Reported: Aug-30-2012 02:40:38**

Incident Location
    Address : **S MILL AVE / E US 60[JS**
    City : **TEMPE**
    District : **S**   Zone : **5**   RD : **1913**

General Information

    Report number: **2012-111699**
    Case Type : **VEHICLE STOP**   Priority : **2**
    Dispatch  : **Aug-30-2012 02:40:38**
    Enroute  : **Aug-30-2012 02:40:38**
    At Scene  : **Aug-30-2012 02:40:38**
    Cleared  : **Aug-30-2012 05:31:05**
    How call received : **SELF-INITIATED**
    Unit ids : #1 - **4P51**  #2 - **4P41**  #3 - **K415**
    Call taker ID : **17308 WATTS, SHERI**

Complainant Information

    State : **AZ**
    Remarks :
        **Aug-30-2012 02:40:38 - 555XZC**

        **WATTS, SHERI(at CON09) on 2012-08-30 02:47:12 - 4P51 1 DTND**

        **WATTS, SHERI(at CON09) on 2012-08-30 02:47:31 - 4P51 INFO**

        **MARTINEZ, ESPERANZA ()(at CON08) on 2012-08-30 02:50:17 - 4P51 !THOMAS,TRAMELL,D,02131979**

        **MARTINEZ, ESPERANZA ()(at CON08) on 2012-08-30 02:50:28 - 4P51 @555XZC**

        **MARTINEZ, ESPERANZA ()(at CON08) on 2012-08-30 02:51:21 - 4P51 PACE CHECK**

        **MARTINEZ, ESPERANZA ()(at CON08) on 2012-08-30 02:53:49 - 4P51 PACE CHECK NEG**

        **MCDOWELL, STACY ()(at CON10) on 2012-08-30 03:07:43 - 4P51 SONY VIAO LAPTOP SERIAL NUMBER 00148-134-168-911**

        **WATTS, SHERI(at CON09) on 2012-08-30 03:12:27 - 4P51 10-42**

        **MARTINEZ, ESPERANZA ()(at CON08) on 2012-08-30 03:44:26 - 4P41 926**

        **PAPKE, JASON A(at K415) on 2012-08-30 04:04:33 - SUPPLEMENT**

MOI_00000490

---

**TEMPE POLICE DEPARTMENT**
**CAD CALL HARDCOPY**

**CP 2012-111699**                                      **Reported: Aug-30-2012 02:40:38**

Clearance Information

Final Case type : **VEHICLE STOP**
Report expected : **Yes**   Founded : **Yes**
Cleared by : **DEPARTMENT REPORT**
Reporting Officer1 : **19343 - SEAL, JONATHAN**

Dispatch Details

Unit number : **4P51**  Dispatched: **Aug-30-2012 02:40:38**
   Officer 1 : **19343 - SEAL, JONATHAN**
Enroute : **Aug-30-2012 02:40:38**
At scene: **Aug-30-2012 02:40:38**
Cleared : **Aug-30-2012 04:03:44**
Dispatcher ID : **17308**

Unit number : **4P41**  Dispatched: **Aug-30-2012 02:44:12**
   Officer 1 : **15368 - SHEARAN, PATRICK**
Cleared : **Aug-30-2012 04:25:30**
Dispatcher ID : **17308**

Unit number : **K415**  Dispatched: **Aug-30-2012 02:45:27**
   Officer 1 : **14710 - PAPKE, JASON A**
Enroute : **Aug-30-2012 02:45:27**
At scene: **Aug-30-2012 02:45:57**
Cleared : **Aug-30-2012 04:05:41**
Dispatcher ID : **14710**

Unit number : **P57**  Dispatched: **Aug-30-2012 03:34:50**
   Officer 1 : **11642 - MITCHELL, ROBERT M**
Enroute : **Aug-30-2012 03:34:50**
At scene: **Aug-30-2012 03:34:59**
Cleared : **Aug-30-2012 04:25:40**
Dispatcher ID : **11642**

Dispatched: **Aug-30-2012 03:44:30**
   Special service : **TOW**
Dispatcher ID : **21723**

Unit number : **5P41**  Dispatched: **Aug-30-2012 04:04:46**
   Officer 1 : **19239 - ESPINOZA, ANIBAL**
At scene: **Aug-30-2012 04:05:48**
Cleared : **Aug-30-2012 05:31:05**
Dispatcher ID : **17308**

Unit number : **4P51**  Dispatched: **Aug-30-2012 04:04:49**
   Officer 1 : **19343 - SEAL, JONATHAN**
Enroute : **Aug-30-2012 04:04:49**
At scene: **Aug-30-2012 04:04:49**

---

165
MOI_00000491

**TEMPE POLICE DEPARTMENT**
**CAD CALL HARDCOPY**

**CP 2012-111699**                                    **Reported: Aug-30-2012 02:40:38**

    Cleared : **Aug-30-2012 04:48:58**
    Dispatcher ID : **21723**

Related text page(s)

  Document: **NCIC/ACIC RESPONSE**
    Author: **19133 - MELTON, JESSICA**
    Subject: **A.C.I.C. WANTED  PERSON BDG/ C**
 Related date/time: Aug-30-2012 0000
         A.C.I.C. WANTED  PERSON

BDG/ C855  ORI/ AZ0070000  OCA/ JC2009148053          DOW/ 03-13-2012  NOA/
             MARICOPA CO SO  PHOENIX              DOP/           DPX/ N
DTE/ 03-27-2012  TOE/ 17:26  DLU/ 03-27-2012  TOU/ 17:26  OPI/ 5W97

        CONFIRM WARRANT -   EXTRADITION WITH ORI
END OF ACIC RECORD

>>>> ORIGINATING TRANSACTION <<<<

MKE/ACWL.BDG/C855.NAM/COLLARD, HEDY.DOB/10261973.OLS/AZ.

  Document: **NCIC/ACIC RESPONSE**
    Author: **19133 - MELTON, JESSICA**
    Subject: **MVD.40-01 DR.00729360.AZ007290**
 Related date/time: Aug-30-2012 0000
MVD.40-01 DR.00729360.AZ0072900.*BDG/C855--.
TXT NAM/COLLARD, HEDY.DOB/19731026
NAME:HEDY,CHRISTINE,COLLARD                    DOB:10/26/1973   RCPT#:L132906
ADDR:1351 N PLEASANT DR UNIT 1092         CHANDLER                AZ 85225
ISSUE DT:10/29/2010 EXP:10/26/2038     SEX:F HGT:502 WGT:130 HAIR:BRN EYE:BLU
OLN:D01291120      SSN:600620251     OLT:OPERATOR CLASS D
PREV LIC: D01291120                 PREV ST: AZ
           D01291120                          AZ
           600620251                          AZ

>>>> ORIGINATING TRANSACTION <<<<

MKE/ACWL.BDG/C855.NAM/COLLARD, HEDY.DOB/10261973.OLS/AZ.

  Document: **NCIC/ACIC RESPONSE**
    Author: **17308 - WATTS, SHERI**
    Subject: **4P51 MVD.18-01 RR.00729704.AZ0**
 Related date/time: Aug-30-2012 0240
COMMENT: 4P51
MVD.18-01 RR.00729704.AZ0072900.*BDG/9K22--.TXT LIC/555XZC.LIY/2012.
LIC:555XZC  001  TAB:555XZC  EXPIRE: 03/31/2013
VIN:2B3KA43R66H390664            VYR:2006  VMA:DODG  VMO:CHAR  VST:4DSD

For: 19343 Tuesday October 24, 2017                              Page: 3 of 6

# TEMPE POLICE DEPARTMENT
## CAD CALL HARDCOPY

**CP 2012-111699**                                    **Reported: Aug-30-2012 02:40:38**

```
NAM:HEATHER,,CARR                       CUST#:D03031108
ADR:1351 N PLEASANT DR UNIT 1110
CTY:CHANDLER                  ST:AZ ZIP:852256593    GVW:000000
TTL:314H007108039 ST:AZ DTE: 04/19/2007
1ST LIEN:CAPITAL ONE AUTO FINANCE  AMT:             DATE: 03/26/2007
     ADDR:P O BOX 255605           CTY:SACRAMENTO       ST:CA
     ZIP: 958655605
NO PRIOR PLATES

>>>> ORIGINATING TRANSACTION <<<<

MKE/ACVR.BDG/9K22.LIC/555XZC.LIS/AZ.LIY/2012.LREM/4P51.
```

   Document: **NCIC/ACIC RESPONSE**
      Author: **21723 - MARTINEZ, ESPERANZA ()**
      Subject: **4P51 MVD.18-01 RR.00729703.AZ0**
   Related date/time: **Aug-30-2012 0250**

```
COMMENT: 4P51
MVD.18-01 RR.00729703.AZ0072900.*BDG/GN84--.TXT LIC/555XZC.LIY/2012.
LIC:555XZC    001    TAB:555XZC  EXPIRE: 03/31/2013
VIN:2B3KA43R66H390664         VYR:2006  VMA:DODG  VMO:CHAR  VST:4DSD
NAM:HEATHER,,CARR                      CUST#:D03031108
ADR:1351 N PLEASANT DR UNIT 1110
CTY:CHANDLER                  ST:AZ ZIP:852256593    GVW:000000
TTL:314H007108039 ST:AZ DTE: 04/19/2007
1ST LIEN:CAPITAL ONE AUTO FINANCE  AMT:             DATE: 03/26/2007
     ADDR:P O BOX 255605           CTY:SACRAMENTO       ST:CA
     ZIP: 958655605
NO PRIOR PLATES

>>>> ORIGINATING TRANSACTION <<<<

MKE/ACVR.BDG/GN84.LIC/555XZC.LIS/AZ.LIY/2012.LREM/4P51.
```

   Document: **NCIC/ACIC RESPONSE**
      Author: **21723 - MARTINEZ, ESPERANZA ()**
      Subject: **4P51 MVD.40-01 DR.00729703.AZ0**
   Related date/time: **Aug-30-2012 0250**

```
COMMENT: 4P51
MVD.40-01 DR.00729703.AZ0072900.*BDG/GN84--.
TXT NAM/THOMAS, TRAMELL D.DOB/19790213
NAME:TRAMELL,DAWAN,THOMAS                DOB:02/13/1979   RCPT#:CY143843
ADDR:1822 E KAIBAB DR               CHANDLER             AZ 85249
ISSUE DT:04/12/2012 EXP:02/13/2044   SEX:M HGT:600 WGT:200 HAIR:BLK EYE:BRN
OLN:D08065663    SSN:305843317   OLT:OPERATOR CLASS D
PREV LIC: 981121157              PREV ST: CO

>>>> ORIGINATING TRANSACTION <<<<
```

For: 19343  Tuesday October 24, 2017                          Page: 4 of 6

**TEMPE POLICE DEPARTMENT**
**CAD CALL HARDCOPY**

**CP 2012-111699**                                            **Reported: Aug-30-2012 02:40:38**

MKE/ACWL.BDG/GN84.NAM/THOMAS, TRAMELL D.DOB/02131979.OLS/AZ.LREM/4P51.

Unit/Officer Details

02:40 Aug 30 CON09   17308  A :4P51    PT 19343  (VEHICLE STOP) S MILL AVE / E
        S MILL AVE / E US 60|JS - 555XZC

02:44 Aug 30 CON09   17308  DP:4P41    PT 15368
        S MILL AVE / E US 60|JS

02:45 Aug 30 K415   14710  EN:K415    K9 14710
        ASSIST:4P51   /S MILL AVE / E US 60|JS

02:45 Aug 30 K415   14710  A :K415    K9 14710

02:47 Aug 30 CON09   17308  A :4P51    PT 19343
        1 DTND

02:47 Aug 30 CON09   17308  A :4P51    PT 19343
        INFO

02:50 Aug 30 CON08   21723  A :4P51    PT 19343
        !THOMAS,TRAMELL,D,02131979

02:50 Aug 30 CON08   21723  A :4P51    PT 19343
        @555XZC

02:51 Aug 30 CON08   21723  A :4P51    PT 19343
        PACE CHECK

02:53 Aug 30 CON08   21723  A :4P51    PT 19343
        PACE CHECK NEG

03:07 Aug 30 CON10   21108  A :4P51    PT 19343
        SONY VIAO LAPTOP SERIAL NUMBER 00148-134-168-911

03:08 Aug 30 CON10   19343  A :4P51    PT 19343  (VEHICLE STOP) EXT ACQA- AZ00
        EXT ACQA- AZ0072900 FD46 Y 00148134168911

03:12 Aug 30 CON09   17308  A :4P51    PT 19343
        10-42

03:21 Aug 30 4P41   15368  DP:4P41    PT 15368
        RMS Q VEH-LIC:555XZC  STATE:AZ TYPE:PC  YR:2012
        REC:Y  CAD:N  EXTN:Y  EXTE:Y TONC:Y  UNIT:4P41

03:21 Aug 30 4P41   15368  DP:4P41    PT 15368
        EXT Q VEH-LIC:555XZC  STATE:AZ TYPE:PC  YR:2012
        REC:Y  CAD:N  EXTN:Y  EXTE:Y TONC:Y  UNIT:4P41

03:34 Aug 30 P57   11642  EN:P57    PS 11642
        ASSIST:4P41   /S MILL AVE / E US 60|JS

03:34 Aug 30 P57   11642  A :P57    PS 11642

For: 19343  Tuesday October 24, 2017                                    Page: 5 of 6

168
MOI_00000494

**TEMPE POLICE DEPARTMENT**
**CAD CALL HARDCOPY**

CP 2012-111699                                      Reported: Aug-30-2012 02:40:38

03:44 Aug 30 CON08   21723  DP:4P41    PT 15368
     926

03:44 Aug 30 CON08   21723
     (TW) TOW:ALL

04:03 Aug 30 CON08   21723  AV:4P51    PT 19343

04:04 Aug 30 CON09   17308  DP:5P41    PT 19239
     S MILL AVE / E US 60|JS

04:04 Aug 30 CON08   21723  A :4P51    PT 19343
     S MILL AVE / E US 60|JS

04:04 Aug 30 CON08   21723  A :4P51    PT 19343
     CONTROL FOR UNIT CHANGED I

04:05 Aug 30 K415   14710  AV:K415    K9 14710

04:05 Aug 30 5P41    19239  A :5P41    PT 19239

04:21 Aug 30 5P41    19239  TR:5P41    PT 19239
     17 JAIL W/42

04:25 Aug 30 4P41    15368  AV:4P41    PT 15368

04:25 Aug 30 P57    11642  AV:P57     PS 11642

04:29 Aug 30 5P41    19239  A :5P41    PT 19239
     TRANSPORT COMPLETED:23 JAIL

04:48 Aug 30 4P51    19343  AV:4P51    PT 19343

04:48 Aug 30 4P51    19343  AV:4P51    PT 19343
     CONTROL FOR UNIT CLEARED

05:31 Aug 30 5P41    19239  AV:5P41    PT 19239

05:31 Aug 30 5P41    19239  AV:5P41    PT 19239
     CLEARED CASE TE111699 FOUNDED-Y REPORT-Y CLEARED
     BY-5 FINAL-VEHICL BOLO-N STUDY FLAG-

** END OF HARDCOPY **

MOI_00000495




# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES

**DATE:**               **December 20, 2012**

**PREPARED BY:**      **SA Sandra Ennis**

**CASE TITLE:**          **Pikes Peak Community College Fraud Ring**

**CASE NUMBER:**     **12-080234**

**REPORT RE:**          **Tempe Police Records 12-111699 & 12-111711**

On or about December 6, 2012, the Financial Aid Director (FAD) of Pikes Peak Community College advised that the Colorado Community College Systems office (CCCS) had been contacted by a Detective from Tempe Arizona Police Department. CCCS's FAD Karla Nash provided contact information for Sergeant Rick Vasquez.

Contact with Sergeant Vasquez disclosed Tramell Thomas had been arrested on August 30, 2012. At the time of his arrest, Thomas had fifty-two (52) debit cards in his possession. Vasquez provided Tempe Police Department report numbers 12-111711 and 12-111699. Further details regarding the communication with Vasquez are detailed in a separate write-up.

On or about December 7, 2012, report numbers 12-111711 and 12-111699 were requested from Tempe Police Department and are included in this report as Attachment A.

---

Date Prepared: 12/19/2012           S/A Ennis           Case No: 12-080234

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.**

OIG-301A (11/06)                                           Page 1 of 1

MOA_00000452

# ATTACHMENT

# A

MOA_00000453

12/07/2012 18:07 FAX 4803508319     TEMPE POLICE RECORDS     ☑002/020
12/07/2012 19:11 FAX 3038440069     ED-OIG DENVER     ☑001



UNITED STATES
DEPARTMENT OF EDUCATION
OFFICE OF INSPECTOR GENERAL
INVESTIGATION SERVICES
1244 SPEER BOULEVARD, SUITE 604A
Denver, CO 80204
Phone: (303) 844-4558
Fax: (303) 844-0069



# Fax

| | | | |
|---|---|---|---|
| To: *Tempe AZ PD Records* | From: | Sandra Ennis | |
| | | Special Agent | |
| Fax: *480·350·8319* | Pages: | *2* including cover sheet | |
| Phone: | Date: | *12/7* *2012* | |
| Re: *request for records* | CC: | | |

☐ Urgent    ☑ For Review    ☐ Please Comment    ☑ Please Reply    ☐ FYI

*Thank You*

● Comments

NOTICE: THIS FACSIMILE TRANSMISSION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO
WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL OR EXEMPT FROM
DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR
EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE
HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY
PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMEDIATELY.

MOA_00000454

12/07/2012 18:08 FAX 4803508319      TEMPE POLICE RECORDS      ☐003/020

# Tempe

**Tempe Police Department**

**Incident Report**

Priority 2                Copy To: _____

| Report Title | Report Date | Incident Number |
|---|---|---|
| INFORMATION CRIMINAL | 08/30/12 | 12-111711 |

| Officer Name/Serial Number | Offense Code | Location of Occurrence |
|---|---|---|
| J. SEAL #19343 | 37010000 | MILL & US 60 |

| RD | Beat | Shift | Division | # Victims | Date Occurred | Time Occurred | Latest Possible Date | Latest Possible Time | Stolen Property |
|---|---|---|---|---|---|---|---|---|---|
| 1913 | 21 | G | | 0 | 08/30/12 | 02:40 | 08/30/12 | 02:40 | |

| Name Type | M | Name (Last, First, Middle) THOMAS, TRAMELL | | Address 1822 E KAIBAB DR | | City CHANDLER |
|---|---|---|---|---|---|---|

| State AZ | Zip Code 85249 | Phone (480) 436-3885 | School/Business Name | | School/Business Phone | DOB 02/13/79 | Sex M | Race B | Height 6'00" |
|---|---|---|---|---|---|---|---|---|---|

| Weight 200 | Hair BRO | Eyes BRO | Veh Lic State | Veh Lic Number | PROSECUTE PAMPHLET NOTIFICATION | Veh Year | Veh Make | Veh Model | Veh Style | Veh Color |
|---|---|---|---|---|---|---|---|---|---|---|

| Name Type | Name (Last, First, Middle) | | Address | | City |
|---|---|---|---|---|---|

| State | Zip Code | Phone | School/Business Name | | School/Business Phone | DOB | Race | Height |
|---|---|---|---|---|---|---|---|---|

| Weight | Hair | Eyes | Veh Lic State | Veh Lic Number | PROSECUTE PAMPHLET NOTIFICATION | Veh Year | Veh Make | Veh Model | Veh Style | Veh Color |
|---|---|---|---|---|---|---|---|---|---|---|

| Name Type | Name (Last, First, Middle) | | Address | | City |
|---|---|---|---|---|---|

| State | Zip Code | Phone | School/Business Name | | School/Business Phone | DOB | Race | Height |
|---|---|---|---|---|---|---|---|---|

| Weight | Hair | Eyes | Veh Lic State | Veh Lic Number | PROSECUTE PAMPHLET NOTIFICATION | Veh Year | Veh Make | Veh Model | Veh Style | Veh Color |
|---|---|---|---|---|---|---|---|---|---|---|

| Name Type | Name (Last, First, Middle) | | Address | | City |
|---|---|---|---|---|---|

| State | Zip Code | Phone | School/Business Name | | School/Business Phone | DOB | Race | Height |
|---|---|---|---|---|---|---|---|---|

| Weight | Hair | Eyes | Veh Lic State | Veh Lic Number | PROSECUTE PAMPHLET NOTIFICATION | Veh Year | Veh Make | Veh Model | Veh Style | Veh Color |
|---|---|---|---|---|---|---|---|---|---|---|

On 8-30-12 at approximately 0312 hours at Mill and US 60, Tempe (S) Tremell
Thomas was arrested after he was contacted as the driver of a vehicle
stopped for a civil traffic violation and found to be in possession of
marijuana and an open container of alcohol in the passenger compartment of
a vehicle.

During contact with Thomas a Tempe Police K-9 unit conducted a
"sniff" of the exterior of the vehicle. During the "sniff" the K-9 alerted
to the odor of an illegal substance within the vehicle. Upon a subsequent
search of the vehicle, a baggie containing a usable quantity of a green
leafy substance believed to be marijuana was located in the center console.
Also in the vehicle, a plastic cup was located on the front passenger
floorboard. This cup, which had an approximately 20 Oz capacity, was
approximately 3/4 full, cold to the touch, and contained a brown liquid
which smelled of alcohol.

In the back seat of this vehicle was located a ziploc baggie containing 52
Mastercard debit cards, all of which had a name different from Thomas. All

TEMPE POLICE RELEASE
TO: _____
DATE: 12/7/12
Dissemination is Restricted to
Criminal Justice Agencies ONLY
Secondary Dissemination to
Non-Criminal Justice Agencies
is Prohibited.

| Routing: | CID | Press/Patrol | QC | Other | | Special Code |
|---|---|---|---|---|---|---|

| Item Type: | | Item # | Property Type | | |
|---|---|---|---|---|---|

| Brand | | Model | Description | | |
|---|---|---|---|---|---|

| Serial Number | | Owner Applied # | Date Stolen | Date Reported | Date Recovered |
|---|---|---|---|---|---|

| Dispo Code: 60 | Property Location: | | Locker Number | Value Stolen $ | Value Recovered $ | Released On (Date) |
|---|---|---|---|---|---|---|

| Property Tag #: | Evidence? | Owner Name | | Owner Address | |
|---|---|---|---|---|---|

| City | State | Zip Code | Location Removed From: | |
|---|---|---|---|---|

| Date/Time Placed Into Property: | | Supervisor's Approval/Signature SGT R. MITCHELL #11642 | | ECC: Yes (No) |
|---|---|---|---|---|

TPD FORM 101 REV. 3/90

MOA_00000455

12/07/2012 18:09 FAX   4803508319                    TEMPE POLICE RECORDS                                    ☒004/020

# TEMPE POLICE DEPARTMENT NARRATIVE

Page 1

| INCIDENT NUMBER: 12-111711 | OFFICER: J. SEAL #19343 |
| --- | --- |

but two had the name "Colorado Community College System" printed at the top.

The marijuana was identified through Officer's training and experience. Thomas was transported to the Tempe City jail where he was booked and released on pending the marijuana charge and held to see a judge for the open container charge.

At the time of this report, no follow up has been conducted or charges submitted regarding the 52 credit/debit cards located in the vehicle.

For further information regarding this investigation refer to the original report written under IR 12-111699.

***Pending***

MOA_00000456



| | TEMPE POLICE DEPARTMENT |
|---|---|
| | GENERAL OCCURRENCE HARDCOPY |
| GO# TE 2012-111699 OPEN | 3562-0 MARIJUANA-POSSESSION |

## General Offense Information

Operational status: **OPEN**
Reported on: **Aug-30-2012 (Thu.) 2034**
Occurred on: **Aug-30-2012 (Thu.) 312**
Approved on: **Sep-04-2012 (Tue.)** by: **10136 - FOUGNER, RANDAL**
Report submitted by: **19343 - SEAL, JONATHAN**
Org unit: **PATROL R**
Address: **S MILL AVE / W US 60**
       Municipality: **TEMPE**
       District: **S**  Beat: **3**  Grid: **1901**
Felony/Misdemeanor: **FELONY**
Bias: **None (No Bias)**
Drugs total: **$5.00**
Family violence: **NO**

## Offenses (Completed/Attempted)

Offense: # 1  **3562-0  MARIJUANA-POSSESSION - COMPLETED**
Location: **Highway/Road/Alley/Sidewalk**
Offender suspected of using: **Not Applicable**
Criminal activity: **Possessing/Concealing**
Offense: # 2  **4199-0  LIQUOR LAW VIOLATION - COMPLETED**
Location: **Highway/Road/Alley/Sidewalk**
Offender suspected of using: **Not Applicable**

TEMPE POLICE RELEASE
TO: US Dept g Edic JG
DATE: 12-7-12
Dissemination is Restricted to
Criminal Justice Agencies ONLY
Secondary Dissemination to
Non-Criminal Justice Agencies
is Prohibited.

MOA_00000457



## TEMPE POLICE DEPARTMENT
### GENERAL OCCURRENCE HARDCOPY

| GO# TE 2012-111699 OPEN | 3562-0 MARIJUANA-POSSESSION |
|---|---|

## Related Event(s)

| CP | TE2012-111699 |
|---|---|
| AB | TE2012-6743 |
| V | TE2012-111699 |

## Related Person(s)

### 1. ARRESTEE # 1 - THOMAS, TRAMELL DAWAN

**(Case Specific Information)**

Sex: Male
Race: BLACK
Date of birth: Feb-13-1979
Address: 1822 E KAIBAB DR
    Municipality: CHANDLER , Arizona  85249-

**Phone Numbers**
    Personal  (480) 436-3885
    Cell:

**Particulars**

Place of birth: Indiana
Occupation: ADVERTISING
Employer: 911 PRINTING
Citizenship: AMERICAN
Ethnicity: Black
Language(s) spoken: English
Height: 6'00 Weight: 200 lbs.
Eye color: BROWN
Hair color: BROWN

**Master Name Index Reference**

Name: THOMAS, TRAMELL DAWAN
Sex: Male
Race: BLACK
Date of birth: Feb-13-1979
Ethnicity: Black
Address: 1822 E KAIBAB DR
    Municipality: CHANDLER , Arizona  85249-

**Phone numbers**
Personal Cell: (480) 436-3885

**Linkage factors**

Resident status : Resident
Age range : 30-49 Years
Armed with : Unarmed
Offense: 4199- 0  LIQUOR LAW VIOLATION  - COMPLETED

| For: 16995     Printed On  Sep-04-2012  (Tue.) | Page 2 of 14 |
|---|---|

MOA_00000458



# TEMPE POLICE DEPARTMENT
## GENERAL OCCURRENCE HARDCOPY

GO# TE 2012-111699 OPEN                                   3562-0 MARIJUANA-POSSESSION

Arrest date: **Aug-30-2012** (Thu.)
Arrest type: **On-View Arrest**

177

MOA_00000459



**TEMPE POLICE DEPARTMENT**
GENERAL OCCURRENCE HARDCOPY

GO# TE 2012-111699 OPEN                    3562-0 MARIJUANA-POSSESSION

## Related Text Page(s)

Document: PC / ARREST SYNOPSIS
Author: 19343 - SEAL, JONATHAN
Related date/time: Aug-30-2012 (Thu.) 431

On 8-30-12 at approximately 0312 hours at Mill and US 60, Tempe (S) Tremell
Thomas was arrested after he was contacted as the driver of a vehicle
stopped for a civil traffic violation and found to be in possession of
marijuana and an open container of alcohol in the passenger compartment of
a vehicle. During contact with Thomas a Tempe Police K-9 unit conducted a
"sniff" of the exterior of the vehicle. During the "sniff" the K-9 alerted
to the odor of an illegal substance within the vehicle. Upon a subsequent
search of the vehicle, a baggie containing a usable quantity of a green
leafy substance believed to be marijuana was located in the center console.
Also in the vehicle, a plastic cup was located on the front passenger
floorboard. This cup, which had an approximately 20 Oz capacity, was
approximately 3/4 full, cold to the touch, and contained a brown liquid
which smelled of alcohol. The marijuana was identified through Officer's
training and experience. Thomas was transported to the Tempe City jail
where he was booked and released pending the marijuana charge and held to
see a judge for the open container charge.

For: 16995    Printed On: **Sep-04-2012** (Tue.)                    Page 4 of 14

MOA_00000460



## TEMPE POLICE DEPARTMENT
### GENERAL OCCURRENCE HARDCOPY

GO# TE 2012-111699 OPEN                              3562-0 MARIJUANA-POSSESSION

## Related Text Page(s)

Document: AB MISDEMEANOR FORM 4
Author: 19343 - SEAL, JONATHAN
Subject: AB MISDEMEANOR FORM
Related date/time: Aug-30-2012 (Thu.) 438

```
                        Victims Name:[ARIZONA, STATE OF          ]
                         Victims DOB:[              ]
                    Victims Address:[                          ]
              Victims Phone Number:[              ]
                           Juvenile?:[No]
        Parent/Guardian Contact Info:[                          ]
Additional Business Victims Name/Address/Phone #:
[

    Is the Victim Willing to Aid in Prosecution?:[Yes     ]
--------------------------------------------------------------------
        Is the suspect on: Parole?:[No    ] Probation?:[No    ]
        Suspect/Victim Relationship:[              ]
            Order out requested?:[No ]
    Was victim injured by suspect?:[No ]
Was victim threatened by suspect?:[No ]
Did the victim receive treatment?:[No ]
Was the Suspect under the influence of drugs and/or alcohol at the time of the
                        Offense?:[Unknown ]
Describe nature of injuries and/or threats:
[NONE                                                                      ]
Describe Property Taken:
[NONE                                                                    ]
        Estimated Property Value:$[           ]
          Was property recovered?:[    ]
Was evidence of the crime found in the suspect's possession?:[Yes]
Describe:[OPEN CONTAINER OF ALCOHOL IN VEHICLE
Did the suspect attempt to avoid/resist arrest?:[No ]
Explain:[
What facts indicate the suspect will flee if released?:
[NONE
Any Previous incidents involving the same parties?:[No ]
Explain:[NONE
Any Additional Information for the Prosecutor?:
[
```

For: 16995    Printed On: Sep-04-2012 (Tue.)                        Page 5 of 14

MOA_00000461



### TEMPE POLICE DEPARTMENT
#### GENERAL OCCURRENCE HARDCOPY

GO# TE 2012-111699 OPEN                    3562-0 MARIJUANA-POSSESSION

## Related Text Page(s)

Document: **ORIGINAL OFFICER NARRATIVE**
Author: **19343 - SEAL, JONATHAN**
Related date/time: Aug-30-2012 (Thu.) 2353

On 8-30-12 at approximately 0312 hours at Mill and US 60, Tempe (S) Tremell
Thomas was arrested after he was contacted as the driver of a vehicle
stopped for a civil traffic violation and found to be in possession of
marijuana and an open container of alcohol in the passenger compartment of
a vehicle. During contact with Thomas a Tempe Police K-9 unit conducted a
"sniff" of the exterior of the vehicle. During the "sniff" the K-9 alerted
to the odor of an illegal substance within the vehicle. Upon a subsequent
search of the vehicle, a baggie containing a usable quantity of a green
leafy substance believed to be marijuana was located in the center console.
Also in the vehicle, a plastic cup was located on the front passenger
floorboard. This cup, which had an approximately 20 Oz capacity, was
approximately 3/4 full, cold to the touch, and contained a brown liquid
which smelled of alcohol. The marijuana was identified through Officer's
training and experience. Thomas was transported to the Tempe City jail
where he was booked and released pending the marijuana charge and held to
see a judge for the open container charge.


On 8-30-12 at approximately 0240 hours, while working as a uniformed
Tempe Police patrol Officer in a fully marked Tempe Police patrol vehicle
driving southbound on Mill Ave approaching Southern, Tempe I observed a
white sedan bearing Arizona registration 555XZC (S/V) in front of me
southbound on Mill Ave also approaching Southern in the median lane (L1).
While driving southbound behind the S/V, my attention was drawn to the
vehicle as it was drifting left to right within its lane. As I continued
to follow the vehicle southbound on Mill, just south of Southern I observed
the S/V drift with its driver's side tires on top of the double yellow line
separating north and southbound traffic. The S/V drove in this manner for
approximately 50 feet, then drifted fully back into its lane and continued
southbound on Mill.

I initiated a traffic stop on the vehicle by activating my overhead red
and blue Police lights affixed to the top of my vehicle and the S/V drove
into the southbound turn lane (LT2) and stopped at the intersection on the
north side of the US 60. After stopping in the roadway, I exited my
driver's door and upon seeing the driver's window of the S/V open I yelled

---

For: 16995     Printed On: Sep-04-2012 (Tue.)                    Page 6 of 14

MOA_00000462

12/07/2012 18:11 FAX 4803508319          TEMPE POLICE RECORDS                          ☑011/020



# TEMPE POLICE DEPARTMENT
## GENERAL OCCURRENCE HARDCOPY

GO# TE 2012-111699 OPEN                                    3562-0 MARIJUANA-POSSESSION

to the S/V to drive south of the US 60 and pull to the right of the
roadway. After yelling this to the driver, the S/V drove southbound across
the US 60 bridge, merged into the curb lane of Mill Ave (L2) and stopped
next to the west curb of southbound Mill Ave.

I then contacted the driver of the vehicle at the open driver's window
and upon doing so I immediately observed the distinct odor of intoxicating
beverage coming from within the vehicle. I also observed that the driver's
eyes were bloodshot and watery when I shined my flashlight toward them.

I asked the driver for his driver's license, registration, and proof of
insurance and I observed the driver reach into his back pocket, retrieve a
wallet, and take an Arizona driver's license out of it. The driver handed
me the drivers license which identified him as (S) Tremell Thomas and bore
a picture that matched his face.

I asked Thomas where he had been coming from and he told me he had been
coming from Chandler. I also asked Thomas where he was headed and he told
me he was headed to his house in Chandler. When I asked Thomas how he
could be coming from Chandler and going to Chandler, Thomas told me that he
had actually been coming from his PO Box at 316 S. Mill, Tempe.

I asked Thomas if he had drank any alcoholic beverages tonight and he
stated, "I don't drink".

While speaking with Thomas, in the back seat I observed a ziploc baggie
on the passenger side seat with what appeared to be approximately 50 credit
cards. I asked Thomas what was in the bag and pointed toward the back
seat. After Thomas looked in the back seat, then back at me I asked him if
he could hand me the bag in the back seat. Thomas said, "Sure", then
reached into the back seat. I watched as Thomas grabbed the bag containing
what appeared to be credit cards and place the bag on the floorboard,
behind the front passenger seat. Thomas then picked up an empty ziploc
back that was already on the passenger side rear floorboard and hand it to
me.

After Thomas handed me the empty bag, I asked him who's vehicle he was
driving to which he advised he was driving his girlfriend, Heather Carr's
vehicle. I then asked Thomas to exit his vehicle to which he asked why. I
told Thomas that I wanted to speak with him on the sidewalk so that I
wasn't standing in the street and he exited the vehicle. I had Thomas sit
on a nearby curb and as he was doing so, K-9 Officer Papke arrived at my

---

For: 16995      Printed On: Sep-04-2012 (Tue.)                              Page 7 of 14

MOA_00000463



**TEMPE POLICE DEPARTMENT**
**GENERAL OCCURRENCE HARDCOPY**

GO# TE 2012-111699 OPEN                           3562-0 MARIJUANA-POSSESSION

location to assist me. Upon Officer Papke's arrival Thomas was detained at
approximately 0247 hours.

After Thomas was detained, Officer Papke had his K-9 partner Neo conduct
an exterior "sniff" of the vehicle. Upon conducting a sniff of the vehicle
Neo alerted to the odor of an illegal substance within the vehicle. For
further information refer to the supplemental report written by Officer
Papke.

Upon a subsequent search of the vehicle, in the center console a plastic
bag containing a usable quantity of a green leafy substance believed to be
marijuana was located. On the front passenger side floorboard I located an
orange plastic cup with a lid which had the capacity of approximately 20 Oz
of liquid. Inside this cup, which was still cold to the touch, was located
a brown liquid that smelled of alcohol. It should be noted that this cup
was approximately 3/4 full, and that it was placed on the floor board
without leaning up against anything and would have fallen over had it been
sitting there when the vehicle was in motion.

In the back passenger floor board I located the previously mentioned
ziploc baggie containing 52 mastercard credit/debit cards. It should be
noted that these cards all had different names on them, none of which
belonged to Thomas or the registered owner of the vehicle. It should also
be noted that all but two of them had "Colorado Community College System"
on them with the same background design.

In the center console of the vehicle I located a cheetah print wallet
which contained a visa debit card with the name of "Hedy C Collard". Upon
a records check of the name an address was located for her at 1351 N.
Pleasant Dr, Chandler. A more current address of 1118 S. Tiago Dr, Gilbert
was also located. In the back seat I also located a pink Sony Vaio laptop
computer (serial number 00148134168911). Upon running the serial number on
this laptop through ACIC/NCIC it was learned that the laptop hadn't been
reported stolen.

After a search of the vehicle, I advised Thomas of his rights per
Miranda, which he stated he understood. It should be noted that my
interview with Thomas was digitally recorded and a copy of that recording
was later impounded as evidence. The following is a summary of that
conversation. For further information refer to the recording.

I asked Thomas why he had moved the bag full of credit cards onto the

For: 16995    Printed On: Sep-04-2012 (Tue.)                                      Page 8 of 14

MOA_00000464



**TEMPE POLICE DEPARTMENT**
GENERAL OCCURRENCE HARDCOPY

GO# TE 2012-111699 OPEN                     3562-0 MARIJUANA-POSSESSION

floorboard behind the passenger seat and he told me he didn't know what I
was talking about. I then told Thomas that I had observed him pick up the
bag and move it and he told me that I didn't see anything. I then pointed
out to Thomas that I was wearing gloves and that he was not, and that his
fingerprints would be on the bag. Upon hearing this Thomas hung his head
and shook it in a "No" movement. I asked Thomas where the credit cards had
come from and he told me that if I knew where he worked I would understand.
I then asked Thomas where he worked and he told me he didn't want to talk
about that right now. Thomas would not respond further to any further
questions from me at this time.

Thomas was placed under arrest at approximately 0312 hours for possession
of marijuana and an open container of alcohol in the passenger compartment
of a vehicle, and placed in the rear of my patrol vehicle.

During the search of the vehicle Thomas had been driving I located the
wallet I had initially observed him remove from his pocket. As the wallet
would go with him to jail, I conducted a search of the wallet and inside I
located several credit cards with his name on them. Also inside the wallet
I located another mastercard debit card with the name of "Manuel Abate" on
it, as well as the same design and "Colorado Community College System" as
the other cards in the ziploc baggie.

I received my police training at the Az Law Enforcement Academy in
Phoenix, Az. During that training I attended a block of instruction in
narcotic recognition. Part of this training consisted of identifying
marijuana by sight and smell. We were exposed to both burned and unburned
marijuana. In my experience as a police officer I have been involved in
many narcotics cases. In all of the cases, whether I was the case officer
or assisting officer, I have successfully identified marijuana.

Photographs of all the credit/debit cards were taken and later impounded
as evidence along with the baggie containing the usable quantity of green
leafy substance believed to be marijuana. All credit/debit cards that did
not belong to Thomas were also seized and impounded as evidence, and the
laptop, which could not be determined to belong to Thomas was impounded as
safekeeping.

Thomas was transported to the Tempe City jail where he was booked and
released pending the marijuana charge and held to see a judge for the open
container of alcohol.

183
MOA_00000465



**TEMPE POLICE DEPARTMENT**
**GENERAL OCCURRENCE HARDCOPY**

GO# TE 2012-111699 OPEN                          3562-0 MARIJUANA-POSSESSION

It should be noted that Thomas has not been charged with anything
regarding the possession of the credit/debit cards at the time of this
report. It should also be noted that "Hedy Collard" has not been contacted
at the time of this report either due to the fact that one of her listed
addresses was the same as the registered owner of the vehicle Thomas had
been driving, which Thomas stated was his girlfriend. Follow up should be
conducted as to the legitimacy of the credit/debit cards and their
connection to Collard, Carr, and Thomas.

***Pending***

MOA_00000466



## TEMPE POLICE DEPARTMENT
### GENERAL OCCURRENCE HARDCOPY

GO# TE 2012-111699 OPEN                    3562-0 MARIJUANA-POSSESSION

## Related Property Report(s)

### Report Information

Property Report #: 122314
Property case status: EVIDENCE/SEIZED
Submitted on: Aug-30-2012 (Thu.)   by: SEAL, JONATHAN
Related:
Offense: GO TE 2012- 111699
Related items: 7

### Articles - Evidence

Status: EVIDENCE/SEIZED                    Tag #: TE122314- 1
Article: IPINCAR- Items of identification
Serial # 1: UNKNOWN                        OAN:
Value: $0.00                               Color:
Description: 52 MASTERCARD COLORADO COMMUNITY COLLEGE SYSTEM DEBIT CARDS
Recovered date: -                          Recovered value: $0.00
Flags: *e
Current Location: WH E633D Barcode(TE122314-1)

### Articles - Evidence

Status: EVIDENCE/SEIZED                    Tag #: TE122314- 2
Article: IPINCAR- Items of identification
Serial # 1: UNKNOWN                        OAN:
Value: $0.00                               Color:
Description: MASTERCARD DEBIT CARD "MANUEL ABATE" IN SUSPECT'S WALLET
Recovered date: -                          Recovered value: $0.00
Flags: *e
Current Location: WH E633D Barcode(TE122314-2)

### Articles - Evidence

Status: EVIDENCE/SEIZED                    Tag #: TE122314- 3
Article: IPINCAR- Items of identification
Serial # 1: UNKNOWN                        OAN:
Value: $0.00                               Color:
Description: VISA DEBIT CARD "HEDY C COLLARD" IN CHEETAH WALLET
Recovered date: -                          Recovered value: $0.00
Flags: *e
Current Location: WH E633D Barcode(TE122314-3)

### Articles - Evidence

Status: EVIDENCE/SEIZED                    Tag #: TE122314- 5
Article: RCDISC- Radio, TV, and sound entertainment devices
Serial # 1: UNKNOWN                        OAN:
Value: $0.00                               Color:
Description: INTERVIEW W/ THOMAS
Recovered date: -                          Recovered value: $0.00

For: 16995    Printed On: Sep-04-2012 (Tue.)                    Page 11 of 14

MOA_00000467

| | TEMPE POLICE DEPARTMENT |
|---|---|
| | GENERAL OCCURRENCE HARDCOPY |
| GO# TE 2012-111699 OPEN | 3562-0 MARIJUANA-POSSESSION |

Flags: *e
Current Location: WH VIDEO12 Barcode(TE122314-5)

### Articles - Evidence

Status: **EVIDENCE/SEIZED**                           Tag #: **TE122314- 6**
Article: **YFLASHC- Items listed under Y or not listed in Article Name Dictionary**
Serial # 1: UNKNOWN                                   OAN:
Value: **$0.00**                                      Color:
Description: **PHOTOS OF CREDIT/DEBIT CARDS**
Recovered date: -                                     Recovered value: **$0.00**
Flags: *e
Current Location: ID ID DEPT Barcode(TE122314-6)

### Articles - Evidence

Status: **EVIDENCE/SEIZED**                           Tag #: **TE122314- 7**
Article: **PWALLET- Personal accessories**
Serial # 1: UNKNOWN                                   OAN:
Value: **$0.00**                                      Color:
Description: **CHEETAH WALLET**
Recovered date: -                                     Recovered value: **$0.00**
Flags: *e
Current Location: WH E633D Barcode(TE122314-7)

### Drugs - Evidence

Status: **EVIDENCE/SEIZED**
Tag #: **TE122314- 4**
Name: **Marijuana**
Form: **Leafy Substance**                             Quantity: **0.00**
Unit: **Unknown**                                     Value: **$0.00**
Description: **USEABLE QNTY MARIJUANA**
Recovered date: -                                     Recovered value: **$0.00**
Flags: *e
Current Location: NV 2100N12 Barcode(TE122314-4)

Flags = d (disposed) x (x-reference) n (entered on NCIC) *e (evidence)

MOA_00000468



## TEMPE POLICE DEPARTMENT
### GENERAL OCCURRENCE HARDCOPY

| GO# TE 2012-111699 OPEN | 3562-0 MARIJUANA-POSSESSION |

## Related Property Report(s)

### Report Information

Property Report #: 122315
Property case status: SAFEKEEPING
Submitted on: Aug-30-2012 (Thu.)    by: SEAL, JONATHAN
Related:
Offense: GO TE 2012- 111699
Related items: 1

### Articles

Status: SAFEKEEPING                          Tag #: TE122315- 1
Article: DLAPTOP- Data processing equipment
Make: VAIO
Model: PCG3G5L                               # of pieces:
Serial # 1: 00148134168911                   OAN:
Value: $0.00                                 Color: Pink
Description: SONY VAIO LAPTOP COMPUTER
Recovered date: -                            Recovered value: $0.00
Current Location: RS RS210B Barcode(TE122315-1)

Flags = d (disposed) x (x-reference) n (entered on NCIC) *e (evidence)

MOA_00000469



## TEMPE POLICE DEPARTMENT
### GENERAL OCCURRENCE HARDCOPY

| GO# TE 2012-111699 OPEN | 3562-0 MARIJUANA-POSSESSION |
|---|---|

\*\*\* END OF HARDCOPY \*\*\*

| For: 16995    Printed On: Sep-04-2012 (Tue.) | Page 14 of 14 |
|---|---|

MOA_00000470

# TEMPE POLICE DEPARTMENT

| Continuation ✓ Supplemental | Original Location of Incident | | Orig Beat· | Offense Code | IR Number 12-111699 |
|---|---|---|---|---|---|
| Date of this Report | Date of Original Report· /12/04 | | Supplemental Title | | |
| Victim Name **STATE OF ARIZONA** | | | Connected Incident Numbers | | |
| ☐ **Booking continuation** | Arrestee· | | DOB | Arrest Number | |

On   9/6/12   , a copy of this report was forwarded to the Maricopa County Attorney's Office seeking a criminal complaint against:

SUSPECT 1: Thomas Tramell
FOR, IPOM/IPODP

SUSPECT 2:
FOR,

SUSPECT 3:
FOR,

SUSPECT 4:
FOR,

SUSPECT 5:
FOR,

                              PENDING


                              **IMIS UPDATE**
                              CURRENT STATUS___ADM
                              NEXT REVIEW DATE_____
                              SPARE #2 _____C

| Reporting Officer **R. Page** | ID Number **11597** | Page **1** Of **1** | Supervising Approval |
|---|---|---|---|

## ☐ ALERT UPDATES ATTACHED

# TEMPE POLICE DEPARTMENT                     Priority 2

| ☐ Continuation<br>■ Supplemental | Original Location of Incident<br>MILL AVE & US 60 | Orig Beat<br>21 | Offense Code<br>133405A0 | I R Number<br>12-111699 |
|---|---|---|---|---|
| Date of this Report<br>08/30/12 | Date of Original Report<br>08/30/12 | Supplement Title<br>POSS/SALE MARIJUANA | | |
| Victim Name<br>STATE OF ARIZONA | | Connected Incident Numbers | | |
| ☐ Booking Continuation | Arrestee | | DOB | Arrest Number |

Ofc. J. Seal #19343

    On 08/30/12 at approx 0245 hours I responded to Mill ave just south of
the US 60, to assist Ofc. J. Seal who had called for backup on a vehicle
stop. Upon my arrival Ofc. Seal indicate he was going to detain the a subject
who was seated on the curb behind a white Dodge with Az plate "555XZC" The
subject was detained without incident.

    Ofc. Seal advised me he pulled the subject over for a traffic violation
and he was acting suspicious upon contact. Ofc. Seal said he observed a clear
plastic ziplock bag with what appeared to be a large amount of credit cards
and when the driver noticed he saw the bag the driver threw the bag behind
the passenger seat. Ofc. Seal asked with the suspects suspicious behavior if
I would do an exterior sniff of the vehicle with my Narcotic detection K9
Neo.

    I ran my K9 partner Neo, who is certified in narcotic detection through
the city of Tempe since 05/09/12 and through the National Police Canine
Association since 07/16/12 on the odors of Marijuana, Methamphetamines,
Heroin, an Cocaine, around the exterior of the White Dodge. Neo alerted on
the Driver door by scratching at it. With the exterior alert I sent Neo into
the vehicle. Neo alerted on the center console and the bottom of the rear
seat on the passenger side by scratching at them.

    With the alerts Ofc. Seal and I conducted a search of the vehicle. I
searched the backseat and did not locate any drugs or drug contraband. I did
locate the clear plastic baggie containing what appeared to be a large amount
of credit cards. Ofc. Seal located a foil type bag with a usable quantity of
marijuana in the center console. I identified the substance as marijuana
through my training at the Arizona Law enforcement academy which included a
block of instruction on drug recognition and through my numerous
investigations that led to the arrest of suspects for possession of
marijuana.

    Ofc. Seal took disposition of the marijuana and the credit cards. For
further details refer to Ofc. Seal's report.

                    * * * * Pending * * * *

| Reporting Officer<br>J. PAPKE | I D Number<br>14710 | Supervisor's Approval<br>CARLETON #14619 |
|---|---|---|

SOUTHWESTERN BUSINESS FORMS

☐ **ALERT UPDATES ATTACHED**                          TPD FORM 134<br>REV. 3/90

MOA_00000472

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/13/18 USDC Colorado pg 191 of
971
Case 1:16-cr-00054-WJM Document 195-3 Filed 10/27/17 Page 1 of 1

# **PLACEHOLDER:**

Audio Recording of August 30, 2012
Traffic Stop, Synched with Transcript

Attachment 4





## UNITED STATES DEPARTMENT OF EDUCATION
### OFFICE OF INSPECTOR GENERAL
### INVESTIGATION SERVICES

**DATE INTERVIEWED**: October 24 & 26, 2017

**PERSON INTERVIEWED**: Detective Jonathan Seal

**INTERVIEWED BY**:　　AUSA Bryan Fields
　　　　　　　　　　　AUSA Martha Paluch
　　　　　　　　　　　Special Agent Sandra Ennis

**LOCATION**:　　　　　Tempe Police Department
　　　　　　　　　　　1855 E Apache Rd, Conference Room
　　　　　　　　　　　Tempe, Arizona 85281

**CASE NUMBER**:　　　12-080234

**CASE NAME**:　　　　Pikes Peak Community College Fraud Ring

After being advised of the nature and purpose of the interview and the identities of all present,
Detective Jonathan Seal provided the following information, summarized as follows:

Seal was previously injured on the job by someone driving under the influence (DUI).

Seal provided a Vehicle Impound Report from Tramell Thomas' arrest on August 30, 2012. This
report is also referred to as a tow report (Attachment A).

Tempe Police Department (PD) policy requires a tow of any vehicle in which the driver is
arrested for DUI or a felony when there is no other person to drive the car. Thomas was not
arrested for DUI but he was arrested on a felony possession charge and the vehicle he was
driving could not be left at the intersection of Mill Street and US Highway 60. The statute
detailing the reason for the tow is listed on the tow report.

Taking an inventory of items in the vehicle prior to towing is a Tempe PD policy. Seal provided
Tempe PD's Vehicle Inventories, Towing and Seizures policy (Attachment B).

Detective Seal pulled Thomas over because the vehicle he was driving was drifting in between
lanes and the tires of the vehicle crossed the double line. Both of these violations have been
identified as potential indicators of DUI by the National Highway Traffic Safety Administration
(NHTSA).

Since the mid-seventies, NHTSA has conducted impaired driver studies on thousands of vehicle
stops. A vehicle drifting in a lane is an NHTSA clue with a 50-75% chance that the driver's
blood-alcohol level will be above .08.

In October 2006, Seal went through basic police academy training. A portion of this training
included field sobriety testing and identifying NHTSA clues. Seal is certified in drug recognition
through the International Chiefs of Police Association (IACP) and is an instructor in Horizontal
Gaze Nystagmus (HGN) testing. Seal provided his curriculum vitae (Attachment C).

Prepared by: Sandra Ennis　　　　　　　　　　　　　　　Date Prepared: October 25, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced
without written permission. The report is **FOR OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public
availability to be determined by 5 U.S.C. 552.

Interview of Detective Jonathan Seal, October 24, 2017                                    12-080234

Seal has made approximately 400 DUI arrests.

During Seal's initial encounter with Thomas, Seal detected an odor of alcohol coming from the vehicle.

Upon his initial encounter, Seal did not notice the open container of alcohol sitting upright on the passenger side floorboard. Thomas must have placed the container there.

When shown photos of a white vehicle, Seal did not remember the vehicle in the photo. Seal confirmed the vehicle in the photo was the same vehicle Thomas was driving the night of his arrest. Seal did so after comparing the vehicle plate number in the photo to the plate number listed in the tow report. Seal positively identified a photo of Thomas.

Seal pulled Thomas over at or around US Highway 60 and Mill road when Thomas' vehicle crossed the double yellow line. Thomas initially stopped in the right left turn lane, at the front of the turn lane. Seal jumped out of the vehicle and yelled at Thomas to pull further down the highway. The vehicle came to a stop about another block down at the off ramp of west bound US highway 60, north of Carter on the west side curb.

Seal cannot remember the exact verbiage of Tempe PD's voice recording policy because it has changed since the department has issued body cameras. Pre-body camera, domestic violence cases were required to be recorded. Generally, Seal's practice of using a voice recorder was on a case by case basis, usually when Seal believed a felony might have been committed or when he felt the encounter might become confrontational. Seal does not record every encounter.

At the time of Thomas' traffic stop, Seal had a voice recorder in his left shirt pocket. At some point during the encounter, Seal made the decision to record the encounter because he felt Thomas was being less than cooperative and he wanted to interview Thomas about what was located in the vehicle.

The unrecorded portion of Seal's encounter with Thomas included asking Thomas where he was headed. Thomas' response did not make sense to Seal. Thomas indicated that he was coming from Chandler and headed home to Chandler. Thomas then said he was going to Chandler after picking up mail from his post office box in downtown Tempe.

Seal stopped behind Thomas' vehicle and turned on his vehicle's spotlight. Seal turned on and held his flashlight in his left hand as he approached the vehicle Thomas was driving. Seal directed his flashlight toward the driver's side mirror. Doing so creates a distraction for the driver of the vehicle and is done for officer safety.

For officer safety, Seal stopped a little behind the driver's side door and window, just behind the driver.  Seal proceeded with his traffic stop by asking the driver where he was headed. Seal also asked for a driver's license, and the vehicle's proof of insurance and registration.

In scanning the interior of the vehicle for officer safety, Seal noticed what he believed to be contraband in plain view. There was a Ziploc plastic bag containing a large stack of credit cards in the rear passenger seat side of the vehicle. The back seat of the vehicle was a bench seat. Seal believed these to be credit cards because they had all the similar characteristics of credit cards such as the same size and shape, silver lettering, and the Master Card symbol.

When shown U.S. Department of Education Office of Inspector General's (ED-OIG) evidence item #4 (Tracker Item #58), Seal confirmed the envelope containing the 52 debit cards had a

Case No. 1:16-cr-00054-WJM-Document 525-1 filed 12/12/18 USDC Colorado pg 194 of
Case 1:16-cr-00054-WJM Document 119-4 Filed 10/27/17 Page 3 of 5 pg 194 of
971

Interview of Detective Jonathan Seal, October 24, 2017                    12-080234

Tempe PD evidence tag created by him. It is customary practice for Seal to seal evidence with his initials and badge number. These identifiers were located on the backside of the envelope.

While on scene at the traffic stop, Seal took photos of the credit cards and made photocopies when the credit cards were entered into evidence. Also taken into Tempe PD custody was a cheetah wallet containing credit cards in the name of Hedy Collard.

Seal provided a Tempe PD Property Report that is included as attachment D.

The debit cards were taken out of the envelope and counted in front of Seal, confirming there were 52 debit cards. Seal noted that four of the debit cards did not have the Colorado Community Colleges name on the card.

Seal asked Thomas about the stack of credit cards in the back seat. Thomas just sat there and did not respond. Seal asked Thomas to hand him the Ziploc plastic bag from the rear of the vehicle and Thomas said "sure." Thomas handed Seal an empty Ziploc plastic bag. It appeared that Thomas was trying to conceal the Ziploc bag full of credit cards underneath the front passenger seat.

Seal determined the encounter needed to be looked into further and for officer safety reasons Seal radioed for assistance. Seal did not want Thomas to drive off or destroy evidence. He was not the most cooperative in answering questions about the credit cards.

Seal detained Thomas by taking him out of the vehicle and placing him in handcuffs. After being placed in handcuffs, Thomas was placed in between the rear of the vehicle Thomas was driving and in front of Seal's patrol vehicle. Thomas' feet were in the gutter and his bottom was on the sidewalk. It is Tempe PD policy to place an individual in handcuffs when they are being detained.

The first officer to arrive was Officer Papke, who was a K-9 officer. In reviewing the Computer Aided Dispatch (CAD) log, Seal assumed Officer Papke was the first to arrive because he was the closest officer in the vicinity. When asked if he requested a K-9 officer to respond, Seal stated "no" and noted that the CAD log showed that Officer Shearan was dispatched as backup (Attachment E).

The CAD log shows the patrol officer's call sign when radioed into dispatch. The CAD log also shows the dispatcher ID who took the call. At times, the dispatcher will not log every radioed call by an officer. A dispatcher's main focus is to get a second unit out to a patrol officer.

The CAD log reflects where Office Papke added himself to the call and arrived approximately five minutes after Thomas' traffic stop. Thomas was out of the vehicle prior to Papke's arrival.

Seal is not a K-9 handler. K-9 officers are out on patrol to assist. There are times when they will arrive at a traffic stop. Drugs do not need to be identified in a traffic stop for a K-9 officer to show up. They are a useful law enforcement tool.

Seal was standing at the A-pillar of Seal's patrol car when Seal informed Papke of what was going on. Papke offered to run the dog around the vehicle. Papke ran his K-9 around the vehicle and the dog alerted on the vehicle. Once inside the vehicle, the dog alerted on the center console of the vehicle and in the rear floorboard area of the vehicle.

A baggie containing a usable amount of marijuana was located in the center console. An approximately 20 ounce plastic cup, containing brown liquid that smelled like alcohol and was

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/18/17 USDC Colorado pg 195 of 971
Case 1:16-cr-00054-WJM Document 119-4 Filed 10/27/17 Page 4 of 5 pg 195 of
971

Interview of Detective Jonathan Seal, October 24, 2017                                12-080234

cold to the touch, was located in the center of the passenger floorboard. Seal seized the Ziploc bag of credit cards. Seal recalled that all of the credit cards were in the names of different individuals. Seal thought these credit cards were fraudulent credit cards or a result of identity theft. Seal has prior experience investigating identity theft.

When shown ED-OIG item #1 (Tracker Item #45), Seal confirmed that it also contained a Tempe PD evidence tag created by him and was the pink laptop located in the vehicle Thomas was driving. The laptop was located in the backseat floorboard area of the vehicle.

Typically, Seal confirmed his voice recorder was operational at the start of his shift by checking to ensure the batteries were not dead. It was common practice for Seal to keep the voice recorder in his left breast pocket. Arizona is a one party state that does not require notification to the person being recorded. Seal's voice recorder is a digital recorder that has a USB hook-up. Seal attaches the USB to transfer the recordings to his agency laptop. These recordings are then transferred to a CD and entered into evidence. This information is annotated on the Tempe PD Property Report.

In reviewing the CAD log, it is customary for an officer to obtain additional information during a traffic stop. A PACE check is an inquiry to obtain information such as wants and warrants, information about a vehicle, and whether or not the driver's license is valid.

In reviewing the voice recordings, Seal confirmed his own voice and the voice of the driver, Thomas. Seal had Thomas step out of the vehicle due to Thomas being less than cooperative and for two possible offenses, DUI and the credit cards in the back seat. The odor of alcohol vanished when Thomas was outside of the vehicle and Thomas did not appear intoxicated.

Seal confirmed Papke's voice. Seal does not recall handing Papke the voice recorder. He may have set the recorder on the hood of his patrol vehicle.

At recorded duration 6 minutes and 23 seconds, Seal looked into Thomas' eyes and noted that they were bloodshot. Seal did not notice any indicators of intoxication. Seal only documents failed HGN test results.

An open container is a misdemeanor arrestable offense in Arizona.  It falls under Title IV of Arizona's penal code. The decision to arrest is discretionary. Having a usable amount of marijuana is a felony arrestable offense and arrest is not discretionary. Thomas was booked for both offenses.

There are times when an individual is booked and released pending charges for a narcotic offense. When a drug arrest is made, the alleged drug is sent to the crime lab to verify whether or not it is a controlled substance.

At duration 11 minutes and 32 seconds, a click of the door handle is heard. Seal recalled this was when the dog alerted on the vehicle and was sent into the vehicle. There was another voice heard on the recording. This was Officer Patrick Shearan. Shearan filled out the tow report and showed up later behind the K-9 unit. Officer Shearan stayed with Thomas while Seal and Papke searched the vehicle. Seal could not recall if he handed the voice recorder to Shearan or if he placed it on the hood of Seal's patrol car.

Thomas told Seal that the vehicle he was driving belonged to his girlfriend, Heather Carr.

Seal did not think Thomas was drunk and Thomas was not given a preliminary breath test (PBT).

OIG Form 301                                                                          Page 4 of 5

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/13/18 USDC Colorado pg 196 of
971
Case 1:16-cr-00054-WJM Document 419-4 Filed 10/27/17 Page 5 of 5 pg 196 of
971

Interview of Detective Jonathan Seal, October 24, 2017                    12-080234

When shown ED-OIG evidence item #3 (Tracker Item #57), Seal confirmed the envelope
containing the one debit card bearing the name Manuel Abate had a Tempe PD evidence tag
created by him. Seal confirmed this debit card was located in Thomas' wallet. Seal does not
recall where he retrieved Thomas' wallet.

Seal counted money in front of Thomas. Seal cannot remember where the money was located.

At this point, Seal placed Thomas under arrest. Thomas was stood up and placed in the patrol
car.

Seal has a practice of turning off his recording device when talking to another officer. If it's not
Tempe PD policy, it is a common practice.

In reviewing page 41 of the voice recorded transcript, Seal confirmed there was a call made for
a tow.

In reviewing page 43 of the voice recorded transcript, Seal could not remember saying
something about alcohol. The DUI investigation would have continued if there were additional
NHTS clues identified.

In reviewing page 44 of the voice recorded transcript, Seal is asking questions required for
booking. These booking forms are included as attachment F.

The entire duration of the stop was two hours and eight minutes. Seal noted most of that time
was spent waiting for the tow truck. Seal noted that the CAD report reflects that he got to
Thomas' window at 2:44 a.m. and the 10-42 code at 3:12 a.m. indicated the time that Thomas
was placed under arrest. A fourth officer came and transported Thomas to the police station.

Seal's call sign is 4P51.

A typical DUI stop on the side of the road takes Seal approximately 30 minutes. A routine traffic
stop takes Seal approximately eight minutes. Back in 2012, Seal took approximately 15 minutes
for a traffic stop due to a lack of familiarity with the traffic codes, which would require more time
spent in looking up the codes.

The marijuana, credit cards, and alcohol were all factors which led to Thomas' detention.

Seal provided a CD of photos taken during the traffic stop. A copy of the disc will be provided to
the U.S. Attorney's Office. These photos are included as attachment G.

On October 26, 2017, Detective Seal emailed additional Tempe PD policies to the investigating
agent. His email and its attached Tempe PD policies are included as attachment H.

On October 26, 2017, Detective Seal emailed photographs of Tempe Police Department
evidence item number TE122314-4. This item was the marijuana inside a plastic baggie located
in the center console of the driver's vehicle. Detective Seal's email and its attachments are
included as attachment I.

On October 26, 2017, Detective Seal emailed photographs of Tempe Police Department
evidence item number TE122314-7. The email and its attachments are included as attachment
J.

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/13/18 USDC Colorado pg 197 of
Case 1:16-cr-00054-WJM Document 198-5 Filed 10/27/17 Page 1 pg 197 of
971
Attachment 5





# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES

| | |
|---|---|
| **DATE:** | **December 20, 2012** |
| **PREPARED BY:** | **SA Sandra Ennis** |
| **CASE TITLE:** | **Pikes Peak Community College Fraud Ring** |
| **CASE NUMBER:** | **12-080234** |
| **REPORT RE:** | **Tempe Police Records 12-111699 & 12-111711** |

On or about December 6, 2012, the Financial Aid Director (FAD) of Pikes Peak Community College advised that the Colorado Community College Systems office (CCCS) had been contacted by a Detective from Tempe Arizona Police Department. CCCS's FAD Karla Nash provided contact information for Sergeant Rick Vasquez.

Contact with Sergeant Vasquez disclosed Tramell Thomas had been arrested on August 30, 2012. At the time of his arrest, Thomas had fifty-two (52) debit cards in his possession. Vasquez provided Tempe Police Department report numbers 12-111711 and 12-111699. Further details regarding the communication with Vasquez are detailed in a separate write-up.

On or about December 7, 2012, report numbers 12-111711 and 12-111699 were requested from Tempe Police Department and are included in this report as Attachment A.

| | | |
|---|---|---|
| Date Prepared: 12/19/2012 | S/A Ennis | Case No: 12-080234 |

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM-2

UNITED STATES OF AMERICA,

Plaintiff,

v.

2.     TRAMMEL THOMAS,

Defendant.

---

## MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANT

---

Defendant Trammel Thomas, through counsel, moves this Court for an order suppressing certain evidence seized during the execution of a search warrant on his residence on 29 November 2012, on the grounds that the evidence was seized in violation of the Fourth Amendment to the Constitution of the United States. Specifically, Mr. Thomas seeks to suppress the several cellphones that law enforcement took on that date.   The seizure of the phones was unconstitutional because there was no probable cause to support the warrant that authorized law enforcement taking the phones.

Background:   In November, 2012, Mr. Thomas resided at 1822 East Kaibab Drive ("Kaibab") in Chandler, Arizona, along with his former co-defendant Heather Carr and some children.   Unbeknownst to Mr. Thomas and to Ms. Carr at the time, they and other individuals were targets of a U.S. Department of Education ("DoEd") investigation into student loan fraud.   In connection with that investigation, on 27 November 2012 DoEd Special Agent Sandra R. Ennis submitted an Application for a Search Warrant

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 199 of
971
Case 1:16-cr-00054-WJM Document 194 Filed 10/30/17 Page 2 of 7

("Application") to the United States District Court for the District of Arizona (Exhibit A).

After reviewing the Application, United States Magistrate Judge Bridget S. Bade issued the requested search warrant (Exhibit B). On 29 November 2012 numerous law enforcement officers executed the search warrant on the Kaibab premises. In the course of the search, the officers seized: a) a slew of hard copy documents ranging from checkbooks to bank statements to spreadsheets to letters to receipts to lists of addresses to cash to i.d.'s; b) computers and related devices, from Apple MacBooks to iPads to hard drives; and, c) ten cellular telephones. Mr. Thomas seeks to suppress these phones as evidence.

Application for the Warrant: The Application sought a warrant to search the Kaibab premises. The Application was accompanied, *inter alia*, by a sworn affidavit from SA Ennis ("Affidavit" [attached independently hereto as Exhibit C]. The Affidavit was divided into six sections: an introduction, an overview of the alleged crime, an overview of the student aid program, evidence associated with Kaibab, areas to be searched, and search and seizure of electronic devices. The latter three portions of the Affidavit are of most relevance here.

Section Four of the Affidavit: Section Four of the Affidavit (pp. 9-15) was titled "**Computer Evidence** Associated with1822 East Kaibab Drive, Chandler, Arizona" (emphasis added). Section Four delineated how two IP addresses linked to Kaibab were the electronic points of origin from which fraudulent student loan applications were submitted. Section Four also hypothesized that Carr and Thomas (and others) were involved in having improper student aid mailings sent to various addresses in Colorado and Arizona and that, at the time of the Affidavit, Carr and Thomas were living

2

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/12/19   USDC Colorado   pg 200 of
971
Case 1:16-cr-00054-WJM   Document 194   Filed 10/30/17   Page 3 of 7

at Kaibab.   Section Four did not postulate that Carr, Thomas, or others had utilized

cellular devices to perpetrate the alleged fraud.

    Section Five of the Affidavit:   Section Five of the Affidavit (pp. 15-17) described

the crimes under investigation, the types of places within Kaibab to be searched, and

the types of evidence to be seized.   In this lattermost respect, ¶ 45 stated, in relevant

part, that "[t]he search warrant is sought for the seizure of documentary evidence,

including handwritten or typewritten records and documents, as well as ***computer***

***generated records***, any ***computer hardware and software***, and other such items as

more fully described in Attachment B . . ." (emphasis added).   In short, SA Ennis

sought authority (which was granted) to search for, and to seize, computer-related

records and hardware and for hard copy documents, all as related to the student aid

fraud scheme.   She again did not focus her request on cellphones.

    She did, at ¶ 46, make a single passing reference to cellphones.   She stated that,

"[b]ased on my experience, knowledge, and training, and that of other agents I have

spoken with, suspects in similar investigations possess storage safes, computers,

facsimile machines, cell phones, and pagers which they use as part of their method of

operation."   However, this sole assertion with respect to cellphones was never

elaborated on.   Of critical importance, the Affidavit was utterly devoid of any explanation

as to how the types of evidence that law enforcement was seeking might be found on a

cellphone or as to how anyone carrying out a student aid fraud scheme might utilize a

cellphone in pursuit thereof.

    Section Six of the Affidavit:   Section Six of the Affidavit (pp. 18-24) was titled

"Search and Seizure of Electronic Devices".   The broad title of this section

3

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 201 of
Case 1:16-cr-00054-WJM Document 194 Filed 10/30/17 Page 4 of
971

notwithstanding however, the content of Section Six made clear that the "Electronic
Devices" that the Government wanted permission to search and to seize were
computers and not cellphones.   To wit, ¶ 50 was titled "*Probable cause to search
computers*" (emphasis added) and the explanatory sub-paragraphs that followed
talked about computer files, computer software, and computer storage media.   There
was no mention of cellphones or of recordation of data thereon.

       ¶ 51 of Section Six was titled "*Forensic evidence*".   The hypothesis of that
paragraph was that "[t]here is probable cause to believe that this forensic electronic
evidence will be *on any computer* in the premises . . ." (emphasis added).
Discussion in the ensuing six sub-paragraphs focused exclusively on evidence that
might be located in computer files, registries, logs, etc.   There was no suggestion in ¶
51 that any forensic evidence of interest to law enforcement in the student aid
investigation might be found on a cellphone.

       ¶ 52 of Section Six was titled "*Necessity of seizing or copying entire computers
or storage media*", and ¶ 53 was titled "*Nature of examination*".   Again, the content of
these two paragraphs was entirely about computers and related storage devices and
not at all about cellphones.   There was no suggestion or discussion that the need to
search "storage media" might extend to cellular devices.

       As such, the three sections of the Affidavit germane to this motion dealt with why
Kaibab was a proper location to be searched, with what places within Kaibab needed to
be searched, and with what types of items were of interest for seizure.   In this
lattermost respect, the Affidavit outlined the need for the seizure of hard copy
documents and of computers and related media and storage devices.   The Affidavit

4

did not establish the basis for search and seizure of cellular telephones.[1]

     <u>Attachment B to the Warrant</u>:   This dearth of any meaningful discussion of

cellular devices in the Affidavit notwithstanding, however, Attachment B to the Warrant

nonetheless contained the following boilerplate references to seizure of cellphones:

     ¶16 "<u>Files to be seized on any computer at 1822 East Kaibab Drive, Chandler,
Arizona.</u>

     a.  Any personal computer, ***cell phone***, PDA, or other digital device used to

facilitate the above-listed violations and forensic copies thereof." (emphasis added).[2]

     ¶ 17:  "As used above, the term records, documents, programs, applications or
materials include records, documents, programs, applications or materials created,
modified or stored in any form, including in digital form on any digital device and any
forensic copies thereof.  As used both above and below, the term 'digital device'
includes any electronic system or device capable of storing and/or processing data in
digital form, including central processing units; laptop or notebook computers; personal
digital assistants; wireless communication devices such as telephone paging devices,
beepers, and ***mobile telephones***; peripheral input/output devices such as keyboards,
printers, scanners, plotters, monitors, and drives intended for removable media; related
communication devices such as modems, cables, and connections, storage media
such as hard disk drives, floppy disks, compact disks, magnetic tapes, and memory
chips; and security devices.  (emphasis added).

     ¶19:  In order to search for data that is capable of being read or interpreted by a
digital device, law enforcement personnel may need to seize the following items:

     . . . .

     c.  Any magnetic, electronic, or optical storage device capable of storing data,
such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical
disks, printer or memory buffers, smart cards, PC Cards, memory calculators,
electronic dialers, electronic notebooks, ***cellular telephones***, and personal digital

---

[1] Indeed, with the exception of the brief allusion to cellphones in ¶ 46 of the Affidavit as
discussed, supra., the Affidavit is utterly bereft of any mention of cellphones.

[2] The *pro forma* nature of this language is evident from the listing of "[a]ny personal computer,
cell phone, PDA, or other digital device" under the heading of "<u>Files to be seized on any computer at
1822 East Kaibab Drive, Chandler, Arizona.</u> "  This simply makes no sense, as a cellphone cannot be a
file type on a computer.

5

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 203 of
971
Case 1:16-cr-00054-WJM Document 194 Filed 10/30/17 Page 3 of 7

assistants;" (emphasis added).

Suppression:   These three boilerplate grants of permission in the warrant to seize cellphones cannot withstand scrutiny under the Fourth Amendment.   It is axiomatic under the Fourth Amendment that, in order to be valid, a warrant must be supported by probable cause.   Indeed, the text of the Amendment itself states, in relevant part, that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . ."   Here, there was no probable cause to support seizure of cellphones, because, as outlined *ad nauseam* above, there was virtually no discussion in the Affidavit of any justification for seizing cellphones.

Therefore, insofar as the warrant authorized seizure of cellphones, the warrant was overbroad, rendering it an impermissible general warrant.   Mr. Thomas acknowledges, though, that the entire warrant need not necessarily be invalidated based upon defects in part of it.   Indeed, "[u]nder the severability doctrine, '[t]he infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant, but does not require the suppression of anything described in the valid portions of the warrant . . .'" United States v. Sells, 463 F.3d 1148, 1150 (10th Cir. 2006), *cert. denied,* 549 U.S. 1229 (2007).

In the instant matter, the seizure of the cellphones was improper because the parts of the warrant authorizing the seizure were unsupported by probable cause. "The ordinary remedy for a search conducted or items seized in violation of the Fourth Amendment's warrant requirements is suppression. Sells, at 1154.   Accordingly, Mr. Thomas respectfully moves for an order from this Court suppressing the cellphones seized (and any data found thereon) from Kaibab.

6

Case No. 1:16-cr-00054-WJM Document 535-1 filed 12/12/19 USDC Colorado pg 204 of
971
Case 1:16-cr-00054-WJM Document 194 Filed 10/30/17 Page 7 of 7

Dated this 30th day of October, 2017.

Respectfully submitted,

s/Thomas E. Goodreid
Thomas E. Goodreid
Attorney at Law
1801 Broadway, Suite 1400
Denver, CO   80202
(303) 296-2048x.136
*t.goodreid@comcast.net*
Attorney for Defendant Trammel Thomas

## CERTIFICATE OF SERVICE

I certify that on this 30th day of October, 2017, I electronically filed the foregoing
**MOTION TO SEIZE EVIDENCE SEIZED PURSUANT TO SEARCH WARRANT** with the
Clerk of Court using the CM/ECF system, which will send notification of such filing to all
counsel of record.

s/Thomas E. Goodreid
Thomas E. Goodreid
Attorney at Law
1801 Broadway, Suite 1400
Denver, CO   80202
(303) 296-2048x.136
*t.goodreid@comcast.net*
Attorney for Defendant Trammel Thomas

7

AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Arizona

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

1822 East Kaibab Drive
Chandler, AZ 85249

Case No. 12-7626 MB

## APPLICATION FOR A SEARCH WARRANT

I, United States Department of Education Special Agent Sandra R. Ennis, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT A incorporated herein by reference.

located in the _____ District of _____ Arizona _____ , there is now concealed *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT B incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Sections* | *Offense Description* |
|---|---|
| Title 20 U.S.C. § 1097 | Conspiracy to commit financial aid fraud, theft of government funds, false |
| Title 18 U.S.C. §§ 371, 641, | statements to a government agency, mail fraud and wire fraud |
| 1001, 1341, 1343 | |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT INCORPORATED BY REFERENCE HEREIN.

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Authorized by AUSA Jennifer Levinson

_____
*Applicant's signature*

SANDRA ENNIS, SPECIAL AGENT
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/27/12 @ 9:30 a.m

_____
*Judge's signature*

City and state: Phoenix, Arizona

Honorable Bridget S. Bade, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A- LOCATION TO BE SEARCHED

### 1822 East Kaibab Drive

### Chandler, Arizona, 85249

The residence is located on the north side of East Kaibab Drive off of South Edith Drive or South Soho Lane at **1822 East Kaibab Drive**. East Kaibab Drive is not a through street and is within the gated community of North Barrington subdivision. **1822 East Kaibab Drive** is further described as an approximately 5,480 square foot, single story home with light brown stucco siding and dark brown trim with a sandy brown colored roof. The address **1822** is in dark numbers on a stone type placard adjacent to the right facing side of the garage door and is below a porch type light.

SW_00013590

## ATTACHMENT B

## ITEMS TO BE SEIZED

The following documents and items including information and/or data stored in a computer readable format to be seized at the premise of **1822 East Kaibab Drive, Chandler, Arizona,** and inside any such areas within the curtilage of the aforementioned location(s) that reasonably serve to store or hide such items, such as storage sheds, outbuildings, storage containers, trailers, or vehicles, which constitute the fruits, instrumentalities and evidence of the crimes of student aid fraud, mail fraud, conspiracy, and related activity in connection with the application for and receipts of federally and or non-federally funded student financial aid, in violation of 20 U.S.C. § 1097 (Financial Aid Fraud), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 641 (Theft of Government Funds), 18 U.S.C. § 1001 (False Statement to a Government Agency), 18 U.S.C. § 1341 (Mail Fraud), and 18 U.S.C. § 1343 (Wire Fraud) for the period of January 2010 through the present:

1. Financial aid applications, financial aid worksheets, financial aid records, tax records, wage and earning statements, and any other documentation containing the names and/or personal identifying information of individuals who are not occupants of the residence.

2. Evidence of application and enrollment to post-secondary institutions, and supporting documentation, including, but not limited to, proof of eligibility, (i.e. high school diploma, or GED transcript), evidence of payment of fees, acceptance

SW_00013591

letters, academic transcripts, student identification cards, and correspondence from the schools to students.

3.  Student, school, or lender copies of applications relating to federal and non-federal student financial aid, servicing student loans, and supporting documentation including, but not limited to, correspondence, identification documents, social security cards, tax documents, and wage and earning statements.

4.  Any and all envelopes, letters, and other correspondence, memoranda, mail, notes, other documents and records of communications, whether handwritten, electronic, or otherwise, bearing the identification of any school, university, post-secondary institution.

5.  Any and all items and any and all records, documents, ledgers, applications, or materials, including, but not limited to, financial aid award letters, promissory notes, loan deferment requests, e-mails, notes, and outstanding loan balance letters, in whatever form, including e-mails, texts, chats, logs, loan applications, bank statements, letters notes, and photographs, whether stored electronically on a computer or other storage media, or in paper form, that pertain or relate to a scheme to defraud any sum of federal financial aid.

6.  Records reflecting the distribution of federal and non-federal student financial aid including, but not limited to, checks, bank records, ledgers, and deposit slips.

7.  Indicia of occupancy, residency, rental and/or ownership of the premises described herein, including, but not limited to, records, documents, receipts, utility and

2

SW_00013592

telephone bills, canceled envelopes, rental purchase or lease agreements, and key(s).

8.    Records relating to current and past residences and all records pertaining to U.S. Post Office mail boxes, or any other mail receipt facilities.

9.    Any and all identification documents such as driver's licenses, social security cards, birth certificates, and any prison related documentation.

10.   All records, documents, programs, applications, or materials, in whatever form, pertaining to accounts held with Internet Service Providers or of Internet use.

11.   All safes or other locked compartments that cannot be opened on the premises during the search.

12.   Cash, debit cards, and other suspected proceeds of the above referenced offenses.

13.   All records, documents, programs, applications or materials, in whatever form, of personal and business activities relating to the operation and ownership of the computer systems in the subject premises.

14.   Any and all tapes, cassettes, cartridges, streaming tapes, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drivers, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, tape systems, CD-ROMs, DVRRW, hard drives, and other computer related operation equipment, computers, and any other equipment that would assist in the completion or submission of federal and non-federal student financial aid and/or loan application or supporting documentation relating

3

SW_00013593

to the application for and receipt of student financial aid funds by individuals not living at the residence.

15. Any and all scanners, fax machines, printers, as well as other digital devices falling within the scope of the foregoing search categories, that could have been used to manufacture, produce, or to facilitate the above-listed violations and forensic copies thereof.

16. **Files to be seized on any computer at 1822 East Kaibab Drive, Chandler, Arizona.**

    a. Any personal computer, cell phone, PDA, or other digital device used to facilitate the above-listed violations and forensic copies thereof.

    b. With respect to any digital devices falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or the absence of same, sufficient to show the actual user(s) of the digital device during the time period between January 1, 2010 and the date this warrant is executed, including:

        i. Evidence of who used, owned, or controlled, the digital devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

4

SW_00013594

ii. Evidence of software that would allow others to control the digital devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. Evidence of the lack of such malicious software;

iv. Evidence of the attachment to the digital devices of other storage devices or similar containers for electronic evidence;

v. Evidence of computer-forensic programs (and associated data) that are designed to eliminate data from the digital devices;

vi. Evidence of the times the digital devices were used;

vii. Password, encryption keys, and other access devices that may be necessary to access the digital devices;

viii. Documentation and manuals that may be necessary to access the digital devices or to conduct a forensic examination of the digital devices;

ix. Contextual information necessary to understand the evidence described in this attachment.

17. As used above, the term records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including in digital form on any digital device and any forensic copies thereof. As used both above and below, the term "digital device" includes any electronic system or device capable of storing and/or processing data

5

SW_00013595

in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections, storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes, and memory chips; and security devices.

18. Records and things evidencing the use of the Internet to communication with community colleges (and any of their offices, divisions, and employees), including:

   a. routers, modems, and network equipment used to connect computers to the Internet;

   b. records of Internet Protocol addresses used;

   c. records of internet activity, including firewall logs, caches, browser history, and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

19. In order to search for data that is capable of being read or interpreted by a digital device, law enforcement personnel may need to seize the following items:

   a. Any digital device capable of being used to commit, further or store evidence of the offenses listed above;

6

SW_00013596

b. Any equipment used to facilitate the transmission, creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c. Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC Cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

d. Any documentation, operating logs and reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters and other software used to facilitate the direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

7

SW_00013597

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/12/19 USDC Colorado page 214 of
Case 1:16-cr-00054-WJM Document 194-2 Filed 10/30/17 Page 214 of
971

EXHIBIT B

AO 93  (Rev. 12/09) Search and Seizure Warrant

AGENT
ORIGINAL

# UNITED STATES DISTRICT COURT

for the

District of Arizona

SEALED

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*      )     Case No.  12-7626MB
                                                   )
1822 East Kaibab Drive                             )
Chandler, AZ 85249                                 )
                                                   )

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ District of ___Arizona_____
*(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT A incorporated herein by reference.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the*
*property to be seized)*:
SEE ATTACHMENT B incorporated herein by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or
property.

**YOU ARE COMMANDED** to execute this warrant on or before _____12|11|12_____
                                                                    *(not to exceed 14 days)*

☐ in the daytime  6:00 a.m. to 10 p.m.        ☐ at any time in the day or night as I find reasonable cause has been
established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property
taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the
place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
_any duty magistrate judge in AZ._
        *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay
of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be
searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30)*.
                                    ☐until, the facts justifying, the later specific date of _____

Date and time issued:    11/27/12 @ 9:30am    _Bridget S. Bade_
                                                        *Judge's signature*

City and state:    Phoenix, Arizona          Honorable Bridget S. Bade, U.S. Magistrate Judge
                                                        *Printed name and title*

214

SW_00000001

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return |
| --- |

| Case No.:<br>12-7626MB | Date and time warrant executed:<br>11-29-2012 6:30am | Copy of warrant and inventory left with:<br>Heather Carr |

Inventory made in the presence of :
Evidence Custodian Brandon Lewis

Inventory of the property taken and name of any person(s) seized:

See attached inventory Sheets
pages 1-3

No other information following
Sheets 1-3

SL

SL

| Certification |
| --- |

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 11.30.2012

_Executing officer's signature_

SANDRA ENNIS SPECIAL AGENT
_Printed name and title_

### ATTACHMENT A- LOCATION TO BE SEARCHED

**1822 East Kaibab Drive**

**Chandler, Arizona, 85249**

The residence is located on the north side of East Kaibab Drive off of South Edith Drive or South Soho Lane at **1822 East Kaibab Drive**. East Kaibab Drive is not a through street and is within the gated community of North Barrington subdivision. **1822 East Kaibab Drive** is further described as an approximately 5,480 square foot, single story home with light brown stucco siding and dark brown trim with a sandy brown colored roof. The address **1822** is in dark numbers on a stone type placard adjacent to the right facing side of the garage door and is below a porch type light.

SW_00000003

## **ATTACHMENT B**

### **ITEMS TO BE SEIZED**

The following documents and items including information and/or data stored in a computer readable format to be seized at the premise of **1822 East Kaibab Drive, Chandler, Arizona,** and inside any such areas within the curtilage of the aforementioned location(s) that reasonably serve to store or hide such items, such as storage sheds, outbuildings, storage containers, trailers, or vehicles, which constitute the fruits, instrumentalities and evidence of the crimes of student aid fraud, mail fraud, conspiracy, and related activity in connection with the application for and receipts of federally and or non-federally funded student financial aid, in violation of 20 U.S.C. § 1097 (Financial Aid Fraud), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 641 (Theft of Government Funds), 18 U.S.C. § 1001 (False Statement to a Government Agency), 18 U.S.C. § 1341 (Mail Fraud), and 18 U.S.C. § 1343 (Wire Fraud) for the period of January 2010 through the present:

1.    Financial aid applications, financial aid worksheets, financial aid records, tax records, wage and earning statements, and any other documentation containing the names and/or personal identifying information of individuals who are not occupants of the residence.

2.    Evidence of application and enrollment to post-secondary institutions, and supporting documentation, including, but not limited to, proof of eligibility, (i.e. high school diploma, or GED transcript), evidence of payment of fees, acceptance

SW_00000004

letters, academic transcripts, student identification cards, and correspondence from
the schools to students.

3.   Student, school, or lender copies of applications relating to federal and non-federal
     student financial aid, servicing student loans, and supporting documentation
     including, but not limited to, correspondence, identification documents, social
     security cards, tax documents, and wage and earning statements.

4.   Any and all envelopes, letters, and other correspondence, memoranda, mail, notes,
     other documents and records of communications, whether handwritten, electronic,
     or otherwise, bearing the identification of any school, university, post-secondary
     institution.

5.   Any and all items and any and all records, documents, ledgers, applications, or
     materials, including, but not limited to, financial aid award letters, promissory
     notes, loan deferment requests, e-mails, notes, and outstanding loan balance
     letters, in whatever form, including e-mails, texts, chats, logs, loan applications,
     bank statements, letters notes, and photographs, whether stored electronically on a
     computer or other storage media, or in paper form, that pertain or relate to a
     scheme to defraud any sum of federal financial aid.

6.   Records reflecting the distribution of federal and non-federal student financial aid
     including, but not limited to, checks, bank records, ledgers, and deposit slips.

7.   Indicia of occupancy, residency, rental and/or ownership of the premises described
     herein, including, but not limited to, records, documents, receipts, utility and

2

SW_00000005

telephone bills, canceled envelopes, rental purchase or lease agreements, and key(s).

8. Records relating to current and past residences and all records pertaining to U.S. Post Office mail boxes, or any other mail receipt facilities.

9. Any and all identification documents such as driver's licenses, social security cards, birth certificates, and any prison related documentation.

10. All records, documents, programs, applications, or materials, in whatever form, pertaining to accounts held with Internet Service Providers or of Internet use.

11. All safes or other locked compartments that cannot be opened on the premises during the search.

12. Cash, debit cards, and other suspected proceeds of the above referenced offenses.

13. All records, documents, programs, applications or materials, in whatever form, of personal and business activities relating to the operation and ownership of the computer systems in the subject premises.

14. Any and all tapes, cassettes, cartridges, streaming tapes, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drivers, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, tape systems, CD-ROMs, DVRRW, hard drives, and other computer related operation equipment, computers, and any other equipment that would assist in the completion or submission of federal and non-federal student financial aid and/or loan application or supporting documentation relating

3

SW_00000006

to the application for and receipt of student financial aid funds by individuals not living at the residence.

15. Any and all scanners, fax machines, printers, as well as other digital devices falling within the scope of the foregoing search categories, that could have been used to manufacture, produce, or to facilitate the above-listed violations and forensic copies thereof.

16. **Files to be seized on any computer at 1822 East Kaibab Drive, Chandler, Arizona.**

   a. Any personal computer, cell phone, PDA, or other digital device used to facilitate the above-listed violations and forensic copies thereof.

   b. With respect to any digital devices falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or the absence of same, sufficient to show the actual user(s) of the digital device during the time period between January 1, 2010 and the date this warrant is executed, including:

      i. Evidence of who used, owned, or controlled, the digital devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

4

SW_00000007

ii. Evidence of software that would allow others to control the digital devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. Evidence of the lack of such malicious software;

iv. Evidence of the attachment to the digital devices of other storage devices or similar containers for electronic evidence;

v. Evidence of computer-forensic programs (and associated data) that are designed to eliminate data from the digital devices;

vi. Evidence of the times the digital devices were used;

vii. Password, encryption keys, and other access devices that may be necessary to access the digital devices;

viii. Documentation and manuals that may be necessary to access the digital devices or to conduct a forensic examination of the digital devices;

ix. Contextual information necessary to understand the evidence described in this attachment.

17. As used above, the term records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including in digital form on any digital device and any forensic copies thereof. As used both above and below, the term "digital device" includes any electronic system or device capable of storing and/or processing data

5

SW_00000008

in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections, storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes, and memory chips; and security devices.

18.  Records and things evidencing the use of the Internet to communication with community colleges (and any of their offices, divisions, and employees), including:

    a.  routers, modems, and network equipment used to connect computers to the Internet;

    b.  records of Internet Protocol addresses used;

    c.  records of internet activity, including firewall logs, caches, browser history, and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

19.  In order to search for data that is capable of being read or interpreted by a digital device, law enforcement personnel may need to seize the following items:

    a.  Any digital device capable of being used to commit, further or store evidence of the offenses listed above;

6

SW_00000009

b. Any equipment used to facilitate the transmission, creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c. Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC Cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

d. Any documentation, operating logs and reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters and other software used to facilitate the direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

7

SW_00000010

### SWORN AFFIDAVIT OF SANDRA R. ENNIS

I, Sandra Ennis, being duly sworn, depose and state:

## I.    INTRODUCTION

### A. Professional Background

1.      I am a Special Agent with the United States Department of Education (ED), Office of Inspector  General (OIG)-Investigation Services.  I am presently based in Denver, Colorado but also investigate allegations of fraud occurring in the Western Region of the United States, including but not limited to  Colorado, Arizona, and New Mexico. I have been employed in this position since March 14, 2010.

2.      Prior to becoming a Special Agent, I was a Postal Inspector with the United States Postal Inspection Service since July 2004.  As part of my training as a Postal Inspector, I attended a twelve-week training course in Potomac, Maryland, which included training in investigating federal financial crimes perpetrated by use of the United States mails.  As a Postal Inspector, I participated in investigations of various types of crimes including conspiracy, mail fraud, wire fraud, and money laundering.

3.      As part of my official duties as a Special Agent, I am authorized to conduct investigations in connection with the enforcement and administration of all laws, regulations, orders, contracts, and programs to which ED is or may be a party of interest, and to perform other duties on behalf of the Secretary of Education.  As a Special Agent, I have participated in investigations of various types of crimes including grant fraud, student loan fraud, and mail fraud.  I have also worked closely with, and learned from, other federal agents who are experienced in investigating criminal cases, making arrests,

executing search warrants, and in the seizure, acquisition, and recovery of electronically-stored evidence.

    4.     Based on my training and experience and through my personal participation, including a review of documents, as well as information received from other law enforcement sources, I have become familiar with the facts and circumstances of this investigation. The information set forth in this affidavit reflects my personal knowledge or has been provided to me by other law enforcement officers, sources, victims, and other interested parties who have themselves obtained the information and subsequently reported it to me. I have also received information through the review of various database searches and institutional documents. Conclusions set forth below are the result of my investigation. This affidavit is presented for purposes of establishing a basis for a search warrant at the location described in Attachment A and does not purport to set forth all of my knowledge of or investigation into this matter.

## II.    OVERVIEW OF THE ALLEGED CRIME

    5.     This investigation began in approximately December 2011, when the Financial Aid Director of Pikes Peak Community College in Colorado Springs, Colorado, reported to ED-OIG that the school had received student enrollment and Federal Student Aid (FSA) financial aid applications for approximately sixteen (16) students who represented themselves as residing in the Colorado Springs, Colorado area. Indications of fraud with respect to these sixteen (16) applications included common last names, common mailing addresses, representations of zero income, and multiple dependent family members.

2

SW_00000012

6.    A review of various law enforcement databases, including an inmate search of the various state Department of Corrections (DOC) websites for these applicants, disclosed that all sixteen (16) applicants were incarcerated at various DOC facilities located in Arizona, Colorado, Illinois, Ohio, and Florida and would therefore be ineligible to receive FSA. On or about January 27, 2012, investigation into information received from Pikes Peak Community College disclosed an additional one hundred and fifteen (115) applications were submitted from six (6) suspect addresses located in Aurora and Fountain, Colorado and Chandler, Mesa, and Phoenix, Arizona.    These mailing addresses were utilized in the FSA application process and fell into the same pattern of listing zero income and single with multiple family members.

7.    Further investigation into the initial complaint from Pikes Peak Community College disclosed that from approximately January 2010 through the present, approximately one-hundred and seventy-five (175) applications were submitted via electronic means at various community colleges in Colorado where applicants received or attempted to receive FSA for which they are not eligible. Many of these applicants shared similar course enrollments and fell into similar patterns such as entering zero income and multiple dependents on their Free Application for Federal Student Aid (FAFSA). Many of these electronically submitted applications shared the same mailing addresses and many of the same characteristics including the same FSA Personal Identification Number (PIN) and FSA PIN challenge question and answer. These are all indicators of potential FSA fraud.

3

SW_00000013

8. All but approximately twelve (12) of these one hundred and seventy-five (175) individuals listed as applicants are currently incarcerated at various DOC facilities and were incarcerated during the electronic submission of these FSA applications. Two (2) of the twelve (12) applicants who are not incarcerated are parolees from Colorado DOC facilities.

9. The Internet is a global network of computers and other devices. Every device on the Internet is identified by a unique number called an Internet Protocol, or "IP" address. This number is used to exchange even the smallest amount of information. Accordingly, when one computer requests information from a second computer, the requesting computer specifies its own IP address so that the responding computer knows where to send its response. An IP address is analogous to a telephone number.

10. Based on IP activity and corresponding physical addresses obtained, this investigation has disclosed that individuals residing at **1822 East Kaibab Drive, Chandler, Arizona** (Heather Carr, Ayanna Jones, and Tramell Thomas), have electronically submitted Free Applications for Federal Student Aid (FAFSA) and Master Promissory Note (MPN) applications using the identities of incarcerated individuals to receive or attempt to receive FSA funds. Investigation also revealed that Mercedes Diaz and Matthew Sanders have utilized their physical addresses to receive debit cards issued in the names of incarcerated inmates as a result of the fraudulently submitted FAFSA and MPN applications. It appears that upon obtaining the identifying information of prison inmates from various Department of Corrections (DOC) locations, either through consent or from the unlawful procurement of this information, Carr, Jones, and Thomas

4

SW_00000014

knowingly enrolled or attempted to enroll prison inmates at community colleges in
Colorado and filed applications on their behalf for FSA.

11.     As explained more fully below, FSA funds are normally disbursed on
behalf of the student to the school. The school applies the funds to the student's account
at the school, and any award amount that exceeds the cost of tuition and fees is normally
given directly to the student, by the school in the form of a refund. The student's refund
can be used to assist the student in paying for living expenses while attending school.
Refunds are disbursed in the form of a debit card, a check, or electronic transfer to an
outside account.

12.     To date, approximately $391,225.00 in FSA funds have been disbursed to
various community colleges under false pretenses, resulting in approximately sixty (60)
of the potential 175 alleged applicants receiving FSA refunds in the form of debit cards.
Approximately $238,929.00 in debit card refunds has been mailed to applicants identified
as involved in this scheme. These debit cards have been mailed to one of approximately
twenty (20) suspect addresses that have been used in furtherance of the scheme to defraud
ED of FSA funds.

## III.    OVERVIEW OF THE STUDENT AID PROGRAM

### A.    Student Aid Eligibility

13.     In order to be eligible for Federal Financial Assistance under Title IV of the
Code of Federal Regulations, including funding under the Federal Pell Grant Program
and Federal Family Education Loan (FFEL) programs, students are required to meet
federal eligibility requirements, which include among others that the student:

5

SW_00000015

a. Is a regular student enrolled, or accepted for enrollment, in an eligible program at an eligible institution (34 CFR 668.32 (a)(2)).

b. For purposes of the FFEL and Direct Loan Programs, is at least a half-time student.

c. For the purposes of the Federal Pell Grant Program, Federal Perkins Loan, FFEL, and Direct Loan Programs, is not incarcerated in a Federal or State penal institution (34 CFR 668.32 (c)(2) and 668.32 (c)(3)).

d. Has a high school diploma or its recognized equivalent (34 CFR 668.32(e)(1)).

e. Maintains satisfactory progress in his or her course of study according to the institution's published standards of satisfactory progress (34 CFR 668.32 (f)).

14. Students apply for the above listed federal financial aid programs each academic year by submitting a FAFSA which contains material representations pertaining to the student's need and eligibility, such as income level, dependency status, and marital status. The student may mail the FAFSA to an ED processing center or transmit it electronically via the Internet. Alternatively, the school may electronically transmit the FAFSA to a processing center contracted with ED. Processing of the FAFSA occurs at the Central Processing System (CPS), which is located in Plano, Texas. After processing is complete, the CPS produces output documents or records that show the information the student originally provided. Colleges may require additional supporting documentation relating to an individual's application for financial aid for verification purposes.

6

SW_00000016

15.     Information captured on the FAFSA at the time of the on-line application, includes name, date of birth, SSN, address, telephone number, email address, and IP address.     The CPS uses the application data to calculate the Expected Family Contribution (EFC), which is used to determine financial aid eligibility and amount of aid to be awarded.     Relying on representations made on the FAFSA, ED determines how much the student and/or the student's family is able to pay towards the cost of attendance. Schools award financial aid based on or up to the cost of attendance and offer those funds to students at the beginning of each enrollment period.     Students may elect to receive all or a portion of their financial aid award, and must notify the school of their decision.

16.     PIN:     A Federal Student Aid personal identification number (PIN) is a 4-digit numeric code or 6-digit alphabetic code that is uniquely assigned to an individual to access FSA websites for use during the FSA application process.     This PIN, along with other identifiers, gives students internet access to their information in FSA systems. Students (and parents) can get a PIN by going to the website at www.pin.ed.gov or by choosing to apply for a PIN when completing a FAFSA on the Web.     The PIN is available to use immediately and serves as an electronic signature on the FAFSA or other FSA records.     Students have the option to create their own PIN or choose to have a unique PIN created for them.     A challenge question and answer is also created during the PIN application process.     The challenge question serves as a security measure in the event a student loses his/her PIN.     The FAFSA includes a warning that should any documents related to the federal student aid programs be signed electronically using a

7

SW_00000017

PIN, the person using the PIN certifies that he/she is the person identified by the PIN, and that person has not disclosed his/her PIN to anyone else.

17.     After a student accepts his or her financial aid award, FSA funds are normally disbursed on behalf of the student to the school where the student is enrolled. The school applies the funds to the student's account at the school, and any award amount that exceeds the cost of tuition and fees is normally given directly to the student, by the school, in the form of a refund. As noted, refunds are disbursed in the form of a debit card, a check, or electronic transfer to an outside account. If issued a refund check, the school will mail the check to the student's address on record with the school or it can be picked up in person, depending on the school's internal procedures.

18.     Should an individual falsify information relating to obtaining a high school diploma or its equivalent, fail to complete courses or withdraw from courses, or fail to maintain satisfactory academic progress, the individual would become ineligible for further federal financial aid and would be required to repay any funding previously received. The accuracy of the information provided by the individual during the application process is important because it is used to determine eligibility for federal financial aid. The FAFSA also includes a warning that by purposely providing false and misleading information, the applicant may receive a fine up to $20,000, a prison sentence, or both.

**B.     Federal Loan Programs and Colorado Community Colleges**

19.     The Colorado Community College System (CCCS) operates a website called www.ccconline.org. This website allows a prospective student to create an on-line

8

SW_00000018

account which collects basic information such as name, address, email address, telephone number, and Social Security Number required for admission to all community colleges in Colorado. Once this account is established the student does not need to reenter the information to apply to another school. Community colleges within the CCCS deliver some of their courses in an on-line distance learning format. Of particular relevance in the current investigation are Aurora, Pikes Peak, Red Rocks, Denver, and Pueblo Community Colleges.

20.      It is the policy of community colleges in the CCCS to use a contracted vendor, "Higher One" to process the student's financial aid refunds. CCCS students can receive their refund from Higher One in three ways: 1) Easy Refund-the funds will be available within 24 hours to the student in the form of a Higher One Bank debit card that is mailed to the student's address; 2) EFT transfer – Higher One will electronically wire the refund to the student's own independent bank account within 2-3 business days; or 3) Paper Check- Higher One will prepare and mail a paper check for the refund within 21 days. A paper check will automatically be issued if the Higher One card is never activated.

## IV.    Computer Evidence Associated with 1822 East Kaibab Drive, Chandler, Arizona

21.      Common IP addresses have been identified in this investigation and an analysis of IP activity obtained for these one-hundred and seventy-five (175) applicants traced back to at least one of approximately four (4) common IP addresses. Activity pertaining to two (2) of the four (4) IP addresses (**72.208.225.151** and **68.2.27.159**) are

9

SW_00000019

detailed below. The third IP address disclosed service had been disconnected in July 2012, and activity for the fourth IP address fell outside of allowable retention periods.

### 1. IP ADDRESS 72.208.225.151

22. Subscriber information received from Cox Communications, Inc., for IP address **72.208.225.151** returned to Ayanna Jones with service at 1351 Pleasant Drive, #1110, Chandler, Arizona. Further subscriber information for Ayanna Jones received from Cox Communications, Inc., disclosed a mailing address of **1822 East Kaibab Drive, Chandler, Arizona**.

23. The IP address of **72.208.225.151** was identified when comparing suspect mailing addresses with captured IP addresses maintained by ED when the applicant accessed either the FAFSA submission or the FAFSA PIN websites. In approximately January 2012, fifty-eight (58) applicants shared the same IP address of **72.208.225.151**. All fifty-eight (58) of these alleged applicants are incarcerated in various DOC facilities and would be ineligible for FSA.

24. FSA records collected by ED disclosed thirty-six (36) of these fifty-eight (58) applicants who had accessed ED websites from the same IP address of **72.208.225.151** also shared the same PIN #1102 and twenty-one (21) shared the same PIN #4547. Thirty-four (34) of these fifty-eight (58) applicants had the same challenge question of the hospital where they were born and answer of Memorial.

25. Approximately $10,316.74 in FSA funds in the form of debit cards has been disbursed to applicants using this IP address. FSA refunds have been mailed in the

10

SW_00000020

name of six (6) incarcerated applicants in the form of debit cards. These six (6) incarcerated applicants also share the same IP address

of **72.208.225.151**. These six (6) incarcerated applicants would be ineligible to receive FSA funds.

26. 724 West Knox Drive, Chandler, Arizona was identified as one of the mailing addresses where approximately twenty-five (25) incarcerated applicants attempted to receive FSA funds and shared the same IP address of **72.208.225.151**. CLEAR records identified Mercedes Diaz as residing at 724 West Knox Drive, Chandler, Arizona. ED records disclosed that in October 2010, Diaz utilized 1351 Pleasant Drive #1110, Chandler, Arizona as her address for her own student loans.

27. Investigation revealed Heather Carr requested that her mail be forwarded from 1351 Pleasant Drive, #110, Chandler, Arizona to a private mail box at a commercial mail receiving agency (CMRA) located in Chandler, Arizona. The PS Form 1583, Application for Delivery of Mail obtained from the CMRA disclosed Heather Carr was the box holder for private mail box #12-174. Other individuals authorized to receive mail at this mail box were Jones and Thomas. On April 30, 2012, surveillance conducted on the residence at 1351 Pleasant Drive, #1110, Chandler, Arizona disclosed a For Rent sign in the window and the unit appeared vacant.

28. CLEAR and other records, including Arizona Department of Motor Vehicle (DMV) and ED FSA records, indicated that Heather Carr, Mercedes Diaz, Ayanna Jones, and Tramell Thomas have previously resided at 1351 Pleasant Drive #1110, Chandler, Arizona. This is the same physical location where applications for FSA were

11

SW_00000021

electronically submitted on behalf of approximately fifty-eight (58) incarcerated applicants.

### 2. IP ADDRESS 68.2.27.159

29. In approximately May 2012, information from Red Rocks Community College disclosed approximately twenty (20) applicants attempted to enroll and obtain FSA. IP addresses for these twenty (20) applicants were recorded by ED when the student accessed either the FAFSA submission or the FAFSA PIN websites. The IP data collected from ED websites disclosed that applications submitted for these twenty (20) individuals traced back to the same IP address of **68.2.27.159**. Cox Communications Inc., confirmed subscriber information for IP address **68.2.27.159** to be that of Ayanna Jones at **1822 East Kaibab Drive, Chandler, Arizona**.

30. IP data captured by ED further disclosed that during the time period from approximately April 2012 through the present, approximately thirty-five (35) applicants have accessed either the FAFSA submission or the FAFSA PIN websites from the same IP address of **68.2.27.159**.

31. FSA records collected by ED disclosed approximately twenty-two (22) of these thirty-five (35) applicants who had accessed ED websites from the same IP address of **68.2.27.159** also shared the same PIN #1102 and these same twenty-two (22) individuals had the same challenge question of the hospital where they were born and answer of Memorial.

32. Approximately $28,421 in FSA funds in the form of debit cards has been disbursed to eight (8) of the thirty-five (35) applicants using the common IP address of

12

SW_00000022

## SWORN AFFIDAVIT OF SANDRA R. ENNIS

I, Sandra Ennis, being duly sworn, depose and state:

### I.   INTRODUCTION

#### A. Professional Background

1.     I am a Special Agent with the United States Department of Education (ED), Office of Inspector  General (OIG)-Investigation Services.  I am presently based in Denver, Colorado but also investigate allegations of fraud occurring in the Western Region of the United States, including but not limited to  Colorado, Arizona, and New Mexico. I have been employed in this position since March 14, 2010.

2.     Prior to becoming a Special Agent, I was a Postal Inspector with the United States Postal Inspection Service since July 2004.  As part of my training as a Postal Inspector, I attended a twelve-week training course in Potomac, Maryland, which included training in investigating federal financial crimes perpetrated by use of the United States mails.  As a Postal Inspector, I participated in investigations of various types of crimes including conspiracy, mail fraud, wire fraud, and money laundering.

3.     As part of my official duties as a Special Agent, I am authorized to conduct investigations in connection with the enforcement and administration of all laws, regulations, orders, contracts, and programs to which ED is or may be a party of interest, and to perform other duties on behalf of the Secretary of Education.  As a Special Agent, I have participated in investigations of various types of crimes including grant fraud, student loan fraud, and mail fraud. I have also worked closely with, and learned from, other federal agents who are experienced in investigating criminal cases, making arrests,

SW_00013598

executing search warrants, and in the seizure, acquisition, and recovery of electronically-stored evidence.

4.      Based on my training and experience and through my personal participation, including a review of documents, as well as information received from other law enforcement sources, I have become familiar with the facts and circumstances of this investigation. The information set forth in this affidavit reflects my personal knowledge or has been provided to me by other law enforcement officers, sources, victims, and other interested parties who have themselves obtained the information and subsequently reported it to me. I have also received information through the review of various database searches and institutional documents. Conclusions set forth below are the result of my investigation. This affidavit is presented for purposes of establishing a basis for a search warrant at the location described in Attachment A and does not purport to set forth all of my knowledge of or investigation into this matter.

## II.     OVERVIEW OF THE ALLEGED CRIME

5.      This investigation began in approximately December 2011, when the Financial Aid Director of Pikes Peak Community College in Colorado Springs, Colorado, reported to ED-OIG that the school had received student enrollment and Federal Student Aid (FSA) financial aid applications for approximately sixteen (16) students who represented themselves as residing in the Colorado Springs, Colorado area. Indications of fraud with respect to these sixteen (16) applications included common last names, common mailing addresses, representations of zero income, and multiple dependent family members.

2

SW_00013599

6.     A review of various law enforcement databases, including an inmate search of the various state Department of Corrections (DOC) websites for these applicants, disclosed that all sixteen (16) applicants were incarcerated at various DOC facilities located in Arizona, Colorado, Illinois, Ohio, and Florida and would therefore be ineligible to receive FSA. On or about January 27, 2012, investigation into information received from Pikes Peak Community College disclosed an additional one hundred and fifteen (115) applications were submitted from six (6) suspect addresses located in Aurora and Fountain, Colorado and Chandler, Mesa, and Phoenix, Arizona. These mailing addresses were utilized in the FSA application process and fell into the same pattern of listing zero income and single with multiple family members.

7.     Further investigation into the initial complaint from Pikes Peak Community College disclosed that from approximately January 2010 through the present, approximately one-hundred and seventy-five (175) applications were submitted via electronic means at various community colleges in Colorado where applicants received or attempted to receive FSA for which they are not eligible. Many of these applicants shared similar course enrollments and fell into similar patterns such as entering zero income and multiple dependents on their Free Application for Federal Student Aid (FAFSA). Many of these electronically submitted applications shared the same mailing addresses and many of the same characteristics including the same FSA Personal Identification Number (PIN) and FSA PIN challenge question and answer. These are all indicators of potential FSA fraud.

3

SW_00013600

8. All but approximately twelve (12) of these one hundred and seventy-five (175) individuals listed as applicants are currently incarcerated at various DOC facilities and were incarcerated during the electronic submission of these FSA applications. Two (2) of the twelve (12) applicants who are not incarcerated are parolees from Colorado DOC facilities.

9. The Internet is a global network of computers and other devices. Every device on the Internet is identified by a unique number called an Internet Protocol, or "IP" address. This number is used to exchange even the smallest amount of information. Accordingly, when one computer requests information from a second computer, the requesting computer specifies its own IP address so that the responding computer knows where to send its response. An IP address is analogous to a telephone number.

10. Based on IP activity and corresponding physical addresses obtained, this investigation has disclosed that individuals residing at **1822 East Kaibab Drive, Chandler, Arizona** (Heather Carr, Ayanna Jones, and Tramell Thomas), have electronically submitted Free Applications for Federal Student Aid (FAFSA) and Master Promissory Note (MPN) applications using the identities of incarcerated individuals to receive or attempt to receive FSA funds. Investigation also revealed that Mercedes Diaz and Matthew Sanders have utilized their physical addresses to receive debit cards issued in the names of incarcerated inmates as a result of the fraudulently submitted FAFSA and MPN applications. It appears that upon obtaining the identifying information of prison inmates from various Department of Corrections (DOC) locations, either through consent or from the unlawful procurement of this information, Carr, Jones, and Thomas

4

SW_00013601

knowingly enrolled or attempted to enroll prison inmates at community colleges in Colorado and filed applications on their behalf for FSA.

11.    As explained more fully below, FSA funds are normally disbursed on behalf of the student to the school. The school applies the funds to the student's account at the school, and any award amount that exceeds the cost of tuition and fees is normally given directly to the student, by the school in the form of a refund. The student's refund can be used to assist the student in paying for living expenses while attending school. Refunds are disbursed in the form of a debit card, a check, or electronic transfer to an outside account.

12.    To date, approximately $391,225.00 in FSA funds have been disbursed to various community colleges under false pretenses, resulting in approximately sixty (60) of the potential 175 alleged applicants receiving FSA refunds in the form of debit cards. Approximately $238,929.00 in debit card refunds has been mailed to applicants identified as involved in this scheme. These debit cards have been mailed to one of approximately twenty (20) suspect addresses that have been used in furtherance of the scheme to defraud ED of FSA funds.

## III.    OVERVIEW OF THE STUDENT AID PROGRAM

### A.    Student Aid Eligibility

13.    In order to be eligible for Federal Financial Assistance under Title IV of the Code of Federal Regulations, including funding under the Federal Pell Grant Program and Federal Family Education Loan (FFEL) programs, students are required to meet federal eligibility requirements, which include among others that the student:

5

SW_00013602

a.    Is a regular student enrolled, or accepted for enrollment, in an eligible program at an eligible institution (34 CFR 668.32 (a)(2)).

b.    For purposes of the FFEL and Direct Loan Programs, is at least a half-time student.

c.    For the purposes of the Federal Pell Grant Program, Federal Perkins Loan, FFEL, and Direct Loan Programs, is not incarcerated in a Federal or State penal institution (34 CFR 668.32 (c)(2) and 668.32 (c)(3)).

d.    Has a high school diploma or its recognized equivalent (34 CFR 668.32(e)(1)).

e.    Maintains satisfactory progress in his or her course of study according to the institution's published standards of satisfactory progress (34 CFR 668.32 (f)).

14.    Students apply for the above listed federal financial aid programs each academic year by submitting a FAFSA which contains material representations pertaining to the student's need and eligibility, such as income level, dependency status, and marital status. The student may mail the FAFSA to an ED processing center or transmit it electronically via the Internet. Alternatively, the school may electronically transmit the FAFSA to a processing center contracted with ED. Processing of the FAFSA occurs at the Central Processing System (CPS), which is located in Plano, Texas. After processing is complete, the CPS produces output documents or records that show the information the student originally provided. Colleges may require additional supporting documentation relating to an individual's application for financial aid for verification purposes.

6

SW_00013603

15.     Information captured on the FAFSA at the time of the on-line application, includes name, date of birth, SSN, address, telephone number, email address, and IP address.     The CPS uses the application data to calculate the Expected Family Contribution (EFC), which is used to determine financial aid eligibility and amount of aid to be awarded.  Relying on representations made on the FAFSA, ED determines how much the student and/or the student's family is able to pay towards the cost of attendance. Schools award financial aid based on or up to the cost of attendance and offer those funds to students at the beginning of each enrollment period.  Students may elect to receive all or a portion of their financial aid award, and must notify the school of their decision.

16.     PIN:  A Federal Student Aid personal identification number (PIN) is a 4-digit numeric code or 6-digit alphabetic code that is uniquely assigned to an individual to access FSA websites for use during the FSA application process.  This PIN, along with other identifiers, gives students internet access to their information in FSA systems. Students (and parents) can get a PIN by going to the website at www.pin.ed.gov or by choosing to apply for a PIN when completing a FAFSA on the Web.  The PIN is available to use immediately and serves as an electronic signature on the FAFSA or other FSA records.  Students have the option to create their own PIN or choose to have a unique PIN created for them.  A challenge question and answer is also created during the PIN application process.  The challenge question serves as a security measure in the event a student loses his/her PIN.  The FAFSA includes a warning that should any documents related to the federal student aid programs be signed electronically using a

7

SW_00013604

PIN, the person using the PIN certifies that he/she is the person identified by the PIN, and that person has not disclosed his/her PIN to anyone else.

17.     After a student accepts his or her financial aid award, FSA funds are normally disbursed on behalf of the student to the school where the student is enrolled. The school applies the funds to the student's account at the school, and any award amount that exceeds the cost of tuition and fees is normally given directly to the student, by the school, in the form of a refund. As noted, refunds are disbursed in the form of a debit card, a check, or electronic transfer to an outside account. If issued a refund check, the school will mail the check to the student's address on record with the school or it can be picked up in person, depending on the school's internal procedures.

18.     Should an individual falsify information relating to obtaining a high school diploma or its equivalent, fail to complete courses or withdraw from courses, or fail to maintain satisfactory academic progress, the individual would become ineligible for further federal financial aid and would be required to repay any funding previously received.     The accuracy of the information provided by the individual during the application process is important because it is used to determine eligibility for federal financial aid. The FAFSA also includes a warning that by purposely providing false and misleading information, the applicant may receive a fine up to \$20,000, a prison sentence, or both.

## B.     Federal Loan Programs and Colorado Community Colleges

19.     The Colorado Community College System (CCCS) operates a website called www.ccconline.org. This website allows a prospective student to create an on-line

8

SW_00013605

account which collects basic information such as name, address, email address, telephone number, and Social Security Number required for admission to all community colleges in Colorado. Once this account is established the student does not need to reenter the information to apply to another school. Community colleges within the CCCS deliver some of their courses in an on-line distance learning format. Of particular relevance in the current investigation are Aurora, Pikes Peak, Red Rocks, Denver, and Pueblo Community Colleges.

20. It is the policy of community colleges in the CCCS to use a contracted vendor, "Higher One" to process the student's financial aid refunds. CCCS students can receive their refund from Higher One in three ways: 1) Easy Refund-the funds will be available within 24 hours to the student in the form of a Higher One Bank debit card that is mailed to the student's address; 2) EFT transfer – Higher One will electronically wire the refund to the student's own independent bank account within 2-3 business days; or 3) Paper Check- Higher One will prepare and mail a paper check for the refund within 21 days. A paper check will automatically be issued if the Higher One card is never activated.

## IV. Computer Evidence Associated with 1822 East Kaibab Drive, Chandler, Arizona

21. Common IP addresses have been identified in this investigation and an analysis of IP activity obtained for these one-hundred and seventy-five (175) applicants traced back to at least one of approximately four (4) common IP addresses. Activity pertaining to two (2) of the four (4) IP addresses (**72.208.225.151** and **68.2.27.159)** are

9

detailed below. The third IP address disclosed service had been disconnected in July 2012, and activity for the fourth IP address fell outside of allowable retention periods.

### 1.  IP ADDRESS 72.208.225.151

22.    Subscriber information received from Cox Communications, Inc., for IP address **72.208.225.151** returned to Ayanna Jones with service at 1351 Pleasant Drive, #1110, Chandler, Arizona. Further subscriber information for Ayanna Jones received from Cox Communications, Inc., disclosed a mailing address of **1822 East Kaibab Drive, Chandler, Arizona**.

23.    The IP address of **72.208.225.151** was identified when comparing suspect mailing addresses with captured IP addresses maintained by ED when the applicant accessed either the FAFSA submission or the FAFSA PIN websites. In approximately January 2012, fifty-eight (58) applicants shared the same IP address of **72.208.225.151**. All fifty-eight (58) of these alleged applicants are incarcerated in various DOC facilities and would be ineligible for FSA.

24.    FSA records collected by ED disclosed thirty-six (36) of these fifty-eight (58) applicants who had accessed ED websites from the same IP address of **72.208.225.151** also shared the same PIN #1102 and twenty-one (21) shared the same PIN #4547. Thirty-four (34) of these fifty-eight (58) applicants had the same challenge question of the hospital where they were born and answer of Memorial.

25.    Approximately $10,316.74 in FSA funds in the form of debit cards has been disbursed to applicants using this IP address. FSA refunds have been mailed in the

10

SW_00013607

name of six (6) incarcerated applicants in the form of debit cards. These six (6) incarcerated applicants also share the same IP address

of **72.208.225.151**. These six (6) incarcerated applicants would be ineligible to receive FSA funds.

26.     724 West Knox Drive, Chandler, Arizona was identified as one of the mailing addresses where approximately twenty-five (25) incarcerated applicants attempted to receive FSA funds and shared the same IP address of **72.208.225.151**. CLEAR records identified Mercedes Diaz as residing at 724 West Knox Drive, Chandler, Arizona. ED records disclosed that in October 2010, Diaz utilized 1351 Pleasant Drive #1110, Chandler, Arizona as her address for her own student loans.

27.     Investigation revealed Heather Carr requested that her mail be forwarded from 1351 Pleasant Drive, #110, Chandler, Arizona to a private mail box at a commercial mail receiving agency (CMRA) located in Chandler, Arizona. The PS Form 1583, Application for Delivery of Mail obtained from the CMRA disclosed Heather Carr was the box holder for private mail box #12-174. Other individuals authorized to receive mail at this mail box were Jones and Thomas. On April 30, 2012, surveillance conducted on the residence at 1351 Pleasant Drive, #1110, Chandler, Arizona disclosed a For Rent sign in the window and the unit appeared vacant.

28.     CLEAR and other records, including Arizona Department of Motor Vehicle (DMV) and ED FSA records, indicated that Heather Carr, Mercedes Diaz, Ayanna Jones, and Tramell Thomas have previously resided at 1351 Pleasant Drive #1110, Chandler, Arizona.     This is the same physical location where applications for FSA were

11

electronically submitted on behalf of approximately fifty-eight (58) incarcerated applicants.

## 2. IP ADDRESS 68.2.27.159

29.  In approximately May 2012, information from Red Rocks Community College disclosed approximately twenty (20) applicants attempted to enroll and obtain FSA. IP addresses for these twenty (20) applicants were recorded by ED when the student accessed either the FAFSA submission or the FAFSA PIN websites. The IP data collected from ED websites disclosed that applications submitted for these twenty (20) individuals traced back to the same IP address of **68.2.27.159**. Cox Communications Inc., confirmed subscriber information for IP address **68.2.27.159** to be that of Ayanna Jones at **1822 East Kaibab Drive, Chandler, Arizona**.

30.  IP data captured by ED further disclosed that during the time period from approximately April 2012 through the present, approximately thirty-five (35) applicants have accessed either the FAFSA submission or the FAFSA PIN websites from the same IP address of **68.2.27.159**.

31.  FSA records collected by ED disclosed approximately twenty-two (22) of these thirty-five (35) applicants who had accessed ED websites from the same IP address of **68.2.27.159** also shared the same PIN #1102 and these same twenty-two (22) individuals had the same challenge question of the hospital where they were born and answer of Memorial.

32.  Approximately $28,421 in FSA funds in the form of debit cards has been disbursed to eight (8) of the thirty-five (35) applicants using the common IP address of

12

SW_00013609

**68.2.27.159**. All thirty-five (35) of these applicants who have received or attempted to receive FSA funds are currently incarcerated at various DOC facilities and are ineligible to receive FSA funds.

33.     At least two (2) of these thirty-five (35) applicants utilizing the IP address of **68.2.27.159** also had IP activity that returned to the IP address of **72.208.225.151**. As previously mentioned, Cox Communications confirmed IP address **72.208.225.151** traced back to subscriber Ayanna Jones at 1351 Pleasant Drive #1110, Chandler, Arizona, which is the previous address of Carr, Jones, and Thomas.

34.     3239 Blackhawk Circle is a mailing address that thirty (30) incarcerated individuals utilized to either receive or attempt to receive FSA funds. DMV records and surveillance have confirmed that former Department of Corrections Inmate Matthew Sanders currently resides at 3239 Blackhawk Circle, Aurora, Colorado. ED records disclosed six (6) of these thirty (30) incarcerated individuals have IP activity that traces back to the same IP address of **68.2.27.159** associated with **1822 East Kaibab Drive, Chandler, Arizona.**

35.     Additional investigation disclosed that the recently identified mailing address of 1605 Oakland Street, Aurora, Colorado is the residence of Sandra De Mango. 1605 Oakland Street, Aurora, Colorado is a mailing address used by approximately four (4) incarcerated applicants in their attempt to receive FSA funds. IP activity for these applicants traces back to the same IP address of **68.2.27.158**, which traces back to **1822 East Kaibab Drive, Chandler, Arizona.**

13

SW_00013610

36. CLEAR records indicate that Sandra De Mango has also been known as (AKA) Sandra Sanders. Colorado DOC visitor records disclosed Sandra De Mango is Matthew Sanders mother. Colorado DOC inmate trust account records disclosed deposits from Sandra De Mango into Matthew Sanders' account during his incarceration in a Colorado DOC facility.

A. **Evidence Associated with 1844 East Kaibab Drive, Chandler, Arizona**

37. On or about September 20, 2012, and again on or about October 26, 2012, address verification information received from USPS confirmed mail for Heather Carr, Ayanna Jones, and Tramell Thomas is delivered to **1822 East Kaibab Drive, Chandler, Arizona**.

38. In approximately October 2010, Thomas utilized a mailing address of 1418 Rushmore, Colorado Springs, Colorado to receive approximately $5,493.25 in FSA funds in the form of debit cards from Pikes Peak Community College. Twenty-eight (28) incarcerated applicants have also used a mailing address of 1418 Rushmore, Colorado Springs, Colorado to either receive or attempt to receive FSA funds.

39. Thomas is a former parolee from the Colorado Department of Corrections and had authorization to serve out his Colorado parolee sentence in the state of Arizona. Thomas' parole was discharged on November 2, 2012.

40. Records obtained from CLEAR disclosed Thomas previously resided at 1351 Pleasant Drive #1110, Chandler, Arizona. On or about June 12, 2012, Arizona DMV information disclosed driver license information for Thomas returned to **1822 East Kaibab Drive, Chandler, Arizona.**

14

SW_00013611

41.     On or about August 15, 2012, United States Postal Inspector William Palmeri informed ED-OIG that the USPS letter carrier for address 1161 West Dragoon Circle in Mesa, Arizona was contacted by postal customer, Mercedes Diaz.  Diaz informed the letter carrier that she wanted to receive mail for approximately fifty (50) college students who did not reside at the address. Diaz told the carrier she was going to get paid for receiving this mail and that's how she paid her rent.

42.     Investigation, including Facebook profile searches, has linked Heather Carr, Mercedes Diaz, and Matthew Sanders, to each other's Facebook profile Friends List.

43.     Based on training, experience, and information provided in the aforementioned paragraphs, there is reason to believe that Carr, Jones, and Thomas are utilizing the identities of incarcerated individuals to electronically apply for FSA loans that they would be ineligible to receive and that information such as names, Social Security numbers, and dates of birth are maintained by the perpetrators to be used year after year.

## V.     AREAS TO BE SEARCHED

44.     This affidavit is in support of an application for issuance of a search warrant for **1822 East Kaibab Drive, Chandler, Arizona.** I believe there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 20 U.S.C. § 1097 (Financial Aid Fraud), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 641 (Theft of Government Funds), 18 U.S.C. § 1001 (False Statement to a Government Agency), 18 U.S.C. § 1341 (Mail Fraud), and 18 U.S.C. § 1343 (Wire Fraud), will be found at **1822**

15

SW_00013612

**East Kaibab Drive, Chandler, Arizona, 82549,** more fully described in "Attachment A." The items to be seized during the search are set forth in "Attachment B."

    45.    The search warrant is sought for the seizure of documentary evidence, including handwritten or typewritten records and documents, as well as computer generated records, any computer hardware and software, and other such items as more fully described in Attachment B, items to be seized, related to the criminal violations discussed above.

    46.    This search should include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage locker areas, cabinets, safes, briefcases, purses, electronic storage devices, vehicles, and other storage locations within the premises, to include the search of any computer-based storage media contained within the premises and any other storage locations within the premises in which items in Attachment B may be found. Based on my experience, knowledge, and training, and that of other agents I have spoken with, suspects in similar investigations possess storage safes, computers, facsimile machines, cell phones, and pagers which they use as part of their method of operation.

    47.    From my background and experience I know that individuals, including persons engaged in illicit activities and/or fraud, frequently retain records of their transactions within their residence, computers, vehicles, and other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, tax documents, school records, and other miscellaneous records. Records of this kind are often stored on computer media.

16

SW_00013613

48. The forensic examination of a computer will not only reveal IP addresses of additional computers that the seized computer has communicated with, but will also reveal websites visited, including Federal Student Aid (FSA) websites, and electronic communications with other individuals involved in the scheme to defraud the United States Government of FSA monies described above.

49. Persons engaged in fraud schemes often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time. There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement cannot not obtain a search warrant to seize the evidence. The criminal offender may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed any computer-related evidence and may be unaware that such evidence may be retrievable by a trained forensic computer expert.

17

SW_00013614

## VI. Search and Seizure of Electronic Devices

50. *Probable cause to search computers:* I submit that, if a computer or storage medium is found on the premises of a search location, there is probable cause to believe that records related to the FSA fraud ring will be stored on that computer or storage medium, for at least the following reasons:

  a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

  b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

  c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of

18

SW_00013615

how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

51.    *Forensic evidence:*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the premises because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs

19

SW_00013616

store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

20

SW_00013617

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I knows that when an individual uses a computer with respect to on-line learning (that is, for financial aid applications, enrollment and coursework), the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to

21

SW_00013618

be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

52. *Necessity of seizing or copying entire computers or storage media*: In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

> a. The time required for an examination: As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above,

22

SW_00013619

because the warrant calls for forensic electronic evidence, it is exceedingly
likely that it will be necessary to thoroughly examine storage media to
obtain evidence. Storage media can store a large volume of information.
Reviewing that information for things described in the warrant can take
weeks or months, depending on the volume of data stored, and would be
impractical and invasive to attempt on-site.

b. Technical requirements: Computers can be configured in several different
ways, featuring a variety of different operating systems, application
software, and configurations. Therefore, searching them sometimes
requires tools or knowledge that might not be present on the search site.
The vast array of computer hardware and software available makes it
difficult to know before a search what tools or knowledge will be required
to analyze the system and its data on the Premises. However, taking the
storage media off-site and reviewing it in a controlled environment will
allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media: Records sought under this warrant
could be stored in a variety of storage media formats that may require off-
site reviewing with specialized forensic tools.

53. *Nature of examination:* Based on the foregoing, and consistent with Rule
41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to
review the media on-site, the warrant I am applying for would permit seizing or imaging
storage media that reasonably appear to contain some or all of the evidence described in

23

SW_00013620

the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## VII.   CONCLUSION

54.    For the reasons stated above, I believe that probable cause exists to search **1822 East Kaibab Drive, Chandler, Arizona** for evidence, fruits, and instrumentalities of violations of 20 U.S.C. § 1097 (Financial Aid Fraud), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 641 (Theft of Government Funds), 18 U.S.C. § 1001 (False Statement to a Government Agency), 18 U.S.C § 1341 (Mail Fraud) and 18 U.S.C. § 1343 (Wire Fraud). Accordingly, I respectfully request that the Court issue the requested search warrant.

Sandra R. Ennis
Special Agent
United States Department of Education
Office of Inspector General

Subscribed and sworn to before me this 27th day of November, 2012,

BRIDGET S. BADE
United States Magistrate Judge

24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM

UNITED STATES OF AMERICA,

          Plaintiff,

v.

**2.  TRAMMEL THOMAS**

          Defendant

---

## DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO SUPPRESS #1

---

Comes now the Defendant, by and through counsel,  Daniel T. Smith and Thomas Edward Goodreid, and submit this Reply to the Government's Response to the Defendant's Motion to Suppress #1.

1.  The Defendant filed his Suppression Motion #1 at Dkt. #181.  This Reply is filed in response to the Government's Motion Response at Dkt. #193.

2.  The Defendant's suppression motion does not challenge the initial traffic stop and detention.   However, once the Tempe police officer, Officer Seal, determined the Defendant was not intoxicated, the justification for the detention ended and the Defendant should have been allowed to leave.

3.  The government acknowledges in its response that Officer Seal changed his investigation focus from one of operating a motor vehicle under the influence of alcohol,  to one of theft (pgs. 8 and 11 of  Dkt. #193).

Case No. 1:16-cr-00054-WJM-Document 521-1 filed 12/2/19 USDC Colorado pg 261 of
Case 1:16-cr-00054-WJM Document 196 Filed 11/01/17 Page 2 of 3
971

4.  These facts are further confirmed in Exh. A to Dkt. #193 at Pg. 447 where it is acknowledged the Defendant was not arrested for DUI.  This was in part based on Officer Seal's statement at Pg. 450 that he did not think the Defendant was drunk.

5.  The government argues that the Defendant's Motion only raises legal issues and there are no factual issues to be determined. The Defendant disagrees with this assertion.  The status of the DUI investigation and the alleged probable cause for the theft investigation are obviously in dispute.  The only basis for continuing the detention of the Defendant beyond the time at which the initial reason for the stop was resolved is a "theft" investigation.  The basis for this investigation in the Government's response is a "bag of credit cards".

6.  The significance of this bag of credit cards is the subject of dispute.  If they were so important to officer Seal and the Arizona authorities why were they discarded to an evidence room and not looked at again until December 6, 2012. (Dkt. #193 pg. 8).

7.  The government relies on *United States v. Pettigrew* 468 F3d 626 (10th Cir. 2006).   This reliance is misplaced.    Initially *Pettigrew* involves 5th Amendment issues, not 4th amendment issues.  Secondly and most important the Court found in *Pettigrew* at pg. 638, "An evidentiary hearing may be appropriate when there are material facts in dispute relevant to the motion to suppress. …, but here, the Government conceded the facts as related by Mr. Pettigrew."  There is no such concession in the case at bar.

8.  The government also argues that the continued detention of the Defendant once the traffic issue was resolved was justified by the new investigation.  In support of this argument the government cites to *United States v. Moore* 795 F3d 1224 (10th Cir. 2015).  In *Moore,* while the initial stop was based on a traffic infraction, the instincts and concerns of the investigating patrolman from the outset were suspected narcotic law violations.  Even here however, the Circuit makes it clear that once the traffic stop has ended, law enforcement must allow the Defendant to leave.

The Defendant submits that factual issues have been raised in his suppression motion that require an evidentiary hearing so as to allow this Court to determine what actually occurred in the early morning hours of August 30, 2012 in Tempe, Arizona.

Dated this 1st day of November, 2017

Daniel T. Smith Attorney at Law

s/ Daniel T. Smith
Daniel T. Smith
4582 S. Ulster St. #1400
Denver, Colorado 80237
Telephone: 303 860 8100
Fax: 303 860 8018
danieltsmith@qwestoffice.net

Thomas Edward Goodreid
1801 Broadway #1400
Denver, Co. 80202
Phone: 303 296 2048
Fax: 303 292 0522
Email: t.goodreid@comcast.net
Attorneys for Trammel Thomas

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 1, 2017 the foregoing **DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE TO MOTION TO SUPPRESS #1** was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all counsel of record.

s/ Daniel T. Smith

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No.  16-cr-00054-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.     TRAMMEL THOMAS,

      Defendant.

---

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT TRAMELL
THOMAS'S MOTION TO SUPPRESS EVIDENCE SEIZED
PURSUANT TO SEARCH WARRANT (ECF NO. 194)**

---

The United States of America (the government), by Robert C. Troyer, Acting

United States Attorney, through Martha A. Paluch and Bryan D. Fields, Assistant United

States Attorneys, respectfully submits this response in opposition to Defendant Tramell

Thomas's Motion to Suppress Evidence Seized Pursuant to Search Warrant (ECF No.

194).

**I.    ISSUE PRESENTED**

Where United States Department of Education Special Agent Sandra Ennis

specifically stated in her affidavit in support of a search warrant for the defendant's

residence that based upon her experience, knowledge, and training, suspects in similar

types of investigations use cell phones to facilitate these crimes, and where the

attachment incorporated by specific reference listed cell phones three separate times as

items to be seized, is there any basis for suppression of the cell phones seized pursuant

1

to the warrant authorized by a United States magistrate judge?  The answer is no, as

explained below.

## II.   THE SEARCH WARRANT AND ATTACHMENTS

On November 27, 2012, Agent Ennis swore to an affidavit in the United States

District Court for the District of Arizona in support of a search warrant to authorize the

search of the defendant's residence at 1822 East Kaibab Drive in Chandler, Arizona.

Agent Ennis set forth in detail her investigation to date of a scheme to defraud the

United States Department of Education through the submission of false claims for

federal student aid.  Agent Ennis described the recurring Internet Protocol (IP)

addresses common to the false submissions that traced back to the Kaibab residence,

the common physical addresses used for receipt of the debit cards containing the

federal aid, and the individuals suspected to be involved in this conspiracy.  Agent

Ennis's affidavit referenced no fewer than six individuals under investigation at that time

as possible members of this conspiracy.[1] ECF 194-3 and 194-4.  The application and

warrant enumerated the offenses under investigation in this complex financial scheme:

financial aid fraud, conspiracy, theft of government funds, false statement to a

government agency, mail fraud and wire fraud.  ECF 194-1 at 1 and 194-4 at 24.[2]

The warrant incorporated by specific reference Attachment A, which identified

with particularity the place to be searched, and Attachment B, which similarly identified

with particularity the items to be seized.  ECF 194-1 at 1and 194-2 at 1.

---

1 Tramell Thomas, Heather Carr, Ayanna Jones, Mercedes Diaz, Matthew Sanders, and Sandra
DeMango, Sanders's mother.  ECF 194-3 and 194-4.

2 The defendant attached the application, search warrant, affidavit and attachments to his
motion and for ease of reference, the government refers to those ECF numbers in this
response.

In her affidavit, Agent Ennis detailed the extensive evidence establishing that probable cause existed to believe the crimes alleged had been committed and that evidence of these crimes would be found at the Kaibab address. She also explained that based upon her "experience, knowledge, and training, and that of other agents [she had] spoken with, suspects in similar investigations possess storage safes, computers, facsimile machines, **cell phones**, and pagers which they use as part of their method of operation." ECF 194-4 at 16, ¶ 46 (emphasis added). Agent Ennis explained that the warrant was "sought for the seizure of documentary evidence, including handwritten or typewritten records, and documents, as well as computer generated records, any computer hardware and software, *and other such items as more fully described in Attachment B, items to be seized, related to the criminal violations discussed*" earlier in the affidavit. *Id.* at ¶ 45 (emphasis added).

Attachment B listed the items to be seized, which list was incorporated by specific reference in the affidavit. In no fewer than three places, Agent Ennis specifically referenced cell phones as items to be seized during the search. *See* ECF 194-2 at p. 4, ¶ 16.a.; pp.5-6, ¶ 17; and pp. 6-7, ¶ 19.c.

## III. DEFENDANT'S ARGUMENT

The defendant argues that the warrant was overbroad in that there was "no probable cause to support seizure of cellphones." Motion at 6. The plain language of the warrant and the applicable case law refutes defendant's argument.

## IV. STANDARD OF REVIEW

In reviewing a magistrate judge's issuance of a search warrant, the court must decide whether the magistrate judge had a substantial basis for concluding that

Case No. 1:16-cr-00054-WJM   Document 521-1   Filed 12/11/19   USDC Colorado   pg 266 of
971
Case 1:16-cr-00054-WJM   Document 157   Filed 11/03/17   Page 4 of 10

probable cause existed. *Illinois v. Gates,* 462 U.S. 213, 236 (1983). The court must

keep in mind that the magistrate's task was merely to make "a practical, common-sense

decision whether, given all the circumstances set forth in the affidavit . . . there is a fair

probability that contraband or evidence of a crime will be found in a particular place." *Id.*

at 238; *United States v. Sells,* 463 F.3d 1148, 1156 (10th Cir. 2006) ("courts should

interpret warrants in a 'commonsense and realistic fashion,' rather than a

'hypertechnical' manner") (citation omitted). In making its probable cause determination,

the magistrate is permitted to draw reasonable inferences from the affidavit and the

magistrate's determination is accorded great deference. *Gates,* 462 U.S. at 240, 288;

*United States v. Edmonson,* 962 F.2d 1535, 1540 (10th Cir. 1992).

## V.   THERE IS NO FACTUAL OR LEGAL BASIS FOR SUPPRESSING THE CELL PHONES SEIZED

"[W]hether a search warrant is sufficiently particular depends in part on the

nature of the crimes being investigated." *United States v. Cooper,* 654 F.3d 1104, 1127

(10th Cir. 2011). Here, Agent Ennis detailed her investigation into numerous people who

were suspected of engaging in a conspiracy to commit complex financial crimes.

"Warrants relating to more complex and far-reaching criminal schemes may be deemed

legally sufficient even though they are less particular than warrants pertaining to more

straightforward criminal matters." *Id.* (citing *United States v. Hargus,* 128 F.3d 1358,

1362 (10th Cir. 1997) ("[W]e are satisfied that [the warrant] is sufficiently limited and

specific, in view of the nature of this extended conspiracy and other crimes for which

[the defendant] was being investigated . . . .")); *Cooper,* 654 F.3d at 1126 ("the warrants

– when read in light of the crime being investigated (i.e., a broad and complex financial

4

Case No. 1:16-cr-00054-WJM Document 528-1 filed 12/13/19 USDC Colorado pg 267 of
971
Case 1:16-cr-00054-WJM Document 117 Filed 11/03/17 USDC Colorado Page 5 of 10

scheme to defraud), and when considered in conjunction with the supporting affidavits –
were sufficiently particular to satisfy the requirements of the Fourth Amendment").

Analogous support for the government's argument that probable cause existed
for the seizure of the cell phones is found in the case law addressing the probable
cause necessary to search the contents of a seized cell phone. Numerous courts have
held that an affidavit establishes probable cause for such a search where that "affidavit
describes evidence of criminal activity involving multiple participants and includes the
statement of a law enforcement officer, based on [her] training and experience, that cell
phones are likely to contain evidence of communications and coordination among these
multiple participants." *United States v. Gholston,* 993 F. Supp. 2d 704, 720 (E.D. Mich.
2014).

In *Gholston,* in an affidavit to search the defendant's cell phone, the officer noted
that two participants were involved in a gas station robbery and that based on his
experience, the cell phone found in the defendant's possession would contain evidence
of coordination and communication among the participants to discuss details related to
the robbery. *Id.* at 718. The court held that the officer did not rely solely on his training
and experience as a basis to search the defendant's cell phone, "but rather cited the
evidence of Defendant's joint participation in the gas station robbery along with another
individual" to support his belief that the cell phone would reveal evidence of this joint
criminal activity. *Id.* at 718-719.

In finding probable cause under these circumstances, the *Gholston* court cited
numerous other opinions from courts that reached the same conclusion. For example, in
*United States v. Barrett,* 824 F. Supp. 2d 419 (E.D.N.Y. 2011), the DEA agent averred

that "(1) cell phones are capable of electronically storing numerous types of information;

and (2) in her experience, individuals involved in narcotics trafficking typically use

cellular phones to communicate and store information and other records on their

phones."  *Id.* at 448. The court there found that the affidavit contained "ample support"

for the magistrate judge's "practical, common-sense determination that there was

probable cause to believe that evidence of a crime would be found" on the defendant's

cell phone.  *Id.* at 449; *cf. United States v. Wiseman*, 158 F. Supp. 2d 1242, 1249 (D.

Kan. 2001) (same, noting that it had "become common knowledge in the courts" that

cellular phones were "known tools of the drug trade").

In this case, Agent Ennis explicitly stated that in her experience, suspects in

similar investigations use cell phones "as part of their method of operation."  ECF 194-4

at 16, ¶ 46.  Even without this clear statement, it would have been reasonable for the

magistrate judge to infer that the conspirators used cell phones to communicate with

each other in order to carry out their scheme.  *Cf. United States v. Williams*, 544 F.3d

683, 687 (6th Cir. 2008) ("[a] magistrate may infer a nexus between a suspect and his

residence, depending upon *inter alia,* "the type of crime being investigated, [and] the

nature of things to be seized"); *see State v. Henderson,* 854 N.W.2d 616, 632 (Neb.

2014) (court that issued search warrant could have reached inference that cell phone in

defendant's possession was used to communicate with others regarding the crime

without the additional allegations that in the officer's training and experience, suspects

used cell phones to communicate).

Defendant relies on *Sells* for his argument that the Court should employ the

severability doctrine to the warrant in this case.  Motion at 6.  In *Sells,* the court

Case No. 1:16-cr-00054-WJM  Document 525-1  filed 12/11/17  USDC Colorado  pg 269 of
971
Case 1:16-cr-00054-WJM  Document 1  Filed 11/03/17  Page 7 of 10

explained that when the greater part of the warrant is valid, and the alleged invalid

aspect of the warrant can be distinguished from the greater valid portion, application of

the severability doctrine might be appropriate.  463 F.3d at 1158.  In that case, the court

separated the warrant into the five categories of evidence for which the agents were

authorized to search.  The defendant did not challenge two of the five categories, and

the government conceded that the affidavit did not provide any reason to authorize a

search for two additional categories of evidence.  463 F.3d at 1156-57.  *Sells* is

therefore distinguishable because no such concession exists in the instant case.  The

government disputes that the severability doctrine is applicable to this case because as

argued above, no part of the warrant in this case is invalid.

In light of the nature of the crimes under investigation, coupled with Agent

Ennis's statement that suspects in similar types of investigations possess and use cell

phones, the defendant's challenge to the search warrant authorizing seizure of the cell

phones should be denied.

## VI.  EVEN IF THE AFFIDAVIT WAS INSUFFICIENT, THE OFFICERS ACTED IN GOOD FAITH IN EXECUTING THE WARRANT AND THEREFORE SUPPRESSION IS NOT WARRANTED

Even if the Court finds defects in the affidavit, it should deny defendant's motion

under the good-faith exception to the exclusionary rule.  In *United States v. Leon*, 468

U.S. 897 (1984), the Supreme Court reasoned that evidence "obtained in objectively

reasonable reliance on a subsequently invalidated search warrant cannot justify the

substantial costs of exclusion."  *Id.* at 922.  To determine whether an officer's reliance

on a warrant is objectively reasonable, the court must consider all of the circumstances,

including "the text of the warrant and the circumstances of the search to ascertain

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/13/19   USDC Colorado   pg 270 of
971
Case 1:10-cr-00054-WJM   Document 119   Filed 11/03/11   USDC Colorado   Page 8 of 20

whether the agents might have reasonably presumed it to be valid." *United States v. Otero,* 563 F.3d 1127, 1134 (10th Cir. 2009). The test is an objective one that asks, "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* (citation omitted).

The Tenth Circuit has identified a number of factors that indicate the good-faith exception should apply, including whether: "the attached affidavit limited the search to the crime for which there was probable cause; the officers executing the warrant were involved in the investigation throughout, and one of them wrote the affidavit to support the application; the officer received assurances that the warrant was legally sufficient [from the prosecuting attorney and the magistrate]; the search methodology was limited to uncovering evidence of the crimes identified in the affidavit; and the officers seized only evidence relevant to those crimes." *Id.* at 1135 (summarizing factors set forth in *United States v. Riccardi,* 405 F.3d 852, 864 (10th Cir. 2005)). Each of these factors is present in the instant case.

There are four exceptions to the good-faith doctrine, none of which are implicated here: "(1) where the judge issued the warrant on a deliberately or recklessly false affidavit; (2) where the judge abandoned his neutral and detached judicial role; (3) where the affidavit is so lacking in indicia of probable cause that it would be unreasonable for the officer to rely on it; and (4) where the warrant is so facially deficient and fails to particularize that an officer cannot reasonably believe it to be valid." *United States v. Holloway,* No. 11-40018, 2011 WL 3300180, at *6 (D. Kan. 2011) (summarizing exceptions set forth in *Leon* at 468 U.S. at 923).

The defendant raises none of these concerns in his motion. A neutral and

Case No. 1:16-cr-00054-WJM-Document 525-1 filed 12/13/13 USDC Colorado pg 271 of
Case 1:16-cr-00054-WJM Document 151 Filed 11/03/17 USDC Colorado Page 9 of 10
971

detached magistrate judge in the District of Arizona authorized the search of the Kaibab

residence based upon Agent Ennis's detailed affidavit. The officers executing the

warrant (to include Agent Ennis) seized cell phones as authorized in Attachment B.

Had the magistrate felt more justification was warranted for the seizure of the cell

phones, that magistrate could have required it.

In sum, even if the Court found the affidavit lacking, the officers who executed

the warrant had an objectively reasonable belief in the legal validity of the warrant, and

therefore, this case clearly falls within the good-faith exception of *Leon.*

## VII. THE DEFENDANT DOES NOT SEEK, NOR IS THERE ANY BASIS FOR, AN EVIDENTIARY HEARING

The defendant's does not request an evidentiary hearing on this motion, and

there is no basis to conduct one, given the arguments set forth above.

## VIII. CONCLUSION

For all of the reasons set forth above the Court should deny the defendant's

motion to suppress the cell phones seized during the search of the Kaibab address.

Respectfully submitted this 3rd day of November, 2017.

ROBERT C. TROYER
Acting United States Attorney
District of Colorado

By:   s/ *Martha A. Paluch*
MARTHA A. PALUCH
BRYAN DAVID FIELDS
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
Bryan.Fields3@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on this 3rd day of November, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

s/ *Martha A. Paluch*
MARTHA A. PALUCH
BRYAN DAVID FIELDS
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov

Case No. 1:16-cr-00054-WJM-2   Document 525-1   filed 12/12/19   USDC Colorado   pg 273 of
971
Case 1:16-cr-00054-WJM   Document 196   Filed 11/06/17   Page 1 of 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM-2

UNITED STATES OF AMERICA,

Plaintiff,

v.

2.      TRAMEL THOMAS,

        Defendant.

---

## REPLY IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE
## SEIZED PURSUANT TO SEARCH WARRANT

---

Defendant Tramel Thomas, through counsel, submits this reply in support of his

earlier motion [#194] to suppress the ten cellphones seized by the Government during

the execution of a search warrant at the residence ("Residence") of Mr. Thomas and his

co-defendant Heather Carr in Chandler, Arizona, on 29 November 2012.

Mr. Thomas averred in his motion that the affidavit submitted by Special Agent

Ennis in support of the search warrant failed to establish probable cause for seizure of

cellphones because, with the exception of one very general and conclusory sentence,

the affidavit did not even mention cellphones, but instead focused almost exclusively on

the need to search and seize computers, their components, and hard copy

documentary evidence.   Therefore, Thomas contended, the search warrant was

overbroad to the extent that it authorized seizure of cellphones, and, as such, the

cellphones should be suppressed as the fruits of an improper seizure.   In its response

[#197], the Government countered that:   a) the affidavit in support of the search

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 274 of
971
Case 1:16-cr-00054-WJM Document 198 filed 11/06/17 Page 2 of 7

warrant did sufficiently establish probable cause for seizure of cellphones and,
alternatively, b) even if the affidavit was insufficient, the seized cellphones was still
appropriate under the good faith exception established by United States v. Leon, 468
U.S. 897 (1984).

## I.   Lack of Probable Cause

Neither of the Government's arguments in support of sustaining the validity of
the seizure of the cellphones withstands scrutiny.   As a starting point, the parties are in
agreement that Special Agent Ennis's sole mention of cellphones in her 24 page, 54
paragraph sworn affidavit ("Affidavit") submitted in support of the Application for a
Search Warrant was the following statement:   "[b]ased on my experience, knowledge,
and training, and that of other agents I have spoken with, suspects in similar
investigations possess . . . cell phones . . . which they use as part of their method of
operation."   This singular, unelaborated-upon assertion was insufficient to establish
probable cause to seize cellphones.

In its opposition brief, the Government points primarily to three different federal
district court cases.   The prosecution avers that these decisions support the
Government's position that a law enforcement agent's mere citation to his or her own
experience that "bad guys use cellphones" is sufficient to establish probable cause for
seizure of the alleged criminals' cellphones.   However, these cases actually do not
establish such an alarmingly broad proposition.

First, United States v. Gholston, 993 F.Supp.2d 704 (E.D. Mich. 2014), involved
the seizure of a cellphone incident to the arrest of the defendant, a situation not present in
the instant matter.   Moreover, the Gholston court specifically held that it did not agree

2

that the law enforcement officer's "affidavit [in support of a request for a search warrant]
was wholly devoid of reference to facts and circumstances uncovered in his investigation
and instead rested solely on his training and experience." *Id.* at 718. The Gholston court
noted how the law enforcement officer therein had established in his affidavit that the
cellphone he had seized incident to the arrest "would contain evidence of pre-planning of
the robbery and of 'coordinat[ion] and communicat [ion]' among the participants 'prior to
the robbery to arrange meeting times, the availability of firearms and other details related
to the robbery.' *Id.*

In addition, the Gholston court pointed to the fact that the law enforcement affiant
in that case "cited the evidence of Defendant's joint participation in the gas station robbery
along with another individual as supporting his belief that a search of this device would
reveal evidence shedding light on the identities of these multiple participants and their
possible pre-planning and coordination of criminal activity." *Id.* at 718-719. In other
words, the Gholston officer did in his affidavit what Special Agent Ennis failed to do in her
Affidavit. He established a linkage between the crime being investigated and the seized
cellphone in a manner that went beyond just a recitation of his prior experience that
criminals use mobile devices.

Second, the law enforcement affiant in United States v. Barret, 824 F.Supp.2d 419
(E.D.N.Y. 2011), the second case discussed by the Government in its response, also
provided more information than just the generic "criminals use cellphones" type of
assertion used by SA Ennis in the Affidavit. To wit, the Barret affiant stated that "cell
phones are capable of electronically storing numerous types of information", *Id.* at 448, an
assertion which, while seemingly obvious, is not a statement in support of probable cause

3

that was set forth in the Affidavit.  Moreover, the <u>Barret</u> law enforcement agent also

stated in her affidavit that "in her experience, individuals involved in narcotics trafficking

typically use cellular phones to communicate and store information and other records on

their phones." *Id.*  This is a much more specific tie between the officer's experience, the

type of information sought as related to the crime(s) under investigation, and the

likelihood of that information being present on cellphones than SA Ennis's very general

statement in the Affidavit that based upon her experience people engaged in student aid

fraud schemes use their cellphones "as part of their method of operation."

Similarly, the law enforcement affiant in <u>United States v. Wiseman</u>, 158 F.Supp.2d

1242 (D. Kan. 2001), the third case cited by the Government in its response, provided

more than just past experience as a basis to seize and search cellphones.   The

<u>Wiseman</u> law enforcement affiant did note, similar to Special Agent Ennis, that individuals

involved in the type of crime he was investigating (the manufacture and sale of

methamphetamine) often use cellphones to facilitate the crime. *Id.* at 1249.   However,

unlike SA Ennis, the <u>Wiseman</u> affiant provided a link among the crime being investigated,

the cellphone to be searched, and the likelihood of information related to that crime being

present on the cellphone:   "[t]hese same devices are commonly used to store

information of their associates [*sic.*] names and phone numbers of other subjects involved

in these types of crimes." *Id.*   By contrast, the absence in the Affidavit of any such linkage

between the student aid fraud scheme under investigation and cellphones rendered the

Affidavit insufficient to establish probable cause to seize cellphones and resultant search

warrant authorizing same constitutionally overbroad.   Therefore, those phones should

be suppressed.

Case No. 1:16-cr-00054-WJM   Document 525-1   Filed 12/12/19   USDC Colorado   pg 277 of
971
Case 1:16-cr-00054-WJM   Document 196   Filed 11/06/17   Page 5 of 7

## II.   Inapplicability of the *Leon* Exception

In its response the Government puts forth a second argument, in the alternative, as
to why the cellphones should not be suppressed.   The prosecution contends that, even if
there was no probable cause to support the warrant's authorization to seize the
cellphones, the phones nonetheless should not be suppressed, due to the good-faith
exception to the exclusionary rule created by United States v. Leon, 468 U.S. 897 (1984).
However, that exception is not applicable to the circumstances of this case.

As the Government points out in its response, one of the exceptions to the good
faith doctrine is "where the affidavit is so lacking in indicia of probable cause that it would
be unreasonable for the officer to rely on it." (Please see p. 8 of Govt. response [#197]
and citations therein).   "The government, not the defendant, bears the burden of proving
that its agents' reliance upon the warrant was objectively reasonable." United States v.
Cook, 854 F.2d 371, 373 (10th Cir.1988), *cert. denied*, 488 U.S. 1006 (1989).     The
Government has not sustained, and cannot sustain that burden here.

In assessing the applicability of the Leon exception, "'the good faith inquiry is
confined to the objectively ascertainable question whether a reasonably well trained
officer would have known the search was illegal despite the magistrate's authorization.' . .
. To answer this 'objectively ascertainable question,' [the court is] to consider 'all of the
circumstances' and assume that the executing 'officers have a reasonable knowledge of
what the law prohibits.'" United States v. Dahlman, 13 F.3d 1391, *cert. denied*, 511 U.S.
1045 (1994), (quoting from Leon, 468 U.S. 919, 922 (1984)).   "[T]he reviewing court
must examine 'the text of the warrant ***and the affidavit*** to ascertain whether the agents

5

might have reasonably presumed it to be valid.'" <u>United States v. McKneely</u>, 6 F.3d 1447, 1454 (10th Cir. 1993), (quoting from <u>Leon</u>, 468 U.S. at 923), (emphasis added).   The determination is not just whether the affidavits contain legally sufficient facts but whether the affidavits are devoid of factual support. <u>United States v. Cardall</u>, 773 F.2d 1128, 1133 (10th Cir. 1985).

As noted, *supra*, the author of the Affidavit was Special Agent Ennis.   She also was the person who directed the execution of the search warrant at the Residence.   She, of all people, had to know that there was barely a mention of cellphones in the Affidavit. She certainly was aware that her single assertion that experience teaches that "suspects in similar investigations possess . . . cellphones . . . which they use as part of their method of operation" was not expanded upon, explained, amplified, or connected in the Affidavit to any types of specific evidence of alleged wrongdoing by Mr. Thomas or Ms. Carr that might have been located on cellphones.

In short, she knew, or should have known, that there was no probable cause set forth in the Affidavit, which she wrote, to support a warrant for seizure of cellphones.   As such, it was manifestly unreasonable for SA Ennis and her fellow officers to rely upon the search warrant as authority for them to search for, and to seize, cellphones at the Kaibab residence.   Therefore, the <u>Leon</u> good-faith exception does not apply, and the phones should be suppressed.   Mr. Thomas again so moves.

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 279 of
971
Case 1:16-cr-00054-WJM Document 196 Filed 11/06/17 Page 7 of 7

Dated this 6th day of November, 2017.

Respectfully submitted,

s/Thomas E. Goodreid
Thomas E. Goodreid
Attorney at Law
1801 Broadway, Suite 1400
Denver, CO   80202
(303) 296-2048x.136
*t.goodreid@comcast.net*
Attorney for Defendant Tramel Thomas

### CERTIFICATE OF SERVICE

I certify that on this 6th day of November, 2017, I electronically filed the foregoing
**REPLY IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT
TO SEARCH WARRANT** with the Clerk of Court using the CM/ECF system, which will
send notification of such filing to all counsel of record.

s/Thomas E. Goodreid
Thomas E. Goodreid
Attorney at Law
1801 Broadway, Suite 1400
Denver, CO   80202
(303) 296-2048x.136
*t.goodreid@comcast.net*
Attorney for Defendant Tramel Thomas

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Case No. __16-cr-00054-WJM_____        Date ____November 27, 2017____

Case Title _____United States v. Tramell Thomas_____

_____Plaintiff_____ FINAL WITNESS LIST
(Plaintiff / Defendant)

| WITNESS & DATE | | | | | | |
|---|---|---|---|---|---|---|
| **WITNESS & DATE** | | **PROPOSED LENGTH OF TESTIMONY** | | | | |
| Moss- Monday, 11/27/17 | Direct: | 60 minutes | Cross: | 30 minutes | Total: | 90 minutes |
| Seal- Monday, 11/27/17 | Direct: | 60 minutes | Cross: | 30 minutes | Total: | 90 minutes |
| Carr- Tuesday, 11/28/17 | Direct: | 120 minutes | Cross: | 180 minutes | Total: | 300 minutes |
| Allred- Tuesday, 11/28/17 | Direct: | 60 minutes | Cross: | 25 minutes | Total: | 85 minutes |
| Joseph- Tuesday, 11/28/17 | Direct: | 45 minutes | Cross: | 25 minutes | Total: | 70 minutes |
| Mullett- Tuesday, 11/28/17 | Direct: | 40 minutes | Cross: | 60 minutes | Total: | 100 minutes |
| Stailey- Wednesday, 11/29/17 | Direct: | 120 minutes | Cross: | 30 minutes | Total: | 150 minutes |
| Omar- Wednesday, 11/29/17 | Direct: | 40 minutes | Cross: | 60 minutes | Total: | 100 minutes |
| Green- Wednesday, 11/29/17 | Direct: | 60 minutes | Cross: | 120 minutes | Total: | 180 minutes |
| Duncan- Wednesday, 11/29/17 | Direct: | 45 minutes | Cross: | 90 minutes | Total: | 135 minutes |
| Ennis - Wed/Thurs, 11/29-30/17 | Direct | 120 minutes | Cross: | 45 minutes | Total: | 165 minutes |

**Total Direct:  770 minutes (12.8 hours)    Total Cross:  695 minutes (11.6 hours)**

**FINAL LIST OF PROPOSED EXHIBITS**

CASE NO. 16-cr-54_____     PLAINTIFF'S LIST: ☒     DEFENDANT'S LIST: ☐     THIRD PTY DEFTS. LIST: ☐

CASE CAPTION   UNITED STATES_____     vs. TRAMMEL THOMAS_____     DATE November 27, 2017_____

LIST PLAINTIFF'S EXHIBITS BY NUMBERS (1, 2, 3, etc.) and DEFENDANT'S BY LETTER (A, B, C, etc.)

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Jonathan Seal | Synched Transcript of Audio Recording of Tempe PD Traffic Stop of Defendant on 8/30/12 | X | | | | | | |
| 2 | Jonathan Seal | Tempe PD Tow Report | X | | | | | | |
| 3 | Jonathan Seal | Photo of White Dodge | | X | | | | | |
| 4 | Jonathan Seal | Envelope of Debit Cards- Seized by Tempe PD | X | | | | | | |
| 4a | Jonathan Seal | Higher One Debit Card- Omar | X | | | | | | |

1

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/11/19 USDC Colorado pg 282 of
971
Case 1:16-cr-00054-WJM Document 205 Filed 11/10/17 Page 2 of 2

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 4b | Jonathan Seal | Higher One Debit Card- V. Jones | X | | | | | | |
| 4c | Jonathan Seal | Higher One Debit Card- R. Pickens | X | | | | | | |
| 4d | Jonathan Seal | Higher One Debit Card- E. Jones | X | | | | | | |
| 5 | Jonathan Seal | Manual Abate Debit Card Located in Wallet Seized by Tempe PD | X | | | | | | |
| 6 | Heather Carr | Heather Carr Plea Agreement | X | X | | | | | |
| 7 | Heather Carr | Photograph of 1822 East Kaibab Drive, Chandler, AZ | X | | | | | | |
| 8 | Heather Carr | Photograph of Office at 1822 East Kaibab Drive, Chandler, AZ | X | | | | | | |

2

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 9 | Heather Carr | Photograph of office at 1822 East Kaibab Drive, Chandler, AZ from Huawei cellphone | X | | | | | | |
| 10 | Heather Carr | Sketch of 1822 East Kaibab Drive, Chandler, AZ | X | | | | | | |
| 11 | Alison Stailey | Evidence Inventory Form | X | | | | | | |
| 12 | Alison Stailey | Search Terms Provided to Stailey | X | | | | | | |
| 13 | Alison Stailey | Excerpt of Report 857 Item 12 Att. 2-SMS re 209-814-5075 | X | | | | | | |
| 14 | Alison Stailey | Excerpt of Report 857 Item 12 Att. 2-SMS re 719-963-7258 | X | | | | | | |

3

Case No. 1:16-cr-00054-WJM-Document 525-1 filed 12/11/19 USDC Colorado pg 284 of
Case 1:16-cr-00054-WJM Document 205 Filed 11/10/17 Page 4 of 12
971

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 15 | Alison Stailey | Excerpt of Report 857 Item 12 Att. 2- SMS Re 719-209-2675 | X | | | | | | |
| 16 | Alison Stailey | Excerpt of Report 857 Item 12 Att. 2- SMS re 260-602-7165 | X | | | | | | |
| 17 | Alison Stailey | Excerpt from Heather Carr's Daughter's Samsung Phone Contact List | X | | | | | | |
| 18 | Alison Stailey | Excerpt from Heather Carr's Ipad Contact List | X | | | | | | |

4

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 19 | Alison Stailey | Excerpt of Report 863, S2 VAIO Att. 17 FAFSA Internet History | X | | | | | | |
| 20 | Alison Stailey | Excerpt of Report 863, S2 VAIO Att. 20 M. Abate HTML Files | X | | | | | | |
| 21 | Alison Stailey | Excerpt of Report 863, S2 VAIO Att. 21 Maricopa Internet Shortcuts | X | | | | | | |
| 22 | Alison Stailey | Excerpt of Report 863, S2 VAIO Att. 2 Search Hits for Inmate Students | X | | | | | | |

Case No. 1:16-cr-00054-WJM-Document 525-1 filed 12/11/19 USDC Colorado
Case 1:16-cr-00054-WJM Document 205 Filed 1/10/17 USDC Colorado pg 286 of
971

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 23 | Alison Stailey | Excerpt of Report 863, S1 Room J Hard Drive Att. 2 Search Hits for Inmate Students | X | | | | | | |
| 24 | Alison Stailey | Cellphone Photograph of Defendant taken on Huawei phone | X | | | | | | |
| 25 | Alison Stailey | Photograph of defendant in closet at 1822 East Kaibab Drive taken on Huawei phone | X | | | | | | |
| 26 | Alison Stailey | Photograph of money taken on Huawei phone | X | | | | | | |
| 27 | Alison Stailey | Photograph of White Dodge taken on Huawei phone | X | | | | | | |

6

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 28 | Alison Stailey | Photograph of defendant at desk at 1822 E. Kaibab Drive taken on Huawei phone | X | | | | | | |
| 29 | Alison Stailey | Photograph of defendant taken on Huawei Phone | X | | | | | | |
| 30 | Michelle Allred | FAFSA | X | | | | | | |
| 31 | Michelle Allred | Common Origination Disbursement ("COD") Report | X | | | | | | |
| 32 | Marcelle Green | Marcelle Green Plea Agreement | X | X | | | | | |
| 33 | | Stipulation Re: FRE 902(11) Records | | X | | | | | |

7

Case No. 1:16-cr-00054-WJM   Document 525-1 filed 12/11/19   USDC Colorado   pg 288 of
971
Case 1:16-cr-00054-WJM   Document 205   Filed 11/10/17   Page 8 of 17

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 34 | | Stipulation Re: FRE 1006 Summary Charts | | X | | | | | |
| 35 | | Stipulation Re: Thomas's Detention in El Paso County | | X | | | | | |
| 36 | | Stipulation Re: Email communication between the defendant and Sambora | | X | | | | | |
| 50 | Cox Communications | Pleasant Street IP Subscriber Records | X | | | | | | |
| 50a | Cox Communications | Declaration | | | | | | | |
| 51 | Cox Communications | East Kaibab Drive IP Subscriber Records | X | | | | | | |
| 51a | Cox Communications | Declaration | | | | | | | |

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/11/19 USDC Colorado pg 289 of
971
Case 1:16-cr-00054-WJM Document 205 Filed 11/10/17 Page 9 of 17

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 52 | CenturyLink | Marcelle Green IP Subscriber Records (4630 S. 21st Place, Phoenix AZ) | X | | | | | | |
| 52a | CenturyLink | Declaration | | | | | | | |
| 53 | CenturyLink | Marcelle Green IP Subscriber Records (4630 S. 21st Place, Phoenix AZ) | X | | | | | | |
| 53a | CenturyLink | Declaration | | | | | | | |
| 54 | Relx Group (Accurint) (Brett Bogan) | | X | | | | | | |
| 54a | Relx Group (Accurint) (Brett Bogan) | Declaration | | | | | | | |

9

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/11/19 USDC Colorado pg 290 of
Case 1:16-cr-00054-WJM Document 203 Filed 11/10/17 Page 10 of 17
971

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 55 | CCCS-Karen Funston | CCCS Online Course Records | X | | | | | | |
| 55a | CCCS-Karen Funston | Declaration | | | | | | | |
| 56 | Higher One-Rebecca Joseph | | X | | | | | | |
| 56a | Higher One-Rebecca Joseph | Declaration | | | | | | | |
| 56b | Rebecca Joseph | Ismael Omar – Higher One Records | X | | | | | | |
| 56c | Rebecca Joseph | Virginia Jones – Higher One Records | X | | | | | | |
| 56d | Rebecca Joseph | Robert Pickens – Higher One Records | X | | | | | | |
| 56e | Rebecca Joseph | Eddie Jones – Higher One Records | X | | | | | | |
| 56f | Rebecca Joseph | Dennis Miller – Higher One Records | X | | | | | | |

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 56g | Rebecca Joseph | Manuel Abate – Higher One Records | X | | | | | | |
| 57 | DOE- Sean Fitzgerald | | X | X | | | | | |
| 57a | DOE- Sean Fitzgerald | Declaration | | | | | | | |
| 57b | Michele Allred- DOE | Ismael Omar - FAFSA | | X | | | | | |
| 57c | Michele Allred DOE | Ismael Omar – Master Promissory Note | | X | | | | | |
| 57d | Michele Allred - DOE | Ismael Omar – Individual Loan Data | | X | | | | | |
| 57e | Michele Allred - DOE | Virginia Jones - FAFSA | | X | | | | | |
| 57f | Michele Allred - DOE | Robert Pickens - FAFSA | | X | | | | | |
| 57g | Michele Allred - DOE | Eddie Jones - FAFSA | | X | | | | | |
| 57h | Michele Allred - DOE | Dennis Miller - FAFSA | | X | | | | | |
| 57i | Michele Allred - DOE | Manuel Abate - FAFSA | | X | | | | | |

11

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 57j | Christine Duncan | Christine Duncan- FAFSA | X | | | | | | |
| 57k | Christine Duncan | Christine Duncan- FAFSA | X | | | | | | |
| 57l | Christine Duncan | Christine Duncan- Master Promissory Note | X | | | | | | |
| 58 | CC of Denver- Theresa Lavin | | X | | | | | | |
| 58a | CC of Denver- Theresa Lavin | Declaration | | | | | | | |
| 59 | Mesa CC- Teresa Toney | | X | | | | | | |
| 59a | Mesa CC- Teresa Toney | Declaration | | | | | | | |
| 60 | Phoenix College- Teresa Toney | | X | | | | | | |

12

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/18 USDC Colorado pg 293 of
Case 1:16-cr-00054-WJM Document 208 Filed 11/10/17 Page 13 of 17
971

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 60a | Phoenix College- Teresa Toney | Declaration | | | | | | | |
| 61 | Pueblo CC- Monica Hardwick | | X | | | | | | |
| 61a | Pueblo CC- Monica Hardwick | Declaration | | | | | | | |
| 62 | RRCC- Linda Crook | | X | | | | | | |
| 62a | RRCC- Linda Crook | Declaration | | | | | | | |
| 63 | Pikes Peak Community College- Kristina Moss | | X | | | | | | |
| 63a | Pikes Peak Community College PPCC- Kristina Moss | Declaration | | | | | | | |
| 63b | Kristina Moss | Ismael Omar – PPCC Documentatio n | X | | | | | | |

13

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 294 of
Case 1:16-cr-00054-WJM Document 208 Filed 11/10/17 Page 14 of 17
971

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 63c | Kristina Moss | Virginia Jones – PPCC Documentation | X | | | | | | |
| 63d | Kristina Moss | Robert Pickens – PPCC Documentation | X | | | | | | |
| 63e | Kristina Moss | Eddie Jones – PPCC Documentation | X | | | | | | |
| 63f | Kristina Moss | Dennis Miller – PPCC Documentation | X | | | | | | |
| 63g | Kristina Moss | Manuel Abate – PPCC Documentation | X | | | | | | |
| 64 | UPS Store- Don Pratt | | X | | | | | | |
| 64a | UPS Store- Don Pratt | Declaration | | | | | | | |

14

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 65 | Citi Prepaid- Marianna Szabo | | X | | | | | | |
| 65a | Citi Prepaid- Marianna Szabo | Declaration | | | | | | | |
| 66 | JP Morgan Chase | | X | | | | | | |
| 66a | JP Morgan Chase | Declaration | | | | | | | |
| 67 | Sandra Ennis | Thomas Student Lookup System FAFSA Doc (1418 Rushmore Drive, Colorado Springs, CO) | | | | | | | |

15

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 296 of
Case 1:16-cr-00054-WJM Document 203 Filed 11/10/17 Page 16 of 17
971

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 68 | Sandra Ennis | Thomas Student Loan and MPN Re: 1418 Rushmore Drive Address | | | | | | | |
| 69 | Sandra Ennis | Thomas Higher One Account Summaries- Re: 1418 Rushmore Drive Address | | | | | | | |
| 70 | Sandra Ennis | Photograph of Broken Huawei phone | X | | | | | | |
| 71 | Sandra Ennis | Photograph of Broken Huawei phone | X | | | | | | |
| 72 | Sandra Ennis | Ennis Summary Chart- Disbursement Totals for DOE and Schools | | | | | | | |
| 73 | Sandra Ennis | Ennis Summary Chart re IP addresses | | | | | | | |

16

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| 74 | Sandra Ennis | Ennis Summary Chart re Physical Addresses | | | | | | | |
| 75 | Sandra Ennis | Ennis Summary Chart re Debit Card Mailings | | | | | | | |
| 76 | Sandra Ennis | Composite Exhibit- Count 2 | | | | | | | |
| 77 | Sandra Ennis | Composite Exhibit- Count 3 | | | | | | | |
| 78 | Sandra Ennis | Composite Exhibit- Count 4 | | | | | | | |
| 79 | Sandra Ennis | Composite Exhibit- Count 5 | | | | | | | |
| 80 | Sandra Ennis | Composite Exhibit- Count 6 | | | | | | | |
| 81 | Sandra Ennis | Composite Exhibit- Count 7 | | | | | | | |

# FINAL LIST OF PROPOSED EXHIBITS

CASE NO. 16-cr-00054-WJM   PLAINTIFF'S LIST: ☐   DEFENDANT'S LIST: ☐   THIRD PTY DEFTS. LIST: ☐

CASE CAPTION United States vs. Tramell Thomas DATE November 27, 2017

LIST PLAINTIFF'S EXHIBITS BY NUMBERS (1, 2, 3, etc.) and DEFENDANT'S BY LETTER (A, B, C, etc.)

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/INFO. |
|---|---|---|---|---|---|---|---|---|---|
| A | Moss | Statement | | | | | | | MOI 245 |
| B | Carr | Visitation summary | X | x | | | | | INV 1753 |
| C | Carr | Visitation roster | X | x | | | | | INV 1758-1760 |
| D | Carr | Statement | | | | | | | MOI 250-266 & Exh. B |
| Exhibit deleted duplicate | | | | | | | | | |
| F | Carr | Proffer agreement | x | | | | | | PROF 1-3 |
| G | Carr | Monthly Statement CMB | X | x | | | | | CMB 46-49 |
| H | Carr | Credit Report | X | x | | | | | EXP 1 |
| I | Carr | Finger Print Report | | | | | | | Inv 1817-1818 |

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| J | Carr Staley | Digital Forensic report | | | | | | | SW 1905-1914 |
| K | Carr | School Summary 2004 | X | x | | | | | INV 1312-1315 |
| L | Carr | School Summary 2005 | X | x | | | | | INV 1316-1319 |
| M | Carr | School Summary 2006 | X | x | | | | | INV 1320-1323 |
| N | Carr | School Summary 2007 | X | x | | | | | INV 1308-1311 |
| O | Carr | School Summary 2009 | X | x | | | | | INV 1294-1297 |
| P | Carr | School Summary 2010 | X | x | | | | | INV 1298-1301 |
| Q | Carr | Email Address | | | | | | | MOA 497-500 |
| R | Carr WFB | Report | | | | | | | WFB 62-80 |

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/INFO. |
|---|---|---|---|---|---|---|---|---|---|
| S | Carr WFB | Investigative report | | | | | | | WFB 07-20 |
| Exhibit deleted duplicate | | | | | | | | | |
| U | Diaz | Plea Agreement | | x | | | | | GJ 274-283 |
| V | Diaz/ Judicial Notice | Chang of Plea Transcript | | | | | | | ECF Doc. 84-1 |
| W | Diaz/ Judicial Notice | Government motion Re: Plea | x | | | | | | ECF Doc. 84 |
| X | Mullett | Statement | | | | | | | MOI 164-166 |
| Y | Mullett | School Records | X | x | | | | | INV 278-281 |
| Z | Mullett | Aid records 2012 | X | x | | | | | INV 285-329 |
| A-1 | Mullett DOE | Abate Pay Records | X | x | | | | | MOA 179-189 |

Case No. 1:16-cr-00054-WJM-Document 525-1 filed 12/12/19 USDC Colorado pg 301 of
Case 1:16-cr-00054-WJM Document 204 Filed 11/10/17 Page 4 of 5
971

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/INFO. |
|---|---|---|---|---|---|---|---|---|---|
| A-2 | Green | Phoenix Police Report | | | | | | | INV 22-42 |
| A-3 | Green | Statement 11/29/12 | | | | | | | MOI 128-129 |
| A-4 | Green | Statement 4/12/17 | | | | | | | MOI 311-313 |
| A-5 | Green | Statement 8/29/12 | | | | | | | MOI 389-397 |
| A-6 | Green | Criminal record | | | | | | | INV 1381-1384 |
| A-7 | Green | Loan Summaries | x | | | | | | INV 1427-1433 |
| A-8 | Green | Proffer Letter | x | | | | | | PROF 4-6 |
| A-9 | Duncan | Statement 9/7/12 | | | | | | | MOI 35-39 |
| A-10 | Duncan | Statement 9/13/12 | | | | | | | MOI 40-42 |

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| A-11 | Duncan | Statement 10/16/12 | | | | | | | MOI 43-44 |
| A-12 | Duncan | Statement 11/30/12 | | | | | | | MOI 45 |
| A-13 | Duncan | Statement 4/18/13 | | | | | | | MOI 46-49 |
| A-14 | Duncan | Statement 9/9/13 | | | | | | | MOI 50-53 |
| A-15 | Duncan | Phone numbers | | | | | | | MOA 222-223 |
| A-16 | Duncan | Notarized Statement | | | | | | | SW 38 |
| A-17 | Omar | Identification card | x | | | | | | DOC 852 |
| A-18 | Omar | Criminal history | | | | | | | DOC 1083-1085 |

Any Exhibit necessary to rebut the Government's case in chief

Any Exhibit necessary to impeach or cross examine any government witness

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martinez**


Case No. <u>16-cr-00054-WJM</u>                    Date  <u>November 27, 2017</u>

Case Title <u>United States v. Tramell Thomas</u>


<u>Defendant's</u>  FINAL WITNESS LIST


| <u>Witness & Date</u> | <u>Proposed Length of Testimony</u> |
|---|---|
| Tracy Eubanks | Direct: ¼ hr Cross1/4hr Total .5hr |
| Mercedes Diaz | Direct ½ hr Cross 3/4hrTotal 1.25 |
| Michael Cox | Direct 1 hr Cross 3/4hrTotal 1.75 |
| Matthew Sanders | Direct 1 hr Cross 3/4hr Total 1.75 |

Total: 5.25 hr

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Criminal Case No. 16-cr-054-WJM-2

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

2.    **TRAMMELL THOMAS**,

      Defendant.

---

## ORDER DENYING MOTIONS TO SUPPRESS

---

In this financial aid fraud case, Defendant is charged with conspiracy to defraud the United States Government (specifically the United States Department of Education ("DOE")), in violation of 18 U.S.C. § 286, and related counts of aiding and abetting mail fraud, 18 U.S.C. §§ 1341 & 2. (ECF No. 131.) Now before the Court are Defendant's Motion to Suppress #1 (ECF No. 181) and Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrant (ECF No. 194). For the reasons set forth below, both motions are denied.

## I. MOTION TO SUPPRESS #1 (WARRANTLESS TRAFFIC STOP)

**A.    Facts**

At 2:40 a.m. on August 30, 2012, Officer Jonathan Seal of the Tempe, Arizona, Police Department pulled Defendant over, suspecting drunk driving, after seeing Defendant's vehicle first drift within its lane and then cross the double line marking the

oncoming traffic lane.  (ECF No. 193-2 at 11; ECF No. 193-1 at 1.)[1]  Officer Seal asked

Defendant to move to a safer location, which he did, after which the traffic stop

effectively began at approximately 2:44 a.m.

When Officer Seal approached the vehicle, he noticed the odor of alcohol

coming from inside, and thought Defendant's eyes looked "bloodshot and watery."

(ECF No. 193-2 at 12.)  When asked where he was going, Defendant answered that he

was both coming from and also going to Chandler, Arizona—an answer which did not

make sense to Officer Seal.  Defendant then indicated that he was headed to Chandler

after picking up mail from his post office box in Tempe.  (ECF No. 193-4 at 2.)

While speaking with Defendant, Officer Seal saw a plastic bag containing

approximately 50 credit cards on the vehicle's back seat.  (*Id.* at 12.)[2]  When Officer

Seal asked about the bag, Defendant first did not respond.  When Officer Seal asked if

he could see the bag, Defendant reached into the back seat as if to comply, but instead

moved the bag containing credit cards onto the floor, while handing Officer Seal an

empty bag which was located nearby.  (*Id.* at 12.)  Observing these actions did not

alleviate Officer Seal's suspicions about the credit cards.  (ECF No. 193-4 at 3.)

Officer Seal then asked Defendant to exit the vehicle, and Defendant complied.

(ECF No. 193-2 at 13.)  While Defendant was speaking with Officer Seal, a K-9 unit

arrived, including Officer Jason Papke and a trained drug-sniffing dog, Neo.  (ECF No.

---

[1] All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

[2] These turned out to be 52 debit cards.  The Court uses the terms "credit card" here, since the distinction makes no difference for present purposes.

2

193-2 at 13.)  According to Officer Seal's report, Defendant was detained at the time Officer Papke arrived, at approximately 2:47 a.m.  (ECF No. 193-2 at 13.)[3]

At approximately 2:50 a.m., Officer Seal began recording the traffic stop on an audio recorder.  (ECF No. 193-3.)[4]  At approximately 2:54 a.m., following a few minutes in which Defendant asked whether he was being detained, and why, Officer Papke asked if they could search the vehicle, and Defendant declined.  (Tr. at 7–8.)  At approximately 2:55 a.m., Defendant offered to take a sobriety test.  (Tr. at 8.)  Officer Seal conducted a field sobriety test—in particular, a horizontal gaze nystagmus or "HGN" test—beginning at approximately 2:56 a.m., or approximately 12 minutes after the traffic stop had begun.  This took slightly less than 2 minutes to complete.  (Tr. at 9–11.)

Officer Seal was satisfied that Defendant was not intoxicated, but still wanted to inquire about the credit cards.  Therefore, approximately 15 minutes after initiating the stop, Officer Seal told Defendant that he was not under arrest but was "just being detained . . . until we can complete our investigation," and that "because you are not free to leave," he informed Defendant of his *Miranda* rights.  (Tr. at 12–13.)

Officer Seal then questioned Defendant regarding the credit cards, asking "what's the deal with those credit cards" and similar follow-up questions.  (Tr. at 13.)

---

[3] Defendant was handcuffed and seated on a curb.  Defendant makes no argument that either being asked to exit the vehicle or being handcuffed constituted a Fourth Amendment violation, so the Court does not further address these facts.

[4] The Court has reviewed the complete audio recording, as submitted to the Court, along with the accompanying written transcripts.  (*See* ECF No. 193-3.)  All of the activity material to the Court's analysis was recorded on the first of the three submitted recording files.  The Court cites the transcript of that recording as "Tr."

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/17/19 USDC Colorado pg 307 of
971
Case 1:20-cr-00054-WJM Document 206 Filed 11/14/14 Page 4 of 21

Defendant responded by insisting he was not drunk or on drugs and had committed no
crime, and generally questioning why he was being detained, but Defendant did not
answer Officer Seal's questions regarding the credit cards. (Tr. at 13–16.)

While Officer Seal was questioning Defendant about the credit cards, Officer
Papke and Neo initiated a sniff of the exterior of the vehicle. (*See* Tr. at 15.)
Approximately 2 minutes after Officer Seal began questioning Defendant about the
credit cards, Neo alerted, leading Officer Papke to open the vehicle's door and begin
searching inside of the car. (Tr. at 15.) At this point, Officer Seal was still questioning
Defendant about the credit cards. (Tr. at 13–16.)[5]

The search inside the vehicle—which turned out to belong to Defendant's
girlfriend, co-defendant Heather Carr—discovered a useable quantity of marijuana, as
well as an open container of what appeared to be an alcoholic beverage. This
container was found sitting on the passenger side floorboard in such a position that the
officers believed it could not have been in that position while the vehicle was in motion
without spilling, making them suspect Defendant had placed it there subsequent to the
traffic stop, as if to hide it.

Defendant was arrested and the vehicle was towed and impounded. The items
inside it were inventoried and the bag of credit cards was seized and placed into
evidence by the Tempe Police Department, along with a laptop computer found in the
vehicle. (ECF No. 193-4 at 1.) In connection with its own investigation of Defendant

---

[5] A third officer, Patrick Shearan, had also arrived on the scene by this time and later
took the primary role in speaking with Defendant, who continued to protest the reasons for his
detention. (Tr. at 16.)

4

and the crimes alleged in this case, DOE was notified of this evidence on December 6, 2012 (ECF No. 193-5), and in February 2013 sought and obtained a warrant to search the laptop (ECF No. 181-1).

Defendant now seeks to suppress "any and all evidence seized from the Defendant on or about August 30, 2012," arguing the seizure of evidence following the traffic stop was illegal and that the fact a warrant was later issued to search the laptop "does nothing to remove the taint that emanated from the original seizure."  (ECF No. 181 at 1, 4.)

**B.      Legal Standard**

      1.      <u>Evidence Obtained From a Warrantless Search or Seizure</u>

The Fourth Amendment to the U.S. Constitution provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  However, "[t]he Amendment says nothing about suppressing evidence obtained in violation of this command.  That rule—the exclusionary rule—is a prudential doctrine created by th[e] Supreme] Court to compel respect for the constitutional guaranty."  *Davis v. United States*, 564 U.S. 229, 236 (2011) (internal quotation marks omitted).  Pursuant to the exclusionary rule, a defendant may move for suppression of evidence obtained in violation of the Fourth Amendment.  *Id.*

On a motion to suppress evidence derived from a warrantless search (such as the search of the vehicle here), the defendant bears the burden of presenting a *prima facie* case that the Fourth Amendment has been "implicated," at which point the burden

Case No. 1:16-cr-00054-WJM-2   Document 525-1   filed 12/13/19   USDC Colorado   pg 309 of
971
Case 1:16-cr-00054-WJM   Document 206   Filed 4/14/17   Page 6 of 21

shifts to the Government to prove "that its warrantless actions were justified (*i.e.*, as a
lawful investigatory stop, or under some other exception to the warrant requirement)."
*United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); *see also id.* at nn.1–2
(citing authorities); 6 Wayne R. LaFave, *Search & Seizure* § 11.2(b) at n.35 and
accompanying text (5th ed., Oct. 2015 update) (hereinafter "*Search & Seizure*").  The
record on Defendant's Motion reflects that his Fourth Amendment rights were
implicated by the traffic stop and ensuing seizure.

    2.    <u>Reasonable Suspicion</u>

The Tenth Circuit has explained reasonable suspicion as follows:

> Reasonable suspicion is a less demanding standard than
> probable cause.  Specifically, reasonable suspicion is merely
> a particularized and objective basis for suspecting criminal
> activity.  To determine whether investigating officers had
> reasonable suspicion, we consider both the quantity of
> information possessed by law enforcement and its reliability,
> viewing both factors under the totality of the circumstances.

*United States v. Mabry*, 728 F.3d 1163, 1167 (10th Cir. 2013) (internal quotation marks,
citations, and ellipses omitted).  Reasonable suspicion, "does not deal with hard
certainties, but with probabilities.  Long before the law of probabilities was articulated as
such, practical people formulated certain common sense conclusions about human
behavior; jurors as factfinders are permitted to do the same—and so are law
enforcement officers."  *United States v. Cortez*, 449 U.S. 411, 418 (1981).
Reasonable suspicion is an objective standard, asking only "whether the facts available
to the detaining officer, at the time, warranted an officer of reasonable caution in
believing the action taken was appropriate."  *United States v. McHugh*, 639 F.3d 1250,

<div align="center">6</div>

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/17/19 USDC Colorado pg 310 of
971
Case 1:16-cr-00054-WJM Document 206 Filed 11/14/17 Page 7 of 21

1256 (10th Cir. 2011) (internal quotation marks omitted).

Consistent with this objective standard, the Tenth Circuit does not require an

officer to have a particular penal offense in mind. *United States v. Guardado*, 699 F.3d

1220, 1225 (10th Cir. 2012) ("[W]e reject the argument that the officers were required to

have evidence linking [the defendant] to . . . particular criminal activity. Direct evidence

of a specific, particular crime is unnecessary."); *see also United States v. Harmon*, 871

F. Supp. 2d 1125, 1160 (D.N.M. 2012) ("to establish that reasonable suspicion exists,

officers have no obligation to articulate a specific offense which they believe the

suspect may have committed"). It is generally sufficient if the facts known to the officer

would reasonably, objectively suggest "some particular variety of criminal activity." 4

*Search & Seizure* § 9.5(c), text following n.122.

**C.     Analysis**

Defendant does not contest the legality of the initial traffic stop, based on Officer

Seal's suspicion of drunk driving. (ECF No. 181, ¶ 14.) However, Defendant argues

that "at the point when Officer Sea[l] abandoned his investigation of the driving offense

that the continued detention of the Defendant became illegal," that the use of the drug

detection dog was illegal in these circumstances, and that "once [Officer Seal]

determined the Defendant was not intoxicated, the justification for the detention ended

and the Defendant should have been allowed to leave." (ECF No. 181 ¶¶ 17–18; ECF

No. 196 ¶ 2.)

        1.     *Rodriguez*

Defendant relies principally on *United States v. Rodriguez*, 135 S. Ct. 1609

7

Case No. 1:16-cr-00054-WJM-Document 525-1 cited 12/17/19 USDC Colorado pg 311 of
971
Case 1:16-cr-00054-WJM Document 208 Filed 11/14/18 USDC Colorado Page 8 of 21

(2015).  (ECF No. 181 at 4, ¶ 20.)  Similar to the facts here, in *Rodriguez*, the police

pulled over the defendant for veering onto the shoulder late at night.  *Id.* at 1612.  The

officer who initiated the stop had a drug dog in the car, *id.*, but he completed the

records check and "got all the reasons for the stop out of the way" without having his

dog sniff the vehicle, and without identifying any articulable reasonable suspicion of a

crime, *id.* at 1613.  Nevertheless, *after* completing all the necessities of the traffic stop,

the officer ordered defendants to exit the vehicle to conduct a dog sniff.  *Id.*

      The Supreme Court held this dog sniff had been impermissible, reiterating that

"the tolerable duration of police inquiries in the traffic-stop context is determined by the

seizure's 'mission'—to address the traffic violation that warranted the stop, and to

attend to related safety concerns."  *Id.* at 1614.  "Because addressing the infraction is

the purpose of the stop, it may 'last no longer than is necessary to effectuate that

purpose.'"  *Id.* at 1614 (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985);

alterations incorporated).  Thus, a traffic stop "remains lawful only 'so long as unrelated

inquiries do not measurably extend the duration of the stop.'"  *Id.* at 1615 (quoting

*Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

      *Rodriguez* does not call for suppression here for the reasons addressed below.

      2.      <u>Reasonable Suspicion of a Crime in Addition to Traffic Violation</u>

      Unlike *Rodriguez*, where there was no identified reasonable suspicion of any

crime other than a traffic infraction, here Officer Seal did have reasonable suspicion to

investigate the credit cards.  "[A] a traffic stop may be expanded beyond its initial

purpose . . . 'if the officer has an objectively reasonable and articulable suspicion that

illegal activity has occurred or is occurring.'" *United States v. Moore*, 795 F.3d 1224,

1229 (10th Cir. 2015) (quoting *United States v. Caro*, 248 F.3d 1240, 1244 (10th Cir.

2001)).  This rule is well established and continues to be the law following *Rodriguez*.

*See, e.g.*, *United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017) ("A traffic stop

must be justified at its inception and, in general, the officer's actions during the stop

must be reasonably related in scope to the circumstances that initially justified it.  A

stop may, however, be extended beyond that scope . . . *if the police have a reasonable

suspicion that other illegal activity has occurred or is occurring*." (emphasis added;

citations omitted)).[6]

Defendant's argument suggests that Officer Seal was required to ignore any

evidence he observed of other criminal activity while he completed the traffic stop, and

then send Defendant on his way.  That is not the law, and *Rodriguez* does not hold

otherwise.  Rather, *Rodriguez* affirmed only that unrelated investigations (such as a dog

sniff) may not unreasonably prolong a traffic stop "*absent the reasonable suspicion

ordinarily demanded to justify detaining an individual.*"  *Id.* at 1615 (emphasis added).[7]

---

[6] Defendant's effort to distinguish *Moore* is unavailing.  (*See* ECF No. 196 ¶ 8.)  In
*Moore*, the officer suspected a drug crime and conducted a dog sniff "[a]pproximately two and a
half minutes" after the traffic investigation was complete and the defendant had refused a
consensual search.  795 F.3d at 1229.  The Tenth Circuit found it a "close question" whether
the officer had an articulable reasonable suspicion for further investigation, based on "(1)
Moore's nervousness, (2) Moore's acknowledgment [of] a prior criminal history, and (3) Moore's
name being recently added to the vehicle's registration."  *Id.* at 1229.  As analyzed below, the
Court finds Officer Seal had a *greater* basis for reasonable suspicion of criminal activity than
was present in *Moore*, warranting a reasonable period of additional detention to question
Defendant.  And, as noted, the rule that a traffic stop may be reasonably extended when there
is suspicion of other illegal activity is not limited to the facts of *Moore*.

[7] Defendant also cites *United States v. Hawley*, 660 Fed. App'x 702 (10th Cir. 2016).
*Hawley* supports the Government's position, not Defendant's.  *Hawley*, citing *Rodriguez*,
reiterated that "*absent reasonable suspicion of other criminal activity*, police may not extend an

Here, Officer Seal had such an objectively reasonable suspicion of an additional
crime, justifying his detention of Defendant while he took reasonable steps to
investigate his suspicions regarding the credit cards.  Before that questioning was
complete, the drug dog had alerted, providing the officers a permissible basis to search
the vehicle for illegal drugs, which they then found.  Defendant argues that "the alleged
probable cause for the theft investigation" and "[t]he significance of [the] bag of credit
cards" are in dispute.  (ECF No. 196 ¶¶ 5, 6.)[8]  But Defendant does not advance any
factual argument or legal authority to contest the Government's showing that Officer
Seal had an objectively reasonable suspicion of criminal activity, based on the totality of
the circumstances, including:  (1) Officer Seal's observation of a bag in plain view
containing a large number of credit cards; (2) Defendant's refusal to answer any
questions about them, (3) Defendant's attempt to hide the cards from Officer Seal by
switching the credit cards for an empty bag, while Officer Seal looked on.  The Court
agrees with the Government that these circumstances created an objectively
reasonable suspicion of criminal activity in the totality of the circumstances, thus
permitting a reasonable period of additional detention (*i.e.*, seizure) to question
Defendant about the credit cards.  *See, e.g.*, *United States v. Alabi*, 597 Fed. App'x

---

otherwise-completed traffic stop in order to conduct a dog sniff."  *Id.* at 708 (emphasis added).
But*,* similar to the facts here, in *Hawley*, "the dog sniff did not unreasonably prolong the stop,"
and thus suppression of evidence was not appropriate.  *Id.*

[8] This argument was raised for the first time in Defendant's Reply.  Defendant's Motion
nowhere disputed that Officer Seal had a reasonable suspicion regarding the credit cards.  The
Court thus might treat this argument as waived (as the Government urges), but is reluctant to
resolve a criminal defendant's constitutional arguments on procedural grounds.  Here,
Defendant's position is unsupported by the law or the facts shown in the record, so it is readily
resolved on the merits.

10

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 314 of
971
Case 1:16-cr-00054-WJM Document 206 Filed 11/14/17 Page 11 of 21

991, 998 (10th Cir. 2015) (possession of multiple credit cards in other peoples' names
contributed to reasonable suspicion of a crime); *United States v. Simpson*, 609 F.3d
1140, 1153 (10th Cir. 2010) (circumstances including "evasive answers that describe[d]
a fairly implausible travel plan" contributed to reasonable suspicion, justifying extension
of a traffic stop); *United States v. DeJear*, 552 F.3d 196, 101 (10th Cir. 2009) ("furtive
gestures in response to the presence of the police can serve as the basis of an officer's
reasonable suspicion" (quoting *United States v. Bullock*, 510 F.3d 342, 348
(D.C.Cir.2007)); *United States v. Corral*, 970 F.2d 719, 725 (10th Cir. 1992) (suspicious
package seen within car justifiably seized under plain view doctrine, even though
specific contents could not be observed; vehicle occupant's attempt to hide that
package by tossing it behind her seat also supported probable cause).

In addition, while Defendant argues that the "use of the drug detection dog Neo
was an illegal effort to try to gain some justifiable reason to search the interior of the
car" (ECF No. 181 ¶ 18), it is well established that "the use of a well-trained
narcotics-detection dog—one that does not expose noncontraband items that otherwise
would remain hidden from public view—during a lawful traffic stop, generally does not
implicate legitimate privacy interests," *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)
(internal quotation marks omitted), and that "a positive alert by a certified drug dog is
generally enough, by itself, to give officers probable cause to search a vehicle," *United
States v. Ludwig*, 641 F.3d 1243, 1250–51 (10th Cir. 2011).  The relevant Fourth
Amendment analysis is therefore not whether the dog sniff itself was impermissible,
only whether the seizure of Defendant—that is, the additional period of detention during

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 315 of
971
Case 1:16-cr-00054-WJM Document 208 Filed 11/14/17 Page 12 of 21

which the dog sniff was conducted—was unreasonable.  *See Rodriguez*, 135 S.Ct. at

164.  Because Officer Seal had a reasonable basis to detain to ask about the credit

cards, and because the dog sniff itself was conducted while that questioning was

occurring, the dog sniff did not constitute a Fourth Amendment violation.

    3.    <u>The Traffic Stop Was Not Unreasonably Prolonged by the Dog Sniff</u>

In addition, the record does not reflect that the traffic stop was unreasonably

prolonged by the dog sniff.  The animating Fourth Amendment concern in

*Rodriguez* and related cases is whether the stop was unreasonably prolonged:  "The

critical question is not whether the dog sniff occurs before or after the officer issues a

ticket . . . but whether conducting the sniff 'prolongs'---*i.e.*, adds time to---'the stop.'"

*Rodriguez*, 135 S. Ct. at 1616.  Contrary to Defendant's argument, the record does not

show that the investigation and checks related to the traffic stop were completed (much

less abandoned) as soon as Officer Seal saw the credit cards.  Rather, although he

observed the credit cards early on in the traffic stop, Officer Seal then asked Defendant

to exit his vehicle and completed the incidents of the traffic stop, including the HGN

sobriety test, before turning to investigation of the credit cards.

Then, *while* Officer Seal was speaking with Defendant, the K-9 unit arrived,

roughly 3 minutes after the 2:44 a.m. traffic stop commenced.  The dog sniff was

initiated shortly thereafter, no later than *during* the time Officer Seal was questioning

Defendant about the credit cards, and the dog alerted *while* Officer Seal's questioning

about the credit cards continued.  (Tr. at 13–16.)  This record reflects two things.  First,

the time by which Defendant's detention was arguable prolonged after completion of

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 316 of
Case 1:16-cr-00054-WJM Document 208 Filed 11/14/17 Page 13 of 21
971

the HGN test and before Neo alerted was no more than approximately 3 minutes,
notably less than the 7 to 8 minute delay in *Rodriguez*.  Second, and more importantly,
this added time was the result of Officer Seal's questioning regarding the credit cards; it
was not the result of the dog sniff which was conducted simultaneously.  Thus the dog
sniff did not unreasonably prolong the traffic stop.

      This record does not suggest that officers may purposefully drag out the time
they take to complete ordinary traffic checks in order to create opportunities for
unrelated investigations absent objectively reasonable suspicion of criminal activity.
That is exactly the result which *Rodriguez* and related cases prohibit.  *See Rodriguez*,
135 S. Ct. at 1614, 1616 ("Because addressing the [traffic] infraction is the purpose of
the stop it may last *no longer than is necessary to effectuate that purpose*," and "[i]f an
officer can complete traffic-based inquiries *expeditiously*, then that is the amount of
'time reasonably required to complete the stop's mission.'"  (internal quotation marks
omitted; certain alterations incorporated; emphasis added)).  But that is not what
occurred here, where the officer had an objectively reasonable suspicion of criminal
activity unrelated to the traffic infraction, and where the additional detention was
reasonable.  Moreover, having reviewed the record as a whole, including the audio
recording, the Court cannot say that Officer Seal's brief questioning regarding the credit
cards was pretextual or dilatory.  In this circumstance, the Court sees no Fourth
Amendment violation calling for suppression of evidence.

      4.    <u>Seizure Following Evidence Inventory</u>

      Other than generically arguing that the subsequent impoundment, inventory, and
search of the laptop and credit cards was tainted by the alleged illegality of the original

13

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 317 of
971
Case 1:16-cr-00054-WJM Document 208 Filed 11/14/17 Page 14 of 21

traffic stop, Defendant makes no Fourth Amendment argument regarding this sequence
of events.  Nor does he challenge the eventual search of the laptop pursuant to
warrant, except to make a generic "taint" argument.  (ECF No. 181 ¶ 22.)  The Court
therefore deems any challenge based on these facts waived and sees no grounds for
suppression based on these facts.  *See United States v. Martínez,* 518 F.3d 763, 768
(10th Cir. 2008) (undeveloped arguments deemed waived); *United States v. Lugo*, 978
F.2d 631, 634 (10th Cir. 1992) (contemporaneous vehicle searches incident to arrest
generally valid); *United States v. Hight*, 127 F. Supp. 3d 1126, 1137 (D. Colo. 2015)
("Inventory searches are an exception to the Fourth Amendment's warrant
requirement," when conducted according to standardized procedures (citing *United
States v. Blaze*, 143 F.3d 585, 591–92 (10th Cir. 1998))).

     5.    <u>Evidentiary Hearing</u>

     Defendant requests an evidentiary hearing "where the government produce [*sic*]
its witnesses to the above detention and search and where the Defendant can
challenge that evidence."  (ECF No. 181 at 4.)  However, other than raising a rhetorical
question about "what actually occurred in the early morning hours of August 30, 2012 in
Tempe, Arizona "(ECF No. 196 at 3), Defendant does not identify any facts in dispute.
Having reviewed the written materials submitted by both parties and the audio recording
of the traffic stop, the Court finds the Government has discharged its burden and that
no facts are materially disputed which an evidentiary hearing might resolve.

## II.  MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANT (HOME SEARCH)

     Defendant separately moved to suppress several mobile (*i.e.*, cellular) phones

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 318 of
971
Case 1:16-cr-00054-WJM Document 206 Filed 11/14/17 Page 15 of 21

seized from his residence in Chandler, Arizona, in November, 2012, along with any data found on those phones.  (*See* ECF No. 194.)

A.     **Facts**

As part of DOE's investigation, Special Agent Sandra R. Ennis submitted an application for a search warrant in the U.S. District Court for the District of Arizona on November 27, 2012.  (ECF No. 194-1.)  The court granted the application, issuing a warrant authorizing the search of Defendant's residence at 1822 East Kaibab Drive. (*Id.* at 1.)

The search warrant, in its list of "Items to Be Seized," permitted seizure of a broadly enumerated list of "documents and items including information and/or data stored in a computer readable format," which included among other items: (1) "[a]ll records, documents, programs, applications or materials, in whatever form, of personal and business activities relating to the operation and ownership of the computer systems in the subject premises," (2) "[a]ny and all . . . data disks . . . hard drives, and other computer related operation equipment, computers, and any other equipment that would assist in the completion or submission of federal and non-federal student financial aid and/or loan application[s] or supporting documentation," and (3) "[a]ny and all scanners, fax machines, printers, as well as other digital devices falling with the scope of [the warrant's] search categories that could have been used to manufacturer, produce, or to facilitate the . . . violations."  (ECF No. 194-1 at 5–6, ¶¶ 13, 15.)  Further, the warrant explicitly authorized seizure of "[a]ny personal computer, *cell phone*, PDA, or other digital device used to facilitate the . . . violations."  (*Id.* at 4, ¶ 16 a. (emphasis added).).

15

The warrant further defined "the term records, documents, programs,
applications or materials [to] include records, documents, programs, applications or
materials created, modified or stored in any form, including in digital form on any digital
device . . . the term 'digital device' includes any electronic system or device capable of
storing and/or processing data in digital form, including: . . . wireless communication
devices such as *telephone paging devices, beepers and mobile telephones*."  (*Id.* at
5–6, ¶ 17 (emphasis added).)

**B.    Legal Standard**

"As a general matter, if the search or seizure was pursuant to a warrant, the
defendant has the burden of proof" to demonstrate that it violated the Fourth
Amendment.  *United States v. Maestas*, 2 F.3d 1485, 1491 (10th Cir. 1993) (internal
quotation marks omitted).  When reviewing a magistrate judge's finding of probable
cause for issuance of a search warrant, a court must consider the totality of the
circumstances and determine whether the affidavit established the probability that
evidence of criminal activity would be located in the desired search area.  *United States
v. Le*, 173 F.3d 1258, 1265 (10th Cir. 1999).  The magistrate judge's determination that
probable cause exists is entitled to "great deference," and a court asks only whether the
issuing magistrate had a "substantial basis" for determining probable cause existed.
*United States v. Wittgenstein*, 163 F.3d 1164, 1172 (10th Cir. 1998).  Close calls should
be resolved in favor of the issuing magistrate judge.  *Massachusetts v. Upton*, 466 U.S.
727, 734 (1984) (*per curiam*).

The Supreme Court has stated that probable cause is a "fluid concept—turning

16

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 320 of
Case 1:16-cr-00054-WJM Document 208 Filed 11/14/17 Page 17 of 21
971

on the assessment of probabilities in particular factual contexts—not readily, or even

usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232

(1983). In the context of search warrants, the Tenth Circuit requires that a magistrate

judge issuing a search warrant find that "there is a fair probability that contraband or

evidence of a crime will be found in a particular place." *United States v. Tisdale*, 248

F.3d 964, 970 (10th Cir. 2001). "Probable cause undoubtedly requires a nexus

between suspected criminal activity and the place to be searched." *United States v.

Corral-Corral*, 899 F.2d 927, 937 (10th Cir. 1990).

As to particularity, a stated place to be searched is sufficiently particularized if

"the description is sufficient to enable the executing officer to locate and identify the

premises with reasonable effort . . . ." *United States v. Lora-Solano*, 330 F.3d 1288,

1293 (10th Cir. 2003). "Whether a search warrant is sufficiently particular depends in

part on the nature of the crimes being investigated." *United States v. Cooper*, 654 F.3d

1104, 1127 (10th Cir. 2011). Thus, "[w]arrants relating to more complex and far-

reaching criminal schemes may be deemed legally sufficient even though they are less

particular than warrants pertaining to more straightforward criminal matters." *Id.*

## C.   Analysis

Defendant argues that the warrant lacked probable cause, given the alleged

"dearth of any meaningful discussion of cellular devices" in Special Agent Ennis's

affidavit in support (ECF No. 194 at 5), and that the warrant's "boilerplate grants of

permission" were overbroad as to seizure of the phones (*id.* at 6). On that basis,

Defendant argues that under the "severability doctrine," the Court should hold the

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 321 of
971
Case 1:16-cr-00054-WJM Document 208 Filed 11/14/17 Page 18 of 21

warrant invalid as to the mobile phones and suppress their use as evidence in this
case. (ECF No. 194 at 6 (citing *United States v. Sells*, 463 F.3d 1148, 1150 (10th Cir.
2006).) The Court agrees with the Government that the search warrant was based on
adequate probable cause to seize mobile phones, and was not overbroad or
insufficiently specific.

Special Agent Ennis's affidavit supporting her warrant application is 24 pages
long. (ECF Nos. 194-3 & 193-4.) It details the investigation and the suspected crimes
which—summarized only generally—allege a multi-year conspiracy to engage in identity
theft and to defraud the government by submitting falsified applications for financial aid
applications and related documents on behalf of individuals who were incarcerated and
therefore ineligible to receive the relevant forms of financial aid. (*See id.* ¶¶ 6–8.) The
investigation had traced the originating IP addresses for these fraudulent applications to
several residences, including Defendant's. (*Id.* ¶¶ 10, 22.) The affidavit implicated at
least five other individuals in addition to Defendant (*id.* ¶¶ 10, 35), as well as the use of
multiple addresses (*id.* ¶¶ 22–32). Given the substantial detail included in the affidavit,
the Court has no trouble concluding it amply provided probable cause to search
Defendant's residence and seize evidence found there. With the exception of the
mobile phones, Defendant does not argue otherwise.

As to the mobile phones, Defendant points out that the affidavit itself contained
only one explicit reference to mobile phones. (ECF No. 194 at 3.) However, the
affidavit stated that based on her background and experience, Special Agent Ellis
"know[s] that individuals, including persons engaged in illicit activities and/or fraud,
frequently retain records of their transactions," which "are often stored on computer

18

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 322 of
971
Case 1:18-cr-00094-WJM Document 206 Filed 11/14/17 Page 19 of 21

media." (*Id.* ¶ 47.)  Further, Special Agent Ellis averred that the search of Defendant's
residence "should include the search of any computer-based storage media," and that
based on her experience, knowledge and training, "suspects in similar investigations
possess storage safes, computers, facsimile machines, cell phones, and pagers which
they use as part of their method of operation." (*Id.* ¶ 46.)

Furthermore, the affidavit incorporated by reference two attachments detailing
the places and items to be searched.  These (specifically, "Attachment B") explicitly and
repeatedly called for search or seizure of "cell phone[s]," "wireless communication
devices such as . . . mobile telephones," and "[a]ny . . . electronic . . . device capable of
storing data, such as . . . cellular telephones." (ECF No. 194-1 at 4–7, ¶¶ 16.a, 17,
19.c.)  This attachment was approved and included in the search warrant issued by the
magistrate judge, as quoted above. (*Id.* at 1.)  In sum, the affidavit (including Exhibit B)
enumerated almost *ad nauseum* the many kinds of electronic devices and storage
media that would likely contain evidence of criminal activity and would be subject to
search and seizure.  Mobile or cellular telephones were explicitly mentioned at least
four times.

Given this record, the Court has little trouble affirming the magistrate judge's
conclusion that probable cause existed to seize the mobile phones.  The affidavit made
clear the investigators' well-founded suspicion that the suspects were using a wide
variety of computer and electronic devices to submit allegedly fraudulent documents
and to communicate with one another,  and as a corollary, that records of their
transactions and communications would likely be found stored on similarly variety of
electronic devices.  *Accord United States v. Gholston*, 993 F. Supp. 2d. 704, 719–20

19

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 323 of
Case 1:18-cr-00034-WJM Document 208 Filed 11/14/17 Page 20 of 21
971

(E.D. Mich. 2014) ("In a number of other cases, the courts have pointed to analogous

facts as supporting the inference that a search of a cell phone was likely to uncover

evidence of criminal activity involving multiple participants." (describing and collecting

cases)).[9]

Moreover, given the uses, ubiquity, and sophistication of "mobile phones" as of

November 2012, the Defendant's attempted distinction between, on the one hand, the

permissible search and seizure of "computers" and all other electronic devices, and, on

one hand, the allegedly unauthorized seizure of "mobile phones" (but only mobile

phones), makes little sense. Applying the "fluid concept" of probable cause, and

considering the complexity and reach of the criminal scheme described in the affidavit,

the Court finds the warrant and supporting affidavit adequately provided probable cause

to seize mobile phones and described them with sufficient specificity, along with a

laundry list of other digital devices likely to contain evidence. *See Gates*, 462 U.S. at

222; *Cooper*, 654 F.3d at 1127. Defendant's concession that the warrant was adequate

as to everything else seized in his home is effectively fatal to his argument that "the

---

[9] Defendant's effort to distinguish *Gholston*—as well as other cases cited therein and by the Government—is unavailing. (*See* ECF No. 198 at 2–4.) Defendant argues Special Agent Ennis's affidavit should have more explicitly spelled out, for example, that "cell phones are capable of electronically storing numerous types of information." *See United States v. Barret*, 824 F. Supp. 2d 419, 448 (E.D.N.Y. 2011). Here, the affidavit stated that the suspects likely possessed "cell phones . . . which they use as part of their method of operation," and that records of their transactions were likely stored on "computer media," albeit without stating in the same paragraph that "computer media" include mobile phones and their storage capabilities. (ECF No. 194-4 ¶¶ 46–47.) The Court fails to see a meaningful difference for Fourth Amendment purposes between the record here and in *Barrett*, *Gholston*, or other cited cases. Given the extensive detail in the affidavit and Defendant's concession it provided sufficient probable cause to seize all devices found in his residence *other than* mobile phones, the failure to belabor obvious points such as stating that modern mobile phones may store data reveals no legal defect.

20

cellphones" should be suppressed, or that the magistrate judge should have excluded mobile phones (and only mobile phones) from the warrant request, while approving it in all other respects.

## III. CONCLUSION

For the reasons set forth above, Defendant's Motions to Suppress #1 (ECF No. 181) is DENIED; Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrant (ECF No. 194) is DENIED; and Defendant's request for an evidentiary hearing is also DENIED.

Dated this 14th day of November, 2017.

BY THE COURT:

_____

William J. Martínez
United States District Judge

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/12/19   USDC Colorado   pg 325 of
971
Case 1:16-cr-00054-WJM   Document 207   Filed 11/17/17   Page 1 of 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

_____

Courtroom Deputy:  Deborah Hansen          Date:  November 17, 2017
Court Reporter:      Mary George              Time: 35 minutes

_____

Criminal Action No.  16-cr-00054-WJM        _Counsel:_

UNITED STATES OF AMERICA,                    Martha A. Paluch
                                             Bryan D. Fields
      Plaintiff,

v.

2.  TRAMMEL THOMAS,                          Thomas E. Goodreid
                                             Daniel T. Smith
      Defendant.

_____

**COURTROOM MINUTES**
_____

TRIAL PREPARATION CONFERENCE

02:00 p.m.    Court in Session

Appearances

The defendant is on bond and his appearance for this conference has been waived.

This case is set for a five-day jury trial to commence at 8:30 a.m. on Monday, November
27, 2017.

Court's comments

**ORDERED:  Each side will be allowed twenty minutes for voir dire and opening
statements.**

Discussion

The Government requests the Court quash the Writs of Habeas Corpus Ad Testificandum for the appearances of:

    1)     Manuel Abate (Doc No. 184)
    2)     Eddie Jones, Jr., (Doc No. 185)
    3)     Dennis Miller (Doc No. 186)
    4)     Robert Pickens (Doc No. 187)

**ORDERED:**  **The Government's oral motion to quash the Writs of Habeas Corpus Ad Testificandum for 1) Manuel Abate, 2) Eddie Jones, Jr., 3) Dennis Miller and 4) Robert Pickens is GRANTED.**

             **The Writs of Habeas Corpus Ad Testificandum for 1) Manuel Abate, 2) Eddie Jones, Jr., 3) Dennis Miller and 4) Robert Pickens are QUASHED.**

The Government enters stipulations on the record (by Ms. Paluch)

**ORDERED:**  **The Government shall send an email to chambers identifying the title and role of anyone who will be seated at counsel table during the trial.**

A jury of thirteen will be selected

**ORDERED:**  **The Government shall file its Amended Witness List by November 21, 2017.**

**ORDERED:**  **No later than the end of the day Monday, November 20th counsel shall meet face-to-face to go over the exhibits and stipulate to the admissibility of as many exhibits as possible.**

             **The parties shall file Amended Exhibit Lists by November 22, 2017.**

**ORDERED:**  **Counsel shall be present at 8:30 a.m., on November 27th.  The court will address pretrial matters at that time.  The jury panel will be brought to the courtroom at 9:00 a.m.**

**ORDERED:**  **The Government shall email to chambers, by Tuesday, November 21, the jury instructions, proposed stipulated instructions and verdict forms in an editable format.**

**ORDERED:**  **No trial briefs are allowed.**

02:35 p.m.    Court in Recess
              Conference concluded

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Case No. __16-cr-00054-WJM_____          Date ___November 27, 2017____

Case Title _____United States v. Tramell Thomas_____

_____Plaintiff_____ AMENDED WITNESS LIST
(Plaintiff / Defendant)

| WITNESS & DATE | | PROPOSED LENGTH OF TESTIMONY | | | | | |
|---|---|---|---|---|---|---|---|
| Moss- Monday, 11/27/17 | Direct: | 60 minutes | Cross: | 30 minutes | Total: | 90 minutes | |
| Seal- Monday, 11/27/17 | Direct: | 60 minutes | Cross: | 30 minutes | Total: | **90** minutes | |
| Carr- Tuesday, 11/28/17 | Direct: | 120 minutes | Cross: | 180 minutes | Total: | **300** minutes | |
| Allred- Tuesday, 11/28/17 | Direct: | 60 minutes | Cross: | 25 minutes | Total: | **85** minutes | |
| Joseph- Tuesday, 11/28/17 | Direct: | 45 minutes | Cross: | 25 minutes | Total: | **70** minutes | |
| Mullett- Tuesday, 11/28/17 | Direct: | 40 minutes | Cross: | 60 minutes | Total: | **100** minutes | |
| Stailey- Wednesday, 11/29/17 | Direct: | 120 minutes | Cross: | 30 minutes | Total: | **150** minutes | |
| Green- Wednesday, 11/29/17 | Direct: | 60 minutes | Cross: | 120 minutes | Total: | 180 minutes | |
| Duncan- Wednesday, 11/29/17 | Direct: | 45 minutes | Cross: | 90 minutes | Total: | 135 minutes | |
| Ennis- Wed/Thurs, 11/29-30/17 | Direct | 120 minutes | Cross: | 45 minutes | Total: | 165 minutes | |

**Total Direct:  730 minutes (12.2 hours)     Total Cross:  635 minutes (10.6 hours)**

# FIRST AMENDED FINAL LIST OF PROPOSED EXHIBITS

CASE NO. 16-cr-00054-WJM   PLAINTIFF'S LIST: ☐   DEFENDANT'S LIST: ☐   THIRD PTY DEFTS. LIST: ☐

CASE CAPTION United States vs. Tramell Thomas   DATE November 27, 2017

LIST PLAINTIFF'S EXHIBITS BY NUMBERS (1, 2, 3, etc.) and DEFENDANT'S BY LETTER (A, B, C, etc.)

| EXHIBIT NO./ LTR | WITNESS | DESCRIPTION | ADM/ AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| A | Moss | Statement | | | | | | | MOI 245 |
| B | Carr | Visitation summary | X | x | | | | | INV 1753 |
| C | Carr | Visitation roster | X | x | | | | | INV 1758-1760 |
| D | Carr | Statement | | | | | | | MOI 250-266 & Exh. B |
| Exhibit deleted duplicate | | | | | | | | | |
| F | Carr | Proffer agreement | x | x | | | | | PROF 1-3 |
| G | Carr | Monthly Statement CMB | X | x | | | | | CMB 46-49 |
| H | Carr | Credit Report | X | x | | | | | EXP 1 |
| I | Carr | Finger Print Report | | | | | | | Inv 1817-1818 |

| EXHIBIT NO./LTR | WITNESS | DESCRIPTION | ADM/AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/INFO. |
|---|---|---|---|---|---|---|---|---|---|
| J | Carr Staley | Digital Forensic Report | | | | | | | SW 1905-1914 |
| K | Carr | School Summary 2004 | X | x | | | | | INV 1312-1315 |
| L | Carr | School Summary 2005 | X | x | | | | | INV 1316-1319 |
| M | Carr | School Summary 2006 | X | x | | | | | INV 1320-1323 |
| N | Carr | School Summary 2007 | X | x | | | | | INV 1308-1311 |
| O | Carr | School Summary 2009 | X | x | | | | | INV 1294-1297 |
| P | Carr | School Summary 2010 | X | x | | | | | INV 1294-1297 |
| Q | Carr | Email Address | x | | | | | | MOA 497-500 |
| R | Carr WFB | Report | | | | | | | WFB 62-80 |

| EXHIBIT NO./LTR | WITNESS | DESCRIPTION | ADM/AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/INFO. |
|---|---|---|---|---|---|---|---|---|---|
| S | Carr WFB | Investigative report | | | | | | | WFB 07-20 |
| Exhibit deleted duplicate | | | | | | | | | |
| U | Diaz | Plea Agreement | | x | | | | | GJ 274-283 |
| V | Diaz/ Judicial Notice | Chang of Plea Transcript | | x | | | | | ECF Doc. 84-1 |
| W | Diaz/ Judicial Notice | Government motion Re: Plea | x | x | | | | | ECF Doc. 84 |
| X | Mullett | Statement | X | | | | | | MOI 164-166 |
| Y | Mullett | School Records | X | x | | | | | INV 278-281 |
| Z | Mullett | Aid records 2012 | X | x | | | | | INV 285-329 |
| A-1 | Mullett DOE | Abate Pay Records | X | x | | | | | MOA 179-189 |

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| A-2 | Green | Phoenix Police Report | | | | | | | INV 22-42 |
| A-3 | Green | Statement 11/29/12 | | | | | | | MOI 128-129 |
| A-4 | Green | Statement 4/12/17 | | | | | | | MOI 311-313 |
| A-5 | Green | Statement 8/29/12 | | | | | | | MOI 389-397 |
| A-6 | Green | Criminal record | | | | | | | INV 1381-1384 |
| A-7 | Green | Loan Summaries | x | | | | | | INV 1427-1433 |
| A-8 | Green | Proffer Letter | x | x | | | | | PROF 4-6 |
| A-9 | Duncan | Statement 9/7/12 | | | | | | | MOI 35-39 |
| A-10 | Duncan | Statement 9/13/12 | | | | | | | MOI 40-42 |

| EXHIBIT NO./LTR | WITNESS | DESCRIPTION | ADM/AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/INFO. |
|---|---|---|---|---|---|---|---|---|---|
| A-11 | Duncan | Statement 10/16/12 | | | | | | | MOI 43-44 |
| A-12 | Duncan | Statement 11/30/12 | | | | | | | MOI 45 |
| A-13 | Duncan | Statement 4/18/13 | | | | | | | MOI 46-49 |
| A-14 | Duncan | Statement 9/9/13 | | | | | | | MOI 50-53 |
| A-15 | Duncan | Phone numbers | | | | | | | MOA 222-223 |
| A-16 | Duncan | Notarized Statement | | | | | | | SW 38 |
| | | | | | | | | | |
| | | | | | | | | | |

Any Exhibit necessary to rebut the Government's case in chief

Any Exhibit necessary to impeach or cross examine any government witness

**LIST OF PROPOSED EXHIBITS- Updated 11.22.17**

CASE NO.___16-cr-00054-WJM____        PLAINTIFF'S LIST__X__   DEFENDANT'S LIST_____        THIRD PTY DEFTS. LIST_____

CASE CAPTION ___United States_____ vs. _____Tramell Thomas_____   PAGE NO._____   DATE_____

LIST PLAINTIFF'S EXHIBITS BY NUMBERS (1, 2, 3, etc.) and DEFENDANT'S BY LETTER (A, B, C, etc.)

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | Bates Range | COMMENTS/ INFO. | COUNT(S) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Jonathan Seal | Synched Transcript of Audio Recording of Tempe PD Traffic Stop of Defendant on 8/30/12 | | | | | | | | |
| 1a | Jonathan Seal | Audio Recording of Tempe PD Traffic Stop of Defendant on 8/30/12 | | | | | | | | |
| 1b | Jonathan Seal | Transcript of Tempe PD Traffic Stop of Defendant on 8/30/12 | | | | | | | | |
| 2 | Jonathan Seal | Tempe PD Tow Report | X | | | | | MOI_00000453-454 | | |
| 3 | Jonathan Seal | Photo of White Dodge | X | X | | | | PHOTO_00000017 | | |
| 4 | Jonathan Seal | Envelope of Debit Cards- Seized by Tempe PD | X | | | | | Physical Evidence | | |

1

| 4a | Jonathan Seal | Higher One Debit Card- I. Omar | X | | | | Physical Evidence | | |
|----|---------------|-------------------------------|---|---|---|---|-------------------|---|---|
| 4b | Jonathan Seal | Higher One Debit Card- V. Jones | X | | | | Physical Evidence | | |
| 4c | Jonathan Seal | Higher One Debit Card- R. Pickens | X | | | | Physical Evidence | | |
| 4d | Jonathan Seal | Higher One Debit Card- E. Jones | X | | | | Physical Evidence | | |
| 5 | Jonathan Seal | Manuel Abate Debit Card Located in Wallet Seized by Tempe PD | X | | | | Physical Evidence | | |
| 6 | Heather Carr | Heather Carr Plea Agreement | X | X | | | GJ_00000284-298 | | |
| 7 | Heather Carr | Photograph of 1822 East Kaibab Drive, Chandler, AZ | X | | | | SW_00001436 | | |
| 8 | Heather Carr | Photograph of Office at 1822 East Kaibab Drive, Chandler, AZ | X | | | | SW_00000216 | | |
| 9 | Heather Carr | Photograph of office at 1822 East Kaibab Drive, Chandler, AZ from Huawei cellphone | X | | | | PHOTO_00000032 | Defendant sitting at his desk | |
| 10 | Heather Carr | Sketch of 1822 East Kaibab Drive, Chandler, AZ | X | | | | SW_00000121-122 | RE: Search Warrant | |
| 11 | Alison Stailey | Evidence Inventory Form | X | | | | SW_00000104-105 | | |
| 12 | Alison Stailey | Search Terms Provided to Stailey | X | | | | MOA_00000704-713 | | |

2

| 13 | Alison Stailey | Excerpt of Report 857 Item 12 Att. 2- SMS re 209-814-5075 | X | | | | | SW_00001078 | Placeholder | |
| 14 | Alison Stailey | Excerpt of Report 857 Item 12 Att. 2- SMS re 719-963-7258 | X | | | | | SW_00001078 | Placeholder RE: Kim Mullett | |
| 15 | Alison Stailey | Excerpt of Report 857 Item 12 Att. 2- SMS Re 719-209-2675 | X | | | | | SW_00001078 | Placeholder | |
| 16 | Alison Stailey | Excerpt of Report 857 Item 12 Att. 2- SMS re 260-602-7165 | X | | | | | SW_00001078 | placeholder | |
| 17 | Alison Stailey | Excerpt from Heather Carr's Daughter's Samsung Phone Contact List | X | | | | | SW_00001268-1270 | "Dad" contact | |
| 18 | Alison Stailey | Excerpt from Heather Carr's Ipad Contact List | X | | | | | SW_00001369, SW_00001374 | "daddy" contact | |
| 19 | Alison Stailey | Excerpt of Report 863, S2 VAIO Att. 17 FAFSA Internet History | X | | | | | SW_00013566 | | |
| 20 | Alison Stailey | Excerpt of Report 863, S2 VAIO Att. 20 M. Abate HTML Files | X | | | | | SW_00013566 | | |
| 21 | Alison Stailey | Excerpt of Report 863, S2 VAIO Att. 21 Maricopa Internet Shortcuts | X | | | | | SW_00013566 | | |
| 22 | Alison Stailey | Excerpt of Report 863, S2 VAIO Att. 2 Search | X | | | | | SW_00013566 | | |

3

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Hits for Inmate Students | | | | | | | |
| 23 | Alison Stailey | Excerpt of Report 863, S1 Room J Hard Drive Att. 2 Search Hits for Inmate Students | X | | | | | SW_00013566 | | |
| 24 | Alison Stailey | Cellphone Photograph of Defendant taken on Huawei phone | X | | | | | PHOTO_00000001 | | |
| 25 | Alison Stailey | Photograph of defendant in closet at 1822 East Kaibab Drive taken on Huawei phone | X | | | | | PHOTO_00000016 | | |
| 26 | Alison Stailey | Photograph of money taken on Huawei phone | X | | | | | PHOTO_00000004 | | |
| 27 | **Intentionally Omitted** | | | | | | | | | |
| 28 | Alison Stailey | Photograph of defendant at desk at 1822 E. Kaibab Drive taken on Huawei phone | X | | | | | PHOTO_00000020 | | |
| 29 | Alison Stailey | Photograph of defendant taken on Huawei Phone | X | | | | | PHOTO_00000030 | | |
| 30 | Michelle Allred | FAFSA | X | X | | | | DOE_00000001-10 | | |
| 31 | Michelle Allred | Common Origination Disbursement ("COD") Report | X | | | | | DOE_00002181 | Placeholder for entire excel spreadsheet | |

4

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 32 | Marcelle Green | Marcelle Green Plea Agreement | X | X | | | | PLEA_00000001-14 | | |
| 33 | | Stipulation Re: FRE 902(11) Records | X | X | | | | | | |
| 34 | | Stipulation Re: FRE 1006 Summary Charts | X | X | | | | | | |
| 35 | | Stipulation Re: Thomas's Detention in El Paso County | X | X | | | | | | |
| 36 | Heather Carr | Photograph of Heather Carr's Office at 1822 E. Kaibab Drive | X | | | | | SW_00000226 | | |
| 37 | | Stipulation Re: Testimony of Certain Witnesses | X | X | | | | | | |
| 38 | | Photograph of wallet taken by Mesa PD with M. Abate card | X | | | | | MOI_00000507 | | |
| 39 - 49 | **Intentionally Omitted** | | | | | | | | | |
| 50- 53a | **Intentionally Omitted** | | | | | | | | | |
| 54 | Sandra Ennis | Accurint Records | | | | | | WFB_00000083 | | |
| 54a-56a | **Intentionally Omitted** | | | | | | | | | |
| 56b | Rebecca Joseph | Ismael Omar – Higher One Records | X | X | | | | FIN_00000813- 817 | | 14 |
| 56c | Rebecca Joseph | Virginia Jones – Higher One Records | X | X | | | | FIN-_00000646- 649 | | |

5

| 56d | Rebecca Joseph | Robert Pickens – Higher One Records | X | X | | | | FIN_0000834- 838 | | |
| 56e | Rebecca Joseph | Eddie Jones – Higher One Records | X | X | | | | FIN_00000539-542 | | 3 |
| 56f | Rebecca Joseph | Dennis Miller – Higher One Records | X | X | | | | FIN_00000742-746, FIN_00000759 | | 12 |
| 56g | Rebecca Joseph | Manuel Abate – Higher One Records | X | X | | | | FIN_00000016 FIN_00000006-13 | | 13 |
| 57- 57a | **Intentionally Omitted** | | | | | | | | | |
| 57b | Michele Allred- DOE | Ismael Omar - FAFSA | X | X | | | | DOE_00001510-1513 | | 14 |
| 57c | Michele Allred DOE | Ismael Omar – Master Promissory Note | X | X | | | | DOE_00001522-1529 | | |
| 57d | Michele Allred - DOE | Ismael Omar – Individual Loan Data | X | X | | | | DOE_00001518-1519 | | 14 |
| 57e | Michele Allred - DOE | Virginia Jones - FAFSA | X | X | | | | DOE_00001306-1309 | | |
| 57f | Michele Allred - DOE | Robert Pickens - FAFSA | X | X | | | | DOE_00001530-1533 | | |
| 57g | Michele Allred - DOE | Eddie Jones - FAFSA | X | X | | | | DOE_00001256-1259 | | 3 |
| 57h | Michele Allred - DOE | Dennis Miller - FAFSA | X | X | | | | DOE_00001469-1472 | | 12 |
| 57i | Michele Allred - DOE | Manuel Abate - FAFSA | X | X | | | | DOE_00000055-58 | | 13 |
| 57j | Christine Duncan | Christine Duncan- FAFSA | X | X | | | | DOE_00000765-768 | | |
| 57k | Christine Duncan | Christine Duncan- FAFSA | X | X | | | | DOE_00000749-752 | | |
| 57l | Christine Duncan | Christine Duncan- Master Promissory Note | X | X | | | | DOE_00000757-764 | | |

6

| 58-63a | **Intentionally Omitted** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 63b | Kristina Moss | Ismael Omar – PPCC Documentation | X | X | | | | SCH_00002712<br>SCH_00002690-2694<br>SCH_00002703<br>SCH_00002708 | | 14 |
| 63c | Kristina Moss | Virginia Jones – PPCC Documentation | X | X | | | | SCH_00002344-2347<br>SCH_00002357 | | |
| 63d | Kristina Moss | Robert Pickens – PPCC Documentation | X | X | | | | SCH_00002736-2739<br>SCH_00002751<br>SCH_00002754 | | |
| 63e | Kristina Moss | Eddie Jones – PPCC Documentation | X | X | | | | SCH_00002164-2167<br>SCH_00002172 | | 3 |
| 63f | Kristina Moss | Dennis Miller – PPCC Documentation | X | X | | | | SCH_00002621-2624<br>SCH_00002640<br>SCH_00002645 | | 12 |
| 63g | Kristina Moss | Manuel Abate – PPCC Documentation | X | X | | | | SCH_00000023-25<br>SCH_00000030<br>SCH_00000038<br>SCH_00000052 | | 13 |
| 64 | Heather Carr | UPS Records | | | | | | INV_00001825-1830 | | |
| 64a-66a | **Intentionally Omitted** | | | | | | | CITI_00000001 - 198 | | |
| 66b | JP Morgan Chase | Defendant's JP Morgan Chase Signature Card | X | X | | | | JPM_00000799 | | |
| 67 | Sandra Ennis | Thomas Student Lookup System | X | X | | | | INV_00001625-1628 | | |

7

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | FAFSA Doc (1418 Rushmore Drive, Colorado Springs, CO) | | | | | | | |
| 68 | Sandra Ennis | Thomas Student Loan and MPN Re: 1418 Rushmore Drive Address | X | X | | | INV_00001633-1640 | | |
| 69 | Sandra Ennis | Thomas Higher One Account Summaries- Re: 1418 Rushmore Drive Address | X | X | | | INV_00001641-1669 | | |
| 70 | Sandra Ennis | Photograph of Broken Huawei phone | X | | | | SW_00000219 | | |
| 71 | Sandra Ennis | Photograph of Broken Huawei phone | X | | | | SW_00000220 | | |
| 72 | Sandra Ennis | Ennis Summary Chart- Disbursement Totals for DOE and Schools | X | X | | | | Mark version with no bates number | |
| 73 | Sandra Ennis | Ennis Summary Chart re IP addresses | X | X | | | | Mark version with no bates number | |
| 74 | Sandra Ennis | Ennis Summary Chart re Physical Addresses | X | X | | | | | |
| 75 | Sandra Ennis | Ennis Summary Chart re Debit Card Mailings | X | X | | | | | |
| 76 | Sandra Ennis | Composite Exhibit- Count 2 | X | X | | | | | |
| 77 | Sandra Ennis | Composite Exhibit- Count 3 | X | X | | | | | |

8

| 78 | Sandra Ennis | Composite Exhibit-Count 4 | X | X | | | | | | |
|----|--------------|---------------------------|---|---|---|---|---|---|---|---|
| 79 | Sandra Ennis | Composite Exhibit-Count 5 | X | X | | | | | | |
| 80 | Sandra Ennis | Composite Exhibit-Count 6 | X | X | | | | | | |
| 81 | Sandra Ennis | Composite Exhibit-Count 7 | X | X | | | | | | |
| 82 | Sandra Ennis | Red Rocks Community College-Ahmad Smith | X | | | | | SCH_00003120 MOA_00000435 | | |
| 83 | Sandra Ennis | Manuel Abate DOC Photo | X | | | | | INV_00001087-1089 | | |

9

SECOND AMENDED FINAL LIST OF PROPOSED EXHIBITS

CASE NO. 16-cr-00054-WJM  PLAINTIFF'S LIST: ☐   DEFENDANT'S LIST: ☐   THIRD PTY DEFTS. LIST: ☐

CASE CAPTION United States vs. Tramell Thomas  DATE November 27, 2017

LIST PLAINTIFF'S EXHIBITS BY NUMBERS (1, 2, 3, etc.) and DEFENDANT'S BY LETTER (A, B, C, etc.)

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| A | Moss | Statement | | | | | | | MOI 245 |
| B | Carr | Visitation summary | X | x | | | | | INV 1753 |
| C | Carr | Visitation roster | X | x | | | | | INV 1758-1760 |
| D | Carr | Statement | | | | | | | MOI 250-266 & Exh. B |
| Exhibit deleted duplicate | | | | | | | | | |
| F | Carr | Proffer agreement | x | x | | | | | PROF 1-3 |
| G | Carr | Monthly Statement CMB | X | x | | | | | CMB 46-49 |
| H | Carr | Credit Report | X | x | | | | | EXP 1 |
| I | Carr | Finger Print Report | | | | | | | Inv 1817-1818 |

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/INFO. |
|---|---|---|---|---|---|---|---|---|---|
| J | Carr Staley | Digital Forensic Report | | | | | | | SW 1905-1914 |
| K | Carr | School Summary 2004 | X | x | | | | | INV 1312-1315 |
| L | Carr | School Summary 2005 | X | x | | | | | INV 1316-1319 |
| M | Carr | School Summary 2006 | X | x | | | | | INV 1320-1323 |
| N | Carr | School Summary 2007 | X | x | | | | | INV 1308-1311 |
| O | Carr | School Summary 2009 | X | x | | | | | INV 1294-1297 |
| P | Carr | School Summary 2010 | X | x | | | | | INV 1294-1297 |
| Q | Carr | Email Address | x | | | | | | MOA 497-500 |
| R | Carr WFB | Report | | | | | | | WFB 62-80 |

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| S | Carr WFB | Investigative report | | | | | | | WFB 07-20 |
| Exhibit deleted duplicate | | | | | | | | | |
| U | Diaz | Plea Agreement | | x | | | | | GJ 274-283 |
| V | Diaz/ Judicial Notice | Chang of Plea Transcript | | x | | | | | ECF Doc. 84-1 |
| W | Diaz/ Judicial Notice | Government motion Re: Plea | x | x | | | | | ECF Doc. 84 |
| X | Mullett | Statement | | | | | | | MOI 164-166 |
| Y | Mullett | School Records | X | x | | | | | INV 278-281 |
| Z | Mullett | Aid records 2012 | X | x | | | | | INV 285-329 |
| A-1 | Mullett DOE | Abate Pay Records | X | x | | | | | MOA 178-189 |

344

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS / INFO. |
|---|---|---|---|---|---|---|---|---|---|
| A-2 | Green | Phoenix Police Report | | | | | | | INV 22-42 |
| A-3 | Green | Statement 11/29/12 | | | | | | | MOI 128-129 |
| A-4 | Green | Statement 4/12/17 | | | | | | | MOI 311-313 |
| A-5 | Green | Statement 8/29/12 | | | | | | | MOI 389-397 |
| A-6 | Green | Criminal record | | | | | | | INV 1381-1384 |
| A-7 | Green | Loan Summaries | x | x | | | | | INV 1427-1433 |
| A-8 | Green | Proffer Letter | x | x | | | | | PROF 4-6 |
| A-9 | Duncan | Statement 9/7/12 | | | | | | | MOI 35-39 |
| A-10 | Duncan | Statement 9/13/12 | | | | | | | MOI 40-42 |

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| A-11 | Duncan | Statement 10/16/12 | | | | | | | MOI 43-44 |
| A-12 | Duncan | Statement 11/30/12 | | | | | | | MOI 45 |
| A-13 | Duncan | Statement 4/18/13 | | | | | | | MOI 46-49 |
| A-14 | Duncan | Statement 9/9/13 | | | | | | | MOI 50-53 |
| A-15 | Duncan | Phone numbers | | | | | | | MOA 222-223 |
| A-16 | Duncan | Notarized Statement | | | | | | | SW 38 |
| A-17 | Duncan | 10/24/17 Statement | | | | | | | MOI 546 |
| A-18 | Carr | 10/30/17 Statement | | | | | | | MOI 549 |
| | | | | | | | | | |

Any Exhibit necessary to rebut the Government's case in chief

Any Exhibit necessary to impeach or cross examine any government witness

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 347 of
Case 1:16-cr-00054-WJM Document 217 Filed 11/27/17 Page 1 of 5
971

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

_____

Courtroom Deputy: Deborah Hansen          Date: November 27, 2017
Court Reporter:     Mary George           Time:  six hours and 17 minutes

_____

Criminal Action No. 16-cr-00054-WJM          _Counsel:_

UNITED STATES OF AMERICA,                    Martha A. Paluch
                                             Bryan D. Fields
          Plaintiff,

v.

2. TRAMMEL THOMAS                            Thomas E. Goodreid
                                             Daniel T. Smith
          Defendant.

_____

**COURTROOM MINUTES**
_____

JURY TRIAL - DAY ONE

08:32 a.m.     Court in Session

Appearances

Defendant is present and on bond.

The Court addresses pre-trial matters.

**ORDERED:**  Government's Motion to Appoint Counsel For Defense Witnesses [211] is
             DENIED AS MOOT.

**ORDERED:**  Government's Motion to Appoint Counsel For Defense Witnesses [213] is
             GRANTED IN PART.

**ORDERED:**  The Government's oral motion for Rule 615 is GRANTED. Rule 615 is
             invoked.

**ORDERED:**  The Government's oral motion under Local Criminal Rule 24.1 for written
             authorization to allow counsel to communicate with members of the jury at

the conclusion of the trial is GRANTED. A text-entry order will enter setting forth restrictions regarding Local Criminal Rule 24.1

Discussion

**ORDERED:**   The transcripts of the **audio recordings will not go back** to the jury during deliberation.

08:55  Court in Recess
09:05  Court in Session

Court's opening remarks to the jury panel

09:22  Voir dire oath administered.

09:23  Voir dire commences.

10:38 Court in Recess
10:57 Court in Session

10:57 Voir dire continued.

11:05  Bench conference

11:07  Voir dire continued.

11:13 Voir dire (by Ms. Paluch)

11:32  Voir dire (by Mr. Goodreid)

11:50  Bench conference

11:55 Voir dire continued.

Challenges For Cause:
1.        100365576
2.        100368725
3.        100341430

Government's Peremptory Challenges:
1.        100358049
2.        100336276
3.        100362671
4.        100359702
5.        100342244
6.        100337310

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 349 of
Case 1:16-cr-00054-WJM Document 217 Filed 11/27/17 Page 3 of 5
971

Defendant's Peremptory Challenges:
1.    100346782
2.    100349964
3.    100334716
4.    100333285
5.    100338765
6.    100328957
7.    100355123
8.    100332877
9.    100330179
10.   100355531
11.   100348756

SELECTED:
1.    100343311
2.    100332948
3.    100356295
4.    100366350
5.    100359195
6.    100352150
7.    100369743
8.    100343216
9.    100346266
10.   100340422
11.   100362966
12.   100355715
13    100333578


12:25  Voir dire concluded.

12:27  Oath to try the case administered to the jury.

12:27  Court's preliminary instructions to the jury

12:32  Court in Recess
01:54  Court in Session

Court's preliminary Instructions to the jury

Opening Statement (by Mr. Fields)

The defendant reserves his right to give an opening statement (by Mr. Smith)

**GOVERNMENT'S FIRST WITNESS KRISTINA MOSS**
02:26 Direct (by Ms. Paluch)

EXHIIBITS STIPULATED, OFFERED AND
RECEIVED: 63b through 63g

02:51 Cross (by Mr. Goodreid)

02:56 Court

02:59  Direct continued (by Ms. Paluch)

**GOVERNMENT'S SECOND WITNESS REBECCA JOSEPH**
03:00 Direct (by Ms. Paluch)

EXHIIBITS STIPULATED, OFFERED AND
RECEIVED: 56b through 56g

03:16 Court in Recess
03:33 Court in Session

**GOVERNMENT'S SECOND WITNESS REBECCA JOSEPH**
03:33 Direct continued (by Ms. Paluch)

03:44 Cross (by Mr. Goodreid)

**GOVERNMENT'S THIRD WITNESS JONATHAN SEAL**
03:50 Direct (by Mr. Fields)

EXHIIBITS STIPULATED, OFFERED AND
RECEIVED: 3, 1a

The Government offers Exhibits 4, 4a, 4b

04:20 Voir dire (by Mr. Smith)

EXHIBITS IDENTIFED, OFFERED AND
RECEIVED: 4, 4a, 4b, 4c, 4d,
38 (objections overruled)

04:21 Direct continued

04:22 Court

EXHIBIT IDENTIFIED, OFFERED AND
RECEIVED: 5

04:43 Cross (by Mr. Smith)

04:52  Redirect (by Mr. Fields)

04:54 Jury excused

Court's comments

**ORDERED:**   Defendant's bond is continued.

04:57 p.m.   Court in Recess
             Trial continued

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

_____

Courtroom Deputy:  Deborah Hansen          Date:  November 28, 2017
Court Reporter:     Mary George              Time: four hours and 48 minutes

_____

Criminal Action No. 16-cr-00054-WJM          _Counsel:_

UNITED STATES OF AMERICA,                    Martha A. Paluch
                                             Bryan D. Fields
          Plaintiff,

v.

2. TRAMMEL THOMAS                            Thomas E. Goodreid
                                             Daniel T. Smith
          Defendant.

_____

**COURTROOM MINUTES**
_____

JURY TRIAL - DAY TWO

08:47 a.m.    Court in Session

Defendant is present and on bond.

Discussion

**ORDERED:**  The portion of the Government's Motion [213], to appoint counsel to
              represent potential witness Michael Cox, is DENIED AS MOOT.

08:59 Jury present

**GOVERNMENT'S FOURTH WITNESS KIMMISHA MULLETT**
09:00 Direct (by Mr. Fields)

                                EXHIBITS STIPULATED, OFFERED AND
                                RECEIVED: 57h, 57i

Government offers Exhibit No. 84.

09:13 Voir dire (by Mr. Smith)

EXHIBIT OFFERED AND RECEIVED: 84

09:17 Court

09:17 Direct continued

EXHIBIT OFFERED AND RECEIVED: 15
(objection overruled)

Government offers Exhibit 64.

09:25 – 09:33 Bench conference

EXHBIT OFFERED AND REJECTED: 64
(objection sustained without prejudice)

Government offers Exhibit No. 14

09:41 Voir dire (by Mr. Smith)

EXHIBIT OFFERED AND RECEIVED: 14
(objection overruled)

09:50 Cross (by Mr. Smith)

09:55 – 10:04 Bench conference

10:05 Redirect (by Mr. Fields)

EXHIBIT OFFERED AND RECEIVED: 64
(objection overruled)

10:12 Court in Recess
10:42 Court in Session

EXHIBITS IDENTIFIED, OFFERED AND
RECEIVED: 57b, 57c, 57d, 57e, 57f, 57g

**GOVERNMENT'S FIFTH WITNESS MICHELLE ALLRED**
10:43 Direct (by Mr. Fields)

EXHIBIT IDENTIFIED, OFFERED AND
RECEIVED: 30

**GOVERNMENT'S SIXTH WITNESS ALISON STAILEY**

11:27 Direct (by Ms. Paluch)

EXHIBIT IDENTIFIED, OFFERED AND
RECEIVED: 12 (redacted)

11:41 Court

11:42  Direct continued

EXHIBITS IDENTIFIED, OFFERED AND
RECEIVED: 13, 16, 9, 24, 25, 26, 28, 29

11:58 Court

11:59  Direct continued

EXHIBITS IDENTIFIED, OFFERED AND
RECEIVED: 19, 20, 21

12:12 Court in Recess
01:35 Court in Session

**GOVERNMENT'S SIXTH WITNESS ALISON STAILEY**
01:35 Direct continued (by Ms. Paluch)

EXHIBITS IDENTIFIED, OFFERED AND
RECEIVED: 22, 23

01:51 Cross (by Mr. Goodreid)

02:00 Redirect

**GOVERNMENT'S SEVENTH WITNESS CHRISTINE DUNCAN**
02:03 Direct (by Ms. Paluch)

EXHIBITS IDENTIFIED, OFFERED AND
RECEIVED: 57j, 57k, 57l

02:25 Cross (by Mr. Goodreid)

02:34 Court

02:35 Bench conference

02:36 Direct continued (by Ms. Paluch)

Case No. 1:16-cr-00054-WJM Document 525-4 filed 12/12/19 USDC Colorado pg 355 of
971
Case 1:16-cr-00054-WJM Document 216 Filed 11/28/17 Page 4 of 4

02:38 Court in Recess
03:29 Court in Session

Court's comments

Jeralyn Merritt, counsel for Witness Marcelle Green, is present.

**GOVERNMENT'S EIGHTH WITNESS MARCELLE GREEN**
03:32  Direct (by Mr. Fields)

EXHIBIT OFFERED AND RECEIVED:
32

03:55 Cross (by Mr. Smith)

04:14 Redirect

**ORDERED:**  Defendant's bond is continued.

04:19 p.m.    Court in Recess
              Trial continued

Case 1:16-cr-00054-WJM   Document 219   Filed 11/29/17   Page 1 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

_____

| | |
|---|---|
| Courtroom Deputy:  Deborah Hansen | Date:  November 29, 2017 |
| Court Reporter:     Mary George | Time:   two hours and 46 minutes |

_____

Criminal Action No. 16-cr-00054-WJM          _Counsel:_

UNITED STATES OF AMERICA,                    Martha A. Paluch
                                             Bryan D. Fields
        Plaintiff,

v.

2. TRAMMEL THOMAS                            Thomas E. Goodried
                                             Daniel T. Smith
        Defendant.

_____

**COURTROOM MINUTES**
_____

JURY TRIAL - DAY THREE

08:50 a.m.    Court in Session

Defendant is present and on bond.

Discussion/Argument

08:57  Jury present

**GOVERNMENT'S NINTH WITNESS SANDRA ENNIS**
08:58 Direct (by Ms. Paluch)

                          EXHIBITS STIPULATED, OFFERED AND
                          RECEIVED: 66b, 67, 68, 69, 72, 73, 74, 75, 76, 77,
                          78, 79, 80, 81, 37, 7, 70, 71, 8, 36

10:02 Cross (by Mr. Goodreid)

1

Case 1:16-cr-00054-WJM Document 219 Filed 11/29/17 Page 2 of 3

10:15 Court in Recess
10:37 Court in Session

**GOVERNMENT'S NINTH WITNESS SANDRA ENNIS**
10:37 Cross continued (by Mr. Goodreid)

> EXHIBIT STIPULATED, OFFERED AND RECEIVED: 35

10:52 Redirect (by Ms. Paluch)

> EXHIBITS OFFERED AND REJECTED: (objection overruled) 85, 86

11:06 Government Rests.

11:06 Jury excused from the courtroom

Denfendant's oral Rule 29 motion for judgment of acquittal as to all counts.

Argument (by Mr. Smith)

Argument (by Ms. Paluch)

11:16 Court in Recess
11:32 Court in Session

The Court enters findings and ruling on the record.

**ORDERED:  The defendant's motion for judgment of acquittal pursuant to Rule 29 on all counts is DENIED.**

11:45  Jury present

Court's comments to the jury

11:47 Court in Recess
01:28 Court in Session

Discussion

Jury present

2

EXHIBITS STIPULATED, OFFERED AND
RECEIVED: U and V

01:30 Defendant Rests.

Court's comments to jury

Jury excused until 8:45 tomorrow.

Court's comments

01:39 Court in Recess
02:19 Court in Session

Jury Instruction Conference

**ORDERED:** Defendant's bond is continued.

02:35 p.m.    Court in Recess
              Trial continued

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

_____

Courtroom Deputy:  Deborah Hansen        Date:  November 30, 2017
Court Reporter:    Mary George           Time:  three hours and 14 minutes
_____

Criminal Action No. 16-cr-00054-WJM        _Counsel:_

UNITED STATES OF AMERICA,                  Martha A. Paluch
                                           Bryan D. Fields
        Plaintiff,

v.

2. TRAMMEL THOMAS                          Thomas E. Goodried
                                           Daniel T. Smith
        Defendant.
_____

## COURTROOM MINUTES
_____

JURY TRIAL - DAY FOUR

09:11 a.m.    Court in Session

Court's comments

Defendant is present and on bond.

**ORDERED:**  The jury will be provided lunches during their deliberations.

09:13 Court instructs jury on the law.

09:48 Closing Argument (by Ms. Paluch)

10:15 Court in Recess
10:28 Court in Session

10:28 Closing Argument (by Mr. Smith)

1

Case 1:16-cr-00054-WJM Document 223 Filed 11/30/17 Page 2 of 3

11:08 Closing Argument (by Ms. Paluch)

Alternate juror excused

11:28 Court in Recess
03:05  Court in Session

The Court has received a question from the jury.

Discussion/Argument

03:09 Court in Recess
03:14 Court in Session

Discussion

The parties tender a stipulated response to the jury's question; the response is sent to the jury.

03:17 Court in Recess
03:43 Court in Session

Court's comments

The jury has reached a verdict.

03:45 Jury present

Court's comments to the jury

Jury polled; all answer affirmatively.

03:50 Jury excused with the thanks of the Court.

**ORDERED:   A sentencing hearing is set Thursday, April 12, 2018 at 9:30 a.m.**

The Court addresses the application of § 3143(a)(1) with regard to immediate remand.

Argument/Discussion

The Court enters findings on the record.

The Court finds by clear and convincing evidence that the defendant's conditions of release reasonably assure that he will not flee or pose a danger to the safety of the

2

community, and that conditions within the meaning of 18 U.S.C. § 3143(a)(1) and Rule 46(c) have been met. Therefore,

**IT IS ORDERED** that the defendant is permitted to remain free on bond subject to the conditions of release as set forth in the Magistrate Judge's Order Setting Conditions of Release.

Court's colloquy with the defendant

04:20 p.m.    Court in Recess
              Trial concluded

3

*Clerk's*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Case No.   16-cr-00054-WJM                           Date      November 27, 2017

Case Title      United States v. Tramell Thomas

_____Plaintiff_____   AMENDED WITNESS LIST
(Plaintiff / Defendant)

| WITNESS & DATE | PROPOSED LENGTH OF TESTIMONY | | |
|---|---|---|---|
| ① Moss- Monday, 11/27/17 | Direct: 60 minutes | Cross: 30 minutes | Total: 90 minutes |
| ③ Seal- Monday, 11/27/17 | Direct: 60 minutes | Cross: 30 minutes | Total: **90** minutes |
| Carr- Tuesday, 11/28/17 | Direct: 120 minutes | Cross: 180 minutes | Total: **300** minutes |
| ⑤ Allred- Tuesday, 11/28/17 | Direct: 60 minutes | Cross: 25 minutes | Total: **85** minutes |
| ② Joseph- Tuesday, 11/28/17 | Direct: 45 minutes | Cross: 25 minutes | Total: **70** minutes |
| ④ Mullett- Tuesday, 11/28/17 | Direct: 40 minutes | Cross: 60 minutes | Total: **100** minutes |
| ⑥ Stailey- Wednesday, 11/29/17 | Direct: 120 minutes | Cross: 30 minutes | Total: **150** minutes |
| ⑧ Green- Wednesday, 11/29/17 | Direct: 60 minutes | Cross: 120 minutes | Total: 180 minutes |
| ⑦ Duncan- Wednesday, 11/29/17 | Direct: 45 minutes | Cross: 90 minutes | Total: 135 minutes |
| ⑨ Ennis - Wed/Thurs, 11/29-30/17 | Direct 120 minutes | Cross: 45 minutes | Total: 165 minutes |

**Total Direct:  730 minutes (12.2 hours)      Total Cross:  635 minutes (10.6 hours)**

Clerks

LIST OF PROPOSED EXHIBITS- Updated 11.22.17

CASE NO. __16-cr-00054-WJM__  PLAINTIFF'S LIST _X_  DEFENDANT'S LIST ____  THIRD PTY DEFTS. LIST ____

CASE CAPTION ___United States___ vs. ___Tramell Thomas___  PAGE NO.____  DATE____

LIST PLAINTIFF'S EXHIBITS BY NUMBERS (1, 2, 3, etc.), and DEFENDANT'S BY LETTER (A, B, C, etc.)

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | Bates Range | COMMENTS/ INFO. | COUNT(S) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Jonathan Seal | Synched Transcript of Audio Recording of Tempe PD Traffic Stop of Defendant on 8/30/12 | | | | | | Demonstrative | | |
| 1a | Jonathan Seal | Audio Recording of Tempe PD Traffic Stop of Defendant on 8/30/12 | | | ✓ | ✓ | | | 11-27 | |
| 1b | Jonathan Seal | Transcript of Tempe PD Traffic Stop of Defendant on 8/30/12 | | | | | | | | |
| 2 | Jonathan Seal | Tempe PD Tow Report | X | | | | | MOI_00000453-454 | | |
| 3 | Jonathan Seal | Photo of White Dodge | X | X | ✓ | ✓ | | PHOTO_00000017 | 11-27 | |
| 4 | Jonathan Seal | Envelope of Debit Cards- Seized by Tempe PD | X | | ✓ | ✓ | | Physical Evidence | 11-27 | |

1

363

| No. | Witness | Description | | S | O | Rec'd | Ref. | Comments |
|-----|---------|-------------|---|---|---|-------|------|----------|
| 4a | Jonathan Seal | Higher One Debit Card- I. Omar | X | | ✓ | ✓ | Physical Evidence | 11-27 |
| 4b | Jonathan Seal | Higher One Debit Card- V. Jones | X | | ✓ | ✓ | Physical Evidence | 11-27 |
| 4c | Jonathan Seal | Higher One Debit Card- R. Pickens | X | | ✓ | ✓ | Physical Evidence | 11-27 |
| 4d | Jonathan Seal | Higher One Debit Card- E. Jones | X | | ✓ | ✓ | Physical Evidence | 11-27 |
| 5 | Jonathan Seal | Manuel Abate Debit Card Located in Wallet Seized by Tempe PD | X | | ✓ | ✓ | Physical Evidence | 11-27 |
| 6 | Heather Carr | Heather Carr Plea Agreement | X | X | | | GJ_0000284-298 | |
| 7 | Heather Carr | Photograph of 1822 East Kaibab Drive, Chandler, AZ | X | | ✓ | ✓ | SW_00001436 | 11-29 |
| 8 | Heather Carr | Photograph of Office at 1822 East Kaibab Drive, Chandler, AZ | X | | ✓ | ✓ | SW_00000216 | 11-29 |
| 9 | Heather Carr | Photograph of office at 1822 East Kaibab Drive, Chandler, AZ from Huawei cellphone | X | | ✓ | ✓ | PHOTO_00000032 | Defendant sitting at his desk 11-28 |
| 10 | Heather Carr | Sketch of 1822 East Kaibab Drive, Chandler, AZ | X | | | | SW_00000121-122 | RE: Search Warrant |
| 11 | Alison Stailey | Evidence Inventory Form | X | | ✓ | | SW_00000104-105 | |
| 12 | Alison Stailey | Search Terms Provided to Stailey | X | | ✓ | ✓ | MOA_00000704-713 | 11-28 |

2

| | | | X | S | O | Rec'd | Ref | Comments |
|---|---|---|---|---|---|---|---|---|
| 13 | Alison Staley | Excerpt of Report 857 Item 12 Att. 2- SMS re 209-814-5075 | X | | ✓ | ✓ | SW_00001078 | Placeholder 11-28 |
| 14 | Alison Staley | Excerpt of Report 857 Item 12 Att. 2- SMS re 719-963-7258 | X | | ✓ | ✓ | SW_00001078 | Placeholder 11-28 RE: Kim Mullett |
| 15 | Alison Staley | Excerpt of Report 857 Item 12 Att. 2- SMS Re 719-209-2675 | X | | ✓ | ✓ | SW_00001078 | Placeholder 11-28 |
| 16 | Alison Staley | Excerpt of Report 857 Item 12 Att. 2- SMS re 260-602-7165 | X | ✓ | | ✓ | SW_00001078 | placeholder 11-28 |
| 17 | Alison Staley | Excerpt from Heather Carr's Daughter's Samsung Phone Contact List | X | | | | SW_00001268-1270 | "Dad" contact |
| 18 | Alison Staley | Excerpt from Heather Carr's Ipad Contact List | X | | | | SW_00001369, SW_00001374 | "daddy" contact |
| 19 | Alison Staley | Excerpt of Report 863, S2 VAIO Att. 17 FAFSA Internet History | X | | ✓ | ✓ | SW_00013566 | 11-28 |
| 20 | Alison Staley | Excerpt of Report 863, S2 VAIO Att. 20 M. Abate HTML Files | X | | ✓ | ✓ | SW_00013566 | 11-28 |
| 21 | Alison Staley | Excerpt of Report 863, S2 VAIO Att. 21 Maricopa Internet Shortcuts | X | | ✓ | ✓ | SW_00013566 | 11-28 |
| 22 | Alison Staley | Excerpt of Report 863, S2 VAIO Att. 2 Search | X | | ✓ | ✓ | SW_00013566 | 11-28 |

3

| # | Witness | Exhibit Description | | S | O | Recd | Ref | Bates | Comment |
|---|---------|---------------------|---|---|---|------|-----|-------|---------|
| 23 | Alison Stailey | Hits for Inmate Students Excerpt of Report 863, S1 Room J Hard Drive Att. 2 Search Hits for Inmate Students | X | | | | | SW_00013566 | 1678 |
| 24 | Alison Stailey | Cellphone Photograph of Defendant taken on Huawei phone | X | | ✓ | ✓ | | PHOTO_00000001 | 11-28 |
| 25 | Alison Stailey | Photograph of defendant in closet at 1822 East Kaibab Drive taken on Huawei phone | X | | ✓ | ✓ | | PHOTO_00000016 | 11-28 |
| 26 | Alison Stailey | Photograph of money taken on Huawei phone | X | | | ✓ | | PHOTO_00000004 | 11-28 |
| 27 | Intentionally Omitted | | | | | | | | |
| 28 | Alison Stailey | Photograph of defendant at desk at 1822 E. Kaibab Drive taken on Huawei phone | X | | ✓ | ✓ | | PHOTO_00000020 | 11-28 |
| 29 | Alison Stailey | Photograph of defendant taken on Huawei Phone | X | | ✓ | ✓ | | PHOTO_00000030 | 11-28 |
| 30 | Michelle Allred | FAFSA | X | X | ✓ | ✓ | | DOE_00000001-10 | 11-28 |
| 31 | Michelle Allred | Common Origination Disbursement ("COD") Report | X | | | | | DOE_00002181 | Placeholder for entire excel spreadsheet |

4

| | | | | S | O | Rec'd | Refus | | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 32 | Marcelle Green | Marcelle Green Plea Agreement | X | X | | ✓ | | PLEA_00000001-14 | 11-29 |
| 33 | | Stipulation Re: FRE 902(11) Records | X | X | | ✓ | | | |
| 34 | | Stipulation Re: FRE 1006 Summary Charts | X | X | | | | | |
| 35 | | Stipulation Re: Thomas's Detention in El Paso County | X | X | ✓ | ✓ | | | |
| 36 | Heather Carr | Photograph of Heather Carr's Office at 1822 E. Kaibab Drive | X | | ✓ | ✓ | | SW_00000226 | 11-29 |
| 37 | | Stipulation Re: Testimony of Certain Witnesses | X | X | ✓ | ✓ | | | 11-29 |
| 38 | | Photograph of wallet taken by Mesa PD with M. Abate card | X | | ✓ | ✓ | | MOI_00000507 | 11-29 |
| 39 - 49 | Intentionally Omitted | | | | | | | | |
| 50- 53a | Intentionally Omitted | | | | | | | | |
| 54 | Sandra Ennis | Accurint Records | | | | | | WFB_00000083 | |
| 54a-56a | Intentionally Omitted | | | | | | | | |
| 56b | Rebecca Joseph | Ismael Omar – Higher One Records | X | X | ✓ | ✓ | | FIN_00000813- 817 | 11-27 |
| 56c | Rebecca Joseph | Virginia Jones – Higher One Records | X | X | ✓ | ✓ | | FIN_00000646- 649 | 11-27 |

14

| # | Name | Description | S | O | Rec | Ref | Document No. | Comments | No. |
|---|---|---|---|---|---|---|---|---|---|
| 56d | Rebecca Joseph | Robert Pickens – Higher One Records | X | X | ✓ | | FIN_0000834- 838 | 11-27 | |
| 56e | Rebecca Joseph | Eddie Jones – Higher One Records | X | X | ✓ | ✓ | FIN_00000539-542 | 11-27 | 3 |
| 56f | Rebecca Joseph | Dennis Miller – Higher One Records | X | X | ✓ | ✓ | FIN_00000742-746, FIN_00000759 | 11-27 | 12 |
| 56g | Rebecca Joseph | Manuel Abate – Higher One Records | X | X | ✓ | ✓ | FIN_0000016 FIN_00000006-13 | 11-27 | 13 |
| 57 - 57a | Intentionally Omitted | | | | | | | | |
| 57b | Michele Allred- DOE | Ismael Omar - FAFSA | X | X | ✓ | ✓ | DOE_00001510-1513 | 11-28 | 14 |
| 57c | Michele Allred DOE | Ismael Omar – Master Promissory Note | X | X | ✓ | ✓ | DOE_00001522-1529 | | |
| 57d | Michele Allred - DOE | Ismael Omar – Individual Loan Data | X | X | ✓ | ✓ | DOE_00001518-1519 | | 14 |
| 57e | Michele Allred - DOE | Virginia Jones - FAFSA | X | X | ✓ | ✓ | DOE_00001306-1309 | | |
| 57f | Michele Allred - DOE | Robert Pickens - FAFSA | X | X | ✓ | ✓ | DOE_00001530-1533 | | |
| 57g | Michele Allred - DOE | Eddie Jones - FAFSA | X | X | ✓ | ✓ | DOE_00001256-1259 | | 3 |
| 57h | Michele Allred - DOE | Dennis Miller - FAFSA | X | X | ✓ | ✓ | DOE_00001469-1472 | | 12 |
| 57i | Michele Allred - DOE | Manuel Abate - FAFSA | X | X | ✓ | ✓ | DOE_0000055-58 | | 13 |
| 57j | Christine Duncan | Christine Duncan- FAFSA | X | X | ✓ | ✓ | DOE_00000765-768 | | |
| 57k | Christine Duncan | Christine Duncan- FAFSA | X | X | ✓ | ✓ | DOE_0000749-752 | | |
| 57l | Christine Duncan | Christine Duncan- Master Promissory Note | X | X | ✓ | ✓ | DOE_00000757-764 | 11-28 | |

6

| # | Witness | Description | S | O | Recd | Refd | Bates | Comments | |
|---|---|---|---|---|---|---|---|---|---|
| 58–63a | Intentionally Omitted | | | | | | | | |
| 63b | Kristina Moss | Ismael Omar – PPCC Documentation | X | X | | | SCH_00002712 SCH_00002690-2694 SCH_00002703 SCH_00002708 | 11-27 | 14 |
| 63c | Kristina Moss | Virginia Jones – PPCC Documentation | X | X | ✓ | | SCH_00002344-2347 SCH_00002357 | 11-27 | |
| 63d | Kristina Moss | Robert Pickens – PPCC Documentation | X | X | ✓ | | SCH_00002736-2739 SCH_00002751 SCH_00002754 | 11-27 | |
| 63e | Kristina Moss | Eddie Jones – PPCC Documentation | X | X | ✓ | | SCH_00002164-2167 SCH_00002172 | 11-27 | 3 |
| 63f | Kristina Moss | Dennis Miller – PPCC Documentation | X | X | ✓ | | SCH_00002621-2624 SCH_00002640 SCH_00002645 | 11-27 | 12 |
| 63g | Kristina Moss | Manuel Abate – PPCC Documentation | X | X | ✓ | | SCH_00000023-25 SCH_00000030 SCH_00000038 SCH_00000052 | 11-27 | 13 |
| 64 | Heather Carr | UPS Records | | | ✓ | ✓ | INV_00001825-1830 | 11-28 | |
| 64a–66a | Intentionally Omitted | | | | ✓ | | CITI_00000001 - 198 | | |
| 66b | JP Morgan Chase | Defendant's JP Morgan Chase Signature Card | X | X | ✓ | | JPM_00000799 | 11-29 | |
| 67 | Sandra Ennis | Thomas Student Lookup System | X | X | ✓ | | INV_00001625-1628 | 11-29 | |

7

| | | | S | O | Rest | Refused | | Comments |
|---|---|---|---|---|---|---|---|---|
| 68 | Sandra Ennis | FAFSA Doc (1418 Rushmore Drive, Colorado Springs, CO) | X | | | | | |
| | Sandra Ennis | Thomas Student Loan and MPN Re: 1418 Rushmore Drive Address | X | X | ✓ | | INV_00001633-1640 | 11-29 |
| 69 | Sandra Ennis | Thomas Higher One Account Summaries- Re: 1418 Rushmore Drive Address | X | X | ✓ | ✓ | INV_00001641-1669 | 11-29 |
| 70 | Sandra Ennis | Photograph of Broken Huawei phone | X | | ✓ | ✓ | SW_00000219 | 11-29 |
| 71 | Sandra Ennis | Photograph of Broken Huawei phone | X | | ✓ | ✓ | SW_00000220 | 11-29 |
| 72 | Sandra Ennis | Ennis Summary Chart- Disbursement Totals for DOE and Schools | X | X | ✓ | | | Mark version with no bates number 11-29 |
| 73 | Sandra Ennis | Ennis Summary Chart re IP addresses | X | X | ✓ | ✓ | | Mark version with no bates number 11-29 |
| 74 | Sandra Ennis | Ennis Summary Chart re Physical Addresses | X | X | ✓ | ✓ | | 11-29 |
| 75 | Sandra Ennis | Ennis Summary Chart re Debit Card Mailings | X | X | ✓ | ✓ | | 11-29 |
| 76 | Sandra Ennis | Composite Exhibit- Count 2 | X | X | ✓ | | | 11-29 |
| 77 | Sandra Ennis | Composite Exhibit- Count 3 | X | X | ✓ | | | 11-29 |

8

| # | Witness | Exhibit | X | X | O | Rcvd | Refused | ID No. | Comments |
|---|---------|---------|---|---|---|------|---------|--------|----------|
| 78 | Sandra Ennis | Composite Exhibit-Count 4 | X | X | ✓ | ✓ | | | 11-29 |
| 79 | Sandra Ennis | Composite Exhibit-Count 5 | X | X | ✓ | ✓ | | | 11-29 |
| 80 | Sandra Ennis | Composite Exhibit-Count 6 | X | X | ✓ | ✓ | | | 11-29 |
| 81 | Sandra Ennis | Composite Exhibit-Count 7 | X | X | ✓ | ✓ | | | 11-29 |
| 82 | Sandra Ennis | Red Rocks Community College-Ahmad Smith | X | | ✓ | | | SCH_00003120 MOA_00000435 | |
| 83 | Sandra Ennis | Manuel Abate DOC Photo | X | | ✓ | | | INV_00001087-1089 | |
| 84 | | | | | ✓ | ✓ | | | 11-29 |
| 85 | | | | | ✓ | ✓ | ✓ | | 11-29 |
| 93 | | | | | ✓ | ✓ | ✓ | | 11-29 |

9

# SECOND AMENDED FINAL LIST OF PROPOSED EXHIBITS

CASE NO. 16-cr-00054-WJM   PLAINTIFF'S LIST: ☐   DEFENDANT'S LIST: ☐   THIRD PTY DEFTS. LIST: ☐

CASE CAPTION United States vs. Tramell Thomas   DATE November 27, 2017

LIST PLAINTIFF'S EXHIBITS BY NUMBERS (1, 2, 3, etc.) and DEFENDANT'S BY LETTER (A, B, C, etc.)

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| A | Moss | Statement | | | | | | | MOI 245 |
| B | Carr | Visitation summary | X | X | | | | | INV 1753 |
| C | Carr | Visitation roster | X | X | | | | | INV 1758-1760 |
| D | Carr | Statement | | | | | | | MOI 250-266 & Exh. B |
| Exhibit deleted duplicate | | | | | | | | | |
| F | Carr | Proffer agreement | X | X | | | | | PROF 1-3 |
| G | Carr | Monthly Statement CMB | X | X | | | | | CMB 46-49 |
| H | Carr | Credit Report | X | X | | | | | EXP 1 |
| I | Carr | Finger Print Report | | | | | | | Inv 1817-1818 |

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/INFO. |
|---|---|---|---|---|---|---|---|---|---|
| J | Carr Staley | Digital Forensic Report | | | | | | | SW 1905-1914 |
| K | Carr | School Summary 2004 | x | | | | | | INV 1312-1315 |
| L | Carr | School Summary 2005 | x | x | | | | | INV 1316-1319 |
| M | Carr | School Summary 2006 | x | x | | | | | INV 1320-1323 |
| N | Carr | School Summary 2007 | x | x | | | | | INV 1308-1311 |
| O | Carr | School Summary 2009 | x | x | | | | | INV 1294-1297 |
| P | Carr | School Summary 2010 | X | x | | | | | INV 1294-1297 |
| Q | Carr | Email Address | x | | | | | | MOA 497-500 |
| R | Carr WFB | Report | | | | | | | WFB 62-80 |

| EXHIBIT NO./LTR | WITNESS | DESCRIPTION | ADM/AUTH | STIP | OFFER | RECD. | REF. | RUL-RSVD | COMMENTS/INFO. |
|---|---|---|---|---|---|---|---|---|---|
| S | Carr WFB | Investigative report | | | | | | | WFB 07-20 |
| Exhibit deleted duplicate | | | | | | | | | |
| U | Diaz | Plea Agreement | x | x | ✓ | ✓ | | | GJ 274-283  11-29 |
| V | Diaz/ Judicial Notice | Chang of Plea Transcript | | x | ✓ | ✓ | | | ECF Doc. 84-1  11-29 |
| W | Diaz/ Judicial Notice | Government motion Re: Plea | x | x | | | | | ECF Doc. 84 |
| X | Mullett | Statement | | | | | | | MOI 164-166 |
| Y | Mullett | School Records | x | x | | | | | INV 278-281 |
| Z | Mullett | Aid records 2012 | x | x | | | | | INV 285-329 |
| A-1 | Mullett DOE | Abate Pay Records | x | x | | | | | MOA 179-189 |

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/INFO. |
|---|---|---|---|---|---|---|---|---|---|
| A-2 | Green | Phoenix Police Report | | | | | | | INV 22-42 |
| A-3 | Green | Statement 11/29/12 | | | | | | | MOI 128-129 |
| A-4 | Green | Statement 4/12/17 | | | | | | | MOI 311-313 |
| A-5 | Green | Statement 8/29/12 | | | | | | | MOI 389-397 |
| A-6 | Green | Criminal record | | | | | | | INV 1381-1384 |
| A-7 | Green | Loan Summaries | x | x | | | | | INV 1427-1433 |
| A-8 | Green | Proffer Letter | x | x | | | | | PROF 4-6 |
| A-9 | Duncan | Statement 9/7/12 | | | | | | | MOI 35-38 |
| A-10 | Duncan | Statement 9/13/12 | | | | | | | MOI 40-42 |

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH. | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO. |
|---|---|---|---|---|---|---|---|---|---|
| A-11 | Duncan | Statement 10/16/12 | | | | | | | MOI 43-44 |
| A-12 | Duncan | Statement 11/30/12 | | | | | | | MOI 45 |
| A-13 | Duncan | Statement 4/18/13 | | | | | | | MOI 46-49 |
| A-14 | Duncan | Statement 9/9/13 | | | | | | | MOI 50-53 |
| A-15 | Duncan | Phone numbers | | | | | | | MOA 222-223 |
| A-16 | Duncan | Notarized Statement | | | | | | | SW 38 |
| A-17 | Duncan | 10/24/17 Statement | | | | | | | MOI 546 |
| A-18 | Carr | 10/30/17 Statement | | | | | | | MOI 549 |

Any Exhibit necessary to rebut the Government's case in chief

Any Exhibit necessary to impeach or cross examine any government witness

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Criminal Case No. 16-cr-054-2-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

**Trammel Thomas**

     Defendant.

*Final Set of read
Instructions to Jury on 30 Nov 2017
at 09:48
WJM*

---

## FINAL JURY INSTRUCTIONS

---

### PART I: GENERAL INSTRUCTIONS & EVIDENTIARY CONSIDERATIONS

Members of the Jury:

In any jury trial there are, in effect, two judges.   I am one of the judges, you are the

other.   I am the judge of the law.   You, as jurors, are the judges of the facts.   I presided

over the trial and decided what evidence was proper for your consideration.   It is also my

duty at the end of the trial to explain to you the rules of law that you must follow and apply

in arriving at your verdict.

In explaining the rules of law that you must follow, first, I will give you some general

instructions which apply in every criminal case—for example, instructions about burden of

proof and insights that may help you to judge the believability of witnesses.   Then I will

give you some specific rules of law that apply to this particular case and, finally, I will

explain the procedures you should follow in your deliberations, and the possible verdicts

you may return.   These instructions will be given to you for use in the jury room, so you

1

need not take notes.[1]

---

## JURORS' DUTIES

In determining what actually happened—that is, in reaching your decision as to the facts—it is your sworn duty to follow all of the rules of law as I explain them to you.

You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences. However, you should not read into these instructions, or anything else I may have said or done, any suggestion as to what your verdict should be. That is entirely up to you.

It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy. That was the promise you made and the oath you took.[2]

---

[2] 10th Cir. Pattern Crim. Jury Instr. § 1.04; Stipulated Instruction No. 3 (ECF No. 201 at 5.)

## PRESUMPTION OF INNOCENCE—BURDEN OF PROOF—REASONABLE DOUBT

The government has the burden of proving the defendant guilty beyond a reasonable doubt.   The law does not require a defendant to prove his innocence or produce any evidence at all.   The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find the defendant not guilty.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt.   There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt.   A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case.   If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crimes charged, you must find him guilty.   If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.[3]

---

[3] 10th Cir. Pattern Crim. Jury Instr. § 1.05; Stipulated Instruction No. 4 (ECF No. 201 at 9).

## EVIDENCE — DEFINED

You must make your decision based only on the evidence that you saw and heard here in court.   Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, and the stipulations to which the lawyers agreed.

Nothing else is evidence.   The lawyers' statements and arguments are not evidence.   Their questions and objections are not evidence.   My legal rulings are not evidence.   And my comments and questions are not evidence.

During the trial, I did not let you hear the answers to some of the questions that the lawyers asked.   I also ruled that you could not see some of the exhibits that the lawyers or parties wanted you to see.   You must completely ignore all of these things.   Do not even think about them.   Do not speculate about what a witness might have said or what an exhibit might have shown.   These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.[4]

---

[4] 10th Cir. Pattern Crim. Jury Instr. § 1.06; Stipulated Instruction No. 5.

## LAWYERS' OBJECTIONS

The lawyers for the government and the lawyers for the defendant objected to some of things that were said or done during the trial.   Do not hold that against either side.   The lawyers have a duty to object whenever they think that something is not permitted by the rules of evidence.   Those rules are designed to make sure that both sides receive a fair trial.

Do not interpret my rulings on their objections as any indication of how I think the case should be decided.   My rulings were based on the rules of evidence, not on how I feel about the case.   Remember, your verdicts must be based only on the evidence that you saw and heard here in court.[5]

---

[5] Stipulated Instruction No. 7, *see generally* 10th Cir. Pattern Crim. Jury Instr. § 1.01; Pattern Crim. Jury Instr. 6th Cir. § 1.09.

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

There are, generally speaking, two types of evidence from which a jury may properly determine the facts of a case.   One is direct evidence, such as the testimony of an eyewitness.   The other is indirect or circumstantial evidence, that is, the proof of a chain of facts which point to the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence.   The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.

While you must consider only the evidence in this case, you are permitted to draw reasonable inferences from the testimony and exhibits, inferences you feel are justified in the light of common experience.   An inference is a conclusion that reason and common sense may lead you to draw from facts which have been proved.

By permitting such reasonable inferences, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in this case.[6]

---

[6]  10th Cir. Pattern Crim. Jury Instr. § 1.07; Stipulated Instruction No. 6.

## **USE OF TRANSCRIPTS**

During this trial you viewed a transcript of the audio recording of a traffic stop. Keep in mind that the transcript is not evidence. The transcript was shown to you only as a guide to help you follow what was being said.   The recording itself is the evidence.   If you noticed any differences between what you heard on the recording and what you read in the transcript, you must rely on what you heard, not what you read. If you could not hear or understand certain parts of the recordings, you must ignore the transcript as far as those parts are concerned.[7]

---

[7] Stipulated Instruction No. 8 (modified); 10th Cir. Pattern Crim. Jury Instr. § 1.40.

## CREDIBILITY OF WITNESSES

I remind you that it is your job to decide whether the government has proved the guilt of the defendant beyond a reasonable doubt. In doing so, you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony. An important part of your job will be making judgments about the testimony of the witnesses who testified in this case. You should think about the testimony of each witness you have heard and decide whether you believe all or any part of what each witness had to say, and how important that testimony was. In making that decision, I suggest that you ask yourself a few questions:

- Did the witness impress you as honest?

- Did the witness have any particular reason not to tell the truth?

- Did the witness have a personal interest in the outcome in this case?

- Did the witness have any relationship with either party?

- Did the witness seem to have a good memory?

- Did the witness clearly see or hear the things about which he/she testified?

- Did the witness have the opportunity and ability to understand the questions clearly and answer them directly?

- Did the witness's testimony differ from the testimony of other witnesses?

When weighing the conflicting testimony, you should consider whether the discrepancy has to do with a material fact or with an unimportant detail. And you should keep in mind that innocent misrecollection—like failure of recollection—is not uncommon.

9

In reaching a conclusion on particular point, or ultimately in reaching a verdict in

this case, do not make any decisions simply because there were more witnesses on one

side than on the other.[8]

---

[8] 10th Cir. Pattern Crim. Jury Instr. § 1.08 & § 1.08.1 (did not testify); Stipulated Instruction No. 8.

## WITNESS USE OF ADDICTIVE DRUGS

The testimony of a drug abuser must be examined and weighed by the jury with greater caution than the testimony of a witness who does not abuse drugs.

Christine Duncan may be considered to be an abuser of drugs.

You must determine whether the testimony of this witness has been affected by the use of drugs or the need of drugs.[9]

---

[9] 10th Cir. Pattern Crim. Jury Instr. § 1.16; Stipulated Instruction No. 11.

11

## **EXPERT WITNESS**

During the trial you heard the testimony of Alison Stailey who expressed opinions concerning computer forensic analysis. In some cases, such as this one, scientific, technical, or other specialized knowledge may assist the jury in understanding the evidence or in determining a fact in issue. A witness who has knowledge, skill, experience, training or education, may testify and state an opinion concerning such matters.

You are not required to accept such an opinion. You should consider opinion testimony just as you consider other testimony in this trial. Give opinion testimony as much weight as you think it deserves, considering the education and experience of the witness, the soundness of the reasons given for the opinion, and other evidence in the trial.[10]

---

[10] Stipulated Instruction No. 12, based on 10th Cir. Pattern Crim. Jury Instr. § 1.17.

## NON-TESTIFYING DEFENDANT

The defendant did not testify and I remind you that you cannot consider his decision not to testify as evidence of guilt     You must understand that the Constitution of the United States grants to a defendant the right to remain silent.   That means the right not to testify.   That is a constitutional right in this country, it is very carefully guarded, and you must not presume or infer guilt from the fact that a defendant does not take the witness stand and testify or call any witnesses.[11]

---

[11] Stipulated Instruction No. 13; 10th Cir. Pattern Crim. Jury Instr. § 1.08.1.

## COOPERATING WITNESS

The government called as a witness an alleged coconspirator, Ms. Marcelle Green, who was named as a codefendant in the Superseding Indictment. The government has entered into a plea agreement with Ms. Green providing for the dismissal of some charges and a recommendation of a lesser sentence than she would otherwise likely receive. Plea bargaining is lawful and proper. In fact, the rules of this Court expressly provide for it.

An alleged coconspirator, including Marcelle Green, who entered into a plea agreement with the government, is not prohibited from testifying. On the contrary, the testimony of an alleged coconspirator may, by itself, support a guilty verdict. You should receive this type of testimony with caution and weigh it with great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that testimony beyond a reasonable doubt. The fact that an alleged co-conspirator has entered a guilty plea to the offense charged is not evidence of the guilt of any other person.

Stipulated Instr. No. 14; 10th Cir. Pattern 1.15

14

## WITNESS TESTIFYING UNDER GRANT OF IMMUNITY

The Government called Kimmisha Mullett to the stand.   The Government entered into a non-prosecution agreement providing that it will not prosecute Ms. Mullett for her involvement in a fraud scheme.

A person may testify under a grant of immunity (an agreement with the government).   Her testimony alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt even though it is not corroborated or supported by other evidence.   You should consider testimony given under a grant of immunity with greater care and caution than the testimony of an ordinary witness.   You should consider whether testimony under a grant of immunity has been affected by the witness's own interest, the government's agreement, the witness's interest in the outcome of the case, or by prejudice against the defendant.

On the other hand, you should also consider that an immunized witness can be prosecuted for perjury for making a false statement. After considering these things, you may give testimony given under a grant of immunity such weight as you feel it deserves.

You should not convict a defendant based on the unsupported testimony of an immunized witness, unless you believe the unsupported testimony beyond a reasonable doubt.[13]

---

[13] 10th Cir. Pattern Crim. Jury Instr. § 1.14; adopted pursuant to discussion at charging conference

## IMPEACHMENT BY PRIOR INCONSISTENCY

You have heard the testimony of one or more witnesses who, before this trial, made statements that may be different from their testimony here in court.

These earlier statements were brought to your attention only to help you decide how believable these witnesses' testimony was in this trial.   You cannot use these statements as proof of anything else.   You can only use them as one way of evaluating their testimony here in court.[14]

---

[14] 10th Cir. Pattern Crim. Jury Instr. § 1.10; Stipulated Instruction No. 15.

## IMPEACHMENT BY PRIOR CONVICTION

The testimony of a witness may be discredited or impeached by showing that the witness previously has been convicted of a felony, that is, of a crime punishable by imprisonment for a term of years.   A prior conviction does not mean that a witness is not qualified to testify, but is merely one circumstances that you may consider in determining the credibility of the witness.   You may decide how much weight to give any prior felony conviction that was used to impeach a witness.[15]

---

[15] Pattern Crim. Jury Instr. 10th Cir. § 1.12 (2011 ed. Updated Jan. 2017); Stipulated Instruction No. 16.

## **"ON OR ABOUT"**

You will note that the Superseding Indictment charges that the crimes were committed on or about certain dates.   The government must prove beyond a reasonable doubt that the defendant committed the crimes reasonably near those dates.[16]

---

[16] Pattern Crim. Jury Instr. 10th Cir. § 1.18; Stipulated Instruction No. 17.

18

## **CONSIDER ONLY CRIMES CHARGED**

You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged.   The defendant is not on trial for any act, conduct, or crime not charged in the Superseding Indictment.

It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crimes charged.   The fact that another person also may be guilty is no defense to a criminal charge.

The question of the possible guilt of others should not enter your thinking as you decide whether this defendant has been proved guilty of the crimes charged.[17]

---

[17]  Pattern Crim. Jury Instr. 10th Cir. § 1.19; Stipulated Instruction No. 18.

## <u>CAUTION – PUNISHMENT</u>

If you find the defendant guilty, it will be my duty to decide what the punishment will be.   You should not discuss or consider the possible punishment in any way while deciding your verdict.[18]

---

[18]  10th Cir. Pattern Crim. Jury Instr. § 1.20; Stipulated Instruction No. 19.

## AND/OR

Some of the counts of the Superseding Indictment accuse the defendant of violating a statute in more than one way.   In other words, the Superseding Indictment alleges that statute was violated by various acts that, in the Superseding Indictment, are joined by the word "and," while the statute and the elements of the offense are stated using the word "or."   In these instances, it is sufficient for a finding of guilt if the evidence establishes beyond a reasonable doubt the violation of the statute by any one of the acts charged.[19]

---

[19] *United States v. Iverson,* 818 F.3d 1015, 1026 (10th Cir.), *cert. denied,* 137 S. Ct. 217 (2016); Stipulated Instruction No. 20.

## PART II:   ELEMENTS OF CRIMES CHARGED

That concludes the part of my instructions explaining your duties and the general rules that apply in every criminal case.   Now I will explain the elements of the crimes with which the defendant is charged.

## SEPARATE CRIMES

A separate crime is charged in each count of the Superseding Indictment.   You must separately consider the evidence on each count and return a separate verdict.

Your verdict as to any one count, whether it is guilty or not guilty, should not influence your verdict as to any other count.[20]

---

[20] 10th Cir. Pattern Crim. Jury Instr. § 1.22; Stipulated Instruction No. 21.

# CONSPIRACY TO FILE FALSE CLAIMS

The Superseding Indictment charges in Count One a violation of a federal statute known as Title 18, United States Code, Section 286.   That statute prohibits

> . . . enter[ing] into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim.

To find the defendant guilty of this crime, you must be convinced that the government has proved each of the following elements beyond a reasonable doubt:

*First*:   The defendant agreed with at least one other person to obtain or aid in obtaining the payment or allowance of any false, fictitious, or fraudulent claim;

*Second*:   The defendant knew the essential objective of the conspiracy;

*Third*:   The defendant knowingly and voluntarily participated; and

*Fourth*:   There was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.[21]

---

[21] Stipulated Instruction No. 22; 10th Cir. Pattern Crim. Jury Instr. § 2.19 (2011 ed. Updated Jan. 2017) (modified for § 286 and to remove overt act requirement); *see Whitfield v. United States,* 543 U.S. 209, 215 (2005) (refusing to add overt act requirement where statutory text does not explicitly require one); *United States v. Dedman,* 527 F.3d 577, 594 n.7 (6th Cir. 2008) (holding that § 286 has no overt act requirement); *United States v. Lanier,* 920 F.2d 887, 892 (11th Cir. 1991) (same); *accord* [21] 1-18 *Modern Federal Jury Instructions*—Criminal ¶ 18.01 (Matthew Bender) ("If a section 286 conspiracy offense is charged . . . the instructions should incorporate the general conspiracy instructions relevant to 18 U.S.C. § 371 as part of the charge. * * * However, the court should not instruct the jury that an overt act is an element of the offense.").

## CONSPIRACY

A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. It is a kind of "partnership in criminal purposes" in which each member becomes the agent or partner of every other member.   The evidence may show that some of the persons involved in the alleged conspiracy are not on trial.   This does not matter.   There is no requirement that all members of a conspiracy be charged or tried together in one proceeding.

The evidence need not show that the members of the alleged conspiracy entered into an express or formal agreement.   Nor does the law require proof that the members agreed on all the details. But the evidence must show that the members of the alleged conspiracy came to a mutual understanding to try to accomplish a common and unlawful plan.

If you are convinced that the charged conspiracy existed, then you must next determine whether the defendant was a member of that conspiracy, that is, whether the defendant knew at least the essential goals of the conspiracy and voluntarily chose to be part of it.   The law does not require proof that the defendant knew all the other members of the conspiracy or knew all the details about how activities were to be carried out.   A person may belong to a conspiracy for a brief period of time or play a minor role.   On the other hand, proof is not sufficient if it merely shows that the defendant knew about the existence of the conspiracy or was associated with members of the conspiracy.   Rather, the evidence must show the defendant knowingly joined the conspiracy with the intent to advance its purposes.

You are also required to find that interdependence existed among the members of

25

the conspiracy.   This means that the members intended to act for their shared mutual

benefit.   To satisfy this element, you must conclude that the defendant participated in a

shared criminal purpose and that his actions constituted an essential and integral step

toward the realization of that purpose.[22]

---

[22] 10th Cir. Pattern Crim. Jury Instr. § 2.87 (2011 ed. Updated Jan. 2017) (adapted); Stipulated
Instruction No. 23.

## **"KNOWINGLY"**

The word "knowingly" means that an act was done voluntarily and intentionally,
and not because of mistake or accident.[23]

---

[23]  10th Cir. Pattern Crim. Jury Instr. § 1.37 (modified); Stipulated Instruction No. 24.

27

## PROOF OF KNOWLEDGE OR INTENT

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind.   In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made, or acts done, by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.   It is entirely up to you, however, to decide what facts to find from the evidence received during this trial.[24]

---

[24] 1A Kevin F. O'Malley, *et al.*, *Federal Jury Practice & Instructions—Criminal* § 17:07 (6th ed. 2015; August 2017 update) ("Fed. Jury Prac. & Instr.").

## AIDING AND ABETTING MAIL FRAUD

Counts Two through Seven of the Superseding Indictment charge the defendant with violating Title 18, United States Code, Section 2.   That statute makes it a crime intentionally to help someone else commit a crime.   The statute provides in pertinent part as follows:

> Whoever . . . aids, abets, counsels, commands, induces or procures [the] commission [of an offense against the United States] . . . [shall commit an offense against the United States.]

The Superseding Indictment charges the defendant with aiding and abetting others with respect to committing mail fraud.   This law makes it a crime to use the mails in carrying out a scheme to defraud.   A scheme to obtain money or property by means of false or fraudulent pretenses, representations, or promises is a specific type of scheme to defraud.   This crime is based upon a federal statute known as Title 18, United States Code, Section 1341, which provides in pertinent part as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . . for the purpose of executing such scheme or artifice or attempting so to do . . . places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . .or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail . . . according to the direction thereon, or at a place at which it is directed to be delivered by the person to whom it is address, any such matter or thing [shall commit an offense against the United States.][25]

---

[25] 18 U.S.C. §§ 2 & 1341; Stipulated Instruction No. 26.

## AIDING AND ABETTING — ELEMENTS

To find the defendant guilty of aiding and abetting mail fraud as charged in Counts 2 through 7 of the Superseding Indictment, you must be convinced that the government has proved each of the following elements beyond a reasonable doubt for each count:

*First:*   someone else committed the charged crime, and

*Second:*   the defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about.   This means that the government must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him or her.

The defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough.   Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.[26]

---

[26] 10th Cir. Pattern Crim. Jury Instr. § 2.06; Stipulated Instruction No. 27.

## AIDING AND ABETTING MAIL FRAUD — ELEMENTS

To find that "someone else" committed the crime of mail fraud — the first element of aiding and abetting — you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*:   a person or persons other than the defendant devised or intended to devise a scheme to defraud the United States Department of Education by making false and fraudulent representations regarding the eligibility of prison inmates for student financial aid, as alleged in the Superseding Indictment;

*Second*:   a person or persons other than the defendant acted with specific intent to defraud;

*Third*:   a person or persons other than the defendant caused another person to mail something through the United States Postal Service for the purpose of carrying out the scheme;

*Fourth*, the scheme employed false or fraudulent pretenses, representations, or promises that were material.

A "scheme to defraud" is conduct intended to or reasonably calculated to deceive persons of ordinary prudence or comprehension.

An "intent to defraud" means an intent to deceive or cheat someone.

A representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity.   A representation would also be "false" when it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud.

31

A false statement is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed.

What must be proven beyond a reasonable doubt is that a person or persons other than the defendant devised or intended to devise a scheme to defraud that was substantially the same as the one alleged in the Superseding Indictment, and that the use of the mails was closely related to the scheme, in that a person or persons other than the defendant caused something to be mailed in an attempt to execute or carry out the scheme. To "cause" the mails to be used is to do an act with knowledge that the use of the mails will follow in the ordinary course of business or where such use can reasonably be foreseen even though a person or persons other than the defendant did not intend or request the mails to be used.[27]

---

[27] 10th Cir. Pattern Crim. Jury Instr. § 2.56; Stipulated Instruction No. 28.

## <u>INDICTMENT NOT EVIDENCE</u>

An indictment is only a formal method used by the government to accuse a defendant of a crime.   It is not evidence of any kind against the defendant.   The defendant is presumed to be innocent of the crimes charged.

The defendant has pleaded "Not Guilty" to the Superseding Indictment and therefore, denies that he is guilty of the charges contained in the Superseding Indictment.[28]

---

[28]  1A *Fed. Jury Prac. & Instr.* § 13:04; Stipulated Instruction No. 29.

## PART III:   DELIBERATION AND JURY FORM

That concludes my part of the instructions explaining the law that applies in this case.   Now let me finish up by explaining some things about your deliberations in the jury room and your possible verdicts.

## DUTY TO DELIBERATE

After the parties' closing statements, the bailiff will escort you to the jury room, where each of you will have a copy of the instructions that I have just read.   Any exhibits admitted into evidence will also be placed in the jury room for your review.

When you go to the jury room, you should first select a foreperson, who will help to guide your deliberations and will speak for you here in the courtroom.   The second thing you should do is review the instructions.   Not only will your deliberations be more productive if you understand the legal principles upon which your verdict must be based, but for your verdict to be valid, you must follow the instructions throughout your deliberations.   Remember, you are the judges of the facts, but you are bound by your oath to follow the law stated in the instructions.

To reach a verdict, whether it is guilty or not guilty, all of you must agree.   Your verdict must be unanimous on each count of the indictment.   Your deliberations will be secret.   You will never have to explain your verdict to anyone.

You must consult with one another and deliberate in an effort to reach agreement if you can do so.   Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors.   During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced that you

34

were wrong.   But do not give up your honest beliefs solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

A form of verdict has been prepared for your convenience.

**[Explain the Verdict Form]**

After you have deliberated and consulted with each other, the foreperson will write the unanimous answer of the jury in response to each question on the Verdict Form and sign it.

Only one copy of ~~each~~ *The* WJM Verdict Form will be provided to you.   If you make an error WJM on ~~either~~ *the* form, please tell the bailiff.   The bailiff will destroy the erroneous form and a blank form will be provided.[29]

---

[29]  10th Cir. Pattern Crim. Jury Instr. § 1.23; Stipulated Instruction No. 30.

## COMMUNICATION WITH THE COURT

If you want to communicate with me at any time during your deliberations, please write down your message or question and give it to the bailiff, who will bring it to my attention.   I will respond as promptly as possible, either in writing or by having you return to the courtroom so that I can address you orally.   I caution you, however, that with any message or question you might send, you should not tell me any details of your deliberations or indicate how many of you are voting in a particular way on any issue.

Let me remind you again that nothing I have said in these instructions, nor anything I have said or done during the trial was meant to suggest to you what I think your decision should be.   That is your exclusive responsibility.[30]

---

[30]  10th Cir. Pattern Crim. Jury Instr. § 1.44; Stipulated Instruction No. 31.

# PART IV:   THE SUPERSEDING INDICTMENT

[*In cases with lengthy indictments, the Indictment will be provided to the jury in
hard copy form at this place in the instructions, but is not read to the jury by the Court.*][31]

## THE SUPERSEDING INDICTMENT

The Superseding Indictment reads in pertinent part as follows:

### Count 1
### Conspiracy to Defraud the Government with Respect to Claims

1.      At all times relevant to this Superseding Indictment:

   a.      The United States Department of Education (the Department) was
an agency of the United States government. The Department's responsibilities
included overseeing the administration of federal student assistance programs,
including financial aid programs designed to assist qualified students with paying for
college. These financial aid programs included both grant and loan programs.

   b.      In order to qualify as recipients/borrowers for these financial aid
programs, students were required to, among other things, certify that the funds
borrowed would be used for authorized educational purposes.

   c.      Students generally began the process of applying for federal
financial aid by completing and submitting the Free Application for Federal Student
Aid (FAFSA). The FAFSA required identifying information such as a student's name,
date of birth, address, Social Security number, telephone number, and e-mail
address. After processing, the information from the FAFSA was sent to the schools
designated by the applicant.

   d.      Once awarded financial aid, and after a student enrolled at a
particular school, financial aid funds were disbursed from the Department to the

---

[31]  ECF No. 131; Stipulated Instruction No. 32

school in the student's name. Those funds were applied to tuition, fees, and other educational expenses the student owed to the school. Any funds in excess of the amount owed were then "refunded" to the student.

e.     The Department and community colleges within the State and District of Colorado worked with a company called Higher One to deliver "refunds" of federal financial aid to students. Refund amounts were placed into accounts in the students' names maintained by Higher One. Students accessed these refunds through the accounts and debit cards issued and mailed to them by Higher One.

f.     The Colorado Community College System (CCCS) included several different schools, such as Pikes Peak Community College, Red Rocks Community College, and Pueblo Community College. CCCS operated a website at www.ccconline.org, sometimes referred to as "Colorado Community Colleges Online," allowing a prospective student to create an online account by entering information such as name, address, e-mail address, telephone number, and Social Security number. A prospective student could then use that information to apply to the various schools in the CCCS. The schools within the CCCS allowed any person who met certain minimum criteria (e.g., having a high school diploma or GED) to enroll and attend classes.

g.     After a student enrolled at a particular CCCS school, the student could then use Colorado Community Colleges Online to take various online distance-learning courses offered by that particular school.

h.     LexisNexis maintained an electronic database called "Accurint," containing personally identifiable information, including Social Security numbers, for individuals throughout the country. To access Accurint, an individual needed a subscription and a username and password.

i.     Several state departments of corrections maintained publicly accessible inmate locator websites so members of the public could search for

38

individuals held in custody. A person could search using an inmate's name, or a portion thereof.   Inmate locator websites also displayed the inmate's date of birth.

2.     Beginning in or about August 2010, and continuing until in or about October 2012, in the State and District of Colorado and elsewhere, Defendants TRAMMEL THOMAS and MARCELLE GREEN, along with co-conspirators Heather Carr and Mercedes Diaz (collectively, "the conspirators"), knowingly agreed, combined, and conspired with each other to defraud an agency of the United States by obtaining and aiding to obtain the payment and allowance of false and fraudulent claims by submitting false claims for federal student aid to the U.S. Department of Education.

3.     The conspiracy was accomplished, in part, through the following manner and means:

a.     The conspirators obtained names and dates of birth for inmates by searching inmate locator websites. Using the Accurint database, conspirators then obtained the social security number of a particular inmate.

b.     The conspirators then applied for federal student assistance funds in the names of inmates and using the inmates' social security numbers. The conspirators prepared and submitted FAFSAs that contained materially false representations about the identity of the person submitting the application, the address of the purported applicant, and the purported applicant's intent to attend college. These false representations supported improper determinations by the Department that the purported applicants were eligible to receive financial aid.

c.     The conspirators also applied for admission to schools within the CCCS and elsewhere, using the identities of the inmates in whose name they had applied for federal student assistance funds. The applications contained false information regarding the purported applicants' mailing addresses. Instead of listing the purported applicant's actual address at a prison or jail, the applications typically

39

listed an address from which the conspirators could obtain the mail.

       d.     The conspirators convinced other individuals, known and unknown to the Grand Jury, to receive mail in the names of purported students so the conspirators could obtain the mail.

       e.     Higher One accounts were created in the names of the purported applicants after financial aid funds were disbursed to the community colleges in the purported applicants' names. Funds were deposited into these accounts and Higher One debit cards intended for the purported applicants were then mailed to the addresses provided by the conspirators. Through the debit cards and associated Higher One accounts, the conspirators used the funds for their own purposes.

       f.     Often, schools would not release financial aid refunds without some confirmation that the student was attending classes. In such cases, the conspirators would sign into online courses to make it appear as if the purported student was in fact attending courses to obtain financial aid funds meant for that purported student.

     4.     During the course of the conspiracy, the conspirators were involved in submitting more than 180 false FASFAs to the Department seeking approximately $1.3 million in federal financial aid funds. The Department disbursed more than $550,000 as a result of the conspirators' false claims. Of this amount, more than $415,000 in refunds were deposited in purported students' accounts and on debit cards. The conspirators shared in these proceeds.

<u>Counts 2-7</u>
**Aiding and Abetting Mail Fraud Trammel Thomas**

     5.     Paragraphs 1 and 3 (including the subparagraphs) are incorporated herein as if fully set forth.

     6.     Beginning in or about August 2010, and continuing until in or about October 2012, the conspirators devised and intended to devise a scheme and artifice

to defraud the U.S. Department of Education as set forth in Paragraph 3 above ("the scheme") by obtaining money by means of false and fraudulent pretenses, representations, and promises in connection with applications for federal financial aid.

7.     Between on or about the dates listed below for each count, in the State and District of Colorado, for the purpose of executing the scheme, Defendant TRAMMEL THOMAS knowingly caused and aided and abetted another who knowingly caused to be delivered by United States mail addressed to the purported student at the address listed below, according to the direction thereon, an envelope containing a Higher One debit card:

| Count | Dates | Card Number (Last Four Digits) | Purported Student | Address Where Sent |
|-------|-------|-------------------------------|-------------------|--------------------|
| 2 | Feb. 8-22, 2011 | 5158 | I.O | 3820 Radiant Dr.; Apt. 239; Colorado Springs, Co |
| 3 | Aug. 11 – Oct. 15, 2011 | 2903 | V.J. | 1418 Rushmore Dr. Colorado Springs, CO |
| 4 | Aug. 11 – Oct. 3, 2011 | 8668 | R.P. | 1418 Rushmore Dr. Colorado Springs, CO |
| 5 | Aug. 29–Nov. 9, 2011 | 0165 | E.J. | 1418 Rushmore Dr.; Colorado Springs, CO |
| 6 | June 26–July 7, 2012 | 7111 | D.M. | 1112 Meadow Oaks Dr.; Colorado Springs, CO |
| 7 | July 18–26, 2012 | 6173 | M.A. | 1112 Meadow Oaks Dr.; Colorado Springs, CO |

All in violation of 18 U.S.C. §§ 1341 and 2.

41

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Case Number:    16-cr-00054-WJM-2
                United States of America v. Trammel Thomas

## NOTE TO COURT

/X/    We the jury have reached a verdict.

_____    We the jury have a question.

_____

_____

_____

_____

_____

3:30    11-30-17
**Date & Time**

**Answer from the Court**

_____

_____

_____

_____

_____

_____

_____

_____        _____
**Date & Time**                       **Judge William J. Martínez**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Case Number:     16-cr-00054-WJM-2
United States of America v. Trammel Thomas

## NOTE TO COURT

_____ We the jury have reached a verdict.

___X___ We the jury have a question.

If something Fraudulent is mailed,
under the law, is it true that
anyone in possesion of that item
is aiding add or abeting in the Fraudent
crime?

2:30pm   11-30-17
**Date & Time**

### Answer from the Court

No. But you may consider that
evidence when evaluating whether the
defendant is guilty of aiding & abetting

30 NOV 2017
**Date & Time**
15:15

_____
Judge William J. Martínez

Case 1:16-cr-00054-WJM Document 233 Filed 11/30/17 Page 1 of 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable William J. Martinez

Criminal Case No.: 16-cr-054-2-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**TRAMMEL THOMAS**,

      Defendant.

---

## VERDICT FORM

---

### COUNT 1

We, the jury, upon our oaths, do unanimously find the defendant, Tramell Thomas, in Count One of the Indictment:

      _____      Not Guilty

      X      Guilty

### COUNT 2

We, the jury, upon our oaths, do unanimously find the defendant, Tramell Thomas, in Count Two of the Indictment:

      _____      Not Guilty

      X      Guilty

## COUNT 3

We, the jury, upon our oaths, do unanimously find the defendant, Tramell

Thomas, in Count Three of the Indictment:

_____         Not Guilty

X               Guilty

## COUNT 4

We, the jury, upon our oaths, do unanimously find the defendant, Tramell

Thomas, in Count Four of the Indictment:

_____         Not Guilty

X               Guilty

## COUNT 5

We, the jury, upon our oaths, do unanimously find the defendant, Tramell

Thomas, in Count Five of the Indictment:

_____         Not Guilty

X               Guilty

## COUNT 6

We, the jury, upon our oaths, do unanimously find the defendant, Tramell

Thomas, in Count Six of the Indictment:

_____         Not Guilty

X               Guilty

## COUNT 7

We, the jury, upon our oaths, do unanimously find the defendant, Tramell

Thomas, in Count Seven of the Indictment:

_____  Not Guilty

⨯  Guilty

Dated this \_\_30\_\_ day of \_\_*November*\_\_, 2017.

3

Case No. 1:16-cr-00054-WJM Document 525-1 cited 12/17/19 USDC Colorado pg 423 of
Case 1:16-cr-00054-WJM Document 262 Filed 4/29/19 USDC Colorado Page 1 of 26
971

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No.   16-cr-00054-WJM-2

UNITED STATES OF AMERICA,

     Plaintiff,

v.

2. TRAMMEL THOMAS,

     Defendant.

---

**GOVERNMENT'S SENTENCING STATEMENT**

---

On November 30, 2017, a jury found the defendant guilty of all charges in the

Superseding Indictment: one count of conspiracy to file false claims and six counts of mail

fraud. The defendant is scheduled to be sentenced on April 12, 2018, at 9:30 a.m. As set forth

in more detail below, the United States Sentencing Guidelines ("U.S.S.G." or "guidelines")

recommend that the defendant be imprisoned for between 135 and 168 months. In advance of

the sentencing hearing, the United States of America, by Robert C. Troyer, United States

Attorney for the District of Colorado, through Martha A. Paluch and Bryan D. Fields, Assistant

United States Attorneys, hereby files this statement pursuant to D.C. Colo. LCrR 32.1 in

support of its recommendation that the Court sentence the defendant to 168 months'

imprisonment followed by 5 years of supervised release, a restitution judgment of $563,890.85

and a forfeiture money judgment in the amount of fraud proceeds directly attributable to this

defendant as established at the sentencing hearing by a preponderance of the evidence.

1

Case No. 1:16-cr-00054-WJM-Document 525-1 filed 12/13/19 USDC Colorado pg 424 of
Case 1:16-cr-00054-WJM Document 262 Filed 12/29/17 Page 2 of 26 pg 424 of
971

## I.   ALL OF THE FACTORS THAT MUST BE CONSIDERED BY THE COURT SUPPORT A SENTENCE OF AT LEAST 168 MONTHS

A sentence of 168 months is fully supported by each of the factors set forth in 18 U.S.C.

§ 3553(a). The defendant's entire adult life has been devoted to crime. Convictions have not

deterred him. Prison did not stop him. Supervised release has not rehabilitated him. To the

contrary, at every stage of his life — inside of prison and out — the defendant has

demonstrated repeatedly that the only person he cares about is himself. Denied what he

wants, he takes it by force, manipulation, or fraud, without regard for the substantial harm

imposed on his victims. At many points along the way, the justice system had an opportunity to

prevent these harms by imposing the sort of stiff sentences that might cause him to consider

the consequences of his actions, or at the very least to protect the public from those actions by

incapacitating him in prison. That did not always happen. The defendant took advantage of the

opportunities provided by his liberty, not to make himself a better person and not to atone for

his crimes, but instead to harm more victims. A sentence of 168 months is necessary to

prevent this from happening again.

### A.  The Nature and Seriousness of the Offense Support the Recommended Sentence

The Court heard extensive evidence of the conspiracy at trial. The harms inflicted by the

defendant were substantial, and fully support the sentence recommended by the government.

First, to make the scheme work, the defendant had to work with his coconspirators to steal the

identities of prisoners. These individuals are particularly vulnerable victims. Prisoners,

especially those incarcerated for many years, face daunting obstacles to their successful

reintegration into society. The victims in this case must now shoulder the additional burden of

Case No. 1:16-cr-00054-WJM Document 525-1 cited 12/12/19 USDC Colorado pg 425 of
Case 1:16-cr-00054-WJM Document 262 Filed 11/29/17 USDC Colorado Page 3 of 16
971

sorting through the damage to their credit histories. Second, the defendant and his co-conspirators targeted community colleges, which provide much needed, last-resort educational services to underserved communities. Finally, the scheme stole precious tax dollars by abusing the implicit bonds of trust that make it possible to provide government services to those in need. This type of fraud erodes support for vital government programs and increases the cost of administering such programs.

The defendant was an enthusiastic participant in the charged scheme. Characteristically, one of his first significant actions to further the fraud was to gain the trust of Christine Duncan — someone he said he loved — and then to betray that trust by stealing her identity to line his pockets with money. Evidence at trial showed that the defendant took Duncan to Pikes Peak Community College (PPCC) in 2010 under the guise of helping her enroll in classes to make a better life for herself. They obtained the necessary paperwork to sign up for financial aid, but Duncan never completed it. Years later, when Duncan applied for a car loan, she learned what happens to people who put their trust in the defendant: they become victims. When the loan officers checked Duncan's credit report, they found defaulted student loans that Duncan had never actually obtained. *See* Gov't Ex. 57j (2010 FAFSA submitted in Duncan's name); Gov't Ex. 57k (2011 FAFSA submitted in Duncan's name); Gov't Ex. 57L (2011 Master Promissory Note submitted in Duncan's name). The truly ruthless nature of Thomas's betrayal came through at trial when Duncan testified that she could not have enrolled in school in 2011 because — convinced that Thomas loved her — she was working in Arizona to help pay a lawyer to defend Thomas on other charges. The money for those loans went to the address she shared with the defendant on Radiant Drive in Colorado Springs.

3

Case 1:16-cr-00054-WJM Document 262 Filed 11/29/17 USDC Colorado Page 4 of 16

Duncan wasn't the defendant's only victim in 2010. The parties stipulated at trial as to the testimony of several of the conspiracy's victims, including an inmate named I.O. At the upcoming sentencing hearing, Special Agent Ennis will testify that I.O. told her much more than was in the stipulation. I.O told investigators that, in October 2010, the defendant tried to recruit I.O. into the scheme, claiming that they could commit student aid fraud to earn money. True to form, Thomas betrayed I.O., just as he betrayed others who put their trust in him. Evidence at trial showed that I.O.'s identity was stolen while I.O was a prisoner, that a fraudulent FAFSA was submitted in I.O's name in 2010, and that Thomas was in possession of a debit card with I.O.'s name when he was arrested during a traffic stop in August 2012. *See* Gov't Ex. 57(b) (fraudulent FAFSA submitted in I.O.'s name in 2010); Gov't Ex. 4(a) (fraudulently obtained debit card in the name of I.O.).

The defendant was arrested in January 2011 for, among other things, aggravated robbery. *See* Gov't Ex. 35 (stipulating to fact of defendant's detention). He spent most of the rest of the year in the El Paso County jail, but this didn't stop him from continuing to profit from his 2010 investment of labor into the scheme. Evidence at trial showed that Thomas's coconspirators used addresses procured by the defendant to continue to receive fraudulent student aid proceeds, which were used in part to help pay for the defendant's legal fees. *See* Gov't Exs. 67, 68, and 69 (confirming the defendant's use of the Rushmore Drive address in Colorado Springs to obtain student aid while outside of prison in 2010); Gov't Exs. 57(e), 57(f), 57(g), 63(c), 63(d), and 63(e) (fraudulently submitted student aid paperwork using the Rushmore Drive address); Gov't Ex. 74 (summary chart of addresses used in the scheme, showing the Rushmore Drive address was used to receive the proceeds of student loans

4

fraudulently obtained in the names of 17 prison inmates who had their identities stolen by the defendant and his coconspirators).

Nearly a year in jail did nothing to dissuade the defendant from continuing to participate in the scheme. Nor did it cause the defendant to stop and reconsider his contempt for the law. After released from jail in November 2011, the defendant continuously lied to the parole officer charged with supervising his release from his earlier aggravated robbery convictions. And he deepened his involvement in the fraud scheme, fully realizing its benefits by moving into the nice house Heather Carr paid for with fraud money.

Records from the Arizona Department of Corrections show that Thomas told his parole officer he was living with his sister.   He was not. He was living with Heather Carr. When Carr used fraud money to upgrade her lifestyle by moving to a new address, the defendant moved with her, but told his parole officer that he was moving because his "sister" had been evicted from the prior address. As established at trial, the defendant was arrested in August 2012 after a patrol officer found him with a stack of debit cards in other people's names. Consistent with his faith that he can use lies and deceit to avoid getting caught and to advance his interests, Thomas did not report this arrest and instead told his parole office that he had not had any police contact.

The defendant lied to his parole officer so that he could hide his involvement in the fraud scheme. Free from the constraints of jail (and obviously convinced that his parole officer was an easy mark, like his other victims), the defendant quickly devoted himself back to the fraud. During one meeting, coconspirator Marcelle Green gave him tips on how to fill out FAFSAs to avoid additional scrutiny. During that same meeting, the defendant, Green and Carr shouted

5

out the names of the victims they were respectively using to submit fraudulent FAFSAs. In February 2012, just a few months after his release from prison, the defendant starting receiving mail at a UPS store on Riggs Road in Chandler, Arizona. *See* Gov't Ex. 64. Evidence at trial showed that the defendant used this mailbox to receive debit cards with the proceeds of the fraud.

While in the El Paso County jail, the defendant had to rely on his coconspirators to keep the fraud moving along. Once released, however, he advanced the scheme using his particularly cruel brand of manipulation. In 2012, Kimmisha Mullett was going through one of the most difficult periods of her life. Health issues and other extremely taxing emotional trials had left her particularly vulnerable. Mullett thought the defendant was a friend; he thought she was a tool to be exploited. Seeing an opportunity to take advantage of her situation, the defendant offered Mullett money (which he never paid) to receive mail in the names of other people. Text messages between Mullett and the defendant established that the defendant directed Mullett to send inmate mail to the Riggs Road PO Box, and specifically, mail related to inmate D.M. Gov't Ex. 15. Mullett didn't know at first what she had signed up for, but it became obvious when envelopes from community colleges arrived. The defendant used Mullett, just like everyone else in his life, to advance his selfish desires.

The defendant's efforts to hide the scheme from investigators, his parole officer, and anyone else who might catch him were remarkably successful for a period. Ultimately, however, the defendant's arrogant flouting of the law caught up with him. On August 30, 2012, he decided to fill a large cup with alcohol, get into a car (with marijuana in the center console), and drive. Detective Seal saw him drifting across his lane and pulled him over. During that stop,

6

Detective Seal saw in plain view a bag containing 52 debit cards, none of which was in the defendant's name.[1] But the defendant had no shame at getting caught red-handed. The defendant thought he could manipulate Detective Seal just like every other law enforcement official he had ever encountered. When Seal asked the defendant to hand him the bag of cards, the defendant tried to hide them and give Detective Seal an empty bag. It didn't work, and the traffic stop was the first sign that, eventually, the law would catch up to the defendant.

The defendant's scheme worked well, but eventually someone saw through his lies. PPCC employee Kristina Moss testified at trial that she uncovered a suspicious pattern in student loan documents. After she referred the case to the Department's Office of Inspector General ("ED-OIG"), Special Agent Ennis began investigating. It didn't take SA Ennis long to see through the deceit. By November, 2012, agents were at the defendant's house executing a search warrant. It's unlikely the defendant was surprised when they showed up: he didn't know that the Department was unaware of his traffic stop, but he certainly was. Instead of answering the door, occupant(s) of the home frantically tried to rip up compromising documents and flush them down the toilet. Thomas used the time to break his cell phone in half, hoping that agents wouldn't be able to retrieve from it his text messages with Mullett, *see* Gov't Ex. 15, or the photographs of him proudly flashing cash, *see* Gov't Exs. 26 & 29, and celebrating his trips to the shooting range (despite being a felon).

The defendant's efforts to obstruct the investigation didn't end with the broken cell phone. After the search, he and Carr went to the home of coconspirator Marcelle Green. There,

---

[1] Among those cards was one in the name of Vanessa Lopez, yet another woman who trusted the defendant as a friend, only to have her identity stolen as part of the fraud.

7

they probed her with questions to determine whether she was cooperating and pointedly noted

that their home had been searched while Green's had not. As special agents reviewed

thousands of pages of documents created by the defendant and his coconspirators,

interviewed numerous victims, and analyzed the computers used in the scheme, Thomas used

the time to contact witnesses in an effort to influence their testimony. He tried to reach out to

Marcelle Green by going to her uncle's house. He called Kimmisha Mullett to talk about his

case (and her trial subpoena) and to once again manipulate her into thinking he was her friend.

It didn't work. ED-OIG's investigation was too thorough and, though some witnesses

refused to testify, enough were brave enough to come to court and explain to the jury what

happened. He was convicted and now stands before the Court to be sentenced for his

conduct.

### B. The defendant's history and characteristics justify a 168-month sentence

The defendant draws strength for himself by preying on the weak. He has robbed the

defenseless. He facilitated the gang rape of a woman who thought he loved her. He used lies

and deceit to avoid getting caught. The history and characteristics of this defendant weigh

heavily towards the 168-month sentence recommended by the government.

The fraud scheme was not enough to satisfy the defendant's greed. The government

will prove at the sentencing hearing by a preponderance of the evidence that while defrauding

the Department, the defendant worked on the side as a pimp who used manipulation and force

to profit from a commercial sex business and to rob its customers.

At around 4 or 5am on November 11, 2010, Victim 1 (a "john") awoke to find Victim 2 (a

woman prostituted by the defendant) texting on her phone. About twenty minutes later, the

8

defendant began knocking loudly on the door of the hotel room the victims were sharing. When Victim 1 answered the door, the defendant, with a knit cap obscuring his face, walked into the room. The defendant pulled out a gun, pointed it at Victim 1, and told Victim 1 to get on the ground. Victim 1 did what he was told. The defendant then rummaged through Victim 1's stuff, taking what he wanted: a cell phone, a laptop, a camera, a watch, and about $500. The defendant yelled at Victim 2 to pack up her stuff and then the two of them left together.

The Colorado Springs Police Department ("CSPD") investigated. They discovered that Victim 2 was using backpage.com, a website frequently used by commercial sex traffickers, to advertise her services. Suspecting that the man who robbed Victim 1 was Victim 2's pimp, CSPD used the website to find a phone number for Victim 2 and to set up a liaison.

On January 27, 2011, an undercover CSPD detective went to a Motel 6 in Colorado Springs to meet with Victim 2, who was using an assumed name. Other CSPD officers conducted surveillance. Among other things, they saw a black male, later identified as the defendant, walking along the second floor landing between two hotel rooms. Below the hotel rooms being used for prostitution, CSPD officers saw a red Toyota sedan. The CSPD detective met with Victim 2 and, after she agreed to perform sex acts for money, signaled to his colleagues to make an arrest. When the officers knocked on the door, Victim 2 called the defendant with her cell phone.

While Victim 2 was being arrested, the defendant slinked away. Surveillance saw him leave a hotel room near the one Victim 2 was using, meet up with a woman, and then get into the red Toyota, which began driving away from the hotel. CSPD detectives, in unmarked undercover vehicles, were unable to follow the Toyota. But El Paso County Sheriff's deputies

9

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/12/19 USDC Colorado pg 432 of
Case 1:16-cr-00054-WJM Document 262 Filed 12/29/17 Page 10 of 16
971

found it, saw it run a stop sign, and pulled it over.   Inside, behind the steering wheel, was the defendant. In a preview of what happened during the search of the defendant's house in November 2012, the deputies were unable to gather evidence from the defendant's cell phone: he smashed it, and broken pieces of it were found on the floorboard.

Victim 2 told detectives that the defendant was her pimp. She told CSPD that she made somewhere between $5,000 and $7,000 as a prostitute between September 2010 and January 2011, but that all of the money was given to the defendant. The exploitative nature of the arrangement was confirmed when the police asked Victim 2 how much she had made that day. She said $700. None of that money was with her. Instead, when the police arrested the defendant, they found approximately $726 in his pocket.

Victim 2 initially cooperated with the police. She told them about the defendant's activities as a pimp. She also positively identified him as the man who had committed the robbery in November. She also took the police to an address used by the defendant. That address was also used as part of the FAFSA fraud.

Two other women were found by CSPD in the hotel room next to Victim 2's.   One of those women was Heather Carr. Just as in this case, Carr refused to testify against the defendant. Victim 2, and others, also refused to testify. As a result, the charges against the defendant were dropped.

Victim 2 also reported that on one occasion the defendant held her down while five of his friends raped her. Victim 2 reported that the defendant would throw her to the floor and choke her. He once told her "you know when you are flopping around like a fish, like you're having a seizure? It's because I've choked to you the point you're no longer breathing and I

10

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/12/19 USDC Colorado pg 433 of
971
Case 1:18-cr-00054-WJM Document 262 Filed 12/29/17 Page 11 of 16

slap you in order to bring you back to life." The defendant terrorized Victim 2 to prevent her

from going to the authorities. "Your family, no one, would ever find you," he told her,

explaining that if he killed her, he would feed her body to pigs.

This defendant's character and previous criminal conduct support the sentence the

government seeks. District courts are routinely permitted to "enhance a defendant's sentence

using uncharged conduct proven to the court by a preponderance of the evidence." *United

States v. Rodriguez-Felix,* 450 F.3d 1117, 1131 (10th Cir. 2006); *Witte v. United States,* 515

U.S. 389, 401 (1995) ("consideration of information about the defendant's character and

conduct at sentencing does not result in 'punishment' for any offense other than the one of

which the defendant was convicted").

### C. A sentence of at least 168 months is necessary to promote respect for the law

The defendant was only 19 when he committed his first violent felony. In 1999, he was

convicted of three counts of aggravated robbery, three counts of using a weapon in a violent

crime, and one count of car theft. Undeterred, unrepentant and unconcerned with the law, he

was convicted just five years later of smuggling contraband into prison.

The defendant was released in 2009. Almost ten years in prison taught him nothing

except the value of lost time. He didn't work to make up for past misdeeds. He didn't try to

make himself a productive and valued part of civil society. Instead, by the end of 2010 he was

committing the felonies for which he was just convicted, while also investing considerable time

and energy into his job as a pimp. After serving nearly a decade in prison, he used the freedom

of his release to commit more crimes. Worse, he committed those crimes while on parole — a

clear message to the judiciary that he has no respect for its authority.

11

When the defendant gets caught, his first instinct is not to admit his wrongdoing, or seek redemption. His first instinct is to try to manipulate the justice system by destroying or hiding evidence. When arrested for his pimping activities in Colorado Springs in 2011, he destroyed his cell phone. When he was caught in November 2012, he did the same. When Detective Seal saw a giant bag of fraudulently-obtained credit cards in the defendant's car, the defendant was so confident in his ability to fool law enforcement that he tried to swipe them under his seat and pass off an empty bag as the one of interest. The defendant either believes that he can commit crimes without being caught, or that the benefits of crime outweigh its consequences. Either way, the only way to convince this particular defendant to take the law seriously is to impose a serious sentence.

### D. 168 Months is a Just Punishment for the Offense

The recommended sentence is a just one that takes into account the multi-faceted harms imposed by the defendant's conduct. As reflected in the guidelines, the defendant's punishment should be a substantial one that takes into account the fact that the defendant chose particularly vulnerable victims, that he didn't stop selecting such vulnerable victims until he was caught (thus increasing the total harm inflicted), that he chose to obstruct justice, that he has never expressed remorse or accepted responsibility for his conduct. These facts all support a sentence of 168 months' imprisonment.

### E. Deterrence Requires the Sentence Recommended by the Government

The need to deter the defendant from further crimes also weighs heavily in favor of the recommended sentence. *See United States v. Pruitt*, 502 F.3d 1154, 1166 (10th Cir. 2007) (concluding that defendant's 292-month sentence was substantively reasonable where, among

12

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/12/19 USDC Colorado pg 435 of
Case 1:16-cr-00054-WJM Document 262 Filed 12/29/17 Page 13 of 16
971

other things, it was "reasonable to infer that [the defendant] is not easily deterred from
engaging in unlawful conduct") *vacated by Pruitt v. United States*, 552 U.S. 1306 (2008)*, and
sentence reimposed on remand by United States v. Pruitt*, 312 F. App'x 100, 2008 WL
4218798 (10th Cir. Sept. 16, 2008).

This was not a crime born of difficult circumstances. It was the deliberate choice of a
calculating criminal weighing the potential rewards of success against the likelihood of being
caught and the consequences that would follow if he was. The defendant had already been
sentenced to serve ten years in prison, but concluded that, even so, it was worthwhile to
commit yet another aggravated robbery and then to participate in this fraud scheme. If ten
years was not enough to deter the defendant the first time around, a substantially more severe
sentence is necessary this time. *See United States v. Morgan,* 635 F. App'x 423, 457 (10th Cir.
2015) (unpublished) (noting that deterrence "is particularly important in the area of white collar
crime"); *United States v. Courtney*, 76 F.Supp. 3d 1267, 1307 n.13 (D.N.M. 2014) ("the Court
must still consider specific deterrence when sentencing, because Congress demands it").

### F.  The Need to Protect the Public from Further Crimes

Of course, the court should also consider the possibility that no sentence will adequately
deter this defendant. The defendant turned to crime right after a lengthy prison sentence,
thinking nothing of his parole or the possible consequences of being caught again. In these
circumstances, this factor, too, weighs heavily in favor of the 168-month sentence
recommended by the government.

13

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/12/19 USDC Colorado pg 436 of
971
Case 1:18-cr-00094-WJM Document 262 Filed 12/29/17 Page 14 of 16

### G.  The Sentence Recommended by the Advisory Sentencing Guidelines

The total offense level is 31: the base offense level is 7 because the defendant was
convicted of mail fraud, which carries a maximum sentence of twenty years imprisonment,
U.S.S.G. § 2B1.1(a)(1); plus 14 levels as a result of the defendant's intent to cause losses of
more than $550,000 but less than $1.5 million, U.S.S.G. § 2B1.1(b)(1)(H); plus 2 levels
because there were 10 or more victims, U.S.S.G. §2B1.1(b)(2)(A); plus 2 more levels because
the defendant stole identities to get other identification cards, U.S.S.G. § 2B1.1(b)(11)(C)(i)-(ii);
plus 2 more levels because the defendant chose prison inmates, vulnerable in their captivity, as
his victims, U.S.S.G § 3A1.1(b)(1); *United States v. Pierre*, 825 F.3d 1183 (11th Cir. 2016); 2
more levels because the defendant was not content with just a few vulnerable victims and,
instead, participated in a scheme to victimize hundreds of inmates, U.S.S.G. § 3A1.1(b)(2); and
plus 2 more levels because the defendant tried to obstruct justice by destroying evidence on
his cell phone and by reaching out to potential witnesses in an effort to influence their
willingness to testify, U.S.S.G. § 3C1.1. The defendant has not accepted responsibility for this
offense and should receive no related decrease.

Based on what the government knows, the defendant's criminal history will likely place
him into Category III. At offense level 31, the guidelines recommend that the defendant be
imprisoned for between 135 and 168 months.

Even if the Court believes that the Guidelines are too harsh, or otherwise not entitled to
deference, the Court should consider that, in this case, the guidelines substantially
*underemphasize* the truly heinous nature of the defendant's criminal history and conduct as
detailed above. This defendant is not the typical white-collar criminal. He is a hardened criminal

14

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/12/19 USDC Colorado pg 437 of
971
Case 1:16-cr-00054-WJM Document 262 Filed 12/29/17 Page 13 of 16

who uses force, violence and intimidation — the same methods employed throughout his life

— to avoid justice. The court can and should consider all of these facts when fashioning an

appropriate sentence in this case.

**II.**    **CONCLUSION**

    The government intends to present testimony at the sentencing hearing.    Therefore, it

respectfully requests that the Court allow 2.5 hours for that hearing. At that time, the

Government will request that the Court impose a sentence of 168 months in prison.

    Dated this 29th day of December, 2017.

                        Respectfully submitted,

                        ROBERT C. TROYER
                        United States Attorney

                        *s/ Martha A. Paluch*
                        MARTHA A. PALUCH
                        BRYAN D. FIELDS
                        Assistant U.S. Attorneys
                        1801 California Street, Suite 1600
                        Denver, Colorado   80202
                        (303) 454-0100
                        FAX: (303) 454-0402
                        Email: Martha.paluch@usdoj.gov
                        Bryan.fields3@usdoj.gov
                        Attorneys for the government

15

## CERTIFICATE OF SERVICE

I certify that on this 29th day of December, 2017, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system that will send

notification of such filing to all counsel of record in this case.

s/ *Martha A. Paluch*
MARTHA A. PALUCH
BRYAN DAVID FIELDS
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov
bryan.fields3@usdoj.gov

16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM-2

UNITED STATES OF AMERICA,

Plaintiff,

v.

2.      TRAMEL THOMAS,

Defendant.

---

## DEFENDANT THOMAS'S SENTENCING STATEMENT

---

Defendant Tramel Thomas, through counsel, pursuant to D.C.COLO.LCrR 32.1 and to the 8 January 2018 Order of this Court, makes the following sentencing statement, in response to the Government's 29 December 2017 sentencing statement [#262].

As a result of the four day jury trial held before this Court from 27 November 2017 through 30 November 2017, Mr. Thomas stands convicted of the one count of conspiracy to defraud the Government and the six counts of aiding and abetting mail fraud, which are set forth in the Superseding Indictment.   These are serious crimes and Mr. Thomas is preparing to face the consequences of his unlawful behavior in participating in the student loan fraud scheme.   However, the Defendant strenuously objects to the Government's attempts in its sentencing statement to portray him as a pimp engaging in armed robbery and as a rapist in order to inflame the sensibilities of this Court and thereby to have the Court maximize Mr. Thomas's punishment.

The Government describes an armed robbery that putatively occurred at an

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/21/18 USDC Colorado pg 440 of
Case 1:16-cr-00054-WJM Document 316 Filed 01/26/18 Page 2 of 5
971

unnamed location in Colorado Springs more than seven years ago.   The Government

contends that Mr. Thomas committed this robbery, based upon statements apparently

made by "Victim 2" shortly after the robbery.   As the Government notes, "[t]he

Colorado Springs Police Department ('CSPD') investigated" the matter and in January

2011, Mr. Thomas was arrested in connection with that investigation, as well as on

charges related to alleged pimping.

He then spent the next ten months in the El Paso County Jail.   By late spring or

early summer of 2011, though, the charges were dismissed because the District

Attorney's Office had determined that it could not prove its case, although Mr. Thomas

remained in jail until November, 2011, because of a probation hold that also then was

dropped.   As a result, Mr. Thomas was released from custody, and the robbery and

pimping charges were not reinstated against him thereafter.   The statute of limitations

on the would-be robbery and pimping has long since run.

Apparently dissatisfied with that result, however, the prosecution in this white

collar case now seeks seven years later to, in effect, penalize Mr. Thomas for the

commission of alleged crimes that the authorities at the time could not establish.   Local

law enforcement in 2010 and 2011 had access to the immediate evidence and to

apparent witnesses, whose recollections then were fresh, but said law enforcement

could not make their case.   The manifest unfairness of the federal Government (a

polity that, indeed, would have had no jurisdiction to prosecute the matter even at the

2

time) attempting to resurrect the matter now should be readily apparent.[1]

The Government's citation to <u>United States v. Rodriguez-Felix</u>, 450 F.3d 1117 (10th Cir. 2006), *cert. denied,* 549 U.S. 968 (2006), as putative authority for the Court to weigh at sentencing evidence of Mr. Thomas's supposed raping, robbery, and pimping is misplaced.   <u>Rodriguez-Felix</u> was a case where the district court had attributed the weight of the drugs in non-charged narcotics deals to the defendant who was indicted on drug distribution charges. *Id.*, at 1131.   In that context, the 10th Circuit ruled that a district court may "enhance a defendant's sentence using uncharged conduct proven to the court by a preponderance of the evidence.   *See*, *United States v. Garcia,* 411 F.3d 1173, 1177 (10th Cir. 2005) . . ." *Id.*

<u>Garcia</u>, for its part, held that:

> Relevant uncharged conduct must be proven by a preponderance of the evidence. . . This court has broadly construed the meaning of relevant conduct. . . Relevant conduct consists of "all acts or omissions ... ***that were part of the same course of conduct or common scheme or plan as the offense of conviction***." U.S.S.G. § 1B1.3(a)(2).

411 F.3d 1173, 1177 (10th Cir. 2005) (emphasis added).   It is beyond cavil that here, the alleged raping, robbery, and pimping, even if they had occurred, had nothing whatsoever to do with the mail fraud and conspiracy charges in this case, of which Mr. Thomas stands

---

[1] This argument applies with even more force to the allegation of gang rape now made against Mr. Thomas, apparently by "Victim 2".   Mr. Thomas, who vociferously denies this allegation, was never charged with such a crime, nor to his knowledge, was he ever investigated for such a crime.   It is worth recalling that his apparent accuser, "Victim 2", testified at the trial in this case that she was so high on methamphetamine during this period of her life that she could barely remember anything coherently from that time.

3

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/12/19   USDC Colorado   pg 442 of
971
Case 1:16-cr-00054-WJM   Document 316   Filed 01/26/18   Page 4 of 5

convicted.   As such, Mr. Thomas respectfully suggests that the focus of his sentencing should be on the facts and circumstances of this case and not upon unrelated, unproven, putative criminal conduct which supposedly occurred seven or eight years ago.[2]

   To this suggested end, Mr. Thomas has already been interviewed by U.S. Probation as part of the presentence investigation process.   The defense anticipates that the PSIR will address each of the 18 U.S.C. § 3553(a) factors, including the Guidelines calculations.   Mr. Thomas will respond as necessary thereto.   At this juncture, Mr. Thomas simply advises the Court, as a preliminary matter, that he disputes the Government's Guidelines calculations in a number of respects, including the loss amount, the proposed obstruction of justice enhancement, and his role in the offense.

---

2 However, to the extent that the Court intends to indulge the Government's stated desire to put on two and one half hours of testimony, apparently relating to robbery, rape, and pimping, the defense asks for detailed, advance notice of the identities of Government witnesses and their planned testimony so that Mr. Thomas and his attorneys properly may be prepared to address same.

Dated this 26th day of January, 2018.

Respectfully submitted,

s/Thomas E. Goodreid
Thomas E. Goodreid
Attorney at Law
1801 Broadway, Suite 1400
Denver, CO 80202
(303) 296-2048x.136
*t.goodreid@comcast.net*

Daniel T. Smith
4582 S. Ulster #1400
Denver, CO 80237
Telephone: 303-860-8100
Fax: 303-860-8018
danieltsmith@qwestoffice.net

Attorneys for Defendant Tramel Thomas


## CERTIFICATE OF SERVICE

I certify that on this 26th day of January, 2018, I electronically filed the foregoing **DEFENDANT THOMAS'S SENTENCING STATEMENT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

s/Thomas E. Goodreid
Thomas E. Goodreid
Attorney at Law
1801 Broadway, Suite 1400
Denver, CO 80202
(303) 296-2048x.136
*t.goodreid@comcast.net*
Attorney for Defendant Tramel Thomas

5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No.  16-cr-00054-WJM-02

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.     TRAMMEL THOMAS,

      Defendant.

---

## GOVERNMENT'S RESPONSE TO DEFENDANT THOMAS'S SENTENCING STATEMENT

---

The United States of America (the government), by Robert C. Troyer, United States Attorney, through Martha A. Paluch and Bryan D. Fields, Assistant United States Attorneys, respectfully submits this response in opposition to Defendant Tramell Thomas's Sentencing Statement (ECF No. 318).

### I.    The Defendant has been Provided With Records Relating to the Other Crimes He Committed While He Was Defrauding the Department of Education

The defendant objects to the government's request that the Court consider his past criminal conduct in fashioning an appropriate sentence under 18 U.S.C. § 3553(a). Specifically, the defendant challenges the government's reliance upon "an armed robbery that putatively occurred at an unnamed location in Colorado Springs more than seven years ago."  ECF 318 at 1-2.  To the extent the defendant is implying he was not provided with the documents related to this offense, that is incorrect.  The government provided over fifty pages of discovery related to the defendant's arrest on armed

1

robbery and pimping charges.  MOA_00000550 through MOA_00000602.  These

records, which include police reports and the affidavit for the defendant's arrest warrant,

are attached hereto as Attachment A.  These documents detail the location of both

offenses (the Residence Inn on North Academy Boulevard in Colorado Springs), and

the dates of these offenses (armed robbery on November 11, 2010, and pimping on

January 27, 2011).  The defendant was detained at the El Paso County Jail for most of

2011 on these charges.  Rather than having the government explain to the jury the

circumstances of the charges upon which the defendant was detained, the defendant

stipulated prior to trial to the dates of his confinement in the El Paso County Jail.  Gov't

Ex. 35.

## II.     Information About Other Crimes Committed by the Defendant While He Was Defrauding the Department of Education is Vital to the Court's Task of Fashioning a Just Sentence

The law requires the Court to consider difficult questions as part of the

sentencing process.  What is the history of this defendant?  What are his

characteristics?  What kind of sentence might specifically deter him from committing

future crimes?  What kind of sentence will protect the public?

The defendant's response essentially asks the Court to answer these weighty

questions while turning a blind eye towards evidence that is vital to their consideration.

The law does not require such a blinkered approach to criminal justice.  To the contrary,

long-standing principles of sentencing codified at 18 U.S.C. § 3661 make it clear that

"[n]o limitation shall be placed on the information concerning the background, character,

and conduct of a person convicted of an offense which a court of the United States may

receive and consider for the purpose of imposing an appropriate sentence."

The sentencing in this case illustrates the vital purposes served by § 3661. How can the Court evaluate whether any given sentence can deter *this* defendant without considering the fact that he committed this crime while he was brazenly robbing and pimping — all after a ten-year prison sentence failed to deter him from committing these additional crimes? [1] How can the Court consider the nature and circumstances of this defendant without taking into account the fact that those circumstances include the manipulation of pimping, the violence of robbery, and the lack of any remorse or concern for the consequences of his actions on others? And how can the Court truly evaluate whether a long sentence is necessary to protect the public without considering past conduct showing that, when free, the defendant preys on its members by lying, cheating, and stealing?

The Supreme Court and the Tenth Circuit have recognized that it cannot. In *United States v. Magallanez,* 408 F.3d 672 (10th Cir. 2005), the court, relying on Supreme Court precedent, held that "a sentencing court [has] broad discretion to consider information concerning the defendant's life and characteristics, including conduct on which he had not been convicted." *Id.* at 684 (citing *Williams v. New York,* 337 U.S. 241, 247 (1949) and *United States v. Watts,* 519 U.S. 148, 151-152 (1997)). The *Magallanez* Court noted that "18 U.S.C. § 3661, which underlay the decision in *Watts*, remains in full force" post-*Booker.* 408 F.3d at 684.

In fact, "[h]ighly relevant – if not essential -- to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning

---

1 In 1999, the defendant was sentenced to 10 years in prison on three counts of aggravated robbery, three counts of using a weapon in a violent crime, and one count of car theft. ECF 262 at 11.

the defendant's life and characteristics." *Watts,* 519 U.S. at 151-152 (citing *Williams, supra*); *Nichols v. United States,* 511 U.S. 738, 747 (1994) (noting that sentencing courts have traditionally and constitutionally "considered a defendant's past criminal behavior, even if no conviction resulted from that behavior") (citing *Williams, supra*); *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 573, n.19 (1996) ("A sentencing judge may even consider past criminal behavior which did not result in a conviction") (citing *Williams, supra*); *see also United States v. Zapete-Garcia,* 447 F.3d 57, 61 (1st Cir. 2006) ("a series of past arrests might legitimately suggest a pattern of unlawful behavior even in the absence of any convictions").

The government is not trying to "penalize Mr. Thomas for the commission of alleged crimes that the authorities at the time could not establish." ECF 318 at 2. Rather, the government is properly bringing to the Court's attention facts and evidence bearing on the sentence that he should receive in this case. Nor is this a case where the government is trying to seek a Guidelines enhancement based on "relevant conduct" under U.S.S.G. § 1B1.3. *See* ECF 318 at 3. The armed robbery and pimping offenses are not relevant conduct. They are, instead, facts that the Court must consider under § 3553(a) in determining whether the sentence sought by the government fulfills the objectives of criminal sentencing.

The Court may properly consider reliable hearsay, including police reports, as part of its sentencing determination. *United States v. Beaulieu*, 893 F.2d 1177, 1180 (10th Cir. 1990); *United States v. McBrayer,* 546 F. App'x 803, 805 (10th Cir. 2013) ("the district court could consider the police reports during sentencing, as hearsay evidence may be considered if it bears a minimal indicia of reliability . . . ." and the

district court gave such reports, which "alleged unadjudicated conduct . . . their proper weight in evaluating Mr. McBrayer's risk to public safety"); *United States v. Marsh,* 486 F.Supp. 2d 150, 156 (D. Mass. 2007) ("disregarding reliable information from police reports would run directly contrary to both 18 U.S.C. § 3661 and its guideline counterpart, [U.S.S.G.] § 1B1.4," and it "would be anomalous, indeed, if during the sentencing process the Court could consider self-serving and often unverifiable information from a defendant (for example, statements concerning childhood abuse or trauma), but not an official record from a law enforcement agency concerning conduct that led directly to a criminal charge (and conviction, albeit later vacated)").

However, to the extent the defendant disputes the evidence that the government seeks to present, "the Guidelines endorse the preexisting practice of allowing the district court to conduct an evidentiary hearing" at sentencing. *Beaulieu*, 893 F.2d at 1180. Should the Court determine that an evidentiary hearing is helpful for establishing the facts on which it will base its decision, the government will seek to present these facts in the form of live testimony. Specifically, the arresting officer in the defendant's armed robbery/pimping case, Detective James Lamberth from the Colorado Springs Police Department, will testify at sentencing as to the circumstances surrounding the defendant's arrest in that case. This testimony, along with the attached police reports, will establish by a preponderance of the evidence that the defendant engaged in this conduct, and this evidence is proper for the Court to consider. In addition to Detective Lamberth, the government will call Special Agent Ennis to testify at the sentencing hearing about additional evidence she obtained during the course of her investigation of the defendant's involvement in the student aid fraud scheme, all of which evidence was

Case No. 1:16-cr-00054-WJM  Document 525-1  filed 12/12/19  USDC Colorado  pg 449 of
971
Case 1:16-cr-00054-WJM  Document 324  Filed 02/20/18  Page 6 of 7

provided to defense counsel in discovery and all of which is relevant to determining the nature and circumstances of the defendant's role in the offense.

For these reasons, the government submits that the defendant's objection to the presentation of evidence pertaining to his arrest and detention on armed robbery and pimping charges should be denied.

Respectfully submitted this 20th day of February, 2018.

ROBERT C. TROYER
United States Attorney
District of Colorado

By:    s/ Martha A. Paluch
MARTHA A. PALUCH
BRYAN D. FIELDS
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
Bryan.Fields3@usdoj.gov

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 450 of
Case 1:16-cr-00054-WJM Document 324 Filed 02/20/18 Page 7 of 7
971

**CERTIFICATE OF SERVICE**

I certify that on this 20th day of February, 2018, I electronically filed the
foregoing with the Clerk of the Court using the CM/ECF system that will send
notification of such filing to all counsel of record in this case.


                                    s/ *Martha A. Paluch*_____
                                    MARTHA A. PALUCH
                                    BRYAN DAVID FIELDS
                                    Assistant United States Attorneys
                                    1801 California Street, Suite 1600
                                    Denver, CO 80202
                                    Telephone 303-454-0100
                                    Facsimile 303-454-0402
                                    martha.paluch@usdoj.gov

# ATTACHMENT

# A

MOA_00000550



Thomas, Tramell Dawan
CNV 1/28/2011 FrontMug
11/13/2012 06:39

Arrest photo, ref. CSPD

Case 11-03873

CITY OF COLORADO SPRINGS
POLICE DEPARTMENT
Records & Identification
Post Office Box 2169
705 South Nevada Avenue
Colorado Springs, CO 80901-2169



CERTIFIED COPY
COLORADO SPRINGS POLICE DEPT.

Records Custodian    #2595/CSPD

Date 9/13/17

Case No. 1:16-cr-00054-WJM Document 524-12 Filed 12/12/22 USDC Colorado pg 453 of 971

```
                    COLORADO SPRINGS POLICE DEPARTMENT
                            OFFICIAL RECORD
                              MNI DETAIL
   FOR NAME/AGENCY: _____        RELEASED BY: _____    DATE __/__/__
   RUN DATE: 09-13-17                                   USER: PWALKERO
===============================================================================

MNI ID : 000745118   LNAME: THOMAS              FNAME: TRAMELL
MNAME  : DAWAN       SUF:    DOB: 02/13/1979
POB    : FT WAYNE        POB ST: IN
RACE: B   SEX: M   HEIGHT: 0600   WEIGHT:  200   HAIR: BLK   EYES: BRO SKIN: DRK
SSN: 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   OLN: 981121157        OLS: CO  OLY:      SID:      1010079
FBI NO:   944342FB2
------------------------ RESIDENCE INFORMATION ------------------------------
ENTER DT   RES ADDRESS                   RES CITY            RES ST  RES ZIP
01/31/12   1129 VERDE DR                 COLORADO SPRINGS      CO     80910
03/09/11   3820 RADIANT DR #239          COLORADO SPRINGS      CO     80917
03/09/11   1418 RUSHMORE DR              COLORADO SPRINGS      CO     80910
01/28/11   3820 RADIANT DR #239D         COLORADO SPRINGS      CO     80917
01/28/11   1418 RUSHMORE DR              COLORADO SPRINGS      CO     80910
08/10/01   TERR CORR FAC                 CANON CITY            CO
02/06/01   1915 CAPULIN DR               COLORADO SPRINGS      CO     80910
02/19/99   1915 CAPULIN DR               COLORADO SPRINGS      CO     80910
02/17/99   1915 CAPULIN DR               COLORADO SPRINGS      CO
11/20/98   2561 E PIKES PEAK AV M203     COLORADO SPRINGS      CO     80910
11/18/98   2561 E PIKES PEAK AV M203     COLORADO SPRINGS      CO
08/04/98   1915 CAPULIN DR               COLORADO SPRINGS      CO     80910
02/11/98   1915 CAPULIN DR               COLORADO SPRINGS      CO
02/06/98   1915 CAPULIN DR               COLORADO SPRINGS      CO
01/12/98   4098 MORLEY DR                COLORADO SPRINGS      CO     80916
RES PHONE
(719)213-9479
------------------------- EMPLOYER INFORMATION ------------------------------
ENTER DT     EMP NAME                    EMP ADDRESS
             911 DESIGNER PRINTING
             UNEMPLOYED/LABORER
             UNEMPLOYED
             DOC INMATE
             UNEMPLOYED
             UNEMPLOYED/LABOR
             UNEMPLOYED
             NONE
             LABOR READY
             LABOR READY
EMP CITY                EMP ST      EMP ZIP     EMP PHONE
COLORADO SPRINGS          CO                    (   ) -
COLORADO SPRINGS          CO
COLORADO SPRINGS          CO
COLORADO SPRINGS          CO
COLORADO SPRINGS          CO
COLORADO SPRINGS          CO
COLORADO SPRINGS          CO

COLORADO SPRINGS          CO
COLORADO SPRINGS          CO

                    NO. OF ALIASES :   0
###############################################################################
```

CERTIFIED COPY
COLORADO SPRINGS POLICE DEPT.
_Ron Walker #2595/CSPD_
Records Custodian
Date 9/13/17

MOA_00000552

```
                    COLORADO SPRINGS POLICE DEPARTMENT
                             OFFICIAL RECORD
                             TRAFFIC HISTORY
  RELEASED BY: PWALKERO                                 DATE: 09-13-17
 ==================================================================
               TRAFF ID: 02111161        MNI ID: 000745118
 LAST NAME               FIRST NAME    MIDDLE NAME      DOB    RACE SEX
 THOMAS                  TRAMELL       DAWAN      02/13/1979   B    M
 ==================================================================
  RESIDENCE CD: 1    AG CD:      AGENCY: CSPD        ACDNT NO:  -
  BK #:   -          OFFICER: 2882 CHARLES, THERON A  CASE: 12M02693
  SUMMONS: 2679287   ARREST DT: 01/15/12   DISP DT: 02/13/12   CT: M
  WARRANT:                           OCC DT: 01/15/12
 <------- Original Charge ------>      <-------- Amended Charge --------->
       SECTION      TITLE                  SECTION      TITLE
       10.5.104B    SPEED 5-9 OVER
       DESC                            DESC
       45/40 ACTUAL 52
 <---- Original Disposition --------- Suspended --------- Final Disposition--->
       FINE :    50.00                              $ 50.00
       COSTS:
       JAIL :
       POL. DSP:          FINDING: Guilty
       COMMENTS:
 ################################################################
```

✱Ticket Purged

COLORADO SPRINGS POLICE DEPARTMENT
OFFICIAL RECORD
CRIMINAL HISTORY
FOR NAME/AGENCY: SA SANDRA ENNIS, US DEPT OF ED. ORI CO016057Y    RELEASED BY: P
WALKERO   DATE: 09-13-17
================================================================================

```
             CRIME ID: 00427553          MNI ID: 000745118
LAST NAME                 FIRST NAME      MIDDLE NAME       DOB      RACE SEX
THOMAS                    TRAMELL         DAWAN          02/13/1979   B    M
================================================================================
 RESIDENCE CD: 1     AG CD: 01     AGENCY: CSPD        POL CASE: 98-05404 A
 BK #: 98-02380   OFFICER: 955 BIECHLER, RODNEY T     CASE:
 SUMMONS: 1481504   ARREST DT: 02/06/78   DISP DT: 03/20/98   CT: C
 WARRANT:                                 OCC DT: 02/06/78
<------- Original Charge ------>      <-------- Amended Charge --------->
       SECTION       TITLE                   SECTION       TITLE
       18-12-105     CONCEAL WEAPON
       DESC                                  DESC

<---- Original Disposition --------- Suspended --------- Final Disposition--->
       FINE :
       COSTS:
       JAIL :
       POL. DSP:           FINDING: Guilty
       COMMENTS:
################################################################################
             CRIME ID: 00463242          MNI ID: 000745118
LAST NAME                 FIRST NAME      MIDDLE NAME       DOB      RACE SEX
THOMAS                    TRAMELL         DAWAN          02/13/1979   B    M
================================================================================
 RESIDENCE CD: 1     AG CD: 01     AGENCY: CSPD        POL CASE: 98-34943 A
 BK #: 98-19907   OFFICER: 1091 BISCARO, STEVEN M SG   CASE:
 SUMMONS:          ARREST DT: 11/18/98   DISP DT:          CT: D
 WARRANT:                                 OCC DT:
<------- Original Charge ------>      <-------- Amended Charge --------->
       SECTION       TITLE                   SECTION       TITLE
       18-4-302      ROBBERY AGRVTD
       DESC                                  DESC
       GAB502
<---- Original Disposition --------- Suspended --------- Final Disposition--->
       FINE :
       COSTS:
       JAIL :
       POL. DSP: HLD           FINDING:
       COMMENTS: PIKES PEAK & UNION
################################################################################
```

*A Reports purged.*

*Final Disposition, =*
*El Paso Combined Courts*
*719-452-5000.*

COLORADO SPRINGS POLICE DEPARTMENT
OFFICIAL RECORD
CRIMINAL HISTORY
FOR NAME/AGENCY: SA SANDRA ENNIS, US DEPT OF ED. ORI CO016057Y    RELEASED BY: P
WALKERO   DATE: 09-13-17
======================================================================

                 CRIME ID: 00463291           MNI ID: 000745118
LAST NAME                  FIRST NAME       MIDDLE NAME       DOB     RACE SEX
THOMAS                     TRAMELL          DAWAN         02/13/1979   B    M
======================================================================
 RESIDENCE CD: 1    AG CD: 01    AGENCY: CSPD        POL CASE: 98-24701 ☆
 BK #:   -          OFFICER: 69 GIFFORD, LOYAL D     CASE: 98M48263
 SUMMONS: 1550652   ARREST DT: 11/18/98   DISP DT: 04/13/99   CT: M
 WARRANT:                               OCC DT: 07/05/98
<------- Original Charge ------>      <-------- Amended Charge --------->
      SECTION      TITLE                   SECTION      TITLE
      21-6-404     THEFT
      DESC                                 DESC

<---- Original Disposition --------- Suspended --------- Final Disposition--->
      FINE :
      COSTS:
      JAIL :
      POL. DSP:           FINDING: DM ⟹ Dismissed
      COMMENTS:
####################################################################
                 CRIME ID: 00473800           MNI ID: 000745118
LAST NAME                  FIRST NAME       MIDDLE NAME       DOB     RACE SEX
THOMAS                     TRAMELL          DAWAN         02/13/1979   B    M
======================================================================
 RESIDENCE CD: 1    AG CD: 01    AGENCY: CSPD        POL CASE: 99-04877 ☆
 BK #: 99-02816     OFFICER: 1091 BISCARO, STEVEN M SG   CASE:
 SUMMONS:           ARREST DT: 02/13/99   DISP DT:          CT: D
 WARRANT:                               OCC DT:
<------- Original Charge ------>      <-------- Amended Charge --------->
      SECTION      TITLE                   SECTION      TITLE
      18-4-302     ROBBERY AGRVTD
      DESC                                 DESC
      F-3 MEH649
<---- Original Disposition --------- Suspended --------- Final Disposition--->
      FINE :
      COSTS:
      JAIL :
      POL. DSP: HLD          FINDING:
      COMMENTS: 1915 CAPULIN DR
####################################################################

☆ Reports purged

COLORADO SPRINGS POLICE DEPARTMENT
OFFICIAL RECORD
CRIMINAL HISTORY
FOR NAME/AGENCY: SA SANDRA ENNIS, US DEPT OF ED. ORI CO016057Y    RELEASED BY: P
WALKERO   DATE: 09-13-17
=======================================================================

```
              CRIME ID: 00473802          MNI ID: 000745118
LAST NAME               FIRST NAME     MIDDLE NAME        DOB     RACE SEX
THOMAS                  TRAMELL        DAWAN          02/13/1979   B    M
```
=======================================================================
```
 RESIDENCE CD: 1   AG CD: 01    AGENCY: CSPD         POL CASE:  -
 BK #: 99-02816    OFFICER: 1091 BISCARO, STEVEN M SG  CASE:
 SUMMONS: 1550652   ARREST DT: 02/13/99   DISP DT:           CT: M
 WARRANT: W98107544                       OCC DT:
<------- Original Charge ------>      <-------- Amended Charge --------->
     SECTION    TITLE                     SECTION      TITLE
     21-6-404   THEFT
     DESC                                 DESC
     FTA MEH649
<---- Original Disposition --------- Suspended --------- Final Disposition--->
     FINE :
     COSTS:                               FTA for previous theft
     JAIL :                               Charge- Warrant cut.
     POL. DSP: HLD        FINDING:        Arrested. No Report
     COMMENTS: 1915 CAPULIN DR
```
##########################################################################
```
              CRIME ID: 00474007          MNI ID: 000745118
LAST NAME               FIRST NAME     MIDDLE NAME        DOB     RACE SEX
THOMAS                  TRAMELL        DAWAN          02/13/1979   B    M
```
=======================================================================
```
 RESIDENCE CD: 1   AG CD: 21    AGENCY: REGL FUG     POL CASE: 99-02297
 BK #: 99-02816    OFFICER: 87020 REDER              CASE: 99CR618
 SUMMONS:           ARREST DT: 02/19/99   DISP DT:           CT: D
 WARRANT: 99CR618                         OCC DT:
<------- Original Charge ------>      <-------- Amended Charge --------->
     SECTION    TITLE                     SECTION      TITLE
     18-4-401   THEFT
     18-5-205   FRAUD BY CHECK
     DESC                                 DESC
     F-4 MEH649
     F-6 MEH649
<---- Original Disposition --------- Suspended --------- Final Disposition--->
     FINE :

     COSTS:

     JAIL :                               ★Report purged

     POL. DSP: HLD        FINDING:
              HLD
     COMMENTS: 2739 E LAS VEGAS
               2739 E LAS VEGAS
```
##########################################################################

```
                    COLORADO SPRINGS POLICE DEPARTMENT
                            OFFICIAL RECORD
                            CRIMINAL HISTORY
    FOR NAME/AGENCY: SA SANDRA ENNIS, US DEPT OF ED. ORI CO016057Y   RELEASED BY: P
WALKERO  DATE: 09-13-17
=====================================================================================
            CRIME ID: 00900807         MNI ID: 000745118
LAST NAME                  FIRST NAME      MIDDLE NAME        DOB      RACE SEX
THOMAS                     TRAMELL         DAWAN           02/13/1979   B    M
=====================================================================================
   RESIDENCE CD: 1    AG CD: 01    AGENCY: CSPD         POL CASE: 11-03873✶
   BK #: 11-01836    OFFICER: 9616 LAMBERTH, JAMES      CASE:
   SUMMONS:          ARREST DT: 01/27/11    DISP DT:            CT: D
   WARRANT:                                 OCC DT:
<------ Original Charge ------>         <-------- Amended Charge -------->
       SECTION    TITLE                     SECTION       TITLE
       18-7-206   PIMPING
       DESC                                 DESC
       F3 AM2394
<---- Original Disposition --------- Suspended --------- Final Disposition--->
       FINE :
       COSTS:
       JAIL :
       POL. DSP: HLD        FINDING:
       COMMENTS: FILLMORE ST / CENTENNIAL
#####################################################################################
            CRIME ID: 00900808         MNI ID: 000745118
LAST NAME                  FIRST NAME      MIDDLE NAME        DOB      RACE SEX
THOMAS                     TRAMELL         DAWAN           02/13/1979   B    M
=====================================================================================
   RESIDENCE CD: 1    AG CD: 01    AGENCY: CSPD         POL CASE: 11-03873✶
   BK #: 11-01836    OFFICER: 9616 LAMBERTH, JAMES      CASE:
   SUMMONS:          ARREST DT: 01/27/11    DISP DT:            CT: D
   WARRANT:                                 OCC DT:
<------ Original Charge ------>         <-------- Amended Charge -------->
       SECTION    TITLE                     SECTION       TITLE
       18-4-302   ROBBERY AGRVTD
       DESC                                 DESC
       F3 AM2394
<---- Original Disposition --------- Suspended --------- Final Disposition--->
       FINE :
       COSTS:
       JAIL :
       POL. DSP: HLD        FINDING:
       COMMENTS: FILLMORE ST / CENTENNIAL
#####################################################################################
```

✶ Same report, two charges.
Report follows.

COLORADO SPRINGS POLICE DEPARTMENT
OFFICIAL RECORD
CRIMINAL HISTORY
FOR NAME/AGENCY: SA SANDRA ENNIS, US DEPT OF ED. ORI CO016057Y    RELEASED BY: P
WALKERO  DATE: 09-13-17
=================================================================================

```
                CRIME ID: 00900809              MNI ID: 000745118
LAST NAME                   FIRST NAME      MIDDLE NAME        DOB      RACE SEX
THOMAS                      TRAMELL         DAWAN        02/13/1979  B    M
=================================================================================
 RESIDENCE CD: 1    AG CD: 01      AGENCY: CSPD        POL CASE:    -
 BK #: 11-01836     OFFICER: 9616 LAMBERTH, JAMES      CASE:
 SUMMONS:           ARREST DT: 01/27/11    DISP DT:           CT: D
 WARRANT:                                  OCC DT:
<------- Original Charge ------>       <-------- Amended Charge --------->
      SECTION      TITLE                   SECTION       TITLE
      17-2-103     PAROLE VIOLATIO
      DESC                                 DESC
      AM2394
<---- Original Disposition --------- Suspended --------- Final Disposition--->
      FINE :
      COSTS:
      JAIL :
      POL. DSP: HLD          FINDING:
      COMMENTS: FILLMORE ST / CENTENNIAL
```

*Violated by Parole Warrant only ~~for~~ arrest*

```
#################################################################################
                CRIME ID: 00903912              MNI ID: 000745118
LAST NAME                   FIRST NAME      MIDDLE NAME        DOB      RACE SEX
THOMAS                      TRAMELL         DAWAN        02/13/1979  B    M
=================================================================================
 RESIDENCE CD: 1    AG CD: 01      AGENCY: CSPD        POL CASE: 10-24711
 BK #: 11-01836     OFFICER: 1758 GARZA, JOHN H        CASE:
 SUMMONS:           ARREST DT: 03/09/11    DISP DT:           CT: D
 WARRANT:                                  OCC DT:
<------- Original Charge ------>       <-------- Amended Charge --------->
      SECTION      TITLE                   SECTION       TITLE
      18-8-105     ACCESSORY
      18-8-610     EVIDENCE TAMPER         DESC
      DESC
      F5 AM2394
      F6
<---- Original Disposition --------- Suspended --------- Final Disposition--->
      FINE :
      COSTS:
      JAIL :
      POL. DSP: HLD          FINDING:
                HLD
      COMMENTS: CJC
#################################################################################
```

*To Homicide*

*Report may be available upon request.*

FRS PDF  PCAB-GNQXVL15SSWF0  15 Feb 2011  14:22:42  Complete  Page 1 of 2

# COLORADO SPRINGS POLICE DEPARTMENT
## OFFENSE REPORT

| ATTRIBUTES | CASE REPORT NUMBER |
|---|---|
| Drugs | 11-03873 |

| TITLE/CLASS/STATUTE/ATTEMPT | LOCATION OF OCCURRENCE |
|---|---|
| pimping C.R.S. 18-7-206 / Felony 3 / /Completed | 3228 N. Chestnut St. #228 |

| CALL FOR SERVICE # | ZONE | SECTOR |
|---|---|---|
| 11034122 | 2 | 21 |

### OFFENSE

| DATE/TIME OCCURRED OR STARTED | | | DATE/TIME ENDED (IF APPLICABLE) | | | DATE/TIME REPORTED | | |
|---|---|---|---|---|---|---|---|---|
| DATE | DAY OF WEEK | TIME | DATE | DAY OF WEEK | TIME | DATE | DAY OF WEEK | TIME |
| 1/27/2011 | Thursday | 22:00 | 1/28/2011 | Friday | 07:00 | 1/27/2011 | Thursday | 22:00 |

| DATA ENTRY USE | DE MODIFIED (IBM/Date/Fields) | VICTIM SSN | VR FORM | VICTIM/OFFENDER RELATION |
|---|---|---|---|---|
| | | | No | |

### VICTIM

| NAME (LAST, FIRST, MIDDLE, SUFFIX) | | | RACE | SEX | DATE OF BIRTH | AGE |
|---|---|---|---|---|---|---|
| State of Colorado | | | | | | |

| RESIDENCE ADDRESS | HOME/CELL PHONE |
|---|---|
| Colorado Springs, CO | |

| WORK NAME/ADDRESS | WORK PHONE | EMAIL |
|---|---|---|
| | | |

| BUSINESS NAME (IF BUSINESS IS VICTIM) | BUSINESS ADDRESS | BUSINESS PHONE |
|---|---|---|
| | | |

### SUSPECT/OTHER PARTIES

| PER # | TYPE | NAME (LAST, FIRST, MIDDLE, SUFFIX) | | RACE | SEX | DATE OF BIRTH | AGE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| SSN | MNI NUMBER | ID TYPE | ID NUMBER | ALIAS/NICKNAME | VR FORM |
|---|---|---|---|---|---|
| | | | | | |

| RESIDENCE ADDRESS | HOME/CELL PHONE |
|---|---|
| Colorado Springs, CO | |

| HEIGHT | WEIGHT | HAIR COLOR | EYE COLOR | BUILD | SUMMONS NUMBER(S) |
|---|---|---|---|---|---|
| | | | | | |

| HAIR STYLE | HAIR LENGTH | FACIAL HAIR | COMPLEXION | TEETH | R/L HAND | EYE WEAR | SPEECH |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| SCAR MARK TATTOO (IF YES DESCRIBE IN NARRATIVE) | SUSPECT CAN BE | SUSPECTS VEHICLE CAN BE |
|---|---|---|
| | | |

| CLOTHING/GENERAL APPEARANCE/UNUSUAL CHARACTERISTICS | |
|---|---|

CERTIFIED COPY
COLORADO SPRINGS POLICE DEPT.
Ron Walker #2545/CSPD
Records Custodian
Date 9/13/17

| EMPLOYER/WORK ADDRESS | WORK PHONE |
|---|---|
| | |

| PERMANENT CONTACT NAME (LAST, FIRST, MIDDLE, SUFFIX) | RELATIONSHIP | RACE | SEX | DATE OF BIRTH |
|---|---|---|---|---|
| | | | | |

| PERMANENT CONTACT ADDRESS | HOME/CELL PHONE |
|---|---|
| | |

### VEHICLE

| VEHICLE RELATION | VEHICLE YEAR | VEHICLE MAKE | VEHICLE MODEL | VEHICLE STYLE | VEHICLE COLORS – TOP/BOTTOM |
|---|---|---|---|---|---|
| | | | | | |

| VEHICLE LICENSE NUMBER | VEHICLE VALUE | LICENSE TYPE | LICENSE YEAR | LICENSE STATE | LIC. COLORS – PRIME/NUMBERS |
|---|---|---|---|---|---|
| | | | | | |

| VIN | VEHICLE TOWED BY/TO | VEHICLE INSURED BY | OWNER HOME/CELL PHONE |
|---|---|---|---|
| | | | |

| VEHICLE OWNER (LAST, FIRST, MIDDLE, SUFFIX) | VEHICLE OWNER ADDRESS |
|---|---|
| | |

| ADDITIONAL VEHICLE INFORMATION | VEHICLE PICKUP ISSUED | GUN PICKUP |
|---|---|---|
| | | |

### PROPERTY / ITEM

| | ITEM # | QTY | CATEGORY | BRAND | MODEL | NIBRS |
|---|---|---|---|---|---|---|
| | | | | | | |

| DESCRIPTION | | | |
|---|---|---|---|

| SERIAL NUMBER | OAN | STOLEN/DAMAGED | VALUE ($) | RECOVERED ($) |
|---|---|---|---|---|
| | | | | |

### PROPERTY / ITEM

| | ITEM # | QTY | CATEGORY | BRAND | MODEL | NIBRS |
|---|---|---|---|---|---|---|
| | | | | | | |

| DESCRIPTION | | | |
|---|---|---|---|

| SERIAL NUMBER | OAN | STOLEN/DAMAGED | VALUE ($) | RECOVERED ($) |
|---|---|---|---|---|
| | | | | |

| ADD'L OFFENSES | TITLE/CLASS/STATUTE/ATTEMPT / / / | PICKUP ISSUED FOR SUSPECT | PICKUP CANCELLED | ID CLERK NAME/IBM |
|---|---|---|---|---|
| | | | | |

| INCLUDED/FORTHCOMING DOCUMENTS | Dictated Supplement - In Custody |
|---|---|
| Evidence | |

| DISPOSITION | EXCEPTIONAL CLEARANCE CATEGORY | NUMBER OF ARRESTS | INITIAL ASSIGNMENT | ASSIGNED DATE |
|---|---|---|---|---|
| Cleared by Arrest | | ADULTS / JUVENILES | | |

| PATROL INVESTIGATION CONTINUING | WORK UNIT | OFFICER'S SUPERVISOR | COMPANION NUMBERS |
|---|---|---|---|
| | VNI | J. Rodgers | 10-37284 = Linked case Follows. |

| OFFICER NAME/NUMBER | APPROVING SUPERVISOR | APPROVAL DATE |
|---|---|---|
| James Lamberth / 9616 | Sergeant J. Rodgers 1412 | 2/4/2011 |

Tracking #FRS-B-2006-0015 v4

**COLORADO SPRINGS POLICE DEPARTMENT**
**NARRATIVE**

CASE REPORT NUMBER

11-03873

GEN

TITLE/CLASS/STATUTE/ATTEMPT

pimping C.R.S. 18-7-206 / Felony 3 / /Completed

On January 27, 2011 beginning at approximately 2200 hours I, ( Detective James Lamberth 9616Z,) who is currently assigned to the Colorado Springs Police Dept. Metro, Vice and Narcotics Div. initiated an case investigation into an illegal escort business that led to an arrest of an individual for pimping. The same suspect was also arrested for AGG. Robbery reference CSPD case investigation # 10-37284. All supplements will be held in Metro VNI until the case is filed with the District Attorney's Office.

NARRATIVE

VER:1 CSPD 08/14/06

CERT:1

OFFICER NAME / NUMBER

James Lamberth / 9616

FRS PDF   PCAB-GNQXVL15SSWF0   15 Feb 2011   14:22:42   Complete   Page 2 of 2

FRS PDF   PCAB-GNQXVL16TIHIZ   29 Feb 2011  18:00 10  Complete   Page 1 of 11

## COLORADO SPRINGS POLICE DEPARTMENT
### NARRATIVE SUPPLEMENT

| | |
|---|---|
| | CASE REPORT NUMBER |
| | 11-03873 |

**TITLE/CLASS/STATUTE/ATTEMPT**
Pimping C.R.S. 18-7-206 / Felony 3 / /Completed

**VICTIM'S NAME (LAST, FIRST, MIDDLE, SUFFIX)**

| | ZONE | SECTOR |
|---|---|---|
| State of Colorado | 2 | 21 |

11-03873
**PIMPING**
**CRS 18-7-206**
02/02/11

**LOCATION OF OCCURRENCE #1:**

MOTEL 6
3228 N. CHESTNUT STREET
COLORADO SPRINGS, CO
ROOM #228

**LOCATION OF OCCURRENCE #2:**

KING SOOPERS PARKING LOT
NEAR INTERSECTION OF W. FILLMORE STREET & CENTENNIAL BOULEVARD
COLORADO SPRINGS, CO

**LOCATION OF OCCURRENCE #3:**

3820 RADIANT DRIVE APT. 239; BLDG D
AKA PARK RIDGE APARTMENTS
3 STORY MULTI FAMILY APARTMENT BUILDING
COLORADO SPRINGS, CO

**ARRESTEE INFORMATION:**

TRAMELL DAWAN THOMAS
BLACK/MALE
DOB: 02/13/79
6'0" TALL
210 POUNDS
BLACK HAIR
BROWN EYES
SSN: 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
LKA as of 01/28/11: 3820 RADIANT DRIVE, APT. 239D, COLORADO SPRINGS, CO 80917
PRIMARY CONTACT TELEPHONE: 719-645-1130

**PERSON OF INTEREST:**

CHRISTINE MARIE DUNCAN
BLACK/FEMALE
DOB: 09/12/86
5'5" TALL
140 POUNDS
BLACK HAIR
BROWN EYES
SSN: 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
COLORADO D.L.: 01-330-0640 ...

| DISPOSITION | EXCEPTIONAL CLEARANCE CATEGORY | OFFICER'S SUPERVISOR | |
|---|---|---|---|
| Cleared by Arrest | | J. Rodgers | |
| **OFFICER NAME/NUMBER** | **WORK UNIT** | **APPROVING SUPERVISOR** | **APPROVAL DATE** |
| James Lamberth / 9616 | VNI | Sergeant J. Rodgers 1412 | 2/26/2011 |

TRCK #FR8-8.2009-001B v2

MOA_00000561

**COLORADO SPRINGS POLICE DEPARTMENT**
**NARRATIVE OVERFLOW**

**GEN**

TITLE/CLASS/STATUTE/ATTEMPT
Pimping C.R.S. 18-7-206 / Felony 3 / / Completed

Overflow from Narrative:

**LKA: 3820 RADIANT DRIVE, APT. #239; BLDG D, AKA PARK RIDGE APARTMENTS, COLORADO SPRINGS, CO**
**LAST CONTACT TELEPHONE: 719-645-1130**

I, Detective James L. Lamberth 9616Z, is a sworn police officer for the Colorado Springs Police Department (CSPD). I have been employed as a police officer in the state of Colorado since 1990 and am currently assigned to the CSPD Metro Vice, Narcotics and Intelligence Division. Metro VNI is a multi agency co-located drug task force designated to investigate, control, and prevent the illegal sale, possession, and/or manufacturing of illegal narcotics. Units of Metro VNI conducts in depth investigations of major drug trafficking organizations, gangs involved in the drug trafficking, money laundering operations, and prostitution throughout El Paso and Teller Counties. I am responsible for the investigation of individuals or groups of individuals involved in the street and mid level distribution of narcotics and prostitution.

**DETECTIVE'S STATEMENTS:**

On 11/11/10, I (**Detective James L. Lamberth 9616**Z) learned Colorado Springs Police Department patrol officers were dispatched to the Residence Inn, located at **3880 N. Academy Boulevard, Colorado Springs, CO**, to investigate a reported personal robbery involving a weapon. Upon arrival, officers contacted the victim/reporting party, who was identified as **David S. White**; Black male; DOB: 06/18/62. Mr. White told officers that he had been seeing a 24 year old female escort; h e had seen advertising on the internet under several different names to include **Christine and Harmony**. Mr. White described AKA Christine/Harmony as being a Black or Indian (he described as Middle Eastern) female mix, 24 years of age, approximately 5'5" tall, 125 pounds, long dark hair, blond streaks in it. Mr. White stated that on 11/10/10, he contacted AKA Christine/Harmony at a telephone number advertised on her website and subsequently made contact with AKA Christine/Harmony. Mr. White stated that he asked AKA Christine/Harmony to spend the evening with him at which time she replied it would cost him $260.00 for an hour. Mr. White stated that he agreed to pay AKA Christine/Harmony the fee for her company and on 11/10/10 she arrived at his room, located at the Residence Inn. Mr. White stated that they drank wine and had sex throughout the evening into the early morning hours of 11/11/10. Mr. White stated that at approximately 4:00a.m. or 5:00a.m. On 11/11/10 he was awaken by AKA Christine/Harmony texting on her cell phone. Mr. White stated that he assumed AKA Christine/Harmony was attempting to contact her driver for a ride home from his hotel room.

Mr. White stated that approximately 20 minutes later an unknown person began knocking on the front entrance door to his hotel room. Mr. White stated that AKA Christine/Harmony answered the door and an unknown Black male, wearing a knit cap covering his face with openings for eyes and mouth, walked into the hotel room. Mr. White further described the suspect's clothing as being green in color fleece sweater and blue and white athletic shoes. Mr. White stated that the Black male then pointed a silver in color semiautomatic pistol in the direction of his head and told him to get on the ground. Mr. White believed that the weapon was a .45 caliber semiautomatic pistol. Mr. White stated that he obeyed the unidentified Black male's orders and laid on the floor. The Black male then rummaged through his belongings and subsequently took Mr. White's cellular telephone, a Hewlett Packard laptop computer, 1 Cannon camera and an Armitron wristwatch. Mr. White stated that the unidentified Black male also took $500.00 in United States currency from his possession. Mr. White stated that while the unidentified Black male was rummaging through his belongings, he told AKA Christine/Harmony to get her things several times. Mr. White stated that after the unidentified Black male completed searching his hotel room, he turned to AKA Christine/Harmony and stated "Bitch get your shit up". Mr. White stated that AKA Christine/Harmony and the unidentified Black male both left his hotel room in an unknown direction. Mr. White feels that the unidentified Black male and AKA Christine/Harmony know each other, because she left with him without displaying any signs of duress.

Mr. White then provided Colorado Springs Police Department patrol officers with the website he used to contact AKA Christine/Harmony. Officers identified the website as www.backpage.com <http://www.backpage.com>. I note that I am familiar with the website www.backpage.com <http://www.backpage.com> as a website utilized by independent female escorts and escort agencies to advertise to advertise their services on the internet. Some of the advertisements are sexual explicit in nature and some of the websites do not provide any sexual explicit advertisements; only a contact telephone number at which time the independent or agency escort will explain to their customers their various services that they provide. Copies of the webpage that Mr. White used to contact ...

**NARRATIVE**

**VER CSPD 07/11/06**

**CERT**

OFFICER NAME / NUMBER
James Lamberth / 9616

FRS PDF   PCAB-GNQXVL15TIH1Z   26 Feb 2011   16:08:10   Complete   Page 2 of 11

**COLORADO SPRINGS POLICE DEPARTMENT**
**NARRATIVE OVERFLOW**

| | CASE REPORT NUMBER |
|---|---|
| | 11-03873 |

TITLE/CLASS/STATUTE/ATTEMPT

Pimping C.R.S. 18-7-206 / Felony 3 / / Completed

Overflow from Narrative:

AKA Christine/Harmony were obtained from the internet by Colorado Springs Police Department officers and placed into evidence as part of their investigation.

On Monday 11/15/10, **Lt. John Godsey 080Z**, who is assigned to the Metro Vice, Narcotics/Intelligence Division received an email from **Commander Kurt Pillard 402**, of the Colorado Springs Police Department in ref to the robbery of Mr. David White while inside a hotel room at the Residence Inn, located at **3880 N. Academy Boulevard, Colorado Springs, CO**. The email read that Commander Pillard observed the story of the robbery on a local Colorado Springs, CO news channel and asked if one of our detectives were involved in the investigation, because of the vice related origins of the investigation. Commander Pillard then asked if one of our detectives were not involved if we could assist the robbery unit with this investigation. I then reached out to **Detective Scott Schneider 2769**, who is a detective with the Colorado Springs Police Department Robbery Division. I informed Detective Schneider that I possessed some knowledge in investigating illegal prostitution advertised on the internet; specifically in the City of Colorado Springs, Denver and Pueblo. I informed Detective Schneider via email that I have read the case investigation involving the robbery that occurred on 11/11/10 at the Residence Inn and have observed other postings from the same described female escort that was involved in the robbery on 11/11/10. I informed Detective Schneider that I will assist him in any way in this investigation to include attempting to contact the female escort, obtain a prostitution related deal with that female escort and then contact Detective Schneider in hopes of conducting an interview with that said female escort.

During my tenure assigned to the Colorado Springs Police Department Metro Vice, Narcotics/Intelligence Division, I obtained some knowledge of the operational procedures of independent female escorts, escort agencies and persons I have arrested for pimping based on their involvement with escort agencies and identifying their sole source of income was from illegal prostitution activities.

During my tenure on Metro VNI, I have investigated or had been a part of investigations involving illegal prostitution being advertised on several internet websites. I also investigated and charged 2 female suspects for pimping. While assisting Robbery Detective Scott Schneider with this investigation, which was all documented and recorded under Colorado Springs Police Department case report **10-37284**; entitled Aggravated Robbery, I observed several photographs on a website entitled sipsap.com of the female I believed was involved or had knowledge of the robbery that occurred on 11/11/10 at the Residence Inn.

I note that the specific website I observed of the female; she identified herself as Harmony. Also displayed on the website were approximately 5 photographs that matched the description provided by the victim (David White) of the female escort, AKA Christine/Harmony, who was hired by Mr. White during the evening hours before the robbery occurred on 11/11/10. I note that each photograph displayed on the sipsap.com website for Harmony, the female is showing her face and some of the photographs display her full figure. This specific website appeared to be created along with the photographs during the month of October 2010. I then began observing advertisements on www.backpage.com <http://www.backpage.com>, which is a website similar to Craigslist.com and openly advertises for adult entertainment/Colorado Springs escorts. I found an advertisement where a female was identifying herself as **Mariah**, with a telephone number of 719-217-0542. I note that the female in the 3 photographs displayed on the website matched the physical description of AKA Harmony on AKA Harmony's website that was advertised on sipsap.com. The only difference was in this advertisement the female is completely covering her face with her long dark in color hair and the contact number and name has changes. I note that this webpage advertisement appeared to be posted on 12/14/10. This was approximately a month after the apparent robbery that occurred at the Residence Inn on 11/11/10.

I also located another independent female escort advertisement again on www.sipsap.com <http://www.sipsap.com>. This profile appeared to be created on 11/19/10. There were approximately 5 photographs of a female with long dark hair matching the description of AKA Harmony's and AKA Mariah's web advertisements that I have observed. In the web advertisement created on 11/19/10 again the female is concealing her face either totally or just displaying one eye and a part of her face where it would be extremely difficult to identify her by facial features. The contact telephone number for **AKA Mystery** was 719-217-0225. I again, based on the physical appearance of the 3 females; believe that the 3 females were in fact one in the same female who was tentatively identified only by the first name of Harmony.

...

OFFICER NAME / NUMBER

James Lamberth / 9616

FRS PDF   PCAB-GNQXVL15TIH1Z   28 Feb 2011  18:08:10  Complete   Page 3 of 11

MOA_00000563

**COLORADO SPRINGS POLICE DEPARTMENT**
**NARRATIVE OVERFLOW**

| CASE REPORT NUMBER |
| --- |
| 11-03873 |

TITLE/CLASS/STATUTE/ATTEMPT

Pimping C.R.S. 18-7-206 / Felony 3  / / Completed

Overflow from Narrative:

Between November of 2010 and January of 2011, I attempted to contact the female advertising under several different aliases and telephone numbers. Each time I attempted to contact the specific telephone number listed as a contact number on each individual webpage advertisement, an automated response would reply "This number is not valid".

Beginning in the week of 01/24/11, I observed a webpage advertisement on www.backpage.com <http://www.backpage.com> for a female advertising under the name of Jazmine, with a contact telephone number of 719-645-1130. There were several photos displayed on the webpage advertisement, which matched the physical description of AKA Harmony's, AKA Mariah's and AKA Mystery's webpage photographs. The photographs appeared to have been taken outdoors at an unknown location. I then advised Detective Sgt. Jimmy Rodgers 1412Z, of the new possible contact number of the female I believe may have some information on the robbery that occurred on 11/11/10. Also located 2 additional webpage advertisements of independent female escorts described only as White females, who displayed on their webpage advertisements the same contact telephone number of 719-645-1130 as was displayed on AKA Jazmine's webpage. Having obtained 2 additional possible females being involved with AKA Jazmine; I initiated a prostitution related operation, which would occur on 01/27/11. The operation involved me posing as a potential customer and attempt to contact AKA Jazmine at the telephone number of 719-645-1130 and arrange to purchase her services, which were not advertised on the specific website found on www.backpage.com <http://www.backpage.com>. If a prostitution related contact was achieved then uniformed patrol officers would contact AKA Jazmine and I at her in-call location in order not to compromise the identities of the rest of the Metro 50s Street Impact Team for future prostitution related transactions in an attempt to contact the female involved if AKA Harmony was not contacted during my operation.

On 01/27/11 beginning at 1700 hours, I began placing recorded telephone calls to the telephone number of 719-645-1130 to attempt to contact AKA Jazmine. On 01/27/11, I was able to contact a female at the above listed telephone number, who identified herself as Jazmine. I asked if I could make an appointment with AKA Jazmine and how much money did I need. AKA Jazmine asked how long I wanted the appointment for at which time I stated an hour. AKA Jazmine stated that an hour appointment would cost $260.00 at which time I told AKA Jazmine that I agreed to the price for the hour long appointment and I had to obtain a hotel room for our appointment. AKA Jazmine then told me that I should just come to her in-call location, located at the Motel 6 near the intersection of I-25 and W. Fillmore Street. AKA Jazmine did not provide the specific hotel room number as this is a normal practice by independent female escorts and/or escort agencies not to provide the specific motel room to avoid detection by law enforcement and to avoid customers who just want to come by and for safety reason. After we both agreed to meet at the Motel 6 in Colorado Springs, CO, I ended the conversation with AKA Jazmine.

I conducted a briefing with detectives from the Metro 50s Street Impact Team on the upcoming operation and with members of the El Paso County Crime Reduction Unit, who are assisting up with a uniform presence only, during the operation to maintain the security of the rest Metro 50s Street Impact Team's undercover identities.

On 01/27/11, I, along with detectives from the Metro 50s Street Impact Team and deputies from the El Paso County Sheriff's Office Crime Reduction Unit all arrived in the area of the Motel 6 with a physical address of 3228 N. Chestnut Street, Colorado Springs, CO. I began placing telephone calls to AKA Jazmine at the telephone number of 719-645-1130 to notify her that I was in the area and was prepared to begin our hour long session and also to obtain a specific room number.

At approximately 2055 hours, I was able to contact a female, who identified herself as Jazmine. AKA Jazmine asked if I could give her approximately 10 more minutes prior to responding to the Motel 6 to begin our session. I agreed to do so and ended our conversation.

At approximately 2110 hours, a deputy assigned to the El Paso County Sheriff's Office Crime Reduction Unit observed a Black male and what appeared to be a Black female with long hair, wearing dark color clothing, exit room #225 of the Motel 6, walk around to the northeast side of the motel on the second floor landing and enter an unknown room on the other side. The deputy also aired that shortly after he observed the 2 emerge from room #225, the Black male returned to room #225 alone, reenter the room and close the door behind him. Surveillance ...

| OFFICER NAME / NUMBER | |
| --- | --- |
| James Lamberth / 9616 | FRS PDF PCAB-GNQXVL15TIH1Z 26 Feb 2011 18:08:10 Complete Page 4 of 11 |

**COLORADO SPRINGS POLICE DEPARTMENT**
**NARRATIVE OVERFLOW**

CASE REPORT NUMBER
11-03873

GEN

TITLE/CLASS/STATUTE/ATTEMPT
Pimping C.R.S. 18-7-206 / Felony 3 / / Completed

Overflow from Narrative:

detectives were able to determine that the Black male walked the Black female over to room #228, which is located on the second floor, northeast side of the motel, with the front entrance door facing east. Room #225 is on the same second floor level; however, the front entrance door faces west. Surveillance detective also were able to determine that a red I color newer model Toyota sedan, bearing Colorado license plate #449WGP parked in the northwest section of the parking lot directly under room #225. Surveillance detectives and deputies believed that this red in color Toyota sedan was associated with the Black male and Black female they observed exiting room #225 and subsequently the female entering room #228.

Between 2110 hours and 2124 hours, I attempted to contact AKA Jazmine at the telephone number of 719-645-1130 with no answer. At approximately 2124 hours, I received an incoming call from the telephone number of **719-645-1130**. The female on the other end of the line identified herself as Jazmine and started to provide instructions to me to park in the back of the motel, because she did not want the management to think that she was receiving a lot of traffic and walk up the northwest flight of stairs and at that time call her again and she would then provide the exact number of the hotel room that she was in.

At approximately 2132 hours, I advised surveillance detectives and deputies of the contents of the latest phone call I had with AKA Jazmine. I then agreed with surveillance detectives and deputies that if I was instructed to enter room #228 that we would abort the operation and then conduct stationary surveillance until the black male was observed exiting room #228 at which time deputies from the El Paso County Sheriff's Office Crime Reduction Unit would contact the male in reference to the activities that were observed earlier on today's date. Another reason why we implemented this option into our operation is because of the aggravated robbery that occurred at the Residence Inn in November 2010 where a Black male was suspected of being a driver for AKA Harmony and that the driver/Black male suspect knew or had knowledge of which room AKA Harmony and her male client/victim was occupying.

At approximately 2132 hours, I arrived in the rear west parking lot of the Motel 6, located at 3228 N. Chestnut Street. I re-contacted AKA Jazmine, who informed me to walk up the northwest stairwell of the hotel, which is right next to room #228 at which time place another telephone call to her and she would provide the room. Surveillance detectives, deputies and I did not feel comfortable with that scenario provided by AKA Jazmine. I then drove around to the east side of the hotel room and chose a parking spot where I could clearly see room #228 and where surveillance detectives were conducting visual observations on room #228 and #225. I then re-contacted AKA Jazmine and told her that I was unable to find a parking spot on the west side of the hotel and I'm now parked in the east side. AKA Jazmine then told me that she was waiting for more in room #228.

I then walked up a flight of stairs located in the center (southeast side) of the hotel, clearly away from where room #225 is located and subsequently contacted AKA Jazmine in room #228. As soon as AKA Jazmine opened the door, I immediately recognized her from the photographs on the webpage created in October 2010 as AKA Harmony, the female that was hired by the victim (David White) during the robbery in November of 2010. Upon entering the room, I was able to determine that myself and AKA Jazmine were the only 2 inside the hotel room. AKA Jazmine and I sat on the bed together and began discussing the terms of the session. I asked AKA Jazmine what type of services she provides. AKA Jazmine stated that she is "full service". The term full service based on my training experience with investigating or being part if investigating over 25 independent female escorts or escort agencies involved in illegal prostitution is used by independent female escorts and employees of escort agencies to inform their clients that they will perform sexual intercourse to completion with their clients without actually saying those words to evade detection by law enforcement agencies. AKA Jazmine then stated that some of her services were all inclusive and some are not. AKA Jazmine then asked me what price did we agree upon for the session. I informed her $260.00 and then handed her $260.00 of prerecorded Metro VNI buy funds. AKA Jazmine took the buy funds and placed them into her wallet. AKA Jazmine then stated that we would engage in a "straight fuck and a little head" (oral sex).

At approximately 2145 hours, having exchanged buy finds with AKA Jazmine, I provided an arrest signal at which time deputies assigned to the El Paso County Sheriff's Office Crime Reduction Unit knocked on the front entrance door to room #228. AKA Jazmine immediately called an unidentified male on her cell phone and asked if that male was at the front door of her room. I could hear the male on the other end of the line state "no what's going on" at which time I responded to the front door and opened it for the El Paso County Sheriff's Office ...

CERT.

OFFICER NAME / NUMBER
James Lamberth / 9616

FRS PDF  PCAB-GNQXVL15TIH1Z  26 Feb 2011  18:08:10  Complete  Page 5 of 11

MOA_00000565

COLORADO SPRINGS POLICE DEPARTMENT
NARRATIVE OVERFLOW

| CASE REPORT NUMBER |
|---|
| 11-03873 |

TITLE/CLASS/STATUTE/ATTEMPT

Pimping C.R.S. 18-7-206 / Felony 3 / / Completed

Overflow from Narrative:

deputies.

They placed both of us into custody and escorted me out of the room and began asking AKA Jazmine for her identification and explaining to her the reasons why her and I were being contacted. Due to the time frame of the contact, surveillance detectives were able to maintain visual surveillance on the red in color Toyota sedan now occupied by an unidentified Black male driver and an unidentified Hispanic female passenger. As the vehicle was leaving the parking lot of the Motel 6 the Hispanic female exited the vehicle and subsequently contacted deputies who were conducting the prostitution related investigation at room #228 with AKA Jazmine. During the preliminary investigation, deputies were able to positively identify AKA Jazmine with valid Colorado driver's license as **Christine Marie Duncan**; a Black female, DOB 09/12/86. Colorado driver's license #01-330-0640. The address of Christine Duncan's driver's license read **528 Red Deer Road, Franktown, CO 80116**. The heavyset Hispanic female observed exiting the newer model red in color Toyota sedan and contacting deputies at room #228 was identified as **Lola Thomas**, who is a relative or the ex-wife of the arrestee, who was later identified as the driver of the red in color Toyota sedan and the Black male who escorted Christine Duncan from room #225 over to room #228.

At this time, surveillance detectives were able to maintain visual surveillance on the red in color Toyota sedan occupied by the Black male, who was later identified as the arrest **Tramell Thomas**. A traffic stop for a traffic violation was conducted on the red in color Toyota sedan and Mr. Tramell Thomas was then detained pending investigation on the prostitution related activities of Christine Duncan and subsequent interviews. During the traffic stop on the vehicle that Tramell Thomas was driving, detectives were able to determine that Tramell Dawan Thomas, Black male, DOB 02/13/79, was currently a parole client and in supervised parole status for aggravated robbery and did have a stint in the Colorado Department of Corrections during the late part of 1990s and the early part of 2000. At that time Detective Sgt. Jimmy Rodgers reached out to the Colorado Department of Parole in an attempt to contact Tramell Thomas's parole agent pending the preliminary investigation into possible pimping case involving Tramell Thomas and possibly being the suspect of the personal robbery, which occurred at the Residence Inn in November 2010.

Also during this time frame, deputies from the El Paso County Sheriff's Office Crime reduction Unit and detectives from the Metro 50s Street Impact Team contacted the 2 occupants still in room #225. The 2 occupants were positively identified as **Alexandra Trujillo**, Hispanic female, DOB 11/16/91 and **Heather Elizabeth Carr**, White female, DOB 10/25/77. I note that Alexandra Trujillo and Heather Carr were the 2 females advertising on the www.backpage.com <http://www.backpage.com> along with Christine Duncan as escorts and all 3 utilizing the contact phone number of 719-645-1130.

I was then contacted by Metro VNI Detective Reuben Crews 3560Z, who advised me that Christine Duncan is trying to convince him that I was her boyfriend and that we were both from the City of Denver Colorado, we had rented the room together and she has no idea why she is being contacted by the police. I then contacted Christine Duncan and identified myself as a detective assigned to the Colorado Springs Police Department Metro Vice and Narcotic Unit. I informed her that we agreed upon several sexual acts in exchange for money, which is illegal and deemed to be prostitution. I then showed Christine Duncan several of the webpage advertisements with her photographs on them and asked her to positively identify the female in those photographs. Christine Duncan did identify the photographs as being her. I explained to Christine Duncan the reason why I specifically chose her to conduct an audit of her web pages and informed her that I believe she witnessed a robbery or was involved in a robbery, which occurred at the Residence Inn in Colorado Springs, CO, in November of 2010. I then asked Christine Duncan if she would be willing to discuss with me that aggravated robbery investigation and her arrest on today's date. Christine Marie Duncan agreed to do so at which time I then advised her of the Miranda Warning on 01/27/10 at approximately 2310 hours.

## MIRANDA WARNING

You have the right to remain silent.
Anything you say can and will be used against you in a court of law.
You have the right to talk to a lawyer and have him present with you while being questioned.
If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish ...

OFFICER NAME / NUMBER

James Lamberth / 9616

FRS PDF  PCAB-GNQXVL15TIH1Z  28 Feb 2011  16:08:10  Complete  Page 6 of 11

MOA_00000566

**COLORADO SPRINGS POLICE DEPARTMENT
NARRATIVE OVERFLOW**

TITLE/CLASS/STATUTE/ATTEMPT
Pimping C.R.S. 18-7-206 / Felony 3 / / Completed

Overflow from Narrative:

one.

After I read the Miranda Warning to Christine Duncan, I asked her if she was willing to discuss those cases with ne now at which time she shook her head up and down in a yes motion. I asked her to respond verbally; however, she did not, she continued to just shake her head up and down. I asked her if she understood her rights that I had explained to her at which time she shook her head up and down in a yes motion.

I asked Christine Duncan if she remembers a Black male client that she saw in November 2010. Christine Duncan did refer to the Black male client she saw twice in November 2010 by the first name of David. I was able to confirm at that time that Christine Duncan was referring to the victim of the robbery that occurred on 11/11/10 as David White. Christine Duncan relayed that she had seen David for a session earlier in the month of November 2010 and that she was re-contacted by David on 11/10/10, because he was in town on personal reasons concerning 3 deaths that had occurred in his family during that same week and that he contacted her for companionship. Christine Duncan stated that she and David agreed upon $260.00 for an hour long session and that her boyfriend, who she positively identified as Tramell Thomas (DOB: 02/13/79) drove her to David's in-call location, located at the residence Inn in Colorado Springs, CO. Christine Duncan stated that she arrived at David's room during the early evening hours of 11/10/10 and they began playing a card game of which the loser had to drink a glass of wine. AKA Christine stated at this point they were both extremely intoxicated and she told David that she was hungry. Christine Duncan stated that David then called a friend of his over to his hotel room who Christine Duncan identified by the last name or moniker of **Smit** or **Schmidt**. Christine Duncan described AKA Smit or Schmidt as being an Asian mixed male, older then David.

Christine Duncan stated that when AKA Smit or Schmidt arrived at the door, David asked her to answer the door in the nude for his friend. Christine Duncan stated that she agreed to do so and answered the door in the nude for AKA Smit or Schmidt. AKA Smit or Schmidt entered the hotel room and agreed to go and get all of them something to eat. Christine Duncan stated a few minutes later, AKA Smit or Schmidt returned to David's hotel room with food. Christine Duncan stated that she believed it was Chinese take-out food. Christine Duncan stated that after her, AKA Smit or Schmidt and David ate, all 3 engaged in "sexual acts". Christine Duncan would not further elaborate on the terms "sexual acts" and proceeded with her statements. Christine Duncan then stated that after they all 3 perform sexual acts AKA Smit or Schmidt left the hotel room.

Christine Duncan stated that David began asking her to stay with him longer and showed her 2 stacks of money and told her that money is no problem if she would stay, because he was grieving from the deaths of his family members. Christine Duncan claimed she then called Tramell Thomas and told him that David wanted her to stay longer. Christine Duncan then identified Tramell Thomas as her boss and that he makes all of the decisions concerning the escort business. Christine Duncan stated that Tramell told her that she could stay a little bit longer as long as he was willing to pay for the extra sessions. Christine Duncan stated that she told Tramell Thomas that David again a lot of money and that he was willing to pay for the extra session. Christine Duncan stated that she then ended her conversation with Tramell Thomas and began having sex with David. Christine Duncan stated after having sex with David, they both fell asleep and did not wake up until the early morning hours of 11/11/10.

Christine Duncan stated that when she awoke, she began sending text messages to Tramell Thomas to come pick her up from David's hotel room. She stated a short time later David woke up and they were both startled by a loud knock on the front entrance door of David's hotel room. Christine Duncan stated that she and David asked who was at the door at which time a male voice replied "management". Christine Duncan claimed that David told her to answer the door at which time she got out of bed and answered the door in the nude. Christine Duncan stated that when she opened the door she immediately recognized the male standing at the door was Tramell Thomas; her boyfriend/boss. She stated that Tramell Thomas was wearing a black ski mask and holding silver semiautomatic weapon. Christine Duncan stated that she immediately recognized the male as Tramell Thomas, because she had been dating him off and on since September 2010 and believed that since she was texting Tramell Thomas to some to the room and pick her up that he was the only person that could have been at the door with the handgun and the ski mask at the time. Christine Duncan stated that Tramell Thomas pushed her out of the way and began asking the victim (David) for the money and appeared to be angry with both of ...

VER CSPD 07/11/06

NARRATIVE

GEN

CERT

OFFICER NAME / NUMBER
James Lamberth / 9616

FRS PDF  PCAB-GNQXVL15TIH1Z  28 Feb 2011  18:08:10  Complete  Page 7 of 11

MOA_00000567

**COLORADO SPRINGS POLICE DEPARTMENT**
**NARRATIVE OVERFLOW**

TITLE/CLASS/STATUTE/ATTEMPT

GEN

Pimping C.R.S. 18-7-206 / Felony 3 / / Completed

Overflow from Narrative:

them, because she had spent so many hours here with David without being properly compensated. She states at one point Tramell Thomas knocked her down to the floor striking her in the face near one of her eyes and kicking her in the side of her torso. Christine Duncan stated that during this time Tramell Thomas continued to complain about the time she spent with David in the hotel room and not being property compensated. Christine Duncan stated that Tramell Thomas then ordered her to gather her belongings and wait for him at the car. Christine Duncan claimed that during this time she did not really know what was going on other than she was extremely intoxicated from drinking so much wine with David earlier in the evening and early morning hours of 11/11/10; however, she stated that she was able to get dressed and as she exited the hotel room, she turned around to wait for Tramell Thomas to exit the hotel room also, because she did not know where the car was at. Christine Duncan stated that a few minutes later Tramell Thomas came out and they ran to the area where Tramell Thomas parked the car.

I asked Christine Duncan what kind of car Tramell Thomas had at that time. Christine Duncan described the car as being a white sedan, possibly a Chrysler 300. Christine Duncan went on to explain that she does not know cars very well, but she is pretty sure that is the type of vehicle Tramell Thomas owned at the time.

Christine Duncan went on to explain that the next day when she awoke she was sore on her face near her eyes and the left side of her stomach. She then asked Tramell Thomas what happened; however, she did not state what Tramell Thomas told her would happen the night before. Christine Duncan claimed that she could not remember what Tramell Thomas's response was. Christine Duncan claimed that she then was able to retrieve some of the victim's (David) personal belongings to include the laptop and a camera. Christine Duncan stated that she then attempted to contact David at the Residence Inn Hotel; however, they stated he had checked out of the hotel.

NARRATIVE

Christine Duncan stated that the hotel management did give her some personal information on David; however, she was still unable to contact him. Christine Duncan stated that she then attempted to contact the victim's (David) friend who was identified by Christine Duncan as Smit or Schmidt; however, she was unable to contact David's friend also. Christine Duncan stated that she did remember while Tramell Thomas was inside the hotel room with the gun and ski mask, he only could find $500.00 in cash. Christine Duncan stated that Tramell Thomas continued to ask the victim (David) for the rest of the money; however, David replied that he did not have any more money and told Tramell Thomas to take everything, "I just want you to leave the hotel room". Christine Duncan stated that the victim (David) first stated "Take everything except for my laptop, because I use it for work"; however he then reversed his statements and stated "you can also take the laptop, just leave the room".

Christine Duncan stated that after the robbery Tramell Thomas exited the hotel room and they both ran to the car parked near the Residence Inn Hotel. Christine Duncan claimed that then next morning she was sore on her left side her eye after Tramell Thomas struck her during the robbery. Christine Duncan claimed that she attempted to return David's laptop computer and other personal belongings; however, she was unable to contact him through the hotel employees providing information on David White.

I asked Christine Duncan if she knows where the semiautomatic pistol used in the robbery is at this point. Christine Duncan claimed that she only saw it one more time after the robbery, which was sometime in December of 2010. She stated that Tramell Thomas had it out on the kitchen table in a gun box and she is afraid of guns so she told Tramell Thomas to put it away. Christine Duncan then made the comment that if she had committed the robbery, she would not keep the gun or any of the items taken from the robbery at their apartment.

I then asked Christine Thomas if she still lived in Franktown Colorado, which is listed on her Master Name Index files and on the Colorado driver's license she presented during our contact. Christine Duncan stated that address located in Franktown Colorado belongs to her parents and she had not lived there for a while. Christine Duncan stated that she has lived off and on with Tramell Thomas in an apartment located near the intersection of Maizeland Road and Academy Boulevard. Christine Duncan then volunteered to show detectives the exact address where she resides with Tramell Thomas.

...

VER CSPD 07/11/06

CERT

OFFICER NAME / NUMBER
James Lamberth / 9616

FRS PDF  PCAB-GNQXVL15TIH1Z  28 Feb 2011  18:08:10  Complete  Page 6 of 11

**COLORADO SPRINGS POLICE DEPARTMENT**
**NARRATIVE OVERFLOW**

| CASE REPORT NUMBER |
| --- |
| 11-03873 |

TITLE/CLASS/STATUTE/ATTEMPT

Pimping C.R.S. 18-7-206 / Felony 3 / / Completed

Overflow from Narrative:

I asked Christine Duncan during the time frame she lived with Tramell Thomas has she ever seen a duffel bag with a new Denver Bronco emblem on the side or did she have any knowledge of his activities during the day. Christine Thomas claimed that she did not have any knowledge of Tramell Thomas's activities during the day and reiterated that all did was work to pay the bills. Christine Duncan defined the word work as the escort business. She stated that between September 2010 and today's date, she has made between $5000.00 to $7000.00 and it was all given to Tramell Thomas to, "pay bills". Christine Duncan stated that on today's date, she made approximately $700.00 in various male customers and stated that Tramell Thomas should be in possession of over $700.00 of United States currency. I note that detectives who were in contact with Tramell Thomas on the traffic stop stated that he was in possession of approximately $726.00 in United States currency. I asked Christine Duncan if she did not work as an escort for Tramell Thomas, was she in fear of being harmed by Tramell Thomas. Christine Duncan stated no she was not in fear of Tramell Thomas; however. She did reiterate that she worked as an escort in order to pay for Tramell Thomas's bills, because she was in love with him and they were having plans to get married. Christine Duncan stated that to the best of her knowledge Tramell Thomas has not worked since she began working as an escort in September of 2010. Christine Duncan confirmed that Tramell Thomas's sole source of income is through her escort/prostitution activities.

I showed Christine Duncan the 2 photographs of the females who were contacted on room #225, who were subsequently identified as Alexandra Trujillo; Hispanic female; DOB: 11/16/91 and Heather Carr; White female; DOB: 10/25/77. Christine Duncan claimed that Alexandra Trujillo and Heather Carr were just friends of her and they were all staying in room #225 while she saw various male clients. Christine Duncan would not elaborate whether or not Alexandra Trujillo or Heather Carr were working for Tramell Thomas as escorts. I note that the back page website I observed displaying Christine Duncan's photos; along with 2 unidentified female were in fact identified as Alexandra Trujillo and Heather Carr. All 3 websites were using the telephone number of 719-645-1130 and advertising as escorts on www.backpage.com <http://www.backpage.com>.

That concluded my interview with Christine Duncan. Detectives from Metro 50s Street Impact Team drove Christine Duncan to the home address of Christine Duncan and Tramell Thomas, which was pointed out by Christine Duncan as the address of **3820 Radiant Drive, Apt. #239D, Colorado Springs, CO**. I responded to the Police Operation Center and drafted a Search Warrant for the address of 3820 Radiant Drive, Apt. #239D, to search for items related to the pimping investigation and to attempt to locate the weapon used during the robbery on 11/11/10 and the personal property belonging to the victim (David White).

Sgt. Jimmy Rodgers was able to contact Tramell Thomas's parole officer, who was briefed on the current charges pending against Tramell Thomas to include Pimping, which is a Class 3 Felony and Aggravated Robbery, which is also a Class 3 Felony. Tramell Thomas's parole officer was identified as **Mariani Mejias**. Mariani Mejias informed Sgt. Rodgers that she would place a parole hold status on Tramell Dawan Thomas as soon as he is placed into the El Paso County Criminal Justice Center on the charges of Pimping and Aggravated Robbery. Tramell Thomas was transported to the Police Operation Center for booking paperwork and interview. While at the Police Operation Center, detectives from Metro 50s Street Impact Team attempted to interview Tramell Thomas who immediately asked for his lawyer prior to making any statements to police concerning his arrest.

After Christine Duncan pointed out the apartment where she and Tramell Thomas lived, she was driven back over to the location where the traffic stop was conducted on the vehicle that Tramell Thomas was driving. She was then provided with the keys to the rental car and was instructed to keep in constant contact with me during this investigation and released by detectives at that location.

On 01/28/11 at approximately 4:05a.m., the **Honorable Judge Feany** reviewed and singed the Search Warrant to allow detectives to search the address of 3820 Radiant Drive, Apt. #239D. Detectives from the Metro 50s Street Impact Team recovered the following items for evidentiary value.

**Evidence item #1:**
1 Cricket cellular telephone, serial #2XA9MB10A1210842. Recovered by **Detective Terry Lantz 026Z** from the center console of the 2011 red Toyota sedan driving by Tramell Thomas. I note that this item was damaged by Tramell Thomas during a traffic stop near the intersection of W. Fillmore Street and Centennial Boulevard. ...

| OFFICER NAME / NUMBER | |
| --- | --- |
| James Lamberth / 9616 | FRS PDF  PCAB-GNQXVL15TIH1Z  28 Feb 2011  16:08:10  Complete  Page 9 of 11 |

MOA_00000569

COLORADO SPRINGS POLICE DEPARTMENT
NARRATIVE OVERFLOW

CASE REPORT NUMBER
11-03873

TITLE/CLASS/STATUTE/ATTEMPT
Pimping C.R.S. 18-7-206 / Felony 3 / / Completed

Overflow from Narrative:

**Evidence Item #2:**
A Garmin Nuvi, serial #1VA082091, recovered by Detective Terry Lantz 026Z from the vehicle driven by Tramell Thomas.

**Evidence Item #3:**
A document in a form of a tow record for a 2011 Toyota Camry; towed from 3820 Rebecca Lane North.
Recovered by Detective Terry Lantz 026Z from the 2011 Toyota Camry driven by the suspect (Tramell Thomas).

**Evidence Item #4:**
A credit/debit card Visa brand, last four numbers are 0786. Recovered by Detective Lantz 026Z, from Tramell Thomas's wallet.

**Evidence Item #5:**
A digital disc recording of a prostitution deal between Detective Lamberth 9616Z and the suspect, Christine Duncan. Recorded on 01/27/11.

**Evidence Item #6:**
$726.00 in United States currency in various denominations recovered by Detective Terry Lantz 026Z from the suspect's (Tramell Thomas) wallet.

**Evidence Item #7:**
Various clothing to include several pairs of basketball and tennis shoes, along with men's clothing, call recovered by Detective Genta 9599Z, from the address of 3820 Radiant Drive, Apt. #239D.

**Evidence Item #8:**
An Olympus FE camera, serial #UA4A07555, recovered by **Detective Kristin Genta 9599Z,** from the address of 3820 Radiant Drive, Apt. #239D.

**Evidence Item #9:**
A small plastic wrap containing approximately 3.53 grams of suspected Crack Cocaine, recovered by Detective Genta 9599Z, from the address of 3820 Radiant Drive, Apt. #239D. Field test positive on 01/28/11 by Detective Lamberth 9616Z.

**Evidence Item #10:**
Item of indicia of occupancy. Recovered by Detective Genta 9599Z from throughout the residence at 3820 Radiant Drive, Apt. #239D.

**Evidence Item #11:**
More of various men's clothing, recovered by Detective Genta 9599Z from the address of 3820 Radiant Drive, Apt. #239D.

**Evidence Item #12:**
1 Hewlett Packard laptop computer, model #DV42049, serial #CND9491HFZ, recovered by Detective Genta 9599Z from the address of 3820 Radiant Drive, Apt. #239D.

**Evidence Item #13:**
A phone pager, Cricket brand SCHR-100, serial #80F0AFCD, recovered by Detective Genta 9599Z from the address of 3820 Radiant Drive, Apt. #239D.

**Evidence Item #14:**
Various computer components, various makes and storage capacities, recovered by Detective Genta 9599Z from the address of 3820 Radiant Drive, Apt. #239D.

This concludes the items recovered by detectives while searching the address of 3920 Radiant Drive, Apt. #239D. ...

OFFICER NAME / NUMBER
James Lamberth / 9616

TITLE/CLASS/STATUTE/ATTEMPT

GEN

Pimping C.R.S. 18-7-206 / Felony 3 / / Completed

Overflow from Narrative:

During the course of this investigation, I was able to contact the victim (David White) who is currently working in
the City of Atlanta Georgia. I informed Mr. White that we made an arrest on the person involved in the personal
robbery that occurred in his hotel room on 11/11/10. David White stated that after the robbery he was able to
re-contact Christine Duncan, who he only knew her by the name of either Christine or Harmony. He stated when
he contacted her via telephone by finding her with page advertisement on backpage.com he asked her why did
she commit the robbery. David White stated that when Christine Duncan realized it was him calling, she
immediately terminated the telephone conversation. I told Mr. White that I was unable to locate any of his
personal items, except for maybe the laptop computer. Mr. White did verify that the laptop computer was a
Hewlett laptop computer and it should have work related items on it if they did not erase those items when they
took it from his hotel room on 11/11/10. Mr. White explained that he works from ITT and the computer that was
taken from him should have several work related items on that computer. Mr. White also stated that the
computer should have photographs of friends and then provided a password for the computer to access his
personal internet site, which was the number 2400. Mr. White was very grateful for the Colorado Springs Police
Department making the arrest and continuing with the investigation and was adamant about testifying against
Tramell Thomas in the personal robbery case investigation. David White was not able to confirm whether or not
he solely believed that Christine Duncan was involved in the robbery; however, he did state that after this
session and they had both feel asleep on the morning of 11/11/10, she was acting very suspicious while texting
someone for a long time and then when they heard a knock at the door, she immediately got up and answered
the door despite him telling her that he did not want her to answer his hotel room door.

No further information at this time.

NARRATIVE

CERT   VER CSPD 07/11/08

OFFICER NAME / NUMBER
James Lamberth / 9616

FRS PDF   PCAB-GNQXVL15TIH1Z   26 Feb 2011   18:06:10   Complete   Page 11 of 11

Case No. 1:16-cr-00054-WJM Document 325-4 Filed 12/12/19 USDC Colorado Page 530 of 971

**COLORADO SPRINGS POLICE DEPARTMENT**
**NARRATIVE SUPPLEMENT**

| | CASE REPORT NUMBER |
|---|---|
| | 11-03873 |

TITLE/CLASS/STATUTE/ATTEMPT

Robbery / Felony / 18-4-301    / Completed

| VICTIM'S NAME (LAST, FIRST, MIDDLE, SUFFIX) | ZONE | SECTOR |
|---|---|---|
| White, David | 4 | 4X |

I, Detective Genta/9599Z, have been a sworn Police Officer with the Colorado Springs Police Department (CSPD) for twelve years and I am currently assigned to the Metro Vice, Narcotics and Intelligence (Metro VNI) Division. I have two years of narcotics experience as an investigator. I am a Commissioned Deputy with both the El Paso and Teller County Sheriff's Offices. Your affiant has been involved in numerous narcotics investigations and is knowledgeable in the means and methods used by persons and groups to purchase, transport, store, and distribute narcotics.

**INITIATING INFORMATION:**

On 01/27/11 at approximately 2040 hours I, Detective K. Genta/9599Z, assisted Detective Lamberth/9616Z and other Metro Vice and Narcotics detectives with a prostitution detail. The female, later identified as Christine Duncan, DOB: 09/12/86, was contacted at 3228 N. Chestnut Street, room #228.

**DETECTIVE STATEMENT:**

Det. Lamberth was investigating an aggravated robbery case which occurred in November of 2010. The prostitution detail on 01/27/11 was a result of the ongoing investigation of the robbery case. As a result of the detail, Det. Lamberth was able to identify and arrest the suspect of the robbery who was identified as Tramell Thomas, DOB: 02/13/79.

Thomas was contacted by C.R.U. officers while driving a red Toyota vehicle from the scene of the prostitution detail. Thomas was transported to the Police Operations Center and placed in a holding cell. Detectives searched his vehicle and several items of evidence were collected. I assisted Det. Lantz/026Z and Det. Crews/3560Z with the packaging and logging of this evidence but I was not present during the search of the vehicle.

Det. Lamberth completed a search warrant for Thomas' address of 3820 Radiant Drive, apartment #239. Detectives executed the search warrant around 0440 hours on 01/28/11. During the search, I located numerous items relevant to the robbery investigation which were collected.

**EVIDENCE COLLECTED AT 3820 RADIANT DRIVE, #239:**

Item #7: Miscellaneous pairs of white and blue men's tennis shoes.

Item #8: Olympus camera containing stored pictures.

Item #9: Baggie of suspected crack cocaine found in top dresser drawer in bedroom, FTP for cocaine at 0539 hrs, 3.53 gross grams.

Item #10: Items of indicia with Thomas' name.

Item #11: Miscellaneous items of clothing to include a green jacket and a green pullover and a pair of blue pants.

Item #12: Hewlett Packard lap top, serial number CND9491HFZ.

Item #13: Cricket cell phone.

Item #14: Three thumb drives with miscellaneous pictures.

...

| DISPOSITION | EXCEPTIONAL CLEARANCE CATEGORY | OFFICER'S SUPERVISOR | |
|---|---|---|---|
| Cleared by Arrest | | Sgt. Rodgers | |
| OFFICER NAME/NUMBER | WORK UNIT | APPROVING SUPERVISOR | APPROVAL DATE |
| K. Genta / 9599 | VNI | Sergeant J. Rodgers 1412 | 2/4/2011 |

TRCK #FRS-8.2004.0018-v2

MOA_00000572

**COLORADO SPRINGS POLICE DEPARTMENT**
**NARRATIVE OVERFLOW**

CASE REPORT NUMBER
11-03873

TITLE/CLASS/STATUTE/ATTEMPT
/ Felony / 18-4-301   Robbery / Completed

Overflow from Narrative:

All of the above listed items were placed into evidence at the Police Operations Center.

There is nothing further at this time.

OFFICER NAME / NUMBER
K. Genta / 9599

FRS PDF  CM0150955848N2  4 Feb 2011  19:33:05  Complete   Page 2 of 2

MOA_00000573

Case No. 1:16-cr-00054-WJM-Document 525-324 filed 12/12/19 USDC Colorado pg 475 of 971

## COLORADO SPRINGS POLICE DEPARTMENT
### NARRATIVE SUPPLEMENT

| | CASE REPORT NUMBER |
|---|---|
| | 11-03873 |

**TITLE/CLASS/STATUTE/ATTEMPT**
PIMPING 18-7-206 / Felony / /

**VICTIM'S NAME (LAST, FIRST, MIDDLE, SUFFIX)**
STATE OF COLORADO

| ZONE | SECTOR |
|---|---|
| 5 | 5X |

11-03873
**PIMPING, CRS 18-7-206**
1-20-11

**VNI/djw**

### LOCATION OF OCCURRENCE #1:

**MOTEL 6**
**3228 N. CHESTNUT STREET**
**COLORADO SPRINGS, CO 80907**

### LOCATION OF OCCURRENCE #2:

**3820 #239 RADIANT DRIVE**
**PARKRIDGE APARTMENTS**

### SUSPECT INFORMATION:

**THOMAS, TRAMELL DAWAN**
**DOB: 2-13-79**
**BLACK MALE, 6 FT, 210 LBS, BLACK HAIR, BROWN EYES**
**SSN: 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**
**HOME ADDRESS:    3820 #239 RADIANT DRIVE**
            **COLORADO SPRINGS, CO**

### DETECTIVE'S STATEMENT:

On January 27, 2011, I, **Detective P. Gurnett 2656Y,** currently assigned to the Colorado Springs Police Department's Metro Vice, Narcotics and Intelligence Division, attended an operational briefing conducted by **Case Agent J. Lamberth 9616Z.** During the operational briefing Detective Lamberth advised he had arranged a prostitution audit with a female suspect who was identified to him as possibly being involved in a Colorado Springs Police Department's 2010 robbery. Detective Lamberth briefed that he was in contact with the Colorado Springs Police Department's Robbery Unit who were interested in speaking with the female subject of the prostitution detail as it related to the 2010 robbery. Detective Lamberth advised he had contacted the prostitution detail subject via an Internet ad and arranged a one hour appointment for the price of $260. The subject, AKA "Jasmine" identified an in-call location at the **Motel 6** located at **3228 N. Chestnut Street.** The El Paso County Sheriff's Office Crime Reduction Unit was requested to assist as uniformed presence and to supplement security measures for Detective Lamberth who would be acting in an undercover capacity. Additionally, during the operational plan process of this prostitution audit, and specifically in an attempt to assist Colorado Springs Police Department's Robbery Unit with the identification of a robbery suspect, the CRU Units were assigned to contact Detective Lamberth after the indication of a bust signal in an attempt to conduct an interview with AKA "Jasmine" to determine further investigative leads into the 2010 robbery. The use of the CRU Unit allowed other undercover officers to remain unseen in the event another audit would present itself. During the operational briefing I was assigned as a member of the surveillance team.

At approximately 2015 hours I arrived on scene in the Motel 6 parking lot along with **Detective Sgt. J. Rodgers 1412Z.** Detective Sgt. Rodgers and I conducted a surveillance sweep of the parking lot in an attempt to identify ...

| DISPOSITION | EXCEPTIONAL CLEARANCE CATEGORY | OFFICER'S SUPERVISOR |
|---|---|---|
| Cleared by Arrest | | J. RODGERS |

| OFFICER NAME/NUMBER | WORK UNIT | APPROVING SUPERVISOR | APPROVAL DATE |
|---|---|---|---|
| PHIL GURNETT / 2656 | VNI | Sergeant J. Rodgers 1412 | 2/4/2011 |

MOA_00000574

**COLORADO SPRINGS POLICE DEPARTMENT**
**NARRATIVE OVERFLOW**

TITLE/CLASS/STATUTE/ATTEMPT

PIMPING 18-7-206 / Felony / /

Overflow from Narrative:

any possible suspect vehicles, motel room, and initiate the surveillance operational plan by having all responding personnel positioned at a point of surveillance where every entrance, exit, and overall observations of the motel itself could be conducted. While positioning ourselves and other team members, the El Paso County Sheriff's Office CRU Unit also responded to the area.

At approximately 2041 hours, while monitoring my handheld radio, I listened as other surveillance team members reported Detective Lamberth was placing outgoing phone calls to AKA "Jasmine" in an attempt to identify the motel room.

At approximately 2055 hours Detective Lamberth advised that he had contacted AKA "Jasmine" and was provided with an approximate time of arrival for their appointment by AKA "Jasmine" of approximately ten minutes.

At approximately 2110 hours **El Paso County Sheriff's Office Deputy Hess** observed a black male and a black female walk from the northeast second floor corner of the motel to the room later identified as **#225** located on the second floor northwest corner of the motel. It appeared the black male had escorted the female to the second floor northeast are and then returned to room #225. Based on the surveillance observations, three rooms were located which we suspected would be utilized during the prostitution audit. Those rooms on the second floor were identified as #226, #227, and #228. Detective Hess was able to provide a description of the black male as having a heavy frame wearing a knit cap and medium length leather coat.

During Sgt. Rodgers' and my surveillance in the parking lot, we had observed a vehicle drive into the parking lot being driven by an individual matching that description who was accompanied by a female also wearing black clothing. We drove through the parking lot and identified a red in color Toyota sedan with attached Colorado license plate 449-WGP parked on the west parking lot area underneath room #225.

At approximately 2123 hours Detective Lamberth reported he had placed another outgoing call and received no answer from AKA "Jasmine."

At this same time frame we continued to monitor the black male's activities as we observed him exit room #225 and stand along the northeast balcony on the second floor. A short time later the same individual re-entered into room #225.

At approximately 2124 hours Detective Lamberth advised he received an incoming call from AKA "Jasmine" that provided directions for where Detective Lamberth was to park in the parking lot. AKA "Jasmine" directed Detective Lamberth to pull into the parking lot, park along the back side (northwest) and utilize the stairs at that location to contact her.

Due to our ongoing surveillance and pre-planned contingencies during the course of this investigation if the prostitution audit subject (AKA "Jasmine") provided the room number of 225 for the appointment, the audit would be concluded and Detective Lamberth would make no attempt to continue. During the course of our surveillance and operational plan to maximize the use of a electronic monitoring device, which Detective Lamberth was fitted with, he was directed not to park on the northwest portion of the motel and to locate a parking spot located along the east portion of the parking lot where our electronic technical equipment would be better utilized during this operation.

At approximately 2132 hours Detective Lamberth again contacted AKA "Jasmine" who provided her motel room as #228. With this information, the operation was planned to continue as briefed previously with the pre-planned consideration.

At approximately 2138 hours Detective Lamberth exited his undercover vehicle, walked to room #228 where he contacted AKA "Jasmine." During this same time, while monitoring Detective Lamberth's electronic transmitting device, I could hear the female with whom he was in contact with who appeared to be conversing on a telephone. At this same time where from my position of surveillance I observed the black male exit room #225 while talking on a cell phone and walk to the northeast where he stood in the center of the stairwell on the second balcony. This ...

OFFICER NAME / NUMBER
PHIL GURNETT / 2656

FRS PDF PVNI-9HONPM15SDNYB 4 Feb 2011 19:33:13 Complete Page 2 of 4

COLORADO SPRINGS POLICE DEPARTMENT
NARRATIVE OVERFLOW

CASE REPORT NUMBER
11-03873

TITLE/CLASS/STATUTE/ATTEMPT
PIMPING 18-7-206 / Felony / /

Overflow from Narrative:

information was immediately relayed to all units on scene in the event this individual was to walk to room #228 and immediate contact of this individual was planned through Detective Sgt. J. Rodgers and the El Paso County Sheriff's Office CRU Unit. I continued to monitor as the female continued the phone conversation and watched as the black unidentified male also maintained a conversation on a cell phone. A short time later a larger heavyset Hispanic female walked from room #225, contacted the black male, both of whom walked down the north stairway and got into the red Toyota, license plate 449-WGP. Surveillance team members watched as they left the area.

At approximately 2143 hours Detective Lamberth advised with a pre-arranged verbal signal that he had initiated an illegal prostitution investigation. The El Paso County Sheriff's Office CRU Unit responded to room #228 contacting Detective Lamberth and AKA "Jasmine."

Jasmine was identified as **Christine Marie Duncan**, DOB 9-12-86.

Due to a secondary goal in Detective Lamberth's prostitution audit, all attempts were initially made to keep additional undercover surveillance team members separate from Ms. Duncan in the event the robbery information was un-obtained and additional audits would be needed. While the El Paso County Sheriff's Office CRU Unit continued their contact with Ms. Duncan, a heavier set Hispanic female was contacted outside room #228. I drove past the area and positively identified the female as the same female we had seen exiting room #225. Based on this information and the surveillance operations of the black male matching the description of the 2010 robbery suspect, we initiated a surveillance operation in an attempt to identify where the red Toyota was now located, presumably being driven by the black male.

Several minutes later Detective Sgt. J. Rodgers and I drove through the apartment complex located directly to the south of the Motel 6 and observed the red Toyota occupied by the black male driving around the west corner eastbound back towards Chestnut Street. We initiated surveillance of the vehicle along with **Detective T. Lantz 026Z** as the vehicle left the apartment complex southbound on Chestnut. We began to follow the vehicle and coordinated with the El Paso County Sheriff's Office CRU Unit to conduct a traffic stop of the vehicle. I observed the vehicle as it continued southbound on Chestnut then turned westbound onto Fillmore Street. I observed that the driver of the vehicle was operating it in a careless manner, not observing the posted speed zones and making quick, abrupt turns. After continuing westbound on **Fillmore Street**, the subject in the red Toyota turned southbound onto **Straus Lane** continuing until he made the first left on **Taylor** and continued south on **Sage Street**. The subject was driving at a rate of speed considerably higher than the 25 MPH posted residential allowed. It did appear to this detective that based on his driving manner, he identified that he was being followed.

It should be noted that vehicles used during a prostitution audit are unmarked vehicles that do not resemble police vehicles. With this information we continued to monitor the subject's status as he continued northbound onto Straus Lane back to Fillmore Street. The subject continued westbound on Fillmore where the El Paso County Sheriff's Office CRU Unit observed a failure to stop at the stop sign at Straus Lane and Fillmore and initiated a traffic stop with the subject at **Centennial Blvd. and W. Fillmore Street**.

During our contact with the driver of the vehicle, he was identified as **Tramel D. Thomas**, DOB 2-13-79. During additional follow-up during the traffic contact, Mr. Thomas was identified as a parole client for Aggravated Robbery. Given the totality of the investigation prostitution audit and previous information of a 2010 Robbery investigation, Detective Lamberth initiated an interview with Ms. Duncan. Preliminary interviews on scene indicated that Mr. Thomas was acting in the capacity of a "pimp" of Ms. Duncan and was instrumental in the 2010 robbery. Based on this information the Colorado Department of Corrections Parole Office was contacted on scene and Mr. Thompson was transported from the traffic stop location to the Police Operations Center where he was later charged with Aggravated Robbery, Pimping, and of Parole Hold Violation was placed.

I was later advised that information was developed that Mr. Thomas resided with Ms. Duncan at **3820 Apt #239 Radiant Drive**, Colorado Springs, CO in the Park Ridge Apartments. Detective Lamberth initiated a search warrant of that address in an attempt to identify any evidence associated with this investigation.
...

OFFICER NAME / NUMBER
PHIL GURNETT / 2656

FRS PDF  PVNI-9H0NPM15SDNYB  4 Feb 2011  19:33:13  Complete  Page 3 of 4

COLORADO SPRINGS POLICE DEPARTMENT
NARRATIVE OVERFLOW

| CASE REPORT NUMBER |
|---|
| 11-03873 |

GEN

TITLE/CLASS/STATUTE/ATTEMPT
PIMPING 18-7-206 / Felony / /

Overflow from Narrative:

At approximately 0400 hours on January 28, 2011, I completed the pre-raid surveillance of Mr. Thomas' residence. It should be noted that initially I had responded at approximately 0100 hours to this location where along with Ms. Duncan physically identified Apt #239 in Bldg. 3820 #D. While conducting the initial surveillance of the apartment door, I made close observations of whether or not it appeared occupied. I observed no indication or heard any indication that anybody was located in the apartment. I spoke with Ms. Duncan who advised that the apartment was occupied only by her and Mr. Thomas. Additionally, while identifying the apartment I spoke with a resident of the Park Ridge Apartments who was sitting on the second floor utilizing Wi-Fi for his laptop. The individual identified the apartment as being occupied by a person he identified as an African American male weighing approximately 230 pounds. I asked him if he had seen this individual in the past several hours. The individual told me he had not and had not seen any other individuals in that time frame go into Apt #239 as he had been in the hallway for a time frame of two hours prior to me contacting him. I relayed this information to Detective Sgt. Rodgers and relayed that based on my observations and contact with the neighbor, I felt that the apartment was vacant. Due to this I initiated a surveillance pre-raid operation for during the course between 0100 hours and 0400 hours no individuals' lights or sounds were identified coming from Apt #239.

I was advised that the search warrant prepared by Detective Lamberth was signed and I, along with Detectives T. Lantz, K. **Genta 9599Z**, and **J. Sarkisian 3287Y** executed the search warrant of the vacant apartment.

During the execution of the search warrant, Detective Genta located a quantity of suspected crack cocaine located in the single apartment bedroom.

I completed both pre-search and after-search photos and obtained photos of the scene to include items of indicia in the name of Mr. Thomas and Ms. Duncan.

At the conclusion of the search warrant, I cleared the scene and had no additional duties regarding this investigation.

End of supplement.

NARRATIVE

VER CSPO 07/11/06

CERT

OFFICER NAME / NUMBER
PHIL GURNETT / 2656

FRS PDF  PVNI-9l:0NPM15SDNYB  4 Feb 2011  19.33.13  Complete  Page 4 of 4

MOA_00000577

# AFFIDAVIT OF PROBABLE CAUSE

The following affidavit is submitted to the Court to document the probable cause in support of the arrest of **THOMAS, TRAMELL** DOB: **02/13/1979** SSN: **Unknown**.

This offense is fully documented in Colorado Springs Police Department Offense Report **11-03873** detailing the offense(s) of:

§18-7-206, PIMPING, CLASS THREE FELONY (F3)

With the victim(s) identified as:

1. State of Colorado

I, Detective R. Crews/3560Z, am a sworn police officer for the Colorado Springs Police Department (CSPD). I have been a sworn police officer for approximately 8 years and is currently assigned to the CSPD Metro Vice, Narcotics and Intelligence Division. Metro VNI is a multi agency co-located drug task force designated to investigate, control, and prevent the illegal sale, possession, and/or manufacturing of illegal narcotics. Units of Metro VNI conduct in depth investigations of major drug trafficking organizations, gangs involved in the drug trafficking, money laundering operations, and prostitution throughout El Paso and Teller Counties. I am responsible for the investigation of individuals or groups of individuals involved in the street and mid level distribution of narcotics and prostitution.

On November 11, 2010, I learned that Colorado Springs Police Department (CSPD) officers were dispatched to the Residence Inn located at 3880 N. Academy Blvd, in Colorado Springs, Colorado to investigate a reported personal robbery with a weapon. The victim/reporting party who was identified as David S. White, black male, DOB: 06/18/1962 told officers that he had been seeing a 24 year old female escort he had seen advertising on the internet. David White identified the female escort by the first names of Christine/Harmony. David White provided a physical description of AKA Christine/Harmony as black/Indian female mix, 24 years of age, approximately 5' 5"tall, 125 pounds, with long dark hair with blonde streaks in it. David White stated that beginning on November 10, 2010, he contacted AKA Christine/Harmony and asked her for her services which cost $260.00 for one hour. David White stated that when Christine/Harmony arrived at his hotel room they drank wine, ate dinner and had sex. David White stated that they then fell asleep, until 4:00 or 5:00 am when he was awakened by her texting on her cell phone. David White stated that he assumed she was contacting her driver for a ride home from his hotel room and engaged in small talk with AKA Christine/Harmony.

David White relayed that on November 11, 2010, approximately 20 minutes after they woke up, an unknown person knocked on the front door of his hotel room. David White stated that AKA Christine/Harmony answered the door and an unknown black male wearing a knit cap covering his face with openings for his eyes and mouth walked into the hotel room. White additionally described the suspect as wearing a green fleece sweater and blue and white athletic shoes. David White stated the black male pointed a sliver in color, semi automatic pistol in the direction of his head and told him to get on the ground. David White believed that the weapon was probably a .45 caliber hand gun. David White stated that the black male began searching through his personal belongings and took his cellular telephone, a Hewlett-Packard laptop computer, one Canon camera, an Armitron wrist watch, and $500.00 in United States currency. David White estimated the valuables taken by the unidentified black male at approximately $2,355.00. David White stated that while the black male was rummaging through the hotel room, he told AKA Christine/Harmony to gather her things. David White stated as the unidentified black male was walking out of the hotel room, he told AKA Christine/Harmony, "bitch, get your shit up". David White stated that they both left the hotel room together in an unknown direction. David White felt that the unidentified black male and AKA Christine/Harmony were connected because she left with him without displaying any signs of duress.

David White then provided officers the website he used to contact AKA Christine/Harmony. The website was identified as, www.backpage.com. Officers were able to locate the web page posting

**SCANNED**

MOA_00000578

# AFFIDAVIT OF PROBABLE CAUSE

identified by David White that depicted AKA "Christine" or "Harmony." The web page posting displayed several photographs of a female matching the description provided by David White. Officers were able to print those photographs and place the copies into official CSPD Evidence. CSPD Robbery Detective S. Schneider subsequently requested the assistance of the Metro VNI unit with contacting the party known as AKA "Christine/Harmony" in regards to the robbery which occurred in November 2010

Between November 2010 and January 2011, Detective J. Lamberth/9616Z of Metro VNI monitored the daily postings on www.backpage.com and other websites on which female escorts advertise. During this time frame, Detective J. Lamberth/9616Z observed several web page postings of a female escort matching the physical description of AKA "Christine/Harmony." It should be noted that some of the photographs that Detective J. Lamberth/9616Z observed on the web page postings were identical to the photographs featured in the web posting identified by the victim, David White.

On January 27th 2011, Detective J. Lamberth/9616Z located a new web posting advertisement in the "Escort" section of www.backpage.com displaying photographs of a female matching the physical description of the party previously identified as AKA "Christine/Harmony." In the advertisement, the female identified herself as AKA "Jazmine," and stated that she would provide "some serious service and action." AKA "Jazmine" listed a contact phone number of 719.645.1130.

On January 27th 2011, at approximately 1700 hrs, Detective J. Lamberth/9616Z, posing as a potential customer, placed a phone call to 719.645.1130 and spoke with a female party who identified herself as "Jazmine." Detective J. Lamberth/9616Z then asked "Jazmine" for a hour-long session and asked if she had any available appointment slots. "Jazmine" replied that she did have availability and informed Detective J. Lamberth/9616Z that an hour-long session would cost $260.00. Detective J. Lamberth/9616Z then arranged to meet "Jazmine" at her in-call location which she indicated was the Motel 6 located on Chestnut St. just north of W. Fillmore Rd. in Colorado Springs, CO.

On January 27th 2011 at approximately 2130 hrs, Detective J. Lamberth/9616Z met "Jazmine" in room #228 at the aforementioned Motel 6. (Detective J. Lamberth/9616Z immediately recognized "Jazmine" as the female party in the photographs on the www.backpage.com used by Detective J. Lamberth/9616Z to contact "Jazmine" as well as the historical postings in which the female identified herself as "Christine/Harmony."

Detective J. Lamberth/9616Z was able to arrange a prostitution-related transaction with "Jazmine" which included sexual intercourse to completion and oral sex in exchange for $260.00 (of pre-recorded official Metro VNI buy funds). Detective J. Lamberth/9616Z then provided a verbal arrest cue, at which time members of the El Paso County Crime Reduction Unit responded to room #228 and detained "Jazmine." Subsequent investigation by responding officers identified "Jazmine" as Christine Marie Duncan – DOB: 09/12/1986. During the arrest of Duncan, detectives conducting surveillance in the area of the Motel 6 observed a red in color Toyota Camry occupied by a black male who was observed walking with Duncan just prior to her meeting with Detective J. Lamberth/9616Z.

Contemporaneous to Detective J. Lamberth/9616Z's interaction with Duncan, other investigating officers and detectives conducted a traffic stop of the red in color Toyota Camry for a traffic violation and subsequently identified the driver as Tramell D. Thomas – DOB: 02/13/1979. During the traffic stop, investigating detectives confirmed via a police dispatcher that Thomas is a current parole client with the Colorado Department of Corrections and has been previously convicted of Aggravated Robbery (see Colorado Court case 1998CR4696). Communication with Thomas' parole officer, Maryanna Meijas, verified his parolee status. Meijas advised investigating detectives that a hold was to be placed on Thomas at the El Paso County Criminal Justice Center pursuant to the charges relating to his involvement in Prostitution/Pimping.

SCANNED

# AFFIDAVIT OF PROBABLE CAUSE

Detective J. Lamberth/9616Z continued his investigation with Duncan and advised her of her Miranda rights which she subsequently waived. After waiving her rights, Duncan elected to provide a statement of involvement to Detective J. Lamberth/9616Z. Detective J. Lamberth/9616Z asked Duncan to divulge any information she had regarding the above referenced robbery which occurred in November 2010. During the interview, Duncan corroborated several of the statements made by the original victim, David White, concerning the robbery including positively identifying Tramell Thomas as the black male who had entered the hotel room with the semi-automatic pistol described by the victim. Duncan told Detective J. Lamberth/9616Z that she had no idea that Thomas was going to rob the victim and only sent text messages to Thomas to ask for a ride home from the victim's hotel room. When Thomas entered the room, he was wearing a black knit ski mask and holding a pistol. Duncan stated that Thomas was upset with her and the victim because he had not been appropriately compensated for the amount of time that Duncan had spent with the victim. Duncan stated that Thomas then began demanding money and personal items from the victim who told Thomas to take his camera, his laptop computer, his cellular phone, his watch, and any cash located in the victim's belongings. Duncan stated that Thomas ordered her to get dressed and go wait in the car. When Thomas came out of the room, Duncan and Thomas ran to the car and left the area.

Duncan stated that she has been living with Thomas and has been working as an escort under Thomas' direction since September of 2010 and that all of the monetary proceeds earned by providing sexual services to clients are given directly to Thomas. Duncan estimated that she has earned approximately $5000-$7000 since September 2010. Duncan stated that she is the sole bread-winner for Thomas and that his only source of income is generated by her work as an escort.

I would respectfully request that probable cause be found that THOMAS, TRAMELL DOB: 02/13/1979 did within the City of Colorado Springs, County of El Paso and State of Colorado, commit in violation of the Colorado Revised Statutes, the offense(s) of §18-7-206, PIMPING, CLASS THREE FELONY (F3)

Friday January 28, 2011
Date

DETECTIVE R. CREWS / 3560
Officer's Signature
Colorado Springs Police Department

Notary Signature

My Commission expires: 06 / 15 / 2013

Address: Colorado Springs Police Department
PO Box 2160
Colorado Springs, CO 80901-2169

**SCANNED**

DISTRICT COURT, EL PASO COUNTY, COLORADO
Court Address: 270 South Tejon Street,
Colorado Springs, CO 80903

People of the State of Colorado
VS.

Defendant: THOMAS, TRAMELL
Defendant DOB: 02/13/1979

▲ COURT USE ONLY ▲

Case #:

Division #:

Courtroom #:

## INFORMATION FOR PRELIMINARY PROCEDURE

The above named Defendant was arrested on Friday January 28, 2011 on the charges of:

- §18-7-206, PIMPING, CLASS THREE FELONY (F3)

The following bonding information is to be considered by the Judge in setting bail on the defendants.

**Standard Bond**

DETECTIVE R. CREWS, 3560
Signature of Peace Officer who furnished the
above information

NOTE: If more than one defendant was arrested for the same or similar acts or series of acts, they must be included on the same sheet.

| Initiating Law Enforcement Agency Information | |
|---|---|
| Initiating Officer Name: | DETECTIVE R. CREWS |
| Agency/Division: | Colorado Springs Police Department Colorado Springs Police Department |
| Case Report Number: | 11-03873 |

**SCANNED**

MOA_00000581

| Adult [X] Juvenile | Agency CSPD METRO VNI | | CUSTODY REPORT | | CSPD No. 74518 |
|---|---|---|---|---|---|
| Custody Date 01/27/11 | Custody Time 2230 | Custody Location FILLMORE ST. + CENTENNIAL | | Zone 2 Sector 1 | Booking No. 10TC01836A |

| Subjects Name (Last, First Middle) THOMAS TRANELL D | | Alias/Maiden ~~37331~~ N/A | Offense No. 11-03873 |
|---|---|---|---|
| Res Add 3820 RADIANT DR #239 D | | | Soc. Sec. No. Unkn |
| City & State C/S CO. 80917 | | Telephone 719-645-1130 | 3584-3917 |

Scars/Marks/Tattoos
Unk.

| DOB 02/13/79 | Race B | Sex M | Age 30 | Ht 600 | Wt 200 | Hair BLK | Eyes BRO | Drivers License No. 98-112-1157 | State CO |
|---|---|---|---|---|---|---|---|---|---|

| POB Unknown | Occupation Unemployed | Subjects Actions [ ] Resisted [ ] Armed |
|---|---|---|
| Employers Name (Firm) | Employers Address | |

| CODES: | A - Accomplice | S - Spouse | M - Mother | F - Father | SM - Stepmother | SF - Stepfather |
|---|---|---|---|---|---|---|

| code | Name (Last, First Middle) | CSPD No. | Address | Telephone |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| Injury/Illness N/A | Treated: [ ] Yes [ ] No [ ] Refused | Treated By: | [ ] Injury Result of Police Action |
|---|---|---|---|
| Where Treated | Date/Time Treated | Visible Injury | [ ] Injured Prior to Police Contact [ ] Injured/Became Ill While In Police Custody |

| CJS Number | Statute Number Ordinance Number | CHARGES | INT | DISPO | Common Code | Warrant Number | Summons Number |
|---|---|---|---|---|---|---|---|
| | A ORI 18-X30 FIN | AGG. ROBBERY | X | HLD | 1207 F | RP∅ | |
| | B ORI 18-726 FIN | PEN. PT | X | HLD | 4002 M | PLA∅ | |
| | C ORI FIN | | | | | | |
| | D ORI FIN | | | | | | |

DISPOSITION CODES

HLD - Held in Custody
NFC - No Formal Charge
ROB - Released on Bond
DBP - Charges Dropped by Police

FAC - Filed as Charged
ROR - Released on Own Recognizance
TOT - Turned over to Another Agency
DEC - Deceased

| RELEASED TO | |
|---|---|
| Agency | |
| Officer | |
| Date & Time | |

| Date/Time of Final Disposition | Officer Making Final Disposition | Filing DDA |
|---|---|---|

| Veh Yr | Veh Make | Model | Style | Color | Veh License No. | State | Location of Vehicle |
|---|---|---|---|---|---|---|---|

| Narrative | RIGHT INDEX |
|---|---|
| 1. ARRESTED ON A TRAFFIC STOP RESULTING IN THE ABOVE LISTED CHARGES. | R.P.D |

VERIFIED
BY

SCANNED

| Officer Name J.L. LAMBERTH 9162 | ID No. | Officer Name | ID No. | Supervisor | Page / of / |
|---|---|---|---|---|---|

OS 863-80

**COLORADO SPRINGS POLICE DEPARTMENT**
**CONTINUATION/SUPPLEMENTAL REPORT**

| CASE REPORT NUMBER |
|---|
| **11-03873** |

| OFFENSE | STATUTE NUMBER | UCR RECLASSIFICATION TO: | | UCR CODE |
|---|---|---|---|---|
| PIMPING | 18-7-206 | | | |

| VICTIM'S NAME (LAST, FIRST MIDDLE) | | | DATE OF THIS REPORT |
|---|---|---|---|
| STATE OF COLORADO | | | Thu Feb 03, 2011 |

| ARRESTEE NAME (LAST, FIRST MIDDLE) | RES ADD: 3820 RADIANT DR. #239D | RACE | SEX | AGE | DOB |
|---|---|---|---|---|---|
| THOMAS, TRAMELL | CITY & STATE: COLORADO SPRINGS, CO 80917 | B | M | 31 | 2/13/1979 |

| ARRESTEE NAME (LAST, FIRST MIDDLE) | RES ADD: | RACE | SEX | AGE | DOB |
|---|---|---|---|---|---|
| | CITY & STATE: | | | 0 | |

**S. SCHNEIDER** presented this case to _____C. Cruson 2.7.11_____ with the District Attorney's Office, for filing of formal criminal charges and the following disposition was reached: **(DDA's please check all that apply)**

| S1 | S2 | | | S1 | S2 | |
|---|---|---|---|---|---|---|
| ___ | ___ | No filed, no criminal charges filed. | | ___ | ___ | Nollied all felony charges. |
| ___ | ___ | Nollied some of the felony criminal charges. | | | | |

**Filed the following Misdemeanor charges:**

| S1 | S2 | | | S1 | S2 | |
|---|---|---|---|---|---|---|
| ___ | ___ | 3rd Degree Assault, 18-3-204 | | ___ | ___ | Harassment, 18-9-111 |
| ___ | ___ | Menacing, 18-3-206 | | ___ | ___ | Reckless Endangerment, 18-3-208 |
| ___ | ___ | Other(s): _____ | | | | |

**Filed the following Felony charges:**

| S1 | S2 | | | S1 | S2 | |
|---|---|---|---|---|---|---|
| ___ | ___ | Menacing, 18-3-206 | | ___ | ___ | Criminal Mischief, 18-4-501 |
| ___ | ___ | Criminal Attempt, 18-2-101 | | ___ | ___ | Conspiracy, 18-2-201 |
| ___ | ___ | Agg. Motor Vehicle Theft, 18-4-409 | | ___ | ___ | Theft, 18-4-401 |
| ___ | ___ | First Degree Assault, 18-3-202 | | ___ | ___ | Robbery, 18-4-301 |
| ___ | ___ | Second Degree Assault, 18-3-203 | | ___ | ___ | Agg. Robbery, 18-4-302 |
| ___ | ___ | Criminal Impersonation, 18-5-113 | | ___ | ___ | First Degree Burglary, 18-4-202 |
| ___ | ___ | False info. to a Pawnbroker, 12-56-104 | | ___ | ___ | 1st Deg. Crim. Trespass, 18-4-502 |
| ___ | ___ | Unauthorized Use of a Financial Transaction Device, 18-5-702 | | ___ | ___ | Forgery, 18-5-102 |
| ___ | ___ | Contributing to the Delinquency of a Minor, 18-6-701 | | ___ | ___ | Intimidating a Witness, 18-8-704 |
| | | | | ___ | _x_ | Other(s): Pimping F3 |

**DA COMMENTS:**

---

## INVESTIGATIONS CASE STATUS REPORT

☒ **Cleared by Arrest** *Thu Jan 27, 2011*
   ☒ CSPD ☐ Outside Jurisdiction -Agency: _____
☐ **Unfounded** – The elements of the crime do not exist
☐ **Exceptional Clearance** *(The following four criteria must exist for exceptional clearance)*
   ☐ Offender can be identified
   ☐ Sufficient probable cause to arrest
   ☐ Offender can be located
   ☐ A reason exists (see below) which prevents the arrest of the offender
      ☐ Death of the offender
      ☐ Prosecution denied by other than lack of PC
      ☐ Extradition denied
      ☐ Victim refused to cooperate
      ☐ Juvenile/No Custody, under age of ten
      ☐ Warrant issued

☐ **Open**
   ☐ Exhausted all investigative leads
   ☐ Other (Comments),
   _____

Victim contact Date: _____ Time: _____
☐ Phone   ☐ In Person   ☐ Letter Sent
Contact By: _____ IBM: _____

| UCR DISPOSITION | OFFICER NAME/NUMBER | SUPERVISOR | DATE | PAGE |
|---|---|---|---|---|
| CLEAR ARREST | S. SCHNEIDER | SGT. FOX | 2/3/2011 | 1 OF 1 |

**RECORDS AND IDENTIFICATION**

# COLORADO SPRINGS POLICE DEPARTMENT
# OFFENSE REPORT

| ATTRIBUTES | CASE REPORT NUMBER |
|---|---|
| Firearms | 10-37284 |

**TITLE/CLASS/STATUTE/ATTEMPT**
ROBBERY AGRVTD / Felony / 18-4-302  / Completed

**LOCATION OF OCCURRENCE**
3880 N. Academy Blvd #723

| CALL FOR SERVICE # | ZONE | SECTOR |
|---|---|---|
| 10437430 | 5 | 55 |

### OFFENSE

| DATE/TIME OCCURRED OR STARTED | | | DATE/TIME ENDED (IF APPLICABLE) | | | DATE/TIME REPORTED | | |
|---|---|---|---|---|---|---|---|---|
| DATE 11/11/2010 | DAY OF WEEK Thursday | TIME 00:50 | DATE 11/11/2010 | DAY OF WEEK Thursday | TIME 00:56 | DATE 11/11/2010 | DAY OF WEEK Thursday | TIME 00:58 |

| DATA ENTRY USE | DE MODIFIED (IBM/Date/Fields) | VICTIM SSN | VR FORM Yes | VICTIM/OFFENDER RELATION Unknown |
|---|---|---|---|---|

### VICTIM

| NAME (LAST, FIRST, MIDDLE, SUFFIX) WHITE, DAVID, SOLOMON | | RACE B (B) | SEX M | DATE OF BIRTH 6/18/1962 | AGE 48 |
|---|---|---|---|---|---|

**RESIDENCE ADDRESS**
2320 N Blakely Lake Rd Apt 1024, Duluth, GA 30096

HOME/CELL PHONE (719) 574-7821 (734) 829-7466

**WORK NAME/ADDRESS**
ITT Systems--Government Contract, Fort Carson, Colorado

WORK PHONE

EMAIL

**BUSINESS NAME (IF BUSINESS IS VICTIM)** | **BUSINESS ADDRESS** | **BUSINESS PHONE**

### SUSPECT/OTHER PARTIES

| PER # 2 | TYPE Susp | NAME (LAST, FIRST, MIDDLE, SUFFIX) Unknown, Unknown | | RACE B (B) | SEX M | DATE OF BIRTH | AGE 25-30 |
|---|---|---|---|---|---|---|---|

| SSN | MNI NUMBER | ID TYPE | ID NUMBER | ALIAS/NICKNAME | VR FORM No |
|---|---|---|---|---|---|

**RESIDENCE ADDRESS**
Unknown, Colorado Springs, CO

HOME/CELL PHONE

| HEIGHT 5'09" | WEIGHT 180 | HAIR COLOR BLK | EYE COLOR BRO | BUILD Medium | SUMMONS NUMBER(S) |
|---|---|---|---|---|---|

| HAIR STYLE | HAIR LENGTH | FACIAL HAIR | COMPLEXION DRK | TEETH | R/L HAND | EYE WEAR | SPEECH |
|---|---|---|---|---|---|---|---|

| SCAR MARK TATTOO (IF YES DESCRIBE IN NARRATIVE) | SUSPECT CAN BE | SUSPECTS VEHICLE CAN BE |
|---|---|---|

**CLOTHING/GENERAL APPEARANCE/UNUSUAL CHARACTERISTICS** Green fleece sweater/blue and white tennis shoes
Wearing a black face mask

EMPLOYER/WORK ADDRESS

CERTIFIED COPY
COLORADO SPRINGS POLICE DEPT.

WORK PHONE

| PERMANENT CONTACT NAME (LAST, FIRST, MIDDLE, SUFFIX) | RELATIONSHIP | RACE | SEX | DATE OF BIRTH |
|---|---|---|---|---|

*RonWalker #2595/SPD*
Records Custodian
9/13/17

| PERMANENT CONTACT ADDRESS | HOME/CELL PHONE |
|---|---|

### VEHICLE

| VEHICLE RELATION | VEHICLE YEAR | VEHICLE MAKE | VEHICLE MODEL | VEHICLE STYLE | VEHICLE COLORS – TOP/BOTTOM |
|---|---|---|---|---|---|

| VEHICLE LICENSE NUMBER | VEHICLE VALUE | LICENSE TYPE | LICENSE YEAR | LICENSE STATE | LIC. COLORS – PRIME/NUMBERS |
|---|---|---|---|---|---|

| VIN | VEHICLE TOWED BY/TO | VEHICLE INSURED BY | OWNER HOME/CELL PHONE |
|---|---|---|---|

| VEHICLE OWNER (LAST, FIRST, MIDDLE, SUFFIX) | VEHICLE OWNER ADDRESS |
|---|---|

| ADDITIONAL VEHICLE INFORMATION | VEHICLE PICKUP ISSUED | GUN PICKUP |
|---|---|---|

### PROPERTY ITEM

| ITEM # | QTY | CATEGORY | BRAND | MODEL | NIBRS |
|---|---|---|---|---|---|

DESCRIPTION

| SERIAL NUMBER | OAN | STOLEN/DAMAGED | VALUE ($) | RECOVERED ($) |
|---|---|---|---|---|

### PROPERTY ITEM

| ITEM # | QTY | CATEGORY | BRAND | MODEL | NIBRS |
|---|---|---|---|---|---|

DESCRIPTION

| SERIAL NUMBER | OAN | STOLEN/DAMAGED | VALUE ($) | RECOVERED ($) |
|---|---|---|---|---|

| ADD'L OFFENSES No | TITLE/CLASS/STATUTE/ATTEMPT / / / | PICKUP ISSUED FOR SUSPECT | PICKUP CANCELLED | ID CLERK NAME/IBM |
|---|---|---|---|---|

**INCLUDED/FORTHCOMING DOCUMENTS** Dictated Supplement - Priority 2
Photos, Property Descriptors

| DISPOSITION Open | EXCEPTIONAL CLEARANCE CATEGORY N | NUMBER OF ARRESTS ADULTS 0 JUVENILES 0 | INITIAL ASSIGNMENT Robbery | ASSIGNED DATE |
|---|---|---|---|---|

| PATROL INVESTIGATION CONTINUING No | WORK UNIT SH3 | OFFICER'S SUPERVISOR Sgt Makofske, 2419 | COMPANION NUMBERS |
|---|---|---|---|

| OFFICER NAME/NUMBER T. Speight / 3344 | APPROVING SUPERVISOR Lt. Buckley 1195 | APPROVAL DATE 11/11/2010 |
|---|---|---|

MOA_00000584

Tracking #FRS-8.2009-0015 v4

| | COLORADO SPRINGS POLICE DEPARTMENT<br>NARRATIVE | CASE REPORT NUMBER<br>10-37284 |
|---|---|---|

**GEN**

TITLE/CLASS/STATUTE/ATTEMPT

ROBBERY AGRVTD / Felony / 18-4-302    / Completed

*Initial Information:*

On Thursday, 11/11/2010 at approximately 0058 hours, I, **Officer T. Speight, 3344 (5A59),** along with other officers were dispatched to 3880 N. Academy Blvd., Apartment #723, Residence Inn Hotel to investigate a possible Robbery In-Progress. Upon arrival I contacted the **victim, Mr. DAVID SOLOMON WHITE, DOB: 06/18/1962** in the living room area of his hotel apartment. Mr. White stated while entertaining a female escort known only as **CHRISTINE or HARMONY**, he heard a knock at his front door. He said Christine opened the front door, and an unknown Black male walked into the apartment holding a silver in color semi-automatic handgun in his right hand.

Mr. White stated the unknown male told him to get onto the ground, which he complied with. He said the male started to rummage through his property and told Christine, "bitch get your shit up" and she started picking her belonging up from the floor. Mr. White stated he believes the suspect male and Christine are connected due to the fact that she left with him without a struggle and with her own free will.

Mr. White stated the male took a laptop computer, camera, cell phone, watch and $500.00 in U.S. Currency. Total value of items stolen is $2,355.00. The male and female suspects departed the area in an unknown direction and by unknown means. A search of the area met with negative results.

Please see supplements from Officer T. Speight and **Officer Clayton Sunada, 1768**.
Nothing further at this time.

**NARRATIVE**

**VER 1 CSPD 09/14/06**

**CERT**

| OFFICER NAME / NUMBER<br>T. Speight / 3344 | FRS PDF  SH0202845O2GON   11 Nov 2010  04:19:01   Complete    Page 2 of 2 |
|---|---|

MOA_00000585

FRS PDF  SH02026750O2GWI  12 Nov 2010  19:00:08  Complete  Page 1 of 1

## COLORADO SPRINGS POLICE DEPARTMENT
### NARRATIVE SUPPLEMENT

CASE REPORT NUMBER
**10-37284**

| TITLE/CLASS/STATUTE/ATTEMPT |
|---|
| ROBBERY AGRVTD / Felony / 18-4-302   / Completed |

| VICTIM'S NAME (LAST, FIRST, MIDDLE, SUFFIX) | ZONE | SECTOR |
|---|---|---|
| WHITE, DAVID | 5 | 55 |

### INITIAL INFORMATION
On 11-11-2010 (Thursday) at approximately 0058 hours I Officer C K Sunada 1768P (5A57) was dispatched to 3880 North Academy Bl #723, The Residence Inn, reference a robbery with a weapon. Suspect #1 described as a black male wearing a green jacket and black ski mask. Suspect #1 had a silver 45 caliber handgun. Suspect #2 described as an Indian/black female.

### OFFICER STATEMENT
I arrived on scene at approximately 0100 hours and contacted Officer M Reynolds 1966P (5P16) who had just arrived on scene. Upon entering the area I did not observe any vehicle or persons attempting to leave the complex. Officer Reynolds was accompanied by Gary Swanson (03-10-71), night clerk at this location. Mr. Swanson pointed out the apartment and officers contacted the victim later identified as David White (DOB 06-18-62). Mr. White was standing on the second floor landing in front of his apartment when officer contacted him. I began asking him if he needed medical attention and he advised that he did not. I asked him what kind of weapon the suspect had and he advised me that it was a silver 45 caliber handgun. I then asked him to give me a suspect description and Mr. White began to get agitated so Officer Reynolds began questioning him. I advised him that this information was pertinent to our investigation.

While Officer Reynolds questioned Mr. White outside the front door I entered the apartment and made sure it was clear and secure. I did not locate any suspect inside the apartment. I photographed the inside of the apartment. The inside was in total disarray. There was old half eaten food left everywhere inside of the apartment and clothes and other items were scatter throughout. I did not attempt any fingerprints due to this fact.

After photographing the scene, I attempted to complete neighborhood follow up. I attempted to contact #724, #713 and #714 but did not get any response. I looked at all of the other apartments and there were no lights on inside. I did not attempt any further contact.

I contacted Gary Swanson (DOB 03-10-71, 3880 North Academy Bl, CSC 80917, 719-574-0370), night clerk. Mr. Swanson stated that they do not have any security cameras at this location. He stated that he had been working the front desk from approximately 2300 hours and has not seen any vehicles or parties leave the parking lot. He has a clear view of the entrance.

Officer Speight 3344P arrived on scene. I gave him the photographs taken and he placed them into evidence at the Stetson Hills Substation. I completed a victim's rights form and gave Mr. White his copy.

### SCENE DESCRIPTION
The apartment at 3880 North Academy Bl #723 is the Residence Inn. It is on the west side of Academy Bl. The property sits at the corner of Academy Bl/Betty Drive. The entrances to the complex is off of Betty Drive. Entering the entrance west of Academy Bl you travel north to the third set of buildings. Apartment #723 in on the northwest side of the building and on the second floor.

At the top of the stairs, there are two apartments on this level. Apartment #723 is the west apartment. Entering the apartment travelling west you enter the living room. To the south of the living room, there is a oval kitchen counter top that separates the kitchen from the living room area. Continuing west from the living room there is a queen size bed along the west wall facing the front door. There is no separation between the bedroom area and the living room area. To the south of the bed there is a small hall that leads to the full bath in the southwest corner of the apartment.

| DISPOSITION | EXCEPTIONAL CLEARANCE CATEGORY | OFFICER'S SUPERVISOR | |
|---|---|---|---|
| Open | | SGT GRIMES | |

| OFFICER NAME/NUMBER | WORK UNIT | APPROVING SUPERVISOR | APPROVAL DATE |
|---|---|---|---|
| C K SUNADA / 1768 | SH2 | Sergeant Devin J. Grimes, 193 | 11/12/2010 |

TRCK #FRS-B-2009-0018 v2

FRS PDF  PSTE-HPXKKM15O2N62  13 Nov 2010  05:22:19  Complete  Page 1 of 2;

| | |
|---|---|
| **COLORADO SPRINGS POLICE DEPARTMENT** | **CASE REPORT NUMBER** |
| **NARRATIVE SUPPLEMENT** | **10-37284** |

**TITLE/CLASS/STATUTE/ATTEMPT**
ROBBERY AGRVTD / Felony / 18-4-302    / Completed

| VICTIM'S NAME (LAST, FIRST, MIDDLE, SUFFIX) | ZONE | SECTOR |
|---|---|---|
| WHITE, DAVID | 5 | 55 |

PATROL/pb

## INITIAL INFORMATION

On Thursday, 11/11/2010, at approximately 0058 hours, I, Officer T. Speight/3344/5A59, along with other Colorado Springs Police Department officers, were dispatched to 3880 N. Academy Blvd., Apartment #723, the Residence Inn Hotel, to investigate a possible robbery in progress. Upon arrival, I contacted the victim, Mr. **David S. White** DOB: 06/18/1962, in the living room area of his hotel apartment. Mr. White stated while entertaining a female escort, known only as **Christine** or **Harmony**, an unknown person knocked at his front door. He said Christine opened the front door and an unknown black male walked into the apartment holding a silver in color semi-automatic handgun in his right hand. He said the unknown suspect held him at gun point while he ransacked his apartment and took several items and cash valued at approximately $2355.00.

## VICTIM'S INFORMATION/STATEMENT

Name: David Solomon White
Date of Birth: 06/18/62
Phone Number: 734-829-7466
Address: 2320 N. Blakely Lake Road, #1024, Duluth, Georgia 30096
Work Address: ITT systems - government contracting, Ft. Carson, Colorado

Mr. White stated the unknown black male walked into his apartment, pointed a silver in color what he believed to be a .45 caliber semi-automatic handgun in the direction of his head, and told him, "Get on the ground." Mr. White stated he got on the ground and observed the unknown black male rummaging through his personal property located on a desk area inside the apartment. Mr. White stated while the suspect was rummaging through his property, he looked at Christine and told her, "Bitch, get your shit up." Mr. White stated Christine started picking up her personal belongings from the floor and around the bed area preparing to leave with the suspect.

Mr. White stated the male suspect picked up his cell phone that was on the kitchen table area and placed it into his left front jacket pocket. He next picked up a camera located on the nightstand near the bed and also placed that in a pocket (unknown which pocket). The suspect then took approximately $500.00 in U.S. currency (all in $20.00 bills) from the kitchen table area, and, just prior to leaving the apartment, the suspect took a laptop computer and placed it under his left arm. The entire time the suspect was rummaging through Mr. White's property, he was telling Christine to get her stuff together, which she did, and then stood by the front door waiting for the male suspect to gather the property.   Mr. White stated the male suspect and Christine departed together. I asked Mr. White if he believed the two were connected and he stated he did due to the fact Christine left with the male without a struggle and of her own free will.

I asked Mr. White how he knew Christine or Harmony. He stated on Saturday, 11/06/2010, he was interested in contacting a female escort to spend the evening with him, so he went to a website called **backpage.com.** He made contact with Harmony, which was her name on the website; however, she later identified herself as Christine. Harmony did come to his apartment that day, and later throughout the week he sent text messages to her and asked her to come over again on 11/10/2010, which she did. Mr. White stated from the time she arrived at approximately 1830 hours to approximately 2300 hours, they drank wine, ate, and had sex. He said they fell asleep together in his bed at approximately 2300 hours. He stated at approximately 0015 hours on 11/11/2010, he was awakened by her sending text messages on her cell phone to an unknown person. Mr. White stated he thought she was possibly trying to call for a ride from his apartment. He believed this because of a conversation ...

| DISPOSITION | EXCEPTIONAL CLEARANCE CATEGORY | OFFICER'S SUPERVISOR | |
|---|---|---|---|
| Open | | Sgt. B. Makofske/2419 | |
| OFFICER NAME/NUMBER | WORK UNIT | APPROVING OFFICER | APPROVAL DATE |
| T. Speight / 3344 | SH3 | Lt. Buckley 1195 | 11/13/2010 |

TRCK #FRS-8.2009.0018.v2

MOA_00000587

COLORADO SPRINGS POLICE DEPARTMENT
NARRATIVE OVERFLOW

CASE REPORT NUMBER
10-37284

TITLE/CLASS/STATUTE/ATTEMPT
/ Felony / 18-4-302    ROBBERY AGRVTD / Completed

Overflow from Narrative:

they had earlier in the evening when she told him that she would be leaving and not spending the night with him. Mr. White said approximately 15 to 20 minutes later, at around 0040 to 0050 hours, the knock at the front door came. This is when Christine got up from the bed, answered the door, and the unknown black male walked into his apartment with the handgun. Mr. White stated the suspect was only in his apartment for approximately 3-5 minutes, and did not see which direction they went, or if they departed on foot or in a vehicle.

**SUSPECTS' DESCRIPTIONS**

Suspect #1, the black male, was described as 25 to 30 years of age, approximately 5'9", 180 pounds, with dark skin. He was wearing a green fleece sweater, blue and white tennis shoes, and a black ski mask with holes in it for the eyes and mouth.

Suspect #2 was a black and Indian (from India) female, 24 years of age, approximately 5'5", 125 pounds, with long dark hair that had blonde streaks in it. She was wearing a red dress and a gray sweatshirt. She also had a Canadian accent.

**ITEMS STOLEN**

Item #1.    One (1) Verizon V-Cast silver in color cell phone, phone number 734-829-7466, valued at $300.00;
Item #2.    One (1) black Hewlett-Packard laptop computer with a 15 inch monitor, valued at $1000.00;
Item #3.    One (1) black Canon camera, valued at $500.00;
Item #4.    $500.00 in U.S. currency (all $20.00 bills);
Item #5.    One (1) silver and gold in color Armitron watch, valued at $55.00.
The total value of the items stolen was $2,355.00.

**OFFICER STATEMENT**

Mr. White took me down to the front lobby area of the hotel where we attempted to go to the backpage.com website; however, due to filters we were unable to get on the website. I was able to access backpage.com from the Stetson Hills Substation and printed pictures of Harmony and placed them into evidence at the Stetson Hills Substation. The phone numbers listed for Harmony are (720) 385-9062, (719) 645-3702 and (719) 291-0531. I called all numbers and they go to a voicemail.

Nothing further at this time.

OFFICER NAME / NUMBER
T. Speight / 3344

FRS PDF  PSTE-HPXKKM15O2N62  13 Nov 2010  05:22:19  Complete    Page 2 of 2

MOA_00000588

FRS PDF MJ0152765TE14N 22 Feb 2011 13 30 51 Complete Page 1 of 3

| COLORADO SPRINGS POLICE DEPARTMENT NARRATIVE SUPPLEMENT | CASE REPORT NUMBER 10-37284 |
|---|---|

| TITLE/CLASS/STATUTE/ATTEMPT |
|---|
| ROBBERY AGRVTD / Felony / 18-4-302 / Completed |

| VICTIM'S NAME (LAST, FIRST, MIDDLE, SUFFIX) | ZONE | SECTOR |
|---|---|---|
| White, David | 5 | 5X |

**DETECTIVES/sjr**

**INITIAL INFORMATION**

**11-15-10**

I, Detective Schneider was assigned to case 10-37284 to conduct a follow-up investigation. Upon being assigned the case, I first reviewed the reports by initial responding officers and then conducted a follow-up investigation.

**VICTIM CONTACT**

**11-16-10**

I was able to make contact with victim **DAVID WHITE** via telephone number 734-829-7466. In speaking with Mr. White, he advised me that the female who was part of the robbery was an individual he found on a website called backpage.com. He looked under the Colorado Springs City link, then escort link. The female suspect's site was dated October 20th under the name of **HARMONY**.

Mr. White advised me that he does not live in Colorado Springs, but was here for business purposes and just wanted to have some companionship while in town. Since the robbery, he has returned to Atlanta, where he lives and he had no plans of coming back to Colorado Springs, unless it was for necessary reasons or work reasons.

Mr. White did not have any serial numbers for the electronics taken from during the robbery, but he advised that he would attempt to get the serial numbers and contact me if he was able to.

The only other information he provided at the time was that the desk clerk from the hotel on the evening of the robbery possibly got a plate off of a green Saturn that was in the parking lot at around the time of the robbery. Mr. White had no additional information at this time.

Later in the afternoon, on 11-16-10, I received a voice message from the victim advising that the plate the front desk had told him about was Colorado 394T07. It should be noted that Colorado plates commonly do not end in numbers, unless it is a customized plate. A query on that plate listed to no record. I then tried the plate of 394TOZ and found that it listed on a blue Kia Spectra. The vehicle year was a 2005. The vehicle listed to a **VICKY AND JESSE JARAMILLO** at 32 Monk St., Colorado Springs.

Mr. White described the female that he met from backpage.com as a white or Indian, which he described further as an individual from the country of India, mix female, approximately 24 years of age, 5'7" to 5'8", 135 lbs., with dark brown or blacked streaked long hair. When he was hanging out with her, she showed him a driver's license, which was from Colorado and he thought the name on it was either **CHRISTINA** or **CHRISTIE**. Mr. White had no additional information at this time.

**HARMONY TRUMP**

**11-12-10**

An email was sent to the Chief's office of the Colorado Springs Police Department advising that they had observed an escort robbery on KKTV news. An individual believed that if the girl had tattoos all over her torso, it sounded like **HARMONY TRUMP**. This information was passed onto me and I then conducted a records search for a Harmony Trump, where I found a record for Harmony Trump (DOB: 05-21-87). ...

| DISPOSITION Cleared by Arrest | EXCEPTIONAL CLEARANCE CATEGORY | OFFICER'S SUPERVISOR Sgt. Fox | |
|---|---|---|---|
| OFFICER NAME/NUMBER S. Schneider / 2769 | WORK UNIT MCROB | APPROVING SUPERVISOR Sgt. Dale R. Fox 127 | APPROVAL DATE 2/22/2011 |

TRCK #FRS-8.2006-0018 v2

MOA_00000589

| COLORADO SPRINGS POLICE DEPARTMENT NARRATIVE OVERFLOW | CASE REPORT NUMBER 10-37284 |
|---|---|

**GEN**

TITLE/CLASS/STATUTE/ATTEMPT

/ Felony / 18-4-302    ROBBERY AGRVTD / Completed

Overflow from Narrative:

**NARRATIVE**

In checking Ms. Trump's record, it showed that she had tattoos on her abdomen and back. Her physical description was listed as a white female, 5'6", 115 lbs., brown hair, and hazel eyes, and medium complected skin.

## BACKPAGE.COM

### 01-24-10

I conducted a search on backpage.com going to the Colorado Springs link and then to the Colorado escorts link. I then went to 11-06-10, where I found a posting of a female using the name of Harmony, which is consistent with the information provided by Mr. White. The link was with the title ((**all the right places**))-22. It was posted on 11-06-10 at 5:03 p.m. In the link it stated, "Hello gentleman, today is such a beautiful day! Enjoy it with a woman like me. My name is Harmony 719-645-3702."

Poster's age 22, location Colorado Springs, post ID #5855569.

In the link there were four photos. The first photo was of a female with a medium brown complected skin, appears to have blue eyes, long dark hair. The photos show the female wearing nothing but a purple bra and panties. The very last photo shows the same female standing outside near a tree wearing a blue dress and hat. The female in these photos was consistent with the description provided by Mr. White. In observing this posting, it confirmed that it was not that of Harmony Trump.

There was another post from 11-06-10 at 10:11 p.m. with the title of ((**take a walk on tha wild side**))-22. Upon observing this link, I immediately observed two of the photos were that of the same female from the previous posting. In the posting it again says that her name is Harmony and lists the phone number of 719-645-3702. It also stated other ads by this user was the posting of All the Right Places and included the following postings:

"Exotic-passionate-affordable-22, the absolute sexiest caramel treat", search no more, an exotic-passionate-affordable.

Continuing the search, I found another posting from 11-17-10 at 8:36 p.m. titled "Discover the Mystery-22." In clicking on it, I observed three photos; none of which showed the full face of the female, but the images of the body and that of the background in the photos was similar to that from the background on two of the pictures from the All the Right Places posting. The details on Discovery the Mystery posting showed the location of Colorado Springs, the poster's age being 22, and a post ID #5911375. In it, the female lists her name as **MYSTERY** and gives a phone number of 719-291-0531.

## VICTIM RE-CONTACT

### 12-20-10

Mr. White contacted me, via phone, and advised me he was unable to locate any serial numbers for the electronics taken from him and that he would not be able to get them. He did provide me with a password code of 2400 for his computer, advising that this would allow us to log onto his computer should we locate it.

## VICE AND NARCOTICS DETECTIVES

I made contact with Detective Crews, 3560 from the Metro Vice and Narcotics Detective Unit. Detective Crews informed me that he was aware of the robbery and had located the postings on backpage.com of the female suspect. He advised that when he was able to, he and other detectives would try and set up a contact to meet with her.

### 01-27-11

Detective Crews contacted me and advised me that they had made contact with the female suspect at the **Motel 6** ...

**CERT | VER CSPD 07/11/06**

| OFFICER NAME / NUMBER S. Schneider / 2769 | FRS PDF  MJ0152765TE14N  22 Feb 2011  13.30.51  Complete   Page 2 of 3 |
|---|---|

MOA_00000590

| COLORADO SPRINGS POLICE DEPARTMENT | CASE REPORT NUMBER |
|---|---|
| NARRATIVE OVERFLOW | 10-37284 |

**TITLE/CLASS/STATUTE/ATTEMPT**

/ Felony / 18-4-302   ROBBERY AGRVTD / Completed

Overflow from Narrative:

located at Fillmore St. and Chestnut St.  They had also contacted a male party during the investigation who they believed was possible the male suspect.

**01-28-11**

Detective Crews advised me that through their investigation the previous night, the female they contacted was identified as **CHRISTINE DUNCAN.**, She had confessed to the robbery and advised that the male party that other detectives had contacted, identified as **TRAMELL THOMAS (2/13/79)**, was the male who robbed the victim. Detective Crews informed me that they arrested Mr. Thomas for the robbery of Mr. White.  He also advised that they had executed a search warrant in relation to the investigation and recovered a number of items of evidence.

For additional information pertaining to the investigation done by Detective Crews and other detectives, please refer to their supplements.

**VICTIM CONTACT**

**01-31-11**

I contacted Mr. White to advise him a male party had been arrested in connection with his case.  Mr. White informed me that he had already been notified by one of the detectives that evening, but he did appreciate the call.  Mr. White then provided me with the following email address in case we needed to email him any photos of items of evidence recovered, so he could verify if they were his or not.  The email address provided was BigDee74041@yahoo.com <mailto:BigDee74041@yahoo.com>.

Mr. White had no additional information.

**ADDITIONAL INFORMATION**

Nothing further at this time

| OFFICER NAME / NUMBER | | |
|---|---|---|
| S. Schneider / 2769 | FRS PDF  MJ0152765TE14N  22 Feb 2011  13:30:51  Complete    Page 3 of 3 | |

MOA_00000591

FRS PDF MJ015276SUET0G 14 Mar 2011 09:52:57 Complete Page 1 of 2

| COLORADO SPRINGS POLICE DEPARTMENT NARRATIVE SUPPLEMENT | CASE REPORT NUMBER 10-37284 |
|---|---|

**TITLE/CLASS/STATUTE/ATTEMPT**
ROBBERY AGRVTD / Felony / 18-4-302    / Completed

**VICTIM'S NAME (LAST, FIRST, MIDDLE, SUFFIX)**
White, David

| ZONE | SECTOR |
|---|---|
| 5 | 5X |

## DETECTIVES/mm

## DETECTIVE STATEMENT

02-17-11

I, Detective Schneider, removed a number of items from evidence that had been collected by other detectives under Colorado Springs Police report #11-03873, a pimping case, which was related to the aggravated robbery under case #10-37284. Upon removing the items from evidence, I then photographed each one. I removed the following items from evidence were:

**Item #12:** a HP laptop, black in color with silver circle designs on it, model HP Pavilion DV4-2049US, serial number CND9491HFZ.

**Item #8:** an Olympus digital camera, model FE-47, serial number UA4A07555.

**Item #13:** a Samsung black, open face cell phone, model SCH-R100, serial number 268435459508849276.

**Item #1:** a black touch-screen cell phone which was broken, model HUAWEIM860, serial number 2XA9MB10A1210842.

**Item #2:** a Garmin NUVI GPS system, black in color, with car charger, serial number 1VA082091.

**Item #14:** three individual memory stick thumb drives:
1. Brand PNY memory 4G, black in color;
2. Brand IMATION memory 1G, silver in color with a black lanyard;
3. Brand Optima Attache memory 2G, orange in color.

02-18-11

I sent e-mails to victim **DAVID WHITE** at the e-mail address of bigdee74041@yahoo.com <mailto:bigdee74041@yahoo.com>. The e-mails I sent contained photos of the above-mentioned items to see if any of them belonged to Mr. White. In response the e-mail regarding the computer, Mr. White replied in the e-mail, "Yes it like my computer." In response to every other e-mail I sent regarding the above-mentioned items, Mr. White advised they were not his.

After receiving the e-mail responses from Mr. White, I then contacted him via telephone. I asked him what about the computer was similar to his and he stated his computer that was taken was a Hewlett Packard and on the top of it there was the logo HP in one of the corners and had silver circular designs on it. Upon opening up the computer, on the keypad area there were a number of stickers on the pad. The description he provided was similar to that of the one recovered from evidence.

## ADDITIONAL EVIDENCE

I placed into evidence the e-mails, including e-mail responses, from Mr. White regarding the evidence items. I also placed into evidence a CD containing the photos I took of the selected evidence items.

## HP LAPTOP

...

| DISPOSITION Cleared by Arrest | EXCEPTIONAL CLEARANCE CATEGORY | OFFICER'S SUPERVISOR Sgt. Fox | |
|---|---|---|---|
| OFFICER NAME/NUMBER S. Schneider / 2769 | WORK UNIT MCROB | APPROVING SUPERVISOR Sgt. Dale R. Fox 127 | APPROVAL DATE 3/14/2011 |

MOA_00000592

**COLORADO SPRINGS POLICE DEPARTMENT**
**NARRATIVE OVERFLOW**

| CASE REPORT NUMBER |
| --- |
| 10-37284 |

TITLE/CLASS/STATUTE/ATTEMPT

GEN

/ Felony / 18-4-302    ROBBERY AGRVTD / Completed

Overflow from Narrative:

Mr. White advised that upon opening the laptop and powering it up, it should have his name as the login.  Upon opening it up, I observed that the name was **Devonte** with the password entry below it.  I did not attempt to go any further at this point given it was not Mr. White's name listed above.

**ADDITIONAL INFORMATION**

I have nothing further to report.

NARRATIVE

VER CSPD 07/11/06

| OFFICER NAME / NUMBER | |
| --- | --- |
| S. Schnelder / 2769 | FRS PDF  MJ0152765UET0G   14 Mar 2011  09:52:57  Complete   Page 2 of 2 |

CERT

MOA_00000593

# AFFIDAVIT OF PROBABLE CAUSE

The following affidavit is submitted to the Court to document the probable cause in support of the arrest of **THOMAS, TRAMELL** DOB: **02/13/1979** SSN: **Unknown**.

This offense is fully documented in Colorado Springs Police Department Offense Report ~~11-03873~~ 10-37284 detailing the offense(s) of:

§18-4-302, AGGRAVATED ROBBERY, CLASS THREE FELONY (F3)

With the victim(s) identified as:

1. White, David – 06/18/62

I, Detective R. Crews/3560Z, am a sworn police officer for the Colorado Springs Police Department (CSPD). I have been a sworn police officer for approximately 8 years and is currently assigned to the CSPD Metro Vice, Narcotics and Intelligence Division. Metro VNI is a multi agency co-located drug task force designated to investigate, control, and prevent the illegal sale, possession, and/or manufacturing of illegal narcotics. Units of Metro VNI conduct in depth investigations of major drug trafficking organizations, gangs involved in the drug trafficking, money laundering operations, and prostitution throughout El Paso and Teller Counties. I am responsible for the investigation of individuals or groups of individuals involved in the street and mid level distribution of narcotics and prostitution.

On November 11, 2010, I learned that Colorado Springs Police Department, (CSPD) officers were dispatched to the Residence Inn located at 3880 N. Academy Blvd, in Colorado Springs, Colorado to investigate a reported personal robbery with a weapon. The victim/reporting party who was identified as David S. White, black male, DOB: 06/18/1962 told officers that he had been seeing a 24 year old female escort he had seen advertising on the internet. David White identified the female escort by the first names of Christine/Harmony. David White provided a physical description of AKA Christine/Harmony as black/Indian female mix, 24 years of age, approximately 5' 5"tall, 125 pounds, with long dark hair with blonde streaks in it. David White stated that beginning on November 10, 2010, he contacted AKA Christine/Harmony and asked her for her services which cost $260.00 for one hour. David White stated that when Christine/Harmony arrived at his hotel room they drank wine, ate dinner and had sex. David White stated that they then fell asleep, until 4:00 or 5:00 am when he was awakened by her texting on her cell phone. David White stated that he assumed she was contacting her driver for a ride home from his hotel room and engaged in small talk with AKA Christine/Harmony.

David White relayed that on November 11, 2010, approximately 20 minutes after they woke up, an unknown person knocked on the front door of his hotel room. David White stated that AKA Christine/Harmony answered the door and an unknown black male wearing a knit cap covering his face with openings for his eyes and mouth walked into the hotel room. White additionally described the suspect as wearing a green fleece sweater and blue and white athletic shoes. David White stated the black male pointed a sliver in color, semi automatic pistol in the direction of his head and told him to get on the ground. David White believed that the weapon was probably a .45 caliber hand gun. David White stated that the black male began searching through his personal belongings and took his cellular telephone, a Hewlett-Packard laptop computer, one Canon camera, an Armitron wrist watch, and $500.00 in United States currency. David White estimated the valuables taken by the unidentified black male at approximately $2,355.00. David White stated that while the black male was rummaging

**SCANNED**

# AFFIDAVIT OF PROBABLE CAUSE

through the hotel room, he told AKA Christine/Harmony to gather her things. David White stated as the unidentified black male was walking out of the hotel room, he told AKA Christine/Harmony, "bitch, get your shit up". David White stated that they both left the hotel room together in an unknown direction. David White felt that the unidentified black male and AKA Christine/Harmony were connected because she left with him without displaying any signs of duress.

David White then provided officers the website he used to contact AKA Christine/Harmony. The website was identified as, www.backpage.com. Officers were able to locate the web page posting identified by David White that depicted AKA "Christine" or "Harmony." The web page posting displayed several photographs of a female matching the description provided by David White. Officers were able to print those photographs and place the copies into official CSPD Evidence. CSPD Robbery Detective S. Schneider subsequently requested the assistance of the Metro VNI unit with contacting the party known as AKA "Christine/Harmony" in regards to the robbery which occurred in November 2010.

Between November 2010 and January 2011, Detective J. Lamberth/9616Z of Metro VNI monitored the daily postings on www.backpage.com and other websites on which female escorts advertise. During this time frame, Detective J. Lamberth/9616Z observed several web page postings of a female escort matching the physical description of AKA "Christine/Harmony." It should be noted that some of the photographs that Detective J. Lamberth/9616Z observed on the web page postings were identical to the photographs featured in the web posting identified by the victim, David White.

On January 27th 2011, Detective J. Lamberth/9616Z located a new web posting advertisement in the "Escort" section of www.backpage.com displaying photographs of a female matching the physical description of the party previously identified as AKA "Christine/Harmony." In the advertisement, the female identified herself as AKA "Jazmine," and stated that she would provide "some serious service and action." AKA "Jazmine" listed a contact phone number of 719.645.1130.

On January 27th 2011, at approximately 1700 hrs, Detective J. Lamberth/9616Z, posing as a potential customer, placed a phone call to 719.645.1130 and spoke with a female party who identified herself as "Jazmine." Detective J. Lamberth/9616Z then asked "Jazmine" for a hour-long session and asked if she had any available appointment slots. "Jazmine" replied that she did have availability and informed Detective J. Lamberth/9616Z that an hour-long session would cost $260.00. Detective J. Lamberth/9616Z then arranged to meet "Jazmine" at her in-call location which she indicated was the Motel 6 located on Chestnut St. just north of W. Fillmore Rd. in Colorado Springs, CO.

On January 27th 2011 at approximately 2130 hrs, Detective J. Lamberth/9616Z met "Jazmine" in room #228 at the aforementioned Motel 6. (Detective J. Lamberth/9616Z immediately recognized "Jazmine" as the female party in the photographs on the www.backpage.com used by Detective J. Lamberth/9616Z to contact "Jazmine" as well as the historical postings in which the female identified herself as "Christine/Harmony."

**SCANNED**

MOA_00000595

# AFFIDAVIT OF PROBABLE CAUSE

Detective J. Lamberth/9616Z was able to arrange a prostitution-related transaction with "Jazmine" which included sexual intercourse to completion and oral sex in exchange for $260.00 (of pre-recorded official Metro VNI buy funds). Detective J. Lamberth/9616Z then provided a verbal arrest cue, at which time members of the El Paso County Crime Reduction Unit responded to room #228 and detained "Jazmine." Subsequent investigation by responding officers identified "Jazmine" as Christine Marie Duncan – DOB: 09/12/1986. During the arrest of Duncan, detectives conducting surveillance in the area of the Motel 6 observed a red in color Toyota Camry occupied by a black male who was observed walking with Duncan just prior to her meeting with Detective J. Lamberth/9616Z.

Contemporaneous to Detective J. Lamberth/9616Z's interaction with Duncan, other investigating officers and detectives conducted a traffic stop of the red in color Toyota Camry for a traffic violation and subsequently identified the driver as Tramell D. Thomas – DOB: 02/13/1979. During the traffic stop, investigating detectives confirmed via a police dispatcher that Thomas is a current parole client with the Colorado Department of Corrections and has been previously convicted of Aggravated Robbery (see Colorado Court case **1998CR4696**). Communication with Thomas' parole officer, Maryanna Meijas, verified his parolee status. Meijas advised investigating detectives that a hold was to be placed on Thomas at the El Paso County Criminal Justice Center pursuant to the charges relating to his involvement in Prostitution/Pimping.

Detective J. Lamberth/9616Z continued his investigation with Duncan and advised her of her Miranda rights which she subsequently waived. After waiving her rights, Duncan elected to provide a statement of involvement to Detective J. Lamberth/9616Z. Detective J. Lamberth/9616Z asked Duncan to divulge any information she had regarding the above referenced robbery which occurred in November 2010. During the interview, Duncan corroborated several of the statements made by the original victim, David White, concerning the robbery including positively identifying Tramell Thomas as the black male who had entered the hotel room with the semi-automatic pistol described by the victim. Duncan told Detective J. Lamberth/9616Z that she had no idea that Thomas was going to rob the victim and only sent text messages to Thomas to ask for a ride home from the victim's hotel room. Duncan stated that when she heard the knock at the hotel room door, the victim told her to answer it and when she did, Thomas pushed her out of the way and entered the room. When Thomas entered the room, he was wearing a black knit ski mask and holding a pistol. Duncan stated that Thomas was upset with her and the victim because he had not been appropriately compensated for the amount of time that Duncan had spent with the victim. Duncan stated that Thomas then began demanding money and personal items from the victim who told Thomas to take his camera, his laptop computer, his cellular phone, his watch, and any cash located in the victim's belongings. Duncan stated that Thomas ordered her to get dressed and go wait in the car. She said that she stood outside the hotel room door and waited for Thomas to come out. When Thomas came out of the room, Duncan and Thomas ran to the car and left the area.

Duncan stated that the next day, she was able to obtain the laptop and camera from Thomas without his knowledge and attempted to contact the victim to return the items. Duncan was unable, however, to make contact with the victim. Duncan stated that the last time she personally observed the victim's

SCANNED

MOA_00000596

# AFFIDAVIT OF PROBABLE CAUSE

belongings and the pistol used in the robbery was in December of 2010 at the apartment where she currently resides with Thomas (3820 Radiant Dr. #239, Colorado Springs, CO). Duncan stated that she has been living with Thomas at that location since September 2010. Duncan stated that she has been working as an escort under Thomas' direction since September of 2010 and that all of the monetary proceeds earned by providing sexual services to clients are given directly to Thomas. Duncan estimated that she has earned approximately $5000-$7000 since September 2010. Duncan stated that she is the sole bread-winner for Thomas and that his only source of income is generated by her work as an escort. Duncan volunteered to identify the apartment where she and Thomas currently reside which is the location where she last observed the victim's belongings and the pistol used in the commission of the robbery.

I would respectfully request that probable cause be found that THOMAS, TRAMELL DOB: 02/13/1979 did within the City of Colorado Springs, County of El Paso and State of Colorado, commit in violation of the Colorado Revised Statutes, the offense(s) of **§18-4-302, AGGRAVATED ROBBERY, CLASS THREE FELONY (F3)**

Friday January 28, 2011
_____
Date

_____ DETECTIVE R. CREWS / 3560
Officer's Signature
Colorado Springs Police Department

_____
Notary Signature

My Commission expires: _06/15/2013_

Address: Colorado Springs Police Department
PO Box 2160
Colorado Springs, CO 80901-2169

SCANNED

Case No. 1:16-cr-00054-WJM Document 525-32 Filed 12/12/19 USDC Colorado Page 99 of
Case 1:16-cr-00054-WJM Document 524 Filed 12/12/19 USDC Colorado pg 499 of
971

| DISTRICT COURT, EL PASO COUNTY, COLORADO<br>Court Address: 270 South Tejon Street,<br>Colorado Springs, CO 80903 | |
|---|---|
| **People of the State of Colorado**<br>VS.<br><br>**Defendant: THOMAS, TRAMELL**<br>Defendant DOB: 02/13/1979 | ▲ COURT USE ONLY ▲<br><br>Case #:<br><br>Division #:<br><br>Courtroom #: |

## INFORMATION FOR PRELIMINARY PROCEDURE

The above named Defendant was arrested on Friday January 28, 2011 on the charges of:

§18-4-302, AGGRAVATED ROBBERY, CLASS THREE FELONY (F3)

The following bonding information is to be considered by the Judge in setting bail on the defendants.

**Standard Bond**

DETECTIVE R. CREWS, 3560
Signature of Peace Officer who furnished the
above information

NOTE: If more than one defendant was arrested for the same or similar acts or series of acts, they <u>must</u> be included on the same sheet.

| Initiating Law Enforcement Agency Information | |
|---|---|
| Initiating Officer Name: | DETECTIVE R. CREWS |
| Agency/Division: | Colorado Springs Police Department<br>Colorado Springs Police Department |
| Case Report Number: | 11-03873 → Pimping /10-37284 - Robbery |

**SCANNED**

| Adult ☒ | Agency CSPD METRO VNI | CUSTODY REPORT | CSPD No. 745118 |
|---|---|---|---|
| Juvenile | | | |

| Custody Date 01/27/11 | Custody Time 2230 | Custody Location FILLMORE ST. + CENTENNIAL | Zone 2 | Sector L | Booking No. 10000 1836 |

Subjects Name (Last, First Middle): THOMAS TRANELL D
Alias/Maiden No.: 37284
Offense No. 11-03677

Res. Add: 3820 RADIANT DR # 239 D
Telephone: 719 645-1130

City & State: C.O. 80917
Soc Sec No.: Unkn

Scars/Marks/Tattoos: Unk.

| DOB 02/13/79 | Race B | Sex M | Age 30 | Ht 600 | Wt 200 | Hair BLK | Eyes BRO | Drivers License No. 98-112-1157 | State CO |

POB: Unknown
Occupation: UNEMPLOYED
Subjects Actions [ ] Resisted [ ] Armed

Employers Name (Firm):
Employers Address:

CODES: A - Accomplice    S - Spouse    M - Mother    F - Father    SM - Stepmother    SF - Stepfather

| code | Name (Last, First Middle) | CSPD No. | Address | Telephone |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Injury/Illness: NA
Treated: [ ] Yes [ ] No [ ] Refused
Treated By:
[ ] Injury Result of Police Action
[ ] Injured Prior to Police Contact
[ ] Injured/Became Ill While In Police Custody

Where Treated:
Date/Time Treated:
Visible Injury:

| CJS Number | Statute Number / Ordinance Number | CHARGES | INT | DISPO | Common Code | Warrant Number | Summons Number |
|---|---|---|---|---|---|---|---|
| | A ORI 18-4302 FIN | AGG. ROBBERY | N | HLD | 1207c | PCAFF | |
| | B ORI 18-7-206 FIN | MENACING | N | HLD 1003 M | | PCAFF | |
| | C ORI FIN | | | | | | |
| | D ORI FIN | | | | | | |

DISPOSITION CODES
HLD - Held in Custody
NFC - No Formal Charge
ROB - Released on Bond
DBP - Charges Dropped by Police
FAC - Filed as Charged
ROR - Released on Own Recognizance
TOT - Turned over to Another Agency
DEC - Deceased

RELEASED TO
Agency
Officer
Date & Time

Date/Time of Final Disposition
Officer Making Final Disposition
Filing DDA

| Veh Yr | Veh Make | Model | Style | Color | Veh License No. | State | Location of Vehicle |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

Narrative: 1 ARRESTED ON A TRAFFIC STOP RESULTING IN THE ABOVE LISTED CHARGES.

RIGHT INDEX
R.P.D

VERIFIED BY

SCANNED

| Officer Name J.L. LAMBERTA | ID No. 9162 | Officer Name | ID No. | Supervisor | Page / of |

OS 863-80

## COLORADO SPRINGS POLICE DEPARTMENT
### CONTINUATION/SUPPLEMENTAL REPORT

| | | | CASE REPORT NUMBER |
|---|---|---|---|
| | | | **10-37284** |

| OFFENSE | STATUTE NUMBER | UCR RECLASSIFICATION TO: | UCR CODE |
|---|---|---|---|
| AGGRAVATED ROBBERY | 18-4-302 | | |

| VICTIM'S NAME (LAST, FIRST MIDDLE) | | | | DATE OF THIS REPORT | | |
|---|---|---|---|---|---|---|
| WHITE, DAVED | | | | Wed Feb 02, 2011 | | |

| ARRESTEE NAME (LAST, FIRST MIDDLE) | RES ADD: UNKNOWN | RACE | SEX | AGE | DOB |
|---|---|---|---|---|---|
| THOMAS, TRAMELL | CITY & STATE: COLORADO SPRINGS, CO 809XX | B | M | 31 | 2/13/1979 |

| ARRESTEE NAME (LAST, FIRST MIDDLE) | RES ADD: | RACE | SEX | AGE | DOB |
|---|---|---|---|---|---|
| | CITY & STATE: | | | 0 | |

<u>S. SCHNEIDER</u> presented this case to _C. Cruson 2-7-11_ with the District Attorney's Office, for filing of formal criminal charges and the following disposition was reached: (**DDA's please check all that apply**)

| S1 | S2 | |
|---|---|---|
| ___ | ___ | No filed, no criminal charges filed. |
| ___ | ___ | Nollied some of the felony criminal charges. |

| S1 | S2 | |
|---|---|---|
| ___ | ___ | Nollied all felony charges. |

**Filed the following Misdemeanor charges:**

| S1 | S2 | |
|---|---|---|
| ___ | ___ | 3rd Degree Assault, 18-3-204 |
| ___ | ___ | Menacing, 18-3-206 |
| ___ | ___ | Other(s): |

| S1 | S2 | |
|---|---|---|
| ___ | ___ | Harassment, 18-9-111 |
| ___ | ___ | Reckless Endangerment, 18-3-208 |

**Filed the following Felony charges:**

| S1 | S2 | |
|---|---|---|
| ___ | ___ | Menacing, 18-3-206 |
| ___ | ___ | Criminal Attempt, 18-2-101 |
| ___ | ___ | Agg. Motor Vehicle Theft, 18-4-409 |
| ___ | ___ | First Degree Assault, 18-3-202 |
| ___ | ___ | Second Degree Assault, 18-3-203 |
| ___ | ___ | Criminal Impersonation, 18-5-113 |
| ___ | ___ | False info. to a Pawnbroker, 12-56-104 |
| ___ | ___ | Unauthorized Use of a Financial Transaction Device, 18-5-702 |
| ___ | ___ | Contributing to the Delinquency of a Minor, 18-6-701 |

| S1 | S2 | |
|---|---|---|
| ___ | ___ | Criminal Mischief, 18-4-501 |
| ___ | ___ | Conspiracy, 18-2-201 |
| ___ | ___ | Theft, 18-4-401 |
| ___ | ___ | Robbery, 18-4-301 |
| ___ | ☒ | Agg. Robbery, 18-4-302 |
| ___ | ___ | First Degree Burglary, 18-4-202 |
| ___ | ___ | 1st Deg. Crim. Trespass, 18-4-502 |
| ___ | ___ | Forgery, 18-5-102 |
| ___ | ___ | Intimidating a Witness, 18-8-704 |
| ___ | ___ | Other(s): |

**DA COMMENTS:**

---

### INVESTIGATIONS CASE STATUS REPORT

☒ Cleared by Arrest *Fri Jan 28, 2011*
  ☒ CSPD ☐ Outside Jurisdiction -Agency:_____
☐ **Unfounded** – The elements of the crime do not exist
☐ **Exceptional Clearance** (*The following four criteria must exist for exceptional clearance*)
  ☐ Offender can be identified
  ☐ Sufficient probable cause to arrest
  ☐ Offender can be located
  ☐ A reason exists (see below) which prevents the arrest of the offender
    ☐ Death of the offender
    ☐ Prosecution denied by other than lack of PC
    ☐ Extradition denied
    ☐ Victim refused to cooperate
    ☐ Juvenile/No Custody, under age of ten
    ☐ Warrant issued

☐ Open
  ☐ Exhausted all investigative leads
  ☐ Other (Comments),

Victim contact Date: _1/31/11_ Time:_____
☒ Phone ☐ In Person ☐ Letter Sent
Contact By: _S. SCHNEIDER_ IBM: _2769_

| UCR DISPOSITION | OFFICER NAME/NUMBER | SUPERVISOR | DATE | PAGE 1 |
|---|---|---|---|---|
| CLEAR ARREST | S. SCHNEIDER | SGT. FOX | 2/2/2011 | OF 1 |

**RECORDS AND IDENTIFICATION**

## COLORADO SPRINGS POLICE DEPARTMENT
## CONTINUATION/SUPPLEMENTAL REPORT

CASE REPORT NUMBER
**10-37284**

| OFFENSE | STATUTE NUMBER | UCR RECLASSIFICATION TO: | | | UCR CODE |
|---|---|---|---|---|---|
| AGGRAVATED ROBBERY | 18-4-302 | | | | |

| VICTIM'S NAME (LAST, FIRST MIDDLE) | | | | | DATE OF THIS REPORT | |
|---|---|---|---|---|---|---|
| WHITE, DAVED | | | | | Wed Feb 02, 2011 | |

| ARRESTEE NAME (LAST, FIRST MIDDLE) | RES ADD: UNKNOWN | RACE | SEX | AGE | DOB |
|---|---|---|---|---|---|
| THOMAS, TRAMELL | CITY & STATE: COLORADO SPRINGS, CO 809XX | B | M | 31 | 2/13/1979 |

| ARRESTEE NAME (LAST, FIRST MIDDLE) | RES ADD: | RACE | SEX | AGE | DOB |
|---|---|---|---|---|---|
| | CITY & STATE: | | | 0 | |

**S. SCHNEIDER** presented this case to _____ with the District Attorney's Office, for filing of formal criminal charges and the following disposition was reached: **(DDA's please check all that apply)**

| S1 | S2 | |
|---|---|---|
| _____ | _____ | No filed, no criminal charges filed. |
| _____ | _____ | Nollied some of the felony criminal charges. |

| S1 | S2 | |
|---|---|---|
| _____ | _____ | Nollied all felony charges. |

_____ Filed the following Misdemeanor charges:

| S1 | S2 | |
|---|---|---|
| _____ | _____ | 3rd Degree Assault, 18-3-204 |
| _____ | _____ | Menacing, 18-3-206 |
| _____ | _____ | Other(s): _____ |

| S1 | S2 | |
|---|---|---|
| _____ | _____ | Harassment, 18-9-111 |
| _____ | _____ | Reckless Endangerment, 18-3-208 |

_____ Filed the following Felony charges:

| S1 | S2 | |
|---|---|---|
| _____ | _____ | Menacing, 18-3-206 |
| _____ | _____ | Criminal Attempt, 18-2-101 |
| _____ | _____ | Agg. Motor Vehicle Theft, 18-4-409 |
| _____ | _____ | First Degree Assault, 18-3-202 |
| _____ | _____ | Second Degree Assault, 18-3-203 |
| _____ | _____ | Criminal Impersonation, 18-5-113 |
| _____ | _____ | False Info. to a Pawnbroker, 12-56-104 |
| _____ | _____ | Unauthorized Use of a Financial Transaction Device, 18-5-702 |
| _____ | _____ | Contributing to the Delinquency of a Minor, 18-6-701 |

| S1 | S2 | |
|---|---|---|
| _____ | _____ | Criminal Mischief, 18-4-501 |
| _____ | _____ | Conspiracy, 18-2-201 |
| _____ | _____ | Theft, 18-4-401 |
| _____ | _____ | Robbery, 18-4-301 |
| _____ | _____ | Agg. Robbery, 18-4-302 |
| _____ | _____ | First Degree Burglary, 18-4-202 |
| _____ | _____ | 1st Deg. Crim. Trespass, 18-4-502 |
| _____ | _____ | Forgery, 18-5-102 |
| _____ | _____ | Intimidating a Witness, 18-8-704 |
| _____ | _____ | Other(s): _____ |

## DA COMMENTS:

---

## INVESTIGATIONS CASE STATUS REPORT

☒ Cleared by Arrest *Fri Jan 28, 2011*
  ☒ CSPD ☐ Outside Jurisdiction –Agency:_____
☐ Unfounded – The elements of the crime do not exist
☐ Exceptional Clearance (*The following four criteria must exist for exceptional clearance*)
  ☐ Offender can be identified
  ☐ Sufficient probable cause to arrest
  ☐ Offender can be located
  ☐ A reason exists (see below) which prevents the arrest of the offender
    ☐ Death of the offender
    ☐ Prosecution denied by other than lack of PC
    ☐ Extradition denied
    ☐ Victim refused to cooperate
    ☐ Juvenile/No Custody, under age of ten
    ☐ Warrant issued

☐ Open
  ☐ Exhausted all investigative leads
  ☐ Other (Comments),

Victim contact Date: 1/31/11 Time: _____
☒ Phone ☐ In Person ☐ Letter Se...
Contact By: S. SCHNEIDER IBM: 27...

*MASTER CASE #11-03873
FOR PIMPING CHARGE*

| UCR DISPOSITION | OFFICER NAME/NUMBER | SUPERVISOR | DATE | PAG... |
|---|---|---|---|---|
| CLEAR ARREST | S. SCHNEIDER | SGT. FOX | 2/2/2011 | OF |

### RECORDS AND IDENTIFICATION

MOA_00000601



# OFFICE OF THE DISTRICT ATTORNEY

Fourth Judicial District
105 East Vermijo
Colorado Springs, CO 80903
VICTIM WITNESS
(719) 520-6049 \ FAX (719) 520-6172



Dan May
District Attorney

Dan Zook
Assistant District Attorney

July 12, 2011

SCOTT A Schneider
Colo Springs Police
Colorado Springs Police Dept
705 South Nevada Ave
Colorado Springs, CO  80903

RE:     Investigating Officer: SCOTT A Schneider
        Arresting Agency:      Colo Springs Police
        Offense #:             10-37284
        Offense Date:          11/11/2010

People v. Tramell Dawan Thomas, Case Number D0212011CR000340

On June 01, 2011, this case was dismissed: victim / witness unavailable

If the Defendant pays restitution pursuant to a court order, the Court will forward these restitution payments to you. If you have any questions regarding restitution please call the Court Registry at 719-448-7588.

To check the status of personal property in the custody of law enforcement, please call 719-390-2481 (El Paso Sheriff's Office) or 719-444-7744 (Colorado Springs Police Dept.) Contact all other law enforcement agencies at their main number. If you are advised your property is being released to you, bring a copy of this letter with you. Any unclaimed property may be destroyed or auctioned if not retrieved.

It is important that you keep the District Attorney's Office informed of any changes in your address or phone number if you wish to be notified of any upcoming court dates.

JUL 1 9 2011
Date

Bryan R Gogarty
Deputy District Attorney

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Daniel Edward Burrows (brittany.herrera@usdoj.gov,
caseview.ecf@usdoj.gov, daniel.burrows@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Mary
Virginia Butterton (co.ecf@fd.org, mary_butterton@fd.org, mitzi_tarver@fd.org), Renee V.
Cooper (attyrcooper@gmail.com, crimdefenseattyrcooper@gmail.com), Bryan David Fields
(bryan.fields3@usdoj.gov, caseview.ecf@usdoj.gov, dequesa.boucher@usdoj.gov,
kelsey.totura@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Beth N. Gibson
(beth.gibson@usdoj.gov, caseview.ecf@usdoj.gov, stephanie.price1@usdoj.gov,
usaco.ecfcriminal@usdoj.gov), Thomas Edward Goodreid (cdobson@ggklaw.com,
t.goodreid@comcast.net), Jeralyn E. Merritt (jeralynm@gmail.com), Martha Ann Paluch
(caseview.ecf@usdoj.gov, dequesa.boucher@usdoj.gov, mariah.hill@usdoj.gov,
martha.paluch@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Siddhartha H. Rathod
(ls@rmlawyers.com, qm@rmlawyers.com, sr@rmlawyers.com), Daniel T. Smith
(danieltsmith@qwestoffice.net), Judge William J. Martinez
(deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Gregory Allen Holloway (maureen.carle@usdoj.gov), Michael Evan
Sander (docketalarm-ecf-admin-0@inbound.docketalarm.com), khami
(kyla_hamilton@cod.uscourts.gov), mgill (matthew_gill@cod.uscourts.gov), mrobe
(melissa_roberts@cod.uscourts.gov), Probation-General (cod_efiling@cod.uscourts.gov),
USM-Criminal Division (gillian.fleck@usdoj.gov, jason.brackett@usdoj.gov,
royce.namoca@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:6382494@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00054-WJM USA v. Carr et al Order
```
Content–Type: text/html

## U.S. District Court – District of Colorado

### District of Colorado

**Notice of Electronic Filing**

The following transaction was entered on 2/21/2018 at 11:34 AM MST and filed on 2/21/2018

| | |
|---|---|
| **Case Name:** | USA v. Carr et al |
| **Case Number:** | 1:16–cr–00054–WJM |
| **Filer:** | |
| **Document Number:** | 326(No document attached) |

**Docket Text:**

**ORDER as to (2) Trammel Thomas: This matter is before the Court on [262] the Government's Sentencing Statement, [318], Defendant's Sentencing Statement, and [324] the Government's Response. The Government has taken the position that the amount of loss is "more than $550,000 but less than $1.5 million" which would lead to a 14–level increase under U.S.S.G. §2B1.1(b)(1)(H), and also that the judgment should include restitution of $563,890.85. (ECF No. [262] at 1, 14.) Defendant has "advise[d] the Court, as a preliminary matter, that he disputes... the loss amount," but without indicating what calculation of loss he believes is correct, and without addressing restitution. (ECF No. [318] at 4.) The Government's Response [324] addresses only the issues surrounding uncharged conduct, but does not address loss or restitution. Accordingly, the parties are DIRECTED to confer as to whether there is a genuine factual dispute regarding the correct calculations of loss**

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/12/19   USDC Colorado   pg 505 of
971
Case 1:16-cr-54   NEF for Docket Entry 326   Filed 02/21/2018   Page 2 of 2

**and/or restitution. If the parties are in agreement, they shall file a joint statement reflecting their shared position no later than <u>March 9, 2018</u>. If the parties disagree, then each party shall file a separate position statement by <u>March 9, 2018</u>, including each party's calculation of loss and/or restitution, the evidentiary materials supporting that position, and a statement as to whether an evidentiary hearing regarding loss and/or restitution is required, either before the sentencing hearing or simultaneous to it. SO ORDERED by Judge William J. Martinez on 2/21/2018. Text Only Entry (wjmlc2, )**

**1:16–cr–00054–WJM–2 Notice has been electronically mailed to:**

Daniel T. Smith    danieltsmith@qwestoffice.net

Jeralyn E. Merritt    jeralynm@gmail.com

Renee V. Cooper (Terminated)    attyrcooper@gmail.com, crimdefenseattyrcooper@gmail.com

Martha Ann Paluch    Martha.paluch@usdoj.gov, CaseView.ECF@usdoj.gov, Mariah.Hill@usdoj.gov, usaco.ecfcriminal@usdoj.gov

Thomas Edward Goodreid    t.goodreid@comcast.net, cdobson@ggklaw.com

Siddhartha H. Rathod    sr@rmlawyers.com, ls@rmlawyers.com, qm@rmlawyers.com

Daniel Edward Burrows (Terminated)    daniel.burrows@usdoj.gov, CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov

Beth N. Gibson    Beth.Gibson@usdoj.gov, CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov, stephanie.price1@usdoj.gov

Mary Virginia Butterton    mary_butterton@fd.org, co.ecf@fd.org, mitzi_tarver@fd.org

Bryan David Fields    bryan.fields3@usdoj.gov, CaseView.ECF@usdoj.gov, Dequesa.Boucher@usdoj.gov, Kelsey.Totura@usdoj.gov, usaco.ecfcriminal@usdoj.gov

**1:16–cr–00054–WJM–2 Notice has been mailed by the filer to:**

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/18 USDC Colorado pg 506 of
Case 1:16-cr-00054-WJM Document 381 Filed 03/05/18 Page 1 of 2
971

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No.  16-cr-00054-WJM-2

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2. TRAMMEL THOMAS

      Defendant.

---

## GOVERNMENT'S MOTION TO RESTRICT DOCUMENTS

---

The United States of America, by and through United States Attorney Robert C. Troyer and the undersigned Assistant United States Attorney, respectfully moves pursuant to District of Colorado Local Rule 47.1(f)(2)  to restrict a document and order revealing the contents of that document, and the brief filed in support of this motion, for the reasons stated in the brief filed in support of this motion.  The United States requests a "Level 3" Restriction which would make the document, and order revealing the contents of that document and the brief filed in support of this motion, viewable by the Court and the filing party only

Respectfully submitted this 5th day of March, 2018.

                                  ROBERT C. TROYER
                                  United States Attorney

By:     *s/ Bryan D. Fields*
          BRYAN D. FIELDS
          MARTH A. PALUCH
          Assistant U.S. Attorneys
          U.S. Attorney's Office
          1801 California Street, Suite 1600
          Denver, CO 80202
          Telephone: (303) 454-0100
          E-mail: Bryan.Fields3@usdoj.gov
          Attorney for Government

Case No. 1:16-cr-00054-WJM-Document 525-1 filed 12/12/19 USDC Colorado pg 507 of
Case 1:16-cr-00054-WJM Document 381 Filed 03/05/18 Page 2 of 2
971

2

## CERTIFICATE OF SERVICE

I certify that on this 5th day of March, 2018, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such filing to

all counsel of record in this case.

s/ *Bryan D. Fields*
BRYAN DAVID FIELDS
MARTHA A. PALUCH
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov
bryan.fields3@usdoj.gov

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/13/19 USDC Colorado pg 508 of
Case 1:16-cr-00054-WJM Document 331-1 Filed 03/05/18 Page 1 of 1 pg 508 of
971

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM-2

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**2. TRAMMEL THOMAS**

      **Defendant**.

---

## ORDER TO RESTRICT DOCUMENT

---

This matter is before the Court on the Government's Motion to Restrict Document. Upon consideration and for good cause shown,

IT IS ORDERED that said Document, the United States' Brief in Support of Motion to Restrict Document, as well as any order revealing the contents of that document, are hereby restricted at a "Level 3 Restriction" and will be viewable by the Court and the filing party only.

IT IS SO ORDERED on this _____ day of _____, 2018.


_____
HON. WILLIAM J. MARTINEZ
UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Daniel T. Smith (danieltsmith@qwestoffice.net), Renee V. Cooper
(attyrcooper@gmail.com, crimdefenseattyrcooper@gmail.com), Jeralyn E. Merritt
(jeralynm@gmail.com), Thomas Edward Goodreid (cdobson@ggklaw.com, t.goodreid@comcast.net),
Daniel Edward Burrows (brittany.herrera@usdoj.gov, caseview.ecf@usdoj.gov,
daniel.burrows@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Martha Ann Paluch
(caseview.ecf@usdoj.gov, dequesa.boucher@usdoj.gov, mariah.hill@usdoj.gov,
martha.paluch@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Mary Virginia Butterton
(co.ecf@fd.org, mary_butterton@fd.org, mitzi_tarver@fd.org), Bryan David Fields
(bryan.fields3@usdoj.gov, caseview.ecf@usdoj.gov, dequesa.boucher@usdoj.gov,
kelsey.totura@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Siddhartha H. Rathod
(ls@rmlawyers.com, qm@rmlawyers.com, sr@rmlawyers.com), Beth N. Gibson
(beth.gibson@usdoj.gov, caseview.ecf@usdoj.gov, stephanie.price1@usdoj.gov,
usaco.ecfcriminal@usdoj.gov), Judge William J. Martinez (deborah_hansen@cod.uscourts.gov,
jamie_h_hubbard@cod.uscourts.gov, jenna_grambort@cod.uscourts.gov,
martinez_chambers@cod.uscourts.gov, theresa_sauer@cod.uscourts.gov)
--Non Case Participants: mrobe (melissa_roberts@cod.uscourts.gov), Gregory Allen Holloway
(maureen.carle@usdoj.gov), Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), khami (kyla_hamilton@cod.uscourts.gov),
mgill (matthew_gill@cod.uscourts.gov), ad hoc (wang_chambers@cod.uscourts.gov)
--No Notice Sent:

Message-Id:6399968@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00054-WJM USA v. Carr et al Memorandum
```
Content–Type: text/html

# U.S. District Court – District of Colorado

## District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 3/5/2018 at 4:10 PM MST and filed on 3/5/2018

| | |
|---|---|
| **Case Name:** | USA v. Carr et al |
| **Case Number:** | 1:16–cr–00054–WJM |
| **Filer:** | |
| **Document Number:** | 334(No document attached) |

**Docket Text:**
 **MEMORANDUM regarding Motion(s) referred to Magistrate Judge Nina Y. Wang. by Judge William J. Martinez on 3/5/2018. Text Only Entry (wjmsec, )**

**1:16–cr–00054–WJM–2 Notice has been electronically mailed to:**

Daniel T. Smith     danieltsmith@qwestoffice.net

Jeralyn E. Merritt     jeralynm@gmail.com

Renee V. Cooper (Terminated)     attyrcooper@gmail.com, crimdefenseattyrcooper@gmail.com

Martha Ann Paluch     Martha.paluch@usdoj.gov, CaseView.ECF@usdoj.gov, Mariah.Hill@usdoj.gov,

usaco.ecfcriminal@usdoj.gov

Thomas Edward Goodreid     t.goodreid@comcast.net, cdobson@ggklaw.com

Siddhartha H. Rathod     sr@rmlawyers.com, ls@rmlawyers.com, qm@rmlawyers.com

Daniel Edward Burrows (Terminated)     daniel.burrows@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov

Beth N. Gibson     Beth.Gibson@usdoj.gov, CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov,
stephanie.price1@usdoj.gov

Mary Virginia Butterton     mary_butterton@fd.org, co.ecf@fd.org, mitzi_tarver@fd.org

Bryan David Fields     bryan.fields3@usdoj.gov, CaseView.ECF@usdoj.gov, Dequesa.Boucher@usdoj.gov,
Kelsey.Totura@usdoj.gov, usaco.ecfcriminal@usdoj.gov

**1:16–cr–00054–WJM–2 Notice has been mailed by the filer to:**

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/12/19   USDC Colorado   pg 511 of
971
Case 1:16-cr-54   NEF for Docket Entry 335   Filed 03/06/2018   Page 1 of 2

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Daniel T. Smith (danieltsmith@qwestoffice.net), Renee V. Cooper
(attyrcooper@gmail.com, crimdefenseattyrcooper@gmail.com), Jeralyn E. Merritt
(jeralynm@gmail.com), Thomas Edward Goodreid (cdobson@ggklaw.com, t.goodreid@comcast.net),
Daniel Edward Burrows (brittany.herrera@usdoj.gov, caseview.ecf@usdoj.gov,
daniel.burrows@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Martha Ann Paluch
(caseview.ecf@usdoj.gov, dequesa.boucher@usdoj.gov, mariah.hill@usdoj.gov,
martha.paluch@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Mary Virginia Butterton
(co.ecf@fd.org, mary_butterton@fd.org, mitzi_tarver@fd.org), Bryan David Fields
(bryan.fields3@usdoj.gov, caseview.ecf@usdoj.gov, dequesa.boucher@usdoj.gov,
kelsey.totura@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Siddhartha H. Rathod
(ls@rmlawyers.com, qm@rmlawyers.com, sr@rmlawyers.com), Beth N. Gibson
(beth.gibson@usdoj.gov, caseview.ecf@usdoj.gov, stephanie.price1@usdoj.gov,
usaco.ecfcriminal@usdoj.gov), Judge William J. Martinez (deborah_hansen@cod.uscourts.gov,
jamie_h_hubbard@cod.uscourts.gov, jenna_grambort@cod.uscourts.gov,
martinez_chambers@cod.uscourts.gov, theresa_sauer@cod.uscourts.gov)
--Non Case Participants: mrobe (melissa_roberts@cod.uscourts.gov), Gregory Allen Holloway
(maureen.carle@usdoj.gov), Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), khami (kyla_hamilton@cod.uscourts.gov),
mgill (matthew_gill@cod.uscourts.gov)
--No Notice Sent:

Message-Id:6401011@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00054-WJM USA v. Carr et al Order on Motion for Leave to
Restrict
Content-Type: text/html
```

### U.S. District Court – District of Colorado

### District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 3/6/2018 at 11:23 AM MST and filed on 3/6/2018

| | |
|---|---|
| **Case Name:** | USA v. Carr et al |
| **Case Number:** | 1:16–cr–00054–WJM |
| **Filer:** | |
| **Document Number:** | 335(No document attached) |

**Docket Text:**
 **ORDER as to Trammel Thomas (2) granting the Government's Motion to Restrict Documents
[331]. The Government's Motion is GRANTED for good cause shown. The documents filed at
ECF Nos. 332 and 333 shall remain RESTRICTED at RESTRICTION LEVEL 3 (viewable only
by the Filer and the Court). SO ORDERED by Judge William J. Martinez on 3/6/2018. Text
Only Entry (wjmsec, )**

**1:16–cr–00054–WJM–2 Notice has been electronically mailed to:**

Daniel T. Smith    danieltsmith@qwestoffice.net

Jeralyn E. Merritt    jeralynm@gmail.com

Renee V. Cooper (Terminated)     attyrcooper@gmail.com, crimdefenseattyrcooper@gmail.com

Martha Ann Paluch     Martha.paluch@usdoj.gov, CaseView.ECF@usdoj.gov, Mariah.Hill@usdoj.gov, usaco.ecfcriminal@usdoj.gov

Thomas Edward Goodreid     t.goodreid@comcast.net, cdobson@ggklaw.com

Siddhartha H. Rathod     sr@rmlawyers.com, ls@rmlawyers.com, qm@rmlawyers.com

Daniel Edward Burrows (Terminated)     daniel.burrows@usdoj.gov, CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov

Beth N. Gibson     Beth.Gibson@usdoj.gov, CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov, stephanie.price1@usdoj.gov

Mary Virginia Butterton     mary_butterton@fd.org, co.ecf@fd.org, mitzi_tarver@fd.org

Bryan David Fields     bryan.fields3@usdoj.gov, CaseView.ECF@usdoj.gov, Dequesa.Boucher@usdoj.gov, Kelsey.Totura@usdoj.gov, usaco.ecfcriminal@usdoj.gov

**1:16–cr–00054–WJM–2 Notice has been mailed by the filer to:**

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/12/18   USDC Colorado   pg 513 of
971
Case 1:16-cr-00054-WJM   Document 336   Filed 03/07/18   Page 1 of 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**2.  TRAMMEL THOMAS**

      Defendant

---

### DEFENDANT'S RESPONSE TO COURT'S ORDER DOCKET #337

---

      Comes now the Defendant, by and through his counsel, Daniel T. Smith and Thomas E. Goodreid,  and responds to the Court's Order dated March 6, 2018 at docket # 337.

1.  The Court has entered an Order requiring the Defendant to respond to the government's motion requesting an arrest warrant and the revocation of the Defendant's pretrial release status. (Docket # 333)

2.  By the Court's Order of March 6, 2018 at Docket #335, the documents filed by the government at docket #'s 332 and 333 were ordered restricted at level 3.  As such neither the Defendant nor his counsel have viewed or could have viewed the restricted document.

3.  Counsel cannot respond to the Government's motion docket #333, as he has never seen the document,  nor can he see the document in its current restricted status.

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 514 of
971
Case 1:16-cr-00054-WJM Document 336 Filed 03/07/18 Page 2 of 3

4. The Court has further set a revocation hearing for Friday March 9, 2018 at 3 P.M. Neither Mr. Smith nor Mr. Goodreid are available for a hearing any time on March 9, 2018.

5. Counsel requests that the Court order the unrestricting of docket #333 so that counsel can be fully apprised of the government's requests. Counsel further requests that any response or hearing date be set such that counsel has adequate time to prepare for a hearing including time to meet with the client.

6. Counsel further requests this additional time based upon their receipt of a memo from U.S. Probation Officer Cohen. This memo was dated March 2, 2018 and identifies several allegations of the Defendant's violation of certain release restrictions.

7. While the memo makes several allegations against the Defendant it recommends, " defendant's bond be revoked and he be taken into custody following his next Court appearance". At the time this memo was received, the Defendant's next Court appearance was his sentencing date of April 12, 2018.

8. Counsel is left only to guess what factors have changed or occurred, to cause the government's request for immediate revocation.

Wherefore, the Defendant requests that the Court enter an Order granting the Defendant additional time to respond to Docket #333, once it has been unrestricted, and further, to set a hearing date that is convenient to this Court's calendar and those of the parties.

Dated this 7th day of, March , 2018.

Daniel T. Smith Attorney at Law

s/ Daniel T. Smith
Daniel T. Smith
4582 S. Ulster St. #1400

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/18 USDC Colorado pg 515 of
971
Case 1:16-cr-00054-WJM Document 358 Filed 03/07/18 Page 3 of 3

Denver, Colorado 80237
Telephone: 303 860 8100
Fax: 303 860 8018
danieltsmith@qwestoffice.net


Thomas E. Goodreid
1801 Broadway #1400
Denver, Co. 80202
Telephone 303 296 2048
Fax: 303 292 0522
t.goodreid@comcast.net

Attorneys for Tramell Thomas

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 7, 2018 the foregoing
**DEFENDANT'S RESPONSE TO COURT'S ORDER DOCKET #337** was
electronically filed with the Clerk of the Court using the CM/ECF system which
will send notification of said filing to the following email addresses:

s/ Daniel T. Smith

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/12/18   USDC Colorado   pg 516 of
971
Case 1:16-cr-00054-WJM   Document 339   Filed 03/08/18   Page 1 of 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Action No: 16-cr-00054-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.      TRAMMEL THOMAS,

      Defendant.

---

## MINUTE ORDER

---

Entered by Magistrate Judge Nina Y. Wang

This matter comes before the court on the Government's Motion for Arrest Warrant and Revocation of Defendant's Order of Release Pursuant to 18 U.S.C. § 3148 ("Motion") [#333, fled March 5, 2018], which was referred to this court pursuant to D.C.COLO.LCrR 57.1 and the Memorandum dated March 5, 2018 [#334]. Defendant Trammel Thomas filed a Response on March 7, 2018, indicating that neither he nor his counsel had received a copy of the Government's Motion. [#338]. Defendant further advised that he could not substantively address any allegations of violations of his conditions of release until receiving a copy of the Government's Motion, and he and his counsel were not available for a revocation hearing on March 8, 2018 at 3:00 p.m.

Upon consideration of the Response, **IT IS ORDERED** that:

(1)      The Clerk of the Court is **DIRECTED to AMEND** the restriction level of [#333] from Level 4 to Level 2, giving access to the Government, the court, and the affected Defendant pursuant to D.C.COLOCrR 47.1(b);

(2)      The Motion is **RESERVED** as to whether Defendant Thomas's bond will be revoked pursuant to 18 U.S.C. §3148; and

(3)      The Parties are **DIRECTED** to contact the chambers of Magistrate Judge Nina Y. Wang to set a revocation hearing and a deadline for a substantive response by Defendant Trammel Thomas.

Dated: March 8, 2018

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/17/18   USDC Colorado   pg 517 of
971
Case 1:16-cr-00054-WJM   Document 341   Filed 03/09/18   Page 1 of 26

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No.  16-cr-00054-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.      TRAMMEL THOMAS,

      Defendant.

---

## GOVERNMENT'S POSITION STATEMENT RE LOSS, RESTITUTION
## AND FORFEITURE

---

      The United States of America (the government), by Robert C. Troyer, United

States Attorney, through Martha A. Paluch and Bryan D. Fields, Assistant United States

Attorneys, respectfully submits this position statement pursuant to the Court's February

21, 2018 Minute Order.  ECF 326.  In this filing, the government sets forth its argument

pertaining to 1) the loss amount to be attributed to this defendant pursuant to U.S.S.G.

§§ 1B1.3 and 2B1.1; 2) the amount of restitution the defendant should be ordered to

pay; and 3) the amount of the forfeiture money judgment it will request that the Court

impose.

      **I.**      **Burden of Proof**

      At the sentencing hearing, the government bears the burden of proving all three

amounts at issue by a preponderance of the evidence.  *See United States v. Riesterer,*

224 F.Supp.3d 1156, 1167 (D. Colo. 2016) (loss amount) (citing *United States v. Schild,*

269 F.3d 1198, 1200 (10th Cir. 2001)); *Riesterer,* 224 F.Supp.3d at 1167 (as to

1

Case No. 1:16-cr-00054-WJM Document 541 Filed 12/11/19 USDC Colorado pg 518 of
971
Case 1:16-cr-00054-WJM Document 341 Filed 03/09/18 Page 2 of 16

restitution, the government must prove "the amount of loss sustained by a victim as a

result of the offense," by a preponderance of the evidence) (citing 18 U.S.C. § 3664));

*see also United States v. Bader,* 678 F.3d 858, 893 (10th Cir. 2012) ("[a] forfeiture

judgment must be supported by a preponderance of the evidence") (citations omitted).

The preponderance of the evidence standard requires the government to "show it

is more likely than not that the factual matters on which it bears the burden are true."

*Riesterer,* 224 F.Supp.3d at 1167 (citing *United States v. Craig,* 808 F.3d 1249, 1257

n.7 (10th Cir. 2015)).  The government will meet its burden of proving all three amounts

at the sentencing hearing through the testimony of Special Agent Sandra Ennis.

## II.    The loss amount is over $550,000 for a 14-level increase in the base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(H)

The defendant was convicted at trial of conspiring with his co-defendants,

Heather Carr, Mercedes Diaz, and Marcelle Green, to submit 181 false Free

Applications for Federal Student Aid (FAFSAs) to the United States Department of

Education (the Department).  The government proved at trial through the testimony of

Special Agent Sandra Ennis that the total amount of loss suffered by the Department

and the victim community colleges from this scheme is $563,890.85.  Gov't Ex. 72.  The

government submits that the entire amount of the loss is attributable to the defendant

pursuant to the Relevant Conduct provisions set forth at U.S.S.G. § 1B1.3.

### a.  Legal Framework

Commentary Note 3(A) to § 1B1.3 provides that with respect to jointly undertaken

criminal activity, such as a scheme to defraud, the defendant is accountable for the acts

and omissions of others that were:  "(i) within the scope of the jointly undertaken

criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably

2

foreseeable in connection with that criminal activity"; *see also United States v. Gordon,*
710 F.3d 1124, 1165 (10th Cir. 2013) ("reasonably foreseeable gains attributable to co-
conspirators' acts are properly tabulated in § 2B1.1(b)(1)'s offense-conduct
computations") (citations omitted).

When several defendants are convicted of the same conspiracy as occurred
here, "'jointly undertaken criminal activity' is not necessarily the same as the scope of
the entire conspiracy, and hence relevant conduct is not necessarily the same for every
participant." U.S.S.G. § 1B1.3 cmt. n.3(B). To determine a particular defendant's
accountability for the conduct of others, the Court "must first determine the scope of the
criminal activity the particular defendant agreed to jointly undertake (*i.e.*, the scope of
the specific conduct and objectives embraced by the defendant's agreement)." *United
States v. Godinez-Perez,* 864 F.3d 1060, 1063 (10th Cir. 2016) (citing § 1B1.3 cmt.
n.3(B)); *United States v. Green,* 175 F.3d 822, 837 (10th Cir. 1999) ("the district court
must make particularized findings tying the defendant to the relevant conduct used to
increase the base offense level") (citation omitted).

### b. The scope of the criminal activity the defendant agreed to jointly undertake

Special agents executed a search warrant at the defendant's home on November
29, 2012. There, stenciled on the wall of the bedroom he shared with co-defendant
Heather Carr, was the statement "Like two armed co-defendants We stick together." [1]

_____

[1] The statement is a quote from the song "Streets is Watching." *See* Jay-Z, In My
Lifetime, Vol. 1 (Roc-A-Fella Records and Def Jam Recordings, 1997). Heather Carr
told investigators that she put up the stencil and that she got the idea from the song.
The Court can consider this statement --- one the defendant would have seen every
time he woke up in that bedroom while carrying out the scheme --- as part of its
evaluation of whether the defendant was fully immersed in the scheme. *See United*

3

(Attachment 1).  There's no reason to doubt that the couple's decorating choice was a
sincere one:  the evidence presented at sentencing will show that the defendant agreed
to jointly undertake all of the criminal activity necessary to further the scheme.

The trial evidence established that Heather Carr searched her employer Wells
Fargo's Lexis Nexis database for the social security numbers (SSNs) used on all 181
false FAFSAs submitted to the Department.  Special Agent Ennis will testify that Carr
stated in proffer sessions that the defendant knew she obtained SSNs in this manner for
use in the scheme, and that he knew of, and participated in, every other aspect of the
scheme to defraud the Department.  Specifically, Carr told Special Agent Ennis:

1) The defendant conducted inmate searches on department of corrections
   websites looking for inmate names to use on false FAFSAs while he resided in
   Arizona.  Attachment 2 at 2 (MOI_00000549 through MOI_00000553).

2) All four conspirators made up information when filling out documents provided to
   the schools for admission.  *Id.*

3) All four conspirators participated in submitting electronic applications to Pikes
   Peak Community College (PPCC).  The conspirators chose PPCC because the
   defendant had previously submitted applications to PPCC and "it was working for
   him."  *Id.* at 3.  Carr was also familiar with obtaining federal student aid (FSA)
   from PPCC.  *Id.*

4) While Thomas was involved in the submission of documents for FSA to be
   disbursed in the names of C.D., V.L., and I.O. (and others), he asked Carr to

_____

*States v. Reico*, 2018 WL 1176938, --- F.3d ---, at **3 (4th Cir. March 7, 2018) ("Lyrics
can also be relevant to show a defendant's knowledge or motive.")

4

520

keep the SSN information for all three in case he lost it. *Id.* at 2, 5. In addition, Carr conducted SSN searches for C.D., V.L., and I.O. through the Lexis Nexis database. Gov't Ex. 72.

5) All four conspirators submitted FAFSAs, completed homework, and pulled money off the debit cards. Attachment 2 at 2-5.

6) At some point during the scheme, all four conspirators submitted Master Promissory Notes (MPNs). *Id.* at 3.

7) All four conspirators provided addresses for use in the scheme. *Id.* at 2.

8) Specifically, Kimmisha Mullett allowed the defendant to use her address for receipt of debit cards. *Id.* (The Court heard testimony from Ms. Mullett confirming this point at the trial.)

9) Debit cards were taken out of their original green envelopes, placed in other envelopes, and mailed to Carr's Arizona Riggs Road post office box addressed to Carr in either the defendant's or a woman's handwriting. *Id.*

10) The defendant stored his belongings at the Rushmore Drive address, lived at the Radiant Drive address, and both were used in the scheme. Carr and the defendant picked up debit cards from the Rushmore address from the mailbox at the end of the curb. *Id.* at 3.

11) The defendant gave Carr Matthew Sanders's Blackhawk address to use in the scheme. *Id.* at 4.

12) During the 2010-2011 time frame, the defendant stayed with Carr at the Pleasant Street address in Chandler, Arizona. Numerous FAFSAs were submitted from IP addresses associated with this address. While at this address, the defendant

5

521

gave Carr Colorado addresses for use in the scheme and enrolled women he
knew in Colorado at community colleges.  The defendant also asked Carr to
obtain SSNs for him.  *Id.* at 3.

13) In 2011 while the defendant was detained in the El Paso County Jail, debit cards
were still being mailed and the defendant knew the scheme was continuing.
During Carr's multiple visits to Colorado to visit the defendant while in jail, they
discussed the scheme in code.  For example, the defendant asked Carr how she
was doing in school and if she was getting good grades, when the defendant
knew Carr was not enrolled in school.  Carr would say she had a lot of
homework.  Carr used funds from the scheme for the defendant's legal fees and
placed money from the scheme into his jail commissary account.  *Id.*

14) After the defendant's release from jail, he moved to Arizona to live with Carr at
the Kaibab address.  He did not work while living in Arizona and continued his
involvement in the scheme.  *Id.* at 4.

15) While living at the Kaibab address, the defendant submitted FAFSAs from his
computer located in his office.  Carr provided the defendant with a list of SSNs.
Carr saw the defendant's handwritten notes that were related to FAFSA
submissions, such as PIN numbers and email addresses in his office. *Id.* at 4.

16) The defendant completed homework for the scheme to work.  On one occasion,
when Thomas could not save or submit psychology coursework on his computer,
Carr saved Thomas's coursework to a USB thumb drive and then transferred the
coursework to her computer in her office.  Carr did not use the computer in the
defendant's office because it was password-protected and the defendant did not

6

give her the password.  *Id.*

17) In 2012 while living with Carr at the Kaibab address, the defendant went to ATM

locations to withdraw money from the debit cards.  Carr knew this because the

defendant would bring home wads of cash and had the debit cards with him or in

his wallet.  The defendant liked to withdraw the cash himself because he did not

trust other people with the money.  *Id.* at 3.

18) With respect to the white Dodge Charger the defendant was driving the night of

his traffic stop, while that vehicle belonged to Carr, the defendant drove it in

Colorado and brought it with him when he moved to Arizona. *Id.* at 4.

19) After the defendant's arrest on traffic charges and subsequent release from jail,

Carr drove the defendant to the impound lot to retrieve the Charger.  The

defendant was "panicky" after he searched the car and realized the police took

the debit cards.  The defendant told Carr he drove to a girl's house to retrieve the

debit cards and a pink laptop (which laptop was used in the scheme).  *Id.* at 4.

20) After the Kaibab residence was searched by law enforcement, the defendant

admitted to Carr that he broke his cell phone (he told her it was so that Carr

wouldn't find out about other "bitches"; the government will show at sentencing

that it was to obstruct the investigation).  Carr confirmed that the picture of the

broken phone was taken in the defendant's closet, and that she and the

defendant each had their own closets.  *Id.* at 5; Gov't Exs  13-16 (text messages

related to the scheme that were retrieved from this phone and admitted at trial.)

21) Carr and the defendant went to co-defendant Marcelle Green's home after the

search of their home and asked Green what questions law enforcement asked

7

her and what she told them. Carr stated that both she and the defendant were
nervous during this meeting. Attachment 2 at 5.

22) Carr stated she used funds from the scheme to pay the rent on the Kaibab
address (where she lived with the defendant), to pay for trips that she took with
the defendant, and stated that she and the defendant used funds from the
scheme at casinos. *Id.* at 4-5.

Carr's statements, along with the debit cards found in the defendant's possession
and the addresses he provided to be used in the scheme, clearly establish the scope of
his jointly undertaken criminal activity. In addition to all of this evidence, the Court
heard the following testimony of co-defendant Green at trial about the defendant's
participation in the scheme:

1) Green testified that she agreed to participate with the defendant in a scheme to
steal money from the Department. Attachment 3 (Transcript of Green's trial
testimony) at 3-4; *see also id.* at 6 (identifying Mercedes Diaz, Heather Carr, and
Tramell Thomas as the other members of the conspiracy).

2) She withdrew money from the debit cards and delivered the money in stacks of
cash to Heather Carr while the defendant and Diaz were present. *Id.* at 13-16.

3) These deliveries of cash occurred during the course of the conspiracy, which
began "[l]ate in the summer of 2010, all the way until 2012, the middle of 2012."
*Id.* at 14-15.

4) In 2012, the defendant, Carr, and their children lived at the Kaibab address and
had a "nice house, nice cars . . . up-to-date electronics." *Id.* at 17.

5) She assisted the defendant with filling out the education part of the FAFSA. *Id.*

at 19-21, 33.

6) The defendant, Green, and Carr would throw out names of inmates "to process the fraudulent FAFSAs and the school applications." *Id.* at 21-22.

7) Green testified that Carr used some of the fraud proceeds for the defendant's lawyer's fees. *Id.* at 16, 23-24.

8) Green testified that her knowledge about the defendant filling out FAFSAs and withdrawing money from debit cards came from her conversations with Carr. *Id.* at 40, 43.

9) Green testified that the defendant and Carr visited her home after their Kaibab residence was searched and asked her what questions law enforcement asked her, what she said to the investigators, and what pictures law enforcement showed her. She described the defendant as nervous, moving his hands back and forth and asking the same questions "over in just a different format." *Id.* at 26.

Factors relevant to determining the scope of jointly undertaken criminal activity include 1) "the existence of a single scheme"; 2) "similarities in modus operandi"; 3) "coordination of activities among schemers"; 4) "pooling of resources or profits"; 5) "knowledge of the scope of the scheme"; and 6) the "length and degree of the defendant's participation in the scheme." *United States v. Salem,* 657 F.3d 560, 564 (7th Cir. 2011) (citations omitted).

All of these factors weigh in favor of the conclusion that the scope of the defendant's jointly undertaken criminal activity covers every aspect of the scheme. There existed a single scheme, that of defrauding the Department. The similarities in

9

the modus operandi included 1) the manner in which the conspirators obtained the inmates' names from state DOC websites; 2) Carr obtained all of the SSNs through her work database; 3) all of the conspirators applied for admission to the community colleges, enrolled in classes, and completed coursework; 4) the conspirators took the same classes because they had already completed the work and would "just resubmit it," Attachment 3 at 11; and 4) all of the conspirators withdrew cash from debit cards. The conspirators coordinated their activities: Carr was the source of the SSNs, and they all completed coursework and withdrew cash from ATMs. Attachment 2 at 2-4. The conspirators shared in the proceeds, and Green testified to giving a portion of the money from the debit cards to Carr in the defendant's presence. Attachment 3 at 13-15. The defendant himself withdrew cash from the debit cards. Attachment 2 at 3. In addition, the defendant here "knew of the scope of the scheme and participated in it fully and for a lengthy time period – more than two years." *Salem,* 657 F.3d 560 at 564.

Any argument that the defendant should not be held accountable for losses to the Department that occurred while he was detained in the El Paso County Jail is refuted by the jury's guilty verdicts convicting him beyond a reasonable doubt on Counts 2-5 of the Superseding Indictment. All of the debit cards listed in these counts were mailed while the defendant was detained. In addition, Carr stated that the defendant knew the scheme was continuing while he was detained, and asked in code about the progress of the scheme. Attachment 2 at 3. Moreover, the defendant benefitted from the scheme while he was in jail through the payment of his legal fees and deposits into his commissary account from the fraud proceeds. *Id.* "Thomas never asked Carr to stop the scheme and never gave Carr the impression that he no longer wanted to be

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/13/19 USDC Colorado pg 527 of
971
Case 1:16-cr-00054-WJM Document 341 Filed 03/09/18 Page 11 of 16

part of the scheme." *Id.* at 4.  As soon as the defendant was released from jail, he was
back playing an active role in all aspects of the scheme.  *Id.*

All of this evidence establishes that "the scope of the specific conduct and
objectives embraced by the defendant's agreement" includes the entire amount of loss
caused by the scheme.  *Godinez-Perez,* 864 F.3d at 1063.

### c.  The conspirators' conduct was in furtherance of the jointly undertaken criminal activity

The defendant's conspirators all acted in ways to further the objectives of the
jointly undertaken criminal activity – defrauding the Department through the submission
of false FAFSAs.  Carr stated that each conspirator performed every function necessary
for the conspiracy to work, with the exception of obtaining the SSNs.  Multiple
addresses were necessary because sending all the cards to one address "would set off
an alert."  Attachment 3 at 12.  Each conspirator contributed to the conspiracy and
worked "together in [the] jointly undertaken criminal activity, as opposed to working
independently and autonomously."  *Salem,* 657 F.3d at 564-65.  This conspiracy was
successful because each conspirator performed his or her role and they relied on each
other to do so.

### d.  The conspirators' conduct was reasonably foreseeable in connection with the criminal activity

Carr and Green's conduct in connection with the scheme was *known and*
*encouraged by* this defendant, not just reasonably foreseeable to him.  For example, the
defendant was in possession of debit cards that had been mailed to addresses obtained
by Green, as well as by Diaz — a co-conspirator with whom he did not have direct
contact, but from whose conduct he profited.  Attachment 4 to this pleading is a revised

version of Gov't. Ex. 72.  The far right column of this chart details how every debit card mailed as a result of this scheme is tied to one of the conspirators, and therefore, tied to this defendant.  Agent Ennis will explain the chart more fully at sentencing.

In any event, the test "is reasonable foreseeability, not actual knowledge." *United States v. Snow,* 468 F. App'x 830, 837 (10th Cir. 2012); *United States v. Aslan,* 644 F.3d 526, 537 (7th Cir. 2011) ([f[oreseeability is not equivalent to actual knowledge") (citation omitted).  Indeed, a defendant "need not know of a co-schemer's actions for those actions reasonably to be foreseeable to the defendant."  *Aslan,* 644 F.3d at 537.   Nor does the inquiry require "that a defendant interact with, or even know of, [his] fellow coconspirators, provided of course that the involvement of the others and their actions in furtherance of the conspiracy were reasonably foreseeable."  *United States v. Sykes,* 774 F.3d 1145, 1151 (7th Cir. 2014) (citing *United States v. Wang*, 707 F.3d 911, 916 (7th Cir. 2013), for the proposition that "a defendant could reasonably foresee the loss caused by forty-one other coconspirators even though he only knew of three others that were involved in the conspiracy").  The Court can base its reasonable foreseeability determination "on whether [the defendant] demonstrated a substantial degree of commitment to the conspiracy's objectives, either through his words or his conduct."  *Wang*, 707 F.3d at 916 (citations omitted).  And a defendant's enhancement under the loss table "holds him responsible for losses caused by the reasonably foreseeable acts of his co-conspirators, with no consideration given to the degree of his culpability."  *United States v. Gallant,* 537 F.3d 1202, 1240 (10th Cir. 2008) (reversing district court's loss calculation because it did not include "losses attributable to the reasonably foreseeable acts of the defendant's co-conspirators" and instead, "used gain

as a proxy for each defendant's culpability").

Accordingly, even if this Court finds the defendant played a lesser role in this conspiracy than his co-conspirators, he is still accountable for the acts of his co-conspirators as they were reasonably foreseeable to him.

### III.    The defendant should be ordered to pay $563,890.85 in restitution

The Mandatory Victims Restitution Act of 1996 made restitution mandatory in certain cases, "particularly crimes of violence and theft crimes with identifiable victims who 'suffered a physical injury or pecuniary loss.'" *United States v. Serawop,* 505 F.3d 1112, 1117 (10th Cir. 2007) (citing 18 U.S.C. § 3663A(c)(1)).  At trial, Agent Ennis testified that the loss suffered by the Department and various community colleges amounted to $563,890.85.  *See* Attachment 4 (annotating government trial exhibit 72 to include information specifically relevant to sentencing).  Based on the evidence available at the time Carr, Diaz and Green pleaded guilty, the government believed that the total loss for purposes of restitution was $562,487.85 .  However, in preparing for trial, Agent Ennis discovered that the Department had suffered an additional $1,403 in loss.  Accordingly, at sentencing, the government will request that the Court order that the defendant pay $562,487.85 in restitution jointly and severally with his co-defendants Carr, Diaz, and Green,[2] and that he be ordered individually to pay an additional $1,403 in loss to the Department.[3]

---

2   Green's plea agreement states that the restitution amount in her case "will not exceed $562,487.85," ECF 178 at 1-2.  The government will therefore seek a restitution order in that amount at her April 11, 2018 sentencing hearing.

3 C.D. has submitted a claim to the probation office for $16,610.65 in restitution due to loans taken out in her name as part of this scheme and resulting collection fess.  The Department and PPCC are in the process of resolving this matter.  If Ms. Duncan is still out any money at the time of sentencing, the government will modify its restitution request accordingly.  Inclusion of

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/13/19 USDC Colorado pg 530 of
Case 1:16-cr-00054-WJM Document 341 Filed 03/09/18 Page 14 of 16
971

## IV.    Forfeiture

The Supreme Court, in *Honeycutt v. United States,* 137 S.Ct. 1626 (2017), held

that under 21 U.S.C. § 853, which mandates forfeiture of proceeds derived from certain

drug crimes, a defendant may not be held "jointly and severally liable for property that

his co-conspirator derived from the crime but that the defendant himself did not

acquire." *Id.* at 1630.  Writing for the unanimous Court, Justice Sotomayor explained

that the structure and language of § 853(a) "limit[s] forfeiture under § 853 to tainted

property; that is, property flowing from ... or used in ... the crime itself," *id.* at 1632, and

"defines forfeitable property solely in terms of personal possession or use."  *Id.* at 1629.

As a result, only "tainted property acquired or used by the defendant" is subject to

§ 853(a) forfeiture.  *Id.* at 1633; *United States v. McGinty,* 610 F.3d 1242, 1247 (10th

Cir. 2010) ("restitution and forfeiture will not necessarily be in the same amount because

'restitution is calculated based on the victim's loss, while forfeiture is based on the

offender's gain'") (citation omitted).

Accordingly, the government will file prior to sentencing a motion for a preliminary

order of forfeiture seeking a forfeiture money judgment in the amount of $260,226.85,

which is a conservative calculation of the gain directly attributable to this defendant.

Attachment 5 to this filing is a chart that sets forth this gain calculation.  The government

attributed to the defendant the gain from all 52 debit cards found in his possession upon

his arrest.  A reference of "DC" for "debit card" is noted in the far right column on

Attachment 5.

---

this amount will not affect the loss calculation.

14

The government also attributed to the defendant any funds mailed to the addresses
listed in Counts of the Superseding Indictment of which he was convicted beyond a
reasonable doubt:  Counts 6 and 7 (Meadow Oaks – Mullett's address); Count 2
(Radiant Drive – the defendant's residence); and Counts 3-5 (Rushmore Drive – the
address the defendant used on school/loan documents, and Carr stated the defendant
retrieved debit cards from this address, Attachment 2 at 3).

      Respectfully submitted this 9th day of March, 2018.

ROBERT C. TROYER
United States Attorney
District of Colorado

By:     s/ *Martha A. Paluch*
MARTHA A. PALUCH
BRYAN DAVID FIELDS
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
Martha.Paluch@usdoj.gov
Bryan.Fields3@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on this 9th day of March, 2018, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system that will send notification of such

filing to all counsel of record in this case.


s/ *Martha A. Paluch*
MARTHA A. PALUCH
BRYAN DAVID FIELDS
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov
Bryan.Fields3@usdoj.gov



SW_00000218

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/13/19 USDC Colorado pg 534 of
Case 1:16-cr-00054-WJM Document 341-2 Filed 09/09/18 Page 1 of 5
971

Attachment 2



# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES



**DATE INTERVIEWED**: October 30, 2017
November 7, 2017
November 13, 2017

**PERSON INTERVIEWED**: Heather Carr

**ALSO PRESENT**: Mary Butterton, Defense Counsel

**INTERVIEWED BY**: Martha Paluch, Assistant US Attorney
Bryan Fields, Assistant US Attorney
Special Agent Sandra Ennis

**LOCATION**: Telephonic
1801 California, 16th floor conference room
Denver, Colorado 80202

**CASE NUMBER**: 12-080234

**CASE NAME**: Pikes Peak Community College

On various dates, Assistant United States Attorneys, Martha Paluch and Bryan Fields, and Special Agent Sandra Ennis, United States Department of Education (ED), Office of Inspector General (OIG), interviewed Heather Carr telephonically. Carr's legal counsel, Mary Butterton, was also present on the call. After being advised of the nature and purpose of the interview and the identities of all present, Carr voluntarily provided the following in essence:

Carr's communications with Thomas are bad. Thomas started paying child support in what Carr believes is an effort to make himself look better at trial. Last month, Thomas stopped paying. Thomas and Carr do not speak. He sends text messages directly to his daughter. Carr feels so stupid and cannot stand Thomas. He is a liar and there is no point in trying to have a conversation with him.

Approximately three months ago in mid-August, on three separate occasions, a strange man came to her door and it scared the shit out of her. The first time he came to her house was around 4:00 p.m. and Carr was at the YMCA. The individual had dreadlocks and was seen on his cellphone standing in her driveway. The individual was not in a car. The second time was around 8:00 p.m. and Aubrey (LNU) was home but Carr was not. About three days later, the same individual came back. Carr answered the door and the individual said, "You are testifying against Marcy. Make sure you do not say anything about anyone else."

Some of Green's family members reside in Virginia. Carr does not know how Green knows where she lives. The occurrence was completely random and has not happened again.

Green is lying about not having been to Colorado. She has been to Colorado on many occasions when transporting drugs from Colorado to California.

Carr has never testified and never been in trouble. Carr owns her own company called "That Goodish" and she is a driver for Lyft.

Prepared by: Sandra Ennis                                    Date Prepared: November 08, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)                                                   Page 1 of 5

MOI_00000549

Interview of Heather Carr, October 30. 2017                                    12-080234

In approximately January 2009, Thomas applied for his own federal student aid (FSA) for attendance at Pikes Peak Community College (PPCC). Thomas used this money as a source of income.

In approximately 2010, Thomas took friends to PPCC and helped them enroll. These individuals were Lola Thomas, Vanessa Lopez, Christine Duncan, Ismael Omar, and Thomas' cousin, Michael Cox. Thomas received a portion of the FSA funds for assisting these individuals. Carr knew this because Thomas told her this information. Cox legitimately attended school.

Thomas met Lola Thomas while he was in prison. At some point, Lola Thomas was not allowed to visit Thomas in prison because she was caught bringing in drugs. Thomas lived with Duncan, and Omar was a friend of Thomas. Carr does not know anything about Lopez.

In searching for inmate names, Carr, Diaz, and Green did Google searches of department of corrections and found inmates through various department of corrections websites. These inmate searches were conducted at both the Pleasant and Kaibab addresses. Green also did inmate searches from her residence.

Carr was not certain if Thomas conducted inmate searches while living in Colorado. Carr was sure Thomas also conducted inmate searches on department of corrections websites while residing in Arizona. Thomas was involved in completing homework, submitting FAFSAs and getting money off the debit cards.

Carr was able to get an inmate's social security number (SSN) from her access to Lexis Nexis at work. Carr conducted legitimate business queries when verifying a customer's SSN. This query was done for auditing purposes. Carr conducted queries related to the scheme on her work issued laptop and on her personally owned computer.

The four of them made up information when filling out documents provided to the school. The applicant's mailing address was not made up. There needed to be a valid address for the Higher One debit card to be mailed to. Higher One sent an email, usually to an email address generated by the school. The email stated that a debit card was mailed and the student should expect to see a bright green envelope containing the debit card within two to three business days. All four of them provided addresses for the debit cards to be mailed to.

Thomas' business partner, Kimmisha Mullet, allowed Thomas to use her address for receipt of the Higher One debit cards. Thomas told Carr this information.

Higher One debit cards were mailed to the 975 E. Riggs Road post office box address. These debit cards were taken out of the original green envelope that they were mailed in and placed in another envelope. These envelopes were addressed to Carr and were in Thomas' handwriting or another female's handwriting.

Carr and Diaz resided at 2441 Lexington Village Lane in Colorado Springs. Michelle Grant, also known as Mychalea, resided at 2372 Lexington Village Lane. Carr forwarded her mail to the 2372 address when she moved to Arizona. Grant gave Carr a key to the mailbox so that Carr could get her actual mail. Initially, Grant did not know that her address was being used in the scheme. Grant became aware when an investigator came around looking to speak with her. The address was no longer used after the investigator came around.

Carr and Diaz did the majority of picking up the debit cards from the 2372 address. Carr recalled a conversation when Diaz did not have the key so Diaz broke into the backside of the mailboxes. Thomas possibly picked up mail from the 2372 address also.

OIG Form 301                                                                    Page 2 of 5

MOI_00000550

The Dragoon and W. Knox addresses were provided by Diaz and Diaz opened post office boxes
for the receipt of debit cards. The Blackhawk address was associated with her step-brother,
Matthew Sanders, and the Rice address was associated with Thomas' cousin, Cox.

Thomas provided the 1418 Rushmore address to parole but he did not actually reside there. He
had access to the garage and kept his belongings there. He resided at the 3820 Radiant
address. La Tania Pickens goes by Tania or Shanelle and she was the owner of the Rushmore
address. An individual named La Toya (LNU) is a different person that was mentioned in
Duncan's interview. La Toya is a crack head.

At times, the Rushmore address has been vacant. Carr and Thomas picked up debit cards from
this address. The mail box at Rushmore sits at the end of the curb.

Carr typically worked from 9 a.m. until 8:00 p.m. and every other weekend. She needed to be
available for CarMax loan decisions.

All four of them submitted FAFSAs. They were not always successful. At times, an applicant
was already in default or had an active PIN number with ED. There were also times when an
SSN was invalid.

All four of them participated in submitting electronic applications to PPCC. Part of the reason in
choosing PPCC was because Thomas had already submitted applications at PPCC and it was
working for him. Carr was also familiar with obtaining FSA from PPCC. Some of the schools
were chosen because of their familiarity with the school as a result of their own enrollment. Diaz
attended Mesa Community College. Green attended Gateway College and Carr attended
Phoenix College. Carr was not familiar with applications being submitted to Chandler-Gilbert
Community College, the Community College of Denver, Pueblo Community College, and Red
Rocks Community College.

At some point, all of them submitted master promissory notes (MPNs) and attended and
completed online coursework. In order to receive the FSA funds, a student had to be enrolled in
at least six credit hours and register attendance. Green did a lot of the work because she was
not employed. The scheme was Green's job.

In 2012, Thomas went to ATM locations to withdraw money from the debit cards. Carr was
never with him but she knew he was withdrawing money because he brought home wads of
cash and had the debit cards with him or in his wallet. Thomas liked to withdraw the cash
himself because he did not trust other people with money. Carr believed the debit cards had a
daily cash withdrawal limit of either $300 or $500. The debit card could also be used to obtain
cash with a purchase.

During the 2010-2011 timeframe, Thomas stayed at the Pleasant address when he visited Carr
in Arizona. Thomas gave Carr Colorado mailing addresses to use for inmate applicants, and he
was still enrolling females that he knew in Colorado. Thomas asked her to obtain SSN
information for him. Carr does not recall Thomas sending her text messages with SSN
information. They were always cautious about what information they put in a text message.

Higher One debit cards were still being mailed while Thomas was in El Paso County jail, and
Thomas knew the scheme was continuing. Carr and Thomas did not discuss the scheme on the
jail phone. Carr and Thomas spoke in code. An example of the code was Thomas asking how
Carr was doing in school and if she was getting good grades. Carr would say she had a lot of
homework. Thomas knew Carr was not enrolled in school. Carr used funds from the scheme for
Thomas' commissary and legal fees.

MOI_00000551

Carr saw the photos of Thomas and money that were taken from his cell phone. Carr assumed he was trying to impress his friends and looked like a dumb ass. Carr has no knowledge of Thomas selling weed. There were two sides to Thomas. He had a family oriented side with her and a flashy showy side with others.

Thomas did not know how much Carr made. He assumed she had a really good job. Carr was making approximately $50-$60K. Carr was broke but it would look like she made a lot of money to someone in jail. Carr used money from the scheme to pay rent at the Kaibab address. Thomas never asked Carr to stop the scheme and never gave Carr the impression that he no longer wanted to be part of the scheme.

After his release from El Paso County, Thomas did not work in Arizona and was still involved in the scheme. Thomas and Kimmisha Mullet co-owned a business and that was his only employment.

Thomas was involved with submitting FAFSAs. Carr believed he did so in his office at the Kaibab address. While she never personally saw him submit FAFSAs she remembers providing Green and Thomas with lists of SSNs. Carr saw Thomas' handwritten notes that were related to FAFSA submissions, such as PIN numbers and email addresses in his office.

Thomas completed coursework. There was one occasion where Thomas could not save or submit the psychology coursework on his computer. Carr saved Thomas' coursework to a USB thumb drive and then transferred the coursework to her computer located in her office. Carr did not use the computer located in Thomas' office. It was password protected and Thomas did not give her the password.

Carr recognized the photo of the white Dodge Charger on Thomas' phone. It was the vehicle Thomas was driving the night of his traffic stop. While the vehicle belonged to Carr, Thomas had the vehicle in Colorado and he brought it with him when he moved to Arizona.

The night of Thomas' traffic stop, Carr was worried because Thomas never came home. Thomas had court the following morning and was released. The vehicle was impounded. Thomas was quiet and did not want to discuss what happened. Thomas seemed nervous. He told Carr that he just wanted to go home, shower, and go to sleep. Carr dropped off Thomas at the impound lot. Thomas called Carr shortly thereafter and asked Carr to meet him near the Pleasant address. Thomas searched the Charger for the debit cards and realized the cops took the debit cards when he was pulled over. He seemed panicky. Carr was not aware he still had the debit cards. She assumed the debit cards were gone. There was no reason for him to still have the debit cards.

Thomas told Carr that he had been cheating on her. The girl Thomas was cheating on her with called him at 1:00 a.m. and threatened to tell Carr. Thomas went to the girl's house to get everything from her house. This included the debit cards, pink laptop, and some other things. Following the traffic stop, Thomas went to stay at a hotel for about three days.

Thomas's time spent in El Paso County jail was approximately two months for the pimping charges. The remaining time was spent for the accessory to murder charge. All of the charges were dismissed.

Thomas gave Carr Sanders' Blackhawk address to use in the scheme. Carr did not speak with Sanders about the scheme. There was an occasion when Sanders inadvertently told Carr about Thomas and some girl at the Radiant address. After that, Carr and Sanders did not talk that much. If they did, it was always about positive stuff.

MOI_00000552

Interview of Heather Carr, October 30. 2017                                           12-080234

Carr and Thomas assumed the search warrant at the Kaibab address resulted from Thomas'
traffic stop. They did not answer the door immediately because items were being destroyed and
she took the time to brush her teeth and put on makeup. During the search a police officer
asked Thomas why he broke his phone. Thomas did not respond. Later, Thomas admitted to
Carr that he broke his phone. He told Carr he did not want her to find out about other bitches.
Carr confirmed the broken phone was in Thomas' closet. Carr and Thomas had their own closet
at the Kaibab address. Carr saw the photo of Thomas standing in a closet. Carr confirmed it
was a photo of Thomas standing in his closet.

Following the search warrant execution at the Kaibab address, both Carr and Thomas went to
Green's house to discuss what happened. Both of them were questioning Green about what law
enforcement asked her and what she told them. Both Carr and Thomas were nervous.

While in El Paso County jail, Thomas asked and Carr offered to assist him with his legal fees
and putting money on his commissary account. The topic of Thomas' legal fees was brought up
when Thomas told Carr he could not use a public defender. Carr assumed he has no one else
to help him.

A portion of Thomas' legal fees came from Christine Duncan's escorting. Carr did not mention
this previously because she was embarrassed. Carr believes there were three payments of
$200. To be on the safe side, Carr thinks she received approximately $800 from Duncan's
escorting. Carr did not receive this money directly from Duncan. She received this money from
Diaz or Green.

In discussing Carr's financial statements, Carr advised there were charges related to a trip to
California. Thomas was on the trip. Carr used funds from the scheme to pay for the California
trip and other trips that she took with Thomas. Carr and Thomas also used funds from the
scheme to go to casinos.

Carr's only knowledge of Thomas' employment was with 911 Design & Printing in Colorado.
This was the business he had with Mullett.  Thomas had wads of cash but he was secretive with
Carr.

Thomas told Carr to keep SSN information for Duncan, Lopez, and Omar in case he lost it.

Carr admitted to lying to Wells Fargo about the Lexis Nexis searches. Carr was afraid of losing
her job and she had her children to think of. Lying to her employer and lying under oath are two
completely different things.

Carr is not angry or jealous of Thomas.

Carr admitted to contacting Green and telling her not to talk to law enforcement. Carr thought
Green should get a lawyer and told Green she could be charged with perjury if she lied to law
enforcement.

Carr did not sign up Thomas for FSA without his permission.

AUSA Bryan Fields was not present during the telephonic interview that occurred on November
13, 2017.

OIG Form 301                                                                          Page 5 of 5

MOI_0000553

Case No. 1:16-cr-0054-WJM Document 535-3 filed 12/12/19 USDC Colorado pg 539 of
971
Case 1:16-cr-00054-WJM Document 341-3 Filed 03/09/18 Page 1 of 47 pg 539 of

Attachment 3

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLORADO

 3    Criminal Action No. 16-cr-0054-WJM-2

 4    UNITED STATES OF AMERICA,

 5    Plaintiff,

 6    vs.

 7    TRAMMEL THOMAS,

 8    Defendant.

 9    ------------------------------------------------------------

10                  REPORTER'S PARTIAL TRANSCRIPT
                          (Jury Trial - Day 2)
11                  TESTIMONY OF MARCELLE GREEN

12    ------------------------------------------------------------

13         Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
      Judge, United States District Court for the District of
14    Colorado, commencing at 3:29 p.m., on the 28th day of
      November, 2017, in Courtroom A801, United States
15    Courthouse, Denver, Colorado.

16

17                            APPEARANCES

18         MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
      Attorneys, 1801 California Street, Suite 1600, Denver,
19    Colorado 80202, appearing for the plaintiff.

20         DANIEL T. SMITH, Attorney at Law, 4582 South Ulster
      Street, Suite 1400, Denver, Colorado 80237 and
21         THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
      Suite 1400, Denver, Colorado 80202, appearing for the
22    defendant.

23                  MARY J. GEORGE, FCRR, CRR, RMR
                 901 19th Street, Denver, Colorado 80294
24              Proceedings Reported by Mechanical Stenography
                    Transcription Produced via Computer

25
```

P R O C E E D I N G S

1  
2       (In open court in the presence of the jury at 3:29  
3  p.m.)  
4       THE COURT:  Thank you very much for your patience,  
5  ladies and gentlemen of the jury.  As I mentioned to you on  
6  the first day that there would be these kind of pauses, but  
7  we ask for your indulgence and your patience given the  
8  importance of what we're dealing with here.  
9       Let me just mention to you the next witness is  
10  going to be a codefendant in this case who has pled guilty,  
11  is not going to trial.  She has her lawyer here present,  
12  Ms. Jeralyn Merritt, at the back table there, and she's --  
13  Ms. Merritt is here because the law allows individuals in  
14  Ms. Green, the next witness' situation, to have counsel  
15  present in the courtroom to make any appropriate objections  
16  that counsel sees fit.  
17       All right.  The Government may call its next  
18  witness.  
19       MR. FIELDS:  Thank you, Your Honor.  We call  
20  Marcelle Green to the stand.  
21       THE COURT:  All right.  
22       COURTROOM DEPUTY:  Right here, ma'am.  Just please  
23  stand in the box and raise your right hand.  
24       MARCELLE GREEN, GOVERNMENT'S WITNESS, SWORN  
25       COURTROOM DEPUTY:  Please be seated.  Scoot your

Direct - Green

1    chair up.  Put your elbows right on the stand so that we

2    can -- put your mouth right there.

3         Please state your full name for the record and

4    spell your first and last name.

5         THE WITNESS:  Marcelle Ruby Green,

6    M-a-r-c-e-l-l-e, G-r-e-e-n.

7         THE COURT:  You may proceed, counsel.

8         MR. FIELDS:  Thank you, Your Honor.

9         Before we get into it, at this point I would move

10   into evidence Government's Exhibit 32, which has been

11   stipulated to by the parties.

12        THE COURT:  Okay.  One second.  All right, given

13   the stipulation of the parties, Government Exhibit 32 is

14   admitted into evidence and may be published to the jury.

15      (Government's Exhibit 32 received)

16        MR. FIELDS:  Thank you, Your Honor.

17                    DIRECT EXAMINATION

18   BY MR. FIELDS:

19   Q.   Ms. Green, did you participate in a scheme to steal

20   money from the Department of Education?

21   A.   Yes, I did, sir.

22   Q.   Did you agree to participate in that scheme with other

23   people?

24   A.   Yes, I did.

25   Q.   Do you see one of those people in the courtroom here

4

Direct - Green

1   today?

2   A.   Yes, I do.

3   Q.   Who do you see?

4   A.   Trammel Thomas.

5   Q.   Could you describe where he's sitting and an article

6   of clothing that he's wearing.

7   A.   In the side over here, between his two lawyers, and he

8   has a black jacket on.

9        MR. FIELDS:  Your Honor, I'd like the Court -- or

10  to re -- the record to reflect that the witness has

11  identified the defendant.

12       THE COURT:  The record will so reflect.

13  BY MR. FIELDS:

14  Q.   Ms. Green, as a result of your choice to participate

15  in a fraud scheme, what has happened to you?

16  A.   I've been indicted and I pleaded guilty.

17  Q.   Do you have an agreement with the Government?

18  A.   Yes, I do.

19  Q.   Let's look at it.  It's Government Exhibit 32.  Is

20  this your agreement?

21  A.   Yes, sir.

22  Q.   If we could go to the last page.  Does that have your

23  signatures on it?

24  A.   Yes, it does.

25  Q.   Take it down.

5

Direct - Green

1       What are your obligations under that agreement?

2    A.   Just to be truthful.

3    Q.   And what do you hope to get in return for this

4    agreement?

5    A.   Leniency on my sentence.

6    Q.   Do you know how much you will get off of your

7    sentence?

8    A.   No, I don't.

9    Q.   Who decides what your stints will be?

10   A.   The judge.

11   Q.   Now, is this the first time you've been in trouble

12   with the law?

13   A.   No, sir.

14   Q.   Have you been convicted of a drug crime?

15   A.   Yes, I have.

16   Q.   What happened?

17   A.   Possession of marijuana with the intent to sell was

18   my -- what I was convicted with.

19   Q.   How much marijuana?

20   A.   300 pounds.

21   Q.   Does that have anything to do with your involvement in

22   this fraud scheme?

23   A.   No, sir.

24   Q.   Have you already been sentenced for that crime?

25   A.   Yes, I have.

Direct - Green

1    Q.    So does your plea agreement in this case have any
2    effect on the outcome in that case?
3    A.    No, sir.
4    Q.    When did you first agree to be part of the conspiracy?
5    A.    Somewhere in 2010.  I can't give you an exact date,
6    I'm sorry.
7    Q.    Who approached you about becoming part of the
8    conspiracy?
9    A.    Heather Carr.
10   Q.    Where did that happen?
11   A.    At her location in Pleasant Drive.
12   Q.    Pleasant Drive where?
13   A.    In Chandler.  I believe Chandler, Arizona.
14   Q.    Describe to us what happened.
15   A.    Conversation at a barbecue, I believe it was around
16   Easter -- yeah, Easter, and just a discussion on how to get
17   money fraudulently by filing false claims.
18   Q.    After that discussion, how long were you part of the
19   conspiracy?
20   A.    To roughly about 2012.
21   Q.    While you were a member of the conspiracy, who were
22   the other members of the conspiracy?
23   A.    Mercede Diaz, Heather Carr and Trammel Thomas.
24   Q.    Now, you testified, you pleaded guilty to a scheme to
25   defraud the Government.  Did you file false claims with the

Direct - Green

1   Government?

2   A.   Yes, I did, sir.

3   Q.   What were the false claims?

4   A.   The false claims were the FAFSA and the enrollment to

5   school.

6   Q.   What was false about the FAFSAs you submitted?

7   A.   The information on the students as far as their

8   addresses and their locations.

9   Q.   If you had put the truth into those FAFSAs, would you

10  have received money?

11  A.   No.

12  Q.   Why not?

13  A.   Because they -- you have to be a present-person

14  student, and they weren't present.  So if we would have put

15  they were in prison, nothing would have happened.

16  Q.   So you've been talking about these people in prison.

17  Whose identities did you put into the FAFSAs?

18  A.   Inmates.

19  Q.   Why prison inmates?

20  A.   Because prison inmates are incarcerated for a number

21  of years and wouldn't think that it would come up -- they

22  wouldn't look it up, theirself, while they were in prison.

23  Q.   How did you decide which prison inmates to use?

24  A.   The length of sentence.

25  Q.   And how did you find out whether or not someone was in

8

Direct - Green

1    prison?

2    A.    It's public records.  You can just see if they're in

3    prison or not.

4    Q.    So what was the overall purpose of the conspiracy?

5    A.    To receive funds.

6    Q.    And who were the victims of the conspiracy?

7    A.    The inmates and the school and the Government.

8    Q.    Did you submit the FAFSAs using the internet?

9    A.    Yes, I did.

10   Q.    What computer did you use?

11   A.    I used the black laptop and a desktop.

12   Q.    Where was that desktop located?

13   A.    At 4630 South 21st Place.

14   Q.    What is that address?  What --

15   A.    That's my house.  That's my address.

16   Q.    That's your house?

17   A.    Yes.

18   Q.    And you mentioned a laptop?

19   A.    Yes.

20   Q.    Where was the laptop located?

21   A.    The laptop was located at 4630 South 21st Place and

22   the address on Pleasant Drive in Chandler.

23   Q.    That address on Pleasant Drive, what's significant

24   about that?

25   A.    That's Heather Carr's location.

9

Direct - Green

1    Q.    Did you need the internet to submit the FAFSAs?

2    A.    Yes, sir.

3    Q.    Where did you go to use the Internet?

4    A.    My address at 4630 Pleasant Drive and then a local

5    Starbucks.

6    Q.    After a FAFSA was submitted, what did you have to do

7    next to get loan money?

8    A.    You have to enroll in school.

9    Q.    How would you enroll?

10   A.    Go to the internet site of the school and enroll and

11   then you would get a letter of acceptance.

12   Q.    What kind of information did you need to enroll in the

13   school?

14   A.    The student's information -- I mean the inmate's

15   information, the location of the address where they're

16   going to.

17   Q.    So just like the FAFSA, was the information in the

18   paperwork you submitted to schools truthful?

19   A.    No, sir.

20   Q.    What was untruthful about it?

21   A.    The address of the inmates.

22   Q.    Also was the identity of the --

23   A.    Of the identity, yes.

24   Q.    Would colleges sometimes ask for documents that were

25   signed?

Case No. 1:16-cr-00054-WJM Document 341 Filed 03/09/18 USDC Colorado pg 10 of 47

10

Direct - Green

1    A.    Yes.

2    Q.    So when a college asked for a document that had to be

3    physically signed, what would you do?

4    A.    Get it printed out, sign it, and then fax it over at a

5    local mail and sell, where you can do fax and things like

6    that.

7    Q.    Would you sign it in your own name?

8    A.    No, sir.

9    Q.    What name would you sign?

10   A.    The -- the name of the inmate.

11   Q.    How did you decide which colleges to pick?

12   A.    Colleges that had online classes where you didn't

13   physically have to be in the classroom.

14   Q.    Why was that important?

15   A.    Because the people were not here, so we couldn't get

16   classes that you had to attend in person.

17   Q.    Where were these colleges located?

18   A.    In Colorado and in Phoenix, Arizona.

19   Q.    What were the colleges in Colorado?

20   A.    Pikes Peak.

21   Q.    And what were the colleges in Arizona?

22   A.    Sorry.  Phoenix College, sorry, and Mesa Community

23   College.

24   Q.    In order to actually get money for student aid, were

25   you required to take classes?

11

Direct - Green

1   A.   Yes, sir.

2   Q.   How many?

3   A.   Four.

4   Q.   Did you take classes?

5   A.   Yes, I did.

6   Q.   So how did that part of the scheme work?

7   A.   You would just log in and -- into the classes and do

8   the homework and submit it so you can stay enrolled in the

9   class.

10  Q.   And why did you have to stay enrolled in the class?

11  A.   In order to receive the funds, you have to be enrolled

12  in class.

13  Q.   How did you decide which classes to pick?

14  A.   The classes that mainly just had discussions or short

15  essays that you could submit.  Those classes you didn't,

16  you didn't want to pick classes that included like math or

17  anything too long like that.

18  Q.   Would you take lots of different classes or the same

19  classes?

20  A.   Usually the same classes.

21  Q.   Why the same classes?

22  A.   Because we already knew -- the work, and we would just

23  resubmit it.

24  Q.   How would the colleges actually send out the student

25  aid?

12

Direct - Green

1    A.    In a debit card form.

2    Q.    And where would the colleges send those debit cards?

3    A.    To the addresses that's on the enrollment form.

4    Q.    How did you decide which addresses to put on the

5    enrollment forms?

6    A.    Just split them up on the list.  It wasn't just like a

7    pinpoint, oh, this one's going to go here; it was just

8    randomly.

9    Q.    Well, did you know which addresses the card would go

10   to?

11   A.    Yes.

12   Q.    How did you get those addresses?

13   A.    The addresses were my physical address.

14   Q.    Were any other addresses used as part of the scheme?

15   A.    Yes.

16   Q.    Which addresses?

17   A.    1915 East Mulberry.

18   Q.    And why didn't you just have all the cards sent to one

19   address?

20   A.    Because we feel it would set off an alert if we had

21   too many going to the address.

22   Q.    After you got the debit cards, could you get money off

23   of them?

24   A.    Yes.

25   Q.    How much in a day?

13

Direct - Green

1    A.    $1,000 was the limit.

2    Q.    So as a result of that, what did you do to actually

3    get the money off the cards?

4    A.    Go to local ATMs or go to local grocery stores and get

5    cash back.

6    Q.    You went to the grocery stores, would you get items,

7    too?

8    A.    Yes.  Buy like a pack of gum and get the cash back

9    limit that they have for the day.

10   Q.    Did you divide up this money with other members of the

11   conspiracy?

12   A.    Yes, I did.

13   Q.    Who?

14   A.    Heather Carr.

15   Q.    How much money did Heather Carr get?

16   A.    If the cards were coming to my house, she would

17   receive 60, I would receive 40.  And then if I went and

18   helped her with her cards, she would receive 70, I would

19   receive 30.

20   Q.    You say "helped her with her cards."  What does that

21   mean?

22   A.    Withdraw her money for her for cards that she had in

23   her possession already.

24   Q.    Do you know how she got those cards in her possession?

25   A.    To the addresses that were used on the forms filled

14

Direct - Green

1    out.

2    Q.   At any point during the conspiracy, did Thomas get any

3    of that money?

4    A.   I physically didn't hand any money to him.

5    Q.   Who would you hand the money to?

6    A.   Heather.

7    Q.   Who would be present when you handed the money to

8    Heather?

9    A.   Either Trammel Thomas, sometimes Mercedes Diaz, and

10   our children.

11   Q.   Describe to the members of the jury the times where

12   the defendant, Trammel Thomas, was there when you delivered

13   the money.

14   A.   I can't --

15            MR. SMITH:   Could we have some foundation as to

16   time, Your Honor.

17            THE COURT:   Yeah.  I -- let's get this in a time

18   frame.

19            MR. FIELDS:  All right.

20   BY MR. FIELDS:

21   Q.   When did the conspiracy take place?

22   A.   In 2010, around April, but the first enrollment wasn't

23   until July, I believe.

24   Q.   And approximately when were you delivering money to

25   Heather Carr?

15

Direct - Green

1    A.   Late in the summer of 2010, all the way until 2012,

2    the middle of 2012.

3    Q.   And these times that we're going to talk about where

4    the defendant was there, do you remember approximately when

5    that was?

6    A.   I can't give a definite date.

7    Q.   Sometime within that time period?

8    A.   Yes, within that time period.

9    Q.   So, again, describe to the members of the jury those

10   times where Trammel Thomas was present.  What was he doing?

11   A.   I'm just --

12        MR. SMITH:  Well, Your Honor, I would object.

13   Could we take it in sequence?  He's referring to multiple

14   times.

15        THE COURT:  Overruled.  I think we can -- I think

16   she has set the stage well enough.  Go ahead.

17   BY MR. FIELDS:

18   Q.   You can answer the question, Ms. Green.  So when you

19   saw the defendant present when you delivered money,

20   describe what you saw.

21   A.   Just us hanging around.  It was either sometimes a

22   barbecue or just over there for -- randomly, but it wasn't

23   physically him -- me handing him the money, it was just him

24   standing around.

25   Q.   When you handed the money, describe how the money was

Direct - Green

```
 1    packaged.

 2    A.   In 20s.

 3    Q.   Was it rolled up, was --

 4    A.   No, just in form -- just -- not rolled up, not

 5    anything, just altogether.

 6    Q.   Did you put it in an envelope?

 7    A.   No.

 8    Q.   So when you say altogether, again, describe to me, is

 9    it sort of fanned out --

10    A.   No, it's just in a stack.  Just in a stack.

11    Q.   What did Carr do with that money?

12    A.   Her living expenses to care -- and financial -- and

13    legal fees.

14    Q.   Would she go on vacation?

15    A.   Yes.

16    Q.   Who did she go on those vacations with?

17    A.   Her children and sometimes Mercedes.

18    Q.   Anyone else?

19    A.   Not that I know of.

20    Q.   What kind of house did she live?

21    A.   She had two different house locations, so the one on

22    Pleasant Drive or the one on Kaibob.

23    Q.   The latter one.

24    A.   Kaibob, it was a nice house.  Beautiful --

25    Q.   When did she get that house?
```

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 555 of
971
Case 1:16-cr-00054-WJM Document 341 filed 03/09/18 Page 17 of 47

17
Direct - Green

1    A.    I would say sometime in the beginning of 2012.  I

2    could be wrong.

3    Q.    Who lived there with her?

4    A.    Heather Carr, Trammel Thomas, and their children.

5    Q.    Were you able to observe Thomas and Carr's lifestyle?

6    A.    Yes.

7    Q.    How would you describe that lifestyle?

8    A.    Nice lifestyle.

9    Q.    Can you go into any more detail?  What would be nice?

10   A.    I mean, nice house, nice cars, you know.  Just all the

11   basic, and the up-to-date electronics.  Just not too many

12   worries, that's what I would say.

13   Q.    Let's talk about other members of the conspiracy.  You

14   mentioned Heather Carr.  What was her role in the

15   conspiracy?

16   A.    I believe it was a major role.

17   Q.    What did she do?

18   A.    She got the information of the inmates and the Social

19   Security numbers and the birth dates and as far as

20   processing FAFSAs and applications and homework.

21   Q.    Do you know how she got that information?

22   A.    From her job.

23   Q.    What was her job?

24   A.    She was a loan closer at CarMax.

25   Q.    Who would she give that information to?

Direct - Green

1    A.   To the -- for me, I know me, myself.

2    Q.   Did she give it to anyone else?

3    A.   I can't speak for that.

4    Q.   When she gave it to you, how would she give it to

5    you?

6    A.   On a paper -- on a lined piece of paper, regular

7    subject paper.

8    Q.   Describe to us what would be on a typical sheet of

9    paper from Heather Carr.

10   A.   The names, the birth dates, and the address -- I mean,

11   sorry, the names, the birth dates, and the Social Security

12   numbers.

13   Q.   And what would you do with that information?

14   A.   I would submit that into FAFSA.

15   Q.   Now, let's talk about Trammel Thomas.  You said he was

16   part of the conspiracy.

17   A.   Correct.

18   Q.   What was his role?

19   A.   His role -- I can't say if he did homework and I can't

20   say if he had a major role, but he had some role in it.

21   Q.   Well, did you ever see him participating in the

22   conspiracy?

23   A.   Yes.

24   Q.   What did you see him doing?

25   A.   The FAFSA part, just one time.

19

Direct - Green

1    Q.   When was that?

2    A.   I can't give a definite date.  Our season, I want to

3    say it was somewhere in 2011.  My -- my mind's a little

4    cloudy there.  I'm sorry.

5    Q.   Well, was this down in Arizona?

6    A.   Yes.

7    Q.   Does Arizona really have seasons?

8    A.   No, we don't.

9    Q.   So was it sometimes hard to frame exactly when

10   something happened?

11   A.   It is, because it's hot all the time.

12   Q.   So this one time where you saw him participating in a

13   conspiracy, where was that at?

14   A.   At the Pleasant Drive address.

15   Q.   Who lived there?

16   A.   Heather Carr, her children, and at that part in time,

17   Trammel Thomas.

18   Q.   So what did you see him doing?

19   A.   The FAFSA part.  Just submitting the FAFSA and just

20   the steps as far as the education part.  That's it.

21   Q.   Explain to us exactly why that was part of the

22   conspiracy, what you saw.

23   A.   Because the education part, the people -- the inmates,

24   we don't know their high school information, so it was

25   easier just to put if they had their GED and we put the

Direct - Green

1    year based on their age.

2    Q.   So let me back up here.  Was this a conversation you

3    were having with the defendant?

4    A.   This was a conversation that I had with Heather Carr,

5    but I showed on that FAFSA.  So I didn't have this

6    conversation with Trammel.

7    Q.   Who were you showing this information?

8    A.   I showed him the information, but I didn't have the

9    physical conversation with him like I did with Heather

10   Carr.

11   Q.   And what was the purpose of showing him this

12   information in the FAFSA?

13   A.   So the FAFSAs wouldn't come back because, you know,

14   when you submit so many, some of them do still come back as

15   invalid, basically.  So that was just the way to by- -- it

16   was a bypass system as I would call it.

17   Q.   So, again, just to make this clear, what was the

18   bypass system you were explaining to the defendant?

19   A.   The information for the education part.  Sorry.  The

20   education part.

21   Q.   And when this happened, did you see him actually

22   submit the FAFSA?

23   A.   I didn't -- the FAFSA was up, but I didn't see the

24   submit button because I had walked away.

25   Q.   When you say "up," up on what?

Case No. 1:16-cr-00054-WJM   Document 525-3   filed 12/12/18   USDC Colorado   pg 559 of
971
Case 1:16-cr-00054-WJM   Document 341   Filed 03/09/18   Page 21 of 47

21

Direct - Green

1    A.    The computer laptop, sorry.

2    Q.    What kind of laptop was he using?

3    A.    I can't recall.  I'm sorry.

4          Can I get some water?

5          THE COURT:  Right next to you.

6    BY MR. FIELDS:

7    Q.    When you were explaining this sort of bypass system,

8    were other people present in the room?

9    A.    Yes.

10   Q.    And was information being thrown out into the room?

11   A.    Yes.

12   Q.    Describe that.

13   A.    Just random names.  I can't recall the names, again,

14   I'm sorry, it was a while ago, but just random names.

15   Q.    Who would throw out random names?

16   A.    Heather Carr and myself.

17   Q.    Anyone else?  Anyone else?

18   A.    Myself.

19   Q.    Who else was present?

20   A.    Oh, Heather Carr, me, Trammel, and our children.

21   Q.    Did Trammel throw out any names?

22   A.    At that time, it was a name, but I can't recall the

23   name.  I'm sorry.

24   Q.    What was the purpose of everyone sitting around in

25   this room throwing out names?

Case No. 1:16-cr-00054-WJM Document 525-3 Filed 12/12/18 USDC Colorado pg 560 of 971
Case 1:16-cr-00054-WJM Document 341 Filed 03/09/18 Page 22 of 47

22

Direct - Green

1   A.   It was part of the -- to process the fraudulent FAFSAs

2   and the school applications.

3   Q.   How was it part of the process of filling out these

4   fraudulent FAFSAs?

5   A.   Because of the names, when you get the names and the

6   information was already there.  So, like I said, I can't

7   recall the names.

8   Q.   When you say the information was already there, what

9   information?

10  A.   The Social Security numbers and the birth dates,

11  sorry.

12  Q.   Did you see Mr. Thomas participate in a scheme at any

13  other time?

14  A.   No.

15  Q.   How often would you see the defendant during this time

16  period?

17  A.   I wouldn't see him as much as I seen Heather and

18  Mercedes, but I've seen him several occasions.

19  Q.   So who would you say was your major contact within the

20  conspiracy?

21  A.   Heather Carr.

22  Q.   How much money did you get from the scheme?

23  A.   I roughly would say a little -- in the $20,000 range.

24  Q.   What did you do with that money?

25  A.   Paid for bills and my financial living situations and

Case No. 1:16-cr-00054-WJM Document 535-3 filed 12/12/18 USDC Colorado pg 561 of
971
Case 1:16-cr-00054-WJM Document 341 Filed 03/09/18 Page 23 of 47

23

Direct - Green

1    my children.

2    Q.   Why did you decide to participate in this fraud

3    scheme?

4    A.   To -- financial gain, to live above.

5    Q.   Did you know it was wrong?

6    A.   Yes, I did.

7    Q.   How did you know it was wrong?

8    A.   Because it's taking -- it's filing something that's

9    false, that's not you, so if it's not you and you're doing

10   it, it's wrong.

11   Q.   Did the conspiracy eventually end?

12   A.   Yes, it did.

13   Q.   What happened to end the conspiracy?

14   A.   A search warrant was served at the Kaibob address.

15   Q.   Who lived at that address?

16   A.   Heather Carr, Trammel Thomas, and their children.

17   Q.   Do you remember approximately when that was?

18   A.   I want to say it was somewhere in August of 2012.

19   Q.   Now, before the conspiracy ended, you mentioned that

20   Ms. Carr used some of the fraud money for lawyers' fees.

21   Do you remember that?

22   A.   Correct.

23   Q.   Whose lawyers' fees?

24   A.   Trammel Thomas.

25   Q.   Do you remember when he was in trouble with the law?

Direct - Green

1    A.    At which -- no, I don't remember the definite date,

2    the time frame.

3    Q.    But you do remember that he had a defense attorney?

4    A.    Correct.

5    Q.    So, again, let's go back.  We were talking about this

6    search warrant.

7    A.    Uh-huh.

8    Q.    Remind me, when was it executed, approximately?

9    A.    I want to say around August of 2012.

10   Q.    Did anything happen after that search warrant was

11   executed?

12   A.    Yes.

13   Q.    What happened?

14   A.    I -- on the part of -- I was questioned and then I was

15   visited by the defendants, Trammel Thomas, Heather Carr, at

16   my residence.

17   Q.    Let me start with that first one.  When you were

18   questioned, who questioned you?

19   A.    The Department of Education, the FB -- the federal.

20   Q.    Federal agents?

21   A.    Yes.

22   Q.    Were you truthful to those federal agents?

23   A.    No, I wasn't.

24   Q.    Why not?

25   A.    Because I was scared.

Direct - Green

1    Q.    Scared of what?

2    A.    Of getting in trouble, or -- well, I know I was in

3    trouble when they came, but getting in more trouble.

4    Q.    And even after that, did investigators come to your

5    house a second time?

6    A.    Yes, they did.

7    Q.    And were you truthful to them even then?

8    A.    No.

9    Q.    But those times when you were untruthful to the

10   investigators, was that all before you pleaded guilty and

11   signed your cooperation agreement?

12   A.    Yes.

13   Q.    Now let's go back.  You said you were questioned.

14   A.    Yes.

15   Q.    What else happened after the search warrant was

16   executed?

17   A.    And then I was visited by Trammel Thomas and Heather

18   Carr.

19   Q.    Do you remember approximately what time of day it was

20   when they came?

21   A.    It was later in the day because the sun was down, I

22   know that.  It was dark.

23   Q.    Did Trammel Thomas say anything to you when he came to

24   your house after his house was searched?

25   A.    Yes.

Cross - Green

1  Q.   What did he say?

2  A.   What did they say to you when the investigators were

3  there?  What did they say to you?  What did you tell them?

4       I told him they had these pictures of people, if I

5  recognized them.  He said that -- Trammel Thomas said, How

6  did this happen?  Trying to figure out why the search

7  warrant was served.  And basically just asking what did I

8  say to the investigators.  And, again, what did -- what

9  were their questions?  And who were the people that they

10  showed me?

11  Q.   Describe to the members of the jury his general

12  demeanor.

13  A.   Nervous.

14  Q.   Describe that.  What makes you think he was nervous?

15  A.   Just the moving of the hands, the moving back and

16  forth, and the same questions over in just a different

17  format.

18       MR. FIELDS:  One moment, Your Honor.

19       THE COURT:  Okay.

20       MR. FIELDS:  Thank you, Your Honor.  I have no

21  further questions.

22       THE COURT:  Cross-examination.

23              CROSS-EXAMINATION

24  BY MR. SMITH:

25  Q.   Ms. Green, if you mentioned this, I missed it and I

Case No. 1:16-cr-00054-WJM   Document 535-3   filed 12/12/18   USDC Colorado   pg 565 of
971
Case 1:16-cr-00054-WJM   Document 341   Filed 03/09/18   Page 27 of 4

27

Cross - Green

1  apologize.  You indicated you have this marijuana issue

2  where you were convicted of possessing and selling 300

3  pounds.  When was that?

4  A.   That was in late 2011, I believe.  I can't give a

5  definite date.

6  Q.   Okay.  So it was during the same time that you

7  testified you were involved in this --

8  A.   No.

9  Q.   -- fraudulent scheme?

10  A.   Well, testify as -- I'm testifying today.  But did it

11  take place when all this was going on?

12  Q.   Yes.

13  A.   Towards the end of it.

14  Q.   Okay.  Well, I understood you to say that you thought

15  your conviction was in 2011?

16  A.   2011.  And then it was pleaded out in 2012, I

17  believe.

18  Q.   Okay.  And you indicated you'd been involved in this

19  student loan business from sometime in 2010 into 2012.

20  A.   Correct.

21  Q.   So at the same time you're involved in the student

22  loan situation, you're involved in the marijuana situation?

23  A.   That is correct, if my dates are correct, sir.

24  Q.   Okay.  This agreement you have with the Government,

25  you have to cooperate, correct?

Case No. 1:16-cr-00054-WJM Document 341 Filed 03/09/18 USDC Colorado pg 28 of 4

28

Cross - Green

1   A.   Truthfully, yes.  Correct.

2   Q.   And then when your sentencing comes up, you're hoping

3   that Ms. Paluch and Mr. Fields will make a recommendation

4   for a lighter sentence?

5   A.   That's correct, sir.

6   Q.   Okay.  And you were represented in negotiating this

7   agreement with Ms. Merritt?

8   A.   Yes, sir.

9   Q.   I assume that you've probably talked a lot more than

10  you wish about this concept of Federal Sentencing

11  Guidelines?

12  A.   I have, Your Honor -- I mean, sir.  I'm sorry.

13          MR. SMITH:  Almost got elevated.

14          THE COURT:  Careful what you wish for.

15          MR. SMITH:  I understand, Your Honor.

16  BY MR. SMITH:

17  Q.   You have some idea of what the guidelines would

18  indicate your sentence might be, correct?

19  A.   I do.

20  Q.   And that sentence could be anywhere from about four

21  years to about six years.

22  A.   Correct.  46 to 71 months, I believe.

23  Q.   Okay.

24  A.   Or 57 to 71 months.

25  Q.   And how much are you hoping that your sentence will be

Cross - Green

1    reduced?

2    A.    I can't give a definite answer because I don't know

3    what the percentage would be.  At least -- hopefully 20

4    percent.  I don't know exact amount when it comes to

5    federal.

6    Q.    Okay.  I didn't -- I didn't say that you knew.  What

7    are you hoping Ms. Paluch and Mr. Fields recommend --

8    A.    Just any less time than what my guidelines say.

9    Q.    -- to the Court?

10                Okay.  And this recommendation depends on your

11   cooperation?

12   A.    Correct.

13   Q.    And their view of it, correct?

14   A.    Correct.

15   Q.    So if you're saying things that they don't like,

16   that's not going to be cooperation, is it?

17   A.    Correct.

18   Q.    Some time in 2010, you had this conversation with

19   Heather Carr at a barbecue about this student loan scheme.

20   A.    That is correct.

21   Q.    Okay.  Was that over at her house?

22   A.    Yes, it was.

23   Q.    And that's the Pleasant --

24   A.    The Pleasant Drive address.

25   Q.    Pleasant Drive address.

Case 1:16-cr-00054-WJM Document 341 Filed 03/09/18 Page 30 of 47

30

Cross - Green

1    A.    Yes.

2    Q.    And it's just you and Ms. Carr.

3    A.    And our children, yes.

4    Q.    Okay.  Mr. Thomas isn't there?

5    A.    Not that I recall for the first conversation.

6    Q.    Okay.  And you get a good understanding of what Carr's

7    idea is?

8    A.    Yes.

9    Q.    Okay.  And am I correct that this whole thing can't

10   work without Heather Carr?

11   A.    That is correct.

12   Q.    And why is that?

13   A.    Because she was able to pull the information from her

14   database at work.

15   Q.    Okay.  So if I'm understanding how this goes about,

16   you can sit down on a computer and access a public website

17   that deals with some state Department of Corrections?

18   A.    Correct.

19   Q.    So maybe Florida?

20   A.    Any -- yeah, any public record, yes.

21   Q.    And you could identify an inmate who was serving a

22   sentence for X number of years?

23   A.    Yes.

24   Q.    And then with -- you'd get that name, correct?

25   A.    Yes.

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 569 of
Case 1:16-cr-00054-WJM Document 341 filed 03/09/18 Page 31 of 4
971

31

Cross - Green

1    Q.    And probably a date of birth?

2    A.    Not for sure what if the date of birth was on the

3    public records, but their time.  Their time and their

4    sentence was -- yes, their date of birth is on there.  I'm

5    sorry, yes.

6    Q.    Okay.  And then you would give that information to Ms.

7    Carr?

8    A.    The names, correct.

9    Q.    Okay.  And she would take that information and because

10   of her position with Wells Fargo -- that's who she worked

11   for, right?

12   A.    She worked for Wells Fargo and CarMax.

13   Q.    Okay.  She worked for Wells Fargo as a loan

14   underwriter and supervisor looking at whether or not Wells

15   Fargo would loan customers money to buy CarMax cars,

16   correct?

17   A.    Correct.

18   Q.    Okay.  And she worked from home.

19   A.    Yes, she did.

20   Q.    Okay.  So she would go in and access these private

21   databases to get the inmate's Social Security number and

22   credit history that you'd provide her, correct?

23   A.    That was provided, correct.

24   Q.    All right.  And you would give her an inmate name and

25   date of birth and she would get the other information,

Cross - Green

1    correct?

2    A.    She would be able to pull that information.

3    Q.    Okay.  And then she would give you back all the

4    information so you could fill out the FAFSA?

5    A.    She would give me the list with all the information on

6    it already.

7    Q.    Okay.  And that would be for any number of inmates?

8    A.    Yes.

9    Q.    Okay.  And you would take that list and then set about

10   filling out the paperwork required to get a student loan.

11   A.    That is correct.

12   Q.    Okay.  And you concentrated in Arizona.

13   A.    Yes.

14   Q.    And you used addresses for these inmates that were

15   your residence?

16   A.    Yes.

17   Q.    And another house, I think you said Mobile?

18   A.    1915 East Mobile Lane.

19   Q.    And did you have any relationship to that address?

20   A.    Yes, that's my deceased uncle's house.

21   Q.    Your uncle's house?

22   A.    Yes.

23   Q.    Okay.  When did you actually start filing?

24   A.    In July of 2010 for the summer session.

25   Q.    Okay.  And so in the fall, you started getting cards

Case No. 1:16-cr-00054-WJM Document 535-3 filed 12/12/19 USDC Colorado pg 571 of
971
Case 1:16-cr-00054-WJM Document 341 Filed 03/09/18 Page 33 of 47

Cross - Green

1    and money?

2    A.    You received the first money -- if you fill out for

3    the summer, you got the summer money; and then the fall;

4    and if you went, into the spring.

5    Q.    Okay.  And at this point in time, Ms. Carr's still

6    living at the Pleasant --

7    A.    Correct.

8    Q.    -- is it Drive?  I'm sorry, I --

9    A.    I think it's Pleasant Drive.  I can't --

10   Q.    Pleasant Drive address.  Okay.

11         And at some point in time in 2011, you're over at

12   that house, if I understood you correctly, and you're

13   talking with Ms. Carr, and Mr. Thomas is there.

14   A.    At that time, yes.

15   Q.    Okay.  And it's at that time when you're explaining to

16   Mr. Thomas something about filling out these -- this

17   paperwork?

18   A.    The FAFSA part, just the education part, sir.

19   Q.    The education part --

20   A.    Yes.

21   Q.    -- of the FAFSA?

22   A.    Yes.

23   Q.    Okay.  But it's at that meeting?

24   A.    Yes.

25   Q.    At Heather Carr's on Pleasant Drive?

34

Cross - Green

1    A.    Correct.

2    Q.    And you believe it's in 2011?

3    A.    I believe it's in 2011.  Like I said, the dates are

4    cloudy, so I can't give you a definite.

5    Q.    Okay.  So it's in Phoenix.

6    A.    Correct, in Phoenix.

7    Q.    Okay.  Is it really hot out?

8    A.    It's hot all the time, sir.  I don't -- I'm sorry.

9    Q.    I'm just trying to -- is it in the spring, the summer,

10   the fall?

11   A.    I can't give a definite time.  I'm sorry.

12   Q.    But it's 2011.

13   A.    2011.

14   Q.    Okay.  If I -- if I could go back just a minute to

15   your agreement with the Government.  My memory is that you

16   had some sort of paperwork that you were going to try to

17   find and give the Government.

18   A.    It was the list of the names, correct.

19   Q.    Okay.  And you weren't able to find that, correct?

20   A.    No, I wasn't.

21   Q.    Okay.

22   A.    I've moved since then.

23   Q.    You mentioned the name Mercedes Diaz.

24   A.    Correct.

25   Q.    I understand Ms. Diaz was -- was very close to Heather

35

Cross - Green

1    Carr.

2    A.    Yes.

3    Q.    Ms. Carr pretty much raised her?

4    A.    Like her daughter.

5    Q.    And that started up in Colorado?

6    A.    Yes.

7    Q.    And then they moved down to Arizona?

8    A.    Heather moved first and then Mercedes followed.

9    Q.    Followed?

10   A.    Yes.

11   Q.    And Ms. Diaz actually lived with Heather Carr for

12   quite a bit of time?

13   A.    A little bit, I believe at the Pleasant Drive, but I

14   don't believe it was a long period of time.

15   Q.    Okay.  She often spent time at Heather Carr's house.

16   A.    Yes.

17   Q.    Okay.  And she would be there when you were there?

18   A.    Yes.

19   Q.    Okay.  Were you all close?

20   A.    Not super close, like me and Heather, but we're

21   okay.

22   Q.    Okay.  You and Heather go back quite a ways?

23   A.    Correct.

24   Q.    Before this got started, you'd known her for some 11

25   years.

Cross - Green

1    A.   I -- 2004, I believe is when I met Heather, or 2005.

2    Q.   Okay.  And you'd been friends ever since.

3    A.   Yes.

4    Q.   Until this happened?

5    A.   Correct.

6    Q.   What was Ms. Diaz's part?

7    A.   The enrolling and then doing homework and receiving --

8    getting addresses -- sorry, addresses.

9    Q.   Okay.  And how do you know that was her job?

10   A.   Just conversation.

11   Q.   With her?

12   A.   Yes.

13   Q.   Okay.  And you knew Heather Carr's job because she

14   told you.

15   A.   Yes.

16   Q.   What was Heather's -- Ms. Carr's Facebook name?

17   A.   Heather Carr.

18   Q.   Heather Bacardi?

19   A.   She changed it before, Heather Carr, Bacardi.

20   Q.   And where did the Bacardi moniker come from?

21   A.   Because she likes to drink Bacardi.

22   Q.   A lot?

23   A.   Yes.

24   Q.   You know this scheme started because of your

25   conversation with Carr in 2010 --

Case No. 1:16-cr-00054-WJM Document 525-3 Filed 12/12/18 USDC Colorado pg 575 of 971
Case 1:16-cr-00054-WJM Document 341 Filed 03/09/18 Page 37 of 47

37

Cross - Green

1    A.    Correct.

2    Q.    -- correct?  That's when you think it started.

3    A.    Correct.

4    Q.    And your part was down in Arizona.

5    A.    Yes.

6    Q.    You didn't file anything at Pikes Peak Community

7    College?

8    A.    Yes, I had a card sent to my address.

9    Q.    Okay.  For Pikes Peak?

10   A.    Yes, for Pikes Peak, sorry.

11   Q.    To your address?

12   A.    In Phoenix at 4630.

13   Q.    Okay.  You didn't have them sent to addresses in

14   Colorado?

15   A.    No.

16   Q.    When you got these debit cards -- and you had to

17   activate them, correct?

18   A.    Correct.

19   Q.    And what was that process?

20   A.    You would just call the number on the card, you know,

21   when you get your sticker, and you would just call and

22   activate it.

23   Q.    Okay.  There's a sticky thing over it and you had to

24   pull that off?

25   A.    Yes.

38

Cross - Green

1    Q.   Okay.  Call the number and whammo, you had 4- or
2    $5,000?
3    A.   Yes.
4    Q.   And then you had to turn that card into the actual
5    cash.
6    A.   Correct.
7    Q.   And you would do that by going to ATMs?
8    A.   Yes.
9    Q.   And that's how you got the 20s?
10   A.   Yes.
11   Q.   Where else would you go to get the cash?
12   A.   Local grocery stores that we have in Arizona.
13   Q.   Okay.  And they have ATMs there or how did that work?
14   A.   Cash backs, so you just buy something and get cash
15   back.
16   Q.   Okay.  Could you pay bills with these cards?
17   A.   Yes.
18   Q.   And did you ever do that?
19   A.   Yes, I did, one time.
20   Q.   One time.
21   A.   Yes.
22   Q.   And that wasn't a very good idea, right?
23   A.   No, it wasn't.
24   Q.   Because then there was a record of your using that
25   card.

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 577 of 971
Case 1:16-cr-00054-WJM Document 341 filed 03/09/18 Page 39 of 47

39

Cross - Green

1    A.    That is correct.

2    Q.    And it would come back to the bank and --

3    A.    My address is linked to it, yes.

4    Q.    All right.  And then eventually the Government and

5    then everybody knows.

6    A.    Correct.

7    Q.    My understanding, Ms. Green, is that when Carr lived

8    at the Pleasant Drive address, that wasn't very far away

9    from where you lived?

10   A.    Yes, it was.

11   Q.    It was far away?

12   A.    Yes.

13   Q.    Okay.  But you were over there quite a bit.

14   A.    Yes.

15   Q.    Okay.  But then I understand once the move was made

16   when Carr moved to the -- I call it Kaibob, is that --

17   A.    I think we're all having issue with that, I think it's

18   Kaibob.  I don't know --

19   Q.    Kaibob?  Okay, I'll use yours.

20   A.    Okay.

21   Q.    To the Kaibob address.

22   A.    Yes.

23   Q.    You didn't go over there very much?

24   A.    No, I didn't.

25   Q.    Okay.  In fact, as I understand it from one of your

40

Cross - Green

1    statements, you only went there one time.

2    A.    One time.

3    Q.    So if Ms. Carr moved into that Kaibob house in March

4    or April of 2012, were you only there once after that?

5    A.    Correct.

6    Q.    So your conversations and dealings in this situation,

7    as far as that residence, were almost all at the Pleasant

8    Drive address.

9    A.    Correct.

10   Q.    Aside from your memory of tutoring, if you will, Mr.

11   Thomas on the education part of the FAFSA, you never talked

12   to him about this scheme, did you?

13   A.    Not personally to him, no.

14   Q.    Okay.  He never told you that he filled out FAFSAs,

15   did he?

16   A.    No.  Him, personally, no.

17   Q.    He never told you that he went out and got money from

18   these cards, did he?

19   A.    No.

20   Q.    Those conversations that you had about that were

21   principally with Heather Carr.

22   A.    That is correct, sir.

23   Q.    And you had some of those conversations, certainly to

24   a lesser degree, with Mercedes Diaz?

25   A.    Correct.

Case No. 1:16-cr-00054-WJM Document 525-3 Filed 12/12/19 USDC Colorado pg 579 of
971
Case 1:16-cr-00054-WJM Document 341 Filed 03/09/18 Page 41 of 47

41

Redirect - Green

 1              MR. SMITH:  May I have a moment?

 2              THE COURT:  You may.

 3              MR. SMITH:  Thank you very much, Ms. Green.

 4         I don't have any further questions at this time,

 5    Your Honor.

 6              THE COURT:  All right.  Redirect.

 7              MR. FIELDS:  Thank you, Your Honor.

 8                     REDIRECT EXAMINATION

 9    BY MR. FIELDS:

10    Q.   Ms. Green, do you remember being asked questions about

11    your cooperation agreement?

12    A.   Yes.

13    Q.   And you were asked about whether or not it would be

14    cooperation if you say something that the Government

15    doesn't like.  Do you remember that?

16    A.   Yes, I do, sir.

17    Q.   Ms. Green, what happens if you lie under oath because

18    you think that would help the Government?

19    A.   That's a lot more trouble than what I'm in now.

20    Q.   How so?

21    A.   Perjury is -- is -- I'm not saying it's the highest

22    offense, but it's an offense in any courts.

23    Q.   Even if you think that will help the Government?

24    A.   Correct.

25    Q.   So does your agreement involve lying to anyone with

Redirect - Green

1    regard to this courtroom here today?

2    A.    No.

3    Q.    Does it cover -- it covers lies to anyone, right?

4    A.    Yes.   Sorry.

5    Q.    Including lies in responses to defense counsel

6    questions?

7    A.    Yes.

8    Q.    So you had to answer defense counsel questions just as

9    truthfully as you answer our questions; isn't that right?

10   A.    That is correct.

11   Q.    And if the judge asks questions, you would have to

12   answer those questions truthfully?

13   A.    That is correct.

14   Q.    Now, you were also asked about whether or not the

15   scheme could work without Heather Carr.

16   A.    Yes.

17   Q.    Do you remember being asked that question?

18   A.    Yes.

19   Q.    Was it also important to the scheme to get other

20   addresses that could be used?

21   A.    Yes.

22   Q.    Would the scheme have been successful if people hadn't

23   been able to get other addresses?

24   A.    No.   Because, like I said before, it's an alert if you

25   send to some addresses, so multiple addresses needed to be

Redirect - Green

1    used.

2    Q.   You used multiple addresses, right?

3    A.   Yes, I did.

4    Q.   Did other members of the conspiracy also use multiple

5    addresses?

6    A.   Yes.

7    Q.   The address you mentioned, this 1915 East Mobile Lane,

8    did you get permission to use that address?

9    A.   It's my -- well, it's a deceased family member, so it

10   was our family house.

11   Q.   Anyone living in the house?

12   A.   No.

13   Q.   You were also asked questions about how frequently you

14   would talk to Thomas.  Did you talk to him all that much?

15   A.   I didn't talk to him much.

16   Q.   Who would you talk to about Thomas' involvement in the

17   scheme?

18   A.   Heather Carr.

19   Q.   Without telling us exactly what was said, how

20   frequently did you have those conversations?

21   A.   We had them frequently, but not like once every other

22   day.  Probably like a couple of times a month.

23   Q.   And during the conspiracy, who did Heather Carr live

24   with?

25   A.   She lived with her children and Trammel Thomas, and at

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 582 of
Case 1:16-cr-00054-WJM Document 341 Filed 03/09/18 Page 44 of 47
971

44

Redirect - Green

1   a time -- well, I can't say because I don't think Mercedes

2   lived there at that time, so, yeah, just her children and

3   Trammel Thomas.

4   Q.   Did Heather Carr appear to be close to Trammel Thomas?

5   A.   Yes.

6   Q.   What made it appear that they were close?

7   A.   Because they were in a relationship and they had

8   children together.

9   Q.   And going back to -- you were asked about, you know,

10  this incident involving Thomas and the FAFSAs.  Do you

11  remember being asked questions about that?

12  A.   Yes.

13  Q.   And defense counsel really tried to pin you down on a

14  date.

15  A.   Yes.

16  Q.   You said it was -- when was it, approximately?

17  A.   Approximately in 2011.  And, like I said before, I

18  cannot give a definite date because I don't want to lie,

19  because I can't recall the date.  I'm sorry.

20  Q.   Do you remember also being asked questions about a

21  period of time in which Trammel Thomas was incarcerated?

22  A.   Yes.

23  Q.   Do you remember approximately when that was?

24  A.   I can't say.  I -- because I know it was several

25  times.  I want to say it was early summer, 2010.  I'm not

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 583 of
Case 1:16-cr-00054-WJM Document 341 Filed 03/09/18 Page 45 of 4
971

45
Redirect - Green

1   for sure.

2   Q.   This incident where you recall seeing Mr. Thomas

3   filling out the FAFSA, did that occur before he was

4   incarcerated or after?

5   A.   Which -- before.

6   Q.   It occurred before?

7   A.   Yes.

8   Q.   Okay.  So you can't remember an exact date?

9   A.   I can't remember the date.

10  Q.   But can you remember a sequence of events?

11  A.   No.

12          MR. FIELDS:  No further questions, Your Honor.

13          THE COURT:  All right.  May this witness be

14  excused?

15          MR. FIELDS:  Yes, from the Government.

16          THE COURT:  All right.  For the defendant?

17          MR. SMITH:  No objection.

18          THE COURT:  All right.  Ms. Green, thank you for

19  your testimony.  You're excused and you may step down.

20          All right, ladies and gentlemen of the jury, I've

21  discussed with the lawyers the sequence of witnesses and

22  this is going to be our last witness for today.  So you're

23  getting released early.  I need to remind you again, please

24  do not do any independent research into or discuss with

25  anyone the facts, the law, the issues or the individuals in

46

1    this case.

2            We're going to attempt to resume tomorrow again at

3    8:45, that is, if I don't have additional issues with the

4    lawyers before that.  But I ask you to please be in the

5    jury deliberation room by 8:35.

6            All right, we'll be in recess until 8:45 tomorrow

7    morning.

8        (Proceedings concluded at 4:20 p.m.)

9

10                          **INDEX**

11   Item                                              PAGE

12                    GOVERNMENT'S WITNESSES

13   **MARCELLE GREEN**
     Direct Examination by Mr. Fields              3
14   Cross-examination by Mr. Smith                26
     Redirect Examination by Mr. Fields           41

15

16

17                    GOVERNMENT'S EXHIBITS

18   EXHIBITS:       Offered    Received   Refused   Stipulated

19   32                         3                    3

20

21

22                   *      *      *      *      *

23

24

25

Case No. 1:16-cr-00054-WJM Document 535-3 filed 12/12/18 USDC Colorado pg 585 of 971
Case 1:16-cr-00054-WJM Document 341 Filed 03/09/18 Page 47 of 47

47

1                       REPORTER'S CERTIFICATE

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled

5     matter.

6          Dated at Denver, Colorado, this 13th day of February,

7     2018.

8

9

10

11

12                    MARY J. GEORGE, FCRR, CRR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25

Case No. 1:16-cr-00054-WJM Document 525-13 filed 12/12/18 USDC Colorado pg 586 of 971
Case 1:16-cr-00054-WJM Document 134 Filed 11/09/19 Page 1 of 5 pg 586 of 971
US vs Thomas

Attachment 4

| Term | Unsubsidized Loans Disbursed to School | Subsidized Loans Disbursed to School | Pell Grants Disbursed to School | Total Disbursed by ED | Return to Title 4 | Drop or Withdrawal | Other | To ED | To School | Payment to Student for Living Expenses | Payment to Student for Books and Supplies | Total Refund | Thomas Associations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Chandler Gilbert CC** | | | | | | | | | | | | | |
| Aaron, Billy (FL DOC) — Fall 2012 | $ - | $ 1,733.00 | $ 1,388.00 | $ 3,121.00 | $ (2,451.00) | $ - | $ - | $ 670.00 | | $ 1,204.00 | $ - | | IP: in May 2012 A: PMB (Diaz) C: |
| Abbate, William (FL DOC) — Fall 2012 | $ - | $ 1,733.00 | $ 1,388.00 | $ 3,121.00 | $ (1,963.00) | $ - | $ - | $ 1,158.00 | $ - | $ 1,204.00 | $ - | | IP: in May 2012 A: 1161 Dragoon Circle and PMB (Diaz) DC: mailed to PMB (Swiss) C: |
| **Totals:** | $ - | $ 3,466.00 | $ 2,776.00 | $ 6,242.00 | $ (4,414.00) | $ - | $ - | $ 1,828.00 | $ - | $ 2,408.00 | $ - | $ 2,408.00 | |
| **Community College of Denver** | | | | | | | | | | | | | |
| Hardin, Jameisha (FL DOC) — Spring 2012 | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | $ (1,316.00) | | | $ 4,799.00 | $ 1,316.00 | $ 3,797.70 | $ 500.00 | | A: Lexington Village Ln (Grant) C: |
| James, Deanna (FL DOC) — Spring 2012 | $ - | $ - | $ - | $ - | | | | $ - | $ - | $ - | | | |
| Martin, Sharon (FL DOC) — Spring 2012 | $ - | $ - | $ - | $ - | | | | $ - | $ - | $ - | | | |
| **Totals:** | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | $ (1,316.00) | $ - | $ - | $ 4,799.00 | $ 1,316.00 | $ 3,797.70 | $ 500.00 | $ 4,297.70 | |
| **Mesa Community College** | | | | | | | | | | | | | |
| Aaron, Dominique (FL DOC) — Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (992.00) | | $ - | $ 5,099.00 | $ 992.00 | $ 4,486.00 | $ 300.00 | | IP: in May 2012 DC: mailed to PMB (Swiss) C: |
| Abbott, Jerry (FL DOC) — Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (897.00) | $ - | $ - | $ 5,194.00 | $ 897.00 | $ 5,620.00 | | | IP: in May 2012 A: Meadow Oak (Mullett) A: PMB (Diaz) C: |
| Abbot, Robert (FL DOC) — Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (963.00) | $ - | $ - | $ 5,128.00 | $ 963.00 | $ 4,466.00 | $ 300.00 | | IP: in May 2012 A: Meadow Oak (Mullett) A: PMB (Diaz) C: |
| Abrams, Robert (FL DOC) — Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ - | | | $ 6,091.00 | $ - | $ 4,486.00 | $ 300.00 | | IP: in July 2012 A: tied to Lola Thomas A: PMB (Diaz) C: |
| Acevedo, Justin (FL DOC) — Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (549.00) | | | $ 5,542.00 | $ 549.00 | $ 4,476.00 | $ 300.00 | | IP: in July 2012 A: 1161 Dragoon (Diaz) C: |
| Acosta, Robert (FL DOC) — Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (797.00) | | | $ 5,294.00 | $ 797.00 | $ 4,486.00 | $ 300.00 | | IP: in July 2012 C: |
| Actisdano, John (FL DOC) — Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (1,175.00) | | | $ 4,916.00 | $ 1,102.00 | $ 4,476.00 | $ 227.00 | | IP: in July 2012 A: PMB (Swiss) C: |
| Adair, Calvin (FL DOC) — Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (1,055.00) | | | $ 5,036.00 | $ 1,055.00 | $ 4,486.00 | $ 300.00 | | IP: in July 2012 A: Meadow Oak (Mullett) C: |
| Adames, Omar (FL DOC) — Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (1,017.00) | | | $ 5,074.00 | $ 1,017.00 | $ 4,486.00 | $ 300.00 | | IP: in July 2012 A: PMB (Diaz) C: |
| Adams, Dee Dee (CO DOC) — Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | | | | $ 6,091.00 | $ - | $ 4,466.00 | $ 300.00 | | IP: in July 2012 A: tied to Lola Thomas A: PMB (Diaz) C: |
| Alcon, Jerrie (CO DOC) — Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (1,301.00) | | | $ 4,790.00 | $ 1,301.00 | $ 4,486.00 | $ 300.00 | | IP: in July 2012 C: |
| Allen, Sarah (FL DOC) — Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (1,081.00) | | | $ 5,010.00 | $ 1,081.00 | $ 4,486.00 | $ 300.00 | | IP: in June 2012 A: Blackhawk address (Sanders) MPN: PMB address (Swiss) C: |
| Angel, Elizabeth (CO DOC) — Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (719.00) | | | $ 5,372.00 | $ 719.00 | $ 4,466.00 | $ 300.00 | | IP: in July 2012 C: |

Thomas Associations: IP: FAFSA from Kaibab / A: FAFSA address tied to Thomas and/or Co-Conspirators / DC: Thomas w/debit card / C: Carr Accurint query

Creation date: November 3, 2017
Revised March 5, 2018

| Name | Term | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Apodaca, Anna (CO DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (708.00) | | $ 5,383.00 | $ 708.00 | $ 4,486.00 | $ 300.00 | IP in July 2012 / A: Meadow Oak (Mullett) / C |
| Bauer, Amy (CO DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (544.00) | | $ 5,547.00 | $ 544.00 | $ 4,486.00 | $ 300.00 | IP in July 2012 / C |
| Bellino, Stephanie (CO DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (1,138.00) | | $ 4,953.00 | $ 1,138.00 | $ 4,456.00 | $ 300.00 | IP in July 2012 / C |
| Diaz, Antonio (CO DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (935.00) | | $ 5,156.00 | $ 935.00 | $ 4,486.00 | $ 300.00 | IP in May 2012 / A: 1161 Dragoon (Diaz) / C |
| Diaz, Jennifer (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (963.00) | | $ 5,128.00 | $ 963.00 | $ 4,466.00 | $ 300.00 | IP July 2012 / A: 1161 Dragoon (Diaz) / DC: Visa Rush Debit card / C |
| Dirito, Barbara (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (840.00) | | $ 5,251.00 | $ 840.00 | $ 4,466.00 | $ 300.00 | IP in July 2012 / C |
| Dison, Heather (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (1,301.00) | | $ 4,790.00 | $ 1,301.00 | $ 4,486.00 | $ 300.00 | IP in July 2012 / A: tied to Lola Thomas / C |
| Dixson, Darlene (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (1,314.00) | | $ 4,777.00 | $ 1,314.00 | $ 4,486.00 | $ 300.00 | IP in July 2012 / A: tied to Lola Thomas / A: PMB (Diaz) / C |
| Dockins, Joyce (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | | | $ 6,091.00 | $ - | $ 4,466.00 | $ 280.00 | IP in July 2012 / A: Meadow Oak (Mullett) / A: PMB (Diaz) / C |
| Dorn, Joy (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (963.00) | | $ 5,128.00 | $ 963.00 | $ 4,466.00 | $ 300.00 | FAFSA: Kaibab IP in July 2012 / FAFSA-PMB (Swiss) |
| Higgs, Myrtle (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (434.00) | | $ 5,657.00 | $ 434.00 | $ 5,325.00 | $ 300.00 | FAFSA: Kaibab IP in April 2012 / FAFSA: 4630 S 21st (Green) |
| Hills, Bobbie (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (1,047.00) | | $ 5,044.00 | $ 1,047.00 | $ 4,486.00 | $ 300.00 | IP in August 2012 / A : 1418 Rushmore (Pickens) / A: PMB (Swiss) / C |
| Jackson, Kenneth (AZ DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (1,212.00) | | $ 4,879.00 | $ 1,212.00 | $ 4,456.00 | $ 300.00 | IP in May 2012 / A: PMB (Swiss) / C |
| Johnson, Byanca (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (1,235.00) | | $ 4,856.00 | $ 1,235.00 | $ 4,486.00 | $ 300.00 | IP in June 2012 / A: Lexington Village Ln (Grant) / DC: mailed to PMB (Swiss) / C / SW: Scraps in toilet with name Bycana |
| Lee, Artazia (FL DOC) | Spring 2012 | $ - | $ 3,484.00 | $ 2,082.00 | $ 5,566.00 | $ (1,388.00) | | $ 4,178.00 | $ 1,388.00 | $ 2,645.00 | $ 300.00 | DC: mailed to 1915 E Mobile Ln (Green) |
| Lee, Lummie (FL DOC) | Spring 2012 | $ - | $ 3,484.00 | $ 2,776.00 | $ 6,260.00 | $ (1,388.00) | $ (1,629.00) | $ 3,243.00 | $ 1,629.00 | $ 2,645.00 | $ 300.00 | DC: mailed to 1915 E Mobile Ln (Green) |
| Lee, Olicia (FL DOC) | Spring 2012 | $ - | $ 3,484.00 | $ 2,776.00 | $ 6,260.00 | $ (1,388.00) | | $ 4,872.00 | $ - | $ 2,645.00 | $ 300.00 | DC: mailed to 1915 E Mobile Ln (Green) |
| Miller, Dennis (OH DOC) | Fall 2012 | $ - | $ 1,733.00 | $ 1,388.00 | $ 3,121.00 | | | $ 3,121.00 | $ - | $ 1,506.00 | $ 300.00 | IP in May 2012 / A: Meadow Oak (Mullett) / C / Thomas text message w/Mullett |
| Powell, Amanda (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (827.00) | | $ 5,264.00 | $ 827.00 | $ 4,486.00 | $ 300.00 | A: 3239 Blackhawk Cir. (Sanders) |
| Powell, Amanda (FL DOC) | Spring 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,387.00 | $ 6,090.00 | $ (1,267.00) | | $ 4,823.00 | $ 1,267.00 | $ 4,485.00 | $ 300.00 | A: 3239 Blackhawk Cir. (Sanders) |
| Powell, Cynthia (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (694.00) | | $ 5,397.00 | $ 694.00 | $ 3,821.00 | $ 300.00 | A: 3239 Blackhawk Cir. (Sanders) |
| Powell, Joyce (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (827.00) | | $ 5,264.00 | $ 827.00 | $ 4,486.00 | $ 300.00 | A: 3239 Blackhawk Cir. (Sanders) |
| Robinson, Annie (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | | | $ 6,091.00 | | $ 4,486.00 | $ 300.00 | IP in July 2012 / A: 1418 Rushmore (Pickens) / A: 724 W Knxo Rd. (Diaz) / DC / C |
| Robinson, Kortni (FL DOC) | Summer 2012 | $ - | $ 3,484.00 | $ 1,388.00 | $ 4,872.00 | $ (1,619.00) | | $ 3,253.00 | $ - | $ 2,655.00 | $ 300.00 | IP in May 2012 / A: 1412 Rushmore (Pickens) / A: PMB (Swiss) / C |

Creation date: November 3, 2017
Revised March 5, 2018

| Name | Term | | | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Robinson, Kortni (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (1,300.00) | | | $ 4,791.00 | $ 1,300.00 | $ 2,867.00 | $ 300.00 | | IP in May 2012 / A: 1412 Rushmore (Pickens) / A: PMB (Swiss) / C |
| Smith, Jamain (FL DOC) | Summer 2012 | | $ 3,484.00 | $ 1,388.00 | $ 4,872.00 | | | | $ 4,872.00 | $ - | $ 2,665.00 | $ 300.00 | | IP in April 2012 / A: PMB (Swiss) / C |
| Smith, Jamain (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (827.00) | | | $ 5,264.00 | $ 827.00 | $ 4,486.00 | $ 300.00 | | IP in April 2012 / A: PMB (Swiss) / C |
| Smith, Jerome (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (912.00) | | | $ 5,179.00 | $ 912.00 | $ 5,320.00 | $ 300.00 | | IP in April 2012 / A: PMB (Swiss) / C |
| Smith, Joseph (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (827.00) | | | $ 5,264.00 | $ 827.00 | $ 4,486.00 | $ 300.00 | | IP in April 2012 / A: PMB (Swiss) / C |
| Smith, Patrick (FL DOC) | Summer 2012 | $ - | $ 3,484.00 | $ 1,388.00 | $ 4,872.00 | | | | $ 4,872.00 | $ - | $ 2,655.00 | $ 300.00 | | IP in April 2012 / A: PMB (Swiss) / C |
| Smith, Patrick (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (1,147.00) | | | $ 4,944.00 | $ 1,147.00 | $ 4,486.00 | $ 300.00 | | IP in April 2012 / A: PMB (Swiss) / C |
| **Totals:** | | **$ 109,890.00** | **$ 86,758.00** | **$ 64,541.00** | **$ 261,189.00** | **$ (37,591.00)** | **$ -** | **$ (1,629.00)** | **$ 221,969.00** | **$ 34,752.00** | **$ 183,700.00** | **$ 12,807.00** | **$ 196,507.00** | |

## Pikes Peak Community College

| Name | Term | | | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Abate, Manuel (FL DOC) | Fall 2012 | $ 2,970.00 | $ 1,733.00 | $ 1,388.00 | $ 6,091.00 | $ (829.00) | $ (3,874.00) | $ 1,388.00 | | $ - | $ 4,746.10 | | | IP in May 2012 / A : Meadow Oak (Mullett) / C / DC |
| Allain, Lori (FL DOC) | Fall 2011 | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | | | $ 6,115.00 | | $ - | $ 4,252.90 | | | A: 1915 E Mobile Ln (Green) / C / DC |
| Allegra, Eryn (FL DOC)aka Mayer | Fall 2011 | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | $ (926.00) | | $ 5,189.00 | | $ 926.00 | $ 4,262.90 | | | A: 1915 E Mobile Ln (Green) / C / DC |
| Allen, Delta (FL DOC) | Fall 2011 | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | $ (900.00) | | $ 5,215.00 | | $ 900.00 | $ 4,304.90 | | | A: 1153 W Dragoon (Diaz) / C / DC |
| Brown, Ellen (FL DOC) | Fall 2011 | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | | | $ 6,115.00 | | $ - | $ 4,314.90 | | | FAFSA: Lexington Village Ln (Grant) / C / DC |
| Brown, Erica (FL DOC) | Fall 2011 | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | | | $ 6,115.00 | | $ - | $ 4,314.90 | | | A: Lexington Village Ln (Grant) / C / DC |
| Brown, Gloria (FL DOC) | Fall 2011 | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | $ (900.00) | | $ 5,215.00 | | $ 900.00 | $ 4,314.90 | | | A: Lexington Village Ln (Grant) / C / DC |
| Brown, Lillian (FL DOC) | Fall 2011 | $ 1,761.00 | $ 1,742.00 | $ 1,388.00 | $ 4,891.00 | $ (900.00) | | $ 3,991.00 | | $ 900.00 | $ 3,090.90 | | | A: Lexington Village Ln (Grant) / C / DC |
| Diaz, Alejandro (CO DOC) | Fall 2011 | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | $ (900.00) | | $ 5,215.00 | | $ 900.00 | $ 4,304.90 | | | A: 1153 W Dragoon (Diaz) / C / DC |
| Duncan, Christine | Spring 2011 | $ 2,985.00 | $ 1,742.00 | $ 2,775.00 | $ 7,502.00 | $ (1,119.00) | | $ 6,383.00 | | $ 1,119.00 | $ 5,230.60 | | | A: 3820 Radiant Dr (Thomas) |
| Duncan, Christine | Summer 2011 | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | $ (559.00) | | $ 5,556.00 | | $ 559.00 | $ 4,996.10 | | | A: 3820 Radiant Dr (Thomas) |
| Ellis, Linda (FL DOC) | Fall 2011 | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | $ (5,421.00) | | $ 694.00 | | $ 1,115.85 | $ 4,305.15 | | | A: 1063 Rice (Cox) / C / DC |
| Ellis, Mark (CO DOC) | Fall 2011 | $ 2,737.00 | $ 1,742.00 | $ 1,388.00 | $ 5,867.00 | $ (905.00) | | $ 4,962.00 | | $ 905.00 | $ 4,057.15 | | | A: 1063 Rice (Cox) / C / DC |
| Ellis, Michael (OH DOC) | Fall 2011 | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | $ (905.00) | | $ 5,210.00 | | $ 905.00 | $ 4,057.15 | | | A: 1063 Rice (Cox) / C / DC |
| Ellis, Monica (FL DOC) | Fall 2011 | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | $ (905.00) | | $ 5,210.00 | | $ 905.00 | $ 4,305.15 | | | A: 1063 Rice (Cox) / C / DC |
| Grant, Donald (FL DOC) | Fall 2011 | $ 2,737.00 | $ 1,742.00 | $ 1,388.00 | $ 5,867.00 | | | $ 5,867.00 | | $ - | $ 4,066.90 | | | A: Lexington Village Ln (Grant) / C / DC |

3

588

Creation date: November 3, 2017
Revised March 5, 2018

| Name | Term | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| Grant, Michelle (FL DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | | 5,867.00 | - | 4,066.90 | A: Lexington Village Ln (Grant) / C / DC |
| Grant, Richard (FL DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | | 5,867.00 | - | 4,066.90 | A: Lexington Village Ln (Grant) / C / DC |
| Grant, Toriano (FL DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | (926.00) | 4,941.00 | 926.00 | 4,014.90 | A: Lexington Village Ln (Grant) / C / DC |
| Hampton, Willie (FL DOC) | Summer 2011 | 4,126.00 | 3,484.00 | 1,388.00 | 8,998.00 | (827.00) | 8,171.00 | 827.00 | 7,334.20 | A: 3239 Blackhawk (Sanders) / C |
| Howard, Derrise (FL DOC) | Fall 2012 | 2,970.00 | 1,733.00 | 1,388.00 | 6,091.00 | (982.00) | 5,109.00 | 982.00 | 4,126.40 | IP in April 2012 / A: 4630 S. 21st Pl, AZ (Green) / C |
| Jones, Alethia (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | | 6,115.00 | - | 4,314.90 | A: 1418 Rushmore (Pickens) / C / DC |
| Jones Jr, Eddie (OH DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | (905.00) | 4,962.00 | - | 4,057.15 | A: 1418 Rushmore (Pickens) / C / DC |
| Jones, Edward (AZ DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | | 5,867.00 | - | 4,066.90 | A: 1418 Rushmore (Pickens) / C / DC |
| Jones, Keavin (FL DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | | 5,867.00 | - | 4,066.90 | A: 1418 Rushmore (Pickens) / C / DC |
| Jones, Linda (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (917.00) | 5,198.00 | 900.00 | 4,281.35 | A: 1418 Rushmore (Pickens) / C / DC |
| Jones, Patsy (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (917.00) | 5,198.00 | 917.00 | 4,281.35 | A: 1418 Rushmore (Pickens) / C / DC |
| Jones, Shamika (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | | 6,115.00 | - | 4,351.80 | A: 1418 Rushmore (Pickens) / C / DC |
| Jones, Virginia (AZ DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | (900.00) | 4,967.00 | 900.00 | 4,066.90 | A: 1418 Rushmore (Pickens) / C / DC |
| Long, Keith (FL DOC) | Summer 2011 | 4,126.00 | 3,484.00 | 1,388.00 | 8,998.00 | | 8,998.00 | - | 7,307.90 | A: 3239 Blackhawk (Sanders) / C |
| Lopez, Vanessa | Spring 2011 | 2,985.00 | 1,742.00 | 2,775.00 | 7,502.00 | | 7,502.00 | - | 5,230.60 | A: 3820 Radiant (Thomas) / C |
| Lopez, Vanessa | Summer 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (559.00) | 5,556.00 | 559.00 | 4,996.10 | A: 3820 Radiant (Thomas) / C |
| Miller, Dennis (OH DOC) | Summer 2012 | - | 3,484.00 | 1,388.00 | 4,872.00 | (891.00) | 4,551.00 | 321.00 | 3,650.35 | IP in May 2012 / A: Meadow Oak (Mullett) / C / Thomas text message w/Mullett |
| Omar, Ismael (CO DOC) | Spring 2011 | 2,985.00 | 1,742.00 | 2,775.00 | 7,502.00 | (1,649.00) | 5,853.00 | 1,649.00 | 4,160.80 | A: 3820 Radiant (Thomas) / C / DC |
| Omar, Ismael (CO DOC) | Summer 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (827.00) | 5,288.00 | 827.00 | 4,461.20 | A: 3820 Radiant (Thomas) / C / DC |
| Pickens, Robert (IL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (900.00) | 5,215.00 | 900.00 | 4,314.90 | A: 1418 Rushmore (Pickens) / C / DC |
| Rowsley, Jesse (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (926.00) | 5,189.00 | 926.00 | 4,575.90 | A: 4630 S. 21st Pl. (Green) / C |
| Sanders, Brian (AZ DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | | 6,115.00 | - | 4,314.90 | A: 3239 Blackhawk (Sanders) / C |
| Sanders, Michael (AZ DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (900.00) | 5,215.00 | 900.00 | 4,314.90 | A: 3239 Blackhawk (Sanders) / C |
| Smith, Adam (OH DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | (900.00) | 4,967.00 | 900.00 | 4,066.90 | A: 3239 Blackhawk (Sanders) / C / DC |
| Smith, Dana (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (891.00) | 5,224.00 | 891.00 | 4,333.35 | A: 3239 Blackhawk (Sanders) / C |
| Smith, Kelly (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (926.00) | 5,189.00 | 926.00 | 4,262.90 | A: 3239 Blackhawk (Sanders) / C / DC |
| Smith, Lyn (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (865.00) | 5,250.00 | 865.00 | 4,385.35 | A: 3239 Blackhawk (Sanders) / C |

Creation date: November 3, 2017

Revised March 5, 2018

| Name | Term | | | | | | | | | | | | | Address |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Smith, Phillip (OH DOC) | Fall 2011 | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | (900.00) | | $ - | 5,215.00 | 900.00 | 4,314.90 | | | A: 3239 Blackhawk (Sanders) C DC |
| **Totals:** | | $ 126,903.00 | $ 81,856.00 | $ 65,233.00 | $ 273,992.00 | $ (32,677.00) | $ - | $ (3,874.00) | $ 238,011.00 | $ 26,050.85 | $ 194,713.00 | $ - | $ 194,713.00 | |
| **Phoenix College** | | | | | | | | | | | | | | |
| Harden, Wendy (FL DOC) | Summer 2012 | $ - | $ - | 1,388.00 | $ 1,388.00 | (1,388.00) | $ - | | $ - | 1,388.00 | 422.00 | | | A: Lexington Village Ln (Grant) |
| Hayes, Ruthey (FL DOC) | Fall 2012 | 2,970.00 | 1,733.00 | 1,388.00 | $ 6,091.00 | (338.00) | | $ - | 5,753.00 | 338.00 | 5,320.00 | $ 300.00 | | IP in April 2012 A: 4630 S. 21st address (Green) |
| Henning, Brenda (FL DOC) | Fall 2012 | 2,970.00 | 1,733.00 | 1,388.00 | $ 6,091.00 | (1,037.00) | | $ - | 5,054.00 | 1,037.00 | 3,874.00 | $ 300.00 | | IP in April 2012 A: 4630 S. 21st address (Green) |
| Hewitt, Nicole (FL DOC) | Fall 2012 | 2,970.00 | 1,733.00 | 1,388.00 | $ 6,091.00 | (1,544.00) | | $ - | 4,547.00 | 1,544.00 | 3,852.00 | | | IP in April 2012 A: 4630 S. 21st address (Green) |
| **Totals:** | | $ 8,910.00 | $ 5,199.00 | $ 5,552.00 | $ 19,661.00 | $ (4,307.00) | $ - | $ - | $ 15,354.00 | $ 4,307.00 | $ 13,468.00 | $ 600.00 | $ 14,068.00 | |
| **Pueblo Community Colelge** | | | | | | | | | | | | | | |
| Sanders, Rosalyn (FL DOC) | Spring 2012 | $ - | 1,742.00 | 1,388.00 | $ 3,130.00 | - | $ - | $ - | 3,130.00 | $ - | 1,308.25 | | | A: 3239 Blackhawk (Sanders) C DC |
| Sanders, Rosalyn (FL DOC) | Summer 2012 | $ - | 1,742.00 | 1,387.00 | $ 3,129.00 | - | $ - | $ - | 3,129.00 | $ - | | | | A: 3239 Blackhawk (Sanders) C DC |
| Smith, Lethena (FL DOC) | Spring 2012 | $ - | 1,742.00 | 1,388.00 | $ 3,130.00 | - | $ - | $ - | 3,130.00 | $ - | 1,524.55 | | | A: 3239 Blackhawk (Sanders) C |
| **Totals:** | | $ - | $ 5,226.00 | $ 4,163.00 | $ 9,389.00 | $ - | $ - | $ - | $ 9,389.00 | $ - | $ 2,832.80 | $ - | $ 2,832.80 | |
| **Red Rocks Community College** | | | | | | | | | | | | | | |
| Sanders, Gina (FL DOC) | Spring 2012 | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | (6,115.00) | $ - | | $ - | 6,115.00 | 4,392.00 | | | IP in December 2011 A: 3239 Blackhawk (Sanders) C DC |
| **Totals:** | | $ 2,985.00 | $ 1,742.00 | $ 1,388.00 | $ 6,115.00 | $ (6,115.00) | $ - | $ - | $ - | $ 6,115.00 | $ 4,392.00 | $ - | $ 4,392.00 | |
| **Grand Totals:** | | | | | $ 582,703.00 | | | | $ 491,350.00 | $ 72,540.85 | | | $ 419,218.50 | |

**Total Loss:** $ 563,890.85

Creation date: November 3, 2017
Revised March 5, 2018

Attachment 5

## Disbursals to School by ED / Adjustments (Returned by School) / Losses / FSA Refunds / Thomas Associations

| | Term | Unsubsidized Loans Disbursed to School | Subsidized Loans Disbursed to School | Pell Grants Disbursed to School | Total Disbursed by ED | Return to Title 4 | Drop or Withdrawal | Other | To ED | To School | Payment to Student for Living Expenses | Payment to Student for Books and Supplies | Total Refund | A: FAFSA address tied to Thomas DC: Thomas w/debit card |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Chandler Gilbert CC** | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| **Community College of Denver** | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| **Mesa Community College** | | | | | | | | | | | | | | |
| Abbott, Jerry (FL DOC) | Fall 2012 | 2,970.00 | 1,733.00 | 1,388.00 | 6,091.00 | (897.00) | - | - | 5,194.00 | 897.00 | 5,620.00 | | | A: Meadow Oak (Mullett) |
| Abbott, Robert (FL DOC) | Fall 2012 | 2,970.00 | 1,733.00 | 1,388.00 | 6,091.00 | (963.00) | - | - | 5,128.00 | 963.00 | 4,466.00 | 300.00 | | A: Meadow Oak (Mullett) |
| Adair, Calvin (FL DOC) | Fall 2012 | 2,970.00 | 1,733.00 | 1,388.00 | 6,091.00 | (1,055.00) | | | 5,036.00 | 1,055.00 | 4,486.00 | 300.00 | | A: Meadow Oak (Mullett) |
| Apodaca, Anna (CO DOC) | Fall 2012 | 2,970.00 | 1,733.00 | 1,388.00 | 6,091.00 | (708.00) | | | 5,383.00 | 708.00 | 4,486.00 | 300.00 | | A: Meadow Oak (Mullett) |
| Diaz, Jennifer (FL DOC) | Fall 2012 | 2,970.00 | 1,733.00 | 1,388.00 | 6,091.00 | (963.00) | | | 5,128.00 | 963.00 | 4,466.00 | 300.00 | | DC: Visa Rush Debit card |
| Dockins, Joyce (FL DOC) | Fall 2012 | 2,970.00 | 1,733.00 | 1,388.00 | 6,091.00 | | | | 6,091.00 | - | 4,466.00 | 280.00 | | A: Meadow Oak (Mullett) |
| Hills, Bobbie (FL DOC) | Fall 2012 | 2,970.00 | 1,733.00 | 1,388.00 | 6,091.00 | (1,047.00) | | | 5,044.00 | 1,047.00 | 4,486.00 | 300.00 | | A: 1418 Rushmore (Pickens) |
| Miller, Dennis (OH DOC) | Fall 2012 | - | 1,733.00 | 1,388.00 | 3,121.00 | | | | 3,121.00 | - | 1,506.00 | 300.00 | | A: Meadow Oak (Mullett) Thomas text message w/Mullett |
| Robinson, Annie (FL DOC) | Fall 2012 | 2,970.00 | 1,733.00 | 1,388.00 | 6,091.00 | | | | 6,091.00 | | 4,486.00 | 300.00 | | A: 1418 Rushmore (Pickens) DC |
| Robinson, Kortni (FL DOC) | Summer 2012 | - | 3,484.00 | 1,388.00 | 4,872.00 | (1,619.00) | | | 3,253.00 | - | 2,655.00 | 300.00 | | A: 1412 Rushmore (Pickens) |
| Robinson, Kortni (FL DOC) | Fall 2012 | 2,970.00 | 1,733.00 | 1,388.00 | 6,091.00 | (1,300.00) | | | 4,791.00 | 1,300.00 | 2,867.00 | 300.00 | | A: 1412 Rushmore (Pickens) |
| **Totals:** | | 26,730.00 | 20,814.00 | 15,268.00 | 62,812.00 | (8,552.00) | - | - | 54,260.00 | 6,933.00 | 43,990.00 | 2,980.00 | 46,970.00 | |
| | | | | | | | | | | | | | | |
| **Pikes Peak Community College** | | | | | | | | | | | | | | |
| Abate, Manuel (FL DOC) | Fall 2012 | 2,970.00 | 1,733.00 | 1,388.00 | 6,091.00 | (829.00) | | (3,874.00) | 1,388.00 | - | 4,746.10 | | | A: Meadow Oak (Mullett) DC |
| Allegra, Eryn (FL DOC)(aka Mayer) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (926.00) | | | 5,189.00 | 926.00 | 4,262.90 | | | A: 1915 E Mobile Ln (Green) DC |
| Allen, Delta (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (900.00) | | | 5,215.00 | 900.00 | 4,304.90 | | | A: 1153 W Dragoon (Diaz) DC |
| Brown, Ellen (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | | | | 6,115.00 | - | 4,314.90 | | | FAFSA: Lexington Village Ln (Grant) DC |
| Brown, Erica (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | | | | 6,115.00 | - | 4,314.90 | | | A: Lexington Village Ln (Grant) DC |
| Brown, Gloria (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (900.00) | | | 5,215.00 | 900.00 | 4,314.90 | | | A: Lexington Village Ln (Grant) DC |
| Diaz, Alejandro (CO DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (900.00) | | | 5,215.00 | 900.00 | 4,304.90 | | | A: 1153 W Dragoon (Diaz) DC |
| Duncan, Christine | Spring 2011 | 2,985.00 | 1,742.00 | 2,775.00 | 7,502.00 | (1,119.00) | | | 6,383.00 | 1,119.00 | 5,230.60 | | | A: 3820 Radiant Dr (Thomas) |
| Duncan, Christine | Summer 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (559.00) | | | 5,556.00 | 559.00 | 4,996.10 | | | A: 3820 Radiant Dr (Thomas) |
| Ellis, Linda (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (5,421.00) | | | 694.00 | 1,115.85 | 4,305.15 | | | A: 1063 Rice (Cox) DC |
| Ellis, Michael (OH DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (905.00) | | | 5,210.00 | 905.00 | 4,057.15 | | | A: 1063 Rice (Cox) DC |
| Ellis, Monica (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (905.00) | | | 5,210.00 | 905.00 | 4,305.15 | | | A: 1063 Rice (Cox) DC |
| Grant, Donald (FL DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | | | | 5,867.00 | - | 4,066.90 | | | A: Lexington Village Ln (Grant) DC |
| Grant, Michelle (FL DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | | | | 5,867.00 | - | 4,066.90 | | | A: Lexington Village Ln (Grant) DC |
| Grant, Richard (FL DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | | | | 5,867.00 | - | 4,066.90 | | | A: Lexington Village Ln (Grant) DC |
| Grant, Toriano (FL DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | (926.00) | | | 4,941.00 | 926.00 | 4,014.90 | | | A: Lexington Village Ln (Grant) DC |
| Jones, Alethia (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | | | | 6,115.00 | - | 4,314.90 | | | A: 1418 Rushmore (Pickens) DC |
| Jones Jr, Eddie (OH DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | (905.00) | | | 4,962.00 | 905.00 | 4,057.15 | | | A: 1418 Rushmore (Pickens) DC |
| Jones, Keavin (FL DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | | | | 5,867.00 | - | 4,066.90 | | | A: 1418 Rushmore (Pickens) DC |
| Jones, Linda (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (917.00) | | | 5,198.00 | 900.00 | 4,281.35 | | | A: 1418 Rushmore (Pickens) DC |
| Jones, Patsy (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (917.00) | | | 5,198.00 | 917.00 | 4,281.35 | | | A: 1418 Rushmore (Pickens) DC |

Creation date: November 3, 2017
Revised March 7, 2018

| Name | Term | | | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jones, Shamika (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | | | | 6,115.00 | - | 4,351.80 | | | A: 1418 Rushmore (Pickens) DC |
| Jones, Virginia (AZ DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | (900.00) | | | 4,967.00 | 900.00 | 4,066.90 | | | A: 1418 Rushmore (Pickens) DC |
| Lopez, Vanessa | Spring 2011 | 2,985.00 | 1,742.00 | 2,775.00 | 7,502.00 | | | | 7,502.00 | - | 5,230.60 | | | A: 3820 Radiant (Thomas) DC |
| Lopez, Vanessa | Summer 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (559.00) | | | 5,556.00 | 559.00 | 4,996.10 | | | A: 3820 Radiant (Thomas) DC |
| Miller, Dennis (OH DOC) | Summer 2012 | - | 3,484.00 | 1,388.00 | 4,872.00 | (891.00) | | | 4,551.00 | 321.00 | 3,650.35 | | | A: Meadow Oak (Mullett) Thomas text message w/Mullett |
| Omar, Ismael (CO DOC) | Spring 2011 | 2,985.00 | 1,742.00 | 2,775.00 | 7,502.00 | (1,649.00) | | | 5,853.00 | 1,649.00 | 4,160.80 | | | A: 3820 Radiant (Thomas) DC |
| Omar, Ismael (CO DOC) | Summer 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (827.00) | | | 5,288.00 | 827.00 | 4,461.20 | | | A: 3820 Radiant (Thomas) DC |
| Pickens, Robert (IL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (900.00) | | | 5,215.00 | 900.00 | 4,314.90 | | | A: 1418 Rushmore (Pickens) DC |
| Smith, Adam (OH DOC) | Fall 2011 | 2,737.00 | 1,742.00 | 1,388.00 | 5,867.00 | (900.00) | | | 4,967.00 | 900.00 | 4,066.90 | | | A: 3239 Blackhawk (Sanders) DC |
| Smith, Kelly (FL DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (926.00) | | | 5,189.00 | 926.00 | 4,262.90 | | | A: 3239 Blackhawk (Sanders) DC |
| Smith, Phillip (OH DOC) | Fall 2011 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (900.00) | | | 5,215.00 | 900.00 | 4,314.90 | | | A: 3239 Blackhawk (Sanders) DC |
| **Totals:** | | 90,536.00 | 57,477.00 | 48,577.00 | 196,590.00 | (25,481.00) | - | (3,874.00) | 167,805.00 | 18,854.85 | 138,552.25 | - | 138,552.25 | |
| **Phoenix College** | | | | | | | | | | | | | | |
| **Pueblo Community Colelge** | | | | | | | | | | | | | | |
| Sanders, Rosalyn (FL DOC) | Spring 2012 | - | 1,742.00 | 1,388.00 | 3,130.00 | - | - | - | 3,130.00 | - | 1,308.25 | | | A: 3239 Blackhawk (Sanders) DC |
| Sanders, Rosalyn (FL DOC) | Summer 2012 | - | 1,742.00 | 1,387.00 | 3,129.00 | - | - | - | 3,129.00 | | | | | A: 3239 Blackhawk (Sanders) DC |
| **Totals:** | | - | 3,484.00 | 2,775.00 | 6,259.00 | - | - | - | 6,259.00 | - | 1,308.25 | - | 1,308.25 | |
| **Red Rocks Community College** | | | | | | | | | | | | | | |
| Sanders, Gina (FL DOC) | Spring 2012 | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (6,115.00) | - | - | - | 6,115.00 | 4,392.00 | | | A: 3239 Blackhawk (Sanders) DC |
| **Totals:** | | 2,985.00 | 1,742.00 | 1,388.00 | 6,115.00 | (6,115.00) | - | - | - | 6,115.00 | 4,392.00 | - | 4,392.00 | |
| **Grand Totals:** | | | | | 271,776.00 | | | | 228,324.00 | 31,902.85 | | | 191,222.50 | |

**Total Loss:** $ 260,226.85

Creation date: November 3, 2017
Revised March 7, 2018

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/18 USDC Colorado pg 593 of
Case 1:16-cr-00054-WJM Document 342 Filed 03/09/18 Page 1 of 4
971

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

**2.  TRAMMEL THOMAS**

        Defendant

---

## DEFENDANT'S POSITION STATEMENT ON APPROPRIATE LOSS AND RESTITUTION AMOUNTS

---

Comes now the Defendant, by and through his attorneys, Daniel T. Smith and Thomas E. Goodreid, and pursuant to this Court's order of February 21, 2018 at docket #326, submits this position statement on the appropriate amount of loss and restitution that this Court should consider for purposes of sentencing.

1.  On February 21, 2018 this Court ordered the parties to confer on the issues of amount of loss and restitution to be found and/or ordered in this matter. If the parties could not agree on these amounts, the Court ordered each to submit their positions relative thereto. See Docket #326

2.  It is the Defendant's position that the correct amount of loss and restitution which this Court should so find, is, $357,231.00.

3.  At the time of trial, the parties stipulated (government's ex. 35) that the Defendant was incarcerated in the El Paso County Jail, Colorado Springs, Colorado continuously from January 28, 2011 through November 3, 2011.

1

4. In the government's superseding indictment, it charged the Defendant with conspiring to violate 18 USC 286 between the dates of August 2010 and October of 2012.

5. It is the position of the Defendant, that there was a paucity of evidence establishing that he had any participation or knowledge of the charged conspiracy until after he was released from the El Paso County facility. The relevant and persuasive evidence establishing the Defendant's knowing participation in the conspiracy suggested that he joined the conspiracy during the latter part of 2011 or early 2012.

6. While there was some evidence that the Defendant may have assisted a few hopeful students in preparing their applications for student aid, none of these individuals were inmates in any Department of Corrections facility. Further, none of these applicants was called as a witness at trial. It was the governments theory at trial, that an important aspect of the conspiracy was to only use incarcerated inmate identities for the loan applications.

7. No evidence was offered at the trial that the Defendant during his period of incarceration, had any participation in the fraudulent loan application process. Further, there was no evidence introduced that the Defendant collected any of the fraudulent loan proceeds while he was incarcerated.

8. Government's ex. 72 and specifically columns A, C, and G thereof, identify the name of the loan applicant, the time period of the loan, and the amount of the loan proceeds. At page 2 of Exhibit 72, the loans funded in 2011 are identified. The Defendant submits, that those loans identified at lines 64-82, 84 and 85, 87-90, 92-94, and 99-106, are loans which should not be attributed to the Defendant, as he was incarcerated at the time. Those loans total $225,472.00. The total amount of the loans represented in ex. 72 is $582,703.00. That difference is $357,231.00.

Case No. 1:16-cr-00054-WJM Document 528-4 filed 12/12/18 USDC Colorado pg 595 of
971
Case 1:16-cr-00054-WJM Document 342 Filed 03/09/18 Page 3 of 4

9. It is the position of the Defendant that the loss attributable to his actions in the conspiracy is $357,231.00. For purposes of correctly determining the advisory guideline calculation under the United States Sentencing Guidelines, that loss amount would trigger an adjustment to the base offense level of 12 points. See USSG 2B1.1(b)(1)(G).

10. It is further the position of the Defendant that the correct amount of restitution for which he should be held responsible is also $357,231.00.

Respectfully submitted this 9th  day of March, 2018.

Daniel T. Smith Attorney at Law

s/ Daniel T. Smith
Daniel T. Smith
4582 S. Ulster St. #1400
Denver, Colorado 80237
Telephone: 303 860 8100
Fax: 303 860 8018
danieltsmith@qwestoffice.net

Thomas E. Goodreid

s/ Thomas E. Goodreid
Thomas E. Goodreid
1801 Broadway #1400
Denver, Co. 80202
Telephone: 303 296 2048
Fax: 303 292 0522
Email: t.goodreid@comcast.net

Attorneys for Tramell Thomas

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on  March 9, 2018 the foregoing **DEFENDANT'S POSITION STATEMENT ON APPROPRIATE LOSS AND RESTITUTION AMOUNTS** was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all counsel of record.

s/ Daniel T. Smith

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM

UNITED STATES OF AMERICA,

        Plaintiff,

v.


**2.  TRAMMEL THOMAS**

        Defendant

---

## RESPONSE TO GOVERNMENT'S REQUEST FOR PRELIMINARY
## ORDER OF FORFEITURE

---

      Comes now the Defendant, by and through his counsel, Daniel T. Smith and Thomas E. Goodreid, and submit this Response to the Government's Motion for Preliminary Order of Forfeiture.

1.  The government has requested in its motion for a preliminary order of forfeiture, docket #343, a personal money judgment against the Defendant in the amount of $260,226.85.  The Defendant objects to the amount of the request, and suggests that a correct amount for the judgment is $35,528.00.

2.  The government argues for a preliminary forfeiture judgment pursuant to 18 USC §981(a)(1)(C), 28 USC §2461(c) and FRCrP 32.2(b)(2).  To qualify its request under these statutes and rule, the government submits the Defendant's convictions at trial on counts 2-7 of the superseding indictment.

3.  The government argues, that the evidence at trial established that the Defendant conspired with other co-defendants to defraud the United States Department of Education, as well as participated in a scheme to

defraud the Department and individuals through violations of the Mail Fraud statute, 18 USC §1341.

4. The superseding indictment in this case charges the Defendant in Count 1 with conspiracy to defraud the government, 18 USC §286, and with 6 Counts (counts 2-7 of the superseding indictment) of violating 18 USC §1341. The Defendant is charged with the Mail fraud allegations only as an Aider and Abettor, 18 USC §2. He is not charged nor convicted of a conspiracy to violate the Mail Fraud statute.

5. It is the Defendant's position, that a preliminary forfeiture order can only enter relating to those specific crimes enumerated in §981 of Title 18 and then only on counts of conviction.

6. The government has argued in its Position Statement, Docket #341, that the loss and restitution amounts to be Ordered by the Court at the Defendant's sentencing are $563,890.85. In its Forfeiture request, the government asks for a "very conservative" Judgment of $260,226.85. Evidently, the government is arguing that the Defendant should be liable for all amounts lost by victims, in its Exhibit 5, but not to all alleged victims of the scheme.

7. The government then creates a web of responsibility for the Defendant by claiming a judgment on each victim that was represented by a debit card recovered from a car driven by the Defendant or from debit cards mailed to a certain address.

8. The fallacy in these theories, is under neither can the government establish the Defendant derived proceeds from the frauds. The Defendant does not argue against a forfeiture judgment relating to the specific counts of conviction (counts 2-7).

9. The Defendant respectfully reminds the Court, that the parties stipulated at trial that the Defendant was continuously held in custody at the El Paso County jail from January 27- November 3, 2011.

10. In governments exhibit 5, it lists some 34 debit cards that were recovered from a car driven by the defendant. Of those 34 cards, 28

were mailed to recipients while the Defendant was jailed. Of the 46 total victims listed in Exhibit 5, 30 were mailed their cards while the Defendant was jailed. There was no evidence produced at trial that indicated the Defendant did anything to further the scheme while he was jailed.

11. The government relies in part for its claim, on a United States District Court opinion out of the District of Kansas, *U.S. v. Yass,* 636 F.Supp. 2d 1177. In *Yass,* that Court stated at page 1182, "Under §981(a)(1)(C), the government is entitled to forfeiture of funds that 'constitute or [are] derived from proceeds traceable to a violation' of §1341, or a conspiracy to commit such an offense."

12. A review of Exhibit 5, and identifying the victims named in counts 2-7, reveals a net loss amount of $35,528.00. The Defendant submits, this is the correct amount upon which a judgment should enter.

13. Considering the charges brought against this Defendant, this is not a case where the Court can consider a conspiracy to defraud under a mail fraud scheme, and thus hold the Defendant responsible for all losses.

Dated this 15th day of, March , 2018.

Daniel T. Smith Attorney at Law

s/ Daniel T. Smith
Daniel T. Smith
4582 S. Ulster St. #1400
Denver, Colorado 80237
Telephone: 303 860 8100

Fax: 303 860 8018
danieltsmith@qwestoffice.net

s/ Thomas E. Goodreid
1801 Broadway #1400
Denver, Co. 80202
Telephone: 303 296 2048
Email: t.goodreid@comcast.net

Attorneys for Tramell Thomas

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on  March 15,  2018 the foregoing **RESPONSE TO GOVERNMENT'S REQUEST FOR PRELIMINARY ORDER OF FORFEITURE** was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all counsel of record.

s/ Daniel T. Smith

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM-2

UNITED STATES OF AMERICA,

Plaintiff,

v.

2.      TRAMEL THOMAS,

        Defendant.

---

## DEFENDANT TRAMEL THOMAS'S OBJECTIONS
## TO THE PRESENTENCE INVESTIGATION REPORT

---

Defendant Tramel Thomas, through counsel, states the following objections to the

PSIR.

1.    ¶ 7-58, pp.4-12:   "**Offense Conduct**"

Objection:   Mr. Thomas objects to the inclusion in the PSIR of the parties'

respective sentencing statements.   These statements, which were previously filed

separately filed and thus are already on the Court's docket, are sentencing arguments

and are not evidence, *per se*, of specific offense conduct.   Indeed, paragraphs 13 and 14

of the Government's sentencing statement, needlessly reprinted in the PSIR, are replete

with allegations and assertions that have nothing whatsoever to do with the specific

offense conduct in this case.   Mr. Thomas therefore asks that the parties' sentencing

statements be stricken from the PSIR, a document, which in final form, will follow him to

the Bureau of Prisons institution to which he is assigned.

2.    ¶ 19, p. 9:   " Instead of answering the door, occupant(s) of the home

frantically tried to rip up compromising documents and flush them down the toilet."

Objection:   Mr. Thomas objects to this characterization, insofar as "occupant(s)"
is intended to apply to him.   There was no evidence produced at trial that Mr. Thomas
tore up any documents or that he tried to flush documents down the toilet.   Outside of
trial, the Government's only apparent evidence on this matter was Ms. Carr's admission
that she tore up documents and tried to flush them down the toilet (Exhibit A [hereto], pp.
004-005 yellow highlights).

2.   ¶ 19, p. 9:   " Thomas used the time to break his cell phone in half, hoping that
agents wouldn't be able to retrieve from it his text messages with Mullett . . . or the
photographs of him proudly flashing cash, see Gov't Exs. 26 & 29, and celebrating his
trips to the shooting range (despite being a felon)."

Objection:   There was no evidence at trial about how or why Mr. Thomas's
cellphone was broken.   Prior to trial, Co-Defendant Heather Carr had told the
Government that she did not know why Mr. Thomas broke his phone; that the broken
phone was one that Thomas was no longer using; and that Thomas later told her that he
broke the phone so that she would not find out about other women he was seeing (Exhibit
A, p. 005, gold highlights).   As such, there is no evidence that Thomas broke the phone
in order to hide information from law enforcement.

3.   ¶ 20, p. 8:   "As special agents reviewed thousands of pages of documents
created by the defendant and his coconspirators . . . Thomas used the time to contact
witnesses in an effort to influence their testimony. He tried to reach out to Marcelle Green
by going to her uncle's house. He called Kimmisha Mullett to talk about his case (and her
trial subpoena) and to once again manipulate her into thinking he was her friend."

2

Objection:   These assertions regarding Mr. Thomas's putative conduct are unfounded.   Ms. Mullett testified at trial that Mr. Thomas spoke to her and that was it. She did not state that he tried to influence her testimony in any way.   As for Co-Defendant Green, she told the Government that Mr. Thomas had tried to reach her through her uncle but that no contact was ever made (Exhibit A, p. 005 and 009, yellow highlights).   As such, neither of these instances adds up to an attempt to influence the testimony of a witness.

4.   ¶ 63, p. 14:   "The scheme was devised by Carr and Thomas."

Objection:   This statement is belied by Co-Defendant Marcelle Green.   Ms. Green testified at trial that she was approached by Ms. Carr to join the scheme (Exhibit A, p. 011, ll. 7-9, teal highlights), that Mr. Thomas had some role in the scheme but that she had only seen him on one occasion fill out a FAFSA (Exhibit A, p. 012, ll. 15-25, teal highlights), and that that was the only time she saw him involved in the scheme (Exhibit A, p. 013, ll. 12-14, teal highlights), that Thomas was not present when she first discussed the scheme with Carr (Exhibit A, p. 014, ll. 2-5, teal highlights), and that Carr was the one person who was essential to the scheme (Exhibit A, p. 014, ll. 9-14, teal highlights).   Ms. Green also told the Government prior to trial that the scheme was Heather Carr's idea (Exhibit A, p. 008, teal highlights). All this goes to show that the scheme was not devised by Mr. Thomas.

5.   ¶ 81, p. 17:   "As asserted by the Government in its Sentencing Statement, the defendant obstructed justice by destroying evidence of his crime and by reaching out to potential witnesses in an effort to influence their willingness to testify."

Objection:   Please see Mr. Thomas's objection #'s 2 and 3, *supra*.

3

6.  ¶ 82, p. 17:  "the probation officer notes that the defendant provided false information regarding his residence."

Objection:  Mr. Thomas objects that the incorrect address information provided to the probation officer was materially false information, as is required for an obstruction of justice enhancement under U.S.S.G. §3C1.1.  There was no intent on the part of Mr. Thomas to "impede the government's investigation, prosecution, or sentencing, and [the incorrect address] did not affect the outcome of his bond hearing or sentencing." United States v. Cardona-Rivera, 64 F.3d 361, 365 (8th Cir. 1995).  Therefore, Mr. Thomas asserts that the wrong address was not materially false information.

7.  ¶ 89, p. 18:  **Specific Offense Characteristics calculation of Level 14**

Objection:  Mr. Thomas adopts herein his previously filed Defendant's Position Statement on Appropriate Loss and Restitution Amounts [#342] in which he argued that the base offense level, based upon loss, should be 12 rather than 14.

8.  ¶ 94, p. 19:  **No Adjustment for Role in the Offense**

Objection:  Mr. Thomas contends that he should be entitled to a two point adjustment under U.S.S.G. 3B1.2(b) for having had a minor role in the offense.  Mr. Thomas bases this upon the following:

a)  Government Position:  The Government conceded, at the sentencing of Co-Defendant Diaz that Carr was the most culpable member of the conspiracy, with Green and Thomas in the middle, and Diaz at the bottom (Exhibit A, pp. 019-020, pink highlights).

b) Green testimony:  Green herself, however, described a small role in the offense for Thomas.  As outlined in detail above in Objection #4, Ms. Green testified that Carr

4

brought Green into the scheme and that Green and Carr took it from there. Green testified that Mr. Thomas had some role in the fraud scheme, but that she had only seen him, on one occasion, fill out a FAFSA (Exhibit A, p. 012, ll. 15-25, teal highlights), that that was the only time she saw him involved in the scheme (Exhibit A, p. 013, ll. 12-14, teal highlights), and that she could not say that he participated in doing homework (Exhibit A, p. 012, ll. 18-20, teal highlights).

      c) <u>Diaz Statements</u>: At the sentencing of Mercedes Diaz, the Court found her to be truthful. (Exhibit A, pp. 017-018, ll. 25-3, lime highlights). The Government chose not to call Diaz as a witness at Mr. Thomas's trial. Diaz had told the Government prior to trial that she was unaware of Thomas's role in the conspiracy (Exhibit A, p. 023, yellow highlights); that Diaz, Carr, and Green (but not Thomas) sat around doing homework as part of the fraud scheme (Exhibit A, p. 024, yellow highlights); that Diaz, Carr, and Green (but no mention of Thomas) were in on the fraud scheme (Exhibit A, p. 025, yellow highlights); and that she never went to ATM machines (to get cash from the fraudulently obtained student debit cards) with Thomas (Exhibit A, p. 026, yellow highlights); and that she never discussed the fraud scheme with Mr. Thomas (Exhibit A, p. 026, yellow highlights).

      d) <u>Limited time in the conspiracy</u>: The Superseding Indictment alleges that the conspiracy began in August, 2010. However, the evidence shows that Mr. Thomas joined the conspiracy after his move to Arizona in February, 2012. His involvement with enrolling four or five individuals at Pikes Peak Community College prior to that time was unrelated to the conspiracy because: a) Thomas was personally acquainted with these people and they were not inmates, in contrast to all the victims of the charged scheme; b)

5

No Arizona IP addresses were used in connection with these individuals, unlike all of the "students" associated with the charged scheme; and c) none of the co-conspirators, Carr, Diaz, or Green, had any link to the applications of any of these four or five people, which again establishes that these people and transactions were outside the charged scheme.

e) <u>Carr Statements</u>: Mr. Thomas was jailed in Colorado from 27 January 2011 to 3 November 2011. Heather Carr stated, when interviewed by Thomas's defense team in January, 2018, that Thomas did not participate in the fraud scheme while he was in jail. The Government has purported to tie Mr. Thomas to the conspiracy while he was in jail by his putative connection to addresses in Colorado.

However, Carr advised the Thomas defense team that Mr. Thomas did not provide the Radiant Drive address. She also told the Government in a pretrial interview that she, not Thomas, came up with the Lexington address (Exhibit A, p. 003, violet highlights). In fact, the only Colorado address that Thomas properly is connected to is that of Kimmisha Mullet, but he did not obtain that address until after he was released from jail and after he had moved to Arizona to live with Ms. Carr in February, 2012.

f) <u>Time in Arizona</u>: Thomas thus was in Arizona and involved in the conspiracy, for only ten months (February to November, 2012) out of a conspiracy that the Government contends lasted for 26 months. Even while there, his involvement was that of a minor participant. The Government argues that Thomas's arrest on a traffic stop shows the contrary because in the stop, over fifty debit cards were found in the Dodge Charger Thomas driving, along with one in his wallet and a laptop with fraud scheme information on it was also seized from the Charger.

6

However, there was no evidence adduced that Thomas owned that car or that he even drove it regularly. To the contrary, Carr told the Government in November, 2016, that Marcy Green kept most of the illicit debit cards and that Green was the owner of the seized pink laptop (Exhibit A, p. 003, yellow highlights). Carr told the Thomas defense team that Green, and not Thomas, is the person who primarily drove the Charger in 2011 and 2012.

Moreover, the FBI was unable to establish that Mr. Thomas's fingerprints were on any of the more than fifty debit cards found in the Charger, including the one in his wallet (Exhibit A, p. 027, yellow highlights). Diaz told the Government that the reason to keep possession of a debit card was that it could be used to fill up one's car with gas (Exhibit A, p. 026, gold highlights), and Green admitted that she used the debit cards to pay some of her bills. However, no evidence existed that Mr. Thomas ever used a debit card for any purpose whatsoever.

Mr. Thomas respectfully submits that all of the foregoing establishes that he was a minor participant in the conspiracy/fraud scheme that is at the heart of this prosecution. Accordingly, he objects to the PSIR's failure to accord him a two point reduction under U.S.S.G. 3B1.2(b). He urges the Court so to grant him this reduction.

Dated this 22nd day of March, 2018.

Respectfully submitted,

s/Thomas E. Goodreid
Thomas E. Goodreid
Attorney at Law
1801 Broadway, Suite 1400
Denver, CO   80202
(303) 296-2048x.136
t.goodreid@comcast.net

7

Case No. 1:16-cr-00054-WJM  Document 525-1  filed 12/12/19  USDC Colorado  pg 608 of
971
Case 1:16-cr-00054-WJM  Document 348  Filed 03/22/18  Page 8 of 8

Daniel T. Smith
4582 S. Ulster #1400
Denver, CO   80237
Telephone:   303-860-8100
Fax:  303-860-8018
danieltsmith@qwestoffice.net

Attorneys for Defendant Tramel Thomas

## CERTIFICATE OF SERVICE

I certify that on this 22nd day of March, 2018, I electronically filed the foregoing **DEFENDANT TRAMEL THOMAS'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

s/Thomas E. Goodreid
Thomas E. Goodreid
Attorney at Law
1801 Broadway, Suite 1400
Denver, CO   80202
(303) 296-2048x.136
*t.goodreid@comcast.net*
Attorney for Defendant Tramel Thomas

8

Case No. 1:16-cr-00054-WJM Document 348 Filed 12/12/18 USDC Colorado pg 609 of
971
Case 1:16-cr-00054-WJM Document 134-1 Filed 03/22/18 Page 1 of 28

EXHIBIT A TO THOMAS OBJECTIONS TO PSIR



## UNITED STATES DEPARTMENT OF EDUCATION
### OFFICE OF INSPECTOR GENERAL
### INVESTIGATION SERVICES



**DATE INTERVIEWED:**        November 3, 2016

**PERSON INTERVIEWED:**   Heather Carr

**ALSO PRESENT:**                Mary Butterton, Assistant Federal Defender
                                          Jessica Leto, Paralegal

**INTERVIEWED BY:**           Martha Paluch, Assistant US Attorney
                                          Beth Gibson, Assistant US Attorney
                                          Sandra Ennis, ED-OIG Special Agent

**LOCATION:**                     U.S. Attorney's Office
                                          1225 17th St., 7th Floor Conference room
                                          Denver, Colorado 80202

**CASE NUMBER:**              12-080234

**CASE NAME:**                   Pikes Peak Community College Fraud Ring

After being advised of the nature and purpose of the interview and the identities of all present,
Heather Carr, voluntarily provided the following information, summarized as follows:

In approximately July 2015, Carr moved from Arizona to Virginia Beach, Virginia, to live with her
oldest daughter Ayanna Brown, formerly Ayanna Jones. Brown moved to Virginia because her
husband is in the Navy. He is currently deployed and will not return home until January 2017.
Brown is currently attending college and is enrolled in a pharmaceutical internship.

The following are Carr's four children: Ayanna (21), Kaira (16), Milani (5), and Tru (1). Aubrey,
who is Ayanna's friend, has resided with Carr since she was 15.

Carr was a mother figure to Mercedes Diaz also. Carr and Diaz's biological mother both worked
at a car dealership. Diaz's mother was prepared to give up Diaz to the state because Diaz was
constantly in trouble. Carr offered to take her in. At the time, Diaz was in junior high at
Panorama Middle School. On Christmas Eve, Diaz stole Carr's vehicle and was arrested. While
in custody, Diaz's brother was murdered. Carr's daughters are like sisters to Diaz.

Carr was born in Virginia but moved to Colorado Springs, Colorado, when she was
approximately ten years old. Shortly after her family moved, her mother divorced and remarried.
Carr ran away from home and stopped attending school in junior high. Carr got pregnant at 17
and obtained her GED during this time period. Omar Jones, who is the father of her two oldest
daughters, was her legal guardian.

In approximately 1997, Carr became familiar with the financial aid process when she attended
Pikes Peak Community College (PPCC) and received federal student aid (FSA).

In approximately 2003, Carr moved from Colorado to Arizona and resided there until summer
2015.

Prepared by: Ennis, Sandra                                                    Date Prepared: November 4, 2016

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced
without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public
availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)

DEFENDANT'S
EXHIBIT

people to do stuff for him. Pickens resided at 1418 Rushmore at various times but Carr could not recall the exact dates. Thomas briefly resided in Pickens garage at 1418 Rushmore. Thomas stayed at other places and also resided at an apartment on 3820 Radiant Drive in Colorado Springs, Colorado.

Pickens was not aware this address was being used for the mailing of debit cards in the names of prison inmates. The mailbox was located at the end of the street. Carr and Thomas would drive-by and pick up student inmate mail from the mailbox. The mailman delivered any and all names to this address.

There was a period of two to three days when Carr knew the Higher One debit card would be delivered. Once the school application was accepted, the student received an email letting them know that a green Higher One envelope would be arriving in the mail. This envelope contained the debit card.

Carr was aware of inmate Robert Pickens. Carr conducted the DOC query in the name Pickens and chose this name because she wanted to make sure the card was delivered to the mail box. Carr thought this card was initially rejected or returned by the postal service.

Prior to moving to Arizona, Carr resided at 2441 Lexington Village Lane, Colorado Springs, Colorado. Her friend, Michelle Grant (aka Michaela) resided at 2372 Lexington Village Lane, Colorado Springs, Colorado. Carr asked Grant to help forward her mail to Arizona. Carr still had the key to her old mailbox.

The postal service would only deliver the last name Grant so they had to use inmates with the last name of Grant at this address. Grant never checked her mailbox. The mailboxes were located in a central area and the backside of the boxes could be removed. Carr, Diaz, Green, and/or Thomas removed the back side of the mailbox on their trips to Colorado and obtained the mail in the inmates' names.

During the 2010 timeframe and prior to Thomas' arrest, Thomas asked Carr to query social security numbers and he would assist in the retrieval of student mail. Carr does not know if he knew how to complete and submit an electronic FAFSA. Both Thomas and Sanders resided at 3820 Radiant Drive, Colorado Springs, Colorado. Carr saw Sanders' signature in the notarized documents provided to PPCC.

Green obtained her own addresses to use. Carr confirmed the Blackhawk address was her step-brother, Matthew Sander's residence. Diaz was responsible for opening private post office boxes and using the Dragoon and 724 W. Knox Court addresses. The Pleasant or Kaibab addresses were never used to receive any school or Higher One information.

People were directed to send the school mail or Higher One debit card to Carr's private mail box address at 975 E. Riggs Road in Chandler, Arizona. Thomas directed Kimmisha Mullett to send debit cards that she received to the private mail box address. Carr does not know about the Oakland Street address in Aurora, Colorado.

Mullett and Thomas had a business together. The business was called 911 Design and Printing. Carr had nothing to do with the business and never met Mullett. Carr later said she may have met Mullett on one or two occasions. Mullett and Thomas shared text messages between each other about where to send the Higher One mail because Mullett's address was used to receive student loan mail in the names of inmates.

12-080234

Michael Cox, Thomas' cousin, resided at the Rice Drive address in Colorado Springs, Colorado. Carr hates Cox and does not speak to him. Carr believes Thomas and Cox talked about the scheme with each other.

Carr was not aware that Arizona addresses were being used to apply for FSA to attend school at PPCC. It was her understanding that this could not be done and that is why they used the mailing addresses in Colorado. In seeing the discovery, the Arizona addresses were new to Carr.

Once the Higher One cards were forwarded to Arizona, Diaz and Green would get people they knew to drive around and withdraw money from the debit cards at various ATM locations until all of the funds were withdrawn from the debit cards. Initially, they did it themselves but it became exhausting because there was a daily withdrawal limit on the debit cards. Diaz and Green would get half of whatever amount was on the debit card.

The cards were used primarily to withdraw funds but there were occasions when the cards were used for purchases. When a purchase was made, they requested additional cash back on the transaction. Thomas and Carr were also involved in withdrawing funds from the debit cards at various ATM and store locations. The bulk of the funds were split between Carr, Diaz, Green, and Thomas. A fee of usually $10 was paid to the "meth-heads" that drove around to the various ATM machines.

Thomas did not reside in Arizona until approximately February 2012. Thomas visited the 1351 Pleasant address on his trips to Arizona but he never resided there. In 2012, Carr moved from the 1351 Pleasant address to 1822 E. Kaibab. Carr and her children resided at the 1822 E. Kaibab address for approximately two weeks prior to Thomas coming to Arizona and moving in with them.

During Thomas' incarceration between approximately January 2011 through November 2011, Thomas was aware of the scheme. Carr and Thomas' conversations about the scheme were limited due to the possibility of his jail calls being recorded. Carr used FSA funds obtained in the names of inmates to pay for Thomas' legal fees. Approximately $10,000 in FSA funds were used to pay for Thomas' attorney. Carr also deposited FSA funds into Thomas' inmate trust account (commissary). It would be a fair assessment that Carr submitted more than ten FAFSA's, considering this money was used to pay for Thomas' attorney fees.

In discussing the Tempe Police car stop, Thomas admitted to Carr that he was seeing another girl. The girl threatened to call Carr at 1:00 a.m. and tell her about Thomas' cheating. The girl had the debit cards and laptop at her house so Thomas went to the girl's house to retrieve these items. On his way home from the girl's house, Thomas was pulled over with the laptop and debit cards. Thomas was driving a vehicle registered to Carr. Thomas used the vehicle, not Carr.

Carr could not find a logical reason why he would still have cards from a long time ago. Higher One mailed the debit cards prior to the disbursement of any FSA funds. In seeing the discovery, Carr noted that some of the cards were never activated. Carr does not understand why someone would have kept a card that was not activated. Green kept the majority of the debit cards and she owned a pink laptop at one time. Carr wondered if that is why her relationship with Green became awkward, because Green and Thomas were messing around with each other.

The four of them took part in filling out the various loan documents for the schools. Diaz was primarily responsible for taking these student loan records to various locations where they could

Case No. 1:16-cr-00054-WJM Document 528 filed 12/12/18 USDC Colorado pg 612 of
Case 1:16-cr-00054-WJM Document 348-12 Filed 03/22/18 Page 7 of 12 612 of
971

Interview of Heather Carr, November 3, 2016                                    12-080234

be faxed to the school, such as the FedEx location. They also had the "meth-head people"
assist with this. There were times with Green personally hand delivered the documents to the
school.

The four of them took part in the electronic submission of school enrollment applications in the
names of various inmates.

Carr has no idea how school loan records were faxed to PPCC from a Wells Fargo location.
Carr has never worked in a Wells Fargo branch building. She either worked from home or at a
leased building while employed with Wells Fargo.

The social security number searches in LexisNexis were only done by Carr.

Prior to 2012, Carr personally saw Diaz and Green fill out documents but she never personally
saw Thomas submit FAFSA's or fill out loan records for the school. She would be able to verify
his handwriting if shown documents.

In 2012, Thomas wanted more money when he was released. When Thomas resided with Carr
in 2012, he submitted FAFSA's and did coursework to ensure FSA funds were released. Carr
recalled him saying he had a psychology paper due. The four of them knew they had to show
attendance in order for funds to be released. Thomas was also involved in the submission of
handwritten loan records to the school and the withdrawing of FSA funds from ATM locations.
Carr knew he did this but she was never with him when he did it. Carr admitted that Thomas
was involved.

Carr worked all day and did not have a lot of time to spend on the scheme. They all
communicated amongst each other about coursework and the four of them took part in logging
in to record attendance. Carr volunteered to do coursework that she was interested in.
Specifically, Carr recalls Green complaining about having four essays due. One was a
psychology assignment about Freud. Carr volunteered to complete that assignment.

The four of them enrolled in courses that interested them. Green, having a degree in criminal
justice, chose a lot of criminal justice courses.

At this point during the meeting, Carr was provided a copy of the search warrant sketch. Carr
annotated what the various rooms identified in the sketch were (Attachment A).

The day the search warrant was executed, Carr was asleep on the couch. At first, Carr thought
her daughter, who was getting ready for school, was playing her music too loud. Carr knew that
law enforcement was outside because they were shining lights on the house. Initially, Carr was
not sure if law enforcement was trying to come in their house. A canine cop resided across the
street from them. Carr went to brush her teeth and put on makeup, knowing she would need to
go outside. She went upstairs to look out the window and flash bang devices were heard in the
backyard.

During this timeframe, she went to her office where she had a notebook with information related
to the inmates' school information written down. Rather than shedding the records in the
shredder she had in her office, she tore the pieces and flushed them down the toilet in the
master bathroom. She did this because she envisioned agents spending hours piecing together
the shredded records. She flushed approximately three pages of information.

The information contained in the notebook was for organizational purposes. It was a checklist
used to keep track of the status of FAFSA's, school applications, and homework. Sometime

Interview of Heather Carr, November 3, 2016                         12-080234

during all of this Thomas came up the stairs. She does not know what he was doing during this timeframe.

Carr does not know why Thomas broke his cell phone. It was an old phone that he was not using. Thomas was downstairs for a portion of the time that Carr was upstairs. Thomas later told Carr that he broke the phone because he did not want Carr to find out about other "bitches."

Initially, Carr did not manage the organization of the inmates' school information. She just started doing that right before the search warrant was executed, once the school's fall semester started.

After Thomas's arrest and the search warrant, Carr and Green became distant. Carr assumed Green was jealous of Carr's relationship with Thomas and the lifestyle they were living. Carr wondered if Green and Thomas were having an affair. Carr thinks Green kept the debit cards and that the pink laptop belonged to Green.

At the time of Thomas' arrest, Thomas told Tempe PD arresting officers that marijuana located in the vehicle belonged to Carr's daughter, Ayanna. When told this, Carr responded that Ayanna did not use marijuana but Thomas did. Marijuana was never used in front of the children. Green used marijuana.

Carr related the following in reviewing photos taken during the search warrant and photos obtained from seized computers (Attachment B):

SW_00001436:   The photo was 1822 E. Kaibab

SW_00000218:   Carr purchased the mural located in the master bedroom. She got the idea from a Jay-Z song.

SW_00000214:   The ACER laptop in the photo was her daughter's Milani. The iPad tablet was her other daughter's Kaira. Green always lost stuff, including her computers. Green used the ACER laptop and other computer devices at Carr's residence. The ACER laptop was used to activate inmate debit cards, including Higher One debit cards. There was the probability that any one of the four of them (Carr, Diaz, Green, and Thomas) could have used the ACER laptop to do this.

SW_00000216:   This was a photo of Thomas' office and his computer.

SW_00000217:   The photo was a close-up of the computer in Thomas' office. Carr did not use this computer because Thomas would not give her the password. The computer's profile login ID was King.

SW_00000223:   Carr confirmed these were the torn notes she tried flushing down the toilet.

SW_00000219:   The broken phone was Thomas' old phone located in his portion of the master bedroom closet. Thomas had a box of miscellaneous items he brought with him when he moved from Colorado. There were other old phones in the box.

SW_00000220:   Carr confirmed the close-up photo of the broken phone was Thomas'.




# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES

**DATE INTERVIEWED:** April 12, 2017

**PERSON INTERVIEWED:** Marcelle Green

**INTERVIEWED BY:** Special Agent Sandra Ennis
Postal Inspector Sonia Hacker

**LOCATION:** 111 W. Monroe Street
Phoenix, Arizona

**CASE NUMBER:** 12-080234

**CASE NAME:** Pikes Peak Community College

After being advised of the identities of the interviewing agents, Marcelle Green was advised of her rights. Upon learning of the purpose of the interview, Green voluntarily signed the attached Advice of Rights Waiver form and consented to the recording of the interview. Green voluntarily provided the following information:

In approximately November 2016, Trammel Thomas came to Green's uncle's home at 4630 S 21st in Phoenix, Arizona. Thomas was looking for Green and left his phone number with her uncle. Green never contacted him. She did not know what Thomas wanted to talk about after so much time had passed. Green's Uncle Elmer told her this information.

In approximately October 2016, Carr called Green about the discovery in the student loan fraud case. Carr wanted to know why Green snitched on her. Green told Carr the interviewing agents asked her questions and she answered them. Green got nervous because she realized information she told investigators was made public.

In 2012, Green was interviewed by investigating agents. Green never heard any more until approximately four or five years later when agents went to her auntie's house to serve Green with a letter. She met the agents at QT. Green was then served with another letter and again met the agents at Circle K.

Shortly after receipt of the second letter, Green's car was repossessed and she lost the letter that required her attendance in Colorado. She contacted the justice department and they could not locate her information.

Green realized that failing to respond to the target letters and trial subpoena did not look good.

The student loan fraud was Carr's idea. Green admitted to allowing the use of her address to receive debit cards. Green would throw away any other mail that did not have a debit card. Green was told to be on the lookout for various names. At the time, Green was enrolled in school and she has since graduated.

Carr was the person who had access to Accurint through her employment at Wells Fargo. Both Thomas and Carr were from Colorado and Green assumed that is how the two were able to use

Prepared by: Sandra Ennis                    Date Prepared: April 25, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)                                    Page 1 of 3



# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES



**DATE INTERVIEWED:** August 29, 2017

**PERSON INTERVIEWED:** Marcelle Green

**ALSO PRESENT:** Jeralyn Merritt, Defense Attorney

**INTERVIEWED BY:** Martha Paluch, Assistant US Attorney
Bryan Fields, Assistant US Attorney
Sandra Ennis, ED-OIG Special Agent

**LOCATION:** U.S Attorney's Office
1801 California Street, 16th Floor Conference Room
Denver, Colorado 80202

**CASE NUMBER:** 12-080234

**CASE NAME:** Pikes Peak Community College Fraud Ring

After being advised of the nature and purpose of the interview and the identities of all present, Marcelle Green, voluntarily provided the following information, summarized as follows:

Green was born and raised in Phoenix, Arizona. Green attended high school in Sacramento, California, where she played volleyball. Green later moved back to Arizona and has resided there ever since.

Green received her associate's degree in liberal arts from Gateway College in Phoenix, Arizona. She wants to pursue her education in social work but Green has not had time because of her three sons. At some point, she wants to attend Arizona State University (ASU). Her oldest son (20) is currently enrolled in school to become a commercial pilot. Her middle son (17) is a senior in high school and plans to attend Northern Arizona University (NAU). Her youngest is 16 years old and is a junior in high school. Green is not married.

While enrolled at Gateway, Green obtained approximately $14,000 in federal student aid (FSA) in the form of loans. She received her student aid refund in the form of a prepaid debit card and confirmed the card was called Citi Prepaid.

Currently, Green resides at 4424 E. Baseline Road, #2072 in Phoenix, Arizona and is employed full time at Granger. Up until last week, she also worked the night shift at Alpha Connect. Prior to her recent employment with Granger, Green was employed at Alpha Connect for the last three years.

Green resided at 1915 E. Mobile Lane, Phoenix, Arizona, when she was in grade school. This house has been owned by her family since approximately 1940. Green's Uncle Jimmy Green resided at the residence. Her Uncle Jimmy is now deceased.

The 4630 S. 21st Place, Phoenix, Arizona, address is owned by her Aunt Hazel Green. Green's aunt did not reside at the address when Green was residing there with her three sons. Green's Uncle Elmer Green resided in the studio type structure that is located behind the house.

Prepared by: Sandra Ennis

Date Prepared: August 29, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)

Green's prior criminal history includes a felony theft charge in 2000, a felony robbery charge in Los Angeles, California in 2007, and a felony marijuana possession charge in 2010.

Approximately 11 years ago, Green met Heather Carr through Green's son's father, Roderick Smith. Smith is her son's father and Carr was dating Smith. Green was no longer involved with Smith so she had no issue with Carr dating Smith. Carr and Green met and became friends when Smith went to jail and Carr called Green. The two became close and Green's son went to Carr's house a lot.

Green met Trammel Thomas when Thomas moved to Arizona to live with Carr. Carr was still residing at the 1351 Pleasant address in Chandler, Arizona. Thomas was out on parole and received permission to serve out the remainder of his sentence in Arizona. Green met Thomas while Thomas and Carr were residing at the Pleasant address.

Green met Mercedes Diaz through Carr. Carr was a mother figure to Diaz. Diaz kept getting into trouble in Colorado and moved to Arizona because of Carr. Carr, Diaz, and Thomas had all lived in Colorado prior to living in Arizona.

The student aid fraud scheme and using the identities of inmates was Carr's idea. Carr had the ability to obtain the personally identifiable information (PII) of inmates through a system that Carr had access to at her work.

Carr and Green discussed how the scheme would work. Carr initially brain stormed the idea and presented it to Green. Green agreed with Carr and told her, "Yeah, I think we could make this work." The idea was brought up when the two of them were discussing how to make money. Green was struggling financially with her three sons. Green often spent time at Carr's address. Carr's and Green's kids were close and the two families spent the holidays together. Green believes the initial conversation occurred at Carr's house during a barbeque for the Easter holiday.

In discussing the scheme, it was Carr's idea to use inmate's identities to apply for FSA. Since Carr, Diaz, and Green had all received financial aid, they knew how the FSA application process worked.

Green did not know what conversations regarding the scheme Carr had with Thomas while in Colorado. Green knew Thomas had knowledge about the scheme while in Colorado because Carr told Green this.

The rationale behind using inmate identities was because the inmate could prove they were in prison and therefore would not have any liability for paying back the FSA. There was never a story or idea to use inmate identities because they were bad people or because of a story on TV. Being a felon herself, Green does not judge or hold anything against felons.

Prior to using inmate identities, Green previously assisted in signing up her ex-boyfriend, Jesse Rowsely. Rowsely gave Green money for her assistance. Green also provided assistance to her cousin by telling her what steps were required to obtain FSA.

Green did not recall a conversation with Carr or Thomas about how it was a pain to enlist individuals in signing up for FSA and sharing in the FSA funds.

Green and Carr discussed how to submit a certain amount of applications in order to get money. Green had three kids and was in school herself so she needed the money. Green was all for

Case No. 1:16-cr-00054-WJM Document 528-1 filed 12/12/21 USDC Colorado pg 617 of
971
Case 1:16-cr-00054-WJM Document 448-1 Filed 03/22/18 Page 9 of 28

Carr told Green that Thomas and Sanders became close while the two were in prison together
and that Sanders provided an address to be used in the scheme.

In October or November 2016, after Carr, Diaz, and Thomas were charged, Carr reached out to
Green through Facebook after turning herself in. Carr wanted to know why Green snitched on
her. Carr told Green that she should have remained quiet and not said anything. Carr told Green
that she cannot be helped if she perjures herself. Also during this timeframe, Green's Uncle
Elmer told Green that Thomas showed up looking for her at Aunt Hazel's house on 4630 S 21st
Place. Her uncle described Thomas as tall and dark and said he left his name. The individual
left his phone number with her Uncle Elmer, requesting that Green contact him. Green can
check to see if her uncle still has the phone number. Green will also look through her belongings
to see if she has Thomas' number. Green does not have contact information for Thomas in her
phone.

Green has been contacted by Carr on three occasions. Once after Carr was charged, when she
contacted Green through Facebook, the second time was after Carr saw Green's written
statement to interviewing agents, and the third time was after Carr had seen all of the discovery.
Carr told Green that she was upset because she thought the two were best friends.

Green met Duncan through Carr. Duncan was brought to Arizona because she was involved in
one of Thomas' arrest. They did not want Duncan to be called as a witness to testify against
Thomas. Thomas and Duncan had a relationship. Duncan began taking escorting calls as soon
as she moved to Arizona. Green assumed she was doing the same thing in Colorado and
seemed comfortable hopping into it. Duncan eventually ran off with one of her escorting clients.
Duncan escorted for a couple of months while in Arizona.

Carr impersonated Thomas' sister and brought Duncan to Arizona because the police were
looking for Duncan. Carr posted online escorting advertisements for Duncan and Diaz and
Green took Duncan to the escorting calls. Duncan was provided with a throw-away phone so
that Duncan was available for calls. Carr told Green to give Duncan money for food and take the
rest of the money and bring it to Carr. Green was allowed to take money from the escorting calls
for gas and Duncan's toiletries.

Green did not meet Michelle Grant. She was Carr's best friend from Colorado Springs,
Colorado. Green possibly saw a photo of Grant on Facebook through her Facebook friendship
with Carr. Green thought Grant allowed Carr to use her address for the receipt of school records
and debit cards.

Sanders also provided an address or addresses for the receipt of school records and debit
cards. Green has never heard of the following names: Vanessa Lopez, Terrell Smith (aka
Swiss), La Tania Pickens, Lola Thomas, the name of Matthew Sander's mother, or Michael Cox.
Green thought the name Kimmisha Mullet sounded familiar. Green heard that Thomas had been
married and thought the name Lola Thomas sounded familiar.

Thomas was involved in looking up inmates and received money from the debit cards from Carr.
Carr told Green this information. Green was also present during the trial run hang out where
Carr and Green helped show Thomas how to fill out FAFSA's at this trial run meeting.

Green heard from both Carr and Duncan that Thomas took Duncan to PPCC.

While Thomas was in jail, Carr paid Thomas' attorney's fees and put money on Thomas' inmate
account. Green knew this from conversations with Carr.

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/19 USDC Colorado pg 618 of 971
Case 1:16-cr-00054-WJM Document 348 Filed 03/22/18 Page 10 of 289
Case 1:16-cr-00054-WJM Document 341-3 Filed 03/09/18 USDC Colorado Page 1 of 47

Attachment 3

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3    Criminal Action No. 16-cr-0054-WJM-2

 4    UNITED STATES OF AMERICA,

 5    Plaintiff,

 6    vs.

 7    TRAMMEL THOMAS,

 8    Defendant.

 9    ------------------------------------------------------------

10               REPORTER'S PARTIAL TRANSCRIPT
                    (Jury Trial - Day 2)
11               TESTIMONY OF MARCELLE GREEN

12    ------------------------------------------------------------

13         Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
      Judge, United States District Court for the District of
14    Colorado, commencing at 3:29 p.m., on the 28th day of
      November, 2017, in Courtroom A801, United States
15    Courthouse, Denver, Colorado.

16

17                        APPEARANCES

18         MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
      Attorneys, 1801 California Street, Suite 1600, Denver,
19    Colorado 80202, appearing for the plaintiff.

20         DANIEL T. SMITH, Attorney at Law, 4582 South Ulster
      Street, Suite 1400, Denver, Colorado 80237 and
21         THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
      Suite 1400, Denver, Colorado 80202, appearing for the
22    defendant.

23               MARY J. GEORGE, FCRR, CRR, RMR
                901 19th Street, Denver, Colorado 80294
24          Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

25
```

6

Direct - Green

1    Q.    So does your plea agreement in this case have any

2    effect on the outcome in that case?

3    A.    No, sir.

4    Q.    When did you first agree to be part of the conspiracy?

5    A.    Somewhere in 2010.  I can't give you an exact date,

6    I'm sorry.

7    Q.    Who approached you about becoming part of the

8    conspiracy?

9    A.    Heather Carr.

10   Q.    Where did that happen?

11   A.    At her location in Pleasant Drive.

12   Q.    Pleasant Drive where?

13   A.    In Chandler.  I believe Chandler, Arizona.

14   Q.    Describe to us what happened.

15   A.    Conversation at a barbecue, I believe it was around

16   Easter -- yeah, Easter, and just a discussion on how to get

17   money fraudulently by filing false claims.

18   Q.    After that discussion, how long were you part of the

19   conspiracy?

20   A.    To roughly about 2012.

21   Q.    While you were a member of the conspiracy, who were

22   the other members of the conspiracy?

23   A.    Mercede Diaz, Heather Carr and Trammel Thomas.

24   Q.    Now, you testified, you pleaded guilty to a scheme to

25   defraud the Government.  Did you file false claims with the

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 620 of
971
Case 1:16-cr-00054-WJM Document 341-3 Filed 03/09/18 USDC Colorado Page 18 of 47

18

Direct - Green

1    A.    To the -- for me, I know me, myself.

2    Q.    Did she give it to anyone else?

3    A.    I can't speak for that.

4    Q.    When she gave it to you, how would she give it to

5    you?

6    A.    On a paper -- on a lined piece of paper, regular

7    subject paper.

8    Q.    Describe to us what would be on a typical sheet of

9    paper from Heather Carr.

10   A.    The names, the birth dates, and the address -- I mean,

11   sorry, the names, the birth dates, and the Social Security

12   numbers.

13   Q.    And what would you do with that information?

14   A.    I would submit that into FAFSA.

15   Q.    Now, let's talk about Trammel Thomas.  You said he was

16   part of the conspiracy.

17   A.    Correct.

18   Q.    What was his role?

19   A.    His role -- I can't say if he did homework and I can't

20   say if he had a major role, but he had some role in it.

21   Q.    Well, did you ever see him participating in the

22   conspiracy?

23   A.    Yes.

24   Q.    What did you see him doing?

25   A.    The FAFSA part, just one time.

22

Direct - Green

1   A.   It was part of the -- to process the fraudulent FAFSAs

2   and the school applications.

3   Q.   How was it part of the process of filling out these

4   fraudulent FAFSAs?

5   A.   Because of the names, when you get the names and the

6   information was already there.  So, like I said, I can't

7   recall the names.

8   Q.   When you say the information was already there, what

9   information?

10  A.   The Social Security numbers and the birth dates,

11  sorry.

12  Q.   Did you see Mr. Thomas participate in a scheme at any

13  other time?

14  A.   No.

15  Q.   How often would you see the defendant during this time

16  period?

17  A.   I wouldn't see him as much as I seen Heather and

18  Mercedes, but I've seen him several occasions.

19  Q.   So who would you say was your major contact within the

20  conspiracy?

21  A.   Heather Carr.

22  Q.   How much money did you get from the scheme?

23  A.   I roughly would say a little -- in the $20,000 range.

24  Q.   What did you do with that money?

25  A.   Paid for bills and my financial living situations and

30

Cross - Green

```
 1    A.    Yes.
 2    Q.    And it's just you and Ms. Carr.
 3    A.    And our children, yes.
 4    Q.    Okay.  Mr. Thomas isn't there?
 5    A.    Not that I recall for the first conversation.
 6    Q.    Okay.  And you get a good understanding of what Carr's
 7    idea is?
 8    A.    Yes.
 9    Q.    Okay.  And am I correct that this whole thing can't
10    work without Heather Carr?
11    A.    That is correct.
12    Q.    And why is that?
13    A.    Because she was able to pull the information from her
14    database at work.
15    Q.    Okay.  So if I'm understanding how this goes about,
16    you can sit down on a computer and access a public website
17    that deals with some state Department of Corrections?
18    A.    Correct.
19    Q.    So maybe Florida?
20    A.    Any -- yeah, any public record, yes.
21    Q.    And you could identify an inmate who was serving a
22    sentence for X number of years?
23    A.    Yes.
24    Q.    And then with -- you'd get that name, correct?
25    A.    Yes.
```

Case No. 1:16-cr-00054-WJM   Document 525-3   filed 12/12/19   USDC Colorado   pg 623 of 971
Case 1:16-cr-00054-WJM   Document 348-1   Filed 03/22/18   USDC Colorado   Page 15 of 289
Case 1:16-cr-00054-WJM   Document 341-3   Filed 03/09/18   USDC Colorado   Page 47 of 47

47

1        REPORTER'S CERTIFICATE

2

3        I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled

5   matter.

6        Dated at Denver, Colorado, this 13th day of February,

7   2018.

8

9

10

11

12        MARY J. GEORGE, FCRR, CRR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/19 USDC Colorado pg 624 of
971
Case 1:16-cr-00054-WJM Document 448 Filed 03/22/18 Page 1 of 289

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLORADO

 3    Criminal Action No. 16-cr-0054-WJM-3

 4    UNITED STATES OF AMERICA,

 5        Plaintiff,

 6    vs.

 7    MERCEDES DIAZ,

 8        Defendant.

 9    ------------------------------------------------------------

10                    REPORTER'S TRANSCRIPT
                          (Sentencing)
11    ------------------------------------------------------------

12

13        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14    Judge, United States District Court for the District of

15    Colorado, commencing at 10:33 a.m., on the 12th day of

16    January, 2018, in Courtroom A801, United States Courthouse,

17    Denver, Colorado.

18
                              APPEARANCES
19
          MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
20    Attorneys, 1801 California Street, Suite 1600, Denver,
      Colorado 80202, appearing for the plaintiff.
21
          SIDDHARTHA H. RATHOD, Rathod Mohamedbhai, LLC, 2701
22    Lawrence Street, Suite 100, Denver, Colorado 80205,
      appearing for the defendant.
23
                  MARY J. GEORGE, FCRR, CRR, RMR
24              901 19th Street, Denver, Colorado 80294
              Proceedings Reported by Mechanical Stenography
25                Transcription Produced via Computer
```

11

1      History Category to be 6, which yields an advisory

2      guideline sentencing range of 92 to 115 months, a period of

3      supervised release of one to three years, a fine range of

4      10,000 to $100,000, and a special assessment of $100.

5            Does counsel agree the Court has correctly

6      calculated the guideline sentencing range in this case

7      before the application of any departure or variance?

8            MS. PALUCH:  Correct, Your Honor.

9            THE COURT:  Okay.

10           MR. RATHOD:  Yes, Your Honor.

11           THE COURT:  All right.  Thank you, counsel.

12           All right.  The -- I'll next take up the

13     Government's motion for a downward departure for

14     substantial assistance, ECF 261.  Ms. Paluch, anything you

15     wish to add to your written submission?

16           MS. PALUCH:  No, Your Honor.

17           THE COURT:  All right.  Mr. Rathod, do you wish to

18     be heard on this?

19           MR. RATHOD:  Not on the Government's --

20           THE COURT:  Okay.  For the reasons set forth in

21     the motion, I grant the Government's motion for a downward

22     departure.  I expressly find that the statutory purposes of

23     sentencing are best served by the imposition of a reduced

24     custodial sentence pursuant to Section 5K1.1 of the

25     guidelines.  Specifically, I find that Ms. Diaz has

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/19 USDC Colorado pg 626 of
Case 1:16-cr-00054-WJM Document 448 Filed 03/22/18 Page 18 of 289
971

12

1    provided truthful and credible information as to her

2    involvement with this offense and the involvement of

3    others, the defendant's information was significant and

4    helpful to the Government's ongoing investigations and

5    prosecutions of criminal activities within the District of

6    Colorado and elsewhere.  More specifically, it was Ms.

7    Diaz's cooperation with the prosecution and law enforcement

8    which provided the Government with the grounds and evidence

9    it needed in order to charge codefendant Marcelle Green in

10   this case.

11            As a result of granting the Government's motion,

12   subject to my ruling on the defendant's motion for

13   departure and the defendant's motion for a variant

14   sentence, I will sentence the defendant to a range centered

15   on the Government's requested departure of 35 percent off

16   the bottom of the guideline sentencing range, which is

17   approximately 16 months.

18            All right.  At this time, I'll take up that

19   portion of the defendant's motion at ECF 255 which seeks a

20   departure based on the grounds that her criminal history

21   category of VI substantially overrepresents the seriousness

22   of her criminal history pursuant to guideline Section

23   4A1.3(b).  Mr. Rathod.

24            MR. RATHOD:  Thank you, Your Honor.  I'm familiar

25   with the Court's practices and so I'm not going to rehash

36

THE COURT:  All right, but you haven't answered my

question --

MS. PALUCH:  Exactly right.

THE COURT:  Maybe I keep interrupting and

preventing you from answering my own question, which is:

How does the Government view the relative culpability of

the four defendants?

MS. PALUCH:  Right.  And I have a difficult time

answering that because it's our view that with -- that they

all four made it happen, all four of them made it happen.

I think an argument could be made that Carr is the most

culpable because of her access to that database.

THE COURT:  Could be made or should be?  I mean,

clearly the Government doesn't view Ms. Diaz as undertaking

a role as significant and major and culpable as Ms. Carr.

MS. PALUCH:  We do not, Your Honor.  And that's --

as you saw in the plea agreement, we agreed with the

two-level reduction for minor role in the offense.  So

clearly if you were to rank the four, I would say Ms. Diaz

is No. 4.  I think Ms. Green was much more involved than

Ms. Diaz.  And Mr. Thomas, our view, is that he has a

history of manipulating women and these three women we

believe were manipulated and that he benefited, but that

the other women probably did more of the work, did have

evidence --

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/19 USDC Colorado pg 628 of
971
Case 1:16-cr-00054-WJM Document 448 Filed 03/22/19 Page 20 of 289

37

THE COURT:  I thought your theory was Ms. Diaz was
manipulated by Ms. Carr, not by Mr. Thomas.

MS. PALUCH:  That's correct.  That's correct, Your
Honor.  I stand corrected.  I don't -- we don't have
evidence of Mr. Thomas' direct involvement with Ms. Diaz.
But I do think Mr. Thomas benefited just as much as anyone
else in this scheme and there is information that he was at
the computer doing the work that he did.

So I don't know that I'm answering your question.
I guess I would put Ms. Carr at the top, I would put Ms.
Diaz as No. 4, Mr. Thomas and Ms. Green in the middle.  I
hope I've answered your question --

THE COURT:  Yes, you have.  Thank you.

MS. PALUCH:  For those reasons we are seeking a
sentence, as we've stated at the beginning of this
hearing.

THE COURT:  So 34 months incarceration?

MS. PALUCH:  33 -- 33 months, Your Honor.

THE COURT:  Oh, 33.  Okay.

MS. PALUCH:  Yes.

THE COURT:  Thank you.

MS. PALUCH:  Thank you.

THE COURT:  Mr. Rathod, it's your motion, I'll
give you an opportunity for a brief reply.

Ms. Diaz, you can remain seated.

70

1                    REPORTER'S CERTIFICATE

2          I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled

4     matter.

5          Dated at Denver, Colorado, this 21st day of February,

6     2018.

7

8

9                                 *Mary J. George*

10

11                          MARY J. GEORGE, FCRR, CRR, RMR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case No. 1:16-cr-00054-WJM Document 525-348 filed 12/11/18 USDC Colorado pg 630 of
Case 1:16-cr-00054-WJM Document 525-348 Filed 03/22/18 Page 22 of 289
971





# UNITED STATES DEPARTMENT OF EDUCATION

## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES

**DATE INTERVIEWED:**   February 10, 2017

**PERSON INTERVIEWED:**   Mercedes Diaz

**ALSO PRESENT:**   Siddhartha Rathod, Defense Attorney

**INTERVIEWED BY:**   Martha Paluch, Assistant US Attorney
Sandra Ennis, ED-OIG Special Agent
Sonia Hacker, Postal Inspector

**LOCATION:**   Colorado Springs Post Office
201 E Pikes Peak Avenue
Colorado Springs, Colorado 80903

**CASE NUMBER:**   12-080234

**CASE NAME:**   Pikes Peak Community College Fraud Ring

After being advised of the nature and purpose of the interview and the identities of all present,
Mercedes Diaz, voluntarily provided the following information, summarized as follows:

Diaz met Heather Carr at the Phil Long Ford car dealership in Colorado Springs, Colorado. Both
Carr and Diaz's mother were employed at the dealership. Diaz was expelled from school when
she was approximately 11 or 12 years old so she would hang out in the basement of the
dealership while her mother worked. Diaz enjoyed hanging out with Carr because she was one
of the youngest people working there.

Carr, who was 24 years old at the time, offered to take Diaz under her care because Diaz was
taken out of her mother's home due to issues Diaz had with her step-father. Carr came from an
upbringing of group homes and foster care and Carr did not want that environment for Diaz.

Carr became a mother figure to Diaz. Diaz lived with Carr for less than a year and during that
time, Diaz continued to get into trouble. On Christmas Eve, Diaz stole Carr's vehicle and the
state took Diaz from Carr's care.

At approximately age 13, Diaz was committed to the Juvenile Youth Corrections in Colorado
Springs, Colorado for approximately two years. Carr wrote to Diaz during this timeframe.

At age 19, Diaz was out of the youth corrections system and living in Denver. While living in
Denver, Diaz was using drugs and involved in prostitution. Diaz got hurt on a call and decided
she wanted a fresh start.

Diaz could not find employment in Colorado and knew Carr was residing in Arizona with her
daughters. At the time, Arizona had the fourth best economy in the country and Diaz was able to
find employment within a week of moving there.

Diaz enrolled in Phoenix College and was able to pay for classes with student loans and with
help from her father, who was prior military. Diaz also purchased a car. Diaz felt like she was
supposed to be in Arizona.

Prepared by: Ennis, Sandra                                          Date Prepared: February 13, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced
without written permission. The report is **FOR OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public
availability to be determined by 5 U.S.C. 552.

Interview of Mercedes Diaz, February 10, 2017                    12-080234

Diaz attended Remington College when she was residing at the Dale House Project in Colorado Springs, Colorado, following emancipation from her mother. Diaz was enrolled in a medical assistant program. During this timeframe, Diaz was employed at Antler's Hilton in Colorado Springs, Colorado.

Diaz resided with Carr at the 1351 Pleasant Drive address in Chandler, Arizona, for about a month. During this timeframe, Tramell Thomas did not live in Arizona. While residing in Colorado, Diaz met Thomas on only one occasion, when Carr came from Arizona to visit him. Carr and Thomas were not married.

Diaz rarely ever saw Thomas when he was on parole. Carr usually travelled once a month to Colorado to see Thomas. Diaz did not know every detail about Carr and Thomas' relationship. Carr and Diaz had more of a mother-daughter relationship.

Diaz was not aware of what part, if any, Thomas played in the financial aid fraud scheme. Thomas was always trying to start businesses and doing all sorts of things to impress Carr. Diaz felt Thomas was mooching off Carr. Carr did not discuss Thomas' involvement in the scheme with Diaz.

Diaz first learned of the financial aid fraud scheme after living in Arizona for approximately six months. Carr informed Diaz of the scheme and told her that it was a way for Diaz to make money.

Part of Diaz's involvement was to receive college and financial aid mail in other people's names. Diaz got into a confrontation with a letter carrier while residing at one of the addresses in Mesa, Arizona. The United States Postal Service (USPS) refused delivery of mail in the names of various individuals to Diaz's house. Diaz questioned this because the mail was correctly addressed. Diaz told the letter carrier that she helped people by receiving their financial aid funds and this is how she paid for her rent.

Diaz knew Christine Duncan from escorting in Colorado. Duncan was messing around with Thomas. When residing in Colorado, Diaz did not hang out with Thomas. Duncan got Thomas in trouble and Diaz and Marcy Green helped Duncan come down to Arizona to raise money for his legal fees.

Diaz never liked Green. Carr introduced the two of them and at no time did Green or Diaz just hang out together. It was a business relationship. Diaz and Green did not drive around together and withdraw funds from the financial aid debit cards. The two of them did their own thing and they did not hang out.

Carr asked Diaz for mailing addresses. Diaz got paid $500 for each piece of mail. Diaz knew people in the "hood" that agreed to accept mail in other people's names and did not ask any questions about the mail.

Diaz recalled using three mailing addresses on Dragoon Circle in Mesa, Arizona and she also used one of her previous addresses at 724 West Knox Court, Chandler, Arizona. Diaz collected mail from her friends that agreed to accept the mail and she turned over all the mail pieces over to Carr. Diaz received $500 in cash and she gave her friends $100. Diaz did not have any knowledge about the addresses used in Colorado Springs, Colorado, such as the Lexington address.

Green was also tasked with finding friends that would allow the use of their address and she also received $500.

Interview of Mercedes Diaz, February 10, 2017                                    12-080234

After approximately two semesters, Carr showed Diaz how to submit Free Applications for Federal Student Aid (FAFSA) and how to complete the online coursework. Carr paid Diaz additional money for submitting the assignments. There were homework assignments for approximately 20 to 30 students and Carr could not complete all of them on her own because she was working full time. Diaz was somewhat familiar with the financial aid process because she submitted FAFSA's to obtain student loans in her own name.

Diaz randomly queried names on various department of corrections' websites and provided Carr a list of inmate names and dates of birth. Carr made additional queries by using a database she had access to with her employment at Wells Fargo. Carr obtained additional information, such as the inmate's social security number. Only inmates serving a sentence of more than eight to ten years were used because they figured the inmates would not access their credit history for a long period of time.

Carr filled in the list with additional information required for the financial aid application process. Diaz took Carr's information and submitted the FAFSA and obtained the FAFSA PIN.

Diaz submitted FAFSA's and did homework at various locations, including Carr's and Green's house and at her own residence too. Diaz did not recall Green's address.

Carr, Diaz, and Green did not discuss the fraud scheme at length with one another. It might have been brought up on one or two occasions at a barbeque, only to mention about a homework assignment being due. The three of them had homework parties. They sat around to complete homework, query department of corrections websites, and fill out FAFSA's while drinking.

Green did everything that Diaz and Carr did in the financial aid fraud scheme. Green had her own laptop to use. Diaz recalled Green's laptop having stickers on it but could not recall the color of the laptop. Carr had Macintosh laptops in her home. If they were hanging out, any laptop or computer in Carr's residence was used for convenience when checking on something related to the financial aid fraud scheme. Diaz owned two laptops that she also used in the financial aid fraud scheme. Her laptops were black in color.

Green and Diaz were not close. They worked together to make money. They saw each other at parties and were cordial. Green lived on the south side so she was not always at Carr's house when Diaz was there but Diaz knows that Green was logging in to register attendance just like she was.

Once the student loan debit cards started coming in, Carr needed help withdrawing the money from the cards since she was working full-time from home. The debit cards had a daily withdraw limit of $500. Each card had approximately $2,500 to $3,000 in financial aid funds. Diaz would hang onto the card until it had been drained. At times, she would also go to Fry's grocery store to buy something and get cash back from the debit card. Other times, she went to various ATM locations or used the cards for personal purchases.

The debit cards were divided up. If you received the mail, then the debit card was yours. Initially, Diaz received a flat fee of $500 but she started receiving three-fourths of the card amount when she started doing homework, department of corrections queries, and FAFSA submissions. Carr received the remaining one-fourth of the amount on each card.

Green also kept the money on the debit card and she also gave a portion of the funds to Carr. Diaz knows this because of conversations between Carr and Green when Diaz was present. Carr also told Diaz that Green gave Carr a portion of the financial aid funds on the debit card.

==Carr and Green taught Diaz how to do everything. Diaz does not know if Carr taught Green the financial aid fraud scheme or vice versa.==

When asked about Marcy Green's interview with investigating agents, Diaz replied that Green was a "fucking liar." Green was way more involved than Diaz. She was a seasoned veteran at the financial aid fraud scheme. She was doing way more than Diaz was, it was scandalous.

The day the search warrants were executed, Diaz went to jail. Diaz was trying to contact Carr. When Carr and Diaz finally spoke about the search warrant, they wondered why investigators took Green's children to school. Their only conclusion was that Green must have talked with the investigators.

Diaz initially agreed to speak with investigators, only to find out what information they were looking for. Once Diaz realized it was about the student loans, she invoked her right to an attorney and questioning stopped.

==Carr, Diaz, and Green were all involved in the financial aid fraud scheme.==

Diaz was never involved in obtaining mailing addresses from Colorado and she never visited Colorado to retrieve mail. Thomas might have been providing names of people in Colorado who were willing to receive mail in other people's names to Carr.

Diaz may have made one trip to Colorado with Carr but Carr would have retrieved the student loan mail on her own time. Diaz made frequent trips to Colorado to visit her family but not to collect student loan mail. Diaz never visited Thomas while he was in jail in Colorado. Diaz thought the retrieval of student loan mail in Colorado was done by Carr.

Duncan came to Arizona to make money for Thomas' legal fees by escorting. Thomas was cheating on Carr with Duncan. Diaz knew Duncan from Colorado and she knew she could get information from her. The three of them (Carr, Diaz, and Green) decided Duncan could not run into Carr because Duncan had already seen pictures of Carr. Diaz and Green meet with Duncan and Carr impersonated Thomas' sister. Thomas' sister was never involved, it was Carr acting like she was Thomas' sister.

Carr did not know Thomas was involved in pimping until his arrest in Colorado Springs. Carr was hurt and wanted to know who this Duncan person was.

Duncan gave all of her escort earnings to Diaz and Green. In return, Diaz and Green fed Duncan and paid for the hotels, where the escorting calls took place. Diaz did not do any escorting while residing in Arizona.

Basically, Diaz and Green were supporting Duncan. They had to do everything, such as setting up client calls and taking Duncan to the call, while Duncan only had to lay there. Some of Duncan's escorting earnings went to Carr so that she could pay for Thomas' attorney's fees.

Diaz and Green were not hanging out, they worked together, and it was only a business relationship.

Diaz was not involved with any of Duncan's student loans. Diaz assumed Duncan took those loans out on her own. Neri Lattimore is of no relation to Thomas. They lied and told Duncan that Lattimore was a relative of Thomas'. Lattimore was Diaz's boyfriend and he went by the name "Larry."

Interview of Mercedes Diaz, February 10, 2017                                      12-080234

Diaz did not recognize a photo of Vanessa Lopez.

Once Thomas was out of custody, he received permission to come live in Arizona with Carr.
Things were good until Thomas was arrested on a Driving Under the Influence (DUI) and all of
the student loan debit cards were in the vehicle. Carr was frantic and pissed at Thomas. Carr
told Diaz that Thomas put all of their lives in jeopardy by having the debit cards with him. Carr
kicked him out of the house shortly after his arrest.

Once Carr moved into the Kaibab residence with Thomas, Diaz rarely went over to the house
because it was a farther distance away from the Dragoon address where Diaz was residing and
Thomas was always home.

When Diaz lived at the 724 West Knox address, she spent a lot of time at the 1351 Pleasant
address because she did not have internet service. The two addresses were within blocks of
each other.

Duncan was out of the picture when Thomas moved to Arizona and Diaz was not involved in
prostitution while in Arizona. Any texts that Thomas made in reference to Diaz's "keeping the
hoes in line" would have been regarding the assistance she provided with Duncan. Thomas was
like family, like a step-father figure. Money made from Duncan's escorting was used to pay for
Thomas' attorney and Carr added money to Thomas' inmate commissary account.

Diaz was not impressed by Thomas so she limited her visits to Kaibab. Diaz went to the Kaibab
residence for barbeques, parties, and holidays. He cheated on Carr and Diaz did not want Carr
to be with him. Carr loved Thomas and Diaz respected Carr, so she stayed out of it.

Thomas was arrested in 2012 and Carr freaked out. The group continued the scheme following
the arrest because the arrest occurred right before funds were going to be disbursed to the debit
cards. After Thomas' DUI arrest, if there was a way to get student loan funds, they still tried.

Diaz used Joelle Chase's ID's to open up three private mail boxes. These private mail boxes
were all opened on the same day. Chase was Diaz's friend and she gave Diaz permission to
use the ID's in exchange for money. Chase did not know about the financial aid fraud scheme.
Diaz gave the private mail box keys to Carr. Diaz opened these boxes after the confrontation
with the letter carrier. She wanted to stop the student loan mail coming to her address.

It was stupid to keep the cards but the group used the cards to buy gas. If the card had at least
one dollar on it, then a full tank of gas could be purchased.

Diaz never went with Thomas to withdraw money from ATM locations and never talked to
Thomas about the financial aid fraud scheme. Carr, Diaz, and Green were not afraid of Thomas.
Diaz did not think that Thomas was having an affair with Green.

Carr is very private and has a lot of secrets. Carr and Diaz did not discuss Thomas' involvement
but Diaz was under the impression that Thomas knew about the financial aid fraud scheme.
Common sense would indicate that Thomas knew. The financial aid fraud scheme was
discussed while Thomas was at home but he may not have been in the room. Carr never said
not to talk about it in front of Thomas or that it should be a secret kept from Thomas.

The community colleges began requiring more information, usually in the form of a faxed
document, from the purported students. Diaz assisted in the faxing of requested documents to
the community colleges. Diaz learned this from Carr. Diaz did not always use the same FedEx

**UNITED STATES**
**POSTAL SERVICE**

Requestor: USPIS\PLCornell

Forensic Laboratory Examination Report
Forensic Laboratory Services
22433 Randolph Dr.
Dulles, VA 20104-1000

October 28, 2015

Case No.1939700-MF - Lab File No. 9-349-011357(2)
Type of Examination: Fingerprint
Request Date(s): 05-11-2015

K. P. Haithcoat
Postal Inspector
1745 Stout Street, Suite 900
Denver, CO 80299

EXAMINATIONS:
Examine Exhibits 1 through 5, a debit card, fifty-two Mastercards, Pikes Peak documents and photocopies of two identification cards, for the presence of latent prints of value for identification.

Compare any latent prints to the fingerprints of the following:

      Tramel Thomas, FBI No. 944342FB2, designated as Exhibit K-1
      Heather Elizabeth Carr, FBI No. 72302EB7, designated as Exhibit K-2
      Mercedes Dee Diaz, FBI No. 269620VC6, designated as Exhibit K-3
      Michaela Inez Grant, FBI No. 480570ED5, designated as Exhibit K-4
      Marcelle Ruby Green, FBI No. 555483MB0, designated as Exhibit K-5
      Matthew Kenneth Sanders, FBI No. 710044RB0, designated as Exhibit K-6

FINDINGS AND OPINIONS:
Exhibits 1 through 5 were examined for the presence of latent prints. Twelve latent fingerprints and one latent palm print were developed on parts of Exhibit 3. No latent prints of value were present or developed on the remaining exhibits. The latent prints were compared to Exhibits K-1 through K-6 resulting in the following identifications:

      <u>Heather Elizabeth Carr, FBI No. 72302EB7, Exhibit K-2</u>
      One latent fingerprint on part of Exhibit 3, Pikes Peak document "Donald F. Grants"

      <u>Mercedes Dee Diaz, FBI No. 269620VC6, Exhibit K-3</u>
      Six latent fingerprints on part of Exhibit 3, Pikes Peak document "Edward Jones",
      Five latent fingerprints on part of Exhibit 3, Pikes Peak document "Virginia Jones"

No known palm prints of Tramel Thomas, Heather Elizabeth Carr, Mercedes Dee Diaz, Michaela Inez Grant, Marcelle Ruby Green or Matthew Kenneth Sanders were available for comparison.



AN ASCLD/LAB - *International* ACCREDITED TESTING LABORATORY SINCE DECEMBER 8, 2014

Case No.1939700-MF - Lab File No. 9-349-011357(2)                                                     Page 2

**REMARKS:**
Clearly and completely recorded palm prints of Tramel Thomas, Heather Elizabeth Carr, Mercedes Dee Diaz, Michaela Inez Grant, Marcelle Ruby Green and Matthew Kenneth Sanders are required for a conclusive comparison to some of the unidentified latent prints.

Photographs of the latent prints have been prepared and will be available for any additional comparisons you may request or for the preparation of court exhibits should it become necessary.

In the event latent print testimony is necessary in the trial of this case, a current set of known prints of Heather Elizabeth Carr and Mercedes Dee Diaz, recorded and signed by an individual who will be available to testify, should be submitted prior to any request for testimony.

**EXHIBITS:**
Exhibits 1 through 5, received in this laboratory on May 14, 2015, are being returned with this report via Registered Mail.

The fingerprints of Tramel Thomas and Heather Elizabeth Carr, obtained from the FBI on October 27, 2015, and the fingerprints of Mercedes Dee Diaz, Michaela Inez Grant, Marcelle Ruby Green and Matthew Kenneth Sanders, obtained from the FBI on October 28, 2015, are being retained.

Secondary evidence, created during this examination, is being retained in this laboratory.

Patricia L. Cornell
Forensic Latent Print Analyst, Sr.
Telephone: 703-406-7113
Fax: 703-406-7115

This is an official FLS examination report only if it contains an original signature of the forensic analyst.



AN ASCLD/LAB - *International* ACCREDITED TESTING LABORATORY SINCE DECEMBER 8, 2014

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**2.  TRAMMEL THOMAS**

      Defendant

## RESPONSE TO GOVERNMENT'S MOTION TO REVOKE DEFENDANT'S RELEASE STATUS DOCKET #333

Comes now the Defendant and submits his response to the government's motion to revoke Defendant's release status.

1.  The government filed its motion for issuance of an arrest warrant and revocation of the Defendant's release status at docket #333.  The Court granted the request for the arrest warrant and ordered the Defendant to respond to the request for revocation of the Defendant's release status on or before March 29, 2018.

2.  The government basis it's request in part on a memorandum submitted to the government by U.S. Probation Officer Cohen on or about March 2, 2018.  In that report, it is noted that the Defendant has failed to update his supervising officer of his business and home addresses. He has also tested positive on one occasion for oxycodone.

3.  The recommendation made by Officer Cohen in his memo was that the Defendant's Bond be revoked at his next court appearance.  The next scheduled Court appearance is Defendant's sentencing hearing, April 12, 2018.  Obviously, Officer Cohen did not view the violations as serious enough to warrant any type of immediate action.

4. The government also basis it's requests in paragraph 5 of its motion on the Defendant's "pimping and robbing" activities. From discovery provided to the Defendant it appears that the government is referring to allegations dating back to 2010 and January of 2011. The Court should be aware, that the Defendant has never been tried on these allegations, and in fact the State of Colorado dismissed all charges in 2011. Counsel submits to the Court that the applicable statute of limitations has long since run on any of these unproven allegations.

5. On November 30, 2017 upon the jury's return of guilty verdicts, the government asked the Court to remand the Defendant. At that time Judge Martinez denied the request noting that if the Defendant had chosen to not face the charges, he by that time had had over 600 days to have absconded.

6. In fact, at each and every scheduled Court appearance where the Defendant has been ordered to appear, he has appeared.

7. There is no evidence offered that the Defendant is a danger to himself or the community. The government argues that such danger exists because the Defendant attempted to contact 2 government witnesses prior to trial. That argument was made to Judge Martinez and obviously found to be unpersuasive. Both witnesses testified at trial and neither witness testified to being threatened or placed in any type of fear by actions of the Defendant.

8. The Defendant is scheduled for sentencing on April 12, 2018. At that hearing it is expected that the Defendant will receive some period of incarceration. At that point, once again, Judge Martinez will have to consider whether or not to allow the Defendant to voluntarily surrender at the Bureau of Prisons facility so designated.

9. The Defendant suggests that that is the proper time and hearing for the issues raised herein to be considered.

Dated this 29th day of, March , 2018

2

Daniel T. Smith Attorney at Law

s/ Daniel T. Smith
Daniel T. Smith
1900 Grant St. #580
Denver, Colorado 80203
Telephone: 303 860 8100
Fax: 303 860 8018
danieltsmith@qwestoffice.net

Thomas E. Goodreid
1801 Broadway #1400
Denver, Co. 80202
Telephone: 303 296 2048
Fax: 303 292 0522
t.goodreid@comcast.net

Attorneys for Tramell Thomas

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 29, 2018 the foregoing **RESPONSE TO GOVERNMENT'S MOTION TO REVOKE THE DEFENDANT'S RELEASE STATUS DOCKET #333** was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification to all counsel of record.

s/ Daniel T. Smith

3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

## 2.  TRAMMEL THOMAS

      Defendant

---

## SENTENCING STATEMENT AND REQUEST FOR A SPECIFIC/VARIANT SENTENCE

---

Comes now the Defendant by and through his counsel, Daniel T. Smith and Thomas E. Goodreid, and submits this sentencing statement and request for a specific/variant sentence.  As grounds therefore, the Defendant states as follows:

1.   The Defendant requests that this Court impose a sentence pursuant to the Defendant's convictions at trial pursuant to 18 U.S.C. §3553(a), which is sufficient but not greater than necessary to comply with the statutory requirements under section 3553.  The Defendant requests a sentence of 84 months.

2.  While the Defendant was convicted at trial, his three co-defendants were all convicted by the entry of guilty pleas.  The co-defendant Carr has been sentenced to a term of 57 months in part based upon an advisory guideline offense level of 25 and a criminal history level 1.  The co-defendant Diaz has been sentenced to a term of 24 months in part based upon an advisory guideline offense level of 23 and a criminal history level 6.   The co-defendant Green is scheduled for sentencing on April 11, 2018.

1

3. The Defendant proceeded to trial and placed the government to its burden of proof.  As the record reflects, the Defendant did not testify at his trial.

4. The PSR filed by the United States Probation Office has computed an advisory guideline criminal offense calculation of 31.  With a criminal history level 4, the advisory guideline calculation is a sentence of between 151 months to 188 months.

5. The Defendant has objected to 3 of the components of the guideline calculation.  Initially the Defendant objects to the loss calculation figure and the offense level adjustment of 14 points.  Pursuant to this Court's Order, the Defendant has submitted his argument  at docket # 342.  The Defendant adopts that argument herein.

6. The Defendant also objects to the adjustment for "obstruction of justice" pursuant to U.S.S.G. §3C1.1.  At the Defendant's trial, there was no evidence introduced to establish this adjustment. The cited basis for the adjustment is threefold  (see PSR para. 81).

7. The first basis is the alleged destruction of the Defendant's phone. The only evidence which the government has to "support" this allegation comes from the co-defendant Carr.  In a statement given to the government in November of 2016, Exhibit A, at page 8,  she advises that Thomas destroyed his phone to conceal the identities of other women he was seeing. She also told the government that the phone was an old phone that the Defendant was no longer using. The government has produced no evidence that the Defendant's actions had any relation to the government's fraud investigation.  In fact,  there is no evidence as to when the phone was broken.

8. The second basis is that the Defendant allegedly contacted potential witnesses in an effort to influence their testimony.  Again, there was no evidence at trial to support these allegations.   The witness Mullett testified the Defendant spoke to her but said nothing about it having any effect on her appearing as a witness or the substance of her

Case No. 1:16-cr-00054-WJM Document 528-1 filed 12/12/18 USDC Colorado pg 642 of
971
Case 1:16-cr-00054-WJM Document 353 Filed 03/29/18 Page 3 of 7

testimony.  The co-defendant Green has told the government that the Defendant contacted her Uncle in an effort to find Ms. Green. Exhibit B page 1.   Green, again mentioned this contact with her Uncle in an interview on August 29, 2017.  Exhibit C page 6.  At no time has Green testified or told the government that the Defendant contacted her and tried to influence her appearance as a witness or her testimony.

9. Finally, it is alleged that the Defendant materially affected the investigation by a pretrial services U.S. Probation Officer by failing to keep current both his employment and residence addresses. While the Defendant acknowledges these two minor transgressions, he disputes that they can form the basis for an obstruction of justice adjustment. The Defendant submits that this Court must make a finding that in failing to update his addresses the Defendant did so with the specific intent to obstruct justice.  *U. S. v. Young*  811 F3d 592 (2d. Cir. 2016). False statements to Probation Officers have been found to justify an obstruction of justice adjustment, but they concerned efforts to conceal a Defendant's true identity *U. S. v. Saintil*  910 F2d 1231 (4th Cir. 1990), *U. S. v. Bedolla-Zavalla*  611 F3d. 392 (7th Cir. 2010).  A similar finding resulted when a Defendant tried to conceal assets from a Probation Officer. See *U. S. v. Greig*  717 F3d 212 (1st Cir. 2013). The Defendant submits that he has been on pretrial release in this case for over 700 days.  He has given numerous true statements to his Pretrial officer.  These two false statements were in no way made to obstruct the Officer's investigation.

10. In paragraph 94 of the PSR the Probation Officer finds no basis for an adjustment for the Defendants role in the offense USSG 3B1.2.  The Defendant submits that the government's evidence at trial as well as its statements and arguments since the trial,  justify an adjustment for minor involvement.   The Government told this Court at Carr's sentencing that she was clearly the most culpable Defendant.   At Diaz's sentencing the Government again argued that Carr was the

most culpable, Diaz the least, and Green and Thomas somewhere in the middle. Ex. D Page 36 and 37

11. The Defendant submits that Green's trial testimony and statements given by Carr, Green and Diaz, demonstrate that the Defendant is the least involved and least culpable of the four co-defendants. In her trial testimony Green said Thomas played "some" role in the conspiracy but she only saw him on one occasion fill out a FAFSA. Exhibit E page 18. Later she stated that the one time was the only time she saw Thomas participate in the scheme. Ex. E Page 22. Green testified and told the government in statements that she and Carr started the scheme not Thomas. Ex. E Page 30, Ex. C Page 2 and 3.

12. Co-defendant Diaz has also given statements and cooperated with the government. At her sentencing, this Court found her to be truthful and credible. Ex. D Page 11 and 12. As part of her cooperation Diaz gave the government her statement on February 10, 2017. She told the government she was not aware of "what part if any" Thomas played in the scheme. Ex. F Page 2. She talked at length about the three women (herself, Carr, and Green) sitting around doing student's homework, searching out inmates and filling out FAFSA's. Thomas is not present. Ex. F Page 3. Diaz discussed the scheme with Carr and Green but never with Thomas Ex. F Page 3 and 6. It is important to note here that Diaz was like a daughter to Carr and lived in the Carr household. If Thomas was the active participant the government claims, Diaz would have seen it. It is obvious that Diaz offered no information against Thomas, thus her absence as a witness at Thomas's trial.

13. The Court will remember that the parties stipulated that Thomas was jailed in Colorado Springs, Colorado from January 27 through November 3, 2011. Co-defendant Carr has provided her affidavit which is Ex. G. At paragraph 9c she states that Thomas played no part in the scheme while he was jailed. She told the government that

4

Thomas did not move to Arizona until February of 2012. Ex. A Page 6.

14. Carr also states in her affidavit that Thomas did not provide the addresses for debit card mailings at Radiant Drive Ex G paragraph 9b. She had previously told the government of her relation to the addresses on Lexington and Rushmore. Ex A page 4 and 5. These pieces of information on addresses further diminish the government's argument that Thomas provided the much needed Colorado addresses. In fact, the evidence shows his only participation in providing an address was that of Ms. Mullett.

15. The government also relied on Thomas being stopped in August of 2012 with some 50 debit cards in the backseat and one in his wallet. Carr provides interesting incite, into this evidence. She states in her affidavit that the principal driver of the Dodge Charger (the car Thomas was driving when stopped) in 2011 and 2012 was Green not Thomas. Ex G paragraph 9h. This was consistent with what she told the government in November of 2016. At that time Carr stated that Green kept most of the debit cards and Green owned the pink laptop. Ex. A page 6.

16. This explanation of who drove the car gives further understanding as to why Thomas's finger prints were on none of the cards. Ex. H

17. The Defendant submits to this Court that when one analyses all the evidence that was available to the government the relative culpability of each Defendant becomes much clearer. The Defendant does not argue his innocence, but rather his minimal involvement.

18. A fair interpretation of the evidence shows the Defendant did not become involved in the scheme until he moved to Arizona in February of 2012. His involvement with registering students in Colorado in 2010 and January of 2011, may have been improper but it had nothing to do with the scheme run out of Arizona by Carr and Green. None of the

Case No. 1:16-cr-00054-WJM  Document 535-1  filed 12/12/18  USDC Colorado  pg 645 of
971
Case 1:16-cr-00054-WJM  Document 353  Filed 03/29/18  Page 6 of 7

with these applications.

19. Were the Court to favorably consider the objections to the advisory guideline calculation made by the Probation Department, the Defendants offense level would be 25.  With a criminal history level of 4 his advisory guideline calculation would be 84 to 105 months.

20. The Defendant submits that when all the evidence is analyzed, and one compares sentences previously imposed on co-defendants, as well as this Defendant's criminal history, a guideline range of 84 to 105 months (offense level 25) is an appropriate sentencing range for this Defendant.  The Court has previously imposed sentences at the low end of the guideline computation for co-defendants.  The Defendant requests the Court do the same here and impose an 84 month sentence.

21. Were the Court to follow the government's request, 168 months, or the Probation Department recommendation of 151 months, the disparity in sentences given to co-defendants is glaring. Certainly there are aspects to each co-defendant's sentence that are not shared by Mr. Thomas.  But such discrepancies hardly justify or explain Thomas receiving over 100 more months than Carr or more that 125 months more than Diaz.

Applicants were inmates and no Arizona IP addresses were associated

Dated this 29th  day of, March , 2018

Daniel T. Smith Attorney at Law

s/ Daniel T. Smith
Daniel T. Smith
1900 Grant St. #580
Denver, Colorado 80203
Telephone: 303 860 8100
Fax: 303 860 8018
danieltsmith@qwestoffice.net

6

645

Thomas E. Goodreid
1801 Broadway #1400
Denver, Co. 80202
Telephone: 303 296 2048
t.goodreid@comcast.net

Attorneys for Tramell Thomas

**CERTIFICATE OF SERVICE**

    The undersigned hereby certifies that on  March 29,  2018 the foregoing **SENTENCING STATEMENT AND REQUEST FOR A SPECIFIC/VARIANT SENTENCE** was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all counsel of record.

s/ Daniel T. Smith



# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES



**DATE INTERVIEWED:** November 3, 2016

**PERSON INTERVIEWED:** Heather Carr

**ALSO PRESENT:** Mary Butterton, Assistant Federal Defender
Jessica Leto, Paralegal

**INTERVIEWED BY:** Martha Paluch, Assistant US Attorney
Beth Gibson, Assistant US Attorney
Sandra Ennis, ED-OIG Special Agent

**LOCATION:** U.S. Attorney's Office
1225 17th St., 7th Floor Conference room
Denver, Colorado 80202

**CASE NUMBER:** 12-080234

**CASE NAME:** Pikes Peak Community College Fraud Ring

After being advised of the nature and purpose of the interview and the identities of all present, Heather Carr, voluntarily provided the following information, summarized as follows:

In approximately July 2015, Carr moved from Arizona to Virginia Beach, Virginia, to live with her oldest daughter Ayanna Brown, formerly Ayanna Jones. Brown moved to Virginia because her husband is in the Navy. He is currently deployed and will not return home until January 2017. Brown is currently attending college and is enrolled in a pharmaceutical internship.

The following are Carr's four children: Ayanna (21), Kaira (16), Milani (5), and Tru (1). Aubrey, who is Ayanna's friend, has resided with Carr since she was 15.

Carr was a mother figure to Mercedes Diaz also. Carr and Diaz's biological mother both worked at a car dealership. Diaz's mother was prepared to give up Diaz to the state because Diaz was constantly in trouble. Carr offered to take her in. At the time, Diaz was in junior high at Panorama Middle School. On Christmas Eve, Diaz stole Carr's vehicle and was arrested. While in custody, Diaz's brother was murdered. Carr's daughters are like sisters to Diaz.

Carr was born in Virginia but moved to Colorado Springs, Colorado, when she was approximately ten years old. Shortly after her family moved, her mother divorced and remarried. Carr ran away from home and stopped attending school in junior high. Carr got pregnant at 17 and obtained her GED during this time period. Omar Jones, who is the father of her two oldest daughters, was her legal guardian.

In approximately 1997, Carr became familiar with the financial aid process when she attended Pikes Peak Community College (PPCC) and received federal student aid (FSA).

In approximately 2003, Carr moved from Colorado to Arizona and resided there until summer 2015.

Prepared by: Ennis, Sandra                                          Date Prepared: November 4, 2016

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)

EXHIBIT

Interview of Heather Carr, November 3, 2016                                     12-080234

Carr worked for Wells Fargo from approximately June 2003 through July 2015. During her employment, Carr held the following positions: mortgage processor, mortgage underwriter, and credit analyst for Car Maxx. Carr's position as credit analyst began with Car Maxx in approximately 2006.

In approximately August 2009, Wachovia and Wells Fargo merged and Carr was one of 200 employees laid off. Carr was brought back and began working from home because Wachovia employees worked from home. Wells Fargo decided that their employees would work from home also.

Carr was issued a T460 Laptop for her work at home. The laptop required her to sign in with a login ID and password. Her work day was spent verifying a potential purchaser's eligibility to get a car loan by conducting credit reviews. These were non-stop deals that required decisions to be made in five minutes or less. She verified the potential purchaser's credit information and their debt-to-income ratio and then indicated whether the potential purchaser's loan should be approved or denied.

Carr had many user names and passwords for different systems. Carr confirmed her LexisNexis login ID as heathercarr1. Her login ID, heathercarr1, remained the same but she was required to change her LexisNexis password every six months. Carr used LexisNexis to verify a potential purchaser's employment history, social security number, date of birth, and/or driver's license information. Carr accessed LexisNexis from her own personally owned computer but she did not think she could access it outside of her home or on a mobile device. There were occasions when she conducted work business on her personally owned computer. This was usually done to verify someone's personal information, such as a Google search on someone. Ayanna Jones did not use or have access to LexisNexis.

From approximately 2006 through 2013, Carr put the Cox Communication's internet service in her daughter's name (Ayanna Jones). Carr did so because she had an outstanding internet bill of $300 dollars in Colorado and could not get internet service in Arizona until that was paid. Carr made the internet service payments to Cox Communications.

In approximately 2003, Carr became acquainted with Tramell Thomas through her step-brother, Matthew Sanders. Carr did not know her parents very well and wanted to learn more about her family. She and Sanders wrote each other while he was in prison in Colorado. Sanders told Carr that Thomas, who was also in prison in Colorado, looked out for him. Carr began exchanging letters with Thomas until his release from prison in approximately 2009. Carr met up with Thomas after he was released from prison. She wanted to thank him for taking care of her "nerdy white-boy step-brother."

Thomas and Carr were together from approximately 2009 through 2012. In 2014, they had a brief reconciliation and travelled to San Diego when Carr won a free trip from work. Carr conceived her son on this trip. Their relationship ended after the trip. Carr and Thomas were never married.

Thomas and Carr have a very strained relationship. When Carr contacts Thomas, she usually puts the phone on speaker and lets him talk to their two children. Thomas does not call his children directly and he does not pay child support. She lets her daughter send him emoji's. In June 2015, Carr filed for child support and the state of Arizona has not served him with the paperwork. When the two of them do talk, it is never about the investigation. Even if they did talk about it, Thomas would lie. He lies so much it sickens Carr. Carr is not intimidated by Thomas.

Interview of Heather Carr, November 3, 2016          12-080234

In approximately 2010, while on parole in Colorado, Thomas and his acquaintances applied for student loans for themselves. Thomas would take individuals to PPCC and show them how to enroll in courses and apply for federal student aid (FSA). The following individuals voluntarily agreed to have Thomas assist them in applying for FSA to attend PPCC: Lola Thomas (Thomas' wife), Christine Duncan, Vanessa Lopez, Ismael Omar (Thomas' friend), and Michael Cox (Thomas' cousin). Cox legitimately went to PPCC and did well in school. Carr believed that Thomas was helping people go to school and he received a portion of their FSA for helping them enroll.

During this time period, Carr and Thomas would fly back and forth from Arizona to Colorado to visit each other.

Carr's friend, Marcy Green, was doing something similar to Thomas, in that Green would sign up people to receive FSA and she would take a portion of their FSA for assisting.

While at a barbeque, Carr was present when Green and Thomas were discussing how it was a hassle to convince people to sign up for school to get financial aid. They were discussing the need for a more elaborate way to get FSA funds. Green watched a show where a woman was sentenced to life in prison for burning her children. The three of them rationalized that using the identities of prison inmates was acceptable because inmates hurt other people. In the event these inmates were released, any student loans in their name could be forgiven because they could show they were in prison during the time period the loans were taken out. The three of them believed they were not hurting anyone and they would no longer need to split the FSA funds with the applicant. Using PPCC was Thomas' idea because he and his acquaintances already obtained FSA from there. The three of them were all in agreement. Diaz was not present at the barbeque.

Carr and Green met under unusual circumstances. Carr dated Green's ex-boyfriend, Roderick Smith. Although the two have had a tumultuous friendship, she helped Green when she was going through a rough period. In approximately 2007, Smith beat up Green and knocked out her tooth. Carr took care of her three sons during this time.

Carr stated Green minimized her involvement when speaking to investigators in November 2012. During the timeframe of the interview, Green was facing marijuana charges. It was a complete lie when Green told investigators that Carr hung out at Green's residence. Green used computers at both of Carr's residences at 1351 Pleasant and 1822 E. Kaibab in facilitating the scheme to obtain FSA in the names of inmates. Debit cards mailed to Green's house were mailed there at Green's direction, not because Carr asked Green to use her address. Carr never paid Green any money for the receipt of debit cards and/or use of Green's address. Carr did not need to pay Green because Green, herself, was getting FSA funds from the debit cards in inmate's names.

Carr did not care to hang out at Green's house because she is involved in drugs and prostitution. Carr and Green do not hang out with the same people. There were possibly the following three occasions when Carr went to Green's house: to pick up one of Green's sons, to help hang pictures, and to attend a barbeque. Green would come to Carr's house because there was a better atmosphere there. Green resided in her Aunt Hazel's home and her uncle resided in a shed in the backyard. Green's aunt was like a mother to Green. Green did not want her Aunt Hazel hearing stuff that she was involved in.

Green came to Carr's residence while Carr was working from home. Carr typically worked five days a week from 9:00 a.m. until 8:00 p.m. Green used various computers at Carr's residence

12-080234

to look up names on various Department of Corrections websites (DOC). Green brought Carr the names and/or dates of birth obtained from DOC websites. With the information Green provided, Carr queried the information in the LexisNexis database and would obtain the information necessary to apply for FSA.

Seeing the number of queries conducted in LexisNexis in the discovery was shocking to Carr. Carr would ask Green to bring her additional inmate names because there were times when the queries conducted would not work, meaning they were unable to get student loans using those names. This was due to the inmate already having student loans and/or other credit issues. Both Green and Thomas conducted DOC inmate searches and had Carr obtain the social security number from LexisNexis. Carr further confirmed this because Green, who would be in another room, would often ask Carr to look at photos of the inmates, "hey, come look at this lady." Carr also queried inmate names on various DOC websites, usually to verify a date of birth.

There was not any particular reason why they chose the various inmate names. Although, they did think the mailman would be more likely to deliver a name that was the same as the person who already occupied the residence. For example, the last name Grant was the same as the person, Michelle Grant, who occupied the residence on Lexington.

Prior to 2012, Carr does not know how Thomas obtained names or if he visited DOC websites to obtain information because he was residing in Colorado at the time. She believes he was mainly signing up people he knew in Colorado.

Prior to 2012, Green asked Carr to obtain a lot of inmate identifiers through LexisNexis. Green was responsible for getting the scheme to work. Green, who was also attending school and familiar with the FSA process, submitted the majority of the FAFSA's. Carr submitted approximately ten FAFSA's in the names of inmates.

Green conducted DOC searches, submitted FAFSA's, and electronic school enrollment applications on her own laptop, and on laptops and computers located in each of Carr's residences, often times when she sat outside and smoked. Carr's wireless internet was used during the DOC searches and electronic FAFSA and school application submissions. Diaz was also present and would assist in the various processes done to receive FSA in the names of inmates. Carr's daughter, Ayanna, was present and saw what was going on but she was usually playing. Ayanna was not involved.

Diaz was legitimately enrolled and attending college during this timeframe. Green, who was not employed, was also enrolled and attending college at Gateway Community College, where she eventually received her degree in criminal justice.

After 2012, when Thomas moved in with Carr in Arizona, things got weird between Carr and Green. Green began doing more of the student loans on her own. Carr did not submit near the amount that was submitted by Green. Green wanted to do it herself because she said Carr kept messing up.

After the search warrant in 2012, Carr and Green ceased communicating with one another for a long period of time. Carr has her own business where she creates caricature shirts. The last time she spoke with Green was almost a year ago when she created a shirt for one of Green's sons.

Carr's friend, La Tania Pickens, allowed Thomas to use her rental property address at 1418 Rushmore Drive in Colorado Springs for his parole address. Thomas has a way of getting

Interview of Heather Carr, November 3, 2016                                      12-080234

people to do stuff for him. Pickens resided at 1418 Rushmore at various times but Carr could not recall the exact dates. Thomas briefly resided in Pickens garage at 1418 Rushmore. Thomas stayed at other places and also resided at an apartment on 3820 Radiant Drive in Colorado Springs, Colorado.

Pickens was not aware this address was being used for the mailing of debit cards in the names of prison inmates. The mailbox was located at the end of the street. Carr and Thomas would drive-by and pick up student inmate mail from the mailbox. The mailman delivered any and all names to this address.

There was a period of two to three days when Carr knew the Higher One debit card would be delivered. Once the school application was accepted, the student received an email letting them know that a green Higher One envelope would be arriving in the mail. This envelope contained the debit card.

Carr was aware of inmate Robert Pickens. Carr conducted the DOC query in the name Pickens and chose this name because she wanted to make sure the card was delivered to the mail box. Carr thought this card was initially rejected or returned by the postal service.

Prior to moving to Arizona, Carr resided at 2441 Lexington Village Lane, Colorado Springs, Colorado. Her friend, Michelle Grant (aka Michaela) resided at 2372 Lexington Village Lane, Colorado Springs, Colorado. Carr asked Grant to help forward her mail to Arizona. Carr still had the key to her old mailbox.

The postal service would only deliver the last name Grant so they had to use inmates with the last name of Grant at this address. Grant never checked her mailbox. The mailboxes were located in a central area and the backside of the boxes could be removed. Carr, Diaz, Green, and/or Thomas removed the back side of the mailbox on their trips to Colorado and obtained the mail in the inmates' names.

During the 2010 timeframe and prior to Thomas' arrest, Thomas asked Carr to query social security numbers and he would assist in the retrieval of student mail. Carr does not know if he knew how to complete and submit an electronic FAFSA. Both Thomas and Sanders resided at 3820 Radiant Drive, Colorado Springs, Colorado. Carr saw Sanders' signature in the notarized documents provided to PPCC.

Green obtained her own addresses to use. Carr confirmed the Blackhawk address was her step-brother, Matthew Sander's residence. Diaz was responsible for opening private post office boxes and using the Dragoon and 724 W. Knox Court addresses. The Pleasant or Kaibab addresses were never used to receive any school or Higher One information.

People were directed to send the school mail or Higher One debit card to Carr's private mail box address at 975 E. Riggs Road in Chandler, Arizona. Thomas directed Kimmisha Mullett to send debit cards that she received to the private mail box address. Carr does not know about the Oakland Street address in Aurora, Colorado.

Mullett and Thomas had a business together. The business was called 911 Design and Printing. Carr had nothing to do with the business and never met Mullett. Carr later said she may have met Mullett on one or two occasions. Mullett and Thomas shared text messages between each other about where to send the Higher One mail because Mullett's address was used to receive student loan mail in the names of inmates.

Interview of Heather Carr, November 3, 2016

12-080234

Michael Cox, Thomas' cousin, resided at the Rice Drive address in Colorado Springs, Colorado. Carr hates Cox and does not speak to him. Carr believes Thomas and Cox talked about the scheme with each other.

Carr was not aware that Arizona addresses were being used to apply for FSA to attend school at PPCC. It was her understanding that this could not be done and that is why they used the mailing addresses in Colorado. In seeing the discovery, the Arizona addresses were new to Carr.

Once the Higher One cards were forwarded to Arizona, Diaz and Green would get people they knew to drive around and withdraw money from the debit cards at various ATM locations until all of the funds were withdrawn from the debit cards. Initially, they did it themselves but it became exhausting because there was a daily withdrawal limit on the debit cards. Diaz and Green would get half of whatever amount was on the debit card.

The cards were used primarily to withdraw funds but there were occasions when the cards were used for purchases. When a purchase was made, they requested additional cash back on the transaction. Thomas and Carr were also involved in withdrawing funds from the debit cards at various ATM and store locations. The bulk of the funds were split between Carr, Diaz, Green, and Thomas. A fee of usually $10 was paid to the "meth-heads" that drove around to the various ATM machines.

Thomas did not reside in Arizona until approximately February 2012. Thomas visited the 1351 Pleasant address on his trips to Arizona but he never resided there. In 2012, Carr moved from the 1351 Pleasant address to 1822 E. Kaibab. Carr and her children resided at the 1822 E. Kaibab address for approximately two weeks prior to Thomas coming to Arizona and moving in with them.

During Thomas' incarceration between approximately January 2011 through November 2011, Thomas was aware of the scheme. Carr and Thomas' conversations about the scheme were limited due to the possibility of his jail calls being recorded. Carr used FSA funds obtained in the names of inmates to pay for Thomas' legal fees. Approximately $10,000 in FSA funds were used to pay for Thomas' attorney. Carr also deposited FSA funds into Thomas' inmate trust account (commissary). It would be a fair assessment that Carr submitted more than ten FAFSA's, considering this money was used to pay for Thomas' attorney fees.

In discussing the Tempe Police car stop, Thomas admitted to Carr that he was seeing another girl. The girl threatened to call Carr at 1:00 a.m. and tell her about Thomas' cheating. The girl had the debit cards and laptop at her house so Thomas went to the girl's house to retrieve these items. On his way home from the girl's house, Thomas was pulled over with the laptop and debit cards. Thomas was driving a vehicle registered to Carr. Thomas used the vehicle, not Carr.

Carr could not find a logical reason why he would still have cards from a long time ago. Higher One mailed the debit cards prior to the disbursement of any FSA funds. In seeing the discovery, Carr noted that some of the cards were never activated. Carr does not understand why someone would have kept a card that was not activated. Green kept the majority of the debit cards and she owned a pink laptop at one time. Carr wondered if that is why her relationship with Green became awkward, because Green and Thomas were messing around with each other.

The four of them took part in filling out the various loan documents for the schools. Diaz was primarily responsible for taking these student loan records to various locations where they could

be faxed to the school, such as the FedEx location. They also had the "meth-head people" assist with this. There were times with Green personally hand delivered the documents to the school.

The four of them took part in the electronic submission of school enrollment applications in the names of various inmates.

Carr has no idea how school loan records were faxed to PPCC from a Wells Fargo location. Carr has never worked in a Wells Fargo branch building. She either worked from home or at a leased building while employed with Wells Fargo.

The social security number searches in LexisNexis were only done by Carr.

Prior to 2012, Carr personally saw Diaz and Green fill out documents but she never personally saw Thomas submit FAFSA's or fill out loan records for the school. She would be able to verify his handwriting if shown documents.

In 2012, Thomas wanted more money when he was released. When Thomas resided with Carr in 2012, he submitted FAFSA's and did coursework to ensure FSA funds were released. Carr recalled him saying he had a psychology paper due. The four of them knew they had to show attendance in order for funds to be released. Thomas was also involved in the submission of handwritten loan records to the school and the withdrawing of FSA funds from ATM locations. Carr knew he did this but she was never with him when he did it. Carr admitted that Thomas was involved.

Carr worked all day and did not have a lot of time to spend on the scheme. They all communicated amongst each other about coursework and the four of them took part in logging in to record attendance. Carr volunteered to do coursework that she was interested in. Specifically, Carr recalls Green complaining about having four essays due. One was a psychology assignment about Freud. Carr volunteered to complete that assignment.

The four of them enrolled in courses that interested them. Green, having a degree in criminal justice, chose a lot of criminal justice courses.

At this point during the meeting, Carr was provided a copy of the search warrant sketch. Carr annotated what the various rooms identified in the sketch were (Attachment A).

The day the search warrant was executed, Carr was asleep on the couch. At first, Carr thought her daughter, who was getting ready for school, was playing her music too loud. Carr knew that law enforcement was outside because they were shining lights on the house. Initially, Carr was not sure if law enforcement was trying to come in their house. A canine cop resided across the street from them. Carr went to brush her teeth and put on makeup, knowing she would need to go outside. She went upstairs to look out the window and flash bang devices were heard in the backyard.

During this timeframe, she went to her office where she had a notebook with information related to the inmates' school information written down. Rather than shedding the records in the shredder she had in her office, she tore the pieces and flushed them down the toilet in the master bathroom. She did this because she envisioned agents spending hours piecing together the shredded records. She flushed approximately three pages of information.

The information contained in the notebook was for organizational purposes. It was a checklist used to keep track of the status of FAFSA's, school applications, and homework. Sometime

Interview of Heather Carr, November 3, 2016                                          12-080234

during all of this Thomas came up the stairs. She does not know what he was doing during this timeframe.

Carr does not know why Thomas broke his cell phone. It was an old phone that he was not using. Thomas was downstairs for a portion of the time that Carr was upstairs. Thomas later told Carr that he broke the phone because he did not want Carr to find out about other "bitches."

Initially, Carr did not manage the organization of the inmates' school information. She just started doing that right before the search warrant was executed, once the school's fall semester started.

After Thomas's arrest and the search warrant, Carr and Green became distant. Carr assumed Green was jealous of Carr's relationship with Thomas and the lifestyle they were living. Carr wondered if Green and Thomas were having an affair. Carr thinks Green kept the debit cards and that the pink laptop belonged to Green.

At the time of Thomas' arrest, Thomas told Tempe PD arresting officers that marijuana located in the vehicle belonged to Carr's daughter, Ayanna. When told this, Carr responded that Ayanna did not use marijuana but Thomas did. Marijuana was never used in front of the children. Green used marijuana.

Carr related the following in reviewing photos taken during the search warrant and photos obtained from seized computers (Attachment B):

SW_00001436:   The photo was 1822 E. Kaibab.

SW_00000218:   Carr purchased the mural located in the master bedroom. She got the idea from a Jay-Z song.

SW_00000214:   The ACER laptop in the photo was her daughter's Milani. The iPad tablet was her other daughter's Kaira. Green always lost stuff, including her computers. Green used the ACER laptop and other computer devices at Carr's residence. The ACER laptop was used to activate inmate debit cards, including Higher One debit cards. There was the probability that any one of the four of them (Carr, Diaz, Green, and Thomas) could have used the ACER laptop to do this.

SW_00000216:   This was a photo of Thomas' office and his computer.

SW_00000217:   The photo was a close-up of the computer in Thomas' office. Carr did not use this computer because Thomas would not give her the password. The computer's profile login ID was King.

SW_00000223:   Carr confirmed these were the torn notes she tried flushing down the toilet.

SW_00000219:   The broken phone was Thomas' old phone located in his portion of the master bedroom closet. Thomas had a box of miscellaneous items he brought with him when he moved from Colorado. There were other old phones in the box.

SW_00000220:   Carr confirmed the close-up photo of the broken phone was Thomas'.

Interview of Heather Carr, November 3, 2016                                    12-080234

SW_00000244:    The disks in the photo were from Thomas' dismissed case. Carr did not
                know who the phone in the photo belonged to. The photo was taken in
                the master bedroom vanity area.

SW_00000233:    The phone in the photo was Carr's work phone. The photo was taken in
                one of the restrooms.

SW_00000230:    The iPad and iPod in the photo belonged to Carr's daughter, Ayanna.

SW_00000231:    Carr did not know who the phone in the photo belonged to. They had a lot
                of phones in the house that were no longer used. Carr confirmed the
                phone was located on a couch in Ayana's bedroom.

SW_00000232:    The laptop was her daughter's, Kaira.

SW_00000236:    The Kindle was located in one of the bedrooms and it belonged to one of
                Carr's daughters.

SW_00000237:    Carr did not know who the phone in the photo belonged to.

SW_00000234:    The laptop was her daughter's, Ayanna.

SW_00000226:    This was a photo of Carr's office, with her computer and her Wells Fargo
                work laptop.

SW_00000227:    This was a photo of Carr's computer in her office.

SW_00000246:    This was a close-up photo of Carr's computer in her office. Carr did not
                know the profile name created for this computer. This computer and the
                computer in Thomas' were the same brand and type of computer.

SW_00000228:    This was a close-up phot of Carr's Wells Fargo work laptop.

SW_00000238:    This was an iPad and BlackBerry located in Carr's vehicle. She did not
                know who they belonged to. They had so many Apple devices and
                phones in the residence. To say that they all used them is a fair
                statement.

SW_00000245:    This was a photo of Carr's step-brother, Matthew Sanders and Thomas.

SW_00000205-213: These were photos of Heather Carr's gun. Carr has always owned a
                gun because she was a victim of a home invasion. The gun was
                registered in her name. She used to go to "ladies night" at the shooting
                range. Thomas never went to the ranges with her and he did not access
                the gun.

Following Thomas's arrest with the debit cards and laptop, Carr was troubled enough to get rid
of an old computer of hers. The computer was one she had while residing at the 1351 Pleasant
address. She destroyed the laptop and threw it away in a dumpster. Carr was concerned
because Thomas used the 1351 Pleasant address for his parole in Arizona.

Interview of Heather Carr, November 3, 2016                                    12-080234

The four of them continued to apply for FSA in the names of inmates following Thomas' arrest. Thomas minimized the arrest and did not make a big deal of it.

The night of the search warrant, Carr went to Green's house to discuss what happened. Green was very dismissive and did not want to discuss what happened. She did mention that people came to her house to talk to her. She told Carr that these people took her kids to school while she was interviewed. She did not want to talk about any details of the interview. Green did not want her Aunt Hazel to find out what happened. Green tried cutting ties with Carr after the search warrant. Approximately a year after the search warrant, Green tried to be friends with Carr. During this timeframe, Carr removed her Facebook profile for a while, and she and Green were Facebook friends.

Carr found out Diaz was arrested the day of the search warrant. Carr was trying to get a hold of Diaz after agents left her residence. She eventually went to Diaz's house. Diaz's roommate was upset because Diaz owed her money and she could not be located. After making a few phone calls, Carr learned Diaz was arrested.

Carr did not recall how some of the names and numbers ended up on her iPad contact list. In reviewing the discovery, she did not believe she had as many contacts as the iPad contact list indicated. She is not sure how iCloud works but she thinks a lot of those contacts are left over from items backed up to iCloud. For example, there was a contact she had in there from 2007, Akeimi. Akeimi is Green's friend. Carr cannot stand Akeimi because Carr claimed that Akeimi hates white people. The last time she spoke with Akeimi is when Green was arrested in Los Angeles, California.

Thomas told Carr to never get rid of Christine Duncan's, Vanessa Lopez', or Ismael Omar's social security numbers so she stored them in her iPad contact list. She does not know why Thomas wanted to keep this information.

Carr had Roderick Smith's social security number in her iPad because she was his power of attorney at one time. Carr did not know why she had Green's social security number stored in her iPad.

Carr does not know why Michael Cox's Chase credit card number was in her iPad contact list. She does not like him.

Carr never contacted the schools and pretended to be one of the students. She does not think anyone did that. They (Carr, Diaz, Green, and Thomas) made inmate queries on the DOC websites.

In reviewing SW_00001427, a document titled "Adams County Jail Population Sheet" that was located on Carr's computer, Carr did not know how this document was located on her computer. She is not familiar with Denver County jail websites, she only queried DOC websites. Carr assumed this was booking information that was pulled from an Adams County website. Thomas might have asked Carr to look up one of his friends that was recently released from jail. Carr could not recall his name. Carr is not aware of anyone using her computer. Thomas and Carr's computers were purchased approximately a week before the search warrant.

Carr met Terrell Smith once. He was a pimp and she did not know him.

Interview of Heather Carr, November 3, 2016                    12-080234

The screen shots from Chandler-Gilbert Community College were from Ayanna's husband. He was attending Chandler-Gilbert and did his course work while at their house. A review of the course login screenshot information shows that the courses listed had prerequisites. They did not enroll inmates in courses that had prerequisites.

Carr is not afraid of Thomas. She believes Thomas is capable of being intimidating because he protected her step-brother while he was in prison. Carr and Thomas never married. They were together from approximately 2009 through 2012 and again in 2014, when they went to San Diego but ended their relationship shortly after the trip.

After Carr left Arizona, Thomas moved his wife, Lola Thomas, down to Arizona.

Carr never met Christine Duncan. Duncan used Carr's identity when Duncan was arrested with Thomas at a hotel in 2011. A police report from January 2011 stated that Carr was present during the arrest. Duncan told law enforcement that she was Heather Carr. Duncan and Thomas commited robberies together.

Carr knew Duncan's name because Thomas told her about signing up Duncan up for school. He asked Carr to save Duncan's social security number. Carr knew they were arrested together and that the two committed robberies together. Duncan was a "meth head." Until seeing the discovery, Carr was not aware that Diaz and Green were involved with Duncan.

One time Carr saw Duncan in a car with Diaz at a gas station. That was the only time Carr saw Duncan. Carr recalled asking Diaz who was with her. Diaz told Carr she was a friend visiting from Colorado. Diaz did not give Carr a name. Carr did not get involved with Diaz's meth life.

Carr knew nothing about Vanessa Lopez. Thomas knew her.

Thomas was evasive about a lot of things. He was a whore who had a crafty way of telling stories. There was an overwhelming amount of stuff that he lied about. If it were not for their kids, she would tell him to "fuck off."

Currently, Carr runs her own business selling t-shirts and is an Uber driver. It is difficult to make ends meet. Carr texts Thomas asking him to send money and he responds by saying that he will see what he can do.

Carr confirmed the number tied to "Daddy" in her iPad contact list belonged to Thomas. Carr confirmed the "Rocketmail" email address belonged to Thomas.

At times, Thomas was a family person and they did things as a family. All four names of Carr's children are tattooed on Thomas. None of this is fair to the kids. Thomas has only seen his kids approximately ten times since 2012. He has been to see the kids in Virginia once. Thomas was there for the birth of their son, Tru. He has seen his son approximately three times. There is a whole other side to Thomas.

Carr confirmed the Blackhawk address in the scheme belonged to her step-brother, Matthew Sanders. Carr did not keep in touch with Sanders. She may have met him once while at the airport in Denver.

Interview of Heather Carr, November 3, 2016                    12-080234

Carr assumed Sanders knew about the scheme because debit cards were mailed to her private mail box on Riggs road. The cards arrived without the green envelope that they were originally sent in. There were a lot of cards coming from different addresses.

Carr did not know an address belonging to Sander's mother was used. Carr does not talk with Sander's mother. She knows her name is Sandy. Carr had nothing to do with the use of this address to obtain FSA.

Marcy Green used to have a pink laptop. Carr never used the laptop that was with Thomas the night that he was arrested.




## UNITED STATES DEPARTMENT OF EDUCATION
### OFFICE OF INSPECTOR GENERAL
### INVESTIGATION SERVICES

| | |
|---|---|
| **DATE INTERVIEWED:** | April 12, 2017 |
| **PERSON INTERVIEWED:** | Marcelle Green |
| **INTERVIEWED BY:** | Special Agent Sandra Ennis<br>Postal Inspector Sonia Hacker |
| **LOCATION:** | 111 W. Monroe Street<br>Phoenix, Arizona |
| **CASE NUMBER:** | 12-080234 |
| **CASE NAME:** | Pikes Peak Community College |

After being advised of the identities of the interviewing agents, Marcelle Green was advised of her rights. Upon learning of the purpose of the interview, Green voluntarily signed the attached Advice of Rights Waiver form and consented to the recording of the interview. Green voluntarily provided the following information:

In approximately November 2016, Trammel Thomas came to Green's uncle's home at 4630 S 21st in Phoenix, Arizona. Thomas was looking for Green and left his phone number with her uncle. Green never contacted him. She did not know what Thomas wanted to talk about after so much time had passed. Green's Uncle Elmer told her this information.

In approximately October 2016, Carr called Green about the discovery in the student loan fraud case. Carr wanted to know why Green snitched on her. Green told Carr the interviewing agents asked her questions and she answered them. Green got nervous because she realized information she told investigators was made public.

In 2012, Green was interviewed by investigating agents. Green never heard any more until approximately four or five years later when agents went to her auntie's house to serve Green with a letter. She met the agents at QT. Green was then served with another letter and again met the agents at Circle K.

Shortly after receipt of the second letter, Green's car was repossessed and she lost the letter that required her attendance in Colorado. She contacted the justice department and they could not locate her information.

Green realized that failing to respond to the target letters and trial subpoena did not look good.

The student loan fraud was Carr's idea. Green admitted to allowing the use of her address to receive debit cards. Green would throw away any other mail that did not have a debit card. Green was told to be on the lookout for various names. At the time, Green was enrolled in school and she has since graduated.

Carr was the person who had access to Accurint through her employment at Wells Fargo. Both Thomas and Carr were from Colorado and Green assumed that is how the two were able to use

---

Prepared by: Sandra Ennis

Date Prepared: April 25, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)

EXHIBIT
B

Page 1 of 3



# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES



**DATE INTERVIEWED:** August 29, 2017

**PERSON INTERVIEWED:** Marcelle Green

**ALSO PRESENT:** Jeralyn Merritt, Defense Attorney

**INTERVIEWED BY:** Martha Paluch, Assistant US Attorney
Bryan Fields, Assistant US Attorney
Sandra Ennis, ED-OIG Special Agent

**LOCATION:** U.S Attorney's Office
1801 California Street, 16th Floor Conference Room
Denver, Colorado 80202

**CASE NUMBER:** 12-080234

**CASE NAME:** Pikes Peak Community College Fraud Ring

After being advised of the nature and purpose of the interview and the identities of all present, Marcelle Green, voluntarily provided the following information, summarized as follows:

Green was born and raised in Phoenix, Arizona. Green attended high school in Sacramento, California, where she played volleyball. Green later moved back to Arizona and has resided there ever since.

Green received her associate's degree in liberal arts from Gateway College in Phoenix, Arizona. She wants to pursue her education in social work but Green has not had time because of her three sons. At some point, she wants to attend Arizona State University (ASU). Her oldest son (20) is currently enrolled in school to become a commercial pilot. Her middle son (17) is a senior in high school and plans to attend Northern Arizona University (NAU). Her youngest is 16 years old and is a junior in high school. Green is not married.

While enrolled at Gateway, Green obtained approximately $14,000 in federal student aid (FSA) in the form of loans. She received her student aid refund in the form of a prepaid debit card and confirmed the card was called Citi Prepaid.

Currently, Green resides at 4424 E. Baseline Road, #2072 in Phoenix, Arizona and is employed full time at Granger. Up until last week, she also worked the night shift at Alpha Connect. Prior to her recent employment with Granger, Green was employed at Alpha Connect for the last three years.

Green resided at 1915 E. Mobile Lane, Phoenix, Arizona, when she was in grade school. This house has been owned by her family since approximately 1940. Green's Uncle Jimmy Green resided at the residence. Her Uncle Jimmy is now deceased.

The 4630 S. 21st Place, Phoenix, Arizona, address is owned by her Aunt Hazel Green. Green's aunt did not reside at the address when Green was residing there with her three sons. Green's Uncle Elmer Green resided in the studio type structure that is located behind the house.

Prepared by: Sandra Ennis                                Date Prepared: August 29, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)

EXHIBIT
**C**

Page 1 of 9

Green's prior criminal history includes a felony theft charge in 2000, a felony robbery charge in Los Angeles, California in 2007, and a felony marijuana possession charge in 2010.

Approximately 11 years ago, Green met Heather Carr through Green's son's father, Roderick Smith. Smith is her son's father and Carr was dating Smith. Green was no longer involved with Smith so she had no issue with Carr dating Smith. Carr and Green met and became friends when Smith went to jail and Carr called Green. The two became close and Green's son went to Carr's house a lot.

Green met Trammel Thomas when Thomas moved to Arizona to live with Carr. Carr was still residing at the 1351 Pleasant address in Chandler, Arizona. Thomas was out on parole and received permission to serve out the remainder of his sentence in Arizona. Green met Thomas while Thomas and Carr were residing at the Pleasant address.

Green met Mercedes Diaz through Carr. Carr was a mother figure to Diaz. Diaz kept getting into trouble in Colorado and moved to Arizona because of Carr. Carr, Diaz, and Thomas had all lived in Colorado prior to living in Arizona.

The student aid fraud scheme and using the identities of inmates was Carr's idea. Carr had the ability to obtain the personally identifiable information (PII) of inmates through a system that Carr had access to at her work.

Carr and Green discussed how the scheme would work. Carr initially brain stormed the idea and presented it to Green. Green agreed with Carr and told her, "Yeah, I think we could make this work." The idea was brought up when the two of them were discussing how to make money. Green was struggling financially with her three sons. Green often spent time at Carr's address. Carr's and Green's kids were close and the two families spent the holidays together. Green believes the initial conversation occurred at Carr's house during a barbeque for the Easter holiday.

In discussing the scheme, it was Carr's idea to use inmate's identities to apply for FSA. Since Carr, Diaz, and Green had all received financial aid, they knew how the FSA application process worked.

Green did not know what conversations regarding the scheme Carr had with Thomas while in Colorado. Green knew Thomas had knowledge about the scheme while in Colorado because Carr told Green this.

The rationale behind using inmate identities was because the inmate could prove they were in prison and therefore would not have any liability for paying back the FSA. There was never a story or idea to use inmate identities because they were bad people or because of a story on TV. Being a felon herself, Green does not judge or hold anything against felons.

Prior to using inmate identities, Green previously assisted in signing up her ex-boyfriend, Jesse Rowsely. Rowsely gave Green money for her assistance. Green also provided assistance to her cousin by telling her what steps were required to obtain FSA.

Green did not recall a conversation with Carr or Thomas about how it was a pain to enlist individuals in signing up for FSA and sharing in the FSA funds.

Green and Carr discussed how to submit a certain amount of applications in order to get money. Green had three kids and was in school herself so she needed the money. Green was all for

12-080234

trying to see if the scheme would work. Thomas was not mentioned in these initial conversations because he was in jail or prison during that time.

The consequence of enlisting a regular person was that the regular person would realize they were a victim sooner than an inmate might, unless an inmate's family checks the inmate's credit history. Using an inmate's identity was still wrong.

Green was aware of the following individuals being involved in the scheme, either by helping or allowing the use of their address for the FSA application and school enrollment process: Heather Carr, Trammel Thomas, Michelle Grant, Christine Duncan, Mercedes Diaz, and Matthew Sanders. Matthew Sanders was the step-brother of Carr and Grant was Carr's longtime friend. Green saw photos of other individuals who were involved but Green did not know their names.

Carr, Diaz, Green, and Thomas all conducted searches of inmate names on department of corrections websites at the Pleasant address. At times, everyone was present and hanging out when these searches were being conducted.

Carr told Green that Thomas also obtained identities from people he knew from being in prison. Thomas provided this information to Carr. Carr used her ability to search information through her access to a system at her work.

There were also times when Carr provided Green with a list of inmate names and identifying information that was already ran by Carr. With the list, Green started the FSA process by submitting a Free Application for Federal Student Aid (FAFSA).

Green did not have a lot of discussions about the scheme with Diaz and Thomas. Grant and Sanders were not Green's friends so she did not know the details of their involvement.

Carr also told Green that Thomas took Duncan to Pikes Peak Community College (PPCC). Green also heard this information in conversations she had with Duncan. The last time Green spoke with Duncan was when Duncan was stranded at a Motel 6 on 44th and Baseline. Green's understanding was that Duncan followed Thomas to Phoenix.

Carr told Green that Thomas was in jail twice before and went back to jail again prior to moving to Arizona.

In conducting department of corrections website searches they were able to obtain an inmate name and date of birth. With a name and date of birth, Carr obtained a social security number from her access through her job at Wells Fargo. Carr also worked at CarMax and was able to continue to pull up personally identifiable information for school applications.

Inmate names were pulled up randomly on department of corrections websites. They did look at inmates serving longer sentences so that the chances of the inmate becoming aware of student loans in their name were less likely.

Carr gave Green a black HP laptop and Green had a black desktop computer at her residence at 4630 S. 21st Place. Green faxed documents to the community colleges from the Mail & Cell location in Arizona.

Green took part in filling out FAFSA's. Filling out FAFSA's using inmate identities was very easy because they submitted the inmate information as an independent student. This did not require

Interview of Marcelle Green, August 29, 2017                                    12-080234

Carr told Green that Thomas and Sanders became close while the two were in prison together
and that Sanders provided an address to be used in the scheme.

In October or November 2016, after Carr, Diaz, and Thomas were charged, Carr reached out to
Green through Facebook after turning herself in. Carr wanted to know why Green snitched on
her. Carr told Green that she should have remained quiet and not said anything. Carr told Green
that she cannot be helped if she perjures herself. Also during this timeframe, Green's Uncle
Elmer told Green that Thomas showed up looking for her at Aunt Hazel's house on 4630 S 21st
Place. Her uncle described Thomas as tall and dark and said he left his name. The individual
left his phone number with her Uncle Elmer, requesting that Green contact him. Green can
check to see if her uncle still has the phone number. Green will also look through her belongings
to see if she has Thomas' number. Green does not have contact information for Thomas in her
phone.

Green has been contacted by Carr on three occasions. Once after Carr was charged, when she
contacted Green through Facebook, the second time was after Carr saw Green's written
statement to interviewing agents, and the third time was after Carr had seen all of the discovery.
Carr told Green that she was upset because she thought the two were best friends.

Green met Duncan through Carr. Duncan was brought to Arizona because she was involved in
one of Thomas' arrest. They did not want Duncan to be called as a witness to testify against
Thomas. Thomas and Duncan had a relationship. Duncan began taking escorting calls as soon
as she moved to Arizona. Green assumed she was doing the same thing in Colorado and
seemed comfortable hopping into it. Duncan eventually ran off with one of her escorting clients.
Duncan escorted for a couple of months while in Arizona.

Carr impersonated Thomas' sister and brought Duncan to Arizona because the police were
looking for Duncan. Carr posted online escorting advertisements for Duncan and Diaz and
Green took Duncan to the escorting calls. Duncan was provided with a throw-away phone so
that Duncan was available for calls. Carr told Green to give Duncan money for food and take the
rest of the money and bring it to Carr. Green was allowed to take money from the escorting calls
for gas and Duncan's toiletries.

Green did not meet Michelle Grant. She was Carr's best friend from Colorado Springs,
Colorado. Green possibly saw a photo of Grant on Facebook through her Facebook friendship
with Carr. Green thought Grant allowed Carr to use her address for the receipt of school records
and debit cards.

Sanders also provided an address or addresses for the receipt of school records and debit
cards. Green has never heard of the following names: Vanessa Lopez, Terrell Smith (aka
Swiss), La Tania Pickens, Lola Thomas, the name of Matthew Sander's mother, or Michael Cox.
Green thought the name Kimmisha Mullet sounded familiar. Green heard that Thomas had been
married and thought the name Lola Thomas sounded familiar.

Thomas was involved in looking up inmates and received money from the debit cards from Carr.
Carr told Green this information. Green was also present during the trial run hang out where
Carr and Green helped show Thomas how to fill out FAFSA's at this trial run meeting.

Green heard from both Carr and Duncan that Thomas took Duncan to PPCC.

While Thomas was in jail, Carr paid Thomas' attorney's fees and put money on Thomas' inmate
account. Green knew this from conversations with Carr.

1

<pre>
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF COLORADO

 3   Criminal Action No. 16-cr-0054-WJM-3

 4   UNITED STATES OF AMERICA,

 5   Plaintiff,

 6   vs.

 7   MERCEDES DIAZ,

 8   Defendant.

 9   ------------------------------------------------------------

10                    REPORTER'S TRANSCRIPT
                         (Sentencing)
11
     ------------------------------------------------------------
12

13       Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14   Judge, United States District Court for the District of

15   Colorado, commencing at 10:33 a.m., on the 12th day of

16   January, 2018, in Courtroom A801, United States Courthouse,

17   Denver, Colorado.

18
                            APPEARANCES
19
         MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
20   Attorneys, 1801 California Street, Suite 1600, Denver,
     Colorado 80202, appearing for the plaintiff.
21
         SIDDHARTHA H. RATHOD, Rathod Mohamedbhai, LLC, 2701
22   Lawrence Street, Suite 100, Denver, Colorado 80205,
     appearing for the defendant.
23
                 MARY J. GEORGE, FCRR, CRR, RMR
24             901 19th Street, Denver, Colorado 80294
             Proceedings Reported by Mechanical Stenography
25               Transcription Produced via Computer
</pre>



EXHIBIT
D

2

```
 1              P R O C E E D I N G S
 2        (Call to order of the court at 10:33 a.m.)
 3        THE COURT:  We're on the record in criminal case
 4   No. 16 cr 054, defendant No. 3, United States of America
 5   versus Mercedes Diaz.  I'll take appearances of counsel.
 6        MS. PALUCH:  Good afternoon, Your Honor, Martha
 7   Paluch appearing on behalf of the United States.  With me
 8   at counsel table is Special Agent Sandra Ennis.
 9        SPECIAL AGENT ENNIS:  Good morning, Your Honor.
10        THE COURT:  Good morning to the two of you.  For
11   the defendant.
12        MR. RATHOD:  Good morning, Your Honor, Siddhartha
13   Rathod, appearing on behalf of Ms. Diaz, who's here to my
14   left.  Also appearing at counsel table today is Nicholas
15   Lutz, another attorney in our office who's not entered on
16   the case, who's just assisting me.
17        THE COURT:  That's fine.  All right.  Welcome to
18   the three of you.
19        Will the probation officer please identify herself
20   for the record.
21        PROBATION OFFICER:  Good morning, Your Honor.
22   Kyla Hamilton with probation.
23        THE COURT:  Good morning, Ms. Hamilton.  Welcome.
24        All right.  Mr. Rathod, will you and your client
25   please approach the lectern.
```

Case No. 1:16-cr-00054-WJM  Document 535-3  filed 12/12/19  USDC Colorado  pg 666 of
Case 1:16-cr-00054-WJM  Document 353  Filed 03/29/18  Page 20 of 409
971

3

1          Ms. Hansen, will you please administer the oath to

2     the defendant.

3          COURTROOM DEPUTY:  Please raise your right hand.

4       (Defendant sworn in)

5          THE COURT:  All right.  The record reflects that

6     way back on the 7th of October of 2016, Ms. Diaz entered a

7     plea of guilty to and she was convicted of Count 1 of the

8     indictment, charging a conspiracy to defraud the Government

9     with respect to claims in violation of 18 United States

10    Code Section 286.  In addition, at her change of plea

11    hearing, the defendant also admitted the forfeiture

12    allegation in the indictment.

13         We are here for the sentencing of the defendant.

14    Since we have three motions respecting the length of the

15    sentence that I'll take considerable argument on, for now,

16    I just need counsel to very briefly summarize their

17    respective sentencing recommendations.

18         MR. RATHOD:  Your Honor, briefly.  The AUSA and I

19    both agreed, and I think there's a motion filed much more

20    significantly.  At the time of the plea agreement, Ms. Diaz

21    was an addict.  She had a positive UA within a period of

22    time -- in time to within 24 hours or 48 hours of her plea

23    agreement.

24         The Government has asked that Ms. Diaz reaffirm

25    her guilty plea and we are in agreement with that as well.

1    History Category to be 6, which yields an advisory

2    guideline sentencing range of 92 to 115 months, a period of

3    supervised release of one to three years, a fine range of

4    10,000 to $100,000, and a special assessment of $100.

5         Does counsel agree the Court has correctly

6    calculated the guideline sentencing range in this case

7    before the application of any departure or variance?

8         MS. PALUCH:  Correct, Your Honor.

9         THE COURT:  Okay.

10        MR. RATHOD:  Yes, Your Honor.

11        THE COURT:  All right.  Thank you, counsel.

12        All right.  The -- I'll next take up the

13   Government's motion for a downward departure for

14   substantial assistance, ECF 261.  Ms. Paluch, anything you

15   wish to add to your written submission?

16        MS. PALUCH:  No, Your Honor.

17        THE COURT:  All right.  Mr. Rathod, do you wish to

18   be heard on this?

19        MR. RATHOD:  Not on the Government's --

20        THE COURT:  Okay.  For the reasons set forth in

21   the motion, I grant the Government's motion for a downward

22   departure.  I expressly find that the statutory purposes of

23   sentencing are best served by the imposition of a reduced

24   custodial sentence pursuant to Section 5K1.1 of the

25   guidelines.  Specifically, I find that Ms. Diaz has

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/19 USDC Colorado pg 668 of 971
Case 1:16-cr-00054-WJM Document 353 Filed 03/29/18 Page 22 of 40

12

1   provided truthful and credible information as to her

2   involvement with this offense and the involvement of

3   others, the defendant's information was significant and

4   helpful to the Government's ongoing investigations and

5   prosecutions of criminal activities within the District of

6   Colorado and elsewhere.  More specifically, it was Ms.

7   Diaz's cooperation with the prosecution and law enforcement

8   which provided the Government with the grounds and evidence

9   it needed in order to charge codefendant Marcelle Green in

10  this case.

11          As a result of granting the Government's motion,

12  subject to my ruling on the defendant's motion for

13  departure and the defendant's motion for a variant

14  sentence, I will sentence the defendant to a range centered

15  on the Government's requested departure of 35 percent off

16  the bottom of the guideline sentencing range, which is

17  approximately 16 months.

18          All right.  At this time, I'll take up that

19  portion of the defendant's motion at ECF 255 which seeks a

20  departure based on the grounds that her criminal history

21  category of VI substantially overrepresents the seriousness

22  of her criminal history pursuant to guideline Section

23  4A1.3(b).  Mr. Rathod.

24          MR. RATHOD:  Thank you, Your Honor.  I'm familiar

25  with the Court's practices and so I'm not going to rehash

36

1          THE COURT:  All right, but you haven't answered my
2    question --
3          MS. PALUCH:  Exactly right.
4          THE COURT:  Maybe I keep interrupting and
5    preventing you from answering my own question, which is:
6    How does the Government view the relative culpability of
7    the four defendants?
8          MS. PALUCH:  Right.  And I have a difficult time
9    answering that because it's our view that with -- that they
10   all four made it happen, all four of them made it happen.
11   I think an argument could be made that Carr is the most
12   culpable because of her access to that database.
13         THE COURT:  Could be made or should be?  I mean,
14   clearly the Government doesn't view Ms. Diaz as undertaking
15   a role as significant and major and culpable as Ms. Carr.
16         MS. PALUCH:  We do not, Your Honor.  And that's --
17   as you saw in the plea agreement, we agreed with the
18   two-level reduction for minor role in the offense.  So
19   clearly if you were to rank the four, I would say Ms. Diaz
20   is No. 4.  I think Ms. Green was much more involved than
21   Ms. Diaz.  And Mr. Thomas, our view, is that he has a
22   history of manipulating women and these three women we
23   believe were manipulated and that he benefited, but that
24   the other women probably did more of the work, did have
25   evidence --

Case 1:16-cr-00054-WJM Document 353 Filed 03/29/18 Page 24 of 409

37

1          THE COURT:  I thought your theory was Ms. Diaz was

2     manipulated by Ms. Carr, not by Mr. Thomas.

3          MS. PALUCH:  That's correct.  That's correct, Your

4     Honor.  I stand corrected.  I don't -- we don't have

5     evidence of Mr. Thomas' direct involvement with Ms. Diaz.

6     But I do think Mr. Thomas benefited just as much as anyone

7     else in this scheme and there is information that he was at

8     the computer doing the work that he did.

9          So I don't know that I'm answering your question.

10    I guess I would put Ms. Carr at the top, I would put Ms.

11    Diaz as No. 4, Mr. Thomas and Ms. Green in the middle.  I

12    hope I've answered your question --

13         THE COURT:  Yes, you have.  Thank you.

14         MS. PALUCH:  For those reasons we are seeking a

15    sentence, as we've stated at the beginning of this

16    hearing.

17         THE COURT:  So 34 months incarceration?

18         MS. PALUCH:  33 -- 33 months, Your Honor.

19         THE COURT:  Oh, 33.  Okay.

20         MS. PALUCH:  Yes.

21         THE COURT:  Thank you.

22         MS. PALUCH:  Thank you.

23         THE COURT:  Mr. Rathod, it's your motion, I'll

24    give you an opportunity for a brief reply.

25         Ms. Diaz, you can remain seated.

Attachment 3

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLORADO

3    Criminal Action No. 16-cr-0054-WJM-2

4    UNITED STATES OF AMERICA,

5    Plaintiff,

6    vs.

7    TRAMMEL THOMAS,

8    Defendant.

9    ------------------------------------------------------------

10                    REPORTER'S PARTIAL TRANSCRIPT
                        (Jury Trial - Day 2)
11                   TESTIMONY OF MARCELLE GREEN

12   ------------------------------------------------------------

13        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
     Judge, United States District Court for the District of
14   Colorado, commencing at 3:29 p.m., on the 28th day of
     November, 2017, in Courtroom A801, United States
15   Courthouse, Denver, Colorado.

16

17                         APPEARANCES

18        MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
     Attorneys, 1801 California Street, Suite 1600, Denver,
19   Colorado 80202, appearing for the plaintiff.

20        DANIEL T. SMITH, Attorney at Law, 4582 South Ulster
     Street, Suite 1400, Denver, Colorado 80237 and
21        THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
     Suite 1400, Denver, Colorado 80202, appearing for the
22   defendant.

23             MARY J. GEORGE, FCRR, CRR, RMR
                901 19th Street, Denver, Colorado 80294
24          Proceedings Reported by Mechanical Stenography
                  Transcription Produced via Computer

25



EXHIBIT
E

2

```
 1              P R O C E E D I N G S
 2        (In open court in the presence of the jury at 3:29
 3   p.m.)
 4        THE COURT:  Thank you very much for your patience,
 5   ladies and gentlemen of the jury.  As I mentioned to you on
 6   the first day that there would be these kind of pauses, but
 7   we ask for your indulgence and your patience given the
 8   importance of what we're dealing with here.
 9        Let me just mention to you the next witness is
10   going to be a codefendant in this case who has pled guilty,
11   is not going to trial.  She has her lawyer here present,
12   Ms. Jeralyn Merritt, at the back table there, and she's --
13   Ms. Merritt is here because the law allows individuals in
14   Ms. Green, the next witness' situation, to have counsel
15   present in the courtroom to make any appropriate objections
16   that counsel sees fit.
17        All right.  The Government may call its next
18   witness.
19        MR. FIELDS:  Thank you, Your Honor.  We call
20   Marcelle Green to the stand.
21        THE COURT:  All right.
22        COURTROOM DEPUTY:  Right here, ma'am.  Just please
23   stand in the box and raise your right hand.
24        MARCELLE GREEN, GOVERNMENT'S WITNESS, SWORN
25        COURTROOM DEPUTY:  Please be seated.  Scoot your
```

Direct - Green

1    chair up.  Put your elbows right on the stand so that we

2    can -- put your mouth right there.

3         Please state your full name for the record and

4    spell your first and last name.

5         THE WITNESS:  Marcelle Ruby Green,

6    M-a-r-c-e-l-l-e, G-r-e-e-n.

7         THE COURT:  You may proceed, counsel.

8         MR. FIELDS:  Thank you, Your Honor.

9         Before we get into it, at this point I would move

10   into evidence Government's Exhibit 32, which has been

11   stipulated to by the parties.

12        THE COURT:  Okay.  One second.  All right, given

13   the stipulation of the parties, Government Exhibit 32 is

14   admitted into evidence and may be published to the jury.

15        (Government's Exhibit 32 received)

16        MR. FIELDS:  Thank you, Your Honor.

17                      DIRECT EXAMINATION

18   BY MR. FIELDS:

19   Q.   Ms. Green, did you participate in a scheme to steal

20   money from the Department of Education?

21   A.   Yes, I did, sir.

22   Q.   Did you agree to participate in that scheme with other

23   people?

24   A.   Yes, I did.

25   Q.   Do you see one of those people in the courtroom here

18

                              Direct - Green

1   A.    To the -- for me, I know me, myself.

2   Q.    Did she give it to anyone else?

3   A.    I can't speak for that.

4   Q.    When she gave it to you, how would she give it to

5   you?

6   A.    On a paper -- on a lined piece of paper, regular

7   subject paper.

8   Q.    Describe to us what would be on a typical sheet of

9   paper from Heather Carr.

10  A.    The names, the birth dates, and the address -- I mean,

11  sorry, the names, the birth dates, and the Social Security

12  numbers.

13  Q.    And what would you do with that information?

14  A.    I would submit that into FAFSA.

15  Q.    Now, let's talk about Trammel Thomas.  You said he was

16  part of the conspiracy.

17  A.    Correct.

18  Q.    What was his role?

19  A.    His role -- I can't say if he did homework and I can't

20  say if he had a major role, but he had some role in it.

21  Q.    Well, did you ever see him participating in the

22  conspiracy?

23  A.    Yes.

24  Q.    What did you see him doing?

25  A.    The FAFSA part, just one time.

22

Direct - Green

1    A.    It was part of the -- to process the fraudulent FAFSAs

2    and the school applications.

3    Q.    How was it part of the process of filling out these

4    fraudulent FAFSAs?

5    A.    Because of the names, when you get the names and the

6    information was already there.  So, like I said, I can't

7    recall the names.

8    Q.    When you say the information was already there, what

9    information?

10   A.    The Social Security numbers and the birth dates,

11   sorry.

12   Q.    Did you see Mr. Thomas participate in a scheme at any

13   other time?

14   A.    No.

15   Q.    How often would you see the defendant during this time

16   period?

17   A.    I wouldn't see him as much as I seen Heather and

18   Mercedes, but I've seen him several occasions.

19   Q.    So who would you say was your major contact within the

20   conspiracy?

21   A.    Heather Carr.

22   Q.    How much money did you get from the scheme?

23   A.    I roughly would say a little -- in the $20,000 range.

24   Q.    What did you do with that money?

25   A.    Paid for bills and my financial living situations and

29

Cross - Green

1   reduced?

2   A.   I can't give a definite answer because I don't know

3   what the percentage would be.  At least -- hopefully 20

4   percent.  I don't know exact amount when it comes to

5   federal.

6   Q.   Okay.  I didn't -- I didn't say that you knew.  What

7   are you hoping Ms. Paluch and Mr. Fields recommend --

8   A.   Just any less time than what my guidelines say.

9   Q.   -- to the Court?

10           Okay.  And this recommendation depends on your

11   cooperation?

12   A.   Correct.

13   Q.   And their view of it, correct?

14   A.   Correct.

15   Q.   So if you're saying things that they don't like,

16   that's not going to be cooperation, is it?

17   A.   Correct.

18   Q.   Some time in 2010, you had this conversation with

19   Heather Carr at a barbecue about this student loan scheme.

20   A.   That is correct.

21   Q.   Okay.  Was that over at her house?

22   A.   Yes, it was.

23   Q.   And that's the Pleasant --

24   A.   The Pleasant Drive address.

25   Q.   Pleasant Drive address.

30

Cross - Green

1    A.    Yes.

2    Q.    And it's just you and Ms. Carr.

3    A.    And our children, yes.

4    Q.    Okay.  Mr. Thomas isn't there?

5    A.    Not that I recall for the first conversation.

6    Q.    Okay.  And you get a good understanding of what Carr's

7    idea is?

8    A.    Yes.

9    Q.    Okay.  And am I correct that this whole thing can't

10   work without Heather Carr?

11   A.    That is correct.

12   Q.    And why is that?

13   A.    Because she was able to pull the information from her

14   database at work.

15   Q.    Okay.  So if I'm understanding how this goes about,

16   you can sit down on a computer and access a public website

17   that deals with some state Department of Corrections?

18   A.    Correct.

19   Q.    So maybe Florida?

20   A.    Any -- yeah, any public record, yes.

21   Q.    And you could identify an inmate who was serving a

22   sentence for X number of years?

23   A.    Yes.

24   Q.    And then with -- you'd get that name, correct?

25   A.    Yes.

Case No. 1:16-cr-00054-WJM Document 525-35 Filed 12/21/18 USDC Colorado pg 678 of
971
Case 1:16-cr-00054-WJM Document 353 Filed 03/29/18 Page 320 of 409





# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES

**DATE INTERVIEWED:** February 10, 2017

**PERSON INTERVIEWED:** Mercedes Diaz

**ALSO PRESENT:** Siddhartha Rathod, Defense Attorney

**INTERVIEWED BY:** Martha Paluch, Assistant US Attorney
Sandra Ennis, ED-OIG Special Agent
Sonia Hacker, Postal Inspector

**LOCATION:** Colorado Springs Post Office
201 E Pikes Peak Avenue
Colorado Springs, Colorado 80903

**CASE NUMBER:** 12-080234

**CASE NAME:** Pikes Peak Community College Fraud Ring

After being advised of the nature and purpose of the interview and the identities of all present, Mercedes Diaz, voluntarily provided the following information, summarized as follows:

Diaz met Heather Carr at the Phil Long Ford car dealership in Colorado Springs, Colorado. Both Carr and Diaz's mother were employed at the dealership. Diaz was expelled from school when she was approximately 11 or 12 years old so she would hang out in the basement of the dealership while her mother worked. Diaz enjoyed hanging out with Carr because she was one of the youngest people working there.

Carr, who was 24 years old at the time, offered to take Diaz under her care because Diaz was taken out of her mother's home due to issues Diaz had with her step-father. Carr came from an upbringing of group homes and foster care and Carr did not want that environment for Diaz.

Carr became a mother figure to Diaz. Diaz lived with Carr for less than a year and during that time, Diaz continued to get into trouble. On Christmas Eve, Diaz stole Carr's vehicle and the state took Diaz from Carr's care.

At approximately age 13, Diaz was committed to the Juvenile Youth Corrections in Colorado Springs, Colorado for approximately two years. Carr wrote to Diaz during this timeframe.

At age 19, Diaz was out of the youth corrections system and living in Denver. While living in Denver, Diaz was using drugs and involved in prostitution. Diaz got hurt on a call and decided she wanted a fresh start.

Diaz could not find employment in Colorado and knew Carr was residing in Arizona with her daughters. At the time, Arizona had the fourth best economy in the country and Diaz was able to find employment within a week of moving there.

Diaz enrolled in Phoenix College and was able to pay for classes with student loans and with help from her father, who was prior military. Diaz also purchased a car. Diaz felt like she was supposed to be in Arizona.

Prepared by: Ennis, Sandra
Date Prepared: February 13, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)

EXHIBIT
F

Page 1 of 6

Diaz attended Remington College when she was residing at the Dale House Project in Colorado Springs, Colorado, following emancipation from her mother. Diaz was enrolled in a medical assistant program. During this timeframe, Diaz was employed at Antler's Hilton in Colorado Springs, Colorado.

Diaz resided with Carr at the 1351 Pleasant Drive address in Chandler, Arizona, for about a month. During this timeframe, Tramell Thomas did not live in Arizona. While residing in Colorado, Diaz met Thomas on only one occasion, when Carr came from Arizona to visit him. Carr and Thomas were not married.

Diaz rarely ever saw Thomas when he was on parole. Carr usually travelled once a month to Colorado to see Thomas. Diaz did not know every detail about Carr and Thomas' relationship. Carr and Diaz had more of a mother-daughter relationship.

Diaz was not aware of what part, if any, Thomas played in the financial aid fraud scheme. Thomas was always trying to start businesses and doing all sorts of things to impress Carr. Diaz felt Thomas was mooching off Carr. Carr did not discuss Thomas' involvement in the scheme with Diaz.

Diaz first learned of the financial aid fraud scheme after living in Arizona for approximately six months. Carr informed Diaz of the scheme and told her that it was a way for Diaz to make money.

Part of Diaz's involvement was to receive college and financial aid mail in other people's names. Diaz got into a confrontation with a letter carrier while residing at one of the addresses in Mesa, Arizona. The United States Postal Service (USPS) refused delivery of mail in the names of various individuals to Diaz's house. Diaz questioned this because the mail was correctly addressed. Diaz told the letter carrier that she helped people by receiving their financial aid funds and this is how she paid for her rent.

Diaz knew Christine Duncan from escorting in Colorado. Duncan was messing around with Thomas. When residing in Colorado, Diaz did not hang out with Thomas. Duncan got Thomas in trouble and Diaz and Marcy Green helped Duncan come down to Arizona to raise money for his legal fees.

Diaz never liked Green. Carr introduced the two of them and at no time did Green or Diaz just hang out together. It was a business relationship. Diaz and Green did not drive around together and withdraw funds from the financial aid debit cards. The two of them did their own thing and they did not hang out.

Carr asked Diaz for mailing addresses. Diaz got paid $500 for each piece of mail. Diaz knew people in the "hood" that agreed to accept mail in other people's names and did not ask any questions about the mail.

Diaz recalled using three mailing addresses on Dragoon Circle in Mesa, Arizona and she also used one of her previous addresses at 724 West Knox Court, Chandler, Arizona. Diaz collected mail from her friends that agreed to accept the mail and she turned over all the mail pieces over to Carr. Diaz received $500 in cash and she gave her friends $100. Diaz did not have any knowledge about the addresses used in Colorado Springs, Colorado, such as the Lexington address.

Green was also tasked with finding friends that would allow the use of their address and she also received $500.

Interview of Mercedes Diaz, February 10, 2017                                    12-080234

After approximately two semesters, Carr showed Diaz how to submit Free Applications for Federal Student Aid (FAFSA) and how to complete the online coursework. Carr paid Diaz additional money for submitting the assignments. There were homework assignments for approximately 20 to 30 students and Carr could not complete all of them on her own because she was working full time. Diaz was somewhat familiar with the financial aid process because she submitted FAFSA's to obtain student loans in her own name.

Diaz randomly queried names on various department of corrections' websites and provided Carr a list of inmate names and dates of birth. Carr made additional queries by using a database she had access to with her employment at Wells Fargo. Carr obtained additional information, such as the inmate's social security number. Only inmates serving a sentence of more than eight to ten years were used because they figured the inmates would not access their credit history for a long period of time.

Carr filled in the list with additional information required for the financial aid application process. Diaz took Carr's information and submitted the FAFSA and obtained the FAFSA PIN.

Diaz submitted FAFSA's and did homework at various locations, including Carr's and Green's house and at her own residence too. Diaz did not recall Green's address.

Carr, Diaz, and Green did not discuss the fraud scheme at length with one another. It might have been brought up on one or two occasions at a barbeque, only to mention about a homework assignment being due. The three of them had homework parties. They sat around to complete homework, query department of corrections websites, and fill out FAFSA's while drinking.

Green did everything that Diaz and Carr did in the financial aid fraud scheme. Green had her own laptop to use. Diaz recalled Green's laptop having stickers on it but could not recall the color of the laptop. Carr had Macintosh laptops in her home. If they were hanging out, any laptop or computer in Carr's residence was used for convenience when checking on something related to the financial aid fraud scheme. Diaz owned two laptops that she also used in the financial aid fraud scheme. Her laptops were black in color.

Green and Diaz were not close. They worked together to make money. They saw each other at parties and were cordial. Green lived on the south side so she was not always at Carr's house when Diaz was there but Diaz knows that Green was logging in to register attendance just like she was.

Once the student loan debit cards started coming in, Carr needed help withdrawing the money from the cards since she was working full-time from home. The debit cards had a daily withdraw limit of $500. Each card had approximately $2,500 to $3,000 in financial aid funds. Diaz would hang onto the card until it had been drained. At times, she would also go to Fry's grocery store to buy something and get cash back from the debit card. Other times, she went to various ATM locations or used the cards for personal purchases.

The debit cards were divided up. If you received the mail, then the debit card was yours. Initially, Diaz received a flat fee of $500 but she started receiving three-fourths of the card amount when she started doing homework, department of corrections queries, and FAFSA submissions. Carr received the remaining one-fourth of the amount on each card.

Green also kept the money on the debit card and she also gave a portion of the funds to Carr. Diaz knows this because of conversations between Carr and Green when Diaz was present. Carr also told Diaz that Green gave Carr a portion of the financial aid funds on the debit card.

**AFFIDAVIT:**

I, Heather Carr, affirm that the statements made in this affidavit are true and correct to my best information and belief.

1. I am a Defendant in case #2016-cr-00054-WJM pending in the United States District Court for the District of Colorado. I was charged in this case along with Tramell Thomas, Mercedes Diaz, and Marcelle Green with participating in a federal student loan fraud scheme. I have previously entered a plea of guilty in the case and have been sentenced pursuant to my plea. I make this affidavit freely and voluntarily and understand that it may be used in a pleading to be filed with the Court by my co-defendant Tramell Thomas.

2. I entered into a cooperation agreement with the United States government and pursuant to that agreement, I was interviewed by representatives of the government on numerous occasions spanning over a 12 month time period.

3. Of particular relevance to this affidavit, I participated in interviews conducted by telephone on the following approximate dates: October 30, 2017, and November 6, 13, and 20, 2017. With the exception of the interview on November 13, 2017, it is my understanding that the participants in the interviews aside from myself, were, my attorney Mary Butterton, Assistant United States Attorneys Paluch and Fields, and Special Agent Ennis. I was advised that Mr. Fields was not a participant in the November 13, 2017 interview. All of the above referenced interviews were conducted by telephone.

4. Early in the interview on October 30, 2017 in response to questioning, I told the government representatives (as I had previously stated in an earlier interview) that I had never seen Tramell Thomas fill out a FAFSA loan application nor did I know if he knew how to fill out such an application.



EXHIBIT
G

5. Once I made these statements AUSA Fields became quite upset and told me that I was now saying something different than what I had said during my original interview with the government in November of 2016.

6. In the November 6, 2017 interview AUSAs Paluch and Fields were asking me if Mr. Thomas had ever threatened me or in any other way had forced me to be involved in the student loan fraud scheme. My response was that he had not and further that the main participants in the scheme were myself, Mercedes Diaz, and Marcelle Green. Mr. Fields was apparently very frustrated with my answers and he began yelling at me. At one point he stated, "I will rip up your fucking plea agreement and send you to jail for a long time".

7. At this point in the interview my attorney Ms. Butterton told Mr. Fields that his behavior was inappropriate and she terminated the interview.

8. The third interview in 2017 occurred the following week on, I believe the thirteenth of November. At the start of the interview, Ms. Paluch advised that Mr. Fields was not participating on the call and would no longer be involved with my participation in the case. She was most apologetic for Mr. Field's prior outbursts. The final interview was held I believe on November 20, 2017 and Mr. Fields was again a participant.

9. During my interviews with the government I remember telling the government representatives the following:

   a. That Marcelle Green had assisted myself by picking up student loan related mail in the state of Colorado.

   b. That Tramell Thomas did not provide the address on Radiant drive for use in the student loan fraud.

   c. That Tramell Thomas did not participate in the loan scheme nor knowingly benefit from the scheme while he was incarcerated in the El Paso County Jail in Colorado Springs, Colorado from approximately late January of 2011 through early November of 2011.

   d. That it was my understanding that the people Tramell Thomas helped apply for federal student loans to assist in attending Pikes Peak

Community College in Colorado prior to his moving to Arizona in 2012 actually did attend or intended to attend school.

e. That further it is my belief, that between statements that I made to the government and what my attorney Mary Butterton told the government, that the government is well aware that I was not present nor was a witness to any type of criminal activity occurring in Colorado Springs, Colorado in January of 2011, as I was residing in Arizona and recovering from the delivery of my child.

f. In the last interview with the government I attempted to explain my understanding of my agreement with the government and was told no such promises or agreement had been made.

g. During my initial interview with the government, I told them that Mercedes Diaz dated Michael Cox prior to her moving to Arizona.

h. During my interviews with the government, I told them that I originally purchased the Dodge Charger automobile (government's exh. 3 in the Thomas trial) for Roderick Smith. Mr. Smith is the father of Marcelle Green's children. Throughout my ownership of that automobile and specifically in 2011 and 2012, Marcelle Green continually borrowed and operated that automobile for her own personal needs.

Further Affiant sayeth not:

Heather Carr

State of Arizona

County _Maricopa_

Subscribed and sworn to before me this 5th day of ~~January~~ February, 2018 by

_____.

Witness my Hand and official Seal.

My Commission expires: 04/30/2019

Notary Public

02/05/18

_____

RAQUEL ARAUJO
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
April 30, 2019



UNITED STATES
POSTAL SERVICE

Requestor: USPIS\PLCornell

Forensic Laboratory Examination Report
Forensic Laboratory Services
22433 Randolph Dr.
Dulles, VA 20104-1000

October 28, 2015

Case No.1939700-MF - Lab File No. 9-349-011357(2)
Type of Examination: Fingerprint
Request Date(s): 05-11-2015

K. P. Haithcoat
Postal Inspector
1745 Stout Street, Suite 900
Denver, CO 80299

EXAMINATIONS:
Examine Exhibits 1 through 5, a debit card, fifty-two Mastercards, Pikes Peak documents and photocopies of two identification cards, for the presence of latent prints of value for identification.

Compare any latent prints to the fingerprints of the following:

       Tramel Thomas, FBI No. 944342FB2, designated as Exhibit K-1
       Heather Elizabeth Carr, FBI No. 72302EB7, designated as Exhibit K-2
       Mercedes Dee Diaz, FBI No. 269620VC6, designated as Exhibit K-3
       Michaela Inez Grant, FBI No. 480570ED5, designated as Exhibit K-4
       Marcelle Ruby Green, FBI No. 555483MB0, designated as Exhibit K-5
       Matthew Kenneth Sanders, FBI No. 710044RB0, designated as Exhibit K-6

FINDINGS AND OPINIONS:
Exhibits 1 through 5 were examined for the presence of latent prints. Twelve latent fingerprints and one latent palm print were developed on parts of Exhibit 3. No latent prints of value were present or developed on the remaining exhibits. The latent prints were compared to Exhibits K-1 through K-6 resulting in the following identifications:

       <u>Heather Elizabeth Carr, FBI No. 72302EB7, Exhibit K-2</u>
     One latent fingerprint on part of Exhibit 3, Pikes Peak document "Donald F. Grants"

       <u>Mercedes Dee Diaz, FBI No. 269620VC6, Exhibit K-3</u>
     Six latent fingerprints on part of Exhibit 3, Pikes Peak document "Edward Jones",
     Five latent fingerprints on part of Exhibit 3, Pikes Peak document "Virginia Jones"

No known palm prints of Tramel Thomas, Heather Elizabeth Carr, Mercedes Dee Diaz, Michaela Inez Grant, Marcelle Ruby Green or Matthew Kenneth Sanders were available for comparison.

EXHIBIT
H
Blumberg No. 5119



AN ASCLD/LAB - *International* ACCREDITED TESTING LABORATORY SINCE DECEMBER 8, 2014

Case No.1939700-MF - Lab File No. 9-349-011357(2)                                      Page 2

REMARKS:
Clearly and completely recorded palm prints of Tramel Thomas, Heather Elizabeth Carr,
Mercedes Dee Diaz, Michaela Inez Grant, Marcelle Ruby Green and Matthew Kenneth Sanders
are required for a conclusive comparison to some of the unidentified latent prints.

Photographs of the latent prints have been prepared and will be available for any additional
comparisons you may request or for the preparation of court exhibits should it become
necessary.

In the event latent print testimony is necessary in the trial of this case, a current set of known
prints of Heather Elizabeth Carr and Mercedes Dee Diaz, recorded and signed by an individual
who will be available to testify, should be submitted prior to any request for testimony.

EXHIBITS:
Exhibits 1 through 5, received in this laboratory on May 14, 2015, are being returned with this
report via Registered Mail.

The fingerprints of Tramel Thomas and Heather Elizabeth Carr, obtained from the FBI on
October 27, 2015, and the fingerprints of Mercedes Dee Diaz, Michaela Inez Grant, Marcelle
Ruby Green and Matthew Kenneth Sanders, obtained from the FBI on October 28, 2015, are
being retained.

Secondary evidence, created during this examination, is being retained in this laboratory.

Patricia L. Cornell
Forensic Latent Print Analyst, Sr.
Telephone: 703-406-7113
Fax: 703-406-7115

This is an official FLS examination report only if it contains an original signature of the forensic analyst.

AN ASCLD/LAB - *International* ACCREDITED TESTING LABORATORY SINCE DECEMBER 8, 2014 

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/17/18 USDC Colorado pg 687 of
Case 1:16-cr-00054-WJM Document 335 Filed 04/03/18 Page 1 of 2
971

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No.  16-cr-00054-WJM-02

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.    TRAMMEL THOMAS,

      Defendant.

_____

## UNITED STATES' RESPONSE TO DEFENDANT TRAMELL THOMAS'S
## OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT, ECF 348

_____

The United States of America, by and through United States Attorney Robert C. Troyer and Assistant United States Attorneys Martha A. Paluch and Bryan D. Fields, hereby responds to Defendant's Objections to the Presentence Investigation Report (PSIR), ECF 348, as follows:

1.   Defendant objects to the inclusion of the parties' sentencing statements in the PSIR.  The United States concurs with the probation office's response to this objection.  ECF 356 at A-1.

After objecting generally to the inclusion of sentencing statements in the PSIR, the defendant then takes exception to three specific excerpts from the government's sentencing statement.  If the Court rules that the sentencing statements are properly included in the PSIR, defendant's objections set forth in Paragraphs 2[1] and

_____

[1] Two paragraphs are labeled with the number 2.

1

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/14/18 USDC Colorado pg 688 of
971
Case 1:16-cr-00054-WJM Document 335 Filed 04/03/18 Page 2 of 17

Paragraph 3 are moot. Nonetheless, the government responds to these objections as follows:

2. Heather Carr stated that she, her daughter, and the defendant were home when law enforcement arrived to execute the search warrant.[2] Once the officers gained entrance into the home, they discovered ripped up financial aid documents in the toilet. Carr admitted to ripping up documents and attempting to flush them down the toilet. Attachment 1 at 7. She also explained, "[t]hey did not answer the door immediately because items were being destroyed . . . ." Attachment 2 at 5. Accordingly, the government's statement that "Instead of answering the door, occupant(s) of the home frantically tried to rip up compromising documents and flush them down the toilet," ECF 348 at 1-2, is a correct statement of the evidence.

The defendant's next objection in the second paragraph labeled as Paragraph 2 relates to the following: While law enforcement was attempting to gain entrance into the home to execute the search warrant, the defendant broke his cell phone in half. Carr stated that the broken phone was the defendant's, that it was found in the defendant's closet (and identified a photograph of the defendant standing in that closet), and that the defendant admitted to her that he broke the phone in half. Attachment 2 at 5. Computer Forensic Expert Alison Stailey testified she was able to retrieve and examine the SIM card located in the broken phone. That SIM card contained damning text messages between the defendant and government witness Kimmisha Mullett in which

---

[2] The defendant attached only select excerpts from Carr's Memorandums of Interviews (MOIs) to his Objections. The government attaches the entire MOIs here as Attachments 1 and 2.

the defendant directs Ms. Mullett to send victim inmate mail to him in Arizona. The phone also contained images of the defendant flashing wads of cash, and texts from the defendant discussing his trips to the shooting range. A logical inference is that the defendant broke his phone to hide this evidence from law enforcement. The defendant objects to the inclusion of this statement in the PSIR and instead, claims that the Court should believe the defendant's statement to Carr -- that he broke the phone so that she wouldn't find out about other "bitches." ECF 348 at Exhibit A P.005. The evidence refutes his claim and the government's characterization of that evidence is accurate.

  3. Defendant disputes that he attempted to influence witnesses. *Id.* at 2-3. However, a condition of the defendant's pretrial release was that he "avoid all direct or indirect contact with co-defendants and witnesses" unless granted permission.[3] ECF 11 (Attachment 3). The defendant showed up at Marcelle Green's uncle's house looking for her after he had appeared in court on the instant charges. A reasonable inference is that he intended to speak to her about the case. The defendant also called Kimmisha Mullett weeks prior to the trial, and referenced her trial subpoena. Both contacts were in violation of the conditions of his pretrial release. A logical inference from the defendant's actions is that he was attempting to influence these witnesses' testimony at his upcoming trial. A criminal defendant contacting government witnesses (or their family members) is inherently manipulative, even in a situation where no words are exchanged at all.

---

[3] At the time the defendant attempted to contact Green, she had not been charged in this case. The discovery provided to the defendant indicated that she was a government witness.

3

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/14/18 USDC Colorado pg 690 of
971
Case 1:16-cr-00054-WJM Document 357 Filed 04/03/18 Page 4 of 7

4.   The defendant disputes the assertion in the PSIR that the scheme was
devised by him and Carr.  ECF 348 at 3.  At sentencing, Special Agent Ennis will testify
about her interview with the defendant's friend I.O.  I.O. stated that in approximately
October 2010 during a conversation with the defendant, the defendant "talked about
committing student financial aid fraud as a way to make money.  Thomas had heard of
a scheme and knew how to do it.  Thomas mentioned this scheme to I.O.  At this time,
they were only in the initial stages of how to carry out the scheme."  MOI_00000080.
Other evidence strongly supports the conclusion that Thomas and Carr worked together
to carry out the scheme in 2010.  Records from Carr's employer show that she used
Lexis Nexis to obtain I.O's social security number in July 2010.  In December 2010, two
months after the defendant's conversation with I.O. about financial aid fraud, a
fraudulent FAFSA was submitted in I.O.' name listing 3820 Radiant Drive as I.O.'s
address.   That address was once the defendant's residence.  Finally, the defendant
was caught with the fruit of this fraud — a debit card issued to I.O. — when he was
pulled over and arrested in 2012.  The defendant's suggestions to I.O. back in October
of 2010 that they engage in a student financial aid fraud scheme, coupled with the
defendant's personal relationship with Carr, support the government's assertion that
Carr and Thomas came up with this scheme together.  Any other conclusion would be
contrary to the jury's determination that the defendant is guilty, beyond a reasonable
doubt, of the execution of the scheme charged in Count Two —the mailing of a debit
card to the Radiant Drive address while the defendant was incarcerated in February
2011.   The defendant's objection should be denied.

4

5.      The defendant objects again to the obstruction enhancement.  ECF 348
at 3.  The government has responded to this objection above in Paragraph 3.

6.      The defendant does not dispute that he provided a false address for his
residence to the probation officer.  *Id.* at 4.  Instead, he asserts this false statement was
not "material" in that it did not "affect the outcome of his bond hearing or sentencing."
*Id.*  The government disagrees.  The facts are as follows:

- On January 19, 2018, the defendant told United States Probation Officer
  Matthew Gill that he resided as 6818 South 40th Drive, Phoenix, AZ  85041.

- On February 8, 2018, District of Arizona United States Probation Officer Susana
  Torres attempted a home visit at this address and the home appeared vacant.

- On February 20, 2018, the defendant advised Pretrial Services Officer Evelia
  Rivera that in October of 2017, he moved to 2040 West Berridge Lane, No. 31,
  Phoenix, AZ 85015.  This was the first Officer Rivera learned of this change of
  address.

- In an email to Officer Rivera dated February 21, 2018, the defendant stated that
  his lease for the 6818 South 40th Drive address expired "around trial time" and
  that he's been "pretty much homeless" since moving to the West Berridge Lane
  address.[4]

- As of the writing of the PSIR, the West Berridge Lane address had not been
  verified.  ECF 355 at 17, ¶ 82.

---

[4]  This information is contained in the Bond Violation Memorandum dated March 2, 2018.

Case No. 1:16-cr-00054-WJM-Document 525-1 filed 12/11/19 USDC Colorado pg 692 of
Case 1:16-cr-00054-WJM Document 135 Filed 04/03/18 Page 6 of 17
971

The order setting the conditions of the defendant's pretrial release required the defendant to "immediately advise the Court, defense counsel and U.S. Attorney in writing of change in address/telephone number." ECF 11 (Attachment 3). The defendant clearly violated this provision of his pretrial release.

Section 3C1.1 of the sentencing guidelines provides for a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." This enhancement is warranted when the defendant willfully provides "materially false information to a probation officer in respect to a presentence or other investigation for the court." U.S.S.G. § 3C1.1, App. N. 4(H); *United States v. Thomas,* 11 F.3d 1392, 1400 (7th Cir. 1993) ("the Guidelines provide that furnishing false information to a probation officer during a presentence investigation is itself conduct which constitutes obstruction of justice"). There is no question the defendant's false statement regarding his physical address was willful; he admitted as much in his email to Officer Rivera.

"Material," as used in this provision, means "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." § 3C1.1, App. N. 6. It is not necessary "that a defendant's falsehood actually obstruct justice; an attempt to obstruct, even if thwarted, is sufficient." *United States v. Magana-Guerrero,* 80 F.3d 398, 400 (9th Cir. 1996) (citation omitted); *Thomas,* 11 F.3d at 1401 (defendant's subsequent recantation of false statements had

6

no effect on the issue because "3C1.1 applies to *attempts* to obstruct justice as well as actual obstruction") (emphasis in original).  Indeed, the threshold for materiality under § 3C1.1 is "conspicuously low."  *United States v. Debeker,* 961 F.2d 164, 167 (11th Cir. 1992).  No "showing that pretrial services' investigation was significantly obstructed" is required.  *United States v. Restrepo,* 53 F.3d 396, 397 (1st Cir. 1995).

The defendant's false statements regarding his physical address (and about his employment, as set forth in ¶¶ 124 and 125 of the PSIR, to which he does not object) could have influenced the Court in two respects:  first, with respect to the Court's ruling on whether to remand the defendant after the jury's verdicts; and second, with respect to the defendant's personal history as reported in the PSIR, which is a sentencing factor.  *See Magana-Guerrero,* 80 F.3d at 400 ("Magana doesn't dispute that, had his lie [regarding his criminal history] been believed, it could have influenced matters such as his entitlement to bail or his sentence").

The PSIR details the difficulties the probation officer had in confirming the defendant's alleged employment at M.S.I., a marketing company:  1) M.S.I.'s Facebook page appeared to have been inactive for some time; 2) a former employee stated that M.S.I. had been "defunct for some time"; 3) the defendant provided a second address for this business, and when the probation officer visited that address, was told that no such business existed at that address; and 4) the defendant provided paystubs for M.S.I. that "appear to have been created and printed on a home computer."  ECF 355 at 24, ¶¶ 124, 125.  Despite all of this deception, the probation officer surmises, "the defendant may have been employed at a company named M.S.I. at one point, but, if so,

he has not been employed there for some time." *Id.* at ¶ 125. What *is* clear is that the defendant was not employed by this company at the time of his trial.

At that time, had the Court known that this defendant was "essentially homeless" and unemployed, the outcome of his hearing on remand most likely have been different. *See Restrepo,* 53 F.3d at 397 ("[a]n obstruction of justice increase is also warranted when a defendant provides materially false information to a pretrial services officer who is conducting a bail investigation for the court"); *Magana-Guerrero,* 80 F.3d at 401 (same).

In addition, the defendant's false statements to the probation officer "thwarted the probation officer from investigating the defendant's personal" history, to include the stability of his home life and his employment. *See United States v. Partee,* 301 F.3d 576, 580 (7th Cir. 2002) (applying § 3C1.1 enhancement because of defendant's false statement to the probation officer about his employment and the fact another individual created pay stubs on his behalf) (citation omitted)).

For these reasons, the defendant's claim that false statements to the probation officer and misleading conduct towards the Court about his residence were not material should be denied.

In sum, a two-level enhancement to the defendant's base offense level pursuant to § 3C1.1is warranted due to his 1) destruction of his cell phone; 2) attempted contact (Green) and actual contact (Mullett) with witnesses in violation of the conditions of his bond; 3) false statements and pretenses regarding his residence; and 4) false statements regarding his employment.

8

Case No. 1:16-cr-00054-WJM-1 Document 525-1 Filed 12/17/18 USDC Colorado pg 695 of
Case 1:16-cr-00054-WJM Document 357 Filed 04/03/18 Page 9 of 17
971

7.      The defendant objects to the loss calculation.  ECF 348 at 4.  The
government relies upon its Position Statement re Loss, Restitution and Forfeiture, ECF
341, in arguing that a 14-level increase to his base offense applies due to a loss in this
case of over $550,000.  Special Agent Ennis will testify at the sentencing hearing as to
the loss calculation in this case.

8.      Finally, the defendant claims he is entitled to a two-level adjustment for
"having had a minor role in the offense."  ECF 348 at 4.  The government disagrees and
asserts that the defendant cannot meet his burden of proving by a preponderance of the
evidence that he is entitled to this reduction.  *United States v. Adams,* 751 F.3d 1175,
1179 (10th Cir. 2014).

Section 3B1.2 of the guidelines provides that if "the defendant was a minor
participant in any criminal activity, decrease by **2** levels."  (Emphasis in original).  Such
a reduction may apply to "a defendant who plays a part in committing the offense that
makes him substantially less culpable than the average participant."  § 3B1.2 App. N.
3(A).  Courts are permitted "not only to compare a defendant's conduct with that of
others in the same enterprise, but also with the conduct of an average participant in that
type of crime."  *United States v. Caruth,* 930 F.2d 811, 815 (10th Cir. 1991) (citation
omitted).  The determination is "heavily dependent upon the facts of the particular case."
§ 3B1.2 at App. N. 3(C).  One of the factors to consider is "the degree to which the
defendant understood the scope and structure of the criminal activity."  *Id.* at App. N.
3(C)(i); *United States v. Salazar-Samaniega,* 361 F.3d 1271, 1277 (10th Cir. 2004) (role
reduction inquiry focuses "upon the defendant's knowledge or lack thereof concerning

9

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/12/19   USDC Colorado   pg 696 of
971
Case 1:16-cr-00054-WJM   Document 357   Filed 04/03/18   Page 10 of 17

the scope and structure of the enterprise and of the activities of others involved in the offense"). The Court is "not bound to accept the defendant's own declarations about his level of participation in the crime." *Caruth,* 930 F.2d at 814-15 (citation omitted). The government responds to the defendant's arguments in support of this reduction as follows:

a) The defendant notes that in response to the Court's questioning at Mercedes Diaz's sentencing hearing, the government stated that it viewed Heather Carr as the most culpable member of the conspiracy, the defendant and Green in the middle, and Ms. Diaz as the least culpable. ECF 348 at 4. This statement does not support the defendant's argument for a reduction. The defendant "does not contest his knowledge of the scope or structure of the criminal enterprise. He only alleges that he was less culpable than his codefendants." *United States v. Moreira,* 333 F. App'x 366, 374 (10th Cir. 2009). A minor role reduction is "not required just because multiple participants with differing levels of culpability are involved." *United States v. McColley,* 419 F. Supp. 2d 1310, 1313 (D. Kan. 2006). Even if this Court were to find the defendant was the least culpable of the four, that finding alone would not entitled him to a role reduction. *Adams,* 751 F.3d at 1179 ("a defendant is not entitled to a minor-participant reduction merely because 'he is the least culpable among several participants in a jointly undertaken criminal enterprise'") (quoting *United States v. Lockhart,* 37 F.3d 1451, 1455 (10th Cir. 1994)).

Accordingly, the government's estimation of the conspirator's culpability does not advance the defendant's argument.

10

Case No. 1:16-cr-00054-WJM Document 525 filed 12/12/19 USDC Colorado pg 697 of
Case 1:16-cp-00054-WJM Document 357 Filed 04/03/18 Page 11 of 17
971

b)   Nor does Green's testimony support his argument.  In its Position Statement, ECF 341 at 8-9, the government summarized Green's testimony.   While she testified she personally assisted the defendant on one occasion with a FAFSA, she also testified that her knowledge about the defendant filling out FAFSAs in the scheme and withdrawing money from debit cards came from conversations she had with Carr.  She testified as to delivering cash to Carr in the defendant's presence, the nice lifestyle the defendant and Carr had, and the questions the defendant asked of her after his house had been searched.  Green's testimony established the defendant's knowledge "concerning the scope and structure of the enterprise and of the activities of others involved in the offense."  *Salazar-Samaniega,* 361 F.3d at 1277 (citation omitted).  It also established that the defendant was one of the primary beneficiaries of the fraud.

c)   The government does not dispute the defendant's characterization of Ms. Diaz's statements to the government.  However, the government is not required to prove that a conspirator knows all other conspirators, or all the details of the conspiracy. *United States v. Smalls,* 423 F.3d 1164, 1182 (10th Cir. 2005).  Nor must the government prove that a conspirator knew of or participated in every aspect of the conspiracy.  *United States v. Eads*, 191 F.3d 1206, 1210 (10th Cir. 1999).  In sum, Ms. Diaz's statements do not negate the substantial evidence establishing the defendant's knowing involvement in the scheme.  *Lockhart,* 37 F.3d at 1455 (defendant was not a minor or minimal participant where he had "knowledge or understanding" of the drug enterprise).

d)  Despite being convicted of the conspiracy charge for conduct beginning in

August of 2010 and continuing until October of 2012, the defendant now argues that he

did not join the conspiracy until February of 2012. This argument should be rejected

outright based upon the jury's verdict. Nonetheless, the government responds to the

defendant's misstatements of the evidence. First, he claims his involvement in enrolling

"four or five individuals"[5] at Pikes Peak Community College prior to 2012 was unrelated

to the scheme because these individuals were not inmates. ECF 348 at 5-6. In its

Position Statement, the government explained that the defendant asked Carr to keep

the social security numbers of three individuals, C.D., V.L., and I.O., in case he lost

them, and Carr actually conducted SSN searches for these individuals through the Lexis

Nexis database, just as she had done with all of the other victims of this scheme. ECF

341 at 4-5.

Next, the defendant claims "[n]o Arizona IP addresses were used in connection

with these individuals," unlike the other victims. ECF 348 at 6. Defendant is mistaken.

IP activity for Higher One (the debit card provider) for C.D., V.L., and I.O. all came back

to the Pleasant and Kaibab addresses. Carr, Green, and Diaz's MOIs, along with

Green's trial testimony, established that all four defendants submitted FAFSAs from one

or both of these addresses. Attachment 2 at 3. The records establishing this IP activity

were provided to the defense in discovery.[6] Defendant also incorrectly states that none

of the defendant's co-conspirators "had any link to the applications" of the four or five

individuals he is relying upon for this argument. ECF 348 at 6. However, school

---

[5] Government counsel assumes the defendant is referring to C.D., V.L, and I.O., but does not know who the fourth or fifth individuals are.

[6] C.D.: FIN_00000240-268. V.L.: FIN_00000678-705. I.O.: FIN_00000794-818.

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/12/19 USDC Colorado pg 699 of
971
Case 1:16-cr-00054-WJM Document 357 Filed 04/03/18 Page 13 of 17

records for C.D., V.L., and I.O. were all faxed from a common FedEx location that was
used in the conspiracy, and these records were also provided to the defense.[7]  In sum,
the jury's verdicts, and the overwhelming evidence supporting those verdicts, soundly
refute the defendant's claim that he was not involved in the conspiracy prior to February
2012.

  e)  Defense counsel states that they interviewed Carr in January of 2018 and she
made statements in that interview contrary to her prior statements to the government.
ECF 348 at 6-7.  Defense counsel does not provide a date of the interview, nor did
counsel provide a copy of this interview to government counsel.  By January 2018, Carr
knew that the government would not file a § 5K1.1 motion for a reduction to her
sentence.  Most likely, the interview took place after January 4, 2018, when she was
sentenced to 57 months in prison.  At that point, she had every reason to retract her
prior statements and try to help the defendant, the father of her children.  Carr's recent
statement that the defendant was not involved in the scheme while he was in jail is
contradicted by her prior statements to the government that she discussed the scheme
with the defendant in code when she visited him in jail, and used money from the
scheme to pay his legal fees and make deposits to his commissary account.
Attachment 2 at 3.

  Carr also allegedly told defense counsel that the defendant did not provide the
Radiant Drive address for use in the scheme.  ECF 348 at 6.  The jury disagreed, and
convicted the defendant of Count 2, which listed this address for I.O.  In addition,

---

[7] C.D.: SCH_00001288-1354.  V.L.:SCH_00002490-2558.  I.O.: SCH_00002659-2725.

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 700 of
Case 1:16-cr-00054-WJM Document 357 Filed 04/03/18 Page 14 of 17
971

Duncan testified that she lived at this address with the defendant.  In sum, Carr's claim

in this regard is not credible.

      f)   Defendant next claims he is entitled to a minor role reduction because he was

involved in the conspiracy for only ten of the twenty-six months of the conspiracy.  ECF

348 at 6.  The government disputes this assertion, but even accepting it as true, ten

months is more than enough involvement to disqualify him from consideration for a

minor role adjustment.  In *Adams,* the defendant was denied a minor role adjustment

where he recruited a friend to drive him and two others to a bank robbery.  Adams

claimed he was entitled to a minor role adjustment because the other two planned the

robbery, he never entered the bank, and the recruitment of his friend to drive was

"merely opportunistic."  751 F.3d at 1179.  The court denied his claim, stating that the

defendant "acted as the lookout, planned to assist in the escape, and admitted to

knowledge of the scheme."  *Id.* at 1180; *see also Lockhart*, 37 F.3d at 1455 (denying

minor role adjustment where "knew that the purpose of driving to the bus station [on one

occasion] . . . was to obtain cocaine," and expected "to be compensated for his

involvement in the conspiracy").  Defendant's admission to involvement in the instant

scheme for at least ten months is more than sufficient evidence to deny him the

reduction he seeks.

      Defendant next claims that there "was no evidence adduced that Thomas owned

[the Dodge Charger] or that he even drove it regularly."  ECF 348 at 7.  Again,

defendant is mistaken.  Duncan testified at trial that Thomas drove the Charger in

Colorado.  Carr apparently told defense counsel the defendant was not the person "who

14

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 701 of
971
Case 1:16-cr-00054-WJM Document 357 Filed 04/03/18 Page 13 of 17

primarily drove the Charger in 2011 and 2012." *Id.* However, Carr previously told the
government that while the Charger was in her name, the defendant drove it in Colorado
and brought it with him when he moved to Arizona. Attachment 2 at 4. Nonetheless,
what matters is not how regularly the defendant drove this vehicle, but that he was
driving it when he was stopped by Detective Seal and the debit cards and laptop were
found in his possession.

Finally, the defendant repeats a claim that was as unpersuasive at trial as it is
here: that his fingerprints were not found on any of the debit cards found in the plastic
bag in the Charger, "including the one in his wallet." ECF 348 at 7. Detective Seal
testified that he saw the defendant move the plastic bag of debit cards from the seat to
the floorboard, and that he found the Abate debit card in the defendant's wallet, which
was on the defendant's person. Moreover, as the jury heard for itself at trial, the
defendant's evasive responses to questions from Detective Seal about the debit cards
were evidence of his guilty conscience. Fingerprint evidence was not necessary in light
of this damning evidence.

## Conclusion

For the reasons set forth above, defendant's objections to the presentence
report, ECF 348, should be denied.

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 702 of
971
Case 1:16-cr-00054-WJM Document 357 Filed 04/03/18 Page 16 of 17

DATED this 3rd day of April, 2018.

Respectfully submitted,

ROBERT C. TROYER
United States Attorney

By:      s/ *Martha A. Paluch*
MARTHA A. PALUCH
BRYAN DAVID FIELDS
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov
bryan.fields3@usdoj.gov

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 703 of
971
Case 1:16-cr-00054-WJM Document 357 Filed 04/03/18 Page 17 of 17

**CERTIFICATE OF SERVICE**

I certify that on this 3rd day of April, 2018, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system that will send notification of such filing

to all counsel of record in this case.

s/ *Martha A. Paluch*
MARTHA A. PALUCH
BRYAN DAVID FIELDS
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov
bryan.fields3@usdoj.gov

Case No. 1:16-cr-00054-WJM Document 527-1 filed 12/12/19 USDC Colorado pg 704 of
971
Case 1:16-cr-00054-WJM Document 351-1 Filed 04/03/18 Page 1 of 12

<span style="color:red">Attachment 1</span>



## UNITED STATES DEPARTMENT OF EDUCATION
### OFFICE OF INSPECTOR GENERAL
### INVESTIGATION SERVICES



| | |
|---|---|
| **DATE INTERVIEWED**: | November 3, 2016 |
| **PERSON INTERVIEWED**: | Heather Carr |
| **ALSO PRESENT**: | Mary Butterton, Assistant Federal Defender<br>Jessica Leto, Paralegal |
| **INTERVIEWED BY**: | Martha Paluch, Assistant US Attorney<br>Beth Gibson, Assistant US Attorney<br>Sandra Ennis, ED-OIG Special Agent |
| **LOCATION**: | U.S. Attorney's Office<br>1225 17th St., 7th Floor Conference room<br>Denver, Colorado 80202 |
| **CASE NUMBER**: | 12-080234 |
| **CASE NAME**: | Pikes Peak Community College Fraud Ring |

After being advised of the nature and purpose of the interview and the identities of all present, Heather Carr, voluntarily provided the following information, summarized as follows:

In approximately July 2015, Carr moved from Arizona to Virginia Beach, Virginia, to live with her oldest daughter Ayanna Brown, formerly Ayanna Jones. Brown moved to Virginia because her husband is in the Navy. He is currently deployed and will not return home until January 2017. Brown is currently attending college and is enrolled in a pharmaceutical internship.

The following are Carr's four children: Ayanna (21), Kaira (16), Milani (5), and Tru (1). Aubrey, who is Ayanna's friend, has resided with Carr since she was 15.

Carr was a mother figure to Mercedes Diaz also. Carr and Diaz's biological mother both worked at a car dealership. Diaz's mother was prepared to give up Diaz to the state because Diaz was constantly in trouble. Carr offered to take her in. At the time, Diaz was in junior high at Panorama Middle School. On Christmas Eve, Diaz stole Carr's vehicle and was arrested. While in custody, Diaz's brother was murdered. Carr's daughters are like sisters to Diaz.

Carr was born in Virginia but moved to Colorado Springs, Colorado, when she was approximately ten years old. Shortly after her family moved, her mother divorced and remarried. Carr ran away from home and stopped attending school in junior high. Carr got pregnant at 17 and obtained her GED during this time period. Omar Jones, who is the father of her two oldest daughters, was her legal guardian.

In approximately 1997, Carr became familiar with the financial aid process when she attended Pikes Peak Community College (PPCC) and received federal student aid (FSA).

In approximately 2003, Carr moved from Colorado to Arizona and resided there until summer 2015.

Prepared by: Ennis, Sandra                                   Date Prepared: November 4, 2016

This report is the property of the Office of Investigation Services and is loaned to your agency; and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)                                             Page 1 of 12

Case No. 1:16-cr-00054-WJM-Document 535 filed 12/12/2013 JBD Colorado pg 705 of
Case 1:16-cr-00054-WJM Document 535 filed 04/03/18 Page 2 of 12
971

Interview of Heather Carr, November 3, 2016                                    12-080234

Carr worked for Wells Fargo from approximately June 2003 through July 2015. During her employment, Carr held the following positions: mortgage processor, mortgage underwriter, and credit analyst for Car Maxx. Carr's position as credit analyst began with Car Maxx in approximately 2006.

In approximately August 2009, Wachovia and Wells Fargo merged and Carr was one of 200 employees laid off. Carr was brought back and began working from home because Wachovia employees worked from home. Wells Fargo decided that their employees would work from home also.

Carr was issued a T460 Laptop for her work at home. The laptop required her to sign in with a login ID and password. Her work day was spent verifying a potential purchaser's eligibility to get a car loan by conducting credit reviews. These were non-stop deals that required decisions to be made in five minutes or less. She verified the potential purchaser's credit information and their debt-to-income ratio and then indicated whether the potential purchaser's loan should be approved or denied.

Carr had many user names and passwords for different systems. Carr confirmed her LexisNexis login ID as heathercarr1. Her login ID, heathercarr1, remained the same but she was required to change her LexisNexis password every six months. Carr used LexisNexis to verify a potential purchaser's employment history, social security number, date of birth, and/or driver's license information. Carr accessed LexisNexis from her own personally owned computer but she did not think she could access it outside of her home or on a mobile device. There were occasions when she conducted work business on her personally owned computer. This was usually done to verify someone's personal information, such as a Google search on someone. Ayanna Jones did not use or have access to LexisNexis.

From approximately 2006 through 2013, Carr put the Cox Communication's internet service in her daughter's name (Ayanna Jones). Carr did so because she had an outstanding internet bill of $300 dollars in Colorado and could not get internet service in Arizona until that was paid. Carr made the internet service payments to Cox Communications.

In approximately 2003, Carr became acquainted with Tramell Thomas through her step-brother, Matthew Sanders. Carr did not know her parents very well and wanted to learn more about her family. She and Sanders wrote each other while he was in prison in Colorado. Sanders told Carr that Thomas, who was also in prison in Colorado, looked out for him. Carr began exchanging letters with Thomas until his release from prison in approximately 2009. Carr met up with Thomas after he was released from prison. She wanted to thank him for taking care of her "nerdy white-boy step-brother."

Thomas and Carr were together from approximately 2009 through 2012. In 2014, they had a brief reconciliation and travelled to San Diego when Carr won a free trip from work. Carr conceived her son on this trip. Their relationship ended after the trip. Carr and Thomas were never married.

Thomas and Carr have a very strained relationship. When Carr contacts Thomas, she usually puts the phone on speaker and lets him talk to their two children. Thomas does not call his children directly and he does not pay child support. She lets her daughter send him emoji's. In June 2015, Carr filed for child support and the state of Arizona has not served him with the paperwork. When the two of them do talk, it is never about the investigation. Even if they did talk about it, Thomas would lie. He lies so much it sickens Carr. Carr is not intimidated by Thomas.

OIG Form 301                                                              Page 2 of 12

In approximately 2010, while on parole in Colorado, Thomas and his acquaintances applied for student loans for themselves. Thomas would take individuals to PPCC and show them how to enroll in courses and apply for federal student aid (FSA). The following individuals voluntarily agreed to have Thomas assist them in applying for FSA to attend PPCC: Lola Thomas (Thomas' wife), Christine Duncan, Vanessa Lopez, Ismael Omar (Thomas' friend), and Michael Cox (Thomas' cousin). Cox legitimately went to PPCC and did well in school. Carr believed that Thomas was helping people go to school and he received a portion of their FSA for helping them enroll.

During this time period, Carr and Thomas would fly back and forth from Arizona to Colorado to visit each other.

Carr's friend, Marcy Green, was doing something similar to Thomas, in that Green would sign up people to receive FSA and she would take a portion of their FSA for assisting.

While at a barbeque, Carr was present when Green and Thomas were discussing how it was a hassle to convince people to sign up for school to get financial aid. They were discussing the need for a more elaborate way to get FSA funds. Green watched a show where a woman was sentenced to life in prison for burning her children. The three of them rationalized that using the identities of prison inmates was acceptable because inmates hurt other people. In the event these inmates were released, any student loans in their name could be forgiven because they could show they were in prison during the time period the loans were taken out. The three of them believed they were not hurting anyone and they would no longer need to split the FSA funds with the applicant. Using PPCC was Thomas' idea because he and his acquaintances already obtained FSA from there. The three of them were all in agreement. Diaz was not present at the barbeque.

Carr and Green met under unusual circumstances. Carr dated Green's ex-boyfriend, Roderick Smith. Although the two have had a tumultuous friendship, she helped Green when she was going through a rough period. In approximately 2007, Smith beat up Green and knocked out her tooth. Carr took care of her three sons during this time.

Carr stated Green minimized her involvement when speaking to investigators in November 2012. During the timeframe of the interview, Green was facing marijuana charges. It was a complete lie when Green told investigators that Carr hung out at Green's residence. Green used computers at both of Carr's residences at 1351 Pleasant and 1822 E. Kaibab in facilitating the scheme to obtain FSA in the names of inmates. Debit cards mailed to Green's house were mailed there at Green's direction, not because Carr asked Green to use her address. Carr never paid Green any money for the receipt of debit cards and/or use of Green's address. Carr did not need to pay Green because Green, herself, was getting FSA funds from the debit cards in inmate's names.

Carr did not care to hang out at Green's house because she is involved in drugs and prostitution. Carr and Green do not hang out with the same people. There were possibly the following three occasions when Carr went to Green's house: to pick up one of Green's sons, to help hang pictures, and to attend a barbeque. Green would come to Carr's house because there was a better atmosphere there. Green resided in her Aunt Hazel's home and her uncle resided in a shed in the backyard. Green's aunt was like a mother to Green. Green did not want her Aunt Hazel hearing stuff that she was involved in.

Green came to Carr's residence while Carr was working from home. Carr typically worked five days a week from 9:00 a.m. until 8:00 p.m. Green used various computers at Carr's residence

Case 1:16-cr-00054-WJM Document 535-1 Filed 04/03/19 Page 4 of 12

to look up names on various Department of Corrections websites (DOC). Green brought Carr the names and/or dates of birth obtained from DOC websites. With the information Green provided, Carr queried the information in the LexisNexis database and would obtain the information necessary to apply for FSA.

Seeing the number of queries conducted in LexisNexis in the discovery was shocking to Carr. Carr would ask Green to bring her additional inmate names because there were times when the queries conducted would not work, meaning they were unable to get student loans using those names. This was due to the inmate already having student loans and/or other credit issues. Both Green and Thomas conducted DOC inmate searches and had Carr obtain the social security number from LexisNexis. Carr further confirmed this because Green, who would be in another room, would often ask Carr to look at photos of the inmates, "hey, come look at this lady." Carr also queried inmate names on various DOC websites, usually to verify a date of birth.

There was not any particular reason why they chose the various inmate names. Although, they did think the mailman would be more likely to deliver a name that was the same as the person who already occupied the residence. For example, the last name Grant was the same as the person, Michelle Grant, who occupied the residence on Lexington.

Prior to 2012, Carr does not know how Thomas obtained names or if he visited DOC websites to obtain information because he was residing in Colorado at the time. She believes he was mainly signing up people he knew in Colorado.

Prior to 2012, Green asked Carr to obtain a lot of inmate identifiers through LexisNexis. Green was responsible for getting the scheme to work. Green, who was also attending school and familiar with the FSA process, submitted the majority of the FAFSA's. Carr submitted approximately ten FAFSA's in the names of inmates.

Green conducted DOC searches, submitted FAFSA's, and electronic school enrollment applications on her own laptop, and on laptops and computers located in each of Carr's residences, often times when she sat outside and smoked. Carr's wireless internet was used during the DOC searches and electronic FAFSA and school application submissions. Diaz was also present and would assist in the various processes done to receive FSA in the names of inmates. Carr's daughter, Ayanna, was present and saw what was going on but she was usually playing. Ayanna was not involved.

Diaz was legitimately enrolled and attending college during this timeframe. Green, who was not employed, was also enrolled and attending college at Gateway Community College, where she eventually received her degree in criminal justice.

After 2012, when Thomas moved in with Carr in Arizona, things got weird between Carr and Green. Green began doing more of the student loans on her own. Carr did not submit near the amount that was submitted by Green. Green wanted to do it herself because she said Carr kept messing up.

After the search warrant in 2012, Carr and Green ceased communicating with one another for a long period of time.  Carr has her own business where she creates caricature shirts. The last time she spoke with Green was almost a year ago when she created a shirt for one of Green's sons.

Carr's friend, La Tania Pickens, allowed Thomas to use her rental property address at 1418 Rushmore Drive in Colorado Springs for his parole address. Thomas has a way of getting

people to do stuff for him. Pickens resided at 1418 Rushmore at various times but Carr could not recall the exact dates. Thomas briefly resided in Pickens garage at 1418 Rushmore. Thomas stayed at other places and also resided at an apartment on 3820 Radiant Drive in Colorado Springs, Colorado.

Pickens was not aware this address was being used for the mailing of debit cards in the names of prison inmates. The mailbox was located at the end of the street. Carr and Thomas would drive-by and pick up student inmate mail from the mailbox. The mailman delivered any and all names to this address.

There was a period of two to three days when Carr knew the Higher One debit card would be delivered. Once the school application was accepted, the student received an email letting them know that a green Higher One envelope would be arriving in the mail. This envelope contained the debit card.

Carr was aware of inmate Robert Pickens. Carr conducted the DOC query in the name Pickens and chose this name because she wanted to make sure the card was delivered to the mail box. Carr thought this card was initially rejected or returned by the postal service.

Prior to moving to Arizona, Carr resided at 2441 Lexington Village Lane, Colorado Springs, Colorado. Her friend, Michelle Grant (aka Michaela) resided at 2372 Lexington Village Lane, Colorado Springs, Colorado. Carr asked Grant to help forward her mail to Arizona. Carr still had the key to her old mailbox.

The postal service would only deliver the last name Grant so they had to use inmates with the last name of Grant at this address. Grant never checked her mailbox. The mailboxes were located in a central area and the backside of the boxes could be removed. Carr, Diaz, Green, and/or Thomas removed the back side of the mailbox on their trips to Colorado and obtained the mail in the inmates' names.

During the 2010 timeframe and prior to Thomas' arrest, Thomas asked Carr to query social security numbers and he would assist in the retrieval of student mail. Carr does not know if he knew how to complete and submit an electronic FAFSA. Both Thomas and Sanders resided at 3820 Radiant Drive, Colorado Springs, Colorado. Carr saw Sanders' signature in the notarized documents provided to PPCC.

Green obtained her own addresses to use. Carr confirmed the Blackhawk address was her step-brother, Matthew Sander's residence. Diaz was responsible for opening private post office boxes and using the Dragoon and 724 W. Knox Court addresses. The Pleasant or Kaibab addresses were never used to receive any school or Higher One information.

People were directed to send the school mail or Higher One debit card to Carr's private mail box address at 975 E. Riggs Road in Chandler, Arizona. Thomas directed Kimmisha Mullett to send debit cards that she received to the private mail box address. Carr does not know about the Oakland Street address in Aurora, Colorado.

Mullett and Thomas had a business together. The business was called 911 Design and Printing. Carr had nothing to do with the business and never met Mullett. Carr later said she may have met Mullett on one or two occasions. Mullett and Thomas shared text messages between each other about where to send the Higher One mail because Mullett's address was used to receive student loan mail in the names of inmates.

Michael Cox, Thomas' cousin, resided at the Rice Drive address in Colorado Springs, Colorado. Carr hates Cox and does not speak to him. Carr believes Thomas and Cox talked about the scheme with each other.

Carr was not aware that Arizona addresses were being used to apply for FSA to attend school at PPCC. It was her understanding that this could not be done and that is why they used the mailing addresses in Colorado. In seeing the discovery, the Arizona addresses were new to Carr.

Once the Higher One cards were forwarded to Arizona, Diaz and Green would get people they knew to drive around and withdraw money from the debit cards at various ATM locations until all of the funds were withdrawn from the debit cards. Initially, they did it themselves but it became exhausting because there was a daily withdrawal limit on the debit cards. Diaz and Green would get half of whatever amount was on the debit card.

The cards were used primarily to withdraw funds but there were occasions when the cards were used for purchases. When a purchase was made, they requested additional cash back on the transaction. Thomas and Carr were also involved in withdrawing funds from the debit cards at various ATM and store locations. The bulk of the funds were split between Carr, Diaz, Green, and Thomas. A fee of usually $10 was paid to the "meth-heads" that drove around to the various ATM machines.

Thomas did not reside in Arizona until approximately February 2012. Thomas visited the 1351 Pleasant address on his trips to Arizona but he never resided there. In 2012, Carr moved from the 1351 Pleasant address to 1822 E. Kaibab. Carr and her children resided at the 1822 E. Kaibab address for approximately two weeks prior to Thomas coming to Arizona and moving in with them.

During Thomas' incarceration between approximately January 2011 through November 2011, Thomas was aware of the scheme. Carr and Thomas' conversations about the scheme were limited due to the possibility of his jail calls being recorded. Carr used FSA funds obtained in the names of inmates to pay for Thomas' legal fees. Approximately $10,000 in FSA funds were used to pay for Thomas' attorney. Carr also deposited FSA funds into Thomas' inmate trust account (commissary). It would be a fair assessment that Carr submitted more than ten FAFSA's, considering this money was used to pay for Thomas' attorney fees.

In discussing the Tempe Police car stop, Thomas admitted to Carr that he was seeing another girl. The girl threatened to call Carr at 1:00 a.m. and tell her about Thomas' cheating. The girl had the debit cards and laptop at her house so Thomas went to the girl's house to retrieve these items. On his way home from the girl's house, Thomas was pulled over with the laptop and debit cards. Thomas was driving a vehicle registered to Carr. Thomas used the vehicle, not Carr.

Carr could not find a logical reason why he would still have cards from a long time ago. Higher One mailed the debit cards prior to the disbursement of any FSA funds. In seeing the discovery, Carr noted that some of the cards were never activated. Carr does not understand why someone would have kept a card that was not activated. Green kept the majority of the debit cards and she owned a pink laptop at one time. Carr wondered if that is why her relationship with Green became awkward, because Green and Thomas were messing around with each other.

The four of them took part in filling out the various loan documents for the schools. Diaz was primarily responsible for taking these student loan records to various locations where they could

be faxed to the school, such as the FedEx location. They also had the "meth-head people" assist with this. There were times with Green personally hand delivered the documents to the school.

The four of them took part in the electronic submission of school enrollment applications in the names of various inmates.

Carr has no idea how school loan records were faxed to PPCC from a Wells Fargo location. Carr has never worked in a Wells Fargo branch building. She either worked from home or at a leased building while employed with Wells Fargo.

The social security number searches in LexisNexis were only done by Carr.

Prior to 2012, Carr personally saw Diaz and Green fill out documents but she never personally saw Thomas submit FAFSA's or fill out loan records for the school. She would be able to verify his handwriting if shown documents.

In 2012, Thomas wanted more money when he was released. When Thomas resided with Carr in 2012, he submitted FAFSA's and did coursework to ensure FSA funds were released. Carr recalled him saying he had a psychology paper due. The four of them knew they had to show attendance in order for funds to be released. Thomas was also involved in the submission of handwritten loan records to the school and the withdrawing of FSA funds from ATM locations. Carr knew he did this but she was never with him when he did it. Carr admitted that Thomas was involved.

Carr worked all day and did not have a lot of time to spend on the scheme. They all communicated amongst each other about coursework and the four of them took part in logging in to record attendance. Carr volunteered to do coursework that she was interested in. Specifically, Carr recalls Green complaining about having four essays due. One was a psychology assignment about Freud. Carr volunteered to complete that assignment.

The four of them enrolled in courses that interested them. Green, having a degree in criminal justice, chose a lot of criminal justice courses.

At this point during the meeting, Carr was provided a copy of the search warrant sketch. Carr annotated what the various rooms identified in the sketch were (Attachment A).

The day the search warrant was executed, Carr was asleep on the couch. At first, Carr thought her daughter, who was getting ready for school, was playing her music too loud. Carr knew that law enforcement was outside because they were shining lights on the house. Initially, Carr was not sure if law enforcement was trying to come in their house. A canine cop resided across the street from them. Carr went to brush her teeth and put on makeup, knowing she would need to go outside. She went upstairs to look out the window and flash bang devices were heard in the backyard.

During this timeframe, she went to her office where she had a notebook with information related to the inmates' school information written down. Rather than shedding the records in the shredder she had in her office, she tore the pieces and flushed them down the toilet in the master bathroom. She did this because she envisioned agents spending hours piecing together the shredded records. She flushed approximately three pages of information.

The information contained in the notebook was for organizational purposes. It was a checklist used to keep track of the status of FAFSA's, school applications, and homework. Sometime

MOI_00000256

during all of this Thomas came up the stairs. She does not know what he was doing during this timeframe.

Carr does not know why Thomas broke his cell phone. It was an old phone that he was not using. Thomas was downstairs for a portion of the time that Carr was upstairs. Thomas later told Carr that he broke the phone because he did not want Carr to find out about other "bitches."

Initially, Carr did not manage the organization of the inmates' school information. She just started doing that right before the search warrant was executed, once the school's fall semester started.

After Thomas's arrest and the search warrant, Carr and Green became distant. Carr assumed Green was jealous of Carr's relationship with Thomas and the lifestyle they were living. Carr wondered if Green and Thomas were having an affair. Carr thinks Green kept the debit cards and that the pink laptop belonged to Green.

At the time of Thomas' arrest, Thomas told Tempe PD arresting officers that marijuana located in the vehicle belonged to Carr's daughter, Ayanna. When told this, Carr responded that Ayanna did not use marijuana but Thomas did. Marijuana was never used in front of the children. Green used marijuana.

Carr related the following in reviewing photos taken during the search warrant and photos obtained from seized computers (Attachment B):

| | |
|---|---|
| SW_00001436: | The photo was 1822 E. Kaibab |
| SW_00000218: | Carr purchased the mural located in the master bedroom. She got the idea from a Jay-Z song. |
| SW_00000214: | The ACER laptop in the photo was her daughter's Milani. The iPad tablet was her other daughter's Kaira. Green always lost stuff, including her computers. Green used the ACER laptop and other computer devices at Carr's residence. The ACER laptop was used to activate inmate debit cards, including Higher One debit cards. There was the probability that any one of the four of them (Carr, Diaz, Green, and Thomas) could have used the ACER laptop to do this. |
| SW_00000216: | This was a photo of Thomas' office and his computer. |
| SW_00000217: | The photo was a close-up of the computer in Thomas' office. Carr did not use this computer because Thomas would not give her the password. The computer's profile login ID was King. |
| SW_00000223: | Carr confirmed these were the torn notes she tried flushing down the toilet. |
| SW_00000219: | The broken phone was Thomas' old phone located in his portion of the master bedroom closet. Thomas had a box of miscellaneous items he brought with him when he moved from Colorado. There were other old phones in the box. |
| SW_00000220: | Carr confirmed the close-up photo of the broken phone was Thomas'. |

MOI_00000257

Interview of Heather Carr, November 3, 2016              12-080234

SW_00000244:      The disks in the photo were from Thomas' dismissed case. Carr did not know who the phone in the photo belonged to. The photo was taken in the master bedroom vanity area.

SW_00000233:      The phone in the photo was Carr's work phone. The photo was taken in one of the restrooms.

SW_00000230:      The iPad and iPod in the photo belonged to Carr's daughter, Ayanna.

SW_00000231:      Carr did not know who the phone in the photo belonged to. They had a lot of phones in the house that were no longer used. Carr confirmed the phone was located on a couch in Ayana's bedroom.

SW_00000232:      The laptop was her daughter's, Kaira.

SW_00000236:      The Kindle was located in one of the bedrooms and it belonged to one of Carr's daughters.

SW_00000237:      Carr did not know who the phone in the photo belonged to.

SW_00000234:      The laptop was her daughter's, Ayanna.

SW_00000226:      This was a photo of Carr's office, with her computer and her Wells Fargo work laptop.

SW_00000227:      This was a photo of Carr's computer in her office.

SW_00000246:      This was a close-up photo of Carr's computer in her office. Carr did not know the profile name created for this computer. This computer and the computer in Thomas' were the same brand and type of computer.

SW_00000228:      This was a close-up phot of Carr's Wells Fargo work laptop.

SW_00000238:      This was an iPad and BlackBerry located in Carr's vehicle. She did not know who they belonged to. They had so many Apple devices and phones in the residence. To say that they all used them is a fair statement.

SW_00000245:      This was a photo of Carr's step-brother, Matthew Sanders and Thomas.

SW_00000205-213: These were photos of Heather Carr's gun. Carr has always owned a gun because she was a victim of a home invasion. The gun was registered in her name. She used to go to "ladies night" at the shooting range. Thomas never went to the ranges with her and he did not access the gun.

Following Thomas's arrest with the debit cards and laptop, Carr was troubled enough to get rid of an old computer of hers. The computer was one she had while residing at the 1351 Pleasant address. She destroyed the laptop and threw it away in a dumpster. Carr was concerned because Thomas used the 1351 Pleasant address for his parole in Arizona.

MOI_00000258

The four of them continued to apply for FSA in the names of inmates following Thomas' arrest. Thomas minimized the arrest and did not make a big deal of it.

The night of the search warrant, Carr went to Green's house to discuss what happened. Green was very dismissive and did not want to discuss what happened. She did mention that people came to her house to talk to her. She told Carr that these people took her kids to school while she was interviewed. She did not want to talk about any details of the interview. Green did not want her Aunt Hazel to find out what happened. Green tried cutting ties with Carr after the search warrant. Approximately a year after the search warrant, Green tried to be friends with Carr. During this timeframe, Carr removed her Facebook profile for a while, and she and Green were Facebook friends.

Carr found out Diaz was arrested the day of the search warrant. Carr was trying to get a hold of Diaz after agents left her residence. She eventually went to Diaz's house. Diaz's roommate was upset because Diaz owed her money and she could not be located. After making a few phone calls, Carr learned Diaz was arrested.

Carr did not recall how some of the names and numbers ended up on her iPad contact list. In reviewing the discovery, she did not believe she had as many contacts as the iPad contact list indicated. She is not sure how iCloud works but she thinks a lot of those contacts are left over from items backed up to iCloud. For example, there was a contact she had in there from 2007, Akeimi. Akeimi is Green's friend. Carr cannot stand Akeimi because Carr claimed that Akeimi hates white people. The last time she spoke with Akeimi is when Green was arrested in Los Angeles, California.

Thomas told Carr to never get rid of Christine Duncan's, Vanessa Lopez', or Ismael Omar's social security numbers so she stored them in her iPad contact list. She does not know why Thomas wanted to keep this information.

Carr had Roderick Smith's social security number in her iPad because she was his power of attorney at one time. Carr did not know why she had Green's social security number stored in her iPad.

Carr does not know why Michael Cox's Chase credit card number was in her iPad contact list. She does not like him.

Carr never contacted the schools and pretended to be one of the students. She does not think anyone did that. They (Carr, Diaz, Green, and Thomas) made inmate queries on the DOC websites.

In reviewing SW_00001427, a document titled "Adams County Jail Population Sheet" that was located on Carr's computer, Carr did not know how this document was located on her computer. She is not familiar with Denver County jail websites, she only queried DOC websites. Carr assumed this was booking information that was pulled from an Adams County website. Thomas might have asked Carr to look up one of his friends that was recently released from jail. Carr could not recall his name. Carr is not aware of anyone using her computer. Thomas and Carr's computers were purchased approximately a week before the search warrant.

Carr met Terrell Smith once. He was a pimp and she did not know him.

Case No. 1:16-cr-00054-WJM Document 525-35 filed 12/12/18 USDC Colorado pg 714 of
971
Case 1:16-cr-00054-WJM Document 357 filed 04/03/18 Page 11 of 12

Interview of Heather Carr, November 3, 2016                                    12-080234

The screen shots from Chandler-Gilbert Community College were from Ayanna's husband. He was attending Chandler-Gilbert and did his course work while at their house. A review of the course login screenshot information shows that the courses listed had prerequisites. They did not enroll inmates in courses that had prerequisites.

Carr is not afraid of Thomas. She believes Thomas is capable of being intimidating because he protected her step-brother while he was in prison. Carr and Thomas never married. They were together from approximately 2009 through 2012 and again in 2014, when they went to San Diego but ended their relationship shortly after the trip.

After Carr left Arizona, Thomas moved his wife, Lola Thomas, down to Arizona.

Carr never met Christine Duncan. Duncan used Carr's identity when Duncan was arrested with Thomas at a hotel in 2011. A police report from January 2011 stated that Carr was present during the arrest. Duncan told law enforcement that she was Heather Carr. Duncan and Thomas commited robberies together.

Carr knew Duncan's name because Thomas told her about signing up Duncan up for school. He asked Carr to save Duncan's social security number. Carr knew they were arrested together and that the two committed robberies together. Duncan was a "meth head." Until seeing the discovery, Carr was not aware that Diaz and Green were involved with Duncan.

One time Carr saw Duncan in a car with Diaz at a gas station. That was the only time Carr saw Duncan. Carr recalled asking Diaz who was with her. Diaz told Carr she was a friend visiting from Colorado. Diaz did not give Carr a name. Carr did not get involved with Diaz's meth life.

Carr knew nothing about Vanessa Lopez. Thomas knew her.

Thomas was evasive about a lot of things. He was a whore who had a crafty way of telling stories. There was an overwhelming amount of stuff that he lied about. If it were not for their kids, she would tell him to "fuck off."

Currently, Carr runs her own business selling t-shirts and is an Uber driver. It is difficult to make ends meet. Carr texts Thomas asking him to send money and he responds by saying that he will see what he can do.

Carr confirmed the number tied to "Daddy" in her iPad contact list belonged to Thomas. Carr confirmed the "Rocketmail" email address belonged to Thomas.

At times, Thomas was a family person and they did things as a family. All four names of Carr's children are tattooed on Thomas. None of this is fair to the kids. Thomas has only seen his kids approximately ten times since 2012. He has been to see the kids in Virginia once. Thomas was there for the birth of their son, Tru. He has seen his son approximately three times. There is a whole other side to Thomas.

Carr confirmed the Blackhawk address in the scheme belonged to her step-brother, Matthew Sanders. Carr did not keep in touch with Sanders. She may have met him once while at the airport in Denver.

OIG Form 301                                                            Page 11 of 12

Interview of Heather Carr, November 3, 2016                                    12-080234

Carr assumed Sanders knew about the scheme because debit cards were mailed to her private mail box on Riggs road. The cards arrived without the green envelope that they were originally sent in. There were a lot of cards coming from different addresses.

Carr did not know an address belonging to Sander's mother was used. Carr does not talk with Sander's mother. She knows her name is Sandy. Carr had nothing to do with the use of this address to obtain FSA.

Marcy Green used to have a pink laptop. Carr never used the laptop that was with Thomas the night that he was arrested.




### UNITED STATES DEPARTMENT OF EDUCATION
#### OFFICE OF INSPECTOR GENERAL
#### INVESTIGATION SERVICES

**DATE INTERVIEWED**: October 30, 2017
November 7, 2017
November 13, 2017

**PERSON INTERVIEWED**: Heather Carr

**ALSO PRESENT**: Mary Butterton, Defense Counsel

**INTERVIEWED BY**: Martha Paluch, Assistant US Attorney
Bryan Fields, Assistant US Attorney
Special Agent Sandra Ennis

**LOCATION**: Telephonic
1801 California, 16th floor conference room
Denver, Colorado 80202

**CASE NUMBER**: 12-080234

**CASE NAME**: Pikes Peak Community College

On various dates, Assistant United States Attorneys, Martha Paluch and Bryan Fields, and Special Agent Sandra Ennis, United States Department of Education (ED), Office of Inspector General (OIG), interviewed Heather Carr telephonically. Carr's legal counsel, Mary Butterton, was also present on the call. After being advised of the nature and purpose of the interview and the identities of all present, Carr voluntarily provided the following in essence:

Carr's communications with Thomas are bad. Thomas started paying child support in what Carr believes is an effort to make himself look better at trial. Last month, Thomas stopped paying. Thomas and Carr do not speak. He sends text messages directly to his daughter. Carr feels so stupid and cannot stand Thomas. He is a liar and there is no point in trying to have a conversation with him.

Approximately three months ago in mid-August, on three separate occasions, a strange man came to her door and it scared the shit out of her. The first time he came to her house was around 4:00 p.m. and Carr was at the YMCA. The individual had dreadlocks and was seen on his cellphone standing in her driveway. The individual was not in a car. The second time was around 8:00 p.m. and Aubrey (LNU) was home but Carr was not. About three days later, the same individual came back. Carr answered the door and the individual said, "You are testifying against Marcy. Make sure you do not say anything about anyone else."

Some of Green's family members reside in Virginia. Carr does not know how Green knows where she lives. The occurrence was completely random and has not happened again.

Green is lying about not having been to Colorado. She has been to Colorado on many occasions when transporting drugs from Colorado to California.

Carr has never testified and never been in trouble. Carr owns her own company called "That Goodish" and she is a driver for Lyft.

Prepared by: Sandra Ennis

Date Prepared: November 08, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)

Case No. 1:16-cr-00054-WJM-Document 525-1 35 Filed 12/13/19 USDC Colorado 2 of 5 pg 717 of
Case 1:16-cr-00054-WJM Document 525-1 Filed 12/03/18 Page 2 of 5
971

Interview of Heather Carr, October 30. 2017                                                    12-080234

In approximately January 2009, Thomas applied for his own federal student aid (FSA) for attendance at Pikes Peak Community College (PPCC). Thomas used this money as a source of income.

In approximately 2010, Thomas took friends to PPCC and helped them enroll. These individuals were Lola Thomas, Vanessa Lopez, Christine Duncan, Ismael Omar, and Thomas' cousin, Michael Cox. Thomas received a portion of the FSA funds for assisting these individuals. Carr knew this because Thomas told her this information. Cox legitimately attended school.

Thomas met Lola Thomas while he was in prison. At some point, Lola Thomas was not allowed to visit Thomas in prison because she was caught bringing in drugs. Thomas lived with Duncan, and Omar was a friend of Thomas. Carr does not know anything about Lopez.

In searching for inmate names, Carr, Diaz, and Green did Google searches of department of corrections and found inmates through various department of corrections websites. These inmate searches were conducted at both the Pleasant and Kaibab addresses. Green also did inmate searches from her residence.

Carr was not certain if Thomas conducted inmate searches while living in Colorado. Carr was sure Thomas also conducted inmate searches on department of corrections websites while residing in Arizona. Thomas was involved in completing homework, submitting FAFSAs and getting money off the debit cards.

Carr was able to get an inmate's social security number (SSN) from her access to Lexis Nexis at work. Carr conducted legitimate business queries when verifying a customer's SSN. This query was done for auditing purposes. Carr conducted queries related to the scheme on her work issued laptop and on her personally owned computer.

The four of them made up information when filling out documents provided to the school. The applicant's mailing address was not made up. There needed to be a valid address for the Higher One debit card to be mailed to. Higher One sent an email, usually to an email address generated by the school. The email stated that a debit card was mailed and the student should expect to see a bright green envelope containing the debit card within two to three business days. All four of them provided addresses for the debit cards to be mailed to.

Thomas' business partner, Kimmisha Mullet, allowed Thomas to use her address for receipt of the Higher One debit cards. Thomas told Carr this information.

Higher One debit cards were mailed to the 975 E. Riggs Road post office box address. These debit cards were taken out of the original green envelope that they were mailed in and placed in another envelope. These envelopes were addressed to Carr and were in Thomas' handwriting or another female's handwriting.

Carr and Diaz resided at 2441 Lexington Village Lane in Colorado Springs. Michelle Grant, also known as Mychalea, resided at 2372 Lexington Village Lane. Carr forwarded her mail to the 2372 address when she moved to Arizona. Grant gave Carr a key to the mailbox so that Carr could get her actual mail. Initially, Grant did not know that her address was being used in the scheme. Grant became aware when an investigator came around looking to speak with her. The address was no longer used after the investigator came around.

Carr and Diaz did the majority of picking up the debit cards from the 2372 address. Carr recalled a conversation when Diaz did not have the key so Diaz broke into the backside of the mailboxes. Thomas possibly picked up mail from the 2372 address also.

MOI_00000550

Interview of Heather Carr, October 30. 2017                                           12-080234

The Dragoon and W. Knox addresses were provided by Diaz and Diaz opened post office boxes
for the receipt of debit cards. The Blackhawk address was associated with her step-brother,
Matthew Sanders, and the Rice address was associated with Thomas' cousin, Cox.

Thomas provided the 1418 Rushmore address to parole but he did not actually reside there. He
had access to the garage and kept his belongings there. He resided at the 3820 Radiant
address. La Tania Pickens goes by Tania or Shanelle and she was the owner of the Rushmore
address. An individual named La Toya (LNU) is a different person that was mentioned in
Duncan's interview. La Toya is a crack head.

At times, the Rushmore address has been vacant. Carr and Thomas picked up debit cards from
this address. The mail box at Rushmore sits at the end of the curb.

Carr typically worked from 9 a.m. until 8:00 p.m. and every other weekend. She needed to be
available for CarMax loan decisions.

All four of them submitted FAFSAs. They were not always successful. At times, an applicant
was already in default or had an active PIN number with ED. There were also times when an
SSN was invalid.

All four of them participated in submitting electronic applications to PPCC. Part of the reason in
choosing PPCC was because Thomas had already submitted applications at PPCC and it was
working for him. Carr was also familiar with obtaining FSA from PPCC. Some of the schools
were chosen because of their familiarity with the school as a result of their own enrollment. Diaz
attended Mesa Community College. Green attended Gateway College and Carr attended
Phoenix College. Carr was not familiar with applications being submitted to Chandler-Gilbert
Community College, the Community College of Denver, Pueblo Community College, and Red
Rocks Community College.

At some point, all of them submitted master promissory notes (MPNs) and attended and
completed online coursework. In order to receive the FSA funds, a student had to be enrolled in
at least six credit hours and register attendance. Green did a lot of the work because she was
not employed. The scheme was Green's job.

In 2012, Thomas went to ATM locations to withdraw money from the debit cards. Carr was
never with him but she knew he was withdrawing money because he brought home wads of
cash and had the debit cards with him or in his wallet. Thomas liked to withdraw the cash
himself because he did not trust other people with money. Carr believed the debit cards had a
daily cash withdrawal limit of either $300 or $500. The debit card could also be used to obtain
cash with a purchase.

During the 2010-2011 timeframe, Thomas stayed at the Pleasant address when he visited Carr
in Arizona. Thomas gave Carr Colorado mailing addresses to use for inmate applicants, and he
was still enrolling females that he knew in Colorado. Thomas asked her to obtain SSN
information for him. Carr does not recall Thomas sending her text messages with SSN
information. They were always cautious about what information they put in a text message.

Higher One debit cards were still being mailed while Thomas was in El Paso County jail, and
Thomas knew the scheme was continuing. Carr and Thomas did not discuss the scheme on the
jail phone. Carr and Thomas spoke in code. An example of the code was Thomas asking how
Carr was doing in school and if she was getting good grades. Carr would say she had a lot of
homework. Thomas knew Carr was not enrolled in school. Carr used funds from the scheme for
Thomas' commissary and legal fees.

OIG Form 301                                                                       Page 3 of 5

MOI_00000551

Carr saw the photos of Thomas and money that were taken from his cell phone. Carr assumed he was trying to impress his friends and looked like a dumb ass. Carr has no knowledge of Thomas selling weed. There were two sides to Thomas. He had a family oriented side with her and a flashy showy side with others.

Thomas did not know how much Carr made. He assumed she had a really good job. Carr was making approximately $50-$60K. Carr was broke but it would look like she made a lot of money to someone in jail. Carr used money from the scheme to pay rent at the Kaibab address. Thomas never asked Carr to stop the scheme and never gave Carr the impression that he no longer wanted to be part of the scheme.

After his release from El Paso County, Thomas did not work in Arizona and was still involved in the scheme. Thomas and Kimmisha Mullet co-owned a business and that was his only employment.

Thomas was involved with submitting FAFSAs. Carr believed he did so in his office at the Kaibab address. While she never personally saw him submit FAFSAs she remembers providing Green and Thomas with lists of SSNs. Carr saw Thomas' handwritten notes that were related to FAFSA submissions, such as PIN numbers and email addresses in his office.

Thomas completed coursework. There was one occasion where Thomas could not save or submit the psychology coursework on his computer. Carr saved Thomas' coursework to a USB thumb drive and then transferred the coursework to her computer located in her office. Carr did not use the computer located in Thomas' office. It was password protected and Thomas did not give her the password.

Carr recognized the photo of the white Dodge Charger on Thomas' phone. It was the vehicle Thomas was driving the night of his traffic stop. While the vehicle belonged to Carr, Thomas had the vehicle in Colorado and he brought it with him when he moved to Arizona.

The night of Thomas' traffic stop, Carr was worried because Thomas never came home. Thomas had court the following morning and was released. The vehicle was impounded. Thomas was quiet and did not want to discuss what happened. Thomas seemed nervous. He told Carr that he just wanted to go home, shower, and go to sleep. Carr dropped off Thomas at the impound lot. Thomas called Carr shortly thereafter and asked Carr to meet him near the Pleasant address. Thomas searched the Charger for the debit cards and realized the cops took the debit cards when he was pulled over. He seemed panicky. Carr was not aware he still had the debit cards. She assumed the debit cards were gone. There was no reason for him to still have the debit cards.

Thomas told Carr that he had been cheating on her. The girl Thomas was cheating on her with called him at 1:00 a.m. and threatened to tell Carr. Thomas went to the girl's house to get everything from her house. This included the debit cards, pink laptop, and some other things. Following the traffic stop, Thomas went to stay at a hotel for about three days.

Thomas's time spent in El Paso County jail was approximately two months for the pimping charges. The remaining time was spent for the accessory to murder charge. All of the charges were dismissed.

Thomas gave Carr Sanders' Blackhawk address to use in the scheme. Carr did not speak with Sanders about the scheme. There was an occasion when Sanders inadvertently told Carr about Thomas and some girl at the Radiant address. After that, Carr and Sanders did not talk that much. If they did, it was always about positive stuff.

MOI_00000552

Carr and Thomas assumed the search warrant at the Kaibab address resulted from Thomas'
traffic stop. They did not answer the door immediately because items were being destroyed and
she took the time to brush her teeth and put on makeup. During the search a police officer
asked Thomas why he broke his phone. Thomas did not respond. Later, Thomas admitted to
Carr that he broke his phone. He told Carr he did not want her to find out about other bitches.
Carr confirmed the broken phone was in Thomas' closet. Carr and Thomas had their own closet
at the Kaibab address. Carr saw the photo of Thomas standing in a closet. Carr confirmed it
was a photo of Thomas standing in his closet.

Following the search warrant execution at the Kaibab address, both Carr and Thomas went to
Green's house to discuss what happened. Both of them were questioning Green about what law
enforcement asked her and what she told them. Both Carr and Thomas were nervous.

While in El Paso County jail, Thomas asked and Carr offered to assist him with his legal fees
and putting money on his commissary account. The topic of Thomas' legal fees was brought up
when Thomas told Carr he could not use a public defender. Carr assumed he has no one else
to help him.

A portion of Thomas' legal fees came from Christine Duncan's escorting. Carr did not mention
this previously because she was embarrassed. Carr believes there were three payments of
$200. To be on the safe side, Carr thinks she received approximately $800 from Duncan's
escorting. Carr did not receive this money directly from Duncan. She received this money from
Diaz or Green.

In discussing Carr's financial statements, Carr advised there were charges related to a trip to
California. Thomas was on the trip. Carr used funds from the scheme to pay for the California
trip and other trips that she took with Thomas. Carr and Thomas also used funds from the
scheme to go to casinos.

Carr's only knowledge of Thomas' employment was with 911 Design & Printing in Colorado.
This was the business he had with Mullett.  Thomas had wads of cash but he was secretive with
Carr.

Thomas told Carr to keep SSN information for Duncan, Lopez, and Omar in case he lost it.

Carr admitted to lying to Wells Fargo about the Lexis Nexis searches. Carr was afraid of losing
her job and she had her children to think of. Lying to her employer and lying under oath are two
completely different things.

Carr is not angry or jealous of Thomas.

Carr admitted to contacting Green and telling her not to talk to law enforcement. Carr thought
Green should get a lawyer and told Green she could be charged with perjury if she lied to law
enforcement.

Carr did not sign up Thomas for FSA without his permission.

AUSA Bryan Fields was not present during the telephonic interview that occurred on November
13, 2017.

MOI_0000553

Case No. 1:16-cr-00054-WJM-Document 525-1 Filed 12/12/19-USDC Colorado 2 pg 721 of
971
Case 2:16-cr-00054-WJM Document 135 Filed 12/03/19 Page 109 2
Case 2:16-mj-09080-ESW   Document 5   Filed 03/08/16   Page 1 of 2   **Attachment 3**

## United States District Court, District of Arizona - Phoenix
## Order Setting Conditions of Release

DATE: __3/8/2016__          CASE NUMBER: __16-09080MJ-PHX-ESW__

**USA vs. Tramell Dawan Thomas**

☒ **PERSONAL RECOGNIZANCE**
☐ **AMOUNT OF BOND**_____
      ☐ **UNSECURED**
      ☐ **SECURED BY**
**SECURITY TO BE POSTED BY**_____
**NEXT APPEARANCE in the District of Colorado as directed by counsel.**

| FILED | ___ LODGED |
|---|---|
| ___ RECEIVED | ___ COPY |

MAR – 8 2016

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

## IT IS ORDERED THAT DEFENDANT IS SUBJECT TO THE FOLLOWING CONDITIONS AND SHALL:

☒    appear at all proceedings as required and to surrender for service of any sentence imposed.

☒    not commit any federal, state or local crime.

☒    cooperate in the collection of a DNA sample if the collection is authorized by 42 U.S.C. § 14135a.

☒    immediately advise the Court, defense counsel and U.S. Attorney in writing of change in address/telephone number.

☒    maintain or actively seek verifiable employment (or combination of work/school) if Defendant is physically or medically able and provide proof of such to Pretrial Services.

☒    not travel outside of: __Arizona and Colorado__ except Defendant may travel directly to the prosecuting district, and through all states and counties in between the District of Arizona and the prosecuting district, for court purposes and lawyer conferences only, unless express PRIOR Court or Pretrial Services permission is granted to do so.

☒    avoid all direct or indirect contact with co-defendants and witnesses unless prior Court or Pretrial Services permission is granted. Defendant may have contact with co-defendant Heather Carr, as she is the mother of their children.

☒    report as directed to the U.S. PRETRIAL SERVICES 1-800-769-7609 or 602-322-7350.

☐    execute an agreement to forfeit upon failing to appear as required, the bond or designated property:_____

☐    be placed in the third party custody of_____

☒    refrain from **ANY** use of alcohol and not use or possess any narcotic or other controlled substance defined by 21 U.S.C. 802 unless prescribed for defendant by a licensed medical practitioner in the course of his/her legitimate medical practice. This provision does not permit the use or possession of medicinal marijuana even with a physician's written certification.

☒    participate in drug/alcohol counseling/treatment and submit to drug/alcohol testing, including breathalyzer testing and make copayment toward the cost as directed by U.S. Pretrial Services. The defendant shall not interfere, obstruct or tamper in any way with the administration of any Court ordered substance abuse testing.

☐    surrender all travel documents to Pretrial Services by _____ and will not obtain a passport or other travel documents during the pendency of these proceedings.

☒    not obtain a passport or other travel documents during the pendency of these proceedings.

☒    not possess or attempt to acquire any firearm, destructive device, or other dangerous weapon or ammunition.

☒    maintain weekly contact with his/her attorney by Friday, noon of each week.

☐    timely pay his/her monthly child support payments as previously ordered by the subject state court in the total amount of $___

☐    actively participate in any mental health treatment program as directed by Pretrial Services. The defendant shall comply with all treatment requirements including taking all medication as prescribed by his/her mental health care provider.

☐    not access via computer or possess any photographs or videos of sexually explicit conduct as defined by 18 U.S.C. § 2256(2).

☒    Defendant shall disclose all financial information to Pretrial Services._____

☒    Defendant shall notify all future employers of these charges._____

☐    _____

## ADVICE OF PENALTIES AND SANCTIONS

The commission of any offense while on pretrial release may result in an additional sentence upon conviction for such offense to a term of imprisonment of not more than ten years if the offense is a felony or a term of imprisonment of not more than one year if the offense is a misdemeanor. This sentence shall be consecutive to any other term of imprisonment.

Title 18 U.S.C. §1503 makes it a criminal offense punishable by imprisonment for life or by death, or, depending upon the specific provisions of the section not more than twenty years or by not more than ten years, and a $250,000 fine to intimidate a juror or officer of the court; Title 18 U.S.C. §1510 makes it a criminal offense punishable by up to five years imprisonment and a $250,000 fine to obstruct a criminal investigation; Title 18 U.S.C. §1512 makes it a criminal offense punishable by imprisonment for life or by death, or, depending upon the specific provisions of the section by not more than twenty years or by not more than ten years and a $250,000 fine for tampering with a witness, victim or informant; or by intentionally harassing another person and thereby hindering /delaying /preventing or dissuading any person from attending or testifying in an official proceeding or otherwise violating the section is punishable by imprisonment for not more than one year and a $250,000 fine; and 18 U.S.C. §1513 makes it a criminal offense punishable by imprisonment for life or by death, or, depending upon the specific provisions of the section not more than twenty years or by not more than ten years of imprisonment, a fine of $250,000, or both, to retaliate against a witness, victim or informant, or threaten or attempt to do so.

It is a criminal offense under 18 U.S.C. §3146, if after having been released, the defendant knowingly fails to appear as required by the conditions of release, or to surrender for the service of sentence pursuant to a court order. If the defendant was released in connection with a charge of, or while awaiting sentence, surrender for the service of a sentence, or appeal or certiorari after conviction, for:(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more, the defendant shall be fined not more than $250,000 or imprisoned for not more than ten years, or both;(2) an offense punishable by imprisonment for a term of five years or more, the defendant shall be fined not more than $250,000 or imprisoned for not more than five years or both;(3) any other felony, the defendant shall be fined not more than $250,000 or imprisoned not more than two years, or both;(4) a misdemeanor, the defendant shall be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender shall be consecutive to the sentence of imprisonment for any other offense. In addition, a failure to appear may result in the forfeiture of any bail posted.

If the person was released for appearance as a material witness, a fine as provided by law or imprisonment for not more than one year, or both.

## ACKNOWLEDGMENT OF DEFENDANT

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and to surrender for service of any sentence imposed. I am aware of the penalties and sanctions set forth above.

| DATE | SIGNATURE OF DEFENDANT |
|------|------------------------|
| March 8, 2016 | |

Custodian agrees to (a) supervise the defendant in accordance with all conditions of release, (b) to use every effort to assure the appearance of the defendant at all scheduled court proceedings, and to notify the court immediately in the event the defendant violates any condition of release or disappears. We, the undersigned, have read and understand the terms of this bond and conditions of release and acknowledge that we are bound by it until duly exonerated.

| SIGNATURE OF CUSTODIAN(S) |
|---------------------------|
| |

Directions to United States Marshal:

☒   The defendant is ORDERED released after processing.

☐   The United States Marshal is ORDERED to keep the defendant in custody until notified by the clerk or judicial officer that the defendant has posted bond and/or complied with all other conditions of release.

DATE:   March 8, 2016

EILEEN S. WILLETT
United States Magistrate Judge

USA, PTS, USMS, DEFT, DEFT ATTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM-2

UNITED STATES OF AMERICA,

Plaintiff,

v.

2.      TRAMEL THOMAS,

        Defendant.

---

## DEFENDANT'S MOTION FOR NEW TRIAL

---

Defendant Tramel Thomas, through counsel, moves, pursuant to Federal Rule of Criminal Procedure 33(b)(1), for a new trial, on the basis of newly discovered evidence.   Specifically, this Motion is premised upon the Government having withheld evidence from the defense, which was exculpatory and which would have been important impeachment material with respect to the cross examination of prosecution witness Marcelle Green, who testified against Mr. Thomas at his November, 2017 trial.   The withholding of this evidence denied Mr. Thomas his due process rights in and to a fair trial.

I.   BACKGROUND

The Defendant was charged in a wide ranging conspiracy to defraud the United States Department of Education.   The Government alleged that Mr. Thomas, along with three other defendants, had participated in a wide-ranging student loan fraud scheme.   At the conclusion of a four day trial in November, 2017, Thomas was found guilty on the conspiracy count, as well as on six counts of aiding and abetting mail

fraud.

Long prior to trial, the Government provided in discovery its write up of an interview of Co-Defendant, and endorsed Government witness, Heather Carr. The interview evidently took place on November 3, 2016. This report was the only report provided to the defense concerning interviews of Ms. Carr until literally days before the trial began.

At that time, the Government gave the defense a report of what was described as an amalgamation of three different interviews of Ms. Carr, all having taken place by telephone. A copy of this report is attached as Exhibit 1. The report indicates that the interviews of Carr took place on October 30, November 6, and November 13, 2017. No additional reports of interviews of Ms. Carr were provided to Thomas's defense team either prior to or subsequent to trial.

Several months prior to trial, Assistant United States Attorney Martha Paluch and Thomas's counsel Daniel T. Smith had reached an agreement that all witnesses who appeared on the Government's witness list would be under subpoena. Any individual on that list therefore would be available at the time of trial for the defense to call as a witness even if the Government chose not to call any particular witness to testify. This agreement obviated the need for Mr. Thomas to subpoena any person who was on the Government's witness list.

On the morning of November 28, 2017 (the second day of trial) the defense was advised by Government counsel prior to Court being called into session, that the prosecution was not going to call Ms. Carr as a witness. AUSA Paluch advised Thomas's counsel that Ms. Carr had decided not to testify even though doing

2

so was an integral part of her plea agreement with the Government.   Government counsel also advised defense counsel that morning, for the first time, that Ms. Carr was not under subpoena.   The prosecution further informed the defense that the Government had no idea where Ms. Carr was at that time.

Ms. Carr did not in fact testify at Thomas's trial. The only indicted co-conspirator who did testify was Marcelle Green.   Green's testimony in pertinent part can be described as follows.   Green stated that she and Carr initiated the conspiracy (Ex. 7, p.6, ll. 7-20).   The conspiracy involved applying for federally funded student loans in the names of inmates being held in various state prisons (Ex. 7, ll. 16-24).   Once an inmate had been identified, Ms Carr , through her employer's (Wells Fargo's) data bases, would identify the inmate's social security number, credit history and other information required for the loan application (Ex. 7, p. 17, ll. 13-24)

Green further testified that money that was received by Green and Carr on these loans was split between them, according to their prior agreement (Ex. 7, p. 13, ll. 10-19).   Green said that she assumed that Thomas had received some of the funds since he lived with Ms. Carr during part of the charged conspiracy (Ex. 7, pp. 13-17).    Green testified that on a single occasion she observed and assisted Thomas in filling out a FAFSA loan document. She stated that the four charged co-conspirators were all present at that time (Ex. 7, p. 18, ll. 21-25; p. 19, ll. 1-14). Green also testified that she did not speak to Thomas about the fraudulent loan scheme (Ex. 7, p. 40, ll. 10-13).

Ms. Carr's sentencing was held before this Court on January 4, 2018.   A transcript of that hearing is attached as Exhibit 4. During her sentencing Ms. Carr

3

made a lengthy statement. Carr recited her memory of parts of the phone interviews she had had with the Government.

Ms Carr stated (Ex. 4, p. 34) that at one point she told the prosecutors that she had never seen Thomas fill out a FAFSA. Ms. Carr stated that, when she told the prosecution this, AUSA Fields began a verbal tirade and that she felt threatened. She stated that the interview was terminated when her counsel, Assistant Federal Defender, Mary Butterton hung up the phone. She further asserted that when she tried to provide additional information to the prosecutors, they cut her off. (Ex. 4, p. 36)

Both counsel for Mr. Thomas were present at Ms. Carr's sentencing hearing. After it ended, counsel Smith approached Ms. Butterton and asked if he could speak with Ms. Carr about the referenced interviews. Ms. Butterton advised that she would ask her client and that she would get back to Mr. Smith.

On January 9, 2018, Smith received an email from Ms. Butterton (Exhibit 3). Butterton informed Smith that Ms. Carr was willing to be interviewed, and the interview was scheduled for January 16, 2018. Pursuant to directions from Ms. Butterton, Smith and Goodreid called her office on the 16th. At that time Ms. Butterton advised that she had decided not to participate in the phone interview of Carr. Smith requested that Butterton reconsider, but she stuck by her plan not to be on the call.

Smith and Goodreid then interviewed Ms. Carr over the telephone. Subsequent to the interview process Carr executed an affidavit, which is attached as Exhibit 2. The affidavit relates in summary fashion a part of what Ms. Carr told Smith

4

and Goodreid.   To begin with, Carr swears (Ex. 2, ¶ 3) that in October and November of 2017, she had spoken with the prosecutors and with SA Ennis on four separate occasions, rather than just the three interviews reflected in Ennis's report (Ex. 1).

In her affidavit, Carr reaffirms her declaration at her sentencing that she had informed prosecutors on October 30, 2017 that she had never seen Thomas fill out a FAFSA form.   Carr also states in her affidavit (Ex. 2, ¶ 6), that when she told the prosecutors in the fall of 2017 that Thomas had never threatened her and that she, Diaz, and Green (but not Thomas) were the main participants in the scheme, the interview was terminated after AUSA Field's verbal fusillade.   Moreover, Carr declares in her affidavit (Ex. 2, ¶ 9a), that Green had participated in collecting money in Colorado that had been generated by the scheme.

Carr states (Ex. 2, ¶ 9b) that Thomas had not provided the Radiant Drive address for the scheme.   Carr also swears (Ex. 2, ¶ 9c) that Thomas did not participate in the scheme during the time period he was in jail in Colorado Springs (January 27-early November 2011).   Carr also declares (Ex. 2, ¶ 9c) that she was not present in Colorado at any point during January of 2011.

She further states that she told the prosecutors in the fall of 2017 that Co-Defendant and co-conspirator Diaz had at one time dated Michael Cox (Ex. 2, p. 9), which bore on the Government's trial theory that Cox's address on Rice Drive had been provided by Thomas since he was related to Cox.   Carr also states that she had told the prosecutors in the fall of 2017 that Ms. Green had regularly and continually used the Dodge Charger automobile (Ex. 2, ¶ 9h) during 2011 and 2012, including right before Thomas was arrested in that vehicle and 52 debit cards were

<div align="center">5</div>

seized from the automobile.   All of this information just outlined from Carr's affidavit was provided to the Government during pre-trial preparation interviews in October and November of 2017, but none of that information is contained in Special Agent Ennis's report (Ex. 1) that was given to the Thomas defense team shortly before trial. None of this information ("Undisclosed Information") was ever provided to the defense by the Government at any other time in any other medium.   As described more fully, *infra*., the Undisclosed Information was both exculpatory and material, should have been turned over to the defense, and would have aided him immeasurably at trial.[1]

## II. ARGUMENT

"'A motion for a new trial based on newly discovered evidence is generally disfavored and should be granted only with great caution. . . [However,] when a movant alleges 'suppression by the prosecution of evidence favorable to [the] accused upon request,' *Brady v. Maryland,* 373 U.S. 83, 87 . . . (1963), the standard is easier to meet." United States v. Redcorn, 528 F.3d 727, 743–44 (10th Cir. 2008), *cert. denied*, 562 U.S. 898 (2010).   "A defendant who seeks a new trial under Rule 33 based on an alleged *Brady* violation must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material. United States v. Velarde, 485 F.3d 553, 558 (10th Cir. 2007).   If these three factors are satisfied, regardless of the prosecution's intentions in suppressing the evidence, a new trial is justified." United States v. Torres, 569 F.3d 1277, 1281 (10th Cir. 2009).   As such, in this Circuit, Mr. Thomas need not show whether the Government's failure to

---

[1]Once the Defendant learned of Carr's information, his counsel immediately asked the Government to produce any exculpatory material in the prosecution's possession (Ex. 5). As of the date of filing of this motion, no such information has been received (Ex. 6).

6

Case No. 1:16-cr-00054-WJM   Document 525-1 filed 12/12/19 USDC Colorado   pg 729 of
971
Case 1:16-cr-00054-WJM   Document 358   Filed 04/03/18   Page 7 of 11

provide the Undisclosed Information was intentional or merely negligent because "'the suppression by the prosecution of evidence favorable to an accused upon request[2] violates due process where the evidence is material to either guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196-97." United States v. Hughes, 33 F.3d 1248, 1251 (10th Cir. 1994).

The first two factors of the three part test for granting a new trial for Mr. Thomas are easily satisfied.   First, as outlined above, the prosecution did not provide the defense with the Undisclosed Information.   Second, as also explored above, the Undisclosed Information was in fact evidence favorable to Mr. Thomas.   Therefore, the efficacy of Mr. Thomas's request for a new trial rises and falls on the third and final part of the test for a new trial, the issue of materiality.

"'Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.   A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Hughes, 33 F.3d at 1251–52.   Assessing the effect that the Undisclosed Information likely would have had on Mr. Thomas's trial is sufficient to undermine confidence in the outcome of that proceeding.

The prosecution's evidence against Mr. Thomas at trial essentially had three main pillars.   The first was the testimony of Co-Defendant Marcelle Green, the second was Mr. Thomas's connection to various addresses in and around Colorado Springs where mail relating to the fraudulently acquired student loans was sent; and the third

---

[2] Mr. Thomas made such a request in this case, as reflected in the 5 April 2016 Discovery Conference Memorandum and Order [#43, p. 4, ¶ I(B).

7

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/13/18   USDC Colorado   pg 730 of
971
Case 1:16-cr-00054-WJM   Document 358   Filed 04/03/18   Page 8 of 11

was the 52 debit cards found in the automobile that Mr. Thomas was driving in August, 2012 when he was pulled over by local police in Chandler, Arizona.   The Undisclosed Information undercuts each of these components of the Government's case.

A.   Testimony of Marcelle Green:   As previously set forth in Mr. Thomas's objections to the PSIR [#348] Green described a small role in the fraud offense for Thomas.   She testified that Mr. Thomas had some role in the fraud scheme, but that she had only seen him, on one occasion, fill out a FAFSA, that that was the only time she saw him involved in the scheme (Ex. 7, p. 18, ll. 15-20), and that she could not say that he participated in doing homework.   In short, the most inculpatory thing she had to say about Mr. Thomas was that he had filled out a fraudulent FAFSA.

However, that assertion about Thomas and the FAFSA was directly contradicted by Ms. Carr (who, as his roommate and his lover and the head of the scheme, was in the best position to know about Thomas's actions and non-actions) as part of the Undisclosed Information.   Had the defense had the benefit of knowing about Carr's contradiction of Green on this key point, Mr. Thomas could have impeached Green on this subject on cross-examination.[3]   Indeed, "[i]mpeachment evidence is considered exculpatory for *Brady* purposes." United States v. Torres, 569 F.3d 1277, 1282 (10th Cir. 2009).

As such, Green's credibility could have been assailed by the defense on cross examination if Mr. Thomas's counsel had had access to this part of the Undisclosed Information.   Unfortunately, for Thomas, he did not have the Information and he thus

---

3 Moreover, Mr. Thomas could have called Carr as a defense witness to testify about this topic (and others) if the prosecution had adhered to its earlier agreement with the defense to have all Government endorsed witnesses under subpoena.

was unable fully and effectively to undermine Green, whose testimony against him was critical to the Government's case because she was the only person with full knowledge of the fraud scheme who pointed the proverbial finger at him. This fact is critical in the context of this Motion, because "[i]n the event that 'the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule [*i.e.*, that a new trial should be granted]." United States v. Torres, 569 F.3d 1277, 1281 (10th Cir. 2009).

B. The Addresses: The Undisclosed Information from Ms. Carr concerning the Colorado addresses used in the scheme would have been vitally important for the Mr. Thomas to have had at trial. To begin with, Heather Carr stated to the Government prior to Thomas's trial that Thomas did not participate in the fraud scheme while he was in jail (Ex. 2, ¶ 9c). This assertion directly contradicted a central theme of the Government at trial that Mr. Thomas was in on the fraud scheme from its inception.

Moreover, Carr told the Government prior to trial that Mr. Thomas did not provide the Radiant Drive address (Ex. 2, ¶ 9b). She previously had informed the Government that she, not Thomas, came up with the Lexington address (Exhibit 8, p. 5, violet highlights). Additionally, Carr, as part of the Undisclosed Information, stated to the prosecutors that Co-Defendant and co-conspirator Diaz had at one time dated Michael Cox (Ex. 2, ¶ 9g), a fact which, if the defense had known of it, could have been used to undercut the Government's trial theory that Cox's address on Rice Drive had been provided by Thomas, since he was related to Cox. The loosening or elimination at trial of Thomas's links to the various addresses, as well as the rebuttal of the

9

Government's contention that Thomas was in on the fraud scheme while he was in jail in Colorado Springs, would have been the likely result of the defense's timely receipt of the Undisclosed Information.   As such, this second pillar of the prosecution's case against Thomas would have been compromised or collapsed entirely.

C.   Debit Cards in Automobile:   Ms. Carr stated, as part of the Undisclosed Information that Marcelle Green continually drove the Dodge Charger (Ex. 2, ¶ 9h) in which Mr. Thomas was pulled over and the 52 fraudulent debit cards were discovered in a plastic bag located within that automobile.   That fact, if it had been disclosed to the defense, could have been utilized as a compelling, countervailing narrative that the cards in the car belonged to Green and not to Mr. Thomas, and, therefore, that the cards were **not** a powerful connection, or any connection at all, between Mr. Thomas and the fraud scheme.   Thereby, this third pillar of the Government's case could have gone by the wayside, just like the first and second pillars of the prosecution, as discussed, *supra*.

In short, the Undisclosed Information was of vital importance to Mr. Thomas's defense.   The Government had that information but failed to turn it over.   Mr. Thomas was irredeemably damaged by that failure.   The only adequate remedy for this situation is for the Court to grant him a new trial, now that he finally, and belatedly, is in possession of the Undisclosed Information.   Mr. Thomas so moves.[4]

---

[4] Although this Motion is focused on the effect of the Undisclosed Information on the trial, the Government's obligation to disclose exculpatory information under Brady also extends to sentencing.   In the latter regard, it is interesting to note that when the Government argues in its sentencing memorandum [#262, p. 10], that Carr was in Colorado in January, 2011, and a supposed witness to criminal activity involving Mr. Thomas, the prosecution was aware that Carr had specifically denied those facts to the Government.

10

Dated this 3rd day of April, 2018.

Respectfully submitted,

s/Thomas E. Goodreid
Thomas E. Goodreid
Attorney at Law
1801 Broadway, Suite 1400
Denver, CO   80202
(303) 296-2048x.136
*t.goodreid@comcast.net*

Daniel T. Smith
4582 S. Ulster #1400
Denver, CO   80237
Telephone:   303-860-8100
Fax:   303-860-8018
danieltsmith@qwestoffice.net

Attorneys for Defendant Tramel Thomas

## CERTIFICATE OF SERVICE

I certify that on this 3rd day of April, 2018, I electronically filed the foregoing **DEFENDANT'S MOTION FOR NEW TRIAL** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

s/Thomas E. Goodreid
Thomas E. Goodreid
Attorney at Law
1801 Broadway, Suite 1400
Denver, CO   80202
(303) 296-2048x.136
*t.goodreid@comcast.net*
Attorney for Defendant Tramel Thomas

11



# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES



**DATE INTERVIEWED:** October 30, 2017
November 7, 2017
November 13, 2017

**PERSON INTERVIEWED:** Heather Carr

**ALSO PRESENT:** Mary Butterton, Defense Counsel

**INTERVIEWED BY:** Martha Paluch, Assistant US Attorney
Bryan Fields, Assistant US Attorney
Special Agent Sandra Ennis

**LOCATION:** Telephonic
1801 California, 16th floor conference room
Denver, Colorado 80202

**CASE NUMBER:** 12-080234

**CASE NAME:** Pikes Peak Community College

On various dates, Assistant United States Attorneys, Martha Paluch and Bryan Fields, and Special Agent Sandra Ennis, United States Department of Education (ED), Office of Inspector General (OIG), interviewed Heather Carr telephonically. Carr's legal counsel, Mary Butterton, was also present on the call. After being advised of the nature and purpose of the interview and the identities of all present, Carr voluntarily provided the following in essence:

Carr's communications with Thomas are bad. Thomas started paying child support in what Carr believes is an effort to make himself look better at trial. Last month, Thomas stopped paying. Thomas and Carr do not speak. He sends text messages directly to his daughter. Carr feels so stupid and cannot stand Thomas. He is a liar and there is no point in trying to have a conversation with him.

Approximately three months ago in mid-August, on three separate occasions, a strange man came to her door and it scared the shit out of her. The first time he came to her house was around 4:00 p.m. and Carr was at the YMCA. The individual had dreadlocks and was seen on his cellphone standing in her driveway. The individual was not in a car. The second time was around 8:00 p.m. and Aubrey (LNU) was home but Carr was not. About three days later, the same individual came back. Carr answered the door and the individual said, "You are testifying against Marcy. Make sure you do not say anything about anyone else."

Some of Green's family members reside in Virginia. Carr does not know how Green knows where she lives. The occurrence was completely random and has not happened again.

Green is lying about not having been to Colorado. She has been to Colorado on many occasions when transporting drugs from Colorado to California.

Carr has never testified and never been in trouble. Carr owns her own company called "That Goodish" and she is a driver for Lyft.

Prepared by: Sandra Ennis                                              Date Prepared: November 08, 2017

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)                                                              Page 1 of 5





MOI_00000549

Interview of Heather Carr, October 30, 2017      12-080234

In approximately January 2009, Thomas applied for his own federal student aid (FSA) for attendance at Pikes Peak Community College (PPCC). Thomas used this money as a source of income.

In approximately 2010, Thomas took friends to PPCC and helped them enroll. These individuals were Lola Thomas, Vanessa Lopez, Christine Duncan, Ismael Omar, and Thomas' cousin, Michael Cox. Thomas received a portion of the FSA funds for assisting these individuals. Carr knew this because Thomas told her this information. Cox legitimately attended school.

Thomas met Lola Thomas while he was in prison. At some point, Lola Thomas was not allowed to visit Thomas in prison because she was caught bringing in drugs. Thomas lived with Duncan, and Omar was a friend of Thomas. Carr does not know anything about Lopez.

In searching for inmate names, Carr, Diaz, and Green did Google searches of department of corrections and found inmates through various department of corrections websites. These inmate searches were conducted at both the Pleasant and Kaibab addresses. Green also did inmate searches from her residence.

Carr was not certain if Thomas conducted inmate searches while living in Colorado. Carr was sure Thomas also conducted inmate searches on department of corrections websites while residing in Arizona. Thomas was involved in completing homework, submitting FAFSAs and getting money off the debit cards.

Carr was able to get an inmate's social security number (SSN) from her access to Lexis Nexis at work. Carr conducted legitimate business queries when verifying a customer's SSN. This query was done for auditing purposes. Carr conducted queries related to the scheme on her work issued laptop and on her personally owned computer.

The four of them made up information when filling out documents provided to the school. The applicant's mailing address was not made up. There needed to be a valid address for the Higher One debit card to be mailed to. Higher One sent an email, usually to an email address generated by the school. The email stated that a debit card was mailed and the student should expect to see a bright green envelope containing the debit card within two to three business days. All four of them provided addresses for the debit cards to be mailed to.

Thomas' business partner, Kimmisha Mullet, allowed Thomas to use her address for receipt of the Higher One debit cards. Thomas told Carr this information.

Higher One debit cards were mailed to the 975 E. Riggs Road post office box address. These debit cards were taken out of the original green envelope that they were mailed in and placed in another envelope. These envelopes were addressed to Carr and were in Thomas' handwriting or another female's handwriting.

Carr and Diaz resided at 2441 Lexington Village Lane in Colorado Springs. Michelle Grant, also known as Mychalea, resided at 2372 Lexington Village Lane. Carr forwarded her mail to the 2372 address when she moved to Arizona. Grant gave Carr a key to the mailbox so that Carr could get her actual mail. Initially, Grant did not know that her address was being used in the scheme. Grant became aware when an investigator came around looking to speak with her. The address was no longer used after the investigator came around.

Carr and Diaz did the majority of picking up the debit cards from the 2372 address. Carr recalled a conversation when Diaz did not have the key so Diaz broke into the backside of the mailboxes. Thomas possibly picked up mail from the 2372 address also.

OIG Form 301      Page 2 of 5

The Dragoon and W. Knox addresses were provided by Diaz and Diaz opened post office boxes for the receipt of debit cards. The Blackhawk address was associated with her step-brother, Matthew Sanders, and the Rice address was associated with Thomas' cousin, Cox.

Thomas provided the 1418 Rushmore address to parole but he did not actually reside there. He had access to the garage and kept his belongings there. He resided at the 3820 Radiant address. La Tania Pickens goes by Tania or Shanelle and she was the owner of the Rushmore address. An individual named La Toya (LNU) is a different person that was mentioned in Duncan's interview. La Toya is a crack head.

At times, the Rushmore address has been vacant. Carr and Thomas picked up debit cards from this address. The mail box at Rushmore sits at the end of the curb.

Carr typically worked from 9 a.m. until 8:00 p.m. and every other weekend. She needed to be available for CarMax loan decisions.

All four of them submitted FAFSAs. They were not always successful. At times, an applicant was already in default or had an active PIN number with ED. There were also times when an SSN was invalid.

All four of them participated in submitting electronic applications to PPCC. Part of the reason in choosing PPCC was because Thomas had already submitted applications at PPCC and it was working for him. Carr was also familiar with obtaining FSA from PPCC. Some of the schools were chosen because of their familiarity with the school as a result of their own enrollment. Diaz attended Mesa Community College. Green attended Gateway College and Carr attended Phoenix College. Carr was not familiar with applications being submitted to Chandler-Gilbert Community College, the Community College of Denver, Pueblo Community College, and Red Rocks Community College.

At some point, all of them submitted master promissory notes (MPNs) and attended and completed online coursework. In order to receive the FSA funds, a student had to be enrolled in at least six credit hours and register attendance. Green did a lot of the work because she was not employed. The scheme was Green's job.

In 2012, Thomas went to ATM locations to withdraw money from the debit cards. Carr was never with him but she knew he was withdrawing money because he brought home wads of cash and had the debit cards with him or in his wallet. Thomas liked to withdraw the cash himself because he did not trust other people with money. Carr believed the debit cards had a daily cash withdrawal limit of either $300 or $500. The debit card could also be used to obtain cash with a purchase.

During the 2010-2011 timeframe, Thomas stayed at the Pleasant address when he visited Carr in Arizona. Thomas gave Carr Colorado mailing addresses to use for inmate applicants, and he was still enrolling females that he knew in Colorado. Thomas asked her to obtain SSN information for him. Carr does not recall Thomas sending her text messages with SSN information. They were always cautious about what information they put in a text message.

Higher One debit cards were still being mailed while Thomas was in El Paso County jail, and Thomas knew the scheme was continuing. Carr and Thomas did not discuss the scheme on the jail phone. Carr and Thomas spoke in code. An example of the code was Thomas asking how Carr was doing in school and if she was getting good grades. Carr would say she had a lot of homework. Thomas knew Carr was not enrolled in school. Carr used funds from the scheme for Thomas' commissary and legal fees.

MOI_00000551
736

Interview of Heather Carr, October 30. 2017                                          12-080234

Carr saw the photos of Thomas and money that were taken from his cell phone. Carr assumed he was trying to impress his friends and looked like a dumb ass. Carr has no knowledge of Thomas selling weed. There were two sides to Thomas. He had a family oriented side with her and a flashy showy side with others.

Thomas did not know how much Carr made. He assumed she had a really good job. Carr was making approximately $50-$60K. Carr was broke but it would look like she made a lot of money to someone in jail. Carr used money from the scheme to pay rent at the Kaibab address. Thomas never asked Carr to stop the scheme and never gave Carr the impression that he no longer wanted to be part of the scheme.

After his release from El Paso County, Thomas did not work in Arizona and was still involved in the scheme. Thomas and Kimmisha Mullet co-owned a business and that was his only employment.

Thomas was involved with submitting FAFSAs. Carr believed he did so in his office at the Kaibab address. While she never personally saw him submit FAFSAs she remembers providing Green and Thomas with lists of SSNs. Carr saw Thomas' handwritten notes that were related to FAFSA submissions, such as PIN numbers and email addresses in his office.

Thomas completed coursework. There was one occasion where Thomas could not save or submit the psychology coursework on his computer. Carr saved Thomas' coursework to a USB thumb drive and then transferred the coursework to her computer located in her office. Carr did not use the computer located in Thomas' office. It was password protected and Thomas did not give her the password.

Carr recognized the photo of the white Dodge Charger on Thomas' phone. It was the vehicle Thomas was driving the night of his traffic stop. While the vehicle belonged to Carr, Thomas had the vehicle in Colorado and he brought it with him when he moved to Arizona.

The night of Thomas' traffic stop, Carr was worried because Thomas never came home. Thomas had court the following morning and was released. The vehicle was impounded. Thomas was quiet and did not want to discuss what happened. Thomas seemed nervous. He told Carr that he just wanted to go home, shower, and go to sleep. Carr dropped off Thomas at the impound lot. Thomas called Carr shortly thereafter and asked Carr to meet him near the Pleasant address. Thomas searched the Charger for the debit cards and realized the cops took the debit cards when he was pulled over. He seemed panicky. Carr was not aware he still had the debit cards. She assumed the debit cards were gone. There was no reason for him to still have the debit cards.

Thomas told Carr that he had been cheating on her. The girl Thomas was cheating on her with called him at 1:00 a.m. and threatened to tell Carr. Thomas went to the girl's house to get everything from her house. This included the debit cards, pink laptop, and some other things. Following the traffic stop, Thomas went to stay at a hotel for about three days.

Thomas's time spent in El Paso County jail was approximately two months for the pimping charges. The remaining time was spent for the accessory to murder charge. All of the charges were dismissed.

Thomas gave Carr Sanders' Blackhawk address to use in the scheme. Carr did not speak with Sanders about the scheme. There was an occasion when Sanders inadvertently told Carr about Thomas and some girl at the Radiant address. After that, Carr and Sanders did not talk that much. If they did, it was always about positive stuff.

MOI_00000552

Interview of Heather Carr, October 30. 2017                    12-080234

Carr and Thomas assumed the search warrant at the Kaibab address resulted from Thomas' traffic stop. They did not answer the door immediately because items were being destroyed and she took the time to brush her teeth and put on makeup. During the search a police officer asked Thomas why he broke his phone. Thomas did not respond. Later, Thomas admitted to Carr that he broke his phone. He told Carr he did not want her to find out about other bitches. Carr confirmed the broken phone was in Thomas' closet. Carr and Thomas had their own closet at the Kaibab address. Carr saw the photo of Thomas standing in a closet. Carr confirmed it was a photo of Thomas standing in his closet.

Following the search warrant execution at the Kaibab address, both Carr and Thomas went to Green's house to discuss what happened. Both of them were questioning Green about what law enforcement asked her and what she told them. Both Carr and Thomas were nervous.

While in El Paso County jail, Thomas asked and Carr offered to assist him with his legal fees and putting money on his commissary account. The topic of Thomas' legal fees was brought up when Thomas told Carr he could not use a public defender. Carr assumed he has no one else to help him.

A portion of Thomas' legal fees came from Christine Duncan's escorting. Carr did not mention this previously because she was embarrassed. Carr believes there were three payments of $200. To be on the safe side, Carr thinks she received approximately $800 from Duncan's escorting. Carr did not receive this money directly from Duncan. She received this money from Diaz or Green.

In discussing Carr's financial statements, Carr advised there were charges related to a trip to California. Thomas was on the trip. Carr used funds from the scheme to pay for the California trip and other trips that she took with Thomas. Carr and Thomas also used funds from the scheme to go to casinos.

Carr's only knowledge of Thomas' employment was with 911 Design & Printing in Colorado. This was the business he had with Mullett. Thomas had wads of cash but he was secretive with Carr.

Thomas told Carr to keep SSN information for Duncan, Lopez, and Omar in case he lost it.

Carr admitted to lying to Wells Fargo about the Lexis Nexis searches. Carr was afraid of losing her job and she had her children to think of. Lying to her employer and lying under oath are two completely different things.

Carr is not angry or jealous of Thomas.

Carr admitted to contacting Green and telling her not to talk to law enforcement. Carr thought Green should get a lawyer and told Green she could be charged with perjury if she lied to law enforcement.

Carr did not sign up Thomas for FSA without his permission.

AUSA Bryan Fields was not present during the telephonic interview that occurred on November 13, 2017.

MOI_00000553

738

**AFFIDAVIT:**

I, Heather Carr, affirm that the statements made in this affidavit are true and correct to my best information and belief.

1. I am a Defendant in case #2016-cr-00054-WJM pending in the United States District Court for the District of Colorado. I was charged in this case along with Tramell Thomas, Mercedes Diaz, and Marcelle Green with participating in a federal student loan fraud scheme. I have previously entered a plea of guilty in the case and have been sentenced pursuant to my plea. I make this affidavit freely and voluntarily and understand that it may be used in a pleading to be filed with the Court by my co-defendant Tramell Thomas.

2. I entered into a cooperation agreement with the United States government and pursuant to that agreement, I was interviewed by representatives of the government on numerous occasions spanning over a 12 month time period.

3. Of particular relevance to this affidavit, I participated in interviews conducted by telephone on the following approximate dates: October 30, 2017, and November 6, 13, and 20, 2017. With the exception of the interview on November 13, 2017, it is my understanding that the participants in the interviews aside from myself, were, my attorney Mary Butterton, Assistant United States Attorneys Paluch and Fields, and Special Agent Ennis. I was advised that Mr. Fields was not a participant in the November 13, 2017 interview. All of the above referenced interviews were conducted by telephone.

4. Early in the interview on October 30, 2017 in response to questioning, I told the government representatives (as I had previously stated in an earlier interview) that I had never seen Tramell Thomas fill out a FAFSA loan application nor did I know if he knew how to fill out such an application.



EXHIBIT
2

5. Once I made these statements AUSA Fields became quite upset and told me that I was now saying something different than what I had said during my original interview with the government in November of 2016.

6. In the November 6, 2017 interview AUSAs Paluch and Fields were asking me if Mr. Thomas had ever threatened me or in any other way had forced me to be involved in the student loan fraud scheme. My response was that he had not and further that the main participants in the scheme were myself, Mercedes Diaz, and Marcelle Green. Mr. Fields was apparently very frustrated with my answers and he began yelling at me. At one point he stated, "I will rip up your fucking plea agreement and send you to jail for a long time".

7. At this point in the interview my attorney Ms. Butterton told Mr. Fields that his behavior was inappropriate and she terminated the interview.

8. The third interview in 2017 occurred the following week on, I believe the thirteenth of November. At the start of the interview, Ms. Paluch advised that Mr. Fields was not participating on the call and would no longer be involved with my participation in the case. She was most apologetic for Mr. Field's prior outbursts. The final interview was held I believe on November 20, 2017 and Mr. Fields was again a participant.

9. During my interviews with the government I remember telling the government representatives the following:

   a. That Marcelle Green had assisted myself by picking up student loan related mail in the state of Colorado.

   b. That Tramell Thomas did not provide the address on Radiant drive for use in the student loan fraud.

   c. That Tramell Thomas did not participate in the loan scheme nor knowingly benefit from the scheme while he was incarcerated in the El Paso County Jail in Colorado Springs, Colorado from approximately late January of 2011 through early November of 2011.

   d. That it was my understanding that the people Tramell Thomas helped apply for federal student loans to assist in attending Pikes Peak

Community College in Colorado prior to his moving to Arizona in 2012 actually did attend or intended to attend school.

e. That further it is my belief, that between statements that I made to the government and what my attorney Mary Butterton told the government, that the government is well aware that I was not present nor was a witness to any type of criminal activity occurring in Colorado Springs, Colorado in January of 2011, as I was residing in Arizona and recovering from the delivery of my child.

f. In the last interview with the government I attempted to explain my understanding of my agreement with the government and was told no such promises or agreement had been made.

g. During my initial interview with the government, I told them that Mercedes Diaz dated Michael Cox prior to her moving to Arizona.

h. During my interviews with the government, I told them that I originally purchased the Dodge Charger automobile (government's exh. 3 in the Thomas trial) for Roderick Smith. Mr. Smith is the father of Marcelle Green's children. Throughout my ownership of that automobile and specifically in 2011 and 2012, Marcelle Green continually borrowed and operated that automobile for her own personal needs.

Further Affiant sayeth not:

Heather Carr

State of Arizona

County *Maricopa*

Subscribed and sworn to before me this 5ᵗʰ day of ~~January,~~ February 2018 by
_____.

Witness my Hand and official Seal.

My Commission expires: 04/30/2019

Notary Public

02/05/18

A. RAQUEL ARAUJO
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
April 30, 2019



From: **Mary Butterton** Mary_Butterton@fd.org
Subject: phone call with Heather Carr
Date: January 9, 2018 at 4:45 PM
To: Dan T. Smith danieltsmith@qwestoffice.net

Hi Dan,

We are all set for Tuesday, January 16 at 2pm to talk to Heather Carr. You can call my office number (listed below) and I'll conference her in.

Thanks!

Mary V. Butterton
Assistant Federal Public Defender, Trial Division
Office of the Federal Public Defender, District of Colorado
633 17th Street, Suite 1000
Denver, CO 80202
(303) 294-7002
mary_butterton@fd.org



EXHIBIT
3

1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2

   Criminal Action No. 16-cr-0054-WJM-1
3

   UNITED STATES OF AMERICA,
4

   Plaintiff,
5

   vs.
6

   HEATHER CARR,
7

   Defendant.
8

   ------------------------------------------------------------
9

                   REPORTER'S TRANSCRIPT
10                     (Sentencing)

11 ------------------------------------------------------------

12     Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13 Judge, United States District Court for the District of

14 Colorado, commencing at 2:02 p.m., on the 4th day of

15 January, 2018 in Courtroom A801, United States Courthouse,

16 Denver, Colorado.

17
                            APPEARANCES
18
       MARTHA PALUCH and BRYAN FIELDS, Assistant U.S.
19 Attorney, 1801 California Street, Suite 1600, Denver,
   Colorado 80202, appearing for the plaintiff.
20
       MARY BUTTERTON, Office of the Federal Public Defender,
21 633 Seventeenth Street, Suite 1000, Denver, Colorado 80202,
   appearing for the defendant.
22

23           MARY J. GEORGE, FCRR, CRR, RMR
             901 19th Street, Denver, Colorado 80294
24        Proceedings Reported by Mechanical Stenography
               Transcription Produced via Computer
25



P R O C E E D I N G S

(Call to order of the court at 2:02 p.m.)

THE COURT:  All right, we're on the record in criminal case No. 16 cr 054, defendant No. 1, United States of America versus Heather Carr.  I'll take appearances of counsel.

MS. PALUCH:  Good afternoon, Your Honor, Martha Paluch and Bryan Fields appearing on behalf of the United States.  With us at counsel table is Special Agent Sandra Innis.

THE COURT:  Good afternoon to the three of you.

MS. BUTTERTON:  Good afternoon, Your Honor.  Mary Butterton on behalf of Heather Carr.  Your Honor, Ms. Carr is on bond and she has joined me at counsel table.

THE COURT:  Good afternoon to the two of you.

All right.  Will the probation officer please identify himself for the record.

PROBATION OFFICER:  Good morning, Your Honor. Matt Gill, U.S. Probation.

THE COURT:  Good afternoon, Mr. Gill.  Welcome.

All right, Ms. Butterton, will you and your client please approach the lectern.

Ms. Hansen, please administer the oath to the defendant.

COURTROOM DEPUTY:  Please raise your right hand.

1       (Defendant sworn in)

2          THE COURT:  Record reflects that on the 5th of

3   December of 2016, Ms. Carr entered a plea of guilty to and

4   she was convicted of Count 1 of the indictment, charging

5   conspiracy to defraud the Government with respect to claims

6   in violation of 18 United States Code Section 286.  In

7   addition, at her change of plea hearing the defendant also

8   admitted the forfeiture allegation in the indictment.  We

9   are here for the sentencing of the defendant.

10         Counsel, can you briefly summarize your respective

11  sentencing recommendations.  Ms. Paluch, let's begin with

12  you.

13         MS. PALUCH:  Yes, Your Honor.  At this point, you

14  would just like the number of months that we're seeking?

15         THE COURT:  Just -- well, custody, supervised

16  release, fine, all that good stuff.

17         MS. PALUCH:  Certainly, Your Honor.  The United

18  States is seeking a sentence of 63 months in prison,

19  followed by three years of supervised release, an order of

20  restitution in the amount of $562,000 -- the approximate

21  amount is contained in the pleadings before the Court -- as

22  well as $100 special assessment fee.

23         Given that the defendant pled to the conspiracy

24  count, and the mail fraud counts were dismissed, there will

25  be no request for an order of forfeiture in this case.

4

```
 1            THE COURT:  All right.  At this hearing, is the
 2    Government intending to make any kind of proffer or put on
 3    any evidence?
 4            MS. PALUCH:  No, Your Honor.
 5            THE COURT:  All right.  Thank you.
 6            Ms. Butterton.
 7            MS. BUTTERTON:  Thank you, Your Honor.
 8    According -- consistent with our pleadings previously
 9    filed, we are seeking a sentence of 24 months incarceration
10    followed by three years supervised release.  We have no
11    contest with the Government with regard to that, nor the
12    restitution amount which is outlined in the pleadings.
13            THE COURT:  All right.  So the restitution amount
14    has been stipulated to?
15            MS. BUTTERTON:  It was stipulated in the plea
16    agreement, Your Honor.
17            THE COURT:  Yeah.  All right.  Does the defendant
18    intend to make any type of proffer or put on any evidence
19    at the hearing?
20            MS. BUTTERTON:  Outside of Ms. Carr's allocution,
21    no, Your Honor.
22            THE COURT:  Okay.  Thank you.  All right.  I'll
23    turn first to the objections to the presentence report.  I
24    note for the record that no objections to the report were
25    filed by the Government.  The defendant did file objections
```

5

1   to the report at ECF 243.  The first objection was to the

2   contents of paragraph 45 of the report which referenced and

3   included in the sentencing recommendation a two-level

4   sentencing enhancement for abuse of position of private

5   trust.

6           Is there any further argument, Ms. Butterton, that

7   you wish to make on this objection?

8           MS. BUTTERTON:  Your Honor, the majority of my

9   argument is outlined in the briefing.  The only thing I

10  will add is in its response, the probation office cited a

11  footnote and I believe that that footnote would be

12  duplicative to another enhancement that Ms. Carr's already

13  receiving --

14          THE COURT:  You are referring to specifically

15  what?

16          MS. BUTTERTON:  The enhancement for use of

17  identity -- I'm sorry, let's go -- it's enhancement in the

18  base offense level.  And I will direct your attention to

19  it; hang on one second.

20          She received, and we stipulated to and agree, to a

21  two-level increase based on the use of a means of

22  identification.  That's 2B1.1b(11)(c)(1) through (2).

23  Again, that's something that has never been in dispute.

24  And I believe that the footnote referred to by probation in

25  their response, that that increase is duplicative with that

6

1  enhancement, in addition to the other reasons I delineated

2  in my briefing.

3  　　　　THE COURT:  All right.  Ms. Paluch, is the

4  Government standing on its response to the objection or do

5  you have any further argument?

6  　　　　MS. PALUCH:  I have no further argument.

7  　　　　THE COURT:  All right.  In my view there's a

8  decent argument to be made for the application of this

9  enhancement to Ms. Carr and the probation officer has done

10 a good job setting forth the legal basis for doing so in

11 his response to the defendant's objection.  But I am going

12 to sustain the defendant's objection to the two-level

13 enhancement for one important reason:  That being to give

14 Ms. Carr the benefit of the bargain she struck with the

15 Government and agreed to enter her plea of guilty to Count

16 1 of the indictment.

17 　　　　A review of the parties' agreement makes it

18 perfectly clear that neither side anticipated the

19 likelihood of the application of this enhancement.  And

20 this is reflected in the position the Government has taken

21 with respect to this objection in that it neither seeks nor

22 advocates for the application of this enhancement.

23 　　　　We will of course never know with any certainty

24 whether this defendant would still have entered into her

25 plea agreement had she known that this enhancement was

Case No. 1:16-cr-00054-WJM Document 528 Filed 12/12/2013 USDC Colorado pg 750 of
Case 1:16-cr-00054-WJM Document 358-4 Filed 04/03/18 Page 70 of 65
971
7

1    possible, but what we do know for sure is that the parties

2    struck a bargain that did not anticipate the application of

3    this enhancement and that Ms. Carr signed her agreement, at

4    least in part, in reliance on that fact in that agreement.

5            So for these reasons, the defendant's objection to

6    the two-level sentencing enhancement for abuse of position

7    of private trust in paragraph 45 of the report is

8    sustained.

9            All right.  The next objection from the defendant

10   is her objection to the special condition permitting

11   expanded searches or searches without the protection of the

12   Fourth Amendment.  Any further argument, Ms. Butterton?

13           MS. BUTTERTON:  No, Your Honor.

14           THE COURT:  All right.  For the Government?

15           MS. PALUCH:  No, Your Honor.  Thank you.

16           THE COURT:  Okay.  All right.  I'm going to

17   overrule the objection to this special search condition.  I

18   find that such a search condition is warranted under the

19   facts of this case.  Specifically I agree with the

20   Government and the probation officer that this special

21   condition is, in fact, tailored to the facts of this case.

22           Most significant in my view on this point is the

23   fact that the defendant and her co-conspirators carried out

24   the offense conduct using computers located in their

25   residences, and analysis of these computers helped prove

8

1    the crimes that were charged.

2           Also important and relevant here is the reality of

3    the difficulty in preventing identity theft and I agree

4    with the probation officer that -- and I agree that the

5    probation officer should be provided with the necessary

6    means to ensure that Ms. Carr does not resort to her old

7    ways, and in the future again use other people's identities

8    to commit fraud.

9           So on that basis, the objection to the special

10   search condition is overruled.

11          With respect to the defendant's remaining

12   objections to paragraphs 52, 66, and 68, I find that the

13   subject matter of these objections will not impact the

14   sentence I intend to impose or that I will not consider

15   these matters in sentencing and thus no ruling on these

16   objections is required under Rule 32 and I will make none.

17          All right. We're done with objections. Turning

18   to the Government's motions, first is ECF 239, motion from

19   the Government for a third-level decrease in the offense

20   level for acceptance of responsibility. There being no

21   objection, that motion is granted.

22          Second motion from the Government is the motion to

23   dismiss Counts 1 through 29 and dismiss the forfeiture

24   allegation of the indictment, ECF 238. Again, there being

25   no objection, the motion is granted. I should have said

Case No. 1:16-cr-00054-WJM Document 358-4 Filed 04/03/18 USDC Colorado pg 752 of 971
Case 1:16-cr-00054-WJM Document 358-4 Filed 04/03/18 Page 9 of 65

9

1    Counts 2 through 29, obviously, because we are proceeding

2    on Count 1.  Counts 2 through 29 and the forfeiture

3    allegation of the indictment are dismissed with prejudice

4    as to defendant No. 1, Carr, only.

5         Given my ruling on the Government's motions and

6    the defendant's objections, I find that the total offense

7    level in this case is 25.  The probation officer has

8    determined that the defendant's Criminal History Category

9    is I, which yields an advisory guideline sentencing range

10   of 57 to 71 months, a period of supervised release of one

11   to three years, a fine range of 20,000 to $200,000, and a

12   special assessment of $100.

13        Subject to any objection the parties may have to

14   my rulings on the defendant's objection, do counsel agree

15   the Court has correctly calculated the guideline sentencing

16   range in this case?

17        MS. PALUCH:  Yes, for the Government, Your Honor.

18        MS. BUTTERTON:  Yes, Your Honor.

19        THE COURT:  All right.  Thank you, counsel.

20        All right.  At this time, I'll take up the

21   defendant's motion for a variant sentence, ECF 24.  Ms.

22   Butterton.

23        MS. BUTTERTON:  Thank you, Your Honor.  I would be

24   brief and mainly focus on a reply to the response that the

25   Government has filed.  I would like to note that I

1    appreciate under ECF -- I believe 265, the Government's

2    correction, which I had intended to address today.  So I --

3    I believe the record is more clear about that issue.

4              THE COURT:  What specifically are you talking

5    about?

6              MS. BUTTERTON:  In its initial motion for -- in

7    their initial response to my motion, they had indicated

8    that Ms. Carr cooperated only after her codefendant

9    cooperated.  And that was simply not the order of things

10   and they filed a correction, and I appreciate that.

11             THE COURT:  Okay.

12             MS. BUTTERTON:  In fact, Ms. Carr was the first

13   codefendant to come to the table and cooperate with the

14   Government.  And I believe it's undisputed, although the

15   Government -- I'm not sure what the Government will say

16   about this, that she did -- her cooperation did lead to the

17   indictment of a fourth codefendant in this case.

18             I say that to balance the -- frankly, the elephant

19   in the room.  The majority of my pleadings, as well as the

20   Government's, has been addressing that Ms. Carr did not

21   testify in the trial of her codefendant.  All I can say

22   about that is that should be weighed with her other

23   cooperation.  Cooperation, again, I believe is undisputed

24   that led to a fourth indictment, something that is not so

25   common in cooperation cases.  It is not so common for

1   cooperation to lead to the indictment and, indeed,

2   conviction of someone for whom the Government did not have

3   sufficient evidence to charge when they initially brought

4   this indictment.  So I believe that should be weighed along

5   with Ms. Carr's failure to testify.

6           Now, do I believe that the Government could have

7   done things to ensure that?  I do.  And I've laid those out

8   in my pleadings.  I'm sure the Court's reviewed them --

9           THE COURT:  To ensure her testimony?

10          MS. BUTTERTON:  Correct.

11          THE COURT:  Well, I was going to ask you about

12  that.  How is it that you believe the Government could have

13  subpoenaed your client if she is a resident of Virginia?

14          MS. BUTTERTON:  I believe that -- well -- let me

15  say this:  My subpoena powers are different from the

16  Government's, so their procedure is completely different

17  from mine.  But I can tell you in preparing for an upcoming

18  trial I have, we have requested subpoenas through the court

19  for many people who live outside the state.  So I suppose I

20  don't know the exact answer to that question only that I'm

21  sure that it's possible.

22          THE COURT:  Okay.  I'm glad your --

23          MS. BUTTERTON:  She has --

24          THE COURT:  I'm glad you're sure; I'm not so sure.

25  But moving past that point, what about the Government's

Case No. 1:16-cr-00054-WJM Document 358 Filed 12/21/18 USDC Colorado pg 755 of 971
Case 1:16-cr-00054-WJM Document 358 Filed 12/21/18 USDC Colorado Page 12 of 69

12

1  point, which I think is the stronger, more significant one

2  here, which is as all litigators know, there's a world of

3  difference between a cooperative testifying witness and a

4  witness that has been subpoenaed against his or her will to

5  come into court and testify involuntarily?  And the latter

6  type of witness, we probably all in this room -- all the

7  lawyers in this room have had experience with such an

8  individual turning on our client, testifying in ways we

9  didn't anticipate, inconsistent with knowledge or evidence

10  that we have prepared prior to trial and otherwise

11  testifying in ways that may require the lawyer calling such

12  an uncooperative witness -- in this case, the Government,

13  in your scenario -- to then have to impeach the

14  Government's own witness because the witness has now

15  provided testimony that's contrary to the testimony the

16  Government believed was going to be coming from the witness

17  who was cooperating and being seated at the witness stand

18  voluntarily?  What about that difference?

19          MS. BUTTERTON:  Your Honor, I have to be a little

20  careful and mindful of my obligations regarding privilege

21  to Ms. Carr, but let me say this:  Any idea that she, or

22  anyone -- I'll just separate it out -- that anyone who is

23  subpoenaed would come in and say something different from

24  the -- that was previously prepared is speculation.  We

25  don't know what Ms. Carr would have said because she didn't

Case 1:16-cr-00054-WJM Document 358 Filed 04/03/18 Page 13 of 69

13

1    testify.  And there's no indication at all that she would

2    have not followed her oath if she was required to do so.

3           She was not required under any law at all to

4    appear in court.  Should she had been subpoenaed --

5           THE COURT:  Other than her -- her agreement with

6    the Government to do so.

7           MS. BUTTERTON:  Certainly.  And she knew the

8    consequences when she made that decision, she was fully

9    informed of those.  But those consequences were not a vow

10    to tell the truth, which she would have done if she sat in

11    that chair.  And I don't believe that the Court should

12    assume that she would have done anything but that.

13           THE COURT:  I'm not making any such assumption.  I

14    was just asking you to respond to the Government's argument

15    of distinguishing between a cooperating witness and a

16    subpoenaed witness.

17           MS. BUTTERTON:  Well, I guess I will make a

18    similar speculation and say if Ms. Carr had been required

19    under the law to appear, I would assume that she would

20    appear as required and testify as -- under oath as her

21    obligations would.

22           I don't think it's fair to assume that she would

23    have been a difficult or adverse witness.

24           THE COURT:  Okay.  Then let's move past that point

25    and I'd like you to address the cases which have -- and I

1    think circuit level cases, that have discussed the fact

2    that what your client did in entering into a plea agreement

3    which precipitated, as just happened a few minutes ago, the

4    dismissal of 28 out of 29 counts and dismissal of a

5    forfeiture allegation in the indictment, and then renege on

6    her agreement to testify, that these cases have held that

7    that is an aggravating factor I can consider under 3553(a)

8    when considering the appropriate sentence to impose.

9         MS. BUTTERTON:  Your Honor, I don't disagree with

10   the cases that it's an aggravating factor.  My point is

11   that it's -- in considering globally her cooperation, that

12   that is out- -- if not outweighed, then equal to weight in

13   the indictment and conviction that she provided to the

14   Government that they would not have gotten without her

15   cooperation.

16        So certainly -- listen, under 3553, the Court can

17   consider all nature and circumstances, her history and

18   characteristics.  And I'm certainly not arguing that the

19   Court can't consider her lack of testimony.  I can't

20   imagine a world where that -- I mean, these are pretty

21   global concepts.

22        THE COURT:  Right.

23        MS. BUTTERTON:  I expect that the Court can and

24   will consider it.  My position is that the Court should

25   also consider her other cooperation that I believe has

15

```
1    been -- well, I'm not going to say the Government has
2    downplayed it, because they're not under any obligation to
3    make such a motion before the Court.  We knew that when we
4    signed the plea agreement.  But the Court can consider it.
5            And, again, I don't think the Government's in a
6    position to not -- to deny that Ms. Carr did provide this
7    kind of very substantial cooperation that, again, led to
8    another conviction.  And --
9            THE COURT:  So it's your position -- you're
10   representing to me as an officer of the court that it's
11   your client's cooperation that resulted in the indictment
12   of Ms. Green?
13           MS. BUTTERTON:  I think that the indictment of Ms.
14   Green would not have happened without Ms. Carr.
15           THE COURT:  Okay.
16           MS. BUTTERTON:  Is it solely that?  I certainly
17   can't say that.  I am not a prosecutor and the methods
18   about which they go about their methods --
19           THE COURT:  We'll let the Government correct us if
20   we're wrong in our assumptions and inferences.
21           All right.  I don't want to be heard as thinking
22   that my sentence is going to rise and fall based on this
23   issue of her failure to testify and the breaching of her
24   plea agreement.  Obviously that's just one factor.  There's
25   a whole host of factors that I need to consider when
```

1    sentencing this defendant today apart from what she did or

2    didn't do in the trial for Mr. Thomas.  So can you address

3    those factors, please.

4         MS. BUTTERTON:  Thank you, Your Honor.  The nature

5    and circumstances of the offense are not in dispute and Ms.

6    Carr has accepted responsibility for those and continues to

7    do so, so I will move past that.

8         Outside of that, Your Honor, Ms. Carr is -- has no

9    criminal history.  She has none.  She -- now, I believe the

10   Government may have misconstrued my speaking about her

11   family, something I typically do in almost every sentencing

12   pleading.  That's not to say that she shouldn't be punished

13   because she has a family.  If that were true, then no --

14        THE COURT:  Then no parent could ever go to

15   jail.

16        MS. BUTTERTON:  And I am certainly not doing that,

17   and it's not my intention.  My point was to show who she is

18   as a person.  This is a woman who came from nothing.  She

19   left home at 14, was on her own, was a runaway.  At 17 was

20   pregnant, has raised that child to be a really

21   extraordinary young woman who's now in pharmacy school,

22   married, and will, in fact, be taking care of Ms. Carr's

23   younger children during the anticipated term of

24   incarceration.

25        She has three additional children, one of whom has

Case No. 1:16-cr-00054-WJM Document 358 Filed 12/12/18 USDC Colorado pg 760 of
Case 1:16-cr-00054-WJM Document 258-3 Filed 04/03/18 Page 17 of 65
971

17

1    special needs.  Again, I don't say that to garner sympathy

2    for that child, I say that so the Court knows a little bit

3    about Ms. Carr and who she is.  I believe in her allocution

4    she's going to speak to some of this, and I spoke to it in

5    my variance motion.  I think the mistakes that she made and

6    the decisions she made were an effort to give her kids a

7    better life than she had and because, frankly, it couldn't

8    get much worse than what she had.

9            Again, this is her first real criminal -- she's --

10   interaction with criminal court, other than a juvenile

11   issue.  And we concede that incarceration is necessary,

12   especially given the number of victims and their vulnerable

13   positions.  But the amount of time that the Government is

14   requesting, over five years, is simply greater than

15   necessary.

16           This is a woman who's not violent, she has

17   maintained every condition of her bond to the T, and has

18   made every effort not only to take responsibility in front

19   of this Court but to make efforts in her life to make sure

20   her family is not so affected.  She just last week moved

21   her family to Arizona so her kids will have some stability

22   while she knows she's going to have to be incarcerated.

23           I will rest on my pleadings for any further

24   argument, Your Honor, and we stand by our request for 24

25   months.

18

1         THE COURT:  Let me ask you to address something

2    you haven't addressed, which is the seriousness of the

3    offense, which is obviously a factor I have to consider

4    under 3553(a).  Not only in my view did -- was Ms. Carr the

5    key player in this conspiracy, because without her access

6    to the Accurint database of the victim, none of the other

7    three could have done anything, so that's one thing.

8         So even though we didn't -- I didn't -- I agreed

9    with your objection to the enhancement for a betrayal of

10    position of trust, the fact remains that but for her access

11    to inside bank information about the victims, these crimes

12    never would have taken place.

13         Secondly, the amount is significant.  We're

14    talking over half a million dollars that was fraudulently

15    obtained.  And, thirdly, the vulnerability of the victims.

16    You know, we don't usually put vulnerable and incarcerated

17    victims in the same sentence in this courtroom or anywhere,

18    but in this case, they are vulnerable because they have no

19    control over what's being done with their identities.  And

20    I don't know if you took the time to read the victim

21    statements, but I did, and I was struck by the eloquence of

22    some -- of a couple of them who pointed out that

23    reintegrating back into civilian life and lawful society is

24    hard enough for any ex-con, but then to run into the

25    buzzsaw of someone having stolen your identity, there being

Case 1:16-cr-00054-WJM Document 358 Filed 04/03/19 Page 19 of 69

19

```
 1    a hold on your credit history, you can't -- probably is
 2    going to be -- if being a felon didn't make it difficult
 3    enough to get a job after your imprisonment, if that
 4    weren't enough, then on top of that, you have all these
 5    credit issues.  And I think it's appropriate for me to take
 6    judicial notice of the fact that most employers look at
 7    credit histories when they're considering prospective
 8    hirees, obtaining loans for any kind of residence they may
 9    want to purchase or rent, vehicles, all that.
10         So your client intentionally -- not that any
11    victim of identity theft would be a preferable or good
12    victim, but it was pretty calculated -- the calculated way
13    in which it was determined that here is a slice of society
14    that literally cannot -- can do nothing to stop or report
15    these crimes being committed against them.  And so all of
16    those things are matters that you haven't addressed either
17    in your motion or orally right now and I'd like you to do
18    that.
19         MS. BUTTERTON:  Your Honor, I'll be honest.
20    Outside the court -- and I'm really speaking in my role as
21    a defense attorney -- I'm probably -- outside of the court
22    I'm probably the most familiar with how terrible people who
23    are incarcerated have it; on the inside and especially when
24    they come out.
25         It's something I've spoken extensively with Ms.
```

1    Carr about because, as I advocate for her and I believe

2    that there are elements of this that are mitigating, but I

3    have strong personal feelings about inmates and the way

4    that they are judged coming out and the difficulties they

5    face.

6            The irony is Ms. Carr is now going to be in the

7    very similar position.  She's going to come out with a

8    felony conviction, her finances are, with all due respect

9    in tatters, and will have a half million dollar judgment

10   hanging over her head.  I think that's a pretty fair and

11   equitable and due punishment.

12           There's no question that she took advantage of

13   vulnerable people.  And is there anything more just that

14   she now becomes one of them?  That's all I can really -- I

15   mean, the nature and circumstances of the offense are what

16   they are.  And I certainly understand why the Court feels

17   strongly about it, or why anyone should feel strongly about

18   it.  But that is all part of the sentence, incarceration

19   and collateral consequences that Ms. Carr is going to have

20   to face, and she's very well aware of that.

21           THE COURT:  Okay.  Anything further you wish to

22   say in support of your motion?

23           MS. BUTTERTON:  No, Your Honor.

24           THE COURT:  All right.  I'll give you an

25   opportunity, as I always do, for movants to have a brief

 1    reply after we hear from the Government.

 2            MS. BUTTERTON:  Thank you.

 3            THE COURT:  All right.  The two of you can sit

 4    down.  I'll hear from the Government in opposition to the

 5    motion.  Ms. Paluch.

 6            MS. PALUCH:  Thank you, Your Honor.  I'd like to

 7    begin by addressing what appears to be a representation

 8    that Ms. Carr alone is responsible for Marcelle Green being

 9    indicted --

10            THE COURT:  I think Ms. Butterton made it clear

11    that she wasn't making that representation.

12            MS. PALUCH:  Right.

13            THE COURT:  But that she was -- that her

14    information -- that her client's information was

15    instrumental in obtaining the probable cause and the

16    indictment against Ms. Green.

17            MS. PALUCH:  And that's fair, Your Honor.  But

18    what's being overlooked is the role that Mercedes Diaz

19    provided as well.  In addition, upon her arrest in the car,

20    Marcelle Green indicated she wanted to cooperate with the

21    Government.  So I don't believe it's fair to say that that

22    indictment were -- or conviction was based entirely -- or

23    the majority of it based on this defendant's cooperation,

24    but what that does highlight is had Ms. Green gone to trial

25    and this defendant not testified, it would have made it

1    even worse.

2            If she's claiming that she's responsible in part

3    for that defendant, the information she provided, and then

4    she doesn't testify against Green, had that happened, it

5    would have made her pulling out of this case even worse,

6    and I think that's a factor for the Court that's fair to be

7    considered.

8            As to a subpoena not being issued in this case,

9    Ms. Butterton on one hand says that the Court shouldn't

10   speculate that Ms. Carr would have taken the stand and not

11   testified consistent with her prior statements.  What she's

12   saying is that we were supposed to assume the risk and that

13   we were supposed to speculate that Ms. Carr would take the

14   stand and testify consistent.

15           You know, this is at the last minute and she's

16   saying, I will not testify.  And we're supposed to assume

17   that if we had her under a subpoena, she then would have

18   taken the stand?

19           One of the cases the Court referenced that's cited

20   in our response, it's the *Turner* opinion, and it's out of

21   the Seventh Circuit.  And in that situation, there, too,

22   the defendant claimed, well, the Court wasn't ordering that

23   defendant to take the stand.  And what the circuit court

24   here held is that all cooperation means is testifying when

25   there is no legal obligation to do so.

23

1          That was the cooperation agreement in this case.

2     She was to come to court and cooperate and testify without

3     us being required to send out FBI agents in Virginia to

4     find her and put her under subpoena.  We had been in

5     constant contact with this defendant leading right up until

6     the day of trial.

7          THE COURT:  When did you first learn that the

8     defendant had decided not to testify in Mr. Thomas' trial?

9          MS. PALUCH:  When we returned to our office after

10    the first day of testimony.

11         THE COURT:  So Monday evening.

12         MS. PALUCH:  Correct.  She did fly to Denver; she

13    was in Denver.  We even looked into the hotel that we had

14    paid for for her to stay and she did not check into that

15    hotel.

16         THE COURT:  Okay.  And before -- just so I'm

17    totally clear in my mind, prior to that moment you had

18    every expectation that she was going to fulfill her

19    obligations under the cooperation agreement and testify?

20         MS. PALUCH:  Absolutely.

21         THE COURT:  You had not -- you had not received

22    any communications from Ms. Butterton or had any reason to

23    believe otherwise?

24         MS. PALUCH:  No, none whatsoever.  And that is the

25    only reason that the opening statement that was given in

24

1    this case outlining the testimony we expected from this

2    witness would be presented and then we were forced in

3    closing to tell the jury that even though we promised you

4    all of this evidence, you would not hear from Ms. Carr.

5         The Court asked defense counsel about the nature

6    and circumstances of the offense and the Court's very well

7    aware of those and we've set forth our arguments in

8    opposition to the variance in our pleading, but there are a

9    few points that I would like to point out in addition to

10   those already made.

11         And as to the nature and circumstances of this

12   offense, what I'd like the Court -- for me to focus on is

13   the fact that this defendant had choices.  She chose to

14   participate in the scheme for over two years.  26 months is

15   the duration of the scheme as set forth in the indictment.

16   And during that time, she chose over and over and over

17   again to steal the identity of these inmates.  181 inmates'

18   identity stolen in 26 months, and that comes out to

19   approximately seven identities stolen each month.  Seven in

20   each of the 26 months.  Every single identity stolen by

21   this defendant, not by her codefendants.

22        Any possible argument -- and I don't believe she's

23   making this -- but that Trammel Thomas was responsible for

24   her involvement, he was in prison for 10 months; he was in

25   jail for 10 months.  During those 10 months, and in

1    addition, during the 26 months at any point this defendant
2    could have said, I'm not going to do this any more.  I'm
3    not going to go online and pull off somebody's identity.
4    I'm not going to fill out the paperwork and submit it to
5    the schools.  I'm not going to keep doing all this homework
6    when I have a full-time job and I'm raising four children.
7    I'm not going to keep completing these homework assignments
8    in order to get the federal student aid.
9            She didn't do that.  She could have stopped after
10   Thomas was arrested with the debit cards; she didn't.  She
11   could have stopped after her home was searched by law
12   enforcement; she didn't.
13           THE COURT:  When was -- when was the search in
14   relation to the end date of the conspiracy as charged in
15   the indictment?
16           MS. PALUCH:  That's a good point, Your Honor.  The
17   end date in the conspiracy is in October.  The --
18           THE COURT:  Of?
19           MS. PALUCH:  Of 2012.  The search occurred in
20   November.  But the testimony from Ms. Green was they had
21   debit cards that were still in the works, that they still
22   continued with the scheme after the search.
23           THE COURT:  Okay.
24           MS. PALUCH:  You know, this is not a defendant who
25   made one bad mistake and was repentant and felt bad about

Case No. 1:16-cr-00054-WJM    Document 358    Filed 12/21/18    USDC Colorado    pg 769 of
971
Case 1:16-cr-00054-WJM    Document 328-3    Filed 04/03/18    Page 26 of 69

26

1    it.  Instead, she made 181 bad mistakes over a period of 26

2    months.  And as to her argument that she has virtually no

3    criminal history, I think that's undercut by the duration

4    that she continued over and over to engage in this fraud.

5         Now, as to the deterrence factor set forth in

6    3553(a), a significant sentence in this case, Your Honor,

7    we believe is submitted -- it's warranted not only to

8    address this defendant's conduct, but also to address and

9    to deter other defendants who may entertain such similar

10   types of schemes, in addition to address this defendant's

11   pulling out of a cooperation agreement at the last moment.

12        What this defendant did is well-known to the

13   federal defense bar, it's well-known to our office.  And

14   when --

15        THE COURT:  How do you know that?  How do you know

16   that?

17        MS. PALUCH:  I know that just through speaking to

18   the prosecutors in our office who have talked to members of

19   the defense bar; I know that from defense bar members

20   talking to me about it.

21        THE COURT:  Okay.

22        MS. PALUCH:  When the next defendant decides to

23   pull out of a cooperation agreement, defense and Government

24   counsel can point to the sentence given in this case and as

25   an example of what happens when someone reneges on a

Case No. 1:16-cr-00054-WJM Document 358 Filed 12/12/18 USDC Colorado pg 770 of 971
Case 1:16-cr-00054-WJM Document 358 Filed 04/03/18 Page 27 of 65

27

1    cooperation agreement at the very last possible moment.

2         Another consideration for the Court is if the

3    Court were to impose the 24-month sentence here, which is

4    approximately a 60-percent reduction from the range as

5    calculated, that sentence will set the stage for the

6    remaining defendants to be sentenced in this case and we

7    will be working off that sentence for all of the other

8    defendants to be sentenced here in order to avoid

9    unwarranted sentencing disparities.

10        Now, in sum, when the Court considers the vital

11   role played by this defendant, the intended loss of 1.3

12   million, the actual loss of over $562,000, the harm caused

13   to the vulnerable victims, to the Department of Education,

14   to the community colleges, and to the justice system

15   through her failure to comply with the terms, for all of

16   those reasons we submit a sentence of 63 months in prison

17   is a just and sufficient one, Your Honor.

18        For those -- thank you for your time.

19        THE COURT:  All right.  Let me ask you a question.

20   Now I didn't see in your response, or any submission, any

21   information to provide me a framework of how these cases

22   have been sentenced by other courts previously in the

23   country, or is this the very first FAFSA fraud case that

24   DOJ has ever prosecuted?

25        MS. PALUCH:  It is not the first, Your Honor.  And

28

1  that is a good point.  I do not have that information for

2  you.

3          THE COURT:  All right.  So you've not researched

4  it?

5          MS. PALUCH:  I have not.

6          THE COURT:  Okay.  What about the other points

7  that were made in the motion in terms of the defendant's

8  history and characteristics and those matters?  Do you want

9  to address that at all or --

10         MS. PALUCH:  No, I think it's -- I think Ms.

11  Butterton explained very well that she's not pointing those

12  out as a basis for the variance but, rather, to just

13  explain the individual that Ms. Carr is and I think that's

14  entirely appropriate.

15         I think when you look at the case law and the case

16  law that we've cited in our response as to hardship to

17  family and all those things, I don't think there's anything

18  in the variance motion filed by the defense that warrants a

19  reduction all the way down to 24 months.

20         So absolutely the Court needs to consider all of

21  those factors, but I don't think in combination they

22  warrant such a significant variance.

23         THE COURT:  All right.  Thank you.

24         MS. PALUCH:  Thank you.

25         THE COURT:  All right.  Ms. Butterton, it's your

29

1   motion, I'll give you an opportunity for a brief reply.

2           MS. BUTTERTON:  May I have just one moment, Your

3   Honor?

4           THE COURT:  You may.

5           MS. BUTTERTON:  Thank you.  Your Honor, at this

6   moment I'm going to rest.  Thank you.

7           THE COURT:  Okay.  You can both stay there for the

8   time being.

9           All right.  Before I rule on the motion, I'm going

10  to consider some of the Section 3553(a) sentencing factors

11  as they apply to this defendant.  The record in this case

12  indicates that Ms. Carr is 40 years old.  She is a citizen

13  of the United States.  The defendant was born in Virginia.

14  After her parents divorced her mother remarried and Ms.

15  Carr claims she was subjected to serious abuse on the part

16  of her stepfather while she was growing up.

17          She moved with her mother and stepfather in 1983

18  from Virginia to Colorado Springs.  In 2003 she relocated

19  to Phoenix, Arizona, with her boyfriend at the time.  She

20  has had little to no contact over the past 30 years with

21  her parents or her sister, Shannon Haddox.  Ms. Carr left

22  East Junior High School in Colorado Springs in the seventh

23  grade and did not return to school.  She has a GED that she

24  earned in 1995.  And she's also earned 67 credits towards a

25  business administration associates degree at Maricopa

Case No. 1:16-cr-00054-WJM Document 528-3 Filed 12/14/18 USDC Colorado pg 773 of 971
Case 1:16-cr-00054-WJM Document 358 Filed 04/03/18 Page 30 of 65

30

1    Community College in Phoenix.

2        The defendant has never been married and she's not

3    currently involved in any committed relationship.  Her last

4    relationship was with codefendant, Trammel Thomas, whom she

5    dated from 2009 to 2014.  She has two children with Mr.

6    Thomas, Miland Thomas, age 7; and Tru Thomas, age 3.

7        From a prior relationship with one Omar Jones, the

8    defendant also has two older daughters, Ayana Brown, age

9    22; and Kaira Jones, age 17.  According to the defendant,

10   she and -- she enjoys an excellent relationship with all of

11   her children, and has informed the probation officer that

12   all four of them are aware of her guilty plea in this case.

13       Ms. Carr currently has custody of her three minor

14   children.  Her oldest daughter, Ayana Brown has indicated

15   that she and her husband, Demarcus Brown, wish to take

16   custody of their three full and half siblings when Ms. Carr

17   is incarcerated.

18       Presently also living with the family is an

19   individual by the name of Aubrey Richardson, age 22, whom

20   the defendant claims she adopted when Ms. Richardson was

21   14.  Probation officer has been unable to verify that this

22   legal relationship exists between these two women.

23   According to the defendant, Ms. Richardson helps to take

24   care of the younger children.

25       With regard to gainful employment, Ms. Carr was

1    working as an underwriter in Wells Fargo Auto Finance in

2    Phoenix in 2009 until she was terminated in the instant

3    offense in 2015.  Prior to that she worked as an

4    underwriter of the mortgages division of that same bank,

5    also in Phoenix.  Prior to 2003, the defendant worked as a

6    credit manager for auto loans.

7         Since being on bond on this case, she has worked

8    for a driver of both Uber and Lyft and she has run a custom

9    digital hard service.

10        Regarding to the defendant's criminal history

11   according to the presentence report, she has one juvenile

12   criminal adjudication and has been assessed zero criminal

13   history points by the probation officer and she is before

14   me on her first felony conviction.

15        Turning to the nature and circumstances of the

16   offense, given the voluminous details of the defrauding of

17   the Government perpetrated by the defendant, I incorporate

18   herein by reference the excellent summary of Ms. Carr's

19   criminal activity by the probation officer found at

20   paragraphs 8 through 15 of the report.

21        I will therefore recite right now for the record a

22   substantially abbreviated summary of this stipulated facts

23   in this case.  Ms. Carr's offense conduct stems over 26

24   months and involved the defendant, as well as her

25   codefendants, conspiring to defraud the Department of

32

1    Education by submitting false claims for federal student

2    aid.

3              This defendant and/or her codefendant, Trammel

4    Thomas, obtained names, birth dates, and Social Security

5    numbers for a large number of incarcerated individuals --

6    181 to be exact -- and used their personal information to

7    apply for federal student aid.

8              In these circumstances, these inmates are

9    currently -- are correctly considered by the guidelines to

10   be vulnerable victims.  While the defendant and Mr. Thomas

11   devised the scheme, codefendant, Mercedes Diaz, agreed to

12   receive mail in the names of the inmates at her residence

13   and mailbox address she rented in the names of other

14   individuals.

15             During the course of the conspiracy, the defendant

16   and her codefendants were involved in submitting over 150

17   FAFSA applications, seeking approximately $1.3 million in

18   federal financial aid funds.  The Department of Education

19   disbursed over 560,000 as a result of Ms. Carr's and her

20   codefendants' false claims.  Of that amount, the defendants

21   received over $420,000 in refunds.

22             As of today, the defendant has served one day in

23   pretrial detention.

24             Mr. Gill, do you wish to make any statement at

25   this time on behalf of the probation office?

1             PROBATION OFFICER:  No, sir, Your Honor.

2             THE COURT:  All right.  Thank you.  All right, Ms.

3    Butterton -- actually before you get back up there, Ms.

4    Paluch, are there any victims in the courtroom that wish to

5    address the Court?

6             MS. PALUCH:  No, Your Honor.

7             THE COURT:  All right.  Thank you.  Now Ms.

8    Butterton, you and your client can go back to the lectern.

9             Ms. Carr, do you wish to make any statement to the

10   Court on your own behalf before I announce your sentence?

11            THE DEFENDANT:  Yes, sir.  I've been waiting a

12   long time to talk to you.

13            THE COURT:  Here's your opportunity.

14            THE DEFENDANT:  Okay.  So I gave my statement in

15   November of 2016.  I had one interview with Beth Gibson,

16   Ms. Paluch, and Sandra.  And as -- I didn't hear from them

17   at all for a year.  I gave my plea and then the month of

18   trial -- Mr. Thomas' trial, I was contacted to prep for

19   trial.

20            The first phone call -- we had a total of four

21   phone calls over the phone to do this prep.  The first

22   phone call --

23            THE COURT:  "We," is who?

24            THE DEFENDANT:  Everybody here on the first phone

25   call.  Everybody on --

1          THE COURT:  At the counsel table.  Okay.

2          THE DEFENDANT:  Yes, sir.  It was pretty much a

3    disaster because I've never -- my extent courtroom

4    experience is Law & Order.  Like I don't know how to answer

5    questions, like they were trying to prep me.  I was like

6    overexplaining everything.  They were getting really mad at

7    me.  You know, kind of saying that, Well, we can't lead you

8    to this, you have to say this.

9          And it was pretty much a disaster.  So they set up

10   a following phone call the following Monday.  That phone

11   call was a super disaster because Mr. Fields started

12   yelling at me -- okay, but let me -- let me lead up to

13   this.

14         First they asked me if Mr. Thomas had ever filled

15   out a FAFSA and I said to my knowledge, No, I had never

16   seen him fill out a FAFSA.  He started getting mad and then

17   was like, Well, if this is the way you're going to answer

18   questions you're in for a lot of trouble.

19         THE COURT:  Okay.  Ms. Carr, let me step in here.

20   Your allocution is an opportunity -- you have the -- and

21   your right to speak to me, giving me your opportunity to

22   tell me who you are and why you did what you did and give

23   me a window into, from your perspective, the criminal

24   activity that you engaged in.

25         It's really going to be very unhelpful and of

Case No. 1:16-cr-00054-WJM   Document 358   Filed 12/21/18   USDC Colorado   Page 35 of 59
Case 1:16-cr-00054-WJM   Document 326-3   Filed 04/03/18   Page 35 of 65   Page 778 of
971

35

 1   little use for you to go into discussions you had with the

 2   Government's attorneys prior to trial because that's not

 3   what you were indicted for.  All right?  What I'm

 4   interested in is your discussion and explanation and your

 5   opportunity to show me remorse and acceptance of

 6   responsibility for your crimes.  Okay?

 7            Your phone calls with the Government are -- is not

 8   what's going to drive your sentence.

 9            THE DEFENDANT:  Okay.

10            THE COURT:  So --

11            THE DEFENDANT:  He just told me he was --

12            THE COURT:  Hold on.  If this is all a lead-up to

13   an explanation of why you didn't testify, just give me

14   that, you know, in a 30-second summary.  Don't go into how

15   you were abused on the phone call by the prosecutors, which

16   I have now seen Mr. Fields on at least a couple of trials,

17   Ms. Paluch on one.  I find it hard to believe that they

18   would be abusive on the phone to you, but go ahead and give

19   me your version.

20            THE DEFENDANT:  Okay.  He started yelling at me.

21   He told me he was going to rip up my deal and send me to

22   prison for a very long time, to which my lawyer had to

23   terminate the phone call and hang up on them, and did not

24   call them back until the following Monday.  The following

25   Monday, they promised me I would never have any contact

1    with Mr. Fields.  They apologized for his actions.  They

2    said he's usually very mild-mannered.  They had no idea

3    where the outburst came from.  And they said I would never

4    have any further contact with him.  That phone call went

5    well.

6          And then our last phone call the week of -- and I

7    tried to give them more information and they never sent

8    over an MOI.  They didn't want to hear the information.  So

9    I was scared that if I got on the stand, they were refusing

10    information that I knew I was going to be cross-examined on

11    and I would be like perjured or something.  And she was

12    like, Nope, nope, I don't want to hear it.  I don't want to

13    hear it.

14          And then the last phone call --

15          THE COURT:  No one can force you to perjure

16    yourself.  If a witness perjures themselves, it's because

17    of what they choose or how they choose to answer questions:

18    truthfully or not.  I mean, there's no -- there's no way

19    the Government is going to force you to perjure yourself.

20    I think that's an absurd contention.

21          THE DEFENDANT:  Maybe I phrased it wrong, but I

22    don't know, I -- just saying something wrong because I was

23    so -- he scared me.  Like he -- I was like, He scared me.

24    I was like hysterically crying when she called me back.  He

25    said he was going to rip up my deal and send me to jail for

1    a very long time.  So, I mean, I'm already going to jail

2    for a very long time, so I didn't know what to do.  I

3    didn't think they would do this the week of Thanksgiving,

4    the week before trial.

5            And then another prep question was:  Did we

6    promise you anything?  And I said yeah, 24 months and a

7    third off the sentence for like acceptance of

8    responsibility.  They were like, No, it just depends how

9    you are in trial.

10           And Mr. Fields already hates me, and said he was

11   going to rip up my deal.  So --

12           THE COURT:  But there's no representation in your

13   plea agreement that you were promised a -- first of all,

14   the Government can only recommend to me a sentence.  I'm

15   the one that decides the sentence.

16           Secondly, there's nothing in your plea agreement

17   that tells me -- independent of what you're telling me

18   right now, but nothing in the plea agreement that the

19   Government committed itself to recommending 24 months or

20   any recommendation.  So -- but the point -- so we can wrap

21   up this portion of your allocution, you're telling me that

22   the reason you didn't testify was you were so traumatized

23   by your phone calls with Mr. Fields and the other

24   prosecutors that that's why you didn't testify.

25           THE DEFENDANT:  So I had called -- so the

Case No. 1:16-cr-00054-WJM Document 358-3 filed 12/21/18 USDC Colorado pg 781 of
Case 1:16-cr-00054-WJM Document 285 Filed 04/03/18 Page 38 of 65
971

1    Wednesday before the trial, I had e-mailed my lawyer:  Did

2    we ever get the MOI about the new information I had given

3    them?

4            I didn't get a response from her because it was,

5    obviously, Thanksgiving and she was probably with her

6    family.  So I went ahead and got on a plane and came out

7    here and went to her office.  And all the concerns I had I

8    went over with her and there --

9            THE COURT:  Don't go into your discussions with

10   Ms. Butterton.

11           THE DEFENDANT:  Okay.

12           THE COURT:  Those are attorney-client privileged,

13   so --

14           THE DEFENDANT:  Sorry.

15           THE COURT:  Proceed, but don't discuss what you

16   and Ms. Butterton told each other.

17           THE DEFENDANT:  So, yes, so due to the overall --

18   everything and him already telling me he was going to rip

19   up my deal and send me to jail for a very long time, I was

20   scared if I deviate anything from the M- -- the original

21   statement, which he wasn't even a part of, that meeting,

22   they were going to rip up my deal anyway, because he stated

23   he was going to rip up my deal and send me to jail for a

24   very long time.

25           THE COURT:  All right.  All right.  That's your

39

1   explanation for why you didn't testify.

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  What else do you have to tell me?

4   What else do you want to tell me that you want me to take

5   into consideration from your view and from your perspective

6   as I consider the sentence I will impose?

7          THE DEFENDANT:  From -- okay, from my move

8   there -- okay, they're saying that I -- I did all this.

9   Yes, I had a part in it, but when I got in my discovery I

10  was shocked at amount.  Marcelle Green used to come to my

11  house to do all these things.  She was already doing this

12  with a boyfriend and she was introduced in this.  She even

13  went into my Accurint and was doing this information.  She

14  was even getting information to her house without my

15  knowledge -- all her addresses that she was using was

16  without my knowledge.  So the -- three, four, five times

17  the amount is because of Mrs. Green -- Ms. Green.

18          So yes, I went into my Accurint and I was giving

19  information, but not to that extent.  So, yes, I'm

20  responsible completely, but for the amount, I wasn't aware

21  that amount at all.

22          THE COURT:  All right.  You're telling me you

23  didn't receive, yourself, individually, personally,

24  $420,000?

25          THE DEFENDANT:  No.  And Mrs. Green obviously

40

1    was -- and I know this was in her -- in this trial in her

2    statements, she was transporting marijuana.  And somebody

3    also came to my home to threaten me before the trial not to

4    say anything about her involvement with transporting

5    marijuana.

6              THE COURT:  Well --

7              THE DEFENDANT:  So there -- there was just so

8    much.  And, yes, I had involvement in this and, yes, my job

9    was at home and I made a mistake by giving this information

10   to her, and I was influenced by doing this.  And, yes, I

11   did some homework, but I was not like this -- I worked from

12   9:00 a.m. to 8:00 p.m. everyday.  We had to have decisions

13   of auto loans within five minutes.  I was constantly on the

14   phone and on the computer.

15             I -- I don't have transcripts of what she actually

16   testified and I don't know if you have access to her MOIS,

17   but she said she was always over at my house doing -- this

18   is what she did all day.  So I just did not know the extent

19   of how much she had done.

20             So I -- I take full responsibility of what was

21   done because of my access to the database and what I

22   allowed -- who I allowed in my home and what I allowed to

23   come out of my work computer and my involvement in the

24   case.

25             THE COURT:  Anything else you want to say?

Case No. 1:16-cr-00054-WJM Document 358 filed 12/21/18 USDC Colorado pg 784 of 971
Case 1:16-cr-00054-WJM Document 235-3 Filed 04/03/18 Page 21 of 65

41

1      THE DEFENDANT:  And I understand that the people
2  have been hurt in the jail.  She had presented to me like
3  they wouldn't know and they wouldn't be hurt, but I
4  understand now, especially trying to rebuild life and
5  rebuild credit, especially knowing how hard it is to
6  rebuild credit, get stuff off.  Me, being a victim of
7  identity theft, myself, how many people I have to call and
8  submit papers and faxes of getting stuff off.
9      I know what I did was wrong and I'm going to
10  impact my kids forever, you know, because I've never been
11  without my kids and now the burden is going to be on my
12  oldest daughter to raise my kids and that's going to kill
13  me.
14      And I'm just so sorry and I'm so sorry if I
15  disrespected the Court in any way.  And, I mean, I'll live
16  with this forever.  I'm sorry.
17      THE COURT:  Did you think about all this before
18  and especially -- what I'm referring to is the effect it
19  would have on your children and particularly your two
20  youngest children, before you engaged in your crimes?
21      THE DEFENDANT:  My two youngest children weren't
22  born yet.  About -- and my two oldest, no.  At the time,
23  you know, my daughter was about to be 16 and she wanted,
24  you know, stuff 16-year-olds want and . . .
25      THE COURT:  All right.

42

```
 1              THE DEFENDANT:  No.

 2              THE COURT:  Anything else you want to -- I have

 3     some questions for you, but before I ask you questions, I

 4     want to make sure you're done with your allocution.

 5              THE DEFENDANT:  Yes, sir, I'm done.

 6              THE COURT:  You are?  Okay.  Can you point to me

 7     any evidence, any text, e-mail, diary entry, that would

 8     tend to show that had you not -- had your fraud not been

 9     uncovered -- or discovered, that you would have voluntarily

10     stopped your criminal activity before the 26, or at least

11     not gone beyond the 26 months?

12              THE DEFENDANT:  I -- can I point to something

13     saying that I would have stopped?

14              THE COURT:  No, that you made some kind of record

15     that -- let me ask it this way:  Is there anything that you

16     could point to me that shows that during this 26 months,

17     you had any remorse for what you were doing and the effect

18     it was having on your victim such that you were considering

19     stopping your criminal activity before your fraud was

20     uncovered?

21              THE DEFENDANT:  Well, Trammel Thomas had moved

22     that year.  And after he had moved in, Marcelle Green was

23     not coming over as much.  And so I was actually trying to

24     sever our relationship with some other stuff that happened,

25     so without her in the picture it wouldn't have kept
```

43

1    happening.

2            THE COURT:  Well, according to the Government, you

3    stole the information -- personally identifying information

4    of 181 individuals from the Accurint database in the course

5    of discharging your duties as a bank officer.  You realize

6    that's what the Government's alleging.

7            THE DEFENDANT:  Yes, seeing the printout, yes.

8            THE COURT:  Do you deny that?

9            THE DEFENDANT:  No.  I saw the printout and it was

10   my log-in, so I --

11           THE COURT:  So as Ms. Paluch said, you heard her,

12   over 26 months, that averages seven times a month.  So 181

13   opportunities to say, you know, I'm going to stop here.

14   I'm going to stop at 93.  And I think what I'm doing is

15   wrong and I'm impacting the lives of these victims and I am

16   committing a felony, a federal crime, so I'm going to stop,

17   even though law enforcement hasn't discovered my scheme

18   yet.  Did you ever have those thoughts?

19           THE DEFENDANT:  I mean, I -- there's nothing I can

20   point out to prove to you --

21           THE COURT:  All right.  Just tell me -- just tell

22   me what you did or not.

23           THE DEFENDANT:  I didn't want to be involved in

24   it.  I wanted to start my own business and be completely

25   done with it.  I didn't like what I was doing and the

Case 1:16-cr-00054-WJM   Document 358   Filed 04/03/18   Page 44 of 65

44

```
 1    amount of -- it was just -- it felt like -- it obviously
 2    felt wrong.  My whole life I've just been in the banking
 3    industry.  I had a job, I had this, I never had to worry
 4    about anything.  And being around Marcie and doing that,
 5    it, of course, felt wrong, but she was over every day, so
 6    it just kind of continued and it just got out of control
 7    and there was -- I'm glad it happened to -- I know that
 8    sounds weird, but I'm glad I got caught because I think I
 9    need to go to prison because obviously I hurt people, I
10    took money that I didn't earn.  My kids need to see that,
11    you know, there's consequences for those actions.
12         I've always -- like I used to work double jobs.  I
13    mean, I have always busted my butt and so for them to know
14    that I just took money I didn't earn, just easy, and then
15    hurt people in the process, I need to go to prison.  I'm
16    not -- I'm not trying to say that I don't have remorse and
17    I don't think I should go, I absolutely think I should go
18    and I don't think it's right to keep doing it just -- she
19    was just over every day and she always, like, needed more,
20    and it was just kind of out of control.
21         I couldn't like -- I just had a hard time, like,
22    saying no.  It just kept going.  And she -- and she had no
23    job, so it was like she, you know, needed income.  She was
24    like my best friend, so I just wanted to help her.  And
25    then Mercedes didn't have a job and she was, you know, on
```

Case No. 1:16-cr-00054-WJM Document 358 Filed 12/21/18 USDC Colorado pg 788 of
Case 1:16-cr-00054-WJM Document 325-3 Filed 04/03/18 Page 49 of 69
971

45

 1      drugs and I was trying to get her off drugs and then do

 2      like a business, and I just was trying to help people but I

 3      really hurt people.  And now they're going to prison.  And

 4      even though I don't like Marcie, like I don't -- she is

 5      going to be away from her kids.  So like if I would have

 6      never had that stupid job from home, she would have never

 7      known like this -- it would have never happened.

 8              THE COURT:  Well, you could have just told her no.

 9      I mean --

10              THE DEFENDANT:  I know.

11              THE COURT:  -- I'm not going to engage in criminal

12      fraud.

13              THE DEFENDANT:  I absolutely agree with you.

14      You're completely right.  And now I'm here and I'm going to

15      be -- the consequence is the rest of my life.  Like I'm 40

16      years old, about to have a felony.

17              My son is three and has never said a word, ever.

18      Not "no," not "mama."  We go to speech therapy three times

19      a week, he has autism and now my 22-year-old has to -- I

20      just want -- the 22-year-old, she has to be a position of a

21      mom because of my greed, because of my friend's greed.

22      It's horrible.  Like I'm a horrible person.  And that's --

23      that's not that what -- this is just like completely

24      spiraled out of control.  It's just a horrible situation.

25      And I am sorry.

46

1        And I meant no disrespect to the Court.  I just
2   didn't want to get in any more trouble saying the wrong
3   thing on the stand.
4        And I absolutely think I should go to prison and I
5   think it's in God's hands, and whatever I'm supposed to
6   have happen in prison is supposed to show me -- and whoever
7   I'm supposed to meet there, I'm supposed to meet.
8        THE COURT:  All right, ma'am.  Are you done?
9        THE DEFENDANT:  Yes, sir.
10       THE COURT:  All right.
11       THE DEFENDANT:  I'm so sorry.  I'm crying like a
12  baby.  I -- in my head, this was not supposed to be crybaby
13  like this.  I'm so sorry.
14       THE COURT:  All right.  I'm prepared to rule on
15  the defendant's motion.  It is their initial contention the
16  defendant argues essentially there should be no adverse
17  consequences to her decision to not abide by her
18  cooperation agreement and testify at the trial of her
19  codefendant and former lover, Trammel Thomas.  I don't
20  think it would be a good use of my time here this afternoon
21  to recount the arguments and counterarguments from the
22  parties on this point.  It will suffice for me to summarize
23  my ruling on this particular point as follows:
24       I note that the Government has fulfilled all of
25  its obligations under the plea agreement.  It has moved to

1    dismiss all the remaining counts in the indictment, to

2    include the aggravated identity charges; it moved for the

3    defendant to receive all three points for acceptance of

4    responsibility; and it did not seek any further charges

5    against the defendant.

6            All of this is very significant because in my view

7    the defendant's failure to fulfill her obligations under

8    the plea agreement gave the Government the option, had it

9    chosen to exercise it, to withdraw from the plea agreement

10   and seek to reinstate all the charges from the original

11   indictment against Ms. Carr. And, frankly, that is what I

12   had anticipated that the Government was going to do and why

13   I originally set a status conference in this case to take

14   up what I thought was coming down the pike.

15           Not only that, but even though the defendant

16   admitted to the forfeiture allegation in the indictment, no

17   order of forfeiture can now be issued on Count 1 and,

18   therefore, unlike her co-conspirator, Mr. Thomas, she will

19   not be subject to an order of forfeiture.

20           Finally, pursuant to the calculations set forth in

21   the plea agreement, the Government did not seek or advocate

22   for an abuse of trust enhancement for the two additional

23   levels for 10 or more victims as requested by the probation

24   officer.

25           In sum, I agree with the Government that Ms. Carr

1   received all the benefits of the plea agreement and at the

2   last possible moment she reneged on her obligation to

3   testify truthfully at Mr. Thomas' jury trial.  And that by

4   doing so, she inflicted the maximum amount of potential

5   harm to the Government's case against Mr. Thomas.  I find

6   that it is appropriate for me to consider the defendant's

7   conduct in breaching her cooperation in fashioning a just

8   sentence to impose upon her.  And I'm referring for support

9   for this position to the Seventh Circuit decision Ms.

10  Paluch referenced, *United States v. Turner*, 864 F.2d 1394

11  at 1399, a 1989 decision from that court.

12          The Tenth Circuit -- the Seventh, rather, the

13  Seventh Circuit in that court held that reneging on one's

14  promise is a basis of punishment independent of the

15  assertion of the privilege not to testify and is a basis on

16  which the sentence legitimately may be augmented.  Apart

17  from her arguments related to her failure to testify at the

18  trial of her codefendant, the defendant's motion and her

19  requested 24-month variant sentence rests primarily on

20  three grounds.

21          First, for someone who has never been in prison

22  before, a 24-month custodial sentence is more than enough

23  time to reflect the seriousness of her offense, provide

24  adequate deterrence, and protect the public from future

25  crimes.

49

1         Her second major argument is that her children

2    and, especially her two youngest children, need her at home

3    and will be very adversely affected by a prolonged absence

4    on her part.

5         And, lastly, that this being her first felony

6    conviction, it places her in a Criminal History Category of

7    I, which according to the Sentencing Commission data,

8    individuals in that category have a recidivism rate of

9    only, I'll use the word "only" of 14 percent and that that

10   is another mitigating factor.

11        So let me first take up grounds 1 and 2.  The

12   first argument essentially that because she has no prior

13   period of imprisonment, any period behind bars will have a

14   profound deterrent effect especially as compared to

15   defendants with several prior felony convictions and

16   periods of incarceration.  I have previously categorically

17   rejected this line of reasoning, especially in cases of

18   so-called white-collar financial crimes prosecutions like

19   the one before me today.  Taken to its extreme, the

20   argument would countenance very light sentences to

21   sentences like Bernie Madoff, who engaged in egregious and

22   protracted fraud and caused vast human and financial

23   damages merely because they were first-time offenders.

24        The defendant's related argument that as an

25   experienced bank employee, the mere fact of this conviction

1    will preclude her from working in the financial services

2    industry ever again, and by virtue of that she will never

3    again be able to use the banking experience and skills she

4    has developed over many years, these are all additional

5    burdens and losses Ms. Carr will already suffer, and as a

6    result this argues for a lower custodial sentence,

7    according to the defendant, in this case.

8           I categorically reject this argument as well.  I

9    note that the circuit courts have swiftly disposed of these

10    arguments for the very same reasons I find they have little

11    to no merit in these circumstances.  Let me quote from just

12    two appellate decisions which very clearly crystallize, in

13    my view, these issues and articulate why we as federal

14    judges must not apply one set of sentencing factors to

15    white-collar fraud defendants and a different set to the

16    so-called drug and gun class of defendants.  *United States*

17    *v. Musgrave*, 761 F.3d 602 at 604, a 2014 decision from the

18    Sixth Circuit.  The Court there considered the drastically

19    reduced sentence I just recorded imposed in the bank and

20    wire fraud case where the guideline sentencing range, like

21    it is here, was 57 to 71 months.  The Sixth Circuit stated,

22    quote, The District Court relied heavily on the fact that

23    Musgrave had already been punished extraordinarily by four

24    years of legal proceedings, legal fees, the likely loss of

25    his CPA license, and a felony conviction that will follow

1    him for the rest of his life, end quote.

2         The Sixth Circuit determined that the consequences

3    of Musgrave's prosecution and conviction were impermissible

4    factors to be considered.  The Court went on, quote, None

5    of these things are his sentence nor are they consequences

6    of his sentence.  A diminished sentence based on these

7    considerations does not reflect the seriousness of his

8    offense or effect a just punishment, end quote.

9         In a similar vein, the Seventh Circuit has even

10    more aptly stated as follows, quote, No middle class

11    sentencing discounts are authorized.  Business criminals

12    are not to be treated more leniently than members of the

13    so-called criminal class just by virtue of being regularly

14    employed or otherwise productively engaged members --

15    individuals in lawful economic activity.  It is natural for

16    judges, drawn as we are from the middle or upper middle

17    classes, to sympathize with criminals drawn from the same

18    classes, but in this instance, we must fight our nature.

19    Criminals who have the education and training that enables

20    people to make a decent living without resorting to crime

21    are more, rather than less, culpable than their desperately

22    poor and deprived brethren in crime.

23         That's from the United States -- case of *United*

24    *States v. Stefonek*, S-t-e-f-o-n-e-k, 179 F.3d 1030 at 1038,

25    a Seventh Circuit decision from 1999.

1        So I will not be varying downward in this case

2    because Ms. Carr is an experienced bank and financially --

3    financial industries employee who has never served time

4    behind bars before.

5        The second argument with respect to the

6    defendant's two young children:  In her motion the

7    defendant also argues that I should impose the dramatically

8    reduced sentence she seeks for the separate reason that her

9    two youngest children, ages 7 and 3, will be strongly and

10   adversely affected by her prolonged absence were she to be

11   sentenced within the guideline sentencing range.

12       This is an argument I hear not infrequently from

13   defendant parents, both mothers and fathers, with young

14   children in the house -- in the home.  I reject this as a

15   separate grounds for granting the motion.  My response to

16   this argument is a very simple one:  Ms. Carr should have

17   paused to consider the effect on her two young children of

18   her possible incarceration before she embarked on her

19   course of criminal conduct and not just afterwards.

20       This is -- this was a -- as Ms. Paluch pointed

21   out, and since this was not just a one-time crime like a

22   single bank robbery, but instead it's a sustained series of

23   criminal actions and fraudulent conduct undertaken 181

24   times and repeatedly over the course of 26 months, that if

25   Ms. Carr's maternal instincts had truly triggered authentic

1    concern for the future welfare of her children, Ms. Carr

2    had ample and multiple opportunities during her protracted

3    crime spree to bring her crimes to a swift end; but she did

4    not.

5         I am not unsympathetic that during -- that two

6    young children in this case will be without their mother

7    for a period of years.  At least in this case, they will

8    apparently be well taken care of by Ms. Carr's adult

9    daughter and son-in-law.

10        The last factor in aggravation I wish to discuss

11   are the victims in this case.  As I discussed earlier in

12   this context, these incarcerated victims are considered a

13   vulnerable group under the Sentencing Commission

14   Guidelines, and for good reason.  My review of their victim

15   letters has convinced me that the harm the defendant's

16   crimes has inflicted upon them is real and significant.

17        I read about the previous damages done to these

18   individuals' credit history and how some of their files

19   have been red flagged and worse, and that such -- and the

20   odds that they will be facing when they are released to

21   obtain credit or loans or educational or housing -- for

22   educational or housing purposes or for trying to get a job,

23   and that all those opportunities have now been

24   significantly diminished.

25        For a societal group which already faces severe

1   impediments to transitioning to law-abiding lives with

2   gainful employment, this added personal damage done to them

3   is, in my view, especially cruel.

4       So in conclusion, I find the defendant has failed

5   to convince me that the statutory services are best served

6   by granting her variance motion.  I specifically find that

7   the variant sentence sought by the defendant in her motion

8   fails to reflect the seriousness of the offense, fails to

9   afford adequate deterrence to future criminal conduct and

10   will, in fact, not protect the public from further crimes

11   of this defendant.  As a consequence the defendant's motion

12   for variant sentence is denied.

13       I do, however, agree with the defendant's final

14   argument in her motion, premised on the fact that this is

15   her first felony conviction and that she has no substantial

16   criminal history and that those are legitimate factors in

17   mitigation.

18       Also in mitigation I think are the very heartfelt

19   and genuine letters of support from her family that I

20   received and read.  And it is for these reasons that I

21   intend to sentence the defendant at the bottom of the

22   guideline range instead of the middle range or higher.

23       Given all the above, I intend to sentence the

24   defendant to a period of incarceration of 57 months to be

25   followed by a term of supervised release of three years.  I

1   also intend to order that Ms. Carr pay restitution in the

2   total amount of $562,487.85, in addition to the special

3   assessment of $100.  Imposing a fine in this case would, in

4   my view, impair Ms. Carr's ability to simultaneously pay

5   restitution.  For this reason, I intend to waive payment of

6   any fine apart from the special assessment as well as any

7   interest on the restitution amount.

8         Before I actually impose sentence, I'll give

9   counsel a final opportunity to make any record they believe

10  appropriate.  Ms. Paluch.

11        MS. PALUCH:  None, Your Honor.  Thank you.

12        THE COURT:  Ms. Butterton.

13        MS. BUTTERTON:  Your Honor, just a couple of, I

14  suppose, housekeeping matters.  First, we are seeking

15  recommendation to a facility in Arizona so Ms. Carr can be

16  close to her family.  I believe there was an FCI in

17  Phoenix; of course that's up to the Bureau of Prisons.

18        THE COURT:  Is there one -- is Arizona as lucky as

19  we are to just have one federal district?

20        MS. BUTTERTON:  I'm embarrassed that I don't know

21  the answer to that question.

22        THE COURT:  I need to recommend to a federal

23  district, not to a state.  Let me ask Mr. Gill.

24        MS. BUTTERTON:  I think it's one district because

25  of the population --

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/19 USDC Colorado pg 799 of
971
Case 1:16-cr-00054-WJM Document 358 Filed 04/03/18 Page 56 of 69

56

1              PROBATION OFFICER:  Your Honor, there is one

2    district of Arizona.

3              THE COURT:  There is just one district of Arizona.

4    Is there any objection from the Government?

5              MS. PALUCH:  No, Your Honor.

6              THE COURT:  Does this facility, to your knowledge,

7    Ms. Butterton -- I hope you looked into this -- house

8    female inmates?

9              MS. BUTTERTON:  That's correct, Your Honor,

10   there's a female facility.  And I don't believe that Ms.

11   Carr's going to be anything above the lowest security

12   designation.

13             THE COURT:  Okay.  So I think you've been to

14   enough sentencings in front of me to know that I don't

15   recommend to a particular facility, just that a facility

16   within a particular district that's appropriate to the

17   security designation of the defendant.

18             MS. BUTTERTON:  That's fine, Your Honor.  Thank

19   you.

20             THE COURT:  Given that there's no objection from

21   the Government, I will include that in the judgment.

22             MS. BUTTERTON:  The only other housekeeping matter

23   which the Court may want to address later is the issue of

24   surrender.

25             THE COURT:  Yeah.  We'll deal with that later.

1           All right.  I find no reason to depart from the

2   guideline sentencing range as calculated by the

3   Government's motion -- let me see -- I -- I find no reason

4   to depart from the guideline sentencing range which does

5   not exceed 24 months and I will impose a sentence within

6   that range.  I find that the sentence I will impose in this

7   case reflects the seriousness of the offense, affords

8   adequate deterrence to future criminal conduct, and will

9   protect the public from further crimes of this defendant.

10          Accordingly pursuant to the Sentencing Reform Act

11  of 1984, it is the judgment of this Court that the

12  defendant, Heather Carr, be committed to the custody of the

13  Bureau of Prisons to be imprisoned for a term of 57 months.

14  The Court recommends that the defendant be incarcerated at

15  a facility appropriate to her security designation located

16  within the district of Arizona.

17          Upon release from imprisonment, the defendant

18  shall be placed on supervised release for a term of three

19  years.  While on supervised release, the defendant shall

20  not commit another federal, state or local crime; shall not

21  possess a firearm as defined in 18 United States Code

22  Section 921; and shall comply with the standard conditions

23  that have been adopted by this Court in District of

24  Colorado General Order 2016-1.

25          The defendant shall not unlawfully possess and she

58

1    shall refrain from unlawfully using a controlled substance.

2    The Court waives the mandatory drug testing provisions of

3    Section 3563(a)(5) because the report indicates a low risk

4    of future substance abuse by this defendant.

5            The defendant shall cooperate in the collection of

6    DNA as directed by the probation officer.

7            The Court finds that the following special

8    conditions of supervision are reasonably related to the

9    factors enumerated in Sections 3553(a) and 3583(d), and

10   they do not constitute a greater deprivation of liberty

11   than reasonably necessary to accomplish the goals of

12   sentencing.

13           Special condition No. 1, the defendant shall not

14   incur new credit charges or open initial lines of credit

15   without the approval of the probation officer unless the

16   defendant is in compliance with the periodic payment

17   obligations imposed pursuant to the Court's judgment and

18   sentence.

19           No. 2, as directed by the probation officer, the

20   defendant shall apply any monies received from income tax

21   refunds, lottery winnings, inheritances, judgments, and any

22   anticipated or unexpected financial gains to the

23   outstanding court-ordered financial obligation in this

24   case.

25           No. 3, the defendant must provide the probation

1   officer access to any requested financial information and

2   authorize the release of any financial information until

3   all financial obligations imposed by the Court are paid in

4   full.

5        No. 4, if the defendant has an outstanding

6   financial obligation, the probation office may share any

7   financial or employment documentation relevant to the

8   defendant with the Asset Recovery Division of the United

9   States Attorney's Office to assist in the collection of the

10  obligation.

11       No. 5, the defendant shall document all income or

12  compensation generated or received from any source and

13  provide such information to the probation officer as

14  requested.

15       No. 6, the defendant shall not cause or induce

16  anyone to conduct any financial transaction on her behalf

17  or maintain funds on her behalf.

18       No. 7, the defendant may not engage in any

19  occupation, business, profession, or volunteer activity

20  that would require, enable, the defendant to obtain

21  personally identifying information of customers or other

22  employees without prior approval of the probation officer.

23       No. 8, the defendant shall not engage in any

24  business activity unless that activity is approved by the

25  probation officer.  Any approved business activity must

Case No. 1:16-cr-00054-WJM   Document 358   Filed 04/03/18   USDC Colorado   Page 60 of 803 of
Case 1:16-cr-00054-WJM   Document 528-3   Filed 12/21/18   USDC Colorado   pg 803 of
971

60

1    operate under a formal registered entity for all -- for any

2    approved business activity.  The defendant shall provide

3    the probation officer with the names of all business

4    entities and their registered agents.  The defendant shall

5    not register any new business entity, foreign or domestic,

6    without the approval of the probation officer.  The

7    defendant shall not cause or induce others to register

8    business entities on her behalf.

9         For any approved business activity, the defendant

10   shall maintain business records.  The defendant shall

11   provide all requested documentation and records to the

12   probation officer regarding any of her business activities

13   as requested by the probation officer.

14        No. 9, the defendant shall maintain separate

15   personal and business finances and shall not commingle

16   personal and business funds or income in any financial

17   accounts including, but not limited to, bank accounts and

18   lines of credit.

19        No. 10, the defendant shall submit her person,

20   property, house, residence, vehicle, papers, and computers,

21   as defined in 18 United States Code Section 1030(e)(1),

22   other electronic communications or data storage devices or

23   media or office to a search conducted by the United States

24   probation officer.  Failure to submit to such search may be

25   grounds for revocation of supervised release.

Case 1:16-cr-00054-WJM Document 258-3 Filed 04/03/18 Page 81 of 65

61

```
1        The defendant shall warn any other occupants that
2    the premises may be subject to searches pursuant to this
3    condition.  An officer may conduct this search pursuant to
4    this condition only when reasonable suspicion exists that
5    the defendant has violated a condition of supervision and
6    that the areas to be searched contain evidence of this
7    violation.  Any search must be conducted at a reasonable
8    time and in a reasonable manner.
9        The defendant is ordered to make restitution in
10   the total of $562,487.85 in the amount and to the
11   individual victims as set forth in the table found at
12   paragraph 93 of the final report, ECF 250.
13       The defendant shall pay a special assessment of $100,
14   which shall be due and payable immediately.
15       The Court finds that the defendant does not have the
16   ability to pay a fine in light of the restitution
17   obligation imposed by the judgment; the Court therefore
18   waives payment of any fine other than the special
19   assessment, and for this reason payment of interest on the
20   restitution amount is also waived.
21       The special assessment and restitution obligations
22   are due immediately.  Any unpaid restitution balance, upon
23   release from incarceration, shall be paid in monthly
24   installment payments during the term of supervised release
25   of not less than 10 percent of the defendant's gross
```

62

1     household monthly income.

2             Within 15 days of release from custody, the

3     defendant shall meet with the probation officer to develop

4     a plan for the payment of an unpaid portion of his

5     obligations under the court's judgment -- of her financial

6     obligations under the court's judgment.  This plan will be

7     based on the defendant's income and expenses.  The plan

8     will be forwarded to the Court for review and approval.

9             All right.  Let me take up now the issue of

10    voluntary surrender.  Ms. Butterton, it's the defendant's

11    burden, so I'll let you go first.

12            MS. BUTTERTON:  Your Honor, the factors at play --

13    the statutory factors at play here are the same as after

14    the change of plea:  Whether she is a risk of flight,

15    danger to the community.  These all come into play.  Again

16    it's the same standard as the change of plea.  The

17    Government did not seek it then.

18            I can't respond to whether they're seeking it now,

19    but Ms. Carr has been on bond for almost a year, has had no

20    violations, has talked to the probation officer, and would

21    request the time to get her affairs in order.

22            THE COURT:  Okay.  Does the Government have any

23    objection to voluntary surrender?

24            MS. PALUCH:  We do not, Your Honor.

25            THE COURT:  I find by clear and convincing

1    evidence that the defendant is not likely to flee, nor does

2    she pose a danger to the safety of any other person or the

3    community.

4         It is therefore ordered that the defendant,

5    Heather Carr, surrender at the institution designated by

6    the Bureau of Prisons on February 8th, 2018, at 12:00 noon.

7    In the interim, the defendant's bond is continued and all

8    conditions set forth in the magistrate judge's order

9    setting conditions of release shall continue to apply.

10        Ms. Carr, I'm giving you five weeks from today to

11   get your affairs in order before you report to the Bureau

12   of Prisons.  Let me point out to you, ma'am, that if you

13   fail to report to the Bureau of Prisons on the 8th of

14   February to begin to serve your sentence, that such a

15   failure to report will, itself, be a new and separate

16   criminal offense.  Are we clear on that?

17        THE DEFENDANT:  Yes, sir.

18        THE COURT:  All right.  And, lastly, Ms. Carr,

19   pursuant to the plea agreement you entered into in this

20   case, you waive the right to appeal your conviction as well

21   as the sentence I just imposed except in very limited

22   circumstances.  Given that I did not impose upon you a

23   custodial sentence which exceeds the statutory maximum, or

24   is greater than that applicable to an offense level of 23,

25   it would appear that your right to appeal under your plea

64

1     agreement is nonexistent unless the Government chooses to

2     file an appeal.

3          In any event, to the extent you retain the right

4     to file an appeal, I'm advising you that should you wish to

5     file such an appeal, a notice of appeal must be filed with

6     the Clerk of the Court within 14 days after entry of

7     judgment or the right to appeal will be lost.

8          If you're unable to afford an attorney for an

9     appeal, the Court will appoint one to represent you.  If

10    you're unable to afford the fees for filing an appeal, you

11    may file a request with the Court that such fees be waived.

12         All right.  Is there anything further from the

13    Government at this time?

14         MS. PALUCH:  No, Your Honor.  Thank you.

15         THE COURT:  All right.  Anything further from the

16    defendant?

17         MS. BUTTERTON:  Just one moment, Your Honor.  I

18    just -- I believe -- no.  Nothing else.  Thank you.

19         THE COURT:  All right.  Anything further from the

20    probation officer?

21         PROBATION OFFICER:  No, sir, Your Honor.

22         THE COURT:  All right.  All right.  Thank you,

23    that will be all.

24         (Proceedings concluded at 3:27 p.m.)

25

65

                    *       *       *       *       *

                    REPORTER'S CERTIFICATE


          I certify that the foregoing is a correct transcript

      from the record of proceedings in the above-entitled

      matter.

          Dated at Denver, Colorado, this 12th day of February,

      2018.




                         _MARY J. GEORGE_

                    MARY J. GEORGE, FCRR, CRR, RMR

# DANIEL T. SMITH

Attorney at Law

4582 S. Ulster St. #1400              Telephone  (303) 860-8100
Denver, Colorado  80237            Fax  (303) 860-8018
e-mail  danieltsmith@qwestoffice.net

February 9,  2018

United States Attorneys Office
Attn:  AUSA Martha Paluch
      AUSA Bryan Fields
1801 California St. #1600
Denver, Co. 80202
Email: Martha.paluch@usdoj.gov
      Bryan.fields3@usdoj.gov

Re: USA v. Thomas

Ms. Paluch & Mr. Fields:

      I write in reference to the above matter, and  specifically regarding the co-defendant and government witness Heather Carr.  Mr. Goodreid and I observed Carr's sentencing hearing and listened to her abbreviated explanation of why she chose not to testify at the trial of our client, Tramell Thomas.  One of the reasons she cited was her description of being "threatened" by AUSA Fields.  While we are concerned about that allegation, of much greater interest to us is what Carr might have said to upset Mr. Fields.  While certainly what may seem a threat to one person may not to another.  Carr's statement at sentencing seemed to imply that she was telling the government something different prior to Mr. Thomas's Trial than what, she related back in November of 2016.

      With that background we have begun pursuing an investigation into the matter.   In reality,  Carr had at least four different interviews in the month prior to trial. The actual content of those interviews appears to be different,  both in substance and tone, than the summary write up prepared by Agent Ennis, which was provided to us shortly before Mr. Thomas's trial.

      As such we are requesting that you provide us,  with  any and all notes of the interviews of the witness Carr as well as any other written, recorded, or  other preservation of the interviews.  We further request that any notes or other memorialization of interviews of the witnesses Green, Duncan, and Diaz that have not been provided previously, be given to us now.

      Please understand that this request is made pursuant to the previous discovery orders entered in the case and, FRCrP 16, and to your prosecutorial duties under the Brady and Giglio doctrines.  We believe that the government possesses information that was material to Mr.



Thomas's defense at trial, as well as issues being raised in relation to his sentencing. We believe that this information is favorable, exculpatory, and/or impeachment evidence. Please advise of your position in regard to these requests and/or provide all of the information requested at your earliest convenience but certainly no later than February 28, 2018.

Daniel T. Smith
Thomas E. Goodreid

From: **Paluch, Martha (USACO)** Martha.Paluch@usdoj.gov 📎
Subject: **Thomas**
Date: **February 27, 2018 at 11:23 AM**
To: Dan Smith danieltsmith4582@gmail.com, **Thomas E. Goodreid** t.goodreid@comcast.net
Cc: **Fields, Bryan (USACO)** Bryan.Fields3@usdoj.gov

Hello, Dan,

Please see attached.

Marty and Bryan



**U.S. DEPARTMENT OF JUSTICE**

**Robert C. Troyer**
*United States Attorney*
*District of Colorado*

*Martha A. Paluch*                    *1801 California Street, Suite 1600    (303) 454-0100*
*Assistant U.S. Attorney*              *Denver, Colorado 80202        FAX (303) 454-0401*

February 27, 2018

Re: *United States v. Thomas*, 16-cr-00054-WJM-02

Dear Mr. Smith:

In your letter of February 9, 2018, you request "any and all notes of the interviews of the witness Carr as well as any other written, recorded, or other preservation of the interviews." You also request the same as it pertains to Green, Duncan, and Diaz.

We provided you with MOIs from all interviews of the individuals you reference in your letter, even though neither Carr nor Diaz testified. You cite no authority that requires disclosure of agent or attorney notes from interviews with any of the individuals referenced in your letter. To the extent your letter infers that the United States is in possession of discoverable *Brady* or *Giglio* material, this letter serves as formal notice that we are aware of our obligations under those cases and do not possess any such material.

Sincerely,

ROBERT C. TROYER
United States Attorney

*Martha A. Paluch* _____
By: Martha A. Paluch
Assistant United States Attorney

*Bryan D. Fields* _____
By: Bryan Fields
Assistant United States Attorney

EXHIBIT
**6**
Blumberg No. 5119

811

Attachment 3

1

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                       FOR THE DISTRICT OF COLORADO

 3     Criminal Action No. 16-cr-0054-WJM-2

 4     UNITED STATES OF AMERICA,

 5     Plaintiff,

 6     vs.

 7     TRAMMEL THOMAS,

 8     Defendant.

 9     -----------------------------------------------------------

10                    REPORTER'S PARTIAL TRANSCRIPT
                         (Jury Trial - Day 2)
11                    TESTIMONY OF MARCELLE GREEN

12     -----------------------------------------------------------

13         Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
       Judge, United States District Court for the District of
14     Colorado, commencing at 3:29 p.m., on the 28th day of
       November, 2017, in Courtroom A801, United States
15     Courthouse, Denver, Colorado.

16

17                              APPEARANCES

18         MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
       Attorneys, 1801 California Street, Suite 1600, Denver,
19     Colorado 80202, appearing for the plaintiff.

20         DANIEL T. SMITH, Attorney at Law, 4582 South Ulster
       Street, Suite 1400, Denver, Colorado 80237 and
21         THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
       Suite 1400, Denver, Colorado 80202, appearing for the
22     defendant.

23                    MARY J. GEORGE, FCRR, CRR, RMR
                  901 19th Street, Denver, Colorado 80294
24              Proceedings Reported by Mechanical Stenography
                   Transcription Produced via Computer
25
```

EXHIBIT

7

Blumberg No. 5119

2

```
1                    P R O C E E D I N G S
2          (In open court in the presence of the jury at 3:29
3     p.m.)
4               THE COURT:  Thank you very much for your patience,
5     ladies and gentlemen of the jury.  As I mentioned to you on
6     the first day that there would be these kind of pauses, but
7     we ask for your indulgence and your patience given the
8     importance of what we're dealing with here.
9               Let me just mention to you the next witness is
10    going to be a codefendant in this case who has pled guilty,
11    is not going to trial.  She has her lawyer here present,
12    Ms. Jeralyn Merritt, at the back table there, and she's --
13    Ms. Merritt is here because the law allows individuals in
14    Ms. Green, the next witness' situation, to have counsel
15    present in the courtroom to make any appropriate objections
16    that counsel sees fit.
17              All right.  The Government may call its next
18    witness.
19              MR. FIELDS:  Thank you, Your Honor.  We call
20    Marcelle Green to the stand.
21              THE COURT:  All right.
22              COURTROOM DEPUTY:  Right here, ma'am.  Just please
23    stand in the box and raise your right hand.
24         MARCELLE GREEN, GOVERNMENT'S WITNESS, SWORN
25              COURTROOM DEPUTY:  Please be seated.  Scoot your
```

3

Direct - Green

1    chair up.  Put your elbows right on the stand so that we

2    can -- put your mouth right there.

3                 Please state your full name for the record and

4    spell your first and last name.

5                 THE WITNESS:  Marcelle Ruby Green,

6    M-a-r-c-e-l-l-e, G-r-e-e-n.

7                 THE COURT:  You may proceed, counsel.

8                 MR. FIELDS:  Thank you, Your Honor.

9                 Before we get into it, at this point I would move

10   into evidence Government's Exhibit 32, which has been

11   stipulated to by the parties.

12                THE COURT:  Okay.  One second.  All right, given

13   the stipulation of the parties, Government Exhibit 32 is

14   admitted into evidence and may be published to the jury.

15          (Government's Exhibit 32 received)

16                MR. FIELDS:  Thank you, Your Honor.

17                        DIRECT EXAMINATION

18   BY MR. FIELDS:

19   Q.   Ms. Green, did you participate in a scheme to steal

20   money from the Department of Education?

21   A.   Yes, I did, sir.

22   Q.   Did you agree to participate in that scheme with other

23   people?

24   A.   Yes, I did.

25   Q.   Do you see one of those people in the courtroom here

4

                              Direct - Green

1    today?

2    A.    Yes, I do.

3    Q.    Who do you see?

4    A.    Trammel Thomas.

5    Q.    Could you describe where he's sitting and an article

6    of clothing that he's wearing.

7    A.    In the side over here, between his two lawyers, and he

8    has a black jacket on.

9         MR. FIELDS:  Your Honor, I'd like the Court -- or

10   to re -- the record to reflect that the witness has

11   identified the defendant.

12        THE COURT:  The record will so reflect.

13   BY MR. FIELDS:

14   Q.    Ms. Green, as a result of your choice to participate

15   in a fraud scheme, what has happened to you?

16   A.    I've been indicted and I pleaded guilty.

17   Q.    Do you have an agreement with the Government?

18   A.    Yes, I do.

19   Q.    Let's look at it.  It's Government Exhibit 32.  Is

20   this your agreement?

21   A.    Yes, sir.

22   Q.    If we could go to the last page.  Does that have your

23   signatures on it?

24   A.    Yes, it does.

25   Q.    Take it down.

5

Direct - Green

1        What are your obligations under that agreement?

2   A.   Just to be truthful.

3   Q.   And what do you hope to get in return for this

4   agreement?

5   A.   Leniency on my sentence.

6   Q.   Do you know how much you will get off of your

7   sentence?

8   A.   No, I don't.

9   Q.   Who decides what your stints will be?

10  A.   The judge.

11  Q.   Now, is this the first time you've been in trouble

12  with the law?

13  A.   No, sir.

14  Q.   Have you been convicted of a drug crime?

15  A.   Yes, I have.

16  Q.   What happened?

17  A.   Possession of marijuana with the intent to sell was

18  my -- what I was convicted with.

19  Q.   How much marijuana?

20  A.   300 pounds.

21  Q.   Does that have anything to do with your involvement in

22  this fraud scheme?

23  A.   No, sir.

24  Q.   Have you already been sentenced for that crime?

25  A.   Yes, I have.

Case No. 1:16-cr-00054-WJM   Document 525-3   filed 12/12/19   USDC Colorado   pg 817 of
971
Case 1:16-cr-00054-WJM   Document 341-3   Filed 03/09/18   USDC Colorado   Page 6 of 47

6

Direct - Green

1    Q.    So does your plea agreement in this case have any

2    effect on the outcome in that case?

3    A.    No, sir.

4    Q.    When did you first agree to be part of the conspiracy?

5    A.    Somewhere in 2010.  I can't give you an exact date,

6    I'm sorry.

7    Q.    Who approached you about becoming part of the

8    conspiracy?

9    A.    Heather Carr.

10   Q.    Where did that happen?

11   A.    At her location in Pleasant Drive.

12   Q.    Pleasant Drive where?

13   A.    In Chandler.  I believe Chandler, Arizona.

14   Q.    Describe to us what happened.

15   A.    Conversation at a barbecue, I believe it was around

16   Easter -- yeah, Easter, and just a discussion on how to get

17   money fraudulently by filing false claims.

18   Q.    After that discussion, how long were you part of the

19   conspiracy?

20   A.    To roughly about 2012.

21   Q.    While you were a member of the conspiracy, who were

22   the other members of the conspiracy?

23   A.    Mercede Diaz, Heather Carr and Trammel Thomas.

24   Q.    Now, you testified, you pleaded guilty to a scheme to

25   defraud the Government.  Did you file false claims with the

Direct - Green

1   Government?

2   A.   Yes, I did, sir.

3   Q.   What were the false claims?

4   A.   The false claims were the FAFSA and the enrollment to

5   school.

6   Q.   What was false about the FAFSAs you submitted?

7   A.   The information on the students as far as their

8   addresses and their locations.

9   Q.   If you had put the truth into those FAFSAs, would you

10  have received money?

11  A.   No.

12  Q.   Why not?

13  A.   Because they -- you have to be a present-person

14  student, and they weren't present.  So if we would have put

15  they were in prison, nothing would have happened.

16  Q.   So you've been talking about these people in prison.

17  Whose identities did you put into the FAFSAs?

18  A.   Inmates.

19  Q.   Why prison inmates?

20  A.   Because prison inmates are incarcerated for a number

21  of years and wouldn't think that it would come up -- they

22  wouldn't look it up, theirself, while they were in prison.

23  Q.   How did you decide which prison inmates to use?

24  A.   The length of sentence.

25  Q.   And how did you find out whether or not someone was in

Direct - Green

1    prison?

2    A.    It's public records.  You can just see if they're in

3    prison or not.

4    Q.    So what was the overall purpose of the conspiracy?

5    A.    To receive funds.

6    Q.    And who were the victims of the conspiracy?

7    A.    The inmates and the school and the Government.

8    Q.    Did you submit the FAFSAs using the internet?

9    A.    Yes, I did.

10    Q.    What computer did you use?

11    A.    I used the black laptop and a desktop.

12    Q.    Where was that desktop located?

13    A.    At 4630 South 21st Place.

14    Q.    What is that address?  What --

15    A.    That's my house.  That's my address.

16    Q.    That's your house?

17    A.    Yes.

18    Q.    And you mentioned a laptop?

19    A.    Yes.

20    Q.    Where was the laptop located?

21    A.    The laptop was located at 4630 South 21st Place and

22    the address on Pleasant Drive in Chandler.

23    Q.    That address on Pleasant Drive, what's significant

24    about that?

25    A.    That's Heather Carr's location.

Direct - Green

1    Q.    Did you need the internet to submit the FAFSAs?

2    A.    Yes, sir.

3    Q.    Where did you go to use the Internet?

4    A.    My address at 4630 Pleasant Drive and then a local

5    Starbucks.

6    Q.    After a FAFSA was submitted, what did you have to do

7    next to get loan money?

8    A.    You have to enroll in school.

9    Q.    How would you enroll?

10   A.    Go to the internet site of the school and enroll and

11   then you would get a letter of acceptance.

12   Q.    What kind of information did you need to enroll in the

13   school?

14   A.    The student's information -- I mean the inmate's

15   information, the location of the address where they're

16   going to.

17   Q.    So just like the FAFSA, was the information in the

18   paperwork you submitted to schools truthful?

19   A.    No, sir.

20   Q.    What was untruthful about it?

21   A.    The address of the inmates.

22   Q.    Also was the identity of the --

23   A.    Of the identity, yes.

24   Q.    Would colleges sometimes ask for documents that were

25   signed?

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/19 USDC Colorado pg 821 of
971
Case 1:16-cr-00054-WJM Document 341-3 Filed 03/09/18 USDC Colorado Page 10 of 47

10
Direct - Green

1   A.   Yes.

2   Q.   So when a college asked for a document that had to be

3   physically signed, what would you do?

4   A.   Get it printed out, sign it, and then fax it over at a

5   local mail and sell, where you can do fax and things like

6   that.

7   Q.   Would you sign it in your own name?

8   A.   No, sir.

9   Q.   What name would you sign?

10  A.   The -- the name of the inmate.

11  Q.   How did you decide which colleges to pick?

12  A.   Colleges that had online classes where you didn't

13  physically have to be in the classroom.

14  Q.   Why was that important?

15  A.   Because the people were not here, so we couldn't get

16  classes that you had to attend in person.

17  Q.   Where were these colleges located?

18  A.   In Colorado and in Phoenix, Arizona.

19  Q.   What were the colleges in Colorado?

20  A.   Pikes Peak.

21  Q.   And what were the colleges in Arizona?

22  A.   Sorry.  Phoenix College, sorry, and Mesa Community

23  College.

24  Q.   In order to actually get money for student aid, were

25  you required to take classes?

Case No. 1:16-cr-00054-WJM   Document 525-3 filed 12/12/18 USDC Colorado   pg 822 of
971
Case 1:16-cr-00054-WJM   Document 341-3   Filed 03/09/18   USDC Colorado   Page 11 of 47

11

Direct - Green

1    A.    Yes, sir.

2    Q.    How many?

3    A.    Four.

4    Q.    Did you take classes?

5    A.    Yes, I did.

6    Q.    So how did that part of the scheme work?

7    A.    You would just log in and -- into the classes and do

8    the homework and submit it so you can stay enrolled in the

9    class.

10   Q.    And why did you have to stay enrolled in the class?

11   A.    In order to receive the funds, you have to be enrolled

12   in class.

13   Q.    How did you decide which classes to pick?

14   A.    The classes that mainly just had discussions or short

15   essays that you could submit.  Those classes you didn't,

16   you didn't want to pick classes that included like math or

17   anything too long like that.

18   Q.    Would you take lots of different classes or the same

19   classes?

20   A.    Usually the same classes.

21   Q.    Why the same classes?

22   A.    Because we already knew -- the work, and we would just

23   resubmit it.

24   Q.    How would the colleges actually send out the student

25   aid?

12

Direct - Green

1    A.    In a debit card form.

2    Q.    And where would the colleges send those debit cards?

3    A.    To the addresses that's on the enrollment form.

4    Q.    How did you decide which addresses to put on the

5    enrollment forms?

6    A.    Just split them up on the list.  It wasn't just like a

7    pinpoint, oh, this one's going to go here; it was just

8    randomly.

9    Q.    Well, did you know which addresses the card would go

10   to?

11   A.    Yes.

12   Q.    How did you get those addresses?

13   A.    The addresses were my physical address.

14   Q.    Were any other addresses used as part of the scheme?

15   A.    Yes.

16   Q.    Which addresses?

17   A.    1915 East Mulberry.

18   Q.    And why didn't you just have all the cards sent to one

19   address?

20   A.    Because we feel it would set off an alert if we had

21   too many going to the address.

22   Q.    After you got the debit cards, could you get money off

23   of them?

24   A.    Yes.

25   Q.    How much in a day?

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 824 of
971
Case 1:16-cr-00054-WJM   Document 341-3   Filed 03/09/18   USDC Colorado   Page 13 of 47

13

Direct - Green

1    A.    $1,000 was the limit.

2    Q.    So as a result of that, what did you do to actually

3    get the money off the cards?

4    A.    Go to local ATMs or go to local grocery stores and get

5    cash back.

6    Q.    You went to the grocery stores, would you get items,

7    too?

8    A.    Yes.  Buy like a pack of gum and get the cash back

9    limit that they have for the day.

10   Q.    Did you divide up this money with other members of the

11   conspiracy?

12   A.    Yes, I did.

13   Q.    Who?

14   A.    Heather Carr.

15   Q.    How much money did Heather Carr get?

16   A.    If the cards were coming to my house, she would

17   receive 60, I would receive 40.  And then if I went and

18   helped her with her cards, she would receive 70, I would

19   receive 30.

20   Q.    You say "helped her with her cards."  What does that

21   mean?

22   A.    Withdraw her money for her for cards that she had in

23   her possession already.

24   Q.    Do you know how she got those cards in her possession?

25   A.    To the addresses that were used on the forms filled

14

Direct - Green

1    out.

2    Q.    At any point during the conspiracy, did Thomas get any

3    of that money?

4    A.    I physically didn't hand any money to him.

5    Q.    Who would you hand the money to?

6    A.    Heather.

7    Q.    Who would be present when you handed the money to

8    Heather?

9    A.    Either Trammel Thomas, sometimes Mercedes Diaz, and

10   our children.

11   Q.    Describe to the members of the jury the times where

12   the defendant, Trammel Thomas, was there when you delivered

13   the money.

14   A.    I can't --

15        MR. SMITH:   Could we have some foundation as to

16   time, Your Honor.

17        THE COURT:   Yeah.   I -- let's get this in a time

18   frame.

19        MR. FIELDS:   All right.

20   BY MR. FIELDS:

21   Q.    When did the conspiracy take place?

22   A.    In 2010, around April, but the first enrollment wasn't

23   until July, I believe.

24   Q.    And approximately when were you delivering money to

25   Heather Carr?

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 826 of 971
Case 1:16-cr-00054-WJM Document 341-3 Filed 03/09/18 USDC Colorado Page 15 of 47

15

Direct - Green

1    A.    Late in the summer of 2010, all the way until 2012,

2    the middle of 2012.

3    Q.    And these times that we're going to talk about where

4    the defendant was there, do you remember approximately when

5    that was?

6    A.    I can't give a definite date.

7    Q.    Sometime within that time period?

8    A.    Yes, within that time period.

9    Q.    So, again, describe to the members of the jury those

10   times where Trammel Thomas was present.  What was he doing?

11   A.    I'm just --

12         MR. SMITH:  Well, Your Honor, I would object.

13   Could we take it in sequence?  He's referring to multiple

14   times.

15         THE COURT:  Overruled.  I think we can -- I think

16   she has set the stage well enough.  Go ahead.

17   BY MR. FIELDS:

18   Q.    You can answer the question, Ms. Green.  So when you

19   saw the defendant present when you delivered money,

20   describe what you saw.

21   A.    Just us hanging around.  It was either sometimes a

22   barbecue or just over there for -- randomly, but it wasn't

23   physically him -- me handing him the money, it was just him

24   standing around.

25   Q.    When you handed the money, describe how the money was

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 827 of
971
Case 1:16-cr-00054-WJM   Document 341-3   Filed 03/09/18   USDC Colorado   Page 16 of 47

16

Direct - Green

1    packaged.

2    A.    In 20s.

3    Q.    Was it rolled up, was --

4    A.    No, just in form -- just -- not rolled up, not

5    anything, just altogether.

6    Q.    Did you put it in an envelope?

7    A.    No.

8    Q.    So when you say altogether, again, describe to me, is

9    it sort of fanned out --

10   A.    No, it's just in a stack.  Just in a stack.

11   Q.    What did Carr do with that money?

12   A.    Her living expenses to care -- and financial -- and

13   legal fees.

14   Q.    Would she go on vacation?

15   A.    Yes.

16   Q.    Who did she go on those vacations with?

17   A.    Her children and sometimes Mercedes.

18   Q.    Anyone else?

19   A.    Not that I know of.

20   Q.    What kind of house did she live?

21   A.    She had two different house locations, so the one on

22   Pleasant Drive or the one on Kaibob.

23   Q.    The latter one.

24   A.    Kaibob, it was a nice house.  Beautiful --

25   Q.    When did she get that house?

Direct - Green

1    A.    I would say sometime in the beginning of 2012.  I

2    could be wrong.

3    Q.    Who lived there with her?

4    A.    Heather Carr, Trammel Thomas, and their children.

5    Q.    Were you able to observe Thomas and Carr's lifestyle?

6    A.    Yes.

7    Q.    How would you describe that lifestyle?

8    A.    Nice lifestyle.

9    Q.    Can you go into any more detail?  What would be nice?

10   A.    I mean, nice house, nice cars, you know.  Just all the

11   basic, and the up-to-date electronics.  Just not too many

12   worries, that's what I would say.

13   Q.    Let's talk about other members of the conspiracy.  You

14   mentioned Heather Carr.  What was her role in the

15   conspiracy?

16   A.    I believe it was a major role.

17   Q.    What did she do?

18   A.    She got the information of the inmates and the Social

19   Security numbers and the birth dates and as far as

20   processing FAFSAs and applications and homework.

21   Q.    Do you know how she got that information?

22   A.    From her job.

23   Q.    What was her job?

24   A.    She was a loan closer at CarMax.

25   Q.    Who would she give that information to?

18

Direct - Green

1    A.    To the -- for me, I know me, myself.

2    Q.    Did she give it to anyone else?

3    A.    I can't speak for that.

4    Q.    When she gave it to you, how would she give it to

5    you?

6    A.    On a paper -- on a lined piece of paper, regular

7    subject paper.

8    Q.    Describe to us what would be on a typical sheet of

9    paper from Heather Carr.

10    A.    The names, the birth dates, and the address -- I mean,

11    sorry, the names, the birth dates, and the Social Security

12    numbers.

13    Q.    And what would you do with that information?

14    A.    I would submit that into FAFSA.

15    Q.    Now, let's talk about Trammel Thomas.  You said he was

16    part of the conspiracy.

17    A.    Correct.

18    Q.    What was his role?

19    A.    His role -- I can't say if he did homework and I can't

20    say if he had a major role, but he had some role in it.

21    Q.    Well, did you ever see him participating in the

22    conspiracy?

23    A.    Yes.

24    Q.    What did you see him doing?

25    A.    The FAFSA part, just one time.

Direct - Green

1    Q.    When was that?

2    A.    I can't give a definite date.  Our season, I want to

3    say it was somewhere in 2011.  My -- my mind's a little

4    cloudy there.  I'm sorry.

5    Q.    Well, was this down in Arizona?

6    A.    Yes.

7    Q.    Does Arizona really have seasons?

8    A.    No, we don't.

9    Q.    So was it sometimes hard to frame exactly when

10   something happened?

11   A.    It is, because it's hot all the time.

12   Q.    So this one time where you saw him participating in a

13   conspiracy, where was that at?

14   A.    At the Pleasant Drive address.

15   Q.    Who lived there?

16   A.    Heather Carr, her children, and at that part in time,

17   Trammel Thomas.

18   Q.    So what did you see him doing?

19   A.    The FAFSA part.  Just submitting the FAFSA and just

20   the steps as far as the education part.  That's it.

21   Q.    Explain to us exactly why that was part of the

22   conspiracy, what you saw.

23   A.    Because the education part, the people -- the inmates,

24   we don't know their high school information, so it was

25   easier just to put if they had their GED and we put the

Case No. 1:16-cr-00054-WJM   Document 535-3   filed 12/12/18   USDC Colorado   pg 831 of
971
Case 1:16-cr-00054-WJM   Document 341-3   Filed 03/09/18   USDC Colorado   Page 20 of 47

Direct - Green

1    year based on their age.

2    Q.   So let me back up here.  Was this a conversation you

3    were having with the defendant?

4    A.   This was a conversation that I had with Heather Carr,

5    but I showed on that FAFSA.  So I didn't have this

6    conversation with Trammel.

7    Q.   Who were you showing this information?

8    A.   I showed him the information, but I didn't have the

9    physical conversation with him like I did with Heather

10   Carr.

11   Q.   And what was the purpose of showing him this

12   information in the FAFSA?

13   A.   So the FAFSAs wouldn't come back because, you know,

14   when you submit so many, some of them do still come back as

15   invalid, basically.  So that was just the way to by- -- it

16   was a bypass system as I would call it.

17   Q.   So, again, just to make this clear, what was the

18   bypass system you were explaining to the defendant?

19   A.   The information for the education part.  Sorry.  The

20   education part.

21   Q.   And when this happened, did you see him actually

22   submit the FAFSA?

23   A.   I didn't -- the FAFSA was up, but I didn't see the

24   submit button because I had walked away.

25   Q.   When you say "up," up on what?

21

Direct - Green

1    A.    The computer laptop, sorry.

2    Q.    What kind of laptop was he using?

3    A.    I can't recall.  I'm sorry.

4          Can I get some water?

5          THE COURT:  Right next to you.

6    BY MR. FIELDS:

7    Q.    When you were explaining this sort of bypass system,

8    were other people present in the room?

9    A.    Yes.

10   Q.    And was information being thrown out into the room?

11   A.    Yes.

12   Q.    Describe that.

13   A.    Just random names.  I can't recall the names, again,

14   I'm sorry, it was a while ago, but just random names.

15   Q.    Who would throw out random names?

16   A.    Heather Carr and myself.

17   Q.    Anyone else?  Anyone else?

18   A.    Myself.

19   Q.    Who else was present?

20   A.    Oh, Heather Carr, me, Trammel, and our children.

21   Q.    Did Trammel throw out any names?

22   A.    At that time, it was a name, but I can't recall the

23   name.  I'm sorry.

24   Q.    What was the purpose of everyone sitting around in

25   this room throwing out names?

22

Direct - Green

1   A.    It was part of the -- to process the fraudulent FAFSAs

2   and the school applications.

3   Q.    How was it part of the process of filling out these

4   fraudulent FAFSAs?

5   A.    Because of the names, when you get the names and the

6   information was already there.  So, like I said, I can't

7   recall the names.

8   Q.    When you say the information was already there, what

9   information?

10  A.    The Social Security numbers and the birth dates,

11  sorry.

12  Q.    Did you see Mr. Thomas participate in a scheme at any

13  other time?

14  A.    No.

15  Q.    How often would you see the defendant during this time

16  period?

17  A.    I wouldn't see him as much as I seen Heather and

18  Mercedes, but I've seen him several occasions.

19  Q.    So who would you say was your major contact within the

20  conspiracy?

21  A.    Heather Carr.

22  Q.    How much money did you get from the scheme?

23  A.    I roughly would say a little -- in the $20,000 range.

24  Q.    What did you do with that money?

25  A.    Paid for bills and my financial living situations and

Direct - Green

1    my children.

2    Q.    Why did you decide to participate in this fraud

3    scheme?

4    A.    To -- financial gain, to live above.

5    Q.    Did you know it was wrong?

6    A.    Yes, I did.

7    Q.    How did you know it was wrong?

8    A.    Because it's taking -- it's filing something that's

9    false, that's not you, so if it's not you and you're doing

10   it, it's wrong.

11   Q.    Did the conspiracy eventually end?

12   A.    Yes, it did.

13   Q.    What happened to end the conspiracy?

14   A.    A search warrant was served at the Kaibob address.

15   Q.    Who lived at that address?

16   A.    Heather Carr, Trammel Thomas, and their children.

17   Q.    Do you remember approximately when that was?

18   A.    I want to say it was somewhere in August of 2012.

19   Q.    Now, before the conspiracy ended, you mentioned that

20   Ms. Carr used some of the fraud money for lawyers' fees.

21   Do you remember that?

22   A.    Correct.

23   Q.    Whose lawyers' fees?

24   A.    Trammel Thomas.

25   Q.    Do you remember when he was in trouble with the law?

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 835 of
971
Case 1:16-cr-00054-WJM Document 341-3 Filed 03/09/18 USDC Colorado Page 24 of 47

24

Direct - Green

1    A.    At which -- no, I don't remember the definite date,

2    the time frame.

3    Q.    But you do remember that he had a defense attorney?

4    A.    Correct.

5    Q.    So, again, let's go back.  We were talking about this

6    search warrant.

7    A.    Uh-huh.

8    Q.    Remind me, when was it executed, approximately?

9    A.    I want to say around August of 2012.

10   Q.    Did anything happen after that search warrant was

11   executed?

12   A.    Yes.

13   Q.    What happened?

14   A.    I -- on the part of -- I was questioned and then I was

15   visited by the defendants, Trammel Thomas, Heather Carr, at

16   my residence.

17   Q.    Let me start with that first one.  When you were

18   questioned, who questioned you?

19   A.    The Department of Education, the FB -- the federal.

20   Q.    Federal agents?

21   A.    Yes.

22   Q.    Were you truthful to those federal agents?

23   A.    No, I wasn't.

24   Q.    Why not?

25   A.    Because I was scared.

Case No. 1:16-cr-00054-WJM   Document 525-3 filed 12/12/18   USDC Colorado   pg 836 of
971
Case 1:16-cr-00054-WJM   Document 341-3   Filed 03/09/18   USDC Colorado   Page 25 of 47

25

Direct - Green

1    Q.    Scared of what?

2    A.    Of getting in trouble, or -- well, I know I was in

3    trouble when they came, but getting in more trouble.

4    Q.    And even after that, did investigators come to your

5    house a second time?

6    A.    Yes, they did.

7    Q.    And were you truthful to them even then?

8    A.    No.

9    Q.    But those times when you were untruthful to the

10   investigators, was that all before you pleaded guilty and

11   signed your cooperation agreement?

12   A.    Yes.

13   Q.    Now let's go back.  You said you were questioned.

14   A.    Yes.

15   Q.    What else happened after the search warrant was

16   executed?

17   A.    And then I was visited by Trammel Thomas and Heather

18   Carr.

19   Q.    Do you remember approximately what time of day it was

20   when they came?

21   A.    It was later in the day because the sun was down, I

22   know that.  It was dark.

23   Q.    Did Trammel Thomas say anything to you when he came to

24   your house after his house was searched?

25   A.    Yes.

Cross - Green

1    Q.   What did he say?

2    A.   What did they say to you when the investigators were

3    there?  What did they say to you?  What did you tell them?

4         I told him they had these pictures of people, if I

5    recognized them.  He said that -- Trammel Thomas said, How

6    did this happen?  Trying to figure out why the search

7    warrant was served.  And basically just asking what did I

8    say to the investigators.  And, again, what did -- what

9    were their questions?  And who were the people that they

10   showed me?

11   Q.   Describe to the members of the jury his general

12   demeanor.

13   A.   Nervous.

14   Q.   Describe that.  What makes you think he was nervous?

15   A.   Just the moving of the hands, the moving back and

16   forth, and the same questions over in just a different

17   format.

18        MR. FIELDS:  One moment, Your Honor.

19        THE COURT:  Okay.

20        MR. FIELDS:  Thank you, Your Honor.  I have no

21   further questions.

22        THE COURT:  Cross-examination.

23                    CROSS-EXAMINATION

24   BY MR. SMITH:

25   Q.   Ms. Green, if you mentioned this, I missed it and I

Case No. 1:16-cr-00054-WJM  Document 525-3  filed 12/12/19  USDC Colorado  pg 838 of
971
Case 1:16-cr-00054-WJM  Document 341-3  Filed 03/09/18  USDC Colorado  Page 27 of 47

27

Cross - Green

 1   apologize.  You indicated you have this marijuana issue

 2   where you were convicted of possessing and selling 300

 3   pounds.  When was that?

 4   A.    That was in late 2011, I believe.  I can't give a

 5   definite date.

 6   Q.    Okay.  So it was during the same time that you

 7   testified you were involved in this --

 8   A.    No.

 9   Q.    -- fraudulent scheme?

10   A.    Well, testify as -- I'm testifying today.  But did it

11   take place when all this was going on?

12   Q.    Yes.

13   A.    Towards the end of it.

14   Q.    Okay.  Well, I understood you to say that you thought

15   your conviction was in 2011?

16   A.    2011.  And then it was pleaded out in 2012, I

17   believe.

18   Q.    Okay.  And you indicated you'd been involved in this

19   student loan business from sometime in 2010 into 2012.

20   A.    Correct.

21   Q.    So at the same time you're involved in the student

22   loan situation, you're involved in the marijuana situation?

23   A.    That is correct, if my dates are correct, sir.

24   Q.    Okay.  This agreement you have with the Government,

25   you have to cooperate, correct?

28

Cross - Green

1    A.    Truthfully, yes.  Correct.

2    Q.    And then when your sentencing comes up, you're hoping

3    that Ms. Paluch and Mr. Fields will make a recommendation

4    for a lighter sentence?

5    A.    That's correct, sir.

6    Q.    Okay.  And you were represented in negotiating this

7    agreement with Ms. Merritt?

8    A.    Yes, sir.

9    Q.    I assume that you've probably talked a lot more than

10   you wish about this concept of Federal Sentencing

11   Guidelines?

12   A.    I have, Your Honor -- I mean, sir.  I'm sorry.

13            MR. SMITH:  Almost got elevated.

14            THE COURT:  Careful what you wish for.

15            MR. SMITH:  I understand, Your Honor.

16   BY MR. SMITH:

17   Q.    You have some idea of what the guidelines would

18   indicate your sentence might be, correct?

19   A.    I do.

20   Q.    And that sentence could be anywhere from about four

21   years to about six years.

22   A.    Correct.  46 to 71 months, I believe.

23   Q.    Okay.

24   A.    Or 57 to 71 months.

25   Q.    And how much are you hoping that your sentence will be

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 840 of 971
Case 1:16-cr-00054-WJM Document 341-3 Filed 03/09/18 USDC Colorado Page 29 of 47

29

Cross - Green

1    reduced?

2    A.    I can't give a definite answer because I don't know

3    what the percentage would be.  At least -- hopefully 20

4    percent.  I don't know exact amount when it comes to

5    federal.

6    Q.    Okay.  I didn't -- I didn't say that you knew.  What

7    are you hoping Ms. Paluch and Mr. Fields recommend --

8    A.    Just any less time than what my guidelines say.

9    Q.    -- to the Court?

10          Okay.  And this recommendation depends on your

11    cooperation?

12    A.    Correct.

13    Q.    And their view of it, correct?

14    A.    Correct.

15    Q.    So if you're saying things that they don't like,

16    that's not going to be cooperation, is it?

17    A.    Correct.

18    Q.    Some time in 2010, you had this conversation with

19    Heather Carr at a barbecue about this student loan scheme.

20    A.    That is correct.

21    Q.    Okay.  Was that over at her house?

22    A.    Yes, it was.

23    Q.    And that's the Pleasant --

24    A.    The Pleasant Drive address.

25    Q.    Pleasant Drive address.

30

Cross - Green

1    A.    Yes.

2    Q.    And it's just you and Ms. Carr.

3    A.    And our children, yes.

4    Q.    Okay.  Mr. Thomas isn't there?

5    A.    Not that I recall for the first conversation.

6    Q.    Okay.  And you get a good understanding of what Carr's

7    idea is?

8    A.    Yes.

9    Q.    Okay.  And am I correct that this whole thing can't

10   work without Heather Carr?

11   A.    That is correct.

12   Q.    And why is that?

13   A.    Because she was able to pull the information from her

14   database at work.

15   Q.    Okay.  So if I'm understanding how this goes about,

16   you can sit down on a computer and access a public website

17   that deals with some state Department of Corrections?

18   A.    Correct.

19   Q.    So maybe Florida?

20   A.    Any -- yeah, any public record, yes.

21   Q.    And you could identify an inmate who was serving a

22   sentence for X number of years?

23   A.    Yes.

24   Q.    And then with -- you'd get that name, correct?

25   A.    Yes.

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 842 of
971
Case 1:16-cr-00054-WJM   Document 341-3   Filed 03/09/18   USDC Colorado   Page 31 of 47

31
Cross - Green

1    Q.    And probably a date of birth?

2    A.    Not for sure what if the date of birth was on the

3    public records, but their time.  Their time and their

4    sentence was -- yes, their date of birth is on there.  I'm

5    sorry, yes.

6    Q.    Okay.  And then you would give that information to Ms.

7    Carr?

8    A.    The names, correct.

9    Q.    Okay.  And she would take that information and because

10   of her position with Wells Fargo -- that's who she worked

11   for, right?

12   A.    She worked for Wells Fargo and CarMax.

13   Q.    Okay.  She worked for Wells Fargo as a loan

14   underwriter and supervisor looking at whether or not Wells

15   Fargo would loan customers money to buy CarMax cars,

16   correct?

17   A.    Correct.

18   Q.    Okay.  And she worked from home.

19   A.    Yes, she did.

20   Q.    Okay.  So she would go in and access these private

21   databases to get the inmate's Social Security number and

22   credit history that you'd provide her, correct?

23   A.    That was provided, correct.

24   Q.    All right.  And you would give her an inmate name and

25   date of birth and she would get the other information,

Case No. 1:16-cr-00054-WJM   Document 525-3   filed 12/11/18   USDC Colorado   pg 843 of
971
Case 1:16-cr-00054-WJM   Document 341-3   Filed 03/09/18   USDC Colorado   Page 32 of 47

32

Cross - Green

1    correct?

2    A.   She would be able to pull that information.

3    Q.   Okay.  And then she would give you back all the

4    information so you could fill out the FAFSA?

5    A.   She would give me the list with all the information on

6    it already.

7    Q.   Okay.  And that would be for any number of inmates?

8    A.   Yes.

9    Q.   Okay.  And you would take that list and then set about

10   filling out the paperwork required to get a student loan.

11   A.   That is correct.

12   Q.   Okay.  And you concentrated in Arizona.

13   A.   Yes.

14   Q.   And you used addresses for these inmates that were

15   your residence?

16   A.   Yes.

17   Q.   And another house, I think you said Mobile?

18   A.   1915 East Mobile Lane.

19   Q.   And did you have any relationship to that address?

20   A.   Yes, that's my deceased uncle's house.

21   Q.   Your uncle's house?

22   A.   Yes.

23   Q.   Okay.  When did you actually start filing?

24   A.   In July of 2010 for the summer session.

25   Q.   Okay.  And so in the fall, you started getting cards

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 844 of 971
Case 1:16-cr-00054-WJM Document 341-3 Filed 03/09/18 USDC Colorado Page 33 of 47

33
Cross - Green

1    and money?

2    A.    You received the first money -- if you fill out for

3    the summer, you got the summer money; and then the fall;

4    and if you went, into the spring.

5    Q.    Okay.  And at this point in time, Ms. Carr's still

6    living at the Pleasant --

7    A.    Correct.

8    Q.    -- is it Drive?  I'm sorry, I --

9    A.    I think it's Pleasant Drive.  I can't --

10   Q.    Pleasant Drive address.  Okay.

11         And at some point in time in 2011, you're over at

12   that house, if I understood you correctly, and you're

13   talking with Ms. Carr, and Mr. Thomas is there.

14   A.    At that time, yes.

15   Q.    Okay.  And it's at that time when you're explaining to

16   Mr. Thomas something about filling out these -- this

17   paperwork?

18   A.    The FAFSA part, just the education part, sir.

19   Q.    The education part --

20   A.    Yes.

21   Q.    -- of the FAFSA?

22   A.    Yes.

23   Q.    Okay.  But it's at that meeting?

24   A.    Yes.

25   Q.    At Heather Carr's on Pleasant Drive?

Case No. 1:16-cr-00054-WJM   Document 525-3 filed 12/12/18   USDC Colorado   pg 845 of
971
Case 1:16-cr-00054-WJM   Document 341-3   Filed 03/09/18   USDC Colorado   Page 34 of 47

34
Cross - Green

1    A.    Correct.

2    Q.    And you believe it's in 2011?

3    A.    I believe it's in 2011.  Like I said, the dates are

4    cloudy, so I can't give you a definite.

5    Q.    Okay.  So it's in Phoenix.

6    A.    Correct, in Phoenix.

7    Q.    Okay.  Is it really hot out?

8    A.    It's hot all the time, sir.  I don't -- I'm sorry.

9    Q.    I'm just trying to -- is it in the spring, the summer,

10   the fall?

11   A.    I can't give a definite time.  I'm sorry.

12   Q.    But it's 2011.

13   A.    2011.

14   Q.    Okay.  If I -- if I could go back just a minute to

15   your agreement with the Government.  My memory is that you

16   had some sort of paperwork that you were going to try to

17   find and give the Government.

18   A.    It was the list of the names, correct.

19   Q.    Okay.  And you weren't able to find that, correct?

20   A.    No, I wasn't.

21   Q.    Okay.

22   A.    I've moved since then.

23   Q.    You mentioned the name Mercedes Diaz.

24   A.    Correct.

25   Q.    I understand Ms. Diaz was -- was very close to Heather

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 846 of
971
Case 1:16-cr-00054-WJM   Document 341-3   Filed 03/09/18   USDC Colorado   Page 35 of 47

35

Cross - Green

1    Carr.

2    A.    Yes.

3    Q.    Ms. Carr pretty much raised her?

4    A.    Like her daughter.

5    Q.    And that started up in Colorado?

6    A.    Yes.

7    Q.    And then they moved down to Arizona?

8    A.    Heather moved first and then Mercedes followed.

9    Q.    Followed?

10   A.    Yes.

11   Q.    And Ms. Diaz actually lived with Heather Carr for

12   quite a bit of time?

13   A.    A little bit, I believe at the Pleasant Drive, but I

14   don't believe it was a long period of time.

15   Q.    Okay.  She often spent time at Heather Carr's house.

16   A.    Yes.

17   Q.    Okay.  And she would be there when you were there?

18   A.    Yes.

19   Q.    Okay.  Were you all close?

20   A.    Not super close, like me and Heather, but we're

21   okay.

22   Q.    Okay.  You and Heather go back quite a ways?

23   A.    Correct.

24   Q.    Before this got started, you'd known her for some 11

25   years.

36

Cross - Green

| | | |
|---|---|---|
| 1 | A. | I -- 2004, I believe is when I met Heather, or 2005. |
| 2 | Q. | Okay.  And you'd been friends ever since. |
| 3 | A. | Yes. |
| 4 | Q. | Until this happened? |
| 5 | A. | Correct. |
| 6 | Q. | What was Ms. Diaz's part? |
| 7 | A. | The enrolling and then doing homework and receiving -- |
| 8 | | getting addresses -- sorry, addresses. |
| 9 | Q. | Okay.  And how do you know that was her job? |
| 10 | A. | Just conversation. |
| 11 | Q. | With her? |
| 12 | A. | Yes. |
| 13 | Q. | Okay.  And you knew Heather Carr's job because she |
| 14 | | told you. |
| 15 | A. | Yes. |
| 16 | Q. | What was Heather's -- Ms. Carr's Facebook name? |
| 17 | A. | Heather Carr. |
| 18 | Q. | Heather Bacardi? |
| 19 | A. | She changed it before, Heather Carr, Bacardi. |
| 20 | Q. | And where did the Bacardi moniker come from? |
| 21 | A. | Because she likes to drink Bacardi. |
| 22 | Q. | A lot? |
| 23 | A. | Yes. |
| 24 | Q. | You know this scheme started because of your |
| 25 | | conversation with Carr in 2010 -- |

37

Cross - Green

1    A.    Correct.

2    Q.    -- correct?  That's when you think it started.

3    A.    Correct.

4    Q.    And your part was down in Arizona.

5    A.    Yes.

6    Q.    You didn't file anything at Pikes Peak Community

7    College?

8    A.    Yes, I had a card sent to my address.

9    Q.    Okay.  For Pikes Peak?

10   A.    Yes, for Pikes Peak, sorry.

11   Q.    To your address?

12   A.    In Phoenix at 4630.

13   Q.    Okay.  You didn't have them sent to addresses in

14   Colorado?

15   A.    No.

16   Q.    When you got these debit cards -- and you had to

17   activate them, correct?

18   A.    Correct.

19   Q.    And what was that process?

20   A.    You would just call the number on the card, you know,

21   when you get your sticker, and you would just call and

22   activate it.

23   Q.    Okay.  There's a sticky thing over it and you had to

24   pull that off?

25   A.    Yes.

Cross - Green

1    Q.    Okay.  Call the number and whammo, you had 4- or

2    $5,000?

3    A.    Yes.

4    Q.    And then you had to turn that card into the actual

5    cash.

6    A.    Correct.

7    Q.    And you would do that by going to ATMs?

8    A.    Yes.

9    Q.    And that's how you got the 20s?

10   A.    Yes.

11   Q.    Where else would you go to get the cash?

12   A.    Local grocery stores that we have in Arizona.

13   Q.    Okay.  And they have ATMs there or how did that work?

14   A.    Cash backs, so you just buy something and get cash

15   back.

16   Q.    Okay.  Could you pay bills with these cards?

17   A.    Yes.

18   Q.    And did you ever do that?

19   A.    Yes, I did, one time.

20   Q.    One time.

21   A.    Yes.

22   Q.    And that wasn't a very good idea, right?

23   A.    No, it wasn't.

24   Q.    Because then there was a record of your using that

25   card.

39

Cross - Green

1   A.   That is correct.

2   Q.   And it would come back to the bank and --

3   A.   My address is linked to it, yes.

4   Q.   All right.  And then eventually the Government and

5   then everybody knows.

6   A.   Correct.

7   Q.   My understanding, Ms. Green, is that when Carr lived

8   at the Pleasant Drive address, that wasn't very far away

9   from where you lived?

10   A.   Yes, it was.

11   Q.   It was far away?

12   A.   Yes.

13   Q.   Okay.  But you were over there quite a bit.

14   A.   Yes.

15   Q.   Okay.  But then I understand once the move was made

16   when Carr moved to the -- I call it Kaibob, is that --

17   A.   I think we're all having issue with that, I think it's

18   Kaibob.  I don't know --

19   Q.   Kaibob?  Okay, I'll use yours.

20   A.   Okay.

21   Q.   To the Kaibob address.

22   A.   Yes.

23   Q.   You didn't go over there very much?

24   A.   No, I didn't.

25   Q.   Okay.  In fact, as I understand it from one of your

Cross - Green

1   statements, you only went there one time.

2   A.   One time.

3   Q.   So if Ms. Carr moved into that Kaibob house in March

4   or April of 2012, were you only there once after that?

5   A.   Correct.

6   Q.   So your conversations and dealings in this situation,

7   as far as that residence, were almost all at the Pleasant

8   Drive address.

9   A.   Correct.

10   Q.   Aside from your memory of tutoring, if you will, Mr.

11   Thomas on the education part of the FAFSA, you never talked

12   to him about this scheme, did you?

13   A.   Not personally to him, no.

14   Q.   Okay.  He never told you that he filled out FAFSAs,

15   did he?

16   A.   No.  Him, personally, no.

17   Q.   He never told you that he went out and got money from

18   these cards, did he?

19   A.   No.

20   Q.   Those conversations that you had about that were

21   principally with Heather Carr.

22   A.   That is correct, sir.

23   Q.   And you had some of those conversations, certainly to

24   a lesser degree, with Mercedes Diaz?

25   A.   Correct.

Case No. 1:16-cr-00054-WJM Document 325-3 filed 12/12/18 USDC Colorado pg 852 of
971
Case 1:16-cr-00054-WJM   Document 341-3   Filed 03/09/18   USDC Colorado   Page 41 of 47

41

                        Redirect - Green

1           MR. SMITH:  May I have a moment?

2           THE COURT:  You may.

3           MR. SMITH:  Thank you very much, Ms. Green.

4           I don't have any further questions at this time,

5    Your Honor.

6           THE COURT:  All right.  Redirect.

7           MR. FIELDS:  Thank you, Your Honor.

8                      REDIRECT EXAMINATION

9    BY MR. FIELDS:

10   Q.   Ms. Green, do you remember being asked questions about

11   your cooperation agreement?

12   A.   Yes.

13   Q.   And you were asked about whether or not it would be

14   cooperation if you say something that the Government

15   doesn't like.  Do you remember that?

16   A.   Yes, I do, sir.

17   Q.   Ms. Green, what happens if you lie under oath because

18   you think that would help the Government?

19   A.   That's a lot more trouble than what I'm in now.

20   Q.   How so?

21   A.   Perjury is -- is -- I'm not saying it's the highest

22   offense, but it's an offense in any courts.

23   Q.   Even if you think that will help the Government?

24   A.   Correct.

25   Q.   So does your agreement involve lying to anyone with

42

Redirect - Green

1   regard to this courtroom here today?

2   A.   No.

3   Q.   Does it cover -- it covers lies to anyone, right?

4   A.   Yes.   Sorry.

5   Q.   Including lies in responses to defense counsel

6   questions?

7   A.   Yes.

8   Q.   So you had to answer defense counsel questions just as

9   truthfully as you answer our questions; isn't that right?

10  A.   That is correct.

11  Q.   And if the judge asks questions, you would have to

12  answer those questions truthfully?

13  A.   That is correct.

14  Q.   Now, you were also asked about whether or not the

15  scheme could work without Heather Carr.

16  A.   Yes.

17  Q.   Do you remember being asked that question?

18  A.   Yes.

19  Q.   Was it also important to the scheme to get other

20  addresses that could be used?

21  A.   Yes.

22  Q.   Would the scheme have been successful if people hadn't

23  been able to get other addresses?

24  A.   No.   Because, like I said before, it's an alert if you

25  send to some addresses, so multiple addresses needed to be

43

Redirect - Green

 1    used.

 2    Q.    You used multiple addresses, right?

 3    A.    Yes, I did.

 4    Q.    Did other members of the conspiracy also use multiple

 5    addresses?

 6    A.    Yes.

 7    Q.    The address you mentioned, this 1915 East Mobile Lane,

 8    did you get permission to use that address?

 9    A.    It's my -- well, it's a deceased family member, so it

10    was our family house.

11    Q.    Anyone living in the house?

12    A.    No.

13    Q.    You were also asked questions about how frequently you

14    would talk to Thomas.  Did you talk to him all that much?

15    A.    I didn't talk to him much.

16    Q.    Who would you talk to about Thomas' involvement in the

17    scheme?

18    A.    Heather Carr.

19    Q.    Without telling us exactly what was said, how

20    frequently did you have those conversations?

21    A.    We had them frequently, but not like once every other

22    day.  Probably like a couple of times a month.

23    Q.    And during the conspiracy, who did Heather Carr live

24    with?

25    A.    She lived with her children and Trammel Thomas, and at

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/18 USDC Colorado pg 855 of
971
Case 1:16-cr-00054-WJM Document 341-3 Filed 03/09/18 USDC Colorado Page 44 of 47

44

Redirect - Green

1    a time -- well, I can't say because I don't think Mercedes

2    lived there at that time, so, yeah, just her children and

3    Trammel Thomas.

4    Q.    Did Heather Carr appear to be close to Trammel Thomas?

5    A.    Yes.

6    Q.    What made it appear that they were close?

7    A.    Because they were in a relationship and they had

8    children together.

9    Q.    And going back to -- you were asked about, you know,

10   this incident involving Thomas and the FAFSAs.  Do you

11   remember being asked questions about that?

12   A.    Yes.

13   Q.    And defense counsel really tried to pin you down on a

14   date.

15   A.    Yes.

16   Q.    You said it was -- when was it, approximately?

17   A.    Approximately in 2011.  And, like I said before, I

18   cannot give a definite date because I don't want to lie,

19   because I can't recall the date.  I'm sorry.

20   Q.    Do you remember also being asked questions about a

21   period of time in which Trammel Thomas was incarcerated?

22   A.    Yes.

23   Q.    Do you remember approximately when that was?

24   A.    I can't say.  I -- because I know it was several

25   times.  I want to say it was early summer, 2010.  I'm not

45

                        Redirect - Green

1    for sure.

2    Q.   This incident where you recall seeing Mr. Thomas

3    filling out the FAFSA, did that occur before he was

4    incarcerated or after?

5    A.   Which -- before.

6    Q.   It occurred before?

7    A.   Yes.

8    Q.   Okay.  So you can't remember an exact date?

9    A.   I can't remember the date.

10   Q.   But can you remember a sequence of events?

11   A.   No.

12             MR. FIELDS:  No further questions, Your Honor.

13             THE COURT:  All right.  May this witness be

14   excused?

15             MR. FIELDS:  Yes, from the Government.

16             THE COURT:  All right.  For the defendant?

17             MR. SMITH:  No objection.

18             THE COURT:  All right.  Ms. Green, thank you for

19   your testimony.  You're excused and you may step down.

20             All right, ladies and gentlemen of the jury, I've

21   discussed with the lawyers the sequence of witnesses and

22   this is going to be our last witness for today.  So you're

23   getting released early.  I need to remind you again, please

24   do not do any independent research into or discuss with

25   anyone the facts, the law, the issues or the individuals in

```
 1    this case.

 2            We're going to attempt to resume tomorrow again at

 3    8:45, that is, if I don't have additional issues with the

 4    lawyers before that.  But I ask you to please be in the

 5    jury deliberation room by 8:35.

 6            All right, we'll be in recess until 8:45 tomorrow

 7    morning.

 8        (Proceedings concluded at 4:20 p.m.)

 9

10                           INDEX

11    Item                                          PAGE

12              GOVERNMENT'S WITNESSES

13    MARCELLE GREEN
      Direct Examination by Mr. Fields            3
14    Cross-examination by Mr. Smith              26
      Redirect Examination by Mr. Fields         41
15

16

17              GOVERNMENT'S EXHIBITS

18    EXHIBITS:     Offered   Received  Refused   Stipulated

19    32                        3                  3

20

21

22            *      *      *      *      *

23

24

25
```

1            REPORTER'S CERTIFICATE

2

3        I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled

5   matter.

6        Dated at Denver, Colorado, this 13th day of February,

7   2018.

8

9

10

11      ─                                              ─

12            MARY J. GEORGE, FCRR, CRR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25

 

# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL
## INVESTIGATION SERVICES

**DATE INTERVIEWED:** November 3, 2016

**PERSON INTERVIEWED:** Heather Carr

**ALSO PRESENT:** Mary Butterton, Assistant Federal Defender
Jessica Leto, Paralegal

**INTERVIEWED BY:** Martha Paluch, Assistant US Attorney
Beth Gibson, Assistant US Attorney
Sandra Ennis, ED-OIG Special Agent

**LOCATION:** U.S. Attorney's Office
1225 17th St., 7th Floor Conference room
Denver, Colorado 80202

**CASE NUMBER:** 12-080234

**CASE NAME:** Pikes Peak Community College Fraud Ring

After being advised of the nature and purpose of the interview and the identities of all present, Heather Carr, voluntarily provided the following information, summarized as follows:

In approximately July 2015, Carr moved from Arizona to Virginia Beach, Virginia, to live with her oldest daughter Ayanna Brown, formerly Ayanna Jones. Brown moved to Virginia because her husband is in the Navy. He is currently deployed and will not return home until January 2017. Brown is currently attending college and is enrolled in a pharmaceutical internship.

The following are Carr's four children: Ayanna (21), Kaira (16), Milani (5), and Tru (1). Aubrey, who is Ayanna's friend, has resided with Carr since she was 15.

Carr was a mother figure to Mercedes Diaz also. Carr and Diaz's biological mother both worked at a car dealership. Diaz's mother was prepared to give up Diaz to the state because Diaz was constantly in trouble. Carr offered to take her in. At the time, Diaz was in junior high at Panorama Middle School. On Christmas Eve, Diaz stole Carr's vehicle and was arrested. While in custody, Diaz's brother was murdered. Carr's daughters are like sisters to Diaz.

Carr was born in Virginia but moved to Colorado Springs, Colorado, when she was approximately ten years old. Shortly after her family moved, her mother divorced and remarried. Carr ran away from home and stopped attending school in junior high. Carr got pregnant at 17 and obtained her GED during this time period. Omar Jones, who is the father of her two oldest daughters, was her legal guardian.

In approximately 1997, Carr became familiar with the financial aid process when she attended Pikes Peak Community College (PPCC) and received federal student aid (FSA).

In approximately 2003, Carr moved from Colorado to Arizona and resided there until summer 2015.

Prepared by: Ennis, Sandra                     Date Prepared: November 4, 2016

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)        DEFENDANT'S EXHIBIT 8        Page 1 of 12        859

people to do stuff for him. Pickens resided at 1418 Rushmore at various times but Carr could not recall the exact dates. Thomas briefly resided in Pickens garage at 1418 Rushmore. Thomas stayed at other places and also resided at an apartment on 3820 Radiant Drive in Colorado Springs, Colorado.

Pickens was not aware this address was being used for the mailing of debit cards in the names of prison inmates. The mailbox was located at the end of the street. Carr and Thomas would drive-by and pick up student inmate mail from the mailbox. The mailman delivered any and all names to this address.

There was a period of two to three days when Carr knew the Higher One debit card would be delivered. Once the school application was accepted, the student received an email letting them know that a green Higher One envelope would be arriving in the mail. This envelope contained the debit card.

Carr was aware of inmate Robert Pickens. Carr conducted the DOC query in the name Pickens and chose this name because she wanted to make sure the card was delivered to the mail box. Carr thought this card was initially rejected or returned by the postal service.

Prior to moving to Arizona, Carr resided at 2441 Lexington Village Lane, Colorado Springs, Colorado. Her friend, Michelle Grant (aka Michaela) resided at 2372 Lexington Village Lane, Colorado Springs, Colorado. Carr asked Grant to help forward her mail to Arizona. Carr still had the key to her old mailbox.

The postal service would only deliver the last name Grant so they had to use inmates with the last name of Grant at this address. Grant never checked her mailbox. The mailboxes were located in a central area and the backside of the boxes could be removed. Carr, Diaz, Green, and/or Thomas removed the back side of the mailbox on their trips to Colorado and obtained the mail in the inmates' names.

During the 2010 timeframe and prior to Thomas' arrest, Thomas asked Carr to query social security numbers and he would assist in the retrieval of student mail. Carr does not know if he knew how to complete and submit an electronic FAFSA. Both Thomas and Sanders resided at 3820 Radiant Drive, Colorado Springs, Colorado. Carr saw Sanders' signature in the notarized documents provided to PPCC.

Green obtained her own addresses to use. Carr confirmed the Blackhawk address was her step-brother, Matthew Sander's residence. Diaz was responsible for opening private post office boxes and using the Dragoon and 724 W. Knox Court addresses. The Pleasant or Kaibab addresses were never used to receive any school or Higher One information.

People were directed to send the school mail or Higher One debit card to Carr's private mail box address at 975 E. Riggs Road in Chandler, Arizona. Thomas directed Kimmisha Mullett to send debit cards that she received to the private mail box address. Carr does not know about the Oakland Street address in Aurora, Colorado.

Mullett and Thomas had a business together. The business was called 911 Design and Printing. Carr had nothing to do with the business and never met Mullett. Carr later said she may have met Mullett on one or two occasions. Mullett and Thomas shared text messages between each other about where to send the Higher One mail because Mullett's address was used to receive student loan mail in the names of inmates.

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

RECEIVED
US MARSHALS SERVICE
DIST-AZ PHOENIX

| | |
|---|---|
| **United States of America** | **Case No.: 18-06121MJ-001-PHX-DKD** |
| v. | **Charging District's Case No.: 16-cr-00054- WJM-2** |
| **Trammel Thomas** | |

## COMMITMENT TO ANOTHER DISTRICT

The defendant has been ordered to appear in the District of Colorado, Denver division. The defendant may need an interpreter for this language: N/A.

The defendant: ☐ will retain an attorney.

☒ is requesting court-appointed counsel.

The defendant remains in custody after the initial appearance.

**IT IS ORDERED:** The United States marshal must transport the defendant, together with a copy of this order, to the charging district and deliver the defendant to the United States marshal for that district, or to another officer authorized to receive the defendant. The marshal or officer in the charging district should immediately notify the United States attorney and the clerk of court for that district of the defendant's arrival so that further proceedings may be promptly scheduled. The clerk of this district must promptly transmit the papers and any bail to the charging district.

Date:    April 4, 2018

Eileen S. Willett
United States Magistrate Judge

AO 466A (Rev. 12/17)  Waiver of Rule 5 & 5.1 Hearings (Complaint or Indictment)

_____ FILED      _____ LODGED
_____ RECEIVED   _____ COPY

MAR 3 0 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT
for the

United States of America )
v. )  Case No.  16- cr - 00054- WJM
)
Trammel Thomas )  Charging District's Case No.  18 - 6121MJ
*Defendant* )

## WAIVER OF RULE 5 & 5.1 HEARINGS
(Complaint or Indictment)

I understand that I have been charged in another district, the *(name of other court)*
District of Colorado
.

I have been informed of the charges and of my rights to:

(1)    retain counsel or request the assignment of counsel if I am unable to retain counsel;

(2)    an identity hearing to determine whether I am the person named in the charges;

(3)    production of the warrant, a certified copy of the warrant, or a reliable electronic copy of either;

(4)    a preliminary hearing to determine whether there is probable cause to believe that an offense has been
committed, to be held within 14 days of my first appearance if I am in custody and 21 days otherwise,
unless I have been indicted beforehand.

(5)    a hearing on any motion by the government for detention;

(6)    request a transfer of the proceedings to this district under Fed. R. Crim. P. 20, to plead guilty.

I agree to waive my right(s) to:

☑    an identity hearing and production of the warrant.

☐    a preliminary hearing.

☐    a detention hearing.

☐    an identity hearing, production of the judgment, warrant, and warrant application, and any preliminary
or detention hearing to which I may be entitled in this district.  I request that my
☐  preliminary hearing and/or ☐ detention hearing be held in the prosecuting district, at a time set by
that court.

I consent to the issuance of an order requiring my appearance in the prosecuting district where the charges are
pending against me.

Date:  3/30/18

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

Shishene Jing
*Printed name of defendant's attorney*

JON M. SANDS
Federal Public Defender
District of Arizona
850 West Adams, Suite 201
Phoenix, Arizona 85007
Telephone: (602) 382-2700

SHISHENE JING
California State Bar No. 315067
Asst. Federal Public Defender
shishene_jing@fd.org
Attorney for Defendant

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| United States of America, | No. 18-6121MJ |
| Plaintiff, | |
| vs. | **NOTICE OF FILING** |
| Trammel Thomas, | |
| Defendant | |

Trammel Thomas, through undersigned counsel, hereby gives notice of filing the attached photos for consideration.

It is expected that excludable delay under Title 18 U.S.C. Section 3161(h)(1)(F) may occur as a result of this motion or from an order based thereon.

Respectfully submitted: April 4, 2018.

JON M. SANDS
Federal Public Defender


 _s/Shishene Jing_
SHISHENE JING
Asst. Federal Public Defender

Copy of the foregoing transmitted
by ECF for filing April 4, 2018, to:

CLERK'S OFFICE
United States District Court
Sandra Day O'Connor Courthouse
401 W. Washington
Phoenix, Arizona 85003

Copy mailed to:

MARGARET PERLMETER
Assistant U.S. Attorney
United States Attorney's Office
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408

TRAMMEL THOMAS
Defendant

 *s/P. Muñoz*
P. Muñoz

2



Case No. 1:16-cr-00054-WJM Document 525-13 filed 12/12/19 USDC Colorado pg 866 of
971
Case 2:18-mj-06121-DKD   Document 8-1   Filed 04/04/18   Page 2 of 3





Case No. 1:16-cr-00054-WJM Document 525-137 filed 12/13/19 USDC Colorado pg 868 of 971
Case 1:16-cr-00054-WJM Document 370-1 Filed 04/04/18 Page 1 of 1
Case 2:18-mj-06121-DKD Document 11 Filed 04/03/18 Page 1 of 1

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

CRIMINAL EXHIBIT LIST

☑ **Detention Hearing**  ☐ Non-Jury Trial  ☐ Jury Trial

Case Number  18 - 6121 MJ
Year Case No. Deft No.

Judge Code _____   Date  4/3/18

USA v.  Thomas , Trammel
Last      First      Middle

☒ Government          ☐ Defendant

| Exhibit No. | Marked for ID | Admitted in Evidence | Description |
|---|---|---|---|
| 1 | 4/3/18 | 4/3/18 | Release Conditions (Doc. 5.) MJ 16-9080 |
| 2 | 4/3/18 | 4/3/18 | ROI 3/22/18 |
| 3 | 4/3/18 | 4/3/18 | ROI 4/2/18 |
| 4 | 4/3/18 | 4/3/18 | Search Warrant - Maricopa County |
| 5 | 4/3/18 | 4/3/18 | Defendant Trammel's Objection to Pre-Sentence Investigation Report CR-16-54 (Doc. 348) |
| 6 | 4/3/18 | 4/3/18 | Defendant Sentencing Statement Doc. 353; CR-16-54 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

FILED ___ LODGED
RECEIVED ___ COPY
APR - 3 2018
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

Case No. 1:16-cr-00054-WJM  Document 525-1 filed 12/13/19  USDC Colorado  pg 869 of 971
Case 2:16-cr-00054-WJM  Document 137-05  Filed 04/04/18  Page 1 of 1
Case 2:18-mj-06121-DKD  Document 13  Filed 04/04/18  Page 1 of 1

1
2
3
4
5

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

8

| | |
|---|---|
| United States of America, | No. 18-06121MJ-001-PHX-DKD |
| Plaintiff, | **MINUTE ORDER RE: EXHIBITS** |
| v. | |
| Trammel Thomas, | |
| Defendant. | |

14

IT IS HEREBY ORDERED that the exhibits marked, whether or not received as evidence, in the above-entitled case at the time of the Detention Hearing which concluded on April 3, 2018, are returned to respective counsel.

Counsel are directed to retain custody of the exhibits until the case has been completely terminated, including all appeals, pursuant to LRCiv 79.1.

Dated this 4th day of April, 2018.

BRIAN D. KARTH,
District Court Executive/Clerk of Court

Marion Holmes, Deputy Clerk

CLOSED

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CRIMINAL DOCKET FOR CASE #: 2:18–mj–06121–DKD–1

Case title: USA v. Thomas

Other court case number:  16–cr–0054–WMJ–2 USDC, District of Colorado

Date Filed: 03/30/2018

Date Terminated: 04/04/2018

---

Assigned to: Magistrate Judge David K Duncan

**Defendant (1)**

**Trammel Thomas**
57094–408
*TERMINATED: 04/04/2018*

represented by  **Shishene Jing**
Federal Public Defenders Office – Phoenix
850 W Adams St., Ste. 201
Phoenix, AZ 85007
602–382–2700
Email: shishene_jing@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Pending Counts**

None

**Disposition**

**Highest Offense Level (Opening)**

None

**Terminated Counts**

None

**Disposition**

**Highest Offense Level (Terminated)**

None

**Complaints**

Rule 5 18:3148 Violation of Pretrial Release Conditions

**Disposition**

---

**Plaintiff**

**USA**

represented by  **Margaret Wu Perlmeter**
US Attorneys Office – Phoenix, AZ
2 Renaissance Square
40 N Central Ave., Ste. 1800
Phoenix, AZ 85004–4408
602–514–7402
Email: margaret.perlmeter@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/29/2018 | 1 | Arrest (Rule 5 – Pretrial Release Violation) of Trammel Thomas. (ESL) (Entered: 03/30/2018) |
| 03/30/2018 | 2 | MINUTE ENTRY for proceedings held before Magistrate Judge David K Duncan: Initial Appearance in Rule 5(c)(3) Proceedings as to Trammel Thomas held on 3/30/2018. FINANCIAL AFFIDAVIT TAKEN. Appointing AFPD Shishene Jing for defendant. Rule 5(c)(3) Identity Hearing waived. Detention Hearing requested. Defendant remains in the temporary custody of the United States Marshal. |
| | | **Appearances**: AUSA Peggy Perlmeter for the Government, AFPD Shishene Jing for defendant. Defendant is present and in custody (restraint level 0). Detention Hearing set for 4/3/2018 at 10:00 AM in Courtroom 606, 401 West Washington Street, Phoenix, AZ 85003 before Magistrate Judge Eileen S Willett. (Recorded by COURTSMART.) Hearing held 3:18 PM to 3:20 PM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (CIS) (Entered: 03/30/2018) |
| 03/30/2018 | 3 | SEALED CJA 23 Financial Affidavit by Trammel Thomas. (CIS) (Entered: 03/30/2018) |
| 03/30/2018 | 4 | WAIVER of Rule 5 and 5.1 Hearings by Trammel Thomas. (CIS) (Entered: 03/30/2018) |
| 04/03/2018 | 5 | MINUTE ENTRY for proceedings held before Magistrate Judge Eileen S. Willett: Detention Hearing as to Trammel Thomas held on 4/3/2018. Government's Exhibits 1 through 6 are identified and admitted into evidence. Counsel present argument to the Court. The Court takes the issue of detention UNDER ADVISEMENT. Defendant remains temporarily detained pending further order of the Court. |
| | | **Appearances**: AUSA Margaret Perlmeter for the Government, AFPD Shishene Jing for defendant. Defendant is present and in custody (restraint level 0). (Recorded by COURTSMART.) Hearing held 10:08 AM to 10:31 AM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MRH) (Entered: 04/03/2018) |
| 04/03/2018 | 11 | EXHIBIT LIST by USA re: 4/3/2018 Detention Hearing as to Trammel Thomas. (MRH) (Entered: 04/04/2018) |
| 04/04/2018 | 8 | NOTICE *of Filing* by Trammel Thomas. (Attachments: # 1 Photos)(Jing, Shishene) (Entered: 04/04/2018) |
| 04/04/2018 | 12 | ORDER OF DETENTION PENDING SENTENCING IN THE CHARGING DISTRICT as to Trammel Thomas. Signed by Magistrate Judge Eileen S. Willett on 4/4/2018. (MRH) (Entered: 04/04/2018) |
| 04/04/2018 | 13 | MINUTE ORDER re: Exhibits from 4/3/2018 Detention Hearing as to Trammel Thomas: Counsel are directed to retain custody of the exhibits until the case has been completely terminated, including all appeals, pursuant to LRCiv 79.1. (MRH) (Entered: 04/04/2018) |
| 04/04/2018 | 14 | COMMITMENT TO ANOTHER DISTRICT as to Trammel Thomas. Defendant committed to District of Colorado. Signed by Magistrate Judge Eileen S Willett on 4/4/2018. (CIS) (Entered: 04/04/2018) |
| 04/04/2018 | 15 | Notice to District of Colorado of a Rule 5 or Rule 32 Initial Appearance as to Trammel Thomas. Your case number is: 16–cr–00054–WJM–2. Please use PACER Court Links to access the public docket and documents. Any necessary sealed or ex parte documents will be sent in a separate e–mail. |
| | | *(If you wish to designate a different email address for future transfers, please send your request to the national list host at InterdistrictTransfer_TXND@txnd.uscourts.gov.)* (CIS) (Entered: 04/04/2018) |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM-02

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**2.**     **TRAMMEL THOMAS,**

      Defendant.

---

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT TRAMELL THOMAS'S MOTION FOR NEW TRIAL (ECF No. 358)

The United States of America (the government), by Robert C. Troyer, United States Attorney, through Martha A. Paluch and Bryan D. Fields, Assistant United States Attorneys, respectfully submits this response in opposition to Defendant Trammel Thomas's "Motion for New Trial" (ECF No. 358) (hereinafter the "Motion"). For the reasons set forth below, the motion should be denied.

## I.    LEGAL QUESTION PRESENTED

The question presented by the defendant's motion is whether there was undisclosed evidence favorable to the defendant, that, had it been disclosed, raises the reasonable probability that the defendant would have been found not guilty. *United States v. Reese*, 745 F.3d 1075, 1084 (10th Cir. 2014). That is, does the allegedly undisclosed evidence "shake [the court's] confidence in the guilty verdict"? *Id.* As set forth below, there was no undisclosed evidence. Furthermore, the allegedly undisclosed evidence would have had no bearing on the outcome of the trial. Accordingly, the answer to the question presented is that there was no undisclosed evidence that undermines the jury's finding, beyond a reasonable doubt, that the defendant is

guilty.

## II.     THE GOVERNMENT DID NOT SUPPRESS EVIDENCE

### A.  The Motion Tendentiously Packages Old Disclosures as New Revelations

There is nothing novel about the "new" evidence presented by the defense.  Perhaps unsurprisingly, it is quite common for defendants who have already been sentenced — and who thus have nothing left to lose— to recant prior statements and otherwise make efforts to assist their former partners in crime (and love).  Unsurprising at all is that the Supreme Court and Tenth Circuit have taken an extremely dim view of these post-trial efforts to manipulate the justice system with strategic recantations and affidavits.  *See generally, Herrerra v. Collins*, 506 U.S. 390, 392, 423 (1993) (explaining that because post-trial affidavits are "obtained without the benefit of cross-examination," they "are to be treated with a fair degree of skepticism" (O'Connor, J., concurring);  *In re Barrett*, 840 F.3d 1223, 1229 (10th Cir. 2016) ("Postconviction recantations are to be viewed with extreme suspicion and have long been disfavored as the basis for a claim of innocence.") (internal quotation marks and citation omitted).

What *is* surprising is that the defendant would file a motion  raising serious allegations of prosecutorial misconduct involving "Undisclosed Information" — attaching two pages of a twelve page report, *see* Motion Ex. 8 — and then *fail to disclose to the Court the information in the missing pages*.  For example, the defendant makes the eye-opening allegation that the government failed to disclose that Carr had never seen the defendant fill out a FAFSA.  Motion, p. 5; Ex. 2, ¶ 4.  But the government did disclose this statement.  Attached as Exhibit A to this response is the full report of Carr's first proffer with the United States.  That report, provided to defense counsel on March, 22, 2017, relayed Carr's comments that (1) she did "not know if he [Thomas] knew how to complete and submit an electronic FAFSA" and (2) "she never

Case 1:16-cr-00054-WJM Document 373 Filed 04/10/18 Page 3 of 16

personally saw Thomas submit FAFSA's or fill out loan records for the school." Ex. A, p. 5, 7. Moreover, when Carr told investigators during one of the 2017 proffer sessions that "she never personally saw him [Thomas] submit FAFSAs" the government recorded that statement and provided it to the defense in the report attached as Exhibit 1 to the Motion. *See* Ex. 1, p. 4.

Further examination of the entire reports shows that much of the allegedly "Undisclosed Information" was anything but. The Motion asserts the government failed to disclose that the defendant helped people who really went to college. It did not. Ex. A, p. 3 (relaying, among other things, Carr's statement that she believed "Thomas was helping people go to school"). The Motion also claims the government suppressed Carr's statement that she was not present in Colorado before 2011. But this, too, is something the government disclosed early in the case. Ex. A., p. 11 (relaying Carr's belief that Duncan used Carr's identity when Duncan was arrested in Colorado in January 2011).[1]

**B. The Motion Mischaracterizes the Affidavit**

Other claims in the Motion mischaracterize the defendant's own "new evidence." The Motion avers that Carr told prosecutors that Green regularly and continually used the Dodge Charger in 2011 and 2012 "*including right before Thomas was arrested in that vehicle and 52 debit cards were seized from that automobile*." Motion, p. 5-6. But the italicized portion is conspicuously missing from Carr's affidavit. Ex. 2, ¶ 9(h). And neither Carr nor the defense

[1] Footnote 4 on Page 10 of the Motion infers something sinister about the government's reference in its sentencing statement, ECF No. 262, to Colorado Springs Police Reports documenting that one of the women at the hotel where Thomas was arrested identified herself as Heather Carr. True, Carr denied being there (admitting to being at the scene of a prostitution ring is something that many would find difficult to admit) — a fact disclosed to the defense. But the notion that the government is required to take everything Carr said at face value — or that it naively did so — is misguided. Carr's statement that Duncan impersonated her does not make sense given the other information in the report documenting Duncan's presence at the scene and her statement that she took the police to the Radiant Drive address she shared with Thomas. It makes no sense she was the third person identified as Heather Carr by the police.

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/12/19 USDC Colorado pg 875 of
971
Case 1:16-cr-00054-WJM Document 137 Filed 04/10/18 Page 4 of 26

challenges Carr's prior statements to the government that "Thomas used the vehicle, not Carr," Ex. A, p. 6, or that Thomas "had the vehicle in Colorado and he brought it with him when he moved to Arizona," Ex. 1, p. 4, a statement corroborated at trial by Duncan's testimony that Thomas drove the Charger in Colorado.

Similarly, the Motion asserts "Carr declares in her affidavit that Green had participated in collecting money in Colorado that had been generated by the scheme." Motion, p. 5 (citing Ex. 2, ¶ 9(a). The affidavit doesn't say that. Instead, it says "Marcelle Green had assisted myself by picking up student loan related mail in the state of Colorado." Ex. 2, ¶ 9(a). This exact information was disclosed to the defense well before trial. Ex. A, p. 5 (relaying Carr's statement that "Carr, Diaz, *Green*, and/or Thomas removed the back side of the mailbox on *their* trips to Colorado and obtained the mail in the inmates' names.") (emphasis added).

### C. The Motion Characterizes New Opinions as Old Evidence

Still other claims in the Motion are less "new evidence" than new opinions about old evidence. For example, the Motion says Carr now claims she, Diaz and Green were the "main" participants in the scheme. Motion, p. 5; Ex. 2, ¶ 6. But this is an odd claim because Carr does not simultaneously disavow the many detailed statements she made about the defendant's involvement in the scheme. Carr told investigators that the defendant obtained addresses, submitted fake Master Promissory Notes, completed coursework, withdrew scheme money from ATMs, used DOC lookups to identify victims, and asked Carr to query the social security numbers of victims. *See generally* Ex A; Ex. 1.[2]

More to the point, the implication that the government somehow suppressed evidence

---

[2] Carr also stated that "Thomas was involved with submitting FAFSAs." Ex. 1, p. 4. She explained while "she never personally saw him submit FAFSAs," she saw "Thomas's handwritten notes that were related to FAFSA submissions, such as PIN numbers and email addresses in his office." *Id.*

Case No. 1:16-cr-00054-WJM-Document 525-1 Filed 12/21/18 USDC Colorado pg 876 of
Case 1:16-cr-00054-WJM Document 375 Filed 04/10/18 Page 5 of 26
971

about the relative culpability of the defendants is, as above, belied by the documentary record.

The proffer reports cited throughout this response make it clear that Carr was not shy about

fingering Green, but not Thomas, as taking the lead in certain aspects of the scheme.  Ex. A, p.3.

(recording Carr's statements about how it was Green's idea to use prison inmates to advance the

scheme); *Id.,* p 4 (recording Carr's statement that "Green was responsible for getting the scheme

to work"); *Id.*, p.5 (recording Carr's statement that Green obtained her own addresses to use); *Id.,*

p 7 (recording Carr's statement that she saw Diaz and Green, but not Thomas, filling out

FAFSAs); *Id.*, p. 8 (relaying Carr's statement that Green "kept the debit cards and that the pink

laptop belonged to Green"); Ex. 1, p. 3 (relaying Carr's statement that "Green did a lot of the

work because she was not employed.  The scheme was Green's job.").  In short, there is no basis

for defendant's claims that Carr's opinions about the relative culpability of members of the

conspiracy was not disclosed to the defense.

### D.  The Motion is an Exercise in Tactical Gamesmanship

The Motion highlights the considerations animating judicial cynicism of post-hoc

affidavits.  Carr, like any dissatisfied defendant in possession of the government's discovery file,

is in a position to strategically pick and choose how she might best help Thomas (the father of

two of her children).

For example, the Motion, citing Carr's affidavit, argues the government suppressed

evidence that Carr told investigators the defendant did not participate in or benefit from the

scheme while he was in jail.  Motion, p.5; Ex. 2, ¶ 9(c).  This cleverly worded statement means

that Carr does not have to explicitly recant her pre-trial statement that "Thomas knew the scheme

was continuing" while in jail.  Ex. 1, p.3.  Instead, the implication seems to be that the defendant

may have known about the scheme, but did not knowingly participate in it or knowingly benefit

from it while he was in prison.  But even these statements are contradicted by Carr's prior

statements (not recanted in the affidavit), that she and the defendant slyly communicated with one another in "code" while the defendant was in jail so that prison officials wouldn't learn about the scheme. *Id.* (giving specific examples). They are also contradicted by Carr's statements (likewise not recanted in the affidavit) to investigators that she paid for the defendant's legal fees while he was in prison, a fact corroborated by at least one check made out to the law firm that represented Thomas in state proceedings. Ex. A, p. 6; Ex. 1, p.3; CMB_00000145 (showing check from Heather Carr to Griffith Law Firm for $774, dated July 11, 2011 with "last payment Tramell Thomas" in the memo line). In other words, Carr now claims that Thomas did not participate in or benefit from the scheme, but also does not deny her prior claims that she paid his attorneys fees and used code to discuss the scheme in prison.

More importantly, whether or not Carr told the government that Thomas did not participate in the fraud scheme while in jail is legally irrelevant. The government's position has always been that Thomas joined the conspiracy in 2010 and never withdrew from it. Whether he could actively participate in the conspiracy while in prison is thus irrelevant to whether he was still guilty of the conspiracy. *See United States v. Alcorta*, 853 F.3d 1123, 1139 (10th Cir. 2017) (explaining that "a conspiracy does not end simply because one conspirator has been arrested" and "incarceration by itself is insufficient to constitute [a conspirator's] withdrawal from the conspiracy") (quotation and citation omitted).

Something similar is afoot with two other claims in the Motion. The Motion claims that the government suppressed evidence that Thomas did not provide the Radiant Drive address. Carr's affidavit makes this claim now, Motion, p. 9; Ex. 2, ¶ 9(b), but does not retract her prior statements to investigators that Thomas resided at that address, Ex. 1, p.3; Ex. A, p. 5. Moreover, the defense ignores the evidence presented at trial on this issue. This address was used for a false FAFSA in the name of I.O., the defendant's former friend, as charged in Count 2

6

of which the defendant was convicted. In addition, Christine Duncan testified that she lived at
the Radiant Drive address with Thomas. In other words, the government never asserted it had
direct evidence that Thomas told Carr that he used the Radiant Drive address in the scheme.
Instead, it asked the jury to make reasonable inferences from the available evidence: that
Thomas enriched himself from the scheme by using his address.

The Motion also claims that the government suppressed evidence that co-defendant
Mercedes Diaz dated Michael Cox, and that had the defense known this, they could have argued
that Diaz actually provided the Rice Drive address for the conspiracy and not Thomas. Motion,
p. 5; Ex. 2, ¶ 9(h). Carr never told the government that Diaz and Cox dated. Indeed, Carr does
not retract her prior statements that "Cox resided at the Rice Drive address," Ex. A, p. 6, that she
"hates Cox and does not speak to him," *id.,* her belief that "Thomas and Cox talked about the
scheme together," *id.,* or that she did not know how Cox's credit card number ended up in her
iPad's list of contacts. *Id.* at 10.

In any event, the defense was in a position to obtain testimony from the two people who
would know if this dating allegation were true: Mercedes Diaz and Michael Cox. Both
individuals were on the defendant's witness list. The defendant could have placed Diaz under
subpoena and compelled her to testify. But Diaz's lawyer informed the government before trial
that Thomas's defense team never tried to serve a subpoena on his client. With Cox, the
situation was even better for the defense. Cox appeared on the first day of trial under the
mistaken impression that he was still under the government's subpoena. The government
informed defense counsel that Cox was present and defense counsel was able to talk to Cox that
day. Ultimately, they decided not to call him to testify.

The defendant's strategic decisions not to compel testimony from Diaz or Cox
substantially undermines his claim that now, after trial, things would have been different if his

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/12/19 USDC Colorado pg 879 of
971
Case 1:16-cr-00054-WJM Document 375 Filed 04/10/18 Page 8 of 26

defense team had access to this alleged "new" information that Diaz and Cox dated.

**E. The Motion Points to "New Evidence" That Was Never the Subject of Dispute**

The Motion also tilts at windmills. For example, the Motion ascribes something nefarious to the idea that the 2017 proffer report has three dates, but Carr says there were four meetings. There were four meetings. Only three are listed in the report because Carr provided new or additional information at only three of the meetings. The last meeting, on November 20, 2017, was a trial prep session to formally ask questions that had already been answered (and described in the report). The government is not required to give its direct examination outlines to defense counsel before trial.

The claim that the government suppressed evidence that Thomas never threatened Carr is likewise empty. The government hasn't claimed otherwise. To the contrary, the reports repeatedly relay Carr's thoughts about Thomas before the trial. *See* Ex. A, p. 2 (recording Carr's statement that she was "not intimidated by Thomas;) *id.* at 11 (recording Carr's statement that she is "not afraid of Thomas"); Ex. 1, p. 1 (recording Carr's statement that she and Thomas "do not speak"); *id.* p. 5 ("Carr is not angry or jealous of Thomas.").

**III.   THE "NEW" EVIDENCE DOES NOT UNDERMINE THE OVERWHELMING EVIDENCE OF THE DEFENDANT'S GUILT**

The government disclosed Carr's pre-trial statements to the defense. There is no "Undisclosed Information." But even if there was such information, none of it would have changed the outcome of the trial.

**A.   There Was Overwhelming Evidence of the Defendant's Guilt**

It's important to put the trial into perspective. The defendant's suggestion that Thomas's conviction rests on "three pillars" is a vast oversimplification of hours of testimony and dozens of exhibits.

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/17/19 USDC Colorado pg 880 of
971
Case 1:16-cr-00054-WJM Document 375 Filed 04/10/18 Page 9 of 16

Text messages found on the defendant's broken phone contained evidence he communicated with Kimmisha Mullett to coordinate the shipment of fraud mail to his P.O. Box in Arizona. Mullett testified about how the defendant manipulated her into sending him mail in the names of other people, including Manuel Abate (whose debit card was in Thomas's *wallet*, not just in the car) and Dennis Miller (who was referenced by name in her text conversations with the defendant). The recording of the traffic stop did more than prove Thomas possessed fruits of the scheme: it showed that the defendant had no good answer for why the cards were in his car (i.e., if it were true that Green had driven the car before him, Thomas could simply have told the officer that. Instead, he babbled on about having a mysterious job that resulted in him having the cards). And Alison Stailey's testimony showed that the defendant used the computer at the home he shared with Carr to advance the scheme. In short, even if the allegedly "Undisclosed Information" (which, as set forth above, was actually disclosed) undermined portions of the government's case (which, as set forth below, it did not) there was still overwhelming evidence that the defendant was guilty. That information would not have changed the outcome of the trial.

**B. The Allegedly "Undisclosed Information" Would Not Have Changed the Defense's Approach to Cross-Examining Marcelle Green**

There is no need to resort to speculative counterfactual scenarios to determine if the "Undisclosed Information" would have changed the outcome of the trial. It would not have, and the Court can be confident of this because, as set forth above, the government disclosed to the defense Carr's assertion that she never saw Thomas personally submit a FAFSA, didn't know if Thomas could even complete and submit a FAFSA, and never saw Thomas fill out loan records. Ex. A, p. 5,7; Ex. 1, p. 4. Accordingly the defense had all it needed to fully and effectively undermine Green's testimony regarding her FAFSA tutorial with Thomas.

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/12/18 USDC Colorado pg 881 of
971
Case 1:16-cr-00054-WJM Document 373 Filed 04/10/18 Page 10 of 16

In a footnote, the defense implies that it would have called Carr to the stand had it known

of the limitations in her testimony.  But, again, they did know.  Furthermore, the government had

good faith bases to believe that all of the witnesses on its witness list would, in fact, testify.

Heather Carr was under the obligations of a contract with the government, the breach of which

exposed her to the risk of a higher sentence.  What more would a subpoena have done?  As the

defense surely knows from their presence at Carr's sentencing, this very issue was the subject of

debate, with Carr claiming that the government should have subpoenaed her after she said she

would not testify.  The Court rejected that argument then; it should reject similar arguments from

Thomas now.  Ex. 4, p. 46-48; *See United States v. Turner,* 864 F.2d 1394, 1399 (7th Cir. 1989)

("[a]ll cooperation means is testifying when there is no legal obligation to do so").

Defense counsel was told that Carr would not testify on the second day of trial.  Should

they have really wanted to call her the stand — a dubious claim to say the least given her prior

statements implicating Thomas and the inherent advantages that the mode of cross-examination

would have given the government — it was in a position to immediately ask for a trial subpoena,

for assistance from the Court in securing her appearance, and a continuance, if necessary.  The

defense did no such thing and there's nothing in the record to show that this was anything more

than what it appears:  a deliberate tactical choice.  Once Carr broke her promise with the

government and refused to testify under oath she became a wildcard that both sides —confronted

with substantial unknowns, trial risks, and ethical concerns about whether she would follow an

oath after breaking a promise with the government — were reluctant to play.

### C.  The Allegedly "Undisclosed Information" Would Not Have Undermined the Fact that Thomas Was Caught Red Handed Trying to Hide a Giant Bag of Debit Cards

The Motion attempts to re-litigate the trial by reducing the traffic stop to an episode in

which Thomas was driving around in a car that happened to have a bag of 52 debit cards.  But as

the Court and Jury saw at trial, it was much more than that. Detective Seal testified that the
defendant actively tried to hide the cards by sweeping them onto the floorboard. The audio
recording of the encounter featured several moments in which Seal showed the defendant the
cards and asked for an explanation. The defendant didn't have one — not even the easy excuse
of claiming that the cards belonged to someone else who might have been driving the car (which
everyone knew was not registered in his name). Most compelling, the defendant also had one of
the debit cards in the wallet he kept on his person.

The Motion claims the defense was stymied because the government suppressed evidence
that Green drove the car. The government denies that Carr ever made such a statement, which,
by the way, contradicts her detailed account of how Thomas reacted to being pulled over that
night and his frantic attempts to retrieve the cards from the Charger while in the impound lot.
More importantly, the defense already had plenty of information to argue that the cards belonged
to Carr: there were no fingerprints on the cards, the Charger was registered in Carr's name, Carr
was the person with the most responsibility for the scheme, and Thomas's efforts to hide the
cards could have been the act of a love-sick fool seeking to protect a partner. The defense never
made such an argument. The defense also knew, before trial, that Carr claimed that Green
owned a pink laptop,[3] Ex. A, p. 6, that forensic work on that laptop did not show ties to Thomas,
and that Carr made many statements about Green's extensive involvement in the scheme, Ex. A,
p. 3, 4, 7, 8. The defense thus had plenty of information to press the theory that someone else
put the cards in the car. They chose not to do that. *See* Ex. 7 (showing that defense counsel
asked Green no questions about the pink laptop in the Charger). The defense also had plenty of
information to cross-examine Green under the theory that the defendant had a small role in the

---

[3] Green denied being the owner of the laptop, a fact disclosed to defense counsel before trial in
the agent's reports of interviews with Green. MOI_00000392.

Case No. 1:16-cr-00054-WJM  Document 525-1  Filed 12/12/18  USDC Colorado  pg 883 of
Case 1:16-cr-00054-WJM  Document 378  Filed 04/10/18  Page 12 of 16
971

scheme relative to Green or Diaz.  In fact, they pursued this line of questioning at trial.  *Id.*
(featuring questions probing Green's testimony that she only helped the defendant one time and
questions about the close relationship between Carr and Diaz).  The jury obviously found it
unconvincing when juxtaposed to the rest of the evidence showing the defendant's guilt.

## IV.  BECAUSE THE DEFENDANT'S MOTION RAISES PURE ISSUES OF LAW, NO HEARING IS REQUIRED

The Court has considerable discretion in ruling on the Motion.  Its determination will not
be disturbed on appeal except for abuse.  *United States v. Easter*, 981 F.2d 1549, 1553 (10th Cir.
1992).  The Court has the same discretion when it comes to deciding whether or not to have a
hearing on the motion.  *United States v. Sutton*, 767 F.2d 726, 729 (10th Cir. 1985).  This is true
even when, as here, the "new evidence" consists of post-trial declarations from a co-defendant
that recants or calls into question evidence presented at the trial.  *United States v. Jones*, 315 F.
App'x 714, 715 (10th Cir. 2009) (Gorsuch, J.) (not precedential).

*Jones* itself is not precedential, but the case is nevertheless instructive as an application of
binding Tenth Circuit precedent.  In that case the Tenth Circuit affirmed a district court's
decision to deny a motion for a new trial without an evidentiary hearing.  In that case, as in this
one, the "new evidence" consisted primarily of a post-trial declaration from the defendant's
family member (cousin) and co-conspirator.  The Tenth Circuit noted that a new trial cannot be
granted unless the court is satisfied that "challenged testimony was actually false" and that
"recantation of prior trial testimony is not looked upon with favor but rather with downright
suspicion."  *Id.* at 716.  Ordinarily, a hearing is necessary to evaluate the credibility and impact
of a recantation.  *Id.* (citing *United States v. Page*, 828 F.2d 1476, 1478 (10th Cir. 1987).  But
not in every case.  "In cases where the written record allows a district court judge to make
credibility findings (and for us to evaluate such findings), no evidentiary hearing is necessary."

*Jones,* 315 F. App'x at 716 (citations omitted). Applying these principles, the *Jones* panel noted that the district judge who denied the motion had also presided over the trial, had taken the guilty plea of the recanting coconspirator, and was thoroughly familiar with all of the evidence presented in the case, much of which corroborated the recanted testimony. Under those circumstances, "we can hardly say that the district court abused its discretion in denying [the defendant's] request for an evidentiary hearing" nor could the Tenth Circuit conclude that the district court's decision to find the coconspirator declaration not credible without an evidentiary hearing arbitrary, capricious, whimsical or manifestly unreasonable. *Id.* at 716-717.

The Court had ample opportunity to assess Carr's credibility at her change of plea and sentencing hearings. At sentencing, Carr downplayed her own role by claiming she was working eleven hours a day on her legitimate job. Ex. 4, p 40 ("I worked from 9:00 a.m. to 8:00 p.m. everyday."). Then she blamed everything on Green. *Id.,* p. 39 (stating that Green went into Carr's Accurint account, Green got addresses without Carr's knowledge, Green did the scheme before Carr got involved and Green was "introduced in this"); *id.* p. 42-43 (claiming that "without her [Green] in the picture" Carr would have stopped the fraud in 2012 when Thomas moved in); *id.* p. 44 (blaming the fraud on "being around" Green). She also blamed Mercedes Diaz, the woman she helped raise. *Id.* p. 44-45 (claiming the scheme "kept going" in part because 'Mercedes didn't have a job and she was, you known, on drugs . . . and I was just trying to help people"). She even blamed her own children. Ex. 4, p. 41 ("At the time, you know, my daughter was about to be 16 and she wanted, you know, stuff 16-year-olds want[.]"). She also, of course, blamed the government.

On the other hand, the Court heard all of the evidence at trial and can see, from the *complete* reports that the government disclosed information about Carr's inconsistent statements, her statements about Green's responsibility for the scheme, and the limitations of her testimony

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/12/19 USDC Colorado pg 885 of
971
Case 1:16-cr-00054-WJM Document 137 Filed 04/10/18 Page 14 of 16

relating to the defendant. Other information allegedly disclosed to the government before trial

and then allegedly not disclosed to the defense is consistent with Carr's obvious dislike for

Green. Carr's affidavit, just like her statements at sentencing, elevates Green's role related to the

Charger and other aspects of the scheme, and is inconsistent with many statements Carr made

before trial that she has not recanted. As set forth above, Carr's new claims do nothing to change

the nature or outcome of the defendant's trial.

The Court has abundant evidence to determine whether information was actually

undisclosed to the defense. The evidence before the Court establishes that the statements the

defendant now claims were never turned over were in fact turned over or simply were never

made pre-Affidavit. On this basis, the Court can, and should, dismiss Carr's affidavit as being

unworthy of belief. But even if the Court credits those allegations, for the reasons above, there is

sufficient evidence in the record to support the determination that the allegedly "Undisclosed

Information" was not "material." Whether evidence is "material" is a legal dispute, not a factual

one, that the Court can resolve without a hearing. The Court should not hold an evidentiary

hearing where the defendant has done nothing more than present an unsubstantiated affidavit

from a disgruntled former conspirator who has numerous familial and emotional ties to the

defendant. *See, e.g., United States v. Bell*, 169 F. Supp. 3d 826, 833 (N.D. Ill. 2015) (seeing no

need to hold an evidentiary hearing on basis of post-trial declaration from co-conspirator that,

even if called to testify, would "merely solidify [his] status as a perennially flip-flopping

witness[.]"); *United States v. Taylor*, 600 F.3d 863, 870 (7th Cir. 2010) (noting that hearing

testimony from former co-defendant would simply illustrate witness's contradictions and that

such post-trial statements do not warrant a new trial); *cf. United States v. Turns*, 198 F.3d 584,

588 (6th Cir. 2000) (noting that granting new trials on the basis of post-trial affidavits would

only encourage such practices from those who "after learning of the defendant's conviction, state

14

Case No. 1:16-cr-00054-WJM Document 525-1 Filed 12/12/19 USDC Colorado pg 886 of
971
Case 1:16-cr-00054-WJM Document 373 Filed 04/10/18 USDC Page 15 of 16

for the first time that they are willing to testify truthfully on the defendant's behalf."); *Baumann v. United States* 692, F.2d 565, 580 (9th Cir. 1982) (raising similar concerns of post-trial "sandbagging").

## V. <u>CONCLUSION</u>

For all of the reasons set forth above the Court should deny the defendant's motion without a hearing.

Respectfully submitted this 10th day of April, 2018.

ROBERT C. TROYER
United States Attorney
District of Colorado

By:    <u>s/ *Bryan David Fields*</u>
BRYAN DAVID FIELDS
MARTHA A. PALUCH
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
Bryan.Fields3@usdoj.gov

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/18 USDC Colorado pg 887 of
971
Case 1:16-cr-00054-WJM Document 373 Filed 04/10/18 Page 16 of 16

## CERTIFICATE OF SERVICE

I certify that on this 10th day of April, 2018, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to all

counsel of record in this case.

s/ *Bryan David Fields*
BRYAN DAVID FIELDS
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
Bryan.Fields3@usdoj.gov

Case No. 1:16-cr-00054-WJM, Document 537-1, filed 12/12/18, USDC Colorado, pg 888 of
Case 1:16-cr-00054-WJM Document 373-1 Filed 04/10/18 Page 1 of 12
971

Exhibit A




## UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF INSPECTOR GENERAL
### INVESTIGATION SERVICES

DATE INTERVIEWED:     November 3, 2016

PERSON INTERVIEWED:    Heather Carr

ALSO PRESENT:          Mary Butterton, Assistant Federal Defender
                            Jessica Leto, Paralegal

INTERVIEWED BY:        Martha Paluch, Assistant US Attorney
                            Beth Gibson, Assistant US Attorney
                            Sandra Ennis, ED-OIG Special Agent

LOCATION:               U.S. Attorney's Office
                            1225 17th St., 7th Floor Conference room
                            Denver, Colorado 80202

CASE NUMBER:            12-080234

CASE NAME:             Pikes Peak Community College Fraud Ring

After being advised of the nature and purpose of the interview and the identities of all present, Heather Carr, voluntarily provided the following information, summarized as follows:

In approximately July 2015, Carr moved from Arizona to Virginia Beach, Virginia, to live with her oldest daughter Ayanna Brown, formerly Ayanna Jones. Brown moved to Virginia because her husband is in the Navy. He is currently deployed and will not return home until January 2017. Brown is currently attending college and is enrolled in a pharmaceutical internship.

The following are Carr's four children: Ayanna (21), Kaira (16), Milani (5), and Tru (1). Aubrey, who is Ayanna's friend, has resided with Carr since she was 15.

Carr was a mother figure to Mercedes Diaz also. Carr and Diaz's biological mother both worked at a car dealership. Diaz's mother was prepared to give up Diaz to the state because Diaz was constantly in trouble. Carr offered to take her in. At the time, Diaz was in junior high at Panorama Middle School. On Christmas Eve, Diaz stole Carr's vehicle and was arrested. While in custody, Diaz's brother was murdered. Carr's daughters are like sisters to Diaz.

Carr was born in Virginia but moved to Colorado Springs, Colorado, when she was approximately ten years old. Shortly after her family moved, her mother divorced and remarried. Carr ran away from home and stopped attending school in junior high. Carr got pregnant at 17 and obtained her GED during this time period. Omar Jones, who is the father of her two oldest daughters, was her legal guardian.

In approximately 1997, Carr became familiar with the financial aid process when she attended Pikes Peak Community College (PPCC) and received federal student aid (FSA).

In approximately 2003, Carr moved from Colorado to Arizona and resided there until summer 2015.

Prepared by: Ennis, Sandra                                      Date Prepared: November 4, 2016

This report is the property of the Office of Investigation Services and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is **FOR OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

OIG Form 301 (10/2014)                                           Page 1 of 12

Case No. 1:16-cr-00054-WJM-Document 525-1 filed 12/12/19 USDC Colorado pg 889 of
971
Case 1:16-cr-00054-WJM Document 373-1 Filed 04/10/18 Page 2 of 12

Interview of Heather Carr, November 3, 2016                                    12-080234

Carr worked for Wells Fargo from approximately June 2003 through July 2015. During her employment, Carr held the following positions: mortgage processor, mortgage underwriter, and credit analyst for Car Maxx. Carr's position as credit analyst began with Car Maxx in approximately 2006.

In approximately August 2009, Wachovia and Wells Fargo merged and Carr was one of 200 employees laid off. Carr was brought back and began working from home because Wachovia employees worked from home. Wells Fargo decided that their employees would work from home also.

Carr was issued a T460 Laptop for her work at home. The laptop required her to sign in with a login ID and password. Her work day was spent verifying a potential purchaser's eligibility to get a car loan by conducting credit reviews. These were non-stop deals that required decisions to be made in five minutes or less. She verified the potential purchaser's credit information and their debt-to-income ratio and then indicated whether the potential purchaser's loan should be approved or denied.

Carr had many user names and passwords for different systems. Carr confirmed her LexisNexis login ID as heathercarr1. Her login ID, heathercarr1, remained the same but she was required to change her LexisNexis password every six months. Carr used LexisNexis to verify a potential purchaser's employment history, social security number, date of birth, and/or driver's license information. Carr accessed LexisNexis from her own personally owned computer but she did not think she could access it outside of her home or on a mobile device. There were occasions when she conducted work business on her personally owned computer. This was usually done to verify someone's personal information, such as a Google search on someone. Ayanna Jones did not use or have access to LexisNexis.

From approximately 2006 through 2013, Carr put the Cox Communication's internet service in her daughter's name (Ayanna Jones). Carr did so because she had an outstanding internet bill of $300 dollars in Colorado and could not get internet service in Arizona until that was paid. Carr made the internet service payments to Cox Communications.

In approximately 2003, Carr became acquainted with Tramell Thomas through her step-brother, Matthew Sanders. Carr did not know her parents very well and wanted to learn more about her family. She and Sanders wrote each other while he was in prison in Colorado. Sanders told Carr that Thomas, who was also in prison in Colorado, looked out for him. Carr began exchanging letters with Thomas until his release from prison in approximately 2009. Carr met up with Thomas after he was released from prison. She wanted to thank him for taking care of her "nerdy white-boy step-brother."

Thomas and Carr were together from approximately 2009 through 2012. In 2014, they had a brief reconciliation and travelled to San Diego when Carr won a free trip from work. Carr conceived her son on this trip. Their relationship ended after the trip. Carr and Thomas were never married.

Thomas and Carr have a very strained relationship. When Carr contacts Thomas, she usually puts the phone on speaker and lets him talk to their two children. Thomas does not call his children directly and he does not pay child support. She lets her daughter send him emoji's. In June 2015, Carr filed for child support and the state of Arizona has not served him with the paperwork. When the two of them do talk, it is never about the investigation. Even if they did talk about it, Thomas would lie. He lies so much it sickens Carr. Carr is not intimidated by Thomas.

Interview of Heather Carr, November 3, 2016                                    12-080234

In approximately 2010, while on parole in Colorado, Thomas and his acquaintances applied for student loans for themselves. Thomas would take individuals to PPCC and show them how to enroll in courses and apply for federal student aid (FSA). The following individuals voluntarily agreed to have Thomas assist them in applying for FSA to attend PPCC: Lola Thomas (Thomas' wife), Christine Duncan, Vanessa Lopez, Ismael Omar (Thomas' friend), and Michael Cox (Thomas' cousin). Cox legitimately went to PPCC and did well in school. Carr believed that Thomas was helping people go to school and he received a portion of their FSA for helping them enroll.

During this time period, Carr and Thomas would fly back and forth from Arizona to Colorado to visit each other.

Carr's friend, Marcy Green, was doing something similar to Thomas, in that Green would sign up people to receive FSA and she would take a portion of their FSA for assisting.

While at a barbeque, Carr was present when Green and Thomas were discussing how it was a hassle to convince people to sign up for school to get financial aid. They were discussing the need for a more elaborate way to get FSA funds. Green watched a show where a woman was sentenced to life in prison for burning her children. The three of them rationalized that using the identities of prison inmates was acceptable because inmates hurt other people. In the event these inmates were released, any student loans in their name could be forgiven because they could show they were in prison during the time period the loans were taken out. The three of them believed they were not hurting anyone and they would no longer need to split the FSA funds with the applicant. Using PPCC was Thomas' idea because he and his acquaintances already obtained FSA from there. The three of them were all in agreement. Diaz was not present at the barbeque.

Carr and Green met under unusual circumstances. Carr dated Green's ex-boyfriend, Roderick Smith.  Although the two have had a tumultuous friendship, she helped Green when she was going through a rough period. In approximately 2007, Smith beat up Green and knocked out her tooth. Carr took care of her three sons during this time.

Carr stated Green minimized her involvement when speaking to investigators in November 2012. During the timeframe of the interview, Green was facing marijuana charges. It was a complete lie when Green told investigators that Carr hung out at Green's residence. Green used computers at both of Carr's residences at 1351 Pleasant and 1822 E. Kaibab in facilitating the scheme to obtain FSA in the names of inmates. Debit cards mailed to Green's house were mailed there at Green's direction, not because Carr asked Green to use her address. Carr never paid Green any money for the receipt of debit cards and/or use of Green's address. Carr did not need to pay Green because Green, herself, was getting FSA funds from the debit cards in inmate's names.

Carr did not care to hang out at Green's house because she is involved in drugs and prostitution. Carr and Green do not hang out with the same people. There were possibly the following three occasions when Carr went to Green's house: to pick up one of Green's sons, to help hang pictures, and to attend a barbeque. Green would come to Carr's house because there was a better atmosphere there. Green resided in her Aunt Hazel's home and her uncle resided in a shed in the backyard. Green's aunt was like a mother to Green. Green did not want her Aunt Hazel hearing stuff that she was involved in.

Green came to Carr's residence while Carr was working from home. Carr typically worked five days a week from 9:00 a.m. until 8:00 p.m. Green used various computers at Carr's residence

Case No. 1:16-cr-00054-WJM Document 528-1 filed 12/12/19 USDC Colorado pg 891 of
971
Case 1:16-cr-00054-WJM Document 373-1 Filed 04/10/18 Page 4 of 12

to look up names on various Department of Corrections websites (DOC). Green brought Carr
the names and/or dates of birth obtained from DOC websites. With the information Green
provided, Carr queried the information in the LexisNexis database and would obtain the
information necessary to apply for FSA.

Seeing the number of queries conducted in LexisNexis in the discovery was shocking to Carr.
Carr would ask Green to bring her additional inmate names because there were times when the
queries conducted would not work, meaning they were unable to get student loans using those
names. This was due to the inmate already having student loans and/or other credit issues.
Both Green and Thomas conducted DOC inmate searches and had Carr obtain the social
security number from LexisNexis. Carr further confirmed this because Green, who would be in
another room, would often ask Carr to look at photos of the inmates, "hey, come look at this
lady." Carr also queried inmate names on various DOC websites, usually to verify a date of
birth.

There was not any particular reason why they chose the various inmate names. Although, they
did think the mailman would be more likely to deliver a name that was the same as the person
who already occupied the residence. For example, the last name Grant was the same as the
person, Michelle Grant, who occupied the residence on Lexington.

Prior to 2012, Carr does not know how Thomas obtained names or if he visited DOC websites
to obtain information because he was residing in Colorado at the time. She believes he was
mainly signing up people he knew in Colorado.

Prior to 2012, Green asked Carr to obtain a lot of inmate identifiers through LexisNexis. Green
was responsible for getting the scheme to work. Green, who was also attending school and
familiar with the FSA process, submitted the majority of the FAFSA's. Carr submitted
approximately ten FAFSA's in the names of inmates.

Green conducted DOC searches, submitted FAFSA's, and electronic school enrollment
applications on her own laptop, and on laptops and computers located in each of Carr's
residences, often times when she sat outside and smoked. Carr's wireless internet was used
during the DOC searches and electronic FAFSA and school application submissions. Diaz was
also present and would assist in the various processes done to receive FSA in the names of
inmates. Carr's daughter, Ayanna, was present and saw what was going on but she was usually
playing. Ayanna was not involved.

Diaz was legitimately enrolled and attending college during this timeframe. Green, who was not
employed, was also enrolled and attending college at Gateway Community College, where she
eventually received her degree in criminal justice.

After 2012, when Thomas moved in with Carr in Arizona, things got weird between Carr and
Green. Green began doing more of the student loans on her own. Carr did not submit near the
amount that was submitted by Green. Green wanted to do it herself because she said Carr kept
messing up.

After the search warrant in 2012, Carr and Green ceased communicating with one another for a
long period of time.  Carr has her own business where she creates caricature shirts. The last
time she spoke with Green was almost a year ago when she created a shirt for one of Green's
sons.

Carr's friend, La Tania Pickens, allowed Thomas to use her rental property address at 1418
Rushmore Drive in Colorado Springs for his parole address. Thomas has a way of getting

Case No. 1:16-cr-00054-WJM-Document 525-1 Filed 12/12/19 USDC Colorado pg 892 of
971
Case 1:16-cr-00054-WJM Document 373-1 Filed 04/10/18 Page 5 of 12

people to do stuff for him. Pickens resided at 1418 Rushmore at various times but Carr could
not recall the exact dates. Thomas briefly resided in Pickens garage at 1418 Rushmore.
Thomas stayed at other places and also resided at an apartment on 3820 Radiant Drive in
Colorado Springs, Colorado.

Pickens was not aware this address was being used for the mailing of debit cards in the names
of prison inmates. The mailbox was located at the end of the street. Carr and Thomas would
drive-by and pick up student inmate mail from the mailbox. The mailman delivered any and all
names to this address.

There was a period of two to three days when Carr knew the Higher One debit card would be
delivered. Once the school application was accepted, the student received an email letting them
know that a green Higher One envelope would be arriving in the mail. This envelope contained
the debit card.

Carr was aware of inmate Robert Pickens. Carr conducted the DOC query in the name Pickens
and chose this name because she wanted to make sure the card was delivered to the mail box.
Carr thought this card was initially rejected or returned by the postal service.

Prior to moving to Arizona, Carr resided at 2441 Lexington Village Lane, Colorado Springs,
Colorado. Her friend, Michelle Grant (aka Michaela) resided at 2372 Lexington Village Lane,
Colorado Springs, Colorado. Carr asked Grant to help forward her mail to Arizona. Carr still had
the key to her old mailbox.

The postal service would only deliver the last name Grant so they had to use inmates with the
last name of Grant at this address. Grant never checked her mailbox. The mailboxes were
located in a central area and the backside of the boxes could be removed. Carr, Diaz, Green,
and/or Thomas removed the back side of the mailbox on their trips to Colorado and obtained the
mail in the inmates' names.

During the 2010 timeframe and prior to Thomas' arrest, Thomas asked Carr to query social
security numbers and he would assist in the retrieval of student mail. Carr does not know if he
knew how to complete and submit an electronic FAFSA. Both Thomas and Sanders resided at
3820 Radiant Drive, Colorado Springs, Colorado. Carr saw Sanders' signature in the notarized
documents provided to PPCC.

Green obtained her own addresses to use. Carr confirmed the Blackhawk address was her
step-brother, Matthew Sander's residence. Diaz was responsible for opening private post office
boxes and using the Dragoon and 724 W. Knox Court addresses. The Pleasant or Kaibab
addresses were never used to receive any school or Higher One information.

People were directed to send the school mail or Higher One debit card to Carr's private mail box
address at 975 E. Riggs Road in Chandler, Arizona. Thomas directed Kimmisha Mullett to send
debit cards that she received to the private mail box address. Carr does not know about the
Oakland Street address in Aurora, Colorado.

Mullett and Thomas had a business together. The business was called 911 Design and Printing.
Carr had nothing to do with the business and never met Mullett. Carr later said she may have
met Mullett on one or two occasions. Mullett and Thomas shared text messages between each
other about where to send the Higher One mail because Mullett's address was used to receive
student loan mail in the names of inmates.

Interview of Heather Carr, November 3, 2016                                    12-080234

Michael Cox, Thomas' cousin, resided at the Rice Drive address in Colorado Springs, Colorado. Carr hates Cox and does not speak to him. Carr believes Thomas and Cox talked about the scheme with each other.

Carr was not aware that Arizona addresses were being used to apply for FSA to attend school at PPCC. It was her understanding that this could not be done and that is why they used the mailing addresses in Colorado. In seeing the discovery, the Arizona addresses were new to Carr.

Once the Higher One cards were forwarded to Arizona, Diaz and Green would get people they knew to drive around and withdraw money from the debit cards at various ATM locations until all of the funds were withdrawn from the debit cards. Initially, they did it themselves but it became exhausting because there was a daily withdrawal limit on the debit cards. Diaz and Green would get half of whatever amount was on the debit card.

The cards were used primarily to withdraw funds but there were occasions when the cards were used for purchases. When a purchase was made, they requested additional cash back on the transaction. Thomas and Carr were also involved in withdrawing funds from the debit cards at various ATM and store locations. The bulk of the funds were split between Carr, Diaz, Green, and Thomas. A fee of usually $10 was paid to the "meth-heads" that drove around to the various ATM machines.

Thomas did not reside in Arizona until approximately February 2012. Thomas visited the 1351 Pleasant address on his trips to Arizona but he never resided there. In 2012, Carr moved from the 1351 Pleasant address to 1822 E. Kaibab. Carr and her children resided at the 1822 E. Kaibab address for approximately two weeks prior to Thomas coming to Arizona and moving in with them.

During Thomas' incarceration between approximately January 2011 through November 2011, Thomas was aware of the scheme. Carr and Thomas' conversations about the scheme were limited due to the possibility of his jail calls being recorded. Carr used FSA funds obtained in the names of inmates to pay for Thomas' legal fees. Approximately $10,000 in FSA funds were used to pay for Thomas' attorney. Carr also deposited FSA funds into Thomas' inmate trust account (commissary). It would be a fair assessment that Carr submitted more than ten FAFSA's, considering this money was used to pay for Thomas' attorney fees.

In discussing the Tempe Police car stop, Thomas admitted to Carr that he was seeing another girl. The girl threatened to call Carr at 1:00 a.m. and tell her about Thomas' cheating. The girl had the debit cards and laptop at her house so Thomas went to the girl's house to retrieve these items. On his way home from the girl's house, Thomas was pulled over with the laptop and debit cards. Thomas was driving a vehicle registered to Carr. Thomas used the vehicle, not Carr.

Carr could not find a logical reason why he would still have cards from a long time ago. Higher One mailed the debit cards prior to the disbursement of any FSA funds. In seeing the discovery, Carr noted that some of the cards were never activated. Carr does not understand why someone would have kept a card that was not activated. Green kept the majority of the debit cards and she owned a pink laptop at one time. Carr wondered if that is why her relationship with Green became awkward, because Green and Thomas were messing around with each other.

The four of them took part in filling out the various loan documents for the schools. Diaz was primarily responsible for taking these student loan records to various locations where they could

893
MOI_00000255

be faxed to the school, such as the FedEx location. They also had the "meth-head people"
assist with this. There were times with Green personally hand delivered the documents to the
school.

The four of them took part in the electronic submission of school enrollment applications in the
names of various inmates.

Carr has no idea how school loan records were faxed to PPCC from a Wells Fargo location.
Carr has never worked in a Wells Fargo branch building. She either worked from home or at a
leased building while employed with Wells Fargo.

The social security number searches in LexisNexis were only done by Carr.

Prior to 2012, Carr personally saw Diaz and Green fill out documents but she never personally
saw Thomas submit FAFSA's or fill out loan records for the school. She would be able to verify
his handwriting if shown documents.

In 2012, Thomas wanted more money when he was released. When Thomas resided with Carr
in 2012, he submitted FAFSA's and did coursework to ensure FSA funds were released. Carr
recalled him saying he had a psychology paper due. The four of them knew they had to show
attendance in order for funds to be released. Thomas was also involved in the submission of
handwritten loan records to the school and the withdrawing of FSA funds from ATM locations.
Carr knew he did this but she was never with him when he did it. Carr admitted that Thomas
was involved.

Carr worked all day and did not have a lot of time to spend on the scheme. They all
communicated amongst each other about coursework and the four of them took part in logging
in to record attendance. Carr volunteered to do coursework that she was interested in.
Specifically, Carr recalls Green complaining about having four essays due. One was a
psychology assignment about Freud. Carr volunteered to complete that assignment.

The four of them enrolled in courses that interested them. Green, having a degree in criminal
justice, chose a lot of criminal justice courses.

At this point during the meeting, Carr was provided a copy of the search warrant sketch. Carr
annotated what the various rooms identified in the sketch were (Attachment A).

The day the search warrant was executed, Carr was asleep on the couch. At first, Carr thought
her daughter, who was getting ready for school, was playing her music too loud. Carr knew that
law enforcement was outside because they were shining lights on the house. Initially, Carr was
not sure if law enforcement was trying to come in their house. A canine cop resided across the
street from them. Carr went to brush her teeth and put on makeup, knowing she would need to
go outside. She went upstairs to look out the window and flash bang devices were heard in the
backyard.

During this timeframe, she went to her office where she had a notebook with information related
to the inmates' school information written down. Rather than shedding the records in the
shredder she had in her office, she tore the pieces and flushed them down the toilet in the
master bathroom. She did this because she envisioned agents spending hours piecing together
the shredded records. She flushed approximately three pages of information.

The information contained in the notebook was for organizational purposes. It was a checklist
used to keep track of the status of FAFSA's, school applications, and homework. Sometime

MOI_00000256

during all of this Thomas came up the stairs. She does not know what he was doing during this timeframe.

Carr does not know why Thomas broke his cell phone. It was an old phone that he was not using. Thomas was downstairs for a portion of the time that Carr was upstairs. Thomas later told Carr that he broke the phone because he did not want Carr to find out about other "bitches."

Initially, Carr did not manage the organization of the inmates' school information. She just started doing that right before the search warrant was executed, once the school's fall semester started.

After Thomas's arrest and the search warrant, Carr and Green became distant. Carr assumed Green was jealous of Carr's relationship with Thomas and the lifestyle they were living. Carr wondered if Green and Thomas were having an affair. Carr thinks Green kept the debit cards and that the pink laptop belonged to Green.

At the time of Thomas' arrest, Thomas told Tempe PD arresting officers that marijuana located in the vehicle belonged to Carr's daughter, Ayanna. When told this, Carr responded that Ayanna did not use marijuana but Thomas did. Marijuana was never used in front of the children. Green used marijuana.

Carr related the following in reviewing photos taken during the search warrant and photos obtained from seized computers (Attachment B):

| | |
|---|---|
| SW_00001436: | The photo was 1822 E. Kaibab |
| SW_00000218: | Carr purchased the mural located in the master bedroom. She got the idea from a Jay-Z song. |
| SW_00000214: | The ACER laptop in the photo was her daughter's Milani. The iPad tablet was her other daughter's Kaira. Green always lost stuff, including her computers. Green used the ACER laptop and other computer devices at Carr's residence. The ACER laptop was used to activate inmate debit cards, including Higher One debit cards. There was the probability that any one of the four of them (Carr, Diaz, Green, and Thomas) could have used the ACER laptop to do this. |
| SW_00000216: | This was a photo of Thomas' office and his computer. |
| SW_00000217: | The photo was a close-up of the computer in Thomas' office. Carr did not use this computer because Thomas would not give her the password. The computer's profile login ID was King. |
| SW_00000223: | Carr confirmed these were the torn notes she tried flushing down the toilet. |
| SW_00000219: | The broken phone was Thomas' old phone located in his portion of the master bedroom closet. Thomas had a box of miscellaneous items he brought with him when he moved from Colorado. There were other old phones in the box. |
| SW_00000220: | Carr confirmed the close-up photo of the broken phone was Thomas'. |

Case No. 1:16-cr-00054-WJM Document 525 filed 12/11/19 USDC Colorado pg 896 of
971

SW_00000244:    The disks in the photo were from Thomas' dismissed case. Carr did not
know who the phone in the photo belonged to. The photo was taken in
the master bedroom vanity area.

SW_00000233:    The phone in the photo was Carr's work phone. The photo was taken in
one of the restrooms.

SW_00000230:    The iPad and iPod in the photo belonged to Carr's daughter, Ayanna.

SW_00000231:    Carr did not know who the phone in the photo belonged to. They had a lot
of phones in the house that were no longer used. Carr confirmed the
phone was located on a couch in Ayana's bedroom.

SW_00000232:    The laptop was her daughter's, Kaira.

SW_00000236:    The Kindle was located in one of the bedrooms and it belonged to one of
Carr's daughters.

SW_00000237:    Carr did not know who the phone in the photo belonged to.

SW_00000234:    The laptop was her daughter's, Ayanna.

SW_00000226:    This was a photo of Carr's office, with her computer and her Wells Fargo
work laptop.

SW_00000227:    This was a photo of Carr's computer in her office.

SW_00000246:    This was a close-up photo of Carr's computer in her office. Carr did not
know the profile name created for this computer. This computer and the
computer in Thomas' were the same brand and type of computer.

SW_00000228:    This was a close-up phot of Carr's Wells Fargo work laptop.

SW_00000238:    This was an iPad and BlackBerry located in Carr's vehicle. She did not
know who they belonged to. They had so many Apple devices and
phones in the residence. To say that they all used them is a fair
statement.

SW_00000245:    This was a photo of Carr's step-brother, Matthew Sanders and Thomas.

SW_00000205-213: These were photos of Heather Carr's gun. Carr has always owned a
gun because she was a victim of a home invasion. The gun was
registered in her name. She used to go to "ladies night" at the shooting
range. Thomas never went to the ranges with her and he did not access
the gun.

Following Thomas's arrest with the debit cards and laptop, Carr was troubled enough to get rid
of an old computer of hers. The computer was one she had while residing at the 1351 Pleasant
address. She destroyed the laptop and threw it away in a dumpster. Carr was concerned
because Thomas used the 1351 Pleasant address for his parole in Arizona.

MOI_00000258

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/19 USDC Colorado pg 897 of
971
Case 1:16-cr-00054-WJM Document 373 filed 04/20/18 Page 10 of 12

The four of them continued to apply for FSA in the names of inmates following Thomas' arrest. Thomas minimized the arrest and did not make a big deal of it.

The night of the search warrant, Carr went to Green's house to discuss what happened. Green was very dismissive and did not want to discuss what happened. She did mention that people came to her house to talk to her. She told Carr that these people took her kids to school while she was interviewed. She did not want to talk about any details of the interview. Green did not want her Aunt Hazel to find out what happened. Green tried cutting ties with Carr after the search warrant. Approximately a year after the search warrant, Green tried to be friends with Carr. During this timeframe, Carr removed her Facebook profile for a while, and she and Green were Facebook friends.

Carr found out Diaz was arrested the day of the search warrant. Carr was trying to get a hold of Diaz after agents left her residence. She eventually went to Diaz's house. Diaz's roommate was upset because Diaz owed her money and she could not be located. After making a few phone calls, Carr learned Diaz was arrested.

Carr did not recall how some of the names and numbers ended up on her iPad contact list. In reviewing the discovery, she did not believe she had as many contacts as the iPad contact list indicated. She is not sure how iCloud works but she thinks a lot of those contacts are left over from items backed up to iCloud. For example, there was a contact she had in there from 2007, Akeimi. Akeimi is Green's friend. Carr cannot stand Akeimi because Carr claimed that Akeimi hates white people. The last time she spoke with Akeimi is when Green was arrested in Los Angeles, California.

Thomas told Carr to never get rid of Christine Duncan's, Vanessa Lopez', or Ismael Omar's social security numbers so she stored them in her iPad contact list. She does not know why Thomas wanted to keep this information.

Carr had Roderick Smith's social security number in her iPad because she was his power of attorney at one time. Carr did not know why she had Green's social security number stored in her iPad.

Carr does not know why Michael Cox's Chase credit card number was in her iPad contact list. She does not like him.

Carr never contacted the schools and pretended to be one of the students. She does not think anyone did that. They (Carr, Diaz, Green, and Thomas) made inmate queries on the DOC websites.

In reviewing SW_00001427, a document titled "Adams County Jail Population Sheet" that was located on Carr's computer, Carr did not know how this document was located on her computer. She is not familiar with Denver County jail websites, she only queried DOC websites. Carr assumed this was booking information that was pulled from an Adams County website. Thomas might have asked Carr to look up one of his friends that was recently released from jail. Carr could not recall his name. Carr is not aware of anyone using her computer. Thomas and Carr's computers were purchased approximately a week before the search warrant.

Carr met Terrell Smith once. He was a pimp and she did not know him.

Case 1:16-cr-00054-WJM Document 473 Filed 04/10/18 Page 11 of 12

The screen shots from Chandler-Gilbert Community College were from Ayanna's husband. He was attending Chandler-Gilbert and did his course work while at their house. A review of the course login screenshot information shows that the courses listed had prerequisites. They did not enroll inmates in courses that had prerequisites.

Carr is not afraid of Thomas. She believes Thomas is capable of being intimidating because he protected her step-brother while he was in prison. Carr and Thomas never married. They were together from approximately 2009 through 2012 and again in 2014, when they went to San Diego but ended their relationship shortly after the trip.

After Carr left Arizona, Thomas moved his wife, Lola Thomas, down to Arizona.

Carr never met Christine Duncan. Duncan used Carr's identity when Duncan was arrested with Thomas at a hotel in 2011. A police report from January 2011 stated that Carr was present during the arrest. Duncan told law enforcement that she was Heather Carr. Duncan and Thomas commited robberies together.

Carr knew Duncan's name because Thomas told her about signing up Duncan up for school. He asked Carr to save Duncan's social security number. Carr knew they were arrested together and that the two committed robberies together. Duncan was a "meth head." Until seeing the discovery, Carr was not aware that Diaz and Green were involved with Duncan.

One time Carr saw Duncan in a car with Diaz at a gas station. That was the only time Carr saw Duncan. Carr recalled asking Diaz who was with her. Diaz told Carr she was a friend visiting from Colorado. Diaz did not give Carr a name. Carr did not get involved with Diaz's meth life.

Carr knew nothing about Vanessa Lopez. Thomas knew her.

Thomas was evasive about a lot of things. He was a whore who had a crafty way of telling stories. There was an overwhelming amount of stuff that he lied about. If it were not for their kids, she would tell him to "fuck off."

Currently, Carr runs her own business selling t-shirts and is an Uber driver. It is difficult to make ends meet. Carr texts Thomas asking him to send money and he responds by saying that he will see what he can do.

Carr confirmed the number tied to "Daddy" in her iPad contact list belonged to Thomas. Carr confirmed the "Rocketmail" email address belonged to Thomas.

At times, Thomas was a family person and they did things as a family. All four names of Carr's children are tattooed on Thomas. None of this is fair to the kids. Thomas has only seen his kids approximately ten times since 2012. He has been to see the kids in Virginia once. Thomas was there for the birth of their son, Tru. He has seen his son approximately three times. There is a whole other side to Thomas.

Carr confirmed the Blackhawk address in the scheme belonged to her step-brother, Matthew Sanders. Carr did not keep in touch with Sanders. She may have met him once while at the airport in Denver.

Case No. 1:16-cr-00054-WJM Document 525-3 filed 12/12/19 USDC Colorado pg 899 of
971
Case 1:16-cr-00054-WJM Document 373-1 Filed 04/10/18 Page 12 of 12

Interview of Heather Carr, November 3, 2016                                    12-080234

Carr assumed Sanders knew about the scheme because debit cards were mailed to her private
mail box on Riggs road. The cards arrived without the green envelope that they were originally
sent in. There were a lot of cards coming from different addresses.

Carr did not know an address belonging to Sander's mother was used. Carr does not talk with
Sander's mother. She knows her name is Sandy. Carr had nothing to do with the use of this
address to obtain FSA.

Marcy Green used to have a pink laptop. Carr never used the laptop that was with Thomas the
night that he was arrested.

899
MOI_00000261

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM-02

UNITED STATES OF AMERICA

      Plaintiff,

v.

2. TRAMMEL THOMAS,

      Defendant.

---

## GOVERNMENT'S MOTION TO RESTRICT DOCUMENT

---

      The United States of America, by and through United States Attorney Robert C. Troyer and the undersigned Assistant United States Attorneys, respectfully moves to restrict a document, any order revealing the contents of that document, and the brief filed in support of this motion, for the reasons stated in the brief filed in support of this motion. The United States requests a "Level 2" Restriction which would make the document, any order revealing the contents of that document and the brief filed in support of this motion, "viewable by Selected Parties & Court" only.

Case 1:16-cr-00054-WJM Document 375 Filed 04/13/18 Page 2 of 2

Respectfully submitted,

*s/ Martha A. Paluch*
Martha A. Paluch
Bryan D. Fields
Assistant U.S. Attorneys
United States Attorney's Office
1801 California Street, Suite 1600
Denver, CO   80202
(303) 454-0100
Martha.paluch@usdoj.gov
Bryan.fields3@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on this 13th day of April, 2018, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system that will send notification of such

filing to **the following counsel only:**

Mary Butterton
Counsel for Heather Carr
mary_butterton@fd.org

Daniel T. Smith
Thomas E. Goodreid
Counsel for Tramell Thomas
danieltsmith4582@gmail.com
t.goodreid@comcast.net

2

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 902 of
Case 1:16-cr-00054-WJM Document 375-1 Filed 04/13/18 Page 1 of 1
971

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No: 16-cr-00054-WJM-02

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2. TRAMMEL THOMAS,

      Defendant.

---

## ORDER TO RESTRICT DOCUMENT

---

      This matter is before the Court on the Government's Motion to Restrict Document.

Upon consideration and for good cause shown,

      IT IS ORDERED that said Document, the United States' Brief in Support of Motion

to Restrict Document, as well as any order revealing the contents of that document, are

hereby restricted until further order by the Court.

      IT IS ORDERED that said Document, the United States' Brief in Support of Motion

to Restrict Document, as well as any order revealing the contents of that document, are

hereby at a "Level 2 Restriction" and will be "viewable by selected parties & court" only.

      IT IS SO ORDERED on this _____ day of April, 2018.

                             _____
                             THE HONORABLE JUDGE WILLIAM J. MARTINEZ
                             UNITED STATES DISTRICT COURT
                             DISTRICT OF COLORADO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM

UNITED STATES OF AMERICA,

       Plaintiff,

v.

**2.  TRAMMEL THOMAS**

       Defendant

---

## DEFENDANT THOMAS'S UNOPPOSED MOTION REQUESTING PERMISSION TO FILE AN ADDITIONAL UNOPPOSED OBJECTION TO PRESENTENCE INVESTIGATION REPORT

---

Comes now the Defendant, Tramell Thomas, and requests permission from this Court to file an additional objection to the Presentence Investigation Report which objection is unopposed by the Government.  As grounds therefore, the Defendant states as follows:

1.  On March 8, 2018 at Docket #340, the Probation Department filed the initial Presentence Investigation Report.  On March 22, 2018, the Defendant filed his objections thereto at Docket #348.

2. The Defendant's sentencing hearing has been continued by the Court *sua sponte* to August 9, 2018.

3. Assistant United States Attorney Martha Paluch, has authorized counsel to state to this Court, that the government has no objection to the Defendant's filing this request to file an additional objection.

4. In its Presentence Investigation Report, the Probation Office at Paragraph 90, found that a 2 point adjustment to the criminal offense level pursuant to the United States Sentencing Guidelines should apply. See USSG 2B1.1(b)(2)(A)(i) (the fraud involved more that 10 victims).

5. The Probation Office also recommended that 4 points be added to the criminal offense level based upon USSG 3A1.(1)(b)(1) and (2). (the victims of the fraud were vulnerable and there were a large number of vulnerable victims)

6. At the time the Defendant filed his objections to the Presentence Investigation Report, counsel was unaware of any valid objection to the adjustment for more than 10 victims, if an adjustment was also made under the vulnerable victim section of the sentencing guidelines.

7. At the sentencing hearing of co-defendant Green on April 11, 2018, the Defendant requested and the government did not object to the 2 point adjustment being withdrawn under USSG 2B1.1(b)(2)(A)(i) since 4 points were being assessed under 3.A1.1(b)(1) and (2).

8. This Court granted the Defendant's request and did not assess the 2 points for more than 10 victims in the fraud.

9. The Defendant submits that the same situation exists with Mr. Thomas as it did with Ms. Green. The government shares this opinion, as Assistant United States Attorney Paluch has again authorized counsel to state to this Court that the government does not object to this request by the Defendant.

10. The Defendant also suggests to the Court, that having ruled as stated above in paragraphs 7 and 8, that the Court has established the "law of the case". See *U.S. v. Gonzales-Sanchez* 329 Fed Appx 802 (10th Cir. 2009).

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 905 of
Case 1:16-cr-00054-WJM Document 387 Filed 04/18/18 Page 3 of 3
971

Wherefore, the Defendant Requests that the Court allow the filing of this motion, requesting permission to file an additional objection to the Presentence Investigation Report, as well as the additional objection.

Dated this 18th day of, April, 2018

Daniel T. Smith Attorney at Law

s/ Daniel T. Smith
Daniel T. Smith
4582 S. Ulster St. #1400
Denver, Colorado 80237
Telephone: 303 860 8100
Fax: 303 860 8018
danieltsmith@qwestoffice.net

Thomas E. Goodreid
1801 Broadway #1400
Denver, Colorado 80202
Telephone: 303 296 2048
Email: t.goodreid@comcast.net

Attorneys for Tramell Thomas

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 18, 2018 the foregoing **DEFENDANT THOMAS'S UNOPPOSED MOTION REQUESTING PERMISSION TO FILE AN ADDITIONAL UNOPPOSED OBJECTION TO PRESENTENCE REPORT** was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all counsel of record.

s/ Daniel T. Smith

Case No. 1:16-cr-00054-WJM   Document 525-1   filed 12/12/19   USDC Colorado   pg 906 of
971
Case 1:16-cr-00054-WJM   Document 396   Filed 04/20/18   Page 1 of 3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

2.  **TRAMMEL THOMAS**

        Defendant

---

## DEFENDANT THOMAS'S UNOPPOSED SECOND OBJECTION TO PRESENTENCE INVESTIGATION REPORT

---

      Comes now the Defendant Tramell Thomas, by and through his attorneys, Daniel T. Smith and Thomas E. Goodreid, and submits the following objection to a specific recommendation in the Presentence Investigation Report.

1.  Pursuant to this Court's Order found at docket #388, the Defendant submits his objection to a specific recommendation found in the Presentence Investigation Report docket #340.

2.  At paragraph 90 of the Presentence Investigation report, the Probation Office recommends a 2 point adjustment in the criminal offense level pursuant to USSG 2B1.1(b)(2)(A)(i), a fraud involving more than 10 victims.

3.  The Presentence Investigation Report also recommends at paragraphs 92 and 93, that an additional 4 points be added to the criminal offense level because the fraud involved a large number of vulnerable victims. See USSG 3A1.1(b)(1) & (2).

4.  The Defendant submits that adding 2 points to the criminal offense level for more than 10 victims of the fraud as well as 2 more points for

a large number of vulnerable victims must be considered as double counting.

5. At the sentencing of the co-defendant Green on April 11, 2018, her counsel argued against the Court assessing 2 points under each guideline as referenced in paragraphs 2 and 3 above. The government represented by Assistant United States Attorney Paluch did not object to that request by Defendant Green.

6. This Court then found that both adjustments should not be assessed and as such did not assess points under USSG 2B1.1(b)(2)(A)(i).

7. It is submitted that as to this issue in sentencing for the Defendant Thomas, the issues the Court faced in the co-defendant Green's sentencing are identical. The Fraud charged is the same as to each Defendant, and the number of victims is the same.

8. The Defendant contends that the Court's ruling on the issue in Green's sentencing establishes the law of the case. See *U.S. v. Gonzales-Sanchez* 329 Fed Appx 802 (10th Cir. 2009).

9. Assistant United States Attorney Paluch has authorized defense counsel to state to this Court, that the government does not object to the Defendant's request in this motion.

Dated this 20th day of April, 2018.

Daniel T. Smith Attorney at Law

s/ Daniel T. Smith
Daniel T. Smith
4582 S. Ulster St. #1400
Denver, Colorado 80237
Telephone: 303 860 8100
Fax: 303 860 8018
danieltsmith@qwestoffice.net

Thomas E. Goddreid
1801 Broadway #1400
Denver, Co. 80202

Telephone: 303 296 2048
Email: t.goodreid@comcast.net

Attorneys for Tramell Thomas

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 20, 2018 the foregoing **DEFENDANT THOMAS'S UNOPPOSED SECOND OBJECTION TO PRESENTENCE INVESTIGATION REPORT** was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all counsel of record.

s/ Daniel T. Smith

Case 1:16-cr-00054-WJM Document 395 Filed 04/27/18 Page 1 of 24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge William J. Martínez**

Criminal Case No. 16-cr-054-WJM

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

**2.**    **TRAMMELL THOMAS**,

       Defendant.

---

## ORDER DENYING MOTION FOR NEW TRIAL

---

In this federal financial aid fraud case, Defendant Trammell Thomas ("Thomas")
was charged with conspiracy to defraud the United States Department of Education
("DOE"). On November 30, 2017, he was convicted by a jury. (ECF No. 233.) Now
before the Court is Thomas's Motion For a New Trial, which argues the Government
withheld or suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).
(ECF No. 358.) As explained below, Defendant has not shown that material evidence
was suppressed, and therefore the Motion is denied.

## II. BACKGROUND

Thomas was charged in this case, along with three co-defendants, including
Heather Carr ("Carr"), Marcelle Green ("Green") and Mercedes Diaz ("Diaz"), with
conspiracy to defraud the government, 18 U.S.C. § 286, specifically DOE, along with
related counts of aiding and abetting mail fraud. (*See generally* ECF No. 131.) In
summary, the fraud scheme for which all four Defendants now stand convicted

Case No. 1:16-cr-00054-WJM-Document 525-1 filed 12/12/17 USDC Colorado pg 910 of
Case 1:16-cr-00054-WJM Document 395 Filed 04/27/18 Page 2 of 24
971

involved submitting falsified federal student financial aid applications (*i.e.*, "FAFSAs")
and related community college enrollment paperwork in the names of incarcerated
prisoners, without their knowledge or consent.  The Defendants provided various
mailing addresses they controlled or could access, so that when student aid funds were
disbursed by means of debit cards issued in the names of inmates whose identities
Defendants had stolen, the Defendants could collect those debit cards from the
addresses they had provided and withdraw the disbursed federal financial aid funds for
their own use.  The Defendants also took various steps to maintain the illusion that the
inmates were enrolled in a community college and were benefitting from the financial
aid funds, by nominally registering the inmates for courses and then completing online
tests and homework.

This scheme was carried out from roughly August 2010 through October 2012.
During much of that time, Thomas and co-Defendant Carr were in a romantic
relationship and living together.  However, Thomas was jailed on unrelated charges in
El Paso County, Colorado, from January to November 2011.

After being indicted, Carr, Green, and Diaz all entered guilty pleas.  Carr and
Green both agreed to cooperate with the Government as witnesses.  Carr had a proffer
interview with the Government in November 2016, and then several telephone
interviews in October–November 2017, in advance of Thomas's trial.  DOE's lead
investigator, Special Agent Sandra Ennis, documented the contents of these interviews
in written reports, which were disclosed to Thomas.  (ECF No. 373-1 (the "2016 Ennis
Report") and ECF No. 358-1 (the "2017 Ennis Report").)  As reported by Special Agent
Ennis, Carr provided substantial information to the Government regarding the operation

2

of the fraud scheme, including the participation of each of the charged co-conspirators.

Thomas proceeded to trial on November 27–30, 2017. On the first day of trial, the Government, Defendant, and the Court, all expected Carr to testify during the Government's case in chief. She was endorsed in the Government's final witness list, and in its opening statement the Government promised the jury it would "pull back the curtains on [the] conspiracy. . . . because the defendant's most trusted co-conspirator, Heather Carr, has agreed to testify," and that Carr's testimony would "explain to [the jury] exactly how the scheme worked."[1]

However, on the morning of the second day of trial, the Government informed Defendant and the Court that Carr had changed her mind about testifying, had "no intention of coming into court [that day]," and would not be abiding by the terms of her cooperation agreement. Thomas represents (and the Government does not dispute) that before trial the parties agreed that all witnesses endorsed by the Government would be under subpoena, thus, in Thomas's view, "obviat[ing] the need for [Thomas] to subpoena any person who was on the Government's witness list." (ECF No. 358 at 2.) However, although the Government had arranged for Carr to travel from Virginia to Colorado to testify (and although she evidently *did* fly to Colorado on the first day of trial), the Government had not placed her under a subpoena. So far as the Court is aware, Thomas made no attempt to subpoena Carr or call her as a defense witness, and in any event she did not testify. Nevertheless, Thomas was convicted on all

---

[1] Although a complete trial transcript has not been docketed, references and quotations from portions of the trial record rely on the Court reporter's draft transcript, to which the Court has access, as well as the Court's own recollection of and notes taken during the trial.

Case No. 1:16-cr-00054-WJM-Document 525-1 filed 12/12/17 USDC Colorado pg 912 of
971
Case 1:16-cr-00054-WJM Document 395 Filed 04/27/18 Page 4 of 14

counts, in part based on the testimony of co-Defendant Green.

When Carr appeared for her sentencing, on January 4, 2018, she addressed on
the record her reasons for deciding not to testify, as part of her allocution, and
addressing her failure to comply with the cooperation terms of her plea agreement.  In
part, Carr reported that during one of her 2017 telephone interviews with the
Government before trial, one of the prosecutors became frustrated with what he
perceived as inconsistencies with, or recantations from, her earlier statements
regarding Thomas's involvement in the fraud scheme, and that the prosecutor then
began "yelling at" Carr, and threatened to "rip up" her plea agreement and to "send her
to prison" for a lengthy sentence.  (*See* ECF No. 358-2 ¶ 4.)  Per Carr's account, this
led her own attorney to terminate the interview, and also to an apology from the
Government and the representation that Carr would no longer deal with that
prosecutor.[2]

Given Carr's statements at sentencing, Thomas's lawyers contacted her (through
her attorney), and ultimately spoke with her about her interviews with the Government.
They then prepared an affidavit, signed by Carr, setting out her account of statements
she made to the Government during her pretrial interviews.  (ECF No. 358-2.)
Thomas's present Motion argues, based on Carr's affidavit, that she made statements
to the Government that were helpful to Thomas but that the Government did not include
in the 2016 and 2017 Ennis Reports, allegedly in violated of the Government's

_____

[2] The Court summarizes Carr's allegations to present the facts and context prompting
Thomas's Motion.  The Government's Response does not dispute Carr's account, but it is not
material to resolution of the present Motion.  The Court takes no view on whether Carr's
allegations are disputed, nor does it attempt to resolve any factual disputes that do exist.

4

disclosure obligations under *Brady*.

## II. LEGAL STANDARDS

### A. Rule 33

Rule 33(a) of the Federal Rules of Criminal Procedure provides that, "[u]pon the

defendant's motion, the court may vacate any judgment and grant a new trial if the

interest of justice so requires." "[I]n deciding a motion for new trial, the court may weigh

the evidence and consider the credibility of witnesses in determining whether the verdict

is contrary to the weight of the evidence such that a miscarriage of justice may have

occurred." *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994) (internal quotation

marks and citation omitted). "The Court's broad discretion empowers it to grant relief

based not only on the sufficiency *vel non* of the evidence at trial but on any other

circumstance that might render the trial 'essentially unfair,' including trial errors." *United

States v. D'Amelio*, 636 F. Supp. 2d 234, 238 (S.D.N.Y. 2009). However, "[d]istrict

courts view motions for new trials with disfavor." *United States v. Lamy*, 521 F.3d 1257,

1266 (10th Cir. 2008). "[T]he authority to grant a new trial should be exercised

sparingly and with caution." *United States v. Sturdivant*, 513 F.3d 795, 802 (8th Cir.

2008).

### B. New Trial on *Brady* Grounds

Under *Brady*, "[d]ue process mandates disclosure by the prosecution of all

evidence that favors the defendant and is 'material either to guilt or punishment.'"

*United States v. Velarde*, 485 F.3d 553, 558–59 (10th Cir. 2007) (internal quotation

marks omitted). "A defendant who seeks a new trial under Rule 33 based on an

5

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 914 of
971
Case 1:16-cr-00054-WJM Document 395 Filed 04/27/18 Page 6 of 14

alleged *Brady* violation must show that (1) the prosecution suppressed evidence, (2) the

evidence was favorable to the defendant, and (3) the evidence was material." *Id.* at

558 (internal quotation marks omitted). The Tenth Circuit has observed that it is

"easier to meet" this three-part standard where a defendant claims that evidence was

suppressed than where the request for a new trial is based on "evidence merely newly

discovered." *See United States v. Redcorn]*, 528 F.3d 727, 743 (10th Cir. 2008); *see*

*also United States v. Torres*, 569 F.3d 1277, 1281 (10th Cir. 2009) ("If these three

factors are satisfied, regardless of the prosecution's intentions in suppressing the

evidence, a new trial is justified.").

The test of materiality is whether there is "a reasonable probability that the result

of the proceeding would have been different had the evidence been disclosed." *United*

*States v. Reese*, 745 F.3d 1075, 1083 (10th Cir. 2014). "A reasonable probability

means the 'likelihood of a different result is great enough to undermine confidence in

the outcome.'" *Id.* (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)). "Put another way,"

the Court is to ask "whether the absence of the withheld evidence at trial shakes [its]

confidence in the guilty verdict." *Reese*, 745 F.3d at 1083 (internal quotation marks

omitted). The Court determines materiality after reviewing the record as a whole. *Id.*

The focus is not on the Government's intentions or culpability, but on *Brady's* purpose,

"not to punish the misdeeds of the prosecutor, but to avoid an unfair trial." *Id.*

### III. ANALYSIS

Thomas's Motion latches onto a number of statements included in Carr's present

affidavit, arguing information helpful to his defense was provided to the Government but

6

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 915 of
971
Case 1:16-cr-00054-WJM Document 395 Filed 04/27/18 Page 7 of 24

not fairly disclosed by the Ennis Reports, in violation of *Brady*. (ECF No. 358 at 5–6.)
However, reviewing each of the factual points raised by Thomas in turn, in the Court's
judgment none presents a *Brady* violation or warrants a new trial.

*First*, Carr's affidavit states she had four interviews with the Government in 2017,
not three, as reflected in Ennis's 2017 Report. (ECF No. 358 at 5.) The Government
states there were, in fact, four interviews, but that the fourth interview was for final
preparation of trial testimony, arguing it was not obligated to disclose a trial outline of
the questions it planned to ask Carr on direct examination. (ECF No. 373 at 8.)
Defendant makes no showing of how the fact that this fourth trial preparation meeting
occurred would have been helpful to his defense or is material for *Brady* purposes, and
does not claim this requires a new trial.

*Second,* Thomas points to the claim in Carr's affidavit that she never saw
Thomas fill out a FAFSA form. (ECF No. 358 at 5; ECF No. 358-2 ¶ 4.) But this fact
*was* plainly disclosed before trial. Ennis's 2016 Report clearly stated that Carr "never
personally saw Thomas submit FAFSA's [*sic*] or fill out loan records" (ECF No. 373-1 at
4), but also that Thomas "was . . . involved in the submission of handwritten loan
records," and "withdrawing of FSA funds from ATM[s]" (*id.* at 7). The 2017 Ennis
Report likewise stated that Carr knew "Thomas was involved with submitting FAFSAs,"
although "she never personally saw him submit FAFSAs." (ECF No. 358-1 at 4.)
Because this information was not suppressed, and in fact had been plainly disclosed on
at least two prior occasions, there has been no *Brady* violation. Thomas's
misrepresentation of the record is not well taken.

Case No. 1:16-cr-00054-WJM-2 Document 525-1 filed 12/12/17 USDC Colorado pg 916 of 971
Case 1:16-cr-00054-WJM Document 356 Filed 04/27/18 Page 8 of 24
971

*Third*, Carr's affidavit states that she "told the prosecutors . . . that Thomas had never threatened her." (ECF No. 358 at 5; ECF No. 358-2 ¶ 6.) But no allegations of such threats were part of Thomas's trial, nor would it have been relevant or admissible as to any element of the fraud and conspiracy charges on which he was convicted. Even if such a statement had been suppressed (and the Court is unpersuaded that is the case), it is not material, since facts irrelevant to any of the elements of Thomas's charges and conviction could have no likelihood of changing the result in a new trial.

*Fourth*, Thomas points to Carr's claim that she told the Government that she, Diaz, and Green were the "main participants" in the fraud scheme, as opposed to Thomas. Initially, the Court sees no true inconsistency between this general characterization and the statements recorded and disclosed in the Ennis Reports regarding the specific acts taken by each of the conspirators, including Thomas. It is, at a minimum, debatable that Carr's characterization of the "main participants" constitutes "undisclosed" information, given the extensive disclosure of specific facts regarding each of the Defendants' actual conduct. In any event, her view of the "main" participants is not material, since again, it does nothing to undermine Thomas's conviction on the basis of his specific actions, proved by the evidence at trial. No charge on which Thomas was convicted required a showing that he was a "main" participant, and Carr's mere *opinion* on this question does nothing to undermine the Court's confidence in Thomas's conviction as *one* of the willing participants in the charged fraud conspiracy.

*Fifth*, Carr's affidavit claims Green "assisted [Carr] by picking up student loan related mail in the state of Colorado." (ECF No. 358-2 ¶ 9.a.) The Court once again

8

Case No. 1:16-cr-00054-WJM-Document 525-1 filed 12/12/17 USDC Colorado pg 917 of
Case 1:16-cr-00054-WJM Document 395 Filed 04/27/18 Page 9 of 24
971

rejects Thomas's contention that this constitutes undisclosed information, since the

2016 Ennis Report clearly disclosed that "Carr, Diaz, Green, and/or Thomas" took trips

to Colorado to retrieve fraud-related mail delivered in inmates' names.  (ECF No. 373-1

at 5.)[3]

*Sixth*, Carr's affidavit states that Green "regularly and continually" used a car

registered to Carr in 2011 and 2012, and Thomas argues this information was not

disclosed.  The evidence at trial was that Thomas also used this car, that he was

stopped while driving it on August 30, 2012, and that 52 debit cards issued in inmates'

names were seized from the car during that traffic stop.  These cards were important

evidence in the Government's case, and Thomas argues that Green's use of the same

car might have led the jury to believe that Green, not Thomas, was responsible for the

debit cards.

But such an argument fails to acknowledge that the evidence introduced at trial

showed not only that these 52 debit cards were in the car, but that one of the cards was

in Thomas's wallet.  And, this argument also totally ignores trial evidence in the form of

an audio recording of the traffic stop, which showed that Thomas made a failed attempt

to hide the cards from police, that he was evasive in answering questions about why he

had them, but never claimed they were not his or pled ignorance of them.  Further,

according to the 2016 Ennis Report, Carr had told the Government that on the night of

---

[3] Thomas's Motion again misrepresents the record, claiming Carr specified that Green had "participated in collecting *money* in Colorado," although the affidavit signed by Carr does not say this.  (*Compare* ECF No. 358 at 5 (emphasis added) *with* ECF No. 358-2 ¶ 9.a.)  The several exaggerations and mischaracterizations of the record made in Thomas's Motion serve only to highlight how thin his factual argument truly is.

9

the stop, Thomas had used the vehicle specifically for the purpose of retrieving the debit cards.[4]  Thus, to the extent there was any non-disclosure regarding Green's use of the car, it was not material.  The Court sees zero likelihood that this information would have undermined the far stronger incriminating evidence directly and unambiguously connecting Thomas to the debit cards.  There is no reasonable probability that this information concerning Green's unrelated use of the vehicle in question would have altered the outcome of trial.

*Seventh,* Carr's affidavit claims she "was not present nor . . . a witness to any type of criminal activity occurring in Colorado Springs . . . in January of 2011."  (ECF No. 358-2 ¶ 9.e.)  The Court rejects the claim that this constitutes undisclosed information, since it refers back to an incident specifically discussed by the 2016 Ennis Report, reflecting Carr's belief that another person used Carr's name as an alias in Colorado Springs in January 2011, during alleged criminal conduct that led to Thomas's arrest and detention in El Paso County.  But in any event, these events were not part of the evidence at trial, nor relevant to any charge on which Thomas was convicted, and therefore are not material under a *Brady* analysis.

*Eighth*, Carr's affidavit states Thomas "did not provide the address on Radiant Drive [in Colorado Springs] for use in the student loan fraud," referring to one of the addresses the conspirators used to receive debit cards.  (ECF No. 358-2 ¶ 9.b.)  But, it

---

[4] *See* ECF No. 373-1 at 6 ("In discussing the Tempe Police car stop, Thomas admitted to Carr that he was seeing another girl.  The girl threatened to call Carr at 1:00 a.m. and tell her about Thomas' cheating.  The girl had the debit cards and laptop at her house so Thomas went to the girl's house to retrieve these items.  On his way home from the girl's house, Thomas was pulled over with the laptop and debit cards.  Thomas was driving a vehicle registered to Carr. Thomas used the vehicle, not Carr.").

remains true that Carr told the Government that Thomas resided at that address (ECF No. 373-1 at 5), a fact that was also established by other testimony at trial. Thomas's conviction did not rest on a showing that he "provided" this address, but on strong evidence that he was associated with multiple addresses to which debit cards were mailed, and that he took other acts to advance the conspiracy. As to the Radiant Drive address, the evidence at trial showed that numerous fraudulent debit cards were mailed to that address, including cards found in Thomas's possession during the August 2012 traffic stop. Thus, even taken at face value, when viewed in the context of the evidence as a whole, the Court easily concludes that there is no "reasonable probability" that Carr's conclusory statement that Thomas did not "provide" this single specific address would have altered the outcome at trial. *See Reese*, 745 F.3d at 1083.

*Ninth*, and lastly, Carr's affidavit claims she told the Government that Thomas "did not participate in the loan scheme nor knowingly benefit from the scheme while he was incarcerated . . . . from approximately late January of 2011 through early November of 2011." (ECF No. 358-2 ¶ 9.c.) This statement echoes a central theme of Thomas's defense, which argued that he could not be culpable for any activity during this time period.

Again, however, Carr's conclusory affidavit falls short of showing that any material evidence was withheld by the Government. Even if Carr's statement had been presented at trial there is, in the Court's view, no likelihood it would have avoided Thomas's conviction on any counts. Initially, given Carr's repeated reports to the Government to the effect that Thomas "lies so much it sickens [her]" (*see* ECF No. 373-1 at 2–3), that he was unfaithful to her, and that he hid facts from her at virtually every

11

turn, there is little reason a jury would have credited Carr as having complete (let alone accurate) knowledge of what Thomas was or was not doing while he was incarcerated in Colorado and she was residing in Arizona.

Moreover, even if this statement were disclosed as-is, it would have been presented at trial alongside Carr's unrecanted statements that Thomas *did* benefit from the conspiracy during this time period, when Carr used fraud proceeds to pay his legal bills and to fund his inmate commissary account, and that the two of them continued speaking about the ongoing fraud scheme, using code words to discuss it while Thomas was in jail. The Court therefore again sees no likelihood that disclosure of Carr's vague statement regarding Thomas's conduct in 2011 would have changed the result at trial. This is particularly true for the conspiracy conviction (Count 1), since the Government needed only to prove some affirmative act taken by Thomas between August 2010 and October 2012, and there was introduced at trial strong evidence which implicated Thomas *after* his release in November 2011, including being caught with the debit cards in August 2012.

As for his convictions for aiding and abetting mail fraud in Counts 2–5, while the charged dates fell during the period of Thomas's incarceration, these dates also correspond to when DOE's debit card provider, Higher One, mailed the cards to addresses used by the conspirators. The fact that Thomas was in jail when Higher One mailed the cards does not undermine the jury's conviction on the aiding and abetting charges, because these convictions did not rest on Thomas himself mailing the debit cards on the specified dates, but rather on actions taken by Thomas beforehand, which in turn led Higher One to mail the debit cards, namely, participating in submitting

12

fraudulent financial aid applications and providing fraudulent addresses. Thomas was ultimately found in possession of the cards that were mailed and which in turn related to each of these four counts. Thus, any nondisclosure of Carr's general statement that he did not "participate" in the scheme while in jail does not meaningfully undermine the Court's confidence in the convictions on these counts.

In sum, to the limited extent that Carr's present affidavit reflects information not disclosed in the Ennis Reports, as opposed to containing different wording of information that was disclosed, any such nondisclosure was not material. Reviewing the record as a whole, as required for the relevant *Brady* analysis, *Reese*, 745 F.3d at 1083, there is in the Court's view no reasonable probability that any of the allegedly undisclosed information would have altered the result at trial, and absolutely nothing in Carr's post-judgment affidavit alters the Court's confidence in Thomas's conviction, or in the fairness of his trial.

Finally, the Court notes that Thomas conspicuously does not request a hearing at which Carr could testify as to the matters set out in a vague, summary fashion in her affidavit, which was obviously written by Thomas's attorneys. Nor does Thomas seek a deposition of Carr, or any other means of obtaining her testimony under oath and subject to cross-examination.

Clearly, Carr's statements as set out in the attorney-written affidavit present the best possible version of the allegedly undisclosed facts for Thomas. But even taken at face value, Carr's affidavit does not present any undisclosed facts or information that warrant a new trial. It is also plain to the Court—having reviewed the affidavit and the Ennis Reports, presided at trial, and heard Carr's statements on the record at her

13

sentencing—that any hearing at which Carr were to testify and be subject to cross-examination would serve only to eviscerate her credibility as to any testimony or *post hoc* recantations offered in Thomas's favor, while drawing out in greater detail the far greater volume of incriminating facts reported by Carr and documented in detail in the Ennis reports.

Likewise, given the damning contents of those reports, which Carr does not now recant or contradict, there can be no contention that Thomas would have fared better at a trial where Carr had testified. This leaves the Court's confidence in the jury's convictions unshaken. Moreover, to the extent Thomas argues that he "could have called Carr as a defense witness . . . if the prosecution had adhered to its . . . agreement" to have her under subpoena (ECF No. 358 at 8 n.3), Thomas has presented no reason to take this suggestion seriously, much less to grant a new trial on this basis.

## IV. CONCLUSION

For the reasons set forth above, Defendant Thomas's Motion for New Trial (ECF No. 358) is DENIED.

Dated this 27th day of April, 2018.

BY THE COURT:

_____

William J. Martínez
United States District Judge

14

Case 1:16-cr-00054-WJM Document 407 Filed 05/11/18 Page 1 of 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 16-cr-00054-WJM-02

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.     TRAMMEL THOMAS,

      Defendant.

_____

**GOVERNMENT'S RESPONSE TO DEFENDANT TRAMELL THOMAS'S
SENTENCING STATEMENT AND REQUEST FOR A
SPECIFIC/VARIANT SENTENCE, ECF 353**

_____

      The United States of America, by and through United States Attorney Robert C.
Troyer and Assistant United States Attorneys Martha A. Paluch and Bryan D. Fields,
hereby responds to Defendant's Statement and Request for a Specific/Variant
Sentence, ECF 353, as follows:

      In paragraphs 5 through 18 of his pleading, the defendant repeats arguments he
raised in his objections to the presentence report, ECF 348, and/or in his motion for a
new trial, ECF 358. The government fully responded to these arguments in its
respective responses, and incorporates those responses herein. ECFs 357 and 373.

      The defendant submits that if he prevails on his objections to three
enhancements (loss calculation, obstruction of justice, and minor role reduction) his
base offense level is 25. With a criminal history category of IV, his advisory guideline
range would be 84 to 105 months. ECF 353 at 6. The defendant then argues that

1

Case No. 1:16-cr-00054-WJM Document 532-1 filed 12/12/19 USDC Colorado pg 924 of
971
Case 1:16-cr-00054-WJM Document 407 Filed 05/11/18 Page 2 of 5

because the Court "has previously imposed sentences at the low end of the guideline

computation for co-defendants . . . the Court [should] do the same here and impose an

84-month sentence." *Id.*

This defendant, who went to trial, is not similarly situated to his three co-

defendants who all plead guilty to a lesser offense. Therefore, his suggestion that he

should be entitled to a sentence at the low end of the advisory guideline range, without

more, should be rejected outright.

The defendant next argues, without citing to any case law in support of his

argument, that were the Court to impose a sentence of 151 months as recommended

by the Probation Department, such a sentence would create a "glaring" disparity

between this defendant and his co-defendants. *Id.* The defendant is wrong as a matter

of fact and law.

The facts are as follows: This defendant was convicted of all charges in which

he was named: Count 1, conspiring to defraud the government with respect to claims,

and Counts 2-7, aiding and abetting mail fraud. The base offense level for mail fraud is

7, as compared to 6 for the conspiracy conviction, to which his co-defendants pled. The

defendant is not entitled to the three-level reduction in his offense level for acceptance

of responsibility that the Court afforded to the defendant's co-defendants. In addition,

this defendant is not deserving of a role reduction, but *is* deserving of a two-level

enhancement for obstruction of justice as set forth in the presentence report and as

argued by the government in its response to the defendant's objections. ECFs 355 at

17 and 357 at 3, 5-8. These six additional points, along with the defendant's criminal

history category of IV, accounts for the difference between his advisory guideline range
and that of his co-defendants.

As a matter of law, 18 U.S.C. § 3553(a)(6) directs the district court to consider
the "need to avoid unwarranted sentence disparities among defendants with similar
records who have been found guilty of similar conduct." The Tenth Circuit has
explained that "the purpose of the guidelines is to 'eliminate disparities [in sentencing]
nationwide . . . not to eliminate disparity between co-defendants." *United States v.
Gallegos,* 129 F.3d 1140, 1143 (10th Cir. 1997) (citation omitted). Therefore, while a
district court "may consider sentencing disparities between codefendants," *United
States v. Zapata,* 546 F.3d 1179, 1194 (10th Cir. 2008), it is not mandated to do so.
*United States v. Smart,* 518 F.3d 800, 804 (10th Cir. 2008).

Sentencing disparity between co-defendants is an impermissible basis for
departure when the disparity is explained by the facts of the case. *United States v.
Contreras,* 108 F.3d 1255, 1271 (10th Cir. 1997) (*Contreras I*) ("while similar offenders
engaged in similar conduct should be sentenced equivalently, disparate sentences are
allowed where the disparity is explicable by the facts on the record"). The Tenth Circuit
has repeatedly held that a defendant convicted at trial is not similarly situated to his co-
defendant(s) who pled guilty to different charges. In *United States* v. *Contreras,* 180
F.3d 1204 (10th Cir. 1999) (*Contreras II),* the Court found that the district court abused
its discretion in granting the defendant's motion for a downward departure in order to
avoid an unwarranted disparity between the defendant, who went to trial and "was
convicted by a jury of four separate offenses, while [his co-defendant], pled guilty to one

3

offense." *Id.* at 1207. The Court held that given these distinctions, "any disparity in their

sentences was not 'unwarranted.'" *Id.* at 1210; *Gallegos*, 129 F.3d at 1144 ("a

departure based on a disparity between co-defendants is not justified when sentences

are dissimilar because of a plea bargain").

　　　　The disparity between this defendant's guideline range and that of his co-

defendants is explained by the facts of case, and therefore, the defendant's claim that a

higher sentence for him would result in an unwarranted sentencing disparity must be

denied.

### Conclusion

　　　　For the reasons set forth above, defendant's request for a variant sentence

should be denied.

　　　　　　　　DATED this 11th day of May, 2018.

　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　ROBERT C. TROYER
　　　　　　　　　　　　United States Attorney

　　　　　　　　　　　　By: s/ *Martha A. Paluch*_____
　　　　　　　　　　　　MARTHA A. PALUCH
　　　　　　　　　　　　BRYAN DAVID FIELDS
　　　　　　　　　　　　Assistant United States Attorneys
　　　　　　　　　　　　1801 California Street, Suite 1600
　　　　　　　　　　　　Denver, CO 80202
　　　　　　　　　　　　Telephone 303-454-0100
　　　　　　　　　　　　Facsimile 303-454-0402
　　　　　　　　　　　　martha.paluch@usdoj.gov
　　　　　　　　　　　　bryan.fields3@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on this 11th day of May, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to all counsel of record in this case.

s/ *Martha A. Paluch*
MARTHA A. PALUCH
BRYAN DAVID FIELDS
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov
bryan.fields3@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM-02

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.     TRAMMEL THOMAS,

      Defendant.

_____

### GOVERNMENT'S SUPPLEMENTAL SENTENCING STATEMENT
_____

The United States of America, by and through United States Attorney Robert C. Troyer and Assistant United States Attorneys Martha A. Paluch and Bryan D. Fields, submit this Supplemental Sentencing Statement in advance of the August 8, 2018 sentencing hearing scheduled in this case.

**The defendant should receive a two-level enhancement to his sentencing guideline range pursuant to U.S.S.G. § 3C1.2, Reckless Endangerment During Flight**

On March 5, 2018, Magistrate Judge Nina Y. Wang issued a warrant for the arrest of the defendant due to his failure to comply with the conditions of his post-conviction release. ECF 369. Given that the defendant was being supervised by the Arizona probation office, it should have been relatively easy to find the defendant and bring him to court. The Deputy U.S. Marshals (DUSMs) assigned to take the defendant into custody should have been able to go to the address the defendant reported to his probation officer as his residence or his place of employment to take him into custody.

1

Better still, if this was a defendant who really intended to face the consequences of his actions, he would peacefully have surrendered to anyone presenting themselves with a warrant for his arrest.

That's not what happened. After the warrant issued, the defendant ignored calls from his probation officer. The Marshals interviewed the defendant's former wife, Lola Thomas, in an effort to find the defendant. Ms. Thomas stated she didn't know where the defendant was. As a result, the Marshals then had to stake out the defendant's likely locations for hours for the next month. Figuring out where the defendant might be by trying to find out what car he was driving was also not an easy task. The defendant was driving a rental car. Finally, when the Marshals *did* find the defendant, living with his girlfriend, he refused to submit to their authority. Instead, when the Marshals approached his girlfriend outside and asked her to open the front door, she ran inside and shut the door.

What followed was a siege of several hours in which the defendant --- who was ultimately found inside of the house --- refused to do the right thing and turn himself over. Eventually, Marshals saw through a garage window that the attic hatch entrance was removed. That's when the Marshals used bean bag rounds fired from a shotgun-like device to break the windows of the residence, and a remaining window was "raked" or busted out. The windows were broken to allow for direct communication into the house and for the deployment of pepper spray into the house in an effort to get the occupants to leave the residence. That didn't work. The defendant's girlfriend sustained a cut above her eye from the flying glass. At that point, she came out of the

2

residence. The defendant did not. The Marshals were required to obtain a body warrant to enter the home and enlisted assistance from the Glendale SWAT team in order to remove the defendant from the home. Four hours after this ordeal began, the SWAT team found the defendant hiding in a bedroom. *See* ECF No. 405 (attaching documents and exhibits admitted during detention proceedings).

DUSM Joe Faranda will testify at the sentencing hearing as to the substantial risk of death or serious bodily injury to another person (namely, the defendant's girlfriend and law enforcement) caused by the defendant resisting arrest. Pepper gas, bean bags, window rakers, and a SWAT team were necessary to secure the defendant's arrest. The defendant's conduct also created a substantial risk of death or serious bodily injury to the SWAT team members who went into the home to retrieve an individual previously convicted of aggravated robbery and three counts of using a weapon in a violent crime. These SWAT members had every reason to believe that this defendant might be armed. The defendant's conduct also created substantial risk of death or serious bodily injury to the Marshals who unsuccessfully attempted to get the defendant to vacate the residence. *Cf. United States v. McDonald*, 521 F.3d 975, 979 (8th Cir. 2008) (noting that "heightened risk of physical injury" was created simply as a result of the defendant's actions requiring officers to enter defendant's residence "with force to arrest him").

Case No. 1:16-cr-00054-WJM-1    Document 528    filed 12/12/19    USDC Colorado    pg 931 of
Case 1:16-cr-00054-WJM    Document 485    Filed 07/24/18    Page 4 of 9
971

Specifically, DUSM Faranda will testify that the bean bags, known as Super
Sock, contain a warning label that states, "Shots to the head, neck, thorax, heart, or
spine can result in fatal or serious injury."[1]

### The defendant's conduct in resisting arrest supports a two-level enhancement pursuant to U.S.S.G. § 3C1.2

Section 3C1.2 provides that "[i]f the defendant recklessly created a substantial
risk of death or serious bodily injury to another person in the course of fleeing from a
law enforcement officer, increase by 2 levels."  Application Note 3 to this provision
explains that the phrase "during flight" is to be "construed broadly and includes
preparation for flight.  Therefore, this adjustment also is applicable where the conduct
occurs in the course of resisting arrest."  § 3C1.2 App. N. 3.

It is this last phrase that renders the enhancement applicable here.  The
defendant resisted arrest when the Marshals were attempting to take him into custody
for violating the conditions of his post-conviction release pending sentencing for the
offense of conviction.  Therefore, the government submits that § 1B1.3's requirement
that Chapter Three enhancements be based upon acts or omissions, *inter alia,* "that
occurred in the course of attempting to avoid detection **or responsibility** for that
offense" has been met.  (Emphasis added).

Any argument that the defendant's resisting arrest post-conviction is not
sufficiently connected to the offense of conviction is refuted by Tenth Circuit law.  The
Court "has never required a nexus under § 3C1.2" between the reckless conduct at

---

[1] A redacted version of this label was provided to defense counsel.

issue and the offense of conviction. *United States v. Davidson,* 283 F. App'x 612, 614 (10th Cir. 2008). Specifically, the *Davidson* Court stated that "we rejected the argument that the reckless endangerment must occur during the flight to avoid arrest for the particular offense of conviction." *Id.* at 614 (citation omitted). "Instead the enhancement is simply part of the relevant conduct a district court may consider under § 1B1.3 in determining the appropriate offense level and criminal history." *Id.*

In two cases, the Tenth Circuit affirmed application of this enhancement in situations where the defendants were involved in high-speed chases, holding that the defendants engaged in serious conduct that endangered anyone who happened to be along those streets. *See United States v. Cano-Bahena,* 713 F. App'x 753, 761-62 (10th Cir. 2017) (in 'fleeing from law enforcement and attempting to evade law enforcement, [the defendant] did engage in very serious behavior that placed anyone along those residential streets at risk of death or serious bodily injury"); *United States v. Gray,* 512 F. App'x 803, 808 (10th Cir. 2013) (noting that while Tenth Circuit does not require nexus between reckless endangerment and offense of conviction, such nexus did exist between the defendant's crime of conviction and his high speed chase, thereby affirming application of the § 3C1.2 enhancement); *see also United States v. Maldonado,* No. CR 14-4061 JB, 2018 WL 344957, at *7 (D.N.M. Jan. 9, 2018) (finding unpublished Tenth Circuit opinions "which consistently reject a nexus requirement" to be persuasive, and finding that the defendant's "high-speed chase is relevant conduct under § 1B1.3," and therefore, applying "a 2-level enhancement under § 3C1.2").

5

The facts of this case, the guideline provisions, and corresponding case law,
make clear that this two-level enhancement is warranted.

**Revised Guideline Calculation**

At sentencing, the government will argue that the following guideline calculation applies:

The base offense level is 7 because the defendant was convicted of mail fraud, which
carries a maximum sentence of twenty years imprisonment, U.S.S.G. § 2B1.1(a)(1);

+14 levels as a result of the defendant's intent to cause losses of more than $550,000
but less than $1.5 million, U.S.S.G. § 2B1.1(b)(1)(H);

+2 levels because the defendant stole identities to get other identification cards,
U.S.S.G. § 2B1.1(b)(11)(C)(i)-(ii);

+2 more levels because the defendant chose prison inmates, vulnerable in their
captivity, as his victims, U.S.S.G § 3A1.1(b)(1); *United States v. Pierre*, 825 F.3d 1183 (11th
Cir. 2016);

+2 more levels because the defendant was not content with just a few vulnerable
victims and, instead, participated in a scheme to victimize hundreds of inmates, U.S.S.G. §
3A1.1(b)(2);[2]

---

[2] The court agreed with co-defendant Green's counsel that applying an enhancement for
the fact there were 10 or more victims, pursuant to U.S.S.G. §2B1.1(b)(2)(A)(i), was essentially double-
counting given that the offense level is increased by four levels due to the fact the scheme targeted a
large number of vulnerable victims. *See* ECF 390. Therefore, the government did not include these
two levels in this calculation.

6

Case No. 1:16-cr-00054-WJM Document 528-1 filed 12/12/19 USDC Colorado pg 934 of
Case 1:16-cr-00054-WJM Document 448 Filed 07/24/18 Page 7 of 9
971

+2 more levels because the defendant tried to obstruct justice by 1) destroying evidence on his cell phone; 2) reaching out to potential witnesses in violation of the terms of his pretrial release; 3) post-conviction false statements and pretenses regarding his residence; and 4) post-conviction false statements regarding his employment.  U.S.S.G. § 3C1.1.

+2 more levels because of the defendant's reckless endangerment during flight.

The defendant has not accepted responsibility for this offense and should receive no related decrease.  The total offense level is therefore 31.

The probation office calculated the defendant's criminal history as Category IV.  ECF 340, p. 23, ¶ 107.  At offense level 31, the guidelines recommend that the defendant be imprisoned between 151-188 months.  The government will recommend that the Court impose a sentence of 180 months in prison, followed by a three-year term of supervised release.  In addition, the government will request that the Court impose the loss, restitution, and forfeiture amounts as set forth in its Position Statement, ECF 341.

**Government Witnesses**

As stated in prior pleadings, the government will call Special Agent Sandra Ennis to testify at the sentencing hearing to explain her calculation of the loss, restitution and forfeiture amounts due from this defendant.  Detective James Lamberth from the Colorado Springs Police Department will be called to testify as to the circumstances surround the defendant's arrest in the armed robbery/pimping case.  Finally, DUSM Joseph Faranda will be called to

testify as to the circumstances surrounding the defendant's arrest after the SWAT standoff and

the circumstances of that event that warrant the application of § 3C1.2.[3]

DATED this 24th day of July, 2018.

Respectfully submitted,

ROBERT C. TROYER
United States Attorney

By:    s/ Martha A. Paluch
MARTHA A. PALUCH
BRYAN DAVID FIELDS
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov
bryan.fields3@usdoj.gov

---

[3] Defense counsel were made aware of the expected testimony from Agent Ennis and Detective Lamberth in prior pleadings, see ECF 324, 341. They were also provided notice via email of all three expected government witnesses on July 6, 2018.

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/19 USDC Colorado pg 936 of
971
Case 1:16-cr-00054-WJM Document 455 Filed 07/24/18 Page 9 of 9

**CERTIFICATE OF SERVICE**

I certify that on this 24th day of July, 2018, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system that will send notification of such filing

to all counsel of record in this case.

s/ *Martha A. Paluch*
MARTHA A. PALUCH
BRYAN DAVID FIELDS
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov
bryan.fields3@usdoj.gov

9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No.  16-cr-00054-WJM-02

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.     TRAMMEL THOMAS,

      Defendant.

_____

## GOVERNMENT'S SENTENCING EXHIBIT LIST
_____

The United States of America, by and through United States Attorney Robert C. Troyer and Assistant United States Attorneys Martha A. Paluch and Bryan D. Fields, submits the attached Exhibit List in anticipation of the sentencing hearing in this matter, scheduled for August 8, 2018.

As the court is aware, defense counsel is away on a pre-planned trip.  As a result, the government has been unable to meet and confer with defense counsel as to whether there will be any objections to the admissibility of the listed exhibits.  However, because this a sentencing hearing, the rules of evidence do not apply and the Court may admit any non-privileged exhibits it finds helpful in making its sentencing decision. 18 U.S.C. § 3661 (codifying rule that no limitation can be placed on information court

1

may consider for purposes of sentencing); Fed. R. Evid. 1101(d)(3) (stating that rules of evidence do not apply at sentencing).

DATED this 1st day of August, 2018.

Respectfully submitted,

ROBERT C. TROYER
United States Attorney

By:    s/ *Bryan David Fields*
BRYAN DAVID FIELDS
MARTHA A. PALUCH
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov
bryan.fields3@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on this 1st day of August, 2018, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system that will send notification of such

filing to all counsel of record in this case.

s/ *Bryan David Fields*
BRYAN DAVID FIELDS
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
bryan.fields3@usdoj.gov

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/18 USDC Colorado pg 940 of
971
Case 1:16-cr-00054-WJM Document 448 Filed 08/01/18 USDC Colorado pg 1 of 1

**LIST OF PROPOSED EXHIBITS FOR SENTENCING**

CASE NO.   16-cr-00054-WJM         PLAINTIFF'S LIST   X    DEFENDANT'S LIST_____         THIRD PTY DEFTS. LIST_____

CASE CAPTION     United States_____         vs.        Trammel Thomas_____         PAGE NO._____         DATE   August 8, 2018_____

LIST PLAINTIFF'S EXHIBITS BY NUMBERS (1, 2, 3, etc.) and DEFENDANT'S BY LETTER (A, B, C, etc.)

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | Bates Range | COMMENTS/ INFO. | COUNT(S) |
|---|---|---|---|---|---|---|---|---|---|---|
| GS- 1 | Ennis | Excerpt of Text Messages | | | | | | SW_00001078 | | |
| GS- 2 | Ennis | Check from H. Carr to Griffin Law Firm | | | | | | CMB_00000145 | | |
| GS- 3 | Ennis | El Paso County Jail Records | | | | | | INV_00001758-INV_00001760 | | |
| GS- 4 | Ennis | Arizona Department of Corrections Records | | | | | | INV_00001947-INV_00001953 | | |
| GS-5 | Faranda | Photo of Shattered Glass | | | | | | PHOTO_00000042 | | |
| GS-6 | Faranda | Photo of Bean Bag Ammunition Box | | | | | | | | |
| GS-7 | Lamberth | Photo of Motel 6 - Front | | | | | | | | |
| GS-8 | Lamberth | Photo of Motel 6 - Back | | | | | | | | |
| GS 72-1 | Ennis | Loss Amount Summary Chart | | | | | | Attachment 4 to ECF 341 | | |
| GS 72-2 | Ennis | Forfeiture Amount Summary Chart | | | | | | Attachment 5 to ECF 341 | | |

1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No.  16-cr-00054-WJM-02

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.     TRAMMEL THOMAS,

      Defendant.

_____

## GOVERNMENT'S SENTENCING WITNESS LIST
_____

The United States of America, by and through United States Attorney Robert C. Troyer and Assistant United States Attorneys Martha A. Paluch and Bryan D. Fields, submits the attached Witness List in anticipation of the sentencing hearing in this matter, scheduled for August 8, 2018.

As the court is aware, defense counsel is away on a pre-planned trip.  As a result, the government has been unable to meet and confer with defense counsel to

determine the estimated amount of time for cross-examination. Defense Counsel has

not previously notified the government of any anticipated defense witnesses.

DATED this 1st day of August, 2018.

Respectfully submitted,

ROBERT C. TROYER
United States Attorney

By:     s/ Bryan David Fields
BRYAN DAVID FIELDS
MARTHA A. PALUCH
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov
bryan.fields3@usdoj.gov

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/89 USDC Colorado pg 943 of
Case 1:16-cr-00054-WJM Document 442 Filed 08/01/18 Page 3 of 3
971

**CERTIFICATE OF SERVICE**

I certify that on this 1st day of August, 2018, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system that will send notification of such

filing to all counsel of record in this case.

s/ Bryan David Fields
BRYAN DAVID FIELDS
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
bryan.fields3@usdoj.gov

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/18 USDC Colorado pg 944 of
Case 1:16-cr-00054-WJM Document 442-1 Filed 08/01/18 Page 1 of 1
971

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Case No. __16-cr-00054-WJM_____          Date ___August 8, 2018___

Case Title _____United States v. Trammel Thomas_____

_____Plaintiff_____  SENTENCING WITNESS LIST
(Plaintiff / Defendant)

| WITNESS | PROPOSED LENGTH OF TESTIMONY | | | | | |
|---|---|---|---|---|---|---|
| Sandra Ennis | Direct: | 60 minutes | Cross: | Unknown | Total: | Unknown |
| James Lamberth | Direct: | 45minutes | Cross: | Unknown | Total: | Unknown |
| Joseph Faranda | Direct: | 30 minutes | Cross: | Unknown | Total: | Unknown |

**Total Direct:  135 minutes ( 2 ¼ hours)    Total Cross:  Unknown**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No.  16-cr-00054-WJM-02

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.     TRAMMEL THOMAS,

      Defendant.

_____

**GOVERNMENT'S AMENDED SENTENCING EXHIBIT LIST**
_____

The United States of America, by and through United States Attorney Robert C. Troyer and Assistant United States Attorneys Martha A. Paluch and Bryan D. Fields, submits the attached Amended Exhibit List in anticipation of the sentencing hearing in this matter, scheduled for August 8, 2018.

The Amended Exhibit List adds two exhibits:  photographs of the broken cell phone found in the center console of the defendant's vehicle when he was pulled over

after leaving the scene of a prostitution sting. These photographs were obtained by the government today and immediately provided to defense counsel.

DATED this 3rd day of August, 2018.

Respectfully submitted,

ROBERT C. TROYER
United States Attorney

By:     s/ *Bryan David Fields*
BRYAN DAVID FIELDS
MARTHA A. PALUCH
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov
bryan.fields3@usdoj.gov

Case No. 1:16-cr-00054-WJM Document 525-1 filed 12/12/18 USDC Colorado pg 947 of
971
Case 1:16-cr-00054-WJM Document 448 Filed 08/03/18 Page 3 of 3

**CERTIFICATE OF SERVICE**

I certify that on this 3rd day of August, 2018, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system that will send notification of such

filing to all counsel of record in this case.

s/ *Bryan David Fields*
BRYAN DAVID FIELDS
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
bryan.fields3@usdoj.gov

**LIST OF PROPOSED EXHIBITS FOR SENTENCING**

CASE NO.\_\_16-cr-00054-WJM_____   PLAINTIFF'S LIST\_\_X\_\_   DEFENDANT'S LIST_____   THIRD PTY DEFTS. LIST\_\_\_\_\_

CASE CAPTION \_\_\_United States_____ vs. _____Trammel Thomas_____ PAGE NO.\_\_\_\_\_   DATE\_\_August 8, 2018_____

LIST PLAINTIFF'S EXHIBITS BY NUMBERS (1, 2, 3, etc.) and DEFENDANT'S BY LETTER (A, B, C, etc.)

| EXHIBIT NO. / LTR | WITNESS | DESCRIPTION | ADM / AUTH | STIP | OFFER | RECD. | REF. | Bates Range | COMMENTS/ INFO. | COUNT(S) |
|---|---|---|---|---|---|---|---|---|---|---|
| GS- 1 | Ennis | Excerpt of Text Messages | | | | | | SW_00001078 | | |
| GS- 2 | Ennis | Check from H. Carr to Griffin Law Firm | | | | | | CMB_00000145 | | |
| GS- 3 | Ennis | El Paso County Jail Records | | | | | | INV_00001758- INV_00001760 | | |
| GS- 4 | Ennis | Arizona Department of Corrections Records | | | | | | INV_00001947- INV_00001953 | | |
| GS-5 | Faranda | Photo of Shattered Glass | | | | | | PHOTO_00000042 | | |
| GS-6 | Faranda | Photo of Bean Bag Ammunition Box | | | | | | PHOTO_00000049 | | |
| GS-7 | Lamberth | Photo of Motel 6 - Front | | | | | | | | |
| GS-8 | Lamberth | Photo of Motel 6 - Back | | | | | | | | |
| GS-9 | Lamberth | Photo of Broken Hauwei phone- Front | | | | | | PHOTO_00000071 | | |
| GS-10 | Lamberth | Photo of Broken Hauwei phone- Back | | | | | | PHOTO_00000072 | | |
| GS 72-1 | Ennis | Loss Amount Summary Chart | | | | | | Attachment 4 to ECF 341 | | |

1

| GS 72-2 | Ennis | Forfeiture Amount Summary Chart | | | | | | Attachment 5 to ECF 341 | | |
|---------|-------|-----------------------------------|--|--|--|--|--|---------------------------|--|--|

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00054-WJM

UNITED STATES OF AMERICA,

       Plaintiff,

v.

**2.  TRAMMEL THOMAS**

       Defendant

---

### DEFENDANT'S RESPONSE TO GOVERNMENT'S SUPPLEMENTAL SENTENCING STATEMENT AND OBJECTION TO AMENDED PRESENTENCE REPORT

---

      Comes now the Defendant by and through his counsel, Daniel T. Smith and Thomas E. Goodreid, and pursuant to this Court's Order at docket # 440, submits the following response to the government's supplemental sentencing statement and objection to the amended presentence report.

1. On July 24, 2018 the government filed its supplemental sentencing statement at docket #435.
2. On July 25, 2018 the Probation Department filed its Amended Presentence report at docket # 437.
3. This Court Ordered the Defendant to file his response, by Monday August 6, 2018 at docket # 440.
4. Both the government in its supplemental pleading, and the Probation Department in the Amended Presentence Report at paragraph # 97 ask the Court to impose a 2 point adjustment in the Defendant's Offense Level pursuant to USSG 3C1.2

1

## FACTS

5. The government in prior Court hearings has provided the Defendant with 2 statements from Deputy United States Marshall (DUSM) Faranda concerning the arrest of the Defendant on March 30, 2018. From those statements it appears that law enforcement officers surrounded a residence where they believed the Defendant was living on March 30, 2018. After several hours a young lady exited the residence. This was after law enforcement had shot "less than lethal" beanbags into the residence as well as "less than lethal" pepper spray.

6. After the female had left the residence, law enforcement agents entered the home and arrested the Defendant. In reviewing DUSM Faranda's reports it appears that the Defendant put up no resistance and no questioning or statements were elicited from the Defendant at the time of his arrest. He was taken from the residence and detained in a federal detention facility in the Phoenix, Arizona metropolitan area.

## ARGUMENT

7. USSG 3C1.2 states: "If the Defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer,…". The Defendant submits that the language in this section requires action by the Defendant while he is fleeing law enforcement that creates the risk of death or serious bodily injury.

8. As one would expect, most of the cases that discuss this enhancement provision involve vehicle chase fact patterns. In *U. S. v. Scott* 131 f3d 1387 (10th Cir. 1997) the risk was created by the defendant leading law enforcement on a vehicle chase through populated areas at speeds reaching 100 mph. In *U. S. v. Wilfong* 475 f3d 1214 (10th Cir. 2007), the defendant and a cohort led law enforcement on a high speed chase all the

2

while attempting to rid themselves of evidence of their crime by throwing
objects from the speeding car.

9.  In the case *U. S. v. Gray* 512 Fed.Appx. 803 (10th Cir. 2013) the Court
makes clear that USSG 3C1.2 is designed to punish actions committed by
the Defendant.  The Court states at pg. 807 of the *Gray* opinion: "A
defendant acts recklessly for purposes of this enhancement when he 'was
aware of the risk created by his conduct and the risk was of such a nature
and degree that to disregard that risk constituted a gross deviation from
the standard of care that a reasonable person would exercise in such a
situation'".

10. Cases concerning this enhancement have also arisen which did not
involve car chases but still involved actions by a defendant that created
the dangerous situation.  In *U. S. v. Hampton* 100 Fed.Appx. 792 (10th Cir.
2004) the defendant ran from law enforcement, tried to force his way into
a residence and in so doing threw a firearm and ammunition into the
residence. The potential for death or serious bodily injury because of
these actions is obvious.

11. In *U. S. v. Brown* 314 f3d 1216 (10th Cir. 2003) a defendant while fleeing
law enforcement attempted to hide a gun in a water turn off hole. The
danger of the defendant's actions was increased because his efforts to
hide the gun was witnessed by several young children.  The Court noted
the potential dangers that the defendant created had the children
attempted to retrieve the weapon.

12. In *U. S. v. Simpson* 845 f3d 1039 (10th Cir. 2017) law enforcement
surrounded the defendant while he was sitting in his car. He ignored the
requests to get out of his car and surrender.  Instead, he started his car
and in reverse gear rammed a police vehicle parked behind him.  It was
not the defendant failing to surrender at the request of law enforcement
that warranted the enhancement, but rather his ramming the police
vehicle.

3

13. In the case at bar, the Defendant simply did not surrender to law enforcement when they so requested. At no time did the Defendant threaten law enforcement nor did he try to run from law enforcement. Rather, he remained in the residence and failed to respond to law enforcement's requests. Once law enforcement entered the home, the Defendant submitted to the arrest. At no time did he offer any resistance.

14. In this case, the Defendant was not fleeing any crime scene nor fleeing from any other scene. He was simply at his home and he chose to stay there. There is no evidence of threatening actions on the part of the Defendant nor any resistance when finally arrested.

15. The Defendant objects to the recommendation of the Probation Department in paragraph 97 which recommends a 2 point enhancement pursuant to USSG 3C1.2.

16. The Defendant requests that the Court deny the request by the government to assess the same adjustment against the Defendant as requested in its motion at docket # 435.

17. It is the understanding of counsel, that the government intends to put on evidence at the sentencing hearing for this Defendant on August 8, 2018. To the extent that such evidence goes beyond or contradicts the statements previously provided to the defense, the Defendant requests he be allowed to supplement this response at the hearing.

Dated this 6th  day of, August, 2018

Daniel T. Smith Attorney at Law

s/ Daniel T. Smith
Daniel T. Smith
4582 S. Ulster St. #1400
Denver, Colorado 80237
Telephone: 303 860 8100
Fax: 303 860 8018
danieltsmith@qwestoffice.net

Thomas E. Goodreid Attorney at Law

s/ Thomas E. Goodreid
Thomas E. Goodreid
1801 Broadway #1400
Denver, Co. 80202
Telephone: 303 296 2048
Fax: 303 292 0522
t.goodreid@comcast.net

Attorneys for Trammel Thomas

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 6,  2018 the foregoing **DEFENDANT'S RESPONSE TO GOVERNMENT'S SUPPLEMENTAL SENTENCING STATEMENT AND OBJECTION TO AMENDED PRESENTENCE REPORT**  was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all counsel of record.

s/ Daniel T. Smith

5

I.

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
8/6/2018
JEFFREY P. COLWELL, CLERK

RECEIVED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

AUG 06 2018

JEFFREY P. COLWELL
CLERK

Greetings Honorable Judge Martinez,

I pray that this letter reaches you in good spirits and the absolute best of health.

For so long I thought about and imagined what I would say if/when I finally had the opportunity to speak to you but it's as if I have been plagued with a case of writer's block. So after praying on what to say or how should I say this or that I decided that it would be best if I just wrote exactly what comes from my soul. No script or rehearsal. I did not go over this with my attorney nor did I have or going to have anyone proof read this letter before sending it out. I thought that by writing this letter in that manner it would provide somewhat of an intimate setting as if we were just two men conversating over a cup of coffee.

Your Honor, thank you in advance for allowing me the time to express who I am and I believe in as a man in my own words.

After the jury convicted me last November and you granted my request to remain free on pre trial services, I went back to the hotel and prayed knowing that everything happens for a reason. Then I got on my laptop and searched your name. Please, do not be alarmed sir. I just wanted to know more about the first judge that has ever defended me or even acknowledged that I wasn't just some knucklehead thug that only deserves to be in prison. That gesture actually gave me a sense of

pride that I still carry with me to this day.

During my search I learned that you were appointed by President Barack Obama and that you have roots from Chicago. My family also has roots stemming from Chicago. I don't mean to imply, but that discovery made me understand how/why you could see me as an individual rather than just a case number.

With that being said, I'm originally from Fort Wayne IN. I was raised by my mother who was a single parent of three. I'm the oldest with two younger sisters. Growing up we weren't poor but we struggled a great deal. Neither of our fathers were around so I grew up as the "man of the house" at a very young age. I do not have a lot of pleasant memories growing up. I just remember being so angry. Not until much later did I know where that anger derived from. As I got older I began to grow physically and I had the false pretense that that somehow made me a grown man so that obviously created conflict between my mother and I. My mother did the best she could but it's difficult for a woman to try to raise a man. She's only equipped to teach the boy what she feels a man should be. I did have a step dad for awhile and we all moved to Chicago. Things were good for awhile until they separated. Looking back I can see how that caused me to resent my mother even more than I had before. My step father was an alcoholic so I understood why she left him but I could not understand why no man wanted to attach his self to us. I felt that it was her fault that we

3.

weren't good enough. I would see my father every couple of years but no encounter that I could actually remember being significant. He and I did not reconnect until I became an adult but our relationship did not bloom until after my state prison stay. I was finally able to get a lot of things off of my chest that had built up for practically my entire life. Again, looking back that anger had resided in me that whole time. It was anger that I did not know even existed. It blocked me from learning who I was as an individual, what I wasn't, and what I could be.

I understand that I made my own decisions in life but it wasn't until my thirties was I able to identify why my decisions were based on the wrong way of thinking and why that needed to change. I tell the kids at the Boys & Girls Club that is called "stinking thinking."

In 2014 I decided to get saved and allow Jesus Christ into my life. That is when my anger really began to completely subside and my capacity to love began to expand. I declared that I would be a giver and not a taker!! My father and I patched everything up and we became the best of friends. He has been diagnosed with stage 4 liver disease. We're praying and we're hopeful. He's a strong man. My mother suffered a massive in 2009. She survived but she's unble to function on her own. It's been rough to say the least. My brother was killed in a house fire this past January.

4.

Your Honor, the government is out to make me the most evil man on planet earth. I can proudly say that that is the furthest thing from the truth. I enjoy being a good guy, a man of Christ, a loving father. I volunteer regularly at the Boys & Girls Club. In 2014 I helped launch a breast cancer awareness campaign with ABOYS and Susan G. Koman Foundation. I mentor at risk youths in the community. I created a Anti Drug program with a compounding pharmacy in Phoenix which allows patients access to a healthy alternative to traditional pain medication so that it can be used externally vs. orally. I did that to help counteract the opioid epidemic in Arizona with hopes of creating the same program here in Colorado. Over 1,700 people have lost their lives in Arizona due to overdose since June 2017! We ran these companies campaigns thru a company that I helped create called Multi Source Inc. I actually sit on the board of directors.

I've channelled my energy to not only changing lives but also saving lives. This transformation took place before the indictment. After I gave my life to the Lord I started walking down a new path. In doing so, I discovered what I was good at, and that is marketing. Knowing that every company needs a marketing arm in order to thrive and grow. I created a niche for myself in that arena. In the last four years we've marketed for companies such as

5.

National Energy, Solar Bear, Go Solar, Carefree Compounding, WestGate Compounding, just to name a few. I enjoy marketing products for clients that actually helps customers as well as the enviorment. I am very active in my kids lives and I have every intent on raising my son and teaching him how to be a man at an early age. Giving him the much needed love and attention that kids crave breaking the cycle of absent father that my father endured and the same cycle that I endured from my father.

Your honor, I admire you. You climbed your way up to where you wanted to be in life. I see other men that are well into their careers and I'm the same age as they are but the difference is I did not find what I was good at until after the age of 35, now I'm close to 40 facing a prison sentence. Where do I go from there is what I ask myself. The thought of that reality weighs very heavy on me. I've prayed about this numerous times in hopes of possibly finding some positivity from this ordeal.

Your honor prison is not my life anymore. I have a purpose for life now. I understand that we're at the sentencing phase of this and I ask that you sentence me within the other defendants' sentences. I did not agree with my attorneys on the 84 month variance. I'm extending my hand to you in the form of a handshake. I vow to make something good come from this. I'm asking you to join me sir. Allow me to continue to be a vessel for change in our communities

6.

I would absolutely cherish all feed back from a man such as your stature on what programs should be implemented in the community as well as how they should be structured. After my arrest in March I feel that it is imperative that I set up a program that teaches youths on how to be properly arrested. The fear of being shot as you surrender is a real fear in the community. At the time of my arrest Phoenix news repeatedly showed a man being shot in the head as he surrendered in a motel on Jan 16 2018. These are just some of the ways I would like to give back to the communities.

Your Honor, I did not want to make this letter about innocence or guilt, for I have been found guilty by jury trial.

I wanted to express who I am and I thank you for allowing me to do so.

Best Regards,

Case 1:16-cr-00054-WJM  Document 445  Filed 08/06/18  Page 7 of 7







Legal Mail

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

_____

Courtroom Deputy: Deborah Hansen          Date: August 8, 2018
Court Reporter:     Mary George           Probation: Laura Ansart
                                          Time: 37 minutes

_____

Criminal Action No.  16-cr-00054-WJM      *Counsel:*

UNITED STATES OF AMERICA,                 Martha A. Paluch
                                          Bryand D. Fields
         Plaintiff,

v.

2. TRAMMEL THOMAS,                        Daniel T. Smith
                                          Thomas E. Goodreid
         Defendant.

_____

## COURTROOM MINUTES
_____

SENTENCING HEARING

09:14 a.m.    Court in Session

Appearances of counsel.

Defendant present and in custody.   Oath administered to the defendant.

On November 30, 2017, a jury convicted the defendant on each of the seven counts of
the Superseding Indictment.

This matter is before the Court for an Evidentiary Sentencing Hearing.

The defendant would like to speak to the court *ex parte.*

09:15  Government counsel and case agent leave the courtroom.

Defendant's comments

1

Case No. 1:16-cr-00054-WJM Document 535-1 filed 12/12/18 USDC Colorado pg 965 of
971
Case 1:16-cr-00054-WJM Document 448 Filed 08/08/18 Page 2 of 3

The defendant requests the Court appoint new counsel, or if that option isn't available, allow him to proceed *pro se.*

Colloquy between the Court and the defendant

Statement by Mr. Smith

**ORDERED:  The defendant's oral request for the Court to appoint new counsel is
DENIED**.

**ORDERED:  The defendant's oral request to appear *pro se* is GRANTED.**

09:38 Court in Recess
09:43 Court in Session

The Court gives *Faretta* warnings and engages in colloquy with the defendant.

The defendant confirms that he still wants to represent himself and give up his right to be represented by counsel at his sentencing hearing, and his decision is entirely voluntary.

The Court finds that the defendant has knowingly and voluntarily waived his right to counsel; and he will be permitted proceed *pro se.*

**ORDERED:  Leave for defense counsel to withdraw from this case is GRANTED.**

09:51 Government counsel are present.

Government's counsel are informed that the Court has engaged in colloquy with the defendant after the defendant made a request for new counsel. After the *Faretta* warnings colloquy, the Court found that the defendant has decided, voluntarily and freely, to represent himself.

**ORDERED:  The defendant's oral request for a continuance of the sentencing
hearing is GRANTED IN PART.**

**ORDERED:  This sentencing hearing is continued to Monday, October 22, 2018 at
10:00 a.m.**

**ORDERED:  No further briefing will be accepted.**

**ORDERED:  Defendant is REMANDED to the custody of the U.S. Marshal.**

2

09:56 a.m.     Court in Recess
               Hearing continued

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

_____

Courtroom Deputy: Socorro West          Date:  October 22, 2018
Court Reporter:     Mary George         Probation: Laura Ansart
                                        Time: 50 minutes

_____

Criminal Action No.   16-cr-00054-WJM          _Counsel:_

UNITED STATES OF AMERICA,                      Martha A. Paluch
                                               Bryan Fields
        Plaintiff,

v.

2. TRAMMEL THOMAS,                             _Pro Se_

        Defendant.

_____

**COURTROOM MINUTES**
_____


SENTENCING HEARING

09:33 a.m.    Court in Session.

Appearances of counsel

Also present:   Sandra Ennis, Special Agent.

Defendant present and in custody.

On November 30, 2017, a jury convicted the defendant on each of the seven counts of
the Superseding Indictment.

Discussion regarding evidence pursuant to Rule 3553(a).

10:00 a.m.    Court in recess.
10:10 a.m.    Court in session.

1

Continued discussion regarding evidence pursuant to Rule 3553(a).

Defendant requests the sentencing hearing be continued.

Government counsel requests witness Joseph Faranda be allowed to testify.

**ORDERED:** **The Government's request to consider evidence related to dismissed state court charges pursuant to Section 3553(a) is DENIED.**

**ORDERED:** **The probation department is to file within a reasonable period of time an addendum to the presentence report which addresses the Government's motion for a final order of forfeiture.**

**ORDERED:** **The defendant's oral request for a continuance of the sentencing hearing on the basis of purportedly being ill is reluctantly GRANTED.**

**ORDERED:** **Absent a true medical emergency, this sentencing hearing is continued for a final time to Monday, January 14, 2019 at 9:30 a.m.**

**ORDERED:** **Defendant is REMANDED to the custody of the U.S. Marshal.**

10:36 a.m.     Court in Recess
               Hearing continued

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No.  16-cr-00054-WJM-02

UNITED STATES OF AMERICA,

     Plaintiff,

V.

2.     TRAMMEL THOMAS,

     Defendant.

_____

**NOTICE OF CORRECTION TO UNITED STATES' RESPONSE TO
DEFENDANT TRAMELL THOMAS'S OBJECTIONS TO
THE PRESENTENCE INVESTIGATION REPORT, ECF 357**

_____

The United States of America, through undersigned counsel, hereby files this

Notice of Correction to its Response to Defendant Tramell Thomas's Objections to the

Presentence Investigation Report, which Response was filed on April 3, 2018, ECF 357.

On Page 4, the United States states that a conversation between the defendant

and I.O. about committing student aid fraud occurred in October of 2010.  During a

second interview with I.O. in November of 2017, he corrected that date and stated his

conversation with the defendant occurred between March 25, 2010, and June 30, 2010.

I.O. was certain about this period because he was not in custody at that time.

The Memorandum of Interview reflecting this information was provided to

defense counsel in November of 2017.

1

DATED this 9th day of January, 2019.

Respectfully submitted,

JASON R. DUNN
United States Attorney

By:    s/ *Martha A. Paluch*_____
MARTHA A. PALUCH
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov

2

Case 1:16-cr-00054-WJM Document 455 Filed 01/09/19 Page 3 of 3

## CERTIFICATE OF SERVICE

I certify that on this 9th day of January, 2019, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system and sent via United States mail

a copy of this filing to the defendant, appearing pro se, at the following address:

Tramell Thomas
Inmate No. 57094-408
FDC Englewood
9595 W. Quincy Avenue
Littleton, CO 80123

<div style="margin-left:50%">

s/ *Martha A. Paluch*_____
MARTHA A. PALUCH
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov

</div>