APPEAL,TERMED

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CRIMINAL DOCKET FOR CASE #: 1:16–cr–00054–WJM–2

Case title: USA v. Carr et al

Date Filed: 02/08/2016
Date Terminated: 06/05/2019

Assigned to: Judge William J. Martinez

Appeals court case number: 19–1209 Tenth Circuit

**Defendant (2)**

| | | |
|---|---|---|
| **Trammel Thomas**<br>*TERMINATED: 06/05/2019* | represented by | **Trammel Thomas**<br>#57094408<br>ENGLEWOOD<br>FEDERAL CORRECTIONAL INSTITUTION<br>Inmate Mail/Parcels<br>9595 WEST QUINCY AVENUE<br>LITTLETON, CO 80123<br>PRO SE |

**Michael Gary Root**
Michael G. Root, Attorney at Law
217 East Seventh Avenue
Denver, CO 80203
303–318–7181
Fax: 303–318–7182
Email: mroot@mikerootlaw.com
*TERMINATED: 01/05/2017*
*LEAD ATTORNEY*
*Designation: CJA Appointment*

**Daniel T. Smith**
Daniel T. Smith, Attorney at Law
4582 South Ulster
Suite 1400
Denver, CO 80237
303–860–8100
Fax: 303–860–8018
Email: danieltsmith@qwestoffice.net
*TERMINATED: 08/08/2018*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Renee V. Cooper**
Cooper & Associates, LLC

1

501 South Cherry Street
Suite 1100
Denver, CO 80246
303–831–1021
Fax: 303-831-1025
Email: attyrcooper@gmail.com
*TERMINATED: 03/15/2017*
*ATTORNEY TO BE NOTICED*

**Tasha Anya Steward**
Tasha A. Steward, LLC, Law Office of
3570 E. 12th Ave
Denver, CO 80206
720–772–6145
Fax: 720.815.3884
Email: tsteward@tstewardlaw.com
*TERMINATED: 06/13/2019*
*Designation: Retained*

**Thomas Edward Goodreid**
Thomas E. Goodreid, Attorney at Law
1801 Broadway
Suite 1400
Denver, CO 80202
303–296–2048
Fax: 303–292–0522
Email: t.goodreid@comcast.net
*TERMINATED: 08/08/2018*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:286.F Conspiracy to Defraud the Government with Respect to Claims (1) | Dismissed. |
| 18 U.S.C. § 286 Conspiracy to Defraud the Government with Respect to Claims (1s) | Defendant sentenced to 120 months imprisonment as to Counts 1 through 7, to run concurrently. 3 years of supervised release as to Counts 1 through 7, to run concurrently. $700 special assessment fee. $563,890.85 restitution joint and several with co–defendants. |
| 18:1343.F Wire Fraud (2–7) | Dismissed. |
| 18 U.S.C. § 1341 Aiding and Abetting Mail Fraud (2s–7s) | Defendant sentenced to 120 months imprisonment as to Counts 1 through 7, to run concurrently. 3 years of supervised release as to Counts 1 through 7, to run concurrently. $700 special assessment fee. $563,890.85 restitution joint and several with co–defendants. |

| | |
|---|---|
| 18:1343.F Wire Fraud (8–13) | Dismissed. |
| 18:1341.F Mail Fraud (14–26) | Dismissed. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

| **USA** | represented by | **Daniel Edward Burrows** |
|---|---|---|

represented by **Daniel Edward Burrows**
U.S. Attorney's Office–Denver
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0201
Email: daniel.burrows@usdoj.gov
*TERMINATED: 10/06/2016*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Martha Ann Paluch**
U.S. Attorney's Office–Denver
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0100
Fax: 303–454–0402
Email: Martha.Paluch@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Beth N. Gibson**
U.S. Attorney's Office–Denver

1801 California Street
Suite 1600
Denver, CO 80202
303–454–0100
Fax: 303–454–0406
Email: Beth.Gibson@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Bryan David Fields**
U.S. Attorney's Office–Denver
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0100
Fax: 303–454–0402
Email: bryan.fields3@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Paul Farley**
U.S. Attorney's Office–Denver
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0361
Email: paul.farley2@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 02/08/2016 | 1 | | INDICTMENT as to Heather Carr (1) count(s) 1, 2–13, 14–26, 27–29, Trammel Thomas (2) count(s) 1, 2–13, 14–26, Mercedes Diaz (3) count(s) 1, 20–21. (Attachments: # 1 Criminal Information Sheet, # 2 Criminal Information Sheet, # 3 Criminal Information Sheet) (cthom, ) (Entered: 02/09/2016) |
| 02/08/2016 | 2 | | RESTRICTED DOCUMENT – Level 4: as to Heather Carr, Trammel Thomas, Mercedes Diaz. (cthom, ) (Entered: 02/09/2016) |
| 02/08/2016 | 4 | | Arrest Warrant Issued in case as to Trammel Thomas. (cthom, ) (Entered: 02/09/2016) |
| 03/08/2016 | 8 | | Arrest of Trammel Thomas in Arizona. Initial Appearance set for 3/29/2016 02:00 PM in Courtroom C201 before Magistrate Judge Kathleen M. Tafoya. (Text Only entry)(morti, ) (Entered: 03/08/2016) |
| 03/09/2016 | 11 | | Rule 5(c)(3) Documents Received as to Trammel Thomas from the District of Arizona in Phoenix. (nmarb, ) (Entered: 03/09/2016) |
| 03/29/2016 | 25 | | COURTROOM MINUTES for Initial Appearance as to Trammel Thomas held on 3/29/2016 before Magistrate Judge Kathleen M. Tafoya. Defendant present on bond and advised. Criminal Justice Act counsel appointed. Arraignment |

| | | | |
|---|---|---|---|
| | | | and Discovery hearings set for 4/5/2016 10:00 AM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty. Discussion regarding waiving the Defendant's appearance for the next set of hearings since he resides in Arizona. Defendant is advised to discuss the waiver with counsel. Defendant's bond continued. (Total time: 9 mins, Hearing time: 219–228)<br><br>**APPEARANCES**: Martha Paluch on behalf of the Government, Pat Hanley on behalf of pretrial. FTR: KMT C201. (sgrim) Text Only Entry (Entered: 03/29/2016) |
| 03/29/2016 | 26 | | ORDER APPOINTING CJA COUNSEL as to Trammel Thomas by Magistrate Judge Kathleen M. Tafoya on 3/29/16. Text Only Entry (sgrim, ) (Entered: 03/29/2016) |
| 03/29/2016 | 27 | | CJA 23 Financial Affidavit by Trammel Thomas. (sgrim, ) (Entered: 03/29/2016) |
| 03/29/2016 | 28 | | CJA 20/30 Appointment of Michael Gary Root for Trammel Thomas by Magistrate Judge Kathleen M. Tafoya on 3/29/2016. (shugh) (Entered: 03/30/2016) |
| 03/29/2016 | 41 | | Utility Setting/Resetting Deadlines/Hearings as to Trammel Thomas: Discovery Hearing set for 4/5/2016 10:00 AM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty, original setting terminated in error. Text Only Entry (cthom, ) (Entered: 04/04/2016) |
| 03/31/2016 | 30 | | MOTION to Disclose Grand Jury Material to Defendant by USA as to Heather Carr, Trammel Thomas, Mercedes Diaz. (Attachments: # 1 Proposed Order (PDF Only))(Paluch, Martha) (Entered: 03/31/2016) |
| 03/31/2016 | 31 | | WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Trammel Thomas (Root, Michael) Modified on 4/4/2016 (nmarb, ). (Entered: 03/31/2016) |
| 03/31/2016 | 33 | | ORDER granting 30 Motion to Disclose Grand Jury Material as to Heather Carr (1), Trammel Thomas (2), Mercedes Diaz (3) by Judge William J. Martinez on 03/31/2016. (cthom, ) (Entered: 03/31/2016) |
| 03/31/2016 | 34 | | Unopposed MOTION for Protective Order *Regarding Grand Jury Material and Personal Identifying Information of Third Parties* by USA as to Heather Carr, Trammel Thomas, Mercedes Diaz. (Attachments: # 1 Proposed Order (PDF Only))(Paluch, Martha) (Entered: 03/31/2016) |
| 04/01/2016 | 35 | | ORDER Setting Trial Date and Related Deadlines as to Heather Carr, Trammel Thomas, Mercedes Diaz: Motions due by 5/3/2016. Responses due by 5/13/2016. 6 day Jury Trial set for 5/31/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Trial Preparation Conference set for 5/24/2016 at 03:00 PM in Courtroom A 801 before Judge William J. Martinez. ORDERED by Judge William J. Martinez on 04/01/2016. (cthom, ) (Entered: 04/01/2016) |
| 04/01/2016 | 36 | | ORDER granting 34 Motion for Stipulated Protective Order as to Heather Carr (1), Trammel Thomas (2), Mercedes Diaz (3) by Judge William J. Martinez on 04/01/2016. (cthom, ) (Entered: 04/01/2016) |
| 04/01/2016 | 37 | | |

| | | | |
|---|---|---|---|
| | | | ORDER on Procedures as to Heather Carr, Trammel Thomas, Mercedes Diaz, by Judge William J. Martinez on 04/01/2016. (cthom, ) (Entered: 04/01/2016) |
| 04/01/2016 | 38 | | ORDER Regarding Joint Defense Agreement Disclosures as to Heather Carr, Trammel Thomas, Mercedes Diaz, by Judge William J. Martinez on 04/01/2016. (cthom, ) (Entered: 04/01/2016) |
| 04/01/2016 | 39 | | Utility Setting/Resetting Deadlines/Hearings pursuant to 35 as to Heather Carr, Trammel Thomas, Mercedes Diaz: Text Only Entry Motions due by 5/3/2016. Responses due by 5/13/2016. 6 day Jury Trial set for 5/31/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Trial Preparation Conference set for 5/24/2016 at 03:00 PM in Courtroom A 801 before Judge William J. Martinez. (cthom, ) (Entered: 04/04/2016) |
| 04/04/2016 | 40 | | MINUTE ORDER granting 31 WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Trammel Thomas (2) by Magistrate Judge Michael E. Hegarty on 04/04/2016. The Arraignment set for 4/5/2016 is CANCELED. The Discovery Hearing is still on the Court's docket. Text Only Entry. (mdave, ) (Entered: 04/04/2016) |
| 04/05/2016 | 42 | | COURTROOM MINUTES/MINUTE ENTRY for proceedings held before Magistrate Judge Michael E. Hegarty: Arraignment and Discovery Hearing as to Trammel Thomas held on 4/5/2016. Plea of NOT GUILTY entered by defendant. Defendant appearance waived, Discovery memorandum executed, Defendants bond continued, Counsel is directed to chambers, (Total time: 3 mins, Hearing time: 10:07–1010 a.m.)  **APPEARANCES**: Martha Pollack on behalf of the Government, Michael Root on behalf of the defendant, Michelle Sinaka on behalf of pretrial. FTR: Courtroom A501. (mdave, ) Text Only Entry (Entered: 04/05/2016) |
| 04/05/2016 | 43 | | Discovery Conference Memorandum and ORDER: Estimated Trial Time – 8 days as to Trammel Thomas by Magistrate Judge Michael E. Hegarty on 04/05/2016. (mdave, ) (Entered: 04/05/2016) |
| 04/19/2016 | 45 | | ORDER granting 44 Motion to Exclude as to Heather Carr (1). All days from today, to and including July 18, 2016, shall be excluded from the Speedy Trial Clock as to **ALL Defendants** ; The 6–day Jury Trial set to commence on May 31, 2016 and the Final Trial Preparation Conference set for May 24, 2016 at 3:00 p.m. are hereby **VACATED as to ALL Defendants**. The Court will enter a separate Order resetting the Trial date and related deadlines. ORDERED by Judge William J. Martinez on 04/19/2016. (cthom, ) (Entered: 04/19/2016) |
| 04/19/2016 | 46 | | ORDER Resetting Trial Date and Related Deadlines as to Heather Carr, Trammel Thomas, Mercedes Diaz: Motions due by 8/1/2016. Responses due by 8/11/2016. 6 day Jury Trial set for 8/29/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Trial Preparation Conference set for 8/19/2016 at 04:00 PM in Courtroom A 801 before Judge William J. Martinez. Ordered by Judge William J. Martinez on 04/19/2016. (cthom, ) (Entered: 04/19/2016) |
| 04/20/2016 | 49 | | NOTICE *REGARDING OF JOINT DEFENSE AGREEMENT* by Trammel Thomas (Root, Michael) (Entered: 04/20/2016) |

| | | | |
|---|---|---|---|
| 04/20/2016 | 50 | | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 49 Notice (Other) : The format for the attorneys signature block is not correct. **DO NOT REFILE THE DOCUMENT. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 4.3(d) of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (cthom, ) (Entered: 04/20/2016) |
| 04/27/2016 | 51 | | MOTION to Continue *Trial* by Trammel Thomas. (Root, Michael) (Entered: 04/27/2016) |
| 04/27/2016 | 52 | | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 51 MOTION to Continue *Trial* : The format for the attorneys signature block is not correct. **DO NOT REFILE THE DOCUMENT. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 4.3(d) of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (cthom, ) (Entered: 04/27/2016) |
| 04/28/2016 | 53 | | CJA 21/31 Request for Service as to Trammel Thomas. (Attachments: # 1 CJA Attachment)(Root, Michael) (Entered: 04/28/2016) |
| 05/01/2016 | 54 | | MOTION to Exclude *An Additional 60 Days From Speedy Trial* by Trammel Thomas. (Root, Michael) (Entered: 05/01/2016) |
| 05/02/2016 | 55 | | ORDER granting 54 Motion to Exclude as to Trammel Thomas (2). All days from September 4, 2016, to and including November 3, 2016, shall be excluded from the Speedy Trial Clock as to **ALL Defendants** ; The 6–day Jury Trial set to commence on August 29, 2016 and the Final Trial Preparation Conference set for August 19, 2016 are hereby VACATED as to **ALL Defendants**. ORDERED by Judge William J. Martinez on 05/02/2016. (cthom, ) (Entered: 05/02/2016) |
| 05/10/2016 | 56 | | CJA 21/31 Authorization for Service as to Trammel Thomas by Judge William J. Martinez on 5/10/2016. (shugh) (Entered: 05/10/2016) |
| 05/11/2016 | 57 | | ORDER Resetting Trial Dates and Related Deadlines as to Heather Carr, Trammel Thomas, Mercedes Diaz: Motions due by 9/23/2016. Responses due by 10/3/2016. 6 day Jury Trial set for 10/24/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Trial Preparation Conference set for 10/17/2016 at 02:00 PM in Courtroom A 801 before Judge William J. Martinez. There will be no trial day on Friday October 28th, accordingly, the trial will extend to November 1st. ORDERED by Judge William J. Martinez on 05/11/2016. (cthom, ) Modified on 5/11/2016 (cthom, ). (Entered: 05/11/2016) |
| 05/11/2016 | 58 | | Utility Setting/Resetting Deadlines/Hearings as to Heather Carr, Trammel Thomas, Mercedes Diaz: Text Only Entry Jury Trial set for 10/24/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Jury Trial set for 10/25/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Jury Trial set for 10/26/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Jury Trial set for 10/27/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Jury Trial set for 10/31/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. Jury Trial set for 11/1/2016 08:30 AM in Courtroom A 801 before Judge William J. Martinez. (cthom, ) (Entered: 05/11/2016) |

| 05/17/2016 | 59 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant's Motion to Continue Jury Trial Set for August 28, 2016 51 . Because the Defendant has since filed a Motion to Exclude 60 Additional Days from the Requirement of the Speedy Trial Act 54 , which was granted at 55 Order Granting Defendant Thomas' Unopposed Motion to Exclude 60 Additional Days from the Requirement of the Speedy Trial Act, the Court DENIES the Motion to Continue Jury Trial 51 as MOOT. SO ORDERED. by Judge William J. Martinez on 05/17/2016. Text Only Entry (wjmsec, ) (Entered: 05/17/2016) |
|---|---|---|---|
| 08/30/2016 | 71 | | MOTION to Exclude *an Additional 90 days from speedy trial* by Trammel Thomas. (Root, Michael) (Entered: 08/30/2016) |
| 08/30/2016 | 72 | | MOTION to Continue *Trial of October 25, 2016* by Trammel Thomas. (Root, Michael) (Entered: 08/30/2016) |
| 08/30/2016 | 73 | | ORDER granting 71 Motion to Exclude as to Trammel Thomas (2); Denying as moot 72 Motion to Continue as to Trammel Thomas (2). **All days from November 4, 2016, to and including February 2, 2017, shall be excluded from the Speedy Trial Clock as to ALL Defendants**. The 6–day Jury Trial set to commence on October 24, 2016 and the Final Trial Preparation Conference set for October 17, 2016 are hereby **VACATED as to ALL Defendants**. ORDERED by Judge William J. Martinez on 08/30/2016. (cthom, ) Modified to add text on 8/30/2016 (cthom, ). (Entered: 08/30/2016) |
| 08/31/2016 | 74 | | ORDER Re–setting Trial Date and Related Deadlines as to Heather Carr, Trammel Thomas. Motions due by 1/2/2017. Responses due by 1/12/2017. 6 day Jury Trial set for 1/30/2017 08:30 AM in Courtroom A 801 before Judge William J. Martinez; the trial will conclude on Tuesday, February 7, 2017, with no trial being held on Friday, February 3, 2017. Trial Preparation Conference set for 1/23/2017 at 10:30 AM in Courtroom A 801 before Judge William J. Martinez. ORDERED by Judge William J. Martinez on 08/31/2016. (cthom, ) (Entered: 08/31/2016) |
| 10/05/2016 | 77 | | NOTICE OF ATTORNEY APPEARANCE Beth N. Gibson appearing for USA. Attorney Beth N. Gibson added to party USA(pty:pla) (Gibson, Beth) (Entered: 10/05/2016) |
| 10/05/2016 | 78 | | MOTION to Withdraw as Attorney by Daniel E. Burrows by USA as to Heather Carr, Trammel Thomas, Mercedes Diaz. (Attachments: # 1 Proposed Order (PDF Only))(Burrows, Daniel) (Entered: 10/05/2016) |
| 10/06/2016 | 79 | | ORDER as to **Heather Carr (1), Trammel Thomas (2), and Mercedes Diaz (3)** granting the Motion to Withdraw 78 : The Motion is GRANTED for good cause shown. Daniel Burrows is hereby granted leave to withdraw from this case. The Clerk shall terminate all further CM/ECF notifications to Mr. Burrows in this case. SO ORDERED by Judge William J. Martinez on 10/06/2016. Text Only Entry (wjmsec, ) (Entered: 10/06/2016) |
| 11/15/2016 | 87 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. In light of the filing of notice of dispositions for the other two Defendants in this case, leaving Defendant Thomas as the only remaining Defendant, the 6 day Jury Trial set to begin on January 30, 2017 is hereby **VACATED and RESET to a 5 day Jury Trial set to begin on January 30, 2017 at 8:30 a.m.** in Courtroom A801. The Trial will conclude on Friday, |

| | | | |
|---|---|---|---|
| | | | February 3, 2017. The Final Trial Preparation Conference remains set for **January 23, 2017 at 10:30 a.m.** in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards to ensure compliance with all deadlines triggered by the dates of the Final Trial Preparation Conference and Trial. SO ORDERED by Judge William J. Martinez on 11/15/2016. Text Only Entry (wjmsec, ) (Entered: 11/15/2016) |
| 11/28/2016 | 88 | | **WITHDRAWN** NOTICE of Disposition by Trammel Thomas (Root, Michael) Modified on 5/15/2017 Pursuant to 152 Order (angar, ). (Entered: 11/28/2016) |
| 11/28/2016 | 89 | | ORDER Setting Change of Plea Hearing as to **Trammel Thomas (2)**: Pursuant to the Notice of Disposition 88 filed by the Defendant, a **Change of Plea Hearing is hereby set for December 28, 2016 at 3:00 p.m. in Courtroom A801. The dates set for the Final Trial Preparation Conference and Trial are hereby VACATED.** Counsel for the parties shall e–mail to Chambers courtesy copies of the "Statement by Defendant In Advance of Change of Plea" and the "Plea Agreement and Statement of Facts" no later than **12:00 p.m. on December 21, 2016**. If these documents are not timely submitted, the hearing may be vacated. The signed original and one copy of these documents must also be given to the courtroom deputy at the time of the hearing, pursuant to D.C.COLO.LCrR 11.1E. It is FURTHER ORDERED that defense counsel who reviewed and advised Defendant regarding the plea agreement must attend this Change of Plea Hearing. Pursuant to WJM Revised Practice Standard IX.1.1.c the AUSA assigned to this matter must also be present at the hearing. If that AUSA cannot attend in person, s/he must be present by phone and a fully–briefed substitute AUSA must be physically present in the courtroom at the time of the hearing. SO ORDERED by Judge William J. Martinez on 11/28/2016. Text Only Entry (wjmsec, ) (Entered: 11/28/2016) |
| 11/28/2016 | 90 | | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 88 Notice of Disposition filed by attorney Michael Root. The format for the attorneys signature block is not correct; missing attorney contact information. **DO NOT REFILE THE DOCUMENT. Action to take –** future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 4.3(d) of the Electronic Case Filing Procedures (Criminal Cases). The document is also missing the certificate of service page. (Text Only Entry) (cthom, ) (Entered: 11/28/2016) |
| 12/21/2016 | 97 | | ORDER as to **Trammel Thomas (2)**: At the Change of Plea Hearing set for December 28, 2016, the parties should be prepared to discuss whether, pursuant to 18 U.S.C. § 3143, Defendant Thomas should remain on pretrial release pending imposition of his sentence, or whether his bond should be revoked and he should be remanded at the conclusion of the Change of Plea Hearing. SO ORDERED by Judge William J. Martinez on 12/21/2016. Text Only Entry (wjmsec, ) (Entered: 12/21/2016) |
| 12/21/2016 | 98 | | MOTION to Withdraw as Attorney *for Trammel Thomas* by Michael Root by Trammel Thomas. (Root, Michael) (Entered: 12/21/2016) |
| 12/21/2016 | 99 | | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 98 MOTION to Withdraw as Attorney *for Trammel Thomas* by Michael Root filed by attorney Michael Root. The format |

| | | | |
|---|---|---|---|
| | | | for the attorneys signature block is not correct; missing attorney contact information. The Certificate of Service page is also incomplete. **DO NOT REFILE THE DOCUMENT. Action to take** – future documents must be filed pursuant to D.C.COLO.LCr49.1(a) and 4.3(d) of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (cthom, ) (Entered: 12/21/2016) |
| 12/21/2016 | 100 | | MEMORANDUM regarding 98 MOTION to Withdraw as Attorney *for Trammel Thomas* by Michael Root filed by Trammel Thomas. Motion(s) referred to Magistrate Judge Michael E. Hegarty. by Judge William J. Martinez on 12/21/2016. Text Only Entry (wjmsec, ) (Entered: 12/21/2016) |
| 12/21/2016 | 101 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defense Counsel's Motion to Withdraw and Appointment of New CJA Counsel 98 . This Motion has been referred to United States Magistrate Judge Michael E. Hegarty 100 . The Change of Plea Hearing set for Wednesday, December 28, 2016 at 3:00 p.m. is hereby **VACATED**. In the event the referred Motion to Withdraw is granted, upon the entry of appearance of Defendant Thomas' new counsel, s/he and counsel for the Government are DIRECTED to jointly contact Chambers (303–335–2805) to inform the Court of their available dates to reset the Change of Plea Hearing. SO ORDERED by Judge William J. Martinez on 12/21/2016. Text Only Entry (wjmsec, ) (Entered: 12/21/2016) |
| 12/22/2016 | 102 | | ORDER Setting Hearing on Motion as to Trammel Thomas. 98 MOTION to Withdraw as Attorney *for Trammel Thomas* by Michael Root by Magistrate Judge Michael E. Hegarty on 12/22/2016. Motion Hearing set for 1/5/2017 02:00 PM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty. Text Only Entry (mdave, ) (Entered: 12/22/2016) |
| 01/03/2017 | 103 | | Unopposed MOTION to Continue *Sentencing* by Mercedes Diaz as to Heather Carr, Trammel Thomas, Mercedes Diaz. (Rathod, Siddhartha) (Entered: 01/03/2017) |
| 01/03/2017 | 104 | | MOTION to Excuse *Mr. Thomas' Presence at January 5 Hearing* by Trammel Thomas. (Root, Michael) (Entered: 01/03/2017) |
| 01/03/2017 | 105 | | Amended MOTION to Excuse *Mr. Thomas' Presence at January 5 Hearing* by Trammel Thomas. (Root, Michael) (Entered: 01/03/2017) |
| 01/05/2017 | 107 | | MEMORANDUM regarding 105 Amended MOTION to Excuse *Mr. Thomas' Presence at January 5 Hearing* filed by Trammel Thomas. Motion(s) referred to Magistrate Judge Michael E. Hegarty, by Judge William J. Martinez on 01/05/2017. Text Only Entry (wjmlc1) (Entered: 01/05/2017) |
| 01/05/2017 | 108 | | ORDER granting 105 Motion to Excuse as to Trammel Thomas (2) by Magistrate Judge Michael E. Hegarty on 01/05/2017. Trammel Thomas is excused from the motion hearing set for 1/5/2017. Text Only Entry (mdave, ) (Entered: 01/05/2017) |
| 01/05/2017 | 109 | | COURTROOM MINUTES/MINUTE ENTRY for proceedings held before Magistrate Judge Michael E. Hegarty: granting 98 Motion to Withdraw as Attorney. Michael Gary Root withdrawn from case as to Trammel Thomas (2); Motion Hearing as to Trammel Thomas held on 1/5/2017. Defendant not present, CJA counsel is appointed. (Total time: 3 mins, Hearing time: |

| | | | |
|---|---|---|---|
| | | | 1:58–2:01 p.m.)<br><br>**APPEARANCES**: Beth Gibson on behalf of the Government, Michael Root on behalf of the defendant. FTR: Courtroom A501. (mdave, ) Text Only Entry (Entered: 01/05/2017) |
| 01/05/2017 | 110 | | ORDER APPOINTING COUNSEL as to Trammel Thomas by Magistrate Judge Michael E. Hegarty on 01/05/2017. CJA counsel is reappointed. (mdave, ) (Entered: 01/05/2017) |
| 01/06/2017 | 111 | | NOTICE OF ATTORNEY APPEARANCE: Renee Cooper appearing for Trammel ThomasAttorney Renee Cooper added to party Trammel Thomas(pty:dft) (Cooper, Renee) (Entered: 01/06/2017) |
| 01/19/2017 | 112 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court upon communication with Counsel regarding the resetting of the Change of Plea Hearing for Defendant Thomas. The Change of Plea Hearing is hereby **RESET to March 10, 2017 at 10:00 a.m.** in Courtroom A801. Counsel for the parties shall e–mail to Chambers courtesy copies of the "Statement by Defendant In Advance of Change of Plea" and the "Plea Agreement and Statement of Facts" no later than **12:00 p.m. on March 3, 2017**. If these documents are not timely submitted, the hearing may be vacated. The signed original and one copy of these documents must also be given to the courtroom deputy at the time of the hearing, pursuant to D.C.COLO.LCrR 11.1E. It is FURTHER ORDERED that defense counsel who reviewed and advised Defendant regarding the plea agreement must attend this Change of Plea Hearing. Pursuant to WJM Revised Practice Standard IX.I.1.c the AUSA assigned to this matter must also be present at the hearing. If that AUSA cannot attend in person, s/he must be present by phone and a fully–briefed substitute AUSA must be physically present in the courtroom at the time of the hearing. It is FURTHER ORDERED that at the Change of Plea Hearing, the parties should be prepared to discuss whether, pursuant to 18 U.S.C. § 3143, Defendant Thomas should remain on pretrial release pending imposition of his sentence, or whether his bond should be revoked and he should be remanded at the conclusion of the Change of Plea Hearing. SO ORDERED by Judge William J. Martinez on 1/19/2017. Text Only Entry (wjmsec, ) (Entered: 01/19/2017) |
| 02/01/2017 | 113 | | NOTICE of Change of Address/Contact Information (Paluch, Martha) (Entered: 02/01/2017) |
| 02/01/2017 | 114 | | NOTICE of Change of Address/Contact Information (Burrows, Daniel) (Entered: 02/01/2017) |
| 03/02/2017 | 118 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. The Change of Plea Hearing currently set for **March 10, 2017 at 10:00 a.m. in Courtroom A801 is hereby VACATED and will be RESET at a later date**. SO ORDERED by Judge William J. Martinez on 3/2/2017. Text Only Entry (wjmsec, ) (Entered: 03/02/2017) |
| 03/02/2017 | 119 | | First MOTION to Withdraw Document *88 Notice of Disposition* by Trammel Thomas. (Attachments: # 1 Exhibit Exhibit A)(Cooper, Renee) (Entered: 03/02/2017) |
| 03/14/2017 | 121 | | |

| | | | |
|---|---|---|---|
| | | | MOTION to Withdraw as Attorney by Renee Cooper by Trammel Thomas. (Cooper, Renee) (Entered: 03/14/2017) |
| 03/15/2017 | 122 | | ORDER as to **Trammel Thomas (2)** granting Attorney Renee Cooper's Motion to Withdraw as Counsel 121 : The Motion is GRANTED for good cause shown. Renee Cooper is hereby granted leave to withdraw from this case. New counsel from the CJA Panel shall be appointed to represent Defendant Thomas. The Change of Plea Hearing will be reset upon the entry of appearance of new counsel for Defendant Thomas. SO ORDERED by Judge William J. Martinez on 3/15/2017. Text Only Entry (wjmsec, ) (Entered: 03/15/2017) |
| 03/15/2017 | 123 | | ORDER APPOINTING COUNSEL as to Trammel Thomas pursuant to 122 Order by Judge William J. Martinez on 3/15/2017. Text Only Entry (wjmsec, ) (Entered: 03/15/2017) |
| 03/16/2017 | 124 | | NOTICE OF ATTORNEY APPEARANCE: Daniel T. Smith appearing for Trammel ThomasAttorney Daniel T. Smith added to party Trammel Thomas(pty:dft) (Smith, Daniel) (Entered: 03/16/2017) |
| 03/17/2017 | 125 | | ORDER as to **Trammel Thomas (2)**: Pursuant to this Court's Order 122 and the Notice of Attorney Appearance of Daniel T. Smith as Defendant Thomas' new counsel, the Change of Plea Hearing for Defendant Thomas is hereby **RESET to April 26, 2017 at 10:00 a.m.**, in Courtroom A801. Counsel for the parties shall e–mail to Chambers courtesy copies of the "Statement by Defendant In Advance of Change of Plea" and the "Plea Agreement and Statement of Facts" no later than **12:00 p.m. on April 19, 2017**. SO ORDERED by Judge William J. Martinez on 3/17/2017. Text Only Entry (wjmsec, ) (Entered: 03/17/2017) |
| 03/29/2017 | 126 | | MOTION to Vacate *and motion to exclude 90 days from speedy trial calculation* by Trammel Thomas. (Smith, Daniel) (Entered: 03/29/2017) |
| 04/03/2017 | 127 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant's Unopposed Motion to Vacate Hearing and to Exclude 90 Days from the Requirements of the Speedy Trial Act 126 . A Status Conference to discuss the matters raised in the Motion is hereby **SET for April 21, 2017 at 10:30 a.m.** in Courtroom A801. SO ORDERED by Judge William J. Martinez on 4/3/2017. Text Only Entry (wjmsec, ) (Entered: 04/03/2017) |
| 04/04/2017 | 128 | | AMENDED ORDER 127 as to **Trammel Thomas (2)**: At the Status Conference set for April 21, 2017, Defendant Thomas's appearance is MANDATORY, but the Court hereby grants leave for him to appear telephonically, presuming he continues to reside in Arizona. Defendant's Counsel, Mr. Smith, must contact Chambers at (303) 335–2805 on or before April 20, 2017 to provide a **land line** telephone number that will be used by Defendant Thomas for participation in the Status Conference. **Chambers will initiate the call to Defendant Thomas**. Mr. Smith must appear in person. SO ORDERED by Judge William J. Martinez on 4/4/2017. Text Only Entry (wjmsec, ) (Entered: 04/04/2017) |
| 04/07/2017 | 129 | | MOTION to Vacate *Status Conference* by Trammel Thomas. (Smith, Daniel) (Entered: 04/07/2017) |
| 04/07/2017 | 130 | | |

| | | |
|---|---|---|
| | | ORDER as to **Trammel Thomas (2)** granting the Defendant's Motion to Vacate 129 . The Defendant's Motion is GRANTED for good cause shown. The Status Conference set for April 21, 2017 at 10:30 a.m. is hereby **VACATED and RESET to April 21, 2017 at 1:30 p.m.**, in Courtroom A801. SO ORDERED by Judge William J. Martinez on 4/7/2017. Text Only Entry (wjmsec, ) (Entered: 04/07/2017) |
| 04/11/2017 | 131 | SUPERSEDING INDICTMENT as to Trammel Thomas (2) count(s) 1s, 2s−7s, Marcelle Green (4) count(s) 1, 8. (Attachments: # 1 Criminal Information Sheet, # 2 Criminal Information Sheet) (angar, ) (Entered: 04/12/2017) |
| 04/11/2017 | 133 | RESTRICTED DOCUMENT – Level 4 (angar, ) (Entered: 04/12/2017) |
| 04/11/2017 | 134 | MINUTE ORDER as to Trammel Thomas Re−Arraignment set for 4/27/2017 10:00 AM in Courtroom A 401 before Magistrate Judge Kristen L. Mix pursuant to 131 Superseding Indictment on 4/11/2017. Text Only Entry (angar, ) (Entered: 04/12/2017) |
| 04/14/2017 | 137 | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant Trammel Thomas' Unopposed Motion to Vacate Hearing and to Exclude 90 Days From the Requirements of the Speedy Trial Act 126 . Given the filing of a Superseding Indictment 131 in this case, and the addition of a new defendant who has yet to be have his initial appearance and arraignment, the Court Orders as follows: (1) That portion of Defendant Thomas' Motion seeking to vacate the Change of Plea Hearing currently set for April 26, 2017 at 10:00 a.m. is GRANTED and said Hearing is hereby VACATED; and (2) the Status Conference currently set for April 21, 2017 at 1:30 p.m. is also VACATED. That portion of Defendant Thomas' Motion which seeks an Ends of Justice Continuance of 90 days will be ruled on after new defendant Marcelle Greene has had his initial appearance and the Speedy Trial Act deadlines for him have been established. In the interim, Defendant Thomas' Notice of Disposition 88 , which the Court fully understands at some point will be withdrawn, will nonetheless for the time being continue to toll Speedy Trial Act deadlines for Defendant Thomas. SO ORDERED by Judge William J. Martinez on 4/14/2017. Text Only Entry (wjmsec, ) (Entered: 04/14/2017) |
| 04/27/2017 | 138 | COURTROOM MINUTES for Re−arraignment on Superseding Indictment as to Trammel Thomas held on 4/27/2017 before Magistrate Judge Kristen L. Mix. Defendant present on bond. Plea of NOT GUILTY entered by defendant. Defendant continued on bond. (Total time: 2 mins, Hearing time: 1017−1019)  **APPEARANCES**: Martha Paluch on behalf of the Government, Dan Smith on behalf of the defendant, Michelle Sinaka on behalf of pretrial. FTR: KLM A401. (sgrim) Text Only Entry Modified on 4/27/2017 to note defendant was on bond and to correct attorneys (Entered: 04/27/2017) |
| 05/11/2017 | 148 | MOTION to Amend/Correct 126 MOTION to Vacate *and motion to exclude 90 days from speedy trial calculation* filed by Trammel Thomas by Trammel Thomas. (Smith, Daniel) (Entered: 05/11/2017) |
| 05/12/2017 | 149 | ORDER as to **Trammel Thomas (2)** granting Defendant's Unopposed Motion to Amend Defendant's Previous Motion to Exclude 90 Days from the Requirements of the Speedy Trial Act 148 . Defendant's Motion is GRANTED |

13

| | | | |
|---|---|---|---|
| | | | for good cause shown. Defendant's Unopposed Motion to Vacate Hearing and to Exclude 90 Days from the Requirements of the Speedy Trial Act 126 is amended to reflect Defendant's request for exclusion of time from 90 days to 120 days. SO ORDERED by Judge William J. Martinez on 5/12/2017. Text Only Entry (wjmsec, ) (Entered: 05/12/2017) |
| 05/15/2017 | 152 | | ORDER as to **Trammel Thomas (2)** granting Defendant Thomas' Motion to Withdraw Notice of Disposition 119 . The Defendant's Motion is hereby GRANTED for good cause shown. The Clerk's Office is DIRECTED to designate the originally–filed Notice of Disposition 88 as WITHDRAWN. SO ORDERED by Judge William J. Martinez on 5/15/2017. Text Only Entry (wjmsec, ) (Entered: 05/15/2017) |
| 05/15/2017 | 153 | | ORDER Granting Defendant Green's 151 Amended Unopposed Motion to Vacate Current Deadlines and Court Dates, And to Exclude 190 Days From Speedy Trial Act Calculations. 126 Unopposed Motion to Vacate Hearing and to Exclude90 Days from the Requirements of the Speedy Trial Act DENIED AS MOOT. 147 AND 150 Unopposed Motion to Amend Motion to Vacate CurrentDeadlines and Court Dates, and to Exclude 90 Days from Speedy Trial ActCalculations ARE DENIED AS MOOT. ORDERED by Judge William J. Martinez on 5/15/2017. (angar, ) (Entered: 05/15/2017) |
| 05/17/2017 | 154 | | ORDER as to Trammel Thomas, Marcelle Green Motions due by 10/30/2017. Responses due by 11/9/2017. Trial Preparation Conference is set for 11/17/2017 at 02:00 PM in Courtroom A 801 before Judge William J. Martinez and a 6–day Jury Trial is set for 11/27/2017 08:30 AM in Courtroom A 801 before Judge William J. Martinez. ORDERED by Judge William J. Martinez on 05/17/2017. (angar, ) (Entered: 05/17/2017) |
| 07/20/2017 | 156 | | CJA MOTION by Trammel Thomas. (Smith, Daniel) (Entered: 07/20/2017) |
| 07/20/2017 | 157 | | First MOTION for Leave to Restrict by Trammel Thomas. (Smith, Daniel) (Entered: 07/20/2017) |
| 07/20/2017 | 158 | | RESTRICTED DOCUMENT – Level 3: by Trammel Thomas. (Smith, Daniel) (Entered: 07/20/2017) |
| 07/20/2017 | 160 | | ORDER as to **Trammel Thomas (2)** granting the Defendant's Motion for Leave to Restrict 157 . The Defendant's Motion is GRANTED for good cause shown. The documents filed at ECF Nos. 156 and 158 shall remain RESTRICTED at RESTRICTION LEVEL 3 (viewable only by the Filer and the Court). SO ORDERED by Judge William J. Martinez on 7/20/2017. Text Only Entry (wjmsec, ) (Entered: 07/20/2017) |
| 07/27/2017 | 163 | | ORDER Granting 156 CJA Motion as to Trammel Thomas (2) ORDERED by Judge William J. Martinez on 07/27/2017. (angar, ) (Entered: 07/27/2017) |
| 07/27/2017 | 164 | | Certificate of Service by Mail by Clerk of Court as to Trammel Thomas re: 163 Order on CJA Motion. Mailed to attorney as Ordered. TEXT ONLY ENTRY (angar, ) (Entered: 07/27/2017) |
| 08/07/2017 | 165 | | NOTICE OF ATTORNEY APPEARANCE: Thomas Edward Goodreid appearing for Trammel ThomasAttorney Thomas Edward Goodreid added to party Trammel Thomas(pty:dft) (Goodreid, Thomas) (Entered: 08/07/2017) |
| 08/25/2017 | 166 | | |

| | | | |
|---|---|---|---|
| | | | NOTICE OF ATTORNEY APPEARANCE Bryan David Fields appearing for USA. Attorney Bryan David Fields added to party USA(pty:pla) (Fields, Bryan) (Entered: 08/25/2017) |
| 09/13/2017 | 169 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. In light of the filing of notice of dispositions for the other three Defendants in this case, leaving Defendant Thomas as the only remaining Defendant, the 6 day Jury Trial set to begin on November 27, 2017, is hereby **VACATED and RESET to a 5 day Jury Trial set to begin on November 27, 2017 at 8:30 a.m.** in Courtroom A801. **The Trial will conclude on Friday, December 1, 2017**. The Final Trial Preparation Conference remains set for November 17, 2017 at 2:00 p.m. in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards to ensure compliance with all deadlines triggered by the dates of the Final Trial Preparation Conference and Trial. SO ORDERED by Judge William J. Martinez on 9/13/2017. Text Only Entry (wjmsec, ) (Entered: 09/13/2017) |
| 10/04/2017 | 172 | | NOTICE of Change of Address/Contact Information (Smith, Daniel) (Entered: 10/04/2017) |
| 10/13/2017 | 174 | | NOTICE *of Stipulation* by Trammel Thomas (Smith, Daniel) (Entered: 10/13/2017) |
| 10/13/2017 | 175 | | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 174 Notice (Other) filed by attorney Daniel T. Smith. **DO NOT REFILE THE DOCUMENT. Action to take –** counsel must submit a change of contact request through the Attorney Services Portal Account pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (angar, ) (Entered: 10/13/2017) |
| 10/13/2017 | 176 | | NOTICE of Intent to Use Evidence by USA as to Trammel Thomas (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Paluch, Martha) (Entered: 10/13/2017) |
| 10/20/2017 | 181 | | MOTION to Suppress *# 1* by Trammel Thomas. (Attachments: # 1 Exhibit)(Smith, Daniel) (Entered: 10/20/2017) |
| 10/20/2017 | 182 | | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 181 MOTION to Suppress *# 1* filed by attorney Daniel T. Smith. **DO NOT REFILE THE DOCUMENT. Action to take –** counsel must submit a change of contact request through the Attorney Services Portal Account pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Criminal Cases). (Text Only Entry) (angar, ) (Entered: 10/23/2017) |
| 10/23/2017 | 183 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant's Motion to Suppress #1 181 . Given that trial in this matter is set for 5 weeks from today, the Court orders the following accelerated briefing schedule on the Motion: (a) the Government's Response to the Motion shall be filed by no later than **October 27, 2017**; and (b) Defendant's Reply Brief shall be filed by no later than **November 1, 2017**. NO EXTENSIONS OF THESE FILING DEADLINES WILL BE GRANTED. After receipt of the Defendant's Reply Brief the Court will determine whether an evidentiary hearing on the Motion will be necessary. SO ORDERED by Judge William J. Martinez on |

| | | | |
|---|---|---|---|
| | | | 10/23/2017. Text Only Entry (wjmsec, ) (Entered: 10/23/2017) |
| 10/25/2017 | 184 | | MOTION for Writ of Habeas Corpus ad Testificandum by USA as to Trammel Thomas. (Attachments: # 1 Proposed Order (PDF Only), # 2 Exhibit)(Paluch, Martha) (Entered: 10/25/2017) |
| 10/25/2017 | 185 | | MOTION for Writ of Habeas Corpus ad Testificandum by USA as to Trammel Thomas. (Attachments: # 1 Proposed Order (PDF Only), # 2 Exhibit)(Paluch, Martha) (Entered: 10/25/2017) |
| 10/25/2017 | 186 | | MOTION for Writ of Habeas Corpus ad Testificandum by USA as to Trammel Thomas. (Attachments: # 1 Proposed Order (PDF Only), # 2 Exhibit)(Paluch, Martha) (Entered: 10/25/2017) |
| 10/25/2017 | 187 | | MOTION for Writ of Habeas Corpus ad Testificandum by USA as to Trammel Thomas. (Attachments: # 1 Proposed Order (PDF Only), # 2 Exhibit)(Paluch, Martha) (Entered: 10/25/2017) |
| 10/25/2017 | 188 | | ORDER for Writ of Habeas Corpus ad Testificandum re: 184 as to Trammel Thomas (2), by Judge William J. Martinez on 10/25/2017. (angar, ) (Entered: 10/25/2017) |
| 10/25/2017 | 189 | | ORDER for Writ of Habeas Corpus ad Testificandum re: 185 as to Trammel Thomas (2), by Judge William J. Martinez on 10/25/2017. (angar, ) (Entered: 10/25/2017) |
| 10/25/2017 | 190 | | ORDER for Writ of Habeas Corpus ad Testificandum re: 186 as to Trammel Thomas (2), by Judge William J. Martinez on 10/25/2017. (angar, ) Modified on 10/25/2017 to edit document (angar, ). (Entered: 10/25/2017) |
| 10/25/2017 | 191 | | ORDER for Writ of Habeas Corpus ad Testificandum re: 187 as to Trammel Thomas (2), by Judge William J. Martinez on 10/25/2017. (angar, ) (Entered: 10/25/2017) |
| 10/25/2017 | 192 | | Writ of Habeas Corpus ad Testificandum Issued in case as to Trammel Thomas (Attachments: # 1 Writ of Habeas Corpus ad Testificandum, # 2 Writ of Habeas Corpus ad Testificandum, # 3 Writ of Habeas Corpus ad Testificandum)(angar, ) (Entered: 10/25/2017) |
| 10/27/2017 | 193 | | RESPONSE to Motion by USA as to Trammel Thomas re 181 MOTION to Suppress # 1 (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Fields, Bryan) (Entered: 10/27/2017) |
| 10/30/2017 | 194 | | MOTION to Suppress EVIDENCE SEIZED PURSUANT TO SEARCH WARRANT by Trammel Thomas. (Attachments: # 1 Exhibit Application for Search Warrant, # 2 Exhibit Search Warrant, # 3 Exhibit Affidavit in Support of Application for Search Warrant, part I, # 4 Exhibit Affidavit in Support of Application for Search Warrant, part II)(Goodreid, Thomas) (Entered: 10/30/2017) |
| 10/31/2017 | 195 | | ORDER as to **Trammel Thomas(2)**: This matter is before the Court on Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrant 194 . Given that trial is set to commence in less than four weeks, the Court orders the following accelerated briefing schedule on the Motion: (a) the Government's Response shall be filed no later than **Friday, November 3, 2017**; and (b) Defendant's Reply shall be filed no later than **Monday,** |

| | | | |
|---|---|---|---|
| | | | **November 6, 2017**. NO EXTENSIONS OF THESE FILING DEADLINES WILL BE GRANTED. After receipt of the Defendant's Reply Brief the Court will determine whether an evidentiary hearing on the Motion will be necessary. SO ORDERED by Judge William J. Martinez on 10/31/2017. Text Only Entry (wjmlc2, ) (Entered: 10/31/2017) |
| 11/01/2017 | 196 | | REPLY TO RESPONSE to Motion by Trammel Thomas re 181 MOTION to Suppress *# 1* (Smith, Daniel) (Entered: 11/01/2017) |
| 11/03/2017 | 197 | | RESPONSE in Opposition by USA as to Trammel Thomas re 194 MOTION to Suppress *EVIDENCE SEIZED PURSUANT TO SEARCH WARRANT* (Paluch, Martha) (Entered: 11/03/2017) |
| 11/06/2017 | 198 | | REPLY TO RESPONSE to Motion by Trammel Thomas re 194 MOTION to Suppress *EVIDENCE SEIZED PURSUANT TO SEARCH WARRANT* (Goodreid, Thomas) (Entered: 11/06/2017) |
| 11/09/2017 | 199 | | Proposed Voir Dire by Trammel Thomas (Goodreid, Thomas) (Entered: 11/09/2017) |
| 11/09/2017 | 200 | | Proposed Voir Dire by USA as to Trammel Thomas (Paluch, Martha) (Entered: 11/09/2017) |
| 11/09/2017 | 201 | | Proposed Jury Instructions by USA as to Trammel Thomas (Paluch, Martha) (Entered: 11/09/2017) |
| 11/09/2017 | 202 | | WITNESS LIST by USA as to Trammel Thomas (Fields, Bryan) (Entered: 11/09/2017) |
| 11/10/2017 | 203 | | EXHIBIT LIST by USA as to Trammel Thomas (Fields, Bryan) (Entered: 11/10/2017) |
| 11/10/2017 | 204 | | EXHIBIT LIST by Trammel Thomas (Smith, Daniel) (Entered: 11/10/2017) |
| 11/10/2017 | 205 | | WITNESS LIST by Trammel Thomas (Smith, Daniel) (Entered: 11/10/2017) |
| 11/14/2017 | 206 | | ORDER Denying Motions to Suppress as to Trammel Thomas (2). Defendant's Motions to Suppress #1 (ECF No. 181 ) is DENIED; Defendants Motion to Suppress Evidence Seized Pursuant to Search Warrant (ECF No. 194 ) is DENIED; and Defendant's request for an evidentiary hearing is also DENIED. ORDERED by Judge William J. Martinez on 11/14/2017. (angar, ) (Entered: 11/14/2017) |
| 11/17/2017 | 207 | | MINUTE ENTRY for proceedings held before Judge William J. Martinez: Trial Preparation Conference as to Defendant 2. Trammel Thomas held on 11/17/2017. ORDERED: Each side will be allowed twenty minutes for voir dire and opening statements.ORDERED: The Government's oral motion to quash the Writs of Habeas Corpus Ad Testificandum for 1) Manuel Abate, 2) Eddie Jones, Jr., 3) Dennis Miller and 4) Robert Pickens is GRANTED. The Writs of Habeas Corpus Ad Testificandum for 1) Manuel Abate, 2) Eddie Jones, Jr., 3) Dennis Miller and 4) Robert Pickens are QUASHED. ORDERED: The Government shall send an email to chambers identifying the title and role of anyone who will be seated at counsel table during the trial. ORDERED: The Government shall file its Amended Witness List by November 21, 2017. ORDERED: No later than the end of the day Monday, November 20th counsel shall meet face–to–face to go over the exhibits and |

| | | | stipulate to the admissibility of as many exhibits as possible. The parties shall file Amended Exhibit Lists by November 22, 2017.ORDERED: Counsel shall be present at 8:30 a.m., on November 27th. The court will address pretrial matters at that time. The jury panel will be brought to the courtroom at 9:00 a.m. ORDERED: The Government shall email to chambers, by Tuesday, November 21, the jury instructions, proposed stipulated instructions and verdict forms in an editable format. ORDERED: No trial briefs are allowed Court Reporter: Mary George. (dhans, ) (Entered: 11/20/2017) |
|---|---|---|---|
| 11/21/2017 | 208 | | WITNESS LIST *Amended* by USA as to Trammel Thomas (Paluch, Martha) (Entered: 11/21/2017) |
| 11/22/2017 | 209 | | WITNESS LIST *First amended Witness List* by Trammel Thomas (Smith, Daniel) (Entered: 11/22/2017) |
| 11/22/2017 | 210 | | EXHIBIT LIST – *Amended* by USA as to Trammel Thomas (Fields, Bryan) (Entered: 11/22/2017) |
| 11/24/2017 | 211 | | MOTION to Appoint Counsel *for Proposed Defense Witnesses* by USA as to Trammel Thomas. (Fields, Bryan) (Entered: 11/24/2017) |
| 11/24/2017 | 212 | | EXHIBIT LIST *second amended exhibit list* by Trammel Thomas (Smith, Daniel) (Entered: 11/24/2017) |
| 11/24/2017 | 213 | | Amended MOTION to Appoint Counsel *for Proposed Defense Witnesses* by USA as to Trammel Thomas. (Fields, Bryan) (Entered: 11/24/2017) |
| 11/27/2017 | 214 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on the Government's oral motion for authorization to communicate with members of the jury in this case. Pursuant to Local Criminal Rule 24.1 the Motion is GRANTED. Such communications with the jury are authorized under the following restrictions, which will be strictly enforced:(1) only counsel may speak with the jurors; (2) the communication may only take place after the conclusion of the trial; (3) the communication may ONLY occur within this courtroom; (4) and ONLY with those jurors who voluntarily choose to return into the courtroom to speak with the lawyers after I meet with them; and (5) there will be NO communication with a juror after that juror has left this courtroom. The intent of this Order is to provide counsel with the opportunity to discuss with jurors what transpired in the jurys presence in the courtroom, and to receive input from them which may assist counsel in improving their trial skills in future cases. Accordingly, counsels communications with the jurors will be restricted to these topics. This Order is NOT intended to give counsel the opportunity to make inquiry into the jurys deliberations or to examine with them the validity or consistency of their verdict. Accordingly, counsel are prohibited from discussing with jurors: (a) facts or information which were not received into evidence; (b) the content of the jurys deliberations; or (c) the reasons the jury returned the verdict that it did. Any attorney violating any of these restrictions is subject to being held in contempt of Court. SO ORDERED by Judge William J. Martinez on 11/27/2017. Text Only Entry (wjmsec, ) (Entered: 11/27/2017) |
| 11/27/2017 | 215 | | ORDER as to **Trammel Thomas (2)** granting in part the Government's Motion to Appoint Counsel for Defense Witnesses 213 . That portion of the Motion which requests the appointment of counsel for Mathew Sanders is GRANTED for good cause shown. Counsel from the CJA Panel shall be |

| | | | |
|---|---|---|---|
| | | | appointed to represent Mr. Sanders in this matter. That portion of the Motion that requests appointment for Michael Cox will be ruled on by separate order. SO ORDERED by Judge William J. Martinez on 11/27/2017. Text Only Entry (wjmsec, ) (Entered: 11/27/2017) |
| 11/27/2017 | 217 | | MINUTE ENTRY for proceedings held before Judge William J. Martinez: Jury Trial – Day One as to Defendant 2. Trammel Thomas held on 11/27/2017. Trial continued. Court Reporter: Mary George. (dhans, ) Modified on 11/29/2017 (dhans, ). (Entered: 11/28/2017) |
| 11/28/2017 | 216 | | ORDER as to **Trammel Thomas (2)** denying in part 213 the Government's Motion to Appoint Counsel for Defense Witnesses as moot. That portion of the Motion which requests the appointment of independent counsel for potential witness Michael Cox is DENIED as MOOT. SO ORDERED by Judge William J. Martinez on 11/28/2017. Text Only Entry (wjmsec, ) (Entered: 11/28/2017) |
| 11/28/2017 | 218 | | MINUTE ENTRY for proceedings held before Judge William J. Martinez: Jury Trial – Day Two as to Defendant 2. Trammel Thomas held on 11/28/2017. Trial continued. Court Reporter: Mary George. (dhans, ) (Entered: 11/29/2017) |
| 11/29/2017 | 219 | | MINUTE ENTRY for proceedings held before Judge William J. Martinez: Jury Trial – Day Three as to Defendant 2. Trammel Thomas held on 11/29/2017. Trial continued. Court Reporter: Mary George. (dhans, ) (Entered: 11/29/2017) |
| 11/30/2017 | 223 | | MINUTE ENTRY for proceedings held before Judge William J. Martinez: Jury Trial – Day Four as to Defendant. 2 Trammel Thomas held on 11/30/2017. Jury Verdict of guilty as to Counts 1 through 7 of the Superseding Indictment. Sentencing set for 4/12/2018 at 09:30 AM in Courtroom A801 before Judge William J. Martinez. Defendant is permitted to remain free on bond subject to the conditions of release as set forth in the Magistrate Judges Order Setting Conditions of Release. Court Reporter: Mary George. (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 224 | | Jury List – Unredacted – Restricted Doc. – Level 4 (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 225 | | Clerk's copy of Government's Witness List (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 226 | | Clerk's copy of Government's Exhibit List (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 227 | | Clerk's copy of Defendant's Exhibit List (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 228 | | Jury Instructions as to Defendant 2. Trammel Thomas (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 229 | | Jury Note as to Defendant 2. Trammel Thomas (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 230 | | Jury question; and answer to the question, as to Defendant 2. Trammel Thomas (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 231 | | Jury Note – Unredacted – Restricted Doc. – Level 4 (dhans, ) (Entered: 12/01/2017) |

| | | | |
|---|---|---|---|
| 11/30/2017 | 232 | | Jury question; and answer to the question, as to Defendant 2. Trammel Thomas – Unredacted – Restricted Doc. – Level 4 (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 233 | | JURY VERDICT as to Defendant 2. Trammel Thomas (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 234 | | Jury Verdict Un–Redacted – Level 4 – Viewable by Court Only (dhans, ) (Entered: 12/01/2017) |
| 11/30/2017 | 235 | | STIPULATION AND ORDER REGARDING CUSTODY OF ORIGINAL EXHIBITS as to Defendant 2. Trammel Thomas, by Judge William J. Martinez on 11/30/2017. (dhans, ) (Entered: 12/01/2017) |
| 12/29/2017 | 262 | | SENTENCING STATEMENT by USA as to Trammel Thomas (Paluch, Martha) (Entered: 12/29/2017) |
| 01/08/2018 | 279 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on the Government's Sentencing Statement 262 . The Defendant is DIRECTED to file a Response to the Government's Sentencing Statement on or before **January 26, 2018**. No Reply will be permitted. SO ORDERED by Judge William J. Martinez on 1/8/2018. Text Only Entry (wjmsec, ) (Entered: 01/08/2018) |
| 01/26/2018 | 318 | | SENTENCING STATEMENT by Trammel Thomas (Goodreid, Thomas) (Entered: 01/26/2018) |
| 01/30/2018 | 319 | | REPORTER TRANSCRIPT ORDER FORM filed by Mary George re 298 Notice of Appeal. Transcript due by 2/28/2018. (nrich) (Entered: 01/30/2018) |
| 02/06/2018 | 320 | | ORDER as to **(2) Trammel Thomas**: The Government is DIRECTED to file a Response to 318 Defendant's Sentencing Statement, no later than **February 20, 2018**. SO ORDERED by Judge William J. Martinez on 2/6/2018. Text Only Entry (wjmlc2, ) (Entered: 02/06/2018) |
| 02/20/2018 | 324 | | RESPONSE by USA as to Trammel Thomas re: 318 Sentencing Statement filed by Trammel Thomas (Attachments: # 1 Attachment A)(Paluch, Martha) (Entered: 02/20/2018) |
| 02/21/2018 | 326 | | ORDER as to **(2) Trammel Thomas**: This matter is before the Court on 262 the Government's Sentencing Statement, 318 , Defendant's Sentencing Statement, and 324 the Government's Response. The Government has taken the position that the amount of loss is "more than $550,000 but less than $1.5 million" which would lead to a 14–level increase under U.S.S.G. §2B1.1(b)(1)(H), and also that the judgment should include restitution of $563,890.85. (ECF No. 262 at 1, 14.) Defendant has "advise[d] the Court, as a preliminary matter, that he disputes... the loss amount," but without indicating what calculation of loss he believes is correct, and without addressing restitution. (ECF No. 318 at 4.) The Government's Response 324 addresses only the issues surrounding uncharged conduct, but does not address loss or restitution. Accordingly, the parties are DIRECTED to confer as to whether there is a genuine factual dispute regarding the correct calculations of loss and/or restitution. If the parties are in agreement, they shall file a joint statement reflecting their shared position no later than **March 9, 2018**. If the parties disagree, then each party shall file a separate position statement by |

| | | | |
|---|---|---|---|
| | | | **March 9, 2018**, including each party's calculation of loss and/or restitution, the evidentiary materials supporting that position, and a statement as to whether an evidentiary hearing regarding loss and/or restitution is required, either before the sentencing hearing or simultaneous to it. SO ORDERED by Judge William J. Martinez on 2/21/2018. Text Only Entry (wjmlc2, ) (Entered: 02/21/2018) |
| 03/05/2018 | 331 | | MOTION for Leave to Restrict by USA as to Trammel Thomas. (Attachments: # 1 Proposed Order (PDF Only))(Fields, Bryan) (Entered: 03/05/2018) |
| 03/05/2018 | 332 | | RESTRICTED DOCUMENT – Level 3: by USA as to Trammel Thomas (Fields, Bryan) (Entered: 03/05/2018) |
| 03/05/2018 | 333 | | RESTRICTED DOCUMENT – Level 3: by USA as to Trammel Thomas (Fields, Bryan) (Entered: 03/05/2018) |
| 03/05/2018 | 334 | | MEMORANDUM regarding 333 Motion(s) referred to Magistrate Judge Nina Y. Wang. by Judge William J. Martinez on 3/5/2018. Text Only Entry (wjmsec, ) Modified on 3/5/2018 to add text (angar, ). (Entered: 03/05/2018) |
| 03/06/2018 | 335 | | ORDER as to **Trammel Thomas (2)** granting the Government's Motion to Restrict Documents 331 . The Government's Motion is GRANTED for good cause shown. The documents filed at ECF Nos. 332 and 333 shall remain RESTRICTED at RESTRICTION LEVEL 3 (viewable only by the Filer and the Court). SO ORDERED by Judge William J. Martinez on 3/6/2018. Text Only Entry (wjmsec, ) (Entered: 03/06/2018) |
| 03/06/2018 | 336 | | RESTRICTED DOCUMENT – Level 4. (nmarb, ) Modified on 3/7/2018 (nmarb, ). (Entered: 03/07/2018) |
| 03/07/2018 | 338 | | RESPONSE to Motion by Trammel Thomas re 331 MOTION for Leave to Restrict *and Order #337* (Smith, Daniel) (Entered: 03/07/2018) |
| 03/08/2018 | 339 | | MINUTE ORDER by Magistrate Judge Nina Y. Wang on 3/8/18 as to Trammel Thomas re 333 Restricted Document – Level 3 filed by USA. Clerk of Court to amend the restriction level of 333 from Level 4 to Level 2. The Motion is reserved as to whether Defendant's bond will be revoked. The Parties are directed to contact the chambers of Magistrate Judge Nina Y. Wang to set a revocation hearing and a deadline for a substantive response by Defendant Trammel Thomas. (nmarb, ) (Entered: 03/08/2018) |
| 03/08/2018 | 340 | | RESTRICTED PRESENTENCE REPORT first disclosure for attorney review as to Trammel Thomas (aarag, ) (Entered: 03/08/2018) |
| 03/09/2018 | 341 | | RESPONSE by USA as to Trammel Thomas re: 326 Order,,,,,, (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Paluch, Martha) (Entered: 03/09/2018) |
| 03/09/2018 | 342 | | MEMORANDUM in Support by Trammel Thomas re 326 Order,,,,,, (Smith, Daniel) (Entered: 03/09/2018) |
| 03/12/2018 | 343 | | MOTION for Order *of Forfeiture for a Personal Money Judgment Against Defendant Tramell Thomas* by USA as to Trammel Thomas. (Attachments: # 1 Proposed Order (PDF Only))(Paluch, Martha) (Entered: 03/12/2018) |
| 03/13/2018 | 344 | | |

| | | | |
|---|---|---|---|
| | | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on the United States' Motion for Preliminary Order of Forfeiture for a Personal Money Judgment against Defendant Trammel Thomas 343 . The Defendant is DIRECTED to file a Response to the Government's Motion on or before **March 22, 2018**. No Reply will be permitted. SO ORDERED by Judge William J. Martinez on 3/13/2018. Text Only Entry (wjmsec, ) (Entered: 03/13/2018) |
| 03/15/2018 | 346 | | RESPONSE in Opposition by Trammel Thomas re 343 MOTION for Order *of Forfeiture for a Personal Money Judgment Against Defendant Tramell Thomas* (Smith, Daniel) (Entered: 03/15/2018) |
| 03/22/2018 | 348 | | OBJECTION/RESPONSE to Presentence Report 340 by Trammel Thomas (Attachments: # 1 Exhibit Exhibit A to Defendant's PSIR objections)(Goodreid, Thomas) (Entered: 03/22/2018) |
| 03/23/2018 | 349 | | ORDER as to **Tramell Thomas (2)**: This matter is before the Court on Defendant Tramel [*sic*] Thomas's Objections to the Presentence Investigation Report 348 . The Government is DIRECTED to file a Response to Defendant's Objections on or before **April 3, 2018**. No Reply will be permitted. SO ORDERED by Judge William J. Martinez on 3/23/2018. Text Only Entry (wjmsec, ) (Entered: 03/23/2018) |
| 03/29/2018 | 352 | | RESPONSE by Trammel Thomas *to motion to revoke release status #333* (Smith, Daniel) (Entered: 03/29/2018) |
| 03/29/2018 | 353 | | SENTENCING STATEMENT *and request for specific/variant sentence* by Trammel Thomas (Attachments: # 1 Exhibit exhibits A through G)(Smith, Daniel) (Entered: 03/29/2018) |
| 04/02/2018 | 355 | | RESTRICTED PRESENTENCE REPORT as to Trammel Thomas (Attachments: # 1 Exhibit A, # 2 Exhibit B)(aarag, ) (Entered: 04/02/2018) |
| 04/02/2018 | 356 | | RESTRICTED ADDENDUM to Presentence Report 355 as to Trammel Thomas (aarag, ) (Entered: 04/02/2018) |
| 04/03/2018 | 357 | | RESPONSE by USA as to Trammel Thomas re: 348 Objection/Response to Presentence Report filed by Trammel Thomas (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Paluch, Martha) (Entered: 04/03/2018) |
| 04/03/2018 | 358 | | MOTION for New Trial by Trammel Thomas. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7, # 8 Exhibit Exhibit 8)(Goodreid, Thomas) (Entered: 04/03/2018) |
| 04/03/2018 | 359 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. In the course of preparing for the Sentencing Hearing, currently set for April 12, 2018 at 9:30 a.m, it has become apparent to the undersigned that he is in need of additional time to adequately prepare for said Hearing. As a consequence the Court hereby **VACATES the current Sentencing Hearing and RESETS same to August 9, 2018 at 9:30 a.m.** in Courtroom A801. SO ORDERED by Judge William J. Martinez on 4/3/2018. Text Only Entry (wjmsec, ) (Entered: 04/03/2018) |
| 04/04/2018 | 360 | | CJA MOTION by Trammel Thomas. (Attachments: # 1 Exhibit)(Smith, Daniel) (Entered: 04/04/2018) |

| 04/04/2018 | 362 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant's Motion for New Trial 358 . The Government is DIRECTED to file a Response to Defendant's Motion on or before **April 13, 2018**. After the Government's Response has been received, the Court will determine whether a Reply Brief will be permitted. SO ORDERED by Judge William J. Martinez on 4/4/2018. Text Only Entry (wjmsec, ) (Entered: 04/04/2018) |
|---|---|---|---|
| 04/04/2018 | 369 | | Arrest of Trammel Thomas (Text Only entry) (cthom, ) (Entered: 04/10/2018) |
| 04/04/2018 | 370 | | Rule 5(c)(3) Documents Received as to Trammel Thomas (Attachments: # 1 Waiver, # 2 Notice, # 3 Exhibit to Notice, # 4 Exhibit List, # 5 Order of Detention, # 6 Docket Sheet)(cthom, ) (Entered: 04/10/2018) |
| 04/04/2018 | 371 | | CJA 23 Financial Affidavit by Trammel Thomas. (cthom, ) (Entered: 04/10/2018) |
| 04/04/2018 | 372 | | RESTRICTED DOCUMENT – Level 3 as to Trammel Thomas. (cthom, ) (Entered: 04/10/2018) |
| 04/05/2018 | 363 | | RESTRICTED DOCUMENT – Level 2: ORDER as to Trammel Thomas. (angar, ) Modified to change restriction level pursuant to 368 Order on 4/10/2018 (cthom, ). (Entered: 04/05/2018) |
| 04/09/2018 | 367 | | CJA MOTION by Trammel Thomas. (Smith, Daniel) Modified on 8/1/2018 to terminate as motion – should have not been a motion but rather a supplement to 360 (angar, ). (Entered: 04/09/2018) |
| 04/09/2018 | 368 | | RESTRICTED DOCUMENT – Level 2 as to Trammel Thomas. (cthom, ) (Entered: 04/09/2018) |
| 04/10/2018 | 373 | | RESPONSE in Opposition by USA as to Trammel Thomas re 358 MOTION for New Trial (Attachments: # 1 Exhibit)(Fields, Bryan) (Entered: 04/10/2018) |
| 04/13/2018 | 375 | | Government's Motion to Restrict as to Trammel Thomas. (Attachments: # 1 Proposed Order (PDF Only))(Paluch, Martha) Modified on 4/13/2018 to edit text(angar, ). (Entered: 04/13/2018) |
| 04/13/2018 | 376 | | RESTRICTED DOCUMENT – Level 2: as to Trammel Thomas. (Paluch, Martha) (Entered: 04/13/2018) |
| 04/13/2018 | 377 | | RESTRICTED DOCUMENT – Level 2: as to Trammel Thomas. (Paluch, Martha) (Entered: 04/13/2018) |
| 04/13/2018 | 379 | | ORDER as to **Trammel Thomas (2)** granting the Government's Motion to Restrict Document 375 . The Government's Motion is GRANTED for good cause shown. The documents filed at ECF Nos. 376 and 377 shall remain RESTRICTED at RESTRICTION LEVEL 2 (viewable only by Selected Parties and the Court). SO ORDERED by Judge William J. Martinez on 4/13/2018. Text Only Entry (wjmsec, ) (Entered: 04/13/2018) |
| 04/16/2018 | 383 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant's Sentencing Statement and Request for a Specific/Variant Sentence 353 . This is the Defendant's second Sentencing Statement (the first having been filed at 318), and nothing in the Court's Revised Practice Standards permits the Defendant to file such an additional statement, particularly without obtaining prior leave of Court to do so. Given that this Defendant's sentencing |

| | | | |
|---|---|---|---|
| | | | hearing has been reset to August 9, 2018, however, and in light of the new relief requested by this Defendant in his latest Sentencing Statement for a variant sentence, in the interest of justice the Court will not strike this filing. As a consequence, the Government is DIRECTED to file a Response to Defendant's additional Sentencing Statement 353 on or before **May 14, 2018**. No Reply will be permitted. SO ORDERED by Judge William J. Martinez on 4/16/2018. Text Only Entry (wjmsec, ) (Entered: 04/16/2018) |
| 04/18/2018 | 387 | | OBJECTION/RESPONSE to Presentence Report by Trammel Thomas (Smith, Daniel) Modified on 4/18/2018 to show as pending motion (angar, ). (Entered: 04/18/2018) |
| 04/19/2018 | 388 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant Thomas's Unopposed Motion Requesting Permission to File an Additional Unopposed Objection to Presentence Investigation Report 387 . The Defendant's Motion is GRANTED for good cause shown. Defendant Thomas is granted leave to file an additional objection limited to the matter raised in the Motion only by no later than **Monday, April 23, 2018**. SO ORDERED by Judge William J. Martinez on 4/19/2018. Text Only Entry (wjmsec, ) (Entered: 04/19/2018) |
| 04/20/2018 | 389 | | RESTRICTED DOCUMENT – Level 3: Minute Order as to Trammel Thomas. (nmarb, ) (Entered: 04/20/2018) |
| 04/20/2018 | 390 | | OBJECTION/RESPONSE to Presentence Report by Trammel Thomas (Smith, Daniel) (Entered: 04/20/2018) |
| 04/26/2018 | 392 | | MINUTE ORDER as to Trammel Thomas pursuant to request from the Chambers of Magistrate Judge Nina Y. Wang on 4/26/18. Initial Appearance on Revocation Proceedings set for 4/30/2018 11:00 AM in Courtroom C204 before Magistrate Judge Nina Y. Wang. Text Only Entry (nmarb, ) (Entered: 04/26/2018) |
| 04/27/2018 | 393 | | ORDER Denying 358 Motion for New Trial as to Trammel Thomas (2). ORDERED by Judge William J. Martinez on 4/27/2018. (angar, ) (Entered: 04/27/2018) |
| 04/27/2018 | 394 | | ORDER as to 360 CJA Motion as to Trammel Thomas (2). ORDERED by Judge William J. Martinez on 4/27/2018. (angar, ) (Entered: 04/27/2018) |
| 04/30/2018 | 395 | | MOTION to Continue *TODAYS INITIAL APPEARANCE ON REVOCATION PROCEEDINGS* by Trammel Thomas. (Goodreid, Thomas) (Entered: 04/30/2018) |
| 04/30/2018 | 396 | | MEMORANDUM regarding 395 MOTION to Continue *TODAYS INITIAL APPEARANCE ON REVOCATION PROCEEDINGS* filed by Trammel Thomas. Motion(s) referred to Magistrate Judge Nina Y. Wang. by Judge William J. Martinez on 4/30/2018. Text Only Entry (wjmsec, ) (Entered: 04/30/2018) |
| 04/30/2018 | 397 | | ORDER granting 395 Motion to Continue as to Trammel Thomas (2). The Initial Appearance on Revocation Proceedings set for 4/30/2018 at 11:00 AM is RESET for today at 01:30 PM in Courtroom C204 before Magistrate Judge Nina Y. Wang. By Magistrate Judge Nina Y. Wang on 4/30/2018. Text Only Entry (nywlc2, ) (Entered: 04/30/2018) |

| 04/30/2018 | 399 | COURTROOM MINUTES for Initial Appearance regarding revocation of pre−sentence release as to Trammel Thomas held on 4/30/2018 before Magistrate Judge Nina Y. Wang. Defendant present in custody. Parties discuss if defendant is entitled to a detention hearing in this district, and his rights for appealing the detention decision by Magistrate Willett from the District of Arizona. Defendant's counsel has done further research and retracts his stance in Defendant's Motion for Brief Continuance 395 . Parties request more time to brief the issue. Defendant waives the three days for a detention hearing. Parties discuss how long defendant may delay a Detention Hearing. The court finds good cause exists to continue any Detention Hearing in this district from 5/3/2018 to 5/9/2018. The court will confer with the USMS on the time for the hearing and issue a further order. Defendant advised of violations of conditions of release. Court appoints counsel. Parties shall file a motion or Joint Status Report on or before May 3, 2018. Defendant remanded. (Total time: 26 minutes, Hearing time: 1:35−2:01)<br><br>**APPEARANCES**: Bryan Fields on behalf of the Government, Thomas Goodreid on behalf of the Defendant, Laura Ansart on behalf of Probation. FTR: Courtroom C−204. (bwilk, ) Text Only Entry Modified on 4/30/2018 to add motion deadline (bwilk, ). (Entered: 04/30/2018) |
| --- | --- | --- |
| 04/30/2018 | 400 | ORDER APPOINTING COUNSEL for revocation of release as to Trammel Thomas by Magistrate Judge Nina Y. Wang on 4/30/2018. Text Only Entry (bwilk, ) (Entered: 04/30/2018) |
| 05/03/2018 | 402 | MEMORANDUM in Support by Trammel Thomas *For Revocation Hearing* (Goodreid, Thomas) (Entered: 05/03/2018) |
| 05/03/2018 | 403 | MEMORANDUM in Opposition by USA as to Trammel Thomas (Fields, Bryan) (Entered: 05/03/2018) |
| 05/08/2018 | 404 | MINUTE ORDER as to Trammel Thomas setting Status Conference for 5/9/2018 02:00 PM in Courtroom C204 before Magistrate Judge Nina Y. Wang. The United States Marshals are directed to transport Mr. Thomas to Courtroom C204 at the designated time. By Magistrate Judge Nina Y. Wang on 5/8/2018. Text Only Entry (nywlc2, ) (Entered: 05/08/2018) |
| 05/08/2018 | 405 | MEMORANDUM in Support by USA as to Trammel Thomas *Regarding Defendant's Detention Pending Sentencing* (Attachments: # 1 Exhibit Arizona Order of Detention, # 2 Exhibit Transcript of Arizona Detention Hearing, # 3 Exhibit Original Arizona Order Setting Conditions of Release, # 4 Exhibit Marshals Reports Regarding Defendant's Apprehension, # 5 Exhibit Search Warrant for Defendant's Person, # 6 Exhibit Defendant Objections to PSR, # 7 Exhibit Defendant Sentencing Statement)(Fields, Bryan) (Entered: 05/08/2018) |
| 05/09/2018 | 406 | COURTROOM MINUTES for Status Conference as to Trammel Thomas held on 5/9/2018 before Magistrate Judge Nina Y. Wang. Defendant present in custody. Parties discuss issues briefed in 402 , and 403 . The court will set a Revocation Hearing in this district. Revocation Hearing re: violations of conditions of release is set for 5/30/2018 10:30 AM in Courtroom C204 before Magistrate Judge Nina Y. Wang. Probation shall have staff present for the hearing. The court will issue a written order. Defendant indicates that counsel may file a motion to withdraw. Defendant remanded. (Total time: 9 minutes, |

| | | |
|---|---|---|
| | | Hearing time: 2:03–2:12) **APPEARANCES**: Bryan Fields on behalf of the Government, Thomas Goodreid on behalf of the Defendant. FTR: Courtroom C–204. (bwilk, ) Text Only Entry (Entered: 05/09/2018) |
| 05/11/2018 | 407 | RESPONSE by USA as to Trammel Thomas re: 353 Sentencing Statement filed by Trammel Thomas (Paluch, Martha) (Entered: 05/11/2018) |
| 05/15/2018 | 408 | ORDER as to Trammel Thomas by Magistrate Judge Nina Y. Wang on 5/15/18. Bond Revocation Hearing set for 5/30/2018 10:30 AM in Courtroom C204 before Magistrate Judge Nina Y. Wang. (nmarb, ) (Entered: 05/15/2018) |
| 05/21/2018 | 409 | Unopposed MOTION to Continue *Time of Revocation Hearing* by Trammel Thomas. (Goodreid, Thomas) (Entered: 05/21/2018) |
| 05/21/2018 | 410 | MEMORANDUM regarding 409 Unopposed MOTION to Continue *Time of Revocation Hearing* filed by Trammel Thomas. Motion(s) referred to Magistrate Judge Nina Y. Wang. by Judge William J. Martinez on 5/21/2018. Text Only Entry (wjmsec, ) (Entered: 05/21/2018) |
| 05/21/2018 | 411 | RESTRICTED SECOND ADDENDUM to Presentence Report 355 as to Trammel Thomas (Attachments: # 1 Exhibit A)(sdean, ) (Entered: 05/21/2018) |
| 05/22/2018 | 412 | MOTION to Withdraw as Attorney by Thomas E. Goodreid and Daniel T. Smith by Trammel Thomas. (Goodreid, Thomas) (Entered: 05/22/2018) |
| 05/22/2018 | 413 | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. The Court has been informed that the Probation Office has training on August 9, 2018. As a result, the Sentencing Hearing set for August 9, 2018 is hereby **VACATED and RESET to August 8, 2018 at 9:30 a.m.** in Courtroom A801. SO ORDERED by Judge William J. Martinez on 5/22/2018. Text Only Entry (wjmsec, ) (Entered: 05/22/2018) |
| 05/22/2018 | 414 | MEMORANDUM regarding 412 MOTION to Withdraw as Attorney by Thomas E. Goodreid and Daniel T. Smith filed by Trammel Thomas. Motion(s) referred to Magistrate Judge Nina Y. Wang. by Judge William J. Martinez on 5/22/2018. Text Only Entry (wjmsec, ) (Entered: 05/22/2018) |
| 05/23/2018 | 415 | MINUTE ORDER by Magistrate Judge Nina Y. Wang on 5/23/18, as to Trammel Thomas re 412 MOTION to Withdraw as Attorney by Thomas E. Goodreid and Daniel T. Smith filed by Trammel Thomas. Motion Hearing set for 5/25/2018 01:30 PM in Courtroom C204 before Magistrate Judge Nina Y. Wang. The United States Marshal is DIRECTED to TRANSPORT Defendant Thomas to court for the purposes of the hearing. (nmarb, ) (Entered: 05/23/2018) |
| 05/25/2018 | 418 | COURTROOM MINUTES for Motion Hearing as to Trammel Thomas held on 5/25/2018 before Magistrate Judge Nina Y. Wang. Defendant present in custody. Parties discuss the Motion to Withdraw as Attorney 412 as to Trammel Thomas (2). Government counsel is asked to leave the courtroom. Record is sealed to discuss reasons for the motion. Record is unsealed and Government counsel re–enters courtroom. Defendant withdraws his request for counsel to withdraw. The court denies as MOOT the Motion to Withdraw as Attorney 412 as to Trammel Thomas(2). Parties discuss the Unopposed |

| | | | |
|---|---|---|---|
| | | | Motion to Continue Time of Revocation Hearing 409 . The Unopposed Motion to Continue Time of Revocation Hearing 409 is GRANTED. The Revocation Hearing is moved from 5/30/2018 at 10:30AM to 5/30/2018 at 2:30PM in Courtroom C–204. Defendant remanded. (Total time: 15 minutes, Hearing time: 1:38–1:53, a portion of this hearing is **sealed 1:39–1:48**)<br><br>**APPEARANCES**: Bryan Fields on behalf of the Government, Thomas Goodreid, and Daniel Smith (via telephone) on behalf of the Defendant, Laura Ansart on behalf of Probation. FTR: Courtroom C–204. (bwilk, ) Text Only Entry (Entered: 05/25/2018) |
| 05/30/2018 | 421 | | COURTROOM MINUTES for Bond Revocation Hearing as to Trammel Thomas held on 5/30/2018 before Magistrate Judge Nina Y. Wang. Defendant present in custody. Parties proceed by proffer. Parties argue if Defendant's order of release should be revoked. The court takes under advisement the Government's Motion to Revoke and will issue a written order by end of day tomorrow (May 31, 2018). Defendant remanded. (Total time: 31 minutes, Hearing time: 2:59–3:30)<br><br>**APPEARANCES**: Bryan Smith and Martha Paluch on behalf of the Government, Thomas Goodreid and Daniel Smith (via telephone) on behalf of the defendant, Justine Kozak on behalf of pretrial. FTR: Courtroom C–204. (bwilk, ) Text Only Entry (Entered: 05/30/2018) |
| 05/31/2018 | 422 | | ORDER OF DETENTION as to Trammel Thomas by Magistrate Judge Nina Y. Wang on 5/31/18. (nmarb, ) (Entered: 05/31/2018) |
| 07/20/2018 | 431 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. In order to more efficiently use the time available for courtroom settings, the Sentencing Hearing set for August 8, 2018 at 9:30 a.m. is hereby **RESET to August 8, 2018 at 9:00 a.m.** in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards with regard to the deadlines for filing sentencing–related motions. SO ORDERED by Judge William J. Martinez on 7/20/2018. Text Only Entry (wjmsec, ) (Entered: 07/20/2018) |
| 07/24/2018 | 435 | | SUPPLEMENT to 262 Sentencing Statement by USA as to Trammel Thomas (Paluch, Martha) (Entered: 07/24/2018) |
| 07/25/2018 | 436 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on the Government's Supplemental Sentencing Statement 435 . The Defendant is DIRECTED to file a Response to the Government's Supplemental Sentencing Statement on or before **August 1, 2018**. No Reply will be permitted. SO ORDERED by Judge William J. Martinez on 7/25/2018. Text Only Entry (wjmsec, ) (Entered: 07/25/2018) |
| 07/25/2018 | 437 | | RESTRICTED REVISED PRESENTENCE REPORT as to Trammel Thomas (Attachments: # 1 Exhibit A, # 2 Exhibit B)(aarag, ) (Entered: 07/25/2018) |
| 07/25/2018 | 438 | | RESTRICTED THIRD ADDENDUM to Presentence Report 437 as to Trammel Thomas (aarag, ) (Entered: 07/25/2018) |
| 07/25/2018 | 439 | | MOTION for Extension of Time to File *response* by Trammel Thomas. (Smith, Daniel) (Entered: 07/25/2018) |
| 07/26/2018 | 440 | | |

| | | | |
|---|---|---|---|
| | | | ORDER as to **Trammel Thomas (2)** granting in part Defendant's Motion for Extension of Time 439 . Were the Court to grant the motion in full, the undersigned would have no time to meaningfully consider the response in preparing for the sentencing hearing the following day. Furthermore, the current sentencing hearing date has been set since May 22, 2018 413 , and counsel made their vacation plans knowing, as experienced criminal defense counsel, of the flurry of filings generally submitted on the eve of a sentencing hearing. Moreover, it should be noted that defense counsel balked at the Court's inquiry into the feasibility of rescheduling the sentencing hearing to August 9 or 10, 2018. In the interest of justice, however, the Motion is GRANTED IN PART. The Defendant's deadline to file his Response to the Government's Supplemental Sentencing Statement is extended up to and including **Monday, August 6, 2018**. SO ORDERED by Judge William J. Martinez on 7/26/2018. Text Only Entry (wjmsec, ) (Entered: 07/26/2018) |
| 08/01/2018 | 441 | | EXHIBIT LIST *for Sentencing Hearing* by USA as to Trammel Thomas (Attachments: # 1 Exhibit)(Fields, Bryan) (Entered: 08/01/2018) |
| 08/01/2018 | 442 | | WITNESS LIST *for Sentencing Hearing* by USA as to Trammel Thomas (Attachments: # 1 Exhibit)(Fields, Bryan) (Entered: 08/01/2018) |
| 08/03/2018 | 443 | | EXHIBIT LIST *Amended for Sentencing* by USA as to Trammel Thomas (Attachments: # 1 Exhibit)(Fields, Bryan) (Entered: 08/03/2018) |
| 08/06/2018 | 444 | | OBJECTION/RESPONSE to Presentence Report by Trammel Thomas (Smith, Daniel) (Entered: 08/06/2018) |
| 08/06/2018 | 445 | | Letter by Trammel Thomas (Attachments: # 1 Envelope)(angar, ) (Entered: 08/07/2018) |
| 08/06/2018 | 447 | | **DUPLICATE ENTRY** NOTICE of Letter by Trammel Thomas (angar, ) Modified on 8/8/2018 to correct filing date (angar, ). Modified on 8/8/2018 to show duplicate to 445 Letter (angar, ). (Entered: 08/08/2018) |
| 08/08/2018 | 446 | | MINUTE ENTRY for all–day Evidentiary Sentencing Hearing, held on 8/8/2018 as to defendant 2. Trammel Thomas, before Judge William J. Martinez: ORDERED: The defendant's oral request for the Court to appoint new counsel is DENIED. ORDERED: The defendant's oral request to appear pro se is GRANTED. ORDERED: Leave for defense counsel to withdraw from this case is GRANTED. ORDERED: The defendant's oral request for a continuance of the sentencing hearing is GRANTED IN PART. ORDERED: This sentencing hearing is continued to Monday, October 22, 2018 at 10:00 a.m. ORDERED: No further briefing will be accepted. Court Reporter: Mary George. (dhans, ) (Entered: 08/08/2018) |
| 10/15/2018 | 448 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. Given the potential length of the Sentencing Hearing in this matter currently set for October 22, 2018 at 10:00 a.m., said Sentencing Hearing is hereby **RESET to October 22, 2018 at 9:30 a.m.** in Courtroom A801. SO ORDERED by Judge William J. Martinez on 10/15/2018. Text Only Entry (wjmsec, ) (Entered: 10/15/2018) |
| 10/15/2018 | 449 | | CERTIFICATE of Mailing by Clerk, re 448 Order, to Trammel Thomas, #57094408, FCI – ENGLEWOOD, 9595 WEST QUINCY AVENUE, LITTLETON, CO 80123. Text Only Entry. (sphil, ) (Entered: 10/15/2018) |

| 10/22/2018 | 450 | | MINUTE ENTRY for Sentencing Hearing, held on 10/22/2018 as to defendant 2. Trammel Thomas, before Judge William J. Martinez. ORDERED: The defendant's oral request for a continuance is GRANTED. ORDERED. This sentencing hearing is continued to Monday, January 14, 2019 at 9:30 a.m. Court Reporter: Mary George. (swest) (Entered: 10/22/2018) |
|---|---|---|---|
| 11/20/2018 | 456 | | RESTRICTED REVISED PRESENTENCE REPORT as to Trammel Thomas (Attachments: # 1 Exhibit A, # 2 Exhibit B)(aarag, ) (Entered: 11/20/2018) |
| 11/20/2018 | 457 | | RESTRICTED FOURTH ADDENDUM to Presentence Report 456 as to Trammel Thomas (aarag, ) (Entered: 11/20/2018) |
| 11/21/2018 | 458 | 36 | TRANSCRIPT of Sentencing Hearing as to Trammel Thomas held on October 22, 2018 before Judge Martinez. Pages: 1–36. <br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 11/21/2018) |
| 01/09/2019 | 459 | | NOTICE *OF CORRECTION* re 357 Response by USA as to Trammel Thomas (Paluch, Martha) (Entered: 01/09/2019) |
| 01/10/2019 | 460 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court *sua sponte*. Due to a conflict with a criminal jury trial the week of January 14, 2019, the Sentencing Hearing set for January 14, 2019 at 9:30 a.m. is hereby **VACATED and RESET to April 30, 2019 at 9:30 a.m.** in Courtroom A801. SO ORDERED by Judge William J. Martinez on 1/10/2019. (wjmsec, ) (Entered: 01/10/2019) |
| 04/23/2019 | 464 | | NOTICE OF ATTORNEY APPEARANCE: Tasha Anya Steward appearing for Trammel ThomasAttorney Tasha Anya Steward added to party Trammel Thomas(pty:dft) (Steward, Tasha) (Entered: 04/23/2019) |
| 04/23/2019 | 465 | | First MOTION to Continue by Trammel Thomas. (Steward, Tasha) (Entered: 04/23/2019) |
| 04/23/2019 | 466 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant's Motion to Continue the Sentencing Hearing 465 . The Government is DIRECTED to file a Response to Defendant's Motion on or before **tomorrow, April 24, 2019**. No Reply will be permitted. SO ORDERED by Judge William J. Martinez on 4/23/2019. Text Only Entry (wjmsec, ) (Entered: 04/23/2019) |
| 04/24/2019 | 467 | | RESPONSE to Motion by USA as to Trammel Thomas re 465 First MOTION to Continue *Sentencing Hearing* (Paluch, Martha) (Entered: 04/24/2019) |
| 04/25/2019 | 468 | | ORDER as to **Trammel Thomas (2)**: This matter is before the Court on Defendant's Motion to Continue the Sentencing Hearing 465 . In its Response to the Motion 467 the Government states that it reluctantly does not oppose a |

| | | | brief continuance of the sentencing hearing, although it does oppose the re–opening of any briefing on the sentencing–related mattes which have already been extensively briefed and are ripe for decision. As the Government correctly points out in its Response, the instant Motion is the Defendant's third request to continue his sentencing hearing. The Court shares the Government's frustration at the Defendant's seeming unending and consistent pattern of manipulating the Court's calendar in successive efforts to delay as much as possible the date on which he will be sentenced. Indeed, the Court's frustration at this state of affairs was previously made clear at the last sentencing hearing on October 22, 2018, at which time the Court stated that "[a]bsent a true emergency, this sentencing hearing is continued for a final time to Monday, January 14, 2019 at 9:30 a.m." *See* Minutes of October 22, 2018 hearing 450 . Balancing all the factors and arguments set forth by counsel in their respective filings on the instant Motion, the Court ORDERS as follows: (a) The sentencing hearing for this Defendant will be continued for a FINAL TIME to **Tuesday, June 4, 2019 at 10:00 a.m.** in Courtroom A801; (b) the briefing on any pending sentencing–related motion filed by either party WILL NOT be reopened; and (c) given that the deadlines for the filing of any sentencing–related motions expired several months ago, NO NEW sentencing–related motion or request for relief will be accepted. SO ORDERED by Judge William J. Martinez on 4/25/2019. Text Only Entry (wjmsec, ) (Entered: 04/25/2019) |
| 05/29/2019 | 473 | | WITNESS LIST *for June 4, 2019 Sentencing Hearing (Amended)* by USA as to Trammel Thomas (Attachments: # 1 Amended Witness List)(Fields, Bryan) (Entered: 05/29/2019) |
| 06/03/2019 | 474 | | SENTENCING STATEMENT by Trammel Thomas (Attachments: # 1 Exhibit Letter of Support, # 2 Exhibit Letter of Support, # 3 Exhibit Letter of Support/Employment, # 4 Exhibit Letter of Support, # 5 Exhibit Letter of Support, # 6 Exhibit Testimony Exhibit, # 7 Exhibit Testimony Exhibit, # 8 Exhibit Certificate, # 9 Exhibit Certificate, # 10 Exhibit Photos, # 11 Exhibit Photos, # 12 Exhibit Photos)(Steward, Tasha) (Entered: 06/03/2019) |
| 06/03/2019 | 475 | | ORDER THAT a Preliminary Order of Forfeiture for a Personal Money Judgment against Defendant Trammell Thomas in the amount of $260,226.85 shall be entered in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). Pursuant to Federal Rule of Criminal Procedure 32.2(b)(4), this Forfeiture Money Judgment shall become final as to the Defendant at the time of sentencing and shall be made part of the sentence and included in the judgment.THAT this Preliminary Order of Forfeiture may be entered pursuant to Rule32.2(e)(1) of the Federal Rules of Criminal Procedure. by Judge William J. Martinez on 6/3/2019. (evana, ) (Entered: 06/03/2019) |
| 06/04/2019 | 476 | | STIPULATION AND ORDER Regarding Custody of Original Exhibits as to Trammel Thomas (2). Entered by Judge William J. Martinez on 6/4/2019. (afran) (Entered: 06/04/2019) |
| 06/04/2019 | 477 | | COURTROOM MINUTES for Sentencing Hearing as to defendant Trammel Thomas (2) held before Judge William J. Martinez on 6/4/2019. Granting Government's Oral Motion for a Two–Level Enhancement in the Offense Level. Granting in part 353 Defendant's motion referenced in the Sentencing Statement and Request for a Specific/Variant Sentence. Defendant sentenced |

| | | | |
|---|---|---|---|
| | | | as reflected on the record. Defendant remanded. Court Reporter: Mary George. (Attachments: # 1 Government's Exhibit List) (afran) (Entered: 06/04/2019) |
| 06/04/2019 | 478 | | RESTRICTED AMENDED PRESENTENCE REPORT as to Trammel Thomas (Attachments: # 1 Exhibit A – Sentence Recommendation, # 2 Exhibit B – Victim Impact Statements)(sdean, ) (Entered: 06/04/2019) |
| 06/04/2019 | 479 | | RESTRICTED FIFTH ADDENDUM to Presentence Report 478 as to Trammel Thomas (sdean, ) (Entered: 06/04/2019) |
| 06/05/2019 | 480 | | JUDGMENT as to defendant Trammel Thomas (2). Counts 1 through 7 of the Superseding Indictment: Defendant sentenced to 120 months imprisonment as to Counts 1 through 7, to run concurrently. 3 years of supervised release as to Counts 1 through 7, to run concurrently. $700 special assessment fee. $563,890.85 restitution joint and several with co–defendants. Entered by Judge William J. Martinez on 6/5/2019. (afran) (Entered: 06/05/2019) |
| 06/05/2019 | 481 | | STATEMENT OF REASONS as to Trammel Thomas (2). (afran) (Entered: 06/05/2019) |
| 06/11/2019 | 482 | | First MOTION to Withdraw as Attorney by Tasha A. Steward by Trammel Thomas. (Steward, Tasha) (Entered: 06/11/2019) |
| 06/12/2019 | 483 | | MEMORANDUM regarding 482 First MOTION to Withdraw as Attorney by Tasha A. Steward filed by Trammel Thomas. Motion(s) referred to Magistrate Judge Scott T. Varholak. by Judge William J. Martinez on 6/12/2019. Text Only Entry (wjmsec, ) (Entered: 06/12/2019) |
| 06/12/2019 | 484 | | ORDER DENYING WITHOUT PREJUDICE 482 Motion to Withdraw as Attorney as to Trammel Thomas (2). Judgment was entered on 6/5/2019 480 as to Defendant Thomas, and the Court is concerned that allowing counsel to withdraw prior to the filing of any notice of appeal will leave new counsel insufficient time to perfect Defendant's appellate rights. If Defendant wishes to appeal, current counsel should assist in filing the notice of appeal. Once any notice of appeal is filed, counsel may file a renewed motion to withdraw as counsel. SO ORDERED, by Magistrate Judge Scott T. Varholak on 6/12/2019. Text Only Entry (stvlc2, ) (Entered: 06/12/2019) |
| 06/12/2019 | 485 | | NOTICE OF APPEAL as to 393 Order on Motion for New Trial, 223 Jury Trial/Jury Verdict,,, Set Hearings,, 480 Judgment, by Trammel Thomas. (Steward, Tasha) (Entered: 06/12/2019) |
| 06/12/2019 | 486 | | MOTION for Leave to Appeal In Forma Pauperis, by Trammel Thomas. (Steward, Tasha) Modified on 6/13/2019 to correct text (angar, ). (Entered: 06/12/2019) |
| 06/12/2019 | 487 | | MOTION to Appoint Counsel by Trammel Thomas. (Attachments: # 1 CJA Attachment Fin. Aff.)(Steward, Tasha) (Entered: 06/12/2019) |
| 06/12/2019 | 488 | | Second MOTION to Withdraw as Counsel by Trammel Thomas. (Steward, Tasha) Modified on 6/13/2019 to correct text (angar, ). (Entered: 06/12/2019) |
| 06/13/2019 | 489 | | MEMORANDUM regarding 488 MOTION to Withdraw as Attorney filed by Trammel Thomas, 487 MOTION to Appoint Counsel filed by Trammel Thomas. Motion(s) referred to Magistrate Judge Scott T. Varholak. by Judge William J. Martinez on 6/13/2019. Text Only Entry (wjmsec, ) (Entered: |

| | | | |
|---|---|---|---|
| | | | 06/13/2019) |
| 06/13/2019 | 490 | | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 485 Notice of Appeal as to Trammel Thomas to the U.S. Court of Appeals. ( CJA,) (Attachments: # 1 Preliminary Record and Docket Sheet)(angar, ) (Entered: 06/13/2019) |
| 06/13/2019 | 491 | | ORDER granting 487 Motion to Appoint Counsel as to Trammel Thomas (2); granting 488 Motion to Withdraw as Attorney. Tasha Anya Steward withdrawn from case as to Trammel Thomas (2) by Magistrate Judge Scott T. Varholak on 6/13/2019. (jgonz, ) (Entered: 06/13/2019) |
| 06/13/2019 | 492 | | ORDER Denying as Moot 486 The Prisoner's Motion and Affidavit for Leave to Proceed on Appeal Pursuant to 28 U.S.C. § 1915 and FED.R.APP.24 as to Trammel Thomas (2), by Judge William J. Martinez on 6/13/2019. (angar, ) (Entered: 06/13/2019) |
| 06/13/2019 | 493 | | USCA Case Number as to Trammel Thomas 19–1209 for 485 Notice of Appeal filed by Trammel Thomas. (angar, ) (Entered: 06/17/2019) |
| 06/13/2019 | 494 | | ORDER of USCA as to Trammel Thomas re 485 Notice of Appeal. (USCA Case No. 19–1209) (angar, ) (Entered: 06/17/2019) |
| 07/03/2019 | 495 | | DESIGNATION OF RECORD ON APPEAL re 485 Notice of Appeal by Trammel Thomas. (Truskoski, Ryan) (Entered: 07/03/2019) |
| 07/03/2019 | 496 | | TRANSCRIPT ORDER FORM re 485 Notice of Appeal by Trammel Thomas. (Truskoski, Ryan) (Entered: 07/03/2019) |
| 07/15/2019 | 497 | | REPORTER TRANSCRIPT ORDER FORM filed by Mary George re 485 Notice of Appeal. Transcript due by 8/12/2019. (nrich) (Entered: 07/15/2019) |
| 08/09/2019 | 498 | 72 | TRANSCRIPT of Final Trial Preparation Conference as to Trammel Thomas held on November 17, 2017 before Judge Martinez. Pages: 1–44. <br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 499 | | VOIR DIRE TRANSCRIPT of proceedings held on November 27, 2017 before Judge Martinez. Pages: 1–155. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 500 | 116 | TRANSCRIPT of Jury Trial, Day 1 as to Trammel Thomas held on November 27, 2017 before Judge Martinez. Pages: 156–290. <br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic** |

| | | | |
|---|---|---|---|
| | | | **Availability of Transcripts document at www.cod.uscourts.gov.\<br>**\<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 501 | 251 | TRANSCRIPT of Jury Trial, Day 2 as to Trammel Thomas held on November 28, 2017 before Judge Martinez. Pages: 291–527. \<br>**\<br> NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.\<br>**\<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 502 | 488 | TRANSCRIPT of Jury Trial, Day 3 as to Trammel Thomas held on November 29, 2017 before Judge Martinez. Pages: 528–652. \<br>**\<br> NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.\<br>**\<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 503 | 613 | TRANSCRIPT of Jury Trial, Day 4 as to Trammel Thomas held on November 30, 2017 before Judge Martinez. Pages: 653–755. \<br>**\<br> NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.\<br>**\<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 504 | 716 | Partial TRANSCRIPT of Sentencing Hearing as to Trammel Thomas held on August 8, 2018 before Judge Martinez. Pages: 1–7. \<br>**\<br> NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.\<br>**\<br> |

| | | | |
|---|---|---|---|
| | | | Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 505 | | RESTRICTED TRANSCRIPT of proceedings held on August 8, 2018 before Judge Martinez. Pages: 1–16. (mgeor, ) (Entered: 08/09/2019) |
| 08/09/2019 | 506 | 723 | TRANSCRIPT of Sentencing Hearing as to Trammel Thomas held on June 4, 2019 before Judge Martinez. Pages: 1–179. <br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 08/09/2019) |
| 09/03/2019 | 507 | | TRANSCRIPT ORDER FORM re 485 Notice of Appeal by Trammel Thomas. (Truskoski, Ryan) (Entered: 09/03/2019) |
| 09/18/2019 | 509 | | REPORTER TRANSCRIPT ORDER FORM filed by AB Court Reporting & Video, Inc. re 485 Notice of Appeal. Transcript due by 9/30/2019. (nrich) (Entered: 09/18/2019) |
| 09/23/2019 | 510 | | REPORTER TRANSCRIPT ORDER FORM filed by Julie Thomas re 485 Notice of Appeal. Transcript due by 10/18/2019. (nrich) (Entered: 09/23/2019) |
| 10/07/2019 | 511 | | TRANSCRIPT of TRANSCRIPT OF PROCEEDINGS as to Trammel Thomas held on 05/09/2018 before Magistrate Judge Wang. Pages: 1–9. Prepared by: AB Court Reporting & Video, Inc..<br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 10/07/2019) |
| 10/17/2019 | 514 | | TRANSCRIPT of MOTION HEARING as to Trammel Thomas held on 5/25/18 before Judge Wang. Pages: 1–7. <br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made** |

| | | | |
|---|---|---|---|
| | | | **electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (Thomas, Julie) (Entered: 10/17/2019) |
| 10/17/2019 | 515 | | RESTRICTED TRANSCRIPT of MOTION HEARING proceedings held on 5/25/18 before Judge Wang. Pages: 1–7. (Thomas, Julie) (Entered: 10/17/2019) |
| 11/18/2019 | 522 | | ORDER of USCA as to Trammel Thomas re 485 Notice of Appeal. (USCA Case No. 19–1209) (angar, ) (Entered: 11/19/2019) |
| 11/21/2019 | 523 | | DESIGNATION OF RECORD ON APPEAL re 485 Notice of Appeal by Trammel Thomas. (Truskoski, Ryan) (Entered: 11/21/2019) |

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
    Criminal Action No. 16-cr-0054-WJM-2
 3
    UNITED STATES OF AMERICA,
 4
    Plaintiff,
 5
    vs.
 6
    TRAMMEL THOMAS,
 7
    Defendant.
 8
    ------------------------------------------------------------
 9
                      REPORTER'S TRANSCRIPT
10                     (Sentencing Hearing)

11  ------------------------------------------------------------

12       Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13  Judge, United States District Court for the District of

14  Colorado, commencing at 9:33 a.m., on the 22d day of

15  October, 2018, in Courtroom A801, United States Courthouse,

16  Denver, Colorado.

17
                          APPEARANCES
18

19       MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
    Attorneys, 1801 California Street, Suite 1600, Denver,
20  Colorado 80202, appearing for the plaintiff.

21       DEFENDANT APPEARING PRO SE.

22
                    MARY J. GEORGE, FCRR, CRR, RMR
23             901 19th Street, Denver, Colorado 80294
               Proceedings Reported by Mechanical Stenography
24                Transcription Produced via Computer

25
```

2

1          P R O C E E D I N G S

2          (Call to order of the court at 9:33 a.m.)

3          THE COURT:  All right.  We are on the record in

4    criminal case No. 16 cr 054, defendant No. 2, the United

5    States of America versus Trammel Thomas.

6          I'll take appearances of counsel and the defendant.

7          MS. PALUCH:  Good morning, Your Honor.  Martha

8    Paluch and Brian Fields appearing on behalf of the United

9    States.  With us at counsel table is Special Agent Sandra

10   Ennis.

11         THE COURT:  Good morning to the three of you.

12         MR. FIELDS:  Good morning, Your Honor.

13         THE DEFENDANT:  Good morning, Your Honor.  Trammel

14   Thomas.

15         THE COURT:  What's the matter?

16         THE DEFENDANT:  Oh, I'm okay.

17         THE COURT:  All right.  Will the probation officer

18   please identify herself for the record.

19         PROBATION OFFICER:  Good morning, Your Honor.

20   Laura Ansart with the probation office.

21         THE COURT:  Welcome, Ms. Ansart, and good morning.

22         All right.  We're here for the sentencing of the

23   defendant.  The record reflects that on the 30th of November

24   of last year, a jury convicted Mr. Thomas on each of the

25   seven counts of the superseding indictment returned by the

3

1    grand jury against him in this case.

2           With respect to Count 1, conspiracy to defraud the

3    Government with respect to claims in violation of 18 United

4    States Code Section 286, there was a guilty verdict returned

5    on that count.  With respect to Counts 2 through 7, there

6    were also guilty verdicts returned by the jury on the -- and

7    aiding and abetting mail fraud counts in violation of 18

8    United States Code Sections 1341 and 2.

9           All right.  Let's begin.  Ms. Paluch, can you

10   briefly summarize your respective sentencing recommendation

11   and including the custodial sentence, the restitution, and

12   supervised release the Government will be recommending.

13          MS. PALUCH:  Yes, Your Honor.  The Government is

14   seeking a sentence of 180 months in prison, followed by

15   three years of supervised release, $700 in special

16   assessment fees, which is $100 on each count of conviction,

17   an order of restitution in the amount of $563,890.85,

18   $562,487.85 of that amount to be ordered jointly and

19   severally with his codefendants, Heather Carr, Marcelle

20   Green, and Mercedes Diaz.  And a final order of forfeiture

21   in the amount of 260,226 -- 226 hundred and 85 cents.  Thank

22   you.

23          THE COURT:  And let me see.  Did we cover

24   forfeiture in the report, Ms. Ansart?  And I don't recall

25   there being a forfeiture order against any of the

4

1  codefendants.

2          MS. PALUCH:  There was not, Your Honor, and that's

3  because the codefendants all pled guilty to conspiracy, the

4  286 charge, for which we cannot obtain forfeiture.  So the

5  forfeiture is only applicable on the mail fraud counts of

6  conviction.

7          THE COURT:  All right.  Ms. Ansart.

8          PROBATION OFFICER:  Your Honor, the only mention of

9  that is just that it was alleged in the superseding

10  indictment.

11         THE COURT:  Okay.  Well, I'm completely unprepared

12  for this forfeiture.  Did you give notice to me that you

13  were going to be seeking forfeiture of a quarter of a

14  million dollars?

15         MS. PALUCH:  I did, Your Honor.  It's in ECF 341

16  and I also filed a preliminary order of forfeiture --

17         THE COURT:  All right.

18         MS. PALUCH:  -- prior to the last sentencing

19  hearing.

20         THE COURT:  One second.  Where does this 220,000

21  come from?

22         MS. PALUCH:  Your Honor, we submitted a chart which

23  articulates how we calculated forfeiture with respect to

24  this defendant.  And what we did is we only attributed to

25  him the amount of loss from the 52 debit cards that were

1      found in his possession, as well as we used the addresses

2      upon which he was convicted beyond a reasonable doubt.  And

3      we used that calculation under the guidance of Honeycut to

4      reduce the forfeiture amount in that way.

5               THE COURT:  What -- give me your ECF number again.

6               MS. PALUCH:  The ECF for our position on forfeiture

7      is found at 341.  And, actually, the spreadsheet that sets

8      forth the forfeiture amounts is found at 341-5.  And if I

9      have a moment, I might be able to find the ECF number of the

10     preliminary order of forfeiture, but I know it was entered

11     just prior to the August 8th sentencing hearing that was

12     scheduled.

13               THE COURT:  Let me see.  Well, because there wasn't

14     any discussion of this in the report is why I didn't prepare

15     for it in my sentencing script.  Let me see.  I've got 341

16     in front of me.

17               MS. PALUCH:  And, Your Honor, if I could, the

18     preliminary -- motion for preliminary order of forfeiture is

19     found at 343.

20               THE COURT:  Okay.  So your spreadsheet's at 341-5?

21               MS. PALUCH:  Yes, sir.

22               THE COURT:  All right.  Ms. West, can you do me a

23     favor and go to ECF 341, pull up Exhibit 5, and print it out

24     and bring it to me here on the bench.

25               MS. PALUCH:  And, Your Honor, if I could interrupt.

6

1  I apologize.  But you will find that same chart in your

2  exhibit book in front of you.  It's found -- we have marked

3  that exact same chart as Government Sentencing Exhibit 72-2.

4  That is the same chart that we submitted with ECF 341.

5          THE COURT:  Oh, okay.  So you don't have to print

6  it out.  So that's Exhibit GS 72-2.

7          COURTROOM DEPUTY:  Your Honor, do you need the

8  motion 343?

9          THE COURT:  No, I have it.  I have that in the

10 file.  Yeah.  So that's your spreadsheet.  Are you going to

11 use this with a witness?

12         MS. PALUCH:  I am, Your Honor.

13         THE COURT:  Okay.  All right.  Well, then, we'll

14 deal with it when we get there.

15         MS. PALUCH:  Thank you.

16         THE COURT:  And give me the -- oh, it should be in

17 the -- I don't have it in front of me.  If you have the

18 number handy, can you give me the total number for

19 forfeiture --

20         MS. PALUCH:  Yes, Your Honor.  The amount of

21 forfeiture that we are seeking is 260 -- I'm having trouble

22 this morning -- $260,000 2 -- 260,226 -- I am struggling,

23 I'm going to give you the numbers, two six zero two two six

24 point 85.

25         THE COURT:  All right.  Mr. Thomas, I need you to

 1    tell me your position on what you are recommending I impose

 2    upon you in terms of the length of your custodial sentence,

 3    the length of your supervised release, the amount in

 4    restitution, and the amount in forfeiture.

 5            THE DEFENDANT:  Whew.  Yes, Your Honor.  I was

 6    thinking a custodial sentence of -- excuse me -- 84 months.

 7            THE COURT:  Okay.

 8            THE DEFENDANT:  A three-year probation period.

 9            THE COURT:  What seems to be the problem, Mr.

10    Thomas?

11            THE DEFENDANT:  I've been dealing with a medical

12    issue this entire morning and last night.  I --

13            THE COURT:  Well, you know, I told you in August --

14    on August 8th that, you know, the delay tactics aren't

15    getting you anywhere.  All right?

16            THE DEFENDANT:  No, sir.

17            THE COURT:  Hold on.  Listen to me.  You sit down.

18            I'm running out of patience with you.  Look at me

19    and listen to me.

20            You're going to get a minimum of seven years, all

21    right?  Because you just said that that's what you're asking

22    for.  So the amount -- if we take five years you get to the

23    sentencing hearing, it ain't going to shorten your time by

24    one day.  So I don't know why all these delay tactics on

25    your part.  You just happened to get sick the morning of

8

1    your sentencing hearing. I find that pretty curious.

2          THE DEFENDANT: Your Honor, I -- I've been trying

3    to keep pace with all the motions that were filed in the

4    last three days. I haven't slept or ate much trying to

5    digest all the information --

6          THE COURT: How does that make you physically ill?

7          THE DEFENDANT: And -- sorry, sir. And when I did

8    eat, I've been sick since then, since I ingested food. I

9    don't know -- I tried to eat and I --

10         THE COURT: You know, the -- you haven't explained

11    to me how it is that reviewing the filings in this case have

12    made you physically ill.

13         THE DEFENDANT: No, sir. I mean, I'm sorry. I

14    hurt. I have -- leading up to this day, I've been trying to

15    understand the filings that were filed and, in doing so, I

16    wasn't eating or sleeping much. Actually, the night before

17    last -- or last night -- or yesterday, I'm sorry, I ate food

18    for the first time and I've been feeling light-headed and

19    nauseated since. And --

20         THE COURT: Well, I mean, if any of this has to do

21    with anxiety of reviewing -- the filings coming from the

22    Government on a pro se basis, I told you on August 8th,

23    strongly, strongly, strongly urged you not to fire your two

24    lawyers. You had two excellent lawyers who were doing a

25    great job for you.

Case 1:16-cr-00054-WJM Document 456 Filed 11/21/18 Page 9 of 36

9

1       I'm convinced you pulled that to try to delay these

2   proceedings and look -- and it hasn't gotten you anywhere.

3   And so that's part of the problem that we're dealing with

4   here is we're -- these matters are so much more complicated

5   when there's not knowledgeable counsel involved in this

6   case.

7       Are you well enough to proceed with this hearing

8   today?

9       THE DEFENDANT:  I told the marshal, I'm getting --

10   given my ulcer -- oh -- I'm just very -- in clenching pain

11   I'm experiencing.  I'm sorry.  I apologize.

12       THE COURT:  Are you prepared to go forward with

13   this hearing this morning?

14       THE DEFENDANT:  Yes, sir.

15       THE COURT:  All right.

16       THE DEFENDANT:  Whew.

17       THE COURT:  You were saying what your

18   recommendation was in the 84-month custodial sentence, three

19   years supervised release.  And what is your request with

20   respect to amounts of restitution and forfeiture?

21       THE DEFENDANT:  I'm sorry, sir.  I'm sorry.  It's

22   hard to listen I'm in so much pain.

23       THE COURT:  Let me say it again.  You've told me --

24   you've put on the record that you're requesting a custodial

25   sentence of 84 months, supervised release period of three

1      years, a -- oh, and you had not -- at least I hadn't heard

2      or I missed what your recommendation is that you're asking

3      of me with respect to restitution and forfeiture amounts.

4             So do you have amounts that you want to put on the

5      record?

6             THE DEFENDANT:  Okay, sir, yes.  First, when I --

7      the custodial --

8             THE COURT:  No, you already gave me custodial and

9      supervised release.  I'm asking you:  Do you have a

10     recommendation to give me with respect to the amounts that I

11     should order you pay in terms of restitution and forfeiture?

12            THE DEFENDANT:  Yes.  $357,231.

13            THE COURT:  For what?

14            THE DEFENDANT:  That is for the restitution.

15            THE COURT:  Okay.  Do you have a request of the

16     amount you are asking me to impose in terms of forfeiture,

17     if any?

18            THE DEFENDANT:  That portion I do not understand,

19     sir.

20            THE COURT:  All right.  Well, then maybe as we

21     proceed with the hearing and the Government puts on its

22     evidence on forfeiture, you may better understand it and

23     then you can tell me what your position is at that time.

24            All right.  Let me, Ms. Paluch, outline what I --

25     it's my understanding that the Government wishes to put on

11

1    evidence about today.  Whether there was -- whether the
2    indicted scheme was devised by Ms. Carr and Mr. Thomas, and
3    that's going to objection No. 4.  The amount of loss and
4    restitution -- and now maybe I should amend that -- were you
5    thinking of doing it jointly with the forfeiture amount?
6              MS. PALUCH:  Your Honor, what I intended to do was
7    start with 72-1, which Agent Ennis set forth how she
8    calculated loss, and how we tied those addresses to the
9    defendant or one of the co-conspirators.
10             Also to discuss how -- his jointly undertaken
11   criminal activity -- the scope of that activity -- and then
12   separately address how Agent Ennis calculated the chart for
13   forfeiture.
14             THE COURT:  Okay.  So you do want to deal with
15   loss, restitution, and forfeiture at the same general time,
16   not -- obviously you have to break it out in steps, but
17   you're not going to do -- do an allowance for restitution
18   and then, you know, an hour later get to forfeiture.
19             MS. PALUCH:  That's correct, Your Honor.
20             THE COURT:  Okay.  Thank you for that.
21             All right.  The other thing I am -- it's my
22   understanding the Government wishes to put on evidence about
23   is whether, during the time of the charged conduct in this
24   case, the defendant was also engaged in the commercial sex
25   business and committed armed robbery, rape.  That's one

1    additional, right?

2         MS. PALUCH:  That's correct, Your Honor.

3         THE COURT:  I'm just trying to get a lay of the

4    land here of what we are trying to accomplish at this

5    hearing.

6         MS. PALUCH:  Certainly.

7         THE COURT:  All right.  And then I think the final

8    one is whether there should be a two-level enhancement for

9    reckless endangerment added to the base offense level given

10   the flight or attempted flight of the defendant during his

11   arrest in Arizona; is that correct?

12        MS. PALUCH:  It is; correct, Your Honor.

13        THE COURT:  All right.  So this is how we're going

14   to do it.  The first one, whether the indicted scheme or --

15   was devised by defendants Carr and Thomas, we will -- I'll

16   take evidence when we're dealing with objection No. 4.

17        With respect to amounts of loss, restitution, and

18   forfeiture, we will receive evidence on that when we deal

19   with defendant's objection No. 7.  I'm going to skip over

20   the third one.  The fourth one with respect to reckless

21   endangerment, we will proceed to that forthwith.

22        But let me first ask both sides for their position

23   on whether I should exercise my discretion in this case

24   under 3553(a) and take evidence on and consider alleged

25   conduct that even the Government admits is not relevant

13

1    conduct, has to do with state charges that were never proven

2    by a reasonable doubt standard, were dismissed and, as far

3    as I can see, have nothing to do with the conduct that the

4    defendant was convicted of during the trial.

5         So, Ms. Paluch, let me ask you first why -- I

6    understand you cited cases I have the discretion to do that.

7    But especially when there are three other codefendants that

8    have already been sentenced and their sentences, to some

9    extent, greater or lesser, depending on one's view, form at

10   least a framework or background to what they received, and

11   especially Ms. Carr, whom the Government in one of our

12   hearings stated on the record viewed as the most culpable of

13   the four defendants in the scheme for which this defendant

14   went to trial, why should I exercise my discretion and take

15   evidence of a wholly unrelated matter that never got past

16   the charging phase?

17        MS. PALUCH:  Thank you, Your Honor.  First of all,

18   while this scheme was unfolding and being carried out, the

19   defendant was involved in the pimping activities with Ms.

20   Duncan at the very same time he's committing this offense.

21   He's also in prison on those charges while the scheme is

22   continuing.  So we would submit to you that the pimping

23   charges and arrest on those offenses is not so attenuated

24   from the instant case so as to render it a completely

25   separate matter.

1          THE COURT:  But the only connection seems to be a

2     temporal one.  So that, you know, understanding the concept

3     that humans can be engaged in more than one activity at a

4     time, I grant you this was done at a contemporaneous time,

5     but what connection, other than temporal, is there between

6     these alleged pimping and armed robbery and rape charges,

7     which, again, never went past the charging phase and were

8     dismissed, what relation do they have to a scheme to defraud

9     the U.S. Department of Education by fraudulently filling out

10    FAFSA forms?

11         MS. PALUCH:  I would agree with you, Your Honor,

12    it's separate criminal conduct, and we would submit to you

13    that it's properly considered by this Court as the history

14    and characteristics of this defendant under 3553(a).  And as

15    the Court has referenced in our pleading, we provided the

16    Court with a number of cases which stand for the proposition

17    that even uncharged conduct, even conduct on which a

18    defendant is acquitted, is properly considered by the

19    sentencing court.

20         And here we have a defendant who spent 11 months in

21    prison, and it was only because witnesses refused to testify

22    that those charges were dismissed.

23         THE COURT:  Well, he wasn't acquitted, right?  The

24    charges were dismissed --

25         MS. PALUCH:  They were dismissed, Your Honor,

1    because witnesses refused to come forward and testify --

2              THE COURT:  Correct.

3              MS. PALUCH:  -- which is a theme we have seen

4    throughout with Mr. Thomas.  And so we would submit under

5    3661, the Court is entitled to consider anything at

6    sentencing --

7              THE COURT:  True.

8              MS. PALUCH:  -- 3553 says you are to consider

9    history and characteristics.  We think the criminal conduct

10   that this defendant has been engaged in over the course of

11   his life is proper information for this Court to consider.

12   It also is proper to consider it in deterrence, it's proper

13   for the consideration of protection of the public.  All of

14   that goes into the proper considerations under that statute

15   of the Court having to consider the person before you being

16   sentenced.  And in trying to protect the public from him,

17   all of that prior criminal conduct, we submit, is

18   appropriate for the Court to consider.

19             Now, what you will be hearing from today is a

20   detective from the Colorado Springs Police Department,

21   Defendant Lambert, and he is going to talk to you about his

22   presence on the scene when this defendant was arrested on

23   the pimping charges, the money that he had with him, which

24   is what Ms. Duncan said he would have on him that was all

25   the money she had earned.  And we just think the case law

16

1     and the statutory law absolutely supports considering -- the

2     Court considering all this conduct.

3          THE COURT:  Okay.  One second.  Now, you did say

4     when I -- at the beginning of the hearing that the

5     Government continues to seek a 180-month sentence?

6          MS. PALUCH:  That's correct, Your Honor.  Which is

7     not the top of the guidelines, it's within range.

8          THE COURT:  I understand.  Right.  Let me tell you,

9     before I turn to Mr. Thomas and get his view on this, one of

10    the concerns I have about proceeding in the fashion the

11    Government is suggesting with respect to this other conduct

12    is this is one way -- this is a back-door way to get in

13    front of me matters that if they were going to trial in the

14    criminal context would have to be proven up by beyond a

15    reasonable doubt status.  But in a sentencing hearing,

16    because the standard is preponderance of the evidence, that

17    other criminal conduct can be proven up, to use that term,

18    by a preponderance of the evidence, a far, far, far lower

19    standard.  And that's a concern I have.

20          So given that comment, let me turn to Mr. Thomas.

21    You understand what we're talking about, right?

22          THE DEFENDANT:  Yeah, I'm following.

23          THE COURT:  Why don't you talk to me sitting down.

24    It will probably be easier for you.

25          THE DEFENDANT:  I'm following you as best as I

1    could, Your Honor.  I'm having trouble following --

2              THE COURT:  Do you have water there with you?

3              THE DEFENDANT:  Yeah, I do.  I drank that first

4    cup.  Whew.  So sorry, Your Honor.  But I -- I agree with

5    you for relevant conduct on past charges that I was not

6    convicted on -- oh, it has nothing to do with the issue

7    sentencing charges that -- uhm, whew, sorry, Your Honor.

8    Can I take a break?

9              THE COURT:  I don't want to be here all day, Mr.

10   Thomas.

11             THE DEFENDANT:  No, sir.  I just -- my stomach is

12   really hurting too bad.

13             THE COURT:  What do you want to take a break to do?

14             THE DEFENDANT:  Oh.  Try to use the restroom.

15   Whatever I -- I have in me, get it out of me some way.  It's

16   hurting bad.  It's making me light-headed.  I'm barely

17   comprehending what's going on, but I'm missing certain parts

18   when the pain comes.

19             THE COURT:  As I mentioned to you before, you are

20   severely taxing my patience.

21             THE DEFENDANT:  I'm --

22             THE COURT:  I have spent more time on this case --

23   on your case and your trial and 500 filings have eaten up so

24   much of my time that I haven't been able to spend on other

25   cases, including civil cases and other criminal cases and

18

1        there comes a point when enough is enough.

2               We're going to take a 10-minute break and I expect

3        you to be able to be in a position to go straight through

4        the hearing.  Do you understand?  Do you understand me?

5               THE DEFENDANT:  I do, sir.  I do.

6               THE COURT:  All right.  We'll take a 10-minute

7        recess.

8            (Recess 10:00 a.m. to 10:10 a.m.)

9               THE COURT:  Mr. Thomas -- the mic's off -- I need

10       you to put on the record your position on whether I should

11       consider these state charges that were dismissed against

12       you.

13              THE DEFENDANT:  I'm sorry, sir.  Oh.  Whew.

14              THE COURT:  Are you going to be in a position to go

15       forward with this hearing today?

16              THE DEFENDANT:  I feel like I have a bulge in my

17       stomach, sir.  I can't go on.

18              THE COURT:  All right.  I want to at least deal

19       with this issue today because I think the Government's

20       entitled to know how I feel about this.  Mr. Thomas, this is

21       in your -- in your interest.

22              THE DEFENDANT:  Okay.  I ask the Court to not

23       consider the past offense as relevant conduct for this

24       sentencing.

25              THE COURT:  All right.

19

1          THE DEFENDANT:  Whew.

2          THE COURT:  Let me state -- Mr. Thomas, please sit

3     up.  Keep it together for another five minutes.  This is in

4     your interest.  Do you not understand what things are in

5     your interest and when they're against your interest?

6          THE DEFENDANT:  Yes, sir.  Yes, sir.

7          THE COURT:  Keep it together for five minutes.

8          All right.  I am not going to take evidence on

9     this -- these dismissed state charges, and I want to put on

10    the record why I am not going to exercise my discretion in

11    favor of hearing and receiving evidence on this point.  I

12    will, however, accept an offer of proof from the Government.

13         So almost every day in this job, I read in a

14    presentence report that includes information about charges

15    of unrelated criminal conduct that were, for one reason or

16    another, dismissed.  And it's in almost every single PSIR

17    that I read.  So for the first time in almost eight years

18    that I've been on the bench, the Government has gone to the

19    length of resurrecting a charge of nonrelevant conduct which

20    the Government has admitted in its paper is not relevant,

21    which were unprovable under a beyond a reasonable doubt

22    standard, and now via a sentencing hearing wishes to prove

23    these charges by preponderance of the evidence.

24         And I don't -- I understand what Ms. Paluch said on

25    the record, but for the reasons I'm going to state on the

1    record, I think it would be unjust for me to do that in this

2    case.

3            The defendant is being sentenced, I have here on my

4    script, today, but he's not going to be sentenced today

5    because we're going to have to reschedule this hearing yet

6    again.  But when we do get this darn sentence imposed, he's

7    being sentenced for submitting false FAFSA applications to

8    the Department of Education.  Nothing more, nothing less.

9            His three codefendants have already been sentenced

10   in this case and have received custodial sentences ranging

11   from a high of 57 months to a low of 24 months.  I'm fully

12   aware that the Criminal History Category of this defendant

13   exceeds that of his codefendants, but from a sense of

14   proportionality, which I see as one of the animated

15   considerations for what constitutes justice over all

16   under -- or over all, and under 3553(a) in particular, I

17   don't understand how the Government can rationalize seeking

18   the sentence of 180 months for Mr. Thomas for this crime, a

19   sentence which is 216 percent greater than the sentence I

20   imposed on Ms. Carr, keeping in mind that at the sentencing

21   hearing for Ms. Diaz, the Government took the position on

22   the record that Ms. Carr was the most culpable member of

23   this criminal enterprise.

24           Were I to impose a sentence of 180 months on Mr.

25   Thomas, that would be a whopping 650 percent greater than

1    the sentence I imposed on Ms. Diaz.  So for these reasons, I

2    find that in the interest of justice, as well as the

3    applicable law under the sentencing statute, that all those

4    would be undermined were I to exercise my discretion in

5    favor of a hearing -- of hearing evidence with respect to

6    unproven -- criminally unproven, dismissed, and completely

7    unrelated alleged criminal conduct.

8            Therefore, I will take no evidence on this matter

9    at this sentencing hearing.  But I will allow the Government

10   to make an offer of proof, should it choose to do so, at

11   this time.

12           MS. PALUCH:  Yes, Your Honor.  First, I'd like to

13   address the disparity between --

14           THE COURT:  I've already ruled, so --

15           MS. PALUCH:  That's correct --

16           THE COURT:  So to the extent you want to address it

17   in some type of form of objection, go ahead.

18           MS. PALUCH:  Your Honor, I would like to make a

19   record for that.

20           THE COURT:  Go ahead.

21           MS. PALUCH:  As the Court knows, those other

22   defendants all agreed to plead guilty.  They all pled guilty

23   to a conspiracy charge which starts out at a 6 in the

24   guideline range; with mail fraud we're starting at 7.  There

25   are four points that we are arguing should be assessed to

22

1    this defendant based on obstructive conduct under both of

2    the provisions of 3C1.1 and 3C1.2.  He is in an entirely

3    different Criminal History Category score.

4         So while there is disparity, there's explanation in

5    the record for that disparity.  And we have not asked the

6    Court to assess points on uncharged conduct, none of the

7    pimping evidence that we wanted to present to the Court

8    increased his guideline range at all.  He got to that

9    guideline range on his own through his conduct.  He did not

10   receive acceptance of responsibility.  We have stayed within

11   an advisory guideline range, so the guidelines themselves

12   say that that's a justified sentence.

13        And we -- so we dispute that it's not -- that we

14   can't explain on the record why we are seeking the sentence

15   that we are.

16        THE COURT:  I never said you couldn't explain on

17   the record why you're seeking it.  I was just denying your

18   request to exercise my discretion to receive the evidence in

19   an evidentiary hearing and to consider that evidence under

20   3553(a).

21        MS. PALUCH:  Correct.  And, Your Honor, just so the

22   record is clear as we have stated, it is our position that

23   that evidence is entirely appropriate for the Court to have

24   at its disposal all of the information about the individual

25   before you in imposing an appropriate and just sentence.

23

1          THE COURT:  All right.  Do you want to make an

2     offer of proof?

3          MS. PALUCH:  As to the pimping offenses?

4          THE COURT:  Yes.  So let me just state so the

5     record is clear:  I will construe everything you've just

6     said as an objection to my ruling and that objection is

7     overruled.

8          I'll allow the Government to make an offer of proof

9     with respect to the evidence it would have put on had I

10    taken evidence on this issue.

11         MS. PALUCH:  Yes, Your Honor.  And given that

12    Detective Lambert was AUSA's Fields' witness, I'm going to

13    ask AUSA Fields to make a proffer as to the testimony that

14    we anticipated from that witness.

15         THE COURT:  That's fine.

16         MR. FIELDS:  May I have a moment, Your Honor?

17         THE COURT:  You may.

18         MR. FIELDS:  Your Honor, first, in terms of this --

19    there are actually two separate things we wanted to include

20    as uncharged conduct.  The first is the rape of the victim,

21    C.D., in the records.  The Court has before you, I think, in

22    the PSR, a victim impact statement from that witness, so I

23    would just incorporate that letter by reference as something

24    the Court should consider.

25         THE COURT:  Okay.

24

          MR. FIELDS:  With regard to Mr. Lambert, what I

would say is that if called to testify, he would testify as

follows:

          That at around 4:00 or 5:00 a.m. on November 11th,

2010, a victim woke to find a woman, another victim, texting

on her phone.  About 20 minutes later --

          THE COURT:  Hold on, I'm -- can you repeat that

sentence.  I just -- I didn't follow that.  There were too

many indefinite pronouns.  Maybe you could fill -- you know,

I'd say probably it's better you don't read from it

verbatim.  You may want to fill in certain information that

will make the record clear because that sentence didn't make

any sense to me.  And --

          MR. FIELDS:  Thank you very much, Your Honor.

          THE COURT:  -- and --

          MR. FIELDS:  I will make it make sense, of course.

I will make it make sense.  So let me start over again.

          So at around 4:00 or 5:00 a.m. on November 11th,

2010, a victim was in a room with a woman who was texting on

her phone.  About 20 minutes later, the defendant, Trammel

Thomas, began knocking loudly on the door of the hotel room

that the woman and the man were sharing.

          When the man answered the door, the defendant, who

had a knit cap obscuring his face, walked into the room.

The defendant pulled out a gun, pointed it at the victim,

1    the man, and told the man to get on the ground.  The man did

2    what he was told.  The defendant then rummaged through the

3    man's stuff.  He took his cell phone, a laptop, a camera, a

4    watch, and about $500.  The defendant yelled at the woman to

5    pack up her stuff and the two of them left together.

6            James Lambert would testify that he took that

7    testimony from the victim, the man, who was in the room.

8    And that later on when he talked to the woman, she

9    identified the defendant as the man who entered that room

10   and robbed the two of them.  Now, later on, Detective

11   Lambert, investigating this robbery, was able to find the

12   woman who had been in the hotel room using a website called

13   Backpage.  Backpage is a website frequently used by

14   individuals advertising escort services or prostitution

15   services.

16           THE COURT:  Right.

17           MR. FIELDS:  Detective Lambert responded to an ad

18   on Backpage for the woman who had been in that hotel room

19   with the victim.  Based on that, he was able to set up a

20   meeting with her at a hotel in Colorado Springs.  It was the

21   Motel 6 located on Academy Boulevard down there.

22           When Detective Lambert went to that hotel with a

23   team of other officers from the Colorado Springs vice task

24   force, they observed the defendant and his ex-wife, Lola

25   Thomas, at the hotel.  When Detective Lambert went to meet

1      with the woman, who was identified as Christine Duncan,

2      Christine Duncan offered him sex in return for money.

3              He gave a signal for an arrest and at that point,

4      they saw the defendant and his wife get into a red car and

5      drive off.  When they pulled over the car, the woman, his

6      wife, was no longer in there.  She had gone to check with

7      the officers as to what had occurred.

8              When the defendant was pulled over by the officers,

9      the officers arrest him because he was on parole.  When they

10     did a search, they found inside the console of the car a

11     broken cell phone.  And those exhibits are in the Court's

12     exhibit book.  Those are Government's Exhibits 9 and 10.

13     And Detective Lambert will testify that is, in fact, the

14     cell phone that was found during that search.

15             Later on after obtaining evidence from Christine

16     Duncan at that location, they obtained a search warrant to

17     search her apartment, 3820 Resident Drive -- Radiant Drive.

18             When they went to 3820 Radiant Drive, they found

19     men's clothes inside and other indicia that Trammel Thomas

20     was, indeed, the occupant of that particular apartment.

21             So that would be Detective Lambert's testimony.

22             THE COURT:  Okay.  All right.  Thank you for that.

23     Just so we know where we're going to start up when we return

24     at our rescheduled -- yet again rescheduled sentencing

25     hearing, I will take evidence from the Government, again, on

Case No. 1:16-cr-00054-WJM   Document 525-6   Filed 12/11/19   USDC Colorado   pg 62 of 901
Case 1:16-cr-00054-WJM   Document 458   Filed 11/29/18   Page 27 of 96

27

1     the -- whether the indicted scheme was devised by Ms. Carr

2     and Mr. Thomas when dealing with objection No. 4; I'll take

3     evidence on the amounts of loss, restitution, and forfeiture

4     when dealing with the objection to No. 7; and I will also

5     take evidence with respect to the two-level sentencing

6     enhancement under guideline Section 3C1.2.   3C1.2.

7               Ms. Ansart, if you will please file -- you know,

8     we're not going to -- Ms. Paluch.

9               MS. PALUCH:   I'm sorry to interrupt, Your Honor.

10    This is the second time we have flown Deputy United States

11    Marshal Joe Faranda from the District of Arizona to

12    Colorado.

13              THE COURT:   Right.

14              MS. PALUCH:   He is available in the witness room.

15    Is there any way he could present his direct testimony, if

16    the defendant is well enough to cross him, on the events of

17    the SWAT standoff, at least --

18              THE COURT:   For the fleeing sentencing enhancement?

19              MS. PALUCH:   That's correct, Your Honor.   Just to

20    address that one enhancement, and we can proceed on the

21    remainder of the hearing at the Court's pleasure.

22              THE COURT:   All right.   Mr. Thomas, can you do

23    that?

24              THE DEFENDANT:   Cross-examine the witness?

25              THE COURT:   Right.   The --

28

1           MS. PALUCH:  It's a deputy U.S. Marshal.

2           THE COURT:  Deputy marshal from Phoenix.

3           MS. PALUCH:  Phoenix.

4           THE COURT:  Having to do with your -- the incidents

5    surrounding your arrest down there.

6           THE DEFENDANT:  I don't think I can, sir.  I'm

7    sorry.  I have a hard time sitting up right now.  I'm

8    fighting everything right now in me to sit up.

9           THE COURT:  If this were a civil case I know

10   exactly what I'd do, but my hands are tied, Ms. Paluch.

11          MS. PALUCH:  I understand, Your Honor.

12          THE COURT:  And I sympathize -- I understand the

13   frustrations that you and your office must have with this

14   case and with this defendant.  I understand your

15   frustrations with respect to your witnesses.  Again, if this

16   were a civil case, I'd know how to handle it pretty quickly,

17   bring all this to an end, but my hands are -- I just don't

18   have that kind of flexibility in a criminal case.  And if I

19   were to force this defendant to go forward right now and

20   force him to do a cross examination of a witness that he's

21   just told me on the record he's not prepared to do, he will

22   file an appeal, the Tenth Circuit will appoint the -- the

23   Tenth Circuit will appoint pro bono counsel and you know the

24   argument they will make.

25          MS. PALUCH:  I understand that, Your Honor, and I

29

1    respect the Court's ruling and we will go that route.

2         Could I just indulge -- could the Court indulge me

3    just to make a brief record?

4         THE COURT:  Sure, go ahead.

5         MS. PALUCH:  It's our position that this is simply

6    a delay tactic; that the defendant is malingering.  And the

7    reason why we think that, Your Honor, is since the spring,

8    essentially April of last year, this defendant has been

9    housed at FDC Englewood, which is essentially a jail.  He

10   understands, given his prior 10-year term of imprisonment,

11   that he's looking at designation to a higher security

12   prison.  And I consulted with senior attorney advisor Clay

13   Cook with the U.S. Bureau of Prisons about this very issue

14   because we anticipated something like this might come up,

15   and it's our position he's delaying because the conditions

16   are better at the jail than they are going to be at a higher

17   security prison.  And Clay Cook confirmed exactly what we

18   were talking about.  And he explained to us that the

19   restrictions on his movement once he's designated in the

20   Bureau of Prisons is going to be much more than the freedom

21   he's enjoying -- relative freedom he's enjoying at FDC

22   Englewood.

23        So it's our position, no matter when the Court sets

24   this, he's going to say that he needs additional time.

25        There's another point I'd like to make, Your Honor.

30

1    He's indicated that the reason for his illness is he's been

2    trying to digest years of pleadings in the three days prior

3    to this hearing.  You authorized him to represent himself

4    back in August.  He's had two months to prepare for today's

5    hearing.  To the extent he's saying he tried to cram it all

6    in the last three days and that's why he's light-headed,

7    it's our position this is nothing more than a delay tactic,

8    and that we will continue on this road.

9         We're going a year after sentencing -- I mean after

10   he was convicted at trial, and we'll continue to see delays

11   is our estimation, and so we just wanted the record to be

12   clear that conditions at FDC Englewood are much -- much

13   nicer and we would ask that the Court reschedule this to a

14   time as soon as practical since everyone is prepared to

15   proceed on this.

16        THE COURT:  I would love to do it tomorrow, but

17   your office has filed a rash of new cases.  I have -- just

18   to give you a taste of my docket, three Mondays in a row,

19   late November to early December, I have criminal jury

20   trials -- initial settings, I grant you -- from your office,

21   I've been assigned 15 cases in one week, that I'm quintuple

22   booked for trials in the upcoming month and six weeks.  I

23   just don't have the flexibility.

24        You know that we have been down to six active

25   Article III judges since March of 2016.  Congress, for

1     whatever reason, is not getting around to confirming Mr.

2     Domenico, and each month this goes on, my five active

3     colleagues and I just get more and more buried.  And I'm

4     working harder than I ever have in my entire career as a

5     lawyer or a judge.  I have to start pacing myself or I'm

6     going to put myself in the hospital.

7          So I can't -- I can't schedule this in the next

8     month or six weeks, as much as I would like to.  Let me also

9     say for the record, I agree with everything you just said.

10    I am going to put on the record that it is the Court's view

11    and belief that this is a delay tactic, a malingering

12    tactic.  And I am running out of patience -- you can sit

13    down, Ms. Paluch.

14          MS. PALUCH:  Okay.

15          THE COURT:  Mr. Thomas, I am -- I'm going to give

16    you one more continuance and that's it.  You know, unless

17    you're having emergency surgery on the day that I'm going to

18    give you, we're going to go forward.  And I don't want any

19    story about all of a sudden -- after a year, all of a sudden

20    the diet doesn't work for you and now you're ill because of

21    the diet or you're stressed to the max because you're

22    reviewing hundreds of filings, which is of your own doing

23    because you fired two excellent lawyers that had been

24    appointed to you at taxpayer expense.  All right?

25          So I'm going to give you another hearing.  And I

1    don't want to put the Government through the task of
2    subpoenaing an out-of-state witness who has to leave all of
3    his duties and functions and responsibilities to come up a
4    third time just to put on evidence with respect to how you
5    attempted to flee and evade arrest and necessitated the
6    calling of a SWAT team to arrest you in Phoenix.  There's a
7    limit.  There's a limit to this.  There's a limit to my
8    patience.
9              And if Ms. Paluch is right, if you're doing this
10   just to keep yourself in FDC Englewood because it's a
11   relatively better place than a high-security penitentiary,
12   then if I were to know for a fact, I would be really upset.
13             THE DEFENDANT:  May --
14             THE COURT:  Have I made myself clear, sir?
15             THE DEFENDANT:  Yes, sir.
16             THE COURT:  All right.  We are going -- I'm going
17   to give you one more date, we're going to go through the
18   hearing, and I'm going to sentence you and you will stop
19   taking up my time.  Do you understand?
20             THE DEFENDANT:  Absolutely, sir.  And may I --
21             THE COURT:  Go ahead.
22             THE DEFENDANT:  Thank you.  Sir, I object to Ms.
23   Paluch stating -- everyone, every inmate in FDC, they all
24   wish to get sentenced quickly to get to a prison so they
25   have more access to yard, visits, and what have you.  FDC is

1       the place where no one wants to be at.

2              Sir, I -- through the whole last two years, I've

3       never asked for a continuance.  I made every court date

4       every single time.

5              THE COURT:  What did you do on August 8th?

6              THE DEFENDANT:  August 8th was the -- with my

7       attorneys, sir.

8              THE COURT:  And effectively that was a continuance

9       you asked because we were ready to go forward, all the work

10      we had -- all of us had done to prepare for that hearing and

11      you announce at the last second, "Oh, you know, I think I

12      don't want my lawyers anymore."

13             THE DEFENDANT:  I understand that, sir.  Then

14      this -- like you said, it -- whether I'm on a death bed or

15      surgery, there won't be any more --

16             THE COURT:  You just told me it's in your interest

17      to be designated to a penitentiary as soon as possible so

18      it's in your interest on the next day that I'm going to give

19      to you to be well, be prepared, be ready to go, face the

20      music, and then we go forward.  Do you understand?

21             THE DEFENDANT:  Absolutely, sir.  And like you

22      said, whether it's two years or five years, it's --

23             THE COURT:  It's not going to shorten a day off

24      your sentence.

25             THE DEFENDANT:  Absolutely.

34

1          THE COURT:  All right.  I'll come back to you, Ms.

2     Paluch and Mr. Fields, for dates that work on your schedule

3     but what I was starting to say to Ms. Ansart before Ms.

4     Paluch stood up, whenever's convenient to you in the next

5     week or two, please prepare and file an addendum to the

6     presentence report that addresses the matters that have been

7     referenced from the Government in ECF filings 341 and 343

8     with respect to a final order of forfeiture.

9          And I would appreciate your analysis and your

10     recommendation for a recommended ruling.

11          PROBATION OFFICER:  I will, Your Honor.

12          THE COURT:  All right.  Thank you.

13          All right.  I need to pull up my schedule.

14          Ms. Paluch and Mr. Fields, does Monday, January 7,

15     work for you?

16          MS. PALUCH:  Mr. Fields is in trial that week, Your

17     Honor.

18          THE COURT:  Okay.  All right.  How about the

19     following Monday, Monday, January 14th, 2019?

20          MS. PALUCH:  That does work, Your Honor.

21          THE COURT:  All right.  Mr. Fields, does that work

22     for you?

23          MR. FIELDS:  It does work for me, Your Honor.  May

24     I check with Deputy U.S. Marshal Jeff Faranda and make sure

25     it works for him?

35

1          THE COURT:  Sure.  Ms. Ennis, does that work for

2     you?

3          AGENT ENNIS:  Yes, it does, Your Honor.  Thank you.

4          MR. FIELDS:  Thank you, Your Honor.  That works.

5          THE COURT:  Okay.  This scheduling hearing is reset

6     for a final sentencing hearing on Monday, January 14th,

7     2019, at 9:30 a.m.

8          All right.  Anything further from the Government at

9     this time?

10          MS. PALUCH:  No, Your Honor.  Thank you.

11          THE COURT:  Thank you.  Mr. Thomas, is there

12     anything further we need to take up from your perspective?

13          THE DEFENDANT:  No, sir.

14          THE COURT:  All right.  Ms. Ansart, anything

15     further from you?

16          PROBATION OFFICER:  No.  Thank you.

17          THE COURT:  All right.  Defendant is remanded to

18     the custody of the United States Marshal.  Thank you, that

19     will be all.

20        (Proceedings concluded at 10:36 a.m.)

21                  *      *      *      *      *

22                    REPORTER'S CERTIFICATE

23      I certify that the foregoing is a correct transcript

24     from the record of proceedings in the above-entitled matter.

25        Dated at Denver, Colorado, this 21st day of November,

1    2018.

2

3

4

MARY J. GEORGE, FCRR, CRR, RMR

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-0054-WJM-2

UNITED STATES OF AMERICA,

Plaintiff,

vs.

TRAMELL THOMAS,

Defendant.

------------------------------------------------------------

REPORTER'S TRANSCRIPT
(Final Trial Preparation Conference)

------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
Judge, United States District Court for the District of
Colorado, commencing at 2:02 p.m., on the 17th day of
November, 2017, in Courtroom A801, United States
Courthouse, Denver, Colorado.


APPEARANCES

MARTHA A. PALUCH and BRYAN FIELDS, Assistant U.S.
Attorneys, 1801 California Street, Suite 1600, Denver,
Colorado 80202, appearing for the plaintiff.

DANIEL T. SMITH, Attorney at Law, 4582 South Ulster,
Suite 1400, Denver, Colorado 80237 AND
THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
Suite 1400, Denver, Colorado 80202, appearing for the
defendant.


MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

2

P R O C E E D I N G S

1

2          (Call to order of the court at 2:02 p.m.)

3                THE COURT:  We're on the record in criminal case

4    No. 16-cr-054, United States of America versus Tramell

5    Thomas, defendant No. 2.  I'll take appearances of counsel.

6                MS. PALUCH:  Good afternoon, Your Honor, Martha

7    Paluch appearing on behalf of the United States.  With me

8    at counsel table is Assistant U.S. Attorney Bryan Fields

9    and Special Agent Sandra Ennis.

10               MR. FIELDS:  Good afternoon, Your Honor.

11               SPECIAL AGENT ENNIS:  Good afternoon, Your

12   Honor.

13               THE COURT:  Good afternoon to the three of you.

14               For the defendant.

15               MR. SMITH:  Good afternoon, Your Honor.  Daniel

16   Smith and Thomas Goodreid appearing for Mr. Thomas, whose

17   appearance has been waived for purposes of this hearing.

18               THE COURT:  All right.  Good afternoon to the two

19   of you.

20               MR. GOODREID:  Good afternoon.

21               THE COURT:  We're here for a final trial

22   preparation conference in this case.  This matter is set

23   for a five-day jury trial to begin Monday morning at 8:30,

24   on November 27th.  As is my practice at these hearings, I'm

25   going to go through some of the matters that I require

3

```
 1    counsel to deliver to me prior to trial and see where we

 2    stand with respect to those, and also to address some other

 3    matters with respect to the trial and the jury selection.

 4           I'm going to begin with opening statements.  Per

 5    my practice standards, my default is 20 minutes.  I don't

 6    see a huge reason here to go beyond that, and unless

 7    counsel really strongly feels they need more than 20

 8    minutes, that's what we're going to go with.  What's the

 9    Government's view?

10           MS. PALUCH:  We are fine with 20 minutes, Your

11    Honor.

12           THE COURT:  Okay.  Defendant.

13           MR. GOODREID:  Your Honor, same for defense.

14           THE COURT:  Okay.  20 minutes it will be.

15           Are there now or will there be any stipulations of

16    fact?

17           MS. PALUCH:  Yes, Your Honor, there are

18    stipulations.  Would you like at this time for me to

19    explain those stipulations?

20           THE COURT:  Okay.  Have you filed them already?

21           MS. PALUCH:  We have not filed them.

22           THE COURT:  Okay.  Why don't you just generally

23    describe them to me.

24           MS. PALUCH:  Certainly, Your Honor.  The first

25    one, which is probably the most important for purposes of
```

1     today, is the fact that we have stipulated as to what the

2     six individuals named in Counts 2 through 7 would testify

3     to if called to testify.  And for Your Honor, those are the

4     initials of the individuals in Counts 2 through 7.  These

5     are what we're calling inmate witnesses.

6             And what the parties have agreed:  If called to

7     testify, they would state that they were incarcerated at

8     the time FAFSA's requesting federal student aid and related

9     school documents were submitted to the Department of

10    Education, and to the various schools.

11            Two, that they did not submit these documents to

12    the Department of Education or to the schools in question.

13            And, three, they did not authorize anyone else to

14    submit these documents in their names using their personal

15    identifying information.

16            We have just recently entered into that

17    stipulation and, because of that stipulation, we would move

18    at this time for the Court to quash the writs that were

19    issued for the four incarcerated inmates.  Two of the six

20    are not incarcerated, four of them are incarcerated, and we

21    had previously asked this Court for writs for their

22    appearance in this trial.

23            THE COURT:  I have signed -- already signed those.

24            MS. PALUCH:  You have.  You have, Your Honor, and

25    it's our understanding these individuals are en route here

1    to Colorado.

2              THE COURT:  Okay.

3              MS. PALUCH:  Those four individuals are Manuel

4    Abate, Eddie Jones, Dennis Miller, and Robert Pickens.  The

5    writs pertaining to those individuals are found at ECF

6    184-2, 185-2, 186-2, and 187-2 respectively.  So at this

7    time, in light of our stipulation as to their testimony,

8    we're asking that the Court quash those writs and those

9    inmates may be returned to their institutions where they

10   were previously held.

11             THE COURT:  All right.  Let me hear from the

12   defendant.  First of all, that the defendant agrees the

13   facts that the Government has stated have been stipulated

14   to?

15             MR. SMITH:  We have stipulated to those facts,

16   Your Honor.  I believe there's one other aspect to the

17   stipulation, though.

18             THE COURT:  Okay.

19             MR. SMITH:  None of those six witnesses will be

20   called at trial.

21             THE COURT:  All right.  But there were only four

22   that I signed the writs for --

23             MR. SMITH:  That's correct.

24             THE COURT:  -- because they were incarcerated.

25   All right.  And does the defendant have any objection to

1    the quashing of those writs?

2              MR. SMITH:  Absolutely not, Your Honor.

3              THE COURT:  Okay.  All right.  So that motion --

4    the motion to quash the four writs to the four incarcerated

5    witnesses is granted.  And it's now the Court's

6    understanding, based on counsel's representations, that the

7    other two witnesses will also not testify given the

8    stipulations.  Is that --

9              MS. PALUCH:  That is correct, Your Honor.  And

10   what you may notice on the witness list that we filed, we

11   had listed Ishmael Omar as one of our witnesses.  Now that

12   we've entered into this stipulation we will be filing a

13   revised witness list to remove his name.

14             THE COURT:  Okay.  Very well.

15             MS. PALUCH:  Okay.  The second matter I'd like to

16   bring to the Court's attention is --

17             THE COURT:  Are we still on stipulations of fact?

18             MS. PALUCH:  We are, Your Honor.

19             THE COURT:  Go ahead.

20             MS. PALUCH:  We have reached a stipulation

21   regarding Federal Rules of Evidence regarding 902.11

22   records in which we've agreed that neither side is required

23   to call as witnesses records custodian who has provided

24   business records and we have agreed that these records fall

25   within the business records exception to the rule against

1    hearsay found at Federal Rules of Evidence 803.6.

2              THE COURT:  Okay.

3              MS. PALUCH:  We are contemplating -- we are

4    still -- there is a possibility of a stipulation on summary

5    charts.  The Government intends to proceed by way of

6    summary charts given the voluminous nature of the records

7    in this case.  That is still a possible stipulation that we

8    can advise the Court on at the beginning of trial whether

9    or not we've reached that stipulation.

10             THE COURT:  All right.

11             MS. PALUCH:  The last one I believe, Your Honor,

12   is -- actually, a couple more agreements.  We have reached

13   a stipulation regarding the defendant's incarceration in

14   the Colorado Department of Corrections between the years

15   2000 and 2009.  The Government has agreed that it will not

16   introduce evidence in its case in chief regarding this

17   period of incarceration.

18             Upon his release from custody, the defendant was

19   allowed to transfer his parole supervision to Arizona.

20   During the search of the hard drives -- the hard drive from

21   the computer, the Government will argue, was used by the

22   defendant in this scheme.  There is e-mail correspondence

23   found between the defendant and his Arizona parole officer.

24             To avoid referencing the defendant's parole

25   status, the parties have agreed to the following:

8

1              That during the direct exam of computer forensic

2    expert Alison Stailey, she will be asked whether she

3    located on that hard drive e-mail communication between the

4    defendant and an Arizona state agency employee.  She will

5    respond yes to that.

6              She will then be asked:  What was the name of that

7    employee?  And she will respond Adrian Sambora.  That will

8    be the extent of the testimony.  We will not be introducing

9    as an exhibit the e-mail communication between the two.

10            Because of this stipulation, it's necessary for

11    the Government to remove Exhibit No. 36.  We will be filing

12    a revised exhibit list to remove that --

13            THE COURT:  Yes, you will both be filing amended

14    exhibit lists, and I'll tell you why.  I have my own reason

15    why you're going to.

16            MS. PALUCH:  Right.

17            THE COURT:  Go ahead.

18            MS. PALUCH:  And you have probably noticed, Your

19    Honor, we had a duplicate exhibit on --

20            THE COURT:  That's not my concern.  My concern is

21    the woefully low number of exhibits that have been

22    stipulated to.  But we'll get to that later.  Keep going

23    with your stipulation.

24            MS. PALUCH:  Okay.  Certainly, Your Honor.  We've

25    also reached a stipulation that between January and

9

1    November of 2011, the defendant was detained in the El Paso

2    County Jail.  The parties have reached a stipulation to

3    advise the jury of the dates of his detention at that

4    facility, as well as the fact that all charges on which he

5    had been detained were dismissed.

6         That concludes the stipulation portion.  I have

7    two other issues to bring to the Court's attention and I

8    can address those later if you would prefer.

9         THE COURT:  Yes, I would prefer that.  You can

10   bring them up either when I raise something that is

11   relevant to those other two matters or at the end when I've

12   covered everything I need to cover at this hearing, and

13   then I always give counsel an opportunity to bring up any

14   additional matters they think we need to cover today.

15        MS. PALUCH:  Thank you, Your Honor.

16        THE COURT:  All right.  Let me first confirm with

17   the defendant that the defendant is stipulating to the

18   matters that Ms. Paluch has just summarized.

19        MR. SMITH:  That is correct, Your Honor.  And we

20   will certainly notify the Government concerning the

21   proposed summary chart exhibits, hopefully early next week.

22   We've just received them, so --

23        THE COURT:  Okay.

24        MR. SMITH:  -- we don't foresee a problem.

25        THE COURT:  All right.  So let me tell you, Ms.

1     Paluch, what I'd like you to do.  There was a lot there

2     that you just summarized.  It goes beyond what I'm looking

3     for in terms of a very specific thing, which is specific

4     factual stipulations that I read as part of my preliminary

5     injunction -- preliminary injunction -- preliminary -- I've

6     had a number of those in addition to a number of trials --

7     but once we impanel the jury, once we have the 13 in the

8     box, I read preliminary instructions.  At the end of those

9     instructions, I read the parties' stipulations of fact, all

10    right?  And then those are included as part of the final

11    set of jury instructions that go back to the deliberation

12    room.

13         You have some additional stuff there.  So what I'm

14    going to ask you to do is file what you just read to me, or

15    summarized to me, as it is, file it, docket it with the

16    Court, and then from that, excise out the precise facts

17    that both parties agree should be read to the jury at the

18    beginning of the trial.  Is that -- am I clear on that?

19         MS. PALUCH:  You are, Your Honor, with one

20    exception.

21         THE COURT:  Okay.

22         MS. PALUCH:  All of those stipulations are

23    prepared to be filed; we can do that this afternoon.

24         THE COURT:  Okay.

25         MS. PALUCH:  The one side agreement that we are

1    not putting in the stipulation, because we don't want the

2    jury to know about that, is the Colorado Department of

3    Education --

4              THE COURT:  I know, but you just summarized for me

5    you had -- you were discussing that this person's not going

6    to do this, and in lieu of that, we're going to do this.

7    That's not what I'm reading to the jury.

8              MS. PALUCH:  Right.

9              THE COURT:  What I'm going to read to the jury,

10   the light was red, the car was a Ford, et cetera,

11   et cetera.  Those are the facts that I want to read to the

12   jury.

13             MS. PALUCH:  Certainly, Your Honor.

14             THE COURT:  Okay.  All right.  So separate those

15   out from the document you have, just distill out the actual

16   brass tacks facts that you are stipulating to, give them to

17   me in a separate document, and that's what I will read to

18   the jury once they're impaneled as part of my preliminary

19   instructions.

20             MS. PALUCH:  I apologize, Your Honor.  I just want

21   to make sure I'm clear.

22             THE COURT:  Okay.

23             MS. PALUCH:  The stipulations regarding business

24   records exceptions, that's a stipulation that we've marked

25   as an exhibit.  And when we have witnesses on the stand,

1    we'll refer to admissibility pursuant to that stipulation

2    found at Exhibit 33.  Is that something that you read to

3    the jury?

4              THE COURT:  No.  You -- if you have a stipulation

5    that Exhibit X comes in and you've put that stipulation

6    into writing, that's fine.  I don't require you to do that.

7    You just -- all you really have to do is put on your

8    exhibit list, just check the column that says Stip --

9              MS. PALUCH:  Okay.

10             THE COURT:  -- and then it comes in.  The jury

11   doesn't have to know all of the background and the reasons

12   for why you stipulated that Exhibit 92 is coming in.  They

13   just -- you just get up and say, "Pursuant to the

14   stipulation of the parties, the Government moves for the

15   admission of 92," I grant it, it's in, simple.

16             MS. PALUCH:  I'm with you.  Thank you for

17   explaining.

18             THE COURT:  All right.  Thank you.

19             All right.  Is there going to be anyone at counsel

20   table, either in the front counsel table or in the back

21   table, other than the five of you here and, obviously, the

22   defendant?  Let's start with the Government.

23             MS. PALUCH:  Yes, Your Honor.

24             THE COURT:  Okay.

25             MS. PALUCH:  In the courtroom today is Special

13

1     Agent Sonia Hacker with the United States Postal Service.

2                THE COURT:  Okay.

3                MS. PALUCH:  She has agreed to display exhibits

4     from both sides during this trial.

5                THE COURT:  Okay.  All right.

6                MS. PALUCH:  And so she will be running Trial

7     Director in the courtroom.

8                THE COURT:  I take it she's not going to be a

9     witness.

10               MS. PALUCH:  She will not be a witness.

11               THE COURT:  Okay.  All right.  So what I'll need

12    you to do -- and I'll ask the defendant the same questions

13    in a moment -- to just send an e-mail to my chambers

14    sometime in the next couple of days identifying everyone

15    that's going to be at either of the two tables by name and

16    their title and role in the case.

17               And the reason I do that is because when I conduct

18    the Court portion of the voir dire, I identify everyone in

19    the courtroom, including my staff and myself, to the venire

20    panel so they can tell us, do they know anyone on the

21    staff, any of the lawyers, IT staff, paralegals, law

22    students, whoever, special agents, defendants.  And because

23    I -- obviously you want to know and I want to know if

24    anybody in the -- on the venire knows anybody.  So we'll

25    need that.  Just send an e-mail.

1          MS. PALUCH:  Certainly.

2          THE COURT:  All right.  Beside you two gentlemen

3     and your client, will there be anyone else at counsel table

4     during the trial?

5          MR. SMITH:  We don't believe so, Your Honor.

6          THE COURT:  Okay.  Good.  So --

7          MR. SMITH:  Do you still want an e-mail that --

8          THE COURT:  No.  I can remember that.

9          MR. SMITH:  Thank you.

10         THE COURT:  Okay.  All right.  Because the other

11    three defendants in this case have pled, and we are now

12    down to one defendant, I have reduced the length of the

13    trial to five days.  So in my -- it's my practice for jury

14    trials of five days or less to have just one alternate

15    juror.  If it's six days or more, I go with two alternates.

16    So there's going to be 13 folks in the box.

17         You should make note that during the voir dire

18    process and during the peremptory challenge process, using

19    the procedure that I use, you need to know that the

20    alternate will be the individual seated in seat 2.  So that

21    is the back row, second seat from the left.  All right?

22         Because under -- because I use the jury selection

23    procedure that I think a number of judges have used in this

24    district for a number of years, and among other things --

25    well, beyond the most obvious, which is that person is not

Case No. 1:16-cr-00054-WJM Document 535-9 Filed 12/13/19 USDC Colorado pg 86 of
Case 1:16-cr-00054-WJM Document 428-9 Filed 08/09/19 USDC Colorado pg 19 of 44
901

15

1     going to be deliberating the verdict, is also the last

2     round of the peremptory challenges can only be asserted

3     against that individual.  All right?  So if you read -- if

4     you read that jury selection process closely, that's what

5     you'll see.

6          I want to stress that that's whoever's sitting in

7     that seat during the voir dire and the peremptory challenge

8     process.  In all my criminal trials I move folks around

9     after that because there's -- we want to get them -- the

10    seats on the left side of the box, there's issues with

11    respect to the exhibit screens and footrests and all that.

12    So I will just confirm with counsel before we start moving

13    folks around that it's Mary Smith in seat 2 that is our

14    alternate who will be excused at the conclusion of the

15    trial.

16          So, anyway, I'll -- for your purposes, you just

17    have to remember during voir dire and the peremptories,

18    seat 2 -- the individual seated in seat 2 is the alternate.

19    Any questions on that?

20          MS. PALUCH:  No, Your Honor.

21          THE COURT:  All right.  Okay.  The defendant is

22    not in custody, so we don't have to deal with the issue of

23    civilian clothing or restraints.

24          Okay.  Let me turn to witness lists.  The -- you

25    folks have complied with my practice standards on witness

Case 1:16-cr-00054-WJM Document 498 Filed 06/09/19 Page 16 of 44

16

1    lists but, obviously, now you are taking six folks off the

2    witness list, so you're going to be filing an amended

3    witness list?

4              MS. PALUCH:  Your Honor, only one of those six was

5    on the witness list.  We --

6              THE COURT:  Okay.  I'm confused, then.  Why did I

7    sign writs for folks to come here?  Just to watch the trial

8    or what?

9              MS. PALUCH:  No.  At the time we filed the writs,

10   we did not have a stipulation as to their testimony.

11             THE COURT:  Okay.

12             MS. PALUCH:  One of the two individuals, who is

13   not in custody, we had planned on calling him.

14             THE COURT:  Okay.  So are any of the six that now

15   we have discussed are not going to testify, are they

16   included in your current -- your most current witness list

17   filing?

18             MS. PALUCH:  Only one.

19             THE COURT:  Okay.  So just file an amended witness

20   list deleting that individual.

21             MS. PALUCH:  Yes.

22             THE COURT:  Okay.  And please do that by Tuesday,

23   the 21st.

24             Defendant has listed four witnesses.  Is there any

25   change to that list?  Mr. Smith?

```
 1              MR. SMITH:  As of this time, no, Your Honor.
 2              THE COURT:  Okay.  All right.  So we'll go with
 3     that.
 4              All right.  Exhibits.  The Government has endorsed
 5     117 -- is the -- do the 117, does that include potential
 6     Rule 1006 summary exhibits?
 7              MS. PALUCH:  It does, Your Honor.
 8              THE COURT:  So like how many of those are there?
 9              MS. PALUCH:  Four.
10              THE COURT:  Four.  So the 117, four are 1006
11     summaries of more voluminous documents.
12              MS. PALUCH:  Right.  Your Honor, also on that
13     point there are a number of exhibits that are the disks
14     that the custodians -- their declarations pertain to, so
15     there's a number of exhibits on this list that pertain
16     to the -- the disk, for example, is 60, the declarant's
17     declarations is 60-A.
18              THE COURT:  Okay.
19              MS. PALUCH:  So -- and that's something that we've
20     stipulated to.
21              THE COURT:  Is that a declaration for foundation?
22              MS. PALUCH:  Correct.  Well --
23              THE COURT:  If you're stipulating to the
24     admission, why do you need a declaration?  Because you
25     didn't at the time know you were going -- got it.
```

1            MS. PALUCH:  Yeah.

2            THE COURT:  I'm figuring out how you guys have

3    been doing this.  Okay.  So 117 exhibits for the

4    Government.  Maybe we're reading it wrong, but it seems

5    to -- the way we read the Government's exhibit list

6    document, that only 16 of those 117 have been stipulated to

7    in terms of admissibility.  Are we misreading that

8    exhibit -- your list?

9            MS. PALUCH:  One moment, Your Honor.

10            THE COURT:  Sure.

11            MS. PALUCH:  So, Your Honor, with the ones that

12    you referenced, it's our understanding that the defense is

13    admitting to authenticity but is reserving rights to

14    challenge relevance.

15            THE COURT:  The important one, the admission.

16            MS. PALUCH:  Exactly.

17            THE COURT:  Admissibility.  Okay.  So we're not

18    misreading your exhibit list.  The defendant has listed 44

19    exhibits, 14 of which are stipulated for admissibility.  Am

20    I reading that correctly, Mr. Smith?

21            MR. SMITH:  I believe you are, Your Honor.

22            THE COURT:  Okay.  So here's the problem:  We have

23    161 exhibits, potentially, with only 30 stipulations.  When

24    I'm saying "stipulations," that's shorthand for stipulation

25    for admissibility.  Because while I appreciate admission --

19

1    stipulations, rather, to authenticity, obviously the

2    important one is admissibility, and now that I find out

3    that four of the 117 are 1006 summary exhibits.

4         So the issue for me is -- let's see, 161 -- 131

5    exhibits without stipulation for admission is going to bog

6    down this trial tremendously and we're not going to get it

7    done in a week if anything like 160 exhibits are going to

8    be offered if we have to do battle on admissibility --

9    or -- and foundation and all that.

10        So I'm going to direct the lawyers to, no later

11   than the end of Monday, this Monday, the 20th, to meet face

12   to face, and you're going to run through your exhibit lists

13   and you're going to do a much better job at coming to an

14   agreement as to far more than 30 exhibits to which you're

15   going to stipulate to admissibility.

16        And then no later than Wednesday, the 22d, each

17   side is going to file their amended final exhibit lists

18   which maximizes, to the greatest extent possible, obviously

19   consistent with your fiduciary duties to your clients, the

20   number of exhibits that have been stipulated to.

21        You know, you will thank me for forcing you to go

22   through this because it makes for a much smoother trial,

23   the jurors are much happier, and nothing turns them off, in

24   my experience, than having to -- for them having to sit

25   through exhibit after exhibit where we're wading through

20

1    foundation and all that.

2              So any questions on what I've just ordered?

3              MS. PALUCH:  No, Your Honor.

4              THE COURT:  All right.  For the defendant?

5              MR. GOODREID:  Your Honor, may I make an inquiry

6    with respect to that?

7              THE COURT:  You may.

8              MR. GOODREID:  Would the Court countenance sort of

9    a halfway position there, that the parties would agree as

10   to foundation, to that sort of stuff, but simply reserve a

11   relevance objection because, as we were going through that,

12   most of them were not -- the Government couldn't lay a

13   foundation, but, rather, just wanted to reserve the point

14   of relevance.

15             THE COURT:  I understand that you were reserving

16   the ultimate decision of stipulating to admissibility, but

17   let me tell you what has always happened.  All my prior

18   trials, whenever I have put the lawyers through this

19   exercise, magically the amended list comes up with far more

20   exhibits that have been stipulated to than previously.  So

21   I think the fact that you -- that I'm going to force you to

22   sit across the table from each other and you're going to go

23   through this list will end up with -- now, if you believe

24   you can't in good faith, and consistent with your duties to

25   your client, stipulate to admission, then I can't force you

1    to do that.

2          It's just what -- the reason to go through this is

3    because it's been my experience, after nearly 50 trials,

4    that lawyers, because they've been too busy or their focus

5    has been elsewhere, have not put in the time to really

6    crunch through what the -- they can agree to that comes in

7    and what doesn't.  And by doing this -- again, you will

8    thank me for forcing to you do this because it will be a

9    much smoother trial.

10          All right.  Voir dire questions.  We're going to

11   use the default length of 20 minutes for each side.  Both

12   sides have submitted their proposed voir dire.  All right.

13          So let me tell you, Monday, the 27th, we're going

14   to meet up again here at 8:30.  We're going to run through

15   any last-minute items that need to be dealt with before we

16   bring up the venire panel at 9:00.  One of the things I'll

17   tell you at 8:30, is -- because I have yet to do it -- is

18   which, if any, of your proposed voir dire questions I will

19   not allow you to ask.  And usually those are in the

20   minority, but I've had some trials where there were a

21   number of voir dire questions that I thought were

22   inappropriate.

23          So you are then allowed to ask any questions that

24   I do not preclude you from asking and any reasonable

25   follow-up to those questions.  You will -- you will

Case 1:16-cr-00054-WJM Document 439 Filed 08/09/19 Page 22 of 44

1    learn -- or you will see that I conduct a pretty exhaustive

2    voir dire, myself, so I'm going to take the wind out of a

3    lot of your sail and ask a lot of your questions, but I

4    think that's good for you because then you can focus on

5    what you really want to focus, as opposed to asking people,

6    have they been on a jury before, has anybody been a

7    defendant or a party in a case.

8              I will go through those kind of questions and then

9    you can focus on the fact-specific nature of your inquiry

10   for this trial.  But in any event, you will learn that that

11   8:30 session which, if any, of your proposed questions you

12   cannot answer.  Or you cannot ask, rather.  Any questions

13   on voir dire?

14             MS. PALUCH:  No, Your Honor.

15             THE COURT:  Okay.

16             MR. GOODREID:  Your Honor, just one, and that is:

17   Your practice standards says the parties are confined to

18   the questions that they've submitted to the Court.  But

19   since we're going second, I assume -- but please -- I'd

20   like to ask:  Are we free to follow up on any point the

21   Government raised even if it wasn't something which was

22   specifically on our list?

23             THE COURT:  That's a good question.  No one has

24   ever asked me that.

25             MR. GOODREID:  Thank you, Your Honor.

Case No. 1:16-cr-00054-WJM Document 525-6 filed 12/12/19 USDC Colorado pg 94 of
901
Case 1:10-cr-00054-WJM Document 493 Filed 08/09/15 Page 23 of 44

23

1          THE COURT:  But I think that's a good question.

2     And the answer would be yes.

3          MR. GOODREID:   Okay.

4          THE COURT:  The reason in my practice standards I

5     say that no voir dire question can be asked that hasn't

6     been pre-cleared with me is because, you know, you can't

7     put the toothpaste back -- once it comes out, it comes out.

8     And if I don't know what's coming, I can't stop it

9     beforehand.  And it might be a question that it could be

10    highly prejudicial to the other side.

11         So if I've cleared the question for either side,

12    then it's fair game for both sides.  That's -- like I said,

13    I never thought of that, no one's asked me that, that's a

14    good point.  And if there's a question on the Government's

15    list that I have not directed the Government to refrain

16    from asking, you're free to ask.  Okay.

17         Let's turn to jury instructions.  You folks did an

18    excellent job on the jury instructions.  I commend you for

19    what you've done there.  I guess you took a good look at

20    the Yurek trial instructions and that's helpful.

21         So -- and I think this -- I think this is accurate

22    for me to say this, that I have never had a case where

23    there's been any disputed -- where there has been no

24    disputed instructions.  I'm happy to see that.  It will

25    make it much -- the task of dealing with jury instructions

1    will be much simpler for Mr. Foster and I, given that.

2         So now, the one thing I do want to cover with you

3    is the statement of the case instruction.  So it's, you

4    know, the usual practice amongst most of my colleagues, I

5    believe -- and I do this when there isn't a stipulated

6    statement of the case -- is to read the instruction -- to

7    read the indictment to the jury during the voir dire

8    process.  But oftentimes the indictment is very lengthy.

9    This one is not as lengthy as some of the others, but even

10   when length is not an issue, sometimes the -- both sides

11   can agree that a statement of the case should be read in

12   lieu of the indictment.

13        So I just want to confirm -- so it looks like you

14   folks did file a stipulated statement of the case, and I

15   just want to confirm from both of you that you are agreeing

16   that that is what I will use to inform the jury -- the

17   venire panel of what this case is about in lieu of reading

18   the indictment.

19             MS. PALUCH:  Yes, Your Honor.

20             THE COURT:  Okay.

21             MR. SMITH:  Yes, Your Honor.

22             THE COURT:  Okay.  And so we're talking about ECF

23   201, instruction No. 1; is that correct?

24             MS. PALUCH:  That's correct, Your Honor.

25             THE COURT:  Okay.  All right.  So I will read

25

1    that.  And that is helpful.

2         Oh, and the other thing you haven't done with the

3    instructions and your proposed stipulated instructions and

4    your verdict forms is that you've not e-mailed them to my

5    chambers in editable form.  So only one side has to do

6    that, so I'll ask the Government to do that.  If you can

7    get that in to us by Monday, Tuesday, next week, that's

8    fine.

9         MS. PALUCH:  Okay.

10        THE COURT:  Just get that to us and we can work

11   with those in that format.

12        Trial briefs I only allow if I'm requested or I

13   order them.  You've not requested and I am not going to

14   order them.  I think I'm familiar enough with this case and

15   the issues and the facts that I don't need trial briefs.

16   So that's one less thing for you folks to have to do

17   between now and the 27th.

18        The last thing that I'm going to cover is I always

19   make a practice to ask this, even if I know what the answer

20   probably will be.  Does there remain any potential for a

21   pretrial resolution of this case?

22        MS. PALUCH:  Not to my understanding, Your Honor.

23        THE COURT:  Okay.  The defendant, does the

24   defendant concur?

25        MR. SMITH:  I concur, Your Honor.

26

1          THE COURT:  Okay.  That's what we're here for, to

2     put on trials.

3          All right.  I'm done covering the items I need to.

4     Let's turn to the Government.  And, Ms. Paluch, you had two

5     other matters that I think I have not raised since you

6     haven't brought them up, so go ahead and bring those up

7     now.

8          MS. PALUCH:  Thank you, Your Honor.

9          Two of the witnesses listed on the defendant's

10    list are Matthew Sanders and Michael Cox.  Sanders is a

11    friend of the defendant; they met while they were both

12    incarcerated.  And Sanders introduced the defendant to

13    Heather Carr, his stepsister.  Sanders' address -- so

14    Sanders and Carr are step-siblings --

15         THE COURT:  Okay.  Got it.

16         MS. PALUCH:  Okay.  And so Sanders' address was

17    used on multiple FAFSAs submitted to the Department of

18    Education.

19         THE COURT:  And Ms. Carr is an endorsed witness.

20         MS. PALUCH:  She is, Your Honor.

21         THE COURT:  All right.  Okay.

22         MS. PALUCH:  So Sanders' address was used on a

23    number of FAFSAs that were submitted to the Department of

24    Education and, in fact, 11 debit cards were mailed to his

25    address.

1            Michael Cox is the defendant's cousin.  His

2    address was used on multiple FAFSAs and four debit cards

3    were mailed to his address.  Carr implicates Sanders and

4    Cox in this scheme.  The Government did not have enough

5    evidence to charge either of those individuals, but is

6    concerned that if they're called to testify, both could

7    invoke their rights not to incriminate themselves.  For

8    this reason --

9            THE COURT:  You're not planning on calling them.

10           MS. PALUCH:  We are not calling them.

11           THE COURT:  Okay.

12           MS. PALUCH:  Now, I would qualify that by saying

13   at the very -- months and months ago when we were -- knew

14   this was going to trial, we did subpoena both individuals,

15   but we have decided for these reasons to not call them --

16   in addition to other reasons -- but to not call them as

17   witnesses in our case.  Our concern is if they're called to

18   testify and they invoke in front of the jury.

19           So we're bringing this to the Court's attention to

20   address whether or not counsel should be appointed to

21   advise them of their rights.  Now, I'm sorry, Your Honor,

22   could I throw one more situation in there?

23           THE COURT:  Sure.

24           MS. PALUCH:  We have a witness on our -- and I

25   apologize for interrupting you.

1          THE COURT:  That's all right.

2          MS. PALUCH:  We have a witness listed on our

3    witness list named Kimmisha Mullett.  Her address was used

4    in this scheme as well.  She has told us in statements that

5    the defendant asked if he could use her address, that he

6    said he wouldn't tell her what it was about because he

7    didn't want her to get involved.  She's a witness, she's

8    flying in, she's scheduled to testify for us.  The same

9    reasons we're concerned for Cox and Sanders -- because she

10   lives in St. Croix, we haven't had the chance to speak with

11   her yet, and we're hoping to get her on the phone before

12   she flies in to Denver.  But for the same reasons --

13         THE COURT:  Bring her all the way from the

14   Carribean --

15         MS. PALUCH:  Absolutely, Your Honor.

16         THE COURT:  She must be an important witness to

17   you.

18         MS. PALUCH:  To us, she is.  But for the same --

19   in fairness, if we're saying Cox and Sanders' addresses

20   were used in this scheme and we think they might need

21   advice of counsel, I think it's only fair to say we've

22   endorsed a witness who might be in the same boat as those

23   two.

24         THE COURT:  All right.

25         MS. PALUCH:  We just don't know at this point.

1    And so we're --

2           THE COURT:  What do you mean you don't know?

3           MS. PALUCH:  Well, we don't know --

4           THE COURT:  You know if you're going to call her

5    or not.

6           MS. PALUCH:  Oh, absolutely we're going to call

7    her.

8           THE COURT:  So what don't you know?

9           MS. PALUCH:  Well, we need to talk to this woman

10   to make sure that there's nothing that could somehow

11   implicate her in the scheme.  Based on our -- her

12   testimony -- or her statement that she gave to

13   investigating agents, we felt she had no involvement in the

14   scheme.

15          THE COURT:  Okay.

16          MS. PALUCH:  So I guess what I'm just previewing

17   for the Court are possible issues with respect to the three

18   of them.

19          THE COURT:  So this concern that you have for --

20   what's her name again?

21          MS. PALUCH:  Kimmisha Mullett.

22          THE COURT:  Mullen?

23          MS. PALUCH:  Mullett.

24          THE COURT:  For Ms. Mullett.  This hasn't come up

25   for -- this issue hasn't come up before in terms of your

30

1    discussions with her or your -- you know, I'm a little

2    surprised that this doesn't come up until now when you're

3    ready to call her as a witness.

4         MS. PALUCH:  Right.  She was interviewed -- was it

5    2013?  2013 was when she was interviewed.

6         THE COURT:  Did she have counsel then?

7         MS. PALUCH:  She did not.

8         THE COURT:  Okay.

9         MS. PALUCH:  And her statement was that she had no

10   involvement in this.

11        THE COURT:  Okay.

12        MS. PALUCH:  Some of the exhibits pointed out by

13   defense counsel, we think Ms. Mullett is going to have some

14   credibility issues on some other aspects.  It's caused us

15   to wonder, could there be an argument that she was somehow

16   involved if mail was going to her address.  Did she really

17   not know what was going on?

18        So I'm just saying this as a matter of candor

19   that, until we get her on the phone and talk and tell her

20   our line of questioning, I don't know at this point.  But I

21   felt it unfair to bring up the Cox and Sanders but not --

22   without mentioning this woman.

23        THE COURT:  I appreciate that.  Let me deal with

24   Ms. Mullett first.  Don't you think before this is really a

25   ripe issue that I need to deal with that you need to have

1    that preliminary discussion with her?  Just like any lawyer
2    that's talking to someone to get a sense of:  Is this
3    someone represented by another -- so I'm thinking civil
4    litigation -- someone represented by someone else or in a
5    criminal context?  Is this someone potentially chargeable
6    with a crime for purposes of the prosecutor's office, and
7    that we should then stop the discussion and the
8    questioning, so then you know enough that, yes, there is an
9    issue or there's not an issue.
10                MS. PALUCH:  Absolutely.
11                THE COURT:  So that's what I'm saying.  I'm
12   surprised you haven't had that discussion previously such
13   that you're now standing up to tell me, "Judge, we had that
14   discussion.  It went for about three minutes and from what
15   we learned from the answers to our preliminary questions,
16   it's clear to us that this is someone that could
17   potentially be chargeable and, therefore, we believe she
18   needs separate counsel, or not."
19                But you haven't done that so I think, you know --
20   I have enough to do dealing with issues that are ripe for
21   decision I have to decide now.
22                MS. PALUCH:  Your Honor --
23                THE COURT:  You're presenting me with a
24   hypothetical that may not -- I may not need to rule on.
25                MS. PALUCH:  You're absolutely correct on that.

Case No. 1:16-cr-00054-WJM Document 525 filed 12/08/19 USDC Colorado pg 103 of
Case 1:16-cr-00054-WJM Document 498 Filed 03/05/15 Page 52 of 44
901

32

1    What I would point out that since the hurricanes have hit

2    the Carribean, it's been extremely difficult to communicate

3    with this woman.

4         THE COURT:  Okay.  I want -- I don't want to be

5    heard to be saying I'm laying blame on -- I'm somewhat

6    surprised, yes, I now understand with the hurricane and all

7    that, there's reasons why maybe you've not been able to

8    communicate with her much up until now.  That's no

9    longer -- I'm not concerned about why you didn't do it and

10   any of that.  The point is that you haven't.  And until you

11   do, you don't know whether you have the same issue as the

12   defendant may have with Sanders and Cox if the defendant

13   calls them -- is planning on calling them.

14        MS. PALUCH:  And you've read it absolutely

15   correct.  We felt, given that Sanders and Cox are on their

16   witness list, that we needed to raise this issue, and in a

17   sense of completeness, which I agree is premature, we

18   brought up Mullett --

19        THE COURT:  Okay.

20        MS. PALUCH:  -- in that vein.  But we do believe

21   that since Cox and Sanders are on their witness list, that

22   the issue is ripe for them.

23        THE COURT:  Okay.  Let --

24        MS. PALUCH:  Go right ahead.

25        THE COURT:  Hold on right there.  Let me turn to

33

1   the defense counsel.  All this is completely moot if you're

2   not planning on calling them.  So where do we stand on

3   that?  I mean, I know you don't want to necessarily

4   telegraph your trial strategy, but we are dealing with a

5   situation where if I need to be appointing counsel to

6   advise a witness on their potential, you know,

7   self-incrimination issues, I'd rather know sooner than the

8   27th or the 28th.

9           MR. SMITH:  I understand, Your Honor.  And we will

10  certainly do our best.  I can't give you an answer to your

11  question right now.

12          THE COURT:  Okay.

13          MR. SMITH:  As to Mr. Cox, I have talked to him

14  one time and it was about five weeks ago.  It was a phone

15  conversation and it was very brief.  He indicated to me at

16  that time that he was under subpoena and expected to be in

17  Denver on the 27th.

18          THE COURT:  Subpoena from you?

19          MR. SMITH:  No.

20          THE COURT:  From whom?

21          MR. SMITH:  From the Government.

22          THE COURT:  I thought you said you weren't calling

23  them as a witness.

24          MS. PALUCH:  I did, Your Honor.  At the very

25  beginning when this case was set for trial, we did subpoena

34

1    the individuals.  Then we determined that we were not going
2    to call Cox and Sanders for the reasons I've explained, but
3    we did have them under subpoena.  We have tried to contact
4    them to tell them the Government is not intending to call
5    them.  We've left a message for one, have had no luck
6    reaching the other.
7             THE COURT:  Okay.  Would it help advance the
8    discussions with them if I were to get the Government to
9    make an oral motion to quash those subpoenas and then you
10   can represent to them that they're no longer under a
11   Government subpoena?
12            MR. SMITH:  My problem --
13            THE COURT:  I'm just asking would it help or would
14   it hurt?
15            MR. SMITH:  I don't believe it would help.
16            THE COURT:  Okay.  All right.  Go ahead.
17            MR. SMITH:  I have never been able to talk to Mr.
18   Sanders.  I've never been able to reach him.  I understand
19   he's under subpoena.  Because of the position that we
20   understand these two gentlemen were in, we think they are
21   important witnesses for this trial.  Whether they would
22   exercise their rights under the Fifth Amendment, I have no
23   idea, especially with Sanders.  I've never been able to
24   talk to him.
25            THE COURT:  Okay.

1          MR. SMITH:  The witness Diaz doesn't fall into

2     this area, but since the Court is asking --

3          THE COURT:  Where's Diaz?  I thought we were

4     talking about Sanders and Cox.

5          MR. SMITH:  We were, but you asked about my

6     witnesses.

7          THE COURT:  Okay.  Go ahead.

8          MR. SMITH:  Diaz is a witness that has pled guilty

9     before Your Honor.  She was codefendant in this case.

10          THE COURT:  Right.

11          MR. SMITH:  I listed her because of the Court's

12     requirements, as I read them in your practice standards.  I

13     have not been able to talk to her either.  Her counsel will

14     not permit that and he will not accept subpoenas, so I

15     don't have her under subpoena.

16          THE COURT:  Okay.

17          MR. SMITH:  Which leaves only one witness, Ms.

18     Eubanks.  She is not under subpoena.  She said she didn't

19     require one.  She's an attorney licensed to practice in

20     Colorado, and will appear on my summons.

21          THE COURT:  All right.  Well, here's what I think

22     we're going to do, and I think the only thing we can do,

23     based on what both of you have told me, is that as soon as

24     the defense makes a definitive decision that Messrs.

25     Sanders and/or Cox are going to be called as witnesses,

1    then you need to notify the Government and notify the

2    Court.  And then I agree with Ms. Paluch, because there's

3    at least a potential that these folks are involved to such

4    an extent that they might have engaged in chargeable

5    conduct that they would need to have counsel to advise them

6    on whether, amongst several other things, to invoke their

7    Fifth Amendment rights.

8              So I think as to them, also it's quite not ripe

9    this moment, like you said -- the first thing you said --

10   but at the point where it crystallizes and you know that's

11   the path, the direction, you're going, you need to tell the

12   Government and me right away and we'll get someone in here.

13             MR. SMITH:  We'll do so, Your Honor.

14             THE COURT:  All right.  Thank you.

15             Okay.  Your second point, Ms. Paluch.

16             MS. PALUCH:  Yes, Your Honor.  Thank you.  This is

17   a point that we just want to alert the Court to, and this

18   is what the Government alleges is the defendant's

19   involvement in a prostitution business.  Government witness

20   Christine Duncan has stated that she and the defendant were

21   involved in a prostitution business with the defendant

22   essentially acting as Ms. Duncan's pimp.  This conduct led

23   in part to the defendant being detained in El Paso County

24   Jail.

25             The Government has no intention of introducing

37

1    witness testimony in its case in chief of the prostitution

2    activities.  It may --

3              THE COURT:  So why are you calling Ms. Duncan?

4              MS. PALUCH:  Ms. Duncan had communications with

5    the defendant regarding the financial aid fraud.

6              THE COURT:  Okay.

7              MS. PALUCH:  It may be --

8              THE COURT:  So they had a number of conversations

9    about different things.

10             MS. PALUCH:  Absolutely.  So we view the

11   prostitution situation as completely separate.  What we are

12   calling her --

13             THE COURT:  I'm glad you view it that way.

14             MS. PALUCH:  Yes.  I don't think we would get

15   anywhere near 404(b) on that topic.

16             THE COURT:  Okay.

17             MS. PALUCH:  So she will be asked about any

18   communication with the defendant about financial aid

19   fraud.

20             THE COURT:  Okay.

21             MS. PALUCH:  It may be that the defendant chooses

22   to impeach Ms. Duncan about her prior activities as a

23   prostitute.  We are just alerting the Court to --

24             THE COURT:  Does she have a conviction?  On

25   prostitution?

38

1    MS. PALUCH:  On prostitution, I don't think she

2  has.  She has other prior convictions, but I don't think

3  she's been convicted of being a prostitute.

4    THE COURT:  All right.  Well --

5    MS. PALUCH:  There's evidence --

6    THE COURT:  How do you think the defendant is

7  going to impeach someone without there being a conviction

8  of -- that gets in under the FRE of potential other

9  criminal conduct?

10    MS. PALUCH:  I believe the way that that would

11  possibly come in is when the defendant was incarcerated in

12  2011, Ms. Duncan was encouraged to go to Arizona and engage

13  in prostitution activities to raise money, what she

14  believed would be used to pay for the defendant's lawyers,

15  for his defense, while he was in custody.

16    Ms. Carr will testify --

17    THE COURT:  Okay.

18    MS. PALUCH:  -- that she gave money from the

19  scheme to pay for the defendant's legal fees.  I would

20  assume that defense counsel would be attempting to impeach

21  Ms. Carr's testimony that proceeds from the conspiracy were

22  used to pay for his legal fees.  What we've proposed is

23  that we phrase it in the terminology of "working."  Ms.

24  Duncan was working in order to provide money for the

25  defendant's defense.  We're just alerting the Court to the

1      fact --

2              THE COURT:  You're -- I think I'm not following

3      you.  You've proposed to do what -- what in what context?

4              MS. PALUCH:  Well, nothing.  The defense counsel

5      and I have had very candid conversations about this whole

6      prostitution issue and who's staying away from it and who's

7      possibly going near it.  We have no intention of going near

8      it.

9              THE COURT:  Okay.

10             MS. PALUCH:  We're just saying to the extent that

11     the defense attempts to impeach this witness, however they

12     can, with information about her being a prostitute, we feel

13     that we would be entitled on redirect to elicit from this

14     witness that the defendant, himself, was involved in the

15     prostitution business.

16             THE COURT:  Okay.  Well, let me just make a

17     comment here.  I think the -- first of all, whether you

18     would be able to get past an objection to attempting to

19     impeach someone for being an alleged prostitute with no

20     conviction, I think the odds of that are pretty -- are in

21     the single digits.

22             Secondly, if you were successful, I have to agree

23     with Ms. Paluch, you would be risking opening a huge door,

24     a huge door to the extent your client is somehow involved

25     with these activities.  I'm not going to tell you how to

1    put on your case or put on your trial, but word to the

2    wise.

3           Okay.  Anything else?

4           MS. PALUCH:  Some other housekeeping matters, Your

5    Honor.

6           THE COURT:  Sure.

7           MS. PALUCH:  Can I address them now?

8           THE COURT:  Go ahead.

9           MS. PALUCH:  Use of exhibits during opening and

10   closing.  I was going to inquire of the Court as to your

11   practice.

12          THE COURT:  In opening, only -- well, actually

13   opening and closing, only exhibits that have been

14   stipulated to and admitted.  In opening you won't have

15   anything admitted but if they've been -- if an exhibit has

16   been stipulated to in terms of admissibility, it may be

17   used in opening statement.

18          In closing argument, an exhibit that has been

19   received into evidence may be used.  And also the final

20   set -- any one or more of the jury instructions in the

21   Court's final set is going to go back to the jury.  That's

22   why I instruct before the closing arguments so that you're

23   all free to use a jury instruction in your closing to the

24   extent you think appropriate.  That's why the final final

25   set we give you of the instructions are non- -- are

1     unannotated, without the citations at the bottom of the

2     page.  They're clean instructions that you can put up on

3     the Elmo and use as you see fit.

4             Now, when you say exhibits, are you also using

5     demonstrative exhibits?  Do you have any?

6             MS. PALUCH:  I would, Your Honor.  Like, for

7     example, if we were to put up the elements and click as to

8     how we believe we've proved that element, is that something

9     that is allowable?

10            THE COURT:  If the defendant has no objection,

11    that's allowable.  If you think that it's an unreasonable

12    objection -- I mean, something like that, the element --

13            MS. PALUCH:  And it would --

14            THE COURT:  Well, I guess you have no disputed

15    instructions, so you stipulated to the elements of the

16    counts.

17            MS. PALUCH:  Right.

18            THE COURT:  I think it would be unreasonable for

19    the defendant to object to you using a slide that lists the

20    elements of the charged conduct in your opening.  And then

21    you can raise that with me and I would probably rule that

22    you can use it.  But, again, the principle point being is

23    there an agreement between the parties, especially in

24    opening, where nothing has been admitted and all that.  If

25    you have a stipulation, if you have an agreement, then you

Case No. 1:16-cr-00054-WJM Document 525-6 Filed 12/16/19 USDC Colorado pg 113 of
Case 1:10-cr-00094-WJM Document 198 Filed 08/09/15 Page 42 of 44
901

42

1      can go ahead and use it.

2               MS. PALUCH:  Okay.  As for the opening, I don't

3      envision that to be a problem at all.  As to the closing, I

4      think where I might be trying to drill down is if we put up

5      the element and I click on five ways that I think we've

6      proven that element and the defense disputes the

7      characterization of that evidence, that might not be

8      something that they would --

9               THE COURT:  Well, that's -- you're talking about a

10     slide that summarizes your argument.

11              MS. PALUCH:  Exactly.

12              THE COURT:  Right.

13              MS. PALUCH:  Is that helpful?

14              THE COURT:  I don't require the defendant to

15     stipulate to your argument.  You can just -- you just go

16     ahead and put on your argument and put -- go through your

17     slides, and if there's an objection in closing -- which I

18     would counsel the lawyers to think very carefully about

19     doing -- but if there is, I'll rule on it.

20              But I can tell you now if it's just -- you're just

21     arguing from the elements and you are saying, "This is what

22     this means and what you need to find that has been

23     established," then that's fine with me.

24              MS. PALUCH:  Thank you, Your Honor.

25              THE COURT:  All right.  Any additional matters

43

1    that -- from the defendant's perspective that we didn't

2    deal with today?

3              MR. SMITH:  Your Honor, I just -- I wasn't quick

4    enough on my feet when you were -- some of the exhibits and

5    your concern about stipulations.

6              THE COURT:  Okay.  Right.

7              MR. SMITH:  When we come back, I just want to

8    advise the Court, there are still going to be a number of

9    defense exhibits that are not going to be stipulated to.

10   They are only listed on our exhibit list because of the

11   Court's requirements.

12             THE COURT:  Right.

13             MR. SMITH:  They're witnesses' statements and I

14   don't think they will ever be offered.  They are there lest

15   I or my cocounsel need them for cross-examination.

16             THE COURT:  Again, understood.  Again, let me just

17   stress, I can't force you -- like I can't force you to get

18   a plea in this case, I can't force you to stipulate to the

19   admissibility of certain exhibits.

20             My only reason for putting you through the

21   exercise I've ordered you to go through is that it's been

22   my experience over seven years of sitting where I'm

23   sitting, and 50 trials, that that usually gets a large

24   number of additional exhibits stipulated to, and whatever

25   we can do in that regard, I think that's in everybody -- it

44

1    inures to everybody's benefit.  But you need to draw a line

2    and take a stand where you think it's appropriate based on

3    your duties to your client, then that's what you're going

4    to do.  I'm not going to get upset about it.

5           Anything else from the defendant's perspective?

6           MR. SMITH:  No, Your Honor.  Thank you.

7           THE COURT:  All right.  Very well.  We'll see you

8    at 8:30 on Monday, November 27th.

9         (Proceedings concluded at 2:56 p.m.)

10

11              *       *       *       *       *

12                 REPORTER'S CERTIFICATE

13

14       I certify that the foregoing is a correct transcript

15    from the record of proceedings in the above-entitled

16    matter.

17       Dated at Denver, Colorado, this 8th day of August,

18    2019.

19

20

21

22

23    _____
      MARY J. GEORGE, FCRR, CRR, RMR

24

25

156

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3     Criminal Action No. 16-cr-0054-WJM-2

4     UNITED STATES OF AMERICA,

5     Plaintiff,

6     vs.

7     TRAMELL THOMAS,

8     Defendant.

9     ------------------------------------------------------------

10                    REPORTER'S TRANSCRIPT
                      (Jury Trial - Day 1)
11                        Volume I

12    ------------------------------------------------------------

13         Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14    Judge, United States District Court for the District of

15    Colorado, on the 27th day of November, 2017, in Courtroom

16    A801, United States Courthouse, Denver, Colorado.

17                         APPEARANCES

18
           MARTHA A. PALUCH and BRYAN FIELDS, Assistant U.S.
19    Attorneys, 1801 California Street, Suite 1600, Denver,
      Colorado 80202, appearing for the plaintiff.
20
           DANIEL T. SMITH, Attorney at Law, 4582 South Ulster,
21    Suite 1400, Denver, Colorado 80237 AND
           THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
22    Suite 1400, Denver, Colorado 80202, appearing for the
      defendant.
23

24             MARY J. GEORGE, FCRR, CRR, RMR
            901 19th Street, Denver, Colorado 80294
25         Proceedings Reported by Mechanical Stenography
            Transcription Produced via Computer

157

1                    P R O C E E D I N G S

2          (This transcript excludes jury voir dire)

3                *      *      *      *      *

4          THE COURT:  All right, folks, we're -- I'm going

5    to read you a couple of preliminary instructions and then

6    we'll take our lunch break.  We have a couple of things

7    first.

8          All right.  Members of the jury, to ensure

9    fairness, you must follow the following rules:  Please do

10   not talk to each other about this case or about anyone

11   involved with this case until the end of the trial when you

12   go to the jury room to decide your verdict.  This rule

13   applies even when the court is not in session and when

14   there's a recess of the trial.

15         Do not talk with anyone else about this case or

16   about anyone else involved with this case until the trial

17   has ended and you've been discharged as jurors.  So "anyone

18   else" means just that, anyone else, and it includes your

19   spouse or partner, members of your family, your friends or

20   acquaintances.

21         You can tell anyone who needs to know that you are

22   a juror in this case and that the judge has ordered you not

23   to discuss the case until you have been discharged.

24   Outside the courtroom, please do not let anyone tell you

25   anything about the case or about anyone involved with the

1    case until the trial has ended.  If someone should try to

2    talk to you about the case during the trial, please report

3    it to my courtroom deputy, Ms. Hansen.

4         During the trial, you should not talk with or

5    speak to any of the parties, any of the lawyers, or

6    witnesses involved in this case.  It's important not only

7    that you do justice in this case, but that you also give

8    the appearance of doing justice.  If any lawyer, party, or

9    witness does not speak to you when you pass in the hall or

10   ride in the elevator together, please remember that they

11   are not being rude, and that I've ordered them not to

12   exchange even small talk with you.

13        During the course of the trial, you will receive

14   all the evidence you legally may consider to decide the

15   case.  You, as jurors, must decide this case based solely

16   on the evidence presented here within the four walls of

17   this courtroom.  This means that during the trial, you must

18   not conduct any independent research about the issues in

19   the case or the involvement -- or the individuals or

20   companies -- there aren't any companies -- or any

21   individuals involved in this case, including the lawyers,

22   the parties and the witnesses.

23        You must not consult any reference materials,

24   search the internet, websites, blogs, or use any electronic

25   tools to obtain information about this case or to help you

159

1    decide the case.  You must not try to find out information

2    about this case from any source outside this courtroom.

3          After you've retired to deliberate, you may begin

4    discussing this case with your fellow jurors, but you

5    cannot discuss the case with anyone else until you have

6    returned a verdict and the case is at an end.

7          You may not under any circumstances have your cell

8    phones on when the court is in session, so please turn your

9    cell phones off and not just on vibrate.  You may not

10   communicate electronically with anyone about this case on

11   your cell phone, through e-mail, text messaging or Twitter,

12   or by way of any social networking websites such as

13   Facebook or LinkedIn.

14         Researching any information on your own which you

15   think might be helpful is against the law and would be a

16   violation of your oath.  Violation of this instruction

17   could cause a mistrial, meaning that all of our efforts

18   over the course of this trial would have been wasted and we

19   would have to start all over again with a new trial before

20   a new jury.

21         If you were to cause a mistrial by violating this

22   order, you would be subject to paying all the costs of

23   these proceedings, and you could be punished for contempt

24   of court.  Let me point out that in the -- at the

25   conclusion of the evidence in another criminal case in this

1    district court, one juror, despite this order, Googled

2    information she thought was relevant to the case.  A

3    mistrial had to be declared and the juror faced contempt of

4    court charges that could have resulted in her being jailed

5    and/or ordered to reimburse both the prosecution and the

6    defense for costs incurred in the trial.

7         Her actions compromised a year's-long

8    investigation and prosecution, violated the defendant's

9    right to confront all evidence against him, and wasted all

10   of the time expended by the Court, the counsel, and her

11   fellow jurors to hear the case.

12        Please do not decide during the trial what your

13   verdict should be.  Keep an open mind throughout the trial,

14   reaching your conclusion only after you have gone to the

15   jury room to decide the case and you and your fellow jurors

16   have discussed all the evidence.

17        If you need to tell me something, simply give me a

18   signed note -- please give a signed note to Ms. Hansen and

19   she will give it to me.

20        You know, I've -- given the length, I think I'm

21   going to read instruction No. 2 when we come back from

22   lunch, so we're going to pause there.  Let me just tell

23   you, Ms. Hansen is going to accompany you now for the first

24   time through these doors.  She will take you to the jury

25   deliberation room, which will be your home away from home

1    for the next week when you're not in here, and that's where

2    you're going to deliberate your verdict.

3           She's going to give you your access cards, she'll

4    give you your instructions for your time here with the

5    court, and she'll distribute to you your jury code of

6    conduct.

7           All right.  So when we return, I will finish

8    reading this remaining preliminary instruction and then

9    we'll go to the opening statements of the parties.  So it's

10   12:35.  We will be in recess until 1:45.  So try to be back

11   in the deliberation room at least five, 10 minutes before

12   that so we can promptly start at that time.

13          All right.  We'll be in recess until 1:45.

14        (Recess taken 12:33 p.m.)

15                    AFTERNOON SESSION

16        (Jury was present at 1:53 p.m.)

17          THE COURT:  Welcome back, ladies and gentlemen of

18   the jury.  I'm going to read you the final preliminary

19   instruction that I need to read to you and then we'll go to

20   opening statements.

21          At the end of the trial, I will give you detailed

22   guidance on the law and how you will go about reaching your

23   decision, but now I simply want to generally explain how

24   the trial will proceed.

25          The first step in the trial will be opening

1    statements.  The Government, in its opening statement, will

2    tell you about the evidence which it intends to put before

3    you.  Just as the indictment is not evidence, neither is

4    the opening statement.  Its purpose is only to help you

5    understand what the evidence will be.  It is a roadmap to

6    show you what is ahead.

7           After the Government's opening statement, the

8    defendant may make an opening statement or the defendant

9    may wait until after the presentation of the Government's

10   case before he makes an opening statement.

11          The Government will then offer its evidence.

12   After the Government's evidence, the defendant may present

13   evidence, but he's not required to do so, and we've

14   discussed this already.  If the defendant submits evidence,

15   the Government may thereafter introduce rebuttal evidence.

16          Now, during the trial, it may be necessary for me

17   to talk with the lawyers out of your hearing about

18   questions of law or procedure.  Sometimes you may be

19   excused from the courtroom for these discussions.  I will

20   try to limit these interruptions, but you should remember

21   the importance of the matter you are here to determine and

22   you should be patient even though the case may at times

23   appear to you to be progressing slowly.

24          During the trial, I will make rulings on

25   objections or motions made by the lawyers.  It is the duty

1     of the lawyer on each side of the case to object when the

2     other side offers testimony or an exhibit that the lawyer

3     believes is not properly admissible under the rules of law.

4          Only by making an objection can the lawyer request

5     and obtain a ruling from me on the admissibility of the

6     evidence being offered by the other side.  You should not

7     be influenced for or against any lawyer or lawyers or the

8     lawyer's client simply because the lawyer has made an

9     objection.

10          When I overrule an objection, that means I am

11     permitting that evidence to be admitted.  When I sustain an

12     objection, that means I am excluding that evidence from

13     this trial for a good reason.  If I sustain an objection to

14     a question, then the witness cannot answer the question and

15     you should not draw any inferences for conclusions simply

16     from the question.  If the witness has already answered a

17     question to which I've sustained an objection and I order

18     that testimony stricken, you must entirely ignore that

19     testimony.

20          Some evidence may be admitted in this trial for a

21     limited purpose only.  When I instruct you that an item of

22     evidence has been admitted for a limited purpose, you must

23     consider it only for that limited purpose and for no other.

24     When I say "admitted into evidence," or "received into

25     evidence," I mean this particular statement or that

164

1    particular exhibit may be considered by you in making the

2    decisions you must make at the end of this case.

3        Do not attempt to interpret my rulings on

4    objections as somehow indicating how I think you should

5    decide this case.  I am simply making a ruling on a legal

6    question.  You should not infer or conclude from any ruling

7    or any other comment that I may make during the course of

8    the trial that I have an opinion on the merits of the case

9    favoring one side or the other.  I do not favor one side or

10   the other.

11       You as jurors are the sole judges of the facts of

12   this case.  It is your recollection and evaluation of the

13   evidence that is important to the verdict in this case.  By

14   your verdict, you will decide disputed issues of fact.  I

15   will decide all questions of law that arise during the

16   trial.

17       Before you begin your deliberations at the close

18   of the case, I will instruct you in more detail on the law

19   that you must follow and apply.

20       Because you will be asked to decide the facts of

21   this case, you should give careful attention to the

22   testimony and evidence presented.  During the trial, you

23   should keep an open mind and should not form or express any

24   opinion about the case until you have heard all the

25   testimony and evidence, the lawyers' closing arguments, and

1    my instructions to you on the law.

2            Now, the evidence in this case will consist of the

3    following:  No. 1, the sworn testimony of the witnesses on

4    both direct and cross-examination, no matter who calls that

5    witness.

6            No. 2, all exhibits received in evidence,

7    regardless of who may have produced that exhibit.

8            No. 3, all facts that have been judicially noticed

9    or stipulated to or -- and as to which you may, but are not

10   required to, take as true for purposes of this case.

11           In deciding the facts, you may have to decide

12   which testimony to believe and which testimony not to

13   believe.  You may believe everything a witness says, part

14   of it, or none of it.

15           In considering the evidence of any witness, you

16   should -- you may take into account many factors, including

17   the witness' opportunity and ability to see, hear, or know

18   the things about which the witness testified, the quality

19   of the witness' memory, the witness' appearance and manner

20   while testifying, the witness' interest in the outcome of

21   the case, and any bias or prejudice the witness may have,

22   other evidence that may have contradicted that witness'

23   testimony, and the reasonableness of the witness' testimony

24   in light of all of the evidence in the case.

25           Statements and arguments of the lawyers are not

Case 1:16-cr-00054-WJM   Document 326-6   filed 02/09/19   USDC Colorado   pg 126 of 901

166

1    evidence unless they are made as an admission or

2    stipulation of fact.  And I will let you know if that's the

3    case.  A stipulation is an agreement between both sides

4    that certain facts are true or that a person would have

5    given certain testimony.  When the lawyers on both sides

6    stipulate or agree to the existence of a fact, you may, but

7    are not required to, accept the stipulation as evidence and

8    regard that fact as proved.

9         In your consideration of the evidence, you are not

10   limited to the statement of the witnesses.  In other words,

11   you're not limited solely to what you see and hear as the

12   witnesses testified.  You may draw from the facts that you

13   find have been proved such reasonable inferences or

14   conclusions as you feel are justified in light of your

15   experience and common sense.

16        You may take notes during the trial, if you wish.

17   In deciding whether to take notes, let me inform you -- and

18   this is important -- that when you're deliberating the case

19   after the conclusion of the trial, you will not be provided

20   with a transcript of any witness' testimony.  If you do

21   take notes, do not discuss them with anyone before you

22   begin your deliberations.

23        At the end of each day, please leave your notes

24   out here on your chair in the jury box.  You will be

25   allowed to take your notes with you when you begin your

167

1    deliberations at the conclusion of the evidence.  At the

2    end of the trial, your notes will be shredded.  No one will

3    read your notes either during or after the trial.

4           If you choose not to take notes, remember it is

5    your own individual responsibility to listen carefully to

6    all the evidence.

7           Again, let me emphasize that neither in these

8    instructions, nor in any ruling, action, or remark that I

9    may make during the course of this trial, has it been or

10   will it be my intention to give any opinion or suggestion

11   as to what your verdict should be.  That is entirely your

12   decision to make.

13          All right.  That concludes the preliminary

14   instructions from the Court.  Opening statement by the

15   Government.

16          MR. FIELDS:  Thank you very much, Your Honor.

17          THE COURT:  All right.  Counsel, you have 20

18   minutes.

19          MR. FIELDS:  Thank you.

20          I have a couple of PowerPoint slides involving one

21   of the stipulated exhibits, that I'd ask permission to

22   publish that.

23          THE COURT:  Sure.  And we won't start your 20

24   minutes until you're all set up technologically here.

25          MR. FIELDS:  Thank you very much.  May it please

1    the Court.

2         THE COURT:  Counsel.

3         MR. FIELDS:  This is a case of greed.  The

4    evidence in this case will show that the defendant, Tramell

5    Thomas, stole thousands of dollars from the U.S. Department

6    of Education to fuel the lifestyle that he wanted.  Now, he

7    did that through student loans.  Loans that he didn't

8    intend to pay back.  As you are aware from jury selection,

9    many of you have filled out a FAFSA.  It's the first, and

10   often tedious, step on the path towards enrolling in

11   college.  It's free, anyone can use it, and it's easy to

12   access on the internet.

13        In July of 2012, the United States Department of

14   Education received a FAFSA through its website for a man

15   named Manuel Abate.  What you're looking at now is the

16   electronic information that the Department of Education

17   received.  And on the surface, at least, this tells the

18   story of a man who's looking to apply to college to build a

19   better life for himself.

20        It told the Department of Education that Mr. Abate

21   was single, that he was about 50 years old, that he had no

22   income, and that he wanted to attend classes at Pikes Peak

23   Community College at Colorado Springs, Colorado.  It was

24   electronically signed using a PIN number, a personal

25   identification number, that's unique to everyone who fills

1    out a FAFSA.

2         Now, because Mr. Abate had told the Department of

3    Education that he wanted to attend Pikes Peak Community

4    College, Pikes Peak Community College got the information

5    in the FAFSA.  And then Pikes Peak Community College made a

6    determination of how much student aid Mr. Abate should get.

7    And in this case, because he had no income, and he was

8    single, they determined that he was entitled to about

9    $6,000 in student aid.  A combination of student loans,

10   about $4,700, and a Pell Grant, a special grant that's

11   given based on need that doesn't have to be paid back, for

12   about $1,388.

13        A few days after the FAFSA was submitted, loan

14   paperwork was submitted, and it was also signed using that

15   same PIN number.

16        Now, student aid first goes directly to the

17   school.  So in this case, the United States Department of

18   Education paid money directly to Pikes Peak Community

19   College.  Pikes Peak Community College deducted tuition and

20   fees and then they made arrangements to send the rest of it

21   to Mr. Abate to pay for his qualified living expenses while

22   he was a student.  In this case, they made arrangements to

23   send a debit card that could be loaded with $4,700 directly

24   to the address listed on the FAFSA, 1112 Meadow Oaks Drive

25   in Colorado Springs, Colorado.

1          Ladies and gentlemen, Mr. Abate wasn't at 1112

2     Meadow Oaks Drive in Colorado Springs, Colorado.  He was

3     thousands of miles away because he was an inmate with the

4     Florida Department of Corrections.  He was a prisoner.

5     That FAFSA was a lie.  It was part of an elaborate scheme

6     by the defendant and his co-conspirators to steal money

7     from the Government.

8          And that FAFSA, it wasn't submitted through the

9     internet through a prison in Florida, it was submitted from

10     a computer at the house in Arizona where the defendant was

11     living.  And Mr. Abate obviously didn't get that debit card

12     at 1112 Meadow Oaks Drive.  Instead it ended up in Mr.

13     Thomas' wallet.  He's the one who got the money.

14          You'll learn during the course of this trial that

15     Mr. Thomas was part of an elaborate scheme to steal money

16     from the Government and altogether, the greed of Thomas and

17     his co-conspirators led them to submit over 180 false

18     FAFSAs, seeking over a million dollars in federal student

19     aid funds that they were not entitled to.  And it was as a

20     result of these false FAFSA, debit cards, that altogether

21     can be loaded with about $415,000 in cash were sent to

22     addresses controlled by Thomas and his co-conspirators.

23          Now, ladies and gentlemen, my name is Bryan

24     Fields, and I'm a federal prosecutor.  You already met my

25     colleague, Martha Paluch, who's also a federal prosecutor.

1    With us at counsel table is Special Agent Sandra Ennis.

2    She is with the Department of Education Office of Inspector

3    General and she was the lead investigator on this case.

4    Also joining us is Postal Inspector Sonia Hacker.  She's

5    with the Postal Inspector Service, which also investigated

6    this case.  And together, we will be presenting the case

7    against Tramell Thomas.

8            So how did it work?  How did this scheme all come

9    together?  Well, the scheme here operated between August of

10   2010 and October of 2012.  You'll learn during the course

11   of this trial that Thomas and his partners used computers

12   in Arizona to submit FAFSAs in the names of prison inmates.

13   FAFSAs claim that the prisoners had no income and they

14   wanted to attend community colleges in Colorado and

15   Arizona.

16           Why community colleges?  Because the tuition's a

17   little bit lower, which means your refund is going to be a

18   little bit higher.  By filling out the FAFSAs the way they

19   did, Thomas and his co-conspirators were able to get debit

20   cards with anywhere from $1,000 to $7,000 sent to these

21   various addresses.

22           Now, of course this is a fraud scheme and the

23   prisoners were in prison.  The prisoners couldn't actually

24   go to school.  So to make it look real, Thomas and his

25   co-conspirators actually submitted fake paperwork to the

172

1    schools to make those schools think that a real student was
2    enrolling.
3            And then to keep up the charade, they actually
4    enrolled in online courses and pretended to be a student,
5    all so that the student aid money would keep flowing in the
6    mail.
7            Now, after submitting these false FAFSAs, the
8    money came on debit cards.  But it would be too fishy if
9    all of the debit cards went to one address.  So also to
10   make this look a little bit more legitimate, an important
11   part of the scheme was to recruit other people so that
12   their addresses could be used so that Thomas and his
13   co-conspirators could have those addresses and put them on
14   the FAFSAs.
15           So as you might imagine, a scheme like this
16   couldn't be done by itself.  It took a team, it was a
17   conspiracy, a group of people all working together to do
18   their part of the job to ensure that everyone can get a cut
19   of the money.
20           So you'll hear about the co-conspirators during
21   this case, but you'll also hear that the defendant was
22   involved in every major part of this conspiracy.  The
23   defendant cruised the Department of Corrections web pages
24   looking for the identities of prisoners that he could use
25   in the FAFSAs.

1          The defendant used computers to submit the false

2    FAFSAs to the Department of Education.  The defendant

3    manipulated other people to let their addresses be used.

4    He made arrangements for that address at 1112 Meadow Oaks

5    Drive to be used, but he also made arrangements for other

6    addresses to be used, including an address on Rushmore

7    Drive in Colorado Springs, an address on Radiant Drive in

8    Colorado Springs, and an address on Rice Drive in Colorado

9    Springs.

10          And then Thomas and his co-conspirators, once they

11   got these debit cards -- you could only take about $500 a

12   day on these debit cards -- so they would go around to

13   various ATMs day after day to turn those debit cards into

14   cold hard cash, or they would go to stores and purchase

15   personal items and get cash back.  Same thing.

16          So the scheme satisfied Thomas's greed.  Thomas

17   got money from the scheme.  Thomas also got to live with

18   his girlfriend and co-conspirator, Heather Carr, in a nice

19   house paid in large part with money from the fraud scheme.

20   And Carr and Thomas also used the money to pay for

21   vacations together.

22          And you'll find out that when there was a period

23   of time where Mr. Thomas got in trouble with the law, fraud

24   scheme proceeds were used to pay for his defense attorney.

25   For this conduct, Count 1 of the indictment charges the

174

1    defendant with a conspiracy to submit false claims to the

2    Government.  The false claims here are the false FAFSAs

3    with the stolen prisoner identities used to claim loans

4    that the group was not entitled to.

5           Counts 2 through 7 charge the defendant with

6    aiding and abetting, which is just legalese for helping

7    with mail fraud.  Mail fraud is the crime of lying to get

8    money and using the post office to help.  So in this case,

9    Counts 2 through 7 charge seven specific mailings of debit

10   cards that were important for the scheme.  So Thomas caused

11   these debit cards to be sent through the mail to addresses

12   that he controlled.

13          There's no dispute in this case that the prisoners

14   in Counts 2 through 7 had their identity stolen.  The

15   parties have stipulated, they've agreed, if those prisoners

16   were called to the stand to testify, each of them would

17   testify that they were in prison when the false FAFSAs were

18   submitted in their name; that they didn't submit fake

19   paperwork to these colleges; and they didn't authorize

20   anyone else to do it either.

21          So the issue in this case is not whether there was

22   a fraud scheme.  The issue is:  Did the defendant know

23   about it and intend to be part of it?  And the Government

24   has to prove that beyond a reasonable doubt.  It's a burden

25   that we embrace, and here's how we're going to do it:

Case No. 1:16-cr-00054-WJM Document 505 filed 08/08/19 Page 20 of 35 pg 135 of

175

1          During the course of this trial, you're going to

2     hear from numerous witnesses who are going to walk you

3     through all of the documentary evidence in this case.  One

4     of the first witnesses you'll hear from is Kristina Moss

5     with Pikes Peak Community College.

6          You'll hear that Thomas and his partners worked

7     hard not to get caught.  They used many addresses and they

8     used the names of prisoners who would be in jail for a long

9     time, thinking that if those prisoners are going to be in

10    jail for a long time, they're not going to be checking

11    their credit and they're not going to know that their

12    identities were stolen.  But Kristina Moss started to see

13    something fishy.  She started to see that students often

14    had clusters, all at the same address.  She noticed that

15    these students all seemed to be enrolled in the same

16    classes; she noticed that they all seemed to have similar

17    references; their e-mail addresses all had similar formats.

18    And it seemed weird.

19         So she reported her findings to the Department of

20    Education and she tipped them off to the fraud.  You will

21    also hear from Michelle Allred with the United States

22    Department of Education, and she'll tell you what should be

23    obvious:  The Department of Education relies on people to

24    tell the truth when they submit a FAFSA.  So she'll explain

25    to you how the Department of Education and the community

176

1     colleges are victimized when people lie to get loans that

2     they're not entitled to and that they don't intend to pay

3     back.

4           You'll also hear from Rebecca Joseph.  She's a

5     representative from Higher One Bank, the company that

6     actually sent out the debit cards.  She'll tell you how

7     those debit cards were generated and when they were mailed,

8     which was important for the mail fraud accounts.

9           And during this trial, ladies and gentlemen, we'll

10    pull back the curtains on this conspiracy and give you an

11    inside look at what was happening between 2010 and 2012.

12    And that's because the defendant's most trusted

13    co-conspirator, Heather Carr, has agreed to testify.  She's

14    pleaded guilty to participating in the scheme and, as part

15    of the plea deal, she's agreed to come here to court and

16    explain to you exactly how the scheme worked.

17          She'll explain to you how she was able to use her

18    job at a bank to get Social Security numbers and dates of

19    birth for these inmates that could be used on the FAFSAs.

20    She'll explain to you how she gave Thomas the lists with

21    those Social Security numbers and identifying information

22    so that Thomas could fill out the FAFSA and submit it on

23    the internet.

24          She'll tell you how the defendant lived in her

25    home and used computers to submit these false FAFSAs to the

1      Department of Education.  And she'll tell you how she and

2      Thomas made thousands of dollars from the scheme which they

3      used to live in their big house and that paid for nice

4      vacations.

5            You'll also hear from others who knew Thomas

6      personally.  Kimmisha Mullett, she'll testify that Thomas

7      convinced her to let him use her address, which was, guess

8      what, 1112 Meadow Oaks Drive.  She'll tell you how that was

9      her address and how she received mail for the defendant,

10     which she then shipped to him down in Arizona.

11           A woman named Christina Duncan will come to court

12     and she'll tell you that she knew Thomas, too.  She'll tell

13     that you she saw text messages on Thomas' phone, text

14     messages that aroused her suspicion because these text

15     messages were to another woman.

16           So Christina Duncan will tell you when she saw

17     these text messages, she saw that they were about Social

18     Security numbers and about student loans.

19           Now, witnesses like Carr, Mullett, and Duncan,

20     they'll explain how the scheme worked to you and show you

21     that a conspiracy actually existed.  But you'll learn from

22     these witnesses that not everyone involved in the

23     conspiracy knew each other.  There were two other

24     co-conspirators, Marcelle Green and Mercedes Diaz.  They

25     were close friends with Carr and they did many of the

1    things that Thomas did.

2         They went around to ATMs to get cash off the debit

3    cards, they submitted false FAFSAs, they got the Social

4    Security number list from Heather Carr.  And in return for

5    getting those Social Security numbers, they paid Carr a cut

6    of the money.  Carr, of course, is living with Thomas, so

7    some of that money was used to pay for their house.

8         But, ladies and gentlemen, you'll find out that to

9    be involved in a conspiracy, you don't need to know

10   everyone else who's involved.  You'll also learn during

11   this trial that for a period of time between 2010 and 2012,

12   while this conspiracy was going on, the defendant was in

13   jail on charges that were later dismissed, so he couldn't

14   participate in every aspect of the conspiracy.  But, ladies

15   and gentlemen, you'll find out that however he could, even

16   when his ability was limited, the defendant eagerly

17   participated in this scheme.  Even while in jail, he

18   continued to help it succeed by continuing to use e-mail --

19   or mailing addresses that he controlled and were used as

20   part of the scheme to keep getting debit cards, and that

21   money from those debit cards was used to pay for his

22   defense attorney.

23        Also, ladies and gentlemen, you'll learn that as

24   part of this investigation, special agents with the

25   Department of Education and postal inspectors with the

179

1     Postal Inspection Service executed a search warrant at

2     Thomas' home, the home that he and Carr shared.  Now Thomas

3     was there and you'll find out that after agents started

4     knocking on the door, he took his cell phone and he broke

5     it in half.

6           But, ladies and gentlemen, special agents with the

7     Department of Education gave that cell phone to computer

8     forensic expert Alison Stailey and, even though it was

9     broken, she found out what was on it.  She will come to

10    court and she'll tell you what was on that phone that was

11    broken in half.

12          She also analyzed the computers found in that

13    house.  And when she takes the stand, she'll explain to you

14    what the defendant was doing on the computers in that

15    house.

16          Near the end of this trial, you'll hear from

17    Special Agent Sandra Ennis, and she'll tell you about the

18    thousands of pages that she reviewed as part of this case,

19    hours of analysis that went into looking at all these false

20    FAFSAs, the fake paperwork submitted to the schools, the

21    bank records from Higher One, internet records showing IP

22    addresses and where these FAFSAs were submitted from.  So

23    she'll show you how she was able to tie certain mailing

24    addresses to the defendant in this case and she'll also

25    tell you about all of the money that was generated as a

1    result of this scheme, and what the total losses were to

2    the United States Department of Education.

3         Ladies and gentlemen, that's not all.  You'll be

4    asked to consider another piece of evidence:  The debit

5    card from Manuel Abate.  It was mailed out near the end of

6    July, 2012.  A couple of weeks later, police officers in

7    Tempe, Arizona, pulled over a white Dodge Charger

8    registered to Heather Carr.  It was late.  It was about

9    2:00 in the morning.  So when the detective who made the

10   stop, Officer Jonathan Seal, when he went up to the window,

11   he carried his flashlight and he used that to illuminate

12   the driver's license and registration of the person driving

13   the car.  The man behind the wheel was Tramell Thomas.

14        Now, because it was late at night and officers are

15   always concerned about their safety, no matter who they

16   pull over, Jonathan Seal used that flashlight to look to

17   see if there was anyone else in the car.  And as the beam

18   of his flashlight crossed over the back passenger seat,

19   something caught Jonathan Seal's eye.  He saw a clear

20   Ziploc bag filled with more credit cards than he had ever

21   seen before.

22        So Detective Seal asks the defendant to hand him

23   the bag.  The defendant looked back at the bag and he

24   looked back at the officer.  So Officer Seal asked again.

25   This time the defendant looked back at the cards and he

181

1    swept them on to the floorboard and then he reached down

2    and he grabbed an empty bag and he handed it to Officer

3    Seal as though that was the bag that the officer wanted to

4    look at.

5           COURTROOM DEPUTY:  You have two minutes.

6           MR. FIELDS:  The ruse didn't work, ladies and

7    gentlemen.  Officer Seal will testify about what happened

8    during that traffic stop.  And what's more, because Officer

9    Seal realized that this wasn't just any old traffic stop,

10   Officer Seal made a recording of it -- of most of it, using

11   a hand-held audio recording device.  So you'll get to hear

12   exactly what the defendant said when he was asked about

13   those credit cards.

14          Eventually during the stop, Officer Seal got to

15   search the car and he'll tell you that when he searched the

16   car, on the floorboard he found a bag filled with 52 debit

17   cards.  All of them in the names of other people.  All of

18   them in the names of prison inmates.

19          As part of the stop, Officer Seal also searched

20   Thomas' wallet.  Inside was the defendant's identification.

21   But next to it, safe inside one of those wallet's card

22   slots was the debit card for Manuel Abate.  The same debit

23   card mailed out as a result of a fake FAFSA sent to the

24   Department of Education and false applications sent to

25   Pikes Peak Community College.

1          After you've heard and seen all of the evidence in

2     this case, you will know how Tramell Thomas ended up with a

3     debit card for Manuel Abate in his wallet and 52 other

4     examples of his greed in the back seat of his car.

5          And at the close of this case, my colleague Martha

6     Paluch will get to address you again, and she'll ask you to

7     return the only verdict that is consistent with all of this

8     evidence:  That's a verdict of guilty on all counts.

9          THE COURT:  Thank you, Mr. Fields.

10          Opening statement for the defendant.

11          MR. SMITH:  Your Honor, at this time, the

12     defendant would reserve its right to give an opening

13     statement.

14          THE COURT:  Okay.  Very well.  Government may call

15     its first witness.

16          MS. PALUCH:  Thank you, Your Honor.  The

17     Government calls Ms. Kristina Moss.

18          THE COURT:  Ms. Paluch, could you swivel that

19     lectern back.

20          MS. PALUCH:  I sure can.

21          THE COURT:  Careful with the wires.

22          Is Ms. Moss anywhere near her?  Ms. Paluch?

23          MS. PALUCH:  Yes, Your Honor.  The agent just went

24     to find her, but I will go check with her.

25          COURTROOM DEPUTY:  Step in the box and raise your

                              Direct - Moss

 1    right hand.

 2              KRISTINA MOSS, GOVERNMENT'S WITNESS, SWORN

 3              COURTROOM DEPUTY:  Please be seated.  Please state

 4    your full name for the record and spell your first and last

 5    name.

 6              THE WITNESS:  Kristina Moss.  K-r-i-s-t-i-n-a,

 7    M-o-s-s.

 8              MS. PALUCH:  May I proceed, Your Honor?

 9              THE COURT:  You may, counsel.

10                         DIRECT EXAMINATION

11    BY MS. PALUCH:

12    Q.   Good afternoon, ma'am.  How are you employed?

13    A.   I'm employed with Pikes Peak Community College.

14    Q.   What is your title there?

15    A.   I'm assistant director of financial aid.

16    Q.   And generally what do your job duties entail?

17    A.   I assist the director with his duties, and I currently

18    supervise eight individuals who verify FAFSA applications.

19    Q.   Just so the record is clear, can you explain what a

20    FAFSA is.  What does that acronym stand for?

21    A.   Free Application for Federal Student Aid.

22    Q.   To what agency is a FAFSA submitted?

23    A.   To the Department of Education.

24    Q.   How many students attend Pikes Peak Community College?

25    A.   We have about 22,000 students.

Direct - Moss

1    Q.   Does Pikes Peak offer online as well as campus

2    courses?

3    A.   Yes, we do.

4    Q.   Are you familiar with the name Colorado Community

5    College System?

6    A.   Yes, I am.

7    Q.   And what is that?

8    A.   They are 13 community colleges in the state

9    of Colorado that all belong in one group, and the --

10   Pikes Peak is part of that group.

11   Q.   Where does Pikes Peak Community College rank as far as

12   size among those 13 schools?

13   A.   We're in the top three.

14   Q.   What are the requirements for someone applying to

15   attend Pikes Peak?

16   A.   There are no requirements; it's an open admissions.

17   Q.   Is it necessary that they have a GED or a high school

18   diploma to attend?

19   A.   No.

20   Q.   Are there academic requirements for someone to receive

21   federal student aid?

22   A.   Yes.

23   Q.   And what are those requirements?

24   A.   One has to have a high school diploma or its

25   equivalency of a GED, and maintain a 2.0 GPA.

Direct - Moss

1    Q.   To apply for admission, does a person need to

2    physically come into the school?

3    A.   No, they do not.

4    Q.   Okay.  And how would they go about applying and

5    accomplishing being admitted?

6    A.   Everything is done online.

7    Q.   Are you familiar with an application certification

8    page?

9    A.   Yes, I am.

10   Q.   And what is that?

11   A.   The confirmation sheet that a student gets when they

12   apply for admissions online.  It's their confirmation page

13   and it applies -- it gives them their student ID number for

14   the school.

15   Q.   And what is the student ID number used for?

16   A.   To access any school database, e-mails, their classes,

17   register for courses.

18   Q.   I'd like to direct your attention, ma'am, to August of

19   2010.  What was your job title then?

20   A.   I was a financial aid advisor.

21   Q.   What were your job responsibilities as a financial aid

22   advisor?

23   A.   To verify files from the Department of Education.

24   Q.   Now, you testified that FAFSAs are submitted to the

25   Department of Education?

Direct - Moss

1    A.    That is correct.

2    Q.    So how is it that Pikes Peak would be involved in the

3    FAFSA verification process?

4    A.    When a student applies for the FAFSA application, they

5    can put up to 10 schools on that application.  And then the

6    Department of Education sends those applications to each

7    school that is placed on that application.

8    Q.    Can you explain for us how the FAFSA verification

9    process begins.

10   A.    Yes.  The Department of Education randomly selects one

11   in every three students for schools to verify.

12   Q.    What are the areas of verification?

13   A.    Household size, income, such as tax information, and

14   certain untaxed income, like child support or tax pensions.

15   Q.    What types of federal student aid are available?

16   A.    There are federal grants and federal student loans.

17   Q.    Can you explain the difference between the two.

18   A.    Yes.  Federal grants are monies that the student does

19   not have to pay back, and student loans are monies that the

20   student has to pay back.

21   Q.    So if awarded a grant, is there an enrollment

22   required -- requirement of the student?

23   A.    Students can be in at least -- in half a credit and

24   still get federal Pell Grant monies.

25   Q.    What about for a loan?

Case No. 1:16-cr-00054-WJM Document 525-6 Filed 12/02/19 USDC Colorado pg 147 of 901

187

Direct - Moss

1    A.    Students have to be in a minimum of six credit hours

2    to obtain a student loan.

3    Q.    Now, ma'am, you mentioned online classes.  If a

4    student is taking online classes, are there any steps to be

5    completed before that student can receive federal financial

6    student aid?

7    A.    Yes.  A student has to go on and initiate contact with

8    the instructor and let them know they will be participating

9    in the online course.

10   Q.    What happens, if anything, with respect to federal

11   student aid if the student drops or fails a class?

12   A.    The school then has to determine a personal

13   calculation to see how much of the monies that was paid for

14   them to attend school has to be repaid back.

15   Q.    And when you say "repaid back," who has to pay the

16   money back?

17   A.    So the school sends the money back to the Department

18   of Education and then the student is responsible for paying

19   back the institution, the funds that we returned on their

20   behalf to the Department of Education.

21   Q.    So the student is required to pay back Pikes Peak

22   Community College?

23   A.    Yes, ma'am.

24   Q.    Does Pikes Peak send notification to the students if

25   that occurs?

Direct - Moss

1    A.   Yes, we send them a letter via e-mail that lets them

2    know that we sent the money back to the Department of

3    Education, how much, and how much they are to pay back to

4    our institution.

5    Q.   I'd like to take you back, ma'am, to August of 2010

6    when you were verifying FAFSAs.  Is there anything you

7    recall that occurred during that time frame with respect to

8    the return to Title IV process that was out of the

9    ordinary?

10   A.   Yes, we received a handful of returned mail back all

11   from the same address.

12   Q.   And when you say -- I believe you said a handful, do

13   you recall an approximate number?

14   A.   I'd say between five and six.

15   Q.   Was that a significant enough number to cause you

16   concern?

17   A.   Yes, it was.

18   Q.   Do you happen to remember the street name on those

19   letters that were returned?

20   A.   Rushmore.

21   Q.   And how was it you remember the name Rushmore?

22   A.   Because as they were coming back, we, within the

23   office, referred to them as the Rushmore people.

24   Q.   Did you then investigate the students listing the

25   Rushmore address?

189

Direct - Moss

1    A.    We did.

2    Q.    And what documents did you review?

3    A.    All documents that were submitted for the FAFSA

4    application that were on file.

5    Q.    And after reviewing those documents, is there anything

6    else that you remember about the Rushmore people's

7    documents?

8    A.    Yes.  They all had similarities with respect to

9    personal e-mail addresses that were on the system.  Their

10   handwriting seemed to be the same.  Their addresses within

11   reference sheets seemed to be similar.  And they were

12   coming from the same fax numbers.

13   Q.    Did you notice anything about handwriting?

14   A.    Yes.  It was similar within the documents.

15   Q.    Does the school generate an e-mail address for its

16   students?

17   A.    Yes, it does.

18   Q.    So when you're talking about similar e-mail addresses,

19   can you explain that a little bit.

20   A.    Yes.  When students fill admissions application or a

21   FAFSA, they're required to use a personal e-mail address,

22   and those e-mail addresses were the ones that we found were

23   similar in nature.

24   Q.    I'm going to ask if you recall the following names:

25   Manuel Abate?

Direct - Moss

1    A.    I do.

2    Q.    Why is it you recall that name?

3    A.    While working on his file, I had to call to get some

4    additional information and a female had picked up and

5    identified herself as Manuel Abate.

6    Q.    Did that stand out to you?

7    A.    It did.

8    Q.    Why is that?

9    A.    Because our records indicated that it was a male and

10   the voice on the other end was very female sounding.

11   Q.    I'm going to ask you if you know the name Christine

12   Duncan.

13   A.    I do.

14   Q.    Why is it you remember that name?

15   A.    She called me.

16   Q.    Do you recall the topic of conversation?

17   A.    Identity theft.

18   Q.    Do you recall the name Tramell Thomas?

19   A.    I do.

20   Q.    Why is it you recall that name?

21   A.    Because his name reminded me of my son's.

22   Q.    Were there any -- were there documents pertaining to

23   Mr. Thomas?

24   A.    Yes, throughout the investigation, I was asked to

25   provide documents with his name on them.

Direct - Moss

1   Q.   Okay.  Were there any other common addresses that you

2   noticed?

3   A.   Yes.  We had a similar address at Lexington Avenue.

4   Q.   Do you recall the number of students coming back to

5   the Lexington address?

6   A.   I would say about the same, a handful, between five

7   and six.

8   Q.   Did you look into that address?

9   A.   I did.

10  Q.   And what did you do?

11  A.   I Googled it and found that it was within a short

12  distance from our main campus, and that it was a little

13  small townhome.

14  Q.   And did that strike you as odd?

15  A.   It did.

16  Q.   And why is that?

17  A.   Because it was not a big townhome, it was small,

18  compared to the number of returned mail that we were

19  getting from that address.

20  Q.   What occurred after you identified these addresses and

21  commonalities between the various documents?

22  A.   We notified the Department of Education's OIG office

23  with our concerns.

24  Q.   Okay.  And after Pikes Peak reported this information,

25  what, if anything, was required of Pikes Peak by the

Direct - Moss

1    Department of Ed?

2    A.    To submit all documentation that we felt was in the

3    nature of fraudulent activity to the Department -- forward

4    those students to them.

5    Q.    And in the course of their investigation, did you

6    continue to provide those records?

7    A.    Yes, we did.

8              MS. PALUCH:  Your Honor, at this time I note that

9    we will be asking the witness to testify about Government

10   Exhibits 63-B through 63-G.  The parties have stipulated to

11   these exhibits.  At this time, I would move for the

12   admission of 63-B through 63-G, and I would request

13   permission to publish as these exhibits are discussed.

14             THE COURT:  All right.  Given the stipulation of

15   the parties, Government Exhibits 63-B through 63-G are

16   admitted into evidence and may be published to the jury.

17        (Government's Exhibits 63-B thru 63-G received)

18             MS. PALUCH:  Thank you, Your Honor.

19   BY MS. PALUCH:

20   Q.    Could you please publish Government's Exhibit 63-B.

21             And, ma'am, you should see that on the screen in

22   front of you.

23   A.    Yes.

24   Q.    Can you identify that exhibit?

25   A.    This is a loan adjustment form.  It's a form that the

193
Direct - Moss

1    student at the institution completes to ask for loan monies
2    from the Department of Education.
3    Q.   I think, ma'am, what I'm going to have you do first is
4    just look through 63-B and just tell me generally what
5    those documents relate to.
6    A.   Okay.
7    Q.   Can you just scroll through?
8         Okay.  If we could now go back to page 1.
9    Generally what are these documents?
10   A.   Documents that our institution required of the student
11   if they were asking for additional funds, such as loan --
12   Q.   Who is the individual referenced in 63-B?
13   A.   This one is -- his name is Ismael Omar.
14   Q.   Okay.  If you could please publish the last page of
15   that exhibit.
16        And I'll ask you, ma'am, that last page, what is
17   that document?
18   A.   That is the acceptance letter.
19   Q.   Is there an address listed for Mr. Omar?
20   A.   Yes.
21   Q.   And what is that address?
22   A.   3820 Radiant Drive, Colorado Springs, Colorado.
23   Q.   Okay.  And please publish the first page of that
24   exhibit.
25        And, ma'am, what is that document?

194
Direct - Moss

1    A.   That's a loan adjustment -- or a loan request form

2    that the student fills out to ask for loan monies.

3    Q.   If you could go to the third page of that exhibit

4    ending in 2692.

5         Does it appear to be signed and dated by Ismael

6    Omar

7    A.   Yes, it does.

8    Q.   Please publish the next document on the next page.

9         Ma'am, can you identify that page?

10   A.   Yes.  This is a loan reference sheet that we ask

11   students to fill out when asking or applying for a student

12   loan.

13   Q.   And why are references asked of a student?

14   A.   In case a student cannot -- doesn't pay back their

15   student loan then we have references to contact to follow

16   up to track the student down to ensure that they're paying

17   back their student loans.

18   Q.   And, Agent Hacker, if you could please enlarge the

19   reference area.

20        Do you recognize any of the addresses on those

21   referenced section?

22   A.   I do.  No. 3, for Virginia Jones, 1420 Rushmore Drive.

23   Q.   Please publish the next page of this exhibit.

24        What is that document?

25   A.   This is an internal form that Pikes Peak uses to

Direct - Moss

1   determine the student's budget and how much loan monies

2   they are eligible for.

3   Q.   Okay.  And how much aid was awarded to Mr. Omar?

4   A.   $9500.

5   Q.   Please publish the next page of this exhibit.

6        And what is that document?

7   A.   This one is the return of Title IV letter letting

8   Ismael know that we returned part of his money back to the

9   Department of Education and he now owes us money.

10  Q.   And how much -- if you could highlight the indented

11  paragraph there.

12       How much was he being notified that was required

13  to pay back to Pikes Peak?

14  A.   $1,649.

15  Q.   Please publish the next page of this exhibit.

16       And please identify that page.

17  A.   This is also a return of Title IV letter letting

18  Ismael know that we were returning funds back and that he

19  owed Pikes Peak.

20  Q.   And if you could state for the record the amount that

21  was owed.

22  A.   $827.

23  Q.   Could you please publish the page ending in 2693.

24  Flip to the beginning of that document.  The third page

25  in -- fourth page.  The reference sheet.

Direct - Moss

1    Do you see the fax number at the bottom of that

2    page, ma'am?

3    A.    Yes.

4    Q.    Do you recall anything about the fax numbers?

5    A.    They usually came from the same fax, or the fax

6    number, and were on the same date.

7    Q.    Okay.  Do you recall anything about the Fed Ex

8    office?

9    A.    We got a couple of fax documents from that office.

10   Q.    Okay.  If you could please publish Government Exhibit

11   63-C.

12         Can you generally, ma'am, identify that packet of

13   documents.

14   A.    Yes.

15         MS. PALUCH:  And, you know, if the witness could

16   have the book in front of her, that might help her to be

17   able to just look through the pages that way.  We are on --

18         COURTROOM DEPUTY:  63-C?

19         MS. PALUCH:  63-C.  Thank you, ma'am.

20   BY MS. PALUCH:

21   Q.    Do you see 63-C?

22   A.    Yes, ma'am.

23   Q.    And generally what are -- what is that exhibit?

24   A.    This is a loan -- again, a loan request form that is

25   filled out by the student asking for monies.

197
Direct - Moss

1    Q.    Is that a packet of documents pertaining to a specific
2    individual?
3    A.    Yes, ma'am.
4    Q.    Okay.  And who's the individual being addressed in
5    that packet?
6    A.    Virginia Jones.
7    Q.    Okay.  Let's look -- please publish the last page of
8    that exhibit, please.
9          And what is that document?
10   A.    That is the acceptance letter into Pikes Peak.
11   Q.    For Ms. Jones?
12   A.    Yes, ma'am.
13   Q.    What is the address listed for Ms. Jones?
14   A.    1418 Rushmore Drive.
15   Q.    Is that the Rushmore address you discussed
16   previously?
17   A.    Yes, ma'am.
18   Q.    Please publish the first page of that exhibit.  Can
19   you identify that page.
20   A.    Yes.  This is the loan request form filled out by
21   Virginia Jones asking for $9,000.
22   Q.    Okay.  And please look at the second page of -- do you
23   see a signature and a date there as well?
24   A.    Yes, ma'am.
25   Q.    The next page, please.

Direct - Moss

1        What is that document?

2    A.    This is the reference sheet.

3    Q.    Okay.  The same information you talked about earlier?

4    A.    Yes.

5    Q.    Okay.  Please publish the next page of this document.

6        What is that page?

7    A.    The budget sheet letting us know how much funds and

8    loans to give Virginia Jones.

9    Q.    If you could blow up the middle part of that page.

10        How much was awarded for Ms. Jones?

11   A.    $9,000.

12   Q.    Okay.  Now please look at Government's Exhibit 63-D.

13   You should have a packet of documents in the book in front

14   of you.  And generally can you state who that packet of

15   documents pertains to.

16   A.    Yes.  This is Robert Pickens.

17   Q.    We'll publish first, if we could, the last page of

18   that exhibit.

19        And what is that page?

20   A.    The acceptance letter for Robert Pickens to be

21   accepted to Pikes Peak Community College.

22   Q.    What's the address listed for Mr. Pickens?

23   A.    1418 Rushmore Drive.

24   Q.    Please publish the first page.

25        What is that document?

199

Direct - Moss

1    A.    The loan request form that Mr. Pickens filled out

2    asking for $9500.

3    Q.    Please, Agent Hacker, go two pages in, 2739.

4          What is that document, ma'am?

5    A.    The budget sheet, again, that Pikes Peak fills out to

6    see how much money the student is eligible for.

7    Q.    And how much money was Mr. Pickens awarded?

8    A.    9500.

9    Q.    Okay.

10         THE COURT:  Counsel, can you hold on a second?

11   How do you get out -- I don't see the number 9500.

12         THE WITNESS:  So there's a top portion on the top

13   calculation where we -- there's two different types of

14   loans that the student can get:  A subsidized loan and an

15   unsubsidized loan.  The top portion is the calculation

16   where we calculate the cost of attendance and any other

17   financial aid that the student gets.  So the estimated

18   financial aid, that 5550, would be the federal grant that

19   the student was awarded.  His EFC of zero, which he gets

20   from filling out the FAFSA, and then his need based on the

21   budget is still 20,500.  So for a subsidized student loan,

22   they can get 3500 extra, so that certified subsidized is

23   the $3500.  The second portion underneath that is the

24   unsubsidized student loan, again, with the budget and the

25   certified unsubsidized is the 6,000.  So the 6,000 plus the

200

Direct - Moss

1    3500 is the 9500 that the student's been awarded.

2              THE COURT:  All right.  Thank you.

3              MS. PALUCH:  Thank you for clarifying that.

4              THE WITNESS:  You're welcome.

5    BY MS. PALUCH:

6    Q.   What is the next page of that exhibit?

7    A.   A return of Title IV letter letting Robert know that

8    we've returned funds on his behalf to the Department of

9    Education and that he owes us money.

10   Q.   And how much was required to be returned?

11   A.   $900.

12   Q.   Please show you -- please display, if you would,

13   Government's Exhibit 63-E.

14              And, ma'am, if you could look in your box and just

15   tell me generally to whom are those records pertaining?

16   A.   These are for Eddie Jones.

17   Q.   So let's stay on the first page of this exhibit.  What

18   is that document?

19   A.   This is the loan request form for Eddie asking for

20   $9,000 in student loan monies.

21   Q.   And is the 9,000 reflected?

22              If you could highlight that middle portion.

23   A.   Yes, on line 3.

24   Q.   Okay.  And does that appear to be signed by Eddie

25   Jones and dated as well?

Direct - Moss

1    A.    Yes.

2    Q.    Okay.  And the next page -- let's go down to the next

3    document, it's a couple of pages later, ending in 2166.

4          What is that document?

5    A.    The loan records sheet that the students fill out.

6    Q.    And is there an address for Mr. Jones at the top, if

7    you could highlight the top portion?

8    A.    Yes, there is.

9    Q.    And what is that address?

10   A.    1418 Rushmore Drive.

11   Q.    Please publish the page after that.

12         What is that document?

13   A.    The budget sheet that we do to find out how much

14   monies Eddie Jones was eligible for.

15   Q.    And what was the total amount disbursed for him?

16   A.    9,000.

17   Q.    And, again, so the record's clear, can you explain the

18   two numbers that you're adding to get to the 9,000?

19   A.    Yes, the top portion, so the certified subsidized of

20   3500 and then the unsubsidized loan certified of 5500.

21   Q.    Okay.  The next page of this exhibit, please.

22         What is that document?

23   A.    This is a -- what we call a loan proceeds letter.  Any

24   time the school sends this student -- or disburses the

25   student loan monies, we're required to send them a letter

Direct - Moss

1    letting them know that we have paid them their funds.

2    Q.   All right.  Turn to 63-F, if you could, and look at

3    that packet of documents.  And to what student, ma'am, do

4    those documents pertain?

5    A.   Mr. Dennis Miller.

6    Q.   Please publish the last page of that exhibit.

7         What is that document?

8    A.   The acceptance letter to Pikes Peak Community College.

9    Q.   What is the address listed for Mr. Miller?

10   A.   1112 Meadow Oaks Drive.

11   Q.   Okay.  Please publish the first page of that exhibit.

12        And please identify what that is.

13   A.   This is the loan form that Dennis Miller filled out

14   asking for $9500 in student loan.

15   Q.   Please go to page -- let's see -- please go to page 3

16   of that document, ending in 2623.

17        And what is that document?

18   A.   The loan reference sheet that we have students fill

19   out.

20   Q.   And the next page of this exhibit.

21   A.   Again, it's the loan budget sheet that we fill out.

22   Q.   And how much money was awarded for Mr. Miller?

23   A.   3500, and 572 in unsubsidized loans.

24   Q.   If we could highlight that, that's the bottom number

25   in both of those boxes.  Okay.  Please publish the next

203

Direct - Moss

1    page of that exhibit.

2         And what is that document?

3    A.   The return of Title IV letter that we sent out letting

4    him know that he owes us money.

5    Q.   And what's the amount that he owed?

6    A.   $891.

7    Q.   And the last number is 63-G, and I would ask you to

8    look at that packet and tell us to which student does that

9    apply?

10   A.   This one is for Manuel Abate.

11   Q.   And is that the name you testified to previously as

12   remembering?

13   A.   Yes, ma'am.

14   Q.   Please publish the last page of that document.  Please

15   identify that.

16   A.   This is an acceptance letter from Manuel to Pikes Peak

17   Community College.

18   Q.   And what is the address listed for Mr. Abate?

19   A.   1112 Meadow Oaks Drive.

20   Q.   Okay.  Please publish the first page of this exhibit.

21        What is that document?

22   A.   The loan request form filled out by Manuel Abate

23   asking for $9500 in student loans.

24   Q.   Okay.  Page 3 of this document ending in 25.

25        What is that document, ma'am?

204

Cross - Moss

1   A.   Again, this is the reference sheet that the students

2   fill out.

3   Q.   Next page, please.  And please blow up the amount.

4        What is this document, ma'am?

5   A.   The budget sheet that we use to see how much the

6   student is eligible for in student loans.

7   Q.   And how much aid was awarded for Mr. Abate?

8   A.   $9500.

9   Q.   Next page of this exhibit.

10       And what is that document, ma'am?

11  A.   The return of Title IV letter letting Mr. Abate know

12  that we returned money on his behalf.

13  Q.   And how much did Mr. Abate owed -- owe to Pikes Peak?

14  A.   $829.

15       MS. PALUCH:  Thank you.  No further questions.

16       THE COURT:  Cross-examination.

17                   CROSS-EXAMINATION

18  BY MR. GOODREID:

19  Q.   Good afternoon, Ms. Moss.

20  A.   Good afternoon.

21  Q.   Now, you indicated on your direct examination that you

22  recall quite distinctly following up on the Manuel Abate

23  matter, right?

24  A.   Correct.

25  Q.   In fact, you said that the reason that that sticks in

205

Cross - Moss

1   your mind is because when you contacted that number, it was

2   actually a female that answered and claiming to be Mr.

3   Abate, right?

4   A.   Correct.

5   Q.   And not surprisingly you found that to be suspicious,

6   didn't you?

7   A.   Correct.

8   Q.   But you weren't actually able to follow up on that,

9   were you, because of some internal regulations?  Is that

10  right?

11  A.   I don't understand your question.

12  Q.   Well, let me put it to you a different way.  I mean,

13  you thought it was suspicious that a woman was claiming to

14  be Manuel Abate.  Were you able to do anything about that?

15  A.   I still talked to the student.  I can't determine

16  whether or not a student has a female voice or not, so I

17  still conducted my business with that person who identified

18  themself as Manuel Abate.

19  Q.   Right.  So, in other words, you had to proceed as if

20  this female person or this female voice was actually Manuel

21  Abate.

22  A.   Correct.

23  Q.   Okay.  Now, going back to the 2009-2010 time frame, it

24  was possible during -- at least during that period for a

25  person to apply for admission to Pikes Peak Community

206

Cross - Moss

1    College in person; isn't that right?

2    A.    Yes.

3    Q.    In other words, you -- one, a prospective student did

4    not have to do it over the internet, right?

5    A.    They did not have to, no.

6    Q.    Okay.  And did Pikes Peak Community College keep any

7    record of how it is that a person applied to get -- for

8    admission?  In other words, whether it was in person or

9    over the internet?

10   A.    Yes.  They keep the hard copy paper application as

11   well as the electronic version in the student's records.

12   Q.    Okay.  And you had occasion, in preparing for your

13   testimony today, to review these records, have you not?

14   A.    Yes.

15   Q.    And you know that -- so you're able to -- at least

16   with respect to the people who are connected with this

17   case, you could say, couldn't you, as to who applied in

18   person and who applied over the internet?

19   A.    No.

20   Q.    You couldn't?

21   A.    I could not.

22   Q.    Now, Ms. Paluch asked you on direct about certain

23   circumstances that raised your suspicion, right?  You

24   recall generally some of those questions?

25   A.    Yes, sir.

Cross - Moss

1    Q.   And you indicated that one of the things that raised

2    your suspicion is that some of these applications or some

3    of these documents that came to the same address appeared

4    to have similar handwriting, correct?

5    A.   Correct.

6    Q.   And you also indicated that a number of these

7    documents from the same address had similar signatures,

8    right?

9    A.   Correct.

10   Q.   And it's also correct, is it not, that in many

11   instances, documents from the same address were coming from

12   the same fax number, right?

13   A.   Well, when the fax is from random businesses in

14   Colorado, that's what brings our suspicion.

15   Q.   Right.  But in this -- my question is in this

16   particular instance, or in this particular case, there were

17   a number of documents that came from the same fax number,

18   right?

19   A.   Correct.

20   Q.   And you found that to be suspicious, didn't you?

21   A.   Correct.

22   Q.   Now, Ms. Paluch asked you about a number of people.

23   She went through Ms. Abate, Mr. Pickens, several people.

24   You recall in 63 you went through a number of different

25   individuals?

Cross - Moss

1    A.    Yes.

2    Q.    And a number of those people came to your attention

3    because they were suspicious, right?

4    A.    I'm sorry?

5    Q.    Well, these applications were suspicious, that's

6    what -- that's why they raised attention -- or why they

7    raised your attention; isn't that right?

8    A.    Some of them the department -- after we were notified

9    of our original -- we were given names to provide

10   documentation to the Department of Education as

11   fraudulent --

12   Q.    Right.

13   A.    -- files.

14   Q.    So, yeah, to clarify:  So a number of these people

15   were determined -- or were at least under suspicion of

16   being fraudulent applications, right?

17   A.    Correct.

18   Q.    Okay.  Now, Ms. Paluch asked you -- you also said that

19   you produced a number of documents in the course of your

20   involvement with this case that were related to Mr. Thomas;

21   isn't that right?

22   A.    Yes.

23   Q.    Okay.  Mr. Thomas was in a little bit different

24   situation, wasn't he?

25   A.    I am not sure what you're talking about.

209

Cross - Moss

1    Q.   Well, Mr. Thomas actually enrolled at Pikes Peak
2    Community College; isn't that right?
3    A.   From the research that I did, yes.
4    Q.   So he was a student and, in fact, he actually -- a
5    transcript was issued in his name; isn't that right?
6    A.   I don't have access to transcripts, so I don't know.
7    Q.   So -- but you know he actually attended classes at
8    Pikes Peak Community College, don't you?
9    A.   I can't confirm that he actually attended, no.
10   Q.   Well, you know that he applied.
11   A.   Based on the documents that I collected to send to the
12   Department of Education, yes.
13   Q.   You know that he applied, you know that -- you know
14   that he received financial aid --
15   A.   Yes.
16   Q.   -- right?
17        But you have no idea whether he actually attended
18   Pikes Peak Community College; is that your testimony?
19   A.   I don't know if he attended classes, to be specific.
20   Q.   Okay.
21        MR. GOODREID:  That's all I have, Your Honor.
22        THE COURT:  Redirect.
23        MS. PALUCH:  None, Your Honor.  Thank you.
24        THE COURT:  All right.  I have a couple questions
25   for the witness.

210
Examination - Moss

1           EXAMINATION
2   BY THE COURT:
3   Q.   Help me understand the distinction between the funds
4   that went from DOE directly to the college and what portion
5   of that went to the student.
6   A.   So when the student is awarded a -- grants or loans,
7   they're awarded in advance.  So when a student does not
8   pass courses, withdraw or fail, then we have to do the
9   return of Title IV calculation, and there's a percentage --
10  a system that the Department of Education has us use to
11  determine the amount that goes back.
12          When we do that calculation, we, as an
13  institution, send that money back to the Department of
14  Education so that the student doesn't owe the Department of
15  Education directly and, instead, owes the school.
16          If we returned -- had the student have to pay the
17  Department of Education directly, it would cause -- the
18  Department of Education would have to do additional steps
19  on the student.
20  Q.   Right.  I think my question was not clear because
21  that's --
22  A.   I'm sorry.
23  Q.   Let me ask it this way:  Is Pikes Peak Community
24  College free?
25  A.   No, it's not free.

Examination - Moss

1    Q.   How much tuition is it?

2    A.   It's per credit hour.  I think right now it's like

3    $145 per credit hour.

4    Q.   Does any monies go from DOE to Pikes Peak Community

5    College directly, without stopping with the student --

6    A.   Oh, I'm sorry.

7    Q.   -- to pay tuition and fees?

8    A.   So when the money comes in, Pikes Peak takes

9    whatever's owed for tuition and fees, and if the student

10   charged books at the book store.  And if there's anything

11   left over -- we call it residuals -- it's deposited on our

12   bank card for the student to use at their discretion.

13   Q.   All right.  So the 9500, for example, 9,000, 9500 that

14   we saw in your calculations, are those -- is that the sum

15   that is going directly to the student via the debit card or

16   is a portion of the 9500 being withheld by the college for

17   tuition and fees?

18   A.   That would depend if the student also got Pell Grants.

19   So on some of these all of them got Pell Grant money, so

20   the grant and some of the loan would be used to pay for the

21   tuition and fees.  And then a majority of the loan would go

22   back to the student.

23   Q.   But looking at the documents we just reviewed, we

24   can't tell how much went to the student and how much went

25   to the university?

212
Examination - Moss

1    A.    Not -- not with the current documents on file.

2    Q.    Okay.  All right.

3         THE COURT:  I'll allow follow-up questions from

4    counsel based on the Court's questions.  From the

5    Government.

6                        EXAMINATION

7    BY MS. PALUCH:

8    Q.    Ms. Moss, are you familiar with a company named Higher

9    One?

10   A.    I am.

11   Q.    And what is their function?

12   A.    When Pikes Peak owes the student money for refunds, we

13   deposit onto the Higher One card.

14   Q.    Okay.  So is Higher One the company that is involved

15   in the refunds or the amount of money going to the student?

16   A.    Yes.  It's through -- the system office has that.

17   Q.    Okay.  That's not necessarily Pikes Peak that's

18   getting the money to the students; is that correct?  It's

19   Higher One?

20   A.    Correct.  Correct.

21        MS. PALUCH:  Thank you, ma'am.

22        THE COURT:  Okay.  Additional questions from the

23   defendant?

24        MR. GOODREID:  Your Honor, I have no follow-up

25   questions based on the Court's questions.

213
Examination - Moss

1          THE COURT:  All right.  May the witness be excused
2     from the Government?
3          MS. PALUCH:  Yes, Your Honor.
4          THE COURT:  May the witness be excused from the
5     defendant?
6          THE COURT:  Yes, Your Honor.
7          THE COURT:  Thank you, Ms. Moss.  Thank you for
8     joining us.  You are excused.  You may step down.
9          The Government may call its next witness.
10         MS. PALUCH:  Thank you, Your Honor.  Government
11    calls Ms. Rebecca Joseph.
12         COURTROOM DEPUTY:  Right here, ma'am.  Step up
13    into the box and raise your right hand.
14         REBECCA JOSEPH, GOVERNMENT'S WITNESS, SWORN
15         COURTROOM DEPUTY:  Please be seated.  Scooch all
16    the way up here.  Put your elbows right on the stand there.
17         Please state your full name for the record and
18    spell your first and last name.
19         THE WITNESS:  Rebecca Joseph.  R-e-b-e-c-c-a,
20    J-o-s-e-p-h.
21         MS. PALUCH:  Thank you.  Ms. Hansen, does the
22    witness have the exhibit book in front of her?
23         COURTROOM DEPUTY:  The same one?
24         MS. PALUCH:  Yes.  Thank you, ma'am.
25                    DIRECT EXAMINATION

Case 1:16-cr-00054-WJM Document 435 Filed 08/09/19 Page 89 of 135

214

Direct - Joseph

 1    BY MS. PALUCH:

 2    Q.   Good afternoon --

 3              MS. PALUCH:  May I proceed, Your Honor?

 4              THE COURT:  You may, counsel.

 5    BY MS. PALUCH:

 6    Q.   Good afternoon, ma'am.

 7    A.   Hello.

 8    Q.   How are you employed?

 9    A.   I'm employed with BankMobile, a division of Customers

10    Bank.

11    Q.   And what is your position with BankMobile?

12    A.   I'm legal, slash, fraud research analyst.

13    Q.   Was BankMobile previously known by another name?

14    A.   Yes, it was.

15    Q.   And what was that?

16    A.   Higher One.

17    Q.   And when did Higher One become BankMobile?

18    A.   June of 2016.

19    Q.   So back in 2010-2012, was the company known as Higher

20    One?

21    A.   Yes, it was.

22    Q.   And so how long have you been employed with Higher One

23    or BankMobile?

24    A.   Five years.

25    Q.   Generally, can you explain what type of business

Direct - Joseph

1   Higher One is.  I'll refer to as Higher One for purposes of

2   this.

3   A.   Okay.  Higher One was a business that contracted with

4   colleges and universities to process financial aid refunds.

5   Q.   And to whom were those refunds disbursed?

6   A.   They were disbursed to the students of the colleges

7   and universities that Higher One contracted with.

8   Q.   And in the 2010-2012 time frame, how did Higher One

9   provide funds to the students?

10  A.   So during that time frame, Higher One proactively

11  mailed debit cards to the students of those colleges and

12  universities, and they also provided the refunds -- or

13  could provide the refunds on a paper check or by ACH to

14  another financial institution.

15  Q.   So was it up to the student to tell Higher One how

16  they wanted those funds?

17  A.   Yes.

18  Q.   Okay.  During that time, how did Higher One provide

19  debit cards to students?

20  A.   By U.S. mail.

21  Q.   Were there employees within Higher -- that worked for

22  Higher One that directed that debit cards be mailed --

23  A.   Yes.

24  Q.   -- to the students?

25  A.   Yes.

216
Direct - Joseph

1    Q.   Now, how did Higher One know where to send a debit
2    card?
3    A.   We would receive an address for the student from the
4    school.
5    Q.   Does Higher One keep records regarding the ordering
6    and mailing of debit cards to students?
7    A.   Yes.
8    Q.   And were you requested to provide Higher One records
9    of that information to the Department of Education
10   pertaining to the debit cards at issue in this case?
11   A.   Yes.
12   Q.   And did you provide those records?
13   A.   Yes.
14   Q.   And, generally, what is the type of information that
15   Higher One records would show?
16   A.   It would show the name, the address, the phone number,
17   the e-mail address.  It would also show any of the card
18   history, when it was ordered, the card number, where it was
19   mailed to, and when it was activated.
20   Q.   And when we say "activated," by whom is a debit card
21   activated?
22   A.   The debit card would have to be activated by the
23   student.
24   Q.   How does a student activate a debit card?
25   A.   They would have to activate the card online.

Direct - Joseph

1    Q.   What steps were required for funds to be loaded onto a

2    debit card?

3    A.   They would have to activate the debit card and open a

4    Higher One account in order -- and then make a selection

5    for the refund to be placed in their Higher One account.

6    Q.   Is that a time-consuming process?

7    A.   No.

8    Q.   In order to receive a Higher One debit card, was it

9    necessary for the students to have a phone conversation

10   with Higher One?

11   A.   No, it was not.

12   Q.   How would they do their business with Higher One?

13   A.   They could do all their business with Higher One

14   online.

15   Q.   When a card is about to be mailed, would Higher One

16   contact a student to let them know that?

17   A.   Yes, they would contact them by e-mail.

18        MS. PALUCH:  At this time, Your Honor, I will be

19   asking this witness to testify about Government's Exhibits

20   56-B through 56-G.  The parties have stipulated to these

21   exhibits.  At this time, I move for the admission of 56-B

22   through 56-G and I request to publish these exhibits as

23   they are discussed.

24        THE COURT:  All right.  Given the stipulation of

25   the parties, Government Exhibits 56-B through 56-G are

Direct - Joseph

1    admitted into evidence and may be published to the jury.

2         (Government's Exhibits 56-B thru 56-G received)

3              MS. PALUCH:   Thank you.

4    BY MS. PALUCH:

5    Q.   Ma'am, you'll find the jury -- the witness -- the

6    exhibit book in front of you.  And I'm going to send --

7    direct your attention to 56-B.  And then the exhibit also

8    will be displayed on the screen in front of you.

9              So, first, can you look at 56-B and just identify

10   generally what that exhibit is.

11   A.   So this is the profile for Ismael Omar.

12   Q.   And please publish the last page of Exhibit 56-B.

13             Does this page indicate -- and I'd ask you to

14   highlight, if you could, the lighter-colored box.

15             Does that page indicate whether a card was ordered

16   in the name of Ismael -- Ismael Omar?

17   A.   Yes, it does.

18   Q.   And what date was it ordered?

19   A.   It was ordered on February 8 of 2011.

20   Q.   And you can just mark that with your finger, just

21   to -- make a mark.

22             THE COURT:   There's also a stylus up there.

23   BY MS. PALUCH:

24   Q.   Okay.  There you go.  Can you mark that with a stylus

25   and see if it will just make a mark there?

Direct - Joseph

1    Okay.  That was the date you said it was ordered.

2    Okay.  Was that card activated?

3    A.    Yes, it was.

4    Q.    And where does that appear?

5    A.    Right here.

6    Q.    And what is the date that that card was activated?

7    A.    February 22d of 2011.

8    Q.    Okay.  Please publish the first page of this exhibit.

9         Was the debit card mailed to Ismael Omar?

10   A.    Yes, it was.

11   Q.    To what address was it mailed?

12   A.    3820 Radiant Drive, Apartment 239, Colorado Springs,

13   Colorado 80907-3932.

14   Q.    If you could highlight that portion, Agent Hacker.

15        THE COURT:  Counsel, when you go to a new exhibit,

16   you should clear the marks.

17        MS. PALUCH:  We just did.

18        THE COURT:  Mr. Fields just did it for you, but

19   keep that in mind.

20        MS. PALUCH:  All right.

21   BY MS. PALUCH:

22   Q.    Do you see Detail column on this page?

23   A.    Yes.

24   Q.    And what information is under the Detail column?

25   A.    So under the Detail column it shows the address where

220

Direct - Joseph

1    the card was mailed to.

2    Q.    Okay.  And do you know approximately when the debit

3    card for Ismael Omar would have been mailed?

4    A.    It would have been mailed any time after the date it

5    was ordered and before it was activated.  So it was ordered

6    February the 8th, so it would have been mailed the day

7    after or shortly after that.

8    Q.    Direct your attention to the first page under the

9    column Action.  What is listed under Action?

10   A.    Report lost.

11   Q.    And what does that mean?

12   A.    That would mean that the card was reported lost or

13   stolen to Higher One.

14   Q.    Was another card ordered?

15   A.    Yes.

16   Q.    Okay.  The very -- at the bottom of that page, do you

17   see a heading that says School Address Listing?

18   A.    Yes.

19   Q.    From whom does Higher One receive those addresses?

20   And if you could go on to the next page.

21   A.    We receive those addresses from the school.

22   Q.    Do you see the sections here where it has addresses

23   and e-mails and phone numbers listed?

24   A.    Yes.

25   Q.    All of that information, where would Higher One

221

Direct - Joseph

1   receive that?

2   A.   From the school.

3   Q.   Okay.  I'd like to refer your attention under E-mail

4   Addresses where it says "confirmed."

5   A.   Yes.

6   Q.   Do you see that?

7   A.   Yes, I do.

8   Q.   What is listed under that column?

9   A.   So we have false, true, false, false.

10  Q.   If you could please highlight that.

11       And so what is meant when it says false or true?

12  A.   So for false, it would mean that the e-mail address

13  was not confirmed.  For true, it would mean that the e-mail

14  address was able to be confirmed.

15  Q.   And what effect, if any, on Higher One is there if the

16  e-mail address is false?

17  A.   If the e-mail address is false, we would use the one

18  that is confirmed, so the one that would show as true.

19  Q.   Is a debit card still sent if an e-mail is not

20  confirmed?

21  A.   Yes.

22  Q.   Now towards the bottom -- if we could back out of

23  that -- towards the bottom do you see a reference to

24  Customer Communication Log?

25  A.   Yes.

222

Direct - Joseph

1    Q.   And then let's go on to the next page of that exhibit.

2         Can you explain what type of information is

3    captured in the customer communication log.

4    A.   The customer communications log just captures any time

5    the student logged on and Higher One had a promotion for

6    them that we wanted them to participate in and what action

7    they took.

8    Q.   Okay.  The next column there has a heading of

9    Cardholder Activity Log.  What information is captured

10   there?

11   A.   So that shows every time the student logged into their

12   account.

13   Q.   Please turn now to Government Exhibit 56-C.  And if

14   that could be published.

15        And can you state, once you look at that exhibit,

16   to whom those records apply.

17   A.   This is the profile for Virginia Jones.

18   Q.   Please publish the last page of that exhibit.

19        Referring your attention to that page -- and if we

20   could blow up that box -- was a debit card ordered for Ms.

21   Jones?

22   A.   Yes, it was.

23   Q.   And what date was that ordered?

24   A.   August 11th of 2011.

25   Q.   And was that card activated?

223

Direct - Joseph

1    A.    Yes, it was.

2    Q.    What date was that?

3    A.    October 3d of 2011.

4    Q.    So the mailing of this card would have occurred

5    when?

6    A.    Any time after August 11th and prior to October 3d.

7    Q.    Please turn to the next page of this exhibit.

8          To what address -- let's see.  To what address was

9    the debit card mailed?  I think we need to go back to --

10   can you see on that page to what address the card was

11   mailed?

12   A.    Yes.

13   Q.    And what was that address?

14   A.    1418 Rushmore Drive, Colorado Springs, Colorado

15   80910-2027.

16   Q.    Okay.  And does this exhibit -- if we could back out

17   of it and scroll on to the next page.

18         Does it contain the same type of information that

19   you testified to about the previous exhibit?

20   A.    Yes, it does.

21   Q.    Okay.  Now, was Higher One able to confirm the e-mail

22   address provided to Ms. Jones by the school?

23   A.    No, it was not.

24   Q.    Okay.  And if you could highlight -- do you see that,

25   Agent Hacker?  Okay.  Please turn to Government Exhibit

224

Direct - Joseph

1    56-D and please publish that exhibit.

2           And identify those records, ma'am.

3    A.    This is the profile for Robert Pickens.

4    Q.    And please publish the last page of that exhibit.

5           Was a debit card ordered for Mr. Pickens?

6    A.    Yes, it was.

7    Q.    On what date?

8    A.    August 11th of 2011.

9    Q.    And was that card activated?

10   A.    Yes, it was.

11   Q.    On what date?

12   A.    October 3d of 2011.

13   Q.    So would the mailing have occurred between those

14   dates?

15   A.    Yes, it would.

16   Q.    Please publish the first page of this exhibit.  If

17   could you highlight on the right-hand side.

18          To what address was this card mailed?

19   A.    1418 Rushmore Drive, Colorado Springs, Colorado

20   Springs 80910-2027.

21   Q.    If we could back out of that and flip through the next

22   few pages of this exhibit.

23          Do the same sections, with e-mail and addresses

24   and phone numbers, type of information appear on these

25   records?

225

Direct - Joseph

1    A.    Yes, it does.

2    Q.    Was the e-mail address for Mr. Pickens confirmed?

3    A.    No, it was not.

4    Q.    Okay.  Was his card still mailed?

5    A.    Yes.

6    Q.    56-E, please.  If you could please publish that

7    exhibit.

8         And, ma'am, if you can identify that when you see

9    it.

10   A.    It's the profile for Eddie Jones.

11   Q.    Please publish the last page of that exhibit.  And

12   highlight the box.

13        Was a card ordered in the name of Eddie Jones?

14   A.    Yes, it was.

15   Q.    What date did that occur?

16   A.    August 29th of 2011.

17   Q.    Does it indicate on the last page whether his card was

18   activated?

19   A.    Yes, it does.

20   Q.    What was that date?

21   A.    November 9th of 2011.

22   Q.    So when would that have -- would that card have been

23   mailed between those dates?

24   A.    Yes, it would have.

25   Q.    Please publish the first page of Exhibit 56-E.

Direct - Joseph

1       And does it show where Mr. Jones' debit card was

2  mailed?

3  A.   Yes, it does.

4  Q.   And what is that address?

5  A.   1418 Rushmore Drive, Colorado Springs, Colorado

6  80910-2027.

7  Q.   And I haven't been asking you this, ma'am, but where

8  on these records would we see the dollar amounts that were

9  placed on those debit cards?

10  A.   You would see it under the Refund History.

11  Q.   Okay.  And let's -- can you look through your exhibit

12  book, ma'am, and tell us where that would be.  I don't know

13  that we have that -- okay, we will move on there.

14       THE COURT:  Ms. Paluch, I just want to make sure

15  you're aware, at least for me, anything that you're not

16  blowing up, I cannot read.

17       MS. PALUCH:  Okay.

18       THE COURT:  This is tiny, tiny font, so unless the

19  jurors have hawk-eyes, I don't think they're reading it

20  either.  So, you know, for me right now, I can't read a

21  single thing on this page.

22       MS. PALUCH:  Right.

23       THE COURT:  Your witness has the hard copy, that's

24  why she can read it, but none of the rest of us are reading

25  anything.

227
Direct - Joseph

1        MS. PALUCH:  Right.  Right.  We've been trying to
2   blow up, Your Honor, on the order, date, and the activation
3   dates in those boxes.
4        THE COURT:  I know what you've been trying to do.
5   I'm just pointing out to you, when you don't do it, assume
6   nobody is reading everything.
7        MS. PALUCH:  Understood, Your Honor.
8        THE COURT:  All right.
9        MS. PALUCH:  Okay.
10  BY MS. PALUCH:
11  Q.   Now let's publish the first page of 56-E.
12       THE COURT:  Let's -- why don't we break here now
13  for our afternoon recess.
14       Ladies and gentlemen of the jury, we'll be in
15  recess for 15 minutes.
16     (Jury left at 3:16 p.m.)
17       THE COURT:  Ms. Joseph, since you're in the middle
18  of your testimony, I direct you not to speak with any of
19  the lawyers during the break.
20       THE WITNESS:  Okay.  Thank you.
21     (Recess taken at 3:16 p.m.)
22     (In open court in the presence of the jury at 3:31
23  p.m.)
24       THE COURT:  Ms. Joseph, I remind you that you
25  remain under oath.

Direct - Joseph

1    Ms. Paluch, you may resume your examination.

2    MS. PALUCH:  Thank you, Your Honor.

3  BY MS. PALUCH:

4  Q.   Ms. Joseph, when we left off, we were talking about

5  Government Exhibit 56-E.  And could you state for the

6  record again from which students do these records pertain?

7  A.   They're for Eddie Jones.

8  Q.   And please publish the last page of that exhibit.  And

9  if we can, as much as we can, if we can highlight the

10  light-colored box and make that as big as we can.

11    Ma'am, can you state whether a card was ordered in

12  the name of Eddie Jones?

13  A.   Yes, it was.

14  Q.   And what was the date?

15  A.   August 29th of 2011.

16    MS. PALUCH:  Your Honor, is that more visible?

17    THE COURT:  Yes.

18    MS. PALUCH:  Okay.

19  BY MS. PALUCH:

20  Q.   Does it indicate on that page whether Mr. Jones' debit

21  card was activated?

22  A.   Yes, it does.

23  Q.   And what date was that?

24  A.   November 9th of 2011.

25  Q.   So would the card have been mailed between those two

Direct - Joseph

1    dates?

2    A.   Yes, it would have.

3    Q.   Please publish the first page of 56-E.

4         On that page, does it show the address to which

5    that debit card was mailed?

6    A.   Yes, it does.

7    Q.   What is that address?

8         And if you could highlight that part, Agent

9    Hacker.   Thank you.

10   A.   The address is 1418 Rushmore Drive, Colorado Springs,

11   Colorado 80910-2027.

12   Q.   And if you could go back, back out of that, and let's

13   highlight the information contained on this page, if we

14   can.   And scroll down.

15        Does this exhibit contain the same type of

16   information we've been talking about with school address

17   listing, address listing, that you've testified about?

18   A.   Yes, it does.

19   Q.   And if you could go down to the next page where it

20   talks about e-mail addresses.   Where it has the Confirm.

21   That middle section, e-mail address listing, could you

22   highlight that.   Make that as big as we can.

23        Was Higher One able to confirm the e-mail address

24   provided for Mr. Jones?

25   A.   No.

230
Direct - Joseph

1    Q.   Was a debit card still mailed, though?

2    A.   Yes.

3    Q.   Please turn to Government Exhibit 56-F, if you could

4    please publish that exhibit.

5         Ma'am, to what student do these records pertain?

6         And if you could highlight the top portion of that

7    document.

8    A.   These records are to Dennis Miller.

9    Q.   Okay.  Please publish the last page of this exhibit

10   and highlight the clear -- or the lighter-colored box.  As

11   large as you can make that.

12        Was a debit card ordered for Mr. Miller?

13   A.   Yes, it was.

14   Q.   On what date?

15   A.   June 26th of 2012.

16   Q.   And is it indicated there whether that card was

17   activated?

18   A.   Yes, it is.

19   Q.   On what date?

20   A.   July 7th of 2012.

21   Q.   Please publish the first page of this exhibit.  And

22   please highlight on the right-hand side.

23        Does that page indicate the address to which that

24   debit card was mailed?

25   A.   Yes, it does.

231
Direct - Joseph

1   Q.   And would that -- what would be the time frame for the
2   mailing of that card?
3   A.   It would have been between the date it was ordered and
4   the date it was activated.
5   Q.   If you could back out to the first page, and if you
6   could highlight the page, the entire page, if you could.
7        Are these the same type of records -- and scroll
8   on to the next page -- that we've been talking about with
9   respect to the other students with the same type of
10  information?
11  A.   Yes, it is.
12  Q.   And under the e-mail address down at the bottom, if
13  you could highlight that.
14       Was Higher One able to confirm that e-mail address
15  for Mr. Miller?
16  A.   Yes.
17  Q.   Okay.  Finally, if you could please turn to Government
18  Exhibit 56-G, and if you could highlight the top portion of
19  that.
20       To what student did these records pertain?
21  A.   Manuel Abate.
22  Q.   And if you go -- we're just going to highlight down
23  below, the bottom portion -- actually, right there, that
24  middle portion of the document, Agent Hacker.
25       Now, reading -- referring you to that section,

Direct - Joseph

1   does that indicate whether a Higher One debit card was

2   ordered for Mr. Abate?

3   A.   Yes, it does.

4   Q.   And what's the date of that ordering?

5   A.   July 19th of 2012.

6   Q.   Okay.  Could you highlight that, Agent Hacker.  Okay.

7   I'm sorry, could you back out of that and take -- grab the

8   column to the right of that -- there you go.  Along with

9   the date.  Off to the left there.

10          I'm sorry, ma'am, I'm trying to capture the date.

11   Is that where you're getting the order date from?

12   A.   Yes.

13   Q.   Okay.  If you could back out of that.

14          Was that debit card mailed?

15   A.   Yes, it was.

16   Q.   All right.  If you could please highlight this whole

17   portion here, Agent Hacker.

18          All right.  Do you see Due Date for U.S. Mail?

19   A.   Yes, I do.

20   Q.   And what's the date listed there?

21   A.   July 26th of 2012.

22   Q.   Okay.  And still looking at that portion, what is the

23   address to which that debit card was mailed?

24   A.   1112 Meadow Oaks Drive, Colorado Springs, Colorado

25   80921-3681.

Direct - Joseph

1    Q.   Please publish the second to the last page of this
2    exhibit, which is found at page ending in 12.  All right.
3    If you could please highlight that whole middle portion
4    there.
5         Ma'am, in that section, does it tell you how
6    much -- how much money was allocated for Mr. Abate?
7    A.   Yes, it does.
8    Q.   And can you tell us where that appears.
9    A.   Under where it says total, it says $4,746.10.
10   Q.   And that's at the bottom of this portion?
11   A.   Yes.
12   Q.   Can you highlight that, please, Agent Hacker.  Okay.
13   Please turn to the fourth page of that exhibit ending in
14   Bates number 08.
15        Was that card activated, ma'am?
16   A.   No, it was not.
17   Q.   Please publish the second to the last page of the
18   exhibit ending in number 12.
19        Ma'am, what is the -- if you could highlight from
20   the title there, Agent Hacker, taking that down, and
21   take -- yeah, keep going down.  There you go.  Just make
22   that larger.  And let's see -- back out.  If you could back
23   out of that a little bit.
24        What is the title of that page?  Do you see a
25   title on that page?

234
Direct - Joseph

1    Are we at the document ending in 12?  I think you
2    need to go over a few more pages.  Okay.  Could you please
3    highlight the title of that page.
4    And, Ms. Joseph, could you state for the record
5    what that title is.
6    A.    Refund Search.
7    Q.    Okay.  And what is a refund search?
8    A.    It's the page we use to pull up the refund history for
9    each student.
10   Q.    Okay.  And if you could highlight that portion -- yes,
11   there you go -- does this page indicate whether funds were
12   ultimately disbursed for Manuel Abate?
13   A.    Yes, it does.
14   Q.    And how were they disbursed?
15   A.    By paper check.
16   Q.    And tell us where on this exhibit you're able to see
17   that.
18   A.    Under Current Status.
19   Q.    So Agent Hacker, if you could please enlarge the
20   Current Status column.
21   Tell us what you're seeing there.
22   A.    It says, "Return to university.  Check returned, time
23   out."  And then "Returned to university, stale check."
24   Q.    So what does that tell you?
25   A.    That tells me that a paper check was sent; however, it

Direct - Joseph

1  was never cashed and so the funds were returned to the

2  university.

3  Q.   Okay.  When would those checks have been mailed?

4       And if you could back out of that exhibit and

5  highlight the middle section.

6       Can you tell us in that column, ma'am, does it

7  give you a date of when the checks were mailed?

8  A.   So, it would have been -- it would have been mailed on

9  the final disbursement date or the day after.

10 Q.   And what is that date?

11 A.   For the first one, it's March 22d of 2013, and then

12 the second one, it's April 2d of 2013.

13 Q.   How much money would have loaded to the debit card had

14 it been activated back in July of 2012?

15 A.   $4,746.10.

16 Q.   And is that the total amount?

17      If you could highlight the total at the bottom.

18 A.   Yes, it is.

19 Q.   That's the amount that would have gone on the card had

20 it been activated?

21 A.   Yes.

22 Q.   Generally under what circumstances would Higher One

23 mail a check?

24 A.   We would mail a check if the student put "paper check"

25 as their refund selection, or if they had not made a refund

236
Cross - Joseph

1   selection, then we would be automatically required to mail

2   a paper check.

3   Q.   Can you explain that, when you say "automatically

4   required"?

5   A.   So we can't -- because it's financial aid refunds, we

6   can't hold it forever.  So if a refund selection is not

7   made, then we have to mail a paper check.

8   Q.   So in this case, when the card was not activated, is

9   that why the check was mailed?

10  A.   Well, it would have been for two reasons:  the card

11  wasn't activated and a refund selection wasn't made.

12  Q.   So in that event, then Higher One is --

13  A.   Would have to mail a paper check, yes.

14           MS. PALUCH:  Thank you, ma'am.

15           No further questions, Your Honor.

16           THE COURT:  All right.  Cross-examination.

17                      CROSS-EXAMINATION

18  BY MR. GOODREID:

19  Q.   Good afternoon, Ms. Joseph.

20  A.   Hello.

21  Q.   Now, you indicated on direct when Government counsel

22  was going through a number of these people's records, that

23  at least on one or more occasions with these people, the

24  e-mail addresses were not able to be confirmed; is that

25  right?

Cross - Joseph

1    A.    Yes.

2    Q.    Okay.  But even though on those occasions the e-mail

3    addresses were not able to be confirmed, the debit cards

4    were nonetheless sent out, right?

5    A.    Correct.

6    Q.    All right.  So let's go -- if we could pull up -- let

7    me ask you from memory first.  If you can't remember, we

8    can go to the exhibit, all right?

9    A.    All right.

10   Q.    I'll ask you some questions about some dates.  So do

11   you recall Exhibit 56-B when Government counsel went

12   through with you, remember the name Ismael Omar?

13   A.    Yes.

14   Q.    Okay.  And if it would be helpful to you, ma'am, if

15   you would turn to page 4 of that exhibit.

16   A.    Okay.

17   Q.    And that indicates that the card for Mr. Omar was

18   activated sometime after February of 2011, right?

19   A.    Yes.

20   Q.    And, similarly, if you can remember -- and if you

21   can't we'll look at the exhibit -- but for Exhibit 56-B,

22   for -- excuse me, 56-C, for Virginia Jones, that card was

23   activated in 2011 as well; isn't that right?

24         Please look, if you don't remember.  If it will be

25   helpful, it will be page 4 of 56-C.

238
Cross - Joseph

1   A.   Yes.

2   Q.   And so that was activated on October 3d of 2011?

3   A.   I'm sorry, which --

4   Q.   56-C for Virginia Jones.

5   A.   Yes.  It was activated on October 3d.

6   Q.   Okay.  So now we've got Mr. Omar activated in 2011,

7   Ms. Jones in 2011, right?

8   A.   Yes.

9   Q.   Okay.  And 56-D, Robert Pickens, his was also

10  activated in 2011, in October; isn't that right?  And,

11  again, if it would help for you to look at 56-D, as in dog,

12  on page 5.

13  A.   Yes.  It was.  October of 2011.

14  Q.   Okay.  So now we've got Omar, Jones, and Pickens all

15  activated in 2011, right?

16  A.   Yes.

17  Q.   Okay.  And same thing with Eddie Jones was also

18  activated in 2011 -- in November 9th, 2011, right?  And,

19  again, if it would help you to look at 56-E on page 4.

20  A.   Yes, in 2011.

21  Q.   So, again, the four individuals we've just gone

22  through, those cards were all activated in 2011, correct?

23  A.   Correct.

24  Q.   All right.  Now, let's change directions here and talk

25  about Mr. Omar.  With any given individual who receives aid

239

Cross - Joseph

1    and is going to be paid through Higher One, three

2    possibilities for getting the money, right?

3    A.   Yes.

4    Q.   Okay.  So they can get a debit card, correct?

5    A.   Correct.

6    Q.   They can get a check, right?

7    A.   Correct.

8    Q.   Or they can have money directly deposited into their

9    account, correct?

10   A.   Correct.

11   Q.   Okay.  And in the case of Mr. Omar, at least initially

12   the records indicated that he wanted a card sent to him,

13   correct?

14   A.   Well, all the cards were proactively mailed.

15   Q.   All right.  So -- fair enough.  So the card was the

16   first option, if you will, and that was sent to Mr. Omar,

17   right --

18   A.   Correct.

19   Q.   -- at the address?  Okay.

20          Now, you've seen -- and you've seen these cards

21   when they get sent out, haven't you?  You've seen a card

22   when it gets sent out?

23   A.   Not when it gets sent out, but I've seen what our

24   cards look like, yes.

25   Q.   That's what I mean, right.  And a Higher One card,

240
Cross - Joseph

1    when it got sent out, it would have a little sticker on it,

2    just like when a person gets a credit card, to activate it;

3    isn't that right?

4    A.    Yes.

5    Q.    Okay.  And, again, just to be clear, with Mr. Omar,

6    the records indicate that his card was never activated,

7    right?

8    A.    Ismael Omar's?

9    Q.    I'm sorry, beg your pardon, with respect to Mr. Abate.

10   Beg your pardon.

11   A.    Correct.

12   Q.    So Mr. Abate's was never activated?

13   A.    Correct.

14   Q.    And as a result, two checks got sent out after that,

15   right, and those were not cashed either?

16   A.    Correct.

17         MR. GOODREID:  Your Honor, may I have just a

18   moment, please, to confer with counsel?

19         THE COURT:  You may.

20         MR. GOODREID:  Your Honor, I have no additional

21   questions.

22         THE COURT:  All right.  Redirect.

23         MS. PALUCH:  None, Your Honor.  Thank you.

24         THE COURT:  All right.  May this witness be

25   excused, for the Government?

Direct - Seal

```
1              MS. PALUCH:  Yes, Your Honor.
2              THE COURT:  For the defendant?
3              MR. GOODREID:  Yes, Your Honor.
4              THE COURT:  All right.  Ms. Joseph, thank you so
5    much for joining us.  You're excused.  You may step down.
6              THE WITNESS:  Thank you.
7              THE COURT:  Government may call its next witness.
8              MR. FIELDS:  Thank you, Your Honor.  The United
9    States calls Jonathan Seal.
10             COURTROOM DEPUTY:  Step up in the box and raise
11   your right hand.
12             JONATHAN SEAL, GOVERNMENT'S WITNESS, SWORN
13             COURTROOM DEPUTY:  Please be seated.  State your
14   full name for the record and spell your first and last
15   name.
16             THE WITNESS:  My name is Jonathan Seal.  Last name
17   is spelled S-e-a-l.
18             MR. FIELDS:  May I proceed, Your Honor?
19             THE COURT:  Yes, you may, counsel.
20                        DIRECT EXAMINATION
21   BY MR. FIELDS:
22   Q.   Mr. Seal, where do you work?
23   A.   I'm a police detective in the City of Tempe, Arizona.
24   Q.   How long have you worked with the City of Tempe Police
25   Department?
```

242

Direct - Seal

1   A.   11 years.

2   Q.   What is your current title?

3   A.   I'm a detective assigned to our vehicular crimes unit.

4   Q.   What was your position on August 30th, 2012?

5   A.   I was a patrol officer.

6   Q.   Were you on patrol that night?

7   A.   I was.

8   Q.   Do you remember making a traffic stop late that night?

9   A.   I do.

10  Q.   Well, let's just pull it up on the screen.  It's not

11  yet in evidence.  Is this a -- looking at Government

12  Exhibit 3.  Should pull up.  Or we can pull it up on a

13  binder.  It will be No. 1.  It won't be published up on the

14  screen.

15          Thank you, Ms. Hansen.  Am I right that we can

16  pull it up just for the witness?

17          COURTROOM DEPUTY:  Yes.

18  BY MR. FIELDS:

19  Q.   So please pull it up for the witness.  Exhibit 3.

20          Just look at it in the binder.  3.  Yes, please.

21          Okay.  I think we've got that sorted out.

22          Do you see that in front of you?

23  A.   I do.

24  Q.   Do you recognize that?

25  A.   I do.

243

Direct - Seal

1   Q.   Is that a photograph of a car?

2   A.   It is.

3   Q.   How do you recognize it?

4   A.   That is a vehicle that I stopped on the night in

5   question.

6        MR. FIELDS:  Your Honor, at this time I'd move for

7   the admission of Government's Exhibit 3.

8        THE COURT:  All right.  It's stipulated to?

9        MR. FIELDS:  It has not been stipulated to.

10       THE COURT:  Okay.

11       MR. GOODREID:  I believe it is stipulated to.

12       MR. SMITH:  I believe it is stipulated, too, Your

13   Honor.

14       MR. FIELDS:  I'm sorry.  It makes it a lot easier.

15   At this time, then, Your Honor, I move for the stipulated

16   Government Exhibit 3 be admitted into evidence.

17       THE COURT:  I wanted to be sure we're looking at

18   the same document.  I'm looking at what I think was filed

19   on Friday.  I don't know when it was filed.  But I have it

20   in -- the exhibit list that I have, it says Exhibit 3 is

21   stipulated to.  So --

22       MR. FIELDS:  Yeah, Your Honor, I'm sorry.  That's

23   my mistake.

24       THE COURT:  Given the stipulation, Government

25   Exhibit 3 is admitted into evidence and may be published to

244

Direct - Seal

1    the jury.

2        (Government's Exhibit 3 received)

3    BY MR. FIELDS:

4    Q.   I'd like to publish that.

5            So that's the car you pulled over that night?

6    A.   Yes, it is.

7    Q.   Do you remember who was driving the car that night?

8    A.   I do.

9    Q.   Do you see the driver in the courtroom here today?

10   A.   I do.

11   Q.   Could you just describe where he's sitting and what

12   he's wearing.

13   A.   Sure.  He's seated to my right in the white button-up

14   shirt and tie.

15           MR. FIELDS:  Your Honor, I'd like the record to

16   reflect that the witness has identified the defendant.

17           THE COURT:  The record will so reflect.

18   BY MR. FIELDS:

19   Q.   As part of the traffic stop that night, did you end up

20   searching the car that's in Government Exhibit 3?

21   A.   I did.

22   Q.   What did you find?

23   A.   Inside the center console, I found a usable

24   quantity --

25   Q.   Let's stop there.  Let's just stop with:  What did you

Case No. 1:16-cr-00054-WJM Document 535-6 Filed 12/02/19 USDC Colorado pg 205 of 901

Direct - Seal

1    find in the back seat?

2    A.    Okay.  In the back seat, on the rear passenger side, I

3    found a Ziploc baggie containing a number of credit cards.

4    Q.    Are you prepared today to tell the jury how you found

5    those credit cards?

6    A.    Yes.

7    Q.    Let's start at the beginning, always a good place.

8    Where were you at around 2:40 in the morning on August

9    30th, 2012?

10   A.    Sure.  I was traveling southbound on Mill Avenue,

11   approaching the intersection of Southern in Tempe in a

12   fully marked police patrol vehicle.

13   Q.    I think you said, but Mill Avenue, we're talking about

14   Tempe, Arizona now?

15   A.    Correct.

16   Q.    Fully marked police vehicle?

17   A.    Yes.  Traveling southbound in the left lane.

18   Approaching the intersection of Southern Avenue, also in

19   Tempe.

20   Q.    What did you see while you are driving southbound on

21   Mill Street?

22   A.    My -- my attention was drawn to a white Dodge Charger,

23   which had also been traveling southbound on Mill Avenue,

24   approaching the intersection of Southern, because the

25   vehicle was drifting both within its lane and outside of

Direct - Seal

1    its lane.

2    Q.   When you say "outside of its lane," describe what you

3    saw.

4    A.   Sure.  As the vehicle traveled southbound from the

5    intersection of Southern, it drifted so that its driver's

6    side tires were on top of the double-yellow solid line that

7    separates the north and southbound lanes of traffic.

8    Q.   As a result of that, what did you do?

9    A.   I initiated a vehicle stop by activating my

10   red-and-blue police lights on top of my vehicle.

11   Q.   Did the car pull over?

12   A.   It did.

13   Q.   Where did it first pull over?

14   A.   It first pulled over on southbound Mill Avenue, just

15   north of the intersection with U.S. 60.

16   Q.   What did you do after he stopped there?

17   A.   After the vehicle stopped there, I got out of my

18   patrol vehicle.  And as I started to approach the driver's

19   open window, I saw the window roll down, and I yelled to

20   the driver for him to pull further south of the freeway and

21   over to the side of the road.

22   Q.   Did he do what you asked?

23   A.   He did.

24   Q.   Did you pull in behind him?

25   A.   I did.

247
Direct - Seal

1    Q.   Did you walk to the driver's side door?

2    A.   I did.

3    Q.   What did you do when you got to the driver's side

4    door?

5    A.   When I got to the driver's side door, I asked the

6    driver for his license, registration, insurance, initially.

7    Q.   Did you ask him where he was coming from?

8    A.   I did.

9    Q.   What did he say?

10    A.   He told me he was coming from Chandler, which is the

11    next city over from Tempe.

12    Q.   Did he say anything else about where he was coming

13    from?

14         MR. SMITH:  Your Honor, I would object at this

15    point and merely renew the arguments that we had made in a

16    suppression motion as to the legality of the interaction.

17         THE COURT:  Well, your objection's noted.

18    Overruled.

19    BY MR. FIELDS:

20    Q.   We were talking about the driver's responses as to

21    where he was coming from.  You said he came from Chandler.

22    Did he also be claiming to come from somewhere else?

23    A.   He also claimed to be coming from his P.O. Box in

24    downtown Tempe.

25    Q.   Did he say anything about the car?  Who it belonged

Direct - Seal

1    to?

2    A.   He told me that it belonged to his girlfriend.

3    Q.   And before we get too far, let's go back to this P.O.

4    Box.  Did he say where that P.O. Box was located?

5    A.   Yes.  Off the top of my head, I don't recall the

6    address, but somewhere around Mill Avenue and 3d Street in

7    downtown Tempe.

8    Q.   If you saw your report, would that help you refresh

9    your recollection as to the address?

10   A.   Yes, it would.

11   Q.   This is not in evidence.  I'm showing it to you just

12   for your -- to refresh your recollection.  Just take a look

13   at this.  You'll see it up on the screen in front of you.

14   Don't read from it.  We're just going to use this to

15   refresh your recollection.

16            COURTROOM DEPUTY:  Do you have it on the lectern,

17    Mr. --

18            MR. FIELDS:  I have it on the Elmo.

19            COURTROOM DEPUTY:  Okay.  I just have to switch

20    that feed.

21   BY MR. FIELDS:

22   Q.   Does that help refresh your recollection?

23   A.   It does.

24   Q.   What was the address?

25            COURTROOM DEPUTY:  Mr. Fields, one minute.  Could

Case 1:16-cr-00054-WJM Document 600 filed 08/09/19 USDC Colorado pg 94 of 135

249
Direct - Seal

1    you move up a little bit.  Your voice is trailing off and

2    the jurors may not be able to hear you.  Thank you.

3    BY MR. FIELDS:

4    Q.   What was the address?

5    A.   360 -- 316 South Mill Avenue.

6    Q.   Now, when you went to this driver's side door, did you

7    carry a flashlight with you?

8    A.   I did.

9    Q.   Why?

10   A.   It was nighttime.  On vehicle stops, a flashlight

11   provides me a couple of advantages.  One is a tactical

12   advantage, as I approach the vehicle, especially at night,

13   it's hard for me to see inside of it.  And for a tactical

14   advantage, I use that flashlight to shine it in the

15   driver's rearview mirror so that it kind of conceals my

16   approach of that vehicle, and hides me in case the driver

17   may want to assault me or attack me.

18        Additionally, when I get up to the vehicle, it

19   assists me in being able to clearly see inside the vehicle;

20   one, to look for contraband or possible contraband; and,

21   two, to watch the occupants' movements inside the vehicle,

22   again for officer safety purposes, to make sure that the

23   individuals inside the vehicle aren't reaching for weapons

24   or trying to conceal things from me.

25   Q.   You talk about attacks, assaults, officer safety.

Direct - Seal

1   Were you concerned about this particular car or are these

2   universal precautions?

3   A.   These are universal precautions.

4   Q.   What did you do with the flashlight when you got to

5   the driver's side door?

6   A.   I held it in my left hand and I used it to scan the

7   interior of the vehicle.

8   Q.   So describe to the members of the jury exactly what

9   you saw.

10   A.   Sure.  On the back passenger side seat, again I

11   observed this Ziploc baggie which contained a very thick

12   stack of what appeared to be credit cards.  It was probably

13   four or five inches thick.

14   Q.   When you say "appeared to be credit cards," how could

15   you tell that they appeared to be credit cards?

16   A.   They just -- they were rectangular shaped, looked like

17   any common credit or debit card that anyone might have in

18   their wallet.

19   Q.   How long had you been a patrol officer at that point?

20   A.   About five years or so.

21   Q.   Had you ever seen anything like that before?

22   A.   No.

23   Q.   What was your reaction?

24   A.   I -- I immediately zeroed in on that.  That -- I had

25   never seen that before this traffic stop, I hadn't seen

251
Direct - Seal

1    something like that since this traffic stop.  It was highly
2    unusual to see someone in possession of that many cards.
3           I immediately started to think about possible
4    crimes that could be associated with that, and thinking
5    about the fact that I needed to investigate further into
6    those credit cards.
7    Q.   What did you ask the driver to do at that point?
8    A.   I asked him to step out of the vehicle.
9    Q.   Well, before that, did you ask him to get that bag?
10   A.   Yes.
11   Q.   And what did he do?
12   A.   He reached back on the passenger seat and I watched
13   with my flashlight, and he grabbed that bag off of the
14   passenger seat, he then placed it on the rear passenger
15   side floorboard, and then kind of tucked it up underneath
16   the front passenger seat, so it was kind of concealed from
17   my view.  He then grabs an empty Ziploc bag and handed that
18   back to me.
19   Q.   And is this the second time you had asked him to give
20   you the bag?
21   A.   Yes.
22   Q.   What did he do the first time?
23   A.   The first time, he -- he looked back at the bag and
24   then looked back at me and just sat there.  Did nothing,
25   didn't say anything.

252

Direct - Seal

1    Q.   So after the defendant tried to give you the empty

2    bag, what did you do?

3    A.   I then had him step out of the vehicle.

4    Q.   At some point during the traffic stop, did you decide

5    to record what was happening?

6    A.   I did.

7    Q.   Why?

8    A.   The Tempe Police Department issues us digital -- or at

9    the time issued us digital recorders.  For us in -- we were

10   required to record domestic violence investigations, which

11   this was not one, but also I personally recorded all felony

12   or potential felony investigations.

13   Q.   So you didn't have a body camera at the time?

14   A.   No.

15   Q.   This was just a hand-held audio recorder?

16   A.   Correct.

17   Q.   If you'll look in that binder -- it should be the

18   binder No. 1 -- if you look at 1-A, you should see a DVD.

19           COURTROOM DEPUTY:  1-A?

20           MR. FIELDS:  Yup.

21           THE WITNESS:  Okay.

22   BY MR. FIELDS:

23   Q.   Do you see 1-A?

24   A.   I do.

25   Q.   Before your testimony today, did you review a copy of

Direct - Seal

1    the recording that's on that disk?

2    A.    I did.

3    Q.    And was a transcript of that recording also made?

4    A.    Yes.

5    Q.    And did you also review a copy where the transcript

6    had been synced to the audio in the recording?

7    A.    Yes.

8          MR. FIELDS:  Your Honor, at this time, I'd move

9    for admission into evidence of Government's Exhibit 1-A,

10   which is the audio recording, and would also like to

11   publish Government Exhibit 1, which is the synced

12   transcript of 1-A and 1-B.

13         THE COURT:  Any objection?

14         MR. SMITH:  I'm sorry, counsel, what is 1-B?

15         MR. FIELDS:  1-B is the transcript.

16         MR. SMITH:  I don't have it.  I have 1 and 1-A.

17         MR. FIELDS:  It should be in that binder.

18         MR. SMITH:  May we have one moment, Your Honor?

19         THE COURT:  Yeah.  While you're looking, I may ask

20   Mr. Field:  So what's the difference between 1 and 1-B?

21         MR. FIELDS:  1 is a composite of both 1-A and 1-B,

22   so 1-A and 1-B is different parts of 1.  1-A, the audio,

23   1-B is the transcript, and 1 just synced the two

24   together.

25         THE COURT:  And you're moving for the admission of

254

Direct - Seal

 1    1-A.

 2            MR. FIELDS:  1-A, and then 1 will just be an aid

 3    to the jury which I'd like to publish --

 4            THE COURT:  Publish 1.  Okay.  And are you doing

 5    anything with 1-B?

 6            MR. FIELDS:  It's there for reference, Your Honor.

 7    At this time I'm not seeking to admit it.

 8            THE COURT:  Okay.  Any objection?

 9            MR. SMITH:  No objection to 1 and 1-A, Your Honor.

10            THE COURT:  Okay.  There being no objection, 1-A

11    is admitted into evidence and may be published to the jury.

12        (Government's Exhibit 1-A received)

13            THE COURT:  And 1, you're not seeking for its

14    admission, but you're seeking to have it published to the

15    jury.

16            MR. FIELDS:  Correct, Your Honor.

17            THE COURT:  All right.  Proceed.

18    BY MR. FIELDS:

19    Q.   At some point during the stop, did another officer

20    arrive?

21    A.   Yes.

22    Q.   Who was that?

23    A.   Officer Jason Papke.

24    Q.   Why did he arrive?

25    A.   I had asked -- after seeing the credit cards in the

Direct - Seal

1  back seat, I knew that I was going to bring the driver out

2  of the vehicle.  I didn't want to do that by myself so I

3  asked for a second unit to assist me.  He was nearby so he

4  responded.

5  Q.   Did Jason Papke, the officer who responded, have any

6  special features to his unit?

7  A.   Yes, he was a K-9 officer, so he had with him his K-9

8  partner.

9  Q.   What was the K-9 trained to do?

10  A.   The K-9 was trained to detect the presence of illegal

11  substances.

12  Q.   What was the K-9's name?

13  A.   Neo.

14  Q.   Officer Papke arrived.  And did another officer arrive

15  at the stop?

16  A.   Yes.

17  Q.   Who was that?

18  A.   Officer Patrick Sheeran.

19  Q.   What did you do when the other officers arrived at the

20  scene?

21  A.   When Officer Papke, who arrived first, when he first

22  arrived, I briefly explained to him what I had seen in the

23  vehicle, and Officer Papke and I then detained the driver.

24  Q.   What do you mean by "detained"?

25  A.   Placed him into handcuffs.

Direct - Seal

1    Q.   Why did you put him in handcuffs?

2    A.   Let me back up just a little bit.  Prior to deciding

3    to put him in handcuffs, while I was explaining to Officer

4    Papke what I'd seen in the vehicle, we had decided that we

5    were -- Officer Papke offered to take his K-9 partner, Neo,

6    and conduct an exterior sniff of the vehicle to again check

7    for the presence of some illegal substance in the vehicle.

8         So we decided for officer safety purposes, because

9    we had the driver outside the vehicle already, we were

10   going to detain him for investigative purposes while we

11   investigated further into what was in the car.

12   Q.   And that means putting him in handcuffs?

13   A.   Correct.

14   Q.   Putting him in handcuffs, did that have anything in

15   particular to do with this particular person or is that,

16   again, a universal precaution?

17   A.   I -- it's a pretty universal thing.

18   Q.   Why do you do it?

19   A.   It helps to have better control over an individual

20   while you're investigating a crime.

21   Q.   While you were recording the stop, did the driver of

22   the car identify himself?

23   A.   He did.

24   Q.   So in Exhibit 1 -- let's see if we can play -- this

25   will be from 1 minute 35 seconds to 1 minute 38 seconds, a

Direct - Seal

 1   very short clip.

 2           MR. SMITH:  Well, Your Honor, the exhibit's been

 3   admitted.  If we're going to play it, I would ask that it

 4   be played in its entirety.

 5           MR. FIELDS:  Your Honor, it's a rather long tape.

 6   We can play it, but I think it will be more efficient --

 7           THE COURT:  No, I don't want to do that.  If

 8   there's any section or portion of the tape that the

 9   defendant wants to have played that the Government doesn't

10   play, you're free to do that.  But I'm not going to have

11   the Government play the entire tape.

12           Go ahead.

13           MR. FIELDS:  Thank you, Your Honor.

14           THE COURT:  Overruled.

15   BY MR. FIELDS:

16   Q.   So let's play 1:35 to 1:38, please.

17        (Audio played)

18   BY MR. FIELDS:

19   Q.   All right.  Stop there.

20           So there are two voices on that tape.  One says

21   Tramell Thomas.  Whose voice is that?

22   A.   That was the driver.

23   Q.   The other voice that's on the tape, the officer who

24   asked the question, who was that?

25   A.   That's Officer Patrick Sheeran.

Direct - Seal

1   Q.   Now, on the transcript, which is synced to the audio,

2   does it mistakenly identify Officer Sheeran as Officer

3   Papke?

4   A.   It does.

5   Q.   During the stop, did the defendant protest being

6   detained?

7   A.   Yes.

8   Q.   Let's see if we can play the second clip.  This will

9   be from a minute 2:13 to 3:02.  It might take us just a

10  second to queue it up.  Looks like we're good.  All right.

11       (Audio played)

12  BY MR. FIELDS:

13  Q.   All right.  So, again, it says Officer Papke.  Who's

14  speaking there?

15  A.   I heard both Officer Papke and Officer Sheeran.  The

16  main officer in that segment is Officer Sheeran.

17  Q.   And the defendant at that point said that it was his

18  girlfriend's car.  Did you run the registration on the car?

19  A.   I did.

20  Q.   To whom was it registered?

21  A.   Heather Carr.

22  Q.   What was the address on the registration?

23  A.   I don't recall.

24  Q.   If you saw the tow slip, would that help refresh your

25  recollection?

Direct - Seal

1     A.    It would.

2     Q.    This is not in evidence, but you should see it on the

3     screen up in front of you.  Again, please don't read from

4     it.  Please take a look at that for a second.  If that

5     refreshes your recollection, just look back at me.

6     A.    Okay.

7     Q.    What was the address that the car was registered to?

8     A.    1321 North Pleasant Drive in Chandler, Arizona.

9     Q.    Say that one more time, please.

10    A.    1321 North Pleasant Drive in Chandler, Arizona.

11    Q.    Are you sure about that?  Would it help to have your

12    recollection refreshed again?

13    A.    Possibly.

14    Q.    Do you write a lot of reports?

15    A.    I do.

16    Q.    Have you conducted many traffic stops?

17    A.    I have.

18    Q.    So when you conduct traffic stops, do you document

19    what happens --

20    A.    Yes.

21    Q.    -- so that you can remember later on?

22    A.    Correct.

23    Q.    All right.  Let's take a look at it one more time.

24    A.    Okay.

25    Q.    All right.  So, again, memory quiz.  Do you remember

260
Direct - Seal

1    the address?

2    A.    Now that it's been zoomed in, I can see that it's 1351

3    North Pleasant Drive in Chandler.

4    Q.    Okay.  Thank you.

5          During the stop, did the defendant give a

6    different address as his residence?

7    A.    Yes.

8    Q.    Let's see if we can pull up another clip from

9    Government Exhibit 1.  That will be 3 minutes and 16

10   seconds to 4 minutes and 32 seconds.

11        (Audio played)

12   BY MR. FIELDS:

13   Q.    What was the address he identified?

14   A.    1822 East Kaibab.

15   Q.    Now, this part of the transcript, again, identifies

16   one of the individuals speaking as Officer Papke.  Did you

17   also recognize another voice in that portion of the tape?

18   Or was that Papke?

19   A.    That was Papke.

20   Q.    That was Papke.

21   A.    Yes.

22   Q.    Okay.  At some point during the stop, did you decide

23   to read the defendant his rights?

24   A.    I did.

25   Q.    Let's see if we can go to 9:01 to 9:36.

261

Direct - Seal

1    (Audio played)

2   BY MR. FIELDS:

3   Q.   Why did you read the defendant his rights?

4   A.   As you can hear me explain in the recording, at that

5   point in time he had been detained, he wasn't free to

6   leave.  And any time someone is not free to leave and that

7   I'm going to question them about some offense that they're

8   suspected of possibly being involved in, I'm required to

9   advise them of their Miranda rights.

10  Q.   You also talk about an investigation.  What were you

11  investigating?

12  A.   There was several crimes that I was looking into that

13  could be associated with those credit cards assembly, such

14  as in Arizona we have identity theft, possession of stolen

15  credit cards, possession of fictitious credit cards, all of

16  which are felony offenses.

17  Q.   So did you ask the defendant about the bag of credit

18  cards you had seen?

19  A.   Yes.

20  Q.   And let's play -- this is a longer clip, from 9:52 to

21  12:21, please.

22       (Audio played)

23  BY MR. FIELDS:

24  Q.   During that clip, the defendant says there was a dog

25  going around his car.  Was that Officer Papke's K-9?

262

Direct - Seal

1   A.   Yes.

2   Q.   And during that clip, the defendant said there were no

3   credit cards.  Did you hear that?

4   A.   I did.

5   Q.   After the K-9 went around the car, did you search the

6   car?

7   A.   I did.

8   Q.   Did you look on the back floorboard?

9   A.   I did.

10  Q.   What did you find?

11  A.   I found that same Ziploc baggie full of really thick

12  four-, five-inch thick stack of credit cards.

13  Q.   Now let's take a look at Government Exhibit 4.  It's a

14  physical exhibit that's on that cart there.  It looks like

15  a big envelope.  It's not yet in evidence.

16       Do you recognize that bag?

17  A.   I do.

18  Q.   How do you recognize it?

19  A.   I recognize it because it has an evidence bar code

20  sticker, or label.  It has my name on it.  This was created

21  by me on August 30th, 2012.  Additionally on the backside

22  of it, I sealed it up with tape and put my initials on it

23  and my badge number.

24  Q.   Did you review that exhibit before your testimony?

25  A.   Yes.

263
Direct - Seal

1    Q.   How many cards are inside there?

2    A.   52.

3    Q.   Is that the same number you found when you searched

4    the car Thomas was driving on August 30th, 2012?

5    A.   Yes.

6    Q.   Are they in the same condition they were when you

7    found them?

8    A.   All but a couple that have been put together with a

9    binder clip and some Government exhibit stickers.

10   Q.   So there's a couple that have been set aside and an

11   exhibit sticker's been put on them?

12   A.   Correct.

13   Q.   Otherwise are they in the same condition?

14   A.   Yes.

15        MR. FIELDS:  Your Honor, at this time I would move

16   to admit Government Exhibit 4 and then Exhibit 4-A through

17   4-D.

18        THE COURT:  4, 4-A and 4-B.  All right.  Is there

19   any objection?

20        MR. SMITH:  Your Honor, I haven't seen this

21   exhibit.  May I look at it?

22        THE COURT:  Yes, you may.

23        Have you seen 4-A?  What is 4-A?

24        MR. FIELDS:  4-A, 4-B, 4-C and 4-D are just four

25   particular credit cards.

Voir Dire - Seal

1     THE COURT:  Are they in four?

2         MR. FIELDS:  They are in there, Your Honor.

3         THE COURT:  Does -- does defense counsel know

4  which cards are 4-A through 4-D?

5         MR. SMITH:  I do, Your Honor.  I can see that.

6         THE COURT:  All right.

7         MR. SMITH:  May I voir dire?

8         THE COURT:  You may.

9                 VOIR DIRE EXAMINATION

10  BY MR. SMITH:

11  Q.    It's Detective Seal now?

12  A.    Right.

13  Q.    Detective, I thought I understood you to say when you

14  saw those credit cards that night they were in a plastic

15  baggie.

16  A.    Correct.

17  Q.    That's when you first saw them with your flashlight?

18  A.    Yes.

19  Q.    And then when you actually recovered them, when you

20  seized them, they were still in a plastic baggie, correct?

21  A.    Correct.

22  Q.    And what did you do with them after you seized them?

23  A.    After I seized them, I took them to our police

24  substation at 8201 South Hardy Drive in Tempe.  While there

25  I took them out of the plastic bag, made photocopies of the

265

Direct - Seal

1  credit cards to attach to my report, and then they were

2  impounded as evidence.

3  Q.   Where's the plastic bag?

4  A.   I -- I don't know.

5  Q.   It's not -- it's not in this exhibit, is it?

6  A.   No, it's not.

7       MR. SMITH:  I object, Your Honor.  The evidence is

8  not in the same condition, it's not in the bag that it was

9  contained in, which I think is going to become an issue in

10 this matter.

11      THE COURT:  Mr. Fields, do you want to ask more

12 questions or respond to that objection?

13      MR. FIELDS:  May I ask just a couple follow-up

14 questions?

15      THE COURT:  Sure.

16           DIRECT EXAMINATION (Cont'd)

17 BY MR. FIELDS:

18 Q.   The cards that are in there, are they the same cards

19 you found in the plastic bag?

20 A.   They are.

21 Q.   How do you know they're the same cards in the plastic

22 bag?

23 A.   Because I've reviewed them -- reviewed them against

24 the photocopies of the cards I made that night.

25      MR. FIELDS:  Your Honor, at this time I move for

Direct - Seal

1    the admission of Government Exhibit 4.

2              THE COURT:  Let me ask a question of the

3    detective.  Did you personally take the credit cards out of

4    the bag -- plastic bag and then put them into that evidence

5    bag?

6              THE WITNESS:  I did.

7              THE COURT:  All right.  And you took the

8    photographs of them before you did that?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  And you examined the photographs

11   against the cards and they are -- they match up?

12             THE WITNESS:  Correct.

13             THE COURT:  All right.  The objection is

14   overruled.  4, 4-A and 4-B are admitted into evidence and

15   may be published to the jury.

16             MR. FIELDS:  And I just want to make sure I

17   understand, Your Honor, it's 4 and then 4-A through 4-D as

18   in --

19             THE COURT:  Oh, I'm sorry, you're right.  I

20   misspoke.  Let me say that again.  The objection's

21   overruled.  Exhibit 4, 4-A, 4-B, 4-C, and 4-D are admitted

22   into evidence and may be published to the jury.

23         (Government's Exhibits 4 and 4-A thru 4-D received)

24   BY MR. FIELDS:

25   Q.   All right.  So publishing might be a little bit

267
Direct - Seal

1    tricky, but can you please take those cards out of that bag

2    there.  And then to the extent you can, just try to put

3    them in a stack so we can show to the jury.

4            COURTROOM DEPUTY:  Do you want me to move the

5    book, too?

6            MR. FIELDS:  That might help, too.

7    BY MR. FIELDS:

8    Q.   All right.  And if you just stand up, just make sure

9    the members of the jury can see it.

10           All right.  Thank you very much.

11           And then those four, 4-A through 4-D, can you

12   please hand them to the courtroom deputy so I can publish

13   them up here on the Elmo.

14           I'll start at the beginning.  I'm going to first

15   look at the back.  Does that say Exhibit 4-A?

16   A.   Yes.

17   Q.   Okay.  All right.  Can you just read what's on the top

18   right of Exhibit 4-A.

19   A.   Sure, it says, "CCCS refund card."

20   Q.   And what does it say -- do you see two yellow bars

21   across the top?

22   A.   Yes.

23   Q.   What's does it say inside those bars?

24   A.   On the left side it says "Colorado Community College

25   System."  And on the right side, it says "Higher One."

268
Direct - Seal

1    Q.   Does this card bear a logo?

2    A.   Yes.

3    Q.   A credit card logo?

4    A.   Yes.

5    Q.   What's the logo?

6    A.   A MasterCard logo.

7    Q.   Is there a name on this card?

8    A.   Yes.

9    Q.   What is the name?

10   A.   Ismael Omar.

11   Q.   What does it say below that?

12   A.   "Pikes Peak CC."

13   Q.   And what is the number on the card -- well, let's not

14   read the whole number, but just for identification

15   purposes, what are the last four digits on that number --

16   on that card?

17   A.   5158.

18   Q.   Okay.  Thank you.

19        Showing you the back of Government Exhibit 4-B.

20   Does that have the exhibit sticker 4-B?

21   A.   It does.

22   Q.   I just flipped it around to the front side.  Does this

23   card look substantially the same as 4-A?

24   A.   It does.

25   Q.   What is the name on this card?

269
Direct - Seal

1    A.   The name as far as the person that's issued to?

2    Q.   Yes.

3    A.   Virginia Jones.

4    Q.   What does it say below that?

5    A.   "Pikes Peak CC."

6    Q.   And, again, just for purposes of the record, what are

7    the last four digits?

8    A.   2903.

9    Q.   Showing you the back of Government Exhibit 4-C, does

10   that bear the exhibit sticker?

11   A.   It does.

12   Q.   Again, I flipped it around to the front.  Is it

13   substantially the same in appearance as the others?

14   A.   Yes.

15   Q.   Does it have the name of the person to whom it was

16   issued?

17   A.   Yes.

18   Q.   What is that name?

19   A.   Robert Pickens.

20   Q.   What does it say below that?

21   A.   "Pikes Peak CC."

22   Q.   And what are the last four digits?

23   A.   8668.

24   Q.   Last one.  Back of the card, does it bear the exhibit

25   sticker, Government Exhibit 4-D?

270
Direct - Seal

1    A.    Yes.

2    Q.    Okay.  Again, I flipped it around to the front.  Is it

3    substantially the same in appearance as 4-A, 4-B, and 4-C?

4    A.    It is.

5    Q.    Does it have the name of the person to whom it was

6    issued?

7    A.    It does.

8    Q.    What is that name?

9    A.    Eddie J. Jones.

10   Q.    What does it say below that?

11   A.    "Pikes Peak CC."

12   Q.    Again, for purpose of the record, what are the last

13   four digits of the card?

14   A.    0165.

15   Q.    All right.  If I could ask the courtroom deputy to

16   give this back to you, we'll put Exhibit 4 away.

17         Did you find anything else on the back seat

18   floorboard of the car?

19   A.    I did.

20   Q.    What did you find?

21   A.    A pink Sony Vaio laptop computer.

22   Q.    When you found these cards that are in Government

23   Exhibit 4, did you confront the defendant with them?

24   A.    I did.

25   Q.    Let's play 19:51 to 21:46.

271

Direct - Seal

1        (Audio played)

2    BY MR. FIELDS:

3    Q.   During that portion of the clip, did you hear a

4    crinkling sound?

5    A.   Yes.

6    Q.   What was that?

7    A.   That was the plastic Ziploc baggie that the cards were

8    in.

9    Q.   At one point on the tape, you mentioned fingerprints.

10   Did you actually check it for fingerprints?

11   A.   I did not.

12   Q.   Do you know if anyone did?

13   A.   I know that the Tempe Police Department did not.

14   Q.   Earlier you said on the tape that the defendant was

15   detained but not arrested.  Did you eventually place him

16   under arrest for possession of stolen property?

17   A.   Not for possession of stolen property.

18   Q.   Did you eventually place him under arrest?

19   A.   I did.

20   Q.   Did you ask him again about the credit cards?

21   A.   Yes.

22   Q.   So let's play from 22:49 to 23:20.

23        (Audio played)

24   BY MR. FIELDS:

25   Q.   Since you arrested Thomas, did you have to fill out a

272

Direct - Seal

1    booking paperwork form?

2    A.    Yes.

3    Q.    As part of that process, did you have to ask him what

4    he did for a living?

5    A.    Yes.

6    Q.    So in the first portion of that tape, do you remember

7    him saying, "If you do my job and what I do," but he didn't

8    answer?

9    A.    Yes.

10   Q.    So let's go to the booking paperwork.  That's 30:15 to

11   32.

12        (Audio played)

13   BY MR. FIELDS:

14   Q.    Is it fair to say that you asked him multiple times

15   about the credit cards?

16   A.    Yes.

17   Q.    Did he ever answer your questions about him?

18   A.    Not once.

19   Q.    When you placed him under arrest, did you search him?

20   A.    Yes.

21   Q.    At some point, did you find his wallet?

22   A.    I did.

23   Q.    What did you find inside his wallet?

24   A.    Inside the wallet I found another MasterCard, credit

25   or debit card, which had the same Colorado Community

Direct - Seal

1    College System wording up at the top with the same

2    background design, with a different name other than the

3    defendant's.

4    Q.   So let's pull up Government Exhibit 38, which is not

5    in evidence so it should go just to the witness.

6            MR. SMITH:  Exhibit?

7            MR. FIELDS:  38.

8    BY MR. FIELDS:

9    Q.   Do you recognize that?

10   A.   I do.

11   Q.   Is it a photograph?

12   A.   It is.

13   Q.   Who took the photo?

14   A.   I took the photograph.

15   Q.   Does it fairly and accurately depict your observations

16   of what was on the left-hand side of the wallet you found

17   that night?

18   A.   I believe that's the right-hand side of the wallet,

19   but yes, it's --

20   Q.   Sorry.  Thank you.

21   A.   -- accurate depiction of what I saw in the wallet.

22   Q.   So it's the right-hand side of the wallet.

23   A.   Yes.

24   Q.   Okay.  Thank you very much.

25           MR. FIELDS:  At this time, Your Honor, I'd move

Direct - Seal

1   for the admission of Government Exhibit 38.  It has not

2   been stipulated to.

3          THE COURT:  Any objection?

4          MR. SMITH:  May I have one moment, Your Honor?

5          THE COURT:  You may.  While counsel's looking at

6   that, is there a reason why, in my exhibit list, there's a

7   reference to a wallet photograph taken by Mesa Police

8   Department?

9          MR. FIELDS:  That's an error, Your Honor.  It

10  should say "Tempe."

11         THE COURT:  Tempe.  Okay.  I guess one Arizona

12  city's like the other.

13         MR. FIELDS:  You have a sharp eye, Your Honor.

14  Thank you.

15         MR. SMITH:  Well, Your Honor, I object to the

16  photograph because, as I looked at the Government's exhibit

17  list, Exhibit 5 appears to be the card.  I don't know why

18  we have a photo if we have the actual card.

19         THE COURT:  Okay.  So you're -- first of all, is

20  the Government going to be moving to admit Exhibit 5 at

21  some point?

22         MR. FIELDS:  We are, Your Honor, so that's just

23  the card.  But it doesn't show the position of where it was

24  found that night.

25         THE COURT:  Okay.  So you -- all right.  Is that

275

Direct - Seal

1    your only objection --

2           MR. SMITH:  Yes, Your Honor.

3           THE COURT:  -- Mr. Smith?

4           All right.  That objection's overruled.

5    Exhibit 38 is admitted into evidence and may be published

6    to the jury.

7        (Government's Exhibit 38 received)

8    BY MR. FIELDS:

9    Q.    Thank you, Your Honor.

10          Let's publish it.

11          So first of all, I just circled the bottom

12   right-hand corner.  What was there?

13   A.    That is the defendant's driver's license -- Arizona

14   driver's license.

15   Q.    I just circled an object in the middle of the screen.

16   Describe that for us.

17   A.    That is a black-colored MasterCard debit card.  On the

18   top right corner of that it says "CCCS refund card."  And

19   then it has a green sticker in the middle of it.

20   Q.    All right.  I just zoomed in, so a little bit clearer.

21   Can you read what the green sticker says.  Hold off, we'll

22   get right to it.

23          Did you take this card into evidence?

24   A.    I did.

25   Q.    So now let's look at Government Exhibit 5.  It's

Direct - Seal

```
 1    another physical exhibit over on that cart.

 2              We can take this down, please.

 3              COURTROOM DEPUTY:  5?

 4              MR. FIELDS:  Yes.  It's on the cart, I believe.

 5              COURTROOM DEPUTY:  Oh, okay.

 6              MR. FIELDS:  It's another envelope.  A small one.

 7              COURTROOM DEPUTY:  Thank you.  I don't see an

 8    exhibit sticker.

 9              MR. FIELDS:  The exhibit sticker is inside.  Thank

10    you.

11    BY MR. FIELDS:

12    Q.   So do you recognize that bag?

13    A.   Are you referring to the envelope?

14    Q.   Yeah, sorry.  The envelope.

15    A.   Yes.

16    Q.   How do you recognize it?

17    A.   Again, it has an evidence label that was generated by

18    myself.  As you can see my name on the bottom of it.  It

19    also has the date of August 30, 2012, on it.

20    Q.   So open that up and please take the object out.

21              Do you recognize that?

22    A.   Yes.

23    Q.   Is that the card you found in the defendant's wallet

24    on August 30th, 2012?

25    A.   It is.
```

Direct - Seal

1    Q.   Is it in the same or substantially the same condition

2    as when you found it?

3    A.   Yes, other than the Government exhibit sticker on the

4    back.

5         MR. FIELDS:  Your Honor, at this time I'd move to

6    admit Government Exhibit 5.

7         THE COURT:  Is there an objection?

8         MR. SMITH:  May I see the exhibit, Your Honor?

9         THE COURT:  You may.

10        MR. SMITH:  No objection, Your Honor.

11        THE COURT:  All right.  There being no objection,

12   Exhibit 5 is admitted into evidence and may be published to

13   the jury.

14        (Government's Exhibit 5 received)

15   BY MR. FIELDS:

16   Q.   All right, Ms. Hansen, I'd like to publish it on the

17   Elmo.

18        All right, so this is the back of the card.  Does

19   it bear the Government's exhibit sticker, Exhibit 5?

20   A.   Yes.

21   Q.   Okay.  I flipped it around to the top.  Does this card

22   appear to be substantially the same in appearance as

23   Government's Exhibits 4-A through 4-D?

24   A.   Yes, it does.

25   Q.   Except does this one have a green sticker on it?

278
Direct - Seal

1   A.   It does.

2   Q.   What does the green sticker say?

3   A.   It says, "The card is issued by Wright Express

4   Financial Services Corporation pursuant to license by

5   MasterCard International.  The card is administered by

6   Higher One, Incorporated."

7   Q.   What is the name on this card?

8   A.   Manuel Abate.

9   Q.   And what does it say below that?

10  A.   "Pikes Peak CC."

11  Q.   Again, just for purposes of the record, what are the

12  last four digits of the card?

13  A.   6173.

14  Q.   Thank you.  After you got all of these cards, what did

15  you do with them?

16  A.   I transported them back to our police station where,

17  again, I photocopied them -- well, out at the scene I took

18  photographs of them.  I then -- back at the station, I took

19  photocopies of them, placed them in the manila envelope,

20  and sealed them and impounded them as evidence.

21  Q.   Is it fair to say you looked at all 52 of those cards?

22  A.   Yes.

23  Q.   How many of them had the defendant's name on them?

24  A.   Not one.

25           MR. FIELDS:  One moment, Your Honor.

Cross - Seal

1              THE COURT:  All right.

2              MR. FIELDS:  I have no further questions for this

3      witness, Your Honor.

4              THE COURT:  All right.  Cross-examination.

5              MR. SMITH:  Your Honor, may I have one moment to

6      look at Exhibit 4 before I begin my --

7              THE COURT:  Sure.

8                            CROSS-EXAMINATION

9      BY MR. SMITH:

10     Q.    Detective, do you know where the wallet is?

11     A.    The defendant's wallet?

12     Q.    Yes.

13     A.    It was placed in its property, after I removed that

14     card, which is Government's Exhibit 5, out of it, and given

15     to him upon his release from Tempe City Jail.

16     Q.    Okay.  And Exhibit 38, the photograph of the

17     MasterCard card, there's another credit card there, right,

18     a Chase card?

19     A.    Yes.

20     Q.    Whose name was that in?

21     A.    The defendant's.

22     Q.    Were there other cards in the wallet?

23     A.    There were.

24     Q.    And they were in his name?

25     A.    Yes, sir.

Cross - Seal

1    Q.   And his driver's license was in his name.

2    A.   Correct.

3    Q.   So this was the only card that didn't have his name on

4    it?

5    A.   To my recollection, yes.

6    Q.   Thank you.  I understood you on direct examination to

7    say that at one point in time he told you he was coming

8    from his post office box?

9    A.   Correct.

10   Q.   And that was in Tempe, Arizona.

11   A.   Yes.

12   Q.   Not Chandler.

13   A.   Correct.

14   Q.   This car, Exhibit 3, the white Charger, that car was

15   registered to Heather Carr?

16   A.   Correct.

17   Q.   And at various times Mr. Thomas identified her as his

18   girlfriend or fiancee?

19   A.   Correct.

20   Q.   Back in August of 2012, did you have any reason to

21   doubt that information?

22   A.   No.

23   Q.   You say that you saw Mr. -- Mr. Thomas reach into the

24   back seat of his car and slide that baggie onto the floor?

25   A.   No, he -- he actually physically picked it up off of

281

Cross - Seal

1    the back seat and then placed it on the floor and slid it
2    under the seat.
3    Q.    So he picked it up with his fingers?
4    A.    Correct.
5    Q.    Put it on the floor and under the seat.
6    A.    Correct.
7    Q.    And you saw him do this.
8    A.    I did.
9    Q.    And you were really suspicious of those 52 cards.
10    A.    I was.
11    Q.    To the point that you told him that night that you had
12    gloves on, the only prints that would be on that bag would
13    be his because of his moving the bag, correct?
14    A.    Correct.
15    Q.    And yet we don't even know where the bag is today.
16    A.    Correct.
17    Q.    It was never sent to a lab for fingerprinting.
18    A.    Correct.
19    Q.    When you initially observed the Charger, is a proper
20    term you thought the car was weaving?
21    A.    Drifting.
22    Q.    Drifting.  It was going over too far?
23    A.    It was driving at an angle in relation to the
24    direction of the lane.  Very gradual movement and it would
25    go from one side of the lane to the other, and then back to

Cross - Seal

1    the other side of the lane, and then back to the other side

2    of the lane continuously.

3    Q.    Sometimes in Colorado we call that weaving.  Would you

4    quarrel with that description?

5    A.    I -- I call it drifting --

6    Q.    Fine, no problem.  You saw the defendant operating a

7    motor vehicle in the state of Arizona and he was drifting

8    and it was after 2:00 a.m. in the morning, correct?

9    A.    Correct.

10   Q.    You thought he was drunk, didn't you?

11   A.    I thought that it was a possibility he was impaired.

12   Q.    And you were with him at the scene for half hour, 45

13   minutes?

14   A.    Thereabouts, yes.

15   Q.    Okay.  And am I correct in my understanding that you

16   determined that he was not under the influence of alcohol?

17   A.    I determined he was not impaired, yes.

18   Q.    Throughout your -- your time that early morning with

19   Mr. Thomas, he certainly denied any -- any involvement in

20   any criminal wrongdoing, correct?

21   A.    Correct.

22   Q.    He acknowledged that he had been pulled over for a

23   traffic violation.

24   A.    Yes.

25   Q.    Aside from his dispute with you, arguing with you,

283

Cross - Seal

1    about what you thought the credit cards were and his

2    ignoring that, and his arguing about what he was doing

3    there, he was cooperative with you, wasn't he?

4    A.   Yes.

5    Q.   I mean --

6    A.   For the most part.

7    Q.   When he pulled over, you wanted him to go farther down

8    the road, for safety purposes, I assume.

9    A.   Correct.

10   Q.   You asked him to.

11   A.   Yes.

12   Q.   And he did.

13   A.   Correct.

14   Q.   You asked him eventually to get out of the car?

15   A.   Yes.

16   Q.   He did.

17   A.   He did.

18   Q.   You asked him to go sit on the sidewalk, I believe?

19   A.   Yes.

20   Q.   He did.

21   A.   Correct.

22   Q.   He didn't try to run away from you.

23   A.   No.

24   Q.   He wasn't physical with you in any way.

25   A.   No.

284
Cross - Seal

1    Q.   He was cooperative during the -- during the encounter,

2    aside from denying any involvement in the crime you were

3    alleging.

4    A.   Yes.

5    Q.   The cards that were in Exhibit 4 --

6            THE COURT:  Can you stay closer to the mic.

7    Remember what I said --

8            MR. SMITH:  Excuse me, Your Honor.

9            THE COURT:  Yeah.

10   BY MR. SMITH:

11   Q.   The cards that were in Exhibit 4 I've taken out of

12   that envelope, correct?

13   A.   Correct.

14   Q.   And there's a smaller stack with a half a dozen --

15   seven, eight cards?

16   A.   These ones?

17   Q.   The shorter stack.

18   A.   Yes.

19   Q.   They're different than the rest of the cards, aren't

20   they?

21   A.   There are a few things about them that are different

22   than the others, yes.

23   Q.   Well, the one thing that sticks out most obviously is

24   they all have a sticker on them, don't they?

25   A.   Correct.

285
Redirect - Seal

1    Q.   Those cards haven't been activated, have they?

2    A.   They don't appear to have been.

3    Q.   Okay.

4         MR. SMITH:  One moment, Your Honor.

5         THE COURT:  Yes.

6         MR. SMITH:  Thank you, Detective.

7         I don't have any further questions at this time,

8    Your Honor.

9         THE COURT:  All right.  Redirect.

10        MR. FIELDS:  Yes, Your Honor, thank you.

11                    REDIRECT EXAMINATION

12   BY MR. FIELDS:

13   Q.   Detective Seal, do you remember being asked questions

14   about whether you thought the defendant was impaired?

15   A.   Yes.

16   Q.   And you concluded that he was not impaired, right?

17   A.   Correct.

18   Q.   So when he was answering your questions, did he seem

19   lucid?

20   A.   He did.

21   Q.   In any way, did he indicate that he didn't understand

22   your questions?

23   A.   No.

24   Q.   Any reason, as you sit here today testifying, to

25   believe that he didn't understand what you were asking him?

286

Redirect - Seal

1   A.   No.

2   Q.   You were also asked a lot of questions about how

3   cooperative he was.  Do you remember those questions?

4   A.   I do.

5   Q.   How many times would you say you asked him about the

6   credit cards?

7   A.   Without counting -- I mean you could hear it on the

8   recordings, I asked him probably -- probably at least 10

9   times -- 10, 15 times, somewhere in there.

10  Q.   Was he cooperative with that part of the traffic stop?

11  A.   No.

12          MR. FIELDS:  No further questions, Your Honor.

13          THE COURT:  All right.  May this witness be

14  excused?

15          MR. FIELDS:  Yes, Your Honor.

16          THE COURT:  All right.  For the defendant?

17          MR. SMITH:  I have no objection.

18          THE COURT:  All right.  Detective, thank you so

19  much for joining us.  You're excused.  You may step down.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  Safe travels back to Arizona.

22          THE WITNESS:  Thank you.

23          THE COURT:  All right.  We're going to call it a

24  day.

25          Ladies and gentlemen of the jury, I don't think I

287
Redirect - Seal

1    mentioned this to you before, but starting tomorrow, we're

2    going to start each remaining day of the trial at 8:45, so

3    I ask that you be in the deliberation room by 8:35.

4         In 97 percent of the trials I've had, the second

5    morning we've had issues with jurors trying to figure out

6    where they're going to park and how long it's going to take

7    them to get from their home, and to be able to be sitting

8    in that room by 8:35, so let's see if you can be -- this

9    can be one of the 3 percent that get it on time.  So give

10   yourself extra time tomorrow morning and then you figure

11   out how long it takes you, then Wednesday through Friday we

12   will be fine.

13        I need to remind you, please don't do any

14   independent research into and don't discuss with anyone any

15   of the facts, or the law, the issues, or the individuals

16   involved with this case.

17        I have something to raise with the lawyers, so

18   lawyers can stick around for a couple of minutes.  I'm

19   releasing the jury at this time.  We will be in recess

20   until 8:45.

21        (Jury left at 4:55 p.m.)

22        THE COURT:  All right, Mr. Smith, where are we

23   with respect to Mr. Cox?

24        MR. SMITH:  No further, Your Honor.  We must have

25   had a miscommunication.  I wasn't able to reach him over

288

Redirect - Seal

1    the lunch hour.  I will continue to try when I get back to

2    my office.

3              THE COURT:  Okay.  Well, you know, I don't know

4    how much longer I'm going to wait and defer ruling on the

5    Government's motion with respect to appointing counsel for

6    Mr. Cox.

7              MR. SMITH:  I understand.

8              THE COURT:  Let's do this:  First thing before the

9    jury comes in tomorrow, we're going to bring this up.  If

10   you haven't communicated with him then, I'm not going to

11   delay any further, I'm going to go forward and grant the

12   Government's motion and -- because it takes time to --

13   these things aren't done instantaneously --

14             MR. SMITH:  I understand.

15             THE COURT:  -- and then we'll get a ruling on it,

16   unless you tell me to the contrary by tomorrow morning that

17   that's no longer necessary.

18             MR. SMITH:  I understand.

19             THE COURT:  All right.  We'll be in recess until

20   8:45.

21        (Proceedings concluded at 4:57 p.m.)

22

23                            **INDEX**

24   Item                                              PAGE

25                    GOVERNMENT'S WITNESSES

289
Redirect - Seal

1   **KRISTINA MOSS**
    Direct Examination by Ms. Paluch              183
2   Cross-examination by Mr. Goodreid             204
    Examination by the Court                      210
3   Examination by Ms. Paluch                     212

4   **REBECCA JOSEPH**
    Direct Examination by Ms. Paluch              214
5   Cross-examination by Mr. Goodreid             236

6   <u>Item</u>                                          <u>PAGE</u>

7               GOVERNMENT'S WITNESSES

8   **JONATHAN SEAL**
    Direct Examination by Mr. Fields              241
9   Voir Dire Examination by Mr. Smith            264
    Direct Examination by Mr. Fields (Cont'd)     265
10  Cross-examination by Mr. Smith                279
    Redirect Examination by Mr. Fields            285

11

12

13               GOVERNMENT'S EXHIBITS

14   <u>EXHIBITS:</u>      <u>Offered</u>     <u>Received</u>   <u>Refused</u>   <u>Stipulated</u>

15   1-A          253         254

16   3            243         243

17   4            263         266

18   4-A          263         266

19   4-B          263         266

20   4-C          263         266

21   4-D          263         266

22   5            277         277

23   38           273         274

24   56-B         217         217

25   56-C         217         217

290

Redirect - Seal

1                        GOVERNMENT'S EXHIBITS

2   EXHIBITS:        Offered    Received  Refused   Stipulated

3   56-D             217        217

4   56-E             217        217

5   56-F             217        217

6   56-G             217        217

7   63-B             192        192

8   63-C             192        192

9   63-D             192        192

10  63-E             192        192

11  63-F             192        192

12  63-G             192        192

13

14                   *      *      *      *      *

15                   REPORTER'S CERTIFICATE

16       I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled

18  matter.

19       Dated at Denver, Colorado, this 8th day of August,

20  2019.

21

22

23

24                   _____

                     MARY J. GEORGE, FCRR, CRR, RMR

25

291

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLORADO

3    Criminal Action No. 16-cr-0054-WJM

4    UNITED STATES OF AMERICA,

5    Plaintiff,

6    vs.

7    TRAMELL THOMAS,

8    Defendant.

9    ------------------------------------------------------------

10                  REPORTER'S TRANSCRIPT
                    (Jury Trial - Day 2)
11
     ------------------------------------------------------------
12
         Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
13   Judge, United States District Court for the District of
     Colorado, commencing at 8:47 a.m., on the 28th day of
14   November, 2017, in Courtroom A801, United States
     Courthouse, Denver, Colorado.
15
                       APPEARANCES
16
         MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
17   Attorneys, 1801 California Street, Suite 1600, Denver,
     Colorado 80202, appearing for the plaintiff.
18
         DANIEL T. SMITH, Attorney at Law, 4582 South Ulster
19   Street, Suite 1400, Denver, Colorado 80237 and
         THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
20   Suite 1400, Denver, Colorado 80202, appearing for the
     defendant.
21
22            MARY J. GEORGE, FCRR, CRR, RMR
            901 19th Street, Denver, Colorado 80294
23        Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer
24

25

1                       P R O C E E D I N G S

2           (In open court outside the presence of the jury at

3      8:47 a.m.)

4               THE COURT:  All right.  First, Mr. Smith, have we

5      come to a decision with respect to Mr. Cox?

6               MR. SMITH:  I will not be calling Mr. Cox, Your

7      Honor.

8               THE COURT:  Okay.  Very well, then let's get the

9      motion here in front of me.  That portion of the

10     Government's motion ECF 213, which requested appointment of

11     independent counsel to represent potential witness, Michael

12     Cox, is denied as moot.

13              All right.  I understand the Government has an

14     issue regarding exhibits.

15              MR. FIELDS:  We do, Your Honor.  Trials are

16     exciting and we had some late-breaking developments last

17     night.

18              THE COURT:  Okay.

19              MR. FIELDS:  The first relates to the --

20              THE COURT:  Some are more exciting than others.

21              MR. FIELDS:  Yeah.  Perhaps, you know, "May you

22     live in exciting times" is the old curse.  So first thing,

23     the first witness from the Government this morning will be

24     Kimmisha Mullett.  We were able to speak to her in more

25     detail last night, and during the course of that

1    conversation, it became clear that she had some guilty

2    knowledge of what was happening with regard to these

3    mailings and, as a result, the United States was able to

4    reach an agreement between her and her attorney over a

5    nonprosecution agreement.

6              THE COURT:  Okay.

7              MR. FIELDS:  We've marked that as an exhibit; it's

8    new Government's Exhibit 84.  That's been provided to

9    defense counsel.

10             THE COURT:  All right.

11             MR. FIELDS:  I have copies here for the Court,

12   which I can pass out, and I put the original on the stand

13   over there.

14             THE COURT:  Yeah.  I don't have one up here; if

15   you could give one to Ms. Hansen, she can give it to me.

16             COURTROOM DEPUTY:  Oh, you put one in the book?

17             MR. FIELDS:  I didn't put it in the book.

18             COURTROOM DEPUTY:  It's on that stand?

19             MR. FIELDS:  It's just on the stand.

20             COURTROOM DEPUTY:  Okay.

21             THE COURT:  All right.  Exhibit 84.  And this is

22   in reference to the -- your next witness?

23             MR. FIELDS:  Yes.

24             THE COURT:  Okay.  One second.  Okay.  And did you

25   say you've already given a copy to counsel?

294

1           MR. FIELDS:  We have, Your Honor.

2           THE COURT:  Okay.  And what -- and are you -- what

3      do you want me to do with it?

4           MR. FIELDS:  We'll be offering its admission into

5      evidence.  I haven't been able to speak to defense counsel

6      about whether they'll stipulate to its admission.  I just

7      wanted to alert the Court, of course, that there's a new

8      exhibit.

9           THE COURT:  Okay.  Very well.

10          MR. FIELDS:  There's one other matter, Your

11     Honor.

12          THE COURT:  Yes.

13          MR. FIELDS:  This one's, you know, even more

14     exciting.

15          THE COURT:  Oh, wow.

16          MR. FIELDS:  Late last night --

17          THE COURT:  Okay.  What can be more exciting than

18     that kind of development with a witness?  Anyway.

19          MR. FIELDS:  Late last night, the Government was

20     informed by Heather Carr's defense attorney that she has no

21     intention of coming into court today, and she will not be

22     abiding by the terms of her cooperation agreement.

23          THE COURT:  Oh.

24          MR. FIELDS:  This obviously puts a bit of a --

25     throws us for a loop in terms of our trial presentation

1    because she was scheduled to testify for, between direct

2    and cross, about four hours.  We have two witnesses here

3    this morning, we have Ms. Mullett and then we have Michelle

4    Allred.  I think together their testimony, depending on the

5    cross-examinations, will take an hour and a half to two

6    hours.  Ms. Duncan --

7              THE COURT:  Combined or each?

8              MR. FIELDS:  Combined.

9              THE COURT:  Okay.

10             MR. FIELDS:  Ms. Duncan, Christina Duncan, and

11   Alison Stailey are scheduled to fly in to Denver at 10:00.

12   They are going to race to the courthouse as quickly as

13   possible.  And we will put on the first witness that is

14   available.

15             THE COURT:  Okay.

16             MR. FIELDS:  But it is possible that we may have a

17   short gap and I would just beg the Court's indulgence.  You

18   know, we could take a break or something else, but --

19             THE COURT:  Right.

20             MR. FIELDS:  -- we might not have the witnesses

21   here and ready to go.

22             THE COURT:  Well, thank you for letting me know.

23   Sure, under these circumstances, it's something you didn't

24   have any control over what Ms. Carr was going to do with

25   respect to her testimony, so I'll work with you.  If it

1    becomes -- if it becomes too late or -- or too long,

2    rather, then what you're telling me is you have no one else

3    for today.

4         MR. FIELDS:  We do have the case agent, Ms. Ennis.

5    The problem with that is we need certain exhibits to be

6    admitted before her testimony will make sense.

7         THE COURT:  Yeah.  And I think you had her as

8    last, right?

9         MR. FIELDS:  Yeah.  And, you know, we can play

10   with that a little bit, you know.  We're, of course, doing

11   everything we can.  We've researched the evidentiary

12   issues, but there are limits to where we could put her in

13   terms of the order, just because we need other exhibits to

14   be in evidence before she can talk about them.

15        THE COURT:  Okay.  All right.  So they're

16   scheduled -- do you know if their flight's on time?

17        MR. FIELDS:  Their flights -- I have no reason to

18   believe their flights are delayed.  They've already been

19   informed they need to get to the courthouse ASAP.  And, of

20   course, our witness coordinator will be working with them,

21   you know, to the minute.  Like the minute they get off that

22   plane, we should hopefully be in --

23        THE COURT:  Okay.  I'll work with you.  I think

24   these are extenuating circumstances and we'll do that.  I

25   mean, maybe we will take an early lunch, depending on how

Case No. 1:16-cr-00054-WJM Document 525-6 filed 12/18/19 USDC Colorado pg 257 of
901
Case 1:16-cr-00054-WJM Document 501 Filed 03/09/15 Page 1 of 237 pg 257 of
901

297

1    things go.

2          With respect to Ms. Carr, are you going to want to

3    have some kind of discussion with me outside the presence

4    of the defense counsel to tell me about what's going to

5    happen with her in her case?  Do you want to do that at

6    another time, or you haven't thought through what you're

7    going to do with her?

8          MR. FIELDS:  We've certainly thought about it, but

9    I think at this point it's premature.  She did fly to

10   Denver, so she's here.

11         THE COURT:  Oh, she's here.  She's just not going

12   to come to the --

13         MR. FIELDS:  According --

14         THE COURT:  You can't get a process server on her

15   to --

16         MR. FIELDS:  Well, yeah.  There's lots of

17   different options.  The bottom line is when we talked to

18   defense counsel yesterday, defense counsel, obviously,

19   because of the reasons of attorney-client privilege,

20   couldn't tell us certain things, right, about exactly how

21   the discussions went yesterday, but I suspect that her

22   attorney is trying to prevail upon her to follow the

23   agreement that she signed and there is hope that maybe she

24   will reconsider.

25         THE COURT:  Okay.  Have you put some kind of time

1    limit on them in terms of when they have to tell us today

2    so that we can try to arrange her schedule today?

3            MR. FIELDS:  It would be today, Your Honor.  I

4    mean, first thing this morning is what we told the defense

5    attorney and we haven't heard anything.

6            THE COURT:  Okay.

7            MR. FIELDS:  So, you know, the hope is

8    diminishing.

9            THE COURT:  Right.  Okay.

10           MR. FIELDS:  I think right now it's probably

11   premature to discuss exactly what will happen with Ms.

12   Carr, but we can certainly have that conversation --

13           THE COURT:  I was just asking if you were going to

14   want to.  Obviously, you know, you have to think through

15   what your strategy's going to be, if, in fact, she doesn't

16   comply with the terms of her agreement and, you know, you

17   probably want to talk to folks in your office and all that

18   good stuff.  I was just wanting to know if you were going

19   to want to take some time now that she's here, during a

20   lunch break or something, when we could have that

21   discussion, but that's fine if we don't.

22           MR. FIELDS:  Thank you, Your Honor.  I appreciate

23   it.

24           THE COURT:  Thank you for telling me all that.

25   It's good to know what's coming down the pike.

1           All right.  Let's bring in the jury.

2           So I'm assuming you don't want me to tell the jury

3    that Ms. Carr is not testifying?

4           MR. FIELDS:  No, Your Honor.

5           THE COURT:  Because you don't know if -- so we'll

6    just go through the witnesses you have and then if there's

7    a break in the action, then I'll just inform them -- I'll

8    give some kind of generic explanation of some procedural or

9    timing issues and that we're going to be needing to take a

10   break.

11          MR. FIELDS:  And reminding the jury -- I mentioned

12   it in my opening, you can remind them that the statement of

13   counsel's not evidence and they have to consider just the

14   evidence.

15          THE COURT:  Right.  Okay.  Correct.

16       (In open court in the presence of the jury at 8:56

17   a.m.)

18          THE COURT:  Good morning, ladies and gentlemen of

19   the jury.  Welcome back to day 2 of our jury trial.  Thank

20   you for your patience.  The lawyers and I were dealing with

21   a number of matters that the law requires be discussed

22   outside of your presence.  So it's not that we were late

23   this time, we were here on time, but we have been working

24   on other matters.

25          All right, the Government may call its next

300
                              Direct - Mullett

1   witness.

2           MR. FIELDS:  Thank you, Your Honor.  The United

3   States calls Kimmisha Mullett.

4           COURTROOM DEPUTY:  Right here, ma'am.  Please just

5   step in the box and raise your right hand.

6        KIMMISHA MULLETT, GOVERNMENT'S WITNESS, SWORN

7           COURTROOM DEPUTY:  Please be seated.  Please state

8   your full name for the record and spell your first and last

9   name.

10          THE WITNESS:  Kimmisha Mullett.  K-i-m-m-i-s-h-a,

11  last name M-u-l-l-e-t-t.

12                     DIRECT EXAMINATION

13  BY MR. FIELDS:

14  Q.   Good morning, Ms. Mullett.  Do you know Tramell

15  Thomas?

16  A.   Yes.

17  Q.   Do you see him in the courtroom today?

18  A.   Yes.

19  Q.   Could you please tell us where he's sitting and

20  describe an article of clothing that he's wearing.

21  A.   He is sitting by his counsel in a black-and-gray-ish

22  sweater.

23          MR. FIELDS:  Your Honor, I would like the record

24  to reflect that the witness has identified the defendant.

25          THE COURT:  The record will so reflect.

301
Direct - Mullett

1   BY MR. FIELDS:

2   Q.   Ms. Mullett, where did you live in 2012?

3   A.   In Colorado Springs, Colorado.

4   Q.   What address?

5   A.   1112 Meadow Oaks Drive, Colorado Springs.

6   Q.   How long had you lived at that address?

7   A.   Roughly about a year and a half.

8   Q.   When did you move out of that address?

9   A.   The fall of 2012.

10  Q.   While you lived there, did you receive mail with other

11  people's names on it?

12  A.   Yes.

13  Q.   Who asked if that mail could be sent to that

14  address?

15  A.   It was set up through Tramell.

16  Q.   When you received that mail with other people's names

17  on it, what did you do with it?

18  A.   I sent it to Tramell in Arizona.

19  Q.   Are you prepared today to tell the ladies and

20  gentlemen of the jury about the arrangement that you had

21  with Mr. Thomas?

22  A.   Yes.

23  Q.   Let's step back for just a little bit.  Have you ever

24  applied for student aid, yourself?

25  A.   Yes.

302

Direct - Mullett

1    Q.   At what school?

2    A.   Pikes Peak Community College.

3    Q.   So as a result, do you know what student aid mail from

4    Pikes Peak Community College looks like?

5    A.   Yes.

6    Q.   Describe it to us.

7    A.   You get an acceptance letter from the college that has

8    your S number on it, and then after that, you get a card

9    from the bank that does the funding of the student loan if

10   you get a refund.

11   Q.   What does that card look like?

12   A.   Back then, it would have been a black Higher One card.

13   Q.   And you've been describing the contents of the mail.

14   When the mail comes, does it come in an envelope that's

15   distinctive?

16   A.   Yes.

17   Q.   What does that envelope look like?

18   A.   It's just an envelope that has the school logo on it.

19   Q.   "School" being Pikes Peak Community College?

20   A.   Yes.

21   Q.   If you'll look at Government's Exhibit 57-I.  It

22   should be in notebook No. 2.  If you could put that in

23   front of you.  It's already in evidence so we can also put

24   it up on the monitor.

25        Can you see that in front of you?

Direct - Mullett

1   A.   Yes.

2   Q.   All right.  Do you see the name on the first page?

3   A.   Yes.

4   Q.   What is the name listed there?

5   A.   Dennis Miller.

6   Q.   Are you looking at 57-I?  Could you just look in the

7   bottom right-hand corner.

8          COURTROOM DEPUTY:  Oh, sorry.  You said this was

9   received into evidence?

10          MR. FIELDS:  I believe so.

11          COURTROOM DEPUTY:  I don't have 57-I --

12          THE COURT:  One thing --

13          MR. FIELDS:  I apologize.  I apologize.

14          THE COURT:  Hold on.  One thing at a time.  One

15   second, Mr. Fields.  I don't show any of 57 in evidence.

16          MR. FIELDS:  Your Honor, at this point, I would

17   move, pursuant to the parties' stipulation, that

18   Government's Exhibits 57-I --

19          THE COURT:  Just I?

20          MR. FIELDS:  And 57-H be moved into evidence.

21          THE COURT:  All right.  Given the stipulation of

22   the parties, Exhibit -- Government Exhibit 57-H and 57-I

23   are received into evidence and may be published to the

24   jury.

25          (Government's Exhibits 57-H and 57-I received)

Direct - Mullett

1    MR. FIELDS:  Thank you, Your Honor.  I apologize.

2    BY MR. FIELDS:

3    Q.   So now I think we've got that hiccup worked out.

4         Are you looking at 57-I, ma'am?

5    A.   Yes.

6    Q.   All right.  Thank you.  And what is the name listed on

7    this page?

8    A.   Abate, Manuel.

9    Q.   Now we'll go to the last page of this exhibit.  Do you

10   see it says in the column or a row there that says Date

11   FAFSA Received by CPS.  Do you see that?

12   A.   Yes.

13   Q.   What is the date?

14   A.   7-7-12.

15   Q.   So now let's go back again to the first page.  Do you

16   see a row for Address?

17   A.   Yes.

18   Q.   What is the address listed there?

19   A.   1112 Meadow Oaks Drive, Colorado Springs, Colorado.

20   Q.   Is that your address?

21   A.   Yes.

22   Q.   Did you live there in July of 2012?

23   A.   Yes.

24   Q.   Did anyone named Mr. Manuel Abate live with you there

25   in July of 2012?

305
Direct - Mullett

1   A.   No.

2   Q.   In July of 2012, did you receive mail at 1112 Meadow

3   Oaks Drive?

4   A.   Yes.

5   Q.   What kind of mailbox did you have?  Describe it to us.

6   A.   It was one of Oaks Community mailboxes.

7   Q.   Did it have a key or key slot?

8   A.   Yes.

9   Q.   Who had a key to that mailbox?

10  A.   I did.

11  Q.   Anyone else?

12  A.   No.

13  Q.   Now let's look at Government's Exhibit 56-G.  And this

14  is in evidence.

15       Do you see the name up at the top?

16  A.   Yes.

17  Q.   What is the name?

18  A.   Manuel Abate.

19  Q.   Is that the same name as the exhibit we just looked

20  at?

21  A.   Yes.

22  Q.   Now if we go to into the middle of this exhibit.

23       COURTROOM DEPUTY:  One minute, Mr. Fields.  We're

24  having a hard time hearing you, so if you could just speak

25  as loud as you can into the mic.

Direct - Mullett

BY MR. FIELDS:

1  Q.   Now we're looking at the middle there.  This describes

2  a credit card.  Do you see over there on the far right,

3  there's a column marked Detail?  Do you see that?

4  A.   Yes.

5  Q.   Below that it says, Card Shipping Address.  What is

6  that address?

7  A.   1112 Meadow Oaks Drive.

8  Q.   And then a little bit over on the left, there's a

9  column and it says Due Date For U.S. Mail Delivery.  What

10 is the date there?

11 A.   7-26-12.

12 Q.   Did you receive mail at 1112 Meadow Oaks Drive around

13 that date?

14 A.   Yes.

15 Q.   Now let's look at 57-H.  It will be in the binder in

16 front of you, but also on the monitors.

17         If we could zoom in a little bit on the top there.

18         Do you see the rows for Last Name and First Name?

19 A.   Yes.

20 Q.   What is the name there?

21 A.   Dennis Miller.

22 Q.   We're going to follow a pattern here.  Let's go to the

23 last page.

24         And do you see that row, Date FAFSA Received By

307
Direct - Mullett

1    CPS?  What is that date?

2    A.   5-16-12.

3    Q.   All right.  So now we go back to the first page.  And,

4    again, what is the address listed on this exhibit?

5    A.   1112 Meadow Oaks Drive, Colorado Springs, Colorado.

6    Q.   That's your address?

7    A.   Yes.

8    Q.   In May of 2012, did you receive any mail at 1112

9    Meadow Oaks Drive?

10   A.   Yes.

11   Q.   Did someone named Dennis Miller live with you at that

12   address at that time?

13   A.   No.

14   Q.   Now, again, let's look at Government Exhibit 56-F,

15   which is in evidence.

16        So if we look at the top, what is the name?

17   A.   Dennis Miller.

18   Q.   Is that the same name that was on Government's Exhibit

19   57-H?

20   A.   Yes.

21   Q.   Now, let's go back to the middle here.

22        And, again, we've got that column marked Detail.

23   What is the card shipping address listed there?

24   A.   1112 Meadow Oaks Drive, Colorado Springs, Colorado.

25   Q.   Now if we go to the last page of this exhibit, it's

Direct - Mullett

1      page 6, and we blow up that box again.

2              Do you see where it says Ordered From Production

3      Facility?

4      A.    Yes.

5      Q.    What is the date there?

6      A.    6-26-12.

7      Q.    And then do you see where it says Activated?

8      A.    Yes.

9      Q.    What is the date?

10     A.    7-7-12.

11     Q.    So between June 26th, 2012, and July 7th, 2012, were

12     you living at 1112 Meadow Oaks Drive?

13     A.    Yes.

14     Q.    Did you receive mail?

15     A.    Yes.

16     Q.    So in July of 2012, did you get mail from Manuel Abate

17     and Dennis Miller delivered to your address?

18     A.    Yes.

19     Q.    Did someone ask you to have it delivered there?

20     A.    Yes.

21     Q.    Who?

22     A.    My contact was Tramell.

23     Q.    What did you do with it when it arrived?

24     A.    I sent it to an address in Arizona.

25              COURTROOM DEPUTY:  You'll have to speak up,

Direct - Mullett

1   please.

2   BY MR. FIELDS:

3   Q.   Did you get that?  Did the witness -- let's step back

4   for a bit.

5        You said you know Mr. Thomas.  How do you know

6   him?

7   A.   That he was a customer that used to come into the

8   store.

9   Q.   What is the store?

10  A.   Print shop.

11  Q.   Whose print shop?

12  A.   Mine.

13  Q.   Where was it at?

14  A.   Colorado Springs.

15  Q.   Approximately when did he come into your print shop?

16  A.   Between 2008 and 2009.

17  Q.   Did you do printing for his businesses?

18  A.   Yes.

19  Q.   What were his businesses?

20  A.   The one that I remember was the barbershop.

21  Q.   Did he have others?

22  A.   There was another one, but I don't remember the

23  nature.

24  Q.   Do you know whether he made any money through those

25  businesses?

310
Direct - Mullett

1   A.   No.

2   Q.   And the name of your print shop, what was its name at

3   the time?

4   A.   9-1-1 Design and Party.

5   Q.   Did you meet with the Government before your

6   testimony?

7   A.   Yes.

8   Q.   Do you have an agreement with the Government?

9   A.   Yes.

10  Q.   What are your obligations under that agreement?

11  A.   To tell the truth.

12  Q.   And in return for that, what are you getting?

13  A.   Immunity.

14  Q.   So let's look at -- this is Government's Exhibit 84,

15  which is not in evidence.

16       Do you recognize that?

17  A.   Yes.

18  Q.   Is that your agreement with the Government?

19  A.   Yes.

20       MR. FIELDS:  Your Honor, at this time I would move

21  to admit Government's Exhibit 84.

22       THE COURT:  Any objection?

23       MR. SMITH:  May I voir dire?

24       THE COURT:  You may.

25                 VOIR DIRE EXAMINATION

311
Voir Dire - Mullettt

1  BY MR. SMITH:

2  Q.  Ms. Mullett, you have Exhibit 84 before you?

3  A.  Yes.

4  Q.  Is that dated?

5  A.  Yes.

6  Q.  What is the date on it?

7  A.  11-28-2017.

8  Q.  That's today?

9  A.  Yes.

10  Q.  So you've entered into this agreement with the

11  Government today?

12  A.  Yes.

13          MR. SMITH:  Thank you.  Nothing further.

14          I have no objection to the exhibit, Your Honor.

15          THE COURT:  All right.  Given that there's no

16  objection, Exhibit 84 is admitted into evidence and may be

17  published to the jury.

18      (Government's Exhibit 84 received)

19              DIRECT EXAMINATION (Continued)

20  BY MR. FIELDS:

21  Q.  Ms. Mullett, you were just asked when you signed that

22  agreement.  When did you get into Denver?

23  A.  Well, late Sunday night.

24  Q.  And before that, where were you living?

25  A.  In St. Croix, in the Virgin Islands.

312
Direct - Mullett

1    Q.   Is the Virgin Islands in good shape right now?

2    A.   No.

3    Q.   What happened?

4    A.   Two Category 5 hurricanes hit it.

5    Q.   As a result, is it pretty difficult to communicate

6    with people on the Continental United States?

7    A.   Yes.

8    Q.   In 2012, did you have telephone number 719-209-2675?

9    A.   Yes.

10   Q.   Did you talk to Mr. Thomas using that telephone?

11   A.   Yes.

12   Q.   Did you text him using that telephone?

13   A.   Yes.

14   Q.   So if you look in the binder in front of you -- well,

15   actually, we need a different binder.  Binder No. 1,

16   please.

17         Would you go to Government Exhibit No. 15, please.

18   Do you have that in front of you?

19   A.   Yes.

20   Q.   Did you see this exhibit before your testimony today?

21   A.   Yes.

22   Q.   Are these text messages between you and the defendant,

23   Tramell Thomas?

24   A.   Yes.

25         MR. FIELDS:  Your Honor, at this time I would move

313

Direct - Mullett

1      for the admission of Government Exhibit 15.

2             MR. SMITH:  May I have a moment, Your Honor?

3             THE COURT:  You may.

4             Mr. Fields, let me ask you a question and tell me

5      if we need to do this up here.  You have a different

6      witness listed in your exhibit document -- exhibit list

7      through which you were going to get this document.

8             MR. FIELDS:  That is right, Your Honor.  We had to

9      upset the order of our witnesses and I believe this

10     witness, through her personal knowledge, can lay the

11     appropriate foundation and has, which is why we referred

12     its admission.

13            THE COURT:  Okay.

14            MR. SMITH:  Your Honor, the Exhibit 15 that I have

15     is a six-page exhibit and my objection would be relevancy

16     as to a majority of it.  There are a series of texts that

17     span from June 4th to July 17th of 2012.

18            THE COURT:  Let me ask Ms. Mullett:  Do you

19     recognize these text messages?

20            THE WITNESS:  Yes.

21            THE COURT:  All right.  And are those text

22     messages between yourself and the defendant?

23            THE WITNESS:  Yes.

24            THE COURT:  All right.  The objection's overruled.

25     15 is admitted into evidence and may be published to the

314
                         Direct - Mullett

 1    jury.

 2         (Government's Exhibit 15 received)

 3              MR. FIELDS:  Thank you, Your Honor.

 4    BY MR. FIELDS:

 5    Q.   So if we could pull up page 2 of that.  There we go.

 6              All right.  You also have it in front of you in

 7    the binder.

 8              Now zoom in on lines 46 through 48.

 9    A.   Okay.

10    Q.   Now, just to orient you here, if you see the column

11    over on the left, it's column A, you'll see a 1 or 2 in

12    that column.  Do you see that?

13    A.   Yes.

14    Q.   If there's a 1 in column A, that means it's a text

15    from you.  If there's a 2, it's a text from Mr. --

16              MR. SMITH:  I'm going to object.  If these are her

17    text messages, she should be the witness testifying, not

18    the prosecutor.

19              THE COURT:  That's true.  I mean, she said that it

20    was her and Mr. -- and the defendant.  Let's get her to

21    identify who's who.

22              MR. FIELDS:  Sure, Your Honor.  Sorry about

23    that.

24              THE COURT:  All right.

25    BY MR. FIELDS:

315

Direct - Mullett

1    Q.   So lines 46 and 47, who sent those texts?

2    A.   I did.

3    Q.   And line 48, who sent that text?

4    A.   Tramell.

5    Q.   Now, if you'll look at column A, you see a 1 in the

6    column for the text that you sent?

7    A.   Yes.

8    Q.   And in the text that Mr. Thomas sent, what do you see

9    in that column?

10   A.   A "2."

11   Q.   All right.  So in line 46, what does that read?

12   Please read that into the record for us.

13   A.   "For Dennis Miller, what do u want me to do with the

14   letter I have?"

15   Q.   And line 47.

16   A.   "U also have other" -- or, wait, "U also have mail."

17   Q.   So Dennis Miller, is that the same person referenced

18   in the documents we looked at earlier in your testimony?

19   A.   Yes.

20   Q.   What was Thomas' response?

21   A.   I was asked to send mail to an address in Arizona.

22   Q.   Well, for purposes of this, could you just read line

23   48, the first part of it there.

24   A.   "Yea, I'll jus have u send it altogether.  I'm gonna

25   send u this lady number.  Three restaurant owners want

Direct - Mullett

1    orders."

2    Q.   So the first part of that, "I'm going to send it to

3    you altogether," what is it that you're -- that was

4    referenced there?

5    A.   Mail.

6    Q.   And then the other part of that, "I'm going to send

7    you this lady number, three restaurant owners want orders,"

8    is that relating to a different topic of conversation?

9    A.   Yes.

10   Q.   So now let's zoom out of this.  And let's look at

11   line -- this goes between pages 2 and 3, so let's look at

12   line -- oh, there we go -- let's see if we could zoom in on

13   lines 56 and 57.

14        What does line 56 say?

15   A.   "It is here."

16   Q.   Is that -- who's that text from?

17   A.   Me.

18   Q.   What was the response in line 57?

19        "Cool.  U can send all the mail to me at 975 East

20   Riggs Road," "12-7-" -- I mean "174, Chandler, Az, 85249.

21   Thanku babe."

22   Q.   All right.  So now let's look at Exhibit 64, which is

23   not yet in evidence.  It will be in -- we're switching back

24   and forth between the binders.  It will be in that other

25   binder there, but we also can pull it up on the screen just

Direct - Mullett

1   for you, Ms. Mullett.

2            MR. FIELDS:  Your Honor, Government Exhibit 64 is

3   not in evidence, but the parties have stipulated to its

4   authenticity and to its status as a business record, and at

5   this time I would move its admission into evidence.

6            MR. SMITH:  Your Honor, may counsel approach?

7            THE COURT:  All right.  What exhibit are we

8   talking about?

9            MR. FIELDS:  64.

10           THE COURT:  Okay.  Yeah, let's do that.  Let me

11  pull the binder.

12         (Sidebar conference held)

13           MR. SMITH:  Do you mind if I place my book here?

14           THE COURT:  No.

15           MR. SMITH:  Your Honor, the defense have indicated

16  that stipulation to Exhibit 64 based on our understanding

17  of what the Government's case would be and witnesses they

18  would be calling.

19           THE COURT:  Right.

20           MR. SMITH:  At this point in time, I would ask the

21  Court to withdraw the stipulation because, as I understand

22  it, in all likelihood Ms. Carr's not going to testify.

23           THE COURT:  Well, I can't force you to stipulate,

24  so if you're withdrawing the stipulation, that's how we

25  will have to deal with it.  So -- and then you're asserting

318
                              Direct - Mullett

1      an objection?

2                MR. SMITH:  Yes.

3                THE COURT:  Okay.  The objection being --

4                MR. SMITH:  Well, this witness can't identify the

5      document.  She can't lay any foundation.

6                THE COURT:  Your response.

7                MR. FIELDS:  Your Honor, we provided Rule 902(11)

8      certificates to the defense several weeks ago.  There's no

9      doubt as to the authenticity of this document or to its

10     status as a business record.  That custody -- that

11     certificate -- the 902(11) certificate describes that under

12     oath -- or under, you know, threat of perjury because it's

13     a declaration, that this is a document --

14               THE COURT:  From whom?

15               MR. FIELDS:  From the UPS store where it was

16     received.  That these documents are kept in the ordinary

17     course of this business, that the store relies on them to

18     conduct its business.  And the face of the document

19     actually bears it out.  This is the application that you

20     receive to get a post office box.  It's --

21               THE COURT:  I don't see any -- I don't see the 902

22     affidavit.

23               MR. FIELDS:  We did not include it in the exhibit

24     binder because of the parties' stipulation, but I can

25     provide it to the Court.  And it has been provided to

Direct - Mullett

1    defense counsel.

2           So under Rules 902(11) and the business records

3    exception to the hearsay rule, I believe this comes in.

4           THE COURT:  I appreciate the bind that you're in

5    given what Ms. Carr has done to you today, or appears to

6    have done to you today, but I have to agree with counsel

7    that this witness is incompetent to enter -- or lay the

8    foundation for the admission of a document that would

9    otherwise be clear hearsay.  So I'm sustaining the

10   objection.

11          MR. FIELDS:  Your Honor, may I be heard just on

12   that?

13          THE COURT:  You can make your record, I'm not

14   changing my objection.

15          MR. FIELDS:  I would --

16          THE COURT:  Lower your voice.

17          MR. FIELDS:  I would concede that this record --

18   this witness cannot lay the foundation, but the whole

19   purpose of 902(11) is to have declarations from a custodian

20   of records.

21          THE COURT:  Right.

22          MR. FIELDS:  There's no way we would be able to

23   get a custodian of records here, and the Rules of Evidence

24   are designed to prevent that, to prevent unnecessary delay

25   and difficulty in laying very basic principles of

320

Direct - Mullett

1    evidentiary law, which is that this is kept in the regular

2    course of business.

3            So for those reasons, I think the 902(11)

4    certificate by itself is enough and we don't have to rely

5    on this witness to lay the foundation.

6            THE COURT:  What is her relationship to this

7    exhibit?

8            MR. FIELDS:  So she has no relationship to it.

9    But --

10           THE COURT:  So what --

11           MR. FIELDS:  Because it's a business record --

12           THE COURT:  So, I mean --

13           MR. FIELDS:  Well --

14           THE COURT:  The documents can be business records,

15   but how do you connect it up with this witness?

16           MR. FIELDS:  The text message that she just

17   referenced has this address in it.  It's the address to

18   which she sent all of that mail, so that's its relevance.

19   It is very relevant and probative evidence that Mr. Thomas,

20   who's on here, received the mail at that address.

21           THE COURT:  All right.  Mr. Smith.

22           MR. SMITH:  This witness still can't lay the

23   foundation, Your Honor.  And --

24           THE COURT:  What about counsel's point that the

25   902 declarations is in lieu of that foundation testimony?

Direct - Mullett

1        MR. SMITH:  I -- we would not have stipulated to

2    the declarations had we known the status of the

3    Government's case, Your Honor.

4        THE COURT:  Well, so we're unravelling -- we're

5    going back in time that I can't -- I can't force a party to

6    stipulate to anything.  The defendant is withdrawing its

7    stipulation to the declarations and to the -- and to this

8    underlying -- and to this exhibit.

9        MR. FIELDS:  May I be heard on that, Your Honor?

10       THE COURT:  Yes.

11       MR. FIELDS:  The parties don't have to stipulate

12   to a 902(11) certificate and if they did, 902(11) wouldn't

13   be a very good rule at all.  The whole purpose of 902(11)

14   is to expedite the presentation of trial testimony by

15   really eliminating boring testimony from custodians of

16   records, so that is a self-authenticating document.  It is

17   a declaration signed by the witness who would come here to

18   testify, and you, under Rule 104, can conclude by a

19   preponderance of the evidence that it meets the business

20   records exception to the hearsay rule based on that

21   certificate alone.  And that's what the Rules of Evidence

22   allow.  And then it's admitted into evidence and the jury

23   gets to consider whether -- what they want to do with it.

24       THE COURT:  Okay.  Well, to some -- go ahead.

25       MR. SMITH:  My problem with that is, Your Honor,

Direct - Mullett

1    to have the witness -- the business records witness come

2    into court, I could have gone through this document with

3    them.   There's information in this document related to

4    Carr.   My client's name happens to be on the document.

5            I would have wanted to go in and identify how they

6    got this document, who presented it.   What -- what relation

7    does page 2 of Exhibit 64 have to page 1, that type of

8    thing.

9            And now that Carr's not -- evidently not going to

10   be here, I'm denied that opportunity.

11           MR. FIELDS:  Your Honor, may I be heard on that?

12           THE COURT:  Yes.

13           MR. FIELDS:  In terms of being able to confront

14   hearsay witnesses, this is a well-established exception to

15   the hearsay rule and there are cases that there's no right

16   to confront a business records custodian.  That's the whole

17   purpose of the 902(11) certificates, which were provided to

18   defense counsel months ago.

19           So even though Heather Carr has decided not to

20   come in and testify, Heather Carr might have been able to

21   answer these questions, but defense counsel could have told

22   us months ago that they still wanted the custodian of

23   records here.

24           We are entitled to rely on those 902(11)

25   certificates and we are entitled under the Rules of

                            Direct - Mullett

1    Evidence to have them come in because they're relevant,

2    extremely probative evidence of the defendant's involvement

3    in this scheme.

4              THE COURT:  Well, to a great extent all of that's

5    academic because I don't have a 902 declarations as an

6    exhibit or in front of me --

7              MS. PALUCH:  Yes, we can provide that to the

8    Court.

9              THE COURT:  Well, for right now, because I don't

10   have it, I'm sustaining the objection.  You have to get

11   that declaration here, you have to get it labeled, and you

12   have to lay the foundation for its admission.

13             MR. FIELDS:  Can we -- I'll have our agents run

14   and get it right now.  May I have --

15             THE COURT:  Sorry, what?

16             MR. FIELDS:  I'll have one of our agents go and

17   get that certificate right now.  May I have just a minute

18   to talk to my agent?

19             THE COURT:  Okay.  Let's -- okay.  Are there -- is

20   this going to come up with other documents with other

21   witnesses?  Are there other 902 declarations that you need

22   to get?

23             MS. PALUCH:  I don't believe that there are any.

24   Defense counsel would be able to answer that better.  I

25   think the other 902(11) certifications went to the

324

Direct - Mullett

1    underlying, you know, Comcast and internet service

2    providers.

3          MR. FIELDS:  The summary charts.

4          MS. PALUCH:  The summary charts, the school

5    records.

6          MR. SMITH:  I'm not trying to avoid counsel's

7    comments, Your Honor, and I'm not trying to go back on

8    statements that were made earlier, but when Mr. Goodreid

9    and I are told this morning at 8:30 that Ms. Carr is not

10   going to testify, that changes the complexion of this case

11   and our approach to the case.  And I'm not prepared at this

12   point in time to say that other 902 declarations or

13   stipulations are still appropriate.

14         THE COURT:  Are you hearing this?

15         MR. FIELDS:  Yes.

16         MR. SMITH:  There are -- as Ms. Paluch said

17   yesterday, there are thousands of documents in this case.

18         THE COURT:  And the only reason you stipulated to

19   accept the 902 verification in lieu of the foundational

20   testimony is because you anticipated Ms. Carr was going to

21   testify?

22         MR. SMITH:  In relation to this Exhibit 64,

23   absolutely.

24         THE COURT:  I'm trying to think ahead so we don't

25   go through this five times.

Direct - Mullett

1          MR. SMITH:  Right.

2          THE COURT:  With respect to the other

3     declarations, are you telling me as an officer of the court

4     that the fact that you only entered into -- you only

5     stipulated to the use of the court -- of those 902

6     verification declarations in lieu of foundational testimony

7     because you anticipated that Ms. Carr was testifying?

8          MR. SMITH:  I'm not saying that to every one, Your

9     Honor.

10         THE COURT:  Okay.  But there are some.

11         MR. SMITH:  But I am saying I believe there are

12    others, and I will have to go back and look at this and

13    re-assess our position as to individual exhibits.

14         THE COURT:  Okay.  Well, to answer your question,

15    yes, you can have a minute with your assistants, get the

16    declarations.  And when they come back, we can take -- if

17    it's time for the morning break, we'll take a morning

18    break, or we can take a very quick recess to allow you to

19    label those as an exhibit and get that in front of me.  And

20    then at least insofar as this 64 is concerned and this

21    witness, we can proceed in that fashion.

22         What I'm also suggesting is that it sounds like

23    counsel's potentially re-assessing the stipulation to those

24    declarations for other documents, so I think you need to

25    get an understanding between yourselves whether he's

Direct - Mullett

1    withdrawing those stipulations, and which you're going to

2    have to bring those declarations in.

3              It might be a good idea for her to bring all the

4    declarations, have them here in the courtroom so you can --

5    so -- but for now --

6              MR. FIELDS:  Thank you, Your Honor.

7              THE COURT:  The objection's sustained subject to a

8    review of the declarations.

9              MR. FIELDS:  Thank you, Your Honor.

10             THE COURT:  All right.

11        (End of discussion at sidebar)

12             THE COURT:  All right.  The objection to Exhibit

13   15 is sustained without prejudice to the Government to move

14   again for its readmission or -- or for its admission based

15   on the discussion we had at sidebar.

16             MR. FIELDS:  Thank you very much, Your Honor.

17             MR. SMITH:  Excuse me, counsel.  I believe it's

18   Exhibit 64.  I might have misunderstood the Court.  I

19   thought the Court said 15.

20             MS. PALUCH:  It is 64.  You are correct, counsel,

21   it is 64.

22             THE COURT:  You're right.  Exhibit 15 came --

23   that's right.  Exhibit 64 is the one we were having the

24   argument about at the sidebar.  Okay.  So that objection is

25   sustained without prejudice to the Government renewing its

327
Direct - Mullett

1    offer of 64 into evidence subject to the conditions we

2    discussed at the sidebar.

3              You may proceed, Mr. Fields.

4              MR. FIELDS:  Thank you, Your Honor.

5    BY MR. FIELDS:

6    Q.   So we were talking about Government Exhibit 50.  Let's

7    go back to that.  In particular, we were looking at lines

8    56 through 57, and they straddle pages 2 and 3?

9              COURTROOM DEPUTY:  Did you reference 50?

10             MR. FIELDS:  15.  I'm sorry, that's one of

11   those --

12             COURTROOM DEPUTY:  15.  Okay.

13   BY MR. FIELDS:

14   Q.   All right.  Line 57, who sent that text?

15   A.   Tramell.

16   Q.   Please read that for us.

17   A.   "Cool.  U can send all the mail to me at 975 East

18   Riggs Rd. 12-174, Chandler, AZ, 85249.  Thank u babe."

19   Q.   You testified earlier that you sent mail to Mr. Thomas

20   in Arizona.  What address did you send it to?

21   A.   To the 975 East Riggs Road.

22   Q.   In Arizona?

23   A.   Yes.

24   Q.   Now let's look at lines 85 through 86.  They're on

25   page 3.

Direct - Mullett

1          I should note for the record they travel pages 3

2     and 4.

3          So line 85, please read that for us.

4     A.    "Im cool.  U get a chance to send tht out?"

5     Q.    Who sent that text?

6     A.    Tramell.

7     Q.    And the response from you was what?

8     A.    It -- "it went out today."

9     Q.    What is "it"?

10    A.    Mail.

11    Q.    And now if we go -- this is completely on page 105 --

12    or page -- page 4, lines 105 through 112.

13          Line 105, who is that a text from?

14    A.    I sent it.

15    Q.    To who?

16    A.    Tramell.

17    Q.    So the first text is from you, line 105, and line 106

18    is from Tramell?

19    A.    Yes.

20    Q.    And then they alternate, you, Tramell, you, Tramell;

21    is that right?

22    A.    Yes.

23    Q.    So starting with line 105, and going to line 112,

24    please read those lines into the record.

25    A.    "U got another letter."

329

Direct - Mullett

1          "Ok babe."

2              "U want me to send or wait."

3              "It can wait till I get there."

4              "I cant get another student loan yet is there"

5     another "way around that?"

6              "U cant get one?"

7              "Ok I figured there is more coming."

8              "I'll call u later."

9     Q.   In line 108, there's a reference to "it can wait till

10    I get there."  Did you meet with Mr. Thomas in person?

11    A.   I do not remember meeting with him in person.

12    Q.   Okay.  And now if we go to page 5.  Lines 135 to 136.

13              Again, to orient us, line 135, who sent that text?

14    A.   I did.

15    Q.   What does it say?

16    A.   "Received another letter."

17    Q.   And line 136, who sent that?

18    A.   Tramell.

19    Q.   And what does it say?

20    A.   "Cool."

21    Q.   "Received another letter."  What type of letter?

22    A.   A letter from the college.

23    Q.   If you look at the next page, lines 150 through 151.

24              Again, to orient us, who sent the text in line

25    150?

330
Direct - Mullett

1    A.    I did.  I did.

2    Q.    What does it say?

3    A.    You "got another letter."

4    Q.    And what was the response in line 151?

5    A.    "Cool, thx.  Do you know a good cpa?"

6    Q.    Who sent that text?

7    A.    Tramell.

8    Q.    "Got another letter."  What kind of letter?

9    A.    From the school.

10   Q.    All right.  Let's put Government Exhibit 15 away.  Now

11   let's go to Government Exhibit 14.  It's not in evidence,

12   so, yeah.

13         Do you have it in the binder?

14   A.    Okay.

15   Q.    Did you see this before your testimony today?

16   A.    I'm sorry, repeat.

17   Q.    Did you see this exhibit before your testimony today?

18   A.    Yes.

19   Q.    Are these also text messages between you and the

20   defendant, Tramell Thomas, but from different phones?

21   A.    Yes.

22         MR. FIELDS:  Your Honor, at this time I'd move for

23   the admission of Government's Exhibit 14.

24         THE COURT:  Any objection?

25         MR. SMITH:  May I voir dire?

Voir Dire - Mullett

1    THE COURT:  You may.

2                    VOIR DIRE EXAMINATION

3    BY MR. SMITH:

4    Q.   Ms. Mullett, counsel asked you if you had seen Exhibit

5    14 before your testimony.  Did you see that last night in

6    your meeting with the prosecutors?

7    A.   I did see it last night, but I also believe you showed

8    me the texts.

9    Q.   Okay.  And that was also yesterday.

10   A.   Yes.

11   Q.   Okay.  These texts in Exhibit 14, they're all sent in

12   calendar year 2012, correct?

13   A.   Yes.

14   Q.   And do I understand you're saying that you actually

15   remember the content of these individual texts?

16   A.   I only remembered because it's right -- it's printed

17   in front of me.

18   Q.   You have no independent memory of them, do you?

19   A.   No.

20        MR. SMITH:  Thank you.  I would object,

21   insufficient foundation, Your Honor.

22        THE COURT:  That objection's overruled.  Exhibit

23   14 is admitted into evidence and may be published to the

24   jury.

25        (Government's Exhibit 14 received)

Direct - Mullett

1          MR. FIELDS:  Thank you, Your Honor.

2              DIRECT EXAMINATION (Continued)

3      BY MR. FIELDS:

4      Q.   You were asked about when you first saw this exhibit,

5      Ms. Mullett.  Did you have a meeting with the defense

6      counsel yesterday?

7      A.   Yes.

8      Q.   When was that meeting?

9      A.   During lunch.

10     Q.   And did you talk to defense counsel about this

11     exhibit?

12     A.   Yes.  He showed me several different text messages

13     conversations.

14     Q.   Okay.  So now let's look at lines 4 and 5, Government

15     Exhibit 14.  And, actually, sorry, 4 through 6.

16             So, again, just to orient us here, who sent the

17     text messages in lines 4 and 5?

18     A.   I did.

19     Q.   Who sent the text message in line 6?

20     A.   Tramell.

21     Q.   And, again, in -- for this one, it's column B, so

22     it's -- this column right here.  What do you see in the

23     column next to the text messages that you sent?

24     A.   What do you mean?

25     Q.   What number is there?

333

Direct - Mullett

1     A.    Oh, 1.

2     Q.    And what number is there?

3     A.    2.

4     Q.    So 1 means you sent it, 2 means Thomas sent it?

5     A.    Correct.

6     Q.    Could you please read for us the text messages that

7     are in lines 4 through 6.

8     A.    Tramell it's Kim.  I was calling to see if you were

9     coming into town?  Also I got another letter for you.  By

10    chance did you get that deposit?  The only reason why I'm

11    asking is I'm going out of town first thing in the morning

12    and I could really use it."

13          "I didnt get it but Ill call u at 9 tonight cuz I

14    do hv something for u."

15    Q.    And line 4, you say, "Also I got another letter for

16    you."  And line 6, the response is "I didn't get it."  What

17    was the letter?

18    A.    Another letter from the school.

19    Q.    All right.  We can put that exhibit away.

20          Your testimony has been that Mr. Thomas asked you

21    to get mail for him.  What was the deal that Thomas

22    proposed to you regarding this mail?

23    A.    Just that if I receive mail and it worked out, I could

24    get paid.

25    Q.    When you first agreed to the deal, did you know what

Direct - Mullett

1    kind of mail would be sent to your address?

2    A.    No, not at the time.

3    Q.    When the mail arrived, again, what did it look like?

4    A.    It was a letter from the school.

5    Q.    At that point, what did you think the mail was?

6    A.    What is that -- not an offer letter, a welcome letter.

7    Q.    Did you suspect -- did you have any inclination one

8    way or another as to whether some of these envelopes

9    contained debit cards?

10   A.    Yes, there was.

11   Q.    What makes you think that?

12   A.    They're -- it was -- there was a card in the envelope.

13   Q.    So when you got this mail and it was Pikes Peak's

14   school mail and there was a debit card in it, did you talk

15   to Thomas about what to do with it?

16   A.    Yes.

17   Q.    What did he ask you to do with it?

18   A.    To mail them.

19   Q.    So your testimony is that Thomas arranged to have mail

20   sent to you, and then when the mail arrived, to send it to

21   him.  Why didn't he just have it sent directly to him?

22   A.    I have --

23              MR. SMITH:   Objection, Your Honor.  Foundation.

24              THE COURT:   Sustained.

25   BY MR. FIELDS:

Direct - Mullett

1    Q.   Did you have a discussion with Mr. Thomas about

2    details as to why mail was being sent to your address?

3    A.   No.  There were no details.

4    Q.   Well, did you have a discussion?

5    A.   Yes, I was asked to receive mail.

6    Q.   Describe that discussion to us.  What did Thomas tell

7    you about the mail?

8    A.   Just that I would receive letters in the mail and that

9    whatever I received, to send it to him.

10   Q.   Would he describe details about why the mail was

11   coming to you?

12   A.   No.

13   Q.   Why not?

14   A.   Because they didn't have --

15        MR. SMITH:  Objection, Your Honor.  Again,

16   foundation.

17        THE COURT:  Oh, I -- that's overruled.  You may --

18   you may answer, ma'am.  Please keep your voice up so we can

19   hear you.

20        THE WITNESS:  He didn't have all the details.

21   BY MR. FIELDS:

22   Q.   Did he tell you why he wouldn't tell you the details?

23   A.   He didn't have all the details.  He just asked if I

24   receive the letters and if it worked out, I would get paid.

25   Q.   Did he say anything else?

336

Direct - Mullett

1   A.   That he didn't want to get me into any kind of
2   trouble.
3   Q.   After Thomas mentioned the idea of trouble, did you
4   still send him the mail?
5   A.   I did.
6   Q.   Was it all in one big package or did you send it to
7   him individually?
8   A.   No, it was one package.
9   Q.   After you sent down that one package, did you get
10  additional mail addressed to other people?
11  A.   Yes.
12  Q.   Did you send that mail to Thomas?
13  A.   No.
14  Q.   What did you do with it?
15  A.   I started sending letters back.
16  Q.   Why?
17  A.   Because I was nervous that I was going to get in
18  trouble, so I sent them back.
19  Q.   Did you know that you were doing something wrong?
20  A.   Yes.
21  Q.   Why did you do it?
22  A.   Because there was a lot going on personally at the
23  time and just was trying to earn extra money.
24          MR. FIELDS:  I have no further questions, Your
25  Honor.

337
Cross - Mullett

Case No. 1:16-cr-00054-WJM, Document 525-6, Filed 02/09/19, Page 47 of 237 pg 297 of

 1          THE COURT:  All right.  Cross-examination.

 2                      CROSS-EXAMINATION

 3   BY MR. SMITH:

 4   Q.   Ms. Mullett, you just said there was a lot going on in

 5   your life at the time and you needed some extra money,

 6   correct?

 7   A.   Correct.

 8   Q.   You were going through some marital difficulties?

 9   A.   Yes.

10   Q.   Getting a divorce?

11   A.   Yes.

12   Q.   You had some health issues?

13   A.   Yes.

14   Q.   And when this discussion started, you asked Mr. Thomas

15   if he could help you financially, if he knew of any way you

16   could make some money, correct?

17   A.   Correct.

18   Q.   And he said he'd try?

19   A.   Yes.

20   Q.   And you talked about this mail.

21   A.   Correct.

22   Q.   You never were paid for doing any of this, were you,

23   by Mr. Thomas?

24   A.   No.

25   Q.   You weren't paid by anybody, were you?

338
Cross - Mullett

1    A.    No.

2    Q.    Do you still have Exhibit 15?

3    A.    Yes.

4    Q.    You went over several lines in this exhibit.  I'd like

5    to direct your attention to page 2 of the exhibit.  You

6    talked about this text exchange on lines 46 through 49.  Do

7    you remember that?

8    A.    Yes.

9    Q.    On line 46, this is your text going to Mr. Thomas?

10   A.    Yes.

11   Q.    "For Dennis Miller, what do you want me to do with

12   this letter?"  Correct?

13   A.    Correct.

14   Q.    And then you also say, "You also have mail."  Correct?

15   A.    Correct.

16   Q.    So there was more mail there other than this Dennis

17   Miller letter, correct?

18   A.    Correct.

19   Q.    And you sent all of the mail down to Arizona.

20   A.    Correct.

21   Q.    Mr. Thomas wasn't an actual employee of your printing

22   company, was he?

23   A.    No.

24   Q.    But he did a lot of work with you, didn't he?

25   A.    Correct.

339
Cross - Mullett

1   Q.   He was, for lack of a better name, maybe kind of a
2   sales representative for you?
3   A.   Yes.
4   Q.   He would go out and find printing jobs?
5   A.   Yes.
6   Q.   Bring in to you?
7   A.   Yes.
8   Q.   You would print whatever for the client, the client
9   would pay you?
10  A.   Yes.
11  Q.   And then you would pay Mr. Thomas whatever the sales
12  commission agreement was, correct?
13  A.   Yes.
14  Q.   And this went on for several years, didn't it?
15  A.   Yes.
16  Q.   It was hiding from me.
17       The mail that came to Mr. Thomas at your house,
18  did you open it?
19  A.   No.
20  Q.   So you never saw any of the contents?
21  A.   No.
22  Q.   You believed there was some kind of card in one of the
23  envelopes.
24  A.   Yes.
25  Q.   Do you have any idea what the card was?

340

Cross - Mullett

1    A.    No.

2    Q.    During the 2012 time frame, your printing company was

3    actually operating out of your residence, correct?

4    A.    Correct.

5    Q.    And that's where -- when Mr. Thomas would meet with

6    you in Colorado Springs, that's where you'd meet, correct?

7    A.    At that time.

8    Q.    Okay.  And that's this address, 1112 Meadow Oak Drive?

9    A.    Correct.

10   Q.    So that's how Mr. Thomas knew your address.

11   A.    No, he knew me from when I was in a retail space.

12   Q.    I understand that, but knowing your home address, he'd

13   actually been there because that's where you were doing

14   business --

15   A.    Yes.

16   Q.    -- during this time period, correct?

17   A.    Yes.

18         MR. SMITH:  Your Honor, may counsel approach?

19         THE COURT:  All right.

20       (Sidebar conference at bench)

21         MR. SMITH:  Your Honor, this morning -- this

22   morning I received several documents from the Government.

23         THE COURT:  Okay.

24         MR. SMITH:  One is a -- it appears to be a

25   criminal record of this witness.

                        Cross - Mullett

1            THE COURT:  Okay.

2            MR. SMITH:  And if I'm reading it correctly, it

3    appears that the witness has a felony tax conviction.

4            MR. FIELDS:  She was arrested but not convicted.

5            MR. SMITH:  The form says disposition:  Guilty.  I

6    don't want to go into this, but this is the only record the

7    Government's provided me.

8            MR. FIELDS:  This is the only record we have, Your

9    Honor.  We ran her criminal history immediately, and it

10   does say guilty -- that she pleaded guilty to a tax charge.

11           THE COURT:  A felony charge?

12           MR. SMITH:  Yes.

13           MR. FIELDS:  I would also represent for the record

14   that she told us that that charge was dismissed.  That's

15   what I believe her testimony would be.

16           THE COURT:  Charge 1 was dismissed; Charge 2,

17   guilty.  Right?

18           MR. FIELDS:  Yeah, that is the way I'm reading

19   it.

20           THE COURT:  Okay.  So what court is this?  Oh,

21   first of all, what's the date of the --

22           MR. SMITH:  It's in 2013, I believe, Your Honor.

23   '11 --

24           THE COURT:  2011.  So six years ago.  So, okay, so

25   it's dismissed.  What's your issue about that?

Cross - Mullett

1          MR. SMITH:  Well, I intend to ask the witness

2    about it because the record indicates to me that she has a

3    felony tax conviction for a false statement on a tax

4    return.  I normally wouldn't rely on this type of document,

5    but just having received it this morning, I . . .

6          THE COURT:  So you want to -- you want to preclear

7    an impeachment of her --

8          MR. SMITH:  I just want to --

9          THE COURT:  -- impeachment of her by a felony

10   conviction.

11         What's the Government's position?

12         MR. FIELDS:  We have no objection to that, Your

13   Honor.

14         THE COURT:  Okay.  Is this -- is that all you're

15   going to do in terms of --

16         MR. SMITH:  Yes, uhm-hum.

17         THE COURT:  -- impeachment by a prior conviction?

18   Okay.  All right.  So the Government has no objection.

19         MS. PALUCH:  And, Your Honor, while we're here.

20   This is our -- these are the UPS declarations by the

21   custodian for UPS.

22         THE COURT:  Okay.  Do we have copies for defense

23   counsel?

24         MS. PALUCH:  Yes.

25         THE COURT:  These are all copies of the same --

Case No. 16-cr-00054-WJM   Document 535-60 filed 12/02/19   USDC Colorado   pg 303 of
901
Case 1:16-cr-00054-WJM   Document 601   Filed 08/09/19   Page 83 of 237

343
                              Cross - Mullett

1              MR. FIELDS:  Yup.

2              MS. PALUCH:  Yes.

3              THE COURT:  So is this for the official --

4              MS. PALUCH:  That would be for the original.

5              MR. FIELDS:  You can keep that one.

6              THE COURT:  Okay.  Let's see.  With respect to

7    Exhibit 64, this is the 902 declarations the Government is

8    offering to function as the foundation for the authenticity

9    of the document?

10             MR. FIELDS:  Yes.

11             THE COURT:  Okay.  Does the defense disagree that

12   this complies with 902?

13             MR. SMITH:  I don't disagree that it may comply

14   with 902, Your Honor, but in the current status of this

15   case with the specter of Ms. Carr not testifying, I

16   don't -- I don't have a witness now that I can go into

17   Exhibit 64 about and identify what's in there and who

18   provided the information.  I'm effectively prevented from

19   cross-examining the document.

20             I understand this may comply with the rule, but

21   because of the situation we're in in trial, had I known

22   before trial that Ms. Carr was not going to be a witness, I

23   would have subpoenaed Pratt or someone from UPS to look

24   into what's behind this -- these documents.

25             THE COURT:  Well, but --

Cross - Mullett

1    MR. SMITH:  So I object to its admission under the

2    current status of the trial.

3    THE COURT:  I understand.  What about counsel's

4    contention that the whole purpose of the rule is if you

5    have a declaration that complies with the rule, that it

6    eliminates the -- this whole process of examination,

7    cross-examination of foundational witnesses for the purpose

8    of admission of a document?

9    MR. SMITH:  I don't --

10   THE COURT:  In other words, that -- if I accept

11   this document as complying with Rule 902, that that's the

12   end of the discussion.

13   MR. SMITH:  I don't think it is the end of the

14   discussion because what the rule talks about is it's

15   satisfying an exception to the hearsay rule as the record

16   and the documents being -- having credibility and

17   believability.

18   The status of this trial right now is I can't go

19   into Exhibit 64 and -- and identify and question the source

20   of the material and the veracity of who's there and who did

21   it.  The implication is being left at this point in time

22   that this post office box, 975 East Riggs Road, Suite 12,

23   that it's Mr. Thomas', and it isn't.

24   But I'm effectively prevented from putting on the

25   evidence to establish that.

Cross - Mullett

1        THE COURT:  Mr. Fields.

2        MR. FIELDS:  Your Honor, there's no right to

3    cross-examine a document.  Let's say it's a bank record.

4    The bank record said it was Mr. Thomas' account.  You

5    wouldn't have a right to cross-examine from the bank about

6    what the record says.  The record speaks for itself.

7        The whole purpose of the business records

8    exception to the hearsay rule is that these are records

9    that were relied upon by businesses and, therefore, there's

10   an independent reason to trust their veracity.  So the

11   document, itself, comes in.

12       We're not asking for testimony about the document,

13   just the document, itself.  And this particular witness,

14   she's not really going to be testifying about the document

15   because she hasn't seen it, but it does link up that text

16   message that we referenced earlier.  So all I want to do is

17   show the jury the document, which is a business record, to

18   show that address.  That's going to be the limitation.

19       THE COURT:  Okay.  So the connection is going to

20   be that we have in Exhibit 15 the defendant texting this

21   witness a message saying "Send those documents to Riggs

22   Road in Chandler."

23       MR. FIELDS:  Correct.

24       THE COURT:  Okay.  All right.  So this is what

25   we're going to do:  With respect to 64, I'm going to allow

346
Redirect - Mullett

1    you, on redirect, to renew your request to admit it into

2    evidence and base -- and base it on this declaration.  And

3    if I allow it in, then I'm going to give you recross on

4    this document -- on 64, if it comes in.  Because obviously

5    it's not going to come in until redirect, so I'll give you

6    a recross.

7            MR. SMITH:  Fine, Your Honor.  If the witness

8    doesn't know anything about the document, so the cross

9    is --

10            THE COURT:  I understand.  So -- and we're all in

11    agreement that counsel can impeach with the criminal

12    history.

13            MR. FIELDS:  Yes, Your Honor.

14            THE COURT:  All right.  Okay.  Thank you.

15        (End of discussion at sidebar)

16            MR. SMITH:  Excuse me, Your Honor.

17            THE COURT:  All right.

18            MR. SMITH:  Thank you, Ms. Mullett.

19    I have no further questions, Your Honor.

20            THE COURT:  All right.  Redirect.

21            MR. FIELDS:  Thank you, Your Honor.  Just give me

22    a second to set up the Elmo.

23                    REDIRECT EXAMINATION

24    BY MR. FIELDS:

25    Q.   All right, Ms. Mullett, could you look at Government's

347
Redirect - Mullett

1    Exhibit 15 again.

2    A.    Okay.

3    Q.    What was the address -- well, first of all, let me

4    actually get you to the specific line.  It's several pages.

5    Let's look again --

6              THE COURT:  It's not in front of the jury yet.

7              MR. FIELDS:  Okay.  Thank you.

8              THE COURT:  So remember, Mr. Fields, if it's not

9    on that back screen, that's your -- that's what you know

10   the jury's looking at.

11             MR. FIELDS:  Oh, thank you very much, Your Honor.

12   BY MR. FIELDS:

13   Q.    All right.  So could we try to put Government's

14   Exhibit 15 up to the jury.  All right.  And if we go to

15   lines 56 through 57.  I believe those travel pages 2 and 3.

16             Do you remember talking about the -- those text

17   messages?

18   A.    Yes.

19   Q.    What was the address in line 57?

20   A.    975 East Riggs Road, 12-174, Chandler, Arizona 85249.

21   Q.    And I want to show you an exhibit, that's not in

22   evidence, on the Elmo.

23             Thank you very much.

24             Could you just read the -- well, just -- have you

25   ever seen this document before?

                          Redirect - Mullett

1    A.    No.

2              MR. FIELDS:  Your Honor, Government Exhibit 64-A

3    has been previously discussed and I would move its

4    admission into evidence.

5              THE COURT:  All right.  Is there an objection?

6              MR. SMITH:  There is, Your Honor.  Based on my

7    arguments at the bench, I would object to 64-A.

8              THE COURT:  All right.  Okay.  This is my ruling:

9    Based on the declaration that's been labeled Exhibit 64-A,

10   that's been provided to me a few moments ago, I find that

11   this declaration provides per Rule 902 the foundational

12   information necessary to admit Exhibit 64 as a business

13   record exception to the hearsay rule and, based on that,

14   the objection is overruled.

15             Government Exhibit 64 is admitted into evidence

16   and may be published to the jury.

17             MR. FIELDS:  Thank you very much, Your Honor.

18             (Government's Exhibit 64 received)

19   BY MR. FIELDS:

20   Q.    Let's look at Government's Exhibit 64.  We'll switch

21   back to the computer.

22             COURTROOM DEPUTY:  64 or 64-A?

23             MR. FIELDS:  Government Exhibit 64, which is now

24   in evidence.

25             COURTROOM DEPUTY:  Thank you.  Do you have it on

349
Redirect - Mullett

1    the lectern or the --
2            MR. FIELDS:  It should be on the computer.
3            COURTROOM DEPUTY:  Okay.  Thank you.
4    BY MR. FIELDS:
5    Q.   All right.  So, first of all, before your involvement
6    with this case, have you ever seen this document before?
7    A.   No.
8    Q.   What I'd like to draw your attention to, you see --
9    let's zoom in to that box, please.  All right.
10           So do you see lines 4-A, B, and C?  Do you see
11   those?
12   A.   Yes.
13   Q.   So 4-A, what does that say?
14   A.   The UPS Store No. 4060.
15   Q.   And line B, what does that say?
16   A.   975 East Riggs Road, No. 12-174, Chandler, Arizona
17   85249.
18   Q.   Is that the same address referenced in the text
19   message in Government Exhibit 15, line 57?
20   A.   Yes.
21   Q.   And if you look at box 2, what are the names listed
22   there?
23   A.   Heather Carr, Jones, Thomas.
24   Q.   Do you know Heather Carr?
25   A.   Yes.

1    Q.   Who is she?

2    A.   At the time, she was Trammel's girlfriend.

3    Q.   If we could zoom out.

4         How did you meet her?

5    A.   He brought her into the store one time.

6         MR. FIELDS:  Just one moment, Your Honor.

7         THE COURT:  Okay.

8         MR. FIELDS:  No further questions.

9         THE COURT:  All right.  Based on our discussion at

10   the bench, I'm allowing recross to the defendant.

11        MR. SMITH:  May I have one moment, Your Honor?

12        THE COURT:  You may.

13        MR. SMITH:  Based on the -- our arguments at the

14   bench, Your Honor, we continue our objection and I have no

15   questions of --

16        THE COURT:  In recross?

17        MR. SMITH:  -- recross.

18        THE COURT:  Okay.  May this witness be excused,

19   for the Government?

20        MR. FIELDS:  Yes, Your Honor.  Thank you.

21        THE COURT:  For the defendant?

22        MR. SMITH:  Yes.

23        THE COURT:  All right.  Ma'am, thank you very much

24   for your testimony.  You're excused and you may step down.

25        I think we're going to take our morning break at

351

1    this time.  Based on the discussion I had with counsel

2    first thing this morning, we're going to take a slightly

3    longer morning break.  We'll be in recess for 20 minutes.

4          (Recess at 10:12 a.m.)

5          (In open court out of the presence of the jury at

6    10:39 a.m.)

7          THE COURT:  Does the Government have any update on

8    the witnesses coming in?

9          MR. FIELDS:  We do, Your Honor.  Alison Stailey is

10   on her way here in a cab.  She'll definitely be here, I

11   think, by the time this witness is finished, so we'll have

12   that witness.

13         Christina Duncan is also at the airport, on her

14   way here, so we'll have another witness.  And then the

15   witness after that we think will be Marcelle Green.  Her

16   flight is set to arrive at 1:10 and she's going to come

17   immediately to the courthouse.

18         THE COURT:  All right.  You've not had additional

19   communication with Ms. Butterton?

20         MR. FIELDS:  We have not heard from Ms.

21   Butterton.

22         THE COURT:  Okay.  All right.  Let's bring in the

23   jury.

24         (Jury was present at 10:39 a.m.)

25         THE COURT:  Government may call its next

352

1    witness.

2         MR. FIELDS:  Thank you, Your Honor.  The United

3    States calls Michelle Allred.

4         COURTROOM DEPUTY:  Right here, ma'am.  If you'll

5    step up in the box, and raise your right hand.

6         MICHELLE ALLRED, GOVERNMENT'S WITNESS, SWORN

7         COURTROOM DEPUTY:  Please be seated.  State your

8    full name for the record and spell your first and last

9    name.

10        THE WITNESS:  Michelle Lee Allred.

11   M-i-c-h-e-l-l-e, A-l-l-r-e-d.

12        MR. FIELDS:  May I begin, Your Honor?

13        THE COURT:  Yes, you may proceed.

14        MR. FIELDS:  Before we start with testimony,

15   pursuant to the stipulation of the parties, I would move

16   for the admission of Government's Exhibits 57-B through

17   57-G.  57-H and -I have already been admitted.

18        THE COURT:  All right.  Given the stipulation of

19   the parties, Government Exhibits 57-B through and including

20   57-G are admitted into evidence and may be published to the

21   jury.

22      (Government's Exhibits 57-B thru 57-G received)

23        MR. FIELDS:  Thank you very much, Your Honor.

24        THE COURT:  Okay.

25                    DIRECT EXAMINATION

353

Direct - Allred

BY MR. FIELDS:

1

2    Q.    Ms. Allred, where do you work?

3    A.    U.S. Department of Education.

4    Q.    How long have you worked at the U.S. Department of

5    Education?

6    A.    Seven years.

7    Q.    What is your current title?

8    A.    Compliance manager.

9    Q.    And what are your responsibilities as a compliance

10   manager?

11   A.    I oversee a team of reviewers who oversee the federal

12   student aid programs.  They visit colleges and universities

13   to make sure that those entities are utilizing the funds

14   correctly.

15   Q.    Before you became a compliance manager, what was your

16   title?

17   A.    Institutional review specialist.

18   Q.    What's an institutional review specialist?

19   A.    Those are the people that go out to the colleges and

20   review the programs.

21   Q.    And you said you've been at the Department of

22   Education for seven years?

23   A.    Yes.

24   Q.    What did you do before that?

25   A.    I had had a variety of jobs that were within the

Direct - Allred

1    federal student aid industry.  I was a financial aid

2    advisor, a loan coordinator, a financial aid director, and

3    I also worked with the student loan guarantor for a number

4    of years also.

5    Q.    How long, total, have you had jobs related to federal

6    student aid?

7    A.    19 years.

8    Q.    Based on these jobs and your experience, have you been

9    able to personally observe how federal student aid is

10   processed?

11   A.    Yes.

12   Q.    Are you prepared today to tell members of the jury

13   about all that?

14   A.    Yes.

15   Q.    Are you familiar with something called Title IV?

16   A.    I am.

17   Q.    What is Title IV?

18   A.    Title IV is a program by which the federal government

19   provides funds to students to assist them in attending

20   college.

21   Q.    Who administers Title IV?

22   A.    The colleges and federal student aid.

23   Q.    What is federal student aid?

24   A.    Federal student aid is the department of the

25   Department of Education that oversees the Title IV

Direct - Allred

1    programs.

2    Q.   And the United States Department of Education, is that

3    a department or agency of the United States?

4    A.   Yes.

5    Q.   What types of programs are administered as part of

6    Title IV?

7    A.   The Pell Grant Program, the Stafford Direct Student

8    Loan Program, Supplementary Educational Opportunity Grant,

9    Federal Work Study, Parkinson.

10   Q.   Let's talk about the Stafford loans.  What is a

11   Stafford loan?

12   A.   The Stafford loan is, as it implies, money that the

13   student can borrow to pay for college.  It has to be

14   repaid.

15   Q.   Where does the money for the Stafford loans come from?

16   A.   From the federal government and taxpayers, and other

17   programs that generate funds.

18   Q.   Are there different types of Stafford loans?

19   A.   Subsidized and unsubsidized.

20   Q.   What is a subsidized Stafford loan?

21   A.   In the subsidized program, the interest does not

22   accrue for the student.  The Government pays the interest

23   on the student's behalf while the student is in school and

24   during their grace period.

25   Q.   And the unsubsidized student loan, I know it might

356

Direct - Allred

1    sound obvious, but what is that?

2    A.   The interest does accrue from the beginning.

3    Q.   Who's in charge of paying the interest --

4    A.   The student is responsible for that interest.

5    Q.   Are you familiar with something called a master

6    promissory note?

7    A.   Yes.

8    Q.   What is that?

9    A.   This is the document that the student signs as their

10   promise to pay the funds back to the Government.

11   Q.   It's called a master promissory note.  What is it the

12   master of?

13   A.   It's reusable.  So you sign each year that you decide

14   to borrow funds and it can be used for up to 10 years.

15   Q.   Who is responsible for paying back a Stafford loan?

16   A.   The student.

17   Q.   What happens if the money is not repaid?

18   A.   The student will go into default.

19   Q.   What are the consequences of default?

20   A.   Well, this costs the taxpayer money.  It could also

21   end up -- well, it does end up impacting the student's

22   credit.  They can have funds withheld from their tax

23   refunds, lottery winnings, wage garnishment.

24   Q.   So if the money is not repaid, you talked about the

25   consequences of default, but who ultimately bears the loss

357
Direct - Allred

1    of this money that's been paid out and not repaid?

2    A.    The government, the taxpayers.

3    Q.    Is there anyone else who might bear the loss?

4    A.    The school's accounts will be impacted.

5    Q.    Explain that.  How could the school be impacted?

6    A.    Well, the default rate that a student who doesn't pay

7    their money back, that number is calculated for the school.

8    All the students that borrow at that school go into an

9    annual default rate calculation.  And so if a high number

10   of students don't pay their loans back, the student -- the

11   school can risk losing their eligibility for the Stafford

12   Loan Program.

13   Q.    And are there any cases where the school might bear a

14   financial loss as a result of a loan that's not repaid?

15   A.    In instances where the student is ineligible for the

16   funds, if the school has to return those funds, the school

17   can end up on the line because they're responsible for

18   returning the money to the government and then the school

19   then would -- or the student then would be responsible for

20   returning their portion to the school, and sometimes that

21   doesn't happen.

22   Q.    You also mentioned something called a Pell Grant.

23   What is that?

24   A.    The Pell Grant is money that does not have to be

25   repaid and it's need-based.

358
Direct - Allred

1    Q.    Who provides the money for the Pell Grant?

2    A.    The federal government.

3    Q.    Now, you said in a Pell Grant it doesn't have to be

4    repaid?

5    A.    Correct.

6    Q.    What happens, though, if the Pell Grant -- what

7    happens to Pell Grant money if a student receives a Pell

8    Grant that later is found to be ineligible?

9    A.    The school has to return it.

10   Q.    To who?

11   A.    To the federal government.

12   Q.    And what happens if that money's already been spent?

13   A.    Then the school can end up holding the bag, so to

14   speak, in that the school, being required to return the

15   money, then might turn around and tell the student that

16   they are required to pay the school back and -- but if the

17   money's already been spent, then the school ends up in a

18   situation where they're owed money.

19   Q.    Talking about Title IV, does every school participate

20   Title IV?

21   A.    No.

22   Q.    How do schools decide to participate in Title IV?

23   A.    There's an application process.  So they determine if

24   they have programs that are eligible and students who need

25   the assistance, and they apply to federal student aid with

359
Direct - Allred

1    the -- a description of the school, the programs that

2    they're offering, and who, within their organization, will

3    be administering the programs.

4    Q.   Before your testimony today, did you review Department

5    of Education records to determine whether certain schools

6    participated in Title IV between 2010 and 2012?

7    A.   Yes.

8    Q.   What about Chandler-Gilbert Community College?

9    A.   Yes.

10   Q.   They participated?

11   A.   They did.

12   Q.   Did the Community College of Denver participate in

13   Title IV?

14   A.   Yes.

15   Q.   Did Mesa Community College participate in Title IV?

16   A.   Yes.

17   Q.   Did Pikes Peak Community College participate in Title

18   IV?

19   A.   Yes.

20   Q.   Did Phoenix College participate in Title IV?

21   A.   Yes.

22   Q.   Did Pueblo Community College participate in Title IV?

23   A.   They did.

24   Q.   And what about Red Rocks Community College?

25   A.   Yes.

360
Direct - Allred

1    Q.   All right.  Let's switch gears a little bit.  We've

2    talked about Title IV, but now I wanted to talk about

3    something else.

4             Are you aware of the document called the Free

5    Appication for Federal Student Aid?

6    A.   I am.

7    Q.   What is that?

8    A.   This is the application that the student fills out to

9    let the school and federal student aid, the Department of

10   Education, know that they're interested in applying for

11   assistance -- financial assistance for colleges.

12   Q.   Is it also sometimes called the FAFSA?

13   A.   It is.

14   Q.   How does someone get access to the FAFSA?

15   A.   It's either on paper or electronic.  You can go to

16   *fafsa.ed.gov* or *fafsa.gov*.

17   Q.   Those web sites that you mentioned, who controls those

18   websites?

19   A.   The federal government, Department of Education.

20   Q.   And who administers the websites?

21   A.   The federal student aid.

22   Q.   This FAFSA form, who can use it?

23   A.   Any person who intends to enroll in college.

24   Q.   Is it possible to get federal student aid funds

25   without first filling out a FAFSA?

Direct - Allred

1   A.   No.

2   Q.   Why not?

3   A.   Because that is the requirement before a student is

4   eligible.  They must provide the information on this

5   document which, in turn, generates a report to the school

6   and determines and describes the student's eligibility to

7   the school.

8   Q.   So earlier we were talking about Stafford loans and

9   Pell Grants.  When it comes to those forms of aid in

10  particular, can someone get those forms of aid without

11  first filling out a FAFSA?

12  A.   No.

13  Q.   Who has access to the information in the FAFSA after

14  it's submitted to the Department of Education?

15  A.   The Department of Education and the schools that the

16  student lists on the FAFSA.

17       MR. FIELDS:  Your Honor, I forgot one exhibit at

18  the beginning.  It's Government's Exhibit 30.  The parties

19  have also stipulated to its admission.  At this time I

20  would move that it be admitted.

21       THE COURT:  One second.  All right.  Given the

22  stipulation of the parties, Government Exhibit 30 is

23  admitted into evidence and may be published to the jury.

24       (Government's Exhibit 30 received)

25  BY MR. FIELDS:

Direct - Allred

1  Q.   All right.  It's got its big title up at the top.

2  What are we looking at here?

3  A.   The Federal Application for Federal Student Aid.

4  Q.   Let's zoom out a little bit.  This is a document

5  that's several pages?

6  A.   Yes.

7  Q.   Page 1.  And then let's go to page 2.

8      Those are just general instructions on how to fill

9  out the form?

10 A.   Correct.

11 Q.   Let's look at page 3, then.

12     So do you see up at the top, it says Step 1, and

13 then Student.  What is step 1 of filling out the FAFSA?

14 A.   This is demographic information about the student.

15 Basic information like your Social Security number, your

16 date of birth, and contact information.

17 Q.   So Social Security number.  Why does the Department of

18 Education need anyone's Social Security number?

19 A.   To determine identity and -- and eligibility.

20 Q.   What about date of birth?  Why does the Department of

21 Education need that?

22 A.   The same.  To determine identity and eligibility.

23 Q.   So identity, why is it important to determine

24 identity?

25 A.   Well, since this program is eligible to specific

Direct - Allred

1    people, we need to determine that the money that is

2    delivered for that person is who they say they are.

3    There's maximums of what a student can receive and so it's

4    important that the right person receive those funds so that

5    they don't run out of their eligibility before they're

6    realizing that they're out of funds.  If somebody else is

7    using their identity, then they don't have access to their

8    funds when they need them.

9    Q.   Does the Department of Education rely on the

10   information, the Social Security number, and the date of

11   birth, when they're making decisions about whether someone

12   qualifies for student aid?

13   A.   Yes.

14   Q.   So what happens if the information in this section is

15   not truthful?

16   A.   Well, then the wrong person can be receiving funds.

17   Q.   And this form also asks for a street address.  Why

18   does the Department of Education ask for a street

19   address?

20   A.   We use that to communicate with the student.

21   Q.   Is that information important?

22   A.   It is because the student will need to be receiving

23   documentations.  There's information that can come to the

24   student electronically and in the mail.

25   Q.   And then it also asks for an e-mail address.  How does

Direct - Allred

1   the Department of Education use an e-mail address?

2   A.   We do communicate with the student electronically as

3   well; confirmation that the form has been sent and

4   processed.

5   Q.   Now, a little bit further down on the form, it asks

6   whether someone's got a high school diploma.  How is that

7   information used?

8   A.   The information is utilized because in order to be

9   eligible for student aid, a student needs to either have a

10  high school diploma or a GED, or, before 2012, show the

11  ability to benefit from higher education.

12  Q.   That high school diploma, do some schools ask for

13  evidence of a high school diploma?

14  A.   Yes.

15  Q.   Why do they do that?

16  A.   To -- to prove that the student is being truthful on

17  the FAFSA.

18  Q.   Now let's look at page 4.  We've been on page 3 so

19  just the very next page.

20          Now here, we've finished up 1, with all that

21  information.  It says step 2, Students.  What information

22  goes in the step 2?

23  A.   This is income information particularly related to tax

24  forms and other sources of income for the student.

25  Q.   And why does the Department of Education need the

Direct - Allred

1    information that's in step 2?

2    A.    Because some of the programs that the students are

3    eligible for are need-based.

4    Q.    So does the Department of Education rely on the

5    information that's in step 2?

6    A.    Yes.

7    Q.    How does it rely on that information?

8    A.    They use the numbers there to calculate something

9    called the expected family contribution, which is a number

10   that's utilized in determining need.

11   Q.    So expected family contribution used to determine

12   need.  Let's break that down.

13         Expected family contribution, what is that?

14   A.    So this would be the amount of money that, based on

15   crunching of the numbers in the FAFSA, which include the

16   income and household size, this is the amount that is the

17   output number.  And the Government is saying you can afford

18   to pay this number of dollars towards your school based on

19   the numbers you have given us.

20   Q.    And how does that expected family contribution impact

21   the amount of aid that is given?

22   A.    The lower the expected family contribution, the higher

23   the need-based data.

24   Q.    So in section 2, all of the information that's

25   required there, what if the information in that section is

Direct - Allred

1   not truthful?

2   A.   Then the student could end up receiving more aid or

3   less aid that's need-based than they're eligible for.

4   Q.   Now, if we go to the next page.  Step 2.

5          So the next one is step 3.  And it also says

6   Student.  What information goes into step 3?

7   A.   This is information that helps determine the student's

8   dependency status.  A student who's married or born before

9   a certain date or served in the Armed Services -- there's

10  also a few other categories -- they would be considered

11  independent and only their information is asked for on this

12  form.

13         If a student is considered dependent, then they

14  still are required to include their parents' information on

15  the form.

16  Q.   Does the Department of Education rely on the

17  information that's in this part of the form?

18  A.   Yes.

19  Q.   How does it rely on that information?

20  A.   To determine which questions need to be answered by

21  the student.

22  Q.   And whether someone's designated a dependent or an

23  independent, how does that affect the amount of financial

24  aid they might get?

25  A.   Well, they can affect it greatly.  If you have more

Direct - Allred

1   resources and if your parents' information is included,

2   sometimes your information -- your eligibility for

3   financial aid could either increase or decrease based on

4   what information is provided.

5   Q.   Now let's go on to page 5.  So I think -- is this

6   page 6?  Okay.  Page 6, step 4.  So step 1, step 2, step 3.

7        We have step 4.  What information goes into this

8   part of the form?

9   A.   This is a parent's identity and household.

10  Q.   And same questions I've been asking before, what --

11  why is this information important to the Department of

12  Education?

13  A.   Well, this -- the household size, particularly, is

14  important because the higher number of people that you have

15  in your household, the more money that you need to support

16  those number of people.  So if you pro -- identify the same

17  amount of money by a higher number of people, your expected

18  contribution is going to go down because you can afford to

19  pay less.

20  Q.   And if your expected family contribution goes down,

21  what does that do to the amount of student aid money?

22  A.   It increases it.

23  Q.   So what happens if the information in this section of

24  the form is untruthful?

25  A.   Then the student can receive more information -- more

Direct - Allred

1    financial aid than they're eligible for.

2    Q.   All right.  So step 4.  Now let's move on.  After 4

3    comes 5.

4         So step 5.  It says step 5, Student.  What goes

5    into step 5?

6    A.   This is the student's household information.  So for a

7    student who's independent, they would include their

8    household information, how many people are in their family,

9    and how many of them are in college.  There's also some

10   questions about public programs that the student might be

11   participating in, like food stamps or other public

12   programs.

13        And then there's also, let's see -- you didn't ask

14   about step 6 yet.  I'll wait.

15   Q.   Yeah, we'll get to step 6.  But same question that

16   I've asked with steps 1, 2, 3, and 4:  In step 5 why is

17   this information important?

18   A.   To help determine the amount of aid the student's

19   eligible for can impact it.

20   Q.   So what if the information in step 5 is untruthful?

21   A.   A student can receive more financial aid than they're

22   eligible for.

23   Q.   Now on to step 6.  What are you doing in step 6?

24   A.   This is where the student would like their information

25   sent and where they plan on living -- on campus, with

Direct - Allred

1    parent, off campus -- so they can list the colleges there

2    that they want this to be sent to.

3    Q.    So what happens if a student puts a college on the

4    step 6?

5    A.    Then that school will receive the information.

6    Q.    Now, finally, let's go to step 7.  This one is Student

7    and Parent.  What is this?

8    A.    This is the promise that the information provided on

9    the form is accurate.

10   Q.    Is this an important part of the FAFSA form?

11   A.    Yes.

12   Q.    How so?

13   A.    Because it is promising that the information is --

14   that you are who you say you are, that the information has

15   been answered to the best of your ability, and that you're

16   being truthful.

17   Q.    Does the form describe the consequences of giving

18   false or misleading information on the FAFSA?

19   A.    It does.

20   Q.    What are the consequences?

21   A.    If you purposely give false and misleading

22   information, you may be fined up to $20,000, sent to

23   prison, or both.

24   Q.    The certification also says in bold -- do you see that

25   right there?

370

Direct - Allred

1   A.   Uhm-hum.

2   Q.   What does it say in bold?

3   A.   The Secretary of Education has the authority to verify

4   information reported on this application with the Internal

5   Revenue Service and other federal agencies.

6   Q.   What does it mean to verify?

7   A.   Well, that means we're going to compare the

8   information entered in the form with the entities that we

9   have contact with.  And we have arrangements with the IRS

10  to compare tax forms to this data.

11  Q.   Is every FAFSA application verified?

12  A.   The -- about 30 percent of applications are verified

13  by the school.  It's sort of a separate process than the

14  IRS verification.  The student has the ability, during the

15  application process, to pull information directly from the

16  IRS into the form and that's where we communicate directly.

17      The verification process, the school could request

18  copies of tax transcripts to provide to the school to

19  participate in the actual verification process.  So every

20  student has the ability to communicate directly with the

21  IRS through this form, but only 30 percent are selected for

22  a secondary verification process through their school.

23  Q.   Why only 30 percent?  Why not verify every single one

24  of these things?

25  A.   Well, the administrative burden to process that many

Direct - Allred

1    applications on the level of detail that is occurring

2    during the verification process would be significant.

3    Q.    That 30 percent, how is it determined which

4    applications are going to be verified and which are not?

5    A.    Some of it is random.  There are certain things that

6    could trigger a verification.  If there's information that

7    looks like it might be inaccurate, like a high household

8    size and a really low income amount, it might trigger a

9    student getting selected for verification.

10   Q.   So at the bottom -- so this is step 7.  There's a box

11   right here in the bottom left-hand corner.  Do you see

12   that?

13   A.   Yes.

14   Q.   And then it's got 104, 105, 106.  I'm just designating

15   that so we know what we're talking about.  What goes into

16   that box?

17   A.   This would be if somebody besides the student is

18   preparing the FAFSA for the student for a fee.

19   Q.   Is that allowed?

20   A.   It is.

21   Q.   Why is it important to know who helped prepare a

22   FAFSA?

23   A.   Well, if the information is a lie, then you want to

24   know whose advice it was that the lie was given.

25   Q.   And who actually signs this certification; the

Direct - Allred

1   preparer or the person who's providing the information?

2   A.   This is the preparer's signature.

3   Q.   But the certification that's above, does the person

4   actually submitting this FAFSA have to sign the

5   certification?

6   A.   They're admitting the same truth in that step on

7   behalf of the student.

8   Q.   Okay.  Either, whether it's the preparer or the

9   student?

10   A.   Correct.

11   Q.   Now, line 103 is the line for Student Sign Below.

12   A.   Correct.

13   Q.   Does it require that the FAFSA be signed?

14   A.   Yes.

15   Q.   But earlier you were talking about how a lot of FAFSAs

16   are submitted through the internet.

17   A.   Right.

18   Q.   So you can't sign a computer screen.  How do you sign

19   an electronic FAFSA?

20   A.   There's a PIN process.  The student applies for

21   federal student aid for a PIN number that they can use to

22   sign.

23   Q.   What is a PIN number?

24   A.   A PIN number is a four-digit number similar to your

25   debit card or banks and authorization code that you use to

Direct - Allred

1    sign and say, "This is me."  It's individually assigned.

2    Q.   So how do you know whether or not a PIN number is

3    associated with a particular person just like a signature?

4    A.   The Government keeps track of that through a system

5    called STAN.

6    Q.   STAN?

7    A.   It's a -- it's a -- it is the identification system

8    that pairs up people with their PIN numbers.

9    Q.   So that PIN number, is it unique to every

10   individual?

11   A.   Yes.

12   Q.   And, you know, we just went through a paper FAFSA

13   form, but you say it's available online.  Is the online

14   form any different?

15   A.   No, it's identical.

16   Q.   And if you go back to Government Exhibit 30 and you go

17   to page 1, up at the top, that's for July 1st, 2011, to

18   June 30th, 2012?

19   A.   Yes.

20   Q.   Was the form any different in the year prior, so July

21   1st, 2010, to June 30th, 2011?

22   A.   No.  It's the same.

23   Q.   When the Department of Education gets information of

24   FAFSA through the internet, does it reformat that

25   information?

374

Direct - Allred

1     A.   Yes.

2     Q.   What is the format that they use?

3     A.    There's an archive format, there's a student aid

4     report and a ISIR, which is the Institutional Student

5     Information Report.

6     Q.   So let's look at Government Exhibit 57-B, which was

7     already admitted.  What is this?

8     A.   This is the -- this is the Inspector General's format

9     for archiving the information.

10    Q.   Is this a FAFSA --

11    A.   It is.

12    Q.   It doesn't look like Exhibit 30.  Why is that?

13    A.   Because this is the output document that includes just

14    the answers.

15    Q.   So -- and, actually, let's get a binder in front of

16    you so you can look at that.  It would be in binder No. 2,

17    please.

18              COURTROOM DEPUTY:  57-B?

19              MR. FIELDS:  Yes, please.

20    BY MR. FIELDS:

21    Q.   So if you look through Government Exhibit 57-B, based

22    on the information that's in that document, can you tell

23    who submitted it?

24    A.   Yes.  The student submitted this application online.

25    Q.   How can you tell that?

375
Direct - Allred

1    A.   Because on the last page of the document, there is a

2    field called Origin of FAFSA Source, and it says "web

3    student."

4    Q.   Does the application identify the schools that were of

5    interest to this student?

6    A.   Yes.  This student was interested in Colorado

7    Technical University and Pikes Peak Community College.

8    Q.   Was this -- so this is a FAFSA, but it was filled out

9    on the internet.  Was a certification signed?

10   A.   Yes.

11   Q.   How can you tell?

12   A.   Because it says there was an electronic signature on

13   the field that says Student's Signature Indicator.

14   Q.   Let's go back to page 1.  I got a little bit ahead of

15   myself.

16        What is the name of the student for which this

17   FAFSA was submitted?

18   A.   Ismael Omar.

19   Q.   Is there an address listed on this?

20   A.   3820 Radiant Drive, No. 239, Colorado Springs.

21   Q.   How would the Department of Education respond if the

22   address listed there wasn't a house like this, but was,

23   instead, a state prison?

24   A.   I don't know that we're cross-referencing for that

25   particular item.

376

Direct - Allred

1    Q.   At this year in question -- the year in question, were
2    state prisoners eligible to receive federal student aid?
3    A.   No.
4    Q.   And earlier we went through the various steps of a
5    FAFSA form, so here, how much income did the student report
6    for purposes of determining financial aid?
7    A.   Zero.
8    Q.   So generally speaking, what is the effect of reporting
9    no income?
10   A.   Then the expected family contribution would also be
11   zero.
12   Q.   And if the expected family contribution is zero, what
13   does that do to the amount of student aid it might get?
14   A.   It increases it.
15   Q.   So now let's look at Government Exhibit 57-C, which
16   has also been admitted into evidence.
17        What is this?
18   A.   This is the master promissory note.
19   Q.   Do you see there's a black box that says section C?
20   A.   Yes.
21   Q.   And then there are items 12-A and 12-B.  Do you see
22   those?
23   A.   Yes.
24   Q.   You can blow them up.
25        What is that?

377

Direct - Allred

1    A.   This is the certification that the information is true

2    and correct to the best of the signer's knowledge, and that

3    the belief that the information is true is made in good

4    faith, and that the proceeds of the loan will be used for

5    authorized educational expenses.

6    Q.   And why is it important that the information in the

7    master promissory note be true?

8    A.   So that the correct eligible student receives

9    financial aid.

10   Q.   And item 12-B talks about authorized educational

11   expenses.  What are authorized educational expenses?

12   A.   Expenses that are related to the attendance of the

13   student in college, which can include living expenses.

14   Q.   Would it include vacations?

15   A.   No.

16   Q.   And what if a student wants to pay for something

17   that's not authorized?

18   A.   Then they're not allowed to do that.

19   Q.   Is there a signature page for this master promissory

20   note?

21   A.   The -- yes.

22   Q.   Where is that?

23   A.   The first time that it is signed, either on paper or

24   electronically, the signature is attributed to this

25   document, and so it would be -- for the electronic version,

378
Direct - Allred

1   it would be corrected as part of the PIN number that they

2   can use to sign through our -- the federal student aid

3   system of record.

4   Q.   The same PIN used to sign the FAFSA?

5   A.   Correct.

6   Q.   And what does that signature indicate once it's on the

7   master promissory note?

8   A.   That the student promises to repay the funds and that

9   the information is correct.

10  Q.   Now, let's look at -- well, first, just for purposes

11  of the record, do you see the name for the student who got

12  the loan here?

13  A.   Yes.

14  Q.   Who is that?

15  A.   Ismael Omar.

16  Q.   All right.  Now let's look at Government 57-D.  Are

17  you familiar with this document?

18  A.   Yes.

19  Q.   What is it?

20  A.   This is a summary of loans received by Ismael Omar.

21  The money was disbursed to the school, which means it was

22  transferred and paid to the school on behalf of the student

23  at Pikes Peak Community College.

24  Q.   What loans did this student receive?

25  A.   A direct Stafford subsidized loan and a direct

379

Direct - Allred

1    Stafford unsubsidized loan.

2    Q.   In what amounts?

3    A.   3500 and 3510.

4    Q.   And why did the student get a subsidized loan?

5    A.   Because they demonstrated need.

6    Q.   And if you go to page 2 of the Government Exhibit

7    57-D, what is listed on page 2?

8    A.   This is the scheduled amount of the loan, which is

9    5550.  And the amount that the school received for the --

10   oh, this is -- yeah, this is a Pell Grant, and the amount

11   that was disbursed to the school on behalf of the student

12   was 4163 for the federal Pell Grant to Pikes Peak Community

13   College.

14   Q.   So going back, the first -- at first you seemed to

15   mention this was a loan, but is this actually for the

16   grant?

17   A.   It is for the grant.  I apologize.

18   Q.   And what does it say at the top?

19   A.   Grant Data.

20   Q.   Okay.  Do all students get Pell Grants?

21   A.   No.

22   Q.   Why did this student get a Pell Grant?

23   A.   They demonstrated need on the FAFSA.

24   Q.   How did they demonstrate need?

25   A.   By the information that was presented.  It described a

380

Direct - Allred

1    situation that a student would need -- would demonstrate

2    need with low income, perhaps high family size.

3    Q.   All right.  So we won't go through all of these

4    documents, but I do want to go through a couple of

5    additional examples.  So let's look at Exhibit 57-E.

6         What is the name of the student on this FAFSA?

7    A.   Virginia Jones.

8    Q.   Is this student identified by Social Security number

9    and date of birth?

10   A.   Yes.

11   Q.   How much income did Virginia Jones report on the

12   FAFSA?

13   A.   None.

14   Q.   And if you go to -- actually, on the last page, what

15   school did this student aspire to attend?

16   A.   Pikes Peak Community College.

17   Q.   Was this application also signed?

18   A.   Yes, electronically by the student.

19   Q.   How was this FAFSA submitted?

20   A.   On the web.

21   Q.   Now let's look at Government Exhibit 57-F.

22        What is the name of the student?

23   A.   Robert Pickens.

24   Q.   Also identified by Social Security number and date of

25   birth?

Direct - Allred

1   A.   Yes.

2   Q.   How much income did Mr. Pickens report to the --

3   A.   Zero.

4   Q.   And what college did Mr. Pickens aspire to attend?

5   A.   Pikes Peak Community College.

6   Q.   Is this also signed?

7   A.   Yes.  Electronically on the web.

8   Q.   How was this FAFSA submitted?

9   A.   Through the website.

10  Q.   Let's look at Government Exhibit 57-G.

11          What is this student's name?

12  A.   This is Eddie Jones.

13  Q.   Identified by Social Security number and date of

14  birth?

15  A.   Yes.

16  Q.   How much income did Mr. Jones report?

17  A.   Zero.

18  Q.   And if you go to the last page, to what college did he

19  aspire to attend?

20  A.   Pikes Peak Community College.

21  Q.   This was also signed?

22  A.   Yes.

23  Q.   How was it submitted?

24  A.   Electronically.

25  Q.   Now before we move on to three additional examples, I

382

Direct - Allred

1    want you to look at 57-E, F, and G, so side-by-side.  You

2    can take them out of the binder if you need to.

3            Do you have E, F, and G all up in front of you?

4    A.   I do.

5    Q.   Now, if you please look at the listed address on each

6    of those FAFSAs.

7    A.   Yes, they're the same.

8    Q.   What is that address?

9    A.   1418 Rushmore Drive, Colorado Springs.

10   Q.   All right.  You can put those -- just set those off to

11   the side, we'll put them back in the binder later.

12           57-H, let's pull that one up.

13           And, you know, same thing we did with the earlier

14   ones:  What is the name of this student?

15   A.   Dennis Miller.

16   Q.   Identified by Social Security number and date of

17   birth?

18   A.   Yes.

19   Q.   How much income did Mr. Miller report to the

20   Department of Education?

21   A.   Zero.

22   Q.   And what college did Mr. Miller aspire to attend?

23   A.   Pikes Peak Community College.

24   Q.   How was this signed?

25   A.   Electronically.

383

Direct - Allred

1    Q.   How was it submitted?

2    A.   On the web.

3    Q.   All right.  One more.  57-I.

4         What's the name of this student?

5    A.   Manuel Abate.

6    Q.   And identified by Social Security number and date of

7    birth?

8    A.   Yes.

9    Q.   How much income did Mr. Abate report to the Department

10   of Education?

11   A.   Zero.

12   Q.   What college did Mr. Abate aspire to attend?

13   A.   Pikes Peak Community College.

14   Q.   How was -- was this signed electronically?

15   A.   Yes.

16   Q.   How was it submitted?

17   A.   On the web.

18   Q.   So, again, if you could pull out 57-H and -I.  And

19   just lay them side-by-side, please.

20   A.   Uhm-hum.

21   Q.   Do you -- look at the listed address.  What do you

22   notice?

23   A.   They're the same.

24   Q.   What is the address?

25   A.   1112 Meadows Oak Drive, Colorado Springs.

Direct - Allred

1   Q.   All right.  We've talked about these FAFSAs, the

2   FAFSAs used by the student to get aid.  But you mentioned

3   earlier, I think, that schools also participate in

4   financial aid programs.

5   A.   Yes.

6   Q.   So how does a school participate in a financial aid

7   program?

8   A.   Well, they -- when they apply for eligibility and

9   they're granted access, then they begin requesting funds.

10  Q.   What does the school have to do in order to

11  participate in a Title IV program?

12  A.   They submit their application to federal student aid,

13  explaining their programs and the administration of those

14  programs.

15  Q.   Must they have a staff that can review financial aid

16  applications?

17  A.   Yes.

18  Q.   Would they also need staff that can verify

19  applications?

20  A.   Correct.

21  Q.   Once that information's submitted to the Department of

22  Education through the FAFSA, can a school get access to it?

23  A.   Yes.

24  Q.   How does the school get access?

25  A.   The student requests that the school have access.

385
Direct - Allred

1   Q.   And you testified earlier that the Department of
2   Education relies on the information in the FAFSA.  Do the
3   schools also rely on that information?
4   A.   Yes.
5   Q.   How?
6   A.   Well, the student uses that information to make the
7   award to the student -- the school does.
8   Q.   So how, if at all, might the school be harmed if the
9   information in the FAFSA is not truthful?
10  A.   Well, the information that the school uses to make the
11  awards determines how much money the student receives, and
12  if it turns out that the student is ineligible, then the
13  school could be on the hook for those funds if they have to
14  return them.
15  Q.   After the school gets the information in the FAFSA,
16  what do they do when they get it?
17  A.   They review it for action on their part to determine
18  if it needs to be verified and then they -- once that
19  process is completed, they look for any additional missing
20  information that they might need to determine if they have
21  all the answers to make the award.  And then they award the
22  student based on the rules of the programs.
23  Q.   Who gets the financial aid money after that process is
24  finished?
25  A.   The school is the -- the money is delivered directly

Direct - Allred

1    to the school.

2    Q.   What does the school do with it?

3    A.   They apply that money to eligible expenses, the

4    tuition and fees.

5    Q.   If a school gets both a Pell Grant and a Stafford

6    loan, are there any rules governing how that money is

7    distributed?

8    A.   The Pell pays first.

9    Q.   That's just pursuant to the regulations?

10   A.   Yes.

11   Q.   So when you say the Pell pays first, what do you mean

12   by that?

13   A.   The funds that are utilized on the student's behalf

14   for tuition and fees and whatever eligible expenses there

15   are, if a Pell Grant and a Stafford loan are received, the

16   Pell Grant would be applied towards that money -- towards

17   those expenses first.

18   Q.   What happens if there's money left over after tuition

19   and fees are deducted?

20   A.   Then the student gets what's called a credit balance

21   refund.

22   Q.   Generally speaking, is the tuition for community

23   colleges on the high end or the low end of tuition for

24   universities?

25   A.   It's lower.

Direct - Allred

1    Q.   As a result, is the student's refund likely to be

2    higher or lower than it would be at a school?

3    A.   It's likely to be higher.

4    Q.   So students gets the rest.  How does a school actually

5    get the money to the student?

6    A.   They -- it can be a debit card or direct deposit to

7    the bank account or a paper check.

8    Q.   How does the school know where to send the paper check

9    or a debit card?

10   A.   The student determines that.

11   Q.   How?

12   A.   By communicating with the school as to their

13   preference.

14   Q.   As to their preference as to how they would like to

15   get the aid?

16   A.   Correct.

17   Q.   How does the school know what address to send the card

18   to?

19   A.   The student provides that information.

20   Q.   Are there certain requirements a student has to meet

21   in order to earn their student aid?

22   A.   They -- yes.

23   Q.   What are their requirements?

24   A.   Well, they do have to begin school and they have to

25   continue attending school and participating.

388
Direct - Allred

1    Q.    Have you heard of something called a Return to Title

2    IV?

3    A.    Yes.

4    Q.    What is that?

5    A.    That's the process by which the school is required to

6    determine how much aid a student has received if they stop

7    attending school, either with notice or without notice.

8    Q.    So what happens if the school needs to return money to

9    Title IV, but the student's already spent the money?

10   A.    Then the school can end up re -- sending that money --

11   having to send that money back to the Government, which

12   then puts them in a situation where they're owed money by

13   the student.

14   Q.    And what happens if the student doesn't pay the

15   school?

16   A.    Then the school is owed that money, then they're in a

17   position -- they're short.

18   Q.    Ultimately, if someone gets a loan without intending

19   to pay it back, who suffers?

20   A.    The school can suffer, the taxpayer can suffer, the

21   government.

22   Q.    One last general question.  Back in the period between

23   2010 and 2012, were prison inmates eligible for federal

24   student aid?

25   A.    Not state and federal.

389
Direct - Allred

1   Q.   If a prison inmate had applied, what would have

2   happened?

3   A.   They would be denied.

4   Q.   So would a prison inmate have been able to get a debit

5   card mailed to them in prison?

6   A.   No.

7           MR. FIELDS:  One moment, Your Honor.

8           THE COURT:  Sure.

9           MR. FIELDS:  No further questions, Your Honor.

10          THE COURT:  All right.  Thank you.

11  Cross-examination.

12          MR. GOODREID:  Your Honor, may I have just a

13  moment, please?

14          THE COURT:  Yes.

15          MR. GOODREID:  Your Honor, I have no questions for

16  this witness.

17          THE COURT:  All right.  May this witness be

18  excused, for the Government?

19          MS. PALUCH:  Yes, Your Honor.

20          THE COURT:  All right.  For the defendant?

21          MR. GOODREID:  Yes.

22          THE COURT:  Ms. Allred, thank you for your

23  testimony.  You may step down.  You're excused.

24          THE WITNESS:  Thank you.

25          THE COURT:  All right, the Government may call its

Direct - Stailey

1    next witness.

2                MS. PALUCH:  Thank you, Your Honor.  The United

3    States calls Alison Stailey.

4                COURTROOM DEPUTY:  Go ahead and step in the box

5    and raise your rights hand.

6            ALISON STAILEY, GOVERNMENT'S WITNESS, SWORN

7                COURTROOM DEPUTY:  Please be seated.  State your

8    full name for the record and spell your first and last

9    name.

10               THE WITNESS:  My full name is Alison Stailey.

11   It's A-l-i-s-o-n, S-t-a-i-l-e-y.

12               MS. PALUCH:  May I proceed, Your Honor?

13               THE COURT:  Yes, you may, counsel.

14                         DIRECT EXAMINATION

15   BY MS. PALUCH:

16   Q.   Good morning, ma'am.

17   A.   Good morning.

18   Q.   What is your educational background?

19   A.   I have a bachelor's degree in management information

20   systems and a master's degree in computer science.

21   Q.   And how are you employed?

22   A.   I work for a company called Mandiant.

23   Q.   What type of company is that?

24   A.   It's an incident response consulting company.  So when

25   companies get hacked or have some sort of security

Direct - Stailey

1    incident, they hire my company to investigate and determine

2    what happened.

3    Q.    Generally what are your duties and responsibilities?

4    A.    I'm an incident response consultant, so I'm part of

5    the investigative team that investigates those security

6    breaches.

7    Q.    How long have you been employed by Mandiant?

8    A.    A little over two years.

9    Q.    Before working for that company, where did you work,

10   ma'am?

11   A.    I worked for the United States Department of Education

12   in the Office of Inspector General.

13   Q.    Did you work in a particular division within the

14   Office of Inspector General?

15   A.    Yes, I worked in the Technology Crimes Division.

16   Q.    And was that for a specific department?

17   A.    For the Department of Education.

18   Q.    Okay.  And what does the Technology Crimes Division

19   do?

20   A.    It provides computer forensic support and analysis in

21   support of any of the Office of Inspector General's

22   investigations into fraud, waste, or abuse of the

23   department's programs.

24   Q.    I'd like to take you to 2012 to 2014.  What was your

25   title during -- titles during that time period?

Direct - Stailey

1    A.    I was a senior forensic analyst as well as the digital

2    forensics team lead.

3    Q.    What would be your responsibilities in those

4    positions?

5    A.    As a senior forensic analyst, I conducted computer

6    forensic exams in support of any of the department's

7    investigations or audits into fraud or waste of the

8    programs -- the department's programs.  I also would assist

9    with on-site acquisitions of any computer or computer

10   media, for example in support of the execution of search

11   warrants.  And I would repair -- prepare reports of my

12   analysis and findings.

13          And as a team lead, I was responsible for the

14   management of our digital forensics lab, which included the

15   budget, the equipment, assigning examinations to other

16   staff members, reviewing all reports that came through the

17   department.

18   Q.    Ma'am, did you receive specialized training for work

19   in computer forensics?

20   A.    Yes, I did.

21   Q.    And in your line of work, are there software programs

22   that you use as a computer forensic examiner for which you

23   received specialized training?

24   A.    Yes.  In particular, I've been trained on Access

25   Data's Forensic Tool Kit, or FTK, and a device called

Direct - Stailey

1    Cellebrite's UFED Touch, that's U-F-E-D, Touch, and it's

2    primarily for acquiring information from the local devices.

3    Q.   Are those programs generally accepted by computer

4    forensic examiners?

5    A.   Yes.

6    Q.   While employed by the Department of Education, can you

7    estimate approximately how many computer forensic

8    examinations you performed?

9    A.   Probably examined hundreds of electronic devices while

10    I was employed there.

11    Q.   Is it a regular practice for your work to be

12    peer-reviewed --

13    A.   Yes.

14    Q.   -- when you analyze computers?

15    A.   Yes.

16    Q.   Can you explain that?

17    A.   Yes.  Every report that -- or every exam and every

18    report that we write goes through a peer review process.

19    Not just a peer review, but a quality assurance review and

20    then a supervisory review before it's issued as a final

21    product, so it's generally reviewed three times.

22    Q.   Have you served as an instructor in computer

23    forensics?

24    A.   Yes, I have.

25    Q.   Approximately how many times would you say you've done

Direct - Stailey

1    that?

2    A.    During my master's program, I was a teaching assistant

3    for the computer forensics course, so that was an entire

4    semester.  And then in my professional career, I've taught

5    probably 15 or 20 times.

6          MS. PALUCH:  Your Honor, at this -- oh, I would

7    back up.

8    BY MS. PALUCH:

9    Q.    Who were you instructing, ma'am?

10   A.    When I was at the Department of Education, I would

11   instruct fellow employees, other forensic examiners, how to

12   use our tools and what our policies and procedures were and

13   how to conduct forensic exams.

14         In my current role at Mandiant, we sell an

15   incident response course to our clients where we help teach

16   security professionals for other companies how to respond

17   to a security incident.  So I teach that course in my

18   current position.

19         MS. PALUCH:  Thank you.  Your Honor, at this time,

20   the Government tenders Ms. Alison Stailey as an expert in

21   computer forensic analysis in this case.

22         THE COURT:  Any objection?

23         MR. GOODREID:  No objection, Your Honor.

24         THE COURT:  All right.

25   BY MS. PALUCH:

395
Direct - Stailey

1    Q.    Ms. --

2              THE COURT:  Hold on.

3              MS. PALUCH:  Oh, I apologize, Your Honor.

4              THE COURT:  There being no objection, Ms. Stailey

5    is qualified under Federal Rule of Evidence 702 to give

6    expert opinion testimony in the field of computer forensic

7    analysis.

8              MS. PALUCH:  Thank you, Your Honor.

9    BY MS. PALUCH:

10   Q.    Ms. Stailey, were you asked to work on this case?

11   A.    Yes.

12   Q.    And what work did you do?

13   A.    I did computer forensic analysis of mobile devices and

14   hard drives that were seized during this investigation.

15   Q.    And the mobile devices, did that include cell phones?

16   A.    Yes.

17   Q.    Let's start with cell phones.  Did you examine the

18   actual phones?

19   A.    Yes, I did.

20   Q.    Okay.  And did you extract data from those phones?

21   A.    Yes, I did.

22   Q.    And did you analyze that data from the phones?

23   A.    Yes.

24   Q.    And were images made of the data?

25   A.    Yes.

396

Direct - Stailey

1  Q.   And where were the original images of the cell phone

2  data maintained?

3  A.   The original images are maintained in the computer

4  forensic lab for the Technology Crimes Division of the

5  Department of Education in Washington, D.C.

6  Q.   And in preparation for your trial testimony today, did

7  you travel to Washington, D.C., to review those images?

8  A.   Yes, I did.

9  Q.   So let's start with mobile devices.  Let's talk about

10  the universe of mobile devices that you examined.

11  A.   There were several mobile phones, cell phones, as we

12  mentioned.  iPads, an iPod, a Kindle, as well as SD cards,

13  or media cards, that were located inside some of those

14  devices.

15  Q.   And where -- from where were those devices obtained?

16  A.   They were obtained during the execution of the search

17  warrant at a home in Chandler, Arizona.

18  Q.   Did you -- do you happen to recall the street address?

19  A.   Can I check my notes?

20  Q.   Certainly.  And just look up when you've refreshed

21  your recollection.

22  A.   Yeah.  1822 --

23  Q.   I'm sorry, ma'am, I need you to set your notes aside.

24  A.   Oh, sorry.

25  Q.   Yeah.  Can you -- have you had a chance to refresh

397
Direct - Stailey

1　your recollection on the address?

2　A.　Yes.

3　Q.　Okay.  Could you state for the record the address of

4　that search warrant?

5　A.　It's 1822 Kaibob Street.

6　Q.　Thank you.  Now, were you asked to look for certain

7　evidence on these devices?

8　A.　Yes, I was.

9　Q.　And what type of evidence was requested that you look

10　for?

11　A.　Contact lists, incoming and outgoing call logs, and

12　text messages, as well as photos.

13　Q.　And who gave -- who provided that information to you?

14　A.　Special Agent Sandra Ennis.

15　Q.　And how did you know what specific information or

16　terms to look for?

17　A.　Special Agent Ennis provided me with a list of key

18　terms for the investigation and I used those to generate

19　search words to search the devices.

20　Q.　Okay.  If the witness could be shown book 1 or

21　Government Exhibit No. 12.

22　A.　Okay.

23　Q.　Can you identify that document, ma'am.

24　A.　Yes.  This is the list of search terms that Special

25　Agent Ennis provided to me.

398
Direct - Stailey

1    Q.   And did you rely on those terms and use those terms in

2    performing your search?

3    A.   Yes, I did.

4            MS. PALUCH:  Your Honor, at this time I'd move to

5    admit and publish Government's Exhibit 12.

6            THE COURT:  Any objection?

7            MR. GOODREID:  Yes, Your Honor.  Among other

8    things, on the first page, there appears to be commentary

9    by somebody about what they're doing in their

10   investigation.  I don't think that's properly admissible.

11           Your Honor, if I direct the Court's attention to

12   the first page of the exhibit, it's down at the very

13   bottom, there's an asterisk.

14           THE COURT:  Right, I see that.

15           MR. GOODREID:  First of all, lack of foundation.

16   Secondly, it's hearsay so far.  And, thirdly, I don't think

17   it's proper to be in this exhibit.

18           THE COURT:  Are you offering this for the truth of

19   the matter asserted?

20           MS. PALUCH:  I'm not, Your Honor.  Only for the

21   effect on the listener as to how -- the actions that she

22   took in response to receiving these search terms.

23           THE COURT:  What about this remark by the

24   asterisk?

25           MS. PALUCH:  I agree with counsel that that should

Direct - Stailey

1    be redacted.  And I could take care of that during the

2    lunch break, Your Honor.

3              THE COURT:  Okay.  So how are we going to publish

4    this --

5              MS. PALUCH:  At this point, I won't need to

6    publish this and I assume we will resume with Ms. Stailey's

7    testimony after the break and I could revisit this exhibit

8    at that time.

9              THE COURT:  All right.  Well, let's do this:  I'm

10   going to overrule the objection.  I'm going to admit

11   Government Exhibit 12, but without the statement that

12   appears at the bottom of page 1 next to the asterisk.  And

13   this exhibit cannot be published to the jury until that

14   comment is removed from the first page.

15             MS. PALUCH:  Thank you, Your Honor.

16        (Government's Exhibit 12 received)

17   BY MS. PALUCH:

18   Q.   Now, in your examination, did you retrieve information

19   from a Huawei cell phone?

20   A.   I retrieved information from an SD card that was found

21   inside the Hauwei cell phone.

22   Q.   Am I pronouncing that right, Huawei?

23   A.   Yes.

24   Q.   Now, can you explain why it is you retrieved

25   information from an SD card rather than the phone itself?

Direct - Stailey

1    A.    When I received the phone, it was broken in half,

2    almost as though someone had just taken it and bent it in

3    half, so we weren't able to recover any data from the

4    phone, itself.

5    Q.    But the SD card was intact?

6    A.    Yes.

7    Q.    And who actually removed the SD card from that cell

8    phone?

9    A.    I did.

10   Q.    Was there a number assigned to that specific piece of

11   evidence in your report?

12   A.    Yes.  I believe it was No. 12.

13   Q.    Okay.  So could you explain for us, please, what an SD

14   card is.

15   A.    It's just another form of storage media, like a USB

16   thumb drive.  Typically SD cards are used in cameras and

17   cell phones because they're very small and flat, so they

18   can fit inside those devices very well.  And they can store

19   any kind of file that a USB thumb drive can store.

20   Q.    So even though the cell phone was broken in half, the

21   SD card was not damaged?

22   A.    Correct.

23   Q.    Okay.  Now let's start with text messages.  Did you

24   find text messages that contained certain of the terms or

25   names provided to you by Agent Ennis on the SD card?

401

Direct - Stailey

1   A.   Yes, I did.

2   Q.   And what was the process you used to extract these

3   text messages from the SD card?

4   A.   The text messages were stored in a database, so I used

5   a forensic program that was capable of reading that

6   database to extract all of the text messages from the

7   database file into an Excel spreadsheet so that they would

8   be easier to read and review.

9   Q.   Okay.  Please display for the witness only -- or,

10  actually, you can look at the book, ma'am, in front of you.

11  If you could turn to Government's Exhibit 13.

12       Can you identify that exhibit?

13  A.   Yes, this is an excerpt of some of the text messages

14  that I extracted from the SD card.

15       MS. PALUCH:  Your Honor, at this time I move to

16  admit and publish Government Exhibit 13.

17       THE COURT:  Is there an objection?

18       MR. GOODREID:  Your Honor, may I have just a

19  moment, please?

20       THE COURT:  You may.

21       MR. GOODREID:  No objection, Your Honor.

22       THE COURT:  All right.  I have a couple of

23  questions for this witness.

24       Ms. Stailey, the comments headed Address, is

25  that -- what is that?

Direct - Stailey

1          THE WITNESS:  That is a phone number that

2    represents the phone number not of the Huawei phone,

3    itself, but of the other phone that was communicating over

4    text message.

5          THE COURT:  So that's the phone number that the

6    phone that you were examining the SD card from was texting

7    to?

8          THE WITNESS:  Correct.

9          THE COURT:  Okay.  Government Exhibit 13 is

10   admitted into evidence and may be published to the jury.

11      (Government's Exhibit 13 received)

12   BY MS. PALUCH:

13   Q.   And I would like to begin by explaining what the

14   columns of this exhibit represent, starting with column A.

15   A.   Column A is a typed column.  It either has a value 1

16   or 2.  The value 1 represents that the text message was

17   incoming to the phone, it was a received text message; and

18   the No. 2 indicates an outgoing communication from the

19   phone.  So 1 is received and 2 is sent.

20   Q.   So is 2 -- all of the entries 2 is -- the person using

21   the Huawei phone is sending the 2; is that right?

22   A.   Yes, that's correct.

23   Q.   I'd like to refer your attention to line 7 and 8 of

24   this exhibit.

25          And if you could please blow those up.

403
Direct - Stailey

1    And, first, could you just state the date of that
2    transmission.
3    A.   June 26th, 2012.  The time is 21:06:58 for the first
4    one.
5    Q.   And could you please read for the record lines 1 and
6    2.
7    A.   Line 1 says, "Who is this?"
8         And line 2 says, Tramell."
9    Q.   And as you stated, line 2 would be the individual
10   using that Huawei phone, correct?
11   A.   Correct.
12   Q.   Okay.  At this time, I'd like to publish Government
13   Exhibit 14, which has already been admitted.
14        And, ma'am, when you have a chance to look at that
15   exhibit, can you identify what that is.
16        COURTROOM DEPUTY:  I don't show that that's
17   admitted.  14?
18        MS. PALUCH:  I believe it was admitted through Mr.
19   Fields' testimony.
20        THE COURT:  I have that in, Deb.
21        COURTROOM DEPUTY:  Do you?  Oh, sorry.
22        MS. PALUCH:  Thank you, Ms. Hansen.
23   BY MS. PALUCH:
24   Q.   All right.  We're looking at Exhibit 14.  Can you
25   identify, ma'am, what this exhibit is?

404

Direct - Stailey

A.   Yes, it's another excerpt from the SD card that
contains both text messages and call log entries.

Q.   And it appears as though there's a different phone
number listed on this exhibit; is that right?

A.   Yes.

Q.   And is it still -- could you identify the 1s and the
2s for us with respect to this exhibit.

A.   Yes.  The -- they mean the same thing, where a 1 is an
incoming message, a 2 is an outgoing message.

Q.   Okay.  If you could please blow up lines 4 and 5 of
this exhibit.

        And, ma'am, could you please read those -- and,
actually, take in line 6, please.

        THE COURT:  Can you make those any bigger -- that
font any bigger?

BY MS. PALUCH:

Q.   Yeah, is there any way we can blow that up any more?
You know what we could do, could you just take the text and
blow up just the text.

        Okay.  Could you read those into the record,
ma'am?

A.   One of 2, Tramell it's Kim.  I was calling to see if
you were coming into town?  Also I also got another letter
for you.  By chance did you get that deposit?  The only
reason" -- and it continues on 2 of 2 -- "why I'm asking is

Direct - Stailey

1    I'm going out of town first thing in the morning and could

2    really use it."

3    Q.    Okay.

4    A.    "I didnt get it but Ill call u at 9 tonight cz I do hv

5    something for u."

6    Q.    At this time I'd like to publish what's been admitted

7    Government's Exhibit 15.

8          Can you identify that exhibit, ma'am.

9    A.    This is another excerpt of the text messages that was

10   retrieved from the SD card.

11   Q.    Okay.  And if you could please blow up lines 46

12   through 48 for the witness.

13         And for 46 and 48, we will first blow those up and

14   have you say 1 and 2, and then we will just blow up the

15   text.

16         So 1 is incoming and 2 is the Huawei user?

17   A.    That's correct.

18   Q.    Okay.  So if you could, please, Agent Hacker, blow up

19   just the text.

20         And, ma'am, could you please read those into the

21   record.

22   A.    "For Dennis miller, what do u want me to do with this

23   letter I have?  U also have mail."

24         "Yea Ill just have u send it altogether.  Im gonna

25   send u this lady number.  Three restaurant owners want

Direct - Stailey

1    orders."

2    Q.    Okay.  I'd like now, if you could go, Agent Hacker, to

3    line 57 of that exhibit.  And we'll -- actually, could you

4    pull 56 as well.

5             And I will have you read -- let's see.

6             Agent Hacker, are you able to pull that?

7             And I will have you read those two entries into

8    the record.

9    A.    The first line says, Is it here [sic]?

10            And the second line says, "Cool.  U can send all

11   of the mail to me at 975 East Riggs Rd. 12-174, Chandler,

12   Az 85249.  Thank u babe."

13   Q.    Okay.  And 2, again, is the Huawei user, correct?

14   A.    Yes.

15   Q.    Okay.  Let's look at Government Exhibit No. 16, the

16   last of the text messages that I'm going to ask you about.

17            And Exhibit 16 is not in evidence yet, so if you

18   could just look at it in the book, ma'am.  Do you recognize

19   that exhibit?

20   A.    Yes.  It's another excerpt of text messages that were

21   retrieved from the SD card.

22   Q.    Retrieved by you, correct?

23   A.    Yes.

24            MS. PALUCH:  At this time, I'd move to admit and

25   publish Government's Exhibit 16.

Direct - Stailey

 1            THE COURT:  Any objection?

 2            MR. GOODREID:  No objection, Your Honor.

 3            THE COURT:  There being no objection, Exhibit 16

 4    is admitted into evidence and may be published to the jury.

 5        (Government's Exhibit 16 received)

 6    BY MS. PALUCH:

 7    Q.   Okay.  If we could display that and please blow up

 8    lines 4 and 5.  And what I'd like to show you first here

 9    is -- if you could state for the record the date of that

10    transmission.

11    A.   July 1st, 2012.

12    Q.   And can you blow up the text alone.

13          Okay.  And could you read that into the record.

14    A.   "Give me ur bank and acct number."

15          "Chase number 455435276."

16    Q.   And if we could back out again so you can state who's

17    giving the bank account number -- or which user's giving

18    the bank account number?

19    A.   The person using the Huawei cell phone.

20    Q.   Okay.  And then if you could please blow up the last

21    line of this exhibit -- or, actually, the last two lines,

22    please, Agent Hacker.  Can you grab the line before that,

23    23?  Okay.  23 and 24.  There you go.

24          Okay.  1 and 2, the date of that transmission?

25    A.   July 3d, 2012.

408

Direct - Stailey

1    Q.    Okay.  And then please just blow up the text.  And I'd

2    like you to read those two text messages in.

3    A.    "Im working on it routing number got messed up it was

4    sent to sydney alishia.  1 number different acct number

5    then urs calm down puddytang."

6          "Chase Tramell Thomas 455435276."

7    Q.    Is that the same number that we just looked at

8    before?

9    A.    Yes.

10   Q.    Okay.  And the Chase indication is coming from the 2,

11   from the Huawei user?

12   A.    Yes, that's correct.

13   Q.    Okay.  Thank you.  You can take that exhibit down.

14         Ma'am, did you locate any photographs taken -- or

15   from the SD card?

16   A.    Yes, I did.

17   Q.    And can you state approximately how many?

18   A.    There were approximately 1750 images on the SD card,

19   and there were around 450 images that were specific to a --

20   the camera folder.

21   Q.    Okay.  And where on the SD card did you locate those

22   images?

23   A.    The camera folder was in another folder called DCIM,

24   which stands for digital camera images.  And it's a folder

25   that basically all digital cameras use to store any photos

Direct - Stailey

1    taken with that camera, and that includes digital cameras

2    used -- that are part of cell phones.

3    Q.   Okay.  There are six of those images I'd like to ask

4    you about this morning.  And if you could please look at

5    that first exhibit book.  And I'd like you to start with

6    Government Exhibit 9.

7         And can you just state for the record what that

8    exhibit is.

9    A.   It is a photo that I located on the SD card.

10   Q.   Okay.  And now I'm going to direct your attention to

11   Government's exhibit starting at 24.  Are they in that book

12   or do we need the next book?

13   A.   They're not in this book.

14        MS. PALUCH:  Ms. Hansen, if you could help us with

15   that.  Thank you.

16   BY MS. PALUCH:

17   Q.   So we're going to start with Government Exhibit 24,

18   please.  And I want you to just flip through.  I'm going to

19   give you the page number -- the exhibit numbers and then

20   I'm going to ask you about those exhibits.  So start with

21   24 and let me know -- look up when you're done, and 25.

22   26.  28.  And 29.

23        What are those exhibits, ma'am?

24   A.   They are photos that I extracted from the camera

25   folder on the SD card.

Direct - Stailey

1    Q.   And did you use the same forensic tools that you have

2    described here today in extracting those photographs?

3    A.   Yes, I did.

4         MS. PALUCH:  Your Honor, at this time I'd move to

5    admit and publish these exhibits one at a time.

6         THE COURT:  Why don't you tell me them again.

7         MS. PALUCH:  They are Exhibits 9, Exhibits 24

8    through 26, and Exhibits 28 and 29.

9         THE COURT:  Any objection?

10        MR. GOODREID:  No, Your Honor.

11        THE COURT:  All right.  There being no objection,

12   the following Government exhibits are admitted into

13   evidence and may be published to the jury:  Exhibit 9,

14   Exhibit 24, 25, 26, 28, and 29.

15        (Government's Exhibits 9, 24 thru 26, 28, 29 received)

16   BY MS. PALUCH:

17   Q.   Thank you.  Agent Hacker, if we could start with

18   Government Exhibit 9.  And since you've already identified

19   these, ma'am, I'm just going to now have Agent Hacker

20   display them for the jury.  So that is Exhibit 9.  Could

21   you please display Exhibit 24.  Exhibit 25.  Is there any

22   way to blow up that image?  Exhibit 26.  Exhibit 28.

23   Exhibit 29.  Okay.  You can take that image down.

24        Ma'am, were you also asked to forensically examine

25   a number of computer hard drives seized during the search

Direct - Stailey

1    of the residence on Kaibab Avenue in Chandler, Arizona?

2    A.    Yes, I was.

3    Q.    Now before we talk about those computer hard drives,

4    generally can you describe what an IP address is.

5    A.    Yes.  An IP address is an internet protocol address.

6    Every computer that is on a network must have an IP address

7    in order to communicate with other computers on the

8    network.  Similar to a physical mailing address, you have

9    to have an address to communicate with a house, you have to

10   have an address to communicate with a computer.

11          For a home computer, for example, an IP address

12   would be assigned by the internet router or the modum.  And

13   then the router or the modum is assigned an internet -- an

14   IP address by an internet service provider such as Comcast

15   or AT&T.

16   Q.    Okay.  In this case, how many computer hard drives

17   were you asked to examine that were seized from the home?

18   A.    Five.

19   Q.    Okay.  Were you also asked to examine a hard drive

20   from a laptop seized by the Tempe Police Department?

21   A.    Yes.

22   Q.    So seven items total or six?

23   A.    Six hard drives.  There was a memory card that was

24   also seized at the home.

25   Q.    Okay.  So seven items total.  Okay.  And did you find

412

Direct - Stailey

1  evidence related to this case on any of those seven items?

2  A.    Yes.

3  Q.    And how many?

4  A.    On six -- on all six hard drives.

5  Q.    Okay.  All except the --

6  A.    The SD memory card.

7  Q.    All right.  And what were you asked to look for on

8  those devices?

9  A.    The same search terms that I was provided by Special

10  Agent Ennis.

11  Q.    And how did you conduct those searches?

12  A.    I used the forensic program FTK.  It is a software

13  program designed for forensic analysis of computer devices.

14  And one of its capabilities is to search for any terms

15  across any piece of digital evidence, no matter where on

16  the hard drive that term would exist.  It's designed to

17  search and return results for any of those search terms.

18  Q.    Did you develop keyword searches in order to perform

19  that analysis?

20  A.    Yes.  So I took the -- the list of relevant terms that

21  Special Agent Ennis provided to me, and I developed my own

22  list of search terms based on that list.

23  Q.    Okay.  One moment here.

24        I'd like to start asking you about an examination

25  that you performed on an item designated as Q-21.  Can you

413
Direct - Stailey

1     state what that item is.

2     A.    That was a hard drive that was located in a Sony Vaio

3     laptop computer.

4     Q.    And do you know who the seizing agency was of that

5     Sony Vaio laptop?

6     A.    It was the Tempe Arizona Police Department.

7     Q.    In performing your examination, were you able to

8     determine when that laptop was last properly shut down?

9     A.    Yes, I was.

10    Q.    And what was that date and time?

11    A.    May I refer to my report?

12    Q.    Yes, you may.  I'm looking for a date and time, ma'am.

13          Have you refreshed your recollection?

14    A.    Yes, I have.

15    Q.    Yes, ma'am, can you tell us?

16    A.    August 28th, 2012, at about 9:21 p.m. Pacific time.

17    Q.    Did you locate any hits for the names of certain of

18    the terms provided to you from Agent Ennis?  For example,

19    did you receive the names of community colleges to look

20    for?

21    A.    Yes.

22    Q.    Did you locate hits for community colleges on that

23    Sony Vaio computer?

24    A.    Yes, I did.

25    Q.    Approximately how many?

Direct - Stailey

1    A.    Hundreds.

2    Q.    In those hundreds of hits, did you retrieve hits for

3    Maricopa County Community College District?

4    A.    Yes.

5    Q.    Did you recover hits for Pikes Peak Community College?

6    A.    Yes.

7    Q.    How about Colorado Community College System?

8    A.    Yes.

9    Q.    Where on the hard drive did you find these hits to

10   these school names or districts?

11   A.    They were located in artifacts associated with the

12   Internet Explorer internet browser.

13   Q.    Can you tell us what that means.

14   A.    Yes.  Internet Explorer browser is just a tool to --

15   that you use to browse the internet, so locating these art-

16   -- these community college names in these artifacts

17   indicate that the user of that computer used Internet

18   Explorer to browse to those websites.

19   Q.    Did you locate any search results related to FAFSA

20   application pages?

21   A.    Yes.

22   Q.    And where did you locate those search results on the

23   Vaio laptop?

24   A.    Also in the Internet Explorer artifacts.

25   Q.    The same explanation you gave us just previously?

415

Direct - Stailey

1    A.    Yes.

2         THE COURT:  Can I interject a question here?

3    Maybe I'm the only one that doesn't know the answer to

4    this:  What is an artifact?

5         THE WITNESS:  In this case, it represented

6    temporary internet files.  So when you browse to a website,

7    some of the pieces that make up that website are downloaded

8    locally to your computer, so that the next time you visit

9    that website, it loads faster.

10        And so that's what some of these artifacts were.

11   Some were just history entries, just showing that that

12   website was visited.  And some of them were internet

13   cookies, which is a small file that a website will write to

14   your computer that will save information like your user

15   name, for example.  So when you visit that website again,

16   it will recognize you and it will say "Welcome back," for

17   example.

18        THE COURT:  All right.  Thank you.

19        MS. PALUCH:  Thank you, Your Honor.

20   BY MS. PALUCH:

21   Q.    Could you please look in one of the books in front of

22   you, Government Exhibit 19.

23   A.    Okay.

24   Q.    Can you identify that exhibit, ma'am.

25   A.    This is -- these are history entries showing visits to

                              Direct - Stailey

 1      the *fafsa.ed.gov* website.

 2      Q.   And are these -- is this an exhibit that you created

 3      after retrieving this information from that laptop?

 4      A.   Yes.

 5           MS. PALUCH:  At this time, Your Honor, I'd move to

 6      admit and publish Government Exhibit 19.

 7           THE COURT:  Any objection?

 8           MR. GOODREID:  No objection, Your Honor.

 9           THE COURT:  All right.  There being no objection,

10      Government Exhibit 19 is admitted into evidence and may be

11      published to the jury.

12           (Government's Exhibit 19 received)

13           MS. PALUCH:  Thank you, Your Honor.

14      BY MS. PALUCH:

15      Q.   Now, if we can blow this up, Agent Hacker, so that we

16      can -- let's go ahead and -- for purposes so we can read

17      this, just blow up column A.

18           And, Ms. Stailey, I'm going to ask you to just

19      explain what -- and if you could pull -- yeah, that's good.

20      Could you explain what's represented in column A.

21      A.   This is a time stamp of the most recent time that the

22      websites defined in the rest of the exhibit were visited.

23      Q.   Okay.  And I believe you testified previously that the

24      laptop was last shut down approximately 9:21 p.m.  Does

25      that time relate to what's reflected here as far as the

Direct - Stailey

1    time?

2    A.   Yes.  So the 9:21 p.m. was converted from UTC, which

3    is what you see in the exhibit, to the local time zone,

4    which was Pacific.  So in UTC, that 9:21 p.m. would be 4:21

5    a.m.  So what we see here are all of these time stamps in

6    the exhibit happened within about a day of that laptop last

7    being shut down.

8    Q.   And so that the record is clear, could you explain

9    what UTC stands for?

10   A.   It's Universal Coordinated Time.  It's just the

11   general time stamp that all computer time stamps are stored

12   in, and then your computer will convert that to your local

13   time zone, like Mountain time.

14   Q.   I see.  Could you please blow up Exhibit -- column B

15   for us, please.

16        And what's represented here?

17   A.   This is the user account or the user profile on the

18   computer, where these artifacts were located.

19   Q.   And, who sets up a user profile?

20   A.   Usually that's done by the user when they boot up the

21   computer for the first time.

22   Q.   Okay.  Let's go to column C, please.

23        What is represented in this column?

24   A.   This is the internet address or the website that was

25   visited.

Direct - Stailey

1    Q.    Okay.  And let's go to column D, please.

2          And what do we see here?

3    A.    This is the title of the web page.  So what we just

4    saw is just the web page, itself, the URL, and this is what

5    the actual title of the web page would be.

6    Q.    Okay.  And can you describe for us what a URL means.

7    A.    It's a Universal -- Uniform Resource Locator, and it's

8    just -- it's another term for internet address for a

9    website address.

10   Q.    Okay.  And the next column, please.

11         What does this show us?

12   A.    This column represents the number of unique times that

13   the web pages were visited by this user on this computer.

14   Q.    Okay.  If we could back out and go to the prior

15   column, column D, and blow that up one more time.

16         I'd like to ask you, ma'am, does the term or the

17   letters "FAFSA" appear on every single entry there?

18   A.    Yes.

19   Q.    Okay.  All right.  If you could take that exhibit

20   down.  Thank you.

21         Ma'am, did you find any HTML files relating to the

22   keyword search terms on the Sony Vaio?

23   A.    Yes.

24   Q.    And can you explain for us what an HTML file is.

25   A.    HTML is Hypertext Markup Language.  It's a program

419

Direct - Stailey

1  link -- programming language that is used to create and

2  define all the elements that make up a web page.

3  Q.   And approximately how many HTML files related to this

4  case did you find on the Sony Vaio laptop?

5  A.   About 300.

6  Q.   Okay.  Is an HTML file readable?

7  A.   It is human readable; however, it has a number of

8  reserved words and symbols that are part of the programming

9  language that make it hard to just read and understand it.

10  So a -- an internet browser like Internet Explorer will

11  read that language and then display the web page to us the

12  way that we're used to seeing web pages.

13  Q.   Did you locate any HTML files related to FAFSAs in the

14  names of any -- in any of the names on the list you were

15  provided by Agent Ennis?

16  A.   Yes, I did.

17  Q.   Approximately how many names are there?

18  A.   I believe 22.

19  Q.   Did you find HTML files related to a person named

20  Manuel Abate?

21  A.   Yes.

22  Q.   How many?

23  A.   Seven.

24  Q.   Okay.  Let's have you look in the book at Government

25  Exhibit 20, please.

420
Direct - Stailey

1        And can you identify that exhibit, ma'am?

2   A.   Yes.  This is one of the HTML files I identified for

3   Manuel Abate.

4        MS. PALUCH:  At this time, Your Honor, I'd move to

5   admit and publish Government Exhibit 20.

6        THE COURT:  Any objection?

7        MR. GOODREID:  And, again, Your Honor, no

8   objection.

9        THE COURT:  All right.  Just for clarification,

10  Ms. Stailey, are these still all from this Q-21 --

11       THE WITNESS:  Yes.

12       THE COURT:  -- Sony laptop?

13       THE WITNESS:  Yes, sir.

14       THE COURT:  Exhibit 20 is admitted into evidence

15  and may be published to the jury.

16      (Government's Exhibit 20 received)

17  BY MS. PALUCH:

18  Q.   Okay.  So let's -- you stated that this is an HTML

19  file, correct?

20  A.   Yes.

21  Q.   And it's readable for us, so can you explain that?

22  A.   Yes, this is -- this is what the HTML file looks like

23  when it's opened with a browser like Internet Explorer.

24  Q.   Okay.  So let's blow up the middle portion of this

25  exhibit, if you could.

Direct - Stailey

1     And can you tell us what type of information is
2  represented there.
3  A.   Yes.  It contains the Social Security number, a -- two
4  times; a first name and a last name; and a date of birth.
5  Q.   Now, you testified that you found seven such HTML
6  files related to Mr. Abate.
7     If you could please take that exhibit down now.
8     In the other six, did you find similar
9  information?
10 A.   Yes, I did.
11 Q.   Similar in the sense of identifying information?
12 A.   Yes.  Social Security numbers; first name, last name;
13 date of birth.
14 Q.   Did any of those files for Mr. Abate list a physical
15 address?
16 A.   Yes.
17 Q.   And how many?
18 A.   Two.
19 Q.   And do you recall, as you testify here, what this
20 address was?
21 A.   Can I review my notes?
22 Q.   Yes, ma'am.  And what was that address?
23 A.   1112 Meadow Oaks Drive in Colorado Springs, Colorado.
24 Q.   Did any of those files list e-mail addresses for Mr.
25 Abate?

422

Direct - Stailey

1    A.    Yes.

2    Q.    How many?

3    A.    Two.

4    Q.    Did you retrieve Department of Education PIN

5    applications on the Sony Vaio in the names of individuals

6    listed on Agent Ennis' list?

7    A.    Yes.

8    Q.    And for how many of those 22 names did you find those?

9    A.    Can I refresh?

10   Q.    Yes, ma'am.  Oh, I'm sorry.  How many names did you

11   find out of -- for DOE PIN applications?

12   A.    Eight.

13   Q.    And how about for application certification pages?

14   A.    Eight.

15   Q.    Did you find any hits for Pikes Peak Community

16   College?

17   A.    Yes.

18   Q.    What type of hits?

19   A.    They were Google searches for Pikes Peak Community

20   Colleges, or Community College.

21   Q.    What about for Maricopa, the term Maricopa?

22   A.    Yes.  The same thing.  Google search results for

23   Maricopa.

24   Q.    How about Pueblo Community College?

25   A.    Yes.

423
Direct - Stailey

1   Q.   And how many names on the names on Agent Ennis' list

2   did you find pages for that?

3   A.   May I --

4   Q.   Yes, ma'am.

5   A.   Okay.

6        THE COURT:  Okay.  Can you ask that question

7   again?

8        MS. PALUCH:  Right.

9   BY MS. PALUCH:

10  Q.   We're talking about application certification pages.

11  Did you find those in the names of students on Agent Ennis'

12  list with respect to Pueblo Community College?

13  A.   Yes.

14  Q.   And how many?

15  A.   Two.

16  Q.   Okay.  What about Maricopa County Community College

17  District?

18  A.   Yes.

19  Q.   How many?

20  A.   May I --

21  Q.   Yes, ma'am.

22  A.   13.

23  Q.   13.  Okay.  Now, did you find any shortcuts on the

24  Sony Vaio laptop?

25  A.   Yes.

Direct - Stailey

1  Q.  Can you explain what a shortcut is?

2  A.  Yeah.  A shortcut is just a file that points to

3  another file or website.  So if you double-click the

4  shortcut file, it will open up the website, for example.

5  Q.  Okay.  What shortcuts did you find?

6  A.  I found 10 shortcuts for websites that were part of

7  the *Maricopa.edu* website.

8  Q.  Okay.  Please look at what's been marked as Government

9  Exhibit 21.  Can you identify that exhibit.

10  A.  Yes.  These are the 10 shortcuts that I identified.

11       MS. PALUCH:  At this time, I'd move to admit and

12  publish Government Exhibit 21.

13       THE COURT:  Any objection?

14       MR. GOODREID:  No objection, Your Honor.

15       THE COURT:  All right.  There being no objection,

16  Exhibit 21 is admitted into evidence and may be published

17  to the jury.

18       (Government's Exhibit 21 received)

19  BY MS. PALUCH:

20  Q.  Ma'am, let's go ahead and blow up the first -- first

21  of all, just generally, what's the information contained in

22  this exhibit?  And I'll have you go through the columns.

23  A.  These are the 10 internet shortcuts for *Maricopa.edu*

24  websites.

25  Q.  Okay.  So let's blow up column A.

425

Direct - Stailey

1    And tell us what's contained there.

2    A.   These are the file names that would appear on the

3    computer.

4    Q.   Okay.  And who would -- how would these file names --

5    explain that to me, if you can.

6    A.   So, for example, if these were on the user's desktop,

7    the user could just double-click on these files and they

8    would open up the websites that are in column B.

9    Q.   Okay.  So let's go to column B, if we could.  And is

10   there any way to make that larger?  Okay.

11       Looks like gobbledygook to me, but can you tell me

12   what is represented in that column?

13   A.   Yes.  So those are the actual websites that would be

14   opened by double-clicking on the shortcut files.

15   Q.   Okay.  Thank you.

16       You can take that exhibit down.

17       Did you find on the Sony Vaio any hits on the

18   inmate names provided to you by Agent Ennis?

19   A.   Yes.

20   Q.   Approximately how many?

21   A.   Can I review my notes?

22   Q.   Yes, ma'am.

23       Okay, how many names of the inmate names did you

24   locate?

25   A.   53.

426

Direct - Stailey

1    Q.   And from that 53, did we ask you to remove certain

2    names from that 53?

3    A.   Yes.

4    Q.   What names did you remove?

5    A.   Heather Carr, Ayana Jones, and Terrel Smith.

6    Q.   Did any of those 53 names include the name Tramell

7    Thomas?

8    A.   No.

9    Q.   So did you create a summary of those 50 names?

10   A.   Yes.

11   Q.   Please look at Government Exhibit 22.  Hopefully you

12   have that in the book in front of you.

13        THE COURT:  Before we go into that exhibit, would

14   this be a good time for our lunch break?

15        MS. PALUCH:  Certainly, Your Honor.

16        THE COURT:  All right.  Ladies and gentlemen of

17   the jury, I need to remind you again, because I have to:

18   Please do not do any independent research into or discuss

19   with anyone the facts, the law, the issues, or individuals

20   involved in this case.

21        We are going to take a lunch recess to 1:30.  I

22   ask that you be back in the jury assembly room by 1:20.

23        (Jury left the courtroom at 12:13 p.m.)

24        THE COURT:  Ms. Stailey, because you're in the

25   middle of your testimony, I direct you not to speak with

                          Direct - Stailey

 1   any of the lawyers during the lunch break.

 2           THE WITNESS:  Okay.

 3       (Recess taken 12:13 p.m.)

 4                    AFTERNOON SESSION

 5       (In open court in the presence of the jury at 1:35

 6   p.m.)

 7           THE COURT:  Ms. Stailey, I remind you that you

 8   remain under oath.

 9           THE WITNESS:  Yes.

10           THE COURT:  All right, Ms. Paluch, you may resume

11   your examination.

12           MS. PALUCH:  Thank you, Your Honor.

13   BY MS. PALUCH:

14   Q.   Ms. Stailey, I'd like to start with this:  Earlier in

15   your testimony, you talked about whether you were given

16   certain terms to search for when you examined the digital

17   and evidence and the mobile devices.  Do you recall that?

18   A.   Yes.

19   Q.   And can you state again who provided you with those

20   terms?

21   A.   Yes, Special Agent Sandra Ennis.

22   Q.   Okay.  I'd like you to look at what's been marked as

23   Government's Exhibit 12.  And I don't know that it's in the

24   book.  Is it in the book?  Okay.

25           COURTROOM DEPUTY:  12?

428
Direct - Stailey

1      MS. PALUCH:  Yes.  I think she has it there.
2  Thank you, Ms. Hansen.
3  BY MS. PALUCH:
4  Q.  Can you identify that exhibit, ma'am.
5  A.  It's the list of search terms that -- and key terms
6  that Special Agent Ennis provided to me.
7  Q.  And you used those terms in order to conduct your
8  examination in this case?
9  A.  That's correct.
10      MS. PALUCH:  Your Honor, at this time I would move
11  for the admission and publication of Government's
12  Exhibit 12.
13      THE COURT:  Well, 12's already been admitted and
14  it's -- now, with the redaction, can be published to the
15  jury.
16      MS. PALUCH:  Thank you, Your Honor.
17      COURTROOM DEPUTY:  Are you going --
18      MS. PALUCH:  Ms. Hansen, I was going to use the
19  Elmo, please.  Thank you.
20  BY MS. PALUCH:
21  Q.  And what I would like to do is have you talk about
22  these headings.  Are you able to see that?
23      THE COURT:  Ms. Paluch, if you're going to be
24  using the Elmo, then move the mic towards you so --
25      MS. PALUCH:  Certainly, Your Honor.

Direct - Stailey

1          THE COURT:  Yeah, we're totally losing you when

2     you move over that far.

3          MS. PALUCH:  Understood, Your Honor.

4     BY MS. PALUCH:

5     Q.   All right.  What I'd like you to do, Ms. Stailey, is

6     just state for the record what the categories of search

7     terms were as represented on this first page.

8     A.   Bank sites, cell phone provider sites, community

9     colleges.

10    Q.   Okay.  And then let's turn to the second page of that

11    exhibit.  And could you state those headings of search

12    terms.

13    A.   Department of Education and miscellaneous sites.

14    Q.   And specifically for the record what's listed under

15    Department of Education?

16    A.   Free Appication for Federal Student Aid, or FAFSA.

17    Q.   If you could turn to the next page, please.  What I'd

18    like to focus on is the column to the far left.

19          And can you state what's listed in that column.

20    A.   Last name.

21    Q.   And the next column over?

22    A.   First name.

23    Q.   And so these are individuals you're searching for?

24    A.   Yes.

25    Q.   And are you also given Social Security numbers and

430

Direct - Stailey

1    dates of births as well as addresses?

2    A.    Yes.

3    Q.    Okay.  And if you could count in this exhibit how many

4    pages that goes on.

5    A.    Eight pages.

6    Q.    And eight pages of the similar type of information?

7    A.    Yes.

8    Q.    Thank you.  What I'd like to do now is return to what

9    we were talking about before the lunch break, ma'am.  And

10   that is we were talking about:  Do you recall that list I

11   had asked you about hits for inmate names on the list

12   provided that you found on the Sony Vaio?

13   A.    Yes.

14   Q.    And do you recall we had that discussion about a --

15   the number was 53?

16   A.    Yes.

17   Q.    And do you recall the three names you said that you

18   removed from that list?

19   A.    Heather Carr, Ayana Jones and Terrel Smith.

20   Q.    Okay.  And then I had asked you if the defendant's

21   name, Tramell Thomas, was in that 50?

22   A.    It was not.

23   Q.    Okay.  So did you create a summary of those 50 names?

24   A.    Yes, I did.

25   Q.    Please look at Government's Exhibit 22.

Direct - Stailey

1          Do you see that exhibit, ma'am?

2     A.   Yes.

3     Q.   Can you identify that?

4     A.   This is the summary that I prepared.

5     Q.   The summary of?

6     A.   Of the search hits for the names on the list.

7     Q.   From the Sony Vaio?

8     A.   Yes.

9          MS. PALUCH:  Your Honor, at this time I would move

10    to admit and publish Government's Exhibit 22.

11         THE COURT:  Any objection?

12         MR. GOODREID:  No, Your Honor.

13         THE COURT:  All right.  Exhibit 22 is admitted

14    into evidence and may be published to the jury.

15       (Government's Exhibit 22 received)

16    BY MS. PALUCH:

17    Q.   Okay.  So why don't we do this:  Let's start with the

18    first column.  And, Agent Hacker, if you could please

19    enlarge column A.

20         And first, before we talk about the individual

21    columns, Ms. Stailey, how large is this exhibit?

22    Approximately how many pages?

23    A.   It's 193 pages.

24    Q.   Okay.  And what is contained in Exhibit A?

25    A.   In column A?

432

Direct - Stailey

1    Q.   I'm sorry, column A.  Excuse me.

2    A.   Column A is the first name and last name of the person

3    from the list that Special Agent Ennis provided.

4    Q.   Okay.  Let's go to the next column.

5    A.   Column B is the file path, or the location, on the

6    Vaio where I located the search hit.

7    Q.   So would it be fair to say that's the address or the

8    location on --

9    A.   Yes.

10   Q.   Okay.  Let's go to the next column.  What is contained

11   in column C?

12   A.   Column C is the search hit, itself, as well as some

13   context, the few characters before the search hit as well

14   as the few characters after the search hit to give the

15   search hit a little bit of context.

16   Q.   Okay.  I'd like to refer your attention to page 2 of

17   this exhibit.  And specifically entry 30.

18        If we could highlight 30 to the bottom of the

19   page.

20        Can you state the name for these hits?

21   A.   Manuel Abate.

22   Q.   Okay.  What I'd like you to do now, Ms. Stailey, is

23   count in that exhibit how many pages have entries for

24   Manuel Abate.

25        You can scroll through, Agent Hacker.

433

Direct - Stailey

1    A.    Seven pages.

2    Q.    Okay.  In what part of the hard drive were these hits

3    located?

4    A.    These were located in System Files and in unallocated

5    space.

6    Q.    Can you describe what you mean by System Files?

7    A.    A system file is a file designed to help the operating

8    system run, like an executable, a program, or a driver.

9    They're not designed for user interaction.

10   Q.    Can you explain what "unallocated space" means.

11   A.    Unallocated space is the unused portion of the hard

12   drive, or the space that's not allocated to a file.  So if

13   we see readable content in an allocated space, it indicates

14   that at one time there was a file saved to that area of the

15   hard drive but that file has since been deleted.

16   Q.    Now, you testified that you examined evidence seized

17   from the Kaibab residence, correct?

18   A.    Correct.

19   Q.    Okay.  And were you provided with an evidence

20   inventory form regarding that search?

21   A.    Yes, I was.

22   Q.    And who provided that form to you?

23   A.    Special Agent Ennis.

24   Q.    And what information did that form provide you with?

25   A.    It has a description of the item that was seized as

Direct - Stailey

1    well as the location within the residence where it was

2    found.  And it assigns an item number to each item that was

3    seized.

4    Q.    Did it also assign a room number of where the evidence

5    was located?

6    A.    Yes.

7    Q.    Okay.  Did you find any evidence on any of the hard

8    drives located at the Kaibab address?

9    A.    Yes.

10   Q.    How many of them?

11   A.    Five.

12   Q.    What I'd like to talk to you about now is one of those

13   specific hard drives that was labeled Q-7.  Do you know

14   what type of computer Q-7 was?

15   A.    May I refer to my notes, please?

16   Q.    Yes, ma'am.

17   A.    It was an HP Touchsmart desktop computer.

18   Q.    And did the inventory form that you just testified

19   about tell you in what room that computer was located?

20   A.    It was room J.

21   Q.    Room J.  On that room J computer, did you locate hits

22   for Department of Corrections websites?

23   A.    Yes.

24   Q.    Do you recall which states?

25   A.    Colorado, California, Indiana, and also a Cook County

435
Direct - Stailey

1    sheriff's office.

2    Q.   Can you state approximately how many hits you

3    retrieved for those states' DOC websites?

4    A.   Hundreds.

5    Q.   Did Q-7 contain search hits for the inmate names on

6    Agent Ennis' list?

7    A.   Yes.

8    Q.   Approximately how many?

9    A.   18.

10   Q.   Did you remove any of the names from that 18?

11   A.   I did.  I removed eight.

12   Q.   And what -- do you happen to recall, or would you need

13   to refer to your report?

14   A.   I can refer to my report.

15   Q.   Okay.

16   A.   Can I read them --

17   Q.   Yes, ma'am.  I think you need to just refresh your

18   recollection, if you can.  If you can't remember them,

19   I'll . . .

20   A.   I may not be able to remember all eight, but Ayana

21   Jones, Heather Carr, Tramell Thomas, Michael Cox, LaTanya

22   Pickens, Leombe Agent.  I think there were one or two more.

23   Q.   Okay.  So I think you testified there were 10

24   remaining names.

25   A.   Yes.

Direct - Stailey

1    Q.    Did you create a summary of those 10 remaining names?

2    A.    Yes.

3    Q.    Please look at Government's Exhibit 23 in the book,

4    please.

5          Can you identify that document?

6    A.    This is the summary I created from the computer in

7    room J, search hits for names on the list.

8    Q.    And what tools did you use to extract that evidence?

9    A.    The FTK, Forensic Tool Kit, analysis program.

10         MS. PALUCH:  At this time, I'd move to admit and

11   publish Government's Exhibit 23.

12         THE COURT:  Any objection?

13         MR. GOODREID:  No, Your Honor.

14         THE COURT:  Exhibit 23 is admitted into evidence

15   and may be published to the jury.

16      (Government's Exhibit 23 received)

17         MS. PALUCH:  Thank you, Your Honor.

18   BY MS. PALUCH:

19   Q.    Okay.  So, again, just briefly, if we could highlight

20   column A.

21         And just -- if you could just state what is

22   represented.

23   A.    It's the first and last name of the person whose

24   identifiers were found in the search hits.

25   Q.    And the next column, please.

Direct - Stailey

1    A.   That's the location on the hard drive where the search

2    hit was found.

3    Q.   Okay.  Could you go back to that search location.  All

4    right.

5         Does it reference room J there?

6    A.   It does.

7    Q.   And that's telling you that that -- whatever you

8    created on this exhibit was located on the computer in room

9    J?

10   A.   Yes.

11   Q.   Okay.  Let's go to the next column, please.

12        And what's represented here?

13   A.   This has the search hit, itself, as well as characters

14   before and after to provide some context around the search

15   hit.

16   Q.   Okay.  If you could please publish the third page of

17   that exhibit.

18        And do you see, Ms. Stailey, towards the bottom of

19   that page, there's reference to a Dennis Miller?

20        If you could highlight that, Agent Hacker.

21   A.   Yes.

22   Q.   Using Mr. Miller as an example, could you explain the

23   entries that you see here.

24   A.   The search hits contain identifiers associated with

25   Dennis Miller, including Social Security number, first and

Direct - Stailey

1    last name, as well as a date of birth.

2    Q.   If you could hold on one second.  Let's -- we need to

3    highlight that area.  Okay.

4         So we're on the Dennis Miller entries.  Can you

5    tell us what you're seeing here.

6    A.   Yes.  So the first line is his Social Security number,

7    and then we see his first name and last name, as well as

8    the 06-11, 1951 is the date of birth, followed by the

9    *fafsa.gov* website as context around that search hit.

10   Q.   And I'm going to stop you there.  When you had

11   received the terms from Agent Ennis, did it provide you

12   with dates of birth and Social Security numbers for

13   specific individuals?

14   A.   Yes.

15   Q.   Okay.  And if you could proceed on to some of the

16   other entries you see for Dennis Miller.

17   A.   The next three are auto recovery save of Dennis

18   Miller.  Generally this is associated with -- Microsoft

19   Office will autosave a file -- in case Office or Microsoft

20   Word crashes, it has this auto recovery save that it can

21   restore from.

22        So that's what this indicates, is that document

23   called Dennis Miller had been autosaved by Microsoft

24   Office.

25   Q.   Okay.  And if you could back out, Agent Hacker, and

Direct - Stailey

1    show us -- continue on to the next page and see if we could

2    continue on.

3           Ms. Stailey, do you see the entries for Dennis

4    Miller proceeding onto the next page?

5    A.    Yes.

6    Q.    And that's page 4.  Let's go on to page 5.

7           Are there more entries for Dennis Miller?

8    A.    Yes.

9    Q.    Let's go on to page 6.

10          Is page 6 all of Dennis Miller?

11   A.    Yes.

12   Q.    Let's go to page 7.  I do not have my glasses on.  Can

13   you tell me there -- okay.  All righty.

14          I think they end on that page; is that correct?

15   A.    That's correct.

16   Q.    Okay.  Now I'd like to ask:  Did you retrieve any

17   e-mails from Tramell Thomas from the computer's hard drive

18   located in room J that were between Tramell Thomas and a

19   Arizona state agency employee?

20   A.    Yes, I did.

21   Q.    What was the name of that employee?

22   A.    Adrian Zamora.

23          MS. PALUCH:  Could I have one second, Your Honor?

24          THE COURT:  You may.

25          MS. PALUCH:  No further questions.

Case No. 1:16-cr-00054-WJM   Document 225-5   filed 12/02/19   USDC Colorado   pg 400 of
901
Case 1:16-cr-00054-WJM   Document 565-1   Filed 03/09/19   Page 150 of 237

440

                        Cross - Stailey

1            THE COURT:  All right.  Cross-examination.

2            MR. GOODREID:  Yes, thank you, Your Honor.

3                        CROSS-EXAMINATION

4     BY MR. GOODREID:

5     Q.    Ms. Stailey, good afternoon.

6     A.    Good afternoon.

7     Q.    Now, you recall, don't you, Government counsel asking

8     you some questions about an IP address?

9     A.    Yes.

10    Q.    And you testified -- well, please tell me if this is

11    correct -- that you testified that an IP address, say for a

12    desktop computer in someone's home, that would be assigned

13    to them typically by the IP service provider such as AT&T

14    or Comcast; is that right?

15    A.    Typically the computer, itself, is assigned an address

16    automatically by the internet router, and the router is

17    assigned an IP address by the ISP, the internet service

18    provider.

19    Q.    Okay.  So let's say a laptop, for example -- so if I

20    had my laptop at home plugged into my router there, we'd

21    have a particular IP address, correct?

22    A.    Correct.

23    Q.    So if I took that same laptop, though, and I went

24    someplace else, say to Starbucks, would it have the same IP

25    address or a different one?

Cross - Stailey

1    A.   It's possible it would have the same because you're

2    joining a local network and local networks use a reserved

3    set of IP addresses that can be used over and over again by

4    any local network.

5         But the device that assigns you that IP address,

6    like the modem or the router, that is going to have a

7    different IP address for different locations.

8    Q.   So in my example of the laptop computer, it might be

9    the same IP address and it might not; is that fair?

10   A.   Yes.

11   Q.   Okay.  All right.  Let's take a look at Government

12   Exhibit 12 again that Ms. Paluch was just asking you about.

13   Do you recall that?

14   A.   Yes.

15   Q.   And, Ms. Hansen, may I have some assistance from you

16   with respect to the Elmo?  I seem to have -- oh, there we

17   go.  We do have it up?  Beg your pardon.  Okay.

18        So before I get -- before we take a look at that,

19   you recall, don't you, Ms. Stailey, that this was the

20   exhibit that you talked about that had a bunch of search

21   terms that were given to you by Special Agent Ennis, right?

22   A.   Yes.

23   Q.   Okay.  So I'd like you to focus on the last page.

24        Well, first of all, before we get to that, the

25   spreadsheet -- just to be clear, the multiple pages of the

Cross - Stailey

1    spreadsheet on here, again, those are terms that were given

2    to you by Ms. Ennis, correct?

3    A.    Correct.

4    Q.    Okay.  So let's take a look at the very last page.

5    And you see that the last name on there is Tramell Thomas.

6    A.    Yes.

7    Q.    And he's -- you know he's the defendant in this case,

8    right?

9    A.    Yes.

10   Q.    Okay.  And then let's scroll across.  You see the

11   addresses now, starting with 1418 Rushmore?

12   A.    Yes.

13   Q.    And 3532 North Carefree Circle, No. B, and then 1351

14   Pleasant Drive?

15   A.    Yes.

16   Q.    I just want to be clear, so these are search terms

17   that were given to you by Special Agent Ennis, right?

18   A.    Yes.

19   Q.    This is not data that you found in any device --

20   A.    That's correct.

21   Q.    -- right?  All right.  I can take that down.

22         Now let me ask you a hypothetical, Ms. Stailey.

23   Suppose my colleague here, Mr. Smith, and I were in a law

24   office and we had a single desktop computer that we shared.

25   Okay?  And suppose that he used it and I used it and then

Cross - Stailey

1      later, for whatever reason, you were asked to analyze the

2      hard drive. It is correct, is it not, that you would not

3      be able to tell whether, let's say, a given e-mail was

4      actually input by Mr. Smith or by me; isn't that right?

5      A.    Unless you were using your own user accounts, that is

6      correct.

7      Q.    Okay. Assume we did not differentiate user accounts.

8      You would not be able to tell by analyzing the hard drive

9      whether he sent an e-mail or whether I did, right?

10     A.    That's correct.

11     Q.    And by the same token, if there was -- if the hard

12     drive analysis showed that I had -- oh, excuse me, that

13     someone on the computer had accessed a particular website,

14     you wouldn't be able to tell whether I had done that or

15     whether Mr. Smith had done that, right?

16     A.    That's correct.

17     Q.    And by the same token, or whether somebody else in the

18     office had used the computer, correct?

19     A.    That's correct.

20     Q.    So let's talk about the Sony Vaio that you actually

21     did an analysis of. Do you remember that laptop?

22     A.    Yes, I do.

23     Q.    And do you recall that Ms. Paluch asked you a number

24     of questions about that?

25     A.    Yes.

444

Cross - Stailey

1    Q.   Okay.  Same thing with respect to that laptop

2    computer:  It's not possible to say who made a

3    particular -- excuse me, who accessed a particular website

4    off of that laptop, is it?

5    A.   That's correct, it's not possible.

6    Q.   And it's not possible to say whether -- whether, with

7    respect to a search term or an inmate, whether a particular

8    person did that, right?

9    A.   That's correct.

10   Q.   And with the same inmate, it's conceivable that two

11   different people could have made the same search for the

12   same inmate; isn't that right?

13   A.   Yes, that's correct.

14   Q.   All right.  Let's talk about the Q-007 hard drive.  Do

15   you remember Ms. Paluch asking you questions about that?

16   A.   Yes.

17   Q.   And that's what was found in what you understood to be

18   what's been labeled as room J, right?

19   A.   Yes.

20   Q.   And that was a hard drive from a desktop, right?

21   A.   Yes.

22   Q.   I believe you said it was an HP Desk Smart computer;

23   is that right?

24   A.   A Touchsmart.

25   Q.   Touchsmart.  Okay.  Touchsmart computer.  All right.

445
Cross - Stailey

1        And you indicated that on that computer -- excuse
2    me, on that hard drive, you found search hits for a number
3    of the individuals that Special Agent Ennis had given you,
4    right?
5    A.    Yes.
6    Q.    You also found some other things -- and that was also
7    the hard drive upon which the e-mail, apparently from Mr.
8    Thomas to the Arizona state employee, was found, correct?
9    A.    Yes.
10   Q.    Okay.  But you also found some other things not -- not
11   e-mails, as such, that were on that laptop -- excuse me, on
12   that hard drive, didn't you?
13   A.    Yes.
14   Q.    In fact, you discovered a Facebook page for Heather
15   Carr; isn't that right?
16   A.    Yes.
17   Q.    You also found an ADT Pulse Live video page for,
18   quote, Heather Carr Home; isn't that right?
19   A.    Yes.
20   Q.    And, again, back to what I was asking you before:
21   There's no way of knowing who put that Facebook for Heather
22   Carr on there, is there?
23   A.    No, there's no way to know.
24   Q.    And there's no way of knowing who put the ADT Pulse
25   Live video page for Heather Carr Home on there, is there?

446
                        Cross - Stailey

1    A.    That's correct.

2          MR. GOODREID:  Your Honor, may I have just a

3    moment, please?

4          THE COURT:  You may.

5    BY MR. GOODREID:

6    Q.    All right.  If we could pull up Exhibit -- Government

7    Exhibit 23, please.  And if we could highlight -- excuse

8    me, not highlight, but if we could enlarge, say, lines 26

9    and 27 of page 1.

10         All right.  And just to re-situate this, Ms.

11   Stailey, again, this is -- this exhibit is a list of things

12   that you actually found on that particular hard drive;

13   isn't that right?

14   A.    Yes.

15   Q.    And so, for example, here we have in 26, we have Eryn

16   Allegre.  You see that, right?

17   A.    Yes.

18   Q.    And 27, we have Shiraki Ellis, right?

19   A.    Yes.

20   Q.    Again, you found those on the hard drive.  In the next

21   column there, where it talks about the partition, tells you

22   where on the hard drive they were found, right?

23   A.    Yes.

24   Q.    But, again, there's no way of telling who looked --

25   who looked for Eryn Allegre, right?

447
Redirect - Stailey

1   A.   That's correct.

2   Q.   And there's no telling who did for Ms. Ellis, right?

3   A.   That's correct.

4   Q.   And you recall Ms. Paluch asked you a number of

5   questions later on in this exhibit about a person named

6   Dennis Miller?

7   A.   Yes.

8   Q.   And, in fact, there are pages and pages of hits for

9   Dennis Miller, right?

10  A.   Yes.

11  Q.   And all those pages and pages, again, there's no way

12  of telling who accessed the computer to look for Dennis

13  Miller, right?

14  A.   That's correct.

15          MR. GOODREID:   That's all I have, Your Honor.

16          THE COURT:   All right.   Redirect.

17          MS. PALUCH:   Thank you, Your Honor.

18                  REDIRECT EXAMINATION

19  BY MS. PALUCH:

20  Q.   Ms. Stailey, you were asked a hypothetical about

21  e-mail communications and Mr. Goodreid gave you an example

22  that if he and his colleague were sending e-mails from the

23  same computer, would it be difficult to tell who was

24  sending the e-mail; is that correct?

25  A.   Yes.

448
Redirect - Stailey

1    Q.   And do you recall I asked you about whether you found
2    e-mail communication between Tramell Thomas and a state
3    employee?  Do you recall that testimony?
4    A.   Yes.
5    Q.   And you gave the name of that woman, correct?
6    A.   Yes.
7    Q.   And without going into details about that
8    communication, was -- based on your review, was there any
9    question that those e-mails were between an individual
10   named Tramell Thomas and an individual named Adrian
11   Zambora?
12   A.   There was no question that they were between an e-mail
13   account with Tramell Thomas, and the name of the e-mail
14   account, and Adrian Zambora.
15            MS. PALUCH:  Thank you.  No further questions.
16            THE COURT:  May this witness be excused?
17            MS. PALUCH:  Yes, Your Honor.
18            THE COURT:  For the defendant?
19            MR. GOODREID:  Yes, Your Honor.
20            THE COURT:  Ms. Stailey, thank you so much for
21   joining us.  You're excused.  You may step down.
22            All right, the Government may call its next
23   witness.
24            MS. PALUCH:  Thank you, Your Honor.  The United
25   States calls Christine Duncan.

                          Direct - Duncan

1           COURTROOM DEPUTY:  Right here, ma'am.

2           THE WITNESS:  Oh, excuse me.

3           COURTROOM DEPUTY:  That's okay.  Step in the box

4    and raise your right hand.

5        CHRISTINE DUNCAN, GOVERNMENT'S WITNESS, SWORN

6           COURTROOM DEPUTY:  Please be seated.  State your

7    full name for the record and spell your first and last

8    name.

9           THE WITNESS:  Yes, my name is Christine Duncan.

10   C-h-r-i-s-t-i-n-e, D-u-n-c-a-n.

11          MS. PALUCH:  May I proceed, Your Honor?

12          THE COURT:  You may, counsel.

13          MS. PALUCH:  Thank you.

14                     DIRECT EXAMINATION

15   BY MS. PALUCH:

16   Q.   Good afternoon, ma'am.

17   A.   Good afternoon.

18   Q.   Did you at one time live in Colorado?

19   A.   Yes.

20   Q.   And in the 2010 to 2011 time frame, did you live in

21   Colorado Springs?

22   A.   Yes.

23   Q.   While living in Colorado Springs, did you meet an

24   individual named Tramell Thomas?

25   A.   Yes.

450

Direct - Duncan

1    Q.   How did you meet him?

2    A.   Through an acquaintance.

3    Q.   Do you know approximately when that was?

4    A.   August of 2010.  At the end of August.

5    Q.   What was the nature of your relationship with Tramell

6    Thomas?

7    A.   I believed it to be a personal relationship.

8    Q.   Did you live together?

9    A.   Yes.

10   Q.   Do you see Tramell Thomas in the courtroom today?

11   A.   Yes.

12   Q.   Could you state where he's seated and what he's

13   wearing.

14   A.   Yes.  He's over there.  And he's wearing a light blue

15   shirt and dark blue tie with a grayish jacket.

16        MS. PALUCH:  I'd ask that the record reflect the

17   witness has identified the defendant.

18        THE COURT:  The record will so reflect.

19        Ma'am, can you scooch up a little bit in your

20   chair, get a little closer to the edge -- there.  Closer to

21   the mic, please.  There you go.

22        THE WITNESS:  Is that better?

23        THE COURT:  That's better.

24   BY MS. PALUCH:

25   Q.   Try to speak right into the microphone if you can.

451

Direct - Duncan

1    A.    Okay.

2    Q.    Ma'am, when you and the defendant were living

3    together, what address was that?

4    A.    It was off of Radiant Drive.

5    Q.    Did you rent that -- was it an apartment or a home?

6    A.    An apartment.

7    Q.    Did you rent that apartment?

8    A.    Yes.

9    Q.    Was the rental in your name?

10   A.    No.

11   Q.    Was it in the defendant's name?

12   A.    No.

13   Q.    In whose name was it?

14   A.    I'm not exactly sure of the exact name.

15   Q.    Do you know why the apartment was not in your name or

16   the defendant's name?

17   A.    Yes, because Tramell explained to me that he didn't

18   want anything coming back to us.

19   Q.    To that address?

20   A.    To the address, yes.

21   Q.    Did anyone else live with you at that Radiant Drive

22   address?

23   A.    No.

24   Q.    When you lived with the defendant in Colorado Springs,

25   do you know what type of car he drove?

Direct - Duncan

1    A.   Yes.  A white Dodge Charger.

2    Q.   Did you ever have occasion to visit Pikes Peak

3    Community College with the defendant?

4    A.   Yes.

5    Q.   Could you explain what occurred during that time.

6    A.   Yes.  We went to Pikes Peak Community College and I

7    inquired about attending.  We received an enrollment

8    packet.  I proceeded to ask a few questions regarding some

9    courses.  And we left with the enrollment packet shortly

10   afterwards.

11   Q.   And what happened after you left with the packet?

12   A.   We went back to the apartment and I filled out the

13   enrollment packet and provided my driver's license and my

14   Social Security card to Tramell.

15   Q.   And why was it necessary for you to give him those

16   documents?

17   A.   He said that he wanted to make some copies.

18   Q.   And what did he do -- did he make those copies, to

19   your knowledge?

20   A.   Yes.

21   Q.   Was it your intent to attend Pikes Peak Community

22   College?

23   A.   Yes.

24   Q.   Did you actually attend Pikes Peak and enroll?

25   A.   No.

453
Direct - Duncan

1    Q.    And why not?

2    A.    I moved to Arizona shortly after I enrolled the

3    following year.

4    Q.    Did you actually complete all the paperwork to enroll?

5    A.    Yes.

6    Q.    Okay.  Now, at some point did you have a discussion

7    with the student -- with the defendant about federal

8    student funds?

9    A.    Yes.

10   Q.    And could you describe for us that conversation.

11   A.    Yes.  So after I filled out the enrollment paperwork,

12   he explained to me that we could apply for student loans,

13   and that the student loans didn't necessarily need to be

14   for items that I needed for school, like books, that we

15   could use it for personal use, such as laptops or a car.

16   Q.    Did you ever fill out a Free Application for Federal

17   Student Aid known as a FAFSA?

18   A.    No.

19   Q.    Have you ever filled out a FAFSA in your life?

20   A.    No.

21   Q.    Did you ever actually receive money to attend

22   Pikes Peak Community College?

23   A.    No.

24   Q.    Were you ever notified that, in fact, you did owe

25   money to Pikes Peak?

454

Direct - Duncan

1   A.   Yes.

2   Q.   And how did that come about?

3   A.   When I had gone to buy a car, they checked my credit

4   and they showed me my credit report and stated that I had

5   current loans open for Pikes Peak Community College in the

6   state of Colorado that were current.

7   Q.   Okay.  If we could please publish Government's Exhibit

8   57-J, which I believe has been admitted.

9        Mr. Fields, could you confirm that for me.  Could

10  you confirm 57-J, 57-K, and 57-L?  Are they all in?  Oh,

11  which ones?  Oh, they are not in?  Okay.

12       At this time I'd just like you to look -- and

13  there should be an exhibit book, I think it should be book

14  2, Ms. Hansen -- for an exhibit --

15       THE COURT:  Which exhibits are we talking about,

16  counsel?

17       MS. PALUCH:  Your Honor, I'm going to be asking

18  her about 57-B, 57-J through 57-L.  I do believe they are

19  stipulated.

20       THE COURT:  All right.  B is in.  J, K, and L are

21  not.

22       MS. PALUCH:  So I would like to move for their

23  admission and publication at this time.

24       THE COURT:  All right.  Given the stipulation of

25  the parties, Government Exhibits 57-J, 57-K, and 57-L are

455

Direct - Duncan

1    admitted into evidence and may be published to the jury.

2        (Government's Exhibits 57-J thru 57-L received)

3            MS. PALUCH:  Thank you.

4    BY MS. PALUCH:

5    Q.   Let's begin with 57-J.

6    A.   I'm sorry, this is 57-B.

7    Q.   Okay.  I'm going to ask you about that one.  Let's

8    start, ma'am, though, with 57-J.  And it should show up on

9    the screen right in front of you.

10           Do you see that there?

11   A.   Yes.

12   Q.   Okay.

13   A.   Thank you.

14   Q.   So if we could highlight the caption there, Agent

15   Hacker, the heading.

16           What's the acronym that you see right at the end

17   of that heading?  Do you see where it says FAFSA?

18   A.   FAFSA?  FAFSA.

19   Q.   Do you see your name on this document, ma'am?

20   A.   Yes.

21   Q.   Is that your Social Security number?

22   A.   Yes.

23   Q.   Is that your date of birth?

24   A.   Yes.

25   Q.   And let's go to the next page of that document.  And

456
Direct - Duncan

1    then one more.  One more.  Do you see -- if you could
2    highlight that, please.
3            Do you see where it says Date FAFSA Received?
4    A.   Yes.
5    Q.   What is the date?
6    A.   12-15 of 2010.
7    Q.   And where were you living, what address on December of
8    2010?
9    A.   We were living off of Radiant Drive.
10   Q.   Please go back to page 1, and highlight the top
11   portion of that document.
12           And underneath your Social and your date of birth,
13   do you see the address there?
14   A.   Yes.
15   Q.   That was your address at that time?
16   A.   Yes.
17   Q.   Okay.  Have you ever seen that document before, ma'am?
18   A.   No.
19   Q.   And you were living, you said, with the defendant at
20   that time?
21   A.   Yes.
22   Q.   Did you submit a FAFSA to receive financial aid in
23   December 2010?
24   A.   No.
25   Q.   Did you give the defendant permission to submit a

457

Direct - Duncan

1   FAFSA in your name?

2   A.   No.

3   Q.   Did you give anyone else permission to -- to submit a

4   FAFSA for you?

5   A.   No.

6   Q.   If we could please publish now Government's Exhibit --

7   Exhibit 57-K.  And if we could highlight the top portion.

8            Ma'am, do you see your name and date of birth

9   on --

10  A.   Yes.

11  Q.   -- this document?

12           Is that your Social Security number?

13  A.   Yes.

14  Q.   And you see the address listed there?

15  A.   Yes.

16  Q.   Please publish the last page of this exhibit.

17           And I'd like you to tell us:  What is the date

18  FAFSA Received By?

19  A.   5-11, 2011.

20  Q.   Where were you living in May of 2011?

21  A.   Arizona.

22  Q.   Did you submit a FAFSA in May of 2011?

23  A.   No.

24  Q.   Did you give anyone permission to do that for you?

25  A.   No.

Direct - Duncan

1   Q.   Please publish Government's Exhibit 57-L.  And if we

2   could highlight the top caption of that document.

3         And if you could, ma'am, do you see the second to

4   the bottom term -- what is the heading of this document?

5   What's that say?  Do you see where it says Master

6   Promissory Note?

7   A.   William D. Ford Federal Direct Loan Program.

8   Q.   And right above that, what does that say?

9   A.   Federal Direct Unsubsidized Stafford/Ford Loan.

10  Q.   And you see where it says Master Promissory Note?

11  A.   Yes.

12  Q.   Okay.  So let's highlight the information in the next

13  box.

14        And do you see off to the left, ma'am, is that

15  your name?

16  A.   Yes.

17  Q.   And then up at the top right, is that your Social

18  Security number?

19  A.   Yes.

20  Q.   Box 5, is that your date of birth?

21  A.   Yes.

22  Q.   If we could go to the bottom of that document.  And if

23  you could highlight that bottom box.

24        Do you see your name at the bottom left?

25  A.   Yes.

459
Direct - Duncan

1    THE COURT:  Can we make that any bigger?  I can't
2    read it.
3    MS. PALUCH:  Yes, let's please enlarge that.
4    BY MS. PALUCH:
5    Q.   Do you see your name there?  Is that your middle
6    initial?
7    A.   Yes.
8    Q.   Okay.  If you could go, Agent Hacker, over to the
9    date.
10    Did you affix an electronic signature to that
11    document in January of 2011?
12    A.   No.
13    Q.   Okay.  Let's go to box 7, please, and highlight that,
14    if you could.  It's up at the top.  Or actually, let's see,
15    box 7.  Do you see that?  And can you make that larger?  If
16    you could just take the individuals' names there.  First of
17    all, let's just look at the heading of that box.
18    Can you read the heading of box 7?
19    A.   References.  "List two persons with different U.S.
20    addresses who have known you for at least three years.  The
21    first reference should be a parent or legal guardian."
22    Q.   Okay.  Agent Hacker, could you blow that up.  Thank
23    you.
24    Do you see the names there listed under 1 and 2?
25    A.   Yes.

460
Direct - Duncan

1  Q.  Are you related to anyone named Michelle Duncan?

2  A.  No.

3  Q.  How about Reese Duncan?

4  A.  No.

5  Q.  Are you familiar with either of the addresses under 1

6  or 2?

7  A.  No, I do not have any family members with those

8  addresses.

9  Q.  Do you have any familiarity with the Rice Drive

10 address?

11 A.  No.

12 Q.  Or how about the Circle Drive address?

13 A.  No.

14 Q.  Did you submit this master promissory note?

15 A.  No.

16 Q.  Did you authorize anyone to submit this in your name?

17 A.  No.

18 Q.  You can take that exhibit down, thank you.

19        Ma'am, do you know someone by the name of Ismael

20 Omar?

21 A.  No.

22 Q.  Please publish Government's Exhibit 57-B.  And if you

23 could blow up the top part of that document.  Taking

24 down -- that would be great.

25        Do you see the name "Ismael Omar" in this

461
Direct - Duncan

1    document?

2    A.    Yes.

3    Q.    Do you see the address listed for him?

4    A.    Yes.

5    Q.    Was that your address?

6    A.    Yes.

7    Q.    Okay.  Let's go to the last page of that document.

8          Do you see Date Received on this document?

9    A.    Yes.

10   Q.    Okay.  And what is that date?

11   A.    04-09 of 2010.

12   Q.    Were you living at Radiant Drive in April of 2010?

13   A.    No.

14   Q.    Okay.  Did you ever live at Radiant Drive with Ismael

15   Omar?

16   A.    No.

17   Q.    Okay.  Did you fill out a FAFSA for Mr. Omar in

18   December 2010?

19   A.    No.

20   Q.    Ma'am, have you -- have you ever lived on Rushmore

21   Drive?

22   A.    Not that I recall, no.

23   Q.    Do you know a woman named Latoya or LaTanya?

24   A.    Yes.

25   Q.    Did you ever live with her?

462

Direct - Duncan

1    A.    I lived with her for about a week.

2    Q.    Do you recall what address she lived at?

3    A.    No.

4    Q.    Okay.  Ma'am, have you ever been convicted of a

5    felony?

6    A.    Yes.

7    Q.    When was that?

8    A.    2007.

9    Q.    And what was the crime you were convicted of?

10   A.    Identity theft.

11   Q.    Can you explain generally what happened.

12   A.    Yes.  I was with my ex in Pueblo, Colorado.  He had

13   stolen some credit cards from a gas station, as well as

14   held a guy up at knifepoint at a Kmart parking lot.  And we

15   were arrested together.  And -- I believe that was the

16   question, correct?

17   Q.    Right.  Just -- were you later found to have those

18   credit cards in your purse?

19   A.    Yes.

20   Q.    What was your original charge?

21   A.    It was accessory to aggravated assault and identity

22   theft.

23   Q.    And what did you end up pleading guilty to?

24   A.    The identity theft.

25   Q.    And what was your original sentence?

463
Direct - Duncan

1  A.  My original sentence was a two-year upon-completion

2  deferred.

3  Q.  And did you complete that term?

4  A.  No, I did not.  It was a two-year upon-completion --

5  excuse me, preferred -- deferred probation.  Sorry about

6  that.

7  Q.  So did you -- if you didn't complete that, what

8  happened, then?

9  A.  I --

10  Q.  Did you end up serving any time, ma'am, on that

11  offense?

12  A.  Oh, yes, I'm sorry.  I served 8 and 1/2 months in

13  county.

14  Q.  Okay.  Have you been charged with any other crimes

15  since 2007?

16  A.  No.

17  Q.  While living with Tramell Thomas, did you see him use

18  a cell phone?

19  A.  Yes.

20  Q.  Do you know what type of phone he had?

21  A.  It was a Cricket Huawei phone.

22  Q.  How is it you remember that?

23  A.  We both shared Huawei phones.  We both had a Huawei

24  phone, excuse me.

25  Q.  Did you ever have occasion to see text messages on

Direct - Duncan

1    Tramell Thomas' phone?

2    A.    Yes.

3    Q.    Did you ever see Social Security numbers in those text

4    messages?

5    A.    Yes.

6    Q.    Can you tell us about that.

7              MR. SMITH:  I'm going to object, Your Honor.  I

8    believe it calls for hearsay.

9              MS. PALUCH:  Your Honor --

10             THE COURT:  Ms. Paluch.

11             MS. PALUCH:  Admission of the party opponent, Your

12   Honor.  These are -- this is evidence pertaining to the

13   crime at issue here.  These are messages this witness has a

14   familiarity with --

15             THE COURT:  Well, the --

16             MS. PALUCH:  -- the defendant's --

17             THE COURT:  The messages coming back to him are

18   not an admission of a party.

19             MS. PALUCH:  Correct, but messages that, if this

20   witness can testify --

21             THE COURT:  Well, you asked -- you asked a general

22   question about all text messages on his phone.

23             MS. PALUCH:  You're correct, Your Honor.  Let me

24   correct that, if I may.

25             THE COURT:  Okay.  You may have.

465
Direct - Duncan

1   BY MS. PALUCH:

2   Q.   Did you ever see messages that appeared to be sent by

3   the defendant Tramell Thomas?

4   A.   Yes.

5   Q.   And what messages -- or what was in the messages that

6   you saw, specifically only stating what was in a message

7   that you believed to be from the defendant?

8          MR. SMITH:   Renew my objection, Your Honor.

9          THE COURT:   Overruled.   It's nonhearsay.   It's a

10  statement by the party.   Go ahead.

11         THE WITNESS:   Okay.   So the text message --

12         THE COURT:   But, ma'am, just -- just the text

13  messages that were being sent from that phone, from Mr.

14  Thomas' phone.

15         THE WITNESS:   Okay.

16         THE COURT:   All right.   Go ahead.

17         THE WITNESS:   I'm sorry, Your Honor, the ones that

18  he sent?

19         THE COURT:   Correct.

20         THE WITNESS:   Okay.   He sent a text message that

21  stated, "Don't worry, I have a woman out here working for

22  me."   And --

23  BY MS. PALUCH:

24  Q.   Was there anything --

25  A.   I'm sorry.

466

Direct - Duncan

1    Q.   Was there anything said about student loans --

2    A.   Yes.

3    Q.   -- from the defendant's -- from the defendant?

4    A.   Yes.

5    Q.   What was said about student loans?

6    A.   He stated that she will -- we will be applying for

7    student loans for her.

8    Q.   Did you see any reference from the defendant about

9    money in those text messages?

10   A.   Yes.

11   Q.   And what do you recall the defendant saying in those

12   text messages about money?

13   A.   That the money that I was making -- he said, "I have a

14   girl out here working and that's how you'll receive the

15   money.  She gave me the money."

16   Q.   What were you thinking when you saw those texts?

17   A.   Well, I was --

18            MR. SMITH:  Objection.  Relevance, Your Honor.

19            THE COURT:  Overruled.

20            THE WITNESS:  I was personally hurt by the text

21   messages because I had found out that the money that I was

22   making was going to another individual.

23   BY MS. PALUCH:

24   Q.   When you say "another individual," do you know if it

25   was a woman or a man?

467
Direct - Duncan

1    A.    Yes.  It was a woman.  And I was hurt because he had

2    told me that we were going to start a family together and

3    that we were in love, basically, so it was hurtful.

4    Q.    Did you ask him about those messages?

5    A.    Yes.

6    Q.    What did he say to you?

7    A.    He told me not to worry about them, that we were still

8    going to apply for the student loans and be happy together,

9    be a family.

10   Q.    During that time, Ms. Duncan, were you using

11   methamphetamine?

12   A.    Yes.

13   Q.    Was your -- was your memory clouded by that drug?

14   A.    Yes.

15   Q.    Are you off drugs now, ma'am?

16   A.    Yes.

17   Q.    How long have you been off?

18   A.    Four years.

19   Q.    Congratulations.

20   A.    Thank you.

21   Q.    How is it, given your drug use, that you specifically

22   recall those text messages?

23   A.    I recall those text messages because I was, you know,

24   alone in our apartment and I was just hurt by them because

25   I found out that the money that I was working so hard to

Direct - Duncan

1    get was going towards another woman and a family out in

2    another state.

3    Q.   In what state was that?

4    A.   Arizona.

5    Q.   During the time you were with Tramell Thomas, did he

6    travel outside of Colorado?

7    A.   Yes.

8    Q.   Where?

9    A.   He told me he was going to Arizona.

10   Q.   Did he tell you why he was going to Arizona?

11   A.   He told me he was traveling out there to set up

12   housing and get everything situated for him and me to move

13   out there.

14   Q.   I'd like to move you to the spring of 2011.  Where did

15   you live at that time?

16   A.   Arizona.

17   Q.   And why did you move from Colorado to Arizona?

18   A.   To continue working.

19   Q.   And what were you doing with the money that you

20   earned?

21   A.   I was handing the money over to who I had believed to

22   be his family members.

23   Q.   And do you remember any names of those individuals?

24   A.   Marcie and Sadie.

25   Q.   Sadie.  Okay.  Did you -- what was the purpose of you

Cross - Duncan

1    handing money over to those individuals?

2    A.   They told me that the money would be going to his

3    lawyer fees.

4    Q.   So did you ever pay the money directly to an attorney?

5    A.   No.

6    Q.   In -- I think you testified you gave it to those two

7    women?

8    A.   Yes.

9    Q.   Do you know for certain that the money you gave to --

10   you said Sadie and Marcie?

11   A.   Yes.

12   Q.   Do you know if that money actually went to Thomas'

13   attorney?

14   A.   No.

15            MS. PALUCH:  Could I have one moment, Your Honor?

16            THE COURT:  You may.

17            MS. PALUCH:  No further questions, Your Honor.

18            THE COURT:  All right.  Cross-examination.

19                       CROSS-EXAMINATION

20   BY MR. SMITH:

21   Q.   Ma'am, these text messages you saw on the phone, when

22   did you see those?

23   A.   I believe I saw them in the year of 2010.

24   Q.   Okay.

25   A.   The end of 2010.

470

Cross - Duncan

1    Q.   The end of 2010?

2    A.   Yes.

3    Q.   Would that be December, November?

4    A.   Yes, I believe so.

5    Q.   Which?

6    A.   I'm not exactly sure which month.

7    Q.   Okay.  How much methamphetamine were you using during

8    November and December of 2011?

9    A.   I would use daily.

10            THE COURT:  Of 2011 or '10?

11            MR. SMITH:  Excuse me, 2010, Your Honor.  Thank

12   you.

13            THE COURT:  You said 2011.

14            THE WITNESS:  I was using daily.

15   BY MR. SMITH:

16   Q.   And how did you use the meth?

17   A.   I smoked it.

18   Q.   Okay.  And when you ingested the methamphetamine, what

19   was the effect on you?

20            MS. PALUCH:  Objection, Your Honor.  Relevance.

21            THE COURT:  Overruled.  You opened the door.

22            THE WITNESS:  I was -- I would describe it as

23   pretty far gone.  I was high.

24   BY MR. SMITH:

25   Q.   You were high.  You were pretty far gone.  It affects

471

Cross - Duncan

1    your ability to move, ambulate, does it not?

2    A.   No.  I -- I'm able to move.  It's just felt numb.

3    Q.   You felt numb.  Physically numb.  What did your mind

4    feel like?

5    A.   Mentally numb as well.  Just zoned out.

6    Q.   Zoned out.  Okay.

7         THE COURT:  You have to give an audible answer,

8    ma'am.  You just shook your head.  You have to give an

9    audible -- an oral answer.

10        THE WITNESS:  Oh, I'm sorry.  Just zoned out.

11   There, present, but not -- like mentally there, if that

12   makes any sense.

13   BY MR. SMITH:

14   Q.   Okay.  And you're smoking this methamphetamine daily

15   in November and December of 2010.

16   A.   Yes.

17   Q.   Okay.  If I understood you correctly, ma'am, I believe

18   you said you went to Pikes Peak Community College with Mr.

19   Thomas?

20   A.   Yes.

21   Q.   To investigate enrolling?  Enrolling --

22   A.   I was inquiring about enrolling to Pikes Peak

23   Community College.

24   Q.   Okay.  And you got a packet?

25   A.   Yes.

472

Cross - Duncan

1    Q.   Okay.  Did you examine that packet?

2    A.   Yes.

3    Q.   Okay.  And in January -- this was in January of 2011,

4    correct?

5    A.   I don't really recall the exact month that we went

6    there.

7    Q.   Okay.  Well, would it have been in November of 2010?

8    A.   I can't recall the exact month.

9    Q.   Okay.

10   A.   Sorry.

11   Q.   Was it before or after you saw these text messages?

12   A.   It was before.

13   Q.   Okay.  So it could have been in the fall of -- early

14   fall of 2010?

15   A.   Like I said, I can't recall the exact month or -- I

16   know it was towards the end of 2010, the year 2010.

17   Q.   Okay.  But it was during the same time period when you

18   were smoking methamphetamine daily?

19   A.   Yes.

20   Q.   And does that affect your ability to remember when you

21   went to the school?

22   A.   Yes.

23   Q.   What did you do with the packet that you got at the

24   school that day?

25   A.   I filled it out fully -- fully, I filled it out.

473
Cross - Duncan

1    Q.   Okay.  And what happened to it?

2    A.   I left it for Tramell to do what he needed to do with

3    it.

4    Q.   Okay.  He was to turn it in for you?

5    A.   We -- we had discussed that we would eventually turn

6    it in, but I never knew what happened to it after -- after

7    I filled it out.

8    Q.   Okay.  And you're certain you weren't applying for any

9    financial assistance, any student loans?

10   A.   No -- yeah, I'm certain.

11   Q.   You're certain of that?

12   A.   Yes.  I just filled out the enrollment packet.

13   Q.   During the investigation of this case, you've been

14   interviewed half a dozen times by agents of the federal

15   government, correct?

16   A.   Yes.

17   Q.   And do you remember your first interview with them

18   back on September 7th of 2012?

19   A.   Vaguely.

20   Q.   Vaguely?  Were you still smoking methamphetamine

21   daily?

22   A.   In 2012?

23   Q.   Yes.

24   A.   No.

25   Q.   You weren't?  Were you smoking it at all?

Cross - Duncan

1    A.    Periodically, yes.

2    Q.    Okay.  Do you remember telling -- you recognize Agent

3    Ennis here, do you not?

4    A.    Yes.

5    Q.    She's interviewed you any number of times?

6    A.    Yes.

7    Q.    Do you remember telling her on September 7th of 2012

8    that you admitted going with Thomas to Pikes Peak Community

9    College and applying for student loans?

10   A.    No.

11   Q.    You never said that to her?

12   A.    I don't recall.

13   Q.    Okay.  If she wrote that down, is she in error?

14   A.    She might -- she might be.

15   Q.    She made the mistake, not you?

16   A.    I -- I know that I didn't apply for student loans.

17   Q.    But you don't remember when you went there?

18   A.    Correct.

19   Q.    Do you remember talking to Agent Ennis again about a

20   week later on September 13th, 2012?

21   A.    I've had many conversations with Ms. Ennis.  I don't

22   really recall all the exact dates.  I don't . . .

23   Q.    I understand.  That's fair enough.

24         Do you remember the interview before you actually

25   broke down during the interview crying because of your use

Cross - Duncan

1    and abuse of methamphetamine?

2    A.   I've been hysterical talking with Ms. Ennis quite a

3    few times because of my past.

4    Q.   I'm confused about this felony conviction of yours.

5    As I understand your description, when you originally pled

6    guilty, you got a deferred judgment?

7    A.   Yes.  It would have been a deferred upon me completing

8    probation.

9    Q.   Okay.  So the --

10    A.   Complying with it.

11    Q.   The agreement was as long as you don't violate the law

12    for two years, you won't have a felony conviction?

13    A.   Yes.

14    Q.   But you do have a felony conviction.

15    A.   Yes.

16    Q.   What law did you violate to trigger the default on the

17    deferred judgment?

18    A.   I violated my probation.

19    Q.   And how did you do that, ma'am?

20    A.   I continued using, and I did not meet with my

21    probation officer on scheduled appointment days, and I did

22    not comply with the rehab that they sent me to.

23    Q.   And this goes back to the '07-'08 time period?

24    A.   Yes.

25    Q.   And were you smoking methamphetamine then as well?

476

A.   Yes.  Oh, no, I'm sorry, in 2007, 2008, no.  My drug
of choice was crack cocaine back then.

Q.   Crack cocaine.

          MR. SMITH:  May I have one moment, Your Honor?

          THE COURT:  You may.

          MR. SMITH:  Thank you very much, ma'am.  I have no
further questions at this time.

          THE COURT:  Redirect.

          MS. PALUCH:  None, Your Honor.  Thank you.

          THE COURT:  All right.  I have a question for you,
Ms. Duncan.

          You testified that when you discovered the text
messages on the defendant's cell phone, that you were hurt
because all the money you were making you found out was
going to another woman.  What money are we talking about?

          MS. PALUCH:  May we approach?

          MR. SMITH:  Your Honor, may we approach?  May we
approach?

          THE COURT:  Okay.

     (Discussion at side bar)

          MS. PALUCH:  Your Honor, the money she earned was
through her prostitution, so this is the topic that we had
discussed not getting into.

          THE COURT:  Oh, that's right.  I was just
trying -- I didn't understand if this was legitimate earned

477
Examination - Duncan

1  income that wasn't reported on this FAFSA summary where

2  there's a zero.

3          MS. PALUCH:  Yeah.  It's for prostitution.

4          THE COURT:  Okay.  That's your understanding?

5          MR. SMITH:  Yes.

6          THE COURT:  Okay.

7          MS. PALUCH:  Thank you.

8          THE COURT:  Let me think here now how to back out

9  of this without causing --

10         MS. PALUCH:  I think you could follow up by just

11  saying:  Did I understand correctly that you were -- you

12  remember the text message because it was money you were

13  earning, and just stop with that?

14         THE COURT:  All right.  I think that's good.  All

15  right.

16     (End of discussion at sidebar)

17         THE COURT:  Just so I'm understanding your

18  testimony correctly, Ms. Duncan, you remembered these

19  messages and you were upset by them because this was money

20  that you had earned and you learned it was going to another

21  woman?

22         THE WITNESS:  Yes, your Honor.

23         THE COURT:  Okay.  I'll allow additional follow-up

24  questions from counsel based on the Court's questions.

25                     EXAMINATION

478

Examination - Duncan

1    BY MS. PALUCH:

2    Q.   Ma'am, you've been very open about your drug abuse.

3    A.   Yes.

4    Q.   Does that affect your ability to recall those text

5    messages as you sit here today?

6    A.   Yes.

7    Q.   Do you recall those text messages --

8    A.   I mean, the specific text messages that I remember

9    distinctly, no.  But I mean, other text messages that I

10   saw, it's --

11   Q.   Right.  You've testified here today that you were hurt

12   and you've explained why you were hurt.

13   A.   Yes.

14   Q.   Do you recall that, as you testify here today?

15   A.   Yes.

16   Q.   Thank you, ma'am.

17            THE COURT:  Okay.  For the defendant?

18            MR. SMITH:  I have nothing, Your Honor.

19            THE COURT:  Okay.  May this witness be excused,

20   for the Government?

21            MS. PALUCH:  Yes, Your Honor.

22            THE COURT:  For the defendant?

23            MR. SMITH:  Yes.

24            THE COURT:  All right.  Ms. Duncan, thank you for

25   your testimony.  You're excused and you may step down.

Examination - Duncan

1        Government may call its next witness.

2        MR. FIELDS:  Your Honor, we've been informed that

3   our next witness is en route.  She should be here shortly

4   after 3:00.

5        THE COURT:  Okay.  So I guess we'll take an early

6   afternoon break.  Do you have any estimate of when she'll

7   be here?

8        MR. FIELDS:  En route from Denver International

9   Airport, so --

10       THE COURT:  Is she like leaving the airport or

11  closer to downtown?

12       MR. FIELDS:  On the highway.

13       THE COURT:  All right.  Folks, we're going to take

14  a 20-minute afternoon break, and if our next witness is not

15  here, I'll just ask you to please be patient.

16       All right.  We'll be in recess.

17     (Recess taken at 2:39 p.m.)

18     (In open court outside the presence of the jury at

19  3:27 p.m.)

20       THE COURT:  All right.  For the Government, I want

21  to get a sense of who's left and when you anticipate

22  calling as witnesses.

23       MS. PALUCH:  Your Honor, the next witness is

24  Marcelle Green.  After Marcelle Green, it would be Special

25  Agent Ennis.  And that is the last witness that we have.

Examination - Duncan

1          THE COURT:  Okay.  So you anticipate calling

2     Special Agent Ennis tomorrow morning?

3          MS. PALUCH:  If that's the Court's preference.  It

4     depends --

5          THE COURT:  Well, how long are we going to go with

6     Ms. Green?

7          MS. PALUCH:  It's hard to say, depending on the

8     cross with Ms. Green, but it's very likely that could take

9     the rest of the afternoon.

10         THE COURT:  Okay.  All right.

11         MS. PALUCH:  So then if that were the case, we

12    would start with Agent Ennis in the morning and that

13    would -- we would then rest after her testimony.

14         THE COURT:  All right.  And does Ms. Green have

15    counsel here?

16         MS. PALUCH:  She does.

17         MS. JERALYN MERRITT:  Yes, Your Honor, Jeralyn

18    Merritt appearing for Ms. Green.

19         THE COURT:  Yes, Ms. Merritt.  Can you get a

20    little bit closer so that --

21         MS. JERALYN MERRITT:  Sure.

22         THE COURT:  Why don't you sit at that -- maybe you

23    could sit at that back table there.

24         MS. JERALYN MERRITT:  Here?

25         THE COURT:  Yes.  And then I will introduce you to

481
Examination - Duncan

1    the jury and let them know that you're the witness'

2    attorney.  And I think that's all we need to discuss right

3    now.

4                MS. JERALYN MERRITT:  Okay.

5                THE COURT:  Okay, let's bring in the jury.

6                THE COURT:  Thank you very much for your patience,

7    ladies and gentlemen of the jury.  As I mentioned to you on

8    the first day that there would be these kind of pauses, but

9    we ask for your indulgence and your patience given the

10   importance of what we're dealing with here.

11               Let me just mention to you the next witness is

12   going to be a codefendant in this case who has pled guilty,

13   is not going to trial.  She has her lawyer here present,

14   Ms. Jeralyn Merritt, at the back table there, and she's --

15   Ms. Merritt is here because the law allows individuals in

16   Ms. Green, the next witness' situation, to have counsel

17   present in the courtroom to make any appropriate objections

18   that counsel sees fit.

19               All right.  The Government may call its next

20   witness.

21               MR. FIELDS:  Thank you, Your Honor.  We call

22   Marcelle Green to the stand.

23               THE COURT:  All right.

24               COURTROOM DEPUTY:  Right here, ma'am.  Just please

25   stand in the box and raise your right hand.

                          Direct - Green

 1              MARCELLE GREEN, GOVERNMENT'S WITNESS, SWORN

 2              COURTROOM DEPUTY:  Please be seated.  Scoot your

 3      chair up.  Put your elbows right on the stand so that we

 4      can -- put your mouth right there.

 5              Please state your full name for the record and

 6      spell your first and last name.

 7              THE WITNESS:  Marcelle Ruby Green,

 8      M-a-r-c-e-l-l-e, G-r-e-e-n.

 9              THE COURT:  You may proceed, counsel.

10              MR. FIELDS:  Thank you, Your Honor.

11              Before we get into it, at this point I would move

12      into evidence Government's Exhibit 32, which has been

13      stipulated to by the parties.

14              THE COURT:  Okay.  One second.  All right, given

15      the stipulation of the parties, Government Exhibit 32 is

16      admitted into evidence and may be published to the jury.

17          (Government's Exhibit 32 received)

18              MR. FIELDS:  Thank you, Your Honor.

19                          DIRECT EXAMINATION

20      BY MR. FIELDS:

21      Q.   Ms. Green, did you participate in a scheme to steal

22      money from the Department of Education?

23      A.   Yes, I did, sir.

24      Q.   Did you agree to participate in that scheme with other

25      people?

483
Direct - Green

1    A.    Yes, I did.

2    Q.    Do you see one of those people in the courtroom here

3    today?

4    A.    Yes, I do.

5    Q.    Who do you see?

6    A.    Tramell Thomas.

7    Q.    Could you describe where he's sitting and an article

8    of clothing that he's wearing.

9    A.    In the side over here, between his two lawyers, and he

10   has a black jacket on.

11          MR. FIELDS:  Your Honor, I'd like the Court -- or

12   to re -- the record to reflect that the witness has

13   identified the defendant.

14          THE COURT:  The record will so reflect.

15   BY MR. FIELDS:

16   Q.    Ms. Green, as a result of your choice to participate

17   in a fraud scheme, what has happened to you?

18   A.    I've been indicted and I pleaded guilty.

19   Q.    Do you have an agreement with the Government?

20   A.    Yes, I do.

21   Q.    Let's look at it.  It's Government Exhibit 32.  Is

22   this your agreement?

23   A.    Yes, sir.

24   Q.    If we could go to the last page.  Does that have your

25   signatures on it?

484

Direct - Green

1    A.    Yes, it does.

2    Q.    Take it down.

3          What are your obligations under that agreement?

4    A.    Just to be truthful.

5    Q.    And what do you hope to get in return for this

6    agreement?

7    A.    Leniency on my sentence.

8    Q.    Do you know how much you will get off of your

9    sentence?

10   A.    No, I don't.

11   Q.    Who decides what your stints will be?

12   A.    The judge.

13   Q.    Now, is this the first time you've been in trouble

14   with the law?

15   A.    No, sir.

16   Q.    Have you been convicted of a drug crime?

17   A.    Yes, I have.

18   Q.    What happened?

19   A.    Possession of marijuana with the intent to sell was

20   my -- what I was convicted with.

21   Q.    How much marijuana?

22   A.    300 pounds.

23   Q.    Does that have anything to do with your involvement in

24   this fraud scheme?

25   A.    No, sir.

485
Direct - Green

1   Q.   Have you already been sentenced for that crime?

2   A.   Yes, I have.

3   Q.   So does your plea agreement in this case have any

4   effect on the outcome in that case?

5   A.   No, sir.

6   Q.   When did you first agree to be part of the conspiracy?

7   A.   Somewhere in 2010.  I can't give you an exact date,

8   I'm sorry.

9   Q.   Who approached you about becoming part of the

10  conspiracy?

11  A.   Heather Carr.

12  Q.   Where did that happen?

13  A.   At her location in Pleasant Drive.

14  Q.   Pleasant Drive where?

15  A.   In Chandler.  I believe Chandler, Arizona.

16  Q.   Describe to us what happened.

17  A.   Conversation at a barbecue, I believe it was around

18  Easter -- yeah, Easter, and just a discussion on how to get

19  money fraudulently by filing false claims.

20  Q.   After that discussion, how long were you part of the

21  conspiracy?

22  A.   To roughly about 2012.

23  Q.   While you were a member of the conspiracy, who were

24  the other members of the conspiracy?

25  A.   Mercede Diaz, Heather Carr and Tramell Thomas.

486

Direct - Green

1   Q.   Now, you testified, you pleaded guilty to a scheme to
2   defraud the Government.  Did you file false claims with the
3   Government?
4   A.   Yes, I did, sir.
5   Q.   What were the false claims?
6   A.   The false claims were the FAFSA the enrollment to
7   school.
8   Q.   What was false about the FAFSAs you submitted?
9   A.   The information on the students as far as their
10  addresses and their locations.
11  Q.   If you had put the truth into those FAFSAs, would you
12  have received money?
13  A.   No.
14  Q.   Why not?
15  A.   Because they -- you have to be a present-person
16  student and they weren't present.  So if we would have put
17  they were in prison, nothing would have happened.
18  Q.   So you've been talking about these people in prison.
19  Whose identities did you put into the FAFSAs?
20  A.   Inmates.
21  Q.   Why prison inmates?
22  A.   Because prison inmates are incarcerated for a number
23  of years and wouldn't think that it would come up -- they
24  wouldn't look it up, theirself, while they were in prison.
25  Q.   How did you decide which prison inmates to use?

487
Direct - Green

1    A.   The length of sentence.

2    Q.   And how did you find out whether or not someone was in

3    prison?

4    A.   It's public records.  You can just see if they're in

5    prison or not.

6    Q.   So what was the overall purpose of the conspiracy?

7    A.   To receive funds.

8    Q.   And who were the victims of the conspiracy?

9    A.   The inmates and the school and the Government.

10   Q.   Did you submit the FAFSAs using the internet?

11   A.   Yes, I did.

12   Q.   What computer did you use?

13   A.   I used the black laptop and a desktop.

14   Q.   Where was that desktop located?

15   A.   At 4630 South 21st Place.

16   Q.   What is that address?  What --

17   A.   That's my house.  That's my address.

18   Q.   That's your house?

19   A.   Yes.

20   Q.   And you mentioned a laptop?

21   A.   Yes.

22   Q.   Where was the laptop located?

23   A.   The laptop was located at 4630 South 21st Place and

24   the address on Pleasant Drive in Chandler.

25   Q.   That address on Pleasant Drive, what's significant

Direct - Green

1    about that?

2    A.   That's Heather Carr's location.

3    Q.   Did you need the internet to submit the FAFSAs?

4    A.   Yes, sir.

5    Q.   Where did you go to use the Internet?

6    A.   My address at 4630 Pleasant Drive and then a local

7    Starbucks.

8    Q.   After a FAFSA was submitted, what did you have to do

9    next to get loan money?

10    A.   You have to enroll in school.

11    Q.   How would you enroll?

12    A.   Go to the internet site of the school and enroll and

13    then you would get a letter of acceptance.

14    Q.   What kind of information did you need to enroll in the

15    school?

16    A.   The student's information -- I mean the inmate's

17    information, the location of the address where they're

18    going to.

19    Q.   So just like the FAFSA, was the information in the

20    paperwork you submitted to schools truthful?

21    A.   No, sir.

22    Q.   What was untruthful about it?

23    A.   The address of the inmates.

24    Q.   Also was the identity of the --

25    A.   Of the identity, yes.

489

Direct - Green

1   Q.   Would colleges sometimes ask for documents that were
2   signed?
3   A.   Yes.
4   Q.   So when a college asked for a document that had to be
5   physically signed, what would you do?
6   A.   Get it printed out, sign it, and then fax it over at a
7   local mail and sell, where you can do fax and things like
8   that.
9   Q.   Would you sign it in your own name?
10  A.   No, sir.
11  Q.   What name would you sign?
12  A.   The -- the name of the inmate.
13  Q.   How did you decide which colleges to pick?
14  A.   Colleges that had online classes where you didn't
15  physically have to be in the classroom.
16  Q.   Why was that important?
17  A.   Because the people were not here, so we couldn't get
18  classes that you had to attend in person.
19  Q.   Where were these colleges located?
20  A.   In Colorado and in Phoenix, Arizona.
21  Q.   What were the colleges in Colorado?
22  A.   Pikes Peak.
23  Q.   And what were the colleges in Arizona?
24  A.   Sorry.  Phoenix College, sorry, and Mesa Community
25  College.

490
Direct - Green

1    Q.    In order to actually get money for student aid, were
2    you required to take classes?
3    A.    Yes, sir.
4    Q.    How many?
5    A.    Four.
6    Q.    Did you take classes?
7    A.    Yes, I did.
8    Q.    So how did that part of the scheme work?
9    A.    You would just log in and -- into the classes and do
10   the homework and submit it so you can stay enrolled in the
11   class.
12   Q.    And why did you have to stay enrolled in the class?
13   A.    In order to receive the funds, you have to be enrolled
14   in class.
15   Q.    How did you decide which classes to pick?
16   A.    The classes that mainly just had discussions or short
17   essays that you could submit.  Those classes you didn't,
18   you didn't want to pick classes that included like math or
19   anything too long like that.
20   Q.    Would you take lots of different classes or the same
21   classes?
22   A.    Usually the same classes.
23   Q.    Why the same classes?
24   A.    Because we already knew -- the work, and we would just
25   resubmit it.

491
Direct - Green

1    Q.   How would the colleges actually send out the student

2    aid?

3    A.   In a debit card form.

4    Q.   And where would the colleges send those debit card?

5    A.   To the addresses that's on the enrollment form.

6    Q.   How did you decide which addresses to put on the

7    enrollment forms?

8    A.   Just split them up on the list.  It wasn't just like a

9    pinpoint, oh, this one's going to go here; it was just

10   randomly.

11   Q.   Well, did you know which addresses the card would go

12   to?

13   A.   Yes.

14   Q.   How did you get those addresses?

15   A.   The addresses were my physical address.

16   Q.   Were any other addresses used as part of the scheme?

17   A.   Yes.

18   Q.   Which addresses?

19   A.   1915 East Mulberry.

20   Q.   And why didn't you just have all the cards sent to one

21   address?

22   A.   Because we feel it would set off an alert if we had

23   too many going to the address.

24   Q.   After you got the debit cards, could you get money off

25   of them?

492

Direct - Green

1   A.   Yes.

2   Q.   How much in a day?

3   A.   $1,000 was the limit.

4   Q.   So as a result of that, what did you do to actually

5   get the money off the cards?

6   A.   Go to local ATMs or go to local grocery stores and get

7   cash back.

8   Q.   You went to the grocery stores, would you get items,

9   too?

10  A.   Yes.  Buy like a pack of gum and get the cash back

11  limit that they have for the day.

12  Q.   Did you divide up this money with other members of the

13  conspiracy?

14  A.   Yes, I did.

15  Q.   Who?

16  A.   Heather Carr.

17  Q.   How much money did Heather Carr get?

18  A.   If the cards were coming to my house, she would

19  receive 60, I would receive 40.  And then if I went and

20  helped her with her cards, she would receive 70, I would

21  receive 30.

22  Q.   You say "helped her with her cards."  What does that

23  mean?

24  A.   Withdraw her money for her for cards that she had in

25  her possession already.

Direct - Green

1   Q.   Do you know how she got those cards in her possession?

2   A.   To the addresses that were used on the forms filled

3   out.

4   Q.   At any point during the conspiracy, did Thomas get any

5   of that money?

6   A.   I physically didn't hand any money to him.

7   Q.   Who would you hand the money to?

8   A.   Heather.

9   Q.   Who would be present when you handed the money to

10  Heather?

11  A.   Either Tramell Thomas, sometimes Mercedes Diaz, and

12  our children.

13  Q.   Describe to the members of the jury the times where

14  the defendant, Tramell Thomas, was there when you delivered

15  the money.

16  A.   I can't --

17       MR. SMITH:   Could we have some foundation as to

18  time, Your Honor.

19       THE COURT:   Yeah.   I -- let's get this in a time

20  frame.

21       MR. FIELDS:   All right.

22  BY MR. FIELDS:

23  Q.   When did the conspiracy take place?

24  A.   In 2010, around April, but the first enrollment wasn't

25  until July, I believe.

Direct - Green

1    Q.   And approximately when were you delivering money to

2    Heather Carr?

3    A.   Late in the summer of 2010, all the way until 2012,

4    the middle of 2012.

5    Q.   And these times that we're going to talk about where

6    the defendant was there, do you remember approximately when

7    that was?

8    A.   I can't give a definite date.

9    Q.   Sometime within that time period?

10   A.   Yes, within that time period.

11   Q.   So, again, describe to the members of the jury those

12   times where Tramell Thomas was present.  What was he doing?

13   A.   I'm just --

14          MR. SMITH:  Well, Your Honor, I would object.

15   Could we take it in sequence?  He's referring to multiple

16   times.

17          THE COURT:  Overruled.  I think we can -- I think

18   she has set the stage well enough.  Go ahead.

19   BY MR. FIELDS:

20   Q.   You can answer the question, Ms. Green.  So when you

21   saw the defendant present when you delivered money,

22   describe what you saw.

23   A.   Just us hanging around.  It was either sometimes a

24   barbecue or just over there for -- randomly, but it wasn't

25   physically him -- me handing him the money, it was just him

495
Direct - Green

1    standing around.

2    Q.   When you handed the money, describe how the money was

3    packaged.

4    A.   In 20s.

5    Q.   Was it rolled up, was --

6    A.   No, just in form -- just -- not rolled up, not

7    anything, just altogether.

8    Q.   Did you put it in an envelope?

9    A.   No.

10   Q.   So when you say altogether, again, describe to me, is

11   it sort of fanned out --

12   A.   No, it's just in a stack.  Just in a stack.

13   Q.   What did Carr do with that money?

14   A.   Her living expenses to care -- and financial -- and

15   legal fees.

16   Q.   Would she go on vacation?

17   A.   Yes.

18   Q.   Who did she go on those vacations with?

19   A.   Her children and sometimes Mercedes.

20   Q.   Anyone else?

21   A.   Not that I know of.

22   Q.   What kind of house did she live?

23   A.   She had two different house locations, so the one on

24   Pleasant Drive or the one on Kaibob.

25   Q.   The latter one.

496

Direct - Green

1    A.    Kaibob, it was a nice house.  Beautiful --

2    Q.    When did she get that house?

3    A.    I would say sometime in the beginning of 2012.  I

4    could be wrong.

5    Q.    Who lived there with her?

6    A.    Heather Carr, Tramell Thomas and their children.

7    Q.    Were you able to observe Thomas and Carr's lifestyle?

8    A.    Yes.

9    Q.    How would you describe that lifestyle?

10   A.    Nice lifestyle.

11   Q.    Can you go into any more detail?  What would be nice?

12   A.    I mean, nice house, nice cars, you know.  Just all the

13   basic, and the up-to-date electronics.  Just not too many

14   worries, that's what I would say.

15   Q.    Let's talk about other members of the conspiracy.  You

16   mentioned Heather Carr.  What was her role in the

17   conspiracy?

18   A.    I believe it was a major role.

19   Q.    What did she do?

20   A.    She got the information of the inmates and the Social

21   Security numbers and the birth dates and as far as

22   processing FAFSAs and applications and homework.

23   Q.    Do you know how she got that information?

24   A.    From her job.

25   Q.    What was her job?

497
Direct - Green

1    A.    She was a loan closer at CarMax.

2    Q.    Who would she give that information to?

3    A.    To the -- for me, I know me, myself.

4    Q.    Did she give it to anyone else?

5    A.    I can't speak for that.

6    Q.    When she gave it to you, how would she give it to

7    you?

8    A.    On a paper -- on a lined piece of paper, regular

9    subject paper.

10   Q.    Describe to us what would be on a typical sheet of

11   paper from Heather Carr.

12   A.    The names, the birth dates, and the address -- I mean,

13   sorry, the names, the birth dates, and the Social Security

14   numbers.

15   Q.    And what would you do with that information?

16   A.    I would submit that into FAFSA.

17   Q.    Now, let's talk about Tramell Thomas.  You said he was

18   part of the conspiracy.

19   A.    Correct.

20   Q.    What was his role?

21   A.    His role -- I can't say if he did homework and I can't

22   say if he had a major role, but he had some role in it.

23   Q.    Well, did you ever see him participating in the

24   conspiracy?

25   A.    Yes.

498

Direct - Green

1    Q.   What did you see him doing?

2    A.   The FAFSA part, just one time.

3    Q.   When was that?

4    A.   I can't give a definite date.  Our season, I want to

5    say it was somewhere in 2011.  My -- my mind's a little

6    cloudy there.  I'm sorry.

7    Q.   Well, was this down in Arizona?

8    A.   Yes.

9    Q.   Does Arizona really have seasons?

10   A.   No, we don't.

11   Q.   So was it sometimes hard to frame exactly when

12   something happened?

13   A.   It is, because it's hot all the time.

14   Q.   So this one time where you saw him participating in a

15   conspiracy, where was that at?

16   A.   At the Pleasant Drive address.

17   Q.   Who lived there?

18   A.   Heather Carr, her children, and at that part in time,

19   Tramell Thomas.

20   Q.   So what did you see him doing?

21   A.   The FAFSA part.  Just submitting the FAFSA and just

22   the steps as far as the education part.  That's it.

23   Q.   Explain to us exactly why that was part of the

24   conspiracy, what you saw.

25   A.   Because the education part, the people -- the inmates,

Direct - Green

1   we don't know their high school information, so it was

2   easier just to put if they had their GED and we put the

3   year based on their age.

4   Q.   So let me back up here.  Was this a conversation you

5   were having with the defendant?

6   A.   This was a conversation that I had with Heather Carr,

7   but I showed on that FAFSA.  So I didn't have this

8   conversation with Tramell.

9   Q.   Who were you showing this information?

10  A.   I showed him the information, but I didn't have the

11  physical conversation with him like I did with Heather

12  Carr.

13  Q.   And what was the purpose of showing him this

14  information in the FAFSA?

15  A.   So the FAFSAs wouldn't come back because, you know,

16  when you submit so many, some of them do still come back as

17  invalid, basically.  So that was just the way to by- -- it

18  was a bypass system as I would call it.

19  Q.   So, again, just to make this clear, what was the

20  bypass system you were explaining to the defendant?

21  A.   The information for the education part.  Sorry.  The

22  education part.

23  Q.   And when this happened, did you see him actually

24  submit the FAFSA?

25  A.   I didn't -- the FAFSA was up, but I didn't see the

500

Direct - Green

1    submit button because I had walked away.

2    Q.    When you say "up," up on what?

3    A.    The computer laptop, sorry.

4    Q.    What kind of laptop was he using?

5    A.    I can't recall.  I'm sorry.

6          Can I get some water?

7          THE COURT:  Right next to you.

8    BY MR. FIELDS:

9    Q.    When you were explaining this sort of bypass system,

10   were other people present in the room?

11   A.    Yes.

12   Q.    And was information being thrown out into the room?

13   A.    Yes.

14   Q.    Describe that.

15   A.    Just random names.  I can't recall the names, again,

16   I'm sorry, it was a while ago, but just random names.

17   Q.    Who would throw out random names?

18   A.    Heather Carr and myself.

19   Q.    Anyone else?  Anyone else?

20   A.    Myself.

21   Q.    Who else was present?

22   A.    Oh, Heather Carr, me, Tramell and our children.

23   Q.    Did Tramell throw out any names?

24   A.    At that time, it was a name, but I can't recall the

25   name.  I'm sorry.

501
Direct - Green

1  Q.   What was the purpose of everyone sitting around in
2  this room throwing out names?
3  A.   It was part of the -- to process the fraudulent FAFSAs
4  and the school applications.
5  Q.   How was it part of the process of filling out these
6  fraudulent FAFSAs?
7  A.   Because of the names, when you get the names and the
8  information was already there.  So, like I said, I can't
9  recall the names.
10 Q.   When you say the information was already there, what
11 information?
12 A.   The Social Security numbers and the birth dates,
13 sorry.
14 Q.   Did you see Mr. Thomas participate in a scheme at any
15 other time?
16 A.   No.
17 Q.   How often would you see the defendant during this time
18 period?
19 A.   I wouldn't see him as much as I seen Heather and
20 Mercedes, but I've seen him several occasions.
21 Q.   So who would you say was your major contact within the
22 conspiracy?
23 A.   Heather Carr.
24 Q.   How much money did you get from the scheme?
25 A.   I roughly would say a little -- in the $20,000 range.

502
Direct - Green

1    Q.   What did you do with that money?

2    A.   Paid for bills and my financial living situations and

3    my children.

4    Q.   Why did you decide to participate in this fraud

5    scheme?

6    A.   To -- financial gain, to live above.

7    Q.   Did you know it was wrong?

8    A.   Yes, I did.

9    Q.   How did you know it was wrong?

10   A.   Because it's taking -- it's filing something that's

11   false, that's not you, so if it's not you and you're doing

12   it, it's wrong.

13   Q.   Did the conspiracy eventually end?

14   A.   Yes, it did.

15   Q.   What happened to end the conspiracy?

16   A.   A search warrant was served at the Kaibob address.

17   Q.   Who lived at that address?

18   A.   Heather Carr Tramell Thomas and their children.

19   Q.   Do you remember approximately when that was?

20   A.   I want to say it was somewhere in August of 2012.

21   Q.   Now, before the conspiracy ended, you mentioned that

22   Ms. Carr used some of the fraud money for lawyers' fees.

23   Do you remember that?

24   A.   Correct.

25   Q.   Whose lawyers' fees?

Direct - Green

1    A.    Tramell Thomas.

2    Q.    Do you remember when he was in trouble with the law?

3    A.    At which -- no, I don't remember the definite date,

4    the time frame.

5    Q.    But you do remember that he had a defense attorney?

6    A.    Correct.

7    Q.    So, again, let's go back.  We were talking about this

8    search warrant.

9    A.    Uh-huh.

10   Q.    Remind me, when was it executed, approximately?

11   A.    I want to say around August of 2012.

12   Q.    Did anything happen after that search warrant was

13   executed?

14   A.    Yes.

15   Q.    What happened?

16   A.    I -- on the part of -- I was questioned and then I was

17   visited by the defendants, Tramell Thomas Heather Carr at

18   my residence.

19   Q.    Let me start with that first one.  When you were

20   questioned, who questioned you?

21   A.    The Department of Education, the FB -- the federal.

22   Q.    Federal agents?

23   A.    Yes.

24   Q.    Were you truthful to those federal agents?

25   A.    No, I wasn't.

504

Direct - Green

1    Q.   Why not?

2    A.   Because I was scared.

3    Q.   Scared of what?

4    A.   Of getting in trouble, or -- well, I know I was in

5    trouble when they came, but getting in more trouble.

6    Q.   And even after that, did investigators come to your

7    house a second time?

8    A.   Yes, they did.

9    Q.   And were you truthful to them even then?

10   A.   No.

11   Q.   But those times when you were untruthful to the

12   investigators, was that all before you pleaded guilty and

13   signed your cooperation agreement?

14   A.   Yes.

15   Q.   Now let's go back.  You said you were questioned.

16   A.   Yes.

17   Q.   What else happened after the search warrant was

18   executed?

19   A.   And then I was visited by Tramell Thomas and Heather

20   Carr.

21   Q.   Do you remember approximately what time of day it was

22   when they came?

23   A.   It was later in the day because the sun was down, I

24   know that.  It was dark.

25   Q.   Did Tramell Thomas say anything to you when he came to

Direct - Green

1   your house after his house was searched?

2   A.   Yes.

3   Q.   What did he say?

4   A.   What did they say to you when the investigators were

5   there?  What did they say to you?  What did you tell them?

6         I told him they had these pictures of people, if I

7   recognized them.  He said that -- Tramell Thomas said, How

8   did this happen?  Trying to figure out why the search

9   warrant was served.  And basically just asking what did I

10   say to the investigators.  And, again, what did -- what

11   were their questions?  And who were the people that they

12   showed me?

13   Q.   Describe to the members of the jury his general

14   demeanor.

15   A.   Nervous.

16   Q.   Describe that.  What makes you think he was nervous?

17   A.   Just the moving of the hands, the moving back and

18   forth, and the same questions over in just a different

19   format.

20         MR. FIELDS:  One moment, Your Honor.

21         THE COURT:  Okay.

22         MR. FIELDS:  Thank you, Your Honor.  I have no

23   further questions.

24         THE COURT:  Cross-examination.

25                CROSS-EXAMINATION

506

Cross - Green

1   BY MR. SMITH:

2   Q.   Ms. Green, if you mentioned this, I missed it and I

3   apologize.  You indicated you have this marijuana issue

4   where you were convicted of possessing and selling 300

5   pounds.  When was that?

6   A.   That was in late 2011, I believe.  I can't give a

7   definite date.

8   Q.   Okay.  So it was during the same time that you

9   testified you were involved in this --

10  A.   No.

11  Q.   -- fraudulent scheme?

12  A.   Well, testify as -- I'm testifying today.  But did it

13  take place when all this was going on?

14  Q.   Yes.

15  A.   Towards the end of it.

16  Q.   Okay.  Well, I understood you to say that you thought

17  your conviction was in 2011?

18  A.   2011.  And then it was pleaded out in 2012, I

19  believe.

20  Q.   Okay.  And you indicated you'd been involved in this

21  student loan business from sometime in 2010 into 2012.

22  A.   Correct.

23  Q.   So at the same time you're involved in the student

24  loan situation, you're involved in the marijuana situation?

25  A.   That is correct, if my dates are correct, sir.

Cross - Green

1    Q.    Okay.  This agreement you have with the Government,

2    you have to cooperate, correct?

3    A.    Truthfully, yes.  Correct.

4    Q.    And then when your sentencing comes up, you're hoping

5    that Ms. Paluch and Mr. Fields will make a recommendation

6    for a lighter sentence?

7    A.    That's correct, sir.

8    Q.    Okay.  And you were represented in negotiating this

9    agreement with Ms. Merritt?

10   A.    Yes, sir.

11   Q.    I assume that you've probably talked a lot more than

12   you wish about this concept of Federal Sentencing

13   Guidelines?

14   A.    I have, Your Honor -- I mean, sir.  I'm sorry.

15            MR. SMITH:  Almost got elevated.

16            THE COURT:  Careful what you wish for.

17            MR. SMITH:  I understand, Your Honor.

18   BY MR. SMITH:

19   Q.    You have some idea of what the guidelines would

20   indicate your sentence might be, correct?

21   A.    I do.

22   Q.    And that sentence could be anywhere from about four

23   years to about six years.

24   A.    Correct.  46 to 71 months, I believe.

25   Q.    Okay.

Cross - Green

1    A.    Or 57 to 71 months.

2    Q.    And how much are you hoping that your sentence will be

3    reduced?

4    A.    I can't give a definite answer because I don't know

5    what the percentage would be.  At least -- hopefully 20

6    percent.  I don't know exact amount when it comes to

7    federal.

8    Q.    Okay.  I didn't -- I didn't say that you knew.  What

9    are you hoping Ms. Paluch and Mr. Fields recommend --

10   A.    Just any less time than what my guidelines say.

11   Q.    -- to the Court?

12         Okay.  And this recommendation depends on your

13   cooperation?

14   A.    Correct.

15   Q.    And their view of it, correct?

16   A.    Correct.

17   Q.    So if you're saying things that they don't like,

18   that's not going to be cooperation, is it?

19   A.    Correct.

20   Q.    Some time in 2010, you had this conversation with

21   Heather Carr at a barbecue about this student loan scheme.

22   A.    That is correct.

23   Q.    Okay.  Was that over at her house?

24   A.    Yes, it was.

25   Q.    And that's the Pleasant --

509
Cross - Green

1   A.   The Pleasant Drive address.

2   Q.   Pleasant Drive address.

3   A.   Yes.

4   Q.   And it's just you and Ms. Carr.

5   A.   And our children, yes.

6   Q.   Okay.  Mr. Thomas isn't there?

7   A.   Not that I recall for the first conversation.

8   Q.   Okay.  And you get a good understanding of what Carr's

9   idea is?

10  A.   Yes.

11  Q.   Okay.  And am I correct that this whole thing can't

12  work without Heather Carr?

13  A.   That is correct.

14  Q.   And why is that?

15  A.   Because she was able to pull the information from her

16  database at work.

17  Q.   Okay.  So if I'm understanding how this goes about,

18  you can sit down on a computer and access a public website

19  that deals with some state Department of Corrections?

20  A.   Correct.

21  Q.   So maybe Florida?

22  A.   Any -- yeah, any public record, yes.

23  Q.   And you could identify an inmate who was serving a

24  sentence for X number of years?

25  A.   Yes.

510

Cross - Green

1   Q.   And then with -- you'd get that name, correct?

2   A.   Yes.

3   Q.   And probably a date of birth?

4   A.   Not for sure what if the date of birth was on the

5   public records, but their time.  Their time and their

6   sentence was -- yes, their date of birth is on there.  I'm

7   sorry, yes.

8   Q.   Okay.  And then you would give that information to Ms.

9   Carr?

10  A.   The names, correct.

11  Q.   Okay.  And she would take that information and because

12  of her position with Wells Fargo -- that's who she worked

13  for, right?

14  A.   She worked for Wells Fargo and CarMax.

15  Q.   Okay.  She worked for Wells Fargo as a loan

16  underwriter and supervisor looking at whether or not Wells

17  Fargo would loan customers money to buy CarMax cars,

18  correct?

19  A.   Correct.

20  Q.   Okay.  And she worked from home.

21  A.   Yes, she did.

22  Q.   Okay.  So she would go in and access these private

23  databases to get the inmate's Social Security number and

24  credit history that you'd provide her, correct?

25  A.   That was provided, correct.

511
Cross - Green

1   Q.   All right.  And you would give her an inmate name and
2   date of birth and she would get the other information,
3   correct?
4   A.   She would be able to pull that information.
5   Q.   Okay.  And then she would give you back all the
6   information so you could fill out the FAFSA?
7   A.   She would give me the list with all the information on
8   it already.
9   Q.   Okay.  And that would be for any number of inmates?
10  A.   Yes.
11  Q.   Okay.  And you would take that list and then set about
12  filling out the paperwork required to get a student loan.
13  A.   That is correct.
14  Q.   Okay.  And you concentrated in Arizona.
15  A.   Yes.
16  Q.   And you used addresses for these inmates that were
17  your residence?
18  A.   Yes.
19  Q.   And another house, I think you said Mobile?
20  A.   1915 East Mobile Lane.
21  Q.   And did you have any relationship to that address?
22  A.   Yes, that's my deceased uncle's house.
23  Q.   Your uncle's house?
24  A.   Yes.
25  Q.   Okay.  When did you actually start filing?

512

Cross - Green

1    A.    In July of 2010 for the summer session.

2    Q.    Okay.  And so in the fall, you started getting cards

3    and money?

4    A.    You received the first money -- if you fill out for

5    the summer, you got the summer money; and then the fall;

6    and if you went, into the spring.

7    Q.    Okay.  And at this point in time, Ms. Carr's still

8    living at the Pleasant --

9    A.    Correct.

10   Q.    -- is it Drive?  I'm sorry, I --

11   A.    I think it's Pleasant Drive.  I can't --

12   Q.    Pleasant Drive address.  Okay.

13          And at some point in time in 2011, you're over at

14   that house, if I understood you correctly, and you're

15   talking with Ms. Carr, and Mr. Thomas is there.

16   A.    At that time, yes.

17   Q.    Okay.  And it's at that time when you're explaining to

18   Mr. Thomas something about filling out these -- this

19   paperwork?

20   A.    The FAFSA part, just the education part, sir.

21   Q.    The education part --

22   A.    Yes.

23   Q.    -- of the FAFSA?

24   A.    Yes.

25   Q.    Okay.  But it's at that meeting?

513
Cross - Green

1  A.   Yes.

2  Q.   At Heather Carr's on Pleasant Drive?

3  A.   Correct.

4  Q.   And you believe it's in 2011?

5  A.   I believe it's in 2011.  Like I said, the dates are

6  cloudy, so I can't give you a definite.

7  Q.   Okay.  So it's in Phoenix.

8  A.   Correct, in Phoenix.

9  Q.   Okay.  Is it really hot out?

10  A.   It's hot all the time, sir.  I don't -- I'm sorry.

11  Q.   I'm just trying to -- is it in the spring, the summer,

12  the fall?

13  A.   I can't give a definite time.  I'm sorry.

14  Q.   But it's 2011.

15  A.   2011.

16  Q.   Okay.  If I -- if I could go back just a minute to

17  your agreement with the Government.  My memory is that you

18  had some sort of paperwork that you were going to try to

19  find and give the Government.

20  A.   It was the list of the names, correct.

21  Q.   Okay.  And you weren't able to find that, correct?

22  A.   No, I wasn't.

23  Q.   Okay.

24  A.   I've moved since then.

25  Q.   You mentioned the name Mercedes Diaz.

Cross - Green

1    A.   Correct.

2    Q.   I understand Ms. Diaz was -- was very close to Heather

3    Carr.

4    A.   Yes.

5    Q.   Ms. Carr pretty much raised her?

6    A.   Like her daughter.

7    Q.   And that started up in Colorado?

8    A.   Yes.

9    Q.   And then they moved down to Arizona?

10   A.   Heather moved first and then Mercedes followed.

11   Q.   Followed?

12   A.   Yes.

13   Q.   And Ms. Diaz actually lived with Heather Carr for

14   quite a bit of time?

15   A.   A little bit, I believe at the Pleasant Drive, but I

16   don't believe it was a long period of time.

17   Q.   Okay.  She often spent time at Heather Carr's house.

18   A.   Yes.

19   Q.   Okay.  And she would be there when you were there?

20   A.   Yes.

21   Q.   Okay.  Were you all close?

22   A.   Not super close, like me and Heather, but we're

23   okay.

24   Q.   Okay.  You and Heather go back quite a ways?

25   A.   Correct.

515

Cross - Green

1   Q.   Before this got started, you'd known her for some 11

2   years.

3   A.   I -- 2004, I believe is when I met Heather, or 2005.

4   Q.   Okay.  And you'd been friends ever since.

5   A.   Yes.

6   Q.   Until this happened?

7   A.   Correct.

8   Q.   What was Ms. Diaz's part?

9   A.   The enrolling and then doing homework and receiving --

10  getting addresses -- sorry, addresses.

11  Q.   Okay.  And how do you know that was her job?

12  A.   Just conversation.

13  Q.   With her?

14  A.   Yes.

15  Q.   Okay.  And you knew Heather Carr's job because she

16  told you.

17  A.   Yes.

18  Q.   What was Heather's -- Ms. Carr's Facebook name?

19  A.   Heather Carr.

20  Q.   Heather Bacardi?

21  A.   She changed it before, Heather Carr, Bacardi.

22  Q.   And where did the Bacardi moniker come from?

23  A.   Because she likes to drink Bacardi.

24  Q.   A lot?

25  A.   Yes.

516

Cross - Green

1    Q.   You know this scheme started because of your
2    conversation with Carr in 2010 --
3    A.   Correct.
4    Q.   -- correct?  That's when you think it started.
5    A.   Correct.
6    Q.   And your part was down in Arizona.
7    A.   Yes.
8    Q.   You didn't file anything at Pikes Peak Community
9    College?
10   A.   Yes, I had a card sent to my address.
11   Q.   Okay.  For Pikes Peak?
12   A.   Yes, for Pikes Peak, sorry.
13   Q.   To your address?
14   A.   In Phoenix at 4630.
15   Q.   Okay.  You didn't have them sent to addresses in
16   Colorado?
17   A.   No.
18   Q.   When you got these debit cards -- and you had to
19   activate them, correct?
20   A.   Correct.
21   Q.   And what was that process?
22   A.   You would just call the number on the card, you know,
23   when you get your sticker, and you would just call and
24   activate it.
25   Q.   Okay.  There's a sticky thing over it and you had to

517

Cross - Green

1    pull that off?

2    A.    Yes.

3    Q.    Okay.  Call the number and whammo, you had 4- or

4    $5,000?

5    A.    Yes.

6    Q.    And then you had to turn that card into the actual

7    cash.

8    A.    Correct.

9    Q.    And you would do that by going to ATMs?

10   A.    Yes.

11   Q.    And that's how you got the 20s?

12   A.    Yes.

13   Q.    Where else would you go to get the cash?

14   A.    Local grocery stores that we have in Arizona.

15   Q.    Okay.  And they have ATMs there or how did that work?

16   A.    Cash backs, so you just buy something and get cash

17   back.

18   Q.    Okay.  Could you pay bills with these cards?

19   A.    Yes.

20   Q.    And did you ever do that?

21   A.    Yes, I did, one time.

22   Q.    One time.

23   A.    Yes.

24   Q.    And that wasn't a very good idea, right?

25   A.    No, it wasn't.

518
Cross - Green

1   Q.   Because then there was a record of your using that

2   card.

3   A.   That is correct.

4   Q.   And it would come back to the bank and --

5   A.   My address is linked to it, yes.

6   Q.   All right.  And then eventually the Government and

7   then everybody knows.

8   A.   Correct.

9   Q.   My understanding, Ms. Green, is that when Carr lived

10  at the Pleasant Drive address, that wasn't very far away

11  from where you lived?

12  A.   Yes, it was.

13  Q.   It was far away?

14  A.   Yes.

15  Q.   Okay.  But you were over there quite a bit.

16  A.   Yes.

17  Q.   Okay.  But then I understand once the move was made

18  when Carr moved to the -- I call it Kaibob, is that --

19  A.   I think we're all having issue with that, I think it's

20  Kaibob.  I don't know --

21  Q.   Kaibob Okay, I'll use yours.

22  A.   Okay.

23  Q.   To the Kaibob address.

24  A.   Yes.

25  Q.   You didn't go over there very much?

519

Cross - Green

1    A.   No, I didn't.

2    Q.   Okay.  In fact, as I understand it from one of your

3    statements, you only went there one time.

4    A.   One time.

5    Q.   So if Ms. Carr moved into that Kaibob house in March

6    or April of 2012, were you only there once after that?

7    A.   Correct.

8    Q.   So your conversations and dealings in this situation,

9    as far as that residence, were almost all at the Pleasant

10   Drive address.

11   A.   Correct.

12   Q.   Aside from your memory of tutoring, if you will, Mr.

13   Thomas on the education part of the FAFSA, you never talked

14   to him about this scheme, did you?

15   A.   Not personally to him, no.

16   Q.   Okay.  He never told you that he filled out FAFSAs,

17   did he?

18   A.   No.  Him, personally, no.

19   Q.   He never told you that he went out and got money from

20   these cards, did he?

21   A.   No.

22   Q.   Those conversations that you had about that were

23   principally with Heather Carr.

24   A.   That is correct, sir.

25   Q.   And you had some of those conversations, certainly to

520

Redirect - Green

1     a lesser degree, with Mercedes Diaz?

2     A.    Correct.

3               MR. SMITH:  May I have a moment?

4               THE COURT:  You may.

5               MR. SMITH:  Thank you very much, Ms. Green.

6          I don't have any further questions at this time,

7     Your Honor.

8               THE COURT:  All right.  Redirect.

9               MR. FIELDS:  Thank you, Your Honor.

10                    REDIRECT EXAMINATION

11    BY MR. FIELDS:

12    Q.    Ms. Green, do you remember being asked questions about

13    your cooperation agreement?

14    A.    Yes.

15    Q.    And you were asked about whether or not it would be

16    cooperation if you say something that the Government

17    doesn't like.  Do you remember that?

18    A.    Yes, I do, sir.

19    Q.    Ms. Green, what happens if you lie under oath because

20    you think that would help the Government?

21    A.    That's a lot more trouble than what I'm in now.

22    Q.    How so?

23    A.    Perjury is -- is -- I'm not saying it's the highest

24    offense, but it's an offense in any courts.

25    Q.    Even if you think that will help the Government?

521
Redirect - Green

 1   A.    Correct.

 2   Q.    So does your agreement involve lying to anyone with

 3   regard to this courtroom here today?

 4   A.    No.

 5   Q.    Does it cover -- it covers lies to anyone, right?

 6   A.    Yes.  Sorry.

 7   Q.    Including lies in responses to defense counsel

 8   questions?

 9   A.    Yes.

10   Q.    So you had to answer defense counsel questions just as

11   truthfully as you answer our questions; isn't that right?

12   A.    That is correct.

13   Q.    And if the judge asks questions, you would have to

14   answer those questions truthfully?

15   A.    That is correct.

16   Q.    Now, you were also asked about whether or not the

17   scheme could work without Heather Carr.

18   A.    Yes.

19   Q.    Do you remember being asked that question?

20   A.    Yes.

21   Q.    Was it also important to the scheme to get other

22   addresses that could be used?

23   A.    Yes.

24   Q.    Would the scheme have been successful if people hadn't

25   been able to get other addresses?

Redirect - Green

1    A.   No.  Because, like I said before, it's an alert if you

2    send to some addresses, so multiple addresses needed to be

3    used.

4    Q.   You used multiple addresses, right?

5    A.   Yes, I did.

6    Q.   Did other members of the conspiracy also use multiple

7    addresses?

8    A.   Yes.

9    Q.   The address you mentioned, this 1915 East Mobile Lane,

10   did you get permission to use that address?

11   A.   It's my -- well, it's a deceased family member, so it

12   was our family house.

13   Q.   Anyone living in the house?

14   A.   No.

15   Q.   You were also asked questions about how frequently you

16   would talk to Thomas.  Did you talk to him all that much?

17   A.   I didn't talk to him much.

18   Q.   Who would you talk to about Thomas' involvement in the

19   scheme?

20   A.   Heather Carr.

21   Q.   Without telling us exactly what was said, how

22   frequently did you have those conversations?

23   A.   We had them frequently, but not like once every other

24   day.  Probably like a couple of times a month.

25   Q.   And during the conspiracy, who did Heather Carr live

Redirect - Green

1    with?

2    A.    She lived with her children and Tramell Thomas and at

3    a time -- well, I can't say because I don't think Mercedes

4    lived there at that time, so, yeah, just her children and

5    Tramell Thomas.

6    Q.    Did Heather Carr appear to be close to Tramell Thomas?

7    A.    Yes.

8    Q.    What made it appear that they were close?

9    A.    Because they were in a relationship and they had

10   children together.

11   Q.    And going back to -- you were asked about, you know,

12   this incident involving Thomas and the FAFSAs.  Do you

13   remember being asked questions about that?

14   A.    Yes.

15   Q.    And defense counsel really tried to PIN you down on a

16   date.

17   A.    Yes.

18   Q.    You said it was -- when was it, approximately?

19   A.    Approximately in 2011.  And, like I said before, I

20   cannot give a definite date because I don't want to lie,

21   because I can't recall the date.  I'm sorry.

22   Q.    Do you remember also being asked questions about a

23   period of time in which Tramell Thomas was incarcerated?

24   A.    Yes.

25   Q.    Do you remember approximately when that was?

Redirect - Green

1   A.   I can't say.  I -- because I know it was several

2   times.  I want to say it was early summer, 2010.  I'm not

3   for sure.

4   Q.   This incident where you recall seeing Mr. Thomas

5   filling out the FAFSA, did that occur before he was

6   incarcerated or after?

7   A.   Which -- before.

8   Q.   It occurred before?

9   A.   Yes.

10  Q.   Okay.  So you can't remember an exact date?

11  A.   I can't remember the date.

12  Q.   But can you remember a sequence of events?

13  A.   No.

14          MR. FIELDS:  No further questions, Your Honor.

15          THE COURT:  All right.  May this witness be

16  excused?

17          MR. FIELDS:  Yes, from the Government.

18          THE COURT:  All right.  For the defendant?

19          MR. SMITH:  No objection.

20          THE COURT:  All right.  Ms. Green, thank you for

21  your testimony.  You're excused and you may step down.

22          All right, ladies and gentlemen of the jury, I've

23  discussed with the lawyers the sequence of witnesses and

24  this is going to be our last witness for today.  So you're

25  getting released early.  I need to remind you again, please

525

1    do not do any independent research into or discuss with

2    anyone the facts, the law, the issues or the individuals in

3    this case.

4           We're going to attempt to resume tomorrow again at

5    8:45, that is, if I don't have additional issues with the

6    lawyers before that.  But I ask you to please be in the

7    jury deliberation room by 8:35.

8           All right, we'll be in recess until 8:45 tomorrow

9    morning.

10      (Proceedings concluded at 4:20 p.m.)

11

12                          **INDEX**

13   Item                                          PAGE

14                   GOVERNMENT'S WITNESSES

15   **KIMMISHA MULLETT**
     Direct Examination by Mr. Fields             300
16   Voir Dire Examination by Mr. Smith           311
     Direct Examination by Mr. Fields (Cont'd)    311
17   Voir Dire Examination by Mr. Smith           331
     Direct Examination by Mr. Fields (Cont'd)    332
18   Cross-examination by Mr. Smith               337
     Redirect Examination by Mr. Fields           347
19
     **MICHELLE ALLRED**
20   Direct Examination by Mr. Fields             353

21   **ALISON STAILEY**
     Direct Examination by Ms. Paluch             390
22   Cross-examination by Mr. Goodreid            440
     Redirect Examination by Ms. Paluch           447
23
     **CHRISTINE DUNCAN**
24   Direct Examination by Ms. Paluch             449
     Cross-examination by Mr. Smith               469
25   Examination by Ms. Paluch                    477

1                                    **INDEX**

2      Item                                                    PAGE

3                          GOVERNMENT'S WITNESSES

4         **MARCELLE GREEN**
          Direct Examination by Mr. Fields                     482
5         Cross-examination by Mr. Smith                       506
          Redirect Examination by Mr. Fields                   520

6

7                          GOVERNMENT'S EXHIBITS

8      EXHIBITS:        Offered     Received    Refused    Stipulated

9      9                410         410

10     12               398         399

11     13               401         402

12     14               330         331

13     15               313         313

14     16               406         406

15     19               416         416

16     20               420         420

17     21               424         424

18     22               431         431

19     23               436         436

20     24               410         410

21     25               410         410

22     26               410         410

23     28               410         410

24     29               410         410

25     30               361         361

527

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 32 | 482 | 482 | | |
| 57-B | 352 | 352 | | |
| 57-C | 352 | 352 | | |
| 57-D | 352 | 352 | | |
| 57-E | 352 | 352 | | |
| 57-F | 352 | 352 | | |
| 57-G | 352 | 352 | | |
| 57-H | 303 | 303 | | |
| 57-I | 303 | 303 | | |
| 57-J | 454 | 454 | | |
| 57-K | 454 | 454 | | |
| 57-L | 454 | 454 | | |
| 64 | 348 | 348 | | |
| 84 | 310 | 311 | | |

\*       \*       \*       \*       \*

REPORTER'S CERTIFICATE

   I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled
matter.
   Dated at Denver, Colorado, this day of August, 2019.


_Mary J. George_

MARY J. GEORGE, FCRR, CRR, RMR

528

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-0054-WJM-2

UNITED STATES OF AMERICA,

Plaintiff,

vs.

TRAMELL THOMAS,

Defendant.

-------------------------------------------------------------

REPORTER'S TRANSCRIPT
(Jury Trial - Day 3)
Volume III

-------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

Judge, United States District Court for the District of

Colorado, commencing at 8:48 a.m., on the 29th day of

November, 2017, in Courtroom A801, United States

Courthouse, Denver, Colorado.

APPEARANCES

MARTHA A. PALUCH and BRYAN FIELDS, Assistant U.S.
Attorneys, 1801 California Street, Suite 1600, Denver,
Colorado 80202, appearing for the plaintiff.

DANIEL T. SMITH, Attorney at Law, 4582 South Ulster,
Suite 1400, Denver, Colorado 80237 AND
THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
Suite 1400, Denver, Colorado 80202, appearing for the
defendant.

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

```
 1              P R O C E E D I N G S

 2         (Call to order of the court outside the presence of

 3    the jury at 8:48 a.m.)

 4            THE COURT:  I want to get an understanding from

 5    Government what it proposes in terms of letting the jury

 6    know, or whether you're going to bring it up at all, that

 7    Ms. Carr's not going to be testifying.

 8            MS. PALUCH:  Your Honor, I intend to reference

 9    that in the closing argument and explain that their role is

10    to consider the evidence -- only the evidence presented in

11    this case and not to speculate as to why she did not

12    testify.

13            THE COURT:  Okay.

14            MS. PALUCH:  And explain that the opening

15    statement was the Government's expectation of its evidence

16    and, as the Court has instructed, opening statements are

17    not evidence in the case.

18            THE COURT:  Okay.  So you're comfortable leaving

19    it to the closing and not raising it as an issue before you

20    close?  Because you're going to get a lot of quizzical

21    looks because Mr. Fields made a big point about this

22    witness that was going to pull back the curtains on -- pull

23    back the curtain on the operations of this conspiracy and

24    we're going to -- you're going to get up and say, "The

25    Government rests," and they're going to be looking at each
```

530

1    other.

2           MS. PALUCH:  And in light of that, Your Honor,

3    we'd have no objection to the Court instructing the jury

4    that while Ms. Carr's expected testimony was referenced in

5    the opening, you did not hear from Ms. Carr and you are

6    instructed to -- that opening statements are not evidence

7    in the case.  We have absolutely no objection with the

8    Court doing that.  And that might be the better approach

9    given what we told the jury and was our complete

10   expectation up until that evening of Monday night.

11          THE COURT:  Okay.  I'm just throwing it out there.

12   I don't -- again, I don't want to tell you how to put on

13   your trial, you know, because the contrary argument could

14   be that if we draw too much attention to it, it will take

15   on an importance beyond that which it would otherwise have.

16          So why don't you give it some more thought and

17   maybe when we come back from morning break, you could let

18   me know which way you want to go.

19          MS. PALUCH:  Thank you, Your Honor.

20          THE COURT:  We're ready to bring in the jury.  Any

21   other issues?

22          MR. SMITH:  The defense would strenuously object

23   to the Court making any statement about a witness'

24   nonappearance.  It seems to me the Court then is injecting

25   itself into the facts of the case.  There are numerous

1    witnesses in this case that the Government hasn't called

2    and their names have been all over the record.

3           And, further, my understanding is this witness,

4    Ms. Carr, wasn't even under subpoena.

5           THE COURT:  Right.

6           MR. SMITH:  I just think it's improper --

7           THE COURT:  She wasn't under a subpoena but she

8    was under a -- or she was party to a cooperation agreement

9    by which I think it was the Government -- the Government

10   reasonably anticipated that she was going to comply with

11   that agreement and testify.  So I don't think the reference

12   to her anticipated testimony was improper.

13          MR. SMITH:  Oh, I don't think the opening

14   statement was improper, Your Honor.  No.

15          THE COURT:  Okay.

16          MR. SMITH:  I just object to the Court commenting

17   on it.

18          THE COURT:  Okay.  Well, that's -- what about

19   that?

20          MS. PALUCH:  Well, Your Honor, I would respond to

21   one statement Mr. Smith said that numerous witnesses that

22   the Government didn't call.  We called every person listed

23   on our witness list save Ms. Carr.  She is the only

24   witness --

25          THE COURT:  Correct.

1          MS. PALUCH:  -- who did not testify in this case

2     beyond -- for reasons completely beyond our control and,

3     certainly, our wishes, and so I don't agree with that

4     statement that was made.  I do believe I can address this

5     in opening [sic] statement, and if counsel has a strenuous

6     objection to the Court saying anything, you know, we are

7     completely fine with saying it in --

8          THE COURT:  Okay.

9          MS. PALUCH:  I do agree with you that the jury's

10    going to have questions based on opening statement, and --

11    there is a way that I could elicit that possibly through

12    this witness.  I could ask Ms. -- Agent Ennis --

13         THE COURT:  Well, again, I -- you know, we may --

14    if you draw -- I don't want to tell you how to do your --

15    put on your trial, but you may be drawing too much

16    attention to this.  But I think Mr. Smith raises a fair

17    point, that for me to interject myself and make a comment

18    as to reference to a Government witness that was called or

19    not called.  You know, we could look at it the other way,

20    if there was some -- you know, there was some reference

21    earlier that I told the jury that the defendant did not

22    have to put on any evidence, but maybe they're anticipating

23    some evidence.  And if I do anything more than just hear --

24    or let the counsel put on the record that they're not

25    calling witnesses or they are, or whatever it's going to

 1    be, that it would be the same thing coming from the other

 2    direction.

 3         So why don't we -- I think Mr. Smith raises a fair

 4    point.  So let's leave it with your first -- your first

 5    inclination to reference it in your closing argument.

 6         MS. PALUCH:  I will do that.  Thank you, Your

 7    Honor.

 8         THE COURT:  All right.  Okay.  Anything --

 9         MR. GOODREID:  Your Honor, one other matter.

10    There are two stipulations in the case and, as I

11    understood, what the Court was planning to do beforehand

12    was to read them at some point for the jury.

13         THE COURT:  I was, if you gave me the stipulated

14    facts that I was looking for but you didn't.  And I

15    tried -- I have probably -- it appears to me now that I

16    didn't do a good enough job at the final trial preparation

17    conference distinguishing what kind of factual stipulations

18    I would read to the jury.  And that was the brass tacks

19    facts as opposed to what you folks have stipulated to --

20    which is entirely proper, and you can move for the -- those

21    exhibits to be admitted into evidence, you can make

22    reference to them in your closing arguments, you can do

23    whatever you want to do that you can do with any other

24    admitted exhibit.

25         But when I reviewed those two exhibits, they were

534

1   not the type of factual stipulations that I -- that I

2   informed you at the trial preparation conference that I

3   generally read at the beginning of the trial, those being,

4   No, the light was red, it was Tuesday, he was wearing a

5   brown sweater.  Those are not the kind of factual

6   stipulations you gave me so that's why I didn't read it.

7           MR. GOODREID:  Well, if I may inquire further,

8   Your Honor, one of the stipulations that the parties agreed

9   to relates to the time that Mr. Thomas spent in the El Paso

10  County Jail.  I want to reference that stipulation when I

11  cross-examine Special Agent Ennis.  So would the Court

12  permit me to read it, would you prefer to read it?  How

13  would you like me to proceed?

14          THE COURT:  Have we admitted it into evidence yet?

15          MR. GOODREID:  No.  No.

16          THE COURT:  Okay.

17          MR. GOODREID:  And I don't know that it has to be

18  admitted as an exhibit.  I mean, I think just reading it --

19          THE COURT:  Well, I think the cleanest way to do

20  it is to handle it just like you would with any other

21  admitted exhibit.

22          So if it's stipulated -- the admissibility of that

23  exhibit is stipulated to, in addition to the contents

24  stipulated to, then move for its admission and we put it up

25  on the -- on the screens and you can examine Agent Ennis on

535

1      it.

2              MR. GOODREID:  Well, what I was suggesting, Your

3      Honor, is I don't know that it has to be admitted as an

4      exhibit.  I think just that reading the statement is

5      sufficient unless --

6              THE COURT:  Well, I don't -- but I don't -- but I

7      don't want documents that are not in evidence to be read

8      from, you know, beyond just like we do to introduce any

9      exhibit:  You do some preliminary foundational things to

10     establish what the document is.  But beyond that, if it's

11     not in evidence, I don't allow it to be read in any form.

12             So if you want to read from that exhibit, get it

13     into evidence.

14             MR. GOODREID:  Okay.

15             THE COURT:  All right.

16             MR. GOODREID:  May I confer with Government

17     counsel for just a minute, Your Honor?  Sorry, just --

18             THE COURT:  Let's bring in the jury while you're

19     doing that.

20             COURTROOM DEPUTY:  Your Honor, I need to explain a

21     couple of things to a couple of jurors that are spending

22     the night, so it will be a couple of minutes.

23             THE COURT:  Okay.

24        (Jury was present at 8:57 a.m.)

25             THE COURT:  Good morning, ladies and gentlemen of

536

1    the jury.  Welcome back to day 3 of our jury trial.

2            Government may call its next witness.

3            MS. PALUCH:  Thank you, Your Honor.  The United

4    States calls Special Agent Sandra Ennis.

5            SANDRA ENNIS, GOVERNMENT'S WITNESS, SWORN

6            COURTROOM DEPUTY:  Please be seated.  State your

7    full name for the record and spell your first and last

8    name.

9            THE WITNESS:  Sandra Ennis.  S-a-n-d-r-a,

10   E-n-n-i-s.

11           MS. PALUCH:  May I proceed --

12           THE COURT:  You may proceed, counsel.

13           MS. PALUCH:  Thank you, Your Honor.  Before I

14   begin to ask questions of this witness, I would like to

15   state that exhibits falling within the range of Government

16   Exhibit 66-B through 69 and 72 through 81 are exhibits I

17   will be asking her about.  These exhibits have all been

18   stipulated to and I would move for their admission at this

19   time and permission to publish as the exhibits are

20   discussed.

21           THE COURT:  Okay.  Given the stipulation of the

22   parties, Government Exhibits 66-B through 69 and 72 through

23   81 are admitted into evidence and may be published to the

24   jury.

25           (Government's Exhibits 66-B thru 69 and 72 thru 81

537

Direct - Ennis

1    received)

2            MS. PALUCH:   Thank you, Your Honor.

3                       DIRECT EXAMINATION

4    BY MS. PALUCH:

5    Q.   Ma'am, how are you employed?

6    A.   I'm employed with the U.S. Department of Education's

7    Office of Inspector General's Office.

8    Q.   And what is your title?

9    A.   I am a special agent.

10   Q.   And generally what do your duties entail as a special

11   agent with the Department of Education?

12   A.   I investigate allegations of fraud, waste, and abuse

13   as they relate to U.S. Department of Education program

14   funding.

15   Q.   Are you the lead case agent in this case?

16   A.   Yes, I am.

17   Q.   How did your investigation into this matter begin?

18   A.   In approximately December 2011, our office received a

19   phone call from Pikes Peak Community College.  They were

20   concerned -- there were -- they had concerns of fraud with

21   respect to multiple applications, FAFSA applications and

22   school enrollment applications, coming back to one address.

23   Q.   And did you look into those specific applicants that

24   they identified for you?

25   A.   Yes, I did.  So I requested the school to send me the

Direct - Ennis

1    records and, in reviewing those records, I wanted to verify

2    the information contained in them, so I conducted Social

3    Security number queries in a data place called Accurint.

4    It is also commonly referred to as LexisNexis. I will

5    refer to it as Accurint from here on out.

6          But what I did is I took those records and I would

7    query the Social Security number in the records the school

8    provided.

9    Q.   Did you take any further steps to verify that, in

10   fact -- first of all, did you already state what did you

11   find out about these applicants?

12   A.   Yes. So when I conducted the Social Security number

13   queries, I was able to determine that the majority of these

14   applications were inmates -- prison inmates.

15   Q.   And once you found that out, did you take any further

16   steps to verify that, in fact, those applicants were prison

17   inmates?

18   A.   Yes, I did. So that -- like Mrs. Paluch said, I

19   wanted to confirm for myself that these people were prison

20   inmates, so I went to various public Department of

21   Corrections web sites and confirmed the name and date of

22   birth matched the name and date of birth on the records

23   that Pikes Peak Community College had provided to me.

24   Q.   And you were able to verify that, in fact, they were

25   all inmates?

539
Direct - Ennis

1    A.    Yes, I was.

2    Q.    Now, over the course of your investigation, what was

3    the time frame of the conduct you were investigating?

4    A.    The time frame was from approximately August 2010

5    through October 2012.

6    Q.    Where were these inmates incarcerated?

7    A.    There were inmates located in Arizona Department of

8    Corrections, Colorado, Florida, Illinois, and Ohio

9    Department of Corrections.

10   Q.    Did you interview some of these inmates?

11   A.    Yes.  I interviewed approximately 43 inmates from all

12   the various Department of Corrections.

13   Q.    And after these interviews, did you determine whether

14   these inmates were involved in a scheme to defraud the

15   Department of Education?

16   A.    Yes.  Through my interviews, I was able to determine

17   that none of these people authorized student loans to be

18   taken out in their name.  And I was also able to determine

19   that they were, indeed, incarcerated during the time that

20   the fraud incurred.

21   Q.    If the witness could please be shown Government's

22   Exhibit 37, which should be in the first book, Ms. Hansen.

23   A.    Exhibit 38?

24   Q.    It's actually 37.

25   A.    Oh.

540

Direct - Ennis

1    Q.   Can you identify that document, ma'am?

2    A.   Yes, it is.

3    Q.   And what is it?

4    A.   It's a -- it's a court-related document, and it's a

5    stipulation as to testimony of certain witnesses.

6         MS. PALUCH:  Your Honor, at this time, I'd move

7    for the admission and publication of Government's

8    Exhibit 37.

9         THE COURT:  All right.  Given the stipulation of

10   the parties, Government Exhibit 37 is admitted into

11   evidence and may be published to the jury.

12        (Government's Exhibit 37 received)

13   BY MS. PALUCH:

14   Q.   And, Agent Hacker, if you could make the text of that

15   document -- zoom in on the text, please.  Okay.

16        Agent Ennis, what I need you to do is read that so

17   it is part of the record, if you could.

18   A.   Sure.  "The United States of America, by and through

19   Assistant United States Attorneys Martha A. Paluch and

20   Bryan D. Fields, and the Defendant Tramell Thomas, by and

21   through his counsel, Daniel T. Smith and Thomas E.

22   Goodreid, hereby agree and stipulate that if called to

23   testify at trial, the following witnesses -- Ishmael Omar,

24   Virginia Jones, Robert Pickens, Eddie Jones, Dennis Miller,

25   and Manuel Abate whose initials appear in Counts 2-7 of the

Direct - Ennis

1    Superseding indictment -- would testify that 1) they were

2    incarcerated at the time FAFSAs requesting federal student

3    aid and related school documents were submitted in their

4    names; 2) they did not submit these documents to the

5    Department of Education or to the schools in question; and

6    3) they did not authorize anyone to submit these documents

7    in their names using their personal identifying

8    information."

9    Q.    Thank you.  You can take that exhibit down.  Thank

10   you, Agent Hacker.

11             Now, what, if anything, did you determine about

12   the FAFSAs that were submitted to the Department of

13   Education?

14   A.    So when a FAFSA's submitted to the Department of

15   Education, the Department of Education captures an IP

16   address, an internet protocol address.

17   Q.    Did you request information about the IP addresses

18   that you discovered?

19   A.    Yes.  So I submitted the names to a group within our

20   Office of Inspector General saying, "Hey, I would like IP

21   data for these applicants," and they were able to provide

22   me IP address information.

23   Q.    Approximately how many IP addresses did you identify

24   in your investigation as being involved in this scheme?

25   A.    There were four primary IP addresses, and then there

542
Direct - Ennis

1     were other IP addresses that fell outside of a retention

2     period.

3     Q.    Could you explain what you mean by a "retention

4     period."

5     A.    Yes.  A retention period -- so internet service

6     providers such as Century Link, they have IP information

7     and they have IP subscriber information.  They only retain

8     those records for a certain set amount of time.  And so

9     some of these records that I requested for certain IP

10    addresses, they were outside of a retention period.

11    Q.    What did you learn about the four primary IP

12    addresses?

13    A.    Three of these IP addresses came back to Ayana Jones.

14    When I say "come back," I mean to say the internet

15    subscriber was Ayana Jones.

16          And then there was another IP address, the

17    internet subscriber was Elmer Green.

18    Q.    Can you remind the jury who Ayana Jones is.

19    A.    Yes, Ayana Jones -- at the time of the fraud, Ayana

20    Jones was the minor daughter of Heather Carr.

21    Q.    What did your investigation reveal as to who Elmer

22    Green is?

23    A.    Elmer Green's the uncle of Marcelle Green.

24    Q.    The Marcelle Green that testified yesterday?

25    A.    Correct.

Direct - Ennis

1    Q.   Did the subscriber information for Ayana Jones come

2    back to a physical address or addresses?

3    A.   Yes.  So two of the IP addresses for subscriber Ayana

4    Jones came back to 1351 Pleasant Drive, unit 1110 in

5    Chandler, Arizona.  And then another IP address associated

6    with Ayana Jones came back to 1822 East Kaibab in Chandler,

7    Arizona.

8    Q.   Did you investigate Ms. Carr?

9    A.   Yes, I did.

10   Q.   And what did you learn about her in relation to those

11   addresses?

12   A.   Heather Carr resided at the Pleasant address for a

13   duration of time in 2011 and then at some point in the

14   early part of 2012, she moved to the 1822 East Kaibab

15   address.

16   Q.   And with whom, if anyone, did she live at these

17   addresses?

18   A.   At the 1351 Pleasant address she resided with her

19   three children and at the 1822 Kaibab address, she resided

20   with the defendant, Tramell Thomas, and her three children.

21   Q.   Did your investigation reveal the connection of the

22   defendant and -- the defendant and Ms. Carr?

23   A.   Yes.  The defendant and Ms. Carr were in a

24   relationship and they had a child together.

25   Q.   Did you discover any other addresses tied to Heather

Direct - Ennis

1    Carr?

2    A.   Yes.  At some point in time, she had put a forwarding

3    address through the United States Postal Service to a P.O.

4    Box at 975 East Riggs Road in Chandler, Arizona.

5    Q.   If we could please publish Government Exhibit 64,

6    which has been admitted.  And if you could zoom in on the

7    handwriting, Agent Hacker.

8         First of all, can you identify what this document

9    is?

10   A.   Yes.  I obtained this application from the private --

11   they're called private mailbox locations.  It's a post

12   office box location at a UPS store in Chandler, Arizona.

13   Q.   And you requested these documents from that UPS store?

14   A.   Yes, I did.

15   Q.   Whose names are listed for receipt of mail on that

16   P.O. Box?

17   A.   As indicated in No. 2, Heather Carr, Jones, and

18   Thomas.

19   Q.   Okay.  Thank you.

20   A.   Uhm-hum.

21   Q.   What did you discover about Ms. Carr's employment?

22   A.   I was able to determine that she was employed at Wells

23   Fargo Bank and she helped approve loans for CarMax through

24   Wells Fargo Bank.

25   Q.   In that position, did she have access to certain

545

Direct - Ennis

1    databases?

2    A.   Yes.  Heather Carr had access to the database I

3    referred to earlier, Accurint.

4    Q.   And what does the Accurint database allow someone to

5    do?

6    A.   The Accurint database allows someone to obtain

7    personal identifying information on someone.

8    Q.   Okay.  Would that include a Social Security number?

9    A.   Yes, it would.

10   Q.   Did your investigation reveal what information she

11   needed to obtain someone's Social Security number?

12   A.   Yes.  She could query a name via just a name or a

13   name -- or a date of birth, or a combination of the two.

14   Q.   Did you obtain records from Wells Fargo pertaining to

15   Ms. Carr?

16   A.   Yes, I did.

17   Q.   Did those records confirm that Ms. Carr had performed

18   those searches for Social Security numbers?

19   A.   Yes, they did.

20   Q.   Now, you mentioned Accurint.  What, if any,

21   relationship does Wells Fargo have with Accurint?

22   A.   So Wells Fargo contracts with Accurint, and Accurint

23   provided the records to Wells Fargo who, in turn, provided

24   those records to me.

25   Q.   And did you review those records before your

Direct - Ennis

1    testimony?

2    A.    Yes, I did.

3    Q.    And did those -- and throughout your investigation, in

4    fact, did you rely on those records?

5    A.    Yes, I did.

6    Q.    And did those records reveal that Ms. Carr had, in

7    fact, performed the searches in question?

8    A.    Yes.  So for the approximately 181 applications that I

9    identified in my investigation, she had queried those 1- --

10   the 181 names I had identified in my investigation.

11   Q.    Was there a user name tied to those searches related

12   to your investigation?

13   A.    Yes.

14   Q.    What was that user name?

15   A.    Heather Carr 1.

16   Q.    Did Wells Fargo in fact confirm that was Heather

17   Carr's login name?

18   A.    Yes, they did.

19   Q.    When was the first query done with the Heather Carr 1

20   logon that you determined related to this scheme?

21   A.    It was July 3d, 2010.  And it was a query for Ismael

22   Omar.

23   Q.    Was there another query done in July of 2010?

24   A.    Yes.  It was approximately July 19th, 2010.  And it

25   was a query for Virginia Jones.

547

Direct - Ennis

1    Q.   After further investigation, did you determine who was

2    involved in this scheme?

3    A.   Yes, I did.  Heather Carr, Tramell Thomas, Mercedes

4    Diaz, and Marcelle Green.

5    Q.   Now, you testified as to the relationship between Carr

6    and Thomas.  What is the connection, if any, between Diaz

7    to any of the named conspirators?

8    A.   Heather Carr and Mercedes Diaz are very close.

9    Heather Carr is like a mother figure to Heather Carr -- or,

10   sorry, Heather Carr is a mother figure to Mercedes Diaz.

11   Q.   And what about Marcelle Green?

12   A.   Marcelle Green and Heather Carr were close friends.

13   Q.   Now, you mentioned the 181 false FAFSAs.  How much

14   money from the Department of Education were those FAFSAs

15   seeking?

16   A.   1.3 million.

17   Q.   And how much did the Department of Education pay out

18   on those claims?

19   A.   Approximately 582,000.

20   Q.   And where did the money go?

21   A.   Into the conspir- -- the conspirators' pockets.

22   Q.   Did some of it go to the schools?

23   A.   Oh, yes, it did.  So the school first went -- the

24   money first went to the school to pay for tuition and fees,

25   and then the remaining refund would go to a purported

548

Direct - Ennis

1    student who were the conspirators in this case.

2    Q.   And what were the alleged students supposed to be

3    using that money refunded to them for?

4    A.   That refunded money was supposed to be used for

5    educational purposes.

6    Q.   How does the money in this case get distributed to the

7    alleged students?

8    A.   It was distributed in the form of a Higher One, or

9    City Prepaid debit card.

10   Q.   So out of that 582,000, how much was paid out in the

11   debit cards?

12   A.   Approximately 419,000.

13   Q.   And the difference between those two numbers went to

14   the schools?

15   A.   Correct.

16   Q.   Okay.  What agency or department paid that money?

17   A.   The U.S. Department of Education.

18   Q.   And is that a federal agency?

19   A.   Yes, it is.

20   Q.   Did you investigate the addresses listed on the FAFSAs

21   that were submitted?

22   A.   Yes, I did.

23   Q.   And what did you determine?

24   A.   The addresses where the debit cards were mailed were

25   some -- in some way associated with Heather Carr, Tramell

Direct - Ennis

1    Thomas, Mercedes Diaz, and Marcelle Green.

2    Q.  At some point in your investigation, were you notified

3    that the defendant had been arrested in Tempe, Arizona?

4    A.  Yes, I was.

5    Q.  And what, if any, evidence was recovered during the

6    arrest that pertained to your investigation?

7    A.  A Sony Vaio laptop, 52 debit cards located in the

8    vehicle, and one debit card located in the defendant's

9    wallet.

10   Q.  And you heard Ms. Stailey testify about the evidence

11   located on the Sony Vaio laptop.

12   A.  Yes, I did.

13   Q.  Let's talk about the debit cards.  Were all 53 debit

14   cards in the names of inmates listed?

15   A.  Yes.  Yes, they were.

16   Q.  If the witness could be shown Government's Exhibits 4

17   and 5.  Those are the envelopes.

18        Let's start with Government Exhibit 4, which has

19   been admitted.  Do you recognize that exhibit?

20   A.  Yes, I do.

21   Q.  And do the -- and what is that exhibit?

22   A.  This is the envelope we received from Tempe Police

23   Department, and in the envelope are the 52 debit cards in

24   the names of inmates.

25   Q.  Did the Tempe PD turn those debit cards over to you?

Direct - Ennis

1     A.   Yes, they did.

2     Q.   And what did you do with those cards?

3     A.   I stored these debit cards in our evidence room.

4     Q.   And have you brought them to court every day this week

5     and including today?

6     A.   Yes, I have.

7     Q.   Please look at Government's Exhibit 5 and state what

8     that is.

9     A.   This is the debit card that I received from Tempe

10     Police Department, and this was the debit card located in

11     the defendant's wallet. The debit card is in the name of

12     Manuel Abate.

13     Q.   And did you similarly store that debit card in your

14     evidence locker?

15     A.   Yes, I did.

16     Q.   And bring it to -- bring it with you to court?

17     A.   Yes, I did.

18     Q.   All right. Do you recall the testimony, Ms. Stailey,

19     regarding text messages found on the broken Huawei phone?

20     A.   Yes, I do.

21     Q.   Please publish Government Exhibit 16, which has

22     already been admitted. And if we could blow up the last

23     two lines of that exhibit. As large as you can make that.

24        Could you read, Agent Ennis, line -- the last line

25     on that entry.

Direct - Ennis

1    A.    Yes.  So it says No. 2, so we know that it's an

2    outgoing text from the phone.  It was done on 7-3-2012 at

3    1:31 and 40 seconds.  The number was -- that the text was

4    being sent to was 260-602-7165.  And it says, "Chase

5    Tramell Thomas, 455435276."

6    Q.    Okay.  At this time -- if we could take that exhibit

7    down -- I'd move to admit and publish -- actually,

8    Government Exhibit 66-B.  It was already admitted, Your

9    Honor.

10            THE COURT:  I thought we did that this morning

11    earlier.

12            MS. PALUCH:  I just meant to say if we could

13    please publish.

14            THE COURT:  Sure.

15            MS. PALUCH:  Thank you.

16    BY MS. PALUCH:

17    Q.    If we could highlight the top half.  In fact, make

18    that even larger, if you can.  Agent Ennis, what is this

19    document?

20    A.    This is a Chase signature card for Tramell Thomas.

21    Q.    Did you request that from Chase?

22    A.    Yes, I did.

23    Q.    And did you confirm that this was a business record?

24    A.    Yes, I did.

25    Q.    All right.  On that first page, does it contain the

Direct - Ennis

1    defendant's name?

2    A.   Yes, it does.

3    Q.   What's the address listed for him?

4    A.   1822 East Kaibab Drive in Chandler, Arizona, 8- --

5    Q.   And if you could read for the record his bank account

6    number?

7    A.   455435276.

8    Q.   Is that the same number listed in the text message,

9    Government Exhibit 16?

10    A.   Yes, it is.

11    Q.   Okay.  Thank you.  Turning your attention now to the

12    debit cards, did you create a summary chart pertaining to

13    debit card mailings?

14    A.   Yes, I did.

15    Q.   Please publish Government's Exhibit 75.  Okay.  So

16    we'll zoom in a bit, but for -- first, can you identify

17    this exhibit?

18    A.   This was a summary chart that I created, and it's a

19    summary of the mailings that occurred from City Prepaid and

20    Higher One.

21    Q.   Does this chart reference every debit card mailed in

22    this case?

23    A.   No, it does not.

24    Q.   What cards does it contain?

25    A.   It's a representation of the cards that were located

Direct - Ennis

1   in the defendant's wallet and is also representative of the

2   City Prepaid cards that were mailed out in 2012.

3   Q.   Can you explain what City Prepaid is.

4   A.   Yes.  So Higher One, the Colorado Community College

5   System, uses Higher One.  The Maricopa County Community

6   College in Arizona use City Prepaid to distribute refunds

7   to students.

8   Q.   Okay.  So I'd like you to walk us through the columns

9   on this chart.  So let's start with the first column, if

10  you could please highlight that.  At least on this first

11  page.

12       And can you explain what this chart shows.

13  A.   So the first row is indicative of the debit cards --

14  the name that the debit card was issued in that name.

15  Q.   Okay.  Let's go to the next column.

16  A.   This would have been the student ID or user ID for

17  that particular name.

18  Q.   And you would have received that from the school?

19  A.   Yes.

20  Q.   Okay.  Let's go to the next column.

21  A.   This is a Higher One or City Prepaid account number.

22  Q.   Thank you.  Next column.

23  A.   This is the school which distributed -- or authorized

24  funds to be released.

25  Q.   And the next column that you see there.

554

Direct - Ennis

1   A.   That would have been the last four digits of the debit
2   card.
3   Q.   Okay.  And the next one.
4   A.   This would have been where the debit card was shipped.
5   Q.   Thank you.  Let's do the next two columns together.
6   A.   So this shows when the card was created from the
7   production facility, and then the second one is when the
8   card is activated.
9   Q.   Okay.  And then let's go with the last section there.
10  A.   That's the date of activation.  And at times Higher
11  One provided a time of activation -- or, wait -- yes, and
12  City Prepaid did not.
13  Q.   Okay.  And if we could scroll through that exhibit and
14  just show how many pages that is.
15           10 pages total?
16  A.   Correct.
17  Q.   Thank you.  What records did you rely on to create
18  that chart?
19  A.   Records obtained from Higher One and City Prepaid.
20  Q.   Please publish Government Exhibit 76.
21           Okay.  And if we could -- if you could -- is there
22  any way to make that exhibit larger?  Let's start with
23  highlighting the blue box.
24           First of all, Agent Ennis, can you identify what
25  this exhibit is?

555
Direct - Ennis

1   A.   Yeah.  This is a composite exhibit.  These -- it comes
2   from Higher One records.  And what this tells us is when
3   the Higher One card was mailed as alleged in Count 2 of the
4   indictment for Ismael Omar.
5   Q.   Okay.  So Agent Hacker, if you could please highlight
6   the blue box.
7        And state what it is saying as far as the mailing
8   dates on the Count 2 of the indictment.
9   A.   That the mailing occurred sometime between
10  approximately February 8th through February 22d, 2011.
11  Q.   Okay.  If you could please then highlight the box.
12  And what does that box tell you?
13  A.   It shows when the card was ordered from the production
14  facility on February 8th, 2011, and then when the card was
15  activated.  So we know that at some point in time between
16  when the card was ordered and when it was activated, we
17  know the mailing occurred of that card through the U.S.
18  Postal Service.
19  Q.   And that's how Higher One got these debit cards to the
20  students?
21  A.   That is correct.
22  Q.   Thank you.  Please publish Government Exhibit 77.
23  Again, the blue box.
24       First of all, what is this document, Agent Ennis?
25  Can you identify it?

Direct - Ennis

1    A.   Again, it's a composite exhibit and it describes what

2    is alleged in Count 3 of the superseding indictment.  And

3    it reflects the date range of when the Higher One debit

4    card was mailed, purported student Virginia Jones, at 1418

5    Rushmore.

6    Q.   And that's August 11th through October 15th?

7    A.   That is correct.

8    Q.   And then let's look at the box from Higher One.  And

9    what are the dates there?

10   A.   It was ordered from the production facility on August

11   11th, 2011, and it was activated by the cardholder on

12   October 3d, 2011?

13   Q.   So are dates in the indictment off by a few days

14   there?

15   A.   Correct.  It was on or about.

16   Q.   Okay.  Please publish Government Exhibit 78.  And

17   we'll go with the blue box.

18        And, first, what is this exhibit, ma'am?

19   A.   Composite exhibit of what is alleged in Count 4 of the

20   superseding indictment.  The date range that the debit card

21   was mailed was August 4th through October 3d, 2011, for

22   Robert Pickens, at 1418 Rushmore Drive in Colorado Springs.

23   Q.   Did I hear you say August 4th?

24   A.   Oh, August 11th through October 3d.

25   Q.   Okay.

557

Direct - Ennis

1   A.   My apologies.

2   Q.   And then let's blow up the box.

3         Do those two dates, August 11th and October 3d,

4   appear in that box?

5   A.   Yes, they do.

6   Q.   Okay.  Please publish Government Exhibit 79.

7         And what is this exhibit?

8   A.   A composite exhibit of what is alleged in Count 5 of

9   the superseding indictment.  The debit card was mailed at

10  some point during August 29th through November 9th, 2011,

11  in the name of Eddie Jones, to 1418 Rushmore in Colorado

12  Springs, Colorado.

13  Q.   And then please blow up the box.

14        Do those same dates appear in that box?

15  A.   Yes, they do.

16  Q.   Okay.  Let's publish Government Exhibit 80.  We have

17  two more to go.

18        What is that exhibit?

19  A.   It's a composite exhibit of Count -- what is alleged

20  in Count 6 of the superseding indictment.  We're alleging

21  that from the time period of June 26th through July 7th,

22  2012, a Higher One debit card was sent through the mail in

23  the name of Dennis Miller, to 1112 Meadow Oaks Drive,

24  Colorado Springs, Colorado.

25  Q.   And do those dates correspond to the Higher One

Direct - Ennis

1    records?

2    A.    Yes, they do.

3    Q.    Last one.  Government Exhibit 81, please.

4          What does this exhibit relate to?

5    A.    It is a composite exhibit of what is alleged in

6    Count 7 of the superseding indictment.  A Higher One debit

7    card was mailed between the time period of approximately

8    July 18th through July 26th, 2012, in the name of Manuel

9    Abate, to the mailing address of 1112 Meadow Oaks Drive,

10   Colorado Springs, Colorado.

11   Q.    And do those same dates appear in the Higher One

12   records?

13   A.    Yes, they do.

14   Q.    Okay.  So I know we see the date imported.  If you

15   could back out of that exhibit, and highlight down below.

16         There's the July 26th date?

17   A.    Correct.  And above that you see Due Date for U.S.

18   Mail Delivery.

19   Q.    Okay.  That -- exactly.  Okay.

20         That appears above the July 26th date, correct?

21   A.    That is correct.

22   Q.    Thank you.  Ma'am, you testified as to the loss to the

23   Department of Education from this scheme?

24   A.    Yes, I did.

25   Q.    Did you prepare a summary chart detailing that loss?

Direct - Ennis

A.    Yes, I did.

Q.    Please publish Government Exhibit 72.  And this is a lot, so we will be highlighting and zooming in.

      But, ma'am, can you identify what this document is?

A.    Yes.  This is the loss sheet I created to reflect the loss to the Department of Education and the loss to the schools affected.

Q.    And what type of records did you use to create this document?

A.    I created -- I use what's called a COD report.  It's called Common Origination Disbursement report that the U.S. Department of Education -- it's how they keep track of the money that goes to the schools, and then it also keeps track of any money that comes back from the school as required by the return to Title IV calculation of when a student doesn't earn all of their financial aid.

Q.    What I would like you to do is just generally explain to the jury how this chart is organized.  And let's go ahead and start with column A.  Agent Hacker, how about we go with the next two, over to Disbursed by Schools.  Let's do that whole box at once.

      Okay.  Can you explain what's contained here?

A.    So, yeah, at the top you'll see Disbursals to School by ED.  ED is U.S. Department of Education.  So it's broken

Direct - Ennis

1    down by unsubsidized loans that are disbursed to the

2    school, the subsidized loans that are disbursed to the

3    school, and the Pell Grant funds that are disbursed.

4         And then if you take those numbers across to the

5    right, you'll see that the total that was -- that was the

6    total amount of aid disbursed by the Department of

7    Education.

8    Q.   Okay.  So let's explain on column 11, can you just

9    state what that -- I'm sorry, not 11.  I don't know what

10   I'm talking about.  There on the left-hand side of this

11   summary chart, what is contained there?

12   A.   So if you go to the left-hand side, because it's a

13   rather large document, you don't see all of it in its

14   entirety but you see that I've broken it down by school.

15   So there was aid disbursed from Chandler-Gilbert Community

16   College, Community College of Denver, Mesa Community

17   College, I think Pikes Peak is the next one, Pueblo

18   Community College -- I'm having to scroll down to refresh

19   my memory, but I think it's Phoenix.  So, yes.

20   Q.   Let's see.  There's Phoenix.  Let's go to the next

21   school after Phoenix.  There's Pikes Peak.  What are the

22   last two?

23   A.   Pueblo Community College and Red Rocks Community

24   College.

25   Q.   Okay.  And let's back out and go back to the first

Direct - Ennis

1    page of that exhibit.  So let's highlight in the box

2    starting with Adjustments and take that to the end so the

3    agent can explain that section of the chart.

4    A.   So you heard testimony this week where Department of

5    Education, they disbursed the money to the school, and

6    there are times when all of the aid is not earned by the

7    applicant or the purported student because they drop out of

8    the course or they withdraw from the course.  So they

9    haven't attended the entire time so, therefore, they

10   haven't earned all of that aid.  So there is a requirement

11   by the school to return that money to the U.S. Department

12   of Education.

13          So what you see reflected here are the times when

14   the school returned money to the U.S. Department of

15   Education.  And what you heard earlier this week is there

16   are times when the money goes to the school, the school

17   takes their tuition and fees, and they disburse that refund

18   to the student so that they can get their educational

19   expenses buying books, transportation to get to school,

20   whatever is related to education.

21          Well, that money's out the door.  But now there's

22   a requirement to return the money to the Department of

23   Education, so the school has to use their own institutional

24   funds to pay back the Department of Education, and that's

25   what the losses reflect there.  That's -- the adjustment is

Direct - Ennis

1    where the school -- they either returned money and they

2    were able to do it before money went out the door, or there

3    were times when money had already gone out the door and the

4    school suffered a loss.

5    Q.   Thank you for that explanation.

6         The names on the left-hand side of this exhibit,

7    are those all names that were implicated in this scheme, or

8    funds were disbursed in these names as part of the scheme?

9    A.   Correct.  These were names identified in this

10   investigation.

11   Q.   Let's use Manuel Abate as an example.

12   A.   Okay.  If we --

13   Q.   Pardon me.

14   A.   Did you want to discuss the very last --

15   Q.   Did we not get to the very last -- I apologize.  Go

16   ahead, and if you could explain that last section.

17   A.   Yes.  So the FSA refunds, that's what I was talking

18   about.  That's what went onto the debit card.  That was the

19   refund that was provided to the purported student.

20   Q.   Thank you.

21   A.   Uhm-hum.

22   Q.   Let's talk about one example and then we'll go to your

23   summaries at the end.  But let's use Abate as an example.

24   If you could highlight -- there's another Abate.  So we've

25   got to scroll down to --

Direct - Ennis

1    A.    Pikes Peak.

2    Q.    The Pikes Peak on page 2.  And if you could look in --

3    we're just looking for a highlighting of Manuel Abate.  Can

4    you find his name?  There he is.  Let's just highlight

5    Pikes Peak and Abate, line 63, if you could.  Okay.  We're

6    going to need to make that bigger.

7            Okay.  So tell us what happened with Manuel Abate.

8    A.    Okay.  What had happened -- and that's kind of hard

9    to -- if you start going -- is there any way to --

10   Q.    Let's -- can we do the whole line for Abate?

11           AGENT HACKER:  It won't be large enough.

12   BY MS. PALUCH:

13   Q.    Let's take this and see how large that is.  There's no

14   way to make it larger?

15           AGENT HACKER:  No, ma'am.

16   BY MS. PALUCH:

17   Q.    Okay.

18   A.    So I'll start with what was disbursed.  You'll see

19   that if you go across, there was subsidized loans,

20   unsubsidized loans, Pell money.  And so the total was

21   $6,091 was provided to the school Pikes Peak -- Pikes Peak

22   Community College.

23   Q.    So then let's back out and pick up from that number

24   and take that to the end.

25           What do these numbers represent?  Are you able to

564
Direct - Ennis

1   say that without the headings?

2   A.   I think so.  So we show that $829 was returned to the

3   Department required by the return to Title IV calculation.

4   And there was also money returned at some point, 3,874.

5   I'll explain that in a moment.  So the remaining amount --

6   amount was 13,088, which is what the school used for

7   tuition and fees.

8        As you heard earlier this week, the school always

9   uses the Pell money first.  And I might need to -- and then

10  the 4,706 I believe is the refund that was issued in the

11  form of a refund for Manuel Abate.

12  Q.   Okay.  Okay.

13  A.   And do you want me to continue?

14  Q.   Yeah, why don't you explain what happened with Mr.

15  Abate's money.

16  A.   So what we found out was that the debit card was never

17  activated.  Manuel Abate never selected the -- the

18  purported Manuel Abate never selected a refund selection.

19  You know, they have the option to have a bank account and

20  activate the debit card, they could choose a check be

21  mailed.  Well, because neither -- neither preference was

22  chosen, Higher One mailed out checks to 1112 Meadow Oaks

23  Drive.  Those checks were never cashed.  Higher One could

24  not keep the money, so they returned the money to the

25  school, and then the school returned that portion you saw,

Direct - Ennis

1   that I said I would explain in a minute, they returned that

2   money to the department.  But there was still a loss

3   because the school took their portion for tuition and fees.

4   Q.   And that $4700 amount was allocated for Manuel Abate

5   had he activated the card or selected some form of

6   payment?

7   A.   That is correct.

8   Q.   Let's go to the last section of this card.  I would

9   like to point out your totals at the end.  If we could

10  highlight just where it talks about totals.

11       What do these numbers represent?

12  A.   You see the 582,000 -- approximately 582-, that is

13  what was disbursed to all the schools based on the amount

14  that was returned to the Department of Education.  You see

15  that 491,000, the loss -- did I say that correctly?

16       The U.S. Department of Education was approximately

17  491,000.  Because some of the money had been returned to

18  them, the school suffered a loss of approximately 72,000,

19  because of, like I said, they had to use their own

20  institutional funds to pay back the department.  So the

21  total of those two numbers are approximately 563,000, you

22  see the total loss there.

23       And then what you see over to the far right is the

24  money that went -- that was distributed via the debit cards

25  and that loss is approx- -- that went to the defendants

Direct - Ennis

1    Heather Carr, Tramell Thomas, Mercedes Diaz, and Marcie

2    Green, and that's approximately $419,000.

3    Q.   By "defendants," you mean the conspirators?

4    A.   Yes, I do.

5    Q.   Okay.  Thank you.  I think we're done with that

6    exhibit.

7         Now, you testified about IP addresses used in this

8    scheme.  Did you create a summary chart of the IP addresses

9    used in this case?

10   A.   Yes, I did.

11   Q.   Please publish Government's Exhibit 73.

12        What is that document?

13   A.   This is a summary chart that I created, and this was

14   related to IP activity -- IP activity associated with the

15   case.

16   Q.   Okay.  What records did you rely on to create this

17   chart?

18   A.   I relied on records I received from the Department of

19   Education, attendance records received from the Colorado

20   Community College System, Higher One, and City Prepaid IP

21   activity, and records obtained from Century Link and Cox

22   Communications.

23   Q.   Okay.  Let's start with -- if I could, I would like to

24   back out, if you could, Agent.  I'd like to do the first

25   column with the names.

Direct - Ennis

1    So tell us what -- who's listed here.

2    A.   So this is a representation, this isn't all of the

3    names identified in the investigation.  This is a

4    representation of the names.  All but two of the names are

5    inmates identified in this investigation.

6    Q.   And who are the two that are not inmates?

7    A.   Vanessa Lopez and Tramell Thomas.

8    Q.   And who's Vanessa Lopez?

9    A.   Vanessa Lopez is a former girlfriend of Tramell

10   Thomas.

11   Q.   Okay.  Let's back out of that.  And then let's

12   highlight the top column, all of the -- across the row.

13       Tell us what we have here.

14   A.   So going from left to right, you'll see the first

15   number, the two four number, that subscriber information we

16   weren't able to obtain records because it was outside of

17   the retention period --

18   Q.   Agent Ennis, I'm going to interrupt you for a second.

19   I'm going to ask Agent Hacker to just blow up the first two

20   columns so we could read those a little bit easier.  Okay.

21       So you -- finish your testimony on that first box.

22   A.   Yes.  So the first box, we weren't able to obtain

23   records due to it falling outside of retention periods.

24       The second column, Subscriber Information, came

25   back to Ayana Jones with service at 1351 Pleasant Drive.

Direct - Ennis

1    Q.   Okay.  And let's go to two more boxes together.

2         What can you tell us about those two boxes?

3    A.   These two IP addresses, Subscriber Information was for

4    Ayana Jones.  One was for service at 1351 Pleasant and then

5    the other six eight number was at 1822 East Kaibab.

6    Q.   Okay.  And you testified that is Heather Carr's minor

7    daughter, correct --

8    A.   That's correct.

9    Q.   -- at the time?

10        Let's go to the last two boxes.

11   A.   So these IP addresses were associated with subscriber

12   Elmer Green, for service at 4630 South 21st Place in

13   Phoenix, Arizona.

14   Q.   Okay.

15   A.   And the --

16   Q.   Go ahead.

17   A.   There's a column for other IP addresses where we

18   weren't able to obtain subscriber information.

19   Q.   Okay.  Could we go to the bottom of the first page and

20   highlight off to the left.  Is there a key at the bottom of

21   this exhibit?

22   A.   Yes, there is.

23   Q.   Can you explain that key.

24   A.   Yes.  So you'll find letters in the spreadsheet and

25   these letters are representative of the following:  An F

Direct - Ennis

1    stands for FAFSA, meaning the FAFSA was submitted from that

2    IP address; A is any attendance IP activity associated with

3    Colorado Community College Systems; an H is the Higher

4    One -- any IP activity associated with Higher One.

5    Q.    Okay.  We could back out of that.  And let's use Abate

6    as an example, if we could.  Is he on there?

7              So what is this showing about Abate?

8              And I think what we'll have to do is back out and

9    grab that heading above.

10             What does this show as far as Manuel Abate?

11   A.    So we show that there was attendance activity, FAFSA

12   was submitted, and Higher One activation or card activity

13   coming back to 1822 East Kaibab Drive in Chandler, Arizona.

14   Q.    And you did that for every inmate listed -- if we

15   could back out of that -- every inmate listed on this

16   summary chart?

17   A.    Yes, I did.

18   Q.    And, Agent Hacker, if you could scroll through to show

19   the jury how many pages are comprised of this exhibit list.

20   Okay.  Thank you.  How many pages is that?  Three.  All

21   right.  You -- thank you for that exhibit.

22             You talked about the physical addresses used in

23   this scheme, correct?

24   A.    That is correct.

25   Q.    I think I'd like to talk about your final summary

Direct - Ennis

1    chart and that's Government Exhibit 74.  Can you identify

2    that exhibit?

3    A.    Yes.  I created this summary chart reflecting

4    addresses associated where Higher One debit card or school

5    enrollment records, any activity related to the scheme that

6    used these addresses.

7    Q.    Okay.  And what addresses are listed on -- on this in

8    relation to the scheme?

9    A.    There's approximately representative of 11 addresses

10   and they are not all -- they didn't all fit on one page,

11   but these addresses are associated with the co-conspirators

12   in this case.

13   Q.    How did you determine that?

14   A.    Through my investigation through conducting interviews

15   and basically my investigation.

16   Q.    To include Department of Education records?

17   A.    Oh, where did I -- yes.  I apologize.  So I obtained

18   this information through Department of Education records,

19   Higher One records.  Department of Education records I

20   obtained from the school, and then also -- that was all, I

21   think.

22   Q.    And you relied on those records to create this chart?

23   A.    Correct.

24   Q.    And now you stated you couldn't get all 11 across.  If

25   we could look at page 4 of this exhibit.  Does that contain

Direct - Ennis

1    the remaining addresses?

2    A.    Yes, it does.

3    Q.    Okay.  So we're going to start with the left-hand

4    column on page 1.  What's contained here?

5    A.    These are the names identified in my investigation.

6    All of these names except for two were prison inmates.

7    Q.    Okay.  And those are the two you said was Vanessa

8    Lopez and the defendant?

9    A.    That is correct.

10   Q.    Okay.  Please explain the next column.  Let's just go

11   with -- for now what we're going to do is just talk about

12   the addresses and let's do two at a time.

13         So the first address, what address is that?

14   A.    1418 Rushmore Drive, Colorado Springs, Colorado.

15   Q.    And whose address is that?

16   A.    That is the address of LaTanya Pickens.

17   Q.    And who is LaTanya Pickens?

18   A.    LaTanya Pickens is a friend of Heather Carr and at an

19   address where the defendant had information associated with

20   such school records.

21   Q.    And can you explain that.  What do you mean

22   "associated with"?

23   A.    School records.

24   Q.    Did he list that address?

25   A.    Yes, he did.

572
Direct - Ennis

1    Q.   As his own?

2    A.   Correct.

3    Q.   Okay.  Let's go to the next address.

4    A.   2372 Lexington Village Lane.

5    Q.   And whose address is that?

6    A.   That is the address of Makayla Grant.

7    Q.   And who is Makayla Grant?

8    A.   Makayla Grant is a close friend of Heather Carr.

9    Q.   Okay.  Let's go to two more addresses.  Let's start

10   with Black Hawk.  Whose address is that?

11   A.   3239 Black Hawk Drive is the address of Matthew

12   Sanders.  Matt --

13   Q.   Who -- I'm sorry, who's Matthew Sanders?

14   A.   Matthew Sanders is the stepbrother of Heather Carr and

15   friend of Tramell Thomas.

16   Q.   Okay.  The next address, Radiant Drive?

17   A.   This is the address where Christine Duncan and Tramell

18   Thomas resided.

19   Q.   Okay.  Let's go to the next -- the last two addresses

20   on this page.  Can you tell us about Rice Drive?

21   A.   1063 Rice Drive is the address of the defendant's

22   cousin, Michael Cox.

23   Q.   And the next address.

24   A.   1112 Meadow Oaks Drive was the address of Kimmisha

25   Mullett.

Direct - Ennis

1    Q.    Let's go to page 4 of this exhibit.  Let's start with

2    two addresses first.  Go to Mobile Lane.

3          Whose address is that?

4    A.    Mobile Lane was the address of Marcelle Green's

5    deceased uncle, Jimmy Green.

6    Q.    How about Dragoon Circle?

7    A.    115 west Dragoon Circle is associated with Mercedes

8    Diaz.

9    Q.    Let's go to two more addresses.  How about Knox Road?

10   A.    Knox Road was the address of Mercedes Diaz at some

11   time.

12   Q.    Mills Avenue?

13   A.    Mills Avenue is a post office box that was opened by

14   Terrel Smith.

15   Q.    And who is Terrel Smith?

16   A.    Terrel Smith is a friend of the defendant.

17   Q.    Okay.  Let's go to the last address.

18         Whose address is that?

19   A.    That is the address of Marcelle Green.

20   Q.    And your investigation revealed that all 11 of those

21   addresses were used in this scheme for receipt of debit

22   cards and on FAFSAs?

23   A.    Correct.

24   Q.    All right.  So now let's go to your last column on

25   this chart and have you explain what that means.

574
Direct - Ennis

1    A.    So the X is indicative that a debit card was located

2    in the car the defendant was driving, and those are the

3    debit cards that were taken into evidence by Tempe PD.

4    Q.    Okay.  Now, let's go to the bottom of the -- and

5    highlight the key, please, if we could.

6          And could you explain the key for this chart to

7    the jury.

8    A.    Yes.  So when you see an F in the columns, it's

9    indicative that that address was used on a FAFSA.  An M

10   stands for master promissory note, that address was used; H

11   or C, that's Higher One or City Prepaid records reflected

12   that that address was used; S stands for school records had

13   that address; and as I said before, X was the card located

14   in Heather Carr's vehicle driven by the defendant.

15   Q.    Okay.  Let's, just for ease of reference, stay with

16   Manuel Abate.  Can you highlight his column and you explain

17   to us what this chart shows us.

18   A.    Correct.  So if you see Manuel Abate's name, and you

19   go to the far right, you'll see that a FAFSA was submitted

20   using the address 1112 Meadow Oaks Drive.  Higher One

21   records that same address was used; master promissory note,

22   that address was used; and it was also used on school

23   records.

24   Q.    And if we go over to page 4, will that indicate

25   whether it was found on the defendant?

Direct - Ennis

1   A.   Yes.  There's an X in the Tempe PD evidence column.

2   Q.   Okay.  Now, Ismael Omar is a name included on this

3   chart.  What was the address listed for Ismael Omar?  And,

4   Agent, if you could scroll down and find him.  Yup, you're

5   there.  Yup.

6        Where is the activity coming back for Ismael Omar?

7   A.   3820 Radiant Drive.

8   Q.   Okay.  How about Virginia Jones, on page 2?

9   A.   1418 Rushmore.

10  Q.   How about Robert Pickens on page 2?

11  A.   1418 Rushmore.

12  Q.   Eddie Jones.

13  A.   1418 Rushmore.

14  Q.   Sorry, we're going too fast there, Agent Hacker.

15       How about Dennis Miller?

16  A.   1112 Meadow Oaks Drive.

17  Q.   Okay.  And we -- thank you.  We're done with that

18  chart.

19       Ma'am, we talked about the Rushmore Drive address.

20  And in the course of your investigation, did you come

21  across documentation tying the defendant to the Rushmore

22  Drive address?

23  A.   Yes, I did.

24  Q.   At this time, I'd move to publish Government

25  Exhibit -- oh, I believe it's already admitted, Government

Direct - Ennis

1  Exhibit 67.  Please publish.  And can you highlight the top

2  portion of that.  Even a little more if you could grab that

3  first area down to the address.

4          Okay.  What is this document, ma'am?

5  A.   It is a FAFSA.

6  Q.   Okay.  And who -- in whose name?

7  A.   Tramell Thomas.

8  Q.   All right.  And what's the address listed for him?

9  A.   1418 Rushmore Drive.

10 Q.   Okay.  And let's go to the back -- the last page of

11 this exhibit.

12         And can you tell us the date that that was

13 submitted?

14 A.   June 27th, 2010.

15 Q.   And for what school?

16 A.   Pikes Peak Community College.

17 Q.   Okay.  Let's now look at Government Exhibit 68, if you

18 could publish that exhibit.  And let's highlight the top

19 box, if we could.  Okay.  Down to there.  Great.  Can you

20 make the name larger in that?  Take just that box there.

21         First of all, what is this document?

22 A.   This is a master promissory note.

23 Q.   In whose name?

24 A.   Tramell Thomas.

25 Q.   And at what address?

577

Direct - Ennis

1      A.    1418 Rushmore Drive.

2      Q.    And what's the date of that master promissory note?

3            I think we have to scroll down to the bottom of

4      the document.  And if you could highlight the 17 and 18.

5      A.    It shows it was electronically signed by Tramell

6      Thomas on June 24th, 2010.

7      Q.    Thank you.  Please publish Government Exhibit 69.  And

8      highlight as much as you can of that document.

9            First, ma'am, what is -- what is this document?

10     A.    These are Higher One bank statements.

11     Q.    And let's highlight, if we can, at the top, the name

12     and address.

13           What is listed there?

14     A.    Tramell Thomas, 1418 Rushmore Drive, Colorado Springs,

15     Colorado.

16     Q.    And did you obtain those records from Higher One?

17     A.    Yes, I did.

18     Q.    Thank you.  We are done with that exhibit.

19           Ma'am, was a search warrant executed in this case

20     on the Kaibab address?

21     A.    Yes, it was.

22     Q.    What date did that search occur?

23     A.    November 29th, 2012.

24     Q.    And who lived at that address at that time?

25     A.    Heather Carr, Tramell Thomas, Heather Carr's children,

578

Direct - Ennis

1   and one of the children was Tramell Thomas'.

2   Q.   Let's look at Government Exhibit 7.  Can you identify

3   that exhibit -- I'm sorry, I don't know that 7 has been

4   admitted.

5           THE COURT:  One second.  Deb, do you show it in?

6           COURTROOM DEPUTY:  No, Your Honor.

7           MS. PALUCH:  No.

8           THE COURT:  Neither do I.

9           MS. PALUCH:  Right.  If the exhibit could be shown

10  just to the witness.  Exhibit No. 7.

11  BY MS. PALUCH:

12  Q.   Can you identify that document, ma'am?

13          Is it up yet?

14  A.   Not yet.

15          COURTROOM DEPUTY:  Do you want the hard copy?

16          MS. PALUCH:  She can look at it out of the book.

17  BY MS. PALUCH:

18  Q.   Do you have the first book --

19  A.   I have it now.

20  Q.   Okay.  Can you identify that exhibit?

21  A.   Yes.  It's 1822 East Kaibab.  It's the address where

22  the search warrant was executed.

23  Q.   And it's the front of the house; is that right?

24  A.   That is correct.

25  Q.   And when was that photograph taken?

579
Direct - Ennis

1    A.   The day of the search warrant.

2    Q.   Okay.  And you were present then?

3    A.   Yes, I was.

4         MS. PALUCH:  I move to admit and publish

5    Government Exhibit 7.

6         THE COURT:  Any objection?

7         MR. GOODREID:  No, Your Honor.

8         THE COURT:  There being no objection, Exhibit 7 is

9    admitted into evidence and may be published to the jury.

10    (Government's Exhibit 7 received)

11   BY MS. PALUCH:

12    Q.   Now, you stated you participated in the search; is

13   that right?

14    A.   Correct.

15    Q.   When you got to the home, were you able to get in

16   right away?

17    A.   No, we were not.

18    Q.   And what happened once you finally got into the house?

19    A.   Once we got into the house, there were torn-up pieces

20   of paper in the toilet.  These torn-up pieces had acronyms

21   relating to federal student aid, such as FAFSA.  One of the

22   torn pieces of paper had the name of inmate Bianca Johnson.

23   She's from Florida Department of Corrections.

24         There was a broken cell phone located in one of

25   the master bedroom closets.  There were laptops and cell

580
Direct - Ennis

1    phones taken into evidence, as well as there were

2    Pikes Peak enrollment records located in the home.

3    Q.   What about cell phones?

4    A.   Yes, there were cell phones seized into evidence.

5    Q.   Was a broken cell phone seized?

6    A.   Yes, there was.

7    Q.   Where was that broken cell phone found?

8    A.   In one of the master bedroom closets.

9    Q.   What type of clothing was found in that closet?

10   A.   Male clothing.

11   Q.   When you're at that level of the house, were there

12   additional closets?

13   A.   Yes.  There were two master bedroom closets.

14   Q.   And what was contained in the other closet?

15   A.   Female clothing.

16   Q.   Please publish Government's -- let's see.  This is in

17   evidence, Government's Exhibit 25.  If you could please

18   publish that.

19        Can you identify that exhibit, ma'am?

20   A.   Yeah.  That's the defendant standing in the master

21   bedroom.

22   Q.   Is there any way to zoom in on that, Agent Hacker?

23        Do you recognize that room?

24   A.   Yes, I do.

25   Q.   And what is that room?

581
Direct - Ennis

1    A.   It's the -- one of the master bedroom closets.

2    Q.   What, if anything, was found in that closet during

3    your search?

4    A.   A broken Huawei phone.

5    Q.   Okay.  Please -- this has not been admitted.  I'd like

6    the witness only to see Government Exhibit 70.

7         Can you identify that exhibit?

8    A.   Yes.  That was the broken Huawei phone.

9    Q.   And when was that photo taken?

10   A.   The day of the search warrant.

11        MS. PALUCH:  Move to admit and publish Government

12   Exhibit 70.

13        THE COURT:  Any objection?

14        MR. GOODREID:  No, Your Honor.

15        THE COURT:  There being no objection, Exhibit 70

16   is admitted into evidence and may be published to the jury.

17        (Government's Exhibit 70 received)

18        MS. PALUCH:  Thank you, Your Honor.

19   BY MS. PALUCH:

20   Q.   Agent Hacker, you can zoom in a little bit.  There you

21   go.

22        And is the phone off to the left there?

23   A.   That is correct.

24   Q.   Okay.  I'd like the witness only to be shown

25   Government Exhibit 71.

Direct - Ennis

1    Can you identify that exhibit, ma'am?

2    A.   Yes, it's a close-up of the broken Huawei phone.

3    Q.   Again taken when?

4    A.   The day of the search warrant.

5         MS. PALUCH:  And move to admit and publish

6    Government Exhibit 71.

7         THE COURT:  Any objection?

8         MR. GOODREID:  No, Your Honor.

9         THE COURT:  There being no objection, Exhibit 71

10   is admitted into evidence and may be published to the jury.

11        (Government's Exhibit 71 received)

12   BY MS. PALUCH:

13   Q.   Thank you.  Ma'am, during the search, was a sketch

14   made of the layout of the home?

15   A.   Yes, it was.

16   Q.   Did you designate rooms by letters?

17   A.   Yes, we did.

18   Q.   Please look at Government Exhibit 8, just for the

19   witness only.

20        Ma'am, can you identify that exhibit?

21   A.   Yeah, that is room J.

22   Q.   And what is room J?

23   A.   Room J was a closet -- sorry, not a closet -- an

24   office.

25   Q.   And how many offices did you -- were at the Kaibab

583
Direct - Ennis

1    residence?

2    A.    There were two.

3    Q.    Okay.  And was this photograph taken at the time of

4    the search?

5    A.    Yes, it was.

6    Q.    And is that what the office looked like at the time of

7    the search?

8    A.    Yes.

9            MS. PALUCH:  Move to admit and publish Government

10   Exhibit 8.

11           THE COURT:  Any objection?

12           MR. GOODREID:  No, Your Honor.

13           THE COURT:  There being no objection, Exhibit 8 is

14   admitted into evidence and may be published to the jury.

15       (Government's Exhibit 8 received)

16   BY MS. PALUCH:

17   Q.    Please publish Government Exhibit 9, which has already

18   been admitted.

19           Can you identify that exhibit?

20   A.    Yeah.  That is the defendant sitting in the office

21   identified as room J.

22   Q.    Okay.  And the room J, you recall the testimony

23   about -- of Ms. Stailey where she talked about the room J

24   computer?

25   A.    Correct.

584

Direct - Ennis

1    Q.   Is that the room J computer?

2    A.   It is.

3    Q.   Let's publish, please, Government Exhibit 28, which

4    has been admitted.

5         And can you identify that exhibit?

6    A.   That is the defendant sitting in room J.

7         MS. PALUCH:   Okay.  Could I have one moment, Your

8    Honor?

9         THE COURT:   You may.

10   BY MS. PALUCH:

11   Q.   If the witness could be shown Government Exhibit 36,

12   please.

13        THE COURT:   Does someone have their phone on?

14        UNIDENTIFIED WOMAN:   I just turned it off.   I

15   apologize.

16   BY MS. PALUCH:

17   Q.   Can you see that exhibit, ma'am?

18   A.   Yes, I can.

19   Q.   What is that?

20   A.   That was the second office that was located on the

21   second floor of the residence, and it was identified as

22   room Z.

23   Q.   Okay.  And if you could, please --

24        MS. PALUCH:   At this time, Your Honor, I would

25   move to admit and publish Government Exhibit 36.

585
Cross - Ennis

1    THE COURT:  Any objection?

2    MR. GOODREID:  No, Your Honor.

3    THE COURT:  There being no objection, Government

4    Exhibit 36 is admitted into evidence and may be published

5    to the jury.

6    (Government's Exhibit 36 received)

7    BY MS. PALUCH:

8    Q.   And if you could highlight that.

9    And that was the second office that you located?

10   A.   Correct.

11   Q.   Did you see a laptop there?

12   A.   I'm not sure if that's a laptop, but there was a

13   laptop located in that room, room Z.

14   Q.   Okay.

15   A.   And it was a Wells Fargo laptop.

16   Q.   Okay.  Thank you.

17   MS. PALUCH:  No further questions at this time,

18   Your Honor.

19   THE COURT:  All right.  Cross-examination.

20   MR. GOODREID:  Yes, thank you, Your Honor.

21   CROSS-EXAMINATION

22   BY MR. GOODREID:

23   Q.   Good morning, Special Agent Ennis.

24   A.   Good morning, sir.

25   Q.   Now, you testified on direct -- if I heard you

586
Cross - Ennis

1  correctly, you testified that the loss to the Government

2  was approximately $500,000, half a million dollars, give or

3  take?

4  A.   Correct.

5  Q.   Okay.  And you said that money went into the

6  conspirators' pockets, didn't you?

7  A.   Not that amount.

8  Q.   Okay.  What sum did you say went into the

9  conspirator's pockets?

10  A.   Approximately 419,000.

11  Q.   Okay.  So you said approximately $419,000 went into

12  the conspirator's pocket, right?

13  A.   Correct.

14  Q.   But you can't say of that $419,000, what specific

15  amount went to Mr. Thomas as opposed to the other

16  conspirators, can you?

17  A.   No, I cannot.

18  Q.   You can't say if he got $30,000 or $300,000 or

19  $319,000, can you?

20  A.   That is correct.

21  Q.   And you also talked about this stop.  And you know

22  what I'm referring to about the stop, the stop of Mr.

23  Thomas?  We've heard a lot of evidence about, you

24  understand what I'm referring to there?

25  A.   The Tempe PD traffic stop?

Cross - Ennis

1   Q.   Yes.  Yeah.  That's what I'm referencing as a stop.

2   Do you understand that?

3   A.   Yes.

4   Q.   Okay.  And, again, you mentioned about things that

5   were -- that the Sony Vaio laptop was seized there,

6   correct?

7   A.   That is correct.

8   Q.   Okay.  But, again, you don't have any evidence, do

9   you, that Mr. Thomas, himself, ever used the Sony Vaio

10  laptop, do you?

11  A.   No, I do not.

12  Q.   All right.  Let's take a look at Government's

13  Exhibit 73.  If we could pull it up, please.

14       And before we go to that exhibit, Special Agent

15  Ennis, you indicated that through the course of your

16  investigation, you found, I believe you said, four

17  different IP addresses that were associated with this case,

18  right?

19  A.   That is correct.

20  Q.   And you said that three of them, if I understood you

21  correctly, were attributable to Ayana Jones, right?

22  A.   Correct.

23  Q.   And you found one to Mr. Elmer Green, right?

24  A.   Correct.

25  Q.   And, again, just to be clear, Ayana Jones was

Cross - Ennis

1    associated with Heather Carr, that was her daughter, right?

2    A.    Correct.

3    Q.    And Mr. Green, Elmer Green, is Marcelle Green's

4    deceased uncle, correct?

5    A.    Elmer Green isn't the deceased uncle.  Jimmy Green is

6    the deceased --

7    Q.    I'm sorry.  So Mr. Green is associated with Marcelle

8    Green, correct?

9    A.    He is an uncle, correct.

10   Q.    Okay.  So you didn't find any IP addresses in the

11   course of your investigation that were specifically

12   associated with Mr. Thomas; isn't that right?

13   A.    An IP address was associated with the address that Mr.

14   Thomas was living at.

15   Q.    Well, I understand that.  But of these four

16   addresses -- well, let's take a look at your chart.  I

17   mean, you've got four different numbers here associated

18   with various addresses, right?  But none of those -- those

19   IP addresses, the subscriber is Tramell Thomas, right?

20   A.    That is correct.

21   Q.    Okay.  And let's take a look at, if we can, Exhibit 7-

22   -- again, still on 73, and let's take a look at the last

23   page of the exhibit, page 3.  And if we can, to the extent

24   we can, let's either highlight or try to enlarge the last

25   line that deals with Mr. Thomas.  Okay.

Cross - Ennis

1    And at the very end there, it says you have F and

2    H for the line for Mr. Thomas, right?

3    A.    Correct.

4    Q.    And that means that there was a FAFSA associated with

5    him, and that there was a Higher One card associated with

6    him, right?

7    A.    That is correct.

8    Q.    But under IP address it says Subscriber Information

9    Not Available, right?

10    A.    That is correct.

11    Q.    So as was established earlier, as far as you know, Mr.

12    Thomas, he applied for aid in his own name, correct?

13    A.    That is correct.

14    Q.    He applied to enroll at Pikes Peak Community College,

15    correct?

16    A.    Yes.

17    Q.    And, in fact, as far as you know, he actually went to

18    school there, didn't he?

19    A.    Yes, he did.

20    Q.    All right.  So this last category, other IPs --

21    Subscriber Information Not Available, you also don't even

22    know if he applied to go to school over the internet, do

23    you?

24    A.    I know that there was an electronic application

25    submitted.

Cross - Ennis

1    Q.   But you don't have an IP address associated with that

2    as such, right?

3    A.   It fell outside of the retention period.

4    Q.   Right.  So talking about 73 as a whole here, you've

5    got a list of all these people and these names who are

6    associated with the fraud generally speaking, right?

7    A.   Correct.

8    Q.   Mr. Thomas is at the end of this exhibit, but he, in

9    contrast to the other people on this list, actually went to

10   school; isn't that right?

11   A.   Yes.

12   Q.   All right.  Let's pull up Government's Exhibit 64,

13   please.

14        And you have this in front of you, Special Agent

15   Ennis?

16   A.   Yes, I do.

17   Q.   Make sure -- okay.  And this is the document you

18   talked about application for delivery of mail through --

19   well, that you got from UPS, right?

20   A.   Correct.

21   Q.   And let's take a look at box 2, if we could enlarge

22   that a little bit.

23        Do you see the names on there?

24   A.   Yes, I do.

25   Q.   Okay.  Do you know whose handwriting that is?

591
Cross - Ennis

1   A.   No.  I know No. 6 says the applicant is Heather Carr.

2   Q.   Okay.  So you -- and you don't have any reason to

3   believe, then, do you, that Ms. Carr didn't actually fill

4   this out, do you?

5   A.   No, I do not.

6   Q.   All right.  Let's talk about the day of the search.

7   That is, I'm talking about the search of the address at

8   Kaibab.

9   A.   Correct.

10  Q.   You indicated on your direct examination that there

11  were pieces of paper that were torn up and did you say

12  placed in the toilet?

13  A.   They were floating in the toilet, yes.

14  Q.   You don't know who tore those pieces of paper up, do

15  you?

16  A.   No, I do not.

17  Q.   And you don't know who put them in the toilet.

18  A.   No, I do not.

19  Q.   And you recall -- back to my question about the

20  handwriting on that UPS document:  You recall, don't you,

21  that Ms. Moss -- you recall her testimony on Monday, she

22  was the representative of Pikes Peak Community College?  Do

23  you recall her testifying that she found -- one of the

24  things that raised her suspicion in this case was that

25  there was -- a lot of the handwriting on a number of these

Cross - Ennis

1    documents was the same?  Do you remember her saying that?

2    A.    Similar handwriting, right.

3    Q.    Similar handwriting, yes.  Okay.  And you've seen a

4    lot of those documents yourself, haven't you?

5    A.    Yes, I have.

6    Q.    But the Government in this case never conducted a

7    handwriting analysis, did it?

8    A.    No, they did not.

9    Q.    So the Government never came -- as far as you know,

10   never came into court and asked for an order compelling Mr.

11   Thomas to give a handwriting exemplar, right?

12   A.    That is correct.

13   Q.    You know what a handwriting exemplar is, right?

14   A.    Yes, I do.

15   Q.    Could you tell the ladies and gentlemen of the jury

16   what it is?

17   A.    Well, I'm not an expert, but it's basically when you

18   go to someone with a court order and you have them write

19   certain things.  You can ask them what to write or you

20   might have a sample, you ask for a number of signatures.

21   And basically this is done so that you can, I would say,

22   test it against a true document that you know the person

23   wrote.

24          Again, I'm not an expert in this area, so I'm

25   probably not the best person to be speaking about it.

Cross - Ennis

1    Q.   But you do know that the Government did not do that in

2    this case to compare Mr. Thomas' handwriting with the

3    document -- with the handwriting of these documents,

4    right?

5    A.   That is correct.

6    Q.   And you also recall Ms. Moss testifying, don't you,

7    that a number of the fax numbers was -- on a number of

8    these documents was very similar, in other words, documents

9    were being sent to Pikes Peak Community College with --

10   with the identical fax number?

11   A.   That is correct.

12   Q.   And you were not able to do any sort of trace or

13   determine where that fax number was coming from, were you?

14   A.   No.  Just in conducting -- like a Google internet

15   query, we were able to determine that it came back to a

16   Mailbox Express or certain Mailbox Express locations.

17          If I could also clarify, located during the search

18   was --

19   Q.   Well, I'm sorry to cut you off, but -- Special Agent

20   Ennis, but my question was simply:  You were not able to

21   determine where the fax number -- excuse me, were not able

22   to tie that to any particular individual, right?

23   A.   Oh, tie it to an individual, no.

24   Q.   All right.  Let me ask you another point about the

25   search, all right?  Which is that in the search -- one

594

Cross - Ennis

1    moment, please.

2              THE COURT:  Mr. Goodreid, would this be a good

3    time for us to take our morning break?

4              MR. GOODREID:  Yes, it would, Your Honor.  I'm

5    sorry, I'm not able to locate the document.  I appreciate

6    it.  Thank you.

7              THE COURT:  Ladies and gentlemen of the jury, we

8    will be in recess for 15 minutes.

9         (Jury left the courtroom at 10:14 a.m.)

10        (Recess taken at 10:14 a.m. to 10:34 a.m.)

11             THE COURT:  Special Agent Ennis, I remind you you

12   remain under oath.

13             THE WITNESS:  Yes, Your Honor.

14             THE COURT:  Mr. Goodreid, you may resume your

15   cross-examination.

16             MR. GOODREID:  Thank you, Your Honor.

17   BY MR. GOODREID:

18   Q.   All right, Special Agent Ennis, let's go back to your

19   charts for a minute.  I'm going to ask for some comparison

20   among several of them, all right?

21   A.   All right.

22   Q.   Okay.  So we'll start with -- start with the 73 again.

23   Pull that up, please.

24             And, again, this is the document we went through

25   before the break.  Do you recall that?

595

Cross - Ennis

1    A.    Correct.

2    Q.    And I asked you some questions about at the very

3    bottom of this document, that Tramell -- excuse me, Tramell

4    Thomas' name appears on this?

5    A.    That is correct.

6    Q.    Along with all these other names that you've

7    determined were fraudulent applications, right?

8    A.    That is correct.

9    Q.    Okay.  So we've got that in 7- -- excuse me, we've got

10   that in 73.  Let's take a look at 74 now.

11         And, again, this document, a little bit different,

12   summary of addresses used, right?

13   A.    Correct.

14   Q.    And the number of most of the people on here, as you

15   described previously, were deemed to be associated with

16   fraud, correct?

17   A.    Correct.

18   Q.    And Mr. Thomas' name also appears in this document,

19   right?

20   A.    The defendant, yes.

21   Q.    Yes.  That's 74.  Let's take a look at 75.

22         And at the top of 75, we have Tramell Thomas'

23   name, and then we've got a bunch of other names down

24   through the rest of this document.  And, again, all these

25   people are associated with -- with fraud.  In other words,

Cross - Ennis

1    these were fraudulent applications made in the names of

2    these people and they didn't actually make them, correct?

3    A.    That is correct.

4    Q.    But Mr. Thomas' name also appears in that document,

5    right?

6    A.    That is correct.

7    Q.    So we've got three documents -- three summary exhibits

8    we've just been through with the names of a lot of people

9    whose identities were used to appropriate this fraud, and

10   we have Mr. Thomas' name in all those three documents; is

11   that right?

12   A.    That is correct.

13   Q.    Even though you've already conceded that Mr. Thomas --

14   Mr. Thomas' application resulted in him, as far as you

15   know, actually going to school; isn't that right?

16   A.    That is correct.

17   Q.    In fact, the Government doesn't contend that Mr.

18   Thomas' application was fraud, because if we take a look at

19   Government Exhibit 72 -- pull that up, please.

20          And, again, we don't need to zoom in, I just want

21   to ask you about:  This is a summary of the losses from the

22   fraud.  Mr. Thomas' name does not appear in this document,

23   does it?

24   A.    No, it does not.

25   Q.    All right.  Special Agent Ennis, I'll switch gears

Cross - Ennis

1    here.  Let's talk about -- do you remember the stop?  We

2    talked about that a little bit before, right?  And you

3    certainly remember the -- the -- all the debit cards and

4    the cards in the bag that were seized at the Tempe Police

5    Department stop of Mr. Thomas?

6    A.    That's correct.

7    Q.    So those documents actually got sent, did they not,

8    to -- for the investigation that was to determine if there

9    were fingerprints on those cards; isn't that right?

10   A.    Correct.

11   Q.    And, in fact, there was a fingerprint analysis done of

12   a single debit card, 52 Master Cards, some Pikes Peak

13   documents that were seized in the search, and also some

14   photocopies of two ID cards, right?  Does that ring a bell?

15   A.    That is correct.

16   Q.    Okay.  And they were -- those -- those documents I've

17   just mentioned were compared to see if there are any latent

18   fingerprints of certain individuals, if they were on those

19   documents, right --

20   A.    Correct.

21   Q.    -- on the cards?

22         And the fingerprints that were compared were

23   fingerprints of Mr. Thomas, right?

24   A.    Correct.

25   Q.    Ms. Carr.

Cross - Ennis

1    A.   Correct.

2    Q.   Ms. Diaz.

3    A.   Correct.

4    Q.   Makayla Grant.

5    A.   Yes.

6    Q.   Ms. Green.

7    A.   Yes.

8    Q.   And Mr. Sanders, right?

9    A.   That is correct.

10   Q.   Okay.  And the only positive ID that came back, there

11   were a couple of them, right?  I mean, there was Heather

12   Carr's fingerprint on one of the Pikes Peak documents came

13   back positive, right?

14   A.   That is correct.

15   Q.   And Ms. Diaz, there were six fingerprints found on one

16   of the -- on the Edward Jones documents, right?

17   A.   That is correct.

18   Q.   And five fingerprints of Ms. Diaz on the Virginia

19   Jones documents, right?

20   A.   That is correct.

21   Q.   Okay.  So there were no known fingerprints that

22   matched Mr. Thomas', correct?

23   A.   Correct.  And can I clarify my response?

24   Q.   Well, let me ask you the next question, all right?

25   There were no known palm prints of Mr. Thomas on those --

Cross - Ennis

1    on those items we just mentioned, right?

2    A.    That is correct.

3    Q.    Okay.  But there was some suggestion, was there not,

4    from the lab that if additional fingerprints were taken

5    from a number of these people, including Mr. Thomas, that

6    perhaps an additional comparison or analysis could be done;

7    isn't that right?

8    A.    That is correct.

9    Q.    Okay.  But that was not in fact done with respect to

10   Mr. Thomas; isn't that right?

11   A.    Correct.

12   Q.    So as far as you know, the Government did not come

13   into this court and ask His Honor for an order compelling

14   Mr. Thomas to give fingerprints that could be compared to

15   what was on these items; isn't that right?

16   A.    That is correct.

17   Q.    Now, you recall, don't you, Special Agent Ennis, you

18   recall Ms. Green's testimony from yesterday?

19   A.    Yes, I do.

20   Q.    And you recall her saying, don't you, that one of the

21   ways they actually got money -- or at least that she, she

22   got money off of these debit cards was they would go to

23   ATMs and simply withdraw cash, right?

24   A.    That is correct.

25   Q.    Now, you know in your experience as a law enforcement

Cross - Ennis

1    officer, as well as I assume just a citizen of our country,

2    that many, if not all, ATM machines have surveillance

3    cameras associated with them, don't they?

4    A.    Correct.

5    Q.    And -- but you didn't seek out any surveillance

6    cameras from any of the ATMs where these cards were cashed

7    to see if Mr. Thomas was on those -- those surveillance

8    tapes, did you?

9    A.    We actually did.

10   Q.    Oh, you did.  Okay.

11   A.    And we were unable to obtain any video surveillance.

12   Q.    Okay.  So you did search it out, but in the end you

13   did not find any surveillance video that showed Mr. Thomas

14   cashing one of these cards, right?

15   A.    We were not able to obtain any video or camera stills.

16   Q.    All right.  And in the course of this investigation

17   that you worked on for many years, you don't have any

18   evidence, do you, that Mr. Thomas, himself, ever personally

19   cashed one of those cards, do you?

20   A.    No, we do not.

21   Q.    Other than perhaps the one that he got for his own

22   loan, right?

23   A.    And even then I wouldn't know personally --

24   Q.    Okay.  That's --

25   A.    -- right.

601

Cross - Ennis

1    Q.   Okay.  All right, Special Agent Ennis, let me ask you

2    to take a look, just to yourself, at Government's

3    Exhibit 35.  And it may be easier, Special Agent Ennis, to

4    look at a hard copy.  It's up to you which is easier.

5    A.   This is fine.

6    Q.   Okay.  All right.  Do you recognize that document?

7    A.   This is --

8    Q.   Take a minute and read it and then tell me if you know

9    what it is.

10   A.   Okay.  Yes.

11   Q.   Okay.  And without revealing the contents, what is

12   it?

13   A.   A stipulation.

14        MS. PALUCH:  Okay.  And, Your Honor, since this is

15   a stipulation, I would ask that it be admitted into

16   evidence and I would ask this witness some questions about

17   it.

18        THE COURT:  All right.  Given the stipulation of

19   the parties, the Government Exhibit 35 is admitted into

20   evidence and may be published to the jury.

21        (Government's Exhibit 35 received)

22   BY MR. GOODREID:

23   Q.   Okay.  And I'm going to ask you -- I'm going to read

24   through this to see if you agree that this is a correct

25   reading of this document, okay?  Are you with me?

602
Cross - Ennis

1    A.   Yes.

2    Q.   So "The United States of America, by and through

3    Assistant United States Attorneys Martha A. Paluch and

4    Bryan D. Fields, and the Defendant Tramell Thomas, by and

5    through his counsel Daniel T. Smith and Thomas E. Goodreid,

6    hereby agree and stipulate that the defendant Tramell

7    Thomas was detained in El Paso County Jail through January

8    28th, 2011 through November 3d, 2011, at which time he was

9    released from custody as a result of the dismissal of all

10   charges upon which he had been detained."

11        Would you say that's an accurate reading of what

12   the stipulation says?

13   A.   Yes.

14   Q.   Okay.  So given that, ask you to take a look at

15   Exhibit 67.  If we could pull that up, please.  All right.

16   And, yeah, if we could highlight -- not highlight, I'm

17   sorry -- if we could enlarge, say, the top four lines, so

18   from Student, down to first name.

19        And just by way of review, Special Agent Ennis,

20   this is Mr. Thomas' FAFSA, correct?

21   A.   That is correct.

22   Q.   And do you see on there where it says Award Year, it

23   says 2011?

24   A.   Correct.

25   Q.   That's probably not -- well, actually, so hold that in

603
Cross - Ennis

1    your mind.  And then let's take a look at Exhibit 75,

2    please.  If we could pull that up.  And, again, if we could

3    just enlarge the part dealing with Tramell Thomas through

4    the 2010 mailings column.  So -- the card shipping address

5    there.  Yeah.

6             So it looks like from 75, does it not, that Mr.

7    Thomas got his card and was going to school in 2010?

8    A.    Correct.

9    Q.    So would you agree that back the other exhibit, that

10   the FAFSA saying that it was award year for 2011, is

11   unlikely given that we have now just learned that he was in

12   jail during that time?

13   A.    No, I would not.  If you would please go back to the

14   prior exhibit, the FAFSA.

15   Q.    Sure.  Good point.  Sure.

16   A.    And go to the last page.

17   Q.    Okay.  Yeah, 67.

18   A.    And highlight.  If I can explain.

19   Q.    Well, okay.  So what you're saying here is it does say

20   on 2010 -- my point, perhaps, is a small one -- and that is

21   it says 2010 on there, that's probably when he got the

22   cards, even though they call it the award year for 2011,

23   right?

24   A.    Correct.

25   Q.    So, in other words, the point being that it's not

Cross - Ennis

1    likely that he got the cards in 2011, but rather in '10; is

2    that right?

3    A.    I think if you look back at the other summary chart --

4    or the mailing, it shows it was mailed in 2010.

5    Q.    Right.  So it was mailed in '10, yeah.

6    A.    Correct.

7    Q.    Okay.  And the -- even though it says Award Year on

8    the FAFSA in 2011, Mr. Thomas was in jail, as we've just

9    learned, for most of 2011, right?

10   A.    That's -- yes.

11   Q.    Okay.

12   A.    I'm not sure where you were going with that.

13   Q.    All right.  So let's take a look at Government Exhibit

14   76, please.  And if we can highlight kind of a series of

15   these -- not highlight, I keep saying that -- if we could

16   enlarge the box to the right.  The box that's -- yeah.

17        Okay.  This document relates to Mr. Omar, right?

18   A.    That is correct.

19   Q.    All right.  And it says that with respect to his card,

20   that it was activated in February of 2011, right?

21   A.    That is correct.

22   Q.    And, again, based on the stipulation, it appears at

23   that time that Mr. Thomas was in jail, right?

24   A.    That is correct.  However, I --

25   Q.    Ma'am, I'm sorry, that's all my question.  My question

Case 1:16-cr-00054-WJM Document 535-6 02 Filed 08/09/19 Page 78 of 125 pg 565 of 901

605

Cross - Ennis

1   is he was in jail, wasn't he?

2   A.   Yes.  I would like to clarify my response.

3   Q.   You can do that on redirect, ma'am.

4        My question was he was in jail; would you agree

5   with that?

6   A.   Yes, that is correct.

7   Q.   All right.  Let's take a look, then, at Exhibit 79.

8   And, again, if you -- let's enlarge that box again.

9        And this has to do with Mr. Jones.  Mr. Eddie

10  Jones, right?  Or at least the identity of Eddie Jones.

11  Would you agree with that?  Would you agree that's what

12  this exhibit is about?

13  A.   Yes.  I wanted to see the initials E.J. --

14  Q.   Okay.

15  A.   -- to verify that I was giving accurate testimony.

16  Q.   Sure.  And with respect to this one, it looks like

17  that the card was ordered for the would-be Eddie Jones on

18  August 29th of 2011.  Right?

19  A.   That is correct.

20  Q.   And Mr. Thomas was in jail at that point, right?

21  A.   Yes, he was.

22  Q.   Okay.  All right.  And then let's take a look at

23  Government Exhibit 77.  And this one has to do with the

24  identity of Virginia Jones, right?

25  A.   That is correct.

Cross - Ennis

1    Q.    Okay.  And, again, taking a look here, it looks like

2    that her card -- say would-be her card, is ordered from

3    production facility on August 8 -- excuse me, August 11th,

4    2011; right?

5    A.    That is correct.

6    Q.    And Mr. Thomas was in jail then, right?

7    A.    That is correct.

8    Q.    Okay.  And then same thing looking above that, the

9    card is actually activated on October 3d of 2011, right?

10   A.    That is correct.

11   Q.    And, again, Mr. Thomas was in jail at that point,

12   right?

13   A.    That is correct.

14   Q.    Okay.  And, finally, let's pull up Government

15   Exhibit 78.

16          And you see on -- you see on this one, this has to

17   do with Mr. -- the identity of Mr. Pickens, right?

18   A.    That is correct.

19   Q.    Okay.  And it looks like that this card was ordered on

20   August 11th -- thank you -- August 11th of 2011, right?

21   A.    That is correct.

22   Q.    When Mr. Thomas was in jail, right?

23   A.    That is correct.

24   Q.    And then, finally, that the card was activated on

25   October 3d of 2011, when Mr. Thomas was in jail, right?

607

Cross - Ennis

1   A.   That is correct.

2   Q.   Okay.  Now, the Government's allegation in this case,

3   as you understand it, is that the conspiracy was ongoing

4   while Mr. Thomas was in jail; isn't that right?

5   A.   That is correct.

6   Q.   And on -- based on the stipulation here, he was in the

7   El Paso County Jail, right?

8   A.   Yes.

9   Q.   Do you have any knowledge as to whether inmates' phone

10  calls are recorded in jail?

11  A.   Yes, they are.

12  Q.   Okay.  And did you seek out the phone calls of Mr.

13  Thomas in this case while he was in jail?

14  A.   Yes, we did.

15  Q.   And did you -- did you -- you weren't able to get any

16  of them?

17  A.   We were not able to get any.

18  Q.   So you don't have any phone calls from him while he's

19  in the El Paso County Jail that indicates he's involved in

20  the conspiracy, right?

21  A.   We weren't able to get phone calls.

22       MR. GOODREID:  Your Honor, may I have just a

23  moment to confer with counsel?

24       THE COURT:  You may.

25       MR. GOODREID:  Your Honor, I have no additional

Redirect - Ennis

1    questions at this point.

2             THE COURT:  All right.  Redirect.

3             MS. PALUCH:  Thank you, Your Honor.

4                    REDIRECT EXAMINATION

5    BY MS. PALUCH:

6    Q.   Agent Ennis, you were asked whether you could say how

7    much money the defendant received from this scheme.  Do you

8    recall that question?

9    A.   Say that again, please.

10   Q.   You were asked by Mr. Goodreid whether you could say

11   how much money the defendant personally received as a

12   result of this scheme.

13   A.    Correct.

14   Q.   Do you know how many debit cards were found in his

15   possession?

16   A.    There were 52 debit cards located in the vehicle that

17   he was driving and there was one located in a wallet.

18   Q.   And do you know how much money could have been loaded

19   to the card in his wallet at the time he was stopped in

20   August of 2012?

21   A.    Approximately $47,000 -- 4,700.

22             THE COURT:  47,000 or 4700?

23             THE WITNESS:  Yeah, my apologies.  4,700.

24             THE COURT:  Okay.

25   BY MS. PALUCH:

609

Redirect - Ennis

1   Q.   Had any of the cards found in his possession had
2   been -- had they been activated?
3   A.   Yes, they had.
4   Q.   Now, you were asked whether there was any evidence
5   that ties the defendant to the Sony Vaio.
6   A.   That is correct.
7   Q.   Do you recall Alison Stailey's testimony about the
8   evidence found on the Sony Vaio?
9   A.   Yes, I do.
10  Q.   And, again, for the record, where was that laptop
11  found?
12  A.   Located in the vehicle Tramell Thomas was driving.
13  Q.   And was that laptop used to query, for example, Manuel
14  Abate?
15  A.   Yes, it was.
16  Q.   And where was Manuel Abate's debit card found?
17  A.   Located in the defendant's wallet.
18  Q.   Okay.  You were asked whether the defendant actually
19  attended Pikes Peak Community College.
20  A.   Correct.
21  Q.   What records indicate that he actually attended that
22  school?
23  A.   Pikes Peak records disclosed that he was enrolled for
24  two semesters and he took one course in the fall of 2009,
25  which he failed; and he took three courses in the fall of

Redirect - Ennis

1   2010, all of which he failed.

2   Q.   And without going into the details, was there a

3   handwritten letter contained in those dockets -- documents

4   from Tramell Thomas to Pikes Peak Community College?

5   A.   Yes, there was.

6   Q.   Was there -- was the Rushmore address contained within

7   the Pikes Peak records as to this defendant?

8   A.   Yes, it was.

9   Q.   Were debit cards sent to the Rushmore address as part

10  of this scheme?

11  A.   Yes, it was.

12  Q.   If we could please display Government Exhibit 74.

13            And what I'd like you to do, Agent Ennis, is look

14  at debit cards that were mailed to the Rushmore address

15  that were also located in the defendant's vehicle.

16  A.   We would need to turn to page 4, please.  That's kind

17  of hard.  Is there like a physical copy I could --

18  Q.   Yeah.  There should be in the book in front of you.

19            COURTROOM DEPUTY:  What number?

20            MS. PALUCH:  This is -- it's in binder 2,

21  Exhibit 74.

22  BY MS. PALUCH:

23  Q.   So the question is we're looking for debit cards

24  mailed to the Rushmore address that were located in the

25  defendant's possession on August 30th.

Redirect - Ennis

1    A.    There was one for Likita Hall -- bear with me.

2    Alethia Jones, Eddie Jones, Keavin Jones, Linda Jones,

3    Patsy Jones, Shamika Jones, Virginia Jones, Vanessa

4    Lopez -- bear with me.  Dana Miller, Starla Miller, Cynthia

5    Mitchell, Mercedes Mitchell, Robert Pickens, Ismael Omar,

6    Annie Robinson, Telsa Robinson, Tessa Robinson, Gina

7    Sanders.

8    Q.    And those were all debit cards mailed to the Rushmore

9    address that were found in the defendant's possession; is

10   that correct?

11   A.    That is correct.

12   Q.    Now, you were asked whether the defendant's name

13   appeared as a subscriber on the IP records at issue in this

14   case.  Do you recall that?

15   A.    Yes, I do.

16   Q.    Are any of the conspirators in this case listed on --

17   their names listed on any of the subscriber records?

18   A.    No, they are not.

19   Q.    Do you have experience investigating these types of

20   offenses?

21   A.    Yes.

22   Q.    In your experience, why might IP records be in someone

23   else's name?

24   A.    Because they don't want the activity tied to

25   their fraudulent activity -- they don't want IP subscriber

612

Redirect - Ennis

1   information tied to their fraudulent activity.

2   Q.   You were asked about fax numbers and evidence located

3   during the search.  Do you recall that?

4   A.   Yes, I do.

5   Q.   And you asked if you could clarify your answer.

6   A.   Yes.

7   Q.   Could you please provide that information now.

8   A.   So during the execution of the search warrant at 1822

9   East Kaibab, there was a fax cover sheet and on the top of

10  the cover sheet was one of the fax numbers that was used

11  repeatedly in this scheme.

12  Q.   Okay.

13  A.   And was located in the residence.

14  Q.   Okay.  Now you were asked about handwriting exemplars.

15  Do you recall that?

16  A.   Yes, I do.

17  Q.   And you're not a handwriting expert, are you?

18  A.   Absolutely not.

19       MS. PALUCH:  I would like the witness to be shown

20  two exhibits that are not on the exhibit list.

21       THE COURT:  All right.  If you could hand them to

22  Ms. Hansen.

23       MS. PALUCH:  They are not marked, Your Honor.  I

24  would ask -- actually, did I give you the marked version?

25  I think I gave the marked -- I apologize.  Your Honor, if I

Redirect - Ennis

1    could -- let me give these to you -- these are the marked

2    exhibits.

3    BY MS. PALUCH:

4    Q.    Ma'am, do you have before you Exhibits 85 and 86?

5    A.    Yes, I do.

6    Q.    Do you recognize these documents?

7    A.    These are Department of Motor Vehicle documents.  One

8    from Colorado and one from Arizona.

9    Q.    And did you obtain those documents?

10   A.    Yes, I did.

11   Q.    How did you obtain them?

12   A.    Through a -- just a request as a law enforcement

13   officer.

14   Q.    I'd like to look at -- have you compare those two

15   documents.  Do the signatures on those pages appear similar

16   to you?

17   A.    To me, they do not.

18   Q.    Okay.

19           MS. PALUCH:  Your Honor, at this time I would move

20   for the admission of Government's Exhibits 85 and 86.

21           MR. GOODREID:  I object on hearsay grounds, Your

22   Honor.

23           MS. PALUCH:  Your Honor, they're public records.

24           MR. GOODREID:  They're not certified.  There's no

25   declarations.  How do we know what they are?  We have two

614

Redirect - Ennis

1    pieces of paper that look like they came from -- I don't

2    know where they came from.

3              THE COURT:  I agree.  Objection sustained.

4              MS. PALUCH:  Thank you, Your Honor.

5    BY MS. PALUCH:

6    Q.   Now, you were asked about your summary charts and

7    asked about the fact that the defendant's name is shown on

8    those summary charts.

9    A.   That is correct.

10   Q.   And what was the purpose of including his name on the

11   summary charts?

12   A.   He was the defendant in this case that was going to

13   trial.

14   Q.   Well, did it pertain to addresses that were tied to

15   that defendant?

16   A.   Yes.

17   Q.   So you were asked also -- well, first of all, you had

18   asked to clarify your answer regarding fingerprint

19   evidence.

20   A.   Correct.

21   Q.   Could you do that now, ma'am?

22   A.   Yes.  So the debit cards, all of the debit cards,

23   none -- there weren't any fingerprints identifiable to any

24   of the co-conspirators in this case.  There weren't any

25   fingerprints that could be lifted from the debit cards.

615
Redirect - Ennis

1   Q.   But who was in possession of 53 of them?

2   A.   It was in the -- the 52 were in the vehicle that the

3   defendant was driving, and one was located in his wallet.

4   Q.   Okay.  Counsel asked you that -- whether there was any

5   evidence that the defendant personally withdrew funds from

6   debit cards.  Do you recall that?

7   A.   Yes.

8   Q.   Was there evidence that you uncovered in your

9   investigation that the defendant benefited from the scheme?

10  A.   Say that again, please.

11  Q.   Was there evidence that you uncovered through your

12  investigation that the defendant, in fact, benefited from

13  the funds obtained in this scheme?

14  A.   Yes.

15  Q.   For example, where did he live?  What type of a house?

16  A.   At 1822 Kaibab.

17  Q.   Was it a large house?

18  A.   It was a large house.

19  Q.   Do you have any idea approximately how much money that

20  house cost?

21  A.   I don't.

22  Q.   Okay.  Based on your investigation, were you able to

23  determine through wage and labor records how much the

24  defendant made?

25  A.   At some point in time, wage records were obtained from

Redirect - Ennis

1    the State of Colorado.  We had no identifiable wage records

2    for the defendant.

3    Q.   And how much money was Ms. Carr making as an employee

4    at Wells Fargo?

5    A.   Approximately 50- to 60,000 a year.

6              MS. PALUCH:  Could I have one moment, Your Honor?

7              THE COURT:  You may.

8    BY MS. PALUCH:

9    Q.   Let's look at Government Exhibit 76, if we could.

10             Now, you asked -- when you were asked about this

11   exhibit, you asked counsel if you could clarify your

12   answer.

13   A.   Yes, I did.

14   Q.   Could you do that now, ma'am?

15   A.   Yes.  So this debit card showed it was activated on

16   February 22d, 2011.  Department of Education records show

17   that a FAFSA was submitted for Ismael Omar in December of

18   2010.

19   Q.   Now, you were asked about a number of these composite

20   exhibits where the cards were ordered or activated while

21   the defendant was in jail.  Do you recall that?

22   A.   Yes, I do.

23   Q.   Do you have the Exhibit 4 in front of you, the

24   envelope?  The envelope of the debit card.

25   A.   Oh, yes.

617
Redirect - Ennis

1    Q.   I'd like you to look at Government's Exhibit 4-A
2    through 4-D.  4-A through 4-D.  And if you could state,
3    ma'am, when you get those out, in whose names those debit
4    cards -- those four marked debit cards are.
5    A.   Government Exhibit 4-A is a Higher One debit card in
6    the name of Ismael Omar.  Government Exhibit 4-B is a
7    Higher One debit card in the name of Virginia Jones.
8    Government Exhibit 4-C is a Higher One debit card in the
9    name of Robert Pickens.  Government Exhibit 4-D is a Higher
10   One debit card in the name of Eddie Jones.
11   Q.   And you were asked about each of those individuals,
12   weren't you, on the composite exhibits, and as to whether
13   or not they were in jail at the time that the debit cards
14   were ordered?
15   A.   That is correct.
16   Q.   And where were those debit cards found?
17   A.   In the vehicle that the defendant was driving.
18          MS. PALUCH:  No further questions, Your Honor.
19          THE COURT:  All right.  Special Agent Ennis, thank
20   you for your testimony.
21          THE WITNESS:  Thank you.
22          THE COURT:  Just leave everything there.
23          THE WITNESS:  Thank you, Your Honor.
24          THE COURT:  All right.  All right, the Government
25   may call its next witness.

Redirect - Ennis

1    MS. PALUCH:  Your Honor, the Government rests.

2    THE COURT:  All right.  Is there going to be a

3    motion from the defendant?

4    MR. SMITH:  There is, Your Honor.

5    THE COURT:  All right.  Ladies and gentlemen of

6    the jury, we're going to need to deal with a motion and

7    some other matters that the law requires be done outside

8    your presence.  So the lawyers and I will continue in here

9    and ask that you be patient and wait for us in the

10   deliberation room.

11       (Jury left at 11:06 a.m.)

12   THE COURT:  I'll hear a motion from the defendant.

13   MR. SMITH:  Your Honor, as to the state of the

14   evidence at the close of the Government's case, and

15   specifically referring to Count 1, the conspiracy count, I

16   would state to the Court that I don't believe the evidence

17   supports the conspiracy as charged in the superseding

18   indictment.

19   THE COURT:  Let me just interrupt you for a

20   second.  Let's get on the record as to which counts you're

21   moving against.

22   MR. SMITH:  I'm talking about Count 1 now.

23   THE COURT:  All right.  Well, just -- I know

24   you're talking about Count 1 now.  Is your motion as to all

25   or a portion or one of the counts?

Redirect - Ennis

1           MR. SMITH:  My motion goes to all counts.  There

2     are different grounds on Counts 1 --

3           THE COURT:  I understand.

4           MR. SMITH:  Okay.

5           THE COURT:  Because the motion doesn't have to be

6     brought against all counts, so I just want to get on the

7     record and have an understanding where you're going with

8     your argument, how many -- so you're moving against all

9     counts.  Go ahead.

10          MR. SMITH:  Correct, Your Honor.

11          The conspiracy that's charged here runs from

12    August of 2010, it's alleged, then, through October of

13    2012.  We heard only from Ms. Green.  She talked about her

14    efforts as they related in Arizona and when she started

15    with Carr.

16          The principal defect, I think, here, is the

17    failure of the Government to comply with the requirement of

18    interdependence between the charged conspirators.

19          As to Counts 2, 3, 4, and 5, they charge my client

20    with violating the mail fraud statute as an aider and

21    abetter.  As I understand the burden on the Government in

22    proving my client guilty as a principal under an aider and

23    abetting theory, they have to show that he intentionally

24    participated.  He doesn't have to perform an underlying

25    act, but he must be aware of the details and the

Redirect - Ennis

1    commission.

2         In this case, my client goes to jail the end of

3    January of '11, and the operative facts in Counts 2 through

4    5 deal with things taking place while he's incarcerated in

5    El Paso County.  I submit to the Court that there's simply

6    a lack of evidence that he was aware, knew, or did anything

7    to further the act.

8         And as to Counts 6 and 7 -- and this actually

9    applies to all of the substantive Counts 2 through 7, there

10   simply is no evidence that my client did anything, that he

11   filed any of the fraudulent forms, that he was operating

12   any of the computers tied to these IP addresses.  We simply

13   have a lot of paper here that says from these IP addresses

14   this fraud scheme was operated, but there is no evidence

15   tying Mr. Thomas to the same.

16         I don't have any further argument --

17         THE COURT:  Let me ask you, going back to your

18   Count 1, you said there's no evidence of interdependence.

19   Well, we have Ms. Green's testimony yesterday that the

20   defendant -- she specifically identified the defendant as

21   being a co-conspirator and in a conspiracy with her

22   together with the other co-conspirators to conceive of and

23   discharge the conspiracy.  That was her testimony.

24         MR. SMITH:  I understand that, Your Honor.  But

25   her testimony also was she never talked to the defendant

Redirect - Ennis

1    about anything in this conspiracy.  The only thing she did

2    with the defendant, she said, was attempt to tutor him on

3    filling out the educational requirements in the FAFSA form.

4           THE COURT:  Well, she also testified she saw him

5    filling out a FAFSA form on the computer while she was in

6    his presence.

7           MR. SMITH:  Right.

8           THE COURT:  And -- go ahead.

9           MR. SMITH:  It's all on the same occasion, to my

10   memory.  And she said it happened in 2011.  Simply couldn't

11   have.  The parties have agreed he was residing in the

12   El Paso County Jail.

13          THE COURT:  Well, not for all of 2011.  He was

14   free for nearly all of January and nearly all of November

15   and all of December.

16          MR. SMITH:  I understand.

17          THE COURT:  And so that's three months.  So for

18   one quarter of the year of 2011, the defendant was not in

19   custody, and the dates of the conspiracy charged in the

20   superseding indictment are not limited to January 28th

21   through November 3d of 2011.

22          MR. SMITH:  I understand.

23          THE COURT:  Thank you.  I'll hear from the

24   Government in response.

25          MS. PALUCH:  Thank you, Your Honor.  As to the

Redirect - Ennis

1    motion pertaining to Count 1, as the Court indicated,

2    Marcelle Green places this defendant in the conspiracy.

3    Kimmisha Mullett's text in which the defendant tells her to

4    send Dennis Miller's mail to him places him in the

5    conspiracy.  Christine Duncan's testimony about

6    conversations with this defendant about student financial

7    aid fraud places him in this conspiracy.  There is ample

8    evidence that this defendant was a member.

9         Marcelle Green talked about the fact that Carr and

10   Thomas came to her home after -- after the search warrant

11   to ask her, "What did you say and what did law enforcement

12   ask you about?"

13        There's just overwhelming evidence of his

14   involvement in this conspiracy.

15        THE COURT:  And that he was nervous -- appeared

16   nervous when he heard of the search warrant.

17        MS. PALUCH:  That's exactly right.

18        THE COURT:  The search of the Kaibab home.

19        MS. PALUCH:  For the defendant to have the debit

20   card in his wallet, on his person, in the car to have that

21   many, to claim that he's not a member of this conspiracy,

22   there's absolutely no basis for that motion.

23        As to the mail fraud counts, what we have to prove

24   is that he assisted somehow in some way for those crimes to

25   be committed, and what we've established, we believe

Redirect - Ennis

1  overwhelmingly, is an address tied to him, Rushmore;

2  another address tied to him, Radiant, were used to receive

3  those debit cards while he was in prison; and then these

4  cards are found in his possession when he is stopped in

5  2012.

6  So to say that he had nothing to do with the mail

7  fraud counts simply isn't accurate. Kimmisha Mullett's

8  texts completely, absolutely establishes that count on

9  Count 7 when he tells her to mail -- or, actually, it's

10  Count 6 -- to mail Dennis Miller's card to him. So it's

11  the Government's position that there is more than

12  sufficient evidence in this case to warrant the Court

13  denying the defendant's motion.

14  THE COURT: All right. We're going to take a very

15  brief recess. I'll come back and give you the -- my ruling

16  on the motion.

17  (Recess taken 11:16 a.m. to 11:31 a.m.)

18  THE COURT: All right, I'm prepared to rule on the

19  defendant's Rule 29 motion.

20  This matter is before me on the defendant's oral

21  mid-trial motion for judgment of acquittal under Federal

22  Rule of Criminal Procedure 29(a). The defendant's motion

23  seeks acquittal on all counts. For the reasons that

24  follow, I deny the motion.

25  In considering the defendant's Rule 29(a) motion,

624

Redirect - Ennis

1    the Court is required to consider the evidence presented in

2    the light most favorable to the Government and may enter

3    judgment of acquittal only if no reasonable jury could find

4    guilt beyond a reasonable doubt.  In making this

5    determination, the Court is not permitted to weigh

6    conflicting evidence or consider the credibility of

7    witnesses as that is the province of the jury.  *United*

8    *States v. White*, 673 F.2d 292 at 301, Tenth Circuit, 1982.

9    The Government bears the burden of establishing each

10   element of the crime charged beyond a reasonable doubt.

11         Count 1 of the superseding indictment alleges

12   conspiracy to defraud the Government with respect to claims

13   in violation of 18 United States Code Section 286.  That

14   statute prohibits entering into any agreement, combination,

15   or conspiracy to defraud the United States, or any

16   department or agency thereof, by obtaining or aiding to

17   obtain the payment or allowance of any false, fictitious or

18   fraudulent claims.

19         To convict on this count, the Government must

20   prove beyond a reasonable doubt:  First, that the defendant

21   agreed with at least one other person to obtain or aid in

22   obtaining the payment or allowance of any false, fictitious

23   or fraudulent claim.

24         Second, that the defendant knew the essential

25   objective of the conspiracy.

Redirect - Ennis

1    Third, that the defendant knowingly and

2  voluntarily participated.

3    And, fourth, that there was an interdependence

4  among the members of the conspiracy; that is, that the

5  members in some way or manner intended to act together for

6  their shared mutual benefit within the scope of the

7  conspiracy charged.

8    On this count, codefendants Marcelle Green --

9  codefendant Marcelle Green testified directly that the

10  defendant, herself, and codefendants Carr and Diaz agreed

11  and acted together as co-conspirators to defraud the

12  Government by submitting falsified FAFSA applications and

13  related submissions to apply for and receive student loans

14  and grants in the name of incarcerated inmates.

15    Ms. Green testified that the applications

16  submitted were not truthful in as much as they were

17  submitted without the inmates' knowledge or consent and

18  used falsified addresses to divert the funds to disburse to

19  the conspirators, rather than to the inmates in whose names

20  they were submitted.  She described how the co-conspirators

21  submitted the materials, used a variety of addresses to

22  receive the disbursed funds, and also participated in

23  online classes to keep the nominally enrolled inmates

24  enrolled and the financial aid payments forthcoming.

25    Ms. Green testified unequivocally that the

626

Redirect - Ennis

1    defendant participated in this conspiracy and that she had

2    seen him completing falsified FAFSAs on at least one

3    occasion.  She testified that he was present when she

4    delivered debit cards to codefendant Carr that were the

5    payments in excess or refunded financial aid payments, and

6    also that the defendant confronted her nervously after a

7    search warrant was executed at his residence and she was

8    questioned by federal agents, providing a reasonable

9    inference that he was aware of the conspiracy's objectives

10   and was integral to its interdependent actions.

11          Taken as a whole, if the jury accepts Ms. Green's

12   testimony, and viewing that testimony in the light most

13   favorable to the Government, it could support a finding

14   that the Government has proven all elements of Count 1

15   beyond a reasonable doubt.

16          Further, as was established during the testimony

17   of Detective Seal, at the time the defendant was stopped in

18   Tempe, Arizona, in August of 2012, he was in possession of

19   52 debit cards issued in the names of prison inmates.

20   Other evidence including the testimony of Special Agent

21   Ennis tended to show that these debit cards were issued as

22   a result of falsified FAFSA and related documentary

23   submissions that were made on the behalf of these inmates

24   but without their authorization.

25          Moreover, one of these debit cards issued in the

Redirect - Ennis

1    name of Manuel Abate was found in defendant's wallet, as

2    reflected by Detective Seal's testimony, in conjunction

3    with Exhibits 5 and 38.  When questioned about the debit

4    cards during the 2012 traffic stop, the defendant neither

5    claimed they were not his nor did he disavow knowledge of

6    them, instead evading questions and giving answers to the

7    detective that made little sense.  This could further

8    confirm a finding that the defendant knowingly and

9    voluntarily participated in the conspiracy charged in Count

10   1.

11          In addition, the Government's other evidence,

12   including the testimony of Special Agent Ennis, tended to

13   establish that the falsified FAFSA submissions and related

14   documents were sent from computers located at addresses

15   affiliated with the defendant and the charged

16   co-conspirators, including his residence on East Kaibab

17   Drive in Chandler, Arizona.  The digital and documentary

18   evidence seized from the Kaibab residence pursuant to a

19   search warrant, and detailed through the testimony of Ms.

20   Stailey, Special Agent Ennis, and Ms. Allred could further

21   support a reasonable finding that the falsified FAFSAs were

22   submitted by the co-conspirators, including the occupants

23   of the defendant's residence on Kaibab Drive, and made use

24   of devices seized there where the -- when the search

25   warrant was executed at that residence.

Redirect - Ennis

1     In Counts 2 through 7, the defendant is charged

2  with six counts of aiding and abetting mail fraud in

3  violation of 18 United States Code Sections 2 and 1341.  To

4  prove each of these counts, the Government must prove

5  beyond a reasonable doubt that someone else committed mail

6  fraud by placing items in the mail for purposes of

7  executing a scheme or artifice to defraud, and that the

8  defendant aided and abetted these acts -- aided or abetted

9  these facts -- these acts.

10     Here, the Government charges that the defendant

11  caused others to mail envelopes containing the Higher One

12  debit cards issued in the inmates' names and by which the

13  defendant and the codefendants allegedly received the

14  proceeds of fraudulently submitted financial aid

15  applications.

16     As established by the testimony of Ms. Rebecca

17  Joseph, as well as the exhibits introduced into evidence

18  which she explained, including Exhibits 56-B through 56-G,

19  as a result of the falsified FAFSAs and related paperwork

20  submitted in the inmates' names, debit cards were issued

21  and mailed by Higher One to the addresses and during the

22  time frames alleged in the indictment as to Counts 2

23  through 7.

24     Special Agent Ennis' testimony also explained the

25  Government's summary charts admitted as Exhibits 75 through

Redirect - Ennis

1   81, which trace the material facts relevant to each of the

2   debit cards corresponding to Counts 2 through 7, including

3   the dates that they were mailed, the addresses to which

4   they were mailed, and the inmates in whose names the cards

5   were issued and to whom they were addressed.

6           Special Agent Ennis' testimony and that of Ms.

7   Joseph could support a jury finding that these debit cards

8   were, in fact, mailed to the addresses affiliated with the

9   defendant, and an inference, at a minimum, that the

10  defendant provided the addresses for that purpose.  Even

11  more directly and as pertains to the facts charged in Count

12  6, the testimony of Ms. Mullett was that the defendant

13  directed mail for Dennis Miller be sent to her address and

14  that she then forwarded that mail to the defendant,

15  himself.  Moreover, the debit card related to these counts

16  were found in the defendant's possession at the time of the

17  August 2012 traffic stop in Tempe, Arizona.

18          Further, the parties stipulated, as expressed in

19  Exhibit 37, that, if called, these inmates -- the inmates

20  whose names were used on the debit cards mailed in

21  connection with Counts 2 through 7 would testify that they

22  did not submit the underlying FAFSAs, they did not

23  authorize anyone else to do so, and were incarcerated at

24  the relevant times.  This evidence could support a

25  reasonable jury finding that the applications for financial

Redirect - Ennis

1    aid in these individuals' names were part of a fraudulent

2    scheme and that the mailing of the debit cards to the

3    addresses provided by the defendant was part of the

4    execution of that scheme.

5         Given this evidence, a reasonable jury could find

6    that the Government has proved the necessary elements of

7    all the counts charged against the defendant in the

8    superseding indictment beyond a reasonable doubt.

9    Therefore, the defendant's motion for acquittal pursuant to

10   Rule 29 on all counts is denied.

11        All right.  Is the defendant going to put on any

12   evidence?

13        MR. SMITH:  Your Honor, I would ask the Court to

14   adjourn until 1:15, so that we might have an opportunity to

15   meet with our client and discuss that.

16        THE COURT:  All right.  Because I'm trying to

17   figure out what I'm going to do with the jury today.

18   Because of the codefendant -- the key witness' decision not

19   to testify in this case, we're finishing about two-thirds

20   of a day earlier than I had anticipated, so Mr. Foster and

21   I are still going to need time to finalize our jury

22   instructions, and I don't want the jury hanging around for

23   that.

24        The best that I can foresee right now is not

25   having the jury here for that and that we would do our jury

Redirect - Ennis

1    charging conference today, we would deal with some

2    remaining loose ends, and that tomorrow morning I would

3    instruct the jury and we would have closing arguments

4    tomorrow morning.  That all assumes that if you decide to

5    do -- to put on evidence, that it's of a sufficiently short

6    duration that it doesn't conflict with that.  But obviously

7    I'm not for a moment suggesting that I'm going to limit

8    your -- the time that you're going to put on, I'm just

9    trying to think ahead of what to do.  The jurors get very

10   angry if they have to hang around here for hours and hours

11   when they're not doing anything.

12            So what we could do is take an early lunch and

13   give you the opportunity to make that decision and then

14   have the jury come back and you will either put on evidence

15   or you'll stand up and say that you have no opening

16   statement, because you've reserved yours from the beginning

17   of the trial, and you have no evidence.  In which case at

18   that point, I would send them home for the day and then we

19   would get to work on the jury instructions.  So is that

20   amenable to you?

21            MR. SMITH:  Sounds like a plan, Your Honor.

22            THE COURT:  Okay.  So how much time did you say

23   you wanted?

24            MR. SMITH:  An hour and a half.  1:15.

25            THE COURT:  Well, I guess we could use that time

632
Redirect - Ennis

 1   to work on the jury instructions.  So, all right, does the
 2   Government have any objection to proceeding in that
 3   fashion?
 4        MS. PALUCH:  No, Your Honor.
 5        THE COURT:  All right.  All right, let's bring in
 6   the jury.
 7     (Jury was present at 11:44 a.m.)
 8        THE COURT:  All right, members of the jury, thank
 9   you again for your patience.  We are going to take an early
10   lunch break and so it's going to be slightly longer than
11   what we've been taking.  I have to deal with matters
12   related to the jury instructions and some other matters
13   that have to be dealt with, again, outside of your
14   presence.
15        So we're going to be in a lunch recess for 90
16   minutes.  We'll be back on the record at 1:15.  I ask you
17   to be back in the deliberation room by five minutes after
18   1:00.
19        Again, I need to remind you, please do not do any
20   independent research into or talk to anyone about the
21   facts, the law, the issues, or the individuals involved in
22   this case.
23        We'll be in recess until 1:15.
24     (Recess taken 11:47 a.m.)
25                    AFTERNOON SESSION

633
                    Redirect - Ennis

1          (In open court outside the presence of the jury at

2      1:27 p.m.)

3              THE COURT:  All right, Mr. Smith, have you -- you

4      and your client reached a decision as to what you're going

5      to do?

6              MR. SMITH:  We have, Your Honor.  My intentions

7      would be to offer Defense Exhibits U and V, which are

8      stipulated exhibits.

9              THE COURT:  Okay.

10             MR. SMITH:  And upon the Court's acceptance of

11     those, the defense would rest.

12             THE COURT:  Okay.  All right.  Let's bring in the

13     jury.

14         (In open court in the presence of the jury at 1:29

15     p.m.)

16             THE COURT:  All right.  The defendant may call his

17     first witness.

18             MR. SMITH:  Your Honor, at this time, the defense

19     would offer into evidence Defendant's Exhibit U, a plea

20     agreement between the United States Government and Mercedes

21     Diaz.  It is a stipulated exhibit.

22             THE COURT:  All right.  Given the stipulation of

23     the parties, Defendant's Exhibit U is received into

24     evidence.  Do you wish for it to be published to the jury

25     at this time?

634
Redirect - Ennis

1        MR. SMITH:  I don't believe that's necessary at

2  this time, Your Honor.

3        THE COURT:  All right.

4    (Defendant's Exhibit U received)

5        MR. SMITH:  I would also request permission to

6  offer Defendant's Exhibit V, as in Victor, which is a

7  transcript of the entry of guilty plea by Mercedes Diaz.

8  Also a stipulated exhibit.

9        THE COURT:  All right.  Given the stipulation of

10  the parties, Defendant's Exhibit V is admitted into

11  evidence and may be published to the jury.

12    (Defendant's Exhibit V received)

13        MR. SMITH:  With that, Your Honor, the defendant

14  would rest.

15        THE COURT:  All right.  Okay.  So, folks, I know

16  you were -- you went to lunch and were waiting and -- but

17  at this point, unfortunately, or fortunately, depending on

18  how you look at your schedules for today, I'm going to

19  release you for the day, because what's left in terms of

20  the trial for the lawyers and I has to be done, again,

21  outside your presence, and it really has to do with

22  finalizing the jury instructions and related documents.

23        So let me tell you what's going to happen tomorrow

24  morning.  I'm going to have you come back in at 8:35.  At

25  8:45, I will read to you the final jury instructions that I

Redirect - Ennis

1    have decided would be the instructions that will guide your

2    deliberations.

3           At that point -- after that, the parties will have

4    their closing arguments.  Then after the closing arguments,

5    I will have the duty to dismiss one of you as our alternate

6    juror and then the remaining 12 will begin your

7    deliberations on the verdict.

8           All right.  The jury -- oh, I have to remind you

9    again:  Please do not do any independent research into or

10   discuss with anyone the facts, the law, the issues or the

11   individuals involved in this case.

12          The jury is released until 8:45 tomorrow morning.

13       (Jury left the courtroom at 1:32 p.m.)

14          THE COURT:  Okay.  Let's talk about closing

15   arguments.  What amount of time would the Government

16   request?

17          MS. PALUCH:  40 minutes total, Your Honor.

18          THE COURT:  All right.  How much does the

19   defendant request?

20          MR. SMITH:  I think 30 minutes is fine, Your

21   Honor.

22          THE COURT:  All right.  Okay.  We'll go with the

23   40.  That means, Ms. Paluch, you cannot reserve more

24   than -- we'll call it 14 -- I'll give you 14 minutes in

25   rebuttal.  You don't have to decide right now how much

Redirect - Ennis

1    you're going to reserve for your rebuttal.  You can let us

2    know first thing in the morning.

3            Let me tell you that if you do not -- let's say

4    you reserve 14, which would leave 26 for your opening

5    portion of your closing argument, say you only use 20 of

6    the 26.  In that example, you can't -- you cannot add 6 to

7    the 14.  You can never have more than 14.

8            MS. PALUCH:  Understood.

9            THE COURT:  All right?  Okay.  And then,

10   obviously, the defendant will have one 40-minute segment

11   for the closing argument.

12           How much of a warning would you want for the two

13   portions of your closing argument, Ms. Paluch?

14           MS. PALUCH:  Two-minute warning for each, Your

15   Honor.

16           THE COURT:  For each?  Okay.  How much of a

17   warning -- who will be doing the closing argument for the

18   defendant?

19           MR. SMITH:  I will, Your Honor.

20           THE COURT:  Okay.

21           MR. SMITH:  Five minutes.

22           THE COURT:  Five minutes.  All right.  Five-minute

23   warning for the defendant.

24           All right.  At this time, it is my practice for

25   Ms. Hansen to go through the exhibits per her records in

Redirect - Ennis

1    terms of what has been received into evidence, so each side

2    follow along with your records.  We will start with the

3    Plaintiff's -- or the Government's exhibits.

4         COURTROOM DEPUTY:  I'm going to just say the ones

5    that are received.  A-1, 3, 4, 4-A, 4-B, 4-C, 4-D, 5, 7, 8,

6    9, 12, 13, 14, 15, 16, 19, 20, 21, 22, 23, 24, 25, 26, 28,

7    29, 30, 32, 35, 36, 37, 38, 56-B, 56-C, 56-D, E, F, G.

8    57-B, C, D, E, F, G, H, I, J, K, L.  63-B, C, D, E, F, G.

9    64, 66-B, 67, 68, 69, 70, 71, 72, all the way through 80,

10   84.

11        THE COURT:  All right.  Does that comport with the

12   Government's records?

13        MR. FIELDS:  I also have 81 being admitted, Your

14   Honor.

15        COURTROOM DEPUTY:  I meant to say that.  Yes.  81.

16   Sorry.

17        THE COURT:  81.  Okay.  Does that comport with the

18   defendant's records?

19        MR. SMITH:  It does with that correction, yes,

20   Your Honor.

21        THE COURT:  All right.  Then obviously we just

22   admitted Exhibits U and V for the defendant.

23        All right.  We're going to go into recess again.

24   Mr. Foster and I are going to finalize the Court's final

25   set of jury instructions.  Yes?

Redirect - Ennis

1        MR. SMITH:  For the charging conference, may I

2    waive my client's appearance and may he be excused?

3        THE COURT:  Yes, he may be.

4        MR. SMITH:  Thank you.

5        THE COURT:  He's not -- it's not necessary for him

6    to be in attendance.

7        MR. GOODREID:  And, Your Honor, one other thing.

8    I don't know if it will be timely to tell you now, but we

9    did find one error in the stipulated instructions, or at

10   least as the evidence turns out.  Do you want me to bring

11   it up now or wait?

12       THE COURT:  Might as well bring it up -- I don't

13   have the set in front of me, but that's what the charging

14   conference is for, to bring -- might as well make those

15   corrections now.

16       MR. GOODREID:  It's -- Your Honor, it's what was

17   in joint instruction No. 11.

18       THE COURT:  Which is about what?

19       MR. GOODREID:  Witness --

20       THE COURT:  Like I said, I don't --

21       MR. GOODREID:  I'm sorry, Your Honor.  I

22   apologize.  It's witness use of addictive drugs.

23       THE COURT:  Okay.

24       MR. GOODREID:  And right now it says Christine

25   Duncan and Virginia Jones may be considered to be --

Redirect - Ennis

1    THE COURT:  Yeah, we caught that.

2    MR. GOODREID:  Oh, you did.

3    THE COURT:  Just Ms. Duncan.  Right.

4    MR. GOODREID:  Sorry.

5    THE COURT:  Okay.  So what my practice is:  Once

6  we finalize the jury instructions back in chambers, we will

7  bring out two sets for each side of the Court's final set

8  and will give you 15 minutes to review that proposed set.

9  15 minutes after you've gotten them I will come out on the

10  bench and we will have our charging conference.

11    So we'll be in recess.

12    (Recess taken at 1:39 p.m. to 2:19 p.m.)

13    THE COURT:  All right.  The record will reflect

14  that all counsel are present and the presence of the

15  parties have been -- has been waived for this charging

16  conference.

17    The record will also reflect that counsel has had

18  15 minutes to review the Court's final set of jury

19  instructions.

20    All right.  Because this was a case in which all

21  the jury instructions were stipulated to, this is going to

22  be a fairly simple charging conference.  I just want to put

23  on the record those instructions that something other than

24  just a wholesale adoption by the Court took place.

25    So with respect to joint instruction 1, the

Redirect - Ennis

1    statement of the case, that was read during the voir dire

2    portion of the trial and will not be included in the final

3    set of instructions.

4         Joint instruction 8 regarding transcripts,

5    instruction 11 regarding witnesses who abuse drugs, and 14,

6    regarding cooperating witnesses, were modified to conform

7    to the evidence and testimony as it came in at trial.

8         Joint instructions 9 regarding the factual

9    stipulations and 15 regarding impeachment by prior

10   inconsistencies were eliminated as unnecessary or

11   irrelevant given the evidence and the testimony as it

12   actually came in at trial.

13        Joint instruction 10 was modified to eliminate the

14   redundancy with joint instruction 13 regarding the

15   nontestifying defendant.  And, finally, a redundant

16   sentence of joint instruction 30 was eliminated.

17        All right.  For the Government, is there -- or are

18   there any objections to the Court's final set of jury

19   instructions?

20        MR. FIELDS:  Minor objections, Your Honor.

21        THE COURT:  All right.

22        MR. FIELDS:  If I could start, it will be on

23   page 14 of the Court's proposed instructions.

24        THE COURT:  All right.

25        MR. FIELDS:  Your Honor, in the second paragraph,

                              Redirect - Ennis

1    we would change the language to read as follows:  An

2    alleged co-conspirator, including Marcelle Green, who

3    entered into a plea agreement with the Government, is not

4    prohibited from testifying.

5           So we would change it from the plural to the

6    singular to reflect that only one cooperating defendant

7    testified during this trial.

8           THE COURT:  Okay.  What's the defendant's view on

9    that?

10          MR. GOODREID:  No objection, Your Honor.

11          THE COURT:  Okay.  So it would change -- I agree,

12   Mr. Fields.  It will be including -- an alleged

13   co-conspirator, including Marcelle Green, who entered into

14   a plea agreement.  But the Government is not prohibited

15   from testifying.  That was the suggested revision you

16   stated?

17          MR. FIELDS:  Yes, Your Honor.

18          THE COURT:  Okay.  All right.

19          MR. FIELDS:  A second change, which is

20   substantial, but I think minor in the grand scheme of

21   things, is that we would add a jury instruction.  This jury

22   instruction would reflect the fact that Kimmisha Mullett

23   testified pursuant to a nonprosecution agreement.

24          So what we would do is after this instruction on

25   page 14 for cooperating witness, would add an instruction

642

Redirect - Ennis

1    for immunized witnesses.  And we would adopt in large part

2    the Tenth Circuit's pattern criminal jury instruction at

3    1.14, which covers immunized witnesses.  And here's exactly

4    what we would do.  We would add a short preface pursuant to

5    the use instruction to that jury instruction, which says

6    that it should be tailored to describe the agreement, at

7    least in a general sense.

8         So the new proposed instruction would start out:

9    The Government called Kimmisha Mullett to the stand.  The

10   Government has entered into a nonprosecution agreement

11   providing that it will not prosecute Ms. Mullett for any

12   involvement in a fraud scheme.

13        And then we would adopt in toto the Tenth

14   Circuit's pattern jury instruction 1.14, which is very

15   similar to the cooperating witness instruction, just with

16   regard to immunized witnesses.

17        THE COURT:  Okay.  Two questions.  One, why didn't

18   you propose such an instruction in the first place?

19   Secondly, do you have a physical copy of that instruction?

20        MR. FIELDS:  I'm very sorry, Your Honor.  The

21   answer to the first one is oversight and for that I am

22   truly sorry.  We should have noticed this earlier.  And the

23   second is no, I'm sorry, I don't have a copy because we

24   just recognized it while we were reviewing these

25   instructions.

Redirect - Ennis

1      THE COURT:  All right.  Let me get the -- why

2  don't you stay there.  Let me get the defendant's position.

3      MR. GOODREID:  Your Honor, we -- I discussed this

4  with Mr. Fields and said we're fine with that instruction,

5  yeah, as he's proposed it.

6      THE COURT:  Okay.  All right.  Okay.  I -- since

7  there's no objection from the defendant and I don't see any

8  real problem with that, I will agree to that.

9      Why don't, when I get off the bench, I can -- you

10  can work with Mr. Foster and dictate to him the exact

11  language that you want.  And let's do it this way:

12  Assuming it's exact -- it's what you -- that what you

13  propose that I approve it, then we'll just put that into

14  the set and we won't take it up any further tomorrow

15  morning.

16      If there's some revision after I've actually seen

17  it on paper and read it, then I'll take it up first thing

18  in the morning before we bring in the jury.

19      MR. FIELDS:  Thank you, Your Honor.  And, again,

20  I'm sorry for not bringing this to the Court's attention

21  sooner.

22      THE COURT:  Okay.  And then let's see if we can

23  somehow -- maybe we can paginate it as 14-A, Nathan, or

24  something so that we don't -- we can save a couple of tree

25  limbs and not have to redo -- repaginate all the remaining

Redirect - Ennis

1    pages and have to reprint out everything.

2         All right.  Anything else?

3         MR. FIELDS:  Yes, Your Honor.  We would also ask

4    that the Court give what was joint instruction No. 15 on

5    impeachment by prior inconsistencies.

6         THE COURT:  Okay.

7         MR. FIELDS:  And the reason we would do that is we

8    believe that Ms. Duncan was actually cross-examined about

9    an inconsistent statement regarding a prior statement that

10   she made, and so we think that the instruction's proper.

11        THE COURT:  Remind me what it is that she

12   testified to that you believe makes the instruction proper.

13        MR. FIELDS:  My recollection is very general, but

14   I believe had to do with her viewing of the cell phone and

15   what she told agents initially versus what her testimony

16   was in court, it was an inconsistency.

17        THE COURT:  Tell me what that inconsistency was.

18   I'm not remembering.

19        MR. SMITH:  It was -- Your Honor, if I may

20   interject.  I asked Ms. Duncan if she had previously made a

21   statement to the postal inspectors on September 7th, 2012,

22   where she admitted going with Thomas to Pikes Peak

23   Community College and applying for student loans.  She had

24   said, and in her direct testimony, that they only went

25   there to apply for school and had gotten the forms and

Redirect - Ennis

1     left.

2                THE COURT:  That's -- I do recall that.  Okay.

3     And so the defendant does not object?

4                MR. SMITH:  No, Your Honor.

5                THE COURT:  All right.  Where did you want --

6     where did you think it most logically should be placed?

7                MR. FIELDS:  I think it goes either before or

8     after the instruction on page 15 of the Court's proposed

9     instructions, which is impeachment by prior conviction.

10               THE COURT:  Okay.  Well, I think that our

11    pagination thing is -- my concern just -- we'll just forget

12    about that.  We'll just -- we'll repaginate everything

13    after 14.  So the immunized witness instruction will now be

14    page 15 and the impeachment by prior inconsistent -- and

15    you have no objection to the text of that instruction as

16    it -- as it was -- obviously it was your stipulated

17    instruction, so you don't have an objection.  That's the

18    one you want to keep for our purposes now?

19               MR. FIELDS:  Yes, please.

20               THE COURT:  Okay.  So page 16 will be the prior

21    inconsistent statement impeachment.  Okay.

22               MR. FIELDS:  And the last one, Your Honor, is on

23    page 37.  This just has to do with a description of the

24    indictment.

25               THE COURT:  Okay.

Redirect - Ennis

1    MR. FIELDS:  In paragraph 2 there, it currently

2    reads:  Beginning on or about August 2010 and continuing

3    until in or about October 2012, in the State and District

4    of Colorado and elsewhere, defendants, plural, Tramell

5    Thomas and Marcelle Green.  We would change that to

6    defendant, singular, Tramell Thomas, and then it would read

7    along with co-conspirators Heather Carr, Marcelle Green,

8    and Mercedes Diaz.

9    THE COURT:  Well, it's generally my practice to

10   allow the jury to see the superseding indictment as it was

11   handed down by the grand jury, not to make revisions and

12   changes to it.

13   MR. FIELDS:  That's acceptable, Your Honor, if

14   that's your general practice.  I just wanted the record to

15   reflect obviously she's not a codefendant, but that's

16   perfectly acceptable.

17   THE COURT:  Right.  I think it was pretty clear to

18   the jury that she's a codefendant, that she's pled guilty,

19   and she testified how she's hoping to get a more lenient

20   sentence in exchange for her cooperation.  So I would

21   prefer to leave the superseding indictment in the -- as it

22   was handed down by the grand jury.

23   MR. FIELDS:  Then I withdraw any objection, Your

24   Honor.

25   THE COURT:  All right.

                        Redirect - Ennis

1              MR. FIELDS:  That's fine as it is.

2              THE COURT:  While I have you up there, does the

3     Government have any objection to the verdict form?

4              MR. FIELDS:  We do not, Your Honor.

5              THE COURT:  All right.  Thank you.

6              MR. FIELDS:  Thank you.

7              THE COURT:  All right.  Any objections from the

8     defendant to the Court's proposed final set of jury

9     instructions?

10             MR. GOODREID:  Your Honor, the only thing we had

11    was the one that's already been addressed by the Court

12    about impeachment by prior inconsistencies.  That's already

13    been addressed, so that was it.

14             THE COURT:  All right.  And do the defendant -- so

15    you have -- just so the record's clear, defendant has no

16    other objection to the Court's final set of jury

17    instructions?

18             MR. GOODREID:  He does not.

19             THE COURT:  Okay.  And does the defendant have any

20    objection to the verdict form?

21             MR. GOODREID:  No, Your Honor.

22             THE COURT:  All right.  All right.  Do counsel

23    agree that, as I read these instructions to the jury

24    tomorrow morning, that I may make any necessary revision on

25    the fly, if you will, as a result of any typographical,

Redirect - Ennis

1   clerical, or syntactical error?

2           MR. FIELDS:  Yes, Your Honor, we would appreciate

3   it.

4           THE COURT:  Okay.

5           MR. GOODREID:  Absolutely, Your Honor.

6           THE COURT:  Okay.  Thank you.  Just so we're all

7   on the same page, each juror is going to have their own set

8   of jury instructions.  Each juror's going to be allowed to

9   take their notes that they've been taking this week back

10  with them after the closing arguments.  And I don't

11  believe, but you can correct me if I'm wrong, that there

12  are any exhibits that were admitted into evidence but which

13  were not going back to the jury.  Because I don't think the

14  audio -- the synchronized transcript was -- was that

15  admitted into evidence.  And I'm just misrecollecting right

16  now.

17          MR. FIELDS:  The synced transcript was not

18  admitted into evidence, it was demonstrative.  The admitted

19  exhibit is the disk with the audio.

20          THE COURT:  Okay.

21          MR. FIELDS:  So what I would propose is if the

22  jury wants to hear that audio they can write a note and at

23  that point the Court could provide them with a laptop and a

24  disk and they can play it if they desire.

25          THE COURT:  What's the defendant's position on

Redirect - Ennis

1    that?

2            MR. GOODREID:  Your Honor, we would oppose that,

3    along the lines of what the Court itself said in the

4    beginning, which is that gives undue emphasis to one piece

5    of testimony.  I mean, they're rehearing that piece of

6    evidence, the same way they can't hear -- they can't rehear

7    other evidence from a witness, so we would oppose that.

8            THE COURT:  All right.  I agree.  I sustain the

9    defendant's objection.  And that's why I have this down

10   here on my list of things to remember to bring up because

11   of that very thing, that there are exhibits that could be

12   received into evidence that don't go back to the jury and

13   the rehearing of statements like that comes within that

14   category.

15           So all right.  Okay.  Anything else that we need

16   to attend to today before we recess?

17           MS. PALUCH:  Not for the Government, Your Honor.

18           THE COURT:  All right.  Have you discussed with

19   the defendant your -- your intentions --

20           MS. PALUCH:  Not yet.  We were going to discuss

21   that tomorrow but we can certainly talk about it --

22           THE COURT:  I think it's fair that defense counsel

23   be apprised of your intentions so that they're prepared to

24   respond to the motion you're going to make in the event

25   there's a guilty verdict.

Redirect - Ennis

1          MS. PALUCH:  Right.  And, Your Honor, just so that

2     the record is clear, we did have this discussion weeks ago

3     with Mr. Smith as well, but we will discuss it now as well.

4          THE COURT:  Okay.  Anything further from the

5     defendant that we need to attend to today?

6          MR. SMITH:  No, Your Honor.

7          THE COURT:  All right.  Okay.  So, Mr. Fields, if

8     you'll work with Mr. Foster to get your immunity --

9     immunized witness instruction finalized, that will be all

10    set for tomorrow.

11         Okay.  We'll be in recess until 8:45 tomorrow

12    morning.

13        (Proceedings concluded at 2:35 p.m.)

14

15                        **INDEX**

16    Item                                          PAGE

17                   GOVERNMENT'S WITNESSES

18       **SANDRA ENNIS**
         Direct Examination by Ms. Paluch            537
19       Cross-examination by Mr. Goodreid          585
         Redirect Examination by Ms. Paluch          608

20

21    RULE 29(a) ARGUMENT:
      Mr. Smith                                     618
22    Ms. Paluch                                    621

23    FINDING BY THE COURT:                         623

24    CHARGING CONFERENCE:                          639

25

Redirect - Ennis

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 7 | 579 | 579 | | |
| 8 | 583 | 583 | | |
| 35 | 601 | 614 | | |
| 36 | 584 | 585 | | |
| 37 | 540 | 540 | | |
| 66-B | 536 | 536 | | |
| 67 | 536 | 536 | | |
| 68 | 536 | 536 | | |
| 69 | 536 | 536 | | |
| 70 | 581 | 581 | | |
| 71 | 582 | 582 | | |
| 72 | 536 | 536 | | |
| 73 | 536 | 536 | | |
| 74 | 536 | 536 | | |
| 75 | 536 | 536 | | |
| 76 | 536 | 536 | | |
| 77 | 536 | 536 | | |
| 78 | 536 | 536 | | |
| 79 | 536 | 536 | | |
| 80 | 536 | 536 | | |
| 81 | 536 | 536 | | |
| 85 | 613 | | 614 | |
| 86 | 613 | | 614 | |

Redirect - Ennis

DEFENDANT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| U | 633 | 633 | | |
| V | 633 | 634 | | |

\*      \*      \*      \*      \*

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated at Denver, Colorado, this 8th day of August, 2019.

_____
MARY J. GEORGE, FCRR, CRR, RMR

653

                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-0054-WJM-2

UNITED STATES OF AMERICA,

Plaintiff,

vs.

TRAMELL THOMAS,

Defendant.
------------------------------------------------------------

                        REPORTER'S TRANSCRIPT
                        (Jury Trial - Day 4)
                            VOLUME IV
------------------------------------------------------------

     Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

Judge, United States District Court for the District of

Colorado, commencing at 9:11 a.m., on the 30th day of

November, 2017, in Courtroom A801, United States

Courthouse, Denver, Colorado.


                            APPEARANCES

     MARTHA A. PALUCH and BRYAN FIELDS, Assistant U.S.
Attorneys, 1801 California Street, Suite 1600, Denver,
Colorado 80202, appearing for the plaintiff.

     DANIEL T. SMITH, Attorney at Law, 4582 South Ulster,
Suite 1400, Denver, Colorado 80237 AND
     THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
Suite 1400, Denver, Colorado 80202, appearing for the
defendant.
                    MARY J. GEORGE, FCRR, CRR, RMR
               901 19th Street, Denver, Colorado 80294
               Proceedings Reported by Mechanical Stenography
                  Transcription Produced via Computer

654

1                        P R O C E E D I N G S
2            (In open court outside the presence of the jury at
3       9:11 a.m.)
4                  THE COURT:  I understand there was a delay with
5       one of the jurors getting here, so that's why we're
6       unfortunately starting as late as we are.
7                  Ms. Paluch, have you decided how you're going to
8       divide up your closing argument?
9                  MS. PALUCH:  Yes, Your Honor.  Along the lines we
10      discussed yesterday, where you said I could reserve 14
11      minutes.
12                 THE COURT:  Up to you.  It's your choice.
13                 MS. PALUCH:  Yeah.
14                 THE COURT:  And that's what you want to do?
15                 MS. PALUCH:  I would like to do that, Your
16      Honor.
17                 THE COURT:  So 26 and -- 26 and 14.  With a
18      two-minute warning on each?
19                 MS. PALUCH:  Yes, sir.
20                 THE COURT:  Okay.  And just so everyone knows,
21      we're going to -- I'm going to read the instructions and
22      then we're going to take a 10-minute recess after the
23      opening segment of the Government's closing argument
24      because my staff and I, and I'm sure the jurors, can't go
25      straight through with the instructions and all of the

655

1    closing argument.  So we'll take a brief recess at that

2    point.

3              Okay.  Let's bring in the jury.

4         (Jury was present at 9:12 a.m.)

5              THE COURT:  Good morning, ladies and gentlemen of

6    the jury.  Welcome back to day 4 of our jury trial.

7              All right.  At this time, I am going to read to

8    you the final set of the Court's jury instructions that

9    will govern your deliberations.

10             All right.  Members of the jury, in any jury

11   trial, there are, in effect, two judges.  I am one of the

12   judges, and you are the other.  I am the judge of the law

13   and you, as jurors, are judges of the facts.  I presided

14   over the trial and decided what evidence was proper for

15   your consideration.  It is also my duty at the end of the

16   trial to explain to you the rules of law that you must

17   follow and apply in arriving at your verdict.

18             In explaining the rules of law that you must

19   follow, first, I will give you some general instructions

20   which apply in every criminal case.  For example,

21   instructions about burden of proof and insights that might

22   help you judge the believability of witnesses.  Then I will

23   give you some specific rules of law that apply to this

24   particular case.  And, finally, I will explain the

25   procedures you should follow in your deliberations and the

1   possible verdicts that you may return.  These instructions

2   will be given to you for your use in the jury room, so you

3   need not take notes at this time.

4         In determining what actually happened, that is, in

5   reaching your decision as to the facts, it is your sworn

6   duty to follow all of the rules of law as I explain them to

7   you.  You have no right to disregard or give special

8   attention to any one instruction or to question the wisdom

9   or correctness of any rule that I may state to you.  You

10  must not substitute or follow your own notion or opinion as

11  to what the law is or ought to be.  It is your duty to

12  apply the law as I explain it to you, regardless of the

13  consequences.  However, you should not read into these

14  instructions, or anything else I may have said or done

15  during the trial, any suggestion as to what your verdict

16  should be.  That is entirely up to you.

17        It is also your duty to base your verdict solely

18  on -- upon the evidence without prejudice or sympathy.

19  That was the promise you made and the oath that you took.

20        The Government has the burden of proving the

21  defendant guilty beyond a reasonable doubt.  The law does

22  not require a defendant to prove his innocence or produce

23  any evidence at all.  The Government has the burden of

24  proving the defendant guilty beyond a reasonable doubt and

25  if it fails to do so, you must find the defendant not

657

1    guilty.

2         Proof beyond a reasonable doubt is proof that
3    leaves you firmly convinced of the defendant's guilt.
4    There are few things in this world that we would know --
5    that we know with absolute certainty, and in criminal
6    cases, the law does not require proof that overcomes every
7    possible doubt.  It is only required that the Government's
8    proof exclude any reasonable doubt concerning the
9    defendant's guilt.  A reasonable doubt is a doubt based on
10   reason and common sense after careful and impartial
11   consideration of all the evidence in the case.  If, based
12   on your consideration of the evidence, you are firmly
13   convinced that the defendant is guilty of the crimes
14   charged, you must find him guilty.  If, on the other hand,
15   you think there is a real possibility that he is not
16   guilty, you must give him the benefit of the doubt and find
17   him not guilty.

18        You must make your decision based only on the
19   evidence that you saw and heard here in court.  Do not let
20   rumors, suspicions, or anything else that you may have seen
21   or heard outside of the courtroom influence your decision
22   in any way.

23        The evidence in this case includes only what the
24   witnesses said while they were testifying under oath, the
25   exhibits that I allowed into evidence, and the stipulations

1    to which the lawyers agreed.  Nothing else is evidence.

2    The lawyers' statements and arguments are not evidence.

3    Their questions and objections are not evidence.  My legal

4    rulings are not evidence.  And my comments and questions

5    are not evidence.

6           During the trial, I did not let you hear the

7    answers to some of the questions that the lawyers asked.  I

8    also ruled that you could not see some of the exhibits that

9    the lawyers or parties wanted you to see.  You must

10   completely ignore all of these things.  Do not even think

11   about them.  Do not speculate about what a witness might

12   have said or what an exhibit might have shown.  These

13   things are not evidence, and you are bound by your oath not

14   to let them influence your decisions in any way.

15          The lawyers for the Government and the lawyers for

16   the defendant objected to some of the things that were said

17   or done during the trial.  Do not hold that against either

18   side.  The lawyers have a duty to object whenever they

19   think that something is not permitted by the Rules of

20   Evidence.  Those rules are designed to make sure that both

21   sides receive a fair trial.

22          Do not interpret my rulings on their objections as

23   any indication of how I think this case should be decided.

24   My rulings are based on the Rules of Evidence and not about

25   how I feel about this case.  Remember, your verdicts must

1    be based solely on the evidence that you saw and heard here

2    in court.

3            There are, generally speaking, two types of

4    evidence from which a jury may properly determine the facts

5    of a case.  One is direct evidence, such as the testimony

6    of an eyewitness.  The other is indirect, or circumstantial

7    evidence, that is, the proof of a chain of facts which

8    point to the existence or nonexistence of certain other

9    facts.

10           As a general rule, the law makes no distinction

11   between direct and circumstantial evidence.  The law simply

12   requires that you find the facts in accord with all the

13   evidence in the case, both direct and circumstantial.

14           While you must consider only the evidence in this

15   case, you are permitted to draw reasonable inferences from

16   the testimony and exhibits, inferences you feel are

17   justified in light of common experience.  An inference is a

18   conclusion that reason and common sense may lead you to

19   draw from facts which have been proved.

20           By permitting such reasonable inferences you may

21   make deductions and reach conclusions that reason and

22   common sense lead you to draw from the facts which have

23   been established by the testimony and evidence in this

24   case.

25           During this trial, you viewed a transcript of the

1    audio recording of a traffic stop.  Keep in mind that the

2    transcript is not evidence.  The transcript was shown to

3    you only as a guide to help you follow what was being said.

4    The recording, itself, is the evidence.  If you noticed any

5    differences between what you heard on the recording and

6    what you read in the transcript, you must rely on what you

7    heard, and not on what you read.  If you could not hear or

8    understand certain parts of the recordings, you must ignore

9    the transcript as far as those parts are concerned.

10              I remind you that it is your job to decide whether

11   the Government has proved the guilt of the defendant beyond

12   a reasonable doubt.  In doing so, you must consider all of

13   the evidence.  This does not mean, however, that you must

14   accept all of the evidence as true or accurate.

15              You are the sole judges of the credibility or

16   believability of each witness and the weight to be given to

17   the witness's testimony.  An important part of your job

18   will be to think about the testimony of each witness -- I'm

19   sorry, let me start that sentence again.

20              An important part of your job will be making

21   judgments about the testimony of the witnesses who

22   testified in this case.  You should think about the

23   testimony of each witness that you have heard and decide

24   whether you believe all or any part of what each witness

25   had to say and how important that testimony was.  In making

1    that decision, I suggest that you ask yourself a few

2    questions:

3              Did the witness impress you as honest?

4              Did the witness have any particular reason not to

5    tell the truth?

6              Did the witness have a personal interest in the

7    outcome in this case?

8              Did the witness have any relationship with either

9    party?

10             Did the witness seem to have a good memory?

11             Did the witness clearly see or hear the things

12   about which he or she testified?

13             Did the witness have the opportunity and ability

14   to understand the questions clearly and to answer them

15   directly?

16             Did the witness's testimony differ from the

17   testimony of other witnesses?

18             When weighing the conflicting testimony, you

19   should consider whether the discrepancy has to do with a

20   material fact or with an unimportant detail.  And you

21   should keep in mind that innocent misrecollection, like

22   failure of recollection, is not uncommon.

23             In reaching a conclusion on a particular point, or

24   ultimately in reaching a verdict in this case, do not make

25   any decisions simply because there were more witnesses on

1    one side than the other.

2           The testimony of a drug abuser must be examined

3    and weighed by the jury with greater caution than the

4    testimony of a witness who does not abuse drugs.

5           Christine Duncan may be considered to be an abuser

6    of drugs.

7           You must determine whether the testimony of this

8    witness has been affected by the use of drugs or the need

9    of drugs.

10          During the trial, you heard the testimony of

11   Alison Stailey who expressed opinions concerning computer

12   forensic analysis.  In some cases, such as this one,

13   scientific, technical, or other specialized knowledge may

14   assist the jury in understanding the evidence or in

15   determining a fact in issue.  A witness who has knowledge,

16   skill, experience, training or education may testify and

17   state an opinion concerning such matters.

18          You are not required to accept such an opinion.

19   You should consider opinion testimony just as you would

20   consider other testimony in this trial.  Give opinion

21   testimony as much weight as you think it deserves,

22   considering the education and experience of the witness,

23   the soundness of the reasons given for the opinion, and

24   other evidence in the trial.

25          The defendant did not testify and I remind you

663

1     that you cannot consider this decision not to testify as

2     evidence of guilt.  You must understand that the

3     Constitution of the United States grants to the defendant

4     the right to remain silent.  That means the right not to

5     testify.

6              This is a constitutional right in this country, it

7     is very carefully guarded, and you must not presume or

8     infer guilt from the fact that a defendant does not take

9     the witness stand and testify or call any witnesses.

10             The Government called Kimmisha Mullett to the

11    stand.  The Government entered into a nonprosecution

12    agreement providing that it will not -- that it will not

13    prosecute Ms. Mullett for her involvement in the fraud

14    scheme.

15             A person may testify under a grant of immunity,

16    which is an agreement with the Government, and her

17    testimony alone, if believed by the jury, may be of

18    sufficient weight to sustain a verdict of guilt even though

19    it is not corroborated or supported by other evidence.  You

20    should consider testimony given under a grant of immunity

21    with greater care and caution than the testimony of an

22    ordinary witness.  You should consider whether testimony

23    under a grant of immunity has been affected by that

24    witness's own interest, the Government's agreement, the

25    witness's interest in the outcome of the case, or by

664

1    prejudice against the defendant.

2           On the other hand, you should also consider that

3    an immunized witness can be prosecuted for perjury for

4    making a false statement.  After considering these things,

5    you may give testimony given under the grant of immunity

6    such weight as you feel it deserves.

7           You should not convict a defendant based on the

8    unsupported testimony of an immunized witness unless you

9    believe the unsupported testimony beyond a reasonable

10   doubt.

11          You may have heard the testimony of one or more

12   witnesses who, before this trial, made statements that may

13   be different from their testimony here in court.

14          These earlier statements were brought to your

15   attention only to help you decide how believable these

16   witnesses' testimony was in this trial.  You cannot use

17   these statements as proof of anything else.  You can only

18   use them as one way of evaluating their testimony here in

19   court.

20          The testimony of a witness may be discredited or

21   impeached by showing that the witness previously had been

22   convicted of a felony.  That is, a crime punishable by an

23   imprisonment for a term of years.  A prior conviction does

24   not mean that a witness is not qualified to testify, but is

25   merely one circumstance that you may consider in

1    determining the credibility of that witness.  You may

2    decide how much weight to give any prior felony conviction

3    that was used to impeach a witness.

4         You will note that the superseding indictment

5    charges that the crimes were committed on or about certain

6    dates.  The Government must prove beyond a reasonable doubt

7    that the defendant committed the crimes reasonably near

8    those dates.

9         You are here to decide whether the Government has

10   proved beyond a reasonable doubt that the defendant -- one

11   second.

12        Thank you, Mr. Fields.  I skipped it because it

13   wasn't in my set.  Does defense counsel agree that I need

14   to read the instruction on cooperating witness?

15        MR. GOODREID:  We do, Your Honor.

16        THE COURT:  All right.  For some reason, folks, my

17   set has it missing.  One second.  All right.  Here's an

18   instruction that I skipped, but will be in your set in the

19   deliberation room, so no worries as far as you're

20   concerned.

21        The Government called as a witness an alleged

22   co-conspirator, Ms. Marcelle Green, who was named as a

23   codefendant in the superseding indictment.  The Government

24   has entered into a plea agreement with Ms. Green providing

25   for the dismissal of some charges and a recommendation of a

1      lesser sentence than she would otherwise likely receive.

2      Plea bargaining is lawful and proper.  In fact, the rules

3      of this court expressly provide for it.

4            An alleged co-conspirator, including Marcelle

5      Green, who entered into a plea agreement with the

6      Government is not prohibited from testifying.  On the

7      contrary, the testimony of an alleged co-conspirator may,

8      by itself, support a jury -- a guilty verdict.  You should

9      receive this type of testimony with caution and weigh it

10     with great care.

11           You should never convict a defendant upon the

12     unsupported testimony of an alleged accomplice unless you

13     believe that testimony beyond a reasonable doubt.  The fact

14     that an alleged co-conspirator has entered a guilty plea to

15     the offense charged is not evidence of the guilt of any

16     other person.

17           You are here to decide whether the Government has

18     proved beyond a reasonable doubt that the defendant is

19     guilty of the crimes charged.  The defendant is not on

20     trial for any act, conduct, or crime not charged in the

21     superseding indictment.

22           It is not up to you to decide whether anyone who

23     is not on trial in this case should be prosecuted for the

24     crimes charged.  The fact that another person also may be

25     guilty is no defense to a criminal charge.

1        The question of the possible guilt of others

2   should not enter into your thinking as you decide whether

3   this defendant has been proved guilty of the crimes

4   charged.

5        If you find the defendant guilty, it will be my

6   duty to decide the punish- -- what the punishment will be.

7   You should not discuss or consider the possible punishment

8   in any way while deciding your verdict.

9        Some of the counts of the superseding indictment

10  accuse the defendant of violating a statute in more than

11  one way.  In other words, the superseding indictment

12  alleges that statute was violated by various acts that, in

13  the superseding indictment, are joined by the word "and,"

14  while the statute and the elements of the offense are

15  stated using the word "or."  In these instances, it is

16  sufficient for a finding of guilt if the evidence

17  establishes beyond a reasonable doubt the violation of the

18  statute by any one of the facts charged.

19       All right.  That concludes the part of my

20  instructions explaining your duties and the general rules

21  that apply in every criminal case.  Now I will explain the

22  elements of the crimes with which the defendant is charged.

23       A separate crime is charged in each count of the

24  superseding indictment.  You must separately consider the

25  evidence on each count and return a separate verdict.

668

1          Your verdict as to any one count, whether it is

2     guilty or not guilty, should not influence your verdict as

3     to any other count.

4          The superseding indictment charges in Count 1 a

5     violation of a federal statute known as Title 18 United

6     States Code Section 286.  That statute prohibits:  Entering

7     into any agreement, combination, or conspiracy to defraud

8     the United States, or any department or agency thereof, by

9     obtaining or aiding to obtain the payment or allowance of

10    any false, fictitious or fraudulent claim.

11         To find the defendant guilty of this crime, you

12    must be convinced that the Government has proved each of

13    the following elements beyond a reasonable doubt.

14         First:  The defendant agreed with at least one

15    other person to obtain or aid in obtaining the payment or

16    allowance of any false, fictitious, or fraudulent claim;

17         Second:  The defendant knew the essential

18    objective of the conspiracy;

19         Third:  The defendant knowingly and voluntarily

20    participated;

21         And, fourth:  There was an interdependence among

22    the members of the conspiracy; that is, the members, in

23    some way or manner, intended to act together for their

24    shared mutual benefit within the scope of the conspiracy

25    charged.

669

1          A conspiracy is an agreement between two or more

2     persons to accomplish an unlawful purpose.  It is a kind of

3     "partnership in criminal purpose" in which each member

4     becomes the agent or partner of every other member.  The

5     evidence may show that some of the persons involved in the

6     alleged conspiracy are not on trial.  This does not matter.

7     There is no requirement that all members of a conspiracy be

8     charged or tried together in one proceeding.

9          The evidence need not show that the members of the

10    alleged conspiracy entered into an express or formal

11    agreement.  Nor does the law require proof that the members

12    agreed on all the details.  But the evidence must show that

13    the members of the alleged conspiracy came to a mutual

14    understanding to try to accomplish a common and unlawful

15    plan.

16         If you are convinced that the charged conspiracy

17    existed, then you must next determine whether the defendant

18    was a member of that conspiracy; that is, whether the

19    defendant knew at least the essential goals of the

20    conspiracy and voluntarily chose to be part of it.  The law

21    does not require proof that the defendant knew all the

22    other members of the conspiracy or knew all the details

23    about how activities were to be carried out.  A person may

24    belong to a conspiracy for a brief period of time or play a

25    minor role.  On the other hand, proof is not sufficient if

670

1     it merely shows that the defendant knew about the existence

2     of the conspiracy or was associated with members of the

3     conspiracy.  Rather, the evidence must show the defendant

4     knowingly joined the conspiracy with the intent to advance

5     its purpose -- its purposes.

6          You are also required to find that the

7     interdependence existed among the members of the

8     conspiracy.  This means that the members intended to act

9     for their shared mutual benefit.  To satisfy this element,

10    you must conclude that the defendant participated in a

11    shared criminal purpose and that his actions constituted an

12    essential and integral step toward the realization of that

13    purpose.

14         The word "knowingly" means that an act was done

15    voluntarily and intentionally and not because of mistake or

16    accident.

17         The intent of a person or the knowledge that a

18    person possesses at any given time may not ordinarily be

19    proved directly because there is no way of directly

20    scrutinizing the workings of the human mind.  In

21    determining the issue of what a person knew or what a

22    person intended at a particular time, you may consider any

23    statements made, or acts done, by that person and all other

24    facts and circumstances received in evidence which may aid

25    you in your deliberation of that person's knowledge or

671

1    intent.

2         You may infer, but are certainly not required to

3    infer, that a person intends the natural and probable

4    consequences of acts knowingly done or knowingly omitted.

5    It is entirely up to you, however, to decide what facts to

6    find from the evidence received during this trial.

7         Counts 2 through 7 of the superseding indictment

8    charge the defendant with violating Title 18 United States

9    Section 2.  That statute makes it a crime intentionally to

10   help someone else commit a crime.  The statute provides in

11   pertinent part as follows:

12         Whoever aids, abets, counsels, commands, induces,

13   or procures the commission of an offense against the United

14   States, shall commit an offense against the United States.

15         The superseding indictment charges the defendant

16   with aiding and abetting others with respect to committing

17   mail fraud.  This law makes it a crime to use the mails in

18   carrying out a scheme to defraud.  A scheme to obtain money

19   or property by means of false or fraudulent pretenses,

20   representations, or promises is a specific type of scheme

21   to defraud.  This crime is based upon a federal statute

22   known as Title 18 United States Code Section 1341, which

23   provides in pertinent part as follows:

24         Whoever, having devised or intending to devise any

25   scheme or artifice to defraud, or for obtaining money or

1   property by means of false or fraudulent pretenses,

2   representation, or promises, for the purpose of executing

3   such scheme or artifice or attempting so to do, places in

4   any post office or authorized depository for mail matter,

5   any matter or thing whatever to be sent or delivered by the

6   Postal Service, or takes or receives therefrom, any such

7   matter or thing, or knowingly causes to be delivered by

8   mail, according to the direction thereon, or at a place at

9   which it is directed to be delivered by the person to whom

10  it is addressed any such matter or thing shall commit an

11  offense against the United States.

12          I need to pause and take a drink after that one.

13          To find the defendant guilty of aiding and

14  abetting mail fraud as charged in Counts 2 through 7 of the

15  superseding indictment, you must be convinced that the

16  Government has proved each of the following elements beyond

17  a reasonable doubt for each count:

18          First:  Someone else committed the crime, and

19          Second:  The defendant intentionally associated

20  himself in some way with the crime and intentionally

21  participated in it as he would in something he wished to

22  bring about.  This means that the Government must prove

23  that the defendant consciously shared the other person's

24  knowledge of the underlying criminal act and intended to

25  help him or her.

1          The defendant need not perform the underlying

2     criminal act, be present when it is performed, or be aware

3     of the details of its commission to be guilty of aiding and

4     abetting.  But a general suspicion that an unlawful act may

5     occur or that something criminal is happening is not

6     enough.  Mere presence at the scene of a crime and

7     knowledge that a crime is being committed are also not

8     sufficient to establish aiding and abetting.

9          To find that "someone else" committed the crime of

10    mail fraud, the first element of aiding and abetting, you

11    must be convinced that the Government has proved each of

12    the following beyond a reasonable doubt:

13         First:  A person or persons other than the

14    defendant devised or intended to devise a scheme to defraud

15    the United States Department of Education by making false

16    and fraudulent representations regarding the eligibility of

17    prison inmates for student financial aid, as alleged in the

18    superseding indictment;

19         Second:  A person or persons other than the

20    defendant acted with specific intent to defraud;

21         Third:  A person or persons other than the

22    defendant caused another person to mail something through

23    the United States Postal Service for the purpose of

24    carrying out the scheme;

25         Fourth:  The scheme employed false or fraudulent

1   pretenses, representations, or promises that were material.

2           A "scheme to defraud" is conduct intended to or

3   reasonably calculated to deceive persons of ordinary

4   prudence or comprehension.

5           An "intent to defraud" means an intent to deceive

6   or cheat someone.

7           A representation is "false" if it is known to be

8   untrue or is made with reckless indifference as to its

9   truth or falsity.  A representation would also be "false"

10  when it constitutes a half truth -- half truth or

11  effectively omits or conceals a material fact, provided it

12  is made with intent to defraud.

13          A false statement is "material" if it has a

14  natural tendency to influence or is capable of influencing

15  the decision of the person or entity to which it is

16  addressed.

17          What must be proved beyond a reasonable doubt is

18  that a person or persons other than the defendant devised

19  or intended to device a scheme to defraud that was

20  substantially the same as the one alleged in the

21  superseding indictment, and that the use of the mails was

22  closely related to the scheme in that a person or persons

23  other than the defendant caused something to be mailed in

24  an attempt to execute or carry out the scheme.  To "cause"

25  the mails to be used is to do an act with knowledge that

675

1    the use of the mails will follow in the ordinary course of

2    business or where such use can reasonably be foreseen even

3    though a person or persons other than the defendant did not

4    intend or request the mails to be used.

5         An indictment is only a formal method used by the

6    Government to accuse a defendant of a crime.  It is not

7    evidence of any crime against the defendant.  The defendant

8    is not -- the defendant is presumed to be innocent of the

9    crimes charged.

10        The defendant has pleaded "not guilty" to the

11   superseding indictment and, therefore, denies that he is

12   guilty of the charges contained in the superseding

13   indictment.

14        Okay.  That concludes my part of the instructions

15   explaining the law that applies in this case.  Let me

16   finish up by explaining some things about your

17   deliberations in the jury room and your possible verdicts.

18        After the parties' closing statements, the bailiff

19   will escort you to the jury room where each of you will

20   have a copy of the instructions that I've just read.  Any

21   exhibits admitted into evidence will also be placed in the

22   jury room for your review.

23        When you go to the jury room, you should first

24   select a foreperson who will help to guide your

25   deliberations and will speak for you here in the courtroom.

1    The second thing you should do is review the instructions.

2    Not only will your deliberations be more productive if you

3    understand the legal principles upon which your verdict

4    must be based, but for your verdict to be valid you must

5    follow the instructions throughout your deliberations.

6          Remember, you are the judges of the facts, but you

7    are bound by your oath to follow the law stated in the

8    instructions.

9          To reach a verdict, whether it is guilty or not

10   guilty, all of you must agree.  Your verdict must be

11   unanimous on each of the counts in the indictment.  Your

12   deliberations will be secret.  You will never have to

13   explain your verdict to anyone.

14         You must consult with one another and deliberate

15   in an effort to reach agreement if you can do so.  Each of

16   you must decide the case for yourself, but only after an

17   impartial consideration of the evidence with your fellow

18   jurors.  During your deliberations, do not hesitate to

19   re-examine your own opinions and change your mind if you

20   are convinced that you were wrong, but do not give up your

21   honest beliefs solely because of the opinion of your fellow

22   jurors or for the mere purpose of returning a verdict.

23         A form of verdict has been prepared for your

24   convenience and it reads as follows:

25         In the matter of criminal case No. 16-cr-054,

1    defendant No. 2, WJM.  United States of America versus

2    Tramell Thomas.  Verdict Form.  Count 1:  We, the jury,

3    upon our oaths, do unanimously find the defendant, Tramell

4    Thomas, in Count 1 of the indictment, not guilty or guilty,

5    with a line next to each for the jury to indicate its

6    decision.

7         Count 2:  We, the jury, upon our oaths, do

8    unanimously find the defendant, Tramell Thomas, in Count 2

9    of the indictment, again, not guilty or guilty.

10         Count 3:  We, the jury, upon our oaths, do

11    unanimously find the defendant, Tramell Thomas, in Count 3

12    of the indictment, not guilty or guilty.

13         And it goes on that way for Counts 4 through 7.  I

14    don't think I need to read all those.  And it ends -- the

15    verdict form ends up by providing a date and signature line

16    for the foreperson.  The foreperson should sign the verdict

17    form and should date the form as well.

18         After you have deliberated and consulted with each

19    other, the foreperson will write the unanimous answer of

20    the jury in response to each questions in the verdict form

21    and sign it.

22         Only one copy each verdict form -- of the verdict

23    form will be provided to you.  If you make an error on the

24    form, please tell the bailiff.  The bailiff will destroy

25    the erroneous form and a blank form will be provided.

1          Do counsel agree that should be changed to "only

2     one copy of the verdict form," and instead of "either the"

3     in the second line?  So let me read what I believe it --

4     that's how I read it, but let me read it and ask counsel if

5     they agree.

6          Only one copy of the verdict form will be provided

7     to you.  If you make an error on the form, please tell the

8     bailiff.  The bailiff will destroy the erroneous form and a

9     blank form will be provided.

10          MR. FIELDS:  Thank you, Your Honor.  Yes.

11          MR. GOODREID:  I believe that's correct, Your

12     Honor.

13          THE COURT:  All right.  Thank you, counsel.

14          If you want to communicate with me at any time

15     during your deliberations, please write down your message

16     or question and give it to the bailiff who will bring it to

17     my attention.  I will respond as promptly as possible

18     either in writing or by having you return to the courtroom

19     so that I can address you orally.  I caution you, however,

20     that with any message or question that you may send, you

21     should not tell me any details of your deliberations or

22     indicate how many of you are voting in a particular way on

23     any issue.

24          Let me remind you again that nothing that I have

25     said in these instructions, or in anything that I've said

679

1    or done during the course of this trial, was meant to

2    suggest to you what I think your decision should be.  That

3    is your exclusive responsibility.

4         And you'll find a part 4 to these instructions,

5    which I'm not going to read, it's for your review and

6    information.  It's a reprint of the actual superseding

7    indictment.  It goes on for a few pages.  Like I said, I

8    won't read it now, but it will be included in -- at the

9    back of the instructions.

10        Okay, ladies and gentlemen, we are now going to

11   hear the closing arguments of the parties beginning with

12   the Government, then the defendant, and then ending with

13   the Government.

14        Let me explain a couple of things to you.  One is

15   that each side gets the exact amount of time, 40 minutes.

16   But the law provides that because the Government has the

17   burden of proof, the Government can elect to not use its 40

18   minutes at one time.  It can apportion its 40 minutes with

19   an opening segment and a rebuttal segment.  The Government

20   has indicated to me that it's chosen to do that, so the

21   Government will have an opening segment and a rebuttal

22   segment totaling 40 minutes.

23        The defendant does not have that opportunity under

24   the law.  The defendant must use his 40 minutes all in one

25   stretch.

1      Because of the amount of time it took me to read

2   the instructions, what we're going to do is we'll hear the

3   opening segment of the Government's closing argument and

4   then we'll take a brief 10-minute recess and then we'll

5   come back and listen to the remaining portions of closing

6   arguments.

7      Let me finally remind you again that these

8   arguments, just like any arguments or statements of the

9   lawyers during the trial, are not evidence and you should

10  not consider it as such.

11     All right.  Closing argument for the Government.

12     MS. PALUCH:  Thank you, Your Honor.

13     THE COURT:  All right.  Ms. Paluch.

14     MS. PALUCH:  Your Honor, counsel, members of the

15  jury.  You see Mr. Fields holding that stack of the 52

16  debit cards from the plastic bag that the defendant tried

17  to hide from Detective Seal and the one tucked into his

18  wallet.  53 debit cards.  There are 13 of you in the jury

19  box.  Those cards represent four jury boxes of inmates

20  whose identities were stolen.  Those cards represent

21  thousands of dollars of fraud proceeds.  Those cards

22  represent this defendant's greed.

23     Now, during his opening statement, Mr. Fields told

24  you the issue in this case is not whether there was a

25  scheme to defraud the Department of Education.  Clearly

1    there was.  The issue is whether the defendant knew about

2    and intended to be a part of it.  The evidence is clear

3    that he did.  He tried to hide that stack of debit cards

4    from Detective Seal because he knew he'd been caught

5    red-handed.  He snapped his cell phone in half because he

6    knew that the text messages on that phone proved his

7    involvement.  He went to Marcelle Green's house after the

8    search warrant because he knew he was in trouble and he

9    wanted to know how bad it was.

10         These are not the actions of someone who didn't

11   know what they were doing.  They're the deliberate actions

12   of someone who knows they're committing a crime.  They are

13   evidence he knew what he was doing was illegal and he

14   didn't want to get caught.  They're evidence that he knew

15   about the scheme and he intended to participate in it.

16         Let's start with the bag of debit cards.  Why did

17   he try to hide them?  Why try to pass off an empty plastic

18   bag to Detective Seal when Detective Seal asks him to hand

19   him the bag?  If he knew nothing about this -- those cards,

20   doesn't it make sense that his response would have been,

21   "What bag?  What are you talking about?"

22         He doesn't say that.  Instead, in response to

23   Detective Seal asking no fewer than 10 times, "What's the

24   deal with those cards?" the only response this defendant

25   provides is, "If you do my job and what I do."  And then he

682

1    refused to answer when the officer asked, "Well, what do

2    you do?"

3            Here's what the defendant did:  He sat in that

4    nice office at his computer in his nice house and he

5    searched for inmates' names and he submitted documents so

6    that he could receive money from the Department of

7    Education to which he was not entitled.  Ms. Stailey told

8    you about the evidence related to this scheme that she

9    recovered from that computer in room J.  The computer where

10   the defendant is sitting in this photo.  Hundreds of hits

11   to DOC websites, hits for inmate names, e-mail

12   communication between a Tramell Thomas and a state

13   employee.  That was his computer and that's his office.

14           Agent Ennis told you about the other office in the

15   house and how they found a Wells Fargo laptop in that other

16   office.  What this defendant did for a living was he sat at

17   the computer and he committed fraud, and he couldn't

18   possibly explain that to Detective Seal.

19           Now, you heard Ms. Stailey describe all of the

20   searches related to the scheme found on the Sony laptop

21   that was taken from the car that the defendant was driving

22   and the fact that that computer had been shut down less

23   than two days before the defendant's arrest.  The laptop

24   and the debit cards in the defendant's possession are

25   irrefutable proof of his guilt.

1          In his opening statement, Mr. Fields told you that

2    this is a case about greed, and it is.  This defendant's

3    greed is why he is sitting in that chair.  Instead of

4    earning money in a legitimate way, he stole it.  And he was

5    proud of it.  So much so, that he took selfies of himself

6    posing with wads of cash.  Who does that?  Who does that?

7    Someone showing off about how they're ripping off the

8    Government, that's who does that.

9          Ms. Green told you they were able to pull off

10   $1,000 a day from the debit cards and she would drop the

11   money off at the house that the defendant shared with

12   Heather Carr.  Stacks of 20s, she told you.

13         You heard Agent Ennis testify she could find no

14   reported wages for this defendant while living in Colorado.

15   You will decide the source of the cash in these photos.

16         Now, you've heard testimony from witnesses and you

17   have seen a number of exhibits and you heard the issue in

18   this case is the defendant's knowledge and intent.  But the

19   Government must prove all of the evidence of the crimes

20   charged beyond a reasonable doubt and here's how the

21   evidence we presented during the trial did just that:

22         Count 1 charges the defendant with participating

23   in a conspiracy to submit false claims.  And as the Court

24   instructed, the first element is that he had entered into

25   an agreement with at least one other person to engage in

1    this scheme.

2           Now, Mr. Fields told you in his opening statement

3    that Heather Carr would testify in this trial, and she did

4    not.  As the Court instructed you in an opening statement,

5    the Government discusses the evidence it expects to present

6    during the trial.  But such statements, themselves, are not

7    evidence.  And the Judge has instructed you you're required

8    to examine the evidence and the testimony that was admitted

9    during this trial and you cannot speculate about why Ms.

10   Carr did not testify.

11          Now, you did hear, however, from Marcelle Green,

12   and she told you that she and the defendant and Mercedes

13   Diaz and Heather Carr were all involved in this conspiracy.

14   Green told you she helped the defendant with the FAFSA.

15   She told you that he was present when she was dropping the

16   cash off.  She told you he was present when they were

17   calling out names for inmate searches.  She also told you

18   she had conversations with her friend, Heather Carr, about

19   the defendant's involvement in this scheme.  Now, you heard

20   about Heather Carr and you heard that she and the defendant

21   were in a relationship.  They lived together and they had a

22   child together.

23          Ultimately, you didn't get to hear her testify,

24   but ladies and gentlemen, you didn't need her to testify to

25   know what the others told you.  She and the defendant were

685

1    close and they committed the fraud together.

2            Ms. Green also told you how Carr and the defendant

3    went to Ms. Green's house after their home had been

4    searched and asked her, "What did you tell them?  What did

5    the officers ask you?"

6            If he's not involved with Green, why would he go

7    to her house, nervous, asking those questions?

8            The Government's Exhibit 74 shows you that the

9    debit card in the name of Eryn Allegra was sent to Marci

10   Green's uncle's house and that card was found in the bag.

11   That card is on the table.  That was found in the bag in

12   the defendant's possession.  Think about that.  A card sent

13   to Marci Green's address is located with the defendant.  It

14   is clear that he conspired with at least one other person.

15           So still on the first element, let's talk about

16   the false claims.  Okay.  So the false claims, of course,

17   are the FAFSAs that are submitted to the Department of

18   Education, an agency of the United States, claiming the

19   funds to which the conspirators were not entitled.  Now, as

20   you know, the FAFSA is the claim that starts the whole

21   financial aid process.  And these FAFSAs were lies.  They

22   were designed to deceive the Department of Education into

23   thinking that real students wanted to attend college when

24   the reality is that the defendant and his partners in crime

25   had stolen identities as part of their plan to obtain loans

1    that they didn't intend to pay back.

2         They listed those inmates' names and including

3    their Social Security numbers, their dates of birth.  181

4    of them were filed.  And they also listed addresses that

5    gave them access to the debit cards.

6         Now, the summary charts prepared by Agent Ennis,

7    Exhibit 73 to 75, set forth the IP and the physical

8    addresses used in the scheme by the conspirators and lists

9    a portion of the debit cards mailed in this case based on

10   those false FAFSAs.  In another chart she prepared, Exhibit

11   72, she shows you how much money the Department of

12   Education paid out on those false claims:  582,000 of the

13   181 claims, seeking 1.3 million.  That's a pretty good

14   return.  There's no question the claims were false.

15        Now, the second and third elements are that the

16   defendant knew the objective of the conspiracy and he

17   voluntarily participated in it.  And the Court instructed

18   you that the intent of a person at any given time may not

19   ordinarily be proved directly, but here you do have direct

20   evidence.  You have the testimony of Ms. Duncan about her

21   conversation with the defendant in 2010 about the use of

22   federal student aid for a laptop and even a car.

23        And she told you what happened when she gave the

24   defendant her personal information and that was it -- it

25   was used to take out student loans.  And you have Green's

1     testimony about explaining to the defendant how best to

2     fill out a FAFSA to commit the fraud.

3           So what if you don't believe these women?  Well,

4     what about the texts from the defendant, himself, to Ms.

5     Mullett related to the scheme?  Mullett sent the text to

6     the defendant saying, for Dennis Miller, "What do you want

7     me to do with this letter I have?"

8           And he responds, "You can send all the mail to me

9     at 975 East Riggs Road."

10          And as you know, that's the defendant's P.O. Box

11    that he shared with Heather Carr.  You know from the

12    evidence that Dennis Miller is an inmate, and Higher One

13    records show that a debit card in his name was mailed to

14    Ms. Mullett's address on Meadow Oaks Drive, it was

15    activated on July 7th, 2012, $3,650 went out to Mr. Miller

16    as a refund on that debit card.  And all of that evidence

17    supports what Ms. Mullett told you.

18          What better evidence of a defendant's knowledge of

19    and voluntarily participating -- voluntary participation in

20    the scheme than his own words sent in a text message

21    establishing just that?  A text message he tried to hide by

22    breaking his phone.  A text message he never thought law

23    enforcement or 12 people in the jury box would see.

24          The last element for the conspiracy count is

25    called interdependence.  And I'm not keeping up with my

1    PowerPoint there.  Okay.  Interdependence.  And essentially

2    that means that members of the conspiracy worked together

3    so that they would all benefit.  So everybody had their

4    role and, as you know, Heather Carr provided the Social

5    Security -- the Social Security numbers, but Green told you

6    the conspiracy could not walk -- work without the

7    addresses.  And that's how they got the money is through

8    the addresses.

9         And she told -- Agent Ennis told you how 11

10   different mailing addresses all tied to at least one of the

11   four members of the conspiracy were used.

12        Now, the defendant Diaz, Green, all participated

13   in different aspects of the conspiracy, including

14   conducting inmate searches, filling out FAFSAs, the school

15   and the loan documents, providing addresses as we

16   discussed, doing the homework, withdrawing cash from the

17   ATMs using the debit cards that Ms. Green told you about.

18   All of the members of the conspiracy benefited.

19        Carr and Thomas' share went to fund their

20   comfortable lifestyle.  And you heard from Green that even

21   while detained, the defendant benefited through the payment

22   of his legal fees from proceeds from the scheme.

23        Now, keep in mind the Court also instructed you

24   that to find the defendant guilty of conspiracy, the

25   Government does not have to prove that the defendant knew

1    every member of the conspiracy.  We don't have to prove

2    that he knew all of the details.  And someone can be guilty

3    of a conspiracy even if they're involved in that conspiracy

4    for a brief period of time or play a minor role.

5           The conspiracy charged in this case is from August

6    of 2010 through October of 2012.  If you find that the

7    defendant participated in this conspiracy at any time

8    during that time frame, he's guilty of Count 1.

9           The fact that he was detained in the El Paso

10   County Jail for a certain number of months during the year

11   2011 does not control your determination as to whether he's

12   guilty on Count 1.  What matters is that we prove that the

13   members of the conspiracy had a mutual understanding in

14   trying to accomplish a common and unlawful plan of stealing

15   money from the Department of Education, and that the

16   defendant participated in a conspiracy for even a brief

17   period of time.

18          Now, think of all of the addresses used in this

19   scheme that are tied to the defendant.  The Rushmore Drive

20   address -- let's see -- I'm not staying up here with

21   this -- think of all the addresses.  Let's start with

22   Rushmore Drive.  He used that address for his own loan

23   documents.  And that's found in Government's Exhibit 67

24   through 69.  And think of Agent Ennis's testimony when she

25   told you about card after card after card that were mailed

1      to the Rushmore address that were later found in the

2      defendant's possession.

3            The Radiant Drive is the address where Thomas

4      lived with Duncan.  Kimmisha Mullett's Meadow Oaks Drive

5      address you heard testimony, you saw the text messages

6      about the defendant's use of that address for receipt of

7      these -- during this scheme.

8            Now, those addresses, along with the defendant

9      performing the tasks of the conspiracy, were all necessary

10     to make this scheme work.  You saw irrefutable evidence

11     that Thomas had access to the cards sent to these

12     addresses.  Abate's card was sent to Mullett's address and

13     was found in his wallet.  It was set for delivery on July

14     26th, 2012, and one month later it's in his wallet.  How

15     did it get there?  It got there because Thomas intended to

16     put it there by telling Mullett to mail it to him at his

17     P.O. Box.  It got there because Thomas was a part of the

18     scheme.

19           When you consider the overwhelming evidence in

20     this case, there is no question the Government has proven

21     beyond a reasonable doubt that this defendant participated

22     in this conspiracy in each and every element, that

23     defendant knowingly and voluntarily involvement in it, and

24     the fact that these conspirators relied on each other to

25     make the scheme work for their mutual benefit.

1          Now, next the defendant was charged with six

2     counts of aiding and abetting mail fraud.  And those are

3     Counts 2 through 7 of the indictment.  And keep in mind the

4     mailings at issue here involve an employee at Higher One

5     placing in the United States mail debit cards that the

6     conspirators were not entitled to because of the fraud, and

7     mailing those cards to addresses under the conspirators'

8     control.

9          Now, the Court instructed you generally about the

10     elements of aiding and abetting.  So, first, the Government

11     has to show that someone else committed the crime; and,

12     second, that the defendant helped to commit the crime as

13     something he wished to bring about.  Now, the best evidence

14     that the defendant wished for the mailing of these six

15     debit cards to be brought about is his possession of five

16     of the six cards.  Each of the mailings in Counts 2 through

17     5 and Count 7 ended up in the defendant's possession when

18     he was pulled over.  And those cards are Exhibits 4-A

19     through 4-D, and Exhibit 5, the Abate card in his wallet.

20          Count 6 is the Dennis Miller count.  And a card

21     for him was not found in the defendant's car, but you have

22     the Mullett text to prove that count.

23          Now, if the defendant did not wish to bring these

24     mailings about, why did he have those cards?  If he didn't

25     wish to bring about those mailings, why were they sent to

692

1    addresses he used and controlled:  Rushmore, Radiant,

2    Meadow Oaks?  He is connected to and he provided the

3    addresses listed in each count.  He did wish to bring about

4    those mailings from Higher One because he wanted to get the

5    money.

6         And then the Court specifically applied these

7    principles to aiding and abetting mail fraud and instructed

8    you about the first element:  Someone other than the

9    defendant came up with the scheme to steal money from the

10   Department of Education in submitting these false claims.

11   Clearly someone came up with the scheme because that's what

12   happened.  And Green tells you it was Carr's idea.  But it

13   doesn't matter really whose idea it was, what's matter --

14   what matters is this defendant thought it was a good idea

15   and he got in on it.

16        Second is that someone other than the defendant

17   acted with a specific intent to defraud.  There's no

18   question about that element.  You heard Ms. Green tell you

19   that it was her specific intent to steal money from the

20   Government.  She also told you about Heather Carr's intent

21   and her efforts to steal the money.  You saw for yourself

22   the Accurint searches done by Heather Carr to steal the

23   inmates' identities.  Mercedes Diaz agreed in her plea

24   agreement that she had specific intent to defraud in this

25   conspiracy, and that's found in the Defendant's Exhibit U.

1          Now, third -- let's see -- someone other than the

2     defendant caused another person to mail something through

3     the U.S. Postal Service for the purpose of carrying out the

4     scheme.  And for this element, you could find that any of

5     the conspirators caused another person, here an employee at

6     Higher One, to mail debit cards through the U.S. mail to

7     carry out the scheme.

8          Now, fourth, that the scheme employed false or

9     fraudulent pretenses, representations or promises that were

10    material.  Now, as to this element, the parties have

11    stipulated or agreed that the FAFSAs listed in Counts 2

12    through 7 were false.  And that's found in Government

13    Exhibit 37.  The inmates referred to in these counts were

14    incarcerated when their FAFSAs were submitted in their

15    names.  They did not fill out the FAFSAs, and they didn't

16    authorize anyone to do that for them.  So the defendant has

17    stipulated, agreed, that the information in those FAFSAs

18    couldn't possibly be true.

19         Now, as you know, the information, those

20    falsities, were material.  The Department of Education made

21    decisions based on those falsities because Michelle Allred

22    told you how important it is for people to tell the truth

23    on their FAFSAs, because if they don't, then people get

24    money that they're not entitled to.

25         Now, based on the evidence already discussed

694

1   there's no question that the defendant aided and abetted in

2   the use of the mail and the mailing of the debit cards to

3   the address listed.

4          Now, the first four counts, Counts 2 through 5,

5   the cards, themselves, were mailed while the defendant was

6   detained at the El Paso County Jail, but that's not a

7   defense.  Ask yourself, ladies and gentlemen:  Did he --

8   did he help make those mailings a success?  Did he benefit

9   from them?  The answer to both questions is yes because he

10  is tied to both of those addresses used for those four

11  counts, and he was in possession of all but Miller's card.

12         Now, specifically Count 2, that's a debit card in

13  Ismael Omar's name and it was mailed to the Radiant Drive

14  address.  And that's the address where the defendant lived

15  with Christine Duncan.  Now, remember Christine Duncan was

16  asked whether she knew Ismael Omar and whether she

17  submitted a FAFSA in his name, and she said her answers to

18  both of those were no.  And, of course, the Omar debit card

19  was found in the defendant's possession.

20         Now, Counts 2 through 5 -- actually, 3 through 5,

21  those were the cards for Virginia Jones, Robert Pickens,

22  and Eddie Jones and all three were mailed to the Rushmore

23  address.

24         Now, remember Exhibits 67 through 69.  These are

25  documents where the defendant listed that address as his

695

1    own mailing address.

2         Now, the debit cards keep coming to the Rushmore

3    Drive address while the defendant is in El Paso County

4    Jail.  And then when he's arrested, he's found with those

5    cards in his possession.  But for the defendant obtaining

6    that address, those mailings don't occur.

7         The next two counts, 6 and 7, this is the Meadow

8    Oaks Drive, and these are the ones for Dennis Miller and

9    Abate.  And you've heard the evidence.  The defendant was

10   not in jail when those mailings occurred and these were the

11   ones sent to Mullett's address.  And she testified that the

12   defendant directed her to mail those cards -- the Miller

13   card, to her P.O. Box.  And you saw that text message.  And

14   the Higher One records confirmed the information she gave

15   you.

16        The Miller debit card was activated, the Abate

17   card was found in the defendant's wallet.

18        COURTROOM DEPUTY:  You have two minutes.

19        MS. PALUCH:  Thank you.

20        There's no question that the Government has met

21   its burden beyond a reasonable doubt of each and every

22   element of aiding and abetting.

23        Those photos you were shown of the defendant

24   holding wads of cash, that pile of credit cards on the

25   table:  That's what greed looks like.

1    Look at the photos of the defendant's broken

2    phone, 70 and 71.  You heard Ms. Stailey tell you it looked

3    like someone just took that phone and broke it in half.

4    That's what criminal intent looks like.  It looks like

5    destroyed evidence.  It looks like the defendant going to

6    Green's house asking federal agents -- after federal agents

7    searched his house, trying to find out if Green was

8    talking.

9    It looks like a defendant who rents an apartment

10   that's not registered in his name so nothing comes back to

11   him.  It looks like a defendant who responds to a question

12   from Mullett about why Pikes Peak mail needed to be

13   forwarded to him by answering he didn't want to get her in

14   trouble.

15   The defendant knew that what he was doing was

16   trouble.  He made the deliberate choice to get himself into

17   trouble because he thought the money was worth it and he

18   thought he would be able to avoid getting caught.  But,

19   ladies and gentlemen, you've seen the evidence he didn't

20   want anyone to see.  Don't let him avoid accountability for

21   what he's done in this scheme.

22   When you apply the law that the Court has given

23   you to the facts that were presented in this trial, there

24   is no question about this defendant's guilt.  We ask you at

25   that time to return the only verdicts possible and that is

697

1    guilty on all counts. Thank you.

2              THE COURT: Thank you, counsel.

3              All right. We're going to take a brief 10-minute

4    recess.

5         (Recess taken 10:15 a.m. to 10:27 a.m.)

6              THE COURT: All right. Closing argument for the

7    defendant.

8              MR. SMITH: Thank you, Your Honor.

9              THE COURT: Mr. Smith.

10             MR. SMITH: Ladies and gentlemen, let me take this

11   opportunity to thank you on behalf of myself and Mr.

12   Goodreid and Mr. Thomas for your attention the last four

13   days and your hard work already and the hard work you're

14   about to set sail on.

15             I want to go back to Monday morning, early Monday

16   afternoon. His Honor talked to you about his duty

17   instructing you on the law and your duty to follow it and

18   the oath you took promising to follow the law. You can't

19   speculate on what happened here. That curtain that Mr.

20   Fields talked about in his opening statement, the curtain

21   that he was going to pull back to show you all the secrets

22   in this conspiracy, it is still closed. You never heard

23   from Carr. You never heard from Diaz.

24             When you go back into that jury room, the first

25   thing you're going to do is encounter the two bedrocks of

698

1    our criminal justice system.  The first one is Tramell
2    Thomas is presumed innocent.  He was presumed innocent the
3    day he was indicted, he was presumed innocent on Monday
4    when you all were sworn in, and as we stand here today,
5    right now, he is presumed innocent.  He has no duty, no
6    requirement to prove anything.
7         So you approach the second bedrock of our criminal
8    justice system and that's proof beyond more than a
9    reasonable doubt.  That presumption stays with Mr. Thomas
10   until each one of you unanimously are convinced that every
11   single element of every single crime charged has been
12   proved to your satisfaction beyond a reasonable doubt.  A
13   doubt based upon reason, common sense, after careful
14   impartial consideration.  You must be firmly convinced, you
15   can't guess.
16        Let's talk about what must be proved here.  Count
17   1, the conspiracy charge.  Several elements to the crime.
18   A couple of them particularly stick out to me.  You first
19   must find that Mr. Thomas agreed with at least one other
20   person to obtain or aid in obtaining payment or allowance
21   of any false, fictitious or fraudulent claim.  Remember the
22   sole co-conspirator charged that you heard from in this
23   case:  Marcelle Green.  "Ms. Green, did you ever talk to
24   Tramell Thomas about filing false claims?"
25        "No."

1      "Did you ever talk to Thomas about collecting with

2   these cards?"

3      "No."

4      She never talked about the scheme with him.  That

5   was her testimony from that witness stand.

6   Interdependence.  Remember Ms. Green.  This can't work.

7   The whole scheme falls flat on its face without Carr.  They

8   can dream up all the inmate names they want from any

9   Department of Corrections throughout this country, but

10  without Carr's access to her employer, Wells Fargo, and her

11  access to those Accurint records, all they have was Mr.

12  Jones, date of birth, May 1st, 1947.  They had to have a

13  Social Security number.  They had to make sure that the

14  person didn't already have a student loan.  They had to

15  make sure the person had some decent credit or it won't be

16  approved.  And without Carr, they don't have any of that.

17      The aiding and abetting charges, the Government

18  says -- because they have to say -- Mr. Thomas didn't

19  commit these crimes charged in Counts 2, 3, 4, and 5.

20  Well, of course he didn't.  He was in jail.  He was in jail

21  on charges for some 10 months that were all dismissed.  So

22  since he couldn't do it, the only way the Government can

23  charge him is to try to convince you that he is an aider

24  and abetter.

25      To be that aider and abetter, they have to prove

1    that someone other than the defendant devised the scheme,

2    that someone other than the defendant caused another person

3    to mail something.  They have to prove that Tramell Thomas

4    knew this.  This isn't the conspiracy charge, ladies and

5    gentlemen; these are specific set crimes.  Read that

6    indictment.

7         Count 2, it's a crime that happened sometime

8    between February 8th and February 22d.  Mr. Thomas is in

9    jail.  What evidence did you hear that he knew someone was

10   filing a false FAFSA on Mr. Omar and someone was causing

11   that card to be mailed out and someone got that card?  It's

12   your memory that controls here, ladies and gentlemen, but I

13   suggest you heard no evidence of that.  You saw Exhibit 76.

14   That relates to Count 2, Mr. Omar.  February 8th to 22d,

15   2011.

16        You had Exhibit 77, that's Count 3, Mrs. Jones.

17   That happens between August and October of 2011.

18   Exhibit 78, Count 4, Mr. Pickens.  That happens between

19   August and October of 2011.  Count 5, Exhibit 79, Mr.

20   Jones.  Sometime between August and early November of '11.

21   He's in jail.  Did you hear any evidence that he knew

22   anything about what was happening?

23        Mr. Goodreid asked Agent Ennis, "You knew he was

24   in jail during this time period, and at the jail, they

25   record phone calls, don't they?"

1          "Yes."

2          "Did you get any of those recordings?"

3          "No."

4          When you're thinking about this burden of proof,

5     this reasonable doubt, you have to think of the witnesses,

6     especially the lay witnesses, that the Government is asking

7     you to rely on.  And the Court has given you several

8     instructions to help you there.  We have the cooperating

9     witnesses:  Ms. Mullett, Ms. Green.  The instruction:  You

10    should receive this type of testimony with caution and

11    weigh it with great care.  Let me come back to that in a

12    minute.

13         The drug abuser, Ms. Duncan.  A person addicted to

14    drugs must be examined and weighed by the jury with greater

15    caution than other testimony.  Pretty obvious.

16         "Ms. Duncan, were you using methamphetamines in

17    2010, 2011?"

18         "Yes."

19         "How often?"

20         "I smoked it every day."

21         "What effect did that have on your mind, Ms.

22    Duncan?"

23         "It put me in a zone.  I was zoned out."

24         And, of course, the methamphetamine comes after

25    years on crack cocaine.  And the Government says you can

1    believe this woman when she has such a specific memory of

2    that time period five years later; that she remembers

3    seeing Social Security numbers and student loan information

4    on a text message on a phone.

5         The Court gave you a general credibility of

6    witness instruction.  This isn't magic, ladies and

7    gentlemen.  It's what you and I do every day of our lives

8    when we meet people, talk to people, engage in business

9    with people.  You're trying to determine:  Are they being

10   honest with me?

11        What's probably a little different for you all in

12   this setting is I doubt very many of you have dealt with

13   people that are bargaining for their freedom.  Hopefully

14   you haven't had to deal with people that are so sadly

15   addicted to a drug like methamphetamine.  But keeping those

16   things in mind, the Court gives you this help:  Does the

17   witness have a particular reason not to tell the truth?

18        Does the person have a personal interest in the

19   outcome of the case?

20        Does the witness have a relationship with the

21   Government?

22        Green, Mullett, they hit on all three.

23        Does the witness seem to have a good memory?  I

24   won't belabor poor Ms. Duncan any longer.

25        And remember Ms. Green.  "Well, I don't know if it

1    was '10 or '11 or '12, or -- I'm not -- the dates, it's too

2    far back.  I don't remember."

3         What did the Government promise you, say they were

4    going to give you last Monday afternoon?  Were you going to

5    see evidence of these 180-some false student loan

6    application, the so-called FAFSAs?  And they gave them to

7    you.  In not a single one is there any evidence that Mr.

8    Thomas prepared it, filed it, or delivered it.

9         They told you they were going to present and give

10   you evidence that Thomas controlled the money.  Well, the

11   evidence you got on money was from Green, first evidence.

12   "I split with Carr.  If it came to my house, the split was

13   60-40.  If it went to her house, the split was 70-30."

14        Green always getting the most, because Green's in

15   charge.  Green is the linchpin; none of this works without

16   Carr.

17        I suppose they did give you some evidence of money

18   if you want to look at the picture of Mr. Thomas holding a

19   wad of cash.  A picture that's undated, a picture that

20   there's no evidence as to when it was taken, where it was

21   taken, why it was taken, what the -- what's going on at the

22   time.  That's not evidence of him controlling the money in

23   this scheme, ladies and gentlemen.

24        Mr. Fields said they were going to present

25   evidence of the lavish lifestyle that Thomas lived,

1    although this morning it's referred to as not lavish, but

2    comfortable.  It was a 2006 used automobile, lived in a

3    rented house.  And remember Green said to Ms. Paluch, I

4    believe, "Did Carr go on vacations?"

5            "Oh, yes."

6            "Many?"

7            "Yes."

8            "Who did she go with?"

9            "Her kids."

10           Not Thomas.  There's probably a good reason for

11   that, ladies and gentlemen, especially with Green's

12   knowledge, because, remember, Thomas didn't live in Arizona

13   in 2010 or 2011.  He didn't move to Arizona, according to

14   the Government's evidence, until sometime into 2012.  And

15   then, remember, Ms. Green said when Carr moved to Kaibab,

16   Kaibab address -- however you say it -- "I only went there

17   once."

18           The Government said in its opening it was going to

19   give you all this evidence of how Mr. Thomas controlled all

20   these addresses.  I'll come back to that.

21           This conspiracy was shrouded in secrecy.  The

22   Government's four charged conspirators were behind this

23   curtain and they kept everything secret.  "And we're going

24   to pull the curtain back and show you what went on."

25           Ms. Carr:  Nope.  Ms. Diaz:  Nope.

Case 1:16-cr-00054-WJM   Document 603   Filed 08/09/19   Page 33 of 103   pg 665 of
901

705

 1          Yesterday Exhibits U and V came into evidence.  I
 2     didn't bother with having you have to sit there and read
 3     them yesterday afternoon, but when you go back to the jury
 4     room, read those two.  U is Diaz's plea agreement, she pled
 5     guilty.  V is the transcript of her doing that in this
 6     courtroom before Judge Martinez.  Why didn't she come
 7     through that door?  If she's conspiring with Mr. Thomas, if
 8     they're out running around cashing these cards, why isn't
 9     she here?  Why isn't Carr here?

10          What did you get in the way of evidence?  You got
11     the stop.  It's August 30th of 2012.  Keep that in mind.
12     The charged conspiracy ends two months later.  There are 52
13     cards in the back seat in a plastic bag and a card in his
14     wallet.  Officer Seal painstakingly went through with what
15     happened to that plastic bag.  Remember I had my hand up
16     holding a bag with my fingers, that's what Mr. Thomas did,
17     and then he supposedly pushed it under the seat.  Okay?

18          Wouldn't you like to know independently if that
19     happened?  And he could have done it.  He told Thomas he
20     was going to do it.  He told Thomas on that tape recording,
21     "You did that with the bag, and I'll prove it.  You don't
22     have gloves on.  You picked it up.  I have gloves on."
23     Detective Seal:  "My fingerprints won't be on that."

24          But we don't have it.  Where did the plastic bag
25     go?  I have no idea.

706

1     He took all the cards and put them in the manila

2     envelope, but not the plastic bag.  It never got to a lab.

3     Would it be helpful?  I suggest to you it would be very

4     helpful.

5         But look at these cards.  They pull four out and

6     individually label them 4-A, 4-B, 4-C, 4-D, because they

7     relate to specific aiding and abetting counts.

8         All those cards were approved, issued, and cashed

9     while Mr. Thomas is in jail.  If you look at Exhibit 4 and

10    those cards, and compare it to just the ones that Agent

11    Ennis picked out and displayed on her Exhibit 75, one of

12    her summary exhibits, the vast majority of the cards in the

13    envelope are in the same category.  They were issued in

14    2011, they were cashed in 2011, when Mr. Thomas is in jail.

15        He has a card in his wallet.  It's worthless.  And

16    we know it's worthless because Mr. Goodreid talked to, I

17    believe it was Ms. Joseph from Higher One.  The card is

18    mailed out, it's not loaded.  You have to tear that sticker

19    off, call in, use the PIN, and then it's loaded, then it

20    can be used.  There are eight other cards in that baggy

21    that are just like that.

22        How did -- how did it get there?  Does it make any

23    sense that this man is supposedly in charge of this vast

24    scheme and he would go and collect these cards?  Remember

25    this morning, you're reminded that -- I think it's the

1    Allegre card, it was mailed to Green.  So does Thomas go

2    over to Green's house and get that card and put it in the

3    baggy along with the other 51, and the one in his wallet?

4    Put it in the back seat.  And then go out driving a car

5    around at 2:00 in the morning?  Does that make any sense?

6            Ms. Mullett.  She and the defendant had a

7    long-standing business relationship.  He was somewhat of a

8    sales rep for her printing company.  And remember how this

9    relationship on the mail started.  Tramell Thomas didn't

10   bring it up.  Mullett told me -- answered in one of my

11   questions, "How did this begin?"

12           "I was going through a tough time in my life, a

13   divorce, health issues.  I needed some money.  I asked him

14   if he had anything I could do to make some money and he

15   said he'd try."

16           "Maybe you can accept some mail.  I don't know if

17   I can pay you or not."

18           I asked her, "Did Mr. Thomas seem to understand

19   what was going on with this mail?"

20           "Not really."

21           She became concerned because she had gotten

22   student loans, she had gotten the cards, and when the one

23   card from Dennis Miller came, she didn't know it was a

24   card.  She never opened any of the mail, but she thought it

25   was.  And she was concerned.  She forwarded mail one time

1   and stopped.

2          Exhibit 15, the texts.  I encourage you to read

3   those texts.  They talk about the business relationship.

4   Dennis Miller is a side thought.

5          One time back to Ms. Duncan.  We were talking

6   about her memory and the effect of the meth -- smoking the

7   methamphetamine every day, how it would have on her memory

8   and her ability to perceive.  Remember, she said, "Thomas

9   took me to the school just to get information so I could --

10  I could enroll in the school.  That's all that was about.

11  I didn't have anything to do with anything else."

12         And then I asked her, "Do you remember on

13  September 7th, 2012, talking to Agent Ennis?"

14            "Well, I talked to her a lot.  I don't know."

15         Well, she wrote down, "Do you remember telling

16  Agent Ennis on that date Duncan admitted going with Thomas

17  to Pikes Peak Community College and applying for a student

18  loan?"

19         That's what she said the first time she talked to

20  the Government way back in September of 2012.

21         Ms. Green.  They brought Ms. Green in.  And she

22  told you she became aware of the scheme, she was brought

23  into the scheme, she learned how to play with the scheme by

24  Heather Carr.  It was Carr's idea.  No one else was there

25  when she and Carr got together and decided to put this

1    scheme together between themselves.  Green worked in

2    Arizona.  She had the two addresses, one's her uncle, one's

3    where she lived.

4            She told you she talked to Carr and Diaz about the

5    scheme.  She worked with them at the Pleasant Drive

6    address.  They would be over there.  They would be -- Diaz

7    and Green would be on the computers looking up various

8    Department of Corrections websites.  They would give Carr

9    names, she'd go on her computer, get the rest of the

10   information, then the three of them would fill out.  The

11   three of them would send in, the three of them would get

12   the cards.  Green and Diaz would go out and turn them into

13   cash.  The three of them would do homework so that it

14   appeared the student was -- was involved.

15           She never mentions Thomas in those descriptions

16   with the exception of one time.  One time at Pleasant

17   Drive.

18           "I was there and I helped teach Thomas how to put

19   the educational information on to the FAFSA."

20           "When was that?"

21           "2011."

22           Couldn't have been.

23           "Are you sure it was 2011?"

24           "Well, maybe 2012, maybe -- I don't -- I don't

25   remember."

710

1        Well, we know it didn't happen in 2012 because she
2   said she went to Kaibab one time and that wasn't when it
3   was.  So is it January of '11?  Or back in 2010?  Thomas
4   isn't in Arizona.  He's in school at Pikes Peak College in
5   the fall of '10, and he's living in the Springs with
6   Duncan.

7        What's the Government trying to prove with Thomas'
8   schooling and loan?  Exhibit 67, 68, and 69.  He applied
9   and was accepted at Pikes Peak Community College, as
10  everybody is who applies.  And he applied for a student
11  loan, was awarded one, and he went to school.  There's
12  nothing fraudulent about it.  And yet we see that loan put
13  on various summary charts.  The IP address chart, the
14  address chart.  Why?  There's nothing fraudulent about it.
15  Agent Ennis told you that.

16        "Did he go to school?"

17        "Yes, he went to school."

18        We know that because we know from DOE that if the
19  student isn't in school, the school has to pay back the
20  tuition and then the school sends a letter to the student,
21  "Now you have to pay us."  And you see many of those
22  letters in all of these files.  None in Thomas.

23        The only summary chart they don't put that on is
24  the loss chart when they're trying to show this $500,000
25  loss.  Thomas isn't there.  It's not fraudulent.

1    The Government gives you literally hundreds and

2    hundreds of pages of FAFSA filings, of printouts from hard

3    drives, the computers, it goes on and on and on.  And it

4    proves beyond any doubt that whoever was operating those

5    three computers in Carr's house or the one computer in

6    Green's house was involved in this loan scheme.  But there

7    is nothing on any of that paper that relates to Thomas.

8    He's guilty because the night that his home he

9    shared with Carr, that she rented and paid for, he and Carr

10   go over to Green and Green says he appears nervous.  And

11   the question he -- she mentioned from the witness stand:

12   "What did he say?"

13   What did Thomas say?  "How did this happen?"

14   He's not -- he's not asking what happened over

15   here.  "How did this happen?"

16   Let's talk about these addresses because the

17   Government stresses them and they're so important.

18   Exhibit 74 gives you the list, as you wade through it, of

19   the 11 addresses.  Remember Monday afternoon, Thomas

20   controls.  1915 Mobile, 4630 South 21st.  Both in the

21   Phoenix area.  Green's uncle and Green's home.  1153 West

22   Dragoon, 724 West Knox.  The Government says these are Diaz

23   addresses.  We don't know how they say that, why they say

24   that, because Diaz never walked through that door.

25   3166 South Mills, Tempe, Arizona.  That relates to

712

Terrel Smith.  The Government says he's a friend of Thomas.
Based on what?  Where's Terrel Smith?  1418 Rushmore,
Colorado Springs.  That's Thomas.

        Now, think about this, ladies and gentlemen:  In
2010, Mr. Thomas applies to go to Pikes Peak Community
College and he applies for a loan and he lists 1418
Rushmore as his residence.  Fast-forward three, four
months, and he's controlling that address, albeit he's in
jail.  And he's knowingly using that address for -- for a
fraud scheme?  That doesn't make any sense.

        2372 Lexington.  The Government says that's
controlled to home of Michelle Green, Carr's good friend.
And remember, 1418 Rushmore, the Government says that's the
home of LaTanya Pitkens, Carr's good friend.  Well, where's
Ms. Pickens and where's Ms. Green?

        3239 Black Hawk Drive, Mr. Sanders' home, Carr's
stepbrother.  Where's Sanders?

        3820 Radiant.  That's where Mr. Thomas lived in
2010.  Again, would you use your home address, give it to
somebody and say, "Go ahead and use it in this fraud
scheme"?

        1063 Rice.  Supposedly Mr. Cox lives there.  The
Government says that's Thomas' cousin.  Well, where are
you, Mr. Cox?

        The Government says these addresses are the key to

1    the whole scheme.  It's what keeps it going.  It's why they

2    had so many.  And yet they don't give you but one

3    witness -- two witnesses, excuse me, Ms. Green and Ms.

4    Mullett, to say how they're tied to a witness.

5         What could the Government have done here?  Well,

6    you see all the handwriting on all these applications.

7    This isn't new science, handwriting exemplars.  Order the

8    man in.  Have him write out one of those applications.

9    Have him write out whatever you want.  The Court can order

10   it done.  Did they?  No.  Not one handwriting comparison.

11        Fingerprinting.  Well, they started that.  They

12   sent a couple of pieces of paper that they had gotten from

13   the search at Kaibab, they sent them into a lab, and they

14   got results.  They said compare -- see if you can find any

15   prints on this paper, and see if they belong to Carr, Diaz,

16   Green, Thomas, Pickens, Grant.  Sure enough, they get two

17   hits:  Carr, Diaz.

18        But the expert in the lab said, "Send me some more

19   known fingerprints.  Reprint Thomas and send those to me.

20   And let me see if I can get matches there."

21        What did they do?  Nothing.

22        I mentioned the jail phone calls earlier.  If he's

23   running the show, ladies and gentlemen, he's got to be

24   talking to somebody on the outside.  They're investigating

25   this in 2012.  We know that.

714

1        They execute a search warrant.  They're talking to

2   Duncan.  And yet there's not one single picture of anybody

3   using one of these cards to get cash at an ATM machine all

4   over Arizona or all over Colorado.

5        You heard this morning the Government say Mr.

6   Thomas snapped his phone in half.  I want you to think

7   back.  I don't believe anyone got on that witness stand and

8   said that.  I don't believe there's any evidence of that

9   before you.

10       It was said that Mr. Thomas sat behind that desk

11  in his office.  Remember that's the picture from Kaibab.

12  He sat there and searched for inmates and filed false

13  FAFSAs.  There's simply no evidence of that, ladies and

14  gentlemen.  Green said, "One time, Pleasant Drive.  I only

15  went to Kaibab once."

16       Green is dropping money off at Kaibab.  There's no

17  evidence of it, ladies and gentlemen.  She went there once.

18  That's what she said.

19       And the statement:  Somebody, somebody came up

20  with this scheme, this fraud scheme.  It doesn't matter

21  who.  Well, ladies and gentlemen, yes, it does matter who

22  because they're asking you to deprive this man of his

23  freedom.  It matters.

24       Go back to the bedrocks.  He's presumed innocent.

25  And until you're convinced beyond a reasonable doubt, that

715

1    presumption never leaves.  It matters who did this.

2          There are simply too many holes, ladies and

3    gentlemen.

4          COURTROOM DEPUTY:  You have two minutes.

5          MR. SMITH:  The evidence on Mr. Thomas, he's --

6    he's not in Arizona in 2010 where Green and Diaz and Carr

7    are.  He's in jail most of '11.  Little or no ties to a

8    vast majority of these addresses.  And so many, so many

9    missing witnesses.

10          I simply go back to Monday afternoon, ladies and

11   gentlemen.  The Government told you, promised you, that

12   this curtain that these conspirators had hung, that they

13   could hide behind and conceal all their criminal acts, that

14   was going to be pulled back and Carr was going to tell you

15   everything about this crime.  Didn't happen, ladies and

16   gentlemen.

17          Read that instruction.  You must rely on the

18   evidence that you heard from that witness stand or you see

19   in the exhibits.  Only that.  You can't guess at what Carr

20   would have said.  You can't assume.

21          I submit to you when you really look at this

22   evidence, the only verdicts that you can return, and I ask

23   you to return, are not guilty.  Thank you very much.

24          THE COURT:  Thank you, counsel.

25          All right, Ms. Paluch, the Government has 14

1   minutes in rebuttal.

2           MS. PALUCH:  Thank you, Your Honor.

3           I'd like to start with what defense counsel calls

4   a side note.  The Dennis Miller text is a side note?

5   Dennis Miller, the inmate in whose name a debit card was

6   issued, which was mailed to Mullett's address, and the

7   defendant tells her, "Mail it to me at Riggs Road."

8           That's a side note?  That's your evidence right

9   there that he's in this scheme.  He's directing Mullett to

10  send him mail that she agreed to receive for him.  That's

11  more than a side note.

12          When he talks about it matters who started the

13  scheme, we've never said it doesn't matter who was in the

14  scheme.  That's what we've been trying to prove.  What we

15  said is whose idea it was.  You know, did Carr come up with

16  this?  Did Green?  That's not one of the elements.  It's

17  who was in the scheme.  It matters who was in the scheme

18  and that's what we've proved to you through this trial.

19          Counsel talked a lot about Diaz.  This is not

20  Diaz's trial.  You have Diaz's plea agreement.  You can see

21  in that plea agreement she agreed that she conspired with

22  this defendant.

23          It says in the instruction on page 18 the fact

24  that another person may also be guilty is not -- is no

25  defense to a criminal charge.  Diaz admitted what she did

717

1    and you can see that in that exhibit, but she's not the one

2    that was found with 52 debit cards in a bag and one in her

3    wallet. She's not the one that manipulated Mullett to let

4    him use her address. She's not the one who was using the

5    computer in room J.

6            Counsel says there's no evidence of that. What

7    about the e-mail communications from Tramell Thomas to a

8    state employee that were found on the computer in room J?

9            She's not the one who had the Sony Vaio in her

10   back seat with all the evidence that the search was being

11   conducted.

12           A lot is being made of Heather Carr. And he's

13   correct, you didn't get to hear from Heather Carr. And the

14   Government told you what it expected to present to you in

15   this trial and we expected to present that testimony. But

16   as we've stated, and as the Court told you before you heard

17   opening statements, the opening statements are not

18   evidence. The defendant lived with Carr during the

19   conspiracy. He used the computers in their houses to look

20   for inmates. You heard Green tell you that they -- the

21   yelling out of the names, the talking about names. He was

22   there when Green brought the fraud money. He's driving

23   around in his car with all of the cards and the one in his

24   wallet.

25           You know, to argue that the Abate card wasn't

718

1   activated so that somehow means that he's not involved in

2   that scheme, how does that make any sense at all?  You

3   heard from the Higher One person there was $4700 waiting to

4   be activated on that card.  I asked her, "How difficult is

5   it to activate?"

6           "It's not difficult.  You make a phone call or you

7   go online.  You take off a sticker."

8           He's walking around with $4700 in his pocket that

9   he can use at any point that he wants to.  The fact that

10  later on when -- when the card wasn't activated that checks

11  were mailed and checks were returned, that doesn't matter.

12  On August 30th, he had money in his pocket just waiting for

13  him to use.

14          But here's the bigger question:  Why does this

15  defendant have debit cards in the names of 53 inmates in

16  his possession at all?  Why would he have a debit card in

17  the name of Manuel Abate in his wallet?  In his wallet.

18  How does that make any sense at all?  If he's not involved

19  in the scheme, he wouldn't be trying to hide the cards from

20  the officer.

21          You heard on the audio the officer said, "I saw

22  you try to move those cards under the seat.  I saw you take

23  them off the back seat."

24          That's guilty knowledge.  That's consciousness of

25  guilt.  He knew.  "If I get caught with these debit cards,

1    I am done for."

2           He knew it.  And he is.

3           Defense says there's no evidence of who broke the

4    phone.  You heard who was in the house during that search.

5    Agent Ennis told you it was Heather Carr and her children.

6    They found the broken phone.  So someone else broke that

7    phone?  Someone else broke the phone with his damning text

8    messages on them?  The phone's found in the closet with the

9    male clothes, exactly where you saw a photo during this

10   trial of the defendant standing.

11          Now, counsel made mention we're speculating or

12   guessing.  We're not asking you to speculate or guess.

13   We're asking you to look at the hard evidence presented

14   here.  Look at the computer evidence, look at the text

15   messages, look at the cards in his possession.

16          Now he talks a lot about Green and how you can't

17   believe her and she didn't know anything.  Do you think if

18   Green's plan was to come into this Court and lie about his

19   involvement, don't you think she would have done a better

20   job of it?  Don't you think she would have said he was more

21   involved than what she said?

22          She said she showed him how to use the FAFSA.  She

23   said he was there when she dropped off the money.  She told

24   you right away off the bat.  Mr. Fields asked, "Who were

25   you involved in this scheme with?"  And she named all of

720

1    the conspirators.

2         We've never disputed the critical role that

3    Heather Carr played in this scheme.  Never.  Certainly

4    she's the one who got the Social Security numbers.  But if

5    they don't have the addresses, how do they get the cash?

6    They can't get the cash.

7         We've never said that this defendant is tied to

8    all 11 addresses.  We have always said that all 11

9    addresses are tied to one of the four conspirators, and the

10   three addresses that come back to this defendant are

11   Radiant Drive, Mullett's address on Meadow Oaks and the

12   Rushmore Drive address that the defendant, himself, used.

13   Those are the three addresses that we've also asserted are

14   tied to him.

15        Talks about the jail recordings.  I mean, Agent

16   Ennis told you they couldn't obtain the jail recordings.

17        Talking about fingerprints.  You know, really,

18   what's the importance of fingerprints here?  The officer

19   saw him move the bag, the cards were taken into evidence in

20   an inventory search of the vehicle.  He's the only person

21   in the car.  What do we need fingerprints -- what do you

22   need fingerprint evidence to establish here?

23        Talked about don't believe a thing that Duncan had

24   to tell you.  She explained why she remembered those text

25   messages and it was because she was earning money and she

1    thought the two of them were going to start a life together

2    and instead he's sending her money to another woman to be

3    with that other woman.  Does that sound like something

4    somebody would recall?

5         Counsel brought up Count No. 2, the mail fraud

6    count, and said that his client was in jail when that FAFSA

7    was submitted.  Take a look at 57-B.  Mr. Omar's FAFSA was

8    submitted to the Department of Education in December of

9    2010, prior to the defendant going to jail.

10        Going back to the jail calls:  Those calls were

11   just no longer available.  There wasn't a lack on the part

12   of the law enforcement of not trying to get those.

13        Counsel indicated that there was no evidence tying

14   this defendant to any of the FAFSAs.  Think about that.

15   None of the conspirators in this case do their names appear

16   on any of these FAFSAs.  That was the whole fraud.  Of

17   course the defendant's name doesn't show up on any of

18   those.  All these FAFSAs at issue that we're talking about

19   were submitted in the names of inmates.

20        He talks about the defendant's name being on Agent

21   Ennis's charts.  His name is on the charts because it shows

22   the address that comes back to him and then we tie that

23   address to the other false submissions.

24        He talks about the stop.  The stop occurred two

25   months before the conspiracy ended.  The stop occurs while

722

1    the conspiracy is going on.  There is -- there is no way to
2    explain why somebody would have that many cards in other
3    people's names in their possession.  And that's why Officer
4    Seal didn't let it go.  That's why he asked over and over
5    and over.  He told you he had never seen anything like
6    that.
7         Perhaps counsel's argument appeared to insinuate
8    that Mullett is behind this, or Mullett was the one
9    bringing this up.  You heard her testify that she needed to
10   make extra money.  She was experiencing a difficult time.
11   And then once she kind of figured out that this didn't
12   sound right, she started sending the letters back.  This is
13   the defendant manipulating another woman in his life to do
14   what he wants them to do.
15        Look at Christine Duncan.  She's making money
16   thinking it's for the two of them.  Look at Mullett.  She's
17   receiving mail for him thinking that she's helping him out
18   and all of a sudden she realizes, "Maybe I shouldn't be
19   doing this."
20        Counsel concedes that Green says one time, one
21   time she helped him with the FAFSA.  We submit that's
22   enough.  That's enough, but you have so much more than
23   that.
24        Talked about the loans that the defendant took out
25   to go to Pikes Peak Community College.  We submitted that

723

1  evidence to you to show -- to tie him to that address.

2          Excuse me one second.

3          Counsel talked to you about aiding and abetting

4  and I'd ask that you go back to the instruction.  And what

5  we're required to prove there somebody else committed the

6  crime and that the defendant helped the person commit the

7  crime as something he wished to bring about.  And we've

8  told you his involvement and that is those addresses, and

9  those addresses being used while he's in prison for the

10 receipt of the cards that he's later found out -- found

11 with.

12         COURTROOM DEPUTY:  You have two minutes.

13         MS. PALUCH:  Thank you.

14         Now, the argument of defense is you can't believe

15 anything that the women say.  Don't believe a thing that

16 they say.  Even if you don't believe them, look at all the

17 physical evidence.  Look at Agent Ennis's investigation,

18 how it corroborates, it supports what they told you.  The

19 text messages, the computer evidence, the searches

20 performed.  The cards, themselves.  All of that convicts

21 this defendant of each and every offense charged.

22         Members of the jury, sometimes in life things

23 might seem too straightforward and you ask yourself, "What

24 am I missing?  There must be a catch."  You're not missing

25 anything.  There is no catch.  The evidence in this case is

724

1    that clear.

2           The Government's job was to present that clear

3    evidence to you, to make your job less difficult.  Not

4    easy, because there is nothing about a criminal trial that

5    is easy.  But you took an oath to consider all of the

6    evidence and to apply the law as given to you by the Court,

7    proof beyond a reasonable doubt, not all possible doubt.

8    And after you carefully and impartially consider all of the

9    evidence that was presented, what does your reason and your

10   common sense tell you?  It tells you that this defendant is

11   guilty of all charges beyond a reasonable doubt.  Thank

12   you.

13          THE COURT:  Thank you, Ms. Paluch.

14          Okay.  Members of the jury, you will remember at

15   the beginning of the trial I informed you that the law

16   prescribes that in a criminal trial such as this one, there

17   will be 12 jurors that deliberate the case to a verdict and

18   one alternate.  The alternate is included in case one of

19   you becomes ill or for some other reason cannot hear all of

20   the evidence.

21          So it's come time for me to dismiss the alternate.

22   At this time, I'm going to release Mr. Kemmis.  I know I

23   can just -- you can -- hold tight there, because you're

24   going to go back with the rest of your colleagues -- I know

25   I speak on behalf of both parties and all lawyers and the

1    Court when I thank you, Mr. Kemmis, for your service and

2    the time that you've taken out of your life and your

3    obligations to be with us this week.

4         In a moment, you're going to return to the

5    deliberation room with your colleagues, and at that time,

6    you should collect your belongings, give your badge back to

7    Ms. Hansen, but -- and make sure that she has your mobile

8    cell phone number before you leave home.

9         Please continue not to talk about this case or do

10   any independent research into this case until you hear from

11   us that a verdict has been returned. The reason being, and

12   this has already happened in one of my criminal trials, the

13   deliberations will start, but something can happen when one

14   of the 12 either physically cannot or for other reasons

15   does not complete his or her deliberations, in which case

16   you would be recalled to come back and fill in for the --

17   that missing juror. And like I said, believe it or not,

18   that has happened.

19        So please do not look at the media, research

20   anything or talk to anyone about this case.

21        Okay. As to the remaining 12 of you, in a few

22   moments you are going to be escorted back to your

23   deliberation room to begin your deliberations and, finally,

24   finally, you're able to talk about this case among

25   yourselves, but only when all 12 of you are present at the

726

1    same time.

2          To ensure that your deliberations are private, a

3    court security officer will serve as a bailiff and he will

4    be present outside the jury room to ensure that you are not

5    interrupted or disrupted by anyone.  Also, the bailiff will

6    collect all of your cell phones during the time that you

7    are deliberating.

8          You will now be able to take your notes that you

9    have been taking during the course of this trial back with

10   you to the deliberation room.  As I mentioned before,

11   you're each going to get your own personal set of jury

12   instructions, so those should be back in the deliberation

13   room when you go back there.

14         After a few moments, or a few minutes after the

15   lawyers and Ms. Hansen have an opportunity to physically go

16   through the binders of exhibits to make sure that only that

17   which has been admitted into evidence are in those binders,

18   those binders will be brought to you in the deliberation

19   room and you'll have all the exhibits that have been

20   admitted into evidence.

21         And, finally, I need to tell you, or should tell

22   you, that today there is such a thing as a free lunch.

23   Lunch will be brought to the deliberation room so you can

24   continue your deliberations without interruption.

25         All right.  Will the court security officer please

1    come forward.  Ms. Hansen, please administer the oath to

2    the court security officer.

3         (court security officer sworn in)

4         THE COURT:  All right, members of the jury, if

5    you'll follow the bailiff.

6         (Jury left at 11:26 a.m.)

7         THE COURT:  All right, counsel, will you please,

8    if you haven't already, provide Ms. Hansen with your mobile

9    phone numbers in the event we get a question from the jury

10   and also, obviously, to advise you when we have a verdict.

11        I'm going to ask the lawyers not to go further

12   than 15 minutes from the courthouse so we can promptly

13   re-assemble in case there is a question or a verdict.  My

14   practice is is that if we do not have a verdict by 5:00,

15   Ms. Hansen will call your offices and let you know that.

16   We will release the jury at 5:00.  There's no need for you

17   to come back to the courtroom.  We'll just release them and

18   tell them to come back tomorrow morning at the usual time.

19        I would ask if that happens, that you do come back

20   tomorrow morning.  We'll bring them out for 30 seconds to

21   make sure all 12 are present and accounted for, and then

22   we'll send them back to the deliberation room to continue

23   their deliberations.

24        Once I go off the bench right now, as you just

25   heard me tell the jury, please stick around for a few

728

1    minutes and go through those physical court -- the physical

2    exhibits in the court binders and the loose exhibits to

3    make sure that only that which has been admitted into

4    evidence goes back to the deliberation room.

5         I want to thank counsel for their professionalism

6    and zealous representation of their clients.

7         All right.  We will be in recess until we have a

8    question for the jury -- from the jury or we have a

9    verdict.

10        (Recess taken at 11:28 a.m.)

11                    AFTERNOON SESSION

12        (In open court outside the presence of the jury at

13   3:05 p.m.)

14        THE COURT:  The record will reflect that all

15   counsel and both parties are present.

16        All right.  At 2:30 today, November 30th, I

17   received the following:  A note to the Court:  We the jury

18   have a question.  The question being:  If something

19   fraudulent is mailed, under the law, is it true that anyone

20   in possession of that item is aiding and -- I guess they

21   meant to say aiding and/or abetting -- in the fraudulent

22   crime?  Signed by -- it looks like Mr. Prosser is our

23   foreperson.

24        All right, I'll take input from the Government as

25   to its preferred response from the Court.

1          MR. FIELDS:  Thank you, Your Honor.  We would

2     propose the following response:  No, but you may consider

3     that evidence in addition to all the other evidence when

4     evaluating whether the defendant is guilty of aiding and

5     abetting.  And I would refer you, ladies and gentlemen,

6     again, to the instruction on page 27.

7          THE COURT:  All right.  Hear from the defendant.

8          MR. GOODREID:  Now, Mr. Fields, can I see the

9     instruction, please?

10          Your Honor, I'd like to give the defense's

11     position in order of priority.  Our first -- our first

12     response would be just no.  I think that's a correct

13     statement of the law.  The mere possession of a fraudulent

14     item, whether it's a product of mail fraud or anything

15     else, is not by itself a crime.  So our first response

16     would be no.

17          THE COURT:  Okay.

18          MR. GOODREID:  If the Court is inclined to give

19     any part of the Government's instruction, we would

20     advocate:  No, but you may consider that evidence when

21     evaluating whether the defendant is guilty of aiding and

22     abetting.

23          The key here is we would eliminate the language,

24     "in addition to all the other evidence."  I think that's

25     almost argumentative, go back and look at everything else.

730

1   And we certainly would not want then to read the

2   instructions again.  They have the instructions.  So is --

3   you know, before the Court's question, is my position at

4   least clear?  First would be no --

5          THE COURT:  Yes.

6          MR. GOODREID:  -- and then second would be, "But

7   you may consider that evidence when evaluating whether the

8   defendant is guilty of aiding and abetting," period.

9          THE COURT:  Generally it's my practice with these

10  type of substantive questions to tell the jury I can't

11  answer the question and they're directed to the Court's

12  instructions, and requested to apply the law as best they

13  can to the facts as they determine it.

14         The exception to that practice is when parties can

15  agree to a response that I think comports with the law.

16  And then I'll -- I at least seriously consider putting that

17  in the response.  Sounds like the two of you at least agree

18  on the first word, "No."  And then you have a disagreement

19  beyond that.

20         Is there an agreement from the parties that if

21  that is all that I put on the response or the answer form,

22  that that would not be objectionable to the -- or let me

23  put it in the positive as opposed to the negative -- would

24  the Government object to the Court, in lieu of what I said

25  is my normal practice, respond merely by stating "No"?

731

1          MR. FIELDS:  Your Honor, we would object.  And the
2     reason for that is we think that this is both a legal and
3     an evidentiary question.  And if you were to say "no," then
4     it might have the effect of de-emphasizing that particular
5     piece of evidence in their deliberations in a way that's
6     unfair to the Government.
7          THE COURT:  All right.  Well, then we don't have
8     an agreement between the parties, so --
9          MR. GOODREID:  Your Honor, may I inquire sort of
10    openly of the Government, if the Government would meet us
11    halfway and at least meet me on my secondary position?
12         MR. FIELDS:  We would, Your Honor.
13         THE COURT:  Let's do this.  Why don't I take a
14    very brief recess.  Let's see if you folks can come up with
15    the language, and I'll give you five minutes.  If you don't
16    have an agreement by then, I'll come back out in five
17    minutes.  And if you do before five minutes, let Deb know
18    so she can let me know and then I'll -- write it down on
19    one of these and then I'll look at it, and then consider
20    whether to give it to the jury.
21         We'll be in recess.
22       (Recess taken 3:09 p.m. to 3:14 p.m.)
23         THE COURT:  All right.  It appears that the
24    parties have reached an agreement as to the Court's
25    response to the question.  I've reviewed it and I find that

732

1    it comports with the law and I will respond to the

2    foreperson using the language that the parties have agreed

3    to.  So let me just state it again for the record and then

4    we'll put on the record that you stipulate that that is an

5    appropriate response to the foreperson.

6           The answer being:  No, but you may consider that

7    evidence when evaluating whether the defendant is guilty of

8    aiding and abetting, period.

9           Does the Government stipulate to that response to

10   the jury?

11          MR. FIELDS:  We do, Your Honor.

12          THE COURT:  Does the defendant stipulate?

13          MR. GOODREID:  Yes, Your Honor.

14          THE COURT:  All right.  Let me fill out this form.

15   And we will get it back to them so they can continue.

16          While I'm writing this, you folks know about the

17   attorney lounge on the third floor?  Okay.  So that you

18   don't have to be hanging out in these rooms out here, if

19   you were necessarily, or in the courtroom.  That's another

20   place you can be waiting in addition, of course, to your

21   offices.

22          All right.  I'm signing it today, the 30th of

23   November, 2017, at 3:16.

24          All right.  Ms. Hansen will give this form back to

25   the jury.  We'll be in recess until there's another

692

733

1    question or we have a verdict.

2        (Recess taken at 3:17 p.m. to 3:43 p.m.)

3        THE COURT:  Okay.  The record will reflect that

4    all counsel and both parties are present.

5        At 3:30 today, November 30th, 2017, I received the

6    following note to the Court:  We the jury have reached a

7    verdict, and signed by the foreperson.

8        All right.  Let's bring in the jury.

9        (Jury was present at 3:45 p.m.)

10       THE COURT:  Okay.  I've been informed by a note

11   from the jury's foreperson that the jury has reached a

12   verdict in this case.  Will the jury foreperson please

13   stand to be identified.  All right.  Mr. Prosser.

14       Has the jury reached a unanimous verdict in this

15   case?

16       THE FOREPERSON:  Yes, Your Honor.

17       THE COURT:  Have you, as the jury foreperson,

18   signed and dated this verdict form?

19       THE FOREPERSON:  Yes, Your Honor.

20       THE COURT:  All right.  Will you please hand the

21   verdict form to the bailiff, who will hand the verdict form

22   to me.

23       All right.  I will now read the jury's verdict.

24       In the matter of criminal case No. 16-cr-052,

25   defendant -- 054, No. 2, WJM, United States of America,

734

1    plaintiff, versus Tramell Thomas, defendant.

2         Verdict form.  Count 1:  We, the jury, upon our

3    oaths, do unanimously find the defendant, Tramell Thomas,

4    in Count 1 of the indictment:  Guilty.

5         Count 2:  We, the jury, upon our oaths, do

6    unanimously find the defendant, Tramell Thomas, in Count 2

7    of the indictment:  Guilty.

8         Count 3:  We, the jury, upon our oaths, do

9    unanimously find the defendant, Tramell Thomas, in Count 3

10   of the indictment:  Guilty.

11        Count 4:  We, the jury, upon our oaths, do

12   unanimously find the defendant, Tramell Thomas, in Count 4

13   of the indictment:  Guilty.

14        Count 5:  We, the jury, upon our oaths, do

15   unanimously find the defendant, Tramell Thomas, in Count 5

16   of the indictment:  Guilty.

17        Count 6:  We, the jury, upon our oaths, do

18   unanimously find the defendant, Tramell Thomas, in Count 6

19   of the indictment:  Guilty.

20        Count 7:  We, the jury, upon our oaths, do

21   unanimously find the defendant, Tramell Thomas, in Count 7

22   of the indictment:  Guilty.

23        Dated the 30th day of November, 2017, signed by

24   the jury foreperson, Derek Prosser.

25        All right.  Is there a request from the Government

735

1    for me to poll the jury?

2              MS. PALUCH:  Yes, Your Honor.

3              THE COURT:  All right.  Members of the jury, when

4    I call out your name, will you please stand.

5              Okay.  Rachelle Saxton.  Ms. Saxon, is this your

6    individual verdict in all respects?

7              THE JUROR:  It is, Your Honor.

8              THE COURT:  Thank you.  Ms. German, is this your

9    individual verdict in all respects?

10             THE JUROR:  Yes, sir.

11             THE COURT:  Thank you.  Ms. Bator, is this your

12   individual verdict in all respects?

13             THE JUROR:  It is, Your Honor.

14             THE COURT:  Thank you.  Mr. Fritzler, is this your

15   individual verdict in all respects?

16             THE JUROR:  Yes, Your Honor.

17             THE COURT:  Thank you.  Mr. Dow, is this your

18   individual verdict in all respects?

19             THE JUROR:  Yes, sir.

20             THE COURT:  Thank you.  Ms. Conley, is this your

21   individual verdict in all respects?

22             THE JUROR:  Yes, sir.

23             THE COURT:  All right.  Mr. Prosser, is this your

24   individual verdict in all respects?

25             THE JUROR:  Yes, Your Honor.

736

1           THE COURT:  Thank you.  Ms. Kirton, is this your
2      individual verdict in all respects?
3           THE JUROR:  Yes, Your Honor.
4           THE COURT:  Thank you.  Mr. Scott, is this your
5      individual verdict in all respects?
6           THE JUROR:  It is, sir.
7           THE COURT:  All right.  Ms. Opie, is this your
8      individual verdict in all respects?
9           THE JUROR:  Yes, Your Honor.
10          THE COURT:  Thank you.  Mr. Jackson, is this your
11     individual verdict in all respects?
12          THE JUROR:  Yes, Your Honor.
13          THE COURT:  Thank you.  And, Ms. Tacha, is this
14     your individual verdict in all respects?
15          THE JUROR:  Yes, Your Honor.
16          THE COURT:  All right.  Thank you.
17          Okay, ladies and gentlemen of the jury, you've now
18     completed your duties as jurors in this case and you're
19     discharged with the considerable thanks and appreciation
20     not just from the Court, but I know also on the part of the
21     parties and their lawyers.  We greatly appreciate, all of
22     us do here in court, your time, your effort and your
23     service here on the jury and that you've taken a four-day
24     interruption of your lives to help us continue this system
25     of justice we have in this country.

1        I hope you're not in too much of a hurry to leave

2   us because I ask those of you who can to stick around in

3   the deliberation room for a few minutes.  I and Mr. Foster,

4   my law clerk, would like to join you back there to discuss

5   the case a little bit, the trial a little bit with you, and

6   also to give you the Court's certificates of appreciation

7   for your service during these last four days.

8        It will be a few -- you'll have to be patient, it

9   will be a few minutes because we have to tend to a matter

10  that only the -- once again, only the lawyers and the

11  parties can do this with me outside of your presence.  But

12  if you'll be patient, Mr. Foster and I will get back to you

13  as soon as we can.

14       You are now probably wondering whether you can

15  finally discuss this case with others.  I should tell you

16  that the local rules of the Court prohibit the parties in

17  this case from contacting you.  I have, however, given the

18  lawyers in this case permission to speak to those of you

19  who wish to speak with them.

20       This discussion will happen, if at all, after I've

21  met with all of you and I'll explain to you in the

22  deliberation room how this process works if you are open to

23  coming back into the courtroom and speaking with the

24  lawyers.

25       Apart from that, whether you talk to anyone about

Case No. 1:16-cr-00054-WJM Document 453 Filed 08/09/19 USDC Colorado pg 698 of 901

738

1    your service on this jury is entirely your own decision.

2    You may talk with others as much or as little as you like

3    about your deliberations or the facts that influence your

4    decision.

5            If any person persists in discussing -- in

6    attempting to discuss this case with you over your

7    objection and you do not choose to discuss this matter with

8    them, or becomes critical of your service either before or

9    after any such discussion has begun, please report it to

10   Ms. Hansen who will let me know about it and I'll do what I

11   can to bring it to an end quickly.

12           All right.  The jury is now discharged.

13       (Jury left at 3:52 p.m.)

14           THE COURT:  Let's take care of the quick thing

15   first -- hopefully quick -- is to set a sentencing date.

16   If counsel will bring out their -- get out their schedules

17   and we'll see what -- I am looking at the middle of April.

18   What works best for me is the Thursday, April 12th, or

19   Friday, April 13th.  Is the Government available on either

20   of those dates?

21           MS. PALUCH:  Yes, Your Honor.

22           THE COURT:  All right.  How about the defendant?

23           MR. SMITH:  That's fine, Your Honor.

24           THE COURT:  All right.  All right.  So let's set

25   this, then, for Thursday, April 12th, at 9:30 a.m.

1          All right.  We now have to deal with the

2     application of Section 3143, given that the defendant is

3     out on bond and I have to make a decision as to whether to

4     continue that bond or order that the defendant be taken

5     into custody at this time.

6          Under 3143, given the guilty verdict, the burden

7     is now on the defendant to show by clear and convincing

8     evidence that the defendant is not likely to flee nor does

9     he pose a danger to the safety of any other person or the

10    community within the meaning of Section 3143(a)(1).

11         So I will hear from the defendant first in terms

12    of -- well, first let me ask:  Does the Government have an

13    objection to the defendant remaining on bond?

14         MS. PALUCH:  We do, Your Honor.

15         THE COURT:  All right.  So then we'll have to go

16    through this.

17         All right.  I'll hear from the defendant in terms

18    of the factors of 3143 and whether clear and convincing

19    evidence exists for me to allow the defendant to remain

20    free on bond.  Mr. Smith.

21         MR. SMITH:  Thank you, Your Honor.  Your Honor, in

22    looking back through the docket in this case, I noted that

23    Mr. Thomas was originally released on his own recognizance

24    March 8th of 2016.  If my rough calculation is correct,

25    that's some 632 days ago.  He has appeared at every court

740

1    appearance.  He has resided in Phoenix where he resided

2    when he was -- when he surrendered.

3            He has complied, it's my understanding, with all

4    requirements of the pretrial release program.  Your staff

5    gave to me this morning the release status report to the

6    Court, which indicates that he has been totally compliant

7    with supervision.

8            That length of time, Your Honor, facing these

9    charges, the type of case that the Government had,

10   certainly I would think that his compliance with the

11   Court's directive to appear on the date set is very

12   indicative of what he would do in the future.

13           As to danger, in my experience, what the Court is

14   looking at here is the potential for harm -- criminal harm

15   to the public.  The crime here ended -- Count 1, the charge

16   ended in October of 2012, over five years ago.  I don't

17   believe the record shows that my client has had any contact

18   with law enforcement or the criminal justice system, state

19   or federal, during that time period.

20           Certainly, he is no stranger to the criminal

21   justice system.  He finished his parole term on his

22   Colorado convictions, state convictions, I believe in

23   mid-2012 and he completed it successfully.

24           I don't think there's any evidence to show that he

25   is a danger to the community, and certainly his reporting

1  record on this case I think gives the Court every

2  indication that he would continue.  I also note from the

3  release status report to the Court that I was provided this

4  morning that the recommendation of pretrial release is that

5  he be continued on release pending sentencing.  And we

6  would so request.

7  THE COURT:  Let me ask you, I believe it's a

8  standard condition in this Court, but just to confirm, to

9  your knowledge, has your client surrendered his passport?

10  MR. SMITH:  I believe that was done some time

11  ago.

12  THE COURT:  Okay.  That was my understanding,

13  that's a standard condition.  Anything else you wish to

14  say?

15  MR. SMITH:  I have nothing unless the Court has

16  further questions of me.

17  THE COURT:  All right.  Is it -- the pretrial

18  service report that was prepared on March 8th, 2016,

19  indicates -- and correct me if I'm wrong, Mr. Smith -- I'm

20  looking at the criminal history of your client that's

21  reflected in this document, sometimes it's not perfectly

22  accurate, but that the last conviction suffered by your

23  client was in Las Animas County, Colorado, February 2006, a

24  guilty plea.  Is that your understanding?

25  MR. SMITH:  My understanding is that conviction

742

1    was in 2003, Your Honor.  It was a crime that was incurred

2    while he was incarcerated in the Department of Corrections

3    in Colorado.

4         THE COURT:  All right.  So I'm just -- I'm reading

5    a report with respect to a three-count indictment against

6    the defendant filed in state charges in September of 2005

7    in Las Animas County, Counts 2 and 3 were dismissed and

8    that your client pled guilty to Count 1, smuggling

9    contraband into prison in February of -- February 10th,

10   2006.

11        MR. SMITH:  That is the conviction, Your Honor.

12   And I apologize to the Court, I'm not familiar with that

13   report.  I wasn't counsel for Mr. Thomas when that report

14   was prepared.  But I -- we do readily acknowledge that is

15   his second felony conviction in the state of Colorado,

16   correct.

17        THE COURT:  Okay.  Do you want to speak to

18   connection to the community in terms of family, employment,

19   matters of that nature?

20        MR. SMITH:  Well, Your Honor, Mr. Thomas has

21   resided in the Phoenix, Arizona, area since 2012.  His

22   father and stepmother reside in the area.  He's employed in

23   the area.

24        THE COURT:  Where is he employed and what is he

25   employed as?

743

1          MR. SMITH:  He's employed as a sales

2     representative, Your Honor.  And if I may have one moment

3     so I make sure I get the name of the company correct.

4          THE COURT:  Sure.

5          MR. SMITH:  The company name is MSI, Inc., Your

6     Honor.  It is in the -- it's a company that its business

7     is -- revolves around the solar energy industry.  Mr.

8     Thomas has been employed there for several years selling

9     mostly in the wholesale area.

10          THE COURT:  The two children that your client has

11     with Ms. Carr, where are they?

12          MR. SMITH:  I believe they're with Ms. Carr, and

13     my understanding --

14          THE COURT:  And where is she?  Apart from what

15     happened this week, where is she?

16          MR. SMITH:  I believe she's in Virginia.  That's

17     the last we knew of.

18          THE COURT:  Okay.  All right.  Thank you.  I'll

19     hear from the Government.

20          MS. PALUCH:  Thank you, Your Honor.  It's the

21     Government's position that the defendant cannot carry his

22     burden to establish that he should be released after this

23     conviction.  Specifically, the defendant is facing --

24     first, I'd like to address the likelihood -- or the risk of

25     the defendant fleeing.  The Government has calculated the

744

1    base offense level after this conviction as a 30, criminal

2    History Category III, facing a guideline range of 121 to

3    151 months in prison.

4            While it is true that the defendant has appeared

5    for his court appearances prior to trial, the situation is

6    completely different now that the defendant has been

7    convicted of a federal felony and is facing such a

8    sentence.

9            Additional support for the Government's argument

10   regarding flight risk is found in statements of certain

11   witnesses.  We have copies of those; they've already been

12   provided in discovery.  But for interest of time, I'm going

13   to go ahead and make a proffer for the Court.

14           Vanessa Lopez told investigators that at the time

15   this case was being investigated, she said if Thomas knows

16   about this investigation, he will be long gone by now.  He

17   will not go back to prison and he will not go back without

18   a fight.

19           Witness Christine --

20           THE COURT:  That hasn't turned out to be true.

21           MS. PALUCH:  Absolutely, Your Honor, but I'm just

22   reciting --

23           THE COURT:  Why are you reading to me comments

24   about someone's opinion about what's going to happen when,

25   in fact, the opposite happened?

745

1          MS. PALUCH:  Well, Your Honor, what I'm saying is

2     is there --

3          THE COURT:  Ms. Paluch, please don't interrupt

4     me.

5          MS. PALUCH:  I'm sorry.

6          THE COURT:  If Ms. Lopez's statement had any

7     validity at all today, November 30th, 2017, then the

8     defendant would not have come back here freely on his own

9     to another state and for his trial.  So, you know, her --

10    what she said -- what you read to me isn't worth the paper

11    it's written on.  So go ahead.

12         MS. PALUCH:  I will go ahead, Your Honor.  Thank

13    you for that.

14         What I'd like to point out is that this defendant

15    was indicted in -- on February 8th of 2016.  One of his

16    conditions of his release, which, of course, was in

17    Arizona, we had sought detention, he was released in

18    Arizona, was that he not have any contact with any

19    witnesses or any individuals involved in this matter.

20         In April of 2017, Marcelle Green indicated that in

21    approximately -- she reported that in November of 2016,

22    Tramell Thomas went to her uncle's home on 21st Place in

23    Phoenix, Arizona.  He was looking for Green, and he left

24    his phone number with her uncle.  Green never contacted

25    him.

1      We had learned --

2            THE COURT:  That's a condition of the pretrial

3      release?

4            MS. PALUCH:  Correct.

5            THE COURT:  Well, then why does his supervising

6      officer tell me in a filing I received yesterday, and I

7      shared with both -- with all counsel this morning,

8      according to his supervising pretrial service -- pretrial

9      services officer, Jason Cohen, in Arizona, that he has been

10     in full compliance with all conditions of release?

11           MS. PALUCH:  And I don't believe that the officer

12     in Arizona is aware of all the facts that the Government

13     has in its possession.  After we became aware of this

14     information, we contacted Mr. Smith and told him that if

15     the defendant contacted any more witnesses in this case, we

16     would seek to revoke his bond.

17           We learned in trial prep with Ms. Kimmisha

18     Mullett, when she arrived in Denver, that the defendant had

19     contacted her after the hurricanes, just recently, and

20     spoke -- spoke to her about this case.  He said he knew

21     that she had been subpoenaed.  He told her that the charges

22     in the case had been dropped down from 20-something charges

23     down to about five or six.  He knew she was coming to

24     Denver to testify.

25           That's a complete violation of the conditions of

1    his bond in having contact with a subpoenaed Government

2    witness.

3          THE COURT:  And what is the evidence you're -- I

4    know you're making a proffer, but what is the source of

5    your proffer?

6          MS. PALUCH:  My source of that proffer is meeting

7    with Kimmisha Mullett.  And when we asked if she'd had

8    contact with the defendant she said yes, she had.  And that

9    on occasion, she and the defendant speak.  And he called

10   after the hurricanes to inquire, and they discussed the

11   case.

12         In discussing the case with the Government

13   witness, he knew she had been subpoenaed to testify on

14   behalf of the Government.

15         We, in trial prep -- this is the information

16   received from Ms. Carr -- on three separate occasions, a

17   strange man came to her door.  On the third occasion she

18   answered the door.  The individual said, "You are

19   testifying against Marcie.  Make sure you do not say

20   anything about anyone else."

21         THE COURT:  Well, she could hardly describe a

22   strange man to the father of her two children.

23         MS. PALUCH:  Well, no, this was an individual she

24   did not know.

25         THE COURT:  All right.  So you're not --

748

1          MS. PALUCH:  I'm not claiming that it was the
2     defendant that showed up --
3          THE COURT:  What evidence do you have --
4          MS. PALUCH:  I don't --
5          THE COURT:  Please don't interrupt me.
6          What evidence do you have that the defendant was
7     the person that caused this strange person to come at Ms.
8     Carr's residence?
9          MS. PALUCH:  I do not have any, Your Honor.
10          THE COURT:  All right.  Go ahead.
11          MS. PALUCH:  The next item, it's in discovery, it
12     is an item that we retrieved off of the defendant's phone.
13     And this is an item that Alison Stailey recovered, and it
14     is from the defendant's phone.  He says, "I love it out
15     here.  I swim in my pool every day.  I go to the shooting
16     range, casino's be crackin'."
17          We uncovered on his phone a picture of an
18     individual at a shooting range with a firearm.  It is from
19     the back.  I can't -- we cannot identify that it is the
20     defendant, but combined with the text message, given
21     that -- this defendant's prior criminal history, that is
22     concern.
23          We have reason to believe -- I haven't even gotten
24     to the -- the other parts of the defendant's criminal
25     history, but I think the Court is aware of his prior

1    convictions of robbery, other convictions that he does

2    have.

3            We have reason to believe that the defendant has

4    lied to his parole officer in Arizona.  The evidence that

5    we have for that is found in Government's Exhibit 15 that

6    was admitted at trial.  In those text messages to Kimmisha

7    Mullett, there is an entry, "Can you send me a check stub

8    from May 3d to June 3d, like $2200?  This will be my last

9    one.  I got one month and then I'm off everything."

10           What he reported to his Arizona Department of

11   Corrections parole officer is that he was employed by 911

12   Designs.  That is the company that Kimmisha Mullett said

13   was her company.  She testified she did not employ this

14   defendant.  It states in the Arizona Department of

15   Corrections notes that have been turned over that that's

16   the place of the defendant's employment.

17           Notably in these correction notes, on 9-27 of

18   2012, the defendant met with his parole officer -- and this

19   is one month after his arrest by the Tempe Police

20   Department -- it states here that "the offender reports no

21   police contact."

22           He had been arrested, he had been kept overnight,

23   had court appearance the next morning, and a month later he

24   reports to his parole officer he's had he no contact.

25           Based on all of these factors, Your Honor, we do

1    not believe that the defendant can establish his burden of

2    proving by clear and convincing evidence that he will

3    comply with orders of the Court now that he's facing such a

4    significant prison sentence and we would ask for his

5    remand.

6            THE COURT:  Would you agree with me, just so we

7    know what subsection of 3143 we're talking about, that this

8    conviction does not come under 3143 A-2?

9            MS. PALUCH:  Yes, Your Honor.

10           THE COURT:  All right.  So that the factors and in

11   the standards applicable to (a)(1) is what applies here.

12           MS. PALUCH:  That's correct, Your Honor.

13           THE COURT:  Okay.  Thank you.  Since it's the

14   defendant's burden, I'll give the defendant an opportunity

15   for a reply.

16           MR. SMITH:  Thank you, Your Honor.

17           I guess let me respond in order.  And I won't

18   waste the Court's time with the Lopez allegation.  This

19   alleged contact with Green, the witness Green in November

20   of 2016, is not with Marcelle Green.  It's alleged to be

21   that Mr. Thomas stopped by her home and talked to her

22   father.  He supposedly left his phone number.  Nothing has

23   ever been found.  When the man was interviewed, he didn't

24   remember it.

25           I asked Ms. Green on the stand, part of her plea

751

1    agreement was to provide the Government any papers --

2    evidence she had.  She provided none.

3         The Mullett contact and her -- his work with Ms.

4    Mullett, I asked her on the witness stand if Mr. Thomas had

5    not worked as a sales rep for her for an extended period of

6    time, she said yes, and she paid him based on his sales.

7         I don't know what to say about this Carr thing.

8    It doesn't -- it doesn't relate to Thomas.  It's talking

9    about Green.  I -- I don't know how it relates to my

10   client.

11        As far as his parole situation, he was terminated

12   from parole in the summer of 2012, successfully.  There

13   were no violations.

14        As to this shooting range incident, the Court saw

15   pictures of my client going back to at least 2012 in

16   Phoenix in this case.  I'm familiar with the picture that

17   the Government is relying on, I'm sorry I don't have it

18   here today, but what I can tell this Court as an officer of

19   the Court is the picture is of a man holding a gun

20   shooting.  His back is to the camera.

21        What you can clearly see in that picture is a man

22   has hair on the top of his head.  My client has had a

23   shaved head going back to at least 2012.  I think we met

24   our burden.  I think we showed that he has complied with

25   the Court's order, and we've showed that he's not a danger

752

1    to the community.  I'd ask for a continued release.

2              THE COURT:  All right.  I'm prepared to rule.  I'm

3    going to enumerate the factors that I find to be material

4    to my decision.

5              The first is that the defendant has been on bond,

6    as counsel has stated, for 632 days and, according to his

7    supervising parole officer -- or pretrial services officer,

8    rather, according to Officer Cohen, the defendant has been

9    and is currently in complete compliance with the terms of

10   his pretrial release.

11             I find it material that the crimes of conviction

12   are not violent and they are not drug-related crimes.  The

13   last conviction for this -- while this defendant does

14   have -- as counsel's stated, he's not unfamiliar with the

15   criminal justice system, I note for the record that a

16   number of these convictions were when he was a teenager or

17   age 20 years old, and that the last conviction this

18   defendant suffered before today was at age of 26 in

19   February of 2006.  So it's been almost 12 years that --

20   according to the record that's available to me, that the

21   defendant has been -- has not been convicted of any crime

22   for the last 12 years.

23             It's -- I give considerable weight to the fact

24   that knowing what the defendant was facing, that he

25   voluntarily came at his expense to another state back here

753

1    to Colorado to stand for his trial.  I think if he were

2    going to flee, he would have probably thought very strongly

3    about it sometime between the time he was first arraigned

4    632 days ago and today.

5            I note that he is full-time employed and he has

6    parents and other family members in the Phoenix area where

7    he resides.

8            I find, therefore, under Section 3143(a)(1) and

9    Rule 46(c), that -- by clear and convincing evidence, that

10   the defendant is not likely to flee nor does he pose a

11   danger to the safety of any other person or the community

12   within the meaning of that rule or that statutory

13   provision.  I will allow the defendant to remain free on

14   bond until the sentencing hearing.  All conditions set

15   forth in the magistrate judge's order setting conditions of

16   release shall continue to apply.

17           Mr. Thomas, let me speak directly to you.  You

18   need to know that should you fail to return to Colorado on

19   April 12th for your sentencing, that that, itself, will be

20   a separate and new federal felony crime, and which would

21   just be tacked on if you were convicted of that to

22   everything else you're going to get today.  So that you

23   have a -- first of all, are you -- do you understand that?

24   Are we clear on that?

25           THE DEFENDANT:  Completely.

754

1          THE COURT:  And that, secondly, some of what Ms.

2     Paluch was referring to was of some concern to me.  I think

3     if she had some stronger, more direct evidence of it, I

4     think I might have ruled differently today, but it was very

5     indirect and attenuated evidence that I heard on these

6     points.  But the best advice I can give you, in addition to

7     showing up on April 12th, is that you follow all the

8     conditions of the magistrate judge's order setting your

9     conditions of release to the T.

10          THE DEFENDANT:  Yeah.

11          THE COURT:  Because if you give any cause to your

12     supervising officer to file with me a report that you're

13     not in compliance with those conditions, then I will, upon

14     motion of the Government, re-examine this question.

15          THE DEFENDANT:  May I speak?

16          THE COURT:  You may.

17          THE DEFENDANT:  Thank you, Your Honor.  You've

18     been very fair to me.  I respect that.  I would definitely

19     be here at sentencing or any other obligations you guys

20     want me to go through.  I'll be here.

21          THE COURT:  All right.  Thank you.

22          All right.  There's -- is there anything further

23     from the Government at this time?

24          MS. PALUCH:  No, Your Honor.

25          THE COURT:  All right.  Anything further from the

755

1      defendant?

2              MR. SMITH:  No, Your Honor.

3              THE COURT:  All right.  The trial's concluded and

4      the Court is adjourned.

5          (Proceedings concluded at 4:20 p.m.)

6

7                              **INDEX**

8      Item                                              PAGE

9      JURY INSTRUCTIONS READ TO THE JURY:               655

10     CLOSING ARGUMENTS:

11     By Ms. Paluch                                     680
       By Mr. Smith                                      697
12     By Ms. Paluch                                     716

13     QUESTION FROM THE JURY:                           728

14     VERDICT:                                          733

15                  *      *      *      *      *

16                   REPORTER'S CERTIFICATE

17         I certify that the foregoing is a correct transcript

18     from the record of proceedings in the above-entitled

19     matter.

20         Dated at Denver, Colorado, this 8th day of August,

21     2019.

22

23

24

25                   MARY J. GEORGE, FCRR, CRR, RMR

1

```
 1                  THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
 2
     Criminal Action No. 16-cr-0054-WJM-2
 3
     UNITED STATES OF AMERICA,
 4
         Plaintiff,
 5
     vs.
 6
     TRAMELL THOMAS,
 7
         Defendant.
 8
     ------------------------------------------------------------
 9
                        REPORTER'S TRANSCRIPT
10                       (Sentencing Hearing)

11   ------------------------------------------------------------

12        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13   Judge, United States District Court for the District of

14   Colorado, commencing at 9:12 a.m., on the 8th day of August,

15   2018, in Courtroom A801, United States Courthouse, Denver,

16   Colorado.

17
                              APPEARANCES
18
         MARTHA A. PALUCH and BRYAN FIELDS, Assistant U.S.
19   Attorneys, 1801 California Street, Suite 1600, Denver,
     Colorado 80202, appearing for the plaintiff.
20
         DANIEL T. SMITH, Attorney at Law, 4582 South Ulster,
21   Suite 1400, Denver, Colorado 80237 AND
         THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
22   Suite 1400, Denver, Colorado 80202, appearing for the
     defendant.
23

24                   MARY J. GEORGE, FCRR, CRR, RMR
                 901 19th Street, Denver, Colorado 80294
25             Proceedings Reported by Mechanical Stenography
                  Transcription Produced via Computer
```

Case No. 1:16-cr-00054-WJM-Document 525-6 Filed 12/12/19 USDC Colorado pg 717 of
Case 1:16-cr-00054-WJM Document 504 Filed 08/09/19 Page 2 of
901

2

1                    P R O C E E D I N G S

2         (Call to order of the court at 9:12 a.m.)

3              THE COURT:  Okay.  We are on the record in criminal

4     case No. 16-cr-054, defendant No. 2, United States of

5     America versus Trammel Thomas.  I'll take appearances of

6     counsel.

7              MS. PALUCH:  Good morning, Your Honor.  Martha

8     Paluch and Bryan Fields appearing on behalf of the United

9     States.  With us at counsel table is Special Agent Sandra

10    Ennis.

11             SPECIAL AGENT ENNIS:  Good morning.

12             THE COURT:  Good morning to the three of you.  For

13    the defendant.

14             MR. SMITH:  Good morning, Your Honor.  Daniel Smith

15    and Thomas Goodreid appearing as counsel for Mr. Thomas, who

16    joins us at counsel table in custody.

17             THE COURT:  All right.  Good morning to the three

18    of you.  Will the probation officer please identify herself

19    for the record.

20             PROBATION OFFICER:  Good morning, Your Honor.

21    Laura Ansart with the probation office.

22             THE COURT:  All right, Ms. Ansart, good morning and

23    welcome.

24             All right.  I think for now, we will just have Mr.

25    Thomas rise to have the oath administered to him by Ms.

Case No. 1:16-cr-00054-WJM Document 525-6 Filed 12/12/19 USDC Colorado pg 718 of
901
Case 1:16-cr-00054-WJM Document 504 Filed 08/09/19 Page 3 of 7

3

1    Hansen, as opposed to all of you going to the lectern right

2    now, because we have a few things I need to cover before

3    that.

4          So if you will please stand, Mr. Thomas, and face

5    Ms. Hansen to your left.

6          COURTROOM DEPUTY:  Please stand.

7          THE COURT:  Please stand.

8      (Defendant sworn in)

9          THE COURT:  All right.  The record reflects that on

10   the 30th of November of 2017, a jury convicted Mr. Thomas on

11   each of the seven counts of the superseding indictment

12   returned by the grand jury against him in this case.  Those

13   were Count 1, conspiracy to defraud the Government with

14   respect to claims in violation of 18 United States Code

15   Section 286, as well as Counts 2 through 7, which were six

16   counts of aiding and abetting mail fraud, in violation of 18

17   United States Code Sections 1341 and 2.

18         We are here for the sentencing of the defendant.

19   Counsel, can you briefly summarize your respective

20   sentencing recommendations on custodial sentence,

21   restitution, and supervised release.  We'll start with the

22   Government.

23         MR. SMITH:  Your Honor, may I briefly address the

24   Court?

25         THE COURT:  Go ahead.

1        MR. SMITH:  Mr. Goodreid and I were advised

2    yesterday afternoon that Mr. Thomas wishes to address the

3    Court on the issue of counsel and representation.  He's

4    advised us this morning that he continues in that regard and

5    wishes to address the Court.  I've asked that he be allowed

6    to do so and, understanding the subject matter, I would ask

7    that it be done ex parte.

8        THE COURT:  This is the earliest that you can --

9    you were able to inform me of this?

10        MR. SMITH:  That's correct, Your Honor.  I received

11    an e-mail late yesterday afternoon from Mr. Thomas.

12        THE COURT:  All right.  I will need to ask the

13    Government to excuse us, please.  Is there anyone else here

14    from your office --

15        MS. PALUCH:  Yes.

16        THE COURT:  -- in the gallery?  They have to leave,

17    too.

18        MS. PALUCH:  Thank you, Your Honor.

19        (The ex parte proceedings are contained in a

20    separate, sealed transcript)

21                    *      *      *      *      *

22        THE COURT:  All right.  Let me advise counsel for

23    the Government that the defendant has made a request for a

24    new counsel, which I have denied, and he has made a request

25    to represent himself at his sentencing hearing and I

5

1    engaged -- for the record I engaged in the *Faretta* colloquy

2    with the defendant and I am convinced that he has decided to

3    voluntarily and freely decided to make a go of it himself in

4    terms of representing himself at a sentencing hearing.

5         I have allowed counsel to -- defense counsel leave

6    to withdraw from the case.  And I've granted the

7    defendant's -- in part the defendant's request for a

8    continuance of the sentencing hearing so that he can prepare

9    individually to represent himself at a sentencing hearing.

10   So that's where we're at.

11        So if counsel for the Government can bring --

12   put -- bring out their calendars, we can get a date here.

13        How does Monday, October 22d, at 10:00 a.m. look

14   for the Government?

15        MR. FIELDS:  Your Honor, may we have a second to

16   consult with our witnesses, who are here, to make sure

17   they're available?

18        THE COURT:  Sure.  Sure.

19      (Pause)

20        MR. FIELDS:  Sorry, Your Honor.  Yes, that works

21   for our witnesses, Your Honor.

22        THE COURT:  Okay.  Excellent.  Glad to hear that.

23   All right.  This sentencing hearing is continued to Monday,

24   October 22d, 2018, at 10:00 a.m.

25        MS. PALUCH:  Your Honor, if I may.

6

1          THE COURT:  You may.

2          MS. PALUCH:  As the Court is very well aware, there

3   has been extensive briefing in this case.  It's our

4   understanding briefing is complete.

5          THE COURT:  Right.

6          MS. PALUCH:  Is the Court's order just to allow the

7   defendant to represent himself at that hearing rather than

8   opening up briefing?

9          THE COURT:  I'm glad you raised that.  Yes.

10  Briefing has concluded.  I'm not going to accept any further

11  briefing.  The defendant can review all the materials that

12  have been submitted and raise whatever arguments he wants to

13  make at the sentencing hearing.  And if you wish to have any

14  witnesses testify, you'll need to file a notice to that

15  effect before the hearing so that we know, but we're not

16  going to reopen briefing on the issues that have been fully

17  briefed.  All right?  Okay.

18          Beyond that, anything further from the Government?

19          MS. PALUCH:  No, Your Honor.  Thank you.

20          THE COURT:  All right.  Thank you.  Anything

21  further from defense counsel?  Or now former defense

22  counsel?

23          MR. SMITH:  I have nothing, Your Honor, no.

24          THE COURT:  All right.  Mr. Goodreid, do you have

25  anything?

7

1          MR. GOODREID:  I have nothing additionally, Your
2    Honor.  Thank you.
3          THE COURT:  All right.  Mr. Thomas, anything
4    further?
5          THE DEFENDANT:  That will be all, sir.
6          THE COURT:  All right.  Anything further from the
7    probation officer?
8          PROBATION OFFICER:  No.  Thank you, Your Honor.
9          THE COURT:  All right.  Defendant is remanded to
10   the custody of the United States Marshal.  Thank you, that
11   will be all.
12        (Proceedings concluded at 9:56 a.m.)
13              *      *      *      *      *
14                  REPORTER'S CERTIFICATE
15       I certify that the foregoing is a correct transcript
16   from the record of proceedings in the above-entitled matter.
17       Dated at Denver, Colorado, this day of August, 2019.
18
19
20
21        MARY J. GEORGE, FCRR, CRR, RMR
22
23
24
25

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
     Criminal Action No. 16-cr-0054-WJM-2
 3
     UNITED STATES OF AMERICA,
 4
     Plaintiff,
 5
     vs.
 6
     TRAMELL THOMAS,
 7
     Defendant.
 8
     -------------------------------------------------------------
 9

10                        REPORTER'S TRANSCRIPT

11                 (Continuation of Sentencing Hearing)

12    -------------------------------------------------------------

13

14       Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

15    Judge, United States District Court for the District of

16    Colorado, commencing at 10:05 a.m., on the 4th day of June,

17    2019, in Courtroom A801, United States Courthouse, Denver,

18    Colorado.

19                            APPEARANCES

20       MARTHA A. PALUCH and BRYAN FIELDS, Assistant U.S.
     Attorneys, 1801 California Street, Suite 1600, Denver,
21    Colorado 80202, appearing for the plaintiff.

22       TASHA A. STEWARD, Law Office of Tasha A. Steward, LLC,
     3570 East 12th Avenue, Denver, Colorado 80206, appearing for
23    the Defendant.

24                 MARY J. GEORGE, FCRR, CRR, RMR
                 901 19th Street, Denver, Colorado 80294
25            Proceedings Reported by Mechanical Stenography
                 Transcription Produced via Computer
```

```
1              P R O C E E D I N G S
2        (Call to order of the court at 10:05 a.m.)
3            THE COURT:  All right.  We're on the record in
4    criminal case No. 16-cr-054, defendant No. 2, United States
5    of America versus Tramell Thomas.  I'll take appearances of
6    counsel.
7            MS. PALUCH:  Good morning, Your Honor.  Martha
8    Paluch and Bryan Fields appearing on behalf of the United
9    States.  With us at counsel table is Special Agent Ennis.
10           THE COURT:  All right.  Good morning to the three
11   of you.  For the defendant.
12           MS. STEWARD:  Tasha Steward for Mr. Thomas.
13           THE COURT:  All right.  Good morning to the two of
14   you.  Probation officer please identify herself for the
15   record.
16           PROBATION OFFICER:  Good morning, Your Honor.
17   Laura Ansart with the probation office.
18           THE COURT:  All right.  Ms. Ansart, good morning
19   and welcome to you.
20           All right, Mr. Thomas, will you please stand and
21   I'm going to have my courtroom deputy administer the oath to
22   you.
23           COURTROOM DEPUTY:  Please raise your right hand.
24        (Defendant sworn in)
25           THE COURT:  All right.  The record reflects that on
```

3

1    the 30th of November, way back in 2017, a jury convicted Mr.

2    Thomas on each of seven counts of the superseding indictment

3    returned by the grand jury against him in this case:  With

4    respect to Count 1, conspiracy to defraud the Government

5    with respect to claims in violation of 18 United States Code

6    Section 286; with respect to Counts 2 through 7, aiding and

7    abetting mail fraud in violation of 18 United States Code

8    Sections 1341 and 2.

9         We are here for the resumption of the sentencing

10   hearing for the defendant, much delayed.  At least we have

11   started it on one occasion, at least back on October 22d of

12   last year.  I want to recap for the record what I decided

13   subsequent to that hearing:

14        On the 22d of October of last year, I ruled that I

15   would not take evidence on, or take into consideration, when

16   determining the sentence to impose on the defendant whether,

17   during the time of the charged conduct in this case, the

18   defendant was also engaged in a commercial sex business and

19   committed armed robbery and rape.

20        At that earlier hearing I found that the interests

21   of justice, as well as the sentencing statute, would be

22   undermined were I to exercise my discretion in favor of

23   hearing evidence with respect to unproven, dismissed, and

24   unrelated alleged criminal conduct.

25        That hearing was then prematurely concluded when I

4

1    granted the defendant's oral motion to continue the

2    sentencing hearing purportedly because he was feeling ill.

3    So we are now resuming that hearing.

4         The parties briefly summarize their respective

5    sentencing recommendations.  Ms. Paluch.

6         MS. PALUCH:  Thank you, Your Honor.  The Government

7    is seeking a sentence of 180 months in prison, followed by

8    three years of supervised release, $700 in special

9    assessment fees, which is $100 on each count of conviction,

10   and an order of restitution of $563,890.85, with all but

11   1,403 of that amount ordered to be paid jointly and

12   severally with his codefendants, Heather Carr, Marcelle

13   Green and Mercedes Diaz.

14        We know that the Court's order of forfeiture that

15   was entered yesterday at ECF 475, and as referenced in that

16   order, we would ask that that order be made a part of

17   today's sentence and included in the judgment.  Thank you.

18        THE COURT:  All right.  Thank you.  Ms. Steward.

19        MS. STEWARD:  Yes, Your Honor.  The defense would

20   ask that the Court sentence Mr. Thomas in accordance with --

21   I'm sorry, similarly to his codefendant Sabrina Diaz.

22   Although he was not a cooperating witness in this case, we

23   believe that he was not given the opportunity to be that.

24        We believe that based on the minimum role that Mr.

25   Thomas played, that that would be serving the interest of

5

1     justice in this case.  We also believe that --
2              THE COURT:  So what -- so you'll have plenty of
3     opportunity in this hearing for argument.  Right now I just
4     want you to summarize the sentencing recommendation.  So
5     with respect to the custodial sentence, what is the
6     recommended custodial sentence you are seeking?
7              MS. STEWARD:  Based on the guidelines, we believe
8     the recommendation should be -- should be 15 to 21 months.
9              THE COURT:  You realize that your prior counsel has
10    filed with me submissions where the requested variance was
11    to 84 months.
12             MS. STEWARD:  I understand, Your Honor.
13             THE COURT:  So I'm just to ignore that and now go
14    to 15 and 21 months?
15             MS. STEWARD:  Based on what we believe the
16    guideline calculations are, yes, Your Honor.
17             THE COURT:  All right.  And what's your position on
18    restitution, forfeiture, and supervised release?
19             MS. STEWARD:  We believe Mr. Thomas is responsible
20    for approximately $38,000 in restitution, that is jointly
21    and severally liable with his other codefendants.  We
22    believe that he would probably be eligible for supervised
23    probation of three years after sentencing.
24             THE COURT:  Supervised release?
25             MS. STEWARD:  Yes.

6

1           THE COURT:  Of how long?

2           MS. STEWARD:  I'm sorry, Your Honor?

3           THE COURT:  Of how long?

4           MS. STEWARD:  Three years.

5           THE COURT:  Okay.  And what's your position on

6    forfeiture?

7           MS. STEWARD:  We -- I looked at document 474, Your

8    Honor.  I don't agree -- I object to that document; however,

9    we understand that the Court and the Government has had a

10   much longer time to come to that number than we have.

11          THE COURT:  All right.  Well, we're going to get to

12   that later on in the hearing.  All right.  Thank you.

13          MS. STEWARD:  Thank you.

14          THE COURT:  From my review of the submissions of

15   the Government, this is what I understand are matters as to

16   which you may be putting on evidence this morning, Ms.

17   Paluch.  And you tell me which you actually are going to.

18          First, there's the issue of whether the indicted

19   scheme was devised by Mr. Carr -- Ms. Carr and Mr. Thomas.

20   Are you planning on putting on any evidence on that issue?

21          MS. PALUCH:  We are, Your Honor.

22          THE COURT:  Okay.  So we'll do that when we deal

23   with the defendant's objection No. 4.

24          With respect to amounts of loss and restitution and

25   forfeiture -- well, actually, forfeiture will be handled

Case No. 1:16-cr-00054-WJM Document 525-6 filed 12/18/19 USDC Colorado pg 729 of
901
Case 1:10-cr-00054-WJM Document 506 filed 08/05/15 USDC Colorado pg 729 of
901

7

1    later -- with respect to amounts of loss and restitution, do

2    you anticipate putting on any evidence with respect to those

3    issues?

4              MS. PALUCH:  We do, Your Honor.

5              THE COURT:  Okay.  So we'll deal with that when I

6    take up the defendant's objection No. 7.

7              With respect to the two-level enhancement for

8    reckless endangerment during flight under guideline Section

9    3C1.2, does the Government anticipate putting on evidence on

10   this issue?

11             MS. PALUCH:  We do, Your Honor.

12             THE COURT:  All right.  Well, since there -- this

13   is probably a good place to start, then, because the other

14   two issues I'll deal with as I get to the objections.  We

15   can take up the specific offense characteristics and the

16   two-level enhancement now.

17             Are there any other issues that the Government

18   anticipates putting on evidence?

19             MS. PALUCH:  Your Honor, just briefly.  When Agent

20   Ennis is testifying, she will also be testifying briefly

21   about our assertion that the defendant was still involved in

22   the scheme while he was incarcerated and that funds from the

23   scheme were used to pay his attorney as well as be put in

24   his commissary account.  And this testimony, we believe,

25   refutes the defendant's assertion that he is entitled to a

8

1    minor role adjustment.

2          So when Agent Ennis is testifying, we would seek

3    the Court's permission to briefly talk to her about that

4    issue.

5          THE COURT:  All right.  Let me see.  One second.

6          So that has to do with the eighth objection --

7    defendant's eighth objection filed by prior counsel to what

8    is now paragraph 95 of the report?

9          MS. PALUCH:  That's correct, Your Honor.

10          THE COURT:  Okay.  All right.  Just let me make a

11    note of that.

12          All right.  Apart from that, anything else?

13          MS. PALUCH:  One last issue, Your Honor.  As you

14    know, there is a two-level enhancement for obstruction of

15    justice on a number of grounds, that's separate from the

16    reckless endangerment.  And one of those grounds is lying to

17    the probation officer about residence and employment.  We

18    also have lies in the record that we have briefed to the

19    Court about lies the defendant told to his state parole

20    officer.  And we believe those are proper consideration

21    under history and characteristics of the defendant.  So I

22    was going to briefly examine Agent Ennis about that last

23    matter.

24          THE COURT:  Okay.  All right.  All right.  So let

25    me -- let's take up as -- the first issue that I will take

9

Direct - Willhite

1    evidence on is whether a two-level enhancement for reckless

2    endangerment during the flight should be assessed under

3    guideline Section 3C1.2.

4           All right.  Ms. Paluch.

5           MS. PALUCH:  Thank you, Your Honor.  Mr. AUSA

6    Fields will be handling this --

7           THE COURT:  Okay.  Mr. Fields, the Government may

8    call its first witness.

9           MR. FIELDS:  We will call Deputy U.S. Marshal Pat

10   Willhite.

11          THE COURT:  Okay.  You can come forward, sir.

12          COURTROOM DEPUTY:  Please raise your right hand.

13           PAT WILLHITE, GOVERNMENT'S WITNESS, SWORN

14          COURTROOM DEPUTY:  Okay.  Please be seated.  You

15   may need to move your chair toward the microphone.

16          Please state and spell your name for the record.

17          THE WITNESS:  My name is Pat Willhite.  Last name

18   is spelled W-i-l-l-h-i-t-e.

19                        DIRECT EXAMINATION

20   BY MR. FIELDS:

21   Q.   Good morning, sir.

22   A.   Good morning, sir.

23   Q.   Do you work for the marshal service?

24   A.   Yes, sir, I do.

25   Q.   What's your title?

10

Direct - Willhite

1  A.   I'm a supervisory Deputy U.S. Marshal.

2  Q.   What unit are you currently in?

3  A.   I am in charge of the prisoner operations in the

4  District of Arizona.

5  Q.   And in March of 2018, where were you assigned?

6  A.   I was the supervisor over there.  Arizona Task Force.

7  Q.   What was your responsibilities in the Arizona Fugitive

8  Task Force?

9  A.   Mine was the supervision of the state and local

10  partners, along with deputies, to go out and arrest state

11  and local fugitives.

12  Q.   Are you familiar with a case involving a fugitive

13  status of Tramell Thomas?

14  A.   Yes, sir.

15  Q.   How did the marshal service learn about his fugitive

16  status?

17  A.   The District of Colorado had a case and they had the

18  warrant for Mr. Thomas.  They received information that

19  possibly he was residing somewhere in the Phoenix area and

20  sent what they call a collateral lead to the office in

21  Phoenix.

22  Q.   To whom was that collateral lead assigned?

23  A.   DUSM -- or, excuse me, Deputy Faranda.

24  Q.   At the time that this lead was assigned, was Tramell

25  Thomas on supervision by the District of Colorado?

Direct - Willhite

1   A.   I believe he was, yes.

2   Q.   Did Deputy U.S. Marshal Joseph Faranda ask his

3   probation officer where Tramell Thomas had reported to

4   probation that he was living?

5   A.   Yes, he did.

6   Q.   Was Faranda able to find him at that address?

7   A.   No, sir.

8   Q.   Generally how was -- well, was Deputy U.S. Marshal

9   Faranda able to track down Tramell Thomas?

10  A.   Yes, sir, he was.

11  Q.   Generally how?

12  A.   Through some interviews, I believe that Deputy Faranda

13  had talked to certain individuals and provided information

14  that he was residing at a different address.

15  Q.   What was that address?

16  A.   6039 West Hughes Drive in Phoenix, Arizona.

17  Q.   On March 29th, 2018, did DUSM Faranda and a team of

18  marshals go to that address?

19  A.   Yes, they did.

20  Q.   At about 4:00 on March 29th, 2018, did a member of DUSM

21  Faranda's team see a female in the backyard of the house?

22  A.   Yes, Deputy Strand contacted a female in the back.  Her

23  last name was Conrad.

24  Q.   What happened when he contacted Ms. Conrad?

25  A.   He instructed her to go --

                        Direct - Willhite

1           MS. STEWARD:  Your Honor, we're going to object to
2   hearsay.
3           MR. FIELDS:  Your Honor, the rules of evidence
4   don't apply at sentencing.
5           THE COURT:  Right.  Well, they don't strictly
6   apply, but let me ask you, where's Deputy Faranda?
7           MR. FIELDS:  Your Honor, we filed an amended
8   witness list; unfortunately --
9           THE COURT:  Yes, I noticed his name wasn't on it.
10          MR. FIELDS:  DUSM Faranda was, unfortunately,
11  rediagnosed with testicular cancer.  He had surgery last
12  week, and is recovering from the surgery.  So rather than
13  delay these proceedings further, Deputy Willhite was at the
14  scene that day and will be able to provide a firsthand
15  account to what happened when Mr. Thomas was captured.
16          THE COURT:  All right.  So he has personal
17  knowledge of what took place on that day.
18          MR. FIELDS:  Yes.
19          THE COURT:  All right.  So right now we're covering
20  background information.
21          MR. FIELDS:  Correct.
22          THE COURT:  All right.  Okay.  Ms. Steward, the
23  rules of evidence do not strictly apply to these hearings.
24  I will, however, point out, as I've done in other cases,
25  that I will sustain objections to leading questions because,

Direct - Willhite

1    in my experience, testimony by an attorney is of little use

2    to me.  I want to hear the testimony from a witness.  So

3    that objection's overruled.

4              You may proceed, Mr. Fields.

5              MR. FIELDS:  Thank you, Your Honor.

6    BY MR. FIELDS:

7    Q.   Deputy Willhite we were talking about when DUSM Strand

8    encountered the female.  What happened when DUSM Strand

9    encountered Ms. Conrad in the backyard of that house?

10   A.   He instructed her that law enforcement was at the front

11   door and go to the front door and open the door.

12   Q.   Did she comply?

13   A.   No, sir.  She went back inside, said she was going to

14   call the police.

15   Q.   Was anyone with the marshals able to figure out if she

16   called the police?

17   A.   Deputy Tillman called the Phoenix Police Department

18   which covers that area and asked if they received a call

19   from that address and they had not.

20   Q.   At some point did members of the team question

21   neighbors about who lived at the address?

22   A.   Yes.  Deputy Tillman interviewed several of the nearby

23   residents and no -- and they identified Mr. Thomas as

24   staying there and driving both the vehicles that were parked

25   in the front yard.

Direct - Willhite

1  Q.   After Ms. Conrad ran into the house, what did the team
2  do?
3  A.   As she went into the front -- she went in the
4  residence, deputies went to the front and knocked and
5  announced, basically the police presence and for them -- any
6  occupants inside to come to the front door with their hands
7  up.
8  Q.   Now, this knock-and-announce procedure, what does that
9  entail?
10  A.   The knock-and-announce is something that the law
11  enforcement does to announce to the occupants in the
12  residence their presence, that they're law enforcement, and
13  they need to come to the front door and comply with their
14  commands.
15  Q.   Is this sort of a quiet tap-tap at the door or could
16  you describe it to us?
17  A.   It's a very loud banging of the front door.
18  Q.   Why are the marshals so loud when they do this
19  knock-and-announce --
20  A.   To make sure any occupants inside hear.
21  Q.   What do they do after the knock-and-announce?
22  A.   There was no response.  And then they ended up taking a
23  perimeter around the residence and DUSM Faranda went back to
24  his vehicle, which is equipped with a PA system, and made
25  announcements from the PA system.

Direct - Willhite

1   Q.   This PA system, could you describe it to us, please.

2   A.   It's a -- basically like a bullhorn.  You give an

3   announcement, basically calling Mr. Thomas' name and any

4   occupants inside the residence.  Giving the residence

5   address to notify the people inside that that's the actual

6   residence that they're addressing, and giving commands to

7   come to the front door.  And it's loud enough to where you

8   can hear from the backyard and other residents in the area

9   could hear it as well.

10  Q.   Was there a response from inside the house?

11  A.   No, sir.  Ms. Conrad did go back out in the backyard

12  several times and encountered some of the deputies, and they

13  were giving her instructions to come to the front door.

14        And at one point she said she would call her lawyer

15  and she was on the phone with her lawyer and he advised her

16  not to open the door.

17  Q.   At what point did you arrive at the scene?

18  A.   I believe this started at about 1500, 3:00 in the

19  afternoon.  I arrived between 4:30 and 5:00.

20  Q.   What did you see when you arrived?

21  A.   What I observed when I first got on scene was vehicles

22  surrounding the area, law enforcement in the back, law

23  enforcement to the east and to the west of the residence.

24  DUSM Faranda giving verbal commands through the PA system.

25        I talked to DUSM Faranda and Tillman, and they

Direct - Willhite

1    briefed me on what the situation was at the time.

2    Q.   What did you decide to do when you arrived?

3    A.   I instructed DUSM Faranda to continue giving

4    announcements over the PA system.  I went around to check

5    the east and the west and make sure that no law enforcement

6    was in a dangerous situation or position.  I then instructed

7    them to start porting out windows.

8    Q.   At some point did you also give an order to evacuate

9    neighbors?

10   A.   Yes.  The neighbors to the east and the west, some of

11   them had small children, and we had -- we had concerns of

12   Mr. Thomas' criminal history, of possibly the situation was

13   escalating, so we evacuated them residents.

14   Q.   And what was the purpose of evacuating the neighbors?

15   A.   Is -- with the criminal history that Mr. Thomas has, if

16   there was any weapons involved -- bullets do go through

17   windows, doors, walls -- we didn't want to put any civilians

18   in harm's way.

19   Q.   Now, you also mentioned that you decided to port the

20   windows.

21   A.   Yes, sir.

22   Q.   What does that mean?

23   A.   Porting the windows is basically using a shotgun with a

24   bean-bag round and it is to hit in the upper sides of the

25   windows to knock off any curtains, any blinds, to gain us --

Direct - Willhite

1   law enforcement access and an advantage to possibly see the

2   occupants inside the residence.

3   Q.   All right.  Now there should be a binder there in front

4   of you.  If you take a look at that, could you please go to

5   Government's Exhibit 6.

6   A.   Yes, sir.

7   Q.   Do you recognize that?

8   A.   Yes, sir, that's the round used.

9   Q.   It's the box that holds the rounds?

10  A.   Yes, sir, it is.

11       MR. FIELDS:  All right.  Your Honor, I would move

12  its admission into evidence.

13       THE COURT:  Okay.  One second.  Are there any

14  objections?

15       MS. STEWARD:  No objection, Your Honor.

16       THE COURT:  All right.  There being no objection,

17  Government Exhibit -- what does the GS stand for, Mr.

18  Fields?

19       MR. FIELDS:  Government sentencing exhibit, Your

20  Honor, to distinguish these from trial exhibits.

21       THE COURT:  Oh, okay.  Government Exhibit GS-6 is

22  admitted into evidence.

23       (Government's Exhibit GS-6 received)

24  BY MR. FIELDS:

25  Q.   Mr. Willhite, do you see there where it says

18
Direct - Willhite

1   "Deployment" --

2   A.    Yes.

3   Q.    -- in the box?

4   A.    Yes, sir.

5   Q.    What does it say after "however"?

6   A.    "However, it is stressed that shot placement rather

7   than deployment range is the critical factor in determining

8   the extent of injury caused.  Shots to the head, neck,

9   thorax, heart, or spine can result in fatal or serious

10  injury."

11  Q.    So these bean bags, are they considered nonlethal arms?

12  A.    Yes, sir.

13  Q.    Even though they're considered nonlethal, can they be

14  dangerous?

15  A.    They can be, yes, sir.

16  Q.    How so?

17  A.    If they're hitting any glass, sometimes the glass will

18  project inside the residence and create small shards that

19  possibly could strike any occupant inside.

20  Q.    And on this particular case, did the team port a back

21  patio door?

22  A.    Yes, sir, they did.

23  Q.    When it was ported, what happened to the glass that

24  made up the door?

25  A.    The glass shattered and it also projected inside to the

Direct - Willhite

1    residence.

2    Q.    In your experience as a Deputy U.S. Marshal, can those

3    glass shards be dangerous?

4    A.    Yes, they can.

5    Q.    How so?

6    A.    Like I said, it is -- if it hits an occupant inside, it

7    can cause -- it can penetrate inside the skin, cause damage

8    if it hits the face area.

9    Q.    I want to show you Government's Sentencing Exhibit 5 in

10   that binder there in front of you.

11           Do you recognize that?

12   A.    Yes, sir.

13   Q.    What is it?

14   A.    That is the back patio window.

15           MR. FIELDS:  Your Honor, I move the admission of

16   Government sentencing Exhibit 5.

17           THE COURT:  Is there any objection?

18           MS. STEWARD:  No objection, Your Honor.

19           THE COURT:  There being no objection, Exhibit --

20   Government Exhibit GS-5 is admitted into evidence.

21       (Government's Exhibit GS-5 received)

22   BY MR. FIELDS:

23   Q.    DUSM Willhite, where at the residence on March 29th,

24   2018, was this photograph taken?

25   A.    Where was it taken?

Direct - Willhite

1    Q.    Yeah.

2    A.    Inside the residence.

3    Q.    And what is this photo depicting?

4    A.    The back patio glass door.

5    Q.    After it had been ported?

6    A.    Yes, sir.

7    Q.    You mentioned glass shattering.  Can you -- do you see

8    in the photograph any glass shards?

9    A.    Yes, sir, several.

10   Q.    Where do you see them?

11   A.    I see them on the floor and then also protruding into

12   the residence.

13   Q.    As a result of that glass shattering on March 29th,

14   2018, was anyone hurt?

15   A.    Yes, Ms. Conrad was.

16   Q.    How was she hurt?

17   A.    She received cuts to her face and, I believe, her

18   forehead.

19   Q.    During the stand-off that day, did your team also

20   decide to use pepper gas rounds?

21   A.    Yes, sir, they did.

22   Q.    What are pepper gas rounds?

23   A.    It's pepper balls.  Basically it's like a paint ball

24   gun on steroids.  It has a little pepper ball you shoot

25   inside and it disburses small areas of gas and pepper, and

21
Direct - Willhite

1    this is to get the occupants inside to exit the residence.

2    Q.   Did it work?

3    A.   No, sir.

4    Q.   At some point, did the team break and rake the windows?

5    A.   Yes, sir, they did.

6    Q.   What does break and rake mean?

7    A.   Break and rake is basically getting closer up with a

8    device and smashing the window out and opening it up, so to

9    speak, with removing the curtains and the blinds.  That was

10   a done in the front window.

11   Q.   What is the purpose of that procedure?

12   A.   That was to gain access to see inside the residence of

13   any occupants.

14   Q.   What happened after the team that performed this

15   break-and-rake procedure?

16   A.   Once they performed that, Ms. Conrad said that she

17   would come out, and she came out with her hands up and was

18   taken into custody.

19   Q.   A the time she came out, how long had the stand-off

20   been occurring?

21   A.   I believe it was about two to three hours in.

22   Q.   Did Ms. Conrad say whether anyone was inside the house?

23   A.   She did not.

24   Q.   While this stand-off was occurring, did the team

25   develop suspicions that Tramell Thomas was inside the house?

22

Direct - Willhite

1    A.    Yes.  Once Ms. Conrad was taken from the residence,

2    announcements continued.  Deputies from the west side of the

3    house stated that they heard noises inside the house, loud

4    banging, something possibly moving around inside.

5    Q.    Were you able to obtain a search warrant to enter the

6    house to look for Tramell Thomas?

7    A.    Yes, DUSM Faranda did so.

8    Q.    Did you call for a SWAT team?

9    A.    I did.

10   Q.    What is a SWAT team?

11   A.    A SWAT team is a special -- specialized team that

12   specializes in situations like this in barricades.  Once

13   they escalate to a certain situation, then it puts law

14   enforcement and civilians at risk.  They are the ones that

15   are equipped to come in and take care of the situation as

16   peaceful as possible.

17   Q.    What sort of risks were created by this situation?

18   A.    The risk created was the -- was the civilians in the

19   area possibly being in harm's way if anything was to happen

20   inside the residence, any rounds being shot inside the

21   residence, outside the residence.  And that created a

22   situation to where I was going to put law enforcement

23   personnel, basically my team, in harm's way if they were not

24   equipped to handle the situation basically going into

25   somebody else's backyard and not knowing the playing field.

23

Direct - Willhite

1  Q.   What kind of equipment and tactics does SWAT use in a
2  situation like this?
3  A.   They have heavier equipment, something that can sustain
4  like a rifle round.  They -- that's how I can explain it.
5  They have the equipment to be able to absorb that, the
6  helmets, the equipment, to be able to handle that
7  situation.
8  Q.   What happened when SWAT got to the scene?
9  A.   When SWAT got to the scene, they -- they announced as
10 well.  They went on their PA system, gave out more
11 announcements, called for Mr. Thomas, told him to come
12 outside the residence, and they got no response.
13 Q.   Did SWAT finally enter the residence?
14 A.   Yes, sir, they did.
15 Q.   What did they find inside?
16 A.   They searched the house and found Mr. Thomas in a
17 west-side back bedroom.
18 Q.   Was he brought outside to the marshals?
19 A.   Yes, sir, he was.
20 Q.   Did he say anything to the marshals when he was brought
21 outside?
22 A.   He was handed off to DUSM Faranda and he stated to DUSM
23 Faranda that he was asleep and did not hear.
24 Q.   DUSM Willhite, how long had you been with the marshal
25 service?

24

Direct - Willhite

1    A.   19 years, sir.

2    Q.   How many fugitives would you say you've apprehended?

3    A.   A little over hundreds to a thousand.

4    Q.   How many barricade situations have you confronted?

5    A.   At least 15.

6    Q.   In your opinion, did Thomas' refusal to come out create

7    risk that someone might be seriously hurt?

8    A.   Yes, sir.

9    Q.   How so?

10   A.   By the situation that kept escalating from -- from one

11   hour to six hours, it puts the civilians in harm's way, it

12   puts the law enforcement in harm's way if it keeps

13   escalating, it -- like I said before, if there's rounds that

14   are -- shots being fired, it could cause harm to law

15   enforcement, innocent civilians in the area.  Just causing

16   everybody to have to actuate the area to deal with the

17   situation.

18        Plus it takes local law enforcement off the streets

19   to handle everyday calls when they have to put out a

20   perimeter to not allow anybody to come in or outside the

21   scene.

22        MR. FIELDS:  Your Honor, may I have a moment?

23        THE COURT:  You may.

24   BY MR. FIELDS:

25   Q.   DUSM Willhite, just a point of clarification.  Where

25

Cross - Willhite

1    was Tramell Thomas found inside the house?

2    A.   I believe it was on the west side of the residence.

3    Q.   Was he hiding inside the house?

4    A.   He was in the back bedroom.  Once he was contacted by

5    SWAT, he gave himself up.

6    Q.   Do you know where he was hiding in that bedroom?

7    A.   I don't.

8         MR. FIELDS:  Thank you.  I have no further

9    questions.

10        THE COURT:  All right.  Cross-examination.

11        MS. STEWARD:  Thank you, Your Honor.

12                   CROSS-EXAMINATION

13   BY MS. STEWARD:

14   Q.   DUSM Willhite, you didn't write a report for this case,

15   did you?

16   A.   No, ma'am, I did not.

17   Q.   And to prepare for today's case, what did you review?

18   A.   I had a couple reports that DUSM Faranda had written

19   and I refreshed my recollection by his reports.

20   Q.   Okay.  So you reviewed Faranda's reports?

21   A.   I did.

22   Q.   Okay.  Were you mentioned in any of those reports?

23   A.   No, ma'am.

24   Q.   Did you review any other notes or anything like that

25   that you took?

26

Cross - Willhite

1    A.    No, ma'am, I didn't have any notes.

2    Q.    Okay.  Now, you say that during this incident, that

3    there was contact with Ms. Conrad, correct?

4    A.    Yes, ma'am.

5    Q.    And Ms. Conrad was in the backyard when she was

6    contacted originally, correct?

7    A.    Yes, ma'am.

8    Q.    And at that point, Ms. Conrad went into the home and

9    said that she was going to call the police; isn't that

10   correct?

11   A.    Yes, ma'am.

12   Q.    And she went in the home on her -- by her own volition?

13   A.    She did.

14   Q.    Okay.  And then you guys began these PA announcements

15   to come out of the home, right?

16   A.    Yes, ma'am.

17   Q.    And Ms. Conrad did not come out of the home, correct?

18   A.    Only in the backyard.

19   Q.    Right.  When I say "not come out of the home," she

20   didn't come out of the home and give herself to law

21   enforcement, did she?

22   A.    No, ma'am.

23   Q.    In fact, she went into the backyard and explained that

24   she was on the phone with her lawyer, correct?

25   A.    Yes.

27
Cross - Willhite

1    Q.    And her lawyer advised her to stay in the home and not

2    give herself up, correct?

3    A.    Yes.

4    Q.    Okay.  And you said that based on Thomas' criminal

5    history, you guys decided to use a shotgun with bean bags to

6    break out windows, correct?

7    A.    Yes, ma'am.

8    Q.    And what criminal history did you base that on, sir?

9    A.    What I was briefed on when I was on scene was his

10   criminal history involved conduct of -- misconduct of

11   weapons, aggravated assault.  And based on my experience, if

12   I have anything with a weapon factor in it, we're going to

13   take a little bit slower approach than just making entry

14   into the home.

15   Q.    So you're saying that Mr. Thomas' history, the bank

16   robbery included an aggravated weapon; is that what you're

17   saying, sir?

18   A.    I didn't say it's an aggravated weapon, ma'am, I said

19   aggravated assault.

20   Q.    Aggravated assault?

21   A.    Yes, ma'am.

22   Q.    And that refers to Mr. Thomas' bank robbery conviction,

23   correct?

24   A.    I believe so, yes, ma'am.

25   Q.    And in that case, sir, were you aware that Mr. Thomas

28

Cross - Willhite

1    was just the driver and he never went inside the bank?

2    A.    No, ma'am, I was not.

3    Q.    Okay.  You didn't know whether -- I mean, none of the

4    agents knew whether or not Thomas was in the home; isn't

5    that right?

6    A.    The information that was provided that he was in the

7    home.

8    Q.    When I say "knew," they didn't have knowledge.  They

9    were provided some information, but they didn't know for

10   sure that he was in the home; isn't that right?

11   A.    I have no idea on that.

12   Q.    When you were there, did you know for sure that he was

13   in the home?

14   A.    Just by the information I was provided that he was in

15   the home.

16   Q.    Okay.  And when you were there, you saw -- you saw Ms.

17   Conrad, correct?

18   A.    I did.

19   Q.    And she appeared to make her own decisions?

20   A.    Yes, ma'am.

21   Q.    Okay.  And then you broke out -- there was this window

22   that was broken out.  I believe it's Government Exhibit 5,

23   correct?

24   A.    The back patio?

25   Q.    Yes.  And as a result of that window being broken out,

29

Cross - Willhite

1    some of the glass came into the home, right?

2    A.    Yes, ma'am.

3    Q.    And some of that glass cut Ms. Conrad.

4    A.    Yes, ma'am.

5    Q.    And that's after Ms. Conrad made the decision not to

6    come out of the home on her own, correct?

7    A.    I believe so.

8    Q.    Okay.  How many officers or agents were at the home

9    that day?

10   A.    I would have to give you a rough count.

11   Q.    I'll make it clear, prior to SWAT being called in.

12   A.    Yes, ma'am.  10 to 12.

13   Q.    Okay.  And after SWAT?

14   A.    20-plus.

15   Q.    20-plus.  Do you know if any of those officers were

16   armed?

17   A.    All of them were armed, ma'am.

18   Q.    Armed?  How many vehicles were there?

19   A.    I'd say 15-plus.

20   Q.    Okay.  And there were no civilians hurt on this day,

21   other than Ms. Conrad, correct?

22   A.    Yes, ma'am.

23   Q.    No law enforcement hurt?

24   A.    None.

25   Q.    Sir, would you consider it reasonable to have a fear of

30

Cross - Willhite

1    such a show of force, 20-plus agents, police officers?

2    A.    No, ma'am.

3    Q.    You wouldn't consider it reasonable to be fearful of

4    those agents?

5    A.    No, ma'am.

6    Q.    Why is that, sir?

7    A.    It's the situation that you put yourself in.  There

8    wasn't that many at the beginning of the situation.  It

9    escalated by the actions that were taken upon us that Ms.

10   Conrad did.

11   Q.    Okay.  So initially, there were 12 agents, correct?

12   A.    Yes, ma'am, but they cannot all be seen at one time.

13   Q.    But there were 12 agents, right?

14   A.    Yes, ma'am.

15   Q.    And Ms. Conrad, you know, having seen some of these

16   agents, decided not to come out of the home, right?

17   A.    Yes, ma'am.

18   Q.    And you are saying you don't believe that it was

19   reasonable for her to be fearful of those agents?

20   A.    Not when they explained themselves the reason why they

21   were there.

22   Q.    Did they -- okay.  And do you believe that after the 20

23   or so agents arrived, that she might have been fearful?

24   Especially --

25   A.    I did --

31

                    Cross - Willhite

1   Q.   I'm sorry, I apologize, sir.

2   A.   It's -- I'm not saying that probably -- it was at least

3   12 of them when the front window was ported out, and that's

4   when she decided to give herself up.

5   Q.   Okay.  So 12 agents, plus your windows being broken in,

6   is that something that might be fearful to someone of . . .

7   A.   I'd say it could be.

8   Q.   Okay.  And this arrest, was it due to some probation

9   violation or some missed hearings or something like that on

10  behalf of Mr. Thomas?

11  A.   It was a probation violation warrant.

12  Q.   A warrant?  Do you know whether he missed any of his

13  hearings or any of that information?

14  A.   I wasn't aware of that.

15  Q.   Do you know what the basis of that probation violation

16  warrant was?

17  A.   No, ma'am.

18  Q.   Okay.  And you don't know whether it was a violent

19  probation violation?

20  A.   No, ma'am.

21  Q.   Okay.  Were you aware that Mr. Thomas had a court date

22  about 13 days after this situation?

23  A.   No, ma'am.

24        MS. STEWARD:  Okay.  Can I have a second, Your

25  Honor?

Redirect - Willhite

1      THE COURT:  You may.

2      MS. STEWARD:  Okay.  No further questions.

3      THE COURT:  All right.  Redirect.

4              REDIRECT EXAMINATION

5   BY MR. FIELDS:

6   Q.   DUSM Willhite, you were asked a lot of questions about

7   fear.  When the marshals are making announcements to the

8   house, what do they say in those announcements?

9   A.   When they make announcements knocking at the front

10  door, they'll say, "Police, U.S. Marshals.  Any occupants in

11  the residence, come out to the front door with your hands

12  free and clear of all objects."

13  Q.   When the marshals are trying to arrest a fugitive, do

14  they try to do so while minimizing the risk?

15  A.   Yes, sir.

16  Q.   How do they try to minimize the risks?

17  A.   One is the knock-and-announce contact that they have.

18  Explain themselves why they're here, meaning if they have a

19  warrant for a certain individual, they'll call that

20  individual's name out, and have them come to the front door,

21  hands free and clear of all objects.

22  Q.   Despite the efforts of the marshal service to minimize

23  risk, were risks created in the situation on March 29th,

24  2018?

25  A.   Yes.

33
Redirect - Willhite

1   Q.   In your experience, how did those risks get created?
2   A.   They're created by the noncompliance of the occupants
3   inside the residence.  It kept escalating.  The
4   announcements were repeated over and over.  As a supervisor,
5   I always have them repeat it over and over continuously so
6   there's no question or doubt that the occupants are well
7   aware of why we're there and what we're there for.
8   Q.   In your experience, do you think it was feasible for
9   anyone to sleep through those announcements and the events
10  that happened --
11  A.   No, sir.
12  Q.   -- that day?
13          MR. FIELDS:  No further questions, Your Honor.
14          THE COURT:  All right.  Supervisor Willhite, thank
15  you for your testimony.  You're excused.  You may step down.
16          THE WITNESS:  Thank you, sir.
17          THE COURT:  Does the Government have any additional
18  witnesses on this issue?
19          MR. FIELDS:  No, Your Honor.
20          THE COURT:  All right.  Does the defendant have any
21  witness on this issue?
22          MS. STEWARD:  No, Your Honor.
23          THE COURT:  All right.  All right.  I'm ready to
24  rule on this specific offense characteristic.  I find that
25  the Government has proven by a preponderance of the evidence

Redirect - Willhite

1    that the two-level enhancement in the offense level is

2    appropriate in regards to this defendant under Section 3C1.2

3    of the guidelines.  I find there's ample evidence from which

4    I can conclude that the defendant engaged in conduct which

5    resulted in a reckless endangerment during flight.

6          In addition, I conclude that the Government has met

7    its burden of establishing by a preponderance of the

8    evidence, as articulated by the Tenth Circuit in the *Gray*

9    case, that, "A defendant acts recklessly for purposes of

10   this enhancement when he was aware of the risk created by

11   his conduct and the risk was of such a nature and degree

12   that to disregard that risk constituted a gross deviation

13   from the standard or care that a reasonable person would

14   exercise in such a situation."

15         Specifically I find that the evidence that I just

16   heard that supports that finding is the repeated failure

17   over a course of nearly three hours of the defendant to

18   respond to the directions and commands of the U.S. Marshals

19   to come out of the residence with hands free and clear of

20   all objects.

21         The unrebutted testimony is that at the conclusion

22   of this incident the defendant informed the U.S. Marshals

23   that he was sleeping in the west side bedroom of the home.

24   I find that it is completely incredible and not believable

25   that a defendant could sleep through such an event, a

Redirect - Willhite

1    three-hours' long engagement in which PA announcements and

2    repeated banging on the door, shotgun filled with bean bags

3    breaking glass doors and windows, in my view, it's

4    impossible for someone to sleep through something like that.

5         I find that the defendant intentionally refused to

6    heed the U.S. Marshals' commands to exit the residence with

7    hands free and clear of all objects, and that this failure

8    to respond to repeated commands, as the unrebutted testimony

9    has shown over the course of nearly three hours, created a

10   heightened risk of serious injury to civilians in the

11   neighborhood and to law enforcement.

12        And as we saw that, in fact, that risk came to be

13   in that Ms. Conrad, herself, was injured from the glass

14   shattered from the glass door that was ported, as I

15   understand that term to be used, through the use of shotguns

16   armed -- that were -- that contained bean bags.

17        So for all those reasons, I find that that

18   two-level enhancement under guideline 3C1.2 is appropriate

19   and has been established by a preponderance of the evidence.

20        I should have noted earlier that no objections to

21   the report were filed by the Government.

22        Let me next turn to the objections that were filed

23   by prior counsel for the defendant at ECF 348.  The first of

24   those objections was an objection to the inclusion of the

25   parties' respective sentencing enhancements in the offense

Redirect - Willhite

1    conduct portion of the report at paragraphs 7 through 58.

2         I am going to sustain this objection in part.  I

3    agree with the defendants that the parties' legal arguments

4    about the facts should not be included in this section of

5    the report, especially because the sentencing statements are

6    already part of the Court's record by virtue of their

7    separate filings, and also because, as prior defense counsel

8    points out, the report in its final form will follow the

9    defendant throughout his stay with the Bureau of Prisons.

10        With this in mind, I find it inappropriate to have

11   counsel's arguments and contentions, some of which on both

12   sides are quite inflammatory, be contained in the report as

13   facts.  At least in this courtroom, facts continue to

14   matter.

15        I am, therefore, going to order that the probation

16   officer prepare an amended final presentence report which

17   has deleted from it the following paragraphs:  8 and 9, 22

18   through 44, 48 and 49, and 53 through 58.

19        Given this ruling and the respective paragraphs

20   which will be deleted from the amended final report,

21   defendant's objections to -- defendant's objections 2 and 3

22   are overruled as moot.

23        All right.  I'm going to next turn to objection No.

24   4, to the statement in paragraph 63 of the report that the

25   scheme was devised by -- the criminal fraud scheme that was

37

Direct - Ennis

1   indicted by the grand jury was devised by Ms. Carr and Mr.

2   Thomas.  All right, Ms. Paluch.

3           MS. PALUCH:  Thank you, Your Honor.  The United

4   States calls Special Agent Sandra Ennis.

5           THE COURT:  Agent Ennis, if you'll come forward.

6           COURTROOM DEPUTY:  Please raise your right hand.

7            SANDRA ENNIS, GOVERNMENT WITNESS, SWORN

8           COURTROOM DEPUTY:  Okay.  Please be seated.  You

9   may need to move your chair up to the microphone.

10          And please state and spell your name for the

11  record.

12          COURTROOM DEPUTY:  My name is Special Agent Sandra

13  Ennis.  Sorry, pull this chair up.  The spelling

14  S-a-n-d-r-a, last name Ennis, E-n-n-i-s.

15          MS. PALUCH:  May I proceed, Your Honor?

16          THE COURT:  You may.

17                      DIRECT EXAMINATION

18  BY MS. PALUCH:

19  Q.   Good morning, Agent Ennis.

20  A.   Good morning.

21  Q.   Are you the case agent for this matter?

22  A.   Yes, I am.

23  Q.   And did you testify at trial as to your investigation?

24  A.   Yes, I did.

25  Q.   How were the Social Security numbers of the individuals

38

Direct - Ennis

1    listed on the applicants obtained?

2    A.    Heather Carr obtained these Social Security numbers

3    through her employment at Wells Fargo Bank.

4    Q.    When did Heather Carr first use her Wells Fargo access

5    to search for an individual's Social Security number that

6    you tied to this scheme?

7    A.    It was July 3d, 2010.

8    Q.    Before the August date, start date, of 2010 and listed

9    in the superseding indictment?

10   A.    That is correct.

11   Q.    And whose Social Security number was she searching?

12   A.    Ismael Omar.

13   Q.    And who is Ismael Omar?

14   A.    Mr. Ismael Omar was a friend of the defendant.

15   Q.    And how -- and did you uncover any associations between

16   Ismael and the defendant and anyone else?

17   A.    Yes.  Mr. Omar met the defendant through the

18   defendant's cousin, Michael Cox.

19   Q.    Did you interview Mr. Omar?

20   A.    Yes, I did.

21   Q.    And how many times did you interview him?

22   A.    I interviewed him twice.

23   Q.    And did you talk to him about students financial aid?

24   A.    Yes.  Mr. Omar told me that he, Mr. Cox, and the

25   defendant would sit around and devise ways to commit fraud

39
Direct - Ennis

1   and that the --

2           THE COURT:  One second.  Oh, I thought you were

3   done.  I'll let you finish your answer and then I'll

4   interject what I was going to say.  Go ahead.

5           THE WITNESS:  Okay.  Mr. Omar informed me that the

6   defendant told him that they could commit financial aid

7   fraud as a way to earn money and that the defendant knew how

8   to do this.

9           THE COURT:  All right.  Agent Ennis, as you, better

10  than anyone else knows, there are four defendants in this

11  case.  So instead of just saying "the defendant," let's make

12  the record clear and either say "Mr. Thomas or "Defendant

13  Thomas," if, in fact, you're referring to the defendant

14  Thomas.

15          THE WITNESS:  Okay.  Thank you.

16          THE COURT:  All right.

17  BY MS. PALUCH:

18  Q.   So before -- let's back up a little bit.

19          Did he -- did you ask him about whether he,

20  himself, had ever applied for financial aid?

21  A.   Yes.  Mr. Omar informed me that he had applied for

22  federal student aid in April of 2010.

23  Q.   And was it your first interview in which he related

24  this conversation between the defendant and Mr. Cox?

25  A.   That is correct.

40

Direct - Ennis

1   Q.   And during your second interview with him, did you give
2   him an opportunity to review the report of his first
3   interview?
4   A.   Yes.   When I interviewed Mr. Omar the second time, he
5   informed me that there was an error in the report.   That the
6   conversation he had with the defendant about committing
7   federal student aid fraud did not occur in October 2010 as
8   the report indicated.   This was not possible because Mr.
9   Omar was in prison at the time.
10         Mr. Omar informed me that the conversation with
11  Defendant Thomas would have occurred between March 2010 and
12  June 2010.
13         MS. PALUCH:   And, Your Honor, at this time, I need
14  to make one correction for the record, and that is ECF 357
15  on page 4, we stated, consistent with the first report, that
16  the conversation had occurred in October of 2010.   The
17  correct time frame was, as the agent testified, March
18  through June of 2010.
19         That information was provided to the defense prior
20  to trial in a memorandum of interview, and the Bates numbers
21  were 597 to 598 MOI.
22         THE COURT:   All right.   I believe you filed a
23  notice of that correction at some point, didn't you?
24         MS. PALUCH:   Correct, Your Honor.
25         THE COURT:   It's hard to keep track of everything

Direct - Ennis

1   that's been filed in this -- see, we're -- I think, aren't

2   we over 600 or something in this case?

3          MS. PALUCH:  Getting close.

4          THE COURT:  Okay.  One second.  So March through --

5   March through June of 2010 as opposed to October?

6          MS. PALUCH:  That's correct, Your Honor.

7          THE COURT:  Okay.  Go ahead.

8          MS. PALUCH:  Thank you.

9   BY MS. PALUCH:

10  Q.   Were false applications for student aid actually filed

11  in Ismael Omar's name?

12  A.   Yes.  The false applications for federal student aid

13  were filed for Mr. Omar on -- in December 2010 and May 2011.

14  Q.   And, again, where was Mr. Omar when those were filed?

15  A.   Mr. Omar was in prison with the Colorado Department of

16  Corrections.

17  Q.   And what address was used on the false applications

18  submitted in Mr. Omar's name?

19  A.   An address of 3820 Radiant Drive was used.

20  Q.   Did the Government attempt to secure Mr. Omar's

21  appearance as a witness in this case at trial?

22  A.   Yes, they did.  Mr. Omar was interviewed prior to

23  trial.  Mr. Omar informed us that he would refuse to answer

24  any questions if he was put on the stand.

25  Q.   Now, you mentioned -- or you testified that the Radiant

Direct - Ennis

1    Drive address was used on Mr. Omar's application.  Were

2    other false applications submitted using the referenced

3    address?

4    A.    Yes.  An application for Vanessa Lopez was used.

5    Q.    And did you interview Ms. Lopez?

6    A.    Yes, I did.  I had left a business card at her address.

7    Ms. Lopez contacted me claiming to be a victim of identity

8    theft.

9    Q.    Did you eventually meet with her?

10   A.    Yes.  I met with Ms. Lopez in approximately October of

11   2015.

12   Q.    And what did she say about the identity theft that she

13   had referenced?

14   A.    Ms. Lopez said that she had met Defendant Thomas in

15   2010.  The two had dated for approximately nine months to a

16   year.  The defendant knew she didn't have a GED and the two

17   of them went to Pikes Peak together to apply for federal

18   student aid.  That the defendant --

19            THE COURT:  Ms. Ennis, please.  Mr. Thomas --

20            THE WITNESS:  Sorry.  Mr. Thomas, okay.

21            Mr. Thomas moved Ms. Lopez out of the way and he

22   started filling out the forms while Ms. Lopez provided her

23   personal identifying information.

24   BY MS. PALUCH:

25   Q.    And by moving her out of the way, this occurred at

43

Direct - Ennis

1    Pikes Peak Community College?

2    A.   Yes, it did.

3    Q.   Okay.  And did she later learn that her application for

4    federal student aid had been submitted?

5    A.   Yes, she did.  She didn't think that federal student

6    aid was disbursed in her name because she said she never

7    attended any courses.  She also said that she didn't benefit

8    from any of the federal student aid money.

9    Q.   Did she say she had -- did she have a conversation with

10   Defendant Thomas about student loans taken out in her name?

11   A.   Yes.  Ms. Lopez received a call from Defendant Thomas

12   and it was then she informed him that she had been contacted

13   by the U.S. Department of Education regarding loans.  The

14   Defendant Thomas informed her that he took out loans in her

15   name because he needed money and that the Defendant Thomas

16   told her to tell the U.S. Department of Education -- to tell

17   the U.S. Department of Education that the loans were hers

18   and not his.  And that the Defendant Thomas said he would

19   repay her any money owed and she could make payments on the

20   loan.

21   Q.   And did she tell you what her response was to that?

22   A.   Ms. Lopez told Defendant Thomas that she was upset

23   about this because she, herself, was going through hard

24   times financially and that this would put a bad mark on her

25   credit.

44

Direct - Ennis

1    Q.   When you were interviewing Ms. Lopez, at first was she

2    willing to give you the name of her ex-boyfriend?

3    A.   No, she was not.

4    Q.   And why was that?

5    A.    Ms. Lopez was afraid of the Defendant Thomas because

6    she was aware of her -- she was in fear for her safety and

7    was aware of what he or her family could do to her.

8    Q.   Did she say anything about when it was that she

9    actually learned his real name?

10   A.    Ms. Lopez said that the Defendant Thomas and her had

11   dated for an entire month before she had learned his name --

12   his true name.

13   Q.   Did Ms. Lopez say anything about threats made by the --

14   by Defendant Thomas?

15   A.   Yes.   There were -- on occasion where she had spoken to

16   Defendant Thomas, Defendant Thomas told her that he would

17   kill any man coming and going from her house, and those men

18   would never be seen from again.

19   Q.   Did she know about his criminal history?

20   A.   Yes, she did.

21   Q.   What did she know?

22   A.    Ms. Lopez knew that Defendant Thomas had served

23   approximately 10 years for robbery.

24   Q.   Did she tell you what she believed would happen if the

25   defendant knew about this investigation?

45

Direct - Ennis

1    A.   Yes.  Ms. Lopez said that Defendant Thomas would never

2    be seen from again and he would not go back to prison

3    without a fight.

4    Q.   Did the Government attempt to secure Ms. Lopez's

5    appearance as a witness in this case?

6    A.   Yes.  Ms. Lopez was served a subpoena to testify at the

7    grand jury.  She failed to appear.  And then multiple

8    attempts were made to locate Ms. Lopez prior to trial and we

9    were unsuccessful in locating her.

10   Q.   Were there any other false applications submitted using

11   the Radiant Drive address?

12   A.   Yes.  There was applications filed in the name of

13   Christine Duncan.

14   Q.   And when were those submitted?

15   A.   Applications for Christine Duncan were submitted in

16   December 2010 and May 2011.

17   Q.   And did she testify at trial?

18   A.   Yes, she did.

19   Q.   And did she state whether she authorized the filing of

20   those applications in her name?

21   A.   Yes, she said she did not authorize the use of her name

22   for student loans.

23        MS. PALUCH:  Your Honor, I will stop here.  This is

24   the Government's evidence that we would submit that supports

25   the finding that not only was Heather Carr using her

46

Direct - Ennis

1    Accurint database in July of 2010 prior to the start of the

2    conspiracy as alleged, but information from Mr. Omar

3    indicated that he had a conversation with the defendant

4    about committing student fraud between March and June of

5    2010. And this, along with Ms. Lopez's statements, we

6    believe supports the Government's assertion that this scheme

7    was devised by the Defendant Thomas and Defendant Carr, and

8    we'd ask that you deny or overrule the defendant's objection

9    on that point.

10        THE COURT: All right. Now, thank you for that.

11   Instead of having Agent Ennis come back to the witness stand

12   two more times to deal with the other subject matter, why

13   don't we run through all those and then I'll take up those

14   portions of her testimony with respect to the objections

15   that they relate to, you know, as it comes up.

16        MS. PALUCH: Certainly, Your Honor.

17        THE COURT: So just tell me which is the next issue

18   or objection.

19        MS. PALUCH: I apologize. With the Court's

20   permission, we would proceed to the loss calculation.

21        THE COURT: Okay. Go ahead.

22   BY MS. PALUCH:

23   Q.   All right. Did you testify, Agent Ennis, at trial as

24   to the amount of loss suffered by the various schools and

25   the Department of Education?

47

Direct - Ennis

1   A.   Yes, I did.

2   Q.   And can you please remind us today how you calculated

3   the loss in this case.

4   A.   Yes.   Through the course of my investigation, I

5   identified approximately 181 false free applications for

6   federal student aid.   These are commonly referred to as a

7   FAFSA.   In review of these FAFSAs, I was able to determine

8   how much money in loans and grants the U.S. Department of

9   Education disbursed to the identified schools.

10          Once the identified schools took out their portion

11  for tuition and fees, any remaining funds were disbursed to

12  the purported students in the form of a Higher One debit

13  card.   It was through my review of the records that I was

14  able to determine the loss in this case.

15  Q.   Okay.   Did you create a chart showing the amount of

16  loss in this case for use at trial?

17  A.   Yes, I did.

18  Q.   And was that chart marked as Government's Trial Exhibit

19  72?

20  A.   Yes, it was.

21  Q.   I'd like to show you what's -- if you could look in

22  your book, Agent Ennis, to what's been marked as GS, for

23  Government's sentencing, Exhibit 72-1.

24  A.   Okay.

25  Q.   Can you identify that chart -- or that exhibit.

48

Direct - Ennis

1    A.   Yes.  This is Government Trial Exhibit 72, with the
2    addition of a column to the far right side.
3    Q.   Okay.  And is it marked as 72-1?
4    A.   Yes, it is.
5            MS. PALUCH:  And for the record, Your Honor, this
6    same chart was submitted to the Court as attachment 4 to the
7    Government's position -- sentencing position on loss,
8    restitution and forfeiture, and that's ECF 341.
9            THE COURT:  All right.  Thank you.
10           MS. PALUCH:  And I would move to admit this exhibit
11   at this time.
12           THE COURT:  Any objection?
13           MS. STEWARD:  No objection, Your Honor.
14           THE COURT:  There being no objection, Government
15   Exhibit 72-1 is admitted into evidence.
16       (Government's Exhibit 72-1 received)
17           MS. PALUCH:  One second, Your Honor, if I could.
18           THE COURT:  Sure.
19   BY MS. PALUCH:
20   Q.   Now, you indicated the difference between this and the
21   sentencing exhibit is the far right column.  Could you
22   explain the heading on the far right column.
23   A.   Yes.  The heading is called Thomas Associations.
24   Q.   Okay.  And what appears under that heading?
25   A.   It is a key explaining the entries in the remainder of

49

Direct - Ennis

1    this spreadsheet.

2    Q.   Okay.  Before we get to that, let's step back for a

3    moment to your investigation.  What did your -- what did

4    that investigation reveal as to the scope of the criminal

5    activity that this defendant agreed to jointly undertake?

6    A.   This investigation revealed that Defendant Thomas was

7    involved directly through the entire course of this scheme

8    and that Defendant Thomas knew Heather Carr -- Defendant

9    Heather Carr was obtaining Social Security numbers through

10   the course of her employment.

11   Q.   Okay.  So if you could break that down a little bit

12   when you talk about every aspect of the scheme.  What were

13   some of those aspects?

14   A.   The investigation disclosed that Defendant Thomas was

15   obtaining addresses that were used in the scheme.  He was

16   assisting in the filing of free applications for federal

17   student aid.  Defendant Thomas was using cash -- or using

18   the Higher One debit cards to obtain cash, and Defendant

19   Thomas was assisting in completion of the homework.

20   Q.   And when you say "obtaining addresses," why were

21   addresses so important, or were they?

22   A.   Addresses were very important.  Multiple addresses had

23   to be used so that the Higher One debit card could be sent

24   to multiple addresses and not arising suspicion in, say,

25   only being delivered to one address.

50

Direct - Ennis

1    Q.   Okay.  I'd like to direct your attention back to

2    Government Exhibit 72-1.  And we're going to start on the

3    left-hand side and have you explain the columns.  And if we

4    could start, first, the headings in blue.

5    A.   Yes.  The headings in blue are the schools listed in

6    alphabetical order.  These were the schools identified in

7    the investigation as being impacted by the scheme.

8    Q.   And then under the blue headings, what appears?

9    A.   Below the blue headings are 91 applicants who had

10   federal student aid disbursed in their name.

11   Q.   And why the difference between the 181 false

12   applications you testified to as compared to the 91 on this

13   chart?

14   A.   Out of the 181, 91 individuals had federal student aid

15   disbursed in their name.

16   Q.   Okay.  If we could go to the next block entitled

17   Disbursals to School by ED.  Could you explain that, please.

18   A.   Yes.  This breaks down the loans and grants that were

19   disbursed to the schools by the U.S. Department of

20   Education.

21   Q.   And the next block entitled Adjustments Returned by

22   School, please explain.

23   A.   At times when an applicant would withdraw or fail out

24   in the courses, the school was required to return money to

25   the U.S. Department of Education.  This column indicates

Direct - Ennis

1　money returned to the department.

2　Q.　And how did those amounts that were returned to the

3　department factor into your loss calculation in this case?

4　A.　These -- these were money returned by the school.  At

5　times the school had to take money out of their own coffers

6　to pay back money to the Department of Education because

7　money had already been disbursed to the students.  So this

8　reflects a loss to the schools.

9　Q.　Okay.  Your next column is entitled Losses.  Could you

10　please explain.

11　A.　Yeah.  This is just the breakdown of loss to the U.S.

12　Department of Education and to the identified schools.

13　Q.　FSA Refunds, please.

14　A.　So when the U.S. Department of Education disburses

15　money to the school, the school takes their portion for

16　tuition and fees, and any remaining amount goes to an

17　applicant.  These numbers here represent money that was

18　disbursed in the form of a Higher One debit card.

19　Q.　Then your final column that you've testified to about

20　Thomas' Associations, could you please go through the key

21　and explain what we're seeing here on this --

22　A.　Yes.  So IP stands for internet protocol activity

23　coming from the Kaibab address, during the month and year at

24　which the Defendant Thomas resided at the Kaibab address

25　with Defendant Heather Carr and their children.

52

Direct - Ennis

1    Q.    Okay.  If you could go on to the letter A.

2    A.    A stands for addresses that were tied to Defendant

3    Thomas and/or the other three co-conspirators in this

4    investigation.

5    Q.    And the letters DC.

6    A.    DC stands for a debit card.  Debit card being one of

7    the debit cards that was found in the possession of

8    Defendant Thomas at the time of his arrest in August 2012.

9    Q.    Final reference is to the letter C.

10   A.    C stands for an Accurint query conducted by Defendant

11   Heather Carr.

12   Q.    Is there a C listed for every single entry at issue in

13   this case?

14   A.    Yes.

15   Q.    Okay.  So let's focus on the address entries.  And what

16   I'd like to do now is have you explain how each address is

17   tied to Defendant Thomas or to one or more of the other

18   three defendants in this case.

19   A.    Okay.

20   Q.    And what we'll do is start with -- the first dash

21   there, you will see it says PMB, Diaz.  Can you explain what

22   that reference is?

23   A.    Yes, this was a private mailbox location.  This address

24   was used in the submission of false applications for federal

25   student aid.  This private mailbox was opened up by

53

Direct - Ennis

1    Codefendant Diaz -- Mercedes Diaz.

2    Q.   And who is Diaz again?

3    A.   She was one of the codefendants in this matter.

4    Q.   Okay.  The next address that we see is Dragoon Circle.

5    What is the connection of that address to this case?

6    A.   1161 Dragoon Circle is an address where Codefendant

7    Mercedes Diaz resided, and there was also a private mailbox

8    address used for this applicant.  And investigation

9    disclosed that Mercedes Diaz opened up this private mailbox.

10   Q.   Okay.

11            THE COURT:  Ms. Paluch, it's not your intention to

12   go through every entry in the spreadsheet, is it?

13            MS. PALUCH:  You know, Your Honor, there are 13

14   addresses that we tie to the defendant.

15            THE COURT:  Oh, you're going to go through the

16   addresses.  Okay.

17            MS. PALUCH:  To -- just the 13 addresses --

18            THE COURT:  Right.

19            MS. PALUCH:  -- and we did confer with counsel

20   before to confirm that they are contesting.

21            THE COURT:  I understand.  Okay.  Now I understand

22   where you're going.

23            MS. PALUCH:  Right.

24            THE COURT:  I just wanted to confirm you weren't

25   going --

54
Direct - Ennis

1   MS. PALUCH:  Not through all 91, Your Honor.

2   THE COURT:  -- through all the --

3   MS. PALUCH:  Yeah, we so we have 11 more to go.

4   THE COURT:  All right.

5   BY MS. PALUCH:

6   Q.   Now, in that same entry, you see a DC, and it states

7   mailed to PMB, Swiss.  Can you explain that entry?

8   A.   Yes, this entry actually should reflect an A.  This was

9   a private mailbox opened up by Terrel Smith.  Terrel Smith

10  is known as Swiss.

11  Q.   And how is it that you know that Terrel Smith is known

12  as Swiss?

13  A.   We know this through law enforcement contact, and we

14  also determined Terrel Smith was Swiss based on text

15  messages recovered from the defendant's broken -- Defendant

16  Thomas' broken phone.

17  Q.   And I believe we jumped over:  How is Terrel Smith

18  connected to anyone in this scheme?

19  A.   Smith -- Terrel Smith is connected to the Defendant

20  Thomas.

21  Q.   How so?

22  A.   We know this from the text messages recovered from the

23  broken phone.

24  Q.   That meaning they're friends or what was --

25  A.   They are friends.

Direct - Ennis

1  Q.   Okay.  Let's go back to the chart.  The next entry we

2  see is Lexington Village.  What is the connection with that

3  address?

4  A.   Lexington village was the address of Makayla Grant.

5  Makayla Grant was a friend of co-conspirator Heather Carr.

6  Q.   Okay.  Now, under the Lexington Village, you see two

7  lines there.  What are those for?  You have James -- Deanna

8  James and Martin -- Sharon Martin.

9  A.   Yes.  Those individuals ultimately did not have aid

10  received in their name.

11  Q.   Okay.  So those entries actually shouldn't have been on

12  the chart; is that right?

13  A.   That is correct.

14  Q.   So the next new address that we see here is Meadow Oak.

15  Can you testify as to what connection, if any, Meadow Oak

16  has to this case?

17  A.   Yes.  Meadow Oak is the address of Kimmisha Mullett.

18  Kimmisha Mullett is a friend of Defendant Thomas.  Kimmisha

19  Mullett testified at trial that Defendant Thomas asked her

20  to use her address for the receipt of federal student aid

21  mail.  And there were text messages recovered from Defendant

22  Thomas' broken phone between Ms. Mullett and Defendant

23  Thomas.

24  Q.   Okay.  The next new address we see, there's an A, and

25  it says tied to Lola Thomas.  Who is Lola Thomas?

56

Direct - Ennis

1   A.   Lola Thomas is the former wife of Defendant Thomas.

2   Q.   Okay.  And the assertion there is that debit cards were

3   being mailed to that address; is that --

4   A.   Well, it was a friend of Lola Thomas.  Her name is Dora

5   Davis.  Dora Davis' address was also used for the receipt of

6   federal student aid mail and text messages on the

7   defendant's broken phone -- Defendant Thomas' broken phone.

8   There were text messages between Defendant Thomas and Lola

9   Thomas about the use of the Dora Davis address.

10   Q.   So we're still on the first page, and the next new

11   address is Blackhawk address, Sanders.  Can you explain

12   that?

13   A.   Yes.  Matthew Sanders resided at the Blackhawk address.

14   Matthew Sanders is the stepbrother of Defendant Heather

15   Carr.  Matthew Sanders met Defendant Thomas while in prison

16   in Colorado Department of Corrections.

17   Q.   Did you interview Mr. Sanders?

18   A.   Yes, I did.

19   Q.   Did he acknowledge receiving mail related to student

20   financial aid?

21   A.   Yes, he did.

22   Q.   And what did he say?

23   A.   He said when he received federal student aid mail, he

24   would throw the mail away.

25   Q.   Did any of the debit cards mailed to Sanders' Blackhawk

57

Direct - Ennis

1    address end up in the defendant's possession?

2    A.    Yes.  I believe six debit cards were in the Defendant

3    Thomas' possession at the time of his arrest in August 2012.

4    Q.    Okay.  Moving on to page 2 of this exhibit.  And the

5    next new address that we see is -- highlighted here is the

6    4630 South 21st Street, it says Green.  Can you please

7    explain?

8    A.    4630 South 21st is the address where Defendant Marcelle

9    Green resided.

10   Q.    And, again, for the record, Marcelle Green?

11   A.    Marcelle Green is a defendant in this matter.

12   Q.    Okay.  Under that entry is the address of Rushmore, and

13   it says Pickens.  Can you explain that?

14   A.    Yes.  1418 Rushmore was the address of LaTanya Pickens.

15   LaTanya Pickens was the friend of Defendant Heather Carr.

16   We also know that 1418 Rushmore was used by Defendant Thomas

17   when he applied for his own federal student aid and

18   Defendant Thomas also used this address on an El Paso

19   Sheriff County booking form dated January 28th, 2012.

20   Q.    Okay.  The next address we see is 1915 East Mobile

21   Lane, Green.

22   A.    Yes, 1915 East Mobile Lane is the deceased Marcelle --

23   Defendant Marcelle Green's deceased uncle, Jimmy.  Defendant

24   Marcelle Green advised that the address was used for receipt

25   of fraudulent federal student aid mail.

58

Direct - Ennis

1    Q.   Okay.  Moving on to page 3, there is references to
2    Radiant Drive.  And have you already testified about the
3    Radiant Drive address?
4    A.   Yes, I have.
5    Q.   And, for the record, who resided at that address?
6    A.   Defendant Thomas resided at the address, along with
7    Christine Duncan.
8    Q.   Okay.  Under that, we see a Rice address with Cox.  Can
9    you explain that?
10   A.   1063 Rice was the address of Defendant Thomas' cousin,
11   Michael Cox.
12   Q.   And was Michael Cox interviewed?
13   A.   Yes, he was.
14   Q.   And what did he say?
15   A.   Mr. Cox advised that federal student loan mail would be
16   delivered to the house and any of that mail he would return
17   to the letter carrier.
18   Q.   In fact, were debit cards that had been mailed to
19   Michael Cox's Rice Drive address found in the defendant's
20   possession?
21   A.   Yes.
22   Q.   Approximately how many?
23   A.   I believe two debit cards.
24   Q.   Okay.  And after the Rice Drive address, can you scroll
25   through the rest to confirm that we've already explained the

Direct - Ennis

1    connection.

2    A.   Yes, we have.

3    Q.   Okay.  I'd like you to look at the last page of this

4    exhibit.

5         On the last page, did you total the loss suffered

6    by the Department of Education as a result of this case?

7    A.   Yes, I did.

8    Q.   And what is that amount?

9    A.   The loss to the Department of Education was -- the

10   total loss?

11   Q.   Yes, ma'am.

12   A.   To U.S. Department of Education and schools or just

13   Department of Education?

14   Q.   The total loss reflected at the very bottom of the

15   chart.

16   A.   The total loss was $563,890.85.

17   Q.   Okay.  And of that amount, how much was paid to the

18   conspirators in the form of refunds or debit cards?

19   A.   $419,218.50.

20   Q.   And is that the amount that appears to the right of the

21   total?

22   A.   Yes.

23   Q.   Okay.  And the difference between those two amounts,

24   what happened to the difference?

25   A.   The difference would be the portion that the schools

60

Direct - Ennis

1    took out for tuition and fees.

2    Q.   Okay.  And the loss to the schools, is that reflected

3    on this chart as well?

4    A.   Yes.

5    Q.   And what is that amount?

6    A.   $72,540.85.

7    Q.   And it's not reflected on this chart, but had aid been

8    disbursed on all 181 false applications, how much would have

9    been paid out?

10   A.   1.3 million.

11   Q.   Are you familiar with plea agreements reached for

12   Codefendants Carr, Diaz and Green?

13   A.   Yes, I am.

14   Q.   And did those plea agreements list a different loss

15   amount?

16   A.   Yes, they did.

17   Q.   And what accounts for the difference between the two

18   losses?

19   A.   In preparing these exhibits for trial, I learned that

20   $1,403 was inadvertently left off the spreadsheet.

21   Q.   Okay.

22        MS. PALUCH:  Your Honor, that is the presentation

23   the Government has on the loss amount --

24        THE COURT:  Okay.

25        MS. PALUCH:  -- which is the same amount we are

61
Direct - Ennis

1    seeking in restitution.

2         I would seek guidance from the Court at this point

3    if you would like me to proceed to evidence on the

4    forfeiture or --

5         THE COURT:  We're going to deal with forfeiture, as

6    I said before, at the end of the hearing.  I don't think I

7    need to take any more evidence on that.  I thought you had

8    told me that Agent Ennis was also going to testify on the

9    known minor role downward adjustment as well.

10        MS. PALUCH:  Yes, Your Honor.

11        THE COURT:  Okay.  Why don't you go to that.

12        MS. PALUCH:  Okay.  Okay.

13   BY MS. PALUCH:

14   Q.   In the course of your investigation, were Defendant

15   Heather Carr's bank records reviewed?

16   A.   Yes, they are.

17   Q.   In those records, did you find evidence of payment from

18   Carr to an attorney?

19   A.   Yes, I did.

20   Q.   I'd like you to look in your exhibit look -- exhibit

21   book at Government's Sentencing Exhibit 2.  When you get

22   there, could you please identify that exhibit.

23   A.   Yes.  This is a check written by Heather Carr to

24   Griffin Law Firm.

25        MS. PALUCH:  Your Honor, I'd move for admission of

62

Direct - Ennis

1    Government's Exhibit 2.

2              THE COURT:  Is there any objection?

3              MS. STEWARD:  No objection, Your Honor.

4              THE COURT:  There being no objection, Exhibit 2 is

5    admitted into evidence.

6         (Government's Exhibit GS-2 received)

7    BY MS. PALUCH:

8    Q.   And who is that check to and from?

9    A.   The check is written from the account of Heather Carr

10   and it was written to Griffin Law Firm.

11   Q.   And what is referenced in the notation?

12   A.   It says "last payment Tramell Thomas."

13   Q.   And what's the amount of that check?

14   A.   $774.

15   Q.   Okay.  Did you research, in the course of your

16   investigation, the Griffin Law Firm?

17   A.   Yes.  I learned Griffin Law Firm was -- had an

18   attorney, Tracey Eubanks, who actually later became Tracey

19   Griffin.

20   Q.   Did the Government make attempts to talk to Ms. Eubanks

21   about that check?

22   A.   Yes.

23   Q.   And were those attempts successful?

24   A.   No, they were not.

25   Q.   Was she endorsed as a witness by the defense for trial?

63
Direct - Ennis

1    A.    Yes, she was.

2    Q.    And did she appear?

3    A.    No, she did not.

4    Q.    In the course of your investigation, did you obtain the

5    jail log visits from El Paso County Jail?

6    A.    Yes, I did.

7    Q.    I'd like you to look at Government's Sentencing Exhibit

8    No. 3.

9    A.    Okay.

10   Q.    And can you identify that document?

11   A.    Yes.  This is the inmate visitor history for Defendant

12   Tramell Thomas, received from El Paso County, and it lists

13   visitors.

14   Q.    And what's the time period of this log?

15   A.    The time period of the log ranges from -- bear with me,

16   I have to remove -- from November 2d -- starting in

17   January -- on January 30th, 2012, and ending November 2d,

18   2012.

19        MS. PALUCH:  Your Honor, at this time I'd move for

20   the exhibit -- admission of Government's Sentencing

21   Exhibit 3.

22        THE COURT:  Any objection?

23        MS. STEWARD:  No objection, Your Honor.

24        THE COURT:  All right.  There being no objection,

25   Government's Sentencing Exhibit 3 is admitted into evidence.

64

Direct - Ennis

1    (Government's Exhibit GS-3 received)

2  BY MS. PALUCH:

3  Q.   Okay.  Did those records document numerous visits to

4  the defendant from Ms. Eubanks?

5  A.   Yes, it did.

6  Q.   Approximately how many times?

7  A.   There were approximately 20 visits from Tracey Eubanks.

8  Q.   Did those records also document visits from Heather

9  Carr to Tramell Thomas?

10  A.   Yes.

11  Q.   Approximately how many times?

12  A.   There were approximately 23 visits from Heather Carr.

13  Q.   In 11 months?

14  A.   Correct.

15  Q.   And where was Ms. Carr living at that time?

16  A.   Ms. Carr was riding -- residing in Arizona.

17  Q.   Okay.  Was the scheme continuing throughout the time

18  that the Defendant Thomas was incarcerated at El Paso County

19  Jail?

20  A.   Yes, it was.

21  Q.   Okay.  Switching gears here:  In the course of your

22  investigation, did you become aware of the fact that the

23  defendant was on state parole while he was committing the

24  instant offense?

25  A.   Yes.

65

Direct - Ennis

1   Q.   And what was the state offense of which he was

2   convicted?

3   A.   One count of aggravated robbery and three counts of use

4   of a weapon in a violent offense.

5   Q.   Did you review the records obtained from his parole

6   officer?

7   A.   Yes, I did.

8   Q.   Please look at Government Sentencing Exhibit No. 4.

9   A.   Okay.

10  Q.   Can you identify those records?

11  A.   Yeah.  These are records I obtained from Arizona

12  Department of Corrections for Defendant Tramell Thomas.

13  Q.   And in those records, did you find information provided

14  by the defendant to his parole officer that was false?

15  A.   Yes, I did.

16  Q.   What was the first false statement?

17  A.   The first false statement was -- you'll see it on page

18  6 of 6.  It's dated February 21st, 2012.

19  Q.   Can I stop you there, agent?

20       MS. PALUCH:  Your Honor, I'd like to move for the

21  admission of Government's Sentencing Exhibit No. 4.

22       THE COURT:  Any objection?

23       MS. STEWARD:  No objection, Your Honor.

24       THE COURT:  There being no objection, Exhibit 4 is

25  admitted.

                                 Direct - Ennis

1          (Government's Exhibit GS-4 received)

2     BY MS. PALUCH:

3     Q.    If you could proceed, Agent Ennis.  What date are you

4     referencing?

5     A.    Yes.  So on page 6 of 6, entry dated February 21st

6     2012.

7     Q.    What's represented?

8     A.    Defendant Thomas "represented that he will reside with

9     his sister Sara Forney at 1351 North Pleasant Drive in

10    Chandler, Arizona."

11    Q.    And was that true?

12    A.    No, that was not.

13    Q.    Who was he living with at that time?

14    A.    He was living with Defendant Heather Carr and their

15    children.

16    Q.    At that Pleasant Drive address?

17    A.    Correct.

18    Q.    Any other false statements you saw in those records?

19    A.    Yes.  There's an entry on page 5 of 6 on April 17th,

20    2012.  Defendant Thomas states that he will be residing with

21    his sister at 1822 East Kaibab Drive in Chandler, Arizona.

22    Q.    And was that true?

23    A.    No, it was not.

24    Q.    And, in fact, what did your investigation reveal?

25    A.    The Defendant Thomas was residing with Defendant

67

Direct - Ennis

1    Heather Carr and their children.

2    Q.   Was he living at that address when a search warrant was

3    executed in this case?

4    A.   Yes, he was.

5    Q.   Were there any other false statements you saw in those

6    records?

7    A.   Yes, there was.

8    Q.   And what would that be?

9    A.   Let's see.  Bear with me.

10   Q.   Refer your attention to page 1, entry September 27.

11   A.   Okay.  There's also an entry on page 3 of 6.

12   Q.   Okay.

13   A.   For -- actually, that's incorrect.  You were correct,

14   on 9-27, on page 1 of 6, there's an entry where the

15   defendant informs his parole officer that he has had no

16   police contact.

17   Q.   And was that true?

18   A.   No, it was not.  Defendant Thomas had been pulled over

19   and arrested by Tempe Police Department in August 2012.

20   Q.   And he did not report that law enforcement contact to

21   the -- his parole officer?

22   A.   That is correct.

23   Q.   In fact, did he spend the night in jail?

24   A.   Yes, he did.

25        MS. PALUCH:  No further questions at this time,

68

Cross - Ennis

1    Your Honor.

2         THE COURT:  All right.  Cross-examination.

3                    CROSS-EXAMINATION

4    BY MS. STEWARD:

5    Q.  Good morning.

6    A.  Good morning.

7    Q.  Give me just a second to get back to the beginning of

8    my notes.  I apologize.

9         Now, ma'am, you testified earlier that Defendant

10   Carr, Heather Carr, received all of the Social Security

11   numbers through her job at Wells Fargo; is that correct?

12   A.  That is correct.

13   Q.  And these -- her first access to -- her first

14   unauthorized access was in 2010 on July 3d?

15   A.  Correct.

16   Q.  Okay.  And that was an Ismael Omar.

17   A.  That is correct.

18   Q.  And then you spoke to Omar, but Mr. Omar later refused

19   to testify, correct?

20   A.  Correct.

21   Q.  And did he state why he refused to testify?

22   A.  He said that he would refuse to answer questions if put

23   on the stand.

24   Q.  Okay.  And he didn't give you a further description of

25   why?

Cross - Ennis

1    A.    He didn't want to be involved.

2    Q.    Okay.  And then, ma'am, you stated that later you spoke

3    to a Ms. Lopez in 2015, correct?

4    A.    Correct.

5    Q.    And Ms. Lopez knew Defendant Thomas.

6    A.    That is correct.

7    Q.    And they briefly -- they briefly dated?

8    A.    That is correct.

9    Q.    And during that time that they dated, they both

10   attend -- they both attempted to register at Pikes Peak

11   College, correct?

12   A.    That is correct.

13   Q.    And at that time, they both had sincere intentions to

14   register for college, correct?

15   A.    I --

16           MS. PALUCH:  Objection.  Objection, Your Honor, she

17   can't speak to the sincerity.

18           THE COURT:  It's cross-examination.  The rules of

19   evidence, as we've established, don't apply.

20           Go ahead.

21           THE WITNESS:  I can't speak to the sincerity.  She

22   said that they -- the two went to Pikes Peak together and

23   that Defendant Thomas knew she didn't have a GED.

24   BY MS. STEWARD:

25   Q.    Okay.  At that time, ma'am, did you -- was there any

70

Cross - Ennis

1    information that you were able to obtain that would suggest

2    that they did not intend to enroll in college?

3    A.    Just based on all the false applications that had been

4    filed in this investigation, that led me to question any

5    sincerity and legitimate attendance at post-secondary

6    institution.

7    Q.    So no, but based on your further investigation, you

8    don't believe that they were insincere; is that correct?

9    A.    Based on the totality of the false FAFSA submitted, I

10   would question the sincerity of anyone's intentions to

11   attend.

12   Q.    Okay.  Did Mr. Thomas attend courses at Pikes Peak

13   College?

14   A.    Yes, he did.

15   Q.    And for how long?

16   A.    Off the top of my head, like I don't have that in front

17   of me, so I wouldn't be comfortable saying for the duration

18   of time.

19   Q.    Do you have an estimate?

20   A.    I would say between when he was released from Colorado

21   Department of Corrections in -- through, approximately, June

22   2010.

23   Q.    Okay.  Now, you also said that Ms. Lopez was afraid for

24   her safety, correct?

25   A.    That is correct.

Cross - Ennis

1    Q.   And that allegedly Mr. Thomas made threats towards

2    people coming to her house, correct?

3    A.   That is correct.

4    Q.   Did she report any threats made directly to her?

5    A.   Not to my knowledge.

6    Q.   Okay.  And you also said that they dated for a month

7    and he -- she didn't know his correct first name, correct --

8    or his correct name?

9    A.   That is correct.

10   Q.   And, ma'am, if you know, is it rare nowadays to have --

11   meet somebody on the internet or whatnot and not know their

12   name in the first month?

13   A.   Based on the investigations I conduct and how many

14   identity theft investigations I conduct, I would not be

15   surprised how people are unwilling to provide their true

16   identity.

17   Q.   Okay.  And then you said that Christine Duncan was also

18   involved -- or her name was also involved and Social

19   Security was involved in the scheme, correct?

20   A.   That is correct.

21   Q.   Wasn't Ms. Duncan, herself, involved in the scheme at

22   some point?

23   A.   Ms. Duncan also went with Defendant Thomas to Pikes

24   Peak Community College to apply for federal student aid.

25   She, like Ms. Lopez, ultimately did not attend classes and

72

1   assumed that federal student aid was not disbursed in her

2   name because of that.

3   Q.   Okay.  Did Ms. Duncan go to Arizona and reside with Ms.

4   Carr at some point?

5   A.   No, she did not.

6   Q.   Was she involved in the scheme, if you know?

7   A.   No, she wasn't involved in the scheme.  There's the

8   separate matter that we shouldn't be discussing that she was

9   involved in.

10  Q.   All right.  Ma'am, and you said that 181 false

11  applications were submitted to the FAFSA system, correct?

12  A.   Correct.

13  Q.   And if I remember reading correctly, about 10 of those

14  might have been attributed to Mr. Thomas?

15  A.   Say that again, please.

16  Q.   About 10 of those were attributed to Mr. Thomas?

17  A.   10 addresses?

18  Q.   Yes, ma'am.

19  A.   Yes, approximately between 10 and 13 addresses.

20  Q.   And some of those -- some of those applicants resulted

21  in a Higher One debit card being sent to those addresses,

22  correct?

23  A.   That is correct.

24  Q.   And some of those -- approximately 50 of those cards

25  were taken by the Phoenix police, correct?

Cross - Ennis

 1   A.   That is correct.

 2   Q.   And they were taken when Mr. Thomas was arrested?

 3   A.   That is correct.

 4   Q.   Were those items searched for fingerprints?

 5   A.   Yes, they were.

 6   Q.   Were Mr. Thomas' fingerprints on those items?

 7   A.   Neither Defendant Thomas' nor any of the other

 8   defendants' fingerprints were located on those debit cards.

 9   Q.   Okay.  So no -- what information do you have that

10   Defendant Thomas knew that Ms. Carr was using her Accurint

11   account in this way?

12   A.   Could you clarify that, please?

13   Q.   Yes.  What information do you have that Mr. Thomas knew

14   that Ms. Carr was using her Accurint account to take

15   people's Social Security numbers?

16   A.   Based on his relationship with the defendant Heather

17   Carr.

18   Q.   So just the relationship?

19   A.   Well, based on, I think, the totality of the

20   investigation you would know how the scheme worked, that you

21   would visit Department of Corrections' websites, obtain a

22   name and date of birth, and there had to be someone who was

23   able to obtain the Social Security number.

24   Q.   And all of that could have been done without Mr.

25   Thomas' knowledge; isn't that correct?

74

Cross - Ennis

1    A.   No, I don't think so.

2    Q.   You don't believe that someone could have gone on the

3    Department of Corrections' website without Mr. Thomas'

4    knowledge?

5    A.   It's possible, but the investigation -- the evidence in

6    this investigation I believe reflects that Defendant Thomas

7    was involved in every aspect of this scheme.

8    Q.   Okay.  I'm going to re-ask the question, ma'am:  Do you

9    believe that someone can go onto the Department of

10   Corrections' website without his knowledge?

11   A.   That would possibly -- that could be possible.

12   Q.   Okay.  Do you believe that Ms. Carr could have used her

13   Accurint access without his knowledge?

14   A.   It could be possible.

15   Q.   Could be possible.  Okay.  Do you believe that homework

16   could have been completed without Mr. Thomas' knowledge?

17   A.   Any -- any of it could be possible.

18   Q.   Okay.  And, ma'am, you interviewed Marcelle Green -- is

19   it Marcelle Green in this case, correct?

20   A.   That is correct.

21   Q.   And she stated that while she was aware that Ms. Carr

22   was involved in the scheme, that Mr. Thomas was just kind of

23   around.

24   A.   Actually, no.  She said that there was like this

25   homework or free application party where they were all there

75

Cross - Ennis

1  and they were all filling out forms and submitting FAFSAs,

2  and that Defendant Thomas was present.

3  Q.   Right.  And that's the only time she saw Mr. Thomas

4  involved in the scheme, correct?

5  A.   That is what Marcelle Green said.

6  Q.   So other times when she would give Ms. Carr money, Mr.

7  Thomas wasn't necessarily around, correct?

8  A.   She said there were occasions when Mr. Thomas --

9  Defendant Thomas was not present.

10  Q.   Okay.  And when she and Ms. Diaz went to Ms. Carr's

11  home, Mr. Thomas was in the home, but he would leave the

12  room, correct?

13  A.   There were occasions where he was not present in the

14  room.

15  Q.   Okay.  Ma'am, when you looked at the Government exhibit

16  that had all of the addresses and whatnot on that, there was

17  no address before May of --

18       THE COURT:  Are you talking about 72-1?

19       MS. STEWARD:  Yes.  Yes, sir, I apologize.

20       THE COURT:  Let's make the record clear.

21  BY MS. STEWARD:

22  Q.   Yes.  Exhibit 72-1, that exhibit, there was no address

23  that was attributed to Mr. Thomas before May 2012, correct?

24  A.   No, there were addresses attributed to him.  The reason

25  why we left it at May 2012 time frame is because there was a

76

Cross - Ennis

1   period Defendant Thomas was incarcerated.

2   Q.   So on that exhibit, there were no addresses attributed

3   to him before May 2012, correct?

4   A.   No, there are addresses attributed to him.

5   Q.   Okay.  Where on the exhibit, ma'am?

6   A.   The Blackhawk address, the Rice Drive address, the 1418

7   Rushmore address, the Lexington Village address.

8   Q.   Now, the Lexington Village address is -- excuse me --

9   attributed to a Grant, correct?

10  A.   Makayla Grant, correct.

11  Q.   Okay.  And Makayla Grant knew Heather Carr, correct?

12  A.   That is correct.

13  Q.   And she might have known Mr. Thomas, but she knew

14  Heather Carr, correct?

15  A.   Correct.  She was not interviewed in this

16  investigation.

17  Q.   All right.  The Radiant Drive address, that Mr. Thomas

18  resided there, correct?

19  A.   That is correct.

20  Q.   And when did he reside there, ma'am?

21  A.   He resided there during the approximate time frame of

22  2010 through his arrest in -- on January 28th, 2012.

23  Q.   Okay.  And then the Rushmore address is attributed to

24  Pickens, correct?

25  A.   It's attributed to Pickens.

77

Cross - Ennis

1    Q.    And Pickens knew Ms. Carr, correct?

2    A.    She did.  Defendant Thomas also used the 1418 Rushmore

3    address prior to the 2012 time frame in submitting

4    applications for federal student aid.

5    Q.    His own application --

6    A.    His own applications.

7    Q.    Do you know whether Mr. Carr -- I'm sorry, Mr. Thomas

8    resided at that address?

9    A.    Definitely, I don't believe, no.

10   Q.    And then Mr. Sanders, he is related to Ms. Carr as

11   well, correct?

12   A.    Correct.  Mr. Sanders also served time with the

13   Defendant Thomas.

14   Q.    But he has a familial relationship to Ms. Carr,

15   correct?

16   A.    I would say he has a familiar relationship to both of

17   them.

18   Q.    I'm sorry, not familiar, familial?

19   A.    Oh, familial, yes.

20   Q.    I apologize.

21   A.    That's okay.

22   Q.    Okay.  So, ma'am, you said that you were aware that Mr.

23   Thomas benefited from the scheme, correct?

24   A.    That is correct.

25   Q.    And it's clear that Ms. Carr wrote a check to his

Cross - Ennis

1   attorney, correct?

2   A.   That is correct.

3   Q.   Now, benefiting from the scheme doesn't necessarily

4   mean that he was aware of it, correct?

5   A.   That could be correct, but based on the other evidence

6   in this investigation, we believe he was fully aware of the

7   scheme.

8   Q.   Okay.  So benefiting doesn't mean that he was aware of

9   it, correct?

10  A.   That is correct.

11  Q.   Okay.  And he was in a relationship with Ms. Carr,

12  correct?

13  A.   That is correct.

14  Q.   And that relationship was approximately seven years,

15  correct?

16  A.   I'm not sure of the exact time frame.

17  Q.   Okay.  And during that relationship, Ms. Carr did

18  things for Mr. Thomas, correct?

19  A.   I assume she did.

20  Q.   She bore two children for him?

21  A.   Yes, she did.

22  Q.   They lived in the home together?

23  A.   Correct.

24  Q.   Okay.  And the bank -- the check that Ms. Carr wrote to

25  Mr. Thomas' attorney, that only had Ms. Carr's name on it,

Cross - Ennis

1    correct?

2    A.    That is correct.

3    Q.    It was signed by Ms. Carr?

4    A.    Yes, it was.

5    Q.    Okay.

6              THE COURT:  Ms. Steward, let's take a pause here.

7    We're going to take a 10-minute recess.

8              Agent Ennis, because you're in the middle of your

9    testimony, I direct you not to speak with any of the lawyers

10   during the recess.

11             All right.  We'll be in recess for 10 minutes.

12         (Recess taken 11:39 a.m. to 11:51 a.m.)

13             THE COURT:  Agent Ennis, I remind you that you

14   remain under oath.

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Ms. Steward, you may resume your

17   cross-examination.

18             MS. STEWARD:  Thank you, Your Honor.

19   BY MS. STEWARD:

20   Q.    Agent Ennis, the -- all the addresses that are on your

21   spreadsheet on 73-1, are those addresses --

22             THE COURT:  72-1.

23             MS. STEWARD:  72-1.  I apologize, Judge.

24   BY MS. STEWARD:

25   Q.    72-1, are those addresses tied to other defendants in

Cross - Ennis

1    this case?

2    A.    Yes, they are.

3    Q.    Okay.  In particular, are all of the addresses tied to

4    Ms. Carr?

5    A.    Yes, they are.

6    Q.    Okay.  And I believe earlier you testified that there

7    was some information about a gentleman named Terrel Smith.

8    A.    Correct.

9    Q.    And that gentleman went by the name of Swift?

10   A.    Swiss.

11   Q.    Swiss.  I apologize.  Swiss.

12   A.    Uhm-hum.

13   Q.    And that there was some text message back and forth

14   between Mr. Swiss and Mr. Thomas, correct?

15   A.    That is correct.

16   Q.    And, ma'am, didn't Swiss and Diaz also date?

17   A.    I'm not aware of that.

18   Q.    Okay.  Ma'am, you interviewed Marcelle Green several

19   times in this case, correct?

20   A.    That is correct.

21   Q.    And Ms. Green told you that Ms. Carr came up with the

22   plan, right?

23   A.    That is correct.

24   Q.    And she said that she invited -- Ms. Carr invited Ms.

25   Green to participate, correct?

81
Redirect - Ennis

1   A.   That is correct.

2   Q.   Ms. Green never mentioned Mr. Thomas inviting her to

3   participate, correct?

4   A.   I interpreted Marcelle Green's interview to mean that

5   they all devised a way, and it was through conversations

6   that Ms. Green had with Ms. Carr, that her assumption was

7   that Defendant Thomas was involved.

8   Q.   All right.  So Ms. Green assumed that Thomas was

9   involved, correct?

10  A.   That is correct.

11  Q.   She didn't say that she knew that Thomas was involved.

12  A.   Well, she testified that she knew he was involved.

13  Q.   At the end.  But in the beginning when she was

14  approached by Ms. Carr?

15  A.   That is correct.

16           MS. STEWARD:  Okay.  Can I have a second, Your

17  Honor?

18           THE COURT:  You may.

19           MS. STEWARD:  Okay.  No further questions.

20           THE COURT:  All right.  Redirect.

21           MS. PALUCH:  Thank you, Your Honor.

22                   REDIRECT EXAMINATION

23  BY MS. PALUCH:

24  Q.   You were just asked a question about whether or not Ms.

25  Green assumed that the Defendant Thomas was involved in the

Redirect - Ennis

1    scheme, correct?

2    A.    That is correct.

3    Q.    Did -- in your interviews of Ms. Green, did she talk

4    about essentially a tutorial or helping the defendant with

5    any aspect of the application?

6    A.    Yes, she did.  She also said that it appeared that

7    Defendant Thomas was benefiting quite well while he was in

8    jail in the 2012 time frame and that it was because

9    Defendant Carr was paying for his legal fees and putting

10   money on his inmate commissary bank account.

11   Q.    And I think my question wasn't clear, but did Marcelle

12   Green testify about helping the defendant with an

13   application?

14   A.    That is correct.

15   Q.    And can you --

16   A.    Yes.

17   Q.    And can you recount that for us?

18   A.    She said there was an occasion when they were all

19   sitting around and that Defendant Green showed Defendant

20   Thomas how to fill out a free application for federal

21   student aid.

22   Q.    Okay.  You were asked by defense counsel that all of

23   the addresses on 72-1, Government Exhibit, were tied to

24   other defendants.  Did you recall that question?

25   A.    Yes.

Redirect - Ennis

1    Q.    Were addresses on that chart tied directly to Defendant
2    Thomas?
3    A.    Yes, it was.
4    Q.    Can you give some examples of those addresses?
5    A.    Yes.  Again, those addresses -- can I pull up 72-1?
6              THE COURT:  Do what you need to do.
7              THE WITNESS:  Okay.  So this exhibit reflects how
8    Thomas was associated.  It was the Meadow Oak address where
9    Kimmisha Mullett resided --
10   BY MS. PALUCH:
11   Q.    And I'm going to stop you there.  Was there any
12   evidence that Heather Carr was involved with Kimmisha
13   Mullett?
14   A.    No, there was not.  Kimmisha Mullett advised she had
15   met Defendant Carr on approximately one occasion, but it was
16   the relationship Ms. Mullett had with Defendant Thomas.
17   Q.    And how did they know each other?
18   A.    Ms. Mullett advised there was some like business
19   opportunity that she was working with the defendant and that
20   the defendant also -- Defendant Thomas asked her to receive
21   federal student aid mail.
22   Q.    Uhm-hum.
23   A.    There was also the Rice Drive -- 1063 Rice Drive
24   address.  1063 is the Defendant Thomas' cousin, Michael
25   Cox's, address.  There was, like I stated earlier, the 1418

84

Redirect - Ennis

1   Rushmore address where we know LaTanya Pickens was a friend

2   of Defendant Heather Carr, but we also know Defendant Thomas

3   used that address not only in applying for federal student

4   aid, but also in providing that address to El Paso County

5   sheriffs.

6   Q.   How about Radiant Drive?

7   A.   3820 Radiant Drive is where the Defendant Thomas

8   resided with Christine Duncan.

9   Q.   So you've listed a handful of addresses that are

10  directly related to this defendant, correct?

11  A.   That is correct.

12  Q.   You testified previously about Ismael Omar, Christine

13  Duncan, Vanessa Lopez.

14  A.   That is correct.

15  Q.   Do any of those individuals have a connection to

16  Heather Carr?

17  A.   No, they do not.

18  Q.   And were their Social Security numbers obtained for use

19  on school applications?

20  A.   Yes, they were.

21  Q.   And who obtained their Social Security numbers?

22  A.   Based on information -- so Ismael Omar, the defendant

23  Mr. Thomas knew --

24  Q.   I'm going to stop you there.  I'm talking about the

25  Social Security numbers.

Redirect - Ennis

1    A.   So it appears that Defendant Heather Carr queried

2    Ismael Omar's.  The other two, Vanessa Lopez and Christine

3    Duncan, it appears that Defendant Thomas obtained their

4    personal identifying information.

5    Q.   Was there connection between Defendant Thomas and

6    Heather Carr related to those specific Social Security

7    numbers as far as saving those numbers?

8    A.   Yes.  We were informed by Defendant Heather Carr that

9    Defendant Thomas asked her to save the Social Security

10   numbers of Ismael Omar, Vanessa Lopez, and Christine Duncan.

11        MS. PALUCH:  Okay.  No further questions, Your

12   Honor.

13        THE COURT:  All right.  Thank you for your

14   testimony.  Agent Ennis, you may step down.

15        THE WITNESS:  Thank you, Your Honor.

16        THE COURT:  Does the Government have any other

17   witness on any of the issues that was covered by testimony

18   of Agent Ennis?

19        MS. PALUCH:  We do not, Your Honor.

20        THE COURT:  Does the defendant have any witness he

21   wishes to present on the issues raised by the testimony of

22   Agent Ennis?

23        MS. STEWARD:  Not other than -- none other than

24   himself, Your Honor.

25        THE COURT:  Other than what?

Direct - Thomas

1      MS. STEWARD:  Himself.

2      THE COURT:  He wants to testify in this?  And let

3  me just be clear, we're talking about -- I took testimony

4  from Agent Ennis on the issues on objection No. 4, the

5  scheme in this case to be conducted by Ms. Carr and Mr.

6  Thomas, the amount of loss, and the objection to the

7  probation officer's failure to recommend a minor role

8  adjustment.  Any of those three issues.

9      MS. STEWARD:  Your Honor, Mr. Thomas would like to

10  testify.

11      THE COURT:  All right.  Come forward, sir.  You've

12  already been put under oath, so we don't have to do that

13  again.  And it will be helpful for me, Ms. Steward, if

14  you'll signal to me which of the three issues we're talking

15  about.

16      MS. STEWARD:  Yes, Your Honor.  I'm pulling them up

17  now so I make sure I stay on task here.

18      THE COURT:  Okay.

19                  DIRECT EXAMINATION

20  BY MS. STEWARD:

21  Q.   Can you state and spell your name for the record, sir?

22  A.   Yes.  Tramell, T-r-a-m-e-l-l, Thomas, T-h-o-m-a-s.

23  Q.   Okay.  And, sir, how do you find yourself in this

24  situation?

25  A.   Well, so long story, but I'll condense it.  I found

87

Direct - Thomas

1    myself in this situation, you know, is -- was a trying

2    situation.  I was in prison, as you well know, for a very

3    long time.  Most of my 20s.  And, you know, I got out in

4    2009 and things were pretty much a blur as far as the

5    movement of how things evolved since I first -- when I left

6    in 1999, technology evolved, just the movement, the speed.

7    Interactions with people was very fast for me.  I had to

8    adapt to that.

9         And I was married to Lola Thomas while I was in

10   prison and she was there for me while I was in prison.  I

11   got out of prison and we realized that our relationship was

12   better -- it was more set off as a friendship.  We didn't

13   have a lot of money and I didn't have a job or anything like

14   that.  And I reconnected with Ms. Carr in 2009.  And in

15   reconnecting with her, it was more or less like a fairytale,

16   a saving grace situation because I just have viewed her as

17   being, you know, a -- a great job, a great mom.  She had

18   articulate conversation and I was -- I was in awe of her.

19   Q.   Okay.  And so when did you begin your relationship with

20   Ms. Carr?

21   A.   We actually began in 2009.  I would say roughly July of

22   2009.

23   Q.   And --

24   A.   August.

25   Q.   In the early parts of that relationship, who had the

Direct - Thomas

1    upper hand, I -- and when I say "upper hand," I mean
2    financially.
3    A.   She did.  She -- I didn't have a job.  I was on parole.
4    I was just trying to find my way in society and life in
5    general.  I felt -- I know I was 30 years old, but I was
6    still operating at a 22 or 21 mentality -- year-old
7    mentality.  And she understood that because her previous
8    boyfriend before me was an ex-con.  He just got out of
9    prison and that relationship went awry.
10           And she, you know, she told me about that.  And in
11   my mind I'm thinking, well, if I was in his place, I would
12   never mess that up because, you know, she told me she took
13   care of him, she helped him get into school, she helped him
14   with clothing.  And it just seemed -- it seemed like if I
15   had that position, that I would be in a better position than
16   I was before.
17           And so to answer your question, she was more well
18   off.  She was the head of the household -- head of the
19   relationship.
20   Q.   Okay.  Did she help you with any of the basic -- your
21   basic needs once you were out of prison?
22   A.   Yes.
23   Q.   In what way?
24   A.   She took care of all of the needs.  Like I said, I
25   wasn't working and, at the time -- when you are in prison

Direct - Thomas

1    for so long and you get out of prison and you still live in

2    the same city like Colorado Springs, you run into a lot of

3    ex-cons, people you're involved with in prison.

4         And I wasn't -- I was seeking a job but I had one

5    foot in and one foot out.  I wasn't being proactive like I

6    should have been as far as a man.  So it was easier

7    transition to -- to utilize -- I don't want to say a certain

8    word, but my -- who I am as a man, there were sexual acts,

9    or being that to her, in order for her not to look at all my

10   other things I don't bring to the table.

11        So it was more or less a boy toy type thing.  And

12   it's difficult saying that now because I've changed since

13   then, I've grown since that took place, but at the time, I

14   feel like my worth with her was who I could be to her

15   emotionally at the time and her worth to me was both

16   emotionally and financially.

17   Q.   Okay.  So we're --

18        THE COURT:  Ms. Steward, time out.  We're not going

19   to spend the day here on this -- I didn't allocate the whole

20   day for this hearing.  You need to ask more focused

21   questions.

22        And, Mr. Thomas, you need to give more focused

23   answers.  We're talking about three discrete issues that

24   were raised by objections filed by your prior counsel.  I

25   don't really want to hear your life story.  I don't really

Direct - Thomas

1    want to hear intimate details of your relationship with your

2    prior girlfriends.  Let's stick with the issues that we're

3    talking about here and I want crisp, efficient questions and

4    crisp efficient answers.

5               MS. STEWARD:  Okay.

6               THE WITNESS:  Understood.

7    BY MS. STEWARD:

8    Q.   So let's fast-forward to your time in El Paso County.

9    When you were in El Paso County, were you aware that Ms.

10   Carr was involved in any -- any scheme?

11   A.   No.

12   Q.   And did she pay your bail -- I'm sorry, did she pay for

13   your attorney?

14   A.   Yes.

15   Q.   Do you know where the money she paid for your attorney

16   came from?

17   A.   No.

18   Q.   Did she put money on your accounts?

19   A.   Yes.

20   Q.   Did you know where money came from?

21   A.   No.

22   Q.   Okay.  And at some point, you moved to Arizona with Ms.

23   Carr, correct?

24   A.   Yes.

25   Q.   And you were arrested in Arizona, right?

Direct - Thomas

1   A.   Correct.

2   Q.   When was that?

3   A.   That was August 30th, 2012.

4   Q.   And when you were arrested, did you become aware of

5   some things in the car?

6   A.   Yes.

7   Q.   Tell us a little bit about that.

8   A.   Well, I know I had alcohol in the car, so when I got

9   pulled over, it's the natural reaction is to search around

10  and see what's in the car.  So I'm doing a basically --

11  basically a check over the car.  And as I'm looking around

12  the car, I notice a bag of cards.  And when I saw it, it was

13  more like -- because I had been drinking as well, I had a

14  lot of drinks, but I drunk that night.  It was a shock.

15       And that's why you can hear the dialogue and the

16  call between -- not the call, excuse me -- the interaction

17  between me and the officer, I was kind of off.  And so I saw

18  the cards and I was shocked.

19  Q.   Okay.  After you found those cards, did you have a

20  conversation with Ms. Carr?

21  A.   Yes.

22  Q.   Regarding?

23  A.   Those cards.

24  Q.   And can you give us some details of that conversation.

25  A.   Well, I went into a long dialogue, Ms. Carr, she wore

Direct - Thomas

1    the pants in the relationship, so certain things I was privy

2    to and certain things I weren't -- I wasn't privy to.  So if

3    I asked her a question, she would give me short answers.

4    But then knowing that all the bills are in her name and

5    she's controlling the situation, it was more of a, "It's?

6    Okay, it will be fine.  Look, I told you be fine."

7    Q.    Okay.  Eventually your home was searched, correct?

8    A.    Correct.

9    Q.    And at that point, you were pretty aware that there was

10   some criminal activity going on.

11   A.    That's when I knew, yeah, it wasn't looking good.

12   Q.    Did you ever participate in the activity, sir?

13   A.    No.

14   Q.    Okay.  Did you ever ask anybody to receive information

15   at their addresses?

16   A.    Yes.

17   Q.    Who was that, sir?

18   A.    Kimberly Mullett.

19   Q.    And when did you do that?

20   A.    Summer 2012.

21   Q.    Okay.  And why would you -- why did you do that?

22   A.    Well, Heather asked me to -- the address in Colorado

23   and -- and the reason I chose Kim is because I thought that

24   Heather was doing something more business.

25         She said she needed a reliable address.  And like I

Direct - Thomas

1  have been stating for a while, had -- if I was criminally --

2  in the criminal mindset, I wouldn't go to Kim Mullett, she's

3  the one of the most cleanest person -- people I know.

4      So I went to Kim, asked her, and she said yes.

5  Q.  Okay.  And did you ever do any homework or anything

6  like that in furtherance of this scheme?

7  A.  No.  I -- that was one of the reasons why I actually

8  quit my course in school because I could not keep up with

9  the online courses.  I had two on-campus courses and I had

10  two online courses.  So I had to drop the online at first

11  and did two on-campus; wasn't enough credits to maintain so

12  I just dropped them both.

13  Q.  And when you went to school, did you -- were you going

14  sincerely?

15  A.  Absolutely.

16  Q.  And what were you going for?

17  A.  One was business administration, if I can recall

18  correctly, and the other, it was criminal justice.

19  Q.  Okay.  And then did you also take Ms. Lopez and Ms.

20  Duncan to school?

21  A.  I did.

22  Q.  Why did you do that, sir?

23  A.  Because they wanted to further their education as well.

24  And not only that, I did know that schools disbursed funds

25  to help you out with bills and stuff like that because I

Direct - Thomas

1    received the same thing.

2          And Christine and Vanessa both said that they

3    wanted to help with finances and things of that nature, they

4    wanted the cards to come to the apartment.  And because I

5    was supposed to help them out and get a cut of the actual

6    disbursement by helping them out.  And the same way I did

7    with other friends I had, so it wasn't a first-time thing

8    that I've done, so . . .

9    Q.   Are you saying you took other people and helped them

10   enroll in school?

11   A.   Absolutely.

12   Q.   And you did that sincerely?

13   A.   Absolutely.  Then I did it then and after.  I've done

14   it numerous times since 2012.

15   Q.   You've done it since the end of the scheme?

16   A.   Yes.

17   Q.   Okay.  And, sir, what would you estimate your -- the

18   amount that might be attributed to you, the loss amount that

19   might be attributed to you in this scheme?

20   A.   The loss that -- I want to take responsibility for the

21   things that came to Kim's house because I feel that --

22   it's -- it's difficult explaining now.  I don't want to get

23   into it, sir, but it's difficult explaining it now because I

24   was a different man then.

25          So the man in me now goes back and think, well, how

Direct - Thomas

1   could you not understand what the complete complexion of
2   things that are going on?  It's a part of me that's thinking
3   did I not want to see it?  Did I not want to see that she
4   was doing this massive scheme, or -- because I benefited
5   from it?  Or because I'm that dumb, right?  One or the
6   other.
7        So from Kim Mullett, I knew that that was my
8   interaction, that's what I did.  That was the cards that
9   were mailed.  I asked Kim to receive mail there and when I
10  received it from Kim, I gave them to Heather Carr.
11  Q.   Did you use those cards yourself?
12  A.   I did not.
13  Q.   Okay.  When you moved to Arizona, did you intend to
14  live with your sister?
15  A.   Well, no, I did not.
16  Q.   Okay.
17  A.   What happened -- what happened was this:  I had had a
18  best friend -- I can't even think of her name right now --
19  and that was a way for me to parole to Arizona and to have
20  an address to parole there.  And Heather was still going
21  through something with her ex, and when I -- and she gave me
22  some big spiel.  I listened, used my sister's address -- or
23  my best friend's address, and you can parole out there.  And
24  then when we move, then you can move me then, and put -- but
25  put your parole address.  I changed the address once I moved

Case No. 1:16-cr-00054-WJM Document 525-6 filed 12/02/19 USDC Colorado pg 818 of 901

Cross - Thomas

1   there and I was there for like two months, so . . .

2   Q.   Okay.  Sir, did you have very much contact with -- with

3   Ms. Green or Ms. Carr -- Ms. Diaz?

4   A.   No, I did not.  I would see them come to the house.

5   They came over a lot.  They was always together.  As you

6   know Ms. Diaz and Heather Carr grew up together.  Ms. Green,

7   Heather Carr are best friends -- close friends.

8   Q.   Okay.  Did Ms. Green ever show you how to fill out a

9   FAFSA form?

10  A.   No.

11  Q.   Sir, did you ever submit any applications to the

12  Department of Education in an effort to get loan money that

13  was fraudulent?

14  A.   No.

15          MS. STEWARD:  No further questions, Your Honor.

16          THE COURT:  All right.  Cross-examination.

17          MS. PALUCH:  Thank you, Your Honor.

18                    CROSS-EXAMINATION

19  BY MS. PALUCH:

20  Q.   Your testimony, sir, is that you went to Pikes Peak

21  just to help Duncan and Lopez apply for federal student aid;

22  is that correct?

23  A.   Well, yeah.  I gave them a ride and helped them out,

24  yes.

25  Q.   And is that the extent of your involvement with their

Cross - Thomas

1    applications for student aid is just going with them to kind

2    of show them through the process?

3    A.    Well, I just showed them basically what I had done.

4    Q.    Okay.  So how is it that the IP activity related to

5    their applications came back to your house with Heather

6    Carr?

7    A.    I do not know.  During what time period?

8    Q.    During the time period that their applications were

9    submitted, they were submitted through the IP address

10   associated with the residence where you were living with

11   Heather Carr.

12   A.    I didn't do it.  I mean, it -- at what time period?  I

13   didn't do it at all, but when are you speaking of, exactly?

14   Q.    Their applications were submitted, sir, in 2011 time

15   frame, 2010.  They come back to the Pleasant Street address

16   and the Kaibab address.  My question is:  Regardless of the

17   time frame, if your testimony here is -- today is that you

18   only went to Pikes Peak to kind of show them the ropes and

19   show them how to -- how to apply, how do you explain that

20   the IP address related to those applications come back to

21   the house that you shared with Heather Carr?

22   A.    I was in jail in 2011.  If any activity was done with

23   those cards, I couldn't do it.

24   Q.    All right.  So what would be the connection, then, with

25   Carr if you had nothing to do with you -- your testimony

Cross - Thomas

1    here today is it was just you helping them at the school?

2    A.   Okay.  The -- when the cards were mailed from the

3    school after Diaz -- excuse me, Lopez -- Ms. Lopez and Ms.

4    Duncan, I took them to the school, the cards were mailed to

5    3820 Radiant Drive, and they both agreed to that.  While I

6    was in jail, those cards were delivered.  Ms. Carr was the

7    only one who had the actual mailbox key.

8         And it is my belief that that is when Ms. Carr

9    decided -- devised this scheme.  She was upset that I was

10   cheating on her with Vanessa Lopez and Christine Duncan.

11   Q.   Isn't it true you told Heather Carr to hold on to their

12   Social Security numbers in case you forgot them?

13   A.   No.  What -- what purpose would that do to hold on to

14   Social Security number?  Why don't I just ask them for the

15   Social Security number if that was the case.  If they're

16   willing to go to the school with me and have me sit -- help

17   them through the process --

18   Q.   Let's move on.  When you were arrested in 2012, you had

19   the bag of debit cards, correct?

20   A.   Yes.

21   Q.   You knew -- you knew to look back there and try to hide

22   them from the officer, correct?

23   A.   No.

24   Q.   Well, isn't it true you tried to sweep the bag

25   underneath the seat?  Isn't that what the audio and the

Cross - Thomas

1  evidence at trial established?

2  A.   All right.  When I saw the bags of card -- excuse me,

3  the cards -- bag of cards, I was -- I went in shock.  I was

4  nervous, and that made me suspect that Heather was up to no

5  good.  And, you know, now, me knowing I'm on parole at the

6  time, I'm on parole, have liquor in the car, and there's a

7  bag of cards in the back seat.

8  Q.   Sir, if you knew nothing about those cards, why

9  wouldn't you just tell that to the officer?  "I know

10  nothing.  I don't know if there's a bag of cards."

11       Why would you -- why would you try to hide them?

12  A.   Heather Carr is -- was the mother of my -- of my child

13  at the time, and I don't know if I did it in the way to

14  protect her or -- I just knew that my experience, being in

15  the prison, it's a -- it's a natural thing, coming from --

16  where I come from to be nervous in a situation like that.

17  Q.   You knew those cards were there.  You knew those cards

18  were there when the officer stopped you and that's why you

19  tried to hide them.

20  A.   I knew the cards were there as the officer was coming

21  to the car, yes.

22  Q.   So if -- you just knew automatically there must be

23  something illegal about this bag of cards?

24  A.   Yes.  It -- and it looked pretty -- you know, it didn't

25  look good.  It was a bad look.

Cross - Thomas

1    Q.    So included in that bag was a card that was being

2    mailed to -- that was mailed to -- in the name of Ismael

3    Omar.

4    A.    Uhm-hum.

5    Q.    And that card was mailed to the Radiant Drive address

6    where you lived.

7    A.    Correct.

8    Q.    And that card was in the bag of cards that you were

9    trying to hide from Officer Seal.  Yes or no?

10   A.    Yes, but --

11   Q.    Okay.  Let's -- that's the address where you lived.

12   And that card was mailed to your address in February of

13   2011, correct?  And you were in prison at that time?

14   A.    I was in jail, right.

15   Q.    Right.  But it's still in your possession in the back

16   seat of your car.

17   A.    In the back seat of Heather's car.

18   Q.    Right.

19   A.    I -- at the time, I owned a car.  I was driving

20   Heather's car that night.

21   Q.    Right.  So why didn't you tell the officer, "I know

22   nothing about this bag, it isn't mine"?

23   A.    My thought was when I get home, I'm going to discuss it

24   with Heather and see what she says.  It's more or less if

25   I -- being in prison for the long period that I have, what

101

Cross - Thomas

1   happens is you start thinking in a certain way.  It's a

2   cover-up, you want to cover it up, you want to -- especially

3   for your significant other.  And so I knew it be a big bomb

4   on Heather if I instantly say, "It's not mine, this is my

5   girl's car."

6   Q.   So you --

7          THE COURT:  Let's move on, Ms. Paluch.  I think

8   we've --

9          MS. PALUCH:  Yeah.

10         THE COURT:  -- exhausted that point.

11  BY MS. PALUCH:

12  Q.   Okay.  You talked about Ms. Mullett and that you had

13  asked for -- to use her address because you needed an

14  address in Colorado; is that correct?

15  A.   Ms. Carr needed an address, yes.

16  Q.   She needed an address.

17  A.   Uhm-hum.

18  Q.   But yet you're texting with Ms. Mullett about specific

19  inmate names.  For example, Dennis Smith.  The card came for

20  Dennis Smith.  Do you recall that trial testimony?

21  A.   No.  Actually, Kim Mullett said she had a card in the

22  name of Dennis Miller --

23  Q.   Dennis Miller, correct?

24  A.   And when she said that, my response was, "Okay."

25  Q.   And you told her to send it on down to you.

Cross - Thomas

1   A.   I told her to send it to Mrs. Carr's P.O. Box, correct.

2   Q.   So you're involved.  You're involved.  You're involved

3   with these inmates' cards going to an address that you

4   secured and then you're sending it down on to Heather Carr.

5   A.   That's -- and that's why I'm saying that the portion

6   that went to Kim Mullett's house I -- I feel responsible for

7   even bringing Kim involved into it.  I would not have -- if

8   I thought it was criminal, Kim would not be the person I'd

9   bring into a criminal enterprise.

10  Q.   So you're taking responsibility for the cards mailed to

11  Mullett because you were involved in the scheme.

12  A.   Because that's the address that I provided for Ms.

13  Carr.

14  Q.   Let's move to the parole records.

15       You didn't give Heather Carr's name because you

16  wanted to distance yourself from Heather Carr, correct?

17  A.   Excuse me?

18  Q.   You did not tell your state parole officer that you

19  were living with Heather Carr because you knew when this

20  fraud scheme broke wide open, you didn't want to be

21  associated with Heather Carr in any way.

22  A.   That's not correct.  I -- I used that address from

23  Arizona that wasn't Heather Carr's address when I moved

24  there.  And then once I was there, I changed my parole

25  address to Mrs. Carr address.

103

Cross - Thomas

1    Q.   Nowhere in the parole records do you reference Heather

2    Carr.  It's always your sister.

3    A.   Well, I -- we -- there's been numerous visits from the

4    parole office that stopped by and they asked -- they met

5    Heather Carr.  When the parole officer typically comes to a

6    home and verify your residence, they ask the main person for

7    the ID to verify the residence.

8    Q.   Let's go back just briefly to the cards that you were

9    trying to protect Heather Carr by moving them.  How do you

10   explain the Manuel Abate card in your wallet?

11   A.   Okay.  The Manuel Abate card was in the actual glove --

12   the cup holder when the cop came.  I knew that that was the

13   card that had came from Kim's house.  I had that -- I put

14   that card in my wallet way before the -- the cop pulled me

15   over because I was going to give the card back to Heather

16   Carr.

17        When I got in the car, the card was already in the

18   cup holder, it wasn't -- I didn't put it in there once I saw

19   the cops.

20   Q.   So your testimony is once the officer pulled you over,

21   then you put that card in your wallet?

22   A.   No, no, I'm saying when I got in the car, I noticed the

23   card in the cup holder and my thought was, Why is this card

24   in this cup holder?

25   Q.   So you wouldn't just leave it there, it's not your

Cross - Thomas

1    card, right?  It's Heather Carr's.  So why would you stick

2    it in your wallet?

3    A.    Why not give it to her?  Is it -- is it -- my

4    recollection certainly is correct, that card was never ever

5    used.  I didn't -- I didn't go to any ATM and take money off

6    of it.  Why would it be in my wallet if I wasn't going to

7    use it to take money off of it?

8    Q.    Well, what does that matter, sir?  What matters is you

9    have a card in an inmate's name in your wallet.

10   A.    Because I knew that that card -- the name -- before I

11   saw the bag of cards, I put the -- that card in my wallet to

12   give back to Heather Carr.

13   Q.    Isn't your strategy to just always place the blame on

14   the women around you?

15   A.    No, it isn't.

16   Q.    It's not?

17   A.    No --

18   Q.    You take responsibility -- you take full responsibility

19   for your conduct?

20   A.    For my things I partake in, yes.

21   Q.    So I believe in your statement that you filed

22   yesterday, it was stated that you take full responsibility

23   for your conduct as of the time of the search warrant at

24   your residence, is that not the case?

25   A.    I'm sorry?  I'm --

Cross - Thomas

1       MS. PALUCH:  One moment, Your Honor.

2       THE COURT:  Sure.

3       MS. PALUCH:  I -- we're --

4   BY MS. PALUCH:

5   Q.   Page 7 of your statement, it says, Tramell takes full

6   responsibility for his role in the case once he became aware

7   of it after the search of the home on Kaibab.

8       So you take responsibility for the scheme?

9   A.   Well, what I take responsibility for is -- it's very

10  difficult to explain -- the portion of me asking Kim and

11  involving Kim for her address.  The other addresses, there

12  was no need for me to even be involved.

13  Q.   So this statement's incorrect, then.  You don't take

14  responsibility for the scheme?

15  A.   I take responsibility for my -- the address that I

16  asked for which was Kim Mullett.

17  Q.   You submitted in support -- I promise, Your Honor, I'm

18  almost done here -- you submitted in support of your letter

19  of -- of your statement a letter from an individual named

20  Frank Wood, didn't you?

21  A.   I'm sorry?

22  Q.   Do you know a Frank Wood?

23  A.   Frank Wood?

24  Q.   Yeah.

25  A.   It doesn't sound familiar.

Case No. 1:16-cr-00054-WJM Document 285-06 Filed 08/09/19 Page 106 of 170 pg 828 of

106

1    Q.   You don't know a Frank Wood?

2    A.   (Shook head.)

3    Q.   So if there's a letter submitted in support of your

4    sentencing statement filed yesterday talking about this

5    letter's in reference to a Tramell Thomas signed by Frank

6    Wood, you have no idea who that is.

7    A.   If you're talking about somebody maybe a support letter

8    from somebody I employed for my business, it's possible.

9    Q.   So how about if we called that phone number and -- if I

10   were to tell you that when we called that number, the person

11   on the other line said, "Quit calling the wrong number.

12   There's no Frank Wood at this number."

13        You don't have an answer for that, correct?

14   A.   Then you can show me the letter.  I had like --

15   Q.   It's a letter that your attorney filed on your behalf.

16   You claim in this filing that you're now an ordained

17   minister, correct?

18   A.   Yes.

19   Q.   And that's just something you went online to apply for,

20   and anybody can do that, isn't that true?  Isn't that true,

21   that's how people just get a license so they can marry

22   someone?

23   A.   No.  I'm a minister and I minister the Word.

24        MS. PALUCH:  Can I have just one moment, Your

25   Honor?

1          THE COURT:  You may.

2          MS. PALUCH:  Nothing further, Your Honor.

3          THE COURT:  All right.  Redirect.

4          MS. STEWARD:  None, Your Honor.

5          THE COURT:  All right.  Mr. Thomas, you may step

6     down.

7          THE WITNESS:  Thank you.

8          THE COURT:  All right, I am going to first take up

9     the defendant's objection to the statement in paragraph 63

10    of the report that the scheme -- "the scheme was devised by

11    Carr and Thomas."  I have now heard evidence and I've

12    reviewed the arguments of counsel that have been previously

13    submitted.  I find that the Government has established by a

14    preponderance of the evidence that the fraudulent scheme

15    which was the subject of the superseding indictment in this

16    case was devised by both defendants Carr and Thomas.

17         A sample of the evidence in support of that

18    conclusion is as follows:

19         Agent Ennis testified about her interview with the

20    defendant's friend, Ismael Omar, who stated that in

21    approximately March through June of 2010 during a

22    conversation with Mr. Thomas, he "talked about committing

23    student financial aid fraud as a way to make money, that he

24    heard of such a scheme and knew how it could be successfully

25    carried out."

1      There's also evidence that in December of 2010, six

2    months after the defendant's conversation with Mr. Omar

3    about financial aid fraud, a fraudulent FAFSA was submitted

4    in Mr. Omar's name listing the 3820 Radiant Drive address in

5    Colorado Springs as Mr. Omar's address.  That address had at

6    one time been the defendant's residence.

7      Then there's evidence now that came in at trial

8    that the defendant was caught with the fruit of his fraud

9    right in his hands, as the debit card issued to Mr. Omar was

10   in his possession when he was pulled over and arrested in

11   2012.

12      In terms of additional evidence at this hearing,

13   the Government has introduced evidence that the Defendant

14   Thomas was individually and knowingly involved in the

15   preparation of false FAFSA applications in the names of

16   Christine Duncan and Vanessa Lopez, both of whom were

17   individuals known well to the defendant.

18      In addition, there was testimony at trial that the

19   defendant had a very close, in fact, a intimate common-law

20   marriage, I guess you could characterize it, of several

21   years' length with Ms. Carr, including the fact that he's

22   the father of Ms. Carr's children, and that two of them had

23   ample opportunity to discuss the scheme and how they would

24   play it out.

25      So for all these reasons, the defendant's objection

109

1    to paragraph 63 of the report is overruled.

2         I'm next going to turn to objection 81 of the

3    report with respect to the two-level enhancement for

4    obstruction of justice under Section 3C1.1.  Ms. Paluch, do

5    you have anything else you would like to add to your written

6    submissions on this objection?

7         MS. PALUCH:  Not to our written submissions, Your

8    Honor.

9         THE COURT:  All right.  Ms. Steward, I know the

10   objection was submitted by prior counsel; do you have

11   anything to add to the written submission?

12        MS. STEWARD:  We would stand on prior counsel's

13   objection.

14        THE COURT:  All right.  I am going to overrule the

15   defendant's objection to paragraph 81 of the report.  I find

16   that the Government has established by a preponderance of

17   the evidence that this two-level enhancement in the offense

18   level is warranted, given the defendant's destruction of

19   evidence of this crime, in reaching out to potential

20   witnesses in this case in an effort to influence their

21   willingness to testify against him.

22        Again, as a small sample of the evidence supporting

23   this conclusion and this ruling on the objections as

24   follows:

25        Evidence was introduced at trial with respect to

1     the defendant destroying evidence that was on his cell

2     phone.  In addition that evidence and testimony was

3     submitted with respect to the defendant reaching out to

4     potential witnesses in violation of -- in direct violation

5     of the terms of his pretrial release.  There is, as well,

6     evidence of the false statements and pretenses regarding his

7     residence that we have evidence of in the record and, in

8     addition, the false statements regarding his employment, all

9     of which provide ample grounds, I believe, for the two-level

10    enhancement for that specific offense characteristic.

11          With respect to the objection No. 6 to paragraph 82

12    of the report regarding obstruction of justice by providing

13    false information to the probation officer regarding correct

14    residence.  This is effectively a complement to the prior

15    objection, objection No. 5, complementary in the sense that

16    they, for all intents and purposes, deal with the same

17    conduct.  And given my ruling on the defendant's objection

18    to paragraph 81 of the report, I am also going to overrule

19    the defendant's objection to paragraph 82.

20          I find, once again, that the Government has

21    established by a preponderance of the evidence that the

22    defendant engaged in the obstruction of justice by providing

23    the materially false information regarding his correct and

24    current address.

25          With respect to objection No. 7 of the defendant,

111

1    and this time with respect to paragraph 90 of the report, in

2    which the probation officer recommends that the offense

3    level be increased by 14 levels given the loss and

4    restitution amounts.  I know we took evidence on this point,

5    Ms. Paluch, but if you have any additional argument you wish

6    to make at this time or you can rely on your written

7    submission.

8            MS. PALUCH:  We rely on our written submission,

9    Your Honor, as well as Agent Ennis' testimony today.

10           THE COURT:  Right.  Ms. Steward, same question.

11           MS. STEWARD:  We would rely, Your Honor, on the

12   prior counsel's objection.

13           THE COURT:  All right.  I find that the

14   Government's established by a preponderance of the evidence

15   that the total amount of loss and restitution owed jointly

16   and severally in this case by all four defendants

17   $563,890.85.  Pursuant to Section 2B1.1(b)(1)(H) of the

18   guidelines, this corresponds to an enhancement in the

19   offense level by 14 levels, given that the intended loss

20   exceeded 550,000 but was less than 1.5 million.

21           In addition to the testimony, I'm going to rely on

22   this decision specifically and expressly on the testimony of

23   Agent Ennis at trial and in addition to her testimony at

24   this hearing, specifically her testimony with respect to

25   trial Exhibit 72-1, and her related testimony as to that

112

1    exhibit; that being the spreadsheet of the loss calculations

2    in this case.

3           The testimony of Agent Ennis was clear and specific

4    that there was a connection of 13 addresses that were

5    contained in this exhibit of FAFSA applicants, 13 different

6    residences, addresses, that were tied to either Mr. Thomas

7    or his co-conspirators, his codefendants.

8           And, in addition, there was direct specific

9    testimony of the fact that the -- this defendant, Defendant

10    Thomas, had a connection, correlation -- a connection and

11    relationship with the following individuals and, as well,

12    the false applications made in their names:  Ms. Mullett,

13    Mr. Cox, Ms. Pickens, and Ms. Duncan, the latter of whom he

14    lived with -- the defendant lived with on Radiant Drive.

15           So with -- for all those reasons, the objection of

16    the defendant to paragraph 90 of the report is overruled.

17           Turning to objection No. 8, which is an objection

18    to paragraph 95 of the report, for the fact that the

19    probation officer did not recommend an adjustment for an

20    alleged minor role in the offense, I heard additional

21    testimony today at this sentencing hearing and I rely on

22    that, and I also am going to rely on the testimony at trial

23    on this issue.  But before I actually rule, I'll let counsel

24    inform me if they're going to make any additional arguments

25    at this time.

113

1             MS. PALUCH: No, Your Honor. Thank you.

2             THE COURT: All right. Ms. Steward?

3             MS. STEWARD: Your Honor, we would stand on the

4   previous arguments and on our sentencing statement.

5             THE COURT: All right. All right. I'm going to

6   overrule the defendant's objection to paragraph 95 of the

7   report where he contests the failure of the probation

8   officer to recommend that he receive a downward adjustment

9   for an alleged minor role played by him in the criminal

10   scheme in this case.

11            I agree with the Government that although

12   Codefendant Carr was indicted as the lead defendant in this

13   case, and even though the Government views Ms. Carr as the

14   most culpable member of this criminal enterprise, these

15   facts alone do not provide a basis from which this defendant

16   can contend that he's entitled to a reduction in his

17   applicable offense level for an allegedly minor role in his

18   crimes of conviction.

19            Indeed, as the Tenth Circuit has itself stated, "A

20   defendant is not entitled to a minor participant reduction

21   merely because he is the least culpable among several

22   participants in a jointly undertaken criminal

23   enterprise." This is from the case of *United States v.*

24   *Lockhart*, 37 F.3d 1451 at 1455, a 1994 case out of the Tenth

25   Circuit.

1          Beyond this, I agree with the Government that

2     there's ample evidence in the record from which I can

3     conclude that this defendant did not have a minor role in

4     the criminal scheme carried out in this case.  For example,

5     the trial testimony of Codefendant Green made clear that

6     while she only personally assisted this defendant on one

7     occasion with one FAFSA application, she also testified her

8     knowledge about Mr. Thomas filling out FAFSA applications in

9     the scheme and withdrawing money from debit cards and that

10    that information came from conversations she had with

11    Codefendant Carr.

12         Ms. Green also testified at trial about the fact

13    that she delivered cash to Ms. Carr in the defendant's

14    presence and about the comfortable lifestyle that this

15    defendant and Ms. Carr shared.  Ms. Green also testified

16    concerning the questions this defendant asked of her after

17    his house had been searched.  I believe it fair to say that

18    Ms. Green's testimony established this defendant's knowledge

19    "concerning the scope and structure of the enterprise and of

20    the activities of others involved in the offense," and it

21    also established that Mr. Thomas was one of the primary

22    beneficiaries of this fraudulent scheme.

23         In spite of being convicted of the conspiracy

24    charge for conduct beginning in August of 2010 and

25    continuing until August of 2012, I note that the defendant

1    now claims that he did not join the conspiracy until

2    February of 2012.  Given the jury's verdict, I reject this

3    contention out of hand.  Moreover, I note that the trial

4    testimony contradicts the defendant's contention that his

5    involvement in enrolling four or five individuals at

6    Pikes Peak Community College prior to 2012 was unrelated to

7    the criminal scheme charged in this case because these

8    individuals were not inmates.

9        I make this finding based on the evidence

10   summarized by the Government in its response to this

11   objection and that is filed at ECF 357 and can be found at

12   pages 12 and 13 of that document.

13       I also reject the defendant's argument that he's

14   entitled to a minor role reduction because he was involved

15   in the conspiracy for only 10 of the 26 months of the

16   conspiracy.  In the first instance, this contention flies in

17   the face of the jury's verdict.  But even if this statement

18   were factually true, I agree with the Government that 10

19   months is more than enough involvement to disqualify him

20   from consideration for a minor role adjustment.

21       In the *Adams* case, the Tenth Circuit in 2014

22   decided the issue of the appropriateness of a minor role

23   adjustment wherein the defendant recruited a friend to drive

24   him and two other individuals to a bank robbery.  Mr. Adams

25   in that case claimed he was entitled to minor role

1    adjustment because the other two individuals planned the

2    robbery, he never entered the bank, and the recruitment of

3    his friends to drive was "merely opportunistic."  The Tenth

4    Circuit rejected this claim noting that the defendant had

5    "acted as a lookout, planned to assist in the escape, and

6    admitted to the knowledge of the scheme," and that this was

7    sufficient involvement in the criminal conduct to disqualify

8    the defendant in that case from a minor role adjustment in

9    the offense level.

10           Also in support of my decision to overrule this

11   objection was additional evidence that came in via the form

12   of testimony of Agent Ennis today, that being that the

13   criminal scheme in this case and the charged -- the

14   indictment that was charged in the superseding indictment by

15   the grand jury continued during the time that the defendant

16   was incarcerated at the El Paso County Jail, and that this

17   was directly tied to this defendant given his very frequent

18   contacts while he was incarcerated and while the criminal

19   scheme continued with both Ms. Carr and Ms. Harris.

20           So for all these reasons, the defendant's objection

21   to paragraph 95 of the report is also overruled.

22           The defendant also filed a second through, or via,

23   his prior counsel also filed a second set of objections at

24   ECF 390.  And the defendant's objection to the second-level

25   specific offense characteristic in paragraph 91 of the

117

1    report is overruled as moot given the elimination of that

2    enhancement in the final report.  So that two-level

3    enhancement is no longer contained in the final report and

4    that -- contained in the second set of objections which I

5    granted leave to prior defense counsel to file is overruled

6    as moot.

7            Given my rulings on the defendant's objections, I

8    find that the total offense level in this case is 31.  The

9    probation officer has determined the defendant's Criminal

10   History Category to be IV, yielding an advisory guideline

11   sentence of 120 months on Count 1, a guideline sentencing

12   range of 151 to 188 months on Counts 2 through 7, a period

13   of supervised release of one to three years on each count of

14   conviction, a fine range of 15,000 to $150,000, and a

15   special assessment of $700.

16           Subject to the objection the parties may have to my

17   rulings on the defendant's objections in this case, do

18   counsel agree that the Court has correctly calculated the

19   guideline range in this case?

20           MS. PALUCH:  We do, Your Honor.

21           THE COURT:  Defendant?

22           MS. STEWARD:  We do, subject to objection, Your

23   Honor.

24           THE COURT:  Yes.  And that's what I just said.

25           All right.  It's almost 10 to 1:00.  We're going to

1    take a short lunch break.  When we come back, Ms. Steward,

2    just so you're prepared, I'm going to take up argument on

3    defendant's motion for a variant sentence.  I'll hear, of

4    course, from the Government in response.

5         I would say let's keep it short so we can get out

6    of here earlier in the afternoon than otherwise.  Let's all

7    be back here at 1:20.  We will resume with the remainder of

8    the sentencing hearing at that time.

9         All right, we will be in recess.

10        (Recess taken at 12:48 p.m.)

11                    AFTERNOON SESSION

12        (In open court at 1:24 p.m.)

13        THE COURT:  All right.  At this time, I'll take up

14   the defendant's motion for a downward variant sentence filed

15   at ECF 353.  Ms. Steward.

16        MS. STEWARD:  Yes, Your Honor.

17        THE COURT:  Can you take the lectern, please.

18        MS. STEWARD:  Sure.  Your Honor, we mostly stand on

19   the sentencing statement that we submitted yesterday;

20   however, I would like to mention the fact that Mr. Thomas

21   grew up in a single-parent home, he was born to a very young

22   mother, and he also -- he witnessed abuse as he -- as a

23   child, particularly alcohol abuse and then physical abuse.

24        From that home, he spent time in juvenile hall

25   where he -- he was -- experienced some head trauma and was

119

1    often knocked out due to the policies that he -- in the

2    Indiana juvenile home.  I would also mention --

3            THE COURT:  The policy of being hit --

4            MS. STEWARD:  Not in the policy of the home, but

5    the internal workings of the home with the older children

6    and the guards often making people fight each other.

7            THE COURT:  Okay.

8            MS. STEWARD:  That was mentioned in the statement,

9    Your Honor.

10           I would also mention that, you know, Mr. Carr --

11   Mr. Thomas is a father for the first time.  He didn't think

12   that that was something that could happen for him.  He met

13   Ms. Carr and Ms. Carr was willing to have children for him

14   and those children are now the love of his life.

15           His older child, Milani, is a young and small

16   little girl, and his younger child, Tru, is a child that

17   suffers from autism.  You know, he's a particularly

18   vulnerable child, and both of those children are being

19   raised by their sibling, who is a young woman who's going

20   through her own marital trouble at this time.

21           I'd also make mention that while -- after the

22   indictment and prior to his incarceration, Mr. Thomas didn't

23   commit any other offenses.  He intend -- he attempted and

24   was successful in turning his life around.  He mentored some

25   people and he got a mentor.  He did his best to try to

120

1    reintegrate back into society, even though this indictment
2    was pending.
3          THE COURT:  What about -- well, as you know, I've
4    overruled prior counsel's objection to obstruction of
5    justice with respect to false information being provided to
6    the probation officer, so that's not something that helps in
7    terms of a mitigating factor with respect to his conduct
8    awaiting trial.
9          MS. STEWARD:  Yes, Your Honor.  I know that, but,
10   you know, it's something that Mr. Thomas made sure to ask me
11   to mention today.
12         THE COURT:  What about the fact that Ms. Carr did
13   not testify at trial?
14         MS. STEWARD:  Well, Your Honor, when I was
15   reviewing the case, and I looked at Ms. Carr's sentencing,
16   it appeared that Ms. Carr was initially going to testify at
17   trial, but ultimately decided not to because she didn't want
18   to give false testimony in this court.  There was some
19   information about, you know, a blowup between her and an
20   AUSA.  I'm not really sure of that gentleman's name, but
21   that's why she pulled out of her testimony agreement.
22         Ultimately that hurt Ms. Carr but she did so
23   because she knew that Mr. Thomas wasn't as involved as the
24   Government was saying.
25         THE COURT:  And so your position is that your

1    client was not involved in any way in Ms. Carr's decision

2    not to comply with the plea agreement, the cooperation

3    agreement, and testify at trial against him?

4         MS. STEWARD:  He was not.  He -- she relied on her

5    own conscience and what she felt was right with her

6    children.

7         THE COURT:  All right.  Let's move on beyond that.

8    You know, your first point about having a less than ideal

9    childhood, unfortunately it's something I see almost every

10   day with almost every single defendant.  And you know that

11   the cases talk about judges to look at variant sentences

12   when the situations really point to something that goes

13   beyond, you know, the usual circumstances that are presented

14   by defendants.  And, again, it is unfortunate, but physical,

15   emotional, sexual abuse, growing up in an impoverished

16   background, which I don't think -- I don't know if that's

17   really the case here, or even growing up in a -- in a

18   violent neighborhood, unfortunately does not distinguish

19   your client from too many other defendants.

20        MS. STEWARD:  I understand, Your Honor; however, we

21   do want you to take note of the fact that those things did

22   occur in his life.  And although he wasn't physically

23   abused, he certainly -- he certainly suffered psychological

24   abuse listening to his mother being abused.  I mean, for a

25   young man, especially one that's about 12 or 13, which is

1       when this happened for Mr. Thomas, and to witness those

2       things, or to hear those things, it's confusing.

3               It -- you know, it's put ideas in their head about

4       what should and shouldn't happen between two adults.  And,

5       you know, this gentleman that started the abuse against his

6       mother, Mr. Jones, Mr. Thomas saw him as a father and, you

7       know, ultimately the trust he put in him -- the trust that

8       Mr. Thomas put into Mr. Jones was betrayed by the fact that

9       Mr. Jones decided to beat his mother.

10              THE COURT:  I take it you disagree with the

11      Government's -- one of the Government's viewpoints of the

12      evidence in this trial, which was highlighted by Ms. -- in

13      part by Ms. Paluch's cross-examination of your client today,

14      that you -- that you disagree with the view that your client

15      is very good at putting blame and responsibility on the

16      women in his life and has taken precious little

17      responsibility for his actions.

18              MS. STEWARD:  I would disagree with that, Your

19      Honor.  You know --

20              THE COURT:  What's the basis for that disagreement?

21              MS. STEWARD:  Well, you know, I -- we still

22      maintain that Mr. Thomas did not get involved into this

23      scheme until 2012 -- about summer of 2012.  However, we

24      understand that -- this Court's ruling in that matter.  We

25      know that -- I know after speaking -- from speaking with

1    Mr. Thomas that he does take full responsibility for all of

2    the things that happened at -- with Ms. Mullett and the

3    things that happened after that.  I mean, so much so that he

4    decided to break off a relationship with the woman that he

5    had been romantically involved with for several years,

6    including that woman was the mother of his child.

7          While he, in this particular --

8          THE COURT:  Wait, wait, hold on.  How does that --

9    I'm not catching the causal relationship.  What's the

10   connection between ending the relationship between Ms. Carr

11   and taking responsibility or not taking responsibility for

12   his conduct in this case?

13         MS. STEWARD:  Well, what I'm saying, Your Honor, is

14   he is taking responsibility from his -- for his conduct.

15   The addresses with Ms. Mullett and -- and anything that

16   happened between those months of about August to November

17   when the raid happened -- when the raid -- the search

18   happened of the home on Kaibab street.  When that search

19   happened, he decided that this -- he could no longer be in

20   the relationship or be around Ms. Carr because he no longer

21   trusted her.

22         That being said, you know, he's not putting the

23   responsibility of those things onto Ms. Carr.  She was

24   involved in this scheme and he's not saying that he had no

25   involvement, he's certainly taking full responsibility for

1  the things that he was involved in.

2  THE COURT: All right. Anything else you wish to

3  say in support of the motion?

4  MS. STEWARD: Well, we would stand on our -- on the

5  legal arguments that we made in our sentencing statement.

6  I would mention, Your Honor -- and I don't know if

7  you are willing to listen or would like the testimony -- but

8  there's a gentleman here named Markel Taylor that spent

9  several -- a good amount of his life in prison and knows Mr.

10  Carr -- Mr. Carr -- Mr. Thomas very well. He also knows

11  some things about the -- you know, the psychology of being

12  in prison and, you know, Mr. Thomas would like for him to

13  testify, about two minutes or so, on his behalf.

14  THE COURT: Testify or give a statement?

15  MS. STEWARD: Give a statement. I apologize, not

16  testify.

17  THE COURT: And what's the -- his relationship to

18  the defendant?

19  MS. STEWARD: They are friends and they worked

20  together on a House Bill, Your Honor.

21  THE COURT: How would that be helpful for me in

22  terms of considering the sentencing factors under 3553(a) to

23  take in -- or listen to this statement?

24  MS. STEWARD: Well, I think it goes to just

25  punishment. It shows that Mr. Thomas worked hard to change

```
 1    his life after that.  You know, when he was involved in this
 2    scheme, you know, he -- he just wasn't being up to being the
 3    man that he should have been.
 4          After the search, he decided that he needed to do
 5    what he had to do to support his children and to support his
 6    community.  And Mr. Taylor can testify a little bit to that.
 7          THE COURT:  All right.  I am going to exercise my
 8    discretion and not allow a statement to that regard from Mr.
 9    Taylor.
10          If you want to summarize, make an offer of proof,
11    if you will, on what he would have said, you can.  I'll give
12    you a few seconds to do that.
13          MS. STEWARD:  Sure, Your Honor.  After speaking to
14    Mr. Taylor, he explained to me that he and Mr. Thomas worked
15    together on a House Bill that hasn't been introduced yet,
16    but is hopefully --
17          THE COURT:  A House Bill?
18          MS. STEWARD:  Yes.  In Colorado.
19          THE COURT:  A bill for legislature?
20          MS. STEWARD:  Yes, Your Honor.
21          THE COURT:  Okay, go ahead.
22          MS. STEWARD:  That would help inmates and former
23    inmates with mental health issues and make sure that they
24    are getting the mental health evaluations that they need as
25    they're leaving prison so that they can come into society
```

1    and find the treatment they might need after leaving prison.

2              THE COURT:  All right.  Anything else?

3              MS. STEWARD:  Other than Mr. Thomas' statement, no,

4    Your Honor.

5              THE COURT:  Yeah, and he'll have his opportunity

6    for an allocution.  All right.  Thank you, ma'am.

7              I'll hear from the Government in response to the

8    variance motion.

9              MS. PALUCH:  Thank you, Your Honor.  I don't

10   believe there is a basis to vary from the guidelines.  With

11   respect to what counsel stated, I don't have anything to

12   refute the defendant's background.  I would like to speak to

13   the sentences imposed on the other defendants because I know

14   that was a concern of the Court, so with the Court's

15   permission, I would go in that direction.

16             THE COURT:  Right.  I think the -- and you're

17   right, that has been my concern on the sentencing phase for

18   this defendant for quite a while now, and we've had

19   opportunities to get a glimpse of that because we've been

20   coming back here so many different times.  And that would be

21   the disparate -- the huge disparity at 180 months as

22   compared to the codefendants' sentences that I've imposed

23   upon them.

24             And I understand, you know, very well the

25   differences in their criminal history, the differences in

1    the specific offense characteristics that cause the

2    significant increase in the offense level that were of the

3    defendant's own doing in terms of obstruction of justice and

4    flight and those things. But we still are not even talking

5    about 50 percent more -- the highest sentence I imposed was

6    on Ms. Carr, the longest sentence in terms of a custody, was

7    57 months. And so we're looking at not a 50 percent

8    increase or a double, you're asking me to impose a sentence

9    that's more than triple that of Ms. Carr's, and so that's

10    what I need you to address.

11          MS. PALUCH: Absolutely, Your Honor, and as the

12    Court has alluded to, this defendant's adjusted offense

13    level is eight levels higher than his codefendants. And

14    those are eight levels where he earned every single one.

15    One of them is for being convicted of a mail fraud scheme,

16    so that's one additional point. Four of them are for the

17    obstructive conduct that we've been talking about. And then

18    three of them are for not taking responsibility.

19          And I differ with defense counsel, he still has not

20    accepted responsibility. I don't think anything the Court

21    heard this morning indicates that he has accepted

22    responsibility for his role in this scheme. So to -- if we

23    were to look at Heather Carr, she starts -- her offense

24    level was a 25, Your Honor, with a Criminal History Category

25    I, and that put her in a range of 57 to 71 months and the

128

Court imposed 57 months.  If we were to take Heather Carr
and add those eight levels, if she had engaged in the same
conduct that he has, her adjusted offense level guideline
range would have been 135 to 168.

        And what our point is is that to just look at this
from a distance and say Okay, Carr got this, Green got this,
Diaz got this, where should Mr. Thomas fall?  We believe
that that will not result in a just sentence because it
would be discounting the harm that he put those SWAT
officers in, it would be discounting what he did to
probation.  It would be discounting his refusal to accept
responsibility.  All of those things have to be addressed
and we believe that that's why the defendant finds himself
in that 151 to 188 range.

        So let's talk criminal history.  Okay.  So this
defendant's in at a 4, Ms. Green was at a 4, and Ms. Diaz, I
believe, was at a 6.  And as, if you will recall with Ms.
Diaz, Your Honor, she was receiving points for a criminal
history that dated back to when she was 13 years old.  As
you recall, this is a girl whose mother abandoned her and
Heather Carr took over the role.  And so this Court agreed
that her criminal history score was overrepresented.  And
that's also an individual who pled guilty, accepted
responsibility early on in the case, she received 5K
cooperation credit for her time.  So I think what we have to

1   do is look at each defendant individually.

2          You look at Marcelle Green, she received a 5K.  She

3   was the only one brave enough to come into this courtroom

4   and testify.  She received acceptance of responsibility.

5   She wasn't convicted of a mail fraud scheme, she -- as far

6   as a level 7, starting out at a 7.

7          So I think the inquiry really should be this

8   defendant is appropriately in that guideline range, and is

9   there a basis upon which to base a variance, to go down all

10  the way -- I mean, counsel astonishingly is asking for a 15-

11  to 21-month sentence or something along those lines.  I

12  mean, how does that make any sense at all?  There has to be

13  a basis -- how do we get from 151 and how do we justify a

14  variance all the way down to even the 84-month sentence

15  proposed by prior counsel?  We think that's 50 percent of

16  where he falls in the guideline range.

17         So we believe basing this defendant's sentence

18  solely on what his codefendants received ignores the SWAT

19  stand-off, it ignores what he did to probation.  You know,

20  he is the master manipulator and we believe he manipulated

21  this Court at his bond hearing after the trial.  He

22  represented he was employed, he had a place to live.  As it

23  turned out, he was not employed, he was homeless, and then

24  we end up having to get an arrest warrant and send out the

25  SWAT team for him.

 1          Let's talk about the harm from the defendant's
 2   conduct.  And as this Court has noted in the other
 3   sentencing hearings, this is 181.  I mean, that's a
 4   staggering number of inmates whose identity was stolen.  And
 5   as you recognized with the other inmates, these are
 6   vulnerable victims who have little ability to monitor their
 7   credit score.
 8          You know, what's particularly telling is that this
 9   defendant and Marcelle Green -- well, first of all, this
10   defendant spent 10 of his 39 years of life in prison.  And
11   so he, better than anyone else, as well as Marcelle Green,
12   they know how vulnerable those people were and yet they
13   still victimized them.  The community colleges that were
14   harmed, the Department of Education that was harmed.
15          They took funds for themselves that were meant for
16   people that are trying to better themselves and go to
17   school.  So we all know that student loan debt is staggering
18   in this country, and that was money that could have gone to
19   students to help them fund their education legitimately.
20          You know, this sentence matters for those students.
21   This sentence matters for the parents who are struggling to
22   put their kids through college.  The Department of Education
23   is owed a half million dollars, the community colleges are
24   owed $72,000.  They're probably never going to see a penny
25   of that money.

1      So we've got the harm to all of those entities, as

2   well as Ismael Omar, Vanessa Lopez, Kimmisha Mullett,

3   Christine Duncan.  These are people who trusted the

4   defendant and he violated that trust and used their identity

5   or used their address, and caused all sorts of problem for

6   them.

7      This Court is very well aware of Christine Duncan's

8   letter and the abuse that she suffered at the hands of this

9   man.  You look at history and characteristics.  Does that

10  provide you with the basis to vary?  There's nothing there

11  that would warrant -- certainly the Court can consider

12  comments of counsel this morning, but when we talk about

13  what we elicited as him lying to his state parole officer,

14  at every step this defendant doesn't want people to know his

15  name, he doesn't want them to know where he lives, he didn't

16  want to associate himself with Heather Carr.  He had to have

17  known, given his history, that whole thing was going to blow

18  and he wanted nowhere near that.  He didn't want to be

19  associated with that fraud.

20     Your Honor, what I'd like to move to is this

21  defendant is --

22     THE COURT:  Before you do that, so it sounds to me

23  like what you're saying is it's because of the

24  defendant's -- this defendant's conduct in the obstruction

25  of justice and the endangerment and flight that justifies

1    these tripling of the guideline range and, more

2    specifically, where I should come out in that range or below

3    that range.  But how do we -- how do we deal with the fact

4    that in terms of the underlying scheme -- the criminal

5    scheme that the grand jury indicted on in the superseding

6    indictment and, as I think you, yourself, conceded at one of

7    the sentencings of the other defendants, that Ms. Carr is

8    and always has been the most culpable individual in this

9    conspiracy and it was but for her theft of the identity of

10   these individuals from her Accurint database, this crime

11   could not have happened.

12           So I understand that this defendant made terrible

13   choices and undertook terrible conduct or engaged in conduct

14   that now what I'm faced with in terms of sentencing has

15   really come back to bite him.  But putting the

16   post-conduct -- the post-scheme conduct aside, isn't it

17   critical for me to sentence individuals here with at least

18   part of the factor that I'm considering here, their relative

19   culpability in the criminal scheme that they were indicted

20   on?

21           MS. PALUCH:  Certainly.  That has to be a

22   consideration for the Court.  Two responses to that:  First

23   of all, when we have Omar saying that back in between March

24   and June, the defendant saying, "I know how to do this.  I

25   know how to commit student financial aid."  And then we have

133

1     this relationship with Carr.  And in July is the very first

2     time she used her -- uses her Accurint database to get a

3     Social Security number on Omar, it's a logical inference

4     that it's this defendant's involvement with Ms. Carr that

5     leads her down this path.  It's her relationship with him

6     that has led to this.  Do we think she's most culpable

7     because without her the scheme doesn't work?  Absolutely.

8            But is it a stretch to say that she's manipulated

9     by him as well?  We don't think that's a stretch.  And we

10    are firm in our belief that her last-minute decision not to

11    testify is because of this defendant.  Just like all these

12    other people we presented evidence to the Court on who were

13    afraid of him and they were afraid to come to court, we

14    believe that's what happened with Ms. Carr.

15           I think ultimately when it came down to having to

16    testify against the father of her children, she couldn't do

17    it.  She couldn't do it and we think she was afraid of him

18    as well.  So I might have gotten off on a tangent there, but

19    let's say that you're trying to figure out how -- how do we

20    gauge their culpability?  And so we had Carr at a 57, and

21    that deserves a footnote.

22           The reason why there was a 57, as the Court knows,

23    is because we stood by the plea agreement when the Court has

24    noted repeatedly we could have pulled out of that.

25               THE COURT:  Right.

134

1          MS. PALUCH:  We could have pulled out of that and

2    we would have had a whole 'nother trial on this case, and we

3    felt it was wiser to argue that the Court should consider

4    her conduct in assessing her sentence.  And we believe that

5    the Court did that.  And we provided you case law that said

6    when the defendant reneges on their cooperation agreement,

7    the Court could factor that in imposing a sentence and

8    that's what happened there.  So she is at a 57.

9          So if we use that as a benchmark and then you take

10   someone with a criminal history I, and then you take him

11   with a IV, you know, that would put you easily in the 84- to

12   100-month range if you were going to keep those two

13   comparable.  I think that's a fair statement.

14         So then you take that about 100-month sentence --

15   well, if he's at an 84, let's say -- and I'm just talking

16   numbers here -- but if he were at 84 and she were 57, you've

17   got to add onto the 84 for all the obstructive conduct and

18   for the refusal to accept responsibility.

19         You know, at least Heather Carr stood at this

20   podium and agreed repeatedly with the Court about what she

21   did, and she accepted full responsibility and told the Court

22   that she did participate in this -- this scheme.  So I don't

23   see any world in which we even get below 100 months, or even

24   120 months, when you factor in all of these issues that

25   we've been talking about.

Case No. 1:16-cr-00054-WJM Document 435 Filed 08/09/19 Page 135 of 170

135

1          So I know on the one page, it's like should we

2     look -- okay, Carr did this, Thomas did this, Green.  I

3     mean, Thomas benefited just as much as Carr.  He benefited

4     probably more because of his attorney being paid for in

5     prison and the money on his commissary account.

6          But if we look at relative culpability and then

7     say, well, he's got to be put down closer to Carr's

8     guideline sentence, that ignores all of his additional

9     conduct.  And I just simply don't view that as being a fair

10    or just sentence.

11         So I think where we are is the Court starting with

12    the 151 to the 188.  We're arguing 180.  Probation is

13    submitting to you that they could find no basis for a

14    variance.  And they're telling you a 151 sentence is

15    appropriate.

16         And I do think when you look at the history and

17    characteristics of this defendant, as far as the nature of

18    his criminal history -- I understand the Court's ruling on

19    not considering the uncharged conduct, but you've heard

20    testimony here today that's concerning.  And I think where

21    that falls in under 3553(a) is the deterrence as well as

22    protecting the public.

23         You know, this individual serves 10 years in prison

24    and he's not deterred.  Within a year of being released,

25    he's involved in this scheme.  Then he goes to prison for an

Case No. 1:16-cr-00054-WJM Document 525-6 filed 12/02/19 USDC Colorado pg 858 of
901
Case 1:16-cr-00054-WJM Document 465 Filed 03/09/19 Page 138 of 179

1    aggravated robbery, he sits in prison for 11 months, and

2    what does he do?  He gets right back into the scheme.  It's

3    like every time he goes to prison, he doesn't learn that the

4    right thing to do is stay out of legal trouble.  Instead, he

5    just -- what's the next scam?  How can I get back involved

6    in criminal activity?

7          Doesn't seem like it matters how much time you give

8    him, it doesn't reform him.  And so those are the type of

9    people that you're more -- more concerned about, that you

10   have to send the message of deterrence.  And those are the

11   type of people where you have to be concerned about

12   protection to the public.  I mean, it's concerning to me

13   that we have that many people that are afraid of this

14   defendant that didn't come in, that I do think protection of

15   the public, deterrence, history and characteristics of this

16   defendant all counsel in favor of a stiff sentence.

17         You know, Your Honor, it's absolutely offensive

18   when we go to the SWAT stand-off -- and I know the Court has

19   already issued a detailed ruling on that -- but for that

20   many hours and to place that many people in danger, and his

21   response is, "Well, I was just sleeping."  As the Court

22   said, that has absolutely no credibility.

23         At the prior bond hearing, his -- his prior counsel

24   argued, "Well, he didn't come out because he was scared."

25         Well, you know who should have been scared are the

1    SWAT members having to go in and arrest this man who has

2    firearm violations in his history.  Who should have been

3    scared is Ms. Conrad, who's in this house and who knows

4    what's going to happen.

5            He placed all those people at risk.  I mean, that's

6    extremely concerning that he would engage in that conduct,

7    and it's exactly what Ms. Lopez said he would do.  She said

8    this defendant will not go back without a fight, and that's

9    exactly what happened.

10           You know, I've talked a lot about this defendant's

11   desire to manipulate people and he's been successful and

12   he's avoided a lot of things in his life because he does

13   have that ability to manipulate people.  And we believe

14   that's what he's trying to do with this Court is manipulate

15   you.  He tried to do that in a letter he sent to you prior

16   to one of his many last sentencing hearings.

17           And through that letter he tried to convince the

18   Court he's just a good guy trying to save lives.  He wasn't

19   saving lives when he caused that stand-off.  He wants you to

20   believe it's the Government who's trying to make him look

21   bad.

22           We are here talking about his conduct; his actions;

23   his choices.  We're not making this stuff up.  He

24   continually blames everyone around him.  And noticeably

25   absent from that letter, Your Honor, was any acceptance of

1    responsibility or remorse at all.  You heard no remorse from

2    him on the stand.  I -- I would submit to you that you can

3    discredit every single thing he said from the stand.

4         You know, he has assertions in his supplemental --

5    his sentencing statements submitted to you yesterday that he

6    doesn't even agree with.  He has no idea who this Frank Wood

7    person is who allegedly sent in a letter in support.

8         I mean, it's just consistent, every stage of this

9    case.  "I'm not feeling well."  "I want to fire my

10   attorneys."  Now at the last minute, "I want to hire an

11   attorney."

12        He has tried successfully to put as much time

13   between the guilty verdict and sentencing as he could.  And

14   I think what he was trying to do there, Your Honor, "If I

15   could put as much distance -- here we are at a year and a

16   half later, that maybe everybody will just -- the fatigue

17   will be too much.  Maybe they'll just stop caring, like

18   what's the big deal, that was so long ago?"

19        We do care.  We haven't forgotten.  We haven't

20   forgotten the harm that he and his co-conspirators caused.

21   We haven't forgotten the harm and the risk to the U.S.

22   Marshal service and to the SWAT team members.

23        We haven't forgotten the harm to Christine Duncan,

24   Lopez, Omar.  We're not going to forget.  And the fact that

25   we're here, a year and a half later, that's okay because the

1    Court has gone through every single objection, we're

2    spending most of the day here today to go through all of the

3    factors of 3553(a).

4          And I think at the end of the day when the Court

5    does that careful analysis, you will agree with the

6    Government that 84 months is too short of a sentence and we

7    submit the 180 that we're asking is appropriate and, at a

8    minimum, we would suggest a guideline sentence, Your Honor,

9    because there simply are not factors that would warrant the

10   variance clearly to what defense counsel is asking for.  But

11   as probation can find no grounds, nor can we.  And for those

12   reasons, we ask you to impose the 180 months.

13         THE COURT:  All right.  Thank you.

14         Ms. Steward, it's your motion.  I'll give you an

15   opportunity for a brief reply.

16         MS. STEWARD:  Thank you, Your Honor.

17         Your Honor, we would state that the Government

18   would be -- before they -- during the plea agreement that

19   they had with Ms. Carr, allowed her to argue for 24 months

20   in confinement.  24 months, which is essentially two years.

21   I mean, ultimately she was sentenced to 57 months, but here

22   is a major --

23         THE COURT:  I don't understand what you just said.

24   The Government allowed her to make an argument?

25         MS. STEWARD:  Per the plea agreement, Your Honor,

1    there was a stipulation that she could argue for 24 months.

2    I understand --

3              THE COURT:  Oh, I see.

4              MS. STEWARD:  -- there were some issues with the

5    plea agreement and ultimately they upheld their end of the

6    bargain, whereas Ms. Carr didn't do so, but the Government

7    was willing to allow Ms. Carr to argue for 24 months at some

8    point, which means that even though she was a major

9    contributor, a major conspirator in this case, they felt

10   that 24 months was something that she could potentially

11   argue for.

12             Here they're asking for, you know, four or five

13   times that amount.  Further, Mr. Thomas didn't take a plea

14   because he felt that he couldn't.  He felt that he couldn't

15   tell the Government that he was fully involved in this

16   scheme because he wasn't.  And he felt that by doing so, he

17   would perjure himself.

18             And when --

19             THE COURT:  Well, that's one way to look at it.

20   The other way to look at it is he didn't want to accept

21   responsibility.

22             MS. STEWARD:  Yes, Your Honor, that's another way

23   to look at it.  But after speaking to Mr. Thomas, that's

24   what he told me, that he felt like he couldn't take a plea

25   because he felt like he would be committing perjury to the

1    Court by doing so.
2              When they said that he tried his hardest to
3    distance himself --
4              THE COURT:  I don't understand that argument.  If
5    someone goes to trial and they decide -- a defendant, and
6    they decide to take the stand -- which no one's going to
7    require them to do -- there's no perjury as long as you tell
8    the truth.
9              MS. STEWARD:  That's correct.
10             THE COURT:  So what's the fear -- it's -- as I
11   recall, there was a similar argument for General Flynn, that
12   he was afraid of having to commit perjury.  Well, no one
13   forces anybody to commit perjury, right?
14             MS. STEWARD:  That --
15             THE COURT:  You decide under oath whether you're
16   going to tell the truth or not.
17             MS. STEWARD:  You're right, Your Honor.  However,
18   what I'm referring to is that he felt like he would have to
19   say that he was fully involved in this scheme from the very
20   beginning and he maintains that he was not.  He was
21   involved, certainly, but not from the very beginning.  And
22   that's why he felt like he couldn't take a plea in this
23   case.  By doing so, he would have to say, "Yes, I was fully
24   involved," and that's not the truth.
25             Further, Your Honor, the Government wants you to

1    believe that he's trying his hardest to distance himself

2    from Mrs. Carr; however, these two have two children

3    together and he is on their birth certificates.  That he

4    can't distance himself from Mrs. Carr, they have children

5    together.  He's not ever denied that they have children --

6         THE COURT:  So there's no such thing as absentee

7    fathers?

8         MS. STEWARD:  Well, Your Honor, there are such --

9    there is absentee fathers --

10        THE COURT:  Because you have your name on --

11   unfortunately because someone has their name on a child's

12   birth certificate does not mean they're going to be around

13   for that child's life.

14        MS. STEWARD:  You're right.  However, Mr. Thomas

15   has been around for his children's lives.  He's been in

16   Milani Thomas' life since he was released from custody in

17   Colorado Springs, and he was there for the birth of Tru

18   Thomas and has been there since.  He -- since the birth.  He

19   briefly didn't have contact with Mr. -- with Tru Thomas

20   whenever Ms. Carr moved to Virginia, but at that point,

21   they -- the child was diagnosed with autism and the two came

22   back together to do what they could to make sure that this

23   child was fully supported.

24        You know, the Government suggests that Mr. Thomas

25   had some hold over Ms. Carr and that she didn't testify

1    because he told her not to do so.  When I looked at

2    Mrs. Carr's sentencing statement, that's not what she said.

3    She said, "I couldn't say what I had said previously about

4    Tramell because that wasn't true.  And that I got into

5    the -- I was talking to the AUSA and he yelled at me and

6    ultimately there was an apology and everything came

7    together."  And she was able to keep her plea agreement, but

8    she didn't say that she was scared, she didn't say that she

9    didn't want to, she said, "I couldn't do it because it was

10   wrong."

11          THE COURT:  Right, but as you know there are

12   oftentimes situations where there's no direct evidence of

13   anything.  We -- there was never any evidence produced at

14   trial of a recording of a phone call that your client placed

15   to Ms. Carr intimidating her into not testifying.  But we,

16   as triers of fact, both a jury and myself -- although this

17   issue wasn't in front of them -- we have to take

18   inferences -- reasonable inferences, from facts.

19          I'll tell you, it really -- let's just say the

20   timing of her pulling out of her testimony was very

21   interesting to me, and she had already come out -- all the

22   way out here from Virginia, or wherever -- I think she lives

23   in Virginia --

24          MS. STEWARD:  Yes, she did.

25          THE COURT:  -- and she was here, she was ready to

1    testify, and then all of a sudden, the cold feet.

2    Knowing -- she didn't know if the Government was going to

3    pull out of the -- of the cooperation agreement or not.  She

4    very well, by doing that, threatened the viability of her

5    agreement and was facing a trial with the potential

6    conviction of all these counts.

7          It's very hard for me to believe that someone does

8    all -- takes that risk and does all that just because

9    allegedly one of the AUSAs raised his voice to her.

10         MS. STEWARD:  Well, and also she has children with

11   Mr. Thomas.  I mean, it's not really -- I mean, if I recall

12   what I read correctly, she was very concerned that her --

13   her oldest child was going to have to take custody of her

14   younger three children, some -- two of which weren't born

15   when the scheme began, and then they were born.

16         So she -- she felt bad for burdening her child, her

17   older child, and she felt like if Tramell didn't have to

18   spend so much time in custody, perhaps he could help take

19   care of the children, too.

20         She has more than one alliance here, not just to

21   Mr. Thomas, but to the children that they have together,

22   especially Tru Thomas, who like I said, is a vulnerable

23   child.

24         Your Honor -- I apologize -- you know, the

25   stand-off, I know that we -- there was a lot of testimony

1   about that stand-off and Mr. Thomas' involvement in it.  You

2   know, I don't know that much can be said that is very

3   positive of Mr. Thomas in the stand-off.  I know that it --

4   it seems like, you know, being asleep through all of that

5   would not be something that someone could do; however, Mr.

6   Thomas --

7                THE COURT:  You would have to be in a deep coma.

8                MS. STEWARD:  I -- I would agree, Your Honor.

9   However, Mr. Thomas did have a reason to be afraid.  You

10  have 12 officers show up at your home and then they call

11  SWAT.

12               You know, sadly -- and I'm -- not that I want to

13  make this a big issue, but sadly in this country people get

14  shot by the police.  Now, that doesn't mean that these

15  people were intending to do that, but that's a concern that

16  some people have.  And so it's not an unvalid concern.

17               THE COURT:  I agree.  I agree that unfortunately

18  those kind of things happen and they have happened in our

19  country, but I think someone in that situation would take a

20  very, very different approach than letting this thing

21  escalate for three hours and just hiding in a home.

22               I mean, I think -- you know, apparently Ms. Conrad

23  had a telephone, you know, there's individuals that had been

24  called, they could have called the -- he could have called

25  the marshals directly and said, "Look, I'm in here.  I'm

1    going to come out, my hands up.  I won't have anything.  You

2    assure me that I will be okay."

3          There's a lot of different ways this could have

4    played out other than hiding in the bedroom for three hours

5    and letting Ms. Conrad do all the interaction with the

6    marshals and having her put herself at risk by being near

7    the glass door that gets shattered and cuts her when the

8    porting of those -- of that door and the windows take place.

9          So it's -- hypothetically, what you've just said is

10   true.  I don't think the facts here bear it out.

11         MS. STEWARD:  Your Honor, my only response to that

12   would be that, you know, what people do when they're scared

13   or when they're afraid is not --

14         THE COURT:  That's not what he said.  I mean, the

15   unrebutted testimony of Supervisor Willhite was that when he

16   was finally taken into custody, all that your client said

17   was that he was asleep in the west side bedroom.

18         MS. STEWARD:  That's correct, Your Honor.

19         THE COURT:  And I have nothing -- I have no other

20   evidence to controvert that, so that's all I can base my

21   assessment of that factual -- that portion of the facts on.

22   There's nothing else in front of me.

23         MS. STEWARD:  I understand.  Well, let me move over

24   to the desire -- the Government's contention that he has a

25   desire to manipulate people.

1            You know, I know we're not necessarily looking at
2    Mr. Thomas' post-scheme conduct, but when we look at that
3    conduct, and the break from Ms. Carr, Mr. Thomas went on in
4    an effort to -- to -- to work with people, he went on to
5    help a young man, Mr. Buffet, to become -- get out of
6    homelessness, he helped his family.  He got his own mentor,
7    Mr. Joseph Conrad, who I believe is the father of Ms. Conrad
8    who was involved in the stand-off there.

9            He went on to try to build a life that was both
10   law-abiding and good.  We all know that it takes a long time
11   for people that have been incarcerated to do that.  And
12   so -- I mean, you know --

13           THE COURT:  Well, then, what -- the problem,
14   again -- I mean the argument, the words make sense and in
15   the abstract and hypothetically could be a meritorious basis
16   for consideration in mitigation, but the facts again don't
17   bear it out.

18           As the -- as Ms. Paluch pointed out, within a few
19   months of being -- you would think if he truly was as you
20   described, someone who has learned his lesson and spent a --
21   to lose your freedom for a decade in your 20s is
22   unmanageable -- or at any age, but especially when you're in
23   the prime of your life.  And someone that would be
24   approaching things differently, earnestly and in good faith,
25   to put that kind of criminal lifestyle behind them and move

148

1      forward, that's belied by the -- by the evidence we have

2      here which is, in a few months your client was right back

3      into committing a new crime.  And then we have the

4      incarceration in El Paso County, which the charges are

5      dropped, and he's there for almost a year.  Comes out and

6      again goes back into, as the evidence at the trial bore out,

7      into criminal conduct again.

8           So, again, I'm just not seeing how the facts

9      support the thrust of the argument that you're making.

10          MS. STEWARD:  Well, Your Honor, I liken Mr. Thomas'

11     conduct to that of a drug abuser.  Certainly they often go

12     into treatment and then relapse, go into treatment and then

13     relapse, and go into treatment and then relapse.  Until

14     something happens to them that forces them -- or they make

15     the decision to get clean totally.

16          Mr. Thomas went to prison as a 19-year-old.  He was

17     stunted in prison.  He didn't -- he wasn't allowed to grow.

18     He -- I mean, well, the growth that he got there wasn't very

19     large, let me just say that, not that he wasn't allowed to

20     grow.  I mean, such that, you know, when he went to prison,

21     America Online was our web-based system.  That's the only

22     thing we had.  We could dial up AOL.

23          So you think about all the things that occurred

24     during the 10 years that he was in prison, and then getting

25     out and just being thrust into the world, you know, all he

1    knows is criminal activity.  All he knows is that, you know,

2    "I need to figure out how to pay for -- get these things, so

3    that I can live."

4          Now, is that correct?  Is that the right thinking

5    to have?  Not necessarily.  But it's something that happens

6    to people that are incarcerated.

7          THE COURT:  Let me ask you to direct your attention

8    to the major point of the Government, which is but for your

9    client's own conduct, we wouldn't be looking at anything

10   near these kind of sentences or at least the guideline

11   range.  So, as you know, because of actions he took to bring

12   this upon himself, we have an eight -- in the aggregate, in

13   the total, eight levels that were increased to the adjusted

14   offense level based on the conduct that was in great part at

15   issue here today.

16         If you remove those eight -- if you subtract,

17   rather, those eight levels from the 31 total offense level

18   we have here, that gets you -- I think it was 31 --

19         MS. STEWARD:  I believe so.

20         THE COURT:  31.  Okay.  31 minus 8 is 23.  Offense

21   level of 23, Criminal History Category of IV, we're at 70 to

22   87 months.  So if your client had just -- you know, when he

23   got arrested, goes to his bonds -- his detention hearing,

24   either gets bond or doesn't, stays on the straight and

25   narrow, keeps his head down, gets a job if he's given bond,

1    you'd be arguing for a variant sentence down from the bottom

2    of guideline range of 70.

3            But, in fact, you're standing here arguing to me

4    for a variant sentence down from the bottom of 151 months.

5    Totally, completely 100 percent of your client's own doing.

6            MS. STEWARD:  You are correct, Your Honor.  I would

7    mention that the mail fraud is 1 point and then for every

8    other codefendant that was able to plead in this case, that

9    the mail fraud counts were dropped against them.  I would

10   say that in our view Mr. Thomas has taken responsibilities,

11   which is another three points.

12           THE COURT:  How so?  How has he taken response --

13   where and in what testimony or filing has your client taken

14   any responsibility in -- for his conduct in this case?

15           MS. STEWARD:  Well, he took responsibility today,

16   Your Honor.  He talked about Ms. Mullett and the fact that

17   he used her address and that he felt terrible for having

18   done so and that, you know, he, you know, probably should

19   have known a little bit better, but he did that anyway.

20           THE COURT:  That's the tiny little piece, I will

21   agree with you, that he did take responsibility for.  But

22   the rest of it that I heard, I have to agree with Ms.

23   Paluch, I don't think your client helped himself much with

24   his testimony today, especially on that score of taking

25   responsibility.

1          MS. STEWARD:  Okay.  Well, Your Honor, like I said,

2   we disagree.  We believe that, you know, he's admitted to --

3   while he didn't admit to the cards at the arrest -- the

4   traffic stop arrest, you know, he ultimately did today, and

5   he's said it to me, certainly, that said that he felt

6   terrible for what had happened with Ms. Mullett, that he did

7   not intend for her to get involved in anything like that,

8   and that she was a friend of his that he felt had gotten

9   used in this situation.

10          And so -- and we would just ask, Your Honor, that

11  you take into account the things that we put in our

12  sentencing memo, along with the sentences of the other

13  codefendants in this case when you're thinking of the

14  sentence for Mr. Thomas.

15          THE COURT:  All right.  Thank you.

16          MS. STEWARD:  Thank you.

17          THE COURT:  All right.  Before I rule on the

18  defendant's motion, I'm going to consider some of the

19  history and characteristics of this defendant as they apply

20  under Section 3553(a).  The record in this case indicates

21  that Mr. Thomas is 40 years old, he's a citizen of the

22  United States, he was born in Fort Wayne, Indiana, to

23  parents who were never married.  Mr. Thomas was raised by

24  his mother and his mother's boyfriend, Steven Jones.  The

25  defendant moved with his family to Colorado Springs in 1997

152

1    when he was 18 years old.  His mother continues to live in

2    Fort Wayne and his father now lives in Phoenix, Arizona.

3            The defendant has three half-sisters and one

4    half-brother.  The defendant left South Side High School in

5    Fort Wayne, Indiana, in 1993 prior to completing the 10th

6    grade.  He never resumed his high school studies and never

7    received a high school diploma.  He did, however, complete

8    the requirements to be awarded a GED certificate in 1996.

9            The defendant married Lola Gallegos in 2004 and the

10   couple divorced in 2010.  Mr. Thomas has two children from a

11   previous relationship with codefendant Heather Carr, as

12   we've discussed at length, whom he dated for approximately

13   seven years.  His two children reside in Phoenix and they

14   live with Ms. Carr's eldest daughter.

15           With regard to gainful employment, Mr. Thomas was

16   unable to provide the probation officer with any employment

17   information which could be independently confirmed.  Not too

18   many defendants appear in front of me that I'm able to say

19   that about.

20           With regard to defendant's criminal history,

21   according to the presentence report, he has no juvenile

22   criminal adjudications, he has been assessed eight criminal

23   history points by the probation officer, which places him in

24   a Criminal History Category of IV.  Most notably in terms of

25   his prior criminal history is the fact that in 1999, the

153

1    defendant was convicted of two counts of aggravated robbery

2    with the use of a weapon and was not paroled until 2009.

3         Turning to the nature and circumstances of the

4    offenses, as all counsel and the parties and -- not all

5    counsel, now that we've had new defense counsel -- with the

6    exception of Ms. Steward, but clearly prior defense counsel

7    was present at the trial, heard all the evidence as did the

8    prosecutors and myself.  I believe little purpose would be

9    served here today by a detailed recitation of the nature and

10   circumstances of the offenses.  I will instead incorporate

11   herein by reference the statements of fact contained in the

12   Government's sentencing statement which was filed pursuant

13   to General -- the Court's General Order 2002-3, as well as

14   local Criminal Rule 32.1, and which were set forth by the

15   probation officer in paragraphs 11 through 21 of the report.

16        I also incorporate herein by reference those

17   statements of facts set forth by the defendant filed in

18   response to the Government's sentencing statement as he was

19   permitted to do so under the Court's General Order 2002-3,

20   as well as local Criminal Rule 32.1, and which were also set

21   forth by the probation officer in paragraphs 50 and 51 of

22   the report, with the important caveat, however, that I will

23   do so only to the extent that these factual contentions are

24   not inconsistent with my findings in this hearing as they

25   relate to the parties' respective objections and their

1    sentencing related motions.

2           For purposes of this hearing, however, I will state

3    for the record a very substantially abbreviated summary of

4    the facts as determined by the jury in this case.

5           Mr. Thomas' offense conduct spanned over two years

6    and involved the defendant, as well as his codefendants,

7    conspiring to defraud the Department of Education by

8    submitting false claims for federal student aid.  This

9    defendant and his codefendant, Heather Carr, obtained names,

10   birth dates, and Social Security numbers for a large number

11   of incarcerated individuals and used their personal

12   information to apply for federal student aid.  In these

13   circumstances, these inmates are correctly considered to be

14   vulnerable victims.

15          While the defendant and Ms. Carr devised the

16   scheme, codefendant, Mercedes Diaz and Marcelle Green,

17   agreed to receive mail in the name of the inmates at their

18   residences as well as other residences under their control.

19   During the course of the conspiracy, Mr. Thomas and his

20   codefendants were involved in submitting over 150 false aid

21   applications seeking approximately $1.3 million in federal

22   financial aid funds.

23          The Department of Education disbursed over $550,000

24   as a result of Mr. Thomas and Ms. Carr's false claims.  Of

25   this amount, the defendants received over 420,000 in

1    refunds.

2           As of today, the defendant has served 433 days or

3    nearly 14 1/2 months in pretrial detention.

4           Ms. Ansart, you've been sitting there very

5    patiently all day.  Do you have any statement you wish to

6    make at this time on behalf of your office?

7           PROBATION OFFICER:  I don't, Your Honor, but thank

8    you.

9           THE COURT:  All right.  Thank you, ma'am.

10          All right, Ms. Steward, if you and your client

11   would please approach the lectern, please.

12          Mr. Thomas, do you wish to make any statement to

13   the Court on your own behalf before I announce your

14   sentence?

15          THE DEFENDANT:  Yes, sir, I do.

16          THE COURT:  Go ahead.

17          THE DEFENDANT:  Your Honor, you said it the best

18   way possible, and you were being kind in saying it, because

19   it's actually worse than what it is.  You said I made wrong

20   choices.  I've made a lot of idiotic, stupid choices.

21          And, honestly, I don't know how I -- how I arrived

22   at the choices that I make.  It's like I have good

23   intentions, or my mind, my thinking is head on to the right

24   process, but then somewhere, I don't know if it's thinking

25   errors or my brain is not adapting like normal people's

1    brains, or what the case may be.  I know I'm not like, you

2    know, stupid.  I know that I have some intelligence.  I can

3    hold a conversation.  I try to be kind to people.

4         I've -- since this scheme ended, yes, you're right,

5    I made wrong choices with the probation department, and how

6    I handled the extraction, if you will, from the SWAT team

7    was completely wrong.  I could say a reason that I was

8    scared or that I was asleep, but both of those are excuses.

9    I feel it's not a reason.  I wish I could have handled it

10   differently.  But that's what happens to me every time.

11        I -- something happens and afterwards I say, "Well,

12   I should have done that this way or I should have -- why

13   didn't I not think that time?"

14        And it's been going on since -- since long as I can

15   remember.  I can't remember when that actually started.  I

16   mean, I think quite often about people that I've heard in my

17   life or I've -- if I lied and I try to find the actual

18   source of why I'm doing that and I'm never able to answer

19   that question for myself.

20        I will say this:  Outside those idiotic choices, I

21   have helped a lot of individuals obtain employment.  My

22   business partner and I had begin a business in Phoenix,

23   Arizona, and -- and he -- I made it a must to -- to hire

24   people who were out of prison, individuals who live in

25   women's homeless shelters, and people -- individuals who are

1    homeless.

2           I guess looking at it, I targeted them, in a way,

3    to maybe give back to the community, knowing I have taken so

4    much from the community.  That's my way to give back.  I

5    don't know.

6           But I do know this:  That I'm worth more than what

7    I've displayed.  I -- I can be salvaged.  I'm not -- I'm not

8    just something we should throw away.  I've spent --

9           THE COURT:  No one's talking here about throwing

10   you away.

11          THE DEFENDANT:  I've spent a lot of my life in

12   prison -- in prison.  And in prison, you adapt certain

13   thinking.  You adapt the thought to cover up.  Cops coming,

14   cover up.  Oh, you don't want them to know what you're doing

15   over here because if they know what you're doing over here,

16   it's a weakness.  Now this guy is going to exploit that

17   weakness.  Now you're the guy who's being exploited.

18          And those things I had to adapt in my 20s when I

19   was in prison.  Then as the older I get, I see that my

20   thinking is -- it's parallel to a coward.  Yeah, I was

21   scared when the SWAT team got there, but, like you said, I

22   could have handled it differently.  But I resorted to hide

23   out, the coward response.

24          And like I say, Your Honor, I've tried.  I know I

25   have good intents.  I have good intentions.  And -- and I

158

1    wrote you a letter in -- about -- last year, about 2014 when

2    I was saved, and that's my way to begin to start to try to

3    implement not just have good thoughts or help people in

4    certain ways but really find a passion in it, and I found a

5    passion.  But then something happened where probation

6    officer asked me a question and I lie.  Something happened

7    where the cops are at the door, I hide.

8         THE COURT:  What do you mean "something happens"?

9    You're almost talking like you're a puppet and someone's

10   above you manipulating the strings.

11        THE DEFENDANT:  Yeah --

12        THE COURT:  These actions you take, these decisions

13   you make, that's you acting out those actions and making

14   those decisions.  So how -- how is that -- how should I take

15   that as some kind of mitigation, something that should cause

16   me to reduce the sentence that I impose upon you when you're

17   just telling me that thoughts come into your head,

18   approaches that you learn in prison come instinctually to

19   you and then you act out on those.  Well, how is that a

20   factor in mitigation in your favor?

21        THE DEFENDANT:  Because I -- I know that if -- that

22   if I had help with those issues, I -- I took a course while

23   I was in -- being detained.  That's one of the most

24   extensive courses that BOP has to offer.  And it's called

25   Criminal Thinking.  And in that course they had different

1   chapters.  They had one called Rationalization and they

2   had -- whereas -- that hit me dead on, that the examples

3   are, I rationalize things to fit my benefit.

4        Well, you know, not knowing is -- well, it's okay.

5   You know, even though you know, but it's like a thin line.

6   And I can't explain or articulate why I think that way.  I

7   just can't.  I've tried.  And to -- you are exactly right.

8   It's me making the choices.  No one's pulling my -- no one's

9   pulling my strings.  No one forces me, but it's more of an

10  impulsive thing -- thought.

11       If I think on it long enough, those results don't

12  happen.  When I think about the actual what's going on, I

13  get good results.  But when I --

14       THE COURT:  Well, your conduct in this case, as the

15  jury pointed out, took place over two years and that's

16  plenty of time for you to get past that instinctual

17  impulsive act at the beginning -- let's say you did this one

18  time -- and then if you're to be believed, if you're given

19  the time, you reflect on it, you think through your -- your

20  decisions, and you come to some conclusion that you

21  shouldn't proceed with that course of conduct.

22       What -- can you point to me any evidence that had

23  you -- had this scheme not been uncovered, had you not --

24  you and your role and the role of your codefendants had not

25  been discovered, that you of your own volition would have

1    stopped this criminal conduct anywhere -- any time before
2    the conclusion of those two years?
3              THE DEFENDANT:  Well, I -- I don't have any actual
4    evidence, but --
5              THE COURT:  Well, describe for me a point in time
6    when that was something that you considered.
7              THE DEFENDANT:  Okay.  Heather Carr and I had
8    discussions -- you know, I want to -- the hard point, the
9    same thing about because it's difficult to admit now that
10   she wore the pants in the relationship.  It's -- because I
11   don't want to -- I don't want anybody assigning excuse, but
12   that's what the situation was.
13             But I -- I asked Heather one time -- because she
14   explained to me something totally different than what she
15   explained obviously was what the truth was.  And I asked
16   her, I said, "You know what, this -- you -- you're spending
17   this money like it's -- like it's free."
18             And she was traveling to the Bahamas and to Hawaii.
19   And I wasn't -- I wasn't going on those trips.  And I talked
20   to my father about it and my father had told me that, "Look,
21   man, if you continue dealing with Heather -- you have a
22   record, she doesn't.  And when this happens -- when whatever
23   happens comes down, you're going to get hammered."
24             And at that time, that was when our relationship
25   really started to tank, different routes.  I did not leave

 1    her at that time.  I did not.  We did not part ways or I did

 2    not stop benefiting at the time, I didn't.

 3         But Your Honor, I will say this:  There's a good

 4    man inside of me.  There's a good spirit inside of me.  When

 5    I look at Ms. Paluch, when I look at the prosecutors, I

 6    don't get angry.  I don't get upset.  When I went -- when I

 7    came to trial here, we were out in the hallway, I was

 8    respectful, held doors.  I had no resentment -- no

 9    resentment.

10         I can conduct myself in the community and society.

11    It's those choices that I make that gets me right where I am

12    at right now.  That's a -- that's a pattern that only I can

13    stop the pattern, but as it's happening, it's as I don't

14    know the pattern's happening.

15         And, Your Honor, I ask you -- ask the Court, I --

16    don't throw me away.  I can be salvaged.  I can be -- I can

17    be a success story versus a suicide mission.  The longer

18    years of in prison is a suicide mission.  I've done that.

19    Like you said earlier, I've done that, and all my 20s.  And

20    now I'm facing through all my 40s.

21         And I've been watching television and news and --

22    and -- about certain things, and as far as the -- the stigma

23    of being taken off of what somebody happens -- in their

24    mental health, it's hard for me to admit something is wrong

25    with me with mental health that possibly something could be

162

1    wrong with me, but when I look at it in retrospect, I look
2    at it, I don't want to admit it, but then I have to face it,
3    what -- what happened to me, what transpired during the
4    course of the last 20 years or longer than that, 25 years,
5    well, I just can't get it right.

6            I've -- I got -- I got a mentor.  I started
7    mentoring youths, helping them get jobs, so I know I can do
8    that.  But then when law enforcement comes around and -- and
9    they coming for me, I think impulsively.

10           And I also put in the letter that I wrote you last
11   year about that I should have took better actions and -- and
12   when being arrested by the SWAT team.  I'm in a thousand
13   percent agreeance with that to the point where my -- see, I
14   have -- I also have good impulses as well, too.  My impulse
15   on that was, well, I need to show these kids a better way to
16   respond to a certain situation like that.  I know I could
17   have responded to it better, but I think if I ever had a
18   training module or if I trained some kids that same
19   situation wouldn't happen to them.

20           And I feel that my niche and my passion in life is
21   to -- is to fix my mistakes, show others how not to fall in
22   the same pit, because I've put my foot in the bear trap
23   numerous times.

24           And like I say, Your Honor, rationalization was one
25   of the big things in my psych class.  It just stood out to

1     me.

2           THE COURT:  Do you have any remorse for your

3     actions in this case?

4           THE DEFENDANT:  Absolutely.  I'm remorseful for

5     every single inmate that was infected -- affected by this

6     because I was once an inmate as well, too.  And being that,

7     I know how difficult it is to -- I'm expressing to you now

8     how -- what it was for me off of choices I made, so you

9     couple that with a financial hardship, that's doubling

10    the -- the hardship for them.

11          THE COURT:  So did you give any thought to that

12    while you were engaging in this scheme?  That you -- that

13    the victims of this scheme were folks who you, better than

14    most persons in this society, knew exactly how vulnerable

15    they were?

16          THE DEFENDANT:  Yes, I -- yes, I did, Your Honor.

17    And that -- and that is the point -- that's the part where

18    my thinking error comes in.  I think, oh, well, if I'm not

19    directly involved, then I'm not hurting them like -- like

20    someone else would be hurting them.

21          And I am remorseful.  I'm remorseful for wasting

22    the Court's time.  I'm remorseful for not being there for my

23    son who's -- he's regressing in his autism.  He has a newer

24    diagnosis.  He has SPD, which is sensory processing

25    disorder.  He has hyposensitivity pain -- to pain, meaning

164

1    that he can't relate danger to pain.  If he's feeling pain,

2    he doesn't relate to danger, which -- and so he can go

3    outside and get hurt, but not understand the point that he

4    must remove himself from the hurt.

5            And his regression, I can't help but to think that

6    his regression stems from Mrs. Carr and my abandonment of

7    him, the same way I was abandoned from my father.  It's now

8    going into a cycle.  Now my son's feeling -- doing the same

9    thing.  And I'm very remorseful for that.

10           I'm very remorseful for just the -- this entire

11   situation this entirety.  And if I could take ownership of

12   all of the loss, if I could take my time, Heather's time,

13   Diaz's time, Green's time and -- in order for someone to be

14   there with my child, I would do that.

15           Your Honor, it's sad to admit these things, but

16   prison -- I'm not afraid of prison.  I've -- that's --

17   that's like more of what I know than being in the community.

18   I'm -- I've been in prison as an adult more than I have in

19   society -- being in society.  So I understand it's a form of

20   punishment, I do understand that; however, I don't want to

21   go to prison and have the same issues that I have now.

22           I -- I want to be better.  I know I can be better.

23   I've done things to prove to myself I can be better.  And I

24   ask the Court to not ignore the things I've done, but also

25   do not ignore the things I've done positively and what I can

165

1    do and how I can help someone.  I'm not -- I can be

2    salvaged, Your Honor.  I know that.  I know with the proper

3    help, treatment, conversation, connectivity with others,

4    these patterns will be obliterated.  And -- and I also have

5    a thing whereas --

6              THE COURT:  All right, sir, I'm going to need you

7    to wrap it up pretty quick here.

8              THE DEFENDANT:  Okay.  Lastly, I will say this,

9    Your Honor:  I ask you -- humbly ask you to give me the

10   opportunity because I know that I'm -- I'm aware -- I'm

11   aware of the circumstances and I'm also aware that I don't

12   have too many times being in front of a bench where I don't

13   go away -- I'm 40 years old, I don't go away for the rest of

14   my life.

15            I ask you for the opportunity to prove not only to

16   myself to show how remorseful I am to all the victims by

17   being productive -- more productive to the community and to

18   inmates who are now in prison.  I feel there's no other way

19   for me to be part of the solution versus part of the

20   problem, but be productive.

21            I don't -- I want to change my thinking errors.  I

22   need a navigation system to get to that change.

23            THE COURT:  I'll give you one more minute.

24            THE DEFENDANT:  Okay.  You've been very patient

25   with me, Your Honor, this entire course -- this entire time.

 1     I wasted the court time.  I have.  I caused a lot of hurt,

 2     not just in this case, but to other cases, I've caused hurt

 3     to things that -- to people that it wasn't the case.  I also

 4     feel remorseful for that.

 5        And lastly, Your Honor, I can look you in your eyes

 6     as a man who has a belief in the faith that if given the

 7     opportunity, to show that I can change, I will change.  I

 8     will not only change, I will present and show my change.  I

 9     will show how remorseful I am to everyone I've ever hurt.

10        THE COURT:  All right.  Thank you.  I'm prepared to

11     rule on the defendant's motion for downward variant

12     sentence.  Let me first state the matters that I have taken

13     into account in mitigation.  There really is only one factor

14     here in mitigation that I see, and that is that the Tenth

15     Circuit has directed that amongst a whole host of other

16     factors I have to consider is the potential for sentencing

17     disparities with codefendants, not just defendants in other

18     cases.  And the sentencing disparity restriction really

19     applies, as the lawyers and I know, to cases in which the

20     defendants are similarly situated.

21        And Ms. Paluch has done a very good job, excellent

22     job, of pointing out how the codefendants are not similarly

23     situated to this defendant, but I can't lose sight of the

24     fact that in terms of the underlying criminal scheme, there

25     were -- there was at least one other member of the

1    conspiracy that, in my view, was more culpable of a scheme
2    that inflicted so much damage on so many different
3    vulnerable victims.  And that person received a custodial
4    sentence of 57 months from me.  But really that's the only
5    factor in mitigation that I see in this case.
6          On the other hand, I see very -- several factors
7    and matters in aggravation.  Mr. Thomas was convicted of all
8    charges in which he was named in the superseding indictment.
9    Count 1, conspiring to defraud the Government.
10         With respect to claims in Counts 2 through 7,
11   aiding and abetting in mail fraud.  So initially it would be
12   noted that the base offense level for mail fraud is 7, as
13   compared to 6 for the conspiracy count that the three
14   codefendants in this case have pled.  In addition, because
15   the defendant chose to go to trial and put the Government to
16   its proof, the defendant is not entitled to a three-level
17   reduction in his offense level of acceptance of
18   responsibility.
19         And beyond that, I agree again with Ms. Paluch that
20   I did not hear today from the defendant a true acceptance of
21   responsibility other than for the one minor point -- or at
22   least the single point of taking responsibility for the
23   Mullett -- using the address of Ms. Mullett.  Apart from
24   that, and even just a few moments ago in his statement to
25   me, the defendant said when I asked him, "You, yourself,

168

1    were an inmate.  Didn't you ever consider -- did you

2    consider how vulnerable inmates -- your victims of this

3    crime were?"

4          And Mr. Thomas, your response was, "Yeah, I did,

5    but it helped me to know that at least I wasn't directly

6    involved".

7          That, to me, is someone who to this moment has not

8    accepted full responsibility for your conduct in this

9    criminal scheme.  And I think that's a hugely aggravating

10   point.  And, moreover, as I previously ruled with respect to

11   one of the defendants's objections, the defendant's role in

12   this case was sufficiently involved and knowing such, that

13   he was not deserving of a minimal role reduction in the

14   offense level, and I think that factors in aggravation.

15         Also, as I previously ruled, a significant

16   aggravation in this case is the defendant's -- is the

17   conduct the defendant freely engaged in both before and

18   after his conviction on all counts found by the jury, which

19   had the effect of obstructing justice and recklessly

20   endangering others during flight.  This conduct was

21   sufficiently serious that I've ruled that the defendant's

22   offense level should be increased by several offense levels

23   called for by the applicable guideline sentencing

24   enhancements.

25         Another factor in aggravation is the victims in

169

this case, which we've already discussed to some extent.
The letters that I received from the victims were very
moving, very poignant, and it reflected and points out
what's obvious to most of us in this courtroom, but I think
very few people think of when they actually -- if they ever
think about it, that although they have committed a crime
for which they've been convicted, the folks in our nation's
prisons are truly among the most vulnerable victim groups of
cohorts of victims that we have in this country because they
have so little open and available to them to protect
themselves from various things, assaults in prison being, of
course, physically the most grievous, but also having their
financial and economic integrity stolen from them.

And as I've said in the sentencing hearings for the
other codefendants, it is truly difficult for me to imagine
how hard it would be for these victims when they're already
struggling, those who were felony convicts, obviously -- or
maybe not so obviously, but I'm assuming some were possibly
not felony convicts, but for these individuals to get
employment, to rent an apartment, to buy things on credit
when their credit is perfect, or near perfect, or intact,
when that credit is destroyed because their identity has
been stolen, the multiple -- multiplying effect of those
adversities is truly hard for us, I think, to measure and
quantify.

1        So if you balance all those aggravating factors and

2   the one mitigating factor, my initial response -- my initial

3   consideration was that there should be no downward variance

4   from the guideline range in this case; however, I am going

5   to grant the motion in part based solely on the parsimony

6   clause, which as the lawyers know, requires me to impose a

7   sentence that is sufficient but not greater than necessary

8   to accomplish the goals of sentencing.

9        And I have to come to the conclusion that 151

10  months is more than sufficient to satisfy the requirements

11  of both protecting the public, of providing both specific

12  and general deterrence, and reflecting the seriousness of

13  the crime.  And so I'm going to grant the motion in part.

14       So it is my intention to sentence the defendant to

15  a period of imprisonment of 120 months on all counts of

16  conviction with each such sentence and count to be served --

17  on each -- with respect to each sentence on those counts to

18  be served concurrently.

19       I also intend to order that this be followed by a

20  term of supervised release of three years on all counts of

21  conviction.  Again, with all such periods to be served

22  concurrently.  I also intend to order that Mr. Thomas pay

23  restitution in the total amount of 563 dollars and --

24  $563,890.85, jointly and severally with his codefendants, in

25  addition to a special assessment of $700.

1          Imposing a fine in this case would, in my view,

2    impair Mr. Thomas' ability to simultaneously pay restitution

3    and for this reason I intend to waive payment of any fine

4    apart from the special assessment, as well as any interest

5    on the restitution amount.

6          Finally, I intend to enter at the appropriate time

7    a final order of forfeiture for personal money judgment.

8    Before I actually impose sentence, I'll give counsel a final

9    opportunity to make any record they believe appropriate.

10   Ms. Paluch.

11         MS. PALUCH:  Nothing further for the Government,

12   Your Honor.

13         THE COURT:  All right.  Ms. Steward.

14         MS. STEWARD:  Nothing further for the defendant,

15   Your Honor.

16         THE COURT:  All right.  I find that a guideline

17   sentence in this case would be greater than necessary to

18   accomplish the goals of sentencing and I will instead impose

19   a sentence below the guideline range.  I find that the

20   sentence I'll impose in this case reflects the seriousness

21   of the offense, affords adequate deterrence to future

22   criminal conduct, and will protect the public from further

23   crimes of this defendant.

24         Accordingly pursuant to the Sentencing Reform Act

25   of 1984, it is the judgment of this Court that the

Case No. 1:16-cr-00054-WJM Document 525-6 filed 12/02/19 USDC Colorado pg 894 of 901
Case 1:16-cr-00054-WJM Document 465 Filed 03/09/19 Page 172 of 179

172

1    defendant, Tramell Thomas, be committed to the custody of

2    the Bureau of Prisons to be imprisoned for a term of 120

3    months on each of the seven counts of conviction with each

4    such sentence to be served concurrently.  In serving this

5    term of incarceration the Court recommends that the director

6    of the Bureau of Prisons give the defendant full credit for

7    his time served in pretrial detention.

8            Ms. Steward, are you asking that I make any

9    recommendation with respect to the location of the

10   institution to be designated?

11           MS. STEWARD:  Yes, Your Honor.  We would ask that

12   Mr. Thomas be able to go to a facility in the Arizona area

13   so that he's closer to his family.

14           THE COURT:  All right.  Is there any objection from

15   the -- from the Government?

16           MS. PALUCH:  No, Your Honor.  Thank you.

17           THE COURT:  All right.  All right.  I'll grant that

18   request.  And the judgment will include an additional

19   recommendation to the director that the defendant be

20   incarcerated at a facility appropriate to his security

21   designation located within the District of Arizona.

22           Upon release from imprisonment, the defendant shall

23   be placed on supervised release for a period of three years

24   on each of the seven counts of conviction, with each such

25   period of supervision to be served concurrently.

1          While on supervised release, the defendant shall

2     not commit another federal, state or local crime, shall not

3     possess a firearm as defined in 18 United States Code

4     Section 921, and shall comply with the standard conditions

5     that have been adopted by this Court in District of Colorado

6     General Order 2016-1.

7          The defendant shall not unlawfully possess and he

8     shall refrain from unlawfully using a controlled substance.

9     The defendant shall submit to one drug test within 15 days

10    of release on supervised release and two periodic tests

11    thereafter.  The defendant shall cooperate in the collection

12    of DNA as directed by the probation officer.

13         The Court finds that the following special

14    conditions of supervision recommended by the probation

15    officer in the report are reasonably related to the factors

16    enumerated in Sections 3553(a) and 3583(d), they do not

17    constitute a greater deprivation of liberty than reasonably

18    necessary to accomplish the goals of sentencing, and they

19    will be included in the Court's judgment.  Those being

20    special conditions numbers 1 through 12.

21         With respect to restitution, the defendant is

22    ordered to make restitution in the final amount of 563

23    dollar -- $563,890.85 in the amounts and to the individual

24    victims as set forth in paragraph 148 in the presentence

25    report filed at ECF 456.

1        The defendant will pay a special assessment of

2   $700, which shall be due and payable immediately.  The Court

3   finds that the defendant does not have the ability to pay a

4   fine in light of the restitution obligation imposed by this

5   judgment.  The Court therefore waives the payment of any

6   fine other than the special assessment.  And for this

7   reason, payment of interest on the restitution amount is

8   also waived.

9        Now, let's get to the issue of forfeiture.  We have

10  gone so long in this case and we're so close to wrapping it

11  up with the final defendant, but I want to make sure that I

12  get everything right.

13       Yesterday, as everyone knows, I entered the Court's

14  preliminary order of forfeiture for personal money judgment

15  that was filed at ECF 343.  And I entered that order over

16  the opposition filed by prior defense counsel at ECF 346.

17  That preliminary order of forfeiture was entered in the

18  amount of $260,226.85 as a money judgment against the

19  defendant, Tramell Thomas, and entered in accordance with 18

20  United States Code Sections 981(a)(1)(C) and 28 United

21  States Code Section 2461(c).

22       However, this is the problem that I see:  The

23  Government's own motion makes clear pursuant to Rule

24  32.2(b)(2)(B) and circuit cases construing that provision,

25  it's mandatory that the preliminary order of forfeiture be

175

1    entered "sufficiently in advance of sentencing to allow the

2    parties to suggest revisions or modifications before the

3    order becomes final as to the defendant."

4         So I take responsibility for the fact that the

5    preliminary order was not entered until yesterday afternoon

6    around 3:30.

7         Unless the defendant -- and I'm going to ask Ms.

8    Steward -- unless the defendant waives the opportunity to

9    have additional time to suggest revisions or modifications

10   as the rule sets forth before I make the order final, if you

11   don't do that then the only alternative I see before us

12   is -- and believe me, I don't want to do this, but I will

13   have to continue this last remaining piece of the hearing to

14   some time next week to give the defendant the opportunity to

15   make final response to the preliminary order.  I'll allow

16   the Government to file a reply to that response and then we

17   can wrap it all up next week, if there's not a waiver.  So

18   do you -- would you like a minute to discuss with your

19   client?

20        MS. STEWARD:  Yes, Your Honor.

21        THE COURT:  Go ahead.

22     (Pause)

23        MS. STEWARD:  We're ready when you are, Your Honor.

24        THE COURT:  Yes.  Go ahead.

25        MS. STEWARD:  Mr. Thomas would waive at this time.

1          THE COURT:  Okay.  Well, given the express waiver

2    of the defendant of his right under Rule 32.2(b)(2)(B) to

3    suggest revisions or modifications of the preliminary order,

4    that order is -- will be entered as the final order of this

5    Court with respect to forfeiture in the form of a personal

6    money judgment against the defendant and the judgment will

7    so indicate.  The special assessment, restitution, and

8    forfeiture obligations are due immediately.  Any unpaid

9    restitution or forfeiture balance, upon release from

10   incarceration, shall be paid in monthly installment payments

11   during the term of supervised release of not less than 10

12   percent of the defendant's gross household monthly income.

13        Within 15 days of release from custody, the

14   defendant shall meet with the probation officer to develop a

15   plan for a payment of the unpaid portion of his financial

16   obligations under the Court's judgment.  This plan will be

17   based on the defendant's income and expenses.

18        Lastly, Mr. Thomas, I need to advise you that you

19   have the right to appeal both your conviction and your

20   sentence.  If you wish to file such an appeal, a notice of

21   appeal must be filed with the Clerk of the Court within 14

22   days after entry of judgment or the right to appeal will be

23   lost.  If you're unable to afford an attorney for an appeal,

24   the Court will appoint one to represent you.  If you're

25   unable to afford the fees for filing an appeal, you may file

177

1     a request with the Court that such fees be waived.

2         All right.  Is there anything further from the

3     Government at this time?

4         MS. PALUCH:  No, Your Honor.  Thank you.

5         THE COURT:  All right.  Anything further from the

6     defendant?

7         MS. STEWARD:  No, Your Honor.

8         THE COURT:  All right.  Anything further from the

9     probation officer?

10         PROBATION OFFICER:  Your Honor, I may have missed

11     it.  Was the restitution obligation ordered joint and

12     several with the codefendants?

13         THE COURT:  Did I not say that?  Good catch.  I did

14     not say that.  So the judgment will reflect that the

15     restitution obligation imposed on the defendant will be

16     joint and several with the restitution obligation of his

17     codefendants.

18         Apart from that, anything else, Ms. Ansart?

19         PROBATION OFFICER:  No.  Thank you, Your Honor.

20         THE COURT:  All right.  Defendant is remanded to

21     the custody of the United States Marshal.  Thank you, that

22     will be all.

23     (Proceedings concluded at 3:00 p.m.)

24

25                      **INDEX**

| Item | PAGE |
|------|------|

### GOVERNMENT'S WITNESSES

**PAT WILLHITE**
Direct Examination by Mr. Fields          9
Cross-examination by Ms. Steward         25
Redirect Examination by Mr. Fields       32

**SANDRA ENNIS**
Direct Examination by Ms. Paluch         37
Cross-examination by Ms. Steward         68
Redirect Examination by Ms. Paluch       82


### DEFENDANT'S WITNESSES

**TRAMELL THOMAS**
Direct Examination by Ms. Steward        87
Cross-examination by Ms. Pakluch         96


### GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| GS-2      | 62      | 62       |         |            |
| GS-3      | 63      | 64       |         |            |
| GS-4      | 65      | 66       |         |            |
| GS-5      | 19      | 19       |         |            |
| GS-6      | 17      | 17       |         |            |
| GS-72-1   | 48      | 48       |         |            |

*     *     *     *     *

1                     REPORTER'S CERTIFICATE

2

3       I certify that the foregoing is a correct transcript

4  from the record of proceedings in the above-entitled matter.

5       Dated at Denver, Colorado, this 9th day of August,

6  2019.

7

8

9

10              MARY J. GEORGE, FCRR, CRR, RMR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25